**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and -

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**BOOK OF AUTHORITIES OF THE
JOINT ADMINISTRATORS' POST-HEARING SUBMISSION REGARDING
ALLOCATION OF THE PROCEEDS OF THE NORTEL ASSET SALES**

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)

Tel.:    302-571-6600
Fax:    302-571-1253

HUGHES HUBBARD & REED LLP

One Battery Park Plaza
New York, New York 10004

William R. Maguire (admitted *pro hac vice*)
Derek J.T. Adler (admitted *pro hac vice*)
Neil J. Oxford (admitted *pro hac vice*)

Tel.:    212-837-6000
Fax:    212-422-4726

LAX O'SULLIVAN SCOTT LISUS LLP

Suite 2750
145 King Street West
Toronto, ON M5H 1J8
Matthew P. Gottlieb (LSUC#: 32268B)
mgottlieb@counsel-toronto.com
Tel.:    416-598-1744
Fax:    416-598-3730

DAVIES WARD PHILLIPS & VINEBERG LLP

155 Wellington Street West
Toronto, Ontario M5V 3J7
James W.E. Doris (LSUC#:  33236P)
jdoris@dwpv.com
Matthew Milne-Smith (LSUC#: 44266P)
mmilne-smith@dwpv.com
Tel.:    416-863-0900
Fax:    416-863-0871

*Counsel for the Joint Administrators*

- 3 -

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and -

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**I N D E X**

**TAB**      **DOCUMENT**

**Canadian Cases**

1.        *Andrews v. Canada*, [2007] T.C.J. No. 195 (T.C.C.)

2.        *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77

- 4 -

| **TAB** | **DOCUMENT** |
|---------|--------------|
| 3. | *Bank Leu AG v. Gaming Lottery Corp.* (2003), 231 D.L.R. (4th) 251 (Ont. C.A.) |
| 4. | *Bank of Montreal v. Glendale (Atlantic) Ltd.* (1977), 20 N.S.R. (2d) 216 (C.A.) |
| 5. | *Campbell River Indian Band v. WorleyParsons Canada Ltd.*, 2013 BCSC 1272 |
| 6. | *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 (S.C.J. (Commercial List)), aff'd [2001] O.J. No. 3918 (Div. Ct.) |
| 7. | *Classic Communications Ltd. v. Lascar* (1985), 51 O.R. (2d) 769 (H.C.J.) |
| 8. | *Covert v. Nova Scotia (Minister of Finance)*, [1980] 2 S.C.R. 774 |
| 9. | *CPU Options, Inc. v. Milton*, [2006] O.J. No. 253 (S.C.J.) |
| 10. | *Disera v. Liberty Development Corp.*, 2008 ONCA 34 |
| 11. | *Downey v. Ecore International Inc.*, 2012 ONCA 480 |
| 12. | *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 |
| 13. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 |
| 14. | *Flello v. Baird* (1999), 67 B.C.L.R. (3d) 293 (C.A.) |
| 15. | *Francey v. Wawanesa Mutual Insurance Company*, 1990 CarswellAlta 133 (Q.B.), aff'd [1991] 117 AR 318 (C.A.) |
| 16. | *Free World Trust v. Électro Santé Inc.*, 2000 SCC 66 |
| 17. | *Garnet Lane Developments Ltd. v. C.R. Investments Ltd.*, [1991] O.J. No. 511 (C.A.), affirming [1988] O.J. No. 735 (Dist. Ct.) |
| 18. | *G.D. Searle & Co. v. Novopharm Ltd.*, [2007] F.C.J. No. 625 (C.A.), leave to appeal to SCC refused [2007] S.C.C.A. No. 340 |
| 19. | *Gelber v. Canada (Minister of National Revenue)*, [1991] 2 C.T.C. 2319 (T.C.C.) |
| 20. | *Gutierrez v. Tropic International Ltd.*, [2002] O.J. No. 3079 (C.A.) |
| 21. | *Hamilton v. Hamilton*, [1996] O.J. No. 2634 (C.A.) |
| 22. | *Hi-Tech Group Inc. v. Sears Canada Inc.*, [2001] O.J. No. 33 (C.A.) |
| 23. | *Inland Kenworth Ltd. v. Fowler*, [1988] B.C.J. No. 241 (C.A.) |

**TAB**      **DOCUMENT**

24.    *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (C.A.)

25.    *Kerr v. Baranow*, 2011 SCC 10

26.    *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 (C.A.)

27.    *Marchands Ro-Na Inc. v. Tefal S.A.* (1981), 14 B.L.R. 123 (F.C. (T.D.))

28.    *Maritime Telegraph and Telephone Co. v. Chateau Lafleur Development Corp.* (2001), 199 N.S.R. (2d) 250 (C.A.)

29.    *McLean v. McLean*, 2013 ONCA 788, leave to appeal to SCC refused [2014] S.C.C.A. No.76

30.    *Midas Realty Corp. of Canada Inc. v. Galvic Investments Ltd.*, 2009 ONCA 84

31.    *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.*, [1995] O.J. No. 1609 (C.A.)

32.    *Nishi v. Rascal Trucking Ltd.*, 2013 SCC 33

33.    *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117

34.    *Peel Condominium Corp. No. 417 v. Tedley Homes*, [1997] O.J. No. 3541 (C.A.)

35.    *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862

36.    *Professional Institute of the Public Service of Canada v. Canada (Attorney General)*, 2012 SCC 71

37.    *QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Revenue)*, [2000] O.J. No. 2582 (S.C.J.), aff'd [2002] O.J. No. 1639 (Div. Ct.)

38.    *Reddin v. Mills*, [1995] B.C.J. No. 352 (S.C.)

39.    *Ricco v. Ryan*, [2007] O.J. No. 4030 (S.C.J.)

40.    *R.L.D. v. M.E.D.*, [2002] O.J. No. 3201 (S.C.J.)

41.    *Ryan v. Moore*, [2005] 2 S.C.R. 53

42.    *St. Onge v. Willowbay Investments Inc.*, [2010] O.J. No. 2480 (S.C.J.)

43.    *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673

| TAB | DOCUMENT |
|---|---|

44.   *Sanofi-Aventis Canada Inc. v. Apotex Inc.*, 2009 FC 676, aff'd [2011] F.C.J. No. 1532 (C.A.), leave to appeal to SCC refused [2012] S.C.C.A. No. 19

45.   *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53

46.   *Saylor v. Madsen Estate* (2005), 261 D.L.R. (4th) 597 (Ont. C.A.)

47.   *Seanix Technology Inc. v. Ircha*, [1998] B.C.J. No. 179 (S.C.)

48.   *SimEx Inc. v. IMAX Corp.* (2005), 11 B.L.R. (4th) 214 (Ont. C.A.)

49.   *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, 2010 SCC 4

50.   *The Plan Group v. Bell Canada*, 2009 ONCA 548

51.   *University of Toronto v. John N. Harbinson Ltd.*, [2005] O.J. No. 5437 (S.C.J.)

52.   *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205

53.   *Williams-Sonoma Inc. v. Oxford Properties Group Inc.*, 2013 ONCA 441

54.   *Wong v. Wong-Koroluk*, [2009] B.C.J. No. 817 (S.C.)

55.   *York University v. Michael Markicevic*, 2013 ONSC 378 (S.C.J. (Commercial List))

56.   *Zelmer v. Victor Projects Ltd.* (1997), 34 B.C.L.R. (3d) 125 (C.A.)

**Canadian Secondary Sources**

57.   Daphne A. Dukelow, *The Dictionary of Canadian Law*, 4th ed. (Toronto: Thomson Reuters, 2011)

58.   Roger T. Hughes, *Patent Legislation & Commentary*, 2014 ed. (Toronto: LexisNexis, 2014)

59.   David Vaver, *Intellectual Property Law*, 2nd ed. (Toronto: Irwin Law, 2011)

**U.S. Cases**

60.   *Hionis Intern. Ents., Inc. v. Tandy Corp.*, 867 F. Supp. 268, (D. Del. 1994)

61.   *In re Harnischfeger Indus., Inc.*, 293 B.R. 650 (Bankr. D. Del. 2003)

62.   *Liggett Grp. Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134 (Del. Super. Ct. 2001)

| TAB | DOCUMENT |
|---|---|

63. *McDermott Inc. v. Lewis*, 531 A.2d 206 (Del. 1987)

64. *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074 (Del. 2011)

**U.S. Secondary Sources**

65. Black's Law Dictionary, 9th ed.

66. Restatement (Second) of Conflict of Laws § 6, 145, 188, 222, 291

67. Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 141*

**U.K. Cases**

68. *Amalgamated Investment & Property Co. Ltd. (In Liquidation) v. Texas Commerce International Bank Ltd.*, [1982] Q.B. 84 (C.A.)

69. *Crabb v. Arun District Council,* [1975] 3 All E.R. 865 (C.A.)

70. *Patchett v. Sterling Engineering Coy. Ltd.* (1955), 72 R.P.C. 50 (H.L.)

71. *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*, [1996] A.C. 669 (HL)

**U.K. Statutes**

72. *Patents Act 1977* (U.K.), c. 37, s. 39

**U.K. Secondary Sources**

73. Piers Feltham, Daniel Hochberg, & Tom Leech, eds., *The Law Relating to Estoppel by Representation*, 4th ed. (London: LexisNexis U.K., 2004)

*Case Name:*

# Andrews v. Canada

**Between
Jonathan S. Andrews, Appellant, and
Her Majesty the Queen, Respondent**

[2007] T.C.J. No. 195

2007 TCC 312

[2007] 5 C.T.C. 2030

2007 D.T.C. 901

Court File No. 2006-3712(IT)I

Tax Court of Canada
Halifax, Nova Scotia

**Webb T.C.J.**

Heard: May 30, 2007.
Judgment: June 4, 2007.

(16 paras.)

*Taxation -- Income tax -- Income from business or property -- Deductions -- Capital cost allowance -- Appeal by taxpayer from disallowance of capital cost allowance on a vehicle -- Appellant's mother had acquired vehicle and appellant repaid mother in monthly installments -- Appeal allowed -- Appellant had acquired beneficial ownership of automobile when vehicle was acquired -- Mother had simply financed purchase and held title as security for debt.*

Appeal by taxpayer from disallowance of capital cost allowance on a vehicle -- Appellant's mother had acquired vehicle and arranged for insurance on vehicle as insurance costs would have been prohibitive if appellant, at age 19, would have acquired vehicle in his name -- Appellant repaid mother in monthly installments - After appellant had repaid certain amount, mother transferred title to vehicle to appellant -- Minister held appellant's mother acquired vehicle and appellant never

acquired vehicle -- HELD: Appeal allowed -- Appellant had acquired beneficial ownership of automobile when vehicle was acquired -- Mother had simply financed purchase and held title as security for debt -- Appellant acknowledged debt by making regular payments to mother -- Fact that registration of vehicle was in mother's name was not determinative of issue.

**Counsel**:

Counsel for the Appellant: Amy E. Higgins.

Counsel for the Respondent: Deanna M. Frappier.

---

 **JUDGMENT**:-- The appeals in relation to the claims for capital cost allowance on the 2002 Volkswagen Golf automobile for the 2003 taxation year and for the 2004 taxation year are allowed in full, with costs.

## REASONS FOR JUDGMENT

**1**   WEBB T.C.J.:-- The Appellant claimed capital cost allowance in his 2003 and 2004 taxation years in relation to a motor vehicle that had been purchased in 2002. The vehicle that was purchased was a 2002 Volkswagen Golf. The Appellant, at the time of the purchase, was 19 years of age and if the vehicle would have been acquired in his name, the cost of the insurance would have been prohibitive. The Appellant's mother financed the purchase of the vehicle and she arranged for the insurance coverage on the vehicle. The Appellant's mother acquired the legal title to the vehicle because she had financed the purchase of the vehicle and she was concerned about providing the funds for the purchase of the vehicle and then registering the vehicle in his name without any security on the vehicle as the Appellant was 19 years of age at the time the vehicle was acquired.

**2**   The arrangement between the Appellant and his mother was that he would repay her at the rate of $500 per month. The payments commenced in August of 2002. There were some months when the Appellant was short of cash and was unable to pay the full amount of $500 but he paid what he could afford and in other months he would pay an additional amount to try to cover the shortfall. The fact that the Appellant's mother was prepared in some months to accept less than the agreed upon sum of $500 does not make it any less of a loan. If the Appellant was financially unable to make a full payment, he would at least pay some amount and thereby acknowledge the debt. Eventually the title to the vehicle was conveyed by the Appellant's mother to the Appellant when she was satisfied that he had made sufficient payments on the loan so she could justify transferring the title to him.

**3**   It was clear from the evidence that the vehicle that was acquired was acquired as the

Appellant's vehicle. He had possession of the vehicle throughout the period in time. The vehicle was a standard and the Appellant's mother stated that she had never learned to drive a standard and therefore never drove the vehicle and as well she did not have any keys to the vehicle.

4    The Appellant was responsible for any repairs to the vehicle and for insuring that the vehicle was inspected each and every year.

5    The position of the Respondent was that the vehicle was acquired by the Appellant's mother and that the Appellant never acquired the vehicle. However, as noted in the case of *M.N.R. v. Wardean Drilling Limited*, Ex. Ct. of Canada, [1969] 2 Ex. C.R. 166, Cattanach J. stated as follows:

> In my opinion the proper test as to when property is acquired must relate to the title to the property in question or to the normal incidents of title, either actual or constructive, such as possession, use and risk.
>
> ...
>
> As I have indicated above, it is my opinion that a purchaser has acquired assets of a class in schedule B when title has passed, assuming that the assets exist at that time, or when the purchaser has all the incidents of title, such as possession, use and risk, although legal title may remain in the vendor as security for the purchase price as is the commercial practice under conditional sales agreements.

6    The above passages were quoted by the Federal Court of Appeal in the case of *R. v. Construction Bérou Inc.*, [1999] F.C.J. No. 1761, Justice Létourneau of the Federal Court of Appeal added the following comments:

> In other words, there was an acquisition of property within the meaning of paragraph 13(21)(*b*) of the *Act* when the person obtaining it held either legal ownership or beneficial ownership.

7    In this case I find that the Appellant had acquired beneficial ownership of the automobile when the vehicle was acquired as his mother had simply financed the purchase and held title as security for this debt. The Appellant acknowledged the debt by making regular payments to his mother. The fact that the registration of the motor vehicle in question at the Registry of Motor Vehicles was in the Appellant's mother's name is not determinative of the issue as that registration is simply for the purpose of that statute. It should also be noted that the Nova Scotia Supreme Court, Trial Division in cases dealing with the definition of "owner" in the *Motor Vehicle Act* (Nova Scotia), have found that the person registered as the "owner" is not always the "owner" (*Greene et al. v. Everett and Smith Ltd.* (1978), 29 N.S.R. (2d) 139; *Hardiman and Hardiman* v. *MacKichan* (1982), 51 N.S.R. (2d) 27, and *Lundrigan Group Ltd. v. Hale Holdings Limited* (1986), 71 N.S.R. (2d) 413).

**8**    As a result the Appellant is entitled to deduct in computing his income for 2003 and 2004 the capital cost allowance amounts that were claimed in relation to the motor vehicle.

**9**    The Appellant, in his Notice of Appeal, did not ask for costs in this matter. Noël J.A. of the Federal Court of Appeal in *Canada (Attorney General) v. Pascal*, [2005] F.C.J. No. 117, 2005 FCA 31, made the following comments:

> After reviewing the record, I note that the notice of motion which led to the dismissal of the appeal did not claim costs. It is only in documentation submitted in support of the motion that the phrase [TRANSLATION] "with costs" is found. Under rule 359(b), the relief sought must be set out in the notice of motion. A party which fails to set out the relief sought in its notice of motion should not be surprised when it is not granted.

**10**    That case dealt with the *Federal Court Rules* and not the *Tax Court of Canada Rules (Informal Procedure)* ("*Rules*") which govern this appeal.

**11**    Paragraph 4 of the *Rules* provides as follows:

> An appeal referred to in section 3 shall be made in writing and set out, in general terms, the reasons for the appeal and the relevant facts. An appeal may be brought by a notice in the form set out in Schedule 4, but no special form of pleadings is required.

**12**    Paragraph 10 of the *Rules* provides as follows in relation to costs:

> 10.    (1) Costs on an appeal shall be at the discretion of the judge by whom the appeal is disposed of in the circumstances set out in subsection 18.26(1) of the Act which reads as follows:
>
> "**18.26** (1) Where an appeal referred to in section 18 is allowed, the Court
>
> (*a*)    shall reimburse to the appellant the filing fee paid by the appellant under paragraph 18.15(3)(*b*); and
> (*b*)    where the judgment reduces the aggregate of all amounts in issue or the amount of interest in issue, or increases the amount of loss in issue, as the case may be, by more than one-half, may award costs to the appellant in accordance with the rules of Court."

**13**    In my opinion, since paragraph 4 of the *Rules* does not provide that the Appellant is required

to set out the relief sought in his Notice of Appeal and since the award of costs is within the discretion of the judge hearing the case, costs may be awarded in an informal procedure matter even though the Appellant has not requested costs.

**14** The Federal Court of Appeal in *Finch v. The Queen*, 2003 D.T.C. 5501, [2003] 4 C.T.C. 172 stated that:

> In our view, it was incumbent upon the Tax Court judge to give the parties an opportunity to be heard on the issue of costs before making the award.

**15** The award of costs in that case was a significant lump sum award of $25,000 in costs. In my opinion, the above comments of the Federal Court of Appeal are to be read in the context of that case and therefore if costs are to be determined in accordance with the *Rules,* there is no need to hear from the parties before such costs are awarded as the amounts that can be recovered as costs are set out in the *Rules*.

**16** The Appellant's appeals are allowed, with costs to be determined in accordance with the *Rules*.

WEBB T.C.J.

cp/e/qlaim/qllkb/qltxp

*Case Name:*

# Apotex Inc. v. Wellcome Foundation Ltd.

**Apotex Inc. and Novopharm Ltd., appellants;**
**v.**
**Wellcome Foundation Limited, Glaxo Wellcome Inc.,**
**Interpharm Inc. and Allen Barry Shechtman, respondents.**

[2002] S.C.J. No. 78

[2002] A.C.S. no 78

2002 SCC 77

2002 CSC 77

[2002] 4 S.C.R. 153

[2002] 4 R.C.S. 153

219 D.L.R. (4th) 660

296 N.R. 130

J.E. 2003-26

21 C.P.R. (4th) 499

118 A.C.W.S. (3d) 436

File No.: 28287.

Supreme Court of Canada

Heard: February 14, 2002;
Judgment: December 5, 2002.

**Present: McLachlin C.J. and L'Heureux-Dubé, Gonthier,**
**Iacobucci, Major, Bastarache, Binnie, Arbour and LeBel**
**JJ.**

(110 paras.)

**Appeal From:**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

**Catchwords:**

 *Patents -- Validity -- Standard of review -- Appropriate standard of review of patent issues of mixed fact and law.*

 *Patents -- Validity -- Biotechnology -- New use for old compound -- Statutory requirement for invention -- Utility -- Doctrine of sound prediction -- Patent holder identifying new use for compound in treatment and prophylaxis of AIDS -- Whether patent valid -- Whether doctrine of sound prediction applies -- Patent Act, R.S.C. 1985, c. P-4, ss. 2 "invention", 27, 34(1).*

 *Patents -- Validity -- Covetous claiming -- Patent holder claiming prophylactic as well as treatment properties for AZT -- Whether claim exceeds disclosure.*

 *Patents -- Inventorship -- Inventors and verifiers -- Patent holder identifying new use for compound in treatment and prophylaxis of AIDS -- Whether verifiers who performed critical testing co-inventors -- Whether omission to name them "wilfully made for the purpose of misleading" -- Patent Act, R.S.C. 1985, c. P-4, s. 53(1).*

**Summary:**

AIDS is one of the great health scourges of the modern world. AZT was one of the earliest and is still one of the most effective drugs for its treatment. The respondents (collectively referred to as "Glaxo/Wellcome") identified a new use for an old compound. They conceived the idea that AZT would work in humans against the HIV retrovirus. Since Glaxo/Wellcome was not equipped to undertake the required testing, it turned to a number of outside laboratories. One of these was the National Institutes of Health (NIH), where two scientists performed critical blind testing on the AZT and other compounds (none of which was identified) supplied by Glaxo/Wellcome. In mid-February 1985, the NIH scientists found that AZT did indeed inhibit HIV replication in their *in vitro* HIV assay system and so advised the respondents. Thereafter, on March 16, 1985, Glaxo/Wellcome filed in the United Kingdom the patent application from which the Canadian patent claims priority.

The appellants, generic drug manufacturers, challenged the validity of Glaxo/Wellcome's patent on the basis that the necessary utility had not been established as of the priority date of the patent, that the claims covered more than the invention (prophylactic properties as well as treatment properties), and that the disclosure was misleading because it omitted any reference to the NIH "co-inventors". The trial judge rejected the substance of this attack, and declared certain of the claims to be valid

and infringed. The Federal Court of Appeal, with a minor variation, dismissed the appeal.

*Held*: The appeals should be dismissed.

The evidence accepted by the trial judge showed that by the date the U.K. patent was applied for, March 16, 1985, Glaxo/Wellcome had sufficient information about AZT and its activity against HIV in human cells to make a sound prediction that AZT would be useful in the treatment and prophylaxis of HIV/AIDS in human beings. To the extent its claims went beyond the limits within which the prediction remained sound, the Federal Court properly struck them out.

The doctrine of "sound prediction" balances the public interest in early disclosure of new and useful inventions, even before their utility has been fully verified by tests, and the public interest in avoiding cluttering the public domain with useless patents and granting monopoly rights in exchange for speculation or misinformation. While allowing a patent based on speculation would have been unfair to the public, requiring Glaxo/Wellcome to demonstrate AZT's efficacy through the clinical tests required for approval of a new drug for medical prescription would have been unfair to Glaxo/Wellcome. The disclosure made in the patent was and is of real use and benefit and Glaxo/Wellcome, by making the disclosure, fulfilled its side of the bargain with the public. It was therefore entitled to legal protection for what it disclosed.

The Commissioner's decision in this case largely raises mixed questions of law and fact. The *Patent Act* has no privative clause and provides an unfettered right of appeal to the Federal Court. The statutory presumption of the patent's validity in s. 45 is weakly worded and adds little to the usual onus already resting on the attacking party. Nevertheless, fact finding by the Commissioner, who has considerable expertise in these matters, generally commands deference. In these circumstances, the appropriate standard of review is reasonableness *simpliciter*.

Utility is an essential part of the statutory definition of an "invention". The inventor must be in a position to establish utility as of the date the patent is applied for, on the basis of either demonstration or sound prediction based on the information and expertise then available. Where the subject matter of the patent is a new use for an old chemical compound, it is not enough that the invention is reduced to a definite and practical shape by the formulation of a written or oral description. Nor is it enough for a patent owner to be able to buttress speculation with post-patent proof. If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, there is evidence of lack of utility in respect of some of the area covered.

The doctrine of sound prediction has three components. Firstly, there must be a factual basis for the prediction. Secondly, the inventor must have at the date of the patent application an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis. Thirdly, there must be proper disclosure. The soundness (or otherwise) of the prediction is a question of fact. The doctrine of sound prediction, in its nature, presupposes that further work

remains to be done. Care must be taken, however, that the doctrine is not abused, and that sound prediction is not diluted to include a lucky guess or mere speculation.

With regard to covetous claiming, it was open to the respondents to claim prophylactic as well as treatment properties. The patent disclosure includes some information described as "Preventing Infection by AIDV", which describes an experiment which showed "decreased infection" of cells in the presence of AZT. The patent then identifies the mechanism by which AZT prevents "the development of signs and symptoms" of AIDS (and is thus prophylactic to AIDS). HIV offers an incubation period in which the virus is present but vulnerable to attack. It is this specific feature that was targeted by the "chain termination" effect known and disclosed by Glaxo/Wellcome at the time of the patent application, and which afforded the basis for its prediction that AZT had prophylactic properties. In these circumstances, the appellants have not demonstrated any palpable and overriding error with respect to this finding by the trial judge.

The appellants contend that the NIH scientists were "co-inventors" and ought to have been so identified in the patent. In the steps leading from conception to patentability, the inventor(s) may utilize the services of others, who may be highly skilled, but those others will not be co-inventors unless they participated in the inventive concept as opposed to its verification. If Glaxo/Wellcome had soundly predicted that AZT could cure nausea in the weightlessness of space for example, it might require NASA and all its rocket ship expertise to "establish" the utility, but NASA would not on that account become a co-inventor. Despite the contribution of the NIH scientists, therefore, they were not co-inventors of the patent in suit.

Moreover, a patent is only void pursuant to s. 53(1) of the *Patent Act* if it contains a "material" misstatement that is "wilfully made for the purpose of misleading". Here, there was no evidence whatsoever that the omission to name the NIH scientists was "wilfully made for the purpose of misleading".

## Cases Cited

Considered: Monsanto Co. v. Commissioner of Patents, [1979] 2 S.C.R. 1108; Olin Mathieson Chemical Corp. v. Biorex Laboratories Ltd., [1970] R.P.C. 157; Ciba-Geigy AG v. Commissioner of Patents (1982), 65 C.P.R. (2d) 73; Beecham Group Ltd. v. Bristol Laboratories International S.A., [1978] R.P.C. 521; distinguished: Harvard College v. Canada (Commissioner of Patents), [2002] 4 S.C.R. 45, 2002 SCC 76; Ernest Scragg & Sons Ltd. v. Leesona Corp., [1964] Ex. C.R. 649; Koehring Canada Ltd. v. Owens-Illinois Inc. (1980), 52 C.P.R. (2d) 1, leave to appeal refused, [1980] 2 S.C.R. ix; Permutit Co. v. Borrowman, [1926] 4 D.L.R. 285; C.G.E. Co. v. Fada Radio Ltd., [1930] 1 D.L.R. 449; referred to: Shell Oil Co. v. Commissioner of Patents, [1982] 2 S.C.R. 536; Tennessee Eastman Co. v. Commissioner of Patents, [1974] S.C.R. 111; Burroughs Wellcome Co. v. Barr Laboratories Inc., 32 U.S.P.Q. 2d 1915 (1994); Travis v. Baker, 137 F.2d 109 (1943); Rubbermaid (Canada) Ltd. v. Tucker Plastic Products Ltd. (1972), 8 C.P.R. (2d) 6; Canada (Director of Investigation and Research) v. Southam Inc., [1997] 1 S.C.R. 748; Procter & Gamble

Co. v. Bristol-Myers Canada Ltd. (1979), 42 C.P.R. (2d) 33, aff'g (1978), 39 C.P.R. (2d) 145; Christiani v. Rice, [1930] S.C.R. 443; May & Baker Ltd. v. Boots Pure Drug Co. (1950), 67 R.P.C. 23; In re I. G. Farbenindustrie A. G.'s Patents (1930), 47 R.P.C. 289; Biogen Inc. v. Medeva PLC, [1997] R.P.C. 1; Mullard Radio Valve Co. v. Philco Radio and Television Corp. (1936), 53 R.P.C. 323; Burton Parsons Chemicals, Inc. v. Hewlett-Packard (Canada) Ltd., [1976] 1 S.C.R. 555; Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd., [1968] S.C.R. 950; Free World Trust v. Électro Santé Inc., [2000] 2 S.C.R. 1024, 2000 SCC 66; Genentech Inc.'s Patent, [1989] R.P.C. 147; Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd., [1981] 1 S.C.R. 504; May & Baker Ltd. v. Ciba Ltd. (1948), 65 R.P.C. 255; Henry Brothers (Magherafelt) Ltd. v. Ministry of Defence and the Northern Ireland Office, [1997] R.P.C. 693; Kellogg Co. v. Kellogg, [1942] Ex. C.R. 87; Gerrard Wire Tying Machines Co. of Canada v. Cary Manufacturing Co., [1926] Ex. C.R. 170; Jules R. Gilbert Ltd. v. Sandoz Patents Ltd. (1970), 64 C.P.R. 14, rev'd sub nom. Sandoz Patents Ltd. v. Gilcross Ltd., [1974] S.C.R. 1336.

## Statutes and Regulations Cited

Food and Drug Regulations, C.R.C. 1978, c. 870, s. C.08.002(2) [am. SOR/95-411, s. 4(2)].

Patent Act, R.S.C. 1985, c. P-4, ss. 2 "invention", 27(1), (3), 34(1)(a), (b), (d), (e), 40, 42, 45, 53(1), (2).

Patents Act, 1949 (U.K.), 1949, c. 87, ss. 4(3), 32(1)(i).

## Authors Cited

"Agency Wants to End AIDS Drug Monopoly", The New York Times, May 29, 1991, p. A24.

Black's Medical Dictionary, 39th ed. Lanham: Madison Books, 1999, "prophylaxis".

Butterworths Medical Dictionary, 2nd ed. London: Butterworths, 1978, "Clinical prophylaxis", "Drug prophylaxis" and "Gametocidal prophylaxis".

Case Comment, "Patent Law -- Pharmaceuticals -- Federal Circuit Upholds Patents for AIDS Treatment Drug -- Burroughs Wellcome Co. v. Barr Laboratories, Inc., 40 F.3d 1223 (Fed. Cir. 1994)" (1995), 108 Harv. L. Rev. 2053.

Dorland's Illustrated Medical Dictionary, 27th ed. Philadelphia: Saunders, 1988.

Fisher, Harold, and Russel S. Smart. Canadian Patent Law and Practice. Toronto: Canada Law Book, 1914.

Fox, Harold G. The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.

Godson, Richard. A Practical Treatise on the Law of Patents for Inventions, and of Copyright, 2nd ed. London: William Benning & Co., 1851.

Mitsuya, Kiroaki, et al. Letter to the editor, The New York Times, September 20, 1989.

Oxford English Dictionary, vol. XII, 2nd ed. Prepared by J. A. Simpson and E. S. C. Weiner. Oxford: Clarendon Press, 1989, "prophylaxis".

Yardley, Jim. "Industry Giant Owns Right to AIDS Drug? N.C. Trial to Decide", Atlanta Constitution, June 27, 1993, p. A4.

**History and Disposition:**

APPEALS from a judgment of the Federal Court of Appeal, [2001] 1 F.C. 495, (2000), 195 D.L.R. (4th) 641, 10 C.P.R. (4th) 65, 262 N.R. 137, allowing in part appeals and cross-appeals from a judgment of Wetston J. (1998), 145 F.T.R. 161, 79 C.P.R. (3d) 193, [1998] F.C.J. No. 382 (QL). Appeals dismissed.

**Counsel:**

Harry B. Radomski, Richard Naiberg and David M. Scrimger, for the appellant Apotex Inc.

Carol Hitchman, Warren Sprigings and Paula Bremner, for the appellant Novopharm Ltd.

Patrick E. Kierans, Kenneth E. Sharpe, Peter J. Stanford and Brian R. Daley, for the respondents Wellcome Foundation Ltd. and Glaxo Wellcome Inc.

---

The judgment of the Court was delivered by

**1    BINNIE J.**:-- AIDS is one of the great health scourges of the modern world. AZT was one of the earliest and is still one of the most effective drugs for its treatment. The patent on the use of AZT for HIV/AIDS treatment and prophylaxis is held by the respondents, but the appellants, Apotex and Novopharm, two "generic" drug manufacturers, say that in fact the respondents (collectively referred to as "Glaxo/Wellcome") did not invent anything. In the alternative, if Glaxo/Wellcome can be said to have invented something, the appellants say it did so in collaboration with others whose work Glaxo/Wellcome wrongly appropriated for its own financial benefit. Moreover, there was no basis at all disclosed in the patent to claim a "prophylactic" as well as a "treatment" benefit. On any or all of these grounds, they say the patent should be declared invalid.

**2**    The appeals therefore require us to consider the statutory requirement for an invention in the context of a new use for an old chemical compound, and the related questions of who ought to have been included as inventors, and what is the appropriate remedy if someone who ought to have been included in the patent is left out.

**3**    In my view, for the reasons which follow, the inventive use of AZT was made by the five Glaxo/Wellcome scientists named in the patent on or before March 16, 1985, the priority date of the patent. It was sufficient that at that time the Glaxo/Wellcome scientists disclosed in the patent a rational basis for making a sound prediction that AZT would prove useful in the treatment and prophylaxis of AIDS, which it did. For the Commissioner of Patents to have allowed Glaxo/Wellcome a patent based on speculation would have been unfair to the public. For him to have required Glaxo/Wellcome to demonstrate AZT's efficacy through the clinical tests required by the Minister of Health for approval of a new drug for medical prescription would have been unfair to Glaxo/Wellcome. The disclosure made in the patent was and is of real use and benefit to millions of HIV and AIDS sufferers around the world (irrespective of Glaxo/Wellcome's pricing policy for AZT, which it must be acknowledged has generated serious controversy in some countries, particularly in the developing world). The fact remains that Glaxo/Wellcome, by making the disclosure, has fulfilled its side of the bargain with the public, and is by law entitled to legal protection for what it has disclosed.

**4**    The claims that have survived the rigours of administrative and judicial scrutiny to date (19 out of 78 claims) do not overreach the invention disclosed. The appellants had the onus of demonstrating the invalidity of the patent and their attack on the factual underpinnings of the trial judgment revealed no palpable and overriding error. The legal outcome was correct. I would affirm the validity of the patent and dismiss the appeals.

    I.   <u>Facts</u>

**5**    During the early 1980s, a deadly disease, now known as AIDS, was identified. It appeared to suppress the immune systems of those who became infected. AIDS (Acquired Immune Deficiency Syndrome) was shown to be caused, in turn, by a retrovirus, now known as the human immunodeficiency virus ("HIV"), which was first isolated at the Institut Pasteur in 1983. A virus is a type of subcellular parasite which is dependent on a cellular host to provide the machinery for its reproduction. HIV infects T-cells, which play an important part in human immune response, hijacking the T-cells to produce copies of itself, eventually destroying the T-cell and degrading the body's immune response. At that point, HIV renders the body prone to infection, ultimately fatally, by opportunistic diseases that the diminished immune system is unable to combat. The trial judge commented that AIDS quickly became "a world-wide health crisis referred to by many as an epidemic": (1998), 145 F.T.R. 161, at para. 8.

**6**    Glaxo/Wellcome had considerable experience in researching retroviruses, and in late 1983 assembled a working group to harness that expertise to the search for an anti-AIDS drug. The group

included Dr. David Barry, head of the Department of Virology at Glaxo/Wellcome, Dr. Janet Rideout, who had been coordinating the various investigations involving the compound 509U81 (AZT) and the one who suggested that AZT be tested in the screens, Dr. Philip Furman, a research scientist with a Ph.D. in virology who had previously worked with anti-viral drugs, Dr. Sandra Nusinoff Lehrman, a physician with expertise in the areas of infectious disease and pediatrics, and Martha St. Clair, a virologist who worked with Dr. Furman and who had experience with retroviruses.

**7**    The fact that HIV attacks the T-cells, which are crucial to the functioning of the human immune system, was known in 1984. It was also known that HIV infects the T-cell by insinuating and integrating a DNA copy of its RNA genome into the genome of the T-cell using reverse transcriptase, an enzyme common to all retroviruses. As the host cell, with the viral DNA integrated into its own DNA, divides, it replicates and thereby provides a template for the further propagation of the virus.

**8**    The Glaxo/Wellcome scientists believed that the reverse transcription stage, unique to retroviruses, offered the best target for a drug. The growing DNA chain could be terminated by adding on a "false" nucleoside, one of the chemical building blocks of DNA. The nucleoside is said to be "false" because, while it appears to others in the chain to be a regular nucleoside, it lacks the OH group for coupling with the incoming nucleoside, which finds it has nothing to hook onto. There being no hook, the chain terminates, thereby arresting the propagation of HIV.

**9**    The Glaxo/Wellcome scientists, in the spring of 1984, began to screen various compounds which, they believed, based on their chemical structure, might serve as chain terminators. One of the hundreds of compounds screened eventually became known as AZT.

**10**    It is important to note that the respondents did not "invent" AZT. It was a known compound, synthesized and tested by Dr. Jerome Horwitz at the Detroit Institute of Cancer Research in 1964 as part of a project to find a cancer treatment for humans. That project was abandoned. Glaxo/Wellcome had more recently been researching the drug for use as an anti-bacterial treatment, though this was not its original purpose.

**11**    Once the Glaxo/Wellcome team had identified suitable compounds, its in-house screening methods were relatively simple. Coating the bottom of a petri dish with murine (mouse) T-cells, the laboratory technician would introduce a retrovirus. Glaxo/Wellcome used two retroviruses found in mice (not humans) because they were readily reproducible, predictable, reliable and easy to use. Using staining techniques, the laboratory technician could see if the virus spread, destroying the mouse T-cells. If the technician were then to add the candidate "remedial" compound, he or she could see whether the virus triumphed by continuing to kill the T-cells, or the compound triumphed by preserving the T-cells. In November 1984, during Glaxo/Wellcome's multiple tests of known compounds, the AZT compound produced surprisingly good results, appearing to eradicate completely the retrovirus in the mouse T-cells. It proved more potent than any other compound

tested. In argument in this Court, counsel for Glaxo/Wellcome called this a "eureka moment", but this seems to be something of an exaggeration. There had been no testing in a human cell line (*in vitro*) or in humans (*in vivo*). The object of the exercise was to eradicate HIV in humans, not a mouse virus in a petri dish.

**12**    It seems clear, and was found as a fact by the trial judge, that scientists at Glaxo/Wellcome and elsewhere recognized that the immune systems of humans and mice are sufficiently different that it is not possible to predict from studies in mouse cells how a drug would work, if at all, in humans. Senior members of the Glaxo/Wellcome team readily acknowledged the problem of predictability:

> Dr. David Barry:

> ... we [do not] wish to indicate that sensitivity testing in [murine retrovirus] is in any way predictive of sensitivity of the Human AIDS Virus. We have generated a considerable amount of data to show that it is extremely unpredictive.

> Dr. Sandra Nusinoff Lehrman:

> Recent data would indicate that human retroviruses are sufficiently different from the [murine retroviruses].... [T]he use of this compound for AIDS could not be predicted.

**13**    However, some of the Glaxo/Wellcome scientists testified that they *believed* as early as November 1984 that AZT would work in humans against the HIV retrovirus. On December 5, 1984, Dr. Jane Rideout, the team member who had recommended testing AZT, sent a note to the Glaxo/Wellcome patent group stating: "Ethically the MD's at BW [Glaxo/Wellcome] cannot suppress the activity of such a compound for very long". By that, she meant that HIV/AIDS sufferers should not be deprived of potential relief through unnecessary delay, scientific timidity, or corporate dithering. Work on a patent application began soon afterwards.

**14**    Dr. Rideout shared the view that further work was essential. She added, in her note to the Glaxo/Wellcome patent group, that a patent should only be pursued "if [AZT is] active against HIV" and "if all of this holds up [i.e., if activity is shown against HIV]" (emphasis added).

**15**    Glaxo/Wellcome was not equipped to undertake the more sophisticated testing required, and, given the lethal nature of HIV/AIDS, may not have been anxious to do so. It turned to a number of outside laboratories for screening compounds. These included Duke University and the Sloan-Kettering Institute whose work Glaxo/Wellcome partly funded. Testing of Glaxo/Wellcome candidate compounds was also done by the U.S. Food and Drug Administration and the National

Cancer Institute of the U.S. National Institutes of Health (NIH). It should be emphasized that both of these U.S. government funded agencies were working for the benefit of the public, not Glaxo/Wellcome, in the search for a drug to combat what was emerging as a national health crisis.

**16**    The critical testing of the AZT compound was done by Drs. Samuel Broder and Hiroaki Mitsuya, both of the NIH, who were in the forefront of efforts to find medicines that could be used as treatments for AIDS. Their mandate was to use the public funds of the NIH to make AIDS therapies available to the public on an emergency basis. As Glaxo/Wellcome was using the NIH to test AZT, so NIH was using Glaxo/Wellcome and other pharmaceutical companies as suppliers of potentially useful compounds to be tested in the NIH program. Although NIH signed confidentiality agreements with Glaxo/Wellcome, as had other outside laboratories, the NIH did not, as had the private institutions, make an assignment to Glaxo/Wellcome of any intellectual property rights generated by work on Glaxo/Wellcome-supplied compounds.

**17**    The NIH screening was very sophisticated. Drs. Broder and Mitsuya had developed a human cell line (ATH8) that could propagate *in vitro*, be infected with HIV *in vitro*, and provide information relevant to the ability of candidate compounds to inhibit the replication of HIV in the T-cells of living patients. At the time, normal human T-cells were very difficult to grow *in vitro*. This work itself required exceptional inventive ingenuity and was eventually patented by the NIH under U.S. patent number 4,704,357.

**18**    By February 6, 1985, Glaxo/Wellcome had prepared a draft patent application. At that point, however, AZT had not been tested against HIV *in vitro* (i.e., in a petri dish), let alone administered to a human being in the context of the AIDS research.

**19**    In mid-February 1985, Drs. Broder and Mitsuya found that AZT did indeed inhibit HIV replication in their *in vitro* HIV assay system, thus vindicating Glaxo/Wellcome's confidence (justified or not at the earlier date) in the potential benefits of AZT. This result was reported to Glaxo/Wellcome on February 21, 1985. At Dr. Broder's request, the identity of the compound was disclosed to the NIH about March 1, 1985. He was surprised. He suspected the mystery compound was probably suramin, with which he was familiar.

**20**    On March 16, 1985, Glaxo/Wellcome filed in the United Kingdom the patent application from which the Canadian patent claims priority. The appellants contend that because AZT had not, at that time, been administered to patients with HIV or AIDS, crucial information regarding its bioavailability, pharmacokinetics, metabolic characteristics, activity and toxicity was not known. Before it could be known whether AZT could be used as a treatment for HIV in humans, the appellants say, Glaxo/Wellcome needed to know if AZT would be absorbed into the human blood stream, make its way to the T-cells infected with HIV, enter the T-cells and inhibit the reproduction of the HIV infection without proving toxic to other cells, and demonstrate clinical improvement in the patient.

**21**    The argument in support of the patent's validity is that at least by March 1, 1985, when

Glaxo/Wellcome received the results from the NIH showing AZT activity *in vitro* against HIV-infected human T-cells, it had a sound basis to predict all of these matters, and did so predict, and has been proven correct in that prediction by subsequent clinical experience. To have withheld disclosure of this new and very important use in a gathering international health crisis would have been, as Dr. Rideout noted back in December 1984, little short of irresponsible.

II.    Relevant Statutory Provisions

22    *Patent Act*, R.S.C. 1985, c. P-4

INTERPRETATION

...

"invention" means any new and useful art, process, machine, manufacture or composition of matter, or any new and useful improvement in any art, process, machine, manufacture or composition of matter;

APPLICATION FOR PATENTS

**27.** (1) Subject to this section, any inventor or legal representative of an inventor of an invention that was

(*a*) not known or used by any other person before he invented it,

(*b*) not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and

(*c*) not in public use or on sale in Canada for more than two years prior to his application in Canada,

may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

SPECIFICATIONS AND CLAIMS

...

**34.** (1) An applicant shall in the specification of his invention

(*a*) correctly and fully describe the invention and its operation or use as contemplated by the inventor;

(*b*) set out clearly the various steps in a process, or the method of constructing, making, compounding or using a machine, manufacture or composition of matter, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most closely connected, to make, construct, compound or use it;

...

(*d*) in the case of a process, explain the necessary sequence, if any, of the various steps, so as to distinguish the invention from other inventions; and

(*e*) particularly indicate and distinctly claim the part, improvement or combination that he claims as his invention.

REFUSAL OF PATENTS

**40.** Whenever the Commissioner is satisfied that an applicant is not by law entitled to be granted a patent, he shall refuse the application and, by registered letter addressed to the applicant or his registered agent, notify the applicant of the refusal and of the ground or reason therefor.

FORM AND TERM OF PATENTS

**45.** Every patent granted under this Act shall be issued under the signature of the Commissioner and the seal of the Patent Office, shall bear on its face the date on which it is granted and issued and shall thereafter, in the absence of any evidence to the contrary, be valid and avail the grantee and his legal representatives for the term mentioned therein.

LEGAL PROCEEDINGS IN RESPECT
OF PATENTS

**53.** (1) A patent is void if any material allegation in the petition of the applicant in respect of the patent is untrue, or if the specification and drawings contain more or less than is necessary for obtaining the end for which they purport to be

made, and the omission or addition is wilfully made for the purpose of misleading.

(2) Where it appears to a court that the omission or addition referred to in subsection (1) was an involuntary error and it is proved that the patentee is entitled to the remainder of his patent, the court shall render a judgment in accordance with the facts, and shall determine the costs, and the patent shall be held valid for that part of the invention described to which the patentee is so found to be entitled.

III.    Case History

A. *Federal Court, Trial Division* (1998), 145 F.T.R. 161

**23**    Wetston J., in a detailed, comprehensive and thoughtful judgment, following 60 days of trial, began with the proposition that a patent is available for a new use for a known compound: *Shell Oil Co. v. Commissioner of Patents*, [1982] 2 S.C.R. 536. Moreover, the patent in this case does not make a claim to a method of medical treatment, which would be invalid: *Tennessee Eastman Co. v. Commissioner of Patents*, [1974] S.C.R. 111. With respect to inventorship, Wetston J. considered the degree and type of testing required to establish utility. The "act of inventing may be different in different circumstances... . The range of expertise required in the pharmaceutical field, the nuances between theoretical and clinical proof, and the underlying public policy concerns of the safe and effective development of medicines, all serve to make utility in the pharmaceutical area highly complex" (para. 84).

**24**    Wetston J. found the insistence of Apotex and Novopharm on regulatory levels of safety to be "excessive" and "too high a standard" (para. 105). On the other hand, he rejected the applicability of the doctrine of sound prediction, which he considered was limited to the situation where inventors claim a number of untested compounds based on the proven utility of one or more compounds.

**25**    He concluded that utility was *not* shown as of the February 6, 1985 draft application date. At that time there was no more than a belief that AZT "might be useful" to treat AIDS, and the claims at that date exceeded the invention. By March 16, 1985, however, the patent met the s. 2 requirements and did not exceed the invention claimed. The Glaxo/Wellcome researchers had received the initial NIH data showing that AZT was active in arresting the HIV retrovirus in human cells.

**26**    On the co-inventorship issue, Wetston J. cited *Burroughs Wellcome Co. v. Barr Laboratories Inc.*, 32 U.S.P.Q. 2d 1915 (Fed. Cir. 1994), where it was observed that Drs. Broder and Mitsuya of the NIH were not a mere "pair of hands". They exercised "considerable skill" and were "uniquely qualified". They were given little instruction by Glaxo/Wellcome. In fact, Glaxo/Wellcome did not

have the expertise to be able to instruct the NIH researchers in this regard. Wetston J. concluded that although all the five named Glaxo/Wellcome inventors were properly included, the NIH researchers were highly skilled "collaborators" and co-inventors on the utility aspect and should not have been omitted from the application: "the utility as claimed was not established without the extensive and direct involvement of the NIH... . In my opinion, the work of the NIH was not ancillary to the invention and this invention would not have been complete without their investigation, skill and research" (paras. 224 and 226). Nevertheless, the failure to name co-inventors in this case was not "material" under s. 53(1) of the *Patent Act*, and the omission therefore did not render the patent invalid.

**27**    As to the claim for prophylaxis (as opposed to treatment), Wetston J. concluded that the claims were not broader than the invention or the disclosure, although the claim "for the treatment or prophylaxis of <u>all</u> human retroviral infections [was] overbroad" and speculative (para. 303 (emphasis added)). Wetston J. adjudged several of the claims to be invalid, but the remaining valid claims were infringed by the appellants' manufacture and sale of the generic version of AZT (para. 377).

B. *Federal Court of Appeal*, [2001] 1 F.C. 495
 (Rothstein,
 Sexton and Malone JJ.A. each writing part of a unitary set
 of reasons)

### 1. Sexton J.A.

### (a)    *Co-Inventorship and Section 53 on Material Misrepresentation*

**28**    Sexton J.A. reversed the trial judge's conclusion on NIH co-inventorship and found that the facts demonstrated that Drs. Broder and Mitsuya do not satisfy the legal definition of inventorship. The subject matter of the invention was conceived without their assistance. They agreed only to test an unknown substance on Glaxo/Wellcome's behalf. That people other than the inventors perform the tests does not make them "inventors".

**29**    Sexton J.A. concluded that February 6, 1985 may be the relevant date of invention, since by that point the draft patent application had been distinctly formulated; however, he declined to choose between February 6, 1985 (draft application) or March 16, 1985 (priority date) because in either event the patent was valid.

**30**    Although he did not find it necessary to address s. 53 given the conclusions on co-inventorship, Sexton J.A. agreed that failure to name an inventor is not a violation of s. 53.

### (b)    *Utility and Date of Completion of Invention*

**31**    Sexton J.A. was of the view that the date of invention can, in effect, be backdated where speculation at the time of invention is subsequently confirmed by the time the patent is attacked. Sexton J.A. offers an analogy with the Wright brothers, suggesting that it would be "illogical" if a hypothetical patent for a heavier-than-air flying machine, considered by critics at the time to be based on an unsound prediction, could not be upheld on the basis of post-patent evidence that the invention actually works. Any other approach would require a court to close its eyes as to "continuing scientific advancements" (para. 52). The attack on the validity of the patent on this ground, too, should be rejected.

        2.   <u>Malone J.A.</u>

**32**    Malone J.A. upheld the trial judge on obviousness, novelty, ambiguity, and sufficiency of disclosure.

        3.   <u>Rothstein J.A.</u>

**33**    Rothstein J.A. agreed with the trial judge that the invention here is a new use for a known compound and not a method of medical treatment. However, only those claims relating to the *use* of the known compound are patentable and not those which purport to include the compound formulation itself. Accordingly, claim No. 1 and those dependent on it were struck down.

**34**    With respect to prophylaxis, Rothstein J.A. held that there was evidence that AZT could prevent fetal transmission of HIV from pregnant women and arrest infections received by health care workers and others stuck with contaminated needles. This, in his view, demonstrated some prophylactic properties and the fact the information was not available until years after the patent was not relevant. "[T]he time at which usefulness is to be established is when required by the Commissioner of Patents or in court proceedings when the validity of the patent is challenged on that ground. There was such evidence before Wetston J... ." (para. 93). Rothstein J.A. thus concluded that the claims for the prophylactic use of AZT against AIDS are valid.

   IV.   <u>Analysis</u>

**35**    AZT has earned for the respondents hundreds of millions of dollars in worldwide sales since its usefulness was discovered for the treatment of HIV and AIDS. In the United States alone, it is estimated that AZT earned for the patent owner a profit of $592 million between 1987 and 1993: J. Yardley, "Industry Giant Owns Right to AIDS Drug? N.C. Trial to Decide", *Atlanta Constitution*, June 27, 1993, at p. A4, quoted in Case Comment, "Patent Law -- Pharmaceuticals -- Federal Circuit Upholds Patents for AIDS Treatment Drug -- *Burroughs Wellcome Co. v. Barr Laboratories, Inc.*, 40 F.3d 1223 (Fed. Cir. 1994)" (1995), 108 Harv. L. Rev. 2053, at note 17.

**36**    It is not surprising that the appellants, being generic drug manufacturers, would like to obtain at least a percentage of the AZT market in Canada. To do so they must somehow have the patent declared invalid. Yet their challenge, understandably motivated by the hope of private profit, raises

broader issues of public interest.

**37**    A patent, as has been said many times, is not intended as an accolade or civic award for ingenuity. It is a method by which inventive solutions to practical problems are coaxed into the public domain by the promise of a limited monopoly for a limited time. Disclosure is the *quid pro quo* for valuable proprietary rights to exclusivity which are entirely the statutory creature of the *Patent Act*. Monopolies are associated in the public mind with higher prices. The public should not be expected to pay an elevated price in exchange for speculation, or for the statement of "any mere scientific principle or abstract theorem" (s. 27(3)), or for the "discovery" of things that already exist, or are obvious. The patent monopoly should be purchased with the hard coinage of new, ingenious, useful and unobvious disclosures. The appellants' argument here is that the identification in March of 1985 of AZT as a treatment and prophylaxis for HIV/AIDS was a shot in the dark, a speculation based on inadequate information and testing, a lottery ticket for which the public in general and HIV and AIDS sufferers in particular have paid an exorbitant price. AZT works, but for reasons both unknown and unknowable by Glaxo/Wellcome at the time it filed its patent application, the appellants argue. A lucky guess is not, they say, patentable.

**38**    Furthermore, if credit is to be given, the appellants argue, it should go to Drs. Broder and Mitsuya at the NIH who actually established the utility of AZT in human T-cells. If the patent on AZT was owned by the NIH or even by a co-ownership of Glaxo/Wellcome and the NIH, they say, the commercial history of AZT would have been vastly more oriented to the public interest.

**39**    The public interest arguments were not advanced in the U.S. just by advocates of rights for AIDS patients. The NIH itself in 1991 granted a non-exclusive licence to Barr Laboratories to "exploit any patent rights" the NIH "might have" in Glaxo/Wellcome's AZT patents. See Case Comment, *supra*, at p. 2054. See also "Agency Wants to End AIDS Drug Monopoly", *The New York Times*, May 29, 1991, p. A24. However, the U.S. patent owner successfully defeated this challenge in *Burroughs Wellcome v. Barr Laboratories, supra*, and see Case Comment, *supra*.

**40**    Under United States law, the Court of Appeals for the Federal Circuit said, it was irrelevant that Glaxo/Wellcome had no evidence of AZT's effectiveness against the HIV/AIDS virus in humans and no reasonable basis for believing that the invention would work (*Burroughs Wellcome v. Barr Laboratories, supra*, at p. 1921) until it subsequently received the NIH results. It was sufficient that on February 6, 1985, Glaxo/Wellcome scientists had a concept that was "definite and permanent" which could be applied by a person skilled in the art "without extensive research or experimentation" (p. 1919). In order for there to be an invention in the United States, U.S. law requires "reduction to practice". "[C]onstructive reduction to practice" may occur when a patent application is filed in which an untested invention is adequately disclosed: *Travis v. Baker*, 137 F.2d 109 (C.C.P.A. 1943), at p. 111. This seems to have some affinity with our doctrine of "sound prediction" discussed below. However, given the differences in our respective patent laws, the outcome of the U.S. litigation on this patent is of limited interest here.

A. *The Standard of Review*

**41**    The Commissioner of Patents in this case allowed 78 claims. His decision in this respect is entitled to limited deference. In fact, the courts below have struck out 59 of the 78 claims allowed by the Commissioner, and no cross-appeal has been taken against these rulings.

**42**    Unlike the *Harvard Mouse* case (*Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76), released concurrently, these appeals are not limited to a question of law (i.e., the statutory limits of patentable subject matter). On that issue, the standard is correctness. The issue here is one of mixed fact and law, namely, was the Commissioner properly satisfied the claimed invention met the statutory test of utility? Fact finding generally commands deference, but here Parliament has provided an unfettered right of appeal to the Federal Court (*Patent Act*, s. 42).

**43**    There is no privative clause and the statutory presumption of the patent's validity in s. 45 of the *Patent Act* is rather weakly worded. It provides that after issuance a patent "in the absence of any evidence to the contrary" is presumed to be valid. As Pratte J. (as he then was) said in *Rubbermaid (Canada) Ltd. v. Tucker Plastic Products Ltd.* (1972), 8 C.P.R. (2d) 6 (F.C.T.D.), at p. 14:

> ... once the party attacking the patent has introduced evidence, the Court, in considering this evidence and in determining whether it establishes the invalidity of the patent, must not take the presumption into account. It cannot be said that the presumption created by [now s. 45] is, as a rule, either easy or difficult to overcome; in some cases, the circumstances may be such that the presumption will be easily rebutted, while, in other cases the same result may be very difficult or even impossible to obtain.

In other words, the statutory "presumption" adds little to the onus already resting, in the usual way, on the attacking party. The Commissioner and his staff have considerable expertise in these matters but the trial judge heard 60 days of expert evidence and legal submissions that post-dated their review of the patent application.

**44**    In the circumstances, I think the appropriate standard of review of these issues, which largely raise mixed questions of law and fact, is reasonableness *simpliciter*, i.e., that the Commissioner's decision must withstand a somewhat probing examination (*Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 56).

B. *Inventorship*

**45**    The role of the Commissioner in scrutinizing patent applications is extremely important. The grant of a patent monopoly for 17 years (20 years after October 1, 1989) creates, and is intended to create, serious anti-competitive effects. Once the subject matter of the patent is fenced in by the

claims, others trespass (advertently or inadvertently) on the forbidden territory at their peril. The boundary is defended by a considerable arsenal of remedies conferred by the *Patent Act*, including an accounting of the infringer's profits in an appropriate case. Patent litigation is usually protracted and costly. (The present litigation commenced in 1990 and took 12 years to get here.) There is in the meantime a chilling effect on other researchers. They will tend to invest their talents in less litigious areas. Parliament considered this chilling effect to be a worthwhile price for the disclosure of a "new and useful" invention, bringing into the public domain information that might otherwise remain a trade secret, but there is nothing in the Act to suggest that Parliament was prepared to accept the chilling effect in exchange for nothing but speculation.

**46**    Glaxo/Wellcome argues that where the subject matter of the patent is a new use for an old chemical compound, it is enough that the invention is reduced to a definite and practical shape "by the formulation of a written or oral description". This cannot be correct. The concept might be beautifully described but at the same time be quite wrong and misleading to people who consult it. In such a case, the public would be spending its monopoly rights for <u>mis</u>information, and in the process litter the patent registry with useless patents that might impede others in their search for a real solution to the same problem. Nor, in my view, is it enough for a patent owner to be able to buttress speculation with post-patent proof, and thereby to turn dross into gold. Utility is an essential part of the definition of an "invention" (*Patent Act*, s. 2). A policy of patent first and litigate later unfairly puts the onus of proof on the attackers to prove *invalidity*, without the patent owner's ever being put in a position to establish validity. Unless the inventor is in a position to establish utility as of the time the patent is applied for, on the basis of either demonstration or sound prediction, the Commissioner "by law" is required to refuse the patent (*Patent Act*, s. 40).

**47**    I propose now to deal with these propositions in more detail.

> 1.    <u>Patentable Subject Matter</u>

**48**    There is no serious challenge in this case to subject matter patentability. "[H]itherto unrecognized properties" can constitute a patentable new use for an old substance: *Shell Oil, supra*, at p. 549, *per* Wilson J. In that case, it was disclosed in the patent that known chemical compounds revealed a previously unrecognized use as plant growth regulators.

**49**    At trial, the present appellants argued that the patent was invalid as seeking to monopolize a method of medical treatment contrary to *Tennessee Eastman, supra*, but this was rightly rejected. *Tennessee Eastman* was concerned with the patentability of a surgical method for joining incisions or wounds by applying certain compounds. The decision was based on the former s. 41 of the *Patent Act*, now repealed. The Court concluded that the method (apart from the compounds) was not patentable. The policy rationale, as explained by Wilson J. in *Shell Oil, supra*, at p. 554, was that the unpatentable claim was

> essentially non-economic and unrelated to trade, industry, or commerce. It was related rather to the area of professional skills.

**50**    The AZT patent does not seek to "fence in" an area of medical treatment. It seeks the exclusive right to provide AZT as a commercial offering. How and when, if at all, AZT is employed is left to the professional skill and judgment of the medical profession.

2.    Proof of Utility

**51**    The *Patent Act* defines an "invention" as, amongst other criteria, "new and useful" (s. 2). If it is not useful, it is not an invention within the meaning of the Act.

**52**    It is important to reiterate that the only contribution made by Glaxo/Wellcome in the case of AZT was to identify a new use. The compound itself was not novel. Its chemical composition had been described 20 years earlier by Dr. Jerome Horwitz. Glaxo/Wellcome claimed a hitherto unrecognized utility but if it had not established such utility by tests or sound prediction at the time it applied for its patent, then it was offering nothing to the public but wishful thinking in exchange for locking up potentially valuable research turf for (then) 17 years. As Jackett C.J. observed in *Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1979), 42 C.P.R. (2d) 33 (F.C.A.), at p. 39:

> By definition an "invention" includes a "new and useful process". A "new" process is not an invention unless it is "useful" in some practical sense. Knowing a new process without knowing its utility is not in my view knowledge of an "invention".

**53**    Glaxo/Wellcome says the invention was complete when the draft patent application was circulated internally on February 6, 1985. Its argument here, as in the United States, was that the written description identified the drug and its new use sufficiently to give the invention "definite and practical shape". It taught persons skilled in the art how the invention could be practised. This, however, misses the point. The question on February 6, 1985, was not whether or how the invention could be practised. The question was whether AZT did the job against HIV that was claimed; in other words, whether on February 6, 1985, there was *any* invention at all within the meaning of s. 2 of the *Patent Act*.

**54**    Canadian case law dealing with inventorship has to be read keeping the particular factual context in mind. In *Christiani v. Rice*, [1930] S.C.R. 443, this Court held, *per* Rinfret J. (as he then was), at p. 454:

> ... for the purpose of section 7 [now s. 27], "it is not enough for a man to say that an idea floated through his brain; he must at least have reduced it to a definite and practical shape before he can be said to have invented a process". [Emphasis added.]

The claimed invention in that case was a process for manufacturing porous cement. The utility of porous cement was not in dispute. The question was how to make it, and who was the first to invent the process. In this case, Dr. Horwitz taught everyone how to make AZT. The question was what

could usefully be done with it. In *Ernest Scragg & Sons Ltd. v. Leesona Corp.*, [1964] Ex. C.R. 649, Thorson P. held that if the invention related to an apparatus or process, it was sufficient if the apparatus had actually been built or the process used. The invention in that case was for "Thermoplastic Yarns and Methods of Processing Them" (p. 659). AZT had been compounded and used in 1964, but not by Glaxo/Wellcome, and not in relation to HIV/AIDS. The invention claimed here related entirely to the new and hitherto unexpected use. Glaxo/Wellcome also cites *Koehring Canada Ltd. v. Owens-Illinois Inc.* (1980), 52 C.P.R. (2d) 1 (F.C.A.) (leave to appeal refused, [1980] 2 S.C.R. ix), which dealt with an invention to harvest and process trees in the middle of a forest. The utility was obvious. The invention lay in the machine and its operation. Glaxo/Wellcome also relied upon two Canadian appeals to the Privy Council for the proposition that "proof of utility is not required for there to be an invention" (factum, para. 45): *Permutit Co. v. Borrowman*, [1926] 4 D.L.R. 285 (P.C.), and *C.G.E. Co. v. Fada Radio Ltd.*, [1930] 1 D.L.R. 449 (P.C.). In neither case was utility in doubt. *Permutit* dealt with a process for softening water and *Fada Radio* dealt with a radio tuning device. There may in such cases be some doubt about the commercial success of the invention, but utility in this context means useful for the purpose claimed, not commercial acceptance.

**55**    In the present case, by contrast, if the utility of AZT for the treatment of HIV/AIDS was unpredictable at the time of the patent application, then the inventors had not made an invention and had offered nothing to the public in exchange for a 17-year monopoly except wishful thinking.

**56**    Where the new use is the *gravamen* of the invention, the utility required for patentability (s. 2) must, as of the priority date, either be demonstrated or be a sound prediction based on the information and expertise then available. If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, *per* Pigeon J. in *Monsanto Co. v. Commissioner of Patents*, [1979] 2 S.C.R. 1108, at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

3.    <u>The Limits of Sound Prediction</u>

**57**    The evidence accepted by the trial judge showed that by March 16, 1985, Glaxo/Wellcome had sufficient information about AZT and its activity against HIV in human cells to make a sound prediction that AZT would be useful in the treatment and prophylaxis of HIV/AIDS in human beings. To the extent its claims went beyond the limits within which the prediction remained sound (e.g., in claiming treatment for human retroviruses other than HIV), the Federal Court properly struck them out.

**58**    Although the trial judge did not consider the doctrine of "sound prediction" to be applicable in this sort of case, he seems to have applied it nevertheless when he decided that the claims did not exceed the invention, starting at para. 108. He also seems to have applied it when he upheld the patent claims for prophylaxis as well as treatment. At para. 292 he pointed out, in that connection,

that "demonstrated utility or reduction to practice is not a requirement under Canadian patent law" (emphasis added). Lack of demonstrated utility does not obviate the need for sound prediction.

**59**    The doctrine of sound prediction seems to have had its genesis in a comment by Lord MacDermott in *May & Baker Ltd. v. Boots Pure Drug Co.* (1950), 67 R.P.C. 23 (H.L.), at p. 50 (where, however, he rejected its application on the facts). It was connected to the requirement that the claims be "fairly based" on the patent disclosure: *In re I. G. Farbenindustrie A. G.'s Patents* (1930), 47 R.P.C. 289 (Ch. D.), at pp. 322-23. The principle of "fair basis" was later explicitly incorporated into the British *Patents Act, 1949* (U.K.) , 1949, c. 87, ss. 4(3) and 32(1)(*i*). While these specific provisions were repealed in 1977, the "fair basis" doctrine seems still to be a force in British patent law; see Lord Hoffmann in *Biogen Inc. v. Medeva PLC*, [1997] R.P.C. 1 (H.L.).

**60**    The doctrine of "sound prediction" was given serious shape and substance by Graham J. in *Olin Mathieson Chemical Corp. v. Biorex Laboratories Ltd.*, [1970] R.P.C. 157 (Ch. D.). In that case the proposition was framed as follows, at p. 182:

> If it is really possible, according to the evidence, to make a sound prediction about a certain area, then prima facie it would be reasonable that the patentee should have a claim accordingly ... .

**61**    The doctrine was explicitly received into our law in *Monsanto, supra*. In that case, the Court was confronted with a patent that included claims to numerous chemical compounds to inhibit premature vulcanization of rubber, but only three of the claimed compounds had actually been prepared and tested before the date the application was filed. The examiner rejected the claims to the untested compounds, holding that "broad product claims must be adequately supported by a sufficient number of [tested] examples" (p. 1111). The rejection was upheld by the Patent Appeal Board and the Federal Court, but this Court reversed on the basis that the "architecture of chemical compounds" was no longer a mystery but, within limits, soundly predictable. Pigeon J. thus wrote, at pp. 1118-19:

> Although the report of the Board is quite lengthy, in the end with respect to claim 9 all it says after stating the principle with which I agree, is that a claim has to be restricted to the area of sound prediction and "we are not satisfied that three specific examples are adequate". As to why three is not enough nothing is said. In my view this is to give no reason at all in a matter which is not of speculation but of exact science. We are no longer in the days when the architecture of chemical compounds was a mystery. By means of modern techniques, chemists are now able to map out in detail the exact disposition of every atom in very complex molecules. It, therefore, becomes possible to ascertain, as was done in *Olin Mathieson*, the exact position of a given radical and also to relate this position to a specific activity. It thus becomes possible to predict the utility of a substance including such radical. [Emphasis added.]

**62**    Pigeon J. found persuasive a line of British patent cases including the decisions of the House of Lords in *May & Baker, supra*, and *Mullard Radio Valve Co. v. Philco Radio and Television Corp.* (1936), 53 R.P.C. 323, as well as the Chancery Division judgment in *Olin Mathieson, supra*. Pigeon J. adopted a number of propositions stated by Graham J. in *Olin Mathieson*, a case dealing with claims to certain chemical derivatives for pharmaceutical use as tranquillizers, in their entirety, at pp. 1116-17:

> Where, then, is the line to be drawn between a claim which goes beyond the consideration and one which equiparates with it? In my judgment this line was drawn properly by Sir Lionel when he very helpfully stated in the words quoted above that it depended upon whether or not it was possible to make a <u>sound prediction</u>. If it is possible for the patentee to make a <u>sound prediction</u> and to frame a claim which does not go beyond the limits within which the prediction remains sound, then he is entitled to do so. Of course, in so doing he takes the risk that a defendant may be able to show that his prediction is unsound or that some bodies falling within the words he has used have no utility or are old or obvious or that some promise he has made in his specification is false in a material respect; but if, when attacked, he survives this risk successfully, then his claim does not go beyond the consideration given by his disclosure, his claim is fairly based on such disclosure in these respects, and is valid. [Emphasis added.]

Adopting this admirably concise formulation, Pigeon J. drew the following conclusion at p. 1117:

> I have quoted again the passage quoted by the [Patent Appeal] Board because I consider the last sentence of the paragraph of some importance as it does clearly indicate what is meant by a "sound prediction". <u>It cannot mean a certainty</u> since it does not exclude all risk that some of the area covered may prove devoid of utility. It thus appears to me that the test formulated by Graham J. involves just two possible reasons for rejecting claims such as those in issue.

> 1. There is evidence of lack of utility in respect of some of the area covered; [or]

> 2.    It is not a sound prediction. [Emphasis added.]

**63**    Our Federal Court of Appeal subsequently applied the doctrine of "sound prediction" in the context of a patent for a pharmaceutical product in *Ciba-Geigy AG v. Commissioner of Patents* (1982), 65 C.P.R. (2d) 73. In that case, Thurlow C.J. upheld product and process claims in relation to certain "new amines" useful in cardiac treatment, but added the qualification that what is predictable chemically may not be predictable pharmacologically, at p. 77:

> The predictability of a particular result seems to me to be essentially a question
> of fact, though in some situations it may be a matter of common knowledge.
> With respect to chemical reactions it is apparent from the foregoing that
> knowledge in the chemical art as to the predictability of chemical reactions has
> advanced considerably in the 50 years since *Chipman Chemicals Ltd. v. Fairview
> Chemical Co. Ltd.*, [1932] Ex. C.R. 107, was decided. <u>The predictability of
> chemical reactions should not, however, be confused with predictability of the
> pharmacological effects and thus of the pharmacological utility of new
> substances.</u> [Emphasis added.]

**64**    Thurlow C.J. was not laying down as a matter of law that pharmacological utility cannot be
predicted because, as he said, predictability is "essentially a question of fact". It will depend on the
evidence. In *Beecham Group Ltd. v. Bristol Laboratories International S.A.*, [1978] R.P.C. 521
(H.L.), for example, claims in respect of a semi-synthetic penicillin were invalidated as being little
more than an announcement of a research project (p. 570). In that case, on the facts, Lord Diplock
stated at p. 579:

> The evidence in the instant case is overwhelming that it is not yet possible
> to predict in advance what, if any, special therapeutic advantages will be
> possessed by a penicillin made to a particular formula. The only way to find out
> is to make it and discover what its therapeutic characteristics are by conducting
> extensive tests upon it *in vitro* and *in vivo*.

**65**    However, where, as here, the trial judge accepts on the evidence that the inventors *could* in
fact make a sound prediction that an old compound (AZT) offers a hitherto unexpected utility in the
treatment and prophylaxis of HIV/AIDS, then (and only then) does their disclosure of "the
invention" offer real consideration for the monopoly benefits they seek.

**66**    The doctrine of "sound prediction" balances the public interest in early disclosure of new and
useful inventions, even before their utility has been verified by tests (which in the case of
pharmaceutical products may take years) and the public interest in avoiding cluttering the public
domain with useless patents, and granting monopoly rights in exchange for misinformation.

<div align="center">4.    <u>The Trial Judge's Rejection of "Sound Prediction" in This Case</u></div>

**67**    The trial judge concluded that the doctrine of sound prediction did not apply here because in
his view the doctrine addresses the issue of *testing* rather than *utility*. Thus the absence of tests
confirming the suitability of certain compounds was held not to be fatal (because the results were
soundly predictable) in *Monsanto* itself, and in *Burton Parsons Chemicals, Inc. v. Hewlett-Packard
(Canada) Ltd.*, [1976] 1 S.C.R. 555. The doctrine was used in those cases to permit the inventors to
extrapolate from the utility of a proven invention to the utility of equivalent chemical compounds.
"Accordingly", the trial judge concluded at para. 99, "it would be inappropriate to rely on the
doctrine of sound prediction where the true cause of invalidity is not inutility but insufficient

testing".

**68**    The Court of Appeal, on the other hand, considered the doctrine of sound prediction to be unnecessarily strict. Sexton J.A., with whom Rothstein J.A. specifically agreed on this point, stated at para. 50:

> In my view, this Court's decision in *Ciba-Geigy* stands for the proposition that even where an invention constitutes a speculation as of the priority date claimed in the patent, the patent will not be invalid if it turns out that the speculation is valid at the time the patent is attacked.

**69**    With respect, I think Parliament intended to get something more than speculation in exchange for the grant of a patent monopoly (a point which is further discussed below). On the other hand, I do not think, with respect, that the doctrine of sound prediction is limited to the narrow ambit ascribed to it by the trial judge. Once it is accepted that in appropriate circumstances utility can be predicted in advance of complete testing (whether of untested chemical compounds or otherwise), there seems no reason in principle why the doctrine should not be applied more generally, depending, of course, on the expert evidence. There is no doubt that care must be taken that the doctrine is not abused, and that sound prediction is not diluted to include a lucky guess or mere speculation. The public is entitled to obtain a solid teaching in exchange for the patent rights.

### 5.    The Requirements of the Doctrine of "Sound Prediction"

**70**    The doctrine of sound prediction has three components. Firstly, as here, there must be a factual basis for the prediction. In *Monsanto* and *Burton Parsons*, the factual basis was supplied by the tested compounds, but other factual underpinnings, depending on the nature of the invention, may suffice. Secondly, the inventor must have at the date of the patent application an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis. In *Monsanto* and *Burton Parsons*, the line of reasoning was grounded in the known "architecture of chemical compounds" (*Monsanto*, at p. 1119), but other lines of reasoning, again depending on the subject matter, may be legitimate. Thirdly, there must be proper disclosure. Normally, it is sufficient if the specification provides a full, clear and exact description of the nature of the invention and the manner in which it can be practised: H. G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), at p. 167. It is generally not necessary for an inventor to provide a theory of *why* the invention works. Practical readers merely want to know that it does work and how to work it. In this sort of case, however, the sound prediction is to some extent the *quid pro quo* the applicant offers in exchange for the patent monopoly. Precise disclosure requirements in this regard do not arise for decision in this case because both the underlying facts (the test data) and the line of reasoning (the chain terminator effect) were in fact disclosed, and disclosure in this respect did not become an issue between the parties. I therefore say no more about it.

**71**    It bears repetition that the soundness (or otherwise) of the prediction is a question of fact.

Evidence must be led about what was known or not known at the priority date, as was done here. Each case will turn on the particularities of the discipline to which it relates. In this case, the findings of fact necessary for the application of "sound prediction" were made and the appellants have not, in my view, demonstrated any overriding or palpable error.

**72**    On March 1, 1985, Glaxo/Wellcome received from the NIH the key results of the *in vitro* test of AZT against the HIV in a human cell line. This, taken together with Glaxo/Wellcome's own data on AZT, including the mouse tests, provided a factual foundation. Glaxo/Wellcome's knowledge of the mechanism by which a retrovirus reproduces, and the "chain terminator effect" of AZT, as disclosed in the patent, was found by the trial judge to provide a line of reasoning by which utility could be established as of the date of the U.K. patent application, March 16, 1985, which is also the priority date by which the invention must be evaluated for purposes of the Canadian patent. Although "sound prediction" was not the precise approach followed by the trial judge, his reasoning as well as his ultimate ruling is entirely consistent with its application.

> 6.    The Trial Judge's Key Findings

**73**    The trial judge upheld the claim in suit on the following bases:

> (i)    Glaxo/Wellcome had information regarding toxicity, pharmacokinetics and the pharmacology of AZT in an internal document called the "Wise-Burchall report" dated December 12, 1984 (paras. 116 and 177), as well as some preliminary testing on HeLa Alpha-DNA polymerase (para. 118).
>
> (ii)    Glaxo/Wellcome's experience with other nucleoside analogues suggested that it was likely that AZT would be absorbed by oral administration making it potentially suitable for prolonged therapy (para. 177).
>
> (iii)    It was known by Glaxo/Wellcome in 1984 that:
>
>> 1)    Compounds of the class of nucleoside analogues could act as chain terminators in reactions involving DNA polymerase;
>>
>> 2)    The inhibition of HIV-I reverse transcriptase would prevent the reverse transcription of the viral genome from RNA into DNA and would thus prevent integration of the viral genome into the genome of the host;
>>
>> 3)    Both MLV and HIV were retroviruses; and
>>
>> 4)    Glaxo knew that AZT would inhibit the replication of [two strains of retrovirus in mouse cells] in November-December 1984. [para. 249]
>
> (iv)    On receipt of the *in vitro* data from the NIH in February 1985, Glaxo/Wellcome knew that AZT inhibits the replication of HIV in a human cell line, albeit through *in vitro* rather than through *in vivo* testing. The trial judge found that "'in vitro' tests may be adequate when the art would accept this as appropriately correlated

with 'in vivo' utility in humans. As such, 'in vitro' tests involving human cells may be sufficient if coupled with other evidence, for example, success with other nucleoside analogues, studies or assays that allowed one to determine whether the drug produces little or no toxicity even in relatively high doses" (para. 179).

(v)   In the trial judge's view, "these results, considered cumulatively, in conjunction with all of the evidence adduced and considered in this trial, moves the invention out of the sphere of belief and into the realm of the inventors having deduced the complete invention" (para. 185).

**74**   At para. 186 of his judgment, the trial judge said that "[a]ccordingly, as of March 16, 1985, I find that the patent satisfied, subject to obviousness, the requirements of s. 2 of the Act and does not exceed the invention claimed. The idea, hypothesis or theory had, at this time, been reduced to a definite and practical shape".

**75**   These conclusions support a finding of sound prediction. The trial judge has found that the inventors possessed and disclosed in the patent both the factual data on which to base a prediction, and a line of reasoning (chain terminator effect) to enable them to make a sound prediction at the time they applied for the patent.

**76**   Not all predictions, even sound ones, turn out to be correct. If the Glaxo/Wellcome prediction had subsequently been shown to be wrong, the patent would have been invalidated for want of utility. But, as Pigeon J. remarked in *Monsanto, supra*, at p. 1116, commenting on *Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.*, [1968] S.C.R. 950, "while the substances without utility had not been tested, the true cause of the invalidity was the fact that they were without utility, not that they had not been tested before the patent was applied for".

**77**   The appellants take issue with the trial judge's conclusion. In their factum (though not in oral argument), they argue that utility must be demonstrated by prior human clinical trials establishing toxicity, metabolic features, bioavailability and other factors. These factors track the requirements of the Minister of Health when dealing with a new drug submission to assess its "safety" and "effectiveness". See now: *Food and Drug Regulations*, C.R.C. 1978, c. 870, s. C.08.002(2), as amended by SOR/95-411, s. 4(2), which provides in part:

> A new drug submission shall contain sufficient information and material to enable the Minister to assess the safety and effectiveness of the new drug ... .

The prerequisites of proof for a manufacturer who wishes to market a new drug are directed to a different purpose than patent law. The former deals with safety and effectiveness. The latter looks at utility, but in the context of inventiveness. The doctrine of sound prediction, in its nature, presupposes that further work remains to be done.

C. *Glaxo/Wellcome's After-the-Fact Validation Theory*

**78**    Glaxo/Wellcome contends that because AZT turned out to have both treatment and (limited) prophylactic properties, its prediction must necessarily have been sound, and the patent upheld on that basis. This argument presupposes that the critical date to establish utility is the state of knowledge when the patent is attacked, even though the attack may come years after its issuance, rather than as of the date the patent application is filed. The patent in this case was applied for in 1986, and issued in 1988. The trial did not occur until 1997, almost a decade after the grant of the AZT patent in Canada.

**79**    The "after-the-fact" validation theory was accepted by the Federal Court of Appeal, at para. 51:

> In other words, so long as an inventor can demonstrate utility or a sound prediction at the time a patent is attacked, the patent will not fail for lack of utility. The time at which usefulness is to be established is when required by the Commissioner of Patents or in court proceedings when the validity of the patent is challenged on that ground.

**80**    In my view, with respect, Glaxo/Wellcome's proposition is consistent neither with the Act (which does not postpone the requirement of utility to the vagaries of when such proof might actually be demanded) nor with patent policy (which does not encourage the stockpiling of useless or misleading patent disclosures). Were the law to be otherwise, major pharmaceutical corporations could (subject to cost considerations) patent whole stables of chemical compounds for all sorts of desirable but unrealized purposes in a shot-gun approach hoping that, as in a lottery, a certain percentage of compounds will serendipitously turn out to be useful for the purposes claimed. Such a patent system would reward deep pockets and the ingenuity of patent agents rather than the ingenuity of true inventors.

**81**    The Federal Court of Appeal was concerned that patents based on "instinct and intuition (and) gut reaction" might be invalidated in a case where the ignorance that passed at the time for "sound prediction" turned out to be wrong and the inventor eventually vindicated. An example was given of a hypothetical patent on the Wright brothers' airplane. Perhaps all the "experts" thought it would not fly, but it did. Would it not be illogical, it was asked, to invalidate a hypothetical patent for a heavier-than-air flying machine because scientific opinion in the pre-flight era was wrong?

**82**    The hypothetical Wright brothers patent relates to a new and useful product, rather than (as here) to a new *use* for an old product, but all the same it illustrates, I think, the flaw in the Glaxo/Wellcome argument. The mere idea of a "heavier-than-air flying machine" is no more patentable than would be "*anything* that grows hair on bald men" (emphasis in original): *Free World Trust v. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66, at para. 32. The patent (even in this improbable scenario) would have to teach precisely *how* the machine could be made to fly. Section 34(1)(*b*) of the *Patent Act* requires the applicant to set out in the specification "the method of constructing, making ... or using a machine ... in such full, clear, concise and exact terms as to

enable any person skilled in the art ... to make, construct ... or use it". This means the Wright brothers' hypothetical patent would have to describe, amongst other things, how to design an air foil that creates "lift" by reducing the air pressure on the upper surface of the wing as the air rushes over it, as well as a suitable airborne method of forward locomotion. If the essentials of the heavier-than-air flying machine were set out with sufficient precision to allow the reader actually to make a flying machine that flies, it is hard to accept the "hypothetical" that experts would continue to insist, after it had flown, that the prediction was unsound. (Of course, if the prediction turned out to be wrong, the patent would be struck down for inutility. Leonardo da Vinci's elegant drawings showed exactly how to make a "bird man" machine but it never could, would or did sustain a person in flight.)

**83**    On the other hand, if the patent failed to disclose the essentials of a heavier-than-air flying machine, such that no one could "soundly predict" whether or not the ill-defined thing could get off the ground, then the patent would be rightly invalidated, even though the inventors had eventually flown some sort of machine in the meantime. It goes back to the same point. The public is entitled to accurate and meaningful teaching in exchange for suffering the patent monopoly. The patent claims must be supported by the disclosure. Speculation, even if it afterwards proves justified, does not provide valid consideration. As Lord Mustill pointed out in *Genentech Inc.'s Patent*, [1989] R.P.C. 147 (Eng. C.A.), at p. 275:

> Many years ago, an inventor could not have patented a heavier-than-air flying machine simply by writing down the concept, but equally the fact that the concept was capable of being written down in advance could not, in itself, exclude the rights of a person who had actually made one fly.

**84**    The Federal Court of Appeal claimed support for its position in a statement by Thurlow C.J. in *Ciba-Geigy, supra*, at p. 77:

> ... if indeed what is in the patent specification was mere speculation or prediction, the speculation or prediction having turned out to be true, ought to be considered to have been well founded at the time it was made. Even at the time it was made it is not improbable that it would have been considered well founded.

It is unfortunate that Thurlow C.J. speaks of "speculation or prediction" in the same breath without distinguishing between the two concepts. The two sentences, standing alone, give some support to the position taken in this case by the Federal Court of Appeal. However, the two sentences do not stand alone. Thurlow C.J. purported to be applying *Monsanto, supra*, and in the passage from *Monsanto* that he quotes Pigeon J. says (at p. 1119) it is central to the analysis that he is dealing with

> a matter which is <u>not of speculation</u> but of exact science. We are no longer in the days when the architecture of chemical compounds was a mystery. [Emphasis added.]

The point of Pigeon J.'s reasons is that a wide gulf separates speculation from "exact science" and it is the latter that may (or may not, depending on the expert evidence) permit sound prediction. Moreover, on the facts of *Ciba-Geigy* itself, Thurlow C.J. says, as quoted above, that "[e]ven at the time it was made it is not improbable [i.e., it is probable] that it [the invention] would have been considered well founded [i.e., a sound prediction]". In the broader context of the *Patent Act*, as well, there is good reason to reject the proposition that bare speculation, even if it afterwards turns out to be correct, is sufficient. An applicant does not merit a patent on an almost-invention, where the public receives only a promise that a hypothesis might later prove useful; this would permit, and encourage, applicants to put placeholders on intriguing ideas to wait for the science to catch up and make it so. The patentee would enjoy the property right of excluding others from making, selling, using or improving that idea without the public's having derived anything useful in return.

**85**    Accordingly, to the extent *Ciba-Geigy* stands for a contrary position, I do not think it should be followed.

D. *Did Glaxo/Wellcome Claim More Than It Had Invented?*

**86**    The appellants argue that even if Glaxo/Wellcome can squeeze over the inventorship hurdle with respect to the *treatment* properties of AZT, there is nothing in the record on which to base a prediction, sound or otherwise, that AZT possessed *prophylactic* properties. The appellants point out that, generally speaking, treatment deals with an infection already acquired, whereas prophylaxis refers to prevention of getting the disease in the first instance.

**87**    Glaxo/Wellcome claims that not only was its prediction sound at the time it was made, but also that it has since been demonstrated in practice. Specifically, as stated, it was established some years after issuance of the patent that AZT can be effective in preventing the transmission of HIV from a pregnant woman to her foetus (and is thus arguably prophylactic for the foetus), and that health care workers who have been pricked by infected needles ("needle-stick") acquire a measure of protection against HIV infection. These particular applications were not disclosed in the patent and were, it appears, unknown to Glaxo/Wellcome on March 16, 1985. (The appellants deny that these are instances of "prophylaxis". They say these are both instances of post-infection treatment.) Interestingly, while the U.K. patent for AZT claimed both treatment and prophylactic properties, the U.S. AZT patent, which was the focus of the U.S. litigation on which Glaxo/Wellcome relies to support the validity of its patent, refers only to treatment.

**88**    While the appellants' argument has some linguistic attraction, it puts too much weight on a supposed "bright line" distinction between treatment and prophylaxis. Dictionaries tend to include prophylaxis as an aspect of treatment:

> *Oxford English Dictionary* (2nd ed. 1989), vol. XII, at p. 644

> *Med.* The preventive treatment of disease... .

*Black's Medical Dictionary* (39th ed. 1999), at p. 446

> Treatment or action adopted with the view of warding off disease.

In *Butterworths Medical Dictionary* (2nd ed. 1978), at p. 1385, the following definitions (amongst others) are given:

> **Clinical prophylaxis.** The prevention of the development of signs and symptoms of the disease without necessarily eradicating the causal factor, e.g. in malaria, by schizonticidal drugs.

> **Drug prophylaxis.** The administration of drugs as protection against infection, in particular malarial infection.

> **Gametocidal prophylaxis.** The administration of drugs in order to kill malarial gametocytes in individuals.

See also *Dorland's Illustrated Medical Dictionary* (27th ed. 1988), at p. 1365.

**89**    If "prophylactic" treatment of malaria may post-date the initial infection, it would seem appropriate that prophylaxis can also include "prevention of the development of signs and symptoms of the disease [AIDS] without necessarily eradicating the causal factor [HIV]".

**90**    The patent itself includes some information described as "Preventing Infection by AIDV", which refers to an experiment which showed "decreased infection" of cells in the presence of AZT. The patent then discloses (as earlier mentioned) the mechanism by which AZT prevents "the development of signs and symptoms" of AIDS (and is thus prophylactic to AIDS), namely as a "chain terminator" which inhibits HIV reverse transcriptase:

> ... it is the triphosphate form of 3'-azido-3'-deoxythymidine which is believed to be the effective chain terminator in the reverse transcription of AIDV, as evidenced by its effect on avian myeloblastosis virus and Moloney murine leukaemia virus. This form also inhibits AIDV reverse transcriptase in vitro whilst having a negligible effect on human DNA polymerase activity. [Emphasis added.]

**91**    HIV offers an incubation period in which the virus is present but vulnerable to attack. It is this specific feature that was targeted by the "chain termination" effect known and disclosed by Glaxo/Wellcome at the time of the patent application, and which afforded the basis for its prediction that AZT had prophylactic properties. In these circumstances, I do not think the appellants have demonstrated any palpable and overriding error with respect to this finding by the trial judge.

**92**    There is another reason why I think we should not be too quick to overrule the conclusion that prophylactic benefits were soundly predicted. The appellants seek to place Glaxo/Wellcome in a "catch-22" situation. If Glaxo/Wellcome had not specifically claimed prophylactic properties, the appellants could have sought to obtain their own patent on the basis of claiming "hitherto unrecognized [prophylactic] properties" (relying on *Shell Oil, supra*, at p. 549), thereby undercutting Glaxo/Wellcome's market for treatment, and leaving Glaxo/Wellcome to try to salvage their patent position by arguing that the prophylactic properties were already implicit (or "obvious") in their own patent as aspects of treatment. If the appellants could lawfully get their AZT to market allegedly for prophylaxis, with or without their own patent, the generic version of AZT would likely be used by cost-conscious health providers in place of the more expensive Glaxo/Wellcome AZT for all aspects of HIV/AIDS treatment at all stages, thus undercutting the commercial value of the Glaxo/Wellcome patent. On the other hand, Glaxo/Wellcome having sought to protect itself from this scenario by claiming prophylactic benefits, the appellants now adopt the opposite strategy and seek to invalidate the entire patent on the ground that the claim to prophylaxis is invalid because it exceeds the invention, and its "covetousness" wipes out all of the combined "treatment and prophylaxis" claims, thereby wiping out the commercial value of the patent. As long ago as *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504, Dickson J. (as he then was) subscribed to the view, at p. 521, that a "patent should be approached 'with a judicial anxiety to support a really useful invention'".

**93**    In the particular circumstances of this case, I think Glaxo/Wellcome's prediction that the "chain terminator" effect disclosed in the patent specification had prophylactic as well as post-infection treatment application was sound. The Commissioner so ruled, and his decision to allow both treatment and prophylaxis was upheld in the courts below. The onus was on the appellants to show that the patent is invalid, not on Glaxo/Wellcome to show that it is valid. I agree with the trial judge and the Federal Court of Appeal that the appellants have not discharged this onus.

      E. *Did Glaxo/Wellcome Wrongly Exclude the NIH from Co-inventorship?*

**94**    The appellants contend that Drs. Broder and Mitsuya were "co-inventors" and ought to have been so identified in the patent. For this argument to benefit the appellants (as opposed to Drs. Broder and Mitsuya), they must further establish that this omission was a "material" misstatement that was "wilfully made for the purpose of misleading". If so, the patent would be void pursuant to s. 53(1) of the *Patent Act*.

**95**    Inventors come in all shapes and sizes. As long ago as 1831, the *London Journal of Arts and Sciences* commented (with gender assumptions no doubt common at the time):

            Useful inventors are of three classes; the first are men of genius, capable of producing important inventions that involve the entire projecting of new machines, or remodelling of existing ones, and the organization of new or

complicated processes and systems of working. These are very few.

The second are men who have not so extensive a scope of imagination and intellect as to project new systems or great changes, and to organize the means of effecting them, but who are capable of making marked improvements upon existing systems and machinery, or partial changes in them. This class is considerable.

The third class is made up of men of small imagination, who are not capable of any great originality of thought, but who have a certain ingenuity which they can apply to the things that come within the range of their observation, and possess a tact for correctly and accurately executing that which they conceive.

... Happily this class is immense, being spread thickly over the whole body of mechanics, from the manufacturer and engineer down to the lowest workman. Such men constitute expert mechanicians, who are never at a loss for expedients for overcoming the practical difficulties of detail that occur in their business, and are perpetually making trifling inventions which they require for immediate application.

(Quoted in *Godson on Patents* (2nd ed. 1851), at pp. 33-34.)

**96**    Inventorship is not defined in the Act, and it must therefore be inferred from various sections. From the definition of "invention" in s. 2, for example, we infer that the inventor is the person or persons who conceived of the "new and useful" art, process, machine, manufacture or composition of matter, or any "new and useful" improvement thereto. The ultimate question must therefore be: who is responsible for the inventive concept?

**97**    Section 34(1) requires that at least at the time the patent application is filed, the specification "correctly and fully describe the invention ... to enable any person skilled in the art or science to which it appertains ... to ... use it". It is therefore not enough to have a good idea (or, as was said in *Christiani, supra*, at p. 454, "for a man to say that an idea floated through his brain"); the ingenious idea must be "reduced ... to a definite and practical shape" (*ibid.*). Of course, in the steps leading from conception to patentability, the inventor(s) may utilize the services of others, who may be highly skilled, but those others will not be co-inventors unless they participated in the conception as opposed to its verification. As Jenkins J. notes in *May & Baker Ltd. v. Ciba Ltd.* (1948), 65 R.P.C. 255 (Ch. D.), at p. 281, the requisite "useful qualities" of an invention, "must be the inventor's own discovery as opposed to mere verification by him of previous predictions".

**98**    More recently, in *Henry Brothers (Magherafelt) Ltd. v. Ministry of Defence and the Northern Ireland Office*, [1997] R.P.C. 693 (Pat. Ct.), in response to a submission that an invention could be divided into contributed elements and patents awarded accordingly, Jacob J. stated, at p. 706:

> I do not think it is right to divide up the claim for an invention which consists of a combination of elements and then to seek to identify who contributed which element. I think the inquiry is more fundamental than that. <u>One must seek to identify who in substance made the combination. Who was responsible for the inventive concept, namely the combination?</u> [Emphasis added.]

**99**    The distinction between conception and verification is consistent with the Canadian authorities, including Fox, *supra*, at p. 225; *Kellogg Co. v. Kellogg*, [1942] Ex. C.R. 87, at p. 97; *Ernest Scragg & Sons Ltd., supra*, at pp. 676-77; H. Fisher and R. S. Smart, *Canadian Patent Law and Practice* (1914), at pp. 27-29. The line is perhaps blurred in *Gerrard Wire Tying Machines Co. of Canada v. Cary Manufacturing Co.*, [1926] Ex. C.R. 170, where the U.S. text *Walker on Patents* is quoted at p. 186:

> Nor is a patent to joint inventors invalidated by the fact that one of them only first perceived the crude form of the elements and the possibility of their adaptation to complete the result desired. In fact the conception of the entire device may be attributed to one, but if the other makes suggestions of practical value, which assist in working out the main idea and making it operative, or contributes an independent part of the entire invention which helps to create the whole, he is a joint inventor even though his contribution be of minor importance.

To the extent this suggests that an individual who contributes to the inventive concept may be a co-inventor without being the prime originator, I agree with it. To the extent, however, that it can be read to include as inventors those who help the invention to completion, but whose ingenuity is directed to verification rather than the original inventive concept, I respectfully, for the reasons already given, disagree.

**100**    Wetston J. concluded at para. 224 that "the utility as claimed was not established without the extensive and direct involvement of the NIH." This is true, but it is not, with respect, the test. If Glaxo/Wellcome had soundly predicted that AZT could cure nausea in the weightlessness of space, it might require NASA and all its rocket ship expertise to "establish" the utility, but NASA would not on that account become a co-inventor.

**101**    It is clear that Drs. Broder and Mitsuya at the NIH were instrumental in providing crucial evidence on which the "sound prediction" of AZT's utility depended, but they were not responsible for the inventive concept. They carried out their investigation using extraordinary skill and expertise but, in my view, their blind test of a chemical compound whose existence they had not identified, and with which (unlike Glaxo/Wellcome) they apparently had no prior experience, did not require

them to be listed as co-inventors.

**102**    There is no question that the ATH8 cell line developed by Drs. Broder and Mitsuya at NIH was original and offered a testing environment that Glaxo/Wellcome could not duplicate in-house. For this achievement they obtained a patent, as mentioned earlier. But the patentees of an invention for testing do not, by virtue of executing tests using that invention, become co-inventors of every sound idea that is so tested.

**103**    Drs. Broder and Mitsuya did not conceive of the utility of AZT for the treatment and prophylaxis of HIV, although they were engaged in a massive search for such a drug. As stated earlier, they initially thought that the coded drug sent by Glaxo/Wellcome was suramin, a compound of longstanding interest to the NIH in its HIV research, but a drug that performed poorly in humans. The trial judge said that "[t]he work that Dr. Broder and Dr. Mitsuya were doing with suramin, at the NIH, situated them uniquely to this research" (para. 202), but that, it seems to me, shows the weakness of their claim. The NIH had one of the best testing facilities in the world but they had not been able, to that point, to identify an effective chemical compound to counter HIV. Their five-star candidate, suramin, turned out to be a disappointment.

**104**    The Court of Appeal referred specifically to Dr. Mitsuya's testimony that in 1984 and 1985, he thought that dideoxynucleosides, of which AZT is a member, "was likely to be harmful to human cells" (para. 38, note 33) and thus "too toxic to be used in the treatment of human diseases" (para. 38). The success of AZT, accordingly, must have come as a surprise.

**105**    It is easy to sympathize with the frustration felt by Drs. Broder and Mitsuya, who felt it necessary, together with NIH colleagues, to send a rather bitter letter to *The New York Times* on September 20, 1989, complaining about what they took to be Glaxo/Wellcome's ingratitude for the immense NIH contribution:

> In a number of specific ways, government scientists made it possible to take a drug already in the public domain with no medical use and make it a practical reality as a new therapy for AIDS. It is unlikely that any drug company could have found a better partner than the government in the development of a new product. We believe that the development of this drug in the record time of two years, start to finish, would have been impossible without the substantive commitment of government scientists and government technology.

**106**    In the circumstances, however, I agree with the Federal Court of Appeal that great though the contribution of Drs. Broder and Mitsuya was to the advancement of science, they were not co-inventors of the patent-in-suit.

F. *Materiality of Co-inventorship*

**107**    The trial judge concluded that Drs. Broder and Mitsuya were co-inventors, but that failure to

include them in the patent was not a material misrepresentation that would invalidate the patent. In reaching this conclusion, he referred to the observation of Addy J. in *Procter & Gamble Co. v. Bristol-Myers Canada Ltd.* (1978), 39 C.P.R. (2d) 145 (F.C.T.D.), at p. 157, that "it is really immaterial to the public whether the applicant is the inventor or one of two joint inventors as this does not got [*sic*] to the term or to the substance of the invention nor even to the entitlement" (aff'd (1979), 42 C.P.R. (2d) 33 (F.C.A.)). At an earlier date, Thurlow J. had suggested in *Jules R. Gilbert Ltd. v. Sandoz Patents Ltd.* (1970), 64 C.P.R. 14 (Ex. Ct.), at p. 74, rev'd (on other grounds) [1974] S.C.R. 1336 (*sub nom. Sandoz Patents Ltd. v. Gilcross Ltd.*), that "allegations in the petition respecting anything other than the subject-matter of the claims in the patent as granted are not material".

**108**    The appellants argue that, while as Addy J. says, it may be that the identity of the inventor is immaterial to the public in most instances, this is not necessarily true in all cases. Here, for example, the issue of "entitlement" to the rewards of the AZT patent has created a significant public controversy. There were arguably important public policy ramifications to the issue of co-inventorship because of the contrasting mandates, objectives and funding sources of the institutions involved, in particular the NIH and the Glaxo/Wellcome corporate group. If indeed the NIH researchers had been "co-inventors", and the NIH or the U.S. government had therefore held an ownership interest in the patent, there potentially could have been a significant effect on both the access to and the cost of the drug AZT across the world.

**109**    There is no need to consider the issue of materiality further in this case however, not only because of the conclusion that Drs. Broder and Mitsuya were not in fact co-inventors in this case, but also because there is no evidence whatsoever that the omission to name them was "wilfully made for the purpose of misleading", as required by the concluding words of s. 53(1).

    V.   Conclusion

**110**    I would dismiss the appeals with one set of costs to the respondents on a party and party basis, payable jointly and severally by the appellants.

**Procureurs :**

Solicitors for the appellant Apotex Inc.: Goodmans, Toronto.

Solicitors for the appellant Novopharm Ltd.: Hitchman & Sprigings, Toronto.

Solicitors for the respondents Wellcome Foundation Ltd. and Glaxo Wellcome Inc.: Ogilvy, Renault, Ottawa.

*Case Name:*

# Bank Leu AG v. Gaming Lottery Corp.


**Between**
**Bank Leu AG, plaintiff (respondent), and**
**Gaming Lottery Corporation, Helix Capital Corp. Ltd.**
**and Guido Franz-Josef Bensberg, defendants**
**(appellants), and**
**Gary L. Moore, Sandy Anderson, North Shore Credit**
**Union, James Ericksteen, Charles Anthony Ferracone,**
**James Farrell, Jill Hall, Max Josef Strauss, Khadjavi**
**Strauss, Claus Koerner and Red Oak Ltd., third parties**
**(respondents)**

[2003] O.J. No. 3213

231 D.L.R. (4th) 251

175 O.A.C. 143

37 B.L.R. (3d) 1

124 A.C.W.S. (3d) 679

Docket No. C37623


Ontario Court of Appeal
Toronto, Ontario

**Weiler, Charron and Rosenberg JJ.A.**

Heard: March 3, 2003.
Judgment: August 14, 2003.

(87 paras.)

*Company law -- Share transfer -- Actions against corporations and directors -- Action for*
*oppressive conduct.*

Appeal by the defendant, Gaming Lottery Corporation, from a judgment in favour of the plaintiff, Bank, for $4.5 million. The Bank Leu loaned money to Bensberg. Bensberg transferred his shares in the Corporation to the Bank as security for the loan. A Bank official ignored concerns over the volatility of Bensberg's security. The certificate was issued in Helix's name and provided that transfers were restricted. It was held by the Bank of Montreal. The Bank was not aware of the restrictions until after most of the money was advanced. When Bensberg defaulted and the Bank attempted to realize on the security, the Corporation refused to honour the share certificate on the ground that the shares were not fully paid for or validly issued. The Corporation claimed that the certificate was part of a stock roll program and should not have been released from safekeeping. The Bank brought an action against the Corporation on the basis this was oppressive conduct. The Corporation had sought contribution and indemnity from North Shore Credit Union on the basis that it was liable for its employee's dishonest conversion of the share certificate. The trial judge found that the Bank Leu was a good faith purchaser of shares.

HELD: Appeal dismissed. The Corporation did not establish that the trial judge erred in the application of the test to determine whether the Bank was a good faith purchaser for value. It was estopped from denying the validity of the share certificate. The restriction on transfer noted on the share certificate did not prevent the shares from being transferred to the Bank. The trial judge did not err in granting relief under the oppression remedy. No contribution and indemnity was available against NorthShore Credit Union as it was not vicariously liable for the fraudulent act of its employee.

**Statutes, Regulations and Rules Cited:**

Ontario Business Corporations Act, R.S.O. 1990 c. B.16, ss. 53(1), 56(1), 56(2), 56(3), 63, 63(2), 248.

**Appeal From:**

On appeal from the order of Justice Sidney N. Lederman of the Superior Court of Justice dated November 29, 2001.

**Counsel:**

Edward J. Babin and Crawford Smith, for the respondent, Bank Leu AG.
Lyndon A.J. Barnes and Donald D. Hanna, for the respondent, North Shore Credit Union.
Benjamin Zarnett and Messod Boussidan, for the appellant, Gaming Lottery Corporation.

---

The judgment of the Court was delivered by

**1    WEILER J.A.**:-- Gaming Lottery Corporation ("GLC"), appeals from the judgment of Lederman J. in favour of Bank Leu (the "Bank") in the amount of 4.5 million dollars U.S. plus prejudgment interest. The appeal raises issues in company law, and concerns more specifically 1) whether the trial judge erred in finding that Bank Leu was a good faith purchaser of the shares represented by Share Certificate 12093 and in his appreciation of the restriction on their transferability noted on the share certificate 2) whether Bank Leu acquired beneficial title to the shares by common law estoppel 3) whether Share Certificate 12093 was a negotiable instrument and 4) whether the oppression remedy under the Ontario Business Corporations Act, R.S.O. 1990 c. B.16, ("OBCA") was available to Bank Leu. In the event the appeal by GLC from the decision of Lederman J. in favour of Bank Leu is unsuccessful, GLC seeks contribution and indemnity from North Shore Credit Union. The detailed reasons of the trial judge are reported at (2001), 29 B.L.R. (3d) 68 (Sup. Ct.).

**2**    For the reasons that follow, I would dismiss the appeal substantially for the reasons given by the trial judge, namely that Bank Leu was a good faith purchaser of the shares represented by Share Certificate 12093 and that GLC was estopped from denying the validity of the share certificate. I would further hold that the restriction on transfer noted on the share certificate in question did not prevent the shares represented by the certificate from being transferred to Bank Leu. With respect to the oppression remedy, I would hold that the trial judge did not err in granting this relief. I would also dismiss the appeal respecting the third party, North Shore Credit Union.

    I.    Facts

**3**    Bank Leu is a Swiss private bank, based in Zurich, and a member of the Credit Suisse group. It is the oldest bank in Switzerland. It has been conducting business in Switzerland and internationally for over 250 years. Bank Leu loaned $5 million to one Guido Bensberg who transferred Share Certificate No. 12093 ("Share Certificate 12093"), issued by Laser Friendly Inc., to the Bank as security for the loans. Laser Friendly Inc. later changed its name to GLC and for ease of reference will be referred to throughout as GLC. When the loans were not repaid, Bank Leu sought to realize on the shares. GLC refused to acknowledge Bank Leu as the valid owner of the shares because the shares were not fully paid for or validly issued. GLC stated that the certificate was part of a "stock roll program" (described below) and should not have been released from safekeeping. The Bank sued GLC on the basis this was oppressive conduct. There is money in court with respect to part of the amount in issue.

    A.    The Stock Roll Program

**4**    Jack Banks ("Banks") was the President, Chief Executive Officer and Chairman of the Board of Directors of GLC. Larry Weltman, a chartered accountant, was Executive Vice-President and a Director of the company. Weltman's primary responsibility at GLC was to develop and implement corporate strategy and oversee and manage the financial affairs of the company.

**5**    In or about October 1994, GLC became interested in implementing a "stock roll program".

GLC had heard that such programs allowed major foreign banks to subscribe for blocks of shares at a discount to the market price and to pay for such shares by way of a debenture to enhance their balance sheets with the company holding the debenture earning interest on it. GLC was told that if it chose to participate in the program no shares needed to be issued by it until fully paid for and that if it wished to do so it could refuse to issue the shares. In addition, GLC would have the right to reject payment for the shares preventing any dilution of GLC's existing shares.

**6**   With this background information, GLC entered into a stock roll program with Helix Capital Corporation ("Helix"). Weltman discussed the stock roll program with Banks who gave him the authority to proceed with the transaction.

**7**   As described by the trial judge, the stock roll program between GLC and Helix had the following characteristics:

> *   Helix entered into a Subscription Agreement for 15 million common shares of GLC at U.S. $4.00 per share;
> *   the Subscription Agreement provided for a closing in one-year's time;
> *   pending the closing, as of the execution of the Subscription Agreement, share certificates were issued by GLC under the Subscription Agreement;
> *   pending the closing, the share certificates were to be delivered to Helix or its agent;
> *   Helix, under the Subscription Agreement, was required to pay GLC interest on the purchase price, based upon a percentage of the market value of the shares subscribed for. In this case $1.8 million USD;
> *   the purchase price and interest payable under the Subscription Agreement were secured by a debenture;
> *   at the end of one year, the subscriber under the Subscription Agreement was entitled to tender for the shares at the base value of the subscription price;
> *   GLC was not required under the Subscription Agreement or Debenture to accept the tender of the subscriber; and
> *   GLC could, in effect, cancel the transaction, never accept the full payment for the shares, and retain the $1.8 million paid under the Subscription Agreement and Debenture.

**8**   The share certificates for the stock roll program with Helix were prepared by Equity Transfer Services Inc., (Equity Transfer") on instructions from GLC. In total, eight GLC certificates (three certificates of 2.5 million shares each and five certificates of 1.5 million shares each) were created. Share Certificate 12093 came into existence as part of the Subscription Agreement between Helix and GLC. The share certificates, including Share Certificate 12093, show the registered holder as Helix and state very clearly on their face that they are:

FULLY PAID AND NON-ASSESSABLE COMMON SHARES WITHOUT
PAR VALUE IN THE CAPITAL OF LASER FRIENDLY INC.

They also state that the shares represented by the certificates are transferable at Equity Transfer in Toronto. Despite this statement and despite the fact that GLC executed a form of stock proxy for voting the shares represented by, inter alia, Share Certificate 12093, it provided instructions to Equity Transfer to confiscate any certificates, including Share Certificate 12093, if submitted for transfer.

**9**   Paul Stein, a lawyer acting for GLC, recommended against the representation on the face of the certificates that they were "fully paid". He suggested a legend indicating that they were not paid for and were subject to another agreement or otherwise not be freely traded. This advice was rejected by Weltman.

**10**   Laser Friendly's (GLC's) shares were publicly traded on the Toronto Stock Exchange ("TSE") as well as on NASDAQ, a stock exchange in the United States. Printed on the back of the share certificates was a so-called "Regulation S" legend. Regulation S under the United States Securities Act of 1933 was an exemption, which allowed a company to issues shares without registration in the United States with respect to transactions outside of the United States that did not involve "United States persons". The legend provided for a time limit before the shares could be transferred (in the case of Share Certificate 12093, that time limit was November 15, 1995). Weltman testified that he was aware that the purpose of such a legend under Regulation S (and Rule 144) was to restrict transfers involving "United States persons" or within the United States.

**11**   GLC understood at all times that the shares would be provided by Helix to a third party to be placed in a "program" that would generate the income to pay the "interest".

B.   The Securities Lease Agreement

**12**   The GLC share certificates issued in connection with the stock roll program were utilized by Helix in connection with a "securities lease" arrangement with Red Oak Ltd. ("Red Oak"), the principal of which was Bensberg.

**13**   Under the securities lease, the shares of several public companies, including shares of GLC were "leased" to Red Oak. Among other things, Helix represented in the agreement that it was the owner of the leased shares. The agreement also indicated that Red Oak wished to lease the shares for the purposes of enabling it to enhance its bank credit lines for its business needs.

**14**   By virtue of the securities lease, Bensberg was able to gain control over the share certificates. The securities lease called for the delivery of the share certificates representing the leased assets, including Share Certificate 12093, to an escrow agent, in this case, Sandy Anderson ("Anderson"), manager of the North Shore Credit Union, Bensberg's Bank in Vancouver.

C.      The Loan by Bank Leu to Bensberg

**15**    In early November 1994, Bensberg was introduced to Claus Koerner ("Koerner"), an employee in the private banking department of Bank Leu. He was introduced by Max Josef Strauss, a lawyer and the son of a well-known former foreign minister of West Germany, Franz Joseph Strauss. Bensberg was introduced as a substantial businessman looking for a bank to do business with and to manage his portfolio. Bensberg indicated that he required a line of credit and that he would be able to provide stock certificates as collateral.

**16**    At a meeting on November 11, 1994, Bensberg physically delivered to Koerner share certificates for five over the counter (OTC) issuers. Koerner had the certificates delivered to his office in Zurich by mail, after which he had them delivered within Bank Leu to the securities administration Department to be deposited into Bensberg's account. At the same time, Koerner was advised by Bensberg that he would be delivering a number of additional shares through his bank in Vancouver ("North Shore") to Bank Leu in care of its depository, the Bank of Montreal ("BMO"). Included in the shares, which Bensberg promised to deliver were shares of GLC, evidenced by Share Certificate 12093.

**17**    Anderson wrote to Bank Leu by letter dated November 17, 1994 and confirmed that the GLC shares had been forwarded to BMO.

**18**    On November 23, 1994, the share certificates for the outstanding securities, including Share Certificate 12093, were received by BMO. At the request of Anderson, a copy of his covering letter to BMO, dated November 17, enclosed with the share certificates, was forwarded to Bank Leu. There is no mention of any loan transaction with Bensberg in the covering letter. Nor is there any mention of any restriction on the shares.

**19**    Enclosed with Share Certificate 12093 was an executed irrevocable stock power, endorsed in blank for a transfer. The stock power was properly executed on behalf of Helix by James Ericksteen, its principal, and his signature was guaranteed by the Royal Bank of Canada.

D.      Execution of the Pledge and Other Documents - November 15, 1994

**20**    On November 15, 1994, Bensberg executed a pledge agreement with Bank Leu in which he pledged all of the assets at any time deposited at Bank Leu as security for any indebtedness to the bank. He also signed a signature card, incorporating Bank Leu's general conditions, and a declaration in which he declared that he was the beneficial owner of the shares he was depositing. He also signed a more comprehensive credit agreement on December 7, 1994.

**21**    After North Shore indicated that it was forwarding to Bank Leu (through BMO) certain shares, including the GLC shares, and after Bensberg signed the pledge, signature card and declaration that he was the beneficial owner of the shares, he was approved for a limited overdraft and funds were initially released to him on November 15, 1994. The amount released as of

November 23,1994 was $860,000 USD.

     E.    Calling the Loan

**22**   When the BMO accepted the securities on behalf of Bank Leu on November 23, 1994 the Legend S restriction on transfer was noticed and duly noted by BMO's employees. On November 30, 1994, Bank Leu advanced Bensberg a further $1.8 million USD by way of overdraft which Keller, a senior credit officer with Bank Leu, approved.

**23**   By memo dated December 1, 1994 Keller recommended that Bensberg's application for credit in the amount of $5 million U.S. be approved by way of a loan against "Marketable Cover". Keller testified that he felt the risk was acceptable, so long as the Bank closely monitored the loan and kept the amount loaned at 10% of the value of the portfolio. He relied primarily on the value of the GLC shares represented by Share Certificate 12093. The trial judge found at paragraph 31 of his reasons that, "[w]hen the certificates were received, Bank Leu satisfied itself that all the share certificates were genuine (not forged) and none was on a list of stolen or lost securities. The total market value of securities held by Bank Leu was thought to be in excess of U.S. $45 million". Subsequently the Bank concluded that the only shares that had any value were the Laser Friendly shares. That being so, the trial judge concluded at paragraph 84 of his reasons that Keller did not adhere to his 10% rule.

**24**   The loan application for 5 million U.S. was approved sometime between December 1 and December 7, 1994. The Legend S restriction was mentioned in a report on December 7, 1994 by BMO to Bank Leu. In about mid-December, 1994, after substantial funds had been loaned to Bensberg, Keller learned of the restriction on the shares that were being held as collateral and took steps to inquire as to their nature. Bank Leu also sought further information about Bensberg and his businesses. Nevertheless, Bank Leu advanced Bensberg a further $495,000 U.S. after December 15, 1994. Bank Leu advanced approximately U.S. 4.3 million to Bensberg from the beginning of November 1994 to early January 1995.

**25**   In or about January 20, 1995, because no concrete positive information on Bensberg was forthcoming, and because of increasing concern that there was a significant problem with the collateral, Bank Leu decided to call the loan. This caused Bensberg's solicitor, Mr. Hladun Q.C., to write a letter dated January 20, 1995, in which he expressed serious concern and threatened Bank Leu with legal action. On January 23, 1995, Bank Leu sent Bensberg a letter calling the loan and requiring repayment by February 6, 1995. The letter was signed by both Koerner and Keller.

**26**   When satisfactory arrangements for repayment had not been made by Bensberg, Bank Leu contacted GLC with respect to Share Certificate 12093 that it held as collateral. Bank Leu was told at that time that the shares had not been paid for and GLC asked Bank Leu to acknowledge that it held the shares only as a depository. Until being so notified by GLC on March 27, 1995, Bank Leu was not aware that the shares had not been paid for. Indeed, Bank Leu was always under the impression that the shares had been validly issued and had been paid for, as appeared on the face of

Share Certificate 12093.

**27** Bank Leu obtained default judgment against Bensberg in Switzerland on January 31, 1996 for the full amount of the loan. That judgment remains outstanding.

**28** In the result, the trial judge granted judgment in favour of Bank Leu. His Honour concluded, at para. 114, that:

> GLC is estopped by its conduct from asserting a defence against Bank Leu as a good faith purchaser. The risk that the share certificates could be misused should be borne entirely by GLC and not by the good faith holder of the share certificate. The risk should not be with the unsuspecting holder of the certificates, but on those who entered into the transaction for the issuance of the certificates in the first place. GLC was motivated to create the certificates in order to make millions of dollars for which it thought there would be no consequences, and had little or no regard that the certificates could be used as instruments of fraud.

**29** In reaching his decision, the trial judge carefully reviewed the evidence at trial, including the evidence surrounding the circumstances of the loan to Bensberg and receipt of Share Certificate 12093. He also specifically found the following:

> * GLC was aware of the relevant risks and concerns arising out of the Stock Roll Transactions and knew of the potential for the certificates to be misused and indeed knew that they could be used in some fashion as "collateral";
> * Weltman knew that there was no legitimate use for the share certificates;
> * Stein expressed to GLC a concern that the shares could be used for an improper purpose and attempted to maintain control over the GLC Shares. His advice was ignored;
> * GLC was aware almost immediately that the sole practitioners it had sent millions of shares to were not complying with their obligations regarding holding the shares;
> * GLC was aware as early as November 18, 1994 that shares from the Helix transaction were to be sent to the BMO. GLC took no steps whatsoever, at anytime, to contact the BMO;
> * In early December 1994, the stock roll programs that GLC was involved in came to the attention of the United States Securities and Exchange Commission (SEC). An SEC enforcement inquiry was instituted and came to the attention of GLC early in December 1994;[1]
> * In connection with the SEC inquiry, GLC retained the firm of Jones & Day in Cleveland. That firm advised GLC to withdraw from the programs and to get its certificates. Jones & Day specifically alluded to "badges of fraud"

in its communications. Within approximately two weeks of its retainer, the firm resigned because GLC refused to follow its advice;

* Stein then arranged for the Washington and New York-based law firm of White & Case to assist GLC. White & Case repeated the advice that Stein and Jones & Day had given, and told GLC that they were aiding and abetting in the perpetration of a fraud.

* On December 14, 1994, GLC learned that certificates in a second stock roll program with Delta West had been endorsed and someone had attempted to use them as collateral with Merrill Lynch;

* Notwithstanding this knowledge, GLC continued to participate in the stock roll programs. It took no steps to alert Merrill Lynch or to prevent the misuse of its other certificates, including Share Certificate 12093. It also continued to receive payments from Helix in respect of that certificate;

* By letter dated February 1, 1995, White & Case outlined in the most explicit terms many of the concerns that had been repeatedly expressed since early November to GLC in connection with the stock roll programs. White & Case advised GLC that as a matter of urgency it should terminate the agreements with Helix and Delta West and seek the return of its share certificates. White & Case wrote:

> Given the foregoing, we believe that there is a substantial risk that if Helix's customer were to be unable to repay the loan from its lending bank, the bank could assert a claim against Laser Friendly for any resulting loss, and probably would be able to raise serious questions as to whether it was aware of the fact that the Laser Friendly certificates did not represent fully paid and issued shares, and whether Laser Friendly was not knowingly participating in fraudulent misrepresentations by the borrower as to the value of the security the borrower had provided.

> ...

> On the basis of the foregoing, we believe that you should, as a matter of urgency, (a) terminate the agreements with Helix (and Delta West if the two certificates issued it have not been returned to you) on the ground that they did not fully disclose to you to the uses to which the certificates would be put and inducing you to enter into those agreements, and (b) take all available actions to recover the certificates you have delivered.

\*     As before, GLC did not follow the advice. In fact, it not only continued, but expanded, its participation in the Helix Stock Roll Program by trying to place through the use of another certificate, No. 12095, in a "program".

With respect to GLC, the trial judge then concluded at paras. 111-112, as follows:

> Given his [Weltman's] education and experience, he must have known that the use of the certificates to enhance balance sheets made no commercial sense and could only be used in some improper nefarious scheme. By allowing GLC certificates into the stream of international commerce he must have known that they were likely to be misused, including being used as collateral, as in this case. Even in the face of warnings throughout the relevant period that there was a substantial risk of liability if the shares were so misused, Weltman persisted in the program.
>
> ...
>
> Weltman and Banks were the decision makers in respect of the stock roll program on behalf of GLC. Banks attended the trial from time to time, but was not called as a witness. In the circumstances it is appropriate to infer that both he and Weltman knew full well of the possibility of GLC stock certificates being used in the perpetration of a fraud or at the least, they did not care what use was made of them so long as GLC received its "interest payments" and there was no possibility of the transfer of shares being registered.

30     Conversely, in relation to Bank Leu's knowledge, the trial judge concluded at para. 86:

> "[T]here is no evidence that there was any obvious indication or suspicion that the shares were invalid or that Bensberg was a dishonest man. The evidence demonstrates that Fischer [Keller's subordinate] was concerned, but his concerns did not relate to the validity of the shares. Even Fischer's comment about Bensberg's motives being unclear is more consistent with his concern that Bensberg was a credit risk rather than any concern about possible fraud ...
>
> ...
>
> It makes no sense whatsoever that Keller ... deliberately shut his eyes to a fact that was obvious to him but he was afraid to inquire into, namely, that Bensberg was perpetrating fraud on Bank Leu by using share certificates of no value that he had obtained in various stock programs.

**31**    GLC brought a third party claim against Koerner alleging that he conspired with Bensberg to defraud Bank Leu. Koerner did not defend this claim and by virtue of rule 19.02(1)(a) he was deemed to admit the allegations against him. Counsel for GLC argued that Keller's deemed admission of his guilt on the third party claim by virtue of a legal fiction was a legal fact in Bank Leu's action against GLC with the result that Bank Leu could not be considered a good faith purchaser. The trial judge held at paras. 89-90:

> Koerner was noted in default approximately 6 years after he ceased to be employed at Bank Leu. At the time he was noted in default, he had no authority to bind the bank with either express admissions or deemed admissions. Apart from the "deemed admissions" argument, there is no evidence on which to found any of GLC's allegations that Koerner had any knowledge that the shares had not been paid for or was otherwise engaged in any conspiracy to defraud.]

> Even if it had been established that Koerner was engaged in perpetrating a fraud on Bank Leu, that knowledge cannot be imputed to the bank. As stated in Crawford & Falconbridge, Banking and Bills of Exchange (8th Edition 1986) at page 1465, "There is no reason to suppose that an agent acting in excess of his authority would inform his principal of the details of his activities" so as to affect its status as a good faith purchaser. (Also see Richards v. Bank of Nova Scotia (1896), 26 S.C.R. 381 at 387; The Commercial Bank of Windsor v. Morrison (1902), 32 S.C.R. 98 at 105.)

> ...

> In ignoring the warnings from Fischer and Jhaveri, in particular, Keller may have been negligent or, indeed, foolish. These individuals, if they were called as witnesses might have provided further evidence of this, but I am not satisfied that their testimony would have added anything to GLC's position that Bank Leu knew or was wilfully blind to the fact that Bensberg was a fraudster and that the share certificates were invalid. Therefore, I am unable to draw any adverse inference from the failure of Bank Leu to call these individuals as witnesses.

**32**    The trial judge's findings were based not only on the documentary record but on his assessment of the credibility of the various witnesses. He did not find Weltman to be credible. He noted that Weltman had plead guilty to securities fraud in the United States, had lied on his discovery (at a time when he thought the documents necessary to impeach him would not be produced) and had actively deceived GLC's auditors. (Banks, although present at the trial, did not testify.)

**33**    The thrust of the trial judge's findings in relation to GLC's participation in the stock roll program was that GLC was a willing participant in what it knew was a fraudulent scheme by which

share certificates, including Share Certificate 12093, were physically pledged as collateral for loans.

II.    Issues and Analysis
A.    The Main Action

1.    Whether the trial judge erred in finding that Bank Leu was a good faith purchaser of the shares represented by Share Certificate 12093 and in his appreciation of the restriction on their transferability noted on the share certificate?

**34**    The appellant submits that the trial judge erred in finding that Bank Leu was a good faith purchaser and further erred in his appreciation of the evidence relating to the restriction on the transferability of the share certificate. The trial judge's finding that Bank Leu was a good faith purchaser is central to his analysis that GLC is estopped from asserting the defence that its shares have not been paid for. The trial judge's finding that Bank Leu was a good faith purchaser is also important when considering the issue of whether Share Certificate 12093 was a negotiable instrument. Provided that the security is a negotiable instrument, a good faith purchaser can acquire higher rights than the transferor.

**35**    Section 53(1) of the OBCA defines a good faith purchaser as follows:

"good faith" means honesty in fact in the conduct of the transaction concerned.

"good faith purchaser" means a purchaser for value, in good faith and without notice of any adverse claim,

(a)    who takes delivery of a security certificate in bearer form or order form or of a security certificate in registered form issued to the purchaser or endorsed to the purchaser or endorsed in blank,

(b)    in whose name an uncertificated security is registered or recorded in records maintained by or on behalf of the issuer as a result of the issue or transfer of the security to the purchaser, or

(c)    who is a transferee or pledgee as provided in section 85; ("acheteur de bonne foi")

**36**    Section 63(2) reads as follows:

A security is valid in the hands of a purchaser for value without notice of any defect going to its validity.

**37**    There is no issue that Bank Leu was a purchaser for value. It was a pledgee of a security for value. The issues are whether Bank Leu acted in good faith and whether the Regulation S restriction on the share certificate was notice of an "adverse claim" to Bank Leu. An adverse claim is defined in s. 53(1) as including, "... a claim that a transfer is or would be unauthorized or wrongful or that a particular adverse person is the owner of or has an interest in the security." GLC submits that Bank Leu was wilfully blind to the fact that Bensberg was not the authorized owner of the shares represented by Share Certificate 12093 because of the circumstances surrounding his application for the loan. The trial judge rejected this submission.

**38**    The test to determine whether a holder of a share certificate is a good faith purchaser as expressed by the trial judge and approved by this court in Assad v. The Economical Mutual Insurance Group et al. (2002), 59 O.R. (3d) 641 (C.A.) at para. 19 is as follows:

> [19] Suspicions combined with blindness adds up to an absence of good faith. In Bank Leu Ag v. Gaming Lottery Corp., [2001] O.J. No. 4715 (S.C.J.), Lederman J. relied on the House of Lords in arriving at this conclusion. At para. 75 et seq. he states:

>> The term "good faith purchaser" has been recognized in the common law for centuries. While mere negligence, commercial stupidity or unreasonableness will not be sufficient to negative good faith on the part of a plaintiff, wilful blindness amounting to dishonesty and refusal to ask obvious questions will suffice. In Jones v. Gordon (1877), 2 App. Cas. 616 (H.L.), Lord Blackburn stated at pages 628-9:

>>> But then I think that such evidence of carelessness or blindness as I have referred to may with other evidence be good evidence upon the question which, I take it, is the real one, whether he did know that there was something wrong in it. If he was (if I may use the phrase) honestly blundering and careless, and so took a bill of exchange or a bank-note when he ought not have taken it, still he would be entitled to recover. But if the facts and circumstances are such that the jury, or whoever has to try the question, came to the conclusion that he was not honestly blundering and careless, but that he *must have had a suspicion* that there was something wrong and that he refrained from asking questions, not because he was an honest blunderer or a stupid man, but because he thought in his own secret mind - I suspect there is something wrong, and if I ask questions and make further inquiry, it will no longer be my suspecting it, but my knowing it, and then I shall not be able to recover - I think that is

> dishonesty. I think, my Lords, that that is established, not only by
> good sense and reason, but by the authority of the cases themselves.

> In London Joint Stock Bank v. Simmons, [1892] A.C. 201 (H.L.) at page
> 221, Lord Herschell stated:

>> One word I would say upon the question of notice, and being put
>> upon inquiry. I should be very sorry to see the doctrine of
>> constructive notice introduced into the law of negotiable
>> instruments. But regard to the facts of which the taker of such
>> instruments had notice is most material in considering whether he
>> took in good faith. *If there be anything which, excites the suspicion
>> that there is something wrong in the transaction, the taker of the
>> instrument is not acting in good faith if he shuts his eyes to the facts
>> presented to him and puts the suspicions aside without further
>> inquiry* [emphasis added].

> GLC acknowledges that mere negligence in the conduct of the transaction
> concerned on the part of the purchaser of the instrument will not deprive
> such purchaser of good faith status. But if there is anything which
> excites the suspicion that there is something wrong (and it is not necessary to have
> notice of what the particular wrong may be) in the transaction, the taker of
> the instrument is not acting in good faith if the taker shuts his or her eyes
> to the facts presented and puts the suspicions aside without further enquiry.

**39**   GLC acknowledges that the trial judge stated the test for a good faith purchaser correctly but submits that he applied it incorrectly. GLC submits that the trial judge made findings of fact that are consistent only with a conclusion that Bank Leu was wilfully blind to suspicions it had about the loan to Bensberg and that Bank Leu was not a good faith purchaser of Share Certificate 12093. In particular, GLC relies on the findings of the trial judge in relation to Peter Keller. Keller was responsible for the department dealing with loans made by Bank Leu's domestic branch network, secured and unsecured lending to private individuals as well as the real estate lending activities of the Bank. At the time of trial, Keller had over 22 years of banking experience, almost all of which was in credit. Keller supported the loan to Bensberg. The specific "findings" on which GLC relies in paragraph 85 of its factum are as follows:

> (1)   Notwithstanding clear warning signals and expressions of concern by people
> within Bank Leu itself, Keller rejected Fischer's opinion that the motives of the
> Bensberg transaction were unclear and that the information on Bensberg was

(2)  inadequate, and advanced a further $1.8 million USD by way of overdraft on the same day that he received Fischer's memo to that effect.

(2)  Keller ignored inconsistencies and contradictory information about Bensberg that had been received by Bank Leu.

(3)  Keller "pushed" for the $5 million credit to Bensberg against the concerns of other Bank Leu representatives, in contravention of Swiss banking law, in contravention of internal Bank guidelines and in contravention of his own "10% rule". In so doing, Keller was, as the learned trial judge found, blinded by the fact that Bensberg offered the possibility of being a very large customer for Bank Leu.

(4)  Fischer posed the correct questions, but Keller did not wait for answers before granting loan advances.

(5)  Keller closed his eyes, as the learned trial judge found, to many warning signals about the credit worthiness of Bensberg, and the value and liquidity of the stock portfolio.

(6)  Keller caused a further advance of $515,000.00 USD after he actually knew of the restrictions on transferability of all the share certificates pledged by Bensberg, including 12093.

**40**    Contrary to GLC's assertion, the first three items on this list are found in paragraph 80 of the trial judge's reasons as some of the indicia on which GLC relied in support of its submission that the evidence established Bank Leu had ample bases for suspicion about Bensberg and the transaction but made no further inquiry. In a similar vein, the trial judge stated at paragraph 81 of his reasons that, "Fischer was posing the correct questions but Keller did not wait for the answers before granting the loan advances. In these circumstances, counsel for GLC argues that Keller suspected something was wrong and yet actively refrained from inquiry, although he had the means of knowledge." Again, at paragraph 85 of his reasons the trial judge stated, "There were many warning signs about the creditworthiness of Bensberg, the value and liquidity of the stock portfolio. The closing of one's eyes to these signs and the failure to adhere to the bank's own internal guidelines might amount to negligence or even gross negligence or recklessness or perhaps even a breach of Swiss banking laws in not seeing that Bensberg was a significant credit risk." After carefully considering GLC's submission that Bank Leu had reason to suspect that the share certificate was invalid or that Bensberg was a dishonest person, the trial judge ultimately rejected that submission. He concluded at paras. 86 and 87:

> [86] [T]here is no evidence that there was any obvious indication or suspicion that the shares were invalid or that Bensberg was a dishonest man. The evidence demonstrates that Fischer [Keller's subordinate] was concerned, but his concerns did not relate to the validity of the shares. Even Fischer's comment about Bensberg's motives being unclear is more consistent with his concern that Bensberg was a credit risk rather than any concern about possible fraud ... It makes no sense whatsoever that Keller ... deliberately shut his eyes to a fact that

> was obvious to him but he was afraid to inquire into, namely, that Bensberg was perpetrating fraud on Bank Leu by using share certificates of no value that he had obtained in various stock programs.

> [87] ... The fact that Keller or others in the bank may have had a broad suspicion that Bensberg was a credit risk, cannot be interpreted so widely as to constitute suspicion about the validity of the share certificates. In these circumstances, Bank Leu was a good faith purchaser in taking the pledge of certificate 12093.

**41**    In addition, as I have mentioned, the trial judge found that Bank Leu was not bound by the deemed admissions of Koerner in GLC's third party action against him and he refused to draw an adverse inference against Bank Leu because Koerner was not called.

**42**    In considering the appellant's submissions, I bear in mind that, as recently reiterated in Housen v. Nikolaisen (2002), 211 D.L.R. (4th) 577 (S.C.C.), appellate courts should not reverse findings of fact unless the trial judge has made a "palpable and overriding error" and that the same degree of deference should be paid to a trial judge's inferences of fact. Questions of law are subject to a standard of correctness. Questions of mixed law and fact involve the application of a legal standard to a set of facts. When the question of mixed fact and law at issue involves a finding of negligence, the standard of "palpable and overriding error" still applies unless the finding of negligence rests on an incorrect statement of the legal standard. The latter can amount to an error of law. The majority summarized the deference required when questions of mixed fact and law are involved at para. 36 as follows:

> To summarize, a finding of negligence by a trial judge involves applying a legal standard to a set of facts, and thus is a question of mixed fact and law. Matters of mixed fact and law lie along a spectrum. Where, for instance, an error with respect to a finding of negligence can be attributed to the application of an incorrect standard, a failure to consider a required element of a legal test, or a similar error in principle, such an error can be characterized as an error of law, subject to a standard of correctness ... where the issue on appeal involves the trial judge's interpretation of the evidence as a whole, it should not be overturned absent palpable and overriding error.

**43**    GLC submits that the trial judge applied the test for a good faith purchaser too narrowly. He erred in focussing on whether Bank Leu suspected a particular wrong, namely, that Share Certificate 12093 represented shares that had not been fully paid for and were invalid. GLC submits that as a result of narrowing the test, the trial judge in effect required that Bank Leu have actual knowledge of a particular wrong.

**44**    I disagree that in applying the test for a good faith purchaser the trial judge narrowed it so as to require actual knowledge of a particular wrong. Although the representation on the share

certificate that the shares were fully paid for, was rightly an important factor in the trial judge's analysis, the trial judge did not just consider the share certificate. He considered the unusual nature of the loan. He also considered whether there was any basis for suspecting that Bensberg was dishonest and found there was not. The trial judge's "findings" on which GLC relies are indicative that Bank Leu had concerns over the volatility of the security package and Bensberg's creditworthiness. The trial judge found that when Keller ignored these concerns, Keller may have been negligent. Negligence is, however, not sufficient. The trial judge specifically rejected the submission that the Bank was suspicious that a fraud was being committed. In relation to its submission that the Bank was wilfully blind, GLC has not met the onus as articulated in Housen, supra, with respect to the trial judge's characterization of the facts. I would also reject GLC's submission that the trial judge misapplied the test for a good faith purchaser.

**45**    GLC's second major submission also cuts across both the issue of whether the Bank is a good faith purchaser and the issue of whether Share Certificate 12093 is a negotiable instrument. GLC's submission is that the effect of the restriction on the certificate was that Bank Leu knew the shares could not serve as security for the loan transaction to Bensberg because the certificate was in Helix's name and any transfer to Bensberg or by him to Bank Leu was prohibited by the restriction noted on the share certificate until November 15, 1995. In order for this submission to succeed GLC must establish: 1) BMO's knowledge of the restriction on the share certificate as of November 23rd should be imputed to Bank Leu; and 2) the effect of the restriction is that the shares are incapable of being transferred at all until November 15, 1995 and are worthless as collateral. The trial judge found, at para. 87 of his reasons, that Bank Leu did not appreciate that the shares pledged to it by Bensberg had on them the Regulation S restriction "until most of the loan was advanced." While the trial judge did not expressly deal with the two components of GLC's submission he implicitly rejected the submission. In effect GLC submits that the trial judge did not properly appreciate the evidence relating to Share Certificate 12093 concerning Regulation S.

**46**    As I have indicated, BMO received Share Certificate 12093 on November 23, 1994 on behalf of Bank Leu. No issue of imputed knowledge arises in relation to the $860,000 USD Bank Leu advanced prior to November 23, 1994, because this money was advanced on the basis that the share certificates for the securities being pledged were being delivered to BMO. BMO had not yet received them and so had no knowledge of the restrictions. Thus it had no knowledge to impute to Bank Leu until after November 23, 1994.

**47**    Bank Leu submits that the knowledge of an agent, in this case BMO, should only be imputed to the principle, Bank Leu, where the circumstances warrant and the agent is involved in the transaction. BMO was acting as the custodian of the share certificates for safe keeping and was not involved in Bank Leu's decision to lend to Bensberg so Bank Leu argues that it should not have knowledge of the Regulation S restriction imputed to it.

**48**    Bank Leu relies on the decision in Rocco v. Northwestern National Insurance Co. (1929), 64 O.L.R. 559 (C.A.) at 562-63 in support of its submission. In that case Middleton J.A. first

emphasized at para. 12 that the knowledge of an agent is not knowledge by the principal unless "the circumstances are such as to justify the opinion that the agent *would be likely to communicate the information to those in charge of the affairs of the company*" [emphasis added]. Here, BMO was not only likely to communicate the information to Bank Leu, it did communicate the information both in a report dated December 7, 1994, which was received about mid-December and in the earlier custody account statement of November 30, 1994. It would appear that BMO's knowledge should be imputed to Bank Leu because BMO was expected to communicate (and did communicate the information) respecting the restriction on Share Certificate 12093 to Bank Leu.

**49**    The custody account statement was typically received a week after it was sent or around December 7, 1994, which would have been about the time Bank Leu approved the loan to Bensberg. Because the custody account statement is not considered important for credit purposes, Bank Leu submits it should not have BMO's knowledge of the Regulation S restriction imputed to it. Bank Leu relies on that portion of Middleton J.A.'s decision in Rocco, supra, in which he quotes with approval the decision of Viscount Sumner in the case of J.C. Houghton & Co. v. Northard Lowe and Wells Ltd., [1928] A.C. 1 at 18-19 to the effect that a company is not deemed to know all the information possessed by its clerks or that is on the books of the company. It is the knowledge of the directors or those who lead the actions of the company that results in knowledge being imputed to the company because it is on the strength of their knowledge that a company would proceed. The company is not affected by what it could not have been expected to know under the system of domestic management established by the company. Bank Leu's submission, however, ignores an exception to this principle that is mentioned in Houghton, supra. It appears that when a company finally does learn the information those directing the company must have taken "prompt and proper action" in order to avoid having the earlier knowledge of the agent imputed to the corporate principal. In this case, once Bank Leu became aware of the Regulation S restriction on the share certificate it did not take "prompt and proper action". Instead, it lent more money to Bensberg. Thus, the decision in Rocco, supra, does not assist Bank Leu.

**50**    To deal with GLC's argument it is therefore necessary to squarely address the effect of the Regulation S restriction on Bank Leu. For ease of reference I reproduce the wording of the restriction:

> The shares represented by this certificate have not been registered under the United States Securities Act of 1933 (The "Act"), have no voting rights and are being transferred pursuant to an exemption under regulation S. Until November 15, 1995 no shares of the stock may be offered, sold or transferred. Offers, sales or transfers in the United States or to a United States person (as defined in regulation S promulgated under the Act) or for the account and benefit of a United States person are not permitted, except as provided in said regulation S unless the shares are registered under the Act or with the prior consent of Laser Friendly Inc. pursuant to an application exemption from such registration under the Act.

**51**     The legend begins by stating that the shares represented by the certificate have not been registered under the United States Securities Act. The legend then goes on to say that they are being transferred pursuant to an exemption to the Act, Regulation S. The next sentence states that, "Until November 15, 1995, no shares of the stock may be offered sold or transferred." If this sentence is interpreted as meaning that the shares cannot be transferred at all, the sentence directly contradicts the preceding one, which states that the shares have been transferred under Regulation S. The sentence that follows makes it clear that Regulation S only applies to offers, sales or transfers in the United States or to a "United States person". Transfers to such persons or within the United States are only permitted pursuant to a regulation S exemption or with the prior consent of Laser Friendly Inc.

**52**     Imputing BMO's knowledge of the Regulation S restriction to Bank Leu is of no import since, as I read the restriction, it did not affect the right to transfer the shares outside the United States to persons who were not "United States persons". None of the transactions involving Share Certificate 12093 took place in the United States or involved "United States persons". Helix, a Canadian company, was identified as the registered owner of the shares on the face of the share certificate. Helix transferred the shares to Bensberg and there was no evidence that he was a "United States person". He in turn transferred them to Bank Leu, a Swiss ban k. The Regulation S restriction did not govern the transfer of GLC's shares in this situation.

**53**     I must also consider s. 56(3) of the OBCA, the relevant the relevant portions of which are:

> (3)     Where a share certificate issued by a corporation .... is, or becomes, subject to,
>
> (a)     a restriction on transfer ...
>
>             ...
>
> the restriction ... is ineffective against a transferee of the share who has no actual knowledge of it, unless it or a reference to it is noted conspicuously on the share certificate.

Because the Regulation S restriction is noted conspicuously on the back of the certificate and Bank Leu had actual knowledge of it through BMO, its agent, GLC submits that the restriction is effective. This submission takes the words of the subsection out of context. Sections 56(1) and (2) must also be considered. They state:

> 56(1) A corporation shall state upon the face of each share certificate issued by it,
>
> (a)     the name of the corporation and the words "Incorporated under the law of the Province of Ontario" or words of like effect:

    (b)    the name of the person to whom it was issued; and

    (c)    the number and class of shares and the designation of any series that the certificate represents

(2)    Where a corporation is authorized to issue shares of more than one class or series, the corporation shall legibly state on each share certificate issued by it,

    (b)    the rights, privileges, restrictions and conditions attached to the shares of each class and series that exists when the share certificate is issued; or

    (c)    that the class or series of shares that it represents has rights, privileges or restrictions or conditions attached thereto, and that the corporation will furnish to a shareholder, on demand and without charge, a full copy of the text of,

    (ii)    the rights, privileges, restrictions and condition attached to that share and to each class authorized to be issued and to each series in so far as the same have been fixed by the directors; and

    (iii)    the authority of the directors to fix the rights, privileges, restrictions and conditions of subsequent series, if applicable.

**54**    The effect of sections 56(1) and (2) is that a corporation authorized to issue more than one class or series of shares must indicate the class or series of shares on the front of the certificate and state the restrictions attaching to that class or series on the certificate or state that a copy of the restrictions on the class or series is available upon request. Considered in the context of the previous subsections, the restrictions referred to in s. 56(3) are the restrictions referred to in s. 56(1) and (2), namely restrictions arising because a corporation is authorized to issue shares of more than one class or series, not a restriction arising by operation of U.S. law.

**55**    This interpretation of s. 56(3) is reinforced by s. 63 of the OBCA, the relevant portion of which provides that, "a security is valid in the hands of a purchaser for value (including by way of pledge) without notice of any defect going to its validity." The defect going to the validity of the shares represented by Share Certificate 12093 was the fact they had not been paid for, a defect of which Bank Leu had no notice. The Regulation S restriction did not purport to affect the validity of the shares.

**56**    Even where there is a restriction on the transfer of shares of a company and the shares are transferred without complying with that restriction, the transfer can be effective as between the transferor and the transferee. See Re M.C. United Masonry Ltd. (1983), 40 O.R. (2d) 330 (C.A.) citing Harrold v. Plenty, [1901] 2 Ch. D. 314; Hawks v. McArthur et al., [1951] 1 All E.R. 22. The principle in Hawks, supra, was recently endorsed by the English Court of Appeal in Pennington v.

Waine, [2002] E.W.J. No. 892 at para. 51 (C.A.). In that case, the court held that a transfer of the beneficial or equitable interest in shares in breach of company articles was nonetheless effective. The fact that the transferee had to do a further act in the form of applying for and obtaining registration in order to perfect legal title did not prevent the transfer from operating. In Pennington, supra, nothing in the articles stated that a transfer in violation of the restrictions made the transfer void. Here, nothing in the Legend S restriction on the back of the share certificate states that a transfer in violation of the restriction makes the transfer void as between the transferor and transferee.

**57**    I would reject GLC's submission that the effect of the restriction on the certificate was that the shares could not serve as security for the loan transaction to Bensberg because the certificate was in Helix's name and any transfer to Bensberg or by him to Bank Leu was prohibited by the restriction noted on the share certificate until November 15, 1995.

**58**    GLC further submits that BMO placed a value on the shares of zero in its end of November custody account statement to Bank Leu because of the Regulation S restriction and, imputing that knowledge to Bank Leu, this is evidence Bank Leu knew the shares were worthless as collateral with the result it was not a good faith purchaser. On the custody account statement there is provision for the share price, the exchange rate as at the end of the month if the price is shown in USD and a valuation in Canadian dollars. Both the share price and value for the 2.2 million shares of Laser Friendly (GLC) represented by Share Certificate 12093 are shown as zero. The uncontradicted evidence of Mr. Barnes, on behalf of BMO, was that the share price number and the valuation number had nothing to do with the market value of the shares. It had to do with the fact that he could not pull up the price feed due to the fact "an in-house CUSIP number" had been assigned to the shares. Thus, the appellant's submission that Bank Leu knew the shares were worthless because BMO affixed a zero value to the shares on account of the Regulation S restriction must fail. I would also reject GLC's submission that the shares were worth nothing as collateral.

**59**    There is no basis for interfering with the trial judge's conclusion that Bank Leu was a good faith purchaser by way of pledge of certificate 12093. I turn now to the issue of whether the trial judge correctly held that GLC was estopped from asserting a defence against Bank Leu by common law estoppel.

2.    Did Bank Leu acquire beneficial title to the shares by common law estoppel?

**60**    There is no issue that a good faith purchaser for value of a share certificate may acquire good title to it even from someone with no title if the issuer has acted in such a way so as to have made a representation which gives rise to an estoppel. The essential elements of such an estoppel are: a) a representation by one party to be acted upon by another party; b) action by the other party on the faith of the representation; and c) resulting detriment to the other party. See Colonial Bank v. Cay and Williams, (1890), 15 A.C. 267 (H.L.) at 286; Bloomenthal v. Ford, [1897] A.C. 156 at 166-167 (H.L.); Burkinshaw v. Nicholls (1978), 3 A.C. 1004 at 1026-1027 (H.L.).

**61**    The share certificate represented that the shares were fully-paid. GLC submits that the only representation GLC could be said to have made to Bank Leu was Share Certificate 12093 taken as a whole. GLC submits that the share certificate represented Helix as the registered owner of the shares and it was clear that Helix did not have the right to dispose of the shares because of the Regulation S restriction noted on Share Certificate 12093. For the reasons given above, I have already rejected the submission that the Regulation S restriction prevented the shares from being transferred at all. I would reject GLC's argument that it made no misrepresentation or that any representation was immaterial because it was clear the shares could not be transferred on account of the Regulation S restriction.

**62**    GLC also submits that the second element of estoppel, reliance by Bank Leu on Certificate 12093 in advancing the funds to Bensberg, is not present. In support of its position GLC makes the following points: 1) BMO did not receive Share Certificate 12093 until November 23, 1994, by which time it had already advanced $620,000 USD to Bensberg. 2) When BMO received the certificate it noted the restrictions on it and ascribed a zero valuation to the shares. 3) By the time Bank Leu had Certificate 12093 in its physical possession it did not review the contents of the certificate until December 15, 1994, by which time it had advanced $3.3 million U.S. to Bensberg. Bank Leu advanced further funds with notice of the restriction. 4) The trial judge was not entitled to consider the conduct of GLC in his analysis of the estoppel issue and could only look to the wording of the Certificate itself because Bank Leu was not aware of any of GLC's acts when it advanced funds to Bensberg.

**63**    I will deal with GLC's submissions in order as follows: 1) In considering whether estoppel should apply, the trial judge was entitled to go beyond the share certificate and to consider that but for GLC's conduct Bensberg could not have made the representation he did: see Colonial Bank v. Cady and William, supra, at 285 and McLeod v. Brazilian Traction and Light and Power Co. (1927), 60 O.L.R. 253 at 261-263 (Ont. S.C.) See also Sylvan Lake Golf and Tennis Club v. Performance Industries (2001), 209 D.L.R. (4th) 318 at 340 (S.C.C.). This applies to the first advance of $860,000, U.S. as well as the other advances. 2) As I have held, the evidence indicates that the zero valuation ascribed to the certificate by BMO has nothing to do with its value as a security; 3) Although Bank Leu had advanced 3.3 million U.S. by the time it had certificate 12093 in its physical custody BMO's possession of the certificate and knowledge of its contents as agent can be imputed to Bank Leu. Thus, Bank Leu relied on the certificate from and after November 23, 1994; 4) GLC created and delivered the share certificates and deliberately placed them in the international stream of commerce knowing, or not caring, that they were likely to be used in a fraud. The Regulation S restriction does not assist GLC in this regard.

**64**    The trial judge did not err in holding that Bank Leu acquired beneficial title to the shares by common law estoppel.

3.    Was Share Certificate 12093 a Negotiable Instrument?

**65**    Certificate 12093 was in "street form", that is the share certificate in the name of Helix had attached to it an irrevocable signed stock power so that it could be freely transferred. GLC submits, however, that the Regulation S restriction noted on the shares means that it is not a negotiable instrument.

**66**    The trial judge did not definitively decide whether the shares were a negotiable instrument or not because he found in favour of Bank Leu on the basis of common law estoppel. The trial judge did, however, say in his reasons at paragraph 65:

>    Drawing on the close analogy to the negotiability of bills of exchange, there may be support for the proposition that any restriction on transfer noted conspicuously on the certificate will render it non-negotiable. Professor Benjamin Geva, in Negotiable Instruments and Banking, Vol II. (Toronto, Edmond Montgomery, 1995) at p. 38 states that a bill, cheque or note must be unconditional at its inception and subsequent fulfilment of the condition does not make it unconditional. That being so, it could be said that because of the restrictions, certificate 12093 was not a negotiable instrument and even after November 15, 1995 certificate 12093 did not become a negotiable instrument.

**67**    I would disagree with the trial judge's interpretation that the time restriction on transferring the shares was a condition. A negotiable instrument is an unconditional promise to pay on demand or at a particular time: see B.A. Garner, ed., Black's Law Dictionary, 7th ed. (St. Paul, Minn.: West Group, 1999). In the worse case scenario, that particular time was after November 15, 1995.

**68**    More importantly, subsection 53(3) of the OBCA states:

>    Except where its transfer is restricted and noted on a security in accordance with subsection 56(3), a security is a negotiable instrument.

**69**    I have already held that the regulation S restriction was not a restriction "in accordance with subsection 56(3)" in paragraphs 50-55 of these reasons.

>    4.    Did the trial judge err in holding that the oppression remedy was available to Bank Leu?

**70**    The oppression remedy is contained in s. 248 of the OBCA. It states:

>    248.(1) A complainant and, in the case of an offering corporation, the Commission may apply to the court for an order under this section.

>    (2) Where, upon an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates,

(a)    any act or omission of the corporation or any of its affiliates effects or threatens to effect a result;

(b)    the business or affairs of the corporation or any of its affiliates are, have been or are threatened to be carried on or conducted in a manner; or

(c)    the powers of the directors of the corporation or any of its affiliates are, have been or are threatened to be exercised in a manner,

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer of the corporation, the court may make an order to rectify the matters complained of.

(3) In connection with an application under this section, the court may make any interim of final order it thinks fit including, without limiting the generality of the foregoing,

(a)    an order restraining the conduct complained of;

(b)    an order appointing a receiver or receiver-manager;

(c)    an order to regulate a corporation's affairs by amending the articles or by-laws or creating or amending a unanimous shareholder agreement;

(d)    an order directing an issue or exchange of securities;

(e)    an order appointing directors in place of or in addition to all or any of the directors then in office;

(f)    an order directing a corporation, subject to subsection (6), or any other person, to purchase securities of a security holder;

(g)    an order directing a corporation, subject to subsection (6), or any other person, to pay to a security holder any part of the money paid by the security holder for securities;

(h)    an order varying or setting aside a transaction or contract to which a corporation is a party and compensating the corporation or any other party to the transaction or contract;

(i)    an order requiring a corporation, within a time specified by the court, to produce to the court or an interested person financial statements in the form required by section 154 or an accounting in such other form as the court may determine;

(j)    an order compensating an aggrieved person;

(k)    an order directing rectification of the registers or other records of a corporation under section 250;

(l)    an order winding up the corporation under section 207;

(m)    an order directing an investigation under Part XIII be made; and

(n)    an order requiring the trial of any issue.

(4) Where an order made under this section directs amendment of the articles or by-laws of a corporation,

(a)    the directors shall forthwith comply with subsection 186(4); and

(b)    no other amendment to the articles or by-laws shall be made without the consent of the court, until the court otherwise orders.

(5) A shareholder is not entitled to dissent under section 185 if an amendment to the articles is effected under this section.

(6) A corporation shall not make a payment to a shareholder under clause (3)(f) or (g) if there are reasonable grounds for believing that,

(a)    the corporation is or, after the payment, would be unable to pay its liabilities as they become due; or

(b)    the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities.

**71**    The oppression remedy is designed to afford a remedy when a corporation acts in an oppressive, unfair or prejudicial manner towards a minority shareholder or creditor or in a manner that unfairly disregards their interests. Important underpinnings of the oppression remedy are the expectations, intentions and understandings of the minority shareholder and creditor. Against these are to be balanced the extent to which the acts complained of were unforeseeable or the extent to which the creditor and minority shareholder could reasonably have protected itself from the acts about which complaint is now made: Sidaplex-Plastic Supplier Inc., v. Elta Group Inc. (1995), 131 D.L.R. (4th) 399 (Ont. Gen. Div.) aff'd (1998), 162 D.L.R. (4th) 367 (Ont. C.A.).

**72**    The expectations of the creditor or minority shareholder are determined on an objective basis. At a minimum the expectations of Bank Leu would include the expectation that a corporation would comply with the fundamental principles of corporate law in issuing shares and share certificates.

**73**    GLC submits that in granting Bank Leu's request for relief, the trial judge failed to take into

consideration Bank Leu's flawed behaviour in the transaction, which he characterized as "approaching recklessness" and in violation of Swiss Banking Law. GLC submits that the direct cause of Bank Leu's situation was its own conduct and that the trial judge granted Bank Leu an inappropriate remedy.

**74**    Section 248(3) empowers a court upon a finding of oppression to make "any order it thinks fit." As held by this court in Naneff v. Con-Crete Holdings Ltd. (1995), 23 O.R. (3d) 481 at 486-487 (C.A.), and as stated in Sidaplex-Plastic Suppliers, supra, at para. 4: "This gives the court at first instance a broad discretion and the appellate court a limited power of review. The appellate court is entitled to interfere only where it is established that the court at first instance has erred in principle or its decision is otherwise unjust."

**75**    The trial judge found that GLC prevented Bank Leu from exercising its rights as a shareholder on the grounds that the shares had not been paid for. GLC created this situation by issuing Share Certificate 12093 which stated that the shares were fully paid for without requiring payment and allowing the certificate into the stream of international commerce. If the shares had been paid for it would not have mattered that the shares were restricted because at the very latest the Bank could have sold them as of November 15, 1995. Moreover, as I have held, the restriction did not prevent the shares from being transferred in these circumstances.

**76**    GLC has not demonstrated any error in principle on the part of the trial judge. He considered all the relevant circumstances. His decision was not unjust.

    B.    The Third Party Claim

        1.    Was North Shore Vicariously liable for the fraudulent acts of its employee Anderson?

**77**    In determining whether an employer is vicariously liable for an employee's intentional tort, the analysis proceeds in two steps. The first step is to determine if existing authorities are decisive. If so, the analysis stops there. If not, the Court then proceeds to determine whether vicarious liability should be imposed in light of a broader based policy analysis based on whether the employer's enterprise created or significantly enhanced the risk of the harm that occurred: see Bazley v. Curry (1999), 174 D.L.R. (4th) 45 at paras. 22, 41 (S.C.C.); Jacobi v. Griffiths (1999), 174 D.L.R. (4th) 71 (S.C.C.) at paras. 67, 79. There must be a strong connection between the employer's enterprise and the risk of the harm that occurred, sufficient to justify imposing employer liability (Bazley, supra, at para. 42; Jacobi, supra, at para. 29).

**78**    GLC submits that North Shore is vicariously liable for Anderson's alleged dishonest conversion of Laser Friendly (GLC's) Share Certificate 12093, in breach of an escrow agreement, in furtherance of a fraudulent conspiracy. The trial judge found that any misconduct on the part of Anderson arose in the course of his private dealings in his personal capacity for which North Shore

cannot be vicariously liable. GLC submits that that distinction was not properly determinative of the issue of vicarious liability.

**79**    Traditionally, an employer is liable for employees' unauthorized acts only if they are so connected with authorized acts that they might be regarded as modes, although improper modes, of doing them. The employer is not responsible if the wrongful act of an employee is not so connected with that authorized by or within the scope of employment as to be a mode of carrying out the employment. If the act can be viewed as an independent act of the employee, the employer will not be responsible: C.P.R. v. Lockhart, [1942] 3 W.W.R. 149 (P.C.) at 157.

**80**    Where the plaintiff deals with the employee in a personal capacity or enters into contracts with the employee in a personal capacity the employer is not vicariously liable: Bagoo v. Tasker, [1993] O.J. No. 1734 (Gen. Div.) at paras. 41-43; Cambell v. Sherman, [1993] O.J. No. 2815 (Gen. Div.) at paras. 168, 170; Bourgeault v. McDermid (1982), 140 D.L.R. (3d) 174 (B.C.S.C.) at 176, 177; Rowe v. Investors Syndicate Ltd., [1984] O.J. No. 346 (H.C.J.) at paras. 150-162.

**81**    I am not persuaded that the trial judge erred in holding that any misconduct of Anderson in wrongfully releasing the shares from escrow was carried out in his personal capacity and that North Shore was therefore not liable for his acts. The trial judge's findings of fact, which are not attacked and which are amply supported by the evidence are as follows:

> [121] It is plain from the very face of the escrow agreement that the contracting parties were Helix, Red Oak and Anderson, in his personal capacity. No one reading the escrow agreement would know that North Shore is involved in any way.

> [122] The business decision to select Anderson and use him as escrow agent was Ericksteen's and Ericksteen dealt with Anderson solely in his personal capacity. Moore, the lawyer for Helix and Ericksteen, confirmed in his evidence that North Shore was not a party to the escrow agreement and that at all times the intention was to deal with Anderson solely in his personal capacity. Moore was responsible to draft legal documentation for Ericksteen and his companies and in that regard he was familiar with the basic legal concepts of separate legal identity of corporations. He was likewise familiar with the need for companies to act through authorized signing officers. Moore was himself an authorized signatory for Helix and signed as such when intending to bind the company. It was Moore who drafted the escrow agreement and was fully aware that the agreement was to be with Anderson in his personal capacity. Moore's communications with Anderson were to him directly without any mention of North Shore, he made demand under the escrow agreement directly on Anderson for the return of certificate 12093. Moore never put anyone at North Shore on notice of this

demand.

[123] In these circumstances, where a party deals with an employee in a personal capacity or enters into contracts with the employee in a personal capacity, the employer cannot be vicariously liable: (see Bagoo v. Tasker, [1993] O.J. No. 1734 (Gen. Div.); Campbell v. Sherman, [1993] O.J. No. 2815 at paras. 168, 170 (Gen. Div.)). Any misconduct by Anderson arose in the course of his private dealings and not as the authorized representative of North Shore.

**82**    In addition, I note that the evidence indicates that North Shore never acted as an escrow agent for shares or securities. This was not a service that North Shore offered its members and Anderson was not authorized to act as an escrow agent on behalf of North Shore. North Shore never held out that he was so authorized.

**83**    In the event this analysis is not determinative, however, I would hold that there should be no vicarious liability under the second stage of the analysis set out in Bazley, supra, and Jacobi, supra.

**84**    The questions a court must ask itself in assessing the evidence at this stage and North Shore's position, which I would adopt, are ably set out in its factum at para. 38 as follows:

> *    What opportunity did North Shore's enterprise offer the employee to abuse his power or position? None. Helix and Red Oak were obviously prepared to deal with Anderson in a personal capacity.
> *    To what extent did Anderson's alleged wrongful act further North Shore's aims? Not at all. This is in contrast to the dreams of financial gain that motivated all other parties involved in the Gaming/Helix/Red Oak/Bank Leu transactions.
> *    To what extent was Anderson's alleged wrongful act related to friction, confrontation or intimacy inherent in the employer's enterprise? Not at all.
> *    What extent of power did North Shore confer on Anderson in relation to the victim? None. Unlike, for example, a credit union member whose assets the credit union entrusts to its employees, North Shore conferred no power on Anderson in relation to Gaming (or Helix or Bank Leu, or any other person involved for that matter).
> *    How vulnerable are potential victims? Not at all. Gaming was a public company, for which one should expect ready access to expert advisors, and high standards of management skill and integrity. Gaming in fact consulted skilled legal advisers, whose advice it consistently ignored. It is hard to imagine a less vulnerable class of "victim".

**85**    I would hold that the trial judge did not err in holding that North Shore is not liable for the conduct of Anderson.

III.    Disposition and Costs

**86**    For the reasons given, I would dismiss the appeal in the main action and in the third party action.

**87**    At the conclusion of the hearing this Court reserved its decision and asked that the parties file submissions with respect to costs. Those submissions have now been received and, while submissions were made that costs of the appeal on a substantial indemnity basis were appropriate, I would award costs on a partial indemnity basis. On a partial indemnity basis Bank Leu seeks $38,945.86 and North Shore seeks $29,003.69 inclusive of disbursements and G.S.T. GLC does not challenge the quantum of costs sought by Bank Leu and North Shore on a partial indemnity basis. Accordingly, I would order that GLC pay the costs of this appeal and fix costs in favour of Bank Leu at $38,945.86 all inclusive and those of North Shore at $29,003.69 all inclusive.

WEILER J.A.
 CHARRON J.A. -- I agree.
 ROSENBERG J.A. -- I agree.

1 During this period, GLC was also involved in two further Stock Roll transactions with the Third Party Defendants Farrell and Ferracone. The parties to the subscription arrangements in those transactions was an entity called "Delta West". It was the use of share certificates issued in the first Delta West transaction that led to the SEC investigations.

*Case Name:*

# BANK OF MONTREAL v. GLENDALE (ATLANTIC) LIMITED

[1977] N.S.J. No. 477

76 D.L.R. (3d) 303

20 N.S.R. (2d) 216

1 B.L.R. 279

27 A.P.R. 216*

[1977] 1 A.C.W.S. 819

Nova Scotia Supreme Court Appeal Division

**Coffin, Cooper and Macdonald, JJ.A.**

May 10, 1977

(44 pages) (133 paras.)

## CASES JUDICIALLY NOTICED:

Saint John Tug Boat Co. Ltd. v. Irving Refining Ltd., [1964] S.C.R. 614 (S.C.C.), appld. [para. 86].
Central London Property Trust, Ld. v. High Trees House, Ld., [1947] 1 K.B. 130, dist. [para. 92].
John Burrows Ltd. v. Subsurface Surveys Ltd. et al. (1968), 68 D.L.R. (2d) 354, appld. [para. 93].
Combe v. Combe, [1951] 2 K.B. 215, appld. [para. 95].
Gordon MacKay & Co., Ltd. v. Capital Trust Corp., Ltd., [1927] 2 D.L.R. 1150 (S.C.C.), appld. [para. 97].
Tailby v. Official Receiver (1880), 13 App. Cas. 523, refd to. [para. 97].
J.R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd., et al., [1968] 2 O.R. 532; 70 D.L.R. (2d) 26 (O.H.C.), appld. [para. 98].
Evans v. Rival Granite Quarries, Ltd., [1910] 2 K.B. 979, appld. [para. 98].
United Electric Co. Ltd. v. Watson, [1927] 1 W.W.R. 87, dist. [para. 99].
Illingworth v. Houldsworth, [1904] A.C. 355, appld. [para. 111].
[*page219]
Mosher v. O'Brien (1905), 37 N.S.R. 286, consd. [para. 126].

The Blackwoods Limited v. Caradian Northern Railway Company (1910), 44 S.C.R. 92, refd to. [para. 43].

Razansoff v. Brounstein Bros., [1924] 2 D.L.R. 1170, refd to. [para. 50].

Ross v. Benjaminson Construction Co., [1927] 2 D.L.R. 830, refd to. [para. 51].

Piggott v. Stratton (1859), 1 De G.F. & J. 33; 45 E.R. 271, refd to. [para. 52].

Hamilton Gear & Machine Co. v. Lewis Bros. Ltd., [1924] 3 D.L.R. 367, refd to. [para. 54].

Evenden v. Guildford City Association Football Club Ltd., [1975] 3 All E.R. 269, refd to. [para. 61].

Moorgate Mercantile Co. Ltd. v. Twitchings, [1975] 3 All E.R. 314, refd to. [para. 64].

**STATUTES JUDICIALLY NOTICED:**

Bills of Sale Act, R.S.N.S. 1900, c. 142, s. 3(1),(5) [para. 125].

Conditional Sales Act, R.S.N.S. 1967, c. 48, s. 2(1) [para. 100, 121]; s. 3 [para. 96, 120].

**AUTHORS AND WORKS JUDICIALLY NOTICED:**

Barron and O'Brien, Chattel Mortgages and Bills of Sale (2nd Ed. 1914), p. 362 [para. 127].

Cheshire and Fifoot, The Law of Contract (6th Ed.), p. 212 [para. 65]; (8th Ed.), p. 85 [para. 90].

Fisher and Lightwood, The Law of Mortgage (8th Ed.), pp. 110, 111 [para. 112].

Palmer, Company Law (21st Ed.), pp. 396-7 [para. 114].

Spencer, Bower and Turner, Estoppel by Representation (2nd Ed.), pp. 5 [para. 90]; 6 [para. 92]; 77 [para. 90].

Waldock, C.H.M., The Law of Mortgages (2nd Ed.), pp. 162 [para. 116]; 164-5 [para. 115].

Ziegel, Jacob S., Uniformity of Legislation in Canada - the conditional sales experience, 39 C.B.R. 1 [para. 124].

**COUNSEL:**

ROBERT G. BELLIVEAU, for the appellant

ROBERT G. MacKEIGAN, for the respondent

---

This case was heard on February 10, 1977, at Halifax, Nova Scotia, before COFFIN, COOPER and MACDONALD, JJ.A., of the Nova Scotia Supreme Court, Appeal Division.

On May 10, 1977, the judgment of the Appeal Division was delivered and the following opinions were filed: [*page220]

COFFIN, J.A., dissenting - See paragraphs 1 to 69,

COOPER, J.A. - See paragraphs 70 to 103,

MACDONALD, J.A. - See paragraphs 104 to 133.

**1**    COFFIN, J.A. (dissenting):-- This is an appeal from the decision of Morrison, J., in which he held that the respondents, W.J.B. Gentleman, Receiver and Manager of Nova Mobile Homes Limited and the Bank of Montreal, were entitled under the terms of a floating charge to recover two mobile homes which had been repossessed by the appellant, the vendor of the units. The repossession was accomplished pursuant to a clause in the invoice under which they were sold to Nova Mobile Homes Limited.

**2**    The clause was worded as follows:

"Title to the above-described merchandise remains vested with the Seller until payment has been received by the Seller in collected funds, in accordance with the terms and conditions as stated on the reverse side of this form."

**3**    On the reverse side of the form of invoice were "terms and conditions of sale" under which title to the two mobile homes was to remain vested in the appellant until payment of the entire purchase price.

**4**    The floating charge appears in a debenture dated December 28, 1972, executed by Nova Mobile Homes Limited in favour of the Bank of Montreal, clause 5 of which is as follows:-

"CHARGING PROVISIONS

5.    As security for the principal sum and interest and all other moneys from time to time payable hereunder and the performance of the obligations of Nova herein contained, Nova hereby grants, bargains, sells, releases, conveys, mortgages and assigns and charges unto the Bank:

(a)    As and by way of a first floating charge, the undertaking and goodwill of Nova and all of its personal assets for the time being, both present and future of whatsoever nature and kind and wheresoever situate, including but not to restrict the generality of the foregoing, all the present and future rents, revenues, incomes and sources of [*page221] money, mortgages, franchises, contracts, negotiable or non-negotiable, stocks, shares, bonds, securities and accounts receivable, mobile homes and trailers, saving and excepting any real property now owned or hereafter acquired by Nova provided that the floating charge hereby created shall not in any way hinder or prevent Nova until the security hereby constituted shall have become enforceable and the Bank shall have determined to enforce the same from giving security to its bankers under The Bank Act of such floating charge in the ordinary course of its business and for the purpose of carrying on the same."

**5**    The relevant facts are set out in the decision of the trial judge.

**6**    The appellant, who manufactured mobile homes in Sussex, New Brunswick had supplied units to Nova Mobile Homes Limited who sold them both in Nova Scotia and New Brunswick. I believe in actual fact the New Brunswick units were delivered to a company called Nova Mobile Homes Saint John, Limited and those for Nova Scotia to Nova Mobile Homes Limited, but nothing really turns on that fact.

**7**    The units in question are identified by serial numbers 6468 and 5889. The first was sold to Nova Mobile Homes Limited on or about June 28, 1974, for $ 11,050.00 and the second, on July 3, 1974 for $ 10,400.00. They were repossessed by the appellant's agent on September 17, 1974. The relevant invoices both contained the clauses which I have mentioned.

**8**    The decision went by way of declaration because a recovery order had been granted to the respondent Gentleman, the units sold and a bond deposited by the respondents with the Court.

**9**    The Bank of Montreal began its dealings with Nova Mobile Homes Limited in 1968. There was evidence that in that year a group including Mr. John A. DeWinters made representations to the bank on behalf of that company, as a result of which it received a line of credit from the bank up to $ 35,000.00. The security for this credit consisted of personal guarantees of Mr. DeWinters and two other shareholders of the company - William Bustin and Simon Sneekes, along with a term deposit receipt for $ 21,000.00. The bank knew at the [*page222] time that the appellant was the source of supply for Mobile.

**10**    Mr. Goldsmith, the manager of the Bank at Haymarket Square Branch, Saint John, New Brunswick said that Mr. John DeWinters told him in 1969 that Glendale had no lien interest and that "the mobile homes were sold without them taking any security". Mr. Goldsmith understood that Mr. DeWinters was Vice President of the appellant Company.

**11**    The trial judge commented on this evidence:-

"There is no dispute in the evidence as to the situation which prevailed at the time, that is, that apparently the defendant company was selling their mobile homes to Nova Mobile Homes Limited without any security or lien on these homes. In the circumstances I accept Mr. Goldsmith's evidence as being accurate. I believe him when he testified that he had contacted Mr. DeWinters and had received an assurance that Glendale (Atlantic) Limited had no lien interest in the mobile homes being sold to Nova Mobile Homes Limited."

**12**    Mr. Goldsmith said that in 1969 there was a floating charge debenture, securing credit of $ 75,000 and it was at that time he had the conversation with Mr. John DeWinters. He made his inquiries from Mr. DeWinters because of a memorandum which he had received from the credit manager on December 1, 1969.

**13**    He acknowledged on cross-examination that his memory of the conversation with Mr. DeWinters was based on his reply to the questionnaire he had received and that when he had the conversation, the bank had already obtained a debenture.

**14**    In discussing the security, Mr. Goldsmith's evidence was that one of the terms on which the bank operating credit was granted was that Nova Mobile Homes Limited was to maintain units on their lots which were covered by the debenture and that the total value of these was to be twenty-five per cent in excess of the bank's loans at all times.

**15**    The trial judge said that until 1973, "it is quite clear that the defendant company claimed no proprietary interest in the homes that they sold to Nova Mobile Homes Limited".

**16**    It was in November, 1973, that the appellant's invoice [*page223] forms were changed to include the terms and conditions as to title which I have mentioned.

**17**    On the matter of checking, Anthony A. Goldsmith said on cross-examination that Nova supplied the bank with a list of the units on the respective lots each month and then the bank verified the actual units against the list provided.

**18**    The trial judge was satisfied that "there was a valid conditional sales contract in existence between the defendant company and Nova Mobile Homes Limited" and that there was default in payment thereunder for the two mobile homes in question.

**19**    He then reached three very important conclusions:

1.    The bank became a creditor before each conditional sales contract was entered into between Glendale and Nova and did not become a creditor at a time subsequent to the completion of the transaction. It was not a creditor within the meaning of s. 2 or s. 3 of the Conditional Sales Act, c. 48, R.S.N.S. 1967.

2.    The debenture holder was not a subsequent mortgagee within the meaning of either of the sections.

3.    After referring to the activities of Mr. John DeWinters in 1969 and the evidence of Mr. Goldsmith, the trial judge expressed himself as being satisfied that Mr. Goldsmith had talked with Mr. DeWinters and that Mr. DeWinters was speaking at that time on behalf of the appellant company and that Mr. Goldsmith was advised by Mr. DeWinters that the appellant "maintained no lien of any kind" over the homes sold to Nova Mobile Homes Limited". He also referred to the memorandum, Exhibit 2, of December 15, 1969, which Mr. Goldsmith sent to his superior in Halifax, and went on to say that it was clear from the evidence that the bank placed great reliance on the assertion of Mr. DeWinters that the appellant had no lien interest over the homes in question. He also remarked on the fact that the bank each month conducted a check of the inventory to ensure that there was sufficient security on the lots to cover the amount of the debenture.

**20**    The trial judge was impressed with the fact that the appellant illustrated its interest in Nova in September, 1974, when its representatives approached the bank with the [*page224] idea that they would allow a certain number of homes on the lot in order to gain further financing from the bank. He felt that the appellant was deeply involved in Nova and was familiar with its operation as Nova was one of its largest customers.

**21**    After reviewing these facts and concluding that the appellant had a special knowledge of the affairs of Nova and must have been aware of the assurance given to the bank, the trial judge stated that in his opinion:

"... the conduct of the defendant company when it failed to notify the Bank of Montreal that it was changing the terms and conditions of its sales amounts to conduct constituting misrepresentation."

**22**    He expressed the view that the respondents were using the estoppel theory as "a shield and not as a sword", and from all these things, he concluded that the appellant should be estopped from setting up the conditional sales contracts as against the respondents.

**23**    The respondent's notice of contention raised two additional grounds on which in the respondent's submission the judgment of the learned trial judge should be upheld:

(1)    There was no valid conditional sales contract existing at the relevant time between the appellant and Nova Mobile Homes Limited, pursuant to which the appellant was entitled to take possession of the mobile Homes in question.
(2)    If there were existing conditional sale contracts, they were void as against the respondents.

**24**    As to ground number (1), the trial judge introduced his reasoning by saying:

"I am satisfied from the evidence that the two mobile homes in question were delivered to Nova Mobile Homes Limited by the defendant company in June and July of 1974."

**25**    The relevant invoices contained the clause, which I have quoted early in these reasons, providing that the property shall remain vested in the seller until the entire purchase price is paid.

**26**    The trial judge posed this question:- [*page225]

"Did Nova by its conduct accept the terms and conditions as put forth by the defendant company on its invoices?"

**27**    He concluded that it did and came to that conclusion by following the test set out by Ritchie, J. in Saint John Tug Boat Co. Ltd. v. Irving Refining Ltd., [1964] S.C.R. 614, at pp. 621 and 622. I quote from p. 621:

"The test of whether conduct, unaccompanied by any verbal or written undertaking, can constitute

an acceptance of an offer so as to bind the acceptor to the fulfilment of the contract, is made the subject of comment in Anson on Contracts, 21st ed., p. 28, where it is said:

'The test of such a contract is an objective and not a subjective one, that is to say, the intention which the law will attribute to a man is always that which his conduct bears when reasonably construed, and not that which was present in his own mind. So if A allows B to work for him under such circumstances that no reasonable man would suppose that B meant to do the work for nothing, A will be liable to pay for it. The doing of the work is the offer; the permission to do it, or the acquiescence in its being done, constitutes the acceptance."

**28**    Ritchie, J., continued at the bottom of p. 622:

"Like the learned trial judge, however, I would adopt the following excerpt from Smith's Leading Cases, 13th Ed. at p. 156 where it is said:

'But if a person knows that the consideration is being rendered for his benefit with an expectation that he will pay for it, then if he acquiesces in its being done, taking the benefit of it when done, he will be taken impliedly to have requested its being done: and that will import a promise to pay for it."

**29**    The trial judge remarked that there was no question that a number of homes were delivered to Nova Mobile Homes Limited between November 9, 1973, and June 28, 1974, and that:

"There is also considerable evidence that no one representing Nova Mobile Homes Limited at any time objected [*page226] to the form of invoice or to the fact that these units were being delivered."

**30**    From this evidence he felt that it could be inferred with reason that Nova Mobile Homes Limited accepted these homes, "sold them and paid for many of them upon sale".

**31**    John Alexander Park, who was General Manager of Glendale in Sussex from October 1973 until the latter part of June or early July 1974 was questioned about the attitude of Nova.

 "Q.    To this date, to your knowledge, has Nova or anyone from Nova ever rejected or
    objected to the terms of the invoices?

A. They were never rejected no."

**32**    There was evidence on which the trial judge could arrive at the conclusion which he did and I would reject the first ground in the Notice of Contention.

**33**    (2) As to the second ground in the Notice of Contention, the trial judge relied on the decision of Lieff, J., in J. R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd. et al. (1968), 70 D.L.R. (2d) 26.

**34**    In that case having concluded that a "subsequent mortgagee" under the Conditional Sales Act

(Ontario) included the holder of a debenture in the nature of a floating charge, he said at P. 35:

"The crux of the matter is whether the debenture holders relied on the apparent ownership of Embassy Motors Ltd. in the motor vehicles, in taking a floating charge as security for the advancement of moneys. I think the term 'subsequent mortgagees' applies only to those who may have acted subsequently in reliance upon such apparent ownership. There clearly was no such reliance in the case at bar and therefore I find that the debenture holders cannot be said to be 'subsequent mortgagees' within the spirit of s. 2(1) of the Conditional Sales Act."

**35**    Section 2(1) of the Ontario Act, c. 61, R.S.O. 1960 referred to "a subsequent purchaser or mortgagee claiming from or under the purchaser, without notice, in good faith and for valuable consideration ...". [*page227]

**36**    The trial judge said that although the bank may have "acted subsequently", in reliance upon "apparent ownership of the mobile homes", the question before him went to its rights under the debenture and the bank neither entered into the debenture nor made advances thereunder following delivery of the mobile homes and invoices in June and July of 1974. In the result he could not find that the bank as the debenture holder was a "subsequent mortgagee" within the meaning of s. 2 and s. 3 of the Act.

**37**    In my opinion, Lieff, J., reached the correct result, although I am not in disagreement with the treatment by my brother Macdonald of the effect of crystallization.

**38**    Accordingly, I agree that the conclusion of the trial judge that the bank was not a "subsequent mortgagee" is correct.

**39**    The trial judge found that the Bank of Montreal was not a creditor for the purposes of s. 2 or s. 3 of the Conditional SSales Act of Nova Scotia. He set out these sections in detail in his decision. On this point I agree with the trial judge and with the reasoning of my brother Macdonald.

**40**    The second ground of the notice of contention therefore fails.

**41**    I now turn to the question of estoppel on which the trial judge found in favour of the respondents. It is from this finding that the appellant appeals.

**42**    The appellant has urged that the principle of estoppel has no application here.

**43**    The argument is that there was no misrepresentation of facts here on which the Bank acted to its detriment and the reasoning of Duff, J., in The Blackwoods Limited v. Canadian Northern Railway Company (1910), 44 S.C.R. 92, at p. 102 applies.

**44**    The Blackwoods owned property adjoining the line of The Canadian Northern and the question was whether the Board of Railway Commissioners had power to extend a railway siding from an existing spur which had been constructed on the Blackwood land.

**45**    In support of the person who was to benefit from the [*page228] construction was a letter signed by Blackwoods to certain people, which said:-

"With reference to your application for right-of-way over our land, on the C.N.R. spur, we are perfectly willing to grant this."

**46**    Duff, J., said at pp. 102 and 103:

"I am unable to agree with the Chief Commissioner that the legal effect of these findings of fact is such as to preclude the Blackwoods from opposing the application....

The argument on this assumption is that this letter contains representations that the Blackwoods will not insist on their legal rights in respect of this spur and that these representations they are bound to make good to the person who acted on the faith of them. Now, that contention can only be sustained upon one of two views respecting the construction of the letter. One of these alternatives is that the letter contains some misrepresentation as to some state of facts alleged to exist at the time it was written upon which Mr. Sutherland acted. If such be the construction of the letter then equities in Mr. Sutherland's favour might arise. But where is the representation of fact? The only representation of fact actually existing relates to the then existing state of the Blackwood's intentions. Nobody suggests that there is any misrepresentation here - that is to say, nobody suggests that the Blackwoods in writing the letter did not sincerely express the state of their minds in the matter - that in other words, they were committing a very stupid and motiveless fraud."

**47**    The principle to be followed in estoppel cases was set out by Ritchie, J. in John Burrows Ltd. v. Subsurface Surveys Ltd. et al. (1968), 68 D.L.R. (2d) 354, at pp. 360 and 361:-

"It seems clear to me that this type of equitable defence can be invoked unless there is some evidence that one of the parties entered into a course of negotiation which had the effect of leading the other to suppose that the strict rights under the contract would not be enforced, and I think that this implies that there must be evidence from which it can be inferred [*page229] that the first party intended that the legal relations created by the contract would be altered as a result of the negotiations.

It is not enough to show that one party has taken advantage of indulgences granted to him by the other for if this were so in relation to commercial transactions, such as promissory notes, it would mean that the holders of such notes would be required to insist on the very letter being enforced in all cases for fear that any indulgences granted and acted upon could be translated into a waiver of their rights to enforce the contract according to its terms."

**48**    Of course in that case there was an acceleration clause and the conduct alleged to have created the estoppel was merely the acceptance of instalments paid after the tenth day of the month by the person entitled. The wording of the headnote was:-

"In default of payment of any interest payment or instalment for a period of ten (10) days after the same became due the whole amount payable under this note is to become immediately due."

**49**    I accept the position that estoppel cannot be founded on a mere representation of intention.

**50**    In Razansoff v. Brounstein Bros., [1924] 2 D.L.R. 1170, McKay, J.A. said p. 1172 after quoting the rule that:-

"In order to found an estoppel a representation must be of an existing fact, not of a mere intention."

- continued:-

"During the argument of the appeal I was under the impression that, in conjunction with the promise to return the note, there was something in the evidence from which could be gathered a statement of fact to the effect that the note was paid or satisfied, but after carefully going over the evidence several times, I cannot find anything that would lead me to that conclusion. There was nothing said or done by respondent that would lead the appellants to the belief that the note was paid, or otherwise satisfied. [*page230]

The promise to return the note, then, was a mere statement of an intention to do something in the future, which is not sufficient."

**51**    The same view was expressed by Mathers, C.J.K.B., in Ross v. Benjaminson Construction Co., [1927] 2 D.L.R. 830, at pp. 832 and 833.

**52**    He compared the case before him with Piggott v. Stratton (1859), 1 De G.F. & J. 33; 45 E.R. 271, where the vendor of property told the purchaser of a portion thereof that the vendor's 999 year lease contained a restrictive covenant which prevented him building so as to obstruct the purchaser's view. The vendor did build in just such a manner, although when he did so he had surrendered the original lease and taken a new one which contained no such restrictive clause.

**53**    Mathers, C.J.K.B., at p. 833 said of Piggott and Stratton:

"It was held that the representation which he made to the plaintiff was not a mere representation of intention with respect to what he might build in the future, but was a representation of an existing fact, to wit, that he was bound by a covenant covering the whole period of the plaintiff's lease not to build so as to obstruct the latter's sea view."

**54**    In Hamilton Gear & Machine Co. v. Lewis Bros. Ltd., [1924] 3 D.L.R. 367, Mulock, C.J. Ex., at p. 372, referred to a letter by the defendants in which they admitted having given the order for 8,000 pairs of gears and pinions and alleged the existence of a contract whereby the plaintiffs were bound. The comment of the Chief Justice was:-

"Evidently they considered that the plaintiffs, by their conduct, had accepted the defendants' offer of

January 9."

**55**    After quoting other correspondence, Chief Justice Mulock said at p. 373:-

"It is, I think, clear from this correspondence that the plaintiffs accepted in writing the defendants' order of January 9, 1920, and I also find that delivery by the plaintiffs to the defendants in pursuance of the said order of a substantial portion of the [*page231] goods so ordered was conduct equivalent to acceptance in writing of the order, whereby the plaintiffs became bound by the contract thus created to deliver the remainder of the goods contracted for (that is, the 8,000 pairs of gears and pinions)."

**56**    At p. 375 he said:-

"Having thus approbated, the defendants are not entitled to reprobate, the contract: Bonner-Worth Co. v. Geddes Bros. (1921), 64 D.L.R. 257, 50 O.L.R. 196."

**57**    The headnote reads as follows:

"A party who has affirmed the existence of a contract subsequent to an alleged breach and dealt with the subject matter of the contract as owners, cannot afterwards repudiate the contract either on the ground of the alleged breach, or on the ground that the subject matter dealt with, was not in accordance with the contract."

**58**    Acknowledging all that has been said by the authorities - that a mere expression of intention is not enough, that indulgence alone does not support an estoppel, it appears to me that there was evidence before the trial judge to support his conclusions. Mr. DeWinters as Vice President of Glendale, when seeking financing of mobile purchases stated as far back as 1969 that Glendale maintained no lien over the homes sold to Mobile Homes Limited. It is true that Mr. Goldsmith's evidence, as the trial judge found, was not precise, and he admitted that his testimony was based on the letter which he wrote on December 15, 1969 to the Senior Vice President of Atlantic Provinces Division of the Bank of Montreal.

**59**    In addition to Mr. DeWinters' statement, there was the evidence of the check made each month on the lots of Nova. The trial judge took all these things into consideration. Finally, he said this:

"It seems to me that knowing that the Bank of Montreal had advanced its credit to Nova Mobile Homes Limited on the basis of the assurance that the defendant company held no liens on the mobile homes, then the defendant company should have given notice to the Bank of Montreal that it was changing its procedure and commencing to sell by way of conditional sales contract. The statement [*page232] made by Mr. DeWinter in 1969 as to the fact that no liens were being maintained on the units was a true representation. However, in my opinion, the conduct of the defendant company when it failed to notify the Bank of Montreal that it was changing the terms and

conditions of its sales amounts to conduct constituting misrepresentation."

**60**    He concluded that the conduct of Glendale was such as to convey a false impression to the Bank of Montreal which induced the plaintiff to advance moneys and continue to advance credit to Nova Mobile Homes Limited. This he said, amounted to conduct constituting misrepresentation.

**61**    In Evenden v. Guildford City Association Football Club Ltd., [1975] 3 All E.R. 269, there was an agreement that the service of the groundsman in question should be regarded as unbroken even although there was a technical change of employers.

**62**    On dismissal because of redundancy, his claim for redundancy payments under the relevant statute was resisted on the ground that he could only claim payments while in the employ of the last employer.

**63**    Lord Denning, M.R., said at p. 273 that the doctrine of promissory estoppel "applies whenever a representation is made, whether of fact or law, present or future, which is intended to be binding, intended to induce a person to act on it and he does act on it". Of course the evidence in the Evenden case was stronger than that before us because there there was an actual document to support the undertaking, but the principle remains.

**64**    In Moorgate Mercantile Co. Ltd. v. Twitchings, [1975] 3 All E.R. 314, Lord Denning said at p. 323:

"Estoppel is not a rule of evidence. It is not a cause of action. It is a principle of justice and of equity. It comes to this. When a man, by his words or conduct, has led another to believe in a particular state of affairs, he will not be allowed to go back on it when it would be unjust or inequitable for him to do so."

**65**    Cheshire and Fifoot's Law of Contract (6th Ed.), p. 212 says: [*page233]

"The particular aspect of this doctrine that seems relevant in the present context is estoppel by misrepresentation, which operates when a man gives to another a false impression of some fact as the result of his own language or conduct."

After quoting these remarks from Cheshire and Fifoot, the trial judge said that the misrepresentation could be,

"by conduct as well as by language.

....

Whether by intent or otherwise, the fact that the circumstances had changed so substantially was not conveyed to the Bank of Montreal which continued to act in reliance upon the representation that the defendant company maintained no lien interest in the homes sold to Nova Mobile Homes

Limited."

**66**    Some indication of the reliance placed on Mr. John DeWinters appears in the re-direct examination of Mr. Goldsmith:

> "Q.    I take it from your answers to the questions, my learned friend put to you that John DeWinter, or that you had many discussions with John DeWinter concerning the operations of this account?
> A.    Over the years, I spoke to him several times, on the phone and I met him several times in St. John.
> Q.    You treated him as a principal of the company as well as an officer of Glendale?

A. I was always under that understanding.

Q. But was he working for Glendale at that time?

A. Yes."

**67**    After consideration of the evidence, the trial judge was of opinion that the conduct of the appellant showed that it was aware of the transaction between Nova and the Bank of Montreal, "with particular reference to the terms of the debenture". He found as a fact that the defendant company had changed the terms of its invoices without notification to the [*page234] Bank. There was no registration of the documents in the Registry of Deeds in Nova Scotia. In the result, he concluded that the appellant should be estopped from setting up the conditional sales contracts as against the respondent.

**68**    In my view there was evidence before him under the authorities on which he could reach this conclusion.

**69**    It is therefore my opinion that the appeal should be dismissed with costs.

**70**    COOPER, J.A.: This is an appeal from the decision and order of Mr. Justice Morrison whereby the respondents, plaintiffs in the action, were declared to be entitled to possession of two mobile homes, serial numbers 6468 and 5889, which had been previously seized and disposed of under an interlocutory recovery order by the respondent, W. J. B. Gentleman as Receiver and Manager of Nova Mobile Homes Limited ("Nova") appointed by the respondent, Bank of Montreal ("the Bank") under the provisions of a debenture dated December 28, 1972, made by Nova to secure, by way of a first floating charge on all the personal assets of Nova, including mobile homes, repayment to the Bank of amounts of money advanced by the Bank to Nova up to $ 150,000.00.

**71**    The facts and circumstances giving rise to the action have been set out by Mr. Justice Morrison in his decision. I must, however, refer to such of the facts as are necessary to an appreciation of the issues before us.

**72**    Nova was incorporated under the laws of New Brunswick. Its head office was in Saint John and it carried on the business of selling mobile homes in Nova Scotia from premises in or in the vicinity of Dartmouth. Its major supplier of the mobile homes was the appellant, Glendale (Atlantic) Limited ("Glendale"), which had manufacturing facilities at Sussex, New Brunswick.

**73**    Nova in 1968 arranged a line of credit of $ 35,000.00 with the Bank through its Haymarket Square Branch in Saint John. The Manager of the branch was Mr. Anthony A. Goldsmith. The security taken by the Bank was a term deposit of $ 21,000.00 and a personal guarantee of those who Mr. Goldsmith understood were the three shareholders of Nova, among whom was Mr. John DeWinters. It also appears that the Bank had taken a debenture as security dated July 11, 1969. [*page235]

**74**    By letter dated December 1, 1969, the Assistant Credit Manager of the Bank, Atlantic Provinces Division, informed Mr. Goldsmith that the Bank was deferring any renewal of the credit to Nova pending information on and clarification of certain matters. In that letter reference is made to the fact that "a Floating Debenture over stock has been obtained in lieu of chattel mortgage security ..." and it is further stated:

"We are most concerned that at year end $ 84,411. is apparently owing to Mobile Homes Limited. It is assumed that the suppliers maintain a lien interest over units prior to payment reducing our debenture security accordingly ...."

Mr. Goldsmith replied to the inquiries addressed to him by letter dated December 15, 1969. He enclosed a copy of the debenture and stated with respect to it that control was being exercised as follows. Glendale supplied the Bank with the serial number of each trailer sold to Nova and the Bank was provided by Nova each month with a list of size and serial numbers of the trailers on hand. The Bank through a branch in Dartmouth inspected the parking lot and verified the stock on hand. There then appears in the letter the following sentence:

"The Vice-President of Glendale Mobile Homes, Eastern Division, confirmed that his company has no lien interest over the units sold to Nova Mobile Homes Ltd."

It is common ground that the reference to Glendale Mobile Homes was to the appellant.

**75**    Although the control procedure outlined by Mr. Goldsmith may have existed as of December 15, 1969, his testimony at the trial is clear that in doing the monthly audit as to the number of mobile homes on Nova's lots the Bank relied entirely on the listings obtained from Nova. I quote Mr. Goldsmith's evidence:

"Q.    In all your audits, did you obtain a listing from Nova Mobile Homes Ltd.?

A. Yes.

> Q.    And, these were used to, what was done after the sheets were obtained? [*page236]
>
> A.    We verified the retail value, or the wholesale value of the mobile homes. Which we were informed were the bank's security to support the loan for the company.

Q. What was that last part, that you?

> A.    We verified the wholesale value of the mobile homes, which we were told by the company were held under bank's debenture for security. On the loans.
>
> Q.    I will just make sure I have it right, you verified the value of the homes, which you understood were covered by? The Bank of Montreal security?

A. Right."

**76**    The learned trial judge said with respect to this matter:

"By way of checking the inventory on the lots of Nova Mobile Homes Limited representatives of the Bank of Montreal would visit Nova Mobile Homes Limited at their retail sales outlets and obtain a list of mobile homes then in possession of Nova Mobile Homes Limited. Then this list would be checked against mobile homes which were actually on the lot. The bank was aware of the fact that some of the mobile homes were being financed through Borg-Warner and also by I.A.C. The list would show which homes were to be financed by these two companies. The bank representatives would then satisfy themselves that there were sufficient mobile homes on the lot the valuation of which homes would exceed by twenty-five per cent the total value of the debenture. This check was maintained monthly. The list obtained by the bank would show the serial numbers and the location of the various units."

**77**    The information as to possible lien interest quoted above was obtained orally by Goldsmith from Mr. John DeWinters who Goldsmith believed was Vice-President of Glendale. In any event, he was the person Goldsmith got in touch with when the Bank had any transaction with Glendale. In cross-examination Goldsmith could not recall where he had spoken to DeWinters nor the day. The only thing in his memory was that he replied to a question "from our Vice-President [in the letter of "December 1 to which I have referred] and I put this in my "letter". He went on to say "I was [*page237] specifically speaking to "him" and that he would not have quoted what DeWinters had said unless he had actually called DeWinters. I quote further from Goldsmith's cross-examination:

> "Q.    No, but what I am saying to you, or suggesting to you, is that you have no, no recollection of the conversation, other than the fact that there is a report of December 15th. [in] which you indicate there was a conversation?

A. That is correct.

> Q.    So, that this document, is all that exists as far as you are concerned, there is nothing in your memory recalling the conversation? Is that correct?

A.    Not, not a [sic] personal details of the actual telephone conversation itself."

**78**    Until November, 1973, Glendale invoiced to Nova the units not being financed through Borg-Warner or Industrial Acceptance Corporation (I.A.C.) on an ordinary form giving no indication of any reservation of title in Glendale. But in that month Glendale changed its form of invoice to Nova on such homes. The specific changes included the following words on the face of the invoice:

"Title to the above-described merchandise remains vested with the Seller until payment has been received by the Seller in collected funds, in accordance with the terms and conditions as stated on the reverse side of this form."

On the back of the invoice were printed "Terms and Conditions of Sale", which read in part:

"In addition to the provisions set forth on the face hereof, it is further agreed:

(1)    The property described on the face hereof shall at all times be and remain personally and the title to said property shall remain vested in Seller or assigns until the entire purchase price thereof shall have been paid.

(2)    Time is of the essence of this agreement, and in [*page238] the event Buyer defaults in payment, Seller or assigns may elect (A) to declare the entire sum remaining unpaid hereunder immediately due and payable and sue therefore [sic], or (B) to repossess said property without notice, demand or legal process. In the latter event, Buyer agrees to permit repossession and removal of said property without legal process of law and to pay all expenses of collection or removal of said property including reasonable attorney's fees. Any payments made by Buyer prior to repossession of the property shall be retained by Seller or assigns as and for rental and depreciation of said property.

....

(4)    All of the terms set forth on the face hereof including price, delivery information, model, colour, serial number and payment, shall be deemed to be accepted by Buyer unless BUYER shall notify Seller or assigns to the contrary in writing three (3) days after Buyer's receipt of the property.

...."

**79**    The first invoice of the new type to Nova was dated December 21, 1973; there having been no sales to Nova between November 12, when the new form seems to have been adopted, until December 21. There was no objection made by Nova to Glendale to the new form of invoice nor apparently did the Bank become aware of the vital change as to reservation of property and title. Glendale made no registration under the Conditional Sales Act, R.S.N.S. 1967, c. 48.

**80**    On September 11, 1974, it was discovered, when an audit was made of Nova's mobile homes in attempting to verify the number of homes which were secured under the debenture, that there was a shortfall of security. The Credit Manager of the Bank was informed and as a result Goldsmith told the President of Nova, Mr. Bustin, that the Bank required more security. He was given five days to comply with this request and on September 18, 1974, payment in full of Nova's loans was demanded by the Bank. On September 19, 1974, the Bank appointed the respondent, Mr. Gentleman, as its Receiver under the terms of the debenture and by which he had power to take possession of, inter alia, the two mobile homes in question and to sell them as agent for Nova.

**81**    In the meantime, on September 17, 1974, Glendale in [*page239] reliance upon the terms of its invoices repossessed the two mobile homes from premises of Nova without any objection being made by Nova. The repossession was effected by Mr. Douglas Williams as agent of Glendale. Mr. Gentleman, upon discovering the repossession, attempted to have the two mobile homes turned over to him but Mr. Williams refused to do so until he had obtained proof of the ownership of the two units.

**82**    Subsequently, Mr. Gentleman obtained a recovery order and both units were seized under it by the Sheriff of Halifax County. They were thereafter disposed of and a bond lodged with the Court in substitution therefor.

**83**    Mr. Justice Morrison came to these conclusions, (1) that the mobile homes in question were sold by Glendale to Nova under conditional sales contracts binding upon Nova (2) those contracts were not void as against the Bank, which he found was not a subsequent mortgagee or creditor under ss. 2 or 3 of the Conditional Sales Act, and (3) that Glendale was estopped from setting up the conditional sale contracts as against the Bank. He disposed of the case, as expressed in the order giving effect to his decision, by a declaration that the plaintiffs, respondents here, were entitled to possession of mobile homes bearing serial numbers 6468 and 5889, "previously seized and disposed of under an Interlocutory Recovery Order by the Plaintiff W. J. B. Gentleman, Receiver and Manager, of Nova Mobile Homes Limited". The result follows that the Bank was entitled to the money realized upon sale of the mobile homes and to the release of its bond.

**84**    The issue raised by Glendale in its notice of appeal is whether the learned trial judge was correct in finding in the circumstances of this case that the respondents could rely on the doctrine of estoppel. The respondents by notice of contention have raised two further issues, (1) was the learned trial judge correct in holding that there were valid conditional sales contracts between Glendale and Nova with regard to the two units in question and, if so, was he correct in holding that those contracts were still in existence between Glendale and Nova on September 17, 1974, and (2) if there were existing conditional sales contracts, was the learned trial judge correct in holding that the contracts were not void as against the respondents?

**85**    I now direct my attention to the first of the two issues raised in the notice of contention. As pointed out by [*page240] the trial judge there was nothing in the evidence to indicate a written

acceptance by Nova of the terms and conditions of sale contained in the invoices adopted by
Glendale commencing in November, 1973. Nova, however, made no objection to the new form of
invoice by which title to the mobile homes supplied by Glendale, and including those for the two
units here in question, was reserved in Glendale until payment. Nova accepted and paid for units on
the basis of the new or revised form of invoice. The trial judge also pointed out that Mr. Charles
Crosby, the Controller of Nova, testified that he was aware of the terms of the invoice in 1973,
shortly after they had been included in or added to the invoices previously in use, and also indicated
that the invoices would be sent to Nova's head office in Saint John. Mr. Crosby did not offer any
objection when Glendale's agent re-possessed the mobile homes and indeed gave full co-operation
to the agent at that time.

**86**    Mr. Justice Morrison found that Nova by its conduct had accepted the terms and conditions as
set out by Glendale on its invoices. I am respectfully in agreement with this finding based as it was
on Saint John Tug Boat Co. Ltd. v. Irving Refining Ltd., [1964] S.C.R. 614 (Supreme Court of
Canada). The trial judge quoted at some length from Mr. Justice Ritchie's judgment in that case. I
need not repeat the whole of that quotation but it reads in part - at p. 621:

"The test of whether conduct, unaccompanied by any verbal or written undertaking, can constitute
an acceptance of an offer so as to bind the acceptor to the fulfilment of the contract, is made the
subject of comment in Anson on Contracts, 21st ed., p. 28, where it is said:

'The test of such a contract is an objective and not a subjective one, that is to say, the intention
which the law will attribute to a man is always that which his conduct bears when reasonably
construed, and not that which was present in his own mind. So if A allows B to work for him under
such circumstances that no reasonable man would suppose that B meant to do the work for nothing,
A will be liable to pay for it. The doing of the work is the offer; the permission to do it, or the
acquiescence in its being done, constitutes the acceptance.'

In this connection reference is frequently made to the following statement contained in the
judgment of [*page241] Lord Blackburn in Smith v. Hughes [(1871), L.R. 6 Q.B. 597 at 607],
which I adopt as a proper test under the present circumstances:

'If, whatever a man's real intention may be he so conducts himself that a reasonable man would
believe that he was consenting to the terms proposed by the other party and that other party upon
that belief enters into a contract with him, the man thus conducting himself would be equally bound
as if he had intended to agree to the other party's terms.'"

The learned trial judge further expressed himself as being satisfied on the evidence that the two
mobile homes were never paid for by Nova and in my opinion he was not in error in this respect. I
therefore think that Mr. Justice Morrison was correct in holding that there were valid conditional
sales contracts between Glendale and Nova with regard to the mobile homes serial numbers 6468
and 5889 and in holding that those contracts were still in existence between Glendale and Nova on
September 17, 1974.

**87**    I deal next with the issue raised by Glendale in its notice of appeal (leaving the second ground raised in the notice of contention for later consideration). Was the learned trial judge correct in finding that the respondents could rely on the doctrine of estoppel? Mr. Justice Morrison found that Glendale was estopped from setting up the conditional sales contracts relating to the two mobile homes in question as against the respondents. I respectfully have much difficulty in understanding the reasoning by which this conclusion was reached. If I understand it correctly the learned trial judge attached importance to the fact that at the time the first debenture was entered into in 1969 Glendale was aware that the Bank had some interest in the financing of Nova; Glendale had "a very intimate knowledge" of Nova's affairs. This was clear because John DeWinters appeared before the Bank in 1969 as one of Nova's shareholders and at the time he was in charge of Glendale's operations in the New Brunswick area (he later became Vice-President of Glendale).

**88**    It was against this background that Mr. Goldsmith called Mr. DeWinters in 1969 to inquire whether or not Glendale maintained any liens on the mobile homes that it sold to Nova. As I have mentioned above, the call to DeWinters was made as a result of the letter dated December 1, 1969, from the Assistant Credit Manager of the Bank's Atlantic Provinces Division [*page242] and in which the writer said, "It is assumed that the suppliers maintain a lien interest over units prior to payment...." The representation on which the estoppel was founded then was made by DeWinters and I repeat it:

"The Vice-President of Glendale Mobile Homes, Eastern Division, confirmed that his company has no lien interest over the units sold to Nova Mobile Homes Ltd."

**89**    Counsel for Glendale contended that the statement said to constitute the representation of Glendale made through DeWinters was inadmissible as being hearsay. It was the record of a conversation, the circumstances of which the witness Goldsmith could not recall. On the other hand under s. 22 of the Evidence Act, R.S.N.S. 1967, c. 94, business records are admissible in evidence and by subsection (4) the circumstances of the keeping of any records, including the lack of personal knowledge of the witness testifying as to such records, may be shown to affect the weight of any evidence tendered pursuant to the section, but such circumstances do not affect its admissibility. I will assume, but, in view of what I say later, without deciding, that the learned trial judge was not in error in admitting this evidence.

**90**    Estoppel by representation may be called in aid not as founding a cause of action but as precluding a person from asserting a version of one set of facts which is in conflict with the version previously put forward by him - see Spencer Bower and Turner, Estoppel by Representation, (2nd Ed.), at p. 77. The representation first made must be a clear and unambiguous representation of fact - with the intention that the person to whom it is made is to act upon it. If the representation turns out to be untrue and if that person does act upon it to his prejudice, the representor is prevented or estopped from denying its truth, "He cannot, as it were, give himself the lie and leave the other party to take the consequences" - see, Cheshire and Fifoot, The Law of Contract, (8th Ed.), p. 85. I also refer to Spencer, Bower and Turner, supra, at p. 5:

"Lord Birkenhead succinctly stated the essentials of the doctrine in Maclaine v. Gatty [[1921] 1 A.C. 376, at p. 386, H.L.] as follows:

'Where A. has by his words or conduct justified B. in believing that a certain state of facts exists, and B. has acted upon such belief to his prejudice, A. is not permitted to affirm against B. that a [*page243] different state of facts existed at the same time. Whether one reads the case of Pickard v. Sears [(1837), 6 Ad. & El. 469], or the later classic authorities which have illustrated this topic, one will not, I think, greatly vary or extend this simple definition of the doctrine.'"

**91**    In my opinion the representation made by Mr. DeWinters to the Bank is not such as to raise the doctrine of estoppel. It was not untrue at the time it was made. Indeed I may say parenthetically that it remained true until December, 1973, and thus through further extensions of credit and after the debenture of December 28, 1972 had been entered into. The Bank did not act upon the representation; indeed, why would it? The representation was merely a confirmation of what Mr. Goldsmith understood the situation to be.

**92**    I think, with respect, that the learned trial judge fell into error in interpreting the representation not as being one relating to an existing fact only but as being also an assurance as to the future. It is pointed out by the author of Spencer, Bower and Turner, supra, at p. 6, that where the representation on which an estoppel is founded is not one as to an existing matter of fact, but an assurance as to future conduct, the matter falls within what has been termed promissory estoppel which, in its modern form at least, has its genesis in Central London Property Trust, Ld. v. High Trees House, Ld., [1947] 1 K.B. 130. I think it impossible to read the representation here as containing any assurance or promise as to the future. It was related to and confirmed an existing fact. Indeed, it would be very strange if Mr. DeWinters who at that time was not, on the record before us, an officer of Glendale would take it upon himself to undertake on behalf of Glendale that the practice of selling mobile homes without reservation of a lien interest would be continued indefinitely into the future.

**93**    In any event we must read the High Trees case in the light of what has been said concerning it by the Supreme Court of Canada. In John Burrows Ltd. v. Subsurface Surveys Ltd. et al. (1968), 68 D.L.R. (2d) 354, Mr. Justice Ritchie in delivering the unanimous judgment of that Court had this to say at pp. 359, 360:

"Since the decision of the present Lord Denning in the case of Central London Property Trust Ltd. v. High Trees House Ltd., [1947] K.B. 130, there has been a [*page244] great deal of discussion, both academic and judicial, on the question of whether that decision extended the doctrine of estoppel beyond the limits which had been theretofore fixed, but in this Court in the case of Conwest Exploration Co. Ltd. et al. v. Letain, 41 D.L.R. (2d) 198 at pp. 206-7, [1964] S.C.R. 20, Judson, J., speaking for the majority of the Court, expressed the view that Lord Denning's statement had not done anything more than restate the principle expressed by Lord Cairns in Hughes v. Metropolitan R. Co. (1877), 2 App. Cas. 439 at p. 448, in the following terms:

'...it is the first principle upon which all Courts of Equity proceed, that if parties who have entered into definite and distinct terms involving certain legal results - certain penalties or legal forfeiture - afterwards by their own act or with their own consent enter upon a course of negotiation which has the effect of leading one of the parties to suppose that the strict rights arising under the contract will not be enforced, or will be kept in suspense, or held in abeyance, the person who otherwise might have enforced those rights will not be allowed to enforce them where it would be inequitable having regard to the dealings which have thus taken place between the parties.'"

94    The parties here had not entered into "definite and distinct terms involving certain legal results" and it followed that there were not, and could not be, "a course of negotiation" such as is referred to in the Hughes case. In the result I am satisfied that there cannot here be an estoppel of the High Trees nature as discussed in the John Burrows Ltd. case.

95    There is one other point with respect to the trial judge's application of the doctrine or principle of estoppel which has troubled me. As I have said above estoppel is not available as a cause of action - see Combe v. Combe, [1951] 2 K.B. 215. It is rather a matter of defence - a shield and not a sword as it has been said on many occasions. It seems to me, with respect, that the Bank has used it as a sword. Its action was one for a declaration. The Bank appears to have based its claim upon estoppel rather than meeting the competing claim of Glendale to possession of the two mobile units by the use of estoppel. On that ground alone it is my opinion that the Bank must fail insofar as estoppel is concerned. [*page245]

96    I have now to consider the second issue raised by the notice of contention, namely, was Mr. Justice Morrison correct in holding that the conditional sales contracts were not void as against the respondents? The answer to this question depends upon the meaning of the words "as against the creditors of the buyer" and "subsequent ... mortgagees in good faith for a valuable consideration" as these words appear in s. 3 of the Conditional Sales Act, supra. That section has been quoted in full in the reasons for judgment of my brother Macdonald.

97    I am satisfied that the Bank was not a subsequent mortgagee. The debenture dated December 28, 1972, created a floating charge. The Bank thereby became an equitable mortgagee prior in time to the conditional sales of the two units here in question. In Gordon MacKay & Co., Ltd. v. Capital Trust Corp., Ltd., [1927] 2 D.L.R. 1150 (Supreme Court of Canada), the instrument before the Court created a floating charge. Duff, J., at p. 1157 said that he had not been able to satisfy himself that "you cannot have a floating security by way of mortgage". He referred to the description of the nature of this class of security by Lord Macnaghten in Tailby v. Official Receiver (1880), 13 App. Cas. 523, at p. 541, and continued:

"The instrument in question in that case seems to have been almost identical in terms with the instrument now before us; and throughout the judgment of Lord Macnaghten it is everywhere spoken of as a mortgage. And in truth the language of that judgment makes it quite clear that in the opinion of that great Judge and Master of Equity, such a document as that before us might properly

be described as an equitable mortgage."

**98**    The Gordon MacKay & Co., Ltd. case was considered in J. R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd., et al., [1968] 2 O.R. 532; 70 D.L.R. (2d) 26, at p. 31 D.L.R., Ontario High Court, where Lieff, J., found that the defendants Herman and Hershoran, the holders of a floating charge debenture, were not subsequent mortgagees under s. 2(1) of the Conditional Sales Act, R.S.O. 1960, c. 61. In reaching that result he first found that the defendants were mortgagees. He then said that whether or not they were subsequent mortgagees would depend on what point of time their interest in the motor vehicles (the property there in question) became effective. Based upon what was said with respect to security by way of floating charge by Buckley, L.J., in Evans v. Rival [*page246] Granite Quarries, Ltd., [1910] 2 K.B. 979, at pp. 999 - 1000, which I need not repeat except for this - "A floating security is not a future security; it is a present security, which presently affects all the assets of the company expressed to be included in it" - Lieff, J., concluded that although "a floating charge does not affect any specific chattel until crystallization ... it does affect all the chattels at the moment that the floating charge is given". I think that the reasoning of Lieff, J., is applicable in the instant case with the result that the Bank is here not a subsequent mortgagee.

**99**    I am also of the opinion that the Bank does not fall within the category of "the creditors of the buyer". The creditors intended to be protected are those who become so after conditional sales agreements are entered into and in reliance upon the apparent or ostensible ownership of the chattels because they are in the possession of the person to whom they have been sold under conditional sales agreements. A person in possession and apparent ownership of goods should not, when he is not the real owner, obtain credit to the prejudice of a person who might rely upon such assets - see United Electric Co. Ltd. v. Watson, [1927] 1 W.W.R. 87, at p. 89.

**100**    This is not the situation here. The Bank in extending credit to Nova relied upon the floating charge created by the debenture dated December 28, 1972. The Bank's status as creditor arose on that date or at the latest in January, 1974, when the operating credit of $ 150,000.00 was renewed and a promissory note evidencing the amount was taken. The credit was related throughout to the security of the floating charge and just as the effective date for determination of whether the mortgage of the floating charge must be related to the date of the debenture so must the date when the Bank became a creditor be related to that time or, possibly, to the date of the promissory note in January 1974. This, as I understand it, is in accord with what was decided by Lieff, J., in the J. R. Auto Brokers case when, at pp. 35 and 36, he deals with the meaning of creditors. I therefore reiterate that in my opinion the Bank is not protected as a "creditor of the buyer" under s. 3 of the Conditional Sales Act, nor under s. 2 of the Act.

**101**    Furthermore, the Bank under its floating charge was not entitled to any specific asset until crystallization on September 19, 1974. But the two mobile homes here in question had before that time been repossessed by Glendale. [*page247] Nova, on September 19, 1974, had neither title to nor possession of the units; they were therefore not then available to the Bank as assets of Nova subject to the terms of the debenture.

**102** Finally, I reiterate that in my respectful opinion the trial judge erred in applying the doctrine of estoppel here and hence in allowing the claim of the respondents.

**103** I would allow the appeal with costs.

**104** MACDONALD, J.A.: I have had the opportunity of reading the reasons for judgment of Mr. Justice Coffin and Mr. Justice Cooper. I agree with my brethren for the reasons they have given that there were valid conditional sales contracts between Nova and Glendale with respect to the two mobile homes in question. With respect to my brother Coffin, I find myself in agreement with Mr. Justice Cooper for the reasons he has given that the trial judge erred in finding that the respondents could rely on the doctrine of estoppel.

**105** With respect to the issue whether the bank, under the floating charge debenture, was a subsequent mortgagee within the provisions of the Conditional Sales Act of this Province, I agree with my brother Coffin and the trial judge that it was not. Both my brother Coffin and the trial judge in reaching this conclusion referred to the decision of Mr. Justice Lieff in J. R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd. et al, [1968] 2 O.R. 532, 70 D.L.R. (2d) 26. As my reasons for arriving at the same conclusion are based on somewhat different grounds I thought it advisable to briefly set forth my views on this aspect of the matter.

**106** The facts have been set forth in detail in the decision of the trial judge and in the reasons for judgment of my brethren; I shall but refer to those facts that are relevant to an appreciation of my opinion.

**107** The dates on which certain events occurred are vital to my approach to the issue. The occurrences and dates thereof that I consider relevant are as follows:

| Occurrence | Date |
|---|---|
| Execution of floating charge debenture. Nova to the bank | December 28, 1972 |
| Delivery by Glendale to Nova of mobile home, serial #6468 | June 28, 1974 |
| Delivery by Glendale to Nova of mobile home, serial #5889 | July 3, 1974 |
| Repossession by Glendale of the two mobile homes | September 17, 1974 |

Crystallization of the floating charge
debenture                                    September 19, 1974

[*page248]

**108**    In J. R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd., supra, Lieff, J., found that under the provisions of the Conditional Sales Act then in force in Ontario the holders of a floating charge debenture were mortgagees, but not subsequent mortgagees, with respect to unregistered conditional sales contracts. Mr. Justice Lieff's reasons for so finding were as follows:

"... I think little turns on the distinction raised by counsel as to the difference in nature of the floating charge security before and after the crystallization. That is not the important question. The crux of the matter is whether the debenture holders relied on the apparent ownership of Embassy Motors Ltd. in the motor vehicles, in taking a floating charge as security for the advancement of moneys. I think the term 'subsequent mortgagees' applies only to those who may have acted subsequently in reliance upon such apparent ownership. There clearly was no such reliance in the case at bar and therefore I find that the debenture holders cannot be said to be 'subsequent mortgagees' within the spirit of s. 2(1) of the Conditional Sales Act."

**109**    Because I am of the opinion, for reasons I shall give, that the bank in the present case was not a subsequent mortgagee I do not intend to embark upon an in-depth analysis of the reasoning of Mr. Justice Lieff. For the purposes of these reasons it is sufficient for me to say that I harbour some doubt as to that portion of his decision above quoted. To my mind, in determining priorities, there is a vital difference between a floating charge that has been crystallized and one that has not. To appreciate this distinction is to appreciate the true nature and character of a floating charge. [*page249]

**110**    It has often been said that perhaps the most accurate description of a floating charge ever given was by Buckley, L. J., of the Court of Appeal in England in Evans v. Rival Granite Quarries Limited, [1910] 2 K.B. 979, when he said (p. 999):

"... A floating security is not a future security; it is a present security, which presently affects all the assets of the company expressed to be included in it. On the other hand, it is not a specific security; the holder cannot affirm that the assets are specifically mortgaged to him. The assets are mortgaged in such a way that the mortgagor can deal with them without the concurrence of the mortgagee. A floating security is not a specific mortgage of the assets, plus a licence to the mortgagor to dispose of them in the course of his business, but is a floating mortgage applying to every item comprised in the security, but not specifically affecting any item until some event occurs or some act on the part of the mortgagee is done which causes it to crystallize into a fixed security."

**111**    The Court of Appeal in the Evans case held that it was necessary for debenture holders, as the price of priority over judgment creditors, to take steps to crystallize. The Court said that as long

as the charge remains floating the debenture holders were not entitled to withdraw any particular asset from the business. In other words, they must choose between a specific and a floating charge for as Fletcher Moulton, L.J., said in Evans "a security of this kind must be either floating or fixed". This result, Buckley, L.J., agreed, flowed from the very nature of the charge as previously defined by Lord MacNaghten in Illingworth v. Houldsworth, [1904] A.C. 355, at p. 358:

"... I should have thought there was not much difficulty in defining what a floating charge is in contrast to what is called a specific charge. A specific charge, I think, is one that without more fastens on ascertained and definite property or property capable of being ascertained and defined; a floating charge, on the other hand, is ambulatory and shifting in its nature, hovering over and so to speak floating with the property which it is intended to affect until some event occurs or some act is done which causes it to settle and fasten on the subject of the charge within its reach and grasp." [*page250]

**112**    In Fisher and Lightwood's Law of Mortgage (8th Ed.), the author states at pp. 110, 111:

"Mortgage debentures almost invariably create a [Emphasis start]floating security[Emphasis end]. Such a security is an immediate equitable charge on the assets of the company for the time being, but [Emphasis start]it remains unattached to any particular property, and leaves the company at liberty to deal with its property in the ordinary course of its business[Emphasis end], as it thinks fit, [Emphasis start] until[Emphasis end] stopped, either by the appointment of a receiver, or by a winding up, or the happening of some agreed event when [Emphasis start]the charge becomes fixed to the assets and effective[Emphasis end] -- or, as it is said, crystallises -- [Emphasis start]and gives the debenture holder priority over the general creditors[Emphasis end]. So long as the security remains a floating security, the property of the company may be dealt with, and even a part thereof sold in the ordinary course of business, as if the security had not been given and any such dealing with a particular property will be binding on the debenture holders, provided that the dealing is completed before the charge ceases to be a floating security."

(Italics are mine)

**113**    It appears that once a floating charge is crystallized it becomes fixed to the assets or, to put it another way, it becomes at such time a specific mortgage.

**114**    At pp. 396-7 of Palmer's Company Law (21st Ed.), the following appears:

"... a floating charge is an equitable charge which does not fasten upon any specific or definite property, but is a charge upon property which may be constantly varying; it will normally be upon the whole of the company's property, including any which is subject to a fixed charge, but it can be restricted to a limited class of property, and the property which is subject to the floating charge can be dealt with by the company without consulting the holder of the charge, and may be sold, exchanged or otherwise dealt with in any way that the directors may think fit. Upon the happening of certain events, which are set out in the charging deed, the floating charge becomes fixed or, in

technical terminology, it 'crystallises', and thereafter the assets comprised in the charge are subject to the same restrictions as those under a specific charge. Unless otherwise agreed, a floating charge [*page251] will also crystallise on the appointment of a receiver (either by the court or by a debenture holder under a power contained in the debenture) or on the commencement of winding up ..."

and at pp. 398-9:

"Although a floating charge operates as an immediate and continuing charge on the property charged, nevertheless, before it crystallises the company has a free hand to deal with and dispose of the property charged in the ordinary course of its business. It may do so by way of sale, lease, exchange, specific mortgage, or otherwise, as it deems most expedient. Thus an assignment by the company of arrears of rent made before the appointment of a receiver gives the assignees a good title as against debenture holders having only a floating charge; but if the land is specifically charged by the debentures, the debenture holders can claim the rents. As to the effect of a prior mortgage of a lease on the debenture holder's interest in fixtures, it was held in Re Rogerstone Brick Co. that the mortgagee by assignment was entitled to the proceeds of sale of the fixed plant as against the debenture holders. By dealing with its debtors during the currency of the floating charge, the company may give them a right of set-off, but there is no mutuality, and therefore no right of set-off, where the debts arise after the floating charge has crystallised.

It should, in particular, be noted that before crystallisation of the floating charge the company has power to create legal mortgages and equitable charges in priority to the floating charge, and such priority is not affected by notice of the floating charge. In Wheatley v. Silkstone Co., where the company, after creating a floating charge on its undertaking, had created a subsequent equitable charge in favour of its bankers by deposit of title deeds, North J., after referring to the authorities, said:

'... those authorities furnish a very clear and intelligible principle to be followed. In this case I find that the debenture is intended to be a general floating security over all the property of the company, as it exists at the time when it is to be put in force; but it is not intended to prevent [*page252] and has not the effect of in any way preventing the carrying on of the business in all or any of the ways in which it is carried on in the ordinary course; and, inasmuch as I find that in the ordinary course of business and for the purpose of the business this mortgage was made, it is a good mortgage upon and a good charge upon the property comprised in it, and is not subject to the claim created by the debentures.'

This decision is a specially strong one, because the debentures in question were expressed to be by way of first charge on the undertaking; but in regard to this the learned judge said:

'I find also that the first charge referred to in the debentures is fully satisfied by being the first charge against the general property of the company at the time when the claim under the debentures arises and can have effect given to it. There will be a declaration, therefore, that the charge of the

plaintiff is prior to the debentures.'"

At p. 404 the author states:

"Where chattels are in the company's possession under a hire-purchase agreement, under which the goods are to remain the property of the supplier, the rights of the owner prevail over a floating charge created by the company, even if the chattels become fixtures. This was decided in a case in which the hire-purchase agreement was made before the debentures were issued; but it is submitted that, even if the hire-purchase agreement were later in date than the floating charge, the debenture holders would only obtain a charge on the company's interest, which is subject to the rights of the owner of the chattel. A mortgagee who obtains a fixed legal mortgage, without notice of the terms of the hire-purchase agreement, would have a prior right to fixtures on taking possession. But this principle does not apply to an equitable charge."

**115**    In The Law of Mortgages (2nd Ed.), by C.H.M. Waldock, the author states at pp. 164-5:

"[Emphasis start]When a floating charge crystallises it becomes a fixed charge having priority from that date[Emphasis end]. It therefore gives debenture holders preference over the unsecured [*page253] creditors, which is, of course, the essence of the security provided by a floating charge. It also prevails over execution creditors unless they have actually obtained satisfaction before the floating charge crystallises. The obtaining of a garnishee order or the seizure of goods by the sheriff under a writ of fi. fa. is not part of a dealing by the company in the ordinary course of business. It is a compulsory legal process directed against the company, not a dealing by the company. Consequently, a judgment creditor who has obtained a garnishee order nisi or 'absolute', or who has had goods of the company seized by the sheriff, does not thereby gain priority over the debenture holders if their charge crystallises before he obtains payment. But if he does obtain payment, even though it be through the pressure of execution, before the debenture holders intervene, they cannot recover the money; and the Court will not restrain a judgment creditor from proceeding with his execution unless the debenture holders have taken steps to crystallise their security. Their security can only fasten on particular assets by crystallising and being converted from a floating to a fixed security." (Italics are mine)

**116**    The author of the last referred to text says (p. 162) that a specific mortgage created after a floating charge has priority over the latter "such specific charge mortgage, being created under implied licence from the debenture holders, has priority over their floating charge whether or not the specific mortgagee had notice of the charge; and whether or not he holds a legal mortgage".

**117**    Had the two units been in the possession of Nova when the floating charge became a specific one upon crystallization on September 19, 1974, it appears to me to be arguable that from that date forward they were covered by such specific mortgage, which mortgage would have priority from that date. If such argument is sound then, of course, the bank having become the holder of a specific mortgage or fixed charge on September 19, 1974, would be a mortgagee subsequent to the unregistered conditional sales contract.

**118**    The foregoing, however, is not the case here. The two units were repossessed and taken out of the possession of Nova on September 17, 1974, two days before the floating charge crystallized. Thus when the floating charge settled and fastened onto the property of Nova on September 19, 1974, [*page254] the two units in question, not then being in Nova's possession and to possession of which Nova was not entitled, (the legal estate being in the unpaid vendor) they were not then within the reach and grasp of the crystallized floating charge and thus did not become part of the specific mortgage security. For this reason it is my opinion that the bank cannot be classified as a subsequent mortgagee within the meaning of the Conditional Sales Act with respect to the unregistered conditional sales contracts.

**119**    I turn now to a consideration of the issue whether the bank, as a creditor of Nova, has for such reason priority over the unregistered conditional sales contracts.

**120**    In my opinion the relevant section of the Conditional Sales Act of this Province is s. 3 which provides:

"In the event of the permanent removal into the Province of goods of the value of fifteen dollars or over, subject to an agreement, made or executed without the Province, that the right of property or right of possession in whole or in part shall remain in the seller or bailor, notwithstanding that the actual possession of the goods passes to the buyer or bailee, then unless;

> (a)    the agreement contains such a description of the goods, the subject of the sale or bailment, that the same may be readily and easily known and distinguished;
>
> (b)    a copy thereof and of the affidavits and instruments relating thereto, proved to be a true copy by the affidavit of some person who has compared the same with the originals, is filed in the office of the proper officer of the district to which the goods and chattels are removed, within thirty days after the seller or bailor has received notice of the place to which the goods have been removed;

the seller or bailor shall not be permitted to set up any right of property or right of possession in or of the goods as against the creditors of the buyer or bailee, a trustee in bankruptcy, a liquidator in winding-up proceedings, subsequent purchasers or mortgagees in good faith for a valuable consideration, whose conveyances or mortgages have been duly registered or are [*page255] valid without registration, or as against judgments, executions or attachments against the buyer or bailee."

**121**    For a better understanding of my opinion on this aspect of the matter I set forth the pertinent part of s. 2(1) of the Act:

"2(1) After possession of goods has been delivered to a buyer under a conditional sale, every provision contained therein whereby the property in the goods remains in the seller shall be void ... as against creditors of the buyer who at the time of becoming creditors have no notice of the provision and who subsequently obtained judgment, execution or an attaching order, under which the goods, if the property of the buyer, might have been seized ..."

**122**    In J.R. Auto Brokers Ltd. v. Hillcrest Auto Lease Ltd. et al, supra, Mr. Justice Lieff had before him the question of the meaning of the word "creditors" as such appeared in s. 2 (1) and (3) of the Conditional Sales Act of Ontario (R.S.O 1960, c. 61). Section 2(1) of that Act is similar to s. 2(1) of the Act of this Province. Section 2(3) of the Ontario Act reads as follows:

"2(3) Where the delivery is made to a person for the purpose of resale by him in the course of business, such provision is also, as against his creditors, invalid and he shall be deemed to be the owner of the goods unless this Act has been complied with."

**123**    At pages 35 and 36 of his decision Lieff, J., said:

"As to the meaning of the word 'creditors' as it appears in s. 2(3) of the Act, I think the same reasoning applies. The only case referred to by counsel on this particular question was United Electric Co., Ltd. v. Watson, [1927] 1 W.W.R. 87. Counsel for the plaintiff has argued that the section of the Conditional Sales Act, R.S.B.C. 1924, c. 44, which was referred to in that case, is in substance the same as s. 2(1) and (3) of the Ontario Act. The pertinent section of the British Columbia Act then read as follows [p. 88]:

'(3).(1). After possession of goods has been delivered to a buyer under a conditional sale, every provision contained therein whereby the property in [*page256] the goods remains in the seller shall be void as against ... creditors of the buyer who at the time of becoming creditors had no notice of the provision and who subsequently obtained judgment, execution, or an attaching order, under which the goods, if the property of the buyer, might have been seized, and the buyer shall, notwithstanding such provision, be deemed as against such persons the owner of the goods, unless the requirements of this Act are complied with.'

Macdonald, J., in United Electric Co. Ltd. v. Watson, in interpreting this section had the following to say at p. 89:

They had already become creditors, and so did not become creditors at a time subsequent to the transaction having taken place. Then it follows from the wording of the section that they could not at the time when they did become creditors in the month of October have become aware of any 'provision' such as was stipulated in the lien agreement, that the property in the goods should not pass. It was impossible for such condition to have existed at the time when the debt was created on which they obtained judgment, because the transaction had not yet come into existence, to which such a 'provision' was applicable.

I think that the class of creditors, sought to be protected and assisted by this Act, are those who have [no] notice of the provision, in the sense that the property in the goods should not pass although possession had been given.

And a little further on the page, His Lordship added:

I might add that in my opinion the mischief sought to be remedied (requiring registration of lien agreements) by the amendment to the Act in 1922, was that a party in possession and apparent ownership of goods should not, when he is not the real owner, obtain credit to the prejudice of a person who might rely upon such asset.

Although the Ontario statute differs somewhat in its wording and phraseology, I think that the mischief which it seeks to avoid is identical with that for which the section [*page257] of the British Columbia Act was enacted. That being so, and for the reasons stated heretofore, I must conclude that s. 2(3) of the Ontario Conditional Sales Act seeks to protect only those persons who became creditors after the conditional sale agreement was entered into. For only creditors subsequent to the conditional sale could have relied on a conditional purchaser's apparent ownership. Consequently, I think that the learned Senior Master has erred in this respect, as the word 'creditors' was intended to apply not to all creditors of a conditional purchaser to whom goods had been delivered for the purpose of resale by him in the ordinary course of business, but just to those persons who achieve the status of creditors subsequent to the conditional sale ...."

**124**    Jacob S. Ziegel in an article entitled Uniformity of Legislation in Canada, the conditional sales experience reproduced in Vol. 39, C.B.R. at p. 1 traces the history and labours of the conference of commissioners on uniformity of legislation in Canada with respect to conditional sales legislation. At p. 207 the author says:

"Conditional Sales Acts generally have two principal objects. One is to protect innocent third parties who may be misled into dealing with the goods or to extend credit to the conditional buyer on the strength of his ostensible ownership, by requiring registration of the agreement. The other is to protect, in a varying degree, the buyer himself against harsh and unconscionable conduct by the seller ...."

**125**    Section 3(1) of The Bills of Sale Act, R.S.N.S. 1900, c. 142, provided that every bill of sale of personal chattels made either conditionally or absolutely had to be recorded in the office of the Registrar of Deeds. Subsection 5 of s. 3 provided:

"(5) and every bill of sale shall, as against purchasers and creditors only take effect and have priority from the time of filing such bill of sale."

**126**    In Mosher v. O'Brien (1905), 37 N.S.R. 286, a judgment of this Court, the facts were that the plaintiff held a bill of sale with respect to the purchase of a certain business, the plaintiff repossessed the assets covered by the bill of sale under the terms thereof. The sheriff subsequently made [*page258] a levy on the goods at the suit of a judgment creditor. The plaintiff successfully brought action against the sheriff for the return of the goods. The bill of sale was attacked on the ground that it did not comply with the Bills of Sales Act. The judgment of the Court was given by Townshend, J., who said (pp. 291-2):

"Then as to the Bills of Sales Act I can find nothing in the evidence to show that the bill of sale does

not comply with its requirements. The only suggestion was that the agreement was not truly set forth, but, in my opinion, the recital does accurately and truly contain the terms of the agreement proved. [Emphasis start]If it were not so, the fact that the plaintiff had taken possession under the bill of sale, and was in possession at the time the sheriff made his levy, is quite sufficient, in the absence of fraud, to enable the plaintiff to maintain this action[Emphasis end]." (Italics are mine)

**127**    The foregoing case inter alia is referred to at p. 362 of Barron and O'Brien on Chattel Mortgages and Bills of Sale (2nd Ed. 1914) as authority for the following proposition in reference to the 1900 Bills of Sale Act of this Province:

"The mortgagee may protect himself in case the mortgage be defective under this Act, by taking possession in good faith of the mortgaged chattels, before they are levied on by the creditors of the mortgagor; and, when possession under the bill of sale is once obtained, it will be quite sufficient, in the absence of fraud, to enable the mortgagee to maintain an action for their wrongful seizure and detention."

**128**    Mosher v. O'Brien, supra, has some relevance to the point in issue in that in the present case Glendale repossessed the two mobile homes on September 17, 1974 and it was not until on or after October 8, 1974, that the respondent Gentleman obtained an interlocutory recovery order with respect to such homes.

**129**    In the present case the bank became a creditor of Nova when the floating charge debenture was executed on December 28, 1972; when the operating credit of $ 150,000.00 was renewed in January, 1974, which credit was supported not only by the floating charge but also by a promissory note in favour of the bank executed by Nova by its president, William Bustin, and when the bank permitted Nova to allow its current account to go into overdraft. Exhibits 12/P and 16/P are [*page259] copies of the current account ledger kept by the bank with respect to the account of Nova. These exhibits show Nova in an overdraft position to the extent of $ 44,910.95 on the dates the two mobile homes in question were sold by Glendale to Nova by way of conditional sales contracts. This overdraft was liquidated by July 31, 1974. On September 9, 1974 Nova's account was overdrawn by $ 51,039.77. This overdraft was covered by a credit memo in the amount of $ 52,000.00. On September 17, 1974 when Glendale repossessed the two mobile homes its account with the bank was overdrawn by $ 2,048.54. This overdraft was liquidated on September 18, 1974, and on September 19, 1974, when the floating charge was crystallized, Nova had a surplus in its account of $ 1,325.53.

**130**    In light of all of the foregoing it is my opinion that the words "creditors of the buyer" as they appear in s. 3 of the Conditional Sales Act of this Province mean the same class of creditors as referred to in s. 2(1) of the Act, i.e., those who at the time of becoming creditors have no notice of the conditional sale contract. This class of creditors can properly be referred to as subsequent creditors in relation to the conditional sale vendor; or, as Lieff, J., expressed it in the J.R. Auto Brokers Ltd. case, supra, it restricts creditors "to those persons who achieve the status of creditors

subsequent to the conditional sale".

**131**    In the present case the bank at one time was a creditor subsequent to the two relevant conditional sales contracts as a result of the bank account of Nova going into overdraft. This situation, however, was corrected by September 18, 1974. Finally, it well may be that even if the bank was a subsequent creditor of Nova it lost the protection of the Conditional Sales Act when Glendale repossessed the two mobile homes on September 17, 1974, prior to any action being taken by the bank.

**132**    In the result it is my opinion, for the reasons given, that the bank at the material times was neither a "subsequent mortgagee" nor a "creditor" of Nova within the meaning I subscribe to such terms in the Conditional Sales Act of this Province.

**133**    I would dispose of this appeal in the manner proposed by my brother Cooper.

Appeal allowed.

*Case Name:*

# Campbell River Indian Band v. WorleyParsons Canada Ltd.

**Between**
**The Campbell River Indian Band a band within the meaning of**
**the Indian Act, with offices located in Campbell River,**
**British Columbia, Plaintiffs, and**
**WorleyParsons Canada Ltd., doing business as Westmar and**
**Westmar Consultants Inc., Defendants, and**
**Mary Klugherz dba Klugherz and Associates and David Nairne &**
**Associates Ltd., Third Parties**

[2013] B.C.J. No. 1572

2013 BCSC 1272

24 C.L.R. (4th) 216

230 A.C.W.S. (3d) 702

2013 CarswellBC 2201

Docket: S093612

Registry: Vancouver

British Columbia Supreme Court
Vancouver, British Columbia

**L.D. Russell J.**

Heard: November 27-28, 2012; April 22-24, 2013.
Judgment: July 19, 2013.

(164 paras.)

*Civil litigation -- Civil procedure -- Trials -- Trial of an issue -- Summary trials -- Availability --*
*Application by defendant for summary trial dismissed -- Plaintiff Indian Band contracted with*
*defendant to design and supervise construction of cruise ship docking facility -- Docking facility*

*flawed -- Plaintiff commenced proceeding for breaches of contact, fiduciary duty and tort -- Defendant sought summary trial concerning alleged limitation clause which limited its contractual liability -- Issue not suitable for summary trial -- Limitation clause did not affect plaintiff's non-contractual claims -- Consideration of limitation clause required assessing circumstances surrounding parties' agreement -- Factual findings relevant to limitation clause intertwined with facts trial judge required to assess to resolve non-contractual claims -- Supreme Court Civil Rules, Rule 9-7.*

 *Contracts -- Terms -- Application by defendant for summary trial dismissed -- Plaintiff Indian Band contracted with defendant to design and supervise construction of cruise ship docking facility -- Docking facility flawed -- Plaintiff commenced proceeding for breaches of contact, fiduciary duty and tort -- Defendant sought summary trial concerning alleged limitation clause which limited its contractual liability -- Issue not suitable for summary trial -- Limitation clause did not affect plaintiff's non-contractual claims -- Consideration of limitation clause required assessing circumstances surrounding parties' agreement -- Factual findings relevant to limitation clause intertwined with facts trial judge required to assess to resolve non-contractual claims -- Supreme Court Civil Rules, Rule 9-7.*

Application by the defendant for a summary trial dismissed. The plaintiff Indian Band contracted with the defendant to design and supervise construction of a cruise ship docking facility. The docking facility was flawed and the plaintiff commenced a proceeding seeking damages for breach of contract, negligence, negligent misrepresentation and breach of fiduciary duty. The dock project evolved over time from a larger cruise ship terminal to a stand-alone dock. A licence agreement entered into by the parties when they entered into a contact concerning the original project included a limitations clause. The defendant argued that the limitations clause was also applicable to the stand-alone dock project and limited its contractual liability. It brought an application for summary trial on the issue of the limitation clause's validity and enforceability.

HELD: The application was dismissed. The limitation clause issue was not suitable for summary trial. Ruling on the limitations clause issue would not improve the efficiency of the trial and would require factual findings being made that might be inconsistent with subsequent findings of the trial judge. The limitations clause had limited scope and would not limit the defendant's liability for the non-contractual claims. To determine whether the clause applied to the stand-alone project, it would be necessary to consider the circumstances surrounding the parties' agreement and not just the contractual documents. Such findings of fact concerning the parties' interactions respecting the project were intertwined with the facts that the trial judge would be required to assess to resolve the non-contractual claims.

**Statutes, Regulations and Rules Cited:**

Supreme Court Civil Rules, Rule 9-7, Rule 9(7)(11)(b)

**Counsel:**

Counsel for the Plaintiffs: S. Wells, D.L. Dalke.

Counsel for the Defendants: J.R. Singleton, Q.C., S.M. Vorbrodt.

---

### I. INTRODUCTION

### II. FACTS

1.  The parties
2.  The Boliden Project
3.  The initial discussions
4.  The January 2002 Proposal
5.  The September 2002 Proposal
6.  The Band obtains funding
7.  Work proceeds on the Boliden Dock
8.  The November 2002 Estimate
9.  The Band receives funding
10. The April 2004 Proposal
11. Ms. Dick takes over as economic development officer
12. The Boliden Project collapses
13. The parties begin planning the Stand-alone dock
14. The City provides funding for conceptual design of the Stand-alone Dock
15. The August 2004 Estimate
16. Mr. Kullmann confirms that Westmar has begun conceptual design work
17. The September 2004 Estimate
18. The Confirmation Letter
19. The June 2005 Proposal
20. The Stand-alone Dock is constructed
21. The litigation begins

### III. POSITION OF THE PARTIES

1.  Westmar's view of the contracts
2.  The Band's view of the contracts

### IV. ISSUES

### V. ANALYSIS

    1.    The Limitation Clause does not limit non-contractual liability

    2.    The Band's contractual and non-contractual claims are based on the same underlying facts

        a.    The facts underlying the contractual claims

        b.    The facts underlying the non-contractual claims

    3.    This matter is not suitable for summary disposition.

### VI. CONCLUSION

**Reasons for Judgment**

L.D. RUSSELL J.:--

### I. Introduction

**1**    This is an application for a summary trial under rule 9-7 of the *Supreme Court Civil Rules*. The applicant, Worleyparsons Canada Ltd., is an engineering firm who designed and supervised the construction of a cruise ship docking facility for the respondents, the Campbell River Indian Band (the "Band"). The applicant's design of that dock has proven flawed, and the Band sues under the contract, in tort, and for breach of fiduciary duty. The applicant says that its agreement with the Band to design the dock was governed by a contract that contains a limitation clause (the "Limitation Clause"). The applicant asks this Court to decide a single issue: is the Limitation Clause valid and enforceable, and does it therefore limit the applicant's liability to the plaintiff?

**2**    I find that the validity of the Limitation Clause is factually intertwined with the Band's claims in tort and breach of fiduciary duty. Resolving the issue of the Limitation Clause in isolation from these other issues does not promote judicial efficiency and risks embarrassing the trial judge. I therefore find that this matter is not suitable for summary trial and I dismiss this application.

### II. Facts

#### 1. The parties

**3**    At the time the parties began working together, the applicant was operating under the name "Westmar Consultants Inc.", and I will refer to the applicant as "Westmar". Westmar is an engineering firm with considerable experience in marine engineering.

**4**    The Band's reserve is located on the coast of Vancouver Island near the City of Campbell

River. In the past, the Band has engaged in a number of economic development projects, including numerous expansions to a marina, the development of a multi-million dollar shopping mall, the development of a strip mall, and the development and operation of an aboriginal art and gift shop. In or around 2006, the Band also negotiated a long-term sublease agreement with Wal-Mart and Home Depot.

### 2. The Boliden Project

**5**    In 2001, a cruise ship called into the City of Campbell River as part of its regular schedule. Later that year, Royal Caribbean Inc. ("Royal Caribbean") expressed an interest in calling into Campbell River more regularly.

**6**    Seeing the potential for economic development, the Band decided to consider constructing a docking facility capable of attracting more cruise ships. The Band believed that Campbell River could be a successful cruise ship port of call, providing that there were facilities adequate to host the cruise ships.

**7**    Boliden-Westmin Canada Ltd. ("Boliden") operates a commercial docking facility in Campbell River, known as the "Boliden Dock". The Boliden Dock is used to ship mining products. The Band believed that the Boliden Dock site could be used both for its original mining purpose and for hosting cruise ships, and Boliden agreed in principle to this arrangement. However, the Boliden Dock would need a number of upgrades and modifications before it could accommodate cruise ships. The Band and Boliden would also eventually need to negotiate a formal agreement.

**8**    Boliden recommended Westmar to the Band, as Westmar had previously done some engineering work on the Boliden Dock. In late 2001 or early 2002, the Band decided to seek Westmar's assistance in upgrading the Boliden Dock in order to use it as a cruise ship facility. I will refer to this work as the "Boliden Project".

### 3. The initial discussions

**9**    At the start of the Boliden Project, the Band's representative was Mr. Robert Duncan, who was the Band's "economic development officer". As such, he was responsible for advancing the Band's business interests. He carried out rent reviews, gathered information for the chief and council, participated in negotiations, sought out economic development opportunities, and performed various business-related planning activities. As economic development officer, he had limited authority and had to submit all significant commitments -- including contracts -- to the Band's council for approval. Mr. Duncan had a high school education and had previously worked as a commercial fisherman, and later as general manager of the Band. Mr. Duncan had some experience in other business developments: he had been involved in a marina expansion and several mall projects.

**10**    At all relevant times, Westmar's representative to the Band was Mr. Harald Kullmann. Mr.

Kullmann has been a marine engineer since 1993 and a senior project manager at Westmar since 2008.

**11**    In their initial discussions, Mr. Kullmann assured Mr. Duncan that Westmar was the leading marine engineering firm in western Canada and that Westmar had significant expertise in cruise ship terminals. Mr. Duncan explained to Mr. Kullmann that the Band did not have funds of its own to pay for the Boliden Project, and that the Band would need to obtain funding from government agencies.

**12**    In order to obtain that funding, the Band needed to show the government agencies a business proposal. So the Band asked Westmar to provide an estimate of costs for the preliminary engineering work that would be needed to begin the Boliden Project.

### 4. The January 2002 Proposal

**13**    This estimate took the form of a letter dated January 10, 2002 (the "January 2002 Proposal"). The January 2002 Proposal contemplated the development of a concept-level design for a cruise ship terminal at the Boliden Dock site. The January 2002 Proposal discussed some of the background to the Boliden Project, listed a number of activities that would need to be completed in the course of preparing conceptual designs, and provided a cost-estimate for that preliminary work. The total projected cost for the work outlined in the January 2002 Proposal was $27,400.

**14**    In its penultimate paragraph, the January 2002 Proposal states:

> We propose to undertake this work on the basis of our Standard Terms of Engagement and Fee and Disbursement Schedule, copies of which are attached.

**15**    Westmar attached two other documents to the January 2002 Proposal. One of the documents is entitled the "Canadian Fee and Disbursement Schedule". This document contains tables listing the hourly rates for various classes of engineers, specialists, draftspersons, and other workers. It also explains Westmar's disbursement policies and terms of payment.

**16**    The second document is entitled the "Standard Terms of Engagement". This document contains various contractual terms and conditions, including terms related to payment of fees and disbursements, notice provisions, and a termination clause.

**17**    The Standard Terms of Engagement contains the Limitation Clause. That clause reads as follows:

### PROFESSIONAL RESPONSIBILITY AND LIMITATION OF LIABILITY

> Westmar shall provide the standards of care, skill and diligence normally provided by a professional engineer in the performance of the Services

contemplated by this agreement.

Westmar shall not be responsible for a Contractor's failure to perform work in accordance with the relevant contract documents; for design of, or defects in, proprietary equipment; for loss of earnings or other consequential damage, however caused.

Notwithstanding anything to the contrary contained in this Agreement, the aggregate liability of Westmar, **its Directors, Officers, and Employees** under this Agreement, including liability for professional errors, omissions or negligence and fundamental breach of contract, shall be limited to compensation under this Agreement and **any such liability** shall expire one year from the completion of the Project or any relevant part of the Project.

**The Client agrees that Westmar's Directors, Officers, and Employees shall have no personal liability to the Client, its Directors, Officers, or Employees, in respect of a claim whether in contract, tort, and/or any other cause of action in law.**

[Emphasis in original.]

**18**    The Standard Terms contains a clause entitled "Compensation", which says:

Charges for the Services performed will be made in accordance with our standard terms, based on the hourly fee and disbursement schedule attached. All charges will be made in, and will be payable in, Canadian dollars.

**19**    Westmar prepared the January 2002 Proposal in order to assist the Band in its search for funding. Mr. Duncan, the Band's representative, did not bring the January 2002 Proposal to the Band Council for approval, as he did not intend to hire Westmar unless and until the Band obtained outside funding. As a result, the Band did not approve the January 2002 Proposal and the Boliden Project did not go forward at that time.

### 5. The September 2002 Proposal

**20**    In September 2002, the Band requested another estimate for preliminary engineering work on the Boliden Project. The Band needed this estimate as it was planning to apply for $100,000 in government funding, which would cover Westmar's preliminary work and some of the geotechnical testing needed to assess the suitability of the Boliden Dock as a cruise ship facility.

21    This estimate took the form of a letter (the "September 2002 Proposal"). This letter is very similar in form to the January 2002 Proposal. The scope of work contemplated in the September 2002 Proposal was also similar: the development of a concept-level design for a cruise ship terminal at the Boliden Dock site. The total cost of the work was estimated to be $94,475, of which $56,000 was budgeted for a geotechnical site investigation. The September 2002 Proposal also referenced the Standard Terms of Engagement and the Fee and Disbursement Schedule, and both of those documents were attached to the letter.

22    Following the preparation of the September 2002 Proposal, Westmar and the Band continued to discuss the work needed to begin the Boliden Project. Over time, they decided to engage in a different scope of work than what was described in the September 2002 Proposal, but the parties did not amend that document or draft a new one.

### 6. The Band obtains funding

23    After the preparation of the September 2002 Proposal, the Band obtained $100,000 in government funding for the Boliden Project.

24    On October 18, 2002, Mr. Duncan informed Westmar by email that the Band had obtained the funding needed to proceed with the initial stages of the Boliden Project. He asked whether Mr. Kullmann wanted "something in writing between us".

25    In an emailed response, Mr. Kullmann made the following comment:

> If you would like to proceed at this time, all we would need is for you (I assume that you have signing authority) to ask us to proceed on the basis of our proposal dated ____. E-mail or letter would work for me. If you like, I can forward a sample invoice and cover letter so that you know what would be coming on a monthly basis.

26    In response to this email, Mr. Duncan replied:

> Sounds fine monthly invoice will be good for my reporting to the Province. I don't mind dealing directly with [the geotechnical contractor] we could save the taxes on the job which will be some savings for us.

27    The Band never sent any other letter or email asking Westmar to proceed on the basis of any particular proposal.

### 7. Work proceeds on the Boliden Dock

28    Despite the lack of clear written approval, Westmar proceeded with the preliminary work on the Boliden Project. This work was generally similar to the work described in the September 2002 Proposal, but some of it varied significantly from what was described in that proposal. For example,

while the September 2002 Proposal has Westmar subcontracting another firm to carry out the geotechnical investigation, in fact the Band contracted that engineering firm directly. This is a significant variation from the September 2002 Proposal, since the geotechnical work made up more than half of the total cost estimate contained in that proposal.

**29**    Westmar continued to work for the Band even after completing all of the preliminary engineering work on the Boliden Project. From late 2002 through 2003, Westmar assisted the Band in obtaining funding approval, attended meetings, and coordinated with other groups, such as Indian and Northern Affairs Canada, Western Economic Diversificiation, and the Campbell River Port of Call Committee. None of this work was outlined in any express written agreement, although Mr. Kullmann charged the Band for his time. Westmar simply invoiced the Band based on Westmar's hourly rates.

**30**    The parties disagree on the nature of this work. The Band says the work was essentially *ad hoc*, billed hourly, and not contractually linked to the September 2002 Proposal. Mr. Duncan says the work from 2003 to 2004 was done pursuant to oral discussions between him and Mr. Kullmann. Westmar says that the work was closely related to the design of the dock and the September 2002 Proposal, and that the work was effectively a continuation of that proposal even if the proposal does not actually contemplate that work. Mr. Kullmann agreed that the scope of work performed shifted as the product unfolded to deal with new issues that arose; while Mr. Kullmann informed Mr. Duncan of those changes, no new proposal, contract, or retainer was created.

### 8. The November 2002 Estimate

**31**    In November 2002, the Band sought and received another letter from Westmar, this time for further detailed design work on the Boliden Project (the "November 2002 Estimate"). The November 2002 Estimate takes a similar form to the earlier proposals, but rather than describing itself as a "proposal" it describes itself as an "estimate". This letter contains a list of the activities needed to complete the detailed designs for the modification and upgrade of the Boliden Dock and an estimate of the cost of each activity. The total cost of the work proposed in this estimate was $162,500. Unlike the earlier proposals, this letter did not contain a reference to the Standard Terms of Engagement or to the Schedule of Fees and Disbursements, and those documents were not attached to the letter.

**32**    It is unclear whether or not Westmar intended the November 2002 Estimate to have any contractual effect, or whether Westmar only prepared it in order to assist the Band in obtaining funding. Mr. Kullmann stated that the November 2002 Estimate was not a "proposal", but merely a quote. However, he also stated that had the Band accepted that estimate, Westmar would have been bound by it. Mr. Kullmann indicated that in his view the difference between a mere quote and a proposal capable of forming an agreement was the inclusion of the "standard terms and conditions".

**33**    In any event, the Band only intended to use the November 2002 Estimate in order to obtain funding, never accepted the estimate, and the work described in the November 2002 Estimate was

not carried out at that time.

### 9. The Band receives funding

**34**    In December 2003, the Band received funding of over $2.7 million for the Boliden Project. The funding approval carried a number of conditions that had to be met before the funds would be released. One of these conditions was that Boliden had to approve the use of the Boliden Dock as a cruise ship facility. This condition would eventually prove to be a fatal hurdle for the Boliden Project.

**35**    Shortly after the Band received funding approval, Mr. Duncan left his position as the Band's economic development officer. In February 2004, Mr. Helmut Urhahn, an environmental consultant who had previously worked on the environmental aspects of the Boliden Project, took over as interim leader of the project.

### 10. The April 2004 Proposal

**36**    In April 2004, Westmar sent Mr. Urhahn a letter containing a written proposal for detailed design and construction inspection work for the Boliden Project (the "April 2004 Proposal"), which was then on hold. Mr. Urhahn wanted to provide this proposal to a funding agency as soon as work on the Boliden Project resumed.

**37**    The April 2004 Proposal takes the same form of the earlier proposals: it sets out a series of activities with an associated price for each. This proposal was for the detailed design work and the construction inspections of the Boliden Project, at a projected total cost of $349,950. The April 2004 Proposal references the Standard Terms of Engagement and the Fee and Disbursement Schedule, and attaches both documents.

**38**    The Band never signed or accepted the April 2004 Proposal and the work set out in that proposal never proceeded.

### 11. Ms. Dick takes over as economic development officer

**39**    In the spring and summer of 2004, Ms. Jodee Dick gradually took over the duties of economic development officer. She was officially appointed economic development officer in the fall of 2004.

**40**    Ms. Dick is the daughter of Mr. Aubrey Roberts, who was then Chief of the Band, and had been his executive assistant for a number of years. As Chief Roberts' executive assistant, she helped draft the Band's taxation bylaw. She also reviewed documents. Before that, she worked as a lands officer for Indian and Northern Affairs Canada ("INAC"). In that position, she reviewed leases and permits, and dealt with land issues, mortgages, and housing, sometimes with the assistance of a lawyer. At times she was contracted to INAC, where she worked as a trainer for a land management training program. Before becoming economic development officer, Ms. Dick had some familiarity

with the Boliden Project, but she did not know any of its details.

**41**    When she started as economic development officer, Ms. Dick did not look over the various documents previously exchanged between Westmar and the Band. She understood that Westmar agreed to work for the Band, and that the Band would pay Westmar for that work if and when the Band secured funding. If the Band wished to proceed with any particular work, her practice was to give Westmar oral approval in an informal fashion. When a contract was to be signed in writing, her practice was to have legal counsel review the contract; however, she would not seek legal counsel if she was reviewing a quote or proposal rather than a contract. Her understanding of the relationship between Westmar and the Band was that Westmar would send a quote, and then she would get approval for the quote from the Band Council.

**42**    As Ms. Dick took over her role as economic development officer, Mr. Kullmann never discussed the Boliden Project or brought the earlier proposals to her attention. They did not discuss the Standard Terms of Engagement or the Limitation Clause. Ms. Dick informed Mr. Kullmann that she had no experience overseeing a construction project like a cruise ship docking facility. She made statements to the effect that Mr. Kullmann would need to "hold her hand" through the process, and that she was counting on him to do so. Ms. Dick relied on Mr. Kullmann's experience and guidance, and she told him so on more than one occasion.

### 12. The Boliden Project collapses

**43**    The Boliden Project ran into unexpected difficulties in the spring and summer of 2004. The project required approval from Boliden before work on the Boliden Dock could begin. Boliden refused to provide this approval, due in part to increased use of the facility for its primary, mining-related purposes. By the summer of 2004, it was clear that the Boliden Project had collapsed.

**44**    After the Boliden Project collapsed, Ms. Dick and Mr. Kullmann discussed some of Westmar's outstanding fees. The Band had intended to pay Westmar once government funding came through. The Band did not otherwise have the funds on hand to pay for consultants. Since Boliden had refused to agree to the joint use agreement, the federal government refused to release the funding. This left the Band without anticipated funds and Westmar was left unpaid for some of the work it had done in excess of the $100,000 the Band received in 2002.

**45**    Westmar contends that it never agreed to an arrangement whereby it would be paid only once funding came through. The Band argues that Westmar knew of and agreed to this arrangement. In discovery, Mr. Kullmann admitted that he understood that he and Westmar would only be paid if and when the Band received funding.

### 13. The parties begin planning the Stand-alone dock

**46**    While the Boliden Project had failed, the Band was still interested in constructing a cruise ship

facility. With the encouragement of the City of Campbell River, the Band decided to pursue the possibility of building a stand-alone cruise ship docking facility. That facility was eventually built, and became the subject of this action (the "Stand-alone Dock"). The Stand-alone Dock has two components: on-shore buildings and various marine structures, including a pontoon dock.

**47**    Westmar advised the Band with respect to the marine portion of the Stand-alone Dock. Westmar determined the design needs and requirements for the Stand-alone Dock and then prepared designs to meet those needs and requirements. Westmar assured the Band that the Stand-alone Dock could be built in its current location. Westmar supervised and managed the construction process on the marine portion of the Stand-alone Dock. Westmar promoted the Stand-alone Dock to various funding agencies and to the cruise industry.

**48**    In the summer of 2004, Ms. Dick, Mr. Kulllmann, and a representative of the City of Campbell River, Mr. Doug Raines, discussed the conceptual design work that the Band would need to undertake to prove the viability of the project to government funding agencies.

**49**    Because Westmar had yet to be paid for some of the work it performed on the Boliden Project, Mr. Kullmann initially resisted starting work on the design of the Stand-alone Dock.

### 14. The City provides funding for conceptual design of the Stand-alone Dock

**50**    Mr. Kullmann's concerns were addressed in two ways. First, the Band promised to pay Westmar's outstanding fees out of any funding the Band managed to obtain for the Stand-alone Dock. Second, the City of Campbell River agreed to provide $10,000 in funding to Westmar as "seed money". Ms. Dick understood that further work would be paid for out of any funding that the Band would be able to secure in the future.

**51**    In a letter dated August 19, 2004, the City sent Westmar a letter which read in part:

> Further to my telephone message this morning, August 19th, 2004 please accept this as authorization to begin the conceptual design of a stand-alone cruise ship dock on the north breakwater of the Discovery Harbour Marina, As per your original estimates to the Band and District of Campbell River, the upset prices on this is $10,000.

The letter was copied to Ms. Dick.

**52**    After receiving the letter from the City, Westmar confirmed that it had started the conceptual design work for the Stand-alone Dock.

### 15. The August 2004 Estimate

**53**    On August 25, 2004, Ms. Dick sent Mr. Kullmann an email asking him to provide her with a cost estimate for the preliminary engineering, geotechnical reports, and concept drawings for the

Stand-alone Dock. Ms. Dick needed this cost estimate in order to support an application for outside funding.

**54**    On August 27, 2004, Westmar sent the Band a brief letter containing an estimate for the cost of preliminary engineering design (the "August 2004 Estimate"). The August 2004 Estimate is a single-page document. It describes itself as an "estimate" rather than a proposal. It contains a description of three tasks (conceptual layout and drawings, geotechnical investigation, and preliminary engineering) with an associated cost for each task. The August 2004 proposal does not mention or attach the Standard Terms of Engagement.

### 16. Mr. Kullmann confirms that Westmar has begun conceptual design work

**55**    In an email sent to Ms. Dick dated September 8, 2004, Mr. Kullmann confirmed that he had begun to prepare conceptual design work for the Stand-alone Project He stated:

> We are proceeding with the conceptual work. I had received approval from the District, but since we are working for the Band, I will need confirmation under Band letterhead. If I can get that in the next few days, that would be great. I assume that we will continue under the existing terms and conditions.

**56**    The parties disagree on the meaning of the words "existing terms and conditions". Westmar says these words refer to the Standard Terms of Engagement. The Band says they refer to the arrangement whereby Westmar would be paid once the Band obtained government funding.

**57**    By this time, it had become clear that in order for the Stand-alone Dock project to proceed to the point where the Band would be able to secure funding, additional preliminary engineering work needed to be completed. This work included geotechnical engineering at an estimated cost of $120,000, which would test the suitability of Stand-alone Dock's proposed location for pilings and other works. This work was to be performed by another engineering firm, Levelton Consultants Inc. ("Levelton").

**58**    In order to fund the geotechnical engineering, the Band pursued more outside funding. The Levelton work did not proceed at that time. Westmar continued to work on the Stand-alone Dock designs. Westmar may have reduced the pace of its progress on the Stand-alone Dock project, although that reduction in pace was not communicated to the Band or the City of Campbell River.

### 17. The September 2004 Estimate

**59**    Westmar prepared another written estimate in a letter dated September 15, 2004 (the "September 2004 Estimate"). Mr. Kullmann attached that estimate to an email, which reads:

> As requested, attached is our letter dated September 15, 2004, detailing the

> proposed scope of work and estimate of fees and disbursements for the
> conceptual and preliminary designs of the marine works for the Campbell River
> Cruise Ship Terminal. If we proceed on this basis I propose that we continue on
> the basis of our existing terms and conditions. Let me know if this works for you.

Once again, the parties do not agree on the meaning of the phrase "existing terms and conditions.

**60**    The September 2004 Estimate was for the preliminary engineering design of the Stand-alone Dock. Westmar was to identify the necessary design requirements for the Stand-alone Dock, and then create a conceptual design that would meet those requirements.

**61**    The September 2004 Estimate does not mention the Standard Terms of Engagement, nor were they attached to Mr. Kullmann's email. The opening lines of the September 2004 Estimate refer to the letter as an "estimate", rather than as a "proposal". It outlines a scope of work and estimates the cost of each aspect of that work, which totalled $185,000. Of that total cost, $120,000 was budgeted for the geotechnical work that was to be carried out by Levelton.

**62**    Ms. Dick provided the September 2004 Estimate to the Band Council, who approved of the plan, providing government funding could be obtained to finance it. To that end, the Band sought funding from a provincial program known as "BCEPI".

**63**    At this point, the Band became concerned with the pace of progress on the project. The Band hoped to have the Stand-alone Dock complete by the fall of 2005, ready for possible visits from Royal Caribbean cruise ships. In order to move the Stand-alone Dock project forward, the Levelton geotechnical engineering work needed to begin. Westmar was unwilling to subcontract Levelton until the Band could assure Westmar that the Levelton work would be paid for, whether or not the Band eventually obtained funding. Thus, the Band had to decide whether it would accept the risk of paying for the Levelton work without the certain availability of funding.

### 18. The Confirmation Letter

**64**    To that end, on October 21, 2004, Westmar told the Band that Westmar would initiate the geotechnical work outlined in the September 2004 Estimate once the Band instructed Westmar to proceed. Westmar asked that those instructions be in writing on Band letterhead, and that the instructions assure Westmar that it would be paid regardless of whether the Band obtained funding. Discussions between Westmar and the Band made clear that in order for the project to move forward, the Band needed to produce a written letter of authorization.

**65**    Ms. Dick and Mr. Kullmann exchanged a series of emails on October 26, 2004. Mr. Kullmann wrote to Ms. Dick requesting that Ms. Dick confirm the September 2004 Proposal:

> Jodee,

> Can you kindly forward written confirmation to proceed with conceptual and
> preliminary design per our letter dated September 15, 2004, along with
> confirmation that you have received the funding to cover this. Note that this letter
> covers $185,000 in fees and disbursements, $120,000 of which is for our
> geotechnical subconsultant.

**66**    Ms. Dick replied later that same day:

> I will draft the letter for the Chief's signature but he will be away until tuesday.
> Please do not let this hold up [your] progress as we are on track and our funding
> for the entire amount for phase one should be forwarded to the band shortly. The
> BCEPI funds have allocated $185,000 to you for geotech/engineering and
> concept drawings. We have access to $138,000 now.

**67**    The BCEPI funding referred to by Ms. Dick in her letter was funding that had been promised
to the Band but that had not yet been transferred to the Band's account.

**68**    Mr. Kullmann replied assuring Ms. Dick that work was proceeding apace even in the absence
of a confirmatory letter:

> Jodee,
>
>
> Rest assured, this is not holding things up. However, I do need this sort of
> back-up for others in my office to relax.

**69**    Despite Ms. Dick's stated intention to draft a confirmation letter, she did not do so. The need
for the letter was discussed at meetings in late October and early November. At one point another
consultant working for the band, David Nairne and Associates ("DNA"), agreed to draft a
confirmation letter, but DNA also failed to draft the letter.

**70**    As Ms. Dick and DNA had not prepared a confirmation letter, Westmar prepared one instead
(the "Confirmation Letter"). Westmar sent Ms. Dick the Confirmation Letter on November 3, 2004.
In the Confirmation Letter's covering email, Mr. Kullmann's assistant asked Ms. Dick to sign the
final page of the Confirmation Letter and return it to Westmar.

**71**    The Confirmation Letter is nearly identical to the September 2004 Estimate. It contains nearly
all of the same language, the same list of tasks, and the same estimated costs for each task.

**72**    However, it differs from the September 2004 Estimate in a few small but significant ways.
The opening line of the September 2004 Estimate says that it is an "estimate for engineering fees",
while the opening line of the Confirmation Letter says that it is a "proposal for engineering fees".
The September 2004 Estimate makes no reference to the Standard Terms of Engagement, while the

Confirmation Letter contains a paragraph reading: "[w]e proposed to undertake this assignment on the basis of our Standard Terms of Engagement and Fee and Disbursement Schedules". Westmar attached copies of the Standard Terms of Engagement and the Fee and Disbursement to the Confirmation Letter, but not to the September 2004 Estimate. Finally, Westmar added a signature line to the last page of the Confirmation Letter.

**73**    When she received the Confirmation Letter from Westmar, Ms. Dick did not read the attached Standard Terms of Engagement, and she assumed that the Confirmation Letter was entirely identical to the September 2004 Estimate. She assumed that the Confirmation Letter was intended only to formalize the agreement already reached through the September 2004 Estimate and in the earlier discussions between the parties, and she did not expect the Confirmation Letter to contain any new contractual terms.

**74**    Ms. Dick brought the Confirmation Letter to the Band council. She explained to the council that the Band needed to commit to pay for the geotechnical work if the Band was to complete the Stand-alone Dock on schedule. Ms. Dick did not present the council with the Standard Terms of Engagement, which had been attached to the Confirmation Letter, as she did not realize their importance. As she recalls, the main issue discussed with the council was the need to commit to paying for the Levelton geotechnical work even before funding could be obtained.

**75**    In any event, the Band approved the work outlined in the September 2004 Proposal and the Confirmation Letter. Chief Roberts signed the Confirmation Letter.

**76**    On November 8, 2004, Ms. Dick returned the signed Confirmation Letter to Westmar. In a cover letter written on Band letterhead, Ms. Dick referred to the Confirmation Letter as a "contract", saying:

> Please find a signed copy of the contract for the preliminary engineering design. We look forward to working with you on this exciting project.

### 19. The June 2005 Proposal

**77**    Over the next year, work continued on the Stand-alone Dock. On June 10, 2005, Westmar sent the Band another proposal for the detailed design work of the Stand-alone Dock (the "June 2005 Proposal"). Like the earlier proposals, the June 2005 Proposal sets out a number of proposed tasks and cost estimates for those tasks, which totalled $220,700. The June 2005 Proposal refers to and attached the Standard Terms of Engagement.

**78**    Like the Confirmation Letter, the June 2005 Proposal has a signature line, but the Band never signed it. According to Ms. Dick, the detailed design work proposed in the June 2005 Proposal had already been agreed to and Westmar began that work at least as early as May 2005. Ms. Dick believes that Westmar drafted the June 2005 Proposal in order to provide a record for funding

agencies.

### 20. The Stand-alone Dock is constructed

**79**    Westmar completed the detailed design work in the fall of 2005. The Stand-alone Dock was conceived of as a pontoon dock with a single gangway. Both of these design decisions would prove unfortunate.

**80**    As construction continued, Westmar continued to meet with various funding agencies and cruise lines. Westmar assured funding agencies, cruise lines and other stakeholders that the Stand-alone Dock as designed by Westmar would be suitable as a cruise ship docking facility.

**81**    Westmar acted as the construction contract manager of the Stand-alone Dock project. This aspect of Westmar's work was not subject to any written contract and Westmar provided no written proposal or estimate for this work. Westmar billed the Band as the work took place.

**82**    In 2006, Royal Caribbean advised the Band that due to concerns regarding tides and wave conditions at the Stand-alone Dock, Royal Caribbean had decided not to make any stops in Campbell River. The Band asked Westmar to address these concerns, which Westmar did by writing a report. Westmar also lobbied Royal Caribbean and other cruise ship lines, attempting to convince them that the Stand-alone Dock would be safe for cruise ships. None of this work was subject to any written contract.

**83**    Ultimately, construction of the Stand-alone Dock was completed in November 2006.

### 21. The litigation begins

**84**    No large cruise ships have ever docked at the Stand-alone Facility.

**85**    The Stand-alone Dock's design contained a number of flaws. Due in part to these design flaws, the Stand-alone Dock was damaged in a series of severe storms. Westmar investigated and concluded that the Stand-alone Dock's pontoon structure would suffer wear and tear during the spring and summer months, and would be unsafe to leave in the water during the winter months. The Band also discovered that many cruise ships prefer a two-gangway dock, as opposed to the single-gangway dock designed by Westmar. The Band identified other potential problems relating to the pontoon design that diminished the attractiveness of the Stand-alone Dock as a cruise ship docking facility.

**86**    As a result of these alleged design deficiencies, the Band sues Westmar in both contractual and non-contractual causes of actions. The Band says that Westmar:

    a)    breached its contract or contracts with the Band;
    b)    acted negligently in the services it provided to the Band;
    c)    made negligent misrepresentations upon which the Band relied; and

d)      breached a fiduciary duty to the Band.

**87**    The Band says that these causes of action have led the Band to suffer a number of losses, including:

a)      a loss of profit from the Stand-alone Dock;

b)      a loss of the opportunity to obtain government funding to build a different, more suitable cruise ship dock;

c)      increased costs to retrofit the Stand-alone Dock;

d)      increased maintenance, repair, deactivation, storage and modification costs; and

e)      costs associated with the Stand-alone Dock's diminished facility life.

**88**    Westmar admits that the Stand-alone dock, as originally designed and constructed, was not robust enough for the local wave and current conditions. It says that other alleged design deficiencies are unfounded and any problems are the fault of other parties, including the Band. Westmar denies making any misrepresentations, and says that even if it had, any reliance by the Band on those representations would have been unreasonable. Westmar denies owing the Band any fiduciary duty.

**89**    Westmar also denies that the Band suffered any damage, and argues that the Band's own negligence contributed to any loss. Finally, Westmar relies on the Limitation Clause, which it says limits the Band's recoverable damages.

## III. Position of the Parties

**90**    In this application, Westmar applies to have a single issue within the dispute resolved by summary trial: whether the Limitation Clause is a valid and enforceable part of the contract between Westmar and the Band (the "Limitation Clause Issue").

**91**    Westmar argues that the Limitation Clause Issue can be decided in a summary fashion. In Westmar's view, a summary determination will streamline the litigation, will save time and reduce complexity at trial, and has implications for the possibility of settlement. Most of the evidence is contained in correspondence, other documents, and affidavits, as well as some discovery evidence, and there are no issues of credibility that make a summary decision inappropriate. Westmar notes that enforceability of a license agreement has been considered appropriate for summary trial in other cases.

**92**    The Band argues that this matter is not suitable for disposition by summary trial, and it applies to dismiss the application under Rule 9-7(11)(b). According to the Band, there are credibility issues and controversies in the evidence. This matter is complex, and at least one witness (former Chief Roberts) has refused to participate in the discovery process. Resolving the Limitation Clause Issue, even if possible, will not resolve many of the Band's other non-contractual claims; therefore a trial on the issue of the Limitation Clause constitutes "litigation in slices".

**93**    At the heart of this application is the parties' disagreement regarding the nature of the contractual arrangement between Westmar and the Band. I will describe the parties' positions on the nature of the contract in some detail because their disagreement on this point underscores the difficulty of resolving the Limitation Clause Issue in a summary fashion.

### 1. Westmar's view of the contracts

**94**    Westmar says that in total there were six contractual documents, made up of the various proposals and letters described above. Each of these proposals and letters contained a list of engineering tasks and the estimated cost of those tasks. The documents usually (but not always) contained the Standard Terms of Engagement.

**95**    Westmar says the six contractual documents are as follows:

a)    The January 2002 Proposal was a written proposal for the conceptual design of the Boliden Dock. The Standard Terms of Engagement were attached to this proposal. The Band did not agree to this proposal.

b)    The September 2002 Proposal was a written proposal for the preliminary engineering and conceptual design of the Boliden Dock. The Standard Terms of Engagement were attached to this proposal. In Westmar's view, Mr. Duncan agreed to this proposal in the email where he said: "sounds fine." Westmar agrees that some of the work it performed on the Boliden Project was outside of the scope of this proposal, but argues that all of that work was closely related to the work described in the proposal, and so that work should also be understood as falling within the September 2002 Proposal.

c)    The April 2004 Proposal was a written proposal for the detailed design and field inspection of the Boliden Dock. The Standard Terms of Engagement were attached to this proposal. The Band did not agree to this proposal.

d)    The September 2004 Estimate was a written estimate for the provision of preliminary engineering services regarding the Stand-alone Dock. This letter was similar in form to the earlier proposals, but did not include the Standard Terms of Engagement. In a covering email, Mr. Kullmann stated "if we proceed on this basis, I propose that we continue on the basis of our existing terms and conditions". Westmar argues that when Mr. Kullmann referred to "existing terms and conditions", Mr. Kullmann actually meant the Standard Terms of Engagement.

e)    Westmar says that it needed the Confirmation Letter to formalize the September 2004 Estimate and to confirm that the Band was prepared to pay for the Levelton geotechnical work, whether or not the Band was able to obtain outside funding. As described above, the Confirmation Letter is a copy of the September 2004 Estimate, modified slightly to include a

signature line and a reference to the Standard Terms of Engagement. The Confirmation Letter was signed by Chief Roberts, and in a covering letter included with the signed Confirmation Letter, Ms. Dick referred to the Confirmation Letter as a "contract".

f)    The June 2005 Proposal was a written proposal for the detailed design work of the Stand-alone Dock. The Standard Terms of Engagement were included with this proposal. This proposal was never signed by the Band, but the Band did instruct Westmar to proceed with the work contained in that Proposal, and that work was carried out.

**96**    Westmar argues that all of the design work on the Boliden Dock was either contained in or closely related to the work proposed in the September 2002 Proposal. All of the design work on the Stand-alone Dock was contained within the Confirmation Letter and the June 2005 Proposal. Westmar says that these three documents represent contracts that were accepted by the Band, that all of these contracts contained the Limitation Clause, and that therefore the Limitation Clause applies to limit Westmar's liability for any work performed under those contracts.

**97**    To the extent that there was no written contract for the contract management work and certain other tasks, Westmar says that the Band is not claiming damages for that aspect of Westmar's work.

**98**    In Westmar's view, then, the contracts take the form of the September 2002 Proposal, the Confirmation Letter, and the June 2005 Proposal, all of which included the Standard Terms of Engagement. In Westmar's view, the contract is clearly governed by the Standard Terms of Engagement, including the Limitation Agreement.

## 2. The Band's view of the contracts

**99**    The Band takes a significantly different view of the contractual arrangement between the parties. In the Band's view, Westmar has failed to prove that the Band accepted any contract that expressly or implicitly incorporated the Standard Terms of Engagement.

**100**    The Band argues that rather than being governed by the September 2002 Proposal, the Confirmation Letter, and the June 2005 Proposal, the parties' business relationship unfolded in a more informal manner. While numerous proposals and other documents were drafted and used for various purposes, such as attempts to obtain funding, not all of these documents contained the Standard Terms of Engagement and only one was ever signed. Moreover, Westmar did extensive work not covered by any of the proposals and Westmar began much of the work described in the Proposals before the Proposals were themselves drafted, demonstrating that the parties' agreement was not confined to the various documents prepared by Westmar.

**101**    According to the Band, the only formalized agreement was that set out in the Confirmation Letter, but that Confirmation letter was only intended to document a prior oral agreement and contained terms that the Band did not knowingly agree to. The Band argues that the various

contractual documents only formalize existing agreements, and so the real question is whether these documents should be considered valid amendments to the already existing contracts.

**102** In support of this argument, the Band makes a number of arguments regarding the contents of the informal agreements. I particularize some of these arguments below:

a) During the Boliden Dock project, Westmar provided the Band with a number of proposals that were used to assist the Band in its attempts to secure funding. Only one of these Proposals, the September 2002 Proposal, resulted in Westmar performing work on the project. The other proposals were not considered contracts by either party.

b) If the September 2002 Proposal is considered an offer, then it was never accepted. Mr. Duncan's emails are not acceptance of any particular proposal. It is not even clear that Mr. Duncan understood that the September 2002 Proposal was intended to be a contractual document. Mr. Duncan's response of "sounds fine" cannot be considered an acceptance of the September 2002 Proposal.

c) The work carried out by Westmar after October 18, 2002, which Westmar says occurred under the September 2002 Proposal, was different in scope to what was outlined under that proposal. The Band says that the work that was performed after October 18, 2002, was the subject of a simple informal retainer agreement that evolved over time as the work evolved, based on discussions between the parties. The Standard Terms of Engagement formed no part of this simple oral arrangement.

d) Westmar continued working for the Band between February 2003 and June 2004. None of this work is documented in any proposal or estimate. Mr. Duncan says the work was contracted orally.

e) Westmar's conduct is inconsistent with the proposal that the Standard Terms of Engagement applied to the parties' arrangement. For example, the Standard Terms of Engagement state that invoices must be paid within 30 days, with interest payable. However, the Band routinely failed to pay its invoices in 30 days, since payment was contingent on the Band receiving funding. The Band says that Westmar agreed to that arrangement, although Westmar disputes that fact.

f) The Confirmation Letter does not represent the contract between the parties for the conceptual work on the Stand-alone Dock. Westmar developed the conceptual designs pursuant to an informal retainer concluded in August, which was concluded partly orally, partly in writing, and partly by conduct, and which did not include the Standard Terms. Once the Band agreed to work towards paying Westmar for the outstanding invoices related to the Boliden Dock project, and the City committed to paying $10,000, Westmar immediately began conceptual

design. The September 2004 Estimate and the Confirmation Letter therefore simply documented a pre-existing contract. Westmar prepared the letters only in order to satisfy funding agencies and to confirm that Westmar would be paid regardless of whether the Band ultimately secured outside funding.

g)   Since the Confirmation Letter was merely intended to formalize the agreement reached in the summer of 2004, Westmar's inclusion of the Standard Terms of Engagement into the Confirmation Letter was an invalid amendment to a pre-existing contract. The parties did not agree that the Confirmation Letter would add new terms to their agreement and Westmar did not offer any fresh consideration for those new terms.

This interpretation is substantiated by the parties' behaviour leading up to the Confirmation Letter. For example, the Confirmation Letter was originally to be written by the Band or DNA, who would not have included the Standard Terms had they drafted the Confirmation Letter. Mr. Kullmann described and treated the Confirmation Letter as a "back-up" needed to comfort the other Westmar staff.

h)   The Band argues that the doctrine of *non est factum* applies, because the Confirmation Letter was radically different from the September 2004 Estimate that the Band believed it was signing and that the Confirmation Letter resembled. While neither Ms. Dick nor the Band read the Confirmation Letter or the Standard Terms of Engagement, the Band says that this failure was not caused by any carelessness.

**103**    Generally, the Band argues that it never agreed to any contract that included the Limitation Clause. The parties' agreement was informal and largely oral. The only document that the Band ever signed (the Confirmation Letter) was intended merely to document a pre-existing agreement, and the inclusion of the Limitation Clause in the Confirmation Letter should not be given legal effect.

**104**    Resolving the License Agreement Issue is therefore not a simple matter of interpreting the language of a mutually agreed upon document. Determining whether or not the License Agreement is a part of the contract for the design of the Stand-alone Dock may require an investigation into all the circumstances that led to the creation of the various documents, a consideration of all the discussions and meetings that preceded the drafting of those documents, and an attempt to discern exactly what was said and done by each party before, after, and during the time of contract.

## IV. Issues

**105**    The issues in this application are as follows:

a)      Is this matter suitable for summary determination?

b)      If so, does the contract between the parties include the Limitation Clause?

c)      If so, is the Limitation Clause enforceable?

**106**    I begin by considering whether the case is suitable for summary determination. Due to my finding on that issue, it is not necessary for me to consider the other issues.

## V. Analysis

**107**    The Band contests the suitability of determining this matter by summary trial, and applies under Rule 9-7(11)(b) to dismiss this application.

**108**    Rule 9-7 provides for a summary trial, which is a trial in chambers, usually based on documents and affidavits, without the need for live testimony. Rule 9-7 was known as Rule 18A under the former *Rules.*

**109**    Rule 9-7(11) allows the court to dismiss a summary trial application if the issues raised are not suitable for summary trial or the summary trial will not assist the efficient resolution of the proceedings. Rule 9-7(11)(b) says:

> **Adjournment or dismissal**
>
> (11)   On an application heard before or at the same time as the hearing of a summary trial application, the court may
>
> ...
>
> (b)    dismiss the summary trial application on the ground that
>
> > (i) the issues raised by the summary trial application are not suitable for disposition under this rule, or
>
> (ii)   the summary trial application will not assist the efficient resolution of the proceeding.

**110**    The courts have developed a number of factors when considering whether a matter is suitable for summary disposition under Rule 9-7:

> [13] There are various factors in the authorities that have been considered as to whether a summary trial is suitable. They include:

(a)    A court should be reluctant to decide isolated issues in the absence of a full factual matrix and should not decide issues on the basis of assumed facts.

(b)    While the court may in certain circumstances resolve issues and find facts in the face of conflicting evidence, it should be reluctant to do so where there are direct conflicts in affidavit evidence, the resolution of which will require findings with respect to credibility.

(c)    A court should be reluctant to resolve factual issues in the absence of admissible evidence where such evidence may well be tendered in admissible form at a subsequent trial.

(d)    A court should be reluctant to "slice off" and decide isolated issues and circumstances where resolution of those issues will not resolve the litigation or will only resolve the litigation if answered in a particular way. In such circumstances, the 18A applicant will be required to demonstrate and the court expected to decide that the administration of justice including the orderly and effective use of court time will be enhanced by dealing with the separate issue brought forth by the applicant.

(e)    The matter will not suitable for resolution by Rule 18A where resolution of a particular issue or issues in the summary trial will require that the court make findings or rulings which will impact on parties or issues which are not before the court on the application. In particular, the court hearing the summary trial must not decide the issues on the basis of facts which might be inconsistent with the findings of the judge at trial.

(f)    In some cases, the complexity of the issues raised or the volume of the material before the court may be such that the matter is unsuitable for resolution by summary trial.


*RC Hotel Ventures Ltd. v. Meristar Sub 2C, L.L.C.*, 2008 BCSC 918.

**111**    The resolution of discrete issues within a dispute raises particular concerns with respect to the efficient use of court resources, and creates a danger of inconsistent findings. In *Coast Foundation Society (1974) v. John Currie Architect Inc.*, 2003 BCSC 1781, Groberman J., as he then was, explained the reluctance of the court to rule on distinct issues:

> [13] The question of when the court ought to give judgment on an issue, as opposed to on the claim generally, is more complex. The court is justifiably reluctant to decide cases in a piecemeal fashion. In addition to all of the concerns that arise when the entire claim is before the court, there is a multitude of others. The result is that the court must exercise considerable caution before coming to the conclusion that it should grant judgment on an issue in a summary trial.

[14] Where a Rule 18A application requires determination of a difficult issue of law that might not need to be resolved in order to decide the claim at trial, for example, the court may conclude that the appropriate development of the common law demands restraint: *Bacchus Agents (1981) Ltd. v. Phillipe Dandurand Wines Ltd.*, 2002 BCCA 138, 164 B.C.A.C. 300.

[15] The court must also be wary of making determinations on particular issues on a Rule 18A application when those issues are inexorably intertwined with other issues that are to be left for determination at trial: *Prevost v. Vetter*, 2002 BCCA 202, 210 D.L.R. (4th) 649; inter-relatedness of issues is not always obvious, and caution is necessary whenever a party seeks judgment on an issue as opposed to judgment generally under Rule 18A: *B.M.P. Global et al v. Bank of Nova Scotia*, 2003 BCCA 534, [2003] B.C.J. No. 2383.

[16] It must be borne in mind that the primary purpose of Rule 18A is the efficient resolution of disputes. Where the court does not consider that the determination of an issue under Rule 18A will assist in the efficient resolution of the dispute, it ought not to make the determination.

[17] There are at least two aspects to be considered in gauging the efficiency of the summary trial process. First, this court must be concerned about the allocation of its own resources: *North Vancouver (District) v. Lunde* (1998), 60 B.C.L.R. (3d) 201 at 212 (C.A.) (paragraph 33). Summary trial applications that will not, even if successful, reduce the length of trial, should, in general, be discouraged. The court must recognize the reality that judicial time is a scarce resource.

[18] Second, the court must consider the efficiency of a partial determination from the standpoint of the litigation itself. Piecemeal decision-making is rarely an efficient manner in which to resolve a dispute. It raises the possibility of multiple appeals on individual issues, and this will generally impede rather than hasten the orderly determination of the action.

**112**    In my view, this matter is not suitable for summary disposition. Ruling on the Limitation Clause Issue while leaving the non-contractual claims unaffected would not improve trial efficiency. I see no way in which I can rule on the Limitation Clause Issue without making findings of fact that might be inconsistent with the subsequent findings of the judge at trial.

**113**    I reach this conclusion for three reasons. First, in my view the Limitation Clause does not

affect the Band's non-contractual claims. Second, the nature of the contract is such that in order to consider the application of the Limitation Clause, I would have to examine the circumstances surrounding the parties' agreement, and not just the contractual documents. Third, the facts I would need to find to resolve the Limitation Clause Issue are intertwined with the facts that the trial judge will need to assess in order to resolve the non-contractual claims.

### 1. The Limitation Clause does not limit non-contractual liability

**114**    The Limitation Clause has a limited scope and does not limit Westmar's liability with respect to non-contractual causes of action. The limited scope of the Limitation Clause is obvious from a plain reading of the Standard Terms of Engagement. Thus, even assuming that I accept Westmar's position that the Limitation Clause forms part of the contract, the Band's non-contractual causes of action will proceed unaffected.

**115**    This is due to the wording of the Limitation Clause, the relevant parts of which I repeat below:

> Notwithstanding anything to the contrary contained in this Agreement, the aggregate liability of Westmar, **its Directors, Officers, and Employees** under this Agreement, including liability for professional errors, omissions or negligence and fundamental breach of contract, shall be limited to compensation under this Agreement and any such liability shall expire one year from the completion of the Project or any relevant part of the Project.
>
> **The Client agrees that Westmar's Directors, Officers, and Employees shall have no personal liability to the Client, its Directors, Officers, or Employees, in respect of a claim whether in contract, tort, and/or any other cause of action in law.**

<div align="center">[Emphasis in original.]</div>

**116**    The Limitation Clause thus has two components. The second paragraph excludes Westmar's directors, officers, and employees from any personal liability whatsoever, whether that liability is rooted in contract, tort or some other cause of action. This paragraph does not purport to limit Westmar's corporate liability. That paragraph of the Limitation Clause is not at issue in this dispute.

**117**    By contrast, the first paragraph limits the aggregate liability of Westmar itself, in addition to that of its directors, officers and employees. But it does not do so at large: it only limits the "aggregate liability of Westmar ... under this Agreement".

**118**    A basic principle of contractual interpretation is that the court should "give effect to every

part of it, if this be possible, and not to strike out or nullify one clause in a deed, unless it be impossible to reconcile it with another in a more express clause in the same deed": *Re Strand Music Hall Co.* (1865), 35 Beav. 153, 55 E.R. 853 (Ch), Lord Romilly M.R. Thus I must endeavour to give effect to the phrase "under this Agreement" and not render it superfluous.

**119**    The plain meaning of the phrase "under this Agreement" is to restrict the limitation of liability to causes of action arising out of the contract. Thus, liability that arises under the agreement is limited, while liability that arises outside the agreement is not limited. See *Sault College of Applied Arts and Technology v. Agresso Corp.*, [2006] O.J. No. 5265 (Sup. Ct. J.), where Riopelle J. held that the phrase "under this ... agreement" limited the application of an arbitration clause to causes of action arising under the contract, and not to causes of action in misrepresentation and tort arising out of the formation of the contract.

**120**    Interpreting the first paragraph as limiting non-contractual damages would be to effectively strike out the phrase "under this Agreement". I am reluctant to construe the contract in a way that renders some of its terms superfluous.

**121**    The first paragraph also lists a number of potential sources of liability that are covered by the limitation of liability: professional errors, omissions or negligence and fundamental breach of contract. These are all examples of contractual breaches that are subject to the limitation of liability. The limitation clause does not limit liability for all professional errors, omissions, or negligence, but only those professional errors, omissions, or negligence that arise "under this Agreement".

**122**    My conclusion on this point is reinforced by the second paragraph of the Limitation Clause, which states: "The Client Agrees that Westmar's Directors, Officers, and Employees shall have no personal liability ... in respect of a claim whether in contract, tort, and/or any other cause of action in law." Unlike the first paragraph, in the second paragraph liability is excluded generally, in contract, tort, and other causes of action.

**123**    This phrasing demonstrates that when Westmar wished to apply a limitation or exclusion of liability to non-contractual claims, it did so expressly. Another basic rule of interpretation applies to this choice of wording: when different clauses in a contract employ different language, a different meaning is intended. If the first paragraph was intended to limit Westmar's liability in "contract, tort, and/or any other cause of action in law," it would have used the same language used in the second paragraph.

**124**    Finally, the doctrine of *contra proferentum* holds that provisions in contracts that are ambiguous are to be construed against the interest of the party who drafted the document. Since I have been able to construe the meaning of the Limitation Clause using other rules of construction, I do not need to apply that doctrine, which "applies, if at all, 'only when all other rules of construction fail'": *Canadian Railway Co. v. Royal and Sun Alliance Insurance Co. of Canada*, 2008 SCC 66 at para. 33, [2008] 3 S.C.R. 453. I do note that in this case Westmar drafted the Limitation Clause upon which it seeks to rely, the Limitation Clause was part of a standard form document, the

Limitation Clause was not brought to the notice of the Band, and the common law has traditionally construed limitation clauses strictly: see, for example, *Alderslade v. Hendon Laundry, Ltd.,* [1945] KB 189, [1945] 1 All E.R. 244, Lord Greene M.R.

**125**    In any event, the plain meaning of the Limitation Clause is that only contractual liability is limited. That being the case, even if I were to find that the Limitation Clause is a valid and enforceable part of the contract between Westmar and the Band, the Limitation Clause will not affect Westmar's non-contractual claims. Those non-contractual claims will continue to trial unaffected.

**126**    As I will discuss below, the non-contractual claims deal with the same set of events, discussions, and documents that I would need to consider in resolving the Limitation Clause Issue. For that reason, any finding I make with respect to the parties' contract -- including a finding regarding what documents and terms are or are not contained in that contract -- would necessarily be revisited at trial in resolving the non-contractual claims.

### 2. The Band's contractual and non-contractual claims are based on the same underlying facts

**127**    In order to decide whether or not the Limitation Clause forms part of the contract I would need to make findings of fact that could impair the trial judge when he or she decides the non-contractual claims. It is my view that the contractual claims and the non-contractual claims are based on many of the same underlying facts.

#### *a. The facts underlying the contractual claims*

**128**    I will begin by considering the nature of the agreement between Westmar and the Band.

**129**    Ordinarily, the "parole evidence rule" dictates that a court's interpretation of a contract is limited to a consideration of the terms of that contract. When the contract is written, clear, and unambiguous, no recourse to extrinsic evidence is needed or admissible: *Tangerine Financial Products Limited Partnership v. Tangerine FP Investments Ltd.*, 2012 BCCA 521 at paras. 29-30, 40 B.C.L.R. (5th) 274 [*Tangerine*].

**130**    This rule makes issues of contractual interpretation generally amenable to summary trial: *Tangerine* at para. 29.

**131**    However, the parole evidence rule does not apply when the written document was not intended to be a final expression of the parties' agreement: *Nevin v. British Columbia Hazardous Waste Management Corp.* (1995), 129 D.L.R. (4th) 569, [1996] 3 W.W.R. 237 (B.C.C.A.).

**132**    I do not take either of the parties to be arguing that in this case I can interpret their contract by reference solely to the words of any written document. A significant portion of the work

performed by Westmar occurred without ever being reduced to writing. For example, Westmar supervised the construction of the Stand-alone Dock, yet no written proposal was ever drafted, much less any written contract executed. Westmar also attended and participated in a number of meetings with the Band, the City, funding agencies, and cruise ship companies. This work did not fall within the scope of any written proposal or contract, and yet Westmar unquestionably performed this work for compensation at the behest of the Band.

133    At other times, work was contemplated by a written proposal, but was carried out in a significantly different way without that proposal ever being amended or a different document drafted. For example, while the September 2002 Proposal contemplated Westmar subcontracting an engineering firm, in fact the Band contracted that firm directly.

134    While Westmar prepared a number of proposals and estimates, there is little evidence that these proposals represent binding written contracts. For example, Westmar says that the second document, the September 2002 Proposal, was accepted by Mr. Duncan and constitutes a binding contract. That document was not signed, and so in order to conclude that the Band accepted it, I must turn to extrinsic evidence. A close reading of the emails exchanged by Mr. Duncan and Mr. Kullmann on October 18, 2002, around a month after the September 2002 Proposal had been prepared, shows that no clear acceptance took place. Mr. Kullmann stated:

> If you would like to proceed at this time, all we would need is for you (I assume that you have signing authority) to ask us to proceed on the basis of our proposal dated _____. E-mail or letter would work for me. If you like, I can forward a sample invoice and cover letter so that you know what would be coming on a monthly basis.

And Mr. Duncan replied:

> Sounds fine monthly invoice will be good for my reporting to the Province. I don't mind dealing directly with [the geotechnical contractor] we could save the taxes on the job which will be some savings for us.

135    Westmar argues that "sounds fine" amounts to an acceptance of the September 2002 Proposal. The words immediately following "sounds fine" concern invoices, and so in my view, it is just as likely that the words "sounds fine" relate to Mr. Kullmann's offer to prepare a sample invoice or cover letter. Nothing in this email constitutes clear and unambiguous acceptance of any proposal, and the September 2002 Proposal is not even mentioned. It is clear that Mr. Duncan wished Mr. Kullmann to carry out some work, but it is not at all clear that Mr. Duncan accepted the September 2002 Proposal.

136    The June 2005 Proposal suffers from similar defects. That contract cannot stand on its own, since, like the September 2002 Proposal, it was never signed and nothing in the written contract itself indicates that it was ever accepted by the Band. According to Ms. Dick, the June 2005

Proposal was prepared for the purpose of providing a record to funding agencies. In May 2005, Westmar had already started the work that would later be described by the June 2005 Proposal, pursuant to an informal agreement reached with the Band. From this perspective, the June 2005 Proposal represents Westmar's understanding of an agreement it had already concluded with the Band.

**137** In this context, it is clear that the Confirmation Letter cannot stand on its own as a clear and unambiguous statement of the parties' intent such that the parole evidence rule can apply. That letter was drafted in a business context where formal written contracts were not used, where agreements were concluded informally and *ad hoc*, and where the agreements changed substantially based on the facts on the ground. In order to determine whether the Confirmation Letter formed part of the parties' agreement, I would need to rely on extrinsic evidence of the circumstances surrounding the formation of that document, the discussion of the parties leading up to its formation, and their subsequent conduct.

**138** In summary, in order to determine whether the License Agreement formed part of the contract for the design of the Stand-alone Dock, I would need to make a number of factual findings regarding the circumstances surrounding the creation of the contract. As I will explain below, those circumstances are the same circumstances that the trial judge will inevitably have to investigate in resolving the Band's non-contractual claims.

### b. The facts underlying the non-contractual claims

**139** In addition to its claims for breach of contract, the Band sues Westmar for negligent misrepresentation, negligence, and breach of fiduciary duty. These claims are unaffected by the Limitation Clause and will have to be resolved by the trial judge. The trial judge's decision will be informed by the facts underlying these non-contractual claims.

**140** The Band's claim of negligent misrepresentation is based on a number of statements it says Westmar made, including statements regarding:

      a)    Westmar's expertise and experience in marine engineering;

      b)    the feasibility of constructing the Stand-alone Dock in its current location;

      c)    the safety of the Stand-alone Dock's design; and

      d)    the work that Westmar would do to ensure that the Stand-alone Dock met the Band's requirements and the needs of visiting cruise ships.

**141** According to the Band, Mr. Kullmann and Westmar represented that it had experience in constructing cruise ship docking facilities. These misrepresentations were allegedly made by Mr. Kullmann throughout the course of the projects, including to Ms. Dick as she was taking over the Stand-alone Dock project and as the Band was deciding whether or not to proceed with the preliminary engineering work on the Stand-alone Dock.

**142**    At the time the Stand-alone Project was first being considered, Mr. Kullmann represented that its location would be suitable for cruise ships: the Band says this too was a misrepresentation. Mr. Kullmann's assurance that the location was suitable necessarily informed the contract that followed. These assurances that the location was suitable continued through the course of the project, even as concerns were raised that the Stand-alone Dock might not be safe.

**143**    The Band says that in the September 2004 Proposal, Westmar represented that it would assess the cruise ships' gangway requirements. Westmar's representations regarding cruise ship requirements informed the Band's decisions regarding the conceptual and preliminary design work. These representations turned out to be false: a single-gangway design proved inadequate for many cruise ships, and the Stand-alone Dock's design proved inappropriate for its location and intended use.

**144**    These misrepresentations occurred during the same discussions, meetings, and communications that I would need to consider in order to interpret the parties' contract. In resolving the claims of misrepresentation at trial, the parties will call the same witnesses to testify regarding the same facts that underlie the contractual claims. In other words, the issues of misrepresentation and contractual interpretation are intertwined and share the same factual underpinnings.

**145**    The same is true of the Band's claim of breach of fiduciary duty. The Band says that Westmar owed it a fiduciary duty because Westmar held itself out as an expert, picked the requirements of the dock's design, gathered information to which the Band was not made privy, made decisions regarding design parameters and requirements based on information that the Band could not understand or appreciate, and used its role as professional engineers to persuade the Band that Westmar had superior knowledge and judgment in this field. The Band, being relatively new to marine development, was forced to rely heavily on Westmar's advice. The Band was therefore highly vulnerable to Westmar, in that the Band had no ability to evaluate Westmar's design decisions for the Stand-alone Dock before it had completed construction.

**146**    Without commenting on the merits of this claim, the facts that underlie it are the same as those that underlie the Band's contractual claims.

**147**    In summary, the Band's contractual and non-contractual claims are based on the same underlying facts. Resolving these claims will necessarily involve the evaluation of the same evidence, the testimony of the same witnesses, and the same findings of fact.

### 3. This matter is not suitable for summary disposition.

**148**    In my view, this case is not suitable for summary disposition. Resolving the Limitation Clause Issue in isolation would constitute litigation in slices, would fail to improve trial efficiency, and would present the risk of embarrassing the trial judge with inconsistent factual findings.

**149**    Courts have repeatedly warned against the danger of resolving some issues in a dispute in

isolation from the dispute itself. In *North Vancouver (District) v. Fawcett* (1998), 162 D.L.R. (4th) 402, 110 B.C.A.C 137, Mr. Justice Lambert said:

> [33] With respect, it seems to me that if the answer to an issue sought to be tried under Rule 18A will only resolve the whole proceeding if one answer is given, but not if a different answer is given, then the applicant should be required to demonstrate, and the judge should be expected to decide, that the administration of justice, as it affects not just the parties to the motion, but also the orderly use of court time, will be enhanced by dealing with the issue as a separate issue. It cannot be enough simply that the parties have agreed to a summary trial of one or more issues, but not all of the issues, raised in the proceeding, without any consideration for the effective use of court time, or the efficient resolution of the proceeding.

**150**    Mr. Justice Lambert's concern carries particular weight in this case, where even if I were able to resolve the issue of the Limitation Clause, the proceeding would continue.

**151**    The Court of Appeal has also indicated that a summary trial is inappropriate where narrow issues are taken out of complex proceedings, especially where the issues to be determined in the summary trial and the issues that will remain after summary determination are clearly interlocked: *Neylan v. Tindale*, [1987] B.C.J. No. 1068 (C.A.).

**152**    Even if I find that the Limitation Clause is enforceable, the Band has a variety of non-contractual claims that will continue to trial. A trial on the issues of negligent misrepresentation or breach of fiduciary duty will necessarily canvass in greater detail all of the same circumstances that were canvassed in this application. A finding that the Limitation Clause does not limit the Band's liability in contract would not resolve the litigation either, since Westmar has asserted a number of other defences to the Band's claims.

**153**    So no matter which way I ruled on the Limitation Clause Issue, the same witnesses will need to be called to testify on the same factual matters. This means that a summary disposition would not save time or reduce the complexity of the trial. It provides no advantage from this perspective, since any facts I find would have to be revisited at trial in light of the Band's other claims and Westmar's various defences.

**154**    Moreover, a summary disposition in these circumstances carries the risk of embarrassing or trammeling the findings of the trial judge. When granting relief by summary trial, courts must avoid embarrassing the conduct of the trial court by placing the trial judge in a position where the findings of fact made after a trial conflict with the conclusions reached in the earlier summary trial: *Georgia Homes Ltd. v. McNestry*, [1993] B.C.J. No. 1896 (S.C.), aff'd [1994] B.C.J. No. 2174 (C.A.).

**155**    The Band's claims of negligent misrepresentation and breach of fiduciary duty go directly to the circumstances surrounding the parties' agreements. Thus any findings of fact I make regarding

those contracts will be intertwined with the findings that the trial judge will eventually be required to make. The trial judge, having the benefit of a fuller record, may well disagree with the findings I would have to make in this application if I were to rule on its merits.

**156**    Counsel for Westmar downplayed the danger of such inconsistent findings. Counsel suggested that a decision on the effectiveness of the Limitation Clause might well avoid the necessity of trial, as one of the parties might be more inclined to settle.

**157**    In the words of McEwan J. in *St. John's United Church v. Ecclesiastical Insurance Office PLC,* 2004 BCSC 170, 9 C.C.L.I. (4th) 120:

> [17] The plaintiffs submit that this is a case where, if the declaration it seeks is granted, the parties may be assisted in reaching an accommodation on other issues. The description Chief Justice McEachern used, however, was "if a <u>critical</u> <u>issue</u> ... can be decided ...". I do not take *Inspiration Management*, [1989] B.C.J. No. 1003 (supra), as authority for the proposition that issues may be snapped off piecemeal for tactical reasons. Rule 18A is a summary <u>trial</u> mechanism, not a tool for coercing settlement. An issue separated and tried under Rule 18A must be determinable in the sense that the whole case for and against it can fairly be addressed on a summary trial basis without embarrassment to the rest of the case as the facts develop. In that sense the issue must be "critical." What the plaintiffs seek here is a declaration as to a state of law that may be highly dependent on the facts, prior to the finding of those facts. Our Court of Appeal has been critical of proceeding in that manner.

**158**    I am reluctant to "snap off" the Limitation Clause issue from the rest of trial, and take little comfort from the uncertain possibility that doing so <u>might</u> assist the parties in reaching a settlement before trial.

**159**    In support of the suitability of determining this matter by summary trial, Westmar cited *Marine Masters Holdings Ltd. v. Greater Victoria Harbour Authority,* 2009 BCSC 953 at para. 4 [*Marine Masters*]:

> [6] In complex litigation, the court can, in my view, expect counsel to consider the relative importance and cost benefit of determining discrete issues. This is because the lawyers generally have a different perspective and appreciation of the parties' needs and wishes than the court. They know, for example, whether the final determination of a discrete issue will alter the course of the proceedings including enhancing the possibility of settlement. Only the lawyer knows whether his or her client will accept the outcome of the particular issue without regard to the resolution of other issues.

**160**    But in *Marine Masters,* all of the parties agreed that a summary disposition of the discrete

issue was advisable. When parties agree that a summary trial is appropriate, courts ought to treat that decision with respect. As Macaulay J. put it:

> [7] The court rarely knows such details yet they are factors driving the cost considerations that all litigants must have regard to. The litigation process cannot be truly proportionate without taking such factors into account. When experienced counsel agree, with full awareness of the implications, that judicial determination of an issue is desirable, the court should try, in my opinion, to develop an approach that permits access to a final judicial decision on that issue in a cost effective and just manner.

**161**    By contrast, in this case experienced counsel do <u>not</u> agree that judicial determination of the Limitation Clause Issue is desirable or even possible. Counsel for Westmar says that a summary trial will save time and reduce complexity at trial, with implications for the possibility of settlement. Counsel for the Band disagrees.

**162**    Westmar also notes that in *Hans v. Volvo Trucks North America Inc*., 2011 BCSC 1574, the enforceability of a limitation clause was considered appropriate for summary trial. However, in that case the parties agreed that the contract containing the limitation clause governed their relationship. Therefore, the contract could be interpreted by relying primarily on the words of a written document. By contrast, in this case the parties do not agree on the form of their contract and do not agree that the written documents represent its terms.

## VI. Conclusion

**163**    For these reasons, I conclude that this matter is not suitable for summary disposition. I therefore dismiss the application.

**164**    Costs will be in the cause.

L.D. RUSSELL J.

cp/e/qljel/qlrdp/qlced/qlbdp/qlhcs

*Indexed as:*
# C.I. Covington Fund Inc. v. White

**Between**
**C.I. Covington Fund Inc., applicant, and**
**Jeffrey A. White, Delta M3 Technologies Corporation, M3**
**Environmental Services Inc., Watertek Corporation, Fred**
**Rossignol, and LF Rossignol Development Corporation,**
**respondents**

[2000] O.J. No. 4589

[2000] O.T.C. 865

10 B.L.R. (3d) 173

22 C.B.R. (4th) 183

10 C.P.R. (4th) 49

101 A.C.W.S. (3d) 504

Court File No. 00-CL-3830

Ontario Superior Court of Justice
Commercial List

**Swinton J.**

Heard: November 17, 2000.
Judgment: December 1, 2000.

(50 paras.)

*Company law -- Shareholders' rights -- Oppressive acts, remedies -- Actions against corporations and directors -- Action for oppressive conduct -- Oppression, prejudice or disregard of interests -- Directors -- Liability of directors -- Duties -- Remedies for breach of fiduciary duty -- Master and servant -- Duties of servant -- Respecting employer's property.*

Application by CI Covington Fund for an oppression remedy. Money lent to the respondent Delta M3 Technologies by Covington was secured by a general security agreement over Delta's assets. Covington also purchased common shares of Delta. Delta was a small, closely-held Ontario company. The respondent White was its president and chief executive officer. He was also Delta's controlling shareholder. Delta spent substantial amounts to develop and patent a certain process. White claimed that he owned the patent and related technology and that Delta had an exclusive right to use the process under a license agreement. Prior to making the loan and investment, Covington received relevant documents as part of its due diligence investigation. The investment agreement between Delta and Covington provided that Delta owned all trade names, patents, licenses and permits, free and clear. Delta also warranted that it had provided all material information. Audited financial statements and other documents referred to Delta's patent. Covington claimed that it would not have made the loan or investment if Delta did not own the intellectual property related to the process. Delta's assets, excluding the patent, were not enough to cover Covington's loan or the funds advanced by other secured creditors. The license agreement came to light only after Delta went into default under its loan agreement. Following Delta's bankruptcy, White had used the patented technology through a new company. After the action was commenced, he assigned the technology and related patents to the respondent corporation, Rossignol, as collateral for loans. Covington argued that the technology was owned by Delta and that White's and Rossignol's conduct was oppressive. It sought an order declaring that Delta was the owner or that the property was held in trust for Delta.

HELD: Application allowed. Delta was declared to be the beneficial owner of the patented technology. The patents and applications were therefore to be assigned to Delta. Rossignol and White were ordered to cease using the technology and to assign the patents and patent applications to Delta. White was also ordered to account for profits made through use of the technology. Covington was entitled to relief both as a shareholder and a creditor, having shown that the business or affairs of Delta were or had been carried on in a manner that was oppressive, unfairly prejudicial to or that unfairly disregarded the interests of the creditor. The investment agreement was one of several representations made by Delta, with White's participation, respecting Covington's ownership of the technology, upon which Delta as a lender and investor reasonably relied when deciding to advance funds. Any ambiguity in the agreement was not to be construed contra proferentem because the document was drafted by both parties. Covington had made reasonable efforts to conduct due diligence prior to making the loan and investment. The reasonable conclusion based on the representations made was that the property belonged to Delta rather than to White. Even though Delta was not a publicly traded company, Covington, as an investor and lender, should have been able to reasonably rely on Delta's public statements as to ownership of the intellectual property and related technology. As White was an employee hired to design or develop the product in question, Delta could assert beneficial ownership of the patents as the employer. As a director of Delta, White had a fiduciary duty to act in its best interests and was obligated not to take advantage of opportunities available to Delta. White's failure to put the patents in Delta's name was analogous to the diversion of assets by self-dealing. White represented that he had ceded ownership of the patented technology. Having regard to his employment and duty to Delta as an officer and director,

his failure to assign ownership constituted conduct unfairly prejudicial to Covington's interests, contrary to section 248(2) of the Ontario Business Corporations Act. Given White's breach of his fiduciary obligations to Delta and the unjust enrichment through wrongful acquisition of the property, it was necessary to impose a constructive trust to protect Delta's proprietary right and provide a remedy for the oppressive conduct. Such a remedy fell within the broad discretion to determine an appropriate remedy under section 248(3) of the Act. As Rossignol was aware of the litigation prior to the assignment of the patents, it could not take any better title than White.

**Statutes, Regulations and Rules Cited:**

Ontario Business Corporations Act, R.S.O. 1990, c. B.16, s. 248.

Patent Act, R.S.C. 1985, c. P-4, ss. 1, 27(1).

**Counsel:**

David Chernos and M. Paul Michell, for the applicant.
John S. Curtis, for the respondents, White, M3 Environmental Services and Watertek.
J. Arthur Cogan, Q.C., for the respondents, Rossignol and LF Rossignol Development.

---

**1    SWINTON J.:**-- C.I. Covington Fund Inc. ("Covington"), as a creditor and shareholder of Delta M3 Technologies Corporation ("Delta"), has brought an application for an oppression remedy against the respondents pursuant to s. 248 of the Ontario Business Corporations Act, R.S.O. 1990, c. B.16. The application arises following the bankruptcy of Delta and the claim by Jeffrey White, president and controlling shareholder of Delta, that certain intellectual property belongs to him personally, rather than to the corporation.

The Facts

**2**    In July, 1997, Covington lent $2 million to Delta and purchased $500,000.00 worth of Delta's common shares. The loan was secured by a general security agreement over Delta's assets. Covington is one of four secured creditors of Delta, the others being the Bank of Montreal, the Business Development Bank of Canada ("BDC"), and the Ontario Development Corporation (formerly Innovation Ontario Corporation - "IOC").

**3**    Delta is an Ontario corporation. Its predecessor, J.A. White & Associates, was formed in 1965 and incorporated under the Ontario Business Corporations Act in 1977. In June, 1997, it changed its name to Delta. Its business was the engineering and design of snowmaking and waste water treatment systems. Sometime in the early 1980s, Delta began to explore the possible use of a freeze crystallization process in the treatment of liquid waste. It subsequently developed the

AFC-Snowfluent technology, a cold weather waste water treatment system, which works by pumping liquid waste through a snow making system to purify it and then spraying it onto fields, where it melts in the spring.

**4**    Jeffrey White is a professional engineer, who is Delta's president and chief executive officer. Between his direct and indirect shareholdings, he is Delta's controlling shareholder. He was responsible for the day to day management of Delta until its assignment into bankruptcy on July 7, 2000. As well, about 75% of his time was spent on research and development. White is also the sole director of the respondents M3 Environmental and Watertek. The latter company currently employs the former employees of Delta, and it has taken on the completion of one of Delta's projects in Westport, Maine using the Snowfluent technology.

**5**    Delta spent over $10,000,000.00 in developing the Snowfluent technology. A Canadian patent application for the technology was filed on October 11, 1995, and a U.S. patent application on October 25, 1995. The U.S. patent was issued March 10, 1998. No Canadian patent has yet been issued. These patent applications, and those pending in other countries, have all been made in the name of White, personally, as the inventor and owner. According to the Patent Act, R.S.C. 1985, c. P-4, s.1, the applicant for a patent includes an inventor and the legal representative of the inventor, and a patent application is to be granted to the inventor or his legal representative (s. 27(1)), unless there has been an assignment or bequest of the right to another person (s. 49; Techform Products Ltd. v. Wolda (2000), 5 C.P.R. (4th) 25 (Ont. S.C.) at 31).

**6**    It is White's position that he owns the Snowfluent patent and technology. However, Delta has an exclusive licence to use the process of Atomizing Freeze Crystallization Technology/Snowfluent, because of an agreement signed by him personally and on behalf of the company dated October 16, 1995. The licence agreement gives Delta an exclusive licence to use the subject matter, defined as "the continued developments patenting in the name of the Licensor/Inventor Jeffrey A. White, P. Eng., together with the sale and marketing of the technology, atomizing freeze crystallization, as systems, partial systems, services, installations et. al., for the treatment of aqueous wastewaters." No royalties were payable except in certain circumstances such as the sale of the company, and the licensing agreement was said to terminate on the bankruptcy or insolvency of the company.

**7**    Delta had successfully obtained financing from IOC in 1994 and BDC in 1995. In 1997, Delta sought further capital to market and develop the Snowfluent technology. Covington provided the loan of $2,000,000.00, and also paid $500,000.00 to Delta for 30,834 common shares and entered into a shareholders agreement with Delta and its other shareholders.

**8**    Prior to making the loan and investment, Covington conducted due diligence with regard to Delta's business. According to Timothy Leitch of Covington Capital Corporation, Delta was asked for and provided relevant documents, which he and others at Covington reviewed. Copies of a 1994 shareholders agreement with IOC, a 1995 collateral assignment to BDC, the 1997 audited financial

statements, and Delta's 1997 Business Plan were all provided and reviewed. The licence agreement was never provided nor disclosed.

**9**    In the Investment Agreement between Delta and Covington, dated July 21, 1997, Delta made the following representation and warranty:

> 4.1.12 Patents, Licences, etc. Schedule C accurately shows for each patentable invention of the Corporation a brief description thereof and the status of any application for a patent in all countries where application has been made. The Corporation owns, free and clear of any lien, other than Permitted Encumbrances, all trade names, patents, licences and permits, including those shown on Schedule C, ("Rights") which are necessary for the conduct of its business as presently conducted or proposed to be conducted. Such Rights are in full force and effect ....

"Permitted encumbrances" is a defined term, and has no bearing in this application. Schedule C contains the heading "J.A. White & Associates Ltd. Waste Water Treatment Method and Apparatus". Below that, there is a chart, listing countries, the date on which a patent application was filed, and its status. The U.S. and Canadian patent applications for Snowfluent are found in this chart.

**10**    Delta also warranted in Article 4.1.14 that the corporation has provided to Covington "all material information relating to the financial condition, business and prospects of the Corporation and all such information is true, accurate and complete in all material respects and omits no material fact necessary to make such information not misleading."

**11**    As part of the closing, White provided an officer's certificate to Covington in which he stated that the "representations and warranties of the Corporation contained in each of the Agreements are true and correct on the date hereof".

**12**    A review of the documents provided to Covington is instructive. The audited financial statements make reference to Delta's patents - for example, "The company has capitalized costs in regards to the development of its specialized sewage treatment technology" (emphasis added). Similarly, the 1997 Business Plan contains a number of references to the Snowfluent technology which leave the impression that Delta is its owner - for example, "Delta's proprietary wastewater process, AFCTM- SnowfluentTM". Near the end, on p. 87 of the plan, it is stated,

> In arriving at a value for the going business of Delta Engineering, an investor should consider the following: The SnowfluentTM technology is unique, proprietary and all indications are that the company will successfully achieve world patent rights for its major claims.

**13**    Covington also reviewed a 1994 Intellectual Property Assignment to Delta that is part of a

shareholders agreement with IOC, given in order to obtain a loan and investment from IOC. According to Article 11.1,

> Intellectual Property Assignment. In consideration of the sum of one dollar ($1.00) and other valuable consideration, the receipt of all of which is hereby acknowledged, Jeffrey A. White (the "Assignor") hereby confirms that he has sold and assigned, and does hereby sell and assign to the Company, as assignee, all right, title and interest, for Canada, the United States and all other countries, all intellectual property developed by or originating from them, including without limitation: all inventions; all patents or patent applications ... The Assignor agrees that he will without further consideration do all such things and execute all such documents as may be necessary or desirable to obtain and maintain patents, ... and to vest title thereto in the Company ...".

**14**    Delta also provided Covington with a copy of a collateral assignment of patents and trademarks to BDC, dated September 1, 1995, which was signed by White & Associates and Vector Technology Inc. That document was provided in relation to BDC's loan and investment in shares, and states in article 3.4:

> J.A. White is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each of the Patents and Trademarks, free and clear of any voluntary or involuntary lien, charges or encumbrances ... except as specifically set forth in the Loan Documents and those licences and sublicences which are existing as of the date hereof and those licences and sublicences which may be entered into after the date hereof in the ordinary course of the Assignor's business.

"J.A. White" is defined as the corporate entity. "Patents and trademarks" are defined as

> all presently existing and hereafter acquired or arising patents and trademarks, including, without limitation, the trademark applications and trademarks listed in Schedule A attached hereto and the trademark registrations identified therein, and the patent applications and patents listed in Schedule B attached hereto .... .

That list of trademarks includes Snowfluent. Schedule B refers only to existing patents for snowmaking technology, as the patent applications for Snowfluent had not yet been made at the time this document was signed.

**15**    Leitch has given evidence that Covington would not have made the loan or investment if Delta did not own the intellectual property related to Snowfluent. It is his position that he never saw the licence agreement, although Covington asked for all material contracts to which Delta was a party. No evidence contradicts this.

**16**    Following Covington's loan and investment, the financial statements of Delta made further reference to Delta's ownership of the intellectual property. For example, the 1999 audited financial statements include the statement, "The company has capitalized costs in regards to the development of its specialized sewage treatment technology". In copies of correspondence from Delta's patent counsel that were provided to Covington, references are made to Delta's patent and patent applications.

**17**    The licence agreement first came to light in May, 2000, after Delta went into default under its loan agreement with Covington. There is affidavit evidence from Darcy Killeen, Chief Financial Officer of Delta from March, 1997 until 1999, that he had never seen the licence agreement while employed there, and was unaware of its content. While White states that the licence agreement was kept in the same filing cabinet as the patent applications at head office, Killeen had never seen it in that cabinet. Nor had the agreement been seen by Kevin Carton, the lawyer acting on the patent applications, who was working for the company and White by October 11, 1995 at the latest - that is, prior to the date of the licence agreement.

**18**    Since the bankruptcy, White has been operating through a new company, Watertek, using the Snowfluent technology and Delta's former employees, and completing at least one of Delta's contracts, with Westport, Maine. After this litigation commenced, White assigned the Snowfluent technology and related patent and patent applications to the respondent LF Rossignol Development Corporation in July, 2000. Fred Rossignol is a former director of Delta and the principal of LF Rossignol Development, a South Carolina company. On cross-examination, White indicated that Rossignol was aware of the litigation and took the patents as a form of collateral for a loan.

**19**    The value of Delta's assets, excluding the intellectual property, is $348,000.00. Covington is owed at least $2,195,398.05, and there are other secured creditors. There is in evidence a letter of intent from EBI Securities to the Receiver of Delta, indicating an interest in purchasing the intellectual property and related assets for $3,150,000.00.

Oppression Remedy Claim

**20**    Covington takes the position that the Snowfluent technology is owned by Delta, and that White's and Rossignol's conduct is oppressive within s. 248 of the OBCA. It seeks an order that Delta is the owner, or that the property is held in trust for it.

**21**    To obtain an oppression remedy, a complainant must show that the business or affairs of the corporation in question are or have been carried on in a manner that is oppressive, or is unfairly prejudicial to or unfairly disregards the interests of a security holder or creditor. The oppression remedy protects the "reasonable expectations" of a corporate stakeholder, having regard to the particular facts (Maple Leaf Foods Inc. v. Schneider Corporation (1998), 42 O.R. (3d) 177 (C.A.) at 201). Bad faith is not necessary to a finding that there has been conduct that unfairly disregards or is unfairly prejudicial to the interests of a security holder or creditor.

**22**    In this case, the applicant seeks relief both as a shareholder and a creditor. The courts have held that in an appropriate case, a creditor can be granted standing as a complainant (see, for example, Re Sidaplex-Plastic Suppliers, Inc. v. Elta Group Inc. (1995), 131 D.L.R. (4th) 399 (Ont. Ct. (Gen. Div.)) at 403, rev'd on other grounds (1998), 40 O.R. (3d) 563 (C.A.)). In my view, this is such a case, for the creditor seeks to protect reasonable expectations about the way in which the corporation should have been operated. As well, Covington has standing to seek relief as a shareholder.

**23**    The respondents argue that there has been no unfair disregard of the applicant's interests or conduct prejudicial to its interests. First, they argue that there was no misrepresentation in the 1997 Investment Agreement, since there was no clear statement that the corporation, rather than White, owned the patents. At most, they suggest that there may have been some ambiguity, and, if so, the contract should be construed contra proferentem. In my view, the argument based on contra proferentem must fail, as the Investment Agreement was a document drafted in a process in which both parties were represented by experienced counsel.

**24**    The respondents then take the position that the applicant did not make reasonable efforts at due diligence prior to making the loan and investment. They argue that the applicant could have determined the ownership of the patents and patent applications by the exercise of reasonable diligence - specifically, through an inspection of the public records of the Canadian and U.S. Patent Offices, which would have disclosed White's name as owner in the patent applications. In Sidaplex, supra, Blair J. observed that the extent to which the acts complained of were unforeseeable or the creditor could reasonably have protected itself from the acts were factors to be considered in determining whether there was oppression (supra, at 405). The respondents argue that it was a condition precedent to the Investment Agreement that Covington assure itself of the adequacy of title. Having failed to do so, Covington can not now complain because White has title to the patents. Therefore, they argue that there is no oppression here.

**25**    The primary position asserted by the applicant rested on the conclusion that the intellectual property rights in the Snowfluent technology had been assigned by White to the corporation in 1994 by the shareholders agreement between White and others and the IOC, quoted above. Therefore, the representation in Article 4.1.12 of the Investment Agreement with Covington that the patentable inventions in Schedule C were those of the corporation was true because of the earlier assignment. According to this line of reasoning, the inventions continue to be the property of Delta, even though White purported to transfer them as owner to Rossignol Development.

**26**    Counsel for White argued that the clause in the 1994 shareholders agreement with respect to inventions does not clearly capture the Waste Water Treatment Method and Apparatus that was the subject of the patents filed in 1995, and, therefore, there has been no assignment of the process covered by the patent applications.

**27**    At the time of the 1994 agreement, no patent applications had been made with respect to this

technology, and the agreement does not clearly state that it is an assignment of future patents and patent applications. The clause does make reference to the assignment of all intellectual property, including "inventions", but I have a dearth of evidence before me about the content of the Snowfluent technology in 1994, and there is no evidence to show the invention as it existed in 1994 was the same as the subject matter of the 1995 patent applications. It is true that Delta's 1997 business plan, as well as White's affidavit, indicate that the Snowfluent technology was under development from the 1980's, and the Snowfluent technology was clearly what interested the IOC, as revealed by other terms of its investment agreement with Delta. But the fact that the technology existed in 1994 does not turn the 1994 agreement into an assignment of future patents for a process as it may have developed over time. Therefore, on the evidence before me, I can not conclude that the clause in the 1994 agreement assigned to the company the patents and patent applications which followed for the Snowfluent technology.

**28**    Nevertheless, the 1994 agreement is of significance, given that it was one of the documents provided by Delta to Covington in an effort to obtain funds from Covington in 1997. In my view, it is one of a series of representations by the corporation, made with White's participation, respecting the corporation's ownership of the Snowfluent technology, upon which lenders and investors were expected to rely and reasonably did rely when they decided to advance funds to Delta.

**29**    Most telling, in my view, is the representation made by Delta about its ownership of the intellectual property in Article 4.1.12 of the Investment Agreement, quoted above. It stated that "Schedule C accurately shows for each patentable invention of the Corporation a brief description thereof and the status of any application" (emphasis added). Schedule C lists the patent applications under the name of "J.D. White & Associates Ltd.", not Jeffrey White. The only reasonable inference from that article is that Delta owns the invention that is the subject of the proceedings in Schedule C - that is, the Snowfluent waste water treatment technology.

**30**    Counsel for the respondents argued that this first sentence, read with the one which follows, should be understood as a representation that the corporation has the rights necessary to conduct its business - and because of the licence agreement, that is a correct representation with respect to Delta's operations. The problem with that argument is that it ignores the wording of the first sentence of the article, which, in my view, states that Delta owns the patents included in Schedule C.

**31**    Moreover, when that clause is read with the other documents provided to Covington, the reasonable conclusion is that the Snowfluent technology and the related intellectual property belong to Delta, not White. I have already made reference to the 1994 shareholders agreement with IOC, which stated that all intellectual property, including inventions, was assigned to Delta. That agreement remained in force until July 18, 1997, well after the patent applications for the Snowfluent technology were made in White's name. The logical inference is that at least some rights in the technology had been assigned to the company, and there is no evidence that they were re-assigned to White. The fact that the shareholders agreement terminated does not automatically

create such a re-assignment.

**32**    In addition, the BDC agreement confirms the corporation's ownership of existing and future patents. This agreement was entered into in September of 1995, very shortly before the first patent applications were filed. Again, the logical inference was that the corporation would be the owner of any Snowfluent patents, given their importance to the company's operations. While they are not mentioned in the list of patents in Schedule B, since no applications had yet been made, the Snowfluent trademark is listed in Schedule A. It strains credulity that one is to interpret this as leaving White with the right to hold the patent for the technology, while the company would have the trademark that controlled use of its name.

**33**    These conclusions are further buttressed by the many references in the Business Plan that suggest Delta owns the Snowfluent technology, as well as the financial statements of the company described earlier in these reasons. All of these representations lead to the conclusion that Delta is the owner of the technology. Given the impression left by all these documents, it is telling that no one from Delta, particularly White, disclosed the existence of the licence agreement to Covington.

**34**    The oppression remedy protects the reasonable expectations of corporate stakeholders. In Themadel Foundation v. Third Canadian General Investment Trust (1998), 38 O.R. (3d) 749, the Court of Appeal stated (at 753):

> The public pronouncements of corporations, particularly those that are publicly traded, become its commitments to shareholders within the range of reasonable expectations that are objectively aroused.

While we are dealing here with a small, closely held company rather than one that is publicly traded, the same logic applies. Investors and lenders should be able reasonably to rely on public statements of a corporation made in various legal and corporate documents. In particular, the representations by Delta with respect to its ownership of the Snowfluent technology and related intellectual property can reasonably be relied upon by a shareholder and investor such as Covington when making a decision whether to invest in the company, whose principal asset is that technology and the ability to exploit it.

**35**    Counsel for the respondents argued that the applicant could have easily determined that White held the patent applications in his name. By the terms of the Investment Agreement, legal counsel for the corporation was to provide a legal opinion with respect to a number of items, as set out in Article 5.1.5, as a condition precedent to closing. The respondents argue that the omission of an opinion with respect to title to the intellectual property in that article meant that this issue was left to examination by the applicant's own legal counsel. If that opinion has turned out to be deficient, that risk should lie on the applicant.

**36**    In fact, counsel for the applicant has stated that there was no opinion from legal counsel for Covington on the ownership of the intellectual property. Whether such an opinion should have been

obtained is not the issue here. This is not a case of professional negligence, nor of negligent misrepresentation in tort involving non-contracting parties, where reasonableness of reliance would be an issue. Here, Delta expressly represented in the Investment Agreement that the patent applications were those of the corporation, and the company had provided other documents that led to the same conclusion. White had certified that the representations were true. At the same time, White and Delta had failed to disclose the licence agreement which purported to circumscribe the corporation's property rights to Covington. Even the Chief Financial Officer of Delta at the time of the investment did not know of the agreement. Indeed, he gave evidence that had he known of the licensing agreement, he would have informed the auditor who prepared the financial statements. In my view, the applicant could reasonably rely on Delta's representations to conclude that the patents were the property of the company, as suggested by Schedule C.

**37**    Therefore, we are left with the situation where the corporation made certain representations about its ownership of the intellectual property pertaining to Snowfluent, but the patents and patent applications were issued in White's name. Without doubt, that state of affairs is prejudicial to the applicant's interests. The question is whether there is unfairness if Delta's ownership interest is not recognized.

**38**    The applicant argued that I should find the patents and patent applications are the property of the company, because White developed those inventions while he was an employee of Delta. There is a presumption at common law that an employee is the owner of his or her inventions, unless there is an express contract to the contrary, or the person was employed for the express purpose of inventing or innovating (Techform, supra, at 32). In particular, courts will find that the employer is the owner of an invention where an employee is hired precisely to design or develop a product (Seanix Technology Inc. v. Ircha (1998), 78 C.P.R. (3d) 443 (B.C.S.C.) at 445).

**39**    White was not in the position of the usual employee, who works for another person in a business. White is the principal shareholder and director of a small, closely held company, where he mixes the roles of manager, employee and inventor. Nevertheless, if one looks at the employment aspect of his relationship, one finds that 75% of his time was spent on research and development. Indeed, the company applied for tax credits based on the fact that he spent 75% of his time on research. There is no dispute that his role in the company was to develop the Snowfluent technology, and that was a predominant focus of his work for many years. Therefore, this is a case where at common law, the employer - here, Delta - could assert that it was the beneficial owner of the patents because of the employment situation.

**40**    No steps were taken by the corporation to assert an ownership interest against White, however, because of the reality that this is a small, closely held company, and it was in White's personal interest not to assign the ownership to the corporation. However, White was not only an employee, but also a director of the corporation. Thus, he had a fiduciary duty to act in the best interests of the corporation, which obligated him not to take advantage of opportunities available to the corporation (Classic Organ Co. v. Artisan Organ Ltd. (1997), 35 B.L.R. (2d) 285 (Ont. Ct. (Gen.

Div.)) at 291). White used the facilities and funds of the corporation, totaling over $10 million, to develop the Snowfluent technology and to advance the patent process, but he retained the benefit of the technology developed with those resources for himself, even though the nature of his employment relationship would normally allow the corporation to claim ownership.

**41**    A number of oppression cases turn on the fact that there has been conduct by directors or majority shareholders that amounts to self-dealing at the expense of the corporation or other corporate stakeholders (SCI Systems Inc. v. Gornitzki Thompson & Little Co. (1997), 36 B.L.R. (2d) 207 (Ont. Ct. (Gen. Div.)), aff'd (1998), 110 O.A.C. 160 (Div. Ct.)).; Neri v. Finch Hardware (1976) Ltd. (1995), 20 B.L.R. (2d) 216 (Ont. Ct. (Gen. Div.)); Loveridge Holdings Ltd. v. King-Pin Ltd. (1991), 5 B.L.R. (2d) 195 (Ont. Ct. (Gen. Div.)). For example, in SCI, there was oppression because the directors unfairly removed assets from the corporation so as to prevent the payment of a corporate debt and to benefit themselves.

**42**    Here, White's failure to put the patents in the name of the company is analogous to the diversion of assets seen in these cases, because it constitutes a form of self-dealing, when all the facts are considered. He chose to use the corporation to solicit funding and to use that funding to develop the Snowfluent technology, but having done that, he sought to keep for himself personally the benefit of that corporate investment in the technology despite his duty of good faith to the corporation. Given the representations about ownership that led Covington to invest in the company, the fact that White's principal employment obligation was research and development with respect to the Snowfluent technology, and White's use of the corporation's resources to develop the technology, Delta should properly be regarded as the owner of the patents and patent applications. In light of all the facts, White's failure to assign the intellectual property to Delta is an unfair disregard of Covington's interests as a creditor and shareholder that is unfairly prejudicial, as Covington had a reasonable expectation that Delta owned the technology and related intellectual property.

**43**    The fact that White personally invested funds in the corporation does not give him any right to claim as his what is properly a corporate asset. Nor can the licence agreement protect White's claim to ownership, given that it was never disclosed to Covington. It is a further example of a conflict of interest where White preferred his personal interests over those of the corporation to which he had a fiduciary duty.

**44**    The facts of this case bear some resemblance to Turbocristal v. Handfield (1991) 41 C.P.R. (3d) 540, although this was not an oppression remedy case. There, the Quebec Superior Court found that the founder of a company, who resigned as a director and employee, had effectively ceded the ownership of patents to the company through his statements and conduct. While there was in that case an ambiguous document suggesting that there had been either a transfer or licence, the Court did not rest its decision on that document, but looked at the factual context, including government grants to the corporation to support research, ownership of a trademark by the company, and the use of large amount of corporate funds for development.

**45**    Similarly here, when all the facts are considered, White represented that he had ceded the ownership of the Snowfluent technology to Delta. Having regard to his employment and his duty to the corporation as an officer and director, the failure to assign ownership to Delta constitutes conduct unfairly prejudicial to the applicant's interests contrary to s. 248(2) of the OBCA.

The Appropriate Remedy

**46**    Section 248(3) of the OBCA confers a broad discretion on the Court in determining an appropriate remedy, including "any interim or final order it thinks fit". The purpose of the remedy is to rectify the oppression. The provision has been used to make compensation orders against individual directors where their conduct has been found oppressive in small, closely held corporations such as Delta, and they have personally benefited - for example, by the removal of assets from the corporation (see, for example, SCI; Sidaplex, supra).

**47**    In this case, Delta has represented that the patents and patent applications for the Snowfluent technology are the property of the corporation, and White, as a principal of the corporation, was behind those representations. The corporation has a right to claim beneficial ownership at common law. This is not a case where a monetary award against White will adequately protect the interests of the stakeholders, especially given his evidence that he faces financial difficulties personally. If Delta's proprietary interest is not protected, the corporation will be denied the value of the patents, both in terms of possible licensing fees for their use and their value if they can be sold. Clearly, the creditors will be in a better position to recoup some of their funds if the patents are assets of the corporation which can be sold.

**48**    In Soulos v. Korkontzilas, [1997] 2 S.C.R. 217, the Court stated that a constructive trust may be awarded in two categories of cases: where there has been a breach of a fiduciary obligation or duty of loyalty, and where there has been unjust enrichment through the wrongful acquisition of property. Given White's fiduciary obligations to the company, this is a case where a constructive trust is the necessary remedy to protect the corporation's proprietary right and to provide a remedy to the applicant for the oppressive conduct. Therefore, I declare that Delta is the beneficial owner of the Snowfluent technology and related patents and patent applications, and I order that these patents and patent applications are to be assigned to it. Rossignol was aware of the Covington litigation prior to the assignment of the patents, and there was no dispute that it can take no better title than White. Therefore, LF Rossignol Development, Rossignol and White are ordered to cease using the Snowfluent technology and to assign the patents and patent applications to Delta.

**49**    The applicant also sought an order that White was in breach of his fiduciary duty to Delta by carrying on the Westport business and using the Snowfluent trademark. As a fiduciary of Delta, White had an obligation not to pursue corporate opportunities available to Delta. Therefore, he and Watertek are ordered to account for profits made through the use of the technology. If there is a dispute about this, I will remain seized. Similarly, the applicant asked that I remain seized with respect to the appointment of a receiver, and I do so.

**50**    If the parties wish to speak to costs, they may make written submissions or make an appointment with my secretary.

SWINTON J.

cp/d/qlsar/qlhcs

*Indexed as:*
# C.I. Covington Fund Inc. v. White

**Between**
**C.I. Covington Fund Inc., moving party (applicant) (respondent**
**on appeal), and**
**Jeffrey A. White, Delta M3 Technologies Corporation, M3**
**Environmental Services Inc., Watertek Corporation, Fred**
**Rossignol and LF Rossignol Development Corporation,**
**respondents (appellants on appeal)**

[2001] O.J. No. 3918

152 O.A.C. 39

17 B.L.R. (3d) 277

28 C.B.R. (4th) 177

15 C.P.R. (4th) 144

108 A.C.W.S. (3d) 826

2001 CarswellOnt 3527

Court File No. Div. Crt. No. 10/2001

Ontario Superior Court of Justice
Divisional Court

**Carnwath, Lang and Day JJ.**

Heard: October 3, 2001.
Judgment: October 9, 2001.

(7 paras.)

*Company law -- Shareholders -- Shareholders' rights -- Oppressive acts, remedies.*

Appeal by the defendants White and Watertek from an order in an oppression action. The judge below found that Delta was represented to the respondent Covington Fund as the owner of the Snowfluent technology. Based on this representation, Covington made certain investments.

HELD: Appeal dismissed. The judge below was entitled to find that Covington had established oppressive conduct. The judge's finding that White had committed a breach of fiduciary duty was supported by the evidence and was correct in law. The relief granted was appropriate.

**Statutes, Regulations and Rules Cited:**

Ontario Business Corporation Act, s. 248(2).

**Counsel:**

David P. Chernos and M. Paul Michell, for the applicant (respondent on appeal).
David C. Moore, for the respondents (appellants on appeal), Jeffrey A. White & Watertek Corporation.

---

The judgment of the Court was delivered by

**1    CARNWATH J.** (endorsement):-- We all agree the Appellants have failed to demonstrate Swinton J. was clearly wrong in her findings or incorrect in her application of the law.

**2**    The Appellants argued Swinton J. erred in finding that Covington had established oppressive conduct. We reject this submission. Swinton J. considered language of Article 4.1.12 of the Investment Agreement, including its Schedule "C", other documents provided to Covington, plus the many references in the Business Plan that suggested Delta owned the Snowfluent technology. She concluded that Delta was represented to Covington as the owner of the technology. This was a finding she was entitled to make on the evidence. In addition, she found it telling that Delta, and particularly Mr. White, failed to disclose the existence of the licensing agreement to Covington.

**3**    The Appellants argued Swinton J. erred in finding that Covington had established oppression, based upon the doctrine of reasonable expectations. They submitted Covington could not be entitled to relief if it could be shown that Covington knew that Delta did not have title to the technology and proceeded with its investment despite that knowledge. In deciding to invest, Covington was entitled to rely on the representations made by Delta and Mr. White. The Appellants are fixed with the reasonable expectations of Covington created by those representations. For this reason, even if the legal opinion showed Mr. White had applied for the patents in his own name, that does not mean he did not hold the technology for the benefit of Delta. Also for this reason, it was unnecessary for there to be the trial of an issue. Swinton J. based her conclusions on the documents filed, there being

no relevant credibility issues identified by the Appellants.

**4**    The Appellants argued Swinton J. erred in finding that Mr. White had committed a breach of fiduciary duty. We reject this submission. She found Mr. White's deliberate withholding of title to the patents from Delta for his own purposes constituted a form of self-dealing at the expense of the corporation, constituting an unfair disregard of Covington's interests as a creditor and shareholder. She found this unfairness prejudicial to Covington, contrary to s. 248(2) of the OBCA. These findings are supported by the evidence and are correct in law.

**5**    The Appellants submit the remedy granted was inappropriate, arguing firstly that paragraphs 1 and 2 of the Order under appeal are unduly broad and ambiguous. We reject this submission. Delta and Mr. White represented to Covington that Delta owned a process - called for sake of convenience, the Snowfluent Technology. If the technology was developed based on both patentable and non-patentable components, that does not nor should not prevent an order declaring Delta the owner of the process. We find no ambiguity.

**6**    The Appellants further submitted Swinton J. erred by directing an accounting and related relief in connection with the Wesport contract. We disagree. Swinton J. correctly concluded Mr. White had an obligation not to pursue corporate opportunities available to Delta. Having done so, Mr. White must now account for any profits derived from the use of the technology. We find no error in the exercise of the broad discretion given to Swinton J. by the OBCA when fashioning a remedy.

**7**    For the above reasons, the appeal is dismissed.

CARNWATH J.

cp/d/qlrme

1985 CarswellOnt 721
Ontario Supreme Court, High Court of Justice

Classic Communications Ltd. v. Lascar

1985 CarswellOnt 721, [1985] O.J. No. 2620, 21 D.L.R. (4th)
579, 32 A.C.W.S. (2d) 403, 36 R.P.R. 186, 51 O.R. (2d) 769

# CLASSIC COMMUNICATIONS LTD. v. LASCAR et al.

Pennell J.

Judgment: August 30, 1985

Counsel: *L.A. Pattillo, Q.C.*, for plaintiff.
*C.J. Abbass*, for defendants.

Subject: Property; Contracts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Easements --- Registration and notice — Under Land Titles Acts**

**Estoppel --- Estoppel in pais — Estoppel by conduct**

Licence — Actual notice — Land Titles Act, R.S.O. 1980, c. 230 — Purchaser having actual notice of existence of TV cables on property taking title subject to equitable rights of owner of cables to maintain its cables.

Equity — Equitable estoppel — Purchaser having actual notice of existence of TV cables on property taking title subject to equitable rights of owner of cables to maintain its cables.

In 1979, defendants purchased a residential property which was registered under the land titles system, and which was subject to a registered easement in favour of Hydro to maintain its poles and cables. The defendants were aware at the time of their purchase that the plaintiff's cables for television signals were also attached to the hydro poles.

The plaintiff had attached its cables to the hydro poles in 1972, after obtaining a permit from Hydro to do so, which permit obligated the plaintiff to obtain any necessary permissions or authorizations to place its cables. The plaintiff had obtained the written consent of B, the predecessor in title of the defendants, to install its cables "on and between the existing hydro poles on the easement in favour of Hydro".

In 1981, the defendants requested that Hydro put in new poles, and that Hydro and the plaintiff raise their cables, which they did. In 1983, the defendants gave notice to the plaintiff to remove its cables, and on the plaintiff's refusal, laid a charge under the Trespass to Property Act. The plaintiff applied for a declaration that an easement or an irrevocable licence existed in its favour over and against the defendants' property.

**Held:**

1985 CarswellOnt 721, [1985] O.J. No. 2620, 21 D.L.R. (4th) 579, 32 A.C.W.S. (2d) 403...

An order was granted declaring that the plaintiff had a right to attach its cable to and between the hydro poles so long as Hydro maintained such poles on its easement.

The consent of B was something more than a mere licence. The consent was for an indefinite period, was for a use or enjoyment of the land and was attended with expense to the plaintiff. An equity was established, and as between the plaintiff and B, the plaintiff had a right to install cable "on and between hydro poles" so long as hydro poles were maintained on Hydro's easement.

The defendants purchased the property with actual notice of the existence of the plaintiff's cables on the property. The Land Titles Act showed no adequate intention of addressing either the status of an interest in land in the nature of a proprietary licence or the registrability of an equitable licence. Any purchaser who took with notice would clearly be bound with the equity, and the Act had not altered the law of real property except where such alteration had been made clear by appropriate words.

## Table of Authorities

### Cases considered:

Clapman v. Edwards, [1938] 2 All E.R. 507 — *referred to*

Commonwealth v. Reg. of Titles for Australia (1918), 24 C.L.R. 348 — *referred to*

Crabb v. Arun Dist. Council, [1976] Ch. 179, [1975] 3 All E.R. 865 (C.A.) — *considered*

Feltham v. Cartwright (1839), 5 Bing. N.C. 569, 132 E.R. 1219, 7 Scott. 695 — *referred to*

Guy v. Sant (1980), 17 R.P.R. 161 (Ont. H.C.), affirmed (1981), (Ont. C.A.) — *referred to*

Hammond v. Prentice Bros. Ltd., [1920] 1 Ch. 201 — *referred to*

Hopgood v. Brown, [1955] 1 W.L.R. 213, [1955] 1 All E.R. 550 (C.A.) — *referred to*

Inwards v. Baker, [1965] 2 Q.B. 29, [1965] 1 All E.R. 446 (C.A.) — *referred to*

Ives (E.R.) Invts. Ltd. v. High, [1967] 2 Q.B. 379, [1967] 1 All E.R. 504 (C.A.) — *considered*

Liggins v. Inge (1831), 7 Bing. 682, 131 E.R. 263, 5 Moo. & P. 712, [1824-34] All E.R. Rep. 754 — *referred to*

Rose v. Peterkin (1885), 13 S.C.R. 677 (S.C.C.) — *referred to*

Smith v. Thornton (1922), 52 O.L.R. 492 (Ont. C.A.) — *referred to*

Taylor v. Needham (1810), 2 Taunt. 278, 127 E.R. 1084 — *referred to*

United Trust Co. v. Dom. Stores Ltd., [1977] 2 S.C.R. 915, 1 R.P.R. 1, 71 D.L.R. (3d) 72, 11 N.R. 97 (S.C.C.) — *referred to*

Wise v. Whitburn, [1924] 1 Ch. 460 — *referred to*

1985 CarswellOnt 721, [1985] O.J. No. 2620, 21 D.L.R. (4th) 579, 32 A.C.W.S. (2d) 403...

**Statutes considered:**

Land Charges Act, 1925 (U.K., 15 & 16 Geo. 5), c. 22.

Land Titles Act, R.S.O. 1970, c. 234, ss. 51, 91.

Land Titles Act, R.S.O. 1980, c. 230 —

s. 75 [am. 1984, c. 32, s. 19]

s. 81 [am. 1984, c. 32, s. 19]

Power Commission Act, R.S.O. 1970, c. 354 [renamed Power Corporation Act, S.O. 1973, c. 57, now R.S.O. 1980, c. 382].

Trespass to Property Act, R.S.O. 1980, c. 511.

**Rules considered:**

Ont. Rules of Civil Procedure, r. 21.01.

APPLICATION for declaration that plaintiff entitled to irrevocable licence over defendants' property.

*Pennell J.*:

1    This application by Classic Communications Ltd. ("Classic") comes before me pursuant to Ont. Rules of Civil Procedure, r. 21.01 for a determination on a point of law. The facts have been agreed upon by stipulation.

2    Classic seeks a declaration that an easement or an irrevocable licence exists in its favour over and against property owned by the respondents. The defence puts in issue the existence of such a right.

3    For brevity I state the facts with omissions but with accuracy sufficient to present the legal problem.

4    Classic is a body corporate which carries on the business of providing cable television services to its customers located, in part, in the Town of Markham. The respondents, husband and wife, are the owners in fee simple of residential property known municipally as 47 Wildrose Crescent in the Town of Markham. Forty-seven Wildrose Crescent is registered in the land titles system. It is convenient to refer to 47 Wildrose Crescent as the "property". Easements are shown on title on the rear ten feet of the property to the Hydro Electric Power Commission of Ontario ("Hydro") and to Bell Canada. Only the easement granted to Hydro is of significance in this application. It was granted to Hydro in 1965 by a distant predecessor-in-title of the respondents.

5    Classic says that the easement claimed was born of the grant to Hydro. That makes it convenient now to set out with some particularity the scope of the grant to Hydro. Essentially it is contained in para. 3(a) of the grant. That paragraph reads as follows:

3. IN CONSIDERATION of the sum of One Dollar ($1.00) of lawful money of Canada, now paid by the Commission to the Transferor (the receipt whereof is hereby acknowledged) the Transferor hereby transfers and conveys in perpetuity to the Commission, its successors and assigns, the rights and easement:

(a) to erect, maintain, operate, examine, repair, renew and relocate on the lands described in Schedule 'A' herein all necessary poles and anchors, with guys and braces, and to string wires thereon (all or any of which works are herein called the line);

6    To this paragraph and its effect I shall have to return in due course.

1985 CarswellOnt 721, [1985] O.J. No. 2620, 21 D.L.R. (4th) 579, 32 A.C.W.S. (2d) 403...

7    In 1965, Hydro exercised its dominion of easement and erected two poles on the property and ran lines between them.

8    Next in order it falls to note an agreement dated January 20, 1970, entered into between Hydro and Classic, then known as Richmond Hill Cable TV Limited. Under that agreement, Hydro gave the applicant the right to attach coaxial cable and associated equipment ("cable") to hydro poles, as designated in any permit approved by Hydro for that purpose.

9    To use pre-owned words "the agreement is its own dictionary". However, a provision representative of the effect of this agreement in relation to the present litigation is contained in cl. 8. So far as material this clause is as follows:

8. The Licensor shall not issue or be obligated to issue a Permit to the Licensee, nor shall any Permit if issued be valid, nor shall the work of placing any attachments be commenced unless and until the Licensee shall first have satisfied the Licensor that it has obtained such easements, rights-of-way, privileges or other interests in lands (including public highways), or other authorizations or permissions, including the authorization or permission of appropriate road and highway authorities or other government agencies necessary or required for the placing, maintaining and operating of its attachments upon the poles, or the cable supported by the poles, designated by the application for, and in a Permit.

10    I postpone my comments on the implications of this clause in order to follow the march of events.

11    The next instrument which requires notice is a consent agreement dated September 29, 1971, entered into between Classic, then known as Richmond, and the respondents' immediate predecessor-in-title, one William Barbour. Under that agreement, Barbour consented to the installation of cable "on and between the existing hydro poles on the easement in favour of Hydro". This consent agreement ("the Barbour consent") is so important that I will set it out in extenso in a moment.

12    Armed with the agreement with Hydro and the Barbour consent, among other things, the applicant proceeded in 1972 to attach cable to the two hydro poles on the Hydro easement at the rear of the property as part of the implementation of its cable system in the subdivision in which 47 Wildrose Crescent is located.

13    On May 15, 1979, the respondents became the owners of 47 Wildrose Crescent. They were aware, both before and after its acquisition, of the physical existence of the cable on the property. However, they acquired it unquestioning; as to whether the cable was there by right or by trespass, they gave no thought.

14    To the respondents, there came a time of aversion to the cable. However, from silence without more, the cable remained in its original position until 1981. In that year Hydro, at the respondent's request, put in a new pole and raised the height of its line. The respondents then suggested that Classic move its cable to the new hydro pole. To that suggestion, Classic yielded. The respondents were still not content, so Classic raised the height of the cable as requested. But this did not solace the respondents. Their aversion to the cable was unconquerable. It led them in September 1983 to notify Classic that the cable would have to go. In reply, Classic said that it would stay.

15    So the deadlock was succeeded by combat in Court. On March 13, 1984, the respondents laid an information charging Classic under the Trespass to Property Act, R.S.O. 1980, c. 511. Classic countered with the instant application under r. 21.01. The tactical situation was resolved thus: the information would lie fallow until the litigation founded upon the instant application has been concluded.

16    Classic asserts its right to install cable in and between the poles on the Hydro easement on one or other of three grounds, namely:

1. that the grant to Hydro extends to Classic, as licensee of Hydro; or

2. that Classic obtained an easement by way of the Barbour consent; or

3. an equitable easement or an irrevocable estoppel licence was created in its favour

(a) by the Barbour consent which runs with the land; or

(b) by the respondents' conduct since acquiring title to the property.

17    I deal with these points in order. To sustain the first point, the following must be established:

(a) that the grant of easement to Hydro, "its successors and assigns" is wide enough to include the use enjoyed by Classic; and

(b) that there is authority in Hydro by virtue of its powers under the Power Commission Act, R.S.O. 1970, c. 354 [renamed Power Corporation Act, S.O. 1973, c. 57; now R.S.O. 1980, c. 382] to extend its easement to Classic.

18    The first branch of this argument raises a problem of construction. The respondents refer to Hammond v. Prentice Bros. Ltd., [1920] 1 Ch. 201, and Clapman v. Edwards, [1938] 2 All E.R. 507, as demonstrative of the broad interpretation of an easement applicable to the Hydro easement here. In those cases, the Courts held in effect that the grants were in such wide terms that the increased user in question was within the contemplation of the parties at the time of the grants. Opinions get their colour and significance from the particular grant they construe. To me, the grant to Hydro here wears a different aspect. By its terms, which are set out above, the easement was granted to Hydro in relation to the transmission of electrical energy and to those "works" of Hydro which have a necessary connection therewith. The use of the property enjoyed by Classic does not accommodate or serve the purposes of the easement granted to Hydro. In other words, it is not reasonably necessary for the better enjoyment of the dominant tenement. Admittedly, the stringing of cable may not, in practical terms, add a significant additional burden on the servient tenement, but that circumstance is not controlling.

19    I hold then that Classic did not acquire a right of easement under the grant to Hydro.

20    Little, if any, aid on the point comes to Classic under its agreement with Hydro dated January 20, 1970. If a glance be given to cl. 8 of that agreement, which is set out above, it will be observed that Hydro made it plain that any easements or permission required for the placing of the cable on the property had to come from sources other than Hydro. This clause strongly suggests the thought that Hydro did not regard its grant of easement as extending to Classic. Hence the Barbour consent.

21    The construction of the easement granted to Hydro which I adopt makes it unnecessary to embark upon a consideration of the second branch of the first argument, that is, the question of the authority of Hydro under the Power Commission Act.

22    As we have seen, Barbour consented to the installation of cable "on and between the existing poles". In effect, he consented to a right of the passage of television signals through suspended cables passing through the air of the property. This was a right of passage over the servient tenement, not indeed on the surface of the soil but through that which, usque ad coelum, is, in the eye of the law, a part of the land: see Commonwealth v. Reg. of Titles for Australia (1918), 24 C.L.R. 348. That is a circumstance to be considered in determining whether the Barbour consent was a grant of easement but it is a circumstance only and is not inevitably conclusive. The foundation of every grant of easement is that it must have been intended by the parties. This question of intention is to be answered like all questions of intention in light of context and occasion.

23    The Barbour consent refers to "the easement in favour of Hydro", but the right given to Classic is dressed up in terms of "consent" to the installation of cables to hydro poles. Is it not strange that Barbour intending to grant an easement omitted language which would put the intention beyond doubt? I am not warranted in stopping there. The Barbour consent is to be construed as it would naturally be understood by persons of common sense who brought this simple consent into being. I have difficulty in squaring its character with that of an easement.

24    The agreed statement of facts tells us that Barbour was a subscriber to Classic Television Services. As stated before, the Barbour consent was an integral part of the arrangements that made such television services available to him and the other members of the community. It is familiar law that when a thing is to be done by a promiser, be it ever so small, it is sufficient consideration in a contractual relationship. The inference is permissible that the promise of the availability of cable television services swayed the conduct of Barbour. The fair implication to be gathered from the whole transaction is that there was a

bilateral agreement with obligation correlative and mutual. I think that the Barbour consent is a licence but something more than a mere licence.

25    At common law, contractual licences were inherently revocable since the licensee was not possessed of any interest in the land. Classic would put its licence within the orbit of equitable rights described as equitable or proprietary estoppel.

26    The nature of rights created by licence enforceable in equity is one of the battlefields of the law. I do not attempt to survey the terrain of the strife except to note two monuments "smalled" in the distance of time. They mark the traces of an equitable concept that a licence relating to or concerning the enjoyment of land is irrevocable after being acted upon: Liggins v. Inge (1831), 7 Bing. 682, 131 E.R. 263, 5 Moo. & P. 712, [1824-34] All E.R. Rep. 754; Feltham v. Cartwright (1839), 5 Bing. N.C. 569, 132 E.R. 1219, 7 Scott. 695. I do not rely upon these early cases for my decision. I view them as part of an informing principle adopted by modern equity so as to live vitally in the living day as proprietary estoppel.

27    The basis of equitable estoppel is the interposition of equity to preclude a licensor from exercising his strict legal rights when it would be inequitable for him to do so having regard to a licence coupled with a validly created interest in property: Inwards v. Baker, [1965] 2 Q.B. 29, [1965] 1 All E.R. 446 (C.A.).

28    What is needed to establish an equity giving rise to proprietary estoppel in the context of licence? We do not recall any reported instance, though not venturing to assert there is none, where the highest Court of Ontario had occasion to consider the matter. Therefore, I refer to three cases decided in the Court of Appeal in England which have a peculiar value, at least in their underlying principles, in relation to the problem now under consideration before me.

29    The first of these cases is that of Inwards v. Baker, supra. In that case, a son had built a bungalow on his father's land and had lived in it thereafter in the expectation and belief that he would be allowed to remain there for his lifetime or for so long as he wished. The trustees of his father's will brought proceedings for the possession of the bungalow. In that case, Lord Denning M.R. said, at p. 37 [Q.B.]:

> ... in this case, even though there is no binding contract to grant any particular interest to the licensee, nevertheless the court can look at the circumstances and see whether there is an equity arising out of the expenditure of money. All that is necessary is that the licensee should, at the request or with the encouragement of the landlord, have spent the money in the expectation of being allowed to stay there. If so, the court will not allow that expectation to be defeated where it would be inequitable so to do. In this case it is quite plain that the father allowed an expectation to be created in the son's mind that this bungalow was to be his home. It was to be his home for his life or, at all events, his home as long as he wished it to remain his home. It seems to me, in the light of that equity, that the father could not in 1932 have turned to his son and said: 'you are to go. It is my land and my house.' Nor could he at any time thereafter so long as the son wanted it as his home.

And Danckwerts L.J. said, at p. 38:

> ... this is one of the cases of an equity created by estoppel, or equitable estoppel, as it is sometimes called, by which the person who has made the expenditure is induced by the expectation of obtaining protection, and equity protects him so that an injustice may not be perpetrated.

30    The next case is that of: E.R. Ives Invts. Ltd. v. High, [1967] 2 Q.B. 379, [1967] 1 All E.R. 504 (C.A.). The defendant, High, built a house on his own land. His neighbour then erected a block of flats whose foundations encroached on High's land. They agreed orally that the foundations should remain and that High should have a right-of-way across the neighbour's yard. High, relying on this agreement, built a garage on his own land so sited that it could only be approached across the yard. The neighbour sold the block of flats to a purchaser who resold it to the plaintiffs, expressly subject to High's right-of-way. The right-of-way was not a legal interest since it had not been formally created; nor had it been registered as an equitable easement under the Land Charges Act, 1925 (U.K., 15 & 16 Geo. 5), c. 22. The Court of Appeal held that High had a right by estoppel, which not being registrable as a land charge, was binding on the plaintiffs who had purchased the legal estate of the licensor with actual notice.

1985 CarswellOnt 721, [1985] O.J. No. 2620, 21 D.L.R. (4th) 579, 32 A.C.W.S. (2d) 403...

31    The next case is that of Crabb v. Arun Dist. Council, [1976] Ch. 179, [1975] 3 All E.R. 865 (C.A.), where the principle of equitable or proprietary estoppel again met the scrutiny of the Court of Appeal. A narrow statement of the elaborate facts of the case will serve our purpose. What was questioned was the plaintiff's claim to a right-of-way over the defendant's land. The Court held that the defendants were estopped from denying that the plaintiff had a right-of-way since, by their oral assurances, they had led the plaintiff to act on their representations to his detriment.

32    I find it of no moment that the issue in that case concerned an easement rather than a licence. There the Court cited the decision in Inwards v. Baker, supra, among others, as the basis for a like ruling. There was no withdrawal or retreat from the principle that an equity, if adequately proved, may be effective to add to the obligation of a licensor. The thought back of equitable estoppel was summarized in two succinct sentences, per Lord Denning M.R. at p. 871 [All E.R.]:

> If [a person] makes a binding contract that he will not insist on the strict legal position, a court of equity will hold him to his contract. Short of a binding contract, if he makes a promise that he will not insist upon his strict legal rights — even though that promise may be unenforceable in point of law for want of consideration or want of writing — and if he makes the promise knowing or intending that the other will act on it, and he does act on it, then again a court of equity will not allow him to go back on that promise.

33    It was for long supposed that estoppel, at least the familiar species known as promissory estoppel, could only be used as a defence and not to found an action. In its enlarged and elevated nature as proprietary estoppel, equity stands ready to strike or defend as and when conscience commands.

34    On these premises I pass to this question: is there an equity established here? In pursuit of that inquiry there must be some degree of duplication by way of a restatement of the facts.

35    As we have seen, Barbour gave consent for the installation of cable "on and between the existing hydro poles". It is of importance to notice that the Barbour consent involved two things: a licence to enter upon the land, a contractual right, and a right to pass television signals over the property, a use or enjoyment of the land. It was a consent for an indefinite period to do something that in its own nature was attended with expense to Classic and intended to be continuing and quasi-permanent. What was consented to Classic did. Small was the resultant burden on the land; it almost drowned in the environment of an easement already there. Barbour, having consented to the installation of the cable, became, in some sense, a party to its installation. He cannot have supposed with reason and right that the consent could be countermanded at pleasure. Good conscience would have been flouted, with injustice to Classic, if Barbour had attempted so to do. In these circumstances, I think an equity was established.

36    In what way should the equity be satisfied? As between Classic and Barbour, I would hold that Classic has a right to install cable "on and between hydro poles" so long as hydro poles are maintained on the easement in favour of Hydro.

37    I confess, as I feel bound to do, that as a matter of construction, the words of the consent and the surrounding circumstances, if they stood alone, would go far to guide me to that conclusion. The nourishment provided, however, by the equitable concept of estoppel makes it more persuasive.

38    The respondents contend that since they were subsequent purchasers, Classic's licence, absent any reference thereto on title, was extinguished by the purchase. I think the equities arising from the licence are not so easily destroyed.

39    We recall at this point the words of Mansfield C.J. in Taylor v. Needham (1810), 2 Taunt. 278 at 282, 127 E.R. 1084:

> Exclusive of all the dicta, it would be a very odd thing in the law of any country, if A. could take, by any form of conveyance, a greater or better right than he had who conveys it to him; it would be contrary to all principle. But it does not rest merely on general principle, for if you look into all the books upon estoppel, you find it laid down, that parties and privies are estopped, and he who takes an estate under a deed, is privy in estate and therefore never can be in a better situation than he from whom he takes it.

What was said by Mansfield C.J. in that case commanded the full assent of Sir Raymond Evershed M.R. in Hopgood v. Brown, [1955] 1 W.L.R. 213, [1955] 1 All E.R. 550 at 560 (C.A.). To borrow the words of Lord Denning M.R. in Inwards v. Baker, supra, at p. 87 [Q.B.]:

> I think any purchaser who took with notice would clearly be bound by the equity.

40    I respectfully adopt that statement as the standard of our law.

41    The law recognizes two kinds of notice, constructive and actual. Instruments when properly executed and placed on record of title as required by statute are constructive notice of their existence and charge all subsequent grantees with notice of all that is shown by the record. Admittedly, the respondents had no constructive notice of the claim of Classic.

42    The argument of the respondents takes me to the Land Titles Act, R.S.O. 1980, c. 230 (the "Act"). Sections 75 and 81 [am. 1984, c. 32, s. 19] of the Act in terms declare the effect of registration of documents of title in the land titles system, priorities between various claims and the effect of unregistered instruments. These sections purport to establish a system which is complete in the sense that the Act governs all questions related to land registered in land titles. I have no thought to disregard the Act. However it has not altered the law of real property "except where such alteration had been made clear by appropriate words": United Trust Co. v. Dom. Stores Ltd., [1977] 2 S.C.R. 915 at 957, 1 R.P.R. 1, 71 D.L.R. (3d) 72, 11 N.R. 97 (S.C.C.). Nor has it abolished the fundamental common law doctrine of actual notice: United Trust Co. v. Dom. Stores Ltd., supra. Of course one must first look to the Act to determine the status of a particular claim. Where the matter is not covered by the Act, I think resort may be had to general principles of common law.

43    In the case of Guy v. Sant (1980), 17 R.P.R. 161 (Ont. H.C.), affirmed (Ont. C.A.), November 18, 1981, by endorsement on the appeal record, Saunders J. considered the status of an unregistered easement claimed against land registered in land titles. It is a case not so precisely similar in fact but pointing in the same direction as the one at hand. The Court there held that the title to the land in question was subject to the unregistered easement. Reading s. 91 (now s. 87) and s. 51 (now s. 47) of the 1970 Act together, Saunders J. concluded that a right-of-way was deemed not to be an "encumbrance" within the meaning of the Land Titles Act, R.S.O. 1970, c. 234. That finding, I believe, is applicable here. An equitable licence is something less than an easement but something measurably akin. The decision in that case is also support for the proposition that an equity may still subsist in equity without being registered.

44    I find no adequate token of intention in the Act or regulations made thereunder to address either the status of an interest in land in the nature of a proprietary licence or the registrability of an equitable licence. I doubt that the Act has any impact upon an estoppel. Nor do I think the Barbour consent could be registrable under its provisions.

45    I do not speculate too closely upon the reason why the subject of equitable licences is left uncovered in the Act. However, if necessity is the mother of legislation, then from silence it may be inferred that there has been no compelling need for such provision in the Act. And that is understandable. Time was when equitable licences abided with the law of property in the guise of a silent exception. Now the unquenchable spirit of equity has given them a proprietary meaning but perhaps not proprietary meaning of a precise order.

46    In these circumstances the requirement of notice is not notice of the consent document but notice of the claim by Classic of a right to attach cables "on and between the existing hydro poles".

47    Actual notice is knowledge shown to be brought home to the party to be charged with it of the very fact of which notice is to be established: Rose v. Peterkin (1885), 13 S.C.R. 677 (S.C.C.). Many are the cases dealing with the question of actual notice. They must be read with discrimination as to their particular features bearing in mind the fact to be proved. In Rose v. Peterkin, supra, it was necessary to the success of the defendant's case to prove that the plaintiff had actual notice of a certain deed to which the registry laws applied. That case is not here. In Smith v. Thornton (1922), 52 O.L.R. 492 (Ont. C.A.) at 502:

Actual notice of the existence of the right [of easement] is essential, but not, as I understand it, actual notice of the instrument, if there was an instrument, creating the right.

48      In Wise v. Whitburn, [1924] 1 Ch. 460, this passage occurs, per Eve J. at p. 470:

When he [Warrington L.J.] says 'actual notice' I think he is referring to something more substantial than mere surmise or suspicion, however plausible, and he does not mean to exclude knowledge of facts from which the existence of a certain state of things is reasonably to be inferred. Where such knowledge is proved I think actual notice exists.

49      I now return to the case at hand. As already stated, it was incumbent on Classic to prove actual notice of the fact that it claimed a right to attach cable to the hydro poles on the easement in favour of Hydro. Concededly the respondents had personal knowledge of the existence of the impugned cables before and at the time of their purchase of the property. In the ordinary plain common sense of the matter, I think that this knowledge is sufficient evidence to establish actual notice to the respondents of the fact to be proved. It was more than a notice of some undefined interest in the land. What the respondents knew was that which Classic claims.

50      Notice of the kind to which Eve J. in Wise v. Whitburn, supra, treated as actual notice was also brought home to the respondents in my view.

51      Failing in the controversy, the respondents then become postulants for equitable relief to this limited extent: pleading the maxim that equity looks in all directions, they seek an order to compel Classic to bury the cable. The prayer was made but debate was reserved until after the disposition of the main controversy in the proceedings. That plea will be heard and answered on a date to be agreed.

52      For the reasons above given and subject to a consideration of the respondents' plea to readjust the incidence of the burden of the cable, an order will go in favour of Classic declaring the existence of a right to attach its cable to and between the hydro poles so long as Hydro maintains such poles on its easement. The form of the order and the matter of costs may be spoken to on the further return of the application.

*Order accordingly.*

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Indexed as:*
# Covert v. Nova Scotia (Minister of Finance)

**Frank M. Covert, Q.C., John S. Jodrey and The Canada Permanent Trust Company, Executors under the Will of the late Roy A, Jodrey (Plaintiffs), Appellants; and The Minister of Finance of the Province of Nova Scotia (Defendant), Respondent; and The Attorney General of British Columbia and the Attorney General of Quebec, Interveners.**

[1980] 2 S.C.R. 774

Supreme Court of Canada

1979: November 22 / 1980: July 18.

**Present: Martland, Ritchie, Pigeon, Dickson, Beetz, McIntyre and Chouinard JJ.**

ON APPEAL FROM THE SUPREME COURT OF NOVA SCOTIA, APPEAL DIVISION

*Taxation -- Constitutional law -- Succession duties -- Non-resident corporation -- "Beneficially entitled" -- Whether resident shareholders of non-resident parent company assessable on estate bequeathed to non-resident subsidiary -- In personam tax on resident successor -- Legislation intra vires of Provincial Legislature -- An Act Respecting Succession Duties, 1972 (N.S.), c. 17, ss. 1 (ae), 2(5). 8, 9.*

The deceased, Roy A. Jodrey, was resident and domiciled in Nova Scotia at the time of his death. He had twelve grandchildren, all of whom were then resident in Nova Scotia. In view of An Act Respecting Succession Duties, 1972 (N.S.), c. 17, which imposed succession duties on all property of a deceased situated within the province at the time of his death, as well as on property situated outside the province, passing to resident "successors", it became apparent that, unless something was done, Mr. Jodrey's grandchildren, heirs of his estate under his will, would be liable to succession duties. Accordingly, a rather elaborate scheme was devised, by which it was hoped to escape the imposition of duty in Nova Scotia on the estate then valued at some $3,500,000.

The scheme involved three main moves: (1) The incorporation of three companies in Alberta: (i) J.B.H. Investments Ltd., the parent company which issued to each of the grandchildren 100 common shares at a price of $1 per share paid by the grandchildren; (ii) J.G.C. Investments Ltd., the subsidiary company which issued 100 common shares, all of which were beneficially owned by the parent company; (iii) White Rock Investments Ltd., which issued two common shares, each beneficially owned by Mr. Jodrey.

(2) A transaction whereby Mr. Jodrey agreed to sell to White Rock, 4,600 shares of R.A. Jodrey Investments Ltd., a Nova Scotia corporation owned and controlled by Mr. Jodrey, for a consideration of $3,735,200, payable at the office of White Rock in Edmonton by a demand promissory note for that amount, without interest.

(3) A codicil to his will, whereby Mr. Jodrey revoked the bequest to his grandchildren and substituted a bequest to the subsidiary company, including the note of White Rock.

The net result of these various incorporations and transactions was that, at the time of Mr. Jodrey's death, the 4,600 shares of R.A. Jodrey Investments Ltd., formerly owned by the deceased, were the property of White Rock, all of the shares of which were beneficially owned by the deceased and would become a part of his estate. The note given by White Rock on the acquisition of the securities was bequeathed to the subsidiary company, together with all the residue of the estate. All of the shares of the parent company were beneficially owned by Mr. Jodrey's twelve grandchildren.

When Mr. Jodrey died, duty was assessed against the grandchildren on the basis that they were successors to the rest and residue of the deceased's estate under subs. 2(5)(b) of the Nova Scotia Act. The executors filed a notice of objection to the assessment. The respondent confirmed the assessment. His decision was confirmed by the Supreme Court of Nova Scotia and an appeal from that decision was dismissed by a unanimous judgment of the Court of Appeal.

Held (Ritchie, Dickson and McIntyre JJ. dissenting): The appeal should be dismissed.

Per Martland, Pigeon, Beetz and Chouinard JJ.: Two issues were to be determined in this appeal: (1) Does the application of subs. 2(5)[1] of the Act result in the grandchildren being deemed to be successors in respect of the residue of the estate? (2) Is subs. 2(5) ultra vires of the Legislature of Nova Scotia?

(1) The case rested on the meaning to be attributed to the words "beneficially entitled" in subs. 2(5). The contention of the appellants that the meaning to be attributed to these words should be that which has been given by courts of equity, that the word "entitled" requires the existence of a right enforceable by a court of law or equity and "beneficially" is used to distinguish an equitable right or interest from a legal right or interest was not accepted. This Court should not feel itself rigidly bound, in interpreting the words "beneficially entitled", by rules of equity evolved in the courts of chancery in connection with trusts. In the circumstances of this case, the parent company was beneficially entitled to the residue of the estate within the meaning of subs. 2(5). The fact that it was

not made a beneficiary under the will did not preclude this finding in view of the fact that it had complete and absolute control of the named beneficiary, the subsidiary company, and had the legal capacity to compel that company to turn over to it the share of the estate bequeathed to it. This conclusion was fortified by the fact that it was the obvious purpose of the scheme adopted by the testator that the subsidiary company should turn over to the parent company the residue of the estate so that it could, in turn, divide the residue among its shareholders, i.e., the grandchildren of the deceased.

This was eminently a case in which the Court should examine the realities of the situation and conclude that the subsidiary company was bound hand and foot to the parent company and had to do whatever its parent said. It was a mere conduit pipe linking the parent company to the estate.

(2) Subsection 2(5) was intra vires of the Legislature of Nova Scotia to enact. Subsection 2(5), coupled with subs. 8(2), merely imposes upon resident shareholder successors the same obligation imposed upon resident successors by subs. 8(2). They do not succeed to property of the deceased directly, but the property ultimately devolves upon them by reason of his death through their ownership of shares in a non-resident corporation which becomes beneficially entitled to property of the deceased.

The tax which is imposed upon the grandchildren of the deceased by the combined effect of subs. 8(2) and subs. 2(5) is a tax imposed upon residents of Nova Scotia measured by their succession to the estate of a resident of Nova Scotia, whose will was made and probated in Nova Scotia. This is a tax upon residents in the province and so is taxation within the province. The tax is not a tax property outside the province. It is a tax upon persons within the province measured by the benefits which they derive as a result of the bequest made to a non-resident corporation of which they are the shareholders. It is clearly imposed upon the very persons who were intended to pay it, and so it cannot be regarded as an indirect tax and thus not within s. 92(2) of the British North America Act.

Per Ritchie, Dickson and McIntyre JJ., dissenting: In order to sustain the assessment, the respondent had to establish that the parent company became "beneficially entitled" to property of the deceased. The meanings of these words are almost invariably drawn from cases concerned with the construction of wills or succession duty statutes which are found in the jurisprudence built up by the courts of chancery. The nub of the problem in this case is that the draftsman of the statute selected a phrase well known to the courts. In the absence of earlier authority and in a context other than one related to estates and succession duties, a court might construe "beneficially entitled" according to what could be regarded as the popular usage of the language employed. But that was not the case here, and in the light of the interpretation given to these words by courts of chancery and of equity, the parent company cannot be said to be "beneficially entitled" for it has no standing or capacity to "sue for and recover" the estate assets. It perhaps has the power, through its share control, to compel the subsidiary company to take steps against the trustees but it has no independent claim and no claim to beneficial entitlement which it can assert. There is nothing in the particular statute or in any rule of statutory construction that permits one to climb up the corporate hierarchical ladder by

applying s. 2(5) time and again. That is the very gap in the legislation of which the testator took advantage.

It is proper for the Court to look not only at principles of trust law, but to those of corporate law to determine whether, by virtue of its ownership of all the outstanding shares of the subsidiary company, the parent company can be said to be "beneficially entitled" to the assets of its subsidiary. The general principle is that a company is not the beneficial owner of the assets of its own subsidiary and that a shareholder has no proprietary interest in the assets of a company in which he holds shares, otherwise than upon a winding-up. In the absence of fraud or improper conduct the courts cannot disregard the separate existence of a corporate entity. No distinction can be made in principle between ownership of 100 shares in a major corporation and ownership of all the issued shares in a small company. In neither case does the shareholder own any asset other than shares.

Finally, the legislation under consideration contained no provisions which introduce a statutory concept of sham, fraud, improper tax avoidance or illegal transactions, and it was also plain that the appellants did not fit the convention "sham" standard of a transaction purporting to create legal rights and obligations which are at variance with the legal relationships which in fact characterize the arrangement.

**Cases Cited**

[Re Chodikoff [1971] 1. O.R. 321, distinguished; In re Miller's Agreement; Uniacke v. Attorney-General, [1947] Ch. 615; Montreal Trust Co. v. Minister of National Revenue, [1958] S.C.R. 146; Rodwell Securities Ltd. v. Inland Revenue Commissioners, [1968] 1 All E.R. 257, considered; Littlewoods Mail Order Stores, Ltd. v. McGregor, [1969] 3 All E.R. 855; D.N.H. Food Distributors Ltd. v. Tower Hamlets London Borough Council, [1976] 1 W.L.R. 852; Minister of Revenue for Ontario v. McCreath, [1977] 1 S.C.R. 2, applied; MacKeen Estate v. Minister of Finance of Nova Scotia (1977), 36 A.P.R. 572; Macaura v. Northern Assurance Co., [1925] A.C. 619; Attorney General (B.C.) v. Canada Trust Co. and Ellett, [1980] 2 S.C.R. 466, referred to.]

APPEAL from a judgment of the Supreme Court of Nova Scotia, Appeal Division [[1978] C.T.C. 554.], dismissing an appeal from a judgment of Hart J. Appeal dismissed, Ritchie, Dickson and McIntyre JJ. dissenting.

J.T. MacQuarrie, Q.C., R.N. Pugsley, Q.C., and R. Jones, for the plaintiffs, appellants.
T.B. Smith, Q.C., J.W. Kavanagh, Q.C., and A.S. Butler, for the defendant, respondent.
H.L. Henderson and M.C. Nash, for the intervener, the Attorney General of British Columbia.
Henri Brun and Jean François Jobin, for the intervener, the Attorney General of Quebec.

Solicitors for the plaintiffs, appellants. R.N. Pugsley and J.T. MacQuarrie, Halifax.
Solicitor for the defendant, respondent. T.B. Smith, Ottawa.

The judgment of Martland, Pigeon, Beetz and Chouinard JJ. was delivered by

**MARTLAND J.**:-- The issue in this appeal is as to the validity of a notice of assessment dated August 8, 1975, addressed by the respondent to the appellants who ace the executors of the estate of Roy A. Jodrey, deceased, which increased the total value of the estate by $3,784,273 and which assessed duty against the twelve grandchildren of the deceased.

The parties in these proceedings agreed to a statement of facts. The following are relevant to the issues in this appeal.

Roy A. Jodrey, who died on August 12, 1973, had lived at Hantsport, Nova Scotia, for approximately thirty years prior to that date. At the time of his death, he was resident and domiciled at Hantsport. He had twelve grandchildren, all of whom were then resident in Nova Scotia.

He executed a will on August 13, 1963. The will provided that the executors were to pay, out of the general capital of the estate, all just debts, funeral and testamentary expenses and all estate taxes, succession duties, inheritance and death taxes payable on the property passing under the will, with the intent that all bequests under the will would be free of such duties and taxes.

The will bequeathed all the estate of the deceased to the executors upon trust to pay certain bequests and to hold the rest and residue of the estate in trust, first to pay to the wife of the deceased $500 per month during her lifetime, unless she renounced all or part of such income, and, second, on her death, to divide the rest and residue of the estate among the grandchildren of the deceased.

On January 1, 1972, the federal government vacated the field of federal estate taxation. The Province of Nova Scotia, as well as five other provinces, enacted succession duty statutes. These provinces were reciprocating provinces and entered into agreements with the federal government to administer the legislation and to collect the succession duties. Alberta did not enact legislation for the imposition of succession duties.

The Nova Scotia legislation, which is in issue here, is An Act Respecting Succession Duties, 1972 (N.S.), c. 17, enacted on May 15, 1972, hereinafter referred to as "the Act". It was made effective from January 1, 1972. The provisions of that Act, relevant to this appeal, are as follows:

> 1. (ae) "successor" in relation to any property of the deceased includes any person who, at any time before or on or after the death of the deceased became or becomes beneficially entitled to any property of the deceased
>
> (i)    by virtue of, or conditionally or contingently on, the death of the deceased,

...

2. (5) Where a corporation which is not resident in the Province, other than a corporation without share capital, by reason of the death of a deceased acquires or becomes beneficially entitled to property of the deceased,

    (a)    the corporation shall be deemed not to be the successor of the property except to the extent that the value of the shares of the shareholders of the corporation is not increased in value by the corporation acquiring or becoming beneficially entitled to the property; and

    (b)    each of the shareholders of the corporation shall be deemed to be a successor of property of the deceased to the extent of the amount by which the value of his shares in the corporation is increased by the corporation acquiring or becoming beneficially entitled to the property.

...

8. (1) Subject as hereafter otherwise provided, duty shall be paid on all property of a deceased that is situated, at the time of the death of the deceased, with the Province.

(2) Subject as hereafter otherwise provided, where property of a deceased was situated outside the Province at the time of the death of a deceased and the successor to any of the property of the deceased was a resident at the time of the death of the deceased, duty shall be paid by the successor in respect of that property to which he is the successor.

9. Each successor to any property of a deceased on which duty is payable under subsection (1) of Section 8 and each successor liable to pay duty under subsection (2) of Section 8 shall pay the duty to the Minister for the raising of a revenue for provincial purposes.

Following the enactment of this legislation, the following events occurred:

1. Solicitors on behalf of Mr. Jodrey incorporated three Alberta corporations:

    (a)    On September 13, 1972, J.B.H. Investments Limited (hereinafter referred to as "the parent company") was incorporated with a capital stock of 20,000 shares, without nominal or par value. The two persons incorporating this company were a solicitor and an articled student in an Edmonton law firm. They became the

     directors and officers of the company. Each of Mr. Jodrey's grandchildren came to hold 100 shares in the capital stock of the company.

(b)    On September 13, 1972, J.G.C. Investments Limited (hereinafter referred to as "the subsidiary company") was incorporated with a capital stock of 20,000 shares, without nominal or par value. The persons incorporating this company were the same as those who incorporated the parent company. Each held one share in the capital stock of the company and they became directors and officers of it. On the same date, 98 shares of the capital stock of the company were allotted to the parent company. Subsequently, the two incorporators of the company made declarations of trust in favour of the parent company in respect of the two shares held by them.

(c)    White Rock Investments Limited ("White Rock") was incorporated on September 13, 1972, with a capital stock of 20,000 shares, without nominal or par value, by the same two persons who had incorporated the other two companies. These persons became directors and officers of the company. Each held one share in the capital stock of the company. One of those shares was immediately transferred to the deceased, Roy A. Jodrey. The other share was the subject of a declaration of trust in favour of the deceased:

On September 22, 1972, an agreement was made between Roy A. Jodrey and White Rock whereby the former sold to White Rock 4,600 shares in the capital stock of R.A. Jodrey Investments Limited for a consideration of $3,735,200 payable by a demand promissory note for that amount, without interest, payable at the office of the company in Edmonton. R.A. Jodrey Investments Limited is a Nova Scotia corporation, with head office at Hantsport, Nova Scotia. Its authorized capital is $50,000 divided into 5,000 shares each with a par value of $10. Five thousand shares had been issued, of which 4,600 shares were owned by and registered in the name of Roy A. Jodrey prior to the September 22, 1972, agreement.

2. On October 5, 1972, Mr. Jodrey executed a codicil to his will whereby the provisions of the will respecting the division of the residue of the estate among his grandchildren were revoked and, instead, it was directed that such residue, including the note from White Rock, be given and bequeathed to the subsidiary company.

Mr. Jodrey's wife survived him and on September 18, 1973, gave a written direction to the executors of the estate renouncing the income given to her under the provisions of the will.

The net result of these various incorporations and transactions was that, at the time of Mr. Jodrey's death, the 4,600 shares of R.A. Jodrey Investments Limited, formerly owned by the deceased, were the property of White Rock, all of the shares of which were beneficially owned by the deceased and would become a part of his estate. The note given by White Rock on the acquisition of the securities was bequeathed to the subsidiary company, together with all the residue of the estate. All of the shares of the subsidiary company were beneficially owned by the parent

company. All of the shares of the parent company were beneficially owned by Mr. Jodrey's twelve grandchildren.

Mr. Jodrey's will and the codicil were duly proved by his executors in Nova Scotia and probate was granted by the Probate Court, Windsor, Nova Scotia, on September 28, 1973. The executors filed a succession duty return declaring the total value of the estate under the Act to be $162,009.50. By a notice of assessment dated August 8, 1975, the total value of the estate was increased by $3,784,273. By the notice, duty was assessed against the twelve grandchildren on the basis that they were successors to the rest and residue of the deceased's estate under subs. 2(5)(b) of the Act. The executors filed a notice of objection to the assessment, based on two grounds, stated as follows:

1.    The twelve grandchildren of the deceased assessed by the Notice of Assessment, are not successors within the meaning of the Succession Duty Act and therefore are not liable to pay any duty.

2.    Section 2(5) of the Succession Duty Act is ultra vires the powers of the Nova Scotia Legislature.

The Minister of Finance of Nova Scotia confirmed the assessment. His decision was appealed by the appellants to the Supreme Court of Nova Scotia. The appeal was based upon the two grounds alleged in the notice of objection. The Court decided both the issues raised in favour of the respondent. The appellants' appeal from that decision was dismissed by an unanimous judgment, of the Court of Appeal.

With leave, an appeal was then brought to this Court.

There are two issues to be determined in this appeal:

1.    Does the application of subs. 2(5) of the Act result in the grandchildren of the deceased being deemed to be successors in respect of the residue of his estate?

2.    Is subs. 2(5) ultra vires of the Legislature of the Province of Nova Scotia to enact?

First Issue:

The Courts below have held that subs. 2(5) of the Act deems the grandchildren of the deceased to be successors in respect of the residue of the estate.

The contention of the appellants is that subs. 2(5) does not so operate because the corporation not resident in the province under the terms of the subsection was the subsidiary company to which the deceased bequeathed the residue of the estate. The grandchildren of the deceased were not shareholders of that company and so the provisions of para. (b).of the subsection did not operate to deem them to be successors in respect of the residue of the estate.

The Courts below were of the opinion that the parent company, which owned outright 98 of the 100 issued shares of the subsidiary company and beneficially owned the remaining two shares, was a non-resident corporation which became beneficially entitled to the residue of the estate of the deceased within the meaning of the opening words of the subsection and consequently para. (b) took effect to deem the shareholders of the parent company (i.e., the twelve grandchildren) to be successors in respect of the residue of the estate.

The Courts below considered the meaning of the words "beneficially entitled" as used in subs. 2(5). The reasoning of Hart J., in the Court of first instance, adopted the reasons he had given in a case heard immediately prior to the present case (the MacKeen case [(1977), 36 A.P.R. 572.]), in which the same issues arose. He said, in that case:

> It seems to me that the plain ordinary meaning of the expression "beneficial owner" is the real or true owner of the property. The property may be registered in another name or held in trust for the real owner, but the "beneficial owner" is the one who can ultimately exercise the rights of ownership in the property.

> I believe that the other expression "beneficially entitled to" has a slightly different meaning from that of "beneficial owner". The person beneficially entitled to property may be further removed from the exercise of ultimate ownership of the property than the "beneficial owner", but as long as that person has the right to legally establish the exercise of the rights of ownership over the property then it may be said that he is beneficially entitled thereto. This distinction between the two expressions is, in my opinion, clearly shown by the judgments in the cases of Rodwell Securities ( [1968] 1 All E.R. 257) and Montreal Trust [Torrance Estate] ([1958] S.C.R. 146). In the Rodwell Securities case the Court was dealing with the situation in which the appellant was required to establish beneficial ownership of the shares of two separate companies in one third company. It was found that the true real ownership of the shares was in a subsidiary company rather than its parent. In the other case the Supreme Court of Canada was considering the meaning of the expression "beneficially entitled to" where the Court found that it was sufficient if the property in question could be applied to one's benefit by resort to an effective cause of payment.

> In my opinion the Legislature of Nova Scotia in using the expression "Where a corporation ... becomes beneficially entitled to property of the deceased" it was using it in the broad sense to cover the situation where the corporation is put in a position to ultimately exercise the rights of ownership over property of the deceased. It would be unnecessary to use additional words such

as "directly or indirectly" or "is controlled by" to effect its purpose. "Becomes beneficially entitled to" is broad enough to cover situations in which the property is registered in another name or held in trust or placed in the form in which the corporation can legally recover the property for its own benefit.

The judgment of Hart J. was sustained on appeal. Chief Justice MacKeagan, who delivered the judgment of the Court of Appeal in the MacKeen (supra) case and in the present case, said in his reasons in the former case:

I agree that being "entitled" to property means being able to "legally recover" it, that is, in the present context, to have the right and power, by lawful means, to fully enjoy the property. The adverb "beneficially" indicates that the person entitled to enjoyment of the property may not have full legal title.

In the modern sense of the phrase, a person is "beneficially entitled" to property if he is the real or beneficial owner of it, even though it is in someone else's name as nominal owner. The nominal owner of the property, whether real property, choses [sic] in action or other personal property, has legal title to it. The real owner, the person "beneficially entitled" to it, can require the nominal owner to let him use or have possession of the property, or to give him the income from it, or otherwise to let him have the benefit and enjoyment of it. He usually can require the nominal owner to convert the property into another form or to transfer the legal title to some other nominal owner. Above all, he is able, unless restricted by the terms of a specific trust, to call on the nominal owner to convey the property to him and to transfer its legal title to him, the real owner. If he does so, he will then fully acquire the property by achieving full ownership and will cease to be merely beneficially entitled to it.

The contention of the appellants is that the meaning to be attributed to the words "beneficially entitled" should be that which has been given by courts of equity, that the word "entitled" requires the existence of a right enforceable by a court of law or equity and "beneficially" is used to distinguish an equitable right or interest from a legal right or interest. It is said that the parent company had no legal or equitable right to the residue of the estate enforceable against the executors of the estate and that the Court is not entitled to ignore the separate corporate existence of the subsidiary company.

The appellants rely upon the judgment of Wynn-Parry J. in In re Miller's Agreement; Uniacke v. Attorney-General [[1947] 1 Ch. 615.]. The question in that case was as to the liability of three daughters of the deceased, Thomas William Noad, for payment of succession duties. The deceased had been in partnership with two other partners. On his retirement from the partnership and its dissolution, it was agreed that the other two partners, after Noad's death, would pay to his three

daughters lifetime annuities. No trust in favour of the daughters was created.

It was held that the daughters were not liable to pay succession duties. They were not parties to the agreement made by Noad with his partners and the agreement did not confer any rights upon them enforceable at law or in equity. They were not, by virtue of the agreement, "beneficially entitled" to any property within the meaning of s. 2 of the Succession Duty Act, 1853.

Wynn-Parry J., at pp. 624-25, said:

> It is clear that the annuities are property under s. 2, since they represent money payable under the engagement, namely, the deed. The material question, as it seems to me, is whether the plaintiffs became "beneficially entitled" to such property on the death of Mr. Noad. Nothing turns, to my mind, on the word "beneficially." If they became "entitled" to the annuities, they became entitled to them beneficially. The crucial question, therefore, is, did they become "entitled" to the annuities on Mr. Noad's death? The word "entitled," as used in this section, appears to me necessarily to carry the implication that for a person to be entitled to property under this section it must be capable of being postulated of him that he has a right to sue for and recover such property.

This statement was relied upon by the taxpayers in this Court in Montreal Trust Company and Others v. Minister of National Revenue [[1958] S.C.R. 146.]. Succession duties were claimed in the following circumstances. A testator set up, out of the residue of his estate, a "Charities Fund" to be divided equally between two charitable institutions. This gift was exempt from succession duties. There were dutiable gifts to other beneficiaries. The gifts to the two institutions were made "absolutely conditional" upon payment by them, equally, of all duties payable on the estate. If they failed to pay such duties, the gifts to them were to lapse and the Charities Fund would be used by the trustees to pay the duties.

The question in issue was as to whether the beneficiaries whose succession duties were directed to be paid by the two institutions were subject to succession duties in respect of the amount of the duties to be paid on their behalf, i.e., whether the benefit to the legatees of the tax exoneration was itself a succession.

Section 2(m) of the Dominion Succession Duty Act defined "succession" in the following manner:

> 2(m) ... every past or future disposition of property, by reason whereof any person has or shall become beneficially entitled to any property ... upon the death of any deceased person, ... either certainly or contingently,...

Rand J., with reference to the statement of Wynn-Parry J., said at p. 149:

Mr. Marler for the appellants urged as the test to determine whether a successor had become "beneficially entitled to any property" that formulated by Wynn-Parry J. in In Re Miller's Agreement; Uniacke v. Attorney-General. The test was, that it must be "postulated of him [the successor] that he has a right to sue for and recover such property". If the word "recover" extends to the application of money to one s benefit, and "sue for" to an ultimate and alternative resort as the effective cause of payment, I am disposed to accept it.

Locke J. said, at p. 147:

In my opinion, the legacies in question each included the amounts designed and, in addition, the right to have either the corpus of the Charities Fund or the moneys paid by the charities, pursuant to their respective agreements, if they elected to accept the legacy to them upon the terms of the will, applied in payment of the duties. As matters stand, the covenants of the charities to pay the duties are enforceable against them by the trustees. It is true that the legatees have no remedy directly against the charities, but they may each require the trustees under the will to enforce compliance with these covenants and, failing such compliance, to pay the succession and other duties out of the corpus of the Charities Fund, as directed by the will.

In the result, it was held that the duties were payable. The feature of this case which is relevant to the present appeal is that the beneficiaries had no enforceable rights as against the charitable institutions but they had an effective means to compel payment by seeking the intervention, on their behalf, of the trustees.

Another case cited by the appellants in support of their position is Re Chodikoff [[1971] 1 O.R. 321.]. This case dealt with the application of the Ontario Succession Duty Act, R.S.O. 1960, c. 386. The question in issue was as to the proper rate of tax to be applied in respect of dispositions made by the deceased during his lifetime. The Minister contended that the dispositions were made to a "stranger". The executors of the estate contended that the dispositions were for the benefit of the wife and children of the deceased and, accordingly, were taxable at a lower rate.

The deceased controlled two companies, one a realty company, the other, Bemar Investments Limited, at no time actively engaged in any business. Bemar had two classes of shares, Class A owned by trustees for the benefit of the wife and children of the deceased, and Class B owned by the deceased. The deceased transferred shares owned by him in the realty company to Bemar. He also caused Bemar to subscribe for shares in the realty company, and the realty company to issue them to Bemar. In each case the price was less than the real value. It was conceded that both transactions constituted "dispositions" under the Act.

Arnup J.A., delivering the judgment of the Court of Appeal, dealt with the contention of the executors as follows, at pp. 329-30:

> Counsel for the respondent, on the other hand, again relies on the definition of s. 1(f)(ii):

> (ii)    any means whereby any person is benefited, directly or indirectly, by any act of the deceased ...

> He says that the only persons who benefited by the transaction were the wife and children of the deceased, as the beneficiaries of the Marvin Chodikoff Number One Trust, that the "corporate veil" should be cut through or lifted by the Court, and the transaction should be regarded as in substance and in reality one by which the deceased benefited his wife and children. This submission makes it necessary to examine exactly what the legal position of those "beneficiaries" was at the time of the transaction. The trustees then held all of the issued Class A shares of Bemar; as previously pointed out, Class A shareholders were entitled ratably to the property of Bemar on its winding up, subject to prior payment of the principal and interest owing to Class B shareholders. Undoubtedly, the effect of the transaction was to increase the assets of Bemar, but the making of the disposition did not in itself, it seems to me, "benefit" the beneficiaries under the trust. Whether in the long run they would be better off by reason of the disposition depended on a number of factors which might occur in the future, including the winding up of Bemar, and the ownership by Bemar at that time of sufficient assets to pay off the Class B shareholders and have a surplus distributable to Class A shareholders.

> Putting it in another way, on the date of the disposition the wife and children of the deceased were the cestuis que trustent of a trust, which owned some of the shares in Bemar. No property interest accrued to the trust, either at law or in equity, by reason of the disposition. The only effect was that in certain events an asset which it already held might become more valuable.

It is unnecessary to consider if this judgment is well founded. The facts in the present case are substantially different from those in Chodikoff The subsidiary company to which the residue of the estate was bequeathed was wholly owned and controlled by the parent company. There were no other shareholders. The statutory provisions under consideration in Chodikoff were entirely different from those now under consideration.

The appellants also rely upon Rodwell Securities Ltd. v. Inland Revenue Commissioners

[[1968] 1 All E.R. 257.], This case involved a claim for exemption from payment of stamp duty in respect of a conveyance of land. The wholly-owned subsidiary of a parent company conveyed land to a company which was a wholly-owned subsidiary of another wholly-owned subsidiary of the parent company. An exemption from payment of stamp duty was permitted under subs. 42(2) of the Finance Act, 1930, which provided:

> 42(2) This section applies to any instrument as respects which it is shown to the satisfaction of the Commissioner of Inland Revenue (a) that the effect thereof is to convey or transfer a beneficial interest in property from one company with limited liability to another such company; and (b) that either--(i) one of the companies is beneficial owner of not less than ninety per cent of the issued share capital of the other company; or (ii) not less than ninety per cent of the issued share capital of each of the companies is in the beneficial ownership of a third company with limited liability.

Neither the transferor nor the transferee company had beneficial ownership of shares of the other company. The parent company wholly owned the transferor company, but the transferee company was not wholly owned by the parent company, but by a subsidiary of the parent company.

Pennycuick J. held that the exempting provision did not apply. He said, at p. 259:

> In order to escape from that position, counsel for the Securities company has to get through the company structure and establish that the exempting provision covers the position where one company has the entire interest, to use a neutral term, in another company, through the medium of a subsidiary of the first company of which the second company is in itself in turn a subsidiary. That is a position which it seems to me is not covered by the wording of s. 42.

At p. 260, he said:

> ... According to the legal meaning of the words, a company is not the beneficial owner of the assets of its own subsidiary. The legal meaning of the words takes account of the company structure and the fact that each company is a separate legal person.

It should be noted that that case was concerned with the meaning of the words "beneficial owner" and not with the words "beneficially entitled" and I agree with Hart J. that there is a distinction. Further, Pennycuick J. was careful to distinguish the ownership of the shares as contrasted with a controlling interest in the company.

The judgment of the Court of Appeal in Littlewoods Mail Order Stores, Ltd. v. McGregor

[[1969] 3 All E.R. 855.], is, in my opinion, much more relevant to the circumstances of this appeal. It dealt with a deduction claimed in computing income for income tax purposes. The taxpayer, which carried on business in London, leased its business premises under a 99-year lease, of which 88 years were unexpired. The annual rent was 23,444 pounds [Eng.] Under an arrangement made with the freehold owner, the freehold title to the land was acquired by a wholly-owned subsidiary of the taxpayer, Fork Manufacturing Co., Ltd. Fork leased the premises to the former owner for 22 years and 10 days at a rent of 6 pounds per year. The former owner then subleased the premises to the taxpayer for 22 years at an annual rent of 42,450 pounds. The taxpayer claimed that amount as a deduction for income tax purposes. The Inland Revenue Commissioners disallowed the difference between 42,450 pounds and the rent of 23,444 pounds previously being paid.

The claim of the taxpayer was that Fork was a separate and independent entity and must be treated in the same way as if its shares were held by someone other than the taxpayer. The freehold title would be acquired by Fork and the taxpayer, as a result of the transaction, would acquire no capital asset at all.

This submission was dealt with by Lord Denning M.R., at p. 860, as follows:

> I cannot accept this argument. I decline to treat the Fork company as a separate and independent entity. The doctrine laid down in Salomon v. Salomon and Co., Ltd. ([1897] A.C. 22; [1895-99] All E.R. Rep. 33) has to be watched very carefully. It has often been supposed to cast a veil over the personality of a limited company through which the courts cannot see. But that is not true. The courts can and often do draw aside the veil. They can, and often do, pull off the mask. They look to see what really lies behind. The legislature has shown the way with group accounts and the rest. And the courts should follow suit. I think that we should look at the Fork company and see it as it really is--the wholly-owned subsidiary of the taxpayers. It Is the creature, the puppet, of the taxpayers in point of fact; and it should be so regarded in point of law. The basic fact here is that the taxpayers, through their wholly-owned subsidiary, have acquired a capital asset--the freehold of Jubilee House; and they have acquired it by paying an extra 19,006 pounds a year. So regarded, the case is indistinguishable from the Land Securities case ( [1969] 2 All E.R. 430; [1969] 1 W.L.R. 604). The taxpayers are not entitled to deduct this extra 19,006 pounds in computing their profits.

Karminski L.J., after referring to the submission of counsel for the taxpayer that the taxpayer and Fork were two separate entities in law, went on to say, at p. 862:

> ... There is no doubt as to the correctness of that submission, based as it is on the rule in Salomon v. Salomon & Co., Ltd. ([1897] A.C. 22; [1895-99] All E.R. Rep. 33) of many years standing. But it is necessary here, as I think, to look at

what I believe to be the realities of this situation. The taxpayers are, as we have heard, a large and important trading company. The Fork company is shown by its balance sheet, which we have seen, to be not only a separate entity, but one which is a creation of, or at any rate, completely dependent on the taxpayers. I say that for this reason: we have the balance sheets for a number of years, beginning with the year ending December 1959, and finishing with the balance sheet for the year ending December 1962. The authorised capital of the Fork company was 20,000 shares of 1 pound [Sterling] each. The issued capital was more modest, being two shares of 1 pound [Sterling] each fully paid. Otherwise the only assets, apart from that modest paid-up capital, was freehold land and buildings valued by the directors in 1959 at 20,000 pounds [Sterling]. By the time of the December 1962 balance sheet that valuation had gone up, no doubt perfectly rightly, to 86,202 pounds [Sterling]; but the rest of the balance sheet remained remarkably unchanged. It is true that the cash in hand in 1958 was 2 pounds [Sterling]; but so it was in 1962. But meanwhile the cash at the bank had increased from nothing to 13 pounds [Sterling] 7s. Those figures, not perhaps very illuminating in themselves, have at any rate convinced me that the only object of the Fork company in 1958 was to hold this very valuable property, which Lord Denning, M.R., has described in detail, for the taxpayers. It is necessary I think to ask myself, after that examination of the details, who really benefited from getting hold of the freehold. To that in my view there can be only one answer, i.e., the taxpayers, and not the Fork company.

Another instance of the so-called lifting of the corporate veil is to be found in another judgment of the Court of Appeal in D.H.N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [[1976] 1 W.L.R. 852.], in which Lord Denning, at p. 860, speaking of the wholly-owned subsidiaries in that case and of the parent company said: "These subsidiaries are bound hand and foot to the parent company and must do just what the parent company says". Goff L.J., at p. 861, referred to the fact that, in that case, "the two subsidiaries were both wholly owned, further they had no separate business operations whatsoever".

I do not think that in order to support the judgments below it is really necessary to "lift the corporate veil". Subsection 2(5) comes into operation not only when a corporation "acquires" property of the deceased but also when it "becomes beneficially entitled" thereto. This last expression, coming as it does after the word "acquires", clearly contemplates that the property has gone to another person for the benefit of the corporation. It would undoubtedly cover the case of property bequeathed to a trustee for the benefit of the corporation. It cannot be denied that in this situation the corporation would become "beneficially entitled" to the property. However the statute does not restrict the application of the provision to such a case. In my view, the corporation is no less "beneficially entitled" when the property is held by its wholly-owned subsidiary as when it is held in trust for it. Its legal entitlement is even more immediate as it does not have to call upon a third party to perform its obligation as trustee. It only has to exercise its rights as sole shareholder of

its subsidiary. Nothing in the context of subs. 2(5) justifies giving a restricted meaning to the expression "beneficially entitled" which ought to be read according to the meaning of the words in ordinary language. I cannot find that it has acquired a technical meaning to which it must be restricted in this statute.

In my opinion, in considering the application of subs. 2(5) to the unusual facts of this case, this Court should not feel itself rigidly bound, in interpreting the words "beneficially entitled" by rules of equity evolved in the courts of chancery in connection with trusts. This approach was manifested by this Court in Minister of Revenue for the Province of Ontario v. McCreath et al. [[1977] 1 S.C.R. 2.]

During her lifetime, Mrs. McCreath established a trust in respect of certain property. The trust provided that, during her lifetime, the trustee was required to pay or apply the whole net income from the trust fund to or for the benefit of Mrs. McCreath and her children, or, in its discretion, to any one or more of the group. On her death, the trustee was to dispose of the fund among her issue or such of them as she might by will direct. In default of such direction, there was to be an equal division.

The taxing statute in question was drafted so as to catch all forms of transactions which had the result of transferring property on death. Therefore, "property passing on the death of a deceased" was broadly defined and was deemed to include, according to s. 1(p)(viii):

> any property passing under any past or future settlement, including any trust, whether expressed in writing or otherwise and if contained in a deed or other instrument effecting the settlement, whether such deed or other instrument was made for valuable consideration or not, as between the settlor and any other person, made by deed or other instrument not taking effect as a will, whereby an interest in such property or the proceeds of sale thereof for life, or any other period determinable by reference to death, is reserved either expressly or by implication to the settlor, or whereby the settlor may have reserved to himself the right by the exercise of any power to restore to himself, or to reclaim the absolute interest in such-property, or the proceeds of sale thereof, or to otherwise resettle the same or any part thereof,...

The question was as to whether, under the trust, Mrs. McCreath had reserved to herself "an interest" in the property expressly or by implication. It was contended on behalf of the respondents that no interest had been reserved. The distribution of the annual income as among Mrs. McCreath and her children was entirely at the discretion of the trustee among one or more of the group. Mrs. McCreath had no enforceable right to obtain any part of the income.

This submission was rejected in the judgment of the majority of the Court (the other member of the Court reached the same result on other grounds). The reasons for the rejection were stated at p. 15 as follows:

I conclude that Mrs. McCreath retained an interest in the settled property for purposes of s. 1(p)(viii) by making herself one of the possible objects of the discretionary trust. The primary objects of the donor's bounty are "the Settlor and her issue from time to time alive", and, in fact, the settlor did receive income pursuant to para. 1(a). Mrs. McCreath could apply to the Court to require the trustee to respect the terms of the trust if it refused to exercise its discretion. The fact that a discretionary object may have no interest in property law terms because she has no "right" to a definable amount of income is irrelevant. I do not believe that the niceties and arcana of ancient property law should be fastened upon with mechanical rigidity to determine the effect of a modern taxation statute whose purpose is plain.

In my opinion, the parent company, in the circumstances of this case, did have beneficial entitlement to the residue of the estate within the meaning of subs. 2(5). The fact that it was not made a beneficiary under the will does not preclude this finding in view of the fact that it had complete and absolute control of the named beneficiary, the subsidiary company, and had the legal capacity to compel that company to turn over to it the share of the estate bequeathed to it. This conclusion is fortified by the fact that it was the obvious purpose of the scheme adopted by the testator that the subsidiary company should turn over to the parent company the residue of the estate so that it could, in turn, divide the residue among its shareholders, i.e., the twelve grandchildren of the deceased. His intention was manifested in the will as it was first drawn. The clear intention of the testator was to divide the residue of his estate among his grandchildren. The codicil, plus the scheme of corporate arrangement with the parent company owning all the shares of the subsidiary company, accomplished the same result, but involved the residue passing through the hands of two corporations before finally reaching the intended beneficiaries.

Both companies were incorporated on the same day in the same office by the same lawyers. Neither the parent company nor the subsidiary company engaged in any business activity between their dates of incorporation and the date of Mr. Jodrey's death. Neither of them had any creditors. Both of them had the same directors. Both had the same officers.

This is eminently a case in which the Court should examine the realities of the situation and conclude that the subsidiary company was bound hand and foot to the parent company and had to do whatever its parent said. It was a mere conduit pipe linking the parent company to the estate.

In the circumstances, it is my view that the parent company was beneficially entitled to the residue of the estate within the meaning of subs. 2(5). Although it is not a named beneficiary under the will, the corporate scheme evolved by the deceased has clothed it with total control over the named beneficiary, the subsidiary company, and has enabled it legally to compel the subsidiary company to turn over the residue of the estate to it. The reality of the situation is that the parent company is the beneficial owner of the residue of the estate and that this was not only known to the deceased when he executed the codicil to his will, but was intended by him. He knew that the

codicil bequeathed the residue of his estate to a company which, under the arrangement evolved for him, was wholly owned by the parent company whose shareholders, his grandchildren, were the intended recipients of his bounty. To use the words of Rand J. in the Montreal Trust Company (supra) case, the parent company, though having no right as a beneficiary of the will to sue the executors directly, had "an ultimate and alternative resort as the effective cause of payment".

This conclusion does not involve any conflict with the principle stated in cases such as Macaura v. Northern Assurance Company, Limited and others [[1925] A.C. 619.], that a corporate shareholder does not have a right to the corporate assets of a corporation. The point in issue in this appeal is that by virtue of its total control over the subsidiary company, the parent company is in a legal position to compel it to deal with its assets in the manner dictated by the parent company.

In my opinion, the appeal on the first issue fails.

Second Issue:

The appellants contend that subs. 2(5) of the Act is ultra vires of the Legislature of Nova Scotia. It is said that subs. 2(5) of the Act requires an application of the charging provisions of subs. 8(2) of the Act, which results in taxation that is not "within the Province" and is indirect and thus not within s. 92(2) of the British North America Act.

For purposes of convenience, s. 8 of the Act is repeated here:

> 8(1) Subject as hereafter otherwise provided, duty shall be paid on all property of a deceased that is situated, at the time of the death of the deceased, within the Province.

> (2) Subject as hereafter otherwise provided, where property of a deceased was situated outside the Province at the time of the death of a deceased and the successor to any of the property of the deceased was a resident at the time of the death of the deceased, duty shall be paid by the successor in respect of that property to which he is the successor.

It is submitted by the appellants that the proper categorization of the tax imposed by subs. 8(2) of the Act is that it is a succession duty and that the subject-matter of the tax is the transmission of property.

The appellants relied, in support of their contention, upon the judgment of the Court of Appeal of British Columbia in Attorney General of British Columbia v. Canada Trust Company and Ellett [[1979] 2 W.W.R. 683, [1980] 2 S.C.R. 466.], which held that s. 6A of the Succession Duty Act, R.S.B.C. 1960, c. 372, as amended by 1972 (B.C.), c. 59, s. 14, was invalid.

Subsection (1) of s. 6A is substantially the same as subs. 8(2) of the Nova Scotia Act. Section 6A provides as follows:

> 6A. (1) Where property of a deceased was situated outside the Province at the time of the death of the deceased, and the beneficiary of any of the property of the deceased was a resident at the time of the death of the deceased, duty under this Act shall be paid by the beneficiary in respect of that property of which he is the beneficiary.

> (2) The beneficiary of the property of the deceased referred to in subsection (1) shall, except as provided in section 5, pay the duty in respect of that property calculated on the dutiable value thereof at the rate prescribed in the Table of Rates in Schedule C, as ascertained according to the following method:

In a judgment of this Court, recently delivered, an appeal from the judgment of the British Columbia Court of Appeal was allowed and s. 6A was held to be intra vires of the Legislature of British Columbia. It was held that s. 6A "imposes an in personam tax on a resident beneficiary".

It must therefore be taken as settled law that subs. 8(2) of the Act is valid legislation and that the tax imposed by it is an in personam tax on a resident successor.

Subsection (5) of s. 2, coupled with subs. 8(2), merely imposes upon resident shareholder successors the same obligation imposed upon resident successors by subs. 8(2). They do not succeed to property of the deceased directly, but the property ultimately devolves upon them by reason of his death through their ownership of shares in a non-resident corporation which becomes beneficially entitled to property of the deceased.

The tax which is imposed upon the grandchildren of the deceased by the combined effect of subs. 8(2) and subs. 2(5) is a tax imposed upon residents of Nova Scotia measured by their succession to the estate of a resident of Nova Scotia, whose will was made and probated in Nova Scotia. This is a tax upon residents in the province and so is taxation within the province. The tax is not a tax upon property outside the province. It is a tax upon persons within the province measured by the benefits which they derive as a result of the bequest made to a non-resident corporation of which they are the shareholders. It is clearly imposed upon the very persons who were intended to pay it, and so it cannot be regarded as an indirect tax.

In my opinion, subs. 2(5) was intra vires of the Legislature of Nova Scotia to enact.

I would dismiss the appeal with costs.

The reasons of Ritchie, Dickson and McIntyre JJ. were delivered by

DICKSON J. (dissenting):-- In this appeal the Court is asked to draw the line between acceptable estate tax planning and unacceptable tax evasion. In broad and general terms, the issue is this: where a testator or taxpayer has studied the relevant legislation and ordered his affairs in such a manner as to avoid the apparent reach of the measure, and where there is no statutory definition of improper tax avoidance, in what circumstances will a court strike down his acts? There is, I think, a distinction to be made between cases in which: (a) tax consequences are clearly delineated in the statute, and, cognizant that he falls squarely within its ambit, the taxpayer sets out to disguise or alter the character of his income; and, (b) those in which a taxpayer finds a lacuna or way in which he can validly take his income wholly outside the express wording of the statute. The taxpayer does not falsely represent his position to the taxing authorities; he merely re-arranges his affairs in a legal manner so as to minimize tax liability.

The decision as to whether his acts constitute (a) reprehensible tax evasion or (b) legitimate tax planning, will depend upon the jurisprudence as applied to the facts of the particular case.

I propose to deal with this question under the following heads:


I    Facts

II   Interpretation of Fiscal Legislation

III "Beneficially Entitled"

IV Lifting the Corporate Veil


V    Sham

VI   Conclusion

I

THE FACTS

Roy A. Jodrey, for thirty years a resident of Hantsport, Nova Scotia, died there on August 12, 1973. By his will, executed on August 13, 1963, he had given his executors, the appellants in the present case, the usual directions as to payment of debts funeral and testamentary expenses, estate taxes and succession duties. Then, after making charitable and other bequests, he had directed that, on the death of his wife, the rest and residue be divided equally among his grandchildren.

Following execution of the will, and during the lifetime of Mr. Jodrey, the federal

government, on January 1, 1972, vacated the estate tax field. The Province of Nova Scotia, in common with a number of other provinces, moved with alacrity to fill the void, and passed An Act Respecting Succession Duties, 1972 (N.S.), c. 17, deemed to have been in force in January 1, 1972. The Act imposed succession duties on all property of a deceased situated within the province at the time of his death, as well as on property situated outside the province, passing to resident "successors".

It became apparent that, unless something were done, Mr. Jodrey's twelve grandchildren, all of whom were resident in Nova Scotia, would be liable, as "successors", to succession duties. Accordingly, a rather elaborate scheme was devised, and implemented, by which it was hoped to escape the imposition of duty in Nova Scotia on the estate then valued at some $3,500,000.

The scheme involved three main moves:

1.    The incorporations--On September 13, 1972, Mr. Jodrey caused to be incorporated in Alberta, then the only province free of succession duties, three companies:

(a)    J.B.H. Investments Ltd.--the parent company which issued to each of Mr. Jodrey's twelve grandchildren, 100 common shares at a price of $l per share, paid by the grandchildren.

(b)    J.G.C. Investments Ltd.--the subsidiary company which issued 100 common shares, all of which were beneficially owned by the parent company.

(c)    White Rock Investments Ltd.--which issued two common shares, each beneficially owned by Mr. Jodrey.

Each of the companies became a registered Alberta corporation. None carried on business in Nova Scotia. The head office, share transfer register and certificates for issued shares of each was located in Alberta. The officers and directors of each were residents of Alberta.

2.    The White Rock Transaction

On September 22, 1972, Mr. Jodrey entered into an agreement whereby he agreed to sell and White Rock Investments agreed to purchase, 4,600 shares of R.A. Jodrey Investments Limited, a Nova Scotia corporation owned and controlled by Mr. Jodrey, for a consideration of $3,735,200. White Rock gave Mr. Jodrey a promissory note in that amount, payable without interest upon presentation at the registered office of White Rock in the Province of Alberta. On July 3, 1973, White Rock paid $105,800 on account of the note, leaving a balance owing at the date of Mr. Jodrey's death, of $3,629,400. The promissory note was situate in Alberta at that date.

3.    The codicil

By a codicil to his will, executed October 5, 1972, Mr. Jodrey revoked the bequest to his grandchildren of the residue of his estate, and substituted therefor:

> the rest and residue of my estate I give and bequeath to JGC Investments Limited, an Alberta company, including without limitation a note of White Rock Investments Limited.

The steps taken were not dissimilar to those which the author of a paper delivered at the Twenty Third Tax Conference, 1971, of the Canadian Tax Foundation (Report of Proceedings, at p. 36) suggested might be taken by a father wishing legally to avoid succession duties. The author, under the rubric of "transmissions", wrote:

> It may be possible under present law for a father legally to avoid succession duties, even if his children are domiciled or resident in the father's province of domicile. If, for example, a father domiciled in Ontario transferred all his assets, including those which are situated in Ontario, to an Alberta holding company, in return for shares of the Alberta company, and if his children then also incorporated a second Alberta holding company and by his will the father left his shares in the first company to the second company, it would seem that Ontario would not be in a position to levy any duty. In Re Chodikoff estate, [1971] 1 O.R. 321, the Ontario Court of Appeal held that a disposition made by way of bargain sale by a father to his children's holding company was a disposition to the holding company, and not to his children, and that it was therefore taxable at the rates of duty applicable to strangers, rather than those applicable to preferred beneficiaries. Applying this reasoning to our hypothetical case, it would seem that a bequest of the shares of the first Alberta company to the second Alberta company could not be considered a transmission to the testator's children, who are resident in Ontario, merely because they were the shareholders of the second Alberta company.

The purpose of the two-tiered, parent-subsidiary relationship in the case at bar was to place the residue of the estate outside the taxing provisions of the newly enacted Nova Scotia statute, s. 1(ae) of which reads:

> (ae) "successor" in relation to any property of the deceased includes any person who, at any time before or on or after the death of the deceased became or becomes beneficially entitled to any property of the deceased
>
> (i) by virtue of, or conditionally or contingently on, the death of the deceased, or ...

The Minister of Finance relied upon s. 2(5)(b) in seeking to tax the grandchildren:

2. (5) Where a corporation which is not resident in the Province, other than a corporation without share capital, by reason of the death of a deceased acquires or becomes beneficially entitled to property of the deceased,

(a) the corporation shall be deemed not to be the successor of the property except to the extent that the value of the shares of the shareholders of the corporation is lot increased in value by the corporation acquiring or becoming beneficially entitled to the property; and

(b) each of the shareholders of the corporation shall be deemed to be a successor of property of the deceased to the extent of the amount by which the value of his shares in the corporation is increased by the corporation acquiring or becoming beneficially entitled to the property.

The charging provisions read:

8. (1) Subject as hereafter otherwise provided, duty shall be paid on all property of a deceased that is situated, at the time of the death of the deceased, within the Province.

(2) Subject as hereafter otherwise provided, where property of a deceased was situated outside the Province at the time of the death of a deceased and the successor to any of the property of the deceased was a resident at the time of the death of the deceased, duty shall be paid by the successor in respect of that property to which he is the successor.

9. Each successor to any property of a deceased on which duty is payable under subsection (1) of Section 8 and each successor liable to pay duty under subsection (2) of Section 8 shall pay the duty to the Minister for the raising of a revenue for provincial purposes.

Section 8(2) is concerned with property situate outside the Province, and successors resident within the Province. The legatee, an Alberta company, was not resident within the Province of Nova Scotia and therefore the bequest was outside s. 8(2), unless s. 2(5)(b) of the Act could be called in aid. That section addresses the situation where a corporation, such as J.G.C. Investments Ltd., not resident in Nova Scotia, becomes beneficially entitled to property by reason of the death of the deceased.

Section 2(5)(b) is clearly intended to reach resident-shareholders of non-resident legatee

companies. If Mr. Jodrey had left the residue of his estate to an Alberta company in which his grandchildren held shares, I do not think there is any doubt (subject to any constitutional challenge) that the grandchildren would have been subject to tax. The scheme I have outlined, however, introduced a second Alberta company. The sole shareholder of the legatee corporation, J.G.C. Investments Ltd., is its patent, J.B.H. Investments Ltd. That corporation is not resident in Nova Scotia. Therefore, it is argued, that company and its shareholders, the grandchildren, fall outside the scope of the Act.

The draftsman of the Act envisaged the possibility of a non-resident corporate legatee with resident shareholders, and made provision for that eventuality. He overlooked the possibility of a legatee subsidiary company having a non-resident parent, controlled by resident shareholders. That lapse, it is said, relieves the grandchildren of tax in respect of the residue received by the subsidiary of the parent company in which they are sole shareholders. Is all this the legitimate arranging of one's affairs so as to fall outside the language of the taxing statute or is it improper tax evasion? If the latter, on what legal basis is it to be so regarded? The views of the individual judge as to the propriety or impropriety of the conduct of the testator, and the desirability or undesirability of the result sought to be attained by the testator, do not furnish any guide to decision.

By Notice of Assessment dated August 8, 1975, addressed to the executors of the estate, the total value of the estate was increased by $3,784,273, of which $2,999,000 was attributable to "promissory note with situs in Alberta"; the applicable rate of duty was established to be 48.5 per cent; the duty was assessed in the amount of $1,534,421.96 and interest thereon at the rate of 8 per cent per annum. It is common ground that by the Notice of Assessment, duty was assessed against the twelve grandchildren on the basis they are successors to the residue of the estate. The executors filed a notice of objection. The Minister of Finance confirmed the assessment "as having been made in accordance with the provisions of the Act and in particular on the ground that the twelve grandchildren of the deceased, all residents in Nova Scotia at the time of death, are true and proper successors to the residue of the estate pursuant to paragraph (b) of subsection (5) of Section 2 of the Act".

The Minister has accepted throughout that the grandchildren were not "successors" under s. 1(ae) of the Act but "deemed" to be successors under s. 2(5)(b), as shareholders of a corporation beneficially entitled. Mr. Justice Hart in the Court below noted this in his reasons for judgment in the MacKeen matter. Unsuccessful appeals in both estates were taken from the Minister's decision to the Trial Division and, later, the Appeal Division of the Supreme Court of Nova Scotia. Argument proceeded before both Courts on an Agreed Statement of Facts and a book of Agreed Exhibits. The Agreed Statement of Facts sets out the two questions for decision at trial, and now before this Court:

> (a)    whether or not the twelve grandchildren of the deceased are or are not successors to the residue of the estate of the deceased within the meaning of section 2(5) of the Act; and

    (b)    if it is found that the twelve grandchildren of the deceased are successors to the residue of the estate of the deceased within the meaning of section 2(5) of the Act, whether or not section 2(5) is ultra vires the powers of the legislature of Nova Scotia.

Identical issues were before the Nova Scotia Courts in appeals respecting the Estate of John Crerar MacKeen and the reasons set out in the MacKeen case were adopted by the Court of Appeal in its reasons for decision in the case at bar. In this Court the Provinces of Quebec and British Columbia intervened in support of an affirmative answer to the following constitutional question:

    Are sub-sections 8(2) and 2(5) of the Succession Duty Act of the Province of Nova Scotia, S.N.S. 1972, c. 17, intra vires of the Legislature of that Province to enact?

II

INTERPRETATION OF FISCAL LEGISLATION

In all Courts the appellants advanced a number of propositions regarding principles of statutory construction of fiscal legislation, that require comment. It is said taxing statutes are to be strictly construed. The Court, it is contended, can only look to the express words of the statute and cannot explore and give effect to the intention or purpose of the Act. A passage from the judgment of Lord Halsbury in Tennant v. Smith [[1892] A.C. 150.], at p. 154, is cited. Then it is said there is no equity in the Crown's favour in a taxing statute. Reliance is placed on a passage from Attorney-General v. The Earl of Selborne [[1902] 1 K.B. 388.], in which Collins M.R. adopted this principle, at p. 396:

    If the person sought to be taxed comes within the letter of the law he must be taxed, however great the hardship may appear to the judicial mind to be. On the other hand, if the Crown, seeking to recover the tax, cannot bring the subject within the letter of the law, the subject is free, however apparently within the spirit of the law the case might otherwise appear to be.

The appellants make reference to the "form versus substance" controversy. The Court, it is said, must examine the "legal effect" of the transaction and disregard, or at least greatly subordinate, the true substance of the matter. The appellants look to well-known passages found in Commissioners of Inland Revenue v. The Duke of Westminster [[1936] A.C. 1.].

Finally, the appellants advance the proposition, not open to challenge, that a taxpayer may so order his affairs as to attract the least amount of tax, however "unappreciative" the taxing authorities as to his "ingenuity", Duke of Westminster, supra, at p. 19.

If the submissions made on behalf of the appellants, as to the proper principles to be applied

in constructing fiscal legislation, simply mean that it is impermissible to bring to the task of construing a fiscal statute a bias in favour of the Crown, then I am in entire accord. A court of justice must act as a neutral umpire, impartially and objectively, between the taxpayer and the taxing authority. Neither occupies a preferred position.

If, on the other hand, the submissions of the appellants mean that there are special principles of construction governing the interpretation of fiscal legislation, or that a court must uncritically and supinely accept the form of the transaction, blind as to what is actually happening, then, with respect, I disagree.

Fiscal legislation does not stand in a category by itself. Persons whose conduct a statute seeks to regulate should know in advance what it is that the statute prescribes. A court should ask--what would the words of the statute be reasonably understood to mean by those governed by the statute? Unnatural or artificial constructions are to be avoided.

The correct approach, applicable to statutory construction generally, is to construe the legislation with reasonable regard to its object and purpose and to give it such interpretation as best ensures the attainment of such object and purpose. The primary object of a succession duty statute, such as the legislation under consideration, is to capture such amounts for the fiscal coffers as the words of the statutory net can catch. No legislative intention can be assumed other than to collect such tax as the statute imposes, no more and no less.

Although a court is entitled, in the case of fiscal legislation as with other enactments, to look to the purpose of the Act as a whole, as well as the particular purpose of a given section, it must still respect the actual words which express the legislative intention. In Corporation of the City of Toronto v. Russell [[1908] A.C. 493.], Lord Atkinson, delivering judgment for the Privy Council stated at p. 501:

> Their Lordships are moreover of opinion that, since the main and obvious purpose and object of the Legislature in passing the Act 3 Edw. 7, c. 86, was to validate sales made for arrears of taxes ... the statute should where its words permit, be construed so as to effect that purpose and attain that object. (Emphasis added.)

The following passage is found in the judgment of Brightman J. in the Chancery Division in Sansom et al. v. Peay [[1976] 3 All E.R. 375.], at p. 379, concerning s. 29(9) of the Finance Act:

> In my view s. 29(9) is capable of bearing either the strict construction for which counsel for the Crown has argued or the broader construction advocated by counsel for the trustees. Subsection (9) is an exempting subsection, and it is not of course my duty, even in the case if (sic) a taxing statute, to try to ensure that the exemption applies. But I think I am permitted to take into consideration one factor which must have been present to the mind of Parliament when

enacting s. 29. The general scheme of s. 29 is to exempt from liability to capital gains tax the proceeds of sale of a person's home. That was the broad conception ... It would not therefore be surprising if Parliament formed the conclusion that, in such circumstances, it would be right to exempt the profit on the sale of the first home from the incidence of capital gains tax so that there was enough money to buy the new home. Nevertheless, it would not be permissible for me to construe sub-s (9) in a manner which I thought was fair or reasonable unless the wording permits that construction. Nor do I intend to travel outside the facts of the particular case before me. (Emphasis added.)

<div align="center">III</div>

BENEFICIALLY ENTITLED

I turn now to the question whether the transaction in the case at bar falls within the meaning of the words of s. 2(5) so as to deem the twelve grandchildren "successors". I repeat s. 2(5)(b):

> Where a corporation which is not resident in the Province, other than a corporation without share capital, by reason of the death of a deceased acquires or becomes beneficially entitled to property of the deceased,

> (a)    ...
> (b)    each of the shareholders of the corporation shall be deemed to be a successor of property of the deceased to the extent of the amount by which the value of his shares in the corporation is increased by the corporation acquiring or becoming beneficially entitled to the property.

If the "corporation which is not resident in the Province" and which "acquires or becomes beneficially entitled to property of the deceased" is identified as the subsidiary company, the direct object of the bequest, then it is clear, upon a plain reading, that the section does not reach the grandchildren as they are not shareholders of the legatee corporation. If the Minister is to sustain the assessment on the basis of s. 2(5)(b), he must establish that the parent company became "beneficially entitled" to property of the deceased.

If one resorts to legal dictionaries in search of the meaning to be attributed such words and phrases as "entitled", "beneficial", "beneficially entitled", "beneficial interest", and the like, it sin becomes apparent their meanings are almost invariably drawn from cases concerned with the construction of wills or succession duty statutes. The phrases naturally take their colour from the word "beneficiary" who is, after all, the target of the tax. Whether we like it or not, this takes us into that formidable body of jurisprudence built up by the courts of chancery. The Nova Scotia Act deals with a subject-matter formerly administered by the courts of equity and it uses phrases long familiar to those courts. At least in the pure wills or trust situations, "beneficially entitled" refers to an

interest that would be recognized by, and enforceable in, a court of equity. See Waters, Law of Trusts in Canada (1974), at pp. 833-35.

The leading modern British authority is Uniacke v. Attorney-General (In re Miller's Agreement) [[1947] Ch. D. 615.], in which Wynn-Parry J. had to determine whether the plaintiffs were "beneficially entitled" to certain annuity payments which partners of the retiring (and since deceased) partner covenanted to pay the plaintiffs, family of the former partner.

In the clearest statement of the law on this point, the learned trial judge said (at p. 625):

> The word "entitled", as used in this section, appears to me necessarily to carry the implication that for a person to be entitled to property under this section it must be capable of being postulated of him that he has a right to sue for and recover such property.

This "sue for and recover" rule was followed in Re J. Bibby and Sons, Ltd. Pensions Trust Deed, Davies v. Inland Revenue Commissioners [[1952] 2 All E.R. 483.]. There, at p. 487, Harman J. held a widow not to be "beneficially entitled" to an income from a pension on the ground that she had not "such an interest in property as would be protected in a court of law or equity".

There are Canadian cases which touch upon the subject. In Re Steed and Raeburn Estates; Minister of National Revenue v. Fitzgerald et al. [[1949] S.C.R. 453.], concerned whether or not the property in question was situated in Canada. Rand J. considered the nature of a beneficiary's interest:

> But in addition to his capacity of representing the deceased, the executor in equity is looked upon as quasi-trustee for the beneficiaries; and the beneficiary is entitled to resort to that court to have the duty of the executor enforced. The "interest" in property that is transmitted results from that right and becomes, therefore, an equitable interest, subject to the rules which underlie equitable administration. (at p. 461)

Locke J., in dissent, indicated he too would define a beneficiary as one who could compel the trustees properly to administer the estate.

Cossitt v. M.N.R. [[1949] 4. D.L.R. 705.] involved, in part, consideration of s.2(m) of the Dominion Succession Duty Act, 1940-41 (Can.), c. 14, as amended by 1942-43, c. 25. The question faced by O'Connor J. was whether the general power given the beneficiary, to use all or any part of the capital, was "property" to which the beneficiary was "beneficially entitled". O'Connor J. held at p. 708:

> "Entitled" in s. 2(m), in my opinion, should be given the same meaning set out by Wynn-Parry J. In re Miller's Agreement, Uniacke v. Attorney-General,

[1947] 2 All E.R. 78, in which after discussing the word "entitled" in s. 2 of the Succession Duty Act, 1853 (Imp.), c. 51, he said at p. 83: "The word 'entitled', as used in this section, appears to me necessarily to carry the implication that, for a person to be entitled to property under this section, it must be capable of being postulated of her that she has a right to sue for and recover such property."

Until the appellant exercised the power in his own favour, he would not have the right to sue for and recover the capital.

Wanklyn et al. v. M.N.R. [[1953] 2 S.C.R. 58.], was a very similar case. In addition to an interest in the income from the capital sum, the beneficiary there was vested with a general power of appointment. If he exercised the power fully he would become absolute owner of the capital. The Minister sought to tax as if the property had been bequeathed absolutely. Cartwright J., delivering judgment for himself and Fauteux J., held at p. 75:

The respondent's argument depends upon the proposition that a person who is given a power over property thereby becomes beneficially entitled to such property but in my view this is not the law and no words in the Statute so provide. As is pointed out in Halsbury, 2nd Edition, Vol. 25, page 515:

The creation of a power over property does not in any way vest the property in the donee, though the exercise of the power may do so; and it is often difficult to say whether the intention was to give property or only a power over property.

These two cases are analogous to the case at bar. The parent company in the case at bar is in a position at any time to wind up its wholly-owned subsidiary and obtain the legacy bequeathed to the subsidiary. The Minister contends that this power places the parent in the position of being "beneficially entitled" to the residue of Mr. Jodrey's estate. It is true that the word "power" is a term of art and was so used in the two cases to which I have referred. The cases are helpful though in that each recognizes beneficial interest as an interest or right recognized by the courts of equity. The fact that there would be no legal impediment to one acquiring the property is not sufficient. Beneficial entitlement arises only in those situations where equity recognizes the interest.

Re Chodikoff [[1971] 1 O.R. 321.] is the closest case, factually, to the present case. The deceased had made two "dispositions" of shares in a private corporation controlled by him. In one, he caused 500 treasury shares to be transferred at an undervaluation to another personal corporation, the common shares of which were held in trust for his wife and children. In the other disposition he made a simple transfer of a quantity of common shares of one private corporation to another. The Minister sought to invoke the rate of taxation imposed on "strangers" on the ground that the corporations were "strangers". The taxpayer responded by asserting that only the wife and children

would ultimately benefit from the dispositions. Consequently the lower rate of tax should have been used. Fraser J., at first instance, agreed. Upon appeal, counsel for the respondent argued that the "corporate veil" should be lifted and the transaction regarded in substance as one by which the deceased conferred a benefit upon his wife and children. That is essentially the argument advanced in the instant case. The following passage from the judgment of Arnup J.A. is pertinent:

> ... Undoubtedly, the effect of the transaction was to increase the assets of Bemar, but the making of the disposition did not in itself, it seems to me, "benefit" the beneficiaries under the trust. Whether in the long run they would be better off by reason of the disposition depended on a number of factors which might occur in the future, including the winding up of Bemar, ...
>
> ...
>
> No property interest accrued to the trust, either at law or in equity, by reason of the disposition. The only effect was that in certain events an asset which it already held might become more valuable.
>
> If the cestuis que trustent did not "benefit" by the disposition, who did? The inevitable answer must be that Bemar did, i.e., that corporation acquired an asset. The asset was not acquired by its shareholders or any class of them, any more than any interest in the asset was acquired by a creditor of the company, if such there were.
>
> In my opinion, the link between the disposition on the one hand and the persons who were said to benefit on the other is much too tenuous and, indeed, is in law non-existent. A person does not, become liable to tax under the Succession Duty Act, by reason of a disposition, merely because it later turns out that as a result of a whole series of events, including the disposition, he is better off than he would have been if the disposition had not been made. Only persons who receive a benefit from the disposition itself are caught by the provisions of the statute. (at pp. 330-331)

Chodikoff's case is important because the Ontario Court of Appeal refused to give effect to the very argument employed in this case. In all likelihood the wife and children would ultimately benefit from the transactions; in law the corporations, and not the family, were the beneficiaries; the Court refused to lift the "corporate veil".

I refer briefly to the American authorities to indicate the uniformity of jurisprudence on the meaning of "beneficially entitled". A case often cited is People v. McCormick [(1904), 208 Ill. R. 437.] This case makes it clear that the phrase is a compendious expression denoting the types of

interests recognized by courts of equity. In Montana Catholic Missions v. Missoula County [(1905), 200 U.S. 118.], the Supreme Court of the United States expressly included in its definition the element of the ability to sue to enforce the rights.

> The expression, beneficial use or beneficial ownership or interest, in property is quite frequent in the law, and means in this connection such a right to its enjoyment as exists where the legal title is in one person and the right to such beneficial use or interest is in another, and where such right is recognized by law, and can be enforced by the courts, at the suit of such owner or of some one in his behalf. (at pp. 127-28)

The trustee Acts of eight of the provinces use the phrase "beneficially interested" in the sense of a beneficiary or successor with such an interest as would be recognized and enforced by the courts, someone who, by definition, is competent to seek relief in the event, for example, of default on the part of the executors and trustees of the estate. See the Trustee Act, R.S.N.S. 1967, c. 317, s. 40.

The meaning attacHed to the phrase "beneficially entitled" is closely linked to the meaning of the word "beneficiary"--at least in succession duty cases. The phrase, the authorities indicate, imports the requirement that he who is "beneficially entitled" be able to go to court to have his interest in the property protected.

The nub of the problem in this case is that the draftsman of the statute selected a phrase well known to the courts; in effect, a term of art. There was awareness of the complications which could arise should a non-resident corporate entity be interposed between the trustee and the resident intended to be benefited. Hence s. 2(5). The draftsman anticipated that courts might be unable to find a shareholder of the corporate legatee to be "beneficially entitled". The draftsman failed, however, to provide for the interposition of a second non-resident shareholder.

Counsel for the Minister of Finance submits that "the expression 'beneficially entitled' has a broad connotation, the ordinary or plain meaning of which encompasses the present transaction". In the absence of earlier authority and in a context other than one related to estates and succession duties, a court might be much inclined to give effect to this submission and construe "beneficially entitled" according to what could be regarded as the popular usage of the language employed. But, in light of the uniform jurisprudence to the contrary, I find it impossible to accede to counsel's submission.

Here, J.B.H. Investments Ltd., the parent company, has no standing or capacity to "sue for and recover" the estate assets. J.G.C. Investments Ltd., the subsidiary, is the beneficial owner of the residue and it alone can sue the estate trustees to obtain legal title of those assets comprising the residue. J.B.H. Investments Ltd. perhaps has the power, through its share control, to compel J.G.C. Investments Ltd. to take steps against the trustees but it has no independent claim and no claim to beneficial entitlement which it can assert. It has no right to require either the executors or the

subsidiary company to deliver or apply the bequest to its benefit.

At trial, Mr. Justice Hart in his reasons for judgment in the MacKeen matter, adopted in this case, expressed these views:

> In my opinion the Legislature of Nova Scotia in using the expression "Where a corporation ... becomes beneficially entitled to property of the deceased", it was using it in the broad sense to cover the situation where the corporation is put in a position to ultimately exercise the rights of ownership over property of the deceased. It would be unnecessary to use additional words such as "directly or indirectly" or "is controlled by" to effect its purpose. "Becomes beneficially entitled to" is broad enough to cover situations in which the property is registered in another name or held in trust or placed in any form in which the corporation can legally recover the property for its own benefit.

Mr. Justice Hart cited Montreal Trust Company v. The Minister of National Revenue (Torrance Estate) [[1958] S.C.R. 146.], where Rand J., in obiter, added a gloss to the Miller's Agreement case, supra, at p. 149:

> The test was, that it must be "postulated of him [the successor] that he has a right to sue for and recover such property". If the word "recover" extends to the application of money to one's benefit, and "sue for" to an ultimate and alternative resort as the effective cause of payment, I am disposed to accept it.

The remarks of Mr. Justice Rand were made in the context of the peculiar facts of the Torrance Estate case and in my view do not assist in understanding the phrase "beneficially entitled".

Mr. Justice Hart cited at length from Rodwell Securities Ltd. v. Inland Revenue Commissioners [[1968] 1 All E.R. 257.], which, as I read the case, roundly rejected the argument that "beneficial ownership" was not a term of art but fell to be construed liberally so as to include any person having complete control over the disposition of property. Pennycuick J. in the Rodwell case rightly noted that the section with which he was dealing did not contain the words "directly or indirectly". In this respect, that case parallels the case at bar. Pennycuick J., in a passage which bears upon the present inquiry said:

> The rest of counsel's contentions really amounted in one set of terms or another to the proposition that the expression "beneficial owner" requires, and must be given a wide and liberal construction. I can answer that only by saying that it seems to me that one must construe the expression according to its legal meaning. I do not think that there is anything in the context of the section which requires one to do otherwise. (at p. 261)

Mr. Justice Hart interpreted the expression "beneficial owner" as meaning "the real or true

owner of the property ... the one who can ultimately exercise the rights of ownership in the property". No authority is given for this proposition. The legal basis is not clear.

Chief Justice MacKeigan agreed with Mr. Justice Hart and reinforced his conclusion that the parent company was beneficially entitled to the estate interest acquired by its subsidiary by combining the operation of s. 1 (ae) and s. 2(5). He said:

> Let me explain. By s. 2(5) each MacKeen parent company is, as the sole beneficial shareholder of its subsidiary, undoubtedly deemed to be the successor in respect of the property bequeathed to that subsidiary. A "successor" by s. 1(ae) is declared to be a person who "becomes beneficially entitled" to property of the deceased on his death. The parent company, having been deemed a successor by s. 2(5), must then by s. 1(ae) be deemed to be a person beneficially entitled to the property in question.

> Turning again to s. 2(5) and applying it again, the parent company is a non-resident corporation. It is a "successor" via its subsidiary. By the combined effect of s. 2(5) and s. 1(ae), as above, it must therefore be itself deemed to have become beneficially entitled to the property. Accordingly its shareholder "shall be deemed to be a successor" of the property.

With great respect, there is nothing in the particular statute or in any rule of statutory construction of which I am aware that permits one to climb up the corporate hierarchical ladder by applying s. 2(5) time and again. That is the very gap in the legislation of which the testator took advantage.

If the lower Courts are correct and the phrase "beneficially entitled" points to the locus of the benefit and the ultimate use and enjoyment of the property, it will be seen, by this process of reasoning, that the grandchildren are "beneficially entitled" by virtue of s. 1(ae) ab initio. This is not the position taken by the Minister in these proceedings. The Minister relied upon s. 2(5) in order to reach the grandchildren. The grandchildren, not the parent J.B.H. Investments, possess the ultimate right and power to achieve by lawful means the full enjoyment of the property. That results in a dilemma that is difficult to resolve. The difficulty in the reasoning of the lower Courts is that such a construction of "beneficially entitled" leads ineluctably to the conclusion that s. 2(5) is superfluous and adds nothing to s. 1(ae).

In sum, the legal meaning of "beneficially entitled" is firmly imbedded in the concrete of earlier adjudication. However unenamoured one may be with the conduct of the testator in this case, I do not think it is open to this Court to jettison trust law and give a broad, non-technical meaning to the phrase "beneficially entitled", based upon (i) the supposed intent of the legislature to catch transactions of this nature or (ii) the proposition that one is beneficially entitled to property if at some time in the future he can exercise powers (not drawn from the will) by which he may ultimately acquire an interest in the property. Here the Court is not being asked to introduce words

into the Act in order to cure an ambiguity, but rather to introduce a new section to provide for a situation not captured by it. To do so would be tantamount to changing the rules after the game has been played.

<div align="center">IV</div>

LIFTING THE CORPORATE VEIL

I think, however, it is proper for the Court to look not only at principles of trust law, but to those of corporate law. Principles of corporate law are of assistance in determining whether, by virtue of its ownership of all of the outstanding shares of J.G.C. Investments Ltd., J.B.H. Investments Ltd. can be said to be "beneficially entitled" to the assets of J.G.C. Investments Ltd.

Hart J. held that "beneficial entitlement" was used in its broadest sense; i.e., the right ultimately to establish the exercise of the rights of ownership. On appeal, MacKeigan C.J.N.S. dealt with the judgment of Pennycuick J. in Rodwell Securities Ltd. v. Inland Revenue Commissioners, supra. There, the question to be answered was whether a wholly-owned subsidiary (Securities) of a wholly-owned subsidiary (Group) of a parent company (London) was beneficially owned by the parent London.

Pennycuick J. held:

> According to the legal meaning of the words, a company is not the beneficial owner of the assets of its own subsidiary. (at p. 260)

MacKeigan C.J.N.S. regarded that statement as (a) inapplicable and, (b) not quite accurate. A completely different statutory context and corporate scheme was involved in that case. In his view:

> It seems to me apparent that a company may, depending on its make-up and status, become the beneficial owner of the assets of its subsidiary, and thus be beneficially entitled to them within the meaning of the latter phrase as used in the Succession Duty Act.

With respect, Pennycuick J. did not hold merely that London was not the beneficial owner of Securities. Nor did he simply hold that it was not the beneficial owner of the Group company. His finding did not turn on the interpretation of a statutory definition of "beneficial owner". Rather, he based his decision on the general principle that a company is not the beneficial owner of the assets of its own subsidiary:

> ... the parent company may very well have a controlling interest right down the line, but does not own any of the assets of the subsidiaries. So here, although the London company plainly has a controlling interest in the Securities company, it does not own beneficially any of the assets of the Group company, including the

> shares in the Securities company. (at p. 260)

In his view, there was no indication in the statutory provision directing any construction of "beneficial owner" other than according to its legal meaning.

The other case directly referred to in the Courts below is Littlewoods Mail Order Stores, Ltd. v. McGregor [ [1969] 3 All E.R. 855.]. It illustrates a contrast in approach. There, a parent, Littlewoods, and its subsidiary, Fork, embarked on an elaborate scheme by which Fork acquired a freehold estate and Littlewoods made payments, in the form of rent. Lord Denning M.R. was not prepared to regard the rent paid as a business expense of Littlewoods. He held (at p. 860):

> I think that we should look at the Fork company and see it as it really--is the wholly-owned subsidiary of the taxpayers. It is the creature, the puppet, of the taxpayers in point of fact; and it should be so regarded in point of law. The basic fact here is that the taxpayers, through their wholly-owned subsidiary, have acquired a capital asset.

In Littlewoods the Court was concerned with the nature of the payment, rather than with a question of proprietary rights of a parent, in the assets of a subsidiary. Denning M.R. drew back the corporate veil in order to ascertain the nature of the rent payments made by the parent company. It is clear though, that since the Court viewed a portion of the rents paid as being on account of capital acquisition, the further inference is that the parent would own the property of the subsidiary, on termination of the lease.

Notwithstanding the views of Lord Denning M.R. as expressed above, the general and unquestioned principle of law is that a shareholder has no proprietary interest in the assets of a company in which he holds shares, otherwise than upon a winding-up.

Bank voor Handel en Scheepvaart v. Slatford and another [[1951] 2 All E.R. 779.] contains a useful discussion on this very point. Citing Salomon v. Salomon [[1897] A.C. 22.], and other cases, Devlin J. affirmed the principle that the assets of a company are not the assets of its shareholders. The cases relied upon: Macaura v. Northern Assurance Co. [ [1925] A.C. 619.]; E.B.M. Co. Ltd. v. Dominion Bank [ [1937] 3 All E.R. 555]; Daimler Co. Ltd. v. Continental Tyre and Rubber Co. (Great Britain) Ltd. [[1916] 2 A.C. 307.] He accepted as correct a statement by the Permanent Court of International Justice, in Standard Oil Co.'s Claim [[1927] B.Y. Int'l L. 156.], at p. 162:

> ... the decisions of principle of the highest courts of most countries continue to hold that neither the shareholders nor their creditors have any right to the corporate assets other than to receive, during the existence of the company, a share of the profits, the distribution of which has been decided by a majority of the shareholders, and, after its winding-up, a proportional share of the assets.

Devlin J. had no doubt that courts can violate principles of company law in considering

relationships between corporate entitles. But he would require statutory language which permits or enables a court to do so:

> No doubt, the legislature can forge a sledgehammer capable of cracking open the corporate shell, and it can, if it chooses, demand that the courts ignore all the conceptions and principles which are at the root of company law, but the phrase "belonging to or held or managed on behalf of" is too mild a weapon for that purpose. (at p. 799)

The Macaura case, supra, is cited by the appellants herein. There, the appellant owned a sizeable estate, on which he held five insurance policies against fire on timber and wood products. He assigned the interest in the timber to a company, in which he held virtually all the shares. He was the shareholder and creditor of the company at the time there was a fire. The House of Lords held he had no insurable interest, as shareholder, in the assets of the company. Lord Buckmaster held:

> Now, no shareholder has any right to any item of property owned by the company, for he has no legal or equitable interest therein. He is entitled to a share in the profits while the company continues to carry on business and a share in the distribution of the surplus assets when the company is wound up. (at p. 626)

Lord Sumner stated, equally as clearly:

> He stood in no "legal or equitable relation to" the timber at all. He had no "concern in" the subject insured. His relation was to the company, not to its goods ... (at p. 630)

Lord Wrenbury agreed:

> ... the corporator even if he holds all the shares is not the corporation, and that neither he nor any creditor of the company has any property legal or equitable in the assets of the corporation. (at p. 633)

In this Court, in the case of Army and Navy Department Store Ltd. v. M.N.R. [[1953] 2 S.C.R. 496.], Cartwright J. stated in his concurring reasons that, "With the greatest respect for those who hold the contrary view, I do not think that shareholders, either individually or collectively, have any ownership direct or indirect in the property of the company in which they hold shares." (at p. 511)

The authors of Fraser & Stewart, Company Law of Canada, 5th ed., 1962, make the point (at p. 20) that the distinction between a company and Its shareholders is equally applicable where a company is a subsidiary of another company, and that a company and its wholly-owned subsidiary are separate and distinct legal entities, citing Cohen L.J. in Ebbw Vale Urban District Council v.

South Wales Traffic Area Licensing Authority [[1951] 2 K.B. 366 (C.A.).], at p. 370:

> Under the ordinary rules of law, a parent company and a subsidiary
> company, even a hundred per cent subsidiary company, are distinct legal entities,
> and in the absence of an agency contract between the two companies one cannot
> be said to be the agent of the other.

Professor Gower in Modern Company Law, 4th ed., at pp. 123 et seq. details exceptional
cases in which the courts have felt themselves able to ignore the corporate entity and treat the
individual shareholders as entitled to its property. These are grouped under headings such as
agency, trust (but not in the sense that a company holds its property on trust for its members qua
members), fraud or improper conduct, public policy, quasi-criminal cases and group enterprises.
There is no hard evidence of agency nor was agency argued before this Court. The present
transaction does not fit easily into any of the other categories mentioned. See also Palmer's
Company Law, 22nd ed., vol. 1, paras. 18-22, 18-23.

Generally speaking, in the absence of fraud or improper conduct the courts cannot disregard
the separate existence of a corporate entity; see Pioneer Laundry and Dry Cleaners Ltd. v. Minister
of National Revenue [[1938-39] C.T.C. 411 (P.C.). There have been a number of helpful articles
written respecting the lifting of the corporate veil in Canadian tax law: "Lifting the Corporate Veil
in Canadian Income Tax Law" by Tamaki (1961-62) 8 McGill L.J. 159; "Taxation and the
Corporate Veil" by Mitchell (1966) 14 Can. Tax J. 534; "Lifting the Corporate Veil: Legislative and
Judicial Incursions for Income Tax Purposes" by Drache (1977) 29 Tax Conference Report 673;
"The Corporate Veil in Tax Law" by Durnford (1979)27 Can. Tax J. 282.

The Minister placed emphasis upon locus of benefit and ultimate control rather than upon
initial or intermediate locus of receipt. The Court is invited to disregard the corporate arrangements,
although the authority for doing so is not specified. The essence of the argument and the decision of
the Appeal Division is that a shareholder can beneficially own, and therefore be beneficially entitled
to, the assets (or right to acquire assets) of the corporation in which he holds shares. With respect,
shareholding control does not give beneficial ownership of corporate assets nor beneficial
entitlement thereto.

There is a tendency to think loosely in terms of a parent owning the assets of its
wholly-owned subsidiary but that is not so in law. No one would suggest that a person owning 100
shares of Canadian Pacific is the owner of, or has a beneficial interest in, the assets of Canadian
Pacific. No distinction can be made in principle between ownership of 100 shares in a major
corporation and ownership of all of the issued shares in a small company. In neither case does the
shareholder own any asset other than shares. And the situation is unaffected by the fact that one or
more shareholders may have voting control and thereby be in a position to acquire the assets or a
portion thereof on wind-up, or upon a distribution of assets other than on wind-up. If shareholders
are beneficially entitled to the property of a corporation in which they hold shares, then s. 2(5)

would not have been necessary.

It is fundamental that a company as a body corporate is in contemplation of law an entity separate and distinct from shareholders who compose it. The principle of Salomon v. Salomon & Co. Ltd., supra, is still very much part of our law and in general the courts have rigidly applied it.

It would appear, therefore, that not even by principles of company law can J.B.H. Investments Ltd. be regarded as beneficial owner of the assets of J.G.C. Investments Ltd. With respect, I think the lower Courts were clearly wrong in law in misapprehending the meaning of beneficial entitlement and in confusing concepts of control and ownership. Thus, the Court of Appeal was able to say that control sufficient to enable J.G.H. Investments Ltd. ultimately to compel transfer of estate assets to it, satisfied the s. 2(5) standard of beneficial entitlement.

<div align="center">V</div>

SHAM

I come finally to the question of "sham". Although sham was not alleged by the Minister, it none the less warrants some consideration. I think it must be kept uppermost in mind that the legislation here under consideration contains no provisions which introduce a statutory concept of sham, fraud, improper tax avoidance or illegal transactions for the purpose of succession duty. In contrast, see Part XVI of the Income Tax Act, 1970-71-72 (Can.), c. 63, entitled "Tax Evasion".

It is also plain that appellants do not fit the conventional "sham" standard of a transaction purporting to create apparent legal rights and obligations which are at variance with the legal relationships which in fact characterize the arrangement. There is here no subterfuge. The documents were intended to be acted upon. They were not used as a cloak to conceal a different transaction. They did not create between the parties legal rights and obligations different from the rights and obligations which the parties intended to create. There is no camouflaging of the rights or obligations of either J.B.H. Investments Ltd. or J.G.C. Investments Ltd.

In the Nova Scotia Courts, Mr. Justice Hart, in his reasons for judgment said:

> I do not believe the Court has any right to set aside bona fide transactions obviously designed for the avoidance of tax on the ground that they are artificial and designed to minimize or avoid payment of tax. The jurisprudence which has arisen around the provisions of Part 16 ... does not apply here since those provisions are not contained in the Nova Scotia Succession Duty Act. The argument of the Crown that the scheme of distribution adopted by Colonel MacKeen was patently designed to avoid the provisions of the Act and that the Court should therefore interpret the Act so as to catch the taxpayer must fail.

I do not see, on the record, any indication that an appeal was taken from the finding of Hart J. on

this issue.

The McCreath case (Minister of Revenue for Ontario v. McCreath [[1977] 1 S.C R. 2.]) was cited in argument and in the Courts below. The question there was whether a settlor had retained an interest in settled property so as to disentitle the property to an exemption under The Succession Duty Act of Ontario. That was a different case. The donor sought to create the impression through the language of the gifting instrument that she had disposed wholly and irrevocably of the subject-matter of the gift. The Court held that the degree of control retained defeated characterization of the transaction as a gift.

CONCLUSION

Applying the statutory language to the facts, I can only conclude that the transaction in the case at bar does not fall within the words of s. 2(5) in such manner that the twelve grandchildren are deemed to be successors to the property of the deceased. On the legal meaning of the words of s. 2(5) of the Act, J.B.H. Investments Ltd. is the deemed successor and has no liability for tax under s. 8(2) because it is not resident in Nova Scotia. The grandchildren are not successors and therefore are not liable for duty under s. 8(2) of the Act. One would have to travel beyond the words of the Act to find otherwise.

This is consistent with the approach of Lord Simon of Glaisdale in Ransom v. Higgs [(1974), 50 T.C. 1.], at p. 94:

> But for the Courts to try to stretch the law to meet hard cases ... is not merely to make bad law but to run the risk of subverting the rule of law itself. Disagreeable as it may seem that some taxpayers should escape what might appear to be their fair share ... it would be far more disagreeable to substitute the rule of caprice for that of law.

The answer I would give to the first question makes it unnecessary to consider the second question which was asked; namely, whether or not s. 2(5) is ultra vires the powers of the Legislature of Nova Scotia.

I would allow the appeal, set aside the judgment of the Appeal Division of the Supreme Court of Nova Scotia and the assessment of the twelve grandchildren of the deceased Roy A. Jodrey under the Act Respecting Succession Duties of Nova Scotia. The appellants are entitled to costs in all Courts.

Appeal dismissed with costs, RITCHIE, DICKSON and MCINTYRE JJ. dissenting.

1

2. (5) Where a corporation which is not resident in the Province, other than a corporation without share capital, by reason of the death of a deceased acquires or becomes beneficially entitled to property of the deceased,

(a) the corporation shall be deemed not to be the successor of the property except to the extent that the value of the shares of the shareholders of the corporation is not increased in value by the corporation acquiring or becoming beneficially entitled to the property; and

(b) each of the shareholders of the corporation shall be deemed to be a successor of property of the deceased to the extent of the amount by which the value of his shares in the corporation is increased by the corporation acquiring or becoming beneficially entitled to the property.

...

*Case Name:*

# CPU Options, Inc. v. Milton

**Between**
**CPU Options, Inc., plaintiff, and**
**Everton Anthony Milton and Ana Milton, defendants**

[2006] O.J. No. 253

79 O.R. (3d) 365

[2006] O.T.C. 60

145 A.C.W.S. (3d) 311

Court File No. 01-CV-212912

Ontario Superior Court of Justice

**R.W.M. Pitt J.**

Heard: October 27 and 28, 2005.
Judgment: January 25, 2006.

(34 paras.)

*Civil procedure -- Actions -- Duplicitous or vexatious -- Action dismissed for being an abuse of process and due to issue estoppel -- Plaintiff had obtained default judgment in US against corporation -- US action arose out of same transaction as present action against corporation's shareholder and director.*

*Civil procedure -- Disposition without trial -- Dismissal of action -- Frivolous, vexatious of abuse of process -- Action dismissed for being an abuse of process and due to issue estoppel -- Plaintiff had obtained default judgment in US against corporation -- US action arose out of same transaction as present action against corporation's shareholder and director.*

*Civil procedure -- Estoppel -- Estoppel by record (res judicata) - Issue estoppel -- Res judicata as a bar to subsequent proceedings -- Action dismissed for being an abuse of process and due to issue estoppel -- Plaintiff had obtained default judgment in US against corporation -- US action arose out*

*of same transaction as present action against corporation's shareholder and director.*

Action for misappropriation, conversion, fraudulent misrepresentation and oppression arising out of contract between plaintiff and Ascii Technology pursuant to which Ascii was to supply material to plaintiff -- Plaintiff had obtained default judgment in 2000 in US against Ascii Technology in action involving Ascii's breach of same contract -- Defendants in present action were sole director and shareholder of Ascii and his spouse -- HELD: Action dismissed -- No indication that defendants in present action were to be jointly and severally liable with Ascii in US action -- Cause of action pleaded in US action was not separate cause of action -- US action and present action arose from same transaction -- All claims against present defendants were known when US action was commenced -- No good reason to permit multiplicity of proceedings -- All causes of action raised in present action were available to plaintiff in US action -- Present action was abuse of process -- Cause of action estoppel also applied to present action.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C.43 s. 138, s. 139(1)

Ontario Business Corporations Act, R.S.O. 1990, c. B.16

**Counsel:**

Chris Hersh and Bruce O'Toole, for the plaintiff

Everton Anthony Milton and Ana Milton self-represented

---

REASONS FOR JUDGMENT

**1    R.W.M. PITT J.**:-- This is an action against the sole director and shareholder of a corporation and his spouse. The action is framed as torts of misappropriation, conversion and fraudulent misrepresentation as well as oppression pursuant to the Ontario Business Corporations Act, R.S.O. 1990, c. B.16. An amendment granted at the opening of the trial added a claim for fraudulent conveyances. The fraudulent conveyances pleaded related to transactions between Everton Anthony Milton and his wife, Ana Milton, after a judgment was entered against the corporation, ASCii Technology, Inc. of which Everton Anthony Milton was the sole director and shareholder. Presumably, the purpose of this amendment was to enable the plaintiff to recover against Ana Milton in the event that judgment was granted against Everton Anthony Milton and he had insufficient assets to satisfy that judgment.

**2**    The claim arises from a contract, made June 5, 2000, between the plaintiff and the corporation, ASCii Technology, Inc., by which the corporation was required to supply material, for which the plaintiff paid. The material was never supplied and the contract price never returned.

**3**    During the course of the trial, the plaintiff's main witness, its principal, testified that the plaintiff had been granted default judgment in October 2000 in the United States District Court of Minnesota for $271,347.50 (U.S.) against ASCii Technology, Inc., the company that defaulted on its obligation under the purchase agreement of June 5, 2000. This judgment was referred to in the amended statement of claim.

**4**    Shortly after receiving the above-noted evidence, I asked plaintiff's counsel and the unrepresented litigants to assist me in determining the significance, if any, of the Minnesota judgment on these proceedings. Understandably, the unrepresented litigants were not helpful, but counsel for the plaintiff was of considerable assistance in his submissions. In substance, counsel's view was that the judgment should have no impact on this proceeding.

**5**    It seems to me, however, that the Minnesota judgment is material to the disposition of this action. In fact, there is substantial authority for finding that this action is unsustainable precisely because of the Minnesota judgment. I will address the effect of the Minnesota judgement under two heads of analysis: first, the doctrine of election and alternative liability and, second, the doctrine res judicata.

THE DOCTRINE OF ELECTION AND ALTERNATIVE LIABILITY: MULTIPLE PROCEEDINGS

**6**    In CFGM 1320 Radio Broadcasting Ltd. v. Doyle, [1987] O.J. No. 1430 (Dist. Ct.), the plaintiff, having obtained judgment against the corporate defendant (for the price of advertising services) on which the plaintiff was unable to realize, sought to continue the action against the defendant personally. Conant D.C.J. dismissed the action on motion brought by the defence. He found that the defendant was not jointly liable, and therefore, the judgment taken against the corporate defendant operated as a bar to the prosecution of the action against the personal defendant. The learned judge did a comprehensive analysis of cases in which the issue was canvassed, and was satisfied that there was no contrary authority.

**7**    Almost six years following CFGM 1320 Radio Broadcasting Ltd. v. Doyle, supra, Spence J. was presented with a similar issue in Westar Aluminum & Glass Ltd. v. Brenner (1993) 17 C.P.C. (3d) 228 (Ont. Gen. Div.). In an action on a contract, the plaintiff had obtained default judgment against one of the corporate defendants and sought to pursue the individual defendant. Spence J. said at p. 229:

> The cases indicate that the principle of election through the obtaining of judgment, applies to a default judgment. While it is clear that the plaintiff wished to pursue its claim against the individual defendant, it obtained default judgment

> against [the corporate defendant]. Accordingly, on the basis of CFGM 1320
> Radio Broadcasting Ltd. v. Doyle, it must be regarded as having made its
> election, there being no suggestion in any of the materials filed or submissions
> made that the individual defendant was intended to be jointly liable.

The reasoning of Spence J. is also applicable to the facts of this action. There is no indication in the materials that the defendants in this action were intended to be jointly liable with the corporate defendant in the first action. In fact, the plaintiff specifically pleaded that Milton agreed, on behalf of ASCii Technology Inc., to supply CPU Options, Inc. with the equipment purchased. Accordingly, s. 139(1) of the Courts of Justice Act, R.S.O. 1990, c. C.43 is not engaged. Section 139(1) of the Courts of Justice Act provides that:

> Where two or more persons are jointly liable in respect of the same cause of
> action, a judgment against or release of one of them does not preclude judgment
> against any other in the same or a separate proceeding.

**8**    These decisions were followed by Justice Ellen Macdonald in Esprit de Corp (1980) Ltd. v. Papadimitriou (1995), 23 O.R. (3d) 733 (Gen. Div.), where the learned judge denied an application by the plaintiff to set aside a judgment against a corporate defendant in order to pursue a personal defendant in similar circumstances.

**9**    In Lang Transport Ltd. v. Plus Factor International Trucking Ltd. (1997), 32 O.R. (3d) 1 (C.A.), the result was different, but so were the circumstances. In that case, the plaintiff sued both the agent and principal. The agent did not defend and the plaintiff signed default judgment against it, and continued to trial against the principal. The Court of Appeal per McMurtry C.J.O. and Weiler J.A. (Catzman J.A. dissenting) found that in the circumstances, the agent could not have been personally liable. Since the agent could not have been personally liable, the plaintiff did not have a choice of suing either the agent or the principal, and accordingly, "the rule of alternative liability" did not apply. The Court, therefore, granted judgment against the principal. The plaintiff in this action has sought support from the Court's observation in Lang Transport Ltd., supra, that:

> In the present case, Lang would appear to have had a cause of action against the
> agent, Plus Factor, for the tort of conversion with respect to the money received
> from Canadian Tire which was not paid over. If Lang's solicitors had sued Plus
> Factor in tort for conversion and obtained default judgment, it would appear on
> the authority of [Findlay v. Findlay, [1952] 1 S.C.R. 96], that its separate cause
> of action in contract against Canadian Tire would not have been barred.

Notably that action for conversion would have been for only part of the money owed to the plaintiff, as the agent had retained some of the money it had received from the principal that was to be transmitted to the plaintiff.

**10**    The cause of action pleaded in the Minnesota action was not a "separate" cause of action, as

the only basis for the claim in either action was ASCii Technology Inc.'s failure to either deliver the product that was purchased and paid for, or to return the purchase price to the plaintiff, without a legitimate reason. On the evidence, there was never any legitimate reason, which accounts for the plaintiff's strategy of instituting a second action. Both the Minnesota action and the case at bar arise from the same transaction.

**11**    I do not accept the plaintiff's submissions that its choice of a tort action and an oppression proceeding to pursue the personal defendants renders the principle expounded in the cases noted above inoperative.

**12**    In addition, section 138 of the Courts of Justice Act, R.S.O. 1990, c. C.43 provides that:

> As far as possible, multiplicity of legal proceedings shall be avoided.

**13**    Given the allegations in this action, all of which, at least with respect to the main defendant, Everton Anthony Milton, were known when the Minnesota action was initiated, there is no good reason to permit multiplicity in a case of this nature. The fraudulent conveyances claim cannot stand as it was designed to recover against Ana Milton in the event judgment was entered against her husband personally and he had insufficient assets to satisfy the judgment. As the claims against Everton Anthony Milton are barred, it is not necessary to consider the claims of fraudulent conveyance.

**14**    In the event that I am wrong, I will now go on to discuss the second head of analysis.

THE DOCTRINE OF RES JUDICATA: CAUSE OF ACTION ESTOPPEL

**15**    The doctrine of res judicata prevents relitigation of matters that have already been determined by a court of competent jurisdiction. There are two branches of this doctrine: cause of action estoppel and issue estoppel. Both branches are founded on the twin principles that the same party shall not be harassed twice for the same complaint and that there is societal value in the finality and conclusiveness of judicial decisions: Angle v. M.N.R., [1975] 2 S.C.R. 248 at 267.

**16**    Cause of action estoppel prevents not only the same cause of action from being relitigated again, but also bars claims which properly belonged to the subject matter of previous litigation: Maynard v. Maynard, [1951] S.C.R. 346. Cause of action estoppel was described in John Sopinka, Sidney N. Lederman and Alan W. Bryant, The Law of Evidence in Canada, 2nd ed. (Markham: LexisNexis Canada Inc., 1999) at 1078 in the following way:

> ... a plaintiff asserting a cause of action must claim all possible relief in respect thereto, and prevents any second attempt to invoke the aid of the courts in the same cause. It is sometimes called merger' because the plaintiff's cause of action becomes merged' in the judgment. The judgment actually operates as a comprehensive declaration of the rights of all parties in respect of the matters in

issue. As a result, the rule applies equally to a defendant who must put forward all defences which will defeat the plaintiff's action; the defendant who does not will be barred from raising them subsequently. This principle prevents the fragmentation of litigation by prohibiting the litigation of matters that were never actually addressed in the previous litigation, but which properly belonged to it.

**17**   In addition to preventing fragmented litigation, cause of action estoppel prevents a party from attempting to relitigate a case by advancing a new legal theory in support of a claim based on essentially the same facts or combinations of facts: Las Vegas Strip Ltd. v. Toronto (City) (1996), 30 O.R. (3d) 286 (Gen. Div.), aff'd (1997), 32 O.R. (3d) 651 (C.A.). In other words, a party cannot recast the claim arising out of the same facts using a different legal description without bumping up against the doctrine of cause of action estoppel and, if the parties or privies requirement is met, it will operate to bar the second action: Britannia Airways Ltd. v. Royal Bank of Canada, [2005] O.J. No. 2 at para. 18 (QL).

**18**   A prior judicial decision will not raise an estoppel by res judicata, either issue estoppel or cause of action estoppel, unless (i) it was a final decision pronounced by a court of competent jurisdiction over the parties and the subject-matter; (ii) the decision was, or involved, a determination of the same issues or cause of action as that sought to be controverted or advanced in the present litigation; and (iii) the parties to the prior judicial proceeding or their privies are the same persons as the parties to the present action or their privies: 420093 B.C. Ltd. v. Bank of Montreal (1995), 128 D.L.R. (4th) 488 at 494 (Alta. C.A.).

**19**   I will now consider the requirements for cause of action estoppel to determine if this doctrine applies to the case at bar. The first requirement is satisfied as the Minnesota court was a court of competent jurisdiction and rendered a final decision. The other two requirements are more complicated and require detailed analysis.

**20**   The second requirement for res judicata to apply is that the same cause of action be raised. Cause of action estoppel applies not only to subsequent claims based on matters specifically decided in the prior action but also to every claim which could properly have been raised in those proceedings: Maynard v. Maynard, [1951] S.C.R. 346. This raises the issue of what causes of action were capable of being properly advanced before the Minnesota court. I raise this issue with particular attention to the oppression claim. Specifically, does Minnesota law recognize of cause of action similar to the oppression claim advanced in the case at bar? Resolution of this issue requires knowledge of the applicable law in Minnesota.

**21**   As a general rule, a court cannot take judicial notice of foreign law. The common law requires formal proof of foreign law as a question of fact: Horton Plaza Inc. v. Richtree, [2002] O.J. No. 4025 at para. 18 (S.C.J.) (QL). Therefore, foreign law must be proved through the testimony of an expert witness: Re Low, [1933] 2 D.L.R. 608 (Ont. C.A.). There was no testimony by an expert as to the law of Minnesota regarding the availability or unavailability of the causes of action pleaded

in the case at bar.

**22**    The result of the foreign law not being put before the court was discussed in J.G. Castel and J. Walker, Canadian Conflict of Laws, 5th ed. (Toronto: Butterworths, 2002) at pp. 7-7:

> It was once said that in the absence of proof the court would presume the foreign law to be the same as the lex fori, but it is better to say that in all cases where foreign law is not proved, the lex fori prevails as it is the only law available. The application of the lex fori in the absence of proof of the applicable foreign law seems to include statutes as well as the law established by judicial decisions.

Therefore, in the absence of proof of the foreign law, a court may presume that the foreign law is the same as the law of the jurisdiction where it is sitting.

**23**    Since I was not presented with expert testimony as to the law of Minnesota, I must presume that it is the same as the law in Ontario. As a result, I find that all causes of action raised in the case at bar were available to the plaintiff in the Minnesota action and were, therefore, the proper subject matter of the Minnesota action. I am not prepared to consider the oppression claim separate from the other relief sought.

**24**    I find that the second requirement for cause of action estoppel has been satisfied.

**25**    The third requirement for res judicata to apply requires that there be a privity of interest between the parties to the Minnesota action (ASCii Technology, Inc.) and the Miltons. Cause of action estoppel operates to bar the claims made against the Miltons in Ontario if the Miltons are privy in interests to the matters and issues that were raised or could have been raised in the Minnesota action between CPU Options, Inc. and ASCii Technology, Inc. relating to the same subject matters as the Ontario action.

**26**    Privity of interests rests on the concept of mutuality. There must be a sufficient degree of connection or identification between the two parties, thus making it fair to permit a party to rely on the earlier determination involving the other party. The determination of privity is made on a case-by-case basis because it is impossible to be categorical about the degree of interest which will create privity: Machin v. Tomlinson (2000), 51 O.R. (3d) 566 at paras. 20, 22-24 (C.A.).

**27**    Individuals who 'own' or control a company, despite the separation of ownership and liability, can have a privity of interest with the company. In 420093 B.C. Ltd. v. Bank of Montreal (1995), 128 D.L.R. (4th) 488 O'Leary J.A., writing for the British Columbia Court of Appeal, found that privity existed between the owners who controlled a company organized as a separate legal entity and the company. Also, privity of interest was found between the principals of the business and the company in Las Vegas Strip Ltd. v. Toronto (City) (1996), 30 O.R. (3d) 286 (Gen. Div.), aff'd (1997), 32 O.R. (3d) 651 (C.A.).

**28**    Therefore, based on the above-mentioned authorities, as Everton Anthony Milton is the sole director and shareholder of ASCii Technology, Inc., he is clearly a privity of ASCii Technology Inc.

**29**    In the final analysis, I find that this entire proceeding is an abuse of process. Goudge J.A. discussed in dissent in Canam Enterprise Inc. v. Coles (2000), 51 O.R. (3d) 481 (C.A.) the doctrine of abuse of process (dissent adopted by the Supreme Court of Canada, [2002] 3 S.C.R. 307):

> The doctrine of abuse of process engages the inherent power of the court to prevent misuse of its procedure, in a way that would be manifestly unfair to a party to the litigation before it or would in some other way bring the administration of justice into disrepute. It is a flexible doctrine unencumbered by the specific requirements of concepts such as issue estoppel. (citations omitted)

**30**    This comment is equally applicable to cause of action estoppel. It would be manifestly unfair to either Everton Anthony Milton or Ana Milton to be sued in the case at bar when they should have been sued in the Minnesota action. Even though Ana Milton does not have a strict privity of interest with the corporation, the doctrine of abuse of process relieves against the strict technicalities of the doctrine of cause of action estoppel. It was open to the plaintiff to name both the Miltons in the Minnesota action but, for whatever reason, that was not done. This fact is fatal to the plaintiff's ability to advance the case at bar.

**31**    As a result of finding that cause of action estoppel and abuse of process apply to the case at bar, all causes of action should have been raised before the Minnesota court, naming both the corporation and the Miltons personally, and are estopped from being raised in the case at bar.

**32**    Admittedly, the claim for fraudulent conveyances could not have been raised before the Minnesota court as the allegations of misconduct occurred after that judgment was entered. However, as was discussed above, the claims for fraudulent conveyances relate to transactions between husband and wife and were designed to allow for recovery against the wife in the event that judgment was entered personally against the husband and he had insufficient assets to satisfy the judgment. Because cause of action estoppel and abuse of process prevent the claims from being made against the Miltons, there is no need to consider the fraudulent conveyance allegations.

DISPOSITION

**33**    The action is, therefore, dismissed.

COSTS

**34**    In the peculiar circumstances of this case, the defendants must make brief written submissions on why they should be entitled to costs, and the quantum by February 5, 2006. If such submissions are made, the plaintiff shall file a response by February 11, 2006; failing submissions by the defendants as aforesaid, there shall be no costs.

R.W.M. PITT J.

*Case Name:*

# Disera v. Liberty Development Corp.

**Between**
**Fiore Disera, David Raffaele Disera, Frederick Byron**
**Disera, and Disera Motels Limited, Plaintiffs**
**(Respondents), and**
**Liberty Development Corporation and 1541677 Ontario**
**Inc., Defendants (Appellants)**

[2008] O.J. No. 167

2008 ONCA 34

63 R.P.R. (4th) 197

2008 CarswellOnt 194

163 A.C.W.S. (3d) 549

Docket: C47180

Ontario Court of Appeal
Toronto, Ontario

**J.M. Simmons, J.L. MacFarland and P.S. Rouleau JJ.A.**

Heard: October 18, 2007.
Judgment: January 21, 2008.

(27 paras.)

*Civil procedure -- Costs -- Special orders -- Increase in scale of costs -- Cross-appeal by successful plaintiffs from costs award dismissed -- Absent error in principle, appeal court would not interfere with judge's exercise of discretion in not awarding increased costs.*

*Municipal law -- Planning -- Zoning bylaws -- Enactment -- When effective -- Appeal by purchasers of property from summary judgment in favour of vendors to enforce bonus provision in agreement of purchase and sale, reported at [2007] O.J. No. 1612, dismissed -- Bonuses were*

*payable under agreement upon approval in final form of application to re-zone property for increased density -- Increase in density approved by City and Region within time frame provide for in agreement -- Hold on construction of some units not relevant -- Implementation of increased density not relevant -- Bonuses payable under agreement within six months of approval in final form.*

*Real property law -- Sale of land -- Agreement of purchase and sale -- Interpretation -- Appeal by purchasers of property from summary judgment in favour of vendors to enforce bonus provision in agreement for purchase and sale dismissed -- Bonuses were payable under agreement upon approval in final form of application to re-zone property for increased density -- Increase in density approved by City and Region within time frame provide for in agreement -- Hold on construction of some units not relevant -- Implementation of increased density not relevant -- Bonuses payable under agreement within six months of approval in final form.*

Appeal by Liberty and 1541677 Ontario from a summary judgment in favour of the Diseras and their company for $3,129,000. The Diseras, vendors of property, cross-appealed, seeking increased costs. Liberty and 1541677 agreed to purchase a property which allowed for the construction of 614 residential units. The Agreement noted that the purchasers intended to apply for re-zoning to permit high-density residential and commercial units on the property, and provided the purchasers would pay a bonus of $7,000 per unit for each unit over 1,000 if the re-zoning application was successful within eight years of the purchase. Bonuses were payable within six months of the success of the application. The purchasers applied for re-zoning in November 2003. The application was allowed in January 2005. The maximum density of the property was increased to 1,598 units. The amendment to the City plan was adopted in February 2005 by Vaughan City Council, and was accepted by York Region in March 2005. The judge held the density increase was approved in final form in March 2005, thereby rendering the bonus for additional units payable. The purchaser did not dispute they were required to pay the bonus for 380 units not subject to a hold, but claimed the bonuses were not payable for six months after the hold was lifted in February 2007. The purchasers also claimed the hold remained on the other 218 units, such that the obligation to pay the bonus with respect to these units had not yet been triggered. The vendors were awarded $30,000 in costs, but sought $50,000.

HELD: Appeal and cross-appeal dismissed. The judge correctly concluded the density increase had been granted in final form. The Agreement between the purchasers and vendors was silent in respect of implementation issues, of which the hold was one. The hold had nothing to do with density or an increase in density. The vendors were granted their application, and whether or not they implemented the density increase was irrelevant. Costs was a matter within the judge's discretion. Absent an error in principle, the court would not interfere with the exercise of that discretion.

**Statutes, Regulations and Rules Cited:**

Planning Act, R.S.O. 1990, c. P.13, s. 36

**Appeal From:**

On appeal from the judgment of Justice Keith A. Hoilett of the Superior Court of Justice dated April 26, 2007, with reasons reported at [2007] O.J. No. 1612.

**Counsel:**

Colin P. Stevenson for the appellants.

Richard E. Anka, Q.C. for the respondents.

---

ENDORSEMENT

The following judgment was delivered by

**1**    THE COURT:-- This is an appeal from the judgment of Hoilett J. dated April 26, 2007 wherein he granted summary judgment in favour of the respondents in the sum of $3,129,000.

**2**    The appellants agreed, by way of an Agreement of Purchase and Sale dated August 19, 2002 ("Agreement"), to purchase a property which allowed for construction of 614 residential units. However, a recital in the Agreement indicated that the appellants intended "to apply for an Official Plan Amendment and a re-zoning of the Property to allow for high density residential and/or commercial townhouses and/or semi-detached homes and/or single homes on the Property".

**3**    Clause 5.01 of the Agreement contemplated that a bonus would be paid by the appellants in certain circumstances. The relevant provision in this case provided that a bonus of $7,000 per unit over 1,000 units would be payable if the appellants applied for and obtained rezoning and a density increase in "final form" from the City of Vaughan on the property.

**4**    Clause 5.01 of the Agreement provides:

> The Purchaser covenants to make an application (the "Application") to all necessary authorities during the period of two (2) years next following the Closing to re-zone the Motel Lands and Front Lands to residential and concurrently to apply for an increase in density or coverage (the "Density Increase") for the easterly portion of the Back Lands ...

> If at any time following the Closing of the transaction herein the City of
> Vaughan, with the consent of all the relevant governmental authorities, has
> granted in final form the Density Increase on the initial Application set out above
> (the "Decision") or any subsequent applications relating to the Property
> commenced within eight (8) years of Closing (the "Subsequent Decision"), on
> reasonably satisfactory terms and conditions, the Purchaser shall pay additional
> funds to the Vendor within six (6) months of the Decision or Subsequent
> Decision equal to the sum of:
>
> ...
>
> ii)    Seven Thousand Dollars ($7,000.00) for each residential unit approved in
>        excess of One Thousand (1,000) units on the entire Property ...

**5**    An application was made in November 2003 to rezone parts of the subject property to
residential and to increase the density coverage for all of the property.

**6**    On January 24, 2005, the City of Vaughan passed By-law No. 5-2005 which adopted
Amendment No. 621 to the Official Plan of the Vaughan Planning Area. Amendment No. 621
re-designates the subject lands High Density Residential and Open Space Park and states that the
following policies shall apply to the High Density Residential lands:

> *    a maximum density of 1,598 units comprising 93 townhouse units and
>      1,505 apartment units, or a combination thereof not to exceed 1,598 units,
>      shall be permitted, and the number of apartment buildings shall not exceed
>      7;
>
> ...
>
> *    the overall development of the subject lands shall be in accordance with a
>      master plan approved by Council, and intended to guide future
>      development within the Amendment No. 621 area, together with the
>      submission of the following reports to be approved through consideration
>      of a draft plan of subdivision application: urban design guidelines,
>      landscape/streetscape and open space master plan, shadow study, traffic
>      impact/phasing report, and any other reports considered appropriate by the
>      municipality.

**7**    In addition, the Amendment states that the Official Plan policies relating to "shall be
implemented by way of an amendment to the Vaughan Zoning By-law, and Draft Plan of
Subdivision and Site Plan approvals".

**8**    On the same day the City of Vaughan also passed By-Law No. 17-2005 which amended

By-Law No. 1-88 to rezone the lands on terms indicating that some of the high density uses were subject to a Holding (H) provision under s. 36 of the *Planning Act* and that the Holding 'H' provision would be lifted in part "as individual site plans are approved by Council in accordance with a phasing plan identified in a Traffic Impact/Phasing Report approved by the City. The By-Law also provided for an adjustment in the number of specific types of units that could be constructed so long as "... the total combined number of residential units in the RA3 and RM2 Zones shall not exceed a maximum of 1,598 units".

**9**    On February 14, 2005, the Council of the City of Vaughan adopted Report No. 7 of the Committee of the Whole. Item 29 of that report included the following:

> (a)    Allocation of water and sewage capacity for an additional 984 units (i.e. a total of 1,598 units) and
>
> (b)    Approval of a traffic impact/phasing report prepared by Cansult Limited in August, 2004.

Item 29 also stipulated:

> The final traffic report is to be approved by the Vaughan Engineering Department and the Region of York Transportation and Works Department, as a condition of subdivision approval. The implementing zoning by-law will include a Holding provision that will be lifted in part as individual site plans are approved in accordance with the above-noted phasing plan identified in the Traffic Impact/Phasing report by Cansult.

**10**    On March 14, 2005, the Regional Municipality of York granted its approval of Official Plan Amendment No. 621, thereby approving the density increase to 1,598 units for the property.

**11**    The appellants' primary ground of appeal is that the motion judge erred in finding that the density increase was approved in "final form" on March 14, 2005 and that the bonus for the additional units was payable as a result. The appellants submit that the clause is unambiguous but, as set out in their factum, should be interpreted as follows:

> ... while the official plan amendment was adopted on March 14, 2005, thereby establishing a policy of increased coverage, that policy was not implemented concurrently by a zoning by-law as the latter was subject to an "H" or "hold" under s. 36 of the *Planning Act* [R.S.O. 1990, c. P-13]. The proposed density increase was ineffective until the "H" was removed. The "H" was removed on February 26, 2007 in respect of 1,380 units and the vast bulk of the bonus is therefore payable on August 26, 2007.

**12**    The appellants do not dispute that they must pay the bonus contemplated in clause 5.01 of the Agreement for the 380 units (1,380 minus 1,000) no longer subject to a hold. With respect to those

units, the only issue is the timing of payment. The appellants, however, maintain that the bonus for the other 218 units (1,598 less 1,380) will not be triggered until the hold is removed.

**13**    The appellants further submit that if the clause is ambiguous, the motion judge erred in granting summary judgment where there are conflicts in the evidence of the planning experts called by the parties.

**14**    The respondents' position, which the motion judge accepted, is that the clause is unambiguous. The density increase to 1,598 had been granted in final form by all relevant governmental authorities on March 14, 2005 and the bonus was payable within six months of that date even though a hold under s. 36 of the *Planning Act* was in place. The respondents submit that it is immaterial that the units subject to the hold could not actually be built until the "H" was removed by the City of Vaughan.

**15**    In our view, the motion judge correctly concluded that this matter falls to be determined on the interpretation of the Agreement, specifically clause 5.01 of the Agreement. The issue is whether the City of Vaughan granted the density increase in final form on Liberty's initial application at the time the amendments and approvals described above were passed, thereby entitling the respondents to the bonus as set out in clause 5.01.

**16**    We find no ambiguity in the language of the Agreement and therefore we do not need to look to extrinsic evidence for interpretative aid. It is not the role of judges to create ambiguity where none exists.

**17**    The obligation to pay the bonus is triggered when the City of Vaughan, with the consent of all relevant governmental authorities, grants the density increase in final form on reasonably satisfactory terms and conditions.

**18**    The Agreement is silent in respect of any implementation issues. As the respondents stated in their factum:

> "H" removal is not part of, and has nothing to do with, the "initial Application" referenced in the Agreement, and it has nothing to do with density or an increase in density. In short, Liberty has been granted its density rights for 1,598 residential units. Whether Liberty implements or uses the density increase is a totally different issue which has nothing to do with triggering payment of the bonus under clause 5.01(i) of the Agreement. Liberty cannot utilize these density rights until individual site plans are approved by the City of Vaughan, but those rights are there and remain there indefinitely.

**19**    In our view, the terms of s. 5.01 of the Agreement requiring that "the City of Vaughan, with the consent of all the relevant governmental authorities, has granted ... the Density Increase on the initial Application [in final form]" were fulfilled when the Regional Municipality of York approved

Official Plan Amendment No. 621 as previously adopted by the City of Vaughan.

**20**    Reading the Agreement as a whole, including the recital indicating that the appellants intended to apply for an Official Plan Amendment and a rezoning of the Property, we conclude that the phrase "initial Application" as it appears in s. 5.01 of the Agreement refers to the request for an Official Plan Amendment increasing the maximum permitted number of units for the property. The fact that Amendment No. 621 stipulates that certain conditions must be fulfilled prior to the issuance of any building permits does not detract from the conclusion that approval of the density increase in final form has been granted on reasonably satisfactory terms and conditions.

**21**    It follows therefore that there are no material facts in dispute requiring a trial.

**22**    The appeal is dismissed.

**Cross-Appeal**

**23**    The respondents cross-appeal the motion judge's disposition of costs and seek an increased amount. They point to no error in principle but suggest a more reasonable figure would be $50,000 plus disbursements and G.S.T. as opposed to the all inclusive sum of $30,000 awarded by the motion judge.

**24**    The awarding of costs is a matter within the motion judge's discretion and absent error in principle this court will not interfere with the exercise of that discretion.

**25**    The motion judge considered the offers made by the respondents and clearly expressed reasons for ruling as he did that the costs sought by the respondents were "grossly excessive".

**26**    The cross-appeal is dismissed.

**27**    Costs of the appeal to the respondents fixed in the sum of $8,000.00 inclusive of disbursements and G.S.T. Costs of the cross-appeal to the appellants fixed in the sum of $1,500.00 inclusive of disbursements and G.S.T.

J.M. SIMMONS J.A.
 J.L. MacFARLAND J.A.
 P.S. ROULEAU J.A.

*Case Name:*

# Downey v. Ecore International Inc.

**Between**
**Paul Downey, Plaintiff, (Respondent/Cross-Appellant), and**
**Ecore International Inc., Defendant, (Appellant/Respondent to**
**Cross-Appeal)**

[2012] O.J. No. 3086

2012 ONCA 480

294 O.A.C. 200

24 C.P.C. (7th) 7

219 A.C.W.S. (3d) 314

2012 CarswellOnt 8459

Docket: C54648

Ontario Court of Appeal
Toronto, Ontario

**K.N. Feldman, J.M. Simmons and E.A. Cronk JJ.A.**

Heard: April 12, 2012.
Judgment: July 6, 2012.

(65 paras.)

*Conflict of laws -- Jurisdiction -- Forum conveniens -- Choice of forum by parties -- Appeal by*
*Ecore from dismissal of motion to stay Ontario action by former consultant allowed, and action was*
*stayed -- Consultant's company was contracted by Ecore to provide consultant's services --*
*Consulting agreement referenced confidentiality agreement, signed by consultant, containing*
*Pennsylvania forum selection clause -- Judge erred in finding that confidentiality agreement failed*
*for lack of consideration -- Agreements had to be read together -- Judge erred in finding that all the*
*benefits of consulting agreement flowed to consultant's company, not to consultant -- Consultant*

*was bound to terms of confidentiality agreement despite fact he never became an Ecore employee.*

*Employment law -- Contract of employment -- Consideration -- Enforceability -- Appeal by Ecore from dismissal of motion to stay Ontario action by former consultant allowed, and action was stayed -- Consultant's company was contracted by Ecore to provide consultant's services -- Consulting agreement referenced confidentiality agreement, signed by consultant, containing Pennsylvania forum selection clause -- Judge erred in finding that confidentiality agreement failed for lack of consideration -- Agreements had to be read together -- Judge ignored the mutual promises in the confidentiality agreement in finding that no consideration passed to consultant -- Consultant was bound to terms of confidentiality agreement despite fact he never became an Ecore employee.*

*Contracts -- Consideration -- Necessity for consideration -- What constitutes -- General principles -- Mutual promises -- Appeal by Ecore from dismissal of motion to stay Ontario action by former consultant allowed, and action was stayed -- Consultant's company was contracted by Ecore to provide consultant's services -- Consulting agreement referenced confidentiality agreement, signed by consultant, containing Pennsylvania forum selection clause -- Judge erred in finding that confidentiality agreement failed for lack of consideration -- Agreements had to be read together -- Judge ignored the mutual promises in the confidentiality agreement in finding that no consideration passed to consultant -- Consultant was bound to terms of confidentiality agreement despite fact he never became an Ecore employee.*

Appeal by Ecore from the dismissal of its motion to stay or dismiss Downey's Ontario action for want of jurisdiction. Downey was working in Toronto for a competitor of Ecore's when he agreed to become a consultant for Ecore, a Pennsylvania corporation. Downey's company, CSR, and Ecore executed a consulting services agreement pursuant to which Downey was to provide services to Ecore as a key CSR employee. The consulting agreement referenced a confidentiality agreement, which Downey executed in his personal capacity when he started providing services to Ecore. The confidentiality agreement contained a forum selection clause, identifying Pennsylvania as the jurisdiction which would adjudicate disputes between the parties. Downey subsequently invented a new process, the rights to which he assigned to Ecore as required by another term of the consulting agreement. He later commenced an action against Ecore, alleging that it failed to honour an oral promise to reasonably compensate him for his assignment of the inventions. He sought damages, or alternatively, rescission of his assignment of the invention and an accounting of profits from Ecore. Ecore terminated the consulting agreement. It moved to stay or dismiss Downey's action on the basis of the forum selection clause in the confidentiality agreement. In dismissing the motion, the judge noted that Downey was never an Ecore employee. He noted that CSR did not execute the confidentiality agreement, but Downey did. As Downey himself was not provided with valid consideration for signing the confidentiality agreement, it failed, and the judge found that Downey was not personally bound by its terms. The judge went on to note that the forum selection clause would otherwise have been enforceable and applicable to Downey's action, as the subject matter of

the claim arose and related to Ecore's business relations with Downey.

HELD: Appeal allowed. The judge erred in finding that the confidentiality agreement failed and was unenforceable against Downey for lack of consideration. The evidence made it clear that the consulting services agreement was executed merely for the tax benefits that Downey could derive from it. The reality of the parties' relationship was that Ecore provided Downey with its proprietary information on the understanding that he would be working for Ecore. Ecore would not have done so without the confidentiality agreement. The consulting agreement and confidentiality agreement needed to be read together. The judge erred in finding that all the benefits of the consulting agreement flowed to CSR, not to Downey. In the context of their dealings, the parties treated CSR and Downey as one in the same. The judge ignored the mutual promises in the confidentiality agreement in finding that no consideration passed to Downey. Downey was bound to the terms of the confidentiality agreement despite the fact he never became an Ecore employee. The confidentiality agreement provided for the survival of Downey's confidentiality obligations beyond the termination of his relationship with Ecore.

**Statutes, Regulations and Rules Cited:**

Ontario Rules of Civil Procedure, R.R.O. 1990, Reg. 194, Rule 21

**Appeal From:**

On appeal and cross-appeal from the order of Justice John S. Fregeau of the Superior Court of Justice, dated November 8, 2011, with reasons reported at 2011 ONSC 6617.

**Counsel:**

L. David Roebuck and Mark Hines, for the appellant/respondent to cross-appeal.

Timothy M. Lowman and Patrick J. Cotter, for the respondent/cross-appellant.

---

The judgment of the Court was delivered by

**E.A. CRONK J.A.**:--

## I. Overview

**1**    Ecore International Inc. ("Ecore") appeals from the dismissal of its motion for an order staying or dismissing an Ontario action commenced against it by the respondent, Paul Downey ("Downey"). Ecore requested that the action be dismissed for want of jurisdiction of the Ontario Superior Court

of Justice based on a forum selection clause ("FSC") in favour of the Pennsylvania courts, as found in a written confidentiality agreement between the parties ("Confidentiality Agreement").

**2**    The narrow issue on appeal is whether the motion judge erred by concluding that the Confidentiality Agreement fails to bind Downey for lack of consideration. Should Ecore succeed on its appeal, Downey cross-appeals, contending that the Confidentiality Agreement is unenforceable because it applied only "during or after" his employment with Ecore. As Downey was never an employee of Ecore, he argues that a necessary precondition to the operation of the Confidentiality Agreement was not satisfied.

**3**    For the reasons that follow, I would allow the appeal and dismiss the cross-appeal.

## II. Facts

**4**    Ecore, formerly known as Dodge-Regupol Inc. ("DRI"),[1] is a Pennsylvania-based manufacturer of recycled rubber and a wide array of rubber-related products. Downey is a professional engineer licensed and resident in Ontario.

### (1)    Genesis of the Contracts

**5**    In the 1990s, Downey was employed by one of Ecore's competitors in Toronto. By 1999, he was seeking a new position in a senior business development or sales and marketing position, with the hope of a later transition to general management.

**6**    In August and September 1999, Downey had discussions with the President of Ecore, Art Dodge, regarding a potential role for him with Ecore. On September 9, 1999, Dodge wrote to Downey, enclosing an "employment proposal" and offering him employment with Ecore in the position of "Business Development Manager - Industrial Products". The letter indicates that Dodge anticipated Downey relocating to Pennsylvania in early 2001 or sooner. The letter states: "given your history and industry knowledge, coincident with your joining the company and as a condition of your employment, we will require you to sign an Employee Confidentiality Agreement."

**7**    Downey responded to Dodge on September 10, 1999 with a counter-proposal. He suggested various changes to the compensation arrangements outlined by Dodge and proposed that the parties operate, "albeit temporarily for the next 12 - 18 months as a business-to-business relationship rather than an employer-employee one". Downey described this arrangement as "necessary given Canadian tax law". He included a draft consulting agreement prepared by his lawyer, which contemplated that Downey's services would be provided to Ecore through his company, CSR Industries Inc. ("CSR"). The draft agreement provided that CSR would execute a copy of Ecore's standard confidentiality agreement.

**8**    Dodge replied to Downey on the same day with a modified proposal that accepted some, but not all, of Downey's suggested compensation arrangements, and that accepted all other terms and

conditions in Downey's counter-proposal.

### (2)    Consulting Agreement

**9**    CSR and Ecore executed a consulting agreement on September 14, 1999 ("Consulting Agreement"). The agreement is between Ecore as the "Client" and CSR as the "Consultant". Downey is not a named party to the Consulting Agreement. However, as will be discussed below, he is described in the terms of the agreement as "a Key Person of the Consultant".

**10**    The Consulting Agreement provides that CSR will provide defined "Services", including acting as Ecore's "Manager Business Development - Industrial Products" and sitting as a member of Ecore's management team. Additional services to be provided by CSR include "the investigation and development of new business opportunities within industrial market segments".

**11**    Section 3 requires Ecore to pay CSR an annual fee of $132,000 CDN, payable in weekly amounts, for the Services provided under the Agreement, as well as various bonuses in 2000. After 2000, CSR would be considered for participation in all company-wide bonus distributions.

**12**    Section 5 of the Consulting Agreement describes the relationship between Ecore and CSR as follows:

> The Consultant's relationship with the Client as created by this Agreement is that of an independent contractor for the purposes of the *Income Tax Act* (Canada) and any similar provincial taxing legislation. It is intended that the Consultant shall have general control and direction over the manner in which its services are to be provided to the Client under this Agreement. Nothing contained in this Agreement shall be regarded or construed as creating any relationship (whether by way of employer/employee, agency, joint venture, association or partnership) between the parties other than as an independent contractor as set forth herein.

**13**    Section 7 recognizes Downey's role as CSR's "Key Person":

> 7. Key Person

> (a)    The parties acknowledge that Paul Downey is a Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement. It is acknowledged by the Consultant that Paul Downey will perform all services of the Services, unless the Client otherwise consents in writing.

**14**    Section 8 requires CSR to execute a confidentiality agreement:

> 8.    Confidential Information

The Consultant will execute a copy of the Client's standard confidentiality agreement, and said confidentiality agreement, upon execution, will form part of this agreement.

### (3)    Confidentiality Agreement

**15**    On Downey's first day of work with Ecore on October 4, 1999, Ecore asked him to sign its standard form confidentiality agreement, backdated to October 1, 1999. Downey executed the agreement in his personal capacity on or about October 4, 1999.

**16**    The Confidentiality Agreement is between Ecore, which is referred to as "Company", and Downey, who is referred to as "Employee". CSR is not a named party to the agreement and is not referenced in the document.

**17**    The preambles to the Confidentiality Agreement include this clause :

BACKGROUND: Company is prepared to engage Employee for employment with Company. Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [sic] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

**18**    Section 1 of the Confidentiality Agreement defines "Proprietary Information", while s. 2 obliges Downey to accept and hold all Proprietary Information as secret and confidential and not to use it for his own benefit, but only for the benefit of Ecore.

**19**    Section 3 of the Confidentiality Agreement contains the FSC at issue in this proceeding. The pertinent part of the FSC states:

Employee hereby consents to the exclusive jurisdiction in the courts of the Commonwealth of Pennsylvania and of the United States situate in the Commonwealth of Pennsylvania, in connection with any action or suit to enforce this Agreement, that relates to this Agreement, that arises out of or in any way relates to the Company's business relations with Employee.

**20**    Section 4 of the Confidentiality Agreement provides that "[a]ll inventions or discoveries which relate to [Ecore's] Proprietary Information shall be the exclusive property of the Company." This section obliges Downey to execute any instruments that Ecore deems necessary to confirm its exclusive rights to any invention or discovery under applicable intellectual property law.

**21**    Section 5 of the Confidentiality Agreement states:

> This Agreement shall not constitute an employment agreement between Company and Employee, and, in the absence of written agreement to the contrary, Employee shall, at all times, be considered an employee at will. This Agreement shall apply during and after the Employee's employment with Employer.

### (4)    Assignment Agreement

**22**    Sometime in 2000, Downey invented a new form of impact sound insulation for use in the construction of flooring systems. He disclosed the inventions to Ecore in 2000. Downey believed that his inventions could lead to a new Ecore product line.

**23**    In a written agreement, dated October 10, 2001, Downey assigned all his rights, title and interest in the inventions to Ecore ("Assignment Agreement"). Downey acknowledged in the Assignment Agreement that he received "valuable consideration" from Ecore.

### (5)    Subsequent Events

**24**    In 2008, Ecore asked Downey to sign an "Amended and Restated Confidentiality Agreement" that sought to create joint and several obligations on the part of Downey and CSR. Downey declined to do so.

**25**    In February 2011, Downey commenced an action in Ontario against Ecore, alleging that it failed to honour an oral promise to "reasonably compensate" him for his assignment of the insulation inventions. Downey alleges in his claim that the inventions were made by him alone using public source materials information and without the use of any Proprietary Information of Ecore. Downey seeks damages or, in the alternative, rescission of his assignment of the inventions and an accounting of profits by Ecore.

**26**    In response to this action, Ecore terminated the Consulting Agreement effective July 2011. Ecore also moved under Rule 21 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to stay or dismiss Downey's action on the ground that the Pennsylvania courts have exclusive jurisdiction over it pursuant to the FSC in the Confidentiality Agreement.

## III. Motion Judge's Decision

**27**    The motion judge reviewed the circumstances leading to the execution of the Consulting and Confidentiality Agreements and the terms of both contracts. He found that, at Downey's request, the Consulting Agreement was between CSR and Ecore, rather than Ecore and Downey, because this structure was "advantageous to [Downey] from a Canadian tax perspective" and was "for his

advantage" (at para. 30). He also found that while it was contemplated that "Downey's position or status might change to that of an employee of Ecore", this never happened.

**28**    As for the Confidentiality Agreement, the motion judge found that while CSR was obliged under the Consulting Agreement to execute the agreement, it did not do so. Instead, as requested by Ecore, Downey signed the Confidentiality Agreement in his personal capacity. The motion judge correctly held that Downey was bound by the FSC in the Confidentiality Agreement only if that agreement was a valid contract to which Downey was personally bound. He concluded, at para. 34, that the Confidentiality Agreement "fails for lack of consideration". The motion judge found that "it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation, pursuant to the terms of the agreement, was to flow to CSR".

**29**    The motion judge summarized his conclusion this way, at para. 37:

> Downey never received consideration for executing the Confidentiality Agreement and is not personally bound by its terms, including the FSC contained therein. The jurisdiction of this court to hear Downey's action against Ecore is therefore not ousted by the FSC contained in the Confidentiality Agreement dated October 1, 1999.

**30**    Although this conclusion was dispositive of Ecore's motion, the motion judge went on to consider the other issues raised by the parties concerning the enforceability of the Confidentiality Agreement against Downey. He held that: (1) the subject matter of Downey's action against Ecore falls within the scope of the FSC in the Confidentiality Agreement since the action arises out of and relates to Ecore's business relations with Downey (at paras. 38-41); and (2) Downey failed to show sufficient strong cause to avoid the enforcement of the FSC in the Confidentiality Agreement (at paras. 42-45). Downey did not challenge these additional findings before this court.

**31**    The motion judge's reasons for dismissing Ecore's motion are summarized in this succinct passage from his reasons, at para. 46:

> The FSC in the Confidentiality Agreement should be enforced, and the stay of proceedings would be granted, but for the finding that the Confidentiality Agreement fails to bind Downey personally for lack of consideration.

## IV. Issues

**32**    There is one issue on the appeal: did the motion judge err by concluding that the Confidentiality Agreement, including the FSC, is unenforceable against Downey for lack of consideration?

**33**    If the motion judge so erred, the only issue on the cross-appeal is whether the Confidentiality

Agreement is unenforceable against Downey on the alternative basis that a necessary precondition to its operation - Downey's employment with Ecore - was never satisfied.

## V. Analysis

### (1) The Appeal

**34** Ecore's basic position is that the motion judge erred by concluding that the Confidentiality Agreement is unenforceable against Downey by reason of a failure of consideration.

**35** Ecore submits that s. 8 of the Consulting Agreement evidences the parties' intentions that Ecore was to receive a confidentiality covenant that bound Downey personally as the Key Person. In addition, Ecore argues that the consideration for signing the Confidentiality Agreement was provided by the monies and benefits that flowed through CSR to Downey. Ecore also submits that consideration is found in the expressed premise of the Confidentiality Agreement that Downey would be granted access to Ecore's confidential information and that he was entering into the agreement to grant Ecore protection in respect of that information.

**36** For the reasons that follow, I agree with Ecore that the motion judge erred by holding that the Confidentiality Agreement "fails" and is unenforceable against Downey due to a lack of consideration.

### (i) Principles of Contractual Interpretation

**37** I begin with the well-established principles of contractual interpretation. As the courts have repeatedly affirmed, the aim of contractual interpretation is to determine the intentions of the parties in accordance with the language used in the written document, having regard to the context in which the contract was signed: see *Dumbrell v. Regional Group of Companies* (2007), 85 O.R. (3d) 616 (C.A.), at paras. 47-56; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673, 268 O.A.C. 279, at para. 16; and *SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.*, 2011 ONCA 616, 282 O.A.C. 339, at para. 16.

**38** The contours of the exact bargain between the parties may sometimes require consideration of more than one contract. Nonetheless, the same principles of contractual interpretation apply. In *Salah*, at para. 16, Winkler C.J.O. provided this instructive overview of the applicable principles:

> When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not

the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. *Where a transaction involves the execution of several documents that form parts of a larger composite whole - like a complex commercial transaction - and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.* [Citations omitted; Emphasis added.]

### (ii) The Wording of the Agreements and the Factual Matrix in this Case

**39**    The motion judge's factual finding that CSR was the recipient of Ecore's Proprietary Information led to his conclusion that the Confidentiality Agreement fails for lack of consideration. In my view, this finding is not consistent with the wording of the Consulting and Confidentiality Agreements, having regard to the factual matrix in which these agreements were made. Nor, with respect, does the motion judge's interpretation of the effect of these agreements accord with sound commercial principles or good business sense.

**40**    From the outset of the parties' dealings, as revealed by Dodge's initial letter to Downey dated September 9, 1999, Ecore contemplated that Downey, personally, would join its "team" and sit as a member of its management group. Consistent with that view, Ecore's position was that Downey would be required to personally commit to protect Ecore's Proprietary Information as a condition of his relationship with Ecore.

**41**    There was no evidence on the motion to suggest that Ecore resiled from its initial position after Downey and his lawyer converted the original employment proposal into a proposed consulting arrangement with CSR. Indeed, both the wording of s. 5 of the Consulting Agreement and the motion judge's findings confirm that Downey proposed this arrangement solely as a means of advantaging his Canadian income tax position. The arrangement with CSR was simply a tax device that, in the motion judge's words, was implemented "at Downey's request and for his advantage" (at para. 30). This business reality is a critical component of the factual context in which the Consulting and Confidentiality Agreements were signed.

**42**    Moreover, the transaction between the parties was effected by the execution of both contracts. The Consulting Agreement was entered on the faith of the Confidentiality Agreement being executed. Consequently, these related contracts must be read together and, as Winkler C.J.O. explained in *Salah*, assistance in the interpretation of each agreement may be drawn from the other.

**43**    That the two agreements together constitute a composite whole is suggested by the language of the agreements themselves. Section 8 of the Consulting Agreement provides for the execution of Ecore's standard form confidentiality agreement by the Consultant. It further states that, upon execution, the confidentiality agreement would form part of the Consulting Agreement.

**44**    The Consulting Agreement does not specifically address the provision or protection of Ecore's Proprietary Information, nor does it refer to the intended recipient of that information. Instead, it confirms that Downey, in his personal capacity, is a "Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement". CSR explicitly acknowledged that Downey would perform all Services, as defined in the Consulting Agreement, unless Ecore otherwise consented in writing.

**45**    The Confidentiality Agreement fills in the gaps in the Consulting Agreement about the provision and protection of Ecore's Proprietary Information. It specifically addresses the disclosure of this information, providing not only that Downey "will be granted access to [Ecore's] confidential and proprietary information" but, also, that Downey was entering into the Confidentiality Agreement to "grant to [Ecore] protections regarding [Ecore's] proprietary information". It confirms that Downey intended "to be legally bound by the covenants as set forth in this Agreement", which include the confidentiality covenants and acknowledgements set out in the body of the agreement.

**46**    It is true, as the motion judge recognized, that CSR never signed a confidentiality agreement and that it was not a named party to the Confidentiality Agreement signed by Downey. However, when the Consulting Agreement and Confidentiality Agreement are read together, the terms of these agreements reveal the parties' intentions that Ecore's Proprietary Information was to be protected in the hands of the person who was to actually receive that information - Downey. It was only reasonable for the parties to intend that Downey - who was then employed by a known competitor of Ecore - would be subject to the terms of the Confidentiality Agreement. He was the person defined in s. 7 of the Consulting Agreement as the actual provider of all the consulting services to Ecore. Indeed, Downey admitted in cross-examination that he was the person who would get Ecore's information if a contract was entered into with Ecore.

**47**    The motion judge erred in finding that Ecore accepted that CSR would receive both the Proprietary Information and the benefits flowing from Downey's relationship with Ecore. The wording of the agreements and the overall factual matrix reveals that the *de facto* relationship between the parties was between Ecore and Downey. It was Downey, not CSR, who committed to perform the consulting services. And it was Downey who would receive the benefits arising from the relationship with Ecore, whether directly or through the corporate vehicle of CSR.

**48**    Two further comments by the motion judge require mention. The motion judge observed, at para. 32, that the Consulting Agreement could have required that both CSR and Downey sign the Confidentiality Agreement. He also commented that it was "[o]f significance" that, in 2008, Ecore asked Downey to sign an amended Confidentiality Agreement that would have bound both CSR and Downey.

**49**    In my view, with respect, these observations are beside the point. The fact that the Consulting Agreement did not require both CSR and Downey to sign the Confidentiality Agreement is explained by the factual matrix in which the agreements were made. At least for the purposes of the

Confidentiality Agreement, the parties understood and intended that CSR and Downey were one and the same.

**50**    In addition, I view the 2008 effort to restate the Confidentiality Agreement as nothing more than a failed attempt by Ecore to formally commit CSR to the contractual protections it already enjoyed with Downey under the Confidentiality Agreement.

**51**    An additional point telling against the motion judge's interpretation of the interaction between the Consulting Agreement and the Confidentiality Agreement is that it fails "to accord with sound commercial principles and good business sense, and [to] avoid commercial absurdity": *Salah*, at para. 16. On the motion judge's approach to the interpretation of the two agreements, the Confidentiality Agreement serves no meaningful purpose. The motion judge viewed CSR as the recipient of Ecore's Proprietary Information. If this were the case, it would have served no logical purpose for Ecore to ask Downey to personally commit to protect Proprietary Information that he never received.

**52**    Moreover, on the motion judge's findings, neither Downey nor CSR is bound by the Confidentiality Agreement. Downey is not bound because, in the motion judge's view, there was no consideration for the agreement. And CSR is not bound because it is not a party to the agreement. On this interpretation, Ecore is deprived of the very protection of its intellectual property for which it bargained.

**53**    Such a result is inconsistent with the parties' demonstrated intentions at the time they entered into the Consulting and Confidentiality Agreements. It is also inconsistent with sound commercial principles and good business sense. An interpretation of the Consulting and Confidentiality Agreements that occasions such a commercially absurd result is to be avoided: *Salah*, at para. 16.

**54**    I therefore conclude that, properly interpreted, the intent of the parties in entering into their contractual arrangements was to require the execution of a confidentiality agreement that bound Downey personally. That s. 8 of the Consulting Agreement required CSR to execute such a confidentiality agreement does not relieve against the parties' joint objective. To conclude otherwise, as the motion judge did, would deprive Ecore of any protection of its Proprietary Information from the intended and actual recipient of that information. This unjust result would permit form to triumph over substance.

**(iii) Confidentiality Agreement is Supported by Valid Consideration**

**55**    It follows from this analysis that the motion judge erred by concluding that Downey's execution of the Confidentiality Agreement was unsupported by valid consideration. The motion judge rejected Ecore's suggestion that "the consideration received by Downey for executing the Confidentiality Agreement is the provision of confidential information by Ecore to the consultant, allowing the 'services' of the Consulting Agreement to be provided, thereby allowing the compensation contemplated in that agreement to flow" (at para. 34). According to the motion judge,

at para. 35:

> [T]his submission overlooks the fact that it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation ... was to flow to CSR. I am mindful that some of the funds owing to CSR pursuant to the Consulting Agreement were paid to Downey personally. However, [Ecore] cannot unilaterally change the parties to the Consulting Agreement by choosing who they pay. Further, the record suggests that these funds were treated by Downey as revenue of CSR.

**56**    In my opinion, the motion judge's conclusion that the Confidentiality Agreement fails for lack of consideration ignores the mutual promises contained in the Confidentiality Agreement. In particular, the motion judge failed to consider the "BACKGROUND" preamble to the Confidentiality Agreement, which reads:

> Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [*sic* ] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

**57**    The mutual promises contained in this provision constitute a *quid pro quo* that formed the basis for the Confidentiality Agreement: Downey would be granted access to Ecore's Proprietary Information, which was necessary to allow him to perform the Services under the Consulting Agreement, and the information so disclosed would be subject to confidentiality protections in favour of Ecore. Contrary to the parties' original expectations, Downey never became an Ecore employee but instead continued to use his corporate vehicle for income tax purposes. However, the fact remains that Downey received Ecore's Proprietary Information.

**58**    In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for Downey's execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted Downey, both personally and through CSR, to realize the benefits of the Consulting Agreement - benefits he would not have received without executing the Confidentiality Agreement to which he was personally bound.

### (iv)    Conclusion

**59**    I therefore conclude, contrary to the motion judge's ruling, that Downey's execution of the Confidentiality Agreement was supported by valid consideration. It follows that the Confidentiality Agreement, including the FSC, is fully enforceable against Downey.

### (2)    The Cross-Appeal

**60**    On his cross-appeal, Downey invokes s. 5 of the Confidentiality Agreement, which provides in part: "This Agreement shall apply *during and after* the Employee's employment with Employer" (emphasis added). Downey submits that even if he did receive valid consideration for entering into the Confidentiality Agreement, it is nonetheless unenforceable against him since he never became an Ecore employee. The motion judge did not need to consider this alternative argument, having accepted that the Confidentiality Agreement was unenforceable against Downey due to a lack of consideration.

**61**    I do not read s. 5 of the Confidentiality Agreement in the manner urged by Downey. The material language of this provision - that the Confidentiality Agreement was to apply "during and after" Downey's employment with Ecore -simply confirms that Downey's confidentiality obligations were to survive the termination of his relationship with Ecore. This makes commercial sense given the purpose of the agreed protections for Ecore's Proprietary Information. It was precisely when Downey's relationship with Ecore fell apart, that those protections would be needed by Ecore.

**62**    It is telling, in this regard, that the relevant language in s. 5 does not provide that the Confidentiality Agreement or Downey's confidentiality covenants were to apply *only* if Downey was an employee of Ecore or that his employment by Ecore was a condition precedent to the triggering of those covenants. This language also accords with common and business sense. If Ecore's Proprietary Information was disclosed to Downey - in any capacity - the protection of that information was of vital concern to Ecore.

## VI. Disposition

**63**    For the reasons given, I am persuaded that the motion judge erred in his interpretation of the Confidentiality Agreement. That agreement forms part of a single transaction between Ecore, Downey and CSR, constituted by both the Consulting and the Confidentiality Agreements. The interpretation of each agreement is informed by the other. It is only when the two agreements are read together, in accordance with the principles of contractual interpretation referenced above, that the intentions of the parties and the true business reality of their relationship emerge.

**64**    Accordingly, I would allow the appeal, dismiss the cross-appeal, set aside the motion judge's order and substitute in its stead an order staying Downey's Ontario action on the basis of the FSC in the Confidentiality Agreement.

**65**    Ecore is entitled to its costs of the appeal and the cross-appeal, in the agreed amount of $13,000, inclusive of all disbursements and taxes.

E.A. CRONK J.A.
 K.N. FELDMAN J.A.:-- I agree.
 J.M. SIMMONS J.A.:-- I agree.

cp/e/qljel/qljxr/qlhcs/qlmll/qlgpr/qlhcs

1 Prior to 2008, Ecore carried on business under the name of DRI. For convenience, DRI is treated in these reasons as being one and the same as Ecore.

*Case Name:*

# Dumbrell v. Regional Group of Companies Inc.

**Between**
**J. Michael B. Dumbrell, Plaintiff/Respondent, and**
**The Regional Group of Companies Inc. and Steven**
**H. Gordon, Defendants/Appellants**

[2007] O.J. No. 298

2007 ONCA 59

85 O.R. (3d) 616

279 D.L.R. (4th) 201

220 O.A.C. 64

25 B.L.R. (4th) 171

55 C.C.E.L. (3d) 155

154 A.C.W.S. (3d) 1097

2007 CarswellOnt 407

Docket: C43885

Ontario Court of Appeal
Toronto, Ontario

**D.H. Doherty, M.J. Moldaver and R.J. Sharpe JJ.A.**

Heard: October 23, 2006.
Judgment: January 31, 2007.

(90 paras.)

*Contracts -- Breach of contract -- Remedies -- Damages -- Appeal by the Regional Group of*
*Companies and Gordon from a decision awarding the respondent 50 per cent of the profit earned*

*on a commercial real estate transaction -- Gordon appeal allowed -- Regional appeal allowed in part -- Trial judge found breach of contract only -- Contract was made between the respondent and Regional only -- No legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional -- Regional was liable under the contract but only for commission on profits earned by Gordon's company and his wife and children -- Regional was not liable for commission on profits earned by the other investors brought into the project by Gordon.*

Appeal by the Regional Group of Companies and Gordon from a decision awarding the respondent 50 per cent of the profit earned on a commercial real estate transaction. The respondent was employed by Regional for about one year beginning in 1998. The appellant, Gordon, was the president, CEO, and directing mind of Regional. The respondent left Regional's employment in November 1999. He sued Regional and Gordon claiming that he was owed 50 per cent of the profit earned on a commercial transaction referred to as the "Queen Street project". The trial judge found that the respondent was entitled, under the terms of his employment contract, to 50 per cent of the $1 million profit earned on the Queen Street project. The appellants submitted that the trial judge erred in holding that the respondent was entitled to 50 per cent of the profit even though that profit was earned long after the termination of his employment contract. Second, the appellants submitted that even if the respondent was entitled to profits under the terms of the employment contract, the trial judge erred in awarding him 50 per cent of the profits earned by entities other than Regional or Gordon. Finally, Gordon submitted that the trial judge erred in holding him personally liable.

HELD: Gordon appeal allowed. Regional's appeal allowed in part. The Court held Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. Regional was not liable for commission on profits earned by the other investors brought into the project by Gordon. Dumbrell had alleged various causes of action against Regional and Gordon; the trial judge found a breach of contract, but rejected the other claims. Dumbrell's contract was with Regional and only Regional. There was no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional.

**Appeal From:**

On appeal from the order of Justice Monique Métivier of the Superior Court of Justice dated June 23, 2005 and amended on October 28, 2005.

**Counsel:**

Benjamin Zarnett and Alexa Abiscott for the appellants.

R.G. Slaght, Q.C., for the respondent.

The judgment of the Court was delivered by

**D.H. DOHERTY J.A.**:--

<div align="center">I</div>

<u>Overview</u>

**1**    The respondent, J. Michael B. Dumbrell ("Dumbrell"), was employed by the appellant, the Regional Group of Companies Inc. ("Regional"), for about one year beginning in November 1998. The appellant, Steven H. Gordon ("Gordon"), was the president, CEO, and directing mind of Regional.

**2**    Dumbrell left Regional's employment in November 1999. He subsequently sued Regional and Gordon claiming he was owed fifty percent of the profit earned on a commercial real estate transaction referred to as the "Queen Street project". The trial judge found that Dumbrell was entitled, under the terms of his employment contract, to fifty percent of the $1,000,000 profit earned on the Queen Street project.

**3**    Regional and Gordon appeal. Counsel raises three issues:

> *    Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit earned on the Queen Street project even though that profit was earned long after the termination of his employment contract?
> *    Even if Dumbrell was entitled to the profits under the terms of the employment contract, did the trial judge err in awarding him fifty percent of the profit earned by entities other than Regional or Gordon?[1]
> *    Did the trial judge err in holding Gordon personally liable?

**4**    I would allow Regional's appeal in part. I would hold Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. I would not hold Regional liable for commission on profits earned by other investors brought into the project by Gordon.

**5**    I would allow Gordon's appeal. Dumbrell alleged various causes of action against Regional and Gordon at trial. The trial judge found a breach of contract, but rejected the other claims made by Dumbrell. Dumbrell's contract was with Regional and only Regional. He could have no reasonable expectation of recovery upon breach of the contract from any entity other than Regional. I see no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional. Nor can Gordon be liable for inducing Regional's breach of contract. Dumbrell did not plead that cause of action and did not adduce evidence capable of

establishing that Gordon induced a breach of contract.

## II

## The Facts

**6**    The trial lasted two weeks. The trial judge heard different versions of many events, some of which are not relevant to this appeal. I will summarize only those facts germane to the issues raised on appeal. My summary also reflects the trial judge's findings of fact and her credibility assessments. Neither are challenged on appeal. The trial judge preferred Dumbrell's version of events over Gordon's whose evidence she found to be unworthy of belief in many respects.

### (a)    Dumbrell's Employment with Regional

**7**    In the summer of 1998, Dumbrell was living in British Colombia. He had spent most of his working life in the real estate development business and was looking for an opportunity to get back into that business in Ottawa where he had previously worked for many years.

**8**    Regional operated a large, well established real estate business in the Ottawa area. Gordon had been Regional's CEO since 1984. He held all the voting shares. Regional provided a variety of services, including property management, property appraisals, land acquisitions, land development, and consulting.

**9**    Regional would sometimes put together groups of investors or syndicates to purchase and develop properties. The properties would be located by Regional and purchased in trust by a shell company for the investors. Regional would earn various fees for arranging the purchase, syndication, management, and development of the property. Investors in the syndicate often were officers or employees of Regional or relatives of Gordon. Gordon sometimes took an equity position in these developments through Regional or various other corporate entities he controlled.

**10**    Gordon had the final say in respect of all facets of Regional's operation. He decided which projects in which Regional would become involved, the fees Regional would charge, which corporate entities would be used, the roles those entities would play in a transaction, and which investors would be invited to join which syndicates.

**11**    Dumbrell met with an employee of Regional in the summer of 1998 to discuss the possibility of Dumbrell working with Regional. Dumbrell met with Gordon either at the same meeting or in a subsequent meeting shortly afterward. Dumbrell had considerable expertise in the commercial real estate field, an area in which Gordon wanted Regional to become more involved.

**12**    Gordon and Dumbrell agreed that Dumbrell would work for Regional and would have the title Vice-President, Commercial Development. Dumbrell understood that he would find commercial real estate projects, bring them to Regional and that Regional would then become involved in the

purchase and development of those properties. Dumbrell would be paid a commission on the profits earned from the projects that he brought to Regional.

**13**    On Gordon's instructions, Regional's lawyer drafted an employment contract between Dumbrell and Regional. Three drafts were prepared and reviewed by Dumbrell, Gordon, and their respective lawyers. There were several changes made in the various drafts of the contract. Almost all of these changes reflected Gordon's and not Dumbrell's preferences. Eventually, in November 1998, they agreed on the terms and both signed the agreement. Gordon signed as president of Regional.

**14**    Some of the contract terms are set out in full below. Generally speaking, the contract provided that Dumbrell would be compensated exclusively on a commission basis. His commission would be calculated as a percentage of the profit generated from projects that he brought to Regional.

### (b)    The Queen Street Property

**15**    Like most people familiar with the Ottawa real estate market, Dumbrell knew of the Queen Street property in November 1998. The property was owned by Canadian Real Estate Investment Trust ("CREIT"). It occupied a full downtown city block in Ottawa and in late 1998 was being used as a parking lot. It was zoned for use as office space. Dumbrell believed that the price of the property would increase dramatically in the immediate future as the need for office space increased in Ottawa. He also believed that the property was ripe for development in late 1998. The property was not on the market, but Dumbrell mentioned it to Gordon as a potential project for development by Regional. Gordon encouraged him to look into the possibility of acquiring the Queen Street property.

**16**    In early 1999, Dumbrell began to assemble a file on the Queen Street property. He received information from an employee of CREIT pertaining to possible development plans for the property and certain rent schedules. CREIT gave the information to Dumbrell on the undertaking that it would be kept confidential.

**17**    Shortly after Dumbrell acquired information from CREIT, he contacted an architect who had worked on development plans for that property some years earlier. Dumbrell and the architect spoke at length and the architect gave Dumbrell a great deal of background information pertaining to the property. Based on the information he had accumulated, Dumbrell concluded that the Queen Street property was under priced and presented an excellent opportunity for a profitable development as an office tower. Regional decided to proceed with efforts to acquire the Queen Street property.

**18**    In February 1999, on Gordon's instructions, Dumbrell prepared and submitted an offer to purchase the Queen Street property for $7,745,000. That offer was in the name of Canadian Gateway, a consortium of five companies, including Regional, that had been assembled by Gordon. CREIT was not interested in selling the property on the terms of the offer.

**19**    Gordon instructed Dumbrell to submit a second offer in February 1999. This offer, also in the name of Canadian Gateway in the amount of $9,000,000, was rejected by CREIT. In March 1999, a third offer, also at $9,000,000, but providing for a shorter due diligence period, was submitted by Dumbrell on Gordon's instructions. This offer was also rejected.

**20**    The trial judge described, at para. 35, Dumbrell's role in these three offers as follows:

> Mr. Dumbrell was the point man in these negotiations, drafting these offers at Mr. Gordon's direction and reporting back the reactions of Mr. Dansereau [the vendors' representative] who communicated only with Mr. Dumbrell.

**21**    Some time after the third offer was rejected, some of the partners in Canadian Gateway decided they were no longer interested in purchasing the Queen Street property. In July 1999, Dumbrell, on Gordon's direction, prepared a fourth offer. This offer showed Regional as the purchaser at a purchase price of $9.3 million. It also provided for a $300,000 commission payable to Regional on closing by CREIT. The corporate identity of the purchaser was irrelevant to Dumbrell. As far as he was concerned, he was working on a "Regional" project and it was up to Gordon to decide what corporate entities would be used to effect the transactions and subsequent development of the property.

**22**    CREIT knew that Regional would not be the ultimate purchaser and developer of its property. It, therefore, wanted to know the identity of Regional's investors. Negotiations broke down when Regional could not or would not identify its investors. The July offer was rejected in August 1999.

**23**    In August, Gordon told Dumbrell that he was no longer interested in the Queen Street property. Dumbrell had spent most of his time since he commenced employment with Regional in November 1998 working on the Queen Street property. His interest in the property continued even after Gordon told him that he was no longer interested in the property.

**24**    In October 1999, Gordon spoke with a government official who told him that there would be a significant increase in the demand for downtown office space in Ottawa in the immediate future. This information made the Queen Street property more attractive.

**25**    In late October 1999, Mr. Samuel Grosz, a friend of Gordon's and a real estate developer whose Ottawa properties were managed by Regional, visited Ottawa primarily to look at his properties. Gordon showed Mr. Grosz the Queen Street property and gave him all of the information that Dumbrell had assembled, including the confidential information that had been provided to him by CREIT in January 1999. Mr. Grosz soon became interested in the Queen Street property.

**26**    Shortly after Gordon alerted Mr. Grosz to the possibility of purchasing the Queen Street property, Mr. Grosz learned that Philip Reichman and his company, O. & Y. Properties Inc. ("O. & Y."), were about to make an offer to purchase the Queen Street property. Mr. Grosz and Mr. Reichman knew each other well and decided to proceed by way of a joint venture with each holding

a fifty percent interest in the Queen Street property if they were able to purchase it from CREIT.

27    By early November 1999, it was clear that the working relationship between Gordon and Dumbrell was not going to last. None of the projects that Dumbrell had worked on had produced any profit for Regional. Dumbrell had not received any remuneration in the year he had been at Regional. Gordon had refused Dumbrell's request for an advance on his commissions. Gordon was also systematically excluding Dumbrell from meetings and the decision-making process at Regional. On November 4, 1999, Dumbrell resigned effective November 22, 1999. He had decided to go into business for himself.

28    On November 19, 1999, after Dumbrell had tendered his resignation from Regional, but while he was still employed there, Mr. Grosz told Gordon that Mr. Grosz and O. & Y. were considering making an offer on the Queen Street property. Mr. Grosz asked Gordon to determine the status of the property. He also told Gordon that because Gordon had brought the property to his attention, he was prepared to allow Gordon to participate with he and O. & Y. in the joint venture. Mr. Grosz indicated that Gordon could purchase one-half of Mr. Grosz's fifty percent interest in the joint venture. This would mean that Gordon would have a twenty-five percent interest in the Queen Street property if the joint venture could acquire it.

29    Mr. Grosz and O. & Y. were respected and high profile participants in the Ottawa commercial real estate market. They did not need Regional's participation to complete the purchase. Gordon wanted to be involved in a joint venture with them. At Mr. Grosz's suggestion, Gordon prepared an offer to purchase the Queen Street property in the name of Regional. When he did so, he anticipated that Regional would purchase the property in trust for Mr. Grosz (twenty-five percent), Gordon or his corporate nominee (twenty-five percent), and O. & Y. (fifty percent).

30    The offer to purchase the Queen Street property prepared by Gordon in November 1999 was very similar to the offer prepared by Dumbrell in July 1999. Both offers provided for a purchase price of $9.3 million with a commission of $300,000 payable to Regional. The only significant difference between the two offers was that the July offer identified Dumbrell as the contact person at Regional and the November offer identified Gordon as the contact person.

31    The asking price for the Queen Street property had dropped by about $1 million since July when Regional had submitted its offer at $9.3 million. Unlike Dumbrell, Gordon was not familiar with the commercial real estate market in Ottawa and was unaware that the asking price for the property had gone down. Gordon did not speak to Dumbrell before preparing this offer. The offer prepared by Gordon was reviewed by his putative partners. Mr. Reichman of O. & Y. learned that the offer prepared by Gordon was about one million dollars more than the current asking price for the Queen Street property. He decided that he would take over any negotiations to purchase the Queen Street property. He submitted an offer in the name of O. & Y. at $8,000,000. That offer did not provide for any commissions payable to Regional.

32    The offer submitted by O. & Y. was accepted by CREIT on or about November 25, 1999. The

transaction was completed on December 2, 1999 and closed on January 24, 2000. The Queen Street property was purchased in trust by a numbered company. The numbered company was owned fifty percent by O. & Y., and fifty percent by a numbered company owned equally by Mr. Grosz and a company controlled by Gordon. Gordon's company held its twenty-five percent interest in the property in trust for a syndicate assembled by Gordon. The syndicate consisted of Gordon, his wife and children, several cousins, and his lawyer. Gordon, his wife and his children owned 73.33 percent of the syndicate. In total, the syndicate advanced about $1,200,000 toward the project. Some of the payments went through Regional.

**33**    Gordon acknowledged in cross-examination that this was not a typical syndication for which Regional would charge a fee for bringing the investors together. Regional did all of the work that had to be done for the syndicate on the project, but did not charge any fees until it submitted an invoice in late May 2002 after the interest in the property was sold. The trial judge was dubious as to the *bona fides* of that invoice.

**34**    Early in 2000, Dumbrell learned through a contact at O. & Y., that O. & Y. had agreed to purchase the Queen Street property. Dumbrell spoke with Gordon and asked him about his or Regional's involvement in that purchase. Gordon lied to Dumbrell. He told him that he was unaware of the proposed purchase of the Queen Street property by O. & Y. and that neither Regional nor Gordon had anything to do with the purchase. Dumbrell subsequently learned of Gordon's involvement and commenced this lawsuit in October 2000. At that time, the syndicate put together by Gordon still held a twenty-five percent interest in the Queen Street property.

**35**    Under the terms of the agreement between O. & Y., Mr. Grosz and Gordon's syndicate, O. & Y. had an option to purchase the interests held by the other partners. In May 2002, O. & Y. exercised its option and bought out Gordon's syndicate. The syndicate's twenty-five percent interest was sold at a profit of slightly more than $1,000,000. Dumbrell amended his statement of claim and alleged that he was entitled to fifty percent of that profit.

### III

### Issue #1 - Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit under the terms of the employment contract?

#### (a)    The trial judge's analysis

**36**    The trial judge found that the potential value of the Queen Street property as a development was made known to Gordon and Regional through Dumbrell's efforts. She further held that it was through those efforts that Regional established contacts with CREIT, assembled a file containing a great deal of information on the property, and was in a position to provide that information to Mr. Grosz when he expressed an interest in the property in October 1999. Mr. Grosz in turn offered Regional/Gordon a twenty-five percent interest in the property because of the information he had received from Gordon.

**37**    On the trial judge's findings, Dumbrell was directly responsible for the syndicate, under Gordon's direction and control, obtaining a twenty-five percent interest in the Queen Street property. The syndicate ultimately made a one million dollar profit from its involvement in the transaction.

**38**    The trial judge rejected Gordon's evidence that he and Dumbrell had agreed that the Queen Street project would not be covered by the terms of Dumbrell's employment contract. She noted that it made no sense that Dumbrell would spend the vast majority of his time over several months trying to secure a property that was excluded from the terms of his employment contract. She then turned to the terms of that agreement.

**39**    The contract was between Regional and Dumbrell. It described Dumbrell as "an employee". The services to be provided to Regional by Dumbrell were described in Schedule "A" to the agreement:

> The Corporation and the Employee agree that the Employee will be charged with the responsibility <u>to provide the Corporation with Development, Acquisitions, Financing and Syndications and Consulting Services. Employee to research, investigate, report and recommend real property capital asset purchases suitable for development or syndication.</u> Employee shall not bind the Corporation to any contract or legal commitment without the prior written authority of the Corporation. [Emphasis added.]

**40**    The contract was for a term of six months with an expiry date of May 1, 1999 and provided for renewal for an additional term of six months on mutual agreement of the parties. Although the contract was not formally renewed, the parties agreed that it was renewed and was in effect when Dumbrell resigned in November 1999.

**41**    The agreement provided for termination "at the end of the Term hereof", and further provided that neither party could commence an action under the contract more than one year after the expiration of the term of the contract. Dumbrell commenced this action in October 2000, less than one year after he quit. This initial claim eventually developed into one for commission on a profit realized more than two years after the contract was terminated.

**42**    The provision of the contract governing Dumbrell's compensation is found under the heading "Employee Earnings":

> 1.    <u>EMPLOYEE EARNINGS</u>

> The Corporation shall pay to the Employee the sum of <u>[as per the commissions payable as set out in Schedule "B" attached].</u> The Corporation is responsible for making source deductions, including payments on account of Canada Pension

> Plan and Employment Insurance. Employee shall be entitled to participate in Corporation's Health Benefit Package as exists as of the date hereof and as amended from time to time. [Emphasis in original.]

**43**    Schedule "B" referred to in the above clause reads as follows:

SCHEDULE "B"

DESCRIPTION OF REMUNERATION PACKAGE TO EMPLOYEE

1(1) The remuneration package for the Employee will be based on performance of the Employee payable as follows:[2]

    (a)    For each project, *profits* to be split 50% to the Employee and 50% to the Corporation.

1(2) For purposes of this Agreement, "*profit*" shall include monies earned and actually received by the Corporation as completed Acquisition Fees, Development Fees and Syndication Fees earned as a result of the Employee's direct involvement for completed and closed projects in accordance with standard operating policy of the Corporation on the following business activities:

(a)    Development projects;
(a)    Syndication projects;
(a)    Special consulting and brokerage fees payable to the Division.

1(3) "*Profit*" shall be defined as the Gross Revenues received for a particular Project less expenses directly related to the negotiation, acquisition, development and sale of the project. All such expenses shall be deducted from Gross Revenues as would a prudent accountant applying generally accepted accounting principles. Expenses shall include, but not limited to:

(a)    Acquisition cost of the property;
(a)    Governmental and development fees;
(a)    Professional advice (accountants, engineers, lawyers, third party consultants);
(a)    Financing fees, brokers fees, interest and carrying charges;
(a)    Fees paid to investors for the project;

(a)    Costs and disbursements paid pursuant to any syndication agreement;

(a)    Realtor's fees; and

(a)    Construction costs and related site improvements. [Emphasis added.]

**44**    The trial judge did not find that the contract of employment provided for payment of commission to Dumbrell on profits earned after the termination of the employment agreement. Rather, she equated the relationship between Regional and Dumbrell with a principal-agent relationship. Relying on *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.* (1994), 19 O.R. (3d) 205 (C.A.), the trial judge held that since Regional accepted the benefit of the work done by Dumbrell regarding the Queen Street property, Regional was obligated to pay for that work in the absence of an agreement to the contrary. Next, she examined the language of the employment contract and concluded at para. 131:

> The fact that crystallization of the deal [the sale of the syndicate's interest in the Queen Street property], and the culminating events occurred after the employee left his employment, is not, in my view, relevant. ... The contract did not deal with this situation and therefore the entitlement is as set out in *Charles P. Rowen & Associates Inc. et al. v. Ciba-Geigy Canada Inc., supra.* [Emphasis added.]

**45**    I agree with the trial judge's conclusion that Dumbrell was entitled to compensation for profits earned after the termination of the agreement, but my analysis is somewhat different than hers. I do not regard *Charles P. Rowen, supra*, as controlling. In *Charles P. Rowen*, the court was faced with a true principal-agent relationship, the terms of which had not been reduced to writing by the parties. The reasoning of the majority blends notions of *quantum meruit* and implied terms of a contract to resolve a problem that the parties had not addressed when establishing their relationship.

**46**    In the present case, the parties did consider the nature of their working relationship. After considerable negotiation and legal assistance, they entered into an employment contract which described Dumbrell as an "employee" and addressed the nature of his compensation. In my view, the question of whether Dumbrell was entitled to commission on the profits earned on the Queen Street project depends on an interpretation of the language used in the contract. If he is entitled to commission on the profits from the Queen Street property, that entitlement must be found in the language of the agreement he entered into with Regional.

### (b)    Contractual interpretation

**47**    Judges spend most of their working time deciphering the meaning of various kinds of legal documents, including written contracts: see e.g. Lord Justice Johan Steyn, "The Intractable Problem of the Interpretation of Legal Texts" (2003) 25 Sydney L. Rev. 5; Sir Christopher Staughton, "How Do the Courts Interpret Commercial Contracts?" (1998) 58 Cambridge L.J. 303. Most Canadian judges faced with interpreting a written commercial contract, cite either or both of *Consolidated-Bathurst Export Limited v. Mutual Boiler and Machinery Insurance Company*, [1980] 1 S.C.R. 888 at 901, and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 52-56.

Professor Ruth Sullivan has observed that these two authorities can be read as advancing different notions of contractual intent. She observes that *Consolidated-Bathurst, supra*, arguably looks to the subjective intention of the contracting parties at the time the contract was made, while *Eli Lilly, supra*, looks to the intent as discerned from the words used in the written contract. Professor Sullivan refers to the former approach as the intentionalist approach, and the latter as the textualist approach: see Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 Sup. Ct. L. Rev. (2d) 369 at 375-86, 392.

**48**    In *Eli Lilly, supra*, at paras. 52-54, Iacobucci J. refers to *Consolidated-Bathurst, supra*, with approval. He clarifies, at para. 54, what is meant in *Consolidated-Bathurst* by "the true intent of the parties" for contractual purposes:

> The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

**49**    On the approach taken in *Eli Lilly, supra*, the focus is on the meaning of the words used in the contract. Evidence of the subjective intention of the parties has "no independent place" in the interpretative process: *Eli Lilly*, at para. 54; see also Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 304-306; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All. E.R. 98 at 114-15 (H.L.).

**50**    In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3d ed. (London: Sweet & Maxwell, 2004) at 18-31.

**51**    *Eli Lilly, supra*, instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not

the subjective intentions of the parties. In this sense, my approach is textualist. However, the meaning of the written agreement must be distinguished from the dictionary and syntactical meaning of the words used in the agreement. Lord Hoffmann observed in *Investors Compensation Scheme Ltd., supra*, at 115:

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.

**52**    No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

**53**    The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at 23-24; *H.W. Liebig & Co. v. Leading Investments Ltd.*, [1986] 1 S.C.R. 70 at 80-81, La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 at 1383-84 (H.L.); Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-308.

**54**    A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

**55**    There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20. Insofar as written

agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at 363 (C.A.).

**56**   I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intracticable Problem of the Interpretation of Legal Texts", *supra*, at 8:

> In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. <u>The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.</u>[3] [Emphasis added.]

### (c)    The interpretation of this contract

**57**   The context in which the written words used in this agreement must be understood begins with the parties who negotiated the agreement. Both were sophisticated, experienced, successful businessmen who could reasonably be expected to negotiate a commercially sensible and workable agreement. When they agreed to work together, it was anticipated that Dumbrell, whose expertise lay in finding commercial real estate projects, would investigate and, where appropriate, bring potentially profitable large-scale commercial developments to Regional. Regional had the ability to finance and develop these projects. It did so in various ways using whatever corporate vehicle Gordon deemed appropriate.

**58**   The agreement reached by the parties contemplated a relatively short working relationship of between six months and one year. It also contemplated that Dumbrell would receive nothing unless he brought projects to Regional which earned profits for Regional. If he did that, his compensation would be significant (fifty percent of the profits). In tying Dumbrell's compensation to profits as opposed to, for example, fees earned by Regional, the parties anticipated that Dumbrell's entitlement to commissions would not be known until a project was complete and Regional's net profit on the project could be determined.

**59**   Given Regional's business history, it could reasonably be anticipated when the employment agreement was made that when projects were brought to it by Dumbrell, Regional would be involved in various ways and that its involvement could yield profits through a variety of methods at different stages of Regional's involvement in any given project. On the findings made by the trial judge, Dumbrell was not taking employment with a company whose sole source of profits came through various forms of fees, but was taking employment with a company whose profits could come through various kinds of involvement in different projects.

**60**    I turn from the context in which the employment agreement was made to the words used in the agreement and in particular the words used in Schedule "B". Schedule "B" begins by stating that Dumbrell's remuneration will be based on his performance. He must produce to be paid. Schedule "B" then describes his remuneration as fifty percent of "profits" for each project. "Profits" are described in paras. 1(2) and 1(3).

**61**    Paragraph 1(2) makes it clear that profits must be earned as a result of Dumbrell's direct involvement in the project. In addition, the project must be "completed and closed ... in accordance with standard operating policy of the Corporation". The reference to "standard operating policy" is of no assistance as it is common ground that there was no such thing.

**62**    Paragraph 1(2) sets out certain kinds of fees that are included in the meaning of profits, such as acquisition fees, development fees, and syndication fees. The fees described in para. 1(2) are not an exhaustive list of the kinds of payments to Regional that can constitute profits. Lastly, para. 1(2) refers to business activities which constitute projects for the purpose of the calculation of profits, including "Syndication projects".

**63**    Paragraph 1(3) sets out a formula by which profits are to be determined by deducting certain expenses from "Gross Revenues". The reference in para. 1(3) to "Gross Revenues" and the types of expenses identified in that paragraph indicates two things. First, the question of whether Regional earned any profit and, if so, the amount of that profit may well not be determined until the end of Regional's involvement in a particular project. Second, Regional's involvement in projects could take forms other than a fee for service basis. The reference to "Gross Revenues" and many of the expenses described in para. 1(3) are consistent with Regional taking equity positions in a project and realizing a profit upon a sale of that equity position.

**64**    On my reading of Schedule "B", Dumbrell was entitled to a fifty percent commission on profits if:

> *    he was directly responsible for the project in that it was secured for Regional through his efforts;
> *    Regional had earned and actually received monies on the project;
> *    the project was "completed and closed", that is Regional's involvement was completed; and
> *    using the method described in para. 1(3), Regional had earned a profit.

**65**    Nothing in the language of Schedule "B" limits Dumbrell's potential remuneration to projects that are completed and closed as of the date of termination of his employment contract. The context in which the contract was made contraindicates imposing any such limitation on profits. Reasonable people in the position of Dumbrell and Gordon would have appreciated that Regional's involvement in the kind of complex large scale commercial projects that it was anticipated Dumbrell would bring to it may well not be completed within the relatively short time span contemplated by the employment contract. Similarly, the method used for calculating Dumbrell's compensation by

reference to profit as calculated in para. 1(3) contemplates that the projects could well extend over a considerable period of time with the ultimate determination of whether any profit was made and, therefore, any remuneration owed to Dumbrell being based on events that occurred well after the relatively brief period of employment contemplated by the agreement. On my reading of Schedule "B", Dumbrell was entitled to fifty percent of Regional's profits even if the profits were made after the employment contract was terminated.

**66**    The appellants rely on the termination provision:

> 1.1 This contract shall terminate:

> 1.1.1
>
> at the end of the Term hereof.

> 1.1 Upon termination or other expiration of this contract the Employee shall forthwith return to the Corporation all papers, materials, equipment and other properties of the Corporation held for the purpose of execution of the contract. In addition, each party will assist the other party in the orderly termination of the contract and the transfer of all aspects hereof, tangible and intangible, as may be necessary for the orderly, non-disrupted business continuation of the Corporation.

> 1.1 Neither party may commence an action under this contract more than one (1) year after the expiration of its term, or, in the event of default, more than one (1) year after the occurrence of said default. [Emphasis added.]

**67**    The termination provision does not assist in defining profits for the purpose of calculating Dumbrell's compensation. The first part of the termination clause speaks to the point at which the contractual relationship ends. It does not purport to terminate obligations that existed under the contract when the contract came to an end. If, as I would hold, profits as defined in Schedule "B" include profits earned and calculated after the termination of the contract, the obligation to pay those profits, when and if they arise, is an obligation that exists under the contract as of the date of termination albeit in an inchoate form.

**68**    The last paragraph in the termination clause is also a relevant consideration. That paragraph answers one of the arguments relied on by the appellants. They submitted that a definition of profits that included profits made after the termination date of the contract would create indefinite and potentially open-ended liability by Regional to Dumbrell for profits earned on projects many years down the road. The limitation provision in the termination clause excludes any claim by Dumbrell that is not advanced within one year of the termination of the contract. This provision effectively

places limits on Regional's potential liability to Dumbrell. As it happens, the limitation clause does not assist Regional here because Dumbrell had commenced his action within the one year period.

**69**    In summary, like the trial judge, I conclude that Dumbrell was entitled to fifty percent of the profits earned by Regional on the Queen Street project. I reach that conclusion through a reading of Schedule "B" of the agreement in the context of the circumstances in which the agreement was made. I do not read the termination clause as modifying the meaning of profits in the agreement.

<div align="center">IV</div>

**Issue #2 - Was Dumbrell entitled to fifty percent of the profits earned by entities other than Regional/Gordon?**

**70**    As outlined above, through Dumbrell's efforts, and at Mr. Grosz's invitation, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property early in 2000.

**71**    At Gordon's direction, the twenty-five percent interest in the Queen Street property was held by one of his companies in trust for a syndicate of investors. Another Gordon company (LPH), his wife and his children held 73.33 percent of the syndicate. Several of Gordon's cousins and his lawyer, who practised with one of the cousins, held the other 26.67 percent of the syndicate.

**72**    The accounting breakdown on the syndicate's investment in the Queen Street property, prepared at Gordon's request, but accepted by Dumbrell at trial, showed that the syndicate advanced about $1,200,000 on the Queen Street project and received about $2,200,000 on that project resulting in a profit of just over $1,000,000. The accounting records indicate that the funds were distributed in accordance with the percentage of ownership in the syndicate. Gordon and his immediate family received about $732,000 of the $1,000,000 profit earned by the syndicate.

**73**    In oral argument, Mr. Zarnett acknowledged that if Dumbrell was entitled to compensation on the Queen Street project under the terms of the employment contract, no distinction could be drawn between profits earned directly by Regional and profits earned by other corporate entities used by Gordon to generate the profit. I would extend the same reasoning to cover profits earned by Gordon's wife and children. On this approach, Dumbrell was entitled to fifty percent of the profits earned by LPH, Gordon's wife and Gordon's children.

**74**    Counsel submits, however, that profits earned by other investors in the syndicate cannot be treated as the same as Regional's profits. The accounting records demonstrate that profits were paid out to the other investors when the syndicate sold its twenty-five percent interest in the Queen Street property to O. & Y.

**75**    In her reasons, the trial judge accepted, at para. 158, that there were "third parties investing and risking money". I take this to mean that the trial judge accepted that Gordon's cousins and his lawyer were *bona fides* investors who helped finance the twenty-five percent interest in the Queen

Street property. She went on to hold, however, that Gordon's resort to other investors could not affect the compensation owed to Dumbrell. She said, at paras. 159-60:

> In calculating damages, there is no evidentiary foundation of any kind on which to assess legitimate costs which might have been set off against this profit.

> Without a scintilla of such evidence, the court is unable to do other than order damages of $500,000, pursuant to the first part of the paragraph in the employment contract dealing with employee remuneration.

**76**    I cannot agree with this analysis. To the extent that the syndicate was owned by third parties who genuinely invested funds in the project, I do not see how profits payable to those investors can become the profits of Regional for the purposes of calculating Dumbrell's compensation. The accounting records do provide evidence that 26.67 percent of the profit realized on the sale of the twenty-five percent interest in the Queen Street project was paid to third party investors and not to Regional, Gordon, his companies, or his immediate family. The calculation of Dumbrell's compensation on the Queen Street project should not have extended to a percentage of the profits earned by third party investors. If my arithmetic is correct, Dumbrell should have received fifty percent of the profits realized by a 73.33 percent interest in the syndicate.

<div align="center">

**V**

</div>

**Issue #3 - Did the trial judge err in holding Gordon personally liable for breach of contract?**

**77**    In his statement of claim, Dumbrell alleged several causes of action against Regional and Gordon. At trial, he succeeded only on the breach of contract claim. In the statement of claim, Dumbrell alleged a breach of contract against only Regional. In her initial reasons for judgment, the trial judge found both Regional and Gordon liable for breaching the contract. She did not separately address Gordon's personal liability for breaching a contract to which he did not appear to be a party. Gordon's liability for breach of contract as distinct from Regional's liability was not addressed by counsel in closing argument.

**78**    After the trial judge released her initial reasons, and at the request of counsel for Regional and Gordon, she heard further argument on Gordon's personal liability for breach of contract. The trial judge gave additional reasons in which she confirmed her initial finding that Regional and Gordon were both liable for the breach of contract.

**79**    I have difficulty understanding the basis upon which the trial judge found Gordon liable for breach of contract. She spoke of "piercing the corporate veil" and described Regional as Gordon's agent for the purposes of the contract. However, she found both Regional and Gordon liable for breaching the contract. I agree with Mr. Zarnett's submission that if Regional acted as Gordon's agent for the purposes of the contract, only Gordon could be liable for breaching that contract. The

trial judge's finding that Regional was liable along with Gordon for breaching the contract was also inconsistent with the trial judge's conclusion, at para. 187, that she should "pierce the corporate veil" and hold Gordon liable. Either Regional had a separate legal persona for the purposes of the contract or it did not.

**80**    The concepts of piercing the corporate veil and holding that a corporation acts as an agent for the individual who controls that corporation achieve the same result in that they both impose personal liability for what appear to be corporate actions. They achieve that result, however, in different ways. The agency relationship assumes that the corporation and the controlling mind are distinct, but that on the relevant facts the former acted as agent for the latter. Piercing the corporate veil ignores the legal persona of the corporation: Bruce L. Welling, *Corporate Law in Canada: The Governing Principles*, 2d ed. (Markham, Ont.: Butterworths, 1991) at 122-36.

**81**    There is no basis in this record for describing Regional as Gordon's agent for the purpose of entering into the employment contract with Dumbrell. Dumbrell did not plead that Regional acted as Gordon's agent. The terms of the contract offer no suggestion that Regional was acting in an agency capacity. Finally, Dumbrell's evidence does not suggest that he regarded Regional as Gordon's agent for the purposes of the contract.

**82**    Nor is any case made out for ignoring Regional's separate legal persona. There can be no doubt that Dumbrell contracted with Regional and only Regional in November 1998. The employment contract clearly describes Dumbrell as Regional's employee. Dumbrell's pleadings and his evidence do not suggest otherwise. Gordon's total ownership and control of Regional and the fact that he made all decisions on behalf of Regional in respect of its dealings with Dumbrell does not detract from Regional's standing as a separate and distinct legal entity. Corporations must necessarily act at the instance and under the direction of those fixed with the responsibility and authority to direct the affairs of the corporation: see *ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.* (1995), 26 O.R. (3d) 481 at 492 (C.A.).

**83**    The separate identity of a corporation can be ignored where the corporation is inserted into a transaction for a fraudulent or dishonest purpose. Corporations used in that way often have no assets, no corporate history, and no reason for existence other than facilitating a particular transaction. None of those indicia apply to Regional. Regional cannot be described as a shell or corporation of convenience put in place by Gordon for the purpose of entering into the contract with Dumbrell. As of November 1998, Regional had been a thriving well established corporate entity for many years. It participated in many different real estate transactions and employed many people. Dumbrell chose to become one of those employees. There is no suggestion in the evidence that the creation of the employer/employee relationship between Regional and Dumbrell was tainted by fraud or dishonesty on the part of Gordon. There is simply nothing to suggest that Gordon set out to deceive or trick Dumbrell when he and Dumbrell negotiated the employment contract which created the contractual relationship between Dumbrell and Regional, and not between Dumbrell and Gordon. Dumbrell knew full well he was contracting with Regional. He could only reasonably

expect to look to Regional for compensation in the event of a breach of the terms of the contract.

**84**    The trial judge's reasons also suggest a second basis for holding Gordon liable. She referred to authorities that hold a directing mind of a company liable for inducing a breach of contract by that company: see e.g. *Said v. Butt*, [1920] 3 K.B. 497 at 504-506 (H.L.); *Truckers Garage Inc. v. Krell* (1993), 68 O.A.C. 106 at 114-15 (C.A.); *Kepic v. Tecumseh Road Builders* (1987), 23 O.A.C. 72 at 74 (C.A.).

**85**    Cases where an individual has been held liable for inducing a corporation's breach of contract have nothing to do with piercing the corporate veil or the concept of agency. These cases acknowledge the separate legal identity of the corporation and its directing mind. They hold the directing mind liable for the discrete tort of inducing the breach of contract and not for breach of contract itself. The measure of damages for inducing the breach of contract may or may not be the same as would apply to the breach of contract.

**86**    Gordon cannot be liable for inducing a breach of the contract between Regional and Dumbrell. That cause of action was not pleaded. Nor do I understand counsel at trial or on appeal to have argued that Gordon's liability could be based on the separate tort of inducing a breach of contract. An allegation of inducing a breach of contract is very different from a claim that a person is liable for breaching the contract. In the absence of any pleading which expressly or impliedly alleges the tort of inducing a breach of contract, I do not think the principles underlying that tort can be relied on to render Gordon liable for the breached contract.

**87**    The difficulties inherent in transforming an allegation of a breach of contract into a finding of inducing a breach of that contract are apparent in the trial judge's reasons. To establish the tort of inducing a breach of contract by the directing mind of the contracting party, it must be shown, among other things, that the conduct of the directing mind was not *bona fides* in the best interest of the corporation. In the addendum to her reasons, the trial judge indicates that Gordon's conduct caused Regional to lose certain fees on the Queen Street property. She states, at para. 173:

> His [Gordon's] secretive and misleading conduct eventually caused a serious loss to his company when the company became unable to make the offer which would have resulted in another $300,000.-$400,000. fee.

**88**    I cannot agree that anything Gordon did caused Regional to act to its detriment in respect of the Queen Street property. The trial judge found that as a result of Dumbrell's efforts, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property. That is the only interest that was available to Gordon in the joint venture that ultimately purchased the property. As the trial judge found, the calculation of Regional's profits and, therefore, Dumbrell's commission, did not depend on what part of the profits Regional described as fees. Had Gordon chosen to describe some of the profits generated for the syndicate from the sale of its interests as fees payable to Regional, it would not have increased the overall profit earned by the syndicate and would have had no effect on the quantification of Dumbrell's compensation. There is no evidentiary

basis to hold that Gordon's conduct in respect of the Queen Street property cost Regional anything. On my reading of Gordon's cross-examination, it was not suggested to him that his conduct had somehow deprived Regional of profits that it would otherwise have earned. A finding that Gordon acted against Regional's best interests in connection with the profit earned on the Queen Street property has no foundation in either the pleadings or the evidence.

## VI

**Conclusion**

**89**    I would allow Gordon's appeal, set aside the trial judge's finding regarding Gordon's personal liability, and dismiss the action against Gordon. I would allow Regional's appeal in part and vary the trial order to provide that Dumbrell is entitled to fifty percent of the profit from the Queen Street project earned by LPH, Gordon's wife and Gordon's two daughters.

**90**    Counsel should make written submissions (no more than ten pages each) as to costs both at the trial and on appeal.

D.H. DOHERTY J.A.
 M.J. MOLDAVER J.A.:-- I agree.
 R.J. SHARPE J.A.:-- I agree.

1 In their factum, the appellants argued that under the terms of the employment contract, Dumbrell was entitled only to fifty percent of Regional's profits and that none of the profit from the Queen Street project was earned by Regional. In oral argument, counsel accepted that the terms of the employment contract would reach profits earned by Regional or other entities controlled by Gordon.

2 In the contract, all of the paragraphs in Schedule "B" are numbered "1". For ease of reference, I have added the numbers in parentheses.

3 Lord Steyn has taken the same approach in his judgments: see *Pagnan SpA v. Tradax Ocean Transportation SA,* [1987] 1 All E.R. 81 (Q.B.), Steyn J., aff'd [1987] 3 All E.R. 565 (C.A.). See also *Toronto-Dominion Bank v. Leigh Instruments Ltd.* (1999), 178 D.L.R. (4th) 634 at 639 (Ont. C.A.); Lewison, *The Interpretation of Contracts, supra*, at 5, 22-24; *Mount Joy Farms Limited v. Kiwi South Island Co-operative Dairies Ltd.*, [2001] NZCA 372 at para. 38.

*Indexed as:*

# Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc.

**Novopharm Limited, appellant;**

v.

**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
**and**
**The Minister of National Health and Welfare, respondent.**
**And between**
**Apotex Inc., appellant;**

v.

**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
**and**
**The Minister of National Health and Welfare, respondent.**

[1998] 2 S.C.R. 129

[1998] S.C.J. No. 59

File Nos.: 25402, 25348.

Supreme Court of Canada

1998: January 21 / 1998: July 9.

**Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin,**
**Iacobucci, Major and Bastarache JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents -- Infringement -- Sublicensing -- Licensee agreeing to supply patented medicine to unlicensed third party -- Licence expressly prohibiting sublicensing -- Breach of licence terms grounds for termination of licence -- Whether supply agreement between licence holder and third party a sublicence or having legal effect of creating a sublicence.*

*Agency -- Supply agreement -- Licensed party to obtain patented bulk medicine for unlicensed party -- Whether licensed party acting as agent of unlicensed party in carrying out contractual*

*obligations.*

*Patents -- Notice of allegation (NOA) -- Proper date for assessing NOA.*

*Jurisdiction -- Declaratory relief -- Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence -- Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.*

*Patents -- Medicine -- Reformulation of patented product -- Bulk medicine reformulated into final-dosage form -- Whether reformulation of patented product amounting to infringement of patent.*

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a compulsory licence, obtained under the Patent Act (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348 (Apotex #1)), under s. 6(1) of the Patented Medicines (Notice of Compliance) Regulations (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended Patent Act, would be the first date on

which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court --Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402 (the Novopharm proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

      Held:    The appeals should be allowed.

 A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly

or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unlicensed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, ex ante, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in Apotex #1 to its decision in Novopharm.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued (see Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare, S.C.C., No. 25419 (Apotex #2)), Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the Patent Act, it was entitled to manufacture the medicine itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the

patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## Cases Cited

Distinguished: E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985); referred to: Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193; Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129; David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588; Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888; Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133, rev'd in part [1995] 2 F.C. 723; Carey v. United States, 326 F.2d 975 (1964); Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519; Lampson v. City of Quebec (1920), 54 D.L.R. 344; Joy Oil Co. v. The King, [1951] S.C.R. 624; Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497; Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605; Gillette v. Rea (1909), 1 O.W.N. 448; Betts v. Willmott (1871), L.R. 6 Ch. App. 245; Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (1993); Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (1996); Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302; National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336; Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, aff'g [1969] 1 Ex. C.R. 529; Rucker Co. v. Gavel's Vulcanizing Co. (1985), 7 C.P.R. (3d) 294.

## Statutes and Regulations Cited

Food and Drug Regulations, C.R.C., c. 870, s. C.08.004.
Patent Act, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [idem].
Patent Act Amendment Act, 1992, S.C. 1993, c. 2, s. 11(1).
Patented Medicines (Notice of Compliance) Regulations, SOR/93-133, ss. 4(1), 5, 6, 7.

**Authors Cited**

Fox, Harold G.  The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.
Fridman, G. H. L.  The Law of Contract in Canada, 3rd ed. Scarborough, Ont.: Carswell, 1994.
Melville, Leslie W.  Forms and Agreements on Intellectual Property and International Licensing, vol. 1, 3rd ed. rev.  New York:  West Group, 1997 (loose-leaf updated August 1997, release 29).


APPEAL (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402) from a judgment of the Federal Court of Appeal (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] F.C.J. No. 576 (QL), allowing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] F.C.J. No. 238 (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348) from a judgment of the Federal Court of Appeal (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] F.C.J. No. 425 (QL), dismissing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] F.C.J. No. 237 (QL), dismissing an application for judicial review. Appeal allowed.


Harry B. Radomski, Richard Naiberg and David Scrimger, for the appellant Apotex Inc.
Donald N. Plumley, Q.C., Mark Mitchell and Stephanie Chong, for the appellant Novopharm Limited.
Anthony G. Creber and David Watson, Q.C., for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.
Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto.
Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.

---

The judgment of the Court was delivered by

**1    IACOBUCCI J.**:-- A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "Novopharm" and "Apotex #1", reasons in Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193 ("Apotex #2"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the

two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

**2**    Owing to the intertwining nature of the lower court decisions in Novopharm and Apotex #1, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

      I.     Background

A. The Patents and the Compulsory Licence

**3**    Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the Patent Act, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> 39.... (4)... (a) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or

> (b)    where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of medicine. . . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

**4**    These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the Food and Drug Regulations, C.R.C., c. 870, thereby permitting Eli Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

**5**    On January 17, 1990, Novopharm applied under s. 39(4) of the Patent Act for a compulsory

licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence".

**6**    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent non-arm's length purchasers from the latter.

**7**    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence".

B.    The Supply Agreement Between Novopharm and Apotex

**8**    On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the Patent Act, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

> WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2.    In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3.    In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4.    In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5.    In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6.    The licensed party shall comply with the terms of the licence.

7.    The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8.    For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9.    The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10.    Neither party will engage in preventing or blocking the accessability [sic] of

HPB clearance of any raw material affecting present and future pharmaceutical products.

11.  This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12.  Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licence [sic] prior to December 20, 1991, then this agreement shall be terminated.

13.  Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

**9**    On February 15, 1993, most of the provisions of the Patent Act Amendment Act, 1992, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the Patented Medicines (Notice of Compliance) Regulations, SOR/93-133 (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129 (F.C.T.D.), at pp. 131-32:

> A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the Food and Drug Regulations, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the Patent Act Amendment Act, 1992, ... (the "Patent Act") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the Regulations.

> ...

> In effect, under Subsection 5(3) of the Regulations, in a "Notice of

> Allegation", the generic drug manufacturer, "the second person", signals its
> compliance with the patents embodied in a medicine. Under Section 4 of the
> Regulations, the patent owner or licensee, usually a brand name drug
> manufacturer like the applicants, submits a list of the patents that contain claims
> for the medicine itself or the use of the medicine. Under Section 3 of the
> Regulations, the Minister compiles the patent lists into a public document called
> the "Patent Register".

**10**    As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

**11**    Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(b) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

**12**    The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

**13**    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in Apotex #1, upon which I shall elaborate shortly.

**14**    On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into

which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

C. The Novopharm Proceeding

**15**    On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

**16**    Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court--Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

**17**    On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

**18**    Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk

material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the Patent Act which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

**19**    McGillis J. of the Federal Court--Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in Apotex #1, infra, held that a sublicence had in fact been conferred by virtue of the supply agreement.

     D.    The Apotex #1 Proceeding

**20**    In cross-examination on the hearing of the application for a prohibition order in Apotex #1, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

**21**    Relying on her analysis in Novopharm, McGillis J. of the Federal Court--Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

**22**    The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form would not have infringed the patents.

     II.    Relevant Statutory Provisions

**23**   Patent Act, R.S.C., 1985, c. P-4

39.11 (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

(a)   where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

(b)   where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

(2) The prohibition under subsection (1) expires in respect of a medicine

...

(c)   ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

39.14 (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

(a)   where the invention is a process, to use the invention for the preparation or production of medicine, or

(b)   where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

Patented Medicines (Notice of Compliance) Regulations, SOR/93-133

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

(a)     state that the person accepts that the notice of compliance will not issue until the patent expires; or

(b)     allege that

      (i)     the statement made by the first person pursuant to paragraph 4(2)(b) is false,

      (ii)     the patent has expired,

      (iii)     the patent is not valid, or

      (iv)     no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(b) or subsection (2) the person shall

(a)     provide a detailed statement of the legal and factual basis for the allegation; and

(b)     serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(b), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the

expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(a)    the expiration of 30 days after the coming into force of these Regulations,

(b)    the day on which the second person complies with section 5,

(c)    subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(d)    subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(e)    subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(f)    the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(e) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(a)    the patent has expired; or

(b)    the court has declared that the patent is not valid or that no claim for

the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(c), (d) and (e) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(e) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(e) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

III.    Judicial History
A.    Novopharm Ltd. v. Eli Lilly and Co.

(1)    Federal Court--Trial Division (1995), 60 C.P.R. (3d) 181

**24**    As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the Regulations is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588 (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

**25**    Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

**26**    Relying on the decision of this Court in Consolidated-Bathurst Export Ltd. v. Mutual Boiler

and Machinery Insurance Co., [1980] 1 S.C.R. 888, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

29    Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on Consolidated-Bathurst, supra. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she

dismissed the application for a prohibition order.

**30**     As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in David Bull Laboratories, supra, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

(2)     Federal Court of Appeal (1996), 67 C.P.R. (3d) 377

**31**     In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in Apotex #1, infra, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

**32**     The court held that, while the previous decision was not res judicata, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in Apotex #1 was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in Apotex #1 could therefore be applied to Novopharm. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

B.     Apotex Inc. v. Eli Lilly and Co.

(1)     Federal Court--Trial Division (1995), 60 C.P.R. (3d) 206

**33**     In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's

licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

**34**   In concluding in Novopharm, supra, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in Novopharm that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in Novopharm applied equally to the case at bar.

**35**   Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

**36**   Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329

(a)    MacGuigan J.A. (Robertson J.A. concurring)

**37**   In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

**38**   MacGuigan J.A. noted that the conclusion of McGillis J. in Novopharm as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol

evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see Consolidated-Bathurst, supra.

**39**    MacGuigan J.A. relied on the decision of the Delaware Supreme Court in E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985) ("du Pont"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on Carey v. United States, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

**40**    In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement" (p. 338). While he recognized that the subjective intention of the parties was to avoid creating a sublicence, he found that this was at odds with the objective intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

**41**    MacGuigan J.A. also found that, in accordance with his reading of Consolidated-Bathurst, supra, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the contra proferentum doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

**42**    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

(b)    Pratte J.A., dissenting

**43**    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

**44**    Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

IV.    Issues

**45**    As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

**46**    Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant

declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

V.    Analysis
A.    The Agreement Between Apotex and Novopharm

**47**    The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

(1)    The Nature of a Sublicence

**48**    Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, Forms and Agreements on Intellectual Property and International Licensing, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at sec. 3.18.

**49**    To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

**50**    Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

**51**    For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

(2)    Contractual Interpretation and the Intentions of the Parties

**52**    In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In Consolidated-Bathurst, supra, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one,

that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

**53**    From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of contra proferentem. Contra proferentem operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that contra proferentem should be applied to interpret the contract against both contracting parties. Indeed, a third party has no basis at all upon which to rely upon contra proferentem: see G. H. L. Fridman, The Law of Contract in Canada (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

**54**    The trial judge appeared to take Consolidated-Bathurst to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

**55**    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in Lampson v. City of Quebec (1920), 54 D.L.R. 344 (P.C.), at p. 350:

> . . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

**56**    When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the

goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in Joy Oil Co. v. The King, [1951] S.C.R. 624, at p. 641:

> . . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

**57**    In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the Patent Act, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

**58**    More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-3.

**59**    Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

**60**    Therefore, I am of the opinion that the trial judge erred, in the Novopharm proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in Apotex #1, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

**61**    Having established that no extrinsic evidence is admissible, what does the text of the

agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to act pursuant to the licence.

**62**    Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

**63**    It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention not to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

**64**    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... on the grounds that there is doubt as to whether or not the licence ... permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If

paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

**65**    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

**66**    In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

(3)    The Legal Effect of the Supply Agreement

**67**    Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing

so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

(i)    Sublicence Versus Purchase and Sale

**68**    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the Patent Act, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

**69**    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605, at p. 610; see also Gillette v. Rea (1909), 1 O.W.N. 448 (H.C.); Betts v. Willmott (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

**70**    But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (Fed. Cir. 1993).

**71**    Thus, practically speaking, the rights of use and alienation can only be determinative of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without

first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of a licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

**72**    In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

**73**    A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in Intel, supra, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

**74**    In the instant appeals, the Federal Court of Appeal relied on du Pont, supra, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view du Pont as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In du Pont, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

**75**    But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal personnae, and legitimate transfers of property do, in fact, take place. In Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to

the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished du Pont, supra, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

**76**    In my view, Cyrix is much more closely analogous than du Pont to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in Cyrix the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

**77**    Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in du Pont. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, inter alia, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

**78**    Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and de facto transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would necessarily render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights

transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

**79**    As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

(4)    The Agency Argument

**80**    In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

**81**    To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

(5)    Conclusion as to the Nature of the Supply Agreement

**82**    The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional

commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

**83**    That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in du Pont, supra. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the Patent Act or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

**84**    Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

      B.     Other Issues in the Novopharm Appeal

             (1)     Did the Federal Court of Appeal Err in Applying its Decision in Apotex #1 to its Decision in Novopharm?

**85**    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the Novopharm appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in Apotex #1 may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in Apotex #1 if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before

the court in Novopharm and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

**86**    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as res judicata or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

(2)    Was Novopharm's Notice of Allegation Premature and Therefore not Justified?

**87**    Even the unequivocal conclusion as to the character of the supply agreement does not put the Novopharm matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

**88**    Pursuant to s. 39.11(2)(c) of the Patent Act, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the Patent Act Amendment Act, 1992, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

**89**    A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

**90**    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on

cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the Patent Act. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

**91**    Pursuant to s. 39.14 of the Patent Act, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

**92**    In Apotex #2, supra, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the Patent Act by obtaining the medicine either from a Canadian supplier or not at all.

(3)    Jurisdiction to Grant Declaratory Relief

**93**    The final issue to be determined with respect to the Novopharm appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

**94**    In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

**95**    As for the third request, I am of the view that it would be inappropriate for this Court to grant

the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302 (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(b) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

**96**    This point was reinforced more recently by Strayer J.A. in David Bull Laboratories, supra, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

**97**    While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the Novopharm appeal. The

nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

      C.     Other Issues in the Apotex #1 Appeal

               (1)     Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

**98**    Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

**99**    In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

> If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

>     The same principles obviously apply when a patented article is sold by a

> licensee who, under his licence, is authorized to sell without restrictions. It
> follows that, if Apotex were to purchase bulk Nizatidine manufactured or
> imported by Novopharm under its licence, Apotex could, without infringing
> Lilly's patents, make capsules from that substance or use it in any other possible
> way. [Emphasis added.]

**100**    Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, supra, at p. 610. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336 (P.C.).

**101**    Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

**102**    No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in Merck & Co. v. Apotex Inc., supra, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage

form of enalapril maleate sold by Apotex was not protected by s. 56 of the Patent Act, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

**103**    However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723. At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: any form of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at [1969] 1 Ex. C.R. 529):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis added.]

**104**    Accordingly, MacGuigan J.A. concluded, at p. 741, that:

> The use and sale of the product of a machine, particularly if production is the only possible use of the machine, is accorded protection under section 56 as a use of the machine itself. . . . In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

**105**    The Merck & Co. v. Apotex Inc. decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the

medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

106    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

108    I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, Rucker Co. v. Gavel's Vulcanizing Ltd. (1985), 7 C.P.R. (3d) 294 (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

109    In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

    VI.    Disposition

A.      Novopharm Ltd. v. Eli Lilly and Co.

**110**     For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court--Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

B.      Apotex Inc. v. Eli Lilly and Co.

**111**     Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

*Indexed as:*
# Flello v. Baird

**Between**
**William David Flello and Charene Fay Flello, petitioners**
**(respondents), and**
**William Gary Baird and Patricia Blaine Baird, respondents**
**(appellants)**

[1999] B.C.J. No. 880

1999 BCCA 244

172 D.L.R. (4th) 741

122 B.C.A.C. 96

67 B.C.L.R. (3d) 293

87 A.C.W.S. (3d) 1039

Vancouver Registry No. CA024227

British Columbia Court of Appeal
Vancouver, British Columbia

**Esson, Cumming and Hall JJ.A.**

Heard: March 9, 1999.
Judgment: filed April 20, 1999.

(30 pp.)

*Real property -- Title, boundaries -- Determination of -- By act or agreement of parties*
*(conventional lines) -- Estoppel -- Estoppel in pais (by conduct) -- Representation, by conduct --*
*Holding out title or boundary to property.*


Appeal by the Bairds from a Chambers judge's decision that they were estopped from asserting a
new boundary between their property and the Flellos' property. The Flellos applied for an order to

resolve a boundary dispute they had with the Bairds. The properties were part of a registered subdivision plan. The plan was inaccurate, as there were discrepancies between what was actually posted and field surveyed and the boundaries described in the plan. Surveyors had been unable to agree on the proper placement of boundaries in the subdivision. The Bairds and the Flellos were unaware of the boundary disputes when they purchased their respective properties. The Bairds hired Maddox to determine the proper boundaries of their property. Maddox determined that the proper boundaries would extend the Baird and Flello properties 66 feet to the north, onto property owned by the Fishers. When the Flellos decided to build a house on their property, the Bairds requested that the house be built as close as possible to the boundary defined in the Maddox survey. The Flellos complied. At some point thereafter, the Bairds purchased the Fishers' property and then reversed their position with respect to the correctness of the Maddox survey. They claimed that the boundary line in the subdivision plan was correct. The Bairds demanded $130,000 compensation from the Flellos for building on the disputed portion of land. The Chambers judge found that the parties had conducted themselves in accordance with their agreement that the Maddox line was to be the boundary between the properties. The Chambers judge concluded that the Bairds were estopped from denying that the Maddox line was the correct boundary, and he ordered that the boundary be as described in the Maddox survey. The Bairds argued that estoppel could not be used to establish a conventional boundary that would have altered the registered boundaries.

HELD: Appeal dismissed. The Chambers judge was correct in finding an estoppel and applying the principle of conventional boundary. The evidence demonstrated that the boundaries of the lots had been described incorrectly. The Maddox survey showed that at least a portion of the Flello's lot was improperly included in the Baird's lot in the erroneous plan. Given the lack of evidence as to the original postings on the land, it was unclear whether the extent of the deprivation was as described in the Maddox survey. Since the subdivision plan was in error and the location of the true boundaries was uncertain, the court was not precluded from resorting to estoppel in order to make a finding of conventional boundary. The words and conduct of the Bairds prior to the Flellos' construction of the house raised an equity in favour of the Flellos.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rule 10(1)(g)(i).

Land Title Act, R.S.B.C. 1996, c. 250, ss. 23, 25, 25(2).

Property Law Act, R.S.B.C. 1996, c. 377, s. 36.

**Counsel:**

P.S. Rosenberg, for the appellants.
D.M. Frechette, for the respondents.

Reasons for judgment were delivered by Cumming J.A., concurred in by Hall J.A. Separate concurring reasons were delivered by Esson J.A. (para. 34).

**CUMMING J.A.**:--

FACTS:

**1**    This is an appeal from the decision of Mr. Justice Taylor [1998] B.C.J. No.3197, pronounced in chambers on 16 Janaury 1998. The Flellos sought an order resolving a disputed boundary between the property, lot 30, and the adjacent property, lot 29, owned by the Bairds.

**2**    The properties in issue were part of Subdivision Plan 521, which was registered in the Kamloops Land Title Office in the early part of this century. Unfortunately, Plan 521 appears to be inaccurate in that there are discrepancies between what was actually posted and field surveyed in 1908 and the boundaries described in the Plan. Over the years, there were additional attempts to survey the lands. However, these were not successful in reconciling the original postings and Plan 521. The result has been ongoing controversy as to the correct placement of the boundaries between the various lots in the subdivision. Surveyors have been unable to agree on the proper placement of the boundaries in the subdivision.

**3**    The Bairds, who purchased their property in 1979, and the Flellos, who purchased their property in 1991, were aware of the boundary disputes at the time they purchased their respective properties. In 1980 the appellants hired Mr. Maddox, a land surveyor, to determine the proper boundaries of lot 29. The lots in the subdivision are rectangular, running length-wise east to west. Mr. Maddox's solution was to shift the north-west corner of lots 29 and 30 approximately 66 feet north. This plan was presented to the Registrar of the Land Title Office for registration. The Surveyor General responded by suggesting a Special Survey be completed. However, the Attorney General refused to fund a Special Survey, primarily because of the costs involved.

**4**    The Bairds petitioned the Ombudsman to review the matter. This resulted in a report by the surveyor firm of Thompson, Isaac, and Osmond (the 'Thompson Report'), which recommended that all the owners who may be affected by the boundary problems meet to attempt to resolve the dispute amongst themselves. By late 1991, reference plans had been filed to resolve the boundaries of the lots to the north and south of lots 28, 29 and 30. The effect was to reduce the disputed boundaries to the boundary between lot 28 and 29 and the boundary between lot 29 and 30.

**5**    When the Flellos purchased their property in 1991, they were made aware of the boundary disputes and that the Bairds considered the survey prepared by Mr. Maddox to be the correct demarcation of the boundaries between their respective properties. As mentioned earlier, the Maddox survey would shift both the north-west corners of lots 29 and 30 by 66 feet to the North.

The Bairds were involved in a dispute with the owners of lot 28, which bordered their property on the north. If the Maddox plan were to be followed, and the northwest corner of lot 29 was shifted 66 feet to the north, then lot 28 would lose 66 feet of frontage. No surprisingly, the owners of lot 28 did not find this acceptable.

6    In 1992 the Flellos decided to build a house on their property, lot 30. Mr. Flello deposed that:

> The respondents requested we build our house as close as possible to the boundary defined by the Maddox survey. The respondent made this request in order to reinforce their interpretation of the correct property boundaries against the owner of lot 28.

7    The learned chambers judge accepted Mr. Flello's version of events and concluded that:

> No doubt on the basis that the plaintiff's siting of their home would assist them in the dispute with the Fishers [the owner's of lot 28], the respondents raised no complaint when the plaintiffs excavated and constructed their home. Their only concern was whether or not the excavation of the building site would in any way undermine the bank. It did not.

8    The Flellos built their home approximately fifteen feet from the edge of the boundary proposed by the Maddox survey (the 'Maddox Line'). The Maddox Line coincides with an embankment that drops about fifteen feet from the higher level of lot 29 to the lower level of lot 30. By building in that location, the Flellos' house straddled the boundary as defined in the original Plan 521. The area between the boundary as it is defined in Plan 521 and as it is defined in the Maddox survey consists of a triangular portion of land, approximately 0.82 acres in size. It is this triangular portion of land that is the subject matter of the present dispute.

9    The learned chambers judge found, on the basis of conversations held between the parties, that the Flellos sited their house on the basis that the Maddox Line was correct. The chambers judge also accepted that Mr. Baird placed little value on the triangular portion of land and that he told the Flellos that if the Maddox Line was incorrect, the Bairds would "simply lose that land." Mr. Baird, in addition to being an employee of the federal government, is a self-described real estate developer with a good knowledge of the issues involved in surveying land. The Flellos are relatively unsophisticated in their knowledge of land dealings.

10    The learned chambers judge further found that up until 1997 the Bairds maintained that the boundaries set out in the Maddox survey were correct. Support for this conclusion is found in letters sent by the Bairds to the owners of lot 28 attempting to settle the disputed boundary between lots 28 and 29 and in the fact that the Bairds erected a fence and hedge along the Maddox Line between lots 29 and 30.

11    In early 1997 the dispute over the boundary between lots 28 and 29 was resolved by the

Bairds purchasing lot 28. This left only the boundary between lots 29 and 30 to be settled. At this point, the Bairds appear to have reversed their position with respect to the correctness of the Maddox Line and asserted that the boundary set out in Plan 521 is the correct one. The chambers judge noted, at paragraph 34:

> It now became, I find, in [the Bairds'] best interest to assert that Maddox was not correct and thus increase the frontage of lot 29 by some sixty-six feet at the petitioner's expense. In short, the respondents repudiated what they heretofore approbated.

**12**    The Bairds demanded $130,000 compensation from the Flellos for the disputed triangular parcel. The Bairds also rejected granting an easement to the Flellos as a measure of compromise. In the chambers application, the Flellos sought three forms of relief: that Baird be estopped from denying the agreement as to the Maddox Line; that if the Maddox Line is wrong that the triangular portion of land be vested in the Flellos; and in the alternative, that the Flellos be granted an easement over the disputed land.

The Chambers Judgment

**13**    The learned chambers judge declined to resolve the dispute by granting a vesting order pursuant to section 36 of the Property Law Act, R.S.B.C. 1996, c.377. Such an order requires survey evidence to determine the correctness of the disputed boundary. Such evidence is lacking in the case at bar.

**14**    However, the chambers judge was satisfied that there was an agreement between the parties that the Maddox Line was to be the boundary between their properties and that the parties conducted themselves as such. Furthermore, he was satisfied that the Bairds, by words and conduct, represented to the Flellos that the Maddox Line was the correct boundary, encouraged the Flellos to build near the Maddox Line to support their dispute with the owners of lot 28, and acquiesced in the excavation for and the construction of the Flellos' house on the site selected. On the basis of the agreement and the words and conduct of the Bairds, the court below concluded that the Bairds are estopped from denying that the Maddox Line is the correct boundary between lots 29 and 30. The chambers judge resolved the dispute by ordering that the boundary between lots 29 and 30 be as described in the Maddox survey.

Estoppel

**15**    The appellants submit that the chambers judge erred in finding an estoppel on the facts of this case. The law with respect to proprietary estoppel has been discussed by Denning L.J. in Crabb v. Arun District Counsel, [1976] 1 Ch. 179, [1975] 3 All E.R. 865. The decision in Crabb was cited with approval by this court in Hastings Minor Hockey Association et al. v. Pacific National Exhibition (1981), 129 D.L.R. (3d) 721 (B.C.C.A.) at 726-727 where Anderson J.A. said:

It was held [in Crabb] that the conduct of the council, in acting as it did, 'raised an equity' or an 'expectation' creating a right by way of estoppel upon which the plaintiff could rely.

In his judgment, Lord Denning M.R. set out the law as to how 'an equity may be raised' ('an expectation') so as to form the basis of a claim founded on proprietary estoppel. His judgment reads at p. 871 as follows:

> The basis of this proprietary estoppel 'as indeed of promissory estoppel' is the interposition of equity. Equity comes in, true to form, to mitigate the rigours of strict law. The early cases did not speak of it as 'estoppel'. They spoke of it as 'raising an equity'. . . . <u>Short of a binding contract, if [a person] makes a promise that he will not insist on his strict legal rights ' even though that promise may be unenforceable in point of law for want of consideration or want of writing ' and if he makes the promise knowing or intending that the other will act on it, and he does act on it, then again a court of equity will not allow him to go back on that promise</u>: see Central London Property Trust v. High Trees House, [1956] 1 All E.R. 256, [1947] K.B. 130, Charles Rickards v. Oppenheim [1950] 1 All E.R. 420 at p.423, [1950] 1 K.B. 616 at p. 623. <u>Short of an actual promise, if he, by his words or conduct, so behaves as to lead another to believe that he will not insist on his strict legal rights 'knowing or intending that the other will act on that belief' and he does so act, that again will raise an equity in favour of the other, and it is for a court of equity to say in what way the equity may be satisfied. The cases show that this equity does not depend on agreement but on words or conduct.</u> In Ramsden v. Dyson (1866), L.R. 1 H.L. 129 at p. 170, Lord Kingsdown spoke of a verbal agreement "or what amounts to the same thing, an expectation, created or encouraged". In Birmingham Land Co. v. London and North Western Railway (1888), 40 Ch. D. 268 at p. 277, [1886-90] All E.R. Rep. 620 at p. 622, Cotton LJ said that "... what passed did not make a new agreement but what took place ... raised an equity against him". And it was the Privy Council who said that "the Court must look at the circumstances in each case to decide in what way the equity can be satisfied", giving instances: see Plimmer v. Mayor v. Wellington (1884), 9 App. Cas. 699 at pp. 713, 714 [1881-5] All E.R. Rep. 1320 at pp. 1325, 1326.

(My emphasis)

**16**    The rule that proprietary estoppel can found a cause of action was confirmed in Zelmer v. Victor Projects Ltd. (1997), 34 B.C.L.R. (3d) 125 (C.A.). Hinds J.A. made the following comments at p. 137:

> Based on the foregoing analysis I conclude that, in appropriate circumstances, a cause of action can be based on the doctrine of proprietary estoppel.
>
> The "appropriate circumstances" may arise as stated by Megaw L.J. in Western Fish Products Ltd. v. Penwith (District Council), [[1981] 2 All E.R. 204] at 217 where he interpreted the judgment of Lord Denning in Crabb in the following manner:
>
>> . . . when A to the knowledge of B acts to his detriment in relation to his own land in the expectation, encouraged by B, of acquiring a right over B's land, such expectation arising from what B has said or done, the court will order B to grant A that right on such terms as may be just.

**17**    In the case at bar, there was ample evidence from which the chambers judge could conclude, as he did, that the Bairds, by words and conduct, led the Flello's to believe that they would not dispute the Maddox Line as being the correct boundary between their respective properties. An example of such conduct is the Bairds' construction of a fence and shrubs along the Maddox Line. Their words to both the Flellos and the owners of lot 28 also indicated that they considered the Maddox Line to be correct. They encouraged, or at the very least, acquiesced in the excavation and construction of the Flellos' house, which was sited on the basis that the Maddox line was correct.

**18**    On the basis of the conversations held between the parties, the chambers judge concluded that the Flellos sited their house in the belief that the Bairds would not dispute the Maddox Line as the correct boundary. Given the aforementioned words and conduct by the Bairds, this was a reasonable belief. The Flellos, having relied upon the words and actions of the Bairds in siting their house, would suffer significant detriment if the Bairds are allowed to resile from the correctness of the Maddox Line. The circumstances have raised an equity in favour of the Flellos, and this is an appropriate case for the use of estoppel to enforce that equity.

**19**    A similar circumstance and result can be found in Grasset v. Carter (1883), 10 S.C.R. 105 where the court invoked the concept of a conventional boundary to enforce the equity that arose in favour of a party who built to a boundary previously agreed upon with his neighbour. Ritchie C.J. commented as follows, at page 110:

> . . . where there may be a doubt as to the exact true dividing line of two lots, and the parties meet together and then and there determine and agree on a line as

> being the dividing line of the two lots, and, upon the strength of that agreement
> and determination, and fixing of a conventional boundary, one of the parties
> builds to that line, the other party is estopped from denying that that is the true
> dividing line between the two properties.

**20**    On the basis of the above authorities I am of the opinion that the learned chambers judge did
not err in finding an estoppel on the facts of this case.

**21**    The appellants further submit, as I understand it, that regardless of any equity raised in this
case, estoppel cannot be used to establish a conventional boundary that would alter the boundaries
as registered under a Torrens system of indefeasible title. Specifically, Plan 521 is registered under
the Land Title Act, R.S.B.C. 1996, c.250, and the appellants submit that in light of the
indefeasibility of title described in section 23 of that Act, the Court is restricted to remedies codified
under Section 36 of the Property Law Act.

**22**    In support of this submission, the appellants rely on Hawkes Estate v. Silver Campsites Ltd.
(1991), 55 B.C.L.R. (2d) 145 (C.A.). In that case, the appellants owned a parcel of land, the
northern boundary of which was defined by the southern boundary of the Cowichan River, as
referenced on a map dating to 1894. Over the years the course of the river changed, moving further
to the north, and the property changed hands several times. In the years after the appellant
purchased the property in 1961 it built trailer pads up to the current southern boundary of the river.
The plaintiff, the executor of the owner of the land to the north, sought a declaration that the true
property line was the location of the southern boundary of the river as it was shown in the 1894 map
and that the placement of the trailer pads by the appellant constituted a trespass. This declaration
was granted at trial.

**23**    The appeal was dismissed by this court on the basis that the river's 1894 boundaries can be
determined by modern survey techniques and the court was unable to find sufficient evidence to
support the appellant's claim that there was an erroneous conveyance earlier in the chain of title. Of
relevance to the case at bar, the court also rejected the appellant's invocation of estoppel to establish
a conventional boundary. The appellant claimed that the owner of the northern parcel of land agreed
the boundary would be defined by where the river is currently located. Gibbs J.A., with Hollinrake
J.A. concurring, made the following comments at page 156:

> The third ground of the Silver Campsites challenge is based upon the concept of
> 'conventional boundary.' Two case authorities were relied upon: Grasett v. Carter
> (1883), 10 S.C.R. 105; and Kaneen v. Mellish (1922), 70 D.L.R. 327
> (P.E.I.C.A.). The decision of each of these cases turned upon estoppel by conduct
> accompanied by many years of adverse possession. This is the statement of the
> principle by Strong J. at p. 127 of Grasett v. Carter:

> > I take the law to be well settled, that if adjoining land owners agree to a

> dividing line between their respective properties, and one of them knowing that the other supposes the line so established to be the true line, stands by and allows him on the faith of such supposition to expend money in building upon the premises according to the line assented to, he is estopped from showing that he was mistaken, and from denying that he is bound by the line which he has thus induced the other party to rely upon.

> Neither Grasett nor Kaneen has any application to the circumstances here. Neither was a Torrens system case. Under the statutory landholding scheme in effect in this province, as set out in the Land Title Act, the court has no power to override the indefeasibility of a title by invoking estoppel to enforce a finding of conventional boundary and thereby to alter or amend the land description. As the Act stipulates, the title is "conclusive evidence . . . that the person named . . . is indefeasibly entitled . . . to the land described." It may be open to a trial judge to take the conventional boundary concept into account when requested to order an easement or make a vesting order under s. 32 [now s. 36] of the Property Law Act, R.S.B.C. 1979, c.340, . . . but even if that is so, the evidence led by Silver Campsites does not support the allegation of an agreement on a conventional boundary.

**24**    Locke J.A. wrote a concurring judgment in which he qualified the above statement as to the applicability of estoppel to establish a conventional boundary under a Torrens system:

> I do not say that under no circumstance could an agreement between the parties ever displace surveyed lines. But to do this, clear and cogent evidence is needed, and the evidence in this case as to conversations at time of sale or as to a subsequently fixed conventional boundary is simply too shadowy and not strong enough to carry the proposition sought to be founded on it.

**25**    If the broad statement of Gibbs J.A., that 'the court has no power to override the indefeasibility of a title by invoking estoppel to enforce a finding of conventional boundary and thereby to alter or amend the land description', were to be applied mechanically to the facts of the current case without a consideration of the differences in the factual circumstances between the two cases, the appeal would succeed. However, it is well established that when interpreting judicial pronouncements, the Court must consider those pronouncements in light of the particular factual matrix from which they arose.

**26**    It is important to note that in Hawkes Estate, the survey stakes were still identifiable and the 1894 survey had been reconstructed so that it was possible to identify the 1894 location of the south boundary of the river. Locke J.A. noted at page 165 that: "The modified Torrens system of British Columbia is based ultimately upon a survey and in the last resort every parcel of land must be

capable of identification on the ground in some way." In Hawkes Estate, such an identification was possible.

27    In the present case, as indicated in the Thompson Report, Plan 521 was not an accurate representation of how the land was originally surveyed and posted. Unfortunately only limited evidence remains of the original field survey. This is no doubt why attempts to resolve the boundaries with subsequent surveys resulted in a lack of agreement among the surveyors as to the correct boundaries. The inability of surveyors to agree on the correct boundaries of the property is a critical distinction between the facts here and those in Hawkes Estate. This distinction has been identified in Bea et al. v. Robinson et al. (1977), 81 D.L.R. (3d) 423 (Ont H.C.J.) at page 429:

> In Grasset v. Carter, one of the prerequisites for finding a conventional line was
> that there be uncertainty as to the dividing line of the two lots and that the
> uncertainty be resolved by the agreement of the parties. In that case it was
> impossible to determine the true boundary of the properties because of errors
> made in the original and subsequent surveys and because the land had been
> physically altered. In my view, when the parties do not know the location of the
> line because they have made no inquiries or other attempts to discover it, that is
> not an uncertain boundary that can be varied by agreement. In the case at bar
> although there had been some problems with the surveys, it is clear that it was
> possible to determine the true boundaries, and from this fact I conclude that the
> boundaries of the adjoining lots were not uncertain, they were merely unknown; I
> doubt, therefore, that the facts support a finding of a conventional line that could
> be enforced as against the true boundary.

28    I find, on the basis of the Thompson Report's conclusion that Plan 521 contained errors and that there remained but limited evidence of what was originally field surveyed and posted on the land and on the basis of the history of discord among the surveyors attempting to resolve the boundary disputes arising under Plan 521, that the true boundary between lot 29 and lot 30 was uncertain. This is not a case where the parties have made no attempts to ascertain the correct boundaries. In fact there have been many attempts over the years to discover the correct boundaries in the subdivision, with little success. Since Plan 521 is in error and the location of the true boundaries is uncertain, the Court is not precluded from resorting to the use of estoppel to enforce the equities raised in this case or from make a finding of conventional boundary.

29    I do not take the comments of Gibbs J.A. in Hawkes Estate as categorically eliminating the use of estoppel to enforce a conventional boundary in all fact situations. I interpret the scope of his comments relating to estoppel as applying to those situations, as in Hawkes Estate and Bea, where the boundaries are readily determinable by modern survey techniques. This interpretation is strengthened by the comments of Locke J.A. in his concurring reasons in Hawkes Estate, at page 167:

> The third argument concerns the enforcement of a conventional boundary
> established by agreement or by an estoppel. That this is possible in a case
> supported by cogent evidence, I have no doubt at all. But again, in the case at bar
> the evidence is not there to support it.

**30**    This interpretation is further strengthened by section 25 of the Land Title Act which provide circumstances under which an action for recovery of land can be commenced despite registration of indefeasible title. Of relevance to the current case, section 25(2) provides:

> An action of ejectment or other action for the recovery
> of land for which an indefeasible title has been
> registered must not be commenced or maintained against
> the registered owner named in the indefeasible title,
> except in the case of
> (d) a person deprived of land improperly included in an
> indefeasible title of other land by wrong description of
> boundaries or parcels.

**31**    I am satisfied on the evidence that the boundaries of the lots in issue have been described wrongly. I am also satisfied on the basis of the Maddox survey that at least a portion of lot 30 was improperly included in lot 29 in the erroneous Plan 521. Whether the extent of the deprivation is as described in the Maddox survey is uncertain, given the lack of evidence remaining as to the original postings on the land. However, as discussed above, I take that uncertainty to be resolved by the equities raised by the words and conduct of the Bairds and the reliance placed thereon by the Flellos in constructing their house. Surveys form the foundation of the Torrens system by enabling boundaries to be identified. In the present case the survey upon which the land was brought under the Torrens system is in error, all the parties with an interest in the property are on notice of that error and further surveys have proved inconclusive as to how the land was originally posted. I see no bar to applying estoppel here when the words and conduct of the Bairds prior to the construction of a house by the Flellos on the property have raised an equity in favour of the Flellos.

**32**    Given my conclusion that the chambers judge was correct in finding an estoppel and applying the principle of conventional boundary in this case, it is not necessary to address the appellant's submissions that the chambers judge erred by failing to have the matter referred to the trial list for resolution pursuant to section 36 of the Property Law Act or that he erred in finding that an agreement existed between the parties.

**33**    I would dismiss the appeal.

CUMMING J.A.
 HALL J.A.:-- I agree.

      The following is the judgment of:

**34**    ESSON J.A.:-- I have read the reasons for judgment prepared by Mr. Justice Cumming. I agree with him that the appeal should be dismissed and agree in general with his reasons but wish to add some observations of my own. I will generally refer to the parties as the "Flellos" and the "Bairds".

**35**    The material provisions of the order appealed from are these:

>             THIS COURT ORDERS that the title to certain property shall vest in the Petitioners, said property to be that which is shown and marked "EASEMENT" on the Plan of Easement in Lot 29 Plan 521 prepared by Douglas A. Goddard dated August 23, 1996 (the "Property");

>             THIS COURT FURTHER ORDERS that the Property shall become a part of Lot 30, Sections 8 and 9, Township 20, Osoyoos Division Yale District, Plan 521 ("Lot 30");

>             THIS COURT FURTHER ORDERS that the Petitioners may present this Order to the Registrar of the Land Title Office in Kamloops, British Columbia to effect registration of title to the Property in the joint names of the Petitioners, and to effect registration of the Property as part of Lot 30;

>             THIS COURT FURTHER ORDERS that the Petitioners shall bear the cost of effecting the above registration;

>             THIS COURT FURTHER ORDERS that the Parties may apply for such further orders as may be necessary to effect the above registration of the Property in the Kamloops Land Title Office;

**36**    A copy of the plan of easement incorporated by reference in the first paragraph of that order is appended to these reasons as Schedule "A" [Ed. note: Schedule "A" is unavailable in electronic form]. Appended as "Schedule B" [Ed. note: Schedule "B" is unavailable in electronic form] is a copy of a sketch-plan prepared at a later date by Mr. Goddard's firm which shows the location of the house constructed by Mr. and Mrs. Flello after they purchased lot 30. The contention of the appellants is that the solid line running through the house is the proper boundary between lots 29 and 30. The effect of the order is to establish the dotted line ("south boundary lot 29 according to Maddox Survey") as the legal boundary.

**37**    The history of the matter is set out in detail in the reasons of Cumming J.A. I would summarize the material fact as follows:

1.   The uncertainty as to the boundary was a matter of general knowledge in the area before the Bairds acquired lot 29 in 1979.

2.   The uncertainty as to that boundary was part of a larger issue affecting a substantial number of lots situate to the north of lot 29. In particular, it affected the boundary between the Bairds' property (lot 29) and lot 28 which was then owned by Mr. and Mrs. Fisher.

3.   The uncertainty in the whole subdivision led the Director of Land Titles to commission an "Adjudication Report" which was issued in February 1983 (the Thomson Report). That report analyzed the situation of each property and recommended a special survey but, because of the expense, nothing came of that.

4.   When the Flellos purchased lot 30 in 1991 they were aware that there was an active dispute between the Bairds and the Fishers. The Bairds took the position that the correct boundary was that established by the Maddox survey and, to be consistent, therefore also took the position that the correct boundary between lots 29 and 30 was that established by Maddox survey.

5.   The Bairds actively encouraged the Flellos to build their house on the pie-shaped area between the Maddox and Gehue lines as shown in Schedule "B", i.e., to act on the assumption that the Maddox survey correctly defined the boundary. The house was built in 1992. At that time, the Bairds' purpose in encouraging the Flellos to build as close as possible to the Maddox boundary was to reinforce their position that the Maddox line was the boundary between lots 28 and 29.

6.   As late as 1995, Mr. Baird wrote to the Fishers to say that he proposed "... to honour the established lot line between B. Flello and myself...". The dispute with respect to the line between lots 29 and 28 was resolved when the Bairds purchased lot 28 and then, for the first time, took the position that the line between lots 29 and 30 was that shown on the Gehue survey. They offered to sell to the Flellos the portion of land occupied by the house for $133,000.00 and said that, if the offer was refused, they would petition the court for an order requiring the house to be removed from lot 29.

**38**    Faced with that threat to their title, the Flellos launched these proceedings in August, 1997 in which they applied by petition for this relief:

(1)   a declaration that the true legal boundary between the Petitioners' property and the Respondents' property is that boundary defined by the William Maddox survey of 1980;

or, in the alternative,

(2)     an order vesting title to the portion of the Respondents' land that is encroached on
         by the Petitioners' house, driveway, and other fixtures in the Petitioners, without
         compensation to the Respondents, pursuant to section 36 of the Property Law
         Act, R.S.B.C. 1996, c.377;

(3)     an order that the Petitioners and their successors in title have in perpetuity, and
         without compensation to the Respondents, an easement on the portion of the
         Respondents' land that is encroached on by the Petitioners' house, driveway, and
         other fixtures, pursuant to section 36 of the Property Law Act, R.S.B.C. 1996,
         c.377;

**39**     The facts relied on by the petitioners were set out in concisely in eight paragraphs. The ninth
paragraph of the statement of facts reads:

> The Petitioners plead that the Parties had established a conventional
> boundary line through their representations and conduct and that, in these
> circumstances, the Respondents are estopped from disputing that the Maddox
> Survey represents the true property boundary line.

**40**     The chambers judge found s. 36 not to be applicable because of the absence of a survey
defining the boundary. However, he granted the declaration sought by the petitioners by the
application of the doctrine of proprietory estoppel. That decision was based primarily on the
decision of the Supreme Court of Canada in Grasett v. Carter (1883), 10 S.C.R. 105.

**41**     The grounds of appeal as stated in the appellants' factum are that the learned trial judge:

-     erred in failing to either dismiss the Petition or have the matter referred to
       the trial list.
-     erred in finding that the Respondents were estopped from disputing the
       boundary claimed by the Petitioners.
-     erred in finding that an agreement existed between the parties.

**42**     The first ground, as argued before us, was essentially that s. 36 is exhaustive of the
jurisdiction of a court in this Province to resolve disputes with respect to encroachments and that the
only course open to the trial judge, upon finding that he could make no determination on the
evidence before him of the location of the boundary, was to dismiss the petition or order that it be
converted into an action with pleadings which should proceed to a trial where survey evidence
could be adduced. There is also a suggestion that the appellants were taken off guard by the petition,
which they viewed as primarily directed at pressing the claim under s. 36, becoming "converted" to
an action based upon estoppel.

**43**     It is clear that the estoppel issue was raised by the petition. The first claim for relief was for a

declaration that the true boundary is that set out in the Maddox survey. The petition, as a matter of pleading, is somewhat irregular in that the basis for claiming that declaration is found in para. 9, quoted supra, of "the facts upon which the petition is based". However, that paragraph is clear in alleging an estoppel based on a "conventional boundary line". The petition therefore gave reasonable notice of that aspect of the claim. It was appropriate to raise that claim by way of petition. Rule 10(1)(g)(i) provides that an application may be made by originating application where:

> (g)    the relief sought relates to land and is for

>> (i)    a declaration of a beneficial interest in or a charge on land and of the character and extent of the interest or charge

I see no substance in the first ground of appeal. Although the Flellos raised estoppel in their petition, this is not truly a case of using that doctrine as a sword rather than a shield. Once the Bairds took the position that the Flellos were trespassing and threatened action to enforce that position, it was incumbent on the Flellos to take steps to regularize the position of the boundary. They were vulnerable, not only to a possible action by the Bairds, but to the possibility of the Bairds disposing of their property to an innocent purchaser for value. Realistically, the Bairds' reversal of position was the sword, the plea of estoppel was the shield.

**44**    A somewhat related procedural point taken in the appellants' factum is that there was a want of parties because the owners of the other lots in the subdivision were not brought before the court. That may be a sound position in many cases involving the internal boundaries of subdivisions but in this case the only issue related to the boundary between lots 29 and 30. No party was interested in that issue other than the petitioners and respondents.

**45**    Mr. Justice Cumming has dealt in detail with the submissions and authorities relating to the issue of proprietory estoppel. I will add that the primary thrust of the appellants' submissions was that the principle of a "conventional boundary" can have no application to a Torrens system of indefeasible title. Mr. Rosenberg for the appellants submits that Grasett v. Carter, supra, has no application because that case arose in Ontario in the context of a metes and bounds system.

**46**    The authority most relied on as supporting that submission is Bea v. Robinson (1977), 81 D.L.R. (3d) 423, a decision of Boland J. of the Ontario High Court of Justice. The ratio of the decision, which is fully and carefully considered, is I think in these paragraphs.

> For these reasons I conclude that the principle of a conventional line is a just and equitable doctrine with much appeal, but one that has application only where there is no other means of establishing the boundaries of adjoining properties. Put another way, an agreement for a conventional line is only enforceable by the mechanism of an estoppel where it would not have the effect

of changing the boundaries of the two properties. That would not be in any case where the true boundaries could be determined by reference to the descriptions in the deeds of the two properties.

It is unfortunate, in my view, that this finding produces the result that a person can by representation as to a boundary, induce another to act to his detriment by building up to a false boundary, and then be allowed to deny his representation and rely on the true boundary to eject the person. This is exactly the injustice the principle of estoppel was meant to prevent, but to follow the cases referred to above, in which the Ontario statutes were not considered, and hold otherwise, would bring chaos to our system of regulating ownership of real property. As I indicated earlier, perhaps in the proper case the victim of such a false or mistaken representation might have a remedy in equitable relief from mistake of fact.

**47**    The other authority primarily relied on by the appellants is the passage in the reasons of Gibbs J.A. for the majority in Hawkes Estate v. Silver Campsites Ltd. which is quoted at length in para. 23 of the reasons of Mr. Justice Cumming. That passage includes the statement, after noting that neither of the authorities relied on was a Torrens system case, that:

Under the statutory landholding scheme in effect in this province, as set out in the Land Title Act, the court has no power to override the indefeasibility of a title by invoking estoppel to enforce a finding of conventional boundary and thereby to alter or amend the land description.

**48**    In general, I agree with what is said in both of those cases. It would be a dangerous thing if the court were, to achieve fairness between two parties, to settle a boundary without due regard to the record established by prescribed means in the Land Titles Office. But the order under appeal does not "alter or amend the land description". Rather, it resolves a question which has remained unresolved since the land was first subdivided some 90 years ago, i.e., what is the location of the boundary between lots 29 and 30? The order also directs the Registrar to effect registration accordingly.

**49**    For the same reason, this order is clearly distinguishable from the order which was sought and refused in Bea v. Robinson. In that case, as Boland J. stated at p.429, it clearly was possible to determine the boundaries - the parties had simply neglected to do so. In this case the boundary in question was never determined and could not be determined except by the extraordinary (and not practically feasible) procedure of a special survey. In Bea, Boland J. held that the boundaries were "not uncertain, they were merely unknown". In this case, the boundary was not merely unknown, it was entirely uncertain.

**50**    In the unusual circumstances of this case, I am of the view that to employ proprietory estoppel

to fix the boundary posed no threat to the integrity of the land titles system. I would therefore agree that insofar as the decision is based on that rule and on the precedents established by the decision of the Court of Appeal in England in Amalgamated Investment and Property Co. Ltd. and the decision of this court in Zelmer v. Victor Projects Ltd., it should be upheld. That conclusion makes it unnecessary to consider the submissions of the appellant with relation to the alternative ground of decision based on agreement.

**51**    I agree that the appeal should be dismissed.

ESSON J.A.

cp/i/drk/jjl/qlcct

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 322 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

1990 CarswellAlta 133
Alberta Court of Queen's Bench

Francey v. Wawanesa Mutual Insurance Co.

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D.
593, 108 A.R. 82, 46 C.C.L.I. 240, 72 D.L.R. (4th) 544, 75 Alta. L.R. (2d) 257

# FRANCEY v. WAWANESA MUTUAL INSURANCE COMPANY

Fraser J.

Judgment: August 2, 1990
Docket: Edmonton No. 8903-16226

Counsel: *B.A. Chatwin*, for plaintiff.
*K.I. Peddie*, for defendant.

Subject: Insurance; Contracts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

   **Contracts --- Rectification or reformation — Evidence — Parol evidence**

   **Insurance --- Extent of risk — Automobile insurance — Theft of vehicle**

Insurance — Motor vehicle insurance — Exclusions and conditions relating to risk — Exclusion clause precluding recovery where loss caused by theft by person in lawful possession — Loss being caused by fraud perpetrated on plaintiff — Plaintiff and perpetrator being in agency relationship — Perpetrator having fraudulent intention at outset, not being person in lawful possession — Exclusion clause not applying.

Insurance — Motor vehicle insurance — Insured perils — Policy providing indemnification against direct and accidental loss or damage of insured motor home from any peril other than by collision or upset — Policy deeming "theft" insurable peril — Loss of motor home being caused by fraudulent sales agent — Loss suffered being accidental and caused directly by agent's fraud — Fraud falling within risks covered and coming within meaning of "theft" in policy — Loss being covered by policy.

The plaintiff advertised her motor home for sale. C., misrepresenting himself as the general manager of a known dealership, told the plaintiff that he had a sure buyer for the motor home. C. made several other untrue statements. The plaintiff confirmed that she wanted to net a certain amount and that C. could retain anything paid by the purchaser over that amount. As agreed, C. paid the plaintiff $1,000 before taking possession of the motor home. The plaintiff then signed a consignment agreement and an additional document. C. did not return the motor home nor did he give payment for it to the plaintiff. C. was later convicted of having unlawfully defrauded the plaintiff of her motor home. The defendant was the insurer of the motor home. Under subs. 3 of the policy, the defendant agreed to indemnify the plaintiff against direct and incidental loss or damage to the motor home other than by collision or upset. It provided further that loss or damage caused by "theft" would be deemed loss or damage caused by insurable perils. There were two exclusion clauses. The first precluded recovery where the loss was caused by the conversion, embezzlement, theft or secretion by any person in lawful possession

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

of the motor home under a mortgage, conditional sale, lease or similar agreement. The second precluded recovery where the loss was caused by the insured's voluntary parting with title or ownership, whether or not the insured had been induced to do so by any fraudulent scheme or false pretence. The plaintiff sought to recover the value of her motor home from the defendant. The defendant denied liability on the basis that the loss was not covered by the policy or that one or both of the exclusion clauses applied.

**Held:**

Judgment for plaintiff.

To recover, the plaintiff must prove that she suffered a loss which was both accidental and caused directly by a risk coming within subs. 3. An "accidental loss" is one which happens by chance, unexpectedly or without design. The plaintiff did not look for or plan her loss. Nothing in the evidence warranted an inference that she "courted" the theft of her motor home. The loss was therefore accidental.

C. secured possession of the motor home through fraud, and his fraudulent intent existed from the beginning of the transaction. The manner in which the plaintiff was deprived of her motor home, i.e., by C.'s fraudulent acts, fell within the parameter of risks covered by the policy. C.'s fraud also brought the loss within the meaning of "theft" in subs. 3, a term which should be interpreted to extend to any situation in which the taking was by fraud, theft or conversion.

C., having obtained possession of the motor home through his fraud, never had lawful possession at any time. The first exclusion clause therefore did not apply.

All the evidence indicated that the consignment agreement was intended to be an agency contract for sale. The plaintiff, as principal, had delivered possession of the motor home to C., as agent only, giving C. the right to sell the motor home on her behalf. The reference to "voluntary parting with title or ownership" in the second exclusion clause did not include that situation. The rights granted to C. under the consignment agreement were limited and did not include all or substantially all of the plaintiff's rights as owner of the motor home. Therefore, an inference that the plaintiff parted with ownership in C.'s favour was unwarranted. The contra preferentem principle also applied to counter any such inference. The consignment agreement, when viewed in combination with the additional document, led to the same conclusion. Consequently, the second exclusion clause was inapplicable.

## Table of Authorities

### Cases considered:

*Berg v. Merit Ins. Co.* (1963), 47 W.W.R. 250 (B.C.S.C.) — *applied*

*Boyle v. Yorkshire Ins. Co.*, 56 O.L.R. 564, [1925] 2 D.L.R. 596 (C.A.) — *applied*

*Can. Indemnity Co. v. Walkem Mach. & Equip. Ltd.*, [1976] 1 S.C.R. 309, [1975] 5 W.W.R. 510, [1975] I.L.R. 1-654, 53 D.L.R. (3d) 1, 3 N.R. 523 — *applied*

*Charrington & Co. v. Wooder*, [1914] A.C. 71 (H.L.) — *referred to*

*Continental Ins. Co. v. Dalton Cartage Ltd.*, [1982] 1 S.C.R. 164, 25 C.P.C. 72, [1982] I.L.R. 1-1487, 131 D.L.R. (3d) 559, 40 N.R. 135 — *referred to*

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14177   Filed 08/07/14   Page 324 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

*Davlyn Corp. Ltd. v. Liberty Mut. Fire Ins. Co.*, [1975] I.L.R. 1-707, 55 D.L.R. (3d) 157 (Alta. S.C.) — *distinguished*

*Great Amer. Ins. Co. v. Gusman*, 56 S.E. 2d 319 (Ga. C.A., 1947) — *considered*

*Indemnity Ins. Co. v. Excel Cleaning Service*, [1954] S.C.R. 169, [1954] I.L.R. 1-143, [1954] 2 D.L.R. 721 — *referred to*

*R. v. Olan*, [1978] 2 S.C.R. 1175, 5 C.R. (3d) 1, 41 C.C.C. (2d) 145, 86 D.L.R. (3d) 212, 21 N.R. 504 [Ont.] — *applied*

*R.M.K. Ent. Ltd. v. Man. Pub. Ins. Corp.*, [1981] I.L.R. 1-1416, 10 Man. R. (2d) 425 (Q.B.) — *applied*

*Smith, Re; Ex parte Bright* (1879), 10 Ch. D. 566 (C.A.) — *referred to*

*Stats v. Mut. of Omaha Ins. Co.*, 14 O.R. (2d) 233, [1976] I.L.R. 1-816, 73 D.L.R. (3d) 324, affirmed [1978] 2 S.C.R. 1153, [1978] I.L.R. 1-1014, 87 D.L.R. (3d) 169, 22 N.R. 91 — *applied*

*Stephanian's Persian Carpets Ltd., Re* (1980), 34 C.B.R. (N.S.) 35, 1 P.P.S.A.C. 119 (Ont. S.C.) — *referred to*

*Thiel v. Perepelitza* (1982), 19 Alta. L.R. (2d) 293, 37 A.R. 43 (C.A.) — *referred to*

*Turner v. Co-op. Fire & Casualty Co.*, 1 C.C.L.I. 1, [1983] I.L.R. 1-1678, 147 D.L.R. (3d) 342, 58 N.S.R. (2d) 1, 123 A.P.R. 1 (C.A.) — *applied*

**Statutes considered:**

Alberta Evidence Act, R.S.A. 1980, c. A-21

s. 27(2)

Criminal Code, R.S.C. 1985, c. C-46

s. 380(1)(a) [re-en. R.S.C. 1985, c. 27 (1st Supp.), s. 54]

**Authorities considered: Black's Law Dictionary, 5th ed. (1979) "equitable ownership", "equitable title", "legal title", "ownership".**

Ziegel, Geva and Cuming, Commercial and Consumer Transactions, 2nd ed. (1987), p. 50.

**Words and phrases considered:**

accidental loss

consignment

ownership

theft

title

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

Action against insurer to recover value of insured motor home.

*Fraser J.*:

1    Selling a used vehicle is often a tiresome and disheartening task. Selling it privately simply adds to one's burden as Mrs. Bessie Francey discovered when she decided to sell her motor home. She advertised in local newspapers. No serious offers were received. She was then contacted by a Todd Checknita who purported to be the general manager of a local motor home dealer. He assured her he had a buyer for her motor home and she would receive the net amount she was seeking. This was not to be. Checknita subsequently sold the motor home. Since then, Francey has seen neither the sale proceeds nor her motor home. Checknita has pled guilty to unlawfully defrauding Francey of her motor home and has been sentenced to ten months in jail. Francey seeks to recover the value of her motor home from her automobile insurer, Wawanesa Mutual Insurance Company. Wawanesa has denied liability.

**I. Issues**

2    This cases raises two issues:

3    1. Has there been a "loss" of the motor home as that term is used in Francey's automobile insurance policy?

4    2. If so, is the insurer entitled to rely upon either of two relevant exclusion clauses in denying coverage to Francey?

5    The first exclusion clause precludes recovery where the loss is caused by the conversion, embezzlement, theft or secretion by any person in lawful possession of the motor home under a mortgage, conditional sale, lease or other similar written agreement. The second clause precludes recovery where the loss is caused by the insured's voluntary parting with title or ownership, whether or not the insured has been induced to do so by any fraudulent scheme, trick, device or false pretence.

6    Wawanesa argues that it is not liable to reimburse Francey on the basis that the loss is not one covered by the policy or if it is, that one (or both) of the exclusion clauses applies to the facts of this case. Francey disagrees with this position and contends that the loss is of a kind covered by the policy and that neither exclusion clause disentitles her from recovering from Wawanesa.

**II. The Facts**

7    The evidence at trial disclosed the following. Wawanesa issued an automobile policy to Francey which the parties agreed applied to the motor home at all relevant times. Francey advertised the motor home for sale in the Edmonton Journal and the Bargain Finder. A number of interested parties called.

8    On 3rd May 1989 Checknita left a card in the Franceys' door with a handwritten note on the back. It said "I'm interested in your RV. Please call". Francey did so. The card indicated that Checknita was the general manager of Stewart R.V. Sales located at 10941 - 166 A Street, Edmonton. The Franceys had noted that Stewart R.V. Sales dealership was involved in the sale of motor homes at 11820 - 156 Street, Edmonton, and that it had advertised in one of the locally published recreational vehicle magazines.

9    Checknita came to the Franceys' home on 5th May 1989 along with another man identified only as Hank. He said he was sure he had a buyer and that he had the motor home sold to such buyer. The identity of the buyer was not discussed with the Franceys other than to indicate that he was an employee of Crosstown Motors. He showed the Franceys a book with motor homes and trailers in it and said he had sold a number of them. He also showed them a picture of a yard which he identified as that of Stewart R.V. Sales. Checknita confirmed to the Franceys that he worked for Duncan Stewart, his stepfather.

10    Checknita stated that he wanted to clean up the motor home before showing it to the buyer. He indicated that the hot water heater, which was not working properly, should be replaced by the Franceys. A discussion ensued concerning the terms and conditions under which the Franceys would sell the motor home. The Franceys confirmed that they wanted to net $17,500 and that anything paid by the purchaser over that amount could be retained by Checknita.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

11      The entire negotiations took place over a period of approximately three hours. Although Mrs. Francey pointed out to Checknita the attractive features of the motor home, it was actually her husband who negotiated the contractual arrangements with Checknita. At one point in the evening, Checknita left to secure the $1,000 he had agreed to pay the Franceys before taking possession of the motor home. At this time, no documents had been executed by Francey. However, at least the consignment agreement had been prepared by then. Checknita took this unexecuted agreement with him when he left.

12      He subsequently returned with $1,000 cash. This was paid to Francey. Francey then signed the consignment agreement at the direction of her husband. Later, she signed the document (additional document) entered as Ex. 8 in these proceedings, again at the direction of her husband. Thereafter, Mr. Francey removed the licence plates from the motor home, gave Checknita two sets of keys to the motor home and Checknita left with the motor home. The next day, a Sunday, Checknita returned one set of keys at the request of the Franceys since that set contained a number of the Franceys' other personal keys.

13      Checknita then phoned the Franceys on several occasions. He discussed the replacement of the hot water heater, which was being bought by the Franceys, he reported on the cleaning of the motor home and he advised as to his progress in selling the motor home. On the following Friday, Checknita reported that the motor home had been sold and he would be over Saturday to conclude the transaction. Then he phoned Saturday morning to say he would be over Saturday afternoon and Saturday afternoon to say he would be over later. He never arrived.

14      The next day, the Franceys went to Crosstown Motors and observed that the motor home was still on the lot. Phone calls were placed to Checknita and never returned. Again, on Tuesday of the following week, the Franceys noted that the motor home was still on the Crosstown Motors lot. This was the last day by which the Franceys were to receive, in accordance with the consignment agreement, either the sum of $16,500 or the return of the motor home. Finally, on Wednesday, 17th May 1989, after still having heard nothing further from Checknita, Mr. Francey called Crosstown Motors only to be told that the motor home had already been purchased by Crosstown from Checknita and resold to a third party.

15      Thereafter, Mr. Francey reported this incident to the city of Edmonton police. Since then, an action has been initiated by Francey against Checknita, Crosstown Motors, Duncan Stewart and a number of other parties. As of the date of trial, the motor home had not yet been recovered.

16      Francey's understanding of the arrangements with Checknita was that Checknita had a buyer, he would arrange for the sale of the motor home to the buyer, he would pay a $1,000 deposit to Francey (in part to permit her and her husband to purchase a new hot water heater for the motor home and in part as an indication of his goodwill) and, once the buyer had confirmed he would be purchasing the motor home, Francey would execute a bill of sale in favour of the purchaser and endorse the registration certificate for the motor home. Mr. Francey's understanding of the arrangements made with Checknita corresponded with those of his wife.

17      Mr. Francey testified that he reviewed both the consignment agreement and the additional document prior to Francey's signing them and that a number of revisions were made thereto at his request. When the keys were delivered to Checknita, Mr. Francey was convinced the deal was going to be completed. Mr. Francey, like his wife, candidly admitted in cross-examination that he did not care to whom Checknita sold the motor home or, for that matter, whether he eventually purchased it himself as long as Francey received another $16,500 net in her hands. Simply put, his understanding was that Francey was to receive either $16,500 or the return of her motor home within 11 days from 5th May 1989. She received neither.

## III. Discussion

### 1. Meaning of "loss" under the policy

18      With these facts in mind, I now turn to a consideration of the issues raised by this case. The first is whether the subject "loss" is covered by the insurance policy issued by Wawanesa. The onus is on Francey to establish that this is so. Both parties agreed at trial that the relevant section of the subject insurance policy is subs. 3 of s. C (subs. 3). It provides, in part, that Wawanesa agrees to indemnify Francey against direct and accidental loss of or damage to the automobile from any peril other

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

than by collision with another object or by upset. The policy goes on to provide that loss or damage caused by "theft" shall be deemed loss or damage caused by perils for which insurance is provided under the subject section.

19    Francey argues that she has suffered a loss. She has not had her motor home returned to her since Checknita defrauded her of it. Since subs. 3 covers loss from any peril other than collision, she submits that it follows that her loss, caused as it has been by Checknita's fraud, must be covered.

20    Wawanesa disagrees. It contends the policy was intended to cover only those risks beyond the control of the insured. Wawanesa submits that the documentation Francey voluntarily executed had the effect of either transferring the motor home to Stewart's R.V. Sales & Storage outright or, alternatively, transferring the motor home to it pursuant to a conditional sales contract. Thus, it argues, viewed in this manner, no loss, as that term is utilized in the policy, has occurred. Implicit in this approach is the premise that any loss which has occurred was not "accidental", but instead, was attributable to Francey's voluntary acts in executing both the consignment agreement and the additional document.

21    In order to recover from Wawanesa, Francey must establish more than the fact she has suffered a loss. She must also prove that the loss was caused directly by the peril in question, that is Checknita's fraud, and further that such loss was accidental. Meeting one of these two requirements will not suffice since the generally accepted view, with which I concur, is that the words "direct and accidental", as used in automobile insurance policies, are to be interpreted as conjunctive and not disjunctive.

22    I propose to deal firstly with whether Francey's loss of the motor home can be considered to be "accidental". The courts have given a very broad interpretation to the word "accidental" in automobile insurance policies. In *Can. Indemnity Co. v. Walkem Mach. & Equip. Ltd.*, [1976] 1 S.C.R. 309, [1975] 5 W.W.R. 510, [1975] I.L.R. 1-654, 53 D.L.R. (3d) 1, 3 N.R. 523, Mr. Justice Pigeon explained an "accident" in these terms [pp. 315-16]:

    While it is true that the word "accident" is sometimes used to describe unanticipated or unavoidable occurrences, no dictionary need be cited to show that in every day use, the word is applied ... to *any unlooked for mishap or occurrence*.

23    Certainly, there was no suggestion in this case that Francey "courted", whether by her negligence or otherwise, the loss of her motor home. Further, her negligence would in any event be irrelevant since the Supreme Court of Canada, in the *Walkem Mach.* case, rejected the negligence concept of foreseeability in determining whether a particular occurrence was an accident.

24    That this is so was confirmed by the Supreme Court of Canada in *Stats v. Mut. of Omaha Ins. Co.*, 14 O.R. (2d) 233, [1976] I.L.R. 1-816, 73 D.L.R. (3d) 324, affirmed [1978] 2 S.C.R. 1153, [1978] I.L.R. 1-1014, 87 D.L.R. (3d) 169, 22 N.R. 91, in which Mr. Justice Spence addressed the concept of an "accident" in the context of an insured's negligence [p. 1164]:

    Pigeon J., in *Canadian Indemnity Company v. Walkem Machinery & Equipment, supra*, adopted Halsbury's words, "any unlooked for mishap or occurrence", and in *Fenton v. Thorley & Co. Limited* [[1903] A.C. 443], Lord Macnaghten said at p. 448:

        ... the expression 'accident' is used in the popular and ordinary sense of the word as denoting an unlooked-for mishap or an untoward event which is not expected or designed.

    These two definitions would bring within the term "accident" those which result from the negligence of the actor whose acts are being considered even if that negligence were gross. With this view, I agree for the reason that to exclude from the word "accident" any act which involved negligence would be to exclude the very largest proportions of the risks insured against.

25    What this means, in essence, is that an "accidental loss" is one which happens by chance, unexpectedly or without design. Further support for this position may be found in *Turner v. Co-op. Fire & Casualty Co.*, 1 C.C.L.I. 1, [1983] I.L.R. 1-1678, 147 D.L.R. (3d) 342, 58 N.S.R. (2d) 1, 123 A.P.R. 1, a decision of the Nova Scotia Supreme Court, Appeal Division, in which the court considered what constituted an accidental loss in a theft case. MacDonald J.A. observed the following [p. 6445]:

    A theft is, of course, a deliberate and non-accidental act. What we are here concerned with, however, is not whether the taking was accident *qua* the taker but whether it is accidental *qua* the insured owner. An accidental theft insofar as the

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

insured is concerned may be said to be a taking of his vehicle by another without his permission, knowledge or consent. Conversely, a non-accidental theft would be one where the circumstances were such that the theft was not unexpected, unlooked for or unusual but rather was an event that was courted by the insured.

26    Nothing in the evidence in this case warrants an inference that Francey "courted" the theft of her motor home. What happened was certainly unlooked for and unplanned by Francey. Therefore, I have concluded that Francey's loss of her motor home was "accidental".

27    This brings me to the question of whether the loss was "direct". This issue is linked to the question of whether the loss arose from one of the perils insured against. Wawanesa contends it did not. Instead, it argues, the loss was attributable to Francey's voluntarily executing both the consignment agreement and the additional document. But Wawanesa's view of events overlooks the fact that the supposed voluntary consensual transaction was induced by Checknita's fraud. Evidence of that fraud is reflected in the conviction certificate which confirms Checknita's conviction under s. 380(1)(a) of the Criminal Code, for having unlawfully defrauded Mrs. Francey of her motor home. Pursuant to s. 27(2) of the Alberta Evidence Act, R.S.A. 1980, c. A-21, when a person has been found guilty of an offence (this includes the case where, as here, Checknita has pled guilty), then, whether or not that person is a party to an action, the proof of the finding of guilt is admissible in evidence for the purpose of proving that the person committed the offence.

28    What is involved in committing "fraud"? The leading case on the law of fraud is the decision of the Supreme Court of Canada in *R. v. Olan*, [1978] 2 S.C.R. 1175, 5 C.R. (3d) 1, 41 C.C.C. (2d) 145, 86 D.L.R. (3d) 212, 21 N.R. 504, which confirmed that the physical element of the offence consists of, as stated by Dickson J. at p. 150, "dishonest deprivation". Of course, the other critical ingredient the Crown must prove is that the accused had the necessary mens rea. This can be established by proving that an accused knew the facts which are considered dishonest and that he desired or foresaw that, as a consequence of such acts, deprivation would result to his victim. Without proof of these ingredients, an accused cannot be found guilty of the criminal offence of fraud.

29    In this case, the evidence of the Franceys corroborates the rationale for Checknita's plea of guilty to fraud. From the very beginning of this transaction, Checknita deceived the Franceys in order to induce them to part with possession of the motor home. It is true that in April 1989 Checknita personally, and without permission of Duncan Stewart, registered as a trade name at Central Registry the name "Stewart R.V. Sales and Storage". Thus, at this date, subject to any passing off action which his stepfather, Duncan Stewart, might bring, Checknita had a right to use this name. It was not until the following day that Stewart, through his counsel, registered as a trade name at Central Registry the name "Stewart's RV". But the fact that one element of the fraud perpetrated by Checknita was true in no way diminishes the effect of the other lies told by him.

30    He indicated to the Franceys that he was the general manager of Stewart R.V. Sales and Storage, a firm which was then known to the Franceys to be located at 11820 - 156 Street. This was not so. He represented that he was acting on behalf of this firm and that he was authorized to use and execute the consignment agreement on its behalf. This was a lie. He indicated that this business was in the process of moving from its location at 11820 - 156 Street to 10941 - 166 A Street. This was a lie. He stated that he had sold a number of motor homes pictured in a brochure in his possession. This was a lie. He insisted that he worked for his stepfather, Stewart. This was a lie. He asserted that the prospective buyer for the motor home was an employee of Crosstown Motors. This was a lie. He assured the Franceys that the further sum of $16,500 would be paid to Mrs. Francey within 11 days or the motor home would be returned. This, too, was a lie.

31    Based on all the evidence, I have concluded that Checknita secured possession of the motor home through his fraud and that his fraudulent intent manifested itself right from the beginning of this transaction. Accordingly, because subs. 3 covers loss from any peril other than collision, the manner in which Francey was deprived of her motor home, that is by reason of Checknita's fraudulent acts, falls within the parameters of the risks covered by subs. 3.

32    I am also satisfied that Checknita's fraud brings the loss within the parameters of "theft" as that term is used in the concluding paragraph of subs. 3. The term should not be construed in accordance with its technical meaning under the Criminal Code but rather in accordance with its ordinary meaning. Therefore, "theft" should be interpreted to extend to any situation in

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 329 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

which the taking was by fraud, theft or conversion. Given Checknita's fraudulent intent, his taking of the motor home is properly regarded as having been without Francey's consent and treated as such, it constituted "theft".

33      I find considerable support for this approach in *Boyle v. Yorkshire Ins. Co.*, 56 O.L.R. 564, [1925] 2 D.L.R. 596, a decision of the Ontario Supreme Court, Appellate Division. A question arose as to whether there had been a "theft" of a car when an employee of a public garage, without permission, took a car kept there by its owner, drove it and damaged it. The court concluded that "theft" included an improper taking even though there was no intent to deprive the owner of his car. In so finding, Middleton J.A. observed [p. 598]:

> I am further of opinion that in the construction of a policy such as this the word "theft" is not used in its narrow and technical sense, and that if the Legislature creates some kind of statutory offence which would quite rightly be regarded as constituting theft, this would be covered by the policy.

34      For these reasons, I have concluded that Francey's loss of her motor home was the "direct" result of Checknita's fraud and that such fraud is a risk covered by subs. 3. Therefore, such loss was both "direct" and "accidental" as those terms are used in the subject insurance policy.

### 2. Applicability of exclusion clauses

35      Do either of the exclusion clauses relied upon by Wawanesa apply in this case? It is a fundamental principle of insurance law that the onus is on the insurer to establish that an exclusion clause applies to preclude recovery by an insured from a risk otherwise falling within the parameters of a given insurance policy: *Continental Ins. Co. v. Dalton Car tage Ltd.*, [1982] 1 S.C.R. 164, 25 C.P.C. 72, [1982] I.L.R. 1-1487, 131 D.L.R. (3d) 559, 40 N.R. 135 .

36      Of equal importance in the interpretation of exclusion clauses is the principle that if there is any ambiguity in the meaning to be given to a particular clause, the contra proferentem doctrine applies. The rationale for this doctrine was explained by Estey J. in *Indemnity Ins. Co. v. Excel Cleaning Service*, [1954] S.C.R. 169, [1954] I.L.R. 1-143, [1954] 2 D.L.R. 721 at 730, in the following terms:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain.

### A. Lawful possession exclusion

37      The first exclusion clause relied upon by Wawanesa provides that the insurer shall not be liable for loss "caused by the conversion, embezzlement, theft or secretion by any person in lawful possession of the automobile under a mortgage, conditional sale, lease or other similar written agreement". Two questions are subsumed in the interpretation of this clause. The first question for determination is whether Checknita was in "lawful possession" of the motor home and, if so, the second question which arises is whether this occurred pursuant to a "mortgage, conditional sale, lease or other similar written agreement".

38      On the first question, Wawanesa argues that Francey's execution of both the consignment agreement and the additional document resulted in Checknita's receiving the motor home as a consequence of Francey's voluntary actions. Thus, it is asserted Checknita was initially in lawful possession of the motor home. Wawanesa concedes that lawful possession may not be secured where there has been a misrepresentation by a rogue as to his identity. But, it is contended, in this case, there was no such misrepresentation as to identity. Checknita was who he claimed to be. And, in view of his registration of the trade name, Stewart R.V. Sales and Storage, he had every right to use this name in his dealings with the Franceys. Wawanesa argues that the only possible misrepresentation was as to agency, as opposed to identity, since Wawanesa agrees Checknita had no authority to represent that he was acting on behalf of his step-father or the business owned by him.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 330 of 1344

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

39    In answer to these submissions, Francey argues that the onus is on the insurer to prove lawful possession and that it cannot do so since the evidence in this case discloses that the entire transaction was, from its inception, a sham designed to defraud Francey of her motor home.

40    There is no question that if a person, by false representations as to his identity, persuades an owner to rent a vehicle to him, the "rogue" is not in "lawful possession" of the vehicle. This is exactly what occurred in *Berg v. Merit Ins. Co.* (1963), 47 W.W.R. 250 (B.C.S.C.). In that case, the insurer argued that the owner, who operated a rental business, was not concerned as to the identity of the renter and that identity was not a material part of the contract. Thus, argued the insurer, even though the individual was not the Mr. Morawsky who he had represented himself to be, there was a consent to the individual's taking possession and therefore, such possession was lawful. The exclusion clause under consideration by the court was identical in terms to the clause under consideration in this case.

41    Lord J. approached the question of whether the rogue had ever been in lawful possession of the vehicle on the following basis and concluded in a well-reasoned decision that he had not been [p. 252]:

The principles to be followed are found in *Lake v. Simmons*, [1927] A.C. 487, 96 LJKB 621, where an insurance policy contained a clause exempting the insurers from liability in the case of,

loss by theft or dishonesty committed by ... any customer ... in respect of goods entrusted to them by the assured.

In that case a woman induced the plaintiff, a jeweller, to let her have possession of two pearl necklets by fraudulently representing that she was the wife of a certain person and that she wanted them for the purpose of showing them to her husband and to a purely fictitious person for approval, with a view to purchase by them. The woman disposed of the necklets for her own benefit, and the jeweller brought an action on the policy when the insurer refused to pay, in which action he was successful. I think the following words of Lord Atkinson fit the facts of the case at bar, at p. 512:

The true character of the operation was larceny of the appellant's goods by means of a trick — the trick being the false and fraudulent representation which this woman made to the appellant, by which the delivery to her of possession of the jewels was obtained.

Similarly, in this case the lessee stole the vehicle from the owner ... He did so by a trick in that he falsely represented himself to be a person named on a credit card as being one entitled to cash credits, and forged the name of that person on the rental application. In *Oppenheimer v. Frazer & Wyatt*, [1907] 2 K.B. 50, 76 L.J.K.B. 806, Fletcher Moulton, L.J. said at p. 72:

It follows that the law recognizes a form of larceny in which the apparent delivery of the possession of goods by the owner of them, which has been obtained by a trick animo furandi, does not in law import consent to that possession by the owner, so that the person who obtained that possession may be treated as having 'taken' the goods without the owner's consent.

42    This decision was cited with approval by Morse J. in *R.M.K. Ent. Ltd. v. Man. Pub. Ins. Corp.*, [1981] I.L.R. 1-1416, 10 Man. R. (2d) 425 (Q.B.). A rental agency sought to recover the value of a rental car leased to a person who represented himself to be a Peter Fisher. The car was not returned after the three-day rental period and neither the car nor Fisher were ever found. The insurer denied liability on the basis the loss fell within an exclusion in the policy identical in terms to that under consideration in this case. Morse J. disagreed and concluded that the loss was covered by the policy. In so doing, he stated [p. 418]:

I think it is clear on authority that a person who, by false representations as to his identity, persuades the owner of an automobile to rent it to him is not in "lawful possession" of that automobile ...

The question, therefore, is whether Fisher obtained possession of the automobile by a trick, or whether he actually was the Peter Fisher who he represented himself to be ...

Case 09-10138-MFW   Doc 14177   Filed 08/07/14   Page 331 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

43    The court concluded that Fisher had, on the evidence, falsely represented his identity to the rental agent and determined that on this basis, Fisher was not in "lawful possession" of the automobile. Therefore, the exclusion clause could not be relied upon by the insurer to deny coverage.

44    Wawanesa seeks to distinguish these cases on the basis they involved false names being given by individuals in order to conceal their identities. It argues that without this ingredient, a party to whom possession is relinquished voluntarily by the owner of a vehicle is in "lawful possession" of the vehicle. In support of this proposition, it relies upon a decision of the Alberta Supreme Court, Trial Division, in *Davlyn Corp. Ltd. v. Liberty Mut. Fire Ins. Co.,* [1975] I.L.R. 1-707, 55 D.L.R. (3d) 157. In this case, the trial judge was presented with an agreed statement of facts which reflected that a Paul Ouimet rented a vehicle, failed to return it and ultimately pled guilty to theft.

45    Moore J. held that the automobile was in the lawful possession of Ouimet under the lease agreement and therefore, the loss fell within the exclusion clause which excluded conversion by a person in lawful possession under a lease. In reaching this decision, Moore J. noted that the agreed statement of facts only disclosed that Ouimet did not return the vehicle. He concluded that Ouimet had converted the vehicle after having initially gained lawful possession of the same under the lease. This must be distinguished from this case where Checknita's fraud originated at the time of, and contemporaneously with, his having first secured possession of the motor home from the Franceys. This is not a situation in which Checknita took the vehicle and thereafter decided, for whatever reason, not to account for the sales proceeds. His fraudulent intent was present at the time he took possession of the motor home. In these circumstances, how can it be said Checknita ever had lawful possession of the motor home?

46    In the United States, an approach similar to that adopted in *Berg* and *R.M.K. Ent.* has been taken to the issue of what constitutes "lawful possession". In *Great Amer. Ins. Co. v. Gusman,* 56 S.E. 2d 319 (Ga. C.A., 1947), MacIntyre P.J. considered the case of an owner of an automobile who was induced to part with possession under the belief that the person to whom the vehicle was delivered would act as her agent in the sale of the vehicle. The evidence was that the person did not sell the automobile but stole it. The court held that the jury was entitled to determine whether the rogue obtained possession of the vehicle by trick or fraud. The court's explanation for this approach was that [p. 319]:

> If a person obtains possession of goods or money by trick or fraud, or under false pretense of a bailment, with intent to appropriate the thing to his own use, and the owner intends to part with the possession only [to that person], and not with the property, the possession is obtained unlawfully, and the subsequent appropriation in pursuance of the original intent is [simple] larceny. *Martin v. State,* 123 Ga. 478, 51 S.E. 334 ...

47    Of course, one of the primary indicia for determining that an individual has obtained possession of property by fraud is whether he has made false representations as to his identity at the time of acquisition by giving a name other than his own. But this is only one indicator of fraudulent intent and it may well be that other objective evidence will establish the existence of fraud even though the perpetrator of the fraud has not misled his victim as to his name.

48    Further, and in any event, in determining whether there has been a misrepresentation as to identity, it is appropriate to consider more than whether an individual has misrepresented his name. Identity is more than just a name. Identity involves all the ingredients by which a person purports to identify himself. When a person, as is the case here with Checknita, misrepresents who he works for, the firm he is associated with, what he does for that firm, the fact he is acting on behalf of that firm and the fact the business is operational when it is not, he is misrepresenting his identity to his victims. Checknita was not the man he claimed to be — a person who worked as general manager for his stepfather in a successful, ongoing business operation which was in the process of moving from one location to another, a person who was entering into the consignment agreement on behalf of such business, a businessman who had sold a number of motor homes — all were lies and all go to the question of identity. Given these lies by Checknita, the fact he used his own name in perpetrating the fraud in no way negates the existence of such fraud from the inception of his dealings with the Franceys.

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 332 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

49    Further evidence of his fraudulent intent is reflected in his having "sold" the motor home to Crosstown Motors for $6,500 and a Thunderbird car (which the representative of Crosstown acknowledged had a maximum value of $5,200), when he knew the Franceys expected to receive another $16,500 if the motor home were sold, resulting therefore in an immediate deficiency of $4,800. In fact, this figure for the Thunderbird was indicated by the witness from Crosstown to be overvalued by approximately $2,700. Crosstown had been most anxious to dispose of the Thunderbird which had, at the time of the transfer to Checknita, been on its lot for more than 90 days. Under these circumstances, the only reasonable inference one can draw, and it is one I draw, is that Checknita simply implemented the fraudulent intention he had right from the moment he deceived the Franceys into delivering possession of the motor home to him. He obtained possession of Francey's motor home through his fraud with intention to steal or deprive Francey permanently of her motor home and, as a result, the law treats such possession as having been without Francey's consent.

50    For these reasons, I have concluded that Checknita never had lawful possession of the motor home at any time. Thus, Wawanesa has not discharged the onus on it to establish that the facts of this case fall within the parameters of the exclusion clause dealing with theft or conversion by a person in lawful possession of the motor home. This being so, it is unnecessary to consider whether the documentation Francey executed constitutes a written agreement similar to a mortgage, conditional sale or lease.

### B. Voluntary parting with title or ownership exclusion

51    What then of the second exclusion clause relied upon by Wawanesa? This provides that Wawanesa shall not be liable for loss "caused by the voluntary parting with title or ownership, whether or not induced to do so by any fraudulent scheme, trick, device or false pretense". Wawanesa contends that Francey's execution of the additional document and the consignment agreement resulted in either the outright transfer of title to or ownership of the motor home or alternatively, the transfer of beneficial title under a conditional sales contract (pursuant to which legal title was not to be transferred until the balance of the purchase price was paid in full).

52    In support of this position, Wawanesa submits that Francey did more than part with possession. She also gave Checknita, in accordance with the express terms of the consignment agreement, the full right to sell, trade or buy the motor home while in his possession. The end result is that Francey and Checknita were parties to a consensual agreement under which Checknita was allowed to deal with the motor home as he saw fit. Wawanesa invites the court to conclude that, given these provisions, Francey voluntarily transferred to Checknita title to or ownership of the motor home. It argues that more than possession was given because Checknita had a number of other rights, including the right to buy or sell the motor home. Implicit in this argument is that these other rights conferred on Checknita some degree of title or ownership in the motor home.

53    It is noteworthy that at one time in Canada, exclusion clauses in automobile policies were commonly worded so as to exclude an insurer's liability for any loss arising where an insured voluntarily parted with *possession* of a vehicle, whether induced to do so by fraud, etc. This is no longer the case. Therefore, it is not enough, where one is dealing with an exclusion clause identical to that under consideration here, for an insurer to establish that an insured has voluntarily parted with possession of the vehicle. If that were all that was required, then given the rights granted to Checknita under the consignment agreement and the fact he secured possession of the vehicle, I would have concluded that Francey had voluntarily parted with possession of her motor home although induced to do so by Checknita's fraud.

54    What then occurred in this case? Counsel for both parties conceded that in construing the parties' intentions and the nature of the transaction concluded by Checknita and Francey, it was appropriate to consider the combined effect of both the consignment agreement and the additional document. There are numerous problems with respect to the additional document. It is a one-page untitled document with conditions of sale printed on the reverse. A careful reading of all the terms and conditions on both sides of the document indicates that it is intended to be used in circumstances in which a party trades in a vehicle and purchases another from a dealer. That was not the situation in this case. Further, a clause on the front of the document dealing with immediate transfer of title to the dealer conflicts with a term on the back which provides that the title and right of property in the motor vehicle shall not pass to the purchaser until the entire purchase price is paid in full. Because of this ambiguity in

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

the additional document with respect to when and, in my view, if title and right to the property described in it was to pass, I permitted parol evidence to be introduced to confirm the parties' intentions with respect to this issue at the time of execution of the subject documents: see *Charrington & Co. v. Wooder,* [1914] A.C. 71 (H.L.).

55     Both Francey and her husband testified that the additional document was intended to be nothing more than a receipt pursuant to which Francey acknowledged receipt of the $1,000 deposit. She testified that although she had not read the document, Checknita, who did not have any receipt books with him, stated that it would act as a receipt. Mr. Francey confirmed this understanding. He testified that the prime purpose of the additional document was to confirm receipt of the deposit since Checknita had asked for some evidence that the deposit had been paid. In cross-examination, Mr. Francey was confronted with the fact that the front of the document contained the following clause:

> I herewith transfer to Dealer all my rights, title and ownership in the above motor vehicle, and I declare I am the sole owner and possessor of same and that there is no mortgage, lien, note or claim of any kind or nature adverse to my rights of, upon, or against said vehicle other than as stated below.

56     When asked why he did not delete this clause if in fact this document was intended to be nothing more than a receipt, his explanation was that it was made clear to Checknita that cl. 3 on the reverse side of the additional document would apply. It was apparent that Mr. Francey was of the view that this clause, which expressly provided that title and right of property in the motor home would not pass to the purchaser until the entire purchase price was paid in full, meant that Checknita did not acquire any interest in the motor home, as purchaser, when he took possession of it. Mr. Francey was adamant that there was never any intention to transfer title or ownership of the motor home to Checknita (or to Stewart R.V. Sales) whether pursuant to this additional document or otherwise. No evidence to the contrary, other than arguably the additional document and the consignment agreement, was adduced on behalf of Wawanesa.

57     I accept the Franceys' evidence as to the purpose of the additional document. Further, had it been intended to constitute a sale agreement, one would reasonably have expected that the "purchaser" would have executed it, especially given the portion of the document on which the purchaser is to acknowledge that the conditions on the reverse were acceptable to him. But the document was not signed by anyone other than Francey.

58     One further provision in the additional document warrants comment. On the front, the words "Deposit No [sic] Refundable" appear. The fact the $1,000 paid to Francey is expressed to be a deposit and to be non-refundable arguably supports Wawanesa's position that Francey sold (or otherwise disposed of some interest in) the motor home to Checknita pursuant to this document. However, although this amount was called a deposit and made non-refundable, it was not a deposit paid in the context of a sale of the motor home.

59     The moneys were paid for two reasons — the first was to permit the Franceys to buy a replacement hot water heater for the motor home as insisted by Checknita. They did so and then arranged for Checknita to pick up the heater at their home. The second reason for the moneys being paid was as an indication of Checknita's goodwill in assuring the Franceys he had a buyer for the motor home. The fact he was willing to make such payment is also arguably reflective of his state of mind — that is, Checknita suspected or knew the Franceys would not likely be prepared to give him possession of their motor home without some assurance that a sale would be forthcoming. By paying the $1,000 and expressing it to be non-refundable, he accomplished his goal of inducing the Franceys to part with possession of the motor home. Thus, in my view, in the light of all these circumstances, the payment of the $1,000 "non-refundable deposit" is explicable for reasons other than the fact that a sale had occurred.

60     Moreover, if the additional document constituted a sale, which would necessarily involve the transfer or disposition of title or ownership by Francey in favour of Checknita, what then would be the purpose of the consignment agreement? It would be redundant and I am satisfied this was not the parties' intention. This being so, I have concluded on all the evidence that the additional document was not intended to, nor does it constitute, anything more than a receipt signed by Francey acknowledging Checknita's payment of the sum of $1,000. As such, it did not result in Francey's parting therein with either title to or ownership of the motor home.

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

61      But what effect, if any, does the consignment agreement have on this conclusion? It provided that Stewart R.V. Sales & Storage received "full right to sell, trade, or buy" the motor home in its possession. For the purposes of this analysis, I propose to treat the reference in the consignment agreement to the consignee as a reference to Checknita since he had registered the name "Stewart R.V. Sales & Storage" as a trade name at Central Registry. The following clauses in the consignment agreement are relevant:

> 2) Bessie Francey shall receive $17,500.00 for this vehicle and full payment will be made within 11 days from the date of possession, being May 16, 1989.

> 5) I hereby grant exclusive possession to Stewart R.V. Sales & Storage for a period of not more than 11 days.

> 6) Owner loses right to sell vehicle in Dealer's possession, giving Dealer first right of purchase.

62      Given these terms, what rights were granted to Checknita as consignee? In particular, did the consignment agreement result in title to or ownership of the motor home being granted or transferred to Checknita? In my view, the answer is no. The question of what a consignment is was addressed in *Re Stephanian's Persian Carpets Ltd.* (1980), 34 C.B.R. (N.S.) 35, 1 P.P.S.A.C. 119 (Ont. S.C. in Bankruptcy) by Saunders J. [pp. 37-38]:

> In its simplest term, a consignment is the sending of goods to another. An arrangement whereby an owner sends goods to another on the understanding that such other will sell the goods to a third party and remit the proceeds to the owner after deducting his compensation for effecting the sale is an example of a consignment agreement.

63      As pointed out by Ziegel, Geva and Cuming in Commercial and Consumer Transactions, 2nd ed. (1987), at p. 50, there are many different substantive forms that a consignment agreement can take:

> The common feature is that goods are delivered by their owner to a consignee for his prospective use or for sale or resale but that title is not to pass until some future event prescribed in the agreement between the parties has taken place. The differences reside in the character of the relationship established between the parties, the purpose of the agreement, and the rights of third parties dealing with the consignee. These questions cannot be answered by looking at the label which the parties themselves have attached to the agreement. Rather ... the answer depends on the substance of the agreement and the fair construction of its provisions.

> More particularly,

> 1) the agreement is an *agency contract for sale* if the consignee of the goods undertakes to sell them as a disclosed or undisclosed agent for the owner;

> 2) the agreement is a *contract of "sale or return"* if the consignee will become the buyer of the goods on a prescribed event (usually the resale of the goods by him);

> 3) the agreement is a *security agreement* if, on an analysis of its terms, the consignee has agreed to buy the goods and pay their price, and title in the meantime merely remains in the consignor by way of security; and ...

> In North America parlance the first three types of agreement are frequently referred to as "consignment agreements." It will be obvious, however, from the above analysis that the term is not a term of art and that it provides little guidance as to the true relationship between the parties.

64      What then is the substance of the consignment agreement made between Francey and Checknita? In considering this issue, I am satisfied that it is appropriate to take into account all of the surrounding circumstances, including the relationship of the consignment agreement to the additional document, in order to determine the true nature of the legal relationship created between Francey and Checknita by the consignment agreement. As stated by Prowse J.A. in *Thiel v. Perepelitza* (1982), 19 Alta. L.R. (2d) 293, 37 A.R. 43 at 46 (C.A.):

Case 09-10138-MFW Doc 14177 Filed 08/07/14 Page 335 of 1344

Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

Although parol evidence is not admissible to vary a contract in writing, evidence of the surrounding circumstances is always admissible to assist the court in determining the true agreement of the parties.

65    The evidence in this case does not support the inference that the contract was one of "sale or return". Checknita never indicated that he intended to be, under any circumstances, either an intervening purchaser or an end purchaser. Instead, he represented he would act as Francey's agent for the sale of the motor home and, accordingly, that he would be paid a commission for doing so. Mr. Francey was adamant that none of the discussions with Checknita addressed the possibility of Checknita's buying the motor home. Instead, it was to be sold by him, as agent for Francey, to the purchaser at Crosstown Motors he insisted he had. I am satisfied it was Francey's intention that the transfer of title and ownership would be made directly in favour of the purchaser found by Checknita and that Checknita would simply act as her agent for the sale of the motor home.

66    Even if I am wrong in this conclusion, and the consignment agreement was one of "sale or return", how would Francey's execution of such agreement result in her parting with title or ownership of her motor home at the time of such execution? The answer is it would not. Further steps would still be required to complete the sale. And in this case, these never took place. Francey was not prepared (and both her conduct throughout and that of Mr. Francey supports their evidence to this effect) to execute in favour of the "purchaser" any documents required to convey title to or ownership of her motor home, including a bill of sale, unless and until she received the further sum of $16,500. This was made clear to Checknita by Mr. Francey. Francey never received the $16,500. To protect herself, she was careful to retain the motor home's registration certificate issued by the Motor Vehicles Branch under the mistaken, though commonly-held, impression that such certificate must be produced in order to effect the transfer of title or ownership of a motor vehicle in Alberta.

67    Can the consignment agreement be regarded as a security agreement under which Checknita agreed to buy the motor home and pay the price with title in the mean time remaining in Francey's name by way of security? It is true that Checknita was entitled to retain all moneys in excess of $16,500 secured on sale of the motor home. However, this fact does not of itself create the relationship of vendor and purchaser or justify the conclusion that the transaction was one of sale: see *Re Smith; Ex parte Bright* (1879), 10 Ch. D. 566 (C.A.).

68    Admittedly, the consignment agreement provides that Francey "shall receive $17,500.00" and "full payment will be made within 11 days from the date of possession, being May 16, 1989". Since payment is not expressed to be contingent on sale, the inference may arguably be drawn that a sale had already occurred. But this interpretation would be inconsistent with cl. 1 which gives the consignee the right to sell, trade or buy the vehicle. What would be the purpose of this clause if the motor home had been sold? Likewise, what would be the purpose of giving exclusive possession to the consignee (as provided in cl. 5) or granting the consignee first right of purchase (as provided in cl. 6)? All of these clauses would be redundant if one were to interpret cl. 2 (or any other terms of the consignment agreement) as resulting in a sale of the motor home to Checknita.

69    Further, it was clear on the evidence that if the sale to the buyer did not proceed as contemplated, Checknita was to return the motor home to Francey. Although the Franceys did not care from whom the moneys were received, it does not follow that the motor home was sold to Checknita pursuant to the consignment agreement. There was no credible evidence that the parties intended that Checknita would buy the motor home and pay Francey for it. Thus, for these reasons, I am satisfied that the consignment agreement did not result in Checknita's agreeing to buy the motor home with title remaining in Francey for security purposes. Accordingly, it cannot be properly construed as a security agreement.

70    Instead, I have concluded on all the evidence, including the actual conduct of the parties herein and the relationship between them, that the consignment agreement was intended to be an agency contract for sale. This being so, does the reference in the policy to Francey's *voluntary parting with title or ownership* include the situation where as here, Francey, as principal, delivered possession of her motor home to Checknita, as agent, with the right on the part of Checknita to sell such vehicle on behalf of Francey? I am satisfied that it does not.

71    Wawanesa asserts that in interpreting the exclusion clause, the reference to parting with title or ownership should be construed as constituting something less than the disposition or transfer by the insured of all rights encompassed within the

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

concept of "title" or "ownership". It then argues that whatever rights were given to Checknita beyond mere possession of the motor home constituted the acquisition by him of some degree of title to or ownership of the motor home. This argument is based on the submission that were the clause intending to refer to the transfer of all rights with respect to title or ownership, it would be redundant because in these circumstances, the insured would, in any event, cease to have any insurable interest in the vehicle. Thus, Wawanesa contends, it follows that the clause must address something less than transfer of all of the insured's rights with respect to title or ownership. I do not agree with this reasoning.

72      The exclusion clause is not designed to, nor does it address, the question of insurable interest. Therefore, in interpreting this clause, one should not do so as if such clause were somehow linked to this issue. An insured retains an insurable interest in a vehicle even if there has been a voluntary transfer of title where such transfer has been induced by fraud. This is because in these circumstances, the rogue does not acquire an interest in the vehicle. What the exclusion clause in the subject insurance policy is dealing with are those circumstances under which Wawanesa is to have no liability for a loss — regardless of whether the parting with title or ownership to the rogue is, in the face of the rogue's fraud, effective in law. Viewed in this context, there is nothing in the wording of this clause which would lead to the conclusion that it was intended to include the situation where an owner delivered a motor home to an agent for sale on behalf of the principal.

73      What is meant by "title" and "ownership"? "Ownership" is defined in Black's Law Dictionary, 5th ed. (St. Paul: West Publishing Co. 1979), at p. 997 as:

> Collection of rights to use and enjoy property, including right to transmit it to others ... The complete dominion, title or proprietary right in a thing or claim. The entirety of the powers of use and disposal allowed by law.

Given the limited rights granted to Checknita under the consignment agreement, it cannot reasonably be argued that such rights included all, or even substantially all, of the rights which Francey enjoyed as "owner" of the motor home so as to warrant the inference that Francey parted with ownership in favour of Checknita.

74      Parting with "title" arguably includes, in the context of the subject insurance policy, either legal title or equitable title. "Legal title" is defined in Black's at p. 807 as:

> One cognizable or enforceable in a court of law, or one which is complete and perfect so far as regards the apparent right of ownership and possession, but which carries no beneficial interest in the property, another person being equitably entitled thereto ...

75      "Equitable title" is equated in Black's at p. 484 with equitable ownership, which is, in turn, defined at p. 483 as:

> The ownership interest of one who has equitable as contrasted with legal ownership of property ...

Checknita did not acquire any rights under the consignment agreement which would, as between Francey and Checknita, be enforceable in a court of law against Francey, so as to permanently deprive her of possession, use or control over the motor home. It is certainly true that one can point to lesser degrees of "title" interests in property other than legal or equitable title. For example, "presumptive title" arises out of the mere simple possession of property. But this is not what is contemplated under the subject exclusion clause. In my view, having regard to the contra proferentem principle, such exclusion clause should not be interpreted to include a case such as this where Francey, pursuant to the consignment agreement, parted with possession of the motor home to her agent, Checknita, for the purposes of sale. This agreement did not create the relationship of vendor and purchaser but only that of principal and agent. Accordingly, Checknita did not, by reason of such relationship, acquire, whether in whole or in part, "title or ownership" of the motor home as these terms are used in subs. 3.

76      I have also considered whether the effect of the consignment agreement, when viewed in combination with the additional document, warrants a different conclusion and I am satisfied the answer is no. If Wawanesa had wanted to exclude coverage for a situation where, as here, Francey transferred voluntary possession of the motor home to Checknita as her agent for the sale of such motor home, although induced to do so by fraud, it would have been a simple matter for the exclusion clause to be so

**Francey v. Wawanesa Mutual Insurance Co., 1990 CarswellAlta 133**

1990 CarswellAlta 133, [1990] 6 W.W.R. 329, [1990] I.L.R. 1-2652, [1990] A.W.L.D. 593...

drafted. It was not. Therefore, I have concluded that Wawanesa has failed to discharge the burden imposed upon it to establish that the second exclusion clause relied upon by it applies in these circumstances.

## IV. Conclusion

77      Accordingly, there will be judgment for Francey in the sum of $16,500, Wawanesa having admitted that this amount represents the value of the loss incurred by Francey. In addition, there will be interest on this amount in accordance with the Judgment Interest Act, S.A. 1984, c. J-0.5, calculated from the date on which Wawanesa was to have reimbursed Francey for her loss in accordance with the subject insurance policy.

78      Francey has also claimed damages in the sum of $1,200 representing the solicitor-client costs incurred by Francey to date in pursuing the return of the motor home. Francey bases her claim upon s. 4(1)(b) of the policy found on p. 12 thereof. It provides that where loss of or damage to the automobile occurs, the insured shall at the expense of the insurer and as far as reasonably possible protect the automobile from further loss or damage. The moneys Francey spent in trying to recover the motor home do not, in my view, represent moneys expended to protect the motor home from loss or damage. Instead, such amount represents moneys spent to recover the motor home. There is nothing in the wording of this clause to indicate that it was intended to apply to anything more than the costs incurred by the insured in *preserving* the insured vehicle as opposed to *recovering* it. To accord to the clause the interpretation suggested by Francey would be expanding the parameters of the losses insured by Wawanesa beyond the scope contemplated by the parties. Thus, Francey's claim for recovery of this amount from Wawanesa is denied.

79      Costs may be spoken to if necessary.

*Judgment for plaintiff.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1991 CarswellAlta 159
Alberta Court of Appeal

Francey v. Wawanesa Mutual Insurance Co.

1991 CarswellAlta 159, [1992] 1 W.W.R. 52, 117 A.R. 318, 29 A.C.W.S.
(3d) 91, 2 W.A.C. 318, 82 Alta. L.R. (2d) 339, 84 D.L.R. (4th) 575

# WAWANESA MUTUAL INSURANCE COMPANY v. BESSIE FRANCEY

Hetherington, Foisy and Côté JJ.A.

Judgment: September 19, 1991
Docket: Edmonton Appeal Doc. 9003-0725-AC

Counsel: *V.R. Stevenson*, for appellant (defendant).
*B.A. Chatwin*, for respondent (plaintiff).

Subject: Contracts; Insurance

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Contracts --- Rectification or reformation — Evidence — Parol evidence**

**Insurance --- Extent of risk — Automobile insurance — Theft of vehicle**

Contracts — Interpretation — Admissibility of parol evidence — Collateral agreements — Trial judge properly admitting parol evidence of circumstances in which contract made — Document not containing whole contract between parties — Fraudulent nature of transaction also justifying reception of parol evidence.

Costs — Factors affecting entitlement to or quantum of costs — Offer to settle — No special circumstances justifying deviation from R. 174 — Plaintiff receiving double costs from service of offer of compromise.

Evidence (civil) — Parol evidence — Trial judge properly admitting parol evidence of circumstances in which contract made — Document not containing whole contract between parties — Fraudulent nature of transaction also justifying reception of parol evidence.

**Table of Authorities**

**Rules considered:**

Alberta Rules of Court

R. 174

Appeal by defendant from decision of Fraser J., 75 Alta. L.R. (2d) 257, [1990] 6 W.W.R. 329, 46 C.C.L.I. 240, 72 D.L.R. (4th) 544, [1990] I.L.R. 1-2652, 108 A.R. 82.

1991 CarswellAlta 159, [1992] 1 W.W.R. 52, 117 A.R. 318, 29 A.C.W.S. (3d) 91...

**_Hetherington J.A._ (for the court) (Memorandum of judgment delivered from the bench):**

1      The only attack on the judgment of the trial judge [reported 75 Alta. L.R. (2d) 257, [1990] 6 W.W.R. 329, 46 C.C.L.I. 240, 72 D.L.R. (4th) 544, [1990] I.L.R. 1-2652, 108 A.R. 82] in this matter is based on her consideration of oral evidence as to the circumstances in which a contract was made. It is our view that looking at Ex. 7 by itself, it is quite clear that it does not contain the whole contract between the parties. It was therefore necessary and appropriate for the trial judge to look to oral evidence in order to determine exactly what the contract was between the parties. Beyond that the transaction was fraudulent from the beginning and that in itself would justify the consideration of oral evidence. Once this oral evidence is considered there is ample evidence to support the conclusions of the trial judge and the appeal must fail.

2      The appeal is therefore dismissed.

3      Argument was then heard on costs.

4      It is our view that there are not special circumstances in this case which would justify any deviation from the rule and we direct that the respondent will have double the costs of these proceedings from the time when the offer of compromise was served in accordance with R. 174.

*Appeal dismissed.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Case Name:*
## Free World Trust v. Électro Santé Inc.


**Free World Trust, appellant;**
**v.**
**Électro Santé Inc., Paul Demers and Noël Desjardins,**
**respondents, and**
**Promotion R.A.S. (1992) Inc. and Électronique SEM Inc.,**
**plaintiffs before the Superior Court, and**
**Procter & Gamble Inc., intervener.**


[2000] S.C.J. No. 67

[2000] A.C.S. no 67

2000 SCC 66

2000 CSC 66

[2000] 2 S.C.R. 1024

[2000] 2 R.C.S. 1024

194 D.L.R. (4th) 232

263 N.R. 150

J.E. 2001-89

9 C.P.R. (4th) 168

101 A.C.W.S. (3d) 796

REJB 2000-21501

File No.: 26406.


Supreme Court of Canada

1999: December 14 / 2000: December 15.

**Present: L'Heureux-Dubé, Gonthier, McLachlin,
Iacobucci, Major, Bastarache and Binnie JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC (76 paras.)

*Patents -- Infringement -- Validity -- Scope and ambit of patent owner's monopoly -- Anticipation by publication -- Extent to which patent monopoly protects "substance" of invention -- Whether claims patented sufficiently elastic to catch competitor's machine.*

The appellant is the owner of two patents of invention issued in 1981 and 1983 which relate to an apparatus that bombards different parts of the human body with low frequency electro-magnetic waves. The system discovered by the appellant was for a new method of controlling the amplitude and frequency of the electro-magnetic waves by "circuit means". The respondent company developed and marketed an apparatus which achieved similar therapeutic purposes, but employed somewhat different technology, using instead a "microcontroller". The appellant acknowledged the difference, but argued that the end result was the same and therefore its patent monopoly was infringed. The trial judge ruled the patents anticipated and thus invalid. The Court of Appeal reversed the finding of invalidity but found there was no infringement.

Held: The appeal should be dismissed.

The interpretive task of the court in claims construction is to separate and distinguish the essential from the inessential and to give to the "field" of the monopoly framed by the essential elements of the claims the legal protection to which the holder of a valid patent is entitled. The essential elements common to the claims of both patents in suit include a control to regulate the peak amplitude and frequency of electro-magnetic waves by "circuit means". The claimed invention effected an ingenious combination rather than a mere aggregation of previously known components. The invention was not anticipated by a prior publication that did not address the technical problems dealt with in these patents.

The more difficult issue is how best to resolve the tension between "literal infringement" and "substantive infringement". The Patent Act seeks both fairness and predictability. Its objective of promoting research and development would be undermined if competitors fear to tread in the vicinity of the patent because its scope lacks a reasonable measure of precision and certainty. Predictability is achieved by tying the patentee to its claims and fairness is achieved by interpreting those claims in an informed and purposive way.

The greater the level of discretion left to courts to peer below the language of the claims in a search for the "spirit of the invention", the less the claims can perform their public notice function, and the greater the resulting level of unwelcome uncertainty and unpredictability. "Purposive construction" does away with a purely literal interpretation but disciplines the scope of the "substantive" claims

construction in the interest of fairness to both the patentee and the public. Some elements of a claimed invention are essential while others are non-essential. These are identified, on the basis of the common knowledge of the worker skilled in the art to which the patent relates as of the date the patent is published (under the current provisions of the Patent Act the date of publication is the "laid open" date). There is no infringement if an essential element is different or omitted in the allegedly infringing device, but there may still be infringement if non-essential elements are substituted or omitted. For an element to be considered non-essential and thus substitutable, it must be shown either that on a purposive construction of the words of the claim it was clearly not intended to be essential, or that at the date of publication of the patent, the skilled addressee would have appreciated that a particular element could be substituted or omitted without affecting the working of the invention.

Based on the foregoing principles, the respondents' device does not infringe. The ingenuity of these patents lay not in their identification of a desirable result but in teaching particular means to achieve it. The claims cannot be stretched to allow the patentee to monopolize anything that achieves the desirable result. The respondents' device differs both structurally and operationally from the device contemplated in the claims. The use of a "microcontroller" substituted a totally different technology and was fatal to the appellant's allegation of infringement.

## Cases Cited

Referred to: Clothworkers of Ipswich Case (1653), Godb. 252, 78 E.R. 147; Minerals Separation North American Corp. v. Noranda Mines, Ltd., [1947] Ex. C.R. 306; Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd., [1981] 1 S.C.R. 504; General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., [1972] R.P.C. 457 ; Beloit Canada Ltd. v. Valmet OY (1986), 8 C.P.R. (3d) 289 ; The King v. Uhlemann Optical Co., [1952] 1 S.C.R. 143 ; Domtar Ltd. v. MacMillan Bloedel Packaging Ltd. (1977), 33 C.P.R. (2d) 182 ; Grip Printing and Publishing Co., of Toronto v. Butterfield (1885), 11 S.C.R. 291; Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605 (1950); Electrolier Manufacturing Co. v. Dominion Manufacturers Ltd., [1934] S.C.R. 436; Smith Incubator Co. v. Seiling, [1936] S.C.R. 251 ; J. K. Smit & Sons, Inc. v. McClintock, [1940] S.C.R. 279 ; Gillette Safety Razor Co. of Canada v. Pal Blade Corp., [1933] S.C.R. 142; Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17 (1997); Clark v. Adie (1873), L.R. 10 Ch. 667; Electric & Musical Industries Ld. v. Lissen Ld. (1939), 56 R.P.C. 23; Catnic Components Ltd. v. Hill & Smith Ltd., [1982] R.P.C. 183; Interpress Associates Ltd. v. Pacific Coilcoaters Ltd. (1994), 29 I.P.R. 635; Smale v. North Sails

Ltd., [1991] 3 N.Z.L.R. 19; Populin v. H.B. Nominees Pty. Ltd.
(1982), 59 F.L.R. 37; Rhone-Poulenc Agrochimie SA v. UIM
Chemical Services Pty. Ltd. (1986), 68 A.L.R. 77;
Multotec Manufacturing (Pty.) Ltd. v. Screenex Wire Weaving
Manufacturers (Pty.) Ltd., 1983 (1) SA 709; Sappi Fine Papers
(Pty.) Ltd. v. ICI Canada Inc. (Formerly CIL Inc.), 1992 (3)
SA 306; Improver Corp. v. Raymond Industrial Ltd., [1991]
F.S.R. 233; Eli Lilly & Co.v. O'Hara Manufacturing Ltd.
(1989), 26 C.P.R. (3d) 1; R. v. Nova Scotia Pharmaceutical
Society, [1992] 2 S.C.R. 606; R.C.A. Photophone, Ld. v.
Gaumont-British Picture Corp. (1936), 53 R.P.C. 167; Western
Electric Co. v. Baldwin International Radio of Canada, [1934] S.C.R. 570
; Mobil Oil Corp. v. Hercules Canada Inc. (1995), 63 C.P.R. (3d) 473
; Computalog Ltd. v. Comtech Logging Ltd.
(1992), 44 C.P.R. (3d) 77; Feherguard Products Ltd. v. Rocky's
of B.C. Leisure Ltd. (1995), 60 C.P.R. (3d) 512; Cutter
(Canada) Ltd. v. Baxter Travenol Laboratories of Canada Ltd.
(1983), 68 C.P.R. (2d) 179; Johnson Controls, Inc. v. Varta
Batteries Ltd. (1984), 80 C.P.R. (2d) 1; Whirlpool Corp. v.
Camco Inc., [2000] 2 S.C.R. 1067, 2000 SCC 67; Whirlpool Corp.
v. Maytag Corp., [2000] 2 S.C.R. 1116, 2000 SCC 68; Improver
Corp. v. Remington Consumer Products Ltd., [1990] F.S.R. 181;
Biogen Inc. v. Medeva PLC, [1997] R.P.C. 1; Dyson Appliances
Ltd. v. Hoover Ltd., [2000] E.W.J. No. 4994 (QL); AT & T
Technologies, Inc. v. Mitel Corp. (1989), 26 C.P.R. (3d) 238;
Lovell Manufacturing Co. v. Beatty Bros. Ltd. (1962), 23 Fox Pat. C. 112
; P.L.G. Research Ltd. v. Jannock Steel Fabricating
Co. (1991), 35 C.P.R. (3d) 346; Foseco Trading A.G. v.
Canadian Ferro Hot Metal Specialties, Ltd. (1991), 36 C.P.R. (3d) 35
;  Incandescent Gas Light Co. v. De Mare Incandescent
Gas Light System, Ld. (1896), 13 R.P.C. 301.

## Statutes and Regulations Cited

Convention on the Grant of European Patents (European Patent Convention), October 5, 1973.
Patent Act, R.S.C., 1985, c. P-4, ss. 10 [rep. & sub. c. 33 (3rd Supp.), s. 2; rep. & sub. 1993, c. 15, s. 28], 27(1), 28(2), 34, 44, 55(2) [rep. & sub. c. 33 (3rd Supp.), s. 21; rep. & sub. 1993, c. 15, s. 48].
Statute of Monopolies (1623).

## Authors Cited

Annand, Ruth E. "Infringement of Patents --  Is "Catnic" the Correct Approach for Determining the

Scope of a Patent Monopoly Under the Patents Act 1977?" (1992), 21 Anglo-Am. L. Rev. 39.

Boudreau, Jean-Claude. "AT&T Technologies: A Contribution to the Purposive Construction Approach for Patent Infringement Analysis in Canada" (1998-99), 15 C.I.P.R. 323.

Fox, Harold G. The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.

Goldsmith, Immanuel. Patents of Invention. Agincourt, Ont.: Carswell, 1981.

Hitchman, Carol V. E., and Donald H. MacOdrum. "Don't Fence Me In: Infringement in Substance in Patent Actions" (1990-91), 7 C.I.P.R. 167.

Sajewycz, Mark. "Patent Claim Interpretation as It Should Be: Promoting the Objects of the Patent Act" (1996-97), 13 C.I.P.R. 173.

Scott, David W. "The Record of Proceedings in the Patent Office in Canada & Foreign Countries as Evidence in Infringement & Validity Contests" (1985-86), 2 C.I.P.R. 160.

Solov'eva, G. R. "Instrumentation and Applications of Low-Frequency Magnetotherapy" (1975), 8 Biomedical Engineering 166.

Sotiriadis, Bob H. "Purposive Construction in Canadian Patent Infringement Cases Since O'Hara" (1996), 11 I.P.J. 111.

Takenaka, Toshiko. "Doctrine of Equivalents after Hilton Davis: A Comparative Law Analysis" (1996), 22 Rutgers Computer & Tech. L.J. 479.

Terrell on the Law of Patents, 15th ed. By S. Thorley, R. Miller, G. Burkill and C. Birss. London: Sweet & Maxwell, 2000.

Turner, Jonathan D. C. "Purposive Construction: Seven Reasons Why Catnic is Wrong" (1999), 21 E.I.P.R. 531.

APPEAL from a judgment of the Quebec Court of Appeal[1997] R.J.Q. 2907, 81 C.P.R. (3d) 456, [1997] Q.J. No. 3479 (QL), allowing in part the appellant's appeal from a judgment of the Superior Court, holding that the appellant's patents were invalid and that they had not been infringed by the respondents. Appeal dismissed.

Louis Masson and Nathalie Vaillant, for the appellant. No one appeared for the respondents.
Bruce W. Stratton and Dino P. Clarizio, for the intervener.

Solicitors for the appellant: Joli-Coeur, Lacasse, Lemieux, Simard, St-Pierre, Sillery, Québec.
Solicitors for the intervener: Dimock Stratton Clarizio, Toronto.

---

The judgment of the Court was delivered by

**1    BINNIE J.**:-- The principal question that arises on this appeal is the extent to which a patent

monopoly protects "the substance" or "the spirit" of an invention, as distinguished from what is literally described in the written claims, and whether on the facts of this case the claims patented by the appellant are sufficiently elastic to catch the electro-magnetotherapy machine of the respondent Électro Santé Inc.

**2**    More specifically, the appellant concedes that the respondents' machine, which is used in the treatment of such bodily ills as rheumatism and arthritis, is not precisely as described in the written claims of its patents. It says, however, that the respondents have stolen the substance of its invention and claims an injunction plus compensatory and punitive damages.

**3**    The appeal thus raises important questions about the scope and ambit of a patent owner's monopoly. Too much elasticity in the interpretation of the scope of the claims creates uncertainty and stifles competition. Too little protection robs inventors of the benefit they were promised in exchange for making a full and complete disclosure of the fruits of their ingenuity. The Quebec Court of Appeal held that the respondents' machines took neither the letter nor the substance of the appellant's patents. I think this conclusion was correct, although I get there by a somewhat different route. The appeal must therefore be dismissed.

    I.    Facts

**4**    The appellant, Free World Trust, is the owner of two patents of invention numbered 1,113,156 (the "'156 patent") and 1,150,361 (the "'361 patent") issued in 1981 and 1983 respectively. The patents relate to an apparatus that bombards different parts of the human body with low frequency electro-magnetic waves. Electro-magnetotherapy is not new, but the appellant persuaded the Commissioner of Patents that it had discovered a new method of controlling the amplitude and frequency of the electromagnetic waves by "circuit means" with desirable and beneficial effects. The appellants put the invention described in these patents on the market in the form of an apparatus called Rhumart, which was a commercial success. In 1991, the appellant sold 3,525 Rhumart systems for a total of $13,683,240.

**5**    On March 4, 1992, the respondent Paul Demers, one of the appellant's sales representatives, quit his employ with the appellant and started the respondent company for the purpose of developing and marketing electro-magnetotherapy machines in competition with his former firm. Within approximately six months of Demers' departure from the appellant company, the "new" product was on sale. The respondent Noël Desjardins, formerly an independent distributor for the Rhumart system, joined Demers to provide distribution and marketing expertise.

**6**    The respondents' apparatus (which it called "Électro-Santé") achieved similar therapeutic purposes, but employed somewhat different technology. The present controversy revolves around these differences, and whether they are sufficiently substantial to put the respondents outside the appellant's monopoly. Of particular importance is the fact that the appellant's patents teach the use of "control circuits" to regulate the magnetic field of waves or pulses whose frequency, orientation and amplitude are critical to therapy. Its Rhumart apparatus employed such "control circuits". The

respondents' Électro-Santé machines, on the other hand, used a "microcontroller" which, according to the appellant's own expert, is a [TRANSLATION] "highly versatile element, similar to an IBM PC computer or the like". He acknowledged that this method of regulating the magnetic field is different from what is contemplated in the claims of the patent. The appellant's position, however, is that the end result was the same and that its monopoly was thereby infringed.

II. Judgments

1.    Trial Judgment (Quebec Superior Court -- Bergeron J.)

**7**    The trial judge ruled against the validity of the patents obtained by the appellant. The Patent Act, R.S.C., 1985, c. P-4, provides that a patent cannot be granted for an invention in a publication printed in Canada or in any other country more than two years prior to the patent application (ss. 27(1) and 28(2)). In Bergeron J.'s view, the invention described in the patent claims was anticipated by a 1975 article authored by G. R. Solov'eva, entitled "Instrumentation and Applications of Low-Frequency Magnetotherapy". The Solov'eva article, he concluded, conveys all of the fundamental elements needed to produce the claimed invention, thereby rendering the patents anticipated and thus invalid:

> [TRANSLATION] In my view, the Solov'eva article discloses all of the fundamental elements necessary to allow a person skilled in the art or science of the relevant field to make or construct the invention. We find present in this article all the essential characteristics described in the patent claims. This is a publication that describes the invention that is the subject of patents 1,113,156 and 1,150,316.

In light of this conclusion, Bergeron J. dismissed the action without expressing an opinion on the issue of patent infringement. The allegation of unfair competition on the part of the respondents Demers and Desjardins was also rejected.

2.    Court of Appeal (Rousseau-Houle J.A. for the Court) (1997), 81 C.P.R. (3d) 456

**8**    Rousseau-Houle J.A. cited the provision of the Patent Act which creates a presumption in favour of the validity of a patent. The burden of proving the invalidity of the appellant's patents on a balance of probabilities rested on the respondents. The respondents failed to discharge this onus. The Solov'eva article did not contain all of the essential elements of the patent claims and a reading of it would not provide a person skilled in the art the information necessary to build, without risk of error, the patented device. Rousseau-Houle J.A. also rejected the arguments of lack of ingenuity and inventiveness. Accordingly, the trial finding of invalidity was reversed and patents '156 and '361 were declared valid.

**9**    On the issue of infringement, Rousseau-Houle J.A. considered the principles applicable to claims construction and noted that the appellant's case rested on an allegation of "substantive"

infringement. Rousseau-Houle J.A. identified certain differences and similarities between the Électro-Santé and Rhumart systems and concluded that there were sufficient differences to distinguish the Électro-Santé device and therefore rejected the allegation of infringement. The appeal with respect to an injunction and damages was therefore dismissed.

**10**    The respondents' trustee in bankruptcy elected not to participate in the appeal to this Court. However, Procter & Gamble Inc. successfully applied to intervene in support of the correctness of the outcome arrived at by the Quebec Court of Appeal.

III.    Relevant Statutory Provisions

**11**    As the patents in suit were issued prior to October 1, 1989, the provisions of the former Patent Act apply. The relevant sections of the Patent Act, R.S.C., 1985, c. P-4, provide as follows:

SECTION 27(1). [APPLICATION FOR PATENTS]

Subject to this section, any inventor or legal representative of an inventor of an invention that was

(a)    not known or used by any other person before he invented it,
(b)    not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and
(c)    not in public use or sale in Canada for more than two years prior to his application in Canada,

may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

SECTION 28(2). [LIMITATION OF TWO YEARS]

No patent shall be granted on an application for a patent for an invention that had been patented or described in a patent or publication printed in Canada or any other country more than two years before the date of the actual filing of the application in Canada, or had been in public use or on sale in Canada for more than two years prior to that filing.

SECTION 34. [SPECIFICATION]

(1) An applicant shall in the specification of his invention

(a)     correctly and fully describe the invention and its operation or use as contemplated by the inventor;

(b)     set out clearly the various steps in a process, or the method of constructing, making, compounding or using a machine, manufacture or composition of matter, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most closely connected, to make, construct, compound or use it;

(c)     in the case of a machine, explain the principle thereof and the best mode in which he has contemplated the application of that principle;

(d)     in the case of a process, explain the necessary sequence, if any, of the various steps, so as to distinguish the invention from other inventions; and

(e)     particularly indicate and distinctly claim the part, improvement or combination that he claims as his invention.

(2)     Claims to be stated distinctly--The specification referred to in subsection (1) shall end with a claim or claims stating distinctly and in explicit terms the things or combinations that the applicant regards as new and in which he claims an exclusive property or privilege.

SECTION 44. [WHAT PATENT SHALL CONTAIN AND CONFER]

Every patent granted under this Act shall contain the title or name of the invention, with a reference to the specification, and shall, subject to the conditions prescribed in this Act, grant to the patentee and his legal representatives for the term therein mentioned, from the granting of the patent, the exclusive right, privilege and liberty of making, constructing, using and vending to others to be used the invention, subject to adjudication in respect thereof before any court of competent jurisdiction.

12   The relevant amended provisions of the Patent Act, R.S.C., 1985, c. P-4, as amended by S.C. 1993, c. 15, provide as follows:

SECTION 10. [INSPECTION BY THE PUBLIC]

(1) Subject to subsections (2) to (6) and section 20, all patents, applications for patents and documents filed in connection with patents or applications for patents shall be open to public inspection at the Patent Office, under such conditions as may be prescribed.

(2) Confidentiality period -- Except with the approval of the applicant, an application for a patent, or a document filed in connection with the application, shall not be open to public inspection before a confidentiality period of eighteen months has expired.

(3) Beginning of confidentiality period--The confidentiality period begins on the filing date of the application or, where a request for priority has been made in respect of the application, it begins on the earliest filing date of any previously regularly filed application on which the request is based.

SECTION 55. [LIABILITY FOR PATENT INFRINGEMENT]

(1) A person who infringes a patent is liable to the patentee and to all persons claiming under the patentee for all damage sustained by the patentee or by any such person, after the grant of the patent, by reason of the infringement.

(2)    Liability damage before patent is granted--A person is liable to pay reasonable compensation to a patentee and to all persons claiming under the patentee for any damage sustained by the patentee or by any of those persons by reason of any act on the part of that person, after the application for the patent became open to public inspection under section 10 and before the grant of the patent, that would have constituted an infringement of the patent if the patent had been granted on the day the application became open to public inspection under that section.

IV.    Analysis

**13**    Patent protection rests on the concept of a bargain between the inventor and the public. In return for disclosure of the invention to the public, the inventor acquires for a limited time the exclusive right to exploit it. It was ever thus. Even before the Statute of Monopolies (1623), the Crown rewarded an inventor with a limited monopoly in exchange for public disclosure of "a new invention and a new trade within the kingdom ... or if a man hath made a new discovery of any thing": Clothworkers of Ipswich Case (1653), Godb. 252, 78 E.R. 147, at p. 148, where the court

went on to say that the effect of an unjustified monopoly was "to take away free-trade, which is the birthright of every subject". The argument for the respondents is that the appellant has failed to live up to its side of the bargain in two ways. In the first place, it did not make a new discovery of anything. The appellant's patents teach nothing that was not well known beforehand. Its patents are therefore invalid. Secondly, even if the patents are valid, the appellant overreaches its bargain with the public by now asserting a monopoly over devices that are in no way disclosed, taught or claimed in its patents. The appellant is trying to get something for nothing. The appellant has given no consideration for the patent protection it now seeks. That is the argument.

      1.     The Claims in Suit

**14**    Patent claims are frequently analogized to "fences" and "boundaries", giving the "fields" of the monopoly a comfortable pretence of bright line demarcation. Thus, in Minerals Separation North American Corp. v. Noranda Mines, Ltd., [1947] Ex. C.R. 306, Thorson P. put the matter as follows, at p. 352:

> By his claims the inventor puts fences around the fields of his monopoly and warns the public against trespassing on his property. His fences must be clearly placed in order to give the necessary warning and he must not fence in any property that is not his own. The terms of a claim must be free from avoidable ambiguity or obscurity and must not be flexible; they must be clear and precise so that the public will be able to know not only where it must not trespass but also where it may safely go.

**15**    In reality, the "fences" often consist of complex layers of definitions of different elements (or "components" or "features" or "integers") of differing complexity, substitutability and ingenuity. A matrix of descriptive words and phrases defines the monopoly, warns the public and ensnares the infringer. In some instances, the precise elements of the "fence" may be crucial or "essential" to the working of the invention as claimed; in others the inventor may contemplate, and the reader skilled in the art appreciate, that variants could easily be used or substituted without making any material difference to the working of the invention. The interpretative task of the court in claims construction is to separate the one from the other, to distinguish the essential from the inessential, and to give to the "field" framed by the former the legal protection to which the holder of a valid patent is entitled.

**16**    The issue in this case turns on the construction of claim 1 in each of the two patents (as the other claims incorporate and build on claim 1, they need not be considered at length).

      (a)    The '156 Patent

**17**    1. An electro-magnetic low frequency therapeutic system comprising a magnetization coil, said magnetization coil being stationary during a magnetic field treatment, for creating a preselected therapeutic magnetic field in response to preselected coil energizing-current waveforms whereby said magnetic field has desired treatment characteristics, said magnetic field having an adjustable

intensity set by adjustable control means, said control means also having:

> (i) circuit means for controlling the peak amplitude of the said magnetic field for achieving a specific modulation of said peak amplitude in a given time;

> (ii) means to select the orientation and/or direction of the therapeutic magnetic field with respect to a tissue to be treated;

> (iii) circuit means to select the frequency of interruption of the coil energizing-current to obtain a selected one of different therapeutic magnetic field time patterns;

> (iv) means to select a desired treatment time; automatic demagnetizing means responsive to a preselected demagnetizing time and mode for attenuating said field in a desired manner to terminate a magnetic field treatment.

>> (b)    The '361 Patent

**18**    Claim 1 of the '361 patent offers certain improvements to the '156 patent; the major innovations lie in a more detailed treatment of the control means. Though it does not refer to a "stationary" coil, it requires "means to secure said coil in a predetermined fixed position" and repeats the requirement of a "control circuit means" to control amplitude and frequency. The broad monopoly asserted in claim 1 reads:

> 1.    An electro-magnetic low-frequency therapeutic system comprising a magnetization coil for creating an electro-magnetic field, means to secure said coil in a predetermined fixed position, generator means for feeding said coil with predetermined treatment signals to obtain a desired magnetic field characteristic, control circuit means for selecting desired characteristics of said treatment signals, said control circuit means having (i) circuit control means for controlling the peak intensity of said desired magnetic field, (ii) frequency control means to select the frequency of said treatment signals to obtain a selected type of a plurality of treatment signals, (iii) adjustment means to preset the duration time of said treatment signals and said electro-magnetic field, said desired magnetic field characteristics being predetermined from a magnetic field pattern chart representative of the parameters of the field of said magnetization coil in the surrounding environment of said coil whereby to obtain a desired range of intensity of said field and a desired orientation thereof relative to a position of said coil.

**19**    This appeal raises questions of both validity and infringement. The task of claims construction is antecedent to both inquiries.

> 2.    Claims Construction

**20**    Based on the expert evidence given at trial as to the meaning of the terms used, and the understanding that these terms would convey at the date of the patent to an ordinary worker skilled in the art of electro-magnetotherapy devices and possessing the common knowledge of people engaged in that field, it appears that while some of the elements of the '156 and '361 patents are essential if the devices are to work as contemplated and claimed by the inventor, others are non-essential. The non-essential elements may be substituted or omitted without having a material effect on either the structure or the operation of the invention described in the claims.

> (a)    The Essential Elements

**21**    The essential elements common to the claims of both the '156 and '361 patents include at least the following:

> 1.    a control to regulate the peak amplitude and frequency of interruption of the current which "energizes" the coil;
> 2.    such control to be provided by "circuit means".

**22**    For purposes of this appeal, it is unnecessary to detail the other features of the invention. The argument is that a device which does not include these essential elements is clearly "outside the fence" of the claimed monopoly.

> (b)    The Non-essential Elements

**23**    The '156 patent includes a number of additional claims dependent on claim 1. Thus, for example, claims 4 and 5 claim a "repeatedly discharged capacitor" that fires an electric current through a damping resistor into a magnetization coil and can be wired to break the current up into pulses ("pulsatile" wave forms) to produce magnetic fields. The appellant argues that any such apparatus would infringe its patent. However, the evidence is that much of this equipment is commonly used in university science laboratories and in other settings involving the production of magnetic fields using electric currents through coiled wires. They are included in the patent only because of their use in conjunction with "essential" elements of the invention described in claim 1. In the case of some of these specific components, anyone skilled in the art reading the patent at the date of its publication would immediately have appreciated that there existed different commonly known substitutes or mechanical equivalents that would do the job just as well. The claims of the '361 patent also contemplate a number of interchangeable components that do not constitute part of the essential invention. Thus, claims 5, 14 and 20 of the '361 patent refer to the use of switches in conjunction with the device described in claim 1. These components themselves were not patented on their own -- indeed, they could not be patented since they represent equipment commonly known

and used by persons skilled in electrical engineering. They came to be included in the claim as an element of an ingenious combination. Substitution of one type of switch for another in this case would not strike at the essentials of the invention.

3.    Validity of the Patents in Issue

**24**    The trial judge declared the patents to be invalid because he agreed with the respondents that the inventions described in the '156 and '361 patents were fully anticipated by the publication of the article in 1975 by Solov'eva. The "invention" was thus considered to have been described "in a ... publication printed in Canada or any other country more than two years" before the filing of the patent application and thus unpatentable by virtue of s. 28(2) of the Act.

**25**    Anticipation by publication is a difficult defence to establish because courts recognize that it is all too easy after an invention has been disclosed to find its antecedents in bits and pieces of earlier learning. It takes little ingenuity to assemble a dossier of prior art with the benefit of 20-20 hindsight. In this case, the respondents contended that all of the essential elements of the appellant's alleged inventions were disclosed in a single publication, the Solov'eva article, which predated the patent application by almost 4 years. If this is correct, the patent would be invalid.

**26**    The Solov'eva article was drawn to the respondents' attention by the appellant who cited it as prior art in the specification of the '361 patent itself. The legal question is whether the Solov'eva article contains sufficient information to enable a person of ordinary skill and knowledge in the field to understand, without access to the two patents, "the nature of the invention and carry it into practical use without the aid of inventive genius but purely by mechanical skill" (H. G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), at pp. 126-27). In other words, was the information given by Solov'eva "for [the] purpose of practical utility, equal to that given in the patents in suit"? (Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd., [1981] 1 S.C.R. 504, per Dickson J. at p. 534), or as was memorably put in General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., [1972] R.P.C. 457 (Eng. C.A.), at p. 486:

> A signpost, however clear, upon the road to the patentee's invention will not suffice. The prior inventor must be clearly shown to have planted his flag at the precise destination before the patentee.

The test for anticipation is difficult to meet:

> One must, in effect, be able to look at a prior, single publication and find in it all the information which, for practical purposes, is needed to produce the claimed invention without the exercise of any inventive skill. The prior publication must contain so clear a direction that a skilled person reading and following it would in every case and without possibility of error be led to the claimed invention.

(Beloit Canada Ltd. v. Valmet OY (1986), 8 C.P.R. (3d) 289 (F.C.A.), per
Hugessen J.A., at p. 297)

**27**    It is clear, with respect, that the Solov'eva article does not address, let alone solve, the
technical problems dealt with in the patents in suit. It is nothing more than a four-page overview of
the history of electro-magnetotherapy. It describes some of the various systems available in 1975 in
Europe and Japan. The appellant, it must be appreciated, does not claim to have invented
electro-magnetotherapy. It obtained a patent for a particular means. Although the various
components were earlier known to persons skilled in the art, the inventor brought the elements
together to achieve what the Commissioner of Patents considered a new, useful and ingenious
result. The claimed invention effected an ingenious combination rather than a mere aggregation of
previously known components (The King v. Uhlemann Optical Co., [1952] 1 S.C.R. 143, per
Rinfret C.J., at p. 150; Domtar Ltd. v. MacMillan Bloedel Packaging Ltd. (1977), 33 C.P.R. (2d)
182 (F.C.T.D.), at pp. 189-91). The ingenious combination was neither taught nor anticipated in the
Solov'eva publication. None of the other arguments against validity are convincing. The patentee
lived up to its side of the bargain by disclosing an invention. The patents are valid.

4.    Infringement Issues

**28**    The appeal in this Court was essentially directed to the infringement issues. It has been
established, at least since Grip Printing and Publishing Co. of Toronto v. Butterfield (1885), 11
S.C.R. 291, that a patent owner has a remedy against an alleged infringer who does not take the
letter of the invention but nevertheless appropriates its substance (or "pith and marrow"). This
extended protection of the patentee is recognized in Anglo-Canadian law, and also finds expression
in modified form in the United States under the doctrine of equivalents, which is said to be available
against the producer of a device that performs substantially the same function in substantially the
same way to obtain substantially the same result: Graver Tank & Mfg. Co. v. Linde Air Products
Co., 339 U.S. 605 (1950), at p. 608.

**29**    It is obviously an important public policy to control the scope of "substantive infringement".
A purely literal application of the text of the claims would allow a person skilled in the art to make
minor and inconsequential variations in the device and thereby to appropriate the substance of the
invention with a copycat device while staying just outside the monopoly. A broader interpretation,
on the other hand, risks conferring on the patentee the benefit of inventions that he had not in fact
made but which could be deemed with hindsight to be "equivalent" to what in fact was invented.
This would be unfair to the public and unfair to competitors. It is important that the patent system
be fair as well as predictable in its operation.

**30**    The argument for the respondents is that even if the patents are valid, the appellant is not
sticking to the bargain it made. It is pushing the envelope of the doctrine of "substantive
infringement" beyond anything disclosed or claimed in its patent specifications. The inventor
brought together known components to achieve a useful and ingenious result, but now attacks the

respondents' device which brings together different components to achieve a comparable result.

**31**    The appeal thus raises the fundamental issue of how best to resolve the tension between "literal infringement" and "substantive infringement" to achieve a fair and predictable result. There has been considerable discussion of this issue in Canada and elsewhere, which I will discuss briefly in support of the following propositions:

    (a)    The Patent Act promotes adherence to the language of the claims.

    (b)    Adherence to the language of the claims in turn promotes both fairness and predictability.

    (c)    The claim language must, however, be read in an informed and purposive way.

    (d)    The language of the claims thus construed defines the monopoly. There is no recourse to such vague notions as the "spirit of the invention" to expand it further.

    (e)    The claims language will, on a purposive construction, show that some elements of the claimed invention are essential while others are non-essential. The identification of elements as essential or non-essential is made:

        (i)    on the basis of the common knowledge of the worker skilled in the art to which the patent relates;

        (ii)    as of the date the patent is published;

        (iii)    having regard to whether or not it was obvious to the skilled reader at the time the patent was published that a variant of a particular element would not make a difference to the way in which the invention works; or

        (iv)    according to the intent of the inventor, expressed or inferred from the claims, that a particular element is essential irrespective of its practical effect;

        (v)    without, however, resort to extrinsic evidence of the inventor's intention.

    (f)    There is no infringement if an essential element is different or omitted. There may still be infringement, however, if non-essential elements are substituted or omitted.

**32**    Based on the foregoing principles, I conclude that the appellant's arguments must be rejected. As stated, the ingenuity of the patent lies not in the identification of a desirable result but in teaching one particular means to achieve it. The claims cannot be stretched to allow the patentee to monopolize anything that achieves the desirable result. It is not legitimate, for example, to obtain a patent for a particular method that grows hair on bald men and thereafter claim that anything that grows hair on bald men infringes. I turn then to the first of the propositions listed above.

    (a)    The Patent Act Promotes Adherence to the Language of the Claims

**33**    The Patent Act requires the letters patent granting a patent monopoly to include a specification which sets out a correct and full "disclosure" of the invention, i.e., "correctly and fully describe[s] the invention and its operation or use as contemplated by the inventor" (s. 34(1)(a)). The disclosure is followed by "a claim or claims stating distinctly and in explicit terms the things or combinations that the applicant regards as new and in which he claims an exclusive property or privilege" (s. 34(2)). It is the invention thus claimed to which the patentee receives the "exclusive right, privilege and liberty" of exploitation (s. 44). These provisions, and similar provisions in other jurisdictions, have given rise to two schools of thought. One school holds that the claim embodies a technical idea and claims construction ought to look to substance rather than form to protect the inventive idea underlying the claim language. This is sometimes called the "central claim drafting principle" and is associated with the German and Japanese patent systems: T. Takenaka, "Doctrine of Equivalents after Hilton Davis: A Comparative Law Analysis" (1996), 22 Rutgers Computer & Tech. L. J. 479, at pp. 491, 502 and 519. The other school of thought supporting what is sometimes called the "peripheral claiming principle" emphasizes the language of the claims as defining not the underlying technical idea but the legal boundary of the state-conferred monopoly. Traditionally, for reasons of fairness and predictability, Canadian courts have preferred the latter approach.

**34**    The "spirit of the invention" school in this country relies on Electrolier Manufacturing Co. v. Dominion Manufacturers Ltd., [1934] S.C.R. 436. In that case, which involved a method to pivot handles for coffins, Rinfret J. spoke of "the spirit of the invention" but did so in a direct quote from the patent itself, at p. 443:

> What the appellant did -- and in that his infringement truly consists -- was to take the idea which formed the real subject-matter of the invention. It does not matter whether he also adopted the substitution of the two holes for the bar in the pivoting means. The precise form of these means was immaterial. In the language of the patent, they could be changed "without departing from the spirit of the invention". [Emphasis added.]

Rinfret J. went on at p. 444 to tie explicitly his finding of infringement to a "fair interpretation of the language of the specification".

**35**    The debate between the advocates of the "central claiming principle" and advocates of the "peripheral claiming principle" can each find precedents to support them. As long ago as Smith Incubator Co. v. Seiling, [1936] S.C.R. 251, at p. 259, counsel pointed out that there appeared to be these two mutually inconsistent lines of authority:

> According to one of these it is proper to consider what is "the pith and substance" or the "spirit" of the invention and to give effect to the patent accordingly. The other is to regard the claims as definitely determining the scope of the monopoly which the patent purports to grant and to give or refuse them effect according to the expressions they contain when these expressions are

properly construed and their meaning determined.

To which Rinfret J., for the Court, responded at pp. 259-60:

> In our view, the rule is that the claims must be regarded as definitely determining the scope of the monopoly, having regard to the due and proper construction of the expressions they contain.

**36**    In J. K. Smit & Sons, Inc. v. McClintock, [1940] S.C.R. 279, Duff C.J., for the Court, reversed the Exchequer Court finding of infringement because he could not "find in these claims the description of a monopoly which clearly and plainly includes a prohibition" (p. 287) against the alleged infringement. Gillette Safety Razor Co. of Canada v. Pal Blade Corp., [1933] S.C.R. 142, per Rinfret J. at p. 147, is to the same effect.

**37**    With respect to the United States, I mentioned earlier the seminal Graver Tank case in 1950. More recently, the United States Supreme Court revisited the doctrine of equivalents in Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17 (1997), and concluded, per Thomas J., at pp. 28-29:

> We do, however, share the concern of the dissenters below that the doctrine of equivalents, as it has come to be applied since Graver Tank, has taken on a life of its own, unbounded by the patent claims. There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement.

**38**    The U.S. approach is to disaggregate the invention as described in the patent claims into its constituent parts, as we do, but instead of characterizing an element as essential or non-essential, they treat all elements as "material", per Thomas J., at p. 29:

> Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

Flexibility is thus achieved under the U.S. doctrine of equivalents by asking whether each of the component elements of the invention as claimed is present in the accused device either as literally described in the claim, or by its "equivalent". Knowledge of interchangeability is evaluated as at the date of infringement, not the date of the patent (ibid., at p. 37). The U.S. approach thus uses the patent claims as a springboard to other considerations (including prosecution history estoppel) some of which are extrinsic to the claims themselves.

**39**    The English courts have also engaged in a debate about the proper reach of a patent monopoly. In Clark v. Adie (1873), L.R. 10 Ch. 667, at p. 675, James L.J. spoke of "an essence or substance of the invention underlying the mere accident of form; and that invention, like every other invention, may be pirated by a theft in a disguised or mutilated form". On the other hand, in Electric & Musical Industries Ld. v. Lissen Ld. (1939), 56 R.P.C. 23 (H.L.), Lord Russell stated at p. 39:

> A patentee who describes an invention in the body of a specification obtains no monopoly unless it is claimed in the claims... . [T]here is no such thing as infringement of the equity of a patent... .

The primacy of the language of the claims was emphatically affirmed in the celebrated case of Catnic Components Ltd. v. Hill & Smith Ltd., [1982] R.P.C. 183 (H.L.). The Catnic approach has been accepted in New Zealand: Interpress Associates Ltd. v. Pacific Coilcoaters Ltd. (1994), 29 I.P.R. 635 (H.C.), and Smale v. North Sails Ltd., [1991] 3 N.Z.L.R. 19 (H.C.); and in Australia in Populin v. H.B. Nominees Pty. Ltd. (1982), 59 F.L.R. 37 (Fed. Ct. (Gen. Div.), at p. 43, and Rhone-Poulenc Agrochimie SA v. UIM Chemical Services Pty. Ltd. (1986), 68 A.L.R. 77 (Fed. Ct. (Gen. Div.)), at pp. 92-93; in South Africa in Multotec Manufacturing (Pty.) Ltd. v. Screenex Wire Weaving Manufacturers (Pty.) Ltd., 1983 (1) SA 709 (App. Div.), and Sappi Fine Papers (Pty.) Ltd. v. ICI Canada Inc. (Formerly CIL Inc.), 1992 (3) SA 306 (App. Div.); and in Hong Kong in Improver Corp. v. Raymond Industrial Ltd., [1991] F.S.R. 233 (C.A.). The Catnic decision has its critics, of course, particularly among those who feel its subsequent application under the European Patent Convention denies the patentee the higher level of protection for patentees afforded in continental Europe. For some critics, the claims should more properly be treated not as a "fence" but as a "guidepost": J. D. C. Turner, "Purposive Construction: Seven Reasons Why Catnic is Wrong" (1999), 21 E.I.P.R. 531; M. Sajewycz, "Patent Claim Interpretation as It Should Be: Promoting the Objects of the Patent Act" (1996-97), 13 C.I.P.R. 173; R. E. Annand, "Infringement of Patents -- Is "Catnic" the Correct Approach for Determining the Scope of a Patent Monopoly Under the Patents Act 1977?" (1992), 21 Anglo-Am. L. Rev. 39.

**40**    The judgment of Lord Diplock was considered and applied by our Federal Court of Appeal in Eli Lilly & Co. v. O'Hara Manufacturing Ltd. (1989), 26 C.P.R. (3d) 1, and its progeny. The primacy of the claims language was already rooted deeply in our jurisprudence and should, I think, be affirmed again on this appeal.

>    (b)    Adherence to the Language of the Claims in Turn Promotes both Fairness and Predictability

**41**    The scope of patent protection must not only be fair, it must be reasonably predictable. A patent is, after all, a public instrument issued under statutory authority which may result in severe financial consequences for its infringement. The scope of its prohibition should be made clear so that members of the public may know where they can go with impunity. As was said in another public law connection by Gonthier J. in R. v. Nova Scotia Pharmaceutical Society, [1992] 2 S.C.R.

606, at p. 639, precision in public enactments is required to "sufficiently delineate an area of risk".

**42**    The patent system is designed to advance research and development and to encourage broader economic activity. Achievement of these objectives is undermined however if competitors fear to tread in the vicinity of the patent because its scope lacks a reasonable measure of precision and certainty. A patent of uncertain scope becomes "a public nuisance" (R.C.A. Photophone, Ld. v. Gaumont-British Picture Corp. (1936), 53 R.P.C. 167 (Eng. C.A.), at p. 195). Potential competitors are deterred from working in areas that are not in fact covered by the patent even though costly and protracted litigation (which in the case of patent disputes can be very costly and protracted indeed) might confirm that what the competitors propose to do is entirely lawful. Potential investment is lost or otherwise directed. Competition is "chilled". The patent owner is getting more of a monopoly than the public bargained for. There is a high economic cost attached to uncertainty and it is the proper policy of patent law to keep it to a minimum.

**43**    The patent owner, competitors, potential infringers and the public generally are thus entitled to clear and definite rules as to the extent of the monopoly conferred. This in turn requires that the subjective or discretionary element of claims interpretation (e.g., the elusive quest for "the spirit of the invention") be kept to the minimum, consistent with giving "the inventor protection for that which he has actually in good faith invented" (Western Electric Co. v. Baldwin International Radio of Canada, [1934] S.C.R. 570, at p. 574). Predictability is achieved by tying the patentee to its claims; fairness is achieved by interpreting those claims in an informed and purposive way.

(c)    The Claims Must Be Construed in an Informed and Purposive Way

**44**    The courts have traditionally protected a patentee from the effects of excessive literalism. The patent is not addressed to an ordinary member of the public, but to a worker skilled in the art described by Dr. Fox as

> a hypothetical person possessing the ordinary skill and knowledge of the particular art to which the invention relates, and a mind willing to understand a specification that is addressed to him. This hypothetical person has sometimes been equated with the "reasonable man" used as a standard in negligence cases. He is assumed to be a man who is going to try to achieve success and not one who is looking for difficulties or seeking failure.

> (Fox, supra, at p. 184)

It is the "common knowledge" shared by competent "ordinary workers" that is brought to bear on the interpretation: Fox, supra, at p. 204; Terrell on the Law of Patents (15th ed. 2000), at p. 125; I. Goldsmith, Patents of Invention (1981), at p. 116. The present appeal does not raise great subtleties of interpretation. The experts called by the parties here more or less agreed on the significance of what is stated in the claims. The electro-magnetotherapy is to be controlled by "circuit means". The

present appeal turns on the scope of the legal protection that arises out of that fact.

> (d)    The Language of the Claims Thus Construed Defines the Monopoly. There
> Is no Recourse to such Vague Notions as "Spirit of the Invention" to
> Expand it Further

**45**    There appears to be a continuing controversy in some quarters as to whether there are two approaches to infringement (literal and substantive) or only one approach, namely infringement of the claims as written but "purposively" construed.

**46**    In the two-step approach, the court construes the claims and determines whether the device accused of infringement has literally taken the invention. If not, the court proceeds to the second step of asking itself whether "in substance" the invention was wrongfully appropriated. On occasion, treatment of the second step in specific cases has attracted criticism as being subjective and unduly discretionary. Once the inquiry is no longer anchored in the language of the claims, the court may be heading into unknown waters without a chart. The one-step approach has to build flexibility and common sense into the initial claims construction because there is no second step.

**47**    The "single cause of action" approach was advocated by Lord Diplock in Catnic, supra, at p. 242:

> My Lords, in their closely reasoned written cases in this House and in the
> oral argument, both parties to this appeal have tended to treat "textual
> infringement" and infringement of the "pith and marrow" of an invention as if
> they were separate causes of action, the existence of the former to be determined
> as a matter of construction only and of the latter upon some broader principle of
> colourable evasion. There is, in my view, no such dichotomy; there is but a single
> cause of action and to treat it otherwise, particularly in cases like that which is
> the subject of the instant appeal, is liable to lead to confusion.

**48**    The Catnic approach was adopted in O'Hara, and has been carried forward by the Federal Court of Appeal in cases such as Mobil Oil Corp. v. Hercules Canada Inc. (1995), 63 C.P.R. (3d) 473, per Marceau J.A., at p. 489:

> It is my opinion that one should not endeavour to create a distinction between a
> substantial and a literal infringement in a case such as this; one should construe
> the claims so as to determine what exactly lies within the scope of the inventor's
> rights. Once this has been determined, then one can consider the defendant's
> product to decide if it falls within the scope of the claim.

However, other decisions of different panels of our Federal Court of Appeal have occasionally sought to breathe life into the earlier dichotomy: see Computalog Ltd. v. Comtech Logging Ltd. (1992), 44 C.P.R. (3d) 77, at pp. 80-81, and Feherguard Products Ltd. v. Rocky's of B.C. Leisure

Ltd. (1995), 60 C.P.R. (3d) 512. B. H. Sotiriadis in "Purposive Construction in Canadian Patent Infringement Cases Since O'Hara" (1996), 11 I.P.J. 111, notes at p. 116:

> In fact, notwithstanding O'Hara, the Court of Appeal [in Imperial Oil v. Lubrizol (1992), 45 C.P.R. (3d) 449] went so far as to state that the notion of the "pith and marrow" of an invention in patent cases was a principle that remains "alive and well and applicable in the case before the court."

**49**    Similarly, in C. V. E. Hitchman and D. H. MacOdrum, "Don't Fence Me In: Infringement in Substance in Patent Actions" (1990-91), 7 C.I.P.R. 167, the authors, at p. 201, cite Cutter (Canada) Ltd. v. Baxter Travenol Laboratories of Canada Ltd. (1983), 68 C.P.R. (2d) 179 (F.C.A.), and Johnson Controls, Inc. v. Varta Batteries Ltd. (1984), 80 C.P.R. (2d) 1 (F.C.A.), as evidence of continuing post-Catnic adherence to the two-step approach and conclude, "[i]t is too early to say whether that Court following O'Hara will focus solely on the Catnic test".

**50**    I do not suggest that the two-stage approach necessarily ends at a different destination than the one-stage approach, or that the two-stage approach has resulted in abuse. I think we should now recognize, however, that the greater the level of discretion left to courts to peer below the language of the claims in a search for "the spirit of the invention", the less the claims can perform their public notice function, and the greater the resulting level of unwelcome uncertainty and unpredictability. "Purposive construction" does away with the first step of purely literal interpretation but disciplines the scope of "substantive" claims construction in the interest of fairness to both the patentee and the public. In my view its endorsement by the Federal Court of Appeal in O'Hara was correct.

> (e)    The Claims Language Will, on a Purposive Construction, Show that Some Elements of the Claimed Invention Are Essential While Others Are Non-essential. This Allocation Will Be Made in the Following Manner:
>
> (i)    On the Basis of the Common Knowledge of the Worker Skilled in the Art to which the Patent Relates

**51**    This point is addressed more particularly in Whirlpool Corp. v. Camco Inc., [2000] 2 S.C.R. 1067, 2000 SCC 67 and Whirlpool Corp. v. Maytag Corp., [2000] 2 S.C.R. 1116, 2000 SCC 68, released concurrently. The involvement in claims construction of the skilled addressee holds out to the patentee the comfort that the claims will be read in light of the knowledge provided to the court by expert evidence on the technical meaning of the terms and concepts used in the claims. The words chosen by the inventor will be read in the sense the inventor is presumed to have intended, and in a way that is sympathetic to accomplishment of the inventor's purpose expressed or implicit in the text of the claims. However, if the inventor has misspoken or otherwise created an unnecessary or troublesome limitation in the claims, it is a self-inflicted wound. The public is entitled to rely on the words used provided the words used are interpreted fairly and knowledgeably.

> (ii)    What Constitutes an "Essential" Element Is to Be Interpreted in Light of the Knowledge of the Art at the Date of the Publication of the Patent

Specification

**52**    The substitutability of non-essential elements derives from an informed interpretation of the language of the claims at the time they are revealed to the target audience of persons skilled in the relevant art. Thus Dickson J., in Consolboard, supra, spoke at p. 523 of "what a competent workman reading the specification at its date would have understood it to have disclosed and claimed" (emphasis added). See also Fox, supra, at p. 204. The date of publication was identified by Lord Diplock in Catnic, supra, and picked up by Hoffmann J. (as he then was) in Improver Corp. v. Remington Consumer Products Ltd., [1990] F.S.R. 181 (Pat. Ct.), at p. 182:

> Would this (i.e.: that the variant had no material effect) have been obvious at the date of publication of the patent to a reader skilled in the art? If no, the variant is outside the claim. [Emphasis added.]

**53**    The date of publication continues to be the critical date in England: Terrell, supra, at p. 106, although Lord Hoffmann (as he now is) has observed that "there is an important difference between the 1949 [Patent Act] and the 1977 [Patent Act]" which requires the date of application (or priority date) to become the critical date for certain purposes: Biogen Inc. v. Medeva PLC, [1997] R.P.C. 1 (H.L.), at p. 54. In that case the court was dealing with the sufficiency of disclosure, but some English judges have taken the cue to construe claims as of the date of application as well, e.g., Dyson Appliances Ltd. v. Hoover Ltd., [2000] E.W.J. No. 4994 (QL)(Pat. Ct.), at para. 48(k). In Canada, Reed J. advocated a similar position in AT & T Technologies, Inc. v. Mitel Corp. (1989), 26 C.P.R. (3d) 238 (F.C.T.D.), at p. 260, even in the absence of these statutory changes. While there may be some advantages to the establishment of a single critical date for multiple purposes including obviousness, sufficiency and claims construction, my view is that Canadian law does not support the date of application as the critical date for claims construction.

**54**    There remains, however, a choice between the date of issuance of the patent and the date of its publication because under the former Act the date of issue and the date of publication were the same. Now, as a result of the obligations assumed by Canada under the 1970 Patent Cooperation Treaty implemented by s. 10 of the new Act (S.C. 1993, c. 15, s. 28), the patent specification is "laid open" 18 months after the effective date of the Canadian patent application. In my view, the same logic that favoured the date of issuance/publication as the critical date for claims construction under the former Act, favours the choice of the "laid open" date under the new Act. On that date, the invention is disclosed to the public, those interested have some ability to oppose the grant of the patent applied for, and the applicant for the patent is eventually allowed to claim reasonable compensation (s. 55(2)), provided the patent is ultimately granted, from and after the "laid open" date. The public, the patentee, its competitors and potential infringers all have an interest and/or concern from that date forward. The notional skilled addressee has a text available for interpretation. In summary, public disclosure and the triggering of legal consequences on the "laid open" date, as well as the policy considerations that underpinned the earlier case law, favour that date over the other possibilities as the critical date for the purpose of claims construction.

(iii)    Regard Is to Be Had to Whether It Was Obvious at the Time the
Patent Was Published that Substitution of a Different Variant Would
Make a Difference to the Way in Which the Invention Works

**55**    It would be unfair to allow a patent monopoly to be breached with impunity by a copycat device that simply switched bells and whistles, to escape the literal claims of the patent. Thus the elements of the invention are identified as either essential elements (where substitution of another element or omission takes the device outside the monopoly), or non-essential elements (where substitution or omission is not necessarily fatal to an allegation of infringement). For an element to be considered non-essential and thus substitutable, it must be shown either (i) that on a purposive construction of the words of the claim it was clearly not intended to be essential, or (ii) that at the date of publication of the patent, the skilled addressees would have appreciated that a particular element could be substituted without affecting the working of the invention, i.e., had the skilled worker at that time been told of both the element specified in the claim and the variant and "asked whether the variant would obviously work in the same way", the answer would be yes: Improver Corp. v. Remington, supra, at p. 192. In this context, I think "work in the same way" should be taken for our purposes as meaning that the variant (or component) would perform substantially the same function in substantially the same way to obtain substantially the same result. In Improver Corp. v. Remington, Hoffmann J. attempted to reduce the essence of the Catnic analysis to a series of concise questions, at p. 182:

(i) Does the variant have a material effect upon the way the invention works? If yes, the variant is outside the claim. If no: --

(ii) Would this (i.e.: that the variant had no material effect) have been obvious at the date of publication of the patent to a reader skilled in the art? If no, the variant is outside the claim. If yes: --

(iii) Would the reader skilled in the art nevertheless have understood from the language of the claim that the patentee intended that strict compliance with the primary meaning was an essential requirement of the invention? If yes, the variant is outside the claim.

**56**    The three questions are not exhaustive but they encapsulate the heart of Lord Diplock's analysis, and have been endorsed in subsequent English cases.

**57**    In AT & T Technologies, supra, at p. 257, Reed J. derived a series of interpretive principles from Catnic, supra, O'Hara, supra, and other cases. Her third principle is as follows:

(3)    if a variant of an aspect of a claim has no material effect on the way the invention works there is a presumption that the patent is infringed and that the patentee

> intended that that variant falls within the scope of the claim... . [Emphasis
> added.]

The desirability of such a presumption is supported by some commentators (see, e.g., J.-C.
Boudreau, "AT&T Technologies: A Contribution to the Purposive Construction Approach for
Patent Infringement Analysis in Canada" (1998-99), 15 C.I.P.R. 323). If this proposition is taken to
mean that a presumption of non-essentiality will arise if it is established in light of the knowledge of
substitutability existing at the date of the infringement (AT & T Technologies, supra, at p. 262) that
a variant would have no material effect on the way the invention works then, with respect, I
disagree with it. The effect would be that the ambit of the monopoly would grow over the life of the
patent as new substitutes are developed and absorbed into the common knowledge of the skilled
worker. The inventor cannot be thought to have the necessary "intent" in relation to after-created
knowledge except in the irrelevant sense of intending to reap the benefit of the maximum coverage
available. In my view, Catnic, supra, and O'Hara, supra, were correct to put the onus on the patentee
to establish known and obvious substitutability at the date of publication of the patent. If the
patentee fails to discharge that onus, the descriptive word or expression in the claim is to be
considered essential unless the context of the claims language otherwise dictates.

> (iv)    According to the Intent of the Inventor Expressed or Inferred from the
>         Claims of the Patent

**58**    The inventor is addressing others in the same line of work. Words have layers of significance
and secondary meanings. A reference to "turf" means something different to racehorse owners than
it does to warring business executives. The word "bench" means a physical object to weightlifters
but has numerous secondary meanings for members of the legal profession. The courts recognize
the pitfalls of language and will do what they can to give the inventor "protection for that which he
has actually in good faith invented" (Western Electric, supra, at p. 574), but there are limits.

**59**    In O'Hara, supra, the Federal Court of Appeal held that a patent for a pill coating machine that
specified a flexible exhaust could not be interpreted to cover a machine that fulfilled the same
function and contained all of the other essential elements but which utilized a fixed exhaust. Pratte
J.A., for the court, considered it important that the patentee had specified "exhaust inlet flexibly
biased", and must be taken to have attached significance to the words chosen (at p. 7):

> ... unless it be obvious that the inventor knew that a failure to comply with that
> requirement would have no material effect upon the way the invention worked.

Pratte J.A. also stated:

> A court must interpret the claims; it cannot redraft them. When an inventor has
> clearly stated in the claims that he considered a requirement as essential to his
> invention, a court cannot decide otherwise for the sole reason that he was
> mistaken.

To the same effect see J. K. Smit & Sons, supra, per Duff C.J., at p. 285.

**60**    The facts of O'Hara have an echo in the facts of this case. Claim 1 of the '156 patent stipulates the "said magnetization coil being stationary" during treatment. Whether the magnetization coil is stationary may or may not affect the way the device works, but the inventor has explicitly so stipulated.

<div style="text-align:center">(v)    Based on the Patent Specification Itself Without Resort to Extrinsic Evidence</div>

**61**    In O'Hara, supra, Pratte J.A. commented at p. 7 that in claims interpretation the Court "is merely trying to find out what was the intention of the inventor", and this comment has given rise to the contention that some forms of extrinsic evidence should be admissible in claims construction to establish the inventor's intention.

**62**    The intervener, Procter & Gamble Inc. urges the Court to allow proof of the intent through evidence of representations to the Patent Office in the course of patent prosecution, i.e., the negotiations over the wording of the claims leading up to issuance of the patent. In her reasons, Rousseau-Houle J.A. made limited reference to the prosecution history in the present case as follows (at pp. 461-62):

> [TRANSLATION] During his study of the patent applications, the Commissioner analyzed various systems described in American and German patents which also were developed to treat the human body through the creation of magnetic fields. He examined the article by Solov'eva which the appellant quoted and specifically commented in patent application 361... . He requested additional details with respect to certain of the claims described in the patents and ordered amendments to the descriptions of certain functions and the deletion of any reference to methods of treatment because methods are not patentable. [Emphasis added.]

**63**    In the United States, representations to the Patent Office were historically noted on the file cover or "wrapper", and the doctrine is thus known in that country as "file wrapper estoppel" or "prosecution history estoppel". In its recent decision in Warner-Jenkinson Co., supra, the United States Supreme Court affirmed that a patent owner is precluded from claiming the benefit of the doctrine of equivalents to recapture ground conceded by limiting argument or amendment during negotiations with the Patent Office. The availability of file wrapper estoppel was affirmed, but it was narrowed in the interest of placing "reasonable limits on the doctrine of equivalents", per Thomas J., at p. 34. While prosecution history estoppel is still tied to amendments made to avoid the prior art, or otherwise to address a specific concern -- such as obviousness -- that arguably would have rendered the claimed subject matter unpatentable, the court placed the burden on the patentee to establish the reason for an amendment required during patent prosecution. Where no innocent explanation is established, the court will now presume that the Patent Office had a substantial

reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel bars the application of the doctrine of equivalents as to that element.

**64**    The use of file wrapper estoppel in Canada was emphatically rejected by Thorson P. in Lovell Manufacturing Co. v. Beatty Bros. Ltd. (1962), 23 Fox Pat. C. 112 (Ex. Ct.), and our Federal Court has in general confirmed over the years the exclusion of file wrapper materials tendered for the purpose of construing the claims: see, e.g., P.L.G. Research Ltd. v. Jannock Steel Fabricating Co. (1991), 35 C.P.R. (3d) 346 (F.C.T.D.), at p. 349. No distinction is drawn in this regard between cases involving allegations of literal infringement and those involving substantive infringement.

**65**    Counsel for Procter & Gamble Inc. argues that prosecutions history ought to be admissible in some circumstances in the interest of obtaining consistent claims interpretation here and in the United States, where many Canadian patents have their origin. There is some nourishment for this proposition in commentary by other experienced practitioners (e.g., D. W. Scott, "The Record of Proceedings in the Patent Office in Canada & Foreign Countries as Evidence in Infringement & Validity Contests" (1985-86), 2 C.I.P.R. 160). References to the intention of the inventor in Catnic, supra, and O'Hara, supra, are said to leave the door ajar to the possibility of reconsideration.

**66**    In my view, those references to the inventor's intention refer to an objective manifestation of that intent in the patent claims, as interpreted by the person skilled in the art, and do not contemplate extrinsic evidence such as statements or admissions made in the course of patent prosecution. To allow such extrinsic evidence for the purpose of defining the monopoly would undermine the public notice function of the claims, and increase uncertainty as well as fuelling the already overheated engines of patent litigation. The current emphasis on purposive construction, which keeps the focus on the language of the claims, seems also to be inconsistent with opening the pandora's box of file wrapper estoppel. If significant representations are made to the Patent Office touching the scope of the claims, the Patent Office should insist where necessary on an amendment to the claims to reflect the representation.

**67**    This is not to suggest that prosecution history can never be relevant for a purpose other than defining the scope of the grant of the monopoly: Foseco Trading A.G. v. Canadian Ferro Hot Metal Specialties, Ltd. (1991), 36 C.P.R. (3d) 35 (F.C.T.D.), at p. 47. That point does not arise in this case for decision and lies outside the scope of these reasons.

>    (f)    Based on the Foregoing Principles, the Respondents' Device Is Outside the Claimed Monopoly and the Appeal Must Be Dismissed

**68**    While the foregoing principles will have to be adapted to the exigencies of different types of patents, it may be helpful to summarize how they apply in this case.

>    (1)    At the claims construction stage, the wording of the claims was analysed to isolate the descriptive words and phrases which identify the elements of the

invention. There is no need here to make heavy weather in the details. The claims specify the presence of "circuit means" to control the electro-magnetotherapy. There is nothing in the context of the claims to suggest that the inventor considered circuit means to be non-essential. On the contrary, it is the core of the invention. Equally, there was no evidence that at the date of publication of the patent the ordinary skilled worker would have appreciated that there were variants that could perform substantially the same function in substantially the same way to achieve substantially the same result as the circuit means specified in the patent.

(2)    Control of the magnetotherapy by circuit means was therefore an essential element of the invention.

(3)    At the infringement analysis stage, the accused Électro-Santé device is now to be examined and its constituent elements similarly identified.

(4)    If the accused device takes all of the essential elements of the invention, there is infringement.

**69**    The appellant complains, with some justice in my view, that having stated its legal test of infringement, the Quebec Court of Appeal then erred in making a comparison between the device of the appellant and the device of the respondents, and coming to the conclusion (which the appellant did not dispute) that the devices were different.

**70**    The appellant contends that the proper comparison is between the claims set out in its patents and the devices marketed by the respondents. I agree, but I believe that on reading the reasons of the Quebec Court of Appeal in their entirety, the court did make the proper comparison, even though that court went on to make a superfluous comparison between the two devices themselves.

**71**    The appellant points out that the Électro-Santé device features many of the characteristics described in claim 1 of the '156 patent. It is an "electro-magnetic low frequency therapeutic system". The magnetic field intensity is adjustable by the user. There are means for controlling the magnetic field's peak amplitude and frequency. As Wills J. said in Incandescent Gas Light Co. v. De Mare Incandescent Gas Light System, Ld. (1896), 13 R.P.C. 301 (Q.B.D.), at p. 330:

> It is seldom that the infringer does the thing, the whole thing, and nothing but the thing claimed in the Specification.

**72**    The appellant however failed to establish that a skilled reader would have understood in 1981 and 1983, when these patents were published, that (i) the inventions as contemplated were intended to include departures (or variants) from the specified circuit technology, (ii) that it would have been obvious to such a skilled reader that substituting variants for the specified "circuit means" would perform substantially the same function in substantially the same way to produce substantially the same result, and (iii) that when the inventor specified "circuit means" he didn't really mean the description to be taken literally. Had the appellant been able to establish these points, its patents

would probably have been declared invalid for covetous claiming.

**73**    The claims clearly require "circuit means". As mentioned, a skilled reader in 1981 or 1983 would associate that descriptive phrase with specific technology and consider the use of such technology essential to the claimed invention. The fact that the Électro-Santé device uses a microcontroller to perform a similar or even the same function does not bring it within the claim. It performs the function in a very different way. Moreover, there is no reason to think the inventor didn't mean what he said, or considered the use of "circuit means" a non-essential element of the claims, or intended to claim more broadly than "circuit means" and thereby put at risk for "covetous claiming" the validity of the patents. As the Court of Appeal observed, the means of control of amplitude and frequency is precisely the difference that validated the patents over the prior art embodied in such predecessor magnetotherapy machines as the Magnétopace, Myodynamic and Elec devices.

**74**    In sum, the respondents' device differs both structurally and operationally from the device contemplated in the claims. Substitution of a microcontroller for the "circuit means" substitutes a totally different technology for the core of the '156 and '361 patents and of itself is clearly fatal to the appellant's allegation of infringement.

**75**    The appellant having failed to establish that the respondents' Électro-Santé system included all of the essential elements of the monopoly set out in its patent claims, purposively construed, the action was rightly dismissed.

     V.    Disposition

**76**    The appeal is dismissed without costs.

*Indexed as:*

# Garnet Lane Developments Ltd. v. C.R. Investments Ltd. (Ont. C.A.)

**Between**
**Garnet Lane Developments Ltd., Plaintiff/Appellant, and**
**C.R. Investments Limited, Klemens Fass, Frank Merigliano,**
**Filomena Mastrogiovanni, Gaetano Catallo and Domator Holdings**
**Inc., Defendants/Respondents**

[1991] O.J. No. 511

Action No. 398/88

Ontario Court of Appeal
Toronto, Ontario

**Houlden, McKinlay and Labrosse JJ.A.**

March 19, 1991

(2 pp.)

Appeal from Smith D.C.J., 10 June 1988.

William G. Dingwall, for the Plaintiff.
Michael E. Caruso, for the Defendants.

---

The judgment of the Court was delivered by

**HOULDEN J.A.** (endorsement):-- The appellants take the position that the learned trial judge erred in her interpretation of an agreement of purchase and sale entered into between the parties, and in admitting extrinsic evidence as to the true nature of the agreement.

The appellants rely on clause 3(d) of the agreement. However, it is also necessary to look at clause 3(g) and Schedule B to interpret the agreement as a whole as it pertains to the dispute between the parties. Reading all of those provisions raises an ambiguity in the agreement which could only be resolved by resort to extrinsic evidence.

The trial judge, having carefully considered that evidence, concluded that the plaintiff/appellants case must fail, and we agree. In so doing, we do not wish to be considered as agreeing with the learned trial judges interpretation of clause 3(d) of the agreement.

The appeal is dismissed with costs.

HOULDEN J.A.

*Indexed as:*

## Garnet Lane Developments Ltd. v. C.R. Investments Ltd.

**Between
Garnet Lane Developments Ltd., Plaintiff, and
C.R. Investments Limited, Klemens Fass, Frank Merigliano,
Filomena Mastrogiovanni, Gaetano Catallo and Domator Holdings
Inc., Defendants**

[1988] O.J. No. 735

Action No. 286041/87

Ontario District Court - York Judicial District
Toronto, Ontario

**Smith D.C.J.**

June 10, 1988

W.G. Dingwall, Q.C. and T.S. Kent, for the Plaintiff.
M.E. Caruso, Q.C., for the Defendants, C.R. Investments, Merigliano, Mastrogiovanni and Catallo.
C.W. Kilian, for the Defendant, Fass.
A. Mostyn (Not Present), for the Defendant, Domator.

---

   **SMITH D.C.J.**:-- There remains a single substantive issue to be determined in this matter. That issue is the entitlement of the plaintiff Garnet Lane Developments Limited to payment out of $176,982.76 plus interest from the monies paid into court pursuant to the Order of His Honour Judge Sheard dated January 16th, 1987.

Background

   The plaintiff Garnet Lane Developments Ltd. is a corporation carrying on buisiness in Metropolitan Toronto as a developer, subdivider and builder and was the purchaser of Lots 7 to 13,

inclusive, Plan 396 in the City of Mississauga, in the Regional Municipality of Peel. These lands were more particularly described in Schedule "B" of an Agreement of Purchase and Sale made in writing and dated November 30th, 1983 between Joe Alessandro, In Trust, as purchaser on behalf of the plaintiff corporation and 1110 Birchmount Industrial Centre Ltd., C.R. Investments Limited, 462322 Ontario Limited, Brownhectares Developments Ltd. and Frank Merigliano Real Estate Holdings Ltd. as vendors.

The original Agreement of Purchase and Sale provided, inter alia, that the vendor represented and warranted to the purchaser (the plaintiff herein) that:

      (a)    "all the planner's costs, engineering costs, surveyor's costs, and any and all expenses incurred by the vendor in connection with the development of the lands will be paid by the vendor on closing and that the vendor will provide the purchaser with proof of payment or in the alternative, the purchaser shall accept the vendor's solicitor's undertaking to pay same out of the proceeds of the sale forthwith after closing, and should same not be paid, the purchaser shall have to set off the said amounts against the principal sum of the mortgage taken back by the vendor; (emphasis added)

      (b)    t he representations and warranties would survive the closing."

On January 13th, 1984, pursuant to the Agreement of Purchase and Sale, the plaintiff Garnet Lane Developments Ltd. gave a $600,000.00 mortgage back to the vendors which mortgage was registered against the lands described in Schedule "B" as Instrument No. 481452 in the Land Titles Division of the Land Registry Office for the Regional Municipality of Peel (hereinafter referred to as "the Mortgage").

The defendants herein, C.R. Investments Limited, Klemens Fass, Frank Merigliano, Filomena Mastrogiovanni, Gaetano Catallo and Domator Holdings Inc. were the owners of the vendor-take-back mortgage arising from the Agreement of Purchase and Sale dated November 30th, 1983, either as the original mortgagees or as subsequent assignees.

The Mortgage provided, inter alia, a number of terms for the repayment of portions of the $600,000.00 principal and contained the following condition:

      "the mortgagor will be entitled to set off against the principal sum owing under the within Mortgage any outstanding planner's costs, engineering costs, surveyor's costs and any and all expenses incurred by the mortgagees (the vendors) in connection with the development of the mortgaged lands."

When the plaintiff subsequently attempted to pay off the balance due on the Mortgage in November of 1986, the defendants herein refused to provide a Discharge.

The issue was whether "any and all expenses incurred" by the vendor (mortgagee) up to

November 30th, 1983 had been paid, or whether subsequent development costs that had to be paid to the municipality by the purchaser mortgagor (the plaintiff herein) could be set off against the principal owing under the Mortgage as "expenses incurred" by the vendor mortgagee (the defendants herein) in connection with the development of the mortgaged lands. The defendants refused to provide a Discharge and the plaintiff Garnet Lane Developments Ltd. brought an application under section 11 of the Mortgages Act to obtain an order for Discharge of Mortgage.

On the 16th of January 1987, the application was returnable before the Honourable Judge Sheard. The judge ordered:

(i)    the Mortgage monies paid into Court;

(ii)   the Mortgage registered as Instrument 481452 with the plaintiff Garnet Lane Developments Ltd. as mortgagor and the defendants C.R. Investments Limited, 462322 Ontario Limited, 1110 Birchmount Industrial Centre Ltd., Brownhectares Developments Ltd. and Frank Merigliano Real Estate Holdings Ltd. as mortgagees, to be discharged;

(iii)  the payment out of some of these mortgage monies to the defendants;

(iv)   the issues to be tried before a judge of the District Court to determine entitlement to the rest of the mortgage funds paid into Court.

All but one of the issues directed to be tried in Paragraph (3) of the order of Sheard, D.C.J., have been resolved between the parties and, in addition, the defendants at the outset of this proceeding acknowledged the plaintiff's entitlement to the $15,633.01 in Paragraph 3(a)(i) of Judge Sheard's Order. Paragraph 3 may therefore be addressed in the following matter:

Paragraph 3(a)(i) and 3(b)(i):

"On consent $15,633.01 with interest thereon at the rate of 10% per annum from March 9th, 1984 to the date of judgment is to be paid out to the plaintiff Garnet Lane Developments Ltd."

Paragraph 3(a)(ii) and 3(b)(ii):

"The issue to be tried is the plaintiff's entitlement to the sum of $176,982.76 plus interest thereon at the rate of 10% per annum from November 8th, 1984 to date of judgment."

Paragraph 3(c):
                No.

Paragraph 3(d):        Yes.

Paragraph 3(e):

> "The Respondents (the defendants herein) are entitled to $4,142.67, to be paid by the applicant (plaintiff herein) representing forty-two days interest from December 2nd, 1986, to January 16, 1987, on $360,000.00 at 10% per annum."

The sole substantive issue that remains is the entitlement of the plaintiff Garnet Lane Developments Ltd. as Mortgagor to a set-off of $176,982.76, plus interest on the monies paid into Court.

The Agreement of Purchase and Sale had set the purchase price of the property at $2,650,000.00 and the vendors had undertaken to pay "all the planner's costs, engineering costs, surveyor's costs and any and all expenses incurred by the vendor in connection with the development of the lands (to November 30th, 1983)."

The plaintiff's position is that the warranty relating to set off contained in the Mortgage echoes the terms of this Agreement of Purchase and Sale in that the Mortgagees (the defendants) would continue to be responsible for "any and all expenses incurred" up to the closing date of November 30th, 1983. Subsequently, the plaintiff Garnet Lane Developments Ltd. was required to pay $176,982.76 to the City of Mississauga on November 8th, 1984 as development costs before the Plan of Subdivision could be registered with the City on the property. The plaintiff therefore now claims over under the warranty set-off provision of the Mortgage insisting that these development costs were "expenses incurred" by the vendor prior to November 30th, 1983. The defendant Mortgagees are likewise adamant that these monies are in no way "expenses incurred" by the vendors prior to closing in connection with the development of the mortgaged lands.

"Any and all expenses incurred by the vendor" must be read in context--that the vendors are undertaking to pay "all the planner's costs, engineering costs, surveyor's costs, and any and all expenses incurred by the vendor in connection with the development of the lands (as of November 30th, 1983.") What do the terms, "any and all expenses incurred" mean? "Expenses" are defined as "the action of expending; disbursement; money "out-of-pocket". "Incurred" has been defined as running into; to come upon; to bring upon oneself. Black's Law Dictionary, revised, (4th ed.), defines "expenses" as "that which is expended, laid out or consumed, an outlay charge, a disbursement, an expenditure. "Expense" is defined as money expended, a disbursement. In the plural, it means "money out-of-pocket." The Shorter Oxford Dictionary (1983) defines "incurred" as "to run, fall or come upon, to render oneself liable to." There is a quality to the terms of these definitions which suggests that this is money out-of-pocket that has in fact been "expensed" by the party and the party has already rendered itself liable for it in the form of a disbursement or money out-of-pocket. Here, the nature of the disputed "expense incurred" is a $176,982.76 cash contribution demanded by the City of Mississauga as a condition precedent to registering the Plan of Subdivision on this property. The "cash contribution" to be paid to the City of Mississauga is set out in a Service Agreement Schedule "A", page 10, Tab 4, of the supplementary record book.

The principal component of the 'cash contribution' paid to the City was $151,360.00 for the reconstruction of Hammond Road which ran north-south along the boundary of the proposed subdivision. The existing road there was already scheduled for reconstruction as part of the capital expenditure budget of the City of Mississauga in 1983. This Hammond Road reconstruction to an urban standard (although cash contribution from the developer was only sought to the rural standard of $430.00 per lineal metre) was almost completed by late October, 1983! It remained only to have the final asphalt added to level out the road, with the curbs and sewer caps already in place by October, 1983. The 'cash contribution' also included the developer's cost for a walkway at the end of Hammond Road crossing to Dundas Street, for some tree planting and incidental park development for a total of $176,982.76. This then was the 'cash contribution' that the City of Mississauga required from the developer before registration of this Plan of Subdivision. The Service Agreement which particularized all aspects of servicing, including the 'cash contribution', had to be signed by the developer and accompanied by a cheque for the full amount outstanding before it was executed by the City. The execution of the Service Agreement is a condition precedent to the registering of the Plan of Subdivision on this development.

It is clear from the evidence of Mr. Alessandro who purchased the property for the plaintiff, that he viewed this property for sale, and he walked along the almost completed Hammond Road in late October, 1983 with Mr. Merigliano, the defendants' representative. Mr. Alessandro was essentially looking out over a parcel of land where except for some pre-servicing by the City during the reconstruction of Hammond Road, the subdivision had "draft approval" only and was essentially unserviced land. Mr. Alessandro is a man of considerable experience in the land development business and the real estate field. He indicated that he was interested in the property and that he and his representatives would sit down with Mr. Merigliano and his accountants, etc., and work through the terms of the Agreement of Purchase and Sale. Mr. Alessandro indicated to Mr. Merigliano that some of his people might need some details but they would "do their own homework" with respect to the purchase. Mr. Alessandro indicated that he wanted to make the deal but to "leave everything the way it is, I want to take over as it is." Mr. Alessandro also indicated that details of information should be given to Mr. Golini, his representative. Alessandro and Merigliano then returned to the office to set up an appointment to get together to discuss the price and terms of the Agreement of Purchase and Sale. Mr. Alessandro indicated that the condition "any and all expenses incurred" by the vendors to November 30th, 1983, was included in the Agreement of Purchase and Sale with the set off claim included in the Vendor take-back mortgage to protect the purchaser should any outstanding "incurred expenses" of the vendor surface after closing. On closing, there was to be an undertaking provided from the vendor's accountant that all expenses and invoices received to date had been paid. This was, in fact, done.

Mr. Merigliano testified that on this initial walk down Hammond Road with Mr. Alessandro, he drew to Mr. Alessandro's attention that 'draft approval only' had been secured for the subdivision with some conditions and that the municipality wanted the developer to pay for the reconstruction of Hammond Road, and that the municipality would look to the developer for contribution for Hammond Road. Subsequently a number of representatives of both plaintiff and defendant attended

Mr. Alessandro's office. A number of the defendants were present as were Mr. Alessandro, Mr. Golini and Mr. Pasqual (Mr. Alessandro's lawyer) as well as some accounts for Mr. Alessandro. Mr. Merigliano candidly and credibly indicated that the vendors were interested in getting out of this development. They didn't want to put up additional money, but they didn't want to lose any money. The defendants were willing to sell it at their cost as of November 30th, 1983.

Schedule "B" of the Agreement of Purchase and Sale sets out their costs as follows:

| | | |
|---|---|---|
| (a) | Land costs - | $1,977,814.00 |
| (b) | Carrying Costs - | 460,297.00 |
| (c) | Engineering & development costs | 176,870.00 |
| | | ------------- |
| | | $2,614,981.00 |

An accountant's breakdown of the engineering and development costs with amounts of cheques addended was attached to this material and available to the purchaser's accountants. It reflected costs to date of items such as surveyor's costs, planning costs, trailor rental, transmitter purchase, etc., with the other various headings that compose the $176,870.00. This loose breakdown was sufficient to make it clear that even though the figures are markedly similar, the $176,870.00 entry for "economic and development costs" could not possibly reflect the cash contribution and reconstruction costs for Hammond Road. It is further the position of Mr. Merigliano that at this meeting with Mr. Alessandro and his representatives, Mr. Golini had the accounting data with him that indicated the costs for things like trees, water, hydro, manholes in the reconstruction of Hammond Road, etc. These were all on the sheets of information that were in front of Mr. Golini. Further Mr. Merigliano testified that Mr. Alessandro had known from the first occasion when he had been shown the subdivision that there would be a cash contribution expected from the developer by the City of Mississauga for the reconstruction of Hammond Road. Mr. Merigliano repeated in his evidence, which I found credible, that throughout his discussion with Mr. Alessandro it was always his position that a condition of draft subdivision approval required that if the vendors had gone ahead and registered the subdivision they would have to pay the cash contribution. It was not the vendors' intention to go ahead. If the vendors had gone on to register the subdivision they would have been obliged to pay. Mr. Merigliano was confident that in Mr. Alessandro, he was dealing with an experienced subdivider and developer, who employed his own staff, reviewed all documentation and did his own homework. Further, that Mr. Alessandro was cognizant of all of these features and of the fact that draft approval required that the 'cash contribution' be paid before the Servicing Agreement was executed and the subdivision was registered.

I found Mr. Merigliano to have some difficulty with English but to be fair, frank, candid and forthright in indicating that he had fully discussed with Mr. Alessandro the fact that the vendors wanted to recover their costs and get out of this subdivision at the 'draft approval only' stage. And that Mr. Alessandro was manifestly aware of this and prepared to come in and pick up the

development in exactly the condition that he found it. Mr. Merigliano had made clear from the outset that the City of Mississauga was looking for a 'cash contribution' from the developer, for the reconstruction of this road. Mr. Merigliano was equally adamant that since he was not going to register this Plan of Subdivision or proceed with this development, the defendants were not responsible, had borne no expense, and had made no outlay or disbursement to cover the 'cash contribution' required under any Servicing Agreement! The defendants had no executed Servicing Agreement with the City and Mr. Alessandro knew that the defendants had not "incurred" that cost or expense and knew the defendants had not secured an executed Servicing Agreement from the City.

   In addition, on the evidence of Mr. Ted Chlebowski, who was the land development co-ordinator for the entire project and who was described by the Applicant's counsel as the most objective, disinterested and independent witness of these proceedings, full disclosure had been given to the purchaser's representatives with respect to background information to date on the development! Chlebowski was instructed by Mr. Merigliano to give to Mr. Golini (Alessandro's representative) any requested documentation and Chlebowski in fact submitted copies of the Conditions of Draft Approval, all the draft agreements, including draft Service Agreements and Financial Agreements to Mr. Golini for his consideration and he did that personally. Mr. Chlebowski went further and indicated that he pointed out the particular section of the agreement dealing with 'cash contribution' to Mr. Golini and asked "whether or not Golini was aware of the extra cost that would be borne by the purchaser that was attributed to the development." He did this because it was a cost over and above the standard development cost that would be attributable to this type of development. He indicated that the City had requested the vendors to compensate for the reconstruction prior to registration of the Plan of been aware that the 'cash contribution' requirement for reconstruction was a condition of Draft Plan Approval.

   In dealing with the 'cash contribution' required of the developer for the reconstruction of Hammond Road and how that cost was to be paid, Mr. Chlebowski indicated that "if you don't pay the money the developer doesn't get registration! The City would never send out an invoice or bill a developer for $176,000.00 any more than the City would send out a bill for the 5% park dedication that is assessed against this property and all developments generally." It is simply a case that if the developer proceeds to registration of a Plan of Subdivision, and has not paid the cash contribution under the Service Agreement the Plan of Subdivision is not registered. Mr. Chlebowski in cross-examination indicated that he had told Mr. Golini about the 'cash contribution' situation because it was a large amount of money to begin with and that he felt that Golini should know about that when he was pricing a development at the time of purchase so that the particular cost would have been included in the estimate of the value of the land. He also indicated to Golini that it was a cost that was over and above the cost that would normally be attributed to the development. He went out of his way to make this position clear. As I have already indicated I find Mr. Chlebowski forthright, candid and compelling on this point.

   Perhaps the term 'cash contribution' is something of a misnomer. It is in effect a cash requirement

that must be paid to the municipality prior to registration of the Plan of Subdivision. Mr. Chlebowski went on to indicate that the reconstruction of Hammond Road was part of the planned capital cost program for the City that particular year (1983), and after its completion a cash contribution would be sought from any developer who subsequently sought registration of the Plan of Subdivision for the property.

Even though the road was reconstructed to urban standards with full curbs and gutters, only the rural standard of $430.00 a lineal metre was sought by way of cash contribution from the developer. Mr. Chlebowski in cross-examination went further to indicate that in its correspondence with the municipality, the vendor's acknowledged undertaking "...to be responsible for reconstruction of Hammond Road to rural standards at a cost not to exceed..." did not convey an undertaking by the signatories that they committed themselves to pay the cost of reconstruction. Mr. Chlebowski's understanding was that this particular undertaking or responsibility or obligation was contingent upon the developer proceeding on to develop and register the Plan of Subdivision! Mr. Chlebowski stated that ..."If the subdivision Servicing Agreement was executed by the municipality and also by the owner vendors, then there will be a price that will have to be paid!" The developer would have to pay at the time of the signing of a Servicing Agreement. The Servicing Agreement cannot be executed by the City until the cash contribution and servicing costs have already been paid. It is then truly cast in stone! The witness indicated, however, that if the vendors do not proceed with the development, they don't pay!

The same position seemed to be expressed in the evidence of Kevin Dennis O'Neill, an employee of the City of Mississauga who was called to explain the nature of 'cash contribution' for road reconstruction. It was paid to the City by the developer as an obligation that had to be met prior to registration of the Plan of Subdivision. He testified that the City looks to whoever is proceeding to develop the lands, the landowner who proceeds to register the subdivision and put in the services. Mr. O'Neill was the liaison co-ordinator with respect to this development with the City. He indicated that a draft approval of a subdivision means that there are a number of requirements identified as conditions of draft approval. Releases for the conditions of draft approval become the responsibility of whoever proceeds to attempt to develop and register the plan of subdivision on these lands. If a new owner has purchased the land with draft approval of subdivision, then in order to develop the land and register the plan of subdivision he would have to meet all of the outstanding conditions, including an executed Service Agreement prior to registration.

As I indicated, I have heard from Mr. Alessandro. He testified that he attended on site, that his desire was to ensure that "all expenses incurred" to date had been paid, since the work had been done on Hammond Road, since the cash contribution had been outlined in the Draft Service Agreement, he took the position that this was an expense already incurred at a price already acknowledged by the vendors prior to November 30th, 1983 and in the result he was entitled to a set off and to a credit on the mortgage monies paid into Court in the full amount of $176,920.00 plus interest thereon from November 8th, 1984. I found Mr. Alessandro to be forthright and forceful. He is a man who has a background in shrewd investments and considerable experience with respect to

land development. He was far from novice and came armed with this respective specialists: legal, accounting, plainning, etc., to the bargaining table.

He negotiated a price for the purchase of the development which was to include all expenses incurred to a certain date by the vendors. I am not content that the cash contribution of $176,926.00 was a cost, much less an expense, incurred and to be borne by the vendors prior to closing. I am content on the totality of the evidence before me that the $176,000.00 cash contribution for Hammond Road, etc., was something that would not be invoiced by the City, would not be varied by the City and would not be foregone by the City. It became the responsibility and liability of the developer that proceeded with development and registration of the Plan of Subdivision to pay that 'cash contribution' when that developer sought registration.

The 'cash contribution' would have to be paid by the developer before the Servicing Agreement would be executed by the City and the Servicing Agreement had to be executed before the Plan of Subdivision could be registered. I am content that Mr. Alessandro is an experienced developer and builder. I am likewise content that Mr. Chlebowski went out of his way to point out to Mr. Golini, Mr. Alessandro's representative, that this particular 'cash contribution' was a special situation and that it should be canvassed as such. There were repeated assurances given by Mr. Alessandro and his representatives that "they were doing their own homework" and that they were doing their own preparation. I am satisfied that the plaintiffs were clearly on notice that Hammond Road reconstruction constituted a special 'cash contribution' situation. I am likewise satisfied that having all draft materials provided to them, Mr. Alessandro and his representatives were cognizant and fully aware of the fact that there were no Financial Agreements executed and no Servicing Agreements executed by the City with respect to this proposed subdivision. In point of fact, it was not until almost a year later that the plaintiff entered into its own Servicing Agreement with the City of Mississauga to permit the registering of this Plan of Subdivision.

On all of the evidence before me, I am content that the cash contribution was neither "an expense" nor was it "incurred" by the vendors prior to closing nor was it represented or implied as such to the purchaser. The facts are is to the contrary. I am content that the 'cash contribution' was, in fact, a contingent liability that became the responsibility of whatever developer proceeded to register this Plan of Subdivision after a Service Agreement had been executed by the City.

In conclusion, I am content that the plaintiff is entitled to set-off and credit against the monies paid into court, of the amount in Paragraph 3(a)(i) and 3(b)(i) of the Order of Judge Sheard, less reimbursement to the defendants in the amount of $4,142.67 pursuant to Paragraph 3(e) of that Order (see page 5 of this judgment).

The plaintiff is entitled to no set-off or credit for its subsequent 'cash contribution' to the City of Mississauga in November of 1984.

The balance of the mortgage monies paid into court plus interest thereon to be paid out forthwith to the defendants herein. Costs of this trial to the defendants after assessment. Costs, reserved to the

trial judge, of the motion before Judge Sheard dated January 16th, 1987, to the applicant (plaintiff herein), after assessment, as the plaintiff was substantially successful on that motion.

SMITH D.C.J.

*Case Name:*

# G.D. Searle & Co. v. Novopharm Ltd.

**Between**
**G.D. Searle & Co. and Pfizer Canada Inc., Appellants,**
**and**
**Novopharm Limited and the Minister of Health,**
**Respondents**

[2007] F.C.J. No. 625

[2007] A.C.F. no 625

2007 FCA 173

2007 CAF 173

281 D.L.R. (4th) 207

361 N.R. 290

58 C.P.R. (4th) 1

157 A.C.W.S. (3d) 630

[2008] 1 F.C.R. 529

Docket A-66-07

Federal Court of Appeal
Toronto, Ontario

**Noël, Sexton and Malone JJ.A.**

Heard: April 23 and 24, 2007.
Judgment: April 30, 2007.

(47 paras.)

Appeal by G.D. Searle & Co. and Pfizer Canada from the dismissal of their application for an order prohibiting the Minister of Health from issuing a Notice of Compliance to the respondent Novopharm. In May 2005, Novopharm filed an Abbreviated New Drug Submission, seeking approval to make and sell 100 mg and 200 mg capsules containing celebix. It filed a Notice of Allegation alleging that Searles ae576 Patent was invalid on the basis of abandonment, obviousness, lack of utility and sufficiency. In response, Searle commenced its application for a prohibition order. The applications judge found that Novopharm's allegations relating to utility and sufficiency were not justified. However, he further found that the allegation of invalidity was justified on the basis of abandonment and obviousness. On that basis the application was dismissed. The application judge held that the claim date, for the purpose of assessing obviousness, was the Canadian filing date, November 14, 1994. He also found that a June 1994 Conference relating to the compound in question constituted a prior disclosure. That disclosure, he stated, rendered celecoxib obvious as of the Canadian filing date as an anti-inflammatory compound with reduced side effects. The June 1994 Conference was not information that fell within the grace period set out in para. 28.3 of the Patent Act. On the issue of abandonment, the applications judge held that in respondent to a requisition from the Patent Office during the prosecution of the ae576 Patent on October 21, 1998, Searle was obliged to advise the Patent Office of the information presented at the June 1994 Conference. He found that Searle's failure to advise the Patent Office of that information constituted a lack of good faith. In finding that Searle's application was abandoned and ultimately, invalid, the applications judge relied on para. 73(1)(a) of the Act.

HELD: Appeal allowed. The judgment was set aside and an order was issued prohibiting the Minister from issuing a notice of compliance to Novopharm respecting the use and/or selling of celecoxib capsules until after the expiry of the ae576 patent. The applications judge did not afford procedural fairness to Searle. Further, the determination that Searle was not the applicant under s. 2 of the Act was not supported by the record. All documentary evidence on the record showed Searle as the applicant. It was evident from Dr. Seibert's oral evidence that she was hired by Searle as part of the biology team to perform research to investigate the potential use of compounds to treat inflammation that would minimize gastrointestinal toxicity. Accordingly, it was clear that the Searle Researchers were hired to invent, and that any product they invented, belonged to Searle from the onset. It followed that, as an applicant, Searle fell within the grace period provided for in para. 28.3(a) of the Act and that any disclosure made by Dr. Seibert at the June 1994 Conference or in an article, was exempt from any consideration as to obviousness. It also followed that the revelations at the June 1994 Conference and in Dr. Seibert's article did not have to be disclosed to the examiner. There was no abandonment.

**Statutes, Regulations and Rules Cited:**

Patent Act, s. 28.3(a), s. 73(1)(a)

Patented Medicines (Notice of Compliance) Regulations, SOR/93-133

**Counsel:**

John B. Laskin, Kamleh J. Nicola for the Appellants.

John F. Rook, Q.C., Dino P. Clarizio for the Respondent Novopharm Limited.

---

[Editor's note: An amendment was released by the Court on November 13, 2007. The changes were not indicated. This document contains the amended text.]

The judgment of the Court was delivered by

MALONE J.A.:--

## I.    <u>Introduction</u>

**1**    The appellants, G.D. Searle and Co. and Pfizer Canada, Inc. (collectively Searle), appeal from a judgment of the Federal Court of Canada, dated January 24, 2007 and reported at [2007] F.C.J. No. 120, 2007 FC 81. The appellants had sought an order to prohibit the Minister of Health (Minister) from issuing a Notice of Compliance to Novopharm Limited (Novopharm). If the Notice of Compliance was issued, that order would have permitted Novopharm to sell 100 mg and 200 mg capsules containing a medicine known as celecoxib in Canada before the expiry of Searle's Canadian Patent No. 2,177,576 (the '576 Patent).

**2**    The '576 Patent is entitled "Substituted Pyrazolyl Benzenesulfonamedes for the Treatment of Inflammation" and names John J. Talley and certain other individuals as inventors. It discloses and claims the compound celecoxib and its uses, including the treatment of inflammation and inflammation related disorders such as arthritis and pain. The objective of the patent is to provide a means to treat inflammation while reducing undesirable gastric side effects.

## II. <u>Time Constraints on Release of Panels Reasons for Judgment and Judgment</u>

**3**    The record on appeal runs to over 10,300 pages in 34 Appeal Books. The judgment of the learned Applications Judge is 56 pages in length encompassing his reasons arising from a four day hearing.

**4**    During the two-day hearing of this appeal on April 22 and 23, counsel for Searle advised this panel of the possibility that the Office of Patented Medicines and Liaison of Health Canada (OPML) could shortly decide to remove from the Patent Register another patent relating to celecoxib. Further, if that patent was delisted the Minister could then issue a Notice of Compliance to Novopharm to make and sell the medicine celecoxib in Canada thereby rendering the relief sought by the appellants moot. On April 24, 2007, counsel for the appellants advised the Court that

this delisting could take place as early as May 1, 2007.

**5**    These reasons are being released now to meet this deadline and should be read with these time constraints in mind.

## III. <u>Factual Background</u>

<u>The Proceedings</u>

**6**    On May 3, 2005, Novopharm filed an Abbreviated New Drug Submission, seeking approval to make and sell 100 mg and 200 mg capsules containing celecoxib. They filed a Notice of Allegation (NOA) alleging that the '576 Patent was invalid on the basis of abandonment, obviousness, lack of utility and sufficiency. In response, the present proceedings were commenced by Searle by Notice of Application under the provisions of the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133 (*Regulations*) for a prohibition order.

**7**    The issues before the Applications Judge were as follows:

1.    Was Novopharm's allegation that Searle had abandoned its application for the '576 Patent justified? and
2.    Could Novopharm's allegations that either or both of claims 4 and 8 of the '576 Patent were invalid be justified on the basis of obviousness, lack of utility and sufficiency?

**8**    In order to be successful, Searle would have to convince the Applications Judge that none of Novopharm's allegations were justified.

<u>Background to the '576 Patent</u>

**9**    Commencing in or before 1991, various teams of scientists were employed by Searle to investigate the potential use of compounds to treat inflammation that would selectively inhibit what became known as COX II; the theory being that such a compound would minimize gastrointestinal side effects experienced with other inflammation treating compounds. Dr. Seibert, employed by Searle, headed up the biological team of those scientists working on this COX II project. Dr. Peter Isakson, also employed by Searle, was the overall team leader for both the biology and chemistry teams (collectively, the Searle Researchers).

**10**    Prior to October 1993, Dr. Seibert's team was working on celecoxib and other compounds including a compound known as compound SC-58125. They studied different constituents on the structure of those compounds to understand the structure-to-activity relationship. By June 1994, Dr. Seibert's team had determined that the SC-58125 compound treated inflammation while reducing undesirable gastric side effects. That compound is one of the compounds that comes within the scope of the U.S Patent 5,134,142 that is referenced at page 2 of the '576 Patent.

**11**    All the inventors were employed by Searle as researchers and the assignment of their rights in the '576 Patent to Searle are evidenced by individual assignments executed between May and July 1996. The stated consideration is $10.

**12**    At an International Conference on Prostaglandins and Related Compounds in June 1994 (the June 1994 Conference), Dr. Seibert disclosed that the SC-58125 compound treated inflammation while not causing gastric toxicity. Further, in August 1994, Dr. Seibert submitted a paper respecting that compound to a peer review scientific publication for publication (the Seibert Article). That paper disclosed that the SC-58125 compound treated inflammation without exhibiting gastric side effects. It was published in December 1994.

**13**    The Commissioner has the authority to cause an application for a patent to be reviewed by examiners employed in the Canadian Patent Office (Patent Office). In this case, such an examiner was appointed during the prosecution stage to examine the '576 Patent application. The examiner initially rejected Searle's '576 application on the basis that the claimed invention was obvious on the claim date as a result of prior art. Accordingly, on October 21, 1998, the examiner requisitioned Searle to respond to a question it had regarding compliance with subparagraph 28.3(a) of the *Act*. Searle replied to the requisition and stated that its claimed compounds had the effect of being COX II selective and that such selectivity was not derivable from nor suggested in prior art.

**14**    The '576 Patent was applied for in Canada on November 14, 1994 and granted to Searle on October 26, 1999. Unless otherwise held to be invalid, the patent will expire on November 14, 2014. The '576 Patent application claimed priority from two patent applications previously filed in the United States on November 30, 1993 and April 6, 1994 (the Priority Applications).

## IV. Decision Below

**15**    The Applications Judge found that Novopharm's allegations relating to utility and sufficiency were not justified. However, he further found that the allegation of invalidity was justified on the basis of abandonment and obviousness. On that basis, the application was dismissed.

**16**    On the issue of obviousness, the Applications Judge held that the claim date, for the purpose of assessing obviousness, was the Canadian filing date, November 14, 1994. He further found that the June 1994 Conference relating to the SC-58125 compound constituted a prior art disclosure. This disclosure, he stated, rendered celecoxib obvious as of the Canadian filing date as an anti-inflammatory compound with reduced side effects (see Reasons for Judgment at para. 95). Moreover, he determined that the June 1994 Conference was not information that fell within the grace period set out in paragraph 28.3(a) of the *Patent Act*, R.S.C. 1985, c P-4 (*Act*), which provides that:

> **28.3** The subject-matter defined by a claim in an application for a patent in Canada must be subject-matter that would not have been obvious on the claim date to a person skilled in the art or science to which it pertains, having regard to

(*a*) information disclosed more than one year before the filing date <u>by the applicant, or by a person who obtained knowledge, directly or indirectly, from the applicant</u> in such a manner that the information became available to the public in Canada or elsewhere [Emphasis added]

\* \* \*

**28.3** L'objet que définit la revendication d'une demande de brevet ne doit pas, à la date de la revendication, être évident pour une personne versée dans l'art ou la science dont relève l'objet, eu égard à toute communication :

*a*) qui a été faite, plus d'un an avant la date de dépôt de la demande, <u>par le demandeur ou un tiers ayant obtenu de lui l'information à cet égard de façon directe ou autrement</u>, de manière telle qu'elle est devenue accessible au public au Canada ou ailleurs [Je souligne]

**17**    On the basis that a person skilled in the art would be "sufficiently confident as to the result," the Applications Judge found that the test for obviousness was met given the disclosure of information made by Dr. Seibert in June of 1994.

**18**    On the issue of abandonment, the Applications Judge held that in responding to a requisition from the Patent Office during the prosecution of the '576 Patent on October 21, 1998, Searle was obliged to advise the Patent Office of the information presented by Dr. Seibert at the June 1994 conference -- that Searle had found the SC-58125 compound to have COX II selectivity and that it had disclosed this fact to the public before the application for the '576 Patent was filed in Canada. He found that Searle's failure to advise the Patent Office of this information constituted a lack of good faith (see Reasons for Judgment at paras. 75 and 77).

**19**    In finding that Searle's application for the '576 Patent was abandoned and ultimately, invalid, the Applications Judge relied on paragraph 73(1)(a) of the *Act*. That paragraph provides that an application for a patent shall be deemed to be abandoned if the applicant does not reply in good faith to any requisition made by an examiner in connection with the prosecution of a patent.

**20**    Finally, on the issues of lack of utility and sufficiency, the Applications Judge held that Searle had successfully demonstrated that Novopharm's allegations were not justified.

**V. <u>Legislative Framework</u>**

**21**    For ease of reference, the following legislative provisions are relevant to this appeal and are set out below:

**2.** In this Act, except as otherwise provided,

> **"applicant"** includes an inventor and the legal representatives of an applicant or inventor;

> **"legal representatives"** includes heirs, executors, administrators, guardians, curators, tutors, assigns and all other persons claiming through or under applicants for patents and patentees of inventions;

**28.1(1)** The date of a claim in an application for a patent in Canada (the "pending application") is the filing date of the application, unless,

(a)    the pending application is filed by

           ...

   (ii)    a person who is entitled to protection under the terms of any treaty or convention relating to patents to which Canada is a party and who has, or whose agent, legal representative or predecessor in title has, previously regularly filed in or for any other country that by treaty, convention or law affords similar protection to citizens of Canada an application for a patent <u>disclosing the subject-matter defined by the claim</u> [Emphasis added].

**28.3(a)** -- *supra* at para. 13.

**73 (1)** An application for a patent in Canada shall be deemed to be abandoned if the applicant does not

(a)    reply in good faith to any requisition made by an examiner in connection with an examination, within six months after the requisition is made or within any shorter period established by the Commissioner;

* * *

**2.** Sauf disposition contraire, les définitions qui suivent s'appliquent à la présente loi.

      **"demandeur"** Sont assimilés à un demandeur un inventeur et les représentants légaux d'un demandeur ou d'un inventeur.

      **"représentants légaux"** Sont assimilés aux représentants légaux les héritiers, exécuteurs testamentaires, administrateurs, gardiens, curateurs, tuteurs, ayants droit, ainsi que toutes autres personnes réclamant par l'intermédiaire ou à la faveur de demandeurs et de titulaires de brevets.

**28.1 (1)** La date de la revendication d'une demande de brevet est la date de dépôt de celle-ci, sauf si :

*a)*     la demande est déposée, selon le cas :

      ...

      (ii)     par une personne qui a antérieurement déposé de façon régulière, dans un autre pays ou pour un autre pays, ou dont l'agent, le représentant légal ou le prédécesseur en droit l'a fait, une demande de brevet divulguant l'objet que définit la revendication, dans le cas où ce pays protège les droits de cette personne par traité ou convention, relatif aux brevets, auquel le Canada est partie, <u>et accorde par traité, convention ou loi une protection similaire</u> aux citoyens du Canada

      [Je souligne].

**28.3(a)** -- *supra* au para. 13.

**73. (1)** La demande de brevet est considérée comme abandonnée si le demandeur omet, selon le cas :

> *a*) de répondre de bonne foi, dans le cadre d'un examen, à toute demande
> de l'examinateur, dans les six mois suivant cette demande ou dans le délai
> plus court déterminé par le commissaire;

**22**    This patent application and the '576 Patent are to be governed by the *Act*, incorporating both the post October 1, 1989 and post October 1, 1996 provisions.

## VI. <u>Analysis</u>

### 1. <u>Claim Date</u>

**23**    In order to resolve this appeal, it is first necessary to inquire as to whether the Applications Judge correctly decided that the claim date for the '576 Patent was November 14, 1994, the date of filing. At paragraph 48 he stated:

> There is a further complexity since the application for the '576 patent was filed in Canada under the provisions of the Patent Co-Operation Treaty (PCT). That treaty provides that a single application can be filed in an appropriate "receiving office" of one of the countries adhering to that Treaty and obtain a filing date pertinent to all, or a selected group of other of such countries, provided that the applicant enters the "national phase" of such other countries within an appropriate time period. Here the original "international" application was filed in the United States as a receiving office on November 14, 1994, and entered the national phase in Canada on May 28, 1996, (Applicant's Record, Vol. 3, pg. 613). However, in accordance with the Treaty, the application is considered to have been filed in the Canadian Patent Office with an effective date of November 14, 1994.

**24**    The '576 Patent application claimed priority from two U.S. patent applications previously filed (*supra* at para.14). For the purpose of obviousness, the Applications Judge held that Searle could only rely upon the Canadian filing date of November 14, 1994 and that no earlier date could be relied upon since the priority applications do not describe or disclose the same invention as claims 4 or 8 of the '576 Patent.

**25**    On this record, I am satisfied that the Applications Judge did not err in making this determination.

### 2. <u>Obviousness and Abandonment</u>

**26**    Pursuant to paragraph 28.3(a), *supra* at para. 16, patent applicants are afforded a one-year grace period within which they can publicly disclose information before filing a patent application in Canada. One of the purposes of that provision is to enable patent applicants to announce their success by disclosing their inventions before they file. Searle attempted to take advantage of this

grace period provision by virtue of the conduct of certain of its employees in 1994 (*supra* at para. 12).

**27**    The Applications Judge made several findings with regard to whether Searle was the applicant as of the claim date, November 14, 1994 (see Reasons for Judgment at paras. 49, 57(4), 57(5), 57(6), 57(10) and 58(2)). In particular, paragraphs 49 and 58(2) read as follows:

> ... Searle is the Applicant because it is the assignee of Talley et al., the named inventors and not otherwise.

> ...

> The knowledge obtained by Dr. Seibert's group as to the activity of SC-58125 namely as to inflammation and non-gastric was information they developed, not Talley et al. Thus the disclosure in June 1994 was not disclosure of information of the named inventors Talley, et al. The fact that Searle is the "applicant" of the '576 patent does not mean that it can claim common ownership of Dr. Seibert's information since section 2 of the *Patent Act* limits an "applicant" to a legal representative of the named inventors Talley et al.

**28**    It is apparent that the Applications Judge found Searle to be the applicant solely as a result of the assignments made in 1996. Based on this finding, he held that Searle was not the applicant on the claim date (November 14, 1994) with the result that it could not benefit from the one year grace period provided in subparagraph 28.3(a) of the *Act*.

**29**    The ramifications of this finding are critical as the remaining issues that the Applications Judge proceeds to address hinge on his finding that Searle was not the applicant as of November 14, 1994. Both his conclusion of obviousness and abandonment are dependant on this finding as follows.

**30**    First, Dr. Seibert's disclosure at the June 1994 Conference and in the Seibert Article made the invention obvious and as Searle was not the applicant, these disclosures were not covered by the grace period.

**31**    Second, by failing to reveal that this information had been disclosed in responding to the examiner's requisition relating to obviousness in October 1996, Searle exhibited bad faith and misled the examiner contrary to paragraph 73(1)(a) of the *Act*. As a result, he concluded that the '576 Patent was deemed abandoned and thus, invalid.

**32**    One has to ask how this issue as to whether Searle was the 'applicant' arose since it was not raised in the NOA (see Appeal Book, Volume 9 at page 2451) nor was it argued before the

Applications Judge. Counsel for both sides admitted being surprised by the finding of the Applications Judge on this crucial point.

**33**    The NOA defines the issues to be determined in proceedings under the *Regulations*. Furthermore, deciding a case on a basis not raised by parties gives rise to an issue of procedural fairness (see *AB Hassle v. Canada (Minister of National Health and Welfare)* (2000), 7 C.P.R. (4th) 272 (F.C.A.) at paras. 16-21; *Regulations*, ss. 5(1), 5(3)(a); *Pfizer Canada Inc. v. Canada (Minister of Health)* (2006), 46 C.P.R. (4th) 281 (F.C.A.) at para. 32). Counsel for Searle made the valid point that if it had been raised before the Applications Judge, evidence could have been called and submissions made accordingly.

**34**    In my analysis, reviewed on a correctness standard, in proceeding as he did, the Applications Judge did not afford procedural fairness to Searle, thereby committing an error of law (see *McConnell v. Canada (Human Rights Commission)*, [2005] F.C.J. No. 1906, 2005 FCA 389 at para.7). Furthermore, the determination that Searle is not the applicant under section 2 of the *Act* is not supported by the record. It is true that the assignment agreements were only executed in May-July of 1996. However, this does not establish that Searle was not the owner of the invention as of the time of discovery. Obviously, a person who is the owner of the rights of the invention can be an applicant. In my view, the Applications Judge erred when he limited the definition of applicant in this case "to a legal representative of the named inventors Talley et al." (see the passage of the Reasons for Judgment quoted at para. 27 above).

**35**    At the hearing, counsel for Searle pointed to numerous key documents, all of which referred to Searle as the applicant from November 14, 1994 onwards. Among the key documents are the following:

> - The application for Canadian Patent '576 lists Searle as the applicant for all designated world states who are signatories to the Patent Cooperation Treaty, except the United States. The inventors, Talley et al., are also named as applicants, but conversely, only for the United States. This application was filed on November 14, 1994.

> - A Notification of Election was completed by the International Bureau and sent to the Patent Office on July 10, 1995, and denotes Searle as the applicant.

> - The International Preliminary Examination Report completed on January 30, 1996 lists Searle as the applicant.

> - A notification concerning transmitted documents was completed by the International Bureau and sent to the Patent Office on January 31, 1996, and lists

the applicant as Searle.

**36**    In addition to this factual evidence, counsel for Searle relies on a decision of Muldoon J. in *Comstock Canada v. Elected Ltd.* (1991), 45 F.T.R. 241 (F.C.). At issue in that case was whether a design that was created by an employee during the course of his or her own separate business is the product of his or her employer, where the employee was not hired to invent that particular design. At paragraph 72, Muldoon J. held:

> In relation to employees' inventions the general principle was established in *Bloxam v. Elsee,* (1825) 1 Car. & P. 558 at p.564, (1827) 6 B & C 169, where it was held by Lord Tenterdon that if a servant, while in the employ of his master, makes an invention, that invention belongs to the servant, not to the master; though <u>if the master employs a skilful person for the express purpose of inventing, the inventions made by him will belong to the master so as to enable him to obtain the patent for them</u> [Emphasis added].

**37**    From the present record, it is clear that Dr. Seibert and her team were employed by Searle to determine the biological activity of a number of compounds, including the SC-58125 compound and celecoxib. She was employed to perform research particularly to investigate the potential use of compounds to treat inflammation that would minimize gastrointestinal side effects. As a result, celecoxib and other compounds were turned over from the named inventors to Dr. Seibert and her team for biological testing.

**38**    During her cross-examination, Dr. Seibert indicated that the Searle Researchers worked in conjunction with the company and that it is all very much a corporate process:

> Q.    Okay. But I guess I was trying to ask who or how did you decide or who decided that, hey, this -- the results that you've now obtained in this particular experiment or set of experiments leads to something that may be worth looking at whether it was patentable or not. Was that a team leader, Dr. Isakson, or --
>
> A.    Well, you know, I think that he probably contributed to those discussions, but that was really in partnership with the scientists, let's say, chemists working to identify novel compounds --
>
> Q.    Uh-huh
>
> A.    -- with members of our legal department, our patent department, --
>
> Q.    Right. Okay.
>
> A.    -- who, in fact, would often even attend team meetings and be well-versed in data.
>
>        ...

> Q.    Okay. And deciding who the inventors would be of a particular invention, because you may have more than one, --
>
> A. Uh-huh.
>
>> Q.    -- that was done with the patent attorneys as well?
>> A.    Yeah. ... that's my understanding that the potential inventors and the patent attorneys ... would take those decisions.
>> Q.    Now, within Searle, back in the early '90s, was there some incentive or some other way of encouraging people, I guess, not only to do their work and do their research, but to be inventive, to try to be -- come up with new inventions? Was there that kind of incentive within Searle?
>> A.    Well, I don't know what you mean by incentive. I mean --
>> Q.    Encouraged.
>> A.    We were -- yeah, we were surely encouraged, you know, to think about how we can apply our science, you know, to the identification in discovering development of new medicines or new uses. I mean that's the work we do [Emphasis added] (See Appeal Book, Volume 8 at pages 2039 and 2040).

**39**    All documentary evidence on this record shows Searle as the applicant. In addition, it is evident from Dr. Seibert's oral evidence that she was hired by Searle as part of the biology team to perform research to investigate the potential use of compounds to treat inflammation that would minimize gastrointestinal toxicity. Accordingly, it is clear that the Searle Researchers were hired to invent, and that any product they invented, belonged to Searle from the onset.

**40**    In my analysis, the assignments by the employees in 1996 simply confirmed Searle's pre-existing right to the invention and were provided in accordance with the Patent Office's procedure to have evidence on record as to who owns the patent prior to its grant. The fact that the assignments were made for a nominal consideration supports that view.

**41**    In sum, it was not open to the Applications Judge to hold that Searle was not the applicant as of the claim date, both as a matter of procedural fairness and based on the record before him.

**42**    It follows, therefore, that as an applicant, Searle falls within the grace period provided for in subparagraph 28.3(a) of the *Act* and that any disclosure made by Dr. Seibert in June of 1994 or in her article, is exempt from any consideration as to obviousness.

**43**    As a consequence of my determination as to Searle's status as an applicant, any disclosure of information made within one year of the claim date is not prior art capable of rendering the '576 Patent obvious. It follows that Dr. Seibert's revelations at the June 1994 Conference and in her Article did not have to be disclosed to the examiner. As such there was no deemed abandonment.

## 3. Lack of Utility

**44**    As an alternative argument, Novopharm argues that if this Court accepts that the Applications Judge erred in determining that Novopharm's allegations of invalidity based on obviousness and abandonment were justified, the Court should find that the Applications Judge also erred in finding that the allegation of invalidity based on lack of utility was not justified.

**45**    Once this Court accepts that the Applications Judge made no error in determining the Canadian filing date to be the relevant date for assessing utility, Novopharm's lack of utility argument falls away. Since I have already accepted the Applications Judge's finding that the Canadian filing date is the relevant date in all aspects, there is no need to address this lack of utility issue. The Applications Judge made a finding of utility as of November 14, 1994, which is a finding of fact that Novopharm does not contest nor allege in its NOA.

**VII. <u>Conclusion</u>**

**46**    The appeal should be allowed, the judgment of the Applications Judge should be set aside and giving the order that the Applications Judge should have given, an order should be issued prohibiting the Minister from issuing a notice of compliance to Novopharm respecting the making, use and/or selling of celecoxib capsules until after the expiry of the '576 Patent.

**47**    The appellants should have their costs on appeal. They should also have their costs in the Federal Court but only insofar as they relate to '576 Patent.

MALONE J.A.
 NOËL J.A.:-- I agree.
 SEXTON J.A.:-- I agree

*Case Name:*

# Novopharm Ltd. v. G.D. Searle & Co.

**Novopharm Limited**
**v.**
**G.D. Searle & Co., Pfizer Canada Inc. and the Minister of**
**Health**

[2007] S.C.C.A. No. 340

[2007] C.S.C.R. no 340

File No.: 32113

Supreme Court of Canada

Record created: June 28, 2007.
Record updated: November 1, 2007.

**Appeal From:**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

**Status:**

Application for leave to appeal dismissed with costs (without reasons) November 1, 2007.

**Catchwords:**

*Intellectual property -- Patents -- Medicines -- Whether s. 73(1)(a) of the Patent Act imposes an obligation on patent applicants to act in good faith when replying to a Patent Examiner -- What is the scope of the obligation? Can a patent applicant discharge its duty to reply in good faith and obtain a monopoly by selectively withholding material information from the Patent Examiner?*

**Case Summary:**

G.D. Searle and Co. and Pfizer Canada Inc. (collectively, "Searle") sought an order prohibiting the Minister of Health from issuing a notice of compliance ("NOC") to the Applicant, Novopharm, a generic drug manufacturer, for its 100 mg and 200 mg capsules containing the drug celecoxib,

before the expiry of Searle's Canadian Patent No. 22,177,576 ("576"). The background to this patent commenced in or about 1991, when Searle employed teams of scientists to investigate the potential use of compounds to treat inflammation and minimize gastro-intestinal side effects. The biological team, headed by Dr. Seibert, was testing a number of compounds for these two properties, including celecoxib and SC-58125, a compound very similar to celecoxib. By February 14, 1994, her team had determined that celecoxib exhibited both anti-inflammatory and analgesic effects. By June 1994, the team determined that SC-58125, a compound claimed in a patent owned by Matsuo, also treated inflammation, while reducing undesirable gastric side effects. Dr. Seibert disclosed this information about SC-58125 at an international conference in June 1994, and again in a paper published in December 1994.

Searle applied for the 576 patent in Canada on November 14, 1994. It claims several compounds, including celecoxib, that reduce inflammation by selectively affecting the enzyme COX II, which is involved in inflammation, and reducing gastro-intestinal side effects by not significantly affecting the enzyme COX I, which acts to protect the gastro-intestinal tract. The dual utility was the inventive aspect of the 576 patent. An examiner was appointed during the prosecution phase of the patent application, and he rejected the 576 patent application on the basis that the claimed invention was obvious on the claim date due to the prior Matsuo art. The examiner requisitioned Searle to respond to this rejection. Searle stated that its compounds were an inventive improvement because the slight difference in structure rendered its compounds COX II selective, and that this selectivity was not suggested in the prior art. Searle did not mention that SC-58125 had the same two properties, although this information had already been disclosed to the public. The patent was granted to Searle on October 26, 1999. Novopharm filed an Abbreviated New Drug Submission on May 3, 2005 seeking approval to market its version of celecoxib, and also filed a Notice of Allegation, alleging that the 576 patent was invalid on the basis of abandonment, obviousness, lack of utility and sufficiency.

**Counsel:**

John F. Rook, Q.C. (Bennett Jones), for the motion.

John B. Laskin (Torys), contra.

---

**Chronology:**

1.    Application for leave to appeal:

        FILED: June 28, 2007. S.C.C. Bulletin, 2007, p. 1110.

SUBMITTED TO THE COURT: October 1, 2007. S.C.C. Bulletin, 2007, p. 1353.
DISMISSED WITH COSTS: November 1, 2007 (without reasons).
S.C.C. Bulletin, 2007, p. 1551.
Before: Binnie, LeBel and Deschamps JJ.

The application for leave to appeal is dismissed with costs to the respondents G.D. Searle & Co. and Pfizer Canada Inc.

**Procedural History:**

Judgment at first instance: Respondents' notice of application for prohibition order dismissed.
Federal Court of Canada, Trial Division, Hughes J.,
January 24, 2007.
Neutral citation: 2007 FC 81.

Judgment on appeal: Appeal allowed; prohibition order granted. Federal Court of Appeal, Noël, Sexton and Malone JJ.A., April 30, 2007.
Neutral citation: 2007 FCA 173; [2007] F.C.J. No. 625.

e/qlhbb

1991 CarswellNat 596
Tax Court of Canada

Gelber v. Minister of National Revenue

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

# Aaron Gelber and Norman Sternthal v. Minister of National Revenue

Rip, T.C.J.

Judgment: June 24, 1991
Docket: File Nos. 87-1078/9

Counsel: *P. Ryan* and *G. Gaenon* for the appellants.
*L. Lamarre* for the respondent.

Subject: Income Tax (Federal)

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

   **Income tax --- Losses — General**

   **Income tax --- Computing individual's taxable income — Losses**

   Income tax — Federal — Income Tax Act, R.S.C. 1952, c. 148 (am. S.C. 1970-71-72, c. 63) — 18(1)(a) — Allocation between a company and its shareholders — Property transferred from company to the shareholders after completion of construction — Intention of taxpayers.

   The appellants were the owners of Fairway Construction Inc. (Fairway), a construction company. Fairway purchased land and built a condominium project in 1982. Ownership was purportedly transferred to the appellants on December 7, 1982, after the completion of construction. In filing their 1982 tax returns the appellants each reported a loss from the condominium project in the amount of $382,000. In preparing their tax returns they claimed to be the owners of the property and in computing their incomes for tax purposes they deducted various costs of construction notwithstanding the property was registered in the name of Fairway. The issue was whether the appellants were correct in deducting expenses of construction of the project on the basis they were co-owners of the property from the time the construction began.

   **HELD:**

   The Court examined the evidence and concluded that Fairway owned the property for 11 months of 1982. The appellants could not claim both that they were the owners of the project for tax purposes, and not the owners for other purposes, e.g. financing, risk management, etc. Their intention to be the owners was not put into effect by their actions. The assessments that disallowed their claims to the losses personally were upheld. Appeals dismissed.

*Rip, T.C.J.*:

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

1    Aaron Gelber ("Gelber") and Norman Sternthal ("Sternthal") appeal from assessments with respect to their 1982 taxation year in which the Minister of National Revenue ("Minister"), the respondent, disallowed expenses deducted by each of them in computing income on the basis the amounts deducted were not outlays or expenses made or incurred for the purpose of gaining or producing income from a business or property, in accordance with paragraph 18(1)(a) of the *Income Tax Act*, R.S.C. 1952, c. 148 (am. S.C. 1970-71-72, c. 63) (the "Act").

2    The appeals were heard on common evidence. Sternthal was the principal witness for the appellants.

3    Gelber and Sternthal are brothers-in-law. They have been in the construction business in Montreal since about 1960 when they incorporated Fairway Construction Inc. ("Fairway"). In their first venture Fairway constructed for sale single family homes on a golf course that had been previously purchased by a related corporation, Elmcrest Realties Ltd. ("Elmcrest"), in Dorval, Quebec. In 1966, the appellants and two of Sternthal's brothers built a 227 townhouse rental project called "Lakeshore Villa", which they still own.

4    Fairway was, and is, a contractor; it holds a licence to carry on a business as a general contractor and towards this end engages subcontractors for the various projects. It also arranges financing.

5    With respect to Lakeshore Villa and at least two other properties, a 74-unit townhouse property called Beacon Hill Villa, and a six-storey office building called Fairway Centre, Fairway acquired the land, arranged the financing and built the project. On completion of each of the projects the ownership of the property was transferred to the appellants as co-owners. [1] Sternthal stated that there were advantages in initially holding the property in Fairway. One advantage was that it facilitated financing since lenders prefer a corporation as mortgagor, even when the mortgage is personally guaranteed by the co-owners of the property, since in Quebec corporations do not have the right to pay off a mortgage after five years, as does an individual. Fairway had also built up a relationship with subcontractors and this relationship facilitated construction. Another advantage in having a corporation build a project was the limited liability inherent in a corporation.

6    Fairway acquired the land on which the Beacon Hill Villa was built on May 5, 1970 and on December 31, 1971, when construction was completed by Fairway, it transferred the ownership of the property to the individual purchasers.

7    In filing his amended income tax return for 1971 [2] Sternthal claimed a net loss for tax purposes from Beacon Hill Villa of $29,458; this amount included income of $6,768 and capital cost allowance of $36,226. An auditor's report for the seven months ended December 31, 1971 was prepared for the owners of Beacon Hill Villa on the basis the owners owned the property throughout the seven-month period.

8    Similarly, Fairway transferred ownership of Fairway Centre to Sternthal and Gelber on April 25, 1972, once construction was completed. Fairway had acquired the land on February 5, 1971. Sternthal testified that Fairway had negotiated a lease with the Department of Public Works, Canada for a post office at Fairway Centre for the period April 1, 1972 to March 31, 1992 and that the rent collected for April, 1972 was included in the income of the appellants. I have reviewed Sternthal's income tax return for 1972 and have been unable to find any reference to Fairway Centre. On page 66 of Exhibit A-A6 income from four properties is reported under the heading "Rental Income" but there is no reference to income from Fairway Centre.

9    Two other projects followed the same procedure. Land for an office building at Queen Mary and Côte des Neiges Roads in Montreal was purchased by Fairway in 1973 and once construction of the building was completed, Fairway transferred ownership of the property on December 2, 1975 to the appellants. Sternthal reported rental income from the property in his 1975 tax return; a schedule attached to the tax return reflects that Gelber claimed a greater capital cost allowance than Sternthal thus resulting in a loss to Gelber for tax purposes.

10    The other project, on Atwater Avenue in Montreal, was a 307-unit apartment building which Fairway sold, again after construction, to the appellants on December 2, 1975. In his 1975 income tax return Sternthal claimed a rental loss of $92,204 from this property.

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

11    Sternthal stated that from 1970 to the date of trial Fairway did not own for its own account any land and had not earned any significant profit from construction. Fairway acted strictly as agent for Gelber and him. Fairway did contract for "two small construction jobs ... not for us", said Sternthal, and made a "small profit". Fairway has had no rental income, he said. Sternthal explained when a property was transferred from Fairway to Gelber and him the consideration included costs of construction and a nominal amount of overhead.

12    The balance sheets of Fairway for fiscal periods during which construction took place, reflect an asset "Construction in Progress" and liabilities for bank advances and mortgages payable. For example, with respect to Fairway's 1974 fiscal year, when it was building the Queen Mary and Côte des Neiges Roads and the Atwater Avenue buildings, the construction in progress for the two buildings aggregate $3,567,154; bank advances total $1,342,088 and mortgages payable aggregates $820,523 with respect to these two projects. The underlying lands are not shown as separate assets on the balance sheet. Nowhere in the financial statements is it noted that Sternthal and Gelber are also liable on the loans or that Fairway is not the owner of the properties but acts only as agent for the absolute owners Sternthal and Gelber.

13    The property that is in issue, Place Ste-Marie, consists of 40 townhouses which were built for sale as condominium units. [3]  As at date of trial only 15 of the units had been sold; the other 25 units were being rented.

14    Fairway purchased the Place Ste-Marie land from a related corporation in February, 1982 and ownership purportedly was transferred to the appellants on December 7, 1982, after completion of construction. The related corporation acquired the land in 1954.

15    Before completion of construction of the townhouses of Place Ste-Marie, a unit was sold to an erstwhile player with the Montreal Expos Baseball Club who, according to Sternthal, was in a rush to buy. At the time of the sale, the property was still registered in the name of Fairway and Fairway was a party to the transaction. The Declaration of Co-Ownership took place "just before" the sale to the baseball player. The profit on the sale of the townhouse unit was approximately $6,000. Sternthal testified that "we decided to keep the profit (in Fairway) as a construction fee for building the condominium" rather than recording it as profit to Gelber and himself. Sternthal stated that the usual practice was to record rents from a property prior to its transfer of ownership as rentals to Gelber and him or apply the rents to reduce costs of construction.

16    In cross-examination counsel for the respondent asked Sternthal why he and Gelber did not appear in the Act of Sale on the purchase of the land by Fairway, since Sternthal executed the deed as officer of Fairway. Sternthal replied that "during the risk period during construction (we) used Fairway on our behalf". He declared the intention was that "we will become owners of the property once construction is completed".

17    Sternthal declared that the Place Ste-Marie project was acquired and built in the same manner as the earlier projects: that is, Fairway buys the land, arranges financing either externally or internally through another Sternthal family owned corporation, builds the building and then transfers the building to him and Gelber. During construction of Place Ste-Marie municipal tax bills were sent to, and paid by, Fairway and were then included in the total costs.

18    The Declaration of Co-Ownership was signed on August 4, 1982 by Fairway. In the Declaration Fairway declared it is the proprietor of the property. The Declaration also states "each co-owner will have the right to bring an action against the declarant and to recover the jointly and severally bails of ... (any budget) ... deficit." There is no indication in the Declaration that persons other than the declarant may be proprietors of the property. Sternthal stated he signed the Declaration for Fairway as its President "without going over the clauses". The notary told Sternthal, he said, the document was in the standard form and he signed it. "It was the first condo I did...". When counsel for the respondent asked him whether he was aware of the clause stating the co-owners had rights against the declarant only, Sternthal replied, "Is it wrong to protect myself?".

19    In filing their 1982 tax returns Sternthal and Gelber each reported a loss from Place Ste-Marie in the amount of $328,215. On April 15, 1983 unaudited financial statements for Place Ste-Marie were prepared. The balance sheet was prepared as at December 31, 1982; the statements of income and owners capital were for the one-month period ended December 31, 1982.

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

The statement entitled "Cost of Revenue Producing Property Under Construction For Income Tax Purposes describes the cost of the property to be $2,972,368; from this amount were deducted amounts capitalized to the building for accounting purposes but deductible for tax purposes, such as interest during construction, marketing and leasing, and landscaping.

20    Interest on funds borrowed during construction was included in the purchase price when the title to property was transferred to the appellants. The books of Fairway record advances during construction to Fairway and not to Sternthal and Gelber. Fairway's fiscal year end is April 30. The balance sheet of Fairway as at April 30, 1982, while construction of Place Ste-Marie was taking place, reflects an asset, "Construction in Progress" in the amount of $2,387,177 and liabilities of accounts payable and accrued liabilities and a loan payable to an affiliated company aggregating $2,687,055. The balance sheet of Fairway reflects the asset of April 30, 1983, a loan receivable of $3,117,134, being the amount owed to it by the appellants on the acquisition of Place Ste-Marie; the loan from the affiliated company had been increased. The note to the balance sheet as at April 30, 1983 describes a related party transaction to include "sale of a condominium project to the shareholders". In Sternthal's view the description should read "transfer of title" of condominium project to the shareholders and not "sale".

21     Sternthal advised that no written agreements exist between him and Gelber with respect to any of the properties they own together.

22     Mr. Michel Rolko, employed by Fairway as an internal auditor, explained how he calculated the purchase price on the sale of Place Ste-Marie. All costs of construction were entered in a journal and were included in the purchase price. The cost of land was also included in the purchase price. Charged to the appellants as costs of construction for accounting purposes were all expenses after the first tenant moved into a townhouse before construction was completed; these costs included electricity, insurance, taxes and interest; rents collected during the period were applied to the purchase price.

23     Mr. Réjean Roy, C.A. is a member of the firm of auditors of Fairway and for many years has prepared the personal tax returns of the appellants. He explained that in the various projects such as Beacon Hill Villa and Queen Mary and Côte des Neiges Roads building, for example, the costs of construction are shown as an asset of Fairway since Fairway incurred the costs. He testified that he understood the intention of the co-owners of Beacon Hill Villa was that they were to own the property from the beginning of operations, that is, from the time the building was completed. This was the reason the financial statements of Beacon Hill Villa were made for a seven-month period. He also explained that frequently tenants enter a building before the completion, that is, before the commencement of operations, and in such a case the rentals are attributed to the individual owners. Later, after prodding by Mr. Ryan, appellant's counsel, he testified it was intended the appellants own the properties from the first day of construction of the particular building. Roy cited, as an example, the Atwater Avenue building in which rents for the four months prior to the transfer of ownership to the appellants were included in their income. Roy also explained that if Fairway had not held the property on its own account he would have shown a cost for land and costs of construction separately, either in the balance sheet or on a note to the balance sheet.

24     The issue before me is one of fact. My finding of fact is dependent on the evidence adduced at trial. Counsel for the appellants advised that if I were to find that Gelber and Sternthal were not owners of Place Ste-Marie from the very start of construction I would be finding as well that Sternthal was not a credible witness. Counsel argued Sternthal was a credible witness.

25     Sternthal is neither a lawyer nor an accountant; he is a businessman. A businessman makes decisions as to what he intends to do with his money. Unfortunately it does not necessarily follow that just because one intends some action to be done, that intended action results. It may well be that Sternthal and Gelber intended to own the Place Ste-Marie land at the moment it was acquired in 1982 by Fairway. In fact Sternthal's evidence was that he and Gelber intended to cause Fairway to do what it had done for them in the past, that is, acquire land, arrange financing and construct a building, and once construction was complete, transfer title to them as co-owners of the land and improvements. In preparing tax returns for past years they had claimed they were owners of property and in computing their incomes for tax purposes they deducted various costs of construction notwithstanding the property was registered in the name of Fairway. I have no problem accepting the bulk of Sternthal's evidence; I have no problem in holding a person in whose name title to a property is registered is not necessarily the owner of that property; I have no problem in finding the purchase price for the property included all costs of construction

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

and that if Gelber and Sternthal owned the property from the start of construction of the townhouses the amounts they claimed as expenses were legitimate expenses.

26      The treatment for tax purposes of expenses claimed in earlier years is not before me and I am not bound by how the respondent may have treated similar claims in previous years; after all, the respondent is not the arbiter of what is right or wrong in tax law. I am only interested in the 1982 taxation year and whether the appellants were correct in deducting expenses of construction of Place Ste-Marie on the basis they were co-owners of the property from the time the construction of the townhouses began.

27      The only indication that Gelber and Sternthal may have owned the Place Ste-Marie property from the start of construction is the evidence of Sternthal that that was his intention; he also stated, however, that ownership would be transferred only after construction was complete. Roy at first declared the appellants' ownership of the property was to take effect once the building started in operation, that is, when the building was completed and available for tenants. He also explained that in previous projects some tenants moved into a project before completion.

28      All documentary evidence supports the basis of the assessments being appealed. There was no documentation such as insurance policies taken out by the owners of Place Ste-Marie during construction before me. The Court was advised such policies were not available at date of trial. The statement of income included in the financial statements for the owners of Place Ste-Marie for 1982 was prepared for the one-month period ended December 31, 1982. In my view if the appellants owned Place Ste-Marie prior to December, 1982 it would have been proper for the accountants to have prepared the statement of income for the whole period during which the appellants owned the property. Since the statement reports income from only one month in 1982 it is not unreasonable to conclude the property was owned by the appellants for only that month.

29      I also refer to the financial statements of Fairway for 1982. Fairway's fiscal year ends on April 30. Fairway's balance sheet as at April 30th, 1982 describes an asset "Construction in Progress". A note with respect to accounting policies for "Construction in Progress" states "[t]he company capitalizes all direct costs relating to the condominium project under development. In addition, indirect costs including interest and property taxes are also capitalized". Fairway's accounts payable and accrued liabilities and loan payable to an affiliated company are liabilities of Fairway. There is no note in the financial statements the assets and liabilities are not those of Fairway. There is no note to the reader that the owners of the property are Gelber and Sternthal and Fairway is the registered owner of the property as nominee or *prête nom* for Gelber and Sternthal. Indeed, if Fairway was simply the contractor of Place Ste-Marie the amount of cost of construction would have been shown as an amount receivable on the balance sheet. I do not accept Roy's reasons for not characterizing the amount as a receivable. If Fairway incurred the costs for another person, then that person is indebted to Fairway and Fairway should show this asset as an amount receivable. If, on the other hand, Fairway owned the property, then the amounts should be described as "costs of construction", as they were. A reader of the financial statements of Fairway would conclude with reason Fairway owned Place Ste-Marie as at April 30, 1982.

30      Representations in the financial statements of Fairway and the Declaration of Co-Ownership are to the effect Fairway was the proprietor of the property known as Place Ste-Marie. These representations, let it not be forgotten, were made to third parties: to the respondent as part of the income tax returns of the appellants, and to the world by way of registration. The testimony at trial was to the effect this was not the intention of the appellants.

31      In his evidence Sternthal stated Fairway held the property as owner during construction in order to protect Gelber and himself. I have no doubt this is true. But one cannot be not an owner of property for one purpose — for protection from personal liability during construction — and be an owner for another purpose — for tax purposes. In the same way a person cannot simultaneously inhale and exhale, a person cannot simultaneously own and not own a property. An owner of a property owns the property throughout the time he is owner, for good and for bad. A person must decide what is more important, protection from potential liability and have a corporation own the property during construction, or potential tax deductions and have oneself own the property during construction. The decision is to be made prior to construction.

32      I have not found the Minister to have made any error in making the assessments and they ought not to be disturbed.

1991 CarswellNat 596, [1991] 2 C.T.C. 2319, 91 D.T.C. 1030

33    The appeals are dismissed.

*Appeals dismissed.*

Footnotes

1    Beacon Hill Villa was owned by the appellants and another individual as co-owners.

2    Except for the income tax returns for 1982, only the income tax returns of Sternthal were filed as exhibits. The Court was advised that with respect to the matters relevant to the appeals, the information in the returns of Gelber are identical to those of Sternthal.

3    Place Ste-Marie was certified as a multiple unit residential building

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Case Name:*

# Gutierrez v. Tropic International Ltd.


**Between**
**Luis Arturo Gutierrez, plaintiff/respondent, and**
**Tropic International Limited and Xela Enterprises Ltd.,**
**defendants/appellants**

[2002] O.J. No. 3079

63 O.R. (3d) 63

162 O.A.C. 247

33 B.L.R. (3d) 18

2002 CanLII 45017

115 A.C.W.S. (3d) 772

2002 CarswellOnt 2599

Docket No. C37063


Ontario Court of Appeal
Toronto, Ontario

**Carthy, Cronk and Gillese JJ.A.**

Heard: March 27, 2002.
Judgment: August 13, 2002.

(43 paras.)


On appeal from the judgment of Justice E. Macdonald dated August 31, 2001, reported at [2001]
O.J. No. 3506.

**Counsel:**

John B. Laskin and Arlen K. Sternberg, for the appellants.
Katherine L. Kay and Danielle K. Royal, for the respondents.

[Quicklaw note: A corrigendum was released by the Court August 13, 2002. The correction has been made to the text and the corrigendum is
appended to this document.]

---

The judgment of the Court was delivered by

**1    CRONK J.A.**:-- Tropic International Limited and Xela Enterprises Ltd. appeal from the
summary judgment of Justice E. Macdonald dated August 31, 2001 by which they were ordered to
pay the sums of Cdn. $3,489,020 and U.S. $1,061,774.36, inclusive of the pre-judgment interest, to
Luis Arturo Gutierrez for redemption of his preference shares in Tropic. The appellants submit that
the motions judge erred i) in concluding that their defences to Luis' action for payment of the
redemption price for his shares give rise to no genuine issue for trial; and ii) in exceeding her role
on a summary judgment motion by assessing credibility, weighing conflicting evidence and making
findings of fact or drawing inferences from facts in controversy. For the reasons that follow, I
would dismiss the appeal.

    I.    FACTS

**2**    Tropic and Xela are holding companies through which the Gutierrez family operate or have
interests in various businesses in the food industry. Xela's interests include shareholdings in a
poultry business in Guatemala operated by Avicola Villalobos, S.A. For several years, Luis was an
officer and director of Xela. He also held 6,999 common shares in that company, gifted to him by
his father, Juan Arturo Gutierrez. In 1994 Luis had a falling out with other family members and
decided to sever his active involvement in the family enterprises. Accordingly, he exchanged his
common shares in Xela for 700 preference shares in Tropic and resigned his position with Xela and
related companies.

**3**    Under Tropic's articles of amendment, Luis' Tropic shares are redeemable by Tropic, at Luis'
election, for an aggregate price of Cdn. $7 million (the "Redemption Price"). As part of the 1994
share exchange, Luis postponed in writing his right to require redemption of the shares for three
years. In 1998, when the postponement period expired, he notified Tropic in writing of his election
to have his Tropic shares redeemed. After Tropic and Xela paid part of the Redemption Price, in the
sum of Cdn. $2 million less withholding taxes, the parties entered into negotiations regarding
payment of the remainder.

            (1)    The Contractual Documents

**4**    By written agreement dated December 1, 1998 (the "Redemption Agreement"), Tropic agreed

with Luis to pay the remainder of the Redemption Price, plus interest, in accordance with the following schedule:

    a)    on December 1, 1998, payment of the sum of Cdn. $1.85 million by delivery to Luis of a promissory note from Tropic in the amount of U.S. $1 million (the "Note") with the balance, net of withholdings for income tax, paid in cash;

    b)    on May 31, 1999, payment in cash of the sum of Cdn. $750,000;

    c)    on November 30, 1999, payment in cash of the sum of Cdn. $1 million; and

    d)    on January 10, 2000, payment in cash of the sum of Cdn. $1.4 million.

**5**    The Redemption Agreement also contains the following terms:

    2.    Accelerated Obligation to Pay. (1) Immediately upon closing of any sale by Xela of all or any part of its interest in Avicola ... or any related companies in Guatemala, Tropic shall pay all amounts owing to Luis hereunder. Xela acknowledges and agrees to such repayment and covenants that it will pay to Tropic all amounts required for Tropic to make such payments to Luis. ... In addition, upon the receipt by Tropic, Xela or any other affiliate of Xela of proceeds from any other Disposition, Tropic and Xela agree that they will use the net after-tax proceeds of any such Disposition to accelerate, acting in good faith, the payment of the remaining portion of the Redemption Price that is still due and payable at the time of receipt of those proceeds. For purposes hereof, "Disposition" means the sale, exchange, lease or other disposition of any property or assets.

    (2) If Tropic fails to complete any one of the payments scheduled in Section 1(1) within 7 Business Days of the date such amount becomes due and payable, the remaining portion of the Redemption Price and all other amounts owing to Luis hereunder shall immediately become due and payable.

    ....

    12.    Entire Agreement. This Agreement, the Note, the Guarantee [defined below] and the share pledge agreement of even date herewith made by Tropic in favour of Luis constitutes the entire and only agreement between the parties hereto with respect to the subject matter hereof, superseding any and all prior negotiations, understandings and agreements, written or oral.

    ...

14.    Time of the Essence. Time shall be of the essence of this Agreement and of every provision hereof.

**6**    Xela guaranteed Tropic's liability to Luis under the Redemption Agreement by written guarantee dated December 1, 1998 (the "Guarantee"). Under s. 1.1 of the Guarantee, Xela:

> *[[I]rrevocably and unconditionally [guaranteed] the due and punctual payment to Luis, whether at stated maturity, by acceleration or otherwise, of all present and future debts, liabilities and obligations, direct or indirect, absolute or contingent, of [Tropic] to Luis arising pursuant to, or in respect of [the Redemption Agreement and the Note]* .... [Emphasis added]

**7**    By s. 1.2 of the Guarantee, Xela's liability thereunder is expressed to be "absolute and unconditional" regardless of:

> (b)    Any contest by [Tropic] or any other Person (as hereinafter defined) as to the amount of [the guaranteed obligations under the Redemption Agreement and the Note], the validity or enforceability of any terms of the [Redemption Agreement and the Note] or the priority of any security granted to Luis in respect of the [Redemption Agreement and the Note];
>
> (c)    Any defence, counter-claim or right of set-off available to [Tropic];
>
> ....
>
> (i)    Any other circumstances which might otherwise constitute a defence available to, or a discharge of, [Xela or Tropic] or any other Person in respect of the [Redemption Agreement and the Note] or this guarantee.

**8**    Tropic and Xela did not honour the payment schedule set out in the Redemption Agreement. Although they paid Luis Cdn. $500,000 on April 19, 2000, they failed to make any of the payments due in 1999 and 2000. Consequently, Luis commenced this action against them for payment of the remainder of the Redemption Price, among other matters.

(2)    The Alleged Collateral Agreement and the Avicola Litigation

**9**    Tropic and Xela do not dispute Luis' entitlement to the remainder of the Redemption Price, or the validity of the Redemption Agreement and the Guarantee. Rather, they argue that prior to execution of those documents, Luis and Arturo entered into an oral agreement or understanding regarding the timing for, and the source of the funds to be used to finance, the payment of the remainder of the Redemption Price. They maintain that Luis orally agreed that i) the Redemption Price would only be fully paid upon completion, and from the proceeds, of a sale of Xela's shares in Avicola; and ii) prior to completion of that sale, Luis would only seek to rely on the Redemption Agreement and the Guarantee if Arturo died or became disabled (the "Collateral Agreement"). They

further contend that the Collateral Agreement was orally reconfirmed by Luis with Arturo at the time of and following execution of the Redemption Agreement and the Guarantee. Luis denies the alleged Collateral Agreement.

**10**    The Avicola share sale has not been completed. It is now the subject of separate litigation in Guatemala and Florida. Arturo is alive and in good health. Therefore, based on the Collateral Agreement, Tropic and Xela allege that Luis is not entitled to now receive payment of the remainder of the Redemption Price. In addition, they assert that Luis has improperly sought to hinder or delay the resolution of the Avicola share sale litigation, thereby preventing the appellants from raising the funds necessary to pay the remainder of the Redemption Price. They argue on that basis that Luis is precluded, in any event, from now seeking payment of the unpaid balance of the Redemption Price.

## II.    ANALYSIS

**11**    The principles governing motions for summary judgment are well-established. Summary judgment may only be granted where there is no genuine issue for trial, the proof of which lies upon the moving party. The role of a motions judge on such a motion is centred on the threshold question of whether a genuine issue exists requiring a trial. The determination of credibility issues, the weighing of conflicting evidence, the making of factual findings and the drawing of factual inferences, other than where only one inference is reasonably available, are matters reserved for the trier of fact. (Aguonie v. Galion Solid Waste Material Inc. (1998), 38 O.R. (3d) 161 (C.A.); Dawson v. Rexcraft Storage & Warehouse Inc.; Pacific & Western Trust Co. v. Carroll (1998), 111 O.A.C. 201 (C.A.); Mason (V.K.) Construction Ltd. v. Canadian General Insurance Group Ltd. (1998), 42 O.R. (3d) 618 (C.A.); Transamerica Occidental Life Insurance Co. et al. v. Toronto-Dominion Bank (1999), 118 O.A.C. 149 (C.A.); and Kilpatrick v. Peterborough Civic Hospital (1999), 44 O.R. (3d) 321 (C.A.)). In order for a motion for summary judgment to be defeated based on one or more credibility issues, the credibility issues must be genuine. Where the evidence demonstrates that there is no genuine issue of fact which requires a trial for its resolution, and that a trial is unnecessary, the foundation for summary judgment is established. (Grossman Holdings Ltd. v. York Condominium Corp. No. 75 (1999), 124 O.A.C. 318 (C.A.); and Irving Ungerman Ltd. v. Galanis (1991), 4 O.R. (3d) 545 (C.A.)).

### (1)    Whether a Genuine Issue Exists Requiring a Trial

**12**    Tropic and Xela submit that the following genuine issues arise in this case, requiring factual findings at a trial:

> a)    the existence and nature of the alleged Collateral Agreement and its effect on Luis' entitlement to now seek payment of the remainder of the Redemption Price; and
>
> b)    whether Luis' alleged conduct concerning the Avicola share sale litigation precludes him from now seeking payment of the remainder of the

Redemption Price.

**13**    After reviewing the case law concerning motions for summary judgment, the motions judge concluded (at para. 8):

> Against the backdrop of these legal considerations, I have concluded that the moving party's motion succeeds. In doing so, I find that genuine issues of fact and law do not exist. Although raised, they are not footed on genuine issues of credibility but more importantly, they cannot survive the clear and unambiguous wording of the Redemption Agreement and the other legal documents which track the material events that underlie this claim ... [I]t is very significant that Xela irrevocably and unconditionally guaranteed the payment of all present and future debts and obligations owing to Luis pursuant to the Note and the Redemption Agreement.

For the reasons that follow, I agree with the motions judge.

(a)    The alleged Collateral Agreement and its effect on Luis' entitlement to now seek payment of the remainder of the Redemption Price

**14**    The Collateral Agreement is not reflected in the Redemption Agreement, the Note, the Guarantee or any other written document.

**15**    The appellants do not allege that the Redemption Agreement and the Guarantee are ambiguous or unclear so that evidence concerning the Collateral Agreement is necessary to interpret those documents. Rather, they argue that evidence concerning the Collateral Agreement is admissible, and gives rise to a genuine issue for trial, because the Redemption Agreement and the Guarantee do not reflect the whole of the agreement between the parties. They maintain that the intent of the parties in entering into the Collateral Agreement was to delay the operation of the Redemption Agreement and the Guarantee until the happening of the future events contemplated under the Collateral Agreement.

**16**    In support of the Collateral Agreement, the appellants filed affidavits from Arturo and Ricardo Castillo, another Gutierrez family member and a director of Tropic. Arturo deposed to the existence and nature of the Collateral Agreement. He swore that it was made prior to his execution of the Redemption Agreement and the Guarantee on behalf of Xela and that it was orally reconfirmed by Luis on several occasions thereafter. On behalf of Tropic, Ricardo Castillo deposed that he executed the Redemption Agreement in reliance on the Collateral Agreement. He did not dispute Arturo's evidence that the Collateral Agreement was made prior to execution of the Redemption Agreement and the Guarantee, nor did he allege that a different assurance or promise was made by Luis after execution of those documents. No other evidence was proffered by the appellants in proof of the Collateral Agreement.

**17**    The appellants do not dispute that the Collateral Agreement is inconsistent with the terms of the Redemption Agreement and the Guarantee. In my view, the Collateral Agreement as alleged by the appellants contradicts i) the payment schedule set out in the Redemption Agreement, which contemplates the first payment to Luis on account of the remainder of the Redemption Price at the time of entering into the Redemption Agreement, the second payment within six months thereafter and full payment by mid-January, 2000; ii) the acceleration clause of the Redemption Agreement, which provides for acceleration of the full amount owing to Luis upon completion of the Avicola share sale; iii) the integration or "entire agreement" clause of the Redemption Agreement, which provides that the Redemption Agreement, the Note and the Guarantee constitute the "entire and only agreement between the parties ..."; and iv) section 14 of the Redemption Agreement, which provides that: "Time shall be of the essence of this Agreement and of every provision hereof".

**18**    The Collateral Agreement is also inconsistent with the express terms of the Guarantee, which provide that Xela's liability thereunder is irrevocable, unconditional and absolute, regardless of "any defence, counter-claim or right of set-off available to Tropic" or "any other circumstances which might otherwise constitute a defence available to, or a discharge of [Xela or Tropic] ...".

**19**    Under the parol evidence rule, when the language of a written contract is clear and unambiguous, extrinsic evidence is not admissible to vary, qualify, add to, or subtract from, the words of the written contract. (See Chitty on Contracts 28th ed., vol. 1, General Principles (London: Sweet & Maxwell, 1999) at 624 and St. Lawrence Cement Inc. v. Wakeham & Sons (1995), 26 O.R. (3d) 321 (C.A.)). However, the rule is not absolute. It admits of numerous exceptions, including where it is alleged that evidence of a distinct collateral agreement exists, which does not contradict, and is not inconsistent with, the written contract (See Hawrish v. Bank of Montreal, [1969] S.C.R. 515 and Bauer v. Bank of Montreal, [1980] 2 S.C.R. 102).

**20**    Some recent authorities suggest a more relaxed approach to the admission of parol evidence. In Power Consolidated (China) Pulp Inc. v. British Columbia Resources Investment Corp., [1989] B.C.J. No. 114 (B.C.S.C.), McLachlin C.J.S.C. (as she then was) stated:

> The starting point in any discussion of when a collateral contract is excluded by the words of the main contract must be the rule -- sometimes called the parol evidence rule -- that evidence of a collateral contract is not admissible unless consistent with the main contract: Hawrish v. Bank of Montreal ... *The application of this rule, however, is narrow. Recent authorities suggest that it applies only where it is clear that the contract sued upon is wholly in writing.* If a party can establish that there was a pre-contractual stipulation which was not intended to be excluded, then it may be relied on even though it is arguably inconsistent with certain terms of the written contract: Toronto-Dominion Bank v. Griffiths et al. (1987), 18 B.C.L.R. (2d) 117 at 126, [1988] 1 W.W.R. 735 .... (Emphasis added)

(See also Gallen v. Allstate Grain Co. (1984), 9 D.L.R. (4th) 496 (B.C.C.A.)).

**21**    Notwithstanding the clear inconsistencies between the Collateral Agreement and the written contractual documents executed by the parties, the motions judge considered the affidavit evidence tendered by Tropic and Xela concerning the Collateral Agreement for the purpose of assessing whether the evidentiary record in this case gives rise to a genuine issue for trial. By doing so, she adopted an expansive approach to the parol evidence rule and the evidentiary record, which clearly favoured Tropic and Xela.

**22**    Luis does not assert on this appeal that the motions judge erred in considering the extrinsic evidence of the Collateral Agreement. He submits that even if the appellants' evidence concerning the Collateral Agreement is considered, no genuine issue arises as an impediment to summary judgment. I agree, for several reasons.

**23**    First, although on this appeal the appellants refer to the Collateral Agreement, variously, as an "agreement" or "understanding" with, or "assurances", a "representation" or "misrepresentation" by Luis, no allegation of a representation or misrepresentation by Luis is made in the appellants' Statement of Defence and Counterclaim, nor do they claim mutual mistake or rectification of the Redemption Agreement or the Guarantee. While representation and misrepresentation are alleged in the appellants' factum, and were asserted in oral argument before this court, such claims are not supported by the appellants' pleading.

**24**    Second, on the facts here, the Collateral Agreement cannot survive the integration clause contained in s. 12 of the Redemption Agreement, which specifically provides that that agreement, the Note and the Guarantee "[supersede] any and all prior negotiations, understandings and agreements, written or oral". Both Tropic and Xela are signatories to the Redemption Agreement. Their own evidence indicates that the Collateral Agreement was made prior to the date of execution of the Redemption Agreement and the Guarantee. Thus, even if the evidence concerning the Collateral Agreement is accepted at trial, it is no answer to the express language of the integration clause subsequently agreed upon in the Redemption Agreement. Moreover, its reconfirmation after execution of the Redemption Agreement and the Guarantee, if proven, does not alter the fact that after entering into the Collateral Agreement the parties agreed to an overriding contractual integration clause. It is not alleged that a fresh bargain was made with Luis after the date of the Redemption Agreement. As McLachlin C.J.S.C. concluded in Power Consolidated:

> The question is whether the intention of the parties in the case at bar was that the written contract ... would constitute the whole of the contract. That intention, as in all matters relating to contractual construction, must be determined objectively. Here the parties expressly agreed that the contract documents constituted the whole of their agreement. While in most cases such an agreement is only a presumption based on the parol evidence rule, in this case it has been made an express term of the contract. A presumption can be rebutted; an express

term of the contract, barring mistake or fraud, cannot.

**25**    Similarly, given the unchallenged validity of the integration clause, the Collateral Agreement cannot operate to postpone or suspend the clear terms of the Guarantee under which Xela agreed that any defence available to it or Tropic would not displace Xela's absolute and unconditional liability thereunder. The Guarantee itself states that it is a continuing guarantee for all present and future obligations of Tropic to Luis under the Redemption Agreement and the Note, binding as a continuing obligation of Xela until Luis releases Xela, or Tropic's obligations to Luis have been paid in full. The Guarantee makes no mention of the Avicola share sale or of Arturo's death or health. It is not expressed to be conditional on any future event. To the contrary, Xela's obligations under the Guarantee are described as irrevocable, unconditional and absolute. Application of the Collateral Agreement to the Guarantee would result in alteration of the fundamental terms of the Guarantee. Thus, the terms of the Guarantee also support the conclusion that the Collateral Agreement gives rise to no genuine issue for trial.

**26**    Third, the appellants' argument that the Collateral Agreement formed part of the entire agreement between the parties cannot be reconciled with the payment schedule set out in the Redemption Agreement. I agree with Luis' submission that the payment schedule is nonsensical if the parties intended Tropic's payment obligations to be conditional on Arturo's death or disability, or completion of the Avicola share sale. If accepted, the appellants' argument would also render meaningless s. 14 of the Redemption Agreement, which provides that "Time shall be of the essence of this Agreement and of every provision hereof".

**27**    Finally, an essential term of the Collateral Agreement asserted by the appellants is that Luis agreed that he would not be paid the remainder of the Redemption Price until the Avicola share sale was complete, unless Arturo earlier died or became disabled. While neither Arturo's death nor his disability is mentioned in the Redemption Agreement, the payment acceleration provision contained in s. 2 of the Redemption Agreement specifically addresses the Avicola share sale. It provides, in part, that immediately upon the closing of any sale by Xela of all or any part of its interest in Avicola, Tropic will pay all amounts owing to Luis under the Redemption Agreement. That part of the acceleration provision would be nonsensical if Luis had agreed, in any event, that he was to receive no part of the remainder of the Redemption Price, so long as Arturo was alive and not disabled, pending completion of the Avicola share sale. The motions judge observed concerning the acceleration clause:

> This is significant. It means that the parties addressed their minds to the pending Avicola sale. The content of the Redemption Agreement is clear. The sale would accelerate the payment schedule ....

I agree.

**28**    The motions judge observed, correctly in my view, that the mere assertion that parol evidence is needed, is not itself sufficient to resist a motion for summary judgment. (See Grossman

Holdings.) The party seeking to defeat summary judgment must show a reasonable basis for admitting parol evidence and, if admitted, that that evidence would raise a genuine issue for trial. I conclude that even if the appellants' evidence concerning the Collateral Agreement is admissible, and accepted at trial, that evidence would not support a defence to the clear and unambiguous terms of the subsequently executed Redemption Agreement and Guarantee.

    (b)    Luis' alleged conduct concerning the Avicola share sale litigation

**29**    Tropic and Xela make two arguments concerning Luis' alleged conduct in connection with the Avicola share sale. First, they argue that Luis has taken steps to hinder the resolution of the Avicola litigation, thereby preventing them from obtaining the funds necessary to pay the remainder of the Redemption Price. They submit that such conduct is in breach of a contractual duty of good faith owed by Luis and fiduciary duties owed by him to Xela, with the result that he is disentitled from now seeking payment of the remainder of the Redemption Price. As there is a factual dispute concerning Luis' role in the Avicola litigation, the appellants submit that a genuine issue for trial arises, requiring factual findings based on credibility assessments. Second, Tropic and Xela contend that they have suffered damage as a result of such conduct by Luis concerning the Avicola litigation. Consequently, they submit that a genuine issue arises as to whether Luis' conduct supports the defence of equitable set-off. In my view, neither of those arguments succeeds.

**30**    Tropic's and Xela's first argument flows from their assertion that Luis agreed, as part of the Collateral Agreement, that payment of the remainder of the Redemption Price would only be made from the proceeds of the Avicola share sale. I have concluded, for the reasons earlier set out, that the Collateral Agreement, if proven, cannot survive the Redemption Agreement and the unconditional language of the continuing Guarantee.

**31**    It is useful to emphasize that Tropic's obligations under the Redemption Agreement are not conditional upon completion of the Avicola share sale. Delay in completion of that sale does not operate to defer commencement of the payment schedule set out in s. 1, nor is that schedule tied in any way to the Avicola share sale. Under s. 2 of the Redemption Agreement, completion of that sale is a triggering event for acceleration, rather than commencement, of the payment schedule.

**32**    Moreover, Tropic and Xela partially performed the Redemption Agreement by delivering the Note and the Guarantee, making some quarterly interest payments on the Note and paying to Luis the sum of Cdn. $500,000 in April 2000. At least some of those actions were taken after February 1999, when the Avicola share sale litigation was in progress. Such partial performance of the Redemption Agreement undermines the appellants' argument that they are relieved at this time of their obligations under the Redemption Agreement.

**33**    Tropic and Xela assert that the motions judge failed to address their evidence concerning Luis' alleged conduct in relation to the Avicola litigation and their claim that, by that conduct, Luis breached a contractual duty of good faith. I do not agree that the motions judge failed to do so. The motions judge clearly recognized that Luis' alleged conduct in connection with the Avicola

litigation was being raised by the appellants as a defence to the motion for summary judgment. The appellants' allegations concerning Luis' conduct were detailed in affidavit evidence filed on the motion, which the motions judge considered and concerning which she concluded (at para. 27):

> I would add that I see the content of the responding affidavits as being in that category of self serving affidavit which does not create a triable issue in the absence of detailed facts and supporting evidence. [Citations omitted]

**34**     In her reasons, the motions judge also expressly referenced the defence of equitable set-off raised by the appellants. After referring to those portions of the appellants' pleading which detail that defence, including the appellants' allegation that Luis breached a duty of contractual good faith and his fiduciary obligations, she stated (at para. 32):

> I do not agree that this defence survives Rule 20. I refer to the yet unreported decision in Walsa Limited v. Robert Megna et al., [2001] O.J. No. 3503, (released August 30, 2001) wherein a similar assertion was made. Rather than repeat the analysis contained therein, I will say simply that I rely on it in concluding that this is not a legally viable defence. See also Marketing Products Inc. v. 1254719 Ontario Ltd. 142 O.A.C. 61.

**35**     In my view, the appellants' argument concerning equitable set-off is flawed in two fatal respects. First, the Guarantee expressly provides that no defence or right of set-off available to Tropic or Xela operates to diminish or displace Xela's absolute and unconditional obligations under the Guarantee. I have concluded that operation of the Guarantee is not delayed or postponed by the Collateral Agreement, even if the latter agreement is established. Accordingly, the appellants are contractually precluded by the Guarantee from raising the defence of equitable set-off in response to Luis' claim.

**36**     Second, I am not persuaded that the appellants have met the requirements for equitable set-off. While that remedy is available in a proper case for an unliquidated claim, in order for it to be successfully advanced the cross-claims must be closely connected. Further, as stated by this court in Canada Trustco Mortgage Co. v. Sugarman (1999), 179 D.L.R. (4th) 548, at p. 555, per Charron J.A.: "Not only must the connection be sufficiently close to warrant an exercise of the equitable jurisdiction of the court, the remedy must not result in any form of inequity". Here, in my view, there is no clear connection between the appellants' assertion of a claim for damages consequent upon Luis' alleged conduct concerning the Avicola share sale litigation and the appellants' breach of their obligations under the Redemption Agreement and the Guarantee. Moreover, on the record before this court, the progress of the Avicola share litigation in foreign jurisdictions is uncertain. Accordingly, the set-off remedy claimed by the appellants, if accepted, could have the inequitable result of delaying indefinitely resolution of Luis' claim for payment of the remainder of the Redemption Price. The intervention of equity is not to be encouraged in such circumstances.

**37**     I conclude, therefore, that Luis' conduct in relation to the pending Avicola share sale litigation,

if proven, does not support a defence to Luis' claim for payment of the remainder of the Redemption Price. Accordingly, it does not give rise to a genuine issue for trial.

(2)    Whether the Motions Judge Exceeded Her Role on the Summary Judgment Motion

**38**    The appellants do not dispute that the motions judge properly instructed herself on her role on a motion for summary judgment and on the legal principles governing determination of such motions. They submit that she erred in her application of those principles by i) assessing the credibility of Arturo and Ricardo Castillo; ii) weighing their evidence against that of Luis and certain surrounding circumstances in finding, as a fact, that Luis and Arturo did not enter into the Collateral Agreement; and iii) considering factors to be taken into account by a trial judge when assessing credibility and weighing evidence. I do not accept that submission.

**39**    The reasons of the motions judge clearly reveal her understanding that she was precluded on a summary judgment motion from assessing credibility, weighing conflicting evidence or making findings on controverted facts. In my view, she correctly instructed herself on her role on the motion and did not transgress the proper boundaries of that role.

**40**    The motions judge was required to assess the threshold issue of whether a genuine issue exists in this case as to material facts, requiring a trial. That assessment includes a determination of whether the evidence raises genuine issues of credibility. To conduct that assessment, it was incumbent on the motions judge to consider the pleadings of the parties and all of the evidence properly admissible before her which constitutes the record in this case. (Dawson, at p. 269).

**41**    In assessing the evidence, the motions judge was entitled to consider the language of the contractual documents entered into by the parties, the history of their dealings at the time of entry into those written contractual documents and the implications of the alleged Collateral Agreement. In conducting that assessment, in my view, she did not make findings of credibility nor improperly weigh conflicting evidence. Based on a review of the motions judge's reasons as a whole, I am not persuaded that her review of the evidentiary record involved anything more than a determination of the narrow question of whether there was a genuine issue for trial.

III.    DISPOSITION

**42**    Accordingly, for the reasons set out above, I would dismiss the appeal. Luis is entitled to his costs of the appeal.

**43**    The Redemption Agreement provides that Tropic will pay for and indemnify Luis for all reasonable solicitor and client legal costs and other related expenses incurred by him in connection with any enforcement proceedings concerning the Redemption Agreement, the Guarantee or the Note. The Guarantee contains a similar agreement by Xela concerning enforcement by Luis of his rights under the Guarantee. Before this court, the appellants agreed that Luis, if successful on appeal, is entitled to his costs on a substantial indemnity basis in accordance with a Bill of Costs

filed on his behalf. Accordingly, Luis' costs of the appeal are fixed on a substantial indemnity basis, in the sum of $37,568.08, inclusive of disbursements and Goods and Services Tax.

CRONK J.A.
 CARTHY J.A. -- I agree.
 GILLESE J.A. -- I agree.

* * * * *

Corrigendum
Released: August 30, 2002

Please note that the name of the Appellant's counsel should be Arlen K. Sternberg.

*Indexed as:*

# Hamilton v. Hamilton

**Between**
**Beverley Hamilton, petitioner/respondent, and**
**John Beatty Hamilton, respondent/appellant**

[1996] O.J. No. 2634

92 O.A.C. 103

64 A.C.W.S. (3d) 828

No. C13792

Ontario Court of Appeal
Toronto, Ontario

**Osborne, Doherty and Moldaver JJ.A.**

Heard: February 29, 1996.
Judgment: July 23, 1996.

(26 pp.)

*Family law -- Husband and wife -- Property, distribution orders -- Equalization payments --*
*Calculation of net family property -- Maintenance of wives and children -- Lump sum award --*
*Non-harassment order, scope of.*

This was an appeal from a decision determining the equalization payment owed by the respondent to the appellant and making a lump sum spousal and child support order. The trial judge deducted the equalization payment she found owing by the respondent wife to the husband from the lump sum support awards for a difference of $167,738. The trial judge dealt separately with the parties' RRSPs and a cottage. As a result, the $167,738 figure found owing by the husband did not reflect the trial judge's treatment of these assets. The husband had shot the wife with a riffle at close range. He was convicted of attempted murder and sentenced to eight years imprisonment. He was serving the sentence at the time of this proceeding. The trial judge imposed a non-molestation order against the appellant. She also banished him from the District of Muskoka where the wife lived. The

appellant submitted that the $167,738 figure was too high because the trial judge did not follow the proper approach for calculating the net family assets of the parties. He also appealed from the lump sum support award and the banishment order.

HELD: Appeal allowed in part. The trial judge erred in excluding certain assets in calculating net family assets. However, the error made little difference to the result and the $167,738 award was affirmed. The lump sum support award was appropriate in the circumstances of this case. There was no statutory authority for the banishment order imposed by the trial judge and that portion of the decision was struck.

**Statutes, Regulations and Rules Cited:**

Family Law Act, ss. 4(1)(b), 4(2)(1), 5(6), 14, 46(1).

**Counsel:**

Michael Miller, for the appellant.
Michael Anne MacDonald, for the respondent.

---

The judgment of the Court was delivered by

**1    OSBORNE J.A.**:-- This is an appeal from the judgment of MacFarland J. in which she determined the equalization payment owed by the respondent, Mrs. Hamilton, and the amount of child and spousal support to be paid by the appellant, Mr. Hamilton. She also imposed an extensive non-molestation order, clearly intended to keep Mr. Hamilton away from his former wife and his children. The trial judge made lump sum spousal and child support orders and a lump sum interim child support adjustment. She deducted the equalization payment that she found Mrs. Hamilton owed to Mr. Hamilton from the total of the lump sum support awards. The difference was $167,738. This amount is shown in paragraph one of the formal judgment and is the amount Mr. Hamilton was ordered to pay Mrs. Hamilton. The trial judge dealt separately with the parties' RRSP's and the cottage. As a result, the $167,738 figure as the trial judge calculated it does not reflect the trial judge's treatment of these assets. Mr. Hamilton contends that the $167,738 figure is too high. He takes issue with all of its constituent elements (the equalization payment and the lump sum support orders). He also appeals from the trial judge's order banishing him from the District of Muskoka where Mrs. Hamilton lives. Mrs. Hamilton, who has not cross-appealed, takes the position that the trial judge was correct in concluding on a bottom line basis that Mr. Hamilton owes her $167,738.

The Facts

**2**    I need only refer to the facts in skeletal form. Mr. and Mrs. Hamilton were married in 1972.

They have five children Eric, born April 25, 1975, Jody born March 5, 1979, Lisa born August 1, 1981, Kim born March 23, 1984 and Tracey born June 22, 1988. Mr. Hamilton has a serious drinking problem. Mrs. Hamilton decided to separate from him in September 1990. On September 25, 1990, Mr. Hamilton moved out of the matrimonial home into the family cottage located on an island in Lake Muskoka.

**3**    On October 4, 1990 Mrs. Hamilton consulted a lawyer to inquire about her legal rights. The next day at about 6:30 a.m., Mr. Hamilton appeared with a rifle at the matrimonial home. He aggressively questioned Mrs. Hamilton about where she had been on October 4th. Eventually Mrs. Hamilton told him that she had been to see a lawyer. Mr. Hamilton's response was to shoot his wife at close range. Miraculously, Mrs. Hamilton was not killed. After a significant period of hospitalization and rehabilitation she recovered, albeit not completely.

**4**    Mr. Hamilton was charged with and convicted of attempted murder on June 28, 1991. He was sentenced to imprisonment for 8 years and 4 months. His appeal against conviction and sentence was dismissed. He is still incarcerated, his applications for parole having been denied.

**5**    Throughout his working life, Mr. Hamilton was employed as a delivery man, first in Toronto and then in Bracebridge. For a number of years before he was incarcerated, he delivered the Toronto Star in the Bracebridge area where the Hamilton family lived. This job required Mr. Hamilton to work for a few hours in the early morning. He frequently spent the rest of the day drinking.

**6**    I see no need to review Mrs. Hamilton's employment history. It will be sufficient to note that she worked throughout the marriage, taking time off only when she gave birth to her five children. At various times she had two jobs.

**7**    Throughout their marriage, through gifts and inheritances, Mr. and Mrs. Hamilton and their children were provided with financial assistance by Mr. Hamilton's family. This, together with their relatively modest earnings, enabled them to acquire assets, including a matrimonial home and a cottage, the value of which substantially exceeded the value of assets they would have been able to accumulate had they had to rely only on their incomes from employment.

**8**    On October 12, 1990 Mrs. Hamilton commenced divorce proceedings. She sought, among other things, custody, a non-molestation order, lump sump child and spousal support and an unequal net family property division. Mr. Hamilton counter-petitioned for access to his children, an unequal division of net family property and a declaration that Mrs. Hamilton held the cottage property in trust for him. In his counter-petition he acknowledged that his conduct toward Mrs. Hamilton after the date of separation was "totally unacceptable." The concession, although somewhat understated, is appropriate.

The Trial Judgment

(i)    The Equalization Payment

**9**    After reviewing the facts in significantly more detail than I have, the trial judge turned to the issue of the parties' net family property. In dealing with that issue, the trial judge appears to have grouped the relevant property into three categories: Mrs. Hamilton's property, Mr. Hamilton's property and what the trial judge referred to as "family property." This latter category included the parties' matrimonial home, their cottage and the RRSP's that each of them had accumulated as of the date of separation. The trial judge dealt with these assets separately in that she did not include them in the net family property ledger sheets.

**10**    The trial judge first considered the cottage. She noted that title was held by Mrs. Hamilton but found that most of the purchase funds were a gift from Mr. Hamilton's mother. She concluded that the gift was to the parties jointly and thus concluded that the cottage was "family property." She reached this conclusion without resort to trust principles. There was no specific evidence as to the value of the cottage on the valuation date which was September 25, 1990 (the date of separation). The estimated value of the cottage in the Spring of 1993 was between $210,000 and $220,000. The trial judge concluded that its value had likely decreased since the valuation date. She held that the appropriate disposition was to direct a sale of the cottage and divide the proceeds equally between Mr. and Mrs. Hamilton after deducting disposition costs, subject to a credit in favour of Mrs. Hamilton for one-half of all of the funds she had paid for realty taxes and insurance from the valuation date to the date of the sale. Because of the approach taken by the trial judge, the cottage did not form part of the net family property of either Mr. or Mrs. Hamilton.

**11**    After dealing with the cottage, the trial judge determined the net family property of Mr. and Mrs. Hamilton, leaving aside their RRSP's and the matrimonial home. Her calculations were as follows:

| Mr. Hamilton | Mrs. Hamilton |
|---|---|
| Boat, motor, trailer $ 15,000 2 Snowmo-biles 1,000 Ford Van 12,000 Shares 2,300 All-Terrain Vehicle 4,000 MGB 5,000 Life Policy 4,600 Bank Accounts 8,000 | House & Cottage Contents $ 8,000 Ford Excel 2,500 Shares 2,300 Life Policy 14,790 Bank Accounts 4,000 |
| Total $ 51,900 | Total $ 31,590 |

**12**    The trial judge then took the parties' debts into account. She found that Mr. Hamilton's debts at separation were $2,736 and Mrs. Hamilton's debts were $6,192. These debts reduced the trial judge's calculation of Mr. Hamilton's net family property from $51,900 to $49,164 and Mrs.

Hamilton's net family property from $31,590 to $25,398. She then subtracted $25,398 from $49,164 and divided the difference by two, with the result that Mr. Hamilton owed Mrs. Hamilton a preliminary equalization payment of $11,883. I refer to the equalization payment as preliminary because it did not take into account all of the parties' property or appropriate deductions and exclusions.

**13**    Having established a preliminary equalization payment of $11,883, the trial judge credited Mrs. Hamilton with $1,500, representing one-half of the realty taxes and insurance that she had paid on the matrimonial home. This increased the preliminary equalization payment from $11,883 to $13,383 owing to Mrs. Hamilton.

**14**    The trial judge then deducted $15,145 from the $11,883 that Mr. Hamilton owed Mrs. Hamilton as the preliminary equalization payment. The $15,145 figure represented the total proceeds from the post-valuation date sale by Mrs. Hamilton of Mr. Hamilton's Ford van and all-terrain vehicle. The result of this deduction left Mrs. Hamilton owing $1,762 to Mr. Hamilton.

**15**    The trial judge next considered the parties' RRSP's. She found that Mr. Hamilton's RRSP account had a value of $29,000 and Mrs. Hamilton's RRSP account had a value of $11,000 at the valuation date. She established a separate equalization payment ledger and equalization payment for the parties' RRSP accounts and ordered Mr. Hamilton to transfer $9,000 out of his RRSP's to Mrs. Hamilton, as one-half the difference between the RRSP account values.

**16**    Finally, the trial judge considered the matrimonial home. Like the cottage and the RRSP's she treated the matrimonial home independently of other property. She noted that title was held by Mrs. Hamilton and ordered that title remain in her name. She found that the value of the matrimonial home on the valuation date was $185,000. She ordered Mrs. Hamilton to pay Mr. Hamilton one-half of that value, being $92,500, "to extinguish his interest in the home."

**17**    The outcome of the trial judge's rolling net family property calculation was that, leaving aside the RRSP's and the cottage, Mrs. Hamilton had to pay $94,262 to Mr. Hamilton. In addition, Mr. Hamilton had to transfer $9,000 from his RRSP account to Mrs. Hamilton and Mr. Hamilton was entitled to one-half the proceeds of the sale of the cottage subject to the deduction for realty taxes and insurance that I have noted.

(ii)    Spousal and Child Support

**18**    To determine the appropriate support awards, the trial judge considered the value of Mr. Hamilton's existing assets. Because he was incarcerated and his job prospects after release were poor, she did not consider any employment-related income in assessing his prospective ability to pay. The trial judge took into account the $94,262 owing to him as the equalization payment, the $108,800 that Mr. Hamilton had on deposit in a trust company (this was excluded property) and his $100,000 share of the estimated proceeds from the sale of the cottage.

**19**    Based on Mr. Hamilton's estimated net worth of approximately $300,000, the trial judge ordered a lump sum spousal support award of $100,000. She deducted the equalization payment owed to Mr. Hamilton with the result that Mr. Hamilton was required to pay $5,738 to meet his spousal support obligations.

**20**    The trial judge then considered child support. She made a lump sum child support order of $150,000. This figure represented an award of $500 a month for each of the parties' five children for five years. She also made a lump sum interim child support adjustment order of $12,000 because Mr. Hamilton had paid what the trial judge viewed as a manifestly inadequate child support to Mrs. Hamilton during the two years between separation and trial. The two lump sum child support awards increased Mr. Hamilton's debt to Mrs. Hamilton to $167,738. It is that figure that appears in paragraph one of the formal judgment.

**21**    To satisfy the debt that the trial judge found Mr. Hamilton owed to Mrs. Hamilton, the trial judge ordered Mr. Hamilton to transfer to Mrs. Hamilton $69,634.12 from his National Trust deposit account, $15,000 from a bank deposit account and his share of the proceeds of the sale of the cottage. He was also ordered to maintain a life insurance policy naming the children as irrevocable beneficiaries and to maintain in good standing the policies owned by each of the children and to turn these policies over to the children when they reached 21 years of age.

The Grounds of Appeal

**22**    The appellant raised a number of grounds of appeal in his notice of appeal and factum. However, in oral argument the appellant raised only the following issues:

1.    The trial judge did not make a proper determination of the equalization payment required by s. 4 of the Family Law Act, R.S.O. 1990, c. F.3. More particularly, the appellant contended that the trial judge failed to calculate the net family property of Mr. and Mrs. Hamilton and left the cottage and matrimonial home out of the net family property calculations.

2.    The trial judge erred in making a spousal support order of $100,000 and a child support order of $150,000. Mr. Hamilton takes issue with the quantum of those orders, not with their lump sum character.

3.    The trial judge erred in banishing Mr. Hamilton from the District of Muskoka permanently. The appellant submits that there is no statutory authority for making this order.

Analysis

1.    The Equalization Payment

**23**    Section 4 of the Family Law Act sets out the framework for determining the equalization payment. The relevant parts of s. 4 for the purposes of this appeal are as follows:

4.--(1)In this Part,

...

"net family property" means the value of all the property, except property
described in subsection (2), that a spouse owns on the valuation date, after
deducting,

(a)    the spouse's debts and other liabilities, and
(b)    the value of property, other than a matrimonial home, that the spouse
       owned on the date of the marriage, after deducting the spouse's debts and
       other liabilities, calculated as of the date of the marriage; ...

(2)    The value of the following property that a spouse owns on the valuation date
       does not form part of the spouse's net family property:

1. Property, other than a matrimonial home, that
was acquired by gift or inheritance from a third
person after the date of the marriage.

...

5. Property, other than a matrimonial home, into
which property referred to in paragraphs 1 to 4 can
be traced.

**24**    It is apparent that the Legislature intended that the steps required for calculating net family
property set out in s. 4 be followed and that the scope of judicial discretion be limited to those cases
to which s. 5(6) of the Act applies. Under s. 5(6) a court may award an amount that differs from the
equalization payment arrived at through the s. 4 calculation if the court is of the opinion that
equalizing the net family properties would be unconscionable having regard to a variety of factors
set out therein. The considerations in s. 5(6), however, have nothing to do with the required
threshold determination of which spouse owns what property: see Skrlj v. Skrlj (1986), 2 R.F.L.
(3d) 305 (Ont. H.C.).

**25**    The first step required by s. 4 is to identify all relevant property. Then ownership has to be
determined. At this stage, trust principles may be brought to bear such that ownership of property
for net family property purposes is deemed to be different from that which may be recorded in a
title document. Once the ownership of property is established, the value of the property at the

valuation date must be determined.

**26**    Next, the court must determine the relevant deductions and exclusions under s. 4(1) and 4(2) of the Family Law Act. When that exercise is complete, the court calculates each spouse's net family property and then, following the Act, determines the required equalization payment to be paid by one party to the other. It is at this point that the court considers whether to reduce or eliminate the equalization payment by resort to the provisions of s. 5(6) of the Act.

**27**    I agree with the appellant's counsel that the trial judge did not follow s. 4 of the Act in determining the parties' net family property. Although I think the trial judge ought to have followed the provisions of the Act, the dollar figure I come to by following the Act does not differ significantly from that determined by the trial judge, once the effect of the lump sum support orders is taken into account.

**28**    I begin by repeating that all property owned by either Mr. or Mrs. Hamilton ought to have been brought into each party's net family property balance sheet according to the ownership of that property. I set out below what I view to be the appropriate net family property statements for Mr. and Mrs. Hamilton, including relevant deductions and exclusions. I highlight those assets and their values that I treat differently than the trial judge.

(a)    Assets Owned by the Parties on Valuation Day

Mr. Hamilton

Mrs. Hamilton

| Mr. Hamilton | | Mrs. Hamilton | |
|---|---|---|---|
| Boat, motor, trailer $ 15,000 2 Snowmobiles 1,000 Shares 2,300 All Terrain Vehicle 4,000 MGB 5,000 Life Policy 4,600 Bank Accounts 8,000 RRSP 29,000 National Trust Account 108,800 Cottage 100,000 | | House & Cottage Contents $8,000 Ford Excel 2,500 Ford Van 12,000 Shares 2,300 Life Policy 14,790 Bank Accounts 4,000 RRSP 11,000 Watch 3,750 Earrings & Necklace 6,000 Engagement Ring 3,000 Cottage 100,000 Matrimonial Home 185,000 | |
| Total | $ 277,700 | Total | $352,340 |

(b)    Deductions

Mr. Hamilton

Mrs. Hamilton

| Debts | $2,736 | | Debts | $6,192 |
| | | | Engagement Ring | 3,000 |
| Total | | | | |
| | $2,736 | | Total | $9,192 |

(c)    Exclusions

| Mr. Hamilton | | | Mrs. Hamilton | |
| National Trust | | | Earrings and Necklace | $6,000 |
| Account $108,800 | | | Watch | 3,750 |
| Total | | | | |
| | $108,800 | | Total | $9,750 |

(d)    Equalization Payment Calculation
(a)    Mrs. Hamilton's Net Family Property = $352,340 - ($9,192 + $9,750) = $333,398
(b)    Mr. Hamilton's Net Family Property = $277,700 - ($2,736 + $108,800) = $166,164

**29**    The equalization payment owed by Mrs. Hamilton is one-half of the difference between $333,398 and $166,164, that is $83,617.

**30**    Some explanation for the adjustments to the trial judge's calculations is required.

   The Matrimonial Home

**31**    The matrimonial home was owned by Mrs. Hamilton. The trial judge took it out of the net family property calculation and dealt with it separately. Unlike the cottage, neither Mr. nor Mrs. Hamilton suggested in their pleadings that the ownership of the matrimonial home was different from its registered ownership. I see no basis upon which to conclude that the house was not owned solely by Mrs. Hamilton. I thus treat it as her property alone. There is no issue as to the value of the matrimonial home on valuation date. Because the matrimonial home is Mrs. Hamilton's property, the amount she paid on it for taxes and insurance from the date of separation to the date of trial is

either a support issue or a s. 5(6) issue; it is not an issue that should be considered in determining the equalization payment (other than by resort to s. 5(6)). Section 5(6) was not raised as a basis on which to vary the equalization payment and Mrs. Hamilton does not take issue with the lump sum support orders. I would, therefore, not grant the $1,500 amount paid for taxes and insurance as a credit to Mrs. Hamilton.

The Cottage

**32**    The cottage was registered in Mrs. Hamilton's name. However, the trial judge treated it as a jointly owned asset and dealt with it separately so as to leave the cottage out of the net family property and equalization payment calculations. In concluding that the cottage was jointly owned, the trial judge did not seem to resort to trust principles. Rather, she viewed the cottage as a "family asset" because most of the money used to purchase it ($250,000 of the $315,000 purchase price) was given to Mr. and Mrs. Hamilton by Mr. Hamilton's mother.

**33**    I think the trial judge's ownership conclusion can be supported. It is established that the Family Law Act definition of property includes beneficial interests arising from express, resulting and constructive trusts: see Rawluk v. Rawluk (1990), 23 R.F.L. (3d) 337 (S.C.C.). In his pleadings, Mr. Hamilton claimed an ownership interest in the cottage. It is not clear to me how, or even whether, he pursued this claim at trial. Nonetheless, in my view, the conclusion reached by the trial judge in respect of the joint ownership of the cottage can be justified by application of trust principles.

**34**    A presumption of a resulting trust arises in favour of persons who contribute financially to the purchase of property but do not take title in their own name, and do not intend to give a gift of the entire beneficial interest in the property to the registered or recorded title holder. Equity presumes that the non-titled party does not intend a gift when he contributes to the purchase price of a property. The non-titled party is treated as the equitable holder of the beneficial interest; the extent of his or her beneficial interest is proportionate to the financial contribution made to acquire the property. The presumption of a resulting trust is rebuttable on a showing by the title-holder that the non-titled party intended the title-holder to have the property for his or her own benefit. The presumption of a resulting trust is also rebuttable on a showing that the transfer to the titled party was not gratuitous. See Oosterhoff and Gillese, Text, Commentary and Cases on Trusts, 4th ed. (1992) and Hovius, Family Law: Cases Notes and Materials, 3rd ed. (1992). Section 14 of the Family Law Act recognizes a presumption of resulting trust notwithstanding the fact that the title-holder and non-titled party are husband and wife. It provides:

> 14.    The rule of law applying a presumption of a resulting trust shall be applied in questions of the ownership of property between husband and wife, as if they were not married, except that,
>
> (a)    the fact that property is held in the name of spouses as joint tenants is

prima facie proof that the spouses are intended to own the property as joint tenants; and

(b)    money on deposit in the name of both spouses shall be deemed to be in the name of the spouses as joint tenants for the purposes of clause (a).

**35**    The concept of a constructive trust is different from that of a resulting trust. Dickson J. in Petkus v. Becker, [1980] 2 S.C.R. 834 held that for a court to impose a constructive trust, there must be an unjust enrichment arising from the way in which title is held. An unjust enrichment exists when there is an enrichment on the part of the titled party, a corresponding deprivation on the part of the non-titled party and no juristic reason for the titled party to retain the enrichment. There must also be a link between the benefit conferred and the property claimed to be subject to the trust: see Peter v. Beblow (1993), 101 D.L.R. (4th) 621 at 649-50.

**36**    Mr. and Mrs. Hamilton acquired the cottage property with a gift of money that the trial judge found was given to them jointly by Mr. Hamilton's mother. Title to the cottage was taken solely by Mrs. Hamilton. Mr. Hamilton testified that the cottage and house were placed in Mrs. Hamilton's name for "business purposes" because he faced losing his licence for impaired driving. However, his cross-examination revealed that the charge of impaired driving arose out of an incident that occurred one month after title was put in Mrs. Hamilton's name. Thus, Mr. Hamilton's supposed business purpose could not have motivated how title was taken and is not relevant to the trust analysis.

**37**    In my view, the facts of this case justify imposing a resulting trust whereby the beneficial ownership of the cottage is held jointly by Mr. and Mrs. Hamilton. Mr. Hamilton made a direct contribution to the purchase price in the sense that he was a joint donee and then a joint contributor of the purchase money. The extent of Mr. Hamilton's equitable interest in the cottage is directly related to his contribution to its purchase price. The precise amount of this contribution is not clear from the trial judge's findings.

**38**    Mr. Hamilton claims to have provided a total of $190,000 toward the purchase of the cottage (an amount representing one-half of the gift from his mother plus $65,000 referred to in the evidence as being inheritances from his aunt and father). He would then be entitled to hold about three-fifths of the beneficial interest in the cottage. However, in the absence of a specific finding by the trial judge on the issue whether he in fact used the $65,000 toward the cottage, it seems sensible to limit his interest to one-half.

**39**    I do not think it is appropriate to resort to a constructive trust remedy in this case. The contribution at issue was a direct financial contribution to the acquisition of the property and thus the circumstances come directly within the traditional resulting trust analysis. It would also be somewhat perverse in light of the facts of this case to argue that the remedy of a constructive trust should be granted in favour of Mr. Hamilton to prevent an unjust enrichment that would accrue to Mrs. Hamilton were he not given an interest in the cottage.

**40**    There was no direct evidence of the value of the cottage on the valuation date, being September 25, 1990. The trial judge assessed its value as $200,000 which was apparently based on its estimated value in the spring of 1993. Considering the lack of evidence regarding the value of the cottage in September 1990, I see no basis upon which to interfere with the value used by the trial judge.

The Van and All-Terrain Vehicle

**41**    Mrs. Hamilton was the registered owner of the van. The trial judge viewed the van as family property, but for reasons not clear to me, treated it as Mr. Hamilton's property for net family property purposes. I see no reason to allocate that item of property to Mr. Hamilton. Treating Mrs. Hamilton as the owner of the van is consistent with the parties' filed net family property statements.

**42**    As noted, the trial judge credited Mr. Hamilton with the $11,145 that Mrs. Hamilton received when she sold the van after the date of separation. The trial judge did this because of her treatment of the van as Mr. Hamilton's property. In light of my conclusion that the van belonged to Mrs. Hamilton's, it was open to her to sell it. Mr. Hamilton is therefore not entitled to this credit.

**43**    There is no reason to interfere with the trial judge's finding that the all-terrain vehicle was Mr. Hamilton's property. Mrs. Hamilton sold this vehicle after separation for $4,000. The trial judge found that the sale proceeds were used "... to support herself and the children" between separation and the trial. In these circumstances I do not think it appropriate to vary the equalization payment under s. 5(6) to credit Mr. Hamilton with the $4,000.

Miscellaneous Assets

**44**    Mrs. Hamilton's watch, earrings, necklace and engagement ring are recorded as her property in the net family property statement I have drafted. The engagement ring was presumably given to her before her marriage and was thus property she owned at the date of marriage. It is therefore recorded as a deduction, as provided in s. 4(1)(b). I have assumed that it did not increase in value between the date of marriage and the date of separation because there was no evidence on that issue. The value of Mrs. Hamilton's earrings, necklace and watch, which were given to her by her parents after the marriage is properly excluded under s. 4(2)1.

**45**    The balance on deposit in Mr. Hamilton's account with National Trust, which represents what is left of his inheritance received during his marriage, is properly recorded as part of his net family property and as an exclusion under s. 4(2)1.

2.    The Spousal and Child Support Order

**46**    This was an appropriate case in which to make lump sum spousal and child support orders. The trial judge approached the quantification of the lump sum orders in a sensible way and I see no reason to interfere with her conclusions that Mr. Hamilton be required to pay $150,000 in lump sum

child support and $100,000 in lump sum spousal support. Nor would I interfere with her adjustment of interim child support, requiring Mr. Hamilton to pay a further lump sum of $12,000. The manner in which the trial judge dealt with child, spousal and interim support does not exceed "the generous ambit within which reasonable disagreement is possible." See Silver v. Silver (1985), 49 R.F.L. (2d) 148 at 150. I would therefore not interfere with the lump sum support orders arrived at by the trial judge.

3.    The Banishment Order

**47**    Mr. Hamilton challenges the scope of the restraining order made under s. 46(1) of the Family Law Act. Section 46(1) provides:

> 46.--(1) On application, a court may make an interim or final order restraining the applicant's spouse or former spouse from molesting, annoying or harassing the applicant or children in the applicant's lawful custody, or from communicating with the applicant or children, except as the order provides, and may require the applicant's spouse or former spouse to enter into the recognizance that the court considers appropriate.

**48**    In practice, most orders issued under s. 46(1) contain standard terms that prohibit a spouse from molesting, annoying, harassing, or even communicating with the applicant spouse. These standard terms seem to have been applied even where the offending spouse has been somewhat violent and an alcoholic: see Godwin v. Bolsco, [1993] O.J. 297 (Prov. Div.); Shaver v. Shaver, [1991] O.J. 2198 (U.F.C.); Zegil v. Zegil, [1987] O.J. 1316 (S.C.).

**49**    Mrs. Hamilton relies on McDonald v. McDonald (1994), 5 R.F.L. (4th) 215 (Ont. Gen. Div.) in support of upholding the order permanently banishing Mr. Hamilton from the District of Muskoka. McDonald was a case in which the husband abused his wife physically and emotionally. The court made the usual order restraining Mr. McDonald from molesting, annoying or harassing his wife and any of her children. The court further ordered that Mr. McDonald enter into a recognizance, which included the conditions that he not communicate in any manner with Mrs. McDonald and "that he not for any reason whatsoever enter upon the property at 2011 Simcoe Street North, Oshawa and the cottage property."

**50**    The banishment order imposed by the trial judge in this case which prevents Mr. Hamilton from being in an entire District, is considerably wider than that imposed in McDonald. In my opinion there is no statutory authority for the trial judge's order. I would strike out paragraph 7 of the final order and in its place put an order requiring that Mr. Hamilton enter into a recognizance with the condition that he not enter upon, for any reason whatsoever, the residence or cottage property occupied by Mrs. Hamilton or any premises or property that to his knowledge is occupied, temporarily or permanently, by her.

Summary and Conclusion

**51**    As I calculate the parties' net family property, Mrs. Hamilton is required to pay an equalization payment of $83,617 to Mr. Hamilton. I would not interfere with the trial judge's awards in respect of child support, spousal support and the interim child support adjustment. Paragraph 1 of the formal judgment and the $9,000 RRSP transfer in favour of Mrs. Hamilton reflects Mr. Hamilton's net obligation after the equalization payment and support awards are taken into account.

**52**    The equalization payment as I have determined it is slightly lower than that determined by the trial judge and then deducted from Mr. Hamilton's support obligations. Because there is no cross-appeal, there is no basis to reflect this modest variation so as to increase the $167,738 figure in paragraph 1 of the trial judge's final order.

**53**    I would not interfere with that part of the judgment directing a sale of the cottage property, with paragraph 2 of the judgment that deals with the parties' RRSP accounts or with the other implementation provisions of the judgment.

**54**    I would therefore dismiss the appeal. The respondent is entitled to the costs of the appeal, which I would fix at $6,000 together with assessable disbursements.

OSBORNE J.A.
 DOHERTY J.A. - I agree.
 MOLDAVER J.A. - I agree.

qp/d/lmm/DRS/DRS

*Indexed as:*
**Hi-Tech Group Inc. v. Sears Canada Inc.**


**Between**
**The Hi-Tech Group Inc. (Formerly MC Club Services, Inc.),**
**plaintiff (appellant), and**
**Sears Canada Inc., defendant (respondent)**

[2001] O.J. No. 33

52 O.R. (3d) 97

141 O.A.C. 56

11 B.L.R. (3d) 197

4 C.P.C. (5th) 35

2001 CanLII 24049

2001 CarswellOnt 9

102 A.C.W.S. (3d) 79

Docket No. C34440


Ontario Court of Appeal
Toronto, Ontario

**Morden, Goudge and Feldman JJ.A.**

Heard: November 8, 2000.
Judgment: January 11, 2001.

(32 paras.)


On appeal from a judgment of John A.B. Macdonald J. dated May 29, 2000.

**Counsel:**

Robert Rueter and Young Park, for the appellant.
Jerome R. Morse and Susan B. Wortzman, for the respondent.

_____

The judgment of the Court was delivered by

**1**    **MORDEN J.A.**:-- This is an appeal by the plaintiff from a summary judgment granted by John A.B. Macdonald J. dismissing one of the plaintiff's claims in this action.

**2**    The grounds of the appeal are that the motions judge erred: (1) in interpreting the termination provision in an agreement between the plaintiff and the defendant; (2) in holding that extrinsic evidence relating to the agreement was inadmissible; and (3) in granting partial summary judgment, on part only of a larger claim, in the circumstances of this case.

**3**    The facts, in so far as they are relevant to the issues that must be addressed on this appeal, are as follows. The plaintiff is in the business of organizing and managing consumer clubs on behalf of retailers, such as the defendant, to offer benefits and costs savings to consumer members as well as increase retail sales for the retailer.

**4**    The plaintiff entered into an agreement with the defendant dated May 1, 1994 which established the "Mature Outlook Program" that was designed for the defendant's customers who were over 50 years of age. Customers purchased membership in the program for $9.99. Out of this membership fee, the plaintiff received $8.99 and the defendant kept $1.00. The plaintiff provided various benefits to members and administered the program. The defendant provided other benefits, notably discount coupons on purchases by members.

**5**    The term of the agreement is set forth in section 4.1 as follows:

> The term of this Agreement will commence as of the date first above written [May 1, 1994] and will end at midnight on May 31, 1995 ("Initial Term") subject to termination as hereinafter provided. *Thereafter, it will automatically renew for successive terms of one year, subject to termination by either party upon 120 days prior written notice*. Upon any such termination, if the Program is to continue in operation under the management of SEARS or a third party, SEARS and MANAGER [the plaintiff] will agree on procedures for the orderly transfer of MANAGER's functions to SEARS or SEARS designee, and MANAGER will be compensated for its reasonable costs incurred therein. [Emphasis added.]

**6**    The program was established in May, 1994. The defendant delivered a notice of termination to the plaintiff on February 21, 1996, to be effective no later than June 30, 1996. The plaintiff's

position was that under section 4.1 of the agreement, the notice was ineffective to terminate the agreement before May 31, 1997. Put shortly, it submitted that the 120 days notice was to precede the commencement of the renewal term beginning on May 31, 1996 and, if it did not, the agreement would renew automatically for a further year from that date.

**7**    The plaintiff commenced this action in November 1996. In its statement of claim, it claimed damages in the amount of $12,000,000 based on various alleged breaches of the agreement by the defendant. One of the breaches, the one in question in the motion and in this appeal, is the alleged breach of the termination provision described in the preceding paragraph.

**8**    The defendant, after delivering its statement of defence, brought a motion for "partial summary judgment" dismissing the claim against it relating to the termination of the agreement. This was a claim for damages for the period July 1, 1996 to May 31, 1997. The motions judge granted the relief sought. The formal judgment provided that "partial summary judgment be granted to the defendant, dismissing the plaintiff's claim for damages for breach or repudiation of the agreement dated May 1, 1994, on the basis that the defendant did not validly terminate the Agreement effective June 30, 1996".

**9**    Both the plaintiff and the defendant filed extrinsic evidence on the motion for summary judgment and, indeed, in the statement of claim the plaintiff pleaded as material facts what it considered to be the general effect of part of this evidence. This related to its "significant start-up costs for the Program" and the expectation that the program would not become profitable until it had been established for some time. The plaintiff also alleged that it relied on the automatic renewal clause to reduce the risk it was assuming. It submitted that this clause would provide a reasonable opportunity for it to obtain a return on its initial investment in establishing the program under the agreement.

**10**    In its evidence filed on the motion the plaintiff furnished details to support the allegation. It is the plaintiff's position that this evidence, which it submits relates to the genesis and one of the aims of the transaction, supports the interpretation that the agreement was to renew automatically for one year periods subject to 120 days notice of termination before a renewal date.

**11**    The defendant challenges this evidence and, in fact, relies on evidence that the plaintiff was prepared to accept the risk of the contract running not longer than its initial term.

**12**    Both parties filed and relied upon evidence of earlier drafts of the agreement and on the parties' conduct under the agreement, submitting that this evidence casts light on its meaning.

**13**    In his reasons, the motions judge referred to several decisions respecting the correct test to apply on a motion for summary judgment under Rule 20. He then said:

> In Guarantee Company of North America v. Gordon Capital Corporation, [1999] 3 S.C.R. 423, Iacobucci and Bastarache JJ. for the Court determined at pp. 434-5

the proper test for a summary judgment motion by reference to both Irving Ungerman Ltd. v. Galanis (1991), 4 O.R. (3d) 545 (C.A.) and Dawson v. Rexcraft Storage and Warehouse Inc. (1998), 164 D.L.R. (4th) 257 (Ont. C.A.) among the cases, and concluded that the appropriate test is to determine whether the Applicant has shown that there is no genuine issue of material fact requiring trial. If the Applicant establishes that, the Respondent must then "establish his claim as being one with a real chance of success": Hercules Management Ltd. v. Ernst & Young, [1997] 2 S.C.R. 165 at para. 15. In determining whether the test (in two parts) has been met, I must recognize my limited role as determined or described in Transamerica Occidental Life Insurance Co. v. Toronto-Dominion Bank (1999), 44 O.R. (3d) 97 at 110 d-e.

**14**    The motions judge then reviewed the basic submissions of the parties and examined "the law which determines how to ascertain the meaning of a written agreement". In doing so, he made several references to the reasons of Iacobucci J. for the Supreme Court of Canada in Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129 particularly, passages in paragraphs 52, 54, 55, 57, 58 and 59.

**15**    A major issue considered by the court in Eli Lilly was the admissibility of extrinsic evidence to aid in the interpretation of the agreement in question in that case. Iacobucci J. concluded that the agreement did not contain any ambiguity that could not be resolved by reference to the text itself and "[n]o further interpretive aids are necessary" (para. 57). He then said at paragraph 58:

> More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.) at pp. 502-503.

**16**    The motions judge in his reasons said: If it were open to the parties to lead evidence of "surrounding circumstances", that evidence could not properly include evidence of the subjective intention of either one party (per Iacobucci J. in Lilly para. 54) or of all parties to the agreement (per Iacobucci J. in Lilly at para. 59). The surrounding circumstances, if admissible in evidence, will encompass factors which assist the Court "to search for an interpretation which, from the whole of the contract would appear to promote or advance the true intent of the parties at the time of entry into the contract". See Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insce. Co., [1980] 1 S.C.R. 888, at p. 901, Kentucky Fried Chicken v. Scotts Food Services Ltd. (1988), 41 B.L.R. (2d) 42 (O.C.A.) at p. 51.

> However, I conclude that, as a question of law, it is not open to the Respondent in the circumstances here to lead such evidence, based on the authority of Eli Lilly v. Novopharm (supra).

> ...

> Where, as here, the agreement is a negotiated commercial agreement, it should be interpreted objectively, rather than from the perspective of one or the other of the parties: see Kentucky Fried Chicken at p. 51 (supra).

> In my opinion, based on these legal principles, the Applicant has established that there is no genuine issue of material fact which requires a trial to determine what the parties intend by their termination language in para. 4.1, interpreted in the light of all of the contractual language. The Respondent has failed, in my opinion, to establish that its claim has a real chance of success, whether it is its claim that it has the right to lead evidence in aid of interpretation of the contract, or its claim of breach of para. 4.1 of the agreement.

**17**    The motions judge then dealt with the interpretation of s. 4.1 in the agreement: In my opinion, the Respondent's argument that termination rights may be exercised only on a May 31st renewal date, and only on 120 days written notice given prior to the renewal date is inconsistent with and incompatible with the usual and ordinary meaning of the language which the contracting parties used. That language is clear and unambiguous in its meaning, and it determines clearly the rights of the parties to terminate the agreement: either party may terminate the agreement by written notice delivered on the other party 120 days prior to the date of termination.

> In my opinion, the case is like Lilly (supra.) The language used in the agreement, in its relevant provisions is so clear and unambiguous that the meaning the parties intended to give to that language may be determined simply by having reference to the agreement itself. In the result, no further interpretive aids are necessary (per Iacobucci J. in Lilly at para. [57]) and it is "unnecessary to consider any extrinsic evidence at all" (per Iacobucci J. in Lilly at para. [55]). Given the applicability of these conclusions of Iacobucci J., I conclude that evidence of "surrounding circumstances" is not admissible herein. In para. [55] of Lilly, after he had mentioned that there is some jurisdiction to read contractual language in the light of "surrounding circumstances", Iacobucci J. held that "it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face." Surrounding circumstances are before the Court only if established by extrinsic evidence; that is, evidence of matters extrinsic to the contractual document.

**18**    According to Eli Lilly, the first step in the process of determining the admissibility of extrinsic evidence in this case is to determine whether the text of s. 4.1 of the agreement is clear and unambiguous. On this question I disagree, with respect, with the views of the motions judge. I think that the provision is ambiguous in the sense that it is reasonably susceptible of more than one

meaning. One of them supports the plaintiff's position.

**19**    For convenience, I repeat the most relevant part of s. 4.1: The term of this Agreement will commence as of the date first above written [May 1, 1994] and will end at midnight on May 31, 1995 ("Initial Term") subject to termination as hereinafter provided. *Thereafter, it will automatically renew for successive terms of one year, subject to termination by either party upon 120 days prior written notice* ... [Emphasis added.]

**20**    The plaintiff's submission, which I think is reasonably open to it to make, is that the statement "it will automatically renew for successive terms of one year" is the dominant part of the sentence that is "subject to" the phrase providing for termination on 120 days prior notice. The court should read the renewal term and the notice provision together and not in opposition to each other. This is done by reading the notice provision as qualifying the automatic renewal. In other words, there will be an automatic renewal unless appropriate notice is given. There is no ability under s. 4.1 to abridge the renewal term; there is only the right to prevent further renewal by giving appropriate notice.

**21**    The plaintiff's submission continues along the following lines. To read s. 4.1 otherwise is to give no meaning to the provision for an initial term and for subsequent automatic one year terms. If it had been intended that the parties could terminate the agreement at any time on 120 days notice, there would be no point to the stipulation of an initial term and of successive renewal terms of one year. If the contract could be terminated at any time, the provision of the successive terms serves no purpose. Support is also found in the use of "prior" in the phrase "prior written notice". Prior to what? The plaintiff answers that the 120 days notice must be read as being "prior" to the end of the annual term then in effect. If it is not, the word "prior" is mere surplusage.

**22**    The defendant has not responded to the submission that the "subject to" clause relates to the automatic renewal feature in the preceding clause but does respond to the submission relating to treating as redundant the provision of an initial term and successive renewal terms. The defendant submits that it bears upon merely a question of the "efficiency" of the language used and has no bearing on the meaning of the term. Against this response the plaintiff relies upon the principle of interpretation that effect must, if possible, be given to every word and every clause in an agreement: Brown Bros v. Popham, [1939] 4 D.L.R. 662 (Ont. C.A.) at 670; and 13 Halsbury's Laws of England, 4th ed. Reissue, at para. 174.

**23**    What is said in Eli Lilly respecting the admissibility of extrinsic evidence has no application in this case if I am right that s. 4.1 is ambiguous. Indeed, because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case: Prenn v. Simmonds, [1971] 1 W.L.R. 1381 (H.L.) at 1383-1384; Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen, [1976] 1 W.L.R 989 (H.L.) at 995-996; Hill v. Nova Scotia (A.G.), [1997] 1 S.C.R. 69 at 78-79; Waddams, The Law of Contracts, 4th ed. (1999), at p. 232.

**24**    A frequently quoted and useful statement respecting surrounding circumstances is that of Lord Wilberforce in Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen, supra, at pp. 995-996. After indicating that particular evidence in that case "would exceed what is permissible" in construing the contract in question, he went on to say: But it does not follow that, renouncing this evidence, one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

**25**    The contract in this case must be interpreted in the context of properly admissible evidence. This process cannot be fully carried out until findings of fact have been made on the evidence. From at least the first part of the 19th century it was the function of the jury to find the surrounding circumstances as part of the process of interpreting documents: 13 Halsbury's, supra, at para. 166.

**26**    This court is clearly not in a position to make the proper findings because the evidence is open to differing interpretations and inferences, and differing views on what weight should be given to it. In short, it gives rise to a genuine issue for trial. It will be the responsibility of the trial judge, in the context of the issues arising at the trial and the submissions made on them, to determine the extent of the admissibility of the evidence and to make the proper findings on it.

**27**    In view of my conclusion on the first two grounds of appeal it is not necessary to deal with the ground of appeal relating to the impropriety of granting a partial summary judgment in the circumstances of this case.

**28**    There is one further matter on which I shall comment and I do so with respect. It may be seen from the reasons of the motions judge that he applied the test governing a motion for summary judgment set forth in Guarantee Co. of North America v. Gordon Capital Corporation, [1999] 3 S.C.R. 423 at 434-5. This test, which is framed as a two-part test, involves, the moving party (1) "show[ing] that there is no genuine issue of material fact requiring trial" and "therefore summary judgment is a proper question for consideration" and then (2), if this showing is made, the responding party must then "establish his claim as being one with the real chance of success".

**29**    In support of the first part of the test the Supreme Court cites, in addition to its own recent decision in Hercules Managements Ltd. v. Ernst & Young, [1997] 2 S.C.R. 165, two decisions of this court: Dawson v. Rexcraft Storage and Warehouse Inc. (1998), 164 D.L.R. (4th) 257 at 267-268 and Irving Ungerman Ltd. v. Galanis (1991), 4 O.R. (3d) 545 at 550-51. It may be inferred from this that the court approved these decisions and considered them to be consistent with its approach.

**30**    These two Ontario decisions, Dawson more fully than Irving Ungerman, make it clear that: (1) the legal or persuasive burden is on the moving party to satisfy the court that there is no genuine issue for trial before summary judgment can be granted (this is what rule 20.04(2) says); and (2), by

reason of rule 20.04(1), there is an evidential burden, or something akin to an evidential burden (because the motions judge does not find facts), on the responding party to respond with evidence setting out "specific facts showing that there is a genuine issue for trial". Failure of the responding party to tender evidence does not automatically result in summary judgment. The "evidential burden" is described by this court (Catzman, Austin, and Borins JJ.A.) in Lang v. Kligerman, [1998] O.J. No. 3708 in paras. 8 and 9[1] and by the High Court (Griffiths J.) in Kaighin Capital Inc. v. Canadian National Sportsmen's Shows (1987), 58 O.R (2d) 790 at p. 792[2].

**31**    The short point is that the motions judge, having considered all of the evidence and the parties' submissions on it, must be satisfied that there is no genuine issue for trial before he or she may grant summary judgment. This is the legal burden resting on the moving party and it never shifts. I do not think that Guarantee Co. of North America intended to detract from this.

**32**    For the foregoing reasons, I would allow this appeal, with costs on a solicitor and client basis, set aside the judgment of the motions judge, and make an order dismissing the defendant's motion, with costs on a solicitor and client basis.

MORDEN J.A.
 GOUDGE J.A. -- I agree.
 FELDMAN J.A. -- I agree.

1 "[8] As well, in considering the evidence these issues, the motions judge held, incorrectly, that the plaintiffs, as responding parties were:

> required to bring to the court a coherent set of facts constituting evidence conflicting with evidence presented by the moving party and establishing that there is a genuine issues for trial on a material fact. [emphasis added]

[9] The authorities are clear that the onus is on the moving party to establish that there is no genuine issue for trial with respect to a claim or defence. There is no onus on the responding party. However, where the evidence presented by the moving party prima facie establishes that there is no genuine issue for trial, and the moving party is entitled to summary judgment as a matter of law, to preclude the granting of summary judgment the responding party assumes the evidentiary burden of presenting evidence which is capable of supporting the position advanced by the responding party in its pleading. On the basis of this evidence, when considered with all the evidence before the motions judge, it will then be for the motions judge to determine whether the evidentiary record raises a genuine issue for trial."

2 "In my view, the rule does not displace the normal burden resting on the party moving for judgment to satisfy the court that there is no genuine issue for trial. The burden placed on the responding party under the rule is an evidentiary burden only to present affidavit material or other evidence to support the allegations or denial in his or her pleadings. The onus never shifts from the moving party to satisfy the court that there is no genuine issue for trial. Thus, for example, where the court, on reviewing the pleadings, affidavit evidence and other material, concludes that the question of whether there is a genuine issue for trial, is in balance, the application of the moving party must fail. Although the responding party may not rest his defence on unsupported defence allegations or denials, it may still be open to the responding party who files no affidavit evidence, to successfully argue that the plaintiff's claim, as supported by affidavit, is so obviously deficient as to raise a triable issue, on the plaintiff's right to succeed."

*Indexed as:*

## Inland Kenworth Ltd. v. Fowler (B.C.C.A.)

**Between**
**Inland Kenworth Ltd., Plaintiff (Respondent), and**
**William Fowler, Defendant, (Appellant), and**
**Quesnel Moving & Storage (1973) Ltd., Defendant**

[1988] B.C.J. No. 241

48 D.L.R. (4th) 372

[1988] 4 W.W.R. 88

24 B.C.L.R. (2d) 57

9 A.C.W.S. (3d) 113

Vancouver Registry: CA007170

British Columbia Court of Appeal

**Anderson, Esson and McLachlin JJ.A.**

February 12, 1988

Conditional Sales s. 19(2).

A vendor under a conditional sales contract seized and sold a vehicle under the Repairers Lien Act and applied the balance of the sale proceeds to the amount outstanding on its conditional sales contract with the purchaser. Issue: Whether such vendor is barred by the seize-or-sue provisions of the Sale of Goods on Condition Act from claiming the balance owing on the conditional sales contract. Per McLachlin J.A. (per curiam): By applying the balance after payment of the repair bill to the conditional sales contract, the vendor effectively elected to seize the goods under the Sale of Goods on Condition Act and is bound by the seize or sue provisions of that Act. [B.C. Recent Decisions, vol. 8, no. 18.]

Counsel for the Appellant: D.R. MacMillan.

Counsel for the Respondent: R.C. Hunter.

---

**McLACHLIN J.A.** (for the Court, allowing the appeal):-- This appeal raises the issue whether a vendor who seizes and sells a vehicle under the Repairer's Lien Act and applies the balance of the sale proceeds to the amount outstanding on its conditional sales contract with the purchaser, is barred by the seize-or-sue provisions of the Sale of Goods on Condition Act from suing for the remaining balance owing on the conditional sales contract.

The facts may be briefly stated. In July, 1982, Quesnel Moving and Storage (1973) Ltd. purchased a tractor-trailer truck from Inland Kenworth Ltd.'s Kamloops branch. In September, 1982, Quesnel entered into a conditional sales agreement with Inland, providing for installment payments over a period of two years. Fowler guaranteed this agreement.

In April 1983, Quesnel Moving and Storage (1973) Ltd. stopped making payments. About the same time, its truck, which had transmission problems, was repaired by Inland's Quesnel branch. This branch, which had formerly been a separate legal entity, had amalgamated with Inland's Kamloops branch in October, 1982. Quesnel Moving failed to pay the repair bill. On April 27, Inland filed a lien under the Repairer's Lien Act, and on August 12, after discussion between the managers of its Kamloops and Quesnel branches, Inland seized the truck. On January 31, 1984, the truck was sold. The sale realized about $26,000.00, including sales tax. After deducting the repair cost of about $4,000.00, paying sales tax and the costs of the sale, Inland's Quesnel branch remitted some $20,000.00, the balance of the purchase price, to its Kamloops branch to be applied on the balance outstanding under the conditional sales contract. The plaintiff, after applying the money to the purchase price, asserted a balance owing of $6,700.00 on the price of the truck and made demand on Fowler as guarantor of the conditional sales contract for the balance owing on the purchase price of the truck. In defence to this action, Fowler contended that the seize-or-sue provisions of the sale of Goods on Condition Act barred Inland's suit for the balance outstanding on the conditional sales contract.

The trial judge rejected this defence and granted judgment against Fowler. Fowler now appeals from that decision.

Fowler makes two arguments. First, he submits that seizure under the Repairer's Lien Act constitutes a taking of possession under s. 19(2) of the Sale of Goods on Condition Act, which provides:

> (2)     Where the seller takes possession of the goods, the buyer's obligations and the obligations of the guarantor or indemnitor under the contract and in any instrument granting collateral security are extinguished.

At trial, the judge found against Fowler's contention that the seizure was intended as a seizure under the Sale of Goods on Condition Act. This leaves only the legal issue of whether a seizure under the Repairer's Lien Act is a taking of possession under s. 19(2). In my opinion, this submission is without merit. A vendor who is also a repairer is entitled to exercise his rights under the Repairer's Lien Act without prejudicing his right to claim the balance of the purchase price, after sale, from the conditional purchaser. The danger arises not from making the seizure under the Repairer's Lien Act, but as I discuss below, from appropriating the balance to the amount owing on the purchase price.

Fowler's second submission is that when Inland applied the balance of the sale price to the deficiency under the conditional sales contract, it constructively seized the goods under the Sale of Goods on Condition Act and effectively elected to seize rather than sue.

Inland replies that it effected no seizure under the Sale of Goods on Condition Act. It contends that in applying the surplus funds to the balance owing under the conditional sales contract, it was merely doing what it was entitled and required to do under s. 2 of the Repairer's Lien Act, which provides inpart:

> (2)    After the sale the mechanic or other person shall apply the proceeds of the sale in payment of the amount due to him, and the costs of advertising and sale, and shall pay over the surplus, if any, to the person entitled to it, on application being made to him for it, and a notice in writing of the result of the sale shall be left at or mailed to the address of the owner at his last known place of abode or business.

I accept Fowler's submission that Inland effectively elected to seize the goods under the Sale of Goods on Condition Act by applying the balance after payment of the repair bill to the conditional sales contract.

Election to seize under the conditional sales agreement was the only way in which Inland could obtain the right to the balance of the proceeds of sale of the truck. It had no judgment or writ of execution against Quesnel Moving and Storage (1973) Ltd. entitling it to the proceeds of the sale of Quesnel's truck. While it had legal title to the truck under the conditional sales agreement, it did not have beneficial ownership of the truck and hence was not entitled to take the proceeds of sale as its owner. This leaves only one basis upon which the claim to the money could rest - seizure under the conditional sales contract.

Having initally seized the truck under the Repairer's Lien Act, Inland effectively adopted the seizure as a seizure under the Sale of Goods on Condition Act when it applied the funds to the debt under the conditional sales contract. This was the reasoning applied in Bank of Montreal v. Traves et al (1985), 63 B.C.L.R. 87, by Hyde, Co. Ct. J. In that case the bank held a promissory note and guarantee in writing signed by Traves and secured by a chattel mortgage. Traves' landlord distrained for rent under the Rent Distress Act and paid the excess of the funds recovered to the bank, which applied them to Traves' indebtedness. After noting that the bank had no judgment or writ of

execution, the judge concluded that the bank had adopted the landlord's seizure as its own under the Chattel Mortgage Act, stating at p. 88:

> I find that in accepting the surplus proceeds of the landlord's seizure and sale, the bank did adopt the seizure and sale as its own, and extinguished its rights to sue the defendants for the balance of the money due and owing.

Inland can escape this conclusion only if it can establish some basis other than seizure under its conditional sales contract entitling it to retain the balance of the sale price of the truck. In my opinion, it cannot do this. As noted, its argument that it was entitled to the proceeds as owner of the truck must fail because it fails to recognize the purchaser's substantial rights in the truck and the conditional nature of Inland's title. Similarly its argument that it was entitled to the funds as funds owing under the contract fails; the contract merely defines rights which remain to be enforced; before the right to enforce payment could be converted to the right to take possession of the funds, some legal process, such as a writ of execution or garnishing order, must intervene. Finally, Inland's contention that it was a party entitled to the money under the Repairer's Lien Act fails, because it begs the question of who is a party entitled. The contractual right to enforce payment cannot be equated with legal entitlement to the funds in issue.

I would allow the appeal.

McLACHLIN J.A.
 ANDERSON J.A.:-- I agree.
 ESSON J.A.:-- I agree.

*Indexed as:*

# Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc.

**Between**
**Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada**
**Ltd., plaintiff (respondent), and**
**Scott's Food Services Inc. and Scott's Hospitality Inc.,**
**defendants (appellants)**

[1998] O.J. No. 4368

114 O.A.C. 357

41 B.L.R. (2d) 42

83 A.C.W.S. (3d) 382

1998 CanLII 4427

Docket No. C28208

Ontario Court of Appeal
Toronto, Ontario

**Moldaver, Goudge JJ.A. and Ferrier J. (ad hoc)**

Heard: May 4 and 5, 1998.
Judgment: November 2, 1998.

(29 pp.)

*Franchises -- Franchise agreement -- Interpretation -- Breach of agreement -- What constitutes --*
*Transfer of franchises -- Consent of franchisor.*

Appeal by Scott's Food Services from a trial judgment allowing Kentucky Fried Chicken's (KFC)
action for termination of a licensing agreement. Scott's was the largest KFC franchisee in the world.
Scott's Food was owned by Scott's Hospitality. Scott's Hospitality owned a school bus business as

well as the KFC franchise. In 1996, as part of a transaction with Laidlaw Inc., the shareholders of Scott's Hospitality transferred its ownership of the franchise to Scott's Restaurants. The Shareholders then owned Scott's Restaurants which owned Scott's Food. Laidlaw purchased the shares of Scott's Hospitality and acquired the school bus business. The change in ownership of the franchise was made without KFC's consent. In issue was whether the license agreement required Scott's to obtain KFC's consent to the change in ownership of the franchisee failing which KFC could terminate the contract. Also in issue was whether Scott's had failed to meet its obligations to enhance its KFC outlets. The trial judge found that consent to a change in ownership was required and that KFC had the right to terminate the agreement. The trial judge also found that Scott's failed to meet its obligation to enhance which was a material and substantive failure also entitling KFC to terminate the license agreement unless the outlets were enhanced within three months. Scott's appealed.

HELD: Appeal allowed. The contract, being a negotiated commercial document, was interpreted objectively and in accordance with sound commercial principles and good business sense. The contract did not give KFC a right to approve a change in the controlling shareholder of the franchisee, Scott's. Such a right would have meant a significant change in the agreement which had governed the franchise relationship since 1969. Prior to executing the agreement, KFC was told that Scott's would not agree to any restriction on changes of ownership in the franchisee. Furthermore, the standard "deemed transfer" language present in every other KFC franchise agreement, which provided for KFC's right to approve a change in shareholders of the franchisee, was conspicuously absent from the Scott's license agreement. The interpretation suggested by KFC resulted in a commercial absurdity. Scott's had bargaining power at least equal to that of KFC and sufficient power to achieve a contract with no restriction on the transferability of shares. Therefore, the license agreement could not be interpreted to give KFC a right to approve a change in the shareholders of Scott's. Consequently, KFC did not have the right to terminate the franchise. The appeal was also allowed on the enhancement issue. The franchise agreement did not give KFC a substantive right to terminate for failure by Scott's to discharge its enhancement obligations.

**Counsel:**

Dennis R. O'Connor, Q.C., David Stockwood, Q.C., Nancy J. Spies and Timothy H. Mitchell, for the appellants.
David R. Byers, Katherine L. Kay and Christopher J. Cosgriffe, for the respondent.

---

The following judgment was delivered by

**1    GOUDGE J.A.**:-- This appeal was heard on May 4 and 5, 1998. This court's reasons for judgment were ready for release on July 9, 1998 when the parties contacted the court to request that

this not be done. On the basis of the reasons given by the parties for this request, the court agreed to refrain from releasing its judgment until November 1, 1998 but made clear that the judgment would then be released unless prior to October 31, 1998 both parties notified the court in writing that the matter had been fully and finally settled and that the appellant wished to withdraw the appeal. This has not happened and these reasons are therefore being released.

**2**    The appellant Scott's Food is the largest Kentucky Fried Chicken ("KFC") franchisee in the world. Its franchise agreement (the "license agreement") with the respondent covers some four hundred outlets, approximately half of all KFC outlets in Canada.

**3**    Up until 1996, Scott's Food was owned by the appellant Scott's Hospitality whose other major business was a school bus operation. At that point, as part of a transaction with Laidlaw Inc. ("Laidlaw") in which Laidlaw acquired the school bus business, the shareholders of Scott's Hospitality replaced it as the sole shareholder of the franchisee with a new company, Scott's Restaurants. As a result, these shareholders then owned Scott's Restaurants which in turn owned Scott's Food. This change was made without the respondent's consent.

**4**    There were two main issues at trial. The second, which the parties call the enhancement issue, was whether, apart altogether from the corporate changes entailed by the Laidlaw transaction, Scott's Food had upgraded its outlets as required by its contract. At trial, Steele J. found that it had not. I will come in due course to the limited appeal taken from the judgment below on this issue.

**5**    The first and indeed the fundamental issue at trial, called the transfer issue, was whether the license agreement required the appellants (to whom I will refer jointly as "Scott's") to obtain the respondent's consent to the change in ownership of the franchisee failing which the respondent could terminate the agreement. Steele J. interpreted the contract as requiring consent, thereby giving the respondent the right to terminate since no consent was obtained. For the reasons that follow, I have come to the opposite conclusion and I would therefore allow the appeal on the transfer issue.

THE TRANSFER ISSUE

     The Relevant Facts

**6**    The license agreement that is the subject of this litigation was signed on June 9, 1989, effective January 1, 1989. The respondent was the franchisor and the appellant Scott's Food the franchisee. The latter was a wholly-owned subsidiary of Scott's Hospitality which was not a party to the agreement.

**7**    At the time the license agreement was made, Scott's operated about one-half of all the KFC outlets in Canada and more than ten times as many as the next largest franchisee in the country. Unlike most franchisees, Scott's had very significant bargaining power in the negotiations which led up to the agreement.

**8**    For the purposes of the transfer issue, the critical paragraphs of the license agreement are the following:

> 16.    Transfer

>> 16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

>> 16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

**9**    Paragraph 17.2(d) reads as follows:

> 17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

> . . .

> (d)    Licensee makes or permits a transfer contrary to the provision of Paragraph 16;

**10**    The history of Scott's as a KFC franchisee predates the license agreement by twenty years. It goes back to 1969 when Scott's Hospitality entered into an agreement to become a franchisee operating KFC outlets in Canada. The franchisor then was Col. Sanders Kentucky Fried Chicken Limited ("Colonel Sanders"), the owner of the KFC trademarks in Canada. This agreement was to run until January 1, 1994. It is noteworthy that it contained no clause like the current paragraph 16.1. It did not specify that the rights of Scott's Hospitality were personal to it, nor were there any provisions restricting the transfer of its shares. There was, however, a provision restricting the

transfer of the license without the prior written consent of the franchisor.

**11**    By 1985, the franchisor had developed a standard franchise agreement ("the 1985 Agreement") containing certain restrictions on the transfer of shares in the franchisee which, at that point, were standard in all KFC franchise agreements in Canada except that with Scott's Hospitality.

**12**    While paragraph 16.1 of the 1985 Agreement reads identically to paragraph 16.1 in the license agreement, paragraph 16.2 of the 1985 Agreement when coupled with paragraph 16.4 contains significant differences. These two paragraphs are reproduced below, highlighting the words that do not appear in the license agreement:

> 16.2 The Franchisee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), and shall not suffer or permit any deemed sale, transfer or assignment of this Agreement or its rights or interest hereunder (hereinafter referred to as "deemed transfer" and more particularly defined in paragraph 16.4), without KFC's prior written consent and Franchisee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or deemed transfer, or any attempt to do so, contrary to this Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in paragraph 17.2(d).

> 16.4 For the purposes of this Paragraph 16, a deemed transfer of this Agreement or the rights and interest hereunder shall include:

> (a)    ...
> (b)    in the event that Franchisee is a corporation, any change (including but without limitation any issuance, sale, assignment, transfer, redemption or cancellation of, or conversion of any securities into, voting shares of the corporate Franchisee or any other corporation referred to in paragraph 16.1, or any amalgamation, merger or other reorganization of the corporate Franchisee or any such other corporation) in any of the holdings of voting shares referred to in paragraph 16.1; provided that, in the case of any such corporation the voting shares of which are listed and publicly traded on a stock exchange, no such change in any of the holdings of its voting shares shall constitute a deemed transfer unless, in the sole opinion of KFC, direct or indirect control of the corporate Franchisee would thereby be changed.

**13**    In 1987, Col. Sanders sold its entire interest in the KFC trademarks in Canada to Kentucky Fried Chicken's corporation ("KFC Corp." or "KFC") which held those rights for the rest of the world.

**14**    Just prior to this sale, by letter agreement dated July 16, 1987, KFC Corp. agreed that when the sale from Col. Sanders was concluded, it would grant Scott's Hospitality a ten-year renewal of the 1969 agreement. This letter agreement suggested no constraint on the transfer of shares of the franchisee.

**15**    Pursuant to the 1987 letter agreement, negotiations ensued between KFC and Scott's Hospitality. In these negotiations, Scott's Hospitality refused to agree to terms in the language of the 1985 agreement, just as it had previously refused to do with Col. Sanders. The Scott's representative made clear to KFC that Scott's would not agree to any restrictions on changes of ownership in the licensee.

**16**    The relative bargaining power of Scott's and KFC in these negotiations was the subject of some considerable attention at trial. The chief KFC negotiator testified that Scott's was at least the equal of KFC in bargaining power. The leading expert for KFC testified that it was unusual for a franchisee to be in such a position.

**17**    Because of these unique circumstances, the trial judge concluded that the evidence of the experts as to the usual practice in the franchising industry must be applied with caution. Ultimately, he found that Scott's had sufficient bargaining power to negotiate a contract in which there would be no restriction on the transferability of shares. The question he had to decide was whether the resulting license agreement contained such a restriction.

**18**    The first of the two Laidlaw transactions, which triggered the need to answer this question, began in January 1996 with an unsolicited offer from Laidlaw to purchase all of the shares of Scott's Hospitality. Laidlaw's intention was that following a successful takeover, it would sell off Scott's Food and retain the school bus business operated by Scott's Hospitality. Laidlaw's offer contained a condition that it be satisfied that there was no impediment to its disposing of the shares of Scott's Food to a third party without affecting the franchisee's rights under the license agreement. KFC was not prepared to give its consent to this transaction and indeed commenced this litigation in response. As a result, this Laidlaw proposal could not be completed within its time frame and hence it did not proceed.

**19**    Rather, a second Laidlaw transaction was structured in which Scott's Restaurants was incorporated as a subsidiary of Scott's Hospitality. Scott's Hospitality then transferred its shares in Scott's Food to Scott's Restaurants in exchange for shares of Scott's Restaurants which were dividended out to the shareholders of Scott's Hospitality. The shareholders of Scott's Hospitality thereby became the owners of Scott's Restaurants which, in turn, became the owner of the franchisee, Scott's Food. Laidlaw then purchased the shares of Scott's Hospitality thereby acquiring the school bus business.

**20**    KFC was kept fully informed of this transaction but continuously opposed it. Indeed, its consent was never expressly sought. The simple question at trial was whether that consent was required.

The Judgment Below

**21**    The trial judge found that while Scott's Food as franchisee was bound by the license agreement, Scott's Hospitality was not bound by its terms. He concluded that Scott's Food was neither the alter ego nor the agent of Scott's Hospitality. The respondent does not contest this conclusion.

**22**    He then went on to his core finding on the transfer issue, namely, the construction of paragraph 16.1 of the license agreement. He construed that paragraph to contain a continuing obligation on the part of the franchisee to obtain approval of KFC to any transfer of the shares of either Scott's Food or its controlling shareholder. He put his findings in these terms:

> In my opinion the disclosure and approval of the directors and holders of majority control would be meaningless unless it was a continuing obligation and not merely at the time of execution. Based on good business sense section 16.1 must be construed as being a continuing obligation.

> ...

> In my opinion there is nothing in section 16 that prohibits or gives the right of approval to KFC of trading of shares of Scott's Food or Hospitality provided that there is no issue of a change of control.

> There are no clearly expressed words requiring the approval of KFC to any transfer of the shares of Scott's Food or its controlling shareholders. However section 16.1 referring to the grant being personal and the reference to the directors and holders of majority control of the shares of Scott's Food and the broad reference to any other corporations with control make it clear that any transfer of the controlling shares of Scott's Food or Hospitality are subject thereto. To interpret the section otherwise would defeat the personal aspect and not make good business sense and would be contrary to the generally accepted practice in the franchise industry.

**23**    He then moved directly and without elaboration to a finding that paragraph 16.2 prohibits a transfer or an attempted transfer of the license agreement without consent and since the first Laidlaw proposal was an attempted transfer and the second was an actual transfer, each breached paragraph 16.2 and gave KFC the right to terminate the license agreement pursuant to paragraph 17.2(d).

Analysis

**24**    The question to be determined on the transfer issue is one of contractual interpretation: properly construed, does either paragraph 16.1 or paragraph 16.2 of the license agreement require KFC's consent to either Laidlaw transaction? The trial judge determined that this was not a case of ambiguity and on this basis, he declined to consider evidence of the subjective intentions of the parties which were not communicated to each other. Equally he excluded the various draft documents leading up to the license agreement. He did, however, consider the relationship between the parties and the custom of the industry, including the license agreements between the respondent and other franchisees in Canada, as part of the factual matrix that must be looked at in interpreting the agreement.

**25**    I agree with this approach. While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

**26**    The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888 at 901.

**27**    Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity[1]. Rather, the document should be construed in accordance with sound commercial principles and good business sense[2]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

**28**    With these broad principles of interpretation in mind, I turn first to the construction to be given to paragraph 16.1 of the license agreement. Properly construed, does it give KFC the right to approve a change in the controlling shareholder of the franchisee? It is the second Laidlaw transaction that requires this question to be answered. Given that the first Laidlaw transaction was not proceeded with, KFC did not argue at trial or on appeal that it breached paragraph 16.1.

**29**    It is helpful at this point to set out the provision again:

> 16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

**30**    I have concluded that this clause does not give KFC a right to approve a change in the controlling shareholder of its franchisee Scott's Food. In other words, paragraph 16.1 does not extend to the second Laidlaw transaction. I say this for a number of reasons.

**31**    First, the license agreement was signed in 1989. The Laidlaw transactions occurred in 1996. The ordinary meaning of the language used in paragraph 16.1 suggests that the franchisor KFC had the right on entering the contract to know and approve the shareholders of the franchisee. There is nothing to suggest a right to approve a change in those shareholders some seven years later.

**32**    Second, such a right would mean a significant change from the agreement which had governed this franchise relationship since 1969 which clearly contained no such right. Moreover, Scott's had refused to enter into an agreement like the 1985 standard franchise agreement which did provide the franchisor with this right. The trial judge found that prior to executing the license agreement, KFC knew this and had been told that Scott's would not agree to any restriction on changes of ownership in the franchisee.

**33**    Third, the language of the 1985 standard franchise agreement is revealing. In 1989, when the license agreement was concluded, every other KFC franchise agreement in Canada expressly provided for the franchisor's right to approve a change in the shareholders of the franchisee. This was done not by means of paragraph 16.1 but rather through the "deemed transfer" language of paragraphs 16.2 and 16.4. Paragraph 16.1 in the license agreement ought not to be construed to provide the franchisor with this right where the identical language in the 1985 standard franchise agreement was clearly not intended to have that effect. The corollary to this is that the deemed transfer language which does provide this right to the franchisor in the 1985 standard franchise agreement is conspicuously absent from the license agreement.

**34**    Fourth, paragraph 16.1 extends the right of approval to the holders of majority control of the franchisee and any corporation which has an interest in the shares of the franchisee. If this language is read to give KFC a right to approve any subsequent change in the majority shareholder of the franchisee, it must also give KFC the right to approve a subsequent change in shareholder control of any corporation which owns any interest in the franchisee, even if it is only a single share. In

argument, the respondent conceded that this would be a commercial absurdity. To find, as the trial judge did, that the franchisor's right of approval is limited to a change of control in the franchisee is, in my opinion, to read out of paragraph 16.1 the phrase "have an interest in". By contrast, to extend this right of approval to the majority shareholder and also to shareholders who have an interest in the shares of the franchisee does not create a commercial absurdity if that right applies simply at the point of entering the license agreement.

**35**    Fifth, paragraph 16.4 provides support for this interpretation. It requires the franchisee to seek KFC's consent to a transfer to a third party of the franchisee's interest under the license agreement. To allow an informed consent, this paragraph expressly obliges the franchisee to give KFC the same information about the shareholders of the third party that paragraph 16.1 provided concerning the franchisee. However, if paragraph 16.1 contained an ongoing right of KFC to be informed of and approve the shareholders of the party holding the franchise, paragraph 16.4 would be superfluous.

**36**    Finally, and with respect, it is my view that the three reasons offered by the trial judge for the opposite interpretation of paragraph 16.1 do not withstand scrutiny.

**37**    The first reason given by the trial judge was that the meaning I would accord to paragraph 16.1 would defeat the personal aspect of the license agreement. That paragraph certainly makes clear that the grant of the license is personal to the licensee. However, that licensee is clearly and expressly Scott's Food, not its controlling shareholder. A change in the latter leaves the licensee unchanged. Following the second Laidlaw transaction, the license is still granted personally to Scott's Food.

**38**    The second reason was that it would not make good business sense to read paragraph 16.1 so that it did not extend to a change in the shareholders of the franchisee. While this might not make good business sense from the perspective of the franchisor, it might well make good business sense for the franchisee. In my view, neither of these is helpful in the required task of contractual interpretation. Rather, in applying objectively the interpretive principle of what accords with sound commercial principles and good business sense, the key fact is that for twenty years, from 1969 to 1989, this franchise relationship operated with apparent viability without the right of approval contended for by the respondent. In light of this history, it cannot be concluded that the meaning I give to paragraph 16.1 would not make good business sense.

**39**    Finally, it was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry. The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship. This franchisee appeared to have bargaining power at least equal to that of KFC and certainly sufficient power to achieve a contract with no restriction on the transferability of shares. By contrast, the trial judge found the industry standard to be that the franchisor has control over the franchisee. In these circumstances, the generally accepted industry practice is of little use in interpreting this particular license agreement.

**40**    Hence, I conclude that paragraph 16.1 of the license agreement cannot be construed to give

KFC the right to approve a change in the shareholders of Scott's Food. This paragraph, therefore, was not breached when Scott's did not obtain KFC's approval of the second Laidlaw transaction.

**41**    It is next necessary to consider the proper interpretation to be given to paragraph 16.2 of the license agreement. It is helpful to reproduce this provision a second time:

> 16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

**42**    The respondent's primary argument was that the second Laidlaw transaction engaged the last sentence of this paragraph. It was said to be a transfer contrary to paragraph 16.1 which, because of paragraph 16.2, triggered the right of termination in paragraph 17.2(d). Given the conclusion I have reached concerning paragraph 16.1, this argument must fail.

**43**    Apart altogether from paragraph 16.1, however, the respondent also argues that for the purposes of paragraph 16.2, the first Laidlaw transaction was an attempted transfer and the second was an actual transfer and that KFC's prior written consent was therefore required.

**44**    In my view, this argument also must fail. On the ordinary meaning of the words used in paragraph 16.2, it is the licensee Scott's Food that is constrained from dealing with its interest under the license agreement. Once the alter ego argument is dismissed, this paragraph simply cannot reach Scott's Hospitality, the shareholder of the franchisee. Nor does it reach the shareholders of Scott's Hospitality. Neither an attempted change nor an actual change in the shareholders of the franchisee constitutes the franchisee dealing with its interest under the license agreement.

**45**    This conclusion is assisted by examining the language of the counterpart paragraph 16.2 in the 1985 standard franchise agreement. The two Laidlaw transactions would be encompassed by that provision only because of the inclusion of the "deemed transfer" concept. As I have said, this concept is conspicuously absent from paragraph 16.2 of this license agreement.

**46**    The respondent argues that its proposed reading of paragraph 16.2 is consistent with good business sense and industry practice. However, as I have indicated in connection with the argument on paragraph 16.1, in the circumstances of this case, neither of these aids to interpretation requires that paragraph 16.2 be read to give KFC the right to consent to a change in the shareholders of its franchisee.

**47**    Finally, the respondent relies on GATX v. Hawker-Siddely Canada Inc. (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.) to assert a broad meaning for the phrase "or otherwise deal with" as found

in paragraph 16.2. That case is different from this one in that, there, the contracting party was clearly dealing indirectly with its interest under the agreement. Here, neither Laidlaw transaction involved the franchisee dealing in any way with its interest under the license agreement.

**48**    I therefore find that, properly construed, paragraph 16.2 does not give KFC the right to prior written consent to either Laidlaw transaction.

**49**    Given my conclusions about paragraphs 16.1 and 16.2 of the license agreement, it is unnecessary to deal with the appellant's alternative arguments: that paragraph 16.1 is limited to a change in ultimate control of the franchisee; that KFC could not have reasonably refused its approval of the second Laidlaw transaction; that a breach of paragraph 16.1 entitles KFC to terminate only if it was a fundamental breach of the license agreement; but in any event, for KFC to terminate would be a breach of its good faith duty under the license agreement; and finally, that the appellants are entitled to relief from forfeiture. Nor is it necessary to deal with the respondent's alternative argument that a breach of paragraph 16.1 allows it to terminate through direct resort to paragraph 17.3 of the license agreement.

**50**    Before leaving the transfer issue, the remaining matter required to be dealt with arises from the finding below that pursuant to paragraph 16.3 of the license agreement, KFC had a right of first refusal in the circumstances of both Laidlaw transactions. That paragraph reads in part as follows:

> 16.3 In the event that <u>Licensee receives</u> a bona fide offer, which <u>licensee is willing to accept</u>, from a third party to purchase or otherwise acquire any of the Licensee's rights and interest in this Agreement, ..., Licensee shall first offer to sell the same to KFC at the same price and on the same terms and conditions as in the third party's offer ... In the event that KFC so accepts such offer to sell, a binding agreement of purchase and sale shall thereby be constituted between Licensee and KFC at the said price and upon the said terms and conditions ... [Emphasis added.]

**51**    The reasons below reveal no analysis of the language in this paragraph by the trial judge in reaching his conclusion.

**52**    In my opinion, the ordinary meaning of the words used in the paragraph dictates the opposite conclusion -- that neither Laidlaw transaction triggered a right of first refusal. Neither an offer to purchase the shares of Scott's Hospitality nor an offer to change the controlling shareholder of Scott's Food is an offer which the franchisee receives or one which the franchisee can accept. The licensee cannot receive a takeover bid for the licensee's parent or for the licensee itself.

**53**    In summary, therefore, the appellant did not breach either paragraph 16.1 or paragraph 16.2 of the license agreement because of the Laidlaw transactions and KFC does not have the right to terminate the license agreement as a result. Nor did either Laidlaw transaction give KFC a right of first refusal.

**54**    I would accordingly allow the appeal on the transfer issue and set aside the declarations in paras. 1, 2, 3 and 4 of the judgment below. Instead, an order will go dismissing the claims for these declarations. Finally, I would set aside para. 13 of the judgment below and would grant the declaration sought therein.

THE ENHANCEMENT ISSUE

**55**    The other major issue at trial was whether Scott's Food had failed to meet its obligations to enhance its KFC outlets. These obligations are contained in the license agreement and the addendum to it, the Master Development Agreement, signed at the same time. The trial judge's two principal findings on this issue were that Scott's Food had failed to enhance its outlets as required by paragraph 7.2 of the Master Development Agreement and, secondly, because more than five to ten per cent of the outlets had not been enhanced as required, the failure was material and substantive, thereby entitling KFC to terminate the license agreement pursuant to paragraph 17.2(e) unless Scott's Food corrects the failure within three months. The appellants appeal neither of these findings. Indeed, they raise only two grounds of appeal in connection with the enhancement issue.

**56**    Firstly, they appeal the declaration that KFC is also entitled to terminate the license agreement pursuant to paragraphs 17.2(e) and 17.3 because Scott's Food's enhancement failures were breaches of paragraphs 3.2, 5 and 6 of the license agreement. While the judgment contains this declaration, the reasons for judgment do not reveal the basis upon which the declaration was made.

**57**    Second, they appeal the finding that to avoid KFC's right to terminate under paragraph 17.2(e), Scott's Food must, within three months, enhance all of its outlets, not just a sufficient number that the failure becomes less than material and substantive.

**58**    Turning to the first of these two grounds of appeal, it is helpful to set out paragraphs 17.2(e) and 17.3 of the license agreement:

> 17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:
>
> . . .
>
> (e)    Licensee fails to satisfy, in a material and substantive manner, the requirements for enhancement and development contained in Articles 3.3, 3.4, 7.2 and 7.3 of the Addendum, provided that notice of any such failure is delivered to Licensee and Licensee shall not have corrected such failure within (3) months from the delivery of such notice.

17.3 The License will terminate on the termination date specified in any notice by KFC to Licensee (without any further notice of termination unless required by law), provided that (a) the notice is hand delivered or mailed at least thirty (30) days (or such longer period as may be required by law) in advance of the termination date, (b) the notice reasonably identifies one or more breaches or defaults in Licensee's obligations or performance hereunder, (c) the notice specifies the manner in which the breach(es) or default(s) are not fully remedied before, and as of, the termination date.

**59**   In my view, paragraph 17.2(e) deals explicitly and exhaustively with the enhancement obligations on the franchisee that, if not met, give KFC the right to terminate the license agreement. None of paragraphs 3.2, 5 or 6 of the license agreement is included in that list.

**60**   Moreover, as indicated by the trial judge, paragraph 17.3 merely sets out the procedure of formal notice. It does not accord to KFC a substantive right to terminate for any failure by Scott's Food to discharge its enhancement obligations. To so interpret paragraph 17.3 would fly in the face of paragraph 17.2 where the parties have carefully selected the enhancement obligations that, if breached, justify termination. Hence I would reverse the declaration that because the franchisee's enhancement failures breached paragraphs 3.2, 5 and 6 of the license agreement, KFC is entitled to terminate pursuant to paragraphs 17.2(e) and 17.3.

**61**   As to the second ground of appeal on the enhancement issue, paragraph 17.2(e) of the license agreement provides that failure <u>in a material and substantive manner</u> (my emphasis) to meet the franchisee's enhancement obligations as specified therein gives KFC the right to terminate if the failure is not corrected within three months. As I have said, the trial judge found that where more than five to ten per cent of the outlets fall below this required standard, Scott's Food was in substantial breach for the purposes of this paragraph. He went on to say this:

... KFC must give three months' notice from the date of this judgment to Scott's to allow it to remedy the default found in this decision on the enhancement issue. In other words, Scott's must be given three months in which to upgrade all of its remaining outlets to certification standards. If it chooses not to do so, it may close those stores under other termination procedures.

**62**   There is nothing in the actual judgment appealed from that requires the franchisee to enhance or close all of its remaining outlets to avoid termination. Hence, I propose to make no order on this ground of appeal.

**63**   However, in my opinion, if failure in a material and substantive manner to meet the enhancement requirements occurs when five to ten per cent of the outlets are below standard, correcting that failure means enhancing at least enough outlets so that there is no possibility of this line being crossed. This means that to correct that failure within three months, Scott's Food must ensure that no more than five per cent of its outlets are substandard. I would therefore not think it

necessary that to correct the failure, the franchisee must sufficiently upgrade all its remaining outlets. To do so would make the correction incongruent with the failure contrary to what I think is meant by the final phrase of paragraph 17.2(e).

**64**   The view I have expressed is also consistent with paragraph 6.3 of the Master Development Agreement. It contemplates that the franchisee could operate outlets for a limited period of time even if they had not been enhanced to the required standard. This paragraph is inconsistent with a correction requirement that would compel the franchisee to properly enhance all of its remaining outlets.

**65**   In summary, I would allow the appeal on the enhancement issue. I would set aside the declaration in para. 9 of the judgment below and order that the claim for this declaration be dismissed.

COSTS

**66**   The trial judge ordered that there be no costs of the trial on the basis of paragraph 18.3 of the license agreement which required this result unless one party prevailed entirely, something that did not occur at this trial.

**67**   Before us, neither party sought to disturb this order and I do not do so. Both parties submitted that costs of the appeal should follow the result. I can see no reason why this should not happen.

**68**   In conclusion, I would allow the appeals with costs on the transfer issue and the enhancement issue in accordance with these reasons. The trial judgment is otherwise undisturbed.

GOUDGE J.A.
 MOLDAVER J.A. -- I agree.
 FERRIER J. (ad hoc) -- I agree.

1 City of Toronto v. W.H. Hotel Ltd. (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.).

2 Scanlon v. Castlepoint Development Corporation et al. (1992), 11 O.R. (3d) 744 at 770 (Ont. C.A.).

** Preliminary Version **

*Case Name:*

# Kerr v. Baranow

**Margaret Patricia Kerr, Appellant;**
**v.**
**Nelson Dennis Baranow, Respondent.**
**And between**
**Michele Vanasse, Appellant;**
**v.**
**David Seguin, Respondent.**

[2011] S.C.J. No. 10

[2011] A.C.S. no 10

2011 SCC 10

[2011] 1 S.C.R. 269

[2011] 1 R.C.S. 269

274 O.A.C. 1

328 D.L.R. (4th) 577

2011EXP-624

411 N.R. 200

J.E. 2011-333

[2011] 3 W.W.R. 575

64 E.T.R. (3d) 1

2011 CarswellBC 240

14 B.C.L.R. (5th) 203

300 B.C.A.C. 1

93 R.F.L. (6th) 1

EYB 2011-186472

File Nos.: 33157, 33358.


Supreme Court of Canada

Heard: April 21, 2010;
Judgment: February 18, 2011.

**Present: McLachlin C.J. and Binnie, LeBel, Abella, Charron,
Rothstein and Cromwell JJ.**

(221 paras.)


**Appeal From:**

ON APPEAL FROM THE COURTS OF APPEAL FOR BRITISH COLUMBIA AND ONTARIO

*Family law -- Marriage -- Common-law marriage -- Property and benefit rights -- Appeals by Kerr and Vanasse from judgments concerning their claims as common law spouses allowed in part -- Common intention approach to resulting trust has no further role to play in resolution of property claims by domestic partners on the breakdown of relationship -- Remedy for unjust enrichment was not restricted to an award based on a fee-for-services approach -- Where unjust enrichment was most realistically characterized as one party retaining a disproportionate share of assets resulting from a joint family venture, and a monetary award was appropriate, it should be calculated on the basis of the share of those assets proportionate to claimant's contributions.*

*Family law -- Maintenance and support -- Spousal support -- Retroactive awards -- Appeals by Kerr and Vanasse from judgments concerning their claims as common law spouses allowed in part -- Judge ordered $1,739 in monthly support for Kerr, effective as of the date she applied to the court for relief -- Court of Appeal held that award of support should be effective as of the date that the trial began -- It was clear that Kerr was in need of support at the date she started her proceedings and remained so at the time of trial -- Kerr should not have been faulted for not bringing an interim application in seeking support for the period in question.*

Appeals by Kerr and Vanasse from judgments concerning their claims as common law spouses. Kerr and Baranow, a couple in their late sixties, separated after a common law relationship of more than 25 years. Kerr claimed support and a share of property in Baranow's name based on resulting trust and unjust enrichment principles. The trial judge awarded Kerr $315,000, a third of the value of the home in Baranow's name that they had shared, both by way of resulting trust and unjust enrichment. The judge also ordered $1,739 in monthly support for Kerr, effective as of the date she applied to the court for relief. The Court of Appeal set aside the trial judge's conclusions on resulting trust and unjust enrichment. It found that Kerr did not make a financial contribution to the acquisition or improvement of Baranow's property. It also held that the award of spousal support should be effective as of the date that the trial began. In the Vanasse appeal, the central problem was how to quantify a monetary award for unjust enrichment. It was agreed that SÚguin was unjustly enriched by the contributions of his partner, Vanasse, during their 12-year common law relationship. The trial judge held that SÚguin had been unjustly enriched at Vanasse's expense during the period in which their children were born, but found no unjust enrichment for the rest of the time that they cohabited. Vanasse was awarded half of the value of the wealth accumulated during the period of unjust enrichment. The Court of Appeal set aside that award and, while ordering a new trial, directed that the proper approach to valuation was to place a monetary value on the services provided by Vanasse to the family, taking due account of SÚguin's contributions by way of set-off. The appeals required the court to resolve five main issues. The first concerned the role of the "common intention" resulting trust in claims by domestic partners. The second issue concerned the nature of the money remedy for a successful unjust enrichment claim i.e. whether the monetary remedy for a successful unjust enrichment claim always had to be assessed on a quantum meruit basis. The third issue related to mutual benefit conferral and at what point in the unjust enrichment analysis this should be taken into account. The fourth issue involved the question of what role the parties' reasonable or legitimate expectations play in the unjust enrichment analysis. Finally, there was the issue of the appropriate date for the commencement of spousal support.

HELD: Vanasse appeal allowed. Kerr appeal allowed in part. Appeal on spousal support issue and on decision to dismiss Kerr's unjust enrichment claim allowed. Appeal in relation to Kerr's claim for a resulting trust dismissed. The "common intention" approach to resulting trust has no further role to play in the resolution of property claims by domestic partners on the breakdown of their relationship. Among other problems, the common intention resulting trust was doctrinally unsound and the notion of common intention could be highly artificial. A successful unjust enrichment claim required the plaintiff to establish that the defendant had been enriched by the plaintiff, the plaintiff had suffered a corresponding deprivation, and the absence of a juristic reason for the enrichment. With respect to the nature of the monetary remedy, the remedy for unjust enrichment was not restricted to an award based on a fee-for-services approach. Where the unjust enrichment was most realistically characterized as one party retaining a disproportionate share of assets resulting from a joint family venture, and a monetary award was appropriate, it should be calculated on the basis of the share of those assets proportionate to the claimant's contributions. Sometimes a proprietary remedy was required. Where the plaintiff could demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed

property, and that a monetary award would be insufficient, a share of the property proportionate to the claimant's contribution could be impressed with a constructive trust in his or her favour. Mutual benefit conferral should be addressed at the defence and remedy stage. The parties' reasonable expectations had a limited role, and had to be considered in relation to whether there was a juristic reason for the enrichment. Where the contributions of both parties over time resulted in an accumulation of wealth, an unjust enrichment occurred when one party retained a disproportionate share of the assets that were the product of their joint efforts following the breakdown of their relationship. In the Vanasse case, there was a clear link between Vanasse's contribution and the accumulation of wealth. The trial judge took a realistic and practical view of the evidence and took into account SÚguin's non-financial contributions and periods during which Vanasse's contributions were not disproportionate to SÚguin and her judgment should be restored. In the Kerr case, the Court ordered a new trial of Kerr's unjust enrichment claim, and affirmed the Court of Appeal's order for a hearing of Baranow's counterclaim. The Court of Appeal erred in assessing Baranow's contributions as part of the juristic reason analysis and prematurely truncated Kerr's prima facie case of unjust enrichment. It was clear that Kerr was in need of support from Baranow at the date she started her proceedings and remained so at the time of trial. Kerr should not have been faulted for not bringing an interim application in seeking support for the period in question.

**Statutes, Regulations and Rules Cited:**

Divorce Act, R.S.C. 1985, c. 3 (2nd Supp.).,

Family Relations Act, R.S.B.C. 1996, c. 128, s. 93(5)(d)

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Family law -- Common law spouses -- Property -- Unjust enrichment -- Monetary remedy -- Whether monetary remedy restricted to quantum meruit award -- Whether evidence of joint family venture should be considered in conferring remedy -- Whether mutual benefit conferral and reasonable expectations of parties should be considered in assessing award.*

*Family law -- Common law spouses -- Property -- Resulting trust -- Whether evidence of common intention should be considered in context of resulting trust -- Whether resulting trust principles apply to property or monetary award in resolution of domestic cases.*

*Family law -- Common law spouses -- Support -- Parties separating after living together for more than 25 years -- Female partner commencing proceedings for a share of property and support --*

*Whether support should be payable from date of trial or date on which proceedings commenced.*

**Court Summary:**

In the *Kerr* appeal, K and B, a couple in their late sixties separated after a common law relationship of more than 25 years. They both had worked through much of that time and each had contributed in various ways to their mutual welfare. K claimed support and a share of property in B's name based on resulting trust and unjust enrichment principles. B counterclaimed that K had been unjustly enriched by his housekeeping and personal assistance services provided after K suffered a debilitating stroke. The trial judge awarded K $315,000, a third of the value of the home in B's name that they had shared, both by way of resulting trust and unjust enrichment, based on his conclusion that K had provided $60,000 worth of equity and assets at the beginning of their relationship. He also awarded K $1,739 per month in spousal support effective the date she commenced proceedings. The court of appeal concluded that K did not make a financial contribution to the acquisition or improvement of B's property that was the basis for her award at trial, and dismissed her property claims. A new trial was ordered for B's counterclaim. The court of appeal further held that the commencement date of the spousal support should be the date of trial.

In the *Vanasse* appeal, it was agreed that S was unjustly enriched by the contributions of his partner, V, during their 12 year common law relationship. For the first four years of cohabitation, both parties pursued their respective careers. In 1997, V took a leave of absence from her employment and the couple moved to Halifax so that S could pursue a business opportunity. Over the next three and a half years, their children were born and V stayed at home to care for them and performed the domestic labour. S worked long hours and travelled extensively for business. In 1998, S stepped down as CEO of the business and the family returned to Ottawa where they bought a home in joint names. In 2000, S received approximately $11 million for his shares in the business and from that time, until their separation in 2005, he participated more with the domestic chores. The trial judge found no unjust enrichment for the first and last periods of their cohabition, but held that S had been unjustly enriched at V's expense during the period in which the children were born. V was entitled to half of the value of the wealth S accumulated during the period of unjust enrichment, less her interest in the home and RRSPs in her name. The court of appeal set aside this award and directed that the proper approach to valuation was a *quantum meruit* calculation in which the value each party received from the other was assessed and set off.

*Held*: In *Kerr*, the appeal on the spousal support issue should be allowed and the order of the trial judge should be restored. The appeal from the order dismissing K's unjust enrichment claim should also be allowed and a new trial ordered. The appeal from the order dismissing K's claim in resulting trust should be dismissed. The order for a new hearing of B's counterclaim should be affirmed.

*Held*: In *Vanasse*, the appeal should be allowed and the order of the trial judge restored.

These appeals require the resolution of five main issues. The first concerns the role of the "common intention" resulting trust in claims by domestic partners. The second issue is whether the monetary

remedy for a successful unjust enrichment claim must always be assessed on a *quantum meruit* basis. The third area relates to mutual benefit conferral in the context of an unjust enrichment claim and when this should be taken into account. The fourth concerns the role the parties' reasonable expectations play in the unjust enrichment analysis. Finally, in the Kerr appeal, this Court must also decide the effective date of the commencement of spousal support.

For unmarried persons in domestic relationships in most common law provinces, judge-made law is the only option for addressing the property consequences of the breakdown of those relationships. The main legal mechanisms available have been the resulting trust and the action in unjust enrichment. Resulting trusts arise from gratuitous transfers in two types of situations: the transfer of property from one partner to the other without consideration, and the joint contribution by two partners to the acquisition of property, title to which is in the name of only one of them. The underlying legal principle is that contributions to the acquisition of a property, which were not reflected in the legal title, might nonetheless give rise to a property interest. In Canada, added to this underlying notion was the idea that a resulting trust could arise based solely on the "common intention" of the parties that the non-owner partner was intended to have an interest. This theory is doctrinally unsound, however, and should have no continuing role in the resolution of domestic property disputes. While traditional resulting trust principles may well have a role to play in the resolution of property disputes between unmarried domestic partners, parties have increasingly turned to the law of unjust enrichment and the remedial constructive trust. Since the decision in *Pettkus v. Becker*, the law of unjust enrichment has provided a much less artificial, more comprehensive and more principled basis to address claims for the distribution of assets on the breakdown of domestic relationships. It permits recovery whenever the plaintiff can establish three elements: an enrichment of the defendant by the plaintiff, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment. This Court has taken a straightforward economic approach to the elements of enrichment and corresponding deprivation. The plaintiff must show that he or she has given a tangible benefit to the defendant that the defendant received and retained. Further, the enrichment must correspond to a deprivation that the plaintiff has suffered. Importantly, provision of domestic services may support a claim for unjust enrichment. The absence of a juristic reason for the enrichment means that there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff. This third element also provides for due consideration of the autonomy of the parties, their legitimate expectations and the right to order their affairs by contract.

There are two steps to the juristic reason analysis. First, the established categories of juristic reason must be considered, which could include benefits conferred by way of gift or pursuant to a legal obligation. In their absence, the second step permits consideration of the reasonable expectations of the parties and public policy considerations to assess whether particular enrichments are unjust.

The object of the remedy for unjust enrichment is to require the defendant to reverse the unjustified enrichment and may attract either a "personal restitutionary award" or a "restitutionary proprietary award". In most cases, a monetary award will be sufficient to remedy the unjust enrichment but two

issues raise difficulties in determining appropriate compensation. Where there has been a mutual conferral of benefits, it is often difficult for the court to retroactively value every service rendered by each party to the other. While the value of domestic services is not questioned, it would be unjust to only consider the contributions of one party. A second difficulty is whether a monetary award must invariably be calculated on a *quantum meruit*, "value received" or "fee-for-services" basis or whether that monetary relief may be assessed more flexibly, on a "value survived basis" by reference to the overall increase in the couple's wealth during the relationship. In some cases, a proprietary remedy may be required. Where the plaintiff can demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed property, and that a monetary award would be insufficient, a share of the property proportionate to the claimant's contribution can be impressed with a constructive trust in his or her favour.

Three areas in the law of unjust enrichment require clarification. Once the choice has been made to award a monetary remedy, the question is how to quantify it. If a monetary remedy must invariably be quantified on a *quantum meruit* basis, the remedial choice in unjust enrichment cases becomes whether to impose a constructive trust or to order a monetary remedy calculated on a *quantum meruit* basis. This dichotomy of remedial choice should be rejected, however, as the value survived measure is a perfectly plausible alternative to the constructive trust. Restricting the money remedy to a fee-for-service calculation is inappropriate for four reasons. First, it fails to reflect the reality of the lives of many domestic partners. The basis of all domestic unjust enrichment claims do not fit into only two categories -- those where the enrichment consists of the provision of unpaid services, and those where it consists of an unrecognized contribution to the acquisition, improvement, maintenance or preservation of specific property. Where the contributions of both parties over time have resulted in an accumulation of wealth, the unjust enrichment occurs when one party retains a disproportionate share of the assets that are the product of their joint efforts following the breakdown of their relationship. The required link between the contributions and a specific property may not exist but there may clearly be a link between the joint efforts of the parties and the accumulation of wealth. While the law of unjust enrichment does not mandate a presumption of equal sharing, nor does the mere fact of cohabitation entitle one party to share in the other's property, the legal consequences of the breakdown of a domestic relationship should reflect realistically the way people live their lives. Second, the remedial dichotomy is inconsistent with the inherent flexibility of unjust enrichment and with the Court's approach to equitable remedies. Moreover, the Court has recognized that, given the wide variety of circumstances addressed by the traditional categories of unjust enrichment, as well as the flexibility of the broader, principled approach, its development requires recourse to a number of different sorts of remedies depending on the circumstances. There is no reason in principle why one of the traditional categories of unjust enrichment should be used to force the monetary remedy for all present domestic unjust enrichment cases into a remedial strait-jacket. What is essential is that there must be a link between the contribution and the accumulation of wealth. Where that link exists, and a proprietary remedy is either inappropriate or unnecessary, the monetary award should be fashioned to reflect the true nature of the enrichment and the corresponding deprivation. Third, the remedial dichotomy ignores

the historical basis of *quantum meruit* claims. Finally, a remedial dichotomy is not mandated, as has been suggested, by the Court's judgment in *Peter. v. Beblow.*

Where the unjust enrichment is best characterized as an unjust retention of a disproportionate share of assets accumulated during the course of a "joint family venture" to which both partners have contributed, the monetary remedy should be calculated according to the share of the accumulated wealth proportionate to the claimant's contributions. Where the spouses are domestic and financial partners, there is no need for "duelling *quantum meruits*". The law of unjust enrichment, including the remedial constructive trust, is the preferable method of responding to the inequities brought about by the breakdown of a common law relationship, since the remedies for unjust enrichment "are tailored to the parties' specific situation and grievances". To be entitled to a monetary remedy on a value-survived basis, the claimant must show both that there was a joint family venture and a link between his or her contributions and the accumulation of wealth.

To determine whether the parties have, in fact, been engaged in a joint family venture, the particular circumstances of each particular relationship must be taken into account. This is a question of fact and must be assessed by having regard to all of the relevant circumstances, including factors relating to mutual effort, economic integration, actual intent and priority of the family. The pooling of effort and team work, the decision to have and raise children together, and the length of the relationship may all point towards the extent to which the parties have formed a true partnership and jointly worked towards important mutual goals. The use of parties' funds entirely for family purposes or where one spouse takes on all, or a greater proportion, of the domestic labour, freeing the other spouse from those responsibilities and enabling him or her to pursue activities in the paid workforce, may also indicate a pooling of resources. The more extensive the integration of the couple's finances, economic interests and economic well-being, the more likely it is that they have engaged in a joint family venture. The actual intentions of the parties, either express or inferred from their conduct, must be given considerable weight. Their conduct may show that they intended the domestic and professional spheres of their lives to be part of a larger, common venture, but may also conversely negate the existence of a joint family venture, or support the conclusion that particular assets were to be held independently. Another consideration is whether and to what extent the parties have given priority to the family in their decision-making, and whether there has been detrimental reliance on the relationship, by one or both of the parties, for the sake of the family. This may occur where one party leaves the workforce for a period of time to raise children; relocates for the benefit of the other party's career; foregoes career or educational advancement for the benefit of the family or relationship; or accepts underemployment in order to balance the financial and domestic needs of the family unit.

The unjust enrichment analysis in domestic situations is often complicated by the fact that there has been a mutual conferral of benefits. When the appropriate remedy is a money award based on a fee-for-services provided approach, the fact that the defendant has also provided services to the claimant should mainly be considered at the defence and remedy stages of the analysis but may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits

constitutes relevant evidence of the existence (or non-existence) of a juristic reason for the enrichment. However, given that the purpose of the juristic reason step in the analysis is to determine whether the enrichment was just, not its extent, mutual benefit conferral should only be considered at the juristic reason stage for that limited purpose. Otherwise, the mutual exchange of benefits should be taken into account only after the three elements of an unjust enrichment claim have been established.

Claimants must show that there is no juristic reason falling within any of the established categories, such as whether the benefit was a gift or pursuant to a legal obligation. It is then open to the defendant to show that a different juristic reason for the enrichment should be recognized, having regard to the parties' reasonable expectations and public policy considerations. Mutual benefit conferral and the parties' reasonable expectations have a very limited role to play at the first step of the juristic reason analysis. In some cases, the fact that mutual benefits were conferred or that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons is present. The parties' reasonable or legitimate expectations have a role to play at the second step of the juristic reason analysis, where the defendant bears the burden of establishing that there is a juristic reason for retaining the benefit that does not fall within the existing categories. The question is whether the parties' mutual expectations show that retention of the benefits is just.

In the *Vanasse* appeal, although not labelling it as such, the trial judge found that there was a joint family venture and that there was a link between V's contribution to it and the substantial accumulation of wealth that the family achieved. She made a reasonable assessment of the monetary award appropriate to reverse this unjust enrichment, taking due account of S's substantial contributions. Her findings of fact and analysis indicate that the unjust enrichment of S at the expense of V ought to be characterized as the retention by S of a disproportionate share of the wealth generated from a joint family venture. Several factors suggested that, throughout their relationship, the parties were working collaboratively towards common goals. They made important decisions keeping the overall welfare of the family at the forefront. It was through their joint efforts that they were able to raise a young family and acquire wealth. S could not have made the efforts he did to build up the company but for V's assumption of the domestic responsibilities. Notably, the period of unjust enrichment corresponds to the time during which the parties had two children together, a further indicator that they were working together to achieve common goals. The length of the relationship is also relevant, and their 12 year cohabitation is a significant period of time. There was also evidence of economic integration as their house was registered jointly and they had a joint bank account. Their words and actions indicated that there was a joint family venture, to which the couple jointly contributed for their mutual benefit and the benefit of their children. There is a strong inference from the factual findings that, to S's knowledge, V relied on the relationship to her detriment. She left her career, gave up her own income, and moved away from her family and friends. V then stayed home and cared for their two small children. During the period of the unjust enrichment, V was responsible for a disproportionate share of the domestic labour. There was a clear link between V's contribution and the accumulation of wealth. The trial judge took a realistic

and practical view of the evidence and took into account S's non-financial contributions and periods during which V's contributions were not disproportionate to S and her judgment should be restored.

The court of appeal was right to set aside the trial judge's findings of resulting trust and unjust enrichment in *Kerr* and in ordering a new hearing on B's counterclaim. On the basis of the unsatisfactory record at trial, which includes findings of fact tainted by clear error, K's unjust enrichment claim should not have been dismissed but a new trial ordered. The court of appeal erred in assessing B's contributions as part of the juristic reason analysis and prematurely truncated K's *prima facie* case of unjust enrichment. The family property approach is rejected, and for K to show an entitlement to a proportionate share of the wealth accumulated during the relationship, she must establish that B has been unjustly enriched at her expense, that their relationship constituted a joint family venture, and that her contributions are linked to the generation of wealth during the relationship. She would then have to show what proportion of the jointly accumulated wealth reflects her contributions. With regard to B's counterclaim, there was evidence that he made very significant contributions to K's welfare such that his counterclaim cannot simply be dismissed. The trial judge also referred to various other monetary and non-monetary contributions which K made to the couple's welfare and comfort, but he did not evaluate them, let alone compare them with the contributions made by B. There are few findings of fact relevant to the key question of whether the parties' relationship constituted a joint family venture. Further, the court of appeal ought not to have set aside the trial judge's order for spousal support in favour of K effective on the date she had commenced proceedings. It is clear that K was in need of support from B at the date she started her proceedings and remained so at the time of trial. K should not have been faulted for not bringing an interim application in seeking support for the period in question. She suffered from a serious physical disability, and her standard of living was markedly lower than it was while she lived with B. B had the means to provide support, had prompt notice of her claim, and there was no indication in the court of appeal's reasons that it considered the judge's award imposed on him a hardship so as to make that award inappropriate.

**Cases Cited**

**Applied:** *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762; *Peter v. Beblow*, [1993] 1 S.C.R. 980, rev'g (1990), 50 B.C.L.R. (2d) 266, rev'g [1988] B.C.J. No. 887 (QL); *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38; *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629; **considered:** *Pettkus v. Becker*, [1980] 2 S.C.R. 834; *Rathwell v. Rathwell*, [1978] 2 S.C.R. 436; *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795; *D.B.S. v. S.R.G.*, 2006 SCC 37, [2006] 2 S.C.R. 231; **referred to:** *Dyer v. Dyer* (1788), 2 Cox Eq. Cas. 92, 30 E.R. 42; *Murdoch v. Murdoch*, [1975] 1 S.C.R. 423; *Gissing v. Gissing*, [1970] 2 All E.R. 780; *Pettitt v. Pettitt*, [1970] A.C. 777; *Nova Scotia (Attorney General) v. Walsh*, 2002 SCC 83, [2002] 4 S.C.R. 325; *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574; *Bell v. Bailey* (2001), 203 D.L.R. (4) 589; *Wilson v. Fotsch*, 2010 BCCA 226, 319 D.L.R. (4) 26; *Pickelein v. Gillmore* (1997), 30 B.C.L.R. (3d) 44; *Harrison v. Kalinocha* (1994), 90 B.C.L.R. (2d) 273; *MacFarlane v. Smith*, 2003 NBCA 6, 256 N.B.R. (2d) 108; *Shannon v. Gidden*, 1999 BCCA 539, 71 B.C.L.R. (3d) 40; *Herman*

*v. Smith* (1984), 42 R.F.L. (2d) 154; *Clarke v. Clarke*, [1990] 2 S.C.R. 795; *Cadbury Schweppes Inc. v. FBI Foods Ltd*., [1999] 1 S.C.R. 142; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217; *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575; *Birmingham v. Ferguson*, 2004 CanLII 4764; *McDougall v. Gesell Estate*, 2001 MBCA 3, 153 Man. R. (2d) 54; *Nasser v. Mayer-Nasser* (2000), 5 R.F.L. (5) 100; *Panara v. Di Ascenzo*, 2005 ABCA 47, 361 A.R. 382; *Ford v. Werden* (1996), 27 B.C.L.R. (3d) 169; *Thomas v. Fenton*, 2006 BCCA 299, 269 D.L.R. (4) 376; *Giles v. McEwan* (1896), 11 Man. R. 150; *Garland v. Consumers' Gas Co.*, [1998] 3 S.C.R. 112; *Nance v. British Columbia Electric Railway Co*., [1951] A.C. 601; *MacKinnon v. MacKinnon* (2005), 75 O.R. (3d) 175; *Reference re Goods and Services Tax*, [1992] 2 S.C.R. 445; *Mack v. Canada (Attorney General)* (2002), 60 O.R. (3d) 737; *S. (L.) v. P. (E.)* (1999), 67 B.C.L.R. (3d) 254.

## Statutes and Regulations Cited

*Divorce Act*, R.S.C. 1985, c. 3 (2 Supp.).

*Family Relations Act*, R.S.B.C. 1996, c. 128, s. 93(5)(d).

## Authors Cited

Birks, Peter. *An Introduction to the Law of Restitution*. Oxford: Clarendon Press, 1985.

Birks, Peter. *Unjust Enrichment*, 2 ed. Oxford: Oxford University Press, 2005.

Davies, J.D. "Duties of Confidence and Loyalty", [1990] *L.M.C.L.Q.* 4.

Fridman, G.H.L. *Restitution*, 2 ed. Toronto: Carswell, 1992.

Gordon, Marie L. "Blame Over: Retroactive Child and Spousal Support in the Post-Guideline Era" (2004-2005), 23 C.F.L.Q. 243.

Lord Goff of Chieveley and Gareth Jones. *The Law of Restitution*, 7 ed. London: Sweet & Maxwell, 2007.

Maddaugh, Peter D., and John D. McCamus. *The Law of Restitution*. Aurora, Ont.: Canada Law Book, 1990.

Maddaugh, Peter D., and John D. McCamus. *The Law of Restitution*. Aurora, Ont.: Canada Law Book, 1990 (loose-leaf updated August 2010, release 6).

*Matrimonial Property Law in Canada*, vol. 1, by James G. McLeod and Alfred A. Mamo, eds. Toronto: Carswell, 1993 (loose-leaf updated 2010, release 8).

McCamus, John D. "Restitution on Dissolution of Marital and Other Intimate Relationships:

Constructive Trust or Quantum Meruit?", in Jason W. Neyers, Mitchell McInnes and Stephen G. A. Pitel, eds., *Understanding Unjust Enrichment*. Portland: Hart Publishing, 2004, 359.

Mee, John. *The Property Rights of Cohabitees: An Analysis of Equity's Response in Five Common Law Jurisdictions*. Portland: Hart Publishing, 1999.

*Oosterhoff on Trusts: Text, Commentary and Materials*, 7 ed. by A. H. Oosterhoff et al. Toronto: Carswell, 2009.

Parkinson, Patrick. "Beyond *Pettkus v. Becker*: Quantifying Relief for Unjust Enrichment" (1993), 43 U.T.L.J. 217.

Pettit, Philip H. *Equity and the Law of Trusts*, 11 ed. Oxford: Oxford University Press, 2009.

Scane, Ralph E. "Relationships 'Tantamount to Spousal', Unjust Enrichment, and Constructive Trusts" (1991), 70 *Can. Bar Rev.* 260.

Waters, Donovan. Comment (1975), 53 *Can. Bar Rev.* 366.

*Waters' Law of Trusts in Canada*, 3 ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith, eds. Toronto: Thomson, 2005.

Youdan, Timothy G. "Resulting and Constructive Trusts", in *Special Lectures of the Law Society of Upper Canada 1993 -- Family Law: Roles, Fairness and Equality*. Scarborough, Ont.: Carswell, 1994, 169.

**History and Disposition:**

APPEAL from a judgment of the British Columbia Court of Appeal (Levine, Tysoe and Smith JJ.A.), 2009 BCCA 111, 93 B.C.L.R. (4) 201, 266 B.C.A.C. 298, [2009] 9 W.W.R. 285, 66 R.F.L. (6) 1, [2009] B.C.J. No. 474 (QL), 2009 CarswellBC 642, reversing in part a decision of Romilly J., 2007 BCSC 1863, 47 R.F.L. (6) 103, [2007] B.C.J. No. 2737, 2007 CarswellBC 3047. Appeal allowed in part.

APPEAL from a judgment of the Ontario Court of Appeal (Weiler, Juriansz and Epstein JJ.A.), 2009 ONCA 595, 252 O.A.C. 218, 96 O.R. (3d) 321, [2009] O.J. No. 3211 (QL), 2009 CarswellOnt 4407, reversing a decision of Blishen J., 2008 CanLII 35922, [2008] O.J. No. 2832 (QL), 2008 CarswellOnt 4265. Appeal allowed.

**Counsel:**

*Armand A. Petronio* and *Geoffrey B. Gomery*, for the appellant Margaret Kerr.

*Susan G. Label* and *Marie-France Major*, for the respondent Nelson Baranow.

*John E. Johnson*, for the appellant Michele Vanasse.

*H. Hunter Phillips*, for the respondent David Seguin.

---

The judgment of the Court was delivered by

**CROMWELL J.**:--

I.     Introduction

**1**     In a series of cases spanning 30 years, the Court has wrestled with the financial and property rights of parties on the breakdown of a marriage or domestic relationship. Now, for married spouses, comprehensive matrimonial property statutes enacted in the late 1970s and 1980s provide the applicable legal framework. But for unmarried persons in domestic relationships in most common law provinces, judge-made law was and remains the only option. The main legal mechanisms available to parties and courts have been the resulting trust and the action in unjust enrichment.

**2**     In the early cases of the 1970s, the parties and the courts turned to the resulting trust. The underlying legal principle was that contributions to the acquisition of a property, which were not reflected in the legal title, could nonetheless give rise to a property interest. Added to this underlying notion was the idea that a resulting trust could arise based on the "common intention" of the parties that the non-owner partner was intended to have an interest. The resulting trust soon proved to be an unsatisfactory legal solution for many domestic property disputes, but claims continue to be advanced and decided on that basis.

**3**     As the doctrinal problems and practical limitations of the resulting trust became clearer, parties and courts turned increasingly to the emerging law of unjust enrichment. As the law developed, unjust enrichment carried with it the possibility of a remedial constructive trust. In order to successfully prove a claim for unjust enrichment, the claimant must show that the defendant has been enriched, the claimant suffered a corresponding detriment, and there is no "juristic reason" for the enrichment. This claim has become the pre-eminent vehicle for addressing the financial consequences of the breakdown of domestic relationships. However, various issues continue to create controversy, and these two appeals, argued consecutively, provide the Court with the opportunity to address them.

**4**     In the *Kerr* appeal, a couple in their late-sixties separated after a common law relationship of more than 25 years. Both had worked through much of that time and each had contributed in various ways to their mutual welfare. Ms. Kerr claimed support and a share of property held in her

partner's name based on resulting trust and unjust enrichment principles. The trial judge awarded her one-third of the value of the couple's residence, grounded in both resulting trust and unjust enrichment claims (2007 BCSC 1863, 47 R.F.L. (6th) 103). He did not address, other than in passing, Mr. Baranow's counterclaim that Ms. Kerr had been unjustly enriched at his expense. The judge also ordered substantial monthly support for Ms. Kerr pursuant to statute, effective as of the date she applied to the court for relief. However, the resulting trust and unjust enrichment conclusions of the trial judge were set aside by the British Columbia Court of Appeal (2009 BCCA 111, 93 B.C.L.R. (4th) 201). Both lower courts addressed the role of the parties' common intention and reasonable expectations. The appeal to this Court raises the questions of the role of resulting trust law in these types of disputes, as well as how an unjust enrichment analysis should take account of the mutual conferral of benefits and what role the parties' intentions and expectations play in that analysis. This Court is also called upon to decide whether the award of spousal support should be effective as of the date of application, as found by the trial judge, the date the trial began, as ordered by the Court of Appeal, or some other date.

**5**    In the *Vanasse* appeal, the central problem is how to quantify a monetary award for unjust enrichment. It is agreed that Mr. Seguin was unjustly enriched by the contributions of his partner, Ms. Vanasse; the two lived in a common law relationship for about 12 years and had two children together during this time. The trial judge valued the extent of the enrichment by determining what proportion of Mr. Seguin's increased wealth was due to Ms. Vanasse's efforts as an equal contributor to the family venture ( 2008 CanLII 35922). The Court of Appeal set aside this finding and, while ordering a new trial, directed that the proper approach to valuation was to place a monetary value on the services provided by Ms. Vanasse to the family, taking due account of Mr. Seguin's own contributions by way of set-off ( 2009 ONCA 595, 252 O.A.C. 218). In short, the Court of Appeal held that Ms. Vanasse should be treated as an unpaid employee, not a co-venturer. The appeal to this Court challenges this conclusion.

**6**    These appeals require us to resolve five main issues. The first concerns the role of the "common intention" resulting trust in claims by domestic partners. In my view, it is time to recognize that the "common intention" approach to resulting trust has no further role to play in the resolution of property claims by domestic partners on the breakdown of their relationship.

**7**    The second issue concerns the nature of the money remedy for a successful unjust enrichment claim. Some courts take the view that if the claimant's contribution cannot be linked to specific property, a money remedy must always be assessed on a fee-for-services basis. Other courts have taken a more flexible approach. In my view, where both parties have worked together for the common good, with each making extensive, but different, contributions to the welfare of the other and, as a result, have accumulated assets, the money remedy for unjust enrichment should reflect that reality. The money remedy in those circumstances should not be based on a minute totting up of the give and take of daily domestic life, but rather should treat the claimant as a co-venturer, not as the hired help.

**8**    The third area requiring clarification relates to mutual benefit conferral. Many domestic relationships involve the mutual conferral of benefits, in the sense that each contributes in various ways to the welfare of the other. The question is how and at what point in the unjust enrichment analysis should this mutual conferral of benefits be taken into account? For reasons I will develop below, this issue should, with a small exception, be addressed at the defence and remedy stage.

**9**    Fourth, there is the question of what role the parties' reasonable or legitimate expectations play in the unjust enrichment analysis. My view is that they have a limited role, and must be considered in relation to whether there is a juristic reason for the enrichment.

**10**    Finally, there is the issue of the appropriate date for the commencement of spousal support. In my respectful view, the Court of Appeal erred in setting aside the trial judge's selection of the date of application in the circumstances of the *Kerr* appeal.

**11**    I will first address the law of resulting trusts as it applies to the breakdown of a marriage-like relationship. Next, I will turn to the law of unjust enrichment in this context. Finally, I will address the specific issues raised in the two appeals.

II.    Resulting Trusts

**12**    The resulting trust played an important role in the early years of the Court's jurisprudence relating to property rights following the breakdown of intimate personal relationships. This is not surprising; it had been settled law since at least 1788 in England (and likely long before) that the trust of a legal estate, whether in the names of the purchaser or others, "results" to the person who advances the purchase money: *Dyer v. Dyer* (1788), 2 Cox Eq. Cas. 92, at p. 93, 30 E.R. 42. The resulting trust, therefore, seemed a promising vehicle to address claims that one party's contribution to the acquisition of property was not reflected in the legal title.

**13**    The resulting trust jurisprudence in domestic property cases developed into what has been called "a purely Canadian invention", the "common intention" resulting trust: A H. Oosterhoff, et al., *Oosterhoff on Trusts: Text, Commentary and Materials* (7th ed. 2009) at p. 642. While this vehicle has largely been eclipsed by the law of unjust enrichment since the decision of the Court in *Pettkus v. Becker,* [1980] 2 S.C.R. 834, claims based on the "common intention" resulting trust continue to be advanced. In the *Kerr* appeal, for example, the trial judge justified the imposition of a resulting trust, in part, on the basis that the parties had a common intention that Mr. Baranow would hold title to the property by way of a resulting trust for Ms. Kerr. The Court of Appeal, while reversing the trial judge's finding of fact on this point, implicitly accepted the ongoing vitality of the common intention resulting trust.

**14**    However promising this common intention resulting trust approach looked at the beginning, doctrinal and practical problems soon became apparent and have been the subject of comment by the Court and scholars: see, e.g., *Pettkus*, at pp. 842-43; Oosterhoff, at pp. 641-47; D.W.M. Waters, M.R. Gillen and L.D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005) ("*Waters'*") at

pp. 430-35; J. Mee, *The Property Rights of Cohabitees*: *An Analysis of Equity's Response in Five Common Law Jurisdictions* (1999), at pp. 39-43; T. G. Youdan, "Resulting and Constructive Trusts" in *Special Lectures of the Law Society of Upper Canada* 1993 - *Family Law: Roles, Fairness and Equality* (1994), 169 at pp. 172-74.

**15**    In this Court, since *Pettkus*, the common intention resulting trust remains intact but unused. While traditional resulting trust principles may well have a role to play in the resolution of property disputes between unmarried domestic partners, the time has come to acknowledge that there is no continuing role for the common intention resulting trust. To explain why, I must first put the question in the context of some basic principles about resulting trusts.

**16**    That task is not as easy as it should be; there is not much one can say about resulting trusts without a well-grounded fear of contradiction. There is debate about how they should be classified and how they arise, let alone about many of the finer points: see, for example, *Rathwell v. Rathwell*, [1978] 2 S.C.R. 436, at pp. 449-50; *Waters'*, at pp. 19-22; P. H. Pettit, *Equity and the Law of Trusts* (11th ed. 2009), at p. 67. However, it is widely accepted that the underlying notion of the resulting trust is that it is imposed "to return property to the person who gave it and is entitled to it beneficially, from someone else who has title to it. Thus, the beneficial interest 'results' (jumps back) to the true owner": Oosterhoff, at p. 25. There is also widespread agreement that, traditionally, resulting trusts arose where there had been a gratuitous transfer or where the purposes set out by an express or implied trust failed to exhaust the trust property: *Waters'*, at p. 21.

**17**    Resulting trusts arising from gratuitous transfers are the ones relevant to domestic situations. The traditional view was they arose in two types of situations: the gratuitous transfer of property from one partner to the other, and the joint contribution by two partners to the acquisition of property, title to which is in the name of only one of them. In either case, the transfer is gratuitous, in the first case because there was no consideration for the transfer of the property, and in the second case because there was no consideration for the contribution to the acquisition of the property.

**18**    The Court's most recent decision in relation to resulting trusts is consistent with the view that, in these gratuitous transfer situations, the actual intention of the grantor is the governing consideration: *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795, at paras. 43-44. As Rothstein J. noted at para. 44 of *Pecore*, where a gratuitous transfer is being challenged, "[t]he trial judge will commence his or her inquiry with the applicable presumption and will weigh all of the evidence in an attempt to ascertain, on a balance of probabilities, the transferor's actual intention" (emphasis added).

**19**    As noted by Rothstein J. in this passage, presumptions may come into play when dealing with gratuitous transfers. The law generally presumes that the grantor intended to create a trust, rather than to make a gift, and so the presumption of resulting trust will often operate. As Rothstein J. explained, a presumption of a resulting trust is the general rule that applies to gratuitous transfers.

When such a transfer is made, the onus will be on the person receiving the transfer to demonstrate that a gift was intended. Otherwise, the transferee holds that property in trust for the transferor. This presumption rests on the principle that equity presumes bargains and not gifts (*Pecore*, at para. 24).

**20**     The presumption of resulting trust, however, is neither universal nor irrebuttable. So, for example, in the case of transfers between persons in certain relationships (such as from a parent to a minor child), a presumption of advancement -- that is, a presumption that the grantor intended to make a gift -- rather than a presumption of resulting trust applies: see *Pecore*, at paras. 27-41. The presumption of advancement traditionally applied to grants from husband to wife, but the presumption of resulting trust traditionally applied to grants from wife to husband. Whether the application of the presumption of advancement applies to unmarried couples may be more controversial: Oosterhoff, at pp. 681-82. Although the trial judge in *Kerr* touched on this issue, neither party relies on the presumption of advancement and I need say nothing further about it.

**21**     That brings me to the "common intention" resulting trust. It figured prominently in the majority judgment in *Murdoch v. Murdoch*, [1975] 1 S.C.R. 423. Quoting from Lord Diplock's speech in *Gissing v. Gissing*, [1970] 2 All E.R. 780 (H.L.), at pp. 789 and 793, Martland J. held for the majority that, absent a financial contribution to the acquisition of the contested property, a resulting trust could only arise "where the court is satisfied by the words or conduct of the parties that it was their common intention that the beneficial interest was not to belong solely to the spouse in whom the legal estate was vested but was to be shared between them in some proportion or other": *Murdoch*, at p. 438.

**22**     This approach was repeated and followed by a majority of the Court three years later in *Rathwell*, at pp. 451-53, although the Court also unanimously found there had been a direct financial contribution by the claimant. In *Rathwell*, there is, as well, some blurring of the notions of contribution and common intention; there are references to the fact that a presumption of resulting trust is sometimes explained by saying that the fact of contribution evidences the common intention to share ownership: see p. 452, *per* Dickson J. (as he then was); p. 474, *per* Ritchie J. This blurring is also evident in the reasons of the Court of Appeal in *Kerr*, where the court said, at para. 42, that "a resulting trust is an equitable doctrine that, by operation of law, imposes a trust on a party who holds legal title to property that was gratuitously transferred to that party by another <u>and where there is evidence of a common intention that the property was to be shared by both parties</u>" (emphasis added).

**23**     The Court's development of the common intention resulting trust ended with *Pettkus*, in which Dickson J. (as he then was) noted the "many difficulties, chronicled in the cases and in the legal literature" as well as the "artificiality of the common intention approach" to resulting trusts: at pp. 842-3. He also clearly rejected the notion that the requisite common intention could be attributed to the parties where such an intention was negated by the evidence: p. 847. The import of *Pettkus* was that the law of unjust enrichment, coupled with the remedial constructive trust, became the more flexible and appropriate lens through which to view property and financial disputes in domestic

situations. As Ms. Kerr stated in her factum, the "approach enunciated in *Pettkus v. Becker* has become the dominant legal paradigm for the resolution of property disputes between common law spouses" (para. 100).

24    This, in my view, is as it should be, and the time has come to say that the common intention resulting trust has no further role to play in the resolution of domestic cases. I say this for four reasons.

25    First, as the abundant scholarly criticism demonstrates, the common intention resulting trust is doctrinally unsound. It is inconsistent with the underlying principles of resulting trust law. Where the issue of intention is relevant to the finding of resulting trust, it is the intention of the grantor or contributor alone that counts. As Professor Waters puts it, "In imposing a resulting trust upon the recipient, Equity is never concerned with [common] intention (*Waters'*, at p. 431)." The underlying principles of resulting trust law also make it hard to accommodate situations in which the contribution made by the claimant was not in the form of property or closely linked to its acquisition. The point of the resulting trust is that the claimant is asking for his or her own property back, or for the recognition of his or her proportionate interest in the asset which the other has acquired with that property. This thinking extends artificially to claims that are based on contributions that are not clearly associated with the acquisition of an interest in property; in such cases there is not, in any meaningful sense, a "resulting" back of the transferred property: *Waters'*, at p. 432. It follows that a resulting trust based solely on intention without a transfer of property is, as Oosterhoff puts it, a doctrinal impossibility: "... a resulting trust can arise only when one person has transferred assets to, or purchased assets for, another person and did not intend to make a gift of the property": p. 642. The final doctrinal problem is that the relevant time for ascertaining intention is the time of acquisition of the property. As a result, it is hard to see how a resulting trust can arise from contributions made over time to the improvement of an existing asset, or contributions in kind over time for its maintenance. As Oosterhoff succinctly puts it at p. 652, a resulting trust is inappropriate in these circumstances because its imposition, in effect, forces one party to give up beneficial ownership which he or she enjoyed before the improvement or maintenance occurred.

26    There are problems beyond these doctrinal issues. A second difficulty with the common intention resulting trust is that the notion of common intention may be highly artificial, particularly in domestic cases. The search for common intention may easily become "a mere vehicle or formula" for giving a share of an asset, divorced from any realistic assessment of the actual intention of the parties. Dickson J. in *Pettkus* noted the artificiality and undue malleability of the common intention approach: at pp. 843-44.

27    Third, the "common intention" resulting trust in Canada evolved from a misreading of some imprecise language in early authorities from the House of Lords. While much has been written on this topic, it is sufficient for my purposes to note, as did Dickson J. in *Pettkus*, at p. 842, that the principles upon which the common intention resulting trust jurisprudence developed are found in the House of Lords decisions in *Pettitt v. Pettitt*, [1970] A.C. 777, and *Gissing*. However, no clear

majority opinion emerged in those cases and four of the five Law Lords in *Gissing* spoke of "resulting, implied or constructive trusts" without distinction. The passages that have been most influential in Canada on this point, those authored by Lord Diplock, in fact relate to constructive rather than resulting trusts: see, e.g., *Waters'*, at pp. 430-35; Oosterhoff, at pp. 642-43. I find persuasive Professor Waters' comments, specifically approved by Dickson J. in *Pettkus*, that where the search for common intention becomes simply a vehicle for reaching what the court perceives to be a just result, "[i]t is in fact a constructive trust approach masquerading as a resulting trust approach": D. Waters, Comment (1975), 53 *Can. Bar Rev.* 366, at p. 368.

**28**    Finally, as the development of the law since *Pettkus* has shown, the principles of unjust enrichment, coupled with the possible remedy of a constructive trust, provide a much less artificial, more comprehensive and more principled basis to address the wide variety of circumstances that lead to claims arising out of domestic partnerships. There is no need for any artificial inquiry into common intent. Claims for compensation as well as for property interests may be addressed. Contributions of all kinds and made at all times may be justly considered. The equities of the particular case are considered transparently and according to principle, rather than masquerading behind often artificial attempts to find common intent to support what the court thinks for unstated reasons is a just result.

**29**    I would hold that the resulting trust arising solely from the common intention of the parties, as described by the Court in *Murdoch* and *Rathwell*, no longer has a useful role to play in resolving property and financial disputes in domestic cases. I emphasize that I am speaking here only of the common intention resulting trust. I am not addressing other aspects of the law relating to resulting trusts, nor am I suggesting that a resulting trust that would otherwise validly arise is defeated by the existence in fact of common intention.

    III.   <u>Unjust Enrichment</u>

A. *Introduction*

**30**    The law of unjust enrichment has been the primary vehicle to address claims of inequitable distribution of assets on the breakdown of a domestic relationship. In a series of decisions, the Court has developed a sturdy framework within which to address these claims. However, a number of doctrinal and practical issues require further attention. I will first briefly set out the existing framework, then articulate the issues that in my view require further attention, and finally propose the ways in which they should be addressed.

B. *The Legal Framework for Unjust Enrichment Claims*

**31**    At the heart of the doctrine of unjust enrichment lies the notion of restoring a benefit which justice does not permit one to retain: *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762, at p. 788. For recovery, something must have been given by the plaintiff and received and retained by the defendant without juristic reason. A series of categories developed in which retention of a

conferred benefit was considered unjust. These included, for example: benefits conferred under mistakes of fact or law; under compulsion; out of necessity; as a result of ineffective transactions; or at the defendant's request: see *Peel*, at p. 789; see generally, G. H. L. Fridman, *Restitution* (2nd ed. 1992), c. 3-5, 7, 8 and 10; and Lord Goff of Chieveley and G. Jones, *The Law of Restitution* (7th ed., 2007), c. 4-11, 17 and 19-26).

**32**    Canadian law, however, does not limit unjust enrichment claims to these categories. It permits recovery whenever the plaintiff can establish three elements: an enrichment of or benefit to the defendant, a corresponding deprivation of the plaintiff, and the absence of a juristic reason for the enrichment: *Pettkus*; *Peel*, at p. 784. By retaining the existing categories, while recognizing other claims that fall within the principles underlying unjust enrichment, the law is able "to develop in a flexible way as required to meet changing perceptions of justice": *Peel*, at p. 788.

**33**    The application of unjust enrichment principles to claims by domestic partners was resisted until the Court's 1980 decision in *Pettkus*. In applying unjust enrichment principles to domestic claims, however, the Court has been clear that there is and should be no separate line of authority for "family" cases developed within the law of unjust enrichment. Rather, concern for clarity and doctrinal integrity mandate that "the basic principles governing the rights and remedies for unjust enrichment remain the same for all cases" (*Peter v. Beblow*, [1993] 1 S.C.R. 980, at p. 997).

**34**    Although the legal principles remain constant across subject areas, they must be applied in the particular factual and social context out of which the claim arises. The Court in *Peter* was unanimously of the view that the courts "should exercise flexibility and common sense when applying equitable principles to family law issues with due sensitivity to the special circumstances that can arise in such cases" (p. 997, *per* McLachlin J. (as she then was); see also p. 1023, *per* Cory J.). Thus, while the underlying legal principles of the law of unjust enrichment are the same for all cases, the courts must apply those common principles in ways that respond to the particular context in which they are to operate.

**35**    It will be helpful to review, briefly, the current state of the law with respect to each of the elements of an unjust enrichment claim and note the particular issues in relation to each that arise in claims by domestic partners.

C. *The Elements of an Unjust Enrichment Claim*

   (1) Enrichment and Corresponding Deprivation

**36**    The first and second steps in the unjust enrichment analysis concern first, whether the defendant has been enriched by the plaintiff and second, whether the plaintiff has suffered a corresponding deprivation.

**37**    The Court has taken a straightforward economic approach to the first two elements -- enrichment and corresponding deprivation. Accordingly, other considerations, such as moral and

policy questions, are appropriately dealt with at the juristic reason stage of the analysis: see *Peter*, at p. 990, referring to *Pettkus*, *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38, and *Peel*, affirmed in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629, at para. 31.

**38** For the first requirement -- enrichment -- the plaintiff must show that he or she gave something to the defendant which the defendant received and retained. The benefit need not be retained permanently, but there must be a benefit which has enriched the defendant and which can be restored to the plaintiff *in specie* or by money. Moreover, the benefit must be tangible. It may be positive or negative, the latter in the sense that the benefit conferred on the defendant spares him or her an expense he or she would have had to undertake (*Peel*, at pp. 788 and 790; *Garland*, at paras. 31 and 37).

**39** Turning to the second element -- a *corresponding* deprivation -- the plaintiff's loss is material only if the defendant has gained a benefit or been enriched (*Peel*, at pp. 789-90). That is why the second requirement obligates the plaintiff to establish not simply that the defendant has been enriched, but also that the enrichment corresponds to a deprivation which the plaintiff has suffered (*Pettkus*, at p. 852; *Rathwell*, at p. 455).

(2) Absence of Juristic Reason

**40** The third element of an unjust enrichment claim is that the benefit and corresponding detriment must have occurred without a juristic reason. To put it simply, this means that there is no reason in law or justice for the defendant's retention of the benefit conferred by the plaintiff, making its retention "unjust" in the circumstances of the case: see *Pettkus*, at p. 848; *Rathwell*, at p. 456; *Sorochan*, at p. 44; *Peter*, at p. 987; *Peel*, at pp. 784 and 788; *Garland*, at para. 30.

**41** Juristic reasons to deny recovery may be the intention to make a gift (referred to as a "donative intent"), a contract, or a disposition of law (*Peter*, at pp.990-91; *Garland*, at para. 44; *Rathwell*, at p. 455). The latter category generally includes circumstances where the enrichment of the defendant at the plaintiff's expense is required by law, such as where a valid statute denies recovery (P.D. Maddaugh, and J. D. McCamus, *The Law of Restitution* (1990), at p. 46; *Reference re Goods and Services Tax*, [1992] 2 S.C.R. 445; *Mack v. Canada (Attorney General)* (2002), 60 O.R. (3d) 737 (C.A.)). However, just as the Court has resisted a purely categorical approach to unjust enrichment claims, it has also refused to limit juristic reasons to a closed list. This third stage of the unjust enrichment analysis provides for due consideration of the autonomy of the parties, including factors such as "the legitimate expectation of the parties, the right of parties to order their affairs by contract (*Peel*, at p. 803).

**42** A critical early question in domestic claims was whether the provision of domestic services could support a claim for unjust enrichment. After some doubts, the matter was conclusively resolved in *Peter*, where the Court held that they could. A spouse or domestic partner generally has no duty, at common law, equity, or by statute, to perform work or services for the other. It follows, on a straightforward economic approach, that there is no reason to distinguish domestic services

from other contributions (*Peter*, at pp. 991 and 993; *Sorochan*, at p. 46). They constitute an enrichment because such services are of great value to the family and to the other spouse; any other conclusion devalues contributions, mostly by women, to the family economy (*Peter*, at p. 993). The unpaid provision of services (including domestic services) or labour may also constitute a deprivation because the full-time devotion of one's labour and earnings without compensation may readily be viewed as such. The Court rejected the view that such services could not found an unjust enrichment claim because they are performed out of "natural love and affection". (*Peter*, at pp. 989-95, *per* McLachlin J., and pp. 1012-16, *per* Cory J.).

**43**    In *Garland*, the Court set out a two-step analysis for the absence of juristic reason. It is important to remember that what prompted this development was to ensure that the juristic reason analysis was not "purely subjective", thereby building into the unjust enrichment analysis an unacceptable "immeasureable judicial discretion" that would permit "case by case 'palm tree' justice": *Garland*, at para. 40. The first step of the juristic reason analysis applies the established categories of juristic reasons; in their absence, the second step permits consideration of the reasonable expectations of the parties and public policy considerations to assess whether recovery should be denied:

> First, the plaintiff must show that no juristic reason from an established category exists to deny recovery [...] The established categories that can constitute juristic reasons include a contract (*Pettkus*, *supra*), a disposition of law (*Pettkus*, *supra*), a donative intent (*Peter*, *supra*), and other valid common law, equitable or statutory obligations (*Peter*, *supra*). If there is no juristic reason from an established category, then the plaintiff has made out a *prima facie* case under the juristic reason component of the analysis.

> The *prima facie* case is rebuttable, however, where the defendant can show that there is another reason to deny recovery. As a result, there is a *de facto* burden of proof placed on the defendant to show the reason why the enrichment should be retained. This stage of the analysis thus provides for a category of residual defence in which courts can look to all of the circumstances of the transaction in order to determine whether there is another reason to deny recovery.

> As part of the defendant's attempt to rebut, courts should have regard to two factors: the reasonable expectations of the parties, and public policy considerations. [paras. 44-46]

**44**    Thus, at the juristic reason stage of the analysis, if the case falls outside the existing categories, the court may take into account the legitimate expectations of the parties (*Pettkus*, at p.

849) and moral and policy-based arguments about whether particular enrichments are unjust (*Peter*, at p. 990). For example, in *Peter*, it was at this stage that the Court considered and rejected the argument that the provision of domestic and childcare services should not give rise to equitable claims against the other spouse in a marital or quasi-marital relationship (pp. 993-95). Overall, the test for juristic reason is flexible, and the relevant factors to consider will depend on the situation before the court (*Peter*, at p. 990).

**45**    Policy arguments concerning individual autonomy may arise under the second branch of the juristic reason analysis. In the context of claims for unjust enrichment, this has led to questions regarding how (and when) factors relating to the manner in which the parties organized their relationship should be taken into account. It has been argued, for example, that the legislative decision to exclude unmarried couples from property division legislation indicates the court should not use the equitable doctrine of unjust enrichment to address their property and asset disputes. However, the court in *Peter* rejected this argument, noting that it misapprehended the role of equity. As McLachlin J. put it at p. 994, "It is precisely where an injustice arises without a legal remedy that equity finds a role." (See also *Nova Scotia (Attorney General) v. Walsh*, 2002 SCC 83, [2002] 4 S.C.R. 325, at para. 61.)

(3)    Remedy

**46**    Remedies for unjust enrichment are restitutionary in nature; that is, the object of the remedy is to require the defendant to repay or reverse the unjustified enrichment. A successful claim for unjust enrichment may attract either a "personal restitutionary award" or a "restitutionary proprietary award". In other words, the plaintiff may be entitled to a monetary or a proprietary remedy (*Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574, at p. 669, *per* La Forest J.).

(a)    *Monetary Award*

**47**    The first remedy to consider is always a monetary award (*Peter,* at pp. 987 and 999). In most cases, it will be sufficient to remedy the unjust enrichment. However, calculation of such an award is far from straightforward. Two issues have given rise to disagreement and difficulty in domestic unjust enrichment claims.

**48**    First, the fact that many domestic claims of unjust enrichment arise out of relationships in which there has been a mutual conferral of benefits gives rise to difficulties in determining what will constitute adequate compensation. While the value of domestic services is not questioned (*Peter*; *Sorochan*), it is unjust to pay attention only to the contributions of one party in assessing an appropriate remedy. This is not only an important issue of principle; in practice, it is enormously difficult for the parties and the court to "create, retroactively, a notional ledger to record and value every service rendered by each party to the other" (R. E. Scane, "Relationships 'Tantamount to Spousal', Unjust Enrichment, and Constructive Trusts" (1991), 70 *Can. Bar Rev.* 260, at p. 281). This gives rise to the practical problem that one scholar has aptly referred to as "duelling *quantum*

*meruits*" (J. D. McCamus, "Restitution on Dissolution of Marital and Other Intimate Relationships: Constructive Trust or Quantum Meruit?", in J.W. Neyers, M. McInnes and S.G.A. Pitel, eds., *Understanding Unjust Enrichment* (2004), 359, at p. 376). McLachlin J. also alluded to this practical problem in *Peter*, at p. 999.

**49**    A second difficulty arises from the fact that some courts and commentators have read *Peter* as holding that when a monetary award is appropriate, it must invariably be calculated on the basis of the monetary value of the unpaid services. This is often referred to as the *quantum meruit*, or "value received" or "fee-for-services" approach. This was followed in *Bell v. Bailey* (2001), 203 D.L.R. (4th) 589, (Ont. C.A.). Other appellate courts have held that monetary relief may be assessed more flexibly -- in effect, on a value survived basis -- by reference, for example, to the overall increase in the couple's wealth during the relationship: *Wilson v. Fotsch*, 2010 BCCA 226, 319 D.L.R. (4th) 26, at para. 50; *Pickelein v. Gillmore* (1997), 30 B.C.L.R. (3d) 44 (C.A.); *Harrison v. Kalinocha* (1994), 90 B.C.L.R. (2d) 273 (C.A.); *MacFarlane v. Smith*, 2003 NBCA 6, 256 N.B.R. (2d) 108, at paras. 31-34 and 41-43; *Shannon v. Gidden*, 1999 BCCA 539, 71 B.C.L.R. (3d) 40, at para. 37. With respect to inconsistencies in how *in personam* relief for unjust enrichment may be quantified, see also: *Matrimonial Property Law in Canada*, vol 1, by J.G. McLeod and A.A. Mamo, eds.(loose-leaf), at pp. 40.78-40.79.

(b)    *Proprietary Award*

**50**    The Court has recognized that, in some cases, when a monetary award is inappropriate or insufficient, a proprietary remedy may be required. *Pettkus* is responsible for an important remedial feature of the Canadian law of unjust enrichment: the development of the remedial constructive trust. Imposed without reference to intention to create a trust, the constructive trust is a broad and flexible equitable tool used to determine beneficial entitlement to property (*Pettkus*, at pp. 843-44 and 847-48). Where the plaintiff can demonstrate a link or causal connection between his or her contributions and the acquisition, preservation, maintenance or improvement of the disputed property, a share of the property proportionate to the unjust enrichment can be impressed with a constructive trust in his or her favour (*Pettkus*, at pp. 852-53; *Sorochan*, at p. 50). *Pettkus* made clear that these principles apply equally to unmarried cohabitants, since "[t]he equitable principle on which the remedy of constructive trusts rests is broad and general; its purpose is to prevent unjust enrichment in whatever circumstances it occurs" (pp. 850-51).

**51**    As to the nature of the link required between the contribution and the property, the Court has consistently held that the plaintiff must demonstrate a "sufficiently substantial and direct" link, a "causal connection" or a "nexus" between the plaintiff's contributions and the property which is the subject matter of the trust (*Peter*, at pp. 988, 997 and 999; *Pettkus* at p. 852; *Sorochan*, at pp. 47-50; *Rathwell*, at p. 454). A minor or indirect contribution will not suffice (*Peter*, at p. 997). As Dickson C.J. put it in *Sorochan*, the primary focus is on whether the contributions have a "clear proprietary relationship" (p. 50, citing Professor McLeod's annotation of *Herman v. Smith* (1984), 42 R.F.L. (2d) 154, at p. 156). Indirect contributions of money and direct contributions of labour may suffice,

provided that a connection is established between the plaintiff's deprivation and the acquisition, preservation, maintenance, or improvement of the property (*Sorochan*, at p. 50; *Pettkus*, at p. 852).

**52**    The plaintiff must also establish that a monetary award would be insufficient in the circumstances (*Peter*, at p. 999). In this regard, the court may take into account the probability of recovery, as well as whether there is a reason to grant the plaintiff the additional rights that flow from recognition of property rights (*Lac Minerals*, at p. 678, *per* La Forest J.).

**53**    The extent of the constructive trust interest should be proportionate to the claimant's contributions. Where the contributions are unequal, the shares will be unequal (*Pettkus*, at pp. 852-53; *Rathwell*, at p. 448; *Peter*, at pp. 998-99). As Dickson J. put it in *Rathwell*, "The court will assess the contributions made by each spouse and make a fair, equitable distribution having regard to the respective contributions" (p. 454).

D. *Areas Needing Clarification*

**54**    While the law of unjust enrichment sets out a sturdy legal framework within which to address claims by domestic partners, three areas continue to generate controversy and require clarification. As mentioned earlier, these are as follows: the approach to the assessment of a monetary award for a successful unjust enrichment claim, how and where to address the mutual benefit problem, and the role of the parties' reasonable or legitimate expectations. I will address these in turn.

E. *Is a Monetary Award Restricted to Quantum Meruit?*

    (1)    Introduction

**55**    As noted earlier, remedies for unjust enrichment may either be proprietary (normally a remedial constructive trust) or personal (normally a money remedy). Once the choice has been made to award a monetary rather than a proprietary remedy, the question of how to quantify that monetary remedy arises. Some courts have held that monetary relief must always be calculated based on a value received or *quantum meruit* basis (*Bell*), while others have held that monetary relief may also be based on a value survived (i.e. by reference to the value of property) approach (*Wilson*; *Pickelein*; *Harrison*; *MacFarlane; Shannon*). If, as some courts have held, a monetary remedy must invariably be quantified on a *quantum meruit* basis, the remedial choice in unjust enrichment cases becomes whether to impose a constructive trust or order a monetary remedy calculated on a *quantum meruit* basis. One scholar has referred to this approach as the false dichotomy between constructive trust and *quantum meruit* (McCamus, at pp. 375-76). Scholars have also noted this area of uncertainty in the case law, and have suggested that an *in personam* remedy using the value survived measure is a plausible alternative to the constructive trust (McCamus, at p. 377; P. Birks, *An Introduction to the Law of Restitution* (1985), at pp. 394-95). As I will explain below, *Peter* is said to have established this dichotomy of remedial choice. However, in my view, the focus in *Peter* was on the availability of the constructive trust remedy, and that case should not be taken as limiting the calculation of monetary relief for unjust enrichment to a

*quantum meruit* basis. In appropriate circumstances, monetary relief may be assessed on a value survived basis.

**56**    I will first briefly describe the genesis of the purported limitation on the monetary remedy. Then I will explain why, in my view, it should be rejected. Finally, I will set out my views on how money remedies for unjust enrichment claims in domestic situations should be approached.

(2)    The Remedial Dichotomy

**57**    As noted, there is a widespread, although not unanimous, view that there are only two choices of remedy for an unjust enrichment: a monetary award, assessed on a fee-for-services basis; or a proprietary one (generally taking the form of a remedial constructive trust), where the claimant can show that the benefit conferred contributed to the acquisition, preservation, maintenance, or improvement of specific property. Some brief comments in *Peter* seem to have spawned this idea, which is reflected in a number of appellate authorities. For instance, in the *Vanasse* appeal, the Ontario Court of Appeal reasoned that since Ms. Vanasse could not show that her contributions were linked to specific property, her claim had to be quantified on a fee-for-services basis. I respectfully do not agree that monetary awards for unjust enrichment must always be calculated in this way.

(3) Why the Remedial Dichotomy Should Be Rejected

**58**    In my view, restricting the money remedy to a fee-for-services calculation is inappropriate for four reasons. First, it fails to reflect the reality of the lives of many domestic partners. Second, it is inconsistent with the inherent flexibility of unjust enrichment. Third, it ignores the historical basis of *quantum meruit* claims. Finally, it is not mandated by the Court's judgment in *Peter*. For those reasons, this remedial dichotomy should be rejected. The discussion which follows is concerned only with the quantification of a monetary remedy for unjust enrichment; the law relating to when a proprietary remedy should be granted is well established and remains unchanged.

(a)    *Life Experience*

**59**    The remedial dichotomy would be appropriate if, in fact, the bases of all domestic unjust enrichment claims fit into only two categories -- those where the enrichment consists of the provision of unpaid services, and those where it consists of an unrecognized contribution to the acquisition, improvement, maintenance or preservation of specific property. To be sure, those two bases for unjust enrichment claims exist. However, all unjust enrichment cases cannot be neatly divided into these two categories.

**60**    At least one other basis for an unjust enrichment claim is easy to identify. It consists of cases in which the contributions of both parties over time have resulted in an accumulation of wealth. The unjust enrichment occurs following the breakdown of their relationship when one party retains a disproportionate share of the assets which are the product of their joint efforts. The required link

between the contributions and a specific property may not exist, making it inappropriate to confer a proprietary remedy. However, there may clearly be a link between the joint efforts of the parties and the accumulation of wealth; in other words, a link between the "value received" and the "value surviving", as McLachlin J. put it in *Peter*, at pp. 1000-1001. Thus, where there is a relationship that can be described as a "joint family venture", and the joint efforts of the parties are linked to the accumulation of wealth, the unjust enrichment should be thought of as leaving one party with a disproportionate share of the jointly earned assets.

**61**    There is nothing new about the notion of a joint family venture in which both parties contribute to their overall accumulation of wealth. It was recognition of this reality that contributed to comprehensive matrimonial property legislative reform in the late 1970s and early 1980s. As the Court put it in *Clarke v. Clarke*, [1990] 2 S.C.R. 795, at p. 807 (in relation to Nova Scotia's *Matrimonial Property Act*), "... the Act supports the equality of both parties to a marriage and recognized the joint contribution of the spouses, be it financial or otherwise, to that enterprise... . The Act is accordingly remedial in nature. It was designed to alleviate the inequities of the past when the contribution made by women to the economic survival and growth of the family was not recognized" (emphasis added).

**62**    Unlike much matrimonial property legislation, the law of unjust enrichment does not mandate a presumption of equal sharing. However, the law of unjust enrichment can and should respond to the social reality identified by the legislature that many domestic relationships are more realistically viewed as a joint venture to which the parties jointly contribute.

**63**    This reality has also been recognized many times and in many contexts by the Court. For instance, in *Murdoch*, Laskin J. (as he then was), in dissent, would have imposed constructive trust relief, on the basis that the facts were "consistent with a pooling of effort by the spouses" to establish themselves in a ranch operation (p. 457), and that the spouses had worked together for fifteen years to improve "their lot in life through progressively larger acquisitions of ranch property" (p. 446). Similarly, in *Rathwell*, a majority of the judges agreed that Mr. and Mrs. Rathwell had pooled their efforts to accumulate wealth as a team. Dickson J. emphasized that the parties had together "decided to make farming their way of life" (p. 444), and that the acquisition of property in Mr. Rathwell's name was only made possible through their "joint effort" and "team work" (p. 461).

**64**    A similar recognition is evident in *Pettkus* and *Peter*.

**65**    In *Pettkus*, the parties developed a successful beekeeping business, the profits from which they used to acquire real property. Dickson J., writing for the majority of the Court, emphasized facts suggestive of a domestic and financial partnership. He observed that "each started with nothing; each worked continuously, unremittingly and sedulously in the joint effort" (p. 853); that each contributed to the "good fortune of the common enterprise" (p. 838); that Wilson J.A. (as she then was) at the Court of Appeal had found the wealth they accumulated was through "joint effort" and "teamwork" (p. 849); and finally, that "[t]heir lives and their economic well-being were fully

integrated" (p. 850).

**66**    I agree with Professor McCamus that the Court in *Pettkus* was "satisfied that the parties were engaged in a common venture in which they expected to share the benefits flowing from the wealth that they jointly created" (p. 367). Put another way, Mr. Pettkus was not unjustly enriched because Ms. Becker had a precise expectation of obtaining a legal interest in certain properties, but rather because they were in reality partners in a common venture.

**67**    The significance of the fact that wealth had been acquired through joint effort was again at the forefront of the analysis in *Peter* where the parties lived together for 12 years in a common law relationship. While Mr. Beblow generated most of the family income and also contributed to the maintenance of the property, Ms. Peter did all of the domestic work (including raising the six children of their blended family), helped with property maintenance, and was solely responsible for the property when Mr. Beblow was away. The reality of their joint venture was acknowledged when McLachlin J. wrote that the "joint family venture, in effect, was no different from the farm which was the subject of the trust in *Pettkus v. Becker*" (p. 1001).

**68**    The Court's recognition of the joint family venture is evident in three other places in *Peter*. First, in reference to the appropriateness of the "value survived" measure of relief, McLachlin J. observed, "[I]t is more likely that a couple expects to share in the wealth generated from their partnership, rather than to receive compensation for the services performed during the relationship" (p. 999). Second, and also related to valuing the extent of the unjust enrichment, McLachlin J. noted that, in a case where both parties had contributed to the "family venture", it was appropriate to look to all of the family assets, rather than simply one of them, to approximate the value of the claimant's contributions to that family venture (p. 1001). Third, the Court's justification for affirming the value of domestic services was, in part, based on reasoning that such services are often proffered in the context of a common venture (p. 993).

**69**    Relationships of this nature are common in our life experience. For many domestic relationships, the couple's venture may only sensibly be viewed as a joint one, making it highly artificial in theory and extremely difficult in practice to do a detailed accounting of the contributions made and benefits received on a fee-for-services basis. Of course, this is a relationship-specific issue; there can be no presumption one way or the other. However, the legal consequences of the breakdown of a domestic relationship should reflect realistically the way people live their lives. It should not impose on them the need to engage in an artificial balance sheet approach which does not reflect the true nature of their relationship.

       (b)    *Flexibility*

**70**    Maintaining a strict remedial dichotomy is inconsistent with the Court's approach to equitable remedies in general, and to its development of remedies for unjust enrichment in particular.

**71**    The Court has often emphasized the flexibility of equitable remedies and the need to fashion

remedies that respond to various situations in principled and realistic ways. So, for example, when speaking of equitable compensation for breach of confidence, Binnie J. affirmed that "the Court has ample jurisdiction to fashion appropriate relief out of the full gamut of available remedies, including appropriate financial compensation": *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142, at para. 61. At para. 24, he noted the broad approach to equitable remedies for breach of confidence taken by the Court in *Lac Minerals*. In doing so, he cited this statement with approval: "... the remedy that follows [once liability is established] should be the one that is most appropriate on the facts of the case rather than one derived from history or over-categorization" (from J. D. Davies, "Duties of Confidence and Loyalty", [1990] *Lloyds' Mar. & Com. L.Q.* 4, at p. 5). Similarly, in the context of the constructive trust, McLachlin J. (as she then was) noted that "[e]quitable remedies are flexible; their award is based on what is just in all the circumstances of the case": *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217, at para. 34.

**72**    Turning specifically to remedies for unjust enrichment, I refer to Binnie J.'s comments in *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575 at para. 13. He noted that the doctrine of unjust enrichment, while predicated on clearly defined principles, "retains a large measure of remedial flexibility to deal with different circumstances according to principles rooted in fairness and good conscience". Moreover, the Court has recognized that, given the wide variety of circumstances addressed by the traditional categories of unjust enrichment, as well as the flexibility of the broader, principled approach, its development has been characterized by, and indeed requires, recourse to a number of different sorts of remedies depending on the circumstances: see *Peter*, at p. 987; *Sorochan*, at p. 47.

**73**    Thus, the remedy should mirror the flexibility inherent in the unjust enrichment principle itself, so as to allow the court to respond appropriately to the substance of the problem put before it. This means that a monetary remedy must match, as best it can, the extent of the enrichment unjustly retained by the defendant. There is no reason to think that the wide range of circumstances that may give rise to unjust enrichment claims will necessarily fall into one or other of the two remedial options into which some have tried to force them.

(c)    *History*

**74**    Imposing a strict remedial dichotomy is also inconsistent with the historical development of the unjust enrichment principle. Unjust enrichment developed through several particular categories of cases. *Quantum meruit*, the origin of the fee-for-services award, was only one of them. *Quantum meruit* originated as a common law claim for compensation for benefits conferred under an agreement which, while apparently binding, was rendered ineffective for a reason recognized at common law. The scope of the claim was expanded over time, and the measure of a *quantum meruit* award was flexible. It might be assessed, for example, by the cost to the plaintiff of providing the service, the market value of the benefit, or even the value placed on the benefit by the recipient: P.D. Maddaugh and J.D. McCamus, *The Law of Restitution* (loose-leaf), vol. 1 at s. 4:200.30. The important point, however, is that *quantum meruit* is simply one of the established categories of

unjust enrichment claims. There is no reason in principle why one of the traditional categories of unjust enrichment should be used to force the monetary remedy for all present domestic unjust enrichment cases into a remedial straitjacket.

> (d) *Peter v. Beblow*

**75**    *Peter* does not mandate strict adherence to a *quantum meruit* approach to money remedies for unjust enrichment. One must remember that the focus of *Peter* was on whether the plaintiff's contributions entitled her to a constructive trust over the former family home. While it was assumed by both McLachlin J. and Cory J., who wrote concurring reasons in the case, that a money award would be fashioned on the basis of *quantum meruit*, that was not an issue, let alone a holding, in the case.

**76**    There are, in fact, only two sentences in the judgments that could be taken as supporting the view that this rule should always apply. At p. 995, McLachlin J. said, "Two remedies are possible: an award of money on the basis of the value of the services rendered, i.e. *quantum meruit*; and the one the trial judge awarded, title to the house based on a constructive trust"; at p. 999, she wrote that "[f]or a monetary award, the 'value received' approach is appropriate". Given that the focus of the case was deciding whether a proprietary remedy was appropriate, I would not read these two brief passages as laying down the sweeping rule that a monetary award must always be calculated on a fee-for-services basis.

**77**    Moreover, McLachlin J. noted that the doctrine of unjust enrichment applies to a variety of situations, and that successful claims have been addressed through a number of remedies, depending on the circumstances. Only one of these remedies is a payment for services rendered on the basis of *quantum meruit*: p. 987. There is nothing in this observation to suggest that the Court decided to opt for a one-size-fits-all monetary remedy, especially when such an approach would be contrary to the very flexibility that the Court has repeatedly affirmed with regards to the law of unjust enrichment and corresponding remedies.

**78**    This restrictive reading of *Peter* is not consistent with the underlying nature of the claim founded on the principles set out in *Pettkus*. As Professor McCamus has suggested, cases like *Pettkus* rest on a claimant's right to share surplus wealth created by joint effort and teamwork. It follows that a remedy based on notional fees for services is not responsive to the underlying nature of that claim: McCamus, at pp. 376-77. In my view, this reasoning is persuasive whether the joint effort has led to the accumulation of specific property, in which case a remedial constructive trust may be appropriate according to the well-settled principles in that area of trust law, or where the joint effort has led to an accumulation of assets generally. In the latter instance, when appropriate, there is no reason in principle why a monetary remedy cannot be fashioned to reflect this basis of the enrichment and corresponding deprivation. What is essential, in my view, is that, in either type of case, there must be a link between the contribution and the accumulation of wealth, or to use the words of McLachlin J. in *Peter*, between the "value received" and the "value surviving". Where that

link exists, and a proprietary remedy is either inappropriate or unnecessary, the monetary award should be fashioned to reflect the true nature of the enrichment and the corresponding deprivation.

**79**    Professor McCamus has suggested that the equitable remedy of an accounting of profits could be an appropriate remedial tool: p. 377. While I would not discount that as a possibility, I doubt that the complexity and technicality of that remedy would be well-suited to domestic situations, which are more often than not rather straightforward. The unjust enrichment principle is inherently flexible and, in my view, the calculation of a monetary award for a successful unjust enrichment claim should be equally flexible. This is necessary to respond, to the extent money can, to the particular enrichment being addressed. To my way of thinking, Professor Fridman was right to say that "where a claim for unjust enrichment has been made out by the plaintiff, the court may award whatever form of relief is most appropriate so as to ensure that the plaintiff obtains that to which he or she is entitled, regardless of whether the situation would have been governed by common law or equitable doctrines or whether the case would formerly have been considered one for a personal or a proprietary remedy" (p. 398).

(4)    The Approach to the Monetary Remedy

**80**    The next step in the legal development of this area should be to move away from the false remedial dichotomy between *quantum meruit* and constructive trust, and to return to the underlying principles governing the law of unjust enrichment. These underlying principles focus on properly characterizing the nature of the unjust enrichment giving rise to the claim. As I have mentioned above, not all unjust enrichments arising between domestic partners fit comfortably into either a "fee-for-services" or "a share of specific property" mold. Where the unjust enrichment is best characterized as an unjust retention of a disproportionate share of assets accumulated during the course of what McLachlin J. referred to in *Peter* (at p. 1001) as a "joint family venture" to which both partners have contributed, the monetary remedy should reflect that fact.

**81**    In such cases, the basis of the unjust enrichment is the retention of an inappropriately disproportionate amount of wealth by one party when the parties have been engaged in a joint family venture and there is a clear link between the claimant's contributions to the joint venture and the accumulation of wealth. Irrespective of the status of legal title to particular assets, the parties in those circumstances are realistically viewed as "creating wealth in a common enterprise that will assist in sustaining their relationship, their well-being and their family life" (McCamus, at p. 366). The wealth created during the period of cohabitation will be treated as the fruit of their domestic and financial relationship, though not necessarily by the parties in equal measure. Since the spouses are domestic and financial partners, there is no need for "duelling *quantum meruits*". In such cases, the unjust enrichment is understood to arise because the party who leaves the relationship with a disproportionate share of the wealth is denying to the claimant a reasonable share of the wealth accumulated in the course of the relationship through their joint efforts. The monetary award for unjust enrichment should be assessed by determining the proportionate contribution of the claimant to the accumulation of the wealth.

**82**    This flexible approach to the money remedy in unjust enrichment cases is fully consistent with *Walsh*. While that case was focused on constitutional issues that are not before us in this case, the majority judgment was clearly not intended to freeze the law of unjust enrichment in domestic cases; the judgment indicates that the law of unjust enrichment, including the remedial constructive trust, is the preferable method of responding to the inequities brought about by the breakdown of a common law relationship, since the remedies for unjust enrichment "are tailored to the parties' specific situation and grievances" (para. 61). In short, while emphasizing respect for autonomy as an important value, the Court at the same time approved of the continued development of the law of unjust enrichment in order to respond to the plethora of forms and functions of common law relationships.

**83**    A similar approach was taken in *Peter*. Mr. Beblow argued that the law of unjust enrichment should not provide a share of property to unmarried partners because the legislature had chosen to exclude them from the rights accorded to married spouses under matrimonial property legislation. This argument was succinctly -- and flatly -- rejected with the remark that it is "precisely where an injustice arises without a legal remedy that equity finds a role": p. 994.

**84**    It is not the purpose of the law of unjust enrichment to replicate for unmarried partners the legislative presumption that married partners are engaged in a joint family venture. However, there is no reason in principle why remedies for unjust enrichment should fail to reflect that reality in the lives and relationships of unmarried partners.

**85**    I conclude, therefore, that the common law of unjust enrichment should recognize and respond to the reality that there are unmarried domestic arrangements that are partnerships; the remedy in such cases should address the disproportionate retention of assets acquired through joint efforts with another person. This sort of sharing, of course, should not be presumed, nor will it be presumed that wealth acquired by mutual effort will be shared equally. Cohabitation does not, in itself, under the common law of unjust enrichment, entitle one party to a share of the other's property or any other relief. However, where wealth is accumulated as a result of joint effort, as evidenced by the nature of the parties' relationship and their dealings with each other, the law of unjust enrichment should reflect that reality.

**86**    Thus the rejection of the remedial dichotomy leads us to consider in what circumstances an unjust enrichment may be appropriately characterized as a failure to share equitably assets acquired through the parties' joint efforts. While this approach will need further refinement in future cases, I offer the following as a broad outline of when this characterization of an unjust enrichment will be appropriate.

(5)    Identifying Unjust Enrichment Arising From a Joint Family Venture

**87**    My view is that when the parties have been engaged in a joint family venture, and the claimant's contributions to it are linked to the generation of wealth, a monetary award for unjust enrichment should be calculated according to the share of the accumulated wealth proportionate to

the claimant's contributions. In order to apply this approach, it is first necessary to identify whether the parties have, in fact, been engaged in a joint family venture. In the preceding section, I reviewed the many occasions on which the existence of a joint family venture has been recognized. From this rich set of factual circumstances, what emerge as the hallmarks of such a relationship?

**88**    It is critical to note that cohabiting couples are not a homogeneous group. It follows that the analysis must take into account the particular circumstances of each particular relationship. Furthermore, as previously stated, there can be no presumption of a joint family venture. The goal is for the law of unjust enrichment to attach just consequences to the way the parties have lived their lives, not to treat them as if they ought to have lived some other way or conducted their relationship on some different basis. A joint family venture can only be identified by the court when its existence, in fact, is well-grounded in the evidence. The emphasis should be on how the parties actually lived their lives, not on their *ex post facto* assertions or the court's view of how they ought to have done so.

**89**    In undertaking this analysis, it may be helpful to consider the evidence under four main headings: mutual effort, economic integration, actual intent and priority of the family. There is, of course, overlap among factors that may be relevant under these headings and there is no closed list of relevant factors. What follows is not a checklist of conditions for finding (or not finding) that the parties were engaged in a joint family venture. These headings, and the factors grouped under them, simply provide a useful way to approach a global analysis of the evidence and some examples of the relevant factors that may be taken into account in deciding whether or not the parties were engaged in a joint family venture. The absence of the factors I have set out, and many other relevant considerations, may well negate that conclusion.

      (a)    *Mutual Effort*

**90**    One set of factors concerns whether the parties worked collaboratively towards common goals. Indicators such as the pooling of effort and team work, the decision to have and raise children together, and the length of the relationship may all point towards the extent, if any, to which the parties have formed a true partnership and jointly worked towards important mutual goals.

**91**    Joint contributions, or contributions to a common pool, may provide evidence of joint effort. For instance, in *Murdoch*, central to Laskin J.'s constructive trust analysis was that the parties had pooled their efforts to establish themselves in a ranch operation. Joint contributions were also an important aspect of the Court's analyses in *Peter*, *Sorochan*, and *Pettkus*. Pooling of efforts and resources, whether capital or income, has also been noted in the appellate case law (see, for example, *Birmingham v. Ferguson*, 2004 CanLII 4764 (Ont. C.A.); *McDougall v. Gesell Estate*, 2001 MBCA 3, 153 Man. R. (2d) 54, at para. 14). The use of parties' funds entirely for family purposes may be indicative of the pooling of resources: *McDougall*. The parties may also be said to be pooling their resources where one spouse takes on all, or a greater proportion, of the domestic labour, freeing the other spouse from those responsibilities, and enabling him or her to pursue

activities in the paid workforce (see *Nasser v. Mayer-Nasser* (2000), 5 R.F.L. (5th) 100 (Ont. C.A.) and *Panara v. Di Ascenzo*, 2005 ABCA 47, 361 A.R. 382, at para. 27).

(b)   *Economic Integration*

**92**   Another group of factors, related to those in the first group, concerns the degree of economic interdependence and integration that characterized the parties' relationship (*Birmingham*; *Pettkus*; *Nasser*). The more extensive the integration of the couple's finances, economic interests and economic well-being, the more likely it is that they should be considered as having been engaged in a joint family venture. For example, the existence of a joint bank account that was used as a "common purse", as well as the fact that the family farm was operated by the family unit, were key factors in Dickson J.'s analysis in *Rathwell*. The sharing of expenses and the amassing of a common pool of savings may also be relevant considerations (see *Wilson; Panara*).

**93**   The parties' conduct may further indicate a sense of collectivity, mutuality, and prioritization of the overall welfare of the family unit over the individual interests of the individual members (McCamus, at p. 366). These and other factors may indicate that the economic well-being and lives of the parties are largely integrated (see, for example, *Pettkus*, at p. 850).

(c)   *Actual Intent*

**94**   Underpinning the law of unjust enrichment is an appropriate concern for the autonomy of the parties, and this is a particularly important consideration in relation to domestic partnerships. While domestic partners might not marry for a host of reasons, one of them may be the deliberate choice not to have their lives economically intertwined. Thus, in considering whether there is a joint family venture, the actual intentions of the parties must be given considerable weight. Those intentions may have been expressed by the parties or may be inferred from their conduct. The important point, however, is that the quest is for their actual intent as expressed or inferred, not for what in the court's view "reasonable" parties *ought* to have intended in the same circumstances. Courts must be vigilant not to impose their own views, under the guise of inferred intent, in order to reach a certain result.

**95**   Courts may infer from the parties' conduct that they intended to share in the wealth they jointly created (P. Parkinson, "Beyond *Pettkus* v. *Becker*: Quantifying Relief for Unjust Enrichment" (1993), 43 U.T.L.J. 217, at p. 245). The conduct of the parties may show that they intended the domestic and professional spheres of their lives to be part of a larger, common venture (*Pettkus*; *Peter*; *Sorochan*). In some cases, courts have explicitly labelled the relationship as a "partnership" in the social and economic sense (*Panara*, at para. 71; *McDougall*, at para. 14). Similarly, the intention to engage in a joint family venture may be inferred where the parties accepted that their relationship was "equivalent to marriage" (*Birmingham*, at para. 1), or where the parties held themselves out to the public as married (*Sorochan*). The stability of the relationship may be a relevant factor as may the length of cohabitation (*Nasser*; *Sorochan*; *Birmingham*). When parties have lived together in a stable relationship for a lengthy period, it may be nearly impossible

to engage in a precise weighing of the benefits conferred within the relationship (*McDougall*; *Nasser*).

**96**    The title to property may also reflect an intent to share wealth, or some portion of it, equitably. This may be the case where the parties are joint tenants of property. Even where title is registered to one of the parties, acceptance of the view that wealth will be shared may be evident from other aspects of the parties' conduct. For example, there may have been little concern with the details of title and accounting of monies spent for household expenses, renovations, taxes, insurance, and so on. Plans for property distribution on death, whether in a will or a verbal discussion, may also indicate that the parties saw one another as domestic and economic partners.

**97**    The parties' actual intent may also negate the existence of a joint family venture, or support the conclusion that particular assets were to be held independently. Once again, it is the parties' actual intent, express or inferred from the evidence, that is the relevant consideration.

(d)    *Priority of the Family*

**98**    A final category of factors to consider in determining whether the parties were in fact engaged in a joint family venture is whether and to what extent they have given priority to the family in their decision making. A relevant question is whether there has been in some sense detrimental reliance on the relationship, by one or both of the parties, for the sake of the family. As Professor McCamus puts it, the question is whether the parties have been "[p]roceeding on the basis of understandings or assumptions about a shared future which may or may not be articulated" (p. 365). The focus is on contributions to the domestic and financial partnership, and particularly financial sacrifices made by the parties for the welfare of the collective or family unit. Whether the roles of the parties fall into the traditional wage earner/homemaker division, or whether both parties are employed and share domestic responsibilities, it is frequently the case that one party relies on the success and stability of the relationship for future economic security, to his or her own economic detriment (Parkinson, at p. 243). This may occur in a number of ways including: leaving the workforce for a period of time to raise children; relocating for the benefit of the other party's career (and giving up employment and employment-related networks as a result); foregoing career or educational advancement for the benefit of the family or relationship; and accepting underemployment in order to balance the financial and domestic needs of the family unit.

**99**    As I see it, giving priority to the family is not associated exclusively with the actions of the more financially dependent spouse. The spouse with the higher income may also make financial sacrifices (for example, foregoing a promotion for the benefit of family life), which may be indicative that the parties saw the relationship as a domestic and financial partnership. As Professor Parkinson puts it, the joint family venture may be identified where

> [o]ne party has encouraged the other to rely to her detriment by leaving the
> workforce or forgoing other career opportunities for the sake of the relationship,
> and the breakdown of the relationship leaves her in a worse position than she

would otherwise have been had she not acted in this way to her economic
detriment. [p. 256].

    (6)    <u>Summary of *Quantum Meruit* Versus Constructive Trust</u>

**100**    I conclude:

    1.    The monetary remedy for unjust enrichment is not restricted to an award based
on a fee-for-services approach.

    2.    Where the unjust enrichment is most realistically characterized as one party
retaining a disproportionate share of assets resulting from a joint family venture,
and a monetary award is appropriate, it should be calculated on the basis of the
share of those assets proportionate to the claimant's contributions.

    3.    To be entitled to a monetary remedy of this nature, the claimant must show both
(a) that there was, in fact, a joint family venture, and (b) that there is a link
between his or her contributions to it and the accumulation of assets and/or
wealth.

    4.    Whether there was a joint family venture is a question of fact and may be
assessed by having regard to all of the relevant circumstances, including factors
relating to (a) mutual effort, (b) economic integration, (c) actual intent and (d)
priority of the family.

F. *Mutual Benefit Conferral*

    (1)    <u>Introduction</u>

**101**    As discussed earlier, the unjust enrichment analysis in domestic situations is often
complicated by the fact that there has been a mutual conferral of benefits; each party in almost all
cases confers benefits on the other: Parkinson, at p. 222. Of course, a claimant cannot expect both to
get back something given to the defendant and retain something received from him or her: Birks, at
p. 415. The unjust enrichment analysis must take account of this common sense proposition. How
and where in the analysis should this be done?

**102**    The answer is fairly straightforward when the essence of the unjust enrichment claim is that
one party has emerged from the relationship with a disproportionate share of assets accumulated
through their joint efforts. These are the cases of a joint family venture in which the mutual efforts
of the parties have resulted in an accumulation of wealth. The remedy is a share of that wealth
proportionate to the claimant's contributions. Once the claimant has established his or her
contribution to a joint family venture, and a link between that contribution and the accumulation of
wealth, the respective contributions of the parties are taken into account in determining the
claimant's proportionate share. While determining the proportionate contributions of the parties is
not an exact science, it generally does not call for a minute examination of the give and take of daily

life. It calls, rather, for the reasoned exercise of judgment in light of all of the evidence.

**103**    Mutual benefit conferral, however, gives rise to more practical problems in an unjust enrichment claim where the appropriate remedy is a money award based on a fee-for-services-provided approach. The fact that the defendant has also provided services to the claimant may be seen as a factor relevant at all stages of the unjust enrichment analysis. Some courts have considered benefits received by the claimant as part of the benefit/detriment analysis (for example, at the Court of Appeal in *Peter v. Beblow* (1990), 50 B.C.L.R. (2d) 266). Others have looked at mutual benefits as an aspect of the juristic reason inquiry (for example, *Ford v. Werden* (1996), 27 B.C.L.R. (3d) 169 (C.A.), and the Court of Appeal judgment in *Kerr*). Still others have looked at mutual benefits in relation to both juristic reason and at the remedy stage (for example, as proposed in *Wilson*). It is apparent that some clarity and consistency is necessary with respect to this issue.

**104**    In my view, there is much to be said about the approach to the mutual benefit analysis mapped out by Huddart J.A. in *Wilson*. Specifically, I would adopt her conclusions that mutual enrichments should mainly be considered at the defence and remedy stages, but that they may be considered at the juristic reason stage to the extent that the provision of reciprocal benefits constitutes relevant evidence of the existence (or non-existence) of juristic reason for the enrichment (para. 9). This approach is consistent with the authorities from this Court, and provides a straightforward and just method of ensuring that mutual benefit conferral is fully taken into account without short-circuiting the proper unjust enrichment analysis. I will briefly set out why, in my view, this approach is sound.

**105**    At the outset, however, I should say that this Court's decision in *Peter* does not mandate consideration of mutual benefits at the juristic reason stage of the analysis: see, e.g., *Ford*, at para. 14; *Thomas v. Fenton*, 2006 BCCA 299, 269 D.L.R. (4th) 376, at para. 18. Rather, *Peter* made clear that mutual benefit conferral should generally not be considered at the benefit and detriment stages; the Court also approved the trial judge's decision to take mutual benefits into account at the remedy stage of the unjust enrichment analysis.

**106**    In *Peter*, the trial judge found that all three elements of unjust enrichment had been established. Before Ms. Peter and Mr. Beblow started living together, he had a housekeeper whom he paid $350 per month. When Ms. Peter moved in with her children and assumed the housekeeping and child-care responsibilities, the housekeeper was no longer required. The trial judge valued Ms. Peter's contribution by starting with the amount Mr. Beblow had paid his housekeeper, but then discounting this figure by one half to reflect the benefits Ms. Peter received in return. The trial judge then used that discounted figure to value Ms. Peter's services over the 12 years of the relationship: [1988] B.C.J. No. 887 (QL).

**107**    The Court of Appeal, at (1990), 50 B.C.L.R. (2d) 266, set aside the judge's finding on the basis that Ms. Peter had failed to establish that she had suffered a deprivation corresponding to the

benefits she had conferred on Mr. Beblow. The court reasoned that, although she had performed the services of a housekeeper and homemaker, she had received compensation because she and her children lived in Mr. Beblow's home rent free and he contributed more for groceries than she had.

**108**    This Court reversed the Court of Appeal and restored the trial judge's award. The Court was unanimous that Ms. Peter had established all of the elements of unjust enrichment, including deprivation. Cory J. (with whom McLachlin J. agreed on this point) made short work of Mr. Beblow's submission that Ms. Peter had not shown deprivation. He observed, "As a general rule, if it is found that the defendant has been enriched by the efforts of the plaintiff there will, almost as a matter of course be deprivation suffered by the plaintiff": at p. 1013. The Court also unanimously upheld the trial judge's approach of taking account of the benefits Ms. Peter had received at the remedy stage of his decision. As noted, the trial judge had reduced the monthly amount used to calculate Ms. Peter's award by 50 percent to reflect benefits she had received from Mr. Beblow. McLachlin J. did not disagree with this approach, holding at p. 1003 that the figure arrived at by the judge fairly reflected the value of Ms. Peter's contribution to the family assets. Cory J., at p. 1025, referred to the trial judge's approach as "a fair means of calculating the amount due to the appellant". Thus, the Court approved the approach of taking the mutual benefit issue into account at the remedy stage of the analysis. *Peter* therefore does not support the view that mutual benefits should be considered at the benefit/detriment or juristic reason stages of the analysis.

(2)    The Correct Approach

**109**    As I noted earlier, my view is that mutual benefit conferral can be taken into account at the juristic reason stage of the analysis, but only to the extent that it provides relevant evidence of the existence of a juristic reason for the enrichment. Otherwise, the mutual exchange of benefits should be taken into account at the defence and/or remedy stage. It is important to note that this can, and should, take place whether or not the defendant has made a formal counterclaim or pleaded set-off.

**110**    I turn first to why mutual benefits should not be addressed at the benefit/detriment stage of the analysis. In my view, refusing to address mutual benefits at that point is consistent with the *quantum meruit* origins of the fee-for-services approach and, as well, with the straightforward economic approach to the benefit/detriment analysis which has been consistently followed by this Court.

**111**    An unjust enrichment claim based on a fee-for-services approach is analogous to the traditional claim for *quantum meruit*. In *quantum meruit* claims, the fact that some benefit had flowed from the defendant to the claimant is taken into account by reducing the claimant's recovery by the amount of the countervailing benefit provided. For example, in a *quantum meruit* claim where the plaintiff is seeking to recover money paid pursuant to an unenforceable contract, but received some benefit from the defendant already, the claim will succeed but the award will be reduced by an amount corresponding to the value of that benefit: Maddaugh and McCamus (loose-leaf), vol. 2, at s. 13:200. The authors offer as an example *Giles v. McEwan* (1896), 11 Man.

R. 150 (Q.B. *en banc*). In that case, two employees recovered in *quantum meruit* for services provided to the defendant under an unenforceable agreement, but the amount of the award was reduced to reflect the value of benefits the defendant had provided to them. Thus, taking the benefits conferred by the defendant into account at the remedy stage is consistent with general principles of *quantum meruit* claims. Of course, if the defendant has pleaded a counterclaim or set-off, the mutual benefit issue must be resolved in the course of considering that defence or claim.

**112**    Refusing to take mutual benefits into account at the benefit/detriment stage is also supported by a straightforward economic approach to the benefit/detriment analysis which the Court has consistently followed. *Garland* is a good example. The class action plaintiffs claimed in unjust enrichment to seek restitution for late payment penalties that had been imposed but that this Court (in an earlier decision) found had been charged at a criminal rate of interest: see *Garland v. Consumers' Gas Co.*, [1998] 3 S.C.R. 112. The company argued that it had not been enriched because its rates were set by a regulatory mechanism out of its control, and that the rates charged would have been even higher had the company not received the late payment penalties as part of its revenues. That argument was accepted by the Court of Appeal, but rejected on the further appeal to this Court. Iacobucci J., for the Court, held that the payment of money, under the "straightforward economic approach" adopted in *Peter*, was a benefit: para. 32. He stated at para. 36: "There simply is no doubt that Consumers' Gas received the monies represented by the [late payment penalties] and had that money available for use in the carrying on of its business... .We are not, at this stage, concerned with what happened to this benefit in the ongoing operation of the regulatory scheme." The Court held that the company was in fact asserting the "change of position" defence (that is, the defence that is available when "an innocent defendant demonstrates that it has materially changed its position as a result of an enrichment such that it would be inequitable to require the benefit to be returned": para. 63). This defence is considered only after the three elements of an unjust enrichment claim have been established: para. 37. Thus the Court declined to get into a detailed consideration at the benefit/detriment stage of the defendant's submissions that it had not benefitted because of the regulatory scheme.

**113**    While *Garland* dealt with the payment of money, my view is that the same approach should be applied where the alleged enrichment consists of services. Provided that they confer a tangible benefit on the defendant, the services will generally constitute an enrichment and a corresponding deprivation. Whether the deprivation was counterbalanced by benefits flowing to the claimant from the defendant should not be addressed at the first two steps of the analysis. I turn now to the limited role that mutual benefit conferral may have at the juristic reason stage of the analysis.

**114**    As previously set out, juristic reason is the third of three parts to the unjust enrichment analysis. As McLachlin J. put it in *Peter*, at p. 990, "It is at this stage that the court must consider whether the enrichment and detriment, morally neutral in themselves, are 'unjust'." The juristic reason analysis is intended to reveal whether there is a reason for the defendant to retain the enrichment, not to determine its value or whether the enrichment should be set off against reciprocal benefits: *Wilson*, at para. 30. *Garland* established that claimants must show that there is no juristic

reason falling within any of the established categories, such as whether the benefit was a gift or pursuant to a legal obligation. If that is established, it is open to the defendant to show that a different juristic reason for the enrichment should be recognized, having regard to the parties' reasonable expectations and public policy considerations.

**115**    The fact that the parties have conferred benefits on each other may provide relevant evidence of their reasonable expectations, a subject that may become germane when the defendant attempts to show that those expectations support the existence of a juristic reason outside the settled categories. However, given that the purpose of the juristic reason step in the analysis is to determine whether the enrichment was just, not its extent, mutual benefit conferral should only be considered at the juristic reason stage for that limited purpose.

(3)    Summary

**116**    I conclude that mutual benefits may be considered at the juristic reason stage, but only to the extent that they provide evidence relevant to the parties' reasonable expectations. Otherwise, mutual benefit conferrals are to be considered at the defence and/or remedy stage. I will have more to say in the next section about how mutual benefit conferral and the parties' reasonable expectations may come into play in the juristic reason analysis.

G. *Reasonable or Legitimate Expectations*

**117**    The final point that requires some clarification relates to the role of the parties' reasonable expectations in the domestic context. My conclusion is that, while in the early domestic unjust enrichment cases the parties' reasonable expectations played an important role in the juristic reason analysis, the development of the law, and particularly the Court's judgment in *Garland*, has led to a more limited and clearly circumscribed role for those expectations.

**118**    In the early cases of domestic unjust enrichment claims, the reasonable expectations of the claimant and the defendant's knowledge of those expectations were central to the juristic reason analysis. For example, in *Pettkus*, when Dickson J. came to the juristic reason step in the analysis, he said that "where one person in a relationship tantamount to spousal prejudices herself in the reasonable expectation of receiving an interest in property and the other person in the relationship freely accepts benefits conferred by the first person in circumstances where he knows or ought to have known of that reasonable expectation, it would be unjust to allow the recipient of the benefit to retain it" (p. 849). Similarly, in *Sorochan*, at p. 46, precisely the same reasoning was invoked to show that there was no juristic reason for the enrichment.

**119**    In these cases, central to the Court's concern was whether it was just to require the defendant to pay -- in fact to surrender an interest in property -- for services not expressly requested. The Court's answer was that it would indeed be unjust for the defendant to retain the benefits, given that he had continued to accept the services when he knew or ought to have known that the claimant was providing them with the reasonable expectation of reward.

**120**    The Court's resort to reasonable expectations and the defendant's knowledge of them in these cases is analogous to the "free acceptance" principle. The notion of free acceptance has been invoked to extend restitutionary recovery beyond the traditional sorts of *quantum meruit* claims in which services had either been requested or provided under an unenforceable agreement. The law's traditional reluctance to provide a remedy for claims where no request was made was based on the tenet that a person should generally not be required, in effect, to pay for services that he or she did not request, and perhaps did not want. However, this concern carries much less weight when the person receiving the services knew that they were being provided, had no reasonable belief that they were a gift, and yet continued to freely accept them: see P. Birks, *Unjust Enrichment* (2nd ed. 2005), at pp. 56-57.

**121**    The need to engage in this analysis of the claimant's reasonable expectations and the defendant's knowledge thereof with respect to domestic services has, in my view, now been overtaken by developments in the law. *Garland*, as noted, mandated a two-step approach to the juristic reason analysis. The first step requires the claimant to show that the benefit was not conferred for any existing category of juristic reasons. Significantly, the fact that the defendant also provided services to the claimant is not one of the existing categories. Nor is the fact that the services were provided pursuant to the parties' reasonable expectations. However, the fact that the parties reasonably expected the services to be provided might afford relevant evidence in relation to whether the case falls within one of the traditional categories, for example a contract or gift. Other than in that way, mutual benefit conferral and the parties' reasonable expectations have a very limited role to play at the first step in the juristic reason analysis set out in *Garland*.

**122**    However, different considerations arise at the second step. Following *Peter* and *Garland*, the parties' reasonable or legitimate expectations have a critical role to play when the defendant seeks to establish a new juristic reason, whether case-specific or categorical. As Iacobucci J. put it in *Garland*, this introduces a category of residual situations in which "courts can look to all of the circumstances of the transaction in order to determine whether there is another reason to deny recovery" (para. 45). Specifically, it is here that the court should consider the parties' reasonable expectations and questions of policy.

**123**    It will be helpful in understanding how *Peter* and *Garland* fit together to apply the *Garland* approach to an issue touched on, but not resolved, in *Peter*. In *Peter*, an issue was whether a claim based on the provision of domestic services could be defeated on the basis that the services had been provided as part of the bargain between the parties in deciding to live together. While the Court concluded that the claim failed on the facts, it did not hold that such a claim would inevitably fail in all circumstances: p. 991. It seems to me that, in light of *Garland*, where a "bargain" which does not constitute a binding contract is alleged, the issue will be considered at the stage when the defendant seeks to show that there is a juristic reason for the enrichment that does not fall within any of the existing categories; the claim is that the "bargain" represents the parties' reasonable expectations, and evidence about their reasonable expectations would be relevant evidence of the existence (or not) of such a bargain.

**124**   To summarize:

1.   The parties' reasonable or legitimate expectations have little role to play in deciding whether the services were provided for a juristic reason within the existing categories.

2.   In some cases, the facts that mutual benefits were conferred or that the benefits were provided pursuant to the parties' reasonable expectations may be relevant evidence of whether one of the existing categories of juristic reasons is present. An example might be whether there was a contract for the provision of the benefits. However, generally the existence of mutual benefits flowing from the defendant to the claimant will not be considered at the juristic reason stage of the analysis.

3.   The parties' reasonable or legitimate expectations have a role to play at the second step of the juristic reason analysis, that is, where the defendant bears the burden of establishing that there is a juristic reason for retaining the benefit which does not fall within the existing categories. It is the mutual or legitimate expectations of both parties that must be considered, and not simply the expectations of either the claimant or the defendant. The question is whether the parties' expectations show that retention of the benefits is just.

**125**   I will now turn to the two cases at bar.

IV.   The *Vanasse* Appeal

*A. Introduction*

**126**   In the Vanasse appeal, the main issue is how to quantify a monetary award for unjust enrichment. The trial judge awarded a share of the net increase in the family's wealth during the period of unjust enrichment. The Court of Appeal held that this was the wrong approach, finding that the trial judge ought to have performed a *quantum meruit* calculation in which the value that each party received from the other was assessed and set off. This required an evaluation of the defendant Mr. Seguin's non-financial contributions to the relationship which, in the view of the Court of Appeal, the trial judge failed to perform. As the record did not permit the court to apply the correct legal principles to the facts, it ordered a new hearing with respect to compensation and consequential changes to spousal support.

**127**   In this Court, the appellant Ms. Vanasse raises two issues:

1.   Did the Court of Appeal err by insisting on a strict *quantum meruit* (i.e. "value received") approach to quantify the monetary award for unjust enrichment?

2.   Did the Court of Appeal err in finding that the trial judge had failed to consider relevant evidence of Mr. Seguin's contributions?

**128**    In my view, the appeal should be allowed and the trial judge's order restored. For the reasons I have developed above, my view is that money compensation for unjust enrichment need not always, as a matter of principle, be calculated on a *quantum meruit* basis. The trial judge here, although not labelling it as such, found that there was a joint family venture and that there was a link between Ms. Vanasse's contribution to it and the substantial accumulation of wealth which the family achieved. In my view, the trial judge made a reasonable assessment of the monetary award appropriate to reverse this unjust enrichment, taking due account of Mr. Seguin's undoubted and substantial contributions.

*B. Brief Overview of the Facts and Proceedings*

**129**    The background facts of this case are largely undisputed. The parties lived together in a common law relationship for approximately 12 years, from 1993 until March 2005. Together, they had two children who were aged 8 and 10 at the time of trial.

**130**    During approximately the first four years of their relationship (1993 to 1997), the parties diligently pursued their respective careers, Ms. Vanasse with the Canadian Security Intelligence Service ("CSIS") and Mr. Seguin with Fastlane Technologies Inc., marketing a network operating system he had developed.

**131**    In March of 1997, Ms. Vanasse took a leave of absence to move with Mr. Seguin to Halifax, where Fastlane had relocated for important business reasons. During the next three and one-half years, the parties had two children; Ms. Vanasse took care of the domestic labour, while Mr. Seguin devoted himself to developing Fastlane. The family moved back to Ottawa in 1998, where Mr. Seguin purchased a home and registered it in the names of both parties as joint tenants. In September 2000, Fastlane was sold and Mr. Seguin netted approximately $11 million. He placed the funds in a holding company, with which he continued to develop business and investment opportunities.

**132**    After the sale of Fastlane, Ms. Vanasse continued to assume most of the domestic responsibilities, although Mr. Seguin was more available to assist. He continued to manage the finances.

**133**    The parties separated on March 27, 2005. At that time, they were in starkly contrasting financial positions: Ms. Vanasse's net worth had gone from about $40,000 at the time she and Mr. Seguin started living together, to about $332,000 at the time of separation; Mr. Seguin had come into the relationship with about $94,000, and his net worth at the time of separation was about $8,450,000.

**134**    Ms. Vanasse brought proceedings in the Superior Court of Justice. In addition to seeking orders with respect to spousal support and child custody, Ms. Vanasse claimed unjust enrichment. She argued that Mr. Seguin had been unjustly enriched because he retained virtually all of the funds from the sale of Fastlane, even though she had contributed to their acquisition through benefits she

conferred in the form of domestic and childcare services. She alleged her contributions allowed Mr. Seguin to dedicate most of his time and energy to Fastlane. She sought relief by way of constructive trust in Mr. Seguin's remaining one half interest in the family home, and a one-half interest in the investment assets held by Mr. Seguin's holding company.

**135**    Mr. Seguin contested the unjust enrichment claim. While conceding he had been enriched during the roughly three-year period where he was working outside the home full time and Ms. Vanasse was working at home full time (May 1997 to September 2000), he argued there was no corresponding deprivation because he had given her a one-half interest in the family home and approximately $44,000 in Registered Retirement Saving Plans ("RRSPs"). In the alternative, Mr. Seguin submitted that a constructive trust remedy was inappropriate because there was no link between Ms. Vanasse's contributions and the property of Fastlane.

**136**    The trial judge, Blishen J., concluded that the relationship of the parties could be divided into three distinct periods: (1) From the commencement of cohabitation in 1993 until March 1997 when Ms. Vanasse left her job at CSIS; (2) From March 1997 to September 2000, during which both children were born and Fastlane was sold; and (3) From September 2000 to the separation of the parties in March 2005. She concluded that neither party had been unjustly enriched in the first or third periods; she held that their contributions to the relationship during these periods had been proportionate. In the first period, there were no children of the relationship and both parties were focused on their careers; in the third period, both parents were home and their contributions had been proportional.

**137**    In the second period, however, the trial judge concluded that Mr. Seguin had been unjustly enriched by Ms. Vanasse. Ms. Vanasse had been in charge of the domestic side of the household, including caring for their two children. She had not been a "nanny/housekeeper" and, as the trial judge held, throughout the relationship she had been at least "an equal contributor to the family enterprise". The trial judge concluded that Ms. Vanasse's contributions during this second period "significantly benefited Mr. Seguin and were not proportional" (para. 139).

**138**    The trial judge found as fact that Ms. Vanasse's efforts during this second period were directly linked to Mr. Seguin's business success. She stated, at para. 91, that

> Mr. Seguin was enriched by Ms. Vanasse's running of the household, providing child care for two young children and looking after all the necessary appointments and needs of the children. Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities. Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane. [Emphasis added.]

> Again at para. 137, the trial judge found that

> Mr. Seguin was unjustly enriched and Ms. Vanasse deprived for three and
> one-half years of their relationship, during which time Mr. Seguin often worked
> day and night and traveled frequently while in Halifax. <u>Mr. Seguin could not
> have succeeded, as he did, and built up the company, as he did, without Ms.
> Vanasse assuming the vast majority of childcare and household responsibilities.
> Mr. Seguin could not have devoted his time to Fastlane but for Ms. Vanasse's
> assumption of those responsibilities....</u> <u>Mr. Seguin reaped the benefit of Ms.
> Vanasse's efforts by being able to focus all of his considerable energies and
> talents on making Fastlane a success.</u> [Emphasis added.]

**139**    The trial judge concluded that a monetary award in this case was appropriate, given Mr.
Seguin's ability to pay, and lack of a sufficiently direct and substantial link between Ms. Vanasse's
contributions and Fastlane or Mr. Seguin's holding company, as required to impose a remedial
constructive trust.

**140**    With respect to quantification, Blishen J. noted that Ms. Vanasse had received a one-half
interest in the family home, but concluded that this was not adequate compensation for her
contributions. The trial judge compared the net worths of the parties and determined that Ms.
Vanasse was entitled to a one-half interest in the prorated increase in Mr. Seguin's net worth during
the period of the unjust enrichment. She reasoned that his net worth had increased by about $8.4
million dollars over the 12 years of the relationship. Although she noted that the most significant
increase took place when Fastlane was sold towards the end of the period of unjust enrichment, she
nonetheless prorated the increase over the full 12 years of the relationship, yielding a figure of about
$700,000 per year. Starting with the $2.45 million increase attributable to the three and one-half
years of unjust enrichment, the trial judge awarded Ms. Vanasse 50 percent of that amount, less the
value of her interest in the family home and her RRSPs. This produced an award of just under $1
million.

**141**    Mr. Seguin did not appeal Blishen J.'s unjust enrichment finding, and conceded unjust
enrichment between 1997 and 2000 on appeal. Therefore, the trial judge's findings that there had
been an unjust enrichment during that period and that there was no unjust enrichment during the
other periods are not in issue. The sole issue for determination in this Court is the propriety of the
trial judge's monetary award for the unjust enrichment which she found to have occurred.

C. *Analysis*

<div align="center">

(1) <u>Was the Trial Judge Required to Use a Q*uantum*
*Meruit A* pproach to Calculate the Monetary Award?</u>

</div>

**142**    I agree with the appellant that a monetary award for unjust enrichment need not, as a matter
of principle, always be calculated on a fee-for-services basis. As I have set out earlier, an unjust
enrichment is best characterized as one party leaving the relationship with a disproportionate share
of wealth that accumulated as a result of the parties' joint efforts. This will be so when the parties

were engaged in a joint family venture and where there is a link between the contributions of the claimant and the accumulation of wealth. When this is the case, the amount of the enrichment should be assessed by determining the claimant's proportionate contribution to that accumulated wealth. As the trial judge saw it, this was exactly the situation of Ms. Vanasse and Mr. Seguin.

   (2)  Existence of a Joint Family Venture

**143** The trial judge, after a six-day trial, concluded that "Ms. Vanasse was not a nanny/housekeeper". She found that Ms. Vanasse had been at least "an equal contributor to the family enterprise" throughout the relationship and that, during the period of unjust enrichment, her contributions "significantly benefited Mr. Seguin" (para. 139).

**144** The trial judge, of course, did not review the evidence under the headings that I have suggested will be helpful in identifying a joint family venture, namely "mutual effort", "economic integration", "actual intent" and "priority of the family". However, her findings of fact and analysis indicate that the unjust enrichment of Mr. Seguin at the expense of Ms. Vanasse ought to be characterized as the retention by Mr. Seguin of a disproportionate share of the wealth generated from a joint family venture. The judge's findings fit conveniently under the headings I have suggested.

   (a)  *Mutual Effort*

**145** There are several factors in this case which suggest that, throughout their relationship, the parties were working collaboratively towards common goals. First, as previously mentioned, the trial judge found that Ms. Vanasse's role was not as a "nanny/housekeeper" but rather as at least an equal contributor throughout the relationship. The parties made important decisions keeping the overall welfare of the family at the forefront: the decision to move to Halifax, the decision to move back to Ottawa, and the decision that Ms. Vanasse would not return to work after the sale of Fastlane are all clear examples. The parties pooled their efforts for the benefit of their family unit. As the trial judge found, during the second stage of their relationship from March 1997 to September 2000, the division of labour was such that Ms. Vanasse was almost entirely responsible for running the home and caring for the children, while Mr. Seguin worked long hours and managed the family finances. The trial judge found that it was through their joint efforts that they were able to raise a young family and acquire wealth. As she put it, "Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these responsibilities" (para. 91). While Mr. Seguin's long hours and extensive travel reduced somewhat in September 1998 when the parties returned to Ottawa, the basic division of labour remained the same.

**146** Notably, the period of unjust enrichment corresponds to the time during which the parties had two children together (in 1997 and 1999), a further indicator that they were working together to achieve common goals. The length of the relationship is also relevant, and their 12-year cohabitation is a significant period of time. Finally, the trial judge described the arrangement between the parties as a "family enterprise", to which Ms. Vanasse was "at least, an equal

contributor" (paras. 138-39).

>    (b)    *Economic Integration*

**147**    The trial judge found that "[t]his was not a situation of economic interdependence" (para. 105). That said, there was a pooling of resources. Ms. Vanasse was not employed and did not contribute financially to the family after the children were born, and thus was financially dependent on Mr. Seguin. The family home was registered jointly, and the parties had a joint chequing account. As the trial judge put it, "She was 'the C.E.O. of the kids' and he was 'the C.E.O. of the finances'" (para. 105).

>    (c)    *Actual Intent*

**148**    The actual intent of the parties in a domestic relationship, as expressed by the parties or inferred from their conduct, must be given considerable weight in determining whether there was a joint family venture. There are a number of findings of fact that indicate these parties considered their relationship to be a joint family venture.

**149**    While a promise to marry or the discussion of legal marriage is by no means a prerequisite for the identification of a joint family venture, in this case the parties' intentions with respect to marriage strongly suggest that they viewed themselves as the equivalent of a married couple. Mr. Seguin proposed to Ms. Vanasse in July 1996 and they exchanged rings. While they were "devoted to one another and still in love", a wedding date was never set (para. 14). Mr. Seguin raised the topic of marriage again when Ms. Vanasse found out she was pregnant with their first child. Although they never married, the trial judge found that there had been "mutual expectations [of marriage] during the first few years of their 12 year relationship" (para. 64). Mr. Seguin continued to address Ms. Vanasse as "my future wife", and she was viewed by the outside world as such (para. 33).

**150**    The trial judge also referred to statements made by Mr. Seguin that were strongly indicative of his view that there was a joint family venture. As the trial judge put it, at para. 28, upon the sale of Fastlane

>    Mr. Seguin became a wealthy man. He told Ms. Vanasse that they would never have to worry about finances as their parents did; their children could go to the best schools and they could live a good life without financial concerns.

>    Again, at para. 98:

>    >    After the sale of the company, Mr. Seguin indicated they could retire, the children could go to the best schools and the family would be well cared

for. The family took travel vacations, enjoyed luxury cars, bought a large cabin cruiser which they used for summer vacations and purchased condominiums at Mont-Tremblant.

**151**    While the trial judge viewed Mr. Seguin's promises and reassurances as contributing to a reasonable expectation on the part of Ms. Vanasse that she was to share in the increase of his net worth during the period of unjust enrichment, in my view these comments are more appropriately characterized as a reflection of the reality that there was a joint family venture, to which the couple jointly contributed for their mutual benefit and the benefit of their children.

(d)    *Priority of the Family*

**152**    There is a strong inference from the factual findings that, to Mr. Seguin's knowledge, Ms. Vanasse relied on the relationship to her detriment. As the trial judge found, in 1997 Ms. Vanasse gave up a lucrative and exciting career with CSIS, where she was training to be an intelligence officer, to move to Halifax with Mr. Seguin. In many ways this was a sacrifice on her part; she left her career, gave up her own income, and moved away from her family and friends. Mr. Seguin had moved to Halifax in order to relocate Fastlane for business reasons. Ms. Vanasse then stayed home and cared for their two small children. As I have already explained, during the period of the unjust enrichment, Ms. Vanasse was responsible for a disproportionate share of the domestic labour. It was these domestic contributions that, in part, permitted Mr. Seguin to focus on his work with Fastlane. Later, in 2003, the "family's decision" was for Ms. Vanasse to remain home after her leave from CSIS had expired (para. 198). Ms. Vanasse's financial position at the breakdown of the relationship indicates she relied on the relationship to her economic detriment. This is all evidence supporting the conclusion that the parties were, in fact, operating as a joint family venture.

**153**    As a final point, I would refer to the arguments made by Mr. Seguin, which were accepted by the Court of Appeal, that the trial judge failed to give adequate weight to sacrifices Mr. Seguin made for the benefit of the relationship. Later in my reasons, I will address the question of whether the trial judge actually failed in this regard. However, the points raised by Mr. Seguin to support this argument actually serve to reinforce the conclusion that there was a joint family venture. Mr. Seguin specifically notes a number of factors, including: agreeing to step down as CEO of Fastlane in September 1997 to make himself more available to Ms. Vanasse, causing friction with his co-workers and partners, and reducing his remuneration; agreeing to relocate to Ottawa at Ms. Vanasse's request in 1998; and making increased efforts to work at home more and travel less after moving back to Ottawa. These facts are indicative of the sense of mutuality in the parties' social and financial relationship. In short, they support the identification of a joint family venture.

(e)    *Conclusion on Identification of the Joint Family Venture*

**154**    In my view, the trial judge's findings of fact clearly show that Ms. Vanasse and Mr. Seguin engaged in a joint family venture. The remaining question is whether there was a link between Ms. Vanasse's contributions to it and the accumulation of wealth.

### (3)    Link to Accumulation of Wealth

**155**    The trial judge made a clear finding that there was a link between Ms. Vanasse's contributions and the family's accumulation of wealth.

**156**    I have referred earlier, in some detail, to the trial judge's findings in this regard. However, to repeat, her conclusion is expressed particularly clearly at para. 91 of her reasons:

> Mr. Seguin could not have made the efforts he did to build up the company but for Ms. Vanasse's assumption of these [household and child-rearing] responsibilities. Mr. Seguin reaped the benefits of Ms. Vanasse's efforts by being able to focus his time, energy and efforts on Fastlane.

**157**    Given that and similar findings, I conclude that not only were these parties engaged in a joint family venture, but that there was a clear link between Ms. Vanasse's contribution to it and the accumulation of wealth. The unjust enrichment is thus best viewed as Mr. Seguin leaving the relationship with a disproportionate share of the wealth accumulated as a result of their joint efforts.

### (4)    Calculation of the Award

**158**    The main focus of the appeal was on whether the award ought to have been calculated on a *quantum meruit* basis. Very little was argued before this Court regarding the way the trial judge approached her calculation of a proportionate share of the parties' accumulated wealth. I conclude that the trial judge's approach was reasonable in the circumstances, but I stress that I do not hold out her approach as necessarily being a template for future cases. Within the legal principles I have outlined, there may be many ways in which an award may be quantified reasonably. I prefer not to make any more general statements about the quantification process in the context of this appeal, except this. Provided that the correct legal principles are applied, and the findings of fact are not tainted by clear and determinative error, a trial judge's assessment of damages is treated with considerable deference on appeal: see, e.g., *Nance v. British Columbia Electric Railway Co*., [1951] A.C. 601 (P.C.). A reasoned and careful exercise of judgment by the trial judge as to the appropriate monetary award to remedy an unjust enrichment should be treated with the same deference. There are two final specific points that I must address.

**159**    Mr. Seguin submits, very briefly, that a proper application of the "value survived" approach in this case would require a careful determination of the contributions by third parties to the growth of Fastlane during the period his own contributions were diminished, as a result of what counsel characterizes as Ms. Vanasse's "demands" that he reduce his hours and move back to Ottawa. This argument is premised on the notion that the money he received from the sale was not justly his to share with Ms. Vanasse. I cannot accept this premise. Unexplained is why he received more than his share when the company was sold or why, having received more than he was due, Ms. Vanasse is still not entitled to an equitable share of what he actually received.

**160**    Second, there is the finding of the Court of Appeal that the trial judge failed to take into account evidence of Mr. Seguin's numerous and significant non-financial contributions to the family. I respectfully cannot accept this view. The trial judge specifically alluded to these contributions in her reasons. Moreover, by confining the period of unjust enrichment to the three and one-half year period, the trial judge took into account the periods during which Ms. Vanasse's contributions were not disproportionate to Mr. Seguin's. In my view, the trial judge took a realistic and practical view of the evidence before her and gave sufficient consideration to Mr. Seguin's contributions.

D. *Disposition*

**161**    I would allow the appeal, set aside the order of the Court of Appeal, and restore the order of the trial judge. The appellant should have her costs throughout.

      V.    The *Kerr* Appeal

A. *Introduction*

**162**    When their common law relationship of more than 25 years ended, Ms. Kerr sued her former partner, Mr. Baranow, advancing claims for unjust enrichment, resulting trust, and spousal support. Mr. Baranow counterclaimed that Ms. Kerr had been unjustly enriched by his housekeeping services provided between 1991 and 2006, and by his early retirement in order to provide her personal assistance. The trial judge awarded Ms. Kerr $315,000, holding that she was entitled to this amount both by way of resulting trust (to reflect her contribution to the acquisition of property) and by way of remedial constructive trust (as a remedy for her successful claim in unjust enrichment). He also awarded Ms. Kerr $1,739 per month in spousal support effective the date she commenced proceedings. Although the trial judge rejected Mr. Baranow's assertion that Ms. Kerr had been unjustly enriched at his expense, the reasons for judgment and the order after trial do not otherwise address Mr. Baranow's counterclaim.

**163**    Mr. Baranow appealed. The Court of Appeal allowed the appeal, concluding that Ms. Kerr's claims for a resulting trust and in unjust enrichment should be dismissed, that Mr. Baranow's claim for unjust enrichment should be remitted to the trial court for determination, and that the order for spousal support should be effective as of the first day of the trial, not as of the date proceedings were commenced.

**164**    Ms. Kerr appeals, submitting that the Court of Appeal erred by setting aside the trial judge's findings that:

      (1)    a resulting trust arose in her favour;
      (2)    she had unjustly enriched Mr. Baranow; and
      (3)    spousal support should begin as of the date she instituted proceedings.

**165**    In my view, the Court of Appeal was right to set aside the trial judge's findings of resulting trust and unjust enrichment. It also did not err in directing that Mr. Baranow's counterclaim be returned to the Supreme Court of British Columbia for hearing. However, my view is that Ms. Kerr's unjust enrichment claim should not have been dismissed, but rather a new trial ordered. While the trial judge's errors certainly were not harmless, it is not possible to say on this record, which includes findings of fact tainted by clear error, that her unjust enrichment claim would inevitably fail if analyzed using the clarified legal framework set out above. With respect to the commencement date of the spousal support order, I would set aside the order of the Court of Appeal and restore the trial judge's order.

B. *Overview of the Facts*

**166**    The trial judge's disposition of both the resulting trust and unjust enrichment claims turned on his conclusion that Ms. Kerr had provided $60,000 worth of equity and assets at the beginning of the relationship. This fact, in the trial judge's view, supported awarding her one-third of the value of the home she shared with Mr. Baranow at the time of separation. According to the trial judge, this $60,000 of equity and assets consisted of three elements: her $37,000 of equity in the Coleman Street home she had shared with her former husband; the value of an automobile; and the value of furniture which she brought into her relationship with Mr. Baranow. The trial judge did not make specific findings of fact about the value of either Ms. Kerr's or Mr. Baranow's non-monetary contributions to the relationship. As previously noted, while the judge rejected in a single sentence Mr. Baranow's contention that Ms. Kerr had been unjustly enriched at his expense, the judge did not explain the basis of that conclusion. Mr. Baranow's counterclaim was not otherwise addressed.

**167**    The trial judge's findings of fact, of course, must be accepted unless tainted with clear and determinative error. In this case, however, the Court of Appeal's intervention on some of the judge's key findings was justified, because those findings simply were not supported by the record. I will have to delve into the facts, more than might otherwise be required, to explain why.

**168**    The parties began to live together in Mr. Baranow's home on Wall Street in Vancouver in May 1981. Shortly afterward, they moved into Ms. Kerr's former matrimonial home on Coleman Street. They had met at their mutual place of work, the Port of Vancouver, where she worked as a secretary and he as a longshoreman. Ms. Kerr was in midst of a divorce. Through her separation agreement, Ms. Kerr received her husband's interest in their former matrimonial home on Coleman Street in North Vancouver, all of the furniture in the house, and a 1979 Cadillac Eldorado. However, Ms. Kerr's ex-husband owed more than $400,000 and Ms. Kerr was guarantor of some of that debt.

**169**    In the summer of 1981, the Coleman Street property was the subject of foreclosure proceedings and, according to the evidence, was about to be foreclosed on July 29, 1981. Ms. Kerr testified at trial that, at the time, she had two teenage children, was earning under $30,000 a year, and had no money to save the house.

**170**    Ms. Kerr instructed her lawyer to place the titles to the Coleman Street property and the vehicle into Mr. Baranow's name. Mr. Baranow paid $33,000 in cash to secure the property against outstanding debts, and guaranteed a $100,000 mortgage at a rate of 22 percent. He then began to make the mortgage payments and eventually refinanced the mortgage, together with that on his Wall Street property, and assumed that new mortgage himself.

**171**    The couple lived together for the next 25 years, first in the Wall Street property, then at Coleman Street, then in a temporary apartment, and finally in their "dream home" which they constructed on Mr. Baranow's Wall Street property.

**172**    While the parties lived together in the Coleman Street property (from September 1981 to December 1985), Mr. Baranow retained the $450 per month he received by renting out his Wall Street property. The trial judge found that, although the parties kept their financial affairs separate, there was an arrangement by which Mr. Baranow would pay the property taxes and mortgage payments on both the Coleman Street and the Wall Street properties. The mortgage on both properties was paid off before July 1985. However, Mr. Baranow took out a $32,000 mortgage on the Wall Street property in July 1985, which was paid in full by August 1988.

**173**    The Coleman Street property was sold in August 1985 for $138,000. This sale was at a considerable loss, taking into account the real estate commission, the $33,000 in cash Mr. Baranow had contributed at the time of the transfer to him, and the mortgage payments he alone had made between the transfer in the summer of 1981 and the sale in the summer of 1985.

**174**    The parties moved into an apartment (from August 1985 until October 1986) while they constructed their "dream home" at the Wall Street location. The existing dwelling was torn down and replaced. Mr. Baranow spent somewhere between $97,000 and $105,000 on its construction, with additional amounts spent for materials, labour and permits. Ms. Kerr, the trial judge found, was involved with the planning, interior decorating and cleaning. She also planted sod, tended the flower garden, and paid for some wood paneling in the downstairs bedroom. In addition, she made contributions towards the purchase of furniture, appliances, and other chattels for the Wall Street property. Her son paid $350 per month in rent, which Mr. Baranow retained. At one point in his reasons, the trial judge stated that Ms. Kerr paid "all of the household expenses and the insurance on the new house ... even after the $32,000.00 mortgage was paid off by [Mr. Baranow] in August 1988" (para. 24). However, at another point, the judge noted that Ms. Kerr paid the utilities and insurance and bought "some groceries" (para. 36). Mr. Baranow, he found, paid the property-related expenses, consisting of property taxes (less the disability benefit attributable to Ms. Kerr) and upkeep (which was minimal in the new house). The trial judge found that the current value of the Wall Street property was $942,500, compared with $205,000 in October of 1986. He then concluded that, given there were no mortgage payments after 1988, Ms. Kerr's share of the expenses "was probably higher" than Mr. Baranow's for approximately 18 years before they stopped living together.

**175**    In 1991, Ms. Kerr suffered a massive stroke and cardiac arrest, leaving her paralyzed on her left side and unable to return to work. Her health steadily deteriorated, and relations between the couple became increasingly strained. Mr. Baranow took an early retirement in 2002. The trial judge acknowledged that Mr. Baranow claimed to have done this to care for Ms. Kerr, but noted that early retirement was also favourable to him. The trial judge found that Mr. Baranow started to experience "caregiver fatigue" and began exploring institutional care alternatives in June 2005. The next summer, in August 2006, Ms. Kerr had to undergo surgery on her knee. After the surgery, Mr. Baranow made it clear to the hospital staff that he was not prepared to have her return home. Ms. Kerr was transferred to an extended care facility where she remained at the time of trial. The trial judge found that, in the last 18 months Ms. Kerr resided at the Wall Street property, Mr. Baranow did most of the housework and helped her with her bodily functions.

C. *Analysis*

> (1)    The Resulting Trust Issue

**176**    The trial judge found that Mr. Baranow held a one-third interest in the Wall Street property by way of resulting trust for Ms. Kerr, on three bases. The Court of Appeal found that each of these holdings was erroneous. I respectfully agree.

> (a)    *Gratuitous Transfer*

**177**    The trial judge found that the transfer of the Coleman Street property to Mr. Baranow was gratuitous, therefore raising the presumption of a resulting trust in Ms. Kerr's favour. At the time of transfer to Mr. Baranow, roughly $133,000 was required to save the property (it was subject to a first mortgage of just under $80,000, a second mortgage of just under $35,000, a judgment in favour of the Bank of Montreal of just under $12,000, and other miscellaneous debts and charges, adding up to roughly $133,000). There was also a $26,500 judgment in favour of CIBC, which was of concern to Ms. Kerr, although it is not listed in the payouts required to close the transfer. We know that Ms. Kerr had guaranteed some of her former husband's debts, and that she declared bankruptcy in 1983 in relation to $15,000 of debt for which she had co-signed with her former husband.

**178**    The Court of Appeal reversed the trial judge's resulting trust finding, holding that the transfer was not gratuitous. The court pointed to the contributions and liabilities undertaken by Mr. Baranow to make the transfer possible, and concluded that the trial judge's finding in this regard constituted a palpable and overriding error.

**179**    On this point, I respectfully agree with the Court of Appeal. There is no dispute that Mr. Baranow injected roughly $33,000 in cash, and guaranteed a $100,000 mortgage, so that the property would not be lost to the bank in the foreclosure proceedings. This constituted consideration, and the transfer therefore cannot reasonably be labelled gratuitous. The respondent would have us hold otherwise on the basis of technical arguments about the lack of a precise coincidence between the time of the transfer and payments, and the lack of payment directly to Ms.

Kerr because Mr. Baranow's payments were made to her creditors. These arguments have no merit. An important element of the trial judge's finding of a resulting trust was his conclusion that there was "no evidence" that Mr. Baranow's payment of $33,000 in cash and his guarantee of the $100,000 mortgage "were in connection with the transfer or part of an agreement between the parties so as to constitute consideration for the transfer" (para. 76). Putting to one side for the moment whether this finding reflects a correct understanding of a gratuitous transfer, the judge clearly erred in making this statement; there was in fact much evidence to that precise effect. Mr. Baranow testified that Ms. Kerr had "tearfully asked" Mr. Baranow for help to save the property from the creditors. Ms. Kerr's solicitor recorded in his reporting letter that Ms. Kerr felt she had little choice but to convey the property to Mr. Baranow "faced with the large outstanding debts of [her] husband which include[d] a Judgment taken by C.I.B.C. for a debt outstanding in the amount of $26,500.00". At trial, Ms. Kerr was asked whether she had requested Mr. Baranow to save the house; she responded, "I guess so". Thus, contrary to the judge's finding, there was in fact considerable evidence that Mr. Baranow's paying off the debts and guaranteeing the mortgage were in connection with the transfer of the property to him. This evidence shows that he accepted the transfer and assumed the financial obligations at Ms. Kerr's request, and in order to further her purpose of preventing the creditors from foreclosing on the property.

**180**    The Court of Appeal was correct to intervene on this point and conclude that the transfer was not gratuitous. The trial judge's imposition of a resulting trust on one-third of the Wall Street property on this basis accordingly cannot be sustained.

(b)    *Ms. Kerr's Contributions*

**181**    The trial judge also based his finding of resulting trust on Ms. Kerr's financial and other contributions to the acquisition of the new home on the Wall Street property. He found Ms. Kerr had contributed a total of $60,000: $37,000 in equity from the transfer of the Coleman Street property to Mr. Baranow; $20,000 for the value of the Cadillac also transferred to Mr. Baranow; and $3,000 for the furniture in the Coleman Street property. In addition, the trial judge noted that, in obtaining the legal title of Coleman, Mr. Baranow was able to "re-mortgage both properties for $116,000.00 and apply the $16,000.00 toward the acquisition of the Wall Street Property" (para. 82). Furthermore, Mr. Baranow would not have been able to pay off the mortgages with the same efficiency but for Ms. Kerr's contributions to household expenses. However, the trial judge did not attach any value to these last two matters in his determination of the extent of the resulting trust which he imposed on the Wall Street property.

**182**    The Court of Appeal reversed this finding as not being supported by the record. The court noted that Ms. Kerr did not have $37,000 in equity in the Coleman Street property when Mr. Baranow took title, Mr. Baranow did not receive any beneficial interest in the vehicle, and there was no evidence of the value of the furnishings.

**183**    I agree with the Court of Appeal's disposition of this issue. As it pointed out, the evidence

showed that, in addition to Mr. Baranow paying cash and guaranteeing a mortgage, he paid the monthly mortgage payments, taxes and upkeep expenses on the Coleman property until it was sold in 1985 for $138,000 (less real estate commission). Mr. Baranow received no beneficial interest in the vehicle and the judge made no finding about the value of the furnishings. There was not, in any meaningful sense of the word, any equity in the Coleman property for Ms. Kerr to contribute to the acquisition or improvement of the Wall Street property. I would affirm the conclusion of the Court of Appeal on this point.

(c) *Common Intention Resulting Trust*

**184**    The trial judge also appears to have based his conclusions about the resulting trust on his finding of a common intention on the part of Ms. Kerr and Mr. Baranow to share in the Wall Street property. For the reasons I have given earlier, the "common intention" resulting trust has no further role to play in the resolution of disputes such as this one. I would hold that a resulting trust should not have been imposed on the Wall Street property on the basis of a finding of common intention between these parties.

(d)    *Conclusion With Respect to Resulting Trust*

**185**    In my view the Court of Appeal was correct to set aside the trial judge's conclusions with respect to the resulting trust issues.

(2)    Unjust Enrichment

**186**    The trial judge also found that Mr. Baranow had been unjustly enriched by Ms. Kerr to the extent of $315,000, the value of the one-third interest in the Wall Street property determined during the resulting trust analysis. The judge found that Ms. Kerr had provided the following benefits to Mr. Baranow:

      a.    $37,000 equity in the Coleman Street property
      b.    the automobile
      c.    the furnishings
      d.    $16,000 in refinancing permitted by the Coleman transfer and applied to the Wall Street property
      e.    $22,000 gained on the resale of the Coleman Street property
      f.    household expenses and insurance paid on both properties
      g.    spousal services such as housework, entertaining guests and preparing meals until Ms. Kerr's disability made it impossible to continue
      h.    assistance with planning and decoration of the Wall Street house
      i.    financial contributions towards the purchase of chattels for the new home
      j.    a disability tax exemption
      k.    approximately five years' worth of rental income from Ms. Kerr's son

**187**    Turning to the element of corresponding deprivation, the trial judge noted that it was "unlikely" that Ms. Kerr had given up any career or educational opportunities over the course of the relationship. Furthermore, her income remained unchanged, even following her stroke, due to her receipt of disability pensions and other benefits. The judge found that she had lived rent-free for the entire relationship. He concluded, however, that she had suffered a deprivation because, had she not contributed her equity in the Coleman Street property, it was "reasonable to infer that she would have used it to purchase an asset in her own name, invest for her own benefit, use it for some personal interest, or otherwise avail herself of beneficial financial opportunity": para. 92. He also concluded, without elaboration, that the benefits that she received from the relationship did not overtake her contributions.

**188**    The Court of Appeal set aside the trial judge's finding of unjust enrichment. It found that Mr. Baranow's direct and indirect contributions, by which Ms. Kerr was enriched and for which he was not compensated, constituted a juristic reason for any enrichment which he experienced at her expense. The court found that, for reasons mentioned earlier, there was no $60,000 contribution by Ms. Kerr and therefore her claim rested on her indirect contributions. The court also concluded that the trial judge's analysis failed to assess the extent of Mr. Baranow's direct and indirect contributions to Ms. Kerr, including: his payment of accommodation expenses for the duration of the relationship; his contribution to the purchase price of the van which Ms. Kerr still possesses; her receipt of almost half of his lifetime amount of union medical benefits, used to pay for her health care expenses; his taking early retirement with a reduced monthly pension to care for Ms. Kerr; and his provision of extensive personal caregiver and domestic services without compensation. Moreover, in the Court of Appeal's view, the trial judge had failed to note that Mr. Baranow's payment of her living expenses permitted her to save about $272,000 over the course of the relationship.

**189**    The appellant challenges the Court of Appeal's decision on two bases. First, she argues that the court improperly interfered with the trial judge's finding of fact with respect to Ms. Kerr's $60,000 contribution to the relationship. Second, she submits that the court improperly considered the question of mutual benefits through the lens of juristic reason, and that this resulted in the court failing to consider globally who had been enriched and who deprived. Ms. Kerr's submission on this latter point is that consideration of mutual benefit conferral should occur during the first two steps of the unjust enrichment analysis: enrichment and corresponding deprivation. Once that has been established, she argues that the legitimate expectations of the parties may be considered as part of the analysis of whether there was a juristic reason for the enrichment. The main point is that, in the appellant's submission, it was open to the trial judge to conclude that the parties' legitimate expectation was that they would accumulate wealth in proportion to their respective incomes; without a share of the value of the real property acquired during the relationship, that reasonable expectation cannot be realized.

**190**    More fundamentally, the appellant urges the Court to adopt what she calls the "family property approach" to unjust enrichment. In essence, the appellant submits that her contributions

gave rise to a reasonable expectation that she would have an equitable share of the assets acquired during the relationship.

**191**    I will deal with these submissions in turn.

(a)    *Findings of Fact Regarding the $60,000 Contribution*

**192**    As noted earlier, the Court of Appeal was right to set aside the trial judge's conclusion that the appellant had contributed $60,000 to the couple's assets. There was, in no realistic sense of the word, any "equity" to contribute from the Coleman Street property to acquisition of the new Wall Street "dream home". Furthermore, the appellant retained the beneficial use of the motor vehicle, and there was no satisfactory evidence of the value of the furniture. The judge's findings on this point were the product of clear and determinative error.

(b)    *Analysis of Offsetting Enrichments*

**193**    On this issue, I cannot accept the conclusions of either the trial judge or the Court of Appeal. As noted, in his determination of the extent of Ms. Kerr's unjust enrichment, the trial judge largely ignored Mr. Baranow's contributions. However, for the reasons I have developed earlier, the Court of Appeal erred in assessing Mr. Baranow's contributions as part of the juristic reason analysis; this analysis prematurely truncated Ms. Kerr's *prima facie* case of unjust enrichment. I have set out the correct approach to this issue earlier in my reasons. As, in my view, there must be a new trial of both Ms. Kerr's unjust enrichment claim and Mr. Baranow's counterclaim, it is not necessary to say anything further. The principles set out above must accordingly be applied at the new trial of these issues.

(c) *The "Family Property Approach"*

**194**    I turn finally to Ms. Kerr's more general point that her claim should be assessed using a "family property approach". As set out earlier in my reasons, for Ms. Kerr to show an entitlement to a proportionate share of the wealth accumulated during the relationship, she must establish that Mr. Baranow has been unjustly enriched at her expense, that their relationship constituted a joint family venture, and that her contributions are linked to the generation of wealth during the relationship. She would then have to show what proportion of the jointly accumulated wealth reflects her contributions. Of course, this clarified template was not available to the trial judge or to the Court of Appeal. However, these requirements are quite different than those advanced by the appellant and accordingly her "family property approach" must be rejected.

(d)    *Disposition of the Unjust Enrichment Appeal*

**195**    I conclude that the findings of the trial judge in relation to unjust enrichment cannot stand. The next question is whether, as the Court of Appeal decided, Ms. Kerr's claim for unjust enrichment should be dismissed or whether it ought to be returned for a new trial. With reluctance, I

have concluded the latter course is the more just one in all of the circumstances.

**196**    The first consideration in support of a new trial is that the Court of Appeal directed a hearing of Mr. Baranow's counterclaim. Given that the trial judge unfortunately did not address that claim in any meaningful way, the Court of Appeal's order that it be heard and decided is unimpeachable. There was evidence that Mr. Baranow made very significant contributions to Ms. Kerr's welfare such that his counterclaim cannot simply be dismissed. As I noted earlier, the trial judge also referred to various other monetary and non-monetary contributions which Ms. Kerr made to the couple's welfare and comfort, but he did not evaluate them, let alone compare them with the contributions made by Mr. Baranow. In these circumstances, trying the counterclaim separated from Ms. Kerr's claim would be an artificial and potentially unfair way of proceeding.

**197**    More fundamentally, Ms. Kerr's claim was not presented, defended or considered by the courts below pursuant to the joint family venture analysis that I have set out. Even assuming that Ms. Kerr made out her claim in unjust enrichment, it is not possible to fairly apply the joint family venture approach to this case on appeal, using the record available to this Court. There are few findings of fact relevant to the key question of whether the parties' relationship constituted a joint family venture. Moreover, even if one were persuaded that the evidence permitted resolution of the joint family venture issue, the record is unsatisfactory for deciding whether Ms. Kerr's contributions to a joint family venture were linked to the accumulation of wealth and, if so, in what proportion. The trial judge found that her payment of household expenses and insurance payments, along with the "proceeds" from the Coleman Street property, allowed Mr. Baranow to pay off the $116,000 mortgage on both properties before July 1985. There is, thus, a finding that her contributions were linked to the accumulation of wealth, given that the Wall Street property was valued at $942,500 at the time of trial. However, as the judge's findings with respect to Ms. Kerr's equity in the Coleman Street property cannot stand, this conclusion is considerably undermined. For much the same reason, there is no possibility on this record of evaluating the proportionate contributions to a joint family venture. In short, to attempt to resolve Ms. Kerr's unjust enrichment claim on its merits, using the record before this Court, involves too much uncertainty and risks injustice.

**198**    In this respect, the *Kerr* appeal is in marked contrast to the *Vanasse* appeal. There, an unjust enrichment was conceded and the trial judge's findings of fact closely correspond to the analytical approach I have proposed. In the present appeal, while the findings made do not appear to demonstrate a joint family venture or a concomitant link to accumulated wealth, it would be unfair to reach that conclusion without giving an opportunity to the parties to present their evidence and arguments in light of the approach set out in these reasons.

**199**    Reluctantly, therefore, I would order a new trial of Ms. Kerr's unjust enrichment claim, as well as affirm the Court of Appeal's order for a hearing of Mr. Baranow's counterclaim.

        (3)   Effective Date of Spousal Support

**200**    The final issue is whether, as the Court of Appeal held, the trial judge erred in making his

order for spousal support in favour of Ms. Kerr effective on the date she had commenced proceedings rather than on the first day of trial. In my respectful view, the Court of Appeal erred in its application of the relevant factors and ought not to have set aside the trial judge's order.

**201**    The trial judge found that the appellant's income in 2006 was $28,787 and the respondent's income was $70,520, on the basis of their respective income tax returns. He then applied the Spousal Support Advisory Guidelines ("SSAG") to arrive at a range of $1,304 to $1,739 per month. He settled on an amount at the higher end of that range in order to assist Ms. Kerr in pursuing a private bed while waiting for a subsidized bed in a suitable facility closer to her family.

**202**    The Court of Appeal agreed with the trial judge that Ms. Kerr was entitled to an award of spousal support given the length of the parties' relationship, her age, her fixed and limited income and her significant disability; she was entitled to a spousal support award that would permit her to live at a lifestyle that is closer to that which the parties enjoyed when they were together; and that the judge had properly determined the quantum of support. The Court of Appeal concluded, however, that the trial judge had erred in ordering support effective the date Ms. Kerr had commenced proceedings. It faulted the judge in several respects: for apparently having made the order as a matter of course rather than applying the relevant legal principles; for failing to consider that, during the interim period, Ms. Kerr had no financial needs beyond her means because she had been residing in a government- subsidized care facility and had not had to encroach on her capital; for failing to take account of the fact she had made no demand of Mr. Baranow to contribute to her interim support and had provided no explanation for not having done so; and for ordering retroactive support where, in light of the absence of an interim application, there was no blameworthy conduct on Mr. Baranow's part.

**203**    The appellant submits that the decision to equate the principles pertaining to retroactive spousal support with those of retroactive child support has been done without any discussion or legal analysis. Furthermore, she argues that the Court of Appeal's reasoning places an untoward and inappropriate burden on applicants, essentially mandating that they apply for interim spousal support or lose their entitlement. Lastly, she argues that there is a legal distinction between retroactive support before and after the application is filed, and that in the latter circumstance there is less need for judicial restraint. I agree with the second and third of these submissions.

**204**    There is no doubt that the trial judge had the discretion to award support effective the date proceedings had been commenced. This is clear from the British Columbia *Family Relations Act*, R.S.B.C. 1996, c. 128 ("*FRA*"), s. 93(5)(d):

> (5)    An order under this section may also provide for one or more of the following:
>
> ...
>
> (d)    payment of support in respect of <u>any period before the order is made</u>;

**205**    The appellant requested support effective the date her writ of summons and statement of claim were issued and served. She was and is not seeking support for the period before she commenced her proceedings, or for any period during which another court order for support was in effect. I note that she was obliged by statute to seek support within a year of the end of cohabitation: s. 1(1), definition of "spouse" para. (b), of the *FRA*. Ms. Kerr made her application just over a month after the parties ceased living together.

**206**    I will not venture into the semantics of the word "retroactive": see *D.B.S. v. S.R.G.*, 2006 SCC 37, [2006] 2 S.C.R. 231, at paras. 2 and 69-70; *S.(L.) v. P.(E.)* (1999), 67 B.C.L.R. (3d) 254, (C.A.), at paras. 55-57. Rather, I prefer to follow the example of Bastarache J. in *D.B.S.* and consider the relevant factors that come into play where support is sought in relation to a period predating the order.

**207**    While *D.B.S.* was concerned with child as opposed to spousal support, I agree with the Court of Appeal that similar considerations to those set out in the context of child support are also relevant to deciding the suitability of a "retroactive" award of spousal support. Specifically, these factors are the needs of the recipient, the conduct of the payor, the reason for the delay in seeking support and any hardship the retroactive award may occasion on the payor spouse. However, in spousal support cases, these factors must be considered and weighed in light of the different legal principles and objectives that underpin spousal as compared with child support. I will mention some of those differences briefly, although certainly not exhaustively.

**208**    Spousal support has a different legal foundation than child support. A parent-child relationship is a fiduciary relationship of presumed dependency and the obligation of both parents to support the child arises at birth. It that sense, the entitlement to child support is "automatic" and both parents must put their child's interests ahead of their own in negotiating and litigating child support. Child support is the right of the child, not of the parent seeking support on the child's behalf, and the basic amount of child support under the *Divorce Act*, R.S.C. 1985, c. 3 (2nd Supp.), (as well as many provincial child support statutes) now depends on the income of the payor and not on a highly discretionary balancing of means and needs. These aspects of child support reduce somewhat the strength of concerns about lack of notice and lack of diligence in seeking child support. With respect to notice, the payor parent is or should be aware of the obligation to provide support commensurate with his or her income. As for delay, the right to support is the child's and therefore it is the child's, not the other parent's position that is prejudiced by lack of diligence on the part of the parent seeking child support: see *D.B.S.*, at paras. 36-39, 47-48, 59, 80 and 100-104. In contrast, there is no presumptive entitlement to spousal support and, unlike child support, the spouse is in general not under any legal obligation to look out for the separated spouse's legal interests. Thus, concerns about notice, delay and misconduct generally carry more weight in relation to claims for spousal support: see, for example, M.L. Gordon, "Blame Over: Retroactive Child and Spousal Support in the Post-Guideline Era" (2004-2005), 23 C.F.L.Q. 243, at pp. 281 and 291-92.

**209**    Where, as here, the payor's complaint is that support could have been sought earlier, but was

not, there are two underlying interests at stake. The first relates to the certainty of the payor's legal obligations; the possibility of an order that reaches back into the past makes it more difficult to plan one's affairs and a sizeable "retroactive" award for which the payor did not plan may impose financial hardship. The second concerns placing proper incentives on the applicant to proceed with his or her claims promptly (see *D.B.S.*, at paras. 100-103).

**210**    Neither of these concerns carries much weight in this case. The order was made effective the date on which the proceedings seeking relief had been commenced, and there was no interim order for some different amount. Commencement of proceedings provided clear notice to the payor that support was being claimed and permitted some planning for the eventuality that it was ordered. There is thus little concern about certainty of the payor's obligations. Ms. Kerr diligently pursued her claim to trial and that being the case, there is little need to provide further incentives for her or others in her position to proceed with more diligence.

**211**    In *D.B.S.*, Bastarache, J. referred to the date of effective notice as the "general rule" and "default option" for the choice of effective date of the order (paras. 118 and 121; see also para. 125). The date of the initiation of proceedings for spousal support has been described by the Ontario Court of Appeal as the "usual commencement date", absent a reason not to make the order effective as of that date: *MacKinnon v. MacKinnon* (2005), 75 O.R. (3d) 175, at para. 24. While in my view, the decision to order support for a period before the date of the order should be the product of the exercise of judicial discretion in light of the particular circumstances, the fact that the order is sought effective from the commencement of proceedings will often be a significant factor in how the relevant considerations are weighed. It is important to note that, in *D.B.S.*, all four litigants were requesting that child support payments reach back to a period in time preceding their respective applications; such is not the case here.

**212**    Other relevant considerations noted in *D.B.S.* include the conduct of the payor, the circumstances of the child (or in the case of spousal support, the spouse seeking support), and any hardship occasioned by the award. The focus of concern about conduct must be on conduct broadly relevant to the support obligation, for example concealing assets or failing to make appropriate disclosure: *D.B.S.*, at para. 106. Consideration of the circumstances of the spouse seeking support, by analogy to the *D.B.S.* analysis, will relate to the needs of the spouse both at the time the support should have been paid and at present. The comments of Bastarache J. at para. 113 of *D.B.S.* may be easily adapted to the situation of the spouse seeking support: "A [spouse] who underwent hardship in the past may be compensated for this unfortunate circumstance through a retroactive award. On the other hand, the argument for retroactive [spousal] support will be less convincing where the [spouse] already enjoyed all the advantages (s)he would have received [from that support]". As for hardship, there is the risk that a retroactive award will not be fashioned having regard to what the payor can currently afford and may disrupt the payor's ability to manage his or her finances. However, it is also critical to note that this Court in *D.B.S.* emphasized the need for flexibility and a holistic view of each matter on its own merits; the same flexibility is appropriate when dealing with "retroactive" spousal support.

**213**    In light of these principles, my view is that the Court of Appeal made two main errors.

**214**    First, it erred by finding that the circumstances of the appellant were such that there was no need prior to the trial. The trial judge found, and the Court of Appeal did not dispute, that the appellant was entitled to non-compensatory spousal support, at the high end of the range suggested by the SSAG, for an indefinite duration. Entitlement, quantum, and the indefinite duration of the order were not appealed before this Court. It is clear that Ms. Kerr was in need of support from the respondent at the date she started her proceedings and remained so at the time of trial. The Court of Appeal rightly noted the relevant factors, such as her age, disability, and fixed income. However, the Court of Appeal did not describe how Ms. Kerr's circumstances had changed between the commencement of proceedings and the date of trial, nor is any such change apparent in the trial judge's findings of fact. As I understand the record, one of the objectives of the support order was to permit Ms. Kerr to have access to a private pay bed while waiting for her name to come up for a subsidized bed in a suitable facility closer to her son's residence. From the date she commenced her proceedings until the date of trial, she resided in the Brock Fahrni Pavilion in a government-funded extended care bed in a room with three other people. In my respectful view, her need was constant throughout the period. If the Court of Appeal's rationale was that Ms. Kerr's need would only arise once she actually had secured the private pay bed, its decision to make the order effective the first day of trial seems inconsistent with that approach. The Court of Appeal did not suggest that her need was any different on that day than on the day she had commenced her proceedings. Nor did the court point to any financial hardship that the trial judge's award would have on Mr. Baranow.

**215**    Respectfully, the Court of Appeal erred in principle in setting aside the judge's order effective as of the date of commencement of proceedings on the ground that Ms. Kerr had no need during that period, while upholding the judge's findings of need in circumstances that were no different from those existing at the time proceedings were commenced.

**216**    Second, the Court of Appeal in my respectful view was wrong to fault Ms. Kerr for not bringing an interim application, in effect attributing to her unreasonable delay in seeking support for the period in question. Ms. Kerr commenced her proceedings promptly after separation and, in light of the fact that the trial occurred only about thirteen months afterward, she apparently pursued those proceedings to trial with diligence. There was thus clear notice to Mr. Baranow that support was being sought and he could readily take advice on the likely extent of his liability. Given the high financial, physical, and emotional costs of interlocutory applications, especially for a party with limited means and a significant disability such as Ms. Kerr, it was in my respectful view unreasonable for the Court of Appeal to attach such serious consequences to the fact that an interim application was not pursued. The position taken by the Court of Appeal to my way of thinking undermines the incentives which should exist on parties to seek financial disclosure, pursue their claims with due diligence, and keep interlocutory proceedings to a minimum. Requiring interim applications risks prolonging rather than expediting proceedings. The respondent's argument based on the fact that a different legal test would have applied at the interim support stage is unconvincing. After a full trial on the merits, the trial judge made clear and now unchallenged

findings of need on the basis of circumstances that had not changed between commencement of proceedings and trial.

**217**    In short, there was virtually no delay in applying for maintenance, nor was there any inordinate delay between the date of application and the date of trial. Ms. Kerr was in need throughout the relevant period, she suffered from a serious physical disability, and her standard of living was markedly lower than it was while she lived with the respondent. Mr. Baranow had the means to provide support, had prompt notice of her claim, and there was no indication in the Court of Appeal's reasons that it considered the judge's award imposed on him a hardship so as to make that award inappropriate.

**218**    While it is regrettable that the judge did not elaborate on his reasons for making the order effective as of the date proceedings had been commenced, the relevant legal principles applied to the facts as he found them support the making of that order and the Court of Appeal erred in holding otherwise.

**219**    In summary, I conclude that the Court of Appeal erred in setting aside the portion of the judge's order for support between the commencement of proceedings and the beginning of trial. I would restore the order of the trial judge making spousal support effective September 14, 2006.

D. *Disposition*

**220**    I would allow the appeal in part. Specifically, I would:

    a.   allow the appeal on the spousal support issue and restore the order of the trial judge with respect to support;

    b.   allow the appeal with respect to the Court of Appeal's decision to dismiss Ms. Kerr's unjust enrichment claim and order a new trial of that claim;

    c.   dismiss the appeal in relation to Ms. Kerr's claim of resulting trust and the ordering of a new hearing of Mr. Baranow's counterclaim and affirm the order of the Court of Appeal in relation to those issues.

**221**    As Ms. Kerr has been substantially successful, I would award her costs throughout.

*Appeal 33157 allowed in part with costs.*

*Appeal 33358 allowed with costs.*

**Solicitors:**

*Solicitors for the appellant Margaret Kerr: Hawthorne, Piggott & Company, Burnaby.*

*Solicitor for the respondent Nelson Baranow: Susan G. Label, Vancouver.*

*Solicitors for the appellant Michele Vanasse: Nelligan O'Brien Payne, Ottawa.*

*Solicitors for the respondent David Seguin: MacKinnon & Phillips, Ottawa.*

*Case Name:*

# MacKEEN ESTATE v. NOVA SCOTIA

[**1978] N.S.J. No. 570**

89 D.L.R. (3d) 426

28 N.S.R. (2d) 3

[1978] C.T.C. 557

2 E.T.R. 264

43 A.P.R. 3*

[1978] 2 A.C.W.S. 524

Nova Scotia Supreme Court Appeal Division

**MacKeigan, C.J.N.S., Cooper, J.A., and Glube, J.**

June 28, 1978

(14 pages) (38 paras.)

**CASES JUDICIALLY NOTICED:**

Inland Revenue v. Duke of Westminster, [1936] A.C. 1, ref'd to. [para. 12].
Minister of National Revenue v. Smith, 11 N.R. 192, [1975] D.T.C. 5242, ref'd to. [para. 13].
Montreal Trust Company v. Minister of National Revenue, [1958] S.C.R. 146, ref'd to. [para. 19].
Rodwell Securities Ltd. v. Inland Revenue Commissioners, [1968] 1 All E.R. 257, dist. [para. 24].

**STATUTES JUDICIALLY NOTICED:**

Succession Duty Act, S.N.S. 1972, c. 17, s. 2(5), 8 [para.
[*page5] 10].

**COUNSEL:**

J.J. ROBINETTE, Q.C., D.A. STEWART, Q.C., RICHARD K. JONES, for the appellants

T.B. SMITH, Q.C., J.W. KAVANAGH, Q.C., ALISON BUTLER, for the respondent

---

This appeal was heard by MacKEIGAN, C.J.N.S., COOPER, J.A., and GLUBE, J., at Halifax, Nova Scotia, on November 16 and 17, 1977 and May 9, 1978.

The judgment of the Nova Scotia Court of Appeal was delivered by MacKEIGAN, C.J.N.S., on June 28, 1978.

**1**    MacKEIGAN, C.J.N.S.:-- The primary issue on this appeal is whether a bequest by the late Colonel J.C. MacKeen, intended by him to be enjoyed by his wife, Dorothy, for her lifetime and then to be enjoyed equally by his four daughters, escaped Nova Scotia succession duty by reason of the corporate devices employed. Mrs. MacKeen and three daughters, Sally Norwood, Catherine Burkart and Christina Shaw, were resident in Nova Scotia when Colonel MacKeen died in Nova Scotia on September 30, 1972. A fourth daughter, Jane Fagan, resided in Massachusetts; the will gave her her portion on her mother's death without any corporate intervention, since she as a non-resident needed no shield from Nova Scotia taxation in respect of her succession to personal property situate in Alberta.

**2**    The assets so bequethed consisted of all the issued common shares of Rockingham Investments Ltd., an Alberta company, and a promissory note made by that company in favour of Colonel MacKeen for $ 1,715,211.21, all of which are referred to in the will as the "Rockingham Securities". The share certificates were physically situate in and transferable only in Alberta. The note was also physically situate in Alberta and payable in Alberta.

**3**    The testator bequeathed the above assets to his executors to hold in trust and to pay the net income derived therefrom during the life of his wife, Dorothy MacKeen, to another Alberta company, Point Pleasant Investments Ltd., a wholly-owned subsidiary of Francklyn Investments Ltd., an Alberta company, all of whose common shares are owned by Mrs. MacKeen.

**4**    On Mrs. MacKeen's death, the executors are to divide the assets into four equal parts: one to be paid to Jane Fagan [*page6] and the other three parts to Alberta companies, as follows:

"(1) One quarter to Chester Investments Ltd., a wholly-owned subsidiary of Blue Water Investments Ltd., all of whose common shares are owned by Sally Norwood;

  (2)    One quarter to Citadel Investments Ltd., a wholly-owned subsidiary of Iberian Investments Ltd., all of whose common shares are owned by Catherine Burkart;

  (3)    One quarter to Sambro Investments Ltd, a wholly-owned subsidiary of Hollis Investments Ltd, all of whose common shares are owned by Christina Shaw."

**5**    The bequests to Chester, Citadel and Sambro provided that if the bequests were void or failed to take effect they should go to the respective daughters. In that event, if at the time of the division of the estate any daughter was not living, "her equal part shall be transferred to her issue then living in equal shares per stirpes".

**6**    The nine Alberta companies referred to above have the same officers and directors, all lawyers resident in Alberta. The share certificates, share registers and head offices of all companies are situate in Alberta.

**7**    In each of the four parent companies, ten voting common shares are held by the Nova Scotia women (Francklyn - Dorothy MacKeen; Blue Water - Sally Norwood; Iberian - Catherine Burkart; and Hollis - Christina Shaw) and each of the three Alberta directors has ten voting preferred shares of the par value of $ 1.00 each.

**8**    The Alberta companies were incorporated June 23, 1972, after the enactment of the Succession Duties Act of Nova Scotia, Stats. N.S. 1972, c. 17.

**9**    Following Colonel MacKeen's death the Minister assessed the estate for succession duty in the sum of $ 483,443.91 plus interest. He alleged that Dorothy MacKeen, Sally Norwood, Catherine Burkart and Christina Shaw were "successors" to the amounts of $ 509,791.50, $ 281,462.65, $ 281,462.65 and $ 281,462.65, respectively, pursuant to s. 2(5)(b) of the Act. Following confirmation by the Minister, the appellants applied to the Supreme Court asking that the assessment be set aside. The Honourable Mr. Justice G.L.S. Hart in chambers held that [*page7] the said persons were successors and that the Act was intra vires the Province of Nova Scotia [see 25 N.S.R.(2d) 572, 36 A.P.R. 572]. From that decision the appellants have appealed.

**10**    The relevant sections of the Act are s. 1(ae) defining "successor", s. 8, which provides by s-s. (2) that a successor resident in the province must pay duty on property of the deceased situate outside the province and s. 2(5) which deems resident shareholders of non-resident corporations to be successors. These sections are:

"1(ae) 'successor' in relation to any property of the deceased includes any person who, at any time before or on or after the death of the deceased became or becomes beneficially entitled to any property of the deceased

      (i)    by virtue of, or conditionally or contingently on, the death of the deceased, or ...

[Then follow alternative clauses as to property passing otherwise than by will]

8(1) Subject as hereafter otherwise provided, duty shall be paid on all property of a deceased that is situated, at the time of the death of the deceased, within the Province.

      (2)    Subject as hereafter otherwise provided, where property of a deceased was situated

outside the Province at the time of the death of a deceased and the successor to any of the property of the deceased was a resident at the time of the death of the deceased, duty shall be paid by the successor in respect of that property to which he is the successor.

2(5) Where a corporation which is not resident in the Province, other than a corporation without share capital, by reason of the death of a deceased acquires or becomes beneficially entitled to property of the deceased,

    (a)    the corporation shall be deemed not to be the successor of the property except to the extent that the value of the shares of the shareholders of the corporation is not increased in value by the corporation acquiring or becoming beneficially entitled to the property; and [*page8]

    (b)    each of the shareholders of the corporation shall be deemed to be a successor of property of the deceased to the extent of the amount by which the value of his shares in the corporation is increased by the corporation acquiring or becoming beneficially entitled to the property."

**11**    I do not find particularly helpful some of the arguments advanced by both sides as to the interpretation of taxing statutes such as the Act before us. The respondent [Minister of Finance] has, in effect, asked us to conclude that, since Colonel MacKeen clearly intended to avoid taxation of his estate by Nova Scotia, we should interpret the Act broadly to stretch the taxation net to make sure that so-called corporate "devices" do not permit his heirs to escape fair contribution to the tax burden which must be borne by other residents of the province where the deceased's fortune was mainly accumulated. On the other hand, and similarly logically irrelevant, are the appellants' suggestions that come close to implying that the heirs of the deceased should be rewarded for the ingenuity of Colonel MacKeen's legal advisers to escape taxation.

**12**    The appellants emphasize the oft-quoted obiter dicta of Lord Tomlin in Commissioners of Inland Revenue v. Duke of Westminster, [1936] A.C. 1, at p. 19, as follows:

"Every man is entitled if he can to order his affairs so as that the tax attaching under the appropriate Acts is less than it otherwise would be. If he succeeds in ordering them so as to secure this result, then, however unappreciative the Commissioners of Inland Revenue or his fellow taxpayers may be of his ingenuity, he cannot be compelled to pay an increased tax."

**13**    Similarly, Urie, J., for the Federal Court of Appeal in Minister of National Revenue v. Smith, 11 N.R. 192, [1975] D.T.C. 5242, at p. 5248, said that "every taxpayer is entitled to so manage his affairs as to minimize the incidence of tax payable".

**14**    I respectfully agree with Mr. Justice Hart who, after a very thorough review of the authorities, said:

"... I must be guided by the plain meaning of the statute as a whole. Before any tax is attracted by the Act the meaning must be clear and unambiguous so that the taxpayer is clearly brought within the wording of [*page9] the statute. The Court in a case of this sort is not permitted as in a Court of Equity to interpret the legislation so as to be fair and just to the Crown or other taxpayers, but must not be so restrictive in its interpretation as to prefer matters of form to those of substance coming clearly within the meaning of the Act.

I do not believe that the Court has any right to set aside bona fide transactions obviously designed for the avoidance of tax on the ground that they are artificial and designed to minimize or avoid payment of tax. The jurisprudence which has arisen around the provisions of Part 16 of the Income Tax Act, which deals with tax evasion and avoidance, does not apply here since those provisions are not contained in the Nova Scotia Succession Duty Act. The argument of the Crown that the scheme of distribution adopted by Colonel MacKeen was patently designed to avoid the provisions of the Act and that the Court should therefore interpret the Act so as to catch the taxpayer must fail, and what remains to be determined is whether or not the taxpayer has successfully brought himself outside the ambit of the legislation."

**15**    I would, however, modify the last sentence to read that what is to be determined is whether or not the statute has successfully brought the taxpayer within its ambit.

**16**    The plain or natural meaning of the legislation must be sought, uninfluenced by ethical or political biases or presumptions and unaffected by either the legislator's wish to ensure fair taxation of estates acquired in Nova Scotia or by the testator's wish to escape such taxation. Moral obligations are irrelevant in the face of the amorality of a taxing statute. The issue is simple: has the legislature used words which in their plain meaning embrace the bequests?

**17**    The widow and daughters of the deceased were not shareholders of the subsidiary corporations which by the will receive an interest from the estate. The respective parent corporations were the shareholders of the receiving subsidiary corporations. The widow and daughters were thus not shareholders of non-resident corporations which "acquired" property of the deceased within the meaning of s. 2(5).

**18**    The issue is then whether the parent corporations can be said to have become "beneficially entitled" to the property by [*page10] virtue of their subsidiaries having acquired it. If so, the widow and daughters become deemed successors and as such dutiable in respect of the increased value of their shares.

**19**    The learned chambers judge relied on Montreal Trust Company v. Minister of National Revenue, [1958] S.C.R. 146 (the Torrance Estate case), where Rand, J., at p. 149, said:

"Mr. Marler for the appellants urged as the test to determine whether a successor had become 'beneficially entitled to any property' that formulated by Wynn-Parry J. in In Re Miller's Agreement; Uniacke v. Attorney General. The test was, that it must be 'postulated of him [the successor] that he

has a right to sue for and recover such property'. If the word 'recover' extends to the application of money to one's benefit, and 'sue for' to an ultimate and alternative resort as the effective cause of payment, I am disposed to accept it."

**20**    Mr. Justice Hart concluded (and I respectfully agree):

"In my opinion the Legislature of Nova Scotia in using the expression 'Where a corporation ... becomes beneficially entitled to property of the deceased' it was using it in the broad sense to cover the situation where the corporation is put in a position to ultimately exercise the rights of ownership over property of the deceased. It would be unnecessary to use additional words such as 'directly or indirectly' or 'is controlled by' to effect its purpose. 'Becomes beneficially entitled to' is broad enough to cover situations in which the property is registered in another name or held in trust or placed in any form in which the corporation can legally recover the property for its own benefit.

The subsidiary companies which received the bequests from Colonel MacKeen were in all cases wholly owned subsidiaries of their parents. There is no doubt in my mind that the parent corporations could cause the subsidiaries to be wound up and the value of their assets would then belong to the parent corporations. The bequest of Colonel MacKeen could legally be brought into the entire control of the parent companies, and to the extent that the shares of the parent companies were increased in value the resident shareholders of those companies would be deemed to be successors to the property of the deceased." [*page11]

**21**    I agree that being "entitled" to property means being able to "legally recover" it, that is, in the present context, to have the right and power, by lawful means, to fully enjoy the property. The adverb "beneficially" indicates that the person entitled to enjoyment of the property may not have full legal title.

**22**    In the modern sense of the phrase, a person is "beneficially entitled" to property if he is the real or beneficial owner of it, even though it is in someone else's name as nominal owner. The nominal owner of the property, whether real property, choses in action or other personal property, has legal title to it. The real owner, the person "beneficially entitled" to it, can require the nominal owner to let him use or have possession of the property, or to give him the income from it, or otherwise to let him have the benefit and enjoyment of it. He usually can require the nominal owner to convert the property into another form or to transfer the legal title to some other nominal owner. Above all, he is able, unless restricted by the terms of a specific trust, to call on the nominal owner to convey the property to him and to transfer its legal title to him, the real owner. If he does so, he will then fully acquire the property by achieving full ownership and will cease to be merely beneficially entitled to it.

**23**    Sometimes the respective rights and duties of the beneficial owner and the nominal owner may be spelled out in a formal trust agreement. When company shares are issued to a nominal shareholder, the solicitor will usually have him sign at least a short declaration of trust, attached to the share certificate, declaring that he holds it for the beneficial owner and that he will transfer it if

requested to do so. Indeed, such declarations of trust were executed by the directors of the MacKeen subsidiary companies in respect of their qualifying shares in those companies. In other cases, a trust or agency arrangement may be oral. Again, the relationship may be inferred from the control exercised by the beneficial owner over the nominal owner, as sometimes where a wholly-owned private investment company holds in its name investments of the owner of the company.

**24**    It seems to me apparent that a company may, depending on its make-up and status, become the beneficial owner of the assets of its subsidiary, and thus be beneficially entitled to them within the meaning of the latter phrase as used in the Succession Duty Act. I respectfully consider inapplicable, and, indeed, not quite accurate, the following dicta of Pennycuick, [*page12] J., in Rodwell Securities Ltd. v. Inland Revenue Commissioners, [1968] 1 All E.R. 257, at p. 260, a case on which the appellants strongly relied:

"According to the legal meaning of the words, a company is not the beneficial owner of the assets of its own subsidiary."

That case involved the meaning of "beneficial owner" under a very different statute involving a very different corporate set-up. The learned judge construed that phrase in the section before him as not equating ownership and control because of other sections dealing specifically with control.

**25**    Here, in considering control, we must be concerned with the facts of the particular case before us--the status and relations of these companies and their shareholders immediately after Colonel MacKeen's death. By reason of that death, each subsidiary company acquired from his estate property in expectancy and became the nominal owner of that property. The parent of each MacKeen subsidiary wholly owns and controls that subsidiary. The parent by that control has the right and power to cause the subsidiary to pass any necessary shareholder and director resolutions, and to convey and transfer the property to it, with any transfer documents completed.

**26**    Mrs. MacKeen's subsidiary, Point Pleasant Investments Ltd., on Colonel MacKeen's death, could be called on to pass resolutions and to assign to the parent company, Francklyn Investments Ltd., any income received by it from the executors. Francklyn, in turn, could be caused to distribute that income to Mrs. MacKeen.

**27**    The subsidiary companies of the MacKeen daughters receive no immediate interest until Mrs. MacKeen's death. Nevertheless, each could be called upon after Colonel MacKeen's death to assign to its parent company its future right to receive a share of the estate, or, upon Mrs. MacKeen's death, to transfer the portion of the "Rockingham Securities" then received by it.

**28**    In each case the subsidiary company in assigning or transferring to its parent its share in the estate would thus distribute its entire capital and assets to its parent, just as if it had been formally wound up. It would be thus quite unnecessary, although legally quite possible, for the parent to cause the subsidiary to be formally wound up, as suggested [*page13] by Mr. Justice Hart.

**29**    Each parent and each subsidiary is an investment company. Each, according to the agreed statement of facts, engaged in no "activity" between incorporation and Colonel MacKeen's death, except to issue its own shares, and, in the case of each parent, to become beneficial owner of the issued shares of its subsidiary. No subsidiary company has, as an ordinary trading company would have had, any minority shareholders, any creditors (not even the Department of National Revenue), any employees, or any customers, whose interests might have to be considered before it could lawfully distribute capital or transfer assets and whose interests might well be protected by bankruptcy law or other preferential legislation or rules of law.

**30**    Each parent company on Colonel MacKeen's death became the beneficial owner of the interest in his estate which was at that time acquired by its respective subsidiary, the nominal owner of that interest. Each parent company thus became "beneficially entitled" to that interest.

**31**    The conclusion that each parent company is, by the ordinary, plain meaning of the words, "beneficially entitled" to the estate interest acquired by its subsidiary, is reinforced by the consideration that by the combined operation of s. 1 (ae) and s. 2(5) each parent, on the facts of this case, is in any event deemed to be so "beneficially entitled".

**32**    Let me explain. By s. 2(5) each MacKeen parent company is, as the sole beneficial shareholder of its subsidiary, undoubtedly deemed to be the successor in respect of the property bequeathed to that subsidiary. A "successor" by s. 1(ae) is declared to be a person who "becomes beneficially entitled" to property of the deceased on his death. The parent company, having been deemed a successor by s. 2(5), must then by s. 1(ae) be deemed to be a person beneficially entitled to the property in question.

**33**    Turning again to s. 2(5) and applying it again, the parent company is a non-resident corporation. It is a "successor" via its subsidiary. By the combined effect of s. 2(5) and s. 1(ae), as above, it must therefore be itself deemed to have become beneficially entitled to the property. Accordingly its shareholder "shall be deemed to be a successor" of the property. [*page14]

**34**    Accordingly, both on the plain meaning of s. 2(5) and on the statutorily deemed effect of it, I conclude, as did Mr. Justice Hart, namely:

"... Francklyn Investments Limited, Bluewater Investments Limited, Iberian Investments Limited and Hollis Investments Limited are non-resident corporations which by reason of the death of Colonel MacKeen became beneficially entitled to property of the deceased as a consequence of bequests to their subsidiaries, and that Dorothy MacKeen, Sally Norwood, Catherine Burkart and Christina Shaw, the sole common shareholders of those companies, were residents of Nova Scotia at the time of his death and shall be deemed to be successors to the property of the deceased to the extent of the amount by which the value of their shares are increased by the parent corporations having become beneficially entitled to the property."

**35**    Three secondary arguments of the appellants should be mentioned but can be briefly disposed

of:

"(1) I cannot accept the contention that the subsidiary companies "acquired" no interest in Colonel MacKeen's estate because the property was given by his will to his executors in trust and not directly bequeathed to the subsidiaries. Section 1(w) of the Act defines "property":

    (w)    'property' means property of every description whatever, whether real or personal, movable or immovable, or corporeal or incorporeal, and without restricting the generality of the foregoing, includes

    (i)    any estate or interest in any such property, a right of any kind whatever and a chose in action, and

    (ii)    money.

The subsidiaries clearly received an "estate or interest".

    (2)    Similarly, I reject the claim that the subsidiaries, other than Point Pleasant (Mrs. MacKeen's subsidiary) neither acquired nor became beneficially entitled to any interest in "Rockingham Securities" because the bequests [*page15] to each of them are conditional or contingent on the gifts taking effect and not being void, with gifts over to the respective daughters, subject to the further contingency that the daughters be alive at the time of division or have issue then alive. Again, the interests, albeit contingent and future interests, are nevertheless "property" within the scope of the definition and thus "property" within the meaning of that word as used in s. 2(5).

    (3)    The appellants point out that Mrs. MacKeen and her three daughters hold ten common shares each of the respective parent companies and do not have voting control of those companies. Three Alberta lawyers, nominal shareholders of the subsidiary companies, each hold, apparently beneficially, ten voting preferred shares of $ 1.00 par value of the parent companies. Thus the common shareholders could not force the lawyers to cause the subsidiaries to do anything, e.g., make gifts to the parents. I respectfully can see no relevancy in the lack of full formal control by the common shareholders. We were concerned in the foregoing discussion whether the parent had the power and the right to direct the subsidiary, which it undoubtedly has, and not whether Colonel MacKeen's wife or daughters could be prevented by the Alberta lawyers from personally enjoying the bequests in due course--an almost unthinkable possibility."

**36**    The appellants also contended, as they did in the court below, that s. 2(5) is ultra vires the Province of Nova Scotia. I fully agree with Mr. Justice Hart that the section is intra vires and I respectfully adopt his reasons in which he reviewed the relevant authorities and the opposing arguments and concluded:

"The Nova Scotia Succession Duty Act under s. 8 makes resident successors to property of deceased persons situate outside the Province liable for payment of succession duties. Section 2 s-s. (5) deems the shareholders of non-resident corporations becoming beneficially entitled to property

of deceased persons as a result of their death to be successors to the extent of the increase in value of their shareholdings. In my opinion this is clearly direct taxation upon residents of the Province and establishes a method for the calculation of the benefit being received by the successor. It is not taxation on property outside the Province but rather on [*page16] persons within the Province to the extent to which they have been benefited by transfers to non-resident corporations."

**37**    I add that the legislation does not affect transmission in Alberta or title to personal property situate in Alberta. It does not seek to tax a beneficiary with respect to personal property passing to him by virtue of a transmission under the law of another province; here the beneficiaries became entitled under Nova Scotia law.

**38**    The appeal should be dismissed with costs.

Appeal dismissed.

*Case Name:*

# MARCHANDS RO-NA INC. v. TEFAL S.A.

[1981] F.C.J. No. 1146

14 B.L.R. 123

55 C.P.R. (2d) 27

8 A.C.W.S. (2d) 71

Federal Court, Trial Division

**Addy J.**

Judgment: March 9, 1981

(21 paras.)

**Counsel:**

*F. Grenier*, for applicant.

*D. R. Bereskin*, for respondent.

---

**1    ADDY J.**:--Pursuant to s. 57 of the *Trade Marks Act*, R.S.C. 1970, c. T-10, the applicant, by originating notice of motion filed on March 30, 1978, requests that trade mark T-FAL & Design registered on March 9, 1962, as No. 125,726 (hereinafter called "the first mark") and trade mark T-FAL registered on January 9, 1970, as No. 167,233 (hereinafter called "the second mark") be expunged from the register of trade marks. The only difference between the two marks was that the second mark was merely a name mark, while the first one included a simple design consisting of the word T-FAL in block form printing with two parallel lines one above and one below the word "T-FAL".

**2    The applicant is a Quebec corporation and the respondent Tefal S.A., formerly known as Société Anonyme dite Tefal and also as S.A. Tefal, is a corporation incorporated and situated in

France. It manufactures various cooking and kitchen utensils which are covered with a coating, commonly known as teflon, to prevent food and cooking materials from sticking to the working surfaces.

**3**    The first mark was originally applied for in 1961 by T-Fal Corporation of New York, New York, U.S.A., which was at the time the sole distributor of the respondent's wares in North America. There was never any corporate relationship between the respondent and the American distributor.

**4**    S.A. Tefal (as Tefal S.A. was then known) applied in 1968 for registration of the second mark and was informed that the registration could not be granted as it would be confusing with the first mark which had been granted to the U.S. corporation. The respondent thereupon immediately obtained an absolute assignment of the first mark from its American distributor and was then granted the second mark. The name T-Fal was only used in North America, the word "Tefal" being used in France and elsewhere in the world. The evidence clearly established that since 1958, until the date of the present application, the respondent has been manufacturing in France, labelling, packaging and shipping to bonded storage in Canada its cooking and kitchen wares with the name T-Fal printed on the label.

**5**    The shipments for sale in Canada would not be delivered to the U.S. distributor but would be sent directly by the respondent to be held in a bonded warehouse in Canada. The U.S. distributor would be invoiced for all such shipments. Distribution to various retailers in Canada would be made through Canadian distributors who, on ordering a quantity through the U.S. distributor and upon receiving the latter's receipt, would obtain the release of the goods from bond, following shipment from France. From 1963, a U.S. firm known as Royal Chambord of New Jersey had been acting as a subdistributor for the U.S.A. In 1974, it replaced T-Fal Corporation of New York as the North American distributor.

**6**    The first mark was applied for by T-Fal Corporation of New York in 1961 on the basis of a proposed use of the mark in Canada. As previously stated, since 1958 the wares duly marked T-Fal had, at all relevant times, been shipped by the French manufacturer directly to Canada and were picked up there by the Canadian distributors. When requested to furnish proof of actual use following application in 1963 on the basis of proposed use, a rather craftily worded and ambiguous affidavit was furnished by the president of T-Fal Corporation of New York. The relevant paragraph reads as follows: "... that use of the trade mark identified in the above trade mark application has been commenced in Canada in respect of all of the wares identified in the said application". Although not untruthful, the statement does not reveal that in fact and to the full knowledge of the deponent, the mark had been used continuously in Canada for three years previous to the application submitted on the basis of proposed future use, nor does the affidavit reveal that it was not T-Fal Corporation of New York but Tefal S.A. of France which had been using it and was continuing to use it. It is now clear from the evidence that the U.S. distributor never at any time used nor intended to use the mark in Canada and it must, therefore, be struck from the register.

**7**    The respondent argued that the first mark should be maintained because since then, in December, 1968, the mark had been absolutely assigned to the French company, which in fact had been using it. The subsequent assignment cannot cure the defect since the assignor had nothing to assign. T-Fal Corporation of New York was not the owner of a valid mark and had no title whatsoever to the T-FAL mark in Canada. The registration was void *ab initio*: it was obtained on misleading evidence and the true facts establish a complete absence of right in the assignor to any mark: *nemo dat quod non habet*.

**8**    As to the second mark which was applied for and obtained by the respondent, the applicant alleges that it was not "distinctive" within the meaning of s. 18(1)(*b*) of the *Trade Marks Act*, at the time that the present application was launched, namely, on March 30, 1978. Section 18(1)(*b*) reads as follows:

> 18(1) The registration of a trade mark is invalid if

> . . . . .

> > (*b*) the trade mark is not distinctive at the time proceedings bringing the validity of the registration into question are commenced; or

**9**    In s. 2 "trade mark" is defined in part as follows:

> 2.    In this Act

> . . . . .

> "trade mark" means

> > (*a*) a mark that is used by a person for the purpose of distinguishing or so as to distinguish wares or services manufactured, sold, leased, hired or performed by him from those manufactured, sold, leased, hired or performed by others.

and "distinctive" is defined by the same section as follows:

> > "distinctive" in relation to a trade mark means a trade mark that actually distinguishes the wares or services in association with which it is used by its owner from the wares or services of others or is adapted so to distinguish them;

**10**    The applicant filed several affidavits of its employees and of employees of its solicitor who, during the spring of 1978, each purchased in the Province of Quebec, kitchen utensils manufactured by the respondent bearing labels including the mark T-FAL. From and after April, 1977, the labels used were all the same: as well as the mark and other advertising and instructions, they bore the French flag in front and the inscription "Locked N' sealed by the famous French T-Fal process". On

the reverse side, after certain instructions as to use in both languages, one finds the following information: "T-FAL 1 Montgomery Street, Belleville, New Jersey 07109. Printed in France. There is only one T-FAL." There were five such labels produced.

**11**    Previous to April, 1977, slightly different labels were used with varying illustrations and words. They were found on certain utensils purchased by the witnesses for the applicant in April, 1978, because utensils had been in stock for some time. There were four such labels. Although there were some differences between them and the labels used subsequently, in so far as the trade mark itself is concerned and any information relevant to this issue the labels were substantially similar to those used after April, 1977, with some minor variations. Three bore the following words on the face of the label "made and packaged in France for T-Fal Housewares, 1 Montgomery Street, Belleville, New Jersey 07109". The fourth conveyed the same information in the French language. On the reverse side, following instructions for use, one found the word "T-Fal" with the same address in New Jersey.

**12**    There is no evidence of any corporation known as T-Fal being situated at the address indicated on the labels nor anywhere in the City of New Jersey. One can only surmise that the word "T-Fal" in the address referred to that part of Royal Charbord's business which related to the wares of Tefal S.A.

**13**    The respondent did not carry on any publicity in Canada but left that matter entirely to the Canadian distributors and retailers. There is no evidence of the American distributors having ever carried on any publicity in Canada. Counsel for the applicant argued that it was in fact the U.S. distributor who was using the mark in Canada, that the company was neither the owner of the mark nor the registered user and that in any event, regardless of whether Royal Chambord was or was not using it in Canada, that Tefal S.A. could not be said to have used it. If such were the case the mark would not be considered as distinctive of the wares in association with which it was used *by its owner* because it was not used in Canada by the respondent but by the U.S. distributor according to the address shown on the label. He argued that, in any event, any Canadian purchaser of the wares on reading the label would conclude that the mark belonged to the U.S. distributor. There was, however, no evidence whatsoever submitted by any independent member of the public to show that any person ever was or might be decieved in any way by the address on the labels into believing that the U.S. company was the actual owner of the mark and that it was a distributor's as opposed to a manufacturer's mark or that the U.S. company itself was the manufacturer.

**14**    As previously stated, the labels were printed and affixed in France by the manufacturer Tefal S.A. or its predecessor. It also stamped each article as being made in France. It packaged and marked the packages with the T-FAL mark and the French flag and shipped the wares directly to Canada in bags on which the words "made in France" were also stamped along with the mark. The only goods ever sold in Canada in association with the mark were so stamped, packaged and shipped. The T-Fal goods were marketed in Canada by Canadian distributors and never by the U.S. distributor Royal Chambord or, previous to 1974, by T-Fal Corporation of New York, New York.

All of the four labels issued previous to April, 1977, contained either in the English language or in the French language the words "made and packaged in France for T-Fal Houseware, 1 Montgomery Street, Belleville, New Jersey".

**15**    There is no evidence of the form of the labels or of any marking on the labels from 1958 to 1963 when Royal Chambord first became involved in the sale of T-Fal goods as a sub-distributor or as a distributor. It never at any time owned or held itself out as owning the mark T-FAL but was merely distributing the goods for T-Fal S.A. or its predecessor S.A. Tefal.

**16**    The affidavit of the export sales manager of the respondent contains the following statement of facts which have not been contradicted:

> To the best of my knowledge and belief, the trade marks T-Fal and T-Fal and Design have always exclusively been applied by Tefal S.A. or its predecessor S.A. Tefal to their kitchenware sold in Canada and the said trade marks have never been applied to the said goods by any distributor in Canada. No distributor of Tefal S.A. or any other person, firm or corporation of which I am aware sells or has sold any kitchenware in Canada to which anyone other than Tefal S.A. has applied the trade mark T-Fal or T-Fal and Design. Tefal S.A. does not act and never has acted as an agent for any distributor of its goods in Canada, and Tefal S.A. has not given any distributor in Canada the right to use the trade marks in advertising or otherwise except in association with genuine T-Fal goods manufactured by Tefal S.A. in France. Atlantic and Feature merely resell Tefal S.A.'s goods and at all material times the packaging, labelling, and advertising associated with the goods and the stamping applied to the goods have always stressed the French origin of the goods.

**17**    It seems, under the circumstances, that the mark is a manufacturer's mark as opposed to a distributor's mark. Futhermore the use of the mark was made by the respondent and its predecessor by stamping on T-FAL trade mark on the labels affixing them to the goods, shipping these goods from France directly to Canada for sale there. It matters not, under those circumstances, whether the sale itself takes place in the foreign country because the sales in bulk were made specifically and solely for the purpose of resale of the goods in Canada with the mark affixed and, therefore, for the use in Canada of the mark. (Refer *Manhattan Industries Inc. v. Princeton Mfg. Ltd.* (1971), 4 C.P.R. (2d) 6; see also editor's note to the effect that the important question is not who is using the mark but whose mark is being used in Canada.) In the present case, it was Tefal S.A.'s mark which was used in Canada and it was the intention of all parties, when the goods were ordered, labelled, packaged and shipped, that it be used here. The goods were placed on the market for sale in Canada in the normal course of trade. The facts are extremely similar to those found in *Uarco Inc. v. Phil Borden Ltd.* (1973), 10 C.P.R. (2d) 97, [1973] F.C. 650 [affirmed 24 C.P.R. (2d) 140, [1976] 1 F.C. 548] which followed the *Manhattan* case, *supra*. Kerr J. on p. 107 of the above-mentioned report of the *Uarco* case stated:

> ... there was, in my opinion, a direct chain (*c.f. Manhattan Industries* case, *supra*) of selling and delivering the wares, in the normal course of trade, from the shipment of the wares from the appellant's plants in the United States to their physical reception by the Canadian customers in Canada, and substantial general trading of such wares by the appellant in Canada prior to July 18, 1968, and thereafter to and including the year 1972. On that appreciation of the evidence the trade mark was "used", within the meaning of ss. 2, 4 and 16 of the *Trade Marks Act*, by the appellant in Canada prior to July 18, 1968.

**18**    The facts before me are more compelling than those in *Breck's Sporting Goods Co. Ltd. v. Magder (Trading as Sportcam Co.* (1975), 17 C.P.R. (2d) 201, 63 D.L.R. (3d) 645, [1976] 1 S.C.R. 527. In that case the importer in Canada was itself assembling and packaging "Mepps" fishing lures which were manufactured in France, yet, the Chief Justice in delivering the unanimous decision of the Supreme Court of Canada, which upheld a unanimous decision of the Federal Court of Appeal, stated at p. 207 C.P.R. p. 535 S.C.R, of the report:

> Throughout the periods of the dealings with the French manufacturer, the imported lures continued to be stamped "Made in France", but the evidence established that assembling came to be done by the appellant which also did packaging to prepare the Mepps lures for the Canadian market. If this is relied on, as it appeared to be, to establish that the use of the trade mark "Mepps" in association with these lures entitled the appellant to claim that a different message was being conveyed to the public after 1956 than before that time I cannot accept this to be so. On this point, *Wilkinson Sword (Canada) Ltd. v. Juda* (1966) 51 C.P.R. 55, [1968] 2 Ex. C.R. 137, 34 Fox Pat. C. 77, is instructive.

**19**    Finally, the respondent's T-FAL trade mark registration is, pursuant to s. 54 of the *Trade Marks Act, prima facie* proof of the facts set out in the application to the effect that it has used the mark in Canada since 1958. That presumption has not been rebutted by any evidence adduced by the applicant. I find that the mark is distinctive in Canada of the goods of the respondent manufactured in France by it for sale in Canada. The applicant has not established that the public was misled by the insertion of the address of Royal Chambord on these labels into believing that anyone but Tefal S.A. was the owner of the mark. There is no evidence that it was at any time abandoned or assigned by the respondent.

**20**    The motion will, therefore, be dismissed in so far as it relates to the striking out of the second mark from the register.

**21**    Since success is divided, there will be no costs.

*Indexed as:*

**Maritime Telegraph and Telephone Co. v. Chateau Lafleur
Development Corp.**


**Between
Chateau LaFleur Development Corporation, a body corporate, and
Can-Euro Investments Limited, a body corporate,
appellants/respondents by cross-appeal, and
Maritime Telegraph and Telephone Company Limited, a body
corporate, and Maritime Tel & Tel Limited, a body corporate,
respondents/appellants by cross-appeal**

[2001] N.S.J. No. 471

2001 NSCA 167

207 D.L.R. (4th) 443

199 N.S.R. (2d) 250

45 R.P.R. (3d) 209

110 A.C.W.S. (3d) 385

Docket: CA 169568


Nova Scotia Court of Appeal
Halifax, Nova Scotia

**Roscoe, Cromwell and Saunders JJ.A.**

Heard: September 14, 2001.
Judgment: November 27, 2001.

(88 paras.)

*Real property -- Easements, licences and prescriptive rights -- Creation by implication of law --
Estoppel.*

Appeal by Chateau from a judgment granting Maritime an easement over Chateau's land. Cross-appeal brought by Maritime from a judgment dismissing its claim for damages for wrongful interference with its easement. Maritime agreed to sell land to the original owners of Chateau's property because the original owners promised to provide an access to Maritime and to maintain it. The original owners promised to construct an alternate access, but never followed through. The agreement for the right of way between Maritime and the original owners of Chateau's property was not registered. Chateau was nonetheless aware of the agreement, and had copies of the agreement prior to its closing. Chateau claimed that the agreement granted only a temporary license rather than a right of way. Maritime claimed that it lost a potential sale of its property because of Chateau's conduct. Chateau disputed the right of way and blocked Maritime's access for 24 hours. The trial judge held that Maritime had an easement over the land, but found that Maritime's inability to provide legal assurance of access to the property prevented the sale of its land, rather than Chateau's conduct.

HELD: Appeal and cross-appeal dismissed. The trial judge correctly held that Maritime had an equitable easement and Chateau was obliged to maintain it. It was not equitable for the original owners to acquire the land subject to only a license in favour of Maritime because the original owner failed to construct an alternate access as they had promised. Maritime relied on the original owners' promise to its detriment. The doctrine of proprietary estoppel applied. Chateau had actual or imputed knowledge of all of the essential facts. The evidence supported the trial judge's conclusion that Maritime's failed sale was not a result of Chateau's conduct.

**Counsel:**

Douglas J. Livingstone, for the appellants (respondents by cross-appeal.
Michael E. Dunphy, Q.C., and Loretta Taylor, for the respondents (appellants by cross-appeal).

---

THE COURT: Appeal and cross-appeal dismissed per reasons for judgment of Cromwell J.A., Roscoe and Saunders JJ.A. concurring.

**CROMWELL J.A.**:--

I.    Introduction:

**1**    The issues in this case are whether the respondents have an easement over the appellants land and, if so, whether the appellants should pay damages for wrongful interference with that easement.

**2**    The respondents ("MTT") sued the appellants ("Can-Euro") for declarations of right and damages. The declarations claimed were: (1) that MTT has an easement over certain lands

belonging to Can-Euro (and previously to Chateau LaFleur) near the MicMac Mall in Dartmouth; and (2) that Can-Euro is obligated to maintain the easement to the standard of a public street. The claim for damages related to the failure of a sale by MTT of its lands to Mark, Joe, Ron and Robin Ghosn ("the Ghosns"). MTT claimed that the Ghosns withdrew from the purchase as a result of unlawful interference in the transaction by Can-Euro's principal, Mr. Gaspar.

**3**    At trial in the Supreme Court of Nova Scotia, Kelly, J. found that the respondents had an easement as claimed and that it was the appellants' duty to maintain it. The judge reached this conclusion on the alternative bases that an easement had been created by express grant or that there was an easement in equity binding on Chateau LaFleur. (The parties also interpret the judge's reasons as holding that an easement of necessity arose in MTT's favour.) The learned judge dismissed MTT's claim for damages against Chateau LaFleur, being of the view that entitlement to such damages had not been proved.

**4**    The appellants appeal the judge's findings that there is an easement and that they must maintain it. The respondents cross-appeal the dismissal of their damages claim.

**5**    For reasons which follow, I have concluded that both the appeal and the cross-appeal should be dismissed. In my opinion, the trial judge was correct to find that there was an equitable easement in the respondents' favour which the appellants must maintain. He was also correct, in my view, to dismiss the respondents' claim for damages arising from the lost sale. He found that the transaction failed, not as a result of the appellants' conduct, but rather, as a result of the respondents' inability to provide legal assurance of access to the property. This is essentially a finding of fact which is reasonably supported by the record. It should, therefore, not be disturbed on appeal.

**6**    I will refer, at times, to the parties as "the appellants", "Can-Euro" or "Chateau LaFleur" and "the respondents" or "MTT". The appellant, Chateau LaFleur Development Corporation, acquired the land which is subject to the disputed easement in August of 1984 and later conveyed it to the appellant Can-Euro Investments Limited. The principal of both companies is Mr. Otto Gaspar. The respondent Maritime Telegraph and Telephone Company Limited is a predecessor company of the respondent Maritime Tel & Tel Limited and the two were amalgamated under the latter name in April of 2000. For the purposes of this appeal, nothing turns on the successorship between, or amalgamation of, the respondents or on the conveyance of the land from the first to the second appellant.

    II.    Facts:

**7**    MacCulloch and Company Limited ("MacCulloch") owned a large parcel of land in Dartmouth (the "MacCulloch lands") in the area where the MicMac Mall is now located. MTT purchased a portion of this land (the "MTT lands") on which it operated a work centre. Access to the MTT lands for many years was over a public street known as Crichton Avenue which ran through the MacCulloch lands. This portion of Crichton Avenue was a gravel road.

**8**    In the 1970's, MacCulloch entered into discussions with the City of Dartmouth with a view to the City closing a portion of Crichton Avenue and conveying it to MacCulloch. As this would affect access to the MTT lands, the City advised MacCulloch that it would only do so if (among other conditions) appropriate alternate access were provided to the MTT lands.

**9**    MTT and MacCulloch discussed the matter and reached agreement concerning alternate access. They signed a letter agreement in May of 1976. The letter, dated April 26, 1976, and accepted by MTT on May 6, 1976, briefly sets out the parties' understanding that: (i) the City would convey the relevant portion of Crichton Avenue to MacCulloch; (ii) MacCulloch undertook to supply MTT with proper access to city streets; (iii) MacCulloch had designed and partially constructed Avonhurst Road to the boundary of the MTT lands; and (iv) MacCulloch undertook "... to maintain Crichton Avenue between MicMac Boulevard and Maritime Tel & Tel property, in a suitable condition, until Avonhurst Road is completed."

**10**    MacCulloch and MTT then entered into a formal written agreement dated July 16, 1976. In summary, MacCulloch: (1) undertook to construct an access road (referred to as Avonhurst Road) in accordance with the standards for public streets in the City and to convey it to the City; and (2) agreed that prior to completion, it would provide and maintain acceptable access to MTT "... either over the former Crichton Avenue or Avonhurst Road." MTT undertook to consent to all steps to be taken by the City for the closure of Crichton Avenue. The new access over Avonhurst Road was to connect over Glencairn Crescent to MicMac Boulevard.

**11**    In Annex "A" to my reasons is a part of a 1977 plan showing the MTT lands, a portion of Crichton Avenue and the proposed new Avonhurst Road. [Editor's note: Annex "A", which contains a map of the area in question, could not be reproduced online.] As the July 16, 1976 agreement is relatively brief and highly relevant to this appeal, it is substantially reproduced in Annex "B".

**12**    With the July agreement resolving MTT's access in hand, MacCulloch reached agreement with the City, in August of 1977, on the closure and conveyance of Crichton Avenue. The City undertook to convey a portion of Crichton Avenue to MacCulloch "... provided that ... [MacCulloch] guarantee[d] road access to the Maritime Telegraph and Telephone Company Limited from its lands ...".

**13**    In November of 1977, the City closed the relevant portion of Crichton Avenue and conveyed it to MacCulloch. Before and after the closure of Crichton Avenue as a public street, MTT continued to use it as its means of access. In January of 1978, MacCulloch conveyed to MTT a small triangular piece of property necessary to link the MTT lands with the proposed Avonhurst Road. On Annex "A", the original MTT lands are labelled "Lot A" and the small triangular parcel "Lot T".

**14**    MacCulloch did not construct Avonhurst Road as contemplated by the July, 1976 agreement with MTT. In August of 1981, MacCulloch conveyed certain of its lands, including a portion of the land upon which it was originally contemplated that the new access over Avonhurst Road would be

constructed, to the Hudson's Bay Company. At the same time, MicMac Shopping Centre Limited ("MicMac"), Hudson's Bay and MacCulloch granted mutual rights of way over portions of what had been Crichton Avenue.

**15**   In 1982, MacCulloch asked the City to close the constructed portion of Glencairn Crescent in order to allow for future expansion of the MicMac Mall. MacCulloch proposed that future access to the MTT lands would be by way of "... an upgraded road to subdivision regulations..." over the former Crichton Avenue. MTT was, of course, consulted and responded that it could "... foresee no problems as long as suitable access is made available while any construction is being carried out." In late 1982, the City closed the relevant portion of Glencairn Crescent and conveyed it to Hudson's Bay Developments Limited.

**16**   In 1984, Chateau LaFleur purchased some remaining MacCulloch lands known as Block L-8. This land included the portion of the former Crichton Avenue between the MTT land and MicMac Boulevard which had been acquired from the City as well as land on which the proposed Avonhurst Road was to have been built. MTT continued to use the former Crichton Avenue as its access route.

**17**   At the time of Chateau LaFleur's purchase in 1984, the agreement of July, 1976 between MacCulloch and MTT was not registered. However, Chateau LaFleur was aware that MTT had some right of access over the property. Prior to the closing of the 1984 transaction, Chateau LaFleur's solicitor raised certain objections to MacCulloch's title relating to access as follows:

> 5.   We refer you to a plan of survey provided us by Servant, Dunbrack, MacKenzie and MacDonald Limited, Land Surveyors, dated July 7, 1982, and signed by Granville Leopold. On that plan of survey, the road formerly known as Crichton Avenue and connecting Micmac Boulevard and Woodland Avenue is shown as a portion of the lands in question. The title reference is a Deed from the City of Dartmouth recorded at 3181/611. From our discussions with Mr. Vincent MacCulloch, we are advised that Maritime Telegraph and Telephone Company Limited has a right of access over that portion of the former Crichton Avenue connecting Micmac Boulevard and their driveway situate at the northeast corner of Lot A-T. We have been unable to determine when, if at all, such rights of access were created and therefore request that you advise as to what rights of access, if any, Maritime Tel & Tel has over that road as against your clients.

> ...

> 10.   We note that the plan showing Block L-8 has not to this point received municipal subdivision approval. It is clear from our investigations that the lands being conveyed herein are not the only remaining lands of MacCulloch and Company Limited from their original grant in this area

and as such, we would submit that such approval is required before the lot
may be conveyed.

(emphasis added)

**18**    In response, MacCulloch's solicitor noted the obligation to provide access was ongoing and
that provision of access was a condition of subdivision approval. She wrote:

> 5.    I enclose a copy of correspondence between MacCulloch & Company
> Limited and M.T.&T. [it is agreed that this correspondence was the
> April/May 1976 letter agreement] together with a copy of the Agreement
> entered into between those two parties in July, 1976. MacCulloch was
> deeded Crichton Avenue by the City of Dartmouth on the condition that an
> arrangement be made with M.T. & T. so that it would not become
> land-locked. You will note that MacCulloch has agreed to construct an
> access road for M.T. & T. known as Avonhurst Road as part of its
> development of these lands. This road was never constructed, so the
> obligation to provide access to M.T.& T. continues. There is reference to
> the rights of M.T. & T. in the legal description of L-8 and I understand
> from Stephen Lockyer at Price Waterhouse that Mr. Gaspar is fully aware
> of the obligation. In any event, continued provision of access to M.T. & T.
> is a condition of the granting of subdivision approval by the City of
> Dartmouth for the transfer of title of L-8.
>
> ...
>
> 10.    Subject to the City being satisfied that the M.T. & T. access is guaranteed,
> there is no problem with subdivision approval and I expect to have the plan
> in hand and registered by the end of this week.

(emphasis added)

**19**    There is no dispute that Chateau LaFleur's solicitor had copies of the April/May, 1976 letter
agreement and the July, 1976 final agreement between MacCulloch and MTT prior to the 1984
closing. There is no evidence, however, that he had any knowledge of the 1982 correspondence
between MacCulloch and MTT.

**20**    The transaction proceeded and the deed from MacCulloch to Chateau LaFleur referred to the
access to MTT land in the following clause:

> Subject Also To rights granted to Maritime Telegraph & Telephone Company
> Limited over the Travelled Way contained within the strip of land conveyed to
> MacCulloch & Company Limited by Indenture recorded at the Registry of Deeds

> office for the County of Halifax in Book 3181 at page 611 as shown on the above
> referred to plan.

> (emphasis added)

**21**    Subdivision approval was granted prior to closing. Chateau LaFleur's solicitor thereafter provided his client with a certificate of title which specifically excepted the rights of MTT. He wrote, in part:

> ... you have a good and merchantable title to the above-noted lands, subject to the
> following:

> ...

> 5.    Rights granted to Maritime Telegraph & Telephone Company Limited
>       over the Travelled Way contained within the strip of land conveyed to
>       MacCulloch & Company Limited by Deed recorded at the Registry of
>       Deeds in Book 3181, at Page 611, and as shown on above referred to plan;

> (emphasis added)

**22**    The judge found as a fact that Chateau LaFleur was aware of the terms of the right of way arrangement made between MacCulloch and MTT.

**23**    By 1986, Chateau LaFleur was disputing MTT's access; MTT claimed it had a right of way, Chateau LaFleur that it was merely, in effect, a licence.

**24**    In or about 1988, Chateau LaFleur's successor, Can-Euro, constructed a high-rise building on a portion of Block L-8 and built a paved private street known as Horizon Court. In the area between MicMac Boulevard and the MTT lands, Horizon Court follows the route of the old Crichton Avenue with the exception of a distance of approximately 10 to 12 feet between Horizon Court and the MTT lands. This 10 to 12 foot area is part of the old Crichton Avenue lands. Horizon Court is maintained by Can-Euro and used for access by the occupants of Can-Euro's properties. MicMac and Hudson's Bay (or their successors in title) have the right to use Horizon Court in accordance with the right of way Agreement entered into in 1981 among MicMac, Hudson's Bay and MacCulloch.

**25**    By 1988, MTT had ceased to operate its work centre on its lands and decided to sell the property. In October of that year, Can-Euro submitted an offer of $340,000 for the land. MTT was of the view that it was worth about $1,000,000 and rejected the offer.

**26**    In June of 1993, MTT received a conditional offer from the Ghosns to buy the property for $800,000. In October of the next year, Can-Euro purported to forbid access to the MTT lands over Horizon Court and physically blocked access for a 24 hour period. Can-Euro's position was communicated to the Ghosn's solicitor. The Ghosns advised MTT that they would not proceed with the transaction unless they were provided with written assurances by Can-Euro and MTT that the access issue had been resolved to their mutual satisfaction. These assurances were not forthcoming and the transaction did not proceed.

**27**    MTT commenced this action in November of 1998.

**28**    As noted earlier, Kelly, J. at trial found that the agreements between MacCulloch and MTT created an easement by grant of which Chateau LaFleur had actual notice. He further held, in the alternative, that an easement arose in equity. He reasoned that MTT had agreed to release its right to use Crichton Avenue as a public street in order to allow MacCulloch to obtain the closure and conveyance to it of Crichton Avenue. He held that it would be unfair to permit Chateau LaFleur, as MacCulloch's successor in title, to benefit from this by receiving title to the former Crichton Avenue and while, at the same time, denying MTT an easement over the property. The judge also made certain findings of fact on the question of an easement of necessity which both parties to this appeal interpret as a further alternative finding that MTT had an easement by necessity.

**29**    The trial judge then turned to the question of whether Chateau LaFleur had a duty to maintain the easement for MTT's benefit. He concluded it did, holding that the right of way agreement among Can-Euro, Hudson's Bay and MicMac required Can-Euro to maintain Horizon Court and that this therefore constituted the most cost effective way of providing a maintained right of way for MTT.

**30**    With respect to MTT's claim for damages, the judge found that: (1) there was no damage resulting from the one day denial of access by Chateau LaFleur; and (2) Chateau LaFleur's actions did not cause the loss of the Ghosn transaction.

III.    Issues:

**31**    Both the appeal and the cross-appeal raise several issues, but in my view it is only necessary to address two of them, one on each of the appeal and the cross-appeal.

**32**    On the appeal, the judge held, in my view correctly, that MTT has an equitable easement which Can-Euro is obliged to maintain. If that is so, the appeal must fail. I will, therefore, limit myself to explaining my view that the judge was correct to find that MTT has an equitable easement which Can-Euro must maintain.

**33**    By restricting my analysis to this issue, I would not want to be taken as approving the trial judge's conclusion that there was an easement by grant. My concern on this aspect of the case is that MacCulloch did not own the Crichton Avenue land at the time of the July, 1976 agreement.

However, as I think that the trial judge was correct to find that there was an equitable easement, I need not express a final opinion on that issue or with respect to whether an easement by necessity arose.

**34**    On the cross-appeal, my view is that it was reasonably open to the judge on this record to find that the loss of the Ghosn transaction, on which the claim to substantial damages is based, was not the result of any unlawful act by Mr. Gaspar. If that is so, the judge's dismissal of the damages claim was correct. I will, therefore, limit my analysis of the cross-appeal to the attack on this key finding by the judge.

IV.    The Equitable Easement Issue:

**35**    It will be convenient to address this issue under four headings: 1. the legal principles relating to equitable easements; 2. the trial judge's findings; 3. the appellants' submissions; and 4. analysis and conclusions.

1.    Equitable Easements:

**36**    An easement is a right attached to the land of a dominant owner allowing use of the land of a different owner (the servient owner) in a particular way for the benefit of the dominant owner: A. H. Oosterhoff and W. B. Rayner, Anger and Honsberger Law of Real Property (2d, 1985) at para. 1803. The essential qualities of an easement are that there must be dominant and servient land, the easement must accommodate the dominant land, the owners of the dominant and the servient land must be different persons and the right must be capable of forming the subject-matter of a grant: Ibid at para. 1803.2. An easement may be created by statute, express or implied grant, prescription or through the application of equitable principles: Ibid para. 1803.4. I am concerned here with this last type of easement.

**37**    Equitable easements may arise through the operation of the equitable doctrines of proprietary estoppel and part performance or through the operation of related equitable principles. Proprietary estoppel comes into operation when one party is encouraged to act to its detriment in relation to its land by the promise or encouragement of another in circumstances in which it would be unjust to allow the latter to insist on its strict legal rights: J. McGhee, Snell's Equity (30th, 2000) at para. 39-12.

**38**    As stated in a leading English case, when the doctrine of proprietary estoppel is raised, the court must answer three questions: first, whether an equity is established; second, what is the extent of the equity; and, third, what relief is appropriate to satisfy the equity: Crabb v. Arun District Council, [1976] Ch. 179 (C.A.) at pp. 192 - 193. Whether an equity arises and its extent depends on the dealings between the parties, including their contract, their promises and their conduct: see, e.g. Crabb, above at p. 187 - 8. The ultimate question in light of all of this is whether it would be inequitable to permit one party to insist on its strict legal rights.

**39**    Crabb has been approved and followed in Canada, notably in the recent decision of the British Columbia Court of Appeal in Zelmer v. Victor Projects Ltd. (1997), 147 D.L.R. (4th) 216; [1997] B.C.J. No. 1044 (Quicklaw) (B.C.C.A.); see also: Hill v. Nova Scotia, [1997] 1 S.C.R. 69 at para. 11; Hastings Minor Hockey Association v. Pacific National Exhibition (1981), 129 D.L.R. (3d) 721; [1981] B.C.J. No. 1388 (Quicklaw) (B.C.C.A.).

**40**    If the equity arises, the courts have broad discretion to fashion an appropriate remedy. As the editor of Snell's Equity, supra, puts it, effect is given to the equity "... in whatever is the most appropriate way taking into account all relevant circumstances including the conduct of the parties": at para. 39-19.

**41**    An easement arising in equity is binding on everyone except a purchaser of the servient tenement who buys without notice of the equitable right: see Jonathan Garret and Paul Morgan, Gale on Easements (16th, 1997) at para. 2-25. In the present case, therefore, the issue of whether there is an equitable easement binding on the appellants which they are obliged to maintain in favour of MTT depends on the answer to two questions. Did such an equitable easement arise as between MacCulloch and MTT? If so, was Chateau LaFleur a purchaser in good faith without notice?

      2.    The trial judge's findings:

**42**    The judge found that MTT had acted to its detriment in reliance on promises given by MacCulloch. Specifically, MTT gave its consent for the City to close Crichton Avenue and to convey it to MacCulloch as a result of MacCulloch's promise to provide MTT with access over a public street to be constructed and, until then, over the former Crichton Avenue. The judge stated:

> [34]    In the matter before the Court, MTT agreed, to its detriment, to release its permanent right to use [Crichton] Avenue as a city street. If it had not done so, MacCulloch would not have obtained the conveyance of the street from the City of Dartmouth. In the interim, MacCulloch agreed to give a right of way to MTT over that street when it was conveyed to it, and when it was MTT had open unopposed use of the "Travelled Way" to gain ingress and egress from the city streets to its lands for over twenty years. ...

    (emphasis added)

**43**    The judge noted that MacCulloch had agreed to provide and maintain acceptable access to MTT either over the former Crichton Avenue or Avonhurst Road and it followed from this that it was MacCulloch's responsibility to maintain the right of access. He found that "... it was intended by MacCulloch and MTT that the latter receive a property right by way of right of way ...". He further found that Can-Euro had "notice and actual knowledge" of these rights and responsibilities. Finally, he concluded that imposing the obligation to maintain a right of way over Horizon Court which, at the relevant point, substantially follows the route of the former Crichton Avenue and

which Chateau LaFleur was already obliged to maintain by virtue of the right of way agreement with Hudson's Bay and MicMac would be the most cost effective way of providing the maintained right of way to which MTT was entitled.

      3.    The appellants' arguments:

**44**   The appellants attack the trial judge's finding that there is an equitable easement, raising two main points.

**45**   First, it is argued that the judge was wrong to find that MacCulloch and MTT intended that the latter receive a property right over MacCulloch's lands pursuant to the July, 1976 agreement. That agreement, it is argued, was for access over a city street to be constructed by MacCulloch, but conveyed to and maintained by the City. Any access over what had been Crichton Avenue was a merely temporary licence, not an easement.

**46**   Second, the appellants submit that Chateau LaFleur did not have notice of any property right in MTT's favour over the lands it acquired from MacCulloch. In other words, even assuming that there was an equitable easement as between MacCulloch and MTT, it is not binding on the appellants because they were purchasers in good faith without notice of it.

      4.    Analysis and Conclusions:

**47**   The linchpin of the appellants' first point is this. The July, 1976 agreement should be interpreted as MacCulloch promising MTT nothing more than a temporary right of access not binding the land, pending the completion of Avonhurst Road, over the former Crichton Avenue. Simply put from the appellants' perspective, MacCulloch promised to provide access by way of a mere temporary license pending completion of the new public road, not to grant an easement binding the MacCulloch land until access by way of the planned public road was completed.

**48**   With respect, this submission is based on much too narrow a view of the equities between MacCulloch and MTT.

**49**   Following Crabb, the first question is whether the dealings between MacCulloch and MTT gave rise to an equity in MTT's favour. What gives rise to an equity? In general, an equity will arise where one party acts to its detriment acting on the strength of an expectation or belief encouraged by the other party. When these conditions are present it will be inequitable for the party who encouraged the belief in the other to thereafter insist on its strict legal rights: see, e.g. Crabb, supra, at p. 187 - 188.

**50**   Proprietary estoppel in a case like this one is concerned with equitable rights to land. It follows, therefore, that the expectation or belief on which the estoppel is based must relate to the acquisition of rights in or over land: see Snell's Equity, supra at 39-13. So, for example, in Western Fish Products Ltd. v. Penwith District Council, [1981] 2 All E.R. 204 at 217, Megaw, L.J. described

the doctrine of proprietary estoppel as follows:

> ... when A to the knowledge of B acts to his detriment in relation to his own land
> in the expectation, encouraged by B, of acquiring a right over B's land, such
> expectation arising from what B has said or done, the court will order B to grant
> A that right on such terms as may be just.

**51**    Are these conditions satisfied here? In my opinion, they are.

**52**    Under the terms of the July, 1976 agreement, MTT was promised three things by MacCulloch.
First, there would be a new access route in exchange for the former one over Crichton Avenue. This
access road would be built over land belonging to MacCulloch. Second, the new access route would
ultimately be over a city street because MacCulloch undertook to convey it to the City after
construction. Unlike the portion of Crichton Avenue previously used as access, this new access
would be built to the standard of a city street. Third, there would be ongoing access over the former
Crichton Avenue until the new access was constructed.

**53**    From this it is clear that MacCulloch encouraged MTT's belief that MTT would acquire rights
over MacCulloch's lands - both over Avonhurst Road to be constructed on MacCulloch's lands and,
pending construction, over the former Crichton Avenue which was to become MacCulloch's land.
This encouragement was unambiguously given by MacCulloch in the July, 1976 agreement in the
form of express contractual promises.

**54**    In exchange for these promises, MTT consented to the closing of Crichton Avenue, thereby
depriving itself of access over a city street until MacCulloch constructed Avonhurst Road and
conveyed it to the City. MTT did this because MacCulloch had promised that MTT's consent to the
closure of Crichton Avenue would be rewarded by alternate access at the standard of a city street to
be provided at MacCulloch's expense and thereafter maintained by the City. MacCulloch failed to
construct Avonhurst Road and, as a result, MTT suffered detriment in reliance on MacCulloch's
promises. Therefore, MTT expected, on the basis of MacCulloch's encouragement, that it would
receive rights over MacCulloch's land, and acted to its detriment in reliance on that expectation.
MTT having fulfilled its part of the bargain, it would be inequitable to permit MacCulloch to insist
on its strict legal rights.

**55**    An equity having arisen, what is its extent? As the editor of Snell's Equity, supra, puts it, the
extent of the equity is to have made good, so far as may fairly be done between the parties, the
expectations of MTT which MacCulloch has encouraged: at para. 39-18. What MTT failed to get,
as a result of MacCulloch's conduct, was permanent access to the standard of a city street
constructed and maintained at no expense to it. MTT expected to get such access and this
expectation was based on MacCulloch's contractual promise. The extent of the equity is, therefore,
that MTT should have such access over MacCulloch's land and at MacCulloch's expense.

**56**    The third question is what remedy is necessary to satisfy the equity. As between MacCulloch

and MTT, the equity would be satisfied by imposing an easement in favour of MTT over the former Crichton Avenue to be constructed and maintained to the standard of a city street by MacCulloch. The easement in this location is appropriate because it was the route surrendered by MTT in exchange for MacCulloch's broken promises. Moreover, MacCulloch promised temporary access over this route pending completion of Avonhurst Road and retained title to the former Crichton Avenue lands after the conveyance in 1981 of a portion of the land on which Avonhurst Road was to have been constructed. The standard of construction and the obligation to maintain are appropriate because MTT would have received an access road to this standard maintained at no cost to it had MacCulloch performed its part of the July, 1976 agreement.

**57** The justice and good sense of this conclusion may be tested by comparing it with the appellants' position. That position, if accepted, would have the following result. MTT, because of MacCulloch's failure to construct the alternate access and dedicate it as a public road, would end up with a mere temporary licence. In other words, MacCulloch's failure to provide the new access it had promised coupled with MTT's reliance on this promise to its detriment would result in MacCulloch acquiring title to the former access route over Crichton Avenue subject only to a license in favour of MTT. That is not what was promised nor would such a result be equitable given MacCulloch's promise and MTT's detrimental reliance on it. The result advanced by the appellants is, in my respectful view, neither equitable nor just in the context of the dealings among the City, MacCulloch and MTT and particularly having regard to the July, 1976 agreement.

**58** The appellants submit that MTT has had a claim against other entities for completion of Avonhurst Road since the signing of the July, 1976 agreement and that there was no evidence that Avonhurst Road could not have been completed. Simply put, this submission is that MTT has sued the wrong party claiming access over the wrong route. With respect, this submission confuses the rights and duties as between MTT and MacCulloch prior to the 1984 purchase by Chateau LaFleur with the question of whether Chateau LaFleur had notice of those rights.

**59** There is no doubt that, as between MTT and MacCulloch, there was a further agreement reached in 1982 that access to the MTT lands would be by way of an upgraded road to subdivision regulations over the relevant portion of the former Crichton Avenue. MTT consented to this arrangement and the City closed the constructed portion of Glencairn Crescent, to which Avonhurst Road was to connect. In these circumstances, I cannot accept the appellants' contention that, after 1982, MTT could have insisted that MacCulloch or anyone else construct Avonhurst Road or that equity would permit MacCulloch to resile from its guarantee of access over the former Crichton Avenue by way of an upgraded road to subdivision regulations.

**60** To summarize, as between MacCulloch and MTT the equitable doctrine of proprietary estoppel applies with the result that MTT had an equitable easement over MacCulloch's lands along the former Crichton Avenue which it was MacCulloch's duty to maintain.

**61** That brings me to the position as between the appellants and MTT. The appellants are not

bound by the unregistered equitable easement if they purchased the MacCulloch land (i.e., the servient tenement) in good faith and without notice of it. There is no question here that the appellants acted in good faith and paid valuable consideration when Block L-8 was purchased. The issue for decision, therefore, is whether the appellants had notice.

**62**    In this context, the term "notice" includes three types of knowledge: actual knowledge (what the party in fact knew), constructive knowledge (what the party might reasonably be considered as having known) and imputed knowledge (what the party's agent knew). All of this is well summarized in the following passage from R.E. Megarry, H.W.R. Wade and Charles Harpum, The Law of Real Property (6th, 2000) at pp. 144 - 145:

> A person is commonly said to have "actual notice" of a fact where he subjectively knows of it, regardless of how that knowledge was acquired.
>
> ...
>
> ... Equitable interests would have been entirely insecure if it had been made easy for purchasers to acquire the legal estate without notice, as by merely asking no questions. Accordingly the Court of Chancery insisted that purchasers should inquire about equitable interests with no less diligence than about legal interests, which they could ignore only at their own peril. The motto of English conveyancing is caveat emptor: the risk of incumbrances is on the purchaser, who must satisfy himself by a full investigation of title before completing his purchase.
>
> ... By the doctrine of constructive notice equity adopted a similar principle and adapted itself to the ordinary conveyancing practice. A purchaser would be able to plead absence of notice only if he had made all usual and proper inquiries, and had still found nothing to indicate the equitable interest. ...

**63**    There is no factual dispute about what the appellants actually knew as a result of the knowledge of their principal, Mr. Gaspar, or what knowledge is imputed to them as a result of the enquiries of their solicitor. In my view, the appellants had actual or imputed notice of all of the essential facts which gave rise to the equitable easement in favour of MTT over the former Crichton Avenue. To put it more precisely, the appellants cannot say that they "... found nothing to indicate the equitable interest" (to use the language of Megarry and Wade, supra at p. 145).

**64**    It may be helpful to consider the facts under the three questions which I used to determine whether the equitable easement should be imposed as between MacCulloch and MTT.

    A.    Did an equity arise?

(i)     Chateau LaFleur's solicitor had a copy of the July, 1976 agreement.

(ii)    He was advised by Vincent MacCulloch that MTT had a right of access over the portion of the former Crichton Avenue connecting MicMac Boulevard and the driveway situate at the northeast corner of Lot A-T (i.e., MTT lands);

(iii)   He was advised by MacCulloch's solicitor: (i) that MacCulloch was deeded Crichton Avenue by the City on condition that an arrangement be made with MTT so that it would not become land-locked; (ii) that MacCulloch had agreed to construct an access road for MTT known as Avonhurst Road as part of its development of these lands; (iii) that Avonhurst Road was never constructed; (iv) that "... the obligation to provide access to MTT continues"; (v) that there was a reference to the rights of MTT in the legal description of Block L-8; and, finally, (vi) that "... continued provision of access to MTT is a condition of the granting of the subdivision approval by the City for the transfer of title of L-8". (the quoted passages are from the letter from MacCulloch's solicitor, to the appellants' solicitor dated May 14, 1984). He reviewed this letter and its enclosures with Mr. Gaspar.

(iv)    The appellants' solicitor had the legal description of Block L-8 which contained a reference to "... rights granted to [MTT] over the Travel [sic] Way contained within the strip of land conveyed to [MacCulloch] by Indenture recorded at the Registry of Deeds office for the County of Halifax in Book 3181 at page 611 as shown on the above referred to plan". This legal description was reviewed with Mr. Gaspar.

(v)     The appellants' solicitor, of course, had the plan just referred to and which shows a travelled way along the former Crichton Avenue from the northeast corner of the MTT lands to MicMac Boulevard.

(vi)    The appellants knew that, as of 1981, MacCulloch could not complete the promised access over Avonhurst Road.

(vii)   The appellants' solicitor testified at trial that he had "probably" seen the plan of Block L-8 dated June 4, 1984 which referred to a Travelled Way within the Crichton Avenue lands between MicMac Boulevard and the MTT lands and which contained Note 2 stating that the "... travelled way [was] currently utilized for ingress and egress to and from [the MTT lands] ...".

**65**    In short, the appellants knew in detail the nature of MacCulloch's promises as set out in the July, 1976 agreement, that MTT had acted to its detriment by relying on those promises and that, as of 1981, MacCulloch could not complete the promised access over Avonhurst Road.

B.    The extent of the equity:

(i)    From the review of the July, 1976 agreement, the appellants knew that MacCulloch had promised new access over lands owned by MacCulloch to the standard of a City street and conveyed to the City. The new access would, therefore, be maintained at no expense to MTT.

(ii)    From the review of the July 1976 agreement, the appellants knew that MTT agreed to give up access over a City street (Crichton Avenue) by promising to consent to its closure by the City. The appellants would also have known from the review of the registered instruments that the relevant portion of Crichton Avenue had been conveyed by the City to MacCulloch in apparent conformity with the July, 1976 agreement.

(iii)    The appellants would also have known from its review of the July, 1976 agreement that MacCulloch had promised ongoing access over Crichton Avenue until Avonhurst Road was constructed. They also knew that MacCulloch had never constructed Avonhurst Road and that after 1981 it could not do so.

(iv)    The appellants' solicitor had the legal description of Block L-8 which contained a reference to "... rights granted to [MTT] over the Travel [sic] Way contained within the strip of land conveyed to [MacCulloch] by Indenture recorded at the Registry of Deeds office for the County of Halifax in Book 3181 at page 611 as shown on the above referred to plan";

(v)    He, of course, had the plan just referred to and which shows a travelled way along the former Crichton Avenue from the northeast corner of the MTT lands to MicMac Boulevard.

(vi)    The appellants' solicitor testified that he had "probably" seen a second plan of Block L-8, one dated June 4, 1984, which referred to a Travelled Way within the Crichton Avenue lands between MicMac Boulevard and the MTT lands. The plan contained Note 2 which stated that the "... travelled way [was] currently utilized for ingress and egress to and from [the MTT lands] ...".

**66**    In summary, the appellants knew that MTT had agreed to the closure of Crichton Avenue in exchange for alternate, permanent access over a new city street to be constructed by MacCulloch, that the alternate access had not been constructed, that MacCulloch could no longer do so and that MTT had been promised, and were exercising, access over the former Crichton Avenue. All of the essential facts relating to the extent of MTT's equity were known to the appellants.

    C.    The relief necessary to give effect to the equity:

**67**    In addition to all of the points mentioned earlier, I note the following:

(i)    The appellants' solicitor knew that the City's approval of the plan of subdivision necessary for the conveyance of Block L-8 to Chateau LaFleur

was conditional on access to MTT being guaranteed and that such approval
had been given prior to closing.

(ii)     The appellants' solicitor acknowledged that the MTT access issue was
something that had to be brought to his client's attention - something that
he described as being "a bit disconcerting or confusing ...". He recognized
that Chateau LaFleur was taking title to Block L-8 subject to the rights of
MTT "... whatever they were ...".

(iii)    After the July 23, 1984 letter from MacCulloch's solicitor, the appellants'
solicitor took no further steps and made no further inquiries in relation to
the issue of MTT's access to its lands.

**68**     The appellants submit they had no notice of the 1982 arrangement among the City,
MacCulloch and MTT in which MacCulloch undertook to provide MTT with access by way of an
upgraded road to subdivision regulations over the former Crichton Avenue. In my view, there are
two answers to this submission. The first is that, even without actual notice of this 1982
arrangement, the appellants had notice of all of the essential facts giving rise to the equity, defining
its extent and in relation to the appropriate relief. Second, Chateau LaFleur took title subject to the
rights of MTT, "whatever they were", and made no further inquiries about these rights after the July
23, 1984 letter from MacCulloch's solicitor. It can hardly be said that the appellants found nothing
to indicate the equitable interest. They are, therefore, bound by the equitable easement in favour of
MTT.

**69**     I would conclude that the trial judge was correct to find that MTT, as against the appellants,
has an equitable easement following the former Crichton Avenue which the appellants are obliged
to maintain. For clarity, I would add that the easement is over Horizon Court from MicMac
Boulevard except for the final 10 to 12 feet between Horizon Court and the MTT lands where the
easement follows the former Crichton Avenue to the northeast corner of the MTT lands. It is the
appellants' obligation to maintain the whole of this easement to the appropriate standard, including
the final 10 - 12 foot section which is at present a gravel road. As I understand that the standard of
the existing Horizon Court is satisfactory to MTT, that should be the appropriate standard.

**70**     The trial judge has not yet issued a formal order and there are, no doubt, technical matters to
be resolved before such an order is issued. In this court, I would simply issue an order dismissing
the appeal and leave the settling of the order at trial, in accordance with the trial judge's reasons and
the reasons of this Court, to the trial judge.

V.     The Damages Issue:

**71**     At trial, MTT claimed damages for wrongful interference with its right of way and for
unlawful interference with economic relations. These claims were dismissed by the trial judge and
MTT challenges that dismissal in its cross-appeal.

**72**     The focus of the damages claim is the failure of MTT's sale of its property to the Ghosns.

Simply put, MTT claims that the transaction failed as a result of illegal interference by Can-Euro which is, therefore, liable for the resulting damages.

**73**    The trial judge relied on a number of grounds to reject this claim. In my view, it is only necessary to consider one of them. The judge found that MTT's sale to the Ghosns did not close because the predecessors' title objections based on the right of way were not satisfied. He stated that:

> [48]    ... the Ghosns would not have purchased the property without being satisfied that legal access to city streets was available to MTT's lot. The inability of MTT to provide this was the essential reason the agreement of sale was not renewed by the Ghosns, not Mr. Gaspar's attitude or threat of suit if the sale went through.

> (emphasis added)

**74**    Mr. Dunphy, for MTT, very fairly and, in my view, correctly conceded during argument that if this finding is supportable on the record, the cross-appeal fails. He submits that the finding is not supported by the evidence and that Mr. Gaspar's communication with the Ghosn's solicitor was the proximate cause of the Ghosn's decision not to renew the agreement and proceed with the purchase.

**75**    Mr. Dunphy submits the trial judge erred in failing to act in accordance with the following evidence.

**76**    On October 7th, 1994, Patrick Duncan, solicitor for the Ghosns, contacted Stefan Gaspar to discuss the access to the MTT lands. Mr. Duncan advised Mr. Gaspar that he was acting for the Ghosns in the prospective purchase of the MTT lands. Mr. Gaspar provided Mr. Duncan with a copy of the October 6, 1994 letter to MTT, which "forbid" access to the MTT lands over Horizon Court which, as noted, mainly follows the route of the former Crichton Avenue at the relevant location. He also advised Mr. Duncan that if the Ghosns proceeded with the purchase without the access being clarified by written agreement, Can-Euro would sue the Ghosns.

**77**    Following his discussion with Stefan Gaspar, Mr. Duncan received instructions from his client not to renew the Agreement of Purchase and Sale which required renewal if it was to remain in existence. Mr. Duncan wrote to Brian Tabor, solicitor for MTT, on October 11, 1994 and stated:

> Further to your letter of September 12, 1994 and our telephone conference of September 22, 1994 I now have instructions from my clients in relation to this matter.
>
> Subsequent to our telephone conference I spoke with Stefan Gaspar, Vice-President of Can-Euro Investments Limited in relation to the access to the

Dartmouth Service Centre land. He provided me with copies of surveys and a letter written to Don Steward, Real Estate Manager for Maritime Tel & Tel which letter was dated October 6, 1994. By these documents and in my conversation with him, it is clear that Can-Euro Investments Limited denies the existence of the easement. It has also been made clear to my clients that if they proceed with the purchase without the access being clarified by written agreement that they will be the subject of litigation which they have no interest in.

Therefore, I am instructed to advise that while my clients are still anxious to proceed with the purchase of the land they will not renew their agreement with Maritime Tel & Tel until such time as they have been provided written assurances by Can-Euro Investments Limited and by Maritime Tel & Tel that the access issue has been resolved to the mutual satisfaction of the parties and to the satisfaction of the Ghosns.

**78**    I cannot accept the submission that the judge erred in finding that Mr. Gaspar's threats of suit were not the proximate cause of the failure of the transaction. The trial judge was required to, and did, assess this evidence in light of all the evidence before him. When all of the relevant evidence is considered, the judge made no palpable or overriding error in reaching the conclusion he did. I will briefly review the evidence which supports the trial judge's conclusion.

**79**    The agreement of purchase and sale between MTT and the Ghosns was dated June 18, 1993 with a closing set for February 18, 1994. The agreement was conditional on many things including MTT obtaining rezoning of the property from light industrial to multi-unit residential. Mr. Duncan testified that he received the agreement in July of 1993 and conducted a title search in August of that year. In reviewing his title search he had concerns about the access to the lot. He had corresponded with MTT's then solicitor and, after receiving his explanation of why MTT thought it had a valid access, the Ghosns were prepared to proceed at that stage.

**80**    As noted, the agreement was conditional on rezoning. By late 1993 and early 1994, the City was taking the position that it would not permit the rezoning unless the access issue was clarified. This is reflected in a November, 1993 letter from a senior planner with the City in response to MTT's rezoning request. The letter stated that the City was aware of an access dispute and that in order to rezone the MTT lands, the City's Planning and Development Department would require confirmation that the property had full and permanent access to a City street.

**81**    Mr. Duncan summed all of this up as follows in his evidence:

> Q.    You indicated that you, as a result of your title search, I believe you said, had concerns about access?
> A.    Yes.

Q.    Do you recall how your concerns were raised? Like, what raised that concern in your mind?

A.    I wrote a letter to Mr. Tabor setting it out as an objection.

Q.    Okay. So you found in your title search that there was no public street attaching to the MT&T property?

A.    Yes, that was what it appeared to be at the time, as I recall it.

Q.    And you were unable to find anything in your search, title search that gave you comfort or satisfaction that there were other, there was other access provided on the records of the Registry?

A.    There was the easement agreement, as I recall, that MT&T had entered into with MacCulloch and, again, without looking at the - I'd have to look at the title search notes to be sure of it. But my recollection was that there was, my sense of it at the time was that there was a valid easement that had been granted by MacCulloch to MT&T when they closed Crichton Avenue. The, if I remember how this worked, initially the problem was that I couldn't see anything that passed that right of easement on to the successors in title to MT&T.

        Mr. Tabor and I discussed the impact of the Conveyancing Act, and whether that would have assisted in the process. At that point, I guess our initial view, and I really, this is, part of it's pretty vague for me. I can't remember exactly what all we had resolved, but it seemed to me at that time that I thought that the access issue probably was not as big a problem as I'd initially thought. I thought that the MT&T - it should have been valid but, and I don't recall and I don't have a note to this, but I suspect that I probably thought that the rezoning that was going to be required, that this would have to be sorted out in that process. I can't say that with certainty today. In any event, it wasn't very long after we had those discussions that it became evident that access was an issue, culminating with the letters in the fall of '94.

Q.    But certainly you objected to it in your report to Mr. Tabor?

A.    Yes, I did.

Q.    In your letter of objection?

A.    Yeah.

Q.    And you never waived that objection?

A.    I, I think we, quite frankly, I think we, I suppose, yes, the answer to that is I did not, but I think the discussions went silent on the issue. We moved on and - we didn't have to worry about, as between us, because the City of Dartmouth was in the picture by that time. That's sort of how I remember it.

(emphasis added)

**82**    MTT and the Ghosns apparently extended their agreement to approximately July of 1994. MTT asked for a further extension of one year to July of 1995 for the rezoning condition to be met. As Mr. Duncan put it, his clients were being asked to wait a year in circumstances where it seemed to be that there was a real problem about access.

**83**    From this evidence, it was open to the trial judge to conclude that the rezoning, which was a condition of the agreement, was not going to occur quickly and that the Ghosns recognized this and moved on.

**84**    In addition to this evidence, the trial judge had before him evidence that MTT was not able to satisfy other potential purchasers that it could convey good access. The trial judge found that the access issue raised by the appellants was at least arguable. He had before him all of the evidence relevant to MTT's claim for access. There was no evidence that MTT took the position with the Ghosns that the access issue was clear enough that MTT could force the conveyance on an unwilling purchaser. There was no evidence that MTT instituted proceedings in a timely way to clarify the access issue during the currency of the agreement with the Ghosns. These proceedings were instituted only in November of 1998. As noted, Mr. Duncan raised access in his objections to title following his title search in August of 1993 and never waived the objection. The City made it clear in November of 1993 that it was not satisfied that MTT had a clear right of access. This was fatal to the rezoning on which the Ghosn agreement was conditional.

**85**    Although the trial judge did not put it precisely this way, as I read his reasons, his fundamental holding on this issue was that MTT's rights of access on the face of the registered documents was at best uncertain. MTT could not satisfy a prospective purchaser that it could convey good access or, for that matter, convince the City of this in the context of its rezoning application. He found that it was MTT's inability to demonstrate to the Ghosns or the City that it had a valid right of access that caused the transaction not to proceed.

**86**    While this is, perhaps, not the only conclusion that one could draw from the evidence at trial, it is one that, in my opinion, was reasonably open to the trial judge. He committed no reviewable error in reaching it.

**87**    It follows that the cross-appeal fails and should be dismissed.

   VI.    Disposition:

**88**    I would dismiss the appeal and the cross-appeal. As success is divided, I would make no order as to costs.

CROMWELL J.A.
 Concurred in:

ROSCOE J.A.
SAUNDERS J.A.

* * * * *

Annex "A"

[Editor's note: Annex "A", which contains a map of the area in question, could not be reproduced online.]

* * * * *

ANNEX "B"

WHEREAS MT&T owns and maintains land and building on Crichton Ave. in the City of Dartmouth and shown on the plan attached as Schedule "A".

AND WHEREAS MacCulloch has entered into an agreement with the City of Dartmouth for the redevelopment of the area, known as "Micmac Village" including the closing of Crichton Avenue in the area.

AND WHEREAS MacCulloch has agreed to construct an access road to the property of MT&T to give access to Glencairn Crescent to replace the existing access to Crichton Avenue.

NOW THE PARTIES AGREE:

1.    MacCulloch will construct at its expense an access road from Glencairn Crescent to serve the lands of MT&T, the said access road being shown as Avonhurst Road on the plan attached as Schedule "A".

2.    Avonhurst Road shall be completed in a good and workmanlike manner, in accordance with the plan attached hereto as Schedule "A" and in accordance with the standards for public streets in the City of Dartmouth, and shall convey and dedicate the said Avonhurst Road to the City of Dartmouth as a public street. Prior to completion MacCulloch will provide and maintain acceptable access to MT&T either over the former Crichton Avenue or Avonhurst Road.

3.    MacCulloch shall convey to MT&T the triangular piece of property outlined in red on the attached Schedule "A".

4.    MT&T shall at its expense install 6" water main service and 8" sanitary sewer service along and under Avonhurst Road to serve the MT&T property.

5.    If at any future time connections are made to the sewer so installed on Avonhurst

Road to serve any property or properties abutting on Avonhurst Road, then the cost of the water and sewer service shall be apportioned as the parties shall agree, and failing agreement, as apportioned by a single arbitrator under the provisions of the Arbitration Act.

6.    MacCulloch shall pay to MT&T that portion of the cost of installation of the water and sewer service as shall be determined in accordance with paragraph 5 to be applicable to the adjacent property or properties.

7.    MT&T shall consent to all steps to be taken by the City of Dartmouth for the closure of Crichton Avenue.

*Case Name:*

# McLean v. McLean

**Between**
**Helen Gertrude McLean, in her personal capacity and as**
**executrix of the Estate of Wilmur Russell McLean, deceased,**
**Plaintiff (Appellant), and**
**Melville Kenneth McLean and Maureen Holly McLean, Defendants**
**(Respondent)**
**And between**
**Maureen Holly McLean, Plaintiff by Counterclaim, and**
**Helen Gertrude McLean, in her personal capacity and as**
**executrix of the Estate of Wilmur Russell McLean, deceased and**
**Trudy McLean, Defendants by Counterclaim**

[2013] O.J. No. 5956

2013 ONCA 788

118 O.R. (3d) 216

313 O.A.C. 364

370 D.L.R. (4th) 167

39 R.P.R. (5th) 181

2013 CarswellOnt 17995

235 A.C.W.S. (3d) 415

Docket: C56293

Ontario Court of Appeal
Toronto, Ontario

**K.M. Weiler, P.S. Rouleau and S.E. Pepall JJ.A.**

Heard: September 12, 2013.

Judgment: December 27, 2013.

(82 paras.)

*Real property law -- Deeds and documents -- Rectification -- Appeal by plaintiff from trial judgment refusing to grant rectification of memorandum of agreement allowed -- Appellant sold farm business to respondents -- She argued that agreement incorrectly listed amount of vendor take-back mortgage at $115,000 less than fair market value of real property -- Parties agreed to sale of business at fair market value -- Trial judge erred in not applying ordinary civil burden of proof and in not adopting objective reasonable bystander approach in determining common intention of parties -- Considering surrounding documentary and oral evidence as a whole, requirements for rectification based on common mistake were met.*

Appeal by the plaintiff from trial judgment refusing to grant her claim for rectification of a memorandum of agreement. The appellant was the mother-in-law of the respondent Maureen. In 1989, the appellant sold her farming business as a going concern, including all real and personal property to her son and Maureen. The agreement listed the various ways that the purchase price for the real and personal property was to be satisfied, including a vendor take-back mortgage in respect of the real property. The appellant argued that the agreement incorrectly listed the purchase price related to the real property, which was to be paid by way of the vendor take-back mortgage. Although the figure for the real property was correctly shown in the agreement as $337,444, the amount of the vendor take back mortgage, which was to be for the full amount of the real property, was incorrectly recorded as $222,444 in the agreement as well as in the mortgage. The respondent argued the parties did not have the requisite common intention as to the purchase price of the farm business at the time that the memorandum of agreement was signed. The trial judge found that the appellant failed to meet the standard of proof for rectification, which he held was convincing proof and that the parties did not have a common intention as to the amount of consideration for the farm business at the time that they executed the agreement. He based his finding almost exclusively on the respondent's s oral evidence at trial that, at the time she entered into the memorandum of agreement, she had formed the impression that the total purchase price was $625,000, not the agreed fair market value of 733,255.

HELD: Appeal allowed. The trial judge erred in requiring the appellant to present a higher standard of proof than the ordinary civil standard. The ordinary civil burden of proof on a balance of probabilities was the standard that now applied to all civil actions, including a claim for rectification. The trial judge also erred in his approach to determining whether, at the time of the sale, a common intention as to the purchase price existed but had been incorrectly expressed in the written agreement. In finding that the parties did not have a common intention, the trial judge relied almost exclusively on the appellant's testimony that she believed the purchase price to be $625,000. Instead, he should have adopted an objective approach and determined what a reasonable observer would have believed the parties intended, taking into consideration the evidence of all the parties as

well as the surrounding documentary evidence. Applying the ordinary civil standard of proof, and considering the surrounding documentary and oral evidence as a whole, the requirements for rectification based on common mistake were met. The parties had a common intention to enter into a transaction for a total selling price at fair market value, the fair market value was clear, and the fair market value was incorrectly expressed in the documentation. Unless rectification was granted, the respondent would be unjustly enriched.

**Statutes, Regulations and Rules Cited:**

Land Titles Act, R.S.O. 1990, c. L.5, s. 160

**Appeal From:**

On appeal from the judgment of Justice Christopher Bondy of the Superior Court of Justice, dated October 26, 2012, as amended January 24, 2013.

**Counsel:**

Avril A. Farlam, for the appellant.

Stephen F. Ault, for the respondent.

---

[Editor's note: An amended judgment was released by the Court March 10, 2014. The changes were not indicated. This document contains the amended text.]

The judgment of the Court was delivered by

K.M. WEILER J.A.:--

## A. OVERVIEW

**1**    In 1989, Helen and Wilmur McLean sold their farming business as a going concern, including all real and personal property, to their son, Melville McLean, and daughter-in-law, Maureen McLean. Wilmur has since died.

**2**    The parties signed a memorandum of agreement outlining the terms of the transfer. It listed the various ways that the purchase price for the real and personal property was to be satisfied, including a vendor take-back mortgage in respect of the real property.

**3**    Helen, the appellant, claimed rectification of the memorandum of agreement on the basis that the total purchase price was incorrectly recorded. Specifically, she alleged that the portion of the purchase price related to the real property, which was to be paid by way of the vendor take-back mortgage, was incorrectly recorded in the agreement as $222,444 or $115,000 less than the fair

market value of the real property, which was $337,444. Helen testified at trial that the sale of the farming business was intended to be at fair market value, which had been appraised as $733,255.

**4**    Maureen, the respondent, submits that Helen has not met the requirements for rectification. She argues that the parties did not have the requisite common intention as to the purchase price of the farm business at the time that the memorandum of agreement was signed. Although she accepted in cross-examination that the consideration for the real property was to be $337,444, she testified that she believed the total purchase price for the farming business, including both the real and personal property, was to be $625,000, not $733,255. She argues that without consensus on this amount, rectification cannot be granted.

**5**    In *Snell's Equity*, 32nd ed. (London: Sweet & Maxwell, 2010), rectification is defined at para. 16-001:

> Where the terms of a written instrument do not accord with the true agreement between the parties, equity has the power to reform, or rectify, that instrument so as to make it accord with the true agreement. What is rectified is not a mistake in the transaction itself, but a mistake in the way in which that transaction has been expressed in writing.

As Laskin J.A. stated in *Royal Bank of Canada v. El-Bris Ltd.*, 2008 ONCA 601, 92 O.R. (3d) 779, at para. 13, "[r]ectification is an equitable remedy designed to ensure that one party is not unjustly enriched at the expense of another."

**6**    If Helen's claim for rectification of the memorandum of agreement were to succeed, then the necessary implication is that the purchase price of the real property and the principal amount of the vendor take-back mortgage as indicated in the parcel register for the real property in the Land Titles system would also need to be rectified.[1]

**7**    Section 160 of the *Land Titles Act*, R.S.O. 1990, c. L.5 allows for rectification of entries in the Land Titles register. It provides:

> 160.    Subject to any estates or rights acquired by registration under this Act, if a person is aggrieved by an entry made, or by the omission of an entry from the register, or if default is made or unnecessary delay takes place in making an entry in the register, the person aggrieved by the entry, omission, default or delay may apply to the court for an order that the register be rectified, and the court may either refuse the application with or without costs to be paid by the applicant or may, if satisfied of the justice of the case, make an order for the rectification of the register.

**8**    Equity continues to have application to claims governed by the *Land Titles Act*: see *MacIsaac v. Salo,* 2013 ONCA 98, 114 O.R. (3d) 226, at para. 39; *Durrani v. Augier* (2000), 50 O.R. (3d) 353, at para. 52.

**9**    The trial judge refused to grant rectification for two reasons. First, he determined that Helen failed to meet the standard of proof for rectification, which he held was "convincing proof". Second, although the trial judge acknowledged that the documentation in issue was poorly drafted and contained errors, he held that the requirements for granting the remedy of rectification were not met because the parties did not have a common intention as to the amount of consideration for the farm business at the time that they executed the agreement.

**10**    I am of the opinion that the trial judge erred in both reasons he gave for refusing rectification. The ordinary civil burden of proof on a balance of probabilities is the standard that now applies to all civil actions, including a claim for rectification. The trial judge also erred in his approach to determining whether, at the time of the sale, a common intention as to the purchase price existed but had been incorrectly expressed in the written agreement. In finding that the parties did not have a common intention, the trial judge relied almost exclusively on Maureen's testimony that she believed the purchase price to be $625,000. Instead, he should have adopted an objective approach; that is, what a reasonable observer would have believed the parties intended, taking into consideration the evidence of all the parties as well as the surrounding documentary evidence.

**11**    Applying the ordinary civil standard of proof, and considering the surrounding documentary and oral evidence as a whole, in my view, the requirements for rectification based on common mistake are met. The parties had a common intention to enter into a transaction for a total selling price at fair market value, the fair market value is clear, and the fair market value was incorrectly expressed in the documentation. Unless rectification is granted, Maureen will be unjustly enriched.

## B. FACTS

**12**    Helen and Wilmur McLean lived on and operated their dairy farm until they moved into a nearby bungalow in May 1988. The farm house was soon occupied by their son, Melville, and his then-fiancée, Maureen, whom he married soon after. Like Melville, Maureen had grown up on a dairy farm, and the couple intended to make farming their life's work. They understood that they would be given the opportunity to purchase the farm from Helen and Wilmur at fair market value. That opportunity arose later in 1988.

**13**    On January 1, 1989, Melville and Maureen began to operate the farm as if it were their own. They became partners in the farm business and entered into a written partnership agreement between themselves. Maureen began doing the books for the farm, including the farm ledger, with help from Helen. She began doing the accounting on her own in January 1990.

**14**    Maureen also worked as a legal secretary for a lawyer named Jennifer Sims in 1989. At this time Maureen had approximately three years of administrative experience: one year working for a financial firm and two years working as a legal secretary.

**15**    Ms. Sims acted for both parties respecting the sale and purchase of the farm. The trial judge found that she "took the vast majority of her instruction from her employee and client Maureen" and

did not require Helen and Wilmur to obtain independent legal advice.

**16**    Ms. Sims dictated to Maureen, while Maureen typed up the documentation relating to the sale. Maureen testified that she simply typed in the figures as instructed by Ms. Sims and did not really understand what she was typing. The trial judge found that Ms. Sims was an inexperienced lawyer who made "countless errors" in drafting the documents, including the memorandum of agreement. Ms. Sims has since lost the file.

**17**    The parties signed the memorandum of agreement in May 1989.[2] The transfer and the vendor take-back mortgage were not signed until October 1989. The consideration recorded on the transfer and the principal amount recorded on the mortgage is $222,444 on both instruments.

**18**    Melville and Maureen ran a successful farming operation together, but they separated in 2005. In 2008, Helen became concerned about her interests. The vendor take-back mortgage remained largely unpaid. Helen read the closing documents for the sale transaction for the first time and became concerned that "the figures did not add up." Specifically, the purchase price for the farm was $115,000 less than the total of the fair market value of all the assets. The figure listed for the principal amount of the mortgage was also missing $115,000. Notably, $115,000 was the fair market value of the stone farm house on the property.

**19**    Helen brought a claim for rectification against both Melville and Maureen. She sought to add $115,000 to the principal amount of the mortgage, and consequently to the total purchase price of the property.

**20**    Melville did not oppose Helen's claim and summary judgment issued against him. Maureen did oppose the claim for rectification and was successful at trial.

## C. THE TRIAL JUDGE'S DECISION

**21**    In considering whether Helen's claim for rectification was made out, the trial judge reviewed the documentary evidence and oral testimony of the witnesses to determine the intentions of the parties at the time they signed the memorandum of agreement.

### (1)    The Memorandum of Agreement, Schedule E, and the Mortgage

**22**    The memorandum of agreement provides that the purchase price is to be based on:

> values as shown on the statement as prepared by BDO Ward Mallette for the business at the close of business on the 31st day of December 1988 as attached and marked as Schedule "E" hereto.

**23**    There was no Schedule E attached to the memorandum of agreement when it was signed. There was no reporting letter from Ms. Sims. The documentation that she sent to Helen and Wilmur following the sale did not include a Schedule E.

**24**     A draft Schedule E appears to have been prepared before the memorandum of agreement was signed. Although Maureen typed all of the other documents relating to the sale, she maintained that she did not type Schedule E. However, in cross-examination, she acknowledged that her initials were at the bottom of a letter dated May 3, 1989, enclosing the draft documents sent by Ms. Sims to Helen and Wilmur for their review. Draft Schedule E appears to have been with the attachments sent for their review. For ease of reference, this document is shown below.

SCHEDULE "E"

WILMUR & HELEN McLEAN

TRANSFER OF FARM OPERATIONS TO MELVILLE McLEAN

(55) 225

|  | Fair Market Value | U.C.C. | Transfer Value |
|---|---|---|---|
| Land | $ 100,000 | $      - | $ 100,000 |
| Principal residence | 115,000 | - | - |
| Barn | 110,000 | 5,510 | 110,000 |
| Other buildings | - | 12,444 | 12,444 |
| Equipment | - | 101,811 | 101,811 |
| Quota | 180,000 | 1,197 | 180,000 |
|  |  |  | 504,255 |
| Inventories - livestock | 105,000 |  | 105,000 |
| - feed, supplies | 9,000 |  | 9,000 |
|  |  |  | $ 618,255 |

Consideration:

| | |
|---|---|
| Bank loan | $   53,129 |
| Open account | 54,000 |
| Demand note | 228,682 |
| Demand mortgage | 222,444 |
| Cash | 60,000 |
|  | $ 618,255 |

25    The values shown in the draft Schedule E for the land ($100,000), principal residence ($115,000), barn ($110,000), and other buildings ($12,444), total $337,444, which is the amount

that Helen contends was the agreed upon purchase price of the real property that should have been included in the memorandum of agreement, the transfer and the mortgage.

**26**    It is not clear why Schedule E was not included in the signed copy of the memorandum of agreement. At paras. 59-60 of his reasons, the trial judge discussed the draft Schedule E document:

> I make the following further observations regarding the draft Schedule E. That document recognizes that the principal residence was to be included in the purchase price and assigns it a "fair market value" of $115,000, but does not assign it a "transfer value". No one was able to explain to me why. It follows that if the document is considered in isolation it is as likely as not the lack of a transfer value for the house was deliberate.

> Complicating matters further, Maureen testified the document was not likely prepared by her. Ms. Joanne King, who was qualified as an expert in income tax matters, testified that the draft Schedule E was likely prepared for tax purposes. It follows that Schedule E may not have been intended for the purpose to which Ms. Sims put it. As a result I have no way of knowing if the Schedule E in those draft documents was intended to be incorporated in the signing copies, or if a different schedule altogether was intended to be included.

The trial judge found that "[w]ithout Schedule E it is difficult or impossible to ascertain the total purchase price and/or the apportionment of it."

**27**    Paragraph 3 of the memorandum of agreement lists the ways in which the purchase price was to be paid and satisfied. Paragraph 3(iv) states:

> as to $337,444.00 by delivery of a registerable Deed for the property described in Schedule "A" attached hereto free and clear of any encumbrances of any nature whatsoever;

**28**    The trial judge commented, "Presumably, that is a reference to real estate included in the deed to be delivered by the vendors on closing."

**29**    Helen testified that the entire purchase price of the real property was to be financed by way of a vendor take-back mortgage. The trial judge observed that if the amount in paragraph 3(iv) was correct, it should coincide with the corresponding mortgage amount in paragraph 3(v). Paragraph 3(v) states:

> as to $222,444.00 by issuance to the Vendors of a Mortgage on the land as set out in Schedule "A" attached hereto;

**30**    The principal amount of the mortgage stated in paragraph 3(v) and on the mortgage itself is $222,444. As such, there is a discrepancy of $115,000 between the amount of the mortgage, $222,444, and the amount indicated in paragraph 3(iv), $337,444.

**31**    The trial judge found that the memorandum of agreement was an inaccurately written document and therefore a candidate for rectification, but that it was not possible to ascertain the intentions of the parties from that contract alone.

### (2)    Other Documentation

**32**    Paragraph 2 of the memorandum of agreement references a statement prepared by BDO Ward Mallette for the farm business as at December 31, 1988 as the basis for the amounts listed in Schedule E. Although BDO did not prepare a statement as at December 31, 1988, it did prepare an opening balance sheet for the farm business one day later, January 1, 1989. That balance sheet values the personal property of the business at $396,311. The bill of sale for the personal property shows consideration of $395,811 (the trial judge presumed the $500 difference in the two figures was the amount of $500 shown in the starting bank account). Maureen approved the opening balance sheet on behalf of Melville.

**33**    Melville and Maureen each applied to the Ministry of Agriculture for a farm grant. In her application, which she filled out sometime after December 1, 1989, Maureen reported to the Ministry in her own handwriting that the farm real estate was acquired for a total price of $337,444. She wrote that the principal residence was acquired for $115,000.

**34**    After reviewing these documents, the trial judge found, at para. 44 of his reasons, that "no assistance can be had from a review of collateral documents". Accordingly, he based his decision as to the prior intentions of the parties with respect to the purchase price on the testimony of the witnesses.

### (3)    Testimony of the Witnesses

**35**    The trial judge found that there was consensus between the parties as to the fundamentals of the transaction. At para. 61 of his reasons, under the heading "The Facts Agreed To", the trial judge found that the parties agreed that:

    i.    Melville and Maureen were buying all of the farm assets and that the farm assets included the stone farmhouse located on the lands.

    ii.    There were no gifts expressed or intended.

    iii.    The transaction was to take place at fair market value.

    iv.    The fair market value of the land and buildings, including the farm house, was $337,444.

    v.    The fair market value of the personal property was $395,811.

    vi.    The fair market value of all assets was $733,755.

**36**    The trial judge commented, at para. 62 of his reasons, that:

> [G]enerally speaking, it would not be necessary for each of them to have
> completed the necessary arithmetic to conclude the purchase price was $733,755
> [*sic* $733,255] in order to establish a common intention. It follows that had the
> evidence gone no further, it is possible that rectification may have been an
> appropriate remedy in the circumstances. However, the evidence did not end
> there.

**37**    Maureen testified that she formed an opinion that the price agreed upon for the sale was
$625,000. She could not remember exactly where this number came from, but thought that she had
either seen it on a document or that Melville had told her that was the price.

**38**    The trial judge held that Maureen's evidence as to her understanding of the purchase price was
consistent and he accepted it. He concluded that if Maureen had been advised that the actual
purchase price of the farming business was $733,255 and not $625,000 as she thought, she may not
have signed the agreement. As a result, he held that it was not possible to ascertain the intention of
the parties from the memorandum of agreement. The onus on Helen to provide "convincing proof"
that the parties agreed on the purchase price had not been discharged. He therefore dismissed
Helen's claim.

## D. ANALYSIS

>    **(1)    Did the trial judge err in requiring Helen to present "convincing
>            proof" as the standard for a claim for rectification?**

**39**    The trial judge held that Helen was required to provide "convincing proof" of a prior common
intention to support her claim for rectification. He relied on the decision in *Performance Industries
Ltd. v. Sylvan Lake Golf & Tennis Club*, 2002 SCC 19, [2002] 1 S.C.R. 678, at para. 41, in which
Binnie J. held that in cases of rectification, "convincing proof", that is, "proof that may fall well
short of the criminal standard, but which goes beyond the sort of proof that only reluctantly and
with hesitation scrapes over the low end of the civil 'more probable than not' standard", is required.

**40**    Helen submits that the decision in *Sylvan Lake* has been superseded by the later decision of
the Supreme Court of Canada, *F.H. v. McDougall*, 2008 SCC 53, [2008] 3 S.C.R. 41, which held
that the only civil standard of proof in Canadian common law is proof on a balance of probabilities.
Writing for a unanimous court, Rothstein J. stated at para. 40, under the heading "The Approach
Canadian Courts Should Now Adopt":

> Like the House of Lords, I think it is time to say, once and for all in Canada, that
> there is only one civil standard of proof at common law and that is proof on a
> balance of probabilities. Of course, context is all important and a judge should
> not be unmindful, where appropriate, of inherent probabilities or improbabilities

or the seriousness of the allegations or consequences. However, these considerations do not change the standard of proof. I am of the respectful opinion that the alternatives I have listed above [including the requirement that evidence must be clear, convincing and cogent] should be rejected for the reasons that follow.

**41**    Maureen submits that if the Supreme Court of Canada had intended to overrule the comments of Binnie J. in *Sylvan Lake,* it would have expressly said so. She alleges that *McDougall* is distinguishable as a case where civil damages were claimed for an alleged sexual assault at an Indian residential school many years before.

**42**    I cannot accept Maureen's submission. Rothstein J. specifically states at para. 49 that his conclusion respecting the standard of proof applies to all civil cases:

> In the result, I would reaffirm that in civil cases there is only one standard of proof and that is proof on a balance of probabilities. In *all* civil cases, the trial judge must scrutinize the relevant evidence with care to determine whether it is more likely than not that an alleged event occurred. [Emphasis added.]

**43**    The trial judge erred in requiring Helen to present a higher standard of proof than the ordinary civil standard.

> **(2)    Did the trial judge err in finding that the parties had no common intention with respect to the total purchase price for the farm?**
> **(a)    Rectification Principles**

**44**    Rectification is an equitable remedy dependent on the trial judge's exercise of discretion. Judicial review of the exercise of that discretion is constrained to situations where the trial judge misdirected himself, came to a decision that is so clearly wrong that it amounts to an injustice, or gave no weight, or insufficient weight, to relevant considerations: see *Wasauksing First Nation v. Wasausink Lands Inc.* (2004), 43 B.L.R. (3d) 244, [2004] 2 C.N.L.R. 355 (Ont. C.A.), at para. 82; *Penner v. Niagara (Regional Police Services Board)*, 2013 SCC 19, 356 D.L.R. (4th) 595, at para. 27 (dealing generally with the standard of review of a trial judge's exercise of discretion). In addition, an appellate court may intervene where the trial judge exercised his or her discretion based on a wrong principle: see *Soulos v. Korkontzilas* (1995), 25 O.R. (3d) 257 (Ont. C.A.), aff'd [1997] 2 S.C.R. 217, at p. 259. For the reasons that follow, I am of the opinion that the trial judge gave insufficient weight to relevant considerations and also erred in principle.

**45**    In this case, rectification is claimed on the basis of common mistake; although the figure for the real property was correctly shown as $337,444 in para 3(iv) of the memorandum of agreement, the amount of the vendor take back mortgage, which was to be for the full amount of the real property, was incorrectly recorded in para. 3(v) as $222,444 as well as in the mortgage. Helen must show: 1) that the parties had a common continuing intention prior to the making of the document

alleged to be deficient; 2) that that intention remained unchanged or existed at the time when the document sought to be rectified was signed; and 3) by mistake, the parties signed a document that did not accurately reflect their common intention: see *Wasauksing First Nation*, at para. 81; *Swainland Builders v. Freehold Properties Ltd.*, [2002] EWCA Civ 560, [2002] 2 E.G.L.R. 71, at para. 33, approved in *Chartbrook Ltd. v. Persimmon Homes Ltd.* [2009] UKHL 38, [2009] 1 A.C. 1101, at para. 48. The claimant may introduce oral or written evidence that there was a common intention between the parties that is not reflected in the written contract due to error, and the court is to decide whether to rectify the document to give effect to this true agreement.

**46**    I would also add the following guidance from *Swainland*, at para. 34:

> While a common intention must be shown, the exact form of words in which the common intention is to be expressed is immaterial if in substance and in detail the common intention can be ascertained. [Citations omitted.]

Furthermore, "[t]he fact that a party intends a particular form of words in the mistaken belief it is achieving his intention does not prevent the court giving effect to the true common intention."

###    (b)    Discussion

**47**    The trial judge found that there was consensus as to the fundamentals of the sale including that it was to take place at fair market value, and that the fair market value of the land and buildings was $337,444, including $115,000 for the farm house. He also found that the parties agreed that the fair market value of the personal property was $395,811. The total of these two figures reflects the purchase price for the farm business of $733,255.

**48**    Despite finding there was consensus on these matters, the trial judge held that the parties did not have a common intention as to the total purchase price that was to be paid for the farm business. He based his finding almost exclusively on Maureen's oral evidence at trial that, at the time she entered into the memorandum of agreement, she had formed the impression that the total purchase price was $625,000. This figure is similar to the purchase price of $618,255 listed at the bottom of the draft Schedule E, which excludes the value of the farm house.

**49**    Although Maureen agreed that fair market value for the assets was likely $733,255, she testified that she thought $625,000 was probably the fair market value. The trial judge excused the discrepancy in her evidence as "a lack of understanding on her part as to precisely what the term 'fair market value' means". He found that Maureen "lacked sophistication in business matters notwithstanding her secretarial training." The trial judge ultimately held that Maureen believed that the purchase price for the farming business was $625,000 and that she intended to close the transaction at that price.

**50**    Helen testified that she did not notice the errors in the memorandum of agreement or the mortgage. With a grade eight education, she has the least formal training of any of the parties. As

noted earlier, Maureen had three years of secretarial experience, including some real estate and corporate commercial work.

**51**    The trial judge found that although Helen intended to sell the farm business for fair market value and Maureen intended to buy the farm business for fair market value, the fact that the parties cannot agree on the 1989 fair market value means they did not have a common intention in relation to the total purchase price of the farming business.

**52**    The trial judge's finding of fact that Maureen intended to buy the farming business for $625,000 raises two sub-issues:

        1)     how is the common intention of the parties to be established? and

        2)     was the trial judge's finding of a lack of common intention reasonable?[3]

### (i)    How is the common intention of the parties to be established?

**53**    The trial judge's reliance on Maureen's subjective belief that the purchase price of the farming business was $625,000 raises the question of how the common intention of the parties is to be established. Is the search for common intention based on the subjective understanding of each party, or on what an objective reasonable observer would have understood the parties' intentions to be up to the time of execution of the contract for which rectification is sought?

**54**    When the issue before the court is simply a question of contractual interpretation, and rectification is not involved, the question is what an objective reasonable bystander would think the agreement meant based on the parties' intentions: see *UBS Securities Canada, Inc. v. Sands Brothers Canada, Ltd.,* 2009 ONCA 328, 95 O.R. (3d) 93, at para. 47; *Ron Ghitter Property Consultants Ltd. v. Beaver Lumber Co.*, 2003 ABCA 221, 330 AR 353, at para. 9; see also S.M. Waddams, *The Law of Contracts*, 5th ed. (Aurora, Ont: Canada Law Book Inc., 2005), at 105. The court begins with the words of the contract and presumes that the parties intended what is written in the contract. In construing the intention behind a particular provision, the court must consider, among other things, the contract as a whole, the factual matrix underlying it, and the need to avoid commercial absurdity. But the court does not consider the subjective intention of the parties: see *Downey v. Ecore International Inc.*, 2012 ONCA 480, 294 O.A.C. 200, at paras. 37-38; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673, 268 O.A.C. 279, at para. 16.

**55**    Helen submits that the same objective approach applies when determining the common intention of the parties in cases where rectification for common mistake is sought. Neither party presented the court with any authority directly on point and further submissions on the issue were sought.

**56**    In his text *Misrepresentation, Mistake and Non-Disclosure*, 3d ed. (London: Sweet & Maxwell, 2012), Professor John Cartwright observes, at pp. 641-42:

Judges and writers have commonly stated, or have used language which appears to suggest, that the test should be subjective. This has, however, been challenged, and in *Chartbrook Ltd. v. Persimmon Homes Ltd.,* [2009] 1 A.C. 1101, Lord Hoffmann considered that the test was objective.

**57**     Lord Hoffmann, at paras. 60-61 of *Chartbrook*,[4] stated that:

> Now that it has been established that rectification is also available when ... the parties had a common continuing intention in respect of a particular matter in the instrument to be rectified, it would be anomalous if the 'common continuing intention' were to be an objective fact if it amounted to an enforceable contract but a subjective belief if it did not. On the contrary, the authorities suggest that in both cases the question is what an objective observer would have thought the intentions of the parties to be. Perhaps the clearest statement is by Denning L.J. in *Frederick E. Rose (London) Ltd. v. William H. Pim Jnr & Co Ltd* [1953] 2 QB 450, 461:

>> Rectification is concerned with contracts and documents, not with intentions. In order to get rectification it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly; and in this regard, in order to ascertain the terms of their contract, you do not look into the inner minds of the parties - into their intentions - any more than you do in the formation of any other contract. You look at their outward acts, that is, at what they said or wrote to one another in coming to their agreement, and then compare it with the document which they have signed. If you can predicate with certainty what their contract was, and that it is, by a common mistake, wrongly expressed in the document, then you rectify the document; but nothing less will suffice.

> Likewise in *Etablissements Georges et Paul Levy v. Adderley Navigation Co Panama SA (The Olympic Pride)* [1980] 2 Lloyd's Rep 67, 72, Mustill J. said:

>> The prior transaction may consist either of a concluded agreement or of a continuing common intention. In the latter event, the intention must have been objectively manifested. It is the words and acts of the parties demonstrating their intention, not the inward thoughts of the parties, which matter.

**58**     The comments of Denning L.J. in *Frederick E. Rose (London)* were also adopted by the

Supreme Court of Canada in *Shafron v. KRG Insurance Brokers (Western) Inc.*, 2009 SCC 6, [2009] 1 S.C.R. 157, at para. 52.

**59**    Lord Hoffmann indicated in *Chartbrook* that the court should consider the relevant documents, the oral evidence of the parties, and the parties' post-agreement conduct in determining common intention. This is precisely the evidence that this court considered in *El-Bris* in holding that the trial judge's decision to grant rectification was reasonable, at para. 20.

**60**    In my view, the question that the court must answer is whether the totality of the evidence supports the conclusion on a balance of probabilities that an agreement was in place but that an error was made in recording it. This is an objective inquiry. The totality of the evidence can include the testimony of a party as to what he or she understood the terms to be. The weight of this testimonial evidence will vary depending on the documentary and other evidence available: see *Chartbrook,* at para. 65; *Ron Ghitter,* at para. 16.

**61**    As I will next discuss, in my view, the trial judge erred in determining that the parties did not have a common intention prior to signing the memorandum of agreement due to Maureen's subjective belief concerning the total purchase price of the farming business. Instead, he ought to have adopted an objective approach that considered Maureen's understanding of the total purchase price together with the remainder of her evidence, as well as the documentary evidence and the evidence of the other witnesses.

### (ii)    Was the trial judge's finding of a lack of common intention reasonable?

**62**    In relying almost exclusively on Maureen's evidence of her subjective belief regarding the total purchase price of the farming business, the trial judge not only erred in principle, he failed to give sufficient weight to all the documentary evidence and did not consider the evidence as a whole, together with Maureen's oral testimony and after the fact conduct. Where several documents are executed to effect a commercial transaction, the interpretation of a document in issue is informed by the related documents. Only when the related documents are considered as a whole does the intention of the parties emerge: see *Salah,* at para. 16; *Downey,* at para. 63. In this case, the related documents are the transfer and the mortgage. However, because other documentation forms part of the factual matrix respecting the transaction it must also be considered in determining the intent of the parties. That documentation includes the draft Schedule E, the appraisal given by Barry Gordon, and Maureen's Farm Start application.

**63**    When the documentary and oral evidence is considered as a whole, the only reasonable conclusions are that: 1) the parties intended to enter into a transaction at fair market value; 2) the fair market value of the farm business was $733,255; and 3) the transfer value of the real property was correctly stated in para. 3(iv) of the memorandum of agreement as $337,444 but the amount of the vendor take-back mortgage was incorrectly stated in para. 3(v) as $222,444. Draft Schedule E incorrectly stated the transfer value of the real property as did the transfer. These documents

therefore do not accurately reflect the intention of the parties.

### a)    The totality of the evidence

**64**    The following aspects of the documentary and oral evidence support Helen's position that the purchase price agreed to for the real property was $337,444 and so the purchase price for the real property expressed in the transfer and the principal amount expressed in the vendor take-back mortgage should have been $115,000 greater than the amount indicated in these documents.

> 1)    <u>The memorandum of agreement.</u> The memorandum of agreement refers to the inclusion of the farm house in the sale and indicates a total price of $337,444 for the real property:
>
>> *    Paragraph 1(a) lists the real property assets to be transferred as "land, dwelling and other buildings (Schedule A)". Schedule A details the metes and bounds description of the property and states, "Including the principal residence, barn and other buildings located thereon."
>> *    Paragraph 3(iv) indicates that the purchase price is to be paid in part "as to $337,444.00 by delivery of a registerable Deed for the property described in Schedule "A" attached hereto free and clear of any encumbrances of any nature whatsoever". As noted above, the trial judge presumed this to be a reference to the real property included in the sale.
>
> 2)    <u>Maureen's cross-examination on the memorandum of agreement.</u> In cross-examination, the following suggestion was put to Maureen:

Q:    [I]t [paragraph 3(iv) of the memorandum of agreement] means that you're going to get a deed to property for which you will pay $337,444. Can you agree with me on that?

A:    Yes.

> She agreed that they were purchasing the farm house, the farm acreage, and the barns. She also agreed that the purchase of the real property was to be 100 percent financed by the vendor take-back mortgage. Logically,

therefore, the consideration shown on the registered transfer and the principal amount on the vendor take-back mortgage should have been $337,444, not $222,444.

3)    <u>The error in the draft Schedule E.</u> The top portion of the draft Schedule E contains three columns: Fair Market Value, "U.C.C." (Undepreciated Capital Cost), and Transfer Value. In the Fair Market Value column, the farm house is listed for $115,000. There is no amount shown for it in the U.C.C. column or the Transfer Value column. As a result, the total of the Transfer Value column is only $618,255. Joanne King, a chartered accountant with experience preparing financial statements for transfers of family businesses, prepared a report and testified at trial that the document appeared to have been created for tax purposes. She stated that the value of the principal residence, $115,000, was likely left out of the "Transfer Value" column - and therefore the total amount of the transfer value shown at the bottom of the column -- because there is no tax on the sale of a principal residence. This explains why the $115,000 for the farm house was left out of the total amount on the draft Schedule E.

The trial judge found that Schedule E was likely prepared for tax purposes, but that Ms. Sims may have used the document for a purpose for which it was not intended. I agree with this finding. However, the trial judge concluded that he had no way of knowing whether the draft Schedule E was intended to be included with the final signed copy of the agreement, or whether a different schedule altogether was intended to be included. The trial judge's comment ignores the fact that draft Schedule E was sent by Maureen on behalf of Ms. Sims as an attachment to the May 3, 1989 letter to Helen and Wilmur enclosing documents for their review. Further, if the draft Schedule E was not the document referred to in the memorandum of agreement, there would be no purpose to the consideration calculation below the Transfer Value column using the $618,255 total and showing a demand mortgage in the amount of $222,444, the exact amount of the mortgage in issue. No other version of Schedule E was presented in evidence. The trial judge's conclusion is not supported by the evidence.

4)    <u>No inference can be drawn that the land transfer tax affidavit correctly records the purchase price.</u> The land transfer tax affidavit attached to the transfer, dated May 16, 1989, indicates that total consideration for the transaction was $222,444. Section two of the affidavit states that it must be

completed where the value of the consideration for a conveyance *exceeds* $250,000. Section two of the affidavit was filled out in the transfer, even though the total consideration for the transaction was indicated as less than $250,000.[5]

5) <u>The appraisal by Barry Gordon.</u> Barry Gordon, an appraiser, prepared an appraisal of the lands and buildings on the property on February 10, 1989. He valued the farm house at $115,000, the barn at $110,000, and the acreage at $100,000. He testified that he was asked to give his opinion by Melville because he and his wife were planning to buy the farm from his parents and he wanted to establish the fair market value of the property. Mr. Gordon affirmed his appraisal at trial. In cross-examination, Maureen testified that she knew that Mr. Gordon was supposed to give an appraisal of the farm real estate.

6) <u>Maureen's Farm Start grant application and her evidence respecting it.</u> After purchasing the farm, Maureen filled out a farm inventory for her application to the Farm Start grant program by hand. On the page titled "Land, Buildings and Quota", dated January 1, 1989, she identified three parcels of "farmland owned", including the year acquired and the cost. She wrote: (1) the acreage, acquired 1989 for $100,000; (2) the principal residence, acquired 1989 for $115,000; and (3) the barn and other buildings, acquired in 1989 for $122,444, for a total of $337,444.

The figures she inserted were identical to those of Mr. Gordon for the acreage and the principal residence. The amount for the barn and other buildings shown by Mr. Gordon was $110,000. The amount Maureen wrote on the form was $122,444, a difference of $12,444. She acknowledged that this was the amount in the draft Schedule E under "Other Buildings". When asked in cross-examination where these values came from, she admitted that they probably came from Mr. Gordon's appraisal and from the draft Schedule E. Maureen then amended her answer to say that her husband had given her the numbers and that he probably obtained them from Schedule E and the appraisal.

Whether Maureen obtained the figures she used in the farm grant application from Mr. Gordon's appraisal and the draft Schedule E or whether her husband gave her the figures, this document is an implicit acknowledgment by her that she did not intend to acquire the real property for $222,444 but for $337,444. She did not dispute that she intended to pay

$395,811 for the personal property. She even agreed in cross-examination that the amounts that she and Melville had agreed to pay totalled $733,255. Despite this, she testified that she did not intend to pay the mathematical total of these two amounts. Instead, she maintained that she intended to pay $625,000 and that the mortgage figure should stand.

**65**    In summary, there is no dispute that the parties intended the purchase of the farm business to be at fair market value. Fair market value at the time of the sale was $733,255 and was comprised of personal property and real property. There is no dispute respecting the amount for personal property. There is no dispute that no gifts were expressed or intended. There is also no dispute that the purchase included the farm house. Maureen does not dispute the figure of $337,444 for real property mentioned in the memorandum of agreement in paragraph 3(iv) or that this amount was being paid in exchange for the deed to the real property. At no point did Maureen testify that the amount of $337,444 in paragraph 3(iv) of the memorandum of agreement for the real property was incorrect or that, at the time, she did not intend to pay this amount, even when the question was specifically put to her. Had the parties intended a lesser figure, there would have been no reason to mention the $337,444 amount. She nonetheless maintains that she intended to pay $625,000 for the farm because she had formed the impression that was what fair market value was, and, consequently, the amount of the mortgage should not be changed.

**66**    The evidence I have outlined above indicates that there was an agreement to sell the property for fair market value and that the parties agreed the fair market value of the real property being conveyed was $337,444, including the farm house valued at $115,000. However, through multiple errors in drafting, the fair market value of the farm house was not included in the consideration for the real property and the principal amount of the vendor take-back mortgage was incorrectly expressed as $222,444.

**67**    In refusing to order rectification, the trial judge placed too much weight on Maureen's oral evidence that she intended to pay $625,000 for the farming business and failed to place any weight on her oral evidence agreeing that the purchase price of the real property was $337,444 and her subsequent conduct in filling out the Farm Start application indicating that the cost of acquiring the real property was $337,444.

**68**    A reasonable third party bystander would conclude that the amount for the farm house had been mistakenly left out of the documents registered on title. Due to error, the common intention of the parties to purchase the real property for $337,444 was not reflected in either para. 3(v) of the memorandum of agreement, or the transfer, or the mortgage.

**b)    Other considerations**

**69**    Maureen submits that this was not a case of common mistake but rather of mutual mistake. In *Lee v. 1435375 Ontario Ltd.*, 2013 ONCA 516, 363 D.L.R. (4th) 222, Strathy J.A. commented on the distinction between common and mutual mistake, at para. 28:

> While the Purchaser put his amended claim in both mutual mistake and common
> mistake, the motion judge held that it was a case of common mistake, rather than
> mutual mistake. She noted that mutual mistake exists when the "'parties
> misunderstand each other and are at cross purposes' - where both parties are
> mistaken, but about different things and are therefore not 'on the same page'":
> referring to M.P. Furnston, *Cheshire and Fifoot's Law of Contract*, 9th ed.
> (London: Butterworths, 1976) at pp. 206-20 and *Ron Ghitter Property
> Consultants Inc. v. Beaver Lumber Co. Ltd.*, 2003 ABCA 221, 330 A.R. 353, at
> para. 10. Common mistake, she observed, is "one in which both parties make the
> same mistake. Each party knows what the other party wants, but the parties are
> 'mistaken about some underlying and fundamental fact'": referring to *Cheshire
> and Fifoot's*, at p. 206.

Professor G.H.L. Fridman states in his text *The Law of Contract in Canada*, 6th ed. (Toronto:
Thomson Reuters, 2011) at 252:

> Whether the kind of mistake that is involved is described as "mutual" or as
> "common", it is suggested that, in the final analysis, the rationale for invalidating
> the alleged contract at common law is the same: was there any error as to the
> intention to contract, or, putting this slightly differently, did the contracting party
> seeking to avoid the contract for mistake obtain the consideration for which he
> had bargained?

**70** This is not a case of mutual mistake. Rather, the parties agreed to a sale of the farming
business at fair market value, and this is not reflected in the documentation. Helen bargained for a
purchase price of real property that reflected the property's fair market value. She did not obtain the
consideration for which she had bargained.

**71** Maureen also submits that this was a case of unilateral mistake.[6] For the reasons given above I
have implicitly rejected that submission.

**72** With respect to unilateral mistake, the question as set out in *Sylvan Lake*, at para. 31, is
whether one party knew or ought to have known of the other party's mistake, sought to take
advantage of it, and whether permitting that party to take advantage of the mistake would amount to
unfair dealing.

**73** This is not a case where one party knew or ought to have known of the other party's mistake
and sought to take advantage of it. It is, however, a case where the effect of the trial judge's refusal
to exercise his discretion to rectify the memorandum of agreement and the mortgage is to allow
Maureen to be unjustly enriched at Helen's expense. There is no juristic reason for this deprivation.
This is yet another case where the pitfalls of having the same lawyer act for both parties involved in
a real estate transaction are all too apparent. The purpose of rectification, to prevent unjust
enrichment, is fulfilled in granting this remedy.

**E. CONCLUSION**

**74**    The trial judge erred in both reasons he gave for refusing rectification. The ordinary civil burden of proof on a balance of probabilities is the standard that now applies to all civil actions, including rectification.

**75**    The trial judge also erred in his approach to rectification. Instead of adopting the objective reasonable bystander approach, he relied almost exclusively on Maureen's testimony as to her subjective intention that the total purchase price for the farming business was $625,000. Instead of considering the documentary and oral evidence as a whole, he looked at individual aspects of the evidence and did not give sufficient weight to the cumulative effect of the evidence including: Maureen's acknowledgment that she and her former husband were to pay $337,444 for the real property; the exclusion of the farm house for tax reasons in draft Schedule E leading to the error on that document in calculating the consideration for the property and the amount of the mortgage; and the manner in which Maureen filled out the Farm Start application.

**76**    The cumulative effect of the evidence is that the parties had a common intention with respect to the amount of the purchase price for the real property and the amount of the vendor take-back mortgage.

**77**    I would accordingly allow the appeal, set aside paragraphs 1, 2(a), and 7(a) of the order of the trial judge, and grant Helen's claim for rectification of the memorandum of agreement by changing the amount in paragraph 3(v) from $222,444 to $337,444. I would also order that the draft Schedule E be attached to the memorandum of agreement and be amended to show the value of the farm house at $115,000 in the Transfer Value column, with the total as $733,255. I would also set aside paragraph 3 of the trial judge's order awarding costs to Maureen.

**78**    I would further order the Land Registrar for the Office of Land Titles Leeds (No. 28) at Brockville to rectify the Parcel Register for Parcel 44238-0060(LT) by indicating that the amount of the transfer and the charge is $337,444 instead of $222,444.

**79**    If necessary to give effect to these reasons, I would order the Land Registrar to permit the registration of a corrected transfer and a corrected mortgage in the amount of $337,444 instead of $222,444, upon payment of any prescribed fee. I note that additional land transfer tax liability may arise with the addition of $115,000 to the consideration paid for the real property.

**80**    Having regard to the decision of Blair J.A. in *Re Regal Constellation Hotel Ltd.* (2004), 71 O.R. (3d) 355 (C.A.), at para. 35-36, this decision is stayed until the time to file a Notice of Appeal has passed or the outcome of any appeal has been determined.

**81**    In addition, having regard to the opening words of s. 160 of the *Land Titles Act,* and the jurisprudence respecting it, this decision is subject to the rights of any third parties for value without notice who may have registered an interest in the property. Thus, any existing charge to a third party

for value without notice registered before this judgment would take priority over the $115,000 increase in the mortgage to Helen.

## F. COSTS

**82**    Helen is entitled to her costs of both the appeal and the trial. The costs at trial were fixed in the amount of $27,343.46 payable by Helen to Maureen. I would set aside that order. In its place, and subject to Helen wishing to have her trial costs assessed in the Superior Court, or other agreement of counsel, I would order that Maureen pay the same amount to Helen. Insofar as the costs of the appeal are concerned, having regard to the costs outlines submitted, I would order costs in the amount of $30,000.00 inclusive of all taxes and disbursements payable by Maureen to Helen.

K.M. WEILER J.A.
 P.S. ROULEAU J.A.:-- I agree.
 S.E. PEPALL J.A.:-- I agree.

1 Presently, the parcel register indicates that the real property was sold by Helen and Wilmur to Maureen and Melville for $222,444, and a vendor-take back mortgage is shown for the same amount. The implication of Helen's claim is that the consideration for the transfer and the principal amount of the mortgage should be in the amount of $337,444.

2 It appears that the memorandum of agreement was intended to be effective as of January 1, 1989, though it was not actually signed until May 1989. Although the signed copy of the memorandum of agreement is dated January 1, 1989, Ms. Sims sent a letter to Helen and Wilmur containing the draft sale documents for their review on May 3, 1989. This package included a draft copy of the memorandum of agreement. The remainder of the documents, including a general security agreement and a promissory note, were signed on May 16, 1989. The trial judge found that the memorandum of agreement was also signed in May 1989 and the parties also take this position.

3 In *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 SCR 235, at para. 10, a majority of the Supreme Court of Canada held that findings of fact should be reversed where it can be established that the finding is a "palpable and overriding" error. In *H.L. v. Canada (A.G.)*, 2005 SCC 25, [2005] 1 S.C.R. 401, at paras. 55-56, Fish J. clarified that the "palpable and overriding" error test is met if the findings are "clearly wrong" or can "properly be characterized as 'unreasonable' and 'unsupported by the evidence.'" In para. 20 of *El-Bris Ltd.*, a case involving rectification, Laskin J.A. framed the issue before the court as whether the trial judge's finding of common intention was reasonable.

4 Although Lord Hoffmann decided the issue in *Chartbrook* as a matter of construction of the contract in issue, he held that both parties were mistaken in thinking that the written contract reflected their prior consensus and would have otherwise granted rectification. Lord Hope of Craghead did not comment on this aspect of Lord Hoffmann's decision, but the other Law Lords on the case, Rodger of Earlsferry, Walker of Gestingthorpe, and Baroness Hale of Richmond, associated themselves with his views on rectification. In his text, Professor Cartwright comments at p. 644, "Lord Hoffmann's approach in *Chartbrook* has now been followed, although it has not been met with unanimous approval."

5 In 1989, land with a value greater than $250,000 that did not contain a single family residence was taxed at a lower rate than land of the same value that did. In 1989, the definition of a single family residence in the *Land Transfer Tax Act*, R.S.O. 1980, c. 231 as am. by S.O. 1985, c. 21 excluded such residences located on farm land. Filling out section two would therefore have entitled the parties to a lower tax rate.

6 I note that even when the situation is one of unilateral mistake, the issue of whether a party "ought to have known" of the other's mistake and is seeking to take advantage of it in circumstances that would amount to unfair dealing or unconscionable conduct, the inquiry is an objective one: see *Downtown King West Development v. Massey Ferguson Industries Ltd.* (1996), 28 O.R. (3d) 327 (C.A.), at paras. 34-35.

*Case Name:*
# McLean v. McLean Estate


**Maureen Holly McLean**
**v.**
**Helen Gertrude McLean, in her personal capacity and as**
**executrix of the Estate of Wilmur Russell McLean, deceased**

**[2014] S.C.C.A. No. 76**

[2014] C.S.C.R. no 76

File No.: 35744


Supreme Court of Canada

Record created: February 25, 2014.
Record updated: May 8, 2014.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

**Status:**

Application for leave to appeal dismissed with costs (without reasons) May 8, 2014.

**Catchwords:**

*Property -- Real property law -- Rectification -- Burden of proof -- Respondents transferring farm property to son and daughter-in-law at fair market value in 1989 -- Transfer and mortgage documents indicating amount $115,000 below fair market value -- Transferor seeking rectification of transfer and mortgage documents -- Is the standard of proof for rectification of a contract the longstanding "convincing proof" that continues to be applied in other common law jurisdictions, or is it the ordinary civil standard of a balance of probabilities?*


**Case Summary:**

The applicant was the daughter-in-law of the respondent, Helen McLean. In 1989, Helen and her

husband sold their farming business, including all real and personal property, to their son, Melville and his wife, Maureen. The agreement listed the various ways that the purchase price for the real and personal property was to be satisfied, including a vendor take-back mortgage in respect of the real property. The lawyer that Maureen worked for at the time acted for both sides of the transaction and made several drafting errors in the purchase and sale documents. Although the figure for the real property should have been shown in the agreement as $337,444, the amount shown there and in the vendor take-back mortgage, which was to be for the full amount of the value of the real property, was recorded as $222,444. In 2005, Melville and Maureen separated. In 2008, Helen became concerned about her interests, as the vendor take-back mortgage remained largely unpaid. She realized then that the purchase price for the real property and the amount of the mortgage was $115,000 less than the total market value. The fair market value of the farm house in 1989 was $115,000. Helen sought to have the agreement and mortgage rectified and brought an action against Melville and Maureen. She sought to add $115,000 to the principal amount of the mortgage and to the total purchase price of the property. Melville did not oppose her claim and summary judgment was issued against him. Maureen's position was that the parties did not have the requisite common intention as to the purchase price of the farm business at the time of the transfer. She had the impression that the total purchase price was $625,000, and not $733,755 that Helen claimed.

**Counsel:**

Geoff R. Hall (McCarthy Tétrault LLP), for the motion.

Avril A. Farlam (Barat Farlam Millson), contra.

---

**Chronology:**

1.    Application for leave to appeal:


             FILED: February 25, 2014.
              SUBMITTED TO THE COURT: April 14, 2014.
              DISMISSED WITH COSTS: May 8, 2014 (without reasons).
              Before: McLachlin C.J. and Cromwell and Wagner JJ.

**Procedural History:**

     Judgment at first instance: Respondents' claim for
rectification of contract dismissed. Judgment in favour
of respondents granted.

Ontario Superior Court of Justice (Bondy J.), October 26,
2012.
2012 ONSC 7072.

Judgment on appeal: Respondents' appeal allowed.
Court of Appeal for Ontario, Weiler, Rouleau and Pepall
(ad hoc) JJ.A., December 27, 2013.
2013 ONCA 788; [2013] O.J. No. 5956.

*Case Name:*

# Midas Realty Corp. of Canada Inc. v. Galvic Investments Ltd.

**Between**
**Midas Realty Corporation of Canada Inc., Applicant**
**(Respondent in Appeal), and**
**Galvic Investments Limited and 618818 Ontario Inc.,**
**Respondent: 618818 Ontario Inc., Appellant: Galvic**
**Investments Limited**

[2009] O.J. No. 327

2009 ONCA 84

75 R.P.R. (4th) 197

2009 CarswellOnt 384

Docket: C49054

Ontario Court of Appeal
Toronto, Ontario

**E.E. Gillese, J.L. MacFarland and H.S. LaForme JJ.A.**

Heard: January 26, 2009.
Oral judgment: January 26, 2009.
Released: January 28, 2009.

(13 paras.)

*Contracts -- Remedies -- Equitable remedies -- Specific performance -- Appeal by Galvic Investments from a decision granting Midas Realty specific performance of an option to lease agreement between Midas and Galvic -- Midas leased premises from Galvic -- Midas sublet premises to Midas franchisee -- Galvic's tenant, a related company, purchased Midas franchise -- Midas' lease with Galvic was terminated and an option to lease agreement was executed -- When Galvic's tenant terminated franchise, Midas purported to exercise option but Galvic refused -- Appeal dismissed -- Galvic and tenant acted in concert to frustrate Midas' attempt to enforce option*

*-- Equities warranted order requiring Galvic to perform obligations under option.*

*Landlord and tenant law -- Agreement for lease -- Remedies -- Specific performance -- Appeal by Galvic Investments from a decision granting Midas Realty specific performance of an option to lease agreement between Midas and Galvic -- Midas leased premises from Galvic -- Midas sublet premises to Midas franchisee -- Galvic's tenant, a related company, purchased Midas franchise -- Midas' lease with Galvic was terminated and an option to lease agreement was executed -- When Galvic's tenant terminated franchise, Midas purported to exercise option but Galvic refused -- Appeal dismissed -- Galvic and tenant acted in concert to frustrate Midas' attempt to enforce option -- Equities warranted order requiring Galvic to perform obligations under option.*

Appeal by Galvic Investments from a decision allowing an application by Midas Realty for specific performance of an option to lease agreement between Midas and Galvic. The application judge granted Midas possession of premises owned by Galvic in priority over a pre-existing lease between Galvic and its tenant. Galvic and the tenant were related corporations. The premises were purchased by Galvic when Midas was a lessee and had sublet the premises to a Midas franchisee. Galvic's tenant then acquired the franchise and became a subtenant of Midas. When the lease between Midas and Galvic expired in 2001, a new arrangement was negotiated among the parties, including an option to lease agreement. The tenant terminated the franchise in 2007. On receiving notice of the termination, Midas purported to exercise an option to acquire a lease of the premises and required Galvic to execute the same, pursuant to the option to lease agreement. When Galvic refused, the application was brought. Galvin argued that the application judge erred in finding that Midas's right under the option to lease agreement was superior to the tenant's right under the pre-existing lease, erred in failing to interpret the option to lease in accordance with the doctrine of contra proferentem and erred in finding that the premises were unique such that the remedy of specific performance was warranted.

HELD: Appeal dismissed. The applications judge was fully justified in finding that Galvic and its tenant were acting in concert to frustrate Midas' attempt to enforce the option to lease agreement and in finding that the equities warranted an order requiring Galvic to perform its obligations under the option agreement, and in declaring that the lease between the tenant and Galvic was terminated. The application judge's interpretation of the option agreement such that Galvic did not have a unilateral right to refuse to execute and deliver the lease on Midas' request was consistent with the fundamental principle that the proper interpretation of a contract was one which promoted the true intent of the parties at the time of entry into the contract. There was no need for the application judge to resort to the principle of contra proferentem. The application judge was entitled to find that the premises had the requisite uniqueness to justify an order for specific performance.

**Appeal From:**

On appeal from the judgment of Cullity J., of the Superior Court of Justice, dated May 29, 2008.

**Counsel:**

David Sterns, for the appellant.

Scott Kugler and James Camp, for the respondent Midas Realty Corporation of Canada.

W. Kaufman, for the respondent 618818 Ontario Inc.

---

ENDORSEMENT

The following judgment was delivered by

**1**    THE COURT (orally):-- This is an appeal from the judgment of Cullity J., dated May 29, 2008, which granted specific performance of an option to lease agreement (OLA) between Midas Realty Corporation of Canada Inc. ("Midas") and Galvic Investments Limited ("Galvic") following an application brought by Midas. In so doing, the application judge granted Midas possession of premises owned by Galvic in priority over a pre-existing lease between Galvic and its tenant, 618818 Ontario Inc. ("Tenant").

**2**    Galvic and Tenant are related corporations. The application judge found that, at the relevant times, Gail Rudachuk and her daughter, Victoria Rudachuk, were the sole directors and officers of Galvic and Tenant.

**3**    The premises were purchased by Galvic in 1981. At that time, Midas was a lessee and had sublet the premises to a Midas franchisee. In 1985, Tenant acquired the franchise and became a subtenant of Midas. When the lease between Midas and Galvic expired in 2001, a new arrangement was negotiated among the parties. Three documents were prepared as part of this arrangement: a new franchise agreement between Midas Canada (as the franchisor) and Tenant (as the franchisee); a lease between Galvic and Tenant; and the OLA between Galvic and Midas. Tenant chose to terminate the franchise on June 28, 2007, and has not carried on business on the premises since July 2007. On receiving notice of the termination, Midas purported to exercise an option to acquire a lease of the premises, and required Galvic to execute the same, pursuant to the OLA. When Galvic refused, the application was brought.

**4**    The application judge found that the three documents had been prepared as part of an arrangement. He further found that Galvic, Tenant and Gail and Victoria were acting in concert in the connected and substantially contemporaneous transactions that led to the execution of the three documents.

**5**    Galvic appeals. It argues that the application judge erred in: (1) finding that Midas's right under

the OLA is superior to Tenant's right under the pre-existing lease; (2) failing to interpret the OLA in accordance with the doctrine of *contra proferentum*; and, (3) finding that the premises are unique and on that basis granting specific performance.

**6**    Tenant joins with Galvic. It reinforces Galvic's first ground of appeal, stressing that the application judge erred in elevating Midas' contractual claim over its pre-existing interest in, and right to quiet enjoyment of, the premises.

**7**    In relation to the first issue, we see no palpable and overriding error in the application judge having found that Gail, Victoria, Galvic and Tenant were acting in concert in the connected, and substantially contemporaneous, transactions that led to the three agreements being executed. Further, we see no error in his finding that having induced Midas Canada to grant the franchise to Tenant by executing the OLA, Gail, Victoria and the two corporations were acting in concert to frustrate Midas' attempt to enforce the OLA. On the record, the application judge was fully justified in making those findings of fact, in finding that the equities warranted an order requiring Galvic to perform its obligations under the OLA, and in declaring that the lease between Tenant and Galvic was terminated.

**8**    In respect to the second issue, the application judge interpreted the OLA such that Galvic did not have a unilateral right to refuse to execute and deliver the lease on Midas' request. This interpretation is consistent with the fundamental principle that the proper interpretation of a contract is one which promotes the true intent of the parties at the time of entry into the contract. The application judge's finding that the purpose of the OLA was to ensure the continued presence of Midas on the premises is entirely consistent with the recitals contained in the OLA. Having interpreted the language of the provisions of the OLA by reference to the purposes of that agreement, as disclosed in the recitals, there was no need for the application judge to resort to the principle of *contra proferentum*.

**9**    We do not accept that the application judge erred as suggested in the third ground of appeal. Contrary to Galvic's submission, on the record, the application judge was entitled to find that the premises had the requisite uniqueness to justify an order for specific performance. In this regard, it is telling that the franchise agreement itself reserves to Midas the right to select the site, and that the franchisee is granted the right to operate a Midas shop only at the designated location as selected by Midas. Although the application judge did not refer expressly in his reasons to the requirement that there be a fair, real and substantial justification for substantial performance, this standard is implicit in his reasons. His reasons also make it clear that the standard was satisfied.

**10**    In its factum, Galvic also impugned the application judge for not weighing the benefit versus the burden of specific performance on the basis of the parties. We do not accept that this complaint is well-founded as there was no evidence on the record regarding the effect that specific performance would have on Galvic, except for the fact that Tenant's lease would come to an end. As Tenant had ceased carrying on business on the premises before Midas sought to exercise the option

to acquire a lease of the premises, it is hard to see what prejudice it would suffer. In any event, we agree with the application judge that the equities in this case favour Midas, not Galvic.

**11**    In short, we find no error in the reasons of the application judge. On the contrary, we endorse them. The application judge articulated and applied the correct legal principles and his detailed findings are fully justified on the record.

**12**    Midas asked this court to vary the date on which the lease is to begin. Counsel for Midas properly conceded that this matter had been raised for the first time on appeal. We decline to decide the matter for that reason - it is an issue which needs to be properly argued and decided in the context of an appropriate evidentiary record.

**13**    For the reasons given, the appeal is dismissed. In the view of the court, there is no basis to award costs other than on a partial indemnity scale. Costs of the appeal to the respondent are fixed at $15,000, all inclusive.

E.E. GILLESE J.A.
 J.L. MacFARLAND J.A.
 H.S. LaFORME J.A.

cp/e/qlbxm/qlpxm/qlcas

*Indexed as:*

# Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.

**Montreal Trust Company of Canada v. Birmingham Lodge Limited et al.**

[1995] O.J. No. 1609

24 O.R. (3d) 97

125 D.L.R. (4th) 193

82 O.A.C. 25

21 B.L.R. (2d) 165

46 R.P.R. (2d) 153

55 A.C.W.S. (3d) 797

File No. C18926

Court of Appeal for Ontario,

**Brooke, Robins and Laskin JJ.A.**

June 2, 1995

**Counsel:**

Andrew M. Robinson, for appellant, Norman N. Warner.

No one appearing for appellant, Paul Martin.

Howard Swartz and Natalie Marconi, for respondent.

The judgment of the court was delivered by

**1** **LASKIN J.A.**: -- The appellants, Norman Warner and Paul Martin, guaranteed payment of any money owing on a mortgage between the lender, Wellington Trust Company, now the respondent Montreal Trust Company of Canada, and the borrower, Birmingham Lodge Ltd. (the "Corporation"). The terms of the mortgage were subsequently varied without the appellants' consent. The issue on this appeal is whether these variations released the appellants from liability. This issue has been litigated in this court many times. Like the previous cases, this appeal turns on the intention of the parties and the interpretation of the guarantee. The motions court judge found the appellants liable and granted summary judgment against them. This is an appeal from his judgment.

A. The Facts

**2** The Corporation owned a residential retirement home and apartment complex in Mount Forest, Ontario. The appellants Warner and Martin were the officers, directors and shareholders of the Corporation.

**3** Under the terms of a registered debenture dated January 13, 1986, Wellington Trust Company loaned the Corporation $1,325,000 for three years at an interest rate of 12 per cent per annum. The Corporation agreed to make monthly payments and to pay the balance of the loan on February 1, 1989. On default in payment the loan would immediately become due and payable at the option of the respondent.

**4** The loan was secured by a first mortgage on the Corporation's property and chattels and the Corporation agreed that it would not sell, assign or transfer the property without the written approval of the respondent. The appellants agreed to guarantee the Corporation's mortgage payments. Article 10.1 of the debenture provides for the appellants' guarantee. It states that variations in the terms of the mortgage made by the Corporation or any successor do not affect the appellants' liability. The relevant parts of art. 10.1 are as follows:

> 10.1 IN CONSIDERATION of the premises and of the Lender advancing the said money to the Corporation, PAUL MARTIN and NORMAN M. WARNER (the "Guarantors") <u>do hereby absolutely and unconditionally jointly and severally guarantee to the Lender, its successors and assigns, the due and punctual payment by the Corporation of all principal monies, interest and other monies owing on the security of this Debenture,</u> and the Guarantors for themselves, their heirs, executors, administrators and assigns, covenant with the Lender that if the Corporation shall at any time make default in the punctual payment of any monies payable hereunder, they will pay all such monies to the Lender without any demand being required to be made.

AND IT IS HEREBY EXPRESSED that although as between the Guarantors and the Corporation, the Guarantors are only sureties for the payment by the Corporation of the monies hereby guaranteed, <u>yet as between the Guarantors and the Lender the Guarantors shall be considered as primarily liable therefor</u> and that no release or releases of any portion or portions of the Secured Property, and no indulgence shown by the Lender in respect of any default by the Corporation or any successor which may arise under this Debenture, and <u>that no extension or extensions granted by the Lender to the Corporation or any successor for payment of the monies hereby secured or for the doing, observing or performing of any covenant, agreement, matter or thing herein contained, to be done, observed or performed by the Corporation or any successor nor any variation in or departure from the provisions of this Debenture nor any other dealings between the Corporation or any successor and Lender including any variation or increase of the interest rate, nor any release of the Corporation or any other thing whatsoever whereby the Guarantors as sureties only would or might have been released shall in any way modify, alter, vary or in any way prejudice the Lender or affect the liability of the Guarantors in any way under this covenant, which shall continue and be binding on the Guarantors, and as well after as before default and after as before maturity of this Debenture, until the said monies are fully paid and satisfied.</u> In the event of an increase in the interest rate, the liability of the Guarantors would continue to include the increased interest rate for which the Guarantors would be considered as primarily liable therefor. And it is hereby further expressly declared that the Lender shall not be bound to exhaust its recourse against the Corporation or the Secured Property before being entitled to payment from the Guarantors of the amount hereby guaranteed by the Guarantors.

. . . . .

ALL COVENANTS, liabilities and obligations entered into or imposed hereunder upon the Guarantors shall be equally binding upon their heirs, executors, administrators and assigns.

THE LENDER may vary any agreement or arrangement with the Guarantors and grant extensions of time to or otherwise deal with them, their heirs, executors, administrators and assigns, without any consent on the part of the Corporation.

(Emphasis added)

**5**    The appellants rely on the repeated use of the phrase "the Corporation or any successor" in the

second clause of art. 10.1 (the "no prejudice clause"). They argue that they did not agree to remain liable on their guarantee for variations in the terms of the mortgage made by the respondent and an assign of the Corporation.

**6**    Following the execution of the debenture, the mortgaged property was transferred twice and the terms of the mortgage were varied three times. The material facts concerning these five transactions are as follows:

(i)    By an agreement dated November 1986, the Corporation sold the property and chattels to 672069 Ontario Inc. ("672069"). The respondent consented to the sale. 672069 assumed liability for the mortgage debt "as principal debtor and not as surety". The appellants, described as "original guarantors", were parties to this agreement. They agreed that the covenant in their original guarantee would remain in effect "notwithstanding the entering into of this agreement". Compleat Health Corporation ("Compleat"), described as the "new guarantor", also agreed to guarantee the debt. The Corporation and each appellant signed this agreement.

(ii)    By an agreement dated February 1, 1989, 672069, the respondent and Compleat agreed to renew the mortgage for one year from March 1, 1989, to February 1, 1990, at a new interest rate of 12.75 per cent per annum. The respondent offered this renewal on condition "that the consent of all existing guarantors shall be obtained to the renewal of the mortgage". The appellants -- again described as original guarantors -- were shown as parties to the renewal agreement but they did not consent to the renewal and they did not sign the agreement.

(iii)    On April 4, 1990, the respondent wrote to Compleat offering to renew the mortgage for another year at a rate of 13.25 per cent per annum. The respondent's offer to renew was conditional on "receipt of acceptance of renewal offer signed by all mortgagors and guarantors". Compleat and 672069 accepted the offer and the mortgage was renewed. Neither the Corporation nor the appellants, however, signed the offer. The Corporation was dissolved on August 14, 1989; and the appellants said that they had no knowledge of this or any other transaction involving the mortgage loan after the Corporation sold the property in 1986.

(iv)    By an assumption agreement dated August 1990, Vanguard Leisure Lodges Limited ("Vanguard") acquired the property and chattels from 672069. The respondent approved the sale and the parties agreed that Vanguard would become the principal debtor and that 672069 and Compleat would continue to be responsible jointly and severally with Vanguard for the loan secured under the debenture. The agreement as drafted provided for its execution by the Corporation, and by the appellants (who are again referred to as original guarantors), but neither the

Corporation nor the appellants signed the agreement. Instead, a line was drawn through their names and a line was also drawn through the clause in the agreement that recited that the appellants' covenants were to "remain in full force and effect".

(v)     On March 25, 1991, the respondent wrote to Vanguard offering to renew the mortgage for another year, this time at an interest rate of 11.5 per cent per annum. Again the offer to renew was conditional on "receipt and acceptance of renewal offer signed by all Mortgagors and Guarantors". Although Vanguard accepted the offer, again, neither the Corporation nor the appellants signed it.

**7**    In summary, the appellants consented to the sale to 672069 in 1986. They did not consent to the subsequent sale to Vanguard and they did not consent to the two renewal agreements that increased the interest rate, or, for that matter, to the last renewal agreement that lowered the rate.

**8**    The debenture went into default on January 1, 1992. The respondent appointed a receiver-manager to operate the retirement home on January 31, 1992. It issued a notice of sale under mortgage in February 1992 and served the notice on the appellants. The respondent commenced this action on April 6, 1992, and brought its motion for summary judgment on April 12, 1992. The motions court judge granted judgment for the respondent for $1,440,931.13, the amount owing on the mortgage, and ordered the appellants to deliver possession of the property to the respondent.

**9**    The appellants submit that they were relieved from liability on their covenant on the following four grounds:

(i)     The terms of the mortgage were varied without their consent.
(ii)    This court's judgment in Manulife Bank of Canada v. Conlin (1994), 20 O.R. (3d) 499, 120 D.L.R. (4th) 234 (C.A.), leave to appeal to the Supreme Court of Canada granted May 4, 1995.
(iii)   Section 20(2) of the Mortgages Act, R.S.O. 1990, c. M.40.
(iv)    Novation.

**10**   Counsel agreed that we could deal with the first three submissions by summary judgment. I propose to address only the appellants' first submission because in my opinion it is decisive of this appeal.

B. Did the Variations in the Terms of the Mortgage Release the
Appellants from Liability?

**11**   The legal principles governing the liability of a guarantor are well-established. Robins J.A. set them out succinctly in his dissenting judgment in Manulife Bank of Canada v. Conlin, supra, at pp. 502-03:

The general rule is that the surety will be discharged if the principal contract which he guaranteed is varied or altered without his consent in a material way not necessarily beneficial to him. The scope of this rule, which has become known as the rule in Holme v. Brunskill, was stated in that case (1878), 3 Q.B.D. 495 at pp. 505-06, 47 L.J.Q.B. 610 (C.A.), as follows:

The true rule . . . is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court will . . . hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged.

It follows that a change in the interest rate payable on a guaranteed obligation may discharge the surety from liability as may an extension of time within which the principal obligor is to pay or perform the guaranteed obligation. Changes of this nature have been held to materially alter the basis on which a surety agreed to become liable under a guarantee and therefore to release him from liability: see Holland-Canada Mortgage Co. v. Hutchings, [1936] S.C.R. 165, [1936] 2 D.L.R. 481.

However, a guarantor will not be released if such changes are provided for under the terms of the guarantee or are otherwise within the contemplation of the contract. It is open to parties to a guarantee to make their own arrangements modifying or excluding the rights and defences to which a surety is entitled in law or in equity. This was made clear by the Supreme Court of Canada in Bank of Montreal v. Bauer, [1980] 2 S.C.R. 102 at p. 107, 110 D.L.R. (3d) 424. Whether in any given case involving changes of the type we are concerned with here the creditor can be said to have effectively reserved its rights against the guarantor or, conversely, whether the guarantor can be said to have contracted out of the defences afforded him by the law is essentially a matter of interpretation. The determination of whether the changes were in fact authorized or contemplated will depend on the construction to be given the contract and the intention of the parties as evidenced by the transaction viewed as a whole: see Communities Economic Development Fund v. Canadian Pickles Corp., [1991] 3

S.C.R. 388, 85 D.L.R. (4th) 88 . . .

**12**    In this case the appellants agreed that if the Corporation or a successor varied the interest rate or extended the time for payment, they would remain liable on their guarantee. They submit, however, that they did not agree to remain liable if an assign of the Corporation varied the terms of the mortgage without their consent. They argue that when 672069 entered into the renewal agreements of February 1, 1989, and April 4, 1990, with the respondent, it did so as an assign of the Corporation, not a successor. Since each renewal agreement extended the time for payment and increased the interest rate, the appellants submit that they are released from liability. The motions court judge dismissed this argument holding that "the distinction between 'successor' and 'assign' is spurious". I respectfully disagree. There is a valid distinction between the two terms. Wilson J. discussed this distinction in National Trust Co. v. Mead, [1990] 2 S.C.R. 410 at p. 423, 71 D.L.R. (4th) 488 at pp. 497-98:

> Turning to s. 40(2) of the Act, the provision states that if a corporation waives its protection, that waiver binds all successors and assigns "notwithstanding anything in this Act." When used in reference to corporations, a "successor" generally denotes another corporation which, through merger, amalgamation or some other type of legal succession, assumes the burdens and becomes vested with the rights of the first corporation. . . .

> The word "assign" has, of course, a broader meaning. An "assign" is anyone to whom an assignment is made and presumably, but for the specific reference to "successors", would include both individuals and corporations. As between mortgagors, an assignment would be an agreement between the original mortgagor and his purchaser by which the latter would assume the mortgage debt in exchange for valuable consideration.

**13**    The definition of "successor" and "assign" that Wilson J. used are taken from Black's Law Dictionary (see, e.g., 6th ed. (1990), at pp. 118 and 1431.) She used them to assist her in interpreting a section of the Saskatchewan Limitation of Civil Rights Act, R.S.S. 1978, c. L-16. I think that they also assist in construing the appellants' guarantee.

> 672069 purchased the Corporation's property and chattels. The respondent submits that a purchaser of the assets of the Corporation is a successor of the Corporation. But these definitions suggest otherwise. A purchaser is "anyone to whom an assignment is made", not someone who takes title through legal succession. Therefore 672069 was an assign of the Corporation, not a successor.

**14**    In art. 10.1 the appellants agreed that their liability as guarantors would be unaffected if the respondent and a successor of the Corporation extended the term of the mortgage or increased the interest rate. They did not agree, however, that their liability would be unaffected if the respondent

and an assign of the Corporation varied these terms without their consent. Undoubtedly the parties intended to make this distinction because the appellants were officers, directors and shareholders of the Corporation. The usual phrase "successors and assigns" appears in several places in the debenture, including in the opening clause of art. 10.1 in reference to the lender. But in the no prejudice clause, which refers to the appellants' liability if the terms of the mortgage are varied, the phrase "the Corporation or any successor" is used and it is used four times. The word assign is conspicuously absent. The appellants did not contract out of the rule in Holme v. Brunskill (1878), 3 Q.B.D. 495, 47 L.J.Q.B. 610 (C.A.), for material variations made without their consent by the respondent and an assign of the Corporation. In my opinion, this is the only reasonable interpretation of art. 10.1. I therefore conclude that the renewal agreement of February 1, 1989, which was an agreement between the respondent and an assign of the Corporation, and which materially varied the terms of the mortgage, released the appellants from liability as guarantors.

**15**    The respondent advances two other arguments to support the judgment under appeal. It submits that even if the appellants are not liable as guarantors, they are still liable as primary debtors. The no prejudice clause of art. 10. I does state that "as between the Guarantors and the Lender the Guarantors shall be considered as primarily liable therefor". As Robins J.A. noted in Manulife Bank of Canada v. Conlin, supra, lenders often include a provision in their guarantee documents purporting to make guarantors liable as principal debtors. Lenders often have considerable leverage in the negotiation of guarantee arrangements and, not surprisingly, strive to cast a wide net to prevent guarantors escaping liability because of some unforeseen event. Nevertheless, a provision such as "the guarantors shall be considered as primarily liable" does not automatically convert a contract of guarantee into a contract of indemnity. In Communities Economic Development Fund v. Canadian Pickles Corp., [1991] 3 S.C.R. 388 at pp. 413-14, 85 D.L.R. (4th) 88 at p. 106, Iacobucci J. wrote:

> Contracts of guarantee are sometimes distinguished from contracts of indemnity. In a contract of indemnity, the indemnifier assumes a primary obligation to repay the debt, and is liable regardless of the liability of the principal debtor. An indemnifier will accordingly be liable even if the principal debt is void or otherwise unenforceable. The distinction between contracts of guarantee and of indemnity ought not to be overemphasized. The resolution of a given case will turn on the correct interpretation of the contract and of the intention of the parties; attempts to label the contract as one of guarantee or of indemnity may be less than helpful.

**16**    Iacobucci J. referred with approval to the English decision of Heald v. O'Connor, [1971] 1 W.L.R. 497, [1971] 2 All E.R. 1105 (Q.B.D.). In that case the clause in question provided "that the liability hereunder of the guarantor shall be as a primary obligor and not merely as surety and shall not be impaired or discharged by reason of any time or other indulgence granted by the registered holder". Despite this language, Fisher J. wrote at p. 503:

In the present case, the instrument was given pursuant to clause 7 of the agreement which calls for a personal guarantee. The word "guarantee" is used in it time and again. The obligation is to pay the principal moneys to become due under the debenture if and whenever the company makes default. The statement of claim refers to it as a guarantee and pleads the company's default and the consequent liability of the guarantor. The only straw for the plaintiff to clutch is the phrase "as a primary obligor and not merely as a surety" but that, in my judgment, is merely part of the common form of provision to avoid the consequences of giving time or indulgence to the principal debtor and cannot convert what is in reality a guarantee into an indemnity.

**17**    Two British Columbia judgments have taken the same view of a similar clause in a guarantee document. In Brown Brothers Motor Lease Canada Ltd. v. Ganapathi (1982), 18 B.L.R. 229 at pp. 235-36, 139 D.L.R. (3d) 227 (S.C.), Locke J. stated:

> The clause has given me much trouble but I adopt the view of Wilde C.J. and say that even the very specific words "I shall be and shall be deemed to be a principal debtor and not a surety . . ." were not intended to alter the basic intention of the parties, i.e., that Ganapathi was intended to be a guarantor alone.

> Among other reasons, if he was ever intended to be the principal debtor, I do not see why he was not so named as a co-debtor in the body of the agreement, nor do I see the need for any guarantee at all. . . .

> . . . . .

> I think the overriding intention was always that Ganapathi be merely a guarantor. Once an overriding intention or circumstance is found, in my view the principle expressed by Davey J.A. (later C.J.B.C.) in Sawley Agency Ltd v. Ginter (1966), 57 W.W.R. 561, 58 D.L.R. (2d) 757 applies, in words approved by the Supreme Court of Canada [1967] S.C.R. 451, 60 W.W.R. 701, 62 D.L.R. (2d) 768n. When interpreting an ambiguous clause he said [at p. 563 W.W.R.]:

> . . . *That circumstance*, in my opinion, dominates the clause and controls its meaning. . . .

> In the result, I think the circumstance of guarantee dominates and was intended to dominate this entire document, and in particular cl. 25, and the clause should be so construed.

(Emphasis in original)

And in Walter E. Heller Financial Corp. v. Timber Rock Enterprises Ltd. (1982), 40 B.C.L.R. 85 (S.C.), Mackoff J. concluded that a provision in which the defendants "covenant with the mortgagee as principal debtors and not as sureties" conflicted with "the rest of the clause constituting the defendants as guarantors". He held that the defendants were guarantors, not principals. In his view (p. 89):

> If the defendants were intended to be principal debtors it would have been very simple to name them as such in the agreement rather than to refer to them as guarantors throughout.

**18**    Other cases have produced the opposite result. For example, in Morguard Trust Co. v. Heritage Horizons Ltd. (1987), 36 B.L.R. 16, 44 R.P.R. 135 (B.C.S.C.), Boyd L.J.S.C. held that a clause in a mortgage in which the guarantor "joins in all covenants with the mortgagee severally as well as jointly" and agrees that he "shall be and be deemed to be a principal debtor and not merely a surety" made the guarantor primarily liable. Justice Boyd distinguished the Walter E. Heller case because of the different language in each mortgage document. He concluded at p. 27 that:

> . . . in construing the document, it is not sufficient to simply identify contradictory wording and to construe the document as against the interests of the creditor. Rather, the Court's inquiry is always aimed at giving effect to that part of the document which is calculated to carry into effect the real intention of the parties.

See also First City Trust Co. v. 122637 Developments Ltd. (1989), 8 R.P.R. (2d) 155 at pp. 166-67, 79 Sask. R. 175 (Q.B.).

**19**    All these cases turn on the specific language of the document being considered. The mere inclusion of a phrase such as "the guarantors shall be considered as primarily liable" is not determinative. The court should examine the entire document to ascertain the parties' intention. If the court is uncertain about the correct interpretation it may resort to extrinsic evidence to assist it.

**20**    In this case I would not give effect to the respondent's submission that the appellants are liable as principal debtors. In my view the parties intended that the appellants would be liable only as guarantors. They are referred to as guarantors throughout the debenture. They signed the debenture as guarantors. I therefore construe art. 10.1 of the debenture as a contract of guarantee.

**21**    Moreover, I think that the respondent's subsequent conduct resolves any doubt about the extent of the appellants' liability under art. 10.1. Subsequent conduct may be used to interpret a written agreement because "it may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date": S.M. Waddams, The Law of Contracts, 3rd ed. (1993), at para. 323. Often, as Thomson J.

wrote in Bank of Montreal v. University of Saskatchewan (1953), 9 W.W.R. (N.S.) 193 at p. 199 (Sask. Q.B.): "there is no better way of determining what the parties intended than to look to what they did under it".

**22**     Lambert J.A. discussed the relevance of subsequent conduct in Canadian National Railways v. Canadian Pacific Ltd., [1979] 1 W.W.R. 358 at p. 372, 95 D.L.R. (3d) 242 (B.C.C.A.), affirmed (1979), 105 D.L.R. (3d) 170, [1979] 6 W.W.R. 96 (S.C.C.):

> In Canada the rule with respect to subsequent conduct is that, if, after considering the agreement itself, including the particular words used in their immediate context and in the context of the agreement as a whole, there remain two reasonable alternative interpretations, then certain additional evidence may be both admitted and taken to have legal relevance if that additional evidence will help to determine which of the two reasonable alternative interpretations is the correct one. It certainly makes no difference to the law in this respect if the continuing existence of two reasonable alternative interpretations after an examination of the agreement as a whole is described as doubt or an ambiguity or as uncertainty or as difficulty of construction.

See also Arthur Andersen Inc. v. Toronto-Dominion Bank (1994), 17 O.R. (3d) 363 at p. 372, 14 B.L.R. (2d) 1 (C.A.).

**23**     In each of its mortgage renewal offers the respondent referred to the appellants only as guarantors, not as primary debtors. Even in its statement of claim in this litigation the respondent sued the appellants as guarantors. It did not allege in its pleading that the appellants were liable as principal debtors.

**24**     All three renewal offers and both sale agreements call for the appellants' consent. Eventually the respondent agreed to the sale to Vanguard and to each renewal without obtaining the appellants' consent. Nevertheless I infer that in making the appellants' consent a term of each transaction, the respondent recognized that without such consent the appellants would no longer be liable. Had the appellants been liable as primary debtors under art. 10.1, their consent to the subsequent transactions affecting the property would have been unnecessary. Had the appellants been liable as guarantors under the no prejudice clause, their consent would also have been unnecessary.

**25**     The conduct of the respondent after the debenture was executed is entirely consistent with interpreting art. 10.1 as a guarantee, not an indemnity and with limiting the appellants' liability for material variations made without their consent to those made by the respondent and a successor of the Corporation.

**26**     The respondent also relies on art. 10.6 of the debenture, which provides:

> 10.6 Everything contained herein shall enure to the benefit of and be binding

> upon the respective, heirs, executors, administrators, successors and assigns of the Lender, and the Corporation.

**27**    This provision -- which parenthetically uses the phrase "successors and assigns" again in reference to the lender -- does not affect the appellants' liability. In my view it does not assist the respondent.

**28**    I would allow the appeal, set aside the judgment below and in its place grant judgment dismissing the action against the appellants Warner and Martin. Both appellants are entitled to their party and party costs of the motion and the appellant Warner is entitled to his costs of this appeal. Finally, I wish to record my appreciation to counsel for a well-argued appeal.

Appeal allowed.

** Preliminary Version **

*Case Name:*

# Nishi v. Rascal Trucking Ltd.

**Edward Sumio Nishi, Appellant;**
**v.**
**Rascal Trucking Ltd., Respondent.**

[2013] S.C.J. No. 33

[2013] A.C.S. no 33

2013 SCC 33

[2013] 2 S.C.R. 438

[2013] 2 R.C.S. 438

336 B.C.A.C. 50

445 N.R. 293

2013EXP-1994

J.E. 2013-1066

EYB 2013-223112

[2013] 8 W.W.R. 419

88 E.T.R. (3d) 1

45 B.C.L.R. (5th) 1

16 B.L.R. (5th) 1

359 D.L.R. (4th) 575

228 A.C.W.S. (3d) 276

2013 CarswellBC 1716

File No.: 34510.

Supreme Court of Canada

Heard: January 16, 2013;
Judgment: June 13, 2013.

**Present: McLachlin C.J. and LeBel, Abella, Rothstein,
Cromwell, Karakatsanis and Wagner JJ.**

(47 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Real property law -- Interests in land -- Equitable interests -- Resulting trusts -- Appeal by Nishi from Rascal Trucking's successful appeal from trial decision dismissing Rascal's claim for beneficial interest in property allowed -- Rascal leased property from Kismet and operated topsoil processing facility -- City removed topsoil and lodged costs as tax arrears -- Nishi bought property and Rascal contributed amount towards purchase that matched arrears -- Trial judge's finding that presumption of resulting trust was rebutted was sound -- Rascal's intention was to advance money without conditions such as obtaining beneficial interest in property -- A contribution to purchase price without any intention to impose conditions or requirements is a legal gift.*

*Wills, estates and trusts law -- Trusts -- Resulting trusts -- Creation -- Presumed resulting trusts -- When presumption operates -- Purchase in the name of another -- Intention -- Rebuttal of presumption of trust -- Appeal by Nishi from Rascal Trucking's successful appeal from trial decision dismissing Rascal's claim for beneficial interest in property allowed -- Rascal leased property from Kismet and operated topsoil processing facility -- City removed topsoil and lodged costs as tax arrears -- Nishi bought property and Rascal contributed amount towards purchase that matched arrears -- Trial judge's finding that presumption of resulting trust was rebutted was sound -- Rascal's intention was to advance money without conditions such as obtaining beneficial interest in property -- A contribution to purchase price without any intention to impose conditions or requirements is a legal gift.*

Appeal by Nishi from Rascal Trucking's successful appeal from the trial judge's decision to dismiss

Rascal's claim for a beneficial interest in Nishi's property. Rascal leased property from Kismet Enterprises and operated a topsoil processing facility on it. After receiving complaints, the City of Nanaimo (the "City") passed resolutions, declaring that the facility was a nuisance and authorizing the City to remove the topsoil. The City removed the topsoil and lodged the costs incurred, amounting to $110,679, against the property as tax arrears. Rascal's lease included provisions which required it to "hold harmless" Kismet for "any and all liabilities resulting from Rascal's operations on the property", but at no point did Rascal reimburse Kismet or the City for the costs of the removal of the topsoil. CIBC began foreclosure proceedings after Kismet stopped making mortgage payments. Rascal failed in attempts to purchase the property and CIBC sold the property to Nishi for $237,500 after paying the tax arrears to the City. Nishi was assisted in the purchase by Rascal, who contributed $110,679 towards the purchase of the property, which was the exact amount of the tax arrears lodged on the property due to Rascal's topsoil activities. Rascal commenced an action claiming a one-half undivided interest in the property. Rascal argued that since it had contributed to the purchase price of the property but did not take title, a resulting trust arose such that Rascal was entitled to a share of the property in proportion to its contribution to the purchase price. The trial judge found that while there was "no issue of a gift", Nishi's evidence was that there was no intention for Rascal to have an interest in the land. The purpose of the payment was to satisfy the debt from Rascal to Kismet as a result of the tax arrears for which Rascal acknowledged responsibility due to the "hold harmless" undertaking by Rascal in its lease with Kismet. The Court of Appeal allowed Rascal's appeal, holding that a presumption of resulting trust arose because of a gratuitous transfer between unrelated parties and the presumption was not rebutted because the trial judge had found that there was "no issue of a gift".

HELD: Appeal allowed, and the trial judge's decision was restored. The finding of the trial judge that the presumption of resulting trust was rebutted was sound. A purchase money resulting trust arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution. The presumption can be rebutted by evidence that at the time of the contribution, the person making the contribution intended to make a gift to the person taking title. While rebutting the presumption requires evidence of the intention of the person who advanced the funds at the time of the advance, after the fact evidence can be admitted so long as the trier of fact is careful to consider the possibility of self-serving changes in intention over time. In this case, Rascal's contribution to the purchase of the property was made without consideration and Rascal and Nishi are not related. Therefore, the legal presumption of resulting trust applied. The trial judge was correct to conclude that the presumption was rebutted in this case. Rascal's contribution to the purchase price was motivated by recognition of the costs that it had imposed on Kismet. Rascal's stated intention was to make the advance without any conditions such as obtaining a beneficial interest in any portion of the land. In his May 28, 2001 fax, Rascal's principal indicated that the contribution to the purchase price and his intention to pay $25,000 of the mortgage was made "without any conditions or requirements, and these instructions are irrevocable". A contribution to the purchase price without

any intention to impose conditions or requirements is a legal gift.

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the
Canada Supreme Court Reports.

**Court Catchwords:**

*Trusts -- Purchase money resulting trust -- Appellant using funds received from respondent to
purchase property in appellant's own name -- Funds representing disputed monies owed to third
party -- Whether purchase money resulting trust should be abolished in commercial transactions in
favour of unjust enrichment principles -- Whether a transfer is gratuitous when it constitutes the
discharge of a legal and moral obligation to a third party -- Whether a proportionate interest in the
property is acquired where the transferor attempted, but failed to secure the title holder's
agreement to an interest in the property -- Whether presumption of resulting trust was rebutted*

**Court Summary:**

In 1996, Kismet Enterprises Ltd. owned approximately two acres of land in Nanaimo, British
Columbia that it leased to Rascal Trucking Ltd. Rascal began operating a topsoil processing facility
on the property that generated significant complaints from the neighbourhood. As a result, the City
passed resolutions declaring that the facility was a nuisance. The City subsequently removed the
topsoil and lodged the costs incurred of $110,679.74 against the property as tax arrears. Rascal's
lease included provisions which required it to "hold harmless" Kismet for "any and all liabilities
resulting from Rascal's operations on the property", but at no point did Rascal reimburse Kismet or
the City for the costs of the removal of the topsoil. Kismet determined that, as a result of the tax
arrears and the existing mortgage to CIBC, there was no equity left in the property. It stopped
making mortgage payments. Throughout the ensuing foreclosure proceedings, Mr. Heringa, the
principal of Rascal, tried in a number of ways to acquire the property, but was unsuccessful. In May
2001, the property was sold to Mr. Nishi for $237,500. Nishi was assisted in the purchase by Rascal
in the amount of $110,679.74, the exact amount of the tax arrears. Heringa sent Nishi's lawyer
several faxes containing offers with different terms, attempting to acquire an interest in the
property. Nishi did not agree. Heringa subsequently sent a fax indicating that the monies would be
advanced "without any conditions or requirements". In November 2008 Rascal began this action
claiming a one-half undivided interest in the property. The trial judge dismissed the action but this
decision was overturned on appeal.

*Held:*  The appeal should be allowed and the decision of the trial judge should be restored.

There is no reason to depart from the long standing doctrine of the purchase money resulting trust in
favour of an approach based on unjust enrichment. While flexibility is no doubt desirable in certain
areas of the law, the purchase money resulting trust provides certainty and predictability because it

relies on a clear rule for determining who holds the beneficial interest in a property. When making a gratuitous transfer of property, the person who makes the transfer must have intended either to pass the beneficial interest (a gift) or retain it (a trust). A purchase money resulting trust is a species of gratuitous transfer resulting trust that arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution. This presumption can be rebutted if the recipient of the property proves, on a balance of probabilities, that at the time of the contribution, the person making the contribution intended to make a gift to the person taking title. While rebutting the presumption requires evidence of the intention of the person who advanced the funds *at the time of the advance*, after the fact evidence can be admitted so long as the trier of fact is careful to consider the possibility of self-serving changes in intention over time.

Reviewing the trial judge's reasons in their full context confirms that he understood that Rascal's intention at the time of the advance was to contribute to the purchase price without taking a beneficial interest in the property because Rascal was motivated by recognition of the costs that it had imposed on Kismet. This intention, to make good on Rascal's obligations to Kismet by way of a payment to Mr. Nishi, is not inconsistent with a finding of a legal gift. Moreover, Rascal's stated intention was to make the advance without any conditions and its contribution towards the mortgage on the property was the amount of the tax arrears ($110,679.74) down to the penny. It was open to the trial judge to conclude that the presumption of resulting trust had been rebutted and it was well supported by the evidence.

## Cases Cited

**Applied:** *Kerr v. Baranow*, 2011 SCC 10, [2011] 1 S.C.R. 269; *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795; **referred to:** *Nanaimo (City) v. Rascal Trucking Ltd.*, 2000 SCC 13, [2000] 1 S.C.R. 342; *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609; *Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3; *Canada v. Craig*, 2012 SCC 43, [2012] 2 S.C.R. 489; *R. v. B. (K.G.)*, [1993] 1 S.C.R. 740.

## Authors Cited

*Oosterhoff on Trusts: Text, Commentary and Materials*, 7 ed. by A. H. Oosterhoff, et al. Toronto: Carswell, 2009.

*Snell's Equity*, 32 ed. by John McGhee. London: Sweet & Maxwell, 2010.

*Waters' Law of Trusts in Canada*, 4 ed. by Donovan W. M. Waters, Mark R. Gillen and Lionel D. Smith. Toronto: Thomson Carswell, 2012.

## History and Disposition:

APPEAL from a judgment of the British Columbia Court of Appeal (Kirkpatrick, Frankel and Smith JJ.A.), 2011 BCCA 348, 21 B.C.L.R. (5) 330, 309 B.C.A.C. 182, 523 W.A.C. 182, 340 D.L.R. (4) 284, [2011] B.C.J. No. 1561 (QL), 2011 CarswellBC 2154, reversing a decision of Dley J., 2010 BCSC 649, [2010] B.C.J. No. 840 (QL), 2010 CarswellBC 1454. Appeal allowed.

**Counsel:**

*D. Geoffrey G. Cowper, Q.C.,* and *Joel Payne*, for the appellant.

*Craig P. Dennis* and *Owen J. James*, for the respondent.

---

The judgment of the Court was delivered by

**ROTHSTEIN J.**:--

I.   Introduction

**1**    A purchase money resulting trust arises when a person advances funds to contribute to the purchase price of property, but does not take legal title to that property. Where the person advancing the funds is unrelated to the person taking title, the law presumes that the parties intended for the person who advanced the funds to hold a beneficial interest in the property in proportion to that person's contribution. This is called the presumption of resulting trust.

**2**    The presumption can be rebutted by evidence that at the time of the contribution, the person making the contribution intended to make a gift to the person taking title. While rebutting the presumption requires evidence of the intention of the person who advanced the funds *at the time of the advance*, after the fact evidence can be admitted so long as the trier of fact is careful to consider the possibility of self-serving changes in intention over time.

**3**    Edward Sumio Nishi has legal title to property. Rascal Trucking Ltd., which advanced funds to assist in the purchase of the property, claims a beneficial interest in that property. The trial judge found that the presumption of resulting trust had been rebutted. That finding was overturned on appeal.

**4**    Mr. Nishi now asks this Court to restore the decision of the trial judge by replacing the doctrine of purchase money resulting trust with the doctrine of unjust enrichment and finding that Mr. Nishi was not unjustly enriched. Alternatively, Mr. Nishi says that the presumption of resulting trust was rebutted. I see no reason to disturb the long settled doctrine of resulting trust in favour of unjust enrichment. Rather, I would allow the appeal based on the factual findings of the trial judge that no resulting trust was created in this case.

II.    Facts

**5**    In 1996, Kismet Enterprises Ltd. owned approximately two acres of land in Nanaimo, British Columbia. In April 1996, Kismet leased the property to Rascal. Rascal began operating a topsoil processing facility on the property.

**6**    Rascal's topsoil operation generated significant complaints from the neighbourhood. As a result, the City of Nanaimo (the "City") passed resolutions, declaring that the facility was a nuisance and authorizing the City to remove the topsoil in the event that neither Kismet nor Rascal did so. The City subsequently removed the topsoil and lodged the costs incurred, amounting to $110,679.74, against the property as tax arrears. Rascal brought an action challenging the City's authority to pass these resolutions, but this Court ruled in favour of the City in 2000: *Nanaimo (City) v. Rascal Trucking Ltd.*, 2000 SCC 13, [2000] 1 S.C.R. 342.

**7**    Rascal's lease included provisions which required it to "hold harmless" Kismet for "any and all liabilities resulting from Rascal's operations on the property", but at no point did Rascal reimburse Kismet or the City for the costs of the removal of the topsoil.

**8**    Kismet determined that, as a result of the tax arrears and the existing mortgage to CIBC, there was no equity left in the property. It stopped making mortgage payments and in December 1997, CIBC began foreclosure proceedings. Throughout the foreclosure proceedings, Hans Heringa, the principal of Rascal, tried in a number of ways to acquire the property, but was rebuffed or ignored by CIBC.

**9**    Upon completion of the foreclosure proceedings, in May 2001, the property was sold to Mr. Nishi for $237,500. Before selling the property to Mr. Nishi, CIBC paid the tax arrears owing to the City.

**10**    Mr. Nishi was assisted in the purchase by Rascal who provided $85,000 in cash and assumed responsibility for paying $25,000 on the mortgage. Mr. Heringa acted as guarantor on the mortgage. Subsequent to the purchase of the property, Mr. Heringa instructed his staff that the total contribution to the mortgage should be $25,679.74. As a result, Rascal's total contribution towards the purchase of the property was $110,679.74, the exact amount of the tax arrears lodged on the property due to Rascal's topsoil activities.

**11**    With respect to this financial support, Mr. Heringa sent Mr. Nishi's lawyer several faxes containing offers with different terms. On May 25, 2001, Mr. Heringa made an offer to contribute $85,000 in cash and to assume $25,000 in mortgage payments in exchange for a second mortgage to secure Rascal's interest in the property and for the bottom half of the property. Part of the text of the May 25, 2001 fax is reproduced below:

> 1)    To advise that $85,000.00 can be applied to a purchase of this property for $232,500.00 plus Legal and Land Title costs, to be in the name of Edward Nishi.

2)   Royal Bank (Colleen Tourout) is to advance a First Mortgage. We are taking a 25 year amortization, 5 yr Term, with payments to include Taxes. H. Heringa will act as a guarantor.

3)   Rascal Trucking Ltd. will be responsible for payments on $25,000.00 of the Mortgage.

4)   We would like Edward Nishi to sign "Registrable Form documentation for a Second Mortgage for $110,000, no interest, to secure Rascal's interest in this land. This Second will <u>not</u> be Registered as yet, and only at some later date perhaps, with the consent of both of us.

5)   There should be an Agreement that Edward Nishi will apply for, transfer & convey the bottom 1/2 of the property to Rascal Trucking Ltd., after completion of the Sale, and that it is the intent that Rascal can use, and later <u>own</u> the bottom portion of the property, commencing at the halfway point of the upper driveway, as per the attached Plan. [Emphasis in original; A.R., at pp. 113-14.]

**12**   There is no evidence that Mr. Nishi accepted this offer.

**13**   On May 28, 2001, Mr. Heringa sent a fax modifying his earlier offer and stating that "the $85,000.00 is to be applied to the purchase without any conditions or requirements, and these instructions are irrevocable" (A.R., at p. 117). He stated that the request for a second mortgage and for the bottom half of the property to be conveyed to Rascal were "just possibilities, for future reference & consideration, and that's <u>all</u>" (<u>ibid.</u> (emphasis in the original)). The text of this second fax is reproduced below:

1)   So there is no confusion, Instruction #1, is a stand alone instruction, and the $85,000.00 is to be applied to the purchase without any conditions or requirements, and these instructions are irrevocable. The sale must complete, in the name of Edward Nishi. Items 2 & 3 are only to confirm what is to occur.

2)   The rest (Items 4 & 5) are just possibilities, for future reference & consideration, and that's <u>all</u>.

3)   However, if you think that a Second Mortgage or anything else makes sense, to properly protect Nishi, Kismet & Rascal, in the future, from demands from the City or from future Nuisance charges, <u>etc.,</u> please advise ... . Also, Rascal doesn't want to lose its legal non-conforming status in regard to topsoil processing at this site. [Emphasis in original; A.R., at p. 117.]

**14**   In November 2008, Rascal began this action claiming a one-half undivided interest in the property.

**15**   For reasons that will become apparent, it is relevant that Mr. Heringa and Cidalia Plavetic, the principal of Kismet, had had a longstanding business and personal relationship. It is also relevant that Ms. Plavetic and Mr. Nishi are common law partners and have lived on the property since

1997.

III.    Judicial History

A. *Supreme Court of British Columbia*

**16**    Rascal advanced three arguments before the trial judge. First, Rascal argued that there was an agreement between the parties that half of the property would belong to Rascal. The trial judge rejected this argument but noted that "[Mr. Heringa's] intention and desire to secure an interest was obvious, but Mr. Nishi would not agree" (para. 39).

**17**    Second, Rascal argued that since it had contributed to the purchase price of the property but did not take title, a resulting trust arose such that Rascal was entitled to a share of the property in proportion to its contribution to the purchase price. The trial judge rejected this argument, finding that while there was "no issue of a gift", Mr. Nishi's evidence was that there was no intention for Rascal to have an interest in the land (paras. 42 and 47). The trial judge found that the purpose of the payment was to satisfy the debt from Rascal to Kismet as a result of the tax arrears for which Rascal acknowledged responsibility due to the "hold harmless" undertaking by Rascal in its lease with Kismet. The trial judge also relied on the fact that the amount of the contribution ($110,679.74) was equal to the tax arrears caused by Rascal.

**18**    Third, the trial judge rejected Rascal's claim for a constructive trust on the basis of unjust enrichment, finding that the purpose of the contribution was simply to place Ms. Plavetic, Mr. Nishi and Kismet in the same position as if the nuisance and resulting tax arrears had never been caused by Rascal.

B. *Court of Appeal for British Columbia*

**19**    The Court of Appeal allowed Rascal's appeal. That court held that a presumption of resulting trust arose because of a gratuitous transfer between unrelated parties. This presumption was not rebutted because the trial judge had found that there was "no issue of a gift". The trial judge had erred in finding that the presumption had been rebutted because that finding was based on Mr. Nishi's intention and not Rascal's intention. The Court of Appeal observed that it is the intention of the person who advances the funds and not the intention of the recipient that is relevant. The trial judge had concluded that "[Mr. Heringa's] intention and desire to secure an interest was obvious" (para. 39). The fact that Rascal had an obligation to indemnify Kismet for the tax arrears could not serve to rebut the presumption because Mr. Nishi, to whom the payment was made, was a legal stranger to Kismet.

IV.    Analysis

**20**    Mr. Nishi appealed to this Court on two grounds. First, he argued that the purchase money resulting trust doctrine should be abandoned in favour of an approach based on unjust enrichment

and that no unjust enrichment occurred here. Alternatively, he argued that if the purchase money resulting trust is to be retained, it would not apply in this case. I would not give effect to the first ground of appeal. In my view, there is no reason to depart from the longstanding doctrine of the purchase money resulting trust. However, I would allow Mr. Nishi's appeal because there was no resulting trust arising on the facts as found by the trial judge.

### A. *Should the Purchase Money Resulting Trust Be Abandoned?*

**21**    The purchase money resulting trust is a species of gratuitous transfer resulting trust, where a person advances a contribution to the purchase price of property without taking legal title. Gratuitous transfer resulting trusts presumptively arise any time a person voluntarily transfers property to another unrelated person or purchases property in another person's name: D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (4th ed. 2012), at p. 397.

**22**    As Cromwell J. noted in *Kerr v. Baranow*, 2011 SCC 10, [2011] 1 S.C.R. 269, at para. 12, it has been "settled law since at least 1788 in England (and likely long before) that the trust of a legal estate, whether in the names of the purchaser or others, 'results' to the person who advances the purchase money". Despite this recent endorsement of the purchase money resulting trust, Mr. Nishi argues that it should be abandoned in favour of the doctrine of unjust enrichment. The purchase money resulting trust provides certainty and predictability. Mr. Nishi has not advanced arguments that would support overruling the Court's jurisprudence in this area.

**23**    This Court has recently considered under what circumstances it should overrule a prior decision of the Court: *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609; *Ontario (Attorney General) v. Fraser*, 2011 SCC 20, [2011] 2 S.C.R. 3; *Canada v. Craig*, 2012 SCC 43, [2012] 2 S.C.R. 489. It is best not to depart from precedent unless there are compelling reasons to do so: *Henry*, at para. 44. The Court will exercise caution in overturning decisions of firm majorities, particularly when those decisions are recent: *Fraser*, at para. 57.

**24**    In this case, Mr. Nishi is asking this Court to depart from both *Kerr* and *Pecore v. Pecore*, 2007 SCC 17, [2007] 1 S.C.R. 795, two recent appeals decided unanimously or by firm majorities. These decisions represent just the most recent endorsements of longstanding doctrine. There is no concrete evidence that the purchase money resulting trust is unworkable or has lead to untenable results: *Fraser*, at para. 83. Nor has Mr. Nishi shown that the purchase money resulting trust has been "attenuated or undermined by other decisions of this or other appellate courts" (*R. v. B. (K.G.)*, [1993] 1 S.C.R. 740, at p. 778).

**25**    Mr. Nishi advances four reasons for abandoning the purchase money resulting trust and gratuitous transfer resulting trusts more generally: overlap with the doctrine of unjust enrichment in terms of purpose; overly restrictive framework for the types of intention that motivate transactions; absence of remedial flexibility; and overall lack of flexibility in terms of what can be considered relative to unjust enrichment.

**26**    Mr. Nishi's first argument is that since the purchase money resulting trust essentially responds to unjust enrichment, it is unnecessary to retain it as a separate doctrine. Even if the purchase money resulting trust is considered to be an inherently restitutionary concept, I would still not give effect to this argument. The argument appears to have been summarily made and in the absence of harm, confusion or other disadvantage, I am not satisfied that conceptual overlap is a sufficient reason to abandon the purchase money resulting trust. This is particularly true in light of the fact that the purchase money resulting trust has been a feature of the common law since at least 1788 and provides certainty and predictability in situations where a person has made a gratuitous advance.

**27**    Mr. Nishi's second argument -- that purchase money resulting trusts provide an overly restrictive framework for the types of intention that motivate transactions -- must fail because it is based on too narrow an understanding of the scope of gifts in law. The concerns that Mr. Nishi raised in how the Court of Appeal applied this test to the facts here can be resolved more appropriately by considering the legal meaning of the word gift. As will be discussed in more detail below, the legal concept of a gift is broad enough to include the type of advance made in this case. Legal gifts do not require philanthropic motivations. The trust-gift dichotomy, as Mr. Nishi describes it, is not restrictive. Rather it reflects the fact that when making a gratuitous transfer of property, the person who makes the transfer must have intended either to pass the beneficial interest (a gift) or retain it (a trust).

**28**    Mr. Nishi's third and fourth arguments can be considered together. In essence, Mr. Nishi argues that the doctrine of unjust enrichment is preferable because of its flexibility in terms of factors to be considered, overall focus on justice between the parties and broader remedial options. However, desire for flexibility does not constitute a compelling reason for departing from the unanimous decision of this Court in *Kerr*, which was issued just two years ago. While flexibility is no doubt desirable in certain areas of the law, the purchase money resulting trust provides certainty and predictability because it relies on a clear rule for determining who holds the beneficial interest in a property. Absent strong dissenting opinions in this Court, contrary decisions in provincial appellate courts or significant negative academic commentary that would justify disturbing such a settled area of the law, there is no reason to abandon the purchase money resulting trust.

B.    *Did a Resulting Trust Arise for the Benefit of Rascal?*

**29**    Rascal's contribution to the purchase of the property was made without consideration and Rascal and Mr. Nishi are not related. Therefore, the legal presumption of resulting trust applies: *Pecore* at paras. 24 and 27. This is because in such circumstances equity presumes bargains rather than gifts: *Pecore*, at para. 24. In the context of a purchase money resulting trust, the presumption is that the person who advanced purchase money intended to assume the beneficial interest in the property in proportion to his or her contribution to the purchase price: see *Waters' Law of Trusts in Canada*, at p. 401.

**30**    However, the presumption of resulting trust can be rebutted if the recipient of the property

proves, on a balance of probabilities, that the person who advanced the funds intended a gift: *Pecore*, at paras. 24 and 44. The relevant intention is the intention of the person who advanced the funds at the time of the contribution to the purchase price: *Pecore*, at para. 59. Therefore, for Mr. Nishi to rebut the presumption in this case, he must prove that Rascal intended to make a gift at the time that Rascal made a contribution to the purchase price, in May 2001.

**31**    In my view, the trial judge was correct to conclude that the presumption was rebutted in this case. In his May 28, 2001 fax, Mr. Heringa indicated that the contribution to the purchase price and his intention to pay $25,000 of the mortgage was made "without any conditions or requirements, and these instructions are irrevocable" (A.R., at p. 117). As will be discussed below, a contribution to the purchase price without any intention to impose conditions or requirements is a legal gift. While Mr. Heringa argued that there was either an agreement to transfer a portion of the land to him or an intention for him to hold a beneficial interest, the trial judge preferred the evidence of Mr. Nishi (para. 40).

**32**    The Court of Appeal held that the trial judge's findings (1) that there was no issue of a gift and (2) that Mr. Heringa's intention to obtain an interest in the property was obvious, meant that the presumption of resulting trust had not been rebutted. In my view, the Court of Appeal erred in the inferences it drew from the trial judge's reasons on these two key issues.

(1)    The Meaning of "Gift"

**33**    The trial judge found that there was "no issue of a gift" (para. 42). The Court of Appeal took this statement to mean that the presumption of resulting trust was therefore not rebutted, because to rebut it would require Mr. Nishi to prove that the contribution was a gift. In my respectful view, the Court of Appeal erred by taking this statement in isolation as conclusive of the trial judge's reasoning.

**34**    In the trial judge's reasons, immediately following his statement about there being "no issue of a gift", he states: "[t]he presumption of a resulting trust is rebuttable by the title holder showing that the payment was not intended to create a beneficial interest" (para. 42). This demonstrates that the trial judge understood the test for rebutting the presumption to be based on the absence of intention to create a beneficial interest for the transferor. There would have been no need for the trial judge to continue his analysis beyond his statement about there being no issue of a gift, if the trial judge had not been of the opinion that an intention to create a beneficial interest in the transferor was the test for determining whether the presumption of resulting trust had not been rebutted.

**35**    The conclusion of the trial judge was that Mr. Nishi had satisfied the burden on him of rebutting the presumption of resulting trust. In so concluding, the reasons of the trial judge appear to suggest that he distinguished between a gift and absence of an intention by the transferor to hold a beneficial interest after the advance. Although he made such a distinction, his conclusion that there was no intention to create a beneficial interest in the property for Rascal is legally the same as saying that there was an intention to make a gift to Nishi. The trial judge erred in distinguishing

between a gift and intention to create a beneficial interest for the transferee but that error was inconsequential.

**36**    Indeed, the trial judge's error may well be explained by reference to the academic authorities as some authorities have phrased the test for rebutting the presumption of resulting trust using language about intention not to hold the beneficial interest in the property. For example, *Snell's Equity* describes the type of evidence required to rebut the presumption as "any evidence tending to indicate that A's intention was that B should take the beneficial interest in the property acquired with A's purchase money" (J. McGhee, ed., *Snell's Equity* (32nd ed. 2010), at para. 25-012). Similarly, *Oosterhoff on Trusts* describes the presumption of resulting trust as "a presumption that the apparent donor did not intend to give the beneficial ownership of the assets to the recipient" (A. H. Oosterhoff et al., eds., *Oosterhoff on Trusts: Text, Commentary and Materials* (7th ed. 2009), at p. 640).

**37**    In my view, these formulations are simply another way of describing whether the transferor's intention was to create a legal gift. There is no second category of intention that rebuts the presumption. *Pecore* and *Kerr* did not recognize a different category of intention, other than intention to make a gift, that would rebut the presumption. This is consistent with other authorities such as *Waters' Law of Trusts* where the proof required to rebut the presumption is intention "to make a gift of the property" (p. 401; see also pp. 406 and 409). In Canada, our jurisprudence is that there is no difference between the intention to make a gift and the intention that the transferor not hold a beneficial interest. In other words, in the case of a gratuitous transfer, there is a gift at law when the evidence demonstrates that, at the time of the transfer, the transferor intended the transferee to hold the beneficial interest in the property being purchased.

**38**    Reviewing the trial judge's reasons in their full context confirms that he understood that Rascal's intention at the time of the advance was to make a legal gift -- i.e. to contribute to the purchase price without taking a beneficial interest in the property. As the trial judge found, Rascal's contribution to the purchase price was motivated by recognition of the costs that it had imposed on Kismet, the company owned by Ms. Plavetic, his friend. As I will explain, this intention, to make good on Rascal's obligations to Kismet by way of a payment to Mr. Nishi, is not inconsistent with a finding of a legal gift. Moreover, as was clear from the May 28, 2001 fax, Rascal's stated intention was to make the advance without any conditions such as obtaining a beneficial interest in any portion of the land.

**39**    The trial judge's comment that the there was "no issue of a gift" was made in the context of reviewing Mr. Nishi and Ms. Plavetic's perspective on the purpose of the payment:

> In this case, there is no issue of a gift. Neither Mr. Nishi nor Ms. Plavetic considered the plaintiff's contribution to be a gift. [para. 42]

Mr. Nishi and Ms. Plavetic did not see the payment as a gift, because as the trial judge went on to describe, Rascal acknowledged its responsibility for a debt to Kismet related to the tax arrears

arising from Rascal's topsoil operation. However, it made no sense for Rascal to make that payment directly to Kismet since Kismet was subject to other liabilities and was essentially defunct. If Rascal had made the payment to Kismet, it would not have assisted Mr. Heringa's friends to obtain title to the property. Making the contribution to the purchase price, therefore, enabled Rascal to live up to its moral commitment in a way that practically benefited Mr. Heringa's friends. It also left open the possibility that in the future they might agree to a second mortgage or a transfer of a portion of the property to Rascal.

**40**    Indeed, Mr. Heringa's instructions to his staff on payment of his contribution towards the mortgage on the property refer to the amount of the tax arrears ($110,679.74) down to the penny. The necessary implication is that Mr. Heringa viewed the payments as connected with that moral obligation. If Mr. Heringa's intention at that time was for Rascal to take a beneficial interest in the property, the moral obligation would not have been fulfilled since Rascal would have used the payment to obtain a corresponding interest in the land and not to make good on its moral obligation. In other words, for these parties, one payment cannot be used both to discharge the moral obligation and to obtain a beneficial interest in the land. The two intentions are incompatible.

(2)    Evidence of Rascal's Intention

**41**    Evidence that arises subsequent to a gratuitous transfer can be admissible to show the true intention of the transferor: *Pecore*, at para. 59. However, it is the intention of the transferor *at the time of transfer* that is determinative. The difficulty with subsequent evidence is that it may well be self-serving or the product of a change in intention on the part of the transferor: *Pecore*, at para. 59.

**42**    The trial judge commented on Rascal's intention twice in his reasons. When discussing whether there was an agreement between Rascal and Mr. Nishi to convey part of the property to Rascal, the trial judge stated that "[Mr. Heringa's] intention and desire to secure an interest was obvious, but Mr. Nishi would not agree" (para. 39). Later in his reasons, the trial judge stated that he "specifically accepted the evidence of Mr. Nishi that there was no intention to have any interest in favour of Rascal created in the land" (para. 47). In my view, neither of these statements is inconsistent with the trial judge's conclusion that the presumption of resulting trust was rebutted.

**43**    The trial judge's first statement was made in the context of discussing whether Mr. Heringa and Mr. Nishi had formed a contract that conveyed an interest in the land to Mr. Heringa. The trial judge stated:

> His intention and desire to secure an interest was obvious, but <u>Mr. Nishi would not agree</u>. As a result, I conclude that <u>there was no agreement</u> whereby Mr. Heringa was to be given an interest or ownership position in the land. [Emphasis added; para. 39.]

Mr. Heringa's desire to obtain an agreement whereby half of the property would be conveyed to him was clear from the content of the May 25, 2001 fax in which he asked for an agreement to transfer

and convey the bottom portion of the land to Rascal. However, Mr. Heringa withdrew this request in his May 28, 2001 fax by stating that there were to be no conditions or requirements attached to the financial support.

**44**     Rascal argued before this Court that the trial judge's finding that Mr. Heringa's "intention and desire to secure an interest was obvious" constitutes a finding of fact as to Rascal's intention to hold a beneficial interest in the property as a result of the advance. However, the trial judge's findings with respect to the presence of an intention and desire to enter a contract should not be applied to the issue of resulting trust, when the trial judge did not choose to do so. The trial judge obviously did not consider his finding of an intention to contract to be determinative of intention for the purpose of the resulting trust analysis. Mr. Heringa withdrew this request in his May 28, 2001 fax by stating that there were to be no conditions or requirements attached to the financial support. It was open for the trial judge to organize his factual findings in this manner.

**45**     With respect to the trial judge's second statement -- that he "accepted the evidence of Mr. Nishi that there was no intention to have any interest in favour of Rascal created in the land" -- the trial judge was speaking not just of Mr. Nishi's evidence as to his own intention at the time but also Mr. Nishi's evidence as to Mr. Heringa and Rascal's intention at that time. This follows from his discussion of Rascal's acknowledgement of its responsibility for the debt (para. 45).

**46**     At trial, it was Rascal's position that at the time of the contribution to the purchase price, Mr. Heringa and Rascal's intention was for Rascal to retain the beneficial interest in proportion to that contribution. The trial judge essentially concluded that Mr. Heringa's evidence at trial about Rascal's intention at the time of the transfer could not be relied upon. Consistent with the caution of this Court in *Pecore*, this is a quintessential example of why after-the-fact evidence should be viewed with skepticism, because it often demonstrates a change in intention, not the intention at the time of the advance. It was open to the trial judge to reach this conclusion and it was well supported by the evidence, particularly Mr. Heringa's May 28, 2001 fax. The trial judge's decision is not in error and ought to be restored.

    V.     Disposition

**47**     The finding of the trial judge that the presumption of resulting trust was rebutted is sound. I would allow the appeal and restore the decision of the trial judge with costs to Mr. Nishi throughout.

    *Appeal allowed with costs throughout.*


**Solicitors:**

*Solicitors for the appellant: Fasken Martineau DuMoulin, Vancouver.*

*Solicitors for the respondent: Dentons Canada, Vancouver.*

*Case Name:*

# Onex Corp. v. American Home Assurance Co.


**Between**
**Onex Corporation, Gerald W. Schwartz, Christopher A. Govan,**
**Mark Hilson and Nigel Wright, Plaintiffs/Defendants by**
**Counterclaim (Respondents/Cross-Appellants), and**
**American Home Assurance Company, Brit Syndicates Ltd. (Lloyd's**
**Syndicate 2987), Heritage Managing Agency Limited (Lloyd's**
**Syndicate 3245), XL Insurance Company Limited, Liberty Mutual**
**Insurance Company, Lloyd's Underwriters Syndicates No. 2623,**
**0623, 0033 and AIG Europe (UK) Limited, and Houston Casualty**
**Company, Defendants/Plaintiff by Counterclaim American Home,**
**(Respondents/Appellant/Respondent on Cross-Appeal)**

[2013] O.J. No. 767

2013 ONCA 117

226 A.C.W.S. (3d) 1152

18 C.C.L.I. (5th) 171

302 O.A.C. 301

[2013] I.L.R. I-5401

114 O.R. (3d) 161

2013 CarswellOnt 1969

Dockets: C54076, C54123 and C55034


Ontario Court of Appeal
Toronto, Ontario

**D.R. O'Connor A.C.J.O., M. Rosenberg and J.M. Simmons JJ.A.**

Heard: June 20, 2012.

Judgment: February 25, 2013.

(180 paras.)

*Insurance law -- The insurance contract -- Interpretation -- Coverage provisions and exclusion clauses -- Appeal by insurer from order to provide coverage allowed -- Cross-appeal by insured from partial denial of coverage dismissed -- Onex claimed coverage under director and officer liability insurance policies to reimburse for costs of defending litigation -- Motion judge did not err in denying coverage under 2004-2005 policy, as sufficient notice of litigation was given under 2002-2003 policy and no notice was given extending coverage period -- Motion judge erred in finding exclusion clause in 2002-2003 policy was unambiguous and did not exclude coverage -- Two commercially reasonable interpretations were available -- Matter returned to Superior Court.*

*Insurance law -- Liability insurance -- Director's and officer's insurance -- Appeal by insurer from order to provide coverage allowed -- Cross-appeal by insured from partial denial of coverage dismissed -- Onex claimed coverage under director and officer liability insurance policies to reimburse for costs of defending litigation -- Motion judge did not err in denying coverage under 2004-2005 policy, as sufficient notice of litigation was given under 2002-2003 policy and no notice was given extending coverage period -- Motion judge erred in finding exclusion clause in 2002-2003 policy was unambiguous and did not exclude coverage -- Two commercially reasonable interpretations were available -- Matter returned to Superior Court.*

Appeal by American Home Assurance Company and cross-appeal by Onex Corporation from a judgment finding certain Onex directors were entitled to reimbursement for defence costs under director and officer liability insurance policies. American Home issued a number of annual director and officer (D&O) insurance policies to Onex, a private equity firm. In 2005, an action was commenced in the United States by the trustees in bankruptcy of an Onex subsidiary, Magnatrax, against Onex and four of its officers and directors, seeking damages in excess of $600 million for breach of fiduciary duty, civil conspiracy and unjust enrichment. The action ultimately settled for $9 million, but not before Onex spent $35 million in defence costs. American Home denied coverage of the US action under the D&O policies on the basis the claims in the action were outside the scope of coverage, the claim was excluded because the allegations did not relate to the individual parties' capacities as directors and officers and the allegations involved intentional acts outside of the policy's scope. Onex commenced an action for reimbursement of their defence costs pursuant to the American Home D&O insurance policies and certain excess policies issued by other insurers and sought summary judgment. American Home sought summary judgment dismissing the action. The cross-motions for summary judgment were allowed in part. The judge ruled the claims asserted against the individual directors and officers in the US action were covered under the D&O policies, as the allegations in that action constituted a claim against an insured person for a wrongful act as defined in the insurance policies. However, the claims were excluded by one of the exclusion clauses of the 2004-2005 American Home D&O policy, and consequently, the excess policies. The

claims were not, however, excluded from coverage under the 2002-2003 American Home D&O policy and, consequently, American Home was required to indemnify the individual plaintiffs for $15 million for their defence costs in respect of the US action pursuant to the 2002-2003 D&O policy. Its claim for set-off based on amounts paid under a run-off policy issued to Magnatrax was refused. The parties appealed.

HELD: Appeal by American Home allowed and appeal by Onex dismissed. The motion judge did not err in concluding the 2004-2005 American Home policy and excess policies did not provide coverage based on Onex having previously given notice under the 2002-2003 policy of the circumstances giving rise to the litigation, and no valid notice was given during the 2002-2003 policy period extending coverage beyond that period. There was no basis to interfere with the finding the notice letter contained sufficient particulars of the threatened litigation. The motion judge did not err in allowing American Home to amend its pleadings to claim set-off under the Magnatrax run-off policy. The motion judge erred in finding coverage for the claims for reimbursement of the costs related to individual directors and officers was not excluded under the 2002-2003 policy. The motion judge's error flowed from characterization of the clause as unambiguous. Two commercially reasonable interpretations were possible, with coverage depending on whether an individual director was acting in his or her capacity as an executive of the company to which coverage accrued. The factual matrix did not resolve which interpretation reflected the parties' reasonable expectations or intentions in putting in place the Magnatrax run-off policy and amending the Onex 2002-2003 Policy by adding the exclusion. The motion judge's order was set aside and the matter was returned to the Superior Court.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 134(1)

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, Rule 20.01(2.1)

**Appeal From:**

On appeal and cross-appeal from the judgment of Justice Laurence A. Pattillo of the Superior Court of Justice, dated June 30, 2011, with reasons reported at 2011 ONSC 1142, 98 C.C.L.I. (4th) 228, with supplementary reasons dated August 4, 2011, and on appeal from the judgment of Justice Laurence A. Pattillo of the Superior Court of Justice, dated January 20, 2012.

**Counsel:**

Geoffrey D.E. Adair, Q.C. and Alexa Sulzenko, for the respondents/cross-appellants.

Glenn A. Smith, Rory Gillis and Marcus B. Snowden, for the appellant and respondent on cross-appeal, American Home Assurance Company.

Alan L.W. D'Silva, Mark E. Walli and Ellen M. Snow, for the respondents Brit Syndicates Ltd. (Lloyd's Syndicate 2987), Heritage Managing Agency Limited (Lloyd's Syndicate 3245) and XL Insurance Company Limited.

---

The judgment of the Court was delivered by

**D.R. O'CONNOR A.C.J.O. and J.M. SIMMONS JJ.A.:**--

## A. OVERVIEW

**1**    The main issues before this court concern whether Onex Corporation is entitled to reimbursement for defence and settlement costs ("defence costs") under various directors' and officers' ("D&O") liability insurance policies.

**2**    In 2005, Onex, four of its directors and officers - Gerald W. Schwartz, Christopher A. Govan, Mark Hilson and Nigel Wright (the "personal defendants") - and others were sued in the state of Georgia by the Trustee of the Magnatrax Litigation Trust (the "Georgia Action").

**3**    The Georgia Action arose out of bankruptcy proceedings involving Magnatrax Corporation under Chapter 11 of the United States Bankruptcy Code. Magnatrax was a former subsidiary of Onex. The Magnatrax Litigation Trust was established during the Chapter 11 proceedings to pursue claims on behalf of the unsecured creditors of Magnatrax and its subsidiaries.

**4**    In the Georgia Action, the Trustee of the Magnatrax Litigation Trust alleged that Onex and the personal defendants used their control of Magnatrax to enrich themselves at the expense of Magnatrax and ultimately caused Magnatrax and its subsidiaries to become insolvent.

**5**    The Georgia Action eventually settled for US$9.25 million. In the course of defending the Georgia Action on behalf of itself and the personal defendants, Onex incurred close to US$35 million.

**6**    Like many corporations, Onex regularly purchased D&O liability insurance and excess D&O liability insurance to protect both its own directors and officers, and also the directors and officers of its subsidiaries, from claims arising from their actions while acting in their capacity as directors and officers.

**7**    In 2008, Onex and the personal defendants commenced this action (the "Onex Action") against American Home Assurance Company[1] and various excess insurers ("Excess Insurers"). Onex and the personal defendants claimed they were entitled to reimbursement for defence costs incurred in the Georgia Action under a US$15 million 2004-2005 American Home D&O policy (the "Onex

2004-2005 Policy") and under various excess D&O policies purchased for the 2004-2005 policy year (the "2004-2005 Excess Policies").[2]

**8**    In the alternative, Onex and the personal defendants claimed they were entitled to reimbursement under a US$15 million 2002-2003 American Home D&O policy (the "Onex 2002-2003 Policy").

**9**    While serving as directors and officers of Onex, the personal defendants, Wright and Hilson, were also directors and officers of Magnatrax. In the Georgia Action, it was alleged that the personal defendants, Schwartz and Govan, acted as *de facto* directors and officers of Magnatrax.

**10**    Before Onex and the personal defendants commenced the Onex Action, American Home paid out US$15 million - the full limit of liability - under a D&O policy issued to Magnatrax (the "Magnatrax Run-Off Policy") to defray the Georgia Action defence costs of the personal defendants and two other directors and officers of Magnatrax.

**11**    The Magnatrax Run-Off Policy was issued on May 12, 2003 - on the eve of Magnatrax's insolvency. It was issued in anticipation of Magnatrax ceasing to be an Onex subsidiary and therefore ceasing to be covered under the Onex 2002-2003 Policy.[3]

**12**    In defending the Onex Action, American Home and the Excess Insurers claimed that Onex learned about the possibility of the Georgia Action in August 2003 and gave notice to American Home of that possibility (the "notice of circumstances") in compliance with clause 7(c) of the Onex 2002-2003 Policy, as well as clause 7(c) of the Magnatrax Run-Off Policy. Accordingly, under clause 4(d) of the Onex 2004-2005 Policy, if Onex was entitled to any coverage for defence costs in connection with the Georgia Action under its American Home D&O policies, it could only be under the Onex 2002-2003 Policy and not under the Onex 2004-2005 Policy or the 2004-2005 Excess Policies.

**13**    Further, American Home relied on Endorsement #14 of the Onex 2002-2003 Policy, which was added effective on the date the Magnatrax Run-Off Policy was issued. American Home denied coverage under the Onex 2002-2003 Policy based on its position that Endorsement #14 of that policy excludes any Magnatrax-related claims from coverage.

**14**    On competing motions for summary judgment, Pattillo J. accepted American Home's argument that Onex gave notice of circumstances under clause 7(c) of the Onex 2002-2003 Policy. Therefore, under clause 4(d) of the Onex 2004-2005 Policy, Onex and the personal defendants were not entitled to reimbursement for defence costs in connection with the Georgia Action. It followed that the Excess Insurers, who had agreed to follow the form of the Onex 2004-2005 Policy, were also excluded from liability under the 2004-2005 Excess Policies for any loss in respect of the Georgia Action. The motion judge accordingly dismissed Onex's action against the Excess Insurers in reasons dated June 30, 2011 and reported at 2011 ONSC 1142, 98 C.C.L.I. (4th) 228 (the "reported reasons").

**15**    However, in his reported reasons, the motion judge rejected American Home's argument that Endorsement #14 of the Onex 2002-2003 Policy excluded Onex's claim for reimbursement of defence costs in connection with the Georgia Action. He concluded that Endorsement #14 does not exclude "any claim by a third party against Onex's directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax."

**16**    The motion judge therefore ordered American Home to pay Onex US$15 million on behalf of the personal defendants for defence costs in connection with the Georgia Action under the Onex 2002-2003 Policy.

**17**    Following the original summary judgment motions, American Home moved to amend its pleadings to further particularize its claim for legal or equitable set-off of amounts that it paid under the Magnatrax Run-Off Policy against amounts owing under the Onex 2002-2003 Policy. American Home also moved for summary judgment on its amended counterclaim. In unreported reasons dated January 20, 2012 (the "unreported reasons"), the motion judge permitted American Home to amend its pleadings, but went on to dismiss the motion for summary judgment on the claim as amended.

**18**    American Home appeals from the motion judge's judgments requiring that it pay US$15 million to Onex and the personal defendants under the Onex 2002-2003 Policy and dismissing its claim for set-off.

**19**    Onex and the personal defendants cross-appeal from that part of the motion judge's judgment dismissing their action for indemnification under the Onex 2004-2005 Policy and the 2004-2005 Excess Policies. They also cross-appeal from the motion judge's judgment granting American Home leave to amend its pleadings to plead set-off (collectively, the "Onex cross-appeal").

**20**    For the reasons that follow, we would allow American Home's appeal, set aside the decision of the motion judge and return the matter to the Superior Court. In addition, we would dismiss the Onex cross-appeal.

## B. FACTS

### (i)    Onex and Magnatrax

**21**    Onex is an Ontario corporation that regularly acquires operating businesses with a view to creating value and subsequently either retaining them or disposing of them.

**22**    To the knowledge of its D&O insurers, Onex's directors and officers often serve in a dual capacity as directors and officers of its subsidiaries while they remain directors and officers of Onex.

**23**    Onex incorporated Magnatrax in Delaware in 1999. Between May 1999 and March 2000, Magnatrax and/or its subsidiaries purchased several U.S. and Canadian manufacturing companies.

Three of these transactions were the subject matter of the allegations against Onex and the personal defendants in the Georgia Action.

### (ii)    Aon Reed Stenhouse

**24**    Aon Reed Stenhouse is an insurance broker who acted as agent and broker for both Onex and Magnatrax in obtaining and negotiating the various policies of insurance at issue.

### (iii)    Onex's D&O Coverage

**25**    As we have said, Onex regularly purchased D&O liability insurance to protect both its own directors and officers and also the directors and officers of its subsidiaries from claims arising from their actions while acting in their capacity as directors and officers. These policies were generally "claims made and reported policies", meaning they provide coverage for claims first made against an insured party during the policy period and reported to the insurer within a time frame defined in the policy.

**26**    The specific language of all relevant policy provisions referred to in these reasons is set out in the Appendix.

### (iv)    Onex 2002-2003 Policy

**27**    In 2002, American Home, which is a member of the American International Group ("AIG"), issued the Onex 2002-2003 Policy. The policy covered the period from November 29, 2002 to November 29, 2003 and had a US$15 million limit of liability.

**28**    Among other things, the Onex 2002-2003 Policy provided "Executive Liability Insurance" and "Organization Insurance". Put briefly, "Executive Liability Insurance" coverage requires an insurer to pay defence costs incurred by directors and officers of a corporation arising from a proceeding against them based on their wrongful conduct as directors and officers of the corporation. "Organization Insurance" entitles a corporation to be reimbursed by the insurer for defence costs it pays on behalf of its directors and officers for such proceedings.

**29**    More specifically, the Onex 2002-2003 Policy's Executive Liability Insurance coverage provision provides that American Home would pay the "Loss" of any "Insured Person" arising from a "Claim" made against the "Insured Person" for any "Wrongful Act" of the "Insured Person". The Organization Insurance coverage provision provides that American Home would pay the "Organization" for such loss only to the extent that the Organization has indemnified such "Insured Person".

**30**    In the definition section of the Onex 2002-2003 Policy, "Loss" is defined to include "Defence Costs". "Insured Person" is defined to include any Executive of Onex or its subsidiaries. "Executive" is defined to include directors and officers, and *de facto* directors and officers, of a

corporation, which would include Onex and its subsidiaries.

**31**    The definitions of "Claim" and "Wrongful Act" are important for the purposes of this appeal. The relevant portions of these definitions read as follows:

> "Claim" means:

> (1)    a written demand for monetary, non-monetary or injunctive relief;
> (2)    a civil ... proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; ...

> ...

> "Wrongful Act" means:

> (1)    any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act ...:

**32**    (i) with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;

**33**    ...

**34**    Clause 7(c) of the Onex 2002-2003 Policy permits an Insured to give written notice to the Insurer "of any circumstance which may reasonably be expected to give rise to a Claim" to enable the insured to obtain coverage for a Claim during the policy period even though the Claim is not advanced until after the expiry of the policy period.

**35**    Endorsement #10 of the Onex 2002-2003 Policy excludes coverage under the policy for "Loss in connection with any Claim made against any Insured in any bankruptcy proceeding by or against an Organization, when such Claim is brought by the examiner, trustee, receiver, creditors' committee, trust, liquidator or rehabilitator (or any assignee thereof) of such Organization."

**36**    In addition to the Onex 2002-2003 Policy, Onex also obtained US$45 million in excess "follow form" D&O insurance for the 2002-2003 coverage period from various excess insurers other than those involved in these proceedings. Onex renewed its D&O policies in each policy year between 2002 and 2005. The level of excess coverage increased over this time frame.

### (v) The Magnatrax Run-Off Policy and Changes to the Onex 2002-2003 Policy

**37**    In January 2003, Onex contemplated selling Magnatrax to a third party. The proposed sale would have ended Magnatrax's status as an Onex subsidiary. This, in turn, would have removed Magnatrax and its executives from coverage under the Onex 2002-2003 Policy.

**38**    In the face of this possibility, Aon on Onex's behalf, requested a quote from American Home for a "run-off" D&O policy. The proposed run-off policy would protect Magnatrax and its executives for a period of six years against claims commenced after Magnatrax ceased to be an Onex subsidiary (and therefore ceased to be protected under Onex's D&O policies), but which claims related to the executives' conduct or status before Magnatrax ceased to be an Onex subsidiary.

**39**    As noted by the motion judge, American Home's quote proposed a number of endorsements to the run-off policy, including #13 - Non-Pyramiding of Limits; and #14 - Absolute Onex Corporation Exclusion - Carve-out for co-defendant with Onex Corporation. Underneath the listed exclusions, the following appeared:

> NOTE: Endorsements to be added to Onex Corporation Policy
>
> 1.    Absolute Exclusion from Magnatrax Corporation;
> 2.    Non-Pyramiding of Limits.

**40**    The motion judge found that Aon had concerns about American Home's quote. However, the contemplated sale of Magnatrax was abandoned before the concerns were fully resolved.

**41**    On May 11, 2003, Aon was advised by the Magnatrax board of directors that Magnatrax was intending to file for bankruptcy protection. Aon asked American Home to bind coverage for a run-off D&O policy for Magnatrax on an urgent basis. On May 12, 2003, American Home issued a Temporary and Conditional Binder of Insurance ("Binder") that described the coverages and endorsements to be included in the US$15 million Magnatrax Run-Off Policy.

**42**    As noted by the motion judge, 13 endorsements were listed in the Binder. In particular, Endorsements #12 and #13 were: "12. Non-pyramiding of Limits (To Be Manuscripted) and 13. Absolute Onex Corporation Exclusion - Carve-put (sic) for co-defendant with Onex Corporation (To Be Manuscripted)". "To Be Manuscripted" means that the wording of these endorsements had not yet been finalized.

**43**    The Binder also indicated that two endorsements were to be added to the Onex 2002-2003 Policy. The following language appeared under the listed exclusions:

> NOTE: Endorsements to be added to Onex Corporation Policy
>
> 1.    Non-pyramiding of Limits (To Be Manuscripted)
> 2.    Absolute Exclusion from Magnatrax Corporation (To Be Manuscripted)

**44**    Although the Binder indicated that two endorsements were to be manuscripted for the Magnatrax Run-Off Policy and two endorsements were to be manuscripted and added to the Onex 2002-2003 Policy, ultimately Endorsements #16 and #4 were added to the Magnatrax Run-Off Policy and only one endorsement was added to the Onex 2002-2003 Policy, namely, Endorsement #14. All of these endorsements are significant for the purposes of this appeal.

**45**    Endorsement #16 of the Magnatrax Run-Off Policy deals with coordinating the limits of liability between the Magnatrax Run-Off Policy and other American Home or AIG policies. The relevant portions of Endorsement #16 read as follows:

> ENDORSEMENT #16
>
> ...
>
> ### COORDINATION OF AIG LIMITS
>
> In consideration of the premium charged, it is hereby understood and agreed that, with respect to any Claim under this policy for which coverage is provided by one or more other policies issued by the Insurer or any other member of the American International Group (AIG), ... the Limit of Liability provided by virtue of this policy shall be reduced by the limit of liability provided by said other AIG policy.

**46**    Endorsement #4 of the Magnatrax Run-Off Policy is important because it provides coverage for Onex Executives in certain circumstances:

> ENDORSEMENT #4
>
> ...
>
> ### DEFINITION OF ORGANIZATION AMENDED TO INCLUDE ENTITY
>
> #### (CO-DEFENDANT ONLY)
>
> In consideration of the premium charged, it is hereby understood and agreed that the term "Organization" is amended to include the following entity, subject to the terms, conditions and limitations of this endorsement and this policy.
>
> <u>ENTITY</u>
>
> Onex Corporation

Coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Persons thereof shall only apply if: (1) such Claim relates to a Wrongful Act committed by an Insured (other than Onex Corporation or an Insured Person thereof); and (2) an Insured (other than Onex Corporation or an Insured Person thereof) is and remains a defendant in the Claim along with Onex Corporation or any Insured Person thereof.

In all events coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Person thereof shall only apply to Wrongful Acts committed or allegedly committed prior to May 12, 2003.

**47**    Neither Onex nor Magnatrax obtained excess insurance for the Magnatrax Run-Off Policy.

### (vi) Endorsement #14 to the Onex 2002-2003 Policy

**48**    Endorsement #14 is central to the issues on appeal. It was added to the Onex 2002-2003 Policy as part of finalizing the terms of the Magnatrax Run-Off Policy. It is a "Specific Entity/Subsidiary Exclusion", which excludes continuing coverage under the policy for certain Magnatrax-related losses:

ENDORSEMENT #14

SPECIFIC ENTITY/SUBSIDIARY EXCLUSION

(Claims brought by or made against)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against the Entity listed below and/or any Insureds thereof.

1.    MAGNATRAX Corporation (including any subsidiary or affiliate thereof)

It is further understood and agreed that the Definition of Subsidiary shall not include MAGNATRAX Corporation. Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof.

### (vii) Magnatrax's Chapter 11 Bankruptcy Proceedings

**49**    Magnatrax sought Chapter 11 bankruptcy protection on May 12, 2003. A Creditors' Committee was formed on May 22, 2003. The Creditors' Committee selected the law firm of Foley & Lardner to act as its counsel.

**50**    On August 19, 2003, the Creditors' Committee reached an agreement with Magnatrax and its subsidiaries on a plan of reorganization. The Magnatrax Plan of Reorganization was subsequently confirmed by the U.S. Bankruptcy Court on November 17, 2003. Magnatrax emerged from Chapter 11 protection on January 20, 2004. After that date, Onex no longer had any ownership interest in Magnatrax.

### (viii) Notice of Circumstances - The Foley Letter

**51**    On August 1, 2003, Foley and Lardner, counsel for the Magnatrax Creditors' Committee, wrote a letter to counsel for Magnatrax asserting that the Creditors' Committee believed that Magnatrax had various claims against Onex and its affiliates, and the officers and directors of Onex and Magnatrax.

**52**    As described in the Foley Letter, the purported claims were against "those parties involved in the May 1999, September 1999, and March 2000 transactions, as well as the credit facilities and related agreements supporting those transactions". The letter refers to numerous claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, preference claims "and possibly other claims yet to be identified".

**53**    The Foley Letter requested confirmation that Magnatrax would prosecute all of these claims or, in the alternative, sought confirmation that the Committee could pursue the claims on Magnatrax's behalf.

**54**    After receiving the Foley Letter, counsel for Magnatrax forwarded it to Aon on August 7, 2003 and inquired about what notice should be sent to Magnatrax's insurers.

**55**    On November 28, 2003, the day before the Onex 2002-2003 Policy was to expire, Aon faxed the Foley Letter to American Home. In doing so, Aon referenced both the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy and stated that the Foley Letter "contains information on a situation which could in future give rise to a claim under [those] polic[ies]".

### (ix)    Onex's 2004-2005 D&O Coverage

**56**    Onex renewed its US$15 million D&O coverage with American Home in 2003-2004 and in 2004-2005. As it had done in other years, Onex also obtained excess "follow form" D&O coverage for 2004-2005.

**57**    The coverage provisions under the Onex 2004-2005 Policy are the same as the coverage

provisions under the Onex 2002-2003 Policy.

**58**    Clause 4(d) of the Onex 2004-2005 Policy is significant to this appeal. It creates an exclusion from coverage where a Claim is covered under a prior policy:

>    4.    EXCLUSIONS
>
>    The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
>
>                                    ...

**59**    (d) alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

**60**    ...

### (x) Removal of the Specific Entity/Subsidiary Exclusion Endorsement

**61**    The policy wording for the Onex 2004-2005 Policy was not sent to Aon for review until May 10, 2005. After receiving the policy language, Aon requested that American Home delete the endorsement containing the Specific Entity/Subsidiary Exclusion, which was Endorsement #14 in the Onex 2002-2003 Policy and Endorsement #13 in the Onex 2003-2004 Policy, and replace it with a Prior Acts Exclusion to provide coverage under the Onex 2004-2005 Policy for wrongful acts committed by Magnatrax directors and officers during the period May 12, 2003 to January 20, 2004 when Magnatrax and its subsidiaries were in Chapter 11 protection.

**62**    The Onex 2004-2005 Policy was later re-issued with the Prior Acts Exclusion replacing the Specific Entity Exclusion. The Prior Acts Exclusion appears in the 2004-2005 Policy as Endorsement #13, which states in part:

>    PRIOR ACTS EXCLUSION FOR LISTED ENTITIES
>
>                                    ...
>
>    In consideration of the premium charged, it is hereby understood and agreed that the term Subsidiary is amended to include the entity(ies) listed below, but only for Wrongful Acts committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to such entity's respective acquisition/creation date listed below and prior to the time the Named Entity no longer maintains Management Control of such entity(ies), respectively, either directly, or

indirectly through one or more other Subsidiaries. Loss arising from the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act.

| ENTITIES | ACQUISITION/CREATION DATE |
|---|---|
| Magnatrax Corporation [...] | May 12, 2003 |

**63**    Significantly, the Excess Insurers never agreed to this change in the policy provisions.

### (xi)    The Georgia Action

**64**    On May 10, 2005, the Trustee of the Magnatrax Litigation Trust commenced the Georgia Action.

**65**    The Magnatrax Litigation Trust was established under s. 4.21 of the Magnatrax Plan of Reorganization, which was approved by the U.S. Bankruptcy Court, to pursue causes of action on behalf of the Litigation Trust beneficiaries, who are defined as unsecured creditors of Magnatrax.

**66**    Of the 19 counts asserted in the Georgia Action, four are asserted against the personal defendants, as well as against two directors of Magnatrax: i) breach of fiduciary duty; ii) aiding and abetting breach of fiduciary duty; iii) civil conspiracy; and iv) unjust enrichment. These four counts were also asserted against Onex and various Onex-related companies. The remaining 15 counts in the Georgia Action are pleaded only against Onex and Onex affiliates.

**67**    The breach of fiduciary duty count alleges that Onex was the *de facto* board and *alter ego* of Magnatrax and its subsidiaries. The count further alleges that the defendants exploited their positions as directors and officers of Magnatrax, as *de facto* directors and officers of Magnatrax, or as the *alter ego* to the board of Magnatrax, to further their own benefit and in breach of their duties owed to the "Debtors" ("Debtors" refers to Magnatrax and Magnatrax-related companies).

**68**    The aiding and abetting breach of fiduciary duty count alleges that each of the defendants knowingly induced, participated in and substantially assisted the other defendants' breaches of fiduciary duty owed to the Debtors.

**69**    The civil conspiracy count alleges that the defendants wilfully conspired to embark on a scheme to divert value from the Debtors to themselves; to fraudulently transfer assets and value from the Debtors to the benefit of themselves; and to breach fiduciary duties.

**70**    The unjust enrichment count alleges that the defendants used their "complete domination and

control of the Debtors" to receive a "benefit from their management of the Debtors, and this benefit inured to the detriment of both the Debtors and the Debtors' creditors."

### (xii) Notice of the Georgia Action to American Home and the Coverage Provided by American Home

**71**    On July 4, 2005, Aon sent on Onex's behalf a copy of the complaint in the Georgia Action to American Home as notice of a Claim under the Onex 2004-2005 Policy.

**72**    On September 15, 2005, American Home denied coverage under that policy because the allegations in the Georgia Action pre-dated May 12, 2003. According to American Home, the Prior Acts Exclusion in Endorsement #13 of the Onex 2004-2005 Policy limited coverage to Wrongful Acts committed after May 12, 2003.

**73**    American Home also contended that the Claim is excluded because the allegations relate to the personal defendants' actions in a capacity other than as an Executive of Onex and subsidiaries of Onex. Finally, American Home raised the possibility that coverage was not available because the allegations in the Georgia Action involved intentional acts that are excluded from coverage by clauses 4(a) and (c) of the Onex 2004-2005 Policy.

**74**    Initially, American Home also denied coverage under the Magnatrax Run-Off Policy. However, on August 28, 2006, American Home's counsel indicated that coverage would be available for the personal defendants under that policy based on Endorsement #4. In counsel's view, this co-defendant endorsement afforded coverage with respect to a Claim against Onex Executives provided an Insured under the policy remained as a co-defendant in the Claim along with Onex or an Insured Person of Onex.

**75**    As we have said, Onex and the personal defendants were jointly represented by counsel throughout the Georgia Action and incurred defence costs totalling approximately US$35 million and settlement costs of over US$9 million. American Home paid out US$15 million - the limit of liability under the Magnatrax Run-Off Policy - to reimburse the personal defendants and two other Magnatrax directors and officers for their defence costs. Of this US$15 million, US$13,881,991.90 was paid to reimburse the personal defendants and the remaining US$1,118,008.10 was paid to reimburse the two other Magnatrax directors and officers. As noted, Onex and Magnatrax did not obtain excess insurance for the Magnatrax Run-Off Policy.

### (xiii) The Onex Action Against American Home and the Excess Insurers

**76**    Onex and the personal defendants commenced this action in 2008 against American Home and the various Excess Insurers seeking coverage under the Onex 2004-2005 Policy and under the 2004-2005 Excess Policies. In the alternative, the plaintiffs sought coverage under the Onex 2002-2003 Policy. American Home and the Excess Insurers defended and also counterclaimed for declarations that they had no obligation to provide coverage.

**77**    Onex and the personal defendants, American Home and the Excess Insurers brought competing motions for summary judgment.[4]

## C. MOTION JUDGE'S REASONS

**78**    In his reported reasons dated June 30, 2011, the motion judge held as follows:

> \*    The Foley Letter constituted notice of circumstances under clause 7(c) of the Onex 2002-2003 Policy with respect to the Georgia Action.
>
> \*    Clause 4(d) of the Onex 2004-2005 Policy operates to exclude American Home from having to pay any defence costs in connection with the Georgia Action under the Onex 2004-2005 Policy. The follow-form 2004-2005 Excess Policies also excluded the Excess Insurers from any liability in respect of the Georgia Action.
>
> \*    Endorsement #14 of the Onex 2002-2003 Policy does not exclude coverage for any claim by a third party against Onex's directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax, and thus, under the Onex 2002-2003 Policy, American Home is required to indemnify Onex and the personal defendants for defence costs incurred in in relation to the Georgia Action.

**79**    In reaching these conclusions, the motion judge found, at para. 97, that the terms of the D&O policies in issue are clear and unambiguous and that evidence of intention adduced by the various parties was inadmissible.

**80**    After receiving the motion judge's decision, American Home brought a motion to amend its counterclaim to have the monies owing under the Onex 2002-2003 Policy set-off against the US$13,881,991.90 already paid to the personal defendants under the Magnatrax Run-Off Policy. American Home also moved for summary judgment on the set-off issue.

**81**    The motion judge granted American Home leave to amend. However, on the motion for summary judgment, he dismissed American Home's counterclaim. In his unreported reasons dated January 20, 2012, he found that Endorsement #16 of the Magnatrax Run-Off Policy does not reduce the limit of liability of the Magnatrax Run-Off Policy, and thus American Home was not entitled to repayment of amounts previously paid to the personal defendants under the Magnatrax Run-Off Policy. Given his conclusion that American Home was not entitled to repayment, he did not consider American Home's claim for set-off.

## D. ISSUES

### The Appeal by American Home

**82**    American Home raises two issues on the appeal:

(1)     Did the motion judge err in concluding that Endorsement #14 of the Onex
        2002-2003 Policy does not exclude coverage for defence costs of the personal
        defendants in connection with the Georgia Action?

(2)     Did the motion judge err in concluding that Endorsement #16 of the Magnatrax
        Run-Off Policy does not entitle American Home to set-off amounts owing under
        the Onex 2002-2003 Policy against payments made under the Magnatrax
        Run-Off Policy?

**83**     It is worth noting that American Home accepts that, but for Endorsement #14, it would be
liable to pay the personal defendants the amounts claimed under the Onex 2002-2003 Policy. Thus,
American Home accepts that the coverage provisions in that policy include the payment of defence
costs of the personal defendants arising from the Georgia Action.

**The Onex Cross-Appeal**

**84**     On the cross-appeal, two issues need to be considered:

(1)     Did the motion judge err in concluding that the Foley Letter complied with the
        requirements of clause 7(c) of the Onex 2002-2003 Policy?

(2)     Did the motion judge err in granting American Home leave to amend its
        Amended Amended Statement of Defence and Counterclaim?

**85**     We will deal with the Onex cross-appeal first.

**E. THE ONEX CROSS-APPEAL**

### (1) The Foley Letter and clause 7(c) of the Onex 2002-2003 Policy

**86**     On its cross-appeal, Onex argues that the motion judge erred in concluding that the Onex
2004-2005 Policy and the 2004-2005 Excess Policies did not provide coverage because Onex had
previously given notice of the circumstances that gave rise to the Georgia Action pursuant to the
Onex 2002-2003 Policy.[5]

**87**     The Onex 2002-2003 Policy and the Onex 2004-2005 Policy are claims made and reported
policies. Losses resulting from a Claim are eligible for coverage under a policy if the Claim is made
and reported during the policy period.

**88**     Clause 7(c) of the Onex 2002-2003 Policy provides that the period of coverage can be
extended beyond the Policy Period if an insured party provides notice during the Policy Period of
circumstances that may lead to a future Claim. Clause 7(c) states in relevant part:

> If during the Policy Period ... an Organization or an Insured shall become aware
> of any circumstances which may reasonably be expected to give rise to a Claim
> being made against an Insured and shall give written notice to the Insurer of the

circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**89**    Clause 7(c) dovetails with clause 4(d) of the standard exclusions in American Home's D&O policies, including the Onex 2004-2005 Policy. Clause 4(d) excludes from coverage under the present policy Loss from any Claim arising out of Wrongful Acts of which notice has been given under a previous policy.

**90**    The cross-appeal turns on whether Onex provided American Home with notice of circumstances during the policy period for the Onex 2002-2003 Policy that complied with clause 7(c) of that policy. If it did, then coverage under the Onex 2004-2005 Policy is excluded pursuant to clause 4(d) and, consequently, coverage under the excess insurance follow-form policies would also be excluded.

**91**    As we have said at paras. 49-53, on August 1, 2003, Foley and Lardner, counsel for the Magnatrax Creditors' Committee, wrote a letter to counsel for Magnatrax asserting that Magnatrax had claims against Onex, the directors and officers of Onex, and the directors and officers of Magnatrax. These claims were said to arise from "the May 1999, September 1999, and March 2000 transactions, as well as the credit facilities and related agreements supporting those transactions." The letter refers to numerous claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, "and possibly other claims yet to be identified".

**92**    On November 28, 2003, the day before the Onex 2002-2003 Policy was to expire, Aon faxed the Foley Letter to American Home. In doing so, Aon referred to both the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy and stated that the Foley Letter "contains information on a situation which could in future give rise to a claim under [those] polic[ies]".

**93**    Onex argues that the Foley Letter does not satisfy the specificity requirements of clause 7(c) of the Onex 2002-2003 Policy in that it does not set out full particulars as to dates, persons and entities involved. Onex contends that the letter did not describe the nature of the commercial transactions or Onex's role in them, did not specify any wrongful act that might be alleged, nor did it set out the names of the directors and officers who were involved in the transactions.

**94**    The motion judge rejected these same arguments. In his reported reasons, he indicated that he was in agreement with U.S. cases holding that, in determining whether a notice by an insured to an insurer is sufficient, an objective test should be applied having regard to the wording of the policy. He held, at para. 136: "The test is whether the insured objectively complied with the notice provision in the Policy", citing *Continental Insurance Co. v. Superior Court Los Angeles County*, 37

Cal. App. 4th 69, 80 (1995) and *McCullough v. Fidelity & Deposit Co.*, 2 F.3d 110, 113 (5th Cir. 1993).

**95**    We see no reason to interfere with the motion judge's finding that the Foley Letter contains sufficient particulars to meet the requirements of clause 7(c). We agree with the motion judge's conclusion, at para. 150, that "it sets out the specific transactions and agreement involved, the dates of the transactions, the claims which are alleged to exist and the entities and individuals involved." What is important here is that Onex, through Aon, provided American Home with the specifics of the threatened litigation as those specifics were provided to it. It was not necessary for the insured to speculate about the names of the individual directors or officers who might be named in the threatened litigation. As found by the motion judge, when viewed objectively as a whole, the Foley Letter contains sufficient particulars of the dates, persons and entities involved to comply with clause 7(c) of the Onex 2002-2003 Policy.

**96**    We share the motion judge's view that the claims being advanced in the Georgia Action are "the same as or related to" the claims asserted in the Foley Letter. The Foley Letter referred to claims arising out of transactions in May 1999, September 1999 and March 2000. The Georgia Action is based on corporate acquisitions by Magnatrax of American Buildings Company in May 1999, Republic Builders Products in August 1999, and Jannock Limited in March 2000.

**97**    Further, the claims asserted in the Georgia Action against the personal defendants are breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy and unjust enrichment. The Foley Letter sets out a number of claims, including breach of fiduciary duty, aiding and abetting breach of fiduciary duty and unjust enrichment. Thus, the Foley Letter alleges the same or related claims against Onex and the personal defendants as were alleged in the Georgia Action.

**98**    We therefore agree with the motion judge that the Foley Letter meets the requirement of clause 7(c) of the Onex 2002-2003 Policy such that the Georgia Action constitutes a Claim made during the Policy Period of the Onex 2002-2003 Policy.

**99**    As a result of clause 4(d) of the Onex 2004-2005 Policy, coverage is excluded under that policy. Coverage is also excluded under the 2004-2005 Excess Policies.

### (2) Leave to Amend American Home's Pleadings

**100**    Onex cross-appeals the motion judge's order granting American Home leave to amend its Amended Amended Statement of Defence and Counterclaim and to further particularize its claim for legal or equitable set-off. Onex submits that the motion judge erred in failing to find that the set-off issue raised by American Home was *res judicata*. On appeal, Onex advances the same arguments that were made to the motion judge on the issue of *res judicata*. Onex also submits, as it did on the motion, that permitting the amendment would result in non-compensable prejudice because American Home was effectively allowed to bolster arguments that had already been considered and rejected by the motion judge.

**101**    The motion judge dealt with these arguments at para. 30 of his unreported January 20, 2012 reasons:

> In my view, *res judicata* does not apply to American Home's proposed amendments. Cause of action estoppel is not applicable. Nor, in my view, is issue estoppel. The issues of whether the limits of the Magnatrax Policy were reduced by the limits of the 2002-2003 D&O Policy and whether American Home was entitled to a refund of amounts paid under the Magnatrax Policy were not decided by me. The former issue was pleaded but not argued. The latter issue is a corollary which arises only on a determination of the first issue. The Action, and specifically the counterclaim has not been concluded.

**102**    We see no reason to interfere with the motion judge's exercise of discretion permitting American Home to amend its pleadings. The motion judge had not yet decided whether the limits of the Magnatrax Run-Off Policy were reduced by the Onex 2002-2003 Policy, nor the corollary issue of whether American Home was entitled to a refund of amounts paid under the Magnatrax Run-Off Policy. We fail to see how Onex was prejudiced by the permitted amendments.

**103**    For the foregoing reasons, we would dismiss the Onex cross-appeal.

## F. AMERICAN HOME'S APPEAL

### (1)    Legal Principles

**104**    The issues raised by American Home relate to the proper interpretation of certain endorsements in the Onex 2002-2003 Policy and the Magnatrax Run-Off Policy. American Home does not argue that the motion judge erred in setting out the legal principles for interpreting the terms of an insurance policy. However, we include a summary of these principles because they inform our analysis of the issues raised by American Home's appeal.

**105**    The Supreme Court of Canada has canvassed the principles of insurance policy interpretation on several occasions: see *Progressive Homes Ltd. v. Lombard General Insurance Co. of Canada*, 2010 SCC 33, [2010] 2 S.C.R. 245, at paras. 21-24; *Co-operators Life Insurance Co. v. Gibbens*, 2009 SCC 59, [2009] 3 S.C.R. 605, at paras. 20-28; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at paras. 27-30; *Non-Marine Underwriters, Lloyd's of London v. Scalera*, 2000 SCC 24, [2000] 1 S.C.R. 551, at paras. 67-71; and *Brissette Estate v. Westbury Life Insurance Co.*, [1992] 3 S.C.R. 87, at pp. 92-93.

**106**    The primary interpretative principle is that when language of the policy is unambiguous, the court should give effect to the clear language, reading the contract as a whole: *Scalera*, at para. 71. The terms of the policy must be examined "in light of the surrounding circumstances, in order to determine the intent of the parties and the scope of their understanding": *Jesuit Fathers*, at para. 27.

**107**    In *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, 114 O.A.C. 357, at para. 25, this court referred to the need to examine the language of a contract in light of the surrounding circumstances: "While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance." In cases of insurance contracts, the evidence of the factual matrix may be of more assistance when the contract is an individually negotiated contract rather than a standard form contract resulting from a routine purchase of an insurance policy.

**108**    Be that as it may, before reaching a finding that a contractual provision is ambiguous, the court must assess the words of a contract in light of the factual matrix in which the agreement was written. As Doherty J.A. stated in *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59, 85 O.R. (3d) 616, at para. 54:

> A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

**109**    It is important to distinguish what is meant by the factual matrix from extrinsic evidence that is admissible to resolve an ambiguity. The factual matrix is gleaned from the context of the transaction. Doherty J.A. explained in *Dumbrell*, at para. 55, that the factual matrix "clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made".

**110**    Where the language of an insurance policy is found to be ambiguous, the court will rely on general rules of contract construction. As explained in *Progressive Homes*, at para. 23:

> For example, courts should prefer interpretations that are consistent with the reasonable expectations of the parties (*Gibbens*, at para. 26; *Scalera*, at para. 71; *Consolidated-Bathurst*, at p. 901 [*Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888]), so long as such an interpretation can be supported by the text of the policy. Courts should avoid interpretations that would give rise to an unrealistic result or that would not have been in the contemplation of the parties at the time the policy was concluded (*Scalera*, at para. 71; *Consolidated-Bathurst*, at p. 901). Courts should also strive to ensure that similar insurance policies are construed consistently (*Gibbens*, at para. 27). These rules of construction are applied to resolve ambiguity. They do

not operate to create ambiguity where there is none in the first place.

**111**    In *Lombard Canada Ltd. v. Zurich Insurance Co*., 2010 ONCA 292, 101 O.R. (3d) 371, at para. 33, this court held that, where there is ambiguity in the sense that a phrase is capable of bearing two equally reasonable interpretations, the court may consider extrinsic evidence and the applicability of the *contra proferentem* rule.

**112**    However, the admission of extrinsic evidence does not mean that the parties' subjective views of what was intended by the agreement will be used to resolve the ambiguity. On the contrary, the court should adopt the interpretation that gives effect to the reasonable expectations or intentions of the parties: *Scalera*, at para. 71; *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.*, [1993] 1 S.C.R. 252, at p. 269; *Dunn v. Chubb Insurance Co. of Canada*, 2009 ONCA 538, 266 O.A.C. 1, at para. 35.

**113**    We turn now to the arguments with respect to the interpretation of Endorsement #14 of the Onex 2002-2003 Policy.

### (2) Endorsement #14 of the Onex 2002-2003 Policy

**114**    American Home argues that the motion judge erred in finding that Endorsement #14 of the Onex 2002-2003 Policy does not exclude coverage for the personal defendants' claims for defence costs arising from the Georgia Action. According to American Home, under the plain meaning of Endorsement #14, the personal defendants' losses in the form of defence costs fall into each of the following three exclusions in Endorsement #14:

> (i)    the Georgia Action is a Claim made against Magnatrax or its Executives;
> (ii)    the Georgia Action is a Claim brought by Magnatrax; and
> (iii)    the Georgia Action is a Claim based on an act or omission of Magnatrax Executives.

**115**    Before turning to the specific arguments, it is important to note that Endorsement #14 to the Onex 2002-2003 Policy is one part of an individually negotiated set of insurance arrangements between Onex, American Home and Magnatrax. Those arrangements resulted from a number of discussions and email exchanges. Those arrangements also included the issuance of the Magnatrax Run-Off Policy. The origin of those arrangements goes back to the discussions between the parties in January 2003 when Onex was contemplating a sale of Magnatrax. The parties added Endorsement #14 to the Onex 2002-2003 Policy as a result of a negotiated set of contractual arrangements.

**116**    Next, it is worth noting that the positions of both parties in approaching the interpretation dispute are commercially reasonable. Onex says that it is reasonable that Onex Executives would have wanted to maintain coverage under the more extensive Onex tower of insurance policies in the face of Magnatrax's Chapter 11 filing and the heightened litigation risk associated with that filing.

American Home, on the other hand, says it would be reasonable for it to provide no more than one of its policy limits to respond to any "Claim" related to Magnatrax. Both of these positions are commercially reasonable when viewed from the parties' own perspective. Hence, the difficulty.

**117**    We first explain why we would not give effect to American Home's argument based on the second exclusion identified by American Home in Endorsement #14 of the Onex 2002-2003 Policy.

### (a) The Georgia Action is a Claim Brought By Magnatrax

**118**    American Home argues that the Loss arising from the Georgia Action is excluded by Endorsement #14 of the Onex 2002-2003 Policy because the Loss arises out of or in connection with a Claim brought by Magnatrax. We repeat for convenience the language of the first paragraph of Endorsement #14 that relates to this argument:

> [T]he Insurer shall not be liable for any Loss ... arising out of ... or in connection with any Claim brought *by* ... [Magnatrax]" ... [Emphasis added.].

**119**    The question then becomes whether the Georgia Action, which was brought by the Magnatrax Litigation Trust as plaintiff, and which asserts only causes of action assigned to it under the Magnatrax Plan of Reorganization, is a Claim brought by Magnatrax. If so, the Loss arising therefrom is excluded by Endorsement #14.

**120**    The motion judge set out the facts relevant to this argument at paras. 175-77 of his reported reasons. American Home does not dispute the motion judge's summary of the facts.

**121**    As we said above, the Georgia Action was brought by the Trustee of the Magnatrax Litigation Trust. The Magnatrax Litigation Trust was established pursuant to s. 4.21 of the Magnatrax Plan of Reorganization, which was approved by the U.S. Bankruptcy Court in the Chapter 11 proceedings. It is clear, however, from both the Foley Letter and the complaint in the Georgia Action that the claims being advanced are claims which, up until their assignment to the Litigation Trust, belonged entirely to Magnatrax and its subsidiaries.

**122**    The Foley Letter requested immediate confirmation from Magnatrax and its subsidiaries in bankruptcy that it would pursue the claims identified against the entities and the individuals named, failing which it requested confirmation that the Creditors' Committee could pursue the claims of Magnatrax on their behalf.

**123**    American Home argues that the motion judge erred in concluding that the Georgia Action was not brought by Magnatrax so as to come within the second exclusion in Endorsement #14 of the Onex 2002-2003 Policy. The Georgia Action is a derivative action instituted by the Litigation Trust and alleges causes of action originally belonging to Magnatrax. American Home correctly points out that if the Georgia Action had been brought by Magnatrax, it would be clear that Endorsement #14 would have excluded coverage.

**124**    American Home also points out that prior to the issuance of Endorsement #14, the exclusion in Endorsement #10 of the Onex 2002-2003 Policy, which amends clause 4(i) in that Policy, would have excluded coverage for proceedings - including derivative actions - commenced by a trustee established in bankruptcy proceedings of Magnatrax for the benefit of its creditors.

**125**    The exclusion in clause 4(i) of the Onex 2002-2003 Policy is a standard "Insured versus Insured" exclusion (see the Appendix for the text of clause 4(i)). This exclusion is designed to protect the insurer from having to provide coverage in relation to a legal proceeding by one insured party against another insured party. The "Insured versus Insured" exclusion is designed to prevent collusive proceedings whereby "an insured company might seek to force its insurer to pay for the poor business decisions of its officers or managers": *Twp. Of Center, Butler County, Pa. v. First Mercury Syndicate, Inc.*, 117 F.3d 115, 119 (3d Cir. 1997).

**126**    Paragraph 3 of clause 4(i) provides that the Insured versus Insured exclusion "shall not apply to":

>    (3)    in any bankruptcy proceeding by or against an Organization, any Claim brought by the examiner, trustee, receiver, receiver manager, liquidator or rehabilitator (or any assignee thereof) of such Organization, if any;

**127**    Endorsement #10 deleted subparagraph 3 of clause 4(i). Thus, the "Insured versus Insured" exclusion would apply to exclude coverage for a Claim brought in bankruptcy proceedings by a trustee of an Organization as defined in the Onex 2002-2003 Policy.

**128**    However, the effect of Endorsement #10 was removed insofar as Magnatrax was concerned after the parties agreed upon Endorsement #14. Endorsement #14 provides that Magnatrax is no longer a Subsidiary of Onex. "Organization" is defined to mean each "Subsidiary".

**129**    American Home argues that there is no evidence that the parties intended that the amendments to the Onex 2002-2003 Policy resulting from the inclusion of Endorsement #14 should operate to expose it to a form of coverage previously excluded - liability for derivative legal proceedings brought against Onex by a creditors' litigation trust.

**130**    The motion judge rejected these arguments. We agree with his conclusion and his reasons, at paras. 178-80 of his reported reasons:

>          Notwithstanding that the claims which are asserted against [the personal defendants] in the [Georgia Action] are derivative claims which initially belonged to Magnatrax and its subsidiaries, in my view, they are not brought by Magnatrax. The exclusion in the first paragraph of Endorsement #14 of the [Onex 2002-2003 Policy] is clear. It applies to "any Claim brought by ..." Magnatrax or any subsidiary or affiliate thereof. While [the Georgia Action] asserts claims which originally belonged to Magnatrax and its subsidiaries, it is

brought by the Trustee on behalf of the Magnatrax Litigation Trust and not Magnatrax.

As noted earlier, exclusions are to be interpreted narrowly. In the absence of more expansive wording in Endorsement #14 to exclude derivative claims, the words: "any Claim brought by or made against [Magnatrax, its subsidiaries and affiliates]" restrict the application of the exclusion to claims brought by Magnatrax, its subsidiaries and affiliates. As [the Georgia Action] is not such a Claim, Endorsement #14 does not exclude it from coverage.

Nor, in my view, can American Home rely on Endorsement #10 of the [Onex 2002-2003 Policy] which excludes claims against any Insured where the claim is brought in any bankruptcy proceeding by or against an Organization when the claim is brought by, among others, the creditors' committee or trust. Endorsement #14 removed Magnatrax as a subsidiary thereby excluding it from the definition of Organization under the [Onex 2002-2003 Policy].

**131**    To those reasons, we would add that the circumstances surrounding the adoption of Endorsement #14 support the motion judge's interpretation of the words in that clause. The reason for the negotiations that resulted in Endorsement #14, as well as Endorsements #4 and #16 to the Magnatrax Run-Off Policy, was the impending bankruptcy of Magnatrax. Although these three endorsements were not, in fact, issued until sometime after the Chapter 11 proceedings involving Magnatrax had commenced, the endorsements were dated May 12, 2003 so as to coincide with the beginning of the Chapter 11 proceedings.

**132**    Endorsement #14 had the effect of removing the bankruptcy exclusion in Endorsement #10 as it applied to Magnatrax. It is significant, we suggest, that the language in Endorsement #14 excludes coverage for Loss arising from a Claim brought by Magnatrax (the insolvent entity) but does not, as Endorsement #10 had, exclude Loss arising from a Claim brought by a trustee, a creditors' committee, or a trust. We do not think that this omission, viewed objectively and reasonably, should be treated as an oversight, particularly when it is considered that Endorsement #14 was drafted in the circumstances of Magnatrax declaring bankruptcy. Rather, given the experience and sophistication of the parties, we conclude, as the motion judge did, that the parties intended the exclusion in Endorsement #14 to apply only to Loss arising from a Claim brought by Magnatrax. Had the parties intended that the exclusion was to apply to Loss arising from a Claim brought by assignees, trustees, or other representatives asserting Magnatrax's claims, they would have specifically said so.

**133**    We now consider together the remaining two exclusions identified by American Home.

**(b) The Georgia Action is a Claim Made Against Magnatrax or its**

### Executives / The Georgia Action is Claim Based on an Act or Omission of Magnatrax Executives

**134**    American Home argues that the defence costs claimed by the personal defendants are excluded from coverage by two additional exclusions in Endorsement #14 of the Onex 2002-2003 Policy: the remaining language in the first paragraph of Endorsement #14 and the second sentence of the second paragraph of Endorsement #14. We repeat the relevant language for convenience:

> In consideration of the premium charged, it is hereby understood and agreed that *the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against* [Magnatrax Corporation] *and/or any* [Executive] *thereof.*
>
> ...
>
> Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof. [Emphasis added.]

**135**    The motion judge did not accept American Home's arguments based on either the first or second paragraphs of Endorsement #14. He concluded, at para. 169 of his reported reasons, that although Endorsement #14 of the Onex 2002-2003 Policy is an exclusion provision, it does not operate as an "absolute" exclusion in respect of all claims against Onex's directors and officers relating to Magnatrax. He concluded that the language of Endorsement #14 was unambiguous and thus only open to the interpretation he adopted.

**136**    We have considered the language of Endorsement #14 of the Onex 2002-2003 Policy in the context of the surrounding circumstances or the factual matrix. In our view, the language viewed in that context is ambiguous. It is open to two reasonable interpretations: the one urged by American Home and the one adopted by the motion judge.

**137**    Because there is ambiguity, it becomes necessary to turn to extrinsic evidence to assist with the interpretative exercise. Before turning to the use of extrinsic evidence, we will set out why we consider both of the competing interpretations to be reasonable.

**138**    We start with the motion judge's interpretation.

**139**    In the motion judge's view, Endorsement #14 excludes coverage for claims against the personal defendants acting in their capacity as Magnatrax Executives, but it does not exclude from coverage claims the personal defendants acting in their capacity as Onex Executives. The motion judge drew the distinction between the capacity in which the personal defendants were

acting at para. 105 of his reported reasons:

> Further, based on a review of the entire Complaint in the [Georgia] Action and in particular the allegations against [the personal defendants], it is my view that the claims against the [personal defendants] are asserted against them in their capacity both as directors and officers of Onex and as directors (or de facto directors ...) and officers of Magnatrax. *The overarching theme of the Complaint* [i.e., the Georgia Action] *is that Onex, as directed by the [personal defendants] in their capacity as Onex directors and officers, engineered the demise of Magnatrax and its subsidiaries for their collective benefit.* [Emphasis added.]

**140**    The motion judge went on, at paras. 173-74, to interpret the exclusionary effect of Endorsement #14 as follows:

> Accordingly, when read in its entirety, Endorsement #14 operates to remove Magnatrax (and any subsidiary or affiliate) from coverage under the [Onex 2002-2003 Policy] and exclude any claim against Onex directors and officers by or against Magnatrax or arising out of, based upon or attributable to any act on the part of Magnatrax or its directors and officers. What Endorsement #14 does not exclude, in my view, is any claim by a third party against Onex's directors and officers in their capacity as such for their wrongful acts in relation to Magnatrax.

> Based on the above interpretation of Endorsement #14, it is my view that the [Georgia] Action is not excluded from coverage under the [Onex 2002-2003 Policy]. As has been previously discussed, the [Georgia] Action asserts claims against the [personal defendants] in their capacity as directors and/or officers of Onex relating to Magnatrax. The claims are not based upon or attributable to any act on the part of Magnatrax or its directors and officers.

**141**    The motion judge elaborated on his understanding of the term "Claim" in the Magnatrax Run-Off Policy and the Onex 2002-2003 Policy at paras. 54-55 of his unreported January 20, 2012 reasons:

> The term "Claim" is broadly defined in both the Magnatrax [Run-Off] Policy and the [Onex 2002-2003 Policy] to include, among other things, a written demand for monetary, non-monetary or injunctive relief as well as [a] civil proceeding for monetary, non-monetary or injunctive relief commenced by statement of claim. It is intended to define a triggering event in respect of coverage under the Policies. In my view, however, based on the wording of the Policies as a whole, the definition of Claim is broad enough to also encompass multiple individual claims within an action or proceeding as well. It is not restricted to mean solely an

action or proceeding.

> To define Claim as being limited to a legal action or proceeding makes no sense having regard to the wording of the Policies. The Policies refer to and deal with actions or proceedings which assert multiple claims where some of the claims are covered and some are not. They also provide for claims against insured in actions where there are co-defendants who are not covered. It is the covered claims within an action or proceeding that are covered rather than the entire action.

**142**    These reasons indicate that the motion judge was satisfied that the Georgia Action advanced claims against the personal defendants both in their capacities as Executives of Magnatrax and in their capacities as Executives of Onex. American Home does not challenge this finding on appeal.

**143**    It is also apparent that the motion judge was satisfied that while the term "Claim" as it is defined in the Onex 2002-2003 Policy refers to a civil proceeding, the term need not necessarily encompass the entirety of the civil proceeding. According to the motion judge, when the wording of the policies is looked at as a whole: "the definition of Claim is broad enough to also encompass multiple individual claims within an action or proceeding as well. It is not restricted to mean solely an action or proceeding": unreported reasons, at para. 54.

**144**    We think that the motion judge's view is tenable to the following extent. We agree that when the wording of the policies is looked at as a whole, it is reasonable to interpret the term "Claim" in Endorsement #14 as not necessarily referring to the entirety of a proceeding. The phrase in the first paragraph of Endorsement #14 - "any Claim ... made against [Magnatrax or its Executives]" - can be taken as referring to the Georgia Action as advanced against Magnatrax or its Executives, and not as referring to the Georgia Action as advanced against Onex or its Executives acting in their capacity as such.

**145**    The following wording of the policies supports this view. Under the terms of the Executive Liability coverage in the Onex 2002-2003 Policy, American Home was responsible to pay the Loss of an Onex Executive arising from a Claim made against the Executive for any "Wrongful Act" of the Executive.

**146**    "Wrongful Act" is defined as meaning:

> (1)    any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act ...

**147**    (i) with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;

**148**    It is apparent from this definition that the capacity in which an Executive is acting when

committing a Wrongful Act is a crucial feature of coverage. It is only when acting in his or her capacity as an Executive of the covered Organization that the Executive is covered.

**149**    When the Magnatrax Run-Off Policy was issued and Magnatrax and Magnatrax Executives were removed from coverage under the Onex 2002-2003 Policy, it would be reasonable to interpret these policies as providing that Magnatrax Executives would no longer be covered under the Onex 2002-2003 Policy for a Claim brought against them in their capacity as Magnatrax Executives, but that Onex Executives would continue to be covered under the Onex 2002-2003 Policy for Wrongful Acts committed by them in their capacity as Onex Executives. In other words, it is reasonable to interpret the term "Claim" in Endorsement #14 as referring to a proceeding against a particular Insured acting in the capacity that attracts coverage. Considered in this light, the wording of the first paragraph of Endorsement #14 - "the Insurer shall not be liable for any Loss ... arising out of ... any Claim ... made against [Magnatrax or its Executives]" - could reasonably mean a Claim to the extent that it is advanced against Magnatrax or its Executives in their capacity as such.

**150**    On this interpretation of the phrase "any Claim", the exclusion in the second paragraph of Endorsement #14 could reasonably be interpreted as not excluding all of the defence costs of the Georgia Action from coverage. If a proceeding (in this case a civil action) includes causes of action against an Insured acting in more than one capacity, it would be necessary to separate the claims based upon the capacities in which the Insured is being sued and to then determine whether or not the Insured is covered or excluded under the provisions of the policy.

**151**    In this case, the motion judge found, at para. 105 of his reported reasons, that "[t]he overarching theme of the Complaint [*i.e.*, the Georgia Action] is that Onex, as directed by the [personal defendants] in their capacity as Onex directors and officers, engineered the demise of Magnatrax and its subsidiaries for their collective benefit." At para. 174 of his reported reasons, he held that at least some of the claims were advanced against the personal defendants "in their capacity as directors and/or officers of Onex" and are not "based upon or attributable to any act on the part of Magnatrax or its directors and officers."

**152**    At least with respect to the unjust enrichment claim, we agree with the motion judge's characterization. This claim is not "alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of Magnatrax [or any Magnatrax Executive]". On this view, it would be reasonable to interpret the second paragraph of Endorsement #14 of the Onex 2002-2003 Policy as not excluding the cost of defending the unjust enrichment aspect of the Georgia Action.

**153**    Having said that, we are not prepared to find that the motion judge's interpretation of Endorsement #14 of the Onex 2002-2003 Policy is the only reasonably available interpretation. We find that American Home's suggested interpretations of the first paragraph of Endorsement #14 and of the second paragraph of Endorsement #14 are also reasonable ones.

**154**    In advancing the argument based on the exclusion in the first paragraph of Endorsement #14, American Home's fundamental position is that the word "Claim" in this clause should be read as it

is defined in the Onex 2002-2003 Policy. The definition of "Claim" states:

"Claim" means:

...

2)      a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; (ii) return of a summons, information, indictment or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges;

**155**    Based on the definition of the term "Claim" as a civil proceeding, American Home contends that the first paragraph of Endorsement #14 clearly excludes the personal defendants' defence costs from coverage for two main reasons.

**156**    First, the personal defendants' defence costs constitute Loss arising out of, attributable to or in connection with "a civil proceeding", namely, the Georgia Action. Second, the Georgia Action is a civil proceeding against Magnatrax Executives, who were named as individual defendants in the Georgia Action. Thus, on a plain reading of the first paragraph of Endorsement #14, the personal defendants' Loss in the form of defence costs arising from the Georgia Action is excluded from coverage.

**157**    Similarly, American Home's argument based on the second paragraph of Endorsement #14 is that this language operates to exclude coverage for Loss in connection with any civil proceeding against Onex Executives alleging, arising out of, based upon or attributable to the conduct of Magnatrax Executives. The Georgia Action includes allegations of wrongful acts committed by directors and officers of both Magnatrax and Onex. Thus, the argument goes, the Georgia Action is a "Claim" - that is, a civil proceeding - arising out of acts by Magnatrax Executives. That being the case, the defence costs associated with the Georgia Action are excluded from coverage by the above-quoted language from the second paragraph of Endorsement #14.

**158**    On American Home's interpretation, there is no basis in the language of Endorsement #14 or elsewhere in the policy language for assigning a different meaning to the term "Claim" than is provided by the definition in the policy. American Home argues that giving a different meaning to the term "Claim" as it appears in Endorsement #14 would deviate from the meaning of the term most commonly used in the D&O insurance industry.

**159**    We agree with American Home to the extent that we conclude that it is reasonable to interpret the term "Claim" in Endorsement #14 in the way the term is defined in the Onex 2002-2003 Policy, namely, as a civil proceeding. On one reading of the first paragraph of Endorsement #14, the Georgia Action constitutes a civil proceeding brought against Magnatrax Executives, and the Insurer is not liable for "any Loss" in connection with this Claim.

**160**    We agree that it is also reasonable to interpret the second paragraph of Endorsement #14 as excluding coverage for the claimed defence costs because these costs arise from a Claim that is based on acts or omissions of Magnatrax Executives. Each of the four counts in the Georgia Action against the individual defendants name both the personal defendants who served as Onex Executives (*i.e.*, Schwartz, Govan, Wright and Hilson), as well as two individual defendants who only served as Magnatrax Executives (*i.e.*, Richard T. Ammerman and Raymond C. Blackmon Jr.). The language of the second paragraph of Endorsement #14 can be read to exclude from coverage the costs of defending the Georgia Action because these costs constitute Loss in connection with a Claim alleging, arising out of, based upon or attributable to the conduct of Magnatrax Executives (*i.e.*, Wright, Hilson, Ammerman and Blackmon).

**161**    In assessing the reasonableness of the competing interpretations of the term "Claim" in Endorsement #14, it is necessary to consider if each interpretation is consistent with the use of that term elsewhere in the Onex 2002-2003 Policy. We have reviewed the language of the policy, and in particular have examined Endorsements #5 and #9. American Home contended that the language of these endorsements supports its interpretation of Endorsement #14. We conclude that the way the term "Claim" is used elsewhere in the policy does not assist in determining which interpretation of the use of that term in Endorsement #14 is the correct one. There are reasonable arguments pointing in both directions.

**162**    We have also considered the factual matrix in this case, which is set out above in paras. 25-48 above. As we see it, plausible arguments can be made on both sides as to the reasonableness of either interpretation in view of the surrounding circumstances, the provisions of the Magnatrax Run-Off Policy and when viewed objectively, what the parties to the negotiations would have been trying to accomplish.

**163**    In reaching the conclusion that Endorsement #14 is ambiguous, we have specifically considered Endorsements #16 and #4 to the Magnatrax Run-Off Policy (see paras. 43 and 44 above). In our view, these endorsements can be interpreted to sit comfortably with American Home's interpretation of Endorsement #14 in the Onex 2002-2003 Policy.

**164**    Using the plain meaning of the definitions provided in the policies, under American Home's interpretation of Endorsement #14 in the Onex 2002-2003 Policy and Endorsement #16 in the Magnatrax Run-Off Policy, coverage is not simultaneously available under the two policies.

**165**    According to American Home, Endorsement #4 of the Magnatrax Run-Off Policy would afford coverage with respect to any civil proceeding against Onex or Onex Executives provided that the civil proceeding relates to a Wrongful Act committed by Magnatrax or a Magnatrax Executive if either Magnatrax or a Magnatrax Executive remains as a defendant in the civil proceeding.

**166**    That said, we do not think that the compatibility of Endorsements #16 and #4 of the Magnatrax Run-Off Policy with American Home's interpretation of Endorsement #14 in the Onex 2002-2003 Policy is determinative of the interpretation exercise.

**167**    As a starting point, American Home's interpretation of these paragraphs in Endorsement #14 of the Onex 2002-2003 Policy leaves a potential gap in coverage for Onex Executives. On American Home's interpretation, Onex Executives would be covered by the Magnatrax Run-Off Policy for their Wrongful Acts in relation to Magnatrax provided they were sued along with Magnatrax or a Magnatrax Executive. However, they would not be afforded coverage under either policy if they were sued on their own in their capacity as Onex Executives for the same Wrongful Acts.

**168**    Further, Endorsement #16 also can be read in a manner that is consistent with the motion judge's interpretation of Endorsement #14 to the Onex 2002-2003 Policy. If "Claim" as it appears in Endorsement #14 to the Onex 2002-2003 Policy is interpreted as meaning the Georgia Action as advanced against Magnatrax or its Executives, and not as referring to the Georgia Action as advanced against Onex or its Executives acting in their capacity as such, the coverage afforded to Magnatrax Executives under the Magnatrax Run-Off Policy would not trigger Endorsement #16 to the Magnatrax Run-off Policy. Similarly, aspects of the Georgia Action advanced against Onex Executives that do not attract coverage under Endorsement #4 of the Magnatrax Run-Off Policy would not trigger Endorsement #16 of the Magnatrax Run-Off Policy. Viewed in this way, Endorsement #16 of the Magnatrax Run-Off Policy does not make the motion judge's interpretation of Endorsement #14 of the Onex 2002-2003 Policy unreasonable.

**169**    Endorsement #4 of the Magnatrax Run-Off Policy may sit less comfortably with the motion judge's interpretation of Endorsement #14 of the Onex 2002-2003 Policy. Arguably, the motion judge's interpretation avoids the potential for a gap in coverage if a civil proceeding involving Magnatrax named only Onex and Onex Executives as defendants and did not name as defendants Magnatrax or any individuals who served as Magnatrax Executives. That said, it is not entirely clear what effect such an interpretation would have on the coordination of liability limits under Endorsement #16 of the Magnatrax Run-Off Policy.

**170**    In our view, however, the difficulty in reconciling the two endorsements from the Magnatrax Run-Off Policy with the motion judge's interpretation of Endorsement #14 of the Onex 2002-2003 Policy does not determine the interpretative exercise. We have concluded that the ambiguity, as discussed above in these reasons, remains. The factual matrix in this case does not resolve which interpretation of Endorsement #14 of the Onex 2002-2003 Policy reflects the parties' reasonable expectations or intentions in putting in place the Magnatrax Run-Off Policy and amending the Onex 2002-2003 Policy by adding Endorsement #14.

**171**    Each party advanced an interpretation of Endorsement #14 reflecting their reasonable expectation of coverage. Viewed objectively, either interpretation of Endorsement #14 would produce a commercially sensible result.

**172**    In summary, we are of the view that the wording of Endorsement #14 in the Onex 2002-2003 Policy is susceptible of more than one meaning and is therefore ambiguous. Accordingly, we do not

agree with the motion judge's conclusion at para. 169 of his reported reasons that the wording of Endorsement #14 is clear and unambiguous.

**173**    Where an ambiguity is first identified on appeal, it must be asked if the appellate court is in a position to resolve the ambiguity *de novo*. Section 134(1) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, empowers this court to make any order that the motion judge could have made. The parties brought competing motions to decide the personal defendants' action by way of summary judgment. The evidentiary record from the motions was filed electronically in this court with leave.

**174**    The governing test for assessing if it is appropriate to exercise the powers conferred by rule 20.01(2.1) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, on a motion for summary judgment is the full appreciation test from *Combined Air Mechanical v. Flesch*, 2011 ONCA 764, 108 O.R. (3d) 1. This court described the test as follows, at para. 50: "can the full appreciation of the evidence and issues that is required to make dispositive findings be achieved by way of summary judgment, or can this full appreciation only be achieved by way of a trial?"

**175**    We have examined the record carefully. Regrettably, we find that we are not in a position to decide the factual issues that need to be determined in order to resolve the interpretative dispute. Having found that Endorsement #14 was unambiguous, the motion judge did not make findings of fact with respect to the issues we consider relevant to the resolution of the interpretation exercise.

**176**    In arguing the appeal, the parties each took the position that the interpretation they urged on the court was unambiguous. That being the case, they paid little attention to the issues that we now find must be determined - what were the reasonable expectations or intentions of the parties in adopting Endorsement #14 of the Onex 2002-2003 Policy?

**177**    Given the disposition we would make of this appeal, we will not express an opinion on the body of evidence that may be relevant to determining that issue. Suffice it to say that there is evidence of discussions and correspondence that took place in January 2003 and again at the time of the issuance of the Magnatrax Run-Off Policy and the issuance of Endorsement #14.

**178**    We note that it will be open to the Superior Court to decide, if need be, whether Endorsement #16 of the Magnatrax Run-Off Policy entitles American Home to set-off amounts that may be found owing under the Onex 2002-2003 Policy against payments made under the Magnatrax Run-Off Policy.

## G. DISPOSITION

**179**    In the result, we would dismiss the Onex cross-appeal. We would allow American Home's appeal, set aside the order of the motion judge, and return the matter to the Superior Court. We leave it open to the parties to decide whether to renew motions for summary judgment or to proceed by way of a trial of the issues that we have identified in these reasons.

**180**    The parties may make brief written submissions on costs within a period of 30 days from the release of these reasons.

D.R. O'CONNOR A.C.J.O.
 J.M. SIMMONS J.A.
 M. ROSENBERG J.A.:-- I agree.

* * * * *

**Appendix**

**1. Onex 2002-2003 Policy**

Coverage A: EXECUTIVE LIABILITY INSURANCE

This policy shall pay the Loss of any Insured Person arising from a Claim (including, but not limited to, an Employment Practices Claim, an Oppressive Conduct Claim, a Canadian pollution Claim and a Statutory Claim) made against such Insured Person for any Wrongful Act of such Insured Person, except when and to the extent that an Organization has indemnified such Insured Person. Coverage A shall not apply to Loss arising from a Claim made against an Outside Entity Executive.

...

2.    DEFINITIONS

...

(c)    "Claim" means:

(1)    a written demand for monetary, non-monetary or injunctive relief,

(2)    a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by: (i) service of a Writ of Summons, Statement of Claim or similar originating legal document; (ii) return of a summons, information, indictment or similar document (in the case of a criminal proceeding); or (iii) receipt or filing of a notice of charges; or

(3)    a civil, criminal, administrative or regulatory investigation of an Insured Person:

        (i)      once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described in Definition (c)(2) may be commenced; or

        (ii)     in the case of an investigation by any PSC or similar foreign securities authority, after the service of a subpoena upon such Insured Person.

The term "Claim" shall include any Securities Claim, Employment Practices Claim, Oppressive Conduct Claim, Canadian Pollution Claim and Statutory Claim.

...

(h)    "Defence Costs" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defence and/or appeal of a Claim against an Insured, but excluding any compensation of any Insured Person or any Employee of an Organization.

...

(l)    "Executive" means any:

        (1)     past, present and future duty elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position), including a de facto director, officer, trustee, governor, management committee member or member of the management board of such entities;

        (2)     past, present and future person in a duty elected or appointed position in an entity organized and operated in a Foreign Jurisdiction that is equivalent to an executive position listed in Definition (l)(1); or

        (3)     past, present and future General Counsel and Risk Manager (or equivalent position) of the Named Entity.

...

(p)    "Insured" means any:

    (1)    Insured Person; or

    (2)    Organization, but only with respect to a Securities Claim, an Oppressive Conduct Claim or a Canadian Pollution Claim.

(q)    "Insured Person" means any:

    (1)    Executive of an Organization;

    (2)    Employee of an Organization; or

    (3)    Outside Entity Executive.

(r)    "Loss" means damages (including aggravated damages), settlements, judgments (including pre/post-judgment Interest on a covered judgment), Defence Costs and Crisis Loss; however, "Loss" (other than Defence Costs) shall not include: (1) civil or criminal fines or penalties; (2) taxes; (3) punitive or exemplary damages; (4) multiplied portion of multiplied damages; (5) any amounts for which an Insured is not financially liable or which are without legal recourse to an Insured; and (6) matters which may be deemed uninsurable under the provincial or state law pursuant to which this policy shall be construed.

...

(w)    "Organization" means:

    (1)    the Named Entity;

...

(dd)    "Subsidiary" means: (1) any for-profit entity that is not formed as a partnership of which the Named Entity has Management Control ("Controlled Entity") on or before the inception of the Policy Period either directly or indirectly through one or more other Controlled Entities and (2) a not-for-profit organization as defined in Section 149.1(b) of the Income Tax Act, R.S.C., 1985 (5th Supp.) sponsored exclusively by the Named Entity.

(ee)    "Wrongful Act" means:

(1)    any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged Employment Practices Violation:

(i)    with respect to any Executive of an Organization, by such Executive in his or her capacity as such or any matter claimed against such Executive solely by reason of his or her status as such;

(ii)    with respect to any Employee of an Organization, by such Employee in his or her capacity as such, but solely in regard to any: (a) Securities Claim; or (b) other Claim so long as such other Claim is also made and continuously maintained against an Executive of an Organization; or

(iii)    with respect to any Outside Entity Executive, by such Outside Entity Executive in his or her capacity as such or any matter claimed against such Outside Entity Executive solely by reason of his or her status as such; or

(2)    with respect to an Organization, any actual or alleged breach of duty, neglect, error, misstatement, mis-leading statement, omission or act by such Organization, but solely in regard to: (a) any Securities Claim or Oppressive Conduct Claim; or (b) a Canadian Pollution Claim so long as such Canadian Pollution Claim is also made and continuously maintained against an Executive of an Organization.

...

4.    EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

(i)    which is brought by or on behalf of an Organization or any Insured Person, other than an Employee of an Organization; or which is brought by any security holder or member of an Organization, whether directly or derivatively, unless such security holder's or member's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any Executive of an Organization or any Organization, provided, however, this

exclusion shall not apply to:

(1)     any Claim brought by an Insured Person in the form of a cross-claim or third-party claim for contribution or indemnity which is part of, and results directly from, a Claim that is covered by this policy;

(2)     any Employment Practices Claim brought by an Insured Person, other than an Insured Person who is or was a member of the Board of Directors (or equivalent governing body) of an Organization;

(3)     in any bankruptcy proceeding by or against an Organization, any Claim brought by the examiner, trustee, receiver, receiver manager, liquidator or rehabilitator (or any assignee thereof) of such Organization, if any;

(4)     any Claim brought by any past Executive of an Organization who has not served as a duty elected or appointed director, officer, trustee, governor, management committee member, member of the management board, General Counsel or Risk Manager (or equivalent position) of or consultant for an Organization for at least four (4) years prior to such Claim being first made against any person; or

(5)     any Claim brought by an Executive of an Organization formed and operating in a Foreign Jurisdiction against such Organization or any Executive thereof, provided that such Claim is brought and maintained outside Canada, the United States, or any other common law country (including any territories thereof);

...

7.     NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to American Home Assurance Company, 145 Wellington Street West, Toronto, Ontario M5J 1H8: Attention Claims Department. If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.

...

(c)     If during the Policy Period or during the Discovery Period (if applicable) an Organization or an Insured shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against an Insured and shall give written notice to the Insurer of the circumstances, the Wrongful Act allegations anticipated and the reasons for anticipating such a Claim, with full particulars as to dates, persons and

entities involved, then a Claim which is subsequently made against such Insured and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**ENDORSEMENT #5**

...

"NO LIABILITY" PROVISION DELETED AND
SECURITIES CLAIM RETENTION APPLIES TO ALL LOSS

In consideration of the premium charged, it is hereby understood and agreed that the policy is hereby amended as follows:

    (1)    The Definition of and all provisions referring to "No Liability" are hereby deleted in their entirety.

    (2)    Clause 6 RETENTION CLAUSE is deleted in its entirety and replaced by the following:

    6.    RETENTION CLAUSE

For each Claim, the Insurer shall only be liable for the amount of Loss arising from a Claim which is in excess of the applicable Retention amounts stated in Items 4(a) through 4(e) of the Declarations, such Retention amounts to be borne by an Organization and/or the Insured Person and remain uninsured, with regard to all Loss other than Non-Indemnifiable Loss. The Retention amount specified in:

    (i)    Item 4(a) applies to Loss that arises out of a Securities Claim;

    (ii)    Item 4(b) applies to Loss that arises out of an Employment Practices Claim; and

    (iii)    Item 4(c) applies to Loss that arises out of Oppressive Conduct Claim;

    (iv)    Item 4(d) applies to Loss that arises out of a Canadian Pollution Claim; and

(v)    Item 4(e) applies to Loss that arises out of any Claim other than a Claim listed in Clause 6(i) through 6(iv) above.

A single Retention amount shall apply to Loss arising from all Claims alleging the same Wrongful Act or related Wrongful Acts.

In the event a Claim triggers more than one of the Retention amounts stated in Items 4(a) through 4(e) of the Declarations, then, as to that Claim, the highest of such Retention amounts shall be deemed the Retention amount applicable to Loss (to which a Retention is applicable pursuant to the terms of this policy) arising from such Claim.

No Retention amount is applicable to Crisis Loss or Non-Indemnifiable Loss.

...

**ENDORSEMENT #9**

...

PREDETERMINED ALLOCATION FOR DEFENCE COSTS
OTHER THAN SECURITIES CLAIM OR EMPLOYMENT PRACTICES CLAIM

In consideration of the premium charged, it is hereby understood and agreed that Clause 8 is hereby amended by adding the following at the end thereof:

If a covered Claim other than a Securities Claim(s) or Employment Practices Claim(s) results in Loss which is both covered under the terms and conditions of this policy and uncovered by the terms and conditions of this policy (other than as a result of an exception of the Definition of Loss, the Definition of Defence Costs or the terms, conditions and limitations of this Clause 8), because such Claim includes both covered and uncovered matters or covered or uncovered parties, then the Insurer, the Insureds and the Company agree to allocate Defence Costs incurred in connection with such Claim, as follows:

Eighty percent (80%) shall be deemed to be Loss incurred by the Insureds;

however, the Insurer shall only be liable to pay such Loss of the Insureds subject to the policy's application retention amount, limits of liability, and expressed exceptions to the definition of Loss and the other provisions of this Clause 8 and the definition of Defence Costs; and the remainder shall be deemed to be the obligation of the Organization and the Insureds and not insured under this policy. ("Preset Allocation of Defence Costs")

Provided that in all events the Preset Allocation of Defence Costs described above shall not apply to or create any presumption with respect to the allocation of any damages, judgments or settlement in regard to any Claim.

...

**ENDORSEMENT #10**

BANKRUPTCY TRUSTEE, RECEIVER, LIQUIDATOR
OR REHABILITATOR EXCLUSION

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured in any bankruptcy proceeding by or against an Organization, when such Claim is brought by the examiner, trustee, receiver, creditors' committee, trust, liquidator or rehabilitator (or any assignee thereof) of such Organization.

It is further understood and agreed that the policy is modified as follows:

1.    Clause 4. EXCLUSIONS, Exclusion (i) is hereby amended by deleting subparagraph (3) in its entirety.

...

**ENDORSEMENT #14**

SPECIFIC ENTITY/SUBSIDIARY EXCLUSION
(Claims brought by or made against)

In consideration of the premium charged, it is hereby understood and agreed that the Insurer shall not be liable for any Loss alleging, arising out of, based upon or attributable to or in connection with any Claim brought by or made against the Entity listed below and/or any Insureds thereof.

1.    MAGNATRAX Corporation (Including any subsidiary or affiliate thereof)

It is further understood and agreed that the Definition of Subsidiary shall not include MAGNATRAX Corporation. Further, the Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured alleging, arising out of, based upon or attributable to any breach of duty, act, error or omission of MAGNATRAX Corporation, or any director, officer, member of the board of managers or employee thereof.

**2. Magnatrax Run-Off Policy**

**ENDORSEMENT #4**

...

**DEFINITION OF ORGANIZATION AMENDED TO INCLUDE ENTITY**
**(CO-DEFENDANT ONLY)**

In consideration of the premium charged, it is hereby understood and agreed that the term "Organization" is amended to include the following entity, subject to the terms, conditions and limitations of this endorsement and this policy.

ENTITY

Onex Corporation

Coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Persons thereof shall only apply if: (1) such Claim relates to a Wrongful Act committed by an Insured (other than Onex Corporation or an Insured Person thereof); and (2) an Insured (other than Onex Corporation or an Insured Person thereof) is and remains a defendant in the Claim along with Onex Corporation or any Insured Person thereof.

In all events coverage as is afforded under this policy with respect to a Claim made against Onex Corporation or any Insured Person thereof shall only apply to Wrongful Acts committed or allegedly committed prior to May 12, 2003.

...

**ENDORSEMENT #11**

...

COVERAGES B(i) DELETED
ALLOCATION ENDORSEMENT

...

DEFENCE COSTS) is deleted in its entirety and replaced with the following:

8.    DEFENCE COSTS, SETTLEMENTS, JUDGMENTS (INCLUDING THE
ADVANCEMENT OF DEFENCE COSTS)

(a)    Under Coverage A, B and C of this policy, except as hereinafter
stated, the Insurer shall advance, excess of any applicable retention
amount, covered Defense Costs no later than ninety (90) days after
the receipt by the Insurer of such defense bills. Such advance
payments by the Insurer shall be repaid to the Insurer by each and
every Insured Person or Organization, severally according to their
respective interests, in the event and to the extent that any such
Insured Person or Organization shall not be entitled under this policy
to payment of such Loss.

...

(f)    In connection with any Claim, other than a Claim that is or includes
a Securities Claim, with respect to: (i) Defense Costs jointly incurred
by, (ii) any joint settlement entered into by, or (iii) any judgment of
joint and several liability against any Organization and any Insured
Person, there shall be a fair and equitable allocation as between any
such Organization and any such Insured Person, taking into account
the relative legal and financial exposures and the relative benefits
obtained by any such Insured Person and any such Organization,
without any presumption that the coverage afforded to the Insured
Person shall in any way reduce the allocation to the Organization
which shall not be insured for such allocation. In the event that a
determination as to the amount of Defense Costs to be advanced
under the policy cannot be agreed to, then the Insurer shall advance

Defense Costs excess of any applicable retention amount which the Insurer states to be fair and equitable until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law.

...

**ENDORSEMENT #16**

...

COORDINATION OF AIG LIMITS

In consideration of the premium charged, it is hereby understood and agreed that, with respect to any Claim under this policy for which coverage is provided by one or more other policies issued by the Insurer or any other member of the American International Group (AIG), (or would be provided but for the exhaustion of the limit of liability, the applicability of the retention/deductible amount or coinsurance amount, or the failure of the Insured to submit a notice of a Claim), the Limit of Liability provided by virtue of this policy shall be reduced by the limit of liability provided by said other AIG policy.

Notwithstanding the above, in the event such other AIG policy contains a provision which is similar in intent to the foregoing paragraph, then the foregoing paragraph will not apply, but instead:

(1)    the Insurer shall not be liable under this policy for a greater proportion of the Loss than the applicable Limit of Liability under this policy bears to the total limit of liability of all such policies, and

(2)    the maximum amount payable under all such policies shall not exceed the limit of liability of the policy that has the highest available limit of liability.

Nothing contained in this endorsement shall be construed to increase the limit of liability of this policy.

**3. Onex 2004-2005 Policy**

4.    EXCLUSIONS

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:

...

(d)     alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

...

**ENDORSEMENT #13**

...

PRIOR ACTS EXCLUSION FOR LISTED ENTITIES

In consideration of the premium charged, it is hereby understood and agreed that the term Subsidiary is amended to include the entity(ies) listed below, but only for Wrongful Acts committed by such entity(ies) and/or any Insureds thereof which occurred subsequent to such entity's respective acquisition/creation date listed below and prior to the time the Named Entity no longer maintains Management Control of such entity(ies), respectively, either directly or indirectly through one or more other Subsidiaries. Loss arising from the same or related Wrongful Act shall be deemed to arise from the first such same or related Wrongful Act.

| ENTITY(IES) | ACQUISITION/CREATION DATE |
|---|---|
| | |
| 1. | |
| MAGNATRAX Corporation [...] | May 12, 2003 |

For the purpose of the applicability of the coverage provided by this endorsement, the entities listed above and the Organization will be conclusively deemed to have indemnified the Insureds of [...] each respective entity to the extent that such entity or the Organization is permitted or required to indemnify such Insureds pursuant to law or contract or the charter, bylaws, operating agreement or similar documents of an Organization. The entity and the

Organization hereby agree to indemnify the Insureds to the fullest extent permitted by law, including the making in good faith of any required application for court approval.

cp/e/qlacx/qlpmg/qlmll/qlhcs/qlhcs/qlced/qljac

1 Now known as Chartis Insurance Company of Canada.

2 As will be further discussed below, the personal defendants' claim for defence costs was based on the Executive Liability section of the applicable D&O policies. Onex's coverage under the applicable D&O policies was limited to reimbursement for defence costs that it incurred on behalf of the personal defendants.

3 It is not clear from the record when Magnatrax in fact ceased to be an Onex subsidiary. The motion judge stated that Magnatrax ceased to be an Onex subsidiary on November 17, 2003, which was the date the U.S. Bankruptcy Court approved the Magnatrax Plan of Reorganization. In their appeal facta, the parties suggest different dates for when Magnatrax ceased to be an Onex subsidiary. Onex and the Excess Insurers indicate that Magnatrax ceased to be an Onex subsidiary when it emerged from Chapter 11 protection on January 20, 2004, whereas American Home indicates that Magnatrax ceased to be an Onex subsidiary when it declared bankruptcy, which was May 12, 2003. We need not resolve this issue because Endorsement #14 of the Onex 2002-2003 Policy provides that the definition of subsidiary shall not include Magnatrax Corporation as of May 12, 2003, which is the date that Endorsement #14 became effective and is the inception date of the Magnatrax Run-Off Policy.

4 The motion judge was advised by the parties that as a result of the settlement of the Georgia Action, the total amount of Onex and the personal defendants' claim in the action would not impact the third and fifth excess layers of D&O coverage insured by excess D&O policies issued by the defendants Liberty Mutual Insurance Company and Houston Casualty Company for the 2004-2005 period. The parties agreed that the action should be dismissed against these defendants on consent.

5 The Onex 2004-2005 Policy does not contain the exclusion found in Endorsement #14 in the Onex 2002-2003 Policy.

*Indexed as:*

## Peel Condominium Corp. No. 417 v. Tedley Homes Ltd.

**Between**
**Peel Condominium Corporation No. 417, applicant/respondent,**
**and**
**Tedley Homes Ltd., Sheldon Libfeld, Jay Libfeld and Mark**
**Libfeld, respondents/appellants**

[1997] O.J. No. 3541

35 O.R. (3d) 257

103 O.A.C. 143

12 R.P.R. (3d) 278

73 A.C.W.S. (3d) 691

1997 CarswellOnt 2998

Docket No. C16122

Ontario Court of Appeal
Toronto, Ontario

**Robins, Abella and Rosenberg JJ.A.**

Heard: April 1-2, 1997.
Judgment: September 4, 1997.

(20 pp.)

*Real property -- Condominiums -- Purchase and sale agreements -- Remedies for breach --*
*Rescission -- Unconscionable transactions -- Evidence and proof.*

This was an appeal from a judgment rescinding an agreement. The respondent condominium
corporation also applied for a declaration. The trial judge rescinded an agreement under which the
respondent agreed to purchase certain guest and superintendent suites that were intended to form

part of the common elements in a condominium project built by the corporate appellant. At issue was whether the respondent was entitled to the suites without payment. The trial judge found that the agreement was unconscionable and that the directors failed to disclose their interest in the agreement contrary to section 17(1) of the Condominium Act so to nullify the agreement.

HELD: Appeal allowed. The application brought by the respondent to rescind the agreement was dismissed. The disclosure of interest requirement under section 17(1) of the Act was not to be invoked to nullify a transaction where all the parties were cognizant of the interests involved and agreed to the transaction. The agreement was not a unilateral act by the initial directors. The elected directors and the co-owners were aware of and agreed to the terms of the acquisition of the suites. It would be improper for them to eliminate the amenities that it was understood would be part of the common elements of the condominium by refusing to complete the transaction and so amend the declaration. The agreement was not unconscionable. The purchase price of the suites was not unfair or unreasonable. The terms were not such that a sensible well-advised purchaser would not have accepted. The obligation by the corporation to pay taxes, insurance and other expenses on the suites was not unfair. The zero allocation as to the contributions to common expenses for the six suites was not inconsistent with the intent of the Act and did not justify rescission of the agreement.

**Statutes, Regulations and Rules Cited:**

Condominium Act, R.S.O. 1990, c. C.26, ss. 3(5), 7, 17(1).

**Counsel:**

Theodore Rotenberg, for the appellant.
Mark H. Arnold, for the respondent.

---

The judgment of the Court was delivered by

**1    ROBINS J.A.**:-- This is an appeal and cross-appeal from a judgment of Blenus Wright J. rescinding an agreement under which the respondent condominium corporation agreed to purchase certain guest and superintendent suites that were intended to form a part of the common elements in a condominium project built by the corporate appellant. The dispute revolves around the question of whether the condominium corporation is entitled to these suites without payment or is obliged to purchase them in accordance with the terms of its agreement with the appellant.

The Facts

**2**    The respondent is a condominium corporation created on October 31, 1990 as result of the registration by the corporate appellant ("the developer" or "the declarant") of a declaration and

description under the Condominium Act, R.S.O. 1990, c. C. 26 ("the Act"). The individual appellants are principals of or otherwise associated with the developer and were the first directors of the condominium corporation. The condominium is a residential project consisting of two high-rise buildings located on Rathburn Road West, in the City of Mississauga containing a total of some 400 suites. Each building has a superintendent's suite and two guest suites. Title to these suites has been held by the developer at all times.

**3**    The disclosure statement or the amended disclosure statement was delivered by the declarant to each and every purchaser of a condominium unit in the project. These statements specified, as did the draft declaration provided to the purchasers and, subsequently, the registered declaration, that the condominium corporation was to be under a "duty and obligation" to purchase a superintendent's unit and two guest units in each of the buildings pursuant to the terms of an agreement which is referred to as the "conveyance and purchase agreement." A draft copy of the conveyance and purchase agreement was attached to the disclosure statement. The total purchase price for these units was to be $480,000. Payment was to be made by way of blended monthly instalments of principal and interest, calculated half-yearly at the rate of 10% per annum, amortized over a term of 20 years. The corporation was entitled to prepay the monies owing under the agreement at any time on 21 days notice. Until the purchase price was fully paid, title to the units was to remain with the declarant. The corporation was to have a revocable licence to use the premises until it received title and, in the event of default, the declarant was to be entitled to terminate the agreement and regain possession. All common expenses and other payments relating to the six units were to be paid by the corporation.

**4**    The disclosure statement made no reference to any allocation of the percentage interest each of these six units had in the common elements or the percentage each was to contribute to common expenses. The declaration as registered allocated a zero percentage for each of the units for these purposes.

**5**    A proposed first year budget statement was attached to the disclosure statement. The expenditures required to satisfy the payments called for under the terms of the corporation's agreement to purchase the guest and superintendent suites were expressly provided for therein.

**6**    The disclosure statement made it clear to the purchasers that their purchase price did not include the superintendent and guest units. While these units were to be used as common elements of the condominium buildings, unlike the recreational facilities and other amenities that were to be provided by the developer, they were to be purchased by the condominium corporation on the terms specified in the disclosure statement and declaration. The declaration defines "guest units" and restricts their use to "guests of owners of Dwelling Units for temporary residential purposes" and subjects them to "such rules and regulations as the board of the Corporation may, from time to time, enact."

**7**    In the case of one of the buildings, the first building, the initial disclosure statement made no

mention of these suites. However, the concept underlying the development was later changed by, among other things, removing a commercial component from the development and, contrary to the original scheme, making both buildings a part of the same project. These were material changes and, by reason of s. 52 of the Act, required the delivery of an amended disclosure statement. One was in fact provided to each of the purchasers. In the case of the first building, the terms of the amended disclosure statement were identical to those applicable to the second building which, from the outset, made it plain that the superintendent and guest suites were not included in the purchase price and were to be purchased by the corporation. Although entitled to do so, no purchaser chose to rescind his or her purchase on receipt of the amended disclosure statement The differences in the factual background of the two buildings are of no consequence to the issues in this appeal. I see no reason to draw any distinction between the two buildings and shall treat both the same.

**8**    The individual appellants, as I have indicated, were the first directors of the corporation acting as proxies for the developer. As such, they enacted the by-laws, rules and regulations of the corporation and did the things normally expected of first directors of a condominium corporation. The complaint against them is that before turning over the board to independent directors elected by the purchasers, they enacted a by-law authorizing the execution of the conveyance and purchase agreement, the terms of which had been set by the developer, and completed the agreement on the corporation's behalf. In doing so, they did not formally disclose their conflict of interest and, it is contended, acted in breach of their fiduciary duty to the condominium corporation.

**9**    After a board of directors elected by the purchasers assumed office, payments were made in accordance with the conveyance and purchase agreement. There was no complaint about this agreement or the zero allocation referable to the suites in issue for almost two years. The corporation then raised a number of questions relating to the ownership of the suites. It took the position that they were common elements in the buildings and, as such, should, like other common elements, have been provided to the condominium corporation "free of charge". This led to the application that has resulted in this appeal.

The Application

**10**    The condominium corporation commenced these proceedings on January 25, 1993 seeking: (a) a declaration that the conveyance and purchase agreement dated November 23, 1990 resulted in a total failure of consideration, was an unconscionable transaction and is therefore null and void; (b) a declaration that the six units form part of the common elements of the condominium buildings; (c) appropriate amendments to the declaration to eliminate any reference to the six units as independent units and to delete the condominium's obligation to purchase the units; (d) an order rescinding the conveyance and purchase agreement; and (e) an order for repayment of all money paid by the corporation pursuant to the conveyance and purchase agreement.

**11**    The matter came on before Wright J. who, for reasons now reported at 32 R.P.R. (2d) 211, concluded that the conveyance and purchase agreement should be rescinded. He did not grant the

declaration sought by the corporation to the effect that the six units formed part of the common elements of the buildings and were therefore the corporation's property. The judge was of the opinion that, because a zero percentage of the common interests and common expenses had been allocated to the units, the declaration was void in this respect and should be amended so as "to allocate the proper percentages of contribution to common expenses for all units including the six units in dispute." As collateral relief, he ordered the corporate appellant to pay the common expenses applicable to the six units and to repay the payments made by the corporation with a set-off in favour of the appellant for the corporation's use of the units.

**12**    Thus, as matters stand, the appellant developer owns the superintendent and guest suites and is entitled to deal with them free of any agreement with the condominium corporation. On the other hand, the condominium corporation has no right to purchase or use the suites even though it was contemplated that they would form part of the common elements of the project pursuant to the terms of the conveyance and purchase agreement. This result is apparently unsatisfactory to both parties. Hence, we have an appeal in which the developer seeks a declaration that the conveyance and purchase agreement is in full force and effect; and a cross-appeal in which the condominium corporation seeks a declaration that the six suites are common elements in the buildings owned by it free and clear of any claim by the developer.

The Issues

**13**    The issues in this appeal may be conveniently dealt with under two general headings: (1) the rescission issue; and (2) the zero percentage issue.

(1)    The Rescission Issue

**14**    The motions judge rescinded the conveyance and purchase agreement on two grounds. First, he was of the view that the individual appellants, as first directors of the condominium corporation, were in breach of s. 17(1) of the Act in failing to disclose their interest in the conveyance and purchase agreement and in voting to conclude the transaction. Second, he was of the view that "[e]ven if non-compliance with s.17(1) was not sufficient to nullify the agreement," the onerous terms and unilateral nature of the agreement rendered it unconscionable.

**15**    In deciding whether there is any proper basis for rescinding the agreement, it is important to bear in mind the terms under which the owners of the condominium units in this project purchased their respective units. Clearly, each of them agreed by way of their purchase documents that the superintendent and guest suites were not included in their purchase price. The disclosure statement and declaration made it abundantly clear that these suites were to be purchased by the condominium corporation and used as common elements in accordance with the terms of the conveyance and purchase agreement. None of the purchasers has suggested that the corporation was to obtain the suites free of charge or that any representation was made with respect to their ownership contrary to the provisions of the purchase documents.

**16**    It is also important to recognize that the Act does not require that guest and superintendent suites be part of the common elements of a condominium. Such suites are not part of the common elements unless there is factual evidence that this was intended to be the case. See York North Condominium Corporation No. 5. v. Van Horne Clipper Properties Ltd. (1987), 60 O.R. (2d) 468 (H.C.J.); Frontenac Condominium Corporation v. Joe Macciocchi and Sons Limited (1975), 11 O.R. (2d) 649 (C.A.); and York Condominium Corporation No. 167 et al. v. Newrey Holdings Limited et al. (1981), 32 O.R. (2d) 458 (C.A.). Whether developers should be entitled to exclude from the common elements facilities of this nature or, indeed, other amenities ordinarily expected to be included in the common elements so as to have them purchased or otherwise dealt with after the unit purchases have been completed is a matter of policy for legislative and not judicial determination. As the Act presently stands, a declaration must contain the specific items set out in s. 3(1), and may contain the items set out in the broadly permissive provisions of s. 3(3). Under s. 3(3)(d), a declaration may contain "a specification of duties of the corporation consistent with its objects."

**17**    As the cases to which I have just made reference demonstrate, there is no question that a condominium corporation's purchase of suites that are not included in the declaration as part of the common elements in order to constitute them a part of the common elements for guest and superintendent purposes is a purchase consistent with the objects of a condominium corporation. The question raised here is whether the corporation can be required by means of a provision in the declaration to purchase such units or whether, as the corporation argues, the declaration to this effect is ultra vires. The motions judge did not give effect to this argument. He nullified the agreement on the grounds to which I have referred and not on the basis that the impugned provision of the declaration was in violation of the Act. I am inclined to the same view. Section 3(3) does not preclude this practice and it, seems to me, is broad enough to permit the inclusion of a provision of this nature. The imposition of a duty on a condominium corporation by way of the declaration in relation to the common elements of the condominium, in my opinion, falls within the category of duties consistent with the objects of the corporation that may be specified in the declaration. Furthermore, in the circumstances of this case, where it can be taken that unit owners have relied on the representations contained in the declaration, I think, for the reasons to which I shall come, it would be unreasonable if not unfair to void the declaration on this basis.

**18**    This brings me more specifically to the two grounds upon which the conveyance and purchase agreement was rescinded in the court below. Neither of these grounds, in my respectful opinion, constitutes a valid basis for rescinding the agreement to purchase and sell the six suites in question.

**19**    As I see the matter, the fact that the first directors did not formally disclose their obvious interest in the conveyance and purchase agreement and enacted a by-law authorizing them to execute the agreement is of no consequence. These directors did no more than organize the affairs of the condominium in the manner anticipated by the declaration and agreed to by the purchasers of the individual units. The purchasers were themselves to constitute the entire membership of the corporation and, under s. 7 of the Act, were to own the suites as tenants in common. Whether the

steps necessary to complete the contemplated purchase transaction were taken by the initial directors or by the subsequently elected directors is immaterial. This is not the type of "disclosure of interest" situation to which s. 17(1) of the Act is directed. Nor is there any question of a breach of a fiduciary duty here. The acts of the first directors cannot be seen as being contrary to or inconsistent with the interests of the unit owners. In my opinion, s. 17(1) ought not to be invoked to nullify a transaction where, as here, everyone concerned was cognizant of the interests involved and specifically agreed to the transaction.

**20**    The motions judge treated the conveyance and purchase agreement as being "unilateral in nature" in that the elected directors had "no input into the agreement". The fact, however, is that the elected directors and their co-owners, as purchasers, were aware of and agreed both to the corporation's acquisition of the six suites and to the terms under which they were to be acquired. From the viewpoint of the purchasers of individual units, the availability of guest suites for visiting relatives and friends may well have been an important factor in the decision of some of them to purchase units in this development. They were told by the declaration and disclosure statement that this amenity (and the superintendent suites) would be included in the common elements pursuant to the conveyance and purchase agreement, and were entitled to rely upon this representation.

**21**    It would not have been open to the developer before closing to resile from its agreement to sell these suites to the corporation without providing the purchasers with an amended disclosure statement and affording them the right to terminate their agreements. By the same token, I would not think it open to the elected directors after closing to effectively amend the declaration by refusing to complete a transaction that had been accepted by all of the owners, including the directors themselves. In my opinion, it would be improper for them to eliminate facilities or amenities that it was understood and expected would form part of the common elements of the condominium at this stage and in this manner. The agreement to purchase the six suites cannot be considered "unilateral" in these circumstances or treated as having been "foisted" on the corporations or its directors or the unit owners. To the contrary, as I have said, in completing the agreement the first directors were acting in compliance with a contract the terms of which had been approved by the unit owners who themselves constituted the total membership of the corporation and who were to be the owners of the suites.

**22**    I turn now to the alternative basis upon which the conveyance and purchase agreement was rescinded. The learned motions judge, as indicated earlier, was of the view that "[e]ven if non-compliance with s. 17(1) was not sufficient to nullify the agreement" the agreement was unconscionable and should be set aside on this ground. He found the agreement to be unconscionable on the basis that its terms were "onerous", and that it was unilateral in nature in that the corporation had "no input into the purchase price or its financing." He pointed only to those terms providing that title to the six units was not to pass to the corporation until all payments had been made at the end of the 20-year period provided for in the agreement; in the interim, he said, the corporation was "saddled" with paying all common expenses and other payments, including realty taxes, on the six units. With respect to the matter of the corporation's input into the agreement, he

was of the view, as he was with respect to the s. 17(1) argument with which I have already dealt, that it was for the elected directors to decide whether the agreement should be accepted by the corporation. No deception, misrepresentation or non-disclosure is suggested in this case.

**23**    On the facts here, it cannot be concluded that the purchase price of the six suites was unfair or unreasonable either at the time the individual purchase agreements were signed or at the time the conveyance and purchase agreement was executed. There is no evidence to this effect. Nor is there any evidence indicating that the unit owners had somehow or other been victimized by the introduction of a term in the declaration applicable to the ownership of their units or the common elements that no sensible, well-advised purchaser would have accepted. Quite to the contrary, the fact that the suites were to be purchased by the condominium corporation and the terms of the purchase was made manifest in the purchase documents. A cursory analysis of the amounts involved shows that the owners are, on an average, effectively responsible for about $1200 per unit of the total cost of the six suites together with their proportionate share of the carrying charges. The outstanding balance is payable on 21 days notice leaving the corporation free to discharge the obligation or refinance the loan should it be thought prudent to do so. The additional costs attributable to this purchase and the resulting increase in the common expenses are made evident in the draft budget statement. One can reasonably expect that these costs would have been factored into the owners' decisions to purchase their units.

**24**    The corporation's obligation to pay taxes, insurance and other expenses relating to the suites cannot be considered unfair. In reality this obligation is no different than the obligation the corporation would have incurred had title been transferred and a mortgage given back to the vendor. The conveyance and purchase agreement is a type of instalment purchase agreement or long form agreement of purchase and sale. While title does not pass until full payment is made, the corporation is a plainly a purchaser in possession and, as such, is the owner of the property in equity subject to the vendor's lien for the unpaid balance of the purchase price. See, Lysaght v. Edwards (1876), 2 Ch. D. 499. Notwithstanding the stringent terms relating to default about which the respondent complains, given the substance of this transaction, the developer would not be permitted to terminate the agreement or otherwise interfere with the corporation's acknowledged right to quiet possession on any summary or peremptory basis. The corporation would be entitled, as indeed the declarant concedes, to all of the rights normally accorded an equitable owner under a purchase and sale transaction of this nature, including the right to relief against forfeiture.

**25**    In sum, none of the usual indicia of unconscionability are to be found on the facts of this case. See, generally, Waddams, The Law of Contract 3rd ed. (1993), ch. 14; Chitty on Contracts, 27th ed. (1994) ch. 9, s. 4. Accordingly, there is no basis upon which to set aside the conveyance and purchase agreement on this ground.

(2)    The Zero Allocation Issue

**26**    The declaration registered by the declarant allocated a zero percentage interest to each of the

six units with respect to their proportions of the common interests and their contributions to the common expenses. The motions judge was of the opinion that this allocation violated the Act in that "[an] owner of a unit has a common interest in the common elements and cannot escape the obligation as an owner of a unit to pay the appropriate percentage of common the expenses." To remedy the situation, he ordered that the declaration be amended so as "to allocate the proper percentages of contribution to common expenses for all units including the six units in dispute" pursuant to s. 3(5) and (8) of the Act. He also ordered the developer to pay the common expenses applicable to the units and to repay the payments it had received from the corporation with a set-off for the corporation's use of the units.

27    In deciding the matter as he did, the judge placed the parties in the position they would have been in had the six units been retained by the developer and not sold to the condominium corporation. This was not the result the condominium corporation intended to achieve in bringing this application. It sought an order declaring that the six units are common elements of the condominium and constitute property of the corporation to which it has good and marketable title, free and clear of any claim of the developer. The argument it advances in its cross-appeal in support of this contention, briefly stated, runs along the following lines.

28    The Act establishes a scheme of ownership of common interests whereby a common interest is appurtenant to an owner's unit. Under s. 7(5), the ownership of a unit is not to be "separated from the ownership of the common interest, and any instrument that purports to separate the ownership of a unit from common interest is void." The declaration, it is argued, is an "instrument" having this effect. Since no ownership of the common interests attaches to the suites in question, the declaration is in breach of s. 7(5). The suites, therefore, cannot be "units" within the meaning of the Act. Moreover, since "owner" is defined to mean "the owner of the freehold estate or estates in a unit and common interest," the developer cannot be the "owner" of the suites. Rights to the common elements can accrue only to "owners" who, under s. 7(1) and (4), are tenants in common of the common elements and entitled to make reasonable use of the common elements. Since the developer here has no interest in the common elements, it does not qualify as an "owner" and has no right to the use of the common elements. This "landlocked" space, the argument proceeds, fits within the definition of "common elements"and no other definition. "All of the property except the units" constitute the "common elements", as that term is defined. Not being "units", the argument concludes, the six suites must be part of the common elements of the condominium, and the motions judge should have so declared.

29    I am respectfully unable to accept this argument. While I do not question that the Act is framed so as to prevent the separation of ownership between a unit and its appurtenant common interest, its provisions must be applied in the light of the factual circumstances of a given case. See, Carleton Condominium Corp. No. 106 v. Mastercraft Development Corp. Ltd. (1985), 49 O.R. (2d) 638 (C.A.). In this case, it is important to appreciate the reasons underlying the zero allocation and the practical consequences of the allocation.

**30**    When the declaration was drawn it was understood that these suites would immediately form a part of the common elements of the condominium and that title would be transferred to the corporation after the purchase price had been paid. The zero allocation was made to accommodate that understanding and not for any devious purpose. It recognized that while the suites were registered in the name of the developer, in reality they were common elements owned, as I stated earlier, in equity by the corporation. In my opinion, the zero allocation cannot properly be treated in these circumstances as a defect in the declaration entitling the corporation to the suites free of charge. Such a result would confer an unwarranted windfall on the corporation and would be plainly inequitable.

**31**    So long as the corporation remains the equitable owner of the suites and they continue to be used as common elements, the zero allocation is not inconsistent with the spirit and intent of the Act. No purpose is to be served in not permitting this allocation to continue in effect. The motion judge's decision to divest the corporation of any interest in the suites and return their ownership to the developer was not sought in these proceedings. This form of relief is unsatisfactory to the corporation and the unit owners. They could not have anticipated that the six suites could conceivably be eliminated from this condominium as the application was framed. Given these circumstances, I think it preferable that the matter be disposed of on the basis that, should the suites revert to the developer in the future, the developer can at that time seek relief from the difficulties that may have been created by the manner in which the percentage allocations attributable to the suites were dealt with in the declaration. The issue can then be dealt with on proper notice to the unit owners and in the light of the circumstances then existing.

Disposition

**32**    For these reasons, I would allow the appeal, set aside the judgment of Wright J. and in place thereof dismiss the application brought by the respondent condominium corporation. I would also dismiss the cross-appeal. I would make no order as to costs either here or in the court below.

ROBINS J.A.
 ABELLA J.A. -- I agree.
 ROSENBERG J.A. -- I agree.

cp/d/mii/DRS/DRS/DRS

*Case Name:*

# Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne

**IN THE MATTER OF the Primo Poloniato Grandchildren's Trust**
**Between**
**The Canada Trust Company, Trustee of the Primo Poloniato**
**Grandchildren's Trust, Applicant (Respondent), and**
**Russell Browne, John Mori Jr., Andrea L. Mori-Mickus, Laura**
**Lee, Marla L. Ashmore, Teresa O'Neil, Michael Poloniato,**
**Kristen Wiley, Brandon Ashmore, and The Children's Lawyer on**
**behalf of the minors, Rachel Browne, Hailey Browne, Michelle**
**Wiley, Jessica Ashmore, Julia Mickus, Robert Mickus, Olivia**
**Mickus, John Mickus, Marissa Lee, Erica Lee and on, behalf of**
**the unborn and unascertained beneficiaries of the Primo**
**Poloniato, Grandchildren's Trust,**
**Respondents (Appellant/Respondents)**

[2012] O.J. No. 5772

2012 ONCA 862

300 O.A.C. 71

115 O.R. (3d) 287

82 E.T.R. (3d) 165

2012 CarswellOnt 15402

225 A.C.W.S. (3d) 281

Docket: C53262

Ontario Court of Appeal
Toronto, Ontario

**K.N. Feldman, J.M. Simmons and E.A. Cronk JJ.A.**

Heard: April 11, 2012.

Judgment: December 7, 2012.

(112 paras.)

*Wills, estates and trusts law -- Trusts -- Administration -- Trust funds -- Encroachment on capital -- Express trusts -- Termination, revocation and variation -- Variation of trusts -- The trustee -- Duties of -- Distribution of assets -- Appeal by Children's Lawyer from interpretation of trust deed as varied dismissed -- Grantor's original intention was to provide income to grandchildren and capital to great-grandchildren, but trust was later varied -- Judge interpreted trust deed as varied as requiring trustee to pay income beneficiaries a set level of income regardless of whether such income was trust income or an encroachment on capital assets, and as relieving Trustee from duty to maintain even hand between income and capital beneficiaries -- Judge interpreted trust deed as varied in accordance with proper principles and in manner it was understood by beneficiaries.*

Appeal by the Children's Lawyer on behalf of minor, unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust from the interpretation of certain terms of the Trust. Poloniato set up the trust in 1980. His seven grandchildren were the income beneficiaries and their grandchildren were the capital beneficiaries of the Trust. The principal asset of the trust was shares in a private investment company controlled by the Trust. The value of the Trust had fluctuated over the years and at its peak was worth in excess of $130 million. The Trust was to accumulate income until the earlier of October 1, 2001, or the death of Poloniato's first grandchild at which time the Trust would split into seven equal sub-trusts for each grandchild, the income of which would be paid to each grandchild during his lifetime, after which the capital would be payable to each grandchild's issue as designated by the grandchild. Because the Trust grew beyond the expectations of the parties, it was varied in 1988 to provide the grandchildren with an increasing percentage of the Trust's income each year from 1988 to 2001, unless one of the grandchildren died before 2001. The Trust was varied again in 1997 to provide for a method of calculating the annual income each grandchild would receive from the Trust based on the rate of return of the Trust's investments. A market downturn since 2002 resulted in the Trust having to sell capital assets to meet its obligations to the income beneficiaries. Canada Trust, the trustee, obtained a report on the expected life of the Trust. Assuming the maintenance of the distributions of yearly income and taxes as current levels, the Trust was likely to be expended within 18 to 20 years. The trustee sought the court's directions as to whether it was required to maintain such distributions or whether it had discretion in this regard. The court interpreted the Trust deed as varied to require the trustee to make the percentage distributions to the income beneficiaries in spite of the downturn in the market and its effect on the capital value of the trust. He concluded that the Trust deed as varied to provide the trustee with a discretion in respect of the management of distributions of cash dividends from the holding company to the trust, which extended to causing the holding company to distribute sufficient income to the trust to meet the annual distribution requirements to the income beneficiaries. He further found that the variations to the trust deed did away with any duty on the trustee's part to maintain an even hand between the income beneficiaries and the capital beneficiaries as there was

never any intention by the parties to restrict the amounts distributed to income beneficiaries from the holding company to the income earned by the company. Finally, he concluded that while this conflicted with Poloniato's original intent, Poloniato's original intent was no longer relevant given the variations to the trust deed that took place over the years with the consent of the beneficiaries. The Children's Lawyer appealed from the decision arguing that the judge ignored trust principles and failed to take into account the proper factual matrix in interpreting the terms of the trust deed as varied.

HELD: Appeal dismissed. The judge interpreted the trust deed as varied in accordance with proper trust principles and in the way it was understood and intended by all of the consenting parties and by the approving court at the time.

**Statutes, Regulations and Rules Cited:**

Variation of Trusts Act, R.S.O. 1990, c. V.1, s. 2

**Appeal From:**

On appeal from the order of Justice Laurence A. Pattillo of the Superior Court of Justice, dated October 5, 2011, with reasons reported at 2011 ONSC 731.

**Counsel:**

Earl A. Cherniak, Q.C. and Cynthia B. Kuehl, for the appellant.

Archie J. Rabinowitz, David Lobl, and Jeremy C. Millard, for the respondent Canada Trust Company.

Mark Abradjian, Christopher R. Durdan and Brad Wiseman, for the respondents John Mori Jr., Marla L. Ashmore and Teresa O'Neil.

---

[Editor's note: A correction was released by the Court December 14, 2012; the change has been made to the text and the correction is appended to this document.]

The judgment of the Court was delivered by

K.N. FELDMAN J.A.:--

## INTRODUCTION

**1**    The Children's Lawyer brings this appeal on behalf of the minor, unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust (the "Trust"). The Trust was settled in

October 1980 by Primo Poloniato, the founder of Primo Foods Ltd., in favour of his grandchildren (the income beneficiaries) and their issue, his great-grandchildren (the capital beneficiaries). The Trust's principal asset is shares in 679312 Alberta Ltd. (the "Holding Company"), a private investment company controlled by the Trust. While the value of the Trust has fluctuated over the years, at its peak it was worth in excess of $130 million.

**2**    Since its inception, the Trust has been varied with court approval twice - in December 1988 and again by a deed of arrangement, dated December 1997, which was approved in March 1998. Both variations were made based on the agreement and consent of all parties, including the Children's Lawyer (in 1988, the Official Guardian) on behalf of minor, unborn and unascertained beneficiaries.

**3**    The application that gives rise to this appeal was brought by Canada Trust, the Trust's current trustee, for the court's advice and direction to clarify the trustee's obligations under the Trust agreement as varied by the 1997 trust deed (the "Trust Deed as Varied"). That variation changed the nature of the Trust to a "percentage trust" or a "unitrust". It allowed the trustee to have a freer hand to make investments within the Holding Company in order to maximize the value of the Trust for the benefit of all beneficiaries, without concern as to whether those investments were income-producing or growth-oriented.

**4**    The Trust Deed as Varied provides that the income beneficiaries receive a fixed percentage of the net fair market value of a defined percentage of the Trust's assets as their distribution each year. This provides the income beneficiaries with a guaranteed annual income, allowing them to be able to plan their spending priorities and obligations with confidence. As a percentage trust, if the income-producing investments chosen by the trustee do not produce sufficient income to make the distributions, the trustee may sell equities or other capital investments held by the Holding Company in order to generate sufficient funds to make the percentage payments to the income beneficiaries.

**5**    For the residuary capital beneficiaries, the benefit of the 1997 variation is that the trustee may invest in equities and other appreciating assets, which will ultimately be available for the capital beneficiaries, rather than being constrained by the obligation to earn income and preserve capital.

**6**    The 1997 variation application was based on accounting projections of the future value of the Trust that were prepared by Ernst & Young based on past market performance. Those projections saw the value of the Trust continue to increase over time.

**7**    Unfortunately, because economic conditions since 2001 have resulted in lower than expected investment returns, the trustee has had to continue to sell a significant portion of the underlying assets owned by the Holding Company in order to make the annual percentage distributions to the income beneficiaries, resulting in an ongoing depletion of the value of the Trust as a whole.

**8**    The application judge interpreted the Trust Deed as Varied to require the trustee to make the percentage distributions to the income beneficiaries in spite of the downturn in the market and its effect on the capital value of the Trust.

**9**   The Children's Lawyer appeals from the application judge's decision, arguing that the application judge ignored trust principles and failed to take into account the proper factual matrix in interpreting the terms of the Trust Deed as Varied. Counsel submits that the effect of the decision is to erode the interests of the capital beneficiaries to the point of elimination, which could not have been what was intended when the 1997 variation received court approval.

**10**   For the reasons that follow, I would dismiss the appeal. In my view, the application judge interpreted the Trust Deed as Varied in accordance with proper trust principles and in the way it was understood and intended by all the consenting parties and by the approving court at the time.

## FACTS

**11**   Mr. Poloniato, who died in 1984, had seven grandchildren. All are now of full age and capacity. At the time of the application there were 12 great-grandchildren, six of full age and capacity and six minors.

**12**   The Trust was settled as part of an estate freeze. Initially, the Trust held the growth shares of Primo Foods through an Ontario numbered company. Upon Mr. Poloniato's death, the shares were sold and the proceeds were invested in securities and near cash equivalents, which are now held by the Holding Company.

**13**   Under the original terms of the Trust, income from the Trust would be accumulated until the earlier of the expiration of 21 years from the settling of the Trust, or the death of the settlor's first grandchild (the latter defined as the "Time of Division"). At the Time of Division, the Trust would be split equally into sub-trusts for each grandchild then living or who had issue living. Subsequent to the Time of Division, the income from each sub-trust would be paid to each grandchild during his or her lifetime and, on the death of the grandchild, the capital of each sub-trust would be payable to one or more of the grandchild's issue as designated by him or her pursuant to a power of appointment. The trustee was given no specific power to encroach on capital.

**14**   By the mid-1980s, the value of the Trust had grown significantly. The grandchildren, who were the income beneficiaries, sought earlier access to some of the income from the Trust to assist them in addressing their immediate financial needs and to prepare them for the anticipated receipt of a large sum of money beginning in October 2001 (the expiration of 21 years from the settlement of the Trust).

**15**   In December 1988, the court approved a trust variation that accelerated payment of income to the income beneficiaries beginning in 1988 and continuing to 2001. The variation sought by the trustee was consented to by all the adult beneficiaries and the Official Guardian.

**16**   The main elements of the 1988 variation (also referred to as the Settlement) were the following:

> \*      The income beneficiaries became entitled to receive 1/7 of the "gross annual income" of the Trust in 1988 and an increasing percentage each

year up to 1/3 of the gross annual income for the years 1998, 1999 and
2000; the distributable income was to be paid to those grandchildren alive
in each of those years, divided in equal shares *per capita*.

* From January 1, 2001 onwards on an annual basis, all the net income from
the Trust fund was to be divided in equal shares *per capita* among the
grandchildren.

* The trustee was permitted to encroach on capital to a maximum of
$200,000 for each family unit for the benefit of the great-grandchildren.

* The income beneficiaries released their power of appointment in respect of
their capital interests under the Trust so that every one of their issue (all
the great-grandchildren) would be equal capital beneficiaries.

**17**    Some problems arose following the 1988 variation, including uncertainty about the meaning
of the term "gross annual income". Also, the grandchildren (the income beneficiaries) wanted to
receive a predictable annual amount of money so that they could plan and live knowing what
amount would be available each year. Finally, because by 1997 the equity markets were performing
very well while interest rates were in decline, it was felt that both classes of beneficiaries were
losing out on overall returns because of the investment restrictions on the trustee regarding the need
for income-producing assets. The trustee was not able to maximize the value of the Trust at a time
when there were significant growth opportunities in the market for those with a more unconstrained
investment mandate.

**18**    According to an affidavit on the motion to approve the 1997 variation sworn by Mike Ruf, a
trust officer of the then trustee, National Trust Company, the second variation in 1997 was meant to
resolve the interpretive issue, to give the trustee more discretion as to the management of the
investments, and to make distributions to income beneficiaries more predictable.

**19**    Among other things, the 1997 variation was designed as a percentage trust or a unitrust, a new
type of trust that had been recommended by the Ontario Law Reform Commission's *Report on the
Law of Trusts* (Ministry of the Attorney General, 1984). The percentage trust or unitrust would
allow the trustee to use a balanced portfolio strategy of investing. Paragraph 26 of the Ruf affidavit
explains:

> The principal advantage of the revised method of distribution is that it will enable
> the Trustee to adopt a balanced portfolio strategy which most likely in the longer
> term will provide the greatest asset base for the capital beneficiaries, being the
> minor children and unborn issue of the Grandchildren.

**20**    As counsel for the trustee at the time of the 1997 variation, Mr. Martin Rochwerg explained in
his evidence on this application that the advantage of a percentage trust is that it allows the trustee
to invest for maximum returns, regardless of whether they result in capital gains or income. The
total growth is then split between the income and capital beneficiaries on a specified percentage

basis. He explained further that the interests of the income and capital beneficiaries would therefore be "in tandem", because they would "either both benefit or they both lose." The effect of the conversion to a percentage trust was that the income beneficiaries were no longer entitled to receive income from the Trust; instead they would receive a fixed amount of money from the Trust each year, based on a percentage formula that included mandatory minimum and maximum limits.

**21**    Prior to the approval of the 1997 variation, a "no-tax" ruling was sought and obtained from Revenue Canada (now the Canada Revenue Agency or "CRA"). By letter of June 1997 addressed to Revenue Canada, Mr. Rochwerg enclosed a memorandum that explained the reasons for the proposed variation and that addressed the issue whether the proposed variation would result in a disposition of a capital interest for tax purposes.

**22**    One of the points covered in the memorandum was the legal requirement that the arrangement be for the benefit of minors and unborn and unascertained beneficiaries, who, in this case, were the capital beneficiaries. The memorandum opined that the court would not approve the proposed arrangement on behalf of those beneficiaries if the result was that their interest would be diminished. In this case, the benefit to the capital beneficiaries was said to come "primarily from the Trustee being freed from restrictions on investing so that the Trustee [could] adopt an investment policy which will further enhance the value of the Trust."

**23**    After some back and forth between the CRA and the Trust's advisors, the CRA granted an advance tax ruling based on the facts as set out in the ruling letter, which included the following paragraph:

> 10.    In no event will the annual distribution [to the Income Beneficiaries] be less than the previous year's distribution. Where it is determined that the amount to be distributed based on the formula is less than the previous year's distribution, the current year's distribution will be adjusted to the amount of the prior year's distribution. The new system will also provide that the current year's distribution cannot exceed 115% of the previous year's distribution. *The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from [the] Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of the Income Beneficiaries.* These provisions will have the effect of providing the Income Beneficiaries with a stable annual income, and ensuring some growth to the Capital Beneficiaries. In determining the appropriate Distribution Percentage (70%) for the years 2001 and onward, various asset mixes were tested and compared with the results using a rigid asset mix. Rates of return for the last 10 years were used in these projections. Provided these rates of return are a reasonable indication of future rates of return, the new formula will provide an after-tax increase for the Capital Beneficiaries and should also provide a slightly greater after-tax return for the Income Beneficiaries over the longer term.

[Emphasis added.]

**24**    The basis for selecting 70 per cent in setting the Yearly Income to be distributed to income beneficiaries starting in 2002, which was the amount recommended and accepted as part of the arrangement, was explained in the Ruf affidavit at para. 23. The distribution percentages of 25 per cent for 1997 and 33-1/3 per cent for 1998-2000 were the same as in the Trust deed as varied in 1988, which he refers to as the Settlement. He then states: "In all years thereafter the Distribution Percentage represents a reduction of 30% from that set out in the Settlement." This was because the Settlement provided that, beginning in 2001, the trustee was to administer the Trust Fund's annual income by dividing 100 per cent of the net income among the grandchildren on a *per capita* basis. Therefore, a 70 per cent distribution represented a 30 per cent reduction from what they would have received under the Settlement.

**25**    The CRA ruling required that income distributions be in the form of cash dividends paid by the Holding Company to the Trust in any year in order to ensure that there would be no encroachment on the capital of the Trust (the shares of the Holding Company). On that basis, the CRA was prepared to give the ruling that "[t]here will not be a disposition of any income or capital interest in the Trust as a result of the proposed transactions". This ruling was needed in order to implement the proposed 1997 variation without adverse tax consequences.

**26**    The Children's Lawyer consented to the 1997 variation on behalf of the capital beneficiaries who were unable to consent, namely those who were minor, unborn or unascertained persons.

**27**    Ernst & Young had prepared a number of calculations for the purpose of advising on the proposed variation, including a comparison of the projected capital using the then existing portfolio mix of 70 per cent debt and 30 per cent equities, and comparing that to an asset mix of 70 per cent equities and 30 per cent debt. Those calculations, which were provided to the Children's Lawyer, showed an expected benefit to the capital beneficiaries of approximately $2 million after five years and $12 million after ten years.

**28**    In a 1996 letter to the Children's Lawyer explaining the background to the proposal, Mr. Rochwerg summarized five benefits of the proposed variation for the capital beneficiaries. It would: 1) increase growth from better investment performance; 2) reduce costs of administration; 3) address the issue of 21-year planning to reduce imminent tax liability; 4) impose a cap on the income entitlement that would leave more growth for the capital beneficiaries; and 5) accelerate the use of significant tax-free and refundable tax amounts.

**29**    This letter also explained the concept of the percentage trust that had been endorsed in 1984 by Ontario's Law Reform Commission in its *Report on the Law of Trusts*. The percentage trust allows the trustee to invest to increase the overall value of the trust and to allocate funds to the income or capital beneficiaries without regard to whether those funds themselves are income or capital of the trust. In that regard, the *Report* recommended that the percentage payment to the income beneficiaries come first from the annual income, and if insufficient, then from capital: p.

303.

**30**    Justice Donna Haley, a Superior Court judge with significant expertise in wills and trusts, approved the 1997 variation. In her endorsement, she found that the proposed variation was in the best interests of the great-grandchildren as they would benefit "both directly as capital beneficiaries and by the certainty of income provided by the variation to their parents who are all grandchildren under the trust".

**31**    Commenting on the context in which the 1997 variation application was made, the application judge below observed that at the time, interest rates were declining and capital markets were heating up. "It was anticipated by all parties", he noted, "that the rates of return which had been historically achieved on the assets of the Holding Company would be equalled or exceeded in the future."

**32**    However, a few years after the 1997 variation was approved, it transpired that investment returns were not consistently as strong as predicted, which has had a significant effect on the Trust and its value.

**33**    The application judge further observed:

> [A] decrease in market performance of the Trust's assets has resulted in the calculation of Yearly Income in each year being less than the Yearly Income which was paid to the income beneficiaries in 2002. Because the definition of "Yearly Income" in clause 0.1(g) of the Trust Deed as Varied provides that the Yearly Income cannot be less than the prior year's Yearly Income, the result has been that the amount the Trust has distributed to the income beneficiaries for each year after 2002 has been the 2002 amount.

In order to be able to pay the Yearly Income to the income beneficiaries as required, the trustee was obliged to cause the Holding Company to sell assets.

**34**    In 2003, the trustee commissioned a report on the expected life of the Trust, assuming distributions were maintained at then current levels. The report indicated that, depending on investment returns, the capital of the Trust would be expended in 18 to 20 years.

**35**    The respondent income beneficiaries rely on a more recent report obtained by the trustee in 2007 that estimates that the projected value of the Trust in 2022 could be about $90 million depending on investment returns.

**36**    Because of the concerns of the trustee, the Children's Lawyer and other beneficiaries that the minimum annual percentage distributions to the income beneficiaries were depleting the Trust capital, the trustee applied to the court for direction on the extent of the trustee's discretion not to make the minimum percentage distributions to the income beneficiaries in order to preserve the value of the Trust corpus for the capital beneficiaries.

**37**    In particular, the trustee wanted to know whether it retained a duty to maintain an even hand between the income and capital beneficiaries in managing Trust distributions, and therefore a discretion to stop making the prescribed percentage payments to the income beneficiaries that were eroding the value of the Trust.

## APPLICATION JUDGE'S DECISION AND REASONS

**38**    The application judge provided detailed reasons explaining his interpretation of the Trust Deed as Varied. The relevant provisions of the Trust deed are set out in the Appendix to these reasons.

**39**    He found the provisions of the Trust Deed as Varied to be clear and unequivocal and thus all that needed to be considered apart from the agreement was the factual matrix. In his view, the Ruf affidavit best summarized the circumstances at the time of the 1997 variation. He concluded that the evidence of the discussions leading up to the agreement and subsequent approval of the 1997 variation, communications with the CRA, the parties' understandings as to what was intended by the 1997 variation or what was communicated to them subsequently, and any legal opinions as to what the 1997 variation means, constituted extrinsic evidence that was inadmissible for the purposes of interpreting the Trust Deed as Varied.

**40**    In bringing the application, the trustee set out two questions to be answered by the application judge. The first question was: does the trustee have the discretion to cause the Holding Company that is controlled by the Trust to distribute sufficient income to the Trust to meet the minimum annual distribution requirements to the income beneficiaries? In order to answer that question, the application judge was required to consider the meaning of the following provisions of the Trust Deed as Varied: the definitions of "Yearly Income", "Applicable Percentage", "Net Income", and paras. 1(a), 1(c) and 5(vi).

**41**    The application judge first found that clause 1(a) together with the definition of "Yearly Income" in clause 0.1(g)(vi) are clear and unambiguous. He concluded that the requirement in clause 1(a) to pay the Yearly Income and associated taxes to the income beneficiaries was mandatory. Those provisions read:

> "Yearly Income" for a calendar year shall mean the amount equal to:
>
> ...
>
> (vi)    in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income *shall not be less than the Yearly Income of the previous calendar year, nor greater*

> *than 115% of the Yearly Income of the previous calendar year ...*

1.  The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a)  *the Trustee shall pay the Yearly Income* to or for the benefit of the Grandchildren in equal shares in each calendar year. ... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the Income Tax Act in respect of the Yearly Income from the trust. The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder. ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital; [Emphasis added.]

**42**    He observed that the mandatory duty created in clause 1(a) is qualified by clause 1(c), which ensures that the mandatory payments are made from the Net Income of the Trust, which means cash dividends paid by the Holding Company (or income from other assets of the trust) and not from a sale or other disposition of the shares of the Holding Company, which would constitute a disposition of the capital of the trust. Paragraph 1(c) provides:

(c)  notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

**43**    The application judge then turned to clause 5(vi) which reads:

5.  The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions:

    ...

(vi)  to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and *to manage the investments of the trust, including any distributions*

> *from any corporations controlled by the Trustee in order that the Net Income, of*
> *any trust hereunder shall be no less than the amount required to be distributed to*
> *a Grandchild during a calendar year*; [Emphasis added.]

**44**    He concluded that this clause grants powers to the trustee, including the power to manage the investments and pay the distributions, in a manner that will achieve the objective of creating sufficient net income to pay the minimum annual amounts to the income beneficiaries. The highlighted portion of clause 5(vi) did not create a duty or obligation on the trustee, but an objective or purpose to guide the trustee.

**45**    The application judge found that the power to manage investments in clause 5(vi) carried with it a discretion in the trustee to determine the way in which the investments would be managed. It followed that the power to manage distributions, which by the wording of clause 5(vi) was included in the power to manage investments, must also give rise to discretion in the trustee to determine how distributions were managed.

**46**    Moreover, clause 5(vi) made clear that the trustee's discretion to manage investments, including distributions from the Holding Company of cash dividends, was guided by the investment objective to ensure that the Net Income "shall be no less than the amount required to be distributed to a Grandchild during a calendar year".

**47**    Based on this analysis, the application judge concluded in answer to the first question that, under the Trust Deed as Varied, the trustee does have a discretion regarding both the investment and distribution of the Trust assets.

**48**    The second question put to the application judge was: if the answer to the first question is "yes", is the trustee still subject to the duty to maintain an even hand between the income beneficiaries and the capital beneficiaries when exercising the discretion to manage distributions?

**49**    Citing *Waters' Law of Trusts in Canada*, the application judge noted that the duty to maintain an even hand could be excluded by the terms of the trust deed. The duty can be ousted either by express words or by implication. In every case it is a matter of construction: Donovan W.M. Waters, Mark R. Gillen & Lionel D. Smith, *Waters' Law of Trusts in Canada*, 3d ed. (Toronto: Thomson Carswell, 2005) at pp. 966 - 969.

**50**    In this case, the application judge considered whether the even hand principle continued to apply in two contexts - the investment of the Trust assets and their distribution to the beneficiaries.

**51**    Dealing first with the trustee's duty with respect to the investment of the Trust assets, the application judge found it was clear that, when read together, the terms of the Trust Deed as Varied ousted the duty on the trustee to maintain an even hand. Because the income beneficiaries were now entitled to receive their percentage share from the total return on investment, whether by income or capital appreciation, there was no longer any necessity to maintain a distinction between interest

and capital for investment purposes. Instead, the trustee could invest in a balanced portfolio for the benefit of all. He noted that this finding was consistent with the intentions of the parties as reflected in the Trust Deed as Varied.

**52**    The application judge came to a similar conclusion regarding the trustee's obligation to maintain an even hand in managing distributions. He found that, too, had been ousted by the terms of the Trust Deed as Varied and the way it was designed to operate with a prescribed minimum payment to the income beneficiaries each year.

**53**    The power to manage distributions in clause 5(vi) was included in the power to manage investments. He reasoned that if the duty to maintain an even hand did not apply to the power to manage the investments of the Trust, it could not apply to the included power to manage distributions.

**54**    The application judge found that the wording of the Trust Deed as Varied clearly required that capital assets held by the Holding Company would be sold, if necessary, to fund the obligations to the income beneficiaries. For the trustee to meet the obligation to pay the Yearly Income to the income beneficiaries, it must require the Holding Company to pay sufficient cash dividends to the Trust and those dividends must be sourced from the Holding Company's returns on its investments, which included both income and capital appreciation. To the extent that the obligations of the Trust could not be met from the income earned on investments, it was intended that they would be met from the sale of assets in the Holding Company sufficient to generate the required cash dividends.

**55**    The application judge also found that to interpret the Trust deed to require the trustee to maintain an even hand between income and capital in respect of the distribution of monies from the Holding Company, so that the trustee could distribute only income from the Holding Company to the Trust to fund the obligations to the income beneficiaries, would render the clear language of clause 1(a) and the definition of "Yearly Income" in clause 0.1(g) completely ineffective.

**56**    He further concluded that that interpretation would also fly in the face of the stated objective of the parties to the 1997 variation - to permit the income beneficiaries to share (with the capital beneficiaries) in the overall appreciation of the Trust's assets on an annual basis, while still providing them with a degree of certainty in respect of the annual amount they would receive.

**57**    The application judge rejected the submission that the settlor's original intent, as discerned from the original Trust deed, was relevant to the interpretation of the Trust Deed as Varied. He also rejected the relevance of the court approval of the 1997 variation by Haley J. He said that it had no bearing on the issue before the court on the application, as the issue before the court was whether the 1997 variation was in the best interests of the capital beneficiaries and the material before the court at that time "clearly confirmed that it was".

**58**    Finally, he did not agree that the 1997 variation would "obliterate" the interests of the capital beneficiaries. There was an indirect benefit to the capital beneficiaries - who were all children of the

income beneficiaries - and, as well, a return to previously projected rates of return would "no doubt go a long way to maintaining and perhaps increasing the capital." The negative projections were all based on the assumption that current low rates would continue.

**59**    To conclude, in answer to the second question, the application judge found that the duty to maintain an even hand was ousted by the terms and necessary operation of the Trust Deed as Varied.

## ISSUE ON APPEAL

**60**    The issue on appeal is whether the application judge made a fundamental error in his interpretation of the Trust Deed as Varied by finding that minimum percentage payments to the income beneficiaries were mandatory and that the even hand rule had been ousted with respect to the management of Trust distributions, leaving open the potential for depletion of the capital of the Trust to the detriment of the capital beneficiaries.

**61**    The appellant takes the position that the application judge erred in the following specific ways:

> 1)    He erred in law by applying only contractual as opposed to trust interpretation principles to the interpretation of the Trust Deed as Varied and in particular:
> a)    He narrowly construed the factual matrix so as to exclude any consideration of the role of the court and its jurisdiction in approving the 1997 variation.
> b)    He excluded other evidence relevant to the factual matrix, specifically the CRA ruling.
> c)    He ignored the intention of the settlor in the interpretive exercise.
> d)    He made inconsistent interpretive findings concerning the trustee's ability to encroach.
> e)    He failed to consider the objective of the 1997 variation that there be capital growth.
> f)    He failed to consider whether his interpretation was consistent with the language of the Trust agreement when read as a whole.
> 2)    He erred in law by finding, contrary to trust principles and the language of the Trust Deed as Varied, when read as a whole, that the obligation of the trustee to maintain an even hand with respect to the management of Trust distributions was ousted.

**62**    Three of the income beneficiaries participated in this appeal. They take the position that the appellant is essentially asking the court to find that the trustee may pay less than the stipulated Yearly Income in the years in which the investment portfolio does not create sufficient returns in the form of income to fund the Yearly Income. They say that there is nothing in the wording of the Trust Deed as Varied or the factual matrix to support this interpretation.

**63**    The current trustee says it takes a "neutral" position on this appeal.

ANALYSIS

**Principles of Interpretation**

**64**    The appellant argues that the application judge erred by interpreting the Trust Deed as Varied only as a contract, and that he failed to apply trust principles as part of the interpretive process. When the court is interpreting a trust that has been varied on consent of the beneficiaries, contractual interpretation principles are applied to determine the objective intent of the parties. However, because the agreement is a trust, trust principles must also inform that interpretation.

**65**    Before he embarked on the interpretation of the Trust Deed as Varied, the application judge acknowledged that "regard must also be had to the fact that the document under review is a trust deed and not strictly a commercial instrument." The appellant's specific concerns will be addressed individually in the course of the following analysis.

**Issue 1 - Factual Matrix - General Principles**

**66**    Before addressing the appellant's specific arguments, it is important to review what is meant by the factual matrix of an agreement.

**67**    It is well established that in interpreting a contract, the court may consider the "factual matrix" surrounding the contract, even where there is no ambiguity. "Indeed, because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case": *Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (C.A.), at para. 23.

**68**    In *Dumbrell v. The Regional Group of Companies Inc.* (2007), 85 O.R. (3d) 616, at para. 53, this court affirmed the relevance of the factual matrix to contractual interpretation:

> [53] The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement ...

**69**    This court noted in *Dumbrell,* at para. 55, that while there is some debate about the outer limits of the scope of factual matrix, it clearly encompasses "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made".

**70**    In *Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317, at para. 18, the British Columbia Court of Appeal described the factual matrix as the "background" of the contract:

The factual matrix is the background of relevant facts, that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement. It can throw light on what the parties must have meant by the words they chose to express their intention ...

The factual matrix is the background which may deepen an understanding of what the parties meant by the language they used, but the Court cannot make a new agreement.

**71**    While the scope of the factual matrix is broad, it excludes evidence of negotiations, except perhaps in the most general terms, and evidence of a contracting party's subjective intentions: Geoff R. Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012), at p. 27. As the cases above suggest, the factual matrix includes only objective facts known to the parties at or before the date of the agreement, and what is common to both parties: Hall, p. 30. Hall goes on to state that while the factual matrix can "be used to clarify the parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, or have the effect of making a new agreement": p. 31 (footnotes omitted). Ultimately, the words of the agreement are paramount.

**Issue 1(a) - Court Approval of the 1997 Variation**

**72**    The appellant's position is that if the interpretation of the 1997 variation is not one that could have been approved by the court, then it could not have been what the parties intended or the court understood or approved at that time. The appellant submits that the application judge erred in finding that the approval of the variation "has no bearing on the issue before the Court in this application". To the contrary, the basis for the court's approval must form part of the factual matrix.

**73**    Under s. 2 of the *Variation of Trusts Act*, R.S.O. 1990, c. V.1, the court must be assured that any variation approved constitutes a benefit for those whose interests it has a duty to protect. It cannot ever have been intended, argues the appellant, that the interests of the capital beneficiaries would be diminished or defeated entirely. Had that been the intention or considered a reasonable consequence of the proposed variation, it would not have been approved by the court, nor could the Children's Lawyer have consented to it.

**74**    The problem with the appellant's submission is that the variation application was brought on a record that explained how the variation would be beneficial to the capital beneficiaries, primarily by increasing the value of the capital through investment in equities with growth potential as part of a balanced portfolio. The expert evidence suggested that, based on past performance, such a portfolio would increase in value in the future. The Children's Lawyer agreed to the variation on that basis and the court approved it on that basis.

**75**    The application from which this appeal is brought is not a variation application, nor is it a late

appeal from that application. Rather, it is an application to the court to interpret the Trust Deed as Varied.

**76**    The appellant's submission is that the approving court would not have found the variation to be for the benefit of the minor, unborn and unascertained capital beneficiaries had it known that markets would fall and not continue to perform as they did through the late 1990's. Therefore this court should interpret the words of the variation in a manner that would allow the trustee to disregard the mandatory provisions of the Trust Deed as Varied. Instead, the court should read the deed as implicitly giving the trustee a discretion to reduce the payments to the income beneficiaries in order to preserve the capital of the Trust for the capital beneficiaries, on the basis that the even hand principle remains in effect under the Trust Deed as Varied.

**77**    Stated another way, the appellant submits in para. 47 of its factum that: "if [the application judge's] interpretation of the 1997 Variation is not one that could have been approved by the court, then of necessity, it could not have been what the parties intended or the court understood or approved at that time."

**78**    The appellant's first argument to support this submission is that the application judge erred by stating that the variation approval and its basis were irrelevant to his interpretation of the Trust Deed as Varied. The appellant says the factual matrix includes the court approval and the record that formed the basis of the approval application and that the application judge was required to consider those factors as part of the factual matrix.

**79**    I agree with the appellant's submission that the court approval of the 1997 variation and the material that supported it are an important part of the factual matrix that informs the interpretation of the Trust Deed as Varied. And I agree that it would have been an error for the application judge to ignore the court approval of the 1997 variation in his analysis. However, it is clear that that is not what occurred.

**80**    As the basis for the factual matrix he considered, the application judge relied on the affidavit of Mr. Ruf that was used to support the court approval variation application. The application judge explicated in detail how the variation had to benefit the capital beneficiaries before it could be approved and that the court found, and the material stated, that it did so.

**81**    What the application judge stated near the end of his reasons is that, on the application before him, the court was not performing an approval function but an interpretation function. In other words, on this application - as distinct from the 1997 variation application - the court was not deciding what was in the best interests of the capital beneficiaries.

**82**    That said, the application judge also went on to dispute the position of the appellant that the effect of the 1997 variation would necessarily be to "obliterate" the interests of the capital beneficiaries. The value of the Trust did increase for a few years following 1997. Although markets later took a downturn, the appellant's pessimistic forecasts are based on a continuation of that

downturn. The application judge observed that a return to previously projected rates of return "would go a long way to maintaining and possibly even increasing the capital". Obviously no one knows the future. However, it was open to the application judge to make this observation based on the evidence in the record before him, including the 2007 projection report.

**Issue 1(b) - CRA Tax Ruling**

**83**    The second aspect of the factual matrix that the appellant says the application judge failed to consider was the CRA tax ruling and related correspondence. In the appellant's submission, the CRA ruling made explicit that the definition of "Net Income" was included to ensure that there would be no disposition of the capital assets of the Trust for the benefit of the income beneficiaries. Moreover, the CRA stated that the purpose of the 1997 variation was to ensure growth of the capital assets for the benefit of the capital beneficiaries and trustee's counsel confirmed in correspondence to the CRA that capital assets would not be diminished as a result of the 1997 variation.

**84**    Contrary to this submission, it is clear that the application judge considered, as part of the factual matrix, the CRA ruling that was appended to the Ruf affidavit, as important relevant background.

**85**    To the extent that the application judge did not consider the correspondence to the CRA and from the tax authorities, I agree with the appellant that this correspondence is helpful in understanding the full factual context of the 1997 variation and I have included some references to it in the statement of facts in these reasons. However, the appellant has not pointed to anything in the ruling or in that correspondence that contradicts or changes the factual matrix as described by the application judge or the basis on which the court approval was obtained in 1998.

**86**    The appellant also argues that the CRA inserted clause 1(c) and the definition of "Net Income" as cash dividends from the Holding Company into the Trust Deed as Varied to ensure that the trustee would not encroach on capital to the detriment of the capital beneficiaries.

**87**    I would not accede to this argument. This interpretation is not supported by anything in the correspondence from the CRA. That correspondence was directed to ensuring that cash dividends would be paid from the Holding Company to the Trust. It was the form of those dividends as income to the Trust that would govern their tax treatment, which was the sole concern of the CRA. This is consistent with the "form rule", used in the administration of trusts, which says that for trust accounting purposes, the form of a distribution determines its characterization as income or capital: *Report on the Law of Trusts*, p. 292. In its submission to the CRA dated November 26, 1997, Ernst & Young stated:

> The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of Income Beneficiaries.

**88**    The "capital of the Trust" being referred to is the shares of the Holding Company. Their disposal would amount to a capital disposition that would be taxable as such. Clause 1(c) ensures that income distributions will only come from cash dividends paid by the Holding Company, taking the form of income.

## Other Correspondence that is Part of the Factual Matrix

**89**    In my view, the correspondence by the trustee's lawyer and by the income beneficiaries' lawyer with the Children's Lawyer that explained the purpose of the variation and its intended effect and benefits also forms part of the factual matrix. In that correspondence, reference was made to the fact that the variation was to be a percentage trust, a new financial approach to the investment and disbursement of trust funds by trustees that was approved by the Ontario Law Reform Commission in its 1984 *Report on the Law of Trusts*.

**90**    In *Waters' Law of Trusts in Canada*, the authors explain that a percentage trust allows the trustee to maximize the overall value of the trust assets for the benefit of all beneficiaries. It dispenses with the distinction between income and capital, instead guaranteeing the "income beneficiary" "a regular return of a fixed percentage on the value of the trust property": p.1059. If, in a particular year, the traditional income from investments exceeds the percentage to be paid to the income beneficiaries, the excess "remains part of the trust property". However, "if the income is less, the percentage is made up out of the trust property": p. 1059.

## Issue 1(c) - Intention of the Settlor

**91**    The appellant next submits that the application judge erred in finding the intention of the settlor was irrelevant in interpreting the Trust Deed as Varied. Relying on *Re Irving* (1975), 11 O.R. (2d) 443 (H.C.J.), the appellant argues that before a trust can be varied, one of the issues is whether the variation keeps intact the settlor's basic intention. Here the basic intention of the settlor was to benefit two generations of the Poloniato family through the creation of income and capital beneficiaries. Yet the interpretation of the 1997 variation by the application judge, the appellant argues, permits unlimited capital encroachment, thus possibly destroying any benefit of the Trust for the second generation.

**92**    In my view, there are three responses to this submission. The first is one already referred to - that this was not an application for a variation, but an application to interpret a Trust Deed as Varied. Therefore, if the varying court approved a variation that did not take the settlor's intent into account, and its meaning is clear, it is not the role of the interpreting court to distort the meaning of the deed as varied.

**93**    Second, the case law both in Ontario since *Re Irving*, as well as in other provinces, suggests that the original intention of the settlor need not be considered when the court approves a variation as long as the necessary criteria are met: See *Russ v. British Columbia (Public Trustee)* (1994), 89 B.C.L.R. (2d) 35 (C.A.); *Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155 (Man. C.A.);

*Finnell v. Schumacher Estate* (1990), 74 O.R. (2d) 583 (C.A.). However, because of my first and third responses to the appellant's submission, it is not necessary in this case to finally decide this issue.

**94**    The third response is that I do not agree with the appellant's suggestion that the intent and effect of the 1997 variation was to benefit only the income beneficiaries at the expense of the capital beneficiaries. That was clearly not the intent of the approving court, which was obliged to approve the variation only if it was for the benefit of the capital beneficiaries on whose behalf the approval was given. As the application judge was entitled to find, if the economy improves, the value of the trust should also see improvement. Moreover, the capital beneficiaries have had the indirect benefit, referred to by Haley J., of a consistent income flowing to their parents since the date of the variation.

**Issue 1(d) - Inconsistent Findings**

**95**    The appellant contends that the application judge erred in making an inconsistent finding. On the one hand, he found the parties intended that the trustee would have the power to encroach on capital assets of the Trust by selling the assets of the Holding Company. That finding is inconsistent, says the appellant, with his earlier finding, at para. 50 of his reasons, that the purpose of the definition of "Net Income" was to ensure that there would be no encroachment on the capital of the Trust.

**96**    As discussed above, the premise of this submission is incorrect. This submission has been answered in the section dealing with the factual matrix surrounding the CRA ruling.

**Issue 1(e) - Objective of 1997 Variation**

**97**    In the appellant's view, the application judge erred in failing to take into account an important objective of the 1997 variation: to ensure some growth to the capital beneficiaries. There is no merit in this submission. The application judge did not fail to take this objective into account: see, for example, paras. 37-39 of his reasons. For economic reasons, the trustee has been unable, at least up until the application, to continue to achieve the hoped for growth of the Trust corpus, despite the clear objective of the Trust and of the trustee to do so.

**Issue 1(f) - Interpretation of the Trust Deed as Varied, Read as a Whole**

**98**    In the appellant's submission, the application judge erred in failing to consider whether his interpretation was consistent with the language of the Trust Deed as Varied, when read as a whole. For instance, counsel points to the fact that the 1988 variation gave the trustee an express power of encroachment on capital to a limited amount for the purpose of benefitting capital beneficiaries. It is argued that when the parties intended to permit encroachment on the capital of the Trust, they did so in clear and unequivocal terms.

**99**    In my view, this submission fails. In his analysis, which is set out in detailed and comprehensive reasons, the application judge takes into account the agreement as a whole. The appellant has provided no suggestion as to how to read the Trust Deed as Varied without giving full effect to the mandatory language to which it objects.

**100**    The Trust document is internally consistent in providing the mandatory percentage distribution scheme to the income beneficiaries. As already explained, to the extent that satisfaction of the percentage distribution may require using capital assets, this is a function of the balanced investment strategy employed in a percentage trust to achieve overall growth of the trust corpus. It is not an encroachment on capital in the traditional sense, which is a discretionary exercise by a trustee to benefit a specific beneficiary for specific or general needs, over and above that beneficiary's regular entitlement under the trust.

**Issue 2 - Even Hand Rule**

**101**    The appellant submits that the application judge erred in his interpretation of the Trust Deed as Varied by failing to recognize and give effect to the duty of the trustee to maintain an even hand between the interests of the income and capital beneficiaries. The obligation of a trustee to treat different classes of beneficiaries fairly and impartially can only be displaced, contends the appellant, by an express intention to the contrary in the trust deed. In the appellant's submission, the 1997 variation did not displace the duty to maintain an even hand in managing distributions.

**102**    It is trite law that executors and trustees have a duty to maintain an even hand between the interests of the income and the capital beneficiaries, unless that duty is ousted explicitly or implicitly by the words of the instrument. Justice Middleton described this duty in the following way in *Armstrong (Re),* (1924), 55 O.L.R. 639 (C.A.), at p. 8:

> [I]t must be borne in mind by trustees that they are trustees not for the remaindermen alone in disregard of the rights of the life-tenant, nor for the life-tenant disregarding the interests of the remaindermen. Trustees must preserve an even hand as between these two conflicting interests. The duty towards the capital is to preserve it intact. The duty towards the tenant for life is to obtain as large a yield as is consistent with safety and the observance of the law under the instrument of trust as to the class of investment made; and, furthermore, so to adjust the investments that the life-tenant will receive annually his due proportion.

**103**    However, in a percentage trust, the trustee's duty is not to obtain a large income yield while preserving the capital but, instead, to increase the size of the entire trust for the benefit of both classes of beneficiaries. This includes increasing the capital rather than preserving it, and therefore involves an investment strategy that may include more risk. Because in a percentage trust the trustee is investing to increase the entire value of the trust to benefit all, the issue is not whether the trustee's even hand duty is ousted in respect of the management of the trust's investments. What is

disputed is whether the duty has been ousted in respect of the obligation of the trustee to make distributions to the beneficiaries.

**104**    The role of the even hand duty in the administration of a percentage trust was addressed in the Law Reform Commission's *Report on the Law of Trusts*. That *Report* recommends that when trustees administer a percentage trust, they continue to maintain an even hand in the periodic valuation of the trust and when making the distributions. Specifically, the *Report* states at p. 303:

> We therefore recommend that the revised [Trustee] Act should contain a provision to the effect that, where trustees are expressly directed by the trust instrument to hold trust assets "on percentage trusts", they shall value the assets periodically and, instead of any income arising from the assets, pay to the person who would otherwise be the income beneficiary a percentage of that valuation in each year of the valuation period. *In so doing, trustees should be required to maintain an even hand between income and capital beneficiaries*. [Emphasis added.][1]

**105**    There is no clear explanation as to what the Commission means when it says that the trustees should maintain an even hand when valuing the assets and making the annual percentage payment to the income beneficiaries. My interpretation is that the Commission contemplates a periodic review and, if necessary, a re-set of the percentage payable to income beneficiaries, based on the value of the trust assets and on the even hand rule.

**106**    The problem here is that in the Trust Deed as Varied, the percentage payable to the income beneficiaries is based on a fixed formula for determining the "Applicable Percentage" and the amount to be paid can never go below the highest amount previously paid in a year. That is why the trustee continues to be obliged to cause the Holding Company to sell assets, if necessary, to meet the obligation to the income beneficiaries, despite the effect on the Trust corpus.

**107**    To the extent the Trust Deed as Varied sets forth a minimum annual payment to the income beneficiaries, the even hand duty on the trustee has been ousted, implicitly, by the words and intended operation of the Trust Deed as Varied. The application judge made no error in making that finding.

## Conclusion

**108**    The experience of this Trust has reinforced the need for percentage trusts to be drafted with specific safeguard mechanisms in place that will allow the trustee to review and revise the annual percentage payable to the income beneficiaries based on the changing value of the trust to ensure that one set of beneficiaries is not favoured over the other. Commentators on the percentage trust concept have recommended including a "force majeure" clause to protect against unforeseen anomalies: see for example, Anne Werker, "The Percentage Trust - Uniting the Objectives of the Life Tenant and Remainderperson in Total Return Investing by Trustees" (Paper delivered at the

Law Society of Upper Canada's 8th Annual Estates and Trusts Summit, November 30, 2005), p. 251.

**109**    Two options would be to include a clause providing for a periodic reset by the trustee of the percentage payable to income beneficiaries, or an option for the trustee to apply to the court for advice and directions on such a reset.

**110**    It is also clear that the material provided to the court in support of a variation application seeking to convert a trust into a percentage trust must include not only upside projections but also potential downside projections that take into account a possible future market downturn. This will give the approving court the basis to include the appropriate safeguards that will ensure, to the extent possible, that the variation will in fact continue to be for the benefit of the future capital beneficiaries.

**111**    However, there are no such provisions in this Trust Deed as Varied. The trustee is obliged to continue to make the minimum percentage distributions provided by its terms.

## DISPOSITION OF THE APPEAL

**112**    For these reasons, I would dismiss the appeal. In the circumstances of this case, I would award full indemnity costs in accordance with their Bills of Costs to each of the parties, payable out of the estate. To the Children's Lawyer, $116,855.13; to the trustee, $145,061.32; to the respondents on the appeal, $122,473.29, all inclusive of disbursements and H.S.T.

K.N. FELDMAN J.A.
 J.M. SIMMONS J.A.:-- I agree.
 E.A. CRONK J.A.:-- I agree.

* * * * *

## APPENDIX

0.1 In this Trust Deed ... the following terms shall have the following meanings: ...

    (a)    "**Applicable Percentage**" for a calendar year shall mean the average Rate of Return of the trust over the previous three calendar years.

...

    (d)    "**Net Fair Market Value**" shall mean the fair market value of the trust's assets at the particular time, provided that where the trust owns shares in a private corporation, the fair market value of such shares shall be deemed to be equal to the fair market value of the assets of the corporation less all the corporation's liabilities, including an amount equal to the current tax liabilities of the corporation with respect to unrealized capital

gains on its assets, less:

* (i) liabilities of the trust;
* (ii) an amount equal to the current tax liabilities of the trust with respect to unrealized capital gains on its assets other than shares in a private corporation; and
* (iii) the value of any outstanding interest-free loans to Grandchildren;

(e) "**Net Income**" of the trust for a calendar year shall mean the cash dividends received by the trust in the calendar year from 679312 Alberta Limited ... and any income that is earned on the other assets of the trust, net of expenses incurred and taxes paid by the Trustee in the calendar year on account of the income of the trust;

(f) "**Rate of Return**" for a calendar year shall mean the resulting percentage when [sic] the difference determined when

(A) the Fair Market Value of the trust calculated on the first business day of the next calendar year is added to the Yearly Income Distribution and other permissible distributions to beneficiaries in respect of the calendar year, and is reduced by receipts during the calendar year for life insurance proceeds

is then reduced by

(B) the Fair Market Value if the trust calculated on the first business day of the calendar year,

is then divided by

(C) the Fair Market Value of the trust on the first business day of the calendar year;

(g) "**Yearly Income**" for a calendar year shall mean the amount equal to:

...

(vi) in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year.

1. The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a)    the Trustee shall pay the Yearly Income to or for the benefit of the Grandchildren in equal shares in each calendar year. ... The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the *Income Tax Act* in respect of distributions of the Yearly Income from the trust. The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder. ... Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

...

(c)    notwithstanding the foregoing subparagraphs of this paragraph 1, the total of all amounts on account of Yearly Income and any additional payments to a Grandchild paid in a year, shall not exceed the Net Income of the trust.

5.    The Trustee in addition to all other powers available to it by law or otherwise, shall have the following powers, authorities and discretions: ...

(vi)    to determine whether any payments made by the Trustee in the due administration of the Trust Fund shall be charged against the capital of the Trust Fund or against the income therefrom or partly against capital and partly against the income and such determination shall be final and binding upon all persons concerned and to manage the investments of the trust, including any distributions from any corporations controlled by the Trustee in order that the Net Income, of any trust hereunder shall be no less than the amount required to be distributed to a Grandchild during a calendar year;

\* \* \* \* \*

## CORRECTION
Released: December 14, 2012

This judgment was released on December 7, 2012. Please be advised that in paragraph 112 of the reasons, the amount to be paid to the respondents on the appeal has been changed from $99,924.14 to $122,473.29 as per the amended bill of costs filed and the consent of all counsel.

1 This recommendation has not been incorporated into the *Trustee Act*, R.S.O. 1990, c. T.23.

** Preliminary Version **

*Case Name:*

# Professional Institute of the Public Service of Canada v. Canada (Attorney General)

**Professional Institute of the Public Service of Canada,
Canadian Merchant Service Guild, Federal Government Dockyard
Trades and Labour Council (East), International Brotherhood of
Electrical Workers, Federal Government Dockyard Chargehands
Association, Research Council Employees' Association,
Association of Public Service Financial Administrators,
Professional Association of Foreign Service Officers, Federal
Government Dockyard Trades and Labour Council (West), Canadian
Association of Professional Radio Operators, Canadian Air
Traffic Control Association, Canadian Military Colleges
Faculty Association and Federal Superannuates National
Association, Appellants;
v.
Attorney General of Canada, Respondent.
And between
Public Service Alliance of Canada, Appellant;
v.
Attorney General of Canada, Respondent.
And between
Armed Forces Pensioners'/Annuitants' Association of Canada,
Association des Membres de la Police Montée du Québec, British
Columbia Mounted Police Professional Association, Mounted
Police Association of Ontario and Canadian Association of
Professional Employees, Appellants;
v.
Attorney General of Canada, Respondent, and
Attorney General of British Columbia, Intervener.**

[2012] S.C.J. No. 71

[2012] A.C.S. no 71

2012 SCC 71

[2012] 3 S.C.R. 660

[2012] 3 R.C.S. 660

274 C.R.R. (2d) 30

300 O.A.C. 202

438 N.R. 1

2012EXP-4458

2012EXPT-2491

J.E. 2012-2355

D.T.E. 2012T-892

EYB 2012-215501

352 D.L.R. (4th) 491

2012 CarswellOnt 15718

221 A.C.W.S. (3d) 470

1 C.C.P.B. (2d) 1

File No.: 33968.


Supreme Court of Canada

Heard: February 9, 2012;
Judgment: December 19, 2012.

**Present: McLachlin C.J. and LeBel, Deschamps, Fish, Abella,
Rothstein, Cromwell, Moldaver and Karakatsanis JJ.**

(165 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Pensions and benefits law -- Private pension plans -- Administration of pensions -- Surplus funds -- Allocation -- Entitlement of employees -- Public service -- Appeal by various unions and employee/pensioner associations from decision upholding the dismissal of appellants' claims for relief that would require government to return $28 billion to pension plans dismissed -- Superannuation Accounts were legislated records and did not contain assets in which appellants had a legal or equitable interest -- Plan members' interests were consequently limited to their interest in defined benefits to which they were entitled under the Plans -- Government was not under a fiduciary obligation to Plan members, nor was it unjustly enriched by amortization and removal of pension surpluses.*

*Government law -- Crown -- Actions by and against Crown -- Appeal by various unions and employee/pensioner associations from decision upholding the dismissal of appellants' claims for relief that would require government to return $28 billion to pension plans dismissed -- Superannuation Accounts were legislated records and did not contain assets in which appellants had a legal or equitable interest -- Plan members' interests were consequently limited to their interest in defined benefits to which they were entitled under the Plans -- Government was not under a fiduciary obligation to Plan members, nor was it unjustly enriched by amortization and removal of pension surpluses.*

Appeal by various unions and employee/pensioner associations from the Ontario Court of Appeal's decision to uphold the dismissal of the appellants' claims for relief that would require the government to return $28 billion to some pension plans. This appeal concerned three statutory, public sector pension plans, the members of which are federal public service employees, members of the Canadian Forces, and members of the RCMP. Each plan was administered by the Government of Canada, and each was a contributory, defined benefit plan. The statutes governing the plans established for each one a "Superannuation Account", which recorded payments into and out of the plan. In the 1990s, the credits to the Superannuation Accounts began to reflect actuarial surpluses. Beginning with the 1990-91 Public Accounts, the government began to "amortize" the actuarial surpluses in the Superannuation Accounts. On April 1, 2000, the Public Sector Pension Investment Board Act ("Bill C-78") came into force. Bill C-78 changed the way in which contributions to the plans were collected, managed and distributed. It also required the Minister to debit from the Superannuation Account certain amounts in excess of specified actuarial surplus ceilings. Unlike the effect of the prior amortization practice, on the basis of Bill C-78, the government debited over $28 billion directly from the Superannuation Accounts, thereby reducing the actuarial surplus in those accounts. The appellants brought an action for the return of the actuarial surplus reflected in the Superannuation Accounts, arguing that the government had breached its trust and fiduciary duties by amortizing and debiting the surplus. The appellants now

sought a declaration that the Plan members had an equitable interest in the outstanding balance in the Superannuation Accounts as of March 31, 2000. They also sought a declaration that ss. 44(9) and 44(10) of Bill C-78 did not authorize the reduction from the Superannuation Accounts of any amount in which Plan members had an equitable interest without compensation. And they sought an order that the Superannuation Accounts be credited with all amounts that were removed following Bill C-78 in which the Plan members had an equitable interest, together with interest. The appellants argued that the Superannuation Accounts were funds that contained assets in which an equitable interest could be claimed. They claimed that their equitable interest was protected by a fiduciary duty on the part of the government, and, in the alternative, by a constructive trust based on unjust enrichment. The government argued that the Superannuation Accounts were merely accounting records and contained no assets to which an equitable interest could attach. A further issue raised on appeal was whether, if the plan members did have an interest in the actuarial surplus, that interest was extinguished by Bill C-78.

HELD: Appeal dismissed. In order to succeed, the plan members had to establish that they had an equitable entitlement to the actuarial surpluses. Otherwise, their entitlement would be limited to the defined pension benefits set out in the governing statutes. The courts below were correct to conclude that the Superannuation Accounts were not separate funds containing assets, but were rather accounting ledgers used to track pension-related payments, and to estimate Canada's future pension liabilities in the Public Accounts. Since the Superannuation Accounts did not contain assets, there was no property in respect of which Plan members could have a legal or equitable interest. However, even if the Accounts did contain assets, the appellants had not established that Plan members had a proprietary interest in either their contributions made or in the government credits under the Superannuation Acts. Consequently, the plan members' entitlements were limited to the statutorily defined benefits set out in the Superannuation Acts. In addition, the government was not subject to a fiduciary obligation in favour of the plan members with respect to the actuarial surplus. Nothing in the Superannuation Acts or any other legislation supported the contention that the government undertook to forsake the interests of all others in favour of the plan members with respect to the actuarial surplus. Further, there was no unjust enrichment and therefore no basis for a constructive trust. As the Superannuation Accounts did not contain assets in which the appellants had an interest, they did not suffer any detriment as a result of the government's accounting treatment of the Superannuation Accounts. Bill C-78 authorized the government to debit the actuarial surpluses in the Superannuation Accounts. Since the Plan members had no equitable interest in the surpluses in the Superannuation Accounts, Bill C-78 could not have expropriated the Plan members' property.

## Statutes, Regulations and Rules Cited:

Act to amend the Civil Service Superannuation Act, S.C. 1944-45, c. 34, s. 6

An Act to amend the Militia Pension Act, S.C. 1946, c. 59, s. 6

Act to amend the Royal Canadian Mounted Police Act, S.C. 1947-48, c. 28, s. 10

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B,

Canadian Forces Superannuation Act, R.S.C. 1985 c. C-17, s. 55(9)-(13)

Canadian Forces Superannuation Act, S.C. 1959, c. 21,

Civil Service Superannuation Act, R.S.C. 1952, c. 50, s. 21, s. 21(1), s. 21(2)

Defence Services Pension Act, R.S.C. 1952, c. 63,

Financial Administration Act, R.S.C. 1985, c. F-11, s. 2, s. 2, s. 2, s. 2, s. 2, s. 2, s. 2, s. 2, s. 17, s. 17(1), s. 17(2), s. 17(2)(a), s. 17(2)(b), s. 17(2)(c), s. 17(2)(d), s. 17(4), s. 63, s. 63(1), s. 63(1)(a), s. 63(1)(b), s. 63(1)(c), s. 63(2), s. 63(3), s. 64, s. 64(1), s. 64(2)(a), s. 64(2)(a)(i), s. 64(2)(a)(ii), s. 64(2)(a)(iii), s. 64(2)(b), s. 64(2)(c), s. 64(2)(d)

Financial Administration Act, S.C. 1951, c. 12, s. 2(e), s. 64

Fisheries Act, R.S.C. 1985, c. F-14,

Pension Benefits Standards Act, 1985, R.S.C. 1985, c. 32 (2nd Supp.), s. 4

Public Pensions Reporting Act, R.S.C. 1985, c. 13 (2nd Supp.), s. 5, s. 7, s. 7(a), s. 7(b), s. 8, s. 8(1), s. 8(2), s. 9(1)

Public Sector Pension Investment Board Act, S.C. 1999, c. 34, s. 4, s. 4(1), s. 4(1)(a), s. 4(1)(b), s. 4(2), s. 4(3), s. 44(9), s. 44(10)

Public Service Labour Relations Act, S.C. 2003, c. 22 [as en. by Public Service Modernization Act, S.C. 2003, c. 22, s. 2], s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 2(1), s. 113, s. 113(a), s. 113(b)

Public Service Modernization Act, S.C. 2003, c. 22, s. 2,

Public Service Staff Relations Act, R.S.C. 1985, c. P-35 [rep. 2003, c. 22, s. 285], s. 2(1), s. 57, s. 57(2)(b)

Public Service Superannuation Act, R.S.C. 1985, c. P-36, s. 3(1), s. 4, s. 4(1), s. 4(2), s. 43, s. 43(1), s. 43(2), s. 43(3), s. 44, s. 44(1), s. 44(1)(a), s. 44(1)(b), s. 44(1)(c), s. 44(2)-(5), s. 44(6)-(8), s. 44(9)-(13), s. 44(14), s. 45

Public Service Superannuation Act, S.C. 1952-53, c. 47, s. 33

Royal Canadian Mounted Police Act, R.S.C. 1952, c. 241,

Royal Canadian Mounted Police Superannuation Act, R.S.C. 1985, c. R-11, s. 29(9)-(13)

Royal Canadian Mounted Police Superannuation Act, S.C. 1959, c. 34,

S.C. 1992, c. 46,

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Pensions -- Pension plans -- Surplus -- Public sector pension plans administered by government -- Government amortizing actuarial surpluses in Superannuation Accounts -- New legislation coming into force on April 1, 2000 amending Superannuation Acts -- Government debiting over $28 billion directly from Superannuation Accounts on basis of new legislation -- Whether Superannuation Accounts contain assets -- Whether government owes fiduciary duty to Plan members -- Whether constructive trust should be imposed over balances in Superannuation Accounts as of March 31, 2000 -- Whether new legislation authorizing government to debit actuarial surpluses in Superannuation Accounts -- Public Service Superannuation Act, R.S.C. 1985, c. P-36 -- Canadian Forces Superannuation Act, R.S.C. 1985 c. C-17 -- Royal Canadian Mounted Police Superannuation Act, R.S.C. 1985, c. R-11 -- Public Sector Pension Investment Board Act, S.C. 1999, c. 34.*

**Court Summary:**

There are three pension plans involved in this appeal (the "Plans"). They were established by statute for each of three groups: substantially all those who are employed in the federal public service; the members of the RCMP; and the regular force of the Canadian Forces (the "Plan members"). Each Plan is administered by the Government of Canada, and each is a contributory, defined benefit plan. The statutes governing the Plans establish for each one a "Superannuation Account", which records payments into and out of the Plan. In the 1990s, the credits to the Superannuation Accounts began to reflect actuarial surpluses (meaning that the credits exceeded the estimated cost of providing pension benefits). By March 1999, the total surpluses of the three Plans had reached approximately $30.9 billion. There are two relevant time periods in this appeal. The first period is up to and including March 31, 2000. It precedes the coming into force of the *Public Sector Pension Investment Board Act*, S.C. 1999, c. 34 ("Bill C-78"), legislation that amended the *Superannuation Acts* (*PSSA*; *CFSA* and *RCMPSA*) and, thus, the Plans. The second period begins on April 1, 2000, when Bill C-78 came into effect.

Beginning with the 1990-91 Public Accounts (Canada's annual financial reports), the government

began to "amortize" the actuarial surpluses in the Superannuation Accounts. The effect of this "amortization" was twofold: it reduced the government's annual budget deficit (or increased the annual budget surplus) by reducing annual pension expenditures, and it brought the government's net debt down by reducing the net pension liabilities to an amount closer to the actuarial estimates of the government's future pension obligations.

In 1999, the government introduced Bill C-78, which came into force on April 1, 2000. It made significant changes to the *Superannuation Acts* and changed the way in which contributions to the Plans were collected, managed and distributed. It established a Pension Fund in each of the *Superannuation Acts* that replaced the Superannuation Accounts for post-March 31, 2000 service. Since April 1, 2000, employee and government contributions in respect of current service have been made to the Pension Funds. All benefits for pensionable service prior to April 1, 2000, when paid, are charged to the appropriate Superannuation Account. However, benefits paid for service thereafter are paid from the appropriate Pension Fund. Bill C-78 also required the Minister to debit from the Superannuation Account certain amounts in excess of specified actuarial surplus ceilings. Unlike the effect of the prior amortization practice, on the basis of Bill C-78, the government debited over $28 billion directly from the Superannuation Accounts, thereby reducing the actuarial surplus in those accounts.

Various unions and associations filed suit, seeking relief that would require the government to return $28 billion to the Plans. The trial judge dismissed the claims and the Ontario Court of Appeal upheld the decision. In their appeal in this Court, they seek a declaration that the Plan members have an equitable interest in the outstanding balance in the Superannuation Accounts as of March 31, 2000. They also seek a declaration that Bill C-78 does not authorize the reduction from the Superannuation Accounts of any amount in which Plan members have an equitable interest without compensation. They seek an order that the Superannuation Accounts be credited with all amounts that were removed following Bill C-78 in which the Plan members have an equitable interest, together with interest.

*Held*: The appeal should be dismissed.

The Superannuation Accounts are legislated records and do not contain assets in which the Plan members have a legal or equitable interest. The Plan members' interests are limited to their interest in the defined benefits to which they are entitled under the Plans. The *Superannuation Acts* created the Accounts to track Plan-related Consolidated Revenue Fund ("CRF") transactions and to estimate the government's pension liabilities to Plan members. In this way, they are accounting records, not funded and segregated pools of assets. When the word "assets" is used in the legislation in reference to the Superannuation Accounts, it merely signifies their credit balances, not anything of value to which the Plan members could have an interest. Even if reference to extrinsic aids was appropriate, the extrinsic evidence available is inconclusive. Nor does it afford insight into the intention of Parliament when creating the Superannuation Accounts.

The courts below were correct to reject the theory that the government borrowed from the Accounts, placing in them promises to pay by the government (the purported assets in the Accounts). This theory is inconsistent with the legislation in that it assumes that the government was required to contribute property into the Accounts in the first place. As the Accounts are no more than accounting records, this would have been impossible. Prior to April 1, 2000, all of the real money associated with Canada's pension scheme remained unsegregated in the CRF, until benefits were actually paid -- out of the CRF -- to Plan members. The superannuation scheme reflects "internal borrowing" only in the sense that it avoids, by design, the need for the external borrowing that would otherwise be required to finance the government's pension obligations. The Superannuation Accounts are just accounting records and they are not funds, nor are they "trust-like", such that it is possible to borrow from them.

As the Superannuation Accounts do not contain assets there was no property in respect of which Plan members can have a legal or equitable interest. However, even if the Accounts did contain assets, it has not been established that the Plan members have a proprietary interest in either their contributions made or in the government credits under the *Superannuation Acts*. On a plain reading of the *Superannuation Acts*, there is no suggestion that the Plan members have a proprietary interest in their contributions. Contributing employees can claim no continuing property interest in these amounts. In exchange for their contributions, and with each year of pensionable service, employees gain a legal entitlement to a future benefit. It has been asserted that employees have an interest in both the employee and employer contributions, plus interest, on the basis that they form part of employees' total compensation. Even if it were to be assumed that employees have an interest in the contributions at the point in time at which their salaries are to be paid to them, no interest in these amounts could survive the requirement in the *Superannuation Acts* that they be paid into the CRF and credited to the Accounts. Rather, this is the "cost" paid by employees for the future legal entitlement to their statutorily defined benefits. The *Superannuation Acts* also do not establish that employees have an equitable interest in the amounts credited to the Accounts. They provide only a legal entitlement to statutorily defined pension benefits.

Nor was the government subject to a fiduciary obligation in favour of the Plan members with respect to the actuarial surplus. In this case, the government does not fall into any of the *per se* fiduciary relationships. It is contended the government is in a recognized fiduciary role in its capacity as a pension plan administrator; however, it is not necessary to decide the precise ambit of any potential fiduciary duty that might arise between the government, as pension plan administrator, and the beneficiaries of the plan, or whether the relationship inherently carries with it some set of fiduciary obligations. It is clear that the government had no fiduciary duty to the plan members with respect to the actuarial surplus. There was no *ad hoc* fiduciary relationship between the government and the Plan members with respect to the actuarial surplus reflected in the Superannuation Accounts. Most importantly, the government did not undertake, either expressly or impliedly, to act in the best interests of the Plan members with respect to the actuarial surplus. Without such an undertaking of loyalty in favour of these particular stakeholders, the government's duty was to act in the best interests of society as a whole. This is inconsistent with the existence of a fiduciary duty.

Moreover, while the government exercised discretion in its accounting treatment of the surpluses in the Superannuation Accounts, the Plan members were not vulnerable to that discretion, nor did they have any legal or practical interest at stake. The effect of the amortization was to disclose more accurately Canada's actual pension obligations, not to affect Plan members' statutory entitlements under the Plans.

Further, a constructive trust should not be imposed over the balances in the Superannuation Accounts as of March 31, 2000. There was no enrichment and corresponding deprivation, and a *prima facie* case of unjust enrichment has not been established. As the Superannuation Accounts are mere accounting records, and do not contain assets in which the Plan members have an interest, no enrichment and corresponding deprivation can be found in either (1) the government's decision prior to April 1, 2000, to amortize the surpluses for accounting purposes, or (2) Parliament's decision to enact Bill C-78 to require the debiting of a portion of the surplus directly from the Accounts.

Bill C-78 authorized the government to debit the actuarial surpluses in the Superannuation Accounts. The courts below did not err in determining that the Plan members have no equitable interest in the surpluses in the Superannuation Accounts. Bill C-78 thus could not have expropriated the Plan members' property. Further, the *Superannuation Acts* are unambiguous in establishing that the Minister *may* debit any actuarial surplus and *must* debit all amounts exceeding 110 percent of the estimated liability under the Plans. Moreover, it is "extremely clear" that Parliament did not intend any compensation to be given to the Plan members for these debits, whether or not this constituted expropriation. It would be absurd to read Bill C-78 as requiring the government to debit excess amounts and then compensate the Plan members for the amounts debited. Such an interpretation would be to convert the relevant provisions of Bill C-78 into a distribution mechanism -- where the surpluses would be reduced and the Plan members would receive some form of compensation in lieu of having surpluses in the Accounts -- which was quite clearly not Parliament's intent.

**Cases Cited**

**Applied:** *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261; **distinguished:** *Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273; *Ermineskin Indian Band and Nation v. Canada*, 2009 SCC 9, [2009] 1 S.C.R. 222; **referred to:** *Schmidt v. Air Products Canada Ltd.*, [1994] 2 S.C.R. 611; *Nolan v. Kerry (Canada) Inc.*, 2009 SCC 39, [2009] 2 S.C.R. 678; *Monsanto Canada Inc. v. Ontario (Superintendent of Financial Services)*, 2004 SCC 54, [2004] 3 S.C.R. 152; *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559; *CanadianOxy Chemicals Ltd. v. Canada (Attorney General)*, [1999] 1 S.C.R. 743; *United States of America v. Dynar*, [1997] 2 S.C.R. 462; *Galambos v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247; *Guerin v. The Queen*, [1984] 2 S.C.R. 335; *Wewaykum Indian Band v. Canada*, 2002 SCC 79, [2002] 4 S.C.R. 245; *Frame v. Smith*, [1987] 2 S.C.R. 99; *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377; *Gladstone v. Canada (Attorney General)*, 2005 SCC 21, [2005] 1 S.C.R. 325; *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217; *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC

75, [2004] 3 S.C.R. 575; *Peter v. Beblow*, [1993] 1 S.C.R. 980; *Pacific National Investments Ltd. v. Victoria (City)*, 2000 SCC 64, [2000] 2 S.C.R. 919.

**Statutes and Regulations Cited**

*Act to amend the Civil Service Superannuation Act*, S.C. 1944-45, c. 34, s. 6.

*Act to amend the Militia Pension Act*, S.C. 1946, c. 59, s. 6.

*Act to amend the Royal Canadian Mounted Police Act*, S.C. 1947-48, c. 28, s. 10.

*Canadian Forces Superannuation Act*, R.S.C. 1985, c. C-17, s. 55(9) to (13).

*Canadian Forces Superannuation Act*, S.C. 1959, c. 21.

*Civil Service Superannuation Act*, R.S.C. 1952, c. 50, s. 21.

*Defence Services Pension Act*, R.S.C. 1952, c. 63.

*Financial Administration Act*, R.S.C. 1985, c. F-11, ss. 2 "Consolidated Revenue Fund", "money", "negotiable instrument", "public money", 17, 63, 64.

*Financial Administration Act*, S.C. 1951, c. 12, s. 2(*e*) "Consolidated Revenue Fund".

*Fisheries Act*, R.S.C. 1985, c. F-14.

*Pension Benefits Standards Act, 1985*, R.S.C. 1985, c. 32 (2 Supp.), s. 4.

*Public Pensions Reporting Act*, R.S.C. 1985, c. 13 (2 Supp.), ss. 5, 7, 8, 9(1).

*Public Sector Pension Investment Board Act*, S.C. 1999, c. 34, s. 4.

*Public Service Labour Relations Act*, S.C. 2003, c. 22 [as en. by *Public Service Modernization Act*, S.C. 2003, c. 22, s. 2], ss. 2(1) "employee", "public service", 113.

*Public Service Modernization Act*, S.C. 2003, c. 22, s. 2.

*Public Service Staff Relations Act*, R.S.C. 1985, c. P-35 [rep. 2003, c. 22, s. 285], ss. 2 "employee", 57.

*Public Service Superannuation Act*, R.S.C. 1985, c. P-36, ss. 3(1) "*Superannuation Act*", 4, 43, 44, 45.

*Public Service Superannuation Act*, S.C. 1952-53, c. 47, s. 33.

*Royal Canadian Mounted Police Act*, R.S.C. 1952, c. 241.

*Royal Canadian Mounted Police Superannuation Act*, R.S.C. 1985, c. R-11, s. 29(9) to (13).

*Royal Canadian Mounted Police Superannuation Act*, S.C. 1959, c. 34.

**Authors Cited**

Canada. House of Commons. *House of Commons Debates*, vol. VI, 3 Sess., 34 Parl., February 24, 1992, p. 7486.

Canada. Receiver General for Canada. *Public Accounts of Canada 1996*, vol. I, *Summary Report and Financial Statements*. Ottawa: Treasury Board, 1996.

Canada. Receiver General for Canada. *Public Accounts of Canada 1997*, vol. I, *Summary Report and Financial Statements*. Ottawa: Treasury Board, 1997.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5 ed. Markham, Ont.: LexisNexis, 2008.

**History and Disposition:**

APPEAL from a judgment of the Ontario Court of Appeal (Laskin, Gillese and Juriansz JJ.A.), 2010 ONCA 657, 102 O.R. (3d) 241, 275 O.A.C. 40, 84 C.C.P.B. 161, [2010] O.J. No. 4248 (QL), 2010 CarswellOnt 7532, affirming a decision of Panet J. (2007), 66 C.C.P.B. 54, 2007 CanLII 50603, [2007] O.J. No. 4577 (QL), 2007 CarswellOnt 7541. Appeal dismissed.

**Counsel:**

*Paul J. J. Cavalluzzo*, *Hugh O'Reilly* and *Amanda Darrach*, for the appellants the Professional Institute of the Public Service of Canada et al.

*James Cameron*, *Andrew Raven* and *Andrew Astritis*, for the appellants the Public Service Alliance of Canada, the Armed Forces Pensioners'/Annuitants' Association of Canada et al.

*Peter Southey*, *Dale Yurka* and *Christine Mohr*, for the respondent.

Written submissions only by *J. Gareth Morley*, for the intervener.

---

The judgment of the Court was delivered by

**ROTHSTEIN J.**:--

I.    <u>Introduction</u>

**1**    This appeal concerns three statutory, public sector pension plans, the members of which are federal public service employees, members of the Canadian Forces, and members of the RCMP. Each plan is administered by the Government of Canada, and each is a contributory, defined benefit plan.

**2**    The statutes governing the plans establish for each one a "Superannuation Account", which records payments into and out of the plan. In the 1990s, the credits to the Superannuation Accounts began to reflect actuarial surpluses (meaning that the credits exceeded the estimated cost of providing pension benefits). By March 1999, the total surpluses of the three plans had reached approximately $30.9 billion.

**3**    Beginning with the 1990-91 Public Accounts (Canada's annual financial reports), the government began to "amortize" the actuarial surpluses in the Superannuation Accounts. On April 1, 2000, the *Public Sector Pension Investment Board Act*, S.C. 1999, c. 34 ("Bill C-78") came into force. Bill C-78 changed the way in which contributions to the plans were collected, managed and distributed. It also required the Minister to debit from the Superannuation Account certain amounts in excess of specified actuarial surplus ceilings. Unlike the effect of the prior amortization practice, on the basis of Bill C-78, the government debited over $28 billion directly from the Superannuation Accounts, thereby reducing the actuarial surplus in those accounts.

**4**    The appellants (being various unions and employee/pensioner associations) filed suit, seeking relief that would require the government to return $28 billion to the plans. The trial judge dismissed the claims, and the Ontario Court of Appeal upheld the decision ((2007), 66 C.C.P.B. 54 (Ont. S.C.J.), aff'd 2010 ONCA 657, 102 O.R. (3d) 241).

**5**    In order to succeed, the plan members must establish that they have an equitable entitlement to the actuarial surpluses. Otherwise, their entitlement will be limited to the defined pension benefits set out in the governing statutes. In this connection, the nature of the Superannuation Accounts is an issue of central importance. The appellants have argued that the Superannuation Accounts were funds that contained assets in which an equitable interest could be claimed. They say their equitable interest is protected by a fiduciary duty on the part of the government, and, in the alternative, by a constructive trust based on unjust enrichment. The government counters that the Superannuation Accounts were merely accounting records and contain no assets to which an equitable interest could attach. A further issue raised on appeal is whether, if the plan members did have an interest in the actuarial surplus, that interest was extinguished by Bill C-78.

**6**    I have determined that the courts below were correct to conclude that the Superannuation Accounts were not separate funds containing assets, but were rather accounting ledgers used to track pension-related payments, and to estimate Canada's future pension liabilities in the Public Accounts. Therefore, the plan members' entitlements are limited to the statutorily defined benefits set out in the *Superannuation Acts*.

**7**    I have also concluded that the government was not subject to a fiduciary obligation in favour of the plan members with respect to the actuarial surplus. Nothing in the *Superannuation Acts*, or any other legislation, supports the contention that the government has undertaken to forsake the interests of all others (including taxpayers) in favour of the plan members with respect to the actuarial surplus. Further, there was no unjust enrichment and therefore no basis for a constructive trust. As the Superannuation Accounts did not contain assets in which the appellants had an interest, they did not suffer any detriment as a result of the government's accounting treatment of the Superannuation Accounts. For the same reason, Bill C-78 did not expropriate any property of the plan members. Accordingly, I would dismiss the appeal.

II.    Facts

A. *The Pension Plans*

**8**    The summary of facts that follows parallels the findings of the Court of Appeal closely. There are three pension plans involved in this appeal (the "Plans"). They were established by statute for each of three groups: substantially all those who are employed in the federal public service; the members of the RCMP; and the regular force of the Canadian Forces (the "Plan members"). The relevant statutes are the *Public Service Superannuation Act*, R.S.C. 1985, c. P-36 ("*PSSA"*); the *Canadian Forces Superannuation Act*, R.S.C. 1985, c. C-17 ("*CFSA"*); and the *Royal Canadian Mounted Police Superannuation Act*, R.S.C. 1985, c. R-11 ("*RCMPSA"*) (collectively, the "*Superannuation Acts*").

**9**    Each of the *Superannuation Acts* has legislative antecedents dating back to the late 19th or early 20th centuries. As currently enacted, they date from the coming into force of the present *Superannuation Acts* -- January 1, 1954, for the *PSSA*, S.C. 1952-53, c. 47 ("*PSSA* 1954"); March 1, 1960, for the *CFSA*, S.C. 1959, c. 21; and April 1, 1960, for the *RCMPSA*, S.C. 1959, c. 34.

**10**    The Plans are the same in all aspects relevant to these proceedings. For ease of reference, I will generally refer only to the *PSSA*, but the analysis and conclusions apply equally to the *CFSA* and the *RCMPSA*.

**11**    The *Superannuation Acts* set out the terms of the Plans. They establish contributory, defined benefit pension plans. Membership in the Plans is compulsory for all eligible public service employees, members of the regular force of the Canadian Forces, and members of the RCMP.

**12**    There are two relevant time periods in this appeal. The first period is up to and including March 31, 2000. It precedes the coming into force of Bill C-78, legislation that amended the *Superannuation Acts* and, thus, the Plans. The second period begins on April 1, 2000, when Bill C-78 came into effect.

**13**    Employees are required to make a contribution to the relevant Plan, by way of reservation of salary. While the contribution rates for these Plans varied, employees generally contribute in the

range of 5 to 7.5 percent of their salaries.

**14**    The defined benefit to which an employee is entitled, upon retirement, is determined in accordance with a formula. The basic pension is two percent per year of pensionable service (to a maximum of 35 years) multiplied by the average of the best five consecutive years of salary.

**15**    The terms of the Plans are not subject to collective bargaining. The *PSSA* Plan is excluded by virtue of s. 113(*b*) of the *Public Service Labour Relations Act*, enacted by the *Public Service Modernization Act*, S.C. 2003, c. 22, s. 2 ("*PSLRA*") (formerly s. 57(2)(*b*) of the *Public Service Staff Relations Act*, R.S.C. 1985, c. P-35 ("*PSSRA*") [rep. S.C. 2003, c. 22, s. 285]). The *RCMPSA* Plan is not subject to collective bargaining because RCMP members are expressly excepted from para. (*d*) of the definition of "employee" in s. 2(l) of the *PSLRA* (formerly para. (*e*) of the definition of "employee" in s. 2(1) of the *PSSRA*) and thus have no collective bargaining rights. The *CFSA* Plan is not subject to collective bargaining because members of the Canadian Forces are neither Crown employees nor part of the public service as defined in the *PSLRA* and therefore do not have collective bargaining rights. Nor are the Plans subject to the *Pension Benefits Standards Act, 1985*, R.S.C. 1985, c. 32 (2nd Supp.) (see s. 4).

**16**    Employee contributions to the Plans were required to be deposited into the Consolidated Revenue Fund ("CRF"). "Consolidated Revenue Fund" is defined to mean "the aggregate of all public moneys that are on deposit at the credit of the Receiver General", in the *Financial Administration Act*, R.S.C. 1985, c. F-11 ("*FAA"*), s. 2. Prior to April 1, 2000, contributions to the Plans were reflected as credits to the "Superannuation Accounts" (or "Accounts"), which were statutorily established for each of the Plans. Amounts payable pursuant to the *Superannuation Acts* (pension benefits) were paid from the CRF and debited to the appropriate Superannuation Account.

**17**    In addition to credits reflecting Plan members' contributions, the legislatively prescribed credits to the Superannuation Accounts prior to April 1, 2000, consisted of the following: (1) credits in respect of contributions by Public Service corporations; (2) government contribution credits; (3) additional actuarial liability credits (to cover actuarial liabilities); (4) transfers from other pension plans and Supplementary Retirement Benefits Accounts; and (5) interest credits on the balance in the Superannuation Accounts at the rate prescribed by regulation.

**18**    The required government contribution credits varied over time. For example, the government was required to credit the Superannuation Account created for the *PSSA* Plan with amounts matching employee contributions in respect of current service: a year in arrears, from 1954 to 1991, and on a monthly basis, from 1991 to 2000. Additionally, further credits were required in relation to past or "buy-back" service, and to provide for the cost of benefits accrued in the month in relation to current service.

**19**    The reporting of the government's pension liabilities is subject to the *FAA*, the applicable *Superannuation Act*, and the *Public Pensions Reporting Act*, R.S.C. 1985, c. 13 (2nd Supp.) ("*PPRA*"). Pursuant to s. 64 of the *FAA*, for each fiscal year the Receiver General must prepare, and

the President of the Treasury Board must lay before the House of Commons, an annual report known as the "Public Accounts". The Public Accounts reflect the value of the assets and liabilities of Her Majesty in Right of Canada. They are the Government of Canada's main financial reporting document.

**20**    The two principal statements in the Public Accounts are the Statement of Financial Position, which sets out the assets and liabilities of the government, and the Statement of Operations and Accumulated Deficit, which sets out the government's revenues and expenditures.

**21**    The transactions and balances in the Superannuation Accounts are reported annually in the Public Accounts. The government's annual credits made pursuant to the *Superannuation Acts* are shown as a government expense in the Statement of Operations and Accumulated Deficit. The amounts set out in the Superannuation Accounts are shown as an ongoing liability of the government in its Statement of Financial Position. The Superannuation Accounts have been classified as "Specified Purpose Accounts" under the liabilities section of the Statement of Financial Position since the 1980-81 fiscal year.

**22**    As required by the *Superannuation Acts* and the *PPRA*, actuarial reports were received from time to time with respect to each of the Plans. The *PPRA* requires the Chief Actuary of the Office of the Superintendent of Financial Institutions to periodically estimate the cost of the government's future pension obligations, and to cause a "certification of the assets" of the Plans (ss. 5, 8(1) and 9(1)). To the extent that the estimated cost of the pension liabilities is greater than the certified value of the "assets" reflected in the Superannuation Accounts, there is an "actuarial deficit". On the other hand, where the certified value of the "assets" reflected in the Superannuation Accounts exceeds estimated pension liabilities, there is an "actuarial surplus".

**23**    In the 1990s, the actuarial valuations showed that the estimated cost of the present and future obligations for each of the three Plans was less than the total of the amounts showing in the Superannuation Accounts. The surplus arose as a result of a combination of factors, including low inflation rates, high interest rates, government-imposed restraints on salaries, the capping of indexing benefits in the 1980s, and changing assumptions in calculating the actuarial liability of the Plans. The surplus in the three Superannuation Accounts reached $16.6 billion by December 1992, climbing to $23.4 billion in March 1996 and $30.9 billion in March 1999.

B. *Amortization of the Surplus*

**24**    In the 1990-91 fiscal year, the government began to "amortize" the actuarial surplus in the Superannuation Accounts. The word "amortize" is used to describe the actions undertaken by the government, over a number of years, to gradually reduce the impact of the actuarial surplus on the Public Accounts. The amortization consisted of the following actions: the government continued to credit its contributions to the Superannuation Accounts in accordance with the *Superannuation Acts*. However, the Public Accounts recorded lower net annual pension expenses. To accomplish this objective, the government booked into the Public Accounts negative expenses to reflect the amount

of the surplus amortized during the year, thereby reducing the government's total pension expenses. For the books to balance, the negative adjustments to pension expenses were equally reflected in reductions in the government's total stated pension liabilities on its Statement of Financial Position. To make this happen, the amounts amortized each year were debited to contra-liability accounts (i.e., liability accounts having a debit balance) created in the Public Accounts. These accounts went by different names over the years -- such as the "Allowance for Pension Adjustments" -- but their function was the same: they allowed the government to reduce its stated net pension liabilities in the Public Accounts by the amount of the amortization without debiting the Superannuation Accounts themselves. The Superannuation Accounts maintained their credit balances, unaffected by the amortization, but the debit balances in the separate allowance accounts partially offset them in the Public Accounts. The government's stated net pension liabilities were in this way gradually brought toward the actuarial valuation of Plan liabilities (i.e., the surplus was gradually reduced), but the balances in the Superannuation Accounts were not affected.

**25**    The effect of this "amortization" was therefore twofold: it reduced the government's annual budget deficit (or increased the annual budget surplus) by reducing annual pension expenditures, and it brought the government's net debt down by reducing the net pension liabilities to an amount closer to the actuarial estimates of the government's future pension obligations.

**26**    During the 1990s, the government amortized a total of $18.6 billion, with further amounts being amortized after the year 2000.

C. *Bill C-78*

**27**    In 1999, the government introduced Bill C-78, which came into force on April 1, 2000. It made significant changes to the *Superannuation Acts*. It established a Pension Fund in each of the *Superannuation Acts* that replaced the Superannuation Accounts for post-March 31, 2000 service ("Pension Funds"). Since April 1, 2000, employee and government contributions in respect of current service have been made to the Pension Funds.

**28**    Under Bill C-78, the amounts in the Pension Funds were to be invested externally. Bill C-78 established an investment board to manage the assets in the Pension Funds. One of the objects of the investment board is to manage the amounts that are transferred to it, pursuant to the amended Superannuation Act, "in the best interests of the contributors and beneficiaries under those Acts" (s. 4(1)(*a*)).

**29**    Bill C-78 added s. 44(9) to (13) to the *PSSA*. In general terms, these subsections both grant discretion to and create an obligation on the Minister to debit the Superannuation Accounts to reduce the actuarial surplus. While the Minister has the discretion to debit the Superannuation Accounts with any amount of the surplus between 100 percent and 110 percent of the amount estimated to be required to meet the cost of benefits payable, as determined from the actuarial reports, the Minister is required to debit the Accounts for any actuarial surplus that exceeds 110 percent of the amount required to pay future benefits.

**30**    Bill C-78 provided that after January 1, 2004, employee contribution rates would no longer be set by legislation but would be set at the discretion of the Treasury Board, subject to certain restrictions. Employees faced a legislated increase of 15 to 33 percent in contribution rates in the years from 2000 to 2003. In 2005, the Treasury Board announced further increases.

**31**    Bill C-78 also changed the basis for the government's annual contributions. Instead of being required to make contributions matching those made by employees, the government's contributions are now determined by the President of the Treasury Board, based on the actuarial valuations for each Plan.

**32**    All benefits for pensionable service prior to April 1, 2000, when paid, are charged to the appropriate Superannuation Account. However, benefits paid for service thereafter are paid from the appropriate Pension Fund.

**33**    Between 2001 and 2004, the government relied on Bill C-78 to debit over $28 billion from the Superannuation Accounts. Since the effect of the prior amortization was to reduce the annual deficit or increase the annual surplus, and to reduce the government's net debt, the debiting of any amounts already amortized had no effect on Canada's financial position.

D. *The Appellants' Action*

**34**    The appellants brought an action for the return of the actuarial surplus reflected in the Superannuation Accounts, arguing that the government had breached its trust and fiduciary duties by amortizing and debiting the surplus. The appellants also maintained that Bill C-78 did not extinguish Plan members' interest in the surplus as it did not evidence an unambiguous intent to expropriate without compensation. The trial judge dismissed the appellants' action. The Ontario Court of Appeal dismissed their appeal.

**35**    In their appeal in this Court, the appellants seek a declaration that the Plan members have an equitable interest in the outstanding balance in the Superannuation Accounts as of March 31, 2000. They say that the equitable interest includes the right to have the entire amount in the Superannuation Accounts used solely for the purpose of providing pension benefits to Plan members. In the alternative, the appellants seek a declaration that the equitable interest of the Plan members constitutes a right to have a share of the actuarial surplus in the Superannuation Accounts used for the purpose of providing benefits to the Plan members. Under this alternative, the appellants have prorated their share in accordance with the ratio of employee and employer contributions as of March 31, 2000. The Plan members' contributions were the equivalent of 42.2 percent of the actuarial surplus on that date. They also seek a declaration that ss. 44(9) and 44(10) of Bill C-78 do not authorize the reduction from the Superannuation Accounts of any amount in which Plan members have an equitable interest without compensation. And they seek an order that the Superannuation Accounts be credited with all amounts that were removed following Bill C-78 in which the Plan members have an equitable interest, together with interest.

E. *Relevant Statutory Provisions*

**36**    The relevant statutory provisions are set forth in the Appendix at the conclusion of these reasons.

III.    <u>Judgments Below</u>

A. *Ontario Superior Court of Justice (Panet J.)*

**37**    The appellants brought a claim for breach of trust, and a claim for breach of fiduciary duty with respect to the outstanding balance in the Superannuation Accounts, as of March 31, 2000.

**38**    In considering the statutes and other documents, Panet J. found that the trust requirement that there be certainty of intention was not present. Panet J. also concluded that there was no certainty of subject matter. He found that there was no separate or segregated fund. Panet J. rejected the appellants' claim for breach of fiduciary duty, as there was no scope for the exercise of any discretion or power, a necessary element of a fiduciary relationship. Panet J. held that the government had no discretion because the *PSSA* was a complete statutory code.

**39**    The appellants also objected to the amortization of the surplus. Panet J. rejected this claim on the basis that the Public Service Superannuation Plan was not a funded plan, and that the amortized amounts in the Superannuation Account were not assets that had been removed.

**40**    In Panet J.'s view, the Superannuation Accounts did not contain assets. Rather, the Accounts were maintained by the government, pursuant to the *FAA*, to record and disclose an estimate of its pension liability (the cost of the pension obligation).

**41**    Panet J. considered whether the government had borrowed from the Superannuation Accounts the difference between the contributions to the Plans plus interest, and the pension payments from the Plans. He found there was no amount owing by the government to the Superannuation Accounts.

**42**    In his view, the government's pension liability comes from the *Superannuation Acts*, not the Accounts. The Superannuation Accounts are effectively an estimate of the cost of the government's pension liability. Panet J. considered the actuarial reports periodically submitted to Parliament, which make reference to assets and liabilities in the Plans. However, he found that the use of the word "assets" in these reports does not correspond to the ordinary meaning of that word. "Asset" was used to mean the recorded contributions of employees and the government, less benefits paid -- i.e., the balances in the Superannuation Accounts.

**43**    Even though he concluded that the Superannuation Accounts did not contain assets, Panet J. went on to consider whether Bill C-78 expropriated any interest that the Plan members had in the surplus. He concluded that, in clear and unambiguous terms, Bill C-78 required the Minister to debit

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 721 of 1344

Page 19

from the Superannuation Accounts any amount that exceeds 110 percent of the amount estimated to be required to meet pension obligations, and that it gave him the discretion to debit additional amounts of the surplus.

**44**    Finally, Panet J. rejected the appellants' argument that Bill C-78 breached the *Charter* rights of Plan members.

**45**    Panet J. concluded that the declarations sought by the appellants should not be granted.

B. *Court of Appeal for Ontario (Gillese J.A., Concurred in by Laskin and Juriansz JJ.A.)*

**46**    Gillese J.A. found that the trial judge had correctly concluded that the Superannuation Accounts did not contain assets, notwithstanding the appearance of the word "assets" in the *PSSA*. In her view, Superannuation Accounts were "legislated ledgers", designed to record the amounts credited to the Plans, and to estimate the government's liability to provide benefits to Plan members. The "real money" deducted from employees' pay cheques was deposited (retained) in the CRF, becoming a part of the aggregate of all public moneys, with a corresponding credit in the appropriate Superannuation Account (paras. 49 to 52).

**47**    Although government documents referred to the Plans as being "fully funded", Gillese J.A. held that, understood in context, that phrase simply meant that the value of credited contributions in the Superannuation Accounts was sufficient to discharge the government's liability for promised pension benefits (para. 55).

**48**    However, Gillese J.A. held that the trial judge erred by determining that the *PSSA* was a complete code. While the *PSSA* listed many of the parties' rights and obligations, prior to April 1, 2000, the *PSSA* did not address the actuarial surpluses in the Superannuation Account. Accordingly, the Act did not constitute a complete code prior to Bill C-78 coming into force.

**49**    It did not follow from this conclusion that Plan members had equitable rights to the actuarial surplus. They did not have an interest in the surplus flowing from the *PSSA*, the employment relationship, trust principles, or from the government's fiduciary obligations as plan administrator.

**50**    Gillese J.A. found that the government was not a fiduciary in its capacity as administrator of the Plans prior to April 1, 2000. However, she held that the trial judge had erred by determining that the government did not have any discretion that could give rise to a fiduciary duty. In her view, the government had discretion in managing the amounts credited to the Superannuation Accounts. The government made the decision to deal with the actuarial surplus by amortizing it, and this amounted to the exercise of discretion.

**51**    Gillese J.A. held that there was no property belonging to the Plan members that was affected by the government's exercise of discretion, but that the way the government exercised its discretion had an effect on the practical interests of the Plan members. It appeared to her that the exercise of

discretion led to the employees having to contribute more towards the cost of their pensions. However, the core question was whether "given all the surrounding circumstances, one party could reasonably have expected that another would act in the former's best interests" (para. 94). In this case, she concluded it would *not* be reasonable for Plan members to expect the government to act in their best interests when exercising its discretion. A fiduciary duty is unlikely to apply to the Crown, as it would create a conflict between the Crown's responsibility to act in the public interest, on one hand, and its obligation to act in the best interests of beneficiaries, on the other.

**52**    Gillese J.A. also held that a constructive trust should not be imposed. She found that it need not be imposed to satisfy the requirements of good conscience, in view of the lack of an equitable obligation on the part of the government. Second, the government was not enriched by the amortization and removal (pursuant to Bill C-78) of the actuarial surplus. In her view, whatever benefit there was to the amortization, it enured to all Canadian taxpayers. In any event, Bill C-78 was a juristic reason justifying any removal.

**53**    Accordingly, Gillese J.A. dismissed the appeal. Laskin and Juriansz JJ.A. concurred.

IV.    Issues

**54**    The issues in this appeal are:

    a.    Did the Superannuation Accounts contain assets?
    b.    Did the government owe a fiduciary duty to the Plan members?
    c.    Should a constructive trust be imposed over the balances in the Superannuation Accounts as of March 31, 2000?
    d.    Did Bill C-78 authorize the government to debit the actuarial surpluses in the Superannuation Accounts?

V.    Analysis

**55**    This Court has considered the law related to pension plan surpluses on several occasions, but it has always done so in the context of private sector pension plans. In this appeal, the Court must consider pension plan surpluses in the context of statutory, public sector pension plans.

**56**    *Schmidt v. Air Products Canada Ltd.*, [1994] 2 S.C.R. 611, is the leading statement of the law on pension plan surpluses. That case establishes the principle that, in the absence of overriding legislation, the first step to assessing competing claims to the surplus is to determine, in accordance with ordinary principles of trust law, whether the pension fund is impressed with a trust. If it is, all applicable trust principles apply. If, on the other hand, the pension fund is not subject to a trust, entitlement to the surplus will be assessed in accordance with the principles of contract interpretation.

**57**    In *Burke v. Hudson's Bay Co.*, 2010 SCC 34, [2010] 2 S.C.R. 273, this Court affirmed *Schmidt*, along with *Nolan v. Kerry (Canada) Inc.*, 2009 SCC 39, [2009] 2 S.C.R. 678, and *Monsanto Canada Inc. v. Ontario (Superintendent of Financial Services)*, 2004 SCC 54, [2004] 3 S.C.R. 152, to the effect that entitlement to a pension plan surplus is "determined according to the words of the relevant documents and applicable contract and trust principles and statutory provisions" (para. 26).

**58**    At trial, the appellants advanced the argument that the *Superannuation Acts* created express trusts for the benefit of Plan members. However, the trial judge rejected the express trust argument, and it has not resurfaced on appeal.

**59**    In this appeal, the appellants have based their arguments not on express trust, but on constructive trust. Their contention is that the Superannuation Accounts contain assets, and that the government is under an equitable (fiduciary) obligation in respect of its management of them. The appellants argue that the government breached its fiduciary duty by amortizing the surplus, and that this gives rise to a constructive trust over the assets in the Superannuation Accounts, in favour of the Plan members. The appellants have also argued that a constructive trust should be imposed on the basis of unjust enrichment. As mentioned above, central to both of these arguments is the issue of whether the Superannuation Accounts in fact contained assets. If they did not, then there could be no equitable interest subject to a fiduciary duty, nor any unjust enrichment justifying a constructive trust. Accordingly, the first issue to address is whether the Superannuation Accounts contained assets.

A. *Did the Superannuation Accounts Contain Assets?*

**60**    Both courts below found that the Superannuation Accounts did not contain assets. At first instance, Panet J. rejected appellants' expert evidence that the primary asset of each Account is a receivable from the government. He found that, in fact, the government had not borrowed from the Superannuation Accounts and that there were no amounts owing by the government to the Accounts. Rather, the Superannuation Accounts were no more than accounts maintained by the government to record and disclose its estimated pension liability. At the Court of Appeal, Gillese J.A. found no error with this conclusion. In her view, "[i]n essence, the Superannuation Accounts are legislated ledgers" (para. 50).

**61**    While there is no question that the Superannuation Accounts are not pools of marketable securities, the appellants maintain that the courts below erred in not finding that the Accounts contain assets, namely, receivables owing from the government to the Accounts. They submit that real money was contributed to the Accounts in each year, but, because the amounts were not invested externally, the government effectively borrowed this money from the Accounts for its own use -- leaving promises to pay in the Accounts. These promises to pay, they say, are assets, much like Government of Canada bonds.

**62**    As I will presently explain, I agree with the respondent and the courts below that the

Superannuation Accounts do not contain assets. The Superannuation Accounts are no more than accounting records designed to track the operation of the Plans and to estimate the government's future pension liabilities.

(1)    The Superannuation Acts

**63**    The Superannuation Accounts are all established by statute and therefore, an analysis of their nature must begin with the legislation. The current Superannuation Account for the Public Service Superannuation Plan is a continuation of the account established by the 1952 revision of the *Civil Service Superannuation Act*, R.S.C. 1952, c. 50 (*PSSA*, definition of "*Superannuation Act*" in s. 3(1) and s. 4(2)). The 1952 Revised Statutes of Canada re-enacted, in turn, a provision that was originally found in *An Act to amend the Civil Service Superannuation Act*, S.C. 1944-45, c. 34, s. 6, enacted by Parliament in 1944.

**64**    The *Civil Service Superannuation Act*, s. 21, provided that all funds collected and distributed pursuant to that Act flowed into, and out of, the CRF:

> **21.** (1) The moneys received under the provisions of this Act shall form part of the Consolidated Revenue Fund, and the moneys payable under the said provisions shall be payable out of the said Consolidated Revenue Fund.

The CRF was defined to mean, at the relevant time, in *The Financial Administration Act*, S.C. 1951 (2nd Sess.), c. 12, s. 2(*e*), assented to December 21, 1951, "the aggregate of all public moneys that are on deposit at the credit of the Receiver General". Section 21 of the *Civil Service Superannuation Act* further provided for a special account in the CRF, to be known as the Superannuation Account, for purposes of funds received and payable in respect of the Act:

> (2)    There shall be kept in a Special Account in the Consolidated Revenue Fund, to be known as the Superannuation Account, of all moneys so received or so payable, and there shall be added to the said Account annually an amount representing interest, at such rate and calculated in such manner as the Governor in Council may by regulation prescribe, on the amount to the credit of such account.

**65**    The description of the Superannuation Account as a "Special Account in the Consolidated Revenue Fund ... of all moneys so *received* or so *payable*" describes accounting entries -- a record of transactions relating to government pension plans reflected in credits and debits. It is apparent from the statutory language that Parliament contemplated that the Account would reflect Plan-related transactions into and out of the CRF. Considered together with the direction to receive all Plan-related moneys into the CRF, and to pay them out of the CRF, the language is consistent with accounting entries rather than with a direction to keep a separate, identifiable accumulation of assets.

**66**    As the current Superannuation Account is a continuation of the account established by the 1952 Revised Statutes of Canada (originally established legislatively in 1944), the current Superannuation Account continues to represent accounting entries reflecting, through credits and debits, superannuation Plan-related transactions into and out of the CRF.

**67**    In this regard, I pause to remind that the Superannuation Account continues to exist notwithstanding the establishment in 2000 of the Pension Funds pursuant to Bill C-78. Benefits for pensionable service prior to April 1, 2000, are, generally, charged to the Superannuation Account and paid out of the CRF (*PSSA*, s. 43).

**68**    The current *FAA* supports the view that all pension-related transactions are into and out of the CRF, and no money is deposited in or withdrawn from the Superannuation Accounts themselves. The *FAA* provides that "all public money shall be deposited to the credit of the Receiver General", and it defines "public money" as including "all money that is paid to or received or collected by a public officer under or pursuant to any Act ... and is to be disbursed for a purpose specified in or pursuant to that Act" (ss. 17 and 2). Thus, while the *PSSA* no longer refers specifically to the Superannuation Account as being an account in the CRF, the scheme of the *FAA* provides that the moneys collected under the *PSSA* form part of the CRF. Thus, the continuation of the 1944 Superannuation Account, an account in the CRF, is consistent with the financial administration legislation currently in force.

**69**    When Parliament first established the Superannuation Account, the intention was to create an accounting ledger to track the operation of the superannuation Plan. Not only does the Account record transactions into and out of the CRF, as I have explained, but the credit balance reflects an estimate of Canada's future pension liability under the *PSSA*. This is demonstrated by the fact that, when the Account is in deficit (i.e., is an understatement of the actuarial estimate of pension liabilities), the *PSSA* requires the government to record actuarial liability credits to bring the credit balance in the Account -- through annual instalments, to spread out the impact on the Public Accounts -- toward the actuarial estimate of the future pension obligation (*PSSA*, s. 44(6) to (8)). In this way, the Superannuation Account is useful from a financial reporting perspective. And it explains why it is disclosed in the Public Accounts as a government liability.

**70**    While the above discussion focuses on the Superannuation Account applicable to the Public Service Superannuation Plan, the conclusions apply equally to the other two pension plans at issue on this appeal. The Canadian Forces Superannuation Account is a continuation of the Permanent Services Pension Account established in the accounts of Canada pursuant to the *Defence Services Pension Act*, R.S.C. 1952, c. 63, as it read before March 1, 1960. The Permanent Services Pension Account was earlier enacted pursuant to *An Act to amend the Militia Pension Act*, S.C. 1946, c. 59, s. 6, and was described as "a Special Account in the Consolidated Revenue Fund". Likewise, the RCMP Superannuation Account is a continuation of the Royal Canadian Mounted Police Pension Account established in the accounts of Canada pursuant to the *Royal Canadian Mounted Police Act*, R.S.C. 1952, c. 241, as it read before April 1, 1960. The Royal Canadian Mounted Police Pension

Account was earlier enacted pursuant to *An Act to amend the Royal Canadian Mounted Police Act*, S.C. 1947-48, c. 28, s. 10, and was also said to be "a Special Account in the Consolidated Revenue Fund".

**71**    The legislation supports the finding that the Superannuation Accounts are accounting entries, rather than funded pools of assets.

(2)    The "Borrowing Theory"

**72**    The appellants' argument that the Superannuation Account contained assets did not rely on the contention that there was identifiable property in the Accounts that could be liquidated or sold. (This much was admitted by the appellants' expert, John Christie, at trial, upon cross-examination: A.R., vol. III, at 142.) His theory (the "Borrowing Theory") was instead, that "[t]he assets of the plan are a promise to pay from the government of Canada, a debt of the government of Canada" (A.R., vol. III, at pp. 142-43). In his opinion, the assets consisted of the "promise to pay to the account the amount that was owed to it by the government of Canada" (p. 147).

**73**    Scott Milne (the appellants' accountant) presented a similar opinion. He stated at trial that the government has

> effectively paid the money into the account, and then they have borrowed the money back from the account. So the end result is ... that the pension account has a receivable from the government and the government has a payable to the pension account. [A.R., vol. IV, at p. 48]

**74**    The trial judge rejected the expert evidence supporting the Borrowing Theory, and the Court of Appeal agreed. I see no reason to interfere with this finding.

**75**    The appellants argue, incorrectly in my view, that "if the Government did not borrow the amounts in the Superannuation Accounts, the only conclusion available is that it violated the *PSSA* by failing to contribute to the Accounts in the first place" (A.F., at para. 57). They assert that the experts testified at trial that the only way for the government to have met its statutory obligations without actually transferring money into the Accounts was through the Borrowing Theory. The problem, however, is that this argument is premised on a legally incorrect interpretation of the governing legislation. As already discussed, the Superannuation Accounts were -- and are -- legislated ledgers to track Plan-related CRF transactions and to estimate the government's pension liabilities to Plan members. In short, they are accounting records -- that is to say, *information* -- not repositories of assets capable of holding property.

**76**    For the appellants' Borrowing Theory to hold together, it must be possible to say that the government was required to contribute property to the Superannuation Accounts, and that it was, in fact, borrowing this property back and depositing it into the CRF for public purposes. However, if the Superannuation Accounts are informational accounting records, as I have already concluded

they are, this is manifestly impossible. There can be no transfer of actual property to -- or borrowing from -- an informational record. The property is, and always was, elsewhere: viz., prior to April 1, 2000, the legislation contemplated that all property associated with the operation of the Plans was to be held in, and ultimately be paid out of, the CRF. Throughout the operation of the Superannuation Accounts, there was no intermediate step in which any property should have gone into the Accounts, only to be immediately borrowed back by the government. Not only were such "offsetting cheques" (A.R., vol. IV, at p. 51) not contemplated by the legislation, but the trial judge also found as a fact that this is not how the government was operating the Accounts. Legislatively, the Accounts were informational records incapable of holding assets; in practice, they were treated as such. There was no borrowing from them; there was no debt owing to them; there was no property in them.

**77**    As I have said, the *Superannuation Acts* required the government to record accounting credits and debits to track the operation of the Plans, and to pay the statutorily defined benefits to members out of the CRF. But they did *not* require the government to transfer assets into the Accounts, nor did they require the government to "borrow" from the Accounts or to place paperless government receivables in them to reflect this "borrowing". The suggestion that any of this was statutorily required is not reflected in the relevant legislation. The Superannuation Accounts were intended to be, and were, part of the government's accounting system. Contrary to the appellants' contention, the Accounts were not capable of holding assets.

**78**    The appellants also put before the Court various government documents and reports that refer to "borrowing" from the Superannuation Accounts. In the Auditor General's 1991 report to the House of Commons, for example, it is stated that a

> substantial portion of the government's budgetary deficit is financed through internal non-cash borrowing from specified purpose accounts (SPAs)... . These borrowings do not involve cash but rather result from a deferral of payments of contributions and interest owed by the government to the third parties on whose behalf the SPAs are administered. [A.R., vol. IV, at p. 233]

**79**    Similarly, it is written in the 1994 report of the Economic Analysis and Forecasting Division, entitled "Public Service Pension Review: The Macroeconomic Impacts of Investing in A Diversified Portfolio of Market Assets":

> At present, the pension funds are, in effect, segmented off from the capital market. They constitute a pool of funds to which only the government has access. The Government 'borrows' from the fund and credits the fund with interest as if the borrowing was done exclusively through 20-year Government of Canada bonds. [A.R., vol. V, at p. 167]

**80**    It is important, however, to understand these references to "borrowing" in context. As the Treasury Board Secretariat explained in its response to the Auditor General's 1991 report:

> The government does not borrow funds directly from the public service pension accounts to finance other spending activities. The government has borrowed from the pension accounts only in the sense that by not raising money to invest required employee and government contributions in marketable securities it has not had to borrow money in the capital markets. [A.R., vol. IV, at p. 237]

**81**    There is a difference between saying that the effect of the superannuation scheme operates *as if* the government were borrowing from the capital markets, without actually doing so -- as the Treasury Board Secretariat explains -- and saying the government is *actually* borrowing *from* the Superannuation Accounts, in the sense that a debt is owing *to* the Accounts (such that the Accounts hold government receivables). The legislation does not support the appellants' contention that there was borrowing from the Accounts. The superannuation scheme reflects "internal borrowing" only in the sense that it avoids, by design, the need for the external borrowing that would otherwise be required to finance the government's pension obligations.

**82**    It remains only to dispose of the appellants' reliance on *Ermineskin Indian Band and Nation v. Canada*, 2009 SCC 9, [2009] 1 S.C.R. 222. In that case, this Court was concerned with the Crown's obligations in respect of oil and gas royalties collected on behalf of Aboriginal bands. The Crown deposited the royalties into the CRF and credited interest based on the market yield of long-term government bonds. Superficially relevant to this appeal is the discussion in that case of the Crown's "borrowing" of royalty moneys. The bands argued that the Crown was in breach of its fiduciary duty because (1) a trustee is not permitted to borrow from a trust fund, and (2) by holding the royalties in the CRF for use by the Crown, the Crown was engaged in "forced borrowing" of the assets in the trust (para. 126). This Court agreed that the "Crown is borrowing the bands' money held in the CRF" (para. 127). However, it concluded that this practice was not a breach of the Crown's fiduciary duty because the "borrowing" was required by legislation (para. 127).

**83**    It might be said that similar type of "borrowing" is reflected in the present appeal. While the government owed future obligations to the Plan members (their statutorily defined benefits), it had the use of current funds in the CRF, including the amounts of employee contributions withheld from their pay cheques. Likewise, by not having to withdraw funds from the CRF to satisfy its own contribution obligations, the government continued to have the use of funds that it would have otherwise had to set aside to invest in marketable securities. As already discussed, however, it does not follow from this "internal borrowing" that the Superannuation Accounts contain government receivables: the Superannuation Accounts are no more than legislated accounting records. *Ermineskin* does not suggest otherwise.

**84**    Further, in *Ermineskin*, the Crown received royalty moneys "in trust" for the bands, and the Court concluded that the relationship between the Crown and the bands was "trust-like in nature" (para. 74). Upon collecting the royalty moneys, "in trust", the Crown was statutorily required to retain them in the CRF (para. 127). In other words, the legislation required the Crown to take property that was subject to a "trust-like" fiduciary duty, collected on behalf of beneficiaries, and to

deposit it into the CRF for public use. It is accurate to describe this statutory scheme as involving the public "borrowing" of property from the "trust". This is in contrast to the present case: the government did not undertake, expressly or impliedly, to act in the best interests of Plan members with respect to the actuarial surplus (discussed below). The Superannuation Accounts are just accounting records and they are not funds, nor are they "trust-like", such that it is possible to borrow from them.

**85**    Accordingly, the courts below were right to reject the Borrowing Theory. Panet J. correctly found that, "[i]n fact, there is no such borrowing and there is no amount owing by the government to the Superannuation Account of each plan" (para. 222).

(3)    The Word "Assets"

**86**    The appellants point out that the *Superannuation Acts* and the *PPRA* use the word "assets" in connection with the Superannuation Accounts.

**87**    The 1954 version of the *PSSA* required the reporting of "an estimate of the extent to which the assets of the said [Superannuation] Account are sufficient to meet the cost of the benefits payable under this Act" (s. 33). The *PPRA* provides that the "Minister shall cause a certification of the assets of a pension plan established under the *Canadian Forces Superannuation Act*, ... the *Public Service Superannuation Act*, [and] the *Royal Canadian Mounted Police Superannuation Act* ... to be made and a report thereof to be filed" (s. 8). The *PPRA* also refers to the "going concern assets" of the Plans (s. 7).

**88**    These provisions pre-date Bill C-78, which amended the *Superannuation Acts* to make specific reference to the *PPRA*. From September 14, 1999, onward, the *PSSA*, for example, provided:

> **45.** In accordance with the *Public Pensions Reporting Act*, a cost certificate, an actuarial valuation report and an assets report on the state of each of the Superannuation Account, the Public Service Superannuation Investment Fund and the Public Service Pension Fund shall be prepared, filed with the Minister designated under that Act and laid before Parliament.

**89**    The appellants say that these legislative references mean that the Superannuation Accounts contain assets, in the sense that there is something of value in the Accounts to which the Plan members could have an equitable interest.

**90**    In my view, the word "assets" in the *Superannuation Acts* and the *PPRA*, when it is used in connection with the Superannuation Accounts, refers to the credit balances reflected in the Accounts. As discussed above, the actual moneys related to pension contributions remained in the CRF until paid out to members, and the Accounts did not contain government debt. The Superannuation Accounts themselves reflect accounting credits and debits. Prior to Bill C-78, there

was no mechanism in the *Superannuation Acts*, or elsewhere, to direct payments into a separate pension fund.

**91**     Accordingly, the word "assets" in the legislation cannot indicate that the Superannuation Accounts contain any property to which the Plan members could have an interest. I would not, however, agree with the Court of Appeal's suggestion that the Parliamentary use of the word "assets" reflects "sloppy use of language" (para. 49). Rather, the word "asset" is being used in the *Superannuation Acts* and the *PPRA* in a different sense: as Panet J. said in respect of the actuarial reports periodically submitted to Parliament, the term "assets" refers to the credit balances in the Superannuation Accounts (para. 228). The same, in my view, applies to the legislation. It is simply a matter of definition.

(4)    Extrinsic Aids

**92**     The appellants rely on several representations by government to the effect that the Superannuation Accounts contain assets. The authority to rely on such representations is found in *Schmidt*, where Cory J. stated:

> Documents not normally considered to have legal effect may nonetheless form part of the legal matrix within which the rights of employers and employees participating in a pension plan must be determined. Whether they do so will depend upon the wording of the documents, the circumstances in which they were produced, and the effect which they had on the parties, particularly the employees. [p. 669]

**93**     In *Burke,* however, this Court determined that, where the relevant articles in the plan documents were unambiguous, it was not necessary to consider surrounding documents (in that case, employer pension booklets) as interpretative aids.

**94**     *Schmidt* and *Burke* were decided in the private law context. As this case involves statutory plans, the considerations are different. Specifically, it is necessary to consider the law on extrinsic evidence in statutory interpretation.

**95**     As this Court reiterated in *Bell ExpressVu Limited Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559, "[i]t is only when genuine ambiguity arises between two or more plausible readings, each equally in accordance with the intentions of the statute, that the courts need to resort to external interpretive aids" (para. 29 (emphasis deleted), quoting *CanadianOxy Chemicals Ltd. v. Canada (Attorney General)*, [1999] 1 S.C.R. 743, at para. 14).

**96**     I have found that the *Superannuation Acts* require the Superannuation Accounts to operate like accounting records, tracking pension-related payments that are made into and out of the CRF. The Accounts are not required by the *Superannuation Acts* to be segregated, funded accounts, that receive or make any actual payments themselves; thus, the legislation does not require them to

contain assets. The language in the legislation is quite consistent: "assets" simply has a statutorily specific meaning, namely, the credit balances in the Accounts. However, even were it appropriate to look at extrinsic materials, they do not assist the appellants for the reasons that follow.

**97**　　The appellants present documents that were produced years after the Superannuation Accounts were established. They have not pointed to documents coinciding with (or preceding) the creation of the Superannuation Accounts, which, as noted above, are *continued* by the current *Superannuation Acts*.

**98**　　The appellants' documents therefore reflect subsequent governments' interpretations of previous Parliamentary work (*United States of America v. Dynar*, [1997] 2 S.C.R. 462, at para. 45). However, as Cory and Iacobucci JJ. wrote in the context of subsequent legislative history, "in matters of legal interpretation, it is the judgment of the courts and not the lawmakers that matters. It is for judges to determine what the intention of the enacting Parliament was" (*Dynar*, at para. 45). Accordingly, it is necessary to be cautious when relying on the many subsequent government documents to which the appellants have referred the Court.

**99**　　Further, Parliament, which created the Superannuation Accounts, is to be distinguished from the executive branch of government, which administers them. Although it is not impossible that governmental documents could assist in the interpretation of legislation, the words of subsequent government Ministers and bureaucrats offer minimal guidance in identifying Parliament's intention concerning the Superannuation Accounts.

**100**　　The appellants present one Parliamentary debate that took place prior to the enactment of Bill C-78. In February 1992, the President of the Treasury Board said, when introducing Bill C-55, that the "bill also proposes that all [superannuation] plans should henceforth be operated on a fully funded basis" (*House of Commons Debates*, vol. VI, 3rd Sess., 34th Parl., February 24, 1992, p. 7486). He went on to say that the *Superannuation Acts* would be amended to "consolidat[e] the assets and obligations in respect of each [sector]" (p. 7486).

**101**　　However, Bill C-55, which was enacted as S.C. 1992, c. 46, did nothing to change the nature of any of the Superannuation Accounts. The Accounts did not hold actual assets before 1992, and the amendments did not change this fact.

**102**　　The notion that Bill C-55 made the Superannuation Accounts "fully funded" is also found in the 1993 document "Treasury Board Secretariat and Department of Finance Study of the Implications of the Current and Alternative Methods of Financing Federal Public Service Pensions". With respect to the words "fully funded", the document states: "Among other provisions of Bill C-55, the Superannuation Acts were amended to require, effective April 1991, that the plans be fully funded; that is, that contributions be made each month by the Government which, together with employee contributions and interest credits, are sufficient to provide for the cost of the benefits that have accrued in respect of that month" (A.R., vol. V, at p. 221). In other words, "fully funded" in this context refers to government contribution credits that must be made to record the cost of

benefits accruing each month. It does not refer to an identifiable fund of assets set aside to cover the government's pension liabilities.

**103**     The appellants also present a Treasury Board document entitled "Basic Facts about Pensions in the Public Service of Canada", dated October 18, 1976. The Treasury Board expressly denied that the Plans (other than indexation benefits) were "pay-as-you go". Rather, the Treasury Board said that the "basic pensions are fully funded in a government account" (A.R., vol. V, at p. 11). The "Basic Facts" document explained the meaning of "fully funded" as follows: "This means that pensions are provided for in such a way that, if the Plan were suddenly terminated, the Account would, without further contributions but with future interest earnings, have sufficient credits to meet the pension payments ..." (A.R., vol. V, at pp. 10-11).

**104**     The description of the Accounts as "fully funded" is also found in an undated pension booklet which was at one time given to federal employees (A.R., vol. V, at p. 83). And, as in the *Superannuation Acts*, the language of "assets" can be found in various internal and external governmental documents (see e.g. "Public Service Pensions", January 1970 (A.R., vol. V, at p. 5).

**105**     While the government documents presented by the appellants use language stating that the Accounts contain assets, other government documents, presented by the government, support the argument that they do not. The Auditor General has several times expressed -- in his official observations on the Public Accounts -- that the Superannuation Accounts are "unfunded pensions, in the sense that assets have not been set aside to pay for ultimate pension benefits" ("Supplementary Information: Observations by the Auditor General on the Financial Statements of the Government of Canada and the Statement of Transactions of the Debt Servicing and Reduction Account", in *Public Accounts of Canada 1997* (1997), vol. I, 1.25, at p. 1.28; see also "Supplementary Information: Observations by the Auditor General on the Financial Statements of the Government of Canada, the Statement Required Under the *Spending Control Act* and the Statement of Transactions of the Debt Servicing and Reduction Account", in *Public Accounts of Canada 1996* (1996), vol. I, 1.24, at p. 1.27).

**106**     Similarly, the Towers Perrin consulting report, "Return Expectations for the Public Service Superannuation Fund", prepared for the Department of Finance and Treasury Board in 1993, states that, "[i]n the case of the PSSF [the "Public Service Superannuation Fund"], the plan is not 'funded' in the sense of an externally invested trust fund, but it is accounted for and actuarially treated as if it were" (A.R., vol. V, at p. 145 (emphasis added)). In this document, the Plans are referred to as "notionally-funded".

**107**     In my view, even if reference to extrinsic aids was appropriate, the extrinsic evidence available is inconclusive. Nor does it afford insight into the intention of Parliament when creating the Superannuation Accounts. Thus, I cannot give much weight to the documents presented by the appellants in their submissions. It would appear that, from time to time, government officials have inaccurately described the Superannuation Accounts in publications and internal communications.

(5)    Conclusion on Whether the Superannuation Accounts Contain Assets

**108**    For the reasons given, I agree with the courts below that the Superannuation Accounts do not hold assets -- not even the government receivables that the appellants suggest they contain. The *Superannuation Acts* created the Accounts to track Plan-related CRF transactions and to estimate the government's pension liabilities to Plan members. In this way, they are accounting records, not funded and segregated pools of assets. When the word "assets" is used in the legislation in reference to the Superannuation Accounts, it merely signifies their credit balances, not anything of value to which the appellants could have an interest.

**109**    The courts below were correct to reject the theory that the government borrowed from the Accounts, placing in them promises to pay by the government (the purported assets in the Accounts). This theory is inconsistent with the legislation in that it assumes that the government was required to contribute property into the Accounts in the first place. As the Accounts are no more than accounting records, this would have been impossible. Prior to April 1, 2000, all of the real money associated with Canada's pension scheme remained unsegregated in the CRF, until benefits were actually paid -- out of the CRF -- to Plan members.

**110**    I have concluded that the Superannuation Accounts do not contain assets. Therefore, there was no property in respect of which Plan members can have a legal or equitable interest. However, even if the Accounts did contain assets, the appellants have not established that Plan members have a proprietary interest in either their contributions made or in the government credits under the *Superannuation Acts*.

**111**    On a plain reading of the *Superannuation Acts*, there is no suggestion that the Plan members have a proprietary interest in their contributions. Contributing employees can claim no continuing property interest in these amounts. In exchange for their contributions, and with each year of pensionable service, employees gain a legal entitlement to a future benefit. That is the nature of this defined benefit plan.

**112**    The appellants asserted that employees have an interest in both the employee and employer contributions, plus interest, on the basis that they form part of employees' total compensation. Even if it were to be assumed that employees have an interest in the contributions at the point in time at which their salaries are to be paid to them, no interest in these amounts could survive the requirement in the *Superannuation Acts* that they be paid into the CRF and credited to the Accounts. Rather, this is the "cost" paid by employees for the future legal entitlement to their statutorily defined benefits. The *Superannuation Acts* also do not establish that employees have an equitable interest in the amounts credited to the Accounts. They provide only a legal entitlement to statutorily defined pension benefits.

B.    *Did the Government Owe a Fiduciary Duty to the Plan Members?*

(1)    Was There a Fiduciary Relationship Between the Government and the Plan Members?

**113**    Fiduciary relationships may be either *per se* or *ad hoc*. The former refers to those relationships that the law presumes to be -- and characterizes as -- fiduciary (*Galambos v. Perez*, 2009 SCC 48, [2009] 3 S.C.R. 247, at paras. 36-37). The recognized categories give rise to fiduciary duties "because of their inherent purpose or their presumed factual or legal incidents" (para. 36). The existence of an *ad hoc* fiduciary relationship, on the other hand, is determined on a case-by-case basis. Whereas the *per se* categories describe relationships in which the fiduciary character is "innate", *ad hoc* fiduciary relationships arise from the specific circumstances of a particular relationship (*Galambos*, at para. 48).

**114**    The appellants argue that the Court of Appeal erred in failing to find that the government was a *per se* fiduciary in its role as plan administrator. Alternatively, they say that the Court of Appeal erred in failing to find an *ad hoc* fiduciary relationship in the circumstances: "the Government had undertaken to act in the Plan Members' best interests with respect to their pension contributions; the Plan Members were in a vulnerable relationship in which the Government had significant discretion; and the Government could exercise this discretion to affect the Plan Members' interests" (A.F., at para. 67). According to the appellants, that interest includes both receiving pension benefits and ensuring that their contributions were maintained to be used for pension purposes.

**115**    Chief Justice McLachlin recently listed the *per se* fiduciary relationships in *Alberta v. Elder Advocates of Alberta Society*, 2011 SCC 24, [2011] 2 S.C.R. 261, identifying the following: trustee-*cestui que trust*, executor-beneficiary, solicitor-client, agent-principal, director-corporation, guardian-ward, and parent-child.

**116**    In this case, the government does not fall into any of these categories. The closest category (trustee-*cestui que trust*) does not apply because the government is not a true trustee in equity in respect of any trust property held for the benefit of the Plan members. The appellants contend, however, that the government is in a recognized fiduciary role in its capacity as a pension plan administrator.

**117**    The administrator/pension Plan member relationship was dealt with in *Burke*. This Court found that the indicia of an *ad hoc* fiduciary relationship were met.

**118**    However, the authority of *Burke* on this point is limited to the private pension plan context. Participants in public pension plans are not subject to the same vulnerabilities or risks as participants in private pension plans. The government stands behind the pension plans that it provides for its employees, and is not subject to the same sort of credit risks as are private entities. Furthermore, this Court recognized in *Elder Advocates* that while the Crown is subject to the normal requirements for establishing an *ad hoc* fiduciary relationship, "the special characteristics of governmental responsibilities and functions mean that governments will owe fiduciary duties only in limited and special circumstances" (para. 37). McLachlin C.J. in that case quoted Dickson J., as

he then was, writing for the majority in *Guerin v. The Queen*, [1984] 2 S.C.R. 335, at p. 385:

> It should be noted that fiduciary duties generally arise only with regard to obligations originating in a private law context. <u>Public law duties, the performance of which requires the exercise of discretion, do not typically give rise to a fiduciary relationship.</u> As the "political trust" cases indicate, the Crown is not normally viewed as a fiduciary in the exercise of its legislative or administrative function. [Emphasis added by McLachlin C.J.; para. 37.]

**119**    Binnie J. made the same point writing for the Court in *Wewaykum Indian Band v. Canada*, 2002 SCC 79, [2002] 4 S.C.R. 245, at para. 96: "The Crown can be no ordinary fiduciary; it wears many hats and represents many interests, some of which cannot help but be conflicting ... ." The same principle also dictates that the Crown will not be presumed to be a fiduciary based solely on its role bearing a similarity to a traditional category of fiduciary.

**120**    It is not necessary to decide the precise ambit of any potential fiduciary duty that might arise between the government, as pension plan administrator, and the beneficiaries of the Plan, or whether the relationship inherently carries with it some set of fiduciary obligations. This is because it is clear that the government had no fiduciary duty to the Plan members with respect to the actuarial surplus. This is demonstrated under the template provided for identifying *ad hoc* fiduciary duties in *Frame v. Smith*, [1987] 2 S.C.R. 99, and *Elder Advocates*.

**121**    Beginning with Wilson J.'s dissenting opinion in *Frame*, and subsequently adopted by the majority of this Court (see e.g. *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377), the following characteristics were said to identify those relationships where fiduciary obligations had been imposed.

> (1)    The fiduciary has scope for the exercise of some discretion or power.
> (2)    The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
> (3)    The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power. [p. 136]

**122**    Most recently, in *Elder Advocates*, McLachlin C.J. stated that the aforementioned characteristics were useful but did not provide a complete code. This Court adopted the *Hodgkinson* factors, but added the requirement of an undertaking by the alleged fiduciary to act in the best interest of the alleged beneficiary or beneficiaries.

**123**    Each lower court in this case applied the earlier version of the test, as *Elder Advocates* had not yet been decided.

> (2)    <u>Undertaking to Act in the Best Interest of the Alleged Beneficiary</u>

**124**    It is now definitely a requirement of an *ad hoc* fiduciary relationship that the alleged fiduciary undertake, either expressly or impliedly, to act in accordance with a duty of loyalty. It is critical that the purported beneficiary be able to identify a forsaking of the interests of all others on the part of the fiduciary, in favour of the beneficiary, in relation to the specific interest at issue.

**125**    I have been able to identify nothing in the *Superannuation Acts*, the *FAA*, or the *PPRA* that supports the contention that the government has undertaken to forsake the interests of all others (including taxpayers) in favour of the Plan members, with respect to the actuarial surplus -- the specific interest at issue here.

**126**    By contrast, Bill C-78 establishes a legislated undertaking on the part of the Board (the administrator of the new Pension Funds) to act in the best interest of contributors, but only in respect of post-April 1, 2000 contributions. Section 4(1)(*a*) of Bill C-78 provides that the Board is "to manage amounts that are transferred to it ... in the best interests of the contributors and beneficiaries under those Acts". These words are not found in the *Superannuation Acts* in respect of the Superannuation Accounts.

**127**    I am reinforced in the view that there was no undertaking here by the Chief Justice's comment in *Elder Advocates* that, where the issue relates to the exercise of a government power or discretion, the required undertaking will generally be lacking. As the Chief Justice said, at para. 44, an undertaking of a duty of loyalty by the government

> is inherently at odds with its duty to act in the best interests of society as a whole, and its obligation to spread limited resources among competing groups with equally valid claims to its assistance: *Sagharian (Litigation Guardian of) v. Ontario (Minister of Education)*, 2008 ONCA 411, 172 C.R.R. (2d) 105, at paras. 47-49. The circumstances in which this will occur are few. The Crown's broad responsibility to act in the public interest means that situations where it is shown to owe a duty of loyalty to a particular person or group will be rare: see *Harris v. Canada*, 2001 FCT 1408, [2002] 2 F.C. 484, at para. 178.

And further, "[i]f the undertaking is alleged to flow from a statute, the language in the legislation must clearly support it" (para. 45). The *Superannuation Acts* do not. Accordingly, I would conclude that there has been no undertaking to act in accordance with a duty of loyalty with respect to the actuarial surplus at issue here. There is not, therefore, a fiduciary relationship between the government and the Plan members. However, for the sake of completeness, I will consider the other elements of the test.

> (3)    <u>Were the Plan Members Vulnerable to the Exercise of Discretion by the Government?</u>

**128**    The second element of an *ad hoc* fiduciary relationship, following *Elder Advocates*, at para. 33, requires (1) a defined *person or class of persons* (i.e., the beneficiary or beneficiaries), who is or

are (2) *vulnerable* to the fiduciary, (3) in that the fiduciary has a *discretionary power* over them.

**129**    In this case, there is no doubt that there is a defined class of persons capable of being the beneficiaries in the alleged fiduciary relationship. The class consists of the current and former employee-contributors and their beneficiaries. The issue is whether the government had a discretionary power over this class of persons in relation to the Superannuation Accounts. Following Bill C-78, the Pension Investment Board and the Treasury Board had clear discretionary powers in relation to the management of the new Pension Funds, including the setting of employee contribution rates (the latter only following January 1, 2004). As the appellants seek an equitable interest in the Superannuation Accounts as they stood on March 31, 2000, the question is whether the government had a discretionary power in relation to the administration of the Superannuation Accounts prior to Bill C-78 coming into force (April 1, 2000).

**130**    If, as the trial judge found, the *Superannuation Acts* constituted a complete code with respect to the actuarial surplus, the government would have no discretionary power to exercise with respect to the surplus so as to affect any interest the Plan members may have in the surplus. The concept of a "complete code" was discussed in *Gladstone v. Canada (Attorney General)*, 2005 SCC 21, [2005] 1 S.C.R. 325. In that case, the Department of Fisheries and Oceans seized and sold spawn that Donald and William Gladstone were accused of attempting to sell in violation of the *Fisheries Act*, R.S.C. 1985, c. F-14. Pursuant to that Act, the Department deposited the net proceeds of the sale in the CRF. The proceedings against the Gladstones were eventually stayed, and the net proceeds from the sale were paid to them. However, the Attorney General refused to pay interest.

**131**    This Court concluded that the *Fisheries Act* is a "complete code" dealing with the return of seized property (*Gladstone*, at para. 9). Major J. reasoned that the Act "creates a comprehensive framework for dealing with issues arising from seizure" (para. 10). Thus, the Act did not create an obligation on the Crown to pay interest on the proceeds of seized property.

**132**    I agree with Gillese J.A. that the *Superannuation Acts* were not "complete codes" as these are described in *Gladstone*, before the amendments made by Bill C-78 on April 1, 2000. Prior to that bill coming into force, the *Superannuation Acts* did not address the surpluses in the Superannuation Accounts. While the *Superannuation Acts* dealt with the accounting of deficits, there was no mention of surpluses. Thus, the *FAA* -- which gave the President of the Treasury Board and the Minister of Finance discretion to include adjustment accounts in the Public Accounts -- was employed to supplement the accounting rules in the *Superannuation Acts* (*FAA*, s. 64(2)(*d*)). The government was entitled to exercise its discretion to amortize the surplus because of the absence of provisions in the *Superannuation Acts* governing the actuarial surpluses. Gillese J.A. correctly concluded that the *Superannuation Acts* were not a complete code prior to April 1, 2000.

**133**    However, as I have explained, the accounting treatment of the surpluses (the amortization) in respect of which the government exercised a discretion did not alter the accounting balances in the Superannuation Accounts; it only altered the representation of the financial position of the

Government of Canada in the Public Accounts.

**134**    As earlier determined, prior to Bill C-78 coming into force, the government exercised discretion in respect of the surplus in the Public Accounts. Section 63(2) of the *FAA* provides that the Receiver General "shall cause accounts to be kept to show such of the assets and direct and contingent liabilities of Canada and shall establish such reserves with respect to the assets and liabilities as, in the opinion of the President of the Treasury Board and the Minister, are required to present fairly the financial position of Canada". Further, s. 64(2)(*d*) of the *FAA* provides that the Public Accounts shall include "such other accounts and information relating to the fiscal year as are deemed necessary by the President of the Treasury Board and the Minister to present fairly the financial transactions and the financial position of Canada".

**135**    While the *FAA* requires the Receiver General to present fairly the financial position of Canada, the President of the Treasury Board and the Minister of Finance have flexibility when it comes to establishing the necessary accounts and adjustments. The amortization, which included the creation of the "Estimate of Pension Adjustments" accounts to set off the overstated liabilities (the actuarial surplus) in the Superannuation Accounts, may be seen as an example of a discretionary decision directed at the accurate presentation of the Public Accounts.

**136**    Prior to Bill C-78, the surpluses reflected in the Superannuation Accounts were left intact. The surpluses were not debited until Bill C-78 required such debiting after April 1, 2000. The amortization in the 1990s was reflected only in the Public Accounts, for the purpose of accurately presenting the true net state of Canada's deficit or surplus and net debt. This was an accounting decision, not a decision going to the substance of the Plan members' entitlements or interests. As the appellants' expert accountant asserted on cross-examination, accounting does not determine the substance of a transaction.

**137**    I agree that there was a discretionary power exercised in connection with the amortization of the Superannuation Accounts in the 1990s. However, this particular discretion existed for, and was exercised in connection with, the presentation of the Public Accounts, rather than the administration of the Plan members' pensions. The Plan members' entitlement to their statutorily defined benefits, remained unchanged and remained subject to Parliament's legislative prerogative, not the government's discretion. Therefore, the discretion exercised by the government in respect of the Public Accounts was irrelevant to the existence of a fiduciary duty in favour of the Plan members. I conclude that the appellants are unable to establish vulnerability to the government's exercise of discretion.

<div align="center">

(4)    <u>Did the Plan Members Have a Substantial Legal or Practical Interest in the Actuarial Surplus?</u>

</div>

**138**    In order to establish an *ad hoc* fiduciary relationship, the purported beneficiary must have an "identifiable legal or vital practical interest that is at stake" (*Elder Advocates*, at para. 35). In *Elder Advocates*, the Chief Justice gave the following examples of sufficient interests: "... property rights,

interests akin to property rights, and the type of fundamental human or personal interest that is implicated when the state assumes guardianship of a child or incompetent person" (para. 51). A statutory interest may also qualify in some circumstances: "... a statute that creates a complete legal entitlement might also give rise to a fiduciary duty on the part of government in relation to administering the interest" (para. 51).

**139**    As I have concluded that the Superannuation Accounts do not contain assets, the amortization of the surpluses cannot have put any of the Plan members' legal or equitable interests at risk. However, the Court of Appeal suggested that the members had a vital practical interest at stake. According to that court, "the exercise of Discretion led to the situation where the employees were obliged to contribute more towards the cost of their pensions" (para. 90).

**140**    Though the Court of Appeal did not finally decide the matter, in my respectful opinion, its perception of the effect of the exercise of discretion on contribution rates is not supported by the evidence. I cannot agree that the amortization or debiting of the Superannuation Accounts caused increases in contribution rates. The government says that in 2006 the Minister started exercising the discretion conferred upon him by Bill C-78 to raise the employee contribution rates up to a maximum of 40 percent of the total required from both employees and the government. In oral argument, the government indicated that during Parliamentary debates on Bill C-78, the government explained that the Minister would be given discretion to increase rates because the contribution ratios between government and Plan members had gone from 60/40, historically, to 70/30, and were projected to go to 80/20. The government indicated that it desired a return to the historical 60/40 contribution rate.

**141**    In any event, as the Chief Justice explained in *Elder Advocates*, the interest at issue must be a specific private law interest, and the entitlement at stake "must not be contingent on future government action" (para. 51). Federal employees are not entitled to any specific contribution rate, whether the contribution is determined by Parliament (as it was prior to January 1, 2004), or by the Treasury Board (starting January 1, 2004). The Plan members did not have a specific private law interest in any prescribed contribution rates such as to ground a fiduciary duty.

(5)    Conclusion on Fiduciary Relationship

**142**    For these reasons, I conclude that there was no *ad hoc* fiduciary relationship between the government and the Plan members with respect to the actuarial surplus reflected in the Superannuation Accounts. Most importantly, the government did not undertake, either expressly or impliedly, to act in the best interests of the Plan members with respect to the actuarial surplus. Without such an undertaking of loyalty in favour of these particular stakeholders, the government's duty was to act in the best interests of society as a whole. This is inconsistent with the existence of a fiduciary duty. Moreover, while the government exercised discretion in its accounting treatment of the surpluses in the Superannuation Accounts, the Plan members were not vulnerable to that discretion, nor did they have any legal or practical interest at stake. The effect of the amortization

was to disclose more accurately Canada's actual pension obligations, not to affect Plan members' statutory entitlements under the Plans.

C.    *Should a Constructive Trust Be Imposed Over the Balances in the Superannuation Accounts as of March 31, 2000?*

(1)    Equitable Obligation

**143**    In order to succeed, the appellants must establish that they have an equitable interest in the actuarial surplus reflected in the Superannuation Accounts, as their legal interest is limited to their entitlement to statutorily defined benefits. They have not pursued their express trust argument on appeal; they have not argued that a resulting trust has arisen in their favour; therefore, a constructive trust is the only basis upon which an "equitable interest" might be recognized in the actuarial surplus (A. F., at para. 142).

**144**    Since this Court's decision in *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217, there have been two grounds on which a court can impose a constructive trust: (1) breach of an equitable obligation, and (2) unjust enrichment. The appellants have argued both in this appeal.

**145**    In *Soulos*, McLachlin J. (as she then was) held that a constructive trust "may be imposed where good conscience so requires" (para. 34). In her view, good conscience might require the imposition of such a trust in two situations: (1) where property is obtained wrongfully by the defendant (such as by breach of fiduciary duty or breach of loyalty), or (2) where the defendant has been unjustly enriched.

**146**    Regarding the first category, McLachlin J. identified four conditions which are generally required before a constructive trust for wrongful conduct may be imposed:

(1)    The defendant must have been under an equitable obligation, that is, an obligation of the type that courts of equity have enforced, in relation to the activities giving rise to the assets in his hands;

(2)    The assets in the hands of the defendant must be shown to have resulted from deemed or actual agency activities of the defendant in breach of his equitable obligation to the plaintiff;

(3)    The plaintiff must show a legitimate reason for seeking a proprietary remedy, either personal or related to the need to ensure that others like the defendant remain faithful to their duties and;

(4)    There must be no factors which would render imposition of a constructive trust unjust in all the circumstances of the case; e.g., the interests of intervening creditors must be protected. [*Soulos*, at para. 45]

**147**    I have found that the government was not subject to a fiduciary obligation in relation to its

management of the Plans, and the appellants have not argued that the government has breached any other equitable obligation that it had to the Plan members. The appellants' argument fails on the first requirement of the *Soulos* test. I therefore turn to the other basis on which a constructive trust may be imposed: unjust enrichment.

(2)    Unjust Enrichment

**148**    As this Court found in *Elder Advocates*, it is possible to claim unjust enrichment against the government (provided the issue is not restitution for taxes paid under an *ultra vires* statute).

**149**    In order to prove a claim in unjust enrichment, the plaintiff must establish: (1) an enrichment of the defendant; (2) a corresponding deprivation of the plaintiff; and (3) an absence of juristic reason for the enrichment (*Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575 ("*Pacific National*"), at para. 14). Where these elements are satisfied, the remedy of constructive trust may be available, if (1) "monetary damages are inadequate", and (2) "there is a link between the contribution that founds the action and the property in which the constructive trust is claimed" (*Peter v. Beblow*, [1993] 1 S.C.R. 980, at p. 988).

**150**    As Binnie J. explained in *Pacific National*, at para. 15, "[a]n enrichment may 'connot[e] a tangible benefit' ..., or it can be relief from a 'negative', such as saving the defendant from an expense he or she would otherwise have been *required* to make" (emphasis in original).

**151**    Following this Court's decision in *Peter v. Beblow*, the enrichment must correspond with a deprivation from the plaintiff. While the test for unjust enrichment is typically articulated as having three elements, it is important to recognize that the enrichment and detriment elements are the same thing from different perspectives. As Dickson C.J. suggested in *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38, cited by Cory J. in his concurring reasons in *Peter v. Beblow*, at p. 1012, the enrichment and the detriment are "essentially two sides of the same coin".

**152**    The "straightforward economic approach", as described in *Pacific National*, to enrichment and detriment, is properly understood to connote a transfer of wealth from the plaintiff to the defendant (para. 20). As the purpose of the doctrine is to reverse unjust transfers, it must first be determined whether wealth has moved from the plaintiff to the defendant.

**153**    Accordingly, the first inquiry is not whether the government was somehow enriched or benefitted by amortizing or removing the surpluses in the Superannuation Accounts. Rather, the question is whether the government was enriched at the appellants' expense. Even if it could be shown that the government benefited in some way by reducing the stated financial obligations of Canada, it would not assist the appellants unless the gain corresponded to the appellants' loss.

**154**    As the Superannuation Accounts are mere accounting records, and do not contain assets in which the appellants have an interest, no enrichment and corresponding deprivation can be found in either (1) the government's decision prior to April 1, 2000, to amortize the surpluses for accounting

purposes under the *FAA*, or (2) Parliament's decision to enact Bill C-78 to require the debiting of a portion of the surplus directly from the Accounts.

**155**    The Court of Appeal found that there was no enrichment because "whatever benefit there was to such actions enured to all Canadian taxpayers" (para. 106). I do not understand the nature of the inquiry in the same way. The enrichment and corresponding deprivation elements ask whether there was a transfer of wealth from the plaintiff to the defendant. The fact that the defendant is a public body is irrelevant to whether such a transfer of wealth took place. Indeed, this reasoning would have the effect of insulating the government from any claim for unjust enrichment.

**156**    The Court of Appeal indicated that there might have been a deprivation because the government's actions "were detrimental to plan members if for no other reason than the fact that those actions apparently led to increases in plan member contribution rates" (para. 107). As I observed in connection with the issue of whether the Superannuation Accounts contained assets, the evidence does not support such an alleged deprivation.

**157**    Further, if the increase in contribution rates did constitute a deprivation, the corresponding enrichment could only be the additional deductions taken from employee pay cheques following the rate hikes, and not the amount of the surpluses amortized and removed. But the appellants have sought a declaration that they have an equitable interest in the balances in the Superannuation Accounts as at March 31, 2000, and not the return of the increased contributions after Bill C-78 came into force. Accordingly, on the argument that increased contribution rates constituted a deprivation, there is no link between the alleged deprivation and the property right they seek, the return of the amortized surplus and subsequently debited surplus.

**158**    I conclude that there was no enrichment and corresponding deprivation, and that the appellants have not established a *prima facie* case of unjust enrichment. The third branch of the test for unjust enrichment, the absence of a juristic reason for the enrichment, need not be analyzed.

> **D.**    *Did Bill C-78 Authorize the Government to Debit the Actuarial Surpluses in the Superannuation Accounts?*

**159**    The courts below ruled that any interest Plan members had in the balances and surpluses in the Superannuation Accounts was extinguished by Bill C-78. The appellants have argued that Bill C-78 did not disclose an explicit intention to expropriate their interest, on the basis of the presumption against expropriation without compensation in statutory interpretation (R. Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 478-82).

**160**    In *Pacific National Investments Ltd. v. Victoria (City)*, 2000 SCC 64, [2000] 2 S.C.R. 919, this Court affirmed the principle that "potentially confiscatory legislation ought to be construed cautiously so as not to strip individuals of their rights without the legislation being clear as to this intent" (para. 26). In order to confiscate an interest, Parliament must "express [it]self extremely clearly where there is an intention to expropriate or confiscate without compensation" (para. 26).

**161**    I have concluded that the courts below did not err in determining that the Plan members have no equitable interest in the surpluses in the Superannuation Accounts. Bill C-78 thus could not have expropriated the Plan members' property. Further, I would agree with the courts below that s. 44(9) to (13) of the *PSSA* are unambiguous in establishing that the Minister *may* debit any actuarial surplus and *must* debit all amounts exceeding 110 percent of the estimated liability under the Plans.

**162**    Moreover, it is "extremely clea[r]" that Parliament did not intend any compensation to be given to the Plan members for these debits, whether or not this constituted expropriation. It would be absurd to read Bill C-78 as requiring the government to debit excess amounts and then compensate the Plan members for the amounts debited. Such an interpretation would be to convert the relevant provisions of Bill C-78 into a distribution mechanism -- where the surpluses would be reduced and the Plan members would receive some form of compensation in lieu of having surpluses in the Accounts -- which was quite clearly not Parliament's intent. If s. 44(9) to (13) amount to confiscatory legislation, the intention was to confiscate without compensation.

**163**    The corresponding amendments to the *CFSA* (s. 55(9) to (13)) and the *RCMPSA* (s. 29(9) to (13)) are to the same effect, and are equally clear.

    VI.    Conclusion

**164**    The Superannuation Accounts are legislated records and do not contain assets in which the appellants have a legal or equitable interest. The Plan members' interests are limited to their interest in the defined benefits to which they are entitled under the Plans. The government was not under a fiduciary obligation to the Plan members, nor was it unjustly enriched by the amortization and removal of the pension surpluses. Finally, the Plan members had no legal or equitable interest in the actuarial surplus reflected in the Superannuation Accounts to be expropriated by Bill C-78.

**165**    I would dismiss the appeal with costs.

<p align="center">* * * * *</p>

<p align="center">**APPENDIX**</p>

*Public Service Labour Relations Act*, S.C. 2003, c. 22, s. 2

       **2.** (1) The following definitions apply in this Act.

<p align="center">...</p>

       "employee", except in Part 2, means a person employed in the public service, other than

          (*a*) a person appointed by the Governor in Council under an Act of

Parliament to a statutory position described in that Act;

(*b*) a person locally engaged outside Canada;

(*c*) a person not ordinarily required to work more than one third of the normal period for persons doing similar work;

(*d*) a person who is a member or special constable of the Royal Canadian Mounted Police or who is employed by that force under terms and conditions substantially the same as those of one of its members;

(*e*) a person employed in the Canadian Security Intelligence Service who does not perform duties of a clerical or secretarial nature;

(*f*) a person employed on a casual basis;

(*g*) a person employed on a term basis, unless the term of employment is for a period of three months or more or the person has been so employed for a period of three months or more;

(*h*) a person employed by the Board;

(*i*) a person who occupies a managerial or confidential position; or

(*j*) a person who is employed under a program designated by the employer as a student employment program.

...

"public service", except in Part 3, means the several positions in or under

(*a*) the departments named in Schedule I to the *Financial Administration Act*;

(*b*) the other portions of the federal public administration named in Schedule IV to that Act; and

(*c*) the separate agencies named in Schedule V to that Act.

...

**113.** A collective agreement may not, directly or indirectly, alter or eliminate any existing term or condition of employment or establish any new term or condition of employment if

(*a*) doing so would require the enactment or amendment of any legislation by Parliament, except for the purpose of appropriating money required for the implementation of the term or condition; or

(*b*) the term or condition is one that has been or may be established under the *Public Service Employment Act*, the *Public Service Superannuation Act* or the *Government Employees Compensation Act*.

*Public Service Superannuation Act*, R.S.C. 1985, c. P-36

**4.** (1) Subject to this Part, an annuity or other benefit specified in this Part shall be paid to or in respect of every person who, being required to contribute to the Superannuation Account or the Public Service Pension Fund in accordance with this Part, dies or ceases to be employed in the public service, which annuity or other benefit shall, subject to this Part, be based on the number of years of pensionable service to the credit of that person.

(2) The Superannuation Account, established in the accounts of Canada pursuant to the *Superannuation Act*, is hereby continued.

...

**43.** (1) All amounts required for the payment of benefits for which this Part and Part III make provision shall be paid out of the Superannuation Account if the benefits are payable in respect of pensionable service to the credit of a contributor before April 1, 2000.

(2) The amounts deposited in the Public Service Superannuation

Investment Fund under subsection 44.1(2) shall be transferred to the Public Sector Pension Investment Board within the meaning of the *Public Sector Pension Investment Board Act* to be dealt with in accordance with that Act.

(3) If there are insufficient amounts in the Superannuation Account to pay all the benefits referred to in subsection (1), the amounts required for the payment of those benefits shall be charged to the Public Service Superannuation Investment Fund and paid out of the assets of the Public Sector Pension Investment Board.

...

**44.** (1) There shall be credited to the Superannuation Account in each fiscal year

(*a*) [Repealed, 1999, c. 34, s. 95]

(*b*) in respect of every month, such amount in relation to the total amount paid into the Account during the preceding month by way of contributions in respect of past service as is determined by the Minister; and

(*c*) an amount representing interest on the balance from time to time to the credit of the Account, calculated in such manner and at such rates and credited at such times as the regulations provide, but the rate for any quarter in a fiscal year shall be at least equal to the rate that would be determined for that quarter using the method set out in section 46 of the *Public Service Superannuation Regulations*, as that section read on March 31, 1991.

(2) to (5) [Repealed, 1999, c. 34, s. 95]

(6) Following the laying before Parliament of any actuarial valuation report pursuant to section 45 that relates to the state of the Superannuation Account and the Public Service Superannuation Investment Fund, there shall be credited to the Account, at the time and in the manner set out in subsection (7), the amount that in the opinion of the Minister will, at the end of the fifteenth fiscal year following the tabling of that report or at the end of the shorter period

that the Minister may determine, together with the amount that the Minister estimates will be to the credit of the Account and the Public Service Superannuation Investment Fund at that time, meet the cost of the benefits payable under this Part and Part III in respect of pensionable service that is to the credit of contributors before April 1, 2000.

(7) Subject to subsection (8), the amount required to be credited to the Superannuation Account under subsection (6) shall be divided into equal annual instalments and the instalments shall be credited to the Account over a period of fifteen years, or such shorter period as the Minister may determine, with the first such instalment to be credited in the fiscal year in which the actuarial valuation report is laid before Parliament.

(8) When a subsequent actuarial valuation report is laid before Parliament before the end of the period applicable under subsection (7), the instalments remaining to be credited in that period may be adjusted to reflect the amount that is estimated by the Minister, at the time that subsequent report is laid before Parliament, to be the amount that will, together with the amount that the Minister estimates will be to the credit of the Superannuation Account and the Public Service Superannuation Investment Fund at the end of that period, meet the cost of the benefits payable under this Part and Part III in respect of pensionable service that is to the credit of contributors before April 1, 2000.

(9) Following the laying before Parliament of any actuarial valuation report pursuant to section 45 that relates to the state of the Superannuation Account and the Public Service Superannuation Investment Fund, there may be debited from the Account, at the time and in the manner set out in subsection (11), an amount that in the opinion of the Minister exceeds the amount that the Minister estimates, based on the report, will be required to be to the credit of the Account and the Public Service Superannuation Investment Fund at the end of the fifteenth fiscal year following the tabling of that report or at the end of a shorter period that the Minister may determine, in order to meet the cost of the benefits payable under this Part and Part III in respect of pensionable service that is to the credit of contributors before April 1, 2000.

(10) If the total of the amounts in the Account and in the Fund referred to in subsection (9) exceeds, following the laying of the report referred to in that subsection, the maximum amount referred to in subsection (13), there shall be

debited from the Account, at the time and in the manner set out in subsection (11), the amount of the excess.

(11) Subject to subsection (12), the amount that may be debited under subsection (9) and the amount that must be debited under subsection (10) shall be debited in annual instalments over a period of fifteen years, or a shorter period that the Minister may determine, with the first such instalment to be debited in the fiscal year in which the actuarial valuation report is laid before Parliament.

(12) When a subsequent actuarial valuation report is laid before Parliament before the end of the period applicable under subsection (11), the instalments remaining to be debited in that period may be adjusted to reflect the amount that is estimated by the Minister, at the time that subsequent report is laid before Parliament, to be the amount that will, together with the amount that the Minister estimates will be to the credit of the Superannuation Account and the Public Service Superannuation Investment Fund at the end of that period, meet the cost of the benefits payable under this Part and Part III in respect of pensionable service that is to the credit of contributors before April 1, 2000.

(13) At the end of the period, the total of the amounts that are to the credit of the Superannuation Account and the Public Service Superannuation Investment Fund must not exceed one hundred and ten percent of the amount that the Minister estimates is required to meet the cost of the benefits payable under this Part and Part III in respect of pensionable service that is to the credit of contributors before April 1, 2000.

(14) The costs of the administration of this Act, as determined by the Treasury Board, with respect to benefits payable under this Act in respect of pensionable service that is to the credit of contributors before April 1, 2000, shall be paid out of the Superannuation Account.

*Public Sector Pension Investment Board Act*, S.C. 1999, c. 34

**4.** (1) The objects of the Board are

(*a*) to manage amounts that are transferred to it under subsections 54(2) and 55.2(5) and section 59.4 of the *Canadian Forces Superannuation Act*, subsections 43(2) and 44.2(5) of the *Public Service Superannuation Act*

and subsections 28(2) and 29.2(5) of the *Royal Canadian Mounted Police Superannuation Act* in the best interests of the contributors and beneficiaries under those Acts; and

(*b*) to invest its assets with a view to achieving a maximum rate of return, without undue risk of loss, having regard to the funding, policies and requirements of the pension plans established under the Acts referred to in paragraph (*a*) and the ability of those plans to meet their financial obligations.

(2) The costs associated with the operation of the Board shall be paid out of the funds.

(3) The Minister shall determine from which funds the costs shall be paid, but no amount shall be taken out of the Canadian Forces Pension Fund or the Canadian Forces Superannuation Investment Fund -- or, if regulations are made under section 59.1 of the *Canadian Forces Superannuation Act*, from the fund referred to in section 59.3 of that Act -- without consulting the Minister of National Defence, or from the Royal Canadian Mounted Police Pension Fund or the Royal Canadian Mounted Police Superannuation Investment Fund without consulting the Minister of Public Safety and Emergency Preparedness.

*Public Pensions Reporting Act*, R.S.C. 1985, c. 13 (2nd Supp.)

**7.** Where, in the review of a pension plan, actuarial assumptions or methods are used that differ from those used for the immediately preceding review in respect of which a cost certificate was filed pursuant to section 5 and such different assumptions or methods result

(*a*) in a decrease in the going concern unfunded actuarial liability but do not result in an excess of going concern assets over the going concern actuarial liabilities, the outstanding special payments shall be recalculated by multiplying each of the amounts thereof by a factor having, as numerator, the going concern unfunded actuarial liability and, as denominator, the sum of the present values of the previously determined special payments where the present values are calculated on the basis of the actuarial assumptions used at the current review; or

(*b*) in an excess of the going concern assets over the going concern actuarial liabilities, the valuation report referred to in section 6 shall include a statement as to the method, if any, proposed for the disposition of such excess.

**8.** (1) The Minister shall cause a certification of the assets of a pension plan established under the *Canadian Forces Superannuation Act*, ... the *Public Service Superannuation Act*, [and] the *Royal Canadian Mounted Police Superannuation Act* ... to be made and a report thereof to be filed with the Minister at the same time as a cost certificate is filed pursuant to subsection 5(1).

(2) The certification and the assets report referred to in subsection (1) shall be made by the Comptroller General of Canada.

**9.** (1) The Minister shall lay before Parliament any cost certificate, valuation report or assets report filed with the Minister pursuant to this Act, within thirty sitting days of their being filed if Parliament is then sitting, or if Parliament is not then sitting, on any of the first thirty days thereafter that Parliament is sitting.

*Financial Administration Act*, R.S.C. 1985, c. F-11

**2.** In this Act,

...

"Consolidated Revenue Fund" means the aggregate of all public moneys that are on deposit at the credit of the Receiver General;

...

"money" includes negotiable instruments;

"negotiable instrument" includes any cheque, draft, traveller's cheque, bill of exchange, postal note, money order, postal remittance and any other similar instrument;

...

"public money" means all money belonging to Canada received or collected by

the Receiver General or any other public officer in his official capacity or any person authorized to receive or collect such money, and includes

(*a*) duties and revenues of Canada,

(*b*) money borrowed by Canada or received through the issue or sale of securities,

(*c*) money received or collected for or on behalf of Canada, and

(*d*) all money that is paid to or received or collected by a public officer under or pursuant to any Act, trust, treaty, undertaking or contract, and is to be disbursed for a purpose specified in or pursuant to that Act, trust, treaty, undertaking or contract;

...

**17.** (1) Subject to this Part, all public money shall be deposited to the credit of the Receiver General.

(2) The Receiver General may establish, in the name of the Receiver General, accounts for the deposit of public money with

(*a*) any member of the Canadian Payments Association;

(*b*) any local cooperative credit society that is a member of a central cooperative credit society having membership in the Canadian Payments Association;

(*c*) any fiscal agent that the Minister may designate; and

(*d*) any financial institution outside Canada that the Minister may designate.

...

(4) Subject to any regulations made under subsection (5), every person employed in the collection or management of, or charged with the receipt of, public money and every other person who collects or receives public money shall pay that money to the credit of the Receiver General.

...

**63.** (1) Subject to regulations of the Treasury Board, the Receiver General shall cause accounts to be kept in such manner as to show

(*a*) the expenditures made under each appropriation;

(*b*) the revenues of Canada; and

(*c*) the other payments into and out of the Consolidated Revenue Fund.

(2) The Receiver General shall cause accounts to be kept to show such of the assets and direct and contingent liabilities of Canada and shall establish such reserves with respect to the assets and liabilities as, in the opinion of the President of the Treasury Board and the Minister, are required to present fairly the financial position of Canada.

(3) The accounts of Canada shall be kept in the currency of Canada.

**64.** (1) A report, called the Public Accounts, shall be prepared by the Receiver General for each fiscal year and shall be laid before the House of Commons by the President of the Treasury Board on or before December 31 next following the end of that fiscal year or, if the House of Commons is not then sitting, on any of the first fifteen days next thereafter that the House of Commons is sitting.

(2) The Public Accounts shall be in such form as the President of the Treasury Board and the Minister may direct, and shall include

(*a*) a statement of

(i)    the financial transactions of the fiscal year,

(ii)    the expenditures and revenues of Canada for the fiscal year, and

(iii)    such of the assets and liabilities of Canada as, in the opinion of the President of the Treasury Board and the Minister, are required to show the financial position of Canada as at the termination of the fiscal year;

(*b*) the contingent liabilities of Canada;

(*c*) the opinion of the Auditor General of Canada as required under section 6 of the *Auditor General Act*; and

(*d*) such other accounts and information relating to the fiscal year as are deemed necessary by the President of the Treasury Board and the Minister to present fairly the financial transactions and the financial position of Canada or as are required by this Act or any other Act of Parliament to be shown in the Public Accounts.

*Appeal dismissed with costs.*

**Solicitors:**

*Solicitors for the appellants the Professional Institute of the Public Service of Canada et al.: Cavalluzzo Hayes Shilton McIntyre & Cornish, Toronto.*

*Solicitors for the appellants the Public Service Alliance of Canada, the Armed Forces Pensioners'/Annuitants' Association of Canada et al.: Raven, Cameron, Ballantyne & Yazbeck, Ottawa.*

*Solicitor for the respondent: Attorney General of Canada, Toronto.*

*Solicitor for the intervener: Attorney General of British Columbia, Victoria.*

*Indexed as:*

# QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Revenue)

**Between**
**QEW 427 Dodge Chrysler (1991) Inc., appellant, and**
**The Minister of Revenue, respondent**

[2000] O.J. No. 2582

49 O.R. (3d) 776

[2000] O.T.C. 658

98 A.C.W.S. (3d) 490

Court File Nos. 94-CT-003052 (Toronto) (formerly 91-A3052/94;

Brampton) 94-CT-003053 (Toronto) (formerly 92-A3053/94;

Brampton) 95-MU-13283 (Toronto)

Ontario Superior Court of Justice

**Trafford J.**

Heard: June 19 - 21, June 26 and 27, 2000.
Judgment: July 7, 2000.

(52 paras.)

**Counsel:**

J. Gregory Richards and Michael Statham, for the appellant.
Anita Veiga-Minhinnett, for the respondent.

**TRAFFORD J.**:--

Introduction

**1**    This is an appeal by QEW 427 Chrysler (1991) Inc. ("QEW") under s. 85 of The Corporations Tax Act, R.S.O 1990, c. C-40, as amended ("Act") against assessments made by the Minister of Finance for Ontario in connection with the payment of capital tax on its taxable paid-up capital for the years 1991, 1992 and 1993. QEW is a Canadian resident corporation carrying on the business of an automobile dealership selling, inter alia, new vehicles manufactured by Chrysler Canada Limited ("Chrysler Canada"). It finances the purchase of the new vehicles from Chrysler Canada through a line of credit arranged with Chrysler Credit Canada Limited ("Chrysler Credit"). It is this financial arrangement that has led to the dispute between the taxpayer and the Minister. By Notice of Assessment dated August 19, 1992 QEW was assessed, inter alia, capital tax in the amount of $5,886 in respect of $4,212,272 described as wholesale finance liabilities in the audited financial statements for the year ending December 31, 1991. By similar Notices of Assessment dated November 3, 1993 and December 21, 1994 QEW was also assessed, inter alia, capital tax in the amounts of $8,411 and $11,665 in respect of $2,803,879 and $3,888,454 described as wholesale finance liabilities in the audited financial statements of QEW for the years ending December 31, 1992 and 1993, respectively.

**2**    After reviewing the circumstances of the case including the ownership of QEW and the interrelationship between QEW, Chrysler Canada, Chrysler Credit, Chrysler Corporation and Chrysler Finance Corporation, the financing of the purchase of the new vehicles from Chrysler Canada and the treatment of such transactions in the financial statements of QEW at the material times will be described. A brief reference will be made to the assessments by the Ministry. The legal issues to be determined by the Court will be defined and the ruling of the Court will be given.

The Ownership of QEW

**3**    QEW is owned to the extent of 50 percent by Ralph Chiodo and Staltyc Investments Inc. each. Staltyc Investments Inc. is owned 100 percent by Marcel Stirpe. He is the president and active partner in QEW. Mr. Chiodo is a silent partner. Neither Chrysler Canada nor Chrysler Credit has any ownership interest on QEW.

**4**    On September 12, 1991 QEW entered into an Inventory and Leasing Finance Security Agreement with Chrysler Credit. In consideration of Chrysler Credit providing, in its sole discretion, a line of credit for "... the purchase of motor vehicles sold by Chrysler Canada or other manufacturers or distributors ...", QEW granted to Chrysler Credit "... a security interest ... in and to the collateral and all proceeds (of it) ... the security interest ... constitutes a Purchase Money Security Interest and (is) a first lien and charge on the collateral ... (QEW) shall keep the collateral free from any other lien, encumbrance or security interest other than the interest of a lessee from (QEW) Other terms and conditions of this agreement include:

VEHICLE FINANCING

2.(a) (QEW) has requested and Chrysler Credit hereby grants to (QEW) a revocable, revolving line of credit for loans (i) to finance its purchases of new motor vehicles including accessories and attachments thereto built in whole or in part by the Manufacturer or its affiliates and of used motor vehicles (all of which are hereinafter called "Vehicle" or "Vehicles") and, (ii) to finance the leasing of Vehicles to other persons, on terms as published from time to time by Chrysler Credit; provided however that loans shall be made available to (QEW) only within such limits and upon such terms as shall be established from time to time by Chrysler Credit, which limits and terms may be Wended, modified, or cancelled in whole or in part at the sole discretion of Chrysler Credit at any time with or without prior notice to (QEW)

  (b) Each loan to be made to (QEW) hereunder and the related Vehicle or Vehicles and lease, if applicable, in which a security interest is created hereby shall be evidenced by (i) in the case of a Vehicle purchased from Chrysler Canada Ltd., a CHRYSLER CANADA VEHICLE INVOICE and such loan shall be in the amount set out in said invoice opposite the words "INVOICE TOTAL";

SECURITY INTEREST AND COLLATERAL

3.(a) The security interest in the Collateral is granted to secure the performance and payment of all obligations and indebtedness of (QEW) to Chrysler Credit arising out of (i) the financing by Chrysler Credit of the purchase by (QEW) of Vehicles for lease or sale to other persons, or for use as demonstrator or service vehicles, ...

... The aggregate amount of indebtedness owing to Chrysler Credit at any time shall constitute a single obligation and shall be payable by (QEW) on demand.

  (b) The collateral covered by this agreement is as follows: All Vehicles financed hereunder and all of (QEW's) present and future equipment, inventory, parts, furniture, merchandise and goods of every type and description whatsoever, any leases of such Vehicles and all rentals or other amounts due thereunder, all of (QEW's) accounts receivable, contract rights, chattel paper, fixtures and all other real and personal property, as well as proceeds of such

collateral, to the extent of the indebtedness owing to Chrysler Credit, including but not limited to trade-in motor vehicles, money, notes, chattel paper, goods, contract rights and any other property or obligations directly or indirectly received when such collateral or proceeds are sold, exchanged, collected, damaged, or destroyed or otherwise disposed of, whether now owned or now in the possession of the (QEW) or hereafter acquired by (QEW), (herein called the "Collateral").

DISPOSITIONS IN ORDINARY COURSE OF BUSINESS

4.    (QEW) shall have no right to sell, lease or dispose of any of the Collateral in respect of which the legal title vests in or a security interest is held by Chrysler Credit, except for sales or leases in the ordinary course of business upon customary sale or lease terms for value received, and then only upon the express condition that on or before delivery to other persons, (QEW) shall secure full settlement of the entire purchase or lease price for the Collateral so sold or leased in money, notes, chattel paper or other property in form satisfactory to Chrysler Credit and until (QEW) shall have made settlement with Chrysler Credit of the full amount due to Chrysler Credit with respect to all such Collateral sold, leased or disposed of by (QEW), (QEW) shall segregate such money, notes, chattel paper, goods, contract rights or other property and hold the same in trust for Chrysler Credit and Chrysler Credit shall have and is hereby granted a security interest therein. (QEW) shall notify Chrysler Credit as to the details of any sales, leases or other dispositions of Collateral and all such trust money shall be deposited and held in trust for Chrysler Credit in a separate bank account. (QEW) shall be entitled to transfer such money, notes, chattel paper, goods, contract rights or other property free of such trusts if at or prior to the time of such transfer the payment due from (QEW) to Chrysler Credit shall be secured to the satisfaction of Chrysler Credit.

DEALER'S WARRANTIES

5.    To induce Chrysler Credit to make loans hereunder, (QEW) hereby represents and warrants that at the time each loan is made hereunder and so long as this agreement is in effect:

    (b) At the time a security interest attaches hereunder with respect to any

Collateral, (QEW) shall be the owner of the said Collateral with good right to sell, transfer, assignor charge the same, free from any lien, security interest, encumbrances or other right, title or interest, other than that of Chrysler Credit and other than that of the lessee, if any, of a Vehicle;

(f) The Collateral shall have been insured under a valid and enforceable policy or policies of insurance issued by an insurer or insurers of recognized standing, protecting the interests of Chrysler Credit or its assignee, (QEW) and lessee, where applicable, and in the case of a lease of a Vehicle by (QEW), shall name Chrysler Credit as an insured.

DEALER'S COVENANTS

6.    (QEW) hereby covenants and agrees with Chrysler Credit that:

(a) (QEW) shall pay to Chrysler Credit upon demand the principal amount of all loans secured hereunder together with interest thereon at a rate per annum equal to the standard wholesale rate of interest charged by Chrysler Credit to automobile dealers in the province of Ontario for "wholesale financing" of inventories of new motor vehicles held for resale as such rate may vary from time to time; (QEW) shall pay the principal of and interest on all loans referrable to Vehicles leased by (QEW) to other persons in accordance with Chrysler Credit's published terms applicable thereto. (QEW) agrees not to assert against Chrysler Credit any claim or defense that it may have against any seller of Vehicles to (QEW).

(c) (QEW) shall keep proper records and books of account of its business operations and shall furnish to Chrysler Credit within ten (10) days after the end of each month hereafter for so long as this agreement shall be effective, copies of (QEW's) balance sheet as of the end of each month and related statements of income and surplus for such month, all in such detail as Chrysler Credit may reasonably require from time to time and certified as to the truth, accuracy and completeness of the information contained therein, in such form and by such officers, employees and representatives of (QEW) as Chrysler Credit may reasonably require from time to time, and, within one hundred and twenty (120) days after the close of each of (QEW's) fiscal years hereafter for so long as this agreement shall be effective, a complete, executed copy of a report of an

examination of (QEW's) financial affairs made by independent chartered accountants selected by (QEW) and acceptable to Chrysler Credit, such report to include (QEW's) balance sheet as of the end of such fiscal year in related statements of income and surplus for such fiscal year in such detail as Chrysler Credit may reasonably require from time to time;

(d) Chrysler Credit or its designee shall have the right to visit and inspect any of the property of (QEW), to examine the books of account of (QEW) and to make copies thereof and to discuss the affairs and finances of (QEW) with, and to be advised as to the same by, (QEW's) officers and representatives at all reasonable times and from time to time and to verify the accuracy of such records and books of account by making inquiry of lessees under leases financed hereunder;

DEFAULT OF DEALER

7.    Chrysler Credit may at its option declare (QEW) to be in default under this agreement and may declare the whole or any part of the unpaid balance of any loan or loans secured by this agreement immediately due and payable, if any of the following events occur:

(b) (QEW) fails to pay to Chrysler Credit as and when the same falls due any amount owing hereunder or fails to pay to Chrysler Credit or its affiliates any amount owing under any other agreement between (QEW) and Chrysler Credit or its affiliates;

(c) (QEW) fails to perform any other covenant or obligation agreed to be performed by it under this agreement or under any other agreement between (QEW) and Chrysler Credit or its affiliates;

**5**    On September 12, 1991, each of the shareholders in QEW also gave to Chrysler Credit personal guarantees of its indebtedness under the Inventory and Lease Financing Security Agreement and subordinated the shareholder loans made to QEW to the interests of Chrysler Credit. Chrysler Credit was also authorized to secure insurance coverage from the Chrysler Insurance Company for each new vehicle purchased by QEW.

The Interrelationship Between QEW and the Affiliates of Chrysler Corporation

**6**    On October 3, 1991 QEW entered into a Sales and Service Agreement with Chrysler Canada. Before describing its terms and conditions insofar as they are relevant to the appeal, it is helpful to begin with a brief description of Chrysler Corporation and its affiliates.

**7**    Chrysler Corporation is an American corporation that produces and markets a full line of motor vehicles. It has a number of major subsidiaries. Chrysler Financial Corporation, another American corporation, is owned 100 percent by Chrysler Corporation and provides financing for Chrysler's dealers and retail customers. The ability of Chrysler Corporation to market its products successfully depends significantly on the availability of inventory financing for its dealers and, to a lesser extent, the availability of financing for retail and fleet purchasers of its products. Both of these services are made available in Canada through Chrysler Credit which is a wholly owned subsidiary of Chrysler Financial Corporation. Chrysler Canada, another wholly owned subsidiary of Chrysler Corporation, is a Canadian company that manufactures Chrysler Corporation motor vehicles. Chrysler Canada does not own any of the shares of Chrysler Credit. However, there is, and was at all material times, a substantial overlap in the directors and officers in all of these companies.

**8**    The Sales and Service Agreement and the related addenda provided a number of terms and conditions relied upon by the appellant. The following are most pertinent to the appeal:

> The purpose of the relationship established by this Agreement is to provide a means for the sale and service of the Chrysler vehicles ... and the sale of parts and accessories manufactured or distributed by Chrysler under any of its trademarks ... in a manner that will maximize customer satisfaction and be of benefit to (QEW) and Chrysler.
>
> ...
>
> While the undertakings of this relationship are set forth in the provisions that follow, their success rest on a recognition of the mutuality of interest of (QEW) and Chrysler Canada and a spirit of understanding and cooperation by both parties in a day-to-day performance of their respective functions. As a result of such considerations, Chrysler Canada has entered into this Agreement in reliance upon and has placed its trust in the personal abilities, expertise, knowledge and integrity of (QEW's) principal owners and management personnel, which Chrysler Canada anticipates will enable (QEW) to perform the personal services contemplated by this Agreement.
>
> ...
>
> (QEW) shall have the non-exclusive right, subject to the provisions of this Agreement, to order and purchase from Chrysler Canada new models of Chrysler vehicles and Chrysler parts and other products specified by Chrysler Canada from time to time for resale at retail at the (QEW's) facilities and location described in the

Dealership Facilities and Location Addendum attached hereto and incorporated herein by reference. (QEW) will actively and effectively sell and promote the retail sale of Chrysler Canada vehicles and Chrysler Canada parts in (QEW's) Sales Locality. As used herein, Sales Locality shall mean the area designated in writing to (QEW) by Chrysler Canada from time to time as a territory of (QEW's) responsibility for the sale of Chrysler Canada's vehicles and Chrysler Canada parts in the Ontario sales region.

...

Chrysler Canada has entered into this Agreement conditional upon the active, substantial and continuing personal participation in the management of (QEW's) organization by Marcel Stirpe, President and General Manager. (QEW) represents and warrants that (Marcel Stirpe) will be physically present at (QEW's) facility ... during most of its operating hours and will manage all of (QEW's) business relating to the sale and service of Chrysler Canada products.

...

If (QEW) is a corporation or partnership, (QEW) represents and agrees (and it is upon this express representation that Chrysler Canada has entered into this Agreement), that the persons named below will own beneficially, and will continue to own beneficially ... unless Chrysler Canada agrees otherwise in writing, the capital stock or ownership interest of (QEW) in the percentages indicated ... Ralph Chiodo (50%) and Staltyc Investments Ltd. (50%) ...

...

The additional terms and provisions set forth in the document entitled Chrysler Canada Limited Sales and Service Agreement additional terms and provisions marked "Form 87 CCL, as may hereafter be amended from time to time, insofar as they are not in consistent with the terms, provisions and conditions of this Agreement, constitute a part of this Agreement with the same force and effect as if set forth at length herein and the term of this Agreement includes said additional terms and provisions."

**9**   The additional terms and provisions of the Sales and Service Agreement are also relied upon the appellant in this case. They provide as follows:

8

SELLING, SERVICE, COMPLIANCE, FACILITIES AND LOCATION, FINANCES, PERSONNEL AND SIGNAGE

    (a)    SELLING

(QEW) shall use its best efforts to promote energetically and sell aggressively and effectively at retail (which includes lease and rental units) each and every model of CHRYSLER vehicles identified in Paragraph 1 of this agreement and CHRYSLER parts, service contracts and other products and services offered by CHRYSLER, to private and fleet customers in (QEW's) Sales and Locality. (QEW) will sell the number of new CHRYSLER vehicles necessary to fulfill (QEW's) minimum Sales Responsibility as defined below for each passenger car line and truck line listed in Paragraph 1 of this Agreement.

(QEW's) Minimum Sales Responsibility for each such line will be determined as follows:

    (c)    FACILITIES AND LOCATION

        (i)    (QEW's) Responsibilities

(QEW) shall provide facilities for the sale and service of CHRYSLER products and related activities ("Dealership Operations") at the location set forth in the aforementioned Dealership Facilities and Location Addendum.

...

(QEW) shall conduct its Dealership Operations only from the dealership location and dealership facilities above mentioned and in the manner and at least during the hours usual in the trade in (QEW's) Sales Locality. (QEW) shall not, except as provided for in subparagraph 8(c)(ii) hereunder, either directly or indirectly, establish any place or places of business for the conduct of any of its Dealership Operations other than at the Dealership Facilities and Dealership Operations location as set forth in the Dealership Facilities and Location Addendum.

    (e)    FINANCES

(QEW) shall maintain and employ in connection with (QEW's) business such net
working capital, net worth, and wholesale credit and retail financing
arrangements necessary for (QEW) to carry out successfully (QEW's)
undertakings pursuant to this Agreement and in accordance with guides therefor
as may be issued by CHRYSLER from time to time. At no time shall (QEW's)
net working capital be less than the amount specified in the Minimum Working
Capital Agreement executed in conjunction with this Agreement and
incorporated herein by reference, or the amount thereafter established by any
superseding Minimum Working Capital Agreement.

9 ADVERTISING

CHRYSLER, in promoting the sale and lease of its products by (QEW) and other
CHRYSLER dealers, shall seek to advertise in the most effective manner to
develop public interest and confidence in its dealers and products. (QEW) shall
engage in advertising and sales promotion programs and shall use effective
showroom displays to help fulfill (QEW's) responsibility to promote
CHRYSLER products and services vigorously and aggressively ...

...

(QEW) shall at all times be a member in good standing of any Dealer Advertising
Association which covers a geographical area that encompasses, in whole or
significant part, (QEW's) Sales Locality and which has been approved by
CHRYSLER.

10 REPORTS, RECORDS AND BUSINESS SYSTEMS

(QEW) shall submit to CHRYSLER for confidential use by CHRYSLER and its
affiliates, in such manner, in such form, and at such times as CHRYSLER may
reasonably request, complete and accurate reports of sales and stocks of new and
used vehicles on hand and other reports, including monthly financial statements
and operating reports.

(QEW) shall use and keep accurate and current at all times a uniform accounting system
and will follow accounting practices, satisfactory to CHRYSLER, which will
enable CHRYSLER to develop comparative information in order, among other
things, to provide business management assistance to dealers for the mutual
benefit of (QEW) and CHRYSLER

...

(QEW) shall maintain an electronic data storage, transmission and communication system in the manner and form required from time to time by CHRYSLER.

...

11 ORDERS

CHRYSLER shall ship CHRYSLER vehicles and CHRYSLER parts to (QEW) only on (QEW's) order.

...

13 ACCEPTANCE OF SHIPMENTS

If (QEW) requests diversion of CHRYSLER products shipped to (QEW) or if CHRYSLER is required to divert any CHRYSLER products because (QEW) fails, refuses or is unable to accept delivery of such products, or if there is a failure to pay as required for the products that (QEW) has ordered, or a failure to accept C.O.D. shipments of products (QEW) has ordered, CHRYSLER may divert the shipments and charge (QEW) the demurrage, transport, storage and other expense arising by reason of any such diversion.

...

18

PRICES, CHARGES, TERMS OF PURCHASE AND PAYMENT

CHRYSLER shall notify (QEW) from time to time of the prices, charges and terms of purchase for products sold under this Agreement and shall charge (QEW) for such products according to the prices, charges and terms of purchase in effect at the date of shipment. CHRYSLER reserves the right, without prior notice, to change prices, charges and terms of purchase for any product sold under this Agreement

...

19 CHANGE IN PRICE

Should CHRYSLER reduce the wholesale price at factory of any CHRYSLER vehicle (not including accessories and optional equipment) of a particular yearly line, model and body style then currently in production, CHRYSLER shall refund to (QEW) in cash or by a credit against (QEW)'s indebtedness to CHRYSLER, for each new, unused and unsold CHRYSLER vehicle (not including demonstrators) of that particular line, model and body style that at the time of the reduction is in (QEW)'s stock or in transit to (QEW), an amount equal to the difference between the reduced wholesale price and the wholesale price paid to CHRYSLER by (QEW).

...

At the time of announcement to the public of new yearly models CHRYSLER will pay to (QEW) an allowance, in an amount to be determined by CHRYSLER for breach new, unused, undamaged and unsold CHRYSLER vehicle of the discontinued yearly model in (QEW)'s stock on the day of the announcement to the public of the new yearly model, unless ...

...

21 COLLECTION OF INDEBTEDNESS

CHRYSLER may apply to any amount owed by (QEW) to CHRYSLER or to any of CHRYSLER's affiliates any credit owing to (QEW) by CHRYSLER or any of its affiliates.

Should (QEW) assign its right to amounts owed to (QEW) by CHRYSLER to any third party, prior to executing such an assignment (QEW) shall notify such third party of CHRYSLER's first priority right to such credits.

...

22 TITLE

The title to products CHRYSLER furnishes to (QEW) shall be and remain in CHRYSLER until paid for in full, in cash. Negotiable instruments are received only as conditional payment.

...

26 REPURCHASE OBLIGATIONS UPON TERMINATION

Except when termination of this Agreement will be followed by CHRYSLER issuing to (QEW), or to (QEW)'s successors, assigns, heirs or devisees, a new agreement of any sort for the sale and service of CHRYSLER vehicles, including, but not in limitation of the generality of the foregoing, such an agreement with a term of limited duration, CHRYSLER agrees to buy and (QEW) agrees to sell, free and clear of any liens and encumbrances, within ninety (90) days after the effective date of any termination under Paragraph 25:

...

CHRYSLER will pay (QEW) for any items purchased pursuant to this Paragraph 26 within ninety (90) days of CHRYSLER'S receipt and acceptance of said items, subject to Paragraph 21 of this Agreement.

33 DEALER IS NOT AGENT

This Agreement does not create the relationship of principal and agent between CHRYSLER and (QEW), and under no circumstances is either party to be considered the agent of the other.

**10**    The remainder of this agreement and the related addenda are not material to the issues in the appeal.

The Use of the Line of the Credit with Chrysler Credit to Purchase New Vehicles from Chrysler Canada

**11**    The wholesale finance liabilities on the financial statements of QEW consist, for the most part, of monies advanced by Chrysler Credit to Chrysler Canada in connection with its sale of new vehicles to QEW to be used as its inventory in the sales to retail customers. It is necessary to review all of the legal aspects of such a transaction.

**12**    Upon receipt of an order from QEW, Chrysler Canada ships the vehicle to QEW together with an invoice and a Conditional Sales Agreement. The invoice provides, inter alia, the amount for the vehicle excluding GST, the GST charged on the transaction and the total purchase price for QEW. The amount held back by Chrysler Canada to fund the advertising of Chrysler vehicles is also stipulated on each invoice. The Conditional Sales Agreement provides, in part, as follows:

Chrysler Canada ... hereby sells and (QEW) hereby purchases and acknowledges to have received in good order and as ordered the goods described in this invoice

for the purchase price set out on the reverse side hereof opposite the words "invoice total".

(QEW) promises to pay to Chrysler Canada or its assignee upon demand the purchase price together with interest at a rate per annum equal to the wholesale rate of Chrysler Credit as such rate may vary from time to time. Title, ownership and right of property shall not pass to (QEW) but shall remain in Chrysler Canada at (QEW's) risk until the entire purchase price and interest and all costs and expenses are fully paid in cash, and (QEW) shall keep said goods unused in his or its regular premises and open to inspection by Chrysler Canada at any time. (QEW) grants a security interest in the goods to Chrysler Canada or its assignee to secure payment of the said purchase price and interest and performance of (QEW's) other obligations hereunder.

If default is made in payment or in any of the other terms hereof or of any other conditional sales contract made between (QEW) and Chrysler Canada, the entire balance owing by (QEW) to Chrysler Canada shall immediately become due and payable and Chrysler Canada may with or without legal process take immediate possession of the goods and concurrently therewith bring suit against (QEW) for the balance unpaid.

**13**    It is executed by a signing officer for Chrysler Canada and, pursuant to a power of attorney, for QEW. Specifically, the Dealer accepts the sale of goods and acknowledges receipt of a signed copy of the Conditional Sales Agreement. The Dealer also acknowledges notice of the assignment of the Conditional Sales Agreement and all of the rights and benefits accruing under it to Chrysler Credit. It further agrees that such rights and benefits shall be exercised by or on behalf of Chrysler Credit. Chrysler Canada, for value received, accepts the contract and sells and assigns it to Chrysler Credit without recourse to Chrysler Canada. When the vehicle is shipped to QEW, Chrysler Credit is notified and arranges for payment of the total price on the invoice to Chrysler Canada. At the same time, the Chrysler Insurance Company is notified by Chrysler Credit of the transaction so as to arrange for the previously agreed upon insurance coverage. Chrysler Credit notifies QEW each mouth of the monies advanced to Chrysler Canada, the interest costs of the advances and the costs of the insurance. Chrysler Credit absorbs the entire cost of the insurance if the new vehicle is sold within the same month of delivery. Interest charges are not levied for in-transit periods, that is, the period between the payment by Chrysler Credit to Chrysler Canada and the delivery of the car to QEW. Moreover, Chrysler Canada covers 35 days of the interest costs otherwise charged in connection with the purchase of each vehicle by QEW. Reimbursements by Chrysler Canada for interest charges to QEW are recorded as accounts receivable in its books. The new vehicles are not registered in the name of QEW unless they are used as demonstrators. On occasion, special interest free periods are given by Chrysler Canada. Once a new vehicle is sold to a retail customer, it is

registered in the customer's name and the required funds are advanced to Chrysler Credit. On average the new vehicles are sold within 60 days of their arrival at the premises of QEW. QEW after covering its costs makes approximately 1-3 percent on each vehicle. All of the communications between Chrysler Canada, Chrysler Credit and QEW are done electronically through a computerized system set up by Chrysler Corporation.

**14**    The amounts owing by QEW to Chrysler Credit are payable on demand. The aggregate amount owing is defined to be a single obligation payable on demand. At a practical level, a separate loan is given to QEW each time a new vehicle is shipped by Chrysler Canada. While the amount owing is payable on demand, the practice is that no money is required of QEW until the vehicle is sold to a retail customer.

**15**    "Collateral" is defined under the Inventory and Lease Financing Agreement to include the new vehicles, present and future, as well as, inter alia, the proceeds from the sale of them. QEW had also granted a security interest in all of its assets to its bank in order to secure a line of credit. The bank postponed any interest it might have in the new vehicles to Chrysler Credit while it postponed its interest in the other assets to the bank.

**16**    Chrysler Credit has a registered security interest on the inventory of QEW by way of registrations under the Personal Property Security Act R.S.O 1990, c. P-10, as amended. If QEW did not pay Chrysler Credit the amount outstanding for a new vehicle, the customer would not be able to obtain financing if the lender wanted the first security interest in the vehicle.

**17**    QEW pays to Chrysler Credit the GST shown on the invoice within 90 days. During this period, QEW applies to the Government of Canada for a GST rebate, receives it and uses it to reduce the liability to Chrysler Credit arising from the purchase of the new vehicle.

Other Aspects of the Agreements Between QEW and Chrysler Credit

**18**    Pursuant to the Assignment of Credit, QEW assigned to Chrysler Credit all of the monies due to it by Chrysler Canada or any of its affiliates and required Chrysler Canada to use them, in its sole discretion, through direct payments to Chrysler Credit. The amounts owing include rebates, holdbacks and other designated funds. At times they have aggregated as much as $1,000,000. They average approximately $500,000. All rebates, holdbacks and other such funds are treated as receivables on the books of QEW.

**19**    Under the vehicle financing agreements entered into with retail customers, Chrysler Canada subsidizes the low interest rates given to the customers.

The Treatment of the Purchase of New Vehicles on the Financial Statements of QEW

**20**    The audited financial statements of QEW and the Dealer financial statements of QEW for the years 1991, 1992 and 1993 disclose, inter alia, the liability incurred through the use of the line of

credit in the purchase of new vehicles from Chrysler Canada. The presentation of this information is different on the audited statements. As they have been prepared in accordance with generally accepted auditing standards, I rely upon them in preference to the Dealer's statements where there is conflict between them.

**21**    The audited financial statements record the interest of QEW in the new vehicles purchased from Chrysler Canada as an asset (inventory) despite the provisions of the Conditional Sales Agreement and the Inventory and Lease Financing Security Agreement providing title and purchase money security interests to Chrysler Canada and Chrysler Credit, respectively. This is compatible with the treatment of the transaction by Chrysler Canada which records the vehicles sales when they are shipped to QEW. To offset the treatment of this interest as an asset (inventory) QEW treats the corresponding use of the line of credit as wholesale finance liabilities. Notes to these financial statements for 1991 and 1992 provide that it is secured by the inventory of new cars and trucks. There is no corresponding note for wholesale finance liabilities in the 1993 financial statements. The 1991 financial statements do not expressly describe the wholesale finance liabilities as a current liability whereas the 1992 and 1993 financial statements do. The wholesale finance liabilities for 1991 was $4,212,272, for 1992 was $2,803,879 and for 1993 was $3,888,454. These audited financial statements were relied upon by (QEW) in filing the returns under the Act for those taxation years.

**22**    However, the wholesale finance liabilities cover new vehicles, demonstrators, used vehicles and parts. The Dealer financial statements break the figures down to new vehicle financing. For the years 1991, 1992 and 1993 they are, respectively, $3,154,479, $2,051,562 and $3,117,826. Capital tax has been paid on those amounts. The figures for demonstrators for each of those years, respectively, are $538,357, $501,379 and $499,319.

The Assessments by the Ministry

**23**    The returns were reviewed by the staff of the Ministry in due course. This led to Notices of Assessment for 1991, 1992 and 1993 in the amounts of $6,811, $9,718 and $14,589, respectively, plus interest. Notices of Objection were filed by QEW for each of them. The assessments were confirmed and, consequently, the amounts recorded as wholesale finance liabilities in the audited financial statements were included as paid-up capital in the calculation of the capital tax for QEW.

The Legislation Applicable to the Case

**24**    Section 61 of the Act was amended effective May 20, 1993. Accordingly, it is necessary in these appeals to interpret the legislation as it was before and after the amendment.

**25**    Section 61 as it applied to the 1991 and 1992 taxation years of QEW provided as follows:

> (1)    The paid-up capital of a corporation for a taxation year is its paid-up capital as it stood at the close of the taxation year and includes,

(d)    all sums or credits advanced or loaned to the corporation,

  (i)    in the case of a corporation incorporated with share capital, by its shareholders, and

  (ii)    in the case of a corporation incorporated without share capital, by its members,

directly or indirectly or by any person related to any of its shareholders or members, as the case may be, or by any other corporation and all sums advanced or loaned to the corporation by any government;

(e)    all its indebtedness, whether assumed or undertaken by it, represented by bonds, bond mortgages, debentures, income bonds, income debentures, mortgages, lien notes and any other securities to which the property of the corporation or any of it is subject;

(2)    For the purpose of clause (1)(d), sums or credits advanced or loaned to the corporation include,

  (a)    accounts payable to a related corporation that have been outstanding for 120 or more days prior to the end of the taxation year; and

  (b)    accounts payable to a corporation other than a related corporation that have been outstanding for 365 or more days prior to the end of the taxation year.

**26** Section 61 as it applied to the 1993 taxation year of QEW provided as follows:

(1)    The paid-up capital of a corporation for a taxation year is its paid-up capital as it stood at the end of the day on which it is required to be measured under this Act and includes,

<div align="center">...</div>

  (d)    all of its liabilities, whether secured or unsecured, including all deferred credits, but not its current accounts payable and any

amounts prescribed by the regulations.

(2)    For the purposes of this Part, a corporation's current accounts payable includes amounts that represent the corporation's,

(a)    employee source deductions;
(b)    current income taxes payable;
(c)    wages and salaries payable;
(d)    cheques issued and outstanding in excess of funds on deposit;

but does not include any amounts that represent;

(e)    the current portion of long term indebtedness;
(f)    accounts payable to a related corporation that have been outstanding 120 or more days; or
(g)    accounts payable to a corporation other than a related corporation that have been outstanding 365 or more days.

**27**    This is the legislative framework governing the capital tax liability of QEW in these appeals.

The Legal Issues to be Determined by the Court

**28**    Let me, then, define the legal issues to be determined by the Court in this appeal. Under the legislation as it was prior to May 1993 the issues are as follows:

1.    What is the meaning of the term "... sums or credit advanced ..." under s. 61(1)d of the Act?
2.    What is the meaning of the term "... accounts payable ..." in s. 61(2) of the Act?
3.    What is the meaning of the term "... property ..." under s. 61(1)e of the Act?
4.    What is the meaning of the term "... indebtedness ..." under s. 61(1)e of the Act?
5.    What is the meaning of the term "... lien note ..." under s. 61(1)e of the Act?

**29**    Under the legislation since May 1993, the following issue is to be determined:

1.    What is the meaning of the term "... current accounts payable ..." under s. 61(2) of the Act?

The Interpretation of Tax Legislation

**30**    At the outset it is important to state the principles governing the interpretation of tax legislation and the characterization of a transaction in the determination of its tax consequences. As there has been a trend away from the strict interpretation of tax legislation, there has also been a trend towards the identification of the essential commercial and practical nature of a transaction. The substance of the transaction takes precedence over its form so as to achieve a more equitable application of the tax legislation. The labels given to a transaction by the parties do not necessarily resolve its liability for tax purposes. The transaction must be looked at as a whole in its surrounding circumstances. The applicable principles were summarized by Gonthier, J. in CUQ v. Corp. Notre-Dame de Bon-Secours [1994] 3 S.C.R. 3 at 20:

> - The interpretation of tax legislation should follow the ordinary rules of interpretation;

> - A legislative provision should be given a strict or liberal interpretation depending on the purpose underlying it, and that purpose must be identified in light of the context of the statute, its objective and the legislative intent: this is the teleological approach;

> - The teleological approach will favour the taxpayer or the tax department depending solely on the legislative provision in question, and not on the existence of predetermined presumptions;

> - Substance should be given precedence over form to the extent that this is consistent with the wording and objective of the statute;

> - Only a reasonable doubt, not resolved by the ordinary rules of interpretation, will be settled by recourse to the residual presumption in favour of the taxpayer.

**31**    See also Bronfman Trust v. The Queen, [1987] 1 S.C.R. 32, and Viceroy Rubber and Plastics Limited v. M.N.R., (1993), 93 D.T.C. 347, (T.C.C.). Moreover, to emphasize the point in the context of this case, as was stated by L'Heureux-Dube, J. in Hickman Motors Limited v. Canada, [1997] 2 S.C.R. 336:

> The law is well established that accounting documents or accounting entries serve only to reflect transactions and that it is the reality of the facts that determines the true nature and substance of transactions.

**32**    Similarly, the generally accepted accounting principles formulated by the Canadian Institute of Chartered Accountants are not determinative in questions of statutory interpretation. In Upper

Lakes Shipping Limited v. Ontario (Minister of Finance), (1998), 107 O.A.C. 155, (Ont. C.A.) this principle was acknowledged as follows:

> It is common ground between the parties that GAAP are not determinative of the issue and that the question is one of statutory interpretation.
>
> ...
>
> There is no doubt that GAAP do not govern the result. It is also clear that the 'paid-up capital of a corporation' as defined in s. 53 of the Act constitutes an extension of the meaning of 'paid-up capital' from its ordinary commercial meaning: Investors Syndicate Limited v. Minister of Revenue, [1994] O.J. No. 259, February 11, 1994, (Ont. Gen. Div.) affd., [1996] O.J. No. 342, February 5, 1996 (C.A.); City Parking Canada Ltd. v. Ontario (Minister of Finance) (1973) 1 O.R (2d) 425 (C.A.). This does not detract from the fact that, in the absence of a statutory definition for 'earned, capital and any other surplus', resort must be had to ordinary commercial principles to attribute any meaning to the phrase.
>
> ...
>
> In this context, the plain and ordinary meaning of these words should be taken from the language accountants speak, not that of persons who are not involved with corporate balance sheets. The tax assessors know accounting language, as do the accountants who certify the corporation's financial statements. The accountants, applying GAAP, do not include a government grant as an item of capital surplus in the year of surplus. Rather, the grant is treated as an item of retained earnings or 'earned surplus' over time as the asset is used in the operations of the business. In our view, the statute should be interpreted in accordance with this approach.

**33**    These, then, are the principles governing the result in this case.

The Integration of the Chrysler Companies

**34**    Although Chrysler Canada and Chrysler Credit are from an accounting perspective properly consolidated in the financial statements of Chrysler Corporation, all of the Chrysler companies are separate legal entities. For the purposes of the Act, Chrysler Canada, Chrysler Credit and QEW are not one economic unit. The paid-up capital of, for example, QEW is to be determined by the application of the legislation to its financial affairs considered separate and apart from its affiliates. The integration of the operation of Chrysler Corporation and Chrysler Canada as the manufacturers of motor vehicles with the operation of Chrysler Financial Corporation and Chrysler Credit as the financing arm of the conglomerate does not detract from this conclusion. Nor does the overall objective of the Chrysler companies and QEW, namely, the selling of Chrysler motor vehicles into

the retail market place change the analysis. Each of the affiliated companies contributes to the achievement of the objective in a fundamentally different way. The terms and conditions of the various agreements concerning the rights of the parties to them in the event of a default by QEW, the assignment to Chrysler Credit of credits due to Chrysler Canada, the role of the Chrysler Insurance Company, the sharing of confidential dealer information by the Chrysler affiliates, the right of setoff amongst the Chrysler affiliates, the availability of financing through Chrysler Credit at low interest rates and the guarantee of Chrysler Credit's external credit facility and short-term debt by Chrysler Financial Corporation also do not affect this conclusion. For legal purposes under the Act, they are separate and distinct from one another.

**35**    It must be observed that as a general rule a corporation is a separate entity from its shareholders. This principle was recently reviewed in Constitution Insurance Company v. Kosmopoulos (1987), 34 D.L.R. (4th) 208 at 213-214 (S.C.C.) in the following terms:

> As a general rule a corporation is a legal entity distinct from its shareholders: Salomon v. Salomon & Co., Ltd., [1897] A.C. 22 (H.L.) The law on when a court may disregard this principle by 'lifting the corporate veil' and regarding the company as a mere 'agent' or 'puppet' of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the 'separate entities' principle is not enforced when it would yield a result 'too flagrantly opposed to justice, convenience or the interests of the Revenue': L.C.B. Gower, Modern Company Law, 4th ed. (1979), at p. 112. I have no doubt that theoretically the veil could be lifted in this case to do justice, as was done in American Indemnity Co. v. Southern Missionary College, supra, cited by the Court of Appeal of Ontario. But a number of factors lead me to think it would be unwise to do so.

> There is a persuasive argument that 'those who have chosen the benefits of incorporation must bear the corresponding burdens, so that if the veil is to be lifted at all that should only be done in the interests of third parties who would otherwise suffer as a result of that choice': Gower, supra, at p. 138. Mr. Kosmopoulos was advised by a competent solicitor to incorporate his business in order to protect his personal assets and there is nothing in the evidence to indicate that his decision to secure the benefits of incorporation was not a genuine one. Having chosen to receive the benefits of incorporation, he should not be allowed to escape its burdens. He should not be permitted to 'blow hot and cold' at the same time.

**36**    A different conclusion might emerge in a different legal context. For an example, see Federal Discount Corporation Limited v. St. Pierre (1962), 32 D.L.R. (2d) 86 (Ont. C.A.) where a debtor company and a finance company were regarded as one for the purposes of determining if the

finance company was a holder in due course of a note and conditional sales contract assigned to it by the debtor company.

The Substance of the Transactions

**37**    Accordingly, it is necessary to begin with a characterization of the substance of the transactions. The essence of them is the purchase by QEW from Chrysler Corporation or Chrysler Canada of a new vehicle under a conditional sales agreement that is financed by Chrysler Credit pursuant to the Inventory and Lease Financing Security Agreement. The sale is completed and a liability is incurred when the vehicle is shipped to QEW by Chrysler Canada. Although title to the vehicle is immediately assigned by Chrysler Canada to Chrysler Credit upon shipment to QEW, QEW is the beneficial owner of the new vehicle. Indeed, despite the contractual limitations on its beneficial ownership, QEW has a property interest in the new vehicles that includes the possession of the vehicles, the right to sell a vehicle free of any lien except for the purchase money security interest created by the Inventory and Lease Financing Security Agreement in favour of Chrysler Credit, the right to negotiate the price of the sale to the retail consumer and the entitlement to profit from the proceeds of a sale. In my opinion, the powers conferred upon Chrysler Canada and Chrysler Credit by the Inventory and Lease Financing Security Agreement, the Assignment of Factory Credit, the personal guarantees of the owners of QEW, the subordination agreements to Chrysler Credit, the Sales and Service Agreement entered into with Chrysler Canada and the complementing addenda and the invoices and conditional sales agreement relating to the purchases of new vehicles, as enumerated earlier in this judgment, and the practical application of them do not detract from, or otherwise alter, its essential character. The new vehicles are sold to QEW by Chrysler Corporation or Chrysler Canada and the purchase price is financed by Chrysler Credit.

The Interpretation of Section 61(1)d of the Act as it was Prior to May 1993

**38**    Section 61(1)d and s. 61(2) of the Act prior to May 1993 include in the paid-up capital of a corporation for taxation year "... all of the sums or credits advanced or loaned to the corporation ... by any other corporation ..." other than "... accounts payable ..." that have been outstanding for less than 365 days. The use of the revolving line of credit by QEW to finance the purchase of each new vehicle from Chrysler Canada is a "... sum or credit advanced or loaned" to QEW. Compare Re City Parking Canada Limited and Minister of Revenue, (1973), 1 O.R. (2d) 425, (Ont. C.A.) and Autobus Thomas Inc. v. The Queen (1998), 99 D.T.C. 259, (Tax Court of Canada) and [2000] F.C.J. No. 231, (Federal Court of Appeal). More will be said later concerning the definition of "accounts payable" under this and the subsequent legislation.

The Interpretation of Section 61(1)e of the Legislation Prior to May 1993

**39**    Section 61(1)e of the Act prior to May 1993 included in the paid-up capital of a corporation "... all of its indebtedness, whether assumed or undertaken by it, represented by ... lien notes and any other securities to which the property of the corporation or any of it is subject The term "... property ..." as defined in s. 248 of the Income Tax Act R.S.C. 1985, c. 1 (5th Supp) as amended is

applicable to the Act through a reference provided by s. 1(1)a of the Act. "Property" means "... property of any kind whatever whether real or personal or corporeal or incorporeal and, without restricting the generality of the foregoing, includes ... a right of any kind whatever, a share or a chose in action ...". The term "... lien notes ..." is not defined by the Act. It is, apparently, peculiar to Canada. It is used to describe the instrument in a commercial transaction creating a charge on the goods and a promise to pay their price. See Crawford and Falconbridge, "Banking and Bills of Exchange, 8th edition, (Toronto, Canada Law Book, 1986, Vol. 2 at pages 818 - 819) and Professor Frederick Read, "Negotiability as it Affects 'Lien Notes'", (1927), 5 Canadian Bar Review at 315-316.

**40**    In my opinion, the use by QEW of the line of credit given by Chrysler Credit was "... indebtedness ...". The conditional sales agreement and the purchase money security interest were "lien notes" and "... other securities to which the property of (QEW) or any of it is subject ...". The absence of title to the new vehicles in QEW is not significant in this legal context. Nor is the absence of the functional equivalent of ownership. See M.N.R. v. Wardean Drilling Limited (1969) 69 D.T.C. 5194 (Ex. Court of Canada) and Alberta (Treasury Branches) v. Canada (M.N.R.) [1996] 1 S.C.R. 963 where in different legislative contexts reference is made to the normal incidents of title, either actual or constructive, as including possession, use and risk. The property interest in the new vehicles acquired by QEW upon the shipment of them by Chrysler Canada and the other property of QEW is sufficient to bring these transactions within this section. See Re Ontship and Minister of Revenue (1974), 6 O.R. (2d) 238 at 240 (HCJ) and compare Investors Syndicate Limited v. Minister of Revenue, Judgment of Haley, J. Released on February 11, 1994 and the endorsement by the Ontario Court of Appeal dismissing an appeal from the Judgment dated February 5, 1996).

**41**    Accordingly, based upon the interpretation of s. 61(1)e of the Act prior to May 1993 and its application of this case, the appeal by QEW against the assessments by the Minister for the 1991 and 1992 taxation years are dismissed.

The Definitions of "Accounts Payable" and "Current Accounts Payable" under Section 61(2) of the Act before and after May 1993

Introduction

**42**    The Act, both and after May 1993, removes from the determination of the paid-up capital of a corporation "... accounts payable ..." and "... current accounts payable ..." as those terms are used in s. 61(1)d and s. 61(2) of the Act. There is no definition of "accounts payable" in the pre-May 1993 legislation. However, s. 61(2) of the Act was amended in May 1993 to include "... employee source deductions, current income taxes payable, wages and salaries payable (and) cheques issued and outstanding in excess of funds on deposit ..." and to exclude "... the current portion of long term indebtedness, (the) accounts payable to a related corporation that have been outstanding 120 or more days (and the) accounts payable to a corporation ... that have been outstanding 365 or more

days ...". The definitions of these terms are critical to the 1993 appeal and the other appeals insofar as they deal with capital tax liability under s. 61(1)d of the Act.

**43**    The rules governing the statutory interpretation of terms routinely used by accountants were concisely stated in Canfor Limited v. Minister of Finance [1976] 3 W.W.R. 519 (B.C.S.C.) where Fulton, J. said at page 522:

> It appears clear from the cases that where a word or expression used in a taxing statute is not expressly defined or interpreted in that statute, then if that word or expression has an accepted meaning or application in accordance with ordinary commercial or accounting principles, that meaning or application is to be given to the word or expression in applying the statute: Dominion Taxicab Assn. v. Minister, [1954] S.C.R. 82, [1954] C.T.C. 34, 54 D.T.C. 1020, [1954] 2 D.L.R. 273; Can. General Electric Co. v. Minister, [1962] S.C.R. 3, [1961] C.T.C. 512, 61 D.T.C. 1300, 30 D.L.R. (2d) 458.

> However, even although a word of expression is not specifically interpreted or defined in the statute, ordinary commercial or accounting principles do not govern the determination of its meaning if from the general context or other provisions of the statute it appears that the legislature intended otherwise. This is clearly the ratio of the decision in Trapp v. Minister, [1946] Ex. C.R. 245, [1946] C.T.C. 30, (1946), 2 D.T.C. 784, [1946] 3 D.L.R. 654, and is inherent in the decision in the Can. General Electric case, supra.

**44**    These reasons were adopted by the Supreme Court of Canada as reported at [1978] 1 S.C.R. 1047.

The Testimony of Experts Concerning "Accounts Payable"

**45**    In this case, two distinguished members of the accounting profession testified on the definition of "accounts payable". Ralph Selby, for QEW, testified that from an accounting perspective an account payable may be owing to a creditor and not just a supplier, may bear interest, may be part of a line of credit and may be secured. In his opinion, the wholesale finance liabilities recorded in the audited financial statements of QEW were properly regarded in substance as accounts payable. On the other hand, Dr. Lawrence Rosen, for the Crown, testified that ordinarily an account payable would only be owed to a supplier. It would not bear interest and would not be part of a line of credit. In most cases, it would not be secured. Reference was made during his testimony to a number of textbooks where authors expressed similar views on the definition of "account payable". In his opinion, the wholesale finance liabilities shown on the audited financial statements of QEW are not accounts payable. Based upon the evidence before the Court, it is difficult to conclude the term "accounts payable" has an accepted meaning under ordinary commercial or accounting principles. However, more will be said about the expert testimony later in this judgment.

**46**    Accordingly, and in any event, it is necessary to consider "... the general context (and) other provisions of the (Act) ..." in defining the term "accounts payable".

Section 61(2) of the Act after May 1993

**47**    Through the amendment of May 1993, the Act gave some definitional import to term "current accounts payable" by expressly including certain amounts and expressly excluding others. Those included were employee source deductions, current income taxes payable, wages and salaries payable and cheques issued and outstanding in excess of funds on deposit. None of them would be owing to a supplier. Under the Act, therefore, a current account payable may be an amount owed to a creditor as opposed to a supplier. Similarly, insofar as the subsection refers to "... cheques issued and outstanding in excess of funds on deposit ...", it contemplates, amongst other arrangements, the issuance of cheques in excess of deposits with a financial institution pursuant to a line of credit. Ordinarily, security is taken by the financial institution when a line of credit is set up. Interest is charged on an outstanding balance of a credit facility.

**48**    Therefore, the Act includes in the definition of "current accounts payable" amounts owed to a creditor including a financial institution and not just suppliers. The amount may be part of a line of credit that is secured and bears interest. Moreover, through the exclusionary portion of this section, "current accounts payable" do not include long term indebtedness or any part of it. Amounts that would otherwise be "current accounts payable" are also excluded if they have been outstanding for 365 or more days.

**49**    Given this definition of "current accounts payable" in the Act, I accept the testimony of Ralph Selby as to the meaning of the term "accounts payable" as it is used in the context of the circumstances of this case by the accounting profession. I accept his testimony because his opinion concerning the definition of "accounts payable" is similar to the position taken by the legislature in the drafting of this provision. This opinion is helpful in the interpretation of the introductory language of s. 61(2) after the amendment of May 1993 and in the interpretation of the term "accounts payable" in the section before the amendment.

**50**    What, then, is the result of the application of this definition to the circumstances of this case? The amounts described as wholesale finance liabilities are owing to Chrysler Credit as a lender under a revocable revolving line of credit. There is a separate loan for each new vehicle. The amounts are secured by the new vehicles and the proceeds of the sale of a new vehicle to a retail consumer pursuant to the Conditional Sales Agreement and the Inventory and Lease Financing Security Agreement. Interest is payable to Chrysler Credit, subject to rebates paid by Chrysler Canada for a period of up to 50 days. These amounts are usually paid within 40-60 days of delivery. This indebtedness of QEW is significant in its amount but is, in its essential character and regardless of the label attached to it under generally accepted accounting principles in the financial statements for QEW, a current liability that is routinely paid off in the short term. Generally accepted accounting principles require current liabilities owing to affiliated companies to be shown

separately. They also require any such liabilities, if secured, to be stated separately together with a statement of the nature of the security. The amounts owing to Chrysler Credit arise from the purchase of goods, namely, new motor vehicles that are sold in the ordinary course of the business of QEW. The substance of the transaction and not its form or the labelling of it in the financial statements of QEW governs the application of the legislation to this case.

Conclusion

**51**    Accordingly, the terms "accounts payable" and "current accounts payable" include the financing of the new vehicle inventory of QEW for the 1991 and 1992, and 1993, taxation years, respectively.

CONCLUSION

**52**    The appeal of QEW is dismissed Insofar as it relates to the 1991 and 1992 taxation years. Insofar as the appeal relates to the 1993 taxation year, it is allowed. The assessment for 1993 is varied by excluding from the computation of paid-up capital the amount relating to new vehicles including demonstrators. The capital tax liability of QEW is to be recalculated under the Act and the refund consequential to this Order plus interest is to be paid forthwith. Counsel may approach the Court on issues of costs if they wish.

TRAFFORD J.

cp/s/qlala/qlalo

*Case Name:*

# QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Finance)

**Between**
**QEW 427 Dodge Chrysler (1991) Inc., appellant (respondent in appeal), and**
**The Minister of Revenue, respondent (appellant in appeal)**

[2002] O.J. No. 1639

59 O.R. (3d) 460

160 O.A.C. 129

2002 D.T.C. 7228

Court File No. 641/01

Ontario Superior Court of Justice
Divisional Court - Toronto, Ontario

**Blair, Kruzick and Linhares de Sousa JJ.**

Heard: January 17, 2002.
Judgment: April 29, 2002. Released: May 1, 2002.

(25 paras.)

**Counsel:**

J. Gregory Richards and Michael Statham, for the appellant (respondent in appeal).
Anita C. Veiga-Minhinnett, for the respondent (appellant in appeal).

---

The judgment of the Court was delivered by

**LINHARES DE SOUSA J.:--**

Nature of the Appeal

**1**    The Appellant, the Minister of Revenue, ("Minister"), brings this appeal against a decision of Mr. Justice Trafford dated July 7, 2000. In his decision, the trial judge allowed an appeal by the Respondent, QEW 427 Dodge Chrysler (1991) Inc. ("QEW"), under s. 85 of The Corporations Tax Act, (R.S.O. 1990, c. C.40), as amended ("Act"), against a capital tax assessment made by the Minister of Finance for Ontario for the taxation year 1993. He dismissed two other capital tax appeals brought by QEW for the taxation years of 1991 and 1992, which are not the subject of this appeal.

**2**    The Minister also appealed the decisions of Mr. Justice Trafford dated 15 September 2000 and 30 January 2001 ordering the Appellant to pay costs of the 1991, 1992 and 1993 appeals to the Respondent, as assessed on a solicitor and client scale, the assessed costs to include all amounts paid for the Respondent's expert at trial, Mr. Ralph F. Selby, including the amounts paid for the expert to prepare his reports.

The Decision of Mr. Justice Trafford

**3**    On the evidence presented before him, the trial judge found that QEW carried on the business of an automobile dealership using a financial arrangement whereby it purchased new vehicles from the manufacturer, Chrysler Canada Limited ("Chrysler Canada") through a line of credit arranged with Chrysler Credit Canada Limited ("Chrysler Credit") which arrangements were described as "wholesale financial liabilities" in the audited statements of QEW for the taxation year in question, 1993. In his decision, the trial judge described in great detail his findings concerning the purchase and financing arrangements of QEW. None of the parties on this appeal took issue with the findings of fact regarding the details and true substance of the financial transactions. For the purposes of the Act, Chrysler Canada, Chrysler Credit and QEW were found to be separate and distinct entities as opposed to one economic unit.

**4**    The issue of legislative interpretation decided in favour of QEW was whether the "wholesale financial liabilities" as found in audited statements of QEW for the year 1993 could be considered "current accounts payable" as that term was used in s. 61(1)(d) and 61(2) of the Act as amended in 1993. Under s. 61(1)(d) and 61(2) of the 1993 amended Act, "current accounts payable" were excluded from the paid up capital of a corporation for the purposes of payment of capital tax. The definition of that term was therefore critical to the appeal.

**5**    In coming to his conclusion, the trial judge found that there was no definition of "accounts payable" in the pre-May 1993 legislation. However, the May 1993 amended legislation provided a list of inclusions and exclusions to a corporation's "current accounts payable" for the purpose of the computation of a corporation's paid up capital. It was found that these May 1993 amendments to the Act gave some definitional import to the term "current accounts payable".

**6**    In addition to this legislative examination and in accordance with the rules governing the statutory interpretation of terms routinely used by accountants, the trial judge also considered the expert evidence presented by both parties to ascertain whether "accounts payable" or "current accounts payable" had an accepted meaning or application, in circumstances such as these, under ordinary commercial or accounting principles. In the face of the conflicting expert evidence on this point, the court could not conclude that the term "accounts payable" had an accepted meaning under commercial or accounting principles.

**7**    Despite the absence of an accepted meaning under commercial or accounting principles to the term "accounts payable", in these circumstances, the Court found that the testimony of one of the experts, Mr. Ralph Selby, concerning the meaning of the term "accounts payable" was consistent with and similar to the definitional import found in the 1993 amended legislation.

**8**    After considering the true nature of the wholesale finance liabilities of QEW owing to Chrysler Credit, as he found them, and in light of the interpretation that could be given to the term "current accounts payable", the trial judge concluded that the term "current accounts payable" includes the financing of the new vehicle inventory of QEW for the 1993 taxation year. The appeal was allowed and the assessment for 1993 was varied to exclude from the computation of paid up capital the amount relating to new vehicles, including demonstrators.

Standard of Review

**9**    The standard of review for appeals from an order of a judge is whether or not the decision of the judge was "clearly wrong". In order to succeed on the appeal, the Minister must show that the trial judge acted on a wrong legal principle or disregarded or, misinterpreted material evidence. In Hickman Motors Ltd. v. Canada, [1997] 2 S.C.R. 336, Madam Justice L'Heureux-Dubé stated at p. 352:

>        ...

>        A reviewable error of law exists where there has been a mistake of law, such as addressing the wrong question, applying the wrong principle, failing to apply or incorrectly applying a legal principle, or drawing an improper inference from established facts ...

See also Cosyns v. Canada (A.G.) [1991] O.J. No. 2612.

**10**    This standard applies equally to both findings of fact and to the application of legal principles. As was stated in Schwartz v. Canada (1996), 133 D.L.R. (4th) 289, a judge's factual findings are entitled to deference on appeal. On this point, it has already been stated that the trial judge's findings of fact regarding the details and true substance of the financial transactions in question were not disputed on the appeal.

Decision

**11**    In the case at bar, I conclude that there is no error in law in the legislative interpretation made by the trial judge in his decision. In response to the first issue raised by the Minister, I cannot find that the trial judge failed to interpret the word "liabilities" in clause 61(1)(d) of the 1993 amendments, as the appellant argued. On reading the decision, it is both explicit and implicit that he found the wholesale financing of QEW for its new vehicles to be liabilities within the meaning of 61(1)(d) of the Act. It can only be for this reason that he then went on to consider whether they were "current accounts payable" which were a designated exclusion under s. 61(1)(d).

**12**    With respect to the second and third issues raised by the Minister, namely that the learned trial judge interpreted incorrectly the term "current accounts payable" and gave it a meaning that it can not bear, I can find no error. The trial judge states the principles of legislative interpretation considered and applied at pp. 20 to 22 inclusive of his decision under the subheading "The Interpretation of Tax Legislation". At p. 26 of his decision, at the commencement of his discussion of the specific term "current accounts payable", he considers the rules governing the statutory interpretation of terms routinely used by accountants as established in Canfor Limited v. Minister of Finance, [1976] 3 W.W.R. 519 (B.C.S.C.). He specifically acknowledges that an accepted meaning of a term under ordinary commercial or accounting principles does not necessarily determine its meaning in a statute. One must also consider the general context and other provisions of the statute to see what was the legislative intent. He considered the appropriate principles of legislative interpretation and applied them correctly in interpreting the term "current accounts payable".

**13**    The Minister argues that the trial judge erred in law when he failed to give the term "current accounts payable" a plain meaning, not based on the definitional import of the enumerated class set out in the list found in s. 61(2)(a), (b), (c) and (d) of the 1993 amendments. However, based on the extremely conflicting expert evidence on this point, the Court could only conclude that on the evidence the term "accounts payable" does not have an accepted plain meaning under ordinary commercial or accounting principles in these circumstances. Having reviewed the transcripts of this expert evidence, I cannot find that the trial judge, in any way, misapprehended this evidence nor that his conclusion of fact on this evidence was unreasonable. Based on that conclusion, the Court proceeded to examine the general context, legislative framework and other provisions of the Act, before coming to its conclusion. (See p. 27 of the decision.)

**14**    The Minister has not convinced me that the trial judge gave to the term "current accounts payable" a meaning which it cannot bear in the context of this case. This meaning has not been shown to be contrary to nor in conflict with the scheme of the Act and its legislative intent. The conflicting expert evidence presented before the Court indicates that the term can bear that meaning. Finally, the jurisprudence cited by the Minister in support of its interpretation of the term, are not on all fours with the facts and the legislation under review, Autobus Thomas Inc. v. Canada (1998), 99 D.T.C. 259 (T.C.C.); aff'd [2000] F.C.J. No. 231 (F.C.A.) leave to appeal to the Supreme Court of Canada granted, [2000] S.C.C.A. 130, October 1, 2000; Harold Gross Machinery Inc. v. Ontario

(Minister of Finance), [1996] O.J. No. 2612 (Gen. Div.); aff'd (1998), 162 D.L.R. (4th) 509 (C.A.) and Investors Syndicate Limited v. The Minister of Revenue, [1994] O.J. 259 (11 February 1994), (O.C.G.D.); [1996] O.J. 342 (5 February 1996) (O.C.A.) . In fact, there is case law consistent with the meaning given to the term by the trial judge in the decision of Canfor Limited v. Minister of Finance, supra at p. 525, reasons adopted by the Supreme Court of Canada, [1978] 1 S.C.R. 1047.

**15**    For the above reasons, I dismiss the appeal for the 1993 taxation year.

Appeal on the Costs Award

**16**    With respect to the issue of costs, in his endorsement of 15 September 2000 and 30 January 2001, the trial judge ordered the Minister to pay the costs of all three appeals to QEW as assessed on a solicitor-client scale, including all amounts paid for Mr. Selby. His reasons for doing so are correctly stated in the Factum of the Respondent in appeal, QEW 427 Dodge Chrysler (1991) Inc. at pp. 26 and 27.

    (1)    "[T]he appellant [QEW 427] ... achieve[d] a substantial measure of success in that the 1993 appeal governs the existing legislation."

    (2)    "[T]he appeals were test cases brought for the purpose of resolving the outstanding tax appeals of many automobile dealers in Ontario."

    (3)    "The issues raised by the appeals were significant ... ."

    (4)    "The appeals were factually and legally complex."

    (5)    "They [the appeals] were integrated with one another with the consequence that the result of the appeals concerning the 1991 and 1992 taxation years should not result in an apportionment of costs."

    (6)    "This case ... is akin to public interest litigation even though it did not involve a consideration of the constitutionality of the legislation."

**17**    The trial judge concluded by saying:

> This ruling of the court on the issue of costs is not intended to disapprove of the conduct of the government's case.

**18**    It is well established in law and by the relevant legislation that a trial judge has a broad discretion in making an award of costs. Section 131 of the Courts of Justice Act reads as follows:

> 131.(1) Subject to the provisions of an Act or rules of court, the costs of and incidental to a proceeding or a step in a proceeding are in the discretion of the court, and the court may determine by whom and to what extent the costs shall be paid. R.S.O. 1990, c. C.43, s. 131(1).

Crown costs

(2)     In a proceeding to which Her Majesty is a party, costs awarded to Her Majesty shall not be disallowed or reduced on assessment merely because they relate to a lawyer who is a salaried officer of the Crown, and costs recovered on behalf of Her Majesty shall be paid into the Consolidated Revenue Fund. R.S.O. 1990, c. C.43, s. 131(2); 1994, c. 12, s. 45.

19     Rule 57.01(1) and (2) provides some general principles for the court's consideration in exercising its discretion under section 131 of the Courts of Justice Act and reads as follows:

Factors in Discretion

57.01(1) In exercising its discretion under section 131 of the Courts of Justice Act to award costs, the court may consider, in addition to the result in the proceeding and any offer to settle made in writing,

(a)     the amount claimed and the amount recovered in the proceeding;

(b)     the apportionment of liability;

(c)     the complexity of the proceeding;

(d)     the importance of the issues;

(e)     the conduct of any party that tended to shorten or to lengthen unnecessarily the duration of the proceeding;

(f)     whether any step in the proceeding was,

(i)     improper, vexatious or unnecessary, or

(ii)     taken through negligence, mistake or excessive caution;

(g)     a party's denial of or refusal to admit anything that should have been admitted;

(h)     whether it is appropriate to award any costs or more than one set of costs where a party,

(i)     commenced separate proceedings for claims that should have been made in one proceeding, or

(ii)     in defending a proceeding separated unnecessarily from another party in the same interest or defended by a different solicitor; and

(iii)  any other matter relevant to the question of costs.

Costs Against Successful Party

(2)  The fact that a party is successful in a proceeding or a step in a proceeding does not prevent the court from awarding costs against the party in a proper case.

**20**  It was stated in Cosyns v. Canada (A.G.), supra that the exercise of judicial discretion should not be interfered with unless it is apparent that the judge applied erroneous principles that rendered the result "clearly wrong". The judge must have acted on a wrong principle or disregarded or misinterpreted material evidence.

**21**  After examining the trial judge's reasons for awarding costs against the Minister, I cannot find that he acted contrary to case law. He appropriately and correctly considered a number of factors listed in R. 57.01 of the Rules of Civil Procedure. He also considered why the Minister should pay costs even though it was successful in two of the three appeals.

**22**  I agree that, based on the current jurisprudence relating to the term "public interest", to characterize a judicial determination of a statutory appeal of fiscal legislation in the Province of Ontario as "public interest litigation" would expand the meaning of that term. However, the trial judge did not find that the case in question was public interest litigation but only "akin to public interest litigation".

**23**  Where the trial judge did err was in his award of the scale of costs. Having specifically found that there was nothing to disprove of in the conduct of the Minister's case, there was no basis in law to award costs on a solicitor and client scale. On this principle, I am guided by the words of Madam Justice McLachlin at p. 134 of Young v. Young, [1993] 4 S.C.R. 3 (S.C.C.):

> ... Solicitor-client costs are generally awarded where there has been reprehensible, scandalous or outrageous conduct on the part of one of the parties.

**24**  On the facts of that case, even a party advancing a position totally without any merit did not justify an award of solicitor and client costs.

**25**  I, therefore, grant the appeal on costs in part and amend the order of costs of the trial judge to an order of costs on a party and party scale against the Minister. The amounts paid for Mr. Selby to prepare his reports is an item of disbursement specifically addressed by the trial judge and I see no reason to change that part of his order.

LINHARES DE SOUSA J.
 BLAIR J. -- I agree.

 KRUZICK J. -- I agree.

cp/s/qlrme/qlrcr

*Indexed as:*

# Reddin v. Mills

**Between**
**Joyce Corrine Reddin, Plaintiff, and**
**John Armstrong Mills, Defendant**

[1995] B.C.J. No. 352

53 A.C.W.S. (3d) 691

Vancouver Registry No. C931691

British Columbia Supreme Court
Vancouver, British Columbia

**Hood J.**

Heard: January 18-20, 1995.
Judgment: filed February 21, 1995.

(70 pp.)

*Trusts -- Resulting trusts -- Transfer of property for illegal purpose -- Rebuttal of the presumption of trust -- Intention -- Evidence.*

Action for a declaration that the defendant held certain real property in trust for the plaintiff. The plaintiff and her husband acquired the property in question in late 1980. They occupied the property as their matrimonial home until 1988 when the couple separated and the plaintiff's husband moved out. Title to the property was registered in the name of the plaintiff and by December 1982, it was subject to a first and second mortgage. In June 1983, the plaintiff transferred the property to the defendant. At the time of the transfer in question, the defendant and the plaintiff's husband had been personal friends for several years. The transfer was made in order to protect the property from potential creditors. The defendant's only role in the matter was to sign the documents and to contribute the sum of $5,500 to the scheme. That sum represented only about four percent of the value of the property. After the transfer, the plaintiff and her husband continued to meet all the property-related obligations, including the mortgage obligations. The plaintiff's husband having died in 1992, she now claimed the property on the basis of a constructive or resulting trust. The

defendant denied that he held the property on an express or resulting trust and contended that given the illegal character of the transaction, the plaintiff was not entitled to equitable relief because she did not have clean hands.

HELD: Action allowed. All of the circumstances bearing upon the plaintiff's claim supported the conclusion that the defendant held the subject property on a resulting trust for her. That resulting trust was presumed and, on the evidence adduced, the defendant had not succeeded in his attempt to rebut it. The fact that he provided a nominal consideration for the transfer made no difference to the plaintiff's entitlement to rely on the presumption of a resulting trust in the scenario presented here. Given that the plaintiff had established her presumed equitable proprietary interest in the property without having to rely on the illegal purpose of the transaction, the defendant could not raise or rely on the illegal purpose in order to rebut the presumption.

Counsel for the Plaintiff: R. Pelletier.
Counsel for the Defendant: R. Shantz and B. Findlay.

---

**HOOD J.**:--

INTRODUCTION

**1**    In late 1980 the plaintiff and her husband, David Reddin, purchased the lands and premises situate at 9491 Finn Road, in Richmond, British Columbia. Thereafter they occupied the property as their matrimonial home, until 1988 when the couple separated and Mr. Reddin moved out. Title to the property was registered in the name of the plaintiff, and a mortgage against the property in the name of Kinross Mortgage Corporation was assumed by her. In December of 1982 a second mortgage was granted against the property to Nadar Holdings Ltd.

**2**    On or about June 17, 1983 the plaintiff transferred the property to the defendant. She says that the transfer was made as a result of an agreement, made between her husband and the defendant, that the defendant was to hold the property in trust for her and her husband. In this action she seeks a declaration that the defendant holds the property in trust for her, her husband having died on September 8, 1992. In the event that the express trust agreement is not made out, she claims the property on the basis of a constructive or a resulting trust.

**3**    The defendant denies the trust agreement asserted. He says that at the time of the transfer he paid the plaintiff and her husband the sum of $5,395.49, being their equity in the property, and assumed the aforesaid mortgages; that it was agreed that the plaintiff and her husband could live on the property provided they paid the property charges or expenses, such as mortgage payments,

taxes, insurance and so on. He says further that at the time of the transfer he also gave the plaintiff and her husband an Option to Purchase the property dated June 17, 1983, for the sum of $155,000.00, being the value agreed to at the time of the transfer, the said Option to be open until August 1, 1989. The Option not being exercised, the defendant counterclaims for a declaration that he is the legal and beneficial owner of the property, and for ancillary relief.

**4**    The primary issue is the nature of the transaction when the plaintiff transferred the property to the defendant on June 17, 1983. There are also evidentiary issues to be resolved, which counsel agreed should be reserved to a later date after the evidence had been heard. The major issues are the admissibility of the plaintiff's evidence as to what her husband told her about the agreement made between him and the defendant, to her exclusion, before the property was transferred; as well as the admissibility of the defendant's evidence as to what the plaintiff's husband said to him about that agreement and related matters.

**5**    Both parties assert that the questioned evidence tendered on their own behalf is admissible hearsay. In retrospect, I am not convinced that the general reservation of evidentiary issues is the best practice to follow. Both counsel took liberties, when examining all witnesses in the area of obvious hearsay, and in any event, the result is a body of evidence containing a fair amount of inadmissible evidence. While I have included most of it in my review of the evidence, I do not rely on any of it in coming to my decision.

THE EVIDENCE

**6**    I turn now to review the evidence, during which I will make observations or express my opinions thereon, from time to time.

**7**    Ms. N. Schick, a notary public, gave evidence on behalf of the plaintiff. Most of the relevant documents were prepared by her or by her father, G. Fox, who was also a notary public, and with whom she shared offices. Most of the relevant documents were prepared and witnessed by one of them.

**8**    The first document, the Interim Agreement, is dated June 15, 1983. It is signed by both parties. It is stated on its face that the purchaser, the defendant, assumes the first mortgage in the approximate sum of $64,000.00 and the second mortgage in the approximate sum of $87,000.00. The second mortgagee's consent dated June 16, 1983, to the assignment of the second mortgage, is contained on the front of the Interim Agreement. Much of the document is in Mr. Fox's handwriting according to the witness.

**9**    The next document is a form letter dated June 17, 1983 signed by the plaintiff and addressed to the witness. By this document, the plaintiff acknowledges that Ms. Schick was representing the purchaser defendant, and that she had been advised to seek independent representation. The date is in the witness's handwriting. She could not recall ever receiving instructions from either party with regard to any of the documentation, or giving either of them any advice on any matter.

**10**    The next document is a Vendor's Statement of Adjustments which the witness prepared. The purchase price is $155,000.00. The value of the first mortgage is $63,015.69, and the second mortgage $87,743.76. The "proceeds of sale due vendors" is $4,694.49. She has no recollection, but she believes that the monies were paid out of her trust account, since monies had been deposited therein.

**11**    The next document referred to is a photocopy of a certified cheque dated June 17, 1983 drawn on the Canada Trust Company by the defendant, in the amount of $5,514.14 and payable to the witness. She could not recall if the monies were paid to the plaintiff. The next document is the Transfer of an Estate in Fee Simple dated June 17, 1983. She has no recollection, but she believes that she prepared the document. She witnessed the plaintiff's signature.

**12**    The next document is a Purchaser's Statement of Adjustments dated June 17, 1983. The "amount required from purchaser" is stated to be $5,395.49. The document was typed from notes in her handwriting, and she believes she prepared it. The cheque amount is different from the amount stated on the Purchaser's Statement of Adjustments, but nothing turns on this, say counsel. She got the information about the first mortgage from its assignee, Canadian Imperial Bank of Commerce, by telephone. She couldn't recall the source of the information with regard to the second mortgage. That mortgage, which is in the name of Nadar Holdings Ltd., was prepared in December of 1982 by Mr. Fox. It is a one year mortgage payable on December 23, 1983, and provides for monthly interest payments only.

**13**    Ms. Schick was asked her recollection of what her understanding was at the time of the transfer; was it a transfer to the defendant as legal owner "to hold in trust the beneficial interest for the plaintiff"? She said that she had no recollection of the transaction. However, she said that she did telephone to and write the defendant in February of 1993, suggesting that in fact the defendant had been acting as trustee for the plaintiff and her husband. This was her "conclusion" after discussing the matter with the plaintiff when she came in to see her in February of 1993.

**14**    Counsel for the defendant objected to the admissibility of the witness's letter which was dated February 19, 1993, on the basis that Ms. Schick was acting for the plaintiff at the time, and was in effect attempting to negotiate settlement. I am satisfied that she certainly was representing the plaintiff's interests at that time, but I am not satisfied that she was then within the confines of settlement negotiations, such that her letter was without prejudice. In any event, I am of the opinion that the letter is admissible, although its evidentiary value is limited. The letter is not evidence of the existence of the express trust arrangement asserted by the plaintiff; and those portions of the letter which amount to hearsay evidence, and were not otherwise properly proven at trial, are not admissible as proof of the truth of the contents. Ms. Schick had very little recollection of what went on at the time of the transfer of the property, and her "conclusion", after discussing matters with the plaintiff, is not evidence and, of course, could not establish the trust agreement asserted.

**15**    I need not refer to the letter further, other than to note the assertions therein that "at the time

the property was transferred the Reddins were not able to hold property in their name", and that "prior to Mr. Reddin's sudden death she assumed Mr. Reddin was taking care of this matter", i.e. that the property had been transferred back into their names; also that there is an alternative assertion made "failing the above trustee situation" that the home was the defendant's principal residence. Finally, according to the letter the defendant's concerns at that time were with regard to capital gains, and he required information for his accountant's purposes.

**16**    Returning to Ms. Schick's evidence, she said that she sent the letter dated February 19, 1993 to the defendant at the request of both the plaintiff and the defendant. The plaintiff had gone to see her after the defendant had delivered to her a "termination notice to tenant" dated December 23, 1992, giving the plaintiff notice to give up possession of the subject property by February 3, 1993. She said that at the time it seemed to her that, as between the parties, it was just a matter of establishing a figure; and the information was forwarded for the purposes of the defendant's accountant. She also sent him copies of a search of title, of the Option to Purchase dated June 17, 1983, and of various assessment notices, which apparently the defendant requested.

**17**    The Option is in evidence by consent, as are all of the other documents referred to. It is dated June 17, 1983, is signed by the defendant as "the vendor", and is in favour of the plaintiff and her husband, David James Reddin, as "the purchaser". The consideration for the Option is $1.00, the purchase price is $155,001.00 and it is stated to be open to August 1, 1989. It is stated in the Option that in the event that it is exercised, the purchase price shall be paid as follows:

> The Purchaser shall have the right to assume any existing financing on the property, providing approval is granted by the Mortgagee(s) if required or the Purchaser may payout any existing mortgages on the property and the amount so paid shall form part of the purchase price.

> The purchase price shall be comprised of the amount of any mortgages assumed by the purchaser, the amount of any mortgages on the property paid out by the purchaser and a balance of cash to total the purchase price of $155,000.00.

**18**    Ms. Schick was asked why she enclosed the three documents with her letter of February 19, 1993. She says that she did this because they were discussed during her telephone conversation with the defendant. She was again asked for her opinion with regard to the trust issue, with which I have already dealt. She concluded her evidence on direct examination saying that "Mills said that he was merely trying to get the ball rolling, and wanted compensation for his trouble over the years."

**19**    On cross-examination Ms. Schick said that before sending out the February 19, 1993 letter, she pulled their files from storage, and discussed the matter with the plaintiff and with Mr. Fox. She then volunteered that Mr. Fox "confirmed what I believed" and "what I surmised from the documents." She was asked why she stated in the letter that the plaintiff had not paid any money "to get the home transferred", when the file would have disclosed otherwise. She said "it was

information I was given, it was Reddin's money." It was suggested to her that the plaintiff had told her that. She said no, that Mr. Fox had told her that. She confirmed that it was not "her information", but what she had been told. It was suggested that she simply believed her father's information, and she said no, that her conversation over the phone with the defendant led her to believe that that was the situation. She gave no particulars. She again said that at the time she understood it was simply a matter of how much money was needed to effect the transfer; an understanding which would seem to be somewhat inconsistent with the assertion that it was "Reddin's money".

**20**    According to her, the letter was her "understanding" of the situation after talking to the plaintiff and reading the documents. She does not remember anything other than what she "can derive from looking at the file." She could not recall anything about "credit problems", or why the Option was to the plaintiff and her husband. When preparing the documents her instructions came from Mr. Fox. She says that that was "the way he did it."

**21**    Defence counsel continued to press her with regard to her "understanding of what the transfer was all about" and she replied again, according to my note: When I looked at all of the documents, a contract prepared by my father, and all of this information - that is where I derive my opinion about the trust.

> It was then put to her that she was giving somebody else's opinion in the letter. She replied no, that she was giving her own opinion after reading the entire file. She was then pressed to agree that she simply chose to ignore the fact of payment of money by the defendant as disclosed by the file, and she said "I believed what Gordon Fox told me about the funds."

**22**    The cross-examination of the witness on her "understanding", and on what she was told by her father, demonstrates the danger in cross-examining an unfriendly witness on inadmissible evidence volunteered or given on direct examination. The result is more unfavourable and inadmissible evidence, save here for what the witness says the defendant said to her.

**23**    Returning to the documents, there is in evidence a Transfer of Estate in Fee Simple dated June 17, 1983, signed by the defendant, and in favour of the plaintiff and her husband. It was to be filed on the Option being exercised. There is also a letter of direction in that regard dated June 17, 1983, from the defendant to Ms. Schick.

**24**    Apparently the witness was unable to produce her December, 1982 trust ledgers, but was able to produce those of her father, Mr. Fox. He was the one who did the "Nadar documents". The ledger shows that $67,000.00 was deposited in his trust account on December 30, 1982 to the credit of "Reddin". The sum of $6,592.00 went to the plaintiff, and $60,000.00 to the Royal Bank, presumably into an interest bearing account.

**25**    A further page of the ledger showed a deposit of $83,877.33 on April 26, 1983. Two other

sums, $5,000.00 and $56,024.19, are shown under a column "Control", for which she had no explanation. She only knows that the monies were credited to the Reddin account. The final page of the ledger shows six $10,000.00 cheques, and a seventh in the amount of $974.19, dated May 2, 1983, being issued to the plaintiff. This was about six weeks prior to the transfer of the property from the plaintiff to the defendant. The witness was unable to produce further 1983 ledgers of her father. And she agreed that she can only assume that what the ledger indicates, that cheques were sent out, were things which they did.

**26**    She also agreed that her father's ledger referred to, does not explain where all the monies held in trust went during the trust period. She seemed to agree that the ledger indicated where the $60,000.00 went, but not the $83,000.00. Apparently Mr. Fox handled the monies relating to both Nadar Holdings Ltd. transactions, that is the Nadar Holdings Ltd. mortgage which is dated December 30, 1982, of which apparently only $67,000.00 was advanced, and the actual pay out of the mortgage when it was discharged. And the evidence is that the mortgage was paid out in 1983, although apparently the discharge was not filed in the Land Registry Office until July of 1984. The evidence in this area, and that which purports to be disclosed by Mr. Fox's ledger, is unclear, to say the least. Clearer evidence should have been forthcoming, if counsel was of the opinion that it was important for the court to know the evidence in this area. Mr. Fox was not called to give evidence at the trial.

**27**    The plaintiff is 62 years of age. She is retired from her part-time employment, as a "demo person" for Save-On Foods. The subject property was purchased by her and her husband in 1980, but was registered in her name only. She and her husband were married in 1958. They separated in 1988, and he left the home. She continues to live in it. She says that she and her husband never discussed what to do with the home; although "I knew someday it would be transferred back to us." She says she knew this because her husband told her that, "we could live there as long as we wanted to, and if not we could sell it."

**28**    Her late husband was always a salesman, and worked for various companies over the years. She could not recall what he was selling in the year 1983. He was a "businessman." He made all the decisions for the family, without discussing matters, or the decisions, with her. He died in September of 1992. The defendant was her husband's good friend for many years, even before they married; although, apparently she had little to do with the defendant.

**29**    She was surprised when the termination notice to tenant was delivered to her door. She never considered herself to be a tenant, or the defendant to be a landlord. She said that it was always a trust relationship, that that was always her "understanding, with my husband right from the beginning, and Jack as well." After receiving the notice she went to the defendant's home to talk with him. Her evidence in this area is unclear. She said that the defendant told her that he was not in any hurry, that he just wanted "to get the ball rolling". This evidence may have some relevance in light of Ms. Schick's evidence, that the defendant used the same terminology with her, when he told her in February of 1993, that he wanted compensation, and in light of the defendant's evidence that

he was to get his equity out on the sale of the property, and that he wanted to see if the plaintiff would buy the property.

**30**    She has had very little recollection of the Nadar Holdings Ltd. mortgage, although apparently she was the one that signed most of the documents, for example a document, entitled "Distribution of Mortgage Proceeds", prepared by Mr. Fox. The document shows that of the $87,000.00 mortgage, $20,000.00 was held back "as prepayment of mortgage to be used for payment of monthly payments until used in full", and that the balance paid out was in the sum of $66,592.00. The statement is signed by the plaintiff under the caption "agreed and approved."

**31**    I pause here to note that initially, even at the time of her discovery, the plaintiff took the position that the Nadar mortgage was never a real mortgage at all; that in effect it was a phony transaction. In her reply to statement of defence, and defence to counterclaim, it is pleaded:

> 3.    In reply to Paragraph 4 of the Statement of Defence herein, the Plaintiff states and the fact is that the said Nadar mortgage allegedly assumed by the Defendant was of no practical or economic effect, and the said mortgage was prepared, executed and registered without consideration or funds being advanced by the mortgagee to the Defendant or anyone on his behalf, and that as a consequence the said mortgage did not represent any indebtedness.

Apparently at discovery the plaintiff testified to this effect, and that no monies had been paid out under the mortgage and no payments made on it. At trial she testified that her evidence was not correct; that she later obtained copies of cheques issued by her for interest payments on the mortgage, which refreshed her memory. And her counsel obtained an order striking out the paragraph numbered 3, to which I have referred.

**32**    It will be seen that I am of the opinion that the plaintiff's initial view of the Nadar mortgage transaction was not that far off the mark. Her evidence in that regard was basically the same as that of the witness Pollen, the principal of Nadar Holdings Ltd., again in the first instance. He testified that initially, when approached by defence counsel, he had been of the opinion that no monies had been advanced on the Nadar mortgage, and that the mortgage had simply been placed against the property. According to his testimony he subsequently changed his view after finding some old company records. He then interpreted the records referred to, mainly handwritten entries of his deceased accountant, as disclosing money advanced, payments against interest and repayment.

**33**    It will be seen that I have concluded from the whole of the evidence that, regardless of whether or not mortgage monies were advanced, interest payments made or the mortgage monies repaid (and I need not decide whether or not they were) David Reddin's purpose in arranging the Nadar mortgage transaction, and having it registered against the property, together with the purported sale to the defendant, was to delay his creditors, or their creditors, given the fact that the properties being foreclosed out were registered in his name and in the name of the plaintiff. It is my

opinion as well, that both the plaintiff, and the defendant, knew of, and joined in, that purpose.

**34**    While I will deal with the records before me pertaining to the Reddins' creditors in a moment, I will note here as well, that there is no evidence before me of any executions having been taken out, or bankruptcy proceedings, against the Reddins. Nor is there any evidence that any of their creditors suffered any losses. In fact, as will be seen in a moment, the title to the two properties which were in foreclosure at the time of the conveyance, ended up registered in the name of the Reddins' son. Hence, it would appear that their financial problems were eventually resolved.

**35**    Returning to the plaintiff's evidence, she acknowledged having seen the Nadar Holdings Ltd. mortgage on a number of occasions, and identified her signature thereon. She could not recall receiving any monies personally, or whether her husband received any of the monies under the mortgage. I have already noted that she signed the document entitled "Distribution of Mortgage Proceeds".

**36**    She then identified a photocopy of the face of a cheque dated January 23, 1983, in the amount of $971.50, payable to Nadar Holdings Ltd., and signed by her husband. She also identified photocopies of the face of three cheques signed by her, in favour of Nadar Holdings Ltd., in the sum of $800.00, and dated respectively February 23, March 23 and June 23, 1983. The cheques are numbered 168, 175 and 200. Finally she identified a photocopy of the face of a fourth cheque in the amount of $800.00, dated July 23, 1983, drawn by her in favour of Nadar Investments Ltd., on another institution, Canada Trust. The plaintiff testified that she recalled making out and signing all of the cheques at the same time, notwithstanding the fact that the numbers on the cheques are not consecutive. It is common ground that the mortgage was eventually paid out. She did not arrange for this, nor did her husband discuss it with her.

**37**    With regard to the signing of the Transfer document, and other documents, pertaining to the transfer to the defendant, she recalls "signing some documents", which she did not read, and had not seen before. This occurred in her husband's car in the parking lot at Ms. Schick's office. She did not seek independent advice before she signed the document, and she could not recall whether Ms. Schick explained their contents to her. Her husband did not do so. She could not recall if she was given an opportunity to review the document. She said that it was a "hurried deal - sign here, sign here, etc. and then I took off in my vehicle."

**38**    She identifies her signature on the documents, for example the Interim Agreement, the Vendor's Statement of Adjustments, and the Transfer, but she cannot recall signing them. She didn't know whether or not she had seen the Option Agreement dated June 17, 1983 prior to commencement of the action. According to her she was shocked to find that there was such a document, and that the time had run. She said again that it was her understanding that they could transfer the property any time she and her husband wanted to.

**39**    After the transfer she and her husband remained in possession and control of the property, and made the mortgage payments, taxes, insurance and other expenses. She continued to do so after her

husband died. She denies any agreement with the defendant that the payment of the costs and expenses were "in lieu of rent". She said that subsequent to the transfer of the property to the defendant on June 17, 1983, she and her husband made a number of improvements to the property. They built a two car garage in August or September of 1983, and still later they put in a swimming pool and a fence. The cost of the garage was approximately $8,000.00, of the pool $1,200.00 to $1,300.00, and the fence $900.00. Most of the work was done "by the family."

**40**    I turn now to the evidence given by the plaintiff on cross-examination. She was asked what the purpose was in transferring the property to the defendant. She said "I don't know, my husband just wanted to do it." She knew that the property was being transferred to the defendant. It was put to her that she and her husband were in financial difficulties at the time. She said that her husband was, and that "he dragged me down with him." It was put to her, that she knew at the time that the transfer was being done in order to avoid their creditors. She said "no I did not, it was never discussed." She was asked again whether she transferred the property to the defendant without knowing the real reason, and she said "that's right, because that's what he wanted to do." It was put to her, that at the time she was aware of the fact that other properties owned by her and her husband were under foreclosure, and she said "I was told that by my husband, yes".

**41**    I pause here to note that I had some concerns with the plaintiff's testimony, which at times was inconsistent, and at other times improbable. The foundation of her evidence is that her husband never told her anything, and made all family and business decisions without discussion with her. She would simply sign documents which she hadn't read, and knew nothing about. She says she did not know why her husband wanted the property transferred to the defendant. Yet she said she knew that he was in financial difficulties, that he told her about their properties being foreclosed out and, if she is to be believed, he told her that the property was being transferred to the defendant in trust for them. In any event, I am satisfied on the whole of her own evidence, that the plaintiff knew that the purpose of the transfer of the property to the defendant was to prevent any of their creditors from taking it, or their equity in it, in the event that an attempt to do so was made. Her discovery evidence on the subject, yet to be referred to, bolsters this conclusion.

**42**    With regard to the Nadar Holdings Ltd.'s mortgage, which she signed in December of 1982, she says she didn't read it before she signed it, and therefore did not know it was a mortgage. For the same reason she didn't know what its purpose was, i.e. to obtain money from the mortgagee. She did not know at the time the reason she and her husband were going in to see Mr. Fox, in whose presence she signed the mortgage. It was pointed out to her that normally a notary public goes over a document and explains its consequences to the signer, and suggested that the document had been explained to her. She denied that this was the case. At discovery she had denied any knowledge of the Nadar mortgage. According to her, she had no recollection of it until some time later, when she found copies of the cheques which she sent to Nadar Holdings Ltd. Again, I am satisfied that the plaintiff knew the nature and purpose of the Nadar Holdings Ltd. mortgage which she signed, that its purpose was to prevent creditors from taking their home.

**43**    The plaintiff also acknowledged, that although she has conducted a search for documents, she has been unable to find any document which establishes her "understanding", that the defendant was to hold the property in trust for her and her husband. She says that she never would have transferred the property to the defendant, nor would her husband have done so, if it was not a trust situation. When questioned about the defendant's cheque in the amount of $5,514.14 dated June 17, 1983 and payable to Ms. Schick, she said that she did not see it before the documents were signed, nor did she see any exchange of funds. She reiterated that she was not a party to the agreement with the defendant, other than that her husband had told her that no money had exchanged hands, "that Jack was not putting up any money." It was put to her again that she knew that her husband was trying to avoid his creditors. She said that her husband never told her that, and never discussed it with her. She was pressed again with regard to the exchange of funds, and she said that the defendant as well as her husband told her that the defendant would not be paying any monies. She said that the defendant told her or them that he would "say that he won the money in Reno, if he was ever asked". When asked why the defendant would say that, she said that she had no idea.

**44**    She was then questioned with regard to the "Transfer of an Estate in Fee Simple" dated June 17, 1983, and acknowledged her signature thereon. She denied knowing at the time that she signed the document that she was transferring title to the property to the defendant. She never knew of the existence of the Option, until she found it after her husband's death. Prior to his death the couple had separated. He left the home, taking his files with him. She denied that she ever transferred title to the defendant, the gist of her evidence being that the defendant was to hold the property in trust for her and her husband. She volunteered this, and repeated it on numerous occasions, throughout her evidence. And she reiterated that the arrangement or deal was made between her husband and the defendant, that she had no participation in it vis-a-vis the defendant. She knew after the transfer that she and her husband would still have to make all of the mortgage, insurance, etc. payments "because it was still our home."

**45**    The plaintiff then had read to her portions of her discovery evidence in which she testified that she and her husband did not receive any monies from the defendant, that his certified cheque was in fact their money; that in effect her husband gave the defendant the monies he paid on the transaction. It is clear from her evidence that she has no direct knowledge of this, that she says that this is what her husband told her.

**46**    She was also referred to her discovery evidence where she was asked if she had found any documentation substantiating that monies had been withdrawn from their bank account and given to the defendant. At discovery she had said simply that they did not keep their money in the bank, that they kept it at their home. At trial she said that she subsequently learned that they did in fact have some money in the bank at the time.

**47**    She also had put to her her discovery evidence, that neither she nor her husband made any payments on the Nadar Holdings Ltd. mortgage. At trial she acknowledged that her answer was not correct, that her memory was "jogged" when she discovered copies of the cheques which she had

forwarded to Nadar Holdings Ltd., and which were referred to earlier. She has no knowledge of any further payments being made, other than those represented by the cheques referred to. She noted that it was a long time ago, and that she does not have a particularly good memory. And I will note here that at times, while testifying, she was inclined to make statements of fact, which subsequently turned out to be simply guesses on her part, or at least not of her own personal knowledge. She was not a reliable witness.

**48**    She then acknowledged her discovery evidence, that at the time of the transfer she knew that her husband was having financial problems, and that some other properties, which were in their names jointly, were being foreclosed. Some of the evidence, which is telling, was:

Q        ... That your husband David was juggling and doing things to try and save properties?

A        He was trying to survive.

Q        Okay, he was caught in the real estate crash that occurred in '81, '82, and that so many were caught in, wasn't he?

A        I believe so.

And:

Q        That short circuits both of us a bit. What I understand is you are saying that whatever your husband did about these real estate transactions you were not aware that he was doing it for the purposes of defeating creditors or for any other specific purpose?

A        I was aware he was in financial trouble.

Q        Okay, and were you aware that he was transferring titles and doing that sort of thing to

| | | avoid creditors? |
|---|---|---|
| | A | Well, he was to get out of his financial problems. |
| | Q | Okay were you of the view or of the understanding that this transfer to Jack Mills was to avoid creditors? |

| | A | As was Jack. |
|---|---|---|
| | Q | Pardon me? |
| | A | As was Jack too. |
| | Q | Sorry, I don't understand what you're saying? |
| | A | Jack was a -- |
| | Q | Oh, Jack was aware too? |
| | A | Jack was aware too. |
| | | (My emphasis) |

When asked whether the latter answers were true she said she didn't know because she couldn't speak for the defendant. And she again denied knowing that the purpose of the transfer was to hinder or defeat their creditors, saying "we never discussed that." I did not believe her.

**49**     She was then referred to the evidence, consisting of foreclosure documents and title searches, pertaining to the two properties, which were registered in her name and her husband's name, and which were being foreclosed out at the time of the transfer, the Swansea and Garrison properties. The evidence is that foreclosure proceedings against her and her husband were taken with regard to both properties, prior to the transfer to the defendant; that the plaintiff and her husband had defaulted in making monthly payments against both properties in December of 1982. The mortgagee, Richmond Savings Credit Union, obtained judgment in the amount of $67,497.03 against the plaintiff and her husband in the Swansea action on June 29, 1983, 12 days after the transfer to the defendant. The Swansea property eventually ended up registered in the name of the plaintiff's son, James Matthew Reddin, then a student, on April 12, 1985. The plaintiff was not asked any questions, nor was any evidence lead, explaining how the property ended up in her son's name.

**50**     I do not recall the evidence with regard to the disposition of the Garrison property, although both petitions were to be heard at the same time. The amount outstanding on the Garrison property

was $177,182.39 plus some interest. The shortfall, as I recall, was around $80,000.00. The property eventually was transferred to Nadar Holdings Ltd. on January 23, 1984, to Berthe Mary Reddin, the plaintiff's mother-in-law, on July 23, 1984, and to the plaintiff's son, James Matthew Reddin on April 11, 1985. Again, the court is left in the dark with regard to how the property ended up in the name of the plaintiff's son, and related matters. The son was not called to give evidence at the trial.

**51**    Finally counsel pointed out to the witness that there was no way of knowing whether or not the four cheques signed by her had actually been cashed. She had only produced photocopies of the faces of the cheques. She said that she knew nothing about them, and "I just sent them."

**52**    I turn to the evidence of Mr. G.P. Pollen, the principal of Nadar Holdings Ltd., who gave evidence on behalf of the plaintiff. The plaintiff's husband was his brother-in-law. It appeared to me, while he was giving his evidence, that in most instances he was more or less interpreting documents and records which he had located, rather than giving evidence of his recollections.

**53**    Mr. Pollen confirmed from company records that Nadar Holdings Ltd. loaned $87,000.00 to the plaintiff's husband in December of 1982, and took a one year mortgage on the subject property. He had no dealings with the plaintiff. $67,000.00 was paid to David Reddin's notary public, Mr. Fox, and the balance of $20,000.00 was held back to cover monthly interest payments pursuant to the terms of the mortgage. The $20,000.00 is referred to as "prepaid interest" in Nadar Holdings Ltd.'s records, which are in the name of the plaintiff. The records also show receipt of a number of cheques to the credit of the account, including those cheques written by the plaintiff, the last cheque apparently being credited on August 23, 1983. According to the witness the mortgage was paid out by the plaintiff's husband shortly after the execution of the Transfer document, probably in the month of August, 1983, although the discharge or mortgage was not executed until July 18, 1984. The pay out monies came from a Texas development company in two cheques, which were received by, and payable to, the witness's wife. He recalled this occurring.

**54**    Mr. Pollen said that he found the Nadar mortgage transaction distasteful. Neither counsel asked him why. He said that on June 16, 1983 he endorsed, on the face of the Interim Agreement dated June 15, 1983, Nadar Holdings Ltd.'s approval of the defendant assuming the Nadar Holdings Ltd. mortgage, on David Reddin's undertaking to pay out the Nadar Holdings Ltd. mortgage shortly thereafter. And Reddin did so.

**55**    On cross-examination Mr. Pollen reiterated that he "really didn't like the set up at all"; and that he endorsed the defendant's assumption of the Nadar Holdings mortgage on the "strong undertaking by Reddin to pay the mortgage off forthwith." He had no dealings with the plaintiff. He was aware of the "real estate crash" in Vancouver. He was not aware at the time that David Reddin was in financial difficulties. He actually had little to do with David Reddin, describing his social relationship with the Reddins as non-existent. David Reddin didn't tell him why he needed the monies, and he never discussed the matter with him further.

**56**    Mr. Pollen was not asked by either counsel to explain or expand upon his statements that he

found the Nadar Holding Ltd.'s mortgage transaction "distasteful", and that he didn't really like the "set up". However, it would seem that he was not prepared to rely on the defendant, as the assignee of the mortgage, nor was he prepared to leave the mortgage on the Reddin property for the full year, as previously agreed to, even though it was fully secured by the property. It was paid off in August of 1983, about six months after it had been granted.

**57**    Mr. Pollen did not agree with the suggestion that a land registry search would reveal an $87,000.00 mortgage against the property, as opposed to a $67,000.00 mortgage, and that a creditor might be mislead. He acknowledged, that initially when approached by counsel with regard to the Nadar Holdings Ltd. transaction, he advised that no monies had been advanced on the Nadar mortgage, and that the mortgage had simply been placed against the property. He said that subsequently, after digging out the Company's old records, he was reminded that the mortgage monies had been paid out, and that the interest cheques had been received. He said that it was "totally impossible" that the mortgage transaction was nothing more than a paper entry in Nadar Holdings Ltd.'s books. He had no idea why Nadar Holdings Ltd. had photocopies of the faces only of the cheques written by the plaintiff. It was pointed out that there was nothing to indicate whether or not the cheques had been cashed, and suggested that the cheques had simply been held by the company. He said simply that it didn't happen. The company does not have copies of the two cheques received by his wife, which paid out the mortgage. He denied that Nadar Holdings Ltd. took title to the Garrison property in January of 1984, as indicated by registry documents. He knew David Reddin's mother, Berthe Mary Reddin. He had no memory of the company transferring title to the property to her.

**58**    I turn to the evidence of the defendant. He is a 64 year old retired veterinary surgeon. He retired in 1983 due to health reasons. By then he had known David Reddin for 39 years, and it is common ground that they were close friends.

**59**    He said that David Reddin was always a salesman, a master at gamesmanship. Prior to the transfer he had asked him, the defendant, on a number of occasions if he wanted to buy the subject property, and the defendant had declined. On the day in question the plaintiff arrived at his residence and said in effect, "today's the day, we are going to buy a house." The defendant says he agreed, and that they then proceeded to Canada Trust Company where he deposited $500.00, and obtained the certified cheque in the amount of $5,514.14. They then went to Ms. Schick's offices which were up multiple steps. Because the defendant was in a wheelchair, David Reddin brought Ms. Schick down to his vehicle, and the documents were executed in the vehicle in the presence of David Reddin, the plaintiff, and Ms. Schick. The plaintiff signed the documents at the same time.

**60**    No one explained the documents to him, and he did not have "time to read, peruse or understand the documents." His cheque in the amount of $5,514.14 was his funds. They were not given to him by David Reddin. His trust company transaction register shows the removal of the monies from his account on June 17, 1983. It also shows his balance at approximately $8,100.00 in the months of April and May of 1983.

**61**    When asked what was the arrangement he made with David Reddin, he said that it was his understanding that he was buying the house from David Reddin. When asked what arrangements were made with regard to the payment of the mortgages and property expenses, he said that the taxes, insurance, mortgage payments, and all other expenses, were to be paid by David Reddin. The property was in the plaintiff's name, and she had to sign the documents. He has never made any of the payments. He denies that he was to hold the property in trust for the plaintiff and her husband.

**62**    It will be seen that I reject the defendant's evidence that he was buying the house from David Reddin, if by that he means, for example, that if Reddin paid off both mortgages he, the defendant, would then end up owning the property clear title, having paid $5,514.14 for it. While the defendant became the assignee of the mortgages, he had no means, nor any intention, of paying them. They were to be paid by the Reddins. His proportionate share of the value of the property was $5,514.14. The Reddins' proportionate share was $150,000.00, although it was mortgaged and they would have to pay the mortgages to keep their interest.

**63**    I am satisfied that the defendant did not buy the property, although it would appear to an uninformed third party that he was purchasing the Reddins' equity in the house, once the two mortgages were taken into consideration. I am also satisfied that the defendant well knew that the Reddins were in financial difficulties, and that the purpose of the transaction, in conjunction with the Nadar mortgage transaction, was to prevent their creditors from taking the property. The defendant was simply helping out his best friend. An investigation by a judgment creditor of the Reddins would simply show a sale of the property which was well mortgaged. It will be seen that in my opinion the defendant became a resulting trustee to hold the property for the Reddins, and for himself, on a proportionate resulting trust.

**64**    Returning to the defendant's evidence, he sent his tenant notice after David Reddin died. He wanted to terminate the deal "because David was no longer around." On December 30, 1992 the plaintiff and her older son came to his house after receiving the notice. He said "at that time I wanted to find out if she was going to buy the house, what arrangements were going to be made since her husband had died." His evidence in this and other areas, is consistent with his only concern being the recovery of his equity or interest in the amount of $5,514.14 from the property. He was not concerned with the fact that the Option time had long run. He was not even aware at the time that the Nadar mortgage had been paid off. And he would have believed then that he could only get his equity back if the plaintiff paid him his monies and took a reassignment of the two mortgages, or if the property was sold and the mortgages and his equity paid out of the purchase monies.

**65**    The defendant reiterated that prior to leaving his home to go to Ms. Schick's with David Reddin, to sign the transfer documents, David Reddin told him that there was only one mortgage on the property. He was surprised to learn of the existence of the Nadar mortgage when executing the documents later on that day. Apparently he did not express his concern to anyone at the time that he signed the documents, apparently without reading them. Perhaps this is some evidence of his close

friendship with David Reddin, his reliance upon him, and his obvious lack of concern about what was being done, other than his $5,514.14 being secured.

**66**    He said also that prior to the expiration of the Option, David Reddin told him that he did not intend to exercise the Option; that because of that he asked David Reddin what arrangements were being made with regard to the Nadar mortgage. He said the conversation took place a few weeks before David Reddin died. Again, it would seem that the defendant's only concern was with regard to the retrieval of his equity or interest in the property, and whether the Nadar mortgage might affect his recovery of it.

**67**    The defendant says that David Reddin did not specifically tell him why he wanted him to buy the house. He knew that Reddin was "leveraged on multi homes, and that there was a good possibility that he was in trouble." He bought the house because of their 39 year old friendship. The plaintiff did not talk to him about the transaction. He denied her evidence that he told her that he would tell people he got the money in Reno. I have already noted my conclusion, that the defendant probably knew, as did the plaintiff, that the purpose of the transaction was to prevent the Reddins' creditors from taking their home.

**68**    He acknowledged that the insurance on the home was put in his name by David Reddin. It was his understanding that everything was in his name, since title was in his name. Each year he would sign the homeowner's grant application which would be submitted by Reddin. He recalled receiving government cheques made out to him. Reddin would bring the cheques to him and he would sign them. He is of course mistaken in this regard, and he corrected himself during cross-examination. Reddin also brought other documents to him for signature such as mortgage renewals. He also recalled an insurance claim for repairs to the roof of the home which Reddin claimed. The cheque was made out to the defendant and Reddin. He endorsed the cheque, but did not receive any monies.

**69**    On cross-examination the defendant reiterated that he had no chance to read the documents before signing them. He was then asked how it was then that he knew about the Option. He indicated that it had been "agreed before", referring, I believe, to his discussion with Reddin at the defendant's home before proceeding to Ms. Schick's office. He denied that David Reddin told him that he was to hold the house in trust. They were extremely close friends, and trusted one another. He had no discussion with the plaintiff about the transfer. He signed the documents "because I was buying the house." I have already stated my opinion as to the sense in which the defendant was "buying the house". And I will have more to say about the Option in a moment.

**70**    He knew nothing about the written Nadar Holdings Ltd. approval, to his assumption of the Nadar mortgage, which can be seen on the face of the Interim Agreement. When he left his home with David Reddin to go to Ms. Schick's office, there was only one mortgage against the property as far as he was concerned. It was when he was signing the Purchaser's Statement of Adjustments that he first learned of the existence of the Nadar Holdings Ltd. mortgage.

**71**    He acknowledged that he must have been mistaken when he said that he received government

cheques refunding the homeowner's grant to him. This is because of course, as counsel explained to the defendant, the government doesn't issue cheques, it just reduces the taxes payable.

**72**    Counsel pressed the defendant with regard to his conversation with David Reddin at the defendant's home, and on the way to Ms. Schick's office, particularly with regard to the terms of the deal made between the two men. He agreed that David Reddin explained to him that he was going to sign documents that would put the home in his name. He denied that Reddin said that it would be "just for a little while" or words to that effect. He said that the deal was that he would have to pay $5,500.00, that the total price was $155,000.00, that there was a mortgage on the property, that the deal would run for six years, and that the "option fit on them."

**73**    He denied that David Reddin told him that he was just putting the house in his name for awhile. It was put to him that Reddin told him that it was not going to cost him anything. After a long pause he said, according to my note:

A       Okay ... I would like to explain. The $5,000.00 was my equity. When the house was sold in six years time then I would get my money back, therefore it would not cost me anything - if that's what you meant, that's right.

Q       The home was to go in your name, but when it was taken out you'd get your money out, and it wouldn't cost you anything.

A        That's right.

This evidence, in my opinion, bolsters my view of the transactions as earlier described. The defendant was only to have an equity in the property equivalent to the payment he made, and which he would recover when the house was sold or when the Reddins paid him out.

**74**    The defendant acknowledged that at the time of the transaction $5,000.00 was a lot of money to him, and still is; also that at the time he had no way of paying the mortgages he was assuming. This, in my opinion, is an important factor in support of the plaintiff's position. And I reject the defendant's subsequent evidence, that the mortgage payments, and other expenses such as taxes and insurance, were to be paid by the Reddins, in lieu of rent. The conduct of the parties after the transfer, particularly that of the defendant which is in the nature of admissions, are inconsistent with a landlord/tenant situation. The defendant's conduct seems more in line with an owner in name only, one having a relatively minor interest in the property, whose interest was perceived to be threatened in some way as a result of the death of David Reddin, at a time when the defendant did not know that the Nadar mortgage had been discharged. Again, I would doubt that if the property values in the area went down, and the Reddins moved out of the property, that the defendant would have stepped forward as owner, and accepted the position that he was liable to both mortgagees for their shortfall.

**75**    The defendant acknowledged that he did not spend "one nickel" on the property. He denied that this was because it was the Reddin's house. He purchased the house, it was his house, the Reddins were just going to pay everything for six years. He did not pay out the Nadar mortgage. When asked whether David Reddin paid it out, he said that he had no idea. He was asked whether he expected David Reddin to pay out the mortgage. My rough note of his answer was:

> As I said yesterday, when I got to the parking lot the price went from $5,000.00 to $5,500.00 that I would have to put up. Ten minutes later ... <u>instead of one mortgage for $155,000.00 there were two mortgages</u> - I first became aware of the second mortgage. Until May of 1993 I was unaware that the Nadar mortgage was taken off. (My emphasis)

The answer again discloses that his equity in the property was to be limited to the amount of his payment, and that he knew that the rest of the equity in the property was to be covered by one or two mortgages. He was then asked whether he asked David Reddin what the deal was with respect to the Nadar mortgage. He said that David Reddin told him that he would pay the interest, and that the principal would be paid off when the house was sold. Again, the arrangement was that the defendant's interest in the property was his equity participation, which he would recover when the property was sold. And he acknowledged that he was surprised when he learned that Reddin had paid the Nadar mortgage off.

**76**    He was then asked about his direct evidence as to his conversation with David Reddin with regard to the exercise of the Option. The Option expired August 1, 1989, and David Reddin died September 8, 1992. He eventually said that he was mistaken when he said the conversation took place shortly before David Reddin's death; that the conversation must have taken place in 1989, when the Option came up.

**77**    He knew in 1988 that the plaintiff and David Reddin had separated; that Reddin had left the house. However, he was not concerned because he knew that David Reddin went back to the house on a regular basis. He was not "nervous" until David Reddin died. He "operated under" the Option until its date passed in 1989. He reiterated that David Reddin had told him that he could not pick up the Option because he had "no money", and that he wanted to carry on as they had done in the past. He said again that he was concerned with regard to the Nadar Holdings Ltd. mortgage and that he asked about it; that David Reddin told him that the Nadar Holdings Ltd. mortgage would be paid off when the house was sold. These statements attributed to David Reddin, are not admissible and simply do not make sense in the circumstances. If this conversation took place, it took place years after the Nadar mortgage had been paid out and had been discharged, these events occurring in 1983 and in 1984. On numerous occasions I found the defendant's evidence to be confusing, perhaps uninformed is a better word, and inconsistent with his now apparent position, that he really purchased the property, as opposed to a purported purchase to prevent creditors from taking his friend's home.

**78**    The defendant acknowledged executing the Option dated June 17, 1983; also that he did not have a copy of the Option in his possession or at his home. He did not know why Ms. Schick sent a copy to him with her letter dated February 19, 1993. He denied asking her to do so.

**79**    The defendant was then asked the purpose of his termination notice to tenant which he sent to the plaintiff. He said that it was "to get the ball rolling". It was put to him that he "just wanted to get off title", and his answer was that to do that the house would have to be sold "to pay back Mr. Pollen." Again, I find this answer telling. At the time the defendant did not expect the Nadar mortgage to have been paid out, and he only wanted to recover his equity, or his share in the property. In his mind he could not recover it until the Nadar mortgage was paid off. There was another option, of course, that being if the plaintiff paid him his share. It was then suggested that the purpose was to get his name off the title, and he said "in essence that is correct." It is to be remembered that as long as both mortgages were on the property, and he was on title, he was liable to the mortgagees.

**80**    The defendant acknowledged that at the time of the service of his notice he did not intend to sell the house to anyone; that he has never listed it for sale. He said he did not know that all he had to do was sell the house if he wanted the plaintiff out. It was put to him that he knew that David Reddin never intended to give him the house. He replied that he never did give it to him, but then agreed that he was saying that he bought a $155,000.00 house for $5,000.00. However, I took him to mean that he purchased the equity remaining after the mortgages were taken into consideration. In my opinion it was never intended by David Reddin or the defendant, that the defendant would also receive the equity in the property belonging to the plaintiff and to David Reddin, in the event that one mortgage or both mortgages were paid off by the Reddins. It was his liability to the two mortgagees, believing that the Nadar mortgage was still on the property, and his equity in the property, which was causing him some concern after David Reddin died.

**81**    He also agreed that he never declared the resulting income from the transaction, saying that there was nothing to declare. He agreed again that he and David Reddin were trusted friends, and that he only signed the Transfer for that reason. And it was put to him that other than that, he never expected to receive any benefit from the transfer and he said "no, it was initially signed - my equity would be looked after - that's right." Again, the answer is revealing, in the face of his somewhat inconsistent evidence.

**82**    And with regard to the defendant's evidence, I will point out here that I believe that the defendant is mistaken when he says that at his home, prior to proceeding to Ms. Schick's office, David Reddin told him that there was only one mortgage against the property. Reddin would have had no need to tell him that and, of course, it is contrary to the true situation, and to the documents he was about to sign. I also question his evidence that David Reddin told him in 1989 that he did not intend to exercise the Option because he didn't have any money; and later, that the Nadar mortgage would be paid off when the house was sold. Reddin would have no reason to tell this to the defendant, particularly since the Nadar mortgage had been paid off years before.

**83**    Finally, before turning to the submissions, I will deal briefly with the Option, which in my opinion bolsters my view of the transaction in question. It is clear from the evidence that the parties anticipated that at some point down the line either the property would be sold, and they would recover their respective equities or shares therein, or the Reddins would purchase back the defendant's equity. In either event, the defendant would recover back his monies, and perhaps something for his "troubles over the years", in the form of interest on his equity if the Reddins paid him out, or any increase in his proportionate interest in the property on its sale.

**84**    In my opinion the Option date was of little significance to the parties. The terms, to which I have already referred, make it clear that the optionees, the Reddins, could have paid off one or both mortgages had they chosen to do so. And the mortgage monies paid by them were to be included in the purchase price, the result being that the defendant would only recover his equity in the property.

SUBMISSIONS

**85**    Counsel for the plaintiff submits that her evidence that her husband told her, before the transfer took place, that the defendant was to hold the property in trust for them, establishes an express trust. I do not agree, and for a number of reasons. First, I would not be prepared to find an express trust on the basis of the plaintiff's evidence alone.

**86**    Second, in my opinion the evidence is hearsay and is not admissible. I do not believe that cases such as Chase v. Chase (1962), 36 D.L.R. (2d) 351, a decision of the Nova Scotia Court of Appeal, and Beaton v. Hayman (1970), 16 D.L.R. (3d) 537, a decision of the Nova Scotia Supreme Court, support the plaintiff's position. In Chase the court believed the evidence of the defendant, the only surviving party, that at the time of the transfer the transferor handed her the deed, saying to her that she could "do what you want with it." And the court found that the statement of the deceased transferor was admissible as a verbal part of the act of the delivery of the deed, saying at page 356:

> The words were contemporaneous with the act, they accompanied it and explained it. They showed the intention of the grantor when he handed the deed to the defendant. They were part of the res gesta:

**87**    In Beaton the plaintiff conveyed a home to his mother, in order to enable her to obtain a home improvement loan. Later when she died her husband, whom she had earlier described as having "come with nothing", claimed the house. The plaintiff's son led evidence that the purpose of the conveyance was solely to enable his mother to obtain a home improvement loan; that at the time that he signed the deed his mother promised to give the property back to him after the loan was paid off. The evidence was objected to. Other persons, the notary who drew up the deed, a student nurse with whom the plaintiff had kept company, and the mother's brother, gave similar evidence, that is, that the mother had said to them that the property would go back to the plaintiff when the loan was paid off. This evidence was also objected to. The contrary position was that the statements were all declarations against the mother's interest and were therefore admissible.

**88**    In deciding that the evidence was admissible, the learned judge expressly declined to rule on the question of whether or not the statements made were declarations against her interest, and hence admissible. He then went on to say:

> What I consider to be clearly admissible - even though not necessarily as to the truth of her declaration - is what Mrs. Hayman told Mr. Fuller at the time when she instructed him to draw the deed. That statement, it will be recalled, was that she required the deed to facilitate a loan to remodel the house. I admit that statement because it accompanied and explained the fact in issue here - in short, that it formed part of the res gestae. I admit that statement for the moment as original evidence. I will consider shortly whether the statement is evidence of the truth of the contents contained therein.

**89**    He then went on to "weigh this statement in the light of other facts adduced" and then stated:

> In my opinion, Mrs. Hayman had no intention of recording that deed. Accordingly, and keeping in mind the excerpts from Phipson, supra, I hold that the statement made by her to Mr. Fuller to the effect that she wanted the deed to facilitate her obtaining a loan is not only admissible as original evidence, but can be accepted by me as to the truth of what it contained. I am therefore satisfied, viewing the evidence as a whole, that it was her undoubted intention to reconvey the property or give back the deed to her son once the loan was discharged.

I need not deal with the case further. However, I will note that it is not clear why the learned judge had to go beyond his first finding that the statement was original evidence, that is, a verbal part of the act, and find that it was admissible as to the truth of its contents; nor why the weight to be given to the statement, was the test of its admissibility. In any event, both Chase and Beaton are clearly distinguishable from the case at bar.

**90**    Similarly, in my opinion the principles contained in the decisions of the Supreme Court of Canada in R. v. Smith (1992), 75 C.C.C. (3d) 257, R. v. Khan (1990), 59 C.C.C. (3d) 92 and R. v. B.(K.G.) (1993), 79 C.C.C. (3d) 257, assuming that they are applicable in a civil case, and they may well be, are not helpful to the plaintiff. While it is easy to be critical of the hearsay rule, a trial judge is well aware of the dangers as well as the difficulties involved, in applying those principles. It is difficult enough to try and ascertain the truth from direct testimony, and if truth is to remain the ultimate goal, the principles should be applied rarely and with much caution. If progress in the law in this area means that the ultimate question should be weight as opposed to admissibility, as advocated by some, then success or failure in a given case will often simply depend upon the impression made by a particular witness on the particular judge. In any event, in the case at bar I need only refer to two matters in support of my view that the principles referred to are not applicable. First, assuming that David Reddin made the statement, there is no doubt that he was an interested party at the time, and that the statement is in his favour. Second, the so called test of

reliability has not come near to being met in the case at bar.

**91**    Counsel for the plaintiff next argues that, failing a finding of express trust, then the evidence supports a finding of a trust by operation of law, either a resulting trust or a constructive trust; although he made few submissions as to a constructive trust occurring. He relies on the hearsay evidence that no consideration was paid by the defendant, that is, that the $5,514.14 if paid was in fact money given to the defendant by David Reddin. Counsel submits that since the plaintiff voluntarily transferred the property to the defendant, the presumption of a resulting trust arises, a presumption which the defendant cannot rebut. Alternatively, he argues that if it is found that the defendant in fact paid his own $5,514.14 to the plaintiff at the time of the transfer, then the plaintiff is entitled to a declaration that the defendant holds a portion of the property on a resulting trust, in proportion to the respective contributions of the parties to the purchase price; that the defendant's contribution to the purchase price is limited to the $5,514.14 of the $155,000.00 transfer price "which is equivalent to approximately 4 percent." In the further alternative, he submits that the plaintiff's contribution to the purchase price is the repayment of the Nadar mortgage, payment of principal and interest on the first mortgage and capital improvements to the property.

**92**    With regard to the ownership of the $5,514.14 paid by the defendant, the only admissible evidence before me is that of the defendant, and his bank records, save for the plaintiff's assertion that the defendant, a stranger to her, told her in effect that he was not contributing any monies to the transaction. I am reluctant to accept her evidence in this regard in the circumstances of this case. Accordingly, I must find that the monies paid were the defendant's monies, and that some consideration was paid. I will have more to say about this in a moment.

**93**    As to the submission of a resulting trust, it will be seen that after some consideration, with particular regard to the fact that some consideration was paid, and the position of the defendant that the purpose of the transfer was illegal and "the estate must lie where it falls", I have concluded that the plaintiff is entitled to a declaration that the defendant holds the property on a resulting trust in proportion to the parties' respective interests therein, being roughly $150,000.00 on the part of the plaintiff, and $5,500.00 on the part of the defendant.

**94**    I turn now to the submissions of counsel for the defendant. He submits that the defendant is bona fide purchaser for value without notice. The defendant purchased the property for the sum of $5,514.14, which was his own money. The Nadar mortgage was placed on the property, and the transfer to the defendant took place, at a time when the plaintiff and her husband were being foreclosed out of the two properties, and were about to be ascended upon by their creditors. The purpose of the transfer to the defendant was to delay or hinder the Reddins' creditors. And the evidence clearly establishes that the plaintiff well knew of, and participated in, that purpose.

**95**    Counsel then went on to review the evidence pertaining to the Nadar mortgage transaction, in effect saying that it was a sham. There is no evidence that the monies ever left Mr. Fox's trust account. The purpose of the mortgage was to make it clear that there was simply no equity in the

subject property for creditors to go after.

**96**    He also maintains the position that the plaintiff cannot claim a resulting trust with regard to the repayment of the Nadar mortgage, because it was repaid by David Reddin, not by the plaintiff. She had no knowledge of and nothing to do with the repayment. I do not agree. As far as I am concerned the plaintiff and David Reddin are one and the same for the purposes of this case. The property was their family home. The plaintiff signed the documents. But it is David Reddin's intentions, at the time of the transfer of the property, as well as those of the defendant's, which must be looked at.

**97**    Counsel also argued that the Option Agreement is nothing more than evidence of an Option to Purchase. It is inconsistent with the claim of resulting trust. There would be no need for a time limit were it a trust situation. Further, the plaintiff didn't exercise the Option and that ends the matter.

**98**    I acknowledge some initial concern with regard to the Option Agreement in relation to the transfer agreement. If, as suggested by these documents, the transactions amounted to nothing more than an outright sale of the property to the defendant, with a right of reconveyance in the plaintiff, the relationship between the parties would be contractual, but not one of trust. But the documents do not reflect the agreement made between David Reddin, on his own behalf and on behalf of the plaintiff, and the defendant, shortly before or at the time of the transfer. For it is clear that while the documents say that the defendant assumes the mortgages, this is simply not so, as between the parties. The defendant had no means of paying the mortgages, and those obligations were assumed, as between the parties, by the Reddins. In my opinion the obligations to pay the mortgages place the Reddins in the same position as if they had paid those mortgage monies at the time of the transfer, as the defendant paid his. The defendant holds the property, as I said earlier, on a proportionate resulting trust.

**99**    Counsel also questioned the credibility of the plaintiff, pointing out a number of inconsistencies and contradictions in her evidence. He submitted that the statements attributed to David Reddin, that the defendant agreed to hold the property on trust and that he provided $5,500.00 to the defendant, are clearly inadmissible hearsay. They do not show the state of mind of the plaintiff. They can only show David Reddin's state of mind, which is not an issue. Again, the declarations attributed to David Reddin were not contemporaneous with the execution of the documents. The only purpose for introducing such evidence is to ask the court to accept the truth of their content. They are not admissible, particularly because the test of their reliability has not been met. There is a high degree of possibility of invention on the part of the plaintiff. None of the hearsay evidence given at trial is admissible, including that led by counsel for the plaintiff when cross-examining the defendant, says counsel. I have already dealt with the hearsay issue.

**100**    Counsel then referred me to a number of sections in the Land Title Act, R.S.B.C. 1979, c. 219 which I do not find to be of assistance. After reiterating that the plaintiff was a bona fide purchaser without notice, as to which I do not agree, counsel referred to authorities which he says

support his positions that an express trust has not been proven, and that the presumption of resulting trust has been rebutted because of the fact that consideration has been proven. As to the latter proposition he relies on the decision of Stevensen, J. in Atherton v. Francis (1986), 73 N.B.R. (2d) 415, appeal dismissed (1987), 81 N.B.R. (2d) 97, for the proposition that where there is nominal consideration, there it was $1.00, the transfer is strictly not gratuitous, and a resulting trust cannot be presumed. I am not satisfied that such a general statement is correct. In any event, in Atherton the court found that even if there was no consideration, it was still of the view that the transferor intended to make a gift to his sister. Further, the case turned in the main on the credibility of the parties.

**101**    Counsel then went on to reiterate his submission that the plaintiff well knew that the purpose of the transfer of the property to the defendant was to delay or hinder their creditors, or that she wilfully shut her eyes to the purpose, with the result that she is in the same position; that the defendant, having paid consideration, is a bona fide purchaser without notice, and the presumption of resulting trust is rebutted. It will be evident that in my opinion the defendant was not a bona fide purchaser without notice; that in fact he did not purchase the Reddins' beneficial interest in the property, but in the circumstances became a resulting trustee of it.

**102**    Finally, and again, counsel submitted that the plaintiff could not "create a resulting trust out of the payment of the Nadar mortgage" because the payment of the mortgage was not contemporaneous with the transfer of the property, she had no knowledge of the payment, and there is no evidence to support the position that she was entitled to a benefit as a result of the payment. I have already noted that in my opinion the plaintiff and David Reddin were one for the purposes of this case. Further, it seems to me, although not fully argued, that, failing a finding of a resulting trust, the law may well impose a constructive trust in favour of the Reddins in relation to the payment of the Nadar mortgage, the payment of principal and interest on the first mortgage, and the capital improvements made on the property.

**103**    In reply to the submissions of defence counsel, counsel for the plaintiff pointed out that the consideration for the transfer was not $5,000.000, but was instead $155,000.00; that the purchase price included the assumption of the two mortgages, which the defendant could not and did not pay, which obligations were in fact "assumed", as between the parties, by the Reddins. I have already dealt with the assumption or retention of the mortgage obligations by the Reddins, and the fact that those obligations, in my opinion, represent their interest or share in the property.

**104**    There is no evidence, says counsel, that the plaintiff transferred legal title to the defendant to avoid creditors. For all that is known the creditors may well have been paid off. In any event, the plaintiff relies on the decision of the Ontario Court of Appeal in Gorog v. Kiss (1977), 78 D.L.R. (3d) 690 for the proposition that even where the transfer is for an illegal purpose, the court may find a resulting trust in favour of the transferor, if the transferor does not have to rely on his own illegality to make out his claim. Counsel also relies on the majority decision in the recent case of the House of Lords, Tinsley v. Milligan, [1993] 3 All E.R. 65.

**105**    In the case at bar it appears clear that the law would presume a resulting trust in favour of the plaintiff, if no consideration had been paid by the defendant. And the defendant would not be able to rely on the illegality of the transaction in order to rebut the presumption.

**106**    In its search for the intention of the parties, and the real transaction entered into by them, the court must look at all of the circumstances, and any presumptions which may arise from them. I refer to the presumption of resulting trust, and the presumption of advancement. The former arises in law where the transfer is made without consideration. Since equity assumes bargains, not gifts, the effect is to place the onus on the transferee to establish that in transferring the property to him the transferor intended a gift. The latter presumption arises when the transfer is made to the transferor's spouse or child. Equity assumes consideration, and presumes that the conveyance was intended as an advancement to the spouse or child, that the transferor intended to make a gift. And to succeed, the transferor must rebut that presumption, by establishing that he did not intend to make a gift.

**107**    These presumptions may play a most important role in the success or failure of a litigant, where the transaction is found to be illegal, for example one entered into in order to avoid or delay creditors. In the case of the presumption of advancement, the transferor cannot succeed if he or she must rely on the illegal transaction in order to establish that a gift was not intended. In the case of the presumption of resulting trust, the transferee, who has the onus, will fail if he or she cannot establish a gift, or otherwise rebut the presumption, without relying on the illegal agreement.

**108**    In the case at bar we are not concerned with the presumption of advancement. We may be concerned with the presumption of resulting trust. However, it will be seen that I am satisfied that the plaintiff should succeed on a resulting trust, because in doing so she does not rely on the illegal purpose of the subject transaction.

**109**    The question is whether the fact the defendant paid some consideration, prevents the presumption of resulting trust from arising, or otherwise prevents the establishment of the resulting trust. In my opinion the nominal consideration paid by the defendant in the case at bar, does not achieve that end. A voluntary or gratuitous transfer of property is not the only factual situation which may give rise to a resulting trust, by presumption or by proof. For example, two persons can contribute money for the purchase of property, which is placed in the name of one of them. That person then holds the property on a proportionate resulting trust. (See the Law of Trusts in Canada, 2nd edition, by D.W.M. Waters at page 306.) And I draw the analogy to the case at bar. The results should be the same when a person transfers his property to another for nominal consideration, and intends to and does retain his beneficial interest in the property, in the present case by assuming or retaining the obligations to pay the mortgages. In my opinion, as in the case of two contributing purchasers, immediately the transaction took place a proportionate resulting trust arose in favour of the Reddins by operation of law. Further, given the fact that the Reddins assumed the mortgage obligations representing 96 percent of the value of the property, in my opinion the consideration is so nominal that in equity it should not stand in the way of the presumption of resulting trust.

**110**    I turn now to a consideration of Gorog and Tinsley. In Gorog the plaintiffs transferred farm property to the male plaintiff's sister. It was found that the transfer was without consideration. The purpose of the transfer was to defeat creditors of the plaintiffs. The headnote reads in part:

> The defendant, the sister of the male plaintiff, held the lands on a resulting trust for the plaintiffs. There was no presumption of advancement between brother and sister. Accordingly, since the Court found that there was no consideration for the transfer the presumption of resulting trust was applicable. It was unnecessary for the plaintiffs to plead the illegal purpose of the transfer. Rather, it was on the defendant to displace the presumption of resulting trust and the defendant was not allowed to rely on the illegal purpose to rebut that presumption. (My emphasis)

**111**    And at page 697 the court quotes "a helpful statement of principle and procedure" found in a paper authored by Donovan M. Waters, as follows:

> ... if the transferor has managed to deceive his creditors, and later seeks to recover the property when "the coast is clear", the courts will still assist him to recover his property, provided the transferee is neither his wife nor his child. He merely proves that the property in the transferee's hands is the transferor's property, and thereafter the transferee becomes a resulting trustee for the transferor. The point is, of course, that the transferor has not needed to put his illegal purpose in evidence. It is of no significance if the transferee tells the court what the purpose was; the transferor is not relying on that purpose. (My emphasis)

The case at bar would be on all fours with Gorog, save for the fact that some consideration has been paid by the defendant, with which I have just dealt.

**112**    In Gorog the court found that the presumption of resulting trust arose, there being no consideration for the transfer. But it does not follow that the above statement contained in Mr. Waters' paper is confined to a no consideration situation, although reference is made to the transferor proving that the property in the transferee's hands is his property. It would seem to me that proof by the transferor of a beneficial interest in the property, would be sufficient enough to give rise to the resulting trust. This is what occurred in Tinsley, a case in which both parties contributed to the purchase price, although the property was put into the name of one of them. The majority of the court found not only that a resulting trust had been established, but that the presumption of resulting trust had arisen. The explanation may be that the proposition that equity assumes bargains, not gifts, applies equally when it is established that the transferor has a beneficial interest in the property purchased or transferred; and a presumption of resulting trust arises with respect to that interest.

**113**    In Tinsley the plaintiff and the defendant jointly purchased a house, which was then

registered in the name of the defendant as the sole legal owner. It was so registered for an illegal purpose, to enable the plaintiff to make false claims to the Department of Social Security for benefits. The headnote reads in part:

> Where property interests were acquired as a result of an illegal transaction a party to the illegality could recover by virtue of a legal or equitable property interest if, but only if, he could establish his title without relying on his own illegality even if it emerged that the title on which he relied was acquired in the course of carrying through an illegal transaction. Where the presumption of advancement applied, the plaintiff was faced with the presumption of gift and therefore could not claim under a resulting trust unless and until he rebutted the presumption of gift, in which case he had to rely on the underlying illegality and would therefore fail. However, where the presumption of resulting trust applied, the plaintiff would not have to rely on the illegality because, if he proved that the property was vested in the defendant alone but that he had provided part of the purchase money or voluntarily transferred the property to the defendant, he would establish his claim under a resulting trust unless either the contrary presumption of advancement displaced the presumption of resulting trust or the defendant led evidence to rebut the presumption of resulting trust. Therefore, in cases where the presumption of advancement did not apply, the plaintiff could establish his equitable interest in the property without relying in any way on the underlying illegal transaction. On the facts, M had established a resulting trust by showing that she had contributed to the purchase price of the house and that there was a common understanding between her and T that they owned the house equally. M had no need to allege or prove why the house was conveyed into the name of T alone since that fact was irrelevant to her claim, and, on the facts, M had raised a presumption of resulting trust which was not rebutted by any evidence to the contrary. (My emphasis)

**114**    In Tinsley the purchase monies were provided jointly by the parties. When the parties parted company the plaintiff moved out, and then sued the defendant for possession. The defendant counterclaimed for an order for sale, and a declaration that the house was held by the plaintiff on trust for the parties in equal shares. The plaintiff defended the counterclaim on the basis that the defendant's claim to joint ownership was tainted by illegality, applying the ancient equitable principle, as does the defendant in the case at bar, that he who comes to equity had to come with clean hands. The trial judge dismissed the plaintiff's claim and gave judgment for the defendant on her counterclaim. Appeals in the Court of Appeal and in the House of Lords were unsuccessful.

**115**    At page 82 Lord Jaunchey states:

> The ultimate question in this appeal is, in my view, whether the respondent in claiming the existence of a resulting trust in her favour is seeking to enforce

unperformed provisions of an unlawful transaction or whether she is simply relying on an equitable proprietary interest that she has already acquired under such a transaction. (My emphasis)

And at page 83:

I find this a very narrow question but I have come to the conclusion that the transaction whereby the claimed resulting trust in favour of the respondent was created was the agreement between the parties that, although funds were to be provided by both of them, nevertheless the title to the house was to be in the sole name of the appellant for the unlawful purpose of defrauding the Department of Social Security. So long as that agreement remained unperformed neither party could have enforced it against the other. However, as soon as the agreement was implemented by the sale to the appellant alone she became trustee for the respondent who can now rely on the equitable proprietary interest which has thereby been presumed to have been created in her favour and has no need to rely on the illegal transaction which led to its creation. (My emphasis)

**116**    At page 84 Lord Lowry states:

The foregoing considerations render me all the more convinced that the right view is that a party cannot rely on his own illegality in order to prove his equitable right, and not that a party cannot recover if his illegality is proved as a defence to his claim.

**117**    At page 86 Lord Browne-Wilkinson states:

The creation of such an equitable interest does not depend upon a contractual obligation but on a common intention acted upon by the parties to their detriment. It is a development of the old law of resulting trust under which, where two parties have provided the purchase price to buy a property which is conveyed into the name of one of them alone, the latter is presumed to hold the property on a resulting trust for both parties in shares proportionate to their contributions to the purchase price. (My emphasis)

And on page 87:

The presumption of a resulting trust is, in my view, crucial in considering the authorities. On that presumption (and on the contrary presumption of advancement) hinges the answer to the crucial question: does a plaintiff claiming under a resulting trust have to rely on the underlying illegality? Where the presumption of resulting trust applies, the plaintiff does not have to rely on the illegality. If he proves that the property is vested in the defendant alone but that

the plaintiff provided part of the purchase money, or voluntarily transferred the property to the defendant, the plaintiff establishes his claim under a resulting trust unless either the contrary presumption of advancement displaces the presumption of resulting trust or the defendant leads evidence to rebut the presumption of resulting trust. Therefore, in cases where the presumption of advancement does not apply, a plaintiff can establish his equitable interest in the property without relying in any way on the underlying illegal transaction. In this case the respondent as defendant simply pleaded the common intention that the property should belong to both of them and that she contributed to the purchase price: ... Therefore the respondent was not forced to rely on the illegality to prove her equitable interest. (My emphasis)

And at page 91:

In my judgment the time has come to decide clearly that the rule is the same whether a plaintiff founds himself on a legal or equitable title: he is entitled to recover if he is not forced to plead or rely on the illegality, even if it emerges that the title on which he relied was acquired in the course of carrying through an illegal transaction.

As applied in the present case, that principle would operate as follows. The respondent established a resulting trust by showing that she had contributed to the purchase price of the house and that there was a common understanding between her and the appellant that they owned the house equally. She had no need to allege or prove why the house was conveyed into the name of the appellant alone, since that fact was irrelevant to her claim: it was enough to show that the house was in fact vested in the appellant alone. The illegality only emerged at all because the appellant sought to raise it. Having proved these facts, the respondent had raised a presumption of resulting trust. There was no evidence to rebut that presumption. Therefore the respondent should succeed. This is exactly the process of reasoning adopted by the Ontario Court of Appeal in Gorog v. Kiss (1977) 78 DLR (3d) 690, which in my judgment was rightly decided. (My emphasis)

And at page 92:

In my judgment the court is only entitled and bound to dismiss a claim on the basis that it is founded on an illegality in those cases where the illegality is of a kind which would have provided a good defence if raised by the defendant. In a case where the plaintiff is not seeking to enforce an unlawful contract but founds his case on collateral rights acquired under the contract (such as a right of

property) the court is neither bound nor entitled to reject the claim unless the
illegality of necessity forms part of the plaintiff's case.

DISPOSITION

**118**    In June of 1983, when David Reddin approached the defendant with regard to the
transference of the Reddin home, the two men had been close personal friends for many years. I
doubt that it was necessary for David Reddin to explain his plans in great detail to the defendant. He
was not a man of means, but no doubt was quite willing to help out his friend. David Reddin had
already placed the Nadar mortgage against the property, and the final step in his plan to protect the
Reddin home from potential creditors who might wish to seize the property, or at least the Reddins'
equity in it, was to have the property put into someone else's name. That someone was the
defendant, David Reddin's trusted friend. I will add that I suspect that David Reddin simply needed
time to rearrange his affairs and deal with his creditors in due course. The evidence suggests that he
was able to do this.

**119**    The defendant's only role in this matter was to sign the documents, and to contribute the
$5,514.14 to the scheme. The evidence is in conflict as to whether or not he in fact used his own
funds in that regard. I have found, on the admissible evidence, that he did so; and that his
post-transfer conduct evidenced at most a minor participant in the transaction, whose only concern
at any time was for the safety of his $5,514.14.

**120**    The case would be simpler if I had found that the $5,514.14 belonged to the Reddins, since
the transfer could be said to be a voluntary one. But all the circumstances must be looked at, and if
they disclose that a resulting trust was intended, as I believe the situation to be in the case at bar,
then the situation is the same, notwithstanding the nominal consideration of $5,514.14, which
represents about 4 percent of the value of the property. I see no basic reason why the presumption of
resulting trust should not arise in such a situation, whether the court relates the consideration to the
property transferred, or whether it simply treats it as being so nominal as to be of little significance.

**121**    The presumption, of course, really only determines the onus of proof. And in this fact
situation little is changed if it is found that the presumption does not arise. The plaintiff need only
prove the same facts asserted to give rise to the presumption, in order to make out her case, leaving
the resultant trustee again to attempt to rebut the prima facie case by proving that a gift of the
Reddins' beneficial interest was intended, or that real consideration was given for it. Further, it may
be said that the Reddins' beneficial interest in the property, represented by their mortgage
obligations which were to continue, was voluntarily "provided", or transferred, to the resultant
trustee.

**122**    The defendant's above referred to role was not the only circumstance attending the true
transaction made by David Reddin and the defendant, which was not a sale of the property at all,
although the legal title was transferred. As I have already indicated, the most important factor to the
plaintiff's case, is the fact that the defendant did not have any means of paying the two mortgages,

or the other house related expenses such as taxes, insurance and so on, as well. But that was not necessary to the transaction. It is common ground that the two men understood or agreed that, as between them, the Reddins would continue to meet the mortgage obligations, and other expenses referred to. And I have already rejected the defendant's evidence that this was to be in lieu of rent, as being, inter alia, inconsistent with his own other evidence and his conduct.

**123**    The total value of the two mortgages, which as between the parties the Reddins were obligated to pay, represented the Reddins' substantial beneficial interest in, or proportionate share of, the property, at the time of the conveyance. It was never agreed that that interest would pass to the defendant. The evidence is to the contrary, viz the Reddins' obligation to pay the mortgages. The situation is the same as if the Reddins and the defendant had decided to buy the property from a third party, and to put it in the defendant's name. The defendant pays the down payment of $5,514.14 to the third party, and as between the Reddins and the defendant, the Reddins pay the balance of the purchase price by assuming the obligation to pay the mortgages on the property. In such a case, the law would presume a resulting trust of the Reddins' interest in their favour, subject to the defendant's right to rebut the presumption if he can do so. In my opinion the result is the same in the case at bar. On the transfer occurring the defendant became a resulting trustee in favour of the Reddins of their aforesaid proportionate interest in the property, and for himself as regards his interests. Or put another way, the defendant held the property in trust for the Reddins, and as security for his minor interest therein.

**124**    It is the presumed intention of the parties, David Reddin representing the Reddins on the one hand, and the defendant on the other, but more importantly that of David Reddin, at the time of the transaction, which is important. The defendant has not rebutted the presumption of resulting trust, by establishing an intention on the part of David Reddin to gift or sell the Reddins' proportionate interest to him. And the defence that there was some consideration, and therefore the transfer was not a voluntary one, cannot stand, given the circumstances which I have described above.

**125**    The existence of the Option does not assist the defendant. Its purpose no doubt was to protect the Reddins in the event of the death of the defendant. In any event, I have already expressed my opinion that the transactions in question did not constitute a sale of the property to the defendant, with a right of reconveyance back to the Reddins. That, of course, would not be a trust situation. Further, the terms of the Option itself would seem to support the view that the defendant's interest in the property was to be limited to the $5,514.14, and that he held the Reddins' beneficial interest in the property in trust. If they chose to pay off one or both of the mortgages the amount so paid would be set-off against the purchase price, the result being that the defendant would only recover the $5,514.14.

**126**    I turn finally to what ended up being the substantial issue in this case, the defendant's plea that the plaintiff is not entitled to equitable relief because she does not have clean hands. The purpose of the transfer of the property was to enable the Reddins to avoid their creditors, and equity will not assist the plaintiff to recover back the property. On the conflicting evidence before me, I

have been unable to reach any conclusion other than that the purpose of the transfer of the property was in fact to at least delay the Reddins' creditors; and as well, that both the plaintiff and the defendant knew of the purpose, and participated in the transaction with such knowledge. I have therefore given careful consideration to this issue, and I have considered the cases referred to by counsel and others. There is no doubt that the law in this area has been developing for some years on the one hand, while on the other in some areas it appears to continue to be uncertain.

**127**    I have already stated my conclusion that in the case at bar the law presumes a resulting trust in favour of the plaintiff. And the plaintiff therefore has established her presumed equitable proprietary interest in the property, without having to rely on the illegal purpose of the transaction to establish the interest. And the defendant cannot raise or rely on the illegal purpose in order to rebut the presumption. See Gorog and Tinsley.

**128**    If I am wrong, and the law does not presume the resulting trust in the case at bar, then in my opinion the defendant still cannot succeed. For when I look at the whole of the circumstances surrounding the transfer, I am satisfied that those circumstances establish the resulting trust, still without reference to the illegal purpose. The trust is established by the plaintiff showing that, while the property was vested in the defendant alone, the consideration paid by him was very nominal (4 percent of the value of the property) and there was a common understanding that their beneficial interest was not being transferred, i.e. the assumption of the mortgage obligations. Again, the defendant is unable to displace the prima facie case of a resulting trust. He cannot establish gift or real consideration, and the establishment of the illegal purpose does not affect the plaintiff's entitlement to her equitable proprietary interest.

**129**    Finally, in my opinion the factual situation which gives rise to a resulting trust, both by presumption and by proof, could also give rise to a remedial constructive trust on the basis of the unjust enrichment of the defendant. The defendant was able to obtain title to the property as a result of the Reddins' contribution and their assumption of the mortgage obligations. And their contributions continued with the payments on the first mortgage, the payment out of the Nadar mortgage, the payment of other expenses, and for the improvements such as the fence and pool and so on. A court could find that the three elements for the imposition of the constructive trust viz an enrichment, a corresponding deprivation, and an "absence of any juristic reason" have been made out. The only stand might be made with respect to the third element. But the evidence before me does not suggest that a plea of gift, consideration or illegality would constitute a juristic reason for the enrichment. And on the prima facie case before me, I would have been prepared to order restitution and declare the defendant a constructive trustee, if necessary.

**130**    Counsel did not speak to the details of the order to be granted in the event that the plaintiff succeeded. Counsel may do so, if really necessary. It seems to me that the plaintiff is entitled to a declaration that the defendant holds the subject lands and premises for the plaintiff on a resulting trust, subject to the plaintiff paying him the sum of $5,514.14 plus any proportionate increase in the value of the property, in excess of $155,000.00, as the case may be. The lands and premises will

have to be appraised, unless the parties can agree to its value, and, as I have indicated, the defendant should be entitled to the return of his monies plus 4 percent of any increased value over the sum of $155,000.00. In this regard I did consider whether the provision in the Option, that the defendant would be entitled to recover the difference between the present value of the property and the two mortgages, should be invoked in calculating the monies to be recovered by the defendant. However, I have rejected the notion, in favour of the view that he should be entitled to recover only his proportionate share of the increase in value of the property, over and above the $155,000.00 value, assuming an increase in value. If there is no increase in value, then he should be entitled to recover the amount of his contribution.

**131**    While counsel did not speak to the question of costs, it seems to me that the plaintiff should be entitled to recover her costs.

HOOD J.

cp/d/cmi/mjb/DRS/DRS/qlcct

*Case Name:*
# Ricco v. Ryan

**Between**
**Barbara Ricco, Helio Nunes, Sandy Nunes, Rick Brown,**
**Joseph Wayne Brazil and Edwin Taylor, Plaintiffs, and**
**Gerard Ryan, Isaiah Von Lichtenberg, Steven Micallef,**
**Derek Page and Wildside Motorcycles (Canada) Inc.,**
**Defendants**

[2007] O.J. No. 4030

161 A.C.W.S. (3d) 901

42 B.L.R. (4th) 265

2007 CarswellOnt 6683

Court File No. CV-06-3220-00

Ontario Superior Court of Justice
Brampton, Ontario

**M.G.J. Quigley J.**

Heard: June 6, 2007.
Judgment: October 22, 2007.

(76 paras.)

*Civil procedure -- Judgments and orders -- Summary judgments -- To dismiss action -- Whether genuine issue for trial -- The motion seeking to summarily dismiss the plaintiff shareholders' action was dismissed -- The action was not a collateral attack on the prior order in bankruptcy or an abuse of process; the claims disclosed a reasonable cause of action that went beyond the prior order, and it was not plain and obvious that it could not possibly succeed.*

*Corporations and associations law -- Corporations -- Actions -- Against corporation and directors -- Oppressive conduct -- By corporation -- Derivative actions -- The motion seeking to summarily dismiss the plaintiff shareholders' action was dismissed -- The action was not a collateral attack on*

*the prior order in bankruptcy or an abuse of process; the claims disclosed a reasonable cause of action that went beyond the prior order, and it was not plain and obvious that it could not possibly succeed.*

The defendants moved to dismiss or permanently stay the action for being frivolous, vexatious and an abuse of process -- In the underlying action, the plaintiff former shareholders of BSR Marketing Inc. alleged oppression, breach of the shareholders agreement, breach of fiduciary duty and unjust enrichment -- The defendants claimed that this was a collateral attack on a prior order in the bankruptcy action accepting an offer by the defendants to purchase the bankrupt company's right to bring a derivative action -- Alternatively, the defendants argued that no reasonable cause of action was disclosed that went beyond those asserted in the original claim -- HELD: The motion was dismissed with $7,500 in costs -- The legal doctrines relied upon by the defendants did not bar the plaintiffs from commencing the new action; nor was the action a collateral attack on the order in bankruptcy or an abuse of process -- The claims asserted disclosed a reasonable cause of action that went beyond the prior order, and it was not plain and obvious that it could not possibly succeed -- Neither the parties nor the claims in the new action were the same as those in the original statement of claim; the company was no longer a plaintiff -- All the claims in the new action were personal, not corporate -- None of these claims had ever been commenced or adjudicated upon by any court -- It was only the company's derivative claims that constituted property of the company capable of being sold by the trustee -- At least two recent decisions of the court supported findings of oppression in circumstances such as these -- It was open to minority shareholders to pursue the statutory remedy of an oppression claim for personal wrongs done to them without regard to whether a derivative claim was also pursued on the company's behalf -- Insofar as the facts and claims asserted in the pleadings were deemed to be true on this motion, and since they did contain reasonable assertions of having sustained damages in their personal rights, it was premature to conclude that the plaintiffs cannot possibly succeed in proving that they sustained damages personally.

**Statutes, Regulations and Rules Cited:**

Ontario Rules of Civil Procedure, Rule 21.01(3)(d)

**Counsel:**

John M. Gray, for the Plaintiffs.

James D.L. Kerr, for the Defendants with the exception of Derek Page.

**REASONS FOR JUDGMENT**

M.G.J. QUIGLEY J.:--

**Introduction**

**1**    On this motion the defendants request an order under rule 21.01(3)(d) of the *Rules of Civil Procedure* to dismiss or permanently stay this action commenced by the plaintiffs on the grounds that it is frivolous, vexatious and an abuse of the court's process.

**2**    The plaintiffs are six of the shareholders of BSR Marketing Inc., a company they formed with nine other investors and the individual defendants in 2004 to establish and promote a motorcycle-marketing, sales, and service business in Toronto. However, there was a falling out between the parties. The defendants took control of BSR and its assets and allegedly appropriated its property to themselves and a new company that they formed. That company, Wildside Motorcyles, continues to this day to carry on a motorcycle sales and related business from the same premises previously occupied by BSR.

**3**    Late in 2005 the plaintiffs took steps to commence an action against the defendants. They intended to bring that action in their own right as shareholders and in a derivative capacity on behalf of BSR (sometimes called the Original Claim). Pleadings were drafted but that action was never commenced. There was no impediment to their personal claims as shareholders, but under section 246 of the *Business Corporations Act* (Ontario) they required leave of this Court to bring the derivative action on behalf of BSR. However, the plaintiffs were unable to obtain leave to commence the derivative claims on behalf of BSR when the matter came before the Court on March 23, 2006 because BSR filed an assignment in bankruptcy only two days before the motion return date. No leave could be granted to commence the derivative action once the Bankruptcy Trustee had issued a stay of proceedings relating to BSR. Jurisdiction over BSR moved to the Bankruptcy Division of this Court in Toronto. The Original Claim did not proceed.

**4**    Not long after, the Bankruptcy Trustee established a bidding process to try to realize value for the derivative claim as an asset of BSR in bankruptcy. If offered that cause of action for sale to BSR's creditors and shareholders. Only one offer to purchase that claim was received. That offer came from the defendant Dr. Von Lichtenburg on behalf of Wildside Motorcycles Inc. and was accepted by the Trustee. On July 10, 2006, Justice Echlin gave Court approval to that sale. As a result, the derivative action which the plaintiffs had hoped to commence on behalf of BSR became vested in the defendants. For all intents and purposes this brought any likelihood of a derivative action being fought on BSR's behalf to an immediate end.

**5**    The plaintiffs have now commenced a New Action against the defendants. Their new claim filed on September 18, 2006 alleges oppression, breach of the shareholders agreement, breach of fiduciary duty and unjust enrichment. It also claims the payment of un-reimbursed amounts of expense incurred by Barbara Ricco on behalf of BSR. It does not include a derivative claim on

behalf of BSR or claims of conversion of BSR's property by the defendants to their own use. It is in response to this narrower set of claims that the defendants bring this motion to strike the plaintiffs' pleadings in the New Action.

**6**    There are two grounds for the defendants' motion. First they contend that the New Action is a collateral attack and an abuse of process that tries to circumvent or re-litigate Justice Echlin's order in the bankruptcy action. They make that claim in reliance on the doctrines of *res judicata* and election and alternative liability in multiple proceedings. Second, they assert that the New Action discloses no reasonable cause of action that goes beyond those asserted in the Original Claim that they contend were fully addressed by Echlin J.'s order.

**7**    There are three issues that must be resolved on this motion:

(a)    Are the plaintiffs precluded from commencing the New Action based on the doctrines of *res judicata* or election and alternative liability in multiple proceedings?

(b)    Does the commencement of the New Action by the plaintiffs amount to a collateral attack on the Order of Echlin J. and an abuse of process?

(c)    Does the New Action disclose a reasonable cause of action that goes beyond that dealt with in the order of Echlin J.?

**8**    For the reasons that follow, I conclude that the legal doctrines relied upon by the defendants do not bar the plaintiffs from commencing the New Action. Neither, is the commencement of the New Action a collateral attack on Echlin J.'s order in bankruptcy or an abuse of this Court's process. Finally, the test relevant on this motion makes clear that this Court should strike out the plaintiffs' pleadings in the New Action only if it is plain and obvious that the New Action cannot possibly succeed, or if the plaintiffs have failed to show the existence in the new pleading of a reasonable cause of action. I find that the claims asserted in the New Action do disclose a reasonable cause of action that goes beyond that dealt with in the order of Echlin J. and it is not plain and obvious to me that the New Action cannot possibly succeed. On both fronts I reject the position of the defendants. The motion is dismissed.

**Rule 21 Framework**

**9**    Rule 21 permits a party to seek determination of an issue before trial. Under rule 21.01(1)(b) a party may move to strike out a pleading on the ground that it discloses no reasonable cause of action or defense and the judge is permitted to make an order or grant judgment accordingly. No evidence is admissible on a motion brought under clause (1)(b), and the authorities establish that all of the facts alleged in the statement of claim should be taken as true for the purposes of determining whether the pleading demonstrates the existence of a reasonable cause of action. This requirement is not surprising. To do otherwise would in effect permit the moving party to conduct the equivalent of a motion for summary judgment without the presence of sworn evidence. Consequently all of the facts pleaded in the statement of claim in the New Action are deemed to have been proven for

purposes of this motion and this court should make the order striking the pleading only in plain and obvious cases in which it is satisfied beyond doubt: *Prete v. Ontario (Attorney General)* (1993), 110 D.L.R. (4th) 94 (C.A.), leave to appeal to S.C.C. dismissed [1994] S.C.C.a. No. 46, 110 D.L.R. (4th) vii; *Trendsetter Developments Limited v. Ottawa Financial Corp.* (1989), 33 C.P.C. (2d) 16 (C.A.).

**10**    Rule 21.01(3) contemplates several grounds upon which an action may be stayed or dismissed, but the only one relevant in this case is whether the plaintiffs' New Action is frivolous or vexatious or is otherwise an abuse of the process of the court. Counsel for the defendants also referenced the *Courts of Justice Act*, R.S.O. 1990, Chap. C-43 at sections 106 and 138 which permit the court on its own initiative or on motion by any person to stay any proceeding on terms the court considers just, noting that as far as possible it is desirable that multiplicities of legal proceedings be avoided.

**11**    The obvious question here is what standard must be met for the pleadings to be sustained. The standard is low. This Court should strike out the plaintiffs pleadings in the New Action only if it is plain and obvious that the New Action cannot possibly succeed, or if the plaintiffs have failed to show the existence in the new pleading of a reasonable cause of action: *Hunt v. Carey Canada & Co.* (1990), 2 S.C.R. 959 (S.C.C.). To paraphrase Henry J. in *Ontario (Securities Commission) v. McLaughlin* (1987), 11 O.S.C.B. 442 (S.C.O.) at paragraph 2, it is only where the motions judge is certain that the plaintiff's cause is hopeless that its statement of claim should be struck. On a motion brought under rule 21 to strike pleadings, it is the plaintiff who must benefit from any doubt on that question.

**12**    The effect of this framework is that all of the pleadings and assertions of fact contained in the statement of claim in the New Action filed on September 18, 2006 are considered for present purposes to be true. In their factum the plaintiffs recited 57 paragraphs of full text from that statement of claim as facts that are deemed to be true on this rule 21 motion. In the following section I have tried to recount the central facts in a somewhat more summary fashion.

**Background**

**13**    It was not long ago, in early 2004, that the plaintiffs and the defendants appeared to share a common vision of establishing a new top-end motorcycle sales, service, and rental business in Toronto. They envisaged that it would also distribute and sell motorcycle parts and clothing, and that it would sell dealerships across Canada. BSR Marketing Inc. was formed to undertake the venture and all of the plaintiffs and defendants invested in shares of BSR. At BSR's initial organizational meeting in November, 2004, the individual defendants, Gerard Ryan, Isaiah Von Lichtenberg, Steve Micallef and Derek Page were appointed as its officers and directors. It was they who were the principal directing minds behind the venture.[1] They were also the parties who later established Wildside Motorcycles (Canada) Inc. and 1651646 Ontario Inc. as Ontario corporations.

**14**    Between September, 2004 and June, 2005, many steps were taken to advance the business,

including the registration by Dr. Von Lichtenberg of the "Wildside Choppers" trade name under which it was intended BSR would carry on business (notably in his own name, not BSR's). There was extensive promotion of the new venture and significant advance sales of products at motorcycle shows across Canada. Soon after, retail premises were opened at 3246 Lakeshore Boulevard West, a property that had been rented from 1651646 under a 5-year commercial lease. BSR also entered into other supply and marketing agreements with third parties. In April, 2005, the BSR shareholders reached a Shareholders Agreement amongst themselves. Not long after, however, relations between the parties began to go downhill, leading to calls for additional capital from shareholders, efforts by the defendants to force the plaintiffs to sell their shares to them, and the replacement of the original accountant, Darius Contractor, by Mr. Ryan's bookkeeper. More significantly, the defendants took control over and relocated BSR's bank accounts.

**15**    By early June, 2005, the defendants had squeezed Mr. Lilly out. They accused him of mismanagement. They advised other shareholders that BSR was in financial trouble. They called for further capital injections, absent which, shareholders would be forced to sell their shares back to BSR. After BSR failed to pay its rent to 1651646 (a company they controlled) the defendants changed the locks on the Lakeshore Boulevard premises. Dr. Von Lichtenberg is alleged to have threatened Barbara Ricco that he would bankrupt the company, leave the plaintiffs with the unpaid bills, and start up business again using the "Wildside Chopper" business name, telling her that he had registered that trade name in his own name personally, rather than in the name of BSR. While I make no finding on the point it not being an issue before me, subsequent events suggest that may be exactly what happened.

**16**    By early July, 2005, the individual defendants had taken control of the BSR board. They confirmed the appointment of Mr. Ryan's bookkeeper as the new accountant, and they changed solicitors. Only days later, on July 19, 2005, they incorporated Wildside Motorcycles (Canada) Inc. and registered the name "Wildside Motorcycles" pursuant to the *Business Names Act*. The registered office address for Wildside Motorcycles (Canada) Inc. is 3246 Lakeshore Boulevard West, the same address previously occupied by BSR. The directors of Wildside Motorcycles (Canada) Inc. are Messrs. Ryan and Micallef, and Dr. Von Lichtenberg, the same board (with the exception of Page) that controlled BSR. Most importantly, Wildside Motorcycles started to use the "Wildside Choppers" business name. It appears to have effectively taken over the fledgling business to the exclusion of BSR and the plaintiffs. Finally, after advising the plaintiffs that Wildside was the new tenant of the Lakeshore Boulevard premises and that BSR's inventory was to be sold at liquidation values to Wildside as purchaser, the defendants notified the plaintiffs that funds remaining to the credit of BSR after the payments of creditors' claims, if any, would be paid to shareholders.

**17**    In November, 2005, the plaintiffs' solicitor wrote to the individual defendants as directors of BSR to request that they commence a derivative action on behalf of BSR. Given that they would have been the focus of that action, it is not surprising that the individual defendants declined. Their solicitor ignored the correspondence from the plaintiffs.

**18**     As a result, the plaintiffs decided to sue on their own. They knew that leave of the Court would be required to bring a derivative claim. They prepared pleadings for the Original Claim. In those pleadings, they requested an injunction restraining the defendants from carrying on business in competition with BSR or from using the "Wildside" or "Wildside Motorcycles" business names and they sought an accounting, not only of Wildside's revenues and profits but also those of the individual defendants. They sought a disgorgement of profit order against both Wildside and the individual defendants in their favour as plaintiffs. They claimed general damages of $310,000, damages for Barbara Ricco of $31,604.06, aggravated damages of $250,000 and punitive damages of $250,000, as well as pre-judgment and post-judgment interest and substantial indemnity costs. The plaintiffs made these claims based on alleged breach of a fiduciary obligation owed to them as shareholders by the defendants, not only in their capacities as directors and officers of BSR, but also as BSR shareholders. They alleged that the defendants unlawfully converted BSR's assets and undertaking to their own use and that they had intentionally interfered with BSR's economic relations. They claimed that they had been personally oppressed by the conduct of the defendants, that the defendants had breached the Shareholders Agreement, and that they had been guilty of passing off and had been unjustly enriched.

**19**     Since a number of the proposed claims were derivative in nature, the plaintiffs brought a motion under section 246 of the OBCA seeking court approval to commence the action. That motion was to have been heard on March 23, 2006. To their surprise, the plaintiffs learned for the first time only the day before that motion was returnable that BSR's directors had caused it to make an assignment in bankruptcy, and that the Trustee in Bankruptcy had stayed legal proceedings relating to BSR. To their further surprise, they learned that the assignment in bankruptcy had been made only one day earlier, on March 21, 2006. However, the plaintiffs had never received any notice of BSR's impending bankruptcy, and no shareholders meeting was ever called on the issue. As such, the plaintiffs concluded that the defendants intentionally bankrupted BSR for the sole purpose of avoiding their derivative action. Moreover, they asserted that the defendants intentionally stripped BSR of all of its assets and unlawfully transferred them to the defendant, Wildside Motorcycles (Canada) Inc., with the singular intent of causing BSR to become insolvent.

**20**     Two months later, based on advice received from its solicitor that the derivative claim was a BSR asset, the Trustee in Bankruptcy offered it for sale to creditors and shareholders of BSR. The only offer received in the course of the process that the Trustee established was for $20,000 from Dr. Von Lichtenberg. The Trustee accepted that offer. Being concerned about conflict issues between the defendants and the plaintiffs, however, the Trustee brought a motion in Bankruptcy Court seeking judicial approval for the sale of the BSR derivative claim to Dr. Von Lichtenberg.

**21**     On July 10, 2006, the matter came before Justice Echlin. At that time the plaintiffs also brought a cross-motion seeking an order under section 37 of the *Bankruptcy and Insolvency Act* (BIA) reversing the Trustee's decision to accept Dr. Von Lichtenberg's offer to purchase, or alternatively, permitting the plaintiffs to bring a derivative action in their own names against the individual defendants. Justice Echlin approved of the sale of the derivative claim and rejected the

plaintiffs' cross-motion. While the plaintiffs did make an offer to purchase the action, their offer was less than had been offered by Dr. Von Lichtenberg, and it was rejected by the Court as too little too late. Echlin J. felt he ought not to interfere with the process the Bankruptcy Trustee had adopted, a process he regarded as fair, by considering that offer after the tender period had closed.

**22**    Just over two months later, the plaintiffs filed a statement of claim in the New Action. It is in response to the commencement of this New Action that the defendants bring this motion to strike the plaintiffs' pleadings.

**Are the plaintiff's precluded from commencing the New Action based on the doctrines of *res judicata* or election and alternative liability in multiple proceedings?**

**23**    The defendants rely heavily on the doctrine of *res judicata* and the doctrine of election and alternative liability in multiple proceedings in their effort to strike the plaintiffs' statement of claim in the New Action, citing *CPU Options Inc. v. Milton* [2006] O.J. No. 253 (S.C.J.) as principal authority. In that case, Pitt J. applied both doctrines in the context of the trial of an action for misappropriation, conversion, fraudulent misrepresentation and oppression under the OBCA.

**24**    In that case, the plaintiff had obtained a default judgment in the United States in 2000 against a corporate defendant but found that it was unable to enforce its judgment. Consequently, it commenced a personal action against the individual defendant, who had been the sole director and shareholder of the defaulting corporation, and his spouse. Justice Pitt concluded that the second action in Ontario was unsustainable because default judgment had previously been granted in Minnesota relating to the same transactions. It was unsustainable under either the doctrine of *res judicata*, or the doctrine of election and alternative liability in multiple proceedings.

**25**    *Res judicata* prevents the re-litigation of matters that have already been determined by a court of competent jurisdiction. The doctrine is founded not only on the principle that the same party should not be harassed twice in litigation for the same complaint, but also that there is a societal value in the finality and conclusiveness of judicial decisions: see *Angle v. M.N.R.*, [1975] 2 S.C.R. 248 at 267.

**26**    *Res judicata* not only prevents the same cause of action from being re-litigated but also bars claims which properly belonged to the subject matter of previous litigation. A plaintiff who asserts a cause of action must claim all possible relief with respect to that cause of action, and will be prevented from invoking the aid of the courts in furtherance of that same cause a second time: *Maynard v. Maynard*, [1951] S.C.R. 346. The value of this principle lies in its prevention of the fragmentation of litigation, prohibiting the litigation of matters that were never addressed in previous litigation, but which ought to have been and which properly belonged to it. This principle will also prevent a party from attempting to re-litigate an already decided case by advancing a new legal theory in support of a claim that is based on essentially the same facts or combination of facts. "In other words", said Justice Pitt, "a party cannot recast the claim arising out of the same facts using a different legal description without bumping up against the doctrine of cause of action

estoppel, and, if the same parties requirement is met, it will operate to bar the second action: *Britannia Airways Ltd. v. Royal Bank of Canada*, [2005] O.J. No. 2 at paragraph 18."

27    The doctrine of election and alternative liability in multiple proceedings addresses a different but related concern. Its objective is that a multiplicity of legal proceedings should be avoided. A plaintiff must bring all causes of action arising out of the same transaction in a single action, and one who does not will be deemed to have elected his or her remedy and be barred from bringing a second action arising out of the same transaction. In the case of an action previously brought as a derivative claim, merely re-characterizing the claim as a tort action and an oppression proceeding will not render that principle inoperative: *CPU Options Inc.*, above, at paragraphs 6 through 13; *Courts of Justice Act*, section 138.

28    The defendants assert that the claims raised in the New Action arise from the same series of transactions as those which were the subject matter of the Original Claim. They observe that the plaintiffs did not appeal the order of Justice Echlin which approved of the sale of the derivative action by the Trustee in Bankruptcy to Dr. Von Lichtenberg. Instead, they sought to issue a new claim for oppression in their personal capacities and not on behalf of BSR merely, it is alleged, by making changes to the statement of claim in the Original Action. Defendants' counsel contends that this is exactly what Pitt J. was addressing in paragraph 17 of his reasons in *CPU Options* when he observed that parties may not re-litigate a case on the basis of a new legal theory when the claim is based on facts or a combination of facts that are the same as those in a prior action: see *Las Vegas Strip Ltd. v. Toronto (City)* (1996), 30 O.R. (3d) 286, aff'd (1997), 32 O.R. (3d) 651 (C.A.).

29    Here, the defence claims that the parties and facts are identical and that the plaintiffs are simply recasting the same transactions and facts into a different claim under the head of oppression, rather than as a derivative action claim. As far as the other claims are concerned, they argue that there could be no cause of action in the New Action with respect to a breach of the Shareholders Agreement, since any claims that might otherwise have arisen for breach of that agreement necessarily fell away by the terms of that agreement (section 10.01) upon the assignment in bankruptcy of BSR. More importantly, they argue that the purchase by one of the defendants of the derivative claim from the Bankruptcy Trustee constitutes a valid and legitimate strategic method to bring litigation to an end. While opposing parties may complain that such action is taken merely to terminate the litigation, it has been held to be a transaction that is in the nature of a settlement of the action, and both the method and the inevitable result have received judicial acceptance in Ontario: see *Re Katz*, [1991] O.J. No. 1369 (O.C.J. Gen. Div. in Bankruptcy) per Farley J. and *Re Geller*, [2005] O.J. No. 2094 (S.C.J.), both of which Echlin J. referred to with approval in his endorsement.

30    In spite of these arguments, the defendants cannot succeed on this ground of attack. There are two reasons. First, neither the parties nor the claims in the New Action are the same as the parties and the claims made in the proposed Original Claim. In the proposed Original Claim, BSR Marketing Inc. was a plaintiff, but in the New Action it is not. There are other variances in the claims asserted by the plaintiffs in the New Action as compared to those in the proposed Original

Claim. In the proposed Original Claim, BSR as plaintiff made claims against the defendants for wrongs allegedly done to it. These included unlawful conversion of BSR's property to the use of the defendants under legal principles of conversion and replevin, intentional interference with BSR's economic relations, and unlawful passing off. In the New Action BSR is not a plaintiff and no claim is made by the individual plaintiffs for any of the foregoing three legal wrongs allegedly perpetrated against BSR at the instance of the defendants. The claims made by the individual plaintiffs in the New Action all purport to be personal claims, not corporate.

**31**    It is true that the New Action arises out of the same series of transactions as those that underlay the proposed Original Claim, but this fact cannot cause either of these two doctrines to be engaged in this case. With the exception of the derivative claims dealt with by Echlin J. in his July 10, 2006 order, the simple reason for this conclusion is that none of the other claims asserted by the plaintiffs under the Original Claim, or in the New Action has ever been commenced or adjudicated on by any court.

**32**    In *CPU Options,* a claim had been legally commenced, and had given rise on its merits to the issuance of a default judgment. It was only after the plaintiff was unable to realize any amount when it sought to enforce its judgment against the corporate defendant in the initial action that it commenced a new action against the individuals who had been the directing minds behind the corporate defendant. In contrast, here the Original action was never even formally issued. It was included in the Motion Record filed by the defendants on this motion, but it remains in the same draft form that it was in when the plaintiffs were thwarted from obtaining leave to bring their derivative action on March 23, 2006 by BSR's assignment in bankruptcy two days before.

**33**    Moreover, there was nothing in the endorsement of Echlin J. in July of 2006 that amounts to a determination of the merits of the plaintiffs proposed Original Claim. Following the assignment in bankruptcy of BSR at the instance of the defendants, all of BSR's property became vested in the Trustee. It was the Trustee's obligation to realize the greatest value possible from a disposition of that property. Even though the claim had not been formally issued, BSR's derivative action claim against the defendants was a chose in action. Any rights of recovery it had for the economic wrongs allegedly done to it by the defendants constituted property to BSR. However, it was only the BSR derivative claims, and not the personal claims of the individual plaintiffs, that constituted property of BSR capable of being sold by the Trustee.

**34**    It is old and trite law that you cannot sell that which you do not have - *nemo dat quod non habet.* As a result of the sale of BSR's derivative claim to one of the defendants, BSR's rights of action against the defendants became the property of that purchaser upon the conclusion of that sale transaction. Justice Echlin approved of the sale of BSR's chose in action to Dr. Von Lichtenberg. However he did not deal with any of the other proposed and un-issued claims that were set out in the Original Claim. Neither, as plaintiff's counsel was quick to point out in argument, did he determine that the plaintiffs' claims were derivative only nor did he make any finding respecting the merits of any of the plaintiffs' claims in the Original Claim, which were not before him.

**35**    Rather, what Echlin J. properly did that day as a judge sitting in Bankruptcy Division was to approve of the sale of the carved out derivative portions of the Original Claim to Dr. Von Lichtenberg. Apart from his right to comment on the process followed and to reject the plaintiffs' cross-motion and their last minute bid, I agree with the plaintiffs' submissions that Echlin J. had no jurisdiction that day to decide anything other than the question of whether the sale of BSR's chose in action by the Bankruptcy Trustee should receive judicial approval. Consequently, in the wake of Echlin J.'s order, the plaintiffs' personal claims against the defendants remained unaffected, in contrast to the derivative claims which were effectively extinguished.

**36**    An un-issued draft claim for damages for *in personam* wrongs alleged by the individual plaintiffs against the defendants cannot engage either the doctrine of *res judicata* or the doctrine of multiple proceedings in circumstances where no claim had ever been formally issued, where no evidence has ever been presented, and where no adjudication on the merits has ever been made by a court. The claims asserted in the New Action filed in September of 2006 are claims asserted by a different group of plaintiffs. While I will address the question more fully later in these reasons in considering the reasonability of the causes of action now asserted by the plaintiffs, neither do the claims asserted in the New Action amount to a re-litigation of the derivative claims asserted in the Original Action. *Res judicata* cannot apply where no action was ever commenced. Neither can a multiplicity of actions result from the issuance of the New Action when it is the only action that has ever been commenced with respect to these transactions and events. The defendants' first ground of attack against the plaintiffs cannot succeed and is rejected.

**Does the commencement of the New Action by the plaintiff's amount to a collateral attack on the Order of Echlin J. and an abuse of process?**

**37**    Collateral attack in civil proceedings involves the calling into question of a prior judicial order by a court of competent jurisdiction in a subsequent proceeding, where that proceeding is not one provided by law for the express purpose of attacking that prior order. Cameron J. observed in *Alvi v. Misir* [2004] O.J. No. 5088 that where, as here, the defendants allege abuse of process by the plaintiffs, the issue is whether the plaintiffs are abusing the process of the court by seeking relief in a new action that is inconsistent with their prior positions, or the prior decisions of the courts, and in doing so are making a collateral attack on prior orders. The doctrine is a flexible one. It is intended to engage the inherent power of the court to prevent the misuse of its procedure in a way that would be manifestly unfair to a party to the litigation before it, or which would in some other way attack the integrity of the adjudicative process and bring the administration of justice into disrespect: see *Alvi*, above, at paragraph 22.

**38**    Here, the defendants argue that the issues raised in the New Action were fundamental to Justice Echlin's order in the bankruptcy action and not merely collateral or incidental to it. They claim that the New Action mirrors the derivative actions asserted in the Original Claim and that the facts on which the New Action is founded are derivative in nature. The right to bring an action based on those facts is now vested in Dr. Von Lichtenberg on behalf of Wildside Motorcycles as a

result of his purchase of the derivative cause of action from the Trustee in Bankruptcy. Moreover, the decision of Echlin J. to approve that sale was a final decision. As such, the defendants regard the commencement of the New Action by the plaintiffs as a collateral attack which calls Justice Echlin's order into question. They contend that the plaintiffs had the opportunity to appeal that order but chose not to avail themselves of that right and instead commenced this New Action. They accuse the plaintiffs of abusing the process of this Court by seeking relief that is allegedly inconsistent with the plaintiffs' prior positions, and in doing so, in making a collateral attack on that prior order.

**39**    Ignoring that the Original Claim was never commenced as an action, in their submission, the plaintiffs "commenced" the proceedings relating to BSR as a derivative action and "litigated" the matter throughout the bankruptcy proceedings as a derivative action. They claim that prior to the issuance of the statement of claim in the New Action, the plaintiffs always viewed and characterized the facts as "derivative" to be litigated in BSR's name, and requiring leave of the court to do so. In summary, having purchased the derivative action to settle those derivative claims, the defendants allege that it would be manifestly unfair to them to now permit the plaintiffs to reopen the case against them by re-characterizing their claim as an oppression remedy claim rather than as a derivative action.

**40**    In response to these complaints, it should first be noted that the draft statement of claim in the proposed Original Claim did not just contain derivative claims. It also set out individual personal claims asserted by the individual plaintiffs for oppression, breach of the Shareholders Agreement, breach of fiduciary duty, and for repayment of the un-reimbursed expense claims of Ms. Ricco. A review of the original proposed statement of claim makes this distinction evident.

**41**    In paragraphs 63 to 67 of the draft pleading, the plaintiffs, all as "complainants" within the meaning of sections 245 and 248 of the OBCA, personally assert oppression against themselves by the defendants. The claim does not merely relate to BSR, but asserts as well that the affairs of BSR were conducted in a manner that was oppressive, unfairly prejudicial to, and that unfairly disregarded the interests of all of them as plaintiffs for which they claim relief under subsection 248(3) of the OBCA.

**42**    Paragraphs 68 and 69 of the original statement of claim set out the plaintiffs' allegations that the defendants were in breach of the Shareholders Agreement. It is hard to conceive of how the defendants could construe those claims as claims properly belonging exclusively to BSR rather than the individual plaintiffs, even though BSR was a party to that agreement. Instead, the plaintiffs' claims under the Shareholders Agreement are made out in terms of wrongs allegedly done to them personally rather than to BSR.

**43**    In paragraphs 50 to 56 of the Original Claim, it is clear that it is the individual defendants who are asserting breach of fiduciary duty against the defendants, as senior officers and directors of BSR, and who allegedly owed duties of loyalty, good faith and the avoidance of conflict of duty and self-interest towards the plaintiffs. In paragraph 79, the plaintiffs claim that the defendants were

unjustly enriched at their expense and to their detriment in reliance on the doctrines of unjust enrichment and *quantum meruit*. Those claims are not merely claims advanced by BSR that are derivative in nature, but are also potentially capable of being *in personam* claims advanced by the individual plaintiffs as well. Finally, paragraphs 80 to 82 detail the reimbursement of expense claims advanced by Barbara Ricco against the defendants in accordance with section 2.4 of the Shareholders Agreement, a claim that is clearly not derivative in nature.

**44**    The plaintiffs needed to obtain leave of the Court to bring the Original Claim as a whole, but that was only because section 246 of the OBCA required the court's leave before the derivative action component of that claim could be commenced. The plaintiffs rebut the defendant's allegations of "manifest unfairness" towards the defendants with the observation that all appearances suggest an intentional bankruptcy of BSR at the instance of the defendants to avoid the derivative action. However, just as the defendants asserted that the law requires all parties and all causes of action to be included in a statement of claim commencing an action, the evident fact is that the plaintiffs fully complied with that procedural requirement. Had they not sought to bring a derivative action, but only the *in personam* claims noted above, no leave would have been required, the bankruptcy of BSR would have had no impact on their ability to prosecute those claims, and there would have been no subject matter for Echlin J. to adjudicate on when he approved of the sale by the Trustee in Bankruptcy of the derivative action to Dr. Von Lichtenberg.

**45**    The plaintiffs should not now be accused of launching a collateral attack in choosing not to appeal Justice Echlin's decision. Given that none of the merits of any of the claims asserted in the Original Claim have been before a court for consideration, and that the claims which the plaintiffs are now seeking to litigate, not for the second but only for the first time, are their personal claims against the defendants in oppression and under the other heads of damage noted above, I see no foundation to support the defendant's assertion that the initiation of the New Action amounts to an abuse of this Court's process, or that there was any need to appeal Echlin J.'s order. Neither is there any foundation for the allegation that the commencement of the New Action amounts to a collateral attack on the order of Justice Echlin. It is evident that the plaintiffs are not attacking Justice Echlin's order, but instead quite legitimately now merely seek to prosecute their *in personam* claims against the defendants for the first time, claims that they were previously unable to prosecute under the Original Claim owing to BSR's assignment in bankruptcy.

**46**    There is a further aspect to the defendant's contentions that needs to be addressed. This seems a useful point in these reasons to do so. A central feature of the defendants' argument was the notion that the plaintiffs never had any intention of pursuing any remedies against the defendants other than for derivative claims for wrongs done to BSR. In the defendant's submission the plaintiffs treated the Original Claim as a derivative action, and a derivative action alone, up until the last minute. Rather than appealing Justice Echlin's order, defendants' counsel contends that they sought in the New Action to issue a new claim for oppression in their personal capacities by simply "recasting" the same transactions that were the subject matter of the proposed Original Claim into a different claim based on oppression rather the derivative rights of BSR.

**47**    However, in *Jabalee v. Abelmark Inc.*, [1996] O.J. No. 2609 (C.A.), our Court of Appeal acknowledged that derivative actions and oppression claims are not mutually exclusive remedies. In the fourth and fifth full paragraphs of that brief endorsement, the Court stated:

> We agree with the motions judge that on the authority of *Brant Investments Limited v. KeepRight Inc.* (1991), 3 O.R. (3d) 289 (C.A.), a majority shareholder owes no fiduciary duty to a minority shareholder. But the plaintiff's allegation is that Simpson breached the fiduciary duty that he owed to the company and as a result unfairly prejudiced the numbered company plaintiff as a shareholder of Abelmark Inc. The oppression remedy in section 248 of the *Ontario Business Corporations Act* is very broad and may well entitle a minority shareholder in a closely-held company to relief arising out of a director's breach of fiduciary duty.

> Equally, although some of the claims in the proposed amended statement of claim could be the subject of a derivative action, they may also make out a case of oppression. The two are not mutually exclusive. See *Deluce Holdings Inc. v. Air Canada* (1992), 12 O.R. (3d) 131 (Gen. Div.) and *PMSM Investments Limited v. Bureau* (1995), 25 O.R. (3d) 586 (Gen. Div.).

**48**    The Court of Appeal acknowledges in this passage that the same series of transactions and the same underlying facts may give rise to distinct causes of action in oppression brought by individual shareholders as complainants, and derivative action claims brought by a corporate plaintiff, such as BSR, albeit in the latter case through the instrumentality of individual shareholders, such as the individual plaintiffs in this matter. To the extent that this distinction has been reinforced in subsequent decisions of our courts (discussed further below), it strikes me that it is not open to the defendants to assert on any reasonable basis that Justice Echlin's order could have affected or compromised the ability of the individual plaintiffs to commence a claim against the defendants, for the first time, claiming breach of their *in personam* rights as asserted in the New Action. By corollary, there is no foundation to assert that the New Action continues derivative claims when the corporate plaintiff has been removed, as have all of the claims that could only be asserted by it. There is no foundation on the record before this court to support the contention of the defendants that the commencement of the New Action by the plaintiffs constitutes either a collateral attack on Justice Echlin's order or that it amounts to an abuse of the process of this Court.

**Does the New Action disclose a reasonable cause of action that goes beyond that dealt with in the order of Echlin J.?**

**49**    The final ground of attack brought by the defendants against the claims asserted by the plaintiffs in the New Action focuses on the nature of those claims tested against the claims that were the subject matter of Echlin J.'s order respecting the bankruptcy sale. They assert that the New Action discloses no reasonable cause of action that goes beyond those asserted in the Original

Claim, which they claim were fully addressed by Echlin J.'s order.

**50**    In considering this line of argument, it must be accepted at the outset that Echlin J.'s order in bankruptcy fully disposed of any derivative claims that might have been asserted by BSR or the individual plaintiffs on its behalf. The defendants correctly assert that the Rule in *Foss v. Harbottle* establishes that a shareholder of a corporation does not have a personal cause of action for a wrong done to the corporation. While the rule does not preclude an individual shareholder from maintaining a claim for harm done directly to that shareholder, in order to maintain a personal claim the shareholder must establish that he or she suffered damages that were not merely derivative of the damage suffered by the corporation: *Meditrust Healthcare Inc. v. Shoppers Drug Mart*, [2002] O.J. No. 3891 (C.A.) per Laskin J.A. at paragraph 12, see also *Walters v. Royal Bank of Canada*, [2000] O.J. No. 702 (C.A.).

**51**    The essence of the defendant's argument on this point is that no damage has been pleaded by the plaintiffs other than a diminution in the value of their shares of BSR, and *Meditrust* establishes in their submission, having unequivocally followed the Rule in *Foss v. Harbottle*, that the individual plaintiffs have no right to make a claim for damages if the essence of that claim is merely that the value of their shares in BSR was diminished as a consequence of the actions of the defendants. Moreover, the defendants argue on the authority of *Brant Investments Limited*, above, that shareholders do not, as such, owe fiduciary duties to each other. As such, the individual plaintiffs can have no reasonable cause of action against the defendants to the extent that their claims are founded in an allegation that the defendants owed them fiduciary obligations. The defendants argue that there could be no possible cause of action that would be reasonable relating to an alleged breach of the Shareholders Agreement, on the basis that that agreement, by its terms, terminated upon the assignment in bankruptcy of BSR. Moreover, they note that section 2.7(j) of the Shareholders Agreement expressly permitted the directors of BSR, by resolution, to authorize the "liquidation or winding up of the Company" without any requirement for shareholder approval to be obtained. Finally, the defendants argue that the plaintiffs' claims for an accounting of the shareholders accounts relating to BSR and for orders entitling them to access BSR's books and records and requiring the defendants to deliver up financial statements of BSR are all matters beyond their control. The books and records of BSR were delivered to the Trustee in Bankruptcy upon BSR's assignment in bankruptcy pursuant to section 158(b) of the BIA, where those records remain, thus allegedly being outside of the control of the defendants.

**52**    The defendants' claim that the individual plaintiffs have no reasonable cause of action on the basis of the preceding lines of argument does not address the plaintiffs' claim for aggravated damages and punitive damages, each in the amount of $250,000. Nevertheless, if there is merit to the defendants' arguments with respect to the substance of the plaintiff's claims, this might cause a trial judge to conclude that there was no legal relationship in existence between the defendants and the individual plaintiffs upon which the award of such damages could be founded.

**53**    I propose to deal with each of the defendants' assertions in turn in the paragraphs that follow.

Before doing so, however, it is important to again emphasize the standard that is to be applied by this Court on this motion brought under rule 21. The decisions in *Hunt* and *McLaughlin*, above, make clear in determining whether the statement of claim of the individual plaintiffs in the New Action ought to be struck, that the standard is a low one, unlike *Meditrust*, which involved a summary judgment motion, and not a motion such as this to strike pleadings.

**54**    In a summary judgment motion, the motions judge has a different standard to apply. The parties are required to file affidavits and *facta*. The judge must "take a hard look" at the matter to determine if there is a genuine triable issue. A party may not rest on mere assertions from its pleadings. While the onus of proving no genuine triable issue remains on the moving party, the respondent must "put its best foot forward" and "lead trump or risk losing": *Guarantee Co. of North America* v. *Gordon Capital Corp.,* [1999] 3 S.C.R. 423 (S.C.C.); *Irving Ungerman Ltd.* v. *Galanis* (1991), 4 O.R. (3d) 545 (C.A.); *1061590 Ontario Ltd. v. Ontario Jockey Club* (1995), 21 O.R. (3d) 547 (C.A.).

**55**    Here, to succeed in striking the plaintiffs' pleadings, the defendants must prove that it is plain and obvious that there is no reasonable cause of action asserted by the plaintiffs that could possibly succeed, on the basis of the pleadings put forward by the plaintiffs as deemed to be true. As such, on this motion, no assessment is made of whether the plaintiff will be able to marshall all the evidence necessary to succeed in the cause of action, but merely whether the cause of action as pleaded, and on the basis of the facts pleaded being deemed to be true, is a hopeless one on which the plaintiff cannot possibly succeed on its face. A review of the case law referenced by the plaintiff satisfies me that this is a standard that the defendants cannot meet on this motion.

**56**    The fundamental attack of the defendants against most of the claims asserted by the individual plaintiffs lies in the allegation that they are in the nature of derivative claims, but that contention ignores the inevitable factual and transactional similarity that will typically exist between derivative claims brought on the corporation's behalf and oppression claims brought by the individual shareholders themselves. Further, it ignores the numerous affirmations in recent decisions of courts in this province that derivative actions and actions for oppressive conduct brought under section 247 of the OBCA are not mutually exclusive. They are complementary and give plaintiffs a choice of remedy. The structure of the statute makes this clear. The Legislature did not enact the derivative action and oppression remedy provisions in section 245 and section 247 of the OBCA as alternative and mutually exclusive approaches to seeking damages for alleged wrongs to a corporation or its shareholders, but as entirely distinct statutory remedies. This choice of remedy, regardless whether the underlying facts and series of transactions that would support the alternative claims are the same, is itself sufficient to preclude the striking out of the plaintiff's statement of claim on a rule 21 motion such as this: *Ontario (Securities Commission) v. McLaughlin*, [1987] O.J. No. 1247 (Ont. S.C.J.), *Jabalee v. Abalmark Inc.*, [1996] O.J. No. 2609 (Ont. S.C.J.), *Waxman v. Waxman*, [2004] O.J. No. 1765 (C.A.). More importantly, however, at least two recent decisions of our Court provide support for findings of oppression in circumstances such as these.

**57**    As in this case, the most recent of these, that of Justice Ground in *Malata Group (HK) Limited v. Henry Chi Hang Jung*, [2007] O.J. No. 1704, 2007 CanLII 14629 (O.S.C.J.), involved a motion brought under rule 21 for a declaration that the plaintiff was without legal capacity to commence the action. The defendants asserted that it was in essence, derivative, which they attacked on the basis of the plaintiff's failure to comply with the procedural requirements of section 246 of the OBCA.

**58**    There, like here, the defendant argued in reliance on the Rule in *Foss v. Harbottle* as enunciated by LaForest J. in *Hercules Management Limited v. Ernst & Young*, 1997 CanLII 345 (S.C.C.), that the claims made by the plaintiffs were derivative in nature and could not be brought within the context of an oppression action. However, Ground J. rejected the defendant's arguments on the basis that Ontario law has evolved through the enactment of the derivative action and oppression action provisions of the OBCA. In his view these statutory remedies have diluted the Rule in *Foss v. Harbottle*, and he noted that the case law recognizes that derivative actions and oppression actions are not mutually exclusive. He referred to the *McLaughlin* case, *Deluce Holdings*, both above, and *Ford Motor Co. of Canada Limited v. Ontario Municipal Employees Retirement Board*, [2004] O.J. No. 191 (O.S.C.J.), where Cumming J. cited both *Jabalee* and *McLaughlin*, above, stating at paragraph 241:

> Conduct which may result in harm to a company and may therefore be the subject of a derivative claim may also result in oppression to minority shareholders. The presence of a derivative action remedy does not preclude minority shareholders from pursuing their personal remedy under section 241. The two are not mutually exclusive.

On this basis, Ground J. concluded that the plaintiff in *Malata* did have the legal capacity to bring an action for oppression, and dismissed the defendants motion under rule 21.

**59**    Moreover, in the recent decision of Justice Kruzick of this region in *Jordan Inc. v. Jordan Engineering Inc.*, [2004] O.J. No. 3260 (S.C.J.), directors were found to have engaged in oppressive conduct with respect to minority shareholders of that company in circumstances remarkably similar to those present here. In that case, oppressive conduct was found where directors formed their own new company, offered the same services as the company that they were directors of, operated out of the same premises as the company of which they were directors, had the same clients as the company they were directors of, and had the same employees. In concluding that the directors who had formed their own company had oppressed the minority, Kruzick J. specifically had in mind that an oppression remedy under section 248 of the OBCA, or indeed at common law, is a discretionary equitable remedy, one which on the facts of the case before him, was found to be warranted. Without making any finding on point, to my mind if the facts that are alleged to have taken place in this case are proven to be true, it would be equally plausible that the trial judge in this matter could find an oppression remedy to be warranted here.

**60**    Regardless of what conclusion the trial judge might reach, however, these authorities establish

beyond doubt that it is open to minority shareholders to pursue the statutory remedy of an oppression claim for personal wrongs done to them without regard to whether a derivative claim is also pursued on the company's behalf. In this case the order in bankruptcy of Echlin J. approving of the sale of the derivative action brought an end to any future prospect of a derivative action brought on behalf of a BSR. However, that order did not prevent the individual plaintiffs from pursuing the New Action against the defendants for any personal damages they may have sustained as a result of the allegedly oppressive manner in which the defendants are accused of having conducted the business and affairs of BSR.

**61**    Turning next to the alleged breach of fiduciary duties, it may well be that such duties could be found at trial not to have been owed by the directors to the minority in this case but there is no doubt that the categories of fiduciary relationships are not fixed in stone. In *Jordan*, above, Kruzick J. referred at paragraph 36 to the seminal decision in *Canadian Aero Service Limited v. O'Malley* (1973), 40 D.L.R. (3d) 371 (S.C.C.) where Laskin J. (later C.J.C.) stated that the categories for breach of fiduciary duty are not closed. There are an unlimited number of possible situations in which the fiduciary may find themself confronted with a conflict between their personal interests and their duty, or where they are in breach of a duty to act honestly and in good faith with a view to the best interests of the corporation. Greer J. referenced the same point in *Algonquin Mercantile Corp. v. Cockwell*, [1997] O.J. No. 4616. In that case, as in this case, the defendant sought under rule 21 to strike out claims of the plaintiff on the basis that they were unsustainable in law. At paragraph 23, Greer J. stated as follows:

> It is Algonquin's position that the law must evolve through Trials, and not Motions to Strike pleadings, since it is necessary in complex legal actions such as the case at bar, that documents are produced and evidence taken which is later to be heard in Court. It relies on the principles as set out by the Court of Appeal in *Hanson v. Bank of Nova Scotia* (1994), 19 O.R. (3d) 142 (O.C.A.), a case in which the Motions Judge had struck out a statement of claim against a law firm as disclosing no reasonable cause of action, and where an appeal against this finding was allowed by the Court of Appeal. There, the Court held at page 145:
>
> > The threshold for sustaining a pleading under rule 21.01(1)(b) is not a high one. Much of the argument before us was directed to the lack of a factual underpinning for the causes of action alleged, particularly as to the damages issue. This is a matter to be resolved on the evidence called at trial: see *Temelini v. Ontario Provincial Police (Commissioner)* (1990), 73 O.R. (2d) 664, 38 O.A.C. 270 (C.A.). It is also accepted that the fact that a cause of action could be a novel one is not a bar to its proceeding to trial: see *Hunt v. T. & N plc*, [1990] 2 S.C.R. 959, 74 D.L.R. (4th) 321 at p. 341. The categories of relationships giving rise to fiduciary duties are not closed nor the categories of negligence in which a duty of care is owed.

**62**    In light of the standard properly applicable on a motion brought under rule 21 to strike pleadings, the defendants' argument that the plaintiffs claim for breach of fiduciary duty ought to be struck must be rejected. The authorities establish that such claims for breach of fiduciary duty should not be struck at the pleadings stage and it is not plain and obvious that such claims could not succeed. Even the *Brant* decision cited by the defendants leaves the question open, and in it's brief endorsement in *Jabalee*, though agreeing with *Brant* that a majority shareholder owes no fiduciary duty to a minority shareholder, the Court of Appeal confirmed that the oppression remedy in section 248 of the OBCA is very broad, and may well entitle minority shareholders in a closely held company, such as BSR, to relief arising out of a director's breach of fiduciary duty.

**63**    The defendants' next assertion is that no claim can be sustained in the New Action for breach of the Shareholders Agreement, since the assignment in bankruptcy of BSR terminated that agreement, thus depriving the shareholders of BSR of potential remedies under that agreement. This was an astonishing submission in these circumstances where the defendants are alleged to have intentionally put BSR into bankruptcy in order to avoid facing a derivative action brought by the plaintiffs and BSR.

**64**    If a trial judge were to find on the evidence that the defendants had improperly forced the assignment of BSR into bankruptcy merely to avoid the plaintiff's claims, it seems unlikely that the trial judge would feel precluded from granting a remedy and damages for breach of the agreement in the face of such conduct, on the theory that the Shareholders Agreement had vanished into thin air. The defendants brought about the circumstances which allegedly suspended the operation of that agreement. The suggestion by the defendants in argument that the Shareholders Agreement contained terms which would now preclude the individual plaintiffs from claiming relief in the face of that conduct is an unacceptable proposition. Moreover, as the plaintiffs' counsel observed in argument, all of the facts pleaded in the statement of claim relating to the alleged breaches of the Shareholders Agreement occurred prior to BSR's assignment in bankruptcy. By the same token, the defendants' assertion that the plaintiff, Barbara Ricco, is unable to now claim for reimbursement of more than $31,000 of expenses due to her personally and incurred by her on behalf of BSR, merely because the forced bankruptcy assignment of BSR suspended the operation of the Shareholders Agreement, is an equally unacceptable and implausible contention. It may be that a trial judge considering the matter with the benefit of the full panoply of evidence before him or her would find that no damage had occurred, but that is a matter to be determined at that time and I reject the defendants' argument that these claims ought to be struck at this time under this rule 21 motion.

**65**    The defendants' contention that they are unable to produce the books and records of BSR to permit an accounting to be done or to permit the plaintiffs to have all relevant information that may be supportive of the personal claims they make against the defendants is a claim that is also unsustainable. If the BSR records are still in the possession of the Trustee in accordance with the BIA, they can be produced in the context of this litigation. There is no basis of which I am presently aware in the BIA or elsewhere, nor was one seriously suggested in argument, that would prevent the plaintiffs from obtaining access to such information. Moreover, while information contained in

those books and records cannot alter the reality that derivative claims on behalf of BSR were dealt with by Echlin J. and cannot now be pursued by the plaintiffs, that information will be necessary to permit the plaintiffs to fully explore the conduct of the defendants in their management of BSR with a view towards determining whether damages the plaintiffs claim in their personal rights are sustainable.

**66**    Finally, I return to consider the important question of damages. The defendants argue in the strongest of terms that the only loss that could have been sustained by any of the individual plaintiffs is a diminution in the value of their BSR shares. That is a loss that the defendants claim cannot be compensated for on the authority of *Meditrust*, above. In the face of this submission, it is important in the context of this rule 21 motion to consider that case more carefully and the limitations, if any, it imposes on this case.

**67**    As noted *Meditrust* involved a summary judgment motion. Meditrust operated a national mail-order pharmacy business. To meet regulatory and statutory requirements across Canada concerning the dispensing of drugs, its business was operated through subsidiaries. In 1997, Meditrust sued Shoppers Drug Mart and other defendants alleging that they had committed a number of business torts to destroy Meditrust and to undermine its initial public offering. Meditrust claimed to have suffered damages for conspiracy, intimidation, misleading advertising, injurious falsehood, unfair competition, unlawful infliction of economic harm and intentional interference with economic relations. However, the Meditrust subsidiaries were not parties to the action and in 2001, the defendants successfully moved for a partial summary judgment to dismiss most of Meditrust's claims. Justice Malloy held that Meditrust had not suffered any direct damages, and that the Rule in *Foss v. Harbottle* barred Meditrust's claims.

**68**    The Ontario Court of Appeal dismissed Meditrust's appeal, except on one point. The Court held that to maintain a personal claim, the shareholder must establish that all of the components of the cause of action alleged are present. In the case before it, the Court held that one of the components of each of the torts alleged by Meditrust was proof of damages suffered, and therefore, in order to maintain its action on a summary judgment motion, Meditrust had to put its best foot forward, and advance some evidence that because of the defendants conduct, it had suffered damages that were not merely derivative of the damage suffered by the subsidiaries, but that were damages directly due to it. Meditrust failed on the summary judgment motion and on appeal, except on the goodwill based claim, because it led no evidence that it had suffered direct damages flowing from the conduct it alleged against the defendants.

**69**    The Court emphasized that a plaintiff responding to a motion for summary judgment must do more than merely assert that it has sustained damages. Except for the claim that Meditrust had made for a loss of goodwill, it had not showed that it suffered any damages that were independent from rather than derivative of the damages suffered by its subsidiaries.

**70**    Importantly, in the context of this action, at paragraphs 16, 17 and 18 Justice Laskin

emphasized that the rule in *Foss v. Harbottle* does not preclude an individual shareholder from maintaining a claim for harm that is done directly to it. Referring to LaForest J. in *Hercules*, above, which in turn referred to *Goldex Mines Limited v. Revill* (1974), 7 O.R. (2d) 216 (C.A.), Laskin J.A. confirms that a shareholder may have a personal cause of action, even though the corporation may also have a separate and distinct cause of action. Nevertheless, to maintain such a personal claim, a shareholder must establish all of the components of the cause of action alleged. At page 214 of the Supreme Court report in *Hercules*, LaForest J. stated:

> Where, however, a separate and distinct claim (say, in tort) can be raised with respect to a wrong done to a shareholder qua individual, a personal action may well lie, assuming that all of the requisite elements of a cause of action can be made out.

**71**    In this case, as in *Meditrust*, one of the necessary components of the cause of action for the alleged torts is proof that the plaintiffs suffered damages personally. Meditrust failed to rebut the defendant's summary judgment motion because it failed to put forward evidence that it had suffered damages owing to the defendant's conduct, that were not derivative of the damages suffered by its subsidiaries. A mere incantation by the plaintiff that it has "sustained damages", no matter how often asserted, will not, standing alone, stave off a motion for summary judgment. Neither, as was made clear in *Guarantee Co.*, above, will a self-serving affidavit be adequate to create a triable issue in the absence of detailed facts and supporting evidence. At paragraph 42, Laskin J.A. addressed claims by a shareholder for loss in the value of its shares in a company, but concluded that a shareholder in a company could have no independent right of action based on alleged diminution of the value of its shares caused by damage to the company, because the shareholder suffers no direct loss in those circumstances. Rather, the shareholder's loss is merely reflective of the loss that has been suffered by the company.

**72**    The defendants here say that the plaintiffs' claim relies solely on *Malata*, which they say flows back to *McLaughlin*. In *Malata,* Justice Ground concludes that the Rule in *Foss v. Harbottle* has been diluted by the enactment of the statutory remedies but the defendants argue that *Meditrust* stands for the exact opposite proposition. Moreover, even though Cumming J. relied on *Jabalee* and *McLaughlin* in his 2004 decision in *Ford*, they claim *Meditrust* must not have been brought to his attention. They assert that in his 2007 decision in *Fernandez v. 2023928 Ontario Inc. (c.o.b. Thorncliffe Bowlerama)*, [2007] O.J. No. 1644, Cumming J. "changes his mind". This, however, seems an erroneous conclusion to my mind because in *Fernandez*, Cumming J. reaffirms the same principles that Ground J. and Laskin J.A. emphasized in their decisions. Rather than having reached a contrary legal conclusion, it appears to me that Cumming J. simply decided in *Fernandez* that the wrongs claimed related solely to the corporation and not the shareholder. Thus, it was not a case where the complainant could bring the action in a personal capacity. It could be brought only as a derivative action. This is entirely consistent with Laskin J.A.'s emphasis in *Meditrust* that there remains room for actions to be brought by shareholders in other than a derivative capacity, but only where a wrong done to the corporation can also be shown to be a wrong done personally to the

shareholder, or where a direct tort is committed against the shareholder, and where the damage sustained by the shareholder is not merely a claim for the diminution in the value of his or her share, but rather damage that can be proven to have been directly sustained by the shareholder.

**73**    Accordingly, in circumstances such as the present, where the derivative actions against BSR have been brought to an end as a result of their sale to the defendants, if the individual plaintiffs prove unable to advance evidence of direct damage sustained by them as a result of the defendants conduct with respect to BSR, or conduct towards them as shareholders of BSR, it seems unlikely that the plaintiffs could succeed in the New Action. They would not succeed because they would have failed to prove an essential element of the cause of action, namely damages directly attributable to them. That, however, is not a question to be resolved here, but by the trial judge.

**74**    Nevertheless, even if the defendants' contention is ultimately found to have merit that the damages claimed by the plaintiffs under the head of oppression relate to a diminution in the value of their investment in BSR, recovery for which may be questionable on the basis outlined above, there are other different claims asserted by the plaintiffs in the New Action that may sound in a separate measure of damages for the torts caused by the defendants conduct. These include the claims for breach of fiduciary conduct or breach of the Shareholders Agreement, and on this motion, as distinct from at trial or on a summary judgment motion, the standard to permit the plaintiffs pleadings to be sustained is low. I have emphasized that this Court should strike out the plaintiffs' pleadings in the New Action only if it is plain and obvious that the New Action cannot possibly succeed, that it is "hopeless", or if the plaintiffs have failed to show the existence in the new pleading of a reasonable cause of action.

**75**    To conclude that the plaintiffs' cause of action asserted in their own right in person is hopeless and cannot possibly succeed, it would have to be evident on this motion that none of the plaintiffs could succeed in establishing that they had incurred recoverable damages personally as a consequence of the defendants conduct towards them or towards BSR. However, that standard of proof is not met on this motion. Insofar as the facts and claims asserted in the pleadings are deemed to be true on this motion, and since they do contain reasonable assertions of having sustained damages in their personal rights, it is premature to conclude that the plaintiffs cannot possibly succeed in proving that they sustained damages personally. It will remain for the plaintiffs to soon be able to marshall the evidence upon which they will rely under each head of damage to demonstrate that the damage claimed is damage to them *in personam* and not merely damage to BSR, for which they could have had no direct claim, and for which they are seeking indirect compensation. On this motion under rule 21, however, with the materials I had before me, I reject the position of the defendants on both fronts. The motion is dismissed.

**76**    At the conclusion of argument counsel provided me with brief submissions on costs, and at least in the case of the plaintiffs, a proper bill of costs. In light of the dismissal of the motion, it is clear that the plaintiffs are entitled to be compensated for their costs. Counsel for the plaintiffs sought full indemnity costs including fees disbursements and taxes in the amount of $9,651, or

$7,238.35 on a partial indemnity scale. Subsequent to the hearing, defendant's counsel wrote to the court to bring the Walters decision to the courts attention. Plaintiff's counsel responded to that submission and thereby incurred additional costs as detailed in his response. In my view, this is not an appropriate case for full indemnity costs, so the plaintiffs shall have their costs on a partial indemnity basis in the amount of $7,500 inclusive of fees disbursements and taxes, and taking account of the additional time spent by plaintiffs' counsel as previously noted.

M.G.J. QUIGLEY J.

cp/e/qlttm/qlbas/qlltl/qltxp/qlcxm/qlhcs

1 The first President, Secretary and Treasurer of BSR, was Mr. Lawrence Lilly, but by June 2005, he also had been eased out of the picture by the other individual defendants. He was removed from his executive position at a July 5, 2005 meeting attended only by the individual defendants. Mr. Lilly is neither a member of the group of plaintiffs, nor does he appear to have ever been named as a defendant.

*Case Name:*

# R.L.D. v. M.E.D.


**Between**
**R.L.D., applicant, and**
**M.E.D., respondent**

[2002] O.J. No. 3201

115 A.C.W.S. (3d) 1015

Court File No. F842/00


Ontario Superior Court of Justice

**Steinberg J.**

Heard: February 19-22, March 11-12, 14-15, April 24-25 and
June 27, 2002; written submissions, June 28, 2002.
Judgment: July 26, 2002.

(85 paras.)

*Family law -- Custody and access -- Considerations in awarding custody -- Welfare of child*
*paramount -- Child's cultural heritage -- Capacity or conditions of parents -- Conduct of parents --*
*Parent-child relationship.*


The father commenced an application against the respondent mother for custody of their children,
MD and KD. The mother sought a divorce and custody. The parties met in 1992 in Cuernavaca,
Mexico where the father was employed with the National Institute of Public Health. The mother
was born in Mexico and had been assigned to work with the father as a secretary. Their two children
were born in Mexico. In 1996, the parties left Mexico for Canada. They were married in 1997 and
separated in 2000. In April 2001 an order was made granting interim custody of the children to the
mother. The order stipulated that the principal residence of the children was with the mother and the
father was granted generous access.

HELD: Divorce judgment issued. The mother was granted custody of the children with access to the
father. The Court took into consideration the best interests of the children in granting custody. the

mother was 33 years old, Roman Catholic and in good health. She had graduated from university and secretarial school in Mexico. After immigrating to Canada, she obtained part-time jobs and accepted placements doing clerical work. She graduated from Mohawk College in 2002 and was currently employed in a secretarial position. The mother was willing to make the necessary adjustments to life in Canada. She organized counselling for her children after separating from the father and was supportive of their present schooling. By contrast, the father was 53 years old, agnostic and had major health difficulties as a result of his diabetes. He was unemployed and received disability benefits. The evidence suggested that his health problems would impact on his ability to care for his children on a full-time basis. The evidence also indicated that the father was not supportive of the children attending church or being educated in the Catholic school system. He became easily frustrated and confrontational. The father had also inappropriately involved his children in the litigation.

**Statutes, Regulations and Rules Cited:**

Children's Law Reform Act, ss. 30, 30(3).

Divorce Act, ss. 8, 16(8), 16(10).

Family Law Act, s. 46.

**Counsel:**

R. Gaasenbeek, for the applicant.
K. Baker, for the respondent.

---

[Quicklaw note: The note "[Text deleted by Quicklaw]" indicates the removal by Quicklaw of information which may identify individuals protected under Quicklaw's Guidelines for the Protection of Identities.]

**1    STEINBERG J.:**-- On May 16, 2000, the applicant, R.L.D., commenced an application in this court against the respondent, M.E.D., for the custody of their children, M.D., born May 26th, 1994 and K.D., born May 16th, 1995. He also claimed exclusive possession of the matrimonial home and its contents as well as costs and prejudgment interest.

**2**    There appears to be no issue as to the claims of exclusive possession of the former matrimonial home or its contents; no evidence was called in relation to those matters. The mother left the couple's subsidized housing unit and has not sought to return there. The claim of prejudgment interest bears no relation to any of the issues advanced in the case.

**3**    The respondent, in her answer dated June 12, 2000, has claimed a divorce under section 8 of the Divorce Act, respecting their marriage dated November 27, 1997, custody of the children, child

support, health care benefits for herself and the children, life insurance designations for herself and the children in respect to any outstanding life insurance policies on the applicant's life, a charging order for support, a restraining order under section 46 of the Family Law Act, and costs.

**4**     The applicant does not work, as he receives provincial disability benefits, thus could not pay support if he were not awarded custody; the respondent's issues relating to property were not pursued, nor were the claims respecting health benefits or life insurance. The claim for a restraining order appears to have been abandoned and no evidence was called pertaining to it.

**5**     In short, the only issues before the court that were advanced were the divorce and custody claims. It is also conceded by the D.'s that the party not being granted custody would have access to the child.

**6**     There have been a number of temporary orders made in this case:

> (a)     On May 19, 2000, Justice Beckett, on consent, ordered that the children not be removed from the then Hamilton-Wentworth region for periods exceeding 24 hours by each party.
>
> (b)     On June 23, 2000, Justice Sills, pronounced the following order after a settlement conference: "On Motion of the Respondent heard on June 23rd, 2000, and upon reading the Interim Interim Minutes of Settlement, filed,

>> 1.     THIS COURT ORDERS THAT subject to legal aid approval, there shall be a custody and access assessment by an assessor (psychiatrist or psychologist) chosen by the Parties. This assessment shall be completed as soon as possible and the assessor shall be so directed.
>>
>> 2.     THIS COURT FURTHER ORDERS THAT pending completion of the assessment report, the Parties shall continue to reside in the family residence at [text deleted by Quicklaw], Hamilton.
>>
>> 3.     THIS COURT FURTHER ORDERS THAT from Monday to Friday, the Applicant shall spend time with the children during the daytime hours (until 5:30 p.m.) and the Respondent shall spend time with the children during the evening hours (from 5:30 pm until bedtime). The Parties agree that they shall not interfere in any way with the other Party's time with the children.
>>
>> 4.     THIS COURT FURTHER ORDERS THAT on alternate weekends commencing June 24, 2000, the Respondent shall spend time with the children on Saturday and Sunday. The Applicant agrees that he shall not interfere in any way with the Respondent's time with the children.
>>
>> 5.     THIS COURT FURTHER ORDERS THAT on alternate weekends commencing on July 1, 2000, the Respondent shall spend time with

the children on Saturdays and the Applicant shall spend time with the children on Sundays. The Parties agree that they shall not interfere in any way with the other Party's time with the children.

6.    THIS COURT FURTHER ORDERS THAT on July 1, 2000, the Applicant shall have the children from 2:00 pm in order to take them to see the local fireworks display.

7.    THIS COURT FURTHER ORDERS THAT the Parties shall instil in the children respect for both parents and neither Party shall by any act, omission or innuendo, in any way tend or attempt to alienate the children from the other. The children shall be taught to continue to love and respect both of their parents.

8.    THIS COURT FURTHER ORDERS THAT the Parties shall respect one another and shall not denigrate, insult or abuse each other in any way.

9.    THIS COURT FURTHER ORDERS THAT the Respondent shall not telephone H.V. from the family residence and the Respondent shall request that H.V. not telephone her at the family residence.

10.    THIS COURT FURTHER ORDERS THAT the Applicant shall not contact H.V. or his family.

11.    THIS COURT FURTHER ORDERS THAT the Respondent's mother shall use her very best efforts to leave the family residence during the Applicant's time with the children.

12.    THIS COURT FURTHER ORDERS THAT a failure to abide by the terms of this agreement, or any other material change in circumstances, will allow either Party to return the issues of custody and access to Court.

13.    THIS COURT FURTHER ORDERS THAT the Motion shall be adjourned sine die, returnable on three days' notice."

(c)    On July 18, 2000, pursuant to minutes of settlement, Justice Czutrin granted the following order:

"THIS COURT ORDERS THAT:

1.    Commencing July 18, 2000 and during the children's summer vacation from school and pending the assessment, the parties shall share time with the children as follows:-

(a)    The Respondent shall have the children from Friday at 5:30 p.m. until Monday at 8:00 a.m. every week.

(b)    The Respondent shall have the children from Wednesday at 5:30 p.m. to Thursday at 8:00 p.m. every week.

(c)    The Applicant shall have the children for the balance of the week every week.

(d)    The Respondent shall pick up the children from the Applicant's residence at the beginning of her time with them and the Applicant shall pick up the children from the Respondent's residence at the beginning of his time with them.

2.    The continuation of the Case Conference will be heard on August 15, 2000 at 2:00 p.m."

(d)    Finally, on April 5, 2001, Justice Whitten made the following order after receiving submissions on a contested temporary custody motion:

"1.    THIS COURT DOTH ORDER that the Motion of the Applicant for adjournment of the Motion by the Respondent seeking custody shall be dismissed.

2.    AND THIS COURT DOTH ORDER that the Respondent, M.E.D. shall have custody of the children, M.D., born March 26, 1994, and K.D., born May 16, 1995.

3.    AND THIS COURT DOTH FURTHER ORDER that the principal residence of the subject children shall be with the Respondent.

4.    AND THIS COURT DOTH FURTHER ORDER that the Applicant, R.L.D., shall have flexible and generous access with the subject children, including Friday at 3:30 p.m. to Monday at 9:00 a.m. on the week commencing April 6, 2001, and from Wednesday at 3:30 p.m. until Saturday at 9:00 a.m. on the alternating week, with the children being picked up from school by the Applicant.

5.    AND THIS COURT DOTH FURTHER ORDER that the children shall be with the Respondent mother the remainder of the time.

6.    AND THIS COURT DOTH FURTHER ORDER that the parties shall share special holidays such as Easter and Thanksgiving from year to year.

7.    AND THIS COURT DOTH FURTHER ORDER that the children shall spend Father's Day with their father and Mother's Day with

their mother.

8.  AND THIS COURT DOTH FURTHER ORDER that the children's birthdays shall be shared equally between the respective parties.

9.  AND THIS COURT DOTH FURTHER ORDER that the children shall spend holiday with their mother one year and their father the next, such that commencing in the year 2001, the Applicant shall have the children from 9:00 a.m. on Christmas Day to 12:00 p.m. the same day. The Respondent mother shall have the children from approximately 12:00 p.m. on Christmas Day to 4:00 p.m. Boxing Day. This schedule shall reverse the following year and thereafter.

10. AND THIS COURT DOTH FURTHER ORDER that the children shall spend summer vacation with each parent.

11. AND THIS COURT DOTH FURTHER ORDER that all educational, medical and recreational information shall be shared between the respective parties. The Respondent mother shall however have the authority to make medical and education decisions regarding the children.

12. AND THIS COURT DOTH FURTHER ORDER both parties shall absolutely refrain from making denigrating or negative comments about the other in the presence of the children.

13. AND THIS COURT DOTH FURTHER ORDER that telephone access shall be liberal and left to the children's discretion when they want to speak to either parent.

14. AND THIS COURT DOTH FURTHER ORDER that the children should continue with counselling and it is strongly suggested that R.L.D. participate in some form of counselling as well.

15. AND THIS COURT DOTH FURTHER ORDER that the children shall continue in their present school for the remainder of the school year to June of 2001.

16. AND THIS COURT DOTH FURTHER ORDER that neither party shall apply for the children's passports.

17. AND THIS COURT DOTH FURTHER ORDER that the children's residence shall not be changed from the City of Hamilton.

18. AND THIS COURT DOTH FURTHER ORDER that the parties shall be restrained from travelling with the children outside of the Province of Ontario, but shall be permitted to travel recreationally within the Province of Ontario.

19. AND THIS COURT DOTH FURTHER ORDER that the Office of the Children's Lawyer shall be requested to become involved for the children, M.D. and K.D.

20. AND THIS COURT DOTH FURTHER ORDER that the trial shall

> be expedited, and the matter shall be put to the Assignment Court of
> Friday, July 27, 2001, at 9:00 a.m.
>
> 21.    AND THIS COURT DOTH FURTHER ORDER that the previously
> scheduled Settlement Conference of June 28, 2001, shall proceed as
> a combined Settlement Conference/Trial Management Meeting.
>
> 22.    AND THIS COURT DOTH FURTHER ORDER that the issue of
> costs shall be reserved to the trial judge."

The Divorce Issue

**7**    The first issue in this case is whether or not a divorce should be granted. The applicant and the respondent were married at Hamilton in a civil ceremony on November 20th, 1997.

**8**    The applicant had been first married to B.M.T. in British Columbia, some time in 1975. A precise date of the wedding was never given; they lived together for about 18 months and then separated. A divorce proceeding was commenced, but apparently was not completed.

**9**    After this separation, the applicant met M.U., a native of Mexico, in 1980 and commenced to live with her in British Columbia in 1980. She then was a professor and also a member of the Mexican consulate in Canada. When she was recalled to Mexico City in 1988, the applicant went with her.

**10**    While in Mexico, the applicant terminated his relationship with M.U. and began seeing Dr. E.L.F. in 1991. M.U. did not appear to take the applicant's separation from her lightly and began to bother R.L.D. and Dr. E.L.F. The applicant and Dr. E.L.F. sought protection from this harassment and consulted with a prosecutor in Mexico City who, I am told, suggested that they might consider an "administrative" marriage as a means of legally fending off their difficulties with Ms. M.U. R.L.D., who does not remember the name of the prosecutor, claims that he told him of his subsisting marriage to Ms. T.

**11**    As a result, Dr. E.L.F. and the applicant were married in 1971. A precise date was not given. According to the applicant, what distinguishes an administrative marriage in Mexico from the traditional form of marriage is that it is much easier to get a divorce, and property is not held "in common".

**12**    The applicant testified that his marriage to Dr. E.L.F. was basically one of form and they slept in separate rooms. R.L.D. and Dr. E.L.F. separated in 1992, according to his testimony, although they remained on friendly terms; she helped him get work teaching English to friends and various companies after he was let go from his position as an archivist with the National Institute of Public Health.

**13**    In 1993, the applicant signed the following document entitled "Certificate of Subsistence of Marriage" which reads as follows:

"CERTIFICATE OF SUBSISTENCE OF MARRIAGE


R.L.D.D.              Citizenship: Canadian

E.L.Y.F.             Citizenship: Mexican


Residing at:

[Text deleted by Quicklaw]


Stated under protest of telling the truth that up to this date our marriage subsists really and legally, since we live together as a family.


...


April 29, 1993"

**14**    When confronted with the document, which appears to be at odds with his avowal that the marriage was one of convenience only, he stated that he did not know why he signed it, but that "In Mexico, you sign anything whether its true or not."

**15**    After Dr. E.L.F. and the applicant separated, R.L.D. testified that divorce proceedings were commenced, however no documentation to substantiate this was ever put before me as he states his lawyer in Mexico disappeared with all of the papers in the divorce proceeding. He also testified that Dr. E.L.F. had assured him that a divorce was granted in September 1996, but that she did not know where the papers were.

**16**    In 1992, when the applicant was employed with the National Institute of Public Health in Cuernavaca, Mexico, he met the respondent who resided in that city and who was assigned to work with him as a secretary. They began to live together in October 1993 and their two children were born in Cuernavaca. The applicant indicated that he informed the respondent of his administrative marriage to Dr. E.L.F.

**17**    The couple and their children left Mexico for Canada in September 1996 and came to live in Hamilton. Because of turbulent times in Mexico during that period, the applicant felt threatened and resolved to flee that country. He had also been wrongfully discharged from his position at the National Institute (for which he received some damages) and had difficulty in finding work. The

respondent initially came to Canada on a visitor's visa and then acquired landed immigrant status. Sometime in 1997, after the applicant found out that his first wife had died on November 27th, 1993, he pressed the respondent to marry him, which she did on November 20th, 1997.

**18**    In considering whether or not to grant a divorce, the first question for the court must always be whether or not the marriage in question is valid. The validity of the marriage between the applicant and the respondent must in turn depend upon the validity of the marriage between the applicant and Dr. E.L.F., especially in the absence of proof that this latter union has been dissolved.

**19**    I would have thought that the applicant, who is a professional archivist, could have provided this court with:

    (a)    the particulars of his marriage to Dr. E.L.F. and the certification of it;

    (b)    the name of the prosecutor who advised him and Dr. E.L.F. that they could enter into an administrative marriage;

    (c)    the particulars of the divorce application in Mexico relating to his marriage to Dr. E.L.F.; and,

    (d)    the name of the lawyer, who prosecuted the divorce.

**20**    The court would also have appreciated receiving a legal opinion from an expert in Mexican law on the concept of an administrative marriage in Mexico, which might justify such a marriage during the existence of another.

**21**    In Canadian Conflict of Laws, 5th edition, Butterworths, Toronto 2002, the authors Castel and Walker write at page 7.7:

> "If foreign law is not pleaded or, if pleaded, it is not proved or is insufficiently proved, the court will supply the lex fori. It was once said that in the absence of proof the court would presume the foreign law to be the same as the lex fori, but it is better to say that in all cases where foreign law is not proved, the lex fori prevails as it is the only law available. The application of the lex fori in the absence of proof of the applicable foreign law seems to include statutes as well as the law established by judicial decision. Where a foreign statute has been proved by admission, in the absence of proof to the contrary, the court will apply the rules of construction of the lex fori. The parties may waive the application of foreign law by omitting to plead and prove it, in which case the lex fori applies."

**22**    The law of Ontario does not admit to the concept of a marriage which might coexist with another marital union. It would, therefore, appear that the marriage between R.L.D. and Dr. E.L.F. was null and void as being bigamous since the union between the applicant and Ms. T. was clearly subsisting at the time of that "administrative marriage". When Ms. T. died on November 27, 1993, the D.'s had already been living together for a month, so that the death clearly came after the date of the date of the F. marriage.

**23**    At law, as a result of his bigamous marriage with Dr. E.L.F. and the death of Ms. T. in November 1993, the applicant was, according to the law of Ontario, free to marry the respondent on November 20th, 1997.

**24**    A divorce judgment shall therefore issue based upon one year's separation. The separation took place on either the day in January 2000 when the parties moved to separate bedrooms or on July 18th, 2000 when the respondent left the home.

The Custody Issue

**25**    I believe, as does the assessor, that both parents love their children and have their best interests at heart. I ascribe no negative motives to the applicant wanting to maintain his present residence and linking that to his custody claim. If he were to be granted custody the wish to maintain his present home would be appropriate.

**26**    There is a conflict in the parenting styles of the parties. The applicant believes in according considerable freedom to his children, whereas, the respondent wishes to keep close tabs on them and wants to know where they are at all times. On occasion, she visits the homes where they play with their friends. She insisted that her children be walked to school each day by her husband when he assumed some day care duties, as the children had to walk by the grounds of a school for older children, and his reluctance to do this caused her to use other day care arrangements. Given the young ages of these children, I cannot say that her judgment has been wrong. In certain areas, she is more flexible than her husband: he is very critical of what he claimed was the Mexican habit of children sleeping with their parents. That, he said, is a tool by which parents maintain control over their children. Ironically, as of trial, when the children were with him in his three-bedroom home, the children slept in his bedroom, with their bed pushed up against his. The respondent, on the other hand, in her new residence, has had the children sleep separately in another room, although K.D. comes in to her mother's bedroom around 5:30 p.m. just as M.E.D. is getting up to organize her day.

**27**    The applicant has had more experience in life and a better education. He has also taken the lead in organizing piano, swimming and skating lessons for the children. The respondent has, in the main, deferred to him in those areas.

**28**    The respondent is Roman Catholic and the applicant is an agnostic. The children were baptized in the mother's faith in Mexico. The father is not very supportive of the children attending church and does not want them educated in the Catholic school system. The respondent has deferred to him with regard to their schooling to this point.

**29**    With regard to health matters, the respondent has ensured that the children have a pediatrician and that the doctor's directions are followed. This lead to some problems in the home when the parties were still together. Both children have had vaginal and anal infections and the medical advice given was that the children were to take showers, not baths. M.D., in particular was resistant to taking showers and the respondent would encounter considerable opposition from the child on

occasions when she was asked to shower. The applicant was not, in these circumstances, supportive of the respondent, all of which prolonged these incidents. During one or two of these episodes, the respondent may have pulled M.D.'s hair or ear.

**30**    On one occasion, after the parties physically separated, when M.D. would not come into the house when called, R.L.D. may have pulled on the child's ear to get her in the house. This lead to the applicant calling in the Children's Aid Society to report a potential abuse by the mother. She, in turn, raised some concerns about the sleeping arrangements in R.L.D.'s home; Ms. Palmer of the C.A.S., did an investigation and found that, at various times, both parents had used some minor physical force on the children. She cautioned them against the use of force, but found no protection concerns and closed the case. Recently, the respondent hit M.D. on the derrière after she was kicked by the child.

**31**    On May 5th, 2000, after inadvertently listening in on part of a telephone conversation in Spanish that the mother was having with her brother, the applicant became convinced that the mother was going to leave for Mexico with the children. He claims that he heard her talk about a sum of money and "Aero Mexico". He then brought this action. The respondent denied that this was so, that he misconstrued what was being said and that those words did not come up in the conversation with her brother. She indicates, and I believe her, that the children's future is in Canada, and although she would prefer to be with her family in Mexico, it is best for the children to permanently reside in Ontario. She denies that she ever threatened to take the children to Mexico to live there.

**32**    It is interesting to note that the respondent has the support of the applicant's mother and his sister, Ms. C. M.E.D.'s mother paid part of the respondent's Landed Immigrant application fee. The children and the respondent see them regularly. The applicant is alienated from his family, save for a sister in Barrie, whom he rarely sees, but talks to regularly on the telephone. It is therefore, through the respondent, that the children will see their paternal grandmother.

**33**    The children, since the order of Justice Whitten, have been in the temporary custody of the mother and they have done well in school. The respondent notes that since that order, tensions have eased in the family. It is significant that although she still receives some benefits through Ontario Works, she gives half of the Child Tax Credit to the applicant as she feels that he needs the money.

**34**    The respondent has developed an intimate relationship with another man who is married and still living with his wife. The seeds of their friendship were sewn while the respondent was in the home, but she states that their intimacy did not commence until she left the home on July 18, 2000. I do not believe her in that regard, since on July 11, 2000, she admitted to Mrs. V. that she was intimate with H.V. There is no evidence that this relationship is having a negative effect upon the children.

**35**    I am confident that either parent could assume custody of the children. However this is not a case where a court ought to order joint custody given that the Davis's have contrasting parenting

approaches, differences respecting religious education, and a lack of trust of each other. The issue for the court is which parent could carry out his or her custodial responsibilities in a way that would satisfy the best interests of the children.

**36**    In determining the issue of custody, reference should be had to subsections (8) and (10) of section 16 of the Divorce Act, which read as follows:

> "16.    (8) In making an order under this section, the court shall take into consideration only the best interests of the child of the marriage as determined by reference to the conditions, means, needs and other circumstances of the child.
>
> ...
>
> (10)   In making an order under this section, the court shall give effect to the principle that a child of the marriage should have as much contact with each spouse as is consistent with the best interests of the child and, for that purpose, shall take into consideration the willingness of the person for whom custody is sought to facilitate such contact."

**37**    The applicant wishes to establish a time sharing regime in which the parties share equal time with the children. The respondent feels that the arrangements provided for in the order of Justice Whitten dated April 5, 2001 are more appropriate.

The Assessment

**38**    Section 30 of the Children's Law Reform Act provides:

> "30.    - (1) The court before which an application is brought in respect of custody of or access to a child, by order, may appoint a person who has technical or professional skill to assess and report to the court on the needs of the child and the ability and willingness of the parties or any of them to satisfy the needs of the child.
> (2)     - An order may be made under subsection (1) on or before the hearing of the application in respect of custody of or access to the child with or without a request by a party to the application.
> (3)     - The court shall, if possible, appoint a person agreed upon by the parties, but if the parties do not agree the court shall choose and appoint the person.
> (4)     - The court shall not appoint a person under subsection (1) unless the person has consented to make the assessment and to report to the court within the period of time specified by the court.
> (5)     - In an order under subsection (1), the court may require the parties, the child and

any other person who has been given notice of the proposed order, or any of them, to attend for assessment by the person appointed by the order.

(6)    - Where a person ordered under this section to attend for assessment refuses to attend or to undergo the assessment, the court may draw such inferences in respect of the ability and willingness of any person to satisfy the needs of the child as the court considers appropriate.

(7)    - The person appointed under subsection (1) shall file his or her report with the clerk or local registrar of the court.

(8)    - The clerk or local registrar of the court shall give a copy of the report to each of the parties and to counsel, if any, representing the child.

(9)    - The report mentioned in subsection (7) is admissible in evidence in the application.

(10)    - Any of the parties, and counsel, if any, representing the child, may require the person appointed under subsection (1) to attend as a witness at the hearing of the application.

(11)    - Upon motion, the court by order may give such directions in respect of the assessment as the court considers appropriate.

(12)    - The court shall require the parties to pay the fees and expenses of the person appointed under subsection (1).

(13)    - The court shall specify in the order the proportions or amounts of the fees and expenses that the court requires each party to pay.

(14)    - The court may relieve a party from responsibility for payment of any of the fees and expenses of the person appointed under subsection (1) where the court is satisfied that payment would cause serious financial hardship to the party.

(15)    - The appointment of a person under subsection (1) does not prevent the parties or counsel representing the child from submitting other expert evidence as to the needs of the child and the ability and willingness of the parties or any of them to satisfy the needs of the child."

**39**    It was pursuant to this section that Ms. Fraidie Burshtyn, BSW MSW RSW, was retained by the parties as an assessor in this case. The report of the assessor dated February 15, 2001 was filed in this court and under subsection 9, it became admissible as evidence. Neither party sought under subsection 10 to have the assessor called as a witness, although for reasons which are noted infra, the applicant was advised by the court to call her and cross-examine her.

**40**    One of the purposes of section 30 of the Children's Law Reform Act is to minimize the exposure of children, who are the subjects of custody litigation, to professional assessors, who might be retained individually by each of the parties. Instead, parents are encouraged to select one assessor and have the court designate him or her as the court's assessor in the matter. The court will usually examine the proposed credentials of the professional in advance of an order for an assessment and satisfy itself of the assessor's expertise. Once the assessment report is submitted and filed with the clerk of the court under subsection 7, it is admissible as evidence and the report

becomes the court's evidence. It is for that reason either party in the case may require the assessor to attend as a witness at the trial for examination under subsection 10. The examination in question will necessarily include cross-examination as the party or parties disputing the report must have the opportunity to properly challenge the approach of the assessor and his or her findings and conclusions.

**41**    It should be noted that while Sills J. did not specifically name an assessor in his order of June 23, 2000, he did provide that the person be a psychologist or psychiatrist. The parties however chose Ms. Burshtyn, a social worker, who was apparently prepared to undertake an assessment at legal aid rates. The court was not formally consulted about the retainer of Ms. Burshtyn, however on a few occasions during the case management meetings, references were made to the presiding judge about the ongoing assessment, all of which were noted in endorsements on the record. In all of the circumstances, an order shall issue nunc pro tunc appointing Ms. Burshtyn as the assessor under section 30(3) of the Children's Law Reform Act. In any event no objection was taken by any party to the presentation of the report to the court.

**42**    The assessor concluded that the respondent should have custody of the children. Here are her summary comments leading up to her recommendation:

> "SUMMARY COMMENTS"

> During the course of this investigation, several issues and concerns were raised by the respective parties. M.E.D. indicated that she had been subjected to a considerable amount of coercive and controlling behaviour on the part of R.L.D. throughout their relationship. She described feeling challenged and diminished by her husband as her opinions and feelings were never validated or respected. Her parenting practises were undermined and scrutinized by R.L.D., but M.E.D. had felt powerless to challenge her husband's authority. M.E.D. had expressed her concerns about R.L.D.'s behaviour to several professionals working within the community. Upon her separation from R.L.D., M.E.D. had sought the support and assistance of Ms. Paterson, a counsellor from Second Stage Housing, Ms. Land, a child play therapist, and Ms. Rogers, a nurse practitioner. They all confirmed that M.E.D. had expressed trepidation towards R.L.D. and was highly sensitive and alarmed about her children's well-being. There was consensus amongst these various professionals including Ms. Palmer, a social worker from the Children's Aid Society of Hamilton-Wentworth, that M.E.D. was a caring and loving parent.

> Impressions of R.L.D. reflected a man that was very devoted to his children and appeared to share a loving relationship with them. Sources did indicate though

that R.L.D. had a propensity to be quite confrontational and argumentative. According to Mr. K., principal at [text deleted by Quicklaw], R.L.D.'s behaviour towards M.D.'s teacher had precluded him from volunteering at her class. Mr. K. had indicated that his relationship with R.L.D. had proved to be quite oppositional which required the intervention of the district superintendent at one time. Ms. Rogers reported that although R.L.D. had attended the children's medical appointments, he usually challenged the necessity of certain types of medical practises. When R.L.D. attended appointments with M.E.D. he would discredit his wife's concerns or issues and emphatically put forth his own. According to Ms. Rogers, R.L.D. had been uncooperative with respect to investigating M.D.'s and K.D.'s recurrent vaginal and anal irritations and according to Dr. Waxman, did not disclose these medical concerns to him.

Ms. Land's opinion, based on her protracted involvement with M.E.D. and the children and a few telephone conversations with R.L.D., was that M.E.D. had been exposed to extensive controlling behaviour by R.L.D. Her behaviour was indicative and strongly reflective of a woman who had limited control and a weak voice in her relationship with R.L.D. Ms. Land noted that M.E.D. was very hesitant with respect to making her own decisions or giving her opinion, a behaviour which was very common amongst women who had been subjected to a controlling partner. Ms. Land indicated that M.E.D. had made significant gains and progress in her own personal development as well as a parent, since her separation from R.L.D. Ms. Land's impressions of R.L.D. was that he was very focused on discrediting M.E.D. as a parent and lauding his own excellent parenting practises. R.L.D.'s vilification of the Mexican culture and people was of particular concern to Ms. Land, considering that the children shared this culture with their mother. Ms. Land and Ms. Palmer both noted the inappropriateness of the girls sharing a bed with their father. Ms. Palmer had investigated M.E.D.'s concerns about possible sexual interference by R.L.D. towards the children but determined that the evidence was inconclusive. The children appeared equally comfortable with both their parents, although M.D. had shared concerns with Ms. Land about her father's health.

If one only focuses on M.E.D.'s and R.L.D.'s relationship with their children there is no question that they are both very devoted and caring parents. What does emerge is a pattern of behaviour on the part of R.L.D. that is quite grandiose and challenging. It was this writer's impression that R.L.D. was quite protective of his children and very sceptical and mistrustful of any professional that challenged his own views and preferences. It was noted by this writer that R.L.D. believed that he was the most qualified to make decisions with respect to his

children, whether it concerned their medical or educational needs. He did not appear to believe that M.E.D. had any redeeming qualities as a parent, but was unable to provide appropriate examples to support his views. His propensity towards discrediting M.E.D.'s culture was of particular concern as it reflected some very strong and entrenched biases and discriminatory ideologies. Considering R.L.D.'s close relationship with his children, one would need to question the impact some of his views may have upon them as they mature into young women. One can speculate that as M.E.D. becomes more empowered and self-confident, her own opinions and beliefs will hopefully be considered and respected by her children. As long as R.L.D. avoids the tendency of diminishing M.E.D. as an individual and parent, the children will learn to trust their own feelings and opinions without fear of being criticized or challenged.

Considering the tremendous power differential between M.E.D. and R.L.D., a shared parenting arrangement would only serve to further disempower M.E.D. R.L.D. has demonstrated that he does not respect or even consider M.E.D.'s opinions. His defended nature and inability to accept opinions which may differ from his own has created several terse relationships with various professionals involved with his children. The same considerations must be given if one considers R.L.D. as securing sole custody of the children. This would further exacerbate the imbalance of power between he and M.E.D. and further erode M.E.D.'s privileges and rights as a parent. Therefore, the most expedient arrangement would be for the children to be in the care and custody of their mother. R.L.D.'s strong and loving relationship with his children must be appreciated and supported despite his domineering and aggressive proclivities. Therefore, the following recommendations will hopefully serve to promote healthier relationships between the children and their parents and reduce the opportunity for antagonistic and acrimonious interchanges between the respective parties."

**43**   The "Summary Comments" of the assessor dwell primarily with some negative aspects of R.L.D.'s personality and conduct, and may, at first blush, seem one sided. However, upon a reading of the whole report, it is apparent that these specific comments about R.L.D. form the foundation for her conclusions, and that they were based upon her interviews and investigations outlined in the previous twenty-two pages of her assessment report.

**44**   Once the assessor's report was filed and put into evidence, this evidence became subject to the rule in Browne v. Dunn (1893), 6 R. 67. At pages 70-71 in Browne v. Dunn, Lord Herschell outlined this evidentiary rule:

"Now, my Lords, I cannot help saying that it seems to me to be absolutely

essential to the proper conduct of a cause, where it is intended to suggest that a witness is not speaking the truth on a particular point, to direct his attention to the fact by some questions put in cross-examination showing that that imputation is intended to be made, and not to take his evidence and pass it by as a matter altogether unchallenged, and then, when it is impossible for him to explain, as perhaps he might have been able to do if such questions had been put to him, the circumstances which it is suggested indicate that the story he tells ought not to be believed, to argue that he is a witness unworthy of credit. My Lords, I have always understood that if you intend to impeach a witness you are bound, whilst he is in the box, to give him an opportunity of making any explanation which is open to him; and, as it seems to me, that is not only a rule of professional practice in the conduct of a case, but is essential to fair play and fair dealing with witnesses."

45    At page 75, Lord Halsbury restated the principle as follows:

"To my mind nothing would be more absolutely unjust than not to cross-examine witnesses upon evidence which they have given, so as to give them notice, and to give them an opportunity of explanation, and an opportunity very often to defend their own character, and, not having given them such an opportunity, to ask the jury afterwards to disbelieve what they have said."

46    In Regina v. Verney (1997), 87 C.C.C. (3d) 363 at pages 375 and 376, Finlayson, J.A. restated the principle in Browne v. Dunn as a rule of fairness and placed some practical limitations on it. He stated:

"This issue arose initially when Crown counsel objected to portions of the examination-in chief of the appellant on the basis that certain of the evidence which he was giving was inconsistent with the evidence of Williams, and yet had not been put to Williams during cross-examination by defence counsel. Extensive submissions followed, during the course of which defence counsel took the position that he had put the essence of the defence position to Williams, who had denied it and would inevitably continue to do so; that it would be a "totally ludicrous waste of time" for him to put to Williams, the entire anticipated defence evidence, and that the suggestion that he was required to do so was "novel" and "completely unfounded". The trial judge ultimately permitted the evidence to be heard, and ruled that the failure to put the defence evidence to Williams during cross-examination went to weight, not to admissibility, and that he would deal with the issue during his charge.

This admonition, based on a civil case, Browne v. Dunn (1893), 6 R. 67, was not

warranted in this case. Browne v. Dunn is a rule of fairness that prevents the "ambush" of a witness by not giving him an opportunity to state his position with respect to later evidence which contradicts him on an essential matter. It is not, however, an absolute rule and counsel must not feel obliged to slog through a witness's evidence-in-chief, putting him on notice of every detail that the defence does not accept. Defence counsel must be free to use his own judgment about how to cross-examine a hostile witness. Having the witness repeat in cross-examination, everything he said in chief, is rarely the tactic of choice. For a fuller discussion on this point, see Palmer and Palmer v. The Queen (1979), 50 C.C.C. (2d) 193 at pp. 209-10, [1980] 1 S.C.R. 759, 14 C.R. (3d) 22 (S.C.C.)."

**47**     It seems to me that the principle of Browne v. Dunn applies with some force in this case. Since the applicant, in particular, has sought to raise issues relating to the professionalism of the assessor, including her evenhandedness in the assessment process, the accuracy of her reporting of the parties' comments, and her overreliance on what was told to her by others, she should have been given the opportunity to explain her position on these concerns. I pointed this out to the applicant's counsel after Ms. Baker for the respondent, raised the principle in Browne v. Dunn in the course of one of her objections to the evidence of Dr. McKay who gave evidence criticizing the assessment. On several occasions thereafter, I suggested that the applicant might wish to call and cross-examine the assessor, but this was not followed upon. Rather some evidence was given by the applicant which challenged some of the statements made by the assessor and as well Dr. McKay, a psychologist, was called to present a professional critique of the assessment. Dr. McKay had not contacted the assessor about the report, nor had she requested the assessor's notes. She indicated that certain professional assessment standards had not been maintained in the report, but did not produce a set of professional standards. Dr. McKay's criticisms and concerns related to the assessor's preparation of the report, a lack of supporting information on some of its conclusions, a suggested lack of discussion on some issues, and some concerns about bias.

**48**     Specifically, Dr. McKay suggested that the assessor did not address with R.L.D. the suggestions that he possibly slept in the nude with the children, that he abused his children or that he shoved the respondent's mother. These concerns were derived from her discussions with the applicant in a meeting with him. (R.L.D. also disputed the time the assessor states that she spent with him.) Dr. McKay also concluded that the absence in the report of comments of R.L.D. as to several allegations respecting him, amounted to an assessment "in abstentia" and an indication of possible bias. The doctor also indicated some concern that the mother's extra marital affair was not addressed in the report. She indicated that it was a common practice to get each party's version as to why the marriage failed. Concern was expressed that the assessor accepted Mary Jo Land's comments made to her at face value to the effect that the respondent showed signs of being an abused woman. Mary Jo Land is a Certified Child Play Therapist hired by Second Stage Housing to provide private counselling services to M.E.D. and her two children. Here is what the assessor wrote as to her consultation with Ms. Land:

""MARY JO LAND (Certified Child Play Therapist):

A telephone interview was conducted with Ms. Land on January 30, 2001. Ms. Land indicated that she had her own private counselling practice but had been retained by Second Stage Housing in the capacity of a consultant, to provide counselling services to M.E.D. and her two children.

On September 8, 2000, Ms. Land had an initial meeting with M.E.D. to ascertain some of her issues and concerns. On September 21, 2000, Ms. Land met with both M.E.D., M.D. and K.D. Since her first meeting with M.E.D. and the children, Ms. Land has conducted approximately fourteen sessions, all at the home of M.E.D. Ms. Land stated that she had more than one extensive telephone conversation with R.L.D. and had met him on a couple of occasions when the parties were at court. She mentioned that she did not have the opportunity to visit with R.L.D. at his home or observe the children in his care. Ms. Land indicated that she had developed a more keen sense of M.E.D. and her abilities as a mother rather than R.L.D. She stated further that she had the opportunity to observe and interact with M.E.D. and her children at a couple of local functions sponsored by Second Stage Housing and the Police Association. She stated that the children demonstrated very appropriate social skills with the other children at these events.

Ms. Land reported that when she first met M.E.D. she displayed signs indicative of a woman who had suffered emotional and psychological abuse. According to Ms. Land, M.E.D. described her life with R.L.D. as very restrictive and regulated. M.E.D. described to Ms. Land the various rules and limits that were imposed upon her behaviour and actions by R.L.D. M.E.D. indicated that she had been unable to wear certain styles or colors of clothing. When she had been shopping for groceries with R.L.D., she would have to remain in the same aisle as him. M.E.D. informed Ms. Land that she had not been permitted to have friends and stringent restrictions were placed upon her use of the telephone. She informed Ms. Land that R.L.D. has held the children's passports and had threatened to have M.E.D.'s immigration status revoked.

According to Ms. Land, the type of control exerted by R.L.D. could be seen to be very extensive. Ms. Land recalled that at the outset of therapy M.E.D.'s behaviour was quite hyper-alert and restrictive. With the assistance and encouragement of Ms. Land, M.E.D. was able to express her feelings and

thoughts with increased comfort and ease. Over a protracted period of time, according to Ms. Land, M.E.D. was able to identify more clearly the extent of control R.L.D. had exerted upon her. She recalled that M.E.D. had continued to harbour apprehension about R.L.D.'s judgement and had difficulty trusting her own opinions and decisions. Ms. Land stated that she had encouraged M.E.D. to cultivate her own opinions regardless of whether R.L.D. concurred or not.

Over the course of the next few months, Ms. Land observed M.E.D. develop and grow as an individual and parent. She demonstrated more confidence and self-assuredness with respect to her parenting practices and was able to set clear limits and guidelines with the children. Ms. Land stated that it had been so habitual for M.E.D. to adhere and acquiesce to R.L.D. that she lost the opportunity to make her own decisions. Ms. Land purported that M.E.D. developed a tremendous amount of insight and awareness to what her children were experiencing as a result of the separation. She observed a considerable amount of affection between M.E.D. and the children as well as with M.E.D.'s mother.

Ms. Land stated that she did not have any concerns about M.E.D.'s ability to parent her children. She commented that the incident which involved M.E.D.'s pulling of the children's hair had occurred prior to her involvement with the family. She indicated that she was confident that M.E.D. would not engage in this type of behaviour in the future. Ms. Land stated further that M.E.D. had every intention of remaining in Canada with the children as she felt there were better opportunities for them in this country. She noted that M.E.D. had not denigrated or ridiculed R.L.D. in the presence of the children.

Ms. Land described her first telephone contact with R.L.D. as confrontational in nature. She indicated that she had contacted R.L.D. for his approval with respect to working with M.D. and K.D. According to Ms. Land, R.L.D. had been initially verbally aggressive with her and challenged the purpose of her involvement with the children. Following a few telephone conversations, Ms. Land reported that R.L.D. was more cooperative and talked about his issues and concerns with respect to M.E.D. and the children. Ms. Land stated that R.L.D. focused more on M.E.D.'s shortcomings as a parent. He indicated to Ms. Land that he had not experienced any difficulties with the children but was quite persistent and critical in his opinions of M.E.D.'s parenting capabilities. He spoke about his extensive education and the fact that he was a better parent for the children. He indicated that he was dedicated to their music lessons and academic studies. Ms. Land

noted that R.L.D. commented that M.E.D. was unable to assist the children with their schoolwork because she was of Mexican descent. Ms. Land questioned whether R.L.D. had expressed these opinions to the children. She expressed concern about whether R.L.D. would be supportive of the children's Mexican heritage considering his vilification of this culture. She stated further that according to M.E.D., R.L.D. had not been supportive of the children speaking Spanish or participating in the Catholic faith.

Ms. Land reported that R.L.D. believed that M.D. and M.E.D. had a conflictual relationship. Ms. Land had not supported this view as it had not reflected her own observations of their relationship. In her opinion, M.D. had lacked appropriate respect for her mother based upon the way R.L.D. had behaved towards his wife. She added that M.D.'s and M.E.D.'s relationship has improved as M.D.'s attitude towards her mother has become more respectful. Ms. Land raised a concern about whether R.L.D. would parent his children, once they entered adolescence, in a similar fashion as he had treated M.E.D.

Ms. Land reported that both M.D. and K.D. had told her that they had shared a bed with their father. Ms. Land stated further that the children had not appeared particularly uncomfortable or ill at ease with this arrangement. She pointed out though, at their respective ages, the children required their own beds and rooms. Ms. Land had informed M.E.D. that these types of boundaries were necessary for the children, but did not have the opportunity to share her concerns with R.L.D. Ms. Land recalled that the children had their own beds at their mother's home.

Ms. Land reported her observations and professional opinion with respect to M.D. and K.D. She stated that both parents had expressed concern about M.D.'s emotional health, shortly following their separation. Ms. Land indicated that M.D. had suffered from panic attacks and had a tendency to become very overwhelmed and emotional. She had also experienced nightmares at both her parents' homes. According to M.E.D., this problem had abated completely but according to R.L.D., M.D. has continued to experience nightmares while at his home. K.D. had been found to be very emotional, prone to periods of crying, aggressive behaviours and a disrespectful attitude. According to M.E.D., the children had witnessed their father push their grandmother but M.D. and K.D. had not reported this to Ms. Land.

Through play therapy, Ms. Land discovered that M.D. had felt torn between her

parents. She had told Ms. Land she had wanted to live with her father. M.D. expressed concern about her father's health and indicated to Ms. Land that he needed someone to look after him. Ms. Land surmised through her conversations with M.D. that she was under some duress to say she had wanted to live with her father. In Ms. Land's opinion, M.D. was a bright and healthy little girl who loved both her parents but had not received permission from either of them to love the other.

Ms. Land described K.D. as a robust and resilient little girl who was very affectionate and responded well to attention. When she had first met K.D., Ms. Land had been quite surprised and concerned about her weak boundaries. Ms. Land explained that K.D. had been overly physically affectionate towards her at their first meeting and she had questioned the reasons for this. Ms. Land explained that over a period of time K.D.'s boundaries became more normalized as she required less physical contact with Ms. Land. Ms. Land noted that K.D. demonstrated a considerable amount of affection towards her mother and maternal grandmother. She stated further that the children had not spoken in a negative manner about either parent."

**49**    It is significant that neither party called Ms. Land as a witness. If called by the applicant, her statements in the report would have made her an hostile witness and, therefore, subject to cross-examination by him.

**50**    Dr. McKay felt that the report did not put to rest the allegations of sexual and physical abuse.

**51**    Finally, she concluded that the report was more a personality assessment than a review of each person's parenting ability and was, in the main, a report of impressions.

**52**    In my view, these concerns should have been addressed with the assessor who could have testified in detail as to the amount of time that she spent with each party, what issues were raised by the parties, what was specifically said to her in response to her questions and the particulars of her interview with Ms. Land as well as the extent to which she relied upon them and her reasons for so doing.

**53**    With regard to putting the abuse allegations to rest, I note that the assessor did so in her comments at page 2 of the report: "The results of the Society's investigation revealed no significant protection concerns with respect to either party and their children and the file was subsequently closed."

**54**    As to the comments of Dr. McKay, who is a psychologist, that the report was more of a personality assessment of each party, was impressionistic, and that it didn't deal with parenting abilities; in my view it did deal with the parenting ability of the parties, however it also reflected an

approach which one might not normally expect from a psychologist. The assessor is an experienced social worker and her methods of assessment in all likelihood would differ from Dr. McKay. To not give Ms. Burshtyn an opportunity to defend her approach to the assessment would be unfair and inconsistent with the principles stated in Browne v. Dunn. I do not feel that a cross-examination of the assessor would have been a waste of time.

**55**    In the absence of any cross-examination of Ms. Burshtyn, I give little weight to the evidence of Dr. McKay and the applicant as to the validity of the assessment. The same can be said of the respondent's denial that she had used the term "racist" to the assessor.

**56**    As will be noted from reading of this judgment, I find that the evidence presented in this case is generally consistent with the conclusions of the assessor. However, I do wish to make some comments about the report with respect to whether the applicant has discriminatory views about the people of Mexico. This took up a significant amount of time in this trial. The respondent is alleged by the assessor to have made the comment that "... she had been quite disturbed and insulted by R.L.D.'s propensity towards racist comments which were often directed towards her and her culture." The assessor also concluded that: "His propensity towards discrediting M.E.D.'s culture was of particular concern as it reflected some very strong and entrenched biases and discriminating ideologies."

**57**    R.L.D., as might be expected, has taken a very strong objection to the assessor's conclusions. M.E.D., as earlier noted, indicated that she did not use the "racist" term, but in the absence of any cross-examination of the assessor, I find that she used words to that effect.

**58**    R.L.D. has spent a great deal of time in Mexico and has developed some fairly firm views about its political and economic structures. Having firm views about anything is not atypical for the applicant: that is his nature. His sister, D.C. describes him as a "know it all" and that "He knows what's right and he knows what's best for everybody". To say however, that he has racist views respecting Mexicans, is inappropriate, especially as he has lived with or "married" three Mexican women and has befriended numerous other people in Mexico. What he has however, is a view of what he calls the "lower" class of Mexican society. Whether that class exists or not, whether his views as to their negative characteristics are valid, his inappropriate ascription of them to the respondent smacks of discrimination in the light of her very positive experiences in Canada. I have no doubt that he has conveyed his erroneous views on that subject to his children, (as he has to Ms. Fawcett and Ms. Palmer), and that must stop.

**59**    R.L.D. must understand that notwithstanding that he has strong views about matters, arguments cannot be won by "ad hominem" approaches. This approach is counter productive and often backfires and as his sister indicated, tends to isolate him.

Factors in determining custody:

**60**    In granting the custody of the children to the respondent, I am influenced by the following

factors which, based upon the oral evidence before me, I find to exist:

(a)     The applicant has tried to persuade this court that the respondent mother is poorly
educated, that she was abused by her family in Mexico, that she does not value
education, that she is not ambitious and therefore is a poor role model for her children.

**61**     R.L.D. testified that the respondent came from a "lower class" family in the city of
Cuernavaca. The lower class in Mexico, he testified, has "Little or no political power, little or no
money; no employment on a regular basis; no drive to seek political appointments or to seek
education of a high standard." He is of the view, members of the so called lower class in Mexico,
basically, fear the system and have no dependence on anybody except family members or relatives.

**62**     He indicated that the respondent, who is, of course, Mexican in origin believes in her own
culture and that for her "education is not that important". R.L.D. testified that his wife did not finish
her last year of preparatory school and that she thereafter went to a "little school" in Cuernavaca to
learn typing and administrative things.

**63**     He feels that Ms. Davis is incapable of learning, is resistant to new things and that she still
communicates in English at a very basic level.

**64**     The applicant's preconceived ideas about Mexican culture have clouded his ability to judge the
respondent's intellectual capability and her industriousness. She is the antithesis of an unambitious
person and, in respect of her work ethic and her ability to assume challenges, is a model for her
children to follow.

**65**     She did graduate from La Universidad Antonoma del Estado de Morelos in 1988. The
applicant claims she didn't, but her diploma supports her evidence that she did. The respondent, in
her younger years, was not without ambition and hoped to become a dentist and enroll in dental
school after her graduation from preparatory school. Unfortunately, neither she nor her family had
the funds to enable her to apply to a dental school, so after reviewing her situation, she elected to
enroll in a private secretarial school where she would learn typing and other secretarial skills in
order to earn money to eventually pursue her career in dentistry. She graduated from her secretarial
school after one year with high marks and was given two placements, the last one being with the
National Institute of Public Health where she met the applicant. She worked with that organization
until she became pregnant with M.D. After M.D. was born, she briefly worked as a secretary for a
lawyer for a month.

**66**     Once she obtained her landed immigrant status in Canada, the respondent obtained a part-time
cleaning job with the Clarion Nursing Home. She also accepted a placement doing clerical work
through St. Joseph's Woman's Immigrant Centre, and as a result of this experience, felt the need for
more secretarial and administrative training. She then enrolled at Mohawk College in Hamilton in a
more extensive course than that which she took in Mexico; it also included computer training. Her
classes took up 35 hours a week with considerable homework. It was necessary for her to take 2

buses each day to get to school and 2 buses to return home. While improving her education, she also continued her cleaning work for a few months and also took a part-time job at St. Joseph's Woman's Immigrant Centre for 4 months. She states that when she returned home each night, normally at 6:00 p.m., sometimes at 7:00 p.m., she had to clean the day's dishes, cook and clean house. Her overloaded schedule and duties caused her to invite her mother from Mexico to come to live with the family to care for the house and the children. The respondent's mother came to live in Hamilton for a year commencing January 2000. Her presence in the home, as might be anticipated, caused some friction in the house.

**67**    M.E.D. graduated from Mohawk College in April 2001 and interpreted Spanish for 2 months with Dofasco on a contract. She then worked as a temporary secretary for Drake Personnel. At the present time, she has a secretarial contract with Great West Life and hopes to find full-time work with that company. She gave her testimony in English in a most fluent way and appeared quite personable. All in all, she is an immigrant success story and is anything but the abused, undereducated and inarticulate person described by the applicant. She has shown to me a flexibility and willingness to make the necessary adjustments to life in Canada and to her family difficulties. It was she who organized counselling for her children after the separation and it is she who is trusting and supportive of the children's present schooling. M.E.D. is not the insular person that her husband paints her to be.

**68**    There is no credible evidence that M.E.D. was ever abused by her family.

**69**    I believe that R.L.D. has wrongly demeaned his wife to his children and others, such as Ms. F., Ms. Palmer and the court. At times, M.D. has shown a disrespect for her mother, which may have its genesis in R.L.D.'s comments to her.

(b)    The respondent, aged 33, appears to be in good health. The applicant, who is 53 years of age has experienced major health difficulties as a result of his diabetes; he was diagnosed with type II diabetes in 1973. Unfortunately, there is little, by way of medical reports, that describes his present medical condition save as to a brief medical report from Dr. Mark L. Waxman dated January 14th, 2002. Dr. Waxman is the applicant's family doctor and had had limited contact with the applicant prior to preparing the following handwritten report:

"    DR. MARK L. WAXMAN
849 Upper Wentworth
Hamilton L9A 5H4

Mr. R. F. Gaasenbeek
131 John St. S. #203

FAX 905-528-8066


Re:   D. vs. D.


Dear Mr. Gaasenbeek:


I am a physician licensed to practice in the Province of Ontario and am writing this medical report in reply to your urgent letter of request. R.L.D. and his daughters have been patients in my practice since October 2000. They have been receiving their care from the Hamilton Urban Core Community Health Centre on Rebecca Street. This is not a walk-in clinic but rather a family practice teaching centre through McMaster University. It was R.L.D. who contacted my office to become a new patient.


R.L.D. is a brittle insulin dependent diabetic. I believe he is taking care of this condition as best he can. He has been seen by several specialists to help control his disease. These include an endocrinologist, wound care specialists and an ophthalmologist. Since I have known him, he has had two lower extremity infections that required treatment at the Hamilton Health Sciences wound clinic. I have enclosed a report from Dr. Gerstein from August 2001. I truly believe that R.L.D. is educated about the nature and severity of his disease and that he is doing everything he can to help control it. It is impossible to predict when the complications of diabetes may strike. However, I doubt that he will have significant problems during the years of rearing his children. In short, his disease should not interfere with his ability to be a good and caring parent.


R.L.D. has attended my office with his children on three or four occasions. He appears to be a loving and caring parent and to have a good rapport with his daughters. M.D. had a check-up in March/01 and this was normal. K.D. also had a check-up.


I hope this information is of some assistance to you in this matter.


Sincerely,

"M. Waxman M.D.""

**70**    The attached report from Dr. Hertzel C. Gerstein reads:

"August 31, 2001

Dear R.L.D.:

Your urine collection did not show evidence of some kidney damage from diabetes. I know that your blood pressure is good, but somebody who has this abnormality would clearly benefit from taking a ACE inhibitor medication such as the drug rampipril. This has been proven to prevent progression of kidney disease and to prevent heart disease in strokes in people with diabetes.

I have therefore asked for the diabetes nurse to arrange a time to see you on a day that I'm in the clinic and at that point, I can drop in and write you a prescription and describe any side effects of this medication. The major one is a dry cough which happens occasionally in <5% of people.

Sincerely,

Dictated but not read

Hertzel C. Gerstein, MD, MSc, FRCPC Director, Division of Endocrinology & Metabolism McMaster University"

**71**    No other report from Dr. Gerstein was filed.

**72**    The doctor's conclusion that "his disease should not interfere with his ability to be a good and caring parent" stops short of stating that he can care for his children on a full-time basis and manage a three bedroom home.

**73**    The applicant's health deteriorated during his years in Mexico due to an inability to monitor his blood glucose and to properly store his insulin. A local doctor had prescribed an alternative medication for him. His evidence in that regard is as follows:

"Mr. Gaasenbeek: Q. At the time, you knew you were suffering from diabetes but did you know at that time that in the foreseeable future you would not be able to work?

> A.    No. When I first went to Mexico to stay, we had taken syringes and we had taken insulin and we had taken all the medical supplies that we thought we needed for a few months' stay and find sources in Mexico to buy these things but, unfortunately, the electrical system wasn't very good. The professor, who I was staying with there - we went away on a weekend - for a week, sorry. We travelled up north and when we come back the electricity had been off in our house and all of the insulin went bad. We were unable to get more insulin. We could not get what is called, the strips, in Mexico, which measures the amount of blood glucose I have in my body in order to regulate my insulin levels. We were also - it was fearful for me to carry around with me needles, because there's a phobia in Mexico that relates to needles and drugs and anybody caught with needles has to do a lot of explaining, especially a foreigner, as to why has the needles. Even though I had my diabetic card and stuff, it could cause me a lot of problems. So, we had problems with needles, and just everything else. So, I had to go off the insulin and for the eight years I was there I was basically on something called euglocon (ph). I don't know how to spell it.

His Honour:    For eight years ...

> A.    E-U-G-L-O-C-O-N. It's a medicine that stimulates the pancreas to produce insulin.

His Honour: For eight years you were off insulin, basically?

> A.    Yes. Yes I was off insulin."

**74**    By the time R.L.D. came back to Canada, he was suffering from severe neuropathy which, he testified, has rendered the nerves in his legs virtually useless; he states that he cannot feel his feet. The neuropathy also affects his arms, back and shoulders. His condition has affected his digestive system and his bowels and he requires medication "to push the food from my stomach into my intestine".

**75**    R.L.D. also has incurred an open sore on his left foot which has required daily or every other day visits by a nurse. Antibiotics for his foot have played havoc with his blood sugar and on one occasion, he lost his eyesight for 3 months. That problem was corrected by a Dr. Martin.

**76**    In the courtroom, it appeared that he could not make out a face in a photograph that he was

viewing at close range. He indicated however, that he can read, although he has problems ascertaining some colours in miniature. M.D.'s teacher, Ms. F. testified that he once declined her invitation to volunteer in M.D.'s class stating that he was blind in one eye.

**77**    Dr. Toews, his neurologist, has advised him that he has to be careful about how much he walks in the future. He requires and has obtained special shoes.

**78**    Initially, when he returned to Canada and received insulin, his ability to concentrate and move about was excellent. Then his health deteriorated to the point where he no longer can work and now receives disability benefits from the Province of Ontario. He also testified that from 1993 to July 2000 he was anxious to teach his wife English because he might lapse into a coma.

**79**    R.L.D. also gave evidence that at times in the past, he became tired when he has the children all day and all night. He states however that he partakes in activities such as swimming and skating with his children, and that when he experiences his tiredness, he will "sit down and take on other activities while they are still playing until the early hours of the morning, as you say". These bouts of tiredness were witnessed by the respondent, his sister D.C. and his friend S.S. Mr. S. testified he witnessed such episodes on three occasions. He stated:


"His Honour:    I have a question or two to ask Mr. S.


A.    Yes.


His Honour: Mr. S., we've heard from R.L.D. that because of his illness he gets tired. Have you ever seen that?


A.    Yeah, that was when his foot was getting worse. Yeah, he was feeling in pain because of his foot or the toe.


His Honour:    What happens when he gets tired?


A.    L., he getting tired, he can't do nothing. He just wanna sit down for a while then if his sugar goes down he get up to drink something.

His Honour:        So, he can't do anything.

    A.    Yeah, just ...

His Honour:        And he sits down.

    A.    Yeah.

    His Honour: How long would he have to sit down for, do you know?

    A.    I don't remember exact.

His Honour:        Beg pardon?

    A.    I don't know exactly how long but he was - like if his sugar goes down, he drinks something after half hour I think it's getting better.

    His Honour: Thank you. Ms. Baker, any questions arising out of mine?

Ms. Baker:      Yes, thank you, Your Honour.

Ms. Baker:      Q. How many times have you seen R.L.D. where he gets to that point that he can't do nothing?

    A.    Once we went together to - me and his kids in my car, was in parking - in May or something, he get, like his sugar is getting low and he came to me, he say, S., please, I want something to drink like something sweet. I believe three times.

Q.    Three times. The one time you've just mentioned you were outside of the home. Correct?

A.    Yeah, it was in park.

Q.    Okay. The other two times, were you at his house or was he at your house?

A.    I was at the house. He came to leave, he say, S., I'm getting tired, I want to relax or something. Then we give him something to drink if he don't have something like that - to get him relax. Two times.

Q.    So, two times he came to you and said, "I need something to drink."

A.    Yes.

Q.    Okay. Were the children with him during those two times?

A.    No, just once when we was in park.

Q.    Okay, so just the first time when you were in the park.

A.    Yeah.

Q.    After you give him something to drink, does he leave your house or do you leave his house?

A.    I think I go with him to his house, then he lay down on his couch for a while, then he getting good, then I leave the house.

Q.    Once you got him lying down, you leave the house.

A.    Yes.

Q.    Okay. Are there any other physical signs like shaking, or anything of that nature?

A.    No. I didn't see him shaking.

Q.    So, if you leave the house, then, I take it you wouldn't know how long he remains lying down on the couch?

A.    No. After that, I go like if he goes, I see him, he call me. I call D. house, you okay, he say, okay.

Q.    So you call back to talk to him later.

A.    Yeah, to check on him.

Q.    How much later would you know?

A.    Maybe half hour, not more.

Q.    I take it you call back after half an hour because you are worried about him.

A.    Yes.

Q.    Because he doesn't look like he's in very good shape at all.

A.    Yeah, sometimes.

Q.    Okay. Thank you.


His Honour:        Re-examination?

Mr. Gaasenbeek:        Thank you very much, Mr. S.


His Honour:        Thank you, sir."

**80**    The respondent indicated that after the separation she did the pick-ups and drop-offs of the children as she was concerned about the applicant's eyesight and his not being able to get home or walk with the girls. Finally, she testified that he often didn't have the energy to care for the children. She indicated that at times, she telephones the children while they are with the applicant and they have told her that their father is sleeping at 10:00 a.m.

**81**    While I appreciate the argument that the applicant's disability has had an indirect benefit to him in the sense that he can now devote all of his time to the benefit of his children, his health problems may not leave him with the necessary energy to properly care for his active children on a full-time basis.

(c)    The evidence reveals a disconcerting aspect of the applicant's personality: he is easily frustrated and confrontational. While this may be understandable as his considerable health problems have severely curtailed his ambitions, this confrontational style could have an impact on his parenting abilities: The following are some examples of this trait:

(i)    He reported a nurse at the Urban Core Clinic to the Ontario College of Physicians and Surgeons because she had given him a nasty look. He stated that: "She looked at me like I had become an epidemic and needed to get away from me as quickly as possible." He had earlier complained to someone at the clinic about his children being prescribed antibiotics.

(ii)    He also reported a Dr. Sergeant to the Ontario College of Physicians and Surgeons at the same clinic. The incident arose on the occasion of R.L.D. attending at the clinic for a shot to ease the excruciating pain in his shoulder. He was kept waiting for 45 minutes whereupon he commenced to leave in a frustrated state. As he was leaving, the doctor offered to treat him, but he would have none of it and left. He did not receive a shot for his shoulder until 3 weeks later.

In neither of the above instances does it appear that the applicant thought of addressing his concerns with the nurse, the doctor or the clinic administrator before making professional complaints to their regulatory bodies.

(iii)  On one occasion when the applicant and M.D., in particular, were walking on a street, a jogger who happened to be a police officer, almost bumped into the child. The applicant became very angry and went up to her "face to face", at perhaps 3 feet, and threatened to "call her boss".

(iv)  A serious incident arose out of the applicant's desire to have M.D. elevated to grade 1, while she was in senior kindergarten. The respondent indicates that she personally was not in favour of this because M.D. could not read. The applicant however, pursued this issue with Ms. F., the child's teacher, during the times he brought the child to school. Ms. F. was not in favour of the idea, but the applicant pressed on. On October 29, a meeting was set up to discuss this issue involving R.L.D., a substitute principal and Ms. F. Ms. F. was requested by the substitute principal to do an assessment of M.D.'s suitability for elevation to grade one covering some areas that he felt were appropriate. When the assessment was not produced to him by October 16th, the applicant wrote the following letter to Mr. K., the full-time principal, who had returned from an absence from the school (and whom the applicant had never met or spoken to):

" The Principal
P.J.S.;

Dear Sir;
                                         Nov. 16, 1999


On the 29th. of October, 1999, your substitute Principal sat down with my wife and I and agreed, as M.D.'s teacher had informed me verbally the day before after M.D.'s class, that informal assessments of M.D. would be conducted over the next week - 1st. Week of November - to determine whether M.D. should be admitted into Grade 1. Our conversation with your substitute clearly established a short time frame after which my wife and I would participate in an evaluation of these informal assessments. The objective was not to promote M.D. ahead of anyone. The objective was to address concerns that I had about M.D.'s reaction to her new school.


I have grave concerns about Ms. F.'s ability to teach due to her pregnancy and the effect this biological condition has on the inter-personal relationship between students and teacher. I also have deep concerns about her demeanour, discipline and sensitivity towards her students. Further, there is no continuity of activities, except for those activities carried on outside the classroom from with the classroom. This continuity can be clearly seen with the activities for my other

Junior Kindergarten daughter/student - K.D. This same continuity was clearly present with M.D.'s activities during her Junior Kindergarten school year. Now that I have been asked to attend a day with my daughter and your substitute has gone - as you have returned to work - you know nothing of this agreement and your staff member did or has not communicated anything about this agreement to you. The attitude of your teacher towards my daughter indicates a lack of respect for the agreement and for the assessment I originally asked for and a dishonest approach to myself, my family, and my daughter.

I am not interested in bias or prejudice getting in the way of the education of my daughter. If her teacher has not completed this informal assessment and/or failed to complete this assessment because you sir have returned and know nothing of the previous agreement - then sir, we have a serious problem with attitude, honesty, and credibility.

I suggest that this informal assessment become formal. Each new student entering a new school needs to be assessed - by law. If there is no formal assessment when a student enters a new school than how can an adequate progress' report be completed using correct methodology and using elements of the progress' ideals.

Your teacher knows of the agreement as does/did the substitute Principal - who should have left at least some sort of entry or acknowledgement of this agreement and plan of action. This agreement should be completed before any other action plan is developed. If this agreement is now null and void, then I should be given a courteous response to that effect. I still have serious problems with Ms. F.'s ability to teach while pregnant but the most important element of this is the education of my daughter.

R.L.D. & Family"

The respondent indicates that she never participated in the writing of the letter, which she indicated was "rude" in its tone. This document, which the applicant naively felt would not come to the attention of Ms. F., irritated Principal K. to the extent, that when the parents attended for a school observation day, he told them to leave. The applicant then took M.D. out of school telling the child that she was "kicked out of school." He kept M.D. out of school for about four days and tried

home schooling for her, but the respondent indicated that he got frustrated after an hour or so in his sessions with M.D. when her concentration would lapse and she got restless. M.D. was then returned to school and a school superintendent was called in to mediate the issues between R.L.D. and Mr. K. The child was not elevated to grade 1. The evidence also indicates that the applicant criticized Ms. F., as being unprofessional to his daughter, M.D.

I believe that the letter about Ms. F. was inappropriate and should not have been written. The concerns about Ms. F. had never been addressed with anyone in the school system before. It is also of interest to note that Ms. F. pointed out that the applicant indicated to her that it was primarily the respondent who was pushing for M.D.'s promotion, which was not the case.

Had the applicant bothered to speak to Mr. K. about the delayed assessment, he would have found out that Ms. F. had it ready for review by her principal.

This episode lead to M.D. being taken from school and being exposed to disrespectful behaviour towards her teacher. It was not a positive experience for the child.

(v)    There have been several other incidents involving the applicant and others involving some violence:

(a)    When he first arrived in Canada, he was hired as an apartment superintendent. It appears that some of the tenants in the building felt that the occupants of one apartment were operating a crack house in their unit. Rather than report this to the proper authorities, the applicant would patrol the halls of his building listening at doors. A tenant took exception to this and assaulted the applicant so badly that he had to be taken to the hospital in an ambulance.

(b)    When the D. family first arrived in Canada, they had no money and the applicant prevailed upon his sister, D.C., to let them stay with her and her children in her one bedroom apartment. This caused the other tenants to complain about the noise emanating from the overcrowded C. apartment. Ms. C., felt that she might be evicted and became alarmed. She raised the issue with the applicant, who became irritated and bumped her with his body. She, in turn, started hitting him. This took place in the winter time and the applicant told the respondent at 10:00 p.m. to pack up the children as they were leaving. They had nowhere to go, and Ms. C. and the respondent persuaded him to stay.

(c)    Lastly, the applicant pushed the respondent's mother, after she told him to be

quiet during a time when R.L.D. was arguing with the respondent.

**82**    These incidents cause me some concern as to the applicant's judgment and ability to deal with the usual day-to-day conflicts and stresses of raising growing children.

(d)    There is evidence that the applicant has treated these young children as if they were more mature than they are, has involved them in this litigation and, on occasion, has encouraged them to take his part. The following are some instances of this:

(i)    Shortly after the parties' physical separation, the applicant received a call from M.D., who indicated that he should pick her up and that she wanted to be with him rather than the respondent. He allowed this to go on for 30 minutes and then gave M.D. the emergency number to the Children's Aid Society. There was no evidence that M.D. was in any danger or need of protection and there is no evidence that at the time, the applicant addressed M.D.'s problem with the respondent. The applicant indicated that he had taped his conversation with M.D., but declined to produce it to Mary Palmer of the Children's Aid Society. It was not introduced as evidence during the trial.

(ii)    The evidence of Mary Palmer, the social worker of the Children's Aid Society, is quite significant. When she went to speak to M.D., as a result of the applicant's complaint of September 14th, 2000, respecting alleged physical abuse by the mother, she asked M.D. why she thought Ms. Palmer was meeting with her. Ms. Palmer testified that M.D. told her: "I was to talk about her health, the bad things that her mother does and who she wants to live with". The child went on to tell Ms. Palmer that she liked it better at her father's as he had more television stations and Sega games and her television at her mother's place only had a few channels. She also told Ms. Palmer that her father lets her do what she wants, buys her candy and does not yell at her.

(iii)    The respondent testified that the applicant talked to his children as if they were adults. They knew when the parents were in court and, as well, K.D. had asked her why she had accused the applicant of sexual abuse.

(iv)    What is somewhat concerning is that the applicant has purchased boxing gloves for the children and has, on four occasions, encouraged them to settle disputes by hitting each other. He felt that this would teach them about pain, violence, respect and authority.

(v)    Lastly, the respondent has indicated that prior to their physical separation, she overhead the applicant telling her children on the phone that their mother did not love them and was going to leave them. He would tell the children that he would miss them if they went to live with their mother. The applicant, in response to other allegations that he would cry in front of the children and say how lonely he was, denied this, but also added that he did say to his children that "I really

missed you today or yesterday". "They understand what I mean".

**83**    These four factors have tipped the scales in favour of the respondent and have lead me to conclude that the children should remain in the custody of their mother.

**84**    An order shall therefore issue as follows:

> (i)    The respondent shall have the custody of the children.
>
> (ii)    The principle residence of the children should be with the respondent.
>
> (iii)    The children's ordinary residence shall not be changed from the city of Hamilton.
>
> (iv)    The provisions for access contained in paragraphs 4, 6, 7, 8, 9, 10 and 13 of Justice Whitten's order shall continue as an interim order, provided further that when the children are staying with their father at his residence, they shall be provided with sleeping quarters that are separate from his.
>
> (v)    The parties may make further submissions on the issue of access once the future location of the father's residence is resolved, or earlier if requested by either party, on a date to be organized by the trial coordinator.

**85**    An order for costs in this case would not seem to be appropriate, although it is open to either party to raise that claim with me at his or her convenience.

STEINBERG J.

cp/qi/e/nc/qlrme

*Indexed as:*

# Ryan v. Moore

**Cabot Insurance Company Limited and Rex Gilbert Moore,**
**deceased, by his Administratrix, Muriel Smith,**
**appellants;**
**v.**
**Peter Ryan, respondent.**

[2005] 2 S.C.R. 53

[2005] S.C.J. No. 38

2005 SCC 38

File No.: 29849.

Supreme Court of Canada

Heard: December 7, 2004;
Judgment: June 16, 2005.

**Present: McLachlin C.J. and Major, Bastarache, LeBel,**
**Deschamps, Abella and Charron JJ.**

(80 paras.)

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL OF NEWFOUNDLAND AND LABRADOR

**Catchwords:**

 *Limitation of actions -- Survival of action against deceased -- Limitation periods -- Estoppel by*
*convention -- Estoppel by representation -- Discoverability rule -- Confirmation of cause of action*
*-- Limitation period under Survival of Actions Act expiring one year after death of party to action or*
*six months after date when letters of administration granted -- Statement of claim for damages in*
*relation to motor vehicle accident issued against defendant within two-year limitation period*
*prescribed by Limitations Act -- Defendant's death unknown to plaintiff until after shorter limitation*

*period in Survival of Actions Act had expired -- Whether doctrine of estoppel by convention or by representation applicable to prevent defendant from raising limitation defence -- Whether confirmation of cause of action or discoverability rule applicable to extend limitation period of Survival of Actions Act -- Survival of Actions Act, R.S.N.L. 1990, c. S-32, s. 5 -- Limitations Act, S.N.L. 1995, c. L-16.1, ss. 5, 16.*

*Estoppel -- Estoppel by convention -- Requirements -- Whether requirements of doctrine of estoppel by convention met.*

*Estoppel -- Estoppel by representation -- Limitation of actions -- Whether defendant's silence regarding [page54] shorter limitation period constitutes representation grounding estoppel.*

**Summary:**

On November 27, 1997, three vehicles operated by the respondent R, the appellant M, and a third party were involved in an accident. R decided to pursue a personal injury claim against M. He was unaware that, on December 26, 1998, M had died of causes unrelated to the accident. On February 16, 1999, Letters of Administration were granted to M's administratrix. On October 28, 1999, R issued his statement of claim naming M as the defendant; it was within the two-year limitation period prescribed by the *Limitations Act*, but outside the limitation period under the *Survival of Actions Act*, namely one year after the death of a party to an action or six months after letters of administration are granted. The appellant insurer sought an order striking out the statement of claim for being out of time. R also filed an application to amend the name of the defendant in the statement of claim. The Supreme Court of Newfoundland and Labrador denied the insurer's application to have the action dismissed and granted R's application. The Court of Appeal allowed, in part, both the appeal and cross-appeal, concluding that the *Survival of Actions Act* applied to the action, but that the appellants were nevertheless estopped from relying upon the shorter limitation period.

*Held*: The appeal should be allowed on the issue of estoppel and the statement of claim struck out. The decision of the Court of Appeal should otherwise be affirmed. There are no reasons based on any legal doctrine to preclude M's estate or the insurer from relying on the *Survival of Actions Act* limitation period.

The discoverability rule does not apply to the *Survival of Actions Act*. This rule cannot be relied on where, as here, the limitation period is explicitly linked by the governing legislation to a fixed event unrelated to the injured party's knowledge or the basis of the cause of action. By using a specific event as the starting point of the "limitation clock" under the *Survival of Actions Act*, the legislature displaced the discoverability rule in all situations to which the *Survival of Actions Act* applies. [paras. 24-25] [para. 27]

Section 16 of the *Limitations Act* does not apply to the *Survival of Actions Act* either. Any confirmation of the cause of action would have no effect on the *Survival of Actions Act* limitation

period because the *Survival of Actions Act* does not create a cause of action but simply confers a right to pursue a claim notwithstanding the fact [page55] that one of the parties has died. In any event, there was no confirmation of the cause of action in this case, as there was no admission of liability through the letters sent between the parties' representatives or through the payments made by the insurer to R's counsel for property damage or for medical reports. The letters and payments were intended only to promote the investigation and early resolution of certain aspects of the claim. [para. 37] [para. 42] [paras. 45-48]

The requirements to establish estoppel by convention -- a communicated shared assumption between the parties, reliance on the shared assumption and detriment -- are not met. None of the letters exchanged by R's counsel and the adjuster with respect to R's personal injury claim prove the existence of a common assumption that M was alive or that the limitation defence would not be relied on. The letters lack clarity and certainty. Even if one could conclude that there was a mutual assumption between the parties, it cannot realistically be asserted that R communicated to the appellants that he shared the mistaken assumption. Moreover, R not only did not rely on the alleged assumption, but his conduct does not show an intention to affect the legal relations between the parties. The record does not disclose that R changed his position in any way on the basis of this alleged mutual assumption. Rather, the evidence suggests that he never put his mind to the shorter *Survival of Actions Act* limitation period. Given that there was no shared assumption or reliance, the detriment requirement does not need to be addressed. It should be noted, however, that a detriment is not established by a reduced limitation period. [paras. 63-66] [paras. 70-72] [para. 75]

Finally, R cannot rely on estoppel by representation. Estoppel by representation cannot arise from silence unless a party is under a duty to speak. In the present case, there was no duty on the appellants to advise R of a limitation period, to assist him in the prosecution of the claim, or to advise him of the consequences of the death of one of the parties. [paras. 76-77]

**Cases Cited**

Referred to: Central Trust Co. v. Rafuse, [1986] 2 S.C.R. 147; Page v. Austin (1884), 10 S.C.R. 132; Kamloops (City of) v. Nielsen, [1984] 2 S.C.R. 2; M. (K.) v. M. (H.), [1992] 3 S.C.R. 6; Peixeiro v. Haberman, [1997] 3 S.C.R. 549; Fehr v. Jacob (1993), 14 C.C.L.T. (2d) 200; Snow v. Kashyap (1995), 125 Nfld. & P.E.I.R. 182; Payne v. Brady (1996), 140 D.L.R. (4th) 88, [page56] leave to appeal refused, [1997] 2 S.C.R. xiii; Burt v. LeLacheur (2000), 189 D.L.R. (4th) 193; Waschkowski v. Hopkinson Estate (2000), 47 O.R. (3d) 370; Canadian Red Cross Society (Re), [2003] O.J. No. 5669 (QL); Edwards v. Law Society of Upper Canada (No. 1) (2000), 48 O.R. (3d) 321; MacKenzie Estate v. MacKenzie (1992), 84 Man. R. (2d) 149; Justice v. Cairnie Estate (1993), 105 D.L.R. (4th) 501; Good v. Parry, [1963] 2 All E.R. 59; Surrendra Overseas Ltd. v. Government of Sri Lanka, [1977] 2 All E.R. 481; Podovinikoff v. Montgomery (1984), 14 D.L.R. (4th) 716; Wheaton v. Palmer (2001), 205 Nfld. & P.E.I.R. 304; MacKay v. Lemley (1997), 44 B.C.L.R. (3d) 382; Harper v. Cameron (1892), 2 B.C.R. 365; Amalgamated Investment & Property Co. (In Liquidation) v. Texas Commerce Intenational Bank Ltd., [1982] 1 Q.B. 84; National Westminster

Finance NZ Ltd. v. National Bank of NZ Ltd., [1996] 1 N.Z.L.R. 548; The "Indian Grace", [1998] 1 Lloyd's L.R. 1; The "August Leonhardt", [1985] 2 Lloyd's L.R. 28; The "Vistafjord", [1988] 2 Lloyd's L.R. 343; Canacemal Investment Inc. v. PCI Realty Corp., [1999] B.C.J. No. 2029 (QL); Capro Investments Ltd. v. Tartan Development Corp., [1998] O.J. No. 1763 (QL); Troop v. Gibson, [1986] 1 E.G.L.R. 1; Hillingdon London Borough v. ARC Ltd., [2000] E.W.J. No. 3278 (QL); Baird Textile Holdings Ltd. v. Marks & Spencer plc, [2002] 1 All E.R. (Comm) 737, [2001] EWCA Civ 274; John v. George, [1995] E.W.J. No. 4375 (QL); Seechurn v. ACE Insurance S.A.-N.V., [2002] 2 Lloyd's L.R. 390, [2002] EWCA Civ 67; Litwin Construction (1973) Ltd. v. Pan (1988), 52 D.L.R. (4th) 459; Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc., [2002] B.C.J. No. 1417 (QL), 2002 BCSC 934; 32262 B.C. Ltd. v. Companions Restaurant Inc. (1995), 17 B.L.R. (2d) 227; Grundt v. Great Boulder Proprietary Gold Mines Ltd. (1937), 59 C.L.R. 641; Queen v. Cognos Inc., [1993] 1 S.C.R. 87.

**Statutes and Regulations Cited**

Fatal Accidents Act, R.S.N.L. 1990, c. F-6.

Limitations Act, S.N.L. 1995, c. L-16.1, ss. 5, 16.

Survival of Actions Act, R.S.N.L. 1990, c. S-32, ss. 2, 5, 8(1).

**Authors Cited**

Bower, George Spencer. The Law Relating to Estoppel by Representation, 4th ed. by P. Feltham, D. Hochberg and T. Leech. London: LexisNexis UK, 2004.

Chitty on Contracts, vol. 1, 29th ed. London: Sweet & Maxwell, 2004.

Dawson, T. Brettel. "Estoppel and obligation: the modern role of estoppel by convention" (1989), 9 L.S. 16.


[page57]

Fridman, G. H. L. The Law of Contract in Canada, 4th ed. Scarborough, Ont.: Carswell, 1999.

Mew, Graeme. The Law of Limitations, 2nd ed. Markham, Ont.: LexisNexis Butterworths, 2004.

Wilken, Sean. Wilken and Villiers: The Law of Waiver, Variation and Estoppel, 2nd ed. Oxford: Oxford University Press, 2002.

**History and Disposition:**

APPEAL from a judgment of the Newfoundland and Labrador Court of Appeal (Wells C.J.N. and

Cameron, Roberts and Welsh JJ.A., and Russell J. (ex officio)) (2003), 224 Nfld. & P.E.I.R. 181, 669 A.P.R. 181, 50 E.T.R. (2d) 8, [2003] N.J. No. 113 (QL), 2003 NLCA 19, reversing, in part, a decision of Orsborn J. (2001), 205 Nfld. & P.E.I.R. 211, 615 A.P.R. 211, 18 C.P.C. (5th) 95, 41 E.T.R. (2d) 287, 19 M.V.R. (4th) 120, [2001] N.J. No. 284 (QL). Appeal allowed.

**Counsel:**

Sandra R. Chaytor and Jorge P. Segovia, for the appellants.

Ian F. Kelly, Q.C., and Gregory A. French, for the respondent.

---

The judgment of the Court was delivered by

**1    BASTARACHE J.**:-- We are asked to decide whether or not a shortened limitation period under s. 5 of the *Survival of Actions Act*, R.S.N.L. 1990, c. S-32 (see Appendix), applicable upon the death of one of the parties to an action, can be enforced against a party who had no knowledge of the death until after the limitation period had expired. The respondent, Peter Ryan ("Ryan"), argues that the answer should be no; he invoked in front of our Court and in the courts below a number of legal principles which I shall address: discoverability, confirmation, estoppel by convention and estoppel by representation. The issue of estoppel was raised for the first time by the Court of Appeal itself.

**2**    The discoverability rule dictates that a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by [page58] the plaintiff by the exercise of reasonable diligence (*Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147, at p. 224).

**3**    Section 16(1) of the *Limitations Act*, S.N.L. 1995, c. L-16.1 (see Appendix), prescribes that confirmation of a cause of action occurs when a person acknowledges the cause of action of another person or makes a payment in respect of that cause of action. Thus, at that moment, the limitation clock is restarted, and the time before the date of the confirmation will not be counted.

**4**    Estoppel by convention operates where the parties have agreed that certain facts are deemed to be true and to form the basis of the transaction into which they are about to enter (G. H. L. Fridman, *The Law of Contract in Canada* (4th ed. 1999), at p. 140, note 302). If they have acted upon the agreed assumption, then, as regards that transaction, each is estopped against the other from questioning the truth of the statement of facts so assumed if it would be unjust to allow one to go back on it (G. S. Bower, *The Law Relating to Estoppel by Representation* (4th ed. 2004), at pp. 7-8).

**5**    Estoppel by representation requires a positive representation made by the party whom it is

sought to bind, with the intention that it shall be acted on by the party with whom he or she is dealing, the latter having so acted upon it as to make it inequitable that the party making the representation should be permitted to dispute its truth, or do anything inconsistent with it (*Page v. Austin* (1884), 10 S.C.R. 132, at p. 164).

**6**   None of these doctrines can find application in the present case. I will address each of these doctrines and in most cases adopt the reasons of the Court of Appeal with mere comment. One legal concept requires more attention from this Court, given that it is being asked to develop a legal test with regard to its application: estoppel by convention.

[page59]

    I.    <u>Background</u>
    A.    *Facts*

**7**   On November 27, 1997, three vehicles were involved in an accident. They were operated by the respondent, Ryan, the appellant, Rex Gilbert Moore, and a third party (not involved in this matter), David Crummey. Ryan decided to pursue a personal injury claim against Moore. He was unaware that, on December 26, 1998, Moore had died of causes unrelated to the accident. On February 16, 1999, Letters of Administration were granted to Moore's administratrix, Muriel Smith. On October 28, 1999, Ryan issued his statement of claim; it was within the two-year limitation period prescribed by the *Limitations Act*, but outside the applicable six-month limitation period from the granting of the letters of administration under the *Survival of Actions Act*. Ryan argues that the appellant is estopped from relying upon the shorter limitation period. Alternatively, he argues that the discoverability principle or the confirmation rule apply to extend this shorter limitation period.

**8**   As this case is centred on issues related to limitation periods, it is important to recollect the important events leading up to this litigation:

| | |
|---|---|
| <u>November 27, 1997</u> | **The accident** |
| **November 28, 1997** | **Cabot Insurance Co. ("Cabot Insurance") appoints adjuster Brian Lacey to look after the claim against its insured Moore. Ryan retains counsel who contacts the adjuster advising of his retainer and that Ryan, while his injuries are being assessed, will pursue his property damage claim directly with the adjuster.** |

**[page60]**

| | |
|---|---|
| **December 1997 -- December 1998** | **Cabot Insurance pays Ryan's property damage claim directly to him. Correspondence is exchanged between Ryan's counsel and the adjuster concerning Ryan's medical condition, the adjuster seeking documentation and updates on Ryan's condition, and the counsel providing the information requested. The counsel forwards Ryan's hospital chart to the adjuster, for which Cabot Insurance reimburses counsel the $40 fee.** |
| **December 26, 1998** | **Moore dies at age 75 from causes unrelated to the accident.** |
| January 25, 1999 | The adjuster writes to Ryan's counsel seeking medical information and reiterating that the insurer would pay a reasonable fee for a medical report. He refers to Moore as "Our Insured". |
| **February 16, 1999** | *Letters of Administration of the Estate of Rex Moore are granted to Muriel Smith.* |
| April 5, 1999 | Ryan's counsel forwards to the adjuster an invoice for a medical report of Ryan's examination by an orthopaedic surgeon. |
| July 29, 1999 | The adjuster forwards to Ryan's counsel a cheque for payment of the medical report. The cheque is payable to [page61] Dr. Landells. He refers to Moore as "Our Insured". |
| **August 16, 1999** | *Six months have passed since the grant of letters of administration of Moore's estate.* |
| October 28, 1999 | The statement of claim is issued naming Rex Moore as defendant. |
| February 10, 2000 | Ryan's counsel writes to the adjuster seeking payment for the cost of obtaining the chart from Ryan's family physician. He refers to Moore as "Your Insured". |
| March 2, 2000 | Ryan's counsel writes to the adjuster requesting payment for the chart of another physician. He refers to Moore as "Your Insured". |

| | |
|---|---|
| **May 18, 2000** | *The adjuster learns of Moore's death.* |
| **<September 22, 2000** | **Ryan's counsel learns of Moore's death after attempting to serve the statement of claim.** |
| **October 24, 2000** | **Ryan's counsel suggests to Cabot Insurance's claims examiner, Valerie Moore, in a meeting (to discuss claims unrelated to this case) that there might be a problem with the limitation period.** |

[page62]

| | |
|---|---|
| **November 9, 2000** | **Cabot Insurance refuses to settle Ryan's claim because the action is outside the limitation period.** |

**9**  Cabot Insurance applied to intervene in the proceedings and sought an order striking out the statement of claim for being out of time. It further claimed that the statement of claim naming a dead person as defendant was a nullity and was not capable of being amended. Ryan also filed an application to amend the statement of claim to describe the defendant as "Rex Moore, Deceased, by his administratrix, Muriel Smith".

   B.   *Supreme Court of Newfoundland and Labrador* (2001), 205 Nfld. & P.E.I.R. 211

**10**  At the Supreme Court of Newfoundland and Labrador, Orsborn J. denied Cabot Insurance's application to have the action dismissed. First, he held that the discoverability rule did not apply to postpone the running of the *Survival of Actions Act* limitation period, since the fact of death was not an element of the cause of action and was not required to complete the cause of action (paras. 50-51). Second, Orsborn J. held that the confirmation provisions of s. 16 of the *Limitations Act* are not expressly confined to the limitation periods fixed by the *Limitations Act*. He saw no reason in principle why a cause of action continued under the *Survival of Actions Act* could not be confirmed and the limitation period fixed by that Act thus continued. He concluded that Cabot Insurance's payment for the medical report on July 29, 1999 constituted a confirmation of Ryan's cause of action. Since the action was commenced within six months of this payment, the proceeding was still within the short *Survival of Actions Act* limitation period and was not statute barred (paras. 52-63). Third, Orsborn J. concluded that in any event, on the facts of this case, the cause of action against Moore was not a cause of action to which the *Survival of Actions Act* applies. The *Survival of*

*Actions Act* permits a cause of action to survive "for the benefit of or against" an estate [page63] (s. 2(b)). The *Survival of Actions Act* deals with the potential acquisition or dissipation of estate assets. However, in this case, Ryan's claim poses no risk to the assets of the estate. Instead, the risk lies on the insurer. Moore was a defendant in name only, and the real party to the action was the insurer. Thus, Ryan's cause of action was not extinguished on Moore's death (paras. 66-76). Fourth, Orsborn J. held that if Ryan's cause of action had not been confirmed and if the *Survival of Actions Act* was indeed applicable (which he held it was not), then the action would have been a nullity for being commenced outside the limitation period. However, as this was not the case, the plaintiff was not statute barred.

        C.    *Court of Appeal of Newfoundland and Labrador* (2003), 224 Nfld. & P.E.I.R. 181, 2003 NLCA 19

        (1)    <u>Wells C.J. (for the majority)</u>

**11**    The majority of the Court of Appeal allowed, in part, both the appeal and cross-appeal. The applications judge's order to permit the intervention of Cabot Insurance and the amendment of the statement of claim was affirmed. Wells C.J. held that the applications judge made no error in considering the existence of insurance in determining whether or not the action posed a financial risk to the estate. He nevertheless held that the applications judge erred in holding that the cause of action against Moore is a cause of action to which the *Survival of Actions Act* did not apply. The court explained that unless the *Survival of Actions Act* applies, the action will be a nullity. The right to institute a tort action after death, or continue an action after death, derives from the statute. Without such a statute, this right does not otherwise exist.

[page64]

**12**    The majority agreed with the applications judge that the discoverability rule does *not* apply to postpone the running of the limitation period under the *Survival of Actions Act*. Concluding that the limitation period in the statute runs from an event that occurs without regard to the injured party's knowledge, the majority deemed that allowing the application of the discoverability rule would disrupt the exception to the common law rule, the courts thereby intruding into the legislature's jurisdiction.

**13**    The majority disagreed with Orsborn J.'s holding that the confirmation provisions of the *Limitations Act* also apply to the limitation period under the *Survival of Actions Act*. Wells C.J. held that s. 16 of the *Limitations Act* provides confirmation of a cause of action and not of the right to commence it. The majority pointed out that the nature of the cause of action, or whether it is confirmed, is not relevant to the date of death or of grant of probate which triggers the limitation period created by the *Survival of Actions Act*. Confirmation did not arise in relation to the limitation

period stemming from the *Limitations Act* because the statement of claim was issued within two years of the collision, i.e. within the prescribed delay.

**14**    Turning to the last issue, the majority held that Moore's estate and Cabot Insurance were barred by the principle of estoppel from relying on the fact of Moore's death and the granting of letters of administration. The particular form of estoppel invoked was estoppel by convention. Wells C.J., having reviewed Canadian and foreign authorities and decisions, concluded that estoppel by convention was established (para. 79). The majority held that detrimental reliance was not required. Consequently, Cabot Insurance and Moore were estopped from pleading that Moore died or that letters of [page65] administration were granted prior to May 2000 in order to invoke the shorter *Survival of Actions Act* limitation period. As a result, nullity could not be established and the statement of claim was amended to name the administratrix of Moore as defendant in the action.

> (2)    Cameron J.A. (dissenting)

**15**    In dissenting reasons, concurred in by Welsh J.A., Cameron J.A. disagreed with the estoppel analysis and held that it did not apply to the case at bar. After analysing case law and doctrine, she concluded that mutual misunderstanding (both parties assuming that Moore was alive) did not amount to a common assumption. The dissenting judges did not find that the letters sent by Cabot Insurance to Ryan's counsel referring to "Our Insured: Rex Moore" formed the basis on which the parties governed their conduct. The failure to commence the action within the *Survival of Actions Act*'s limitation period was *not* due to any arrangement between the parties, and consequently, there was no reliance on any convention. Therefore, this principle did not apply. Ryan's action was therefore time barred. The dissenting judges would have allowed the appeal.

> II.    Analysis
> A.    *Discoverability*

> (1)    Statutory Limitation Periods

**16**    The situation here is governed by two limitation periods: s. 5 of the *Limitations Act* (see Appendix) and s. 5 of the *Survival of Actions Act*. The limitation period in s. 5 of the *Limitations Act* applies initially. Section 5 of the *Survival of Actions Act* superimposes itself on s. 5 at a later point in time, but does not eliminate it. This follows from the fact that the *Survival of Actions Act* does not create a new cause of action, as will be explained later.

[page66]

**17**    Pursuant to s. 5 of the *Limitations Act*, a person can bring an action for damages in respect of injury based on contract or tort within two years of the date on which the right to do so arose. Ryan,

by issuing a statement of claim on October 28, 1999, naming Rex Moore as the defendant, therefore, met the prescribed limitation period in the *Limitations Act*. Nevertheless, unknown to the parties, Rex Moore had died on December 26, 1998, altering the fact scenario.

**18**    As stated by the Court of Appeal, it is well known that at common law a personal action in tort is extinguished on the death of the victim or the wrongdoer: *actio personalis moritur cum persona* (see G. Mew, *The Law of Limitations* (2nd ed. 2004), at p. 253). Being unable to sue the estate of a deceased tortfeasor was particularly severe as it left injured survivors of motor vehicle accidents without any means of recovery. This led legislatures to enact statutes to diminish the hardship of the common law rule. The *Fatal Accidents Act*, R.S.N.L. 1990, c. F-6, and the *Survival of Actions Act* were such statutes. Under the *Fatal Accidents Act*, the estate of a person who died as a result of the accident, or the survivors of that person, are accorded the right to maintain an action for death by wrongful act. Also, pursuant to s. 2 of the *Survival of Actions Act* (see Appendix), an action vested in or existing against a person who has died can be maintained by or against the deceased person's estate. However, s. 5 of the *Survival of Actions Act* prohibits an action brought six months after letters of probate or administration of the estate of the deceased have been granted, and after the expiration of one year from the date of death. Hence, the provision is meant to keep the action "alive" for a specific period of time. The *Survival of Actions Act* imposes an additional limitation period. As eloquently affirmed by Orsborn J., the *Survival of Actions Act* does not create a cause of action. It grafts its provision onto an existing cause of action, one which is complete in all of its elements before the operation of the *Survival of Actions Act* (para. 45).

[page67]

**19**    In the case at bar, the *Survival of Actions Act* has the effect of shortening the time period within which the action could be taken because "an action founded in tort may only be taken by or against the estate of a deceased person if it is commenced within that period of time that is common to both limitations periods": *per* Wells C.J., at para. 37.

**20**    Ryan argues that the *Survival of Actions Act* contemplates that a cause of action can arise under the *Survival of Actions Act*. I fail to see how the expression "[c]auses of action under this Act" or "an action ... under this Act" found in ss. 8(1) and 5 respectively can be seen to indicate the *creation* of a new cause of action. The *Survival of Actions Act* expressly contemplates the *survival* of causes of action *existing* against a person who has died (s. 2). I take that to mean that the cause of action existed prior to the application of the *Survival of Actions Act*. The survival of a cause of action for a time and its creation are two different things.

(2)    Discoverability: The Judge-Made Rule

**21**    The debate concerning the use of the discoverability principle in tort actions has been settled by this Court in *Kamloops (City of) v. Nielsen*, [1984] 2 S.C.R. 2, *Central Trust* and *M. (K.) v. M.*

*(H.)*, [1992] 3 S.C.R. 6.

**22**    The discoverability principle provides that "a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence": *Central Trust*, at p. 224. In some provinces, the discoverability rule has been codified by statute; in others, it has been deemed redundant because of other remedial provisions.

**23**    While discoverability has been qualified in the past as a "general rule" (*Central Trust*, at p. 224; *Peixeiro v. Haberman*, [1997] 3 S.C.R. 549, at [page68] para. 36), it must not be applied systematically without a thorough balancing of competing interests (*Peixeiro*, at para. 34). The rule is an interpretative tool for construing limitation statutes. I agree with the Manitoba Court of Appeal when it writes:

> In my opinion, the judge-made discoverability rule is nothing more than a rule of construction. Whenever a statute requires an action to be commenced within a specified time from the happening of a specific event, the statutory language must be construed. When time runs from "the accrual of the cause of action" or from some other event which can be construed as occurring only when the injured party has knowledge of the injury sustained, the judge-made discoverability rule applies. <u>But, when time runs from an event which clearly occurs without regard to the injured party's knowledge, the judge-made discoverability rule may not extend the period the legislature has prescribed.</u> [Emphasis added.]

> (*Fehr v. Jacob* (1993), 14 C.C.L.T. (2d) 200, at p. 206)

See also *Peixeiro*, at para. 37; *Snow v. Kashyap* (1995), 125 Nfld. & P.E.I.R. 182 (Nfld. C.A.).

**24**    Thus, the Court of Appeal of Newfoundland and Labrador is correct in stating that the rule is "generally" applicable where the commencement of the limitation period is related by the legislation to the arising or accrual of the cause of action. The law does not permit resort to the judge-made discoverability rule when the limitation period is explicitly linked by the governing legislation to a fixed event unrelated to the injured party's knowledge or the basis of the cause of action (see Mew, at p. 55).

(3)    <u>Discoverability Principle Does Not Apply to the *Survival of Actions Act*</u>

**25**    Ryan submits that the discoverability rule applies to the limitation period contained in s. 5 of the *Survival of Actions Act*. He argues that the [page69] limitation period should not begin to run until he knew, or ought reasonably to have known, the material facts which determine (i) his cause of action under the *Survival of Actions Act* and (ii) the limitation period. In sum, Ryan claims that

the death of Moore is integral to the cause of action and that the limitation period should not start to run until he knew that he had a cause of action against the estate of Rex Moore. The appellants submit that the discoverability rule does not apply to the *Survival of Actions Act* as it would transcend the logic of statutory interpretation and the scheme enacted by the legislature. In addition, they say that the rule does not apply where time runs from a fixed event.

**26**    Like the Court of Appeal, I am of the view that the appellants' position is correct. For ease of reference, I reproduce s. 5 of the *Survival of Actions Act*:

> **5.** An action shall not be brought under this Act unless proceedings are started within 6 months after letters of probate or administration of the estate of the deceased have been granted and proceedings shall not be started in an action under this Act after the expiration of 1 year after the date of death of the deceased.

**27**    Pursuant to the *Survival of Actions Act*, the limitation period is triggered by the death of the defendant or the granting by a court of the letters of administration or probate. The section is clear and explicit: time begins to run from one of these two specific events. The Act does not establish a relationship between these events and the injured party's knowledge. I agree with the appellants that knowledge is not a factor: the death or granting of the letters occurs regardless of the state of mind of the plaintiff. We face here a situation in respect of which, as recognized by this Court in *Peixeiro*, the judge-made discoverability rule does not apply to extend the period the legislature has prescribed. Thus, I [page70] agree with the Court of Appeal that by using a specific event as the starting point of the "limitation clock", the legislature was displacing the discoverability rule in all the situations to which the *Survival of Actions Act* applies.

**28**    A number of the appellate courts have dealt with the question of discoverability in the context of actions by or against estates of deceased persons. The appellants rely extensively on *Payne v. Brady* (1996), 140 D.L.R. (4th) 88 (Nfld. C.A.), leave to appeal refused, [1997] 2 S.C.R. xiii. While the facts of that case are very similar to the present, it is not clear whether the Court of Appeal of Newfoundland decided that the rule of discoverability did not apply because death is always a possibility or because the appellant Payne had ample time after she became aware of the death of Brady to commence her action. What is clear is the point advanced by O'Neill J.A.: the death of a prospective defendant and the possibility of a shortened period to commence an action is a reality that claimants and their counsel have to guard against: *Payne*, at p. 94.

**29**    The Nova Scotia Court of Appeal decision in *Burt v. LeLacheur* (2000), 189 D.L.R. (4th) 193, is invoked by the respondent. However, the reasoning of that case cannot be applied in the case at bar. In *Burt*, the Court of Appeal held that the discoverability rule applied to s. 10 of the *Fatal Injuries Act*, R.S.N.S. 1989, c. 163. The Nova Scotia Court of Appeal stated its position in the following manner (at p. 208):

> If the discoverability rule applies to a limitation period running from

"when the damages were sustained" (*Peixeiro*) and from "the final determination of the action against the insured" (*Grenier*), I think it is not unreasonable to apply it to the period one year after the death so as to start time running only when the claimant knows or ought to know that the death might be a <u>wrongful</u> one. This, having in mind the statutory scheme of the *Fatal [page71] Injuries Act*, is no greater a stretch of the language than was made by the courts in *Peixeiro, Grenier* and other cases, all for the purpose of preventing a potential injustice.

<u>We must avoid the accusation of usurping the role of the Legislature</u>, but in my opinion to apply the discoverability rule here is consistent with what has already been done before. <u>On the true consideration of s. 10 of the *Fatal Injuries Act*, time does not run simply from a fixed event, but from constituent elements of the cause of action created by the statute.</u> [Emphasis added.]

**30**    In *Burt*, the death of a person for which an action can be brought under the *Fatal Injuries Act* does not merely refer to the time of death as provided in the *Survival of Actions Act*, but to a "<u>wrongful</u>" death. It is not an event totally unrelated to the accrual of the cause of action. Hence, the death of the person there is in fact a "constituent elemen[t] of the cause of action", contrary to the present case.

**31**    In my view, the case that best assists this Court in the present matter is the one giving rise to the Ontario Court of Appeal's decision in *Waschkowski v. Hopkinson Estate* (2000), 47 O.R. (3d) 370. The court had to determine the possible application of the discoverability rule to s. 38(3) of the *Trustee Act*, R.S.O. 1990, c. T.23, the statutory provision in Ontario permitting an action in tort by or against the estate of a deceased person and limiting the period during which such actions may be commenced. Abella J.A., as she then was, concluded, at para. 16, that the discoverability rule did not apply to the section since the state of actual or attributed knowledge of an injured person in a tort claim is not germane when a death has occurred. She explained at paras. 8-9:

In s. 38(3) of the *Trustee Act*, the limitation period runs from a death. Unlike cases where the wording of the limitation period permits the time to run, for example, [page72] from "when the damage was sustained" (*Peixeiro*) or when the cause of action arose (*Kamloops*), <u>there is no temporal elasticity possible when the pivotal event is the date of a death</u>. Regardless of when the injuries occurred or matured into an actionable wrong, s. 38(3) of the *Trustee Act* prevents their transformation into a legal claim unless that claim is brought within two years of the death of the wrongdoer or the person wronged.

The underlying policy considerations of this clear time limit are not difficult to understand. The draconian legal impact of the common law was that

death terminated any possible redress for negligent conduct. <u>On the other hand, there was a benefit to disposing of estate matters with finality. The legislative compromise in s. 38 of the *Trustee Act* was to open a two-year window, making access to a remedy available for a limited time without creating indefinite fiscal vulnerability for an estate.</u> [Emphasis added.]

See also *Canadian Red Cross Society (Re)*, [2003] O.J. No. 5669 (QL) (C.A.), and *Edwards v. Law Society of Upper Canada (No. 1)* (2000), 48 O.R. (3d) 321 (C.A.).

**32**    Ryan's cause of action arose prior to Moore's death and Ryan was well aware of his cause of action both before Moore's death and before the expiration of the *Survival of Actions Act* limitation period. In fact, the day following the accident, Ryan retained a solicitor to pursue a claim for damages against Moore for injuries alleged to have resulted from the accident. At that point, Ryan could have sued Moore as all the elements of his cause of action were known. He did not need to have knowledge of the death in question to prove his claim or issue and serve the statement of claim. Moore's subsequent death had no impact whatsoever on the accrual of Ryan's cause of action. Consequently, I agree with the conclusion of the applications judge, at para. 50:

> The fact of death is of no relevance to the cause of action in question. It is not an element of the cause of action and is not required to complete the cause of action. Whatever the nature of the cause of action, it is existing [page73] and complete before the *Survival of Actions Act* operates, in the case of a death, to maintain it and provide a limited time window within which it must be pursued. The fact of the death is irrelevant to the cause of action and serves only to provide a time from which the time within which to bring the action is to be calculated.

**33**    A further reason for the non-application of the discoverability rule is the evident impact such a rule would have on the distribution of assets to the beneficiaries. Without a time limit, an executor or an administrator would not feel free to distribute the assets of an estate until all reasonable possibilities of claim had been addressed. This would be cumbersome and unrealistic. "An estate should not be held to ransom interminably by the advancement of claims which are not proceeded with in a timely manner": *MacKenzie Estate v. MacKenzie* (1992), 84 Man. R. (2d) 149 (Q.B.), at para. 18, cited in *Justice v. Cairnie Estate* (1993), 105 D.L.R. (4th) 501 (Man. C.A.), at p. 510.

**34**    The *Survival of Actions Act* is itself a legislative exception to a common law rule. Thus, it would displace the intention of the legislature to "stretch" the limitation period. Borrowing the words of Marshall J.A. in *Snow*, at para. 43, to apply the rule of construction of reasonable discoverability to such a provision would be tantamount to mounting a fiction transcending the limits of logical statutory interpretation. Hence, it would constitute an impermissible incursion into the legislative process.

(4)    <u>Special Circumstances</u>

**35**    Ryan submits, as an alternative, that if the discoverability rule does not apply, the limitation period should be extended because of the "special circumstances" principle. He claims that, pursuant to this principle, fairness and justice require that an innocent plaintiff should not be deprived of compensation through no fault of his own. This argument was not invoked in front of the applications judge or the Court of Appeal, and is not supported by any evidence; under these circumstances, it is, in my view, without merit.

[page74]

   B.    *Confirmation*

**36**    Ryan claims that the confirmation of the cause of action pursued under s. 16 of the *Limitations Act* applies to extend the limitation period contained in s. 5 of the *Survival of Actions Act*. He argues that the correspondence exchanged between Cabot Insurance's adjuster and his previous counsel, the payment made by Cabot Insurance for his property damage claim, as well as a payment of $500 to his previous counsel for a medical report, prove acknowledgment (as contemplated by the *Limitations Act*) and therefore confirmation.

**37**    The appellants submit that s. 16 of the *Limitations Act* does not apply to the *Survival of Actions Act*. They claim that any confirmation of the cause of action would have no effect on the *Survival of Actions Act* limitation period because the *Survival of Actions Act* does not create a cause of action but simply confers a right to pursue a claim notwithstanding the fact that one of the parties has died. Finally, they argue that there was no confirmation of the cause of action in this case as there was no admission of liability through the letters nor the payments made.

**38**    I agree with the appellants' position as accepted by the Court of Appeal.

**39**    The relevant portions of s. 16 of the *Limitations Act* provide:

> **16.** (1) A confirmation of a cause of action occurs where a person
>
> (a)    acknowledges that cause of action, right or title of another person; or
> (b)    makes a payment in respect of that cause of action, right or title of another.
>
> (2) Where a person against whom an action lies confirms that cause of action, the time before the date of that confirmation shall not count when determining the limitation period for a person having the benefit of the

confirmation against the person bound by that confirmation.

[page75]

(3) Subsection (2) applies only to a right of action where the confirmation is given before the expiration of the limitation period for that right of action.

...

(5) In order to be effective a confirmation must be in writing and signed by

(a)    the person against whom that cause of action lies; or

(b)    his or her agent

and given to the person or agent of the person having the benefit of that cause of action.

**40**    When a person acknowledges the cause of action of another person or makes a payment in respect of that cause of action, a confirmation of that cause of action occurs. Consequently, the time accrued before the date of that confirmation shall not be considered when determining the limitation period (s. 16(2)). Confirmation must, of course, be made prior to the expiration of the limitation period (s. 16(3)).

**41**    Section 16 can only apply to a limitation period which limits the time during which an action may be taken. Since the limitation period which arises under the *Survival of Actions Act* supersedes the first limitation period of the *Limitations Act*, and does not create or revive an action, but merely permits it to continue , s. 16 cannot apply to it as found by the Court of Appeal (para. 67).

**42**    Even if this were not the case, the facts here do not support a finding of confirmation on the part of the appellants. I will address this issue briefly as a matter of principle.

**43**    In order to establish confirmation, one of two events must be proven: (1) that the party acknowledged the cause of action; or (2) that there was a payment made in respect of the cause of action (see Mew, at p. 115).

**44**    The term "acknowledges" as used in s. 16(1)(a) of the *Limitations Act* has been described by Lord Denning in *Good v. Parry*, [1963] 2 All E.R. 59 (C.A.), at p. 61, as requiring an "admission". While [page76] care must be shown when applying English case law, as the English *Limitation Act*, 1939, 2 & 3 Geo. 6, c. 21, does not provide for the acknowledgment of the "cause of action" but the

acknowledgment of the "claim", it is still persuasive authority for the present interpretation.

**45**    Thus, a party can only be held to have acknowledged the claim if that party has in effect admitted his or her liability to pay that which the claimant seeks to recover (see *Surrendra Overseas Ltd. v. Government of Sri Lanka*, [1977] 2 All E.R. 481 (Q.B.)). As the British Columbia Court of Appeal concluded in *Podovinikoff v. Montgomery* (1984), 14 D.L.R. (4th) 716, at p. 721, a person can acknowledge as a bare fact that someone has asserted (by making a claim) a cause of action against him, without acknowledging any liability. Simple acknowledgment of the "existence" of a cause of action is insufficient to meet the requirements of s. 16(1)(a). Acknowledgment must involve acknowledgment of some liability.

**46**    Consequently, the letters from the adjuster to Ryan's counsel (i.e. letters of November 18, 1998 and January 25, 1999) do not restart the clock as they do not constitute an admission of liability on the part of Cabot Insurance. These were obviously only requests for information and part of the normal investigation process. As submitted by the appellants, if mere investigation of claims were to constitute confirmation, then potential defendants, in order to protect limitation defence, would have no choice but to refuse to investigate until a statement of claim is issued. This would destroy the possibility of early settlements and lead to increased litigation and costs.

**47**    The same conclusion applies to the second way that confirmation can occur, through payment. Of importance is the fact that both payments mentioned by Ryan, payments for Ryan's medical chart [page77] and Dr. Landells' medical report, were not evidence of liability by Cabot Insurance; nor did they indemnify Ryan, at least in part, for damages caused by the accident. Thus, they cannot be payments in respect of the "cause of action". Ryan relies on the Newfoundland Court of Appeal decision in *Wheaton v. Palmer* (2001), 205 Nfld. & P.E.I.R. 304, for the proposition that a payment made to a physician, but sent to the plaintiff's solicitor will constitute confirmation. With respect, I am of the view that the Court of Appeal erred in this determination. I prefer the contrary position of the British Columbia Court of Appeal in *MacKay v. Lemley* (1997), 44 B.C.L.R. (3d) 382, at para. 21. Payment for a medical report with a cheque payable to a physician, but sent to the plaintiff's solicitor, does not constitute confirmation of the plaintiff's cause of action:

> The mere fact that the payment, although made payable to the doctor, was directed through the lawyer's office for forwarding does not, in my view, bring the payment into the express wording of the section. The payment here, as in *Germyn*, was intended to pay to the doctor. The doctor was not a person through whom the appellant could claim. This was not a reimbursement to anyone for having paid for the medical report but a direct payment to the doctor by [the Insurance Corporation of British Columbia].

**48**    The purpose for which these types of payments and correspondence are made is critical. In this case, they were not intended as admissions of liability, but only to promote investigation and early resolution of certain aspects of the claim.

C.    *Estoppel*

**49**    Moore's estate and Cabot Insurance submit that the majority of the Court of Appeal erred when it concluded that they were estopped from relying on the fact of Moore's death and the granting of letters of administration, thus preventing them from arguing that Ryan's action was outside the *Survival of Actions Act* limitation period. They claim that neither estoppel by convention nor estoppel by [page78] representation applies to the facts of the present case. Ryan argues that the appellants are precluded or estopped from relying on the limitation period in the *Survival of Actions Act* because of the application of either of these two types of estoppel.

**50**    While the principle of estoppel is often referred to in connection with cases of waiver, election, abandonment, acquiescence and laches, in the context of commercial and contractual relationships, the case law in Canada on this subject is not as abundant as that in the United Kingdom. It is therefore useful for this Court to address the issue in some detail, especially where it has long been accepted that estoppels are to be received with caution and applied with care (see *Harper v. Cameron* (1892), 2 B.C.R. 365 (Div. Ct.), at p. 383).

**51**    The state of the law of estoppel was articulated by Lord Denning in *Amalgamated Investment & Property Co. (In Liquidation) v. Texas Commerce International Bank Ltd.*, [1982] 1 Q.B. 84 (C.A.), at p. 122, as follows:

> The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption -- either of fact or of law -- whether due to misrepresentation or mistake makes no difference -- on which they have conducted the dealings between them -- neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

[page79]

**52**    The jurisprudence discloses six types of estoppel: estoppel by representation of fact, proprietary estoppel, promissory estoppel, estoppel by convention, estoppel by deed and estoppel by

negligence (see Bower , at pp. 3-9). I will examine here the ones at the centre of this dispute, estoppel by convention and estoppel by representation.

  (1) Estoppel by Convention

    (a)    *Definition and Principles*

**53**    The origin of the doctrine of estoppel by convention can be traced to estoppel by deed for which sealing and delivery were essential, and for which the foundation of duty lay not in the agreement itself, or any reliance thereon, but in the formal solemnity of the deed, reflecting the concern of ancient jurisprudence with form as opposed to substance. The modern rule has evolved enormously (see Bower, at pp. 179-80; T. B. Dawson, "Estoppel and obligation: the modern role of estoppel by convention" (1989), 9 *L.S.* 16).

**54**    Bower defines the modern concept of estoppel by convention as follows (at p. 180):

> An estoppel by convention, it is submitted, is an estoppel by representation of fact, a promissory estoppel or a proprietary estoppel, in which the relevant proposition is established, not by representation or promise by one party to another, but by mutual, express or implicit, assent. This form of estoppel is founded, not on a representation made by a representor and believed by a representee, but on an agreed statement of facts or law, the truth of which has been assumed, by convention of the parties, as a basis of their relationship. When the parties have so acted in their relationship upon the agreed assumption that the given state of facts or law is to be accepted between them as true, that it would be unfair on one for the other to resile from the agreed assumption, then he will be entitled to relief against the other according to whether the estoppel is as to a matter of fact, or promissory, and/or proprietary.

  [page80]

**55**    S. Wilken, *Wilken and Villiers: The Law of Waiver, Variation and Estoppel* (2nd ed. 2002), at p. 223, affirms that estoppel by convention will occur where:

  (i)    the parties have established, by their construction of their agreement or a common apprehension as to its legal effect, a convention basis;

  (ii)    on that basis the parties have regulated their subsequent dealings;

  (iii)    one party would suffer detriment if the other were to be permitted to resile from that convention.

See also *Chitty on Contracts* (29th ed. 2004), vol. 1, at p. 283.

**56**    The Court of Appeal of Newfoundland and Labrador, after a review of the case law in the United Kingdom and in Canada, formulated the following four elements which need to be proven (at para. 79):

>   (i)    The evidence establishes an assumption in common between the parties as to a state of facts;
>
>   (ii)   The parties have adopted the common assumption as the conventional basis for a transaction into which they have entered;
>
>   (iii)  The dispute in respect of which the estoppel by convention is asserted arises out of that transaction; and,
>
>   (iv)   A detriment would flow to the party asserting the estoppel if the other party is permitted to resile from the assumed stated facts.

These requirements were accepted by the respondent.

**57**    The appellants submit that there are six requirements for the estoppel by convention. They cite as support the New Zealand Court of Appeal decision in *National Westminster Finance NZ Ltd. v. National Bank of NZ Ltd.*, [1996] 1 N.Z.L.R. 548, at p. 550. In fact, they simply advocate a more detailed description of the requirements also found in other foreign cases.

**58**    The jurisprudence in the United Kingdom is indeed abundant in contrast to that in Canada (see, [page81] e.g., *The "Indian Grace"*, [1998] 1 Lloyd's L.R. 1 (H.L.), at p. 10; *The "August Leonhardt"*, [1985] 2 Lloyd's L.R. 28 (C.A.), at pp. 34-35; *The "Vistafjord"*, [1988] 2 Lloyd's L.R. 343 (C.A.), at pp. 349-53) .

**59**    This Court is not bound by any of the above analytical frameworks. After having reviewed the jurisprudence in the United Kingdom and Canada as well as academic comments on the subject, I am of the view that the following criteria form the basis of the doctrine of estoppel by convention:

>   (1)    The parties' dealings must have been based on a shared assumption of fact or law: estoppel requires manifest representation by statement or conduct creating a mutual assumption. Nevertheless, estoppel can arise out of *silence* (impliedly).
>
>   (2)    A party must have conducted itself, i.e. acted, in reliance on such shared assumption, its actions resulting in a change of its legal position.
>
>   (3)    It must also be unjust or unfair to allow one of the parties to resile or depart from the common assumption. The party seeking to establish estoppel therefore has to prove that detriment will be suffered if the other party is allowed to resile from the assumption since there has been a change from the presumed position.

See Wilken, at pp. 227-28; *Canacemal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (QL) (S.C.), at para. 35; *Capro Investments Ltd. v. Tartan Development Corp.*, [1998] O.J. No.

1763 (QL) (Gen. Div.), at para. 31.

     (b)   *Application of the Law*

**60**    The majority of the Court of Appeal held that estoppel by convention applied in the circumstances of this case. It concluded that there was an assumption between the parties as to a state of facts, namely: that Moore was alive; that the parties adopted this assumption as the basis upon which [page82] their transactions relating to Ryan's claim were to be conducted; that the dispute in respect of which the estoppel was asserted arose out of the transactions between the parties in dealing with Ryan's claim; and that detriment would flow to Ryan if Moore's estate or the insurer were permitted to resile from the common assumption. As will be evidenced from the analysis below, I cannot agree with this conclusion.

     (i)   <u>Assumption Shared and Communicated</u>

**61**    The crucial requirement for estoppel by convention, which distinguishes it from the other types of estoppel, is that at the material time both parties must be of "a like mind" (*Troop v. Gibson*, [1986] 1 E.G.L.R. 1 (C.A.), at p. 5; *Hillingdon London Borough v. ARC Ltd.*, [2000] E.W.J. No. 3278 (QL) (C.A.), at para. 49). The court must determine what state of affairs the parties have accepted, and decide whether there is sufficient certainty and clarity in the terms of the convention to give rise to any enforceable equity: *Troop*, at p. 6; see also *Baird Textile Holdings Ltd. v. Marks & Spencer plc*, [2002] 1 All E.R. (Comm) 737, [2001] EWCA Civ 274, at para. 84.

**62**    While it may not be necessary that the assumption by the party raising estoppel be created or encouraged by the estopped party, it must be shared in the sense that each is aware of the assumption of the other (*John v. George*, [1995] E.W.J. No. 4375 (QL) (C.A.), at para. 37). Mutual assent is what distinguishes the estoppel by convention from other types of estoppel (Bower, at p. 184). The courts have described communications complying with this requirement as "crossing the line". In *The "August Leonhardt"*, at pp. 34-35, Kerr L.J. held that

> [a]ll estoppels must involve some statement or conduct by the party alleged to be estopped on which the alleged representee was entitled to rely and did rely. In this sense <u>all estoppels may be regarded as requiring some manifest representation which crosses the line between representor and representee, either by [page83] statement or conduct</u>. It may be an express statement or it may be implied from conduct, e.g. a failure by the alleged representor to react to something said or done by the alleged representee so as to imply a manifestation of assent which leads to an estoppel by silence or acquiescence. Similarly, in cases of so-called estoppels by convention, there must be some mutually manifest conduct by the parties which is based on a common but mistaken assumption... .

> There cannot be any estoppel unless the alleged representor has said or done something, or failed to do something, with the result that -- across the line between the parties -- his action or inaction has produced some belief or expectation in the mind of the alleged representee, so that, depending on the circumstances, it would thereafter no longer be right to allow the alleged representor to resile by challenging the belief or expectation which he has engendered. To that extent at least, therefore, the alleged representor must be open to criticism. [Emphasis added.]

See also *The "Vistafjord"*, at p. 350. Thus, it is not enough that each of the two parties acts on an assumption not communicated to the other (*The "Indian Grace"*, at p. 10). Further, the estopped party must have, at the very least, communicated to the other that he or she is indeed sharing the other party's (*ex hypothesi*) mistaken assumption (*John*, at para. 81; Bower, at p. 184).

**63**    In the present case, the record discloses 14 letters exchanged by Ryan's counsel and the adjuster with respect to the respondent's personal injury claim (A.R., vol. II, at pp. 150-70). However, none of these prove the existence of a common assumption. The letters lack clarity and certainty. The mere fact that communications occurred between the parties does not establish that they both assumed that Moore was alive. It is unlikely the question of whether Moore was alive or dead crossed the minds of either the appellants or the respondent. The fact that Ryan's counsel had originally diarized the claim as having a two-year limitation period under the *Limitations Act* shows that he had not turned his mind to the possibility of a shorter limitation period under the *Survival of [page84] Actions Act*. Effectively, this Court is in the presence of mutual ignorance, not mutual assumption.

**64**    Ryan submits, and it was agreed by the Court of Appeal, that the subject line in the letters exchanged between his counsel and the adjuster which read "Your Insured: Rex Moore" or "Our Insured: Rex Moore" is self-explanatory and indicates an assumption by both parties, that Moore was alive. I strongly disagree. This is an unrealistic interpretation of the subject line in the letters. Such an expression can mean one thing only: the named insured under the automobile insurance policy was Rex Moore. The words are a mere identification of the file the undersigned is dealing with. The Court of Appeal erred by giving weight to the subject line of these letters, which, properly interpreted, provide no evidence of a mutual assumption that Moore was alive.

**65**    Nor did the fact that the parties were conferring without regard to the limitation period establish a shared assumption that the limitation defence would not be relied on. The letters contain limited and simple requests for details of the claim, and do not establish a convention between the parties (see *Hillingdon London Borough*, at paras. 57 and 60; *Seechurn v. ACE Insurance S.A.-N.V.*, [2002] 2 Lloyd's L.R. 390, [2002] EWCA Civ 67, at p. 396). In fact, the matter did not proceed beyond the preliminary stage of investigating the merits of the personal injury claim. There were no negotiations or settlement discussions, no admission of liability, and no agreement to forego a possible limitation defence.

**66**    Even if one could conclude that there was a mutual assumption between the parties, I am of the view that it cannot realistically be asserted that the respondent communicated to the appellants that he indeed shared the mistaken assumption. In this regard, I agree with the dissenting members of the Court of Appeal when they affirm (at para. 108):

[page85]

It is true that both parties assumed Mr. Moore was alive. That, as noted above, is not sufficient to establish estoppel by convention. Prior to Mr. Moore's death, any reference to him implying he was alive was a reflection of the truth at that time. That cannot be said to be a communication which becomes the basis of a convention that they will proceed on the assumption that Mr. Moore is alive, even beyond his death. There is no direct or circumstantial evidence which would lead to such a conclusion. The question becomes: could any agreement have arisen after Mr. Moore's death? The two letters written by the adjuster after Mr. Moore's death were in error when they said "Our insured -- Rex Moore" but there is no communication to the other party and acceptance that they are to govern their future conduct on that basis.

(ii)    Detrimental Reliance

**67**    The appellants submit that detrimental reliance is a requirement that must be proven in order to find convention estoppel. I agree. The Court of Appeal erred in finding this condition fulfilled by simple proof that a detriment would flow to the party asserting the estoppel if the other party were permitted to resile from the assumed stated facts, without a finding of reliance.

**68**    The jurisprudence and academic comments support the requirement of detrimental reliance as lying at the heart of true estoppel (see Bower, at pp. 6 and 184; *John*, at para. 86; *Hillingdon London Borough*; *The "August Leonhardt"*, at p. 35; *Litwin Construction (1973) Ltd. v. Pan* (1988), 52 D.L.R. (4th) 459 (B.C.C.A.), at pp. 469-70; *Canacemal*, at paras. 33-35; *Vancouver City Savings Credit Union v. Norenger Development (Canada) Inc.*, [2002] B.C.J. No. 1417 (QL), 2002 BCSC 934, at para. 74; *32262 B.C. Ltd. v. Companions Restaurant Inc.* (1995), 17 B.L.R. (2d) 227 (B.C.S.C.), at pp. 235-36) .

**69**    Detrimental reliance encompasses two distinct, but interrelated, concepts: reliance and detriment. The former requires a finding that the party seeking to establish the estoppel changed his or her course of conduct by acting or abstaining from acting in reliance upon the assumption, thereby altering his [page86] or her legal position. If the first step is met, the second requires a finding that, should the other party be allowed to abandon the assumption, detriment will be

suffered by the estoppel raiser because of the change from his or her assumed position (see Wilken, at p. 228; *Grundt v. Great Boulder Proprietary Gold Mines Ltd.* (1937), 59 C.L.R. 641 (Austl. H.C.), at p. 674).

**70**    Returning to the case at bar, even if one were to assume the existence of a communicated common assumption between the parties, there is no evidence that the respondent relied on this assumption. The evidence suggests that the respondent never put his mind to the shorter *Survival of Actions Act* limitation period. First, Ryan's counsel diarized the matter as a two-year limitation period. Second, the issue of estoppel by convention was raised for the first time by the Court of Appeal itself and was never discussed before the applications judge. Moreover, in the affidavit of Ryan's counsel, nowhere does he state that he believed that the adjuster intended him to act or refrain from acting in reliance on any agreement (A.R., vol. II, at pp. 137-46). From the date of the accident, November 27, 1997, to the expiry of the *Survival of Actions Act* limitation period, August 16, 1999, there was never any discussion by the respondent of the limitation period. On October 24, 2000, when Ryan's counsel indicated for the first time to Cabot Insurance's claim examiner that there might be a problem with the limitation period, he did not refer to a mutual understanding that Moore was to be treated as being alive for the purposes of Ryan's claim, nor did he raise the existence of an agreement.

**71**    It was not open to Ryan's counsel to refrain from bringing an action against Rex Gilbert Moore based solely on the limited communications between counsel. The letters relied upon were limited to the collection of medical information and documentation about Ryan's alleged injuries -- nothing more. I have already spoken about the subject line; one [page87] cannot disregard the fact that all negotiations/communications were also done on a "without prejudice" basis.

**72**    Consequently, I agree with the dissenting members of the Court of Appeal that the respondent not only did not rely on this alleged assumption, but his conduct does not show an intention to affect the legal relations between the parties. The record does not disclose that the respondent changed in any way his position on the basis of this alleged mutual assumption.

(iii)    Detriment

**73**    Once the party seeking to establish estoppel shows that he acted on a shared assumption, he must prove detriment. For the plea to succeed, it must be unjust or unfair to allow a party to resile from the common assumption (Wilken, at p. 228). It is often said that the fact that there will have been a change from the presumed legal position will facilitate the establishment of detriment: "This is because there is an element of injustice inherent within the concept of the shared assumption -- one party has acted unjustly in allowing the belief or expectation to 'cross the line' and arise in the other's mind": Wilken, at p. 228.

**74**    This final requirement of estoppel has been described as proving that it would be "unjust", "unconscionable" or "unfair" to permit a party to resile from the mutual assumption (see, e.g., Bower, at p. 181; *John*; *The "Indian Grace"*; *The "Vistafjord"*). However, it may be preferable to

refrain from using "unconscionable", in order to avoid confusion with this last concept which has developed a special meaning in relation to inequality of bargaining power in the law of contracts (where we speak of unconscionable transactions, for instance) (see *Litwin Construction*, at p. 468).

**75**     In the case at bar, given that there was no shared assumption or reliance, the detriment criterion does not need to be addressed. I would note, however, [page88] that a detriment is not established by a reduced limitation period, as suggested by the respondent. Limitation periods and prescriptions, in the diverse areas of the law, have the similar effect and impact. The *Survival of Actions Act* has provided a benefit not available at common law; this benefit cannot legitimately be characterized as unfair and unjust.

<div style="text-align:center">(2)    <u>Estoppel by Representation</u></div>

**76**     Where there is no shared assumption, as in the present case, there can be no estoppel by convention, no matter how unjust the other party's conduct may appear to be. However, in some circumstances, the party seeking to establish estoppel may be able to rely on estoppel by representation, an alternative here advocated by the respondent. The added difficulty in such a case is that an estoppel by representation cannot arise from silence unless a party is under a duty to speak. Silence or inaction will be considered a representation if a legal duty is owed by the representor to the representee to make a disclosure, or take steps, the omission of which is relied upon as creating an estoppel: see Wilken, at p. 227; Bower, at pp. 46-47.

**77**     Ryan submits that in the present case silence constituted a representation grounding estoppel because there was a duty to disclose relevant information as it would be unfair for the appellants to benefit from non-disclosure. I disagree. In the present case, there was no duty on the appellants, who were at the time only potential defendants, to advise Ryan of a limitation period, to assist him in the prosecution of the claim, or to advise him of the consequences of the death of one of the parties. There is no fiduciary or contractual relationship here (contrast with *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87). The appellants had no duty to exercise reasonable care, nor to divulge any information.

[page89]

**78**     Hence, there was no representation, no duty to speak, no intention to affect legal relations and no reliance in this case.

III.    <u>Conclusion</u>

**79**     The legislature created an exception to the common law rule by enacting the *Survival of Actions Act*. It extended the rights of the parties to permit them to continue an action against a deceased. The relevant provision modifies the common law. It is not this Court's role to interfere

with the scheme established by the legislature.

**80**    There are no reasons based on estoppel, or any other legal doctrine, to preclude Moore's estate or Cabot Insurance from relying on the *Survival of Actions Act* limitation period. Accordingly, I would allow the appeal on the issue of estoppel, affirm the decision of the Court of Appeal on the other issues, and strike the statement of claim, with costs throughout, at all levels of court.

\* \* \* \* \*

## APPENDIX

*Limitations Act*, S.N.L. 1995, c. L-16.1

**5.** [Limitation period 2 years] Following the expiration of 2 years after the date on which the right to do so arose, a person shall not bring an action

(a)    for damages in respect of injury to a person or property, including economic loss arising from the injury whether based on contract, tort or statutory duty;

...

**16.** [Confirmation] (1) A confirmation of a cause of action occurs where a person

(a)    acknowledges that cause of action, right or title of another person; or
(b)    makes a payment in respect of that cause of action, right or title of another.

[page90]

(2) Where a person against whom an action lies confirms that cause of action, the time before the date of that confirmation shall not count when determining the limitation period for a person having the benefit of the confirmation against the person bound by that confirmation.

(3) Subsection (2) applies only to a right of action where the confirmation is given before the expiration of the limitation period for that right of action.

...

(5) In order to be effective a confirmation must be in writing and signed by

(a)    the person against whom that cause of action lies; or
(b)    his or her agent

and given to the person or agent of the person having the benefit of that cause of action.

*Survival of Actions Act*, R.S.N.L. 1990, c. S-32

**2.** [Causes of action to survive] Actions and causes of action

(a)    vested in a person who has died; or
(b)    existing against a person who has died,

shall survive for the benefit of or against his or her estate.

**5.** [Limitation of action] An action shall not be brought under this Act unless proceedings are started within 6 months after letters of probate or administration of the estate of the deceased have been granted and proceedings shall not be started in an action under this Act after the expiration of 1 year after the date of death of the deceased.

**Solicitors:**

Solicitors for the appellants: Cox Hanson O'Reilly Matheson, St. John's.

Solicitors for the respondent: Curtis, Dawe, St. John's.

*Case Name:*
# St. Onge v. Willowbay Investments Inc.

**Between**
**Benoit St. Onge and Denise Dominelli, Plaintiffs, and**
**Willowbay Investments Inc., Ballantry Homes Inc. and Fox Farm**
**Developments Inc., Defendants**

[2010] O.J. No. 2480

2010 ONSC 3318

95 R.P.R. (4th) 289

2010 CarswellOnt 3905

Court File No. 374/08

Ontario Superior Court of Justice

**J.C. Murray J.**

Heard: March 15-17, 2010.
Judgment: June 8, 2010.
Released: June 11, 2010.

(50 paras.)

*Real property law -- Sale of land -- Remedies -- Specific performance -- Action by purchasers for specific performance dismissed -- Purchasers bought lot in proposed subdivision -- Prior to closing, developer conveyed small portion of lot to adjacent developer, reducing lot frontage by just over five per cent -- Transaction closed and conveyance subsequently discovered by purchasers -- Specific performance unavailable, as conveyance was discoverable had title search been conducted prior to closing -- Under doctrine of merger, purchasers accepted lot as conveyed -- Adjacent developer was bona fide purchaser without knowledge of purchasers' interest -- No discretionary vesting order available to purchasers -- Courts of Justice Act, s. 100.*

Action by the plaintiff purchasers, Onge and Dominelli, for specific performance of an agreement

of purchase and sale with the defendant, Willowbay Investments. In August 2005, the purchasers agreed to pay $430,990 to buy a lot in a proposed subdivision for the construction of a Ballantry home. The original closing date of June 2006 was extended to Mary 2007 by mutual agreement. Willowbay was a builder and developer of residential homes. It was part of the same corporate group as the defendant developer, Ballantry Homes. The other defendant, Fox Farm Developments, owned a tract of land adjacent to the Ballantry lands. One of the Fox Farm lots shared a property line with the lot bought by the purchasers. However, the Fox Farm lot was too small to develop. Consequently, Fox Farm and one of Ballantry's numbered companies agreed to a land swap conveyance whereby a small triangular portion of the purchasers' lot was transferred to Fox Farm. Severance was obtained in respect of the triangular portion and it was duly registered in the Land Registry Office. However, the purchasers' interest in the lot was not made known to Fox Farm or the Committee of Adjustment that approved the severance. The purchasers were unaware of the severance and conveyance until after closing. The principal of Ballantry testified that he too was unaware of the severance and conveyance until after closing. The purchase and sale agreement specified the approximate dimensions of the lot. The variation caused by the conveyance to Fox Farm was greater than the permissible five per cent contemplated by the agreement. The purchasers contended that the transfer to Fox Farm was void and sought specific performance of the agreement.

HELD: Action dismissed. The documentation made it clear that Ballantry had full knowledge of the severance application and conveyance to Fox Farm. Ballantry failed to notify the purchasers of the proposed arrangement, failed to obtain their prior consent, and failed to take any steps to protect their beneficial ownership interest. The lot was unique to the purchasers for aesthetic reasons. However, the purchasers agreed not to register the sale agreement against title to protect their interest from the type of transaction that occurred. The fact that the agreement contemplated variation of the lot size militated against a remedy of specific performance. In addition, the purchasers were in a position to discover the conveyance to Fox Farm had they followed the usual practice of a title search prior to closing. Fox Farm was a bona fide purchaser. It had no notice of the purchase and sale agreement and had no reason to look behind the numbered company as registered owner of the lot. Therefore, Fox Farm was not liable as an intermediate owner under the theory of deferred indefeasibility. Under the doctrine of merger, the purchasers' failure to object to the severance constituted acceptance of what was conveyed. No vesting order was available under s. 100 of the Courts of Justice Act.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act R.S.O. 1990, c. C.43, s. 100

Land Titles Act, R.S.O. 1990, c. L.5, s. 72(1)

Planning Act, R.S.O. 1990, c. P.13,

**Counsel:**

John Whitehead, counsel for the Plaintiffs.

Milton A. Davis, counsel for the Defendants Willowbay Investments Inc. and Ballantry Homes Inc.

Peter T. Henderson, counsel for the Defendant Fox Farm Developments Inc.

---

**REASONS FOR JUDGMENT**

J.C. MURRAY J.:--

<u>Overview</u>

**1**    The evidence in this case does not disclose significant factual controversy.

**2**    Benoit St. Onge and Denise Dominelli are the plaintiffs. On August 25, 2005, Benoit St. Onge and Denise Dominelli entered into an Agreement of Purchase and Sale with Willowbay Investments Inc. (hereinafter referred to as "Willowbay") in which the plaintiff purchasers agreed to purchase a "Ballantry" home to be built on property described as Lot 69 of a proposed plan of subdivision in the Town of Oakville. The consideration for the purchase of Lot 69 on which a residential home was to be constructed was $430,990, with a scheduled closing date of June 30, 2006. The scheduled closing date was eventually postponed by agreement of both parties to March 8, 2007.

**3**    The defendant Willowbay Investments Inc. is a builder and developer of residential homes. It is one of the Ballantry Group of companies, which also includes the defendant Ballantry Homes Inc., were involved in the development of a tract of land (the "Ballantry lands") in which Lot 69 was located. Other companies involved in the development of the land included Mattamy Homes (hereinafter referred to as "Mattamy") and the numbered company, 1312200 Ontario Limited. The subdivision being developed was known as "Ballantry - Upper Glen Abbey West" and the plan of subdivision was registered as plan 20 M-897. The numbered company, 1312200 Ontario Limited, is a joint venture between Ballantry and Mattamy and it owned the Ballantry lands on which Lot 69 was situate. At closing, Willowbay Investments Inc. caused the property to be transferred directly to the purchasers by 1312200 Ontario Limited. Only Willowbay Investments Inc. and Ballantry Homes Inc. are named as defendants.

**4**    The defendant, Fox Farm Developments Inc. (hereinafter referred to as "Fox Farm"), is the developer of a tract of land adjacent to the Ballantry lands. Fox Farm is unrelated to any of the Ballantry companies involved in the development of the Ballantry lands. One of the lots owned by Fox Farm is a lot that shares a property line with Lot 69 in the Ballantry development. The shared property line is on the western boundary of Lot 69, the lot purchased by the plaintiffs.

**5**    Fox Farm was unable to build a house on its lot abutting Lot 69 on the western boundary because of the dimensions of the Fox Farm lot. Put simply, the lot was too small. Fox Farm required a conveyance of a part of Lot 69 in order to end up with a lot big enough on which to build a house in accordance with municipal regulations.

**6**    Sometime prior to September 28, 2005, Fox Farm and 1312200 Ontario Limited agreed to sever small parts of various lots lying along the boundary of their respective properties and to transfer those severed parts to each other. The purpose of this agreement was to regularize the size and shape of lots in the adjacent development to maximize development potential. According to the defendants, this is a very common practice between developers of adjacent tracts of land. One of the properties affected by this land swap was Lot 69 of the Ballantry development which was subject to an existing Agreement of Purchase and Sale between the plaintiffs and Willowbay. 1312200 Ontario Limited, the registered owner of the property being developed by Ballantry, agreed to transfer to Fox Farm a triangular piece of property on the western boundary of Lot 69, having a frontage of approximately 5.77 feet.

**7**    By application, dated September 28, 2005, Fox Farm applied for severance of this section of Lot 69. The application was granted and Lot 69 was severed into two parts, Part 1 and Part 2 as shown on Plan 20R-16634. *Planning Act* consent to the conveyance of Part 1 of Lot 69 was given by the Town of Oakville Committee of Adjustment on the 6th of December, 2005. A Certificate of Consent of the Committee of Adjustment, dated May 30, 2006, was subsequently issued confirming consent to transfer the following parcel: "Part 1 of Lot 69, registered plan 20M-867, being described as Part 1, Plan 20R-16634". Part 1 was transferred from 1312200 Ontario Limited to Fox Farm by transfer registered October 4, 2006 in Land Registry Office # 20 as instrument number HR516613.

**8**    The evidence is also clear that the plaintiffs' ownership interest in Lot 69 was not made known to the Committee of Adjustment at the time of the severance application and that if the Committee had known of the Agreement of Purchase and Sale, it would have required the agreement of the plaintiffs before granting consent to the proposed severance.

**9**    It was not disputed that valuable consideration was given by Fox Farm for the transfer. It is further not disputed that with the annexation of Part 1, Lot 119 in the Fox Farm development became a buildable lot. Without Part 1, Lot 119 of the adjacent Fox Farm development was of little value to Fox Farm.

**10**    Fox Farm had no knowledge that Lot 69 was the subject of an Agreement of Purchase and Sale prior to the severance of Part 1 and its transfer to Fox Farm. Prior to its acquisition of Part 1, Fox Farm was not aware of or given any notice of the plaintiffs' interest in Lot 69.

**11**    At all times prior to the transfer of Part 1 to Fox Farm, the Parcel Register for Lot 69 (Parts 1 and 2 after the severance) indicated that 1312200 Ontario Limited was the registered owner of the property being conveyed to Fox Farm. The Agreement of Purchase and Sale between the plaintiffs and Willowbay was not registered on title.

**12**    The severance of Lot 69 into two parts and the conveyance of Part 1 to the neighbouring developer, Fox Farm Developments Inc., occurred without the knowledge or consent of the plaintiff purchasers.

**13**    The plaintiffs closed their purchase on April 5, 2007. On closing the vendor transferred to them only Part 2 of Lot 69, Plan 20R-16634. At the time of closing, the Parcel Register showed the prior registration of plan 20R-16634, the creation of a new PIN number on October 19, 2006 and the transfer of Part 1 from 1312200 Ontario Limited to Fox Farm by transfer registered October 4, 2006 as instrument number HR516613. Before closing, the plaintiffs were not aware of the earlier severance and registration of the transfer of Part 1 to Fox Farm. The plaintiffs closed the transaction thinking that they were buying all of Lot 69 in accordance with the Agreement of Purchase and Sale. The plaintiffs testified that their real estate lawyer did not advise them before closing that only Part 2 of Lot 69 would be transferred. The lawyer who acted for the plaintiffs on closing did not testify.

**14**    The plaintiffs did not raise the issue of the transfer of Part 1 Fox Farm for several months after closing although they did raise the issue as soon as they were told that they had only purchased part 2 of Lot 69 and that a small triangular portion of the original Lot 69 was not transferred to them.

**15**    Mr. David Hill gave evidence on behalf of Ballantry Homes Inc. He is the chief executive officer of that company. His evidence was that Ballantry Homes was unaware of the severance of Lot 69 and of the conveyance of Part 1 to Fox Farm. Mr. Hill's evidence was that Ballantry Homes first learned about the severance of Lot 69 and the conveyance of Part 1 only after the closing by the plaintiffs and he expressed great sympathy for their plight and regret that he was unable to do anything to help them. It may well be that Mr. Hill did not know about the transfer of Part 1 of Lot 69 before it occurred. However, Mr. Hill's evidence that representatives of Ballantry Homes Inc. were unaware of the proposed severance and the conveyance of Part 1 is not credible. The documentary evidence establishes that Ballantry Homes Inc. and its lawyers were intimately involved with the activities of 1312200 Ontario Limited, which, as noted above, is a joint venture between Ballantry and Mattamy and was the registered owner of the Ballantry lands on which Lot 69 was situate. The documentary evidence makes it clear that Ballantry Homes Inc. was fully knowledgeable with respect to the severance application and the subsequent conveyance of Part 1 to Fox Farm. The evidence is also clear that the representatives of Ballantry Homes Inc. failed to notify the plaintiffs of the proposed severance and transfer, made no effort to obtain the plaintiffs' consent and failed to take any action to protect the plaintiffs' ownership interest in Lot 69.

**The Agreement of Purchase and Sale between Benoit St. Onge and Denise Dominelli and Willowbay Investment Inc.**

**16**    The Agreement of Purchase and Sale includes a number of schedules which are appended to the agreement and form part of the agreement.

**17**    The following provisions of the Agreement of Purchase and Sale are relevant to the

disposition of this case:

1)     In the Agreement, the dimensions of the lot are not stated as exact but are described as follows:

"*Approximate Frontage: 15.76 meters; Approximate Depth: 25 meters (irregular).*"

2)     Schedule "X", paragraph 2(g), contains the following:

*Prior to closing, the purchaser covenants not to register this agreement or any other document on title.*

3)     Schedule "X", paragraph 2(m) is as follows:

*The Purchaser acknowledges that the real property dimensions and the square footage of the dwelling unit are approximate only. In the event the frontage, depth or area of the real property and/or the square footage of the dwelling unit and/or the dimensions or square footage of any room or area in the dwelling unit are varied by up to and including five (5%) percent, from those specified in this Agreement or the sales brochure, or any or all of the foregoing, the Purchaser agrees to accept all such variations without notice and without claim for compensation or abatement in the purchase price and this Agreement shall be read with all amendments required thereby. If any such variation exceeds five (5%) percent, the vendor may, at its sole option, terminate this Agreement and the Purchaser shall be entitled to a refund of the deposit money only without interest, and the Vendor, Vendor's Agent and Purchaser shall be relieved of all further obligations and liabilities.*

**18**     The evidence established that Part 1 comprises less than 5% of the total area of the combined Parts 1 and 2 and is a narrow triangle of land on the western boundary of Lot 69. On the other hand, the transfer of Part 1 to Fox Farm reduced the frontage conveyed to the plaintiffs from 15.71 meters (or 51.54 feet) to 13.72 meters (or 45 feet) - a reduction of more than 5% of the frontage of the original Lot 69. In other words, the reduction of the frontage by more than 5% as described in the Agreement was greater than the variation that the purchasers had agreed to accept and amounts to a breach of contract.

**The following is the chronology of events:**

1) On August 25, 2005 an Agreement of Purchase and Sale was signed between Benoit St. Onge and Denise Dominelli, and Willowbay Inc., wherein the plaintiffs agreed to buy Lot 69 in the Ballantry subdivision registered as subdivision plan 20M-897 in Land Registry Office # 20;

2) On September 28, 2005 a application for severance of Lot 69 was received by Building Services Department, Oakville;

3) On December 6, 2005 consent was given by the Committee of Adjustment to convey part of Lot 69, designated as Part 1on plan 20R-16634.

4) On March 31, 2006 plan 20 R-16634 was received and deposited by Assistant Deputy Registrar for the Land Titles Division of Halton;

5) On May 30, 2006 a certificate of consent was issued;

6) On October 4, 2006 part of Lot 69 plan 20M897 and designated as Part 1on plan 20 R-16634 was transferred from 1312200 Ontario Limited to Fox Farm Development Inc.;

7) On April 5, 2007 the plaintiffs closed on their purchase and the vendor conveyed Part 2 of Lot 69, plan 20M897;

8) On January 18, 2008 a statement of claim was issued by the plaintiffs;

9) On January 23, 2008 a certificate of pending litigation was issued indicating that the plaintiffs claimed ownership of Part 1 of Lot 69.

**The Dispute and the Relief Requested**

**19**   The issue in this case is whether the plaintiffs, Benoit St. Onge and Denise Dominelli, have a right to secure ownership of a strip of land on the western boundary of Lot 69, Plan 20M897, in the Town of Oakville, Ontario known as Part 1 of Registered Plan 20R-16634.

**20**   The plaintiffs ask this Court to make an order of specific performance requiring the conveyance of Part 1 of Lot 69 from the defendant Fox Farm to them.

**21**   The plaintiffs have made it clear throughout that they are not interested in compensation or in an abatement of the purchase price.

**Analysis**

*"In considering the remedies of a purchaser, it must be stressed at the outset that the position is very different after closing than it was before closing."*

Howland C.J.O. in *Di Cenzo Construction Co. v. Glassco*, (1978), 21 O.R. (2d) 186

**22**    I start with the observation that, at common law, after the plaintiffs entered into an Agreement of Purchase and Sale with Willowbay, they became the beneficial owners of the property known as Lot 69, Subdivision Plan 20M-897. In material respects, the beneficial owner of property is the real owner of property even though it is in the name of another. See: *MacKeen Estate v. Nova Scotia* (1978), 89 D.L.R. (3d) 426 at para. 22, where the Nova Scotia Court of Appeal stated as follows:

> A person is "beneficially entitled" to property if he is the real or beneficial owner of it, even though it is in someone else's name as nominal owner. The nominal owner of the property, whether of real property, choses in action or other personal property, has legal title to it. The real owner, the person "beneficially entitled" to it, can require the nominal owner to let him use or have possession of the property, or to give him the income from it, or otherwise to let him have the benefit and enjoyment of it. He usually can require the nominal owner to convert the property into another form or to transfer the legal title to some other nominal owner. Above all, he is able, unless restricted by the terms of a specific trust, to call on the nominal owner to convey the property to him and to transfer its legal title to him, the real owner. If he does so, he will then fully acquire the property by achieving full ownership and will cease to be merely beneficially entitled to it.

**23**    The purchasers wanted to purchase a lot of a certain width to provide more space between their property and the neighbouring property and for other valid aesthetic reasons relating to the design of their house. For the purpose of this judgment, I conclude that Part 1 of Lot 69 was unique to the purchasers for purposes of deciding the appropriateness of an order of specific performance and that an award of damages (assuming that damages were available) would not have put the plaintiffs in the position they would have been in but for the breach. See: *Erie Sand and Gravel Limited v. Tri-B Acres Inc.*, 2009 ONCA 709.

**Was Fox Farm Developments Inc. entitled to rely on the land Registry in order to take valid title of Part 1 of Lot 69 from 1312200 Ontario Limited ?**

**24**    At the heart of the plaintiffs' action in this case is their assertion that Fox Farm could not acquire Part 1 of Lot 69 from 1312200 Ontario Limited because only the true owner of land could grant an interest in the land. The plaintiffs assert they were the true owners of the land by reason of the Agreement of Purchase and Sale. It follows, the plaintiffs say, that the transfer of Part 1 of Lot 69 by 1312200 Ontario Limited to Fox Farm is void. Reliance in this regard is placed on the common law as articulated above in *MacKeen Estate v. Nova Scotia* and on the Ontario Court of Appeal decision in *Lawrence v. Maple Trust Company and Thomas Wright*, (2007), 84 O.R. (3rd) 94. The plaintiffs assert that Fox Farm could not take valid title from 1312200 Ontario Limited and is not in a position to defeat the plaintiffs' claim to ownership of the Part 1of Registered Plan 20R-16634. In short, the plaintiffs say that the common law abrogates the right of Fox Farm Developments Inc. to rely on the register which showed the registered owner was 1312200 Ontario Limited.

**25**    In the *Lawrence* case, the Court of Appeal explained why the doctrine of deferred indefeasibility is preferable to that of immediate indefeasibility under *The Land Titles Act*, R.S.O. 1990, c. L.5 and held that an intermediate owner could not obtain good title from a fraudster because the intermediate owner had the opportunity to avoid the fraud. While it is clear from *Lawrence v. Maple Trust Company and Thomas Wright* that the *Land Titles Act* is to be interpreted in accordance with the theory of deferred indefeasibility, it is also clear that interests in property that are acquired in good faith from a registered owner are protected. In the case at bar, 1312200 Ontario Limited was the registered owner of Lot 69 which had entered into an agreement to sell the property to the plaintiffs. Therefore, even though at common law 1312200 Ontario Limited could convey no better title than it had, it had not obtained its title by fraud and was the registered owner of the property.

**26**    The position of the real owner in *Lawrence* can be contrasted to that of the plaintiffs in this case. In *Lawrence v. Maple Trust Company and Thomas Wright,* the real owner of the property had no knowledge of a subsequent fraudulent transaction in which her property was purportedly sold to another. Importantly, the real owner of the property in *Lawrence* had no ability to discover the fraud. In the case at bar, although the severance of Lot 69 took place after the execution of the Agreement of Purchase and Sale, and without the plaintiffs' knowledge or consent, the severance and the conveyance of Part 1 of Lot 69 to Fox Farm Developments Inc. were registered on title prior to the plaintiffs closing their transaction. The plaintiffs were in a position to discover that Part 1 of Lot 69 had been conveyed to Fox Farm. If the plaintiffs had followed the usual conveyancing practice of searching the title prior to closing, they would have been made aware of the severance of Lot 69 into 2 parts and the conveyance of Part 1 to Fox Farm. In any event, because of the registration, the plaintiffs are deemed to have knowledge of the severance and the conveyance of Part 1 of Lot 69 to Fox Farm prior to closing. To put the matter another way, the plaintiffs, being deemed to be fully informed, elected to purchase Part 2 of Lot 69 knowing that Part 1 had been conveyed to a third party. Prior to closing, the plaintiffs were in a position to take steps to secure the conveyance to them of all of Lot 69. For example, the plaintiffs would have been in a position to attack the decision of the Committee of Adjustment on the basis that it was made without notice to them and without any disclosure of the plaintiffs' unregistered ownership interest in Lot 69.

**27**    1312200 Ontario Limited was the registered owner of lot 69 in the subdivision registered as subdivision plan 20 M-897 and did not obtain its title by fraud and could convey good title to Part 1of Lot 69 to Fox Farm. The position of 1312200 Ontario Limited therefore was very different from that of the fraudster in *Lawrence v. Maple Trust Company and Thomas Wright* who obtained title by fraud, was not the registered owner and was not in a position to deliver valid title to an intermediate owner.

**28**    Fox Farm had no notice of the Agreement of Purchase and Sale between Willowbay and the plaintiffs. Fox Farm Developments Inc. had no reason to believe that 1312200 Ontario Limited, the registered owner, was not the common law owner of Lot 69. Fox Farm was responsible for the registration of plan 20 R-16634 and for the registration of the transfer of Part 1 of plan 20 R-16634

from 1312200 Ontario Limited to Fox Farm Development Inc. Being responsible for the registration of the severance and the transfer of Part 1, Fox Farm knew that no agreement of purchase and sale had been registered on title. As a practical matter, Fox Farm would also have known that if there happened to be a purchaser of Lot 69 who had not registered an Agreement of Purchase and Sale, the purchaser, by conducting a title search prior to closing, would be informed that Part 1 of Lot 69 had been severed from Lot 69 and conveyed to Fox Farm. In the circumstances of this case, it is not reasonable to impose on Fox Farm Developments Inc. any obligation to look behind the registered owner of Lot 69 as recorded in Land Registry Office #20. I conclude that Fox Farm Developments Inc. is not an intermediate owner as the phrase is used in the theory of deferred indefeasibility as explained in *Lawrence v. Maple Trust Company and Thomas Wright*. Fox Farm Developments Inc. was a *bona fide* purchaser for value without notice and was entitled to rely on the register when it purchased Part 1 of Lot 69.

**29**    This conclusion is consistent with the provisions of s. 72(1) of the *Land Titles Act,* which provides as follows:

> No person, other than the parties thereto, shall be deemed to have any notice of the contents of any instruments, other than those mentioned in the existing register of title of the parcel of land or that have been duly entered in the records of the office kept for the entry of instruments received or are in course of entry.

## The Agreement of Purchase and Sale

**30**    I am also of the opinion that the plaintiffs cannot succeed in their claim for specific performance because of the provisions of their Agreement of Purchase and Sale. While the Agreement establishes their common law ownership of the property, other provisions of the Agreement operate against their ownership interest being enforced by an order of specific performance - at least in the circumstances of this case.

**31**    As outlined above, the terms of the Agreement of Purchase and Sale precluded registration of the Agreement. The plaintiffs, by agreeing not to register the Agreement of Purchase and Sale, left themselves vulnerable to the very sort of transaction to which they now object. Registration of their Agreement would have protected the plaintiffs against the sale of Part 1 of Lot 69 by 1312200 Ontario Limited to Fox Farm. This too distinguishes the plaintiffs from the plaintiff in *Lawrence v. Maple Trust Company and Thomas Wright.*

**32**    The Agreement of Purchase and Sale contains other provisions which create further difficulties for the plaintiffs. In the Agreement, the plaintiffs agreed that the dimensions of the lot being purchased were approximate. They also agreed to the provisions of Schedule "X" which, *inter alia*, deal with the possible variation of the size of the property from that identified in the agreement of purchase and sale. The Schedule also stipulates a remedy for the vendor in the event of a variation of more than 5% as follows: "*If any such variation exceeds five (5%) percent, the vendor may, at its sole option, terminate this Agreement and the Purchaser shall be entitled to a refund of*

*the deposit money only without interest, and the Vendor, Vendor's Agent and Purchaser shall be relieved of all further obligations and liabilities."*

**33**    In my opinion, the contractual provisions relating to possible variation of the size of the lot being purchased work against and are inconsistent with the claim of the plaintiffs for specific performance - quite apart from the operation of *The Land Titles Act* - by specifying the rights of the parties where the size of the parcel to be transferred on closing is less than specified in the Agreement of Purchase and Sale. Where the variation is less than 5%, the purchaser is required to accept such variation. Where the variation exceeds 5%, the parties agree that the vendor may terminate the contract. Consider a dispute (like the one at bar) where, before closing, a purchaser is faced with a variation which exceeds 5% and insists that the vendor convey the parcel initially described in the agreement of purchase and sale. Assume further that the vendor is not in a position to comply with the purchasers demand to convey all or substantially all of the property described in the agreement of purchase and sale. In such circumstances, the vendor is in a position to rely on its contractual right to terminate the agreement of purchase and sale and to refund the deposit of the purchaser without any further obligation to the purchaser. I am of the opinion that this contractual provision which specifies the right of the vendor to terminate the contract is inconsistent with the plaintiffs' claim for specific performance.

## The Doctrine of Merger

**34**    The doctrine of merger provides that "upon completion of an agreement for the sale of land, the agreement and the parties' rights thereunder are merged in the deed so that thereafter the parties can no longer rely on the terms of the contract, but must look to the deed for any remedy." See Anne Warner La Forest, *Anger & Honsberger: Law of Real Property*, 3rd ed., (looseleaf ) (Canada Law Book, 2009) at 23-88.

**35**    Prior to the 1979 Supreme Court case *Fraser-Reid v. Droumtsekas*, [1980] 1 S.C.R. 720, courts presumed that the doctrine was operative, absent fraud or a substantial error, such as a total failure of consideration or a considerable mistake as to the quality or quantity of land conveyed, which would warrant setting the contract aside. In *Fraser-Reid*, Justice Dickson at p. 738 held that "[t]here is no presumption of merger," particularly for independent covenants or collateral stipulations that the parties intend should survive closing. Dickson J. stated at pp. 734-5:

> ... a deed of conveyance is a mere transfer of title, and it is not to be supposed that the whole contract between the parties is incorporated in the deed. Many provisions found in a contract of sale are not repeated in the deed; for example, an obligation to construct or finish a house in the future, or to install fixtures, or to make improvements or repairs. Where the sale agreement creates rights or imposes obligations or stipulations collateral to, or independent of, the conveyance, the question of whether those stipulations are extinguished by merger is to be treated as one of intention ... In the absence of evidence on the

point, there is no presumption that the purchaser intended to surrender or
abandon the rights acquired by him under the sale agreement.

"The proper inquiry" according to Dickson J. at p.738, "should be to determine
whether the facts disclose a common intention to merge the warranty in the
deed." In short, a covenant will survive closing when the parties mutually intend
it should do so. Further, courts will not presume merger unless it is clear that the
parties mutually intended that "conveyance should be taken as performance or
satisfaction of the warranty in the sale agreement."

**36**    In this case, I find that the doctrine of merger applies for the reasons hereinafter set out and is
a further reason why the plaintiffs' action must fail. The conveyance to the purchasers of Part 1 of
Lot 69 is not an obligation collateral to the conveyance of Part 2 of Lot 69 that both parties
contemplated would survive closing.

**37**    Even in the case of warranties capable of surviving closing, where the vendor's
non-compliance with a warranty is readily discoverable by the purchaser prior to closing, the
purchaser's failure to object will permit a court to credit the purchaser with an intention to
extinguish or merge a warranty where the deed is executed without objection. See the O.C.A.
decision in *Richview Construction Co. Ltd. v. Raspa* (1975), 11 O.R. (2d) 377. In *Richview* the
purchaser discovered, after closing, that the lot was not fully serviced as warranted. The Court of
Appeal held that the purchaser's failure to make inquiries into whether the lot was serviced was fatal
and that the parties had not expressly agreed that this warranty would survive closing. Arnup J.A.
explained at paras. 33-35 as follows:

[The purchaser's] solicitor, or Mr. Grella himself, could have ascertained the true
facts by a routine inquiry to the Borough engineering department (which Mr.
Grella eventually made). On ascertaining the facts, prior to closing, the purchaser
could then have said to the vendor: "Make good your warranty to me, or give me
an undertaking to do so, else I will refuse to close."

I cannot find, on these facts, circumstances compelling us to find a presumed
intention of the parties -- which I think must be an intention of both parties -- that
anything further was to be done by the vendor after closing. The purchaser could
have protected itself by searches which careful conveyancing required, or by
express wording in the deed, or by a warranty or undertaking clearly expressed as
surviving the closing. It did none of these things.

With some regret, I conclude that in the absence of fraud by the vendor, the
purchaser had no rights after its purchase was closed.

**38**    In *Di Cenzo Construction Co. v. Glassco* (1978) 21 O.R. (2d) 186 the purchaser received eight percent less than the total acreage described in the agreement of purchase and sale owing to an undisclosed road allowance. The Court emphasized (see para. 34) that the onus was on the purchaser to "investigate fully the title to the road allowance ... and to submit requisitions on title." Howland C.J.O. stated in para. 33 as follows:

> In considering the remedies of a purchaser, it must be stressed at the outset that the position is very different after closing than it was before closing. Prior to closing the vendor who does not have a good title to part of the lands being sold may be entitled to rely on a contractual provision to rescind the contract rather than be required to accept an abatement. If he does not exercise this right, he may be required to accept an abatement in the purchase price. After the closing of the transaction, a purchaser is generally restricted to the covenants, conditions and warranties set forth in the conveyance. Apart from the conveyance, relief can only be obtained in the case of (1) fraud, (2) a mutual mistake resulting in a total failure of consideration or a deficiency in the land conveyed amounting to error in substantialibus, (3) a contractual condition, or (4) a warranty collateral to the contract which survives the closing: Di Castri, *Law of Vendor and Purchaser,* 2nd ed. (1976), at pp. 559-61; *Redican v. Nesbitt*, [1924] S.C.R. 135 at pp. 146-7, [1924] 1 D.L.R. 536 at pp. 543-4, [1924] 1 W.W.R. 305; *Dalladas v. Tennikat*, [1958] O.J. No. 491, [1958] O.W.N. 169. Apart from these exceptional cases caveat emptor applies. Finality and certainty in business requires that this be the case. The acceptance of the conveyance marks the transition from an executory to an executed contract. There would appear to be no distinction between a case where the purchase price is paid in full, and where a mortgage is given back for part of the purchase price.

**39**    In the case at bar, the vendor's severance of a portion of the lot was readily discoverable by the plaintiffs before closing. Reference to either the survey or to the parcel register would have disclosed the severance. I note in passing that the closing documents, including the statement of adjustments, referred to the transfer of Part 2 of Lot 69.

**40**    In the case at bar, the purchasers' failure to object to the severance prior to closing amounts to acceptance of what was conveyed - that being Part 2 of Lot 69 - and the purchasers' remedies are restricted to the deed.

**Are the plaintiffs entitled to a vesting order pursuant to s. 100 of the Courts of Justice Act R.S.O. 1990, c. C.43 ("CJA")?**

**41**    The Court's jurisdiction to grant a vesting order is contained in s. 100 of the *Courts of Justice Act*:

> 100.    A court may by order vest in any person an interest in real or personal property

that the court has authority to order be disposed of, encumbered or conveyed.

**42**    Such orders, according to the Court of Appeal, "are equitable in origin and discretionary in nature". See *Chippewas of Sarnia Band v. Canada (A.G.)* (2001), 51 O.R. (3d) 641 (C.A.) at para. 281.

**43**    Vesting orders may be granted where a separate, valid claim to ownership is made out. The Court of Appeal has held that s. 100 of the *CJA* gives the Court the discretionary power to make a vesting order "whenever it might have ordered a conveyance to be executed." See *Chippewas of Sarnia, supra,* at para. 281. The circumstances in which a vesting order may be granted were outlined by the Ontario Court of Appeal in *Trick v. Trick* (2006), 81 O.R. (3d) 241. In *Trick*, the Court of Appeal held that s. 100 of the *CJA* does not provide stand-alone jurisdiction to grant the relief claimed; rather, s. 100 simply provides "a mechanism to vest title to a property" where "a separate, valid claim to ownership" is made out by the applicant. As Lang J.A. explained for the Court in *Trick*, this approach is consistent with the plain meaning of s. 100 of the CJA. Lang J.A. stated at para. 19 as follows:

> The starting point referenced by the motion judge is s. 100 of the CJA, which provides a court with jurisdiction to vest property in a person but only if the court also possesses the "authority to order [that the property] be disposed of, encumbered or conveyed." Thus, s. 100 only provides a mechanism to give the applicant the ownership or possession of property to which he or she is otherwise entitled; it does not provide a free standing right to property simply because the court considers that result equitable.

**44**    In order to obtain a vesting order, the applicant must first satisfy the Court that it has a separate valid claim to ownership. As the Court of Appeal stated in *Trick* at para. 20: "... the question is whether, at law or in equity, the motion judge had that necessary authority to dispose of, encumber or convey the appellant's interest" in the land. For reasons given above, I have concluded that the plaintiffs do not have a separate valid claim to ownership and are not entitled to the ownership or possession of Part 1 of Lot 69.

**45**    Further, according to *Trick* (see para. 56), an applicant will not be entitled to equitable relief under s. 100 of the *CJA* where the relief sought runs "directly counter to a prescribed legislative scheme". To grant the plaintiffs relief pursuant to s. 100 of the *CJA* would run counter to the *Land Titles Act,* the purpose of which is to provide the public with security of title and facility of transfer. As stated by Epstein J., as she then was, in *Durrani v. Augier* (2000), 50 O.R. (3rd) 353 at paras. 40-42, the notion of title registration establishes title by setting up a register and guaranteeing that a person named as the owner had the perfect title, subject only to registered encumbrances and enumerated statutory exceptions.

**46**    In conclusion, a vesting order is a discretionary order that may properly be issued where a party can establish a separate, valid claim to possession or ownership by virtue of statute, common

law, or equity. The plaintiffs opted to close and before closing had effective notice of the prior severance of Lot 69 into 2 parts and of the conveyance of Part 1 of Lot 69 to Fox Farm. In the circumstances of this case, the plaintiffs do not have a statutory or common law remedy available to them which permits this Court to recognize their ownership interest in Part 1 of Lot 69.

**47**    The plaintiffs cannot rely on s. 100 of the *CJA* to obtain a vesting order.

### Conclusion

**48**    The plaintiffs' action for specific performance is dismissed. Concomitantly, the Certificate of Pending Litigation registered against part of Lot 69, Plan 20M97, and designated as Part 1, Reference Plan 20-OR-16634 is vacated.

### Costs

**49**    The defendants shall make brief written submissions on costs within 3 weeks from the date of this judgment. The plaintiffs shall have 3 weeks after receipt of the defendants' costs submissions in which to make brief written submissions in reply.

**50**    The costs, if any, to be awarded as a result of the motion by the defendant Fox Farm on August 7, 2008 in which it unsuccessfully sought an order vacating the certificate of pending litigation is an issue that remains outstanding. That costs decision was deferred by me until after trial. The parties are now invited to make supplementary submissions on this issue as well keeping in mind that written submissions have already been made and I do not invite duplication of submissions on this point.

J.C. MURRAY J.

*Case Name:*
# Salah v. Timothy's Coffees of the World Inc.


**Between**
**Abdulhamid Salah and 1470256 Ontario Inc., Plaintiffs**
**(Respondents), and**
**Timothy's Coffees of the World Inc., Defendant (Appellant)**

[2010] O.J. No. 4336

2010 ONCA 673

268 O.A.C. 279

74 B.L.R. (4th) 161

2010 CarswellOnt 7643

Docket: C51317


Ontario Court of Appeal
Toronto, Ontario

**W.K. Winkler C.J.O., M. Rosenberg J.A. and R.W.M. Pitt J. (ad**
**hoc)**

Heard: September 16, 2010.
Judgment: October 14, 2010.

(33 paras.)

*Commercial law -- Franchising -- Franchise agreement -- Renewal -- Termination -- Appeal by franchisor from decision finding it breached franchise agreement dismissed -- Parties entered into franchise agreement with respect to mall location -- Franchisor was lessee under head lease with mall and prior to expiry of lease, it negotiated lease for new location, entered into new franchise agreement with new franchisee and informed respondents that franchise agreement expired when lease expired -- Trial judge made no error in finding that franchisor breached franchise agreement and duty of good faith, or in assessment of damages at $230,358 for future loss of income and $50,000 for breach of duty of good faith and mental distress.*

*Contracts -- Remedies -- Damages -- Appeal by franchisor from decision finding it breached franchise agreement dismissed -- Parties entered into franchise agreement with respect to mall location -- Franchisor was lessee under head lease with mall and prior to expiry of lease, it negotiated lease for new location, entered into new franchise agreement with new franchisee and informed respondents that franchise agreement expired when lease expired -- Trial judge made no error in finding that franchisor breached franchise agreement and duty of good faith, or in assessment of damages at $230,358 for future loss of income and $50,000 for breach of duty of good faith and mental distress.*

*Damages -- In contract -- Breach of contract -- Type of contract -- Franchise -- Appeal by franchisor from decision finding it breached franchise agreement dismissed -- Parties entered into franchise agreement with respect to mall location -- Franchisor was lessee under head lease with mall and prior to expiry of lease, it negotiated lease for new location, entered into new franchise agreement with new franchisee and informed respondents that franchise agreement expired when lease expired -- Trial judge made no error in finding that franchisor breached franchise agreement and duty of good faith, or in assessment of damages at $230,358 for future loss of income and $50,000 for breach of duty of good faith and mental distress.*

Appeal by the franchisor from a finding that it breached a franchise agreement with the respondents. In the fall of 2001, the individual respondent entered into a franchise agreement with the appellant to operate a franchise store in a mall in Ottawa. The appellant was a lessee under a head lease for a location on the third floor of the mall, and when the respondent entered into the franchise agreement, he became a sublessee under the head lease. There were only four remaining years on the head lease and the term of the franchise agreement was tied to the head lease. As the respondent was concerned about the short length of the lease, the parties included a schedule to the franchise agreement that provided that in the event the appellant entered a new head lease with the mall, the franchise agreement would be renewed with a new sublease. Concurrent with executing the franchise agreement, the individual respondent also executed an assignment, assigning the franchise agreement, the sublease and the general security agreement to his newly incorporated numbered company. Prior to the expiry of the head lease, the appellant entered into a new lease for a location on the second floor of the mall and signed a new agreement with a new franchisee for that location. The respondents were then advised that their franchise agreement would end on the day the lease expired. The trial judge found that both the individual respondent and the numbered company were franchisees of the appellant, that the schedule to the agreement was not related to the entire mall and was not limited to the existing third floor location and that the appellant breached the franchise agreement and breached a duty of good faith contrary to the Arthur Wishart Act. The trial judge awarded damages in the amount of $230,358 for future loss of income flowing from the appellant's breach of contract and an additional $50,000 for the breach of the duty of good faith and mental distress. The franchisor sought to appeal the judgment on the basis that the trial judge erred in failing to distinguish between the individual respondent and the numbered company, in her interpretation of the schedule to the agreement, in her finding that the franchisor owed a duty of

care and breached it, and in her assessment and award of damages.

HELD: Appeal dismissed. There was ample evidence to support the trial judge's finding that the appellant maintained a relationship with both the individual franchisee and its assignee corporation. The trial judge engaged in an analysis of the contractual rights between the parties, considered all of the relevant documents, and there was no error in the approach she adopted. On the facts found by the trial judge, there was no doubt that the conduct at issue fell squarely within the performance or enforcement of the franchise agreement and that the appellant breached the duty of good faith it owed to the franchisee under the Arthur Wishart Act. Finally, there was no basis to interfere with the trial judge's assessment of damages.

**Statutes, Regulations and Rules Cited:**

Arthur Wishart Act (Franchise Disclosure), 2000, S.O. 2000, c. 3, s. 3, s. 3(1), s. 3(2)

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 123(4), s. 123(7)

**Appeal From:**

On appeal from the judgment of Justice Monique Métivier[1] of the Superior Court of Justice dated October 26, 2009, with amended reasons dated January 21, 2010, and reported at (2010), 65 B.L.R. (4th) 235.

**Counsel:**

Alan J. Lenczner, Q.C., and Jaan E. Lilles, for the Appellant.

Stephen S. Appotive, for the Respondents.

_____

The judgment of the Court was delivered by

**1**    W.K. WINKLER C.J.O.:-- Timothy's Coffees of the World Inc. ("Timothy's") appeals a decision of the Superior Court of Justice finding that it breached a franchise agreement with the respondents. The trial judge found that the franchise agreement provided the respondents with a conditional right of renewal and that the appellant denied them this right. She awarded damages for breach of contract, breach of the duty of good faith and mental distress. I agree with the trial judge's reasons and find no error in her decision. I would dismiss the appeal. My reasons follow.

**BACKGROUND**

**2**    In the fall of 2001, the respondent Abdulhamid Salah ("Mr. Salah") entered into a franchise agreement with Timothy's to operate a franchise store in the Bayshore Shopping Centre in Ottawa. Timothy's was a lessee under a head lease for a location on the third floor in the shopping centre. When Mr. Salah entered into the franchise agreement, he became a sublessee under the head lease. There were only four years remaining on the head lease, which was set to expire on September 30, 2005. The term of the franchise agreement was tied to the length of the head lease.

**3**    Mr. Salah was concerned about the short term of the lease and the franchise agreement, given the amount of his investment in purchasing the franchise and setting up operations. In response to Mr. Salah's concerns about the term, Timothy's proposed the inclusion of Schedule "A" in the franchise agreement. Schedule "A" provided that in the event that Timothy's entered into a new head lease with the Bayshore Shopping Centre, Mr. Salah's franchise agreement would be renewed with a new sublease. In the event that the new head lease was to be for a period of less than five years, there would be no additional franchise fee payable by Mr. Salah. If the new head lease was for a period of more than five years, Mr. Salah would be required to pay an amount equal to 50% of the then current franchise fee.

**4**    Concurrent with the execution of the franchise agreement, Mr. Salah assigned the agreement, the sublease, and the general security agreement to his newly incorporated company 1470256 Ontario Inc. ("147") by way of an Assignment and Guarantee. This was permitted by Timothy's, but with the condition expressed in the Assignment and Guarantee that Mr. Salah remained personally liable for all franchisee obligations under the franchise agreement.

**5**    Prior to September 30, 2005, the expiry date of the head lease on the third floor, Timothy's entered into a new lease on the second floor and signed an agreement with a new franchisee for that location. The appellant then advised Mr. Salah that his franchise agreement would come to an end on September 30, 2005. Mr. Salah and 147 commenced proceedings against Timothy's alleging breach of the franchise agreement and seeking damages arising both from the breach and from the appellant's conduct.

**6**    At trial, Timothy's argued that the respondents had no right of renewal and that the parties had intended the franchise agreement to end with the expiry of the head lease on September 30, 2005. It submitted that any right of renewal provided by Schedule "A" only concerned the original location on the third floor of the shopping centre. Since the appellant could not renew its head lease on the third floor, the provisions of Schedule "A" were inoperative. Timothy's also argued that because Mr. Salah had assigned his franchisee rights to 147, only that corporation could bring a claim against the franchisor.

## DECISION OF THE TRIAL JUDGE

**7**    The trial judge, in a clear and carefully reasoned decision, held as follows:

>        1.    that both Mr. Salah and 147 were franchisees of Timothy's and could be

2.    treated as one entity for the purpose of enforcing rights or seeking remedies;

2.    the proper interpretation of Schedule "A" is that it related to the Bayshore Shopping Centre in general and was not limited to the existing third floor location;

3.    Timothy's breached the franchise agreement by failing to observe the terms of Schedule "A" with respect to the new head lease on the second floor of the Bayshore Shopping Centre;

4.    Timothy's breached a duty of good faith, contrary to s. 3 of the *Arthur Wishart Act (Franchise Disclosure), 2000*, S.O. 2000, c. 3 ("*Wishart Act*"); and

5.    the breach of the duty of good faith was an independent actionable wrong.

**8**    The trial judge awarded Mr. Salah damages in the amount of $230,358 for future loss of income flowing from the appellant's breach of contract, and an additional $50,000 for breach of the duty of good faith and mental distress.

## ISSUES ON APPEAL

**9**    Timothy's submits that the trial judge erred in:

i.    failing to distinguish between Mr. Salah and 147;

ii.    interpreting Schedule "A" as providing an option to amend the franchise agreement;

iii.    finding that Timothy's owed a duty of good faith and that Timothy's breached it;

iv.    assessing damages for breach of contract at $230,358 and awarding $50,000 for breach of the duty of good faith and mental distress;

v.    awarding damages to Mr. Salah for breach of contract when these damages were pleaded only by 147.

## ANALYSIS

### i. Treating Mr. Salah and 147 as one entity

**10**    The appellant argues that the trial judge erred in failing to distinguish Mr. Salah from his corporation, 147. Since a corporation is a distinct entity from its owner, and since Mr. Salah assigned the franchise agreement to 147, the appellant submits that only the corporate franchisee could assert contractual rights against the franchisor.

**11**    I cannot accede to that submission. There was ample evidence to support the trial judge's finding that the appellant "maintained a relationship with both the individual franchisee and its assignee corporation. It never intended to accept the corporation in the place of Mr. Salah for all purposes." While the franchisor allowed Mr. Salah to assign the franchise agreement to 147, one of

the main purposes of the Assignment and Guarantee was to ensure that all obligations under the franchise agreement continued to be those of Mr. Salah personally. In addition, as noted by the trial judge, the concluding words of s. 4 of the Assignment and Guarantee state as follows:

> Furthermore and without restricting the generality of the foregoing, the assignor shall continue to be personally bound by any and all provisions of the franchise agreement related to confidentiality and non-competition.

**12**    Indeed, the business model of Timothy's, as reflected in its franchise agreement, was to treat a corporate franchisee and its personal owner as one and the same. To this effect, clause 19.19 of the agreement provides:

> In the event that there is more than one Franchisee, or if the Franchisee should consist of more than one legal entity, the Franchisee's liability hereunder shall be both joint and several. A breach hereof by one such entity or Franchisee shall be deemed to be a breach by both or all.

**13**    Moreover, it is revealing and significant that Timothy's June 8, 2005 letter -- in which Timothy's informed the franchisee that the franchise agreement would not be renewed -- was addressed to Mr. Salah personally, and not to the corporate respondent. The *de facto* relationship under the franchise agreement was between Timothy's and Mr. Salah.

**14**    The trial judge concluded that Mr. Salah and his corporation were one entity for the purposes of the franchise agreement. Accordingly, she held that to deny Mr. Salah a remedy on the basis of separateness would yield a result "too flagrantly opposed to justice": see *Kosmopoulos v. Constitution Insurance Co.*, [1987] 1 S.C.R. 2, at p. 10. I agree with her conclusion. In the context of this dispute between franchisor and franchisee, it would be incongruous, not to mention unfair to Mr. Salah, if he and his corporation were treated as one entity for the purposes of franchise liabilities, but were treated as separate entities when the question of enforcing franchisee rights under the franchise agreement is at issue.

### ii. Interpretation of the franchise agreement

**15**    Timothy's submission that the trial judge improperly construed Schedule "A" as providing an "option to amend" the franchise agreement is an attempt to ground an appeal on a statement taken out of context in the reasons for the decision. Read as a whole, it is clear that the trial judge was engaged in an analysis of the contract between the parties, and the rights and obligations conferred by its terms. The argument fails on this basis alone. Moreover, there was no error in the approach adopted by the trial judge in construing the agreement before her.

**16**    The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what

they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole -- like a complex commercial transaction -- and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements. See *3869130 Canada Inc. v. I.C.B. Distributing Inc.* (2008), 66 C.C.E.L. (3d) 89 (Ont. C.A.), at paras. 30-34; *Drumbrell v. The Regional Group of Companies Inc.* (2007), 85 O.R. (3d) 616 (C.A.), at paras. 47-56; *SimEx Inc. v. IMAX Corp.* (2005), 11 B.L.R. (4th) 214 (Ont. C.A.), at paras. 19-23; *Kentucky Fried Chicken Canada v. Scott's Food Service Inc.* (1998), 41 B.L.R. (2d) 42 (Ont. C.A.), at paras. 24-27; and Professor John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law Inc., 2005), at pp. 705-722.

**17**    I see no error in the manner in which the trial judge applied the principles of construction of commercial agreements. The trial judge considered all of the relevant documents and found that the seminal document, the franchise agreement, was not ambiguous. All of the documents executed by the parties referred to the premises under the franchise agreement as "Bayshore Shopping Centre, 100 Bayshore Drive, Nepean, Ontario", and not to a specific store on the third floor.

**18**    Indeed, the only agreement that specifically referred to the third floor was the head lease between the Bayshore Shopping Centre and Timothy's. The appellant contends that the trial judge failed to take the head lease into account in her analysis. I do not agree. A review of her reasons demonstrates otherwise. Moreover, to the extent that any discrepancy exists between the head lease and the franchise agreement, I agree with the trial judge that the franchise agreement should be interpreted *contra proferentem*. The head lease had been negotiated by Timothy's with the landlord, and its terms were obviously known to Timothy's at the time it drafted Schedule "A". Timothy's had the opportunity to limit the scope of Schedule "A" to the third floor premises and either chose not to do so or was aware that Mr. Salah would not have accepted such a limitation. In either event, there is no basis to find that the trial judge committed a reviewable error. Her conclusions that the franchise agreement and Schedule "A" applied to the whole shopping centre and that Timothy's conduct -- which effectively amounted to a refusal to allow Mr. Salah the option of renewing the franchise agreement -- constituted a breach of contract are unassailable.

### iii. Breach of duty of good faith

**19**    Section 3 of the *Wishart Act* provides:

> **Fair dealing**

**3.(1)** Every franchise agreement imposes on each party a duty of fair dealing in its performance and enforcement.

**Right of action**

**(2)** A party to a franchise agreement has a right of action for damages against another party to the franchise agreement who breaches the duty of fair dealing in the performance or enforcement of the franchise agreement.

**Interpretation**

**(3)** For the purpose of this section, the duty of fair dealing includes the duty to act in good faith and in accordance with reasonable commercial standards.

**20**    Timothy's argues that its conduct leading up to the expiration of the franchise agreement could not constitute a breach of the duty of good faith because s. 3(1) of the *Wishart Act* only imposes the duty of good faith and fair dealing in the "performance or enforcement" of the existing franchise agreement. In other words, the appellant would have it that a terminated agreement is not caught by the section. In my view, it is unnecessary in this case to consider the full scope of the words "performance or enforcement" as used in the *Wishart Act*. The premise underlying the appellant's submission has been negated by the trial judge's interpretation of the agreement between the parties and the effect of Schedule "A". On the facts as found by the trial judge, there can be no doubt that the conduct at issue arises squarely within the "performance or enforcement" of the franchise agreement.

**21**    Since I find no error in the trial judge's conclusion that Schedule "A" applies to the whole shopping centre and that the right of renewal was triggered, the appellant's submission on the effect of s. 3(2) of the *Wishart Act* cannot succeed.

**22**    I turn then to the conduct of the appellant. When Timothy's could no longer renew the head lease of the third floor location and was negotiating a new lease on the second floor, the evidence showed that the franchisor deliberately kept Mr. Salah in the dark about its intentions. The trial judge found that "Mr. Black [the senior vice-president of development at Timothy's] e-mailed Bayshore Shopping Centre representatives asking them to refrain from passing on any information about the second floor location to Mr. Salah". The trial judge made further factual findings that Timothy's "actively sought to keep the franchisee from finding out what was going on with the lease" and that Timothy's deliberately withheld "critical information and did not return calls". These

findings of fact more than support the conclusion that there was a breach of the duty of good faith that franchisors owe franchisees under s. 3(1) of the *Wishart Act*.

### iv. Damages

**23**    The trial judge awarded damages under two heads: (1) damages flowing from the breach of contract, and (2) damages for the breach of the duty of good faith and for mental distress.

**24**    For past and future losses flowing from the breach of contract, the trial judge had before her both the opinion of the appellant's expert, who calculated the loss of profits only to 147, and the opinion of the respondents' expert, who assessed the losses to Mr. Salah and 147 collectively. As the trial judge decided to treat Mr. Salah and his corporation as one and the same, it was open to her to prefer the evidence of the respondents' expert, which took into account the loss of income to Mr. Salah as a result of the breach. I would not interfere with this decision.

**25**    The appellant submits that it is not open to the trial judge to award damages under the *Wishart Act* for anything other than compensatory damages relating to pecuniary losses. In other words, it is not open to a trial judge to award damages under the head of compensatory damages relating to non-pecuniary losses, or under exemplary or punitive damages. It argues that any damages flowing from the breach of the duty of good faith is limited to lost profits, and in particular the lost profits, if any, of 147. The latter point is addressed above. The trial judge treated Mr. Salah and 147 as a single entity for the purpose of determining losses flowing from the breach of contract and, on the evidence, she was entitled to do so.

**26**    In like fashion, the argument advanced by the appellant with respect to the limitations applicable to damage awards under s. 3(2) of the *Wishart Act* is misconceived. The *Wishart Act* is *sui generis* remedial legislation. It deserves a broad and generous interpretation. The purpose of the statute is clear: it is intended to redress the imbalance of power as between franchisor and franchisee; it is also intended to provide a remedy for abuses stemming from this imbalance. An interpretation of the statute which restricts damages to compensatory damages related solely to proven pecuniary losses would fly in the face of this policy initiative.

**27**    The right of action provided under s. 3(2) of the *Wishart Act* against a party that has breached the duty of good faith and fair dealing is meant to ensure that franchisors observe their obligations in dealing with franchisees. In that regard, the conduct that the trial judge found egregious in the present case is precisely the mischief that this legislation was enacted to remedy.

**28**    Our courts have given limited recognition to the duty of good faith between contracting parties in general. However, by enacting legislation that addresses the particular relationship between franchisors and franchisees, the legislature has clearly indicated that such relationships give rise to special considerations, both in terms of the duties owed and the remedies that flow from a breach of those duties. This is evident in the wording of s. 3(2), which focuses on the conduct of the breaching party and not injury to the other side. The trial judge's award of damages was informed by these

considerations.

**29**    In summary, I am in agreement with the trial judge that s. 3(2) of the *Wishart Act* permits an award of damages for the breach of the duty of good faith, separate and in addition to any award in compensation of pecuniary losses. I would go further to say that any such award must be commensurate with the degree of the breach or offending conduct in the particular circumstances. Taking the conduct of the appellant as found by the trial judge into account, I see no error in her decision to award damages on a merged basis for the breach of duty of good faith and mental distress, either in principle or in respect of quantum. In my view, her findings as to the breach of duty of good faith alone would support the amount of the award.

**30**    Accordingly, I would not interfere with her decision as to damages.

### v. The Pleadings Argument

**31**    I will deal summarily with the pleadings argument advanced by the appellant. The trial judge found that Mr. Salah and 147 should be treated as one entity with regard to the franchise agreement. As noted above, there was ample evidence to support this finding. Having done so, she was entitled thereafter to treat the pleadings of one as the pleadings of the other. This is a complete answer to the appellant's argument. Accordingly, I would not give effect to this ground of appeal.

## CONCLUSION

**32**    I would dismiss the appeal.

**33**    The respondents shall have their costs in the amount of $32,500, all inclusive.

W.K. WINKLER C.J.O.
 M. ROSENBERG J.A.:-- I agree.
 R.W.M. PITT J. (ad hoc):-- I agree.

1 The case was tried over a period of 12 days by Justice A. de Lotbinière Panet. However, due to illness, he was unable to deliver judgment. The Chief Justice of the Superior Court of Justice made an order under ss. 123(4) and (7) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, appointing Métivier J. to rehear the matter. On consent, the rehearing was based on a review of all of the transcripts, exhibits, and oral and written submissions from counsel.

*Case Name:*
# Sanofi-Aventis Canada Inc. v. Apotex Inc.

**Between**
**Sanofi-Aventis Canada Inc., Sanofi-Aventis Deutschland GmbH**
**and Schering Corporation, Plaintiffs, and**
**Apotex Inc., Defendant**
**And between**
**Apotex Inc., Plaintiff by Counterclaim, and**
**Sanofi-Aventis Canada Inc. and Schering Corporation,**
**Sanofi-Aventis Deutschland Gmbh and Ratiopharm Inc.,**
**Defendants by Counterclaim**
**And between**
**Sanofi-Aventis Canada Inc., Schering Corporation and**
**Sanofi-Aventis Deutschland GmbH, Plaintiffs, and**
**Novopharm Limited, Defendant**
**And between**
**Novopharm Limited, Plaintiff by Counterclaim, and**
**Sanofi-Aventis Canada Inc., Schering Corporation and**
**Sanofi-Aventis Deutschland GmbH, Defendants by Counterclaim**

[2009] F.C.J. No. 986

[2009] A.C.F. no 986

2009 FC 676

77 C.P.R. (4th) 99

350 F.T.R. 165

180 A.C.W.S. (3d) 487

Dockets T-161-07, T-1161-07

Federal Court
Toronto, Ontario

**Snider J.**

Heard: January 12-16, 19-23, 26-29, February 2-6, 9-13,
16-20, 23, 24 and April 6-9, 14, 15, 2009.
Judgment: June 29, 2009.

(364 paras.)

*Intellectual property law -- Patents -- Infringement -- Defences to infringement -- Invalidity of
patent -- Obviousness -- Insufficiency of claims -- Action for patent infringement dismissed -- The
plaintiff sold a trademarked blood pressure and cardiac drug -- Its active ingredient was the subject
of a patent licensed to the plaintiff -- The plaintiff contended that the generic products
manufactured by the defendants infringed its patent -- The court found that the impugned claims
under the patent were invalid under the doctrine of sound prediction -- Even had the claims been
based on sound prediction, the same prior art would have rendered the claims invalid for
obviousness.*

Two actions by the plaintiff, Sanofi-Aventis Canada, against the defendants, Apotex and
Novopharm, for damages for patent infringement. The plaintiff sold a drug, ALTACE, used to treat
high blood pressure and cardiac insufficiencies. The active ingredient was ramipril, which was
included in the 206 patent, under which the plaintiff was a licensee. The 206 patent was filed in
1981 and issued in 2001 following resolution of conflict proceedings. The defendants began selling
generic versions of ALTACE following a series of notice of compliance proceedings. The plaintiff
claimed that the defendants' products infringed the 206 patent. Each defendant asserted that the 206
patent was invalid on the basis of lack of utility, the doctrine of sound prediction, obviousness and
double patenting. Each party adduced evidence from several experts in support of their respective
positions.

HELD: Actions dismissed. The defendants infringed certain claims of the 206 patent. However, the
claims in question were invalid on the ground that particular compounds of the impugned claims
lacked utility. On a balance of probabilities, the inventors of the 206 patent could not have soundly
predicted in 1981 that the compounds of the impugned claims would have the utility promised by
the patent. The claim was drafted to account for future possibilities in a manner that lacked
specificity. As such, the claims included compounds for which there was no underlying data or
sound reasoning. The plaintiffs failed on all three requirements making up the test for sound
prediction; factual basis, articulable line of reasoning and disclosure. Even had the claims been
based on a sound prediction, the same prior art that would form the basis of a sound prediction
would render the relevant claims of the 206 patent obvious as of the appropriate date for assessing
obviousness. No invalidity was found on the basis of double patenting.

**Statutes, Regulations and Rules Cited:**

Federal Courts Act, R.S.C. 1985, c. F-7, s. 50(1)

Patent Act, R.S.C. 1985, c. P-4, s. 2, s. 27(a), s. 34, s. 34(1), s. 34(1)(b), s. 34(1)(c), s. 36(1), s. 43(2), s. 44, s. 55.2(1), s. 61(1)(b), s. 78.1, s. 78.2

Patented Medicines (Notice of Compliance) Regulations, SOR/ 93-133,

**Counsel:**

Gunars Gaikis, Sheldon Hamilton, Jeremy Want, Jeffrey Coles and Junyi Chen, for the Plaintiffs, Sanofi-Aventis Canada Inc. et al (in T-161-07 & T-1161-07).

Anthony Creber and Marc Richard, for the Plaintiff, Schering Corporation (in T-161-07 & T-1161-07).

Harry Radomski, Nando Deluca, Jerry Topolski, Benjamin Hackett and Karen Murdoch, for the Defendant, Apotex Inc. (in T-161-07).

Jonathan Stainsby, Mark Davis, Bill Mayo, Lesley Caswell and Keya Dasgupta, for the Defendant, Novopharm Limited (in T-1161-07).

---

## REASONS FOR JUDGMENT

SNIDER J.:--

## I. Introduction

**1**    Sanofi-Aventis Canada (Sanofi Canada) sells a drug in Canada with the trademark of ALTACE, which is used primarily in the treatment of high blood pressure and cardiac insufficiency. The active ingredient in ALTACE is ramipril. With some exceptions, Sanofi Canada purchases ramipril from its affiliate, Sanofi-Aventis Deutschland GmbH (Sanofi Deutschland) who manufactures ramipril in Germany. Ramipril is included in Canadian Patent No. 1,341,206 (the '206 Patent), a patent that was issued March 20, 2001 and held by Schering Corporation (Schering). Each of Sanofi Canada and Sanofi Deutschland are licensees under the '206 Patent.

**2**    In January, 2007, Apotex Inc. (Apotex) commenced sales of a generic version of ALTACE - Apo-Ramipril - in Canada. Similarly, Novopharm Limited (Novopharm) began selling Novo-Ramipril in Canada in May, 2007. Apotex and Novopharm became authorized to sell a ramipril product in face of an existing patent following the conclusion of a series of proceedings brought under the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133 (the *NOC Regulations*) which I will detail later.

**3**     In 2007, Sanofi Canada, Sanofi Deutschland and Schering commenced two actions claiming infringement of the '206 Patent. The defendant in the first action (Court File T-161-07) is Apotex and the defendant in the second (Court File T-1161-07) is Novopharm. Each of the two Defendants responded to the Statement of Claim filed against it with a Statement of Defence and Counterclaim, asserting that the '206 Patent was invalid on a number of grounds. The counterclaims of Novopharm and Apotex joined Ratiopharm Inc. (Ratiopharm) as a defendant by counterclaim in each of the actions. The portions of the counterclaims affecting Ratiopharm were stayed under the provisions of s. 50(1) of the *Federal Courts Act*, R.S.C. 1985, c.F-7 by Order of Justice Roger Hughes dated September 12, 2007. There is no further reference to Ratiopharm in these Reasons.

**4**     Since the patent in question, the issues raised by the parties and much of the evidence is common to both actions, the two were heard together. These Reasons for Judgment apply to both actions.

**5**     The combination of the two actions in this manner resulted in great efficiencies in the trial process. The 37-day trial, which involved complex issues on both patent validity and damages, took place within two years of the filing of the first Statement of Claim. The efficiencies and timeliness of the trial were only possible due to the great degree of cooperation amongst the four sets of counsel involved and to the effective case management of Prothonotary Milczynski. I thank them all sincerely.

**6**     For the reasons expressed in these Reasons for Judgment, I have concluded that Apotex and Novopharm have infringed certain claims of the '206 Patent. However, I have also found that Claims 1, 2, 3, 6 and 12 of the '206 Patent are invalid. In very general terms, the key determination leading to this result is my finding that, on a balance of probabilities, the inventors of the '206 Patent could not soundly predict, as of October 20, 1981, that all of the eight compounds of Claim 12 of the '206 Patent would have the utility promised by the patent. Claims 1, 2, 3 and 6 include the same compounds as are covered by Claim 12. Accordingly, it follows that Claims 1, 2, 3, 6 and 12 of the '206 Patent are invalid and the claims of Schering and Sanofi will be dismissed.

**7**     If I am wrong in this conclusion, and the claims were based on a sound prediction, it follows - on the particular facts of this case - that the same prior art that would form the basis of a sound prediction would render the relevant claims of the '206 Patent obvious as of the appropriate date for assessing obviousness.

**8**     The Defendants have raised other grounds of invalidity. In light of my finding of invalidity on the basis of lack of utility, it is not strictly necessary for me to rule on these other grounds. However, if I were required to do so, I would conclude that:

-     The '206 Patent is not invalid for obviousness double patenting;
-     For the '206 Patent, there is no requirement that the patentee disclose the "best mode" for producing the patented compounds;
-     The *Gillette* defence is unavailable to the Defendants on these facts; and

-    Apotex's argument that Schering was not the first to invent the subject matter of the '206 Patent fails.

**9**    The application leading to the '206 Patent was filed in Canada on October 20, 1981. According to s. 78.1-78.2 of the present *Patent Act* (R.S.C. 1985, c.P-4), patent applications filed before October 1, 1989 are to be dealt with under the provisions of the *Patent Act* as they read immediately before that date. Accordingly, references the *Patent Act* in these Reasons will, unless specifically noted otherwise, be to the *Patent Act* as it stood immediately prior to October 1, 1989.

**10**    Finally, I note that the trial of these actions was not bifurcated. Sixteen days of evidence and two days of final argument were devoted to the remedies phase of this matter. Because of my dismissal of the actions, there is no need to consider these issues. Nevertheless, I will retain my notes from the second phase of the trial. In the event that it becomes necessary, I could be available to hear further updates to the evidence and submissions and make determinations on the appropriate damages and remedies.

## II. <u>Table of Contents</u>

**11**    To assist the reader, the following sets out a Table of Contents for these Reasons with paragraph numbers for each heading:

I.     Introduction ...................................................................... [1] to [10]
II.    Table of Contents ........................................................................ [11]
III.   Witnesses ....................................................................... [12] to [43]
       A.   Introduction ............................................................... [12]
       B.   Plaintiffs' Expert Witnesses ............................................... [15]
       C.   Plaintiffs' Fact Witnesses ................................................ [29]
       D.   Defendants' Expert Witnesses ............................................. [30]
       E.   Defendants' Factual Witnesses ............................................ [43]
IV.    Background to the '206 Patent ..................................... [44] to [64]
       A.   Introduction ............................................................... [44]
       B.   Chemical Principles ...................................................... [45]
            (1)   Stereochemistry ..................................................... [46]
            (2)   ACE Inhibitors Generally .......................................... [50]
       C.   History of ACE Inhibitors ................................................ [53]
       D.   Schering's Work on ACE Inhibitors ....................................... [58]
       E.   The Conflict Proceedings ................................................. [63]
V.     Prior Litigation .................................................................. [65] to [73]
VI.    Validity, Presumption and Burden ............................... [74] to [78]
VII.   Claims Construction ..................................................... [79] to [138]
       A.   Principles of Claims Construction ........................................ [79]
       B.   Person Skilled in the Art ................................................ [85]
       C.   Description of the '206 Patent ........................................... [86]
       D.   Construction of Claims 1, 2, 3 and 6 .................................... [99]
       E.   Construction of Claim 12 ................................................ [105]
       F.   The "Promise" of the '206 Patent ........................................ [119]
       G.   Summary on Construction ................................................ [138]
VIII.  Infringement ............................................................... [139] to [141]
IX.    Utility            ........................................................... [142] to [231]
       A.   General Principles ...................................................... [142]
       B.   Sound Prediction: Factual Basis and Articulable and
            Sound Line of Reasoning ................................................. [151]
            (1)   Importance of Stereochemistry ..................................... [156]
            (2)   The Schering Work .................................................. [164]
            (3)   The stereochemistry at the carboethoxy position .......... [189]
            (4)   The "space" theory ................................................. [203]
       C.   Sound Prediction: Disclosure ............................................ [213]
       D.   Conclusion on Sound Prediction .......................................... [229]

X.     Sound Prediction of Making ....................................... [232] to [259]
       A.   The requirement to soundly predict how to make ................... [233]
       B.   Alternative Synthesis Methodologies ..................................... [238]
       C.   Example 20 .............................................................. [247]
XI.    Obviousness ................................................................ [260] to [320]
       A.   General Principles ...................................................... [260]
       B.   The Invention ........................................................... [267]
       C.   Date of Invention ....................................................... [269]
       D.   Application of the *Sanofi-Synthelabo* Test for Obviousness ..... [288]
            (1)   Identify the "person skilled in the art" ......................... [289]
            (2)   Identify the relevant common general knowledge ........ [290]
            (3)   Identify the inventive concept .................................... [298]
            (4)   Identify the Differences Between the "State of the
                  Art" and the inventive concept .................................... [299]
            (5)   Would the differences constitute steps that would
                  have been obvious? ................................................. [301]
       E.   Conclusion on Obviousness ............................................... [319]
XII.   Best Mode       ....................................................... [321] to [333]
XIII.  Double Patenting ......................................................... [334] to [343]
XIV.   *Gillette* Defence ......................................................... [344] to [349]
XV.    First Inventorship ....................................................... [350] to [354]
XVI.   Conclusions     ....................................................... [355] to [364]

       Postscript      ................................................................ [1] to [2]

### III.Witnesses

A. *Introduction*

**12**    During the 31-day evidentiary phase of this trial, many witnesses appeared, both as expert and fact witnesses. Fifteen days of the trial consisted of evidence dealing with the infringement and validity issues. The balance of the trial was spent considering possible remedies should the plaintiffs be successful in their claims. As noted above, I have concluded that the '206 Patent is invalid. Accordingly, there is no need (at this time) to assess the evidence presented by the many capable witnesses who appeared in the damages phase of the trial.

**13**    In the following, I will provide a brief overview of the expert and fact witnesses who appeared during the infringement and validity portion of the trial and the areas to which they testified. For the expert witnesses, I have set out a very short description of their education and experience in the areas for which this court found each of them to be qualified. More detailed references to the experts' evidence are contained in the appropriate sections of these reasons.

**14**    The experts produced by both the Plaintiffs and Defendants were very helpful to the Court. I would comment, however, that there was considerable overlap and repetition in their evidence.

B. *Plaintiffs' Expert Witnesses*

(1)    Dr. Paul A. Bartlett

**15**    After completing his Ph.D. studies in Organic Chemistry, Dr. Paul A. Bartlett began an impressive academic career in 1973 with University of California, Berkley. From 1996 to 2000, he was Chair of the Department of Chemistry. Dr. Bartlett is, at present, a Professor Emeritus of Chemistry at the University of California, Berkley. He has extensive consulting and research experience in fields of relevance to the issues before me in this case. I accepted his qualifications as an expert in medicinal chemistry and synthetic organic chemistry. During his appearances and in his expert reports, on behalf of Schering, Dr. Bartlett provided opinions on the issues of claims construction, infringement, utility, sound prediction and obviousness.

(2)    Dr. André Charette

**16**    Dr. Charette is a professor at the University of Montreal, Department of Chemistry. He holds the Canada Research Chair in Stereoselective Drug Synthesis of Bioactive Molecules as well as the NSERC, Merck Frosst and Boehringer Ingelheim Industrial Chair on the same topic. He was qualified as an expert in the areas of organic chemistry relating to stereochemistry and stereoselective synthesis.

**17**    On behalf of Sanofi, Dr. Charette gave opinions directed to the methods of synthesis of the compounds included in Claims 1, 2, 3, 6 and 12 of the '206 Patent. He reviewed and opined on the

experimental techniques used by Dr. Bihovsky, Dr. Mariampillai and Dr. Lautens in their attempts to follow the directions of Example 20 of the '206 Patent. His evidence and testimony also touched on whether the compounds covered by Claim 12 could be prepared using methods known in the art, other than that given by Example 20.

(3)    Dr. Arthur Patchett

**18**    Dr. Patchett has had a lengthy and distinguished career in pharmaceutical chemistry. He joined Merck & Co. (Merck) as a research chemist in 1957, remaining with that company in various capacities until 2002. Dr. Patchett is a co-inventor of the ACE inhibitors enalapril and lisinopril. Of particular relevance to this trial is the role that he played in Merck's disclosure of its work in the design of enalapril and lisinopril at a lecture at Troy, New York in June 1980. Dr. Patchett was qualified as a medicinal chemist with experience in the design and development of ACE inhibitors. Since his retirement in 2005, Dr. Patchett has been retained as a consultant for Schering-Plough.

**19**    On behalf of Schering, Dr. Patchett provided his opinions on the issues of sound prediction and obviousness. Although there was a certain level of repetition between the evidence of Dr. Patchett and Dr. Bartlett, Dr. Patchett's experience at Merck brought a unique experience to the Court that was very helpful.

(3)    Dr. Wendel Nelson

**20**    Dr. Nelson is a professor in the Department of Medicinal Chemistry, University of Washington. He has been in academia since 1965 and served for 19 years (from 1989 to 2007) as a senior editor for the Journal of Medicinal Chemistry. He was qualified as an expert in the area of medicinal chemistry.

**21**    On behalf of Sanofi, Dr. Nelson provided his opinions on the issues of patent construction, utility, sound prediction and obviousness. To a large degree, his opinions were confirmatory and repetitive of those of Dr. Bartlett.

(4)    Dr. James D. Wuest

**22**    Dr. James D. Wuest is a Professor of Chemistry at the University of Montreal, where he has been a full professor since 1986. Prior to joining the University of Montreal, he was an Assistant Professor of Chemistry at Harvard University and Harvard Medical School. Since 2001, Dr. Wuest has held the Canada Research Chair in Molecular Materials. He was qualified as an expert in synthetic organic chemistry.

**23**    On behalf of Sanofi, Dr. Wuest commented on the experimental work of Dr. Bihovsky, as well as that of Drs. Mariampillai and Lauten, with respect to Example 20. He also provided his opinion on whether the compounds covered by Claim 12 could be prepared using methods known in the art, other than that given by Example 20. There was considerable overlap and repetition between

his opinions and those offered by Dr. Charette and Dr. Roach.

(5)    Dr. Mark Lautens

**24**    Dr. Lautens is the AstraZeneca Professor of Organic Synthesis at the University of Toronto, where he has been a full professor since 1995. Dr. Lautens was qualified as an expert in synthetic organic chemistry.

**25**    On behalf of Sanofi, Dr. Lautens carried out the synthesis described in Example 20 of the '206 Patent.

(6)    Dr. Zola Horovitz

**26**    Dr. Zola Horovitz was qualified as an expert in pharmacology with particular experience in the area of hypertension and ACE inhibition. Dr. Horovitz worked for almost 35 years in pharmacological research at the Squibb Institute for Medical Research (Squibb). Since his retirement from that post in 1994, he has been a consultant to the biotechnology and pharmaceutical industries, including various companies that develop products in the cardiovascular field. Dr. Horovitz gave evidence on obviousness, sound prediction and utility.

**27**    As with Dr. Patchett, Dr. Horovitz's opinions overlapped to some extent with that of other witnesses. However, Dr. Horovitz brought a unique perspective to the trial because of his pharmacological experience in industry.

(7)    Dr. Braden Roach

**28**    Dr. Braden Roach has been involved in research, for over 20 years, in areas of chemical synthesis research, in both academic and industry settings. Dr. Roach was qualified as an expert in the synthesis of organic compounds. He was asked by counsel for Schering to opine on the work of each of Dr. Lautens and Dr. Bihovsky in their attempts to follow the synthesis of Example 20. There was considerable overlap and repetition between his opinions and those offered by Dr. Charette and Dr. Roach.

C. *Plaintiffs' Fact Witnesses*

**29**    Schering presented two fact witnesses to the Court. Dr. Bernard Neustadt is employed by Schering as a research fellow serving as a medicinal chemist in the company's discovery effort. He has been an employee with Schering since 1969. He is one of the inventors of the subject matter of the '206 Patent. The other fact witness was Dr. Elizabeth Smith, who has been an employee at Schering since 1972. She is a one of the inventors of the subject matter of the '206 Patent.

D. *Defendants' Expert Witnesses*

(1)    Dr. Eugene Thorsett

**30**    Dr. Eugene Thorsett is a synthetic organic chemist with 33 years of experience in the pharmaceutical industry. Of particular interest in this case, Dr. Thorsett was a researcher at Merck from 1975 to 1988, including during the early stages of the development of ACE inhibitors, including enalapril and lisinopril. Dr. Thorsett was qualified as an expert in medicinal and synthetic organic chemistry with particular knowledge in pre-clinical drug development, especially those related to pharmacology, such as pharmacokinetics and the absorption, distribution, metabolism and excretion of a pharmaceutical compound within an organism, and in the area of lead drug candidate optimization, and in the design and development of enzyme inhibitors, including ACE inhibitors. His testimony and reports, on behalf of Apotex, were directed to the issues of claims construction, utility, sound prediction and obviousness.

(2)    Dr. Mario Ehlers

**31**    Dr. Ehlers is a physician-scientist with 11 years of experience in academic research and 8 years of biopharmaceutical industry experience in drug development, diagnostic product development, and central lab services. He was qualified as a biochemist with academic and industry experience in structure function studies on ACE and ACE inhibitors and the design and synthesis of new ACE inhibitors. On behalf of Novopharm, Dr. Ehlers provided his opinion on patent construction and sound prediction.

(3)    Dr. Christopher John Moody

**32**    Since 1979, Dr. Moody has been in academia. At present, he is the Sir Jesse Boot Professor of Chemistry at the University of Nottingham, United Kingdom. Of particular interest, Dr. Moody was employed, from 1977 to 1979, as a senior research chemist by Roche to work on a project involving the design and synthesis of ACE inhibitors as potential medicines for hypertension. Dr. John Moody was qualified as an expert in organic chemistry with experience in heterocyclic chemistry. He spoke to the issues of claims construction and the process used by Schering and Novopharm to synthesize ramipril.

(4)    Dr. Robert Allan McClelland

**33**    Dr. McClelland is Professor Emeritus of the University of Toronto. From 1983 to June 2005, he was Professor of Chemistry at the University of Toronto. Dr. McClelland was qualified as an expert in the area of physical organic chemistry, especially reactive intermediates generated in nucleophilic substitution and addition reactions, and in the area of biological and medicinal chemistry, especially the properties of heterocyclic drugs and synthesis of new analogues.

**34**    On behalf of Apotex, Dr. McClelland provided his expert opinion and replied to certain opinions of the Plaintiffs' experts in the following areas: a comparison of the claims of the '087 Patent with those of the '206 Patent; a comparison of the Apotex manufacturing process of ramipril with that claimed in Canadian Patent No. 1,187,087 (the '087 Patent); Example 20 of the '206 Patent; and the Schering research work in respect of the '206 Patent.

(5)    Dr. Ian Fleming

**35**    Dr. Fleming is a Professor Emeritus of Chemistry at the University of Cambridge and an Emeritus Fellow at Cambridge's Pembroke College. From 1965 to 2002, he held various academic posts at Cambridge, his last position being that of Chemistry Professor from 1998 to 2002. He was qualified as an expert in synthetic organic chemistry.

**36**    On behalf of Apotex, Dr. Fleming provided his expert opinion in the following areas: Example 20; a comparison of the claims in the '087 Patent and the '206 Patent; and, a comparison of the Apotex manufacturing process of ramipril with that claimed in the '087 Patent.

**37**    While Dr. Fleming was a highly competent and knowledgeable expert, I question whether his opinions were necessary to the understanding of the Court, given that his mandate was almost identical to that of Dr. McClelland. It seems to me that one or the other of these two experts would have been adequate.

(6)    Dr. Timothy J. Ward

**38**    Dr. Ward is the Associate Dean of the Sciences and a Professor in the Department of Chemistry at Millsaps College in Jackson, Mississippi. Dr. Ward worked for Dionex Corporation and Syntex Pharmaceuticals between 1987 and 1990, when he entered academia. He was qualified as an expert in separation science, including chromatography. On behalf of Apotex, he provided his expert opinion on the science of chromatography and separation. In particular, Dr. Ward opined on the separation methodology needed for the compounds of Claim 12 of the '206 Patent and on the work done by Schering in separating compounds within the scope of Claim 12.

(7)    Dr. Clayton Heathcock

**39**    Dr. Heathcock is a chemist with over 45 years of academic experience in organic chemistry and medicinal chemistry. He is currently Professor Emeritus at the University of California at Berkeley and Chief Scientist of the Berkley branch of the California Institute for Quantitative Biosciences. Dr. Heathcock was qualified as a synthetic organic chemist.

**40**    On behalf of Novopharm, Dr. Heathcock provided his opinion on whether the subject matter of the '206 Patent would have been obvious to a person skilled in the art. In light of the evidence of Dr. Thorsett, I question whether Dr. Heathcock added materially to the Court's knowledge in this area.

(8)    Dr. Ron Bihovsky

**41**    Dr. Bihovsky is a scientist with over 20 years of experience in chemistry, including in academia and private industry. In 2001, he founded Key Synthesis LLC, an organic chemistry lab that performs contract synthetic projects for pharmaceutical and biotechnology companies, process

research and consulting work. Dr. Bihovsky was qualified as an expert in organic synthesis.

**42**    Dr. Bihovsky was retained on behalf of Apotex to attempt to reproduce the synthesis described in Example 20 of the '206 Patent and to provide his opinion on the ability of a person skilled in the art to carry out the chemical reactions of Example 20.

E. *Defendants' Factual Witnesses*

**43**    Apotex presented two factual witnesses to the Court. Dr. Stephen Horne is the vice president of research and development at Apotex Pharmachem. His testimony related to a sample of a compound known as "Ram 85" that was provided to Dr. Bihovsky. Dr. Gabriela Mladenova testified as to her laboratory work in or around 2003. At that time, Dr. Mladenova performed some experiments, under the direction of Dr. Lee-Ruff, in which she unsuccessfully attempted to reproduce the synthesis described in Example 20 of the '206 Patent.

**IV. <u>Background to the '206 Patent</u>**

A. *Introduction*

**44**    The '206 Patent is entitled "Carboxyalkyl Dipeptides, Processes for Their Production and Pharmaceutical Compositions Containing Them". Some background information on the subject matter and history of the patent and the relevant chemical principles may be helpful.

B. *Chemical Principles*

**45**    The experts did not disagree on the organic chemistry and biochemistry applicable to these proceedings. What follows is a very brief outline of that evidence.

(1)    <u>Stereochemistry</u>

**46**    An understanding of the basic principles of stereochemistry is necessary to understand the nature of the invention as claimed in the '206 Patent.

**47**    Stereochemistry is the study of the three dimensional spatial orientation of compounds of atoms in molecules and the consequences of such arrangements. Molecules having exactly the same chemical composition (and molecular formula) as well as the same molecular structure (i.e. the same connectivity of atoms) may differ in their spatial arrangement in three dimensions. Such compounds are referred to as "stereoisomers".

**48**    The term "chiral centre" or "stereocentre", as it appears in stereochemistry, is used to describe carbon atoms that have four different function atoms or groups attached to it. A chiral compound is one that exists in two mirror image forms that are not superimposable -- like a person's hands.

**49**    In order to describe the stereochemistry of molecules having chiral centres, chemists have

devised a system whereby a chiral centre is described as being in either the R or S configuration, depending on the exact spatial arrangement of atoms around the chiral centre.

(2)    ACE Inhibitors Generally

**50**    Amino acids are the basic building blocks from which living matter is constructed. By combining various numbers and groups of these acids in various configurations, larger structures known as peptides are formed. The bonds between these acids are known as peptide bonds. Larger groups known as proteins may be formed from such acids.

**51**    Enzymes are organisms present in the body that facilitate the conversion of materials such as proteins and peptides into other material. The enzyme that is of interest in this case is the angiotensisn-converting enzyme (ACE). ACE can bind with a compound known as angiotensin I to produce angiotensin II. This conversion increases blood pressure by constricting blood vessels.

**52**    Ramipril, along with other drugs mentioned in these reasons, are all "ACE inhibitors". ACE inhibitors bind with ACE to prevent the conversion of angiotensin I to angiotensin II; the result is lower blood pressure.

C. *History of ACE Inhibitors*

**53**    A number of the experts in this trial were present at various critical times during the history of ACE inhibitors and provided very useful evidence. A number of the articles produced in evidence were also helpful. I summarize this evidence in the following paragraphs.

**54**    Dr. Horovitz, who became Director of Pharmacology at Squibb in 1967, provided an excellent summary in his report of the early history of ACE inhibitors. The story begins in the late 1960s, when scientists began studying the venom of the *Bothrops jararaca*, an indigenous Brazilian snake, because it was known to reduce blood pressure. Scientists at Squibb isolated the active compound and synthesized a compound known as teprotide, a peptide. Teprotide was first tested on humans in 1973 and proved to be an effective antihypertensive agent in humans. However, teprotide was only effective through intravenous administration.

**55**    The transformation of teprotide into an orally-effective ACE inhibitor occurred as a result of work done by a team of scientists working for Squibb, including Drs. Miguel Ondetti and David Cushman. Although the precise structure of ACE was not known at the time, the Squibb scientists developed some hypotheses about a model in the human body for ACE, relying upon what was known about another enzyme known as carboxypeptidase A. According to Dr. Horovitz, one of the first steps taken by the Squibb scientists was to include a carboxyl group (HO2C) at the terminal of the teprotide molecule based on prior art in relation to carboxypeptidase A. They then added a CH2 to the backbone. Next, the scientists introduced a sulfhydryl (SH) group in the terminal position instead of the carboxyl group. This was captopril, the first small molecule, orally-effective ACE inhibitor. As stated by Dr. Horovitz, "[a]fter almost ten years of work at Squibb, and the testing of

thousands of compounds, Squibb finally had a drug that could be used for the treatment of hypertension and was orally active". The structure of captopril is set out below:



Captopril

**56**    While captopril was a tremendous innovation in the development of ACE inhibitors, the presence of the sulphur atom was responsible for serious side effects in some people. The next major advancement came from Merck. In response to the problem of the side effects, the Merck scientists (including Dr. Thorsett and Dr. Patchett) focused on removing the sulfhydryl (SH) group (also referred to as a thiol group or thiol moiety). The replacement of the thiol group with a carboxylic acid (COOH) moiety resulted in enalapril. While enalapril lacked the sulphur moiety present in captopril, it retained the proline unit or five-membered ring structure at the C-terminus of the compound. This new ACE inhibitor had three stereocentres, all of which were in the S configuration. The structure of enalapril is set out below:



Enalapril

**57**    On June 18, 1980, at a medicinal chemistry conference in Troy, New York (the Troy conference), Dr. Patchett presented Merck's new ACE inhibitor. The disclosure made by Merck at the Troy conference was widely anticipated by the ACE inhibitor community. During his appearance at this trial, Dr. Patchett testified that there were at least several hundred - maybe more - attendees for his lecture. Many of those in attendance were scientists at a number of pharmaceutical companies who had been carrying out research to develop new ACE inhibitor drugs. Dr. Elizabeth Smith of Schering was one such scientist. As discussed below, Dr. Smith had carried out some preliminary work that, she hoped, could build on or incorporate the Merck disclosure.

D. *Schering's Work on ACE Inhibitors*

**58**    Although more will be said further on in this decision about the development work done by Schering during the late 1970s and early 1980s, it is helpful at this point to provide an overview of the nature of the research work that was being done by Schering leading up to the application for what would become the '206 Patent and the compound ramipril. In this respect, the evidence of Dr. Smith and Dr. Neustadt was helpful.

**59**    Prior to the Merck announcement at the Troy conference in June of 1980, scientists at Schering, including Dr. Smith, were trying to develop an antihypertensive compound that would be more effective than captopril. While Merck's work involved the removal of the thiol group, Schering's work focused on a different aspect of the captopril molecule - that is, the proline unit. By late 1979 or early 1980, Dr. Smith and her colleagues had found that the replacement of the proline in captopril with certain fused ring or spirocyclic moieties resulted in active compounds.

**60**    As a result of the Merck disclosure at the Troy conference, the Schering scientists decided to try to create compounds combining the Merck disclosure with the work that they had already been working on in relation to the proline end of the molecule. That is, Schering's scientists decided to try using various spirocyclic and bicyclic ring structures in place of the proline on an enalapril-type molecule. This proposed work was documented in an invention disclosure report dated June 20, 1980. According to Dr. Smith, this report shows the conception of the generalized structure of the compounds in what ultimately became the '206 Patent.

**61**    On October 23, 1980, Schering filed US Application No. 199,886. The subsequent Canadian patent application claimed priority from this U.S. patent application.

**62**    On October 20, 1981, Schering filed Patent Application 388,336 (the '336 Application) in Canada. The Canadian application ultimately resulted in the issuance of the '206 Patent in March of 2001. The '206 Patent Claims 1, 2, 3, 6 and (subject to some disagreement) 12 cover the molecule known as ramipril, a very successful commercialized compound. The structure of ramipril is set out below:

**Ramipril**

E. *The Conflict Proceedings*

**63**    As noted, Schering filed the '336 Application in Canada on October 20, 1981. Other claimants also applied for the issuance of patents covering certain compounds. Of specific interest, ADIR filed Application 387,093 (the '093 Application) and Hoechst Aktiengesellschaft (Hoechst), a predecessor to Sanofi Deutschland, filed Patent Application 384,787 (the '787 Application). As provided for in the *Patent Act*, certain of the claims in the '336 Application were placed into conflict with claims in the other applications.

**64**    The conflict proceedings continued until December 12, 2000 when the three parties to the conflict consented to an Order of Justice Marc Nadon, which Order provided for an allocation of the claims in conflict. As a result, the '206 Patent finally issued on March 20, 2001.

**V. Prior Litigation**

**65**    These actions are not the first litigation involving the '206 Patent and ramipril. All of the earlier cases involved applications brought pursuant to the *NOC Regulations*. The legislative scheme of the *NOC Regulations* is complex. Simply stated and of particular relevance to this litigation, a party such as Apotex or Novopharm (referred to in the *NOC Regulations* as a "second person") may seek authorization (in the form of a Notice of Compliance (NOC)) from the Minister of Health to market a drug, in spite of the fact that the drug may be the subject of a patent. Once a party has declared its intentions to seek an NOC, it must address all patents that might affect its proposed product. A patent holder or other "first person" may apply to the Federal Court for an Order of Prohibition preventing the Minister from issuing the necessary authorization to the "second

person".

**66**    There is no doubt that the applications brought under the *NOC Regulations* involve allegations of infringement and invalidity. However, at the end of the proceeding, the judge hearing the application is not tasked with making a final determination of infringement and validity. Rather, the judge must determine whether the allegation by the second person is "justified". The distinction is a fine one, which is based, to a large degree, on the "summary" nature of the NOC hearing (see, for example, *Pharmacia Inc. v. Canada (Minister of Health and Welfare)* (1994), 58 C.P.R. (3d) 209 at paras. 13-14 (F.C.A.); *AB Hassle v. Apotex Inc.*, 2006 FCA 51, [2006] 4 F.C.R. 513 at para. 2 [*AB Hassle*]). An NOC proceeding is conducted on a "paper record" of affidavit evidence and on the limited written and oral submissions of counsel. There is no opportunity for *viva voce* evidence from the experts who might provide further guidance and clarification to the hearing judge. So, even though these "summary" proceedings involve thousands of pages of affidavit evidence, extensive cross-examination and many hundreds of hours of work by all parties concerned (and the applications Judge), the result does not provide a determinative finding on the patent's validity. A patent holder who fails to obtain an Order of Prohibition may still commence a patent infringement action. Conversely, a generic company against whom a Prohibition Order has been made may bring an action to impugn the patent. Given this situation, I can sympathize with the frustration expressed by Dr. Bernard Sherman who, during his testimony, expressed the following views:

> It may well be that some didn't turn his mind adequately to what happens afterwards and maybe no one even considered the possibility that there would be subsequent litigation.

> But the regime doesn't make sense if generic manufacturers are going to do the research, litigate for years, win under the regulations and then be unable to launch; particularly if there is no undertaking for damages, the industry can't survive.

**67**    However, until and unless Parliament sees fit to address the scheme of the *NOC Regulations*, the situation will arise where a party to an NOC proceeding is exposed to the risk of patent infringement or impeachment proceedings, as applicable.

**68**    This was the background against which the earlier ramipril litigation was conducted and against which I must consider such jurisprudence.

**69**    In the case of *Aventis Pharma Inc. v. Pharmascience Inc.*, 2005 FC, 340, [2005] 4 F.C.R. 301, [referred to as *Ramipril I (FC)*)], Aventis Pharma Inc. (a predecessor to Sanofi Canada) sought an Order of Prohibition, under the *NOC Regulations*, to prevent the Minister of Health from issuing an NOC to Pharmascience Inc. in respect of ramipril. At that time, three different patents were listed for ALTACE on the register maintained by the Minister pursuant to *NOC Regulations*: the '206 Patent; Canadian Patent 1,187,087 and Canadian Patent 1,246,457 (the '457 Patent). In the Notice of

Allegation served by Pharmascience in relation to its ramipril capsules, Pharmascience alleged that claims 1, 2, 3, 6 and 12 of the '206 Patent were invalid because they covered subject matter that is not patentably distinct from the subject matter of the claims of the '087 Patent and the '457 Patent. In other words, Pharmascience argued that the '206 Patent was invalid on the basis of "double patenting", an argument that is raised in the case now before me, by both Apotex and Novopharm. On the evidence before me in that application, an Order of Prohibition was issued.

**70**    My overall conclusion in *Ramipril I (FC)* was affirmed in *Pharmascience Inc. v. Sanofi-Aventis Canada Inc.*, 2006 FCA 229, [2007] 2 F.C.R. 103 [*Ramipril I (FCA)*]. Specifically, the Court of Appeal rejected Pharmascience's arguments that the '206 Patent was invalid for obviousness or double patenting.

**71**    In *Aventis Pharma Inc. v. Apotex Inc.*, 2005 FC 1283, 278 F.T.R. 1 [referred to as *Ramipril II (FC)*], Justice Anne Mactavish dismissed an application by Aventis Pharma Inc. to prohibit the Minister of Health from issuing an NOC to Apotex. The basis of Justice Mactavish's decision was that Apotex's allegation of the absence of sound prediction for the claims in question was justified. The result of this decision was that the Minister of Health issued an NOC to Apotex, permitting Apotex to market Apo-Ramipril. The decision of Justice Mactavish was affirmed by the Court of Appeal in *Aventis Pharma Inc. v. Apotex Inc.*, 2006 FCA 64, 265 D.L.R. (4th) 308 [*Ramipril II (FCA)*].

**72**    In *Sanofi-Aventis Canada Inc. v. Novopharm Ltd.*, 2007 FCA 163, [2008] 1 F.C.R. 174 [*Ramipril III*], another case dealing with NOC proceedings in respect of the '206 Patent, the majority of the Court of Appeal found it to be an abuse of process within the meaning of the *NOC Regulations* for a patent holder to relitigate an allegation of invalidity against a generic, if the allegation had been held to be well founded in an earlier proceeding against a different generic. Subsequently, Novopharm was also issued an NOC, permitting it to market Novo-Ramipril.

**73**    The final decision involving ramipril and the '206 Patent was *Sanofi-Aventis Inc. v. Laboratoire Riva Inc.*, 2007 FC 532, 58 C.P.R. (4th) 109 [*Ramipril IV (FC)*]. Justice Sean Harrington followed the Court of Appeal decision in *Ramipril III* and dismissed the application by Sanofi-Aventis et al. Because of the prospect of a successful appeal to the Supreme Court of Canada in *Ramipril II (FCA)* - which did not come to pass - Justice Harrington continued on to express his views on the substantive issues before him. While he agreed with Justice Mactavish's conclusions on the issue double patenting in *Ramipril II (FC)*, he would have come to different conclusion on the question of sound prediction. Justice Harrington, based on the evidence before him, would have concluded that there was a sound basis for Schering's prediction of ACE inhibition by the compounds of the relevant claims of the '206 Patent.

## VI. <u>Validity, Presumption and Burden</u>

**74**    The Plaintiffs bear the burden of demonstrating that the Defendants have infringed the '206 Patent. Once infringement has been established, the burden shifts. Under s. 43(2) of the *Patent Act*,

a patent is presumed valid in the absence of evidence to the contrary. The Defendants have the onus of demonstrating that the '206 Patent is not valid. The Defendants do not disagree with this burden. The parties differ, however, with respect to one aspect of the appropriate evidentiary burden on the Defendants.

**75**    The Plaintiffs point to Supreme Court jurisprudence that teaches that the burden is on the Defendants to show that the Commissioner of Patents erred in allowing the '206 Patent (see *Schmeiser v. Monsanto Canada Inc.*, 2004 SCC 34, [2004] 1 S.C.R. 902 at para. 24 (*Schmeiser)*; *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 at paras. 42-44 [referred to as *Wellcome AZT (SCC)*]). Further, the Plaintiffs submit that I should review the Commissioner's decision on a reasonableness standard, as one would do in the context of an application for judicial review of the decision by the Commissioner to issue the '206 Patent.

**76**    In my view, the burden on the Defendants in this patent infringement action is not one that can easily be defined by judicial review standards. The focus of the Court in this litigation is s. 43(2) of the *Patent Act*, which directly places the burden on the Defendants to rebut the presumption of validity. For the most part, the decision of the Commissioner is simply not relevant to the determination before me. Having said that, this does not mean that I cannot have any regard for the Commissioner's decision. Subject to weight, some determinations of the Commissioner may be of assistance.

**77**    The evidentiary burden is that of a civil burden of proof. The Defendants can meet their burden if they can persuade me, on a balance of probabilities, either that: (a) they have not infringed the '206 Patent; or (b) the claims at issue are invalid on any one of the grounds advanced by them.

**78**    In this case, the Defendants do not contest all of the claims of the '206 Patent; issue is taken only with respect to Claims 1, 2, 3, 6 and 12. Accordingly, a finding that Claims 1, 2, 3, 6 and 12 are invalid would invalidate only those claims and not the entire '206 Patent.

## VII. Claims Construction

A. *Principles of Claims Construction*

**79**    The first step in a patent suit is to construe the claims, in accordance with principles that were clearly stated in *Whirlpool Corp. v. Camco Inc.*, 2000 SCC 67, [2000] 2 S.C.R. 1067 [*Whirlpool*] and many other cases. This jurisprudence teaches that claims are to be interpreted in a purposive way in order "to achieve fairness and predictability and to define the limits of the monopoly" (*Dimplex North America Ltd. v. CFM Corp.*, 2006 FC 586, 292 F.T.R. 38 at para. 49, aff'd 2007 FCA 278, 60 C.P.R. (4th) 277 [*Dimplex*]). Where necessary, the whole of the patent, and not only the claims, should be interpreted (*Eli Lilly Canada Inc. v. Apotex Inc*, 2008 FC 142, 63 C.P.R. (4th) 406 at para. 25; *Eli Lilly Canada Inc. v. Novopharm Ltd.*, 2007 FC 596, 58 C.P.R. (4th) 214 at para. 103).

**80**     Construction of the claims is a matter for the Court to determine. The Court is called on to determine, on an objective basis, what a hypothetical skilled person would have understood the inventor to mean (*Whirlpool,* above, at paras. 45, 53). Where a patent is of a highly technical nature, the person skilled in the art will be someone possessing a high degree of expert scientific knowledge and skill in the particular branch of the science to which the patent relates (*Ramipril II (FC)*, above, at para. 64; *Apotex Inc. v. Syntex Pharmaceuticals International Ltd.*, [1999] F.C.J. No. 548 at para. 38 (C.A.) (QL)).

**81**     The Court should construe the claims in light of the description in the specification, assisted, where necessary, by experts as to the meaning of technical terms, if they cannot be understood by the Court from reading the specification (*Shire Biochem Inc. v. Canada (Minister of Health)*, 2008 FC 538, 328 F.T.R. 123 at para. 22 [*Shire*]; *Whirlpool,* above, at para. 45).

**82**     It is also important to recognize that purposive construction should be directed at the points at issue between the parties. To quote Justice Hughes in *Shire,* above, at paragraph 21:

> The Court, however is not to construe a claim without knowing where the disputes between the parties lie. To quote Justice Floyd of the England and Wales High Court (Patent Court) in *Qualcomm Incorporated v Nokia Corporation* [2008] EWHC 329 (Pat) at paragraphs 7 to 11, who in turn quoted the late Justice Pumfrey (as he then was) in *Nokia v Interdigital Technology Corporation* [2007] EWHC 3077 (Pat), "it is essential to see where the shoe pinches so that one can concentrate on the important points".

**83**     Lastly, as the '206 Patent was issued under the old *Patent Act*, all claims at issue are to be construed as of the date of issue and grant of the patent (*Pfizer Canada Inc. v. Canada (Minister of Health)*, 2005 FC 1725, 285 F.T.R. 1 at para. 36).

**84**     With these overarching principles in mind, I turn to the patent in question.

B. *Person Skilled in the Art*

**85**     Having reviewed the submissions of the parties and the expert evidence on the qualifications of a skilled person, I am satisfied that there is no material difference amongst the positions of the parties or their experts. In short, I am satisfied that the skilled person is an individual holding a Master's or Ph.D. degree in synthetic organic chemistry, medicinal chemistry, pharmacology or another area of biochemistry or biology and having at least a few years of experience in either industry or academia.

C. *Description of the '206 Patent*

**86**     As noted, claims should be construed in light of the specification offered in the patent. A brief review of the description of the '206 Patent would therefore be useful at this time.

**87**    The '206 Patent is entitled "Carboxykyl Dipeptides, Processes for Their Production and Pharmaceutical Compositions Containing Them". The introductory first paragraph of the description gives a broad description of the invention and sets the stage for the skilled reader's understanding of the claims:

> The present invention relates to carboxyalkyl dipeptides which are useful as inhibitors of angiotensin-converting enzyme and as antihypertensive agents.

**88**    The patent description then sets out that the compounds of the invention are compounds of a very general formula (referred to as Formula I). Formula I covers a huge class of compounds as it identifies numerous variable substituents and includes all possible stereochemistry and all pharmaceutically acceptable salts.

**89**    In 18 pages of the description, various configurations of Formula I are described and further formulae set out. Embodiments including bicyclic rings and spiral rings are listed and some compounds are described as "preferred" or "more preferably" or even "most preferably" (see page 14, for example). Of particular note is the fact that, beyond these bare allegations of relative effectiveness, there is no information on how these designations were arrived at and no experimental data to assist the reader in making such determinations.

**90**    Furthermore, throughout the patent, the compounds are described as including "all possible stereoisomers" (see, for example, page 16). The only statement that appears to limit stereochemistry is on page 17 where the inventors state the following:

> In general ... the aminoacid part-structures ... of Formula I are preferred in the configuration most similar to that of natural L-amino acids. Usually, natural L-aminoacids are assigned the S-configuration. A notable exception is the natural amino acid L-cysteine which is assigned the R-configuration.

**91**    These descriptions are all so broad as to be of little use in interpreting the claims of the patent.

**92**    Beginning on page 18, the description turns to the making of the compounds, stating that:

> The compounds of the present invention can be produced by one or more of the methods and subroutes depicted in the following equations. Reactive groups not involved in the condensations described below such as amino, carboxy, mercapto, etc., may be protected by methods standard in peptide chemistry prior to the coupling reactions and subsequently deprotected to obtain the desired products. In other words, in the formula of the following description of the processes R, R1, R2, R3, R4, R5, R6 and R7 are as defined above for Formula I, including suitable protection.

Following these introductory words, the writers describe processes A to E by which a compound of

Formula I can be obtained. Once obtained, a compound "obtained by any one of processes A to E can be transformed into another compound of formula I by methods known in the art" (p. 22). The first mention of diastereomers and mixtures of compounds and the need to separate them is found at page 23, where it is stated that:

> In the compounds of Formula I, the carbon atoms to which R1, R3 and R5 are attached may be asymmetric. The compounds accordingly exist in disastereoisomeric [sic] forms or in mixtures thereof. The above described syntheses can utilize racemates, enantiomers or diastereomers as starting materials. Enantiomeric intermediates may be obtained by resolution methods known in the art. When diastereomeric products result from the synthetic procedures, the diastereomeric products can be separated by conventional chromatographic or fractional crystallization methods.

**93**    With respect to the making of the compounds of Formula I, I can see no limiting language. That is, while the description sets out some ways to obtain the compounds, I read this to mean that there may be other processes that could be used. The experts do not disagree with this interpretation. For example, during his appearance, Dr. Fleming agreed that "the teaching of this patent is that bicyclic ring is either a known compound and/or can be prepared according to known methods". Applying this finding to the claims, I would not construe the patent claims to require that the claimed compounds result from any particular synthesis route.

**94**    Beginning at page 26 of the '206 Patent, the description sets out 67 examples which "illustrate the preparation of the compounds of the present invention". The authors state that any diastereomers prepared by any of the methods "may be isolated by column chromatography or fractional crystallization". Of particular interest in this litigation is Example 20, which sets out the method for making 1-[N-(1-carboethoxy-3-phenylpropyl) - (S)-alanyl] octahydrocyclopenta [b] pyrrole-2(S)-carboxylic acid:

> A.    Substitute octahydrocyclopenta [b] pyrrole (prepared by reduction of 2-ketooctahydrocyclopenta [b] pyrrole in tetrahydrofuran with lithium aluminum hydride) for octahydroisoindole in Example l8A to obtain octahydrocylo-penta [b] pyrrole-2-carboxylic acid.
>
> B.    Use ethyl octahydrocyclopenta [b] pyrrole-2-carboxylate (prepared by esterification with the ethanol of the acid prepared as described in paragraph A) in place of ethyl octahydroindole-2-carboxylate in the procedure described in paragraphs B through E of Example 1 to give the title compound.

**95**    Example 20A, in turn, relies on Example 18A which is as follows:

> 2-[N- (l-carboethoxy-3-phenylpropyl) - (S) -alanyl] octahydroisoindol -1(S) - carboxylic acid

Heat <u>cis</u>-octahydroisoindole (prepared by reduction of <u>cis</u>-hexahydrophthalimide in tetrahydrofuran with lithium aluminum hydride) and mercuric acetate in 10% aqueous acetic acid under reflux for twenty hours to give <u>cis</u>-hexahydro-?1-isoindole. Dissolve this compound in water and treat with potassium cyanide followed by 2N hydrochloric acid at 0 degrees for two hours and at room temperature for twenty hours to give l-cyano-<u>cis</u>-octahydroisoindole. Heat this cyano compound in 6N hydrochloric acid under reflux for 6 hours followed by concentration of the reaction mixture and absorption of the residue on an XAD-2 resin column. Elute with methanol to obtain <u>cis</u>-octahydroisoindole-l-carboxylic acid.

**96**    Following the examples, at pages 72 to 97, a lengthy list of compounds is provided, which compounds, according to the inventors "exemplify the compounds of formula I, which can be prepared according to the described processes".

**97**    Finally, beginning at page 97, the description sets out sample formulations that are "illustrative of the present invention" and notes that:

> It will be apparent to those skilled in the art that many modifications, both of materials and methods, may be practiced without departing from the purpose and intent of this disclosure.

**98**    With the perspective given by this lengthy disclosure, I turn to the construction of the claims at issue, beginning with Claims 1, 2, 3 and 6.

D. *Construction of Claims 1, 2, 3 and 6*

**99**    There is no material controversy over the proper construction of Claims 1, 2, 3 and 6. Those claims state as follows:

1. Compounds having the general formula:



wherein:

Y is selected from:



R₄ is selected from hydrogen and C₁₋₄ alkyl;
R₁ is selected from C₁₋₄ alkyl which may be substituted with amino;
R₂ is selected from hydrogen and C₁₋₄ alkyl;
R₃ is selected from phenyl—C₁₋₃ alkyl and (CH₂)₁₋₂—X—C₁₋₄ alkyl wherein X is S or NH; and
their pharmaceutically acceptable salts.

2. Compounds having the general formula:



wherein:

Y is selected from:



R₄ is selected from hydrogen and C₁₋₄ alkyl
R₁ is selected from C₁₋₄ alkyl which may be substituted with amino;
R₂ is selected from hydrogen; and C₁₋₄ alkyl;
R₃ is selected from C₁₋₉ alkyl, phenyl—C₁₋₃ alkyl and (CH₂)₁₋₂—X—C₁₋₄ alkyl wherein X is S or NH; and
their pharmaceutically acceptable salts.

3. Compounds having the general formula:



wherein:

Y is selected from:



R₁ is selected from C₁₋₄ alkyl which may be substituted with amino;
R₂ is selected from hydrogen and C₁₋₃ alkyl;
R3 is selected from phenyl – C₁₋₂ alkyl;
and their pharmaceutically acceptable salts.

6. Compounds having the general formula:



wherein:

R₁ is selected from C₁₋₄ alkyl;
R₂ is selected from hydrogen and C₁₋₄ alkyl; and
R₄ is selected from hydrogen and C₁₋₄ alkyl; and
their pharmaceutically acceptable salts.

**100**    Each of Claims 1, 2, 3 and 6 is what is known as a "*Markush*" claim. (*Markush* claims were named after Eugene Markush, the first inventor to use them successfully in a U.S. patent (see *Ex parte Markush*, 1925 Dec. Comm'r Pat. 126, 128 (1924)). A *Markush* claim is expressed as a chemical formula with multiple "functionally equivalent" chemical entities allowed in one or more parts of the compound. In very general terms and as described by Schering in its final argument, each of Claims 1, 2, 3 and 6 claims a class of compounds containing various ring moieties, which are coupled with a "backbone" taught in the earlier Merck enalapril patent.

**101**    Claims 1, 2 and 3 describe subclasses of compounds which can cover the following analogues of enalapril:

-    octahydroindole (which can be referred to as "6,5-saturated bicyclic ring");
-    perhydroquinoline and perhydroisoquinoline (which can be collectively referred to as "6,6-saturated bicyclic ring);
-    octahydrocyclopenta[b]pyrrole (which can be referred to as "5,5-saturated bicyclic ring"); and
-    1,4-dithia-7-azaspiro[4.4]nonane (which can be referred to as "spirocyclic").

**102**    Because of the multiple variations of substituents described in each of Claim 1 and 2 and the existence of unspecified chiral centres, the number of compounds encompassed is vast. For example, Dr. McClelland estimated that Claim 1 would cover about 29 million compounds. Claim 2 is even larger (about 228 million compounds). Claim 3 is slightly narrower (about 215,424 compounds), according to the evidence of Dr. McClelland.

**103**    Claim 6 is limited to 5,5-saturated compounds, where R1, R2 and R4 have the options described in the claim. The structure drawn in Claim 6 contains five asymmetric carbon atoms; the claim does not specify chirality at any of the five asymmetric carbon atoms or stereocentres. According to Dr. McClelland, Claim 6 would include about 28,800 compounds.

**104**    It was accepted by all of the experts that ramipril is one of the compounds covered by Claims 1, 2, 3 and 6.

E. *Construction of Claim 12*

**105**    Insofar as Novopharm is concerned, the "shoe pinches" in the construction of Claim 12 of the '206 Patent. Claim 12 is as follows:

12.    The compound 1- [N- (l-carboethoxy-3-phenylpropyl) - (S) - alanyl] octahydrocyclopenta [b] pyrrole-2 (S) -carboxylic acid and its pharmaceutically acceptable salts thereof.

**106**    As written, Claim 12 specifies the stereochemistry at only two stereocentres: (S)-alanyl and

2(S)-carboxylic acid at the 2-position of the bicyclic ring structure. As noted, those are set in the S configuration; the others are not specified. Yet, as agreed by all of the experts and accepted by me, the skilled person would know that the described structure would have five stereocentres or chiral centres. Since the Claim does not exclude any possible diastereomers for the unspecified three stereocentres, Claim 12 includes eight possible compounds. Each compound would have two centres designated in the S configuration, with the other three in either an R or S configuration. When all stereocentres are in the S configuration, the compound is ramipril.

**107**    With respect to the construction of Claim 12, the question that has arisen is whether it claims each of the eight individual diastereomers, as submitted by Schering and Sanofi, or only a mixture of the eight - and not to the individual diastereomers - as asserted by Novopharm. Initially, both Apotex and Novopharm claimed that Claim 12 was a claim to a mixture. In final argument, only Novopharm pursued this argument. The question is important because, if Novopharm is correct, Claim 12 cannot be construed to cover ramipril.

**108**    Except for two Novopharm expert witnesses, all of the experts accepted that Claim 12 is a claim to eight individual diastereomers, one of which is ramipril. Specifically, the testimony of Drs. Bartlett, Patchett, Nelson and Wuest for the Plaintiffs and Drs. Thorsett, Fleming and McClelland for Apotex was consistent with this construction of Claim 12. Novopharm's experts, Dr. Ehlers and Dr. Moody, were the only experts to differ. I turn to a consideration of the arguments for the "mixture construction" advanced by Novopharm and its two experts.

**109**    Briefly stated, the arguments of Novopharm can be summarized as follows:

- In Claim 12, the patentee uses the singular word "compound". In contrast, the plural word "compounds" is used in claims 1, 2, 3 and 6, each of which include many compounds.
- Dr. Ehlers opined that chemists often do not resolve and characterize diastereomers; the product of a reaction will often be referred to as "the compound", even where it is a mixture of diastereomers.
- In the disclosure, the word "compound" is used to describe mixtures of diastereomers. By way of example, Example 20B states that the process described will give "the title compound"; the title compound in Example 20 is a mixture of diastereomers. Importantly, since the compound named in Example 20 is the "compound" claimed in Claim12, this means that the claim refers to a single compound.
- As acknowledged by Dr. Bartlett, the majority of the examples in the '206 Patent are for a compound which consists of a mixture of diastereomers.
- The use of the word "compound" to describe a mixture is consistent with the common use of the word; even Dr. Patchett referred to a mixture as a compound in the scientific paper published in *Nature Magazine* that disclosed enalapril.

**110**    I am not persuaded that the construction proposed by Novopharm should prevail.

**111**    The first problem that I have with the submissions relates to the comparison of Claim 12 to Claims 1, 2, 3 and 6. Claim 12 differs fundamentally from the earlier claims in that it describes only one chemical formula. In contrast, claims 1, 2, 3 and 6 are *Markush* claims. As such, the plural "compounds having the general formula" is used because the alternative -- writing each of the names of the compounds covered -- would be a tedious and unnecessary exercise. Thus, it is logical to refer to Claims 1, 2, 3 and 6 as "compounds", while using the term "compound" to describe the sole chemical formula given by Claim 12. The construction that I have adopted finds further support in a review of all of the claims of the '206 Patent, which discloses that the word "compounds" is used for all of the *Markush* claims and the word "compound" where a general formula is not used. Therefore, I do not believe that any deeper inference should be drawn from the use of "compounds" in Claims 1 to 7 and "compound" in Claims 8 to 13.

**112**    When I review the format of the claims in the context of the entire patent, I am satisfied that the use of the word "compound" in Claim 8 was never intended to apply to only a mixture. Rather, it appears to me that the word was used only as a means to differentiate the later claims from the earlier *Markush* claims. Novopharm's interpretation of the word "compound" in isolation from the balance of the '206 Patent ignores this difference.

**113**    With respect to some of the other arguments of Novopharm, I am not in disagreement. Dr. Ehlers is no doubt correct that scientists may sometimes refer to a mixture as a "compound". Nevertheless, I do not believe that one can draw from this a conclusion that every reference to a "compound" is to a mixture or that the use of the word "compound" precludes use of the word to describe more than one compound.

**114**    Novopharm also submits that its interpretation of Claim 12 is consistent with the fact that Schering had not, as of the Canadian filing date, made any of the diastereomers of Claim 12 as a single compound, but only as mixtures. Thus, Novopharm argues, Schering did not have sufficient information to claim each compound on its own.

**115**    The basic flaw in this argument is that, on these facts, it is illogical. Novopharm is correct that Schering had not made the individual compounds. However, it also never made a mixture of all eight compounds included in the Claim 12 description. The application of Novopharm's reasoning would lead to the absurd conclusion that Claim 12 cannot cover either the individual compounds or a single mixture of all eight. The more serious problem with Novopharm's submission is that Schering was not required to make each of the individual compounds claimed, provided that there was a sound prediction that the claimed compounds of Claim 12 would be useful. Therefore, the fact that each of the eight compounds claimed in Claim 12 has not been made has no bearing on the proper construction of that claim. The question of sound prediction is addressed later in these reasons.

**116**    The notion of Claim 12 as a mixture was unequivocally rejected by most of the experts. Dr.

Bartlett's testimony on this question was particularly helpful. When asked in direct examination about his view of the construction of Claim 12, Dr Bartlett noted that chemists will "use the term compound when what we are talking about is a conceptual structure". He also pointed out aspects of the '206 Patent that would lead a skilled reader to interpret Claim 12 as a claim to eight individual compounds. One such point is that the patent teaches separating mixtures of compounds to obtain individual stereoisomers, thereby inferring that individual stereoisomers are the claimed products. Even Dr. Moody, in cross-examination, agreed that the patent teaches to separate mixtures by known methods such as conventional chromatographic separation or fractional crystallization. If Novopharm's construction is correct and the claims refer only to mixtures, then why would the inventors instruct the skilled reader on how to separate such mixtures?

**117**    Dr. Bartlett also referred to Claim 8, a claim not in dispute but which is described as a "compound". With no stereochemistry identified, there are 32 possible compounds. On Novopharm's interpretation, Claim 8 would be a mixture of all 32 compounds. This, as Dr. Bartlett opined, would lead to an absurdity since Example 67 of the '206 Patent illustrates the preparation of an all-S configuration compound that would be included in Claim 8. Why would an inventor explicitly describe the preparation of a compound in the specification and then claim the compound only as a mixture with 31 others?

**118**    In sum, I prefer the evidence of Dr. Bartlett and the other experts for Sanofi, Schering and Apotex over that of Dr. Ehlers and Dr. Moody. As taught by *Whirlpool*, above, at paragraph 49, claims "must be read with a mind willing to understand". In my view, a skilled reader would not embark on a dry, linguistic interpretation of this patent but would read the claims in the context of the specification and having regard to the inventor's purpose. Reading Claim 12 as proposed by Novopharm is not a reading by a mind willing to understand but by a mind seeking to distort the logical meaning that flows from a reading of the claims in their context. I find that a person skilled in the art would construe Claim 12 as a claim to eight individual compounds. One of those compounds is ramipril.

F. *The "Promise" of the ' 206 Patent*

**119**    A serious disagreement exists between the experts for the Defendants and the Plaintiffs on the question of whether claims should be construed to include an inherent promise that the compounds are useful as both ACE inhibitors and as antihypertensive agents. The experts for Apotex and Novopharm construe the patent such that the compounds claimed would have utility in both ACE inhibition and reduction of high blood pressure. In contrast, the experts for Schering and Sanofi are of the view that the claims do not include a promise of antihypertensive reduction.

**120**    The place to begin is the '206 Patent specification. What meaning can be drawn from the words used by the inventors to describe their invention?

**121**    As noted, the '206 Patent opens with a simple declaration that:

> The present invention relates to carboxyalkyl dipeptides <u>which are useful as inhibitors of angiotensin-converting enzyme and as antihypertensive agents.</u> [Emphasis added]

**122**    A key statement is made on p. 24 of the patent specification, where the inventors state that

> The compounds of this invention have useful pharmacological properties. <u>They are useful in the treatment of high blood pressure.</u> The compounds of the present invention can be combined with pharmaceutical carriers and administered in a variety of well known pharmaceutical forms suitable for oral or parental administration <u>to provide compositions useful in the treatment of cardiovascular disorders and particularly mammalian hypertension</u>. [Emphasis added]

**123**    There is absolutely no language on p. 23-25 of the patent description that places any limitation on the usefulness of any of the compounds. There is nothing in the words that can be read to indicate that only some of the compounds will be useful or that only some of them will work as either ACE inhibitors or antihypertensive agents.

**124**    When these provisions at pages 23-25 of the patent are read in light of the assertion that the compounds "are useful in the treatment of high blood pressure", I believe that the skilled reader would assume that the inventors were alleging that all of the compounds covered by Formula I would be useful in treating hypertension. Of course, the compounds claimed in the patent are subsets of those included in Formula I. Thus, if the patent is interpreted such that it asserts that all of the compounds will be useful in the treatment of hypertension, it follows that the inventors are also asserting that all of the claimed compounds of Claim 12 (and the other claims) would have such use.

**125**    This interpretation of the promise of the patent was accepted by a number of the experts for the Defendants, including Drs. Thorsett, Moody, Patchett and Ehlers.

**126**    Dr. Bartlett was the key expert witness for the Plaintiffs on this aspect of the '206 Patent. Specifically, his view of the promise of the patent, as contained in his expert report, is as follows:

> In my opinion, the person of ordinary skill would understand the logical linkage between ACE inhibition and antihypertensive activity ... ; that is, that the compounds of the patent have activity as ACE inhibitors and that the utility of ACE inhibitors in medicine is as potential antihypertensive agents. The person of ordinary skill would not believe that every compound that has ACE inhibitory activity would possess all of the other properties necessary to exert an in vivo antihypertensive effect.

**127**    In criticizing the experts who disagreed on this point, Dr. Bartlett stated that:

> In suggesting that every individual stereoisomer of every structure covered by the 206 Patent will possess the panoply of properties that is required for a drug to be effective in the treatment of a disease, Drs. Thorsett, Freidinger [who did not testify], and Ehlers are setting the bar too high. Indeed, at the time a patent is applied for, it is simply not possible for the inventors to have carried any compound covered far enough into commercial development to be able to assess whether it possesses all the properties, including lack of side effects or toxicity, that would enable it to be used to treat a disease like high blood pressure. Such an interpretation would be inconsistent with the understanding of a person skilled in the art with respect to a large number of other patents in the field of ACE inhibition and in other fields of medicinal chemistry where the activity of a compound can be linked to a means of treating a disease.

**128**    This passage demonstrates that Dr. Bartlett has not construed the claims in light of the promised utility; rather he has modified or read down the promise of the patent to suit his understanding of the claims. I cannot accept this reasoning. Such an approach to the question of the promise of the patent excuses the inventors from any requirement of precision in their claims or in the patent specification. If a patentee promises a particular result, he should be held to that promise. In expressing this view, I am not requiring commercial success or a certain level of commercial development to have taken place. As noted, a "mere scintilla of utility" would be sufficient. Schering could have claimed only those compounds for which it had obtained some level of *in vivo* activity and those other compounds "more or less closely related", (*Monsanto Co. v. Commissioner of Patents* (1979), 42 C.P.R. (2d) 161 at 175 (S.C.C.) [*Monsanto*]), where it could reasonably infer some factual basis for concluding that activity could be predicted. Instead, Schering chose to claim a huge class of compounds; they should be construed in light of the promised utility described in the patent.

**129**    I have another problem with the testimony of Dr. Bartlett. As was drawn to the attention of Dr. Bartlett and the Court, Dr. Bartlett's evidence in *Laboratoires Servier v. Apotex Inc.*, 2008 FC 825, 332 F.T.R. 193 [*Perindopril*] was inconsistent with his position before this Court. During cross-examination of Dr. Bartlett on this point, Dr. Bartlett expressed the opinion that the promise in Canadian Patent No. 1,341,196 (the '196 Patent) (the patent considered in *Perindopril*) was the same promise as that found in United States Patent No. 4,105,776 (Squibb) and United States Patent No. 4,374,829 (Merck):

> Q.    And you would agree with me that this Merck patent would be an example of something that would be contrasted to the '196 Patent and its promise?
> A.    The wording is different. I think that one of skill in the art would understand that all of the patents in this field rest on the same scientific basis which I outline in my report; that is, people understand that inhibition of angiotensin-converting enzyme in vivo leads to an antihypertensive effect and, therefore, the utility of ACE inhibitors is as potentially antihypertensive agents.

> I think although the wording of the French patent is different from the
> wording of these English language patents, <u>I think a person of ordinary skill in
> the art would take [the '196 Patent and the '206 Patent] as the same art and the
> same purpose and the same teachings in that sense.</u> [ Emphasis added]

**130**    This is in stark contrast to his opinion in the *Perindopril* litigation in which Dr. Bartlett
suggested that, unlike the *Perindopril* patent, the same Squibb and Merck patents and other patents
in the field were promising both antihypertensive and ACE inhibition activity. The following are
paragraphs from Dr. Bartlett's *Perindopril* report that were read into the record during his
cross-examination in this proceeding:

> An antihypertensive effect of the compounds is not expressly promised by the
> '196 Patent. However, it was understood by the 1980s, and certainly by the
> publication date, that inhibition of angiotensin-converting enzyme in vivo leads
> to a lowering of arterial blood pressure. It was thus understood by one of skill in
> the art that the utility of an angiotensin-converting enzyme inhibitor is as a
> potential antihypertensive agent.

> The explicit promise of the '196 Patent is that the compounds disclosed are
> inhibitors of ACE, <u>a promise that is less encompassing than that of other issued
> patents in the field.</u> Merck's patents [e.g., the '829 Patent] that cover the
> carboxyalkyl dipeptide class of ACE inhibitors stated that the compounds are
> useful as converting-enzyme inhibitors <u>and</u> as antihypertensives. ... and as
> antihypertensives... . The patents from the Squibb Research Group [e.g., the '776
> Patent] which cover a variety of ACE inhibitors classes state ... [Emphasis added]

**131**    The difficulty that I have with how Dr. Bartlett has interpreted the promise of the '206 Patent
together with his inconsistent testimony as between the *Perindopril* action and this litigation leads
me to question his objectiveness and to reduce the weight that his evidence on this point should be
accorded.

**132**    On this question, I prefer the opinion of Dr. Thorsett and Dr. Ehlers, each of whom
concluded that the '206 Patent promises that all of the compounds will have utility as both ACE
inhibitors and antihypertensives.

**133**    My conclusion of a dual promise is consistent with existing jurisprudence on the promised
utility of this and other ACE inhibition patents.

**134**    Although the decision of Justice Mactavish in *Ramipril II (FC)*, above, may not be binding, I
observe that Justice Mactavish was faced with the same question of the promise of the '206 Patent.

Her conclusion was that the '206 Patent had a two-fold promise: "that is, the patent promises that the compounds claimed by the patent will have utility as both ACE inhibitors and as anti-hypertensive agents" (*Ramipril II (FC)*, above, at para. 280). Similarly, Justice Harrington in *Ramipril IV (FC)*, above, at paragraph 45, stated that "The promise was simply that the compounds claimed by the patent would have utility as both ACE inhibitors and anti-hypertensive agents".

**135**    My assessment of the promise of the '206 Patent is also consistent with the determination of Justice Elizabeth Heneghan in *Pfizer Canada Inc. v. Apotex Inc.*, 2005 FC 1205, 43 C.P.R. (4th) 241 [*Pfizer Quinapril (FC)*]. In that case, Justice Heneghan was asked to examine the utility of claims of Canadian Patent No. 1,341,330 ('330 Patent), which patent covers another drug in the general class of ACE inhibitors. Pfizer argued that a purposive construction of the relevant claims, including reference to the specifications, discloses that the invention of the '330 Patent relates to ACE inhibition. On the other hand, Apotex argued that all of the claims of the '330 Patent promise compounds useful in reducing or relieving hypertension, which is distinct from ACE inhibition. With reference to the specification of the '330 Patent, Justice Heneghan concluded that the claims of the '330 Patent would be read by a person skilled in the art as referring to compounds useful for the relief of hypertension (*Pfizer Quinapril (FC)*, above, at para. 64). It appears clear that she reached this conclusion on the basis of specific words in the '330 Patent. The abstract of the patent stated that: "The compounds of the invention, their salts and pharmaceutical compositions thereof <u>are useful as antihypertensive agents</u>" [Emphasis added]. Another example of this direct promise could be seen in the sentence in the specification that read:

> Thus by the administration of a composition containing one or a combination of compounds of formula I or pharmaceutically acceptable salts thereof, hypertension in the species of mammal suffering therefrom is alleviated (*Pfizer Quinapril (FC)*, above, at para. 65).

**136**    Although this decision was reversed in the Federal Court of Appeal, the Court of Appeal concluded that Justice Heneghan's characterization of the promise of the '330 Patent "is reasonable in light of the passage cited above and the overall [tenor] of the disclosure" (*Pfizer Canada Inc. v. Apotex Inc.*, 2007 FCA 209, 60 C.P.R. (4th) 81 at para. 121 [*Pfizer Quinapril (FCA)*]. The words of the specification for the '330 Patent and those contained in the '206 Patent are similar.

**137**    In contrast, I observe the promise expressed in the words of the '206 Patent as compared to those of the '196 Patent considered in *Perindopril*, above. In *Perindopril*, the patent at issue related to a large class of compounds all of which were promised to have utility as ACE inhibitors. Apotex, in that case, argued that the patent made a two-fold promise; that is, the '196 Patent promised that all of the compounds would have utility as both ACE inhibitors and as antihypertensive agents. In rejecting that argument, I noted that "there is no statement in the '196 Patent, as there was for the '330 Patent, that the compounds of the invention ... are useful as antihypertensive agents". (*Perindopril*, above, at para. 292). In the case now before me, there is such an explicit statement.

G. *Summary on Construction*

**138**    In sum, the key aspects of the construction of Claims 1, 2, 3, 6 and 12 are as follows:

- Each of Claims 1, 2, and 3 claims a class of compounds all of which contain various ring moieties coupled with a "backbone" taught in the earlier Merck enalapril patent. The various bicyclic moieties encompass the following:

  - octahydroindole (which can be referred to as "6,5-saturated bicyclic ring");
  - perhydroquinoline and perhydroisoquinoline (which can be collectively referred to as "6,6-saturated bicyclic ring");
  - octahydrocyclopenta[b]pyrrole (which can be referred to as "5,5-saturated bicyclic ring"); and
  - 1,4-dithia-7-azaspiro[4.4]nonane (which can be referred to as "spirocyclic ring").

- Claim 6 is limited to compounds with a 5,5-saturated bicyclic ring structure.
- Claim 12 is a claim to 8 individual stereoisomers - all with a 5,5-saturated bicyclic ring structure - as described in the stated formula.
- Inherent in Claims 1, 2, 3, 6 and 12 is the utility of the compounds in inhibiting ACE <u>and</u> reducing hypertension.

## VIII. <u>Infringement</u>

**139**    A patent grants to the patentee, for the term of the patent, "the exclusive right, privilege and liberty of making, constructing, using and vending" (*Patent Act*, s.44). The question to be asked by the Court in determining infringement is: did the defendant by his acts or conduct, deprive the inventor, in whole or in part, directly or indirectly, of the advantage of the patented invention? (*Schmeiser*, above, at para. 44)

**140**    In December 2006, Apotex received an NOC from Health Canada allowing it to market and sell ramipril capsules under the trade name of Apo-Ramipril. In May 2007, Novopharm received an NOC to market and sell ramipril capsules under the trade name of Novo-Ramipril. The evidence is clear that the sale of Apo-Ramipril and Novo-Ramipril constitutes an infringement of Claims 1, 2, 3, 6 and 12 of the '206 Patent. Infringement has been proved by the Plaintiffs.

**141**    In the event that I were to find that the '206 Patent was infringed and valid, the only question that would remain is whether all ramipril product handled by the Defendants should be characterized as infringing product. Since I conclude, for the reasons that follow, that the claims in issue are not valid, there is no need to examine whether some volumes of product manufactured or in the possession of the Defendants should be exempted from liability. However, should it become

necessary to do so I would begin with the exemption from liability pursuant to s. 55.2(1) of the *Patent Act* (as it now applies) or because of relevant common law principles.

## IX. Utility

A. *General Principles*

**142**    The *Patent Act* defines an invention as something that is "new and useful" (*Patent Act*, s. 2). From this comes the concept of "utility".

**143**    A number of principles associated with the law of utility are well established through the jurisprudence. To begin, the overarching concept is that, as of the relevant date, there must have been a demonstration of utility of the invention or, lacking that, a sound prediction of utility based on the information and science available at the time of the prediction (see, for example, *Merck & Co. v. Apotex Inc.*, 2005 FC 755, 41 C.P. R. (4th) 35 at para. 121; *Pfizer Canada Inc. v. Apotex Inc.*, 2007 FC 26, 306 F.T.R. 254 at paras. 36-40, aff'd 2007 FCA 195, leave to appeal to S.C.C. refused, [2007] S.C.C.A. No. 371).

**144**    As with the other questions of validity, the Defendants bear the burden. To demonstrate lack of utility, the Defendants must show "that the invention will not work, either in the sense that it will not operate at all or, more broadly, that it will not do what the specification promises that it will do" (*Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.* [1981] 1 S.C.R. 504 at 525 [*Consolboard*]). As stated in *Wellcome AZT (SCC)*, above, at paragraph 56:

> If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, per Pigeon J. in Monsanto Co. v. Commissioner of Patents, [1979] 2 S.C.R. 1108, at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

**145**    Beyond these general statements of the law, there are a number of other guiding posts:

-    Where the specification does not promise a specific result, no particular level of utility is required - a "mere scintilla" of utility will suffice (H.G. Fox, *Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 153). However, as stated in *Consolboard*, above, where the specification sets out an explicit "promise", utility must be measured against that promise (see also *Pfizer Canada Inc. v. Canada (Minister of Health)*, 2008 FCA 108, 67 C.P.R. (4th) 23 at para. 53 [*Pfizer Atorvastatin (FCA)*]);

-    Utility does not depend upon marketability (*Consolboard*, above, at 525; *Ramipril II (FC)*, above, at paras. 271-272). In other words, in assessing whether an invention has utility, the issue is not whether the invention is sufficiently

useful as to be able to support commercialization, unless commercial utility is specifically promised;

- The relevant date has been held to be the filing of the Canadian patent application (*Ramipril II (FC)*, above, at paras. 88-96); and

- Where a claim is to a class of compounds, lack of utility of one or more of the compounds will invalidate all of the compounds of that particular claim (*Ramipril II (FCA)*, above, at para. 26).

**146**    The doctrine of sound prediction can be relied upon by an inventor to justify patent claims whose utility has not actually been demonstrated, but can be soundly predicted based upon the information and expertise available (*Wellcome AZT (SCC)*, above, at para. 56). At paragraph 70 of *Wellcome AZT (SCC)*, above, the Supreme Court of Canada articulated a three-part test that must be satisfied in order to establish that a sound prediction has been made by the an inventor. The three elements of the test are:

1.    There must be a factual basis for the prediction;
2.    The inventor must have an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis; and
3.    There must be proper disclosure.

**147**    To be sound, a prediction does not need to amount to a certainty, as it does not exclude the risk that some compounds within the area claimed may, at some later time, prove to be devoid of utility. With these principles in mind, I turn to the '206 Patent and the evidence before me.

**148**    As of the Canadian filing date - that is, October 20, 1981 - Schering had not made and tested all of the compounds that are included in the claims in dispute. While Schering had carried out some testing and obtained some positive results, it is evident that the efficacy of most of the compounds of the '206 Patent was based on a prediction. In other words, Schering - supported by Sanofi - asserts that the prediction of utility of all compounds included in the claims of the '206 Patent was sound.

**149**    The Defendants are not asserting that there is evidence of lack of utility. Rather, they submit that the prediction at the date of application was not sound.

**150**    I will focus first on the eight compounds of Claim 12. If the defendants are successful in their arguments with respect to any one of the compounds of Claim 12, they have met their burden. Since Claims 1, 2, 3 and 6 all encompass Claim 12, they will also fail if Claim 12 fails.

B. *Sound Prediction: Factual Basis and Articulable and Sound Line of Reasoning*

**151**    The question of sound prediction is one of fact (*Wellcome AZT (SCC)*, above, at para.71). The inventors must be able to show that, at the relevant time, they were in possession of a factual basis upon which they could articulate the desired result. It is important to note that the perspective

being examined at this stage is a subjective one. In assessing sound prediction, we are not confined to examining the invention through the eyes of a person skilled in the art. Rather, the knowledge, activities and endeavours of the inventors themselves must be considered.

**152**    As noted, the first two prerequisites for sound prediction are that the inventors had: (a) a factual basis for their conclusion; and (b) an articulable line of reasoning from which the desired result can be inferred from the factual basis. In this case, the two prongs of the test work in tandem. The Plaintiffs submit that their sound prediction rests on a combination of Schering's research program into ACE inhibitors and the publicly-available literature and other information, from which they could infer utility of those compounds not yet tested. In other words, they argue that the actual research work of the Schering scientists, together with knowledge in the public domain, would have given Schering a factual basis and an articulable line of reasoning to soundly predict, as of October 20, 1981, that all of the compounds of Claim 12 of the '206 Patent would have utility.

**153**    Keeping in mind that utility is measured against the promise of the '206 Patent, the question before me is: did Schering have a factual basis for predicting that all eight compounds of Claim 12 would have utility as ACE inhibitors and antihypertensives?

**154**    In responding to the question of sound prediction, I was provided with the opinions of a number of experts: for the Defendants, Drs. Thorsett and Ehlers, and Drs. Bartlett, Patchett and Nelson, for the Plaintiffs. These experts provided substantive views, supported by their reading of the research carried out by the Schering scientists and of the literature and other publicly available information. Not surprisingly, the Defendants' experts concluded that there was no factual basis and the Plaintiffs' experts reached the opposite conclusion.

**155**    The opinions of the experts were of assistance, particularly in the understanding of the literature and knowledge in the field. However, in assessing the factual basis, the task facing me was to comprehend the nature and extent of the work of the Schering scientists. Fortunately, I had the benefit of hearing from Dr. Smith and Dr. Neustadt, two of the named inventors of the '206 Patent. These two witnesses spoke candidly and honestly about the research program of Schering and about their understanding of the knowledge in the field at the relevant time of October 20, 1981.

(1)    Importance of Stereochemistry

**156**    The stereochemistry of potential ACE inhibitors and, thus, of the compounds of Claim 12 is an important element in assessing the potential activity of any given compound. I begin by expanding on the stereochemistry of Claim 12. For the assistance of the reader, I have included a diagram of Claim 12, taken from the Report of Dr. Thorsett, showing the location of the five chiral centres of the compounds covered by that claim.



**Molecular Depiction of Claim 12**

**157**   The skilled person would recognize that the compound described in Claim 12 would have five chiral centres. Two of the centres - at the 2 position or the carboxylic acid position of the bicyclic ring moiety (2(S)-carboxy group) and at the alanyl position on the backbone - have been specified as being in the S configuration. The stereochemistry of the bridgehead carbons - at the 3a and 6a positions - and the chiral centre nearest the carboethoxy moiety have not been specified. Throughout the experts' reports, the chiral centre nearest the carboethoxy group is referred to by a variety of names. The experts (as have I in these Reasons) interchangeably described this position on the molecule as the carboethoxy or pro-drug position, centre or site.

**158**   The skilled person would recognize that there are four different orientations for the bridgehead carbons. When these carbons are both oriented in the same direction, the structure is described as "*cis*"; the two parts of the ring will form a "V" shape. When both are in the S configuration together with the 2(S) carboxy group, the result is a structure described as "*cis-endo*" ((S,S,S) configuration). When both are in the R configuration, with the carboxylic group still fixed in the S configuration, the result is "*cis-exo*" (R,R,S). If the carbons at the bridgehead are differently oriented from each other, the compound is said to be in the "*trans*" configuration. When joined with the carboxylic acid fixed as S at the 2-position, the two possible structures have configuration of (3aR,6aS,S) and (3aS,6aR,S). The shape of these two structures can be described as being in a "W" shape.

**159**    The final unspecified chiral centre in Claim 12 is at the carboethoxy position on the enalapril backbone. Depending on whether this position is R or S, the resulting compounds will have materially different shapes. Combining the two possible configurations of the carboethoxy position on the backbone with the possibilities for the bridgehead, we can recognize that there are eight possible configurations for the compounds of Claim 12.

**160**    The importance of the stereochemistry of the Claim 12 compounds was discussed by a number of experts. It appears to be common ground that even small changes to a molecule can have profound effects on activity.

**161**    Therefore, depending on differences in stereochemical configuration, the eight 5,5 bicyclic stereochemical configurations possible for Claim 12 would have conformational and spatial differences. As a result of the different conformations, it may be difficult to extrapolate the activity of one stereochemical configuration based on that of another. This was confirmed by Dr. Ehlers and Dr. Thorsett.

**162**    Moreover, it would be understood that a change in conformation or orientation of one group of an ACE inhibitor could have an impact upon the ability of other groups of the ACE inhibitor to bind to the enzyme. Dr. Nelson agreed that "the effects of multiple chiral centres are not expected to be additive, since a change from R to S at one centre may alter other aspects of the ligand enzyme interactions". In his expert report, Dr. Ehlers described the situation as follows:

> Generally, most of the substituents (including the side chains) on an inhibitor will interact with the active site in a manner analogous to a key fitting into a lock. If a side chain or group is no longer present, or if its shape or orientation has changed, then the compound may no longer fit in the active site and therefore may no longer act as an inhibitor. Alternatively, an absent or altered group or side chain may force the inhibitor to reposition itself in the active site, thereby causing other binding groups to go out of alignment, again leading to ineffective binding of the inhibitor to the active site and reduced or no activity.

**163**    With this background, I turn to the question of whether the Schering scientists had a factual basis for soundly predicting, as of October 20, 1981, that all of the stereochemical configurations represented by Claim 12 would have utility.

(2)    The Schering Work

**164**    In reviewing the possible factual basis for Schering's sound prediction, there are three distinct timeframes: pre-Troy conference; immediate post-Troy to the date of conception (June 20, 1980); and from the date of conception to the Canadian filing date of October 20, 1981. Dr. Smith and Dr. Neustadt described the events, in their oral testimony and through many Schering documents entered as exhibits.

(a)    *Pre-Troy*

**165**    The Schering scientists provided the company with semi-annual reports of their "Antihypertensive Program", which reports give some indication as to their work up leading up to the Troy conference. In the January 1980 report, Dr. Smith described the work of her team as the synthesis of a series of "N-[3-mercapto-2(R,S)-methylpropanoyl]-(S)-prolines...having substituents at the 4 position on proline".

**166**    The bulk of Schering's work up to this date had been on proline rings that were substituted with one or two substituents at the 4-position. Some of these compounds were described as active and some were described as inactive. The results can best be described as inconsistent. For example, SCH 30077 and 30078 were two closely-related compounds with one in the *cis* configuration and the other in the *trans* configuration. The *trans* configuration showed *in vitro* activity and the *cis* showed no activity at the dose tested. In other compounds, the *cis* showed activity and the *trans* showed no activity.

**167**    The program included the synthesis of SCH 30178, a molecule with a spirocyclic moiety at the proline end of a captopril model. SCH 30178 was found to have activity *in vitro*. In test results for the period between December 18, 1979 and February 7, 1980, the activity was described as being "same or slightly greater than that of captopril".

**168**    Prior to June 20, 1980, the only compound synthesized with the captopril backbone or side chain fused to a 6,5 bicyclic ring was SCH 30928. This was a mixture of diastereomers in which the configuration of the chiral centres was *cis-endo*. SCH 30928 was synthesized on May 2, 1980 and tested *in vitro* on May 8, 1980; its *in vitro* activity was described as "slightly less potent than captopril". SCH 30928 was tested *in vivo* on June 12, 1980 and showed activity described as "moderate". However, later testing, in July, August and September, 1980, showed inconsistent results.

**169**    Schering had not made either a *trans* or *cis-exo* 6,5 bicyclic ring fused to the captopril side chain.

**170**    The results of SCH 30178 and SCH 30928 demonstrated to the Schering scientists that there is considerable structural latitude with respect to alterations to the proline moiety of the captopril backbone. Their work seemed to show that both ACE inhibition *in vitro* and antihypertensive activity *in vivo* could be maintained while incorporating different ring structures in place of the proline right of a captopril-like compound. However, with the inconsistency in certain of the test results and the various choices made for synthesis, it is not clear to me that these pre-Troy compounds alone could provide the factual basis for the inventors of the Claim 12 compounds to formulate a sound prediction.

(b) *Troy and Dr. Smith's Disclosure*

**171**    By June, 1980, the Merck scientists had succeeded in replacing the thiol moiety of captopril; the result was enalapril. Dr. Patchett, in his presentation at the Troy conference, on June 18, 1980, disclosed the results of the Merck work to an audience of several hundred scientists. Dr. Patchett did not provide any written materials. Our understanding of what was disclosed is based on the testimony of Dr. Patchett and that of Dr. Smith, who attended the conference. We also have some photocopies of poorly reproduced photographs which Dr. Smith confirmed were photographs of Dr. Patchett's slide presentation.

**172**    Significantly, Merck had not disturbed the proline end of the captopril model. Thus, Dr. Smith immediately felt that the work of the Schering scientists could be combined with the enalapril backbone to produce some molecules of interest.

**173**    In her Disclosure Notebook, Dr. Smith's entry of June 20, 1980 reflects what Schering describes as the "conception" of the '206 Patent. Dr. Smith began her disclosure entry on p. 8 with the words, "[T]his disclosure relates to N-á-(á-substituted)acetic acid (or acetate) dipeptides of type 1, 2, 3, 4 as inhibitors of angiotensin converting enzyme and antihypertensive agents". The molecule diagrams set out include 6,5 and 5,5 rings with "Z" being the enalapril backbone of Merck. On p. 9, Dr Smith wrote down a model synthesis.

**174**    In her semi-annual report of July 3, 1980, Dr. Smith described the work her team intended to pursue. Included in that report was the following:

> From the structure activity relationships in the N-(3-mercapto-2-methylpropanoyl) substituted-(S)-prolines, two compounds SCH 30178 and SCH 30928 showed an interesting biological profile as compared to captopril. Therefore it is of great interest to incorporate the substituted proline moiety from SCH 30178 and SCH 30928 into the novel target compounds 130 and 131.

> [Target compound 130 incorporated a spirocyclic onto the enalapril backbone and 131, a 6,5-bicyclic onto the enalapril backbone.]

> ... In 131 the stereochemistry of the ring junction is probably cis and either syn or anti to the (S) carboxylic acid group... .

**175**    At this stage, neither 130 nor 131 had been synthesized. Dr. Smith had envisioned a model synthesis of at least these two compounds and had made an educated guess as to some of the stereochemistry of the chiral centres on the 6,5 bicyclic rings. Thus, even taking into account Dr. Smith's July 3, 1980 report, Schering's work up until July 1980 falls far short of a factual basis for a sound prediction.

(c)    *Post-Troy*

**176**    We now move onto the post-Troy phase of Schering's "Antihypertensive Program".

**177**    The first compound to be synthesized using the Merck disclosure was SCH 31309, a spirocyclic at the proline position of enalapril. It was a mixture of R and S at the carboethoxy position. In vitro testing demonstrated activity described as "moderate". I agree with Dr. Ehlers that the spiro compounds have a very different shape than the bicyclic rings. With the rings of the spiro compound being attached only at one carbon, one could reasonably expect the spiro structure to be more flexible and not particularly helpful in predicting whether the 6,5 or 5,5 ring compounds would have utility.

**178**    It is more likely that helpful insight could be obtained from the synthesis and testing of compounds incorporating a 6,5-ring at the proline end of the molecule. SCH 31335 and SCH 31336, both with a 6,5-bicyclic ring on an enalapril backbone, were synthesized in August 1980. The only difference between the two appears to have been the stereochemistry. On August 19, 1980, when the two compounds were tested *in vitro*, SCH 31336 showed some activity even though the compound included three stereocentres (out of five possible) in the R configuration. SCH 31335, however, was reported to be "10 fold more active than SCH 31336".

**179**    SCH 31846 - one of the individual diastereomers of SCH 31335 - was synthesized December 10, 1980. SCH 31847 - the other diastereomer of SCH 31335 - was synthesized December 11, 1980. Because SCH 31846 showed activity *in vivo* and SCH 31847 did not show *in vivo* activity, the Schering scientists concluded that SCH 31846 had the S configuration at the carboxyalkyl position; it was the S,S,S(S,S)-isomer. SCH 31847 was concluded to have the R configuration at the carboxyalkyl position - the R,S,S(S,S)-isomer. Dr. Bartlett agreed that SCH 31847 - a 6,5 enalapril backbone compound with the only R at the carboethoxy position - was described by the Schering scientists as inactive *in vivo* up to 300 /kg.

**180**    Two other compounds synthesized were SCH 32494, a compound with a *trans* 6,5-bicyclic ring configuration and SCH 31846, a *cis-endo* 6,5 bicyclic configuration. SCH 32494 was inactive and SCH 31846 was active at the levels tested. In short, Schering was unable to show that any 6,5 bicyclic enalapril analogue with a *trans* configuration at the bridgehead exhibited ACE inhibition. The testing results of these two compounds demonstrate that Schering could not predict, based on the results from *cis-endo* compounds, that compounds with a *trans-* 6,5 bicyclic configuration would have activity.

**181**    In February 1981, the Schering scientists made and tested their first (and only) 5,5-bicyclic analogues. SCH 31925 was a mixture of two compounds, one of which was - as we now know - ramipril. SCH 31924 differed from SCH 31925 only in its stereochemistry. As reported by Dr. Smith in her semi-annual report of July 1, 1981, "Stereochemistry has not been assigned to the ring junction in relationship with the hydrogen at the position 2, however the stereochemistry is assumed to be cis-syn". That is, Dr. Smith assumed the stereochemistry of SCH 31924 was R at the

2-position of the bicyclic ring and (R,R) on the bridgehead and that of SCH 31925 was S (S,S). Thus, SCH 31925 was a mixture of two diastereomers having an S,S,S(S,S) configuration and an R,S,S(S,S) configuration. SCH 31924 was a mixture of an S,S,R(R,R) configuration and an R,S,R(R,R) configuration. Because of the R configuration at the 2-position carboxylic acid, the diastereomers of SCH 31924 are not included in Claim 12 but would be included in Claims 1, 2, 3 and 6 of the '206 Patent.

**182**    In the semi-annual report of July 1, 1981, Dr. Smith reported that SCH 31925 was tested *in vivo* and identified as "active" and SCH 31924 was identified as "inactive". Schering did not synthesize any other of the possible stereochemical configurations of the 5,5 bicyclic moiety, namely *cis-exo* or *trans*. Moreover, Schering did not synthesize any 5,5 bicyclic compounds where there was only an R configuration at the carboethoxy position. All of these configurations are included in Claim 12.

**183**    As acknowledged by Dr. Smith and Dr. Neustadt during their appearances, Schering attempted but was unable to synthesize and isolate other *trans* configurations beyond SCH 32494 and was unable to synthesize any *cis-exo* stereochemical configurations of the 6,5 bicyclic moieties.

(d)    *Summary of Schering work*

**184**    In summary, the Schering scientists' synthesis and testing program was limited. With respect to compounds that included a 5,5 bicyclic ring within Claim 12, only one compound - a mixture - has been made and tested by the Canadian filing date. Of particular interest, the scientists:

-    Had not synthesized a single stereoisomer within Claims 6 and 12;
-    Had not synthesized compounds with 5,5 bicyclic moieties in the *cis-exo* and *trans* configurations;
-    Had synthesized two mixtures of compounds with 5,5 *cis-endo* bicyclic moieties and found one to be active and the other to be inactive *in vivo*.

**185**    Given that Schering tried unsuccessfully to synthesize the *cis-exo* form of the 6,5 bicyclic ring compound and had never even attempted such syntheses for the 5,5 *cis-exo* configuration, it is difficult to accept that, based on their experimental work, the Schering scientists had a factual basis to predict that these configurations, which are included in Claim 12, would be active either *in vitro* or *in vivo*. For the stereoisomers in the *cis-exo* and *trans* configurations, this conclusion would apply even if the promise of the patent is for ACE inhibition only.

**186**    I digress for a moment to discuss an argument made by the Plaintiffs in respect of the "inactive" testing results reported by Schering. The Plaintiffs submit that the "inactive" results should be read in the context of the limits of the testing. Schering had evidently set an internal testing threshold to provide them with guidance on which compound warranted further testing. At a higher dosage, they assert, it is entirely conceivable that the compounds would show activity. Thus, the Plaintiffs argue, I should not conclude that a compound is devoid of ACE inhibition or

antihypertensive effect on the basis of an "inactive" finding by the Schering scientists.

**187**    The critical flaw in this argument is that, in respect of some of the compounds covered by Claim 12, the Schering scientists have no results that could lead to a prediction of activity <u>at any level</u>. Inactive test results do not provide any insight as to how the Schering scientists could predict activity at a higher dose. A prediction of activity at a higher does would be pure speculation.

**188**    Having concluded that no factual basis for a sound prediction can be founded on the Schering work alone, it is necessary to turn to the knowledge that was available to Schering as of the relevant date. Upon consideration of all of the testimony and arguments by the parties, I believe that there are two determinative areas. The first of these relates to the stereochemistry at the carboethoxy position. The second area is the overall "space" theory, which relates to the notion of the three-dimensional shape of the active site of ACE

(3)    <u>The stereochemistry at the carboethoxy position</u>

**189**    I begin with a review of what was understood about the chirality of ACE inhibitors. In 1977, a hypothetical model of the ACE active site was proposed by the Squibb group (Cushman et al., "Design of Potent Competitive Inhibitors of Angiotensin-Converting Enzyme. Carboxyalkanoyl and Mercaptoalkan Amino Acids", *Biochemistry,* 1977, 16, No. 25, 5485-5491 [*Biochemistry, 1977*]). The model disclosed is commonly referred to as the "Cushman-Ondetti model". The *Biochemistry, 1977* publication provided the following teachings on stereochemical considerations:

-    First, that the choice of carboxy terminal amino acid from among the natural L-amino acids can vary considerably. The data established that a D-amino acid at the carboxy terminus markedly attenuated inhibitory activity; in one instance, the D-proline analogue was about 9000-fold less active than the L-proline analogue.
-    Second, the data in Table III establish that the stereochemistry of the second chiral position must also correspond to the L-configuration of a natural amino acid.

**190**    In a later paper ("Design of New Antihypertensive Drugs: Potent and Specific Inhibitors of Angiotensin-Converting Enzyme", *Progress in Cardiovascular Diseases* (1978) 21, No. 3, 176-82), the same authors, in comparing two of the compounds tested, noted that "[T]he requirement for a substituent of the proper optical configuration is again strikingly apparent".

**191**    As we know, Merck first disclosed enalapril at the Troy conference on June 18, 1980. The enalapril molecule has three stereocentres. At the Troy conference, according to the evidence before me, Dr. Patchett commented that the potency of the ACE inhibition was dependent on each of the three chiral centers being in the S configuration. Merck's first published reference to enalapril was in European Patent Application No. EP 12,401 (published June 25, 1980) [EP 401]. This publication reinforced that the preferred stereochemistry at the three chiral centers of the enalaprilat class of molecules is S.

**192**    This point was later confirmed by the inventors in November 1980 (Patchett et al., "A New Class of Angiotensin-Converting Enzyme Inhibitors", *Nature* (1980) 288, No. 5788, 280-3 [*Nature, 1980*]), when the Merck enalapril group presented a comparison of *in vitro* ACE inhibition data for compound 6a (enalaprilat in the (S,S,S) configuration) to compound 6b (an enalaprilat analogue in the (R,S,S) configuration). A change in chirality of the single chiral center resulted in a 683-fold loss of activity from separated isomers.

**193**    In the result, it was common knowledge, well before the Canadian filing date of October 20, 1981, that an S configuration at the carboethoxy position, together with S at the 2-position carboxylic acid on the proline end of the molecule and at the alanyl position would be preferable.

**194**    As noted above, SCH 31925 was synthesized at the same time as SCH 31924. The Schering scientists did not immediately know the stereochemistry of each. However, when tested, SCH 31925 was found to have an ID50 value of 126 micrograms per kilogram of body weight (g/kg) in the test animals. SCH 31924 did not show activity at 300 /kg. Thus, in the view of Dr. Bartlett, "it was apparent that SCH 31925 was the diastereomeric mixture with the favoured S configuration at the C-terminal carboxy position and that the S configuration at the bridgehead carbons as well". No further separation was carried out. However, from Schering's test results coupled with the Merck disclosure that an all-S configuration for enalapril was preferred, one could reasonably predict that an all-S configuration would be an active compound. In other words, a factual basis and line of reasoning exists for a prediction that ramipril would meet the promise of the '206 Patent. But, what about the other seven compounds?

**195**    It does not necessarily follow that the results from the mixture of SCH 31925 would enable Schering to make a sound prediction that both diastereomers would be active if separated. In the first place, as acknowledged by Dr. Nelson during his cross-examination, it might not be possible to ascertain which of the diastereomers was the active one: "you would not know whether one was active or two were active". In addition to Dr. Nelson, each of Drs. Thorsett and Ehlers accepted that the SCH 31925 would not enable one to conclude that the other member of the mixture - that is, the *cis-endo* (R,S,S,S,S) compound would be active. I agree.

**196**    In the '206 Patent, Schering did not claim only an (S,S,S) configuration; it also claimed the (R,S,S) configuration. Thus, the question remaining is: was there a factual basis upon which to predict that an (R,S,S) configuration would be active, leaving aside, for the moment, the bridgehead chirality? It appears that very little work can be found in the publicly-available literature to directly respond directly to the question of possible activity for those four compounds of Claim 12 with an R configuration at the carboethoxy position.

**197**    In his written report, Dr. Nelson provided his opinion on what was known about the stereochemistry at the carboethoxy position. In his view, the work done by the Merck group supports a prediction that either an S or an R configuration at this position would be active. The Merck group, he stated, reported activity for this group in both the R and S configurations (see

*Nature, 1980*, above). Dr. Nelson observed that, in A. Maycock, et al., "Inhibition of Thermolysin by N-Carboxymethyl Dipeptides", *Biochemical and Biophysical Research Communications* (1981) 102, No. 3, 963-969, the Merck group tested two diastereomers of the pro-drug phenyipropyl-Leu-Trp analogues, having opposite configurations at the pro-drug end of the molecule. Both diastereomers were potent ACE inhibitors, with one diastereomer having greater ACE inhibition. In Dr. Nelson's opinion, this demonstrates that a change in configuration at the carboethoxy position does not eliminate ACE inhibition activity.

**198**    In my view, there are a number of problems with Dr. Nelson's opinion:

- As brought out during cross-examination, both articles cited and their underlying studies were really directed at the inhibition of thermolysin.
- Dr. Nelson also acknowledged that both papers provided data on molecules with an acid - and not an ester as was the case with all of the compounds of Claim 12 - at the carboethoxy position. Indeed, as accepted by Dr. Nelson, Schering had synthesized monoesters with an R configuration at the carboethoxy position that were found to be inactive when tested in vivo (SCH 31924 and 31847).
- Finally, Dr. Nelson agreed that he could not cite a single compound, in which all of the carboethoxy, alanyl and 2-position of the proline ring were in the R configuration, that was active as an ACE inhibitor.

**199**    Referring to the *Biochemistry, 1977* paper, which reported activity for compounds with both the S and R at the terminal proline carboxyl group (which is fixed by Claim 12 as S), Dr. Nelson also opined that, "while stereochemistry clearly impacts on the ACE inhibitory activity, changes to stereochemistry would not be expected to abolish such activity". However, such a statement is not born out by the work of the Schering scientists. For example, the only difference between the 6,5-bicyclic compounds SCH 31846 and 31847, was the stereochemistry at the carboethoxy position. When tested, one compound was found to be active *in vivo* and the other to be inactive. Based on these results, the Schering scientists assigned the S configuration at the carboethoxy position to SCH 31846 and the R configuration to the inactive SCH 31847. These results diminish the reliance that I would place on Dr. Nelson's opinion. While he may be correct in general terms, the very work being done by Schering - for whatever reason - did not provide consistent support for Dr. Nelson's opinion. Ultimately, the Cushman paper and other literature cited by Dr. Nelson could not reasonably have been used by Schering to predict activity of some of the Claim 12 compounds.

**200**    In brief, I find, on a balance of probabilities, that the literature referred to by Dr. Nelson would not have provided the Schering scientists with a prediction that an R configuration at the carboethoxy position would lead to ACE inhibition activity.

**201**    Given the uncertainty of available information, one would expect the Schering scientists to carry out confirmatory testing on at least a critical few configurations to allow them to predict that all configurations would show activity. This would be particularly true for any change from an S

configuration at the carboethoxy position on the enalapril backbone. However, as described above, the Schering scientists' "Antihypertensive Program" contained only one testing of a 5,5-bicyclic ring compound in the R configuration at that position. And, that compound was only made as a mixture of two diastereomers, one of which was the active (S,S,S,S,S) configuration.

**202**    In sum, the combination of Schering's work and the available literature or knowledge does not, in my view, form a factual basis upon which one could form a sound prediction that the four compounds of Claim 12 with an R configuration at the carboethoxy position would be active as ACE inhibitors and antihypertensive agents. This finding means that the Defendants have satisfied their burden of demonstrating, on a balance of probabilities, that Schering could not soundly predict, as of October 20, 1981, that at least four of the eight compounds of Claim 12 (i.e. those with an R configuration at the carboethoxy position) would meet the promise of the patent. On this basis alone, the Defendants have, in my view, succeeded in their counterclaim of invalidity. Nevertheless, I will continue these reasons to consider the other arguments made on these questions.

(4)    The "space" theory

**203**    In the Plaintiffs' submissions, the strongest argument in support of a factual basis lies in a theory relating to the three-dimensional shape of the active site of ACE. A number of the experts commented on the work done by the scientists at Squibb in developing the Cushman-Ondetti model, which appeared in various scientific papers at the time (see, for example, *Biochemistry, 1977*, above; Cushman et al., "Development of Specific Inhibitors of Angiotensin I Converting Enzymes (kininase II)" *Federal Proceedings* (1979) 38, No. 13, 2778-2782). In simple terms, the Squibb team developed a hypothetical model of the active site that included three "pockets" or "subsites" - referred to as S1, S1' and S2' - that could each accommodate and bind to a distinct substrate or side chain of a molecule, resulting in ACE inhibition.

**204**    By the late 1970s, researchers at a number of companies were attempting to discern the exact nature of the optimal types of side chains; there was little certainty as to what would work (as to size, polarity, charge, and chirality) at each of the sites. Schering argues that the knowledge available to its scientists was that the S2' site could accommodate large moieties at the proline end of the captopril (and, subsequently, the enalapril and lisinopril) molecules.

**205**    The Plaintiffs point to other evidence that was publicly available to support their submissions on the "space" theory. Between June 20, 1980 and October 30, 1981, additional teachings regarding C-terminus groups that could be accommodated by ACE were published. In Cheung et. al "Binding of Peptide Substrates and Inhibitors of Angiotensin-Converting Enzyme", *J. Biological Chemistry* (1980) 255, No. 2, 401-407, Squibb scientists, assuming the correctness of the Cushman-Ondetti model, demonstrated considerable tolerance for large side chains at the C-terminus position.

**206**    The Cushman-Ondetti model was, at this time, hypothetical; it is difficult to see how the fact that there was significant space at the S2' subsite of ACE could have been of much assistance without further information on such matters as size, polarity, charge, and chirality of molecules that

could be accommodated. As far as I can see, Schering did not have or develop significant advancements to the hypothetical framework.

**207**    Dr. Bartlett, in his reports and testimony, explored how Schering could have used the Cushman spatial theory to predict the utility of the claimed compounds. As I understand Dr. Bartlett's opinion, he begins with Schering's syntheses of SCH 30178 and SCH 30928. The spiro ring of SCH 30178 would occupy a different region of space than the fused 6,5 ring of SCH 30928. Since both of these compounds were shown to have ACE inhibition, Schering had evidence that the ACE active site is very tolerant of different structures at the proline site of captopril analogues. Using computer-modeling techniques, Dr. Bartlett mapped the spatial requirements of a number of moieties to show that compounds with useful levels of ACE inhibition could fit within the dimensional regions carved out by SCH 30178 and SCH 30928. Such models included compounds with *cis* and *trans* substituted moieties and compounds with spirocyclic and fused bicyclic ring structures. As such, it is alleged, Schering could have predicted utility for a large number of compounds with moieties that fit within the spatial limitations of SCH 30178 and SCH 30928.

**208**    The main problem with Dr. Bartlett's theory is that I have no evidence that the Schering scientists had incorporated this theory or concept into their conceptualization. Dr. Bartlett, with the help of today's sophisticated software provides a fine explanation of why many of the compounds included in the '206 Patent could be effective ACE inhibitors. However, this does not assist with the question of whether the Schering scientists had, as of October 20, 1981, considered this as part of the factual basis for their prediction.

**209**    For example, Dr. Smith makes no mention whatsoever of this concept in her Disclosure Notebook. In the semi-annual report of January 2, 1980, there is reference to the Squibb hypothesis. However, as confirmed by Dr. Smith, there is no description in that document of the volume, space or dimension that might explain how the Cushman-Ondetti model assisted the Schering scientists with their prediction. Similarly, the July 3, 1980 report contains only a passing remark of a "binding hypothesis". Dr. Smith, in her oral testimony, expanded substantially on this small reference:

> A.    I have a hypothesis of where these groups would fit and, remember, it's a hypothesis, and in this day and age, when I look at projects like this and you would crystallize something out into an active site and you would be able to view it and see where things fit. At this time, there was an hypothesis.
>
> Q.    Right, you ... couldn't do then what you can do now in terms of--
>
> A.    But you knew from the structure activity that Dr. Patchett's group had presented that you needed something like the phenethyl group out there, those compounds were better. You had the carboxylic the carboxylate group in the left hand portion which was believed to bind to zinc. The NH to the enzyme, you knew that there was a space for the methyl of the alanyl or the lysine of compound 129. The carbonyl attached to the proline, also, you know, was needed for binding as well as the carboxylic acid.

> And when you go through their SAR and where parts are missing or substituted or whatnot, you know, they are not as active. So looking at their results, you can depict that you need these groups there, or they are allowed there for the best ... activity.

**210**    The difficulty that I have with this explanation is that it is not contained anywhere in the semi-annual reports. If this hypothesis was so central to the thinking of the Schering scientists, one would reasonably expect it to be included in the semi-annual reports. Dr. Smith's notes, in general, were very detailed. Omission of this important explanation from any of the relevant reporting documents leads me to an inference that, at the time period in question, it was not in the thinking of the Schering scientists. I find that the spatial notion of Cushman-Ondetti model was not relied on in any material way to predict the activity of the compounds being explored by Schering in 1980 to 1981. Quite simply, it is not part of any articulable line of reasoning that could support a prediction that all of the compounds of Claim 12 would have utility as ACE inhibitors.

**211**    Moreover, I also observe that Dr. Bartlett's hypothesis is not consistent with the data obtained by Schering. Schering's own work indicated that some of the compounds that fall within the relevant volume or space mapped by Dr. Bartlett were, in fact, likely to be inactive. One example would be the R,S,S(S,S) component of the SCH 31925 mixture, which was a stereoisomer with an R configuration at the carboethoxy position that falls within Claim 12. Although this compound would have come within the volume carved out by Dr. Bartlett's hypothesis, the combined inactivity of other compounds with an R configuration at the carboethoxy position (i.e. SCH 31847, 32457 and 31924) taught that the R,S,S,(S,S) stereoisomer would have been inactive *in vivo*. In other words, even if the Schering scientists were aware of the theory, their own experimental work taught away from such a theory. While Dr. Bartlett has provided a theoretical framework that may or may not have been known as of October 1981, there is no evidence that this line of reasoning was or could have been used to predict the utility of the compounds of the '206 Patent.

**212**    To be sound, there must be a factual basis for Schering's prediction, and the inventors must have had an articulable line of reasoning from which the desired result could have been inferred from the factual basis. I appreciate that the jurisprudence teaches that I should approach these issues "with a judicial anxiety to support a really useful invention" (*Wellcome AZT (SCC)*, above, at para. 92). However, for the reasons given, I am satisfied, on a balance of probabilities, that as of October 20, 1981, the prediction made by Schering that the eight compounds within Claim 12 (with the exception of ramipril) would be useful as ACE inhibitors and as antihypertensive agents was not sound.

C. *Sound Prediction: Disclosure*

**213**    In the event that I am in error and there was, as of October 20, 1981, a factual basis and an

articulable line of reasoning upon which inventors could soundly predict the utility of the compounds of Claim 12, I turn to the final criterion of sound prediction. Specifically, the test for sound prediction obliges the patentee to disclose the facts and reasoning for soundly predicting the utility of his invention.

**214**    The Federal Court of Appeal recently provided the following guidance on the disclosure requirement in *Eli Lilly Canada Inc. v. Apotex Inc.*, 2009 FCA 97 at paras. 13-15 [*Raloxifene (FCA)*]:

> 13.    The importance of the disclosure obligation in applying for a patent has been emphasized by the Supreme Court of Canada on a number of occasions in recent years (*Pioneer Hi Bred Ltd. v. Canada (Commissioner of Patents)*, [1989] 1 S.C.R. 1623 at paragraph 23; *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 at paragraph 46; *Free World Trust v. Électro Santé Inc.* 2000 SCC 66, [2000] 2 S.C.R. 1024 at paragraph 13; *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 at paragraph 37 (commonly referred to as *AZT* and hereinafter referred to as such)).
>
> 14.    The decision of the Supreme Court in *AZT* is particularly significant to the disposition of this appeal. According to *AZT*, the requirements of sound prediction are three-fold: there must be a factual basis for the prediction; the inventor must have at the date of the patent application an articulable and sound line of reasoning from which the derived result can be inferred from the factual basis; and third, there must be proper disclosure (*AZT*, supra, at paragraph 70). As was said in that case (para. 70): "the sound prediction is to some extent the *quid pro quo* the applicant offers in exchange for the patent monopoly". <u>In sound prediction cases there is a heightened obligation to disclose the underlying facts and the line of reasoning for inventions that comprise the prediction.</u> [Emphasis added]
>
> 15.    In my respectful view, the Federal Court Judge proceeded on proper principle when he held, relying on *AZT*, that when a patent is based on a sound prediction, the disclosure must include the prediction.

**215**    In *Raloxifene (FCA)*, a particular study (the Hong Kong study) was necessary to turn the prediction on which the patent was predicated into a sound one. The result of failure to disclose the Hong Study in the patent was that "the underlying factual basis for the prediction and the sound line of reasoning that grounded the inventors' prediction were not disclosed" (*Raloxifene (FCA)*, above, at para. 12).

**216**    *Raloxifene (FCA)* arose from an application under the *NOC Regulations*. The underlying patent was for the use of certain chemical compounds for the treatment of osteoporosis. Nevertheless, I can see no reason why the legal principles applied by the Court of Appeal in that NOC proceeding on the question of sound prediction should not apply in the case before me. Nor

can I accept the Plaintiffs' apparent argument that this "heightened obligation" for disclosure only applies when we are dealing with a use patent, as was the case in *Wellcome AZT (SCC)* and *Raloxifene (FCA)*. Indeed, the Federal Court of Appeal has stated unequivocally that the doctrine of sound prediction applies to a claim for a new compound (*Pfizer Canada Inc. v. Apotex Inc.*, 2007 FCA 195, 60 C.P.R. (4th) 177 at para. 3).

217    The case before me stands in contrast to *Wellcome AZT (SCC)* where the court held that the disclosure requirements had been met given that both the underlying facts (the test data) and the sound line of reasoning (the chain terminator effect) were in fact disclosed. The facts of the case before me are closer to those in *Raloxifene (FCA)* than to those in *Wellcome AZT (SCC)*.

218    The disclosure provided by Schering in its '206 Patent is insufficient for several reasons. First, there is no test data included in the specification of the patent. Test data may provide the public with enough information from which to make significant inferences. The '206 Patent provides no *in vitro* or *in vivo* data for any of the compounds disclosed in the claims. It does not describe how the allegedly useful properties of ACE inhibition and antihypertensive activity were established. It also does not give any indication as to how potent or selective any of the compounds are.

219    Second, nowhere in the patent is there any discussion that the active site of the ACE inhibitor has sufficient volume to fit all stereoisomers of the bicyclic rings disclosed in the '206 Patent. Further, there is no explanation that this belief is based on certain spiro and 6,5 bicyclic rings fused to the enalapril or captopril backbone or how activity for all the clamed compounds can be inferred from the limited information the inventors had with respect to these compounds.

220    Third, the '206 Patent also makes no reference to the Troy conference or any publications. There is also no evidence that the inventors relied on those disclosures to predict that all of the various permutations of the side chain claimed in the '206 Patent would have utility. Likewise, the '206 Patent makes no reference to any Squibb disclosures about captopril.

221    Fourth, no reference to any of the work Schering did on captopril analogues, including the analogues where the proline ring was substituted with one or more substituents, is set out.

222    Finally, I turn to the argument of the Plaintiffs that the promise of the '206 Patent is a differentiated promise that all of the compounds will have ACE inhibition with a potential or possibility of reducing hypertension in mammals. As discussed in the section of these reasons dealing with the construction of the patent, certain of the Plaintiffs' experts argue for a stepwise or quasi-bifurcated promise of utility in which all of the claimed compounds are promised to be ACE inhibitors while only certain compounds are promised to exhibit antihypertensive effect. If this is a correct interpretation of the promise of the '206 Patent (which I do not accept), then I have further difficulty with the lack of disclosure in the Patent.

223    The failure to provide information as to which claimed compounds have the promised utility

of a patent was specifically addressed by the English Court of Appeal in *American Home Products Corp, v. Novartis Pharmaceuticals*, [2001] R.P.C. 8 (Eng. C.A.). In *American Home Products*, Lord Justice Aldous held that a sufficient specification requires that there be an enabling disclosure across the breadth of the claimed invention.

> The invention as described was the discovery that rapamycin had those advantages. Some derivative would be expected to have similar advantages, but the skilled person would not be able to predict which ones would have that actuality and, even if the right one was selected, it would take prolonged tests to find out whether it had the appropriate qualities. It follows that, as Lord Hoffmann pointed out in *Biogen*, the patent, to be sufficient, must provide an enabling disclosure across the breadth of the claim. [Emphasis added]

> ...

> There is a difference between on the one hand a specification which requires the skilled person to use his skill and application to perform the invention and, on the other, a specification which requires the skilled person to go to the expense and labour of trying to ascertain whether some product has the required properties. When carrying out the former the skilled person is trying to perform the invention, whereas the latter requires him to go further and to carry out research to ascertain how the invention is to be performed. If the latter is required the specification would appear to be insufficient. [Emphasis added]

> (*American Home Products*, at paras. 37, 40)

**224**    Although Lord Aldous wrote these comments under the heading "Insufficiency", they are, on any plain reading, directed to more than the simple question of whether the specification discloses a method of preparation. As I read these reasonable and comprehensive remarks of Lord Aldous, the principles contained therein are directly applicable to the situation before me. This interpretation of the disclosure obligation is also fully consistent with the broader principles of disclosure set out by the Supreme Court of Canada in cases such as *Free World Trust v. Électro Santé Inc.*, 2000 SCC 66, [2000] 2 S.C.R. 1024 [*Free World Trust*], *Consolboard*, *Wellcome AZT (SCC)* and others.

**225**    Assuming that the patent promises that some but not all of the claimed compounds are potential antihypertensive agents, the '206 Patent does not specify which of the compounds within the scope of the patent would have a potential for *in vivo* antihypertensive activity. As acknowledged by Dr. Horovitz, the '206 Patent provides no criteria by which the skilled reader would be able to ascertain which compounds would be antihypertensive agents. Furthermore, as mentioned above, there is no *in vitro* or *in vivo* activity data contained within the '206 Patent. Thus,

a skilled reader of the patent could not determine which compounds are promised to have antihypertensive activity without going to "the expense and labour of trying to ascertain whether some product has the required properties" (*American Home Products,* above, at para. 40).

**226**    The Plaintiffs rely quite heavily on a concept called ADME to support their argument that the '206 Patent contains a bifurcated promise of utility. ADME refers to the following pharmacological considerations: oral absorption of the compound (A); distribution of the compound (D); metabolism (M); and excretion of the compound and/or its metabolites (E). According to the Plaintiffs, the promise of the patent is that the compounds disclosed are useful as ACE inhibitors and, subject to ADME, as antihypertensive agents. Thus, the concept of ADME assists in determining whether any given ACE inhibitor would have the potential to lower blood pressure in mammals. Yet, this principle is not disclosed anywhere in the specification of the '206 Patent. The absence of information on ADME in the specification could possibly have been overcome by the inclusion of test results. Had the inventors provided test results in the specification, it is possible that the skilled person reading the patent could draw reasonable inferences from that information. Yet, no test results are included.

**227**    In light of the foregoing, the lack of information in the '206 Patent makes it very hard, if not impossible, for a person skilled in the art to make a decision about exactly which of the compounds disclosed are active, and which are not active. As a result, if the invention of the '206 includes a promise that some of the compounds will be active as antihypertensives, the patent fails to teach what is the invention and how it works; there is no enabling disclosure across the breadth of the claimed invention.

**228**    In conclusion, on the question of disclosure, I find that there is inadequate disclosure in the '206 Patent. The '206 Patent discloses neither the underlying facts (their test data) nor a sound line of reasoning (for example, ADME considerations and space theory). The underlying factual basis and line of reasoning that grounded the inventors' alleged prediction were not disclosed.

D. *Conclusion on Sound Prediction*

**229**    I return to the words of Justice Binnie in *Wellcome AZT (SCC)*, above, at paragraph. 56, where he stated:

> If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, per Pigeon J. in Monsanto Co. v. Commissioner of Patents, [1979] 2 S.C.R. 1108, at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

**230**    In this case, the Defendants' challenge of the Plaintiffs' claim of sound prediction succeeds; they have persuaded me that, on a balance of probabilities, Schering's prediction at the date of

application (October 20, 1981) was not sound. The Plaintiffs have failed on all three requirements making up the test for sound prediction - factual basis, articulable line of reasoning and disclosure. On this basis, Claims 1, 2, 3, 6 and 12 are found to be invalid for lack of sound prediction.

**231**    Given this conclusion, there is no need to consider the other grounds of invalidity advanced by the Defendants. Nevertheless, I will express my views of the balance of the arguments advanced by the Defendants, in the hope that they will be of assistance.

## X. <u>Sound Prediction of Making</u>

**232**    In addition to arguing that the claims in issue should be held to be invalid on the grounds of no sound prediction of the subject matter, Apotex also submits that Schering had no sound basis to predict that it would be able to make and isolate each of the stereoisomers of Claim 12. However, if I were required to reach a conclusion on this issue, I would begin by noting that there are two serious problems with this argument. The first is that the doctrine of sound prediction does not extend as far as proposed by Apotex; rather, the sufficiency requirement set out in the *Patent Act* protects a third party from patents that provide inadequate disclosure of how the patent is to be practised. The second problem is that the evidence demonstrates that the Claim 12 compounds could be made and separated either by the methods set out in Example 20 or by methods known as of the Canadian filing date.

A. *The requirement to soundly predict how to make*

**233**    There is no question that a patentee must disclose a methodology for making its invented compounds. Section 34(1)(b) of the *Patent Act* requires that a patentee set out, in the specification, the method of making or using the composition "in such full, clear and concise and exact terms as to enable any person skilled in the art ... to make ... or use it". Considerable jurisprudence has developed that reinforces the sufficiency requirement (see, for example, *Consolboard*, above, at 517). The material date for determining the sufficiency of a specification is the publication date of the patent. The "bargain" that is struck between the inventor and the public exists only from the date of the grant. Until then, the inventor has limited rights to protect his invention and the public cannot expect to acquire any rights in the bargain. Given the nature of the bargain, it is logical to measure sufficiency as of the date of the grant.

**234**    In the particular facts of this case, much happened between the Canadian filing date of October 1981 and the issuance of the '206 Patent in 2001. Because of the conflict proceedings, the '206 Patent did not issue until 20 years after the application. During that period of time, the advances in chemistry - both as to known methodology and sophistication of equipment - made the synthesis and separation of the compounds of the compounds of Claim 12 viable on a large commercial scale. An argument by the Defendants on the sufficiency of the specification as of 2001 would be certain to fail. In response to this difficulty, it appears, Apotex has developed the novel argument that the doctrine of sound prediction requires that, at the time of the Canadian filing, Schering was required to soundly predict and disclose in its specification methods of making and

isolating each of the stereoisomers of Claim 12.

**235**    In my view, Apotex is merely attempting to circumvent the sufficiency assessment date.

**236**    Apotex weaves snippets of the jurisprudence on sound prediction together to support its arguments. However, when those extracts are analyzed, I cannot find a single case that stands for the proposition now advanced by Apotex.

**237**    In any event, even if such a doctrine can be said to apply, the evidence does not support Apotex's contention. As discussed above (at paragraph [[93]] ), the '206 Patent specification includes, but is not limited to, the methodology set out in Example 20. I begin by reviewing what methods, beyond Example 20, might have been known to a person skilled in the art as of October 20, 1981 that could have been used to synthesize the Claim 12 compounds. If I am satisfied, on a balance of probabilities, that even one of those methods could be made to work, Apotex's argument fails, regardless of whether Example 20 works or not.

B. *Alternative Synthesis Methodologies*

**238**    The key experts on the question of methodologies known in the art as of October 20, 1981 were Dr. Charette, for Sanofi, and Dr. McClelland, for Apotex. Dr. Charette was asked to address whether a skilled person in the art could have prepared the compounds covered by Claim 12 of the '206 Patent by using methods known in the art other than that of Example 20 as of October 23, 1980, October 20, 1981 and March 20, 2001. He described 15 alternative synthetic models all of which he opined were "based upon well-established literature reactions that were known before 1980". Dr. Charette focused on and presented the alternative syntheses of the following compounds described in Example 20A of the '206 Patent:



Compounds Described in Example 20A

**239**    It was generally accepted that, once these intermediate compounds were obtained, the steps remaining to produce the actual Claim 12 compounds were possible with known methods, including separation. Dr. McClelland confirmed that both conventional chromatographic and fractional crystallization methods were known as general methods for separating diastereomers. He also

acknowledged that fractional crystallization techniques were known in 1980, even though some trial and error would be required. However, Dr. McClelland's opinion was that none of the 15 methods of preparing the necessary intermediate proposed by Dr. Charette would be available to the skilled person in 1981.

**240**    All of the methodologies described by Dr. Charette could be described as "paper exercises". During cross-examination, Dr. Charette agreed that he did not actually carry out any of the syntheses that he designed. Nevertheless, just because there is no evidence that any one of these 15 methods was used in 1980 or 1981 to make the compounds of Claim 12, it does not inevitably follow that they would not have worked, had they been tried. If the proposed method contains a sound line of reasoning and includes steps that would be known to the skilled - but unimaginative - chemist, then I am not prepared to reject it simply because it is a "paper exercise". After all, the root concept of sound prediction is that something has not been done but, on close inspection, can be predicted to work in the fashion expected by the patent. In general, I found Dr. Charette's methods to be well articulated and to have a reasonable factual basis. Dr. Charette's proposed methods were not the subject of cross-examination, other than with some general questions.

**241**    Based on the evidence, I am prepared to accept, without deciding, that several of the examples proposed by Dr. Charette could not reliably be predicted to work. I have rejected those methods that involve steps that were the subject of patents, indicating that they were inventive and, thus, not methods that would be within the knowledge of the skilled worker. This was the opinion of Dr. McClelland and it was not vigorously objected to by the Plaintiffs. The methods that I have rejected are the following:

-    Method 1, 2 and 3: Synthesis of the *cis* isomer from *cis*-octahydrocyclopenta[b]pyrrole proposed with three possible variations;
-    Method 6, 7: Synthesis of the *cis* isomer from cyclopentanone;
-    Method 9: Synthesis of the *cis* isomer from ring contraction;
-    Method 10, 11: Synthesis of the *cis* isomer from pyrrole hydrogenation, in two variations;
-    Method 14: Synthesis of the *trans* isomer from ring contraction; and
-    Method 15: Synthesis of the *trans* isomer from trans-octahydrocyclopenta[b]pyrrole.

**242**    This leaves Methods 4, 5, 8, 12 and 13. In respect of these proposed synthetic methods, I am persuaded that, on a balance of probabilities, they could be predicted to work.

**243**    One of Dr. McClelland's general criticisms is that the remaining methods involve multiple steps. In my view, while this may make any given synthesis more difficult, it does not mean that a person of ordinary skill in a chemical laboratory could not have carried it out with due diligence and motivation. From first-year chemistry laboratory courses, university students are taught to carry out multi-step processes.

**244**    An example within this remaining class of methods is Dr. Charette's proposed Method 8: synthesis of *cis* isomer from cyclopentadiene. Dr. Charette based this synthesis on known methods from the literature, most of which dates back to the 1960s. In his report, Dr. McClelland's only criticism of Method 8 was that it was a "complex multi-step sequence". He offered no explanation beyond this to justify his opinion.

**245**    In addition to criticizing the number of steps involved in Methods 4, 5, 12 and 13, Dr. McClelland commented that these methods involved ring closure processes that were "analogous" to a claimed process in US Patent No. 4,727,160 (the US '160 Patent). I will accept Dr. McClelland's argument that the novel process disclosed in the US '160 Patent would make it less likely that Methods 6 and 7, both of which directly utilize the invention of the US '160 Patent, would be known to the skilled person. However, absent some further explanation, which was not offered by Dr. McClelland, I do not accept that every process that might be termed "analogous" to a patented process is novel.

**246**    In sum, if there is a requirement for sound prediction to make the compounds of Claim 12, at least five of the methods outlined by Dr. Charette would satisfy that requirement.

C. *Example 20*

**247**    Much evidence was produced with respect to Example 20. I begin by observing that, in light of my conclusion on the other methods by which the Claim 12 compounds could be made, Example 20 is not determinative. Even if Example 20 would not produce the results indicated, it is more likely than not that the Claim 12 compounds could have been made by other known methods. Nevertheless, it may be helpful for me to briefly address the evidence on this very contentious point.

**248**    I have set out the full text of Example 20 above at paragraph [[95]] and will not repeat it here.

**249**    In short, Example 20 teaches preparation of eight stereoisomers, one of which is ramipril. I was assisted by the various experts who tried to explain Example 20 in more accessible terms. Dr. Lautens reduced the text of Example 20 to the following diagram:

**Step 1**: mercuric acetate oxidation



Octahydrocyclopenta-
[b]pyrrole ("amine")

$\Delta^1$-Hexahydrocyclopenta-
[b]pyrrole ("$\Delta^1$-imine")

**Step 2**: cyano addition



$\Delta^1$-Imine

2-Cyano-octahydrocyclo-
penta[b]pyrrole ("nitrile")

**Step 3**: hydrolysis



Nitrile

Octahydrocyclopenta[b]pyrrole-
2-carboxylic acid ("carboxylic acid")

## Example 20A of the '206 Patent

**250**    During his testimony, Dr. Fleming commented that Example 20 was "notably lacking in any experimental detail". He described the process in Example 20 as follows:

> 20A describes the starting material by merely calling it octahydrocyclopenta[b]pyrrole. It says it is prepared by reduction of a particular starting material and is then fed into 18A.

So, you then have to go to 18A and replace the starting material in that, and then go through the sequence using this new starting material until you get to the end, I guess.

**251**    Dr. Fleming continued on to express his understanding of the steps of Example 20. His steps 2, 3 and 4 equate to steps 1, 2 and 3 in Dr. Lautens depictions.

1.    The first step is the one that is mentioned in parentheses in 20A, prepared by reduction of 2 keto, so the 2 keto octahydrocyclopenta[b]pyrrole is the compound on the left, in that stereochemistry. The product is the octahydrocyclopenta[b]pyrrole.

2.    The next step is, of course, the problematic one, the mercuric acetate oxidation.

3.    Next step, the next arrow? Is the addition of HCN effectively across that double bond, effected by KCN in a protic solvent of some kind. The target compound of the step 3? That's the, I guess, 2-cyano-octahydrocyclopenta[b]pyrrole.

4.    And the fourth and final step depicted there? Is a reagent with the HCL. That must be aqueous HCL, to achieve the reaction that is shown, so that is probably the concentrated hydrochloric acid. Heated probably means reflux, and it gives the carboxylic acid, which is the octahydrocyclopenta[b]pyrrole 2-carboxylic acid.

**252**    All of the experts agreed that the reaction described by Dr. Bihovsky as, "an Hg(OAc)2 -promoted oxidation of the amine (-NH) group in the starting material to form an imine" (i.e. the mercuric oxidation reaction described by Dr. Fleming as Step 2 of Example 20) is the most difficult of the steps.

**253**    This is not the first litigation where Example 20 has been in issue. The problem of Example 20 was raised in the late 1980s, in the context of litigation involving a European patent opposition. In those proceedings an expert retained by Schering, Dr. Roach, working with Dr. Jerrold Meinwald, succeeded in following the direction of Example 20. In 2003, in the context of Canadian NOC proceedings, Dr. Gabriela Mladenova, working under the direction of Dr. Lee-Ruff, failed to do so. For this litigation, each party retained experts who were asked to replicate Example 20. The other side was permitted to have observers attend the experiments.

**254**    There were issues raised by the parties with respect to the earlier experiments by Dr. Roach and Dr. Mladenova. Accordingly, I will focus on the experimental work of Dr. Lautens and Dr. Bihovsky as these two highly-qualified synthetic organic chemists were retained for the purposes of these two actions. Dr. Lautens was able to successfully follow Example 20; Dr. Bihovsky was not. They both prepared expert reports and were available for cross-examination. Dr. Lautens was retained on behalf of the Plaintiffs and Dr. Bihovsky on behalf of the Defendants.

**255**    One serious area of disagreement was the decision taken by Dr. Bihovsky to filter the initial mixture to remove mercurous acetate precipitate before the addition of hydrogen sulfide. In his

method, yellow solids that had precipitated during the reaction were removed by filtration. The question that was raised was whether Dr. Bihovsky lost the desired material in the filtration. In E. Farkas, E.R. Lavignino, and R. T. Rapala, "Preparation of 3- Dehydroeserpic Acid Lactone and Its Conversion to Reserpic Acid Lactone", *Journal of Organic Chemistry* (1957) 22, No. 10, 1261-1263 (Farkas), the authors report the mercuric oxidation of a tertiary amine. When the Farkas article was reviewed by Dr. Fleming, he stated that he "found it ambiguous as to whether it was filtered or not". In light of this ambiguity, Dr. Fleming expressed the view that "I think the skilled chemist might well try both ways to see what would happen ...". Dr. Bihovsky did not "try both ways".

**256**   In addition to the possibility that the desired imine was discarded, I am also concerned that Dr. Bihovsky only attempted the synthesis once. If any one of his steps was even a little "off", his results become questionable. The most obvious example is the filtration step. What would have happened if Dr. Bihovsky had understood the ambiguity of the Farkas article and had carried out a second experiment with a different process? Or, would Dr. Bihovsky still have been unable to replicate the experiment if he had attempted the oxidation at higher concentrations? We will never know.

**257**   Most of the experts, I believe, would accept, without question, that a skilled person would be expected to use some trial and error in any experimental process. For example, in the context of discussing the concept of separation, Dr. Ward opined that:

> In any separation, ... in attempting it, and this has happened many, many times in my career, sometimes we are very fortuitous, but first conditions I will pick will result in a successful separation, <u>sometimes it may take extensive trial and error</u>, and then sometimes I may never be successful. [Emphasis added]

I find it surprising that an expert of Dr. Bihovsky's calibre did not carry out further experimentation.

**258**   Dr. Lautens' work was also the subject of criticism. The most serious - and troubling - concern expressed by the Defendants is that Dr. Lautens was unduly influenced by the earlier work of Dr. Roach. Dr. Roach supervised laboratory work conducted in 1988, in which Example 20 was successfully followed. In effect, the Defendants are asserting that Dr. Lautens was biased in his approach to the experiment. Impugning the objectivity of a scientist is a serious allegation. Having reviewed the expert report of Dr. Lautens and his oral testimony, I am satisfied that this allegation is unjustified. Dr. Lautens, throughout his testimony, exhibited all the hallmarks of an objective and competent scientist. I am not persuaded in the least that his access to the earlier work of Dr. Roach caused Dr. Lautens to come to any particular result. I believe Dr. Lautens when he stated:

> ... we were neither trying to repeat anybody's results per se. We were trying to say: Can we run a reaction using information that would have been available.

**259**   The evidence before me demonstrates unequivocally that running Example 20 involves

complex chemical processes. However, the difficulty of the exercise does not, in and of itself, render Example 20 undoable as of the relevant date. In terms of how the experiments were run, I prefer the evidence of Dr. Lautens. Accordingly, I find that the Defendants have not persuaded me that Example 20 would not have worked, if carried out by a skilled person in October 1981.

## XI. Obviousness

### A. *General Principles*

**260**    The term "invention" is defined in s. 2 of the *Patent Act* to include "any new and useful ... composition of matter". In the alternative to their submissions that the claims of the '206 Patent do not demonstrate utility, Apotex and Novopharm assert that the claims of the '206 Patent were obvious, as of the relevant date, in that they were not "new". Briefly stated, they submit that, if the Court finds that a sound prediction could be made on the basis of the prior art, that same prior art would have made the claims obvious to a person skilled in the art.

**261**    The test for obviousness was recently clarified by the Supreme Court of Canada in *Apotex Inc. v. Sanofi-Synthelabo Canada Inc.*, 2008 SCC 61, [2008] 3 S.C.R. 265 [*Sanofi-Synthelabo*]. Justice Rothstein, writing for a unanimous Court, adopted a four-step approach (at paragraph 67):

> 1.    Identify: (a) the notional "person skilled in the art"; and, (b) the relevant common general knowledge of that person;
> 2.    Identify the inventive concept of the claim in question or if that cannot readily be done, construe it;
> 3.    Identify what, if any, differences exist between the matter cited as forming part of the "state of the art" and the inventive concept of the claim or the claim as construed;
> 4.    Viewed without any knowledge of the alleged invention as claimed, do those differences constitute steps which would have been obvious to the person skilled in the art or do they require any degree of invention?

**262**    As part of his analysis, Justice Rothstein stated that the so-called "obvious to try" test, derived from UK jurisprudence, should be approached cautiously and with the understanding that "obvious to try" means "very plain" or "more or less self evident".

> ... I am of the opinion that the "obvious to try" test will work only where it is very plain or, to use the words of Jacob LJ., more or less self evident that what is being tested ought to work.

> For a finding that an invention was "obvious to try", there must be evidence to convince a judge on a balance of probabilities that it was more or less self-evident to try to obtain the invention. Mere possibility that something might

turn up is not enough.

(*Sanofi-Synthelabo*, above, at paras. 65-66)

**263**    If an "obvious to try" analysis is warranted, Justice Rothstein proposed a non-exhaustive list of factors that may apply (*Sanofi-Synthelabo*, above, at paras. 69-71):

    1.    Is it more or less self-evident that what is being tried ought to work? Are there a finite number of identified predictable solutions known to persons skilled in the art?

    2.    What is the extent, nature and amount of effort required to achieve the invention? Are routine trials carried out or is the experimentation prolonged and arduous, such that the trials would not be considered routine?

    3.    Is there a motive provided in the prior art to find the solution the patent addresses?

    4.    What was the actual course of conduct that culminated in the making of the invention, including whether time, money and effort were expended?

**264**    In the recent case *Apotex Inc v. Pfizer Canada Inc*., 2009 FCA 8, 385 N.R. 148 at para 29 [*Sildenafil*], the Federal Court of Appeal provided further guidance on the "obvious to try" notion.

> The test recognized is "obvious to try" where the word "obvious" means "very plain". According to this test, <u>an invention is not made obvious because the prior art would have alerted the person skilled in the art to the possibility that something might be worth trying. The invention must be more or less self-evident</u>. [Emphasis added]

**265**    As noted by all parties, there are significant differences between the tests for obviousness and utility. Obviousness is not merely the reverse of sound prediction. A finding that an invention is based on a sound prediction does not necessarily mean that the invention was obvious. In its final written submissions, Schering provided a very helpful summary of the differences; that chart is reproduced below:

|  | Sound Prediction | Obviousness |
|---|---|---|
| Who is the relevant person | Inventor | Person of ordinary skill in the art |
| Abilities of the relevant person | Someone who is by definition "inventive" | Average person, no imagination; not "inventive" |
| What information can be considered | Common general knowledge, previous private work | Common general knowledge published before the date of the invention; |
| Level of certainty required | Must be more than a lucky guess, but certainty is not required, a reasonable prediction | Must be very plain that it would work |

**266**    With these principles in mind, I turn to the issues before me.

B. *The Invention*

**267**    As expressed by Justice Rothstein in *Sanofi-Synthelabo*, obviousness of the "invention" is to be measured. However, it appears to me that the assessment must be focused on the "inventive concept of the claim in question" and not to some larger "invention" that might be described in the specification of the patent. Otherwise, we would have the illogical result that a finding of obviousness could invalidate all of the claims in a patent and not just those in issue. Thus, I will proceed with my analysis on the basis that the "invention" or "inventive concept" being examined is limited to those "inventions" as identified by Claims 1, 2, 3, 6 and 12.

**268**    Because Claims 1, 2, 3 and 6 include the eight compounds of Claim 12, it follows that a finding that Claim 12 was obvious will necessarily mean that Claims 1, 2, 3 and 6 are also obvious. A conclusion that even one of the compounds of Claim 12 was obvious will invalidate all of the compounds of Claim 12.

C. *Date of Invention*

**269**    Before turning to the application of the approach taught by Justice Rothstein in *Sanofi-Synthelabo*, a preliminary issue arises on the arguments before me. As of what date should I examine the question of obviousness?

**270**    Obviousness must be assessed as of the date of the invention. In the absence of proof of an earlier invention date, the date of invention is presumed to be the first priority date (see, for example, *Pfizer Quinipril (FC)*, above, at paragraph 89). Should a party wish to assert an earlier

date, that party bears the burden of establishing that the date of invention was different than the first priority date (*Westaim Corp. v. Royal Canadian Mint* (2001), 23 C.P.R. (4th) 9 at para. 87). In this case, the parties disagree on the date of invention. Apotex and Novopharm assert that the date should be October 23, 1980 - the first priority date - when the US application was filed. Schering argues that the date of invention should be the much earlier date of June 20, 1980, that being the date on which Dr. Smith had reduced her invention to writing. Sanofi makes no submissions on this point. Alternatively, Schering argues, the date of invention should be mid-August 1980, when Schering made and tested the first compounds of the invention.

**271**    Much turns on this date. Between June 20, 1980 and October 23, 1980, a number of patent applications and publications related to ACE inhibitors were published. The question of whether this art preceded or followed Dr. Smith's invention is directly relevant to the question of obviousness. If that art followed the invention, it cannot be said that it is "prior art" for purposes of assessing obviousness. If, however, the invention was preceded by the art, the question is whether that prior art would have led a person skilled in the art to the invention claimed by Schering in its '206 Patent.

**272**    There is considerable jurisprudence considering the issue of the date of an invention. An early statement of the test was set out in the Supreme Court of Canada decision in *Christiani v. Rice* [1930] S.C.R. 443, where Justice Rinfret adopted the statement of the Lord Chancellor (Viscount Cave) in *Permutit Company v. Borrowman* (1926) 43 R.P.C. 356 at 359, who stated that:

> It is not enough for a man to say that an idea floated through his brain; he must at least have reduced it to a definite and practical shape before he can be said to have invented a process.

**273**    More recently, Justice Binnie in *Wellcome AZT (SCC)*, above, at paragraph 53, stated as follows:

> Glaxo/Wellcome says the invention was complete when the draft patent application was circulated internally on February 6, 1985. Its argument here, as in the United States, was that the written description identified the drug and its new use sufficiently to give the invention "definite and practical shape". It taught persons skilled in the art how the invention could be practised. This, however, misses the point. The question on February 6, 1985, was not whether or how the invention could be practised. The question was whether AZT did the job against HIV that was claimed; in other words, whether on February 6, 1985, there was *any* invention at all within the meaning of s. 2 of the *Patent Act*.

**274**    Summarizing my understanding of the date of invention, the date of invention will be the date on which the inventor can demonstrate three things:

1.    the invention is identified;

2.    the invention has been reduced to writing: and
3.    the invention is "practical" in that it will do the job that is claimed; in other
       words, it will have utility.

**275**    The question before me is a factual one. On or about June 20, 1980, had the Schering
scientists identified and written down an invention that would be expected to have some practical
use as an ACE inhibitor and, arguably, as an antihypertensive agent? In my view, they had not.
There are a number of reasons why I have come to this conclusion.

**276**    The main problem that I have with the position of Schering is that there is little evidence to
support that there was an invention as of June 20, 1980. The most direct evidence linking June 20,
1980 to a date of invention is Dr. Smith's Disclosure Notebook. As noted earlier, Dr. Smith first
recorded a "concept" for bicyclics on the enalapril backbone in her Disclosure Notebook on June
20, 1980. In my view, this evidence disclosed very little beyond bare sketches of a proposed
chemical structure.

**277**    The evidence is clear that, as of June 20, not a single compound within the scope of the
genus of compounds included in Dr. Smith's Disclosure Notebook or subsequently claimed in the
claims in issue had been made or tested.

**278**    Further, Dr. Smith described the contents of her Disclosure Notebook in the following terms:

Q.    And on these two pages, what was it that you were trying to disclose, or what did
        you disclose in these two pages, in your understanding?
A.    What we disclosed was our -- our plans, our hypothesis to make 4,4 disubstituted
        prolines, the spiro compounds related to them, to make I'll call them proline
        bridge compounds shown by 3 and 4, and attached them to what I'll refer to as
        the Merck side chain ...

**279**    Dr. Smith had some idea as to what would support her hypothesis. During her oral testimony,
she described her "invention" in the following terms:

Q.    So, what led you to contemplate those various what I'll call fused ring structures?
A.    [We] contemplated those fused ring structures after the captopril analogue that
        we had made, where we had the perhydroindole in place of the proline. The
        results we obtained from that for ACE inhibition *in vitro* looked very promising,
        that compounds of this type should be as active or more active than the captopril
        analogue that we had prepared. And if we used the Merck side chain, they should
        also display activity as good or better than the Merck compound, which I'll refer
        to as enalapril.

**280**    Such a statement provides some reasoning behind Dr. Smith's concept. However, it does not,
in my view, rise to the level of an "invention".

**281**    When the Plaintiffs' expert, Dr. Bartlett, was asked about the contents of Dr. Smith's Disclosure Notebook, he expressed the view that, as of June 20, 1980, Dr. Smith "imagined that these compounds would be active ACE inhibitors". Later in the same exchange with counsel for Apotex, Dr. Bartlett stated as follows:

> Q.    So, would you describe what she wrote on these pages as a sort of thought experiment?
>
> A.    In the context of what I answered, I think I said yes, there has been no experimental application of the reactions that she's written down that had not been carried out before.

**282**    In my view, there is a great difference between an invention and some writings that are characterized as a "thought experiment". I believe that the better view is that, as of June 20, 1980, there was insufficient information to call the contents of Dr. Smith's notebook an "invention". Dr. Smith had a hypothesis that a huge genus of compounds could have useful properties. She had a concept that - arguably - was inventive. That is all.

**283**    With respect to the mid-August 1980 date, there is the additional evidence that some of the compounds had been made and tested. By this date, it is true that Schering had made and tested two compounds with bicyclic rings coupled with an enalapril side chain or backbone (SCH 31309 and SCH 31335). Further, I also observe that, for purposes of the conflict proceedings, the Commissioner of Patents determined that August 8, 1980 was the date of the invention for at least one of the claims of the '206 Patent. This is of some importance since the Commissioner was tasked with the problem of determining the first inventor of a number of compounds. His very job was to identify the date of invention and he did not identify June 20, 1980 for the Schering invention. Nevertheless, before me in this trial, there is little evidence that would allow me to determine whether the Commissioner's finding of an August 8, 1980 invention date was reasonable. Thus, I conclude that the Commissioner's decision in this regard is of little assistance.

**284**    Apotex also submits that Schering is precluded from asserting a date of invention that is earlier than the first priority date, having failed to make an affirmative plea of this material fact and allegation. Apotex pleaded in its Statement of Defence and Counterclaim, at paragraphs 45 and 46, that the subject matter of the claims in issue was obvious in light of the common general knowledge as of either October 23, 1980 or October 20, 1981. This was not a general pleading that the claims were obvious; rather, two specific dates are referred to. In response, each of Sanofi and Schering responded with a bare denial, with no reference to any different date. At paragraph 37 of its Reply and Defence to Counterclaim, Schering states:

> Schering denies the allegations in paragraphs 45 to 51, namely that the claims of the '206 are invalid since the alleged invention claimed and disclosed was obvious ...

**285**    Schering, in response to this argument of inadequate pleadings, argues that Apotex was well

aware that Schering was relying on an invention date of June 20, 1980. Further, Schering notes, Novopharm, in its Statement of Defence and Counterclaim, at paragraph 65, merely refers to any of "the invention date, October 23, 1980, and October 20, 1981".

**286**    I agree with Apotex. The question of the invention date is not a minor detail. The invention date sets up the test for obviousness which, in turn, can invalidate a patent. The failure to expressly plead in reply that Schering was relying on an earlier invention date than was asserted by Apotex in its pleadings is, in my view, misleading. The fact that questions were asked and responded to during discovery that made reference to the June 20, 1980 date does not provide Apotex with knowledge of the facts upon which Schering is now relying to respond to the allegation that the subject matter of the patent was obvious. Accordingly, I conclude that Schering is precluded from asserting anything other than October 23, 1980 as the date of invention, at least as against Apotex.

**287**    In conclusion on this question, while the issue is not free from doubt, the better view is that the date of invention was neither June 20, 1980 nor August 8, 1980. Accordingly, I will address the question of obviousness as of the first priority date - that being October 23, 1980.

D. *Application of the Sanofi-Synthelabo Test for Obviousness*

**288**    I turn now to the four-stage analysis described by Justice Rothstein in *Sanofi-Synthelabo*, above.

(1)    Identify the "person skilled in the art"

**289**    The qualifications of the person skilled in the art are as set out above at paragraph [[85]] ; there is no disagreement amongst the parties. That person would hold a Master's or Ph.D. degree in synthetic organic chemistry, medicinal chemistry, pharmacology or another area of biochemistry biology and would have at least a few years of experience in either industry or academia.

(2) Identify the relevant common general knowledge

**290**    The next task before me is to consider what "common general knowledge" would be held by the skilled person as of the relevant date. There is no doubt that I am restricted to considering information in the public domain.

**291**    There are five bodies of work which, in my view, should be considered. Of interest, Sanofi, in its final argument, provides a helpful list of "prior art" which includes all of the following.

**292**    First, the work done by Squibb, as disclosed in a series of scientific papers that are important for the reasons detailed below, would be part of the common general knowledge:

(a)    Ondetti et. al., "Design of Specific Inhibitors of Angiotensin-Converting Enzyme: New Class of Orally Active Antihypertensive Agents", *Science* (1977) 196, No. 4288, 441-444; Cushman et al., "Design of Potent Competitive

Inhibitors of Angiotensin-Converting Enzyme. Carboxyalkanoyl and Mercaptoalkanoyl Amino Acids", *Biochemistry* (1977) 16, No. 25, 5485-5491. Together, these papers taught:

- The Cushman-Ondetti model discussed earlier in these reasons, which allowed for the design of potential ACE inhibitors.

- The preferred stereochemistry of the captopril series of compounds. The papers showed that the S configuration is better than the R configuration with respect to the stereochemistry of the proline carboxy group. They also showed that the stereochemistry of the methyl group in the side chain was also important (it needed to be in the S configuration); and

(b) Cushman et al., "Development of Specific Inhibitors of Angiotensin I Converting Enzymes (kininase II)", *Federal Proceedings*, (1979), 38, No. 13, 2778-2782 at 2780, which further expounded theory that had been provided by the Cushman-Ondetti model of how peptide inhibitors bind to the active site of ACE.

293    Secondly, the skilled worker would also look to work done by Merck in respect of enalapril. Specifically, Merck's EP 401 (published June 25, 1980), and the Merck disclosure at the Troy conference on June 18, 1980 were significant because they:

- Disclosed the compound enalapril;

- Corroborated the Squibb work and further preferred an all-S stereochemistry at the three chiral centers of the enalaprilat class of the molecule; and

- Disclosed that a pipecolic acid (a 6-membered ring analog of enalapril) could be used in place of proline on the enalapril backbone.

294    Thirdly, a person of ordinary skill in the art would have been aware of a publication by Fisher and Ryan, entitled "Superactive Inhibitors of Angiotensin Converting Enzyme: Analogs of BPP9a containing dehydroproline", *FEBS Letters* (1979) 107, No. 2, 273-276, [referred to as "Fisher and Ryan"] which suggested that there may be an advantage, in terms of potency, to making the proline ring at the C-terminus more conformationally rigid rather than more flexible.

295    Fourthly, the skilled person can be presumed to be aware of patent applications filed in the same area of research. Referring specifically to the late 1970s and early 1980s, Dr. Patchett stated that "the groups tried to be on top of everything that was published, including in the patent literature". Further, Dr. Nelson agreed that researchers would most likely be looking for a drug product that is not already claimed and patented. The Defendants highlight a number of patent applications related to ACE inhibitors, which applications disclosed that, despite the fact that proline was the most common head group, moieties other than proline could be used to produce ACE inhibitory compounds. The more significant of these applications, all but one of which were published before August 8, 1980, are:

- U.S. Patent No. 4,046,889 (published September 6, 1977), U.S. Patent No.

4,052,511 (published October 4, 1977), U.S. Patent no. 4,105,776 (published August 8, 1978) and EP 401, which taught that the C-terminal proline group (a 5-membered ring structure) could be substituted with a 2-S pipecolic acid group (a 6-membered ring structure);

- U.S. Patent No. 4,129,566 (published December 12, 1978), U.S. Patent No. 4,154,942 (published May 15, 1979), U.S. Patent No. 4,156,084 (published May 22, 1979) and EP 401 (June 25, 1980), which disclosed that proline was substitutable with a dehydroproline, a 5-membered unsaturated ring or, a dehydropipecolic acid, a 6-membered unsaturated ring;

- UK Patent No. 2,000,508 (published January 10, 1979), which disclosed that proline could be substituted with thiazolidine derivatives;

- UK Patent Application No. 2,018,248 (published October 17, 1979), which disclosed a series of thiazolidinecarboxylic acid analogues of captopril that used bulky substituents attached to the thiazolidine ring;

- European Patent Application No. 0.012,845 (published July 9, 1980) [referred to as Tanabe], which disclosed ACE inhibitors with a tetrahydrosiquinoline (THIQ) head group; and

- UK Patent Application No. 2,039,478 (published August 13, 1980), which disclosed a series of captopril analogues, wherein the proline moiety had been substituted with a spiro-type bicyclic moiety.

**296**    Fifthly, the literature of the day included a series of work, which taught that there was sufficient volume for groups larger than the proline ring at the ACE active site, including bicyclic rings. The most significant of those publications and their teachings are as follows:

- Funae Y, et al, "Effects of N-mercaptoacylamino acids on inhibition of angiotensin I converting enzyme", *Japanese Journal of Pharmacology* (1978) 28, No. 6, 925-7; Mita I, et al., "New sulfhydryl compounds with potent antihypertensive activities", *Chemical & Pharmaceutical Bulletin* (1978) 26, No. 4, 1333-5; and Iso T, et al, "Pharmacological studies on SA 446, a new angiotensin I-converting enzyme inhibitor", *Japanese Journal of Pharmacology* (1979) 30, Supp: 136P, which disclosed ACE inhibition activity for thiazolidine analogues with terminal residues larger than proline;

- Holmquist B and Vallee BL, "Metal-coordinating substrate analogs as inhibitors of metalloenzymes", *Proceedings of the National Academy of Sciences of the United States of America* (1979) 76, No. 1, 6216-20, which examined the interaction of metal-ion coordinating peptides having an N-terminal sulfhydryl group with ACE;

- Iso T, et al, "Potentiating mechanism of bradykinin action on smooth muscle by sulfhydryl compounds", *European Journal of Pharmacology* (1979) 54, No. 3, 303-5, which disclosed that compounds with terminal residues larger than proline or thiazolidine (such as N-Thioacetyl tryptophan, tyrosine and

dihydroxyphenylalanine (DOPA) derivatives) exhibited ACE inhibition activity; and

- Cheung et. al., "Binding of Peptide Substrates and Inhibitors of Angiotensin-Converting Enzyme", *J. Biological Chemistry* (1980) 255, No. 2, 401-407, published January 25, 1980, which disclosed activity for amino acids tryptophan, phenylalanine and tyrosine -- molecules that are larger than proline.

**297**    In very non-specific terms, it was relevant general knowledge of the skilled person, by August 8, 1980 - and even more so by October 23, 1980 - that the proline of captopril and enalapril could be replaced by larger structures and even fused-ring structures. Further, on the basis of Fisher and Ryan, the skilled person would know that there may be an advantage to making any variants to the proline ring at the C-terminus more rigid as opposed to more flexible.

(3)    Identify the inventive concept

**298**    The next step, as taught by *Sanofi-Synthelabo*, is to identify the inventive concept of the claim in question. In my view, the allegedly inventive concept of Claim 12 is the combination of the enalapril backbone with a 5,5 bicyclic ring moiety, at the C-terminus, in place of the proline ring of enalapril.

(4)    Identify the Differences Between the "State of the Art" and the inventive concept

**299**    The next step in the approach for considering obviousness is to identify any differences between the relevant general knowledge of the skilled person - the "state of the art" - and the inventive concept.

**300**    As acknowledged by Apotex, in their final written argument, "[T]he difference between the state of the art as of October 1980 and the inventive concept was that the relevant prior art had not disclosed all of the bicyclic moieties of the Claims in Issue and had disclosed no bicyclic moieties on the enalapril backbone". Whether one uses the date of October 1980 or August 1980, I agree.

(5)    Would the differences constitute steps that would have been obvious?

**301**    The critical step in the analysis is whether this difference - the 5,5, bicyclic ring as opposed to other moieties on the enalapril backbone - would have been obvious.

**302**    In order to provide context for the assertions of obviousness (and sound prediction), some appreciation for the state of the prior art as of various dates is required. Sanofi, in its written argument, provides a long list of what it describes as "prior art". In Sanofi's view, "[t]aken as a whole, the art demonstrates inventiveness and provides data that supports a sound prediction by Schering (including when combined with Schering's work)". However, with respect to the issue of obviousness, Sanofi submits that the prior art discloses a "diverse number of options" and that "[o]nly after the fact can one trace a direct patent through the forest of art to the invention".

**303**    As we know, interest in developing new, patentable ACE inhibitors was high. Thus, our person skilled in the art, by October 1980, would have been highly motivated to come up with new ACE inhibitors. The skilled person would no doubt be reviewing any and all publications on ACE inhibitions. In their arguments on sound prediction, the Plaintiffs refer to much of this prior art as supporting a sound prediction. Just as this information would have been reviewed by the Schering scientists, it would also have been available to and likely reviewed by persons skilled in the art. The question is whether the notional skilled person, having reviewed this same art, would consider that a 5,5-bicyclic ring on an enalapril backbone would have been "obvious to try".

**304**    I agree with the Plaintiffs that there is a long list of prior art. As I see it, the term "general knowledge" is not so much the "forest of art" or list of documents, publications and patent applications. Rather, it is the knowledge that emerges from this prior art and whether such knowledge would have been generally known. When the art referred to by the parties is examined, it is clear that there are some general themes that emerge that would come to the attention of our person skilled in the art. All of the art referred to by the Defendants and their experts is in the field of ACE inhibition, unlike *Perindopril*, above, where some of the art was in relation to non-ACE research and development. The skilled person, in this case, in assessing the information described by the parties, would not be asked to extend his research beyond the ACE inhibition field.

**305**    The first obvious concept or theme is the enalapril backbone. I think that it is undisputed that the skilled person would have been aware of and able to understand the implications of the disclosure by the Merck scientists at the Troy conference, as reinforced by subsequent publications. The Troy conference disclosures and subsequent art established that enalapril was the new standard in ACE inhibition research. Given the excitement generated by the enalapril disclosure, I agree with Dr. Thorsett when he states, in his report:

> In my opinion, the unimaginative notional person skilled in the art seeking to design a novel compound possessing some level of ACE inhibition activity would have derivitized enalapril in a manner that was analogous to, or a simple variant of previously described derivatives of captopril or would have prepared a simple variant of the previously described class of compounds disclosed within Merck's "enalapril" patent - European Patent Application No. 12,401.

**306**    In other words, there would have been much motivation in the industry to develop "novel" analogues of enalapril.

**307**    In addition to the molecular structure itself disclosed at Troy, the concept of all-S configuration on the backbone was reinforced. Thus, whatever else emerged, it would have been obvious to the skilled person to focus his experimentation on compounds with an all-S configuration on the enalapril backbone.

**308**    The second concept or theme is the possibility of replacing the proline ring of enalapril. The Schering scientists were not the only ones to investigate this possibility. Several publications

disclosed that the proline ring of captopril could be replaced by other structures and still maintain activity. It logically would follow that our notional skilled person would look to draw analogies with the work done on the captopril model. The majority of the experts appear to accept that the teachings with respect to the C-terminus of the captopril analogues were transferable to the C-terminus of the enalapril analogues. For example, during cross-examination of Dr. Bartlett, the following exchange took place:

> Q.    ... You are aware of the Tanabe patent application which was published on July 25th, 1980?
> A.    Yes.
> Q.    And you are aware that are it discloses in my lingo, my lay lingo a 6,6 THIQ on a captopril backbone?
> A.    A 6,6 tetrahydroisoquinoline, but captopril backbone, yes.
> Q.    So, we understand each other. And would you say that with the benefit of the Merck disclosure, that a person skilled in the art, having Tanabe, would arrive at the conclusion that he or she could transpose the THIQ 6,6 to enalapril and get an ACE inhibitor?
> A.    <u>So, the tetrahydroisoquinoline head group with the Merck enalapril backbone, I think one would have an expectation that that would be an active ACE inhibitor</u>. [Emphasis added]

**309**    Dr. Nelson in his report noted that, as of October 23, 1980, it was known that:

> The C-terminus end of the ACE inhibitors could incorporate a large number of structures varied in size, shape and conformation, based on activity obtained for ACE inhibitors having various different amino acid groups, substituted proline analogs, fused bicyclic rings with an aromatic second ring or other large substituents on captopril, enalapril or related backbone structures.

**310**    The next step is the size and shape of any proline replacements. The clearest signpost to a fused ring structure would have been the Cushman-Ondetti model together with the Tanabe patent. The Cushman-Ondetti model, together with Tanabe and other literature, taught that the S2' site of ACE was relatively promiscuous and could, thus, accommodate bulkier substitutions for proline at the C-terminus. In discussing his views of sound prediction, Dr. Bartlett presented the hypothesis that 5,5 bicyclic ring structures would fall within the space available. If that theory was available to Schering to assist in founding a sound prediction (which, of course, I have found was not the case), it was also available to others in the field.

**311**    From this point, it is more likely than not that the skilled person would be motivated to try various fused-ring structures. I acknowledge that having to try every size and shape of fused rings would be extremely difficult for the skilled person. The syntheses involved are, as I have learned in this trial, not simple. However, in my view, some of the prior art would have led the skilled person

quickly to try a 5,5 bicyclic ring structure.

**312**     Fisher and Ryan suggested that there may be an advantage, in terms of potency, to making the proline ring at the C-terminus more conformationally rigid rather than more flexible. In light of this, a skilled person would understand that the fusion of a second ring to proline would accomplish this goal. Sanofi argues that the Fisher and Ryan article is of limited assistance, primarily because it disclosed two different hypotheses to explain the increased potency. I agree that the art of Fisher and Ryan, on its own, would not make trying a 5,5 bicyclic ring obvious. Nevertheless, in combination with the other art, I accept the view of Dr. Thorsett that Fisher and Ryan would teach toward increasing the rigidity of the any substituents at the C-terminus.

**313**     Further, as discussed by Dr. Heathcock, in his report:

> A medicinal chemist would understand that there are a finite number of ways of rigidifying the proline ring. The most obvious way would be to fuse a further ring to proline at two different carbon atoms.

Dr. Heathcock also opined that a person skilled in the art would likely consider 3, 4, and 5 membered rings (cyclopropane, cyclobutane and cyclopentane) for the added ring.

**314**     The Plaintiffs' experts suggested that there were other more obvious options. One possibility was that, instead of adding a fused ring to the proline, the skilled person might have added a double bond or two double bonds to the proline ring. The first problem with this suggestion is that Merck had already done this in EP 401. Common sense dictates that our skilled person would not waste his time pursuing research paths that were already crowded with existing patent applications. The second problem with this notion is that, as described by Dr. Heathcock, the compounds would not be very stable. I have similar difficulties in accepting that fusing a benzene ring onto the proline ring would be of interest to the skilled person.

**315**     Having reviewed all of the evidence presented on the question of obviousness, I am persuaded that the 5,5 bicyclic ring substituted for the proline ring on the enalapril backbone would have been obvious to try. This is not a case where "the prior art would have alerted the person skilled in the art to the possibility that something might be worth trying" (*Sildenafil*, above, at para. 29). On these particular facts, I am satisfied that the invention of ramipril, as embodied in Claim 12, was "more or less self evident".

**316**     This is not to say that the skilled person would not also have tried synthesizing and testing a 6,5 bicyclic ring moiety or other configurations on an enalapril backbone. I do not know. But, even if that is the case, the existence of more than one possibility does not automatically exclude the possible obviousness of any given option.

**317**     The final question that would be asked of our notional skilled person is whether it was obvious that the 5,5 bicyclic ring on an enalapril backbone "ought to work". I think that the answer

to that question is a qualified "yes". If Dr. Bartlett is correct that, on the basis of his "space" theory, one could soundly predict that a 5,5 bicyclic ring on an enalapril backbone would work, then a skilled person would expect that compound to have activity. If the theory is applicable and available to the Schering scientists, I see no reason why it was not available to the person skilled in the art.

**318**    Referring to those factors identified by Justice Rothstein in *Sanofi-Synthelabo* as are directly relevant to this case, I can summarize as follows:

- Based on the general knowledge available to the skilled person, it would have been more or less self-evident that a 5,5-bicyclic ring substituted for the proline moiety of the enalapril molecule ought to work, particularly where the molecule is in an all-S configuration.
- The 5,5 ring would be one of a relatively small class of choices that would be predictable to a person skilled in the art.
- The effort, nature and amount of effort required to achieve the invention would not be insignificant. However, as noted above (see paragraph [[242]] ), there were known methods of synthesis available to the skilled person to make, separate and test the targeted compounds.

E. *Conclusion on Obviousness*

**319**    In conclusion, the answer to the question - Would the differences constitute steps that would have been obvious? - is "yes". Accordingly, in the alternative to my conclusion that the claims in issue are invalid on the basis that there was no sound prediction of utility, I would conclude that the same claims are invalid as being uninventive or obvious.

**320**    I am well aware that, in *Perindopril*, above, I came to an opposite conclusion on the question of obviousness. There are a number of reasons why I have reached a different outcome in these proceedings. In very general terms, a reader of the two decisions would note two important distinctions. The first is that the patents and their claims are different. Secondly, in each case, I was presented with a unique and fundamentally different record.

## XII. **Best Mode**

**321**    Apotex submits that the Schering scientists failed to disclose the best (and only) method known to them to actually make the 5,5 bicyclic compounds when they filed the '336 Application. They argue that Schering's failure to disclose the "best mode" of putting the invention into practice is a breach of its obligations under s. 34(1) of the *Patent Act*. In Apotex's view, "the inventor's duty is to describe the best method known to him, not just a method known to him" (*TRW Inc. v. Walbar of Canada Inc.* (1991), 39 C.P.R. (3d) 176 at 195-197 (FCA) [*TRW*]).

**322**    As acknowledged by Dr. Neustadt, Schering never made a compound with a 5,5-fused ring structure using the methods described in the '206 Patent, specifically Examples 18 and 20:

> Q.     Am I correct that the only process Schering used to synthesize the 5,5 was the
>        method that you devised, the catalytic hydrogenation?
> A.     The only method that was used to produce a complete ACE inhibitor target with
>        the 5,5 system is this.
> Q.     Thank you. That is not in the '206 patent?
> A.     I believe it is not.

**323**    The catalytic hydrogenation method was conceived by the Schering scientists and was
described as "a novel synthetic route". Schering scientists employed this method of synthesis for
two of the compounds tested - SCH 31924 and SCH 31925. These compounds were the first to
contain a 5,5 bicyclic fused ring on an enalapril backbone. Both of these compounds were
synthesized after the October 1980 priority date (the date of the US application), but before the
Canadian filing date. It was conceded by Dr. Neustadt that his process would provide more ready
access than the examples given in the patent; it would be easier to run than the mercuric acetate
procedure described in Example 20 and 18 of the '206 Patent. In spite of this further work and
acquired knowledge, the '336 Application - and, hence, the '206 Patent - made no reference to this
superior method of synthesis.

**324**    In *Minerals Separation North America Corp. v. Noranda Mines Ltd.*, [1947] Ex. C.R. 306 at
316, President Thorson spoke of the standard to be applied in assessing the sufficiency of a
disclosure required by section 36, when he stated:

> It must not contain erroneous or misleading statements calculated to deceive or
> mislead the persons to whom the specification is addressed <u>and render it difficult
> for them without trial and experiment to comprehend in what manner the
> invention is to be performed.</u> It must not, for example, direct the use of
> alternative methods of putting it into effect if only one is practicable, even if
> persons skilled in the art would be likely to choose the practicable method....
> <u>Moreover, the inventor must act *uberrima fide* and give all information known to
> him that will enable the invention to be carried out to its best effect as
> contemplated by him.</u> [Emphasis added]

**325**    In *Consolboard*, above, at page 520, Justice Dickson adopted the words of President
Thorson:

> Section 36(1) [s. 34(1) of the *Patent Act*] seeks an answer to the questions:
> "What is your invention? How does it work?" With respect to each question the
> description must be correct and full in order that, as Thorson P. said in *Minerals
> Separation North American Corporation v. Noranda Mines, Limited* [1947] Ex.
> C.R. 306]:

> ... when the period of monopoly has expired the public will be able, having only

the specification, to make the same successful use of the invention as the
inventor could <u>at the time of his application</u>. [Emphasis added]

**326**    Apotex argues that these words of President Thorson, as endorsed in *Consolboard*, above.
make it clear that the inventor's duty is to describe the best method known to him, not just a method
known to him. Further, Apotex submits the date to assess the "best mode" is the time of the
application - in this case, October 1981.

**327**    I have considerable sympathy for the argument of Apotex. It appears that the Schering
scientists were well aware of a better method of making some of the compounds of Claim 12.
Schering made a conscious decision not to include this better method into the specification for the
Canadian application. As I understand it, this could have caused legal difficulties for Schering with
respect to the priority date of its invention. So, all that one can glean from the patent specification is
that the Claim 12 compounds can be made using either Example 20 or by known methodology. As
we have seen, the synthesis of compounds of Claim 12 using Example 20 is complex. Further, there
is a clear difference of opinion between at least two of the experts on whether a person skilled in the
art could, as of the relevant date, use known methods to synthesize the Claim 12 compounds (Dr.
McClelland and Dr. Charette). Common sense and fair play would tell me that Schering ought to
have disclosed the catalytic hydrogenation method that its scientists had actually used to synthesize
SCH 31924 and SCH 31925. Nevertheless, I must conclude that the position of Apotex is beyond
the scope of the *Patent Act* and current jurisprudence.

**328**    The first problem with Apotex's argument is with the use of the "best mode" requirement in
respect of a patent to a medicinal compound. Section 34 of the *Patent Act* sets out the requirements
for the specification in a patent. In part, that section reads as follows:

34.    (1) An applicant shall in the specification of his invention

...

(*b*) set out clearly the various steps in a process, or the method of
constructing, making, compounding or using a machine, manufacture or
composition of matter, in such full, clear, concise and exact terms as to
enable any person skilled in the art or science to which it appertains, or
with which it is most closely connected, to make, construct, compound or
use it;

(*c*) in the case of a machine, explain the principle thereof and the best
mode in which he has contemplated the application of that principle;

* * *

34.    (1) Dans le mémoire descriptif, le demandeur :

...

b) expose clairement les diverses phases d'un procédé, ou le mode de
construction, de confection, de composition ou d'utilisation d'une machine,
d'un objet manufacturé ou d'un composé de matières, dans des termes
complets, clairs, concis et exacts qui permettent à toute personne versée
dans l'art ou la science dont relève l'invention, ou dans l'art ou la science
qui s'en rapproche le plus, de confectionner, construire, composer ou
utiliser l'objet de l'invention;

c) s'il s'agit d'une machine, en explique le principe et la meilleure manière
dont il a conçu l'application de ce principe;

**329**    As can be seen from the words of the statute, the "best mode" obligation only arises in the
case of a patent to a machine. Neither the words nor the underlying concept that a patentee must set
out the best available manner of putting the invention into practice are used elsewhere in s. 34(1) or
in the *Patent Act*. In *Sanofi-Synthelabo*, above, the Supreme Court reiterated the importance of the
statutory scheme when interpreting patents. At paragraph. 12, Justice Rothstein stated as follows:

At the outset, it is appropriate to refer to the words of Judson J. for this Court in
*Commissioner of Patents v. Farbwerke Hoechst Aktiengesellschaft Vormals
Meister Lucius & Bruning*, [1964] S.C.R. 49, at p. 57:

There is no inherent common law right to a patent. An inventor gets his
patent according to the terms of the *Patent Act*, no more and no less.

The most recent reference to the law of patents being wholly statutory are the
words of Lord Walker in *Synthon B.V. v. SmithKline Beecham plc*,[2006] 1 All
E.R. 685, [2005] UKHL 59, at paras. 57-58:

The law of patents is wholly statutory, and has a surprisingly long history...
. In the interpretation and application of patent statutes judge-made
doctrine has over the years done much to clarify the abstract generalities of

the statutes and to secure uniformity in their application.

Nevertheless it is salutary to be reminded, from time to time, that the general concepts which are the common currency of patent lawyers are founded on a statutory text, and cannot have any other firm foundation.

**330**    Where Parliament has chosen to include a "best mode" obligation in respect of machine patents only, the courts must respect that choice. Accordingly, reading such a requirement into non-machine patents would be contrary to the principles of statutory interpretation.

**331**    Even if the notion of "best mode" is applicable, the jurisprudence raises another difficulty. As noted, the Schering scientists developed the new method of synthesis in the time period between the US filing and the Canadian filing. Such a situation was addressed by the Federal Court of Appeal in the case of *Lido Industrial Products Ltd. v. Teledyne Industries Inc.* (1981), 57 C.P.R. (2d) 29. In that case, involving a patent for a showerhead, the inventors failed to refer to certain improvements to the device that were known to them after the US filing date of September 4, 1973 but before the Canadian filing date of February 27, 1974. In explaining the applicable date for application of the best mode test, Chief Justice Thurlow, speaking for the entire court on this point, concluded that the relevant date was that of the US filing. On that basis, he found (at paragraph 50) that:

> While the device with these modifications was contemplated by the applicant Teledyne Industries, Inc. at the material time it has not been established that it was known or contemplated by the applicant as the best mode for the application of the principle of its device.

Thus, on the facts before me, the best mode obligation, even if it applies, would not have required Schering to disclose the better synthesis method in its specification.

**332**    I also note that the words of President Thorson in *Mineral Separation*, above, must be placed in context. President Thorson's words were *obiter* only; nowhere in the decision, did President Thorson apply the concept of best mode or good faith to his decision. Further, Justice Dickson's words referred to above, in the *Consolboard* decision, were addressed to the issue of sufficiency. In brief, I do not read either of these cases as importing a "best mode" requirement into a patent for a compound.

**333**    Apotex also relies on the words of Justice Stone in *TRW*, above. There are two difficulties with relying on this Court of Appeal decision. The first is that the Court's analysis of the validity of the patent at issue was not "strictly necessary"; the Court had already concluded that the defence of non-infringement had been made out (*TRW*, above, at p. 191). Accordingly, the Court's comments on invalidity, including those on the best method requirement must be considered as *obiter*. Secondly, it appears that the patent in issue disclosed a practice that was in direct contradiction to

how one would actually implement the invention. The patent, in that case, dealt with the method for producing compressor blades. The patent specification explicitly disclosed that the invention eliminated the need to clamp on the root portion of the compressor blade. However, the expert evidence was that a person skilled in the art would be expected to clamp onto the root "despite the teaching in the Patent away from any need to do so...and, accordingly, the disclosure fails to comply with s. 36(1) of the *Patent Act*" (*TRW*, above, at p. 197). Thus, even if the words of Justice Stone are accepted as authoritative (and not just as *obiter*), the case stands for the proposition that an inventor cannot provide directions in the specification that are misleading or in direct conflict with actual practice. The *TRW* case does not assist Apotex.

## XIII. Double Patenting

**334**    The Defendants argue that the claims in issue in the '206 Patent are invalid on the basis of double patenting over the invention described and claimed in claims 2 and 4 of the '087 Patent issued to Hoechst, a predecessor to Sanofi Deutschland.

**335**    The '087 Patent issued May 14, 1985 to Hoechst, based on an application filed November 4, 1982 and claiming a first priority date of November 11, 1981. It is entitled "*Derivatives of Cis, Endo-2-Azabicyclo- (3.3.0) - Octane - 3 - Carboxylic Acid, a Process For Their Preparation, Agents Containing These Compounds and Their Use*". Of particular interest, Claim 2 and Claim 4 of '087 Patent are claims to compounds "whenever obtained according to a process as claimed in claim 1 or by an obvious chemical equivalent thereof"; these are product-by-process claims. Ramipril would be a compound to which Claims 2 and 4 of the '087 Patent applies, provided that it is made in accordance with the processes set out in that patent. The '087 Patent expired on November 4, 2002.

**336**    The jurisprudence is clear that the same invention cannot be patented twice. As stated by Justice Binnie in *Whirlpool*, above, at paragraph. 63:

> The inventor is only entitled to "a" patent for each invention: *Patent Act*, s. 36(1). If a subsequent patent issues with identical claims, there is an improper extension of the monopoly. It is clear that the prohibition against double patenting involves a comparison of the claims rather than the disclosure, because it is the claims that define the monopoly.

Thus, a monopoly should not be granted, nor should previous inventions be "evergreened", by the expedient of obvious or uninventive additions (*Whirlpool*, above, at para. 37).

**337**    The jurisprudence identifies two categories of double patenting. In the first category, "same invention double patenting", two patents are the same or have an identical or conterminous claim. The second category, "obviousness double patenting", is somewhat broader. In obviousness double patenting, the claims of the patents are not identical or conterminous, but the later patent has claims that are not patentably distinct from the other patent, or involve no novelty or ingenuity (see

*Whirlpool*, above, at paras. 65-67). Since the claims of the '206 Patent are not identical or conterminous with the claims of the '087 Patent, the invalidity allegation in this case must be understood as an allegation of obviousness double patenting.

**338**    In my view, this argument of the Defendants must fail.

**339**    The specific question of double patenting with respect to the '206 Patent and the '087 Patent was considered and rejected in a number of cases. In each of *Ramipril I (FC)*, *Ramipril I (FCA)*, *Ramipril II (FC)*, and *Ramipril II (FCA)*, the courts determined the very issue that the Defendants are putting forward in this case. Although these decisions were all made in the context of NOC proceedings, the Defendants have failed to persuade me that the evidence before me would lead to a different result.

**340**    It is undisputed that the priority filing date of the '206 Patent is earlier than that of the '087 Patent. Even though the '206 Patent issued later than the '087 Patent, the date of the invention (as discussed above) is considered to be no later than October 23, 1980. Thus, the allegation of obviousness double patenting is inapplicable on these facts since the '206 Patent cannot be considered a "later patent" that has been made obvious by the '087 Patent.

**341**    I also observe that the inventors and owners of the '087 Patent are different from the inventors and owner of the '206 Patent. There is no corporate relationship between the owners of the respective patents. The fact that Sanofi Deutschland, the successor of the original owner of the '087 Patent, is a licensee under the '206 Patent, appears to be irrelevant to any question of double patenting. Although I considered and rejected the notion that double patenting could only exist where patents are owned by the same parties (see *Ramipril I (FC)*, at para. 59), subsequent jurisprudence has consistently assumed that double patenting can only arise where the two patents are held by the same parties (see *Merck v. Apotex*, 2006 FC 524, 53 C.P.R. (4th) 1, at para. 207; *Apotex Inc. v. Sanofi-Synthelabo Canada Inc.*, 2006 FCA 421, 59 C.P.R (4th) 46 at para. 45, aff'd 2008 SCC 61). In *Bristol Myers v. Apotex*, 2009 FC 137 at paragraph 174, Justice Hughes described the applicability of double patenting as follows:

> Double patenting only applies when dealing with the same person getting two or more patents. If some other person has received an earlier patent, then the second patent is to be considered in the context of anticipation and obviousness or, in the case of pre-October 1989 patent applications, the first to invent.

**342**    Further, in *Sanofi-Synthelabo*, above, at paragraph 102, the Supreme Court found that, for double patenting purposes, there was no identity between claims of one patent and those of another where the claims of one patent are process or product-by-process claims and the claims of the other are product claims.

**343**    For these reasons, I am of the view that the Defendants would not succeed in their claims that the '206 Patent should be held to be invalid on the basis of double patenting.

## XIV. *Gillette* Defence

**344**    The decision of the UK House of Lords, in *Gillette Safety Razor Co. v. Anglo-American Trading Co.* (1913), 30 R.P.C. 465 (H.L.), gives rise with an argument raised by Apotex (supported by Novopharm) referred to as the "*Gillette* defence". The *Gillette* decision dealt with a patent issued to the plaintiffs for safety razors. The plaintiffs sued the defendants for infringement. In the House of Lords, Lord Moulton commenced by examining the state of the art and, in particular, an earlier patent that had been issued to Mr. Butler, also for a safety razor. He then turned to an analysis of the defendant's razor, in light of the Butler patent, and then said (at p. 480, line 28 *et seq*.):

> I am of the opinion, therefore, that there is no patentable difference between the Defendants' safety razor and that shown and described by Butler. If the blade used by the Defendants be put into Butler's handle (and this, as I have said, involves no invention) you have a safety razor which is indistinguishable from the Defendants' razor in anything which bears on the question of invention. <u>It follows, therefore, that no Patent of date subsequent to the publication of Butler's specification could possibly interfere with the right of the public to make the Defendants' razor.</u> [Emphasis added]

**345**    Apotex points out that the uncontradicted evidence is that the ramipril used in Apo-Ramipril is made in accordance with the process for making ramipril set out in the '087 Patent. As noted, the '087 Patent was issued in May, 1985 and expired in November, 2002, whereas the '206 Patent did not issue until 2001. Thus, Apotex submits, the reasoning and result in *Gillette* are directly applicable. In other words, Apotex argues, since Apo-Ramipril is made using ramipril that is made in accordance with teachings of the '087 Patent - which is the equivalent of the Butler patent - the existence of the '206 Patent cannot possibly interfere with Apotex's right to manufacture, use and sell Apo-Ramipri1 and there is no infringement of the '206 Patent.

**346**    The *Gillette* defence has been referred to in at least three Canadian cases - *AB Hassle*, above, at paragraph 15 (FCA); *Eli Lilly Canada Inc. v. Apotex Inc*., 2009 FC 320 [*Raloxifene (FC)*]; and *Pfizer Canada Inc. v. Apotex Inc.*, 2005 FC 1421, 282 F.T.R. 8. I accept that, in the proper factual context, the *Gillette* defence could have applicability. However, this case does not present such a factual context.

**347**    In dismissing this argument, I note that the application for the '087 Patent was filed after that for the '206 Patent. Given the unusual timing that arose because of the conflict proceedings under the old *Patent Act*, we should not look at the issue date of the respective patents, as was done in *Gillette*. Rather, we must consider the subject matter itself. Even though the '206 Patent - because of the conflict proceedings - issued later, its subject matter was in the public domain prior to the filing of the '087 Patent. Thus, if any patent is "old" or the equivalent of the Butler patent, it is the '206 Patent. On the facts before me, the *Gillette* defence is not available to the Defendants.

**348**    In the recent case of *Raloxifene (FC)*, above, Justice Hughes considered the *Gillette* defence.

Justice Hughes found, on the facts of that NOC proceeding, that Apotex's allegations as to the *Gillette* Defence were justified. However, his finding should be placed in context, at paragraph 64, where he concluded as follows:

> ... I find, on the civil burden of proof, that the Apotex product to be produced in accordance with the process would not be different from that produced by the'068 patent process and would fall within the scope of the claims of the '399 patent. To that extent, it would infringe. However since I have found that the product of the '068 patent anticipates the product as claimed in the '399 patent, the claims are not valid. Therefore, as to the Gillette Defence would have it, no valid claim has been infringed. Apotex's allegations as to Gillette Defence are justified. The simple allegation as to non-infringement is not justified.

**349**    As I read this part of the decision, Justice Hughes' conclusion on the *Gillette* Defence was entirely reliant on his conclusion of anticipation. Absent a conclusion of anticipation, the *Gillette* defence would not have been available to Apotex. In the case before me, Apotex has not made a claim of invalidity due to anticipation by the '087 Patent. It follows that the *Gillette* defence cannot be sustained - in isolation - as a defence to the Plaintiffs' claims of infringement.

## XV. <u>First Inventorship</u>

**350**    Under the *Patent Act* - but not under the current *Patent Act* - the concept of first inventorship is fundamental. Section 27(a) of the *Patent Act* limits the grant of a patent to an inventor of an invention where it was not known or used by any other person before he invented it. Thus, where the invention was first known or used by another, an inventor may not receive a patent for that invention. There are limits to attacks that may be brought against a patent issued under the *Patent Act*. Specifically, pursuant to s. 61(1)(b) of the *Patent Act*, a patent cannot be declared invalid or void on the ground that the named inventors were not the first to have known or used the invention unless "that other person had, before the issue of the patent, made an application for patent in Canada on which conflict proceedings should have been directed".

**351**    Apotex claims that the claims in issue should be held invalid on the basis that Schering was not the first to invent ramipril. Apotex argues that, because Schering did not isolate and test ramipril before Hoechst isolated and tested ramipril, scientists at Hoechst, not Schering were the first inventors of ramipril. Apotex points to this Court's findings in *Perindopril*, above, at paras. 440-455, where it was found that, for the purposes of a first inventorship inquiry, Dr. Smith had not first "invented" the invention of the '196 Patent (6,5 bicyclic substitutions on an enalapril backbone possessing a linear alkyl group) despite the fact that she had first synthesized and tested a 6,5 bicyclic substitution on an enalapril backbone and her "invention disclosure book" included substitutions with a linear alkyl group. In Apotex's view, my finding in *Perindopril* should be read to mean that a party has not first invented a compound or material for the purposes of a first inventorship inquiry until that compound or material has, in fact, made and tested the material

claimed.

**352** I do not accept Apotex's arguments on this question. The first problem with this argument is that, in my view, it requires an interpretation of the conclusions in *Perindopril* that is not sustainable. In my view, *Perindopril* does not stand for the proposition that a compound cannot be invented unless it is actually made. The entire concept of sound prediction is predicated on the fact that an inventor may have a valuable invention that has not yet been made, provided that the requirements for sound prediction are met.

**353** This leads to the second difficulty that I have with the argument. Assuming, for purposes of this issue, that the requirements of sound prediction had been met by Schering, the date of invention would be either August 8, 1980 or October 23, 1980. These dates are discussed earlier in these reasons. The only evidence that I have of an invention date for the subject matter of the '087 Patent is that the Canadian filing date of the application was November 4, 1982, a date well after the invention disclosed in the '206 Patent. On these facts, I would find that the invention of the compounds of the invention included in Claims 1, 2, 3, 6 and 12 of the '206 Patent - including ramipril - was invented prior to the date of invention of the subject matter of the '087 Patent.

**354** Since I am not persuaded that Hoechst was an earlier inventor of the subject matter of the claims of the '206 Patent in issue, there is no need to consider s. 61(1)(b) of the *Patent Act* and Apotex's argument that there was a missed conflict.

## XVI. <u>Conclusions</u>

**355** In conclusion, the Plaintiffs' actions, in each of Court File No. T-161-07 and T-1161-07, will be dismissed. The Defendants will be entitled to a declaration that Claims 1, 2, 3, 6 and 12 of the '206 Patent are invalid. A separate Judgment will issue in respect of each Court File.

**356** In summary form, my determinative finding is that the compounds of Claim 12 lack utility, in that the inventors were, as of October 20, 1981 (the Canadian application date), unable to soundly predict that all of the compounds of Claim 12 would have utility as ACE inhibitors and as antihypertensive agents. Further, I have found that, even if the promised utility is only that the compounds would be useful to inhibit ACE, the utility of the compounds - or at least some of them - could not be soundly predicted. Since the compounds of Claim 12 are also included in Claims 1, 2, 3 and 6, it follows that those claims fail as well.

**357** In closing, I would like to make one additional observation in relation to the '206 Patent. Reviewing the evidence as a whole, I am struck by the apparent rush in 1980 and 1981 by the Schering scientists to bring forward something - anything - that could give Schering's patent department enough information to file a patent application. The following exchange between Dr. Smith and counsel for Apotex is particularly telling:

> Q.    ... Let's go to the bottom of the page. You write: "This disclosure contemplates

all possible stereoisomers" And obviously by this point, you hadn't tested very many different stereoisomers, certainly none of the enalapril backbone; is that correct?

A.   Right, because June --

Q.   Right.

A.   It was June 20th?

Q.   Right. And would I be correct that you had not even tested all of the stereoisomers of the bicyclics on the captopril backbone by this point? All the various possibilities?

A.   Right.

Q.   <u>And I take it the reason you wrote that was to cover off the possibility that at some point down the road, a particular stereoisomer might surprisingly turn out to have a very good activity, because you didn't want to miss one and then have the patent department come back to you and say, "Dr. Smith, you missed a good one"?</u>

<u>A. Right.</u>

<u>Q. So you were just protecting yourself, and you wrote this down to just make sure in case there was an unexpected one down the road, you had it covered off?</u>

<u>A. Yes, that would have it covered, and it's also what is done in patents.</u>

[Emphasis added]

**358**   Patent protection rests on the concept of a bargain between the inventor and the public (*Free World Trust*, above, at para. 13). In the case before me, the Schering scientists chose to include compounds in their patent for which they had no data or sound line of reasoning. It seems that, as Dr. Smith states, Claim 12 was drafted just to cover off future possibilities. While it may be "what is done in patents", this practice is not in keeping with the fundamental principles of patent protection. Schering failed to live up to its side of the bargain.

**359**   In the alternative, in the event that the inventors could have soundly predicted the effectiveness of the compounds of Claim 12, I have found that, on the record before me and on a balance of probabilities, at least one of those compounds lacked inventiveness. That is, the inventive concept of placing a 5,5 bicyclic ring moiety onto an enalapril backbone was obvious in light of the general common knowledge of persons skilled in the art, as of either the first priority date or as of August 8, 1980.

**360**    Further findings, none of which is determinative, are as follows:

- On a purposive construction, Claim 12 of the '206 Patent claims eight individual stereoisomers, one of which is ramipril; it does not claim only a mixture of the eight compounds;
- Both Apotex, with Apo-Ramipril, and Novopharm, with Novo-Ramipril, infringe Claims 1, 2, 3, 6 and 12 of the '206 Patent;
- Claims 1, 2, 3, 6 and 12 are not invalid on the basis of double patenting over the invention described and claimed in certain claims of the '087 Patent;
- The *Gillette* defence is inapplicable on the facts of this case;
- The Defendants' argument that Schering could not soundly predict, as of October 20, 1981, that it could make the compounds of Claim 12 fails, on the bases that:

    (a)    there is no such requirement at law;
    (b)    Example 20 described in the '206 Patent has not been shown to be unable to work; and
    (c)    other methods of synthesis were available to the skilled person as of October 20, 1981; and

- Apotex has not persuaded me that Schering was not the first to invent the compounds of Claim 12.

**361**    The question of costs was not addressed by the parties in their final submissions. As is normal in trials of this nature, the parties will be given a period of time to attempt to resolve the issue of costs among themselves. There have been a number of decisions recently where, in my view, principles have been sufficiently defined in cases such as these that the parties in these two actions should be able to settle the matter of costs without my intervention (see, for example, *Adir v. Apotex Inc.*, 2008 FC 1070, 70 C.P.R. (4th) 347). I hope that they do so. Prothonotary Milczynski has advised me that she would be available to assist the parties in settling this matter.

**362**    In respect of any award of costs, I would point to the following factors specific to this litigation. The first is that, I feel that there was some duplication of expert evidence on both sides. Secondly, the parties should carefully consider the question of costs related to the damages/remedies phase of the trial. Had these proceedings been bifurcated, 16 days of evidence, two days of final argument, many days of discovery and countless pages of testimony and expert evidence could have been avoided.

**363**    Should the parties be unable to agree on costs, they may serve and file written submissions as to costs on or before August 15, 2009, such submissions not to exceed ten pages. Reply submissions, not to exceed five pages may be served and filed by August 31, 2009.

**364**    Once again, I thank the counsel involved in this litigation for their professionalism, competence, enthusiasm and courtesy towards the bench and each other. Justice is well served by such members of the bar.

## POSTSCRIPT

[1] These Reasons for Judgment are un-redacted from confidential Reasons for Judgment which were issued on June 29, 2009 pursuant to the Direction dated June 29, 2009.

[2] The Court canvassed counsel for the parties whether they had concerns if the reasons were issued to the public without redactions. On June 30, 2009, July 2, 2009 and July 3, 2009, in separate emails, the parties advised that there are no portions of the confidential Reasons for Judgment that should be redacted. Counsel for Apotex requested that two dates described in paragraph 64 of the confidential Reasons for Judgment be amended to December 12, 2000 and March 20, 2001. Counsel for Sanofi agreed with the requested corrections. The corrected dates are included in paragraph 64 of these Reasons for Judgment.

SNIDER J.

*Case Name:*

# Sanofi-Aventis Canada Inc. v. Apotex Inc.

**Between**
**Sanofi-Aventis Canada Inc., and Sanofi-Aventis Deutschland**
**GmbH, Appellants, and**
**Apotex Inc., Respondent, and**
**Schering Corporation, Respondent**
**And between**
**Schering Corporation, Appellant, and**
**Apotex Inc., Respondent, and**
**Sanofi-Aventis Canada Inc., and Sanofi-Aventis Deutschland**
**GmbH, Respondents**
**And between**
**Sanofi-Aventis Canada Inc., and Sanofi-Aventis Deutschland**
**GmbH, Appellants, and**
**Novopharm Limited, Respondent, and**
**Schering Corporation, Respondent**
**And between**
**Schering Corporation, Appellant, and**
**Novopharm Limited, Respondent, and**
**Sanofi-Aventis Canada Inc., and Sanofi-Aventis Deutschland**
**GmbH, Respondents**

[2011] F.C.J. No. 1532

[2011] A.C.F. no 1532

2011 FCA 300

426 N.R. 196

97 C.P.R. (4th) 415

Dockets A-390-09, A-386-09, A-389-09, A-387-09

Federal Court of Appeal
Toronto, Ontario

**Noël, Pelletier and Layden-Stevenson JJ.A.**

Heard: October 31 and November 1 and 2, 2011.
Oral judgment: November 2, 2011.

(14 paras.)

*Intellectual property law -- Patents -- Criteria for patent protection -- Utility -- Doctrine of sound prediction -- Defences to infringement -- Invalidity of patent -- Appeal by patent holders from dismissal of infringement action dismissed -- Patent's claim identifying eight compounds declared invalid for lack of sound prediction, as only one compound demonstrated to have promised utility -- Judge applied proper test for sound prediction -- Judge considered both inventors' findings as well as state of the art in concluding claim lacked utility -- Inventor himself admitted future, unconfirmed claims covered off in patent -- Appeal court would not re-weigh evidence absent palpable error by judge.*

Appeal by Sanofi-Aventis and Schering from the dismissal of their patent infringement actions against Apotex and Novopharm. The judge declared invalid several claims contained in the subject patent, held by Sanofi-Aventis and Schering, based on the fact that the patent could not soundly predict that all eight compounds listed in the patent would have the utility promised. The judge found that only one compound, ramipril, was proven to have the desired effect. The judge found that, given the volatility of stereochemistry, that positive test results for the other compounds were required to afford them patent protection. After reviewing the state of the art at the time of the invention, the judge found that common general knowledge, applied to Schering's own investigations, did not suffice to provide a factual basis for a sound prediction. The judge considered the testimony of one of the inventors, who admitted that Schering included compounds in the claim to cover off future possibilities that had yet to yield results.

HELD: Appeal dismissed. The judge applied the proper test for sound prediction and did not err in finding the patent invalid for lack of utility. Her reasons were detailed and comprehensive and her findings were grounded in the evidence. The appeal court would not re-weigh the evidence and draw its own conclusions in the absence of a palpable and overriding error on the judge's part.

**Appeal From:**

Appeal from the judgment of the Honourable Justice Snider, dated june 29, 2009, in docket No. T-161-07, [2009] F.C.J. no 1626.

**Counsel:**

Gunars A. Gaikis, J. Sheldon Hamilton and Junyi Chen, for the Appellants, Sanofi-Aventis Canada Inc., Sanofi-Aventis Deutschland Gmbh.

Anthony Creber and Marc Richard for the Appellant, Schering Corporation.

Harry Radomski, Nando De Luca and Ben Hackett, for the Respondent, Apotex Inc.

Jonathan Stainsby, Mark Davis and Lesley Caswell, for the Respondent, Novopharm Limited.

---

[Editor's note: An amendment was released by the Court on November 18, 2011. The changes were not indicated. This document contains the amended text.]

The judgment of the Court was delivered by

**1**    LAYDEN-STEVENSON J.A. (orally):-- These reasons relate to Court File Numbers A-390-09, A-386-09, A-389-09 and A-387-09. The original of the reasons will be filed in A-390-09, the lead file, and copies will be placed in the other three files.

**2**    The appeals are from the judgment of Justice Snider of the Federal Court (the judge). The judge dismissed patent infringement actions against Apotex Inc. (Apotex) and Novopharm Limited (Novopharm) and declared Claims 1, 2, 3, 6 and 12 of Canadian Patent No. 1,341,206 (the '206 Patent) to be invalid, void, unenforceable and of no force or effect. The judge's reasons (2009 FC 676) contain a lengthy and detailed review of the background, the evidence, the law and the judge's findings.

**3**    The basis of the judge's conclusion is her finding, on a balance of probabilities, that the inventors of the '206 Patent could not soundly predict, as of the filing date of the patent application, that all eight compounds of Claim 12 of the '206 Patent would have the utility promised by the patent. Claim 12 comprises eight compounds and describes compounds with five stereocentres (or chiral centres) that can have either an S or R configuration (stereochemistry). It prescribes the S configuration for two chiral centres and allows for the other three to be either S or R. When all five stereocentres are in the S configuration, the compound is ramipril. The judge found, of the eight compounds, only ramipril could be soundly predicted (judge's reasons at paragraph 194). Consequently, the claim failed for want of utility.

**4**    Since Claims 1, 2, 3 and 6 include the same compounds as Claim 12, it followed that Claims 1, 2, 3, and 6 of the '206 Patent are also invalid. The judge stated, at paragraph 230 of her reasons, that the prediction of the appellant, Schering Corporation (Schering), at the date of the patent application, was not sound because it "failed on all three requirements making up the test for sound prediction - factual basis, articulable line of reasoning and disclosure."

**5**    Despite the detailed and capable arguments of the appellants' counsel, we are of the view that the appeals must be dismissed. The soundness of a prediction is a question of fact: *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 at paragraph 71 (*AZT*). The appellants contend that the judge erred in law by elevating the legal test for sound prediction to a

level requiring near certainty. More particularly, they submit that the judge required positive test results and ignored the common general knowledge of the person skilled in the art. Although we agree that, if the judge applied the wrong legal test, it would constitute an error of law, we do not believe that is what the judge did.

**6**    Rather, the judge correctly identified the test for sound prediction set out in *AZT*. Indeed, she applied the test to arrive at her conclusion regarding ramipril. The appellants' submissions ignore the fundamental factual finding that underpins and informs the judge's analysis. That is, in the stereochemistry context, even a small change to a molecule can yield profound effects on activity (judge's reasons at paragraphs 160-162). The judge's references to testing related to that specific factual context of volatility.

**7**    The thrust of the appellants' attack on the trial judge's findings is that she applied a purely subjective test to the issue of sound prediction, basing her conclusion on the inventor's state of mind without reference to the common general knowledge attributable to the person of ordinary skill in the art. This attack cannot be sustained in light of the judge's reasons. She did focus on the work done by the inventor (judge's reasons at paragraphs 164 to 188) and found that, taken by itself, it did not provide a factual basis for a sound prediction. She then went on to consider the common general knowledge. After reviewing the state of the art she found that the common general knowledge, applied to Schering's own investigations, did not suffice to provide a factual basis for a sound prediction (judge's reasons paragraphs 199-200).

**8**    The appellants also find fault with the judge's treatment of Schering's test results. In their view, she mischaracterized inactive test results as evidence of inactivity as opposed to evidence of lack of potency at the stipulated test levels. This line of attack is misconceived. The appellants' position was that the patent promised utility with the R configuration at the various chiral centres, though at a reduced level. They took this from the patent's statement that S configurations were preferred ('206 Patent at pages 17, 18). When the trial judge's reasons are read as a whole, it is apparent that the conclusion she drew from Schering's test results was that an inactive test at a stipulated test level did not prove or allow one to predict activity at a different test level. Thus, to the extent that the appellants claimed a sound prediction of some activity in relation to molecules with the R configuration, inactive test results did not support their prediction. This is not an error.

**9**    Indeed, in summarizing her conclusions, the judge reiterated the proposition that patent protection rests on the concept of a bargain between the inventor and the public. She noted that Schering included compounds in Claim 12 to cover off future possibilities. In this respect, she referenced an excerpt from the cross-examination of Dr. Smith, one of the inventors of the '206 Patent. Part of that excerpt is reproduced here; the entire excerpt may be found at paragraph 357 of the judge's reasons.

> Q.    And I take it the reason you wrote that was to cover off the possibility that at some point down the road, a particular stereoisomer might surprisingly turn out to have a very good activity, because you didn't want to miss one and then have

the patent department come back to you and say, "Dr. Smith, you missed a good one"?

A. Right.

Q.    So you were just protecting yourself, and you wrote this down to just make sure in case there was an unexpected one down the road, you had it covered off?

A.    Yes, that would have it covered, and it's also what is done in patents.

**10**    The remaining issues raised by the appellants involve questions of fact or mixed fact and law, which can be reversed on appeal only if palpable and overriding error is demonstrated. We are not persuaded that the appellants have demonstrated such errors.

**11**    The judge rendered detailed and comprehensive reasons for her conclusions with respect to sound prediction. Her findings are grounded on her assessment of the evidence and are fulsomely explained. The appellants have not identified any reviewable error in the judge's assessment of the evidence although they question the judge's application of the legal principles to the facts before her. Essentially, the appellants' arguments constitute an invitation to this Court to reweigh the evidence and to draw our conclusions from it. That is not our function.

**12**    To reiterate, absent palpable and overriding error, there is no basis upon which this Court can intervene. In our view, the judge properly cited the legal principles applicable to the doctrine of sound prediction, applied those principles to the evidence before her and arrived at her conclusions. The appellants have not demonstrated any error warranting this Court's intervention.

**13**    Having concluded that Claims 1, 2, 3, 6 and 12 of the '206 Patent were invalid for want of utility, in the alternative, the judge addressed the issue of validity on the basis of obviousness. The judge's obviousness analysis is *obiter*. The matter was determined on the basis of sound prediction. These reasons should not be taken as an endorsement of the judge's conclusions regarding the issue of obviousness and do not constitute such an endorsement.

**14**    The appeals will be dismissed with costs to the respondents in each appeal.

LAYDEN-STEVENSON J.A.

*Case Name:*

# Schering Corp. v. Apotex Inc.

**Schering Corporation**
**v.**
**Apotex Inc.**
**And between**
**Schering Corporation**
**v.**
**Novopharm Limited**
**And between**
**Sanofi-Aventis Canada Inc, Sanofi-Aventis Deutschland GmbH**
**v.**
**Novopharm Limited, Schering Corporation**
**And between**
**Sanofi-Aventis Canada Inc, Sanofi-Aventis Deutschland GmbH**
**v.**
**Apotex Inc., Schering Corporation**

[2012] S.C.C.A. No. 19

[2012] C.S.C.R. no 19

File No.: 34600

Supreme Court of Canada

Record created: January 4, 2012.
Record updated: July 12, 2012.

**Appeal From:**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

**Status:**

Application for leave to appeal dismissed with costs (without reasons) July 12, 2012.

**Catchwords:**

*Intellectual property -- Patents -- Medicines -- Validity -- Doctrine of sound prediction -- Patent declared invalid on basis that utility had not been demonstrated and could not be soundly predicted as at the date of the patent application -- What is the threshold for patentability? -- Whether patent law is statutory or whether judge-made obligations can be imposed on Applicant? -- Whether decisions of this Court in Consolboard, Monsanto, Sanofi, Christiani and Free World have been superseded? -- Whether AZT decision and doctrine of sound prediction ought to be clarified and what is meant by the disclosure obligation? -- How is utility of an invention determined for the purposes of sound prediction? -- How sound is sound -- defining the threshold and disclosure element? -- How does sound prediction relate to obviousness, if at all?*

**Case Summary:**

In 2007, the two Applicants, referred to here as Schering and Sanofi, brought separate patent infringement actions against two generic drug manufacturers Apotex Inc. ("Apotex") and Novopharm Limited ("Novopharm") with respect to Schering's'206 patent for ramipril, a drug used in the treatment of high blood pressure and cardiac insufficiency. In Claim 12 of the '206 patent, eight compounds, including ramipril were claimed. The '206 patent application was filed in Canada on October 20, 1981and the patent was issued to Schering in 2001. The Sanofi companies are licencees under the '206 patent. Apotex and Novopharm commenced sales of their generic version of ramipril in 2007, after receiving Notices of Compliance from the Minister, following a series of proceedings under the Patented Medicines (Notice of Compliance) Regulations, SOR/93-133. Schering and Sanofi commenced an infringement action against Apotex and Novopharm related to those sales. Apotex and Novopharm counterclaimed to impeach the patent.

**Counsel:**

Anthony G. Creber (Gowling Lafleur Henderson LLP), for the motion.

Gunars A. Gaikis (Smart & Biggar), for the motion.

Harry B. Radomski (Goodmans LLP), contra.

Jonathan Stainsby (Heenan Blaikie LLP), contra.

---

**Chronology:**

1.    Applications for leave to appeal:

FILED: January 3 and 4, 2012.

2.    Motion by Novopharm Limited to extend the time to serve and file the
respondent's responses to February 21, 2012 granted February 16, 2012. Before:
R. Bilodeau, Registrar.

3.    Motion for an extension of time granted February 23, 2012. Before: R. Bilodeau,
Registrar.

UPON APPLICATION by counsel on behalf of the respondent, Apotex Inc., for
an order extending the time within which to serve and file two responses to the
applications for leave to appeal to February 21, 2012.

IT IS ORDERED that the motion is granted.

4.    Motion by Sanofi-Aventis to extend the time to serve and file their two
applicants replies to March 9, 2012 granted March 16, 2012. Before: R.
Bilodeau, Registrar.

5.    Applications for leave to appeal:

SUBMITTED TO THE COURT: June 4, 2012. DISMISSED WITH COSTS:
July 12, 2012 (without reasons). Before: McLachlin C.J. and Rothstein and
Moldaver JJ.

The motion for an extension of time to serve and file the applications for leave to
appeal is granted. The applications for leave to appeal are dismissed with costs.

**Procedural History:**

Judgment at first instance: Applicants' infringement actions
dismissed on grounds that relevant claims of '206 patent
invalid.
Federal Court, Snider J., June 29, 2009.
(2009 FC 676).

Judgment on appeal: Appeal dismissed.
Federal Court of Appeal, Noël, Pelletier and
Layden-Stevenson JJ.A., November 2, 2011.
(2011 FCA 300); [2011] F.C.J. No. 1532.

e/qlhbb

** Preliminary Version **


*Case Name:*

# Sattva Capital Corp. v. Creston Moly Corp.


**Sattva Capital Corporation (formerly Sattva Capital Inc.),
Appellant;
v.
Creston Moly Corporation (formerly Georgia Ventures Inc.),
Respondent, and
Attorney General of British Columbia and BCICAC Foundation,
Interveners.**


[2014] S.C.J. No. 53


[2014] A.C.S. no 53


2014 SCC 53


File No.: 35026.


Supreme Court of Canada


Heard: December 12, 2013;
Judgment: August 1, 2014.


**Present: McLachlin C.J. and LeBel, Abella, Rothstein,
Moldaver, Karakatsanis and Wagner JJ.**


(125 paras.)


**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Alternative Dispute Resolution -- Binding arbitration -- Commercial arbitration awards -- Appeals*

*and judicial review -- Jurisdiction of the court to review -- Appeal by Sattva from two judgments of the British Columbia Court of Appeal, one setting aside a decision denying Creston's leave to appeal an arbitrator's decision and another overturning the arbitrator's decision, allowed -- In order for leave to be granted from a commercial arbitral award, a threshold requirement had to be met: leave had to be sought on a question of law -- The Leave Court erred in finding that the construction of the agreement constituted a question of law -- However, even had the CA Leave Court properly identified a question of law, the arbitrator's decision was reasonable.*

Appeal by Sattva Capital Corp. (Sattva) from two judgments of the British Columbia Court of Appeal, one setting aside a decision denying Creston Moly Corporation's (Creston) leave to appeal an arbitrator's decision and another overturning the arbitrator's decision. The issues in this case arose out of the obligation of Creston to pay a finder's fee to Sattva. The parties agreed that Sattva was entitled to a finder's fee of US$1.5 million and was entitled to be paid this fee in shares of Creston, cash or a combination thereof. They disagreed on which date should be used to price the Creston shares and therefore the number of shares to which Sattva was entitled. The parties entered into arbitration pursuant to the Arbitration Act (AA). The arbitrator found in favour of Sattva. Creston sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the AA. Leave was denied by the British Columbia Supreme Court. Creston successfully appealed this decision and was granted leave to appeal the arbitrator's decision by the British Columbia Court of Appeal. The British Columbia Supreme Court judge who heard the merits of the appeal upheld the arbitrator's award. The British Columbia Court of Appeal overturned this decision and found in favour of Creston.

HELD: Appeal allowed. Appeals from commercial arbitration decisions were narrowly circumscribed under the AA. In order for leave to be granted from a commercial arbitral award, a threshold requirement had to be met: leave had to be sought on a question of law. Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law. However, the historical approach should be abandoned. Contractual interpretation involved issues of mixed fact and law, as it was an exercise in which the principles of contractual interpretation were applied to the words of the written contract, considered in light of the factual matrix. Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract was a question of fact. The Court of Appeal erred in finding that the construction of the agreement constituted a question of law. The conclusion that Creston's application for leave to appeal raised no question of law was sufficient to dispose of this appeal. However, even had the Court of Appeal properly identified a question of law, leave to appeal should have been denied. The requirement that there be arguable merit that the arbitrator's decision was unreasonable was not met and the miscarriage of justice threshold was not satisfied. Further, even if the Court of Appeal had identified a question of law and the miscarriage of justice test had been met, it should have upheld the Superior Court's denial of leave to appeal in deference to that court's exercise of judicial discretion. In the context of commercial arbitration, where appeals were restricted to questions of law, the standard of review was reasonableness, unless the question

was one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise, which was not the case here. Here, the arbitrator's reasoning met the reasonableness threshold of justifiability, transparency and intelligibility.

**Statutes, Regulations and Rules Cited:**

Administrative Tribunals Act, S.B.C. 2004, c.á45, s. 58, s. 59

Arbitration Act, R.S.B.C. 1996, c.á55, s. 31, s. 31(2), s. 31(2) (a), s. 31(2)(b), s. 31(2)(c)

Civil Code of QuÚbec, S.Q. 1991, c. 64,


**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Arbitration -- Appeals -- Commercial arbitration awards -- Parties entering into agreement providing for payment of finder's fee in shares -- Parties disagreeing as to date on which to price shares for payment of finder's fee and entering into arbitration -- Leave to appeal arbitral award sought pursuant to s. 31(2) of the Arbitration Act -- Leave to appeal denied but granted on appeal to Court of Appeal -- Appeal of award dismissed but dismissal reversed by Court of Appeal -- Whether Court of Appeal erred in granting leave to appeal -- What is appropriate standard of review to be applied to commercial arbitral decisions made under Arbitration Act -- Arbitration Act, R.S.B.C. 1996, c. 55, s. 31(2).*

*Contracts -- Interpretation -- Parties entering into agreement providing for payment of finder's fee in shares -- Parties disagreeing as to date on which to price the shares for payment of finder's fee and entering into arbitration -- Whether arbitrator reasonably construed contract as a whole -- Whether contractual interpretation is question of law or of mixed fact and law.*

**Court Summary:**

S and C entered into an agreement that required C to pay S a finder's fee in relation to the acquisition of a molybdenum mining property by C. The parties agreed that under this agreement, S was entitled to a finder's fee of US$1.5 million and was entitled to be paid this fee in shares of C. However, they disagreed on which date should be used to price the shares and therefore the number of shares to which S was entitled. S argued that the share price was dictated by the date set out in the Market Price definition in the agreement and therefore that it should receive approximately 11,460,000 shares priced at $0.15. C claimed that the agreement's "maximum amount" proviso

prevented S from receiving shares valued at more than US$1.5 million on the date the fee was payable, and therefore that S should receive approximately 2,454,000 shares priced at $0.70. The parties entered into arbitration pursuant to the B.C. *Arbitration Act* and the arbitrator found in favour of S. C sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *Arbitration Act*, but leave was denied on the basis that the question on appeal was not a question of law. The Court of Appeal reversed the decision and granted C's application for leave to appeal, finding that the arbitrator's failure to address the meaning of the agreement's "maximum amount" proviso raised a question of law. The superior court judge on appeal dismissed C's appeal, holding that the arbitrator's interpretation of the agreement was correct. The Court of Appeal allowed C's appeal, finding that the arbitrator reached an absurd result. S appeals the decisions of the Court of Appeal that granted leave and that allowed the appeal.

*Held*: The appeal should be allowed and the arbitrator's award reinstated.

Appeals from commercial arbitration decisions are narrowly circumscribed under the *Arbitration Act*. Under s. 31(1), they are limited to questions of law, and leave to appeal is required if the parties do not consent to the appeal. Section 31(2)(*a*) sets out the requirements for leave at issue in the present case: the court may grant leave if it determines that the result is important to the parties and the determination of the point of law may prevent a miscarriage of justice.

In the case at bar, the Court of Appeal erred in finding that the construction of the finder's fee agreement constituted a question of law. Such an exercise raises a question of mixed fact and law, and therefore, the Court of Appeal erred in granting leave to appeal.

The historical approach according to which determining the legal rights and obligations of the parties under a written contract was considered a question of law should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix of the contract.

It may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law, however, the close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. The goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. Accordingly, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Legal errors made in the course of contractual interpretation include the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor. Concluding that C's application for leave to appeal raised no question of law is sufficient to dispose of this appeal, however the Court found it salutary to continue with its analysis.

In order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(*a*), an alleged

legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case. According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law by the leave court is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case. The appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit, meaning that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law.

Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the standard of review. The leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal.

The words "may grant leave" in s. 31(2) of the *Arbitration Act* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met. Discretionary factors to consider in a leave application under s. 31(2)(*a*) include: conduct of the parties, existence of alternative remedies, undue delay and the urgent need for a final answer. These considerations could be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria have been met. However, courts should exercise such discretion with caution.

Appellate review of commercial arbitration awards is different from judicial review of a decision of a statutory tribunal, thus the standard of review framework developed for judicial review in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. As a result, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise. The question at issue here does not fall into one of those categories and thus the standard of review in this case is reasonableness.

In the present case, the arbitrator reasonably construed the contract as a whole in determining that S

is entitled to be paid its finder's fee in shares priced at $0.15. The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both that definition and the "maximum amount" proviso and reconciles them in a manner that cannot be said to be unreasonable. The arbitrator's reasoning meets the reasonableness threshold of justifiability, transparency and intelligibility.

A court considering whether leave should be granted is not adjudicating the merits of the case. It decides only whether the matter warrants granting leave, not whether the appeal will be successful, even where the determination of whether to grant leave involves a preliminary consideration of the question of law at issue. For this reason, comments by a leave court regarding the merits cannot bind or limit the powers of the court hearing the actual appeal.

**Cases Cited**

**Referred to:** *British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122; *King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63; *Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945; *Prenn v. Simmonds*, [1971] 3 All E.R. 237; *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570; *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII); *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221; *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78; *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748; *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744; *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69; *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98; *Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316; *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63; *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257; *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712; *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262; *R. v. Fedossenko*, 2013 ABCA 164 (CanLII); *Enns v. Hansey*, 2013 MBCA 23 (CanLII); *R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174; *R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270; *Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326; *MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6; *R. v. Bellusci*, 2012 SCC 44, [2012] 2

S.C.R. 509; *R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651; *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297; *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011; *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190; *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654; *Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3; *Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, leave to appeal refused, [2013] 3 S.C.R. viii; *Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566.

## Statutes and Regulations Cited

*Administrative Tribunals Act*, S.B.C. 2004, c. 45, ss. 58, 59.

*Arbitration Act*, R.S.B.C. 1996, c. 55 [formerly *Commercial Arbitration Act*], s. 31.

*Civil Code of Québec*.

## Authors Cited

Brown, Donald J. M., and John M. Evans, with the assistance of Christine E. Deacon. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated May 2014).

Dyzenhaus, David. "The Politics of Deference: Judicial Review and Democracy", in Michael Taggart, ed., *The Province of Administrative Law*. Oxford: Hart, 1997, 279.

Hall, Geoff R. *Canadian Contractual Interpretation Law*, 2nd ed. Markham, Ont.: LexisNexis, 2012.

Lewison, Kim. *The Interpretation of Contracts*, 5th ed. London: Sweet & Maxwell, 2011 & Supp. 2013.

McCamus, John D. *The Law of Contracts*, 2nd ed. Toronto: Irwin Law, 2012.

## History and Disposition:

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Low and Levine JJ.A.), 2010 BCCA 239, 7 B.C.L.R. (5th) 227, 319 D.L.R. (4th) 219, [2010] B.C.J. No. 891 (QL), 2010 CarswellBC 1210, setting aside a decision of Greyell J., 2009 BCSC 1079, [2009] B.C.J. No. 1597 (QL), 2009 CarswellBC 2096, and from a subsequent judgment of the British Columbia Court of Appeal (Kirkpatrick, Neilson and Bennett JJ.A.), 2012 BCCA 329, 36 B.C.L.R. (5th) 71, 326 B.C.A.C. 114, 554 W.A.C. 114, 2 B.L.R. (5th) 1, [2012] B.C.J. No. 1631 (QL), 2012 CarswellBC 2327, setting aside a decision of Armstrong J., 2011 BCSC 597, 84 B.L.R. (4th) 102, [2011] B.C.J. No. 861 (QL), 2011 CarswellBC 1124. Appeal allowed.

**Counsel:**

*Michael A. Feder* and *Tammy Shoranick*, for the appellant.

*Darrell W. Roberts*, *Q.C.*, and *David Mitchell*, for the respondent.

*Jonathan Eades* and *Micah Weintraub*, for the intervener the Attorney General of British Columbia.

*David Wotherspoon* and *Gavin R. Cameron*, for the intervener the BCICAC Foundation.

---

**TABLE OF CONTENTS**

I.    Facts
II.   Arbitral Award
III.  Judicial History

       *A. British Columbia Supreme Court -- Leave to Appeal Decision, 2009 BCSC 1079*

       *B. British Columbia Court of Appeal -- Leave to Appeal Decision, 2010 BCCA 239*

       *C. British Columbia Supreme Court -- Appeal Decision, 2011 BCSC 597*

       *D. British Columbia Court of Appeal -- Appeal Decision, 2012 BCCA 329*

IV.   Issues
V.    Analysis

       *A. The Leave Issue Is Properly Before This Court*

       *B. The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

(1)    Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

(2)    The Result Is Important to the Parties

(3)    The Question Under Appeal Is Not a Question of Law

*(a) When Is Contractual Interpretation a Question of Law?*

*(b) The Role and Nature of the "Surrounding Circumstances"*

*(c) Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

*(d) Application to the Present Case*

(4)    May Prevent a Miscarriage of Justice

*(a) Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

*(b) Application to the Present Case*

(5)    Residual Discretion to Deny Leave

*(a) Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

*(b) Application to the Present Case*

*C. Standard of Review Under the AA*

*D. The Arbitrator Reasonably Construed the Agreement as a Whole*

> *E. Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

VI.    Conclusion

**APPENDIX I**

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

**APPENDIX II**

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

**APPENDIX III**

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

The judgment of the Court was delivered by

**1**    ROTHSTEIN J.:-- When is contractual interpretation to be treated as a question of mixed fact and law and when should it be treated as a question of law? How is the balance between reviewability and finality of commercial arbitration awards under the *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (now the *Arbitration Act*, hereinafter the "*AA*"), to be determined? Can findings made by a court granting leave to appeal with respect to the merits of an appeal bind the court that ultimately decides the appeal? These are three of the issues that arise in this appeal.

I.    <u>Facts</u>

**2**    The issues in this case arise out of the obligation of Creston Moly Corporation (formerly Georgia Ventures Inc.) to pay a finder's fee to Sattva Capital Corporation (formerly Sattva Capital Inc.). The parties agree that Sattva is entitled to a finder's fee of US$1.5 million and is entitled to be paid this fee in shares of Creston, cash or a combination thereof. They disagree on which date should be used to price the Creston shares and therefore the number of shares to which Sattva is entitled.

**3**    Mr. Hai Van Le, a principal of Sattva, introduced Creston to the opportunity to acquire a molybdenum mining property in Mexico. On January 12, 2007, the parties entered into an agreement (the "Agreement") that required Creston to pay Sattva a finder's fee in relation to the acquisition of this property. The relevant provisions of the Agreement are set out in Appendix I.

**4**    On January 30, 2007, Creston entered into an agreement to purchase the property for US$30 million. On January 31, 2007, at the request of Creston, trading of Creston's shares on the TSX

Venture Exchange ("TSXV") was halted to prevent speculation while Creston completed due diligence in relation to the purchase. On March 26, 2007, Creston announced it intended to complete the purchase and trading resumed the following day.

**5**    The Agreement provides that Sattva was to be paid a finder's fee equal to the maximum amount that could be paid pursuant to s. 3.3 of Policy 5.1 in the TSXV Policy Manual. Section 3.3 of Policy 5.1 is incorporated by reference into the Agreement at s. 3.1 and is set out in Appendix II of these reasons. The maximum amount pursuant to s. 3.3 of Policy 5.1 in this case is US$1.5 million.

**6**    According to the Agreement, by default, the fee would be paid in Creston shares. The fee would only be paid in cash or a combination of shares and cash if Sattva made such an election. Sattva made no such election and was therefore entitled to be paid the fee in shares. The finder's fee was to be paid no later than five working days after the closing of the transaction purchasing the molybdenum mining property.

**7**    The dispute between the parties concerns which date should be used to determine the price of Creston shares and thus the number of shares to which Sattva is entitled. Sattva argues that the share price is dictated by the Market Price definition at s. 2 of the Agreement, i.e. the price of the shares "as calculated on close of business day before the issuance of the press release announcing the Acquisition". The press release announcing the acquisition was released on March 26, 2007. Prior to the halt in trading on January 31, 2007, the last closing price of Creston shares was $0.15. On this interpretation, Sattva would receive approximately 11,460,000 shares (based on the finder's fee of US$1.5 million).

**8**    Creston claims that the Agreement's "maximum amount" proviso means that Sattva cannot receive cash or shares valued at more than US$1.5 million on the date the fee is payable. The shares were payable no later than five days after May 17, 2007, the closing date of the transaction. At that time, the shares were priced at $0.70 per share. This valuation is based on the price an investment banking firm valued Creston at as part of underwriting a private placement of shares on April 17, 2007. On this interpretation, Sattva would receive approximately 2,454,000 shares, some 9 million fewer shares than if the shares were priced at $0.15 per share.

**9**    The parties entered into arbitration pursuant to the *AA*. The arbitrator found in favour of Sattva. Creston sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *AA*. Leave was denied by the British Columbia Supreme Court (2009 BCSC 1079 (CanLII) ("SC Leave Court")). Creston successfully appealed this decision and was granted leave to appeal the arbitrator's decision by the British Columbia Court of Appeal (2010 BCCA 239, 7 B.C.L.R. (5th) 227 ("CA Leave Court")).

**10**    The British Columbia Supreme Court judge who heard the merits of the appeal (2011 BCSC 597, 84 B.L.R. (4th) 102 ("SC Appeal Court")) upheld the arbitrator's award. Creston appealed that decision to the British Columbia Court of Appeal (2012 BCCA 329, 36 B.C.L.R. (5th) 71 ("CA Appeal Court")). That court overturned the SC Appeal Court and found in favour of Creston. Sattva

appeals the decisions of the CA Leave Court and CA Appeal Court to this Court.

    II.    Arbitral Award

**11**    The arbitrator, Leon Getz, Q.C., found in favour of Sattva, holding that it was entitled to receive its US$1.5 million finder's fee in shares priced at $0.15 per share.

**12**    The arbitrator based his decision on the Market Price definition in the Agreement:

> What, then, was the "Market Price" within the meaning of the Agreement? The relevant press release is that issued on March 26 ... . Although there was no closing price on March 25 (the shares being on that date halted), the "last closing price" within the meaning of the definition was the $0.15 at which the [Creston] shares closed on January 30, the day before trading was halted "pending news" ... . This conclusion requires no stretching of the words of the contractual definition; on the contrary, it falls literally within those words. [para. 22]

**13**    Both the Agreement and the finder's fee had to be approved by the TSXV. Creston was responsible for securing this approval. The arbitrator found that it was either an implied or an express term of the Agreement that Creston would use its best efforts to secure the TSXV's approval and that Creston did not apply its best efforts to this end.

**14**    As previously noted, by default, the finder's fee would be paid in shares unless Sattva made an election otherwise. The arbitrator found that Sattva never made such an election. Despite this, Creston represented to the TSXV that the finder's fee was to be paid in cash. The TSXV conditionally approved a finder's fee of US$1.5 million to be paid in cash. Sattva first learned that the fee had been approved as a cash payment in early June 2007. When Sattva raised this matter with Creston, Creston responded by saying that Sattva had the choice of taking the finder's fee in cash or in shares priced at $0.70.

**15**    Sattva maintained that it was entitled to have the finder's fee paid in shares priced at $0.15. Creston asked its lawyer to contact the TSXV to clarify the minimum share price it would approve for payment of the finder's fee. The TSXV confirmed on June 7, 2007 over the phone and August 9, 2007 via email that the minimum share price that could be used to pay the finder's fee was $0.70 per share. The arbitrator found that Creston "consistently misrepresented or at the very least failed to disclose fully the nature of the obligation it had undertaken to Sattva" (para. 56(k)) and "that in the absence of an election otherwise, Sattva is entitled under that Agreement to have that fee paid in shares at $0.15" (para. 56(g)). The arbitrator found that the first time Sattva's position was squarely put before the TSXV was in a letter from Sattva's solicitor on October 9, 2007.

**16**    The arbitrator found that had Creston used its best efforts, the TSXV could have approved the payment of the finder's fee in shares priced at $0.15 and such a decision would have been consistent with its policies. He determined that there was "a substantial probability that [TSXV] approval

would have been given" (para. 81). He assessed that probability at 85 percent.

**17**    The arbitrator found that Sattva could have sold its Creston shares after a four-month holding period at between $0.40 and $0.44 per share, netting proceeds of between $4,583,914 and $5,156,934. The arbitrator took the average of those two amounts, which came to $4,870,424, and then assessed damages at 85 percent of that number, which came to $4,139,860, and rounded it to $4,140,000 plus costs.

**18**    After this award was made, Creston made a cash payment of US$1.5 million (or the equivalent in Canadian dollars) to Sattva. The balance of the damages awarded by the arbitrator was placed in the trust account of Sattva's solicitors.

III.    Judicial History
A.    *British Columbia Supreme Court -- Leave to Appeal Decision, 2009 BCSC 1079*

**19**    The SC Leave Court denied leave to appeal because it found the question on appeal was not a question of law as required under s. 31 of the *AA*. In the judge's view, the issue was one of mixed fact and law because the arbitrator relied on the "factual matrix" in coming to his conclusion. Specifically, determining how the finder's fee was to be paid involved examining "the TSX's policies concerning the maximum amount of the finder's fee payable, as well as the discretionary powers granted to the Exchange in determining that amount" (para. 35).

**20**    The judge found that even had he found a question of law was at issue he would have exercised his discretion against granting leave because of Creston's conduct in misrepresenting the status of the finder's fee to the TSXV and Sattva, and "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41).

B.    *British Columbia Court of Appeal -- Leave to Appeal Decision, 2010 BCCA 239*

**21**    The CA Leave Court reversed the SC Leave Court and granted Creston's application for leave to appeal the arbitral award. It found the SC Leave Court "err[ed] in failing to find that the arbitrator's failure to address the meaning of s. 3.1 of the Agreement (and in particular the 'maximum amount' provision) raised a question of law" (para. 23). The CA Leave Court decided that the construction of s. 3.1 of the Agreement, and in particular the "maximum amount" proviso, was a question of law because it did not involve reference to the facts of what the TSXV was told or what it decided.

**22**    The CA Leave Court acknowledged that Creston was "less than forthcoming in its dealings with Mr. Le and the [TSXV]" but said that "these facts are not directly relevant to the question of law it advances on the appeal" (para. 27). With respect to the SC leave judge's reference to the preservation of the integrity of the arbitration system, the CA Leave Court said that the parties would have known when they chose to enter arbitration under the *AA* that an appeal on a question of law was possible. Additionally, while the finality of arbitration is an important factor in exercising

discretion, when "a question of law arises on a matter of importance and a miscarriage of justice might be perpetrated if an appeal were not available, the integrity of the process requires, at least in the circumstances of this case, that the right of appeal granted by the legislation also be respected" (para. 29).

### C.    *British Columbia Supreme Court -- Appeal Decision, 2011 BCSC 597*

**23**    Armstrong J. reviewed the arbitrator's decision on a correctness standard. He dismissed the appeal, holding the arbitrator's interpretation of the Agreement was correct.

**24**    Armstrong J. found that the plain and ordinary meaning of the Agreement required that the US$1.5 million fee be paid in shares priced at $0.15. He did not find the meaning to be absurd simply because the price of the shares at the date the fee became payable had increased in relation to the price determined according to the Market Price definition. He was of the view that changes in the price of shares over time are inevitable, and that the parties, as sophisticated business persons, would have reasonably understood a fluctuation in share price to be a reality when providing for a fee payable in shares. According to Armstrong J., it is indeed because of market fluctuations that it is necessary to choose a specific date to price the shares in advance of payment. He found that this was done by defining "Market Price" in the Agreement, and that the fee remained US$1.5 million in $0.15 shares as determined by the Market Price definition regardless of the price of the shares at the date that the fee was payable.

**25**    According to Armstrong J., that the price of the shares may be more than the Market Price definition price when they became payable was foreseeable as a "natural consequence of the fee agreement" (para. 62). He was of the view that the risk was borne by Sattva, since the price of the shares could increase, but it could also decrease such that Sattva would have received shares valued at less than the agreed upon fee of US$1.5 million.

**26**    Armstrong J. held that the arbitrator's interpretation which gave effect to both the Market Price definition and the "maximum amount" proviso should be preferred to Creston's interpretation of the agreement which ignored the Market Price definition.

**27**    In response to Creston's argument that the arbitrator did not consider s. 3.1 of the Agreement which contains the "maximum amount" proviso, Armstrong J. noted that the arbitrator explicitly addressed the "maximum amount" proviso at para. 23 of his decision.

### D.    *British Columbia Court of Appeal -- Appeal Decision, 2012 BCCA 329*

**28**    The CA Appeal Court allowed Creston's appeal, ordering that the payment of US$1.5 million that had been made by Creston to Sattva on account of the arbitrator's award constituted payment in full of the finder's fee. The court reviewed the arbitrator's decision on a standard of correctness.

**29**    The CA Appeal Court found that both it and the SC Appeal Court were bound by the findings

made by the CA Leave Court. There were two findings that were binding: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but shares valued at approximately $8 million if Sattva took its fee in shares; and (2) the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement.

**30**     The Court of Appeal found that it was an absurd result to find that Sattva is entitled to an $8 million finder's fee in light of the fact that the "maximum amount" proviso in the Agreement limits the finder's fee to US$1.5 million. The court was of the view that the proviso limiting the fee to US$1.5 million "when paid" should be given paramount effect (para. 47). In its opinion, giving effect to the Market Price definition could not have been the intention of the parties, nor could it have been in accordance with good business sense.

    IV.   <u>Issues</u>

**31**     The following issues arise in this appeal:

> (a)     Is the issue of whether the CA Leave Court erred in granting leave under s. 31(2) of the *AA* properly before this Court?
> (b)     Did the CA Leave Court err in granting leave under s. 31(2) of the *AA*?
> (c)     If leave was properly granted, what is the appropriate standard of review to be applied to commercial arbitral decisions made under the *AA*?
> (d)     Did the arbitrator reasonably construe the Agreement as a whole?
> (e)     Did the CA Appeal Court err in holding that it was bound by comments regarding the merits of the appeal made by the CA Leave Court?

    V.   <u>Analysis</u>
    A.   *The Leave Issue Is Properly Before This Court*

**32**     Sattva argues, in part, that the CA Leave Court erred in granting leave to appeal from the arbitrator's decision. In Sattva's view, the CA Leave Court did not identify a question of law, a requirement to obtain leave pursuant to s. 31(2) of the *AA*. Creston argues that this issue is not properly before this Court. Creston makes two arguments in support of this point.

**33**     First, Creston argues that this issue was not advanced in Sattva's application for leave to appeal to this Court. This argument must fail. Unless this Court places restrictions in the order granting leave, the order granting leave is "at large". Accordingly, appellants may raise issues on appeal that were not set out in the leave application. However, the Court may exercise its discretion to refuse to deal with issues that were not addressed in the courts below, if there is prejudice to the respondent, or if for any other reason the Court considers it appropriate not to deal with a question.

**34**     Here, this Court's order granting leave to appeal from both the CA Leave Court decision and the CA Appeal Court decision contained no restrictions (2013 CanLII 11315). The issue -- whether

the proposed appeal was on a question of law -- was expressly argued before, and was dealt with in the judgments of, the SC Leave Court and the CA Leave Court. There is no reason Sattva should be precluded from raising this issue on appeal despite the fact it was not mentioned in its application for leave to appeal to this Court.

**35**    Second, Creston argues that the issue of whether the CA Leave Court identified a question of law is not properly before this Court because Sattva did not contest this decision before all of the lower courts. Specifically, Creston states that Sattva did not argue that the question on appeal was one of mixed fact and law before the SC Appeal Court and that it conceded the issue on appeal was a question of law before the CA Appeal Court. This argument must also fail. At the SC Appeal Court, it was not open to Sattva to reargue the question of whether leave should have been granted. The SC Appeal Court was bound by the CA Leave Court's finding that leave should have been granted, including the determination that a question of law had been identified. Accordingly, Sattva could hardly be expected to reargue before the SC Appeal Court a question that had been determined by the CA Leave Court. There is nothing in the *AA* to indicate that Sattva could have appealed the leave decision made by a panel of the Court of Appeal to another panel of the same court. The fact that Sattva did not reargue the issue before the SC Appeal Court or CA Appeal Court does not prevent it from raising the issue before this Court, particularly since Sattva was also granted leave to appeal the CA Leave Court decision by this Court.

**36**    While this Court may decline to grant leave where an issue sought to be argued before it was not argued in the courts appealed from, that is not this case. Here, whether leave from the arbitrator's decision had been sought by Creston on a question of law or a question of mixed fact and law had been argued in the lower leave courts.

**37**    Accordingly, the issue of whether the CA Leave Court erred in finding a question of law for the purposes of granting leave to appeal is properly before this Court.

> B.    *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

> (1)    Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

**38**    Appeals from commercial arbitration decisions are narrowly circumscribed under the *AA*. Under s. 31(1), appeals are limited to either questions of law where the parties consent to the appeal or to questions of law where the parties do not consent but where leave to appeal is granted. Section 31(2) of the *AA*, reproduced in its entirety in Appendix III, sets out the requirements for leave:

> (2)    In an application for leave under subsection (1) (b), the court may grant leave if it determines that

(a)     the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,

(b)     the point of law is of importance to some class or body of persons of which the applicant is a member, or

(c)     the point of law is of general or public importance.

**39**     The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* give the courts judicial discretion to deny leave even where the statutory requirements have been met (*British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122 ("*BCIT*"), at paras. 25-26). Appellate review of an arbitrator's award will only occur where the requirements of s. 31(2) are met and where the leave court does not exercise its residual discretion to nonetheless deny leave.

**40**     Although Creston's application to the SC Leave Court sought leave pursuant to s. 31(2)(a), (b) and (c), it appears the arguments before that court and throughout focused on s. 31(2)(a). The SC Leave Court's decision quotes a lengthy passage from *BCIT* that focuses on the requirements of s. 31(2)(a). The SC Leave Court judge noted that both parties conceded the first requirement of s. 31(2)(a): that the issue be of importance to the parties. The CA Leave Court decision expressed concern that denying leave might give rise to a miscarriage of justice -- a criterion only found in s. 31(2)(a). Finally, neither the lower courts' leave decisions nor the arguments before this Court reflected arguments about the question of law being important to some class or body of persons of which the applicant is a member (s. 31(2)(b)) or being a point of law of general or public importance (s. 31(2)(c)). Accordingly, the following analysis will focus on s. 31(2)(a).

(2)     The Result Is Important to the Parties

**41**     In order for leave to be granted from a commercial arbitral award, a threshold requirement must be met: leave must be sought on a question of law. However, before dealing with that issue, it will be convenient to quickly address another requirement of s. 31(2)(a) on which the parties agree: whether the importance of the result of the arbitration to the parties justifies the intervention of the court. Justice Saunders explained this criterion in *BCIT* as requiring that the result of the arbitration be "sufficiently important", in terms of principle or money, to the parties to justify the expense and time of court proceedings (para. 27). The parties in this case have agreed that the result of the arbitration is of importance to each of them. In view of the relatively large monetary amount in dispute and in light of the fact that the parties have agreed that the result is important to them, I accept that the importance of the result of the arbitration to the parties justifies the intervention of the court. This requirement of s. 31(2)(a) is satisfied.

(3)     The Question Under Appeal Is Not a Question of Law
(a)     *When Is Contractual Interpretation a Question of Law?*

**42**     Under s. 31 of the *AA*, the issue upon which leave is sought must be a question of law. For the

purpose of identifying the appropriate standard of review or, as is the case here, determining whether the requirements for leave to appeal are met, reviewing courts are regularly required to determine whether an issue decided at first instance is a question of law, fact, or mixed fact and law.

**43**    Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law (*King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63, at para. 20, *per* Steel J.A.; K. Lewison, *The Interpretation of Contracts* (5th ed. 2011 & Supp. 2013), at pp. 173-76; and G. R. Hall, *Canadian Contractual Interpretation Law* (2nd ed. 2012), at pp. 125-26). This rule originated in England at a time when there were frequent civil jury trials and widespread illiteracy. Under those circumstances, the interpretation of written documents had to be considered questions of law because only the judge could be assured to be literate and therefore capable of reading the contract (Hall, at p. 126; and Lewison, at pp. 173-74).

**44**    This historical rationale no longer applies. Nevertheless, courts in the United Kingdom continue to treat the interpretation of a written contract as always being a question of law (*Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945, at paras. 58 and 82-83; and Lewison, at pp. 173-77). They do this despite the fact that U.K. courts consider the surrounding circumstances, a concept addressed further below, when interpreting a written contract (*Prenn v. Simmonds*, [1971] 3 All E.R. 237 (H.L.); and *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570 (H.L.)).

**45**    In Canada, there remains some support for the historical approach. See for example *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII), at para. 10; *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84, at para. 26; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221, at paras. 11-12; and *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78, at para. 34. However, some Canadian courts have abandoned the historical approach and now treat the interpretation of written contracts as an exercise involving either a question of law or a question of mixed fact and law. See for example *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1, at para. 11; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98, at para. 13; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230, at para. 44; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81, at paras. 22-23 (majority reasons, *per* Blair J.A.) and paras. 133-35 (*per* Gillese J.A. in dissent, but not on this point); and *King*, at paras. 20-23.

**46**    The shift away from the historical approach in Canada appears to be based on two developments. The first is the adoption of an approach to contractual interpretation which directs courts to have regard for the surrounding circumstances of the contract -- often referred to as the factual matrix -- when interpreting a written contract (Hall, at pp. 13, 21-25 and 127; and J. D. McCamus, *The Law of Contracts* (2nd ed. 2012), at pp. 749-51). The second is the explanation of the difference between questions of law and questions of mixed fact and law provided in *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 35, and

*Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235, at paras. 26 and 31-36.

**47**    Regarding the first development, the interpretation of contracts has evolved towards a practical, common-sense approach not dominated by technical rules of construction. The overriding concern is to determine "the intent of the parties and the scope of their understanding" (*Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at para. 27 *per* LeBel J.; see also *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69, at paras. 64-65 *per* Cromwell J.). To do so, a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract. Consideration of the surrounding circumstances recognizes that ascertaining contractual intention can be difficult when looking at words on their own, because words alone do not have an immutable or absolute meaning:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed... . In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> (*Reardon Smith Line*, at p. 574, *per* Lord Wilberforce)

**48**    The meaning of words is often derived from a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement (see *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300, at para. 15, *per* Hamilton J.A.; see also Hall, at p. 22; and McCamus, at pp. 749-50). As stated by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 (H.L.):

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. [p. 115]

**49**    As to the second development, the historical approach to contractual interpretation does not fit well with the definition of a pure question of law identified in *Housen* and *Southam*. Questions of law "are questions about what the correct legal test is" (*Southam*, at para. 35). Yet in contractual interpretation, the goal of the exercise is to ascertain the objective intent of the parties -- a fact-specific goal -- through the application of legal principles of interpretation. This appears closer to a question of mixed fact and law, defined in *Housen* as "applying a legal standard to a set of facts" (para. 26; see also *Southam*, at para. 35). However, some courts have questioned whether this

definition, which was developed in the context of a negligence action, can be readily applied to questions of contractual interpretation, and suggest that contractual interpretation is primarily a legal affair (see for example *Bell Canada*, at para. 25).

**50**     With respect for the contrary view, I am of the opinion that the historical approach should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix.

**51**     The purpose of the distinction between questions of law and those of mixed fact and law further supports this conclusion. One central purpose of drawing a distinction between questions of law and those of mixed fact and law is to limit the intervention of appellate courts to cases where the results can be expected to have an impact beyond the parties to the particular dispute. It reflects the role of courts of appeal in ensuring the consistency of the law, rather than in providing a new forum for parties to continue their private litigation. For this reason, *Southam* identified the degree of generality (or "precedential value") as the key difference between a question of law and a question of mixed fact and law. The more narrow the rule, the less useful will be the intervention of the court of appeal:

> If a court were to decide that driving at a certain speed on a certain road under certain conditions was negligent, its decision would not have any great value as a precedent. In short, as the level of generality of the challenged proposition approaches utter particularity, the matter approaches pure application, and hence draws nigh to being an unqualified question of mixed law and fact. See R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at pp. 103-108. Of course, it is not easy to say precisely where the line should be drawn; though in most cases it should be sufficiently clear whether the dispute is over a general proposition that might qualify as a principle of law or over a very particular set of circumstances that is not apt to be of much interest to judges and lawyers in the future. [para. 37]

**52**     Similarly, this Court in *Housen* found that deference to fact-finders promoted the goals of limiting the number, length, and cost of appeals, and of promoting the autonomy and integrity of trial proceedings (paras. 16-17). These principles also weigh in favour of deference to first instance decision-makers on points of contractual interpretation. The legal obligations arising from a contract are, in most cases, limited to the interest of the particular parties. Given that our legal system leaves broad scope to tribunals of first instance to resolve issues of limited application, this supports treating contractual interpretation as a question of mixed fact and law.

**53**     Nonetheless, it may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law (*Housen*, at paras. 31 and 34-35). Legal errors made in the course of contractual interpretation include "the application of an incorrect

principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor" (*King*, at para. 21). Moreover, there is no question that many other issues in contract law do engage substantive rules of law: the requirements for the formation of the contract, the capacity of the parties, the requirement that certain contracts be evidenced in writing, and so on.

**54**    However, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Given the statutory requirement to identify a question of law in a leave application pursuant to s. 31(2) of the *AA*, the applicant for leave and its counsel will seek to frame any alleged errors as questions of law. The legislature has sought to restrict such appeals, however, and courts must be careful to ensure that the proposed ground of appeal has been properly characterized. The warning expressed in *Housen* to exercise caution in attempting to extricate a question of law is relevant here:

> Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" ... . [para. 36]

**55**    Although that caution was expressed in the context of a negligence case, it applies, in my opinion, to contractual interpretation as well. As mentioned above, the goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. The close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. In the absence of a legal error of the type described above, no appeal lies under the *AA* from an arbitrator's interpretation of a contract.

(b)    *The Role and Nature of the "Surrounding Circumstances"*

**56**    I now turn to the role of the surrounding circumstances in contractual interpretation and the nature of the evidence that can be considered. The discussion here is limited to the common law approach to contractual interpretation; it does not seek to apply to or alter the law of contractual interpretation governed by the *Civil Code of Québec*.

**57**    While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement (*Hayes Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract. The interpretation of a written contractual provision must always be grounded in the text and read in light of the entire contract (Hall, at pp. 15 and 30-32). While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement (*Glaswegian Enterprises Inc. v. B.C. Tel*

*Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62).

**58**    The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case. It does, however, have its limits. It should consist only of objective evidence of the background facts at the time of the execution of the contract (*King*, at paras. 66 and 70), that is, knowledge that was or reasonably ought to have been within the knowledge of both parties at or before the date of contracting. Subject to these requirements and the parol evidence rule discussed below, this includes, in the words of Lord Hoffmann, "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" (*Investors Compensation Scheme*, at p. 114). Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

> (c)    *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

**59**    It is necessary to say a word about consideration of the surrounding circumstances and the parol evidence rule. The parol evidence rule precludes admission of evidence outside the words of the written contract that would add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing (*King*, at para. 35; and Hall, at p. 53). To this end, the rule precludes, among other things, evidence of the subjective intentions of the parties (Hall, at pp. 64-65; and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, at paras. 54-59, *per* Iacobucci J.). The purpose of the parol evidence rule is primarily to achieve finality and certainty in contractual obligations, and secondarily to hamper a party's ability to use fabricated or unreliable evidence to attack a written contract (*United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at pp. 341-42, *per* Sopinka J.).

**60**    The parol evidence rule does not apply to preclude evidence of the surrounding circumstances. Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. The surrounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.

**61**    Some authorities and commentators suggest that the parol evidence rule is an anachronism, or, at the very least, of limited application in view of the myriad of exceptions to it (see for example *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63 (C.A.), at paras. 19-20; and Hall, at pp. 53-64). For the purposes of this appeal, it is sufficient to say that the parol evidence rule does not apply to preclude evidence of surrounding circumstances when interpreting the words of a written contract.

> (d)    *Application to the Present Case*

**62**    In this case, the CA Leave Court granted leave on the following issue: "Whether the Arbitrator erred in law in failing to construe the whole of the Finder's Fee Agreement ..." (A.R., vol. 1, at p. 62).

**63**    As will be explained below, while the requirement to construe a contract as a whole is a question of law that could -- if extricable -- satisfy the threshold requirement under s. 31 of the *AA*, I do not think this question was properly extricated in this case.

**64**    I accept that a fundamental principle of contractual interpretation is that a contract must be construed as a whole (McCamus, at pp. 761-62; and Hall, at p. 15). If the arbitrator did not take the "maximum amount" proviso into account, as alleged by Creston, then he did not construe the Agreement as a whole because he ignored a specific and relevant provision of the Agreement. This is a question of law that would be extricable from a finding of mixed fact and law.

**65**    However, it appears that the arbitrator did consider the "maximum amount" proviso. Indeed, the CA Leave Court acknowledges that the arbitrator had considered that proviso, since it notes that he turned his mind to the US$1.5 million maximum amount, an amount that can only be calculated by referring to the TSXV policy referenced in the "maximum amount" proviso in s. 3.1 of the Agreement. As I read its reasons, rather than being concerned with whether the arbitrator ignored the maximum amount proviso, which is what Creston alleges in this Court, the CA Leave Court decision focused on how the arbitrator construed s. 3.1 of the Agreement, which included the maximum amount proviso (paras. 25-26). For example, the CA Leave Court expressed concern that the arbitrator did not address the "incongruity" in the fact that the value of the fee would vary "hugely" depending on whether it was taken in cash or shares (para. 25).

**66**    With respect, the CA Leave Court erred in finding that the construction of s. 3.1 of the Agreement constituted a question of law. As explained by Justice Armstrong in the SC Appeal Court decision, construing s. 3.1 and taking account of the proviso required relying on the relevant surrounding circumstances, including the sophistication of the parties, the fluctuation in share prices, and the nature of the risk a party assumes when deciding to accept a fee in shares as opposed to cash. Such an exercise raises a question of mixed fact and law. There being no question of law extricable from the mixed fact and law question of how s. 3.1 and the proviso should be interpreted, the CA Leave Court erred in granting leave to appeal.

**67**    The conclusion that Creston's application for leave to appeal raised no question of law would be sufficient to dispose of this appeal. However, as this Court rarely has the opportunity to address appeals of arbitral awards, it is, in my view, useful to explain that, even had the CA Leave Court been correct in finding that construction of s. 3.1 of the Agreement constituted a question of law, it should have nonetheless denied leave to appeal as the application also failed the miscarriage of justice and residual discretion stages of the leave analysis set out in s. 31(2)(a) of the *AA*.

(4) <u>May Prevent a Miscarriage of Justice</u>

(a)    *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

**68**    Once a question of law has been identified, the court must be satisfied that the determination of that point of law on appeal "may prevent a miscarriage of justice" in order for it to grant leave to appeal pursuant to s. 31(2)(a) of the *AA*. The first step in this analysis is defining miscarriage of justice for the purposes of s. 31(2)(a).

**69**    In *BCIT*, Justice Saunders discussed the miscarriage of justice requirement under s. 31(2)(a). She affirmed the definition set out in *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257 (C.A.), which required the error of law in question to be a material issue that, if decided differently, would lead to a different result: "... if the point of law were decided differently, the arbitrator would have been led to a different result. In other words, was the alleged error of law material to the decision; does it go to its heart?" (*BCIT*, at para. 28). See also *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712, which discusses the test of whether "some substantial wrong or miscarriage of justice has occurred" in the context of a civil jury trial (para. 43).

**70**    Having regard to *BCIT* and *Quan*, I am of the opinion that in order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(a) of the *AA*, an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case.

**71**    According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

**72**    At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case.

**73**    *BCIT* sets the threshold for this preliminary assessment of the appeal as "more than an arguable point" (para. 30). With respect, once an arguable point has been made out, it is not apparent what more is required to meet the "more than an arguable point" standard. Presumably, the leave judge would have to delve more deeply into the arguments around the question of law on appeal than would be appropriate at the leave stage to find *more* than an arguable point. Requiring this closer examination of the point of law, in my respectful view, blurs the line between the function of the court considering the leave application and the court hearing the appeal.

**74**    In my opinion, the appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit. The arguable merit standard is often used to assess, on a preliminary basis, the merits of an appeal at the leave stage (see for example *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262, at para. 5; and *R. v. Fedossenko*, 2013 ABCA 164 (CanLII), at para. 7). "Arguable merit" is a well-known phrase whose meaning has been

expressed in a variety of ways: "a reasonable prospect of success" (*Quick Auto Lease*, at para. 5; and *Enns v. Hansey*, 2013 MBCA 23 (CanLII), at para. 2); "some hope of success" and "sufficient merit" (*R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174, at para. 11); and "credible argument" (*R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270, at para. 8). In my view, the common thread among the various expressions used to describe arguable merit is that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law. In order to decide whether the award should be set aside, a more thorough examination is necessary and that examination is appropriately conducted by the court hearing the appeal once leave is granted.

**75**    Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the applicable standard of review. As I will later explain, reasonableness will almost always apply to commercial arbitrations conducted pursuant to the *AA*, except in the rare circumstances where the question is one that would attract a correctness standard, such as a constitutional question or a question of law of central importance to the legal system as a whole and outside the adjudicator's expertise. Therefore, the leave inquiry will ordinarily ask whether there is any arguable merit to the position that the arbitrator's decision on the question at issue is unreasonable, keeping in mind that the decision-maker is not required to refer to all the arguments, provisions or jurisprudence or to make specific findings on each constituent element, for the decision to be reasonable (*Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708, at para. 16). Of course, the leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal. As such, this should not be taken as an invitation to engage in extensive arguments or analysis about the standard of review at the leave stage.

**76**    In *BCIT*, Saunders J.A. considered the stage of s. 31(2)(a) of the *AA* at which an examination of the merits of the appeal should occur. At the behest of one of the parties, she considered examining the merits under the miscarriage of justice criterion. However, she decided that a consideration of the merits was best done at the residual discretion stage. Her reasons indicate that this decision was motivated by the desire to take a consistent approach across s. 31(2)(a), (b) and (c):

> Where, then, if anywhere, does consideration of the merits of the appeal belong? Mr. Roberts for the Student Association contends that any consideration of the merits of the appeal belongs in the determination of whether a miscarriage of justice may occur; that is, under the second criterion. I do not agree. In my view, the apparent merit or lack of merit of an appeal is part of the exercise of the residual discretion, and applies equally to all three subsections, (*a*) through (*c*). Just as an appeal woefully lacking in merit should not attract leave under (*b*) (of importance to a class of people including the applicant) or (*c*) (of general or public importance), so too it should not attract leave under (*a*). Consideration of the merits, for consistency in the section as a whole, should be made as part of

the exercise of residual discretion. [para. 29]

**77**    I acknowledge the consistency rationale. However, in my respectful opinion, the desire for a consistent approach to s. 31(2)(a), (b) and (c) cannot override the text of the legislation. Unlike s. 31(2)(b) and (c), s. 31(2)(a) requires an assessment to determine whether allowing leave to appeal "may prevent a miscarriage of justice". It is my opinion that a preliminary assessment of the question of law is an implicit component in a determination of whether allowing leave "may prevent a miscarriage of justice".

**78**    However, in an application for leave to appeal pursuant to s. 31(2)(b) or (c), neither of which contain a miscarriage of justice requirement, I agree with Justice Saunders in *BCIT* that a preliminary examination of the merits of the question of law should be assessed at the residual discretion stage of the analysis as considering the merits of the proposed appeal will always be relevant when deciding whether to grant leave to appeal under s. 31.

**79**    In sum, in order to establish that "the intervention of the court and the determination of the point of law may prevent a miscarriage of justice" for the purposes of s. 31(2)(a) of the *AA*, an applicant must demonstrate that the point of law on appeal is material to the final result and has arguable merit.

      (b)    *Application to the Present Case*

**80**    The CA Leave Court found that the arbitrator may have erred in law by not interpreting the Agreement as a whole, specifically in ignoring the "maximum amount" proviso. Accepting that this is a question of law for these purposes only, a determination of the question would be material because it could change the ultimate result arrived at by the arbitrator. The arbitrator awarded $4.14 million in damages on the basis that there was an 85 percent chance the TSXV would approve a finder's fee paid in $0.15 shares. If Creston's argument is correct and the $0.15 share price is foreclosed by the "maximum amount" proviso, damages would be reduced to US$1.5 million, a significant reduction from the arbitrator's award of damages.

**81**    As s. 31(2)(a) of the *AA* is the relevant provision in this case, a preliminary assessment of the question of law will be conducted in order to determine if a miscarriage of justice could have occurred had Creston been denied leave to appeal. Creston argues that the fact that the arbitrator's conclusion results in Sattva receiving shares valued at considerably more than the US$1.5 million maximum dictated by the "maximum amount" proviso is evidence of the arbitrator's failure to consider that proviso.

**82**    However, the arbitrator did refer to s. 3.1, the "maximum amount" proviso, at two points in his decision: paras. 18 and 23(a). For example, at para. 23 he stated:

                In summary, then, as of March 27, 2007 it was clear and beyond argument that under the Agreement:

(a)   <u>Sattva was entitled to a fee equal to the maximum amount payable
pursuant to the rules and policies of the TSX Venture Exchange -
section 3.1. It is common ground that the quantum of this fee is
US$1,500,000.</u>

(b)   The fee was payable in shares based on the Market Price, as defined
in the Agreement, unless Sattva elected to take it in cash or a
combination of cash and shares.

(c)   The Market Price, as defined in the Agreement, was $0.15.


[Emphasis added.]

**83**    Although the arbitrator provided no express indication that he considered how the "maximum
amount" proviso interacted with the Market Price definition, such consideration is implicit in his
decision. The only place in the contract that specifies that the amount of the fee is calculated as
US$1.5 million is the "maximum amount" proviso's reference to s. 3.3 of the TSXV Policy 5.1. The
arbitrator acknowledged that the quantum of the fee is US$1.5 million and awarded Sattva US$1.5
million in shares priced at $0.15. Contrary to Creston's argument that the arbitrator failed to
consider the proviso in construing the Agreement, it is apparent on a preliminary examination of the
question that the arbitrator did in fact consider the "maximum amount" proviso.

**84**    Accordingly, even had the CA Leave Court properly identified a question of law, leave to
appeal should have been denied. The requirement that there be arguable merit that the arbitrator's
decision was unreasonable is not met and the miscarriage of justice threshold was not satisfied.

### (5) <u>Residual Discretion to Deny Leave</u>


(a)   *Considerations in Exercising Residual Discretion in a Section 31(2)(a)
Leave Application*

**85**    The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* confer on
the court residual discretion to deny leave even where the requirements of s. 31(2) are met (*BCIT*, at
paras. 9 and 26). In *BCIT*, Saunders J.A. sets out a non-exhaustive list of considerations that would
be applicable to the exercise of discretion (para. 31):

1.   "the apparent merits of the appeal";

2.   "the degree of significance of the issue to the parties, to third parties and to the
community at large";

3.   "the circumstances surrounding the dispute and adjudication including the
urgency of a final answer";

4.   "other temporal considerations including the opportunity for either party to address the result through other avenues";

5.   "the conduct of the parties";

6.   "the stage of the process at which the appealed decision was made";

7.   "respect for the forum of arbitration, chosen by the parties as their means of resolving disputes"; and

8.   "recognition that arbitration is often intended to provide a speedy and final dispute mechanism, tailor-made for the issues which may face the parties to the arbitration agreement".

**86**   I agree with Justice Saunders that it is not appropriate to create what she refers to as an "immutable checklist" of factors to consider in exercising discretion under s. 31(2) (*BCIT*, at para. 32). However, I am unable to agree that all the listed considerations are applicable at this stage of the analysis.

**87**   In exercising its statutorily conferred discretion to deny leave to appeal pursuant to s. 31(2)(a), a court should have regard to the traditional bases for refusing discretionary relief: the parties' conduct, the existence of alternative remedies, and any undue delay (*Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326, at pp. 364-67). Balance of convenience considerations are also involved in determining whether to deny discretionary relief (*MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6, at para. 52). This would include the urgent need for a final answer.

**88**   With respect to the other listed considerations and addressed in turn below, it is my opinion that they have already been considered elsewhere in the s. 31(2)(a) analysis or are more appropriately considered elsewhere under s. 31(2). Once considered, these matters should not be assessed again under the court's residual discretion.

**89**   As discussed above, in s. 31(2)(a), a preliminary assessment of the merits of the question of law at issue in the leave application is to be considered in determining the miscarriage of justice question. The degree of significance of the issue to the parties is covered by the "importance of the result of the arbitration to the parties" criterion in s. 31(2)(a). The degree of significance of the issue to third parties and to the community at large should not be considered under s. 31(2)(a) as the *AA* sets these out as separate grounds for granting leave to appeal under s. 31(2)(b) and (c). Furthermore, respect for the forum of arbitration chosen by the parties is a consideration that animates the legislation itself and can be seen in the high threshold to obtain leave under s. 31(2)(a). Recognition that arbitration is often chosen as a means to obtain a fast and final resolution tailor-made for the issues is already reflected in the urgent need for a final answer.

**90**   As for the stage of the process at which the decision sought to be appealed was made, it is not a consideration relevant to the exercise of the court's residual discretion to deny leave under s. 31(2)(a). This factor seeks to address the concern that granting leave to appeal an interlocutory

decision may be premature and result in unnecessary fragmentation and delay of the legal process (D. J. M. Brown and J. M. Evans, with the assistance of C. E. Deacon, *Judicial Review of Administrative Action in Canada* (loose-leaf), at pp. 3-67 to 3-76). However, any such concern will have been previously addressed by the leave court in its analysis of whether a miscarriage of justice may arise; more specifically, whether the interlocutory issue has the potential to affect the final result. As such, the above-mentioned concerns should not be considered anew.

**91**   In sum, a non-exhaustive list of discretionary factors to consider in a leave application under s. 31(2)(a) of the *AA* would include:

> \*   conduct of the parties;
> \*   existence of alternative remedies;
> \*   undue delay; and
> \*   the urgent need for a final answer.

**92**   These considerations could, where applicable, be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria of s. 31(2)(a) have been met. However, courts should exercise such discretion with caution. Having found an error of law and, at least with respect to s. 31(2)(a), a potential miscarriage of justice, these discretionary factors must be weighed carefully before an otherwise eligible appeal is rejected on discretionary grounds.

> (b)   *Application to the Present Case*

**93**   The SC Leave Court judge denied leave on the basis that there was no question of law. Even had he found a question of law, the SC Leave Court judge stated that he would have exercised his residual discretion to deny leave for two reasons: first, because of Creston's conduct in misrepresenting the status of the finder's fee issue to the TSXV and Sattva; and second, "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41). The CA Leave Court overruled the SC Leave Court on both of these discretionary grounds.

**94**   For the reasons discussed above, fostering and preserving the integrity of the arbitral system should not be a discrete discretionary consideration under s. 31(2)(a). While the scheme of s. 31(2) recognizes this objective, the exercise of discretion must pertain to the facts and circumstances of a particular case. This general objective is not a discretionary matter for the purposes of denying leave.

**95**   However, conduct of the parties is a valid consideration in the exercise of the court's residual discretion under s. 31(2)(a). A discretionary decision to deny leave is to be reviewed with deference by an appellate court. A discretionary decision should not be interfered with merely because an appellate court would have exercised the discretion differently (*R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509, at paras. 18 and 30). An appellate court is only justified in interfering with a lower court judge's exercise of discretion if that judge misdirected himself or if his decision is so clearly

wrong as to amount to an injustice (*R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651, at para. 15; and *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297, at para. 117).

**96**    Here, the SC Leave Court relied upon a well-accepted consideration in deciding to deny discretionary relief: the misconduct of Creston. The CA Leave Court overturned this decision on the grounds that Creston's conduct was "not directly relevant to the question of law" advanced on appeal (at para. 27).

**97**    The CA Leave Court did not explain why misconduct need be directly relevant to a question of law for the purpose of denying leave. I see nothing in s. 31(2) of the *AA* that would limit a leave judge's exercise of discretion in the manner suggested by the CA Leave Court. My reading of the jurisprudence does not support the view that misconduct must be directly relevant to the question to be decided by the court.

**98**    In *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011, at pp. 1037-38, misconduct by a party not directly relevant to the question at issue before the court resulted in denial of a remedy. The litigation in *Homex* arose out of a disagreement regarding whether the purchaser of lots in a subdivision, Homex, had assumed the obligations of the vendor under a subdivision agreement to provide "all the requirements, financial and otherwise" for the installation of municipal services on a parcel of land that had been subdivided (pp. 1015-16). This Court determined that Homex had not been accorded procedural fairness when the municipality passed a by-law related to the dispute (p. 1032). Nevertheless, discretionary relief to quash the by-law was denied because, among other things, Homex had sought "throughout all these proceedings to avoid the burden associated with the subdivision of the lands" that it owned (p. 1037), even though the Court held that Homex knew this obligation was its responsibility (pp. 1017-19). This conduct was related to the dispute that gave rise to the litigation, but not to the question of whether the by-law was enacted in a procedurally fair manner. Accordingly, I read *Homex* as authority for the proposition that misconduct related to the dispute that gave rise to the proceedings may justify the exercise of discretion to refuse the relief sought, in this case refusing to grant leave to appeal.

**99**    Here, the arbitrator found as a fact that Creston misled the TSXV and Sattva regarding "the nature of the obligation it had undertaken to Sattva by representing that the finder's fee was payable in cash" (para. 56(k)). While this conduct is not tied to the question of law found by the CA Leave Court, it is tied to the arbitration proceeding convened to determine which share price should be used to pay Sattva's finder's fee. The SC Leave Court was entitled to rely upon such conduct as a basis for denying leave pursuant to its residual discretion.

**100**    In the result, in my respectful opinion, even if the CA Leave Court had identified a question of law and the miscarriage of justice test had been met, it should have upheld the SC Leave Court's denial of leave to appeal in deference to that court's exercise of judicial discretion.

**101**    Although the CA Leave Court erred in granting leave, these protracted proceedings have

nonetheless now reached this Court. In light of the fact that the true concern between the parties is the merits of the appeal -- that is how much the Agreement requires Creston to pay Sattva -- and that the courts below differed significantly in their interpretation of the Agreement, it would be unsatisfactory not to address the very dispute that has given rise to these proceedings. I will therefore proceed to consider the three remaining questions on appeal as if leave to appeal had been properly granted.

C.    *Standard of Review Under the AA*

**102**    I now turn to consideration of the decisions of the appeal courts. It is first necessary to determine the standard of review of the arbitrator's decision in respect of the question on which the CA Leave Court granted leave: whether the arbitrator construed the finder's fee provision in light of the Agreement as a whole, particularly, whether the finder's fee provision was interpreted having regard for the "maximum amount" proviso.

**103**    At the outset, it is important to note that the *Administrative Tribunals Act*, S.B.C. 2004, c. 45, which sets out standards of review of the decisions of many statutory tribunals in British Columbia (see ss. 58 and 59), does not apply in the case of arbitrations under the *AA*.

**104**    Appellate review of commercial arbitration awards takes place under a tightly defined regime specifically tailored to the objectives of commercial arbitrations and is different from judicial review of a decision of a statutory tribunal. For example, for the most part, parties engage in arbitration by mutual choice, not by way of a statutory process. Additionally, unlike statutory tribunals, the parties to the arbitration select the number and identity of the arbitrators. These differences mean that the judicial review framework developed in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. For example, the *AA* forbids review of an arbitrator's factual findings. In the context of commercial arbitration, such a provision is absolute. Under the *Dunsmuir* judicial review framework, a privative clause does not prevent a court from reviewing a decision, it simply signals deference (*Dunsmuir*, at para. 31).

**105**    Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. Both involve a court reviewing the decision of a non-judicial decision-maker. Additionally, as expertise is a factor in judicial review, it is a factor in commercial arbitrations: where parties choose their own decision-maker, it may be presumed that such decision-makers are chosen either based on their expertise in the area which is the subject of dispute or are otherwise qualified in a manner that is acceptable to the parties. For these reasons, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

**106**    *Dunsmuir* and the post-*Dunsmuir* jurisprudence confirm that it will often be possible to determine the standard of review by focusing on the nature of the question at issue (see for example *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61,

[2011] 3 S.C.R. 654, at para. 44). In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise (*Alberta Teachers' Association*, at para. 30). The question at issue here, whether the arbitrator interpreted the Agreement as a whole, does not fall into one of those categories. The relevant portions of the *Dunsmuir* analysis point to a standard of review of reasonableness in this case.

###### D.    *The Arbitrator Reasonably Construed the Agreement as a Whole*

**107**    For largely the reasons outlined by Justice Armstrong in paras. 57-75 of the SC Appeal Court decision, in my respectful opinion, in determining that Sattva is entitled to be paid its finder's fee in shares priced at $0.15 per share, the arbitrator reasonably construed the Agreement as a whole. Although Justice Armstrong conducted a correctness review of the arbitrator's decision, his reasons amply demonstrate the reasonableness of that decision. The following analysis is largely based upon his reasoning.

**108**    The question that the arbitrator had to decide was which date should be used to determine the price of the shares used to pay the finder's fee: the date specified in the Market Price definition in the Agreement or the date the finder's fee was to be paid?

**109**    The arbitrator concluded that the price determined by the Market Price definition prevailed, i.e. $0.15 per share. In his view, this conclusion followed from the words of the Agreement and was "clear and beyond argument" (para. 23). Apparently, because he considered this issue clear, he did not offer extensive reasons in support of his conclusion.

**110**    In *Newfoundland and Labrador Nurses' Union*, Abella J. cites Professor David Dyzenhaus to explain that, when conducting a reasonableness review, it is permissible for reviewing courts to supplement the reasons of the original decision-maker as part of the reasonableness analysis:

> "Reasonable" means here that the reasons do in fact or in principle support the conclusion reached. That is, even if the reasons in fact given do not seem wholly adequate to support the decision, <u>the court must first seek to supplement them before it seeks to subvert them</u>. For if it is right that among the reasons for deference are the appointment of the tribunal and not the court as the front line adjudicator, the tribunal's proximity to the dispute, its expertise, etc, then it is also the case that its decision should be presumed to be correct even if its reasons are in some respects defective. [Emphasis added by Abella J.; para. 12.]

> (Quotation from D. Dyzenhaus, "The Politics of Deference: Judicial Review and Democracy", in M. Taggart, ed., *The Province of Administrative Law* (1997), 279, at p. 304.)

Accordingly, Justice Armstrong's explanation of the interaction between the Market Price definition and the "maximum amount" proviso can be considered a supplement to the arbitrator's reasons.

**111**    The two provisions at issue here are the Market Price definition and the "maximum amount" proviso:

### 2. DEFINITIONS

**"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

And:

### 3. FINDER'S FEE

3.1 ... the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations. [Emphasis added.]

**112**    Section 3.1 entitles Sattva to be paid a finder's fee in shares based on the "Market Price". Section 2 of the Agreement states that Market Price for companies listed on the TSXV should be "calculated on close of business day before the issuance of the press release announcing the Acquisition". In this case, shares priced on the basis of the Market Price definition would be $0.15 per share. The words "provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations" in s. 3.1 of the Agreement constitute the "maximum amount" proviso. This proviso limits the amount of the finder's fee. The maximum finder's fee in this case is US$1.5 million (see s. 3.3 of the TSXV Policy 5.1 in Appendix II).

**113**    While the "maximum amount" proviso limits the amount of the finder's fee, it does not affect the Market Price definition. As Justice Armstrong explained, the Market Price definition acts to fix the date at which one medium of payment (US$) is transferred into another (shares):

> The medium for payment of the finder's fee is clearly established by the fee agreement. The market value of those shares at the time that the parties entered into the fee agreement was unknown. The respondent analogizes between payment of the $1.5 million US finder's fee in shares and a hypothetical agreement permitting payment of $1.5 million US in Canadian dollars. Both agreements would contemplate a fee paid in different currencies. The exchange rate of the US and Canadian dollar would be fixed to a particulate date, as is the value of the shares by way of the Market Price in the fee agreement. That exchange rate would determine the number of Canadian dollars paid in order to satisfy the $1.5 million US fee, as the Market Price does for the number of shares paid in relation to the fee. The Canadian dollar is the form of the fee payment, as are the shares. Whether the Canadian dollar increased or decreased in value after the date on which the exchange rate is based is irrelevant. The amount of the fee paid remains $1.5 million US, payable in the number of Canadian dollars (or shares) equal to the amount of the fee based on the value of that currency on the date that the value is determined.

(SC Appeal Court decision, at para. 71)

**114**    Justice Armstrong explained that Creston's position requires the Market Price definition to be ignored and for the shares to be priced based on the valuation done in anticipation of a private placement.

**115**    However, nothing in the Agreement expresses or implies that compliance with the "maximum amount" proviso should be reassessed at a date closer to the payment of the finder's fee. Nor is the basis for the new valuation, in this case a private placement, mentioned or implied in the Agreement. To accept Creston's interpretation would be to ignore the words of the Agreement which provide that the "finder's fee is to be paid in shares of the Company based on Market Price".

**116**    The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both the Market Price definition and the "maximum amount" proviso. The arbitrator's interpretation of the Agreement, as explained by Justice Armstrong, achieves this goal by reconciling the Market Price definition and the "maximum amount" proviso in a manner that cannot be said to be unreasonable.

**117**    As Justice Armstrong explained, setting the share price in advance creates a risk that makes selecting payment in shares qualitatively different from choosing payment in cash. There is an inherent risk in accepting a fee paid in shares that is not present when accepting a fee paid in cash. A fee paid in cash has a specific predetermined value. By contrast, when a fee is paid in shares, the price of the shares (or mechanism to determine the price of the shares) is set in advance. However, the price of those shares on the market will change over time. The recipient of a fee paid in shares hopes the share price will rise resulting in shares with a market value greater than the value of the

shares at the predetermined price. However, if the share price falls, the recipient will receive shares worth less than the value of the shares at the predetermined price. This risk is well known to those operating in the business sphere and both Creston and Sattva would have been aware of this as sophisticated business parties.

**118**    By accepting payment in shares, Sattva was accepting that it was subject to the volatility of the market. If Creston's share price had fallen, Sattva would still have been bound by the share price determined according to the Market Price definition resulting in it receiving a fee paid in shares with a market value of less than the maximum amount of US$1.5 million. It would make little sense to accept the risk of the share price decreasing without the possibility of benefitting from the share price increasing. As Justice Armstrong stated:

> It would be inconsistent with sound commercial principles to insulate the appellant from a rise in share prices that benefitted the respondent at the date that the fee became payable, when such a rise was foreseeable and ought to have been addressed by the appellant, just as it would be inconsistent with sound commercial principles, and the terms of the fee agreement, to increase the number of shares allocated to the respondent had their value decreased relative to the Market Price by the date that the fee became payable. Both parties accepted the possibility of a change in the value of the shares after the Market Price was determined when entering into the fee agreement.

> (SC Appeal Court decision, at para. 70)

**119**    For these reasons, the arbitrator did not ignore the "maximum amount" proviso. The arbitrator's reasoning, as explained by Justice Armstrong, meets the reasonableness threshold of justifiability, transparency and intelligibility (*Dunsmuir*, at para. 47).

>    E.    *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

**120**    The CA Appeal Court held that it and the SC Appeal Court were bound by the findings made by the CA Leave Court regarding not simply the decision to grant leave to appeal, but also the merits of the appeal. In other words, it found that the SC Appeal Court erred in law by ignoring the findings of the CA Leave Court regarding the merits of the appeal.

**121**    The CA Appeal Court noted two specific findings regarding the merits of the appeal that it held were binding on it and the SC Appeal Court: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but allowed it to receive shares valued at approximately $8 million if Sattva received its fee in shares; and (2) that the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement:

> The [SC Appeal Court] judge found the arbitrator had expressly addressed the maximum amount payable under paragraph 3.1 of the Agreement and that he was correct.

> This finding is contrary to the remarks of Madam Justice Newbury in the earlier appeal that, if Sattva took its fee in shares valued at $0.15, it would receive a fee having a value at the time the fee became payable of over $8 million. If the fee were taken in cash, the amount payable would be $1.5 million US. Newbury J.A. specifically held that the arbitrator did not note this anomaly and did not address the meaning of paragraph 3.1 of the Agreement.

> The [SC Appeal Court] judge was bound to accept those findings. Similarly, absent a five-judge division in this appeal, we must also accept those findings. [paras. 42-44]

**122**    With respect, the CA Appeal Court erred in holding that the CA Leave Court's comments on the merits of the appeal were binding on it and on the SC Appeal Court. A court considering whether leave should be granted is not adjudicating the merits of the case (*Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3, at para. 88). A leave court decides only whether the matter warrants granting leave, not whether the appeal will be successful (*Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, at para. 27, leave to appeal refused, [2013] 3 S.C.R. viii). This is true even where the determination of whether to grant leave involves, as in this case, a preliminary consideration of the question of law at issue. A grant of leave cannot bind or limit the powers of the court hearing the actual appeal (*Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566 (C.A.), at para. 32).

**123**    Creston concedes this point but argues that the CA Appeal Court's finding that it was bound by the CA Leave Court was inconsequential because the CA Appeal Court came to the same conclusion on the merits as the CA Leave Court based on separate and independent reasoning.

**124**    The fact that the CA Appeal Court provided its own reasoning as to why it came to the same conclusion as the CA Leave Court does not vitiate the error. Once the CA Appeal Court treated the CA Leave Court's reasons on the merits as binding, it could hardly have come to any other decision. As counsel for Sattva pointed out, treating the leave decision as binding would render an appeal futile.

   VI.    Conclusion

**125**    The CA Leave Court erred in granting leave to appeal in this case. In any event, the arbitrator's decision was reasonable. The appeal from the judgments of the Court of Appeal for British Columbia dated May 14, 2010 and August 7, 2012 is allowed with costs throughout and the

arbitrator's award is reinstated.

\* \* \* \* \*

## APPENDIX I

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

(a)    "Market Price" definition:

### 2. DEFINITIONS

**"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

(b)    Finder's fee provision (which contains the "maximum amount" proviso):

### 3. FINDER'S FEE

3.1 ... the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations.

## APPENDIX II

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

### 3.3 Finder's Fee Limitations

The finder's fee limitations apply if the benefit to the Issuer is an asset purchase or sale, joint venture agreement, or if the benefit to the Issuer is not a specific financing. The consideration should be stated both in dollars and as a percentage of the value of the benefit received. Unless there are unusual circumstances, the finder's fee should not exceed the following percentages:

| Benefit | Finder's Fee |
|---|---|
| On the first $300,000 | Up to 10% |
| From $300,000 to $1,000,000 | Up to 7.5% |
| From $1,000,000 and over | Up to 5% |

As the dollar value of the benefit increases, the fee or commission, as a percentage of that dollar value should generally decrease.

## APPENDIX III

_Commercial Arbitration Act_, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the _Arbitration Act_)

### Appeal to the court

**31** (1) A party to an arbitration may appeal to the court on any question of law arising out of the award if

(a)    all of the parties to the arbitration consent, or
(b)    the court grants leave to appeal.

(2)    In an application for leave under subsection (1) (b), the court may grant leave if it determines that

(a)    the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,
(b)    the point of law is of importance to some class or body of

persons of which the applicant is a member, or

(c)    the point of law is of general or public importance.

(3)    If the court grants leave to appeal under this section, it may attach conditions to the order granting leave that it considers just.

(4)    On an appeal to the court, the court may

(a)    confirm, amend or set aside the award, or

(b)    remit the award to the arbitrator together with the court's opinion on the question of law that was the subject of the appeal.

*Appeal allowed with costs throughout.*

**Solicitors:**

*Solicitors for the appellant: McCarthy Tétrault, Vancouver.*

*Solicitors for the respondent: Miller Thomson, Vancouver.*

*Solicitor for the intervener the Attorney General of British Columbia: Attorney General of British Columbia, Victoria.*

*Solicitors for the intervener the BCICAC Foundation: Fasken Martineau DuMoulin, Vancouver.*

*Case Name:*

## Saylor v. Madsen Estate; Saylor v. Ackerman

**IN THE ESTATE OF Niels Michael Madsen, deceased**
**Between**
**Mary Elizabeth Saylor and William Anthony Madsen,**
**plaintiffs (respondents), and**
**Patricia Ann Brooks, Estate Trustee, respondent**
**(appellant)**
**And between**
**Mary Elizabeth Saylor and William Anthony Madsen,**
**moving party (respondents), and**
**Robert Ackerman, responding party (appellant)**

[2005] O.J. No. 4662

261 D.L.R. (4th) 597

203 O.A.C. 295

20 E.T.R. (3d) 171

143 A.C.W.S. (3d) 570

2005 CarswellOnt 5896

Dockets: C41921 and C42850

Ontario Court of Appeal
Toronto, Ontario

**D.H. Doherty, K.N. Feldman and H.S. LaForme JJ.A.**

Heard: June 30, 2005.
Judgment: November 1, 2005.

(87 paras.)

*Civil procedure -- Costs -- Against solicitor personally -- Party and party or partial indemnity --*

*Solicitor and client or substantial indemnity -- Appeal by solicitor from order requiring him to pay substantial indemnity costs allowed where no reasons provided for increased scale of costs.*

*Legal profession -- Barristers and solicitors -- Compensation -- Measure of compensation -- Reasonable charges, reasonably performed -- Appeal by solicitor from award of $25,000 for services rendered on behalf of estate allowed where no reasons supported quantum of award.*

*Wills, estates & trusts law -- Gifts -- Inter vivos -- Proof of gift -- Appeal by daughter of deceased from finding joint accounts set up by deceased with daughter prior to death formed part of estate, reported at [2004] O.J. No. 5179, dismissed -- Deceased did not intend to grant beneficial joint ownership of funds to daughter -- Family Law Act, s.14.*

Appeal by Brooks from an order requiring her to pay restitution to her father's estate and dismissing Brooks' counterclaim against her siblings. Ackerman, Brooks' lawyer, appealed from an order requiring him to repay estate funds he held in trust into court. Brooks was executor of her father's will. Her brother and sister commenced an action against Brooks as executor for an accounting of the estate's property, for division of the property in accordance with the will, and for an injunction requiring Brooks to pay all estate moneys into court. At issue were joint accounts between Brooks and her father, set up by Brooks and her father before his death. Brooks had a right of survivorship with respect to the funds in the joint accounts. During her father's life, Brooks made no deposits into the accounts and drew money from them only on her father's say-so. She testified her father discussed removing her from the joint accounts if he was to remarry. Brooks did not include the joint accounts in the estate. Brooks commenced a counter-claim, alleging her brother and sister owed the estate money for loans their late father made to them. Brooks and her siblings subsequently entered into a consent order under which Brooks was required to pay $365,000, the funds in the estate account, to Ackerman to be held in trust. Brooks was found to have breached her fiduciary duty to the estate by failing to include funds she held in joint accounts with her father in the estate. The judge found a resulting trust existed with respect to the funds in the joint accounts in favour of Brooks' siblings. Brooks was ordered to make restitution to the estate and to pay her siblings' costs of $120,000. Brooks' claims against her brother and sister were dismissed as statute-barred. Money paid to Ackerman for Brooks' legal costs was ordered repaid into the estate. During the course of proceedings, the siblings brought a motion against Ackerman alleging he improperly took funds for his services from those he was holding in trust. Ackerman was ordered to pay $175,216 into court, and to pay the costs of the motion on a substantial indemnity basis. Ackerman was awarded $25,000 for his estate representation.

HELD: Appeal by Brooks dismissed. The father never meant to give Brooks beneficial joint ownership of the funds in the accounts. Because the father's intention was clear, neither the law of resulting trust nor the presumption of advancement was triggered. The finding the Brooks breached her fiduciary duty to the estate was set aside, as it was unnecessary to the ultimate decision and appropriate remedy. Brooks' appeal from the dismissal of her counter-claim was dismissed because

Brooks did not establish her siblings had outstanding loans to their father. Ackerman's appeal was allowed. There were no reasons for ordering Ackerman to pay costs on a substantial indemnity scale. The award of $25,000 Ackerman received for representing the estate did not represent reasonable compensation. An assessment of his fees and disbursements on behalf of the estate was ordered.

**Statutes, Regulations and Rules Cited:**

Family Law Act, R.S.O. 1990, c. F.3, s.14

Limitations Act

**Appeal From:**

On appeal from the judgment of Justice Francine E. Van Melle of the Superior Court of Justice dated November 23, 2004, and from the motion dated May 4, 2004.

**Counsel:**

Robert Cohen, for Mary Elizabeth Saylor and William Anthony Madsen

Joel Skapinker, for Patricia Ann Brooks

Sean Cumming, for Robert Ackerman

---

[Editor's note: A corrected version was released by the Court November 22, 2005; the corrections have been made to the text and the corrigendum is appended to this document.]

Reasons for judgment were delivered by H.S. LaForme J.A., concurred in by D.H. Doherty J.A. Separate reasons were delivered by K.N. Feldman J.A.

**1**    H.S. LaFORME J.A.:-- These are two appeals that were heard together because of the close relationship between them. In what I will for the moment call the main appeal, this court is called upon to consider the application of the two equitable presumptions of advancement and resulting trust to a joint account. The second appeal involves rulings made by the trial judge in connection with accounts for professional services and costs orders regarding then counsel of record for Patricia Ann Brooks.

OVERVIEW

**2**    The respondents are the sister and brother of Ms. Brooks who was named executor by their late father.

**3**    Litigation was commenced by the respondents by way of application in September 2001. The appellant, Ms. Brooks was named in the application as respondent in her capacity of estate trustee only. In that application, the respondents sought an order requiring Ms. Brooks to account for the property of their deceased father; for division of the property in accordance with the will; and for an injunction requiring her to pay all estate monies into court. Ms. Brooks issued a counter application on February 11, 2002, solely in her capacity as estate trustee seeking an order for directions from the court. The application was returnable on February 13, 2002.

**4**    The parties entered into a consent order in which Ms. Brooks was required to pay the amount in the estate account, $365,000.00, to her lawyer, Mr. Ackerman, who was to hold such funds pursuant to a handwritten undertaking agreed to by the parties. It was also ordered that the application was to be converted to an action. The statement of claim was issued on August 22, 2002, and Ms. Brooks was named as defendant both in her personal capacity and as estate trustee.

**5**    The late father had transferred all of his bank accounts and investments into the joint names of himself and Ms. Brooks approximately seven and one half years before he died. At the time of his death he owned his interest in these joint accounts, a life insurance policy and real property in Mississauga, Ontario. Additionally, Ms. Brooks, as estate trustee, alleged that the respondent sister owed the estate $35,900.00 and the respondent brother owed $26,360.00 to the estate, which they had borrowed from their late father and sought an order for payment.

**6**    The trial judge gave judgment allowing the claim that the funds contained in the bank account and certain investments held jointly by Ms. Brooks and her late father formed part of the estate. The trial judge also found that Ms. Brooks had breached her fiduciary duty by failing to include the joint accounts in the estate, but did not award damages; rather, Ms. Brooks was required to make restitution to the estate. Ms. Brooks' compensation as estate trustee was fixed. The trial judge dismissed the counter-claim and held that the sum paid by the estate to Mr. Ackerman for Ms. Brooks' legal fees was to be repaid to the estate, either by Ms. Brooks or by Mr. Ackerman. The determination of costs was then made on May 3, 2005, and Ms. Brooks was, in her personal capacity, ordered to pay the respondents' costs fixed in the amount of $120,000.00.

**7**    That judgment is being appealed by Ms. Brooks, and while I referred to it above as the main appeal, I will set it out below under the heading, "The Brooks Appeal".

**8**    Directly related to the estate proceedings, in mid trial, the respondents brought a motion against Mr. Ackerman, seeking payment into court of funds taken by that counsel from estate funds he was holding in trust. The trial judge found that the funds had been improperly taken and ordered Mr. Ackerman to pay $175,216.73 into court. In her May 3rd ruling on costs, the trial judge ordered Mr. Ackerman to pay costs of certain motions and awarded him $25,000 for his estate representation. I will say more about this later. Mr. Ackerman appeals those orders, and his appeal and that of Ms. Brooks were heard together. I will refer to Mr. Ackerman's appeal of those orders as "The Ackerman Appeal".

THE BROOKS APPEAL

**9**    Ms. Brooks argued that the trial judge erred by failing to apply the presumption of advancement in determining whether her father gifted the joint accounts to her or whether they were meant to form part of his estate. Alternatively, she argues that if the presumption of resulting trust were to apply instead, she adduced ample evidence to rebut that presumption. Finally, she argues that the trial judge erred in finding that the estate's claims for funds allegedly owed to the estate by the respondents were statute barred, as the respondents failed to raise this issue in their pleadings.

**10**    In May 1991 the father, who died December 5, 1998, made Ms. Brooks the joint signatory on his bank accounts, which provided for a right of survivorship. In September 1997 the joint accounts were closed and the funds deposited into an investment account, which again was a joint account with Ms. Brooks and had a right of survivorship.

**11**    The issue is whether the father intended to make a gift of that money to Ms. Brooks or whether he intended to remain the beneficial owner of it. If it was a gift, Ms. Brooks will take it outside of the will. If it was not a gift, and the father remained the beneficial owner, the money will form part of his estate.

ANALYSIS

**12**    Much of the analysis of the trial decision focused on determining the appropriate presumption to apply to the transfer of the accounts. Although I do not find the presumptions necessary in order to determine the intention of the parties in this case, I will nonetheless start with an examination of the relevant presumptions.

   The Presumptions

**13**    As a starting point it is important to remember that: Equity does not assume a gift; rather, a donee is required to prove that a gift was intended: Waters' Law of Trusts in Canada, (3d) (Toronto: Carswell, 2005) at 362 ["Waters"]. From this tenet two equitable principles have evolved: the presumption of resulting trust, and advancement. The trial judge in this case held that:

> [I]t is time for the presumption of advancement from father to child to be abandoned in favour of the presumption of resulting trust in all but the most limited cases. I agree with the views of Heeney J. [in McLear v. McLear, [2000] O.T.C. 505 (S.C.J.)] that because the presumption of advancement was historically grounded in relationships of dependency, then logically it should apply equally to mothers and fathers with respect to dependent children but should not apply to either mothers or fathers in situations where the recipient children are independent adults. (para. 24)

**14**    Generally speaking, and in the context of this case, a resulting trust is presumed where a person makes a gratuitous transfer of property into another person's name, or into the joint name of him or herself and another. There is then a presumption that the transferee intended to transfer legal title, but retain beneficial title. This presumption may be rebutted by evidence showing that the transferor intended a gift.

**15**    The presumption of advancement is somewhat different. Historically the presumption of advancement arose in the limited circumstance where a male person transferred property into the name of his child or his wife. In these circumstances it was presumed that a gift was intended, unless there was evidence to the contrary: see Waters, supra.

**16**    In Ontario, s. 14 of the Family Law Act, R.S.O. 1990, c. F.3 mandates that the presumption of resulting trust be applied to questions of the ownership of property between spouses. However, if property is held in each of the spouses' names as joint tenants, or if money on deposit is in the name of both, that is sufficient to prove joint tenancy, unless there is evidence to the contrary. In Cho Ki Yau Trust (Trustees of) v. Yau Estate (1998), 29 E.T.R. (2d) 204 at para. 27 (Ont. S.C.), Cullity J. describes the law in Ontario:

> [T]he presumption of advancement ... in this jurisdiction has been preserved for this purpose [i.e. where a bank account is held in the name of both spouses] by the provisions of section 14 of the Family Law Act ...

**17**    Thus, the general rule in this province, at least as it relates to transfers of property between spouses, is that the presumption of resulting trust will apply, except where property is held in both names. Where property is held jointly, the written record - subject to rebuttal by evidence - proves the presumption of advancement to the contrary.

**18**    Where, however, a parent transfers property into a child's name, or into both of their names, the application of the presumption of advancement is less clear. And, as I will demonstrate below, while there is some debate surrounding the presumptions of advancement and resulting trust, the presumption of advancement might still apply in situations where a parent transfers property into the name of a child, or into their joint names.

**19**    While it seems clear that the presumption of advancement applies to transfers from a father to a child, the jurisprudence is conflicted about whether it applies to transfers between a mother and child: see for example Edwards v. Bradley, [1957] S.C.R. 599. This case, given the facts, does not require that I enter into this debate. It is sufficient for my purposes to say that, at least between father and child, "the presumption appears to retain much of its original vigour:" Waters, supra, at 381.

**20**    As well, there is some jurisprudence that suggests the presumption of advancement would not apply to a transfer from a parent to an independent adult child: McLear v. McLear, supra. More recently, however, the Alberta Court of Appeal held that the presumption of advancement did apply in a transfer of assets from a father to his adult son: Plamondon v. Czaban (2004), 348 A.R. 103.

**21**    There have been other decisions that have disagreed with the suggestion in McLear, supra, and have instead grounded the presumption of advancement on parental affection, not on financial dependence: see for example Re Dagle (1990), 70 D.L.R. (4th) 201 (P.E.I.S.C. (A.D.)); Christmas Estate v. Tuck, (1995), 10 E.T.R. (2d) 47 (Ont. Gen. Div.); and Yau, supra. This seems to me to be

a reasonable and sensible approach. Therefore, the presumption of advancement can still apply to transfers of property from a father to a child, including an independent adult child.

**22**    For the reasons just stated then, the trial judge was incorrect in applying the law of resulting trust and should have applied a presumption of advancement - if indeed, as I explain below, she was required to consider either.

**23**    While the debates surrounding the application of the presumption of advancement are interesting and important, they are not necessary to resolve the issue in this case. Here, the intention of the parties at the time of transfer is demonstrated on the evidence.

### The Role of the Presumptions

**24**    Reliance on the presumptions has diminished because the courts are now first examining all the evidence to determine the transferor's intent. That is to say, courts are tending to examine the evidence in its entirety, and base findings regarding intention on all the facts. It will only be where the evidence itself is unclear that reliance on the presumptions becomes necessary.[1] Cully J., in Yau, supra, demonstrates this approach wherein he states that the overall aim is to discern the intention of the transferor:

> [T]he historical origins of the equitable presumptions are generally ignored and their justification is most commonly found in the extent to which they reflect, and correspond with, the more likely intentions of a transferor or purchaser. The relationship that is said to give rise to a presumption of advancement "is no more than a circumstance of evidence which may rebut the presumption of resulting trust" [footnotes omitted] (para. 37).

**25**    This approach reflects what I believe to be a sensible and modern approach to an analysis of the presumptions. I take comfort in knowing that other knowledgeable jurists and scholars also share this view: see Dredger (Litigation Guardian of) v. Dredger (1994), 5 E.T.R. (2d) 250 (Man. C.A.); Cooke v. Cooke Estate (2005), 16 E.T.R. (3d) 108 (B.C.C.A.). Indeed, my colleague, Gillese J.A. in Essentials of Canadian Law: The Law of Trusts (Irwin Law: Concord, 1997), advocates the approach that there is no need to resort to the presumptions where evidence of intention is clear. This approach is both contemporary and reasonable since the overall purpose is, after all, to ascertain the transferor's intention.

### Intent at the Time of the Transfer - The Bank Accounts

**26**    It was forcefully argued - and I think with some persuasion - that the uncontested evidence of bank documents establishes joint accounts as being per se evidence of intent to gift. This, it might be said, taken together by way of analogy with the above-referenced law in Ontario, as it exists with respect to spouses and as clarified in s. 14 of the Family Law Act, demonstrates a clear intention to advance a gift to Ms. Brooks.

**27**    Bank documents can be strong evidence of a party's intention at the time the parties signed them. I do not, however, agree that the bank documents should be assigned presumptive value when trying to determine a party's intention. The probative value of such documents, like any other relevant evidence, can only be ascertained after an assessment of the totality of the relevant evidence. As this case demonstrates, the document does not always provide accurate evidence of the parties' intent.

**28**    A judicially created presumption, which places documents at the top of the evidentiary ladder, may bring some predictability to the factual question of a party's intention, but it will do so, in my view, at the expense of the fact finding process. Triers of fact routinely determine questions of intention without any judicially created presumptions. I am confident that they can do so where bank documents constitute part of the evidentiary picture.

**29**    In this case, the trial judge specifically addressed the evidentiary value of the bank documents. She found that "[t]he joint account agreement is not determinative of the relationship between [the deceased] and [Ms. Brooks]". In doing so she relied on Vokey v. Vokey Estate (1997), 149 Nfld. & P.E.I.R. 1 (Nfld. C.A.) where, in connection with documents stipulating that funds were to be held as joint property with survivorship, that court held that the terms, "cannot be viewed as supporting rebuttal of the presumption of a resulting trust in favour of the deceased's estate" (para. 26).

**30**    She also relied on Re McKenna Estate (1994), 134 N.S.R. (2d) 218 (Prob. Ct.), following the Supreme Court of Canada decision, Niles v. Lake, [1947] S.C.R. 291, that quoted the head note of Niles at p. 248 as follows:

> The bank form, although it may have indicated a joint tenancy by way of beneficial interest, merely defined the relationship between the holders of the account and the bank and, even though it was under seal, it could not be deemed decisive as to the relationship between A and B inter se.

**31**    The more recent bank agreements provide for a right of survivorship so it can no longer be said that the documents do not define rights as between the joint account holders. However, there is no reason to treat the documents as dispositive of the actual relationship between the parties. Documents remain a piece of evidence - perhaps a very important piece of evidence - going to the intention of the parties who created the document. Nevertheless, the weight to be assigned to such documents in any given case must be left to the trier of fact.

The Approach to Joint Accounts[2]

**32**    By way of summary then, I would approach the issue of the joint accounts in this case as follows. First, the court should have evaluated the whole of the evidence, including the bank documents, to determine whether there was a clear intention at the time of the transfer on the part of the late father to gift the joint accounts to Ms. Brooks. Second, if, the intention of the late father remained unclear after this evaluation, then the court should have resorted to an analysis of the

application of the presumptions of advancement or resulting trust. Indeed, this was the method of analysis in Yau, supra, wherein Cullity J. concluded that the bank agreement was the only reliable evidence before him and thus the presumption of advancement applied.

Application to this case

**33**    In applying the just-stated principles to the case at bar, the evidence at trial established that in 1991 the father made his bank accounts joint accounts with the appellant. In 1994 he executed new powers of attorney in favour of the appellant. Then in 1997 all of the joint bank accounts were transferred into two new joint accounts. On the evidence of Ms. Brooks, from 1991 on, her father was in control of his finances. In this regard, he claimed all the interest from the joint accounts for tax purposes. Further, during her father's lifetime, she never deposited any of her own money into the accounts and she only drew cheques on her father's directions. Finally, she testified that there was some discussion she had with her father where he suggested that he might remove her from the joint accounts if he were to remarry.

**34**    The evidence relevant to the execution of the bank documents more than supports the trial judge's findings and demonstrates the correctness in her assessment of the persuasiveness of this evidence. In this regard, the trial judge found that:

> *    The deceased had sole control over the money in the joint accounts during his lifetime and it was used solely for his benefit. Ms. Brooks herself testified that, she "would follow his instructions regarding the money in the accounts and that the investments with CIBC Wood Gundy were done with the knowledge, consent and agreement of [the deceased]". As further evidence of this finding, a letter written to the respondents' solicitor by Ms. Brooks' former counsel stated that, "[the deceased] was in full control of his assets until the time of his death. Ms. Brooks did not assume any control or management of [the deceased's] estate and was merely acting at his discretion in assisting him to carry on his personal accounts."
> *    The deceased was the one who declared and paid income tax on the money in the joint accounts.

**35**    Significantly, the trial judge plainly did not believe much of Ms. Brooks' evidence. She found that Ms. Brooks "was evasive and gave conflicting evidence, [and,] she purposely misrepresented events." The trial judge in my view had ample evidence on which to base her scepticism with respect to Ms. Brooks' evidence. For example, she cites:

> *    The fact that Ms. Brooks allegedly went to her former solicitor's office and may have stolen his file on this matter.
> *    The fact that Ms. Brooks testified that a colleague of her former solicitor forced her into signing an affidavit that contained statements that she claims were untrue. The trial judge clearly believed the solicitor's evidence

> that he spent quite a bit of time going over it with her, and that she signed it voluntarily.

* Uncorroborated allegations that her brother physically abused their mother and his first wife, and that he physically assaulted his father on one occasion.

**36**    Importantly, the trial judge did not simply believe the respondents' evidence in its entirety and disbelieve Ms. Brooks'. In fact, she finds that:

> There is no question that at trial, the parties to this action all gave evidence designed to support his or her version of events. I am sure that Anthony [the respondent son of the deceased] and Betty [the respondent daughter of the deceased] left out certain incidents and skewed events to put themselves in the most positive light possible. However, I do not believe that they purposely misrepresented events that had occurred. (para. 49)

**37**    As I noted above, the trial judge found the opposite was true with respect to Ms. Brooks' evidence. The respondents testified that their father put the bank accounts in both Ms. Brooks' name and his own purely for convenience. They also testified that their father treated all of them equally.

**38**    A finding that the depositor is the beneficial owner generally depends on evidence that the depositor's intention was to permit an account to be operated by the other party solely for the convenience and benefit of the depositor. Based on the findings of fact by the trial judge, this is such a case. While Ms. Brooks had access to the funds, it was only to administer her father's finances; it was not for the purpose of Ms. Brooks' spending money on herself.

**39**    Ms. Brooks gave evidence that she never deposited any of her own money into the joint accounts and she never withdrew money except in accordance with her father's directions. Absent evidence that both parties made withdrawals for their own benefit, which is not present in this case, the facts as found by the trial judge establish that beneficial joint ownership was not intended. The presumption of advancement therefore is not triggered.

**40**    In the final analysis, regardless of whether the trial judge applied a presumption of advancement or a resulting trust, it is evident from her detailed reasons that she carefully weighed all of the evidence before arriving at the conclusion that at the time of transfer the joint bank account and joint investments were not intended as gifts, but rather were intended to be included as part of the estate. Specifically, she found there was "no evidence to support [Ms. Brooks'] position that [the deceased] intended to gift the contents of his joint accounts to her."

**41**    In sum, there is simply no basis upon which this court should interfere with the trial judge's factual findings and conclusions on this issue.

**42**    Finally, I would set aside the trial judge's finding that Ms. Brooks was in breach of her

fiduciary duty by failing to include the joint accounts as estate assets. The trial judge did not provide any analysis or reasons for her findings on this issue. Moreover, the litigation was to determine the intention of the father, and Ms. Brooks defended the action on that basis. It was unnecessary to the trial judge's ultimate decision, including the appropriate remedy, to decide the issue of any breach of fiduciary duty

The Loans

**43**   Finally, Ms. Brooks argues that the trial judge erred in finding that the estate's claims for the loans allegedly owed by the respondents were statute-barred. She submits that the respondents failed to raise this as a defence at trial, and therefore the trial judge was precluded from relying on it.

**44**   Even if the trial judge should not have considered it because the Limitations Act was not pleaded, she had an entirely independent basis for deciding the matter as she did. The trial judge clearly stated that, even if the collection of the loans was not statute-barred, she was "not satisfied" that Ms. Brooks had "successfully established that the Promissory Notes [were] outstanding and were meant to be repaid to the estate." Again, there is no basis on which this court should interfere with this factual finding.

**45**   Accordingly, the Brooks' Appeal is dismissed.

THE ACKERMAN APPEAL

**46**   On April 30, 2004, the trial judge made rulings respecting three mid-trial motions. One was in connection with a previously referenced motion, where the trial judge merely reaffirmed her order given on April 8th, namely, that any estate funds held by Mr. Ackerman were to be paid into court, and that he was to account for the balance. The second was regarding Mr. Ackerman's motion to be removed as counsel of record. And, the third was in connection with a motion brought on behalf of Ms. Brooks' children, who had asked that a mistrial be declared because they, and the other beneficiaries, had not been made parties to this action.

**47**   As I noted at the outset, prior to the commencement of this trial, the parties had entered into a consent order that required Ms. Brooks to pay the amount that was in the estate account, namely, $365,000.00, to Mr. Ackerman. Mr. Ackerman was to hold such funds pursuant to a handwritten undertaking agreed to by the parties. From this estate account, Mr. Ackerman had unilaterally paid himself legal fees for the ongoing litigation. His contention was that he was entitled to such fees in accordance with the language of the undertaking.

**48**   Pursuant to a motion brought by the respondents in mid-trial, the trial judge found that the funds had been improperly taken and ordered Mr. Ackerman to pay $175,216.73 into court. The trial judge disagreed with Mr. Ackerman's interpretation of the undertaking. Mr. Ackerman immediately appealed the mid-trial order causing a stay of the order. Thus, the funds have not been

paid into court. They remain in Mr. Ackerman's trust account, and he claims on this appeal that he is entitled to at least some of them as reasonable compensation for work done on behalf of the estate.

**49**    In her reasons for costs issued on May 3, 2005, the trial judge ordered Mr. Ackerman to pay the entire amount of Mr. Blackadder's account for the second of the three motions argued on April 30, 2004. Mr. Blackadder acted as counsel for the respondents on that particular motion, because the respondents' regular counsel had filed an affidavit. Regarding the costs sought against Mr. Ackerman, the trial judge held:

> I see no reason why he should not pay Mr. Blackadder's entire account, which I find to be eminently reasonable for the work that he did on the motion. He should also pay something towards the motion on April 8, 2004. I fix costs against Mr. Ackerman in the amount of $6,500.00. (para. 41)

**50**    The trial judge indicated earlier on in her reasons - and I think correctly - that Mr. Ackerman was only required to pay the costs of the motion where the respondents sought the remitting of the estate's funds into court. As noted, three motions were heard on that date, and it is clear that Mr. Blackadder's account related to all of the motions heard that day. Thus, in ordering Mr. Ackerman to pay the entire amount, the trial judge effectively ordered Mr. Ackerman to pay for the costs of the work done on motions unrelated to the one for which he was ordered to pay.

**51**    Costs are normally awarded on a partial indemnity basis and the trial judge did not conduct an analysis as to whether substantial indemnity costs should have been awarded. Despite this, she ordered Mr. Ackerman to pay the entire amount of Mr. Blackadder's account. The trial judge provided no reasons for departing from the normal rule of awarding costs on a partial indemnity scale. Her reasons for awarding substantial indemnity costs appear to relate only to the costs awarded against Ms. Brooks. There are in effect no real reasons provided by the trial judge for awarding substantial indemnity costs. Accordingly, this part of Mr. Ackerman's appeal is allowed.

**52**    Mr. Ackerman should only have been responsible for costs in connection with the payment into court motion, and then only on a partial indemnity scale. In his factum Mr. Ackerman submits that an appropriate amount would be $3,000 and I agree with that amount.

**53**    As regards Mr. Ackerman's claim for costs payable out of the estate for the proper estate expenses, the trial judge held that, an appropriate amount was $25,000 inclusive of fees, disbursements, and G.S.T. Furthermore she found no reason to award an amount payable from the estate for the issuance and prosecution of the Counter-Claim.

**54**    With respect to this issue, all parties generally agree that the mid-trial ruling of the trial judge is no longer of any consequence. Rather, they accept that the real issue is whether the trial judge properly held that Mr. Ackerman's reasonable entitlement was $25,000. I think this concession is correct.

**55**    In reaching the conclusion that $25,000 was the appropriate amount to be paid out as the proper expenses of the estate, the trial judge gave virtually no reasons for settling on this amount. Furthermore, she provided no reasons for not allowing any amount referable to the counter-claim, which was clearly brought on behalf of the estate and related to the loans to the respondents. It was apparent that the counter-claim was not without merit.

**56**    In addition, the trial judge was in error when she treated Mr. Ackerman's claim for reasonable compensation for estate work as though it were a claim by a lawyer for costs from an opposing party. In fact, Mr. Ackerman was claiming reasonable compensation from his own client, and the factors referable to that claim should have guided the trial judge's assessment. Accordingly, this aspect of Mr. Ackerman's Appeal is also allowed.

DISPOSITION

**57**    The Brooks Appeal is dismissed.

**58**    The Ackerman Appeal is allowed. First, the order of the trial judge that Mr. Ackerman is to pay all the costs of Mr. Blackadder is set aside. Mr. Ackerman shall be ordered to pay only the costs of the motion regarding payment into court of estate funds. This amount is fixed at $3,000. Second, the trial judge's order fixing Mr. Ackerman's entitlement for estate expenses at the all-inclusive amount of $25,000 is also set aside. In connection with this, there is to be an order for an assessment to review the payments made by Mr. Ackerman from monies held in trust to determine, what were reasonable legal fees and expenses of the estate, including the expenses of litigation. In addition, the assessment is to be further guided by the following:

> *    In so far as Mr. Ackerman's work before the issuing of the statement of claim is concerned, the parties are at liberty to argue what part, if any, was referable to estate work and what part was referable to work on behalf of Ms. Brooks personally. Mr. Ackerman is entitled to compensation from the estate only for the former work.
> *    With respect to work done after the statement of claim was issued, it is agreed that work, if any, referable to the counter-claim is properly charged to the estate and Mr. Ackerman is entitled to reasonable compensation. It is also agreed that work referable to the "joint account" issue was work done for Ms. Brooks personally and Mr. Ackerman is not entitled to compensation from the estate.

COSTS

**59**    On the Brooks Appeal, the respondents are entitled to their costs on a partial indemnity scale in the all-inclusive amount of $15,000 to be paid by Ms. Brooks.

**60**    Regarding the Ackerman Appeal, Mr. Ackerman is awarded his costs on the first part of his

appeal dealing with Mr. Blackadder's account, again on a partial indemnity scale, paid by the respondents in the all-inclusive amount of $3,000. As for his second ground of appeal, namely, his entitlement to estate expenses, costs of this appeal, if any, will be determined by the assessment officer on a partial indemnity scale. It may well be that the trial judge was correct in choosing the original amount of $25,000.

H.S. LaFORME J.A.
 D.H. DOHERTY J.A. -- I agree.

**61**    K.N. FELDMAN J.A. (dissenting):-- I have had the benefit of reading the reasons for judgment prepared by LaForme J.A., and I agree with his disposition of the Ackerman appeal. However, on the Brooks appeal, respectfully, I do not agree with his approach or with the conclusion he reaches about the proper disposition of the appeal.

**62**    The trial judge made an error of law by concluding that the presumption of advancement from father to child must be abandoned in law in favour of the presumption of resulting trust in all but limited cases (the parameters of which were not defined); that the presumption of resulting trust applied in this case; and therefore, that the onus was on the appellant to prove that her father intended to "gift the joint investment to her." My colleague acknowledges that the trial judge erred in law.

**63**    The trial judge viewed all of the evidence in terms of the burden of proof, which she placed on the appellant because she incorrectly applied the presumption of resulting trust. The trial judge also treated the case as one that turned on credibility. In part because she made negative findings about the appellant's credibility, she found that the appellant had not met the burden of proof.

**64**    The trial judge also erred by considering as part of the evidence of the father's intention at the time he put the funds into joint accounts, events that occurred long afterward such as Christmas gifts he gave to his children years later and a statement he made when he was ill in the hospital shortly before his death. The law is clear that relevant evidence of intention is restricted to evidence that relates to the donor's intention at the time of the transfer: see Shephard v. Cartwright (1954), [1955] A.C. 431 at 445-46 (H.L.); Clemens v. Clemens Estate, [1956] S.C.R. 286 at 294; Re Wilson, [1999] O.J. No. 1274 at para. 49 (Gen. Div.); Donovan W.M. Waters, Waters' Law of Trust in Canada, (3d) (Toronto: Thomson Carswell, 2005) at 376; John Sopinka, Sidney N. Lederman & Alan W. Bryant, The Law of Evidence in Canada, (2d) (Toronto: Butterworths, 1999) at 116.

**65**    My colleague is of the view that although the trial judge erred in law on the key legal issue in the case, the application of the presumptions, this court is still in a position to decide, based on the findings of credibility and fact made by the trial judge and by applying the correct law and onus of proof, what was the actual intention of the parties' father when he put his funds into joint accounts and investments with the appellant.

**66**    As the joint account documents are not determinative, the issue turns on hearsay evidence

given by witnesses, much of which was uncorroborated. The court must also consider the acts of the father and determine what weight to give to them and what significance to assign to them, as discussed below. In my view, this is the type of case that requires the court to order a new trial. In this case the trial judge's findings of credibility and fact were made based on applying the incorrect onus of proof. That error may well have influenced those findings: see e.g. Shakur v. Pilot Insurance Co. (1990), 74 O.R. (2d) 673 (C.A.) at 682. Furthermore, it is the role of the trial court that hears all of the evidence to decide what weight to give to the relevant factors and acts of the father. This court does not have that benefit.

**67**    My colleague places significance on certain facts and factors as showing that the father's intent was not to give the appellant a shared interest or right of survivorship in the accounts. However, I note that similar factors were viewed by another panel of this court in the recent decision in Pecore v. Pecore, [2005] O.J. No. 3712, as either not determinative of such an intention by the father in that case, or as reinforcing the opposite conclusion, namely that his intent was to benefit the joint tenant child.

**68**    In Pecore, the father put significant funds into joint accounts with one of his three adult children, Paula, because she was the most financially in need. In his will, the father named Paula and her dependant husband as residuary beneficiaries. After the father's death, the husband separated from Paula, learned that he was a residuary beneficiary under his ex-father-in-law's will, and, in the course of his divorce proceeding against Paula, challenged her right of survivorship to the jointly-held funds, because the effect of the right of survivorship was that those funds did not form part of the estate.

**69**    In the context of examining the facts that might speak to the father's intention at the time he transferred his investments into joint ownership, the court first noted that the father was familiar with joint ownership as an estate planning tool because he and his wife had held their investments jointly and they had devolved to him as the survivor. The court concluded that the father therefore knew that on his death, his joint investments would devolve to Paula as his survivor.

**70**    In this case, there was evidence that the father had also held his investments in joint tenancy with his wife, and they devolved to him on her death. Following his wife's death, he opened a joint account with his daughter, the appellant. A court could therefore conclude that he knew that when he died, his joint investments would devolve to the appellant as his survivor. However, neither the trial judge nor my colleague chose to take this factor into account.

**71**    A second factor considered by the court in Pecore was that the father gave Paula his power of attorney. The court took that as evidence that he was not using the joint account with Paula as a tool of convenience to give her signing access on the account. She would have that with the power of attorney. Rather, it showed that the father intended something more.

**72**    Similarly, in this case, the father also gave the appellant his power of attorney. The appellant was also the executrix of his estate and looked after him physically at the end of his life. Again,

neither the trial judge nor my colleague viewed the giving of the power of attorney as a factor that suggested that the joint account was not set up merely as a tool of convenience for mutual access to funds.

**73**    A third factor considered by the court in Pecore involved the significance of the father maintaining control over the investments during his life. In Pecore, Paula and her father had agreed that he would manage the investments and pay the taxes on them. This court held that "[w]hile control can be consistent with an intention to retain ownership, it is also not inconsistent in this case with an intention to gift the assets. Hence, this factor was not determinative of [the father's] actual intention" (para. 40). In contrast, in this case, one of the main factors my colleague relies on to show that the father did not intend to create a beneficial joint tenancy is that he remained in control of his finances and that he paid the taxes on the interest on the funds.

**74**    As demonstrated, the factors a court may take into account in its attempt to determine the transferor's intention at the time of transfer will be given different weight. This will depend on how the trial judge views the whole of the evidence, including the credibility of the witnesses, and the trial judge's view of the evidence may be affected by the onus of proof he or she applies. Since the trial judge in this case applied the incorrect onus of proof and relied on evidence that occurred years after the joint account was established, I am of the view that this court ought not to rely on her assessment of the evidence in order to determine the actual intention of the father when he put his funds into joint accounts with the appellant, nor should it determine the weight to be given to the factors that speak to the father's intent at the time he established the joint account. Instead, in order to fairly decide this case, it seems to me that a new trial must be ordered.

**75**    Having said that, I would like to comment on the issue of the status of the presumptions, and the effect of this court taking the approach that 1) the presumptions will only apply if the court is unable to determine the true intent of the transferor based on all the evidence; 2) there is no prima facie effect of placing funds into joint accounts, and that that action is just one piece of evidence to be weighed; and 3) the intent of every person who puts funds into a joint account can only be conclusively determined by a court (after the person's death) based on "all of the evidence."

**76**    It appears that the common law origins of the presumptions of resulting trust and advancement are indeed ancient and arose from now obsolete technicalities of property law in England. They have also evolved over the centuries, sometimes with some conflict as to their application and interpretation: see the discussion by Cullity J. on this issue in Cho Ki Yau Trust (Trustees of) v. Yau Estate, [1999] O.J. No. 3818 at paras. 36-37 (S.C.J.).

**77**    In particular, there has been judicial disagreement over whether the presumption of advancement applies to transfers from a mother to a child (see e.g. Edwards v. Bradley, [1957] S.C.R. 599; Re Wilson, supra; Yau, supra), and over whether it applies to transfers from parents to adult children (see e.g. McLear v. McLear Estate, [2000] O.J. No. 2570 (S.C.J.) (no); Plamondon v. Czaban (2004), 348 A.R. 103 (C.A.) (yes)). The presumptions, as they applied between spouses,

were criticized by the Supreme Court of Canada, first by Laskin J. in dissent in Murdoch v. Murdoch, [1975] 1 S.C.R. 423, and later by Dickson J. in Rathwell v. Rathwell, [1978] 2 S.C.R. 436. However, as Cullity J. points out at para. 35 of his reasons for judgment in Yau, in spite of the criticism, the presumption of advancement between parents and children is still regarded as effective:

> Quite apart from the present statutory endorsement of the presumption of advancement where spouses hold property in joint names [see s. 14 of the Family Law Act, R.S.O. 1990, c. F-3], I believe it would be a mistake to extrapolate the treatment of the equitable presumptions in Rathwell out of their matrimonial property context to other situations including those involving the acquisition, or transfer, of property between strangers and between parents and their children. The trend of the authorities since Rathwell is consistent with this view: see Re Albert (1982), 13 E.T.R. 149 (Alt. Q.B.); Cohen v. Cohen, [1985] A.J. No. 583 (Alt. Q.B.); Re Tucker Estate (1986), 22 E.T.R. 73 (N.B.Q.B.); Boulos v. Boulos (1986), 24 E.T.R. 56 (Nfld. S.C.); Dreger v. Dreger (1993), 5 E.T.R. (2d) 250 (Man. C.A.); Re Wilson's Attorney [1999] O.J. No. 1274 (G.D.). In the second edition of Law of Trusts in Canada published in 1984, Professor Waters stated "for children, the presumption appears to retain all its original vigor."

**78**    The presumption of resulting trust and the presumption of advancement have also been the subject of criticism in other common law jurisdictions as well as in the academic literature on the subject, in large part because their origin is anachronistic, and their application by categories, is, in today's social context, somewhat arbitrary: see e.g. Nelson v. Nelson (1995), 184 C.L.R. 538 at 601-602 per McHugh J. (H.C.A.); Dullow v. Dullow (1985), 3 N.S.W.L.R. 531 at 535-36 per Hope J.A. (C.A.); Pettitt v. Pettitt, [1970] A.C. 777 at 793 per Lord Reid, at 802 per Lord Morris, at 811 per Lord Hudson, at 823-824 per Lord Diplock (H.L.); Eileen E. Gillese & Martha Milczynski, The Law of Trusts, (2d) (Toronto: Irwin Law, 2005) at 109-112.

**79**    I agree that there may be a need for a new system to replace the presumptions, however, in my view, their abolition or reform should be a matter for the legislature and not the courts. Other judges have expressed a similar view in recent years. In the 1995 decision of the Australian High Court in Nelson, McHugh J. observed that while the presumptions may not accord with contemporaneous practices and modes of thought, "[i]n the absence of knowledge as to what effect the abolition of the presumptions would have on existing entitlements, the better course is to leave reform of this branch of the law to the legislature which can, if it thinks fit, abolish or amend the presumptions prospectively" (p. 602). Similarly, in the 1985 decision of the New South Wales (Australia) Court of Appeal in Dullow, Hope J.A. stated that although the presumptions may be anachronisms, they "are so entrenched that they cannot be discarded by judicial decision. Their reform, which seems to me to be overdue, is a matter for the legislature" (p. 536). Most recently, in Plamondon, Côté J.A, writing for the Alberta Court of Appeal, stated that "[t]o do as the dicta in McLear hint, and abolish any presumption of advancement in any situation, and make resulting trusts universal, would upset

a vast number of gifts every day. No expensive Christmas gift or birthday present would be safe" (para. 30). On this point, Côté J.A. concluded that "[t]his court should be slow to change precedent on which property rights depend" (para. 31).

**80**    To date the Ontario legislature has stepped in to clarify the matter only for spouses. Under s. 14 of the Family Law Act, the presumption of resulting trust applies to all spousal property unless it is jointly-held, in which case the joint ownership is effective with the attendant right of survivorship, subject to actual evidence of a contrary intention. The effect of this section is to create a situation of effective certainty and predictability for spouses who hold property jointly.

**81**    Furthermore, with all their flaws, the advantage of maintaining the presumptions pending legislative action in respect of transfers by people other than spouses, is that they provide a measure of certainty and predictability when persons give gifts to strangers or relatives, or put property into joint accounts. The result of this court acting on its own accord and replacing the presumptions with a system where a court must determine the actual intention of a person, who now being deceased is unable to speak for herself or himself, based on "all of the circumstances," is to create uncertainty potentially in every instance. This is particularly the case where the document that the person has signed setting up a joint account with the right of survivorship is treated, not as prima facie evidence of intent, but only as one piece of evidence. It seems to me that if the presumptions were to be abolished, prima facie effect ought to be given to the document signed by the transferor, subject to relevant evidence that the person did not intend to give a gift or a right of survivorship.

**82**    No doubt many people create joint accounts with one or more of their children, expecting and intending that the accounts will operate primarily for their own benefit during their life and any balance will belong to the surviving child or children upon their death. Cullity J. referred to this type of arrangement in Yau at paras. 25 and 28. It is precisely what occurred in the Pecore case. Part of the purpose of such an arrangement is to avoid the payment of probate fees on the amount remaining in the account, as it will not form part of the estate if the right of survivorship is effective.

**83**    It seems to me that now in light of this court's decision in the instant case, if a person wishes to set up such a joint account with one or more of his or her children, to be effective as a joint account with the right of beneficial survivorship, the person may have to write an "I really mean it" side letter, perhaps lodged with a lawyer, or a contemporaneous codicil to the person's will, explicitly exempting the joint account from passing under the will. Another approach may be to specifically indicate on the bank's joint account document whether the intent of the parties is that the funds remaining in the account at the death of either of the joint account holders is to belong to the survivor beneficially and not form part of the estate of the deceased.

**84**    Such steps could provide clear evidence of a person's intent and understanding of the effect of the transfer of an asset into joint tenancy.

**85**    Otherwise, the outcome will be left to the vicissitudes of the anecdotal evidence that may be brought forward at a trial after the person's death and will also turn on which evidence a court may

accept and what weight the court may give to any particular piece of evidence or factor. My concern is that replacing the presumptions with an unstructured inquiry into the intentions of a deceased person is not a useful approach. Its effect is to create legal uncertainty and therefore the necessity, failing agreement or a settlement, for the survivor of the joint account to obtain a determination by the court of the intent of the transferor before he or she can confidently retain the funds.

**86**    In a situation where there is no issue of undue influence or overbearance, but strictly a voluntary and intentional transfer into a joint account, in order to retain some certainty and predictability, my view is that the presumptions should remain as the prima facie result of a transfer, always subject to relevant evidence to the contrary, until the legislature deals with the issue in a comprehensive manner.

CONCLUSION

**87**    I would allow the appeal, set aside the order of the trial judge and order a new trial. I would award costs of the appeal to the appellant fixed at $15,000. The costs of the original trial would be left to the trial judge hearing the new trial.

K.N. FELDMAN J.A.

* * * * *

Corrigendum Released: November 22, 2005

A correction was made to paragraph 58, the words "on a partial indemnity scale" were removed.

cp/e/qw/qlmxf/qlkjg/qlrme

1 This approach is consistent with that recently advocated by this court in Pecore v. Pecore, [2005] O.J. No. 3712 at para. 9.

2 It should be noted that the issue of the evidentiary value of joint bank accounts was not before this court in Pecore v. Pecore, supra.

*Indexed as:*
# Seanix Technology Inc. v. Ircha

**Between**
**Seanix Technology Inc., plaintiff, and**
**Vladislav Ircha, defendant**

[1998] B.C.J. No. 179

[1998] 10 W.W.R. 688

53 B.C.L.R. (3d) 257

38 B.L.R. (2d) 279

78 C.P.R. (3d) 443

77 A.C.W.S. (3d) 158

Vancouver Registry No. C967276

British Columbia Supreme Court
Vancouver, British Columbia

**Macdonald J.**

Heard: January 15-16, 1998.
Judgment: filed January 29, 1998.

(14 pp.)

*Patents of invention -- Ownership of invention, where inventor an employee -- Practice --*
*Judgments and orders -- Summary judgment.*

This was an application by the plaintiff for summary judgment on its claim for a declaration that it
was the rightful owner of an invention by the defendant. The defendant was hired by the plaintiff in
1995 as a mechanical engineer with the specific task of designing computer cases and chassis. In the
absence of design facilities at the workplace, the defendant worked at home during the latter part of
1995 to develop a swing-out concept which was later refined and included in the computer case

design described in the patent application in issue here. In 1996, the defendant produced a mock-up of his swing-out design feature to the plaintiff's president. His model was welcomed with open arms. The plaintiff requested that he prepare a technical specification summary for such a computer case. In June, 1996, the defendant participated in instructing a patent attorney engaged by the plaintiff to determine whether any features of the new case design were capable of patent protection. However, the defendant refused to sign an assignment of the patent application to the plaintiff. The plaintiff relied on the employment relationship to support its claim that it was the beneficial owner of the invention and entitled to an assignment of the patent from the defendant.

HELD: The plaintiff was granted summary judgment and was declared to be the beneficial owner of the invention and the patent rights to the device. The defendant invented the swing-out feature of while employed by the plaintiff as a computer-case designer. The idea was a normal incident of his employment. He was doing exactly what he had been hired to do. Under the case law, where an employee was hired to innovate, and created something new or different in the course of those duties, the invention belonged to the employer.

**Statutes, Regulations and Rules Cited:**

British Columbia Supreme Court Rules, Rules 18A, 18A(11)(b).

**Counsel:**

Arthur D.C. Ross, for the plaintiff.
Vladislav Ircha, appearing in person.

---

**1    MACDONALD J.**:-- The plaintiff applies for summary judgment on its claim for a declaration that it is the rightful owner of an invention by the defendant. That invention is described in a pending U.S. patent application as a "computer case with swing-out motherboard/backplane support". It is the swing-out feature of the case design which lies at the heart of this dispute.

**2**    The defendant was employed by the plaintiff as a mechanical engineer and designer at the time of his invention. It is that employment relationship on which the plaintiff relies in support of its claim that it is the beneficial owner of the invention and entitled to an assignment from the defendant of the patent application which was made in his name as the inventor.

THE LAW

**3**    In Spiroll Corp. v. Putti (1975), 64 D.L.R. (3d) 280 (B.C.S.C.), the court concluded that certain patents owned by the employee were not held in trust for the employer, even though the inventions were developed while the employer-employee relationship existed, because the work from which

the inventions were developed was not part of the employee's normal duties. However, the decision accepts the principle that where an employee is engaged to innovate, and creates something new or different in the course of those duties, the invention belongs to the employer. While the mere fact of employment does not obligate an employee to transfer an invention to the employer, where it is the product of the very work that the employee is paid to do, then the employer is the rightful owner of the invention.

**4**    At page 292 of Spiroll Corp. v. Putti, the court concludes:

> I take this to mean that a court must first find what the employee is engaged to do and, if he invents something while performing that function, it belongs to the employer. If he is employed to design then it would be a "normal incident" of his contract of employment that he should do so and that the result of his ingenuity should belong to his employer.

> I read all of the cases discussed ... to have that message in common. In none of them do I find the notion that the mere fact of employment ipso facto obligates the employee to deliver up his invention to his employer.

**5**    The decision in Spiroll Corp v. Putti was affirmed on appeal (see, (1976) 77 D.L.R. (3d) 761) and adopted and applied in Comstock Canada v. Electec Ltd. (1991), 38 C.P.R. (3d) 29 (Fed. Ct. Tr. Div.) at pp. 53 and 54. While that more recent decision also sets out at those pages a check list of some eight matters which the court should consider in determining the nature and context of the employer-employee relationship in a given case, I find the more general approach articulated by McKenzie J. in Spiroll Corp. v. Putti to be adequate for the purposes of this case.

SUMMARY TRIAL

**6**    There is always a question on applications under Rule 18A as to whether or not the issues are appropriate for disposition by summary trial on affidavit evidence. Often, the information and understanding necessary to determine that question are not available until the application itself has been fully argued. That was the situation here.

**7**    I was satisfied at the conclusion of this 2-day hearing that this is an appropriate case for a summary trial. In part, the fact that the defendant was without counsel contributed to that conclusion. While english is not his native tongue, his ability to communicate is good, and the affidavit on which he relies (filed October 24, 1997) was clearly organized and drafted with the assistance of counsel. While not under oath, I had the opportunity during the hearing of listening to the defendant's version of the events in almost the same manner as would have occurred at a full trial.

**8**    In addition, events in the commercial world are moving faster than this litigation.

**9**    The defendant's employment by the plaintiff was terminated in mid-November of 1996. By late August of 1997, enquiries from the U.S. Patent Office demanded response, and the deadline for world-wide patent protection was looming. Yet the defendant was faced with a consent order in these proceedings restricting him from "dealing with" the invention in any manner. He felt obligated to take steps to preserve and protect the invention in the face of the apparent unwillingness by the plaintiff to do so. In June of 1997, the plaintiff had alleged in its Statement of Defence to the defendant's Counter-claim that "the swing-out feature ... is of limited value and ... solves no problem that the plaintiff was looking to solve at the time or ... has now. The swing-out feature is expensive to manufacture ... and is of no benefit in the service of the computer is contains."

**10**    One wonders what this lawsuit is all about in the face of that pleading. The explanation I received for that allegation was not entirely satisfactory, but one aspect of that explanation pertains to the fact that the swing-out backplane is only one of several features covered by the U.S. Patent application which is the subject of this action.

**11**    The point is that it is important for both parties, but for the defendant in particular, to resolve quickly the issue of who owns this invention. The commercial exigencies require a legal solution at the earliest possible moment. For the reasons set out below, I am satisfied that summary trial is the appropriate procedure for the disposition of this case, although there will be terms imposed under Rule 18A(11)(b).

THE FACTS

**12**    In February of 1995, the plaintiff advertised for additional engineering staff, including:

> Mechanical Engineer
>
> Will be responsible for PC chassis and case design and development. Must have experience with sheet metal and injection moulding, mechanical design and packaging, and CSA certification. Must have a Mechanical Engineering Degree.

**13**    The defendant responded, and after several meetings with Mr. Leong Terblanche of the plaintiff's engineering department, he received an offer of employment dated March 28, 1995, a copy of which is found as Exhibit "C" to the affidavit of Paul Girard (the president of the plaintiff and the author of the offer) filed December 20, 1996, shortly after this action was commenced. That offer was accepted by the defendant, as is evidenced by his signature thereon. He commenced work on the day of his acceptance, March 30, 1995.

**14**    The terms of that offer of employment are crucial to the outcome of this action. In addition to establishing a starting salary during the 3-month probation period and thereafter, and confirming entitlement to "normal company benefits" on permanent appointment, the offer outlined the defendant's duties as including the following, subject to alteration "based on changing Company

requirements":

- PC case and chassis design (plastics, sheet metal, etc) and implementation for various new products.
- all mechanical analysis, design, recommendations, improvements relating to existing and new products
- interfacing with subcontractors
- mechanical aspects of motherboards and peripherals

**15**   On their face, those initial terms of employment clearly bring the defendant's invention within the principle expressed in Spiroll Corp. v. Putti (above), in the sense that he was employed specifically to design computer cases and to comment on the design of others for such cases.

**16**   The defendant responds to the written terms of his employment by submitting that his initial responsibilities were in fact limited to liaison with a subcontractor (Gad Shannan) which had been engaged by the plaintiff for the specific purpose of designing a case to accommodate the new ATX motherboard. While it is clear that his initial duties were limited to such liaison (much to the irritation of Gad Shannan), the defendant was impatient with that limited role. An appraisal of his performance completed by another mechanical department employee on October 9, 1995, attached a summary of his duties and responsibilities which related "designing" to working with the plaintiff's subcontractors.

**17**   The defendant was convinced that the Gad Shannan design would prove unworkable. In the absence of design facilities at his place of employment, he worked at home during the latter part of 1995 to develop the swing-out concept which was later refined and included in the case design described in the patent application in issue here.

**18**   His first annual performance review, completed by him for the plaintiff in late 1995, refers to his enjoyment of "work which is related to my professional background of Mechanical Engineer-Designer where required to achieve a good technical solution". He also lists ASI case modifications and mechanical improvements to Sonoma front bezel design as "major accomplishments" since he was employed. Training in Autocad design skills is listed as the first targeted area for his improvement.

**19**   In early 1996, when it became evident that the Gad Shannan design was not the answer to the plaintiff's ATX motherboard problem, the defendant produced a mock-up of his swing-out design feature to the plaintiff's president. His solution was welcomed with open arms. He was requested to prepare a technical specification summary for such a computer case. That summary included a reference to "a hinge system" for the motherboard mounting plate, as well as incorporating features which were the subject of prior patents held by the plaintiff, including some arising out of the Gad Shannan design in which the plaintiff had participated in his liaison capacity.

**20**   Ultimately, in June of 1996, the defendant participated in instructing a patent attorney engaged

by the plaintiff to determine whether any features of the new case design with the swing-out motherboard/backplane support were capable of patent protection. The U.S. patent application in issue here was prepared, together with an assignment thereof in favour of the plaintiff. The defendant signed the application, but not the assignment, in late August of 1996, stating that he wanted to speak with the plaintiff's president before he executed the assignment.

**21**    I pause to note the existence in the defendant's statement which accompanied the patent application (his Small Entity Status - Independent Investor declaration) of a clause naming the plaintiff as "an organization to which [he] is under an obligation under contract or law to assign ... rights in the invention ...". I am satisfied that the provision was not brought to the defendant's attention when that declaration was signed. Rather, he was presented with the actual assignment. His refusal to sign that document suggests what his reaction would have been had the clause in his declaration been discussed. His limited command of english, particularly in the context of the "fine print" in a legal document, is an ample excuse for his failure to see and understand that clause.

**22**    On the contrary, the defendant at no time prior to being presented with the assignment suggested that he planned to keep his idea for himself. He produced the idea to his employer as part of the solution to the ATX motherboard design problem. He did so to impress his employer with his design capabilities. He was impatient with the limits placed on his design functions to that point in time. His idea had the desired effect.

**23**    The plaintiff's president was impressed, to the point of suggesting the defendant's inclusion in a joint venture with Taiwanese manufacturers to develop and market computer cases. When that idea was shelved, the defendant was offered a bonus, a contribution toward a holiday in Europe and a 30 % raise in his monthly salary. Those, presumably, were the matters which the defendant wanted to resolve before he executed an assignment of his invention. The plaintiff insisted in mid-November of 1996 that he sign first and they would talk later. He refused.

**24**    I make the following findings of fact based on the affidavit material before me and on the submissions of the defendant in the course of argument:

1.    Computer case design was a major component of the defendant's job description from the outset of his employment.
2.    While his duties at the outset were restricted to liaison with subcontractors (both design and manufacturing), even his critiques of the Gad Shannan design were a design function. His input to that design led to him being named a co-inventor on that patent application.
3.    The defendant himself cites his "efforts to convince the plaintiff that he could do design work". I find that he produced the swing-out motherboard feature for exactly that purpose.
4.    The fact that the invention was conceived at home, after work hours, in anticipation of the Gad Shannan design being too expensive to produce

commercially, is simply not relevant.

5.    While the proposed joint venture was under discussion in the summer of 1996, the defendant was never employed by it and discussions regarding such an enterprise never came to fruition. One of the many outstanding issues was the percentage of the defendant's equity.

6.    Despite the attempt of the plaintiff in its defence to the counterclaim to downplay the importance of the swing-out feature, that is the feature listed first on the patent application. While not the only feature covered by the application, it was the major new idea embodied therein, the remainder being modifications of a patent already held by the plaintiff.

7.    The defendant invented the swing-out feature while employed by the plaintiff as a computer case designer. The idea was a "normal incident" of his employment. He was doing exactly what he had been hired to do. The general exception in Spiroll Corp. v. Putti (above) applied here, and the plaintiff is entitled to the declaration which it seeks.

## TERMS

**25**    It was reasonable for the defendant, in the face of an apparent unwillingness on the part of the plaintiff, to take steps to preserve the priority of the U.S. Patent application and make timely application for patent protection elsewhere. As a term of the defendant's obligation to assign the invention (and all patent rights in connection therewith) to the plaintiff, and by way of set-off against any costs to which the plaintiff is entitled by virtue of my judgment below, the defendant will recover any and all costs, expenses, fees and other charges incurred by him (through or with a patent attorney or agent, or directly) in connection with maintaining the U.S. Patent application or responding to enquiries from the U.S. Patent Office in connection therewith, or in extending to other countries patent protection for the computer case which is the subject of that application.

**26**    There will be a reference to the Registrar in the event that the parties are unable to agree on those costs and expenses, and liberty to apply in respect to the costs of any such reference.

## JUDGMENT

**27**    The plaintiff is the beneficial owner of the invention and the patent rights to the device described in United States Application Serial No. 08-697,554 filed August 27, 1996 and entitled Computer Case With Swing-Out Motherboard/Backplane Support.

**28**    In the event that the defendant fails or refuses, on payment or credit to him of all expenses incurred in the preservation or extension of those patent rights, to execute and deliver an assignment to the plaintiff of the invention and all such rights, the District Registrar of this court at Vancouver, British Columbia, shall be and is hereby empowered to do so in his place and stead.

**29**    The plaintiff will recover its costs of this action on Scale 3.

**30**    The defendant is entitled to set-off against those costs (or to be paid as a condition of delivering the assignment aforesaid) all expenses incurred in preserving the said U.S. Patent application or in extending patent protection for the invention.

**31**    If necessary, there will be a reference to the Registrar to determine the amount which the defendant is entitled to set off against the plaintiff's costs (or recover, as the case may be), with liberty to apply in respect of the costs of any such reference.

MACDONALD J.

cp/d/sfr/DRS

*Case Name:*

# SimEx Inc. v. IMAX Corp.

**Between**
**SimEx Inc., applicant (appellant), and**
**IMAX Corporation and Robots of Mars, Inc., respondents**
**(respondents in appeal)**

[2005] O.J. No. 5389

206 O.A.C. 3

11 B.L.R. (4th) 214

144 A.C.W.S. (3d) 256

2005 CarswellOnt 7297

2005 CanLII 46629

Docket: C43373

Ontario Court of Appeal
Toronto, Ontario

**K.M. Weiler, M. Rosenberg and E.E. Gillese JJ.A.**

Heard: September 15, 2005.
Judgment: December 15, 2005.

(57 paras.)

*Contract -- Formation -- Parties -- Assignment -- Appeal from finding that contractual dispute was governed by arbitration provision, reported at [2005] O.J. No. 817, allowed -- Assignment of specific contractual rights did not include assignment of obligation to submit disputes to arbitration.*

Appeal by SimEx from the dismissal of its application for declaratory and injunctive relief. The parties entered a transfer agreement whereby SimEx acquired rights to films that were subject of a

production agreement between Ridefilm, a subsidiary of the respondent, IMAX, and a third party. The production agreement provided for resolution of disputes by arbitration. The transfer agreement provided that any legal action was to be brought in the courts of Ontario. A dispute arose over the scope of SimEx's assumption of liability for the payment of royalties to certain filmmakers under a compensation provision in the production agreement. SimEx sought a declaration that the dispute was governed by the law of Ontario and an order enjoining IMAX and its subsidiaries from taking any steps to add SimEx to arbitration proceedings in the United States. The judge held that the assignment of the transfer agreement conveyed the burden and benefits of the entire production agreement to SimEx, including the provision that any dispute be resolved by arbitration. SimEx appealed on the basis that the judge erred in his interpretation of the agreements. SimEx submitted that it was not bound by the compensation and arbitration provisions of the production agreement.

HELD: Appeal allowed. IMAX failed to establish strong cause or good reason why it should not be bound by the forum selection clause of the transfer agreement. A combined reading of the transfer agreement, the assignment, and the relevant provisions of the production agreement, revealed that IMAX and Ridefilm transferred ownership rights of films. IMAX and Ridefilm did not transfer any other obligations or rights under the production agreement, including liability for the payment or royalties, or the requirement to submit disputes to arbitration. The assignment of specific rights under the production agreement, as opposed to an assignment of the entire agreement, meant that the presumption of conveyance of burdens and benefits was not applicable. There was no ambiguity in the contract, and thus no need to refer to extrinsic evidence regarding its negotiation. Accordingly, the order below was set aside and it was declared that IMAX and Ridefilm did not assign to SimEx the compensation and arbitration obligations under the production agreement.

**Appeal From:**

On appeal from the judgment of Justice Romain Pitt of the Superior Court of Justice dated March 8, 2005 dismissing the application for declaratory and injunctive relief.

**Counsel:**

John B. Laskin and Sandeep J. Joshi for SimEx Inc., appellant

Julian Heller and Rebecca Toth for IMAX Corporation, respondent

Darryl T. Mann for Robots of Mars Inc., respondent

---

The judgment of the Court was delivered by

**1    M. ROSENBERG J.A.:**-- This appeal concerns the interpretation of a contract (the "Transfer

Agreement") under which the appellant SimEx Inc. acquired the rights to certain films that were the subject of an agreement (the "Production Agreement") between Ridefilm Corporation, a subsidiary of the respondent, IMAX Corporation, and a third party. In his judgment, the application judge, Pitt J., held that the assignment attached to the Transfer Agreement conveyed both the burden and the benefits of the Production Agreement to SimEx, including the obligation that any dispute concerning royalties be resolved by arbitration. He therefore dismissed SimEx's application for a declaration that any legal proceedings concerning the Transfer Agreement must be brought in the Ontario courts.

**2**    For the following reasons I would allow the appeal. In my view, interpreting the Transfer Agreement is a matter for the Ontario Courts. Further, the Transfer Agreement did not assign to SimEx the obligation under the Production Agreement to pay royalties and the requirement to submit disputes to arbitration.

THE FACTS

    (a)    The parties

**3**    The appellant SimEx is an Ontario corporation based in Toronto. It is in the business of creating and developing simulation attractions that show films incorporating 3-D and other special effects. It also has a substantial presence in California through a subsidiary.

**4**    The respondent IMAX is a Canadian corporation. It develops, manufactures and supplies motion picture technology for specialty theatre venues. It too has substantial premises and assets in California. Ridefilm was a wholly owned subsidiary of IMAX and was in the business of manufacturing and selling ride bases and selling or leasing films for use with those bases (the "Ridefilm bases") to create an attraction in amusement parks and other event attraction sites. For the purposes of this appeal, Ridefilm and IMAX are interchangeable.

**5**    Midland Production Corp. makes films that can be used in the type of attractions produced by Ridefilm. This appeal concerns compensation for two of Midland's films that were sold to Ridefilm. Midland is a California corporation. It is the predecessor to the respondent Robots of Mars, Inc. For the purposes of this appeal, Midland and Robots are interchangeable. SimEx has an ongoing relationship with Robots through its California subsidiary.

    (b)    The first agreement: The 1994 Midland (Robots) and Ridefilm (IMAX) Production Agreement

**6**    In 1994, Midland (now Robots) and Ridefilm agreed that Midland would produce two films for use and distribution by Ridefilm. This Production Agreement has several provisions that are important to resolving this appeal. The following is a brief summary of these provisions:

        1.    Ownership: Ridefilm would be the owner of the films produced by Midland and

        Midland assigned, sold and transferred all its right, title and interest in the films to Ridefilm.

2.    Compensation: Midland was entitled to contingent compensation (referred to in some of the court documents as royalties) from the use of the films. The compensation was based on a sliding scale depending on the profits from the exploitation of the films.

3.    Assignment: Ridefilm had the right to "assign any and all of this Agreement and the rights, licenses and privileges granted it hereunder". Midland's consent to the assignment was not required.

4.    Choice of law: The agreement was to be interpreted in accordance with the law of New York and any legal action was to be instituted in a court in New York.

5.    Arbitration of disputes: In the event of any dispute the parties agreed to submit the dispute to "binding arbitration before an arbitration panel of the American Arbitration Association at a site to be selected by the arbitration panel."

(c)    The second agreement: The 2001 IMAX/Ridefilm and SimEx Transfer Agreement

**7**    By 1999, IMAX was anxious to get out of the simulation ride business carried on by its subsidiary Ridefilm. To avoid potential liability to Ridefilm's clients, IMAX needed to find an entity that would be willing to fulfill Ridefilm's obligations to its clients. It sought to sell Ridefilm's assets to a purchaser who would provide the services required under Ridefilms' contracts with its clients. After a lengthy search, IMAX was able to reach an agreement with SimEx. The negotiations culminated in the March 2001 Transfer Agreement. The resolution of this appeal turns on the interpretation of several provisions of this agreement. The following is a brief summary of the relevant provisions of the Transfer Agreement:

1.    Acquired assets (Article 1): Ridefilm agreed to sell its interest in various physical assets listed in a schedule to the agreement and certain rights such as the right to use the Ridefilm mark. The films were not listed in this schedule. SimEx paid $200,000 U.S. for the acquired assets.

2.    Liabilities assumed by SimEx (Article 2): SimEx agreed to assume certain liabilities, such as payment of taxes on the acquired assets but also stated that it was not responsible for other liabilities not provided for in the section. SimEx relies on the wording of this clause because it appears to limit its obligation to assume other liabilities of IMAX.

3.    Representations and Warranties of Ridefilm and IMAX (Article 3): Ridefilm/IMAX made certain representations concerning ownership of the films listed in Schedule 3.04 "subject to the terms and conditions of the relevant agreements attached hereto as Schedule 3.04(b)." The two films in question in this appeal that were produced by Midland are listed in

Schedule 3.04(a). Schedule 3.04(b) includes the 1994 Production Agreement between Midland and Ridefilm and the agreements between Ridefilm or IMAX and other production companies. Under some of these other agreements IMAX/Ridefilm did not acquire ownership of the films as it did in the 1994 Ridefilm and Midland Production Agreement.

4.    Transfer of rights to films (Section 5.05): This section sets out the crucial agreement concerning assignment of rights. "At the Closing Date, Ridefilm and or IMAX agree[d] to transfer title or assign its rights, as the case may be, to the films set out in Schedule 3.04(a)." Ridefilm did not require Midland's consent to the assignment or transfer of title in these two films. The form of assignment set out in Schedule 5.05 tracks the wording of Section 5.05.

5.    Royalties (Section 5.09): SimEx agreed to pay royalties to Ridefilm where the Schedule 3.04(a) films were used. The amount of royalties depended on whether the films were played on Ridefilm or SimEx bases. However, SimEx's obligation to pay royalties terminated on the fourth anniversary of the Closing Date.

6.    Choice of law (Section 8.01): The agreement was to be governed by the laws of Ontario and any legal action was to brought in the courts of Ontario.

7.    Assignment (Section 8.05): The consent of the other party was required to assign "any right, remedy, obligation or liability" arising under the agreement.

**8**    Michael Needham, the president of SimEx, was involved in the negotiations that gave rise to the Transfer Agreement. He states in his supplementary affidavit that the phrase "subject to the terms and conditions of the relevant agreements" in section 3.04 and the phrase "subject to the terms and conditions of said Agreement" in the assignment were added when it was discovered that Ridefilm did not have legal title to three of the ten films but was a mere licensee. This problem did not affect the two films involved in this case. IMAX's principals state that they understood that the assignment of the films included assignment of the obligation to pay the compensation to Robots. The Transfer Agreement and the Assignments were not drafted solely by SimEx but were a matter of negotiation with IMAX and Ridefilm.

(d)    The California arbitration

**9**    In California in June 2003, Robots (the successor to Midland) commenced arbitration in accordance with the Production Agreement alleging that IMAX had failed to pay royalties owing under the Production Agreement. In September, IMAX cross-claimed against SimEx alleging that SimEx had assumed all the liabilities and obligations under the Production Agreement because of the Transfer Agreement. SimEx took the position that it was not a party to the Production Agreement and that, in any event, any legal proceedings had to be taken in Ontario in accordance

with the Transfer Agreement. Nevertheless, Robots served an amended statement of claim in the arbitration proceedings purporting to add SimEx as a party to the arbitration.

(e)    The Application

**10**    SimEx commenced its application in October 2004, seeking a declaration that it was not a party to and not bound by the Production Agreement and that any legal proceedings commenced by IMAX or Robots arising out of the Transfer Agreement had to be taken in Ontario courts. It also sought an injunction enjoining IMAX or Robots from filing any document, taking any step to attempt to add SimEx as a party, or requiring SimEx to submit to the jurisdiction of or participate in the California arbitration.

THE REASONS OF THE APPLICATION JUDGE

**11**    The core of the application judge's reasons appears in para. 22:

> On the face of the Assignment, which is a freestanding document, it contains nothing that would be seen as rebutting the presumption that it conveyed both the burden and benefits of a contract to the assignee. See ABN Amro Bank Canada v. Krupp Mak Maschinenbau Gmbh (1996), 135 D.L.R. (4th) 130 (Ont. Div. Ct.); and Petro-Canada v. 366081 Ltd. (1995), 25 B.L.R. (2d) 19 (Ont. Ct. (Gen. Div.)).

**12**    The application judge also took into account that the Transfer Agreement "specifically provides for the assumption of liabilities", referring to section 2.01. He was of the view that, at a minimum, the last paragraph of this clause was unclear. Accordingly, he could invoke the contra proferentum rule and the ejusdem generis principle. The application judge found that other provisions of the Transfer Agreement showed that the parties were aware that the agreement would impact on the rights of third parties. He stated that it was not clear why the other party to the Production Agreement (now Robots) was not a party to the Transfer Agreement, "if only to give its consent".

**13**    The application judge held that SimEx could not avoid the effect of the arbitration provision in the Production Agreement by inserting its own choice of forum and law in its Transfer Agreement. SimEx obviously had notice of the arbitration provision.

**14**    Finally, the application judge noted that all parties had a connection with California, that SimEx had participated on a special appearance basis in the arbitration, and that Ontario and California law "in the context of this dispute are very similar". These additional features "would lead to judicial equanimity about the matter proceeding wholly in California."

**15**    He therefore dismissed the application.

POSITION OF THE PARTIES

**16**    SimEx submits that the application judge made several errors as follows:

> *    Finding that the Transfer Agreement was ambiguous.
> *    Applying the contra proferentum and ejusdem generis rules to resolve the
>       ambiguity.
> *    Holding that the Assignment was a free-standing document.
> *    Applying a presumption that assignment of rights carries the assignment of both
>       the benefits and the burden of the contract.

**17**    SimEx submits that as a result of these errors the application judge failed to properly interpret the contract, and therefore, erred in failing to make a declaration that SimEx is not a party to, and is not bound by the compensation and arbitration terms of, the Production Agreement.

**18**    IMAX and Robots support the decision of the application judge.

ANALYSIS

(a)    Interpreting a contract

**19**    The Supreme Court of Canada has considered the rules respecting interpretation of contracts on several occasions. The best known articulation of these principles is found in the reasons of Estey J. in Consolidated-Bathurst Export Limited. v. Mutual Boiler & Machinery Insurance Co., [1980] 1 S.C.R. 888 at 901:

> Even apart from the doctrine of contra proferentum as it may be applied in the
> construction of contracts, *the normal rules of construction lead a court to search
> for an interpretation which, from the whole of the contract, would appear to
> promote or advance the true intent of the parties at the time of entry into the
> contract.* Consequently, literal meaning should not be applied where to do so
> would bring about an unrealistic result or a result which would not be
> contemplated in the commercial atmosphere in which the insurance was
> contracted. Where words may bear two constructions, the more reasonable one,
> that which produces a fair result, must certainly be taken as the interpretation
> which would promote the intention of the parties. Similarly, an interpretation
> which defeats the intentions of the parties and their objective in entering into the
> commercial transaction in the first place should be discarded in favour of an
> interpretation ... which promotes a sensible commercial result. [Emphasis added.]

**20**    In Eli Lilly & Co. v. Novopharm Ltd., [1998] 2 S.C.R. 129 at para. 56, Iacobucci J. elaborated on the concepts of promoting the intent of the parties and a commercially sensible interpretation. He explained that absent ambiguity, the primary vehicle for divining the intent of the parties is the

words of the contract itself:

> When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. *However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.* [Emphasis added.]

**21**    Iacobucci J. also stated at para. 54 that the contract must be interpreted "in light of the surrounding circumstances."[1] Evidence of the subjective intent of the parties has "no independent place in this determination" (at para. 54). Furthermore, "it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face" (at para. 55).

**22**    In Canadian Premier Holdings Ltd. et al. v. Winterthur Canada Financial Corp. et al. (2000), 132 O.A.C. 172 (C.A.) at para. 13, Laskin J.A. explained that, "Where the words of a contract are not ambiguous commercial reasonableness may inform the court's reading of the text, but the interpretation that produces a sensible commercial result is not determinative."

**23**    To summarize, while the court strives to interpret a contract in a manner consistent with the intent of the parties, the parties are presumed to have intended the legal consequences of their words. The court will consider the context or factual matrix in which the contract was drafted, including commercial reasonableness, to understand what the parties intended. The court will not adopt an interpretation that is "clearly" commercially absurd. The court must also consider the contract as a whole. The various provisions "should be read, not as standing alone, but in light of the agreement as a whole and other provisions thereof": Scanlon v. Castlepoint Development Corp. (1992), 99 D.L.R. (4th) 153 (Ont. C.A.) at 179. Where the contract is unambiguous, extrinsic evidence is inadmissible. In my view, the contract in this case was unambiguous. Therefore, while evidence as to the background that led to the two agreements, especially concerning the Transfer Agreement, may be helpful in understanding the context, the assertions by the parties as to what they intended is not admissible.

(b)    Nature of the dispute

**24**    At the heart of this case is choice of forum. IMAX and Robots assert that this case is about interpreting the Production Agreement and the interpretation of that agreement is vested in the arbitrators in California. SimEx asserts that the case is about interpreting the Transfer Agreement, a task that is presumptively vested in Ontario courts.

**25**    In my view, the gist of the dispute between SimEx and IMAX turns on the interpretation of

the Transfer Agreement. It is only by interpreting the Transfer Agreement that it is possible to determine what portions of the Production Agreement may have been incorporated by reference into that agreement and what parts of the Production Agreement were assigned to SimEx. Under the Transfer Agreement, the parties have chosen to be governed by Ontario law and have agreed that any disputes should be brought in the courts of Ontario. As such, the burden is on IMAX to show there is "good reason" that it not be bound by the forum selection clause. See Z.I. Pompey Industrie v. ECU-Line N.V., [2003] 1 S.C.R. 450 at para. 20. Given SimEx and IMAX's connection to Ontario and Canada and since the case turns primarily on interpretation of the Transfer Agreement, IMAX has not shown "strong cause" or "good reason" why it should not be bound by the forum selection clause.

     (c)    The Transfer Agreement

**26**    In interpreting the Transfer Agreement, it is helpful to look at its overall structure. I start with the recitals and in particular recital "D," where Ridefilm and IMAX recite that they "wish to assign certain rights that they have to certain films". That recital does not suggest that Ridefilm and IMAX wish to assign the agreements that led to the production of those films.

**27**    The Transfer Agreement itself contains eight articles. Article One is entitled "SALE OF CERTAIN ASSETS". These are for the most part physical assets but also included are rights, such as the right to use the Ridefilm mark. There is a discrete price of U.S. $200,000 attached to these "acquired assets". The rights to the films are not included in this part of the agreement.

**28**    Article Two is entitled "LIABILITIES". SimEx places a great deal of importance on this part because, while it sets out certain liabilities, such as payment of taxes in relation to the "acquired assets", it also states that "SimEx is not responsible for any liabilities (employee, maintenance, warranty) other than those noted in this section 2.01". The full text of the clause is as follows:

    2.01 LIABILITIES ASSUMED BY SIMEX

    SimEx will assume, as of the Closing Date, the following liabilities and obligations of Ridefilm (collectively, the "Assumed Liabilities"):

       (a)   payment of taxes, if any, in respect of the Acquired Assets; and

       (b)   all liabilities for provision of film prints to the Ridefilm Base Owners as set out in Schedule 2.01(b) to a maximum of US $251,900.

    SimEx is not responsible for any liabilities (employee, maintenance, warranty) other than those noted in this Section 2.01.

**29**    Schedule 2.01(b) sets out a list of film prints that Ridefilm was obligated to supply to various clients. This obligation, which SimEx assumed, was valued at U.S. $251,900. SimEx submits that Article Two is clear and unambiguous and wholly determines its liabilities.

**30**    Having regard to the position of clause 2.01(a) in the contract and its reference back to the acquired assets, it seems to me that Article Two is intended to govern the relationship between the parties with respect to the acquired, mostly physical, assets and liabilities. It is apparent on the face of the contract that SimEx's obligations are not limited to what is set out in Article Two. For example, in Article Five, to which I will turn shortly, SimEx agreed to pay royalties to RideFilm.

**31**    Article Three is entitled "REPRESENTATIONS AND WARRANTIES OF RIDEFILM AND IMAX." In this article, Ridefilm/IMAX represent that they have good title to the acquired assets. In a separate section, Ridefilm/IMAX represent that they have the right to assign their rights to the films. Because of its importance, I set this section of Article Three out in full:

> 3.04 **ASSIGNMENT OF FILMS**
>
> Ridefilm and/or IMAX have the right to assign their rights to the films set out on Schedule 3.04(a) *subject to the terms and conditions of the relevant agreements* attached hereto as Schedule 3.04(b). The films set out in this Section 3.04 shall hereinafter collectively be referred to as the "Ridefilm Films". [Emphasis added.]

**32**    The two films in question in this appeal that were produced by Midland are listed in Schedule 3.04(a). Schedule 3.04(b) includes the 1994 Production Agreement between Midland and Ridefilm and the agreements between Ridefilm or IMAX and other production companies. It appears that for certain of these other agreements IMAX/Ridefilm did not acquire ownership of the films as it did in the 1994 Ridefilm and Midland Production Agreement.[2] IMAX considers the emphasized portion, "subject to the terms and conditions of the relevant agreement" supports its submission that the assignment carried with it the obligations in the agreements, such as the obligation to pay royalties and submit disputes to arbitration. I do not agree with this submission. Again, given the context, apart from the clause dealing with representations and warranties, it seems to me that this section merely makes explicit that there may be limits on the ownership of certain films and the right to assign rights to those films. In other words, IMAX may not be able to give clear title to certain films, the rights to which it purports to convey to SimEx. This section, in my view, does not answer the question of what other rights or obligations SimEx may have assumed.

**33**    Section 3.04 is important, however, because it demonstrates that certain parts of the Production Agreement have been incorporated by reference into the Transfer Agreement by the use of the words "subject to the terms and conditions of the relevant agreements". As a result, Ontario courts interpreting the Transfer Agreement will, of necessity, have to interpret some aspects of the Production Agreement, despite the choice of law and forum in the Production Agreement. I do not consider this exercise as violating the arbitration clause in the Production Agreement since the

parties themselves, one of whom (Ridefilm) was party to the Production Agreement, have chosen to incorporate references to the Production Agreement in the Transfer Agreement. Resort to the Production Agreement can also be justified in view of the need to understand the context in which the Transfer Agreement was drafted. It is not only incorporated by reference, but is also part of the factual matrix.

**34**    Article Four is entitled "REPRESENTATIONS AND WARRANTIES OF SIMEX". It does not seem to me that this article is of any assistance in resolving the issues in this appeal.

(d)    What was assigned

**35**    In my view, the important provisions for resolving this appeal are to be found in Article Five, which is entitled "POST CLOSING COVENANTS". The heading alone signals that this provision will deal with the ongoing obligations between IMAX and SimEx. The Article first sets out certain obligations by SimEx to the Ridefilm base owners. Section 5.05 then describes the relationship between SimEx and IMAX with respect to IMAX/Ridefilm film library. Again, because of its importance I set that provision out in full:

<p align="center">5.05 <b><u>TRANSFER OF RIGHTS TO EXISTING FILM LIBRARY</u></b></p>

(a)    At the Closing Date, Ridefilm and or IMAX agrees to *transfer title or assign its rights, as the case may be,* to the films set out in Schedule 3.04(a). The form of such transfer is attached hereto as Schedule 5.05.

(b)    *Where applicable, Ridefilm and IMAX shall use commercially reasonable efforts to procure the consent of Midland Productions to assign the rights to the films to SimEx set out in Schedule 3.04(a)* as soon as is reasonably practicable. Ridefilm and IMAX provide no covenant as to the likelihood of success in obtaining the consent of Midland Productions to the assignment contemplated in this Section 5.05. [Emphasis added.]

**36**    There are several important aspects to this section. First, it is apparent that section 5.05 deals with two different classes or bundles of rights. There are some films to which IMAX/Ridefilm have title and there are some films to which they have some lesser interest. Second, there may be some films for which assignment depends on Midland's consent. There are no such limits with respect to the two films at issue in this appeal. Under the Production Agreement relating to these two films, Ridefilm was to be the owner of the films produced by Midland, which "assigned, sold and transferred all its right, title and interest in the films to Ridefilm." As well, Ridefilm had the right to "assign any and all of this Agreement and the rights, licenses and privileges granted it hereunder". Midland's consent to the assignment was not required. It seems to me that given the unlimited nature of Ridefilm/IMAX's title to these two films, the important part of section 5.05 of the Transfer Agreement is that part whereby Ridefilm and IMAX agree to "transfer title ... to the films".

**37**    The form of the transfer is set out in Schedule 5.05. I disagree with the application judge that this assignment is a "freestanding document". It is integral to the Transfer Agreement. It is the vehicle by which IMAX fulfils one of its key obligations under the Transfer Agreement, the promise to transfer title to the films to SimEx. The schedule refers back to the Transfer Agreement. In my view, it must therefore be read together with and interpreted as part of the contract.

**38**    Schedule 5.05 is entitled "ASSIGNMENT". It provides that Ridefilm or IMAX

> for good and valuable consideration as set forth in the agreement between IMAX Corporation, Ridefilm Corporation and SimEx Inc. dated March 2, 2001 (the [Transfer] "Agreement") the receipt and sufficiency of which are hereby acknowledged:

>> Sells, assigns, and transfers, as the case may be to SimEx Inc., ... (the "Assignee") subject to the terms and conditions of said Agreement the Assignor's entire right, title, and interest in and to the films listed in Schedule 3.04(a) *subject to the terms of the agreements contained in Schedule 3.04(b)*. [Emphasis added.]

**39**    IMAX relies upon this clause, especially the emphasized portion, as transferring not only title to the films but the basket of rights and obligations in the Production Agreement, which is one of the agreements listed in Schedule 3.04(b). In my view, that is not a proper interpretation of the clause when one has regard to the Production Agreement. I will turn to the Production Agreement below. However, to finish with Article Five of the Transfer Agreement, the other important part is section 5.09 entitled "FILM ROYALTIES". This section sets out the obligations of SimEx to pay royalties to Ridefilm depending on the use of the films. Thus, SimEx agrees to pay royalties to Ridefilm for the Schedule 3.04(a) films, which includes the two films at issue in this case. These payments were, however, time limited. The royalties cease on the "Termination Date", being the fourth anniversary of the Closing Date.

**40**    Turning then to the Production Agreement, Ridefilm acquired unrestricted title to the films, under clause 8 of that agreement. Clause 8 is entitled "OWNERSHIP" and includes the following provisions:

> [Ridefilm] shall at all times own the Films and all elements and components thereof ... and [Midland] shall not at any time own the same.

> ...

> [Midland] hereby assigns, sells, transfers and quitclaims to [Ridefilm] all right,

title and interest in and to the Films, the negative and the results and proceeds of
the services of all persons rendering services in connection with production of
the Films.

**41**    It would be difficult to imagine a more complete divesture of ownership rights than that
contained in clause 8. Ridefilm, of course, agreed to pay for the films to which it had acquired these
rights. That payment is set out in clause 4, which is entitled "CONTINGENT COMPENSATION".
The compensation is based on a formula that gives Midland a percentage of the net profits. Robots,
the successor to Midland, claims that it has not been paid the compensation contemplated by this
clause, and therefore, in accordance with the arbitration clause it has launched the California
arbitration. However, Ridefilm's ownership rights were not limited by the compensation promises.
If Ridefilm failed to make the payments required, Midland would have a remedy for breach of
contract but there is nothing to indicate that Ridefilm's ownership rights would be impacted. In
addition, Ridefilm agreed in clause 12.2 to indemnify Midland for any breach of the agreements
made by Ridefilm. Out of interest, this may be contrasted with the Transfer Agreement. Under
Article Seven of the Transfer Agreement entitled "DEFAULT", if the Agreement is terminated prior
to the fourth anniversary of the closing date, the rights assigned by IMAX/Ridefilm to SimEx under
section 5.05 revert back to IMAX/Ridefilm.

(e)    Presumptions concerning interpretation of contracts and assignments

**42**    In my view, it is unnecessary to resort to any presumptions of construction and interpretation
of contracts to resolve the issue in this case. The combined effect of reading the clauses of the
Transfer Agreement and Schedule 5.05, with the relevant provisions of the Production Agreement,
is that Ridefilm/IMAX transferred its ownership rights in the films to SimEx. It did not transfer its
other obligations or rights under the Production Agreement. Ridefilm's ability to transfer title to a
third party (here SimEx) was unfettered. SimEx paid for those ownership rights through the
time-limited royalties set out in section 5.09. I see nothing to indicate that it agreed to pay any other
amounts to any other party. The obligation under the Production Agreement to pay Midland (now
Robots) is a matter between Robots and IMAX.

**43**    It seems to me that the application judge's error is in his statement at para. 18:

Transferors can only transfer the interest that they have in an asset being
transferred and the transferors [sic, transferees] can receive no more than the
transferor had to transfer. *If the transferor's right, title and interest are limited in
scope then the right, title and interest of the transferee receiving it are also
limited in scope.* [Emphasis added.]

**44**    As I have demonstrated, Ridefilm's title to the films at issue in this case was not limited. The
contractual obligation to pay royalties did not affect the ownership rights.

**45**    I do not say that Ridefilm/IMAX could not assign its obligations under the Production

Agreement to SimEx. Under clause 13 of the Production Agreement, Ridefilm "shall have the right to assign any and all of this Agreement and the rights, licenses and privileges granted it hereunder". Thus, it would appear that Ridefilm could have assigned the obligations to pay royalties to SimEx and apparently without Midland's consent contrary to the ordinary rule that a contractor cannot shift the burden of a contract without the consent of the other party to the contract. See Lounsbury Co. v. Duthie, [1957] S.C.R. 590 at 596-97 and Rodaro v. Royal Bank of Canada (2002), 59 O.R. (3d) 74 (C.A.) at para. 33. Equally, Ridefilm could assign "any ... of this agreement", meaning that it could assign part, if it so chose. That is what happened here. It assigned or transferred title to the films. It did not transfer or assign the other bundle of rights and obligations in the Production Agreement.

**46**    The cases relied upon by IMAX that stand for the proposition that vicarious performance of the assignor's burdens or obligations without the consent of the contractor will only be permitted where it "could make no difference" have no application here.[3] By contract, IMAX/Ridefilm was entitled to assign any part of the Production Agreement without Midland's consent. The issue is whether it did so.

**47**    In this respect, I cannot agree with the application judge that the principle (he called it a presumption) that an assignment conveys both the burden and benefits of a contract to the assignee had any application. The application judge relied upon two cases. The first is ABN Amro Bank Canada v. Krupp Mak Maschinenbau GmbH (1996), 135 D.L.R. (4th) 130 (Ont. Div. Ct.). In that case, ABN received a general assignment of accounts including a Technology Licensing Agreement (TLA) from its customer. The TLA included an arbitration clause. ABN, however, claimed that it was not bound by the arbitration clause. In that context, Adams J. speaking for a majority of the court said the following at pp. 135-36:

> ABN is, in law, a party to the arbitration agreement. It is a fundamental and, I think, universal commercial legal principle that *an assignor is not entitled to divide that which is assigned amongst assignees so as to convey the benefits and nullify the burdens*: First City Capital Ltd. v. Petrosar Ltd. (1987), 42 D.L.R. (4th) 738, 61 O.R. (2d) 193, 7 A.C.W.S. (3d) 112 (H.C.J.). Thus, a party seeking to enforce assigned rights under an agreement can only do so subject to the terms and conditions embodied therein: Best v. Beatty (1920), 53 D.L.R. 44, 47 O.L.R. 265, 18 O.W.N. 67 (C.A.); affirmed 58 D.L.R. 552, 61 S.C.R. 576. This principle has been applied, by this and other courts, to include arbitration clauses ... [Emphasis added.]

**48**    The difference between the ABN case and this case is that IMAX did not assign the Production Agreement but only ownership of the films that were produced as a result of the Production Agreement. Obviously, if it had assigned the entire Production Agreement, the principle set out in ABN would apply and SimEx as the assignee of the Agreement would have been bound to pay the contingent compensation and bound by the arbitration clause. IMAX assigned its rights to the films not to the agreement.

**49**    The other case relied upon by the application judge, Petro-Canada v. 366084 Ontario Ltd. (1995), 25 B.L.R. (2d) 19 (Ont. Ct. (Gen. Div.)) is similar to ABN. It deals with assignment of a party's interest in an agreement. In that context, Cumming J. held at para. 55 that the assignee "steps into the shoes of [the assignor] and has the rights and is subject to the obligations of [the assignor] under the agreement".

**50**    There is no rule of law that prevents a party to a contract (here IMAX/Ridefilm) from assigning the rights or benefits of the contract to a third party (SimEx), while keeping the burdens. To the contrary, without the consent of the other party to the contract (here Midland/Robots), the ordinary rule is that the party (IMAX/Ridefilm) can only assign the benefits and will remain personally liable to the other party (Midland/Robots). See Rodaro, supra at paras. 33-4 and G.H.L. Fridman, The Law of Contract in Canada, 4th ed. (Toronto: Carswell, 1999) at 727. It will be recalled that the application judge queried why Robots was not a party to the Transfer Agreement "if only to give its consent" (at para. 25). Two reasons suggest themselves. Robots' consent was not required under the terms of the Production Agreement, and in any event, IMAX was assigning only the rights not the burdens.

**51**    Since, in my view, there is no ambiguity in this contract, it is unnecessary to resort to principles of interpretation such as the contra proferentum rule. I can see nothing in this record that would justify invoking that rule against SimEx. These were both sophisticated parties with legal advisers. The Transfer Agreement appears to have been a joint effort. Absent ambiguity, extrinsic evidence, such as the assertion by the IMAX principals that SimEx understood that the assignment of the films was "subject to" the obligation to pay the compensation to Robots, is not admissible.

(f)    Sensible commercial result

**52**    IMAX submits that the interpretation suggested by SimEx results in a "commercial absurdity." According to IMAX, it would not make sense for IMAX to retain the obligation to pay royalties to Robots, while deprived, after four years, of the income stream from the use of the films, especially given what IMAX refers to as the "modest initial purchase price" of U.S. $200,000. I think that a court would have a difficult time deciding whether or not the U.S. $200,000 was a modest initial purchase price.

**53**    In any event, U.S. $200,000 was not the only benefit that IMAX acquired from this agreement. SimEx also assumed Ridefilm/IMAX's liability to provide film prints to the Ridefilm Base Owners, an obligation that the parties valued at U.S. $251,900. Finally, SimEx gave Ridefilm base owners access to its film library. The importance of those rights is expressed in section 7.01(b) whereby the parties acknowledge that "access to and conversion of the SimEx Film Library is a significant and unique inducement to IMAX and Ridefilm to enter into this Agreement and of a nature of which a remedy in damages for the breach of SimEx's obligation in connection therewith will not be sufficient".

**54**    If, on the other hand, IMAX's interpretation is correct, for the four year period following the

closing of the Transfer Agreement, SimEx would be obliged to pay compensation and royalties to two different parties for use of the same films. It is not apparent to me that the interpretation of the Transfer Agreement given in these reasons is clearly commercially absurd.

DISPOSITION

**55**    Accordingly, I would allow the appeal, set aside paragraph one of the Judgment that dismisses the application, and make a declaration that IMAX/Ridefilm did not assign to SimEx, through the Transfer Agreement, the compensation and arbitration obligations under the Production Agreement. SimEx did not pursue its appeal from the dismissal of the application for an anti-suit injunction.

**56**    At the hearing of the appeal, the parties agreed that the successful party was entitled to costs fixed at $25,000 inclusive of disbursements and G.S.T. I would fix the costs accordingly, payable by IMAX and Robots.

**57**    SimEx is also entitled to its costs of the application. Under paragraph 2 of the judgment, the application judge reserved the issue of costs. If the parties are unable to agree on the costs of the application they should make submissions to the application judge in accordance with the judgment.

M. ROSENBERG J.A.
 K.M. WEILER J.A. -- I agree.
 E.E. GILLESE J.A. -- I agree.

cp/e/qw/qlgkw/qlgxc

1 What this court referred to as "the factual matrix" in Arthur Andersen Inc. v. Toronto-Dominion Bank (1994), 17 O.R. (3d) 363 at 372.

2 For example, in a 1996 agreement between New Wave International ("NWI") and IMAX, while IMAX had exclusive rights "in perpetuity" to distribute the film produced by NWI, NWI retained ownership of the copyright of the film.

3 Some of these cases are discussed by Farley J. in Tru-Wall Group Ltd. v. Stadium Corp. of Ontario Ltd., [1995] O.J. No. 2610 (Ont. Ct. (Gen. Div.)).

** Preliminary Version **

*Case Name:*

# Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)

**Tercon Contractors Ltd., Appellant;**
**v.**
**Her Majesty The Queen in Right of the Province of British,**
**Columbia, by her Ministry of Transportation and Highways,**
**Respondent, and**
**Attorney General of Ontario, Intervener.**

[2010] S.C.J. No. 4

[2010] A.C.S. no 4

2010 SCC 4

[2010] 1 S.C.R. 69

[2010] 1 R.C.S. 69

86 C.L.R. (3d) 163

100 B.C.L.R. (4th) 201

EYB 2010-169491

2010EXP-608

J.E. 2010-321

397 N.R. 331

[2010] 3 W.W.R. 387

315 D.L.R. (4th) 385

2010 CarswellBC 296

281 B.C.A.C. 245

65 B.L.R. (4th) 1

File No.: 32460.


Supreme Court of Canada

Heard: March 23, 2009;
Judgment: February 12, 2010.

**Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish,
Abella, Charron, Rothstein and Cromwell JJ.**

(142 paras.)


**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Contracts -- Formation -- Offer -- Invitation to tender or bid -- Terms -- Express terms -- Exclusion clauses -- Appeal by Tercon Contractors Ltd. (Tercon) from judgment of British Columbia Court of Appeal setting aside Tercon's successful action against British Columbia allowed -- The Province not only acted in a way that breached the express and implied terms of the contract by considering a bid from an ineligible bidder, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process -- Properly interpreted, the exclusion clause did not protect the Province from Tercon's damage claim which arose from the Province's dealings with a party not even eligible to bid, let alone from its breach of the implied duty of fairness to bidders.*

*Construction law -- Bidding process -- Invitation to tender or bid -- Bids -- Breach of tender -- Contracts -- Building contracts -- Terms -- Clauses -- Appeal by Tercon Contractors Ltd. (Tercon) from judgment of British Columbia Court of Appeal setting aside Tercon's successful action against British Columbia allowed -- The Province not only acted in a way that breached the express and implied terms of the contract by considering a bid from an ineligible bidder, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process -- Properly interpreted, the exclusion clause did not protect the Province from Tercon's damage claim which arose from the Province's dealings with a party not even eligible to bid, let alone from its breach of the implied duty of fairness to bidders.*

Appeal by Tercon Contractors Ltd. (Tercon) from a judgment of the British Columbia Court of Appeal setting aside Tercon's successful action against British Columbia. A request for expressions of interest by the Ministry of Transportation and Highways (the Province) for designing and building a highway resulted in six teams making submissions. The Province subsequently decided to design the highway itself. Following a request for proposals (RFP) by the Province for the construction of the highway, Brentwood and Tercon were the two short-listed proponents and the Province selected Brentwood for the project. However, Brentwood had entered into an agreement with an unqualified bidder to undertake the work as a joint venture, as the RFP stipulated that only the six teams were eligible to submit a proposal. The RFP included an exclusion of liability clause which barred claims for compensation as a result of participating in the tendering process. The trial judge found that the Province breached the express provisions of the tendering contract with Tercon by accepting a bid from another party who was not eligible to bid and by ultimately awarding the work to that ineligible bidder. The judge also found that this and related conduct by the Province breached the implied duty of fairness to bidders, holding that the Province had acted egregiously. She also held that it was not within the contemplation of the parties that this clause would bar a remedy in damages arising from the Province's unfair dealings with a party who was not entitled to participate in the tender in the first place. The Court of Appeal set aside the decision, holding that the exclusion clause was clear and unambiguous and barred compensation for all defaults.

HELD: Appeal allowed. The trial judge correctly concluded that the bid was submitted on behalf of a joint venture which was an ineligible bidder under the terms of the RFP and that this breached not only the express eligibility provisions of the tender documents, but also the implied duty to act fairly towards all bidders. Clear language would have been necessary to exclude liability for breach of the implied obligation, particularly in the case of public procurement. The Court could not accept the contention that, by agreeing to exclude compensation for participating in this RFP process, the parties could have intended to exclude a damages claim resulting from the Province unfairly permitting an ineligible bidder to participate. Further, the Court could not conclude that the parties, through the words found in the exclusion clause, intended to waive compensation for conduct like that of the Province in this case that struck at the heart of the integrity and business efficacy of the tendering process which it undertook.

**Statutes, Regulations and Rules Cited:**

Ministry of Transportation and Highways Act, R.S.B.C. 1996, c. 311, s. 4, s. 23, s. 23(1)(c)

**Subsequent History:**

NOTE: This document is subject to editorial revision before its reproduction in final form in the Canada Supreme Court Reports.

**Court Catchwords:**

*Contracts -- Tendering contract -- Breach of terms -- Ineligible bidder -- Exclusion of liability clause -- Doctrine of fundamental breach -- Province issuing tender call for construction of highway -- Request for proposals restricting qualified bidders to six proponents -- Province accepting bid from ineligible bidder -- Exclusion clause protecting Province from liability arising from participation in tendering process -- Whether Province breached terms of tendering contract in entertaining bid from ineligible bidder -- If so, whether Province's conduct fell within terms of exclusion clause -- If so, whether court should nevertheless refuse to enforce the exclusion clause because of unconscionability or some other contravention of public policy.*

**Court Summary:**

The Province of British Columbia issued a request for expression of interest ("RFEI") for the design and construction of a highway. Six teams responded with submissions including Tercon and Brentwood. A few months later, the Province informed the six proponents that it now intended to design the highway itself and issued a request for proposals ("RFP") for its construction. The RFP set out a specifically defined project and contemplated that proposals would be evaluated according to specific criteria. Under its terms, only the six original proponents were eligible to submit a proposal; those received from any other party would not be considered. The RFP also included an exclusion of liability clause which provided: "Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for any compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a proposal each proponent shall be deemed to have agreed that it has no claim." As it lacked expertise in drilling and blasting, Brentwood entered into a pre-bidding agreement with another construction company ("EAC"), which was not a qualified bidder, to undertake the work as a joint venture. This arrangement allowed Brentwood to prepare a more competitive proposal. Ultimately, Brentwood submitted a bid in its own name with EAC listed as a "major member" of the team. Brentwood and Tercon were the two short-listed proponents and the Province selected Brentwood for the project. Tercon successfully brought an action in damages against the Province. The trial judge found that the Brentwood bid was, in fact, submitted by a joint venture of Brentwood and EAC and that the Province, which was aware of the situation, breached the express provisions of the tendering contract with Tercon by considering a bid from an ineligible bidder and by awarding it the work. She also held that, as a matter of construction, the exclusion clause did not bar recovery for the breaches she had found. The clause was ambiguous and she resolved this ambiguity in Tercon's favour. She held that the Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the Province's breach. The Court of Appeal set aside the decision, holding that the exclusion clause was clear and unambiguous and barred compensation for all defaults.

*Held* (McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting): The appeal should be allowed. The Court agreed on the appropriate framework of analysis but divided on the applicability of the exclusion clause to the facts.

*Per* McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.: With respect to the appropriate framework of analysis the doctrine of fundamental breach should be "laid to rest". The following analysis should be applied when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed. The first issue is whether, as a matter of interpretation, the exclusion clause even applies to the circumstances established in evidence. This will depend on the court's interpretation of the intention of the parties as expressed in the contract. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable and thus invalid at the time the contract was made. If the exclusion clause is held to be valid at the time of contract formation and applicable to the facts of the case, a third enquiry may be raised as to whether the court should nevertheless refuse to enforce the exclusion clause because of an overriding public policy. The burden of persuasion lies on the party seeking to avoid enforcement of the clause to demonstrate an abuse of the freedom of contract that outweighs the very strong public interest in their enforcement. Conduct approaching serious criminality or egregious fraud are but examples of well-accepted considerations of public policy that are substantially incontestable and may override the public policy of freedom to contract and disable the defendant from relying upon the exclusion clause. Despite agreement on the appropriate framework of analysis the court divided on the applicability of the exclusion clause to the facts of this case as set out below.

*Per* LeBel, Deschamps, Fish, Charron and **Cromwell** JJ.: The Province breached the express provisions of the tendering contract with Tercon by accepting a bid from a party who should not even have been permitted to participate in the tender process and by ultimately awarding the work to that ineligible bidder. This egregious conduct by the Province also breached the implied duty of fairness to bidders. The exclusion clause, which barred claims for compensation "as a result of participating" in the tendering process, did not, when properly interpreted, exclude Tercon's claim for damages. By considering a bid from an ineligible bidder, the Province not only acted in a way that breached the express and implied terms of the contract, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process.

Submitting a compliant bid in response to a tender call may give rise to "Contract A" between the bidder and the owner. Whether a Contract A arises and what its terms are depends on the express and implied terms and conditions of the tender call and the legal consequences of the parties' actual dealings in each case. Here, there is no basis to interfere with the trial judge's findings that there was an intent to create contractual obligations upon submission of a compliant bid and that only the six original proponents that qualified through the RFEI process were eligible to submit a response to the RFP. The tender documents and the required ministerial approval of the process stated expressly that the Province was contractually bound to accept bids only from eligible bidders. Contract A therefore could not arise by the submission of a bid from any other party. The trial judge found that the joint venture of Brentwood and EAC was not eligible to bid as they had not simply changed the composition of their team but, in effect, had created a new bidder. The Province fully understood this and would not consider a bid from or award the work to that joint venture. The trial judge did not err in finding that in fact, if not in form, Brentwood's bid was on behalf of a joint venture

between itself and EAC. The joint venture provided Brentwood with a competitive advantage in the bidding process and was a material consideration in favour of the Brentwood bid during the Province's evaluation process. Moreover, the Province took active steps to obfuscate the reality of the true nature of the Brentwood bid. The bid by the joint venture constituted "material non-compliance" with the tendering contract and breached both the express eligibility provisions of the tender documents, and the implied duty to act fairly towards all bidders.

When the exclusion clause is interpreted in harmony with the rest of the RFP and in light of the commercial context of the tendering process, it did not exclude a damages claim resulting from the Province unfairly permitting an ineligible bidder to participate in the tendering process. The closed list of bidders was the foundation of this RFP and the parties should, at the very least, be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred only upon one potential bidder. The requirement that only compliant bids be considered and the implied obligation to treat bidders fairly are factors that contribute to the integrity and business efficacy of the tendering process. The parties did not intend, through the words found in this exclusion clause, to waive compensation for conduct, like that of the Province in this case, that strikes at the heart of the tendering process. Clear language would be necessary to exclude liability for breach of the implied obligation, particularly in the case of public procurement where transparency is essential. Furthermore, the restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. When the statutory provisions which governed the tendering process in this case are considered, it seems unlikely that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. The text of the exclusion clause in the RFP addresses claims that result from "participating in this RFP". Central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders -- the process followed by the Province -- is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

*Per* McLachlin C.J. and **Binnie**, Abella and Rothstein JJ. (dissenting): The Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion compensation clause. The clause is clear and unambiguous and no legal ground or rule of law permits a court to override the freedom of the parties to contract with respect to this particular term, or to relieve Tercon against its operation in this case. A court has no discretion to refuse to enforce a valid and applicable contractual term unless the plaintiff can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contact and defeat what would otherwise be the contractual rights of the parties. The public interest in the transparency and integrity of the government tendering process, while important, did not render unenforceable the terms of the contract Tercon agreed to.

Brentwood was a legitimate competitor in the RFP process and all bidders knew that the road contract would not be performed by the proponent alone and required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major

sub-contractor or identified with Brentwood as a joint venture "proponent" with EAC. Tercon has legitimate reason to complain about the Ministry's conduct, but its misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

Contract A is based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent of the parties. At issue is the intention of the *actual* parties not what the court may project in hindsight would have been the intention of *reasonable* parties. Only in rare circumstances will a court relieve a party from the bargain it has made.

The exclusion clause did not run afoul of the statutory requirements. While the *Ministry of Highway and Transportation Act* favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement and cannot plausibly be interpreted to have that effect. Tercon -- a sophisticated and experienced contractor -- chose to bid on the project, including the risk posed by an exclusion of compensation clause, on the terms proposed by the Ministry. That was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

The trial judge found that Contract A was breached when the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. The Ministry was at fault in its performance of the RFP, but the process did not thereby cease to be the RFP process in which Tercon had elected to participate.

The interpretation of the majority on this point is disagreed with. "Participating in this RFP" began with "submitting a proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid was considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (an ineligible bidder) instead of Brentwood itself (an eligible bidder) would be to give the clause a strained and artificial interpretation in order, indirectly and obliquely, to avoid the impact of what may seem to the majority *ex post facto* to have been an unfair and unreasonable clause.

Moreover, the exclusion clause was not unconscionable. While the Ministry and Tercon do not exercise the same level of power and authority, Tercon is a major contractor and is well able to look after itself in a commercial context so there is no relevant imbalance of bargaining power. Further, the clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A were available. The parties expected, even if they did not like it, that the "no claims" clause would operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

Finally, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

**Cases Cited**

By Cromwell J.

**Applied:** *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; **considered:** *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *Cahill (G. J.) & Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1; **referred to:** *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57.

By Binnie J. (dissenting)

*Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *The Queen in Right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111; *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Tercon Contractors Ltd. v. British Columbia* (1993), 9 C.L.R. (2d) 197, aff'd [1994] B.C.J. No. 2658 (QL); *Karsales (Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461; *Re Millar Estate*, [1938] S.C.R. 1; *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4) 650.

**Statutes and Regulations Cited**

*Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, ss. 4, 23.

**Authors Cited**

Hall, Geoff R. *Canadian Contractual Interpretation Law*. Markham, Ont.: LexisNexis, 2007.

Kain, Brandon, and Douglas T. Yoshida. "The Doctrine of Public Policy in Canadian Contract Law", in Todd L. Archibald and Randall Scott Echlin, eds., *Annual Review of Civil Litigation, 2007*. Toronto: Thomson Carswell, 2007, 1.

McCamus, John D. *The Law of Contracts*. Toronto: Irwin Law, 2005.

Waddams, S. M. *The Law of Contracts*, 5 ed. Aurora, Ont.: Canada Law Book, 2005.

**History and Disposition:**

APPEAL from a judgment of the British Columbia Court of Appeal (Donald, Mackenzie and Lowry JJ.A.), 2007 BCCA 592, 73 B.C.L.R. (4) 201, 40 B.L.R. (4) 26, 289 D.L.R. (4) 647, [2008] 2 W.W.R. 410, 249 B.C.A.C. 103, 414 W.A.C. 103, 66 C.L.R. (3d) 1, [2007] B.C.J. No. 2558 (QL), 2007 CarswellBC 2880, setting aside a decision of Dillon J., 2006 BCSC 499, 53 B.C.L.R. (4) 138, [2006] 6 W.W.R. 275, 18 B.L.R. (4) 88, 51 C.L.R. (3d) 227, [2006] B.C.J. No. 657 (QL), 2006 CarswellBC 730. Appeal allowed, McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting.

**Counsel:**

*Chris R. Armstrong*, *Brian G. McLean*, *William S. McLean* and *Marie-France Major*, for the appellant.

*J. Edward Gouge*, *Q.C.*, *Jonathan Eades* and *Kate Hamm*, for the respondent.

*Malliha Wilson* and *Lucy McSweeney*, for the intervener the Attorney General of Ontario.

---

[Editor's note: A corrigendum was published by the Court March 18, 2010. The corrections have been incorporated in this document and the text of the corrigendum is appended to the end of the judgment.]

The judgment of LeBel, Deschamps, Fish, Charron and Cromwell JJ. was delivered by

CROMWELL J.:--

I.    Introduction

**1**    The Province accepted a bid from a bidder who was not eligible to participate in the tender and then took steps to ensure that this fact was not disclosed. The main question on appeal, as I see it, is whether the Province succeeded in excluding its liability for damages flowing from this conduct through an exclusion clause it inserted into the contract. I share the view of the trial judge that it did not.

**2**    The appeal arises out of a tendering contract between the appellant, Tercon Contractors Ltd., who was the bidder, and the respondent, Her Majesty the Queen in Right of the Province of British Columbia, who issued the tender call. The case turns on the interpretation of provisions in the contract relating to eligibility to bid and exclusion of compensation resulting from participation in the tendering process.

**3**    The trial judge found that the respondent (which I will refer to as the Province) breached the express provisions of the tendering contract with Tercon by accepting a bid from another party who was not eligible to bid and by ultimately awarding the work to that ineligible bidder. In short, a bid was accepted and the work awarded to a party who should not even have been permitted to

participate in the tender process. The judge also found that this and related conduct by the Province breached the implied duty of fairness to bidders, holding that the Province had acted "egregiously" ( 2006 BCSC 499, 53 B.C.L.R (4th) 138, at para. 150). The judge then turned to the Province's defence based on an exclusion clause that barred claims for compensation "as a result of participating" in the tendering process. She held that this clause, properly interpreted, did not exclude Tercon's claim for damages. In effect, she held that it was not within the contemplation of the parties that this clause would bar a remedy in damages arising from the Province's unfair dealings with a party who was not entitled to participate in the tender in the first place.

**4**    The Province appealed and the Court of Appeal reversed (2007 BCCA 592, 73 B.C.L.R. (4th) 201). Dealing only with the exclusion clause issue, it held that the clause was clear and unambiguous and barred compensation for all defaults.

**5**    On Tercon's appeal to this Court, the questions for us are whether the successful bidder was eligible to participate in the request for proposals (RFP) and, if not, whether Tercon's claim for damages is barred by the exclusion clause.

**6**    In my respectful view, the trial judge reached the right result on both issues. The Province's attempts to persuade us that it did not breach the tendering contract are, in my view, wholly unsuccessful. The foundation of the tendering contract was that only six, pre-selected bidders would be permitted to participate in the bidding. As the trial judge held, the Province not only acted in a way that breached the express and implied terms of the contract by considering a bid from an ineligible bidder, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process. One must not lose sight of the fact that the trial judge found that the Province acted egregiously by "ensuring that [the true bidder] was not disclosed" (para. 150) and that its breach "attacke[d] the underlying premise of the [tendering] process" (para. 146), a process which was set out in detail in the contract and, in addition, had been given ministerial approval as required by statute.

**7**    As for its reliance on the exclusion clause, the Province submits that the parties were free to agree to limitations of liability and did so. Consideration of this submission requires an interpretation of the words of the clause to which the parties agreed in the context of the contract as a whole. My view is that, properly interpreted, the exclusion clause does not protect the Province from Tercon's damage claim which arises from the Province's dealings with a party not even eligible to bid, let alone from its breach of the implied duty of fairness to bidders. In other words, the Province's liability did not arise from Tercon's participation in the process that the Province established, but from the Province's unfair dealings with a party who was not entitled to participate in that process.

**8**    I would allow the appeal and restore the judgment of the trial judge.

II.    <u>Brief Overview of the Facts</u>

**9**    I will have to set out more factual detail as part of my analysis. For now, a very brief summary will suffice. In 2000, the Ministry of Transportation and Highways (the "Province") issued a request for expressions of interest ("RFEI") for designing and building a highway in northwestern British Columbia. Six teams made submissions, including Tercon and Brentwood Enterprises Ltd. Later that year, the Province informed the six proponents that it now intended to design the highway itself and would issue a RFP for its construction.

**10**    The RFP was formally issued on January 15, 2001. Under its terms, only the six original proponents were eligible to submit a proposal. The RFP also included a clause excluding all claims for damages "as a result of participating in this RFP" (s. 2:10).

**11**    Unable to submit a competitive bid on its own, Brentwood teamed up with Emil Anderson Construction Co. ("EAC"), which was not a qualified bidder, and together they submitted a bid in Brentwood's name. Brentwood and Tercon were the two short-listed proponents and the Ministry ultimately selected Brentwood as the preferred proponent.

**12**    Tercon brought an action seeking damages, alleging that the Ministry had considered and accepted an ineligible bid and that but for that breach, it would have been awarded the contract. The trial judge agreed and awarded roughly $3.5 million in damages and prejudgment interest. As noted, the Court of Appeal reversed and Tercon appeals by leave of the Court.

III.    Issues

**13**    The issues for decision are whether the trial judge erred in finding that:

1.    the Province breached the tendering contract by entertaining a bid from an ineligible bidder.
2.    the exclusion clause does not bar the appellant's claim for damages for the breaches of the tendering contract found by the trial judge.

IV.    Analysis

A. *Was the Brentwood Bid Ineligible?*

**14**    The first issue is whether the Brentwood bid was from an eligible bidder. The judge found that the bid was in substance, although not in form, from a joint venture of Brentwood and EAC and that it was, therefore, an ineligible bid. The Province attacks this finding on three grounds:

(i)    a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture;

(ii)    it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract;

(iii)    there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original proponent, in place and allowed it to enhance its ability to perform the work.

**15**    While these were the Province's main points, its position became more wide-ranging during oral argument, at times suggesting that it had no contractual obligation to deal only with eligible bidders. It is therefore necessary to take a step back and look at that threshold point before turning to the Province's more focussed submissions.

1.    The Province's Contractual Obligations in the Bidding Process

**16**    The judge found, and it was uncontested at trial, that only the six original proponents that qualified through the RFEI process were eligible to submit a response to the RFP. This finding is not challenged on appeal, although there was a passing suggestion during oral argument that there was no contractual obligation of this sort at all. The trial judge also held, noting that this point was uncontested, that a joint venture between Brentwood and EAC was ineligible to bid. This is also not contested on appeal. These two findings are critical to the case and provide important background for an issue that is in dispute, namely whether the Brentwood bid was ineligible. It is, therefore, worth reviewing the relevant background in detail. I first briefly set out the legal framework and then turn to the trial judge's findings.

2.    Legal Principles

**17**    Submitting a compliant bid in response to a tender call *may* give rise to a contract -- called Contract A -- between the bidder and the owner, the express terms of which are found in the tender documents. The contract may also have implied terms according to the principles set out in *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; see also *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, and *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860. The key word, however, is "may". The Contract A - Contract B framework is one that arises, if at all, from the dealings between the parties. It is not an artificial construct imposed by the courts, but a description of the legal consequences of the parties' actual dealings. The Court emphasized in *M.J.B.* that whether Contract A arises and if it does, what its terms are, depend on the express and implied terms and conditions of the tender call in each case. As Iacobucci J. put it, at para. 19:

What is important ... is that the submission of a tender in response to an invitation to tender may give rise to contractual obligations, quite apart from the obligations associated with the construction contract to be entered into upon the acceptance of a tender, <u>depending upon whether the parties intend to initiate contractual relations by the submission of a bid</u>. If such a contract arises, its terms are governed by the terms and conditions of the tender call [Emphasis added.]

3.    The Trial Judge's Findings Concerning the Existence of Contract A

**18**    The question of whether Tercon's submission of a compliant bid gave rise to contractual relations between it and the Province was contested by the Province at trial. The trial judge gave extensive reasons for finding against the Province on this issue. We are told that the Province did not pursue this point in the Court of Appeal but instead premised its submissions on the existence of Contract A. The Province took the same approach in its written submissions in this Court. However, during oral argument, there was some passing reference in response to questions that there was no Contract A. In light of the position taken by the Province on its appeal to the Court of Appeal and in its written submissions in this Court, it is now too late to revisit whether there were contractual duties between Tercon and the Province. Even if it were open to the Province to make this argument now, I can see no error in legal principle or any palpable and overriding error of fact in the trial judge's careful reasons on this point.

**19**    The trial judge did not mechanically impose the Contract A - Contract B framework, but considered whether Contract A arose in light of her detailed analysis of the dealings between the parties. That was the right approach. She reviewed in detail the provisions of the RFP which supported her conclusion that there was an intent to create contractual relations upon submission of a compliant bid. She noted, for example, that bids were to be irrevocable for 60 days and that security of $50,000 had to be paid by all proponents and was to be increased to $200,000 by the successful proponent. Any revisions to proposals prior to the closing date had to be in writing, properly executed and received before the closing time. The RFP also set out detailed evaluation criteria and specified that they were to be the only criteria to be used to evaluate proposals. A specific form of alliance agreement was attached. There were detailed provisions about pricing that were fixed and non-negotiable. A proponent was required to accept this form of contract substantially, and security was lost if an agreement was not executed. The Ministry reserved a right to cancel the RFP under s. 2.9 but in such event was obliged to reimburse proponents for costs incurred in preparing their bids up to $15,000 each. Proponents had to submit a signed proposal form, which established that they offered to execute an agreement substantially in the form included in the RFP package. Further, they acknowledged that the security could be forfeited if they were selected as the preferred proponent and failed to enter into good faith discussions with the Ministry to reach an agreement and sign the alliance agreement.

**20**    In summary, as the trial judge found, the RFP set out a specifically defined project, invited proposals from a closed and specific list of eligible proponents, and contemplated that proposals would be evaluated according to specific criteria. Negotiation of the alliance construction contract was required, but the negotiation was constrained and did not go to the fundamental details of either the procurement process or the ultimate contract.

**21**    There is, therefore, no basis to interfere with the judge's finding that there was an intent to

create contractual obligations upon submission of a compliant bid. I add, however, that the tender call in this case did not give rise to the classic Contract A - Contract B framework in which the bidder submits an irrevocable bid and undertakes to enter into contract B on those terms if it is accepted. The alliance model process which was used here was more complicated than that and involved good faith negotiations for a contract B in the form set out in the tender documents. But in my view, this should not distract us from the main question here. We do not have to spell out all of the terms of Contract A, let alone of Contract B, so as to define all of the duties and obligations of both the bidders and the Province. The question here is much narrower: did contractual obligations arise as a result of Tercon's compliant bid and, if so, was it a term of that contract that the Province would only entertain bids from eligible bidders? The trial judge found offer, acceptance and consideration in the invitation to tender and Tercon's bid. There is no basis, in my respectful view, to challenge that finding even if it were open to the Province to try to do so at this late stage of the litigation.

## 4.    The Trial Judge's Finding Concerning Eligibility

**22**    It was not contested at trial that only the six original proponents that qualified through the RFEI process were eligible to bid. This point is not in issue on appeal; the question is what this eligibility requirement means. It will be helpful, therefore, to set out the background about this limited eligibility to bid in this tendering process.

**23**    To begin, it is worth repeating that there is no doubt that the Province was contractually bound to accept bids only from eligible bidders. This duty may be implied even absent express stipulation. For example, in *M.J.B.*, the Court found that an implied obligation to accept only compliant bids was necessary to give business efficacy to the tendering process, noting, at para. 41, that a bidder must expend effort and incur expense in preparing its bid and must submit bid security and that it is "obvious" that it makes "little sense" for the bidder to comply with these requirements if the owner "is allowed, in effect, to circumscribe this process and accept a non-compliant bid". But again, whether such a duty should be implied in any given case will depend on the dealings between the parties. Here, however, there is no need to rely on implied terms. The obligation to consider only bids from eligible bidders was stated expressly in the tender documents and in the required ministerial approval of the process which they described.

**24**    As noted, in early 2000, the Province issued a RFEI based on a design-build model; the contractor would both design and build the highway. The RFEI contemplated that a short list of three qualified contractors, or teams composed of contractors and consultants, would be nominated as proponents. Each was to provide a description of the legal structure of the team and to describe the role of each team member along with the extent of involvement of each team member as a percentage of the total scope of the project and an organization chart showing each team member's role. Any change in team management or key positions required notice in writing to the Province which reserved the right to disqualify the proponent if the change materially and negatively affected the ability of the team to carry out the project.

**25**    Expressions of interest ("EOI") were received from six teams including Tercon and Brentwood. The evaluation panel and independent review panel recommended a short list of three proponents with Tercon topping the evaluation. Brentwood was evaluated fifth and was not on the short list. Brentwood was known to lack expertise in drilling and blasting and so its EOI had included an outline of the key team members with that experience. EAC did not participate and had no role in the Brentwood submission. The results of this evaluation were not communicated and the process did not proceed because the Province decided to design the project itself and issue an RFP for an alliance model contract to construct the highway.

**26**    It was clear from the outset that only those who had submitted proposals during the RFEI process would be eligible to submit proposals under the RFP. This was specified in the approval of the process by the Minister of Transportation and Highways ("Minister") before the RFP was issued. It is worth pausing here to briefly look at the Minister's role.

**27**    Pursuant to s. 23 of the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, the legislation in force at the relevant time, the Minister was required to invite public tenders for road construction unless he or she determined that another process would result in competitively established costs for the work. The section provided:

>    **23** (1) <u>The minister must invite tenders</u> by public advertisement, or if that is impracticable, by public notice, <u>for the construction and repair of</u> all government buildings, <u>highways</u> and public works, <u>except for the following</u>:
>
>                            ...
>
>    (c)    <u>if the minister determines that an alternative contracting process will result in competitively established costs for the performance of the work.</u>

>    (2)    The minister must cause all tenders received to be opened in public, at a time and place stated in the advertisement or notice.
>    (3)    The prices must be made known at the time the tenders are opened.
>    (4)    <u>In all cases where the minister believes it is not expedient to let the work to the lowest bidder, the minister must report to and obtain the approval of the Lieutenant Governor in Council before passing by the lowest tender, except if delay would be injurious to the public interest.</u>

>                            ...

**28**    These provisions make clear that the work in this case had to be awarded by public tender, absent the Minister's approval of an alternative process, and had to be awarded to the lowest bidder, absent approval of the Lieutenant Governor in Council. As noted, ministerial approval was given for an alternative process under s. 23(1)(c). The Minister issued a notice that, pursuant to that

section, he approved the process set out in an attached document and had determined it to be an alternative contracting process that would result in competitively established costs for the performance of the work. The attached document outlined in seven numbered paragraphs the process that had been approved.

**29**    The document described the background of the public RFEI (which I have set out earlier), noting that *only those firms identified through the EOI process would be eligible to submit proposals for the work* and that they would receive invitations to do so. The Minister's approval in fact referred to the firms who had been short-listed from the RFEI process as being eligible. If this were taken to refer only to the three proponents identified by the evaluation process of the RFEI, Tercon would be included but Brentwood would not. However, no one has suggested that anything turns on this and it seems clear that ultimately all six of the RFEI proponents -- including both Tercon and Brentwood -- were intended to be eligible. The ministerial approval then briefly set out the process. Proposals "by short listed firms" were to be evaluated "using the considerations set out in the RFP".

**30**    It is clear, therefore, that participation in the RFP process approved by the Minister was limited to those who had participated in the RFEI process.

**31**    The Province's factum implies that the Minister approved inclusion of the exclusion clause in the RFP. However, there is no evidence of this in the record before the Court. The Minister's approval is before us. It is dated as having been prepared on August 23, 2000 and signed on October 19, 2000, and approves a process outlined in a two-page document attached to it. It says nothing about exclusion of the Province's liability. The RFP, containing the exclusion clause in issue here, is dated January 15, 2001 and was sent out to eligible bidders under cover of a letter of the same date, some three months after the Minister's approval.

**32**    The RFP is a lengthy document, containing detailed instructions to proponents, required forms, a time schedule of the work, detailed provisions concerning contract pricing, a draft of the ultimate construction contract and many other things. Most relevant for our purposes are the terms of the instructions to proponents and in particular the eligibility requirements for bidders.

**33**    The RFP reiterates in unequivocal terms that eligibility to bid was restricted as set out in the ministerial approval. It also underlines the significance of the identity of the proponent. In s. 1.1, the RFP specifies that only the six teams involved in the RFEI would be eligible. The term "proponent", which refers to a bidder, is defined in s. 8 as "a team that has become eligible to respond to the RFP as described in Section 1.1 of the Instructions to Proponents". Section 2.8(a) of the RFP stipulates that *only* the six proponents qualified through the RFEI process were eligible and that *proposals received from any other party would not be considered*. In short, there were potentially only six participants and "Contract A" could not arise by the submission of a bid from any other party.

**34**    The RFP also addressed material changes to the proponent, including changes in the proponent's team members and its financial ability to undertake and complete the work. Section

2.8(b) of the RFP provided in part as follows:

> If in the opinion of the Ministry a material change has occurred to the Proponent
> since its qualification under the RFEI, including if the composition of the
> Proponent's team members has changed ... or if, for financial or other reasons, the
> Proponent's ability to undertake and complete the Work has changed, then the
> Ministry may request the Proponent to submit further supporting information as
> the Ministry may request in support of the Proponent's qualification to perform
> the Work. If in the sole discretion of the Ministry as a result of the changes the
> Proponent is not sufficiently qualified to perform the Work then the Ministry
> reserves the right to disqualify that Proponent and reject its Proposal.

**35**    The proponent was to provide an organization chart outlining the proponent's team members,
structure and roles. If the team members were different from the RFEI process submission, an
explanation was to be provided for the changes: s. 4.2(b)(i). A list of subcontractors and suppliers
was also to be provided and the Ministry had to be notified of any changes: s. 4.2(e).

**36**    The RFP provided proponents with a mechanism to determine whether they remained
qualified to submit a proposal. If a proponent was concerned about its eligibility as a result of a
material change, it could make a preliminary submission to the Ministry describing the nature of the
changes and the Ministry would give a written decision as to whether the proponent was still
qualified: s. 2.8(b).

**37**    Brentwood tried to take advantage of this process. The trial judge thoroughly outlined this, at
paras. 17-23 of her reasons. In brief, Brentwood lacked expertise in drilling and blasting and by the
time the RFP was issued, it faced limited local bonding capacity due to commitments to other
projects, a shorter construction period, the potential unavailability of subcontractors and limited
equipment to perform the work. It in fact considered not bidding at all. Instead, however, it entered
into a pre-bidding agreement with EAC that the work would be undertaken by a joint venture of
Brentwood and EAC and that upon being awarded the work, they would enter into a joint venture
agreement and would share 50-50 the costs, expenses, losses and gains. The trial judge noted that it
was common in the industry for contractors to agree to a joint venture on the basis of a pre-bid
agreement with the specifics of the joint venture to be worked out once the contract was awarded
and that Brentwood and EAC acted consistently throughout in accordance with this industry
standard.

**38**    Brentwood sent the Province's project manager, Mr. Tasaka, a preliminary submission as
provided for in s. 2.8(b) of the RFP, advising of a material change in its team's structure in that it
wished to form a joint venture with EAC. This was done, the trial judge found, because Brentwood
thought it would be disqualified if it submitted a proposal as a joint venture without the Ministry's
prior approval under this section of the RFP. The Province never responded in writing as it ought to
have according to s. 2.8(b).

**39**    It seems to have been assumed by everyone that a joint venture of Brentwood and EAC was not eligible because this change would not simply be a change in the composition of the bidder's team, but in effect a new bidder. Without reviewing in detail all of the evidence referred to by the trial judge, it is fair to say that although Brentwood ultimately submitted a proposal in its own name, the proposal in substance was from the Brentwood-EAC joint venture and was evaluated as such. As the trial judge concluded:

> The substance of the proposal was as a joint venture and this must have been apparent to all. The [project evaluation panel] approved Brentwood/EAC as joint venturers as the preferred proponent. The [panel] was satisfied that Tercon had the capacity and commitment to do the job but preferred the joint venture submission of Brentwood/EAC. [para. 53].

**40**    There was some suggestion by the Province during oral argument that the trial judge had wrongly imposed on it a duty to investigate Brentwood's bid, a duty rejected by the majority of the Court in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116. In my view, the trial judge did no such thing. As her detailed findings make clear, the Province: (1) fully understood that the Brentwood bid was in fact on behalf of a joint venture of Brentwood and EAC; (2) thought that a bid from that joint venture was not eligible; and (3) took active steps to obscure the reality of the situation. No investigation was required for the Province to know these things and the judge imposed no duty to engage in one.

5.    The Province's Submissions

**41**    I will address the Province's first two points together.

(i)    a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture; and

(ii)   it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract;

**42**    I cannot accept these submissions. The issue is not, as these arguments assume, whether the Province contracted with a joint venture or whether EAC had contractual obligations to the Province. The issue is whether the Province considered an ineligible bid; the point of substance is whether the bid was from an eligible bidder.

**43**    At trial there was no contest that a bid from a joint venture involving an ineligible bidder would be ineligible. The Province's position was that there was no need to look beyond the face of the bid to determine who was bidding: the proposal was in the name of Brentwood and therefore the bid was from a compliant bidder. Respectfully, I see no error in the trial judge's rejection of this position. There was a mountain of evidence to support the judge's conclusions that first, Brentwood's bid, in fact if not in form, was on behalf of a joint venture between itself and EAC; second, the Province knew this and took the position that it could not consider a bid from or award

the work to that joint venture; third, the existence of the joint venture was a material consideration in favour of the Brentwood bid during the evaluation process; and finally, that steps were taken by revising and drafting documentation to obfuscate the reality of the situation.

**44**    Brentwood was one of the original RFEI proponents and was of course eligible to bid, subject to material changes in the composition of its team. EAC had not submitted a proposal during the RFEI process. It had been involved in advising the Ministry in relation to the project in 1998 and, in the fall of 2000, the Ministry had asked EAC to prepare an internal bid for comparison purposes (although EAC did not do so) as EAC was not entitled to bid on the Project.

**45**    As noted earlier, after the RFP was issued, Brentwood and EAC entered into a pre-bidding agreement that provided that the work would be undertaken in the name of Brentwood-Anderson, a joint venture, that the work would be sponsored and managed by the joint venture and that upon being awarded the contract, the parties would enter into a joint venture agreement. Brentwood advised the Ministry in writing that it was forming a joint venture with EAC "to submit a more competitive price"; this fax was in effect a preliminary submission contemplated by s. 2.8(b) of the RFP and was written, as the trial judge found, because Brentwood assumed that it could be disqualified if it submitted a proposal as a joint venture unless prior arrangements had been made. The Province never responded in writing to this preliminary submission, as required by s. 2.8(b). There were, however, discussions with the Province's project manager, Mr. Tasaka who, the trial judge found, understood that a joint venture from Brentwood and EAC would not be eligible. As the judge put it, the Province's position appears to have been that the Brentwood/EAC proposal could proceed as long as the submission was in the name of Brentwood.

**46**    In the result, EAC was listed in the ultimate submission as a "major member" of the team. The legal relationship with EAC was not specified and EAC was listed as a subcontractor even though, as the trial judge found, their relationship bore no resemblance to a standard subcontractor agreement. The trial judge found as facts -- and these findings are not challenged -- that Brentwood and EAC always intended between themselves to form a joint venture and to formalize that arrangement once the contract was secured, and further, that the role of EAC was purposefully obfuscated in the bid to avoid an apparent conflict with s. 2.8(a) of the RFP.

**47**    During the selection process, it became clear that the bid was in reality on behalf of a joint venture. The project evaluation panel ("PEP") requested better information than provided in the bid about the structure of the business arrangements between Brentwood and EAC. Brentwood responded by disclosing the pre-bid agreement between them to form a 50/50 joint venture if successful. The PEP understood from this that Brentwood and EAC had a similar interest in the risk and reward under the contract and that this helped satisfy them that the "risk/reward" aspect of the alliance contract could be negotiated with them flexibly. The PEP clearly did not consider EAC to be a subcontractor although shown as such in the bid. In its step 6 report, the PEP consistently referred to the proponent as being a joint venture of Brentwood and EAC or as "Brentwood/EAC" and the trial judge found that it was on the basis that they were indeed a joint venture that PEP

approved Brentwood/EAC as the preferred proponent. This step 6 report was ultimately revised to refer only to the Brentwood team as the official proponent. The trial judge found as a fact that this revision was made because "it was apparent that a joint venture was not eligible to submit a proposal"(para. 56).

**48**    The findings of the trial judge and the record make it clear that it was no mere question of form rather than a matter of substance whether the bidder was Brentwood with other team members or, as it in fact was, the Brentwood/EAC joint venture. As she noted, at para. 121 of her reasons, the whole purpose of the joint venture was to allow submission of a more competitive price than it would have been able to do as a proponent with a team as allowed under s. 2.8(b) of the RFP. The joint venture permitted a 50/50 sharing of risk and reward and co-management of the project while at the same time avoiding the restrictions on subcontracting in the tendering documents. As the judge put it, the bid by the joint venture constituted "material non-compliance" with the tendering contract: "[t]he joint venture with EAC allowed Brentwood to put forward a more competitive price than contemplated under the RFEI proposal. This went to the essence of the tendering process" (para 126).

**49**    The Province suggests that the trial judge's reasons allow form to triumph over substance. In my view, it is the Province's position that better deserves that description. It had a bid which it knew to be on behalf of a joint venture, encouraged the bid to proceed and took steps to obfuscate the reality that it was on behalf of a joint venture. Permitting the bid to proceed in this way gave the joint venture a competitive advantage in the bidding process, and the record could not be clearer that the joint venture nature of the bid was one of its attractions during the selection process. The Province nonetheless submits that so long as only the name of Brentwood appears on the bid and ultimate contract B, all is well. If ever a submission advocated placing form above substance, this is it.

**50**    It is true that the Province had legal advice and did not proceed in defiance of it. However, the facts as found by the trial judge about this legal advice hardly advance the Province's position. The judge found that the Province's lawyer was not aware of the background relevant to the question of whether the Brentwood bid was eligible, never reviewed the proponent eligibility requirements in the RFP and was not asked to and did not direct his mind to the question of eligibility. As the trial judge put it, the lawyer "appears to have operated on the assumption that Brentwood had been irreversibly selected" (para. 70).

**51**    The Brentwood/EAC joint venture having been selected as the preferred proponent, negotiations for the alliance contract ensued. The trial judge found that by this time, all agreed that a joint venture was not an eligible proponent and the Ministry was taking the position that the contract could not be in the name of the joint venture. Brentwood and EAC executed a revised pre-contract agreement that provided, notwithstanding the letter of intent from the Ministry addressed to Brentwood indicating that the legal relationship between them would be contractor/subcontractor, the contract would be performed and the profits shared equally between

them. The work was to be managed by a committee with equal representation, the bond required by the owner was to be provided by both parties and EAC indemnified Brentwood against half of any loss or cost incurred as a result of performance of the work. According to schedule B4 of the RFP, all subcontracts were to be attached to the RFP but no contract between Brentwood and EAC was ever provided or attached to the proposal.

**52**    The Province has identified no palpable and overriding error in these many findings of fact by the trial judge. I conclude, therefore, that we must approach the case on the basis of the judge's finding that the bid was in fact, if not in form, submitted by a joint venture of Brentwood and EAC, that the Ministry was well aware of this, that the existence of the joint venture was a material consideration in favour of the bid during the evaluation process and that by bidding as a joint venture, Brentwood was given a competitive advantage in the bidding process.

**53**    I reject the Ministry's submissions that all that matters is the form and not the substance of the arrangement. In my view, the trial judge's finding that this bid was in fact on behalf of a joint venture is unassailable.

**54**    I turn to the Province's third point:

> (iii)   there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original proponent in place and allowed it to enhance its ability to perform the work.

**55**    This submission addresses the question of whether the joint venture was an eligible bidder. The Province submits that it is, arguing that s. 2.8(b) of the RFP shows that the RFP contemplated that each proponent would be supported by a team, that the composition of the team might change and that the Province under that section retained the right to approve or reject changes in the team of any proponent. I cannot accept these submissions.

**56**    Section 2.8 must be read as a whole and in light of the ministerial approval which I have described earlier. Section 2.8(a), consistent with that approval, stipulates that only the six proponents qualified through the RFEI process were eligible to submit responses and that proposals from any other party "shall not be considered". The word "proponent" is defined in s. 8 as a team that has become eligible to respond to the RFP. The material change provisions in s. 2.8(b) should not be read as negating the express provisions of the RFP and the ministerial approval of the process. When read as a whole, the provisions about material change do not permit the addition of a new entity as occurred here. The process actually followed was not the one specified in the bidding contract and was not authorized by the statute because it was not the one approved by the Minister.

**57**    Moreover, even if one were to conclude (and I would not) that this change from the Brentwood team that participated in the RFEI to the Brentwood/EAC joint venture by whom the bid was submitted could fall within the material change provisions of s. 2.8(b), the Province never gave

a written decision to permit this change as required by that provision. As the trial judge noted, in fact the Province's position was that such a bid would not be eligible and its agents took steps to obfuscate the true proponent in the relevant documentation.

**58**    The trial judge also found that there was an implied obligation of good faith in the contract and that the Province breached this obligation by failing to treat all bidders equally by changing the terms of eligibility to Brentwood's competitive advantage. This conclusion strongly reinforces the trial judge's decision about eligibility. Rather than repeating her detailed findings, I will simply quote her summary at para. 138:

> The whole of [the Province's] conduct leaves me with no doubt that the [Province] breached the duty of fairness to [Tercon] by changing the terms of eligibility to Brentwood's competitive advantage. At best, [the Province] ignored significant information to its [i.e. Tercon's] detriment. At worst, the [Province] covered up its knowledge that the successful proponent was an ineligible joint venture. In the circumstances here, it is not open to the [Province] to say that a joint venture was only proposed. Nor can the [Province] say that it was unaware of the joint venture when it acted deliberately to structure contract B to include EAC as fully responsible within a separate contract with Brentwood, so minimizing the [Province's] risk that the contract would be unenforceable against EAC if arrangements did not work out. .... The [Province] was ... prepared to take the risk that unsuccessful bidders would sue: this risk did materialize.

**59**    To conclude on this point, I find no fault with the trial judge's conclusion that the bid was in fact submitted on behalf of a joint venture of Brentwood and EAC which was an ineligible bidder under the terms of the RFP. This breached not only the express eligibility provisions of the tender documents, but also the implied duty to act fairly towards all bidders.

B. *The Exclusion Clause:*

    1.   <u>Introduction</u>

**60**    As noted, the RFP includes an exclusion clause which reads as follows:

> **2.10** ... Except as expressly and specifically permitted in these Instructions to Proponents, <u>no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP</u>, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim.[Emphasis added.]

**61**    The trial judge held that as a matter of construction, the clause did not bar recovery for the breaches she had found. The clause, in her view, was ambiguous and, applying the *contra proferentem* principle, she resolved the ambiguity in Tercon's favour. She also found that the

Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the nature of the Province's breach. The Province contends that the judge erred both with respect to the construction of the clause and her application of the doctrine of fundamental breach.

**62**    On the issue of fundamental breach in relation to exclusion clauses, my view is that the time has come to lay this doctrine to rest, as Dickson C.J. was inclined to do more than 20 years ago: *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, at p. 462. I agree with the analytical approach that should be followed when tackling an issue relating to the applicability of an exclusion clause set out by my colleague Binnie J. However, I respectfully do not agree with him on the question of the proper interpretation of the clause in issue here. In my view, the clause does not exclude Tercon's claim for damages, and even if I am wrong about that, the clause is at best ambiguous and should be construed *contra proferentem* as the trial judge held. As a result of my conclusion on the interpretation issue, I do not have to go on to apply the rest of the analytical framework set out by Binnie J.

**63**    In my view, the exclusion clause does not cover the Province's breaches in this case. The RFP process put in place by the Province was premised on a closed list of bidders; a contest with an ineligible bidder was not part of the RFP process and was in fact expressly precluded by its terms. A "Contract A" could not arise as a result of submission of a bid from any other party. However, as a result of how the Province proceeded, the very premise of its own RFP process was missing, and the work was awarded to a party who could not be a participant in the RFP process. That is what Tercon is complaining about. Tercon's claim is not barred by the exclusion clause because the clause only applies to claims arising "as a result of participating in [the] RFP", not to claims resulting from the participation of other, ineligible parties. Moreover, the words of this exclusion clause, in my view, are not effective to limit liability for breach of the Province's implied duty of fairness to bidders. I will explain my conclusion by turning first to a brief account of the key legal principles and then to the facts of the case.

2.    <u>Legal Principles</u>

**64**    The key principle of contractual interpretation here is that the words of one provision must not be read in isolation but should be considered in harmony with the rest of the contract and in light of its purposes and commercial context. The approach adopted by the Court in *M.J.B.* is instructive. The Court had to interpret a privilege clause, which is somewhat analogous to the exclusion clause in issue here. The privilege clause provided that the lowest or any tender would not necessarily be accepted, and the issue was whether this barred a claim based on breach of an implied term that the owner would accept only compliant bids. In interpreting the privilege clause, the Court looked at its text in light of the contract as a whole, its purposes and commercial context. As Iacobucci J. said, at para. 44, "the privilege clause is only one term of Contract A and must be read in harmony with the rest of the tender documents. To do otherwise would undermine the rest of the agreement between the parties."

**65**    In a similar way, it is necessary in the present case to consider the exclusion clause in the RFP in light of its purposes and commercial context as well as of its overall terms. The question is whether the exclusion of compensation for claims resulting from "participating in this RFP", properly interpreted, excludes liability for the Province having unfairly considered a bid from a bidder who was not supposed to have been participating in the RFP process at all.

3.    Application to this Case

**66**    Having regard to both the text of the clause in its broader context and to the purposes and commercial context of the RFP, my view is that this claim does not fall within the terms of the exclusion clause.

**67**    To begin, it is helpful to recall that in interpreting tendering contracts, the Court has been careful to consider the special commercial context of tendering. Effective tendering ultimately depends on the integrity and business efficacy of the tendering process: see, e. g., *Martel*, at para. 88; *M.J.B.*, at para. 41; *Double N Earthmovers Ltd.*, at para. 106. As Iacobucci and Major JJ. put it in *Martel*, at para. 116,"it is imperative that all bidders be treated on an equal footing ... Parties should at the very least be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred upon only one potential bidder".

**68**    This factor is particularly weighty in the context of public procurement. In that context, in addition to the interests of the parties, there is the need for transparency for the public at large. This consideration is underlined by the statutory provisions which governed the tendering process in this case. Their purpose was to assure transparency and fairness in public tenders. As was said by Orsborn J. (as he then was) in *Cahill (G. J.)& Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145, at para. 35:

> The owner -- in this case the government -- is in control of the tendering process and may define the parameters for a compliant bid and a compliant bidder. The corollary to this, of course, is that once the owner -- here the government -- sets the rules, it must itself play by those rules in assessing the bids and awarding the main contract.

**69**    One aspect that is generally seen as contributing to the integrity and business efficacy of the tendering process is the requirement that only compliant bids be considered. As noted earlier, such a requirement has often been implied because, as the Court said in *M.J.B.*, it makes little sense to think that a bidder would comply with the bidding process if the owner could circumscribe it by accepting a non-compliant bid. Respectfully, it seems to me to make even less sense to think that eligible bidders would participate in the RFP if the Province could avoid liability for ignoring an express term concerning eligibility to bid on which the entire RFP was premised and which was mandated by the statutorily approved process.

**70**    The closed list of bidders was the foundation of this RFP and there were important competitive advantages to a bidder who could side-step that limitation. Thus, it seems to me that both the integrity and the business efficacy of the tendering process support an interpretation that would allow the exclusion clause to operate compatibly with the eligibility limitations that were at the very root of the RFP.

**71**    The same may be said with respect to the implied duty of fairness. As Iacobucci and Major JJ. wrote for the Court in *Martel*, at para. 88, "[i]mplying an obligation to treat all bidders fairly and equally is consistent with the goal of protecting and promoting the integrity of the bidding process." It seems to me that clear language is necessary to exclude liability for breach of such a basic requirement of the tendering process, particularly in the case of public procurement.

**72**    The proper interpretation of the exclusion clause should also take account of the statutory context which I have reviewed earlier. The restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. It seems unlikely, therefore, that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. Of course, it is true that the exclusion clause does not bar all remedies, but only claims for compensation. However, the fact remains that as a practical matter, there are unlikely to be other, effective remedies for considering and accepting an ineligible bid and that barring compensation for a breach of that nature in practical terms renders the ministerial approval process virtually meaningless. Whatever administrative law remedies may be available, they are not likely to be effective remedies for awarding a contract to an ineligible bidder. The Province did not submit that injunctive relief would have been an option, and I can, in any event, foresee many practical problems that need not detain us here in seeking such relief in these circumstances.

**73**    The Province stresses Tercon's commercial sophistication, in effect arguing that it agreed to the exclusion clause and must accept the consequences. This line of argument, however, has two weaknesses. It assumes the answer to the real question before us which is: what does the exclusion clause mean? The consequences of agreeing to the exclusion clause depend on its construction. In addition, the Province's submission overlooks its own commercial sophistication and the fact that sophisticated parties can draft very clear exclusion and limitation clauses when they are minded to do so. Such clauses contrast starkly with the curious clause which the Province inserted into this RFP. The limitation of liability clause in *Hunter Engineering*, for example, provided that "[n]otwithstanding any other provision in this contract or any applicable statutory provisions neither the Seller nor the Buyer shall be liable to the other for special or consequential damages or damages for loss of use arising directly or indirectly from any breach of this contract, fundamental or otherwise ..." (p. 450). The Court found this to be clear and unambiguous. The limitation clause in issue in *Guarantee Co. of North America v. Gordon Capital Corp.* [1999] 3 S.C.R. 423, provided that legal proceedings for the recovery of "any loss hereunder shall not be brought ... after the expiration of 24 months from the discovery of such loss" (para. 5). Once again, the Court found this language clear. The Ontario Court of Appeal similarly found the language of a limitation of liability clause to be clear in *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34

O.R. (3d) 1. The clause provided in part that if the defendant "should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% or the annual service charge or $10,000, whichever is less, as the agreed upon damages and not as a penalty, as the exclusive remedy ..." (p. 4). These, and many other cases which might be referred to, demonstrate that sophisticated parties are capable of drafting clear and comprehensive limitation and exclusion provisions.

**74**    I turn to the text of the clause which the Province inserted in its RFP. It addresses claims that result from "participating in this RFP". As noted, the limitation on who could participate in this RFP was one of its premises. These words must, therefore, be read in light of the limit on who was eligible to participate in this RFP. As noted earlier, both the ministerial approval and the text of the RFP itself were unequivocal: only the six proponents qualified through the earlier RFEI process were eligible and *proposals received from any other party would not be considered*. Thus, central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders, as the trial judge found the process followed by the Province to be, is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

**75**    The Province would have us interpret the phrase excluding compensation "as a result of participating in this RFP" to mean that compensation is excluded that results from "submitting a Proposal". However, that interpretation is not consistent with the wording of the clause as a whole. The clause concludes with the phrase that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim". If the phrases "participating in this RFP" and "submitting a Proposal" were intended to mean the same thing, it is hard to understand why different words were used in the same short clause to express the same idea. The fact that the Minister had approved a closed list of participants strengthens the usual inference that the use of different words was deliberate so as not to exclude compensation for a departure from that basic eligibility requirement.

**76**    This interpretation of the exclusion clause does not rob it of meaning, but makes it compatible with other provisions of the RFP. There is a parallel between this case and the Court's decision in *M.J.B.* There, the Court found that there was compatibility between the privilege clause and the implied term to accept only compliant bids. Similarly, in this case, there is compatibility between the eligibility requirements of the RFP and the exclusion clause. Not any and every claim based on any and every deviation from the RFP provisions would escape the preclusive effect of the exclusion clause. It is only when the defect in the Province's adherence to the RFP process is such that it is completely outside that process that the exclusion clause cannot have been intended to operate. What is important here, in my view, is that the RFP in its conception, in its express provisions and in the statutorily required approval it was given, was premised on limiting eligibility to the six proponents in the RFEI process. Competition among others was not at all contemplated and was not part of the RFP process; in fact, the RFP expressly excluded that possibility. In short, limiting eligibility of bidders to those who had responded to the RFEI was the foundation of the

whole RFP. As the judge found, acceptance of a bid from an ineligible bidder "attacks the underlying premise of the process" established by the RFP: para. 146. Liability for such an attack is not excluded by a clause limiting compensation resulting from participation in this RFP.

**77**     This interpretation is also supported by another provision of the RFP. Under s. 2.9, as mentioned earlier, the Province reserved to itself the right to unilaterally cancel the RFP and the right to propose a new RFP allowing additional bidders. If the exclusion clause were broad enough to exclude compensation for allowing ineligible bidders to participate, there seems to be little purpose in this reservation of the ability to cancel the RFP and issue a new one to a wider circle of bidders. It is also significant that the Province did not reserve to itself the right to accept a bid from an ineligible bidder or to unilaterally change the rules of eligibility. The RFP expressly did exactly the opposite. None of this, in my opinion, supports the view that the exclusion clause should be read as applying to the Province's conduct in this case.

**78**     To hold otherwise seems to me to be inconsistent with the text of the clause read in the context of the RFP as a whole and in light of its purposes and commercial context. In short, I cannot accept the contention that, by agreeing to exclude compensation for participating in this RFP process, the parties could have intended to exclude a damages claim resulting from the Province unfairly permitting a bidder to participate who was not eligible to do so. I cannot conclude that the provision was intended to gut the RFP's eligibility requirements as to who may participate in it, or to render meaningless the Minister's statutorily required approval of the alternative process where this was a key element. The provision, as well, was not intended to allow the Province to escape a damages claim for applying different eligibility criteria, to the competitive disadvantage of other bidders and for taking steps designed to disguise the true state of affairs. I cannot conclude that the parties, through the words found in this exclusion clause, intended to waive compensation for conduct like that of the Province in this case that strikes at the heart of the integrity and business efficacy of the tendering process which it undertook.

**79**     If I am wrong about my interpretation of the clause, I would hold, as did the trial judge, that its language is at least ambiguous. If, as the Province contends, the phrase "participating in this RFP" could reasonably mean "submitting a Proposal", that phrase could also reasonably mean "competing against the other eligible participants". Any ambiguity in the context of this contract requires that the clause be interpreted against the Province and in favour of Tercon under the principle *contra proferentem*: see, e.g. *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57, at pp. 68-69. Following this approach, the clause would not apply to bar Tercon's damages claim.

    V.    <u>Disposition</u>

**80**     I conclude that the judge did not err in finding that the Province breached the tendering contract or in finding that Tercon's remedy in damages for that breach was not precluded by the exclusion clause in the contract. I would therefore allow the appeal, set aside the order of the Court of Appeal and restore the judgment of the trial judge. The parties advise that the question of costs

has been resolved between them and that therefore no order in relation to costs is required.

The reasons of McLachlin C.J. and Binnie, Abella and Rothstein JJ. were delivered by

**81**    BINNIE J. (dissenting):-- The important legal issue raised by this appeal is whether, and in what circumstances, a court will deny a defendant contract breaker the benefit of an exclusion of liability clause to which the innocent party, not being under any sort of disability, has agreed. Traditionally, this has involved consideration of what is known as the doctrine of fundamental breach, a doctrine which Dickson C.J. in *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, suggested should be laid to rest 21 years ago (p. 462).

**82**    On this occasion we should again attempt to shut the coffin on the jargon associated with "fundamental breach". Categorizing a contract breach as "fundamental" or "immense" or "colossal" is not particularly helpful. Rather, the principle is that a court has no discretion to refuse to enforce a valid and applicable contractual exclusion clause unless the plaintiff (here the appellant Tercon) can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contact and defeat what would otherwise be the contractual rights of the parties. Tercon points to the public interest in the transparency and integrity of the government tendering process (in this case, for a highway construction contract) but in my view such a concern, while important, did not render unenforceable the terms of the contract Tercon agreed to. There is nothing inherently unreasonable about exclusion clauses. Tercon is a large and sophisticated corporation. Unlike my colleague Justice Cromwell, I would hold that the respondent Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion clause. In turn, there is no reason why the clause should not be enforced. I would dismiss the appeal.

I.    Overview

**83**    This appeal concerns a contract to build a $35 million road in the remote Nass Valley of British Columbia (the "Kincolith project"). The respondent Ministry accepted a bid from Brentwood Enterprises Ltd. that did not comply with the terms of tender. Tercon, as the disappointed finalist in the bidding battle, seeks compensation equivalent to the profit it expected to earn had it been awarded the contract.

**84**    Tercon alleged, and the trial judge found, that although the winning bid was submitted in the name of Brentwood (an eligible bidder) Brentwood in fact intended, with the Ministry's knowledge and encouragement, to do the work in a co-venture with an ineligible bidder, Emil Anderson Construction Co. ("EAC"). The respondent Ministry raised a number of defences including the fact that the formal contract was signed in the name of Brentwood alone. This defence was rejected in the courts below. The Ministry's substantial defence in this Court is that even if it failed to abide by the bidding rules, it is nonetheless protected by an exclusion of compensation clause set out clearly in the request for proposals ("RFP"). The clause provided that "no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP" and that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim" (s. 2.10

of the RFP).

**85**     The appeal thus brings into conflict the public policy that favours a fair, open and transparent bid process, and the freedom of contract of sophisticated and experienced parties in a commercial environment to craft their own contractual relations. I agree with Tercon that the public interest favours an orderly and fair scheme for tendering in the construction industry, but there is also a public interest in leaving knowledgeable parties free to order their own commercial affairs. In my view, on the facts of this case, the Court should not rewrite -- nor should the Court refuse to give effect to -- the terms agreed to by the parties.

**86**     I accept, as did the courts below, that the respondent Ministry breached the terms of its own RFP when it contracted with Brentwood, knowing the work would be carried out by a co-venture with Brentwood and EAC. The addition of EAC, a bigger contractor with greater financial resources than Brentwood, created a stronger competitor for Tercon than Brentwood alone. However, I also agree with the B.C. Court of Appeal that the exclusion of compensation clause is clear and unambiguous and that no legal ground or rule of law permits us to override the freedom of the parties to contract (or to decline to contract) with respect to this particular term, or to relieve Tercon against its operation in this case.

II.     The Tendering Process

**87**     For almost three decades the law governing a structured bidding process has been dominated by the concept of Contract A/Contract B initially formulated in *The Queen in Right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111. The analysis advanced by Estey J. in that case was that the bidding process, as defined by the terms of the tender call, may create contractual relations ("Contract A") prior in time and quite independently of the contract that is the actual subject matter of the bid ("Contract B"). Breach of Contract A may, depending on its terms, give rise to contractual remedies for non-performance even if Contract B is never entered into or, as in the present case, it is awarded to a competitor. The result of this legal construct is to provide unsuccessful bidders with a *contractual* remedy against an owner who departs from its own bidding rules. Contract A, however, arises (if at all) as a matter of interpretation. It is not imposed as a rule of law.

**88**     In *Ron Engineering*, the result of Estey J.'s analysis was that as a matter of contractual interpretation, the Ontario government was allowed to retain a $150,000 bid bond put up by Ron Engineering even though the government was told, a little over an hour after the bids were opened, that Ron Engineering had made a $750,058 error in the calculation of its bid and wished to withdraw it. Estey J. held:

> The contractor was not asked to sign a contract which diverged in any way from its tender but simply to sign a contract in accordance with the instructions to tenderers and in conformity with its own tender. [p. 127]

In other words, harsh as it may have seemed to Ron Engineering, the parties were held to their bargain. The Court was not prepared to substitute "fair and reasonable" terms for what the parties had actually agreed to.

**89**    In *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, Contract A included a "privilege" clause which stated that the owner was not obliged to accept the lowest or *any* tender. The Court implied a term, based on the presumed intention of the parties, that notwithstanding the privilege clause, only compliant bids were open to acceptance. While the owner was not obliged to accept the lowest compliant bid, the privilege clause did not, as a matter of contractual interpretation, give the owner "the privilege" of accepting a non-compliant bid. *M.J.B.* stops short of the issue in the present appeal because in that case, there was a breach of Contract A but no clause purporting to exclude liability on the part of the owner to pay compensation in the event of a Contract A violation.

**90**    In *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943, the Court enforced the rules of the bid depository system against a contractor whose bid was based on what turned out to be a mistaken view of its collective bargaining status with the International Brotherhood of Electrical Workers. The Court again affirmed that "[t]he existence and content of Contract A will depend on the facts of the particular case" (para. 36). Ellis-Don sought relief from its bid on the basis of a labour board decision rendered subsequent to its bid that upheld, to its surprise, the bargaining rights of the union. This Court held that no relief was contemplated in the circumstances under Contract A and none was afforded, even though this was a costly result when viewed from the perspective of Ellis-Don.

**91**    In *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860, citing *M.J.B.*, the Court implied a term in Contract A obligating the owner to be fair and consistent in the assessment of tender bids. On the facts, the disappointed bidder's claim of unfair treatment was rejected.

**92**    Finally, in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116, the unsuccessful bidder claimed that Edmonton had accepted, in breach of Contract A, a competitor's non-compliant bid to provide heavy equipment of a certain age to move refuse at a waste disposal site. The Court refused to imply a term "requiring an owner to investigate to see if bidders will really do what they promised in their tender" (para. 50). Accepting the existence of a duty of "fairness and equality", the majority nevertheless held that "[t]he best way to make sure that all bids receive the same treatment is for an owner to weigh bids on the basis of what is actually in the bid, not to weigh them on the basis of subsequently discovered information" (para. 52). In other words, the majority's interpretation of the express terms of Contract A was enforced despite Double N Earthmovers' complaint of double dealing by the owner.

**93**    On the whole, therefore, while *Ron Engineering* and its progeny have encouraged the establishment of a fair and transparent bidding process, Contract A continues to be based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent

of the parties. Only in rare circumstances will the Court relieve a party from the bargain it has made.

**94**    As to implied terms, *M.J.B*. emphasized (at para.29) that the focus is "the intentions of the actual parties". A court, when dealing with a claim to an implied term, "must be careful not to slide into determining the intentions of reasonable parties" (emphasis in original). Thus "if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis".

**95**    Tercon is a large and experienced contractor. As noted by Donald J.A. in the B.C. Court of Appeal, it had earlier "successfully recovered damages from the [Ministry] on a bidding default on a previous case" (2007 BCCA 592, 73 B.C.L.R. (4th) 201, at para. 15). See *Tercon Contractors Ltd. v. British Columbia* (1993) 9 C.L.R. (2d) 197 (B.C.S.C.) aff'd, [1994] BCJ No. 2658 (C.A.) (QL). Thus Tercon would have been more sensitive than most contractors to the risks posed by an exclusion of compensation clause. It nevertheless chose to bid on the project on the terms proposed by the Ministry.

III.    Tercon's Claim for Relief from the Exclusionary Clause it Agreed to

**96**    In these circumstances, the first question is whether there is either a statutory legal obstacle to, or a principled legal argument against, the freedom of these parties to contract out of the obligation that would otherwise exist for the Ministry to pay compensation for a breach of Contract A. If not, the second question is whether there is any other barrier to the court's enforcement of the exclusionary clause in the circumstances that occurred. On the first branch, Tercon relies on the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311 ("*Transportation Act*" or the "Act"). On the second branch, Tercon relies on the doctrine of fundamental breach.

A. *The Statutory Argument*

**97**    Section 4 of the *Transportation Act* provides that before awarding a highway contract, "the minister must invite tenders in any manner that will make the invitation for tenders reasonably available to the public", but then provides for several exceptions: "The minister need not invite tenders for a project ... if ... (c) the minister believes that an alternative contracting process will result in a competitively established cost for the project". Here the required ministerial authorization was obtained for an "alternative process". The reason is as follows. As noted by Cromwell J., the Ministry's original idea was to use a "design-build" model where a single contractor would design and build the highway for a fixed price. The Ministry issued a request for expressions of interest ("RFEI") which attracted six responses. One was from Tercon. Another was from Brentwood. EAC declined to bid because it did not think the "design-build" concept was appropriate for the job.

**98**    On further reflection, the Ministry decided not to pursue the design-build approach. It decided to design the highway itself. The contract would be limited to construction, as EAC had earlier advocated. EAC was not allowed to bid despite the Ministry coming around to its point of view on

the proper way to tender the project. The Ministry limited bidding on the new contest to the six respondents to the original RFEI, all of whom had been found capable of performing the contract. But to do so, it needed, and did obtain, the Minister's s. 4 approval.

**99**    A question arose during the hearing of the appeal as to whether the Minister actually approved an "alternative process" that not only restricted eligibility to the six participants in the RFEI process (an advantage to Tercon and the other five participants), but also contained the "no claims" clause excluding compensation for non-observance of its terms (no doubt considered a disadvantage). In its factum, the Ministry states:

> In this case, the Minister approved an alternate process under [s. 4(2) of the B.C. *Transportation Act* ]. That process was set out in the Instructions to Proponents, which included the No Claim Clause. Having been approved by the Minister, the package (including the No Claims Clause) complied with section 4 of the *Transportation Act*. [para. 70]

**100**    Tercon argued at the hearing of this appeal that as a matter of *law*, Contract A could not have included the exclusion clause because

> [t]he policy of the [*Transportation Act*] is to ensure that the Ministry is accountable; to preserve confidence in the integrity of the tendering process. To ensure that is so and that the Minister is accountable, the Ministry must be held liable for its breach of Contract A in considering and accepting a proposal from the joint venture... .
>
> ...
>
> **MADAM JUSTICE ABELLA:**  Can I just ask you one question. Is it your position, sir, that you can never have -- that a government can never have a no claims clause?
>
> **MR. McLEAN:**  Yes. Under this statute because of the policy of the statute. [Transcript, at pp. 26-27]

**101**    While it is true that the Act favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement, and cannot plausibly be interpreted to have that effect.

**102**    In the ordinary world of commerce, as Dickson C.J. commented in *Hunter*, "clauses limiting or excluding liability are negotiated as part of the general contract. As they do with all other contractual terms, the parties bargain for the consequences of deficient performance" (p. 461). Moreover, as Mr. Hall points out, "[t]here are many valid reasons for contracting parties to use

exemption clauses, most notably to allocate risks" (G. R. Hall, *Canadian Contractual Interpretation Law* (2007), at p. 243). Tercon for example is a sophisticated and experienced contractor and if it decided that it was in its commercial interest to proceed with the bid despite the exclusion of compensation clause, that was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

**103**    To the extent Tercon is now saying that as a matter of *fact* the Minister, in approving the RFP, did not specifically approve the exclusion clause, and that the contract was thus somehow *ultra vires* the Ministry, this is not an issue that was either pleaded or dealt with in the courts below. The details of the ministerial approval process were not developed in the evidence. It is not at all evident that s. 4 *required* the Minister to approve the actual terms of the RFP. It is an administrative law point that Tercon, if so advised, ought to have pursued at pre-trial discovery and in the trial evidence. We have not been directed to any exploration of the matter in the testimony and it is too late in the proceeding for Tercon to explore it now. Accordingly, I proceed on the basis that the exclusion clause did not run afoul of the statutory requirements.

B. *The Doctrine of the Fundamental Breach*

**104**    The trial judge considered the applicability of the doctrine of fundamental breach. Tercon argued that the Ministry, by reason of its fundamental breach, had forfeited the protection of the exclusion of compensation clause.

**105**    The leading case is *Hunter* which also dealt with an exclusion of liability clause. The appellants Hunter Engineering and Allis-Chalmers Canada Ltd. supplied gearboxes used to drive conveyor belts at Syncrude's tar sands operations in Northern Alberta. The gearboxes proved to be defective. At issue was a broad exclusion of warranty clause that limited time for suit and the level of recovery available against Allis-Chalmers (i.e. no recovery beyond the unit price of the defective products). Dickson C.J. observed: "In the face of the contractual provisions, Allis-Chalmers can only be found liable under the doctrine of fundamental breach" (p. 451).

**106**    This doctrine was largely the creation of Lord Denning in the 1950s (see, e.g., *Karsales (Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936 (C.A.)). It was said to be a rule of law that operated independently of the intention of the parties in circumstances where the defendant had so egregiously breached the contract as to deny the plaintiff substantially the whole of its benefit. In such a case, according to the doctrine, the innocent party was excused from further performance but the defendant could still be held liable for the consequences of its "fundamental" breach even if the parties had excluded liability by clear and express language. See generally S. M. Waddams, *The Law of Contracts* (5th ed. 2005), at para. 478; J. D. McCamus, *The Law of Contracts* (2005), at pp. 765 *et seq.*

**107**    The five-judge *Hunter* Court was unanimous in the result and gave effect to the exclusion clause at issue. Dickson C.J. and Wilson J. both emphasized that there is nothing inherently unreasonable about exclusion clauses and that they should be applied unless there is a compelling

reason not to give effect to the words selected by the parties. At that point, there was some divergence of opinion.

**108**    Dickson C.J. (La Forest J. concurring) observed that the doctrine of fundamental breach had "spawned a host of difficulties" (p. 460), the most obvious being the difficulty in determining whether a particular breach is fundamental. The doctrine obliged the parties to engage in "games of characterization" (p. 460) which distracted from the real question of what agreement the parties themselves intended. Accordingly, in his view, the doctrine should be "laid to rest". The situations in which the doctrine is invoked could be addressed more directly and effectively through the doctrine of "unconscionability", as assessed at the time the contract was made:

> It is preferable to interpret the terms of the contract, in an attempt to determine exactly what the parties agreed. If on its true construction the contract excludes liability for the kind of breach that occurred, the party in breach will generally be saved from liability. Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties, should the courts interfere with agreements the parties have freely concluded. [p. 462]

Dickson C.J. explained that "[t]he courts do not blindly enforce harsh or unconscionable bargains" (p. 462), but "there is much to be gained by addressing directly the protection of the weak from over-reaching by the strong, rather than relying on the artificial legal doctrine of 'fundamental breach'" (p. 462). To enforce an exclusion clause in such circumstances could tarnish the institutional integrity of the court. In that respect, it would be contrary to public policy. However, a *valid* exclusion clause would be enforced according to its terms.

**109**    Wilson J. (L'Heureux-Dubé J. concurring) disagreed. In her view, the courts retain some residual discretion to refuse to enforce exclusion clauses in cases of fundamental breach where the doctrine of *pre*-breach unconscionability (favoured by Dickson C.J.) did not apply. Importantly, she rejected the imposition of a general standard of reasonableness in the judicial scrutiny of exclusion clauses, affirming that "the courts ... are quite unsuited to assess the fairness or reasonableness of contractual provisions as the parties negotiated them" (p. 508). Wilson J. considered it more desirable to develop through the common law a *post*-breach analysis seeking a "balance between the obvious desirability of allowing the parties to make their own bargains ... and the obvious undesirability of having the courts used to enforce bargains in favour of parties who are totally repudiating such bargains themselves" (p. 510).

**110**    Wilson J. contemplated a two-stage test, in which the threshold step is the identification of a fundamental breach where "the foundation of the contract has been undermined, where the very thing bargained for has not been provided" (p. 500). Having found a fundamental breach to exist, the exclusion clause would *not* automatically be set aside, but the court should go on to assess whether, having regard to the circumstances of the breach, the party in fundamental breach should escape liability:

> Exclusion clauses do not automatically lose their validity in the event of a fundamental breach by virtue of some hard and fast rule of law. They should be given their natural and true construction so that the meaning and effect of the exclusion clause the parties agreed to at the time the contract was entered into is fully understood and appreciated. But, in my view, the court must still decide, having ascertained the parties' intention at the time the contract was made, whether or not to give effect to it <u>in the context of subsequent events such as a fundamental breach</u> committed by the party seeking its enforcement through the courts... . [T]he question essentially is: in the circumstances that have happened should the court lend its aid to A to hold B to this clause? [Emphasis added; pp. 510-11.]

**111**    Wilson J. reiterated that "as a general rule" courts should give effect to exclusion clauses *even in the case of fundamental breach* (p. 515). Nevertheless, a residual discretion to withhold enforcement exists:

> Lord Wilberforce [in *Photo Production Ltd. v. Securicor Transport Ltd.*, [1980] A.C. 827 (H.L.)] may be right that parties of equal bargaining power should be left to live with their bargains regardless of subsequent events. I believe, however, that there is some virtue in a residual power residing in the court to withhold its assistance <u>on policy grounds</u> in appropriate circumstances. [Emphasis added; p. 517]

Wilson J. made it clear that such circumstances of disentitlement would be rare. She acknowledged that an exclusion clause might well be accepted with open eyes by a party "very anxious to get" the contract (p. 509). However, Wilson J. did not elaborate further on what such circumstances might be because she found in *Hunter* itself that no reason existed to refuse the defendant Allis-Chalmers the benefit of the exclusion clause.

**112**    The fifth judge, McIntyre J., in a crisp two-paragraph judgment, agreed with the conclusion of Wilson J. in respect of the exclusion clause issue but found it "unnecessary to deal further with the concept of fundamental breach in this case" (p. 481).

**113**    The law was left in this seemingly bifurcated state until *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423. In that case, the Court breathed some life into the dying doctrine of fundamental breach while nevertheless affirming (once again) that whether or not a "fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law" (at para. 52). In other words, the question was whether the parties *intended* at the time of contract formation that the exclusion or limitation clause would apply "in circumstances of contractual breach, whether fundamental or otherwise" (para. 63). The Court thus emphasized that what was important was not the label ("fundamental or otherwise") but the intent of the contracting parties when they made their bargain. "The <u>only limitation</u> placed

upon enforcing the contract as written in the event of a fundamental breach", the Court in *Guarantee Co.* continued,

> would be to refuse to enforce an exclusion, of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., <u>or</u> [note the disjunctive "or"] unfair, unreasonable or otherwise contrary to public policy, according to Wilson J. [Emphasis added; para. 52.]

> (See also para. 64.)

What has given rise to some concern is not the reference to "public policy", whose role in the enforcement of contracts has never been doubted, but to the more general ideas of "unfair" and "unreasonable", which seemingly confer on courts a very broad after-the-fact discretion.

**114**   The Court's subsequent observations in *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461, should be seen in that light. *Domtar* was a products liability case arising under the civil law of Quebec, but the Court observed with respect to the common law:

> Once the existence of a fundamental breach has been established, the court must still analyse the limitation of liability clause in light of the general rules of contract interpretation. If the words can reasonably be interpreted in only one way, it will not be open to the court, <u>even on grounds of equity or reasonableness</u>, to declare the clause to be unenforceable since this would amount to rewriting the contract negotiated by the parties. [Emphasis added; para. 84.]

While the *Domtar* Court continued to refer to "fundamental breach", it notably repudiated any judicial discretion to depart from the terms of a valid contact upon vague notions of "equity or reasonableness". It did not, however, express any doubt about the residual category mentioned in *Guarantee Co.*, namely a refusal to enforce an exclusion clause on the grounds of public policy.

**115**   I agree with Professor Waddams when he writes:

> [I]t is surely inevitable that a court must reserve the ultimate power to decide when the values favouring enforceability are outweighed by values that society holds to be more important. [para. 557]

**116**   While memorably described as an unruly horse, public policy is nevertheless fundamental to contract law, both to contractual formation and enforcement and (occasionally) to the court's relief *against* enforcement. As Duff C.J. observed:

> It is the duty of the courts to give effect to contracts and testamentary

dispositions according to the settled rules and principles of law, since we are under a reign of law; but there are cases in which rules of law cannot have their normal operation because the law itself recognizes some paramount consideration of public policy which over-rides the interest and what otherwise would be the rights and powers of the individual.

(*Re Millar Estate*, [1938] S.C.R. 1, at p. 4)

See generally B. Kain and D. T. Yoshida, "The Doctrine of Public Policy in Canadian Contract Law", in T. L. Archibald and R. S. Echlin, eds., *Annual Review of Civil Litigation, 2007* (2007), 1.

**117**    As Duff C.J. recognized, freedom of contract will often, but not always, trump other societal values. The residual power of a court to decline enforcement exists but, in the interest of certainty and stability of contractual relations, it will rarely be exercised. Duff C.J. adopted the view that public policy "should be invoked only in clear cases in which the harm to the public is substantially incontestable, and does not depend upon the idiosyncratic inferences of a few judicial minds" (p. 7). While he was referring to public policy considerations pertaining to the nature of the *entire contract*, I accept that there may be well-accepted public policy considerations that relate directly to the nature of the *breach*, and thus trigger the court's narrow jurisdiction to give relief against an exclusion clause.

**118**    There are cases where the exercise of what Professor Waddams calls the "ultimate power" to refuse to enforce a contract may be justified, even in the commercial context. Freedom of contract, like any freedom, may be abused. Take the case of the milk supplier who adulterates its baby formula with a toxic compound to increase its profitability at the cost of sick or dead babies. In China, such people were shot. In Canada, should the courts give effect to a contractual clause excluding civil liability in such a situation? I do not think so. Then there are the people, also fortunately resident elsewhere, who recklessly sold toxic cooking oil to unsuspecting consumers, creating a public health crisis of enormous magnitude. Should the courts enforce an exclusion clause to eliminate contractual liability for the resulting losses in such circumstances? The answer is no, but the contract breaker's conduct need not rise to the level of criminality or fraud to justify a finding of abuse.

**119**    A less extreme example in the commercial context is *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650. The Alberta Court of Appeal refused to enforce an exclusion clause where the defendant Dow knowingly supplied defective plastic resin to a customer who used it to fabricate natural gas pipelines. Instead of disclosing its prior knowledge of the defect to the buyer, Dow chose to try to protect itself by relying upon limitation of liability clauses in its sales contracts. After some years, the pipelines began to degrade, with considerable damage to property and risk to human health from leaks and explosions. The court concluded that "a party to a contract will not be permitted to engage in unconscionable conduct secure in the

knowledge that no liability can be imposed upon it because of an exclusionary clause" (para. 53). (See also McCamus, at p. 774, and Hall, at p. 243). What was demonstrated in *Plas-Tex* was that the defendant Dow was so contemptuous of its contractual obligation and reckless as to the consequences of the breach as to forfeit the assistance of the court. The public policy that favours freedom of contract was outweighed by the public policy that seeks to curb its abuse.

**120**    Conduct approaching serious criminality or egregious fraud are but examples of well-accepted and "substantially incontestable" considerations of public policy that may override the countervailing public policy that favours freedom of contract. Where this type of misconduct is reflected in the breach of contract, all of the circumstances should be examined very carefully by the court. Such misconduct may disable the defendant from hiding behind the exclusion clause. But a plaintiff who seeks to avoid the effect of an exclusion clause must identify the overriding public policy that it says outweighs the public interest in the enforcement of the contract. In the present case, for the reasons discussed below, I do not believe Tercon has identified a relevant public policy that fulfills this requirement.

**121**    The present state of the law, in summary, requires a series of enquiries to be addressed when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed.

**122**    The first issue, of course, is whether as a matter of interpretation the exclusion clause even *applies* to the circumstances established in evidence. This will depend on the Court's assessment of the intention of the parties as expressed in the contract. If the exclusion clause does not apply, there is obviously no need to proceed further with this analysis. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable at the time the contract was made, "as might arise from situations of unequal bargaining power between the parties" (*Hunter*, at p. 462). This second issue has to do with contract formation, not breach.

**123**    If the exclusion clause is held to be valid and applicable, the Court may undertake a third enquiry, namely whether the Court should nevertheless refuse to enforce the valid exclusion clause because of the existence of an overriding public policy, proof of which lies on the party seeking to avoid enforcement of the clause, that outweighs the very strong public interest in the enforcement of contracts.

IV.    Application to the Facts of this Case

**124**    I proceed to deal with the issues in the sequence mentioned above.

A. *Did the Ministry Breach Contract A?*

**125**    The trial judge found that the parties intended to create contractual relations at the bidding stage (i.e. Contract A): 2006 BCSC 499, 53 B.C.L.R. (4th) 138, at para. 88. I agree with that conclusion. If there were no intent to form Contract A, there would be no need to exclude liability

for compensation in the event of its breach.

126    The Ministry argued that Contract A was not breached. It was entitled to enter into Contract B with Brentwood and it did so. There was no privity between the Ministry and EAC. The Ministry would have had no direct claim against EAC in the event of deficient performance. I accept as correct that Brentwood, having obtained Contract B, was in a position of considerable flexibility as to how and with whom it carried out the work. Nevertheless, it was open to the trial judge to conclude, as she did, that the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. At the end of an unfair process, she found, Contract B was not awarded to Brentwood (the eligible bidder) but to what amounted to a joint venture consisting of Brentwood and EAC. I therefore proceed with the rest of the analysis on the basis that Contract A was breached.

> B.    *What is the Proper Interpretation of the Exclusion of Compensation Clause and Did the Ministry's Conduct Fall Within its Terms?*

127    It is at this stage that I part company with my colleague Cromwell J. The exclusion clause is contained in the RFP and provides as follows:

> **2:10**...

>> Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agree that it has no claim.

In my view, "participating in this RFP" began with "submitting a Proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid *was* considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (ineligible) instead of Brentwood itself (eligible) would, I believe, take the Court up the dead end identified by Wilson J. in *Hunter*:

>> ... exclusion clauses, like all contractual provisions, should be given their natural and true construction. Great uncertainty and needless complications in the drafting of contracts will obviously result if courts give exclusion clauses strained and artificial interpretations in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause. [p. 509]

Professor McCamus expresses a similar thought:

>> ... the law concerning exculpatory clauses is likely to be more rather than less

> predictable if the underlying concern is openly recognized, as it is in *Hunter*,
> rather than suppressed and achieved indirectly through the subterfuge of strained
> interpretation of such terms. [p. 778]

**128**    I accept the trial judge's view that the Ministry was at fault in its performance of the RFP, but the conclusion that the process thereby ceased to be the RFP process appears to me, with due respect to colleagues of a different view, to be a "strained and artificial interpretatio[n] in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause".

**129**    As a matter of interpretation, I agree with Donald J.A. speaking for the unanimous court below:

> The [trial] judge said the word "participating" was ambiguous. With
> deference, I do not find it so. The sense it conveys is the contractor's involvement
> in the RFP/contract A <u>stage</u> of the process. I fail to see how "participating" could
> bear any other meaning. [Emphasis added; para. 16.]

Accordingly, I conclude that on the face of it, the exclusion clause applies to the facts described in the evidence before us.

> C.    *Was the Claim Excluding Compensation Unconscionable at the Time Contract A
> was Made?*

**130**    At this point, the focus turns to contract formation. Tercon advances two arguments: firstly, that it suffered from an inequality of bargaining power and secondly, (as mentioned) that the exclusion clause violates public policy as reflected in the *Transportation Act*.

> (1)    <u>Unequal Bargaining Power</u>

**131**    In *Hunter*, Dickson C.J. stated, at p. 462: "Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties, should the courts interfere with agreements the parties have freely concluded." Applying that test to the case before him, he concluded:

> I have no doubt that unconscionability is not an issue in this case. Both
> Allis-Chalmers and Syncrude are large and commercially sophisticated
> companies. Both parties knew or should have known what they were doing and
> what they had bargained for when they entered into the contract. [p. 464]

While Tercon is not on the same level of power and authority as the Ministry, Tercon is a major contractor and is well able to look after itself in a commercial context. It need not bid if it doesn't like what is proposed. There was no relevant imbalance in bargaining power.

(2)    Policy of the *Transportation Act*

**132**    As mentioned earlier, Tercon cites and relies upon the policy of the Act which undoubtedly favours the transparency and integrity of the bidding process. I have already discussed my reasons for rejecting Tercon's argument that this "policy" operates as a bar to the ability of the parties to agree on such commonplace commercial terms as in the circumstances they think appropriate. In addition, the exclusion clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A (specific performance or injunctive relief, for example) were available.

**133**    In this case, injunction relief *was* in fact a live possibility. Although Tercon was not briefed on the negotiations with other bidders, the trial judge found that Glenn Walsh, the owner of Tercon, "had seen representatives of EAC with Brentwood following [the Brentwood/EAC interviews with the Ministry and Bill Swain of Brentwood]", and when asked whether Tercon was going to sue, Walsh had said "no" without further comment. Had Tercon pushed for more information and sought an injunction (as a matter of private law, not public law), at that stage the exclusion clause would have had no application, but Tercon did not do so. This is not to say that estoppel or waiver applies. Nor is it to say that injunctive relief would be readily available in many bidding situations (although if an injunction had been sought here, the unavailability of the alternative remedy of monetary damages might have assisted Tercon). It is merely to say that the exclusion clause is partial, not exhaustive.

**134**    The Kincolith road project presented a serious construction challenge on a tight time frame and within a tight budget. Contract A did not involve a bid for a fixed price contract but for the right to negotiate the bid details once the winning proponent was selected. In such a fluid situation, *all* participants could expect difficulties in the contracting process. Members of the construction bar are nothing if not litigious. In the circumstances, the bidders might reasonably have accepted (however reluctantly) the Ministry's need for a bidding process that excluded compensation, and adjusted their bids accordingly. The taxpayers of British Columbia were not prepared to pay the contractor's profit twice over -- once to Brentwood/EAC for actually building the road, and now to Tercon, even though in Tercon's case the "profit" would be gained without Tercon running the risks associated with the performance of Contract B. The Court should not be quick to declare such a clause, negotiated between savvy participants in the construction business, to be "contrary to the Act".

D.    *Assuming the Validity of the Exclusion Clause at the Time the Contract was Made, is There Any Overriding Public Policy That Would Justify the Court's Refusal to Enforce it?*

**135**    If the exclusion clause is not invalid from the outset, I do not believe the Ministry's performance can be characterized as so aberrant as to forfeit the protection of the contractual exclusion clause on the basis of some overriding public policy. While there is a public interest in a fair and transparent tendering process, it cannot be ratcheted up to defeat the enforcement of Contract A in this case. There *was* an RFP process and Tercon participated in it.

**136**    Assertions of ineligible bidders and ineligible bids are the bread and butter of construction litigation. If a claim to defeat the exclusion clause succeeds here on the basis that the owner selected a joint venture consisting of an eligible bidder with an ineligible bidder, so also by a parity of reasoning should an exclusion clause be set aside if the owner accepted a bid ineligible on other grounds. There would be little room left for the exclusion clause to operate. A more sensible and realistic view is that the parties here expected, even if they didn't like it, that the exclusion of compensation clause would operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

**137**    While the Ministry's conduct was in breach of Contract A, that conduct was not so extreme as to engage some overriding and paramount public interest in curbing contractual abuse as in the *Plas-Tex* case. Brentwood was not an outsider to the RFP process. It was a legitimate competitor. All bidders knew that the road contract (i.e. Contract B) would not be performed by the proponent alone. The work required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major sub-contractor (to which Tercon could not have objected) or identified with Brentwood as a joint venture "proponent" with EAC. All bidders were made aware of a certain flexibility with respect to the composition of any proponent's "team". Section 2.8(b) of the RFP provided that if "a material change has occurred to the Proponent since its qualification under the RFEI, including if the composition of the Proponent's team members has changed, ... the Ministry may request [further information and] ... reserves the right to disqualify that Proponent, and reject its Proposal". Equally, "[i]f a qualified Proponent is concerned that it has undergone a material change, the Proponent can, at its election, make a preliminary submission to the Ministry, in advance of the Closing Date, and before submitting a Proposal... . The Ministry will, within three working days of receipt of the preliminary submission give a written decision as to whether the Proponent is still qualified to submit a Proposal."

**138**    The RFP issued on January 15, 2001. The Ministry was informed by Brentwood of a "proposed material change to our team's structure" in respect of a joint venture with EAC by fax dated January 24, 2001. From the Ministry's perspective, the change was desirable. EAC was a bigger company, had greater expertise in rock drilling and blasting (a major part of the contract) and a stronger balance sheet. EAC was identified in Brentwood's amended proposal as a sub-contractor. In the end, the Ministry did not approve the January 14, 2001 request, presumably because it doubted that a change in the "composition of the Proponent's team's members" could, according to the terms of the RFP, include a change in the Proponent itself.

**139**    The Ministry did obtain legal advice and did not proceed in defiance of it. On March 29, 2001, the Ministry noted in an internal e-mail that a Ministry lawyer (identified in the e-mail) had come to the conclusion that the joint venture was not an eligible proponent but advised that Contract B could lawfully be structured in a way so as to satisfy both Brentwood/EAC's concerns and avoid litigation from disappointed proponents.

**140**    I do not wish to understate the difference between EAC as a sub-contractor and EAC as a

joint-venturer. Nor do I discount the trial judge's condemnation of the Ministry's lack of fairness and transparency in making a contract B which on its face was at odds with what the trial judge found to be the true state of affairs. Tercon has legitimate reason to complain about the Ministry's conduct. I say only that based on the jurisprudence, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

**141**    The construction industry in British Columbia is run by knowledgeable and sophisticated people who bid upon and enter government contracts with eyes wide open. No statute in British Columbia and no principle of the common law override their ability in this case to agree on a tendering process including a limitation or exclusion of remedies for breach of its rules. A contractor who does not think it is in its business interest to bid on the terms offered is free to decline to participate. As Donald J.A. pointed out, if enough contractors refuse to participate, the Ministry would be forced to change its approach. So long as contractors are willing to bid on such terms, I do not think it is the court's job to rescue them from the consequences of their decision to do so. Tercon's loss of anticipated profit is a paper loss. In my view, its claim is barred by the terms of the contract it agreed to.

     V.    <u>Disposition</u>

**142**    I would dismiss the appeal without costs.

*Appeal allowed,* McLACHLIN C.J. *and* BINNIE, ABELLA *and* ROTHSTEIN JJ. *dissenting.*


**Solicitors:**

*Solicitors for the appellant: McLean & Armstrong, West Vancouver.*

*Solicitor for the respondent: Attorney General of British Columbia, Victoria.*

*Solicitor for the intervener: Attorney General of Ontario, Toronto.*


\* \* \* \* \*

Corrigendum, released March 18, 2010

Please note the following changes in *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, released February 12, 2010:

    (1)    Para. 5, line 2: "RFP" should read "request for proposals ("RFP")".
    (2)    Para. 9, line 7: "request for proposals ("RFP")" should read "RFP".
    (3)    Para. 26, lines 2-4: "This was specified in the Minister of Transportation and

Highway's ("Minister") approval of the process before the RFP was issued." should read "This was specified in the approval of the process by the Minister of Transportation and Highways ("Minister") before the RFP was issued."

(4)    Para. 39, line 2 of the quote: " The [project evaluation panel ("PEP")] approved" should read "The [project evaluation panel] approved". In line 3 of the quote, "PEP" should read "[panel]".

(5)    Para. 47, line 2: "PEP" should read "project evaluation panel ("PEP")".

(6)    Para. 50, line 7: "appears" should read " "appears".

(7)    Para. 58, line 8 of the quote: "fo" should read "of". In line 9 of the quote "exclude" should read "include".

(8)    Para. 81, line 6: "[1989" should read "[1989]".

(9)    Para. 85, line 5: "knowledgable" should read "knowledgeable".

(10)    Para. 91, line 1: "2006" should read "2000".

(11)    Para. 113, line 12: "*Guarantee Trust*" should read "*Guarantee Co.*".

(12)    Para. 114, line 4 after the quote: "*Guarantee Trust*" should read "*Guarantee Co.*".

*Case Name:*
# The Plan Group v. Bell Canada

**Between**
**Bell Canada, Respondent (Appellant), and**
**The Plan Group, 1248163 Ontario Limited, 1248164 Ontario**
**Limited and 1248165 Ontario Limited, Applicants (Respondents)**

[2009] O.J. No. 2829

**2009 ONCA 548**

252 O.A.C. 71

96 O.R. (3d) 81

81 C.L.R. (3d) 9

62 B.L.R. (4th) 157

2009 CarswellOnt 3807

179 A.C.W.S. (3d) 40

Docket: C48892

Ontario Court of Appeal
Toronto, Ontario

**S.T. Goudge, E.E. Gillese and R.A. Blair JJ.A.**

Heard: December 18, 2008.
Judgment: July 7, 2009.

(215 paras.)

*Alternative dispute resolution -- Binding arbitration -- Voluntary binding arbitration -- Agreement*
*to arbitrate -- Interpretation -- Appeal by Bell Canada from application judge's interpretation of an*
*arbitration clause allowed -- Application judge erred in his failure to give meaning to important*
*term of arbitration clause specifying that arbitration was to be conducted "under the then-current*

*rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

*Administrative law -- Judicial review and statutory appeal -- Standard of review -- Correctness -- Appeal by Bell Canada from application judge's interpretation of an arbitration clause allowed -- Application judge erred in his failure to give meaning to important term of arbitration clause specifying that arbitration was to be conducted "under the then-current rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

*Contracts -- Interpretation -- General principles -- Ordinary meaning -- Consider the entire contract -- Appeal by Bell Canada from application judge's interpretation of an arbitration clause allowed -- Application judge erred in his failure to give meaning to important term of arbitration clause specifying that arbitration was to be conducted "under the then-current rules" of Institute -- He further erred in interpretation of phrase "to file" in waiver provision of arbitration clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained.*

Appeal by Bell Canada from an application judge's interpretation of an arbitration agreement. Bell and The Plan Group entered into an Alliance Agreement in February 1999 concerning joint projects for the delivery of services to customers on cabling projects. The Agreement contained a two-step dispute resolution process. The parties were first to engage in good faith discussions using their commercially-reasonable efforts to settle the dispute. Thereafter, if those discussions failed, the parties were to resort to arbitration. The arbitration clause stipulated that it was to be conducted under the Arbitration Act "and the then-current rules" of the Institute. In this regard there were two sets of rules that were considered by the application judge - those that were in effect at the time the Agreement was negotiated (the 1999 Rules), and those that were in effect at the time the dispute arose between the parties (the Current Rules). In 2005, a dispute arose between Bell and The Plan Group in relation to work performed under the Agreement for the Greater Toronto Airport Authority. The differences could not be resolved, and in August 2005 The Plan Group delivered to Bell a draft notice demanding arbitration. In December 2005, it delivered a final notice demanding arbitration. However, no notice to arbitrate the dispute was ever filed with the Institute. The arbitration clause's waiver provision specified that a failure to file a notice of arbitration in time would constitute an irrevocable waiver of the claim. The application judge held that the arbitration clause did not mandate delivery and filing of a Notice of Arbitration. The arbitration clause contemplated that after commencement of the arbitration and the appointment of the arbitrator, the arbitrator would apply the 1999 ADR Rules during the proceedings. The arbitration clause did not express the intention of the parties that any dispute or any arbitration under the Agreement was to be arbitrated and resolved in accordance with the rules of the Institute. On a plain reading, the arbitration clause limited the reach of the 1999 Rules to the conduct of the arbitration rather than requiring compliance with all such Rules. The arbitration clause expressly stipulated the procedure for the appointment of the arbitrator, thus contemplating a procedure for the appointment of an

arbitrator outside the Rules of the Institute. The parties agreed that the arbitrator was to apply the procedural rules of the Institute in effect from time to time in the conduct of the arbitration and did not agree that either the remaining rules of the Institute were also to be applied in respect of any arbitration under the Agreement or that the Institute was to administer any such arbitration. By the reference to the then-current rules of the Institute in the second sentence of the arbitration clause, the parties did not agree to accept the possibility that their agreement could be overridden by a substitution of the Current Rules for the 1999 Rules by the Institute.

HELD: Appeal allowed, order set aside, and arbitration under the Alliance Agreement directed to be commenced by filing a Notice of Request to Arbitrate with the Institute. The application judge's interpretation of the arbitration clause was to be reviewed on a standard of correctness. The application judge erred in his failure to give meaning and effect to an important term of the arbitration clause specifying that the arbitration was to be conducted "under the then-current rules" of the Institute. He further erred in his interpretation of the phrase "to file" in the waiver provision of the clause as "to deliver" or "to serve" the notice upon Bell, which could not be sustained. The application judge erred by misapplying, or failing to apply, the principle that a contract was to be interpreted in a manner that gave meaning to all of its terms and avoided an interpretation that rendered one or more of its terms ineffective. The error stemmed in large part from his undue focus on the parties' "conceptual approaches" to the arbitration rather than on the wording of the arbitration clause itself. His approach led him to ground his interpretation on a set of Institute rules (the 1999 Rules) that had no direct application and, even to the extent they provided "context" to the interpretive exercise, did not support the interpretation he adopted. That error reinforced the narrow interpretation of the arbitration clause he embraced, premised on his erroneous conclusion as to the nature of the arbitration the parties had agreed to. This led to his refusal to give effect to the set of Institute rules that were applicable (the Current Rules) because - in his view - they represented a "fundamental change" from that flawed view of the nature of the arbitration process agreed to. In refusing to apply the Current Rules, the application judge ignored, and failed to give effect to, the clear and unequivocal language of the arbitration clause stipulating that the arbitration was to be conducted under "the then-current rules" of the Institute. The application judge equated the word "filing" in the waiver clause with "delivering" the notice to, or "serving" it upon, the other side. In the context of a legal document relating to the resolution of disputes, "filing" could not be properly or reasonably interpreted to bear such a meaning. "Filing" was a well-understood concept in the dispute resolution milieu. It meant placing or depositing a document with the institutional overseer of the proceeding. It did not mean delivering the document to, or leaving it with, or serving it upon, the other party. The application judge's erroneous interpretation of the waiver provision served to bolster his conclusion that the type of arbitration agreed to was not one that was to be administered by the Institute and that the clause was to be interpreted largely in light of the application of the 1999 Rules.

**Statutes, Regulations and Rules Cited:**

Arbitration Act, 1991, S.O. 1991, c. 17, s. 2(1), s. 6, s. 23

**Appeal From:**

On appeal from the judgment of Justice Herman J. Wilton-Siegel of the Superior Court of Justice dated April 29, 2008 and reported at (2008), 71 C.L.R. (3d) 205, [2008] O.J. No. 1633.

**Counsel:**

Matthew P. Gottlieb and James D. Bunting, for the appellant.

Neal J. Smitheman and Antonio Di Domenico, for the respondents.

---

Reasons for judgment were delivered by R.A. Blair J.A., concurred in by S.T. Goudge J.A. Separate dissenting reasons were delivered by E.E. Gillese J.A.

**R.A. BLAIR J.A.**:--

## I. BACKGROUND

**1**    Bell and The Plan Group entered into an Alliance Agreement on February 1, 1999, concerning joint projects for the delivery of services to customers on cabling projects in the Greater Toronto Region. The Agreement contained a two-step dispute resolution process, found in section 22. The parties were first to engage in good faith discussions using "their commercially reasonable efforts to settle the dispute" (s. 22.1). Thereafter, if those discussions failed, the parties were to resort to arbitration (s. 22.2).

**2**    Section 22.2, the arbitration clause - the interpretation of which is at the heart of this appeal - reads as follows:

> Bell and [The Plan Group] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 21.1 hereof.[1] *A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc.* Bell and [The Plan Group] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered into any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.*

[Emphasis added.][2]

**3**    The second sentence of the arbitration clause (which I shall refer to as "the conduct of arbitration provision") stipulates that the arbitration will be conducted under the *Arbitration Act, 1991*, S.O. 1991, c. 17, "and the then-current rules" of the Institute. In this regard there are two sets of rules that were considered by the application judge - those that were in effect at the time the Agreement was negotiated (the "1999 Rules"), and those that were in effect at the time the dispute arose between the parties (the "Current Rules").

**4**    In 2005, a dispute arose between Bell and The Plan Group in relation to certain work performed under the Agreement for the Greater Toronto Airport Authority. Invoices exceeding $40 million in value were at the heart of the dispute. The differences could not be resolved through "commercially reasonable efforts to settle." Accordingly, on August 26, 2005, The Plan Group delivered to Bell a draft notice demanding arbitration. On December 14, 2005 it delivered a final notice demanding arbitration. No notice to arbitrate the dispute was - nor has one ever been - filed with the Institute, however. The last sentence of the arbitration clause (which I will refer to as the "waiver provision") specifies that a failure to file a notice of arbitration in time will constitute an irrevocable waiver of the claim.

## II. THE POSITIONS OF THE PARTIES

**5**    Bell has repeatedly taken the position that, in order to commence the arbitration, The Plan Group must deliver to Bell and file with the Institute, a written notice of request to arbitrate. This position is based upon section 22.2 of the Agreement, and the requirements of Articles 11 and 13 of the Current Rules. Article 11 provides for the submission of disputes under agreements to arbitration "by delivering a written Notice of Request to Arbitrate to the respondent". Article 13 specifies that, "The arbitration *is deemed to have commenced* when a Notice of Request to Arbitrate ... *has been filed with the Institute* and the initial filing fee has been paid" (emphasis added). Bell also relies on Article 5, which says that, "By agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute", and the stipulation in Article 3 that, "To the extent that the Rules conflict with the Act, the provisions of the Rules shall apply".

**6**    The Plan Group contends, on the other hand, that no notice of arbitration need be filed with the Institute for the arbitration to be commenced. It submits that none of the Rules of the Institute apply to govern the initiation or commencement of the arbitration and that the Rules are only engaged after the arbitrator has been chosen and only to the extent that the Institute's rules pertain to the procedural conduct of the arbitration. The arbitration may be commenced in any way permissible under the Act, The Plan Group argues, and it has complied with section 23(1)3 of the Act by delivering provisional and final notices demanding arbitration upon Bell.

**7**    Underlying all of these arguments is the real issue between the parties. It is Bell's position that as a result of The Plan Group's failure to file a notice of arbitration with the Institute, its complaints are time barred by virtue of the closing sentence of Section 22.2 cited above. For reasons that are

not entirely clear on the record, this issue has not been addressed directly. Instead, it has been equated by the parties - and by the application judge - with the issue of how the arbitration is to be commenced.

## III. LAW AND ANALYSIS

### Interlocutory/Final Order

**8**    The Plan Group argues that the judgment below is interlocutory in nature and, therefore, that Bell requires leave to appeal, which it has not sought. I disagree. The decision is a final order because it finally determined the only issue raised in the application before the application judge.

**9**    The Plan Group's theory is that the practical and legal result of the decision is to confirm that an arbitration proceeding has already been commenced, given the declaration that the filing of a notice of arbitration was not necessary to commence the arbitration. The decision was therefore an intervention by the court to assist in the conduct of the arbitration in order to ensure that the arbitration was being conducted in accordance with the arbitration clause in the Agreement, as contemplated by s. 6 of the *Arbitration Act, 1991*. So far as is relevant, s. 6 provides:

> ### Court intervention limited
>
> 6.    No court shall intervene in matters governed by this Act, except for the following purposes, in accordance with this Act:
>
> > 1.    To assist the conducting of arbitrations.
> > 2.    To ensure that arbitrations are conducted in accordance with arbitration agreements.

**10**    The Plan Group accordingly submits that the decision below was simply interlocutory in nature, within the context of an ongoing arbitration proceeding; it did not finally determine any substantive matter in the arbitration.

**11**    There is no merit in this argument. It misconceives the nature and purpose of the interlocutory/final order dichotomy, which is to act as a gatekeeper for appeals to a higher court in the particular proceeding before the courts. An application, like an action, is a free-standing proceeding.

**12**    The classic explanation of whether an order is final or interlocutory is that of Middleton J.A. in *Hendrickson v. Kallio*, [1932] O.R. 675 (C.A.), at p. 678:

> The interlocutory order from which there is no appeal is an order which does not determine the real matter in dispute between the parties - the very subject matter

of the litigation, but only some matter collateral. It may be final in the sense that it determines the very question raised by the application,[3] but it is interlocutory if the merits *of the case* remain to be determined. [Emphasis added.]

**13**    Here, the merits *of the case* - i.e., of the application proceeding before the court - have been determined.

**14**    In my view, the decision of this Court in *Buck Bros. Ltd. v. Frontenac Builders Ltd.* (1994), 19 O.R. (3d) 97 (C.A.), is determinative of this issue. There, Morden A.C.J.O. made it quite clear that ancillary proceedings are not relevant in determining whether an order of a judge is final or interlocutory.

**15**    In *Buck Bros.*, the application judge, [1994] O.J. No. 37, ordered that whether a condition precedent for arbitration had been met should be determined, not by the court, but by a panel of arbitrators appointed in accordance with the arbitration agreement. An appeal was launched, but the responding party moved to have the appeal quashed. The argument was that the order under appeal was interlocutory, because the real subject-matter of the litigation between the parties was still to be determined on the merits in the arbitration, and therefore the appeal was not properly before the court.

**16**    Morden A.C.J.O rejected this argument. At p. 100, after citing the passage from *Hendrickson v. Kallio* set out above, he said:

> In one sense, it can be said that the order in question does not determine "the real matter in dispute between the parties" (which is the right of the moving parties to be paid fair and equitable consideration by the responding parties and, if so, its amount, or, something less than this, whether the condition precedent to commencing an arbitration proceeding has been met). I do not think, however, that, in the circumstances, the order is interlocutory. I read the passage from *Hendrickson v. Kallio* as referring to "the real matter in dispute between the parties" *in the proceeding which is before the court* and not in some other proceeding which may, or may not, then be in existence. In accordance with this interpretation, I read "the litigation" in "the very subject matter of the litigation" as referring to the proceeding in which the order in question is made. Similarly, I read "the case" in "if the merits of the case remain to be determined" as also referring to the proceeding in which the order is made. [Emphasis in original.]

**17**    Contrary to the submission of The Plan Group, the decision of the British Columbia Court of Appeal in *Tamarack Capital Advisors Inc. v. SEM Holdings Ltd.* (2006), 54 B.C.L.R. (4th) 80 (C.A.), does not conflict with *Buck Bros*. In *Tamarack*, the proposed appeal was from an order dismissing a motion for a stay of the action. It was a not a final order because it did not determine a substantive matter in the litigation; it had merely refused to stay the proceeding.

**18**    I conclude that the judgment of Wilton-Siegel J. here is a final order. Leave to appeal from it is not necessary.

**Standard of Review**

**19**    The parties disagree on the standard of review applicable to the application judge's interpretation of the Agreement. Bell submits that the interpretation of the Agreement is a question of law, and therefore is reviewable on a standard of correctness. The Plan Group argues that the interpretation of the Agreement involves questions of mixed fact and law, and that this court cannot intervene absent palpable and overriding error.

**20**    The historical view is that the interpretation of a contract is a question of law, and reviewable on the standard of correctness. However, the standard of appellate review in matters of contractual interpretation is not as straightforward as it once appeared to be, and there has been considerable debate about it in the jurisprudence since the decision of the Supreme Court of Canada in *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235.

**21**    *Housen* is considered to be the leading authority on the standard of appellate review, directing that the applicable standard of review will depend upon the nature of the question - whether the alleged error is one of law, mixed fact and law, or fact. But, it is fair to say that appellate courts across the country have sent mixed signals about the standard of review in contract interpretation cases in the post-*Housen* era. In British Columbia, the general approach seems to be to treat contractual interpretation as a matter of mixed fact and law attracting review on a deferential basis.[4] In Alberta, on the other hand, the opposite appears to be the case. The interpretation of contracts is considered to be a question of law, giving rise to a standard of correctness.[5] New Brunswick and Nova Scotia appear to hold to the traditional view that the standard of review in contractual interpretation is correctness, while recognizing that a trial judge's findings of fact and drawing of factual inferences should be accorded deference.[6]

**22**    Steel J.A. addressed the current status of this dialogue in *Prairie Petroleum Products Ltd. v. Husky Oil Ltd.* (2008), 295 D.L.R. (4th) 146 (Man. C.A.), at paras. 34-36, where she said:

> Until recently, interpretation of a contract was considered a question of law reviewable by an appellate court on a standard of correctness.
>
> At present, however, the standard of appellate review will depend on the nature of the question, whether it is a question of law, a question of fact or a question of mixed fact and law. *A question of law attracts the correctness standard, while a palpable and overriding error must be found with respect to a question of fact or mixed fact and law*. See *Housen*.

> The proper interpretation and application of the principles of contractual interpretation is a question of law. A trial judge's determination of the factual matrix, consideration of extrinsic evidence and consideration of the evidence as a whole is a question of fact. Finally, the application of the legal principles to the language of the contract in the context of the relevant facts, or a question involving an intertwining of fact and law, is a question of mixed fact and law. [Citations omitted; emphasis added.]

**23**    I generally agree with Steel J.A.'s summary, except for her categorical statement - purportedly reflecting *Housen* - suggesting that questions of mixed fact and law always attract the palpable and overriding error standard. In my view, *Housen* does not stand for such a definitive statement, nor does the jurisprudence in this Court.

**24**    It must be remembered, particularly when considering the appropriate standard of review for questions of mixed fact and law, that the Court in *Housen* did not tackle that subject in the context of contractual interpretation. It did so *clearly and explicitly* in the context of a negligence action, an entirely different brand of case.

**25**    The distinction between these two types of cases is meaningful for these purposes, it seems to me. Whereas the application of legal principles to the facts in a negligence action is very much a fact-driven exercise, the interpretation of a contract - leaving aside the factual issues that may underlie the task - is not; it is very much a legal exercise. In my view, Lang J.A. of this Court accurately summarized the effect of *Housen* in *MacDougall v. MacDougall* (2006), 262 D.L.R. (4th) 120, at para. 25, when she said:

> The leading authority on standard of review is *Housen v. Nikolaisen*. *Housen* does not address directly the standard of review for the interpretation of a contract. Rather, it canvasses the standard of review in a case involving the application of the law of negligence to findings of fact. *In that context*, it distinguishes among questions of fact, questions of law, and questions of mixed fact and law concluding that questions of fact are reviewed on the standard of palpable and overriding error and questions of law on the standard of correctness. Where the question of fact and of law are inextricably intertwined so that the question is one of mixed fact and law, the trial judge's finding is entitled to deference. [Citations omitted; emphasis added.]

**26**    In determining the proper standard of review, however, it is important to keep in mind the distinction between the nature of the question addressed by the trial court (i.e. a question of fact, a question of law, or a question of mixed fact and law) and the standard of appellant review of the trial court's disposition of that question. The distinction does not matter if the trial court was answering a question of fact (where the standard of appellant review is palpable and overriding error) or a question of law (where it is correctness). But the distinction *is* important where the

question addressed was one of mixed fact and law. To say that a matter raises a question of mixed fact and law, by itself, does not mean that the standard of appellate review is necessarily one of palpable and overriding error. As *Housen* tells us, at para. 36, "matters of mixed fact and law lie along a spectrum." Thus, where the question at issue is determined to be one of mixed fact and law, the appellate court must take a further step and go on to locate the precise question at the proper point on the *Housen* spectrum in order to determine the applicable standard of appellate review.

**27**   Where the matter referred to is more a matter of legal principle and sits towards the error of law end of the spectrum, the standard is correctness. Where the matter is one in which the legal principle and the facts are inextricably intertwined - where the facts dominate, as it were - it falls more towards the factual end of the spectrum, and significant deference must be accorded. Contractual interpretation, in my opinion, is generally the type of case that falls within the former category, negligence one that generally falls into the latter.

**28**   In my view, this distinction between the nature of the question to be determined and the standard of appellate review to be applied to that determination can help in clarifying a number of cases that might otherwise be misunderstood. For example, in *Casurina Limited Partnership et al. v. Rio Algom Ltd. et al.* (2004), 181 O.A.C. 19 (C.A.), at para. 34, Feldman J.A. concluded that, "The construction of a written instrument is a question of mixed fact and law". She did not say, however - nor should she be understood to have said, I think - that a deferential standard of appellate review must *always* be applied to the interpretation of a contract. Indeed, in *Palumbo v. Research Capital Corp.* (2005), 72 O.R. (3d) 241 (C.A.), Laskin J.A. observed at para. 32 that, "The standard of review of the interpretation of a contract provision ordinarily is correctness."

**29**   The palpable and overriding error standard of review, it seems to me, is designed to afford deference to trial judges in their essential fact-finding functions, including the drawing of inferences from the facts and the determination of issues where law and facts are inextricably intermixed. We leave it to trial judges to sort these matters out with good reason. They have seen and heard the witnesses and are attuned to the dynamics of the trial. In *Waxman et al. v. Waxman et al.* (2004), 186 O.A.C. 201, at para. 292, this Court articulated the policy reasons for giving such deference to trial judges:

> The "palpable and overriding" standard demands strong appellate deference to findings of fact made at trial. Some regard the standard as neutering the appellate process and precluding the careful second hard look at the facts that justice sometimes demands. This viewpoint is tenable only if facts found on appeal are more likely to be accurate than those determinations made at trial. If findings of fact were to be made on appeal they might be different from those made at trial. Most cases that go through trial and onto appeal will involve evidence open to more than one interpretation. Merely because an appellate court might view the evidence differently from the trial judge and make different findings is not, however, any basis for concluding that the appellate court's findings will be more

accurate and its result more consistent with the justice of the particular case than the result achieved at trial.

**30**    The exercise of interpreting a contract is not essentially a fact-finding exercise, however. As the authorities cited above have noted, there may be questions involving the determination of the factual context in which the contract was negotiated, or considerations of extrinsic evidence, that evoke the fact-finding functions. Those decisions are to be addressed from the palpable and overriding error perspective. In substance, though, the exercise of interpreting a contract is a legal exercise, calling upon the learning and training that judges and lawyers acquire over years of experience. Apart from the truly factual aspects that may underlie the task, trial judges have no particular advantage over appellate judges in the art of contractual interpretation.

**31**    In my view, certainty in contract is an important policy value underlying the construction of contracts. This factor alone is sufficient to push the standard of review in such cases towards correctness and away from deference. At the very least, contractual interpretation is an exercise that generally falls much more towards the error of law end of the *Housen* spectrum, once the factual issues referred to above have been resolved or if - as is the case here - they are not in dispute. The Supreme Court of Canada has yet to consider the standard of review in contractual interpretation cases post-*Housen*. I am not entirely persuaded that it makes sense to take one type of analysis (the *Housen* analysis) that is designed to discourage appellate courts from re-trying *the factual issues* in cases, and apply its analytical paradigm (the facts/mixed fact and law/law spectrum) to what is essentially *a legal exercise*.

**32**    In any case, I am satisfied that the decision of the application judge must be set aside in this case whether the standard of review is properly one of correctness, or palpable and overriding error.

**33**    In my view, the issues raised on appeal tend toward questions of law, attracting review by this court on a standard of correctness. There were no underlying evidentiary or factual issues of a contested nature that the application judge was required to resolve. The arbitration clause was to be interpreted in light of its own wording in the context of the Agreement as a whole and having regard to the 1999 Rules and the Current Rules. There was no dispute as to what these Rules were. The application judge was in no better position than we are to ascertain the meaning of the arbitration clause in those circumstances.

**34**    Even if it can be said that the standard is palpable and overriding error, the decision cannot stand. In *H.L. v. Canada (Attorney General)*, [2005] 1 S.C.R. 401, at para. 110, the Supreme Court of Canada observed that "clearly wrong" and "unreasonable" are the "functional equivalents" of palpable and overriding error. Respectfully, in my view, the arbitration clause cannot reasonably bear the interpretation endorsed by the application judge.

**35**    The errors in the application judge's reasoning manifest themselves particularly in two areas: (i) in his failure to give meaning and effect to an important term of the arbitration clause, namely the requirement in the conduct of arbitration provision that the arbitration was to be conducted

"under ... the then-current rules [of the Institute]"; and (ii) in his interpretation of the phrase "to file" in the waiver provision as "to deliver" or "to serve" the notice upon Bell, which cannot be sustained.

**36**    I turn briefly now to a review of the relevant principles of contractual interpretation before resuming the analysis of the errors in the application judge's reasons, and the interpretation of the arbitration clause itself.

## Principles of Contractual Interpretation

**37**    Little, if anything is to be found in the application judge's reasons about the principles of interpretation he invoked. Broadly speaking, however - as this Court noted in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254, at para. 24 - a commercial contract is to be interpreted,

> (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;
>
> (b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;
>
> (c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract),
>
> (d)    in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity. [Footnotes omitted.]

**38**    In addition, as Doherty J.A. observed in *Glimmer Resources Inc. v. Exall Resources Ltd.* (1999), 119 O.A.C. 78 (C.A.), at para. 17, each word in an agreement is not to be "placed under the interpretative microscope in isolation and given a meaning without regard to the entire document and the nature of the relationship created by the agreement." Courts should not strain to dissect a written agreement into isolated components and then interpret them in a way that - while apparently logical at one level - does not make sense given the overall wording of the document and the relationship of the parties. Yet that is precisely the effect of accepting The Plan Group's interpretation of the word "conduct" in the arbitration clause and of minimizing or eliminating the import of the words "the then-current rules [of the Institute]."

## Interpreting the Arbitration Clause

**39**    For ease of reference, I set out the text of section 22.2 of the Agreement - the arbitration clause - again here:

> Bell and [The Plan Group] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant

to Section 21.1 hereof.[7] *A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc.* Bell and [The Plan Group] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered into any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.* [Emphasis added.]

**40**    I understand The Plan Group's argument to be the following. Arbitrations are governed by the provisions of the *Arbitration Act, 1991*, except to the extent that the parties have contracted out of those provisions, expressly or by implication. With that proposition, I do not quarrel. The Plan Group goes on to submit, however, that they and Bell have not contracted out of the provisions of the Act with respect to the commencement of arbitration proceedings; instead, they agreed only that the arbitrator, once appointed by the parties, would "conduct" the arbitration by applying only the Institute's procedural rules, that is, that portion of the Institute rules dealing with the procedural "conduct" of the arbitration by the arbitrator. The parts of the Institute's rules relating to commencement of the arbitration, the administration of the arbitration generally, and anything other than procedural conduct, have no application. Accordingly, The Plan Group properly commenced the arbitration, they say, by delivering a preliminary and final Notice of Request to Arbitrate to Bell in accordance with s. 23(1)3 of the Act which permits arbitration to be commenced in that fashion.

**41**    The application judge accepted this argument. Respectfully, I do not think it is tenable. As I have mentioned, his interpretation fails to give meaning to an important term in the arbitration clause specifying that the arbitration would be conducted under the "then-current rules" of the Institute, and further, assigned an unsustainable interpretation to the word "file" in the waiver portion of the clause.

<u>Failure to Give Effect to the Phrase "The Then-Current Rules [of the Institute]"</u>

**42**    The application judge did not apply the Current Rules. His interpretation failed to give meaning and effect to a critical term of the parties' agreement calling for conduct of the arbitration under "the then-current rules [of the Institute]." Early in his reasons, at para. 19, the application judge recognized that "[v]iewed on its own, the second sentence in the Arbitration Clause constitutes a straight-forward agreement to comply with the provisions of both the Act and *the rules of the Institute from time to time*" (emphasis added). He added that he "[saw] no reason not to give effect to the express wording of this provision." That is not what he did, however. In this respect, he erred in law by misapplying, or failing to apply, the principle that a contract is to be interpreted in a manner that gives meaning to all of its terms and avoids an interpretation that renders one or more

of its terms ineffective.

*(i) The Application Judge's Focus on "Conceptual Approaches"*

**43**    Some background is necessary to understand how the application judge arrived at this result. The error stems in large part, in my view, from his undue focus on the parties' "conceptual approaches" to the arbitration rather than on the wording of the arbitration clause itself. Indeed, he was persuaded that, "*The issue on this application [turned] on* which of such conceptual approaches is applicable" (para. 15; emphasis added). Instead of asking himself what the clear wording of the conduct of arbitration provision meant - viewed in the context of the arbitration clause and the Agreement as a whole, and the Institute rules - he embarked upon a search for the proper "conceptual approach" to the type of arbitration agreed to by the parties.

**44**    The application judge's approach led him to ground his interpretation on a set of Institute rules (the 1999 Rules) that had no direct application and, even to the extent they provide "context" to the interpretive exercise, they did not support the interpretation he adopted. That error reinforced the narrow interpretation of the arbitration clause he embraced, premised on his erroneous conclusion as to the nature of the arbitration the parties had agreed to. This, in turn, led to his refusal to give effect to the set of Institute rules that were applicable (the Current Rules) because - in his view - they represented a "fundamental change" from that flawed view of the nature of the arbitration process agreed to.

**45**    An understanding of the two concepts put forward is therefore important to provide insight into his reasoning process. The two different conceptual approaches were summarized by the application judge at paras. 16 and 17 of his reasons:

> Plan says that the parties did not agree that the Institute would administer any arbitration under the Agreement. It submits that the parties agreed only to be bound by the procedural rules of the Institute (whether the 1999 Rules or the Current Rules) that apply in the conduct of an arbitration after the appointment of an arbitrator, and only to the extent that the arbitrator chooses to apply them. Accordingly, Plan submits that the rules of the Institute do not apply to determine the method of initiating arbitration. It also argues that the Arbitration Clause permits an arbitration to be commenced by any means recognized under law, including delivery of a notice demanding arbitration, using the language of paragraph 23(1)3 of the Act.

> Bell argues that the parties agreed that (1) the Institute is to administer any arbitration under the Agreement; and (2) any such arbitration must be commenced by filing a Notice to Arbitrate with the Institute. Bell relies on the reference in the second sentence of the Arbitration Clause to the "then-current rules" of the Institute, and the substitution of the Current Rules for the 1999

Rules including, in particular, section 5 of the Current Rules. Bell says that, collectively, these provisions have the result that the parties are bound by the Current Rules of the Institute in their entirety including, in particular, the provisions respecting commencement of an arbitration.

**46**    The application judge adopted The Plan Group's conceptual approach.

**47**    I do not mean to suggest that the different conceptual approaches to the arbitration clause are meaningless. They shaped a good part of the debate between the parties. However, the meaning of a document is not determined by the conceptual approaches taken by the parties to it; it is the meaning of their written document that sheds light on their chosen conceptual approach. Here, the application judge tackled the interpretative exercise in the reverse. He ascertained what he believed to be the proper "conceptual approach" to the arbitration clause by relying on a set of Institute rules that had no application (the 1999 Rules). He then used that conceptual approach to interpret the arbitration clause in a way that would justify his refusal to give effect to the set of Institute rules that did apply (the Current Rules).

**48**    But, as outlined below, the structure of the arbitration clause read as a whole, and in the context of the 1999 Rules and the Current Rules, simply does not support the conceptual approach and interpretation advanced by The Plan Group and adopted by the application judge, in my opinion.

> *(ii)    The Structure of the Arbitration Clause*

**49**    The structure of the arbitration clause and the sequence in which it evolves are themselves of some significance. In fact, the parties outline their concept of the arbitration at the very outset of the clause. They do not agree that they will arbitrate their disputes by first appointing their arbitrator and then leaving it to the arbitrator to "conduct" the procedural aspects of the arbitration and the hearing in accordance with the procedural portion of the rules of the Institute. Rather, in the first two sentences of the arbitration clause, they agree (a) to resolve their disputes by arbitration, (b) to resort to a single arbitrator to do so, and (c) to have the arbitration conducted by the single arbitrator "under the Arbitration Act, 1991 (Ontario) and *the then-current rules* [of the Institute]." That is their "conceptual approach" to their dispute-resolution mechanism: a single-decision-maker arbitration held under the Act and the rules of the Institute in effect at the time the dispute arises.

**50**    The parties *then* turn their attention to a number of specifics about the arbitration process. They will themselves select the arbitrator from a panel of knowledgeable persons (contrary to the application judge's reasoning, this does "carve out" a right that would otherwise be governed by the rules of the Institute). The arbitrator's decision will be final and binding, and enforceable. The arbitration will take place in Toronto. The arbitrator will not be empowered to award punitive damages. Finally, the parties create what is in effect a limitation period for the bringing of claims which is tied to the filing of a notice of arbitration.

**51**    I see nothing in the structure or development of the arbitration clause itself to suggest that the applicable rules of the Institute are to be limited to procedural rules to be applied by the arbitrator. Indeed, had the parties intended that to be the case they would have said "under the then-current rules [of the Institute] *pertaining to the procedural conduct of the arbitration and the hearing by the arbitrator*". They did not do so.

> *(iii) The Arbitration Clause in Context: The Agreement, the 1999 Rules, and the Current Rules*

**52**    This view is buttressed by the language of the arbitration clause in the context of the Agreement and the rules of the Institute in effect at the time the Agreement was negotiated (the 1999 Rules).

**53**    A major flaw in The Plan Group's reasoning is to assume - as the application judge appears to have concluded - that the parties agreed to be bound (i) by a particular bundle of rules that could conveniently be amputated from the 1999 Rules (Part IV - Conduct of the Arbitration) and (ii) by any future changes to that specific bundle of rules only. That is not the case, however. The 1999 Rules may be of some assistance as an interpretive aid - they provide part of the context or factual matrix existing at the time the Agreement was negotiated - but they do not apply to this arbitration directly, nor did the parties ever agree that they would apply to any arbitration other than one that happened to be commenced during the period when they were in force. The parties did not agree in the arbitration clause to be bound by any particular set of rules. They agreed only that that the arbitration would be conducted under whatever set of Institute rules were operative at the time the arbitration in question took place.

**54**    The Agreement itself was for a five-year term which was renewable.[8] The parties had therefore agreed to a long-term contractual relationship. They clearly contemplated that disputes arising during that relationship would be resolved through arbitration conducted under the rules of the Institute and that those rules could change from time to time during the term of the Agreement.

**55**    Moreover - to the extent they may provide some guidance - the 1999 Rules do not support the amputation approach to the "conduct" of the arbitration or the lack of involvement of the Institute. The application judge drew comfort from the fact that the 1999 Rules are conveniently divided in four Parts: Part I - General; Part II - Commencing the Arbitration; Part III - The Arbitrators; and Part IV - Conduct of the Arbitration. He found reinforcement for The Plan Group's conceptual approach to the arbitration in these separate divisions of those Rules and, in particular, Part IV - Conduct of the Arbitration. The logic does not work, however.

**56**    First, it would be purely fortuitous if successor Institute rules continued to be similarly structured and divided. While it happened that the 1999 Rules were conveniently divided into Parts and that Part IV was conveniently entitled "Conduct of the Arbitration", the Current Rules are not divided in that fashion and there is no obvious successor to Part IV. The Current Rules consist of 49 individual rules and two Schedules. How the application judge understood the parties would

determine what were revisions to or changes in the procedural rules in Part IV in such circumstances is unknown.

**57**    Second, the view that rules relating to the conduct of the arbitration can be separated into those that are "procedural" and those that are not, makes no sense. Rules relating to the conduct of arbitrations are in essence procedural in nature. They are not "substantive". They provide for the process or procedure to be followed by the parties in having the substantive nature of their dispute resolved by the arbitrator. Indeed, the set up of the 1999 Rules themselves is incompatible with the notion that only Part IV relates to "the conduct of arbitrations" (in spite of the title to that Part). The 1999 Rules are entitled: "Rules of Procedure for the Conduct of Arbitrations". In Article 1(d), they define themselves - taken in their entirety - as meaning "these *Rules for the conduct of arbitrations of the Institute*" (emphasis added). Thus, when the parties agreed that the arbitration would be conducted "under ... the then-current rules [of the Institute]", they were agreeing - so long as the 1999 Rules remained in effect, in any event - that it would be conducted under "these Rules for the conduct of arbitrations of the Institute", which, as worded, necessarily refers to the Rules as a whole.

**58**    Third, both the 1999 Rules and the Current Rules provide for the arbitration to be administered by the Institute. Rule 5 of the Current Rules expressly states that by agreeing to arbitration under the Rules, the parties agree that the arbitration shall be administered by the Institute. Article 3.1 of the 1999 Rules likewise stipulates that where parties have provided for arbitration under the auspices of the Institute, the arbitration is to take place in accordance with the rules in affect at the date of commencement of the arbitration. In both instances, then, once the parties agree to conduct the arbitration under the rules of the Institute, they accept that the arbitration will be administered by the Institute. This is consistent with the jurisprudence indicating that where parties agree to use the rules of an institutional arbitration body, they cannot cherry pick the rules they wish to apply and ignore the rest; they are bound to follow all of the rules: see e.g. *Spectra Innovations Inc. v. Mitel Corp.*, [1999] O.J. No. 1870 (S.C.).

**59**    In short, neither the 1999 Rules nor the Current Rules are amenable to be adopted by parties intending to administer their arbitration privately. Had the parties wished to adopt an arbitration mechanism that borrowed already existing arbitration rules but maintained a privately administered arbitration, they could easily have done so, for example, by resorting to the UNCITRAL Arbitration Rules or the CPR Institute for Conflict Prevention & Resolution - Non-Administered Arbitration Rules. Both those regimes permit such an opt-in or opt-out. The rules of the Institute do not.

**60**    Fourth, even the opening provision in Part IV of the 1999 Rules envisages the conduct of the arbitration "in all respects" - that is, not just what is touched on in Part IV - to be governed by the Act, the Rules, and the parties' agreements. Article 10.1 states:

> Subject to Article 2.1, the arbitration shall be *conducted in all respects* in
> accordance with the provision of the *Arbitration Act*, these Rules, the Arbitration

> Agreements and any other agreement of the parties applicable to the conduct of the proceedings. [Emphasis added.]

**61**    Finally, the provisions of Part IV clearly contemplate the involvement of the Institute in overseeing the arbitration - again, refuting the notion that the arbitration was to be a "non-administered" arbitration with the parties borrowing only the procedural-conduct related rules of the Institute for the purposes of their own arbitration. Notices, statements and written communications may be sent to the other parties "at the address set out on the records of the Institute" (Article 11.1). The parties are jointly and severally liable for costs and expenses of the arbitration, "including the administrative fees of the Institute" (12.1). The arbitrator or the Institute "may request supplementary deposits for the costs and expenses" (12.2). After the completion of the arbitration and delivery of the award, "the Institute shall provide an accounting" (12.3). Significantly, "the Institute", as well as the arbitrator, "may extend or abridge any time prescribed by these Rules" (14.2). Finally, the Institute's Schedule of Fees completes Part IV.

**62**    With respect, I am at a loss to understand how the framework of the 1999 Rules - even if Part IV of those Rules alone is to be considered - can be said to support the non-administered arbitration interpretation adopted by the application judge. But that is the interpretation that led to his failure to apply the Current Rules.

**63**    After a lengthy analysis of the arbitration clause in light of the 1999 Rules, the application judge then went on to consider whether the legal result would be any different with regard to the Current Rules. He answered that question in the negative because he concluded that the application of the Current Rules would result in a fundamental change from Plan Group's "conceptual approach," which he had accepted as applicable following his analysis of the impact of the 1999 Rules. At paras. 21, 56 and 59 of his reasons, he said:

> For the reasons set out below, I find that the Arbitration Clause did not mandate delivery and filing of a Notice of Arbitration in compliance with sections 4.1 and 4.3 of the 1999 Rules in order to initiate an arbitration. Instead, I find that the Arbitration Clause contemplated that after commencement of the arbitration and the appointment of the arbitrator, the arbitrator would apply the 1999 Rules during the proceedings.
>
> ...
>
> Moreover, even if they had agreed to the possibility of a change of some nature to the fundamental conceptual approach in the Arbitration Clause by means of a revision of the 1999 Rules, there is no basis for concluding that the parties agreed to the involvement of the Institute in the administration of any arbitration under the Agreement, which is implied by Bell's position.
>
> ...

> In summary, I do not think that the Court can find that the parties agreed to be bound by any revisions to, or replacement of, the 1999 Rules beyond revisions to, or changes in, the procedural rules in Part IV of the 1999 Rules in the absence of either (1) wording in the Arbitration Clause that is more extensive than the phrase relied upon by Bell or (2) other contextual evidence, both of which are lacking in this proceeding.

**64**    For the reasons I have articulated, these conclusions are unsustainable.

*(iv) The Effect of the Term "The Then-Current Rules" of the Institute*

**65**    In the end, the application judge refused to apply the Current Rules. In doing so, he ignored, and failed to give effect to, the clear and unequivocal language of the arbitration clause stipulating that the arbitration was to be conducted under "the then-current rules" of the Institute. The "then-current rules" cannot mean anything other that the Current Rules in the context of this arbitration. The Current Rules call for an arbitration administered by the Institute and commenced by the filing of a notice of arbitration with the Institute.

**66**    Four provisions of the Current Rules, in particular, are important for determining whether commencement of arbitration under the Agreement requires a party to file a request to arbitrate with the Institute. They are:

> 3.    (a) The Rules shall apply where the parties have agreed that the National Arbitration Rules of the ADR Institute of Canada apply. ... *To the extent that the Rules conflict with the Act, the provisions of the Rules shall apply* except to the extent that the parties may not lawfully contract out of the provision of the Act...[9]

> 5.    By agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute. ...

> 11.    Where a dispute falls under an arbitration clause or agreement, a party, as claimant, *may submit that dispute to arbitration by delivering* a written Notice of Request to Arbitrate to the respondent...

> 13.    The arbitration is *deemed to have commenced* when a Notice of Request to Arbitrate ... has been *filed with the Institute and the initial filing fee has been paid*. The Institute shall notify the parties when an arbitration has been commenced and shall deliver to them a Notice of Commencement of Arbitration.

[Emphasis added.]

**67**    Clearly, where the Current Rules govern the arbitration - as in my view they do here - a

dispute under an agreement is submitted to arbitration by delivering a Notice of Request to Arbitrate to the other party, but the arbitration is not deemed to have been "commenced" for purposes of its administration until that Notice is filed with the Institute and the initial filing fee paid. The Plan Group has not taken that step.

**68**    Were the arbitration governed by the 1999 Rules, The Plan Group would be in a different position. While sections 4.1 and 4.4 of those Rules call for the filing of a notice of arbitration with the Institute, the 1999 Rules also provided that in the event of a conflict between them and the Arbitration Act, the Act prevailed. Section 23(1)3 of the Act stipulates that an arbitration may be commenced in any way recognized by law, including where "[a] party serves on the other parties a notice demanding arbitration under the agreement." That is what the Plan Group did here.

**69**    But this arbitration is not to be conducted under the 1999 Rules. It is to be conducted under the Current Rules, which provide that *they* trump the Act (s. 3(a)), and which require a Notice of Request to Arbitrate to be filed with the Institute before the arbitration is deemed to have been commenced (s. 13).

<u>The Waiver Provision</u>

**70**    The second major error of the application judge is found in his treatment of the words "failure *to file* a notice of arbitration" (emphasis added) in the waiver provision of the arbitration clause, which states:

> Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.

**71**    The concept of "filing" the notice of arbitration signals that it is to be deposited or placed with an organization or institution overseeing the proceeding. The application judge equated it, however, with "delivering" the notice to, or "serving" it upon, the other side. In the context of a legal document relating to the resolution of disputes, "filing" cannot be properly or reasonably interpreted to bear such a meaning.

**72**    The application judge addressed the meaning of the phrase "failure to file a notice of arbitration" only incidentally. He did so in the course of his lengthy examination of what he calls the "Operation of the Arbitration Clause in 1999." In the result, he rejected Bell's interpretation of the arbitration clause as providing for arbitration administered by the Institute and commenced by filing a notice to arbitrate with the Institute. This rejection - or, at least, his conclusion that the last sentence of the arbitration clause "is at best equivocal with respect to the agreement of the parties" - rests, as he saw it, on the failure of the parties to make reference to three things in that sentence, namely:

> (i)    the failure to specify filing with the Institute in accordance with Article 4.1 of the 1999 Rules and to identify the "notice of arbitration" as the notice of

arbitration provided for in Article 4 of those Rules;

(ii)    the failure to insert the words "with the Institute" after the words "failure to file a notice of arbitration" (leaving open The Plan Group's suggested interpretation equating "filing" with "delivery" to the other party, he concludes); and

(iii)   the failure to clarify, for limitation purposes, which of the filing requirements under Article 4.2 or Article 4.4 - one requires the filing of a single notice; the other of three copies - applied.

**73**    There are a number of reasons why this rationale for the rejection of Bell's position is not sustainable under the language of the arbitration clause, even as interpreted through the lens of the 1999 Rules.

**74**    In the first place, the language of the arbitration clause makes it clear that the arbitration is to be conducted, not in accordance with the 1999 Rules (unless the arbitration happens to be commenced when they are in force), but in accordance with the Rules of the Institute in place from time to time - the "then-current rules." Consequently, there was no reason for the parties to refer specifically to any particular provisions in the 1999 Rules. Indeed, to have done so might well have created problems of interpretation in the future because references to specific rules might set up a conflict with different rules in effect at a later time.

**75**    Secondly, the notion that "filing" may be equated with "delivery" - or with "service", or with "giving notice" - in the context of a legal-related proceeding is seriously flawed. "Filing" is a well-understood concept in the dispute resolution milieu. It means placing or depositing a document with the institutional overseer of the proceeding. It does not mean delivering the document to, or leaving it with, or serving it upon the other party.

**76**    A cursory review of any number of dictionary resources confirms the distinction between these concepts. For example, *The Shorter Oxford English Dictionary*, 3d ed., defines the verb "file" to mean "to place in due manner among the records of a court or public office," and the verb "deliver" to mean "to hand over to another's possession or keeping."[10] Service involves the formal delivery of a document to someone: *Black's Law Dictionary*, 8th ed., *s.v.* "service".

**77**    Both the 1999 Rules and the Current Rules of the Institute use the terms "file", "deliver" and "serve" in distinct contexts. "Filing," is used in the context of depositing a document with the Institute - for example, a notice of arbitration or a pleading. Often, filing is what triggers the requirement for an administrative fee payment. Article 4.4 of the 1999 Rules requires the claimant to "*file at the office of the Institute* three copies of the Notice of Arbitration together with the administrative fee". Articles 4.6 - 4.8 provide that the pleadings are to be *served* on the opposite party *and filed* with the Institute. Rule 13 of the Current Rules deems the arbitration to have been commenced "when a Notice of Request to Arbitrate ... *has been filed with the Institute* and the initial filing fee has been paid." Under the Current Rules, pleadings are "delivered" to the parties

and to the Institute, but they are not "filed" with the other party.

**78**    Finally, it was not necessary for the parties to the arbitration clause to have added the words "with the Institute" after the words "failure to file a notice of arbitration" in the final sentence of the arbitration clause. The fact that the notice was to be filed with the Institute is self-evident from a reading of the arbitration clause as a whole. The arbitration was to be conducted in accordance with the Rules of the Institute.

**79**    The application judge's treatment of the waiver provision in the last sentence of the arbitration clause had several unfortunate consequences. It caused him to lose sight of the simple, straight-forward meaning of that stipulation in the arbitration clause: a notice of arbitration must be filed with the Institute within 12 months of the occurrence upon which the claim is based; otherwise the claim is irrevocably waived. Of equal importance, however, it skewed his interpretation of the balance of the arbitration clause. Instead of leading him to conclude - as it should have done - that the parties had agreed to an arbitration procedure to be administered by the Institute, his erroneous interpretation served to bolster his conclusion that type of arbitration agreed to was not one that was to be administered by the Institute and that the clause was to be interpreted largely in light of the application of the 1999 Rules.

**The Dissent**

**80**    I have had the opportunity to review the dissenting reasons of my colleague, Justice Gillese. Respectfully, I do no share her view of the proper disposition of the appeal for the reasons I have given.

**81**    In completion I should address an issue she has raised as a preliminary matter, namely, the question whether the matters in the application should have been referred to the arbitrator for determination, based on the principles set out in *Dell Computer Corp. v. Union des Consommateurs*, [2007] 2 S.C.R. 801. The parties to this appeal are sophisticated commercial parties represented by sophisticated commercial counsel. They did not argue or ask us to deal with this issue, presumably for their own practical reasons. I would be reluctant to determine the appeal on that basis.

**82**    In any event, I do not see the application (and the appeal) as raising a question regarding the jurisdiction of the arbitrator, but rather a question of whether there *is* an arbitration within which the arbitrator may or may not exercise a jurisdiction.

**IV. DISPOSITION**

**83**    Accordingly, for the foregoing reasons, I would allow the appeal, set aside the order of the application judge, and in its place direct that arbitration under the Alliance Agreement must be commenced by filing a Notice of Request to Arbitrate with the Institute.

**84**    Bell is entitled to its costs of the appeal and of the application. Counsel have agreed on amounts. In accordance with that agreement, the costs of the appeal are fixed at $20,000 and the costs of the application at $30,000. Both amounts are inclusive of fees, disbursements and GST.

R.A. BLAIR J.A.
 S.T. GOUDGE J.A.:-- I agree.

**85**    E.E. GILLESE J.A. (dissenting):-- I have read the draft reasons of my colleague, Blair J.A. With respect, I do not agree that the application judge's interpretation of the arbitration clause is to be reviewed on a standard of correctness. In any event, however, in my view, the application judge's interpretation is not only reasonable, it is correct. Accordingly, I would dismiss the appeal.

**86**    As will become apparent, the factual context plays a significant role in the disposition of this appeal. Thus, I begin there.

## BACKGROUND[11]

### *The Alliance Agreement*

**87**    Going into the 1990s, Bell Gateways (a division of the appellant, Bell Canada ("Bell")) was dominant in the structured cabling market. Its competitors were principally small, unsophisticated cabling installation contractors. This changed in the early 1990s when electrical contractors entered the structured cabling market and larger contractors began providing the same value-added services as Bell. Electrical contractors brought sophisticated project-management skills to the cabling market and developed relationships with general contractors, project managers, electrical engineers and Bell's clients. Over time, customers gave their electrical and cabling work to electrical contractors.

**88**    These developments posed a problem for Bell Gateways because it found it difficult to penetrate the longstanding relationships that electrical contractors had with project managers and general contractors. Bell Gateways increasingly lost market share to electrical contractors, including the Plan Group, a premier structured cabling contractor.

**89**    In early 1998, Bell and the Plan Group joined forces and began to jointly pursue cabling projects. Success in those projects led Bell and the respondents ("Plan") to enter into an agreement dated February 1, 1999 (the "Alliance Agreement").

**90**    The Alliance Agreement contemplated that Plan would perform electrical and cabling services contracted in Bell's name and Bell would provide marketing, bonding and project financing services for Plan. It reflected the parties' expectation that a number of projects would be started during the term of the agreement. The initial term of the Alliance Agreement was for five years, ending on January 31, 2004.

**91**    Article 22 of the Alliance Agreement establishes a two-step process for resolving disputes that

might arise between the parties. The first step in the process is set out in art. 22.1. It requires the party that considers a dispute to exist to provide written notice to the other. The parties must then make good faith efforts to resolve the dispute through a structured discussion process.

**92**     If the good faith efforts fail to resolve the dispute, the parties move to the second step of the dispute resolution process. The second step, contained in art. 22.2 (the "Arbitration Clause"), requires the dispute to be settled by arbitration. The last sentence in the Arbitration Clause provides that a failure to file a notice of arbitration within twelve months of the occurrences supporting a claim constitutes an irrevocable waiver of that claim (the "Waiver").

**93**     The full text of art. 22 is set out below.[12] The critical portions of the Arbitration Clause read as follows:

> 22.2 Bell and [Plan] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 22.1 hereof. A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc. ... Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim.

### *The Dispute*

**94**     The parties contracted to provide the Greater Toronto Airport Authority ("GTAA") with electrical systems in its new airport terminal. Plan continued to work on the GTAA project after January 31, 2004, the end date of the initial five-year term of the Alliance Agreement.

**95**     By October 2004, Bell had not paid Plan for invoices it had rendered in relation to the GTAA project. The invoices claimed for amounts in excess of $40 million. Without collecting a significant amount of the invoiced amounts, Plan would have gone bankrupt.

**96**     On December 16, 2004, Plan accepted $23 million as settlement for the invoiced amounts (the "Settlement"). Plan says that it was compelled to accept the significantly reduced amount because it was in a vulnerable financial state. It further alleges that its compromised financial state was brought about by Bell's capital investment demands of Plan that were made as part of the Alliance Agreement, coupled with Bell's subsequent breach of cash flow obligations.

**97**     Plan wished to dispute the Settlement in accordance with art. 22.

**98**     On August 26, 2005, Plan took the first step in the dispute resolution process to which the parties are bound by virtue of art. 22 of the Alliance Agreement. It delivered written notice to Bell that a dispute existed between the parties. In addition, Plan alerted Bell to the possibility that the

dispute might proceed to arbitration by attaching to the notice of dispute a 20-page draft "Notice Demanding Arbitration" (the "Draft Notice"), which set out particulars of its claim. Among other things, the Draft Notice asserted Plan's claim to compensation in respect of the Settlement.

**99**    What happened thereafter is most easily understood by means of a timeline.

### *A Chronology of the Events that Followed*

September 8, 2005

-    Fall and winter 2005 Bell responds to Plan's notice of dispute and Draft Notice. It asserts that Plan's claim was waived, pursuant to art. 22.2, as it was in respect of occurrences that took place over 12 months previously. It says nothing about the need to file a notice of arbitration with the Arbitration and Mediation Institute of Ontario Inc. (the "Institute") or in accordance with the Institute's rules. Bell also agrees to meet with Plan pursuant to art. 22.1.

Fall and winter 2005

-    Bell asks for extensive particulars of Plan's claim. Plan provides them.

December 12, 2005

-    Although discussions between the parties continue, Plan delivers a final notice demanding arbitration (the "Notice") to counsel for Bell. In the cover letter that accompanies the Notice, Plan states that it wishes to preserve its rights under the Alliance Agreement, reiterates its willingness to continue with settlement discussions and asks counsel for Bell to confirm that it can accept service of the Notice. The Notice complies with the requirements for commencement of arbitration in s. 23(1)3 of the *Arbitration Act, 1991*, S.O. 1991, c. 17.

January 17, 2006

-    As Plan has received no response to the Notice, it contacts Bell by email, asking when it might hear back.

January 20, 2006

-       Bell responds by email, saying that it is continuing to review Plan's claim and asks for further particulars. It raises no issue about the adequacy of the Notice or the need for it to be filed with the Institute. It says that it has not ruled out the possibility of further meetings and discussions.

March 2, 2006

-   Plan provides Bell with further particulars.

April 11, 2006

-       Plan concludes that Bell is not making good-faith efforts to settle the dispute. It sends Bell a letter to that effect and advises that it will proceed in accordance with the Arbitration Clause. It asks Bell to contact it by April 18 to discuss the selection of a suitable arbitrator.

April 19, 2006

-       Bell responds saying it will make an application to the court to seek relief consistent with its position that Plan's claims are not arbitrable because they have been waived and, in some cases, released. It says it will serve a notice of application shortly. Counsel for Bell asks counsel for Plan not to commence arbitration proceedings until it serves its notice of application.

Spring and summer 2006

-       Plan makes a number of inquiries of Bell about the status of the notice of application and is assured repeatedly that the notice will be sent.

August 11, 2006

-    Bell serves Plan with the notice of application. The relief sought includes a declaration that Plan had waived its claim and that Plan is barred from commencing arbitration by virtue of its failure to file a notice of arbitration in accordance with the Arbitration Clause.

September 20, 2006

-    Bell serves Plan with the supporting affidavit material.

December 7, 2006

-    Plan brings a motion seeking to stay Bell's application and refer the dispute to arbitration on the basis that Bell's application required the determination of arbitrable issues.

Spring or summer of 2007

-    Settlement discussions take place in respect of Bell's application and Plan's motion. The parties agree to withdraw their respective court proceedings (*i.e.* the application and stay motion), without prejudice to their ability to advance their positions at arbitration.

Summer or fall of 2007

-    Plan and Bell agree on the Honourable Coulter Osborne as arbitrator of the dispute.

September 2007

-    The application and stay motion are withdrawn.

Fall 2007

-    Bell refuses to appoint the Honourable Coulter Osborne or schedule a

hearing of the arbitration until Plan files a notice of request to arbitrate in accordance with s. 11 of the Institute's rules.

### *The Proceedings Below*

**100**    Plan found itself in a "catch 22" position. It could not get the matter before the arbitrator because Bell refused to accept that Plan had commenced arbitration and would not appear before the arbitrator unless Plan filed a notice of request to arbitrate with the Institute. If Plan took that step however, it was concerned that it would jeopardize its position in respect of the Waiver.

**101**    On November 8, 2007, in an attempt to get the court's help to break the deadlock, Plan brought a notice of application to the Superior Court of Justice. The relief sought was an order appointing the Honourable Coulter Osborne as arbitrator of the dispute, pursuant to art. 22.2 of the Alliance Agreement.

**102**    On January 23, 2008, the parties agreed that they would advise the application judge that the only issue for determination was whether commencement of arbitration under the Alliance Agreement required a party to file a written request to arbitrate with the Institute. They also agreed not to rely on disputed evidence.

**103**    Plan maintains that it asked the court, alternatively, to resolve the impasse by appointing an arbitrator to interpret the Arbitration Clause regarding commencement of arbitration. It says that the agreement between counsel concerning the scope of the application pertained only to the relevance of disputed evidence and the suitability for summary determination by way of application. It says it did not abandon its alternative position that if the court declined to determine the matter summarily in accordance with the principles in *Dell Computer Corp. v. Union des consommateurs*, [2007] 2 S.C.R. 801, then the matter should be decided by an arbitrator appointed by the court, without prejudice to either party's position concerning the proper procedure for commencing arbitration.

**104**    On February 28, 2008, Wilton-Siegel J. heard the application.

**105**    By order dated April 29, 2008 (the "Order"), the court declared that as of December 14, 2005, the Arbitration Clause did not require a party commencing arbitration under the Alliance Agreement to file a Notice of Request to Arbitrate with the Institute.

**106**    Bell appeals.

## ARTICLE 22 OF THE ALLIANCE AGREEMENT

**107**    For ease of reference, art. 22 is set out in full, below:

22.    DISPUTE RESOLUTION

22.1

    The Parties seek to avoid disputes whenever possible. In the event of a dispute between the Parties concerning any matter arising from or connected with this Agreement, the Parties shall use their commercially reasonable efforts to settle the dispute in accordance with the following procedures:

    (a)    A Party which considers that a dispute exists shall provide written notice (in this paragraph 22.1(a), a "Notice of Dispute") to the other Party to the attention of the other Party's representative. For this purpose the nominated representative of Bell shall be its Assistant Vice-President Internetworking and the nominated representative for [Plan] shall be either of Bill Kurtin or Marshel Cohen. (Either Party may change its representative(s) on written notice to the other Party.) Following the provision of a Notice of Dispute to a Party's representative, the representatives of the Parties will forthwith make commercially reasonable efforts to, in good faith, resolve all disputes which are the subject of such notice in no more than 10 days from the date of the notice.

    (b)    Should the dispute between the Parties not be resolved pursuant to the settlement process set out in Paragraph 22.1(a) hereof during the 10 day period referred to therein, the dispute shall be referred for resolution to Bell's Vice-President Gateways and to either of Bill Kurtin or Marshel Cohen. Following such referral, such persons will forthwith make commercially reasonable efforts, in good faith, to resolve all disputes which are the subject of such referral within 10 days from the date of such referral.

22.2

    *Bell and [Plan] will settle by arbitration any dispute arising out of or related to this Agreement or any Sub-contract that is not finally resolved pursuant to Section 22.1 hereof. A single arbitrator will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the Arbitration and Mediation Institute of Ontario Inc*. Bell and [Plan] will select the arbitrator from a panel of persons knowledgeable in business information and the construction industry. The decision and award of the arbitrator will be final and binding and the award so rendered may be entered in any court having jurisdiction thereof. The arbitration will be held in Toronto, Ontario. The arbitrator will not be empowered to award punitive damages to either Party. *Failure to file a notice of arbitration within twelve (12) months after the occurrences supporting a claim constitutes an irrevocable waiver of that claim*. [Emphasis added.]

## THE REASONS OF THE APPLICATION JUDGE

**108**    The application judge understood the application to have raised a single issue: did the Arbitration Clause require a party to file a "Notice of Request to Arbitrate" with the Institute in

order to commence arbitration? He noted that the parties had very different conceptions of how the Arbitration Clause operated and that the issue turned on which conceptual approach applied. At paras. 16 and 17 of the reasons, the application judge set out the parties' conceptual approaches:

> Plan says that the parties did not agree that the Institute would administer any arbitration under the Agreement. It submits that the parties agreed only to be bound by the procedural rules of the Institute (whether the 1999 Rules or the Current Rules) that apply in the conduct of an arbitration after the appointment of an arbitrator, and only to the extent that the arbitrator chooses to apply them. Accordingly, Plan submits that the rules of the Institute do not apply to determine the method of initiating arbitration. It also argues that the Arbitration Clause permits an arbitration to be commenced by any means recognized under law, including delivery of a notice demanding arbitration, using the language of paragraph 23(1)3 of the Act.

> Bell argues that the parties agreed that (1) the Institute is to administer any arbitration under the Agreement; and (2) any such arbitration must be commenced by filing a Notice to Arbitrate with the Institute. Bell relies on the reference in the second sentence of the Arbitration Clause to the "then-current rules" of the Institute, and the substitution of the Current Rules for the 1999 Rules including, in particular, section 5 of the Current Rules. Bell says that, collectively, these provisions have the result that the parties are bound by the Current Rules of the Institute in their entirety including, in particular, the provisions respecting commencement of an arbitration.

**109**    The application judge summarized the two relevant sets of Institute rules at paras. 5-14 of the reasons:

> ### The 1999 Rules

> The Rules of the Institute that applied at the time of execution of the Agreement (the "1999 Rules") were divided into four parts under the following headings: "General", "Commencing the Arbitration", "The Arbitrators" and "Conduct of the Arbitration". The following provisions have relevance to the issue herein.

> First, in Part I, section 2.1 provided that the provisions of the *Arbitration Act, 1991*, S.O. 1991, c.17 (the "Act") would govern in the event of any conflict between the Act and the 1999 Rules.

Second, in Part II (entitled "Commencing the Arbitration"), section 4.1 required that written notice of a proposed arbitration be given by a party initiating arbitration to the Institute and all other necessary parties. Section 4.2 provided that the arbitration would be deemed to commence on the date on which the Institute received a Notice of Arbitration from the claimant (presumably, but not expressly, the written notice contemplated by section 4.1).

Third, in Part IV (entitled "Conduct of the Arbitration"), section 10.1 provided that the arbitration was to be conducted in accordance with the Act, the 1999 Rules and any applicable agreement between the parties including the arbitration agreement.

### *The Current Rules*

Since at least 2003, the Institute has applied the ADR Institute of Canada, Inc. National Arbitration Rules (the "Current Rules"). The Current Rules are not divided into discrete sections in the manner of the 1999 Rules.

Section 3 of the Current Rules provides that the Current Rules, rather than the Act, govern in the event of any conflict, except to the extent that the parties may not lawfully contract out of the provisions in the Act.

The first sentence of section 5, upon which Bell places considerable reliance, provides that "[b]y agreeing to the Rules, the parties agree that the arbitration shall be administered by the Institute".

Section 11 of the Current Rules requires the delivery of a "Notice of Request to Arbitrate" to the respondent and to the Institute to commence an arbitration. Section 11 also specifies in detail the required content of a Notice of Request to Arbitrate.

Section 13 provides that an arbitration is deemed to have commenced when a Notice of Request to Arbitrate has been filed with the Institute and the initial filing fee has been paid.

> More generally, in addition to the matters addressed by the 1999 Rules, the
> Current Rules address a number of procedural and substantive issues that are also
> addressed in the Act. The Current Rules essentially constitute a complete code
> for the commencement and conduct of an arbitration.

**110**    The application judge considered the operation of the Arbitration Clause at the time the
Alliance Agreement was executed in 1999 and then considered whether the legal result was
different under the Current Rules. He found that the Arbitration Clause did not mandate delivery
and filing of a Notice of Arbitration in compliance with ss. 4.1 and 4.3 of the 1999 Rules in order to
initiate arbitration.

**111**    Instead, the application judge interpreted the Arbitration Clause as providing that after
commencement of arbitration and the appointment of the arbitrator, the arbitrator would apply the
Institute rules to the conduct of the arbitration. He reached this conclusion because, on its face, he
found the Arbitration Clause favoured Plan's interpretation. He gave several reasons for this
conclusion, the most significant of which may be summarized as follows:

1. The wording and order of the second and third sentences in the Arbitration
   Clause. The Arbitration Clause does not say that any dispute or arbitration under
   the Alliance Agreement is to be resolved in accordance with the Institute rules.
   Instead, it refers specifically to the "conduct" of the arbitration being subject to
   the Act and the then-current Institute rules. Thus, "on a plain reading", the
   Arbitration Clause limits the reach of the 1999 Rules to the conduct of the
   arbitration rather than compliance with all of the Institute rules. Part IV of the
   1999 Rules is entitled "Conduct of the Arbitration". It is separate and distinct
   from Part II of the 1999 Rules which is entitled "Commencing the Arbitration."

2. The Arbitration Clause contemplates a procedure for appointment of an arbitrator
   outside the Rules. Had the parties intended the reference in the second sentence
   of the Arbitration Clause to constitute an agreement to comply with all of the
   1999 rules, the third sentence should have carved the appointment process out of
   the rules. The fact that it doesn't suggests the parties did not intend all of the
   Institute rules to apply.

3. Plan's interpretation is more consistent with the context in which the Arbitration
   Clause was negotiated. The application judge gave a detailed explanation for this
   view, based on the 1999 Rules and the wording of the Arbitration Clause. For
   example, Bell's interpretation was based on its position that the Institute would
   administer the arbitration. However, this position was based on s. 5 of the
   Current Rules, for which there was no counterpart in the 1999 Rules. Moreover,
   there is nothing in the Arbitration Clause to say that the Institute would
   administer the arbitration. Further, Plan's interpretation is consistent with the
   1999 Rules which are divided into parts, making it feasible that only the parts
   governing conduct of the arbitration would apply.

**112**    After concluding that the Arbitration Clause did not mandate compliance with the 1999 Rules for commencement of arbitration, the application judge considered whether the Current Rules had that effect. This question arose because the Arbitration Clause provides that the arbitration will be conducted in accordance with the "then-current" Institute rules. Bell argued that if the Arbitration Clause did not mandate filing of a Notice to Arbitrate under the 1999 Rules, the result is different because of ss. 3 and 5 of the Current Rules. The effect of those sections, read together with the Arbitration Clause, Bell argued, was that any arbitration must be commenced in accordance with the Current Rules, *i.e.* by filing a Notice of Request to Arbitrate with the Institute under s. 11.

**113**    After outlining Plan's response to this argument, the application judge explained that the difference between the parties turned on fundamentally different views of the nature of the agreement between the parties in 1999 with respect to (1) the scope of the rules to which the parties agreed to be bound, and (2) the involvement of the Institute in the administration of an arbitration. He concluded that the parties agreed that the arbitrator was to apply the procedural rules of the Institute in effect from time to time in the conduct of the arbitration. He did not agree that either (1) the remaining rules of the Institute were also to be applied in respect of any arbitration under the Agreement; or (2) the Institute was to administer any such arbitration.

**114**    Thus, the issue was whether, by the reference to the then-current rules of the Institute in the second sentence of the Arbitration Clause, the parties agreed to accept the possibility that their agreement could be overridden by a substitution of the Current Rules for the 1999 Rules by the Institute.

**115**    He gave two reasons for rejecting the notion that by referring to the "then-current" Institute rules, the parties intended that they would be bound by anything more than changes to procedural rules. First, he found it unlikely that the parties turned their minds to the possibility that by virtue of a change to the Institute rules, the fundamental approach to arbitration embodied in the Arbitration Clause could be changed without their involvement. There was nothing in the limited scope of the 1999 Rules or the Act to suggest the possibility of such a fundamental change. He saw it as far more likely that the parties envisaged that possible changes to the Institute rules would relate to the conduct of arbitration.

**116**    The second reason, given at paras. 55-58 of the reasons, is a contextual consideration:

> Most important, the Agreement was the product of a negotiation between two sophisticated commercial parties represented by legal counsel. In the absence of wording suggesting otherwise, the Court should proceed on the basis that the conceptual approach to arbitration set out in the Arbitration Clause was meaningful to the parties. In the absence of express wording suggesting otherwise, I do not think the Court should interpret the acknowledgment in the Arbitration Clause of possible revisions to the 1999 Rules to constitute an agreement to be bound by rules that change the fundamental conceptual approach

in the Arbitration Clause without the consent of the parties.

Moreover, even if they had agreed to the possibility of a change of some nature to the fundamental conceptual approach in the Arbitration Clause by means of a revision of the 1999 Rules, there is no basis for concluding that the parties agreed to the involvement of the Institute in the administration of any arbitration under the Agreement, which is implied by Bell's position.

If the parties were agreeable to Institute administration of any such arbitration, they could have selected this approach from the outset. Despite the more limited set of provisions in the 1999 Rules, they could have agreed that the arbitration was to be governed in all respects by the 1999 Rules. Alternatively, they could have addressed the possibility of future Institute involvement in the Arbitration Clause. They did neither. The failure to do either reinforces the conclusion that the parties did not agree to accept Institute administration of any arbitration.

In addition, the position of Bell implies that the parties agreed to accept all revised rules of the Institute, sight unseen and without any opportunity to consider the consequences thereof for any arbitration under the Agreement. While I think it is reasonable to contemplate an agreement of this nature extending to revisions of procedural rules designed to facilitate the conduct of an arbitration, it is unreasonable to expect that the parties in this proceeding would have agreed to be bound by a revision that broadened the scope of the operation of the rules of the Institute. For example, I do not think it is reasonable to conclude that the parties agreed to comply with any revision to the rules that imposed additional costs of arbitration upon the parties without their consent by imposing Institute involvement in respect of any arbitration.

**117**    Accordingly, the application judge could not find that the parties agreed to be bound by any revisions to, or replacement of, the 1999 Rules beyond changes to procedural rules in the absence of either wording to that effect in the Arbitration Clause or other contextual evidence.

**118**    In the result, he concluded that as of December 14, 2005, the Arbitration Clause did not require that in order to commence arbitration, a party had to file a "Notice of Request to Arbitrate" with the Institute.

## THE ISSUE

**119**    The Order declared that as of December 14, 2005, the Arbitration Clause did not require a party commencing arbitration under the Alliance Agreement to file a Notice of Request to Arbitrate

with the Institute. Thus, the issue on appeal is whether the application judge erred in making that declaration.

**120**    The application judge was required to interpret the Arbitration Clause in order to reach the conclusion that such notice was not required. Accordingly, the first step in the analysis is to determine what standard of review applies to the application judge's interpretation of art. 22.2.

**121**    Before turning to the standard of review, however, a preliminary matter needs to be addressed.

## A PRELIMINARY MATTER

**122**    In *Dell* at paras. 84-86, the Supreme Court laid down "a general rule that in any case involving an arbitration clause, a challenge to the arbitrator's jurisdiction must be resolved first by the arbitrator." The court should "depart from the rule of systematic referral to arbitration only if the challenge to the arbitrator's jurisdiction is based solely on a question of law" or a question of mixed law and fact where "the questions of fact require only superficial consideration of the documentary evidence in the record." Further, "[b]efore departing from the general rule of referral, the court must be satisfied that the challenge to the arbitrator's jurisdiction is not a delaying tactic and that it will not unduly impair the conduct of the arbitration proceeding." Thus, "even when considering one of the exceptions, the court might decide that to allow the arbitrator to rule first on his or her competence would be best for the arbitration process."

**123**    This court has endorsed a similarly deferential approach that mandates referral to arbitration where it is arguable that a dispute falls within the scope of an arbitration clause: see *Dalimpex Ltd. v. Janicki* (2003), 64 O.R. (3d) 737 (C.A.); *Greenfield Ethanol Inc. v. Suncor Energy Products Inc.*, 2007 ONCA 823 (C.A.), aff'g [2007] O.J. No. 3104 (S.C.); *Dancap Productions Inc. v. Key Brand Entertainment, Inc.* (2009), 246 O.A.C. 226 (C.A.). Moreover, although the court has concurrent jurisdiction to decide the arbitrability of a dispute under the *Arbitration Act, 1991*, it will construe broadly drafted arbitration clauses generously, "consistent with the legislative policy... which favours arbitration over litigation where the parties so provide by agreement": see *Woolcock v. Bushert* (2004), 246 D.L.R. (4th) 139 (Ont. C.A.), at paras. 23, 25; *Greenfield* at para. 11.

**124**    In my view, it may well have been preferable had the application judge been asked to refer the whole matter to arbitration, including the dispute regarding the validity of commencement. Such an approach would have been consistent with the parties' agreement in art. 22.2 to have all disputes "arising out of or related to" the Alliance Agreement resolved by arbitration. Further, Bell's stance appears to be a delaying tactic, and, as the decision of my colleague may permanently prevent the arbitration from taking place, it cannot be said that the court proceedings have been "best for the arbitration process". However, the application judge did not refer the issue of commencement to the arbitrator and neither party asked this court to approach the appeal on this basis.

**125**    Having said that, it is significant that the Order is consonant with the *Dell* principles, set out

above, and the jurisprudence of this court. The Order does not state that Plan has commenced arbitration. It simply says that as of the relevant date, it was not necessary to file a notice with the Institute to commence arbitration pursuant to art. 22.2 of the Alliance Agreement. That is, the Order leaves the question of whether Plan commenced arbitration with the arbitrator, just as the jurisprudence urges.

**126**    I do not see the form of the Order as some kind of happenstance. The Order takes its form from the conscious decision of counsel for both parties to ask the application judge to perform a single task and decide a single question: interpret the Arbitration Clause and determine whether, on December 14, 2005, a party had to file a notice with the Institute to commence arbitration. The parties did not ask the application judge to decide if Plan had commenced the arbitration nor did he decide that question. Consequently, it is open to Bell to raise that matter as an issue once the parties are before the arbitrator.

**127**    I raise this preliminary matter for a single purpose - it provides an additional reason for dismissing the appeal. If the Order stands, the parties can appear before the arbitrator and have him decide whether Plan commenced the arbitration. That is, the arbitration will be conducted in a way that conforms with the guidance of this court and that of the Supreme Court.

## THE STANDARD OF REVIEW IN CONTRACTUAL INTERPRETATION

**128**    I agree with much of what my colleague has said generally in respect of appellate review on matters of contractual interpretation. However, I disagree with the view that the question of contractual interpretation in this appeal attracts a standard of review of correctness. To explain my position, I must recap some of the discussion on the guiding legal principles.

### *The Guiding Legal Principles*

**129**    As my colleague noted, historically, interpretation of a contract was treated as a question of law, reviewable on a standard of correctness. However, *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 dictates that a more nuanced approach be taken by reviewing courts. The standard of review in contractual interpretation - as in other types of civil proceedings - depends on the nature of the question that the trial judge decided: was it one of law, fact, or mixed law and fact? Questions of law are reviewable on a standard of correctness. Questions of fact are reviewable on a standard of palpable and overriding error, or the "functional equivalents" of "clearly wrong", "unreasonable" or "not reasonably supported by the evidence": *H.L. v. Canada (Attorney General)*, [2005] 1 S.C.R. 401, at para. 110. Questions of mixed law and fact, however, lie along a spectrum, with some questions being more akin to questions of law and others being more akin to questions of fact.

**130**    At para. 36, *Housen* explains the approach that appellate courts are to take when determining the standard of review to apply to a question of mixed law and fact. Such matters

lie along a spectrum. Where, for instance, an error with respect to a finding of

negligence can be attributed to the application of an incorrect standard, a failure to consider a required element of a legal test, or similar error in principle, such an error can be characterized as an error of law, subject to a standard of correctness. Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" and is subject to a more stringent standard. The general rule... is that, where the issue on appeal involves the trial judge's interpretation of the evidence as a whole, it should not be overturned absent palpable and overriding error.

**131**    While *Housen* is a negligence case, this court recognized in *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120, that the *Housen* principles inform the standard of review to be applied by appellate courts when reviewing decisions based on the interpretation of contracts.

**132**    Writing for the court, Lang J.A. explained in *MacDougall* at para. 30, that the trial judge must apply the proper principles of contract interpretation and that a failure to follow such principles is an error of law attracting review on a correctness standard. At para. 31, Lang J.A. states that when the task of interpretation includes consideration of extrinsic evidence or a determination of the factual matrix, the trial judge is making findings of fact or drawing factual inferences. Such findings are not to be overturned except in the case of palpable and overriding error. At para. 32, she states that where the trial judge applies legal principles to the language of the contract in the context of the relevant facts and inferences, he or she is applying law to fact, which is a question of mixed law and fact. Similarly, if the question is an "inextricable intertwining" of law and fact, it is a question of mixed law and fact. Questions of mixed law and fact are to be reviewed in accordance with the principles from *Housen*, quoted above: *MacDougall* at para. 33.

**133**    Based on *Housen* and in accordance with *MacDougall*, I understand that an appellate court should determine the standard of review in matters of contractual interpretation in the following way. Begin by identifying the nature of the question that the trial judge decided. This first step is extremely important as a mischaracterization of the question can obscure the true issues and alter the applicable standard of review.

**134**    If the question is either one of law or fact, the standard of review is straight forward - the former is to be reviewed on a standard of correctness; the latter on a standard of palpable and overriding error or its "functional equivalents".

**135**    If, however, the question is one of mixed law and fact, the standard of review may be either correctness or palpable and overriding error. To decide which of those standards applies, the appellate court must determine whether the trial judge made an "extricable" error in legal principle in arriving at his or her interpretation. In the area of contractual interpretation, errors in principle

include the failure to apply proper principles of contractual interpretation,[13] the application of an incorrect standard,[14] or the failure to consider a required element of a legal test.[15] Such errors constitute errors of law.

**136**    If an error of law can be identified (*i.e.* extricated), the trial judge's interpretation is subject to review on a standard of correctness. Where, however, the alleged error cannot be extricated from the factual findings, the trial judge's interpretation is is to be subjected to a more deferential standard of review. In such cases, appellate courts should review the decision on a standard of palpable and overriding error or its "functional equivalents".

### *Determining the Standard of Review in Matters of Contractual Interpretation*

**137**    Before determining the standard of review in accordance with these principles, it is useful to recognize that three matters complicate the application of the *Housen* principles to matters of contractual interpretation.

**138**    First, it can be difficult to determine the nature of the question. For example, in the present case Bell asserts that the contractual interpretation question decided by the application judge is one of law whereas Plan says it is a question of mixed law and fact.

**139**    Second, if the question is one of mixed law and fact, it is difficult to establish where it lies on the spectrum. A spectrum is not an "either-or" proposition. I do not think it is possible to place a question at a precise point on the spectrum. At most, it appears to me that a question of mixed law and fact can be seen to lie more closely toward one end of the spectrum, rather than the other.

**140**    In my view, however, *Housen* resolves this second difficulty as it provides that if the trial judge has not made an extricable error of law, the question is to be reviewed on the standard of palpable and overriding error.

**141**    The third challenge arises from the nature of the task that the trial judge performs when interpreting a contract. When interpreting contracts, trial judges are engaged in the application of settled legal principles - which are designed to give effect to the mutual intentions of the parties - to the contractual provisions. However, the "proper" interpretation often depends, to a greater or lesser extent, on a consideration of the factual matrix and the weighing of evidence. Thus, the very nature of the task performed by the trial judge can make it difficult to determine whether an "extricable" error in law has been committed.

### *A Deferential Standard of Review is Owed in the Present Case*

**142**    In my view, the application judge's interpretation of art. 22.2 of the Alliance Agreement is reviewable on a standard of palpable and overriding error or its functional equivalents of clearly wrong, unreasonable or not reasonably supported by the evidence.

**143**    I reach this conclusion for three reasons. First, the question in this case is one of mixed law and fact. Second, the application judge committed no extricable error of law. Third, there are sound policy reasons for a deferential standard of review in this case.

### 1. The question is one of mixed law and fact

**144**    As I have mentioned, the first step in determining the standard of review is to identify the nature of the question that the application judge decided. My colleague treats the question as one of law or, if mixed law and fact, as falling at the correctness end of the spectrum. I do not agree.

**145**    The reasons of the application judge make it clear that his interpretation of the Arbitration Clause depends on the application of legal principles to the language used by the parties with due consideration for the factual matrix, particularly the facts as he found them to be in 1999 when the Alliance Agreement was entered into. As I explain more fully below, it is not possible to interpret the Arbitration Clause without regard to such factual determinations. Accordingly, the application judge was deciding a question of mixed law and fact.

**146**    My colleague gives three reasons for viewing the question as one of law or strongly akin to a question of law. The first is that the application judge heard the matter in writing, without oral evidence, and the same written materials are available to this court. However, the law is clear that a first instance judge's findings are to be accorded deference by an appellate court, even when he or she heard no oral evidence: *Equity Waste Management of Canada v. Halton Hills (Town)* (1997), 35 O.R. (3d) 321 (C.A.), at pp. 334-35. There are numerous reasons for giving deference to factual findings of trial judges apart from those that arise when the trial judge has heard testimony firsthand and observed witnesses: *Housen* at para. 24.

**147**    The second reason given by my colleague for holding that a correctness standard applies is that there are no underlying evidentiary or factual issues of a contested nature. This, however, does not necessarily make the question one of law alone. To reiterate, a question of mixed law and fact is one in which the trial judge "applies the legal principles to the language of the contract in the context of the relevant facts and inferences": *MacDougall* at para. 32.

**148**    In the recent decision of *Dumbrell v. The Regional Group of Companies Inc*. (2007), 85 O.R. (3d) 616 (C.A.), at para. 52, Doherty J.A. explained that contractual interpretation involves the interplay between the words of a contract and the context in which those words were chosen:

> No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

> There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

**149**    In the present case, the application judge was called on to interpret the Arbitration Clause within the Alliance Agreement as a whole and in the context of these parties, in the particular circumstances at the time the Alliance Agreement was created, with regard to the expectations the parties had at that time. That is, the application judge was called on to decide a question of mixed law and fact, not one of law alone.

**150**    The third reason given by my colleague for a correctness standard of review is that the interpretation of a contract is "very much a legal exercise". I agree that interpreting the language of a contract is a legal exercise. That, however, does not change the fact that the application judge was required to interpret art. 22.2 within its unique factual matrix. The application judge did not decide a question of wide or general application nor did he answer a broad jurisdictional question. In fact, he answered a very narrow, discrete question - as of December 2005, did art. 22.2 of the Alliance Agreement require a party to commence arbitration by means of filing a notice with the Institute? Identifying the precise question that the application judge was called on to decide reinforces my view that the true nature of the question is one of mixed law and fact. The question builds into it the factual context, namely, the situation of the parties and their expectations at the time the agreement was entered into.

### 2. The application judge committed no extricable error of law

**151**    In interpreting a particular clause of an agreement, the trial judge is engaged in drawing a legal inference as to what the parties intended from the objective standpoint of the law of contract. Such an inference, although a conclusion of law, may be dependent on findings of fact regarding the words of the document and the surrounding circumstances. In such situations, the meaning of the words in the contract cannot be divorced from their context and the factual circumstances in which the agreement was made. That is, it may be inherently difficult to "extricate the legal questions from the factual" in matters of contractual interpretation, just as in negligence: *Housen* at para. 36.

**152**    This is just such a case. The application judge held that the Arbitration Clause did not require the delivery and filing of a notice of arbitration with the Institute in order to commence the arbitration. In his view, the Arbitration Clause contemplated that after the commencement of arbitration and the appointment of the arbitrator, the arbitrator would apply the Institute's procedural rules, as amended from time to time. The application judge held that the subsequent replacement of

the 1999 Rules with the Current Rules could not retroactively change the intention of the parties as of 1999 when the Alliance Agreement was executed.

**153**    In drawing a legal conclusion as to what the parties mutually intended from the words of the contract and the surrounding circumstances, the application judge was involved in a context-driven inquiry that depended on the weighing of documentary and other evidence, findings of fact and factual inferences. The end result is a legal conclusion that cannot be neatly or easily separated from its factual underpinnings.

**154**    Although the application judge did not recite the principles of contractual interpretation when interpreting the Arbitration Clause, he carefully and thoughtfully applied them. He thoroughly dealt with the arguments of both parties and gave cogent reasons for choosing the interpretation advanced by Plan. In so doing, he indicated the principles of contractual interpretation that guided him.

**155**    On my reading of his reasons, the application judge interpreted art. 22.2 in the context of the whole agreement and the factual matrix. Unlike my colleague, as I explain below, I view the application judge as having given meaning and effect to the requirement in the second sentence of art. 22.2 that the arbitration be conducted under the then-current Institute rules and to the meaning of "file" in the Waiver. In my view, his reasons demonstrate no extricable error of law.

### 3. Policy reasons favour a deferential approach in this case

**156**    Since the nature of the question is one of mixed law and fact, in the absence of an extricable error of law, this court should accord deference to the trial judge's interpretation. This conclusion flows from *Housen* and is based on sound judicial policy.

**157**    Although it may be difficult to identify the nature of the question and the standard of review - particularly where questions of mixed law and fact are involved - *Housen* provides guidance in two ways. First, it grounds the issue of the standard of review in the different roles that trial and appellate courts play. The "primary role of trial courts is to resolve individual disputes based on the facts before them and settled law". The primary role of appellate courts, by contrast, "is to delineate and refine legal rules and ensure their universal application": *Housen* at para. 9.

**158**    Because of the different roles of trial and appellate courts, the precedential value of the question can be of some relevance in determining its nature and the standard of review. If the question is "apt... to be of much interest to judges and lawyers in the future", or if the dispute is over a "general proposition that might qualify as a principle of law", it is more likely to be a question of law reviewable for correctness: *Housen* at para. 28, citing *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 37. Conversely, where "the matrices of facts at issue... are so particular, indeed so unique" that the decision would not have precedential value, it "draws nigh to being an unqualified question of mixed law and fact" that is generally subject to a more stringent standard, unless the error is traceable to an error in principle that would engage the law-making function of an appellate court: *Housen* at paras. 28, 36-37; *Southam* at para.

37.

**159**    In the present case, the interpretation of the Arbitration Clause is of little or no precedential value. The dispute regarding art. 22.2 depends on a unique matrix of facts that is particular to two parties to a specific negotiated agreement. Further, there is no identifiable error in legal principle at issue that would engage the law-making function of the appellate court.

**160**    The second way in which *Housen* provides guidance is that it directs appellate courts to be cautious in finding that a trial judge erred in law in his or her determination of negligence because it is "often difficult to extricate the legal questions from the factual": *Housen* at para. 36. In my view, and for the same reason, this court should be reluctant to find the application judge's interpretation to be attributable to an error of law. As I have explained, the application judge was engaged in the application of settled legal principles to the evidence and the facts of the case. His legal conclusion regarding the parties' intentions is an "inextricable intertwining of fact and law": *MacDougall* at para. 33.

**161**    Furthermore, a deferential approach reflects sound judicial policy. In *Bradscot (MCL) Ltd. v. Hamilton-Wentworth Catholic District School Board* (1999), 42 O.R. (3d) 723 (C.A.), Laskin J.A. deferred to a trial judge's interpretation of a contractual provision that was reasonable (and therefore not "unreasonable"), noting that the appellant had not alleged any error in the application of the relevant legal principles. In my view, this approach is consistent with *Housen*. As discussed above, where the question is one of mixed law and fact and no extricable error in principle has been made, deference should be paid to the trial judge's interpretation of a contractual provision in the absence of palpable and overriding error or an interpretation that is clearly wrong, unreasonable or not reasonably supported by the evidence.

**162**    In *Bradscot*, Laskin J.A. referred to his earlier decision in *Gottardo Properties (Dome) Inc. v. Toronto (City)* (1998), 162 D.L.R. (4th) 574 (Ont. C.A.). In *Gottardo*, he stated at para. 48:

> Deference is desirable for several reasons: to limit the number and length of appeals, to promote the autonomy and integrity of the trial or motion court proceedings on which substantial resources have been expended, to preserve the confidence of litigants in those proceedings, to recognize the competence of the trial judge or motion judge and to reduce needless duplication of judicial effort with no corresponding improvement in the quality of justice.

**163**    This passage was quoted with approval by the majority in *Housen* at para. 12 in relation to findings of fact and the drawing of factual inferences. In relation to questions of mixed law and fact, the majority held that "in the absence of a legal error or a palpable and overriding error, a finding of negligence by a trial judge should not be interfered with": *Housen* at para. 31. As the majority explained at para. 32, since both legal and factual inferences

> are intertwined with the weight assigned to the evidence, the numerous policy

reasons which support a deferential stance to the trial judge's inferences of fact, also, to a certain extent, support showing deference to the trial judge's inferences of mixed fact and law.

**164**    In contractual interpretation, as in negligence, it can be inherently difficult to extricate the legal questions from the factual. Owing to the fact-sensitive nature of the inquiry - ascertaining the parties mutual and objective intentions - courts frequently make conclusions regarding the "proper interpretation" of a contractual provision without directly applying the interpretive principles or canons of construction. Conclusions as to the "proper interpretation" of a contractual clause summarily express conclusions of law as to what the parties are objectively taken to have intended based on a set of facts. In these situations, as I have said, the interpretation of a contract is a question of mixed law and fact.

**165**    While courts express opinions on the "proper interpretation" of a contract, there may be more than one reasonable interpretation. It is not uncommon, for instance, for various guidelines or canons of construction to point in different directions on a set of facts and for different courts to reach different conclusions regarding the interpretation of a particular clause.

**166**    Accordingly, a deferential approach to the application judge's interpretation of a contract, given the absence of an identifiable error of law, is grounded in sound judicial policy and consistent with the guidelines laid down by the Supreme Court in *Housen*.

## INTERPRETING THE ARBITRATION CLAUSE

**167**    The application judge's interpretation of the Arbitration Clause underlies the Order. If his interpretation is reviewed on a palpable and overriding error standard, I see no basis on which to interfere with it. He made no extricable error in legal principle and his interpretation is not "plainly unreasonable". While one might reasonably interpret the Arbitration Clause other than as the application judge did, that is a function of its wording and does not make the application judge's interpretation unreasonable.

**168**    In any event, however, as I have said, in my view, the application judge was correct in finding that a party did not have to file a notice with the Institute in order to commence arbitration. I reach that conclusion based on the following chain of reasoning:

   1.    The Arbitration Clause does not specify how arbitration is to be commenced;
   2.    The Arbitration Clause does specify that the arbitration will be conducted in accordance with the *Arbitration Act, 1991* and the then-current Institute rules;
   3.    Article 24.6 of the Alliance Agreement says that Ontario law governs;
   4.    In 1999, when the Alliance Agreement was executed and at the time of the dispute in 2005, the *Arbitration Act, 1991* was the Ontario law that applied to the Alliance Agreement;
   5.    Section 23(1) of the *Arbitration Act, 1991* reads as follows:

An arbitration may be commenced in any way recognized by law, including the following:

1.  A party to an arbitration agreement serves on the other parties notice to appoint or to participate in the appointment of an arbitrator under the agreement.

2.  If the arbitration agreement gives a person who is not a party power to appoint an arbitrator, one party serves notice to exercise that power on the person and serves a copy of the notice on the other parties.

3.  *A party serves on the other parties a notice demanding arbitration under the agreement.* [Emphasis added.]

6.  Thus, as the application judge held, in 2005, the Arbitration Clause did not require a party commencing arbitration in respect of a dispute under the Alliance Agreement to file a notice of request to arbitrate with the Institute. It appears from s. 23 of the Act that filing such a notice would have been an acceptable way of commencing arbitration, just as was the method chosen by Plan (*i.e.* service on Bell of a notice demanding arbitration under the agreement);

7.  The Waiver does not detract from this reasoning;

8.  This reasoning promotes a result that is reasonable, fair and sensible.

**169**    Below, I explain how I arrive at the foregoing reasoning. Before doing so, I make the following observations about the principles that guide the courts when interpreting contracts.

### *The Principles that Guide Contractual Interpretation*

**170**    The primary goal when interpreting a contract is to give effect to the intention of the parties. There is no need to repeat the general principles of contractual interpretation which assist in achieving that goal as they are well set out in the reasons of the majority. However, the following quotation from *Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance*, [1980] 1 S.C.R. 888, at p. 901 provides useful guidance:

> *[T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.* Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. *Where words may bear two*

*constructions, the more reasonable one, that which produces a fair result, must
certainly be taken as the interpretation which would promote the intention of the
parties.* Similarly, an interpretation which defeats the intention of the parties and
their objective in entering into the commercial transaction in the first place
should be discarded in favour of an interpretation of the policy which promotes a
sensible commercial result. [Emphasis added.]

**171**    What, then, was the true intent of the parties in February 1999 when they entered into the
Alliance Agreement? Did they intend that if a dispute arose between them that could not be
resolved through good faith discussions, the party with the claim could commence arbitration in
only one way, namely, by complying with the Institute's rules for commencement of arbitration? I
turn now to the analysis which leads me to conclude that the answer to that question is "no".

### Article 22

**172**    The Arbitration Clause does not stand alone - it is but one part of art. 22. Article 22
establishes a two-step process for dispute resolution. Given that art. 22.2 governs the second step in
a two-step dispute resolution process, the first of which is contained in art. 22.1, both logic and the
guiding principles of contractual interpretation dictate that article 22 be considered as a whole.

**173**    Article 22 reflects the parties' shared intention to resolve disputes quickly, co-operatively and
without recourse to the courts. The first step in the dispute resolution process is laid out in art. 22.1.
Pursuant to art. 22.1(a), a party who considers a dispute to exist must provide a designated
representative of the other party with written notice to that effect. Within 10 days of the date of the
notice, designated representatives of both parties must make commercially reasonable efforts, in
good faith, to resolve the dispute. If the dispute is not resolved within 10 days, pursuant to art.
22.1(b) the dispute "shall" be referred to other designated persons in the two organizations (the
"second tier"). Within a further 10 days, the second tier must again make commercially reasonable
efforts, in good faith, to resolve the dispute.

**174**    It is worthy of note that while art. 22.1(a) makes it clear how the dispute resolution process is
to be commenced (*i.e.* by written notice delivered by the party alleging the dispute to a designated
representative of the other party), art. 22.1(b) does not indicate how the dispute is to be referred to
the second tier should the initial good faith discussions fail to resolve the dispute. That is, it says
nothing about how to commence the second tier discussions.

**175**    If the dispute is unresolved through the good faith efforts required by art. 22.1, the parties
move to the second step of the dispute resolution process. Art. 22.2 governs the second step; it
states that the parties "will settle by arbitration" any disputes unresolved through the first step. It
goes on to stipulate that a single arbitrator, selected by the parties from a panel of persons
knowledgeable in business information and the construction industry, will conduct the arbitration in
Toronto in accordance with the *Arbitration Act, 1991* and the then-current rules of the Institute.
Failure to file a notice of arbitration within 12 months "after the occurrences supporting a claim"

constitutes an irrevocable waiver of that claim.

**176**    Three things are immediately apparent on reading art. 22.2. First, it says nothing expressly about how arbitration is to be commenced. In that regard, it stands in sharp contrast with art. 22.1(a) which, as has been noted, spells out the requirements for commencing the dispute resolution process.

**177**    Second, while art. 22.2 is silent on how the arbitration is to be commenced, as already indicated, a number of other aspects of the arbitration process are specified.

**178**    Third, the Waiver is in the last sentence of art. 22.2 and it says nothing expressly about commencement of arbitration. That makes sense. The Waiver, on which more is said below, is an important provision which affects substantive rights. How a party commences arbitration is a procedural matter.

### How is arbitration to be commenced under art. 22.2?

**179**    I return to the question which lies at the heart of this appeal. In February 1999, when the parties entered into the Alliance Agreement, did they intend that arbitration could be commenced by only one method, namely, in accordance with the then-current Institute rules?

**180**    Art. 22.2 does not say that and, with respect, there is no basis on which to imply such an intention. What is clear is this: the parties intended that if the good faith efforts called for by art. 22.1 failed to resolve the dispute, the matter would go to arbitration. How was the arbitration to be commenced? In the absence of any specified manner, I see no reason why the Arbitration Clause must be interpreted so as to permit a party to commence arbitration by one method only, namely, compliance with the Institute rules. The parties to the Alliance Agreement are sophisticated, experienced businesses. Legal counsel assisted in the drafting of the agreement. Had they intended to stipulate a single method by which to commence the arbitration process, that matter would have been specified, just as the method for commencement of the first step in the process in art. 22.1 is specified and just as so many other aspects of the arbitration process are specified.

**181**    Moreover, art. 24.6 of the Alliance Agreement provides that it is to be governed and construed in accordance with Ontario law.[16] Accordingly, in 1999, when the parties entered into the Alliance Agreement, the *Arbitration Act, 1991* applied to the agreement. Section 2(1) of the *Arbitration Act, 1991* provides that, subject to exceptions that do not apply in this case, the Act applies to arbitrations conducted under an arbitration agreement. "[A]rbitration agreement" is defined as "an agreement by which two or more persons agree to submit to arbitration a dispute that has arisen or may arise between them". Clearly, art. 22.2 is such an agreement. Thus, as I have said, the *Arbitration Act, 1991* applied to art. 22.2.

**182**    Consequently, I see the true intention of the parties - as expressed in the Arbitration Clause - to be that arbitration could be commenced "in any way recognized by [Ontario] law". Thereafter,

the parties would select an arbitrator with the specified background who would conduct the arbitration in accordance with the Act and the Institute rules, as amended.

**183**    This interpretation is consistent with the flow and structure of art. 22. As has been noted, the method for commencing the dispute resolution process itself is spelt out in art. 22.1(a) but, thereafter, nothing is specified in terms of how notice should be given to move the dispute resolution forward. Art. 22.1(b) says nothing as to how the dispute is to be placed before the second tier, should the initial good faith discussions fail. Similarly, art. 22.2 says nothing as to how to commence arbitration should both tiers of the good faith discussions fail. This suggests that the parties' intention was that once the dispute resolution process was commenced, they would co-operate in seeing it through to settlement.

**184**    It is also consistent with the Alliance Agreement as a whole. Under the terms of the Alliance Agreement, Bell and Plan agreed to work collaboratively and cooperatively. The Alliance Agreement is not a standard form contract, nor is it a contract in which one party provides goods or services and the other pays for them. It is not a detailed agreement. Rather, it sets out the parties respective rights and obligations in broad terms to create a unique arrangement in which the parties agree to work together to deliver expensive, complicated, technical electrical cabling projects.

**185**    The parties' agreement to extensive levels of co-operation in all aspects of the joint venture is evident throughout the Alliance Agreement, beginning with the preambles in which the parties recognize that each has unique capabilities and express the desire to cooperate in providing their services on cabling projects. In art. 2, the parties agree to co-ordinate their marketing efforts in respect of existing and new customers and to collaborate in pursuing business opportunities. In art. 3, Plan agrees to refer to Bell all of its cabling project customers in the region and Bell agrees to use Plan to provide customer services to all of its customers in the region. In arts. 8 and 9, the parties agree to provide one another with all training necessary to support customer inquiries in respect of deliverables. The parties also agree to forego any other similar types of alliance agreements in the region and to work together on all new cabling projects.

**186**    In short, within the structure created by the Alliance Agreement, co-operation between the parties is the hallmark. Similarly, the interpretation I offer for how arbitration is to be commenced relies on the parties' co-operation, within the agreed-on structure provided by art. 22.

**187**    Furthermore, the factual matrix supports this interpretation. The parties had been working together in a co-operative fashion. As has been mentioned, they were sophisticated, experienced business people working with legal counsel. Their whole approach - both from a legal and a business perspective - was to set out, in broad strokes, that which they wished to accomplish and then co-operate in seeing the matter through to fruition.

**188**    The interpretation given by my colleague is restrictive and technical - arbitration can be commenced in only one way, by filing a notice with the Institute. In my view, for the reasons already given, such an interpretation is not consistent with the flow and structure of the overall

dispute resolution process in art. 22, with the Alliance Agreement as a whole or the factual matrix.

**189**    Furthermore, the interpretation adopted by my colleague relies heavily on the statement in art. 22.2 that the arbitration is to be conducted under the Institute's rules. There are two responses to this. First, recall that the sole reference to the Institute in art. 22.2 is in the second sentence, which provides that the arbitrator "will conduct the arbitration under the Arbitration Act, 1991 (Ontario) and the then-current rules of the... Institute". One cannot conduct an arbitration unless it has been commenced. Thus, on a plain reading, art. 22.2 says that the Institute rules are to apply to the conduct of the arbitration, not to its commencement.

**190**    Second, and in any event, even if "conduct" of the arbitration is taken to include its commencement, I see no reason to constrain it to include commencement only by compliance with the Institute rules. That is not what art. 22.2 says. Art. 22.2 says that the arbitrator is to conduct the arbitration under both the *Arbitration Act, 1991* and the Institute rules. Both contain rules for the commencement of arbitration. There is nothing in the wording of art. 22.2 to suggest that the Institute's rules are to govern commencement. Indeed, there is force to the argument that as art. 22.2 refers to the *Arbitration Act, 1991* before the Institute rules, the parties' evinced an intention that the rules set out in the *Arbitration Act, 1991* are to govern commencement of arbitration.

**191**    Nor do I see *Spectra Innovations Inc. v. Mitel Corp.*, [1999] O.J. No. 1870 (S.C.) as supportive of the interpretation advanced by my colleague. The wording of the clause in *Spectra* is materially different than the Arbitration Clause. The clause in *Spectra* provided that the arbitration tribunal should determine the matter "*acting in accordance with the Rules [of the ICC]*" (emphasis added). However, the Arbitration Clause stipulates that the arbitrator "will *conduct* the arbitration *under the Arbitration Act, 1991* (Ontario) and the then-current [Institute rules]" (emphasis added).

**192**    Moreover, as the application judge noted at para. 41 of his reasons:

> While the arbitration clause in *Spectra* also addresses the appointment of the arbitrator by the parties (in this case, an arbitration board), it does not refer to compliance with the applicable rules in the context of the conduct of the arbitration by the arbitrator so appointed. This difference points to a specific intention in the Arbitration Clause that the arbitrator, once appointed, would be required to apply the procedural rules in the Act and in the rules of the Institute, as in effect from time to time, rather than to a more general intention that the Institute was to administer all aspects of the arbitration, as was held to be the case in *Spectra*. Accordingly, rather than supporting the interpretation of the Arbitration Agreement proposed by Bell, I think that the decision in *Spectra* actually supports the interpretation of Plan by identifying the unique feature of the Arbitration Clause that distinguishes it from clauses that would contemplate the administrative involvement of the Institute.

**193**    Further, in *Spectra*, the court relied on the factual matrix in interpreting the clause. After

observing that the applicant was based in Singapore, the respondent was based in Ontario and the agreement concerned the supply of product in India, the court in *Spectra* concluded at para. 17:

> ...The I.C.C. court which was founded in Paris in 1923, has a long-standing reputation as one of the leading institutions for arbitration of international commercial disputes. *In this context*, it would be altogether logical that the parties would want to resolve any dispute by setting up an arbitration board acting in accordance with the Rules of conciliation and arbitration of the I.C.C. [Emphasis added.]

**194**    No such inter-jurisdictional commercial considerations operate in the case at bar, in which all aspects of the business arrangement take place in Ontario and the parties have expressly chosen to have their agreement governed by Ontario law.

**195**    Finally, the Waiver is an exclusionary provision which warrants strict interpretation as its operation affects substantive rights. In contrast, the clause in *Spectra* dealt with matters of mere procedure.

### *The Waiver*

**196**    The Waiver is the mechanism chosen by the parties to ensure that claims under the Alliance Agreement are dealt with in a timely fashion - file a notice of arbitration within 12 months of the occurrences which support a claim or the claim is to be treated as irrevocably waived.

**197**    Bell contends that the Waiver dictates that arbitration could have been commenced in only one way - by filing a notice with the Institute. It says that the word "file" in the Waiver must mean to file with the Institute and, as the Notice was not filed and issued through the Institute, Plan's claim is extinguished. In large measure, my colleague accepts that contention by interpreting the word "file" in the Waiver as a crucial indicator of the parties' intention that the Institute rules were to govern the commencement of arbitration.

**198**    With respect, I see the Waiver to be of little significance in determining whether the arbitration has been commenced.

**199**    "Waiver" of a claim and "commencement" of arbitration are not synonymous. The Waiver may be a defence to be raised in the arbitration but it does not dictate whether and how the arbitration is to be commenced.

**200**    Similarly, I see no reason to adopt an unnecessarily restrictive meaning of "file". "File" is not a defined term in the Alliance Agreement. As the parties intended that disputes would be resolved without recourse to the courts, it does not make sense to ascribe to that word a narrow, strictly legal meaning. Where the parties wanted to closely circumscribe some aspect of the dispute resolution process they did so - good faith discussions were to be conducted within 10 days of the date of the

notice of dispute, the arbitration was to be in Toronto, the arbitrator was to be selected from a panel of persons with a particular background and so on.

**201**    Further, the broader dictionary meaning of "file" includes delivery and receipt and to do that which is necessary to commence a legal proceeding. The common meaning of "file" includes "actual delivery" to the recipient (as opposed to simply mailing) or to initiate proceedings by proper formal procedure. For example, *The Canadian Dictionary of Law*, 3d ed. defines "file" as follows:

> **File**. v. 1. To leave with the appropriate office for keeping. 2. Register. 3. Requires actual delivery. A mailed document is not filed until received by the other party.

**202**    These broad meanings of "file" are consistent with the commencement of arbitration under s. 23 of the *Arbitration Act, 1991*.

**203**    To the extent that there is ambiguity in the Waiver, as it is an exclusionary provision, it ought to be construed strictly against the forfeiture of legal rights. This principle of interpretation is particularly apt in the present case where Plan sought to commence arbitration in a manner which complied with a plain reading of the Arbitration Clause and with the express purpose of protecting its rights and Bell raised no objection to the form of the purported commencement of arbitration until many months later. The broader interpretation advanced here recognizes commencement of arbitration by any means allowable in law and would not work an injustice by causing the loss of rights.

**204**    I do not intend to suggest that the Waiver is irrelevant or unimportant. To the contrary. On its own, the Waiver is important as it is the mechanism that the parties chose to ensure that claims would be raised in a timely fashion. Furthermore, if this matter were permitted to proceed to arbitration, as I have mentioned, it raises a significant issue for the arbitrator to decide.

### The result is reasonable, fair and commercially sensible

**205**    In the quotation from *Consolidated Bathurst* set out above, the Supreme Court states that where a provision admits of more than one construction, the court should choose the one which produces a result that is more reasonable, fair and commercially sensible.

**206**    The result, on the interpretation advanced above, is that Plan may assert that it commenced arbitration on December 12, 2005, when it delivered to Bell the Notice pursuant to s. 23 of the *Arbitration Act, 1991*, if not earlier. That matter, however, remains to be determined by the arbitrator. I say that because, as I have already explained, the Order does not declare that Plan has commenced arbitration and, if so, on what date. By answering the question in the manner in which the parties had framed it (*i.e.* in the negative), the application judge left the question of when Plan commenced arbitration, if at all, to be determined by the arbitrator.

**207**    In my view, this result is reasonable, fair and commercially sensible.

**208**    When parties have agreed that disputes are to be settled by arbitration and that the *Arbitration Act, 1999* applies, it is reasonable for the parties to follow the provisions of that legislation regarding commencement of arbitration.

**209**    Moreover, this interpretation promotes a fair result as it would permit the arbitration to proceed while leaving it to the parties to pursue the issues of both commencement and operation of the Waiver before the arbitrator.

**210**    There is no commercial necessity that would augur in favour of excluding the operation of s. 23 of the *Arbitration Act, 1991*.

**211**    No commercial injustice arises from this interpretation. Bell was given ample notice of Plan's intention to take its claim to arbitration. It took advantage of that notice by demanding extensive particulars in respect of the claim. Moreover, Bell was manifestly aware of all the elements of a notice of request to arbitrate under the Institute's then-current rules.

**212**    There is no evidence that Bell would suffer any prejudice from this interpretation of the Arbitration Clause. Instead, the evidence suggests opportunism on the part of Bell. It seeks - very late in the day - to invoke the Waiver on grounds that are entirely formalistic in nature. Plan delivered the Draft Notice to Bell on August 26, 2005, when it initiated the good faith discussions required by art. 22.1(a). Bell raised no objection then to the fact that the Draft Notice was made under the *Arbitration Act, 1991* instead of the Institute rules. Nor did it suggest that such a notice would not be adequate to preserve Plan's rights with respect to the Waiver. It raised the Waiver, but only to suggest that Plan's claim was out of time as the occurrences on which it was based had taken place over 12 months previously.

**213**    In the context of good faith discussions, Bell should have raised this objection at that time, if it were genuine. At the very least, if no objection were raised when the Draft Notice was delivered, Bell should have raised its concerns when the Notice was delivered on December 12, 2005. Instead, Bell remained silent on this issue, demanded further particulars and suggested that the good faith discussions might continue.

**214**    In summary, interpreting the Arbitration Clause to allow commencement of arbitration in any manner recognized by s. 23 of the *Arbitration Act, 1991* - which would include the Institute rules as well as delivery of a notice demanding arbitration - meets the reasonable expectations of the parties, reflects their intention as expressed in the Alliance Agreement in 1999 when they executed the agreement, and produces a result that is reasonable, fair and commercially sensible.

## DISPOSITION

**215**    Accordingly, I would dismiss the appeal with costs to the respondents fixed at $20,000,

inclusive of disbursements and G.S.T.

E.E. GILLESE J.A.

1 This appears to be a mistake. The reference should be to Section 22.1.

2 I have italicized the two provisions in the Agreement that are central to the appeal.

3 "Application" here is used in the sense of "motion". See *Buck Bros., infra*, at p. 1000.

4 See e.g. *Petty v. Telus Corp.* (2002), 164 B.C.A.C. 152 (C.A.); *IWA - Forest Industry Pension Plan (Trustees of) v. Aspen Planers Ltd.*, (2006), 56 B.C.L.R. (4th) 1 (C.A.); *A.L. Sott Financial (FIR) Inc. v. PDF Training Inc.* (2008), 77 B.C.L.R. (4th) 154 (C.A.).

5 See e.g. *Double N Earthmovers Ltd. v. Edmonton (City)* (2005), 363 A.R. 201 (C.A.), aff'd [2007] 1 S.C.R. 116; *Alberta v. Western Irrigation District* (2002), 312 A.R. 358 (C.A.); *Dreco Energy Services Ltd. v. Wenzel* (2008), 440 A.R. 273 (C.A.); *942925 Alberta Ltd. v. Thompson* (2008), 432 A.R. 177 (C.A.).

6 See e.g. *Robichaud, Williamson, Theriault and Johnstone v. Pharmacie Acadienne de Beresford Ltée* (2008), 328 N.B.R. (2d) 205 (C.A.), at para. 16; *Ryan v. Sun Life Assurance* (2005), 230 N.S.R. (2d) 132 (C.A.), at para. 15; *White v. E.B.F. Manufacturing Ltd.* (2005), 239 N.S.R. (2d) 270 (C.A.), at para. 16; *United Gulf Developments Ltd. v. Iskandar* (2008), 267 N.S.R. (2d) 318 (C.A.), at para. 5.

7 This appears to be a mistake. The reference should be to Section 22.1.

8 That it was ultimately not renewed is immaterial.

9 The latter caveat has no relevance to the case at bar.

10 See also, *The Canadian Oxford Dictionary*, 2d ed., *s.v.* "file" and "deliver"; *Black's Law Dictionary*, 8th ed. *s.v.* "file" and "deliver".

11 **The facts are taken largely from the Notice Demanding Arbitration prepared by Plan.**

12 It can be found at para. 107 below.

13 *MacDougall* at para. 30.

14 *Housen* at para. 36. Although stated to be an example of an extricable error in the negligence context, I see no reason that it ought not to apply equally to contractual interpretation.

15 *Ibid*.

16 Article 24.6 provides:

> ***Governing Law.*** This Agreement shall be governed and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein. The Parties hereby attorn to the non-exclusive jurisdiction of the Courts of Ontario.

*Case Name:*

# University of Toronto v. John N. Harbinson Ltd.

**Between**
**Governing Council of the University of Toronto and the**
**University of Toronto Innovations Foundation,**
**applicants, and**
**John N. Harbinson Limited, respondent**

[2005] O.J. No. 5437

Court File No. 05-CV-283673PD2

Ontario Superior Court of Justice

**E.M. Stewart J.**

Heard: August 16, 2005.
Judgment: December 16, 2005.

(37 paras.)

*Contracts -- Express terms -- Conditions and warranties -- Arbitration panel had jurisdiction to adjudicate dispute over warranty in licence agreement between company and university -- Subject matter of dispute was ownership of invention, not patent law, so arbitration clause in contract governed and panel had jurisdiction -- Arbitration Act, s. 17(3).*

*Intellectual property law -- Patents -- Arbitration panel had jurisdiction to adjudicate dispute over warranty in licence agreement between company and university -- Subject matter of dispute was ownership of invention, not patent law, so arbitration clause in contract governed and panel had jurisdiction.*

*Harbinson had licence agreement with University, granting Harbinson exclusive right to exploit products relating to two inventions -- Harbinson had related research contract with university requiring Harbinson to fund research by University professor on inventions -- Licence agreement contained arbitration clause, terms stating professor was sole inventor, University owned invention and had right to grant exclusive licence -- Harbinson claimed University breached warranties regarding professor being inventor and University having ownership of invention -- Harbinson claimed professor misappropriated invention from another scientist not employed by University,*

*claimed invention and concealed misconduct from Harbinson -- Harbinson claimed it would not have entered licence agreement or research contract with University had it know invention was misappropriated, consequently not owned by University -- Harbinson claimed damages relating to over billing for professor's research -- Claimed University obstructed Harbinson's efforts to exploit commercial potential of invention, made no meaningful attempt to investigate alleged misconduct of professor -- University disputed jurisdiction of arbitration panel to conduct arbitration regarding Harbinson's claim -- Panel rejected University's arguments, ruled it had jurisdiction -- Ruled Harbinson's claim had nothing to do with patent law, within jurisdiction of federal court -- University applied for order declaring arbitration panel lacked jurisdiction -- Application dismissed -- Dispute involved factual analysis of who made invention, engaging principles of property law, proper subject matter for arbitration -- Panel made correct determination Harbinson's claims were within its jurisdiction -- Harbinson's claims raised several issues constituting a dispute.*

**Statutes, Regulations and Rules Cited:**

Arbitration Act s. 17(3)

Federal Courts Act s. 20(1)(b)

Patent Act

**Counsel:**

David Stratas and Brad Elberg, for the Applicants

David W. Kent and Carol Hitchman, for the Respondent

---

**E.M. STEWART J.**:--

Nature of the Application

**1**    In this Application, the Applicants (collectively, the "University") seek an order declaring that the Arbitral Panel (the "Panel"), appointed under an arbitration clause contained in a licensing agreement (the "Licence Agreement") between the University and a predecessor of the Respondent John N. Harbinson Limited ("Harbinson"), lacks jurisdiction to conduct an arbitration of Harbinson's claim. In the alternative, the University seeks an order prohibiting the Panel from hearing Harbinson's claim until such time as the Commissioner of Patents or the Federal Court determines that the University does not have exclusive rights over the inventions claimed in Canadian Patent Applications 2,285,038 and 2,342,310, or until such time as the Commissioner of Patents rules on those Canadian Patent Applications.

**2**    In essence, the University asserts that the Panel lacks jurisdiction to determine who is the sole inventor of the inventions claimed in the Patent Applications and takes the position that, as a result, the arbitration should not proceed.

Background Facts

**3**    The claims which Harbinson seeks to arbitrate stem from the Licence Agreement. The Licence Agreement contains an arbitration clause which provides:

> 15.01 Any dispute, controversy or claim arising from this Agreement or its breach, termination or alleged invalidity shall be settled by arbitration in accordance with the Arbitrations Act of Ontario, as amended.

**4**    The Licence Agreement grants Harbinson the worldwide exclusive right to exploit products relating to an invention (the "Invention") which is, in fact, comprised of two inventions - one with respect to the application of an elicitor for the prevention of Dutch Elm Disease (the "DED Invention"), and a second which concerns the use of that elicitor for the control of Fire Blight in fruit trees (the "Wilt Disease Invention").

**5**    Harbinson and the University also entered into a related research agreement (the "Research Contract") which required Harbinson to fund research by Professor Martin Hubbes ("Hubbes") on the Invention. Hubbes was a professor at the University and had made some discoveries with respect to the DED Invention.

**6**    In the Licence Agreement, the University provided the following warranties:

> 9.02 To the best of its knowledge, the University warrants that Hubbes is the sole inventor of the Invention.

> 9.03 To the best of its knowledge, the University warrants that it owns the Invention and any Patentable Improvements and otherwise has the exclusive right to grant the licence contained in this Agreement, without the consent of any Person, and free and clear of any claim, charge, licence, sublicenses, lease, sublease, covenant, encumbrance, security interest, lien, option, pledge, right or other restriction.

> ....

> 9.07 The Foundation does not warrant the validity of any Patent which may be issued with respect to the Invention or any Patentable Improvement or that the

Invention or any Patentable Improvement is patentable.

**7**     Harbinson claims that the University breached the warranties contained in sections 9.02 and 9.03 of the Licence Agreement. In the arbitration, Harbinson seeks damages for those alleged breaches, damages for other alleged breaches of the Licence Agreement, as well as punitive damages.

**8**     More particularly, Harbinson claims that the warranty that Hubbes was the sole inventor of the Invention is untrue and says that the Wilt Disease Invention was actually made by Dr. Antonet Svircev ("Svircev"), a research scientist with Agriculture and Agri-Food Canada ("AAFC"), a ministry of the Government of Canada. Harbinson claims that Hubbes misappropriated Svircev's invention, claimed it for himself and then concealed his misconduct from Svircev and Harbinson. Harbinson alleges that, at most, Hubbes was a co-inventor of the Invention, and had little to do with the key Wilt Disease portion of it.

**9**     In Article 9.03 of the Licence Agreement, the University warranted that it owned the Invention and otherwise had the exclusive right to licence the exploitation of the Invention. Harbinson claims that this representation was also untrue. It argues that, as Svircev was the inventor in respect of the Wilt Disease Invention, then the ownership interest in that portion of the Invention lies with the AAFC, her employer. Harbinson also says that even if Hubbes was the sole inventor of the Invention and the University, as his employer, was the original owner of the entire Invention as a consequence of his inventorship, the University disposed of its right in the Wilt Disease Invention to AAFC under a research collaboration contract (the "OREP Agreement") between the University and AAFC pursuant to which the Wilt Disease Invention was made.

**10**     Harbinson says it would not have entered into the Licence Agreement or Research Contract and would not have advanced research funds had it known the truth.

**11**     Harbinson also claims compensatory damages in respect of specific alleged misconduct by the University after the Licence Agreement was entered into. It claims that it was overbilled by the University for Hubbes' research efforts. Harbinson also claims that, during the course of research on the Invention, Hubbes discovered a new fungus that had large but untested commercial potential and misled Harbinson as to the status of his investigation. It maintains that the University obstructed its efforts to obtain and capitalize upon its contractual rights to exploit the commercial potential of the discovery. Harbinson alleges that the University thereby breached the Licence Agreement and that Harbinson suffered damages in respect of its loss of this opportunity.

**12**     Finally, Harbinson claims that the University made no meaningful attempt to investigate its complaints about the alleged misconduct of Hubbes and others with respect to the invention, and is liable in damages as a result.

**13**     It is notable that in the arbitration Harbinson does not claim any ownership interest in the Invention or in any patents relating to the Invention. In particular, Harbinson does not seek any

order whose effect would be to invalidate or expunge any of the patents or patent applications.

Decision of the Arbitral Panel

**14**    In its Defence, the University disputed the jurisdiction of the Panel to conduct the arbitration. It brought a preliminary motion in which two main propositions were advanced:

> (a)    the Panel generally lacked jurisdiction because the essence of Harbinson's claims must be advanced elsewhere pursuant to the Patent Act; and
>
> (b)    the Panel lacked jurisdiction to consider specific aspects of Harbinson's claims because they fell outside the scope of the arbitration.

**15**    In its Preliminary Jurisdictional Ruling, the Panel rejected the University's arguments and ruled that it had jurisdiction to adjudicate Harbinson's claims.

**16**    With respect to the Patent Act argument, the Panel noted that Harbinson alleged separate breaches of two discrete warranties - one as to Hubbes' inventorship, and the other as to the University's ownership rights in the Invention. The Panel analyzed the University's attack on jurisdiction separately with respect to each of these two breaches. The Panel held that Harbinson's inventorship warranty claim had nothing to do with the Patent Act and lay separately within the Panel's jurisdiction, declaring (at p. 3):

> As regards the issue of "sole inventor", we have been directed to nothing in the Patent Act that restricts or extinguishes the Panel's jurisdiction to consider the claim that the [University] misrepresented Professor Hubbes' role as sole inventor. We are not now persuaded, as a preliminary matter of jurisdiction, that even the grant of a patent under the Patent Act would determine that question. We have the jurisdiction to consider and determine the validity of this claim and what, if any, damages flow from it.

**17**    The Panel held that it could not question the exclusive ownership rights that a person derived from the Patent Act, and so lacked jurisdiction to entertain an attack on any rights or status of the University that flowed from a grant of those rights under the Patent Act. However, the Panel noted that it was not "entirely clear whether the [University] alienated or diluted some of their patent rights by contract or otherwise". As a result, the Panel concluded that it still had jurisdiction to deal with Harbinson's exclusive ownership warranty claim, saying (at p. 3):

> We recognize that [Harbinson] must address the fact that there has been no attack on the University's claim of exclusive ownership under its Patent Act application and that we do not have jurisdiction to entertain an attack on the patent or on the University's rights that would flow from the grant of a patent to it. Assuming the patent is issued, the University will have exclusive rights over the inventions. Nonetheless, while the existence of the patent and the rights flowing from the

> patent and the application for a patent will have to be dealt with by [Harbinson]
> during the arbitration, we conclude that this is not a matter that goes to the
> panel's jurisdiction to deal with the issues raised. We have not been asked
> directly to challenge the exclusivity granted by the patent or the patent itself.

**18**    The Panel also rejected the University's argument that Harbinson's claims do not arise under the Licence Agreement and therefore cannot be advanced pursuant to the arbitration clause found in that Agreement. The Panel noted Harbinson's assertion that it alleged liability only under the Licence Agreement and sought only damages arising from breaches of the Licence Agreement. The Panel held (at p. 4):

> On the basis of this representation or assertion, we are not inclined now to finally
> rule out any of the disputed claims on a jurisdictional basis. However, we do
> make it clear that if some or all of these claims are pursued by [Harbinson], at the
> hearing on the merits, [Harbinson] will have to satisfy this Panel that the
> additional claims really do, in fact and law, flow out of the Licence Agreement
> and that, as such, this Panel has jurisdiction to address the additional claims.

Issue

**19**    Was the Arbitration Panel correct in determining that it had jurisdiction to hear Harbinson's claims?

Discussion

**20**    The University maintains that the Patent Act provides a complete code for determination of patent claims. It also argues that Harbinson's claim is academic at this point and necessarily premature because the University's title to the Invention remains unchallenged. It suggests a number of procedures allegedly available to Harbinson under the Patent Act whereby Harbinson can apply to the Federal Court to "change a record" in the Office of the Commissioner or to set aside the granting of a patent. Unless and until that occurs, it says, the title of the University to the Invention stands.

**21**    Under the Federal Courts Act, the Federal Court does have exclusive jurisdiction over some of the proceedings contemplated by the Patent Act. In particular, section 20(1)(b) of the Federal Courts Act gives the Federal Court exclusive jurisdiction over cases in which it is sought to impeach or annul any patent of invention.

**22**    However, I do not agree that the Patent Act necessarily provides a complete and exhaustive code regulating all claims of inventorship and ownership of inventions, nor does it provide a comprehensive set of remedies. Inventorship issues and the ownership of inventions have been routinely adjudicated in forums other than pursuant to the present action in the Federal Court (see: W.J. Gage Ltd. v. Sugden, [1967] 2 O.R. 151; Spiroll Corp. Ltd. v. Putti et al. (1976), 29 C.P.R.

(2d) 260 (B.C.C.A.); Forget v. Speciality Tools of Canada Inc., [1993] B.C.J. No. 822 (B.C.S.C.), aff'd. [1995] B.C.J. No. 1653).

**23** In addition, the Federal Court has determined that contract disputes relating to patents are not within its jurisdiction to adjudicate. Even where Patent Act relief is sought, contract claims which engage provincial contract law issues are to be resolved within the context of provincial adjudication mechanisms (see: Axia Incorporated v. Northstar Tool Corporation, [2003] F.C.J. No. 708, 2005 FC 573 (F.C.) at paras. 17-19; R.L.P. Machine & Steel Fabrication Inc. v. DiTullo (2001), 12 C.P.R. (4th) 15 (F.C.T.D.); Maple Creek Manufacturing & Marketing Inc. v. Hanson Marketing Inc. (1997), 72 C.P.R. (3d) 417 (Ont. Gen. Div.), at p. 418).

**24** As noted above, the University warranted that Hubbes was the sole inventor of the Invention. Harbinson claims that the warranty was materially false and that, in fact, Svircev made the Wilt Disease Invention and is a co-inventor of the Invention. Harbinson says it would not have funded Hubbes' research had it known of Svircev's key role and seeks damages for breach of contract as a result.

**25** Harbinson does not claim to be the inventor or the owner of the Invention. Harbinson does not seek any relief under the Patent Act. Instead, Harbinson advances claims that arise under contract law and seeks damages pursuant to damages principles. Given the arbitration clause, the contract requires that this dispute be adjudicated by the Panel. In my view, there is no inconsistency between Harbinson's claim of breach of the inventorship warranty and the fact that the University may have patent applications pending in respect of the Invention.

**26** The University also gave a warranty to the effect that it owned the Invention and had the exclusive right to license it to Harbinson. Harbinson claims that this statement was untrue and that, in fact, the Wilt Disease Invention belonged to AAFC. Harbinson says that the University thereby breached the Licence Agreement, entitling Harbinson to damages for breach of contract.

**27** Harbinson says that ownership of the Wilt Disease Invention never arose in favour of the University in the first place because Svircev was the inventor. In the alternative, it asserts that the University disposed of any rights it had in the Wilt Disease Invention to AAFC under the OREP Agreement.

**28** The Licence Agreement was made as of January 1, 1999 and was executed on March 30, 1999. As of that time, no Canadian patents had been issued in respect of the Invention. While section 42 of the Patent Act confers "ownership" of an invention on the patentee, it does so only "from the granting of the patent". When the University gave its warranty, Harbinson says that it enjoyed no ownership rights in the Invention derived from the Patent Act. Harbinson argues that the University's 1999 ownership warranty cannot become true retrospectively by operation of the Patent Act, and an attack on the truth of that warranty is neither inconsistent with nor capable of being adjudicated under the Patent Act.

**29**    The dispute as to who was the original owner of the Invention as of 1999 will involve a factual analysis of who made the Invention since ownership of a unpatented invention depends upon a determination of who made it. It is evident that the adjudication of such a dispute will engage common law principles relating to property rights and is the proper subject matter for arbitration.

**30**    Harbinson's alternative complaint, that the University had disposed of its ownership interest to AAFC by contract, is likewise arbitrable. This aspect of Harbinson's claim turns on the interpretation and application of the OREP Agreement between AAFC and the University. Harbinson asserts that this agreement, under which collaborative research was conducted into wilt disease, had the effect of conferring ownership of the Wilt Disease Invention on AAFC.

**31**    As already noted, Harbinson is not advancing Patent Act causes of action, nor does it seek Patent Act remedies. Traditional contract causes of action arising from alleged misstatements by the University are asserted, and damages are sought as a result. In my view, nothing in the Patent Act or the Federal Courts Act removes or impairs the jurisdiction of the Panel to deal with the matter.

**32**    Accordingly, I am of the opinion that the Panel was correct in its determination that it has jurisdiction to hear the claims made in the arbitration, within the parameters observed in its Preliminary Jurisdictional Ruling.

Is there a "Dispute" to Trigger the Arbitration Clause?

**33**    The University also appears to be suggesting that there is no "dispute" to submit to arbitration because no one yet has raised any challenge to the University's title to the Invention in the forum in which such challenge may be asserted, the Federal Court. This argument was raised by the University for the first time at the hearing of this Application.

**34**    I agree with the submission made on behalf of Harbinson that to suggest that there is no "dispute" before the Panel to determine accords neither with the facts nor with common sense. The mere fact that proceedings have not been initiated in Federal Court does not result in a conclusion that there is no dispute to be submitted for arbitration. In my opinion, there is a dispute which raises several issues which are wide-ranging.

**35**    In view of this conclusion, I consider it unnecessary to determine the application of s. 17(3) of the Arbitration Act to the argument advanced by the University at this stage.

Conclusion

**36**    For these reasons, the Application is dismissed.

Costs

**37**    If the parties cannot agree on the subject of costs, written submissions from the Respondent may be delivered within 30 days of the date of release of this decision, and submissions from the

Applicants within 15 days thereafter.

E.M. STEWART J.

cp/e/qw/qlmxd/qlhcs/qlmll

*Case Name:*

# Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust

**Between**
**Ventas, Inc., 2124678 Ontario Inc., and 2124680 Ontario**
**Inc., Applicants (Respondents in Appeal), and**
**Sunrise Senior Living Real Estate Investment Trust,**
**Sunrise REIT Trust, Sunrise REIT GP, Inc., Sunrise**
**Senior Living Inc., and Health Care Property Investors,**
**Inc., Respondents (Appellants in Appeal)**
**And between**
**Sunrise Senior Living Real Estate Investment Trust,**
**Sunrise REIT Trust, and Sunrise REIT GP, Inc.,**
**Applicants (Appellants in Appeal), and**
**Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario**
**Inc.), Ventas SSL Ontario I, Inc. (Formerly 2124680**
**Ontario Inc.), Ventas Inc., Sunrise Senior Living,**
**Inc., and Health Care Property Investors, Inc.,**
**Respondents (Respondents in Appeal) (Ventas Inc.**
**and numbered companies) (Appellant by Cross-Appeal)**
**(Health Care Property Investors, Inc.)**

[2007] O.J. No. 1083

**2007 ONCA 205**

85 O.R. (3d) 254

222 O.A.C. 102

29 B.L.R. (4th) 312

56 R.P.R. (4th) 163

156 A.C.W.S. (3d) 95

2007 CarswellOnt 1705

Dockets: C46790 and C46791


Ontario Court of Appeal
Toronto, Ontario

**R.A. Blair, J.L. MacFarland and H.S. LaForme JJ.A.**

Heard: March 20, 2007.
Judgment: March 23, 2007.

(69 paras.)

*Corporations and associations law -- Sale of a business -- Asset purchase agreement -- Conditions and warranties -- Restrictive covenants -- Appeal by trust and potential purchaser of trust's assets from decision concluding trust was precluded from considering or accepting bid from potential purchaser dismissed -- Trust and plaintiff purchaser entered into purchase agreement -- Agreement precluded trust from negotiating other bids and obliged trust to enforce existing standstill agreements -- Potential purchaser made post-auction bid, exceeding plaintiff purchaser's bid -- Trust held to be unable to consider or accept bid -- Fact plaintiff purchaser negotiated better terms in its standstill agreement did not render potential purchaser's agreement unenforceable -- Trust's shareholders still entitled to vote on plaintiff purchaser's bid, such that court's decision did not prevent trust from maximizing shareholder value.*


Appeal by Sunrise and HCPI from a decision concluding Sunrise was precluded from considering or accepting a post-auction bid for its assets by HCPI. Sunrise owned and invested in seniors communities. It decided to sell its assets. All bidding parties were required to enter into confidentiality agreements, as well as standstill agreements preventing bidders from attempting unsolicited takeover bids. Ventas' standstill agreement differed from HCPI's, in that Ventas' agreement would terminate at the end of the auction process. HCPI's standstill agreement did not contain this term. Ventas and HCPI were the two bidders asked to participate in the final round of an auction. Sunrise waived the standstill agreements for Ventas and HCPI for the purpose of further negotiations, and informed both companies they should not assume the winning bid was assured of acquiring the assets. HCPI withdrew from the auction process. Ventas' bid of $15 per unit succeeded, and was to be put to Sunrise's shareholders on March 30, 2007. Ventas and Sunrise entered a purchase agreement for all of Sunrise's assets, subject to subsequent third-party unsolicited bids. Sunrise was allowed to accept such bids if they were financially superior to Ventas' bid. Sunrise was precluded from participating in discussions or negotiations for acquisition proposals, and was bound to enforce existing standstill agreements. HCPI subsequently put forward a post-auction bid for $18 per unit. Ventas took the position Sunrise breached its confidentiality agreement, by permitting HCPI to communicate with another potential bidder, SSL. Ventas did not assert HCPI was in breach of its standstill agreement because Ventas assumed it contained the same

termination clause as Ventas' standstill agreement. Sunrise applied to court for an interpretation of the purchase agreement it had with Ventas. Ventas then learned of the terms of the HCPI standstill agreement, and brought an application for a declaration Sunrise was required to enforce it. The judge found Sunrise had agreed with Ventas that it would continue to enforce standstill agreements, that HCPI's bid was in breach of its standstill agreements, and therefore unacceptable. Sunrise's application was dismissed as moot in light of the judge's decision on Ventas' application.

HELD: Appeal dismissed. The purchase agreement between Sunrise and Ventas precluded Sunrise from considering HCPI's post-auction bid. The enforcement of standstill agreements by Sunrise was an important purpose of the purchase agreement, negotiated by Ventas to protect its position with respect to competition from unsuccessful bidders in the auction. The fact Ventas was more skillful than HCPI in negotiating its standstill agreement did not render HCPI's agreement unenforceable. The court's interpretation of the purchase agreement was not inconsistent with Sunrise's obligation to maximize shareholder value. Sunrise's shareholders were still entitled to reject the Ventas bid when they voted on March 30.

**Appeal From:**

On appeal from the Order of Justice Sarah E. Pepall of the Superior Court of Justice dated March 6, 2007.

**Counsel:**

Peter F.C. Howard and Eliot Kolers for the Appellants (Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc.).

Jeffrey S. Leon and Derek J. Bell, for the Appellants (Health Care Property Investors, Inc.).

Mark A. Gelowitz and Laura K. Fric, for the Respondents (Ventas, Inc. and numbered companies).

Luis G. Sarabia and Cynthia Spry, for the Respondent Sunrise Senior Living Inc.

---

The judgment of the Court was delivered by

**R.A. BLAIR J.A.**:--

**OVERVIEW**

**1**    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the

United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

**2**    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

**3**    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid - after it knew what Ventas had offered - "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

**4**    Hence the urgency of this appeal.

**5**    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

**6**    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

**7**    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

**FACTS**

**8**    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

**9**    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

**10** In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

**11** Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

**12** Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

**13** On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

**14** Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

**15** On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

**16** On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

**17** On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

**18**   The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however - after learning of the HCPI Proposal - Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

**19**   On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

**20**   The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**THE PROVISIONS OF THE AGREEMENT**

**21**   Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

> 4.4(1) <u>Following the date hereof, Sunrise REIT shall not</u>, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

> (i)   <u>solicit</u>, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or <u>proposals</u> regarding, or other action that constitutes, or may reasonably be <u>expected to lead to, an actual or potential</u>

<u>Acquisition Proposal</u>,

(ii)     <u>participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries</u>,

(iii)    approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv)    accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v)     withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2)     Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (<u>that did not result from a breach of this Section 4.4</u>), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i)     the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii)    such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3)     Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (<u>that did not</u>

result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i)    it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii)    the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

(iii)    a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv)    if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v)    if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4)    If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5)    Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of

section 4.4.

(6)    During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7)    Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8)    Sunrise REIT shall

    (i)    ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

    (ii)    immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

    (iii)    require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition

> Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;
>
> (iv)    terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and
>
> (v)    not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.

**22**    The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

> "Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

> "Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

> (a)    is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;
>
> (b)    in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and
>
> (c)    would, if consummated in accordance with its terms, result in a transaction

more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

## ANALYSIS

**23**    The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

**24**    Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated - without reproducing in full the relevant passages from her reasons (paras. 29-34) in full - she held that a commercial contract is to be interpreted,

> (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[1]
> (b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;[2]
> (c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[3] and (to the extent there is any ambiguity in the contract),
> (d)    in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[4]

**25**    The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

> a)    by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,
> b)    by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

**26**    I do not agree.

<u>The Application Judge's Reasoning</u>

**27**    The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

> 35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

> 36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[Footnote omitted.]


<u>The Scheme and Interpretation of Section 4.4</u>

**28**    I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills - unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction - and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

**29**    From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available - one worth the risk of rejecting the Ventas proposal - they may well vote to reject the Ventas proposal at their meeting on March 30.

**30**    The language used by the parties in the Purchase Agreement supports this interpretation.

**31**    Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

**32**    As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (<u>that are not in breach of the provisions of section 4.4</u>) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3) - 4.4(7)).[5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

> (v)    not amend, modify, waive or fail to enforce any of the standstill terms or other
> conditions included in any of the confidentiality agreements between Sunrise

REIT and any third parties ...

**33**     Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party that is not in breach of section 4.4 of the Agreement.

**34**     Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) - "notwithstanding anything contained in Section 4.4(1)" - do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

**35**     In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

### The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)

**36**     Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) - namely, sections 4.4(8)(ii) and (iii) - refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

**37**     There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise - whether made before or after the close of the auction - constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

**38**    Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case - whether a prior bidder or not - from continuing to participate in the bidding process.

**39**    It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

**40**    Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

> 4.4(1) Following the date hereof, Sunrise REIT shall not ...

> (ii)    participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

**41**    Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

**42**    Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

<u>An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible",
and Accords with the Fiduciary Obligations of the Sunrise Trustees</u>

**43**    Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

**44**    In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

<u>The Factual Matrix</u>

**45**    Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken, supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

**46**    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

   a)    the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

   b)    the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

   c)    Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

   d)    Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

   e)    Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

**47**    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such

matters. Here, the experienced Commercial List judge was exercising a function common to that role - the interpretation of a commercial contract - and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

**48**    At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

**49**    I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

**50**    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken, supra*, at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make

good business sense to one party would not necessarily do so for the other.

**51** The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

**52** As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

**53** On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid - or, in this case, the Trustees - have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755, at 768 and 774 (Gen. Div.). That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

**54** It is not necessary - nor would it be wise, in my view - to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communications, Inc. v. QVC Network Inc.* 637 A. 2d 34 (Del. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A. 2d 95 at 105 (Del. Ch. 1999). That is not what happened in this case.

**55** The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

**56** An auction process is well-accepted as being one - although only one - "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Maple Leaf Foods Inc. v. Schneider Corp.* (1999), 42 O.R. (3d) 177 at 200 (C.A.). Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize

value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

**57**    It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

**58**    Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... the Board is not prevented from ...". I would not ascribe to it the expanded role that HCPI proposes.

The Meaning of "*Bona Fide*"

**59**    The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

**60**    There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[7] She

found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

**61**    In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated - particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) - I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

   Miscellaneous

**62**    Two additional points were made by the appellants, but need not be dealt with at length.

**63**    First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

**64**    Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

**The HCPI Cross-Appeal**

**65**    HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

**66**    I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

**CONCLUSION**

**67**   For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

**68**   If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

**69**   In closing, I would like to thank all counsel for their able presentations and assistance.

R.A. BLAIR J.A.
 J.L. MacFARLAND J.A.:-- I agree.
 H.S. LaFORME J.A.:-- I agree.

1 *B.G. Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 at 770 (C.A.).

2 *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 at para. 403 (Ont. Gen. Div.), aff'd (1999), 45 O.R. (3d) 417 (C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 at para. 26 (C.A.); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at 166-68 [*Eli Lilly*].

3 *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 25-27 (C.A.) [*Kentucky Fried Chicken*].

4 *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901; *Kentucky Fried Chicken, ibid.*

5 The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

6 That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

7 2d ed., *s.v.* "bona fide".

*Case Name:*

# Williams-Sonoma Inc. v. Oxford Properties Group Inc.

**Between**
**Williams-Sonoma Inc., Williams-Sonoma Canada Inc., Pottery**
**Barn and Pottery Barn Kids, Plaintiffs (Appellants), and**
**Oxford Properties Group Inc., Paragon Protection Ltd. and**
**EllisDon Corporation, Defendants (Respondent), and**
**Yorkdale Shopping Centre Holdings Inc. and Omers Realty**
**Management Corporation, Third Parties (Respondents)**

[2013] O.J. No. 2980

2013 ONCA 441

307 O.A.C. 314

Docket: C56194

Ontario Court of Appeal
Toronto, Ontario

**K.M. Weiler, E.E. Gillese and A. Hoy JJ.A.**

Heard: May 9, 2013.
Judgment: June 26, 2013.

(40 paras.)

*Landlord and tenant law -- Landlord and tenant relationship -- Contract -- Privity of contract --*
*Appeal by tenant from the dismissal of its action against respondent Ellis Don Corporation*
*dismissed -- Respondent was a contractor performing construction in mall in which tenant had a*
*store -- Vandal broke into area being used by respondent and opened a fire hose, which caused*
*significant water damage to tenant's premises -- Respondent was entitled to rely on provision in*
*lease between landlord and tenant in which tenant had waived all claims against landlord and those*
*for whom landlord was in law responsible.*

*Landlord and tenant law -- Commercial tenancies -- Lease -- Exclusion clauses -- Shopping centre*
*-- Landlord's obligations -- Emergency repairs -- Appeal by tenant from the dismissal of its action*

*against respondent Ellis Don Corporation dismissed -- Respondent was a contractor performing construction in mall in which tenant had a store -- Vandal broke into area being used by respondent and opened a fire hose, which caused significant water damage to tenant's premises -- Respondent was entitled to rely on provision in lease between landlord and tenant in which tenant had waived all claims against landlord and those for whom landlord was in law responsible.*

Appeal by the tenants, Williams-Sonoma, from the dismissal of its action against the respondent Ellis Don Corporation. The appellant was a tenant at Yorkdale Shopping Centre. The landlord, Yorkdale Shopping Centre Holdings Inc, had contracted for the respondent, an independent contractor, to perform certain construction work in the mall. A vandal opened a fire hose located in the vacant, third floor area of the mall the landlord permitted the respondent to use for its office and storage. The tenant's premises suffered significant water damage. The tenant sued the respondent contractor; however, the respondent brought a motion to dismiss the action, arguing it was covered by a clause in the lease between the tenant and landlord in which the tenant waived all claims against the landlord and those for whom the landlord was in law responsible with respect to water damage. The motion judge agreed the respondent was an entity for which the landlord was responsible in law and that although the respondent was not a party to the lease it nonetheless was entitled to the benefit of the above-mentioned clause. The tenant argued the motion judge erred in coming to this decision.

HELD: Appeal dismissed. The respondent was indeed an entity for which the landlord was responsible in law within the meaning of the lease. The activities the respondent performed were activities contemplated as coming within the scope of the impugned clause in the lease. The respondent was providing services to the landlord as a contractor, an activity specifically contemplated within the indemnity provisions of the lease. The respondent was accordingly entitled to enforce the lease to defend the tenant's claim against it.

**Appeal From:**

On appeal from the judgment of Justice Darla A. Wilson of the Superior Court of Justice, dated October 1, 2012, with reasons reported at 2012 ONSC 5448.

**Counsel:**

Raj K. Datt and Gerry Grossi, for the appellants.

Marcia J. Oliver, for the respondent, EllisDon Corporation.

---

The judgment of the Court was delivered by

**A. HOY J.A**:--

## I. OVERVIEW

**1**    Williams-Sonoma Inc., Williams-Sonoma Canada Inc., Pottery Barn and Pottery Barn Kids (the "Tenants") appeal the October 1, 2012 judgment of the motion judge, 2012 ONSC 5448, dismissing their action against the respondent, Ellis Don Corporation.

**2**    The Tenants are tenants at Yorkdale Shopping Centre in Toronto. The landlord, Yorkdale Shopping Centre Holdings Inc., (the "Landlord") contracted for the respondent -- an independent contractor -- to perform certain construction work at the mall. Early one morning, a vandal opened a fire hose located in the vacant, third floor area of the mall that the Landlord had permitted the respondent to use for its office and storage. As a result, the Tenants' premises suffered what they allege is some $7,000,000 of water damage.

**3**    The leases between the Tenants and the Landlord (each a "Lease") required the Tenants to take out and maintain insurance covering water damage to the leased premises and to the Tenants' property within those premises. Under subsection 8.3.1 of each Lease, the Tenant waives all claims against the Landlord and "those for whom the [Landlord] is in law responsible" with respect to occurrences required to be insured against by the Tenant.

**4**    The Tenants sued the respondent contractor, alleging that it breached common-law and statutory duties owed to the Tenants by failing to properly secure the area where the fire hose was located. The respondent brought a motion for summary judgment, arguing that the Tenants had waived all claims against it pursuant to s. 8.3.1 of the Leases. The respondent argued that: the Landlord is in law responsible for the respondent within the meaning of that phrase in s. 8.3.1 of the Lease; s. 8.3.1 accordingly applies; the benefit of s. 8.3.1 extends to the non-party respondent; and the Tenants are therefore barred from suing the respondent.

**5**    The motion judge concluded that the respondent was an entity for which the Landlord was responsible in law, and that, although the respondent was not a party to the Lease, the benefit of s. 8.3.1 should be extended to it pursuant to *Fraser River Pile & Dredge Ltd. v. Can-Dive Services Ltd.*, [1999] 3 S.C.R. 108. She accordingly granted summary judgment, dismissing the Tenants' claims against the respondent.

**6**    On this appeal, the Tenants argue that the motion judge erred in concluding that the Landlord could be responsible in law for the respondent if not vicariously responsible for it, and that the respondent did not fall within any exception to the general immunity from vicarious liability for the negligence of an independent contractor.

**7**    The Tenants do not argue that this was a matter that should not have been dealt with by way of a motion for summary judgment.

**8**    For the reasons that follow, I conclude that the Landlord is responsible in law for the respondent, within the meaning of those words in the Leases, and that the benefit of s. 8.3.1 should be extended to the respondent. I would accordingly dismiss this appeal.

## II. THE RELEVANT PROVISIONS OF THE LEASES

**9**    The Leases are the same in all material respects. The relevant provisions are contained in Part 8, entitled "Insurance". That Part requires the Landlord and the Tenant to take out certain insurance coverage and to release the other to the extent of such coverage.

**10**    Section 8.1 provides that the "Landlord shall not be required to take out or maintain any insurance with respect to any loss, injury or damage required to be insured against by Tenant or with respect to Tenant Property."

**11**    Section 8.2 then requires the Tenant to take out and maintain, among other insurance coverage, coverage with respect to "water damage howsoever caused ... fully covering the Store (including all Leasehold Improvements), all Tenant Property and any other property owned by [the] Tenant or for which it is legally liable and which is located within the Project."

**12**    Pursuant to s. 8.3, the Tenant releases the Landlord and those for whom it is "in law responsible" from claims arising out of the water damage with respect to which s. 8.2 requires the Tenant to obtain coverage:

> 8.3.1. Subject to sections 8.3.2 and 8.3.3, each of the Landlord and Tenant hereby releases the other and waives all claims against the other and *those for whom the other is in law responsible* with respect to occurrences insured against or required to be insured against by the releasing party, whether any such claims arise as a result of the negligence or otherwise of the other or those for whom it is in law responsible. [Emphasis added.]

> 8.3.2. Such release and waiver shall be effective only to the extent of proceeds of insurance received by the releasing party and proceeds which would have been received if the releasing party obtained all insurance required to be obtained by it under this lease and for this purpose deductible amounts shall be deemed to be proceeds of insurance received.

> 8.3.3. Notwithstanding anything to the contrary in this section 8.3, Landlord and Tenant shall each be liable to any third person (being any person other than Landlord or Tenant) to the extent of their respective fault or negligence and each shall be entitled to full indemnity and contribution from the other to the extent of the other's fault or negligence.

**13**    Finally, pursuant to s. 8.4, "to the extent not released under s. 8.3", the Landlord is required to indemnify the Tenant in respect of any losses occasioned by the act, default or negligence of the respondent, which was its contractor:

> 8.4 To the extent not released under section 8.3, each party shall indemnify and save harmless the other from all liabilities, damages, losses or expenses growing out of:
>
> ...
>
> 2.    ... any loss, cost or expense arising from occasioned by the act, default or negligence of the indemnifying party, its officers, agents, servants, employees, *contractors,* customers or licensees ... [Emphasis added.]

## III. EXCEPTIONS TO THE DOCTRINE OF PRIVITY OF CONTRACT

**14**    In addition to the provisions of the Leases, the law regarding privity of contract is relevant to the analysis that follows.

**15**    In two decisions -- *London Drugs Ltd. V. Kuhne & Nagel Ltd*., [1992] 3 S.C.R. 299 and *Fraser River -* the Supreme Court decided that, in certain circumstances, the doctrine of privity of contract should be relaxed to recognize the rights of a third party beneficiary to enforce contractual provisions made for its benefit to defend against an action commenced by one of the contracting parties.

**16**    In *London Drugs*, a storage company was party to a contract limiting its liability to $40 for any one package. A package -- a 7,500-pound transformer -- was damaged while being moved by its employees. The owner of the transformer sued the company and its employees for negligence. All were found liable. At first instance, the liability of the company was limited to $40 while the employees were found liable for the full amount of the damages. The traditional exceptions to the doctrine of privity did not apply. At para. 107, the Supreme Court held that an employee should be entitled to benefit from a limitation of liability clause found in a contract between his employer and a plaintiff if:

> 1.    The limitation of liability clause, either expressly or impliedly, extends its benefit to the employee seeking to rely on it; and
> 2.    The employee seeking the benefit of the limitation of liability clause was acting in the course of his employment and performing the very services provided for in the contract between the employer and the plaintiff when the loss occurred.

**17**   *Fraser River* followed some seven years later. That case dealt with a subrogation clause in an insurance contract in which the insurer waived its right of subrogation against persons to whom the insured owner chartered its vessels. The owner chartered a barge to a third party. The barge sunk through the negligence of the charterer. The insurer paid the loss; the owner waived the subrogation clause, and sued the charterer for the benefit of the insurer.

**18**   The Supreme Court clarified that the principled approach in *London Drugs* was not limited to employee-employer relationships and applies where the traditional exceptions to the doctrine of privity do not. At para. 32, it rephrased the test in *London Drugs*, in general terms:

> 1.   Did the parties to the contract intend to extend the benefit in question to the third party seeking to rely on the contractual provision; and
> 2.   Are the activities performed by the third party seeking to rely on the contractual provision the very activities contemplated as coming within the scope of the contract in general, or the provision in particular, again as determined by reference to the intentions of the parties.

**19**   The Supreme Court found that the first prong of the test was clearly met: the clause expressly referenced "charters". The second prong was also met: "the relevant activities arose in the context of the relationship of Can-Dive to Fraser River as a charterer, the very activity anticipated in the policy pursuant to the waiver of subrogation clause" (at para. 39).

## IV. MOTION JUDGE'S REASONS

**20**   The motion judge considered the two factors in *Fraser River*.

**21**   As to the first, she concluded that the parties must have intended the protection arising from s. 8.3 of the Lease to extend to others involved in the renovation work ongoing in the mall. At para. 28, she reasoned that one of the intentions of the release was "the allocation of risk and certainty that cost will not be affected by one party asserting subrogation rights. In order to give effect to this intention, in my opinion, the benefit must be extended to a contractor such as [the respondent]." The first part of the test was therefore satisfied.

**22**   With respect to the second part of the test, she concluded that "the consideration of vicarious liability is irrelevant." The motion judge found that the Landlord was responsible for the presence of the respondent at the mall: the Landlord hired the respondent to perform work to satisfy the Landlord's obligations to its tenants. Moreover, the respondent "utilized the third floor space to house its site office and to store equipment and other items necessary for the work it was conducting."

**23**   The motion judge concluded, "In my view, the waiver of subrogation extends to the benefit of [the respondent], being an entity for whom the landlord is responsible in law. To permit [the Tenants] to advance a subrogated claim against [the respondent] when it cannot advance a claim

against the landlord would lead to a result that the subrogation clause is intended to prevent."

## V. ANALYSIS

### (1)    Summary

**24**    I come to the same conclusion as the motion judge, although for slightly different reasons.

**25**    The Respondent was not a party to the Leases; consequently, it can only claim the benefit of s. 8.3.1 if it falls within the test set out in *Fraser River*. In this case, as in *Fraser*, the parties specifically indicated the persons to whom they intended the benefit of the waiver of subrogation extend. Here, the Lease extends the benefit of the waiver of subrogation to those for whom the Landlord is in law responsible. The first task for the court, therefore, is to determine whether the respondent was a person for whom the Landlord was "in law responsible," within the meaning of those words as used in the Lease. Applying the ordinary principles of contract interpretation, I conclude that the Landlord was in law responsible for the respondent, within the meaning of those words as used in the Lease.

**26**    I also conclude that the two-part test in *Fraser* is met in this case, and that the respondent was accordingly entitled to invoke s. 8.3.1 of the Lease as a defence to the Tenants' claims against it.

### (2)    Interpretation of "in law responsible"

**27**    The Tenants argue that s. 8.3 is in essence a waiver, or exclusion of liability, and, as such, should be strictly construed against the party seeking to invoke it: *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, para. 132. In *Hunter Engineering*, sellers sought to rely on provisions in their contracts to preclude the application of the warranty implied by the *Sale of Goods Act* that the goods supplied were reasonably fit for the purpose. In this case, unlike *Hunter Engineering*, the exclusion clause is a mutual one. In my view, the principle of strict construction relied on by the Tenants is therefore not applicable. The ordinary principles of contract interpretation apply.[1]

**28**    I start by considering the ordinary meaning of the words "in law responsible."

**29**    The *Dictionary of Canadian Law* defines "responsible" as meaning liable, accountable legally, answerable.[2] The *Canadian Oxford Dictionary* defines "responsible" as "liable to be called to account (to a person or for a thing)," and defines "liable" as legally bound.[3]

**30**    Vicarious liability is a theory that holds one person responsible for the misconduct of another because of the relationship between them: *671122 Ontario Ltd. v. Sagaz Industries Canada Inc.*, 2001 SCC 59, [2001] 2 S.C.R. 983, at para. 25.

**31**    In my view, the ordinary meaning of the phrase "in law responsible" is liable, accountable in law, or legally responsible; its ordinary meaning is not necessarily limited to legal responsibility

arising through vicarious liability, and the manner in which the phrase is used in the Lease does not restrict its ordinary meaning.

**32**    The respondent argues that a person may become legally responsible for another through the operation of a contract of indemnity. I agree. Indeed, in this case, under s. 8.4, "to the extent not released under s. 8.3," the Landlord specifically agrees to indemnify the Tenant in respect of losses occasioned by the act, default or negligence of the Landlord's "officers, agents, servants, employees, contractors, customers or licensees" -- a class of persons including the respondent. Under this clause, the Landlord agrees to indemnify the Tenant for damages caused by its contractors, such as the respondent. In other words, the Landlord has specifically made itself legally responsible for the respondent. In my view, the effect of s. 8.4 is that the Landlord is generally "in law responsible" to the Tenant for the respondent within the meaning of s. 8.3.1.

**33**    My conclusion is not altered by the phrase "to the extent not released under s. 8.3" that prefaces s. 8.4. Part 8 of the Lease is entitled "Insurance"; it allocates risk between the parties based on which party is required to obtain insurance coverage. The indemnity in s. 8.4 is situated in the part of the Lease dealing with insurance. The effect of the phrase "to the extent not released under s. 8.3" is that the Landlord is not required to indemnify the Tenant in respect of the act, default or negligence of a person listed in s. 8.4.1, if the claim is with respect to an occurrence insured against or required to be insured against by the Tenant. It does not mean that the Landlord is not in law responsible to the Tenant for such persons within the meaning of s. 8.3.1

**34**    In my view, any other interpretation of the interplay of ss. 8.3.1 and 8.4 is inconsistent with the overall scheme of risk allocation envisaged by Part 8 of the Lease and would not make commercial sense. For that reason, I reject the Tenants' argument that if it were the intent of the parties that the release in s. 8.3.1 were to extend to the parties' "officers, agents, servants, employees, contractors, customers or licensees" then they would have used that wording, and not the words "those for whom the other is in law responsible".

**35**    Having concluded that the Landlord is, under the Lease, in law responsible for the respondent, it is unnecessary to address the arguments of the Tenants regarding vicarious liability.

### (3)    The application of the test in *Fraser River*

**36**    I turn next to the issue of whether the two-part test in *Fraser* has been met.

**37**    It follows from my conclusion that the respondent is a person for whom the Landlord is "in law responsible" that the parties intended the benefit of s. 8.3.1. to extend to the respondent, and that the first prong of the test is met.

**38**    I also conclude that the activities performed by the respondent were activities contemplated as coming within the scope of s. 8.3.1. The respondent was providing services to the Landlord as a contractor -- an activity specifically contemplated by the indemnity provision contained in s. 8.4 of

the Lease. The second prong of the test is also met.

**39**     The respondent is accordingly entitled to enforce s. 8.3.1.of the Leases to defend against the Tenants' claim against it.

## VI. DISPOSITION AND COSTS

**40**     I would accordingly dismiss this appeal, and award costs in the agreed upon amount of $30,000, inclusive of disbursements and applicable taxes, to the respondent.

A. HOY J.A.
 K.M. WEILER J.A.:-- I agree.
 E.E. GILLESE J.A.:-- I agree.

1 A commercial contract is to be interpreted,

> (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;
>
> (b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;
>
> (c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and
>
> (d)    to the extent that there is ambiguity in the contract, in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.

*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, 85 O.R. (3d) 254, at para. 24.

2 D.A. Dukelow ed, *The Dictionary of Canadian Law*, 4th ed. (Toronto: Carswell, 2011), at p. 1124.

3 K. Barber ed, *Canadian Oxford Dictionary*, 2nd ed. (Don Mills, ON: Oxford University Press, 2004), at pp. 1317 and 883.

*Case Name:*
# Wong v. Wong-Koroluk

**Between
Kristen Kareen Wong, Plaintiff, and
Nicole Mary Wong-Koroluk, Jason Koroluk, Tony Wong, and
Elizabeth Rae Wong, Defendants**

[2009] B.C.J. No. 817

2009 BCSC 545

177 A.C.W.S. (3d) 526

Docket: S074793

Registry: Vancouver

British Columbia Supreme Court
Vancouver, British Columbia

**J.S. Sigurdson J.**

Heard: November 17-21, 26-28, 2008; January 9, 2009.
Judgment: April 23, 2009.

(149 paras.)

*Contracts -- Formation -- Oral contracts -- Application by the plaintiff for an order for sale of a property and for an order that the proceeds be divided on the basis that her parents had a beneficial interest in the property dismissed -- Parents had transferred family home to their three children in exchange for children paying off $400 debt on property -- Although purchase price stated as $625,000, children only paid $400,000 -- Each child had registered one-third interest in property -- No oral agreement established that parents retained interest in property.*

*Wills, estates and trusts law -- Trusts -- Constructive trusts -- Judicial recognition of constructive trust -- Circumstances when may be recognized -- Unjust enrichment -- Application by plaintiff for order for sale of a property and order that the proceeds be divided on the basis that her parents had a beneficial interest in the property dismissed -- Parents had transferred family home to their three*

*children in exchange for children paying off $400 debt on property -- Although purchase price stated as $625,000, children only paid $400,000 -- Each child had registered one-third interest in property -- No implied trust established in favour of parents -- Mo intention on part of parents that the property be held partly in trust for them.*

Application by the plaintiff for an order for sale of a property and for an order that the proceeds be divided on the basis that her parents had a 36 per cent beneficial interest in the property, that the plaintiff had a 21 1/3 per cent beneficial interest in the property, and that the defendants Koroluk together had a 42 2/3 per cent beneficial interest in the property. The plaintiff was the registered owner of a one-third interest in the property. The defendants Nicole Koroluk, the plaintiff's sister, and her husband, the defendant Jason Koroluk, had a registered two-third interest. The property was the family home which the parents had transferred in 1998 to their three children. The son had sold and transferred his interest to Nicole and her husband. The transfer occurred due to the parents' financial difficulties. The parties agreed that the children would purchase the family home to pay out the parents' debt. Pursuant to the purchase agreement, the children were to pay $625,000 for the property. The children actually paid only $400,000. The parents and plaintiff argued that the arrangement was a binding oral contract that, after closing, the parents would retain an interest in the property. Nicole and her husband argued that the children acquired the property entirely by paying $400,000 to discharge their parents' indebtedness and the parents did not retain an interest.

HELD: Application dismissed. There was no evidence of an express agreement of the parents' interest being retained on a certain basis or how it would be calculated. The evidence in support of an agreement or an intention that the parents retained an interest was highly unreliable. The $625,000 value was placed on the property only to ensure that a new mortgage could be obtained to pay off the existing $400,000 mortgage on the property. In order to obtain the new mortgage, the agreed purchase price had to be higher than the existing mortgage. The fact that there was a written agreement did not provide an answer to the question of whether there was an oral agreement that the parents would retain an interest. The subsequent conduct of the parties did not support the view that the parties' intention was that the parents retained an interest. There was no discussion and no expectation by the parents that any unpaid balance of the contract price would be paid at a later time, or somehow represented a continuing interest. No implied trust was established in favour of the parents. The plaintiff and her parents had not demonstrated that the value of the land was substantially greater than the amount paid or that there had been a deprivation to the parents and an enrichment to the children. There was no intention on the part of the parents that the property be held partly in trust for them. The parents had no interest in the property, either by way of contract or trust. The ownership of the property was that reflected in the legal title of the property.

**Counsel:**

Counsel for the Plaintiff: R.A. Kasting.

Counsel for the Defendants, Nicole Mary Wong-Koroluk and Jason Koroluk: P.A. Hildebrand.

Counsel for the Defendants, Tony Wong and Elizabeth Rae Wong: D.B. Phelps.

---

**Reasons for Judgment**

J.S. SIGURDSON J.:--

## INTRODUCTION

**1**   The plaintiff Kristen Wong is the registered owner of a 1/3 interest in a residential property located in the Dunbar area of Vancouver, B.C. (the "property"). The plaintiff's sister, the defendant Nicole Wong-Koroluk, and her husband, the defendant Jason Koroluk, are the registered owners of the other 2/3 interest in the property.

**2**   The plaintiff applies for an order for sale of the property pursuant to the ***Partition of Property Act***, R.S.B.C. 1996, c. 347.

**3**   The plaintiff also applies for an order that the proceeds be divided on the basis that her parents, who are the other defendants, Tony Wong and Elizabeth Rae Wong (the "parents"), have a 36% beneficial interest in the property, that the plaintiff has a 21 1/3% beneficial interest in the property, and that Nicole and her husband Jason Koroluk together have a 42 2/3% beneficial interest.

**4**   The parents support the plaintiff's position, but Nicole and Jason, the registered 2/3 owners, say that the registered ownership reflects the true beneficial ownership. Nicole says that her parents have no beneficial interest in the property, either by agreement or on a trust basis.

**5**   The history of this dispute begins in 1998 with a transfer of the family home by the parents to their three children. Shortly after that was done, in 1999, Darin Wong, Kristen and Nicole's brother, sold and transferred his 1/3 interest to his sister Nicole and her husband.

**6**   The central issue in the trial is whether, at the time of the original transfer in 1998, the parents retained any interest in the property either by an oral contract or by an implied trust, resulting trust or constructive trust.

**7**   Once the interests of the parties in the property are determined at this trial, the issue is whether the property should be sold. If there is a sale, then there is a question of what adjustments should be made among the co-owners. The applicants may insist on a sale only if the interests in the property of the applicants for a sale exceed 50%. I was asked by the parties to hear further submissions as to whether to order a sale and what adjustments, if any, to make once I had determined the beneficial ownership of the property

**ISSUES**

**8**    I have identified the following major issues:

> 1.    At the time of the transfer of title in 1998, was there an oral agreement among the parties (the parents and the three children, as well as Jason Koroluk) that the parents would retain an interest in the property, and if so, what were the terms of that agreement and what is that interest?
>
> 2.    Alternatively, do the parents have an interest in the property by way of an implied, resulting or constructive trust?
>
> 3.    What order should be made on the application under the ***Partition of Property Act***, including whether an order for sale should be made, and what adjustments, if any, should be made in favour of the plaintiff or Nicole?

**FACTS**

**9**    I will outline the facts that led to this unfortunate dispute.

**10**    The parents, Rae Wong and her husband Tony Wong, moved to the Dunbar area of Vancouver in the late 1960s when they purchased the subject home in Dunbar. There, they raised their family of three children: Darin, Nicole and Kristen.

**11**    Thirty years later, by the summer of 1998, the children were all young, independent adults. Darin was working in the film industry, Nicole had recently married Jason Koroluk and was a make-up artist, and Kristen was working as an administrator.

**12**    Darin, who had been helping his parents out financially, as they had been having some difficulties in the summer of 1998, learned that that his parents' financial situation was quite dire, and his parents' debt, largely secured by a mortgage on the family home, was approaching $400,000.

**13**    It is common ground that there was a family meeting some time in or around the latter part of September 1998, where the three children and their parents met to discuss the predicament, which appeared to be likely to lead to foreclosure of the parents' home. The general agreement or understanding that was reached was clear enough; the children would purchase the parents' home, or acquire the parents' home by way of a transfer, and in the course of doing so, they would obtain a mortgage and pay out the parents' debt. The issue is whether it was agreed, or whether it was the parents' intention that the parents would retain an interest after the transfer.

**14**    The parties, together with the input of Molly Buchanan, a realtor and very close family friend, prepared an interim agreement that was signed the day after the family meeting, on September 27, 1998. It provided on its face for a purchase price of $625,000 for the property, to be paid by a

deposit by cheque in the sum of $275,000 and cash on completion of $350,000. The transaction, with the assistance of lawyers acting for the purchasers (the three siblings and Jason Koroluk) and lawyers acting for the vendors (the parents), completed on November 13, 1998. The children actually paid only $400,000. $350,000 was from the proceeds of a mortgage obtained from Canadian Trustco Mortgage Company by the three children and each child contributed 1/3 of the remaining amount of $50,000.

**15**    The crucial issue in this case is the nature of the agreement and its terms. The parents, Darin, and Kristen assert that the arrangement was a binding oral contract that, after closing, the parents would retain an interest in the property. Nicole (and her husband Jason) says that the children acquired the property entirely by paying $400,000 to discharge their parents' indebtedness and the parents did not retain an interest, or at least there was no agreement to that effect.

**16**    After the title was transferred to the children, the prior mortgage was paid out, and the three children became the registered owners. The two daughters, Kristen and Nicole, and Nicole's husband moved into the home in November 1998.

**17**    In relatively short order, in September 1999, Darin (who was buying his own home) sold his interest in the property to his sister Nicole. Nicole and her husband continue to live in the house, and Kristen lived there until she moved out in December 2004. Over the years improvements were made to the house and a basement suite was built.

**18**    In 2007, there were discussions between Kristen and Nicole relating to the purchase of Kristen's interest in the property. Those negotiations included a reference by Nicole to the "parents' interest", the term's significance is disputed. Those discussions were not fruitful, and this litigation ensued.

## DISCUSSION

**Was there an agreement at the time of the conveyance in 1998 that the parents would retain an interest in the property, and if so, what was that interest?**

**19**    In 1998 the parties signed a standard interim real estate agreement for the sale of the property for $625,000, and it was completed with the assistance of lawyers for both the purchasers and the vendors in November 1998. However, no party to this litigation takes the position that the written agreement clearly states the full agreement that was reached.

### Kristen and the parents' position

**20**    The plaintiff and her parents, supported by Darin, say that an agreement was reached at a family meeting in September 1998 before the interim agreement was signed. The agreement was that the children would take out a mortgage to pay the parents' debt, have the property transferred to them, and after the transfer the parents would retain an interest, even though this was not

specifically reflected in the written agreement. The plaintiff and her parents contend that the parents' continued interest is implied and the extent of it determined by the fact that the price was $625,000, but the children paid only $400,000. Thus, they say, the proportion of the unpaid amount of $225,000 to the total purchase price represents and remains the parents' interest.

21     Their position is that there was an oral agreement that was followed by a written agreement, and that parol evidence is admissible to explain the missing elements in the written agreement. Those missing elements allegedly are that the parents' equity was based on $225,000, the amount of the purchase price that was not paid by the children, and that the written contract is incomplete in that it fails to set out the method by which the parents' equity or interest would be secured against the property.

22     In the alternative, the plaintiff and the parents assert that the amount paid for the property was less than its market value and the parents, if they do not have an interest by way of contract, have one by way of implied, resulting or constructive trust.

**Nicole and Jason's position**

23     The defendants Nicole and her husband, on the other hand, say that the extent of the understanding or agreement among the family members was that the children would pay $400,000 in total for the property, which the children did by mortgage and cash payment. They say that there was no agreement that the parents would retain any interest.

24     Their position is that there was never an agreement or expectation for the children to pay $625,000 and that the purpose of using that figure in the interim agreement was to create a document with a price sufficient to justify a lender advancing mortgage proceeds of $350,000.

25     As to the parol evidence rule, Mr. Hildebrand, counsel for Nicole, argues that neither party is asserting an oral agreement that is consistent with the written agreement, given that, on the one hand, it provides that there is no interest in the property remaining with the parents after the conveyance (which he says contradicts the version that Mr. Kasting asserts). On the other hand, Mr. Hildebrand recognizes that an oral agreement which provides for no interest being retained by the parents and a price of $400,000, may contradict the written agreement which provides for a purchase price of $625,000.

26     Mr Hildebrand says that the burden is on the plaintiff to establish what she asserts, a contract that the parents would retain an interest after the transfer and registration of the purchasers' interest. Mr. Hildebrand's submission is that the plaintiff and her parents have not proven the existence of a contract that the parents would retain an interest.

27     Mr. Hildebrand also argues that the plaintiff and her parents have not established on the evidence that the parents retained an equitable interest by way of a trust. He says that the children did not pay an amount significantly different from the market value in 1998 and in those

circumstances there is no enrichment to the children or deprivation to the parents. Thus, the beneficial ownership must be based on the registered title.

**Discussion of the contract**

**The evidence surrounding the alleged contract**

**28**     The key facts in outline form are quite simple. The children met at the family home with their parents, at a time when they learned that their parents' debt was apparently beyond their management. Mrs. Wong was upset and Mr. Wong was obviously distressed and perhaps embarrassed by the situation he and his wife were in. At the meeting, the family appears to have agreed that the children would buy the property or that it be transferred to them and they would obtain a mortgage to pay off their parents' debt. The parties, either or both before and after that family meeting, obtained the assistance of a family friend, who was a realtor, to assist them with valuation of the home, at least for the purpose of obtaining a mortgage.

**29**     Leaving aside for a moment the parol evidence rule, the burden is on the plaintiff to establish that there is an oral contract that the beneficial ownership of the property is different from the registered interests. The plaintiff asserts that the oral contract that the parents would retain an interest was made at that family meeting. As I will try to demonstrate, the evidence is that any discussion of the parents' interest was brief; it was not a focus of the parties' discussion. I will review some of the evidence of the participants in that meeting, now over a decade ago, as well as the evidence of Molly Buchanan, the family friend and realtor, who met some family members in the days before and after the family meeting.

*Darin Wong's evidence*

**30**     Darin, it appears, was probably the source of the idea to transfer the house from the parents to the children, although it also might have been Nicole's idea. He was, it appears, the first child who knew his parents' actual financial circumstances.

**31**     Darin's evidence of the arrangement that the children and Mrs. Wong discussed suffered from the same frailty as the evidence of all of the witnesses did. He tried to reconstruct events to try to explain what the parties agreed to on matters that they never expected to deal with as a legal or a practical matter in the future - in particular, the extent, if any, of his parents' continuing interest in the property.

**32**     Darin testified that shortly after Nicole's wedding, he told Nicole that their parents could lose their home. He said that he had a solution: the parents could sell and start again. He testified that he proposed an alternative to his sisters and parents at the meeting in the family house, which was also attended by his father who was in an adjoining room:

>          A.      ... We could -- between myself, Kristen, Nicole, and Jason, we could -- we

could make it look like we're buying the house but we can't do it alone. And we could take that -- that debt that dad has on the house, we can convert it into a mortgage so that we're paying it, but what we need to do is we need to have a down payment and we don't have the money for the down payment. So we need you and dad to help us, and -- and we need you to assist us in the sense that we need the money that you have in the house to be able to -- to use it, to look like it's the down payment because we're not going to come up with -- I'm going to ballpark, the 100,000 or whatever the -- the -- percentage that it's going to take to get a conventional mortgage. We won't be able to do it, but we all have to agree, and Jason wasn't there and I know that he wasn't there but Nicole said, "I'll talk to Jason. Leave it to me, don't worry."

**33**    Darin testified that it was not his intention "to take his parents' money". He said they would "leave their equity in the home" to be able to keep the house in the family and that Molly Buchanan was contacted so that they could know the value of the house. However, it does not appear from his evidence that Darin actually said at the family meeting that the parents would retain their equity in the house or how that equity or interest was to be calculated.

**34**    As to his parents' interest or equity, Darin testified:

    A      And it was my suggestion that part of the -- the -- the <u>transaction be that mom and dad's equity would be able to be in the house and in -- in a form -- "gifted" was what we called it, to us in order to suffice a down payment in order to</u>-- to get a transaction done so that we didn't have to come up with a $100,000 or money that we didn't have.

    Q      Okay. And do you recall what Nicole's reaction was to that?

    A      Nicole's was yes. It was "yes" from everybody.

**35**    Darin Wong was unclear how the figure of $625,000, the purchase price under the written contract, was arrived at. As to the figure of $275,000 called for in the agreement, he appears to have concluded that such sum would come from his parents at least notionally in terms of "what they left in the house".

**36**    Darin said that after the initial meeting he had little involvement in the mortgage, or in arriving at the figure of $625,000. In describing the amount of $275,000 referred to in the Statement of Adjustments as a gift, he said this:

A       It was described as a gift because the understanding was that to -- to qualify for the mort-
gage and to facilitate -- make it easy for this transaction to go through with a mortgage
company or a bank or whatever, you -- you can't just have money from nowhere, and we
used the term "gift" to describe our parents' investment, their -- their money, we called it a
gift during the transaction.

Q       Okay. And do you recall how much cash money you and the other purchasers put into this?

A       We all came up with under $20,000. It was 17 and change.

*Kristen Wong's evidence*

**37**    Kristen is the youngest child. She was 26 years old in 1998. Refreshing her memory from her
journal, she recalls meeting with everyone in the family home on September 26, 1998, in the
morning. She said when she learned of her parents' situation that she was shocked and very upset:

A       Well, like I said, he -- he did explain my parents financial situation and -- and that's when I
was advised that there was a secondary mortgage on the house and because of that, it was
going to have to be foreclosed upon, and he had a proposal or an idea that -- that the kids
would -- being my brother, my sister, Darin and Jason -- would apply for a mortgage and --
of 350,000 I recall and if approved, that mortgage would go toward paying off my parents'
debt. And if that would -- if that all got approved, then the house would be transferred or
registered into the children's names. And I -- I was -- I understood it that the interest my --
the money that would be left behind would be the interest for my parents in that house. It
would be maintained in the house.

Q       Okay. And you understood that based on -- on -- on who telling you that?

A       Nicole and Darin because Nicole was alongside Darin.

**38**    Kristen Wong considered the terms transfer and purchase to be similar. Although she used the
phrase "transfer of title" during the trial, she gave this answer on discovery:

A       He explained at the house there was a second mortgage on the house and that because of
that, they were going to have to sell the house but he had an idea, too, that the children pur-
chase the house from our parents to clear the debt.

**39**    She said the meeting was 45 minutes long and the plan was to:

A       The plan was just what my brother had proposed. The -- we -- the kids would try to apply
        for a mortgage and hopefully if that was successful, then whatever else -- whatever the rest
        of the process would be, I guess, to -- to make it happen.

**40**    She recalls going to Molly Buchanan's house after the meeting but has no recollection beyond
signing an interim agreement on September 27, 1998.

*Rae Wong's evidence*

**41**    In 1998 Mrs. Rae Wong was in her late 50's. She recalls the meeting with her family being on
September 26, 1998 because her daughter Kristen's diary refreshed her memory. She testified about
what she said was Darin's suggestion this way:

A       He and Nicole actually pretty much did most of the chairing of the meeting, if you will.
        Darin I know expressed that there was real dire problems with this loan that we've been
        speaking of this morning at Vancity, and that it was getting to a point where it was a very
        big possibility that the bank would be foreclosing on that loan.

Q       The bank being Vancity?

A       Vancity, yes, sir, yes. It was the Vancity loan and that because of this, he had to come up
        with a proposal that he hoped would help to fix this problem, to help us out of this prob-
        lem, Tony and I, our problem. And his suggestion was that the three children and -- it
        would actually be four children because, of course, we had another son, a son-in-law at this
        point. Nicole had just married Jason so it would be four of them, and that the four of them
        could hope to transfer the -- the title of our -- of the mortgage -- of the home actually into
        their name by way of securing a mortgage that they would go and apply for and be able to
        pay off the debt to Vancity by transferring the title of the property and --

Q       Okay. I'll get you to --

A       -- pay off the Vancity debt.

**42**    She also testified:

A       ... And then they would -- he made a point of saying that -- that in order to do that, yes,
        they would have to do that but there would have to be some kind of a down payment or

some equity shown in the property and that, of course, he -- he thought would be -- be-
cause the property was -- did have a certain value he was thinking and that our equity in --
Tony's and my equity in the property could be that deposit, to -- to make it possible to
make a loan of that size and we didn't know what size yet was needed but you know what I
mean, to take care of the debt.

**43**    Rae Wong, in describing her interest, did not recall any discussion of its valuation or
calculation:

Q     And another aspect of getting this loan would be you and your husband providing your in-
terest in the property?

A      Yes.

Q     Was there any discussion at this meeting about what the property -- what anybody thought
the property was worth at that time, or what the value of the property was to your recollec-
tion?

A      I don't recall that particularly.

In chief, Rae Wong said:

Q     And was there any other discussion about the interest of you and Tony in the property at
that meeting?

A     Well, as we just discussed, Nicole, Darin said that always the equity in that home would be
ours and Kristen piped right in. She was wonderful. ...

                   ...

Q     By the end of the meeting, had anybody in the family taken any objection to the proposal?

A        No, sir.

Q        Now, during the meeting, was there any discussion as to when you and your husband
         might be able to have your equity from the property?

A        No.

                    ...

Q        Was there any specific discussion -- was there any discussion at the September 26th meet-
         ing about the specific worth or value of the equity of you and your husband in that prop-
         erty?

A        No.

Q        Was there any specific discussion in terms of what that equity might be, in terms of a per-
         centage or a fraction?

A        No.

**44**   When she was asked to describe the terms of the agreement on cross-examination, she said:

A        ... I recall, by both Darin and Nicole, that the equity that would be in the house and left
         there would be something that we agreed to leave there to assist them in getting -- obtain-
         ing a mortgage and that that -- that equity was our interest that would always be in that
         home, and that we were not to worry because that could -- we didn't know how much
         money it was but that we weren't to worry, that it would always be our interest in that fam-
         ily home. Have I left anything out?

**45**   Mrs. Wong probably prepared the interim agreement from a standard form. It appears Mrs.
Wong found the lawyer to act for her and her husband and the lawyer to act for her children, the

purchasers. She also described a discussion with Molly Buchanan about protecting her and her husband's interest after the conveyance but testified she did not think it would be necessary. She said she had no idea who put the word "gift" next to the amount that ordinarily would have been paid to the vendors on its statement of adjustments.

*Nicole Wong-Koroluk's evidence*

**46**    Nicole had just returned from her honeymoon before the meeting. According to her evidence, there was only one meeting of all family members. Nicole testified that when the family met in the living room of the family home, they discussed the possibility her parents might lose the house in foreclosure, and she said <u>she</u> brought up the idea of potentially purchasing the home. Her father was upset and was in a different but adjoining room the majority of the time. She said that no one ever said that the children were buying the house for $625,000 or that amount was the market value. She gave this evidence:

> Q    All right. Now, you heard him testify and he said that at this meeting, he said that there were two options to resolve this financial situation. Either your parents would sell the property and they would take their money and that would be the end of the house for the family -- Wong family. Do you recall him setting that out as one possibility of how to re-solve the problem?

> A    No, I don't recall that.

> Q    And he said that the other possibility was that the children would purchase the interest of the parents but that the parents would keep their equity or interest in the property. Do you recall him saying that?

> A    No, I don't recall that.

**47**    Nicole said that because her in-laws had recently sold their home, she had some knowledge of the market at that time. She said that the children were paying $400,000 to their parents and that price reflected a discount "but not much". In her mind the value of the property was not more than $500,000.

**48**    In terms of the parents' equity, Nicole testified:

Q        Is your position that there was no discussion as part of the idea that we're talking --

A        Yeah.

Q        -- about that your parents would keep an interest or any equity in the property?

A        Yes, that's -- that -- they -- that was not part of the idea.

THE COURT: That's not quite the question. The question was whether there's any discussion, whether there was --

...

Q        Your position is that there was no discussion at the family meeting about your parents keeping any equity or interest in the property after the children purchased the property; is that correct?

A        Yes.

Q        At this family meeting, was there any discussion about your parents moving out of the property?

A        Sorry, after the meeting was there a discussion?

Q        During the meeting.

A        During the meeting? No. We hadn't gotten that far.

**49**    Her position was set out in this passage from her evidence:

Q        All right. So your position is that the idea was the children would purchase the home and
         own it. They would provide enough money for your parents to pay off their mortgage debt
         and that that amount was approximately $400,000. There was never any further discussion
         among yourself -- between yourself and anyone else in the family about any additional
         terms?


A        I don't recall any additional discussions.

**50**    Nicole said that she and her husband had to come up with 1/3 of $50,000 or about $17,000 of
which they had $13,000 from the wedding and for the rest they borrowed from Jason's parents. She
says she was told by her mother to sign the interim agreement to process the mortgage.

*Molly Buchanan's evidence*

**51**    Ms. Buchanan is a good friend of the parents and of the Wong family and has been for many
years. Like all witnesses, she tried to reconstruct the events and the circumstances of the
arrangement at the time of the sale; her memory was, not surprisingly, faulty. She was not involved
in the family meeting but was involved with some of the participants before and after that meeting
trying to assist them.

**52**    Apparently, she was told by a family member, probably Darin, that the children were going to
take out a mortgage so they could save the home for their mother and father. She was unclear
whether she understood that the Wong parents were trying to sell the land to the children, saving the
property for themselves, or whether the parents were going to remain in the property.

**53**    She provided information on listings and sales in the period May 1, 1998 to September 24,
1998. She said she gave an estimated value by way of a market analysis to the parties around
September 25, 1998. She dropped it off at the parents' home.

**54**    She also gave the parties the tax information on the property which indicated the land value
was $525,000 and improvements of $9,800 for a total of $534,800 for assessment purposes.

**55**    She says that although she gave the family a range, the figure of $625,000 was not chosen by
her but decided upon by the Wongs. However, her evidence is unclear as to whether that figure
came from Darin or came from the Wong women when they visited her, shortly after the family
meeting, at her home in Horseshoe Bay. Rae Wong testified that she did not recall the discussion of
value and Kristen had no idea where that figure of $625,000 came from. Darin agreed they had to
have a contract with a large enough amount to secure a mortgage.

**56**    It appears that there was a meeting with Molly Buchanan and the Wong women shortly after
the family meeting. At that time, there was discussion about securing a mortgage, that the Wong

women arrived with a blank interim agreement form and that only some parts were completed by Ms. Buchanan - the legal description and the price.

**57**    There was no suggestion that the parents would only sell the home at market value or the purpose of the valuation was to determine the extent of the parents' interest.

**58**    The mortgage was secured through Don Boychuk of Canada Trust, who appears to have been recommended by Ms. Buchanan. He spoke to a number of the family members. The children had to put in $50,000 cash, as the amount of the mortgage that Mr. Boychuk would get was $350,000.

**59**    There are conflicting oral agreements alleged in this case. The parents and Kristen say that there was an oral agreement that the parents would retain an interest after the property was acquired by the children. Nicole and her husband assert that the oral agreement was that the children would purchase the house for $400,000, and the children would be the legal and beneficial owners.

*Discussion of the evidence*

**60**    The written contract, the conveyance and the registered title after completion do not expressly state or refer to the parents retaining an interest.

**61**    Was there an enforceable oral agreement that the parents would retain an interest in the property and, if so, on what basis?

**62**    No witness who testified about an agreement that the parents would retain an interest appeared to have a clear recollection of the formation of the agreement that they assert.

**63**    It appears on the evidence that the understanding that the children would become owners of the family home was reached relatively quickly. Moreover, it was resolved in probably one meeting among family members in a stressful situation, conducted over a decade ago, where the central focus of the discussions was saving the family home. The focus of the discussions in September 1998, at the time that the children and Mrs. Wong reached their agreement for the children to acquire the property, was not the parents' possible continued interest, or the extent of it or how it might be calculated, but how to save the family home from possible foreclosure.

**64**    There are no contemporaneous or subsequent written records or other reliable documentation of these discussions, and of course nothing that confirms an agreement that the parents would retain an interest.

**65**    Nicole's evidence was that there was no discussion of her parents retaining an interest. Apart from the absence of a reliable recollection of what happened at the meeting, I also note that one party to the alleged agreement, Jason, was not even present.

**66**    There was no evidence of a clear statement by anyone at the meeting or at any time before the conveyance that the parents' interest would be retained or that it would be based on an agreed

formula, whether that was to be a $225,000/$625,000 interest or based on any other agreed formula. There is no evidence that any participant in the discussion ever stated or used a percentage figure.

**67**    I expect that there was some discussion about the parents' equity but the significance of that in the family discussion was not that it was to be paid out or recognized some day, but that there had to be sufficient value for the purchasers to qualify for the conventional mortgage that the children were seeking.

**68**    The discussion about the parents' equity in the property was, I believe, only a short form for the fact that there had to be value, above the existing mortgage, to justify a new loan. Even the way Darin explained it in his testimony, that the equity would be gifted, did not support the basis for an understanding that an interest would be retained by the parents.

**69**    The figure of $625,000 was not contemplated at the time of the meeting, and no one could explain precisely how it was arrived at. Kristen had no opinion of the market value at the time, and Mrs. Wong had no recollection of any discussion of fair market value with her daughter. Nicole testified that she thought the value was between $400,000 - $500,000, Jason thought it was worth less. I think it is a reasonable conclusion that the discussion with Ms. Buchanan may have led to the figure of $625,000. It may have been picked by Mrs. Wong, or by Darin. The precise figure was not important to the parties except that it had to be large enough to allow the purchasers to qualify for a mortgage to pay the debt. There was no discussion of the children actually paying $625,000. It was not a negotiated figure. The purpose was to justify to a lender that there was, on some reasonable basis, sufficient value. The fact that the statement of adjustments indicated "gift" supports the limited role the contract price may have actually played in the transaction.

**70**    Certainly there was no evidence of an express agreement of the parents' interest being retained on a certain basis or how it would be calculated.

**71**    The evidence in support of an agreement or an intention that the parents retained an interest I find is highly unreliable. I find that the witnesses have tried to reconstruct what happened in light of the positions that they now take, perhaps thinking what they would have said had they considered the issue at the time. I find that the evidence on all sides is to a large extent tailored by the result that they are seeking, or what the parties now think would be fair if they had put their minds to it ten years ago.

**72**    Darin Wong, like other witnesses, used both the terms "transfer of title" and "buy", but I do not place significance on the particular choice of words that any of the witnesses used in that respect because I do not think any of the parties have an accurate recollection of the precise terminology that was used when the transaction was discussed or completed, that is whether it was "sale" or "transfer". Darin Wong had a highly restricted recollection of the discussion in September 1998, and on discovery the evidence he gave did not approach the specific agreement that is now alleged by the plaintiff.

**73**    I think it is also important to note that Mrs. Wong and Kristen used the term "transfer title" at trial instead of "buy" or "purchase", I think because the terminology of "transfer title" suggests that an interest may have been retained by the vendor parents. On discovery, Mrs. Wong could not remember the terminology used to describe the transaction in September 1998, but at trial she testified that she could recall the use of the terminology "transfer title". However, as far as Kristen was concerned the terms were synonymous. I do not think that any of the witnesses have a clear recollection of whether either "purchase" or "transfer" was used at the time and are now, perhaps subconsciously, tailoring their evidence to say what they might have said at the time if they had considered the significance. I do not place any weight on the use of the term "purchase" or "transfer" title as the meeting was described a decade later in court.

**74**    I note that Mr. Tony Wong did not testify. He was in and around the house at the time of the meeting, but appeared too uncomfortable to participate. Counsel did not argue that I should draw an adverse inference from the fact that he did not testify.

**75**    What of the role of Molly Buchanan? She was contacted by Darin at the time of the agreement and spoke to the parties, but she did not participate in any discussions when an agreement was made. I do not think that Ms. Buchanan had any understanding from the participants whether the parents intended to retain any interest when the transaction was completed.

**76**    From all of the evidence, I find that Molly Buchanan likely put the material on related listings and sales material together for the parties because it was understood that the children had to obtain a mortgage to pay off the debt and that was only possible if there was value in the property greater than the debt. I find that the essential reason for consulting Molly Buchanan was to assist the parties to come up with a figure in the interim agreement in order that they could obtain that mortgage.

**77**    The purpose of her involvement was clearly not to find the market value for a purchase price at arms' length. The cash that was required to discharge the parents' debt was about $400,000 and these young people could probably not obtain the mortgage unless the contract was a reasonable one that showed sufficient value in the property.

*The parol evidence rule*

**78**    Although each side alleges an oral contract, one side that the parents retained an interest and the other side that they sold their interest, there is a written contract between the children and the parents to purchase the home for $625,000.

**79**    Both parties assert that the version of the oral agreement that the other advances violates the parol evidence rule.

**80**    In ***Ahone v. Holloway*** (1988), 30 B.C.L.R. (2d) 368 (C.A.) at 372, McLachlin J.A. (as she then was) stated:

The parol evidence rule is formulated in Corbin on Contracts (1952) p. 534 as follows:

> When the terms of a contract have been embodied in a writing to which both parties have assented as the definite and complete statements thereof, parol evidence of antecedent agreements, negotiations and understandings is not admissible for the purpose of varying or contradicting the contract so embodied.

**81**    As noted in ***Ahone***, the parol evidence rule is not absolute. Mr. Justice Lambert in ***Gallen v. Butterly, Nunweiler, and Allstate Grain Company Ltd.*** (1984), 53 B.C.L.R. 38 at 49-50, (*sub nom. Gallen v. Allstate Grain Co. Ltd.)* 9 D.L.R. (4th) 496 (C.A.), after describing the basic rule set out some of the exceptions:

> So the rule does not extend to cases where the document may not embody all the terms of the agreement. And even in cases where the document seems to embody all the terms of the agreement, there is a myriad of exceptions to the rule. I will set out some of them. Evidence of an oral statement is relevant and may be admitted, even where its effect may be to add to, subtract from, vary or contradict the document:
>
> ...
>
> (f)    in support of an allegation that the document itself was not intended by the parties to constitute the whole agreement;

**82**    Although Mr. Hildebrand argues that both alleged oral contracts violate the parol evidence rule, it is arguable that neither does. On the one hand, if the oral understanding was that the parents retained an interest, the written agreement for a greater price than was paid may simply be seen as providing some measure of the parents' continued interest. Certainly the price of $625,000 and the fact that monies were not paid totalling that amount might suggest that the vendors' interest was to be retained.

**83**    On the other hand, the written agreement as it was completed with the parents is not necessarily inconsistent with the oral agreement that Nicole asserts, because, according to the statement of adjustments, any equity of the parents was gifted during the transaction and title was registered only in the names of the children.

**84**    Jason testified that he spoke to the parents at the signing of the contract and complained that the price of $625,000 was not the deal. Although I think that evidence is not admissible because it

violates the parol evidence rule, and I have not taken it into account, the oral contract alleged by Nicole does not necessarily violate that rule.

**85**    I am not persuaded that the parol evidence rule operates to prevent evidence of either party's version of the alleged oral contract being introduced. I think that the plaintiff's version is not inconsistent with but may complete the written contract and the defendants' version is not inconsistent with the contract as it was apparently performed.

**86**    The fact that there is a written agreement does not provide an answer to the question of whether there was an oral agreement that the parents would retain an interest.

*Admissibility of subsequent conduct*

**87**    In certain circumstances, evidence of subsequent conduct is admissible to interpret an agreement. If there is an ambiguity in a written agreement, evidence of subsequent conduct may be admissible.

**88**    Mr. Justice Lambert stated in ***Re Canadian National Railways and Canadian Pacific Ltd.*** (1978), 95 D.L.R. (3d) 242 at 262, (*sub nom*. ***Canadian National Railway v. Canadian Pacific Ltd***.) [1979] 1 W.W.R. 358:

> In Canada the rule with respect to subsequent conduct is that if, after considering the agreement itself, including the particular words used in their immediate context and in the context of the agreement as a whole, there remain two reasonable alternative interpretations, then certain additional evidence may be both admitted and taken to have legal relevance if that additional evidence will help to determine which of the two reasonable alternative interpretations is the correct one. It certainly makes no difference to the law in this respect if the continuing existence of two reasonable alternative interpretations after an examination of the agreement as a whole is described as doubt or as ambiguity or as uncertainty or as difficulty of construction.

> The types of extrinsic evidence that will be admitted, if they meet the test of relevance and are not excluded by other evidentiary tests, include evidence of the facts leading up to the making of the agreement, evidence of the circumstances as they exist at the time the agreement is made and, in Canada, evidence of subsequent conduct of the parties to the agreement. However, to say that these types of evidence become admissible where two reasonable interpretations exist is not to say that the evidence, if tendered, must be given weight. In the case of evidence of subsequent conduct the evidence is likely to be most cogent where the parties to the agreement are individuals, the acts considered are the acts of both parties, the acts can relate only to the agreement, the acts are intentional and

the acts are consistent only with one of the alternative interpretations. Where the parties to the agreement are corporations and the acts are the acts of employees of the corporations, then evidence of subsequent conduct is much less likely to carry weight. In no case is it necessary that weight be given to evidence of subsequent conduct. In some cases it may be most misleading to do so and it is to this danger that allusions are made throughout the recent English cases, particularly *L. Schuler AG v. Wickman Machine Tool Sales Ltd*., [1974] A.C. 235, [1973] 2 All E.R. 39, and *James Miller & Partners Ltd. v. Whitworth Street Estates (Manchester) Ltd*., [1970 A.C. 583, [1970] 1 All E.R. 796. In England the risks have been considered sufficiently grave that the possibility of illumination from the use of subsequent conduct has been ruled out. In Canada they have not, but those risks must be carefully assessed in each individual case before determining to give weight to subsequent conduct.

**89**    At best, it is ambiguous whether the parties to this dispute agreed to a term that the parents would retain an interest.

**90**    To the extent that the subsequent conduct is admissible, it on balance does not support the view that the parties' intention was that the parents retained an interest.

**91**    Most tellingly, when Darin transferred his 1/3 interest to his sister for valuable consideration in September, 1999, he did not transfer only 64% reserving the balance to his parents, nor, it appears, did he consult with his parents. There were some earlier proposals to increase Nicole and Jason's interest and reduce Darin's and Darin at some point made a note on some handwritten calculations by Nicole that read: "1 legal document stating Tony & Rae still retain an equity portion in (the property) to the outstanding value in the house from what was paid based upon the appraisal closest to the purchase price". Darin Wong's handwritten note after the sale was complete may suggest that the parents had an interest, but, as Mr. Hildebrand points out, it was on a fundamentally different basis than that asserted at trial, that is one based on a (yet-to-be determined) fair market value rather than the figure of $625,000. It also appears that the handwritten note about the "parents' interest" was probably not discussed with Nicole as she testified she had not seen it until this litigation started.

**92**    Many other things were pointed to, such as the absence of consultation with the parents over things like the construction of a basement suite.

**93**    Ultimately, in 2007 when Kristen wanted her interest bought out, there were discussions between Nicole and Kristen about settlement, and there was reference to her parents' "interest". The evidence in this area is ambiguous, but it appears just as likely that Nicole simply wanted to support her parents in some fashion as it was that the discussion confirmed any past agreement or understanding that her parents would retain an interest.

**94**    I find on a consideration of all the evidence there is certainly no subsequent conduct or event

that confirms the existence of an oral agreement that the parents would retain an interest in the property.

*Conclusion*

**95**    I have reached the following conclusion.

**96**    The essential arrangement to acquire the house was reached at the initial meeting, with all parties there except Jason. I find that there was no express oral agreement that after the conveyance the parents retained an interest.

**97**    If the question of the "parents' equity" was discussed it was vague and general at best and probably was only an explanation for a possible value that might justify an adequate mortgage to pay off the parents' debt. There was never an express oral agreement on how any equity the parents retained would be determined.

**98**    The figure of $625,000 used on the contract was to allow a mortgage to be obtained and was not the parties' agreement of the value of the property at the time, or considered by any of them to be a true purchase price.

**99**    There was probably never a discussion that the parents retained an interest after the transfer, or how that interest was calculated. There was never a discussion or understanding as to how the parents might realize any interest they maintained. There was no discussion and I find no expectation by the parents that any unpaid balance of the contract price would be paid at a later time, or somehow represented a continuing interest.

**100**    The evidence does not support that there was a settled oral agreement that the parents would retain an interest in the property.

**101**    Even if some or all of the parties believed that the parents retained an interest, I expect that in 1998 they considered that issue to be academic as they thought that any interest the parents had in the property would ultimately go to their children equally.

**102**    I think Darin and Kristen have convinced themselves that their parents have been inequitably dealt with in this matter. I am to some extent surmising, but I think that if the three children had remained owners of the property, it would be unlikely that the parents would have asserted an interest. The evidence suggests that they are asserting an interest because the property values have increased significantly since the transfer, and the parents believe that that growth in value should benefit all of their children.

**103**    I think there is some belief that some money perhaps was "left on the table" - that the house was worth over $400,000 at the time of the transaction - although I will come to that in a moment.

**104**    I find that the plaintiff has not proven an agreement that the parents retained an interest when

they transferred or sold the property in 1998. The evidence in support of that alleged agreement is too unclear and unreliable. I find the alleged oral agreement that the parents retained an interest is not proven.

**105**    Therefore, I go on to consider the next matter, and that is whether there is a trust in favour of the parents.

**Trust - Implied, Resulting or Constructive?**

**106**    The Wong parents and Kristen assert that if there is no enforceable contract that the parents would retain an interest, they submit that the parents have an interest arising by way of an implied, resulting or constructive trust.

**107**    As to the existence of an implied trust, the plaintiff and the parents rely on the intention to establish a trust that was allegedly expressed at the initial meeting and in the emails that were exchanged shortly before this litigation began between Nicole and Kristen where there was reference to the parents' interest. However, I do not find that the evidence supports the contention that the parties specifically intended to recognise an interest of the parents after the conveyance. Accordingly, I reject the argument that there was an implied trust.

**108**    I think that the real issue is whether there is a constructive trust or a resulting trust in favour of the parents. The law in this area is not really in dispute.

**109**    Both the constructive and resulting trust arguments in this case are grounded in the contention that the parents were paid less than the property was worth in 1998. This argument perhaps obtains some force from Nicole's belief that the purchase was at a discount or the price paid was modestly less than market value.

**110**    When a parent transfers a property to an adult, independent child there is no longer a presumption of advancement: ***Pecore v. Pecore***, 2007 SCC 17, [2007] 1 S.C.R. 795. In the case of gratuitous transfers for no consideration there is a presumption of resulting trust, as Rothstein J. set out in ***Pecore*** at para. 24:

> The presumption of resulting trust is a rebuttable presumption of law and general rule that applies to gratuitous transfers. When a transfer is challenged, the presumption allocates the legal burden of proof. Thus, where a transfer is made for no consideration, the onus is placed on the transferee to demonstrate that a gift was intended: see *Waters' Law of Trusts*, at p. 375, and E. E. Gillese and M. Milczynski, *The Law of Trusts* (2nd ed. 2005), at p. 110. This is so because equity presumes bargains, not gifts.

**111**    The plaintiff and the parents say that this case is one of inadequate consideration. Their submission is that this situation is similar to a gratuitous transfer (at least to the extent that the

amount actually paid was less than the purchase price). They say that there should be a resulting trust in favour of the parents to that extent. They say that the situation is similar to one where two people contribute money to the purchase of property and the property is held by one of them: that person holds the property on a resulting trust: D.W.M. Waters, *Law of Trusts in Canada,* 2d ed. (Toronto: Carswell, 1984) at 306.

**112**    The plaintiff and the parents say that the result is the same if a property is transferred for nominal consideration and the transferor intends to retain a beneficial interest. As Hood J said in ***Reddin v. Mills***, [1995] B.C.J. No. 352 at para. 109, "the consideration is so nominal that in equity it should not stand in the way of the presumption of resulting trust."

**113**    The parents and the plaintiff also rely on constructive trust as a remedy for unjust enrichment. The basic principles as to when a constructive trust might arise were described by McLachlin J, as she then was, in ***Peter v. Beblow,*** [1993] 1 S.C.R. 980 at 987, 101 D.L.R. (4th) 621:

> The basic notions are simple enough. An action for unjust enrichment arises when three elements are satisfied: (1) an enrichment; (2) a corresponding deprivation; and (3) the absence of a juristic reason for the enrichment.

And at 997:

> The next question is the extent of the contribution required to give rise to a constructive trust. A minor or indirect contribution is insufficient. The question, to quote Dickson J. (as he then was) in *Pettkus v. Becker*, [1980] 2 S.C.R. 834, at p. 852, is whether "[the plaintiff's] contribution [was] sufficiently substantial and direct as to entitle her to a portion of the profits realized upon sale of the ... property." Once this threshold is met, the amount of the contribution governs the extent of the constructive trust.

**114**    Let me quote from the written submissions of counsel for the parents as to the underlying basis of the claim for a resulting trust and constructive trust. As to the claim for a resulting trust, Mr. Phelps, counsel for the parents, says as follows:

> The extent of the interest of the Wong parents in the property upon a resulting trust is proportionate to the value of the portion of the interest of the Wong parents in the property, which was gratuitously transferred to the Wong children, which is the difference between the fair market value of the property at the time of the transfer, and the total amount of the outstanding indebtedness of the Wong parents at that time which was paid by the Wong children and Jason. In order to calculate that interest, it is necessary for this Court to determine the fair market value of the property at the time of the transfer, by reviewing the opinions in that regard of Molly Buchanan, Canada Trust, the BC Assessment Authority, James Herriott, and Nicole and Jason.

**115**    As to the claim for a constructive trust, Mr. Phelps made a similar submission:

> If this Court determines that the value of the property at the time the Wong parents transferred their interest to the Wong children and Jason substantially exceeded the amount of the indebtedness paid by the Wong children and Jason, the Wong parents will have made a "sufficiently substantial and direct" contribution which enriched the Wong children and Jason, with a corresponding deprivation of the Wong parents, and there was not juristic reason for the enrichment. In the circumstances, there was an unjust enrichment of the Wong children and Jason, and the Wong parents claim an interest in the property pursuant to a constructive trust proportionate to their contribution.

**116**    Nicole and Jason say that the resulting trust argument fails, not only because there was no intent to create the trust, but importantly, and as with the claim for a constructive trust, because there was no enrichment to the children and no deprivation to the parents because the evidence does not establish any real difference between the market value of the house in 1998 and the amount paid by the children.

**117**    A central factual question therefore is whether at the time of the transaction the property was worth substantially more than approximately $400,000 such that the parents might, if the other elements are established, be entitled to a declaration of resulting trust or a constructive trust.

**118**    This requires a consideration of the evidence of value that the plaintiffs suggest is found in the evidence of expert witness Mr Herriott, the realtor Ms. Buchanan, records of the trust company, the BC Property Assessment roll, and the possible views of the parties.

**119**    The only witness who was tendered and accepted as qualified to give expert opinion evidence on value was the defendants' expert, James Herriott.

**120**    Mr. Herriott has been appraising real estate for 21 years, doing residential appraisals for 17 of those years. He appears to be well qualified in the area of residential appraisals. His opinion was that property on September 27, 1998 had a market value of $405,000. If that value is accepted and not challenged, then the evidence does not disclose that the property was worth more than the parents were paid for it in 1998.

**121**    Mr. Herriott performed his valuation on a market comparison basis. He relied on information from Nicole as to the condition of the house, as well as information in an affidavit of Jason Koroluk as to the house condition in September 1998.

**122**    The report stated.

> Condition of the house at at September 27, 1998 was provided by section 8 of an affidavit dated August 29, 2007 by Jason Koroluk and verbally provided on

inspection by Nicole Wong-Koroluk.

In summary at September 27, 1998 the subject house required repair/renovation of: 1) fence and gates were rotten; 2) main rear deck and west side patio and stairs were rotting and porch footing were sinking; 3) large majority of the plumbing was outdated, needed replacement and were leaking in 2 locations; 4) major crack in the east side foundation; 5) basement cement slab was cracked and heaved; 6) mainly knob and tube wiring and electrical box was fuses; 7) lack of insulation, top floor was "cheaply constructed"; 8) lino floor in kitchen was stained, torn and lifting, kitchen floor had dropped out of level by 2.5"; 9) carpet in the den and dining area was stained and worn out; 10) kitchen counter was delaminating from the front edge and splash, the counter around the sink was rotting due to water leak; 11) top floor - water was leaking in around the chimney; 12) top floor had wind and water penetration at the exterior walls around the windows and framing around the windows was rotten; 13) cedar roof was old and leaked; 14) exterior needed painting; 15) internal stairs were extremely steep and had no hand rail; and 16) the forced air heating system was insufficient to heat the top floor or basement. Overall the condition appears as fair to average.

**123**    I am certain that over the years there was a lot of loving attention paid to this home, but I think that at the time of the transfer the house had not been updated and was generally in a poor state of repair. The plumbing was outdated, there were water leaks in various places; the foundation was cracked, the wiring was obsolete, the linoleum in the kitchen was lifting and the kitchen counters delaminating, the roof leaked, and the stairs and deck needed repair. The fence was in poor condition, the deck was rotting, there was little insulation and the windows were single glazed, the house was in need of painting, and the heating was inadequate to properly heat the house. There had been renovations to the bathrooms about 7 years earlier, but the kitchen was 40 years old and the wall to ceiling fireplace was likely 20 years old.

**124**    I concluded that the condition of the house was generally as it was described by Nicole and Jason in their evidence and that was generally the description that was provided to Mr. Herriott and is as set out above.

**125**    Unlike many of the houses suggested to be comparables on the cross examination of Mr. Herriott, the subject property was not updated.

**126**    Mr. Herriott did his appraisal on a market comparison basis. The subject property was 50' by 130.2' with a total site area of 6501 square feet. The comparables that he used were of houses on lots of very similar size. After hearing his direct and cross examination, I found his evidence to be careful and persuasive. He was cross-examined on the comparables that he used and on other

comparables that Mr. Kasting suggested that he might have considered. It was suggested to him that other comparable sales at the time indicated a higher market value than he found, but I found his evidence that those sales were different compelling and the properties that were suggested as comparables had been substantially upgraded and were not true comparisons.

**127**    It was suggested to Mr. Herriott that the assessed value at $525,000 for the land and $9,800 for the improvements was a more accurate measure of value. He rejected that approach. He said that the only proper way to determine market value was the direct comparable approach and the cost approach.

**128**    I found him to be a stubborn but objective and competent witness who appeared to be very experienced and qualified in determining the actual market value of residential real estate. His opinion was based on the fact that the subject house had not been substantially renovated and that fact explained why some similar sized properties in close proximity on the west side of Vancouver sold for a substantially greater amount than he valued this property at the relevant time.

**129**    What of the other evidence?

**130**    Ms. Buchanan is a realtor and a long time family friend who I think is particularly close to the Wong parents.

**131**    She was consulted by family members in 1998 to provide some advice for the transaction that the parents and the children were going to embark on. The weight of the evidence indicates that Darin likely contacted her and that she prepared what was referred to as an estimate of value by market analysis.

**132**    She testified that she examined recent listings and sales in the $300 - $700,000 range. Her evidence was that she probably gave the children and Mrs. Wong a range of prices; that she did not come up with the figure of $625,000, although it is in her writing on the document; and it is not clear from her evidence whether that figure was suggested by Darin or was suggested by one of the Wong women based on their review of the material that she provided.

**133**    Counsel for the plaintiff and the Wong parents submit that the evidence of Ms. Buchanan is some evidence of value for the purposes of determining market value at the time of the transfer. Although Ms. Buchanan is an experienced realtor on the west side and obviously has experience with listing and sales prices, she was not tendered nor qualified as an expert appraiser. The evidence that she gave was general market information at the time, but the evidence lacked the precision of Mr. Herriott's evidence and did not analyze the data with sufficient detail to be of great assistance to me in any event. It appears that houses on the west side at the time with similar lot sizes sold for prices that could vary by upwards of $200,000 depending on the condition of the houses and whether it was recently upgraded and renovated. However, the subject property was not recently upgraded and was in need of substantial work.

Case 09-10138-MFW    Doc 14177    Filed 08/07/14    Page 1273 of 1344

Page 28

**134**    Ms. Buchanan was not asked to help the family determine the fair market value of the house in 1998. What she did was provide rather general listing and sales information to the family so that they could choose a supportable figure for the purposes of their agreement and securing a mortgage.

**135**    In these circumstances, I am able to place little if any weight on Ms. Buchanan's evidence to support the inference that the value of the property was greater than the amount paid by the children in 1998.

**136**    However, the plaintiff and the family point to the fact that the assessment for tax purposes had a land value in 1998 of $525,000. Although Nicole was not an expert or tendered as one, the tax assessment may explain in part why she thought at the time that the value of the house was between $400,000 and $500,000. Jason's evidence at the trial was that the property was not worth more than $450,000 at the time.

**137**    Mr. Phelps suggested that I could find some support in the Canada Trust records for an inference that, at the time it granted the mortgage, it had evidence the market value of the property exceeded $400,000. Any such evidence, even if admissible, is hearsay and should be given limited weight.

**138**    There was no other expert evidence of value. I think that I might be able to give some modest weight to the evidence of Molly Buchanan on the issue of value in the absence of other evidence. However, I place little weight on it on the issue of value as, although she considered listings and sales at the time of the transfer, she was not asked to determine the market value; the purpose of her involvement was to create a number to justify a mortgage and her evidence in terms of value lacked precision in any event.

**139**    There are 2 pieces of evidence that concern me. First the assessment for tax purposes valuing the property at $525,000 and the belief of Nicole that the property at the time was worth between $400,000 and $500,000.

**140**    The assessed value of the property may be the source of Nicole's belief, but, it is not admissible evidence of value, and if that is wrong, to the extent that it is, the weight I give that evidence must be modest in light of the expert evidence I found to be persuasive. Nicole's belief at the time is not admissible evidence of value in any event.

**141**    The only expert evidence of value at the time of the transfer was tendered by the defendants. That evidence, which I found to be cogent, indicated that the amount of the payment was approximately the market value of the property at the time.

**142**    If the parents and Kristen were able to demonstrate that the amount paid by the children for the property was substantially less than the value of the property at the time, then absent a juristic reason for the enrichment, the transaction may give rise to a constructive trust or perhaps a resulting trust. Although I think Mr Hildebrand concedes this, he argues that the required threshold

disproportionate payment has not been made.

**143**    Given the evidence that I accept, I am not satisfied that the plaintiff and her parents have demonstrated that the value of the land was substantially greater than the amount paid or that there has been a deprivation to the parents and an enrichment to the children. Moreover, to the extent that the issue of intention is relevant to either an implied, or a resulting trust, I am not satisfied that there was an intention on the part of the parents that the property be held partly in trust for them.

**144**    My conclusion is that the parents have no interest in the property, either by way of contract or trust. The ownership of the property is that reflected in the legal title of the property, Kristen as to 1/3 and Nicole and Jason as to 2/3.

**145**    I was asked by the parties to hear further submissions on the nature of the order that I should make once I have decided the issue of beneficial ownership.

**146**    Prior to the commencement of the hearing Nicole and Jason paid Kristen certain monies that were owing to her for rent received from the basement suite. The only issues remaining between Kristen on the one hand and Nicole and Jason on the other are amounts for utilities and a management fee. I have concluded that there was no agreement that Nicole and Jason receive a management fee and I find that the arrangement was that Kristen would pay 1/4 of the utilities after she moved out. Accordingly, Kristen is entitled to be reimbursed by Nicole and Jason in the amount of $3,919.75.

**147**    At the further hearing I will decide if there should be a sale and if so on what terms. At that time, I said I would entertain further submissions on whether an allowance is warranted to Jason and Nicole. They say that they have expended slightly under $93,000 for improvements, have received about $23,000 for work and materials and seek an allowance in their favour of at least $50,000 if the house is to be sold. The other parties dispute that their work increased the value of the property or that any allowance should be made on a sale of the property.

**148**    The parties have liberty to make a further application in connection with the sale of the property in accordance with these reasons.

**149**    The parties may also speak to the question of costs at the further hearing.

J.S. SIGURDSON J.

cp/e/qlrds/qlpwb/qlbrl/qlaxw

*Case Name:*

# York University v. Markicevic

**RE: York University, Plaintiff, and**
**Michael Markicevic, Janet Fleming, Mima Veronica Markicevic,**
**Aleeyah Apparel Inc. operating as A-Tech Construction and**
**Design Inc., Aleeyah Inc., AFC Inc. operating as Arsenal**
**Facility Consulting Inc., Toronto Engineering Company, Guga's**
**International, Canadian & American Concrete Renovation &**
**Drain-Layer Ltd., Roman Ritacca, Luigi Lato, Phil Brown, Riaz**
**Jadavji, Helen Saoulli, Guram Sekhniashvili, Gia**
**Sekhniashvili, John Doe #1, John Doe #2, John Doe #3, Jane Doe**
**#1, Jane Doe #2 and Jane Doe #3, Defendants**

[2013] O.J. No. 249

2013 ONSC 378

Court File No. CV-12-107954-00

Ontario Superior Court of Justice
Commercial List

**D.M. Brown J.**

Heard: October 30, November 2 and 5, 2012.
Judgment: January 21, 2013.

(162 paras.)

[Editor's note: Supplementary reasons for judgment were released February 14, 2013. See [2013] O.J. No. 1217.]

*Civil litigation -- Civil procedure -- Actions -- Lis pendens (certificates of pending litigation) --*
*Judgments and orders -- Summary judgments -- To dismiss action -- Injunctions -- Circumstances*
*when not granted -- Considerations affecting grant -- Serious issue to be tried or strong prima facie*
*case -- Interlocutory or interim injunctions -- Preservation of property -- Anton Piller orders --*
*Mareva injunctions -- Motion by defendants for summary judgment to dismiss action dismissed and*
*motion by plaintiff for injunctive and other relief allowed in part -- Plaintiff commenced action*

*against former employer and others alleging deceit, conversion and conspiracy with respect to*
*fraudulent invoicing scheme and misappropriation of materials -- There was genuine issue for trial*
*as to whether release was complete defence to claims and whether defendants fraudulently*
*conveyed property -- With respect to injunctive relief plaintiff had not established prima facie case*
*or shown defendant would dispose of assets -- Plaintiff had reasonable claims to interest in*
*properties -- Anton Piller order not required.*

Motion by the defendant Markicevic, the former Assistant Vice-President and Head of Campus
Services and Business Operations of the plaintiff, York University, for summary judgment to
dismiss York's action and motion by York for a Mareva injunction, Anton Piller order and
certificates of pending litigation. In late 2009, York received information that Markicevic had
bullied some employees and had engaged in financial improprieties involving the misappropriation
of materials for the construction of his private residence. As a result of the allegations, Markicevic
was terminated without cause in February 2010. As a term of Markicevic's termination, York signed
a release releasing Markicevic from any claim existing at the time. It also paid Markicevic $693,166
as salary in lieu of notice. Markicevic subsequently found employment in another province. As part
of an alleged separation agreement between himself and his wife, Markicevic paid off the mortgage
on his residence and transferred it to his wife in July 2010. After Markicevic's departure, York
continued its investigation. It learned that payments made to certain companies were fraudulent and
that payments of $1.237 million had been made by York to the defendants in a false invoicing
scheme. In 2012 York commenced this action against Markicevic and the other defendants for
damages of $3 million for deceit, conversion and conspiracy. It claimed that Markicevic approved
false invoices for payment by York and diverted some of the payments to his personal benefit and
that he misused university resources for personal use unrelated to his employment and diverted
services away from the university to improve family residences at York's expense. In addition, York
claimed that Markicevic fraudulently conveyed the residence to his wife and that some of the
misappropriated funds and materials were used for improvements at his daughter's residence.
Markicevic, his wife and daughter sought summary judgment dismissing the action against them
pursuant to the terms of the release York granted to Markicevic. York opposed the motion for
summary judgment arguing that the release did not bar the action, did not include Markicevic's wife
and daughter and was obtained through deceit, and that there were genuine issues for trial. York
sought a Marvea injunction against Markicevic restraining his disposition of assets, an Anton Piller
order requiring Markicevic to deliver his computer for electronic examination and certificates of
pending litigation against his and his daughter's residence.

HELD: Motion by the defendants dismissed and motion by the plaintiff allowed in part. There was a
genuine issue for trial as to whether the release was a complete defence to York's claims. Evidence
of the parties' subjective intentions in signing the release was inadmissible. The language of the
release did not cover future claims. There was a dispute about the scope of the release as it was not
demonstrated that at the time that York signed the release it was aware of the fraudulent invoicing
scheme. In addition, it was possible that the release was void by reason of material non-disclosure

or fraudulent misrepresentation by Markicevic. In addition, a genuine issue for trial existed with respect to the fraudulent conveyance claim as the transfer revealed several badges of fraud. Viva voce evidence was required to assess the credibility of witnesses. York had not satisfied the requirements for the granting of a Marvea injunction. It had not established a strong prima facie case with respect to the wrongful invoicing schemes and it had not shown that Markicevic would dispose of his assets. York was entitled to certificates of pending litigation against Markicevic's and his daughter's residences as it had demonstrated reasonable claims to interests in those properties on the basis of claims of fraudulent conveyance and constructive trust. An Anton Piller order was not required as Markicevic's computer was in the hands of his counsel.

**Statutes, Regulations and Rules Cited:**

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 103(6)

Fraudulent Conveyances Act, R.S.O. 1990, c. F.29, s. 2, s. 3

Rules of Civil Procedure, Rule 20, Rule 20.04(2.1), Rule 20.04(2.2), Rule 29.1

**Counsel:**

W. McDowell, D. Varah and B. Kolenda, for the Plaintiff.

B. Shiller, for the Defendant, Michael Markicevic.

L. Caylor and M. Paris, for the Defendants, Janet Fleming and Mima Veronica Markicevic.

---

## REASONS FOR DECISION

D.M. BROWN J.:--

**I.**

**Summary judgment motion to dismiss the action and a motion to grant a *Mareva* injunction, *Anton Piller* order and certificates of pending litigation**

**1**    York University commenced this action against Michael Markicevic, its former Assistant Vice-President and Head of Campus Services and Business Operations, together with the other defendants, for damages in the amount of $3 million for deceit, conversion and conspiracy. On June 14, 2012, York moved for an *Anton Piller* order and an interim *Mareva* injunction. That day Newbould J. issued a consent order adjourning that motion, but granting interim preservation orders which restrained Michael Markicevic, his wife, Janet Fleming, his daughter, Mima Veronica

Markicevic and a related company, from dealing with specified assets.

**2**    York's motion came back on before me on October 30, 2012. At the same time, Michael Markicevic, Janet Fleming and Mima Markicevic moved for summary judgment dismissing the action against them or, alternatively, summary judgment dismissing York's claim that the transfer of residential property at 211 Osprey Height, Duntroon, Ontario (the "Duntroon Residence"), from Michael to Janet was a fraudulent conveyance under the *Fraudulent Conveyances Act*, R.S.O. 1990, c. F.29.

**3**    At the conclusion of the motions on November 5, 2012, I continued the consent preservation orders until the release of these Reasons. I will first deal with the defendants' summary judgment motion, and then with York's motion for injunctive relief.

## II.

### Defendants' motion for summary judgment: the evidence

### A. Markicevic's role at York

**4**    York's Campus Services and Business Operations ("CSBO") department handles all of the construction, maintenance and operations for its two campuses at Keele and Glendon College. The CSBO was part of York's Finance and Administration Division, and CSBO's procurement requirements were handled by the Procurement Services department of the Finance Division. York had put in place a number of formal procurement policies.

**5**    Michael Markicevic joined York in late 2004 as the Executive Director, Security, Parking and Transportation Services, and in early 2006 he became Assistant Vice-President, CSBO. His responsibilities later expanded to include facility services. By May, 2007, Markicevic was supervising 1,000 employees and managing an annual operating budget of about $120 million and a capital budget ranging from $40 to $180 million. By the time of his termination in February, 2010, Markicevic's base salary had risen to about $200,000.

### B. York obtains information about Markicevic's conduct

**6**    In its evidence York stated that in the last quarter of 2009 Noel Badiou, the Director of Human Rights Office, received information that Markicevic had bullied some employees and "also received some documentation from one of these employees purporting to demonstrate that Mr. Markicevic had engaged in financial improprieties". The employees who provided this initial information were not prepared to be named.

**7**    On December 16, 2009, however, Badiou met with an individual who provided information about alleged harassment by Markicevic and "the fact that he had heard information about financial improprieties". In its materials York described this employee as the Whistleblower. Badiou communicated this information to York's President on December 17, and he agreed to report back to

the President on January 17, 2010.

**8**    Markicevic deposed that in late 2009 he began to hear rumours that York was investigating the possible misappropriation of materials, but he had no indication the investigation involved him.

**9**    Markicevic and his family spent the Christmas holidays at the house in Duntroon. He testified that York's General Counsel, Harriett Lewis, mentioned to him before Christmas that she had a farm in the area and would visit him if she had the chance. Markicevic found that odd. Around New Year's Day 2010 Lewis called, and she and her husband ended up dropping in on the Markicevics at their Duntroon house. Markicevic recalled that they asked some questions about the construction of the house.

**10**    Gary Brewer, York's Vice-President, Finance and Administration, and Markicevic's superior, deposed that "an allegation arose in late 2009 and early 2010 that Markicevic was involved in an invoicing scheme". Brewer dismissed the allegation as an unsubstantiated rumour. He then found out "in early 2010 that there were some documents that may have indicated Markicevic's involvement in misappropriated material."

**11**    Later in January, 2010 Markicevic learned from one of his subordinates, Dani Ierullo, that the allegations at the centre of York's investigation concerned Markicevic.

**12**    Markicevic deposed that he thought the allegations against him might involve an attempt by Jack McCann, a York carpenter and the incumbent President of CUPE Local 1356, to curry favour with his members by appearing tough on the management of CSBO. Markicevic met McCann and other members of the Local executive on January 27, cautioned them against dragging CSBO management into the Local's pending election, and he gave McCann a letter. In that letter Markicevic stated that there appeared to be "concerns emanating from some CUPE Executive members that York employees affiliated with CUPE are performing work on my private residence at York's expense", and he put McCann on notice that he considered such accusations to be libelous and slanderous. That same day Markicevic sent a copy of the letter to his superior, Brewer, stating: "Please interpret this as my need to extricate CSBO management from being pulled into the ongoing CUPE pre-election feuding".

**13**    According to Markicevic, on January 27 he met with Brewer who confirmed that York was investigating allegations that he was bullying employees and misappropriating York materials. Brewer said that York had been investigating these allegations for over a month.

**14**    On January 28 Markicevic emailed Brewer and Lewis acknowledging that there had been allegations with respect to "my involvement in the misappropriation of University resources" and stating:

>        My understanding is that once again such information is unsubstantiated and to
>        date I have no documentation or am I aware of who my accuser is or what the

> factual elements of the allegations are. I trust this will be made clear at our
> Friday meeting with Harriet.
>
> ...
>
> As for the misallocation of University resources, I will remind you that one of
> my first management initiatives at York was to work with Procurement to vastly
> improve and tighten Procurement policy and procedures within CSBO.
>
> The establishment of a separate and objective financial control process within
> CSBO has received numerous accolades from our Audit department.
>
> My willingness to effectively steward and manage University resources in a
> consistent and prudent manner with the upmost of integrity, I suggest to you, is
> unquestionable.

**15**    On January 29, 2010, York's in-house counsel, Harriet Lewis, met with the Whistleblower
who relayed complaints about bullying by Markicevic experienced by himself and other employees.
Ms. Lewis did not file an affidavit on these motions. The evidence about what transpired at that
meeting with the Whistleblower came from an affidavit filed by Bruno Bellissimo, the Director,
Internal Audit, of York. According to Mr. Bellissimo, during that meeting:

> [T]he Whistleblower also advised [Lewis] that another employee had been asked
> to sign an invoice for emergency work that he did not believe was in fact
> completed. The Whistleblower provided a copy of the invoice issued by the
> defendant, AFC Inc., a memorandum from two senior employees approving the
> invoice and a sole/single source certification. He also provided, among other
> things, requisitions for materials, including paint and oak lumber, which he
> alleged were diverted for Mr. Markicevic's personal use. The Whistleblower
> alleged that these documents suggested inappropriate financial activities by
> senior members of CSBO, including Mr. Markicevic. The allegations of financial
> impropriety related to:
>
> (a)    an invoice in the amount of approximately $23,000 for locksmith services
>         the University never received;
> (b)    the purchase of approximately $15,000 of flooring supplies that the
>         University never received; and
> (c)    expenditures in respect of painting labour and materials amounting to

approximately $9,000 that the University did not require and never received.

**16**    Bellissimo deposed that he first learned about the Whistleblower on February 1, 2010, at which time the President asked him to investigate the specific allegations and to determine whether they had any basis in fact.

### C. Friday, January 29, 2010 meeting between York officials and Markicevic

**17**    Gary Brewer deposed that in late January, 2010, Markicevic asked to meet with him. A meeting amongst Brewer, Lewis and Markicevic took place on January 29, 2010. Markicevic described his recollection of that meeting in his affidavit; Brewer concurred with most, but not all, of Markicevic's account. Brewer agreed with the following portion of Markicevic's recollection of the meeting:

> On January 29, 2010, I met with Brewer and Lewis to discuss the allegations against me. Lewis advised that, in addition to the complaints regarding my management style, an unnamed person had alleged that I had misappropriated hardwood flooring material, commercial locks and painting material purchased for York. Lewis indicated that it was alleged that the materials had been used in my "residence at Bathurst and Rathburn". I explained that I have never owned or rented any property near Bathurst Street or Rathburn Road and advised that I was living in my daughter's home at 124 Wooodville Drive, Vaughan, Ontario ("124 Woodville"). I have since learned that Bathurst Street and Rathburn Road do not meet.

> I also explained that the hardwood and locks at 124 Woodville had been installed by the builder, explained that commercial locks would not work in a residential home and denied that I had misappropriated any painting materials ...

> I asked Lewis for the name of her source for the allegations. Lewis refused. She did indicate that the source had heard the allegations on a second or third-hand basis.

**18**    Markicevic went on to depose that he had offered to take Lewis and Brewer to the 124 Woodville property (the "Vaughan Residence"), and that while Brewer had approved of the idea, Lewis rejected it saying that "that's not what the President wants". Brewer disputed that he had agreed with the idea, and he denied that Lewis made the statement Markicevic attributed to her.

**19**    According to Markicevic, Lewis said the investigation into the allegations had been going on for some time and was continuing. Brewer recalled that as the meeting progressed Markicevic

began pushing for details and "Lewis mentioned something about locks and doors but indicated throughout that the investigation was just starting":

> At that point, we could not know whether the allegations were true, and both Lewis and I communicated this to Markicevic but indicated that we had to investigate.

**20**    After the meeting Markicevic spoke with Brewer in his office, and there is no dispute that Brewer suggested Markicevic take some vacation time to be away from York. Markicevic sent Brewer an email on the evening of January 29 summarizing the discussions they had had that day. As to the allegations made against him, Markicevic wrote:

> Harriet advised that there is some documentation showing hardwood flooring material was purchased and was not installed at Glendon.

> Further Harriet advised it is verbally alleged that this missing material ended up in my residence at Bathurst and Rathburn (nowhere near where I reside).

> ...

> Harriet advised the materials in question are commercial door hardware taken from Vari Hall ... hardwood flooring intended for Glendon ... and various paint materials all of which are alleged to have been installed in my residence at Bathurst and Rathburn.

> ...

> Harriet stated that she would be obtaining a written statement confirming the allegation that the hardwood flooring materials was ordered and that it was not installed at Glendon.

> ...

> I am left to understand the situation as follows ... person A provided person B (a person in authority) with some sort of document indicating that the material ... hardwood flooring ... was purchased and not installed at Glendon and alleged

verbally that I had the hardwood flooring installed in my house. Person B, having
this information went to Noel B (York University Office of Human Rights) and
provided him with this information. Noel brought it to the attention of senior
management ... who has decided to conduct a full investigation based on this
information with an anticipated hope that further information was coming
forward in writing not to substantiate a reasonable probability that I stole the
material but that someone told them I stole the material and that it was not
installed at Glendon.

AGAIN, GIVEN THAT THE SIMPLE SOLUTION IS TO DETERMINE
WHETHER OR NOT I HAVE THE HARDWOOD FLOORING IN MY
RESIDENCE AS ACCUSED, I OFFERED TO IMMEDIATELY MAKE MY
RESIDENCE AVAILABLE FOR INSPECTION ... THIS WAS DECLINED.

...

To be absolutely clear ... I do not have any door hardware ... hardwood floors ...
or painting materials that belong to York University and I am pleased to offer
any York University employee to inspect my residence for stolen materials.

**D. Monday, February 1, 2010 termination of Markicevic**

**21**    Late on the morning of February 1, Markicevic emailed Brewer outlining what he would
consider acceptable conditions for the termination of his employment. Those terms included:

That a "Mutual Joint Release" document be executed to hold each party
"harmless" from current and future actions."

**22**    There is no dispute that Brewer and Markicevic negotiated the conditions of his termination
over the course of that day by telephone and, as well, they exchanged faxes of the settlement
documentation, including a draft release. Brewer deposed that he did not believe the allegations
being made against Markicevic:

By Monday, February 1, 2010, it became clear to me that Markicevic could not
continue in his role. I still did not believe the allegations of fraud against him, but
his position required that members of both York's administration and the CSBO
staff have complete trust in Markicevic's integrity. The allegations, even if false,
had destroyed that trust. I advised Markicevic that York would be terminating his
employment without cause.

**E. Disputed evidence: the negotiation of the release**

**23**    A dispute exists between the parties over the admissibility of the drafts of the release negotiated by the parties. I will consider the issue of admissibility shortly, but first let me set out the relevant portions of the draft documentation exchanged by the parties.

**24**    Late on the afternoon of February 1, 2010, Brewer faxed Markicevic a draft letter setting out the terms of termination, including the draft of a full and final release. Paragraph 3 of the draft release contained the release of Markicevic by York:

> In consideration of this Release and Undertaking, YORK UNIVERSITY hereby remises, releases and forever discharges the Releasor, of and from all manner of actions, causes of action, suits, debts, dues, accounts, bonds, covenants, contracts, complaints, human rights applications, claims and demands for money, damages, loss or injury of any nature of kind whatsoever, existing up to the present time, that York University ever had or now has against the Releasor, for or by reason of, or in any way arising out of the Releasor's employment with York University, *but for claims heretofore unknown to the Releasee arising out of any illegal acts and for breaches referred to in paragraph 3 hereof.* (emphasis added)

**25**    Markicevic asked for certain changes to be made to the draft release. He deposed that Brewer agreed and sent him a revised draft later that evening at 10:35 p.m. The proposed language for the release of Markicevic by York read:

> 2.    a) In consideration of this Release and Undertaking, YORK UNIVERSITY (the Releasee) hereby remises, releases and forever discharges the Releasor, of and from all manner of actions, causes of action, suits, debts, dues, accounts, bonds, convenants, contracts, complaints, human rights applications, claims and demands for money, damages, loss or injury of any nature or kind whatsoever, *existing up to the present time*, that York University and its present and former directors, officers, employees, Board of Governors, agents, servants and insurers as the case may be, ever had or now has against the Releasor, for or by reason of, or in any way arising out of the Releasor's employment with York University. (emphasis added)

York also agreed not to initiate proceedings against a third party who might claim contribution or indemnity from Markicevic.

**26**    Markicevic asked for further changes to the release. Brewer faxed him another draft at 11:45 p.m. on February 1, 2010 in which the language of York's release read:

> 2.    a) In consideration of this Release and Undertaking, YORK UNIVERSITY (the

> Releasee) hereby remises, releases and forever discharges the Releasor, of and
> from all manner of actions, causes of action, suits, debts, dues, accounts, bonds,
> convenants, contracts, complaints, human rights applications, claims and
> demands for money, damages, loss or injury of any nature or kind whatsoever,
> *the Releasee ever had or now has against the Releasor*, that York University and
> its present and former directors, officers, employees, Board of Governors, agents,
> servants and insurers as the case may be, ever had or now has against the
> Releasor, for or by reason of, or in any way arising out of the Releasor's
> employment with York University. (emphasis added)

**27**    Markicevic signed back the termination agreement containing this release. Brewer signed it on behalf of York University and faxed it back at 12:06 a.m. on February 2, 2010. Accordingly, the final, agreed-upon language of York's release read as follows:

> 2.    a) In consideration of this Release and Undertaking, YORK UNIVERSITY (the
> Releasee) hereby remises, releases and forever discharges the Releasor, of and
> from all manner of actions, causes of action, suits, debts, dues, accounts, bonds,
> convenants, contracts, complaints, human rights applications, claims and
> demands for money, damages, loss or injury of any nature or kind whatsoever,
> the Releasee ever had or now has against the Releasor, that York University and
> its present and former directors, officers, employees, Board of Governors, agents,
> servants and insurers as the case may be, ever had or now has against the
> Releasor, for or by reason of, or in any way arising out of the Releasor's
> employment with York University.
>
> b)    York University (the Releasee) confirms that it shall not take any steps or initiate
> any proceedings against the Releasor or such entity which might be entitled to
> claim contribution, indemnity or other relief against the Releasor in respect of, or
> arising out of the Releasor's employment with York University. The Releasee
> acknowledges that the Releasor does not, by the consideration aforesaid or
> otherwise, admit any liabilities or obligations of any kind whatsoever.
>
> c)    The Releasee confirms that this Release is a complete bar to any proceeding of
> any kind involving any claim, complaint or demand against the Releasor for any
> cause, matter or thing, except for breaches referred to in paragraph 3 hereof.

The parties signed formal copies of the termination agreement and release later on February 2.

## F. The termination agreement

**28**    Under the termination agreement York paid Markicevic $693,166.43 as salary in lieu of notice, together with some other amounts for accrued vacation pay and outplacement services. York also agreed to provide "a letter of reference attesting to your service and achievements at York

University" and the parties agreed upon a mutually acceptable form of announcement for Markicevic's resignation.

**29**     Bellisimo deposed that "I am advised by Ms. Lewis that, at the time of the letter agreement, release and letter of recommendation, the University had no knowledge of the extent of Mr. Markicevic's involvement in the invoicing scheme described above, which was only uncovered following his departure." Ms. Lewis did not file an affidavit on these motions.

### G. From the termination agreement until the commencement of this action

**30**     Markicevic deposed that following his termination he heard rumours that York was continuing an investigation into him. On April 25, 2010, Markicevic emailed Brewer asking York to stop "conducting itself in such a manner as to continue to promote its slanderous activities against me". He continued:

> To date York through its actions continues to publicly accuse and implicate me in York affairs without providing for the slightest opportunity for me to defend myself against any and all of its slanderous insinuations. This has now gone well beyond the reasonable process of "fact-finding" which any York audit and/or investigation may involve.

> To this end I would like to kindly refer you to our formal "agreement" which, I am advised Ms. Lewis would like to "tear-up". Frankly, given York's behaviour, I am prepared to, and would welcome any formal process aimed at terminating our agreement allowing both sides to pursue other legal means of addressing their respective concerns.

**31**     The next day, April 26, Markicevic emailed Bellissimo that he understood the investigation included looking into which York employees had attended his private residence and for what purpose. In the course of his email Markicevic stated that he was copying Brewer and Lewis "to ensure all the relevant parties are aware given the serious nature of York's actions and the terms and conditions of my 'Severance Agreement'". The same day Markicevic emailed Ireullo stating that York was "continuing to investigate me and tie me to Phil [Brown] ...".

**32**     According to Bellissimo, between February and August, 2010, York's Internal Audit department conducted an investigation which resulted in July 28 and August 10, 2010 reports. The July 28 report concluded:

> Based on our analysis, we have concluded that all payments made to A-Tech Construction & Design and Aleeyah Inc. were fraudulent and that York University did not receive the services claimed. The invoices were approved and submitted for payment as instructed by Mr. Brown and Mr. Markicevic.

The August 10 report addressed transactions involving AFC, painting by Mr. Humberto Correia, SBH, Canadian & American Concrete Renovation & Drain-Layer Ltd. and A-Tech Construction & Design Inc.

**33**    York then retained Navigant Consulting on August 16, 2010 to review the internal audit which York had performed and to conduct its own investigation into the misappropriation of York funds. Navigant delivered a report at the end of May, 2011 in which it reported discovering a false invoicing scheme involving the diversion of about $1.237 million in payments from York to the defendants.

**34**    On January 30, 2011, Markicevic emailed York's President, Dr. Shoukri, stating that his solicitors would be contacting the President to discuss Markicevic's continued concerns about York's investigation. Markicevic opened his email by writing:

> A year has past since the university, acting on rumours, secretly investigated whether I had misappropriated university property alleging that I had university owned hardwood flooring installed in my residence.

**35**    As to why the investigation was taking so long, Bellissimo deposed:

> The investigation took many months and required the assistance of the Court to obtain banking records from various financial institutions and to permit York to conduct pre-action discovery so that it could gather sufficient information with which to commence legal proceedings. Indeed, it was not until shortly before the 2011 holiday season that York had the necessary information with which to launch its claim.

**H. The allegations in York's Statement of Claim**

**36**    York commenced this action on January 26, 2012. It did not serve Markicevic and his family with the Statement of Claim until June 9 and 11, 2012, when it served its motion seeking injunctive relief.

**H.1**              **Claims asserted against Markicevic**

**37**    In its Statement of Claim York has advanced two types of claims against Markicevic: (i) he approved false invoices for payment by York and diverted some of the payments to his personal benefit; and, (ii) he misused university resources for personal use unrelated to his employment and diverted services away from the university to improve family residences at York's expense.

**38**    As to the first type of claim, in its Statement of Claim York made the following allegations

against Markicevic:

> (i)    SBH Consulting and Project Management Limited ("SBH"), a corporation owned by the spouse of Dani Ierullo, Markicevic's second-in-command, issued invoices to York totaling $90,958 for equipment not delivered or services not performed, and Markicevic knowingly approved the invoices for payment;
>
> (ii)   Markicevic approved for payment an invoice from AFC Inc. for the replacement of locks and door hardware when, in fact, the work was carried out internally in the university. York alleges that Markicevic received cash from the payment of this invoice;
>
> (iii)  Toronto Engineering Company submitted invoices for work it never carried out, and Markicevic approved payment of the invoices. York alleges that Markicevic received cash from the payment of this invoice;
>
> (iv)  A-Tech Construction and Design Inc. issued invoices to York for work which it did not perform or which was performed internally or by another vendor. Markicevic approved payment of the invoices by York. In its claim York pleaded that it required "the assistance of the various interim orders sought herein to uncover the true nature of the invoicing related to these entities and individuals, and their relationship to Markicevic and the other defendants";
>
> (v)   Canadian & American Concrete Renovation & Drain-Layer Ltd. ("CACRD"), a company owned by Roman Ritacca, issued invoices to York for the replacement of 96 drains when, in fact, it only replaced 52 drains. Ierullo approved payment of the invoices. York pleaded:

> > Approximately $122,300 of the $350,000 received by CACRD from York was used for labour and materials relating to work completed by Ritacca on the Residences owned by Markicevic family members, including the purchase of a Jacuzzi for the Residence at 124 Woodville Drive.

For ease of reference, I will refer collectively to these allegations as the Wrongful Invoicing Claims.

**39**    As to its allegations that Markicevic diverted materials and services for personal home improvements, York pleaded, in paragraph 76 of its Statement of Claim, that three York employees spent prolonged periods of time, at the instruction of Markicevic, providing painting, carpenter and electrical service work to the residences at 124 Woodville Drive, Vaughan and 211 Osprey Heights, Duntroon. In respect of two of the persons, York alleged that Markicevic had represented to the individuals that York had authorized the work; the third person did not submit any timesheets to

York for the work performed. However, York claimed that "the work and services carried out by these individuals were paid for by the University, without its knowledge or authorization". I will refer to these allegations as the Residence Improvement Claims.

**H.2**      **Claims asserted against Janet Fleming and Mima Markicevic**

**40**    As against Markicevic's wife, Janet Fleming, York asserts the following claims:

> (i)    The conveyance by Markicevic to his wife on July 5, 2010 of the Duntroon Residence is void as a fraudulent conveyance and York is entitled to a certificate of pending litigation;
>
> (ii)    Damages representing the value of unlawful improvements made to the Duntroon Residence, together with a declaration that such improvements using York funds and materials are held in constructive trust in favour of York.

**41**    As against Markicevic's daughter, Mima Markicevic, York claims:

> (i)    Damages representing the value of unlawful improvements made to the Vaughan Residence, registered title of which is in Mima's name, together with a declaration that such improvements using York funds and materials are held in constructive trust in favour of York.

**42**    York has sought damages against all defendants, including Janet Fleming and Mima Markicevic, for deceit, conversion and conspiracy, as well as orders that they disgorge all monies and profits as a consequence of any wrongdoing perpetrated upon York by them. As part of general pleas against all defendants, York alleges that Janet and Mima (i) received the benefit of the proceeds from payment of the unlawful invoices by York and conspired to cover up their wrongful activities and (ii) were complicit in the breaches by Markicevic and another York employee, Phil Brown, of their employment and fiduciary duties to York, acting "in concert with Markicevic and Brown to elicit a financial benefit and participated in efforts to cover up and conceal this deceitful conduct, the purpose of which was to injure the University and to profit from their wrongful conduct."

**III.      Summary judgment motion: positions of the parties**

**43**    Markicevic, Fleming and Mima Markicevic seek summary judgment dismissing the action against them pursuant to the terms of the Release which York granted to Markicevic. Specifically, they argue that:

(i)    By its terms the Release barred any claim York might have in the future;

(ii)   The evidence of the changes made to the language of the Release during its negotiation indicated that the parties intended to include in the Release the claims now asserted by York;

(iii)  At the time the Release was signed York knew or could have known of the invoicing scheme it now alleges against Markicevic; and,

(iv)   The fraudulent conveyance allegation in respect of the Duntroon property makes no sense in light of evidence that the transfer was made pursuant to a long-standing separation agreement between Markicevic and Fleming.

**44**    York opposed the granting of summary judgment on the following grounds:

(i)    The plain terms of the Release provided that York's action was not barred against Markicevic;

(ii)   Fleming and Mima Markicevic were third parties to the Release and therefore unable to benefit from it;

(iii)  Markicevic lied to York to secure his employment, and York sought leave to amend its Statement of Claim to plead that Markicevic's lies in obtaining his position at York vitiated his employment contract and the terms of his severance agreement, including the Release; and,

(iv)   Genuine issues requiring a trial existed in respect of the transfer of the Duntroon Residence from Markicevic to Fleming, including the existence of numerous "badges of fraud" and the lack of credibility of the defendants' explanation for the transfer.

## IV.    Summary judgment motion: governing legal principles

### A. Motions for summary judgment

**45**    In *Combined Air Mechanical Services Inc. v. Flesch*,[1] the Court of Appeal observed that the purpose of the new Rule 20 was to eliminate *unnecessary* trials, not to eliminate all trials.[2] In each case the guiding consideration must be whether the summary judgment process, in the circumstances of a given case, will provide an appropriate means for effecting a fair and just resolution of the dispute before the court.[3] The appropriateness of a summary judgment motion for the final determination of a claim on its merits, instead of proceeding to trial, depends on the nature of the issues posed and the evidence led by the parties.[4]

**46**    As the Court of Appeal noted, generally speaking there are three types of cases that are amenable to summary judgment: (i) cases where the parties agree that it is appropriate to determine an action by way of a motion for summary judgment; (ii) cases where the claims or defences are

shown to be without merit in the sense that they have no chance of success; and, (iii) cases where the trial process is not required in the "interest of justice".[5] In deciding if the powers under Rule 20.04(2.1) should be used to weed out a claim as having no chance of success or be used to resolve all or part of an action, the motion judge must ask the following question: can the full appreciation of the evidence and issues that is required to make dispositive findings be achieved by way of summary judgment, or can this full appreciation only be achieved by way of a trial?[6]

**47**    The full appreciation test requires a motion judge to do more than simply assess if he is capable of reading and interpreting all of the evidence that has been put before him; a motion judge is required to assess whether the attributes of the trial process are necessary to enable him to fully appreciate the evidence and the issues posed by the case. In making this determination, the motion judge is to consider, for example, whether he can accurately weigh and draw inferences from the evidence without the benefit of the trial narrative, without the ability to hear the witnesses speak in their own words, and without the assistance of counsel as the judge examines the record in chambers.[7] Unless full appreciation of the evidence and issues that is required to make dispositive findings is attainable on the motion record - as may be supplemented by the presentation of oral evidence under Rule 20.04(2.2) - the judge cannot be "satisfied" that the issues are appropriately resolved on a motion for summary judgment.[8]

## B. Interpretation of releases

**48**    Geoff Hall, in *Canadian Contractual Interpretation Law, Second Edition*, summarized the general principles concerning the interpretation of releases as follows:

> A release is a contract, and the general principles governing interpretation of contracts apply equally to releases. However, there is also a special rule which is super added onto the regular ones. This rule comes from *London and South Western Railway v. Blackmore*, an 1870 decision of the House of Lords. The rule in *London and South Western Railway* holds that a release is to be interpreted so that it covers only those matters which were specifically in the contemplation of the parties at the time the release was given. The rule allows the court to consider a fairly broad range of evidence of surrounding circumstances in order to ascertain what was in fact in the specific contemplation of the parties at the relevant time, and it is not uncommon for a significant amount of extrinsic evidence to be examined when the rule is applied. However, like the law of contract interpretation generally, the scope of permissible extrinsic evidence does not extend to evidence of the parties' subjective intentions; such evidence is strictly inadmissible.[9]

**49**    In *Bank of British Columbia Pension Plan v. Kaiser*[10] the British Columbia Court of Appeal expanded on those general principles:

> Chitty on Contracts [1] sums up the relevant case law with respect to the

interpretation of a discharge of a contract or release as follows (pp. 1074-5):

1.  No particular form of words is necessary to constitute a valid release. Any words which show an evident intention to renounce a claim or discharge the obligation are sufficient.
2.  The normal rules relating to the construction of a written contract also apply to a release, and so, a release in general terms is to be construed according to the particular purpose for which it was made.
3.  The court will construe a release which is general in its terms in the light of the circumstances existing at the time of its execution and with reference to its context and recitals in order to give effect to the intention of the party by whom it was executed.
4.  In particular, it will not be construed as applying to facts of which the party making the release had no knowledge at the time of its execution or to objects which must then have been outside his contemplation.
5.  The construction of any individual release will necessarily depend upon its particular wording and phraseology.

In a recent decision in this Court, *Hannan v. Methanex Corp.* (1998), 46 B.C.L.R. (3d) 230 at 241, Donald J.A. (for the court) quoted with approval this passage from *White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236 (N.B.C.A.), where La Forest J.A. (as he then was) said this, at pp. 247-8:

...

By referring to what was in the contemplation of the parties, Lord Westbury was, of course, not opening the door to adducing evidence of what was actually going on in their minds, still less to making inferences about it. Such considerations are relevant solely to issues such as undue influence, mistake, fraud and the like which have no application here. What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about. For authority for the foregoing propositions, see in addition to the cases to which I expressly refer, those cited in Halsbury's Laws of

England, 4th ed., Vol. 9, pp. 412-3, and Vol. 12, p. 642 ...

**50**    The circumstances surrounding the making of the release do not include either party's own reasons for wanting a particular clause or form of words used in a document or any particular subject addressed by it,[11] nor does it include evidence of what may have been said in negotiations or draft agreements.[12]

**51**    In the present case York's claims against Markicevic sound in fraud. While there is no legal impediment to granting the release of an antecedent claim in fraud, the general language of a release will only cover such a claim provided it was in the contemplation of the parties to the release at the time it was given.[13]

**52**    Finally, in its 2001 decision in *Bank of Credit and Commerce International SA v. Ali,* the House of Lords held that if parties to a release intend to provide for the release of rights and the surrender of claims of which they have no knowledge, then they should use specific language which leaves no room for doubt that such was their intention.[14] Further, where the party receiving the benefit of the release knew that the other party might have a claim and also knew the other party was ignorant of the claim, taking a general release without disclosing the existence of the possible claim would constitute unacceptable sharp practice for which a remedy should be provided.[15]

**V.**
### Analysis of the summary judgment motion by Markicevic

**53**    Turning to the motion for summary judgment by Markicevic to dismiss the action against him on the basis of the Release, for several reasons I am not satisfied that he has demonstrated that no genuine issue requiring a trial exists as to whether the Release stands as a complete defence to York's claims.

## A. Evidence of subjective intent and drafts of the release most likely inadmissible

**54**    First, the case law is consistent in stating that when considering the circumstances surrounding the negotiation of a contract, including a release, a court cannot admit evidence of the parties' subjective intentions. This is so because, as explained by the Court of Appeal in *Dumbrell v. The Regional Group of Companies Inc.*:

> In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.[16]

In the present case, that principle would result in the exclusion of those portions of

Markicevic's affidavit in which he deposed to what he understood he was securing from the various changes made to the drafts of the release.[17]

55      As to the admissibility of the evidence concerning pre-contract negotiations, the Canadian case law has held that the factual matrix does not include evidence of negotiations, except perhaps in the most general of terms, such as to understand the genesis, aim or reason for the negotiations.[18] The treatment of drafts of an agreement was summarized by Geoff Hall as follows:

> It has long been established in Canada that prior drafts and evidence of the negotiations leading up to a final agreement may not be considered as part of the interpretative process. This represents one of the few areas to which the factual matrix does not extend.
>
> ...
>
> However, the rule has an important exception: it does not extend to preclude the admission of evidence of prior drafts and negotiations showing pertinent surrounding circumstances other than the parties' subjective intentions. From the perspective of contractual interpretation, there would seem to be considerable logic to this exception. Contractual interpretation is fundamentally about finding the correct meaning by considering both the words the parties agreed upon and the context in which the words were used. Prior drafts and evidence of negotiation may in some cases be quite helpful in setting the context for a final agreement and thereby assist in ascertaining meaning correctly. As long as such evidence does not touch upon subjective intention, it is difficult to see such evidence as objectionable in principle.[19]

56      A different approach was advocated by Peter Howard and Samaneh Hosseini in a recent article dealing with the admissibility of evidence of negotiations and drafts:

> It is also stated quite baldly that evidence as to negotiations and drafts is not admissible as part of the factual matrix. There is indeed some support found for that in the seminal case of *Prenn v. Simmonds*, [1971] 3 All E.R. 237, and, as will be seen, in other English authority. However, there is in practice and in effect, no such blanket rule. It is possible to adduce such evidence in an appropriate case and there is some case law to that effect as well. The lingering effect of the older statement of the rule survives in some Canadian judgments today and serves only to obscure the analysis that ought to occur.[20]

The authors made an interesting proposal that much of the uncertainty in this area of law could be reduced if parties included in their contract a provision which described the specific

evidence which would be admissible for the purpose of interpreting their agreement.

**57**    For the purposes of deciding this summary judgment motion, the binding governing principles would exclude the use which Markicevic seeks to make of the drafts of the Release which passed between Brewer and himself on February 1 and 2, 2010. He sought to use such drafts as evidence of the subjective intention of the parties, and our principles of contractual interpretation do not permit such a use.

### B. The language of the Release did not cover "future claims"

**58**    Turning, secondly, to the actual language used by the parties in the Release, York released Markicevic from any claims which it "ever had or now has" against Markicevic "for or by reason of, or in any way arising out of the Releasor's employment with York University". This general language of the release did not refer to future claims. Courts have made clear that specific language is required in order to release future claims. For example, in *Privest Properties Ltd. v. Foundation Co. of Canada Ltd.* the British Columbia Court of Appeal observed that had the parties not intended the release to cover only claims existing up until the time of the document:

> [I]t would have been an easy matter to use more expansive wording, such as "... all claims and demands howsoever and whensoever arising, whether known or unknown, which each may have now or hereafter against the other". (See, e.g., *Bank of Montreal v. Irwin* (1995) 6 B.C.L.R. (3d) 239, where this Court gave full effect to a release of all claims "whether known or unknown, suspected or unsuspected.")[21]

On its face the Release did not contain language dealing with future claims.

### C. Knowledge of York as releasor at the time of the Release

**59**    Third, what, then, were the claims released by York? Although the Release did not contain any recitals, the parties did adduce some evidence about the circumstances existing at the time of the Release's execution and, more specifically, what facts were or were not within the knowledge of York at the time of its execution. Prior to the execution of the Release, the parties had engaged in the following conversations about the allegations which had been made against Markicevic:

    (i)    from Markicevic's January 27 emails to McCann, he understood that there appeared to be "concerns emanating from some CUPE Executive members that York employees affiliated with CUPE are performing work on my private residence at York's expense";

    (ii)    at his January 27 meeting with Brewer, Markicevic learned York was investigating allegations he had misappropriated materials. His January 28 emails to Brewer and Lewis referred to allegations that he had been involved in the misappropriation of University resources;

    (iii)    at their January 29 meeting Markicevic and Brewer discussed complaints that Markicevic had misappropriated hardwood flooring material, commercial locks and painting material purchased for York for use in his residence. Brewer recalled that as the meeting progressed Markicevic began pushing for details and "Lewis mentioned something about locks and doors but indicated throughout that the investigation was just starting"; and,

    (iv)    Markicevic's email to Brewer on the evening of January 29 also referred to allegations that hardwood flooring, commercial door hardware and paint materials had been used or installed in Markicevic's house.

Following the Release's execution, Markicevic wrote to the President on January 30, 2011 stating:

> A year has past since the university, acting on rumours, secretly investigated whether I had misappropriated university property alleging that I had university owned hardwood flooring installed in my residence.

**60**    Evidence was also adduced about the information York had obtained concerning the allegations before it executed the Release:

    (i)    in last quarter of 2009 Badiou received information that Markicevic had engaged in "financial improprieties";

    (ii)    Brewer recalled that an allegation arose in late 2009 and early 2010 that Markicevic was involved in an invoicing scheme and, in early 2010 he found out that there were some documents that may have indicated Markicevic's involvement in misappropriated material;

    (iii)    at a January 29, 2010 meeting with the Whistleblower Lewis learned:

> [T]hat another employee had been asked to sign an invoice for emergency work that he did not believe was in fact completed. The Whistleblower provided a copy of the invoice issued by the defendant, AFC Inc., a memorandum from two senior employees approving the invoice and a sole/single source certification. He also provided, among other things, requisitions for materials, including paint and oak lumber, which he alleged were diverted for Mr. Markicevic's personal use. The Whistleblower alleged that these documents suggested inappropriate financial activities by senior members of CSBO, including Mr. Markicevic. The allegations of financial impropriety related to:

>     (a)    an invoice in the amount of approximately $23,000 for locksmith services the University never received;

(b)     the purchase of approximately $15,000 of flooring supplies that the University never received; and

(c)     expenditures in respect of painting labour and materials amounting to approximately $9,000 that the University did not require and never received.

**61**     The Markicevic moving parties have not demonstrated that, when taken as a whole, this evidence disclosed that York has no chance of success in establishing that at the time it executed the Release it had no knowledge of the allegations concerning the Wrongful Invoicing Claims which it has pleaded. The evidence suggests that at the time of the Release York's knowledge was limited to allegations concerning the Residence Improvement Claims and, even in respect of those claims, to narrow allegations concerning locks, hardwood flooring and painting, not the more extensive Residence Improvement allegations asserted by York in its Statement of Claim. In sum, a dispute exists about the scope of the claims extinguished by the Release.

**D. The validity of the Release**

**62**     In this case it is not possible to determine the disputes about the scope or validity of the Release because of two related factors.

**63**     First, York has put the validity of the Release in issue. York argued that the Release should be set aside because Markicevic, as a fiduciary, failed to disclose the full extent of his alleged fraud before contracting with York for his termination. In his Statement of Defence Markicevic denied York's allegation that he was a fiduciary. Nonetheless, the undisputed evidence showed that as Assistant Vice-President, CSBO, Markicevic supervised large operating and capital expenditure budgets so, in light of that evidence, it cannot be said that York has no chance of success of establishing that Markicevic owed it fiduciary duties.

**64**     York pointed to cases which have held that where a person releases another who stands in a fiduciary position as a result of the non-disclosure of material information by the fiduciary or by his misrepresentation of the true state of affairs to which the release is directed, the release will not bar an action against the fiduciary.[22] York submitted that had it known the full extent of Markicevic's fraud when it terminated him, it never would have given him a release.

**65**     Markicevic relied on the decision of the Alberta Court of Appeal in *Radhakrishnan v. University of Calgary Faculty Assn. (c.o.b. TUCFA)*[23] to make two points. He contended that mere proof of fraud was insufficient to set aside a release in the absence of proof of materiality, actual inducement and prompt repudiation on learning the truth. Markicevic contended that York never relied on anything he told them around the time of his termination because Lewis and Brewer informed them that York's investigation would continue. But that submission overlooks the statements in the case law that non-disclosure of material facts by a fiduciary may also result in the voiding of a release. The materiality of the misconduct alleged by York cannot be disputed; the allegations are most serious ones. And, Bellissimo deposed that it was not until late 2011 that York

possessed sufficient facts to launch its claims, which it did in January, 2012. In its Statement of Claim York sought the repayment by Markicevic of the termination payments and pleaded that at the time of his termination he had actively deceived and took steps to conceal from the university his misconduct as an employee - "[Markicevic] knew that the University was unaware of the unlawful invoicing scheme and that it never would have offered severance payments to Markicevic or dealt with any of the defendant corporations or individuals described herein in the manner it did, if the true facts had been disclosed to it".

**66**    Markicevic also relied on the *Radhakrishnan* case for the proposition that one cannot upset a contract for failure to disclose that which one suspected, even if the party had a duty to disclose the information.[24] While the decision does contain that statement, the Alberta Court of Appeal immediately went on to state that "there need not be full disclosure, despite a duty to disclose, in order to have a valid settlement contract, *where nondisclosure was in dispute*". As the facts of the *Radhakrishnan* case made clear, at the time of the settlement the plaintiff professor was aware that the university possessed a report about his performance, suspected it was favourable to him, asked for the report, the university refused, but the professor decided to settle in any event.

**67**    In this case Markicevic argued that prior to his termination York had heard allegations about an "invoicing scheme" involving him, yet decided to proceed with a settlement in the face of that information. While it is true Brewer deposed that in early 2010 he had heard such allegations and that Lewis, at her January 29, 2010 meeting with the Whistleblower, received a copy of an invoice issued by AFC Inc. for disputed emergency repairs, as well as requisitions for materials, including paint and oak lumber, York filed extensive evidence on these motions to support its position that it was not aware of the scope and particulars of its Wrongful Invoicing Claim until long after the termination agreement, following the completion of its internal audit and the Navigant investigation.

**68**    Markicevic submitted that mere suspicion by York of the existence of an invoicing scheme was sufficient to undercut its position that the Release did not bar its action. I disagree. Which takes me to the second factor why a trial is required to determine the disputes about the scope and the validity of the Release. The structure of the issues raised in this case makes it impossible to determine whether the Release is void for fraud without first dealing with York's allegations of fraud against Markicevic, both its Wrongful Invoicing Claims and Residence Improvement Claims. Markicevic strongly denied the allegations of fraud made against him by York. No party suggested that those allegations could be adjudicated by way of summary judgment; obviously, a trial will be required. Therefore, it is not possible for me to conclude, on a motion for summary judgment, that Markicevic has demonstrated that York has no chance of success in arguing that the Release was void by reason of material non-disclosure or fraudulent misrepresentation on his part. Whether the Release provides Markicevic with a full defence to York's action requires, on the complex facts of this case, a trial.

**69**    In light of that conclusion, I need not address, on this motion, York's argument that the

termination agreement could be set aside by reason of after-acquired cause relating to misrepresentations York alleged Markicevic made about his academic qualifications when he initially applied for a job with York.

**70**    For these reasons I am not prepared to grant Markicevic's summary judgment motion. A trial is required.

### VI.
#### Analysis of the summary judgment motion by Mima Markicevic

**71**    Although Mima is not a party to the Release, she submitted that because section 2(b) of the Release prevented York from commencing any action against a person who could claim contribution or indemnity against her father, she was entitled to the benefit of the Release since if she was found liable to York, she could seek contribution or indemnity from her father.

**72**    As I have found that a genuine issue requiring a trial exists in respect of the validity and scope of the Release, Mima is not entitled to summary judgment.

### VII.
#### Analysis of the summary judgment motion by Fleming

## A. Defence based on reliance on the Release

**73**    Similarly, Janet Fleming, while not a party to the Release, submitted that because section 2(b) of the Release prevented York from commencing any action against a person who could claim contribution or indemnity against her husband, she was entitled to the benefit of the Release since if she was found liable to York, she could seek contribution or indemnity from Michael.

**74**    As I have found that a genuine issue requiring a trial exists in respect of the validity and scope of the Release, Fleming is not entitled to summary judgment on the basis of the Release.

## B. Defence to the fraudulent conveyance claim

**75**    Fleming advanced one further argument in support of the grant of summary judgment. York, in its Statement of Claim, sought a declaration that the July 5, 2010 transfer of the Duntroon residence from Markicevic to Fleming was void as a fraudulent conveyance under the *Fraudulent Coveyances Act*. York pleaded that the transfer of the property was undertaken for the purpose of defeating, hindering or delaying Markicevic's creditors and Fleming "was a knowing participant in the fraudulent conveyance". In her Statement of Defence Fleming pleaded that "the transfer of property to Janet from Michael was further to an agreement made long before Michael began to work at York". Specifically, Fleming pleaded that the 2010 transfer of the Duntroon property was done to fulfill a 2008 separation arrangement reached between Michael and herself.

**B.1**

**Evidence regarding the fraudulent conveyance claim**

## Acquisition of the Duntroon property

**76**    Markicevic bought the Duntroon property in 1985. He held title jointly with his mother. At the time it was vacant land. Within four years he had cleared the land and built a home, in which he lived with his mother.

**77**    Markicevic met Fleming in April, 1989. As a result of their relationship Mima was conceived. Before Mima's birth Fleming and Markicevic decided to live together at the Duntroon Residence. At the time Fleming owned a house in Collingwood, which she rented out. Fleming and Markicevic did not marry, but continued to live together.

**78**    According to Markicevic, in November, 1997 Fleming sold her Collingwood property and used part of the proceeds to purchase a lot next to the Duntroon property.

**79**    In 1999 Markicevic bought-out his mother's interest in the Duntroon property for $200,000. He deposed that Janet contributed approximately $138,000 to that purchase. Janet recalled that the amount was made up of a personal injury settlement and part of the proceeds from the sale of her Collingwood property. Title was placed solely in the name of Markicevic because, according to Michael, Janet and his mother had experienced some personal issues. Janet's evidence on this point was different; she deposed: "I agreed not to have my name put on title because Michael assured me that it was only a formality."

**80**    Fleming deposed that she paid for a number of improvements made to the Duntroon Residence.

## Michael and Janet discuss a separation agreement

**81**    Fleming deposed that since the mid-1990s she and Michael had lived separately under one roof, with both devoting their time to raise their daughter.

**82**    Markicevic deposed that when he was hired by York in 2004, his life became more focused in Toronto. He and Janet began to discuss their future: "Our plan had always been that Janet would get title to 211 Osprey and would not seek any further financial assistance from me." Markicevic stated that in May, 2008, he and Janet "retained a lawyer to prepare a separation agreement, to formalize Janet's ownership of 211 Osprey and the other details of our arrangement." However, "we advised our lawyer not to finalize the separation agreement and we never executed one". Markicevic offered the following reason for that decision:

> [W]e had purchased 124 Woodville for Mima using the LOC secured against 211 Osprey. We were advised that the limit of the LOC would be reduced if the title

to 211 Osprey was transferred to Janet's name, as she made less money than me.

Fleming gave evidence to the same effect.

**83**    A lawyer, Brian McLellan, deposed that in early 2007 he was retained by Markicevic and Fleming to prepare a formal separation agreement. McLellan stated that the separation agreement was to reflect Fleming receiving title to the Duntroon property and, in return, executing an agreement foregoing any future support from Markicevic, who would be able to take out a mortgage on the Duntroon property to purchase a house in Toronto. A note to file by McLellan reflected some elements of that arrangement. The note also recorded: "[Markicevic] wants to create two principal residences."

**84**    McLellan instructed his clerk to prepare a draft separation agreement. That was done, but it was not sent to the clients because, according to McLellan, by May, 2008 Markicevic and Fleming had contacted him to advise they wanted to hold off formalizing their separation. McLellan filed a copy of the draft separation agreement prepared by his clerk. That draft treated the Duntroon property as being jointly owned by Markicevic and Fleming and contemplated the sale of the property and an equal division of the sale proceeds. McLellan deposed that he did not review the draft at the time. Having now reviewed it, "it does not accurately reflect the instructions that I received from Ms. Fleming and Mr. Markicevic".

**The transfer of the Duntroon Residence**

**85**    Markicevic deposed that he used part of his termination payment from York to pay off the line of credit secured against the Duntroon Residence and then found employment in British Columbia which began on June 1, 2010:

> As part of that process, and given that the LOC had been paid off, Janet and I decided that it would be a good time to transfer the title to 211 Osprey to her name, in furtherance of our long-standing arrangement. As such, on July 5, 2010, the title to 211 Osprey was transferred to Janet.
>
> ...
>
> The exclusive purpose of transferring the title to 211 Osprey into Janet's name was to recognize our long-standing arrangement and her substantial contribution to the property, providing Janet with legal ownership of the home that was already rightfully hers.

**86**    Fleming deposed:

> I contributed substantially to the acquisition and improvement of 211 Osprey, both in money and labour. Moreover, I received title to 211 Osprey as part of a separation agreement between Michael and me. The exclusive purpose of the transfer was to carry out that arrangement and I provided substantial consideration for the transfer.

**87**    The July 5, 2010 Transfer recorded the consideration for the transaction as $495,000.00. In fact, no cash was exchanged on the transfer. As Markicevic deposed: "For purposes of the transfer, we roughly valued the property at $495,000." Fleming deposed: "I have not sought any financial assistance from Michael since that time."

### B.2        Governing legal principles

**88**    Section 2 of the *Fraudulent Conveyances Act* provides that "every conveyance of real property or personal property ... made with intent to defeat, hinder, delay or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, penalties or forfeitures are void as against such persons and their assigns." In *392278 Ontario Ltd. (c.o.b. Group Three) v. Interopeka S.A.*, Spence J. set out the accepted law on the subject of fraudulent conveyances:

> The plaintiff must prove that the conveyance was made with the intent defined in that section. Whether the intent exists is a question of fact to be determined from all of the circumstances as they existed at the time of the conveyance. Although the primary burden of proving his case on a reasonable balance of probabilities remains with the plaintiff, the existence of one or more of the traditional "badges of fraud" may give rise to an inference of intent to defraud in the absence of an explanation from the defendant. In such circumstances there is an onus on the defendant to adduce evidence showing an absence of fraudulent intent. Where the impugned transaction was, as here, between close relatives under suspicious circumstances, it is prudent for the court to require that the debtor's evidence on bona fides be corroborated by reliable independent evidence.[25]

**89**    Kevin McElcheran, in *Commercial Insolvency in Canada, Second Edition*, elaborated on this test:

> As in the cases of a fraudulent preference, the hallmark of a fraudulent conveyance is the "intent" of the debtor. However, provincial fraudulent conveyance legislation does not give the trustee or creditor the advantage of a presumption of intent. The requisite intention must be established in each case on its facts. Intention is a state of mind. Accordingly, unless the fraudulent intent is admitted by the transferor (and the transferee if dual intent must be demonstrated), the court must make its own determination of the intention of

parties based on their actions. In this respect, the courts have developed a number of indicia of fraudulent intent that have been dubbed the "badges of fraud". Although no list can be complete, the following is a list that has received judicial recognition in many cases:

1/ The conveyance was general (i.e., a transfer of substantially all of the transferor's property);

2/ The transferor continued in possession and used the goods as its own, including selling them;

3/ The conveyance was secret;

4/ The conveyance was made in the face of an ongoing legal process;

5/ The conveyance amounted to a trust of the goods;

6/ The deed contained the self-serving and unusual provision "that the gift was made honestly, truly, and bona fide";

7/ The deed gives the transferor a general power to revoke the conveyance;

8/ The deed contains false statements as to the consideration;

9/ The consideration is grossly inadequate;

10/ There is unusual haste to make the conveyance;

11/ Some benefit is retained under the settlement by the settlor;

12/ Cash is taken in payment instead of a cheque; and,

13/ A close relationship exists between the parties to the conveyance.

A number of these "badges of fraud" are expressed in antiquated language and all of them need not be present in any particular transaction in order for the court to conclude that the transaction was made with the intention to defeat, hinder or delay creditors of the debtor by putting valuable assets outside of the reach of the trustee. These badges are just external manifestations of fraudulent intent. On the basis of these or other external manifestations of the requisite intention, the court will set aside fraudulent conveyances so that the value of the property conveyed can be recovered for the estate.[26]

**90**    In her submissions Fleming pointed to 2006 case law to argue that while the applicable standard of proof in fraudulent conveyance cases is proof on a balance of probabilities, it must be to a higher degree of probability than would apply in an ordinary civil case. In my view no such elevated standard exists in light of the 2008 decision of the Supreme Court of Canada in *F.H. v. McDougall* in which that Court addressed the tension between the civil standard of proof on a balance of probabilities and cases in which allegations made against a defendant are particularly grave, such as those involving allegations of fraud. The Supreme Court of Canada stated a clear rule:

> I think it is time to say, once and for all in Canada, that there is only one civil standard of proof at common law and that is proof on a balance of probabilities. Of course, context is all important and a judge should not be unmindful, where appropriate, of inherent probabilities or improbabilities or the seriousness of the allegations or consequences. However, these considerations do not change the standard of proof.

> In the result, I would reaffirm that in civil cases there is only one standard of proof and that is proof on a balance of probabilities. In all civil cases, the trial judge must scrutinize the relevant evidence with care to determine whether it is more likely than not that an alleged event occurred.[27]

**B.3**
### Positions of the parties

**91**    York submitted that a full trial is required to determine the issue of fraudulent intent, but contended that the evidence revealed several "badges of fraud": (i) the non-arm's length nature of the transaction; (ii) the continued use of the Duntroon property by Markicevic following the transfer; (iii) the repayment of the line of credit on Duntroon, coupled with the transfer of the Duntroon property, effectively transferred substantially all of his assets, apart from $100,000 in his RRSP; (iv) no cash passed in the transaction; (v) the separation agreement was never documented; (vi) McLellan's note indicated that Markicevic planned for the transfer to create two principal

residences; and, (vii) if Markicevic and Fleming lived separate and apart, as they deposed, their relationship would not have given rise to any obligation by Markicevic to support her and therefore a separation agreement would not be necessary.

**92**    Fleming submitted that (i) the evidence established that the transfer reflected a longstanding separation agreement between Markicevic and herself; (ii) the transfers occurred at a time when Markicevic thought he had been released by York from any claims; and, (iii) she gave good consideration for the transfer by agreeing to forego support rights, which brought the transaction within the saving provisions of section 3 of the *FCA*.[28]

## B.4 Analysis

**93**    On her motion for summary judgment Fleming bears the onus of demonstrating that York's fraudulent conveyance claim has no chance of success and, therefore, no genuine issue requiring a trial exists. I am not satisfied that Fleming has so demonstrated.

**94**    Although both Fleming and Markicevic gave evidence regarding their intentions for the transfer, that evidence must be assessed in light of the external, surrounding circumstances. York argued that some of the circumstances disclosed by the evidence fell within recognized categories of the "badges of fraud", such as the non-arm's length nature of the transfer and the lack of cash consideration. Although Markicevic submitted that at the time of the transfer he was acting under the knowledge that his dispute with York lay in the past because of the February, 2010 settlement, his April 25 and 26, 2010 emails referred to earlier in these Reasons disclosed that, in fact, he was aware York was continuing to investigate his conduct. While both Markicevic and Fleming deposed to a 2007/2008 separation arrangement as the reason for the transfer, they never executed any formal separation agreement and Fleming did not adduce any written evidence that she had released Markicevic from any future support claims, which was the main consideration she contended underlay the transfer. Also, their description of the 2007/2008 separation arrangement did not coincide with the recollection of their lawyer, McLellan, as recorded in one of his 2007/2008 notes. In light of this evidence, I cannot conclude that York stands no chance of success in its fraudulent conveyance claim. Also, a trial process with *viva voce* evidence from Markicevic and Fleming is required to assess the credibility of the evidence about their intentions and explanations for the transfer. I therefore dismiss this part of Fleming's summary judgment motion.

## VIII. Summary on summary judgment motion

**95**    For the reasons set out above, I dismiss the motion for summary judgment brought by Markicevic, Fleming and Mima Markicevic.

## IX.
### York's request for interlocutory injunctive relief

**96**    In its Notice of Motion, as amended by the submissions in its Supplementary Factum, York sought several types of interlocutory relief:

> (i)    A *Mareva* injunction against Markicevic restraining his disposition of assets wherever situated and requiring him to deliver an affidavit describing his world-wide assets;
>
> (ii)   An *Anton Piller* order requiring Markicevic to deliver his computer and relevant passwords to an Independent Supervising Solicitor for examination for relevant electronic documents; and,
>
> (iii)  Certificates of pending litigation against the Duntroon and Vaughan Residences.

**X.**

> **York's motion for a *Mareva* injunction against Markicevic and certificates of pending litigation against the Duntroon and Vaughan Residences**

## A. Governing legal principles

**97**    A *Mareva* injunction is an extraordinary remedy. On a motion seeking a *Mareva* injunction a moving party must make full and frank disclosure of all material matters within his or her knowledge. As well, it must:

> (i)    give particulars of the claim against the defendant, stating the grounds of the claim and the amount thereof, and the points that could be fairly made against it by the defendant, and demonstrate that it has a strong *prima facie* case;
>
> (ii)   provide grounds for believing that the defendant has assets in the jurisdiction;
>
> (iii)  establish grounds for believing that there is a real risk of the assets being removed out of the jurisdiction, or disposed of within the jurisdiction or otherwise dealt with so that the defendant would be unable to satisfy a judgment made against him or her; and,
>
> (iv)   give an undertaking as to damages.[29]

**98**    The test for granting a certificate of pending litigation is the same as the test on a motion to discharge one, and that includes a consideration of whether the plaintiff has demonstrated a reasonable claim to an interest in the land.[30] In the *Waxman v. Waxman* case Lane J. stated that his duty as a motion judge was "to examine the whole of the evidence as it stands after cross-examination and, without deciding disputed issues of fact and credibility, consider whether on the whole of the evidence the plaintiff's case constitutes a reasonable claim to the interest in the land claimed". Section 103(6) of the *Courts of Justice Act* also directs courts to consider several other factors when granting or discharging a certificate of pending litigation, including the adequacy of

damages and the protection of the plaintiff's interests by another form of security.[31]

**B. Summary of the evidence relating to each of the alleged Wrongful Invoicing Claim**

**B.1**        **Overview**

**99**    Although York's Statement of Claim pleads several Wrongful Invoicing Claims against Markicevic, on its motion for a *Mareva* injunction, York focused on two claims in its notice of motion, factums and oral argument - those involving A-Tech and Canadian & American Concrete Renovation & Drain-Layer Ltd. Accordingly, I have only considered those two Wrongful Invoicing Claims. In addition, York relied on its Residence Improvement Claims.

**100**    I do not propose to set out all of the evidence filed in respect of each of the two Wrongful Invoicing Claims relied on by York. Instead, I will describe the material essentials of each claim.

**B.2**        **A-Tech Construction and Design Inc. ("A-Tech")**

**101**    York pleaded that: (i) A-Tech Construction and Design Inc. issued invoices to York for work which it did not perform or which was performed internally or by another vendor; (ii) Markicevic had approved payment of the invoices by York; and, (iii) York required "the assistance of the various interim orders sought herein to uncover the true nature of the invoicing related to these entities and individuals, and their relationship to Markicevic and the other defendants".

**102**    Through the affidavit of Robert MacDonald, a managing director at Navigant Consulting Inc., its external investigator, York adduced the evidence it had accumulated regarding a Wrongful Invoice scheme involving A-Tech:

    (i)    Aleeyah Apparel Inc., an Ontario corporation, registered the business name, A-Tech Construction and Design Inc., on August 15, 2007. Riaz Jadavji was the sole registered officer and director of A-Tech/Aleeyah;

    (ii)    Between August 23, 2007 and June 29, 2009, A-Tech and Aleeyah issued 30 invoices to York for goods and services they did not perform or provide. The goods and services were provided internally at York by York employees, performed by other external service providers approved by York or not provided at all;

    (iii)    Either Phil Brown or Markicevic approved the invoices. More specifically, Markicevic approved 8 of the 30 invoices, totaling $135,320;

    (iv)    York paid almost $375, 000 to A-Tech and Aleeyah;

    (v)    Jadavji has refused to speak to Navigant about the invoices and payments;

(vi)   On June 8, 2011, York obtained a *Norwich* order to obtain the records of a
       Royal Bank of Canada account into which its cheques to A-Tech/Aleeyah
       had been deposited;

(vii)  The RBC records disclosed (i) an April 25, 2008 cheque for $26,745.50
       was made payable to "M. Markicevic" and deposited into a Collingwood
       bank account and (ii) a deposit by way of cheque made in the amount of
       $26,754.50 to "Mark Markicevic & A-Tech Construction & Design";

(viii) The RBC records disclosed 69 cheques written to "Midnight Sun". York
       obtained a *Norwich* order for the production of Toronto-Dominion Bank
       and Bank of Nova Scotia records in respect of Midnight Sun. Those
       records did not disclose any payments to Markicevic, Fleming or Mima
       Markicevic.

**103**    York filed an affidavit from Jack McCann, a carpenter in its employ and the former President
of CUPE Local 1256. McCann worked in Markicevic's group. McCann deposed that at Markicevic's
direction he approached a friend, Jadavji, to incorporate a company for the purpose of invoicing
York. According to McCann, it was Markicevic who chose the name "A-Tech Construction and
Design Inc."

**104**    McCann deposed that Markicevic initiated the process of A-Tech submitting false invoices
by providing McCann with a description of the work and amount to be stated on the invoices which
McCann was to transmit to Jadavji. According to McCann, Jadavji kept a little over one-third of the
payments made by York on the false invoices, while he and Markicevic shared the balance. He said
he gave Markicevic cash for his share.

**105**    McCann did not specify the amount of cash he gave Markicevic under this scheme. McCann
thought that he personally made about $20,000 to $30,000. McCann suggested that he used about
$1,500 of the scheme proceeds to buy an electric fireplace and glass shower doors for Markicevic's
Vaughan Residence.

**106**    Markicevic admitted that he had signed eight A-Tech invoices, but stated that in so doing he
would have been "relying on whichever of my direct reports brought the invoices to me, along with
the process that I established for invoice approvals".

**107**    Markicevic denied knowing Jadavji and deposed that he had never received any improper
payment or benefit in relation to A-Tech. McCann filed a December 2, 2007 email to Markicevic in
which he wrote: "I have sent Rj a email and left a voice mail message with regards to the address
and the names of the companies, as soon as I hear back I will forward them to you ..." McCann
deposed that he sent this email to prove he had reached out to Jadavji about a new company to send
false invoices to York; McCann stated that the nickname for Riaz Jadavji was "Rj". Markicevic
testified that the email arose in the context of McCann asking about opportunities at York for
companies owned by his business partners, and Markicevic, in order to assess whether any conflict

of interest might exist, requested McCann to provide details of the names of the companies with which he had dealings.

**108**    As to Aleeyah, Markicevic stated that McCann had helped to arrange for an external consultant to provide some training seminars to CSBO employees. Markicevic saw the seminars take place, and thereafter he received invoices from Aleeyah indicating that it had run the seminars. Markicevic signed the invoices. He denied receiving any improper benefit.

**109**    McCann produced a July 21, 2009 email from Markicevic to which was attached a spreadsheet - the so-called "Circle Draw" spreadsheet - on which he contended Markicevic had listed some of the A-Tech invoices and the amounts of the shares taken by McCann and himself. On its face the Circle Draw spreadsheet made no reference to A-Tech or any invoice, although a few of the numerical entries corresponded to amounts on some A-Tech invoices. Markicevic admitted helping McCann to prepare a spreadsheet for his family's business, but could not recall the spreadsheet attached to the email.

**110**    McCann also deposed that in January, 2008, Markicevic required him to attend at the Duntroon Residence to repair some flood damage in the basement. Markicevic told McCann to submit an invoice for the work for submission to the insurer. McCann prepared a January 14, 2008 invoice on A-Tech letterhead for $2,887.50 for "cleanup of flooding in basement". As well, McCann prepared and sent a letter from Jadavji on A-Tech letterhead confirming payment of the invoice. McCann also prepared a quote for $27,745.50 in respect of additional repair work required in Markicevic's basement. McCann believed that Markicevic planned to complete the proposed repair work himself and then bill the insurer. McCann deposed that at Markicevic's direction, he prepared a second set of quote documents which changed the references to Jadavji to himself so that the insurer would not contact Jadavji "who would not know what was going on in his basement".

**111**    McCann stated that he was present when Markicevic tried to deposit a cheque from the insurer, but was unable to do so because the names on the cheque were "Mark Markicevic" and "A-Tech". According to McCann, he was able to arrange for Jadavji to deposit the cheque (how with the name "Mark Markicevic" on the cheque, he did not explain), and Jadavji wrote Markicevic a replacement cheque. According to McCann, Markicevic was angry that Jadavji had written him a cheque.

**112**    Markicevic acknowledged that he had called McCann to help repair the flood damage, but it turned out he was not needed and, Markicevic contended, the work McCann performed had not been authorized by him. To preserve peace with the union Markicevic agreed to pay the company McCann was doing the work through, and against that background Markicevic later signed and paid a $2,887.50 invoice from A-Tech. Markicevic also allowed McCann to quote on the flood repair work, which led to the A-Tech quote. Markicevic deposed that he submitted that quote to the insurer but, at the same time, told the insurer, in a February 1, 2008 fax, that he would be doing the repair work himself. Markicevic acknowledged receiving the cheque from the insurer made out to

"Mark Markicevic & A-Tech Construction & Design", encountering difficulty depositing the cheque, and requesting McCann to have his business partners - i.e. A-Tech - issue a replacement cheque.

**113**    So, at the end of the day, the only financial transaction which York was able to document between A-Tech and Markicevic was explained by Markicevic as consisting of insurance funds to which he was otherwise entitled, with the involvement of A-Tech explained by his understanding that McCann was business partners with that company and used them to do some flood repair work at the Duntroon Residence.

**114**    Markicevic otherwise denied any knowledge of A-Tech, its improper invoicing activities or its principal. McCann, as the evidence showed, told a completely different story which, if accepted, would demonstrate that Markicevic knew about Jadavji and his company and shared in wrongful payments obtained from York. I should note that in his initial interview by Naviant McCann provided different information, stating that he did not know of A-Tech and had no idea they did work at York, a position he changed in his September, 2012 affidavit. On cross-examination McCann admitted that he had lied to Naviant in his interview.[32] The documentary record provided little assistance in resolving this dispute. There was no evidence from Jadavji in the record. Markicevic described McCann as the head of a union local who knew how to survive in that hard world, although in one email he had told McCann that he was not a strong individual. McCann described himself as the vulnerable victim of an aggressive, insulting, bullying Markicevic who terrorized him into doing things he should not have done in order to save his job. The assessment of the credibility of Markicevic and McCann will be central in the adjudication of this Wrongful Invoicing claim.

### B.3    Canadian & American Concrete Renovation & Drain-Layer Ltd. ("CACRD")

**115**    York alleges that Canadian & American Concrete Renovation & Drain-Layer Ltd. ("CACRD"), a company owned by Roman Ritacca, issued invoices to York for the replacement of 96 drains when, in fact, it only replaced 52 drains. York pleaded:

> Approximately $122,300 of the $350,000 received by CACRD from York was used for labour and materials relating to work completed by Ritacca on the Residences owned by Markicevic family members, including the purchase of a Jacuzzi for the Residence at 124 Woodville Drive.

**116**    Naviant reported that the CACRD invoices were approved by Markicevic and Dani Ierullo, at the time York's Operations Associate Director. York alleges that of the $696,300 invoiced by CACRD to York, at least $350,000 was for materials and services not received because only 52, not 96, drains were replaced. Authorization to single source the work was signed by Ierullo, Markicevic

and Brewer.

**117**    Ritacca provided evidence that while CACRD invoiced York for the replacement of 96 drains, in fact it only replaced 52 drains. He stated that Ierullo had approved his quote for 96 drains, and Ierullo told him that he was expected to pay a finder's fee to Ierullo and others in return for the work. According to Ritacca, Ierullo also directed him to inflate the cost per drain in CACRD's quote. Ritacca did so, billed the work and deposited the payments by York into the CACRD bank account. From Ritacca's evidence, it is clear that Ierullo was his main contact at York for this work and that Ierullo actually prepared some of the CACRD invoices submitted to York. Ritacca did not give evidence about any involvement by Markicevic in the origins or mechanics of the over-invoicing scheme.

**118**    Ritacca, however, said he paid finder's fees in cash and by cheque to Ierullo and others, and a finder's fee to Markicevic by providing $122,330 in goods and services for the Vaughan Residence. Ritacca provided a chart to Navigant itemizing the work he contended he had performed on the Markicevic Vaughan Residence. Ritacca made clear in his September 6, 2012 affidavit that Ierullo was the one who asked him to go to the Vaughan Residence to perform work which Ritacca understood was to form part of the finder's fee for the drain contract. Although Ritacca deposed that he began to receive instructions directly from Markicevic about the type of yard work to be done, some of which involved heavy equipment and the purchase of a hot tub, Ritacca attributed no statement to Markicevic indicating that the work was part of the finder's fee for the drain job. Ritacca simply deposed: "At no point did Markicevic ever pay me for any of the above work, nor did I ever ask him for any."

**119**    Ierullo was one of Markicevic's direct reports. Ierullo alleged in his testimony that:

> (i)    Markicevic told him the contractor selected for the drain repair work would have to be willing to "play" by providing payments to Ierullo and himself;
>
> (ii)    Markicevic agreed to Ierullo's proposal of CACRD as the contractor;
>
> (iii)    Markicevic directed Ierullo to prepare an email which would justify sole-sourcing the project;
>
> (iv)    Markicevic selected the inflated project price;
>
> (v)    Markicevic approved all CACRD invoices knowing they were false;
>
> (vi)    Markicevic knew that although only 52 drains would be replaced, York would be billed for 96;
>
> (vii)    Ierullo remitted to Markicevic between $60,000 to $90,000 in cash from monies received by CACRD from York; and,
>
> (viii)    Markicevic also benefitted from work done by Ritacca at the Vaughan Residence. According to Ierullo, Markicevic had directed him to have Ritacca do the work.

**120**    Brewer deposed that Markicevic told him that the drain repair work had to be done immediately and that CACRD had experience in the area. Brewer approved the project.

**121**    Markicevic deposed that he relied on representations from Ierullo for the selection of CACRD and the approval of its invoices. He was not aware that CACRD had not installed the full number of contracted-for drains, and Markicevic denied receiving any benefit from work performed by or invoices submitted by CACRD.

**122**    Markicevic acknowleged that Ierullo arranged for work to be performed on the Vaughan Residence. According to Markicevic, between September, 2005 and February, 2009 he was involved with Ierullo in the trade-in and sale of a number of second-hand vehicles. Markicevic provided the particulars in his affidavit. Ierullo ended up owing Markicevic $47,000 on the transactions. (Markicevic deposed that he sent Ierullo an email following the latter's April, 2010 termination at York asking how he was to pay the balance owing of about $7,000.) In 2009 Ierullo proposed to repay Markicevic by providing construction services from his father's company. That, according to Markicevic, led to the work done by Ritacca at the Vaughan Residence. Markicevic thought that Ritacca was working for Ierullo's father's company, and he valued those services at around $35,000. Markicevic stated that he and his family did most of the landscaping at the Vaughan Residence.

**123**    Ierullo admitted purchasing some vehicles from Markicevic, but not the total number described by the latter. Ierullo denied any indebtedness to Markicevic and disputed Markicevic's evidence about certain of the cheques he said were related to the vehicle transactions. Ierullo denied that the work done at the Vaughan Residence was for the repayment of debt he owed to Markicevic.

**124**    As in the case of York's allegations about A-Tech, its allegations against Markicevic concerning CACRD will require an assessment of the relative credibilities of Markicevic and another of his former subordinates, Ierullo. The documentary record provides little assistance in weighing York's allegations that Markicevic benefited from inflated billing by CACRD.

**C. Residence Improvement Claims**

**C.1**
              **Duntroon Residence**

**125**    York alleges that Markicevic diverted materials and services for personal home improvements, at both the Duntroon and Vaughan Residences, and that painting, carpenter and electrical service work performed by York employees at those locations was paid for by the University, without its knowledge or authorization.

**126**    Humberto Correia, a painter at York, testified that over the course of a month he spent time at the Duntroon Residence supervising a bricklayer working in Markicevic's basement and

performing some tiling work. He deposed that York paid for the time he spent working at Markicevic's house.

**127**    Luis Figueiredo, a York electrician, deposed that at Markicevic's direction he spent about 10 days working at the Vaughan Residence, doing electrical work and helping to erect a fence. York paid for his time.

## C.2
### Vaughan Residence

**128**    Markicevic bought the Vaughan Residence in 2008 for about $600,000 and put the title in the name of his daughter, Mima. He did so to provide her with a head-start in life. Part of his termination payment was used to retire the acquisition debt for this property.

**129**    Correia deposed to spending three to four weeks painting the Vaughan Residence, as well as doing three weeks' worth of plastering. York paid for his work.

**130**    Figueiredo deposed that he also did about two weeks' worth of various electrical work at the Vaughan Residence for which York paid his time.

**131**    McCann deposed that Markicevic had him working "for hours upon hours at his house during my work day", painting the interior, hanging chandeliers, assisting with electrical work, renovating the basement and building an outdoor fence. McCann spend "hundreds of hours" on the work over many months. York paid for his time.

## C.3
### York's estimate of the value of the time spent by York employees on Markicevic's res-idences

**132**    Clifford Strachan, of Navigant, deposed that based upon information provided by York, he calculated the total cost to York of work performed on the Duntroon and Vaughan Residences as follows: (i) work by Correia: $13,323.37; (ii) work by Figueiredo: $4,599.60; (iii) work by McCann: $2,736.72.

## C.4
### Markicevic's defence

**133**    Markicevic admitted that McCann, Correia and Figueiredo all performed work at the Duntroon and/or Vaughan Residences. He deposed that he had paid reasonable cash compensation for the work and had no knowledge that York had paid for any of it. He thought that the workers had not been on duty at York when they did the work at the residences. Markicevic deposed:

At most the workers arranged by McCann performed several thousand dollars of work on 211 Osprey and 124 Woodville. The amounts that McCann, Figueiredo and Correia claim to have worked at 211 Osprey and 124 Woodville vastly exceed this amount. As such it appears that McCann, Figueiredo and Correia may have been "moonlighting" and charging their time to York while doing so. However, the vast majority of that time was not spent working at 211 Osprey or 124 Woodville. I do not know what McCann, Figueiredo and Correia were doing during the times that were billed at York.

## D. Analysis

### D.1
#### York's request for a Mareva injunction

**134**    Although York's requests for a *Mareva* injunction and certificates of pending litigation engage different legal tests, both involve requests that the Court preserve the *status quo* with respect to the assets of Markicevic, Fleming and Mima Markicevic pending the trial of this action. Consequently, while I must apply different legal tests to each form of relief, one cannot lose sight of the bigger picture which is whether York, in light of the evidence it has adduced in support of its pleaded claims, is entitled to some degree of protection in respect of its claim prior to trial.

**135**    Dealing first with York's request for a *Mareva* injunction, I have concluded that York has not satisfied the requirements for the grant of such an extraordinary remedy. As to its claims involving the Wrongful Invoicing schemes using A-Tech and CACRD, I am not satisfied that York has demonstrated a strong *prima facie* claim on the evidence filed. Markicevic, on the one hand, and Ierullo and McCann on the other, gave diametrically opposed stories. McCann admitted to participating in a false invoicing scheme, yet remains in the employ of York. Ierullo was fired, but reached a co-operation agreement with York and has not been charged criminally. Neither is a disinterested witness. Apart from the evidence of those witnesses, York did not file any documentary evidence which traced payments it made to A-Tech and CACRD to Markicevic, notwithstanding the grant of several *Norwich* orders to assist in its pre-action discovery.

**136**    I have taken into account York counsel's submission that this was one of those frauds which cleverly left no paper trail. There always exists such a possibility. But that is not sufficient for obtaining a *Mareva* injunction. Obviously, York has put forward genuine issues requiring a trial. For the purposes of obtaining a pre-trial *Mareva* injunction, however, a party must meet a higher threshold on the merits and demonstrate that it has a strong *prima facie* claim. That higher requirement is imposed, in part, because of the more limited nature of the evidence adduced on an interlocutory motion and the difficulties faced by a motion judge in assessing credibility on an entirely written record.

**137**    Although York's Residence Improvement Claims are also characterized by diametrically

opposed stories as to whether Markicevic paid for any of the work or whether he knew York was picking up the tab, they do contain a material difference from the Wrongful Invoicing Claims. Whereas Markicevic denied any knowledge of the Wrongful Invoicing Claims, he admitted that he knew three York employees had spent time working at the Duntroon and Vaughan Residences. By way of explanation, he contended that he thought they were not on duty and he had paid them, claims denied by the employees. But, in his initial affidavit Markicevic included a lengthy section entitled, "My Ongoing Concerns with York's Culture". He deposed that he had worked to improve "accountability and transparency within my departments"; he sought to "combat what I viewed as a dysfunctional York culture, in which certain employees refused to comply with established management protocols"; and, "one issue that caused me a great deal of concern was the possibility that York employees, and in particular York tradespeople, might be 'moonlighting'". Yet, by his own admission, Markicevic enabled three employees to moonlight by doing jobs at his houses and, moreover, paying them in cash, hardly a method by which to ensure financial transparency in dealings with York employees.

**138**    Such a fundamental contradiction between what Markicevic professed to be his managerial policy designed to protect the interests of York and his actual use of York employees to work on his residences inclines me to place greater weight on the strength of York's case on these claims, notwithstanding the disputes in credibility amongst the key witnesses. However, York was not able to establish the second key requirement for the grant of a *Mareva* injunction - the existence of a real risk that Markicevic would remove his assets out of the jurisdiction or dispose of them within the jurisdiction so that he would be unable to satisfy a judgment made against him.

**139**    York's own evidence on the risk of dissipation was thin. Bellissimo deposed that York had serious concerns that the defendants might dissipate or abscond with funds belonging to York, but he provided no details. In its written and oral argument York submitted that the risk of dissipation of assets was evident in Markicevic's transfer of three assets - the two residences and a small airplane.

**140**    Shortly after his termination Markicevic used some of the termination payment to buy a small airplane for about $72,000. In February, 2011, Markicevic transferred title in the plane to a company, Direct Signal Ltd., in which his daughter was the sole director and shareholder. Markicevic and his daughter deposed that the plane was transferred to Direct Signal so that Mima could fall back on a career as a flight instructor if her plans to attend medical school did not work out. At the present time Mima does not have a pilot's licence, let alone an instructor's licence. While the evidence concerning the reason for the transfer of the plane strikes me as quite dubious, I do not regard the transfer as evidence of dissipation entitling York to *Mareva*-style relief for a very simple reason. Markicevic used part of York's termination payment to buy the plane. When York developed concerns about Markicevic in early 2010, a number of options were available to it. Most would not have involved paying Markicevic any money. But, York chose the option under which it paid him a very healthy severance package. By doing so it ran the risk that Markicevic might well spend some of that money. He did just that, and transferred one of his purchases to his daughter. I

do not think York is entitled to relief in respect of a risk which it created.

**141**    As to the Vaughan Residence, it was purchased, title placed in Mima's name and partly paid for before Markicevic's termination and before some the wrongful schemes alleged by York. I do not see how the taking of title by Mima back in 2008 constitutes evidence of a current risk of dissipation of this asset.

**142**    The evidence in respect of the Duntroon Residence is different. In my view, York has demonstrated a reasonable claim against the house on two bases. First, it has a reasonable claim that the residence benefited from work and services performed by York employees and which were paid for by York. Second, York has demonstrated a reasonable claim that the July, 2010 transfer of title from Markicevic to Fleming was a fraudulent conveyance. At that time Markicevic knew of York's continuing investigation into his activities, and his explanation that the transfer simply fulfilled an earlier separation agreement between himself and Fleming raises questions in light of the absence of any written separation agreement and the failure of Fleming to provide him with a written release of any support claims by her, the purported consideration for the transfer.

**143**    However, while the July, 2010 transfer of the Duntroon property constitutes some evidence of a risk that Markicevic might dissipate his assets, it really is the only relevant evidence adduced by York. By itself it does not justify the granting of a broad *Mareva* injunction against all of Markicevic's assets; a more tailored form of relief - a certificate of pending litigation - is available. Accordingly, I am not prepared to grant the *Mareva* injunction requested by York.

**D.2**

### York's request for certificates of pending litigation

**144**    I am satisfied that York is entitled to certificates of pending litigation against the Duntroon and Vaughan Residences. For reasons already stated, York has demonstrated reasonable claims to interests in both properties - on the basis of the claims of fraudulent conveyance and constructive trust for York-paid improvements in the case of the Duntroon Residence, and on the basis of a constructive trust claims for the Vaughan Residence.

**145**    Mima's counsel submitted that it would be unfair to order a certificate of pending litigation against the Vaughan property when on the evidence of a York expert witness, Mr. Strachan, the total value of the work performed by York employees on the Duntroon and Vaughan properties was no more than $20,000. I disagree. While I concluded that York had not demonstrated a strong *prima facie* claim that both residences benefited to the extent of $122,330 in goods and services provided by Ritacca as part of the CACRD scheme, York has demonstrated a reasonable claim in that regard sufficient to support the grant of certificates of litigation.

**146**    Moreover, under the June 14, 2012 Consent Order of Newbould J., Fleming and her daughter were entitled to encumber both residences in order to pay for their legal representation in this

action, but any such borrowed funds were to be held in trust by their lawyers until further order of this court. Janet obtained a $365,000 line of credit secured against the Duntroon Residence and placed $350,000 of the available funds in her lawyers' trust account. Both Janet and Mima seek an order from this Court releasing those funds to their lawyers for the payment of their accounts. Since both those defendants are looking to the Duntroon Residence as the source for the immediate payment of their legal fees and thereby significantly reducing the equity in the Duntroon Residence, I see no reason why any limit should be placed on the amount secured by a certificate of pending litigation against the Vaughan Residence.

**147**    Consequently, while I dismiss York's motion for a *Mareva* injunction against Markicevic, I grant York's motion for the issuance of certificates of pending litigation against the Duntroon and Vaughan Residences.


### XI.

**Request by Janet and Mima to access funds to pay their legal fees**

**148**    As observed, the Consent Order of Newbould J. permitted Janet and Mima to borrow against the two residences in order to finance their legal fees, but no funds could be released without the consent of York or the order of this Court. Janet and Mima now seek such an order so that the funds held in trust by their counsel, Bennett Jones, can be released to pay that firm's accounts.

**149**    They are entitled to such an order, but York raises an objection as to the amount, contending that the work product filed on these motions revealed that Markicevic, Fleming and Mima Markicevic are running joint defences and it would not be appropriate for Markicevic to "run his legal defence through the properties that allegedly belong to Fleming and Mima".

**150**    There is merit to York's submission. The Consent Order permitted encumbrances on the two properties for the benefit of Mima and Janet's legal defence, not that of Markicevic. The three family members filed joint materials on these motions. While co-operation between their counsel may well reduce their overall legal costs, Janet and Mima have to be able to demonstrate that the funds whose release they seek will only benefit them.

**151**    The materials filed on these motions do not enable me to figure out how much, if any, of the amounts billed by Bennett Jones covered work which benefited Markicevic. I would ask counsel to see whether they can reach an agreement on the amount of the Bennett Jones fees which benefited only Mima and Janet. If they can agree on an amount, that amount may be released to the law firm from the funds it presently holds in trust. If the parties cannot agree, then I would ask them to book a 9:30 appointment before me within the next 7 days so that I can determine how much to release. This matter must be dealt with this month.


### XII.

**York's motion for an *Anton Piller* order in respect of Markicevic's computer**

**152**    Initially, York sought *Anton Piller* orders in respect of the Duntroon and Vaughan Residences. By the time of the hearing York had reduced its request to an order requiring the delivery-up of Markicevic's computer and all relevant passwords to the Independent Supervising Solicitor, Stockwoods LLP,[33] to be examined for relevant electronic documentation, including e-mail correspondence. The computer is in the possession of Markicevic's counsel.

**153**    The request as presently framed arose on Markicevic's September 21, 2012 cross-examination when York's counsel asked for the production of all emails passing to or from Markicevic, on the one hand, and Ierullo, McCann and Phil Brown, on the other, as well as the email addresses for each of those individuals.[34] That then morphed into a request by York's counsel to have a consultant examine Markicevic's computer, look at the hard drive and pull up the identifiers for those three individuals. Markicevic's counsel took the request under advisement.

**154**    Then, in the answers to undertakings and advisements given by Markicevic, he responded that he would provide shortly copies of all the requested emails and the email addresses and, in regards to the request for a computer search, responded:

> The requested computer searches have been undertaken. As discussed in our answer above (Q. 527), no such emails were identified in those searches.

In its October 29 factum York questioned that response, pointing out that in his affidavits Markicevic had produced two emails from 2004 (albeit not to any of those individuals) and an August, 2009 email from Brown to Markicevic's personal gmail account.[35]

**155**    Markicevic, in his October 29 factum submitted that he had substantially complied with the request to produce emails passing between himself and Brown, McCann and Ierullo, and "the emails sought by the undertaking can reasonably be expected to be in the possession of the recipients, most of whom are witnesses for York."

**156**    If I have accurately described the issue which remained at the time of the hearing, I do not regard York's substantive request any longer as one for an *Anton Piller* order. Instead, the narrow issue strikes me more as one involving the scope of e-discovery under Rule 29.1. Markicevic's computer lies in the hands of his counsel; seizure under an *Anton Piller* is not required. At issue is whether data exists on the computer which are relevant to the issues in this action, specifically email correspondence involving Brown, McCann and Ierullo. Markicevic's undertaking answer stated that a search had been conducted and none was found; the parameters and protocol for the search were not disclosed. York questioned that result, pointing to the 2009 email from Brown. Counsel need to sit down, consult the *Sedona Canada Principles Addressing Electronic Discovery*, and develop a formal e-discovery plan, including one for the search of Markicevic's computer. That plan can address solicitor-client privilege issues. Given the nature of the allegations asserted in this action and the strong denial advanced by Markicevic, it probably would be in the interests of both parties to ensure that whatever data search ultimately is conducted of Markicevic's computer pursuant to the formal e-discovery plan be undertaken by an independent person.

**157**    Consequently, I am not prepared to make any order regarding a data search of Markicevic's computer in the absence of an attempt by the parties to agree upon a formal e-discovery plan. If the parties cannot agree on such a plan within a reasonable time, they should book a 9:30 appointment before me to discuss their respective versions of the proposed e-discovery plan.

## XIII. Summary and Costs

**158**    By way of summary, for the reasons set out above, I make the following orders:

> (i)    The motion for summary judgment by Markicevic, Fleming and Mima Markicevic is dismissed;
>
> (ii)    York's motion for a *Mareva* injunction is dismissed;
>
> (iii)    Certificates of pending litigation shall issue in respect of the Duntroon and Vaughan Residences;
>
> (iv)    The following paragraphs of the Consent Order of Newbould J. made June 14, 2012 shall continue in force: paragraphs 8, 11 and 12. The other paragraphs of the Consent Order are now spent. As to paragraph 8, it is varied so that Fleming and Mima may not further encumber either Residence without the prior consent of the plaintiff or an order of this Court;
>
> (v)    Counsel for the parties shall attempt to reach an agreement on the amount of the Bennett Jones fees which benefited only Mima and Janet. If they can agree on an amount, that amount may be released to the law firm from the funds it presently holds in trust. If the parties cannot agree, they must book a 9:30 appointment before me this month to determine how much should be released; and,
>
> (vi)    The parties shall develop a formal e-discovery plan which deals, in part, with the search of Markicevic's computer in the possession of his counsel for relevant data. The term "computer" includes all materials referred to in paragraph 12(b) of the Consent Order of Newbould J. made June 14, 2012. If the parties cannot agree on such a plan within a reasonable time, they should book a 9:30 appointment before me to discuss their respective versions of the proposed e-discovery plan.

**159**    In respect of the last point, I will case manage this proceeding. I would ask the parties to consult over the next few weeks to develop a plan for "next steps" which would see this matter proceed to trial in a reasonably quick fashion. Counsel shall book a one-hour case conference before me for some time in late February or early March, 2013.

**160**    I would note that York, in its Factum, stated that it sought leave to amend its Statement of Claim to plead facts against Markicevic relevant to its after-acquired cause claim. No notice of motion to that effect was delivered. If the parties cannot agree on the amendment, York may book a

9:30 appointment before me to deal with the matter.

**161**    I would encourage the parties to try to settle the costs of this motion, including considering whether the costs should be reserved to the trial judge. If they cannot, any party seeking costs may serve and file with my office written cost submissions, together with a Bill of Costs, by February 8, 2013. Any party opposing the award of costs may serve and file with my office responding written cost submissions by February 22, 2013. The costs submissions shall not exceed five (5) pages in length, excluding the Bills of Costs.

**162**    Any responding cost submissions should include a Bill of Costs setting out the costs which that party would have claimed on a full, substantial, and partial indemnity basis. If a party opposing a cost request fails to file its own Bill of Costs, I shall take that failure into account as one factor when considering the objections made by the party to the costs sought by any other party. As Winkler J., as he then was, observed in *Risorto v. State Farm Mutual Automobile Insurance Co.*, an attack on the quantum of costs where the court did not have before it the bill of costs of the unsuccessful party "is no more than an attack in the air".[36]

D.M. BROWN J.

cp/e/qlacx/qlpmg/qlced/qlrxg

1 2011 ONCA 764, paras. 1 and 2.

2 *Ibid*., para. 38.

3 *Ibid*., para. 38.

4 *Ibid*., para. 39.

5 *Ibid.,* paras. 40 to 45.

6 *Ibid*., para. 50.

7 *Ibid*., paras. 53-54.

8 *Ibid.*, para. 55.

9 Geoff R. Hall, *Canadian Contractual Interpretation Law, Second Edition* (Toronto: LexisNexis, 2012), s.7.10.1.

10 2000 BCCA 291, paras. 17 and 18.

11 *Penderville Apts. Development Partnership v. Cressey Development Corp.* (1990), 43 B.C.L.R. (2d) 57 (B.C.C.A.).

12 *Athwal v. Black Top Cabs Ltd.*, 2012 BCCA 107, para. 45; *P.C. Devlin Law Corp. v. 403827 B.C. Ltd.,* 2011 BCSC 1255, para. 29.

13 *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*, 2008 ONCA 587, para. 111.

14 [2001] 1 All E.R. 961 (H.L.), para. 19.

15 *Ibid.*, para. 32.

16 (2007), 85 O.R. (3d) 616 (C.A.), para. 56.

17 Affidavit of Michael Markicevic sworn July 23, 2012, paras. 71 and 73.

18 Hall, *supra.*, s. 2.3.4.

19 Hall, *supra.*, s. 3.1.1.

20 Peter F.C. Howard and Samaneh Hosseini, *Evidence and Process in Canadian Court for Contract Interpretation: Time to Grasp the Nettle on Drafts, Negotiations & Communicated Subjective Intention*, 2012 Annual Review of Civil Litigation (Toronto: Carswell, 2012), p. 181.

21 (1997), 145 D.L.R. (4th) 729 (B.C.C.A.), para. 13.

22 *China Software Corp. v. Leimbigler*, [1989] B.C.J. No. 1138 (B.C.S.C.); *Francis v. Dingman* (1983), 43 O.R. (2d) 641 (C.A.), para. 30.

23 2002 ABCA 182.

24 *Radhakrishnan,* para. 69.

25 (2001), 38 R.P.R. (3d) 239 (Ont. S.C.), para. 38, aff'd [2002] O.J. No. 3795 (C.A.).

26 Kevin P. McElcheran, *Commercial Insolvency in Canada, Second Edition* (Toronto: LexisNexis, 2011), pp. 78-79.

27 [2008] 3 S.C.R. 41, paras. 40 and 49.

28 Section 3 provides: "Section 2 does not apply to an ... interest in real property ... conveyed

upon good consideration and in good faith to a person not having at the time of the conveyance to the person notice or knowledge of the intent set forth in that section."

29 See *Aetna Financial Services Ltd. v. Feigelman*, [1985] 1 S.C.R. 2 and the cases cited in *Sibley & Associates LP v. Ross* (2011), 106 O.R. (3d) 494 (S.C.J.), para. 11.

30 *Waxman v. Waxman*, [1991] O.J. No. 89 (Gen. Div.)

31 See the discussion of these factors in *572383 Ontario Inc. v. Dhunna* (1987), 24 C.P.C. (2d) 287.

32 Transcript of cross-examination of Jack McCann, QQ. 215-6.

33 Brian Gover swore an affidavit dated November 1, 2012 stating that he would act as an officer of the court to carry out the terms of an *Anton Piller* order and that York had made available Forese Forensic Partners Ltd. to act as independent information and technology experts.

34 Transcript of Markicevic's September 21, 2012 Cross-examination, Q. 526 *et seq*.

35 Markicevic July 23, 2012 affidavit, Exhibit 31.

36 (2003), 64 O.R. (3d) 135 (S.C.J.), para. 10, quoted with approval by the Divisional Court in *United States of America v. Yemec*, [2007] O.J. No. 2066 (Div. Ct.), para. 54.

*Indexed as:*
## Zelmer v. Victor Projects Ltd.


**Between**
**Ted Robert Thomas Zelmer, Susan Zelmer, Rometsch Enterprises**
**Ltd., and Kelowna Management Inc., plaintiffs (respondents),**
**and**
**Victor Projects Ltd., defendant (appellant), and**
**D.E. Pilling & Associates Ltd., and Dale Pilling, defendants**
**(respondents)**

[1997] B.C.J. No. 1044

147 D.L.R. (4th) 216

[1997] 6 W.W.R. 536

[1997] 7 W.W.R. 170

90 B.C.A.C. 302

34 B.C.L.R. (3d) 125

9 R.P.R. (3d) 313

70 A.C.W.S. (3d) 1104

1997 CanLII 4068

Vancouver Registry No. CA021163


British Columbia Court of Appeal
Vancouver, British Columbia

**Hinds, Rowles and Braidwood JJ.A.**

Heard: March 10, 1997.
Judgment: filed May 7, 1997.

(24 pp.)

*Real property -- Easements, licences and prescriptive rights -- Creation by implication of law -- Estoppel.*

This was an appeal from a decision that the plaintiffs were entitled to an easement over the defendant's land. The parties were adjoining landowners. The plaintiffs had constructed a water reservoir on land owned by the defendant, based on the plaintiffs' expectation, arising from representations made by the principal and an agent of the defendant, that the plaintiffs would acquire an easement over the defendants' lands occupied by the water reservoir and its ancillary pipes. At a meeting on site on August 2, 1992, the principal of the defendant agreed that the plaintiffs could construct the water reservoir on his land, at a location which the plaintiffs' witnesses testified was the location at which it was later installed. On August 11, 1992, one plaintiff faxed particulars of the easement to the defendant, who did not respond. A fax of the plaintiff's agent on August 13 confirmed the location. The statement by the defendant to the effect that he would be a good neighbour and would not require compensation for the land which would be subject to the easement, confirmed that the easement would be given gratuitously. The trial judge found that proprietary estoppel had been established.

HELD: The appeal was dismissed. There was ample evidence to support the findings of fact which the trial judge made in the course of his reasons for judgment. In the absence of palpable and overriding error, those findings of fact should not be disturbed. The plaintiffs established their claim against the defendant on the basis of proprietary estoppel. The words of the principal of the defendant and his agent led the plaintiffs to believe that they had approval to build the reservoir, and would be granted an easement.

**Counsel:**

Alfred C. Kempf, for the appellant (defendant).
Michael R. Dirk, for the respondents (plaintiffs).

---

Reasons for judgment were delivered by Hinds J.A.:--

INTRODUCTION

1      This appeal involves consideration of the doctrine of proprietary estoppel.

2      Briefly stated, the trial judge, Mr. Justice Lowry, found that the respondents (plaintiffs) had constructed a water reservoir on land owned by the appellant (the defendant) which was located adjacent to the plaintiffs' lands. The plaintiffs had constructed the reservoir in the expectation, arising from what the principal of the defendant, Mr. R.J. Bennett, and an agent of the defendant,

Mr. Wayne Tomlinson, had said or done, that they, the plaintiffs, would acquire an easement over the defendant's lands to embrace the land occupied by the water reservoir and its ancillary water lines or pipes. Based upon the equitable doctrine of proprietary estoppel the trial judge granted a declaration that the plaintiffs were entitled to the easement. The defendant has appealed that decision.

**3**    Shortly before the date set for the hearing of the appeal, the defendant abandoned its appeal with respect to an award of special costs against it in favour of the second respondents, D.E. Pilling & Associates Ltd. and Dale Pilling. They are therefore no longer involved in this appeal.

ISSUE

**4**    Based upon the doctrine of proprietary estoppel, did the learned trial judge err in granting the declaration that the plaintiffs were entitled to an easement over the defendant's land.

FACTUAL BACKGROUND

**5**    In 1992 Rometsch Enterprises Ltd. and Kelowna Management Inc. jointly owned approximately 23 acres of land (the Rometsch-Kelowna land) located on Mount Boucherie in the Kelowna area upon which they intended to develop a 33 lot subdivision. It bordered approximately 150 acres of land owned by the defendant.

**6**    Mr. and Mrs. Zelmer owned approximately 18 acres of land (the Zelmer land) upon which they intended to develop a 14 lot subdivision. It bordered the defendant's land to the southeast.

**7**    In order to proceed with the two subdivisions the owners of the Rometsch-Kelowna land and the owners of the Zelmer land (the plaintiffs) retained Dale Pilling and his company, D.E. Pilling & Associates Ltd., to design and develop the subdivisions and to obtain the necessary permits and approvals therefor. It was determined that a water system would be required and that it would entail the construction of a water reservoir on land at a higher elevation than the lands owned by the plaintiffs. A site for the reservoir on the defendant's land, or alternatively on adjacent Crown land, appeared to be suitable.

**8**    On or about 23 June 1992 Mr. Pilling approached Mr. Bennett concerning the construction of the water reservoir on the defendant's land. The result of that meeting was inconclusive. Nevertheless Mr. Pilling caused a survey and a contour sketch to be prepared which showed the proposed location of the reservoir. He faxed those documents to Mr. Bennett for his consideration.

**9**    During July 1992 the development of the subdivision of the Rometsch-Kelowna land proceeded and it became necessary to deal with the water system and the location of the reservoir.

**10**    By prior arrangement, on 5 August 1992 Mr. Pilling met Mr. Wayne Tomlinson in the area of the proposed subdivisions. Mr. Tomlinson was a professional engineer who had acted for Mr.

Bennett or his companies with respect to previous subdivisions. The purpose of the meeting on 5 August was to discuss the possibility of constructing a road that would connect a road in the plaintiffs' subdivision with a road in a subdivision developed on a lower portion of the defendant's land. It became apparent that an inter-connecting road was not feasible.

**11**    On 6 August 1992 a further meeting was held on the defendant's land. It was an important meeting with respect to this litigation. Mr. Pilling had arranged the meeting. In attendance were Mr. Pilling, Gordon Bower, a field representative of the Pilling firm, Mr. Ted Zelmer, Mr. Edward Jeffery, the administrator of the Lakeview Area Irrigation District, Mr. Bennett, and Mr. Tomlinson.

**12**    The trial judge summarized the evidence as to what occurred at that meeting as follows:

> Mr. Pilling says that all of those attending met and walked up to the bench area together. Mr. Bennett took exception to what was to be a 60 by 30 foot concrete structure being built there because it would have been above ground and visible from his subdivision below. Mr. Pilling suggested that it be located somewhat further to the north (a distance of less than 60 feet) and set back into the hill -- the location where in fact it was ultimately built -- where it could be completely buried. Mr. Pilling says Mr. Bennett did not seem to have any problem with that as long as it could not be seen. He says they walked around that area. He suggested having the value of the land that would be used appraised so that Mr. Bennett could be fairly compensated and he said he would arrange to have his survey crew flag the site that was being discussed as soon as possible so that it could be inspected before construction began. He does not recall whether Mr. Bennett said he would look at it once it was flagged or not.

> Mr. Bennett's recollection is quite different. He says that after meeting the others where they had parked their vehicles he was asked to walk up to the bench area to consider the reservoir proposal and he reiterated he was not prepared to have a reservoir that would be of no value to him built on his land. Mr. Pilling asked him to go up and take a look anyway. He and the others did but he continued to say "no!" until, just as they were leaving, when he and Mr. Pilling were apparently alone, Mr. Pilling suggested putting the reservoir into a gulley on what was a very steep part of the hillside some greater distance north of the bench area than where it was built, perhaps beyond what is in fact Victor Projects property. Mr. Bennett says he questioned whether the location was on his property but said, that if it was, the reservoir could be built there. He said he told Mr. Pilling "he could have it" and he accepts that he would have granted an easement had the reservoir been built in that location. He has no recollection of any discussion at that time about an appraisal. He says there may have been something said about the site being flagged but Mr. Pilling had to determine

whether the location was on Victor Projects' property and then, if it was, the two of them would return to the site together.

I digress here to say that it is the account of the site meeting given by Mr. Pilling that is generally supported by the others who were there and who have testified. Mr. Bower, Mr. Zelmer, and Mr. Jeffery all say that Mr. Bennett was amenable to locating the reservoir where it was ultimately built, set back into the hillside off the bench area. Mr. Tomlinson, the only other person there, and the only person there at Mr. Bennett's behest, has not testified.

**13**    Following the 6 August meeting Mr. Pilling caused his crew to survey the site of the proposed location of the reservoir and to erect flags to indicate the corners of the reservoir. He prepared a computer plan, drawn to scale, indicating the area of the easement that would be required.

**14**    On 11 August 1992 Mr. Pilling sent a copy of the plan to Mr. Bennett by means of the following fax:

Attached is a copy of the Easement proposed for the Lakeview Reservoir. - We have retained the firm of Kent, MacPherson Appraisals to ascertain the value.

Please advise of your acceptance of this location.

**15**    On the same date Mr. Pilling sent a copy of the plan to Mr. Tomlinson by means of the following fax:

Attached is a copy of the easement proposed for the reservoir on RJ's property. The site has been staked, and falls in the location we looked at on Thursday morning.

Please advise of any concerns you may have with this site.

**16**    Mr. Bennett did not respond to the fax he received from Mr. Pilling; he simply set it to one side. However, on 13 August 1992, without speaking to Mr. Bennett or obtaining instructions from him, Mr. Tomlinson faxed Mr. Pilling as follows:

I reviewed your drawing of the proposed reservoir easement required on Mr. Bennett's Mt. Boucherie property, that was sent over Aug 11/92.

The location as reviewed in the field on August 6/ would not interfer[e] with proposed development on the Mt. Boucherie property, therefore we do not have

any concerns with the proposed location.

It will be necessary for you to get formal approval from Mr. Bennett for the easement noted.

**17**    On 18 August 1992 Mr. Pilling instructed William Gossett, of Kent-MacPherson Appraisals in Kelowna to prepare an appraisal to establish the amount of compensation to be paid by the plaintiffs to the defendant for the easement. Mr. Gossett was well known to Mr. Bennett from previous occasions on which he had acted for Mr. Bennett's companies. Mr. Gossett contacted Mr. Bennett who told him he would be a good neighbour and did not want any compensation for the easement. Mr. Bennett testified that he told Mr. Gossett he would "give it to them". Mr. Gossett reported back to Mr. Pilling who thereupon caused a contractor to proceed with the construction of the reservoir.

**18**    It is noted that para. 2 of the amended statement of defence specifically admitted that the defendant offered gratuitously to allow construction of the reservoir on a portion of the defendant's land.

**19**    Prior to the end of August 1992 construction of the reservoir began. It was substantially completed by mid-October, at a cost to the plaintiffs of approximately $108,000.

**20**    Mr. Bennett testified that on Thanksgiving Day in 1992 he went horseback riding on the defendant's land and observed, to his displeasure, the location of the reservoir. He testified that the next day he telephoned Mr. Pilling and told him the reservoir had been constructed in the wrong location and that it would have to be removed. Mr. Pilling denied he had received the telephone call the day after Thanksgiving. He testified that he, with other employees, had been away from their office all that day attending a conference concerning computers. He said he was not telephoned by Mr. Bennett until some time in November 1992. It was not until 18 December 1992 that Mr. Bennett notified Mr. Jeffery, the District Administrator, that the location of the reservoir was not satisfactory to him and that he would not sign the easement documents. All parties understood that the easement, when granted, would have to be in the name of the Irrigation District, as it was to be responsible for the preservation and maintenance of the reservoir and the water system.

**21**    Under the heading of "Conclusion", the trial judge stated:

It appears quite evident that Mr. Bennett must have had a different location in mind than the site where the reservoir was built. But, regardless of what he may have intended, by whatever he said in the course of the discussion on August 6th, he led not only Mr. Pilling but all of those who were at the meeting to believe that he was agreeable to the reservoir being constructed just to the north of the bench area and set back into the side of the hill. Then, perhaps more importantly, two days after Mr. Pilling had reported that the site had been staked and asked if the location was acceptable, Mr. Tomlinson told him there was no

concern about it. I can see no reason why Mr. Pilling should not have assumed Mr. Tomlinson was speaking for Mr. Bennett and that there was then no question that the reservoir could be built where it was in fact constructed. Indeed, once any allegation of fraudulent conduct is put to one side, it appears to me to be virtually beyond question that Mr. Pilling had every reason to proceed as he did. His clients are entitled to the declaration they seek.

**22**    In the course of his reasons for judgment Lowry J. made a number of findings, including the following:

1. That Mr. Pilling's testimony of what occurred at the meeting on the site on 6 August 1992 was generally supported by the other persons who were present, and who testified at the trial. Mr. Tomlinson, who the trial judge considered to be the agent of the defendant, was not called by the defendant to testify at the trial. The trial judge drew an inference adverse to the defendant for its unexplained failure to call Mr. Tomlinson as a witness.
2. That Mr. Tomlinson had attended the 6 August 1992 meeting at the request of Mr. Bennett.
3. That Mr. Tomlinson was acting with at least the apparent authority of Mr. Bennett when he sent his fax to Mr. Pilling on 13 August 1992.
4. That as a result of the tenor of the dealings between Mr. Bennett and Mr. Pilling, the receipt of the fax from Mr. Tomlinson indicating there was no concern about the location, and the information conveyed by Mr. Gossett to Mr. Pilling that Mr. Bennett did not require payment, Mr. Pilling understood he could proceed with construction of the reservoir on the defendant's land without further contact with Mr. Bennett.
5. That the water reservoir was constructed on the defendant's land at the location agreed upon at the 6 August 1992 meeting and as shown on the plan faxed by Mr. Pilling to Mr. Bennett, and to Mr. Tomlinson, on 11 August 1992.
6. That Mr. Bennett was prepared to grant, gratuitously, the easement for the area occupied by the reservoir and its ancillary works if it was located in an area where he, mistakenly, believed it was to be located.

**23**    In my view there was ample evidence to support the foregoing findings of fact. In the absence of palpable and overriding error those findings of fact should not be disturbed. It is not the function of this Court to retry the case: see Stein v. The "Kathy K", [1976] 2 S.C.R. 802.

DISCUSSION

**24**    The concept of proprietary estoppel was considered in Crabb v. Arun District Council, [1976]

1 Ch. 179 (Eng.C.A.). The facts of the case are complicated but the following is a sufficient summarization of the facts for the purpose of this appeal.

**25**    The plaintiff owned two acres of land. At a location (point A) approximately one-quarter of the way south of the northerly boundary of the land, on the easterly boundary, access was provided to a road constructed on the defendant's 3 parcel of land which lay to the east of the plaintiff's land. The plaintiff decided to divide his land into two one acre parcels. At a meeting between the plaintiff, his architect, and a representative of the defendant District Council, it was verbally agreed that the plaintiff would have access to the road at a location (point B) approximately three-quarters of the distance south of the northerly boundary of the property, on the easterly boundary of the plaintiff's land. Later, the defendant fenced the boundary between the plaintiff's land and the road, but at points A and B erected costly gates.

**26**    The plaintiff sold the northerly one acre portion of his land in October 1968 with the right of access at point A and easement to the road, without reserving any right in favour of the southerly one acre parcel to have access to the road at point A by means of an easement over the northerly one acre parcel.

**27**    The plaintiff padlocked the gate at point B to prevent vehicles associated with the defendant from coming onto his property. In retaliation, the defendant removed the gate at point B and fenced the gap, thereby causing the southerly acre of land, still owned by the plaintiff, to be landlocked. There was no legal access to the road on the defendant's land or to any other road. The defendant offered to grant access and an easement to the southerly one acre parcel of land, but at a substantial cost.

**28**    The plaintiff brought an action claiming a right of access at point B and a right of way along the road on the defendant's land.

**29**    The trial judge found that as a result of the meeting between the plaintiff and a representative of the District Council there was an agreement in principle that the plaintiff should have an additional access at point B because it was envisaged that he would sell his two acres of land in two portions; the northerly portion with access to the road at point A, and the southerly portion, with access to the road at point B. The trial judge, however, found that there was no definite assurance to that effect and, even if there had been such an assurance, it would not have been binding in the absence of either writing or consideration.

**30**    On appeal, Lord Denning pointed out that the plaintiff had no right of access at point B with a right of way along the road because there was no deed, conveyance or written agreement. On this basis the defendant District Council was entitled to its land, subject to an easement at point A but not at point B. However, to overcome the strictness of the law, the plaintiff claimed a right of access at point B on the ground of proprietary estoppel. Lord Denning concluded that the District Council had led the plaintiff to believe that he had, or would be granted, a right of access at point B. He considered it would be inequitable for the District Council to insist upon its strict legal rights and

accordingly granted the plaintiff a right of access at point B and a right of way along the road together with a declaration that he had an easement.

31      After setting forth the facts of the case in considerable detail Lord Denning stated, at 187:

> When Mr. Millett, for the plaintiff, said that he put his case on an estoppel, it shook me a little: because it is commonly supposed that estoppel is not itself a cause of action. But that is because there are estoppels and estoppels. Some do give rise to a cause of action. Some do not. In the species of estoppel called proprietary estoppel, it does give rise to a cause of action.

32      It is noted that Lord Denning concluded that there is a difference between proprietary estoppel and promissory estoppel. In his view the former, but not the latter, can give rise to a cause of action.

33      Lord Denning continued at 187-188 and stated:

> The basis of this proprietary estoppel as indeed of promissory estoppel is the interposition of equity. Equity comes in, true to form, to mitigate the rigours of strict law. The early cases did not speak of it as "estoppel". They spoke of it as "raising an equity". If I may expand what Lord Cairns L.C. said in Hughes v. Metropolitan Railway Co. (1877) 2 App.Cas. 439, 448: "it is the first principle upon which all courts of equity proceed," that it will prevent a person from insisting on his strict legal rights whether arising under a contract, or on his title deeds, or by statute when it would be inequitable for him to do so having regard to the dealings which have taken place between the parties.
>
> What then are the dealings which will preclude him from insisting on his strict legal rights? If he makes a binding contract that he will not insist on the strict legal position, a court of equity will hold him to his contract. Short of a binding contract, if he makes a promise that he will not insist upon his strict legal rights then, even though that promise may be unenforceable in point of law for want of consideration or want of writing - then, if he makes the promise knowing or intending that the other will act upon it, and he does act upon it, then again a court of equity will not allow him to go back on that promise: see Central London Property Trust Ltd. v. High Trees House Ltd. [1947] K.B. 130 and Charles Rickards Ltd. v. Oppenhaim [1950] 1 K.B. 616, 623. Short of an actual promise, if he, by his words or conduct, so behaves as to lead another to believe that he will not insist on his strict legal rights knowing or intending that the other will act on that belief and he does so act, that again will raise an equity in favour of the other; and it is for a court of equity to say in what way the equity may be satisfied. The cases show that this equity does not depend on agreement but on words or conduct. In Ramsden v. Dyson (1866) L.R. 1 H.L. 129, 170 Lord

> Kingsdown spoke of a verbal agreement "or what amounts to the same thing, an expectation, created or encouraged." In Birmingham and District Land Co. v. London and North Western Railway Co. (1888) 40 Ch.D. 268, 277, Cotton L.J. said that "... what passed did not make a new agreement, but ... what took place ... raised an equity against him?" And it was the Privy Council in Plimmer v. Wellington Corporation (1884) 9 App.Cas. 699, 713-714 who said that "... the court must look at the circumstances in each case to decide in what way the equity can be satisfied" giving instances.

<div align="center">(emphasis added)</div>

**34** The third basis upon which a defendant may be precluded from insisting on his legal rights (which I have emphasized in the foregoing quotation from the judgment of Lord Denning) was applied by Lord Denning to the facts of the appeal brought by Mr. Crabb, to grant relief to him on the basis of proprietary estoppel.

**35** The principle in the Crabb case was interpreted by Megaw L.J. in Western Fish Products Ltd. v. Penwith District Council, [1981] 2 All E.R. 204 at 217 as follows:

> In our judgment what was decided in that case was this: when A to the knowledge of B acts to his detriment in relation to his own land in the expectation, encouraged by B, of acquiring a right over B's land, such expectation arising from what B has said or done, the court will order B to grant A that right on such terms as may be just. This principle is a development of what was stated in Ramsden v. Dyson (1866) LR 1 HL 129 at 144, 168, 170, per Lord Cranworth LC, Lord Wensleydale and Lord Kingsdown. There have been a number of reported cases since then in which the principle enunciated in Ramsden v Dyson has been applied (see, for example, Plimmer v Wellington Corpn (1884) 9 App Cases 699 and Inwards v Baker [1965] 1 All ER 446, [1965] 2 QB 29). In all these cases the court was concerned with the creation by estoppel of rights and interests in or over land.

**36** A few months after the decision in Western Fish Products, Lord Denning affirmed his decision in Crabb, in his judgment in Amalgamated Investment & Property Co. Ltd. (in Liquidation) v. Texas Commerce International Bank Ltd., [1981] 3 All E.R. 577. At 584 he spoke thus:

> The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by acquiescence and promissory estoppel. At the

same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence; estoppel cannot give rise to a cause of action; estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption (either of fact or of law, and whether due to misrepresentation or mistake, makes no difference), on which they have conducted the dealings between them, neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

**37**    The foregoing statement is a helpful exposition of the historical formulation of equitable estoppel with its different forms and limitations, its flexibility, the reluctance to classify it into different categories and the underlying principle of what equity entails - that justice be done.

**38**    The extract from Lord Denning's judgment in Crabb at 187-188, to which I have referred, was quoted with approval by this Court in Hastings Minor Hockey Association, Eaton and Christofferson v. Pacific National Exhibition (1982), 32 B.C.L.R. 1. Anderson J.A., who delivered the written reasons for judgment of the Court, stated at 7:

It is apparent from the reasons for judgment that the chambers judge held that an equity had been raised in favour of the association, not by agreement but by the conduct of P.N.E. It follows that the chambers judge concluded that the P.N.E.'s conduct met the requirements stated by Lord Denning M.R. in the passage from the judgment in Crabb to which I have added emphasis in the above quotation. In my opinion, the determinative issue is whether there was any evidence to support the chambers judge's finding that the conduct of the P.N.E. was such as to bring the case within the principles to be applied where there is no actual agreement and conduct alone is relied upon.

**39**    After reviewing the evidence, Anderson J.A. was unable to find evidence of conduct on the part of the appellant P.N.E. sufficient to invoke the principles enunciated in the Crabb case and, consequently, the appeal was allowed.

**40**    While Anderson J.A. did not specifically state that proprietary estoppel can give rise to a cause of action, it is apparent that he recognized that possibility. At 5-6 he observed:

The chambers judge did not deal with the claim for an injunction on the basis of the agreement alleged in the endorsement of the writ, but based his decision on proprietary estoppel. His reasons in that respect read in part as follows [at p.236]:

> The case for the association is: that the P.N.E. by its conduct over many years, led the association to believe that the good community relations evidenced by the annual renewal of its licence would be continued; that the P.N.E. knew the association expected the P.N.E. to carry on as it always did; and that for these reasons the association made plans for its new season, did not seek other arrangements or abandon its members and cannot now make other suitable arrangements. The association does not say it has a right of perpetual renewal, only reasonable notice of termination of their long-standing relationship.

> He went on to hold that the conduct of the P.N.E. raised an equity in favour of the association in accordance with the judgment of Lord Denning M.R. in Crabb v. Arun Dist. Council, [1976] 1 Ch. 179, [1975] 3 All E.R. 865 (C.A.).

**41**    Another British Columbia case to which reference should be made is Stiles v. Tod Mountain Development Ltd. (1992), 64 B.C.L.R. (2d) 366, a decision of Huddart J. (as she then was). The case involved the doctrine of proprietary estoppel. After referring to a number of authorities, including the judgment of Lord Denning in the Amalgamated Investment case, and in Snell's Equity, 29th ed. (London: Sweet & Maxwell, 1990), at 573-74, she summarized her opinion by stating, at 375:

> Thus, where a party expends money on the land of another under an expectation created or encouraged by the owner, or even where the landowner merely stands silent, the authorities establish that proprietary estoppel may found a cause of action, a revocable licence may be rendered irrevocable, or the party's interest may be found in a licence coupled with an equity, the circumstances may establish a contract between the parties, or equity may require that the fee simple be transferred. The equity is enforceable against a successor in title who takes with notice.

**42**    Counsel for the appellant contended that the plaintiffs could not found their action on estoppel. He referred to the decision of the Supreme Court of Canada in Canadian Superior Oil v. Hambly, [1970] S.C.R. 932. At 937 Martland J., who delivered the judgment of the Court, stated:

> But, subject to the equitable rule as to acquiescence, which has sometimes been described as estoppel by acquiescence, and to which I will refer later, a cause of action cannot be founded upon estoppel: Low v. Bouverie, Combe v. Combe, Spencer Bower & Turner on Estoppel by Representation, 2nd ed., p.279, para. 289.

**43**    It is noted that Martland J.'s statement that a cause of action cannot be founded on estoppel is subject to the qualification of the operation of the equitable rule of acquiescence or, as he

characterized it, of "estoppel by acquiescence".

**44**    I digress to observe that proprietary estoppel is a modern term used to describe estoppel by encouragement or by acquiescence: see Spencer Bower and Turner, The Law Relating to Estoppel by Representation, 3rd ed. (London: Butterworths, 1977), at 306: Proprietary estoppel

> It has recently become fashionable to use the term "proprietary estoppel" to signify the doctrine which we have been discussing above under the name of estoppel by encouragement or acquiescence; and, so long as it is understood that this terminology does not produce a new estoppel, but is effective only to assign a new name to an old and well-established one, there can be no objection to the new term.

**45**    Later, at 938-9, Martland J. in Canadian Superior Oil v. Hambly, (supra) referred to the equitable defence of estoppel by acquiescence and observed:

> We do not have here evidence to support an allegation of fraud, of the kind which was defined by Fry J., when dealing with the equitable defence of acquiescence, in his well-known statement in Willmott v. Barber (1880), 15 Ch.D. 96, at p.105:
>
>> It has been said that the acquiescence which will deprive a man of his legal rights must amount to fraud, and in my view that is an abbreviated statement of a very true proposition. A man is not to be deprived of his legal rights unless he has acted in such a way as would make it fraudulent for him to set up those rights. What, then, are the elements or requisites necessary to constitute fraud of that description? In the first place the plaintiff must have made a mistake as to his legal rights. Secondly, the plaintiff must have expended some money or must have done some act (not necessarily upon the defendant's land) on the faith of his mistaken belief. Thirdly, the defendant, the possessor of the legal right, must know of the existence of his own right which is inconsistent with the right claimed by the plaintiff. If he does not know of it he is in the same position as the plaintiff, and the doctrine of acquiescence is founded upon conduct with a knowledge of your legal rights. Fourthly, the defendant, the possessor of the legal right, must know of the plaintiff's mistaken belief of his rights. If he does not, there is nothing which calls upon him to assert his own rights. Lastly, the defendant, the possessor of the legal right, must have encouraged the plaintiff in his expenditure of money or in the other acts which he has done, either directly or by abstaining from asserting his legal right. Where all these elements exist, there is fraud of such a nature

> as will entitle the Court to restrain the possessor of the legal right from
> exercising it, but, in my judgment, nothing short of this will do.

**46**    The foregoing quotation from the judgment of Fry J. in Willmott v. Barber, was quoted with approval by Scarman L.J., in the Crabb case, at 194-5.

**47**    Immediately following the quotation from Willmott v. Barber, Scarman L.J. gave the following illuminating explanation of the use of the term "fraud" by judges in the last century:

> Mr. Lightman, in the course of an interesting and vigorous submission,
> drew the attention of the court to the necessity of finding something akin to fraud
> before the equity sought by the plaintiff could be established. "Fraud" was a word
> often in the mouths of those robust judges who adorned the bench in the 19th
> century. It is less often in the mouths of the more wary judicial spirits today who
> sit upon the bench. But it is clear that whether one uses the word "fraud" or not,
> the plaintiff has to establish as a fact that the defendant, by setting up his right, is
> taking advantage of him in a way which is unconscionable, inequitable or unjust.
> It is to be observed from the passage that I have quoted from the judgment of Fry
> J., that the fraud or injustice alleged does not take place during the course of
> negotiation, but only when the defendant decides to refuse to allow the plaintiff
> to set up his claim against the defendants' undoubted right. The fraud, if it be
> such, arises after the event, when the defendant seeks by relying on his right to
> defeat the expectation which he by his conduct encouraged the plaintiff to have.
> There need not be anything fraudulent or unjust in the conduct of the actual
> negotiations the conduct of the transaction by the defendants.

**48**    Based on the foregoing analysis I conclude that, in appropriate circumstances, a cause of action can be based on the doctrine of proprietary estoppel.

**49**    The "appropriate circumstances" may arise as stated by Megaw L.J. in Western Fish Products Ltd. v. Penwith District Council, (supra) at 217, where he interpreted the judgment of Lord Denning in Crabb in the following manner:

> ... when A to the knowledge of B acts to his detriment in relation to his own land
> in the expectation, encouraged by B, of acquiring a right over B's land, such
> expectation arising from what B has said or done, the court will order B to grant
> A that right on such terms as may be just.

## APPLICATION OF THE LAW

**50**    I now turn to consider whether, on the facts of this case, the plaintiffs established their claim against the defendant on the basis of proprietary estoppel.

**51**    I shall consider the question on the basis of the third alternative expressed by Lord Denning in Crabb: i.e.

> ... if he, by his words or conduct, so behaves as to lead another to believe that he will not insist on his strict legal rights - knowing or intending that the other will act upon that belief - and he does so act ...

**52**    At the meeting on site on 6 August 1992 Mr. Bennett agreed that the plaintiffs could construct the water reservoir on his land at a location which the plaintiffs' witnesses testified was the location at which it was in fact installed. On 11 August 1992 Mr. Pilling faxed to Mr. Bennett the particulars of the easement to which Mr. Bennett did not respond. The fax of his agent, Mr. Tomlinson, to Mr. Pilling on 13 August confirmed the location. The statement by Mr. Bennett to Mr. Gossett to the effect that he would be a good neighbour and would not require compensation for the land which would be subject to the easement, confirmed that the easement would be given on a gratuitous basis. In my view the words or conduct of Mr. Bennett, including those of his agent Mr. Tomlinson, taken as a whole, led the plaintiffs to believe that they had the approval of Mr. Bennett to construct the reservoir and would be granted an easement. I find that the equitable doctrine of proprietary estoppel has been established.

**53**    In my view proprietary estoppel was established in this case. That being so, it was for the learned trial judge to determine the way in which the equity would be satisfied. The trial judge granted the declaration sought by the plaintiffs, that Lakeview Area Irrigation District was entitled to an easement over a portion of the defendant's land in the form of easement agreed upon between the parties prior to the commencement of trial.

**54**    In my view, the trial judge did not err in concluding that proprietary estoppel had been established, or in granting the declaration concerning the easement. For the foregoing reasons, I would dismiss the appeal.

HINDS J.A.
 ROWLES J.A.:-- I agree.
 BRAIDWOOD J.A.:-- I agree.

cp/d/jep/DRS/qlgxc

# THE
# DICTIONARY
## OF
# CANADIAN
# LAW

## Fourth Edition

by
Daphne A. Dukelow, B.Sc., J.D., LL.M.
of the British Columbia Bar

**CARSWELL**®

**BEGIN**

**BEGIN**. *v.* To start, to commence. See RIGHT TO ~.

**BEHAVIOUR**. *n.* Conduct; comportment. See GOOD ~; MIS~.

**BEING**. *adj.* Living; existing. See IN ~.

**BELIEF**. *n.* " ... [M]ore than acceptance, and involves knowledge, probably knowledge of consequences ... *R. v. Budin* (1981), 20 C.R. (3d) 86 at 96, 32 O.R. (2d) 1, 58 C.C.C. (2d) 352, 120 D.L.R. (3d) 536 (C.A.), Brooke J.A. (concurring). See HONEST ~.

**BELIEVE**. See REASONABLE GROUND TO ~.

**BELLIGERENT**. *n.* A country or group of people waging war as determined by the law of nations.

**BELITTLE**. *v.* To make one appear inferior to another.

**BELLO PARTA CEDUNT RESPUBLICAE**. [L.] The spoils of war belong to the Crown.

**BELLUM JUSTUM**. [L.] Just war.

**BELONG**. *v.* 1. To be the property of, to be owned. 2. " ... [B]roader than legal ownership." *Agnew v. Ontario Regional Assessment Commissioner, Region No. 7* (1990), 1 M.P.L.R. (2d) 13 8 at 140, 74 D.L.R. (4th) 154 (Ont. Gen. Div.), Philp J.

**BELOW**. See COURT ~.

**BELOW PAR**. At a price lower than face or nominal value; at a discount.

**BELT**. See SAFETY ~; SEAT ~.

**BENCH**. *n.* 1. The judge's seat in a court. 2. A single judge. 3. Judges collectively. See QUEEN'S ~.

**BENCHER**. *n.* A member of the governing body of a provincial law society. May be elected by lawyers in a region of the province, in the province as a whole or may be appointed by the government to be a member of the governing body. See LIFE ~.

**BENCH WARRANT**. 1. A court-issued warrant to arrest a person. 2. Where an indictment has been preferred against a person who is at large, and that person does not appear or remain in attendance for his trial, the court before which the accused should have appeared or remained in attendance may issue a warrant for his arrest. *Criminal Code*, R.S.C. 1985, c. C-46, c. 597.

**BENDS**. See DECOMPRESSION SICKNESS.

**BENEDICTA EST EXPOSITIO QUANDO RES REDIMITUR A DESTRUCTIONE**. [L.] Well-spoken is the statement which saves anything from destruction.

**BENEFICIAL INTEREST**. 1. " ... [E]quitable and not a legal interest ..." *Vancouver A & W Drive-Ins Ltd. v. United Food Services Ltd.* (1980), 13 B.L.R. 89 at 102, 10 E.T.R. 34, 38 B.C.L.R. 30 (S.C.), Fulton J. 2. The interest of a beneficiary or beneficial owner. 3. An interest arising out of the beneficial ownership of securities. *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 2. 4. Includes ownership through a trustee, legal representative, agent or other intermediary. *Business Corporations Act*, S.N.B. 1981, c. B-9.1, s. 1.

**BENEFICIAL OWNER**. " ... [T]he real owner of property even though it is in someone else's name. *Csak v. Aumon* (1990), 69 D.L.R. (4th) 567 at 570 (Ont. H.C.), Lane J.

**BENEFICIAL OWNERSHIP**. Includes ownership through a trustee, legal representative, agent or other intermediary. *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 2.

**BENEFICIAL USE**. A use of water, including the method of diversion, storage, transportation, and application, that is reasonable and consistent with the public interest in the proper utilization of water resources, including but not being limited to domestic, agricultural, industrial, power, municipal, navigational, fish and wildlife and recreational uses. *An Act Respecting the Protection of the Environment*, S.N. 1995, c. E-16.1, Sched. B, s. 2.

**BENEFICIARY**. *n.* 1. A person designated or appointed as one to whom or for whose benefit insurance money is to be payable. 2. A person entitled to benefit from a trust or will. 3. A person entitled to receive benefits under a statutory scheme. See IRREVOCABLE ~; PREFERRED ~.

**BENEFIT**. *n.* 1. [S]omething that is a favourable or helpful circumstance. To provide legal representation under a contingent fee agreement to a client who is unable to pay for legal services is clearly to confer a benefit on the client. *Lee (Guardian ad litem of) v. Richmond Hospital Society*, 2005 BCCA 107. 2. A pension; a monetary amount paid under a pension or other plan. 3. A drug or other good or service that is supplied to an eligible person. 4. Compensation or an

**2014 Edition**

# PATENT
# LEGISLATION
# &
# COMMENTARY

**The Honourable Roger T. Hughes**

 LexisNexis®

will have a term governed by the original filing date. Old Act divisionals endure for a term of 17 years from the date of grant.

# OWNERSHIP — ASSIGNMENT — LICENSING

The inventor (or inventors) is the first owner of a patent or application, but normally, the inventor — because of an employment or contractual relationship — assigns the application or patent. A patent will be granted in the name of the person or body on record as being the owner at the time of the grant. A patent may subsequently be assigned. All assignments should be in writing and preferably filed with the Patent Office, however, this is not essential if the fact of an assignment can otherwise be proved, for instance, in a court proceeding. The owner of a patent is referred to in the *Patent Act* as the patentee.

A patent may be licensed, exclusively or non-exclusively, in whole or in part. While the Patent Office will file licences, it is rare that a licence is submitted for filing.

The Canadian *Patent Act* is unusual in that it provides a damages remedy not only to a patentee, but also to "all persons claiming under the patentee",[15] a phrase which has been given a broad interpretation by the courts so as to include non-exclusive licensees and even purchasers of patented products.

# CO-OWNERSHIP

Where there is more than one inventor named in a patent application, each is entitled to be a co-owner. Where different inventors are employees of different organizations or have assigned their rights to different parties, this means that there may be several different owners, not always of one mind.

Canadian courts have held that each co-owner may itself practice the patented invention. None can assign or license the invention without the consent of all the others. Different results may prevail in other countries.

# COMPULSORY LICENCES

Until 1993, the *Patent Act* contained provisions that the Commissioner of Patents must grant a licence in respect of patents claiming medicines. These provisions no longer prevail.

The *Patent Act* still contains provisions permitting the Commissioner discretion to grant a licence of a patent where it is demonstrated that a patent is not being worked on in Canada by the patentee or a licensor. Rarely has such a licence been given — the procedure is long and cumbersome and provides

---

[15]   *Patent Act*, s. 55(1).

# ESSENTIALS OF
## CANADIAN LAW

# INTELLECTUAL PROPERTY LAW
## COPYRIGHT · PATENTS · TRADE-MARKS

### SECOND EDITION

## DAVID VAVER

Professor of Intellectual Property Law,
Osgoode Hall Law School, York University
Emeritus Professor of Intellectual Property &
Information Technology Law, University of Oxford



## a)   Patent Opposition: An Alternative?

Invalid trade-marks hamper trade less than invalid patents do and yet may be opposed before grant. An opposition procedure deserves consideration for patents too if a solution to the delays endemic to such procedures can be devised. Pre-grant oppositions for trade-marks in Canada take years to resolve; so do post-grant patent oppositions in Europe. Pre-grant patent oppositions have proved even worse. In both New Zealand and Britain, when it still had a pre-grant opposition, patent terms would sometimes run out before a patent was granted over opposition. With a six-year time bar on infringement suits,[479] opponents and other infringers could often end up paying a mere fraction of the loss the patent holder had suffered from their infringements.[480]

Delays typically cause less harm in post-grant than pre-grant oppositions but still create serious uncertainty until the proceedings are resolved. Devising a scheme that gives opponents a fair chance at exposing an invalid patent while minimizing their ability to play the system to their advantage would require considerable thought. Yet the challenge may be worth meeting if it paves the way for a fair procedure that eliminates invalid patents at the earliest opportunity.

# E.  TITLE

Since title to an invention is derived only through the inventor, the petition should correctly state her name, or their names if the invention is jointly made. Yet, surprisingly, getting names wrong has been said to be "immaterial to the public" and not enough to invalidate the patent, at least where its term, substance, or title would remain the same.[481] One may doubt whether an inventor's interest in being named and recognized as such is any less than an author's parallel interest in respect of

---

479  The same period as in Canada: see section E(9), "Time Limits for Suing," in chapter 5.

480  *Sevcon Ltd. v. Lucas CAV Ltd.*, [1986] 1 W.L.R. 462 (H.L.), followed in *Pacific Coilcoaters Ltd. v. Interpress Associates Ltd.*, [1998] 2 N.Z.L.R. 19 (C.A.). A rough analogy is the situation where the purchaser of a twenty-year lease is barred from taking possession for so long that the lease runs out, leaving him with a damages claim against the lessor for just the last six years of the lease.

481  *Gamble*, above note 59 at 157 (Fed. T.D.). See section A(6), "Truthful Application," in this chapter. A misnomer may not invalidate a patent that is, in fact, granted to the right person. Suppose W1 and W2 are both employed by E, and W1 is the inventor or co-inventor with W2. A patent granted to E is valid even though W2 was named sole inventor.

her work.[482] The inventor's identity may also be far from "immaterial" where, for example, she may want to exploit an invention differently from the cuckoo who ousted her. Still, the onus is apparently on her to show that all inventors are not alike.[483]

This casual attitude towards inventors, which risks making them patent law's forgotten folk, contrasts sharply with old British patent law, where a patent was treated as a reward for the true inventor, whose identity was therefore very material.[484] In truth, identity is immaterial only if the patent system aims to encourage invention, not inventors—an aim that would, in itself, be senseless because without inventors there can be no invention. True, contract or employment may strip an inventor of her rights, and the law does not grant her the moral rights that authors have long enjoyed.[485] Still, the requirement to be named in the petition and on the patent registry is some small recognition of the accomplishment and does not deserve to be immaterialized.

Getting inventorship right is nevertheless worthwhile if only for pragmatic reasons, for example, to forestall distracting arguments from infringers ("who are *you* to sue me?").[486] So who, then, is an inventor or co-inventor?

## 1) Inventor

"Inventor" is not defined in the Act, but the old British law that equated an inventor with whoever first imported a new technology into the country has long been abandoned.[487] Case law establishes that the inventor is whoever first independently thought of the inventive concept behind the claims[488] and objectively manifested it by putting it into practice, telling someone else about it, writing it down, or embodying

---

482  Compare section I, "Moral Rights," in chapter 2.

483  See *Wellcome I*, above note 56 at [108]–[9] (SCC), where the argument was put but not considered because the court concluded the right inventors had applied.

484  Hindmarch, above note 386 at 42–43 & 47; R. Frost, *Treatise on the Law and Practice relating to Letters Patent for Inventions*, 4th ed. (London: Stevens & Haynes, 1912), vol. 1 at 14–16.

485  *Balanyk v. University of Toronto* (1999), 1 C.P.R. (4th) 300 at 339–40 (Ont. S.C.J.). Compare section I(2), "Attribution," in chapter 2.

486  An assignee who cannot trace title back to the true inventor cannot sue for infringement: *Q'Max*, above note 56.

487  U.S. and Canadian law never embraced this theory, although before Confederation the Province of Canada allowed patenting to first importers from anywhere outside the United States and the British dominions in Europe and America: *An Act respecting Patents for Invention*, C.S.C. 1859, 22 Vict., c. 34, s. 10.

488  *Markem Corp. v. Zipher Ltd.*, [2005] EWCA Civ 267 at [101]–[4] [*Markem*].