it in a working model.[489] Just to think of or verify a concept, or take it from someone or somewhere else, is not to invent.[490]

Since people in different parts of the world are often working on the same idea at the same time, two or more may very well independently qualify as inventors. The scientific community may give priority to one, but patent law gives priority to whoever first files for a patent.

The Act allows either the inventor or the assignee to apply for and obtain a patent, but an assignor to whom a patent is granted holds it in trust and must assign it to the assignee on demand. Employers who applied in their own name used to have to file a written assignment from the employee inventor to establish or confirm their title, even where a contract or the common law clearly entitled them to the benefit of the invention.[491] Although such paperwork remains sound practice, the PO is now content with a simple declaration of entitlement from the employer.[492]

The true inventor or owner can also invalidate a patent issued to the wrong person or have it corrected to reflect the true title.[493] Even where the patent is valid despite a wrong attribution of inventorship,[494] the true inventor or inventors should be able to have this error corrected, so that the register may function as an accurate database of inventors as well as inventions.[495]

## 2) Joint Inventors

The Act does not define joint inventorship, yet most inventions today come from teamwork. Co-inventors can be added or deleted from an application with the PO's approval but, once the patent is issued, they may not change the order in which they appear.[496] A patent can

489 *Christiani & Nielsen v. Rice*, [1930] S.C.R. 443, aff'd (*sub nom. Rice v. Christiani & Nielsen*) [1931] A.C. 770 (P.C); *Scragg*, above note 434; *Sanofi Canada*, above note 372 at [274]. Reduction to practice is essential in the United States but not elsewhere: *Stanelco Fibre Optics Ltd. v. BioProgress Technology Ltd.*, [2004] EWHC 2263 at [14] (Ch.) [*Stanelco*].

490 *Wellcome I*, above note 56 at [97]–[99] (SCC); *University of Western Australia v. Gray (No. 20)*), [2008] FCA 498 at [1419]*ff.* (Austl. Fed. Ct.), aff'd (*sub nom. University of Western Australia v. Gray*) [2009] FCAFC 116 (Austl. Full Fed. Ct.) [*Gray*]; *Muntz v. Foster* (1844), 2 Web. Pat. Cas. 96 (C.P.) [*Muntz*].

491 *Searle*, above note 64 at [40] (FCA).

492 *PR*, above note 1, s. 37(2), in effect since 2010.

493 *P Act*, above note 1, s. 52; *Comstock Canada v. Electec Ltd.* (1991), 38 C.P.R. (3d) 29 (Fed. T.D.) [*Comstock*]; *Q'Max*, above note 56..

494 See text accompanying notes 58 and 59, above.

495 Compare *Q'Max*, above note 56 at [33]–[36].

496 *Fina Technology, Inc. v. Ewen*, 265 F.3d 1325 (Fed. Cir. 2001).

be issued even if co-inventors refuse to join in applying or have dis-
appeared from sight. On the other hand, someone who concurs in be-
ing named co-inventor will later find it difficult to claim that she was
really the sole inventor.[497]

In the past courts tended to look for a single inventor. Where differ-
ent people thought up different parts of a combination, the inventor was
the person who thought of combining the parts. Today, when teamwork
is common and frankly acknowledged, everyone who materially helped
to create or to develop the idea, however big or small a role, often lays
claim to co-ownership. This is especially so where there was a prior
agreement to collaborate or where team members are named as co-auth-
ors of the publication disclosing the invention.[498] Yet, just as not every
contributor to a work becomes a joint author, not every contributor to an
invention is a joint inventor. Being on the team is not enough: one must
be jointly responsible for devising the inventive concept. Posing the
problem, doing tests and experiments, or working on the patent claims
is not the mark of a co-inventor, any more than presenting specifica-
tions, beta-testing, or describing a work is the mark of a co-author.[499]

To decide whether inventorship is joint or sole, one first ascertains
the patent's inventive concept—its heart—from the whole specifica-
tion, not just its individual claims. Despite the "one patent, one in-
vention" rule,[500] courts recognize that a patent can have two or more
inventive concepts, to which one or more people may have contributed.
Suppose, for example, that a patent claims both a method and a ma-
chine to implement it,[501] and A devised the method and B devised the
machine. If skilled person C, on seeing the method, could easily imple-
ment it much as B did, B's contribution is inessential and the invention
is A's alone. But A and B will be joint inventors if B's contribution is
essential and C could not, with ordinary skill, have implemented the
method. B has effectively contributed the enabling disclosure without

497  *P Act*, above note 1, ss. 31(1) & (3); *Putti v. Gasparics* (1973), 13 C.P.R. (2d) 260
      (B.C.S.C.).
498  *Monsanto Co. v. Kamp*, 267 F. Supp. 818 (D.D.C. 1967); *Re CSIRO & Gilbert*
      (1995), 31 I.P.R. 67 (Austl. Patent Office).
499  *Wellcome I*, above note 56 at [99]–[102] (SCC); *Procter & Gamble Co. v. Kimberly-
      Clark of Canada Ltd.* (1991), 40 C.P.R. (3d) 1 (Fed. T.D.); *Stanelco*, above note
      489 at [15]–[20]; *IDA Ltd v. University of Southampton*, [2006] EWCA Civ 145 at
      [38]–[39]. See also section E(2)(c), "Joint Authors and Co-Owners," in chapter 2;
      compare *Fylde Microsystems Ltd. v. Key Radio Systems Ltd.*, [1998] F.S.R. 449 at
      457–60 (Ch.) (copyright).
500  See section A(2)(a), "Unity of Invention," in this chapter.
501  *Libbey-Owens-Ford Glass Co. v. Ford Motor Co.*, [1970] S.C.R. 833 at 840–1, aff'g
      [1969] 1 Ex. C.R. 529 [*Libbey-Owens-Ford*].

which the patent would be invalid. The degree of his inventiveness, compared to A's, is relevant only to determine the share (half, more, or less) that each deserves in the patent.[502]

### a)   Non-Inventive Co-owner

May someone claim co-ownership without being a co-inventor? Suppose, for example, that someone's body part is the source of an invention developed by researchers: Can the subject claim part ownership in any patent? Traditional patent principle says no: not even the owner of a stolen blank canvas on which a thief paints a masterpiece can claim copyright in the artwork. Yet the analogy is inexact for, without the starting material, the invention could not have been made at all. Excluding that person, without his or her consent, from the benefits of the invention may dampen the supply or enthusiasm of human research subjects. Charges of colonialism may also be unavoidable where the body parts came from a remote villager with limited understanding of the implications of the activity. Perhaps such subjects may not deserve to be called "co-inventors," but why not "co-owners"?[503]

## 3)  Ownership: Employees

The inventor first owns the invention she made, but the federal Act says nothing about what happens when the inventor is an employee.[504] This question is left to provincial laws. Typically, they say nothing about inventive employees. Provincial law might, through either legislation or judicial decision, have developed a theory of co-ownership that recognizes invention as a collaboration between employer and employee, where the employer provides the capital and a conducive culture, and the employee provides the brains and persistence.[505] It might, as in the United States and Japan, have left patent ownership with the employee, while allowing the employer a non-exclusive licence to work the patent

---

502  *Polwood Pty Ltd. v. Foxworth Pty Ltd.*, [2008] FCAFC 9 at [34]–[67] (Austl. Full Fed. Ct.); *Gray*, above note 490 at [1442]–[43] (FCA). On enabling disclosure, see section C(1)(b), "Prior Publication," in this chapter.

503  Compare *Moore v. Regents of the University of California*, 793 P.2d 479 at 511–12 (Cal. S.C. 1990) (dissent).

504  *University of Toronto v. John N. Harbinson Ltd.* (2005), 78 O.R. (3d) 547 at [29] (S.C.J.). On whether someone is an employee or freelancer, see section E(3)(a), "Contract of Service," in chapter 2.

505  Compare D. Vaver, "Recreating a Fair Intellectual Property System for the 21st Century" (2001) 15 I.P.J. 123 at 138 [Vaver, "Recreating"].

in its plant (what Americans call a "shop right").[506] Instead, provincial law is usually an all-or-nothing affair. Whoever is owner—typically by contract, the employer—can exploit the patent and reap all its rewards. Without a special contract provision or implication in a particularly pressing case, nobody gets a licence, extra money, or anything else.[507]

There are enlightened employers who, despite the law's silence, do provide incentives—salary increases, stock options, promotions, bonuses, or other tangible tokens of recognition—to particularly innovative employees. The reward may be required by the employment contract or may just be good management practice. Other employers could not care less. They may sack their salary-only employee inventors on the usual notice while continuing to profit handily from the patents their employees generated—as the co-inventor of the anti-cholestrol drug LIPITOR learned to his cost in 2007.[508] We are left with individual inventors with a sense of grievance, other employees who do their duty and no more, and a society that is worse off through wasted potential.

Some countries make up such deficits by encouraging employers to negotiate collective agreements or reward employee inventors for particularly profitable patents and inventions. British legislation attempts this but it took thirty years for the first claim under it to succeed.[509] By contrast, in Japan the patent holder of blue light-emitting diode technology was told that its employee should have got half the $US1.4 billion that it expected to make from exploiting the patent. Since the employee had just asked for $190 million as adequate remuneration, the court awarded him that sum, although pending appeal the case settled for much less.[510] Japanese industry naturally cried foul, and compromise legislation was passed which retained the principle of adequate

506 C. Fisk, "Rights in Employee Inventions and Ideas: An Overview of United States Law" (1998) 23 (2) N.Z. Jo. Industrial Relations 47; *Patent Law* of Japan (Law No.121 of 1959), s. 35(1).

507 *W.J. Gage Ltd. v. Sugden*, [1967] 2 O.R. 151 (H.C.J.) [*Gage*]; *Victoria University of Technology v. Wilson*, [2004] VSC 33 at [106] (Austl.) [*Wilson*]; *Willard's Chocolates Ltd. v. Bardsley* (1928), 35 O.W.N. 92 at 93 (H.C.J.) (shop right implied).

508 A. Johnson, "Paradigm Lost: As Drug Industry Struggles, Chemists Face a Layoff Wave" *Wall Street Journal* (European ed.) (12 December 2007) 18. The axed inventor had worked for his employer and predecessor for twenty-three years and was in mid-career with a working spouse and pre-college age children.

509 *Kelly v. GE Healthcare Ltd.*, [2009] EWHC 181 (Pat. Ct.) (£1 million and £500,000 to inventors of a patented radioactive imaging agent worth £50 million); see *Patents Act*, above note 215, ss. 39–42 (as am. in 2004); Vaver, "Recreating," above note 505 at 136–37.

510 *Nakamura v. Nichia Chemical Co. Ltd.* (30 January 2004), Case No. Heisei 13 (wa) 17772 (Tokyo District Court), appeal to Tokyo High Court settled.

remuneration but let the employment contract prevail if it operated reasonably on the facts.[511] Mandatory employee compensation applies in Germany, France, and the Nordic states and has also been proposed for Canada, but meanwhile a comparable Canadian employee would be bound by her contract of employment, reasonable or not.[512]

Where there is no express contractual provision on the issue, the common law position has fluctuated over time and among jurisdictions. In Canada today, the law appears to favour the individual slightly more than the corporate employer.[513] It starts from the principle that an employee is initially entitled to the benefit of any invention she makes. When or where the work is done — at work, at home, in or out of working hours — does not matter. University work is the clearest example: inventive academics own their patentable inventions, whether they think them up in the departmental lab or their home shower. A university could, if it wished, hire someone specifically to invent: it then might own any patentable invention he produced. But academics are usually hired to teach and research, not invent and patent. Principles of academic freedom dictate that what they research is largely their choice. A duty to research does not imply a further duty to be inventive or do patentable work.[514]

This position may change through contract. Although policies are not standard, some universities split IP rights: academics may get to keep their copyrights (except perhaps for computer programs), but the university can patent any worthwhile invention and share in its benefits.[515] Private sector employers are typically more proprietary. The employment contract often claims everything, no matter how much or how little the worker's exertions affect the employer's bottom line.[516]

---

511  Previously, an employer's compensation policy was disregarded: J. Tessensohn & S. Yamamoto, "Japan: Patents—Inventor/Ownership Disputes relating to Ex Employees" (2004) 26 E.I.P.R. 63.

512  *Gage*, above note 507; compare A. Gloor, "Leveling the Global Field: A Case for Mandatory Employee Compensation in Canadian Patent Law" (2011) 23 I.P.J. 37.

513  Compare Australia, where private sector employees are apparently treated more strictly than university employees: *Gray*, above note 490 at [206]*ff.* (FCAFC).

514  *Gray, ibid.* at [194]–[95] (FCAFC); P.K. Chew, "Faculty-generated Inventions: Who Owns the Golden Egg?" [1992] Wis. L. Rev. 259. For the copyright position, see section E(3), "Ownership: Employees," in chapter 2.

515  K. LaRoche, C. Collard, & J. Chernys, "Appropriating Innovation: The Enforceability of University Intellectual Property Policies" (2007) 20 I.P.J. 135 at 139*ff.* [LaRoche].

516  For a pro-employer argument, see R. Merges, "The Law and Economics of Employee Inventions" (1999) 13 Harv. J.L. & Tech. 1; compare Vaver, "Recreating", above note 505 at 135–38.

More particularly, at common law the employer owns the patent or the rights to any patentable invention in the following cases:[517]

- if the employment contract so provides;[518]
- if the employee was initially specifically hired to invent or innovate, and the invention was produced in fulfilment of that duty;[519]
- if the employee undertook a specific innovative task and the parties expressly or impliedly agreed that the employer would own any resulting invention;[520] or
- if the employee's retention of ownership would be inconsistent with her duty of good faith and loyalty to her employer.[521]

If either the employer or employee applies for any patent in his or her own name contrary to these principles, the other may compel the benefit of the application or resulting patent to be transferred, on reimbursing the offender's reasonable costs and expenses.[522] The obligations survive the end of the employment.[523]

Just as not every copyright work made on the job belongs to the employer,[524] nor does every invention. The cleaner at the automobile plant who designs a new kind of engine, at home or the workplace, may not lose the invention to the car maker, whatever the employment contract says.[525] The economics professor does not lose her invention to the

---

517  See generally, *Gray* above note 490 at [112]*ff.* (FCA) (full comparative discussion, including summary of U.K. law at [130] and Canada at [140]–[42]).

518  Contract provisions sometimes make the implicit explicit and so are enforceable if they are not unduly restrictive. Those that try to catch inventions made by ex-employees from ideas developed after they have quit employment may be void as unreasonable restraints of trade.

519  *Searle*, above note 64 at [36]–[40] (FCA) (research scientist at pharmaceutical company).

520  The initial employment contract or job description must presumably have contemplated the possibility of such projects. Otherwise, at common law, the employee must receive some additional benefit or promise of benefit as consideration if the reallocation of rights is to be effective: *Techform Products Ltd. v. Wolda* (2000), 15 C.P.R. (4th) 44 (Ont. C.A.) [*Techform*].

521  *Wilson*, above note 507 (university beneficially owns invention created and patented by economics professor who breached duty of loyalty).

522  *Wilson*, *ibid.* at [223].

523  *Techform*, above note 520; *Seanix Technology Inc. v. Ircha* (1998), 78 C.P.R. (3d) 443 (B.C.S.C.).

524  See section E(3), "Ownership: Employees," in chapter 2.

525  *Spiroll Corp. v. Putti* (1975), 64 D.L.R. (3d) 280 (B.C.S.C.), aff'd (1976), 77 D.L.R. (3d) 761 (B.C.C.A.); *Comstock*, above note 493 at 55–56; *Greater Glasgow Health Board's Application*, [1996] R.P.C. 207 at 222 (Pat. Ct.); *Techform*, above note 520; *Tobin v. De Lanauze*, [2000] Q.J. No. 3137 at [61]–[63] (S.C.); *Electrolux Ltd. v. Hudson*, [1977] F.S.R. 312 (Ch.) (overclaiming employment contract with stor-

university just because she is paid to teach, research, or run her department.[526] The employee who is not hired or paid to invent owns and can patent for herself any invention resulting from her experiments. The employer has no legal or moral claim to the entire fruits of employees' intellectual labour simply because it provided a propitious environment for invention or encouraged its employees' endeavours.[527] Nor may it stop an ex-employee using that intellectual labour later to obtain a patent that uses none of the employer's confidential information.[528]

There are variations on these themes. Ownership may sometimes be split, as when someone partly develops a technology before joining a company to market the product. As an employee, she may impliedly license the company to use the rights she has in her earlier work. What she does on the job to make the product marketable may belong to her employer. On a later sale of all the rights, the employee may be entitled to share in the proceeds as part owner of those rights.[529] Or a researcher may work consecutively for two universities and develop her invention partly at both. If the patenting policies of both employers require her to assign to them her interest in the invention, both universities may have to remit to her the respective share of royalty income due under their rules.[530] In such cases, employers may owe their employees the same duty of good faith that their employees owe them.[531]

The law favours employees who are open with their employers. Work done surreptitiously, using the employer's resources or information when the employee is in conflict of interest, raises suspicions of disloyalty and may lead courts to find that the employee has broken implied obligations of good faith owed to the employer and that any resulting invention belongs to the employer.[532]

## 4) Ownership: Freelancers

The *Copyright Act* is built round the image of the freelance author who earns her living from her copyrights and who may, without conflict

---

age manager unreasonable restraint of trade and void). Compare section E(3), "Ownership: Employees," in chapter 2.

526  *Wilson*, above note 507.

527  For a moral case for co-ownership, see Vaver, "Recreating," above note 505 at 138.

528  *Markem*, above note 488.

529  *Victorov v. Davison* (1988), 20 C.P.R. (3d) 481 (Ont. H.C.J.).

530  Compare *Fardad v. l'École polytechnique de Montréal*, 2007 QCCS 5430, aff'd with reduced damages, 2010 QCCA 992.

531  Compare LaRoche, above note 515 at 163–70.

532  *Corso v. Nebs Business Products Ltd.* (2009), 72 C.C.E.L. (3d) 110 at [76]–[77] (Ont. S.C.J.), applying patent principles to copyright.

of interest, recycle them for different clients. Where this is not so in fact—for example, where the author develops a business product for a firm to use as its own in its business—courts often realign the legal position to give the client ownership, or at least liberal rights of use.[533] The *Patent Act* says nothing on the subject but recent court decisions treat the commissioned inventor much like the freelance author. She owns the fruits of her inventiveness unless she expressly or implicitly has agreed otherwise. An implicit agreement might be found where the freelancer is given access to the firm's trade secrets or confidential information[534] or is hired to put into practice an idea that the firm had already partly developed. No such agreement is likely if the inventive idea is entirely the freelancer's.[535] Any implicit understanding between the parties that the freelancer will share in gains made from exploiting the patent or may herself also license the patent on paying the patent holder a reasonable royalty will also be given legal effect.[536]

It is of course best for everyone to agree explicitly on ownership and benefit-sharing before work starts, preferably in writing to avoid the tricks that self-interest plays on memory after the event.

## 5) Co-owners

Provincial law also governs the incidents of ownership, since the Act is silent on them. Without agreement, co-owners can work the patent themselves for their own account and may, except in Quebec, also assign their interest without their co-owners' consent.[537] But a co-owner is entitled to object to dealings that affect its right to exclude, such as adding another permitted user. An assignment to more than one assignee or a licence to someone else to use the patent is void without the co-owners' consent.[538] On death, a co-owner's share usually goes to the estate, not the co-owners, especially if one of them is a corporation.[539]

A co-owner can sue third parties for infringement, but should recover monetary remedies only according to its interest. Thus, a

---

533 See section E(6), "Changing Ownership and Implying Rights of Use," in chapter 2.

534 Compare *Stanelco*, above note 489 at [112]–[21].

535 *Techform*, above note 520.

536 For example, *Goddin & Rennie's Application*, [1996] R.P.C. 141 (Scot. Ct. Sess.).

537 *Steers*, above note 8; *Marchand v. Péloquin* (1978), 45 C.P.R. (2d) 48 (Que. C.A.).

538 *Forget*, above note 8; see also R.A. Wilkes, "The Rights of Co-Patentees" (2004) 21 C.I.P. Rev. 213.

539 *Re Usines De Melle's Patent* (1954), 91 C.L.R. 42 (Austl. H.C.) [*Usines*]; *Walton v. Lavater* (1860), 8 C.B. (N.S.) 162 at 184 (C.P.) [*Walton*]; compare *Hegeman v. Rogers*, [1971] 3 O.R. 600 at 608 (H.C.J.) (land). See also section E(2)(c), "Joint Authors and Co-owners," in chapter 2.

half-owner gets a whole injunction and delivery up, but only half the damages or profits.[540]

## 6) Government Inventions

Governments and Crown corporations can own and acquire patents just as the private sector may. The federal government also owns inventions made by federal employees within the scope of their duties. Included are inventions made with government equipment or financial aid, or "result[ing] from" or "connected with" the employee's duties or employment; these are effectively compulsory takings, since the government does not have to pay the inventor a cent.[541] The government can, however, make a discretionary award or waive its ownership rights. In practice, departmental heads act on the advice of an interdepartmental Public Servants Inventions Committee. Since 1993 there have been no ceilings on the amounts of an award, ostensibly to encourage inventiveness and teamwork in the public service.

Federal employees or federal Crown corporation employees who invent instruments or munitions of war are bound to secrecy if the Ministry of National Defence decides that the invention should be assigned to it. This will certainly occur with inventions vital to Canada's defence, where publication would prejudice public safety. The specification and eventual patent may be kept secret, but good faith infringers cannot be sued and can be licensed if secrecy is lifted. Less coercive procedures apply to inventions relating to the production, application, or use of atomic energy. These go to the Atomic Energy Control Board before being laid open or examined by the PO.[542]

# F. OWNERS' RIGHTS

The patent owner has the exclusive right of "making, constructing and using the invention and selling it to others to be used" from the date

---

540 *Usines*, *ibid.* at 50 (patent); similarly, *Massie & Renwick Ltd. v. Underwriters' Survey Bureau Ltd.*, [1940] S.C.R. 218 at 243 (copyright); see section E(2)(c), "Joint Authors and Co-owners," in chapter 2.

541 *Public Servants Inventions Act*, R.S.C. 1985, c. P-32, s. 3; *Public Servants Inventions Regulations*, C.R.C. 1978, c. 1332; *Mansfield v. M.N.R.* (1962), 23 Fox Pat. C. 19 at 29 (Tax Appeal Bd.).

542 *P Act*, above note 1, ss. 20, 21 & 22.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

**H**

United States District Court,
D. Delaware.

HIONIS INTERNATIONAL ENTERPRISES, IN-
CORPORATED, and A–Hionis, Ltd., Plaintiffs,
v.
The TANDY CORPORATION, Defendant.

Civ. A. No. 93–288–JLL.
Oct. 12, 1994.

Dealer brought action for breach of contract against manufacturer that permitted dealer to use its marks in certain cities in Greece. On manufacturer's motion for summary judgment, the District Court, Latchum, Senior District Judge, held that: (1) Texas law applied under Delaware choice of law rules based on agreement of parties; (2) manufacturer did not agree to protect dealer from competition in Greece within territory of distributorship; and (3) manufacturer did not have special relationship with dealer to give rise to fiduciary duty.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A ⬦2552**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determina-
tion
                    170Ak2552 k. Ascertaining exist-
ence of fact issue. Most Cited Cases
    The appropriate inquiry on summary judgment is whether there is need for trial. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⬦2544**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2544 k. Burden of proof.
Most Cited Cases
    In motion for summary judgment, it is party seeking summary judgment who bears the initial responsibility of informing the court of the basis for its motion. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[3] Federal Courts 170B ⬦3029(1)**

170B Federal Courts
    170BXV State or Federal Laws as Rules of Decision; Erie Doctrine
        170BXV(B) Application to Particular Matters
            170Bk3022 Procedural Matters
                170Bk3029 Conflict of Laws; Choice of Law
                    170Bk3029(1) k. In general. Most Cited Cases
    (Formerly 170Bk409.1)
    Federal district court sitting in diversity must apply choice of law rules of state in which it sits to determine which state's law governs controversy before it.

**[4] Contracts 95 ⬦2**

95 Contracts
    95I Requisites and Validity
        95I(A) Nature and Essentials in General
            95k2 k. What law governs. Most Cited Cases

**Contracts 95 ⬦144**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k144 k. What law governs. Most Cited

© 2014 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

Cases

Delaware courts apply modern "most significant relationship" test to resolve conflict of law issues arising out of interpretation and validity of contracts. Restatement (Second) of Conflicts § 188.

**[5] Contracts 95 ☞206**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k206 k. Legal remedies and proceedings. Most Cited Cases
Under Delaware law, parties' choice of law, as expressed in their agreement, will be upheld unless state whose law would control in absence of choice has materially greater interest in subject matter.

**[6] Contracts 95 ☞206**

95 Contracts
    95II Construction and Operation
        95II(C) Subject-Matter
            95k206 k. Legal remedies and proceedings. Most Cited Cases
Texas law applied in contract dispute under Delaware choice of law principles in diversity case, where both contracts in case contained express choice of law provisions, and choice was Texas.

**[7] Contracts 95 ☞312(4)**

95 Contracts
    95V Performance or Breach
        95k312 Acts or Omissions Constituting Breach in General
            95k312(4) k. Contract not to engage in or injure business carried on by another. Most Cited Cases
Manufacturer did not breach any promise to protect dealer from competition in territory of distributorship in Greece, where neither distribution nor license agreements between parties contained promise of protection.

**[8] Evidence 157 ☞397(2)**

157 Evidence
    157XI Parol or Extrinsic Evidence Affecting Writings
        157XI(A) Contradicting, Varying, or Adding to Terms of Written Instrument
            157k397 Contracts in General
                157k397(2) k. Completeness of writing and presumption in relation thereto; integration. Most Cited Cases
Under Texas law, parol evidence rule precludes communications and negotiations before execution of written contract because they are deemed to be merged into written agreement, especially where written contract contains merger clause stating that contract represents parties' entire agreement.

**[9] Contracts 95 ☞143(2)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k143 Application to Contracts in General
                95k143(2) k. Existence of ambiguity. Most Cited Cases

**Contracts 95 ☞176(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
            95k176 Questions for Jury
                95k176(1) k. In general. Most Cited Cases
If court can interpret contract's meaning with certainty, there is no ambiguity, and construction of contract becomes matter of law.

**[10] Federal Civil Procedure 170A ☞2492**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2492 k. Contract cases in general. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

Existence of loan agreement was not sufficient evidence of identity between creditor and debtor from which to find creditor responsible for actions of debtor on creditor's motion for summary judgment dismissing its contract dispute with third party.

**[11] Torts 379 ⚖433**

379 Torts
   379V Other Miscellaneous Torts
     379k431 Bad Faith
      379k433 k. Contractual relations; implied covenants. Most Cited Cases
   (Formerly 379k6)

Manufacturer did not have special and close relationship with dealer arising out of commercial contractual relationship from which to apply duty of good faith and fair dealing under Texas law.

**[12] Torts 379 ⚖433**

379 Torts
   379V Other Miscellaneous Torts
     379k431 Bad Faith
      379k433 k. Contractual relations; implied covenants. Most Cited Cases
   (Formerly 379k6)

General rule in Texas is that tort cause of action for breach of duty of good faith and fair dealing does not apply to ordinary commercial contractual relationships.

**[13] Fraud 184 ⚖13(3)**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
     184k8 Fraudulent Representations
      184k13 Falsity and Knowledge Thereof
       184k13(3) k. Statements recklessly made; negligent misrepresentation. Most Cited Cases

Distributor did not establish prima facie case of negligent misrepresentation against manufacturer for agreeing that it would be exclusive distributor in Greece for period of three years despite existence of another dealer distributing manufacturer's products in Greece, where competing dealer did not commence operation until one year after distributorship agreement was executed, so that manufacturer could not have known of its existence when parties negotiated and executed agreements.

**\*269** Kevin W. Gibson, of Kassab, Archbold, Jackson & O'Brien, Wilmington, DE, for plaintiffs.

F.L. Peter Stone, of Connolly, Bove, Lodge & Hutz, Wilmington, DE (James B. Spisak, of The Tandy Corp., Fort Worth, TX, of counsel), for defendant.

**MEMORANDUM OPINION**

LATCHUM, Senior District Judge.

**I. *INTRODUCTION***

Defendant, The Tandy Corporation ("Tandy"), has moved for summary judgment against plaintiffs, Hionis International Enterprises, Inc. and A–Hionis, Ltd., pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Item ["D.I."] 19.) Plaintiffs bring this action against Tandy alleging the following: First and Second Claims, breach of contract; Third Claim, breach of fiduciary duty; Fourth Claim, fraudulent misrepresentation; and Fifth Claim, negligent misrepresentation. (D.I. 1.)

Plaintiff Hionis International Enterprises, Inc., is a Pennsylvania corporation. Plaintiff A–Hionis, Ltd. is a Greek corporation. Tandy is a Delaware corporation. The amount in controversy exceeds fifty-thousand dollars, exclusive of interest and costs. This Court's jurisdiction is based on diversity of citizenship in accordance with 28 U.S.C. § 1332. (D.I. 1.)

For the reasons set forth below, Tandy's motion for summary judgment will be granted.

**II. *FACTS***

Hionis International entered into a Distribution Agreement and a License Agreement with Tandy

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

on December 17, 1991. (D.I. 1, Exs. A & B.) The purpose of these agreements was to allow Hionis International to open Radio Shack stores in six cities in Greece. Under the terms of the License Agreement, Hionis International was permitted to use "Radio Shack" and other marks in certain cities in Greece, including Athens, for a period of one day shy of three years with **270** an option to renew for another period of three years minus a day. (D.I. 1, Ex. B, ¶ IV.) The License Agreement also regulated the display of the Tandy marks, and stated standards for operation of the stores, among other provisions. Under the terms of the Distribution Agreement, Hionis International agreed to purchase various minimum amounts of Tandy merchandise for resale in its stores in Greece for a period of three years with an option to renew for another three years. (D.I. 1, Ex. A, ¶ V.) During these three year periods, Tandy agreed not to open any other dealers in the six cities awarded to Hionis. (D.I. 1, Ex. A, ¶ VI.)

Both agreements contained assignability clauses which contemplated Hionis International's assignment of its rights, authority, and obligations to a corporation formed under the laws of Greece. The Greek corporation was formed and was named A–Hionis, Ltd., the co-plaintiff. (D.I. 1 at 2.) Because the agreements control the rights of both plaintiffs in the exact same way, and because the plaintiffs allege Tandy committed the exact same tortious acts against both, the plaintiffs will be collectively referred to as "Hionis" for the remainder of this opinion.

Hionis opened its Athens store in May 1992, and opened a second store in Ioanina/Agrinio in January 1993. In December 1992, a competitor of Hionis, "Sakiotis S.A.," began advertising and selling Tandy products in its store in Athens. (D.I. 1, ¶ 13.) Hionis first claimed in the complaint that Tandy violated the parties' agreements by authorizing Sakiotis to distribute Tandy products. However, nowhere in the briefing papers for this motion does Hionis controvert Tandy's claim that it did not au-

thorize Sakiotis to sell Tandy products. (D.I. 22, ¶ 4.) In its answering brief, Hionis shifts its position to claiming Tandy was in breach because it did not take affirmative steps to stop Sakiotis from advertising and selling those products. (D.I. 34 at 9.) Hionis bases this right on affidavit and deposition evidence now before the Court. (*Id.* at 9–13.)

Rather than Tandy, it is apparent a company named InterTAN dealt with Sakiotis. (D.I. 23, ¶ 2.) InterTAN was created as a corporate spin off from Tandy in 1986. (D.I. 21, ¶ 2.) While InterTAN originally had authority to open a distributor in Greece, Tandy and InterTAN agreed to terminate that right in November 1990. (*Id.*)

Hionis further alleges that Tandy either intentionally or negligently misrepresented to Hionis that there were no other authorized Tandy distributors in Greece at the time Hionis and Tandy entered into their agreements. (D.I. 1, ¶¶ 27–40.)

### III. *DISCUSSION*

[1] Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The appropriate inquiry is whether there is a need for a trial. "In other words, [are] there any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

[2] In a motion for summary judgment it is the party seeking summary judgment who bears the "initial responsibility of informing the Court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The Supreme Court has further held that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2511. (Citation omitted.) The standard for summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)." Id. at 250, 106 S.Ct. at 2511. The inquiry is "whether **\*271** the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. Justice White, writing for the Court, clarified the standard as follows:

> If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (Citations omitted; emphasis in original.)

*Id.* at 252, 106 S.Ct. at 2512. Highly relevant to the disposition of this case is the fact that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon a motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

**A. First and Second Claims**

The First and Second Claims both allege breach of contract but the First Claim asks for damages while the Second Claim asks for the equitable remedy of recision. (D.I. 1, ¶¶ 19 & 22.) Accordingly, they will be discussed together.

[3][4][5][6] A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits to determine which state's law governs the controversy before it. *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Therefore, this Court must apply the State of Delaware's choice of law rules. Delaware courts apply the modern "most significant relationship" test of the *Restatement (Second) of Conflicts § 188 (1971)* to resolve conflicts issues arising out of the interpretation and validity of contracts. *Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41 (Del.1991). Delaware choice of law rules also rely on *Restatement (Second) of Conflicts of Law § 187* for the proposition that "the parties' choice of law, as expressed in their agreement, will be upheld unless the state whose law would control in the absence of a choice has a materially greater interest in the subject matter." *Rosenmiller v. Bordes,* 607 A.2d 465, 468 (Del.Ch.1991) (citing *Wilmington Trust Co. v. Wilmington Trust Co.,* 24 A.2d 309, 313 (Del.1942) . Thus, "under Delaware law, express choice of law provisions in contracts are generally given effect." *A.I.C. Ltd. v. Mapco Petroleum Inc.,* 711 F.Supp. 1230, 1237 (D.Del.1989). Both contracts in this case have an express choice of law provision. (D.I. 1, Exs. A & B.) That choice was Texas. This Court finds no reason to disturb the parties' choice.

[7] The crux of Hionis's argument with regard to the first two claims is that Tandy breached the Distribution and License Agreements by refusing to protect Hionis's "exclusive territory" in Greece.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

(D.I. 1, ¶ 18.) During his deposition, Mr. Alexander Hionis (the president of Hionis International) was asked the basis of his belief that Tandy had granted an exclusive territory. He identified the final draft of the Distribution Agreement as the source for that belief. (D.I. 20 at A–136.) He also went on to say that he thought the grant of the exclusive territory meant he would be free from any competition from Tandy products from any other sources. (*Id.* at A–137.) On the other hand, Tandy points out that, when asked, Mr. Hionis stated that Tandy had not violated the License Agreement in any way. (*Id.* at A–131 to A–132.)

**\*272** The relevant portion of the Distribution Agreement is, paragraph VI, which reads in its entirety:

Area of Responsibility

DISTRIBUTOR has not been granted an exclusive trade area for TANDY products under the terms hereof, and TANDY reserves the unrestricted right to determine locations for the establishment of Future Authorized Sales Centers, TANDY company-owned stores or other outlets. However, TANDY will not open any dealers in the Territory for a period of thirty-six (36) months from the date of execution of this Agreement, provided that DISTRIBUTOR is not in default under this Agreement.

(D.I. 1, Ex. A.) In order to guide the Court in interpreting this paragraph, Hionis directs the Court's attention to affidavits of Mr. Hionis and Mr. Koorosh Vafadari, a former Tandy employee from the International Division. The Court declines to consider the affidavits, and, instead, will apply the agreement as written.

[8] The law of Texas is unequivocal: "The parol evidence rule precludes consideration of extrinsic evidence to contradict, vary, or add to the terms of an unambiguous written agreement absent fraud, accident, or mistake." *Gold Kist, Inc. v. Carr,* 886 S.W.2d 425, 429 (Tex.Ct.App.1994) (citing *Kuper v. Schmidt,* 161 Tex. 189, 338 S.W.2d 948, 952 (1960)).[FN1] Such precluded evidence includes

communications and negotiations prior to the execution of the written contract because they are deemed to be merged into the written agreement. *Texas Export Dev. Corp. v. Schleder,* 519 S.W.2d 134, 137 (Tex.Civ.App.1974). This rule is all the more applicable where the written contract contains a merger clause stating that the contract represents the parties' entire agreement. *Ragland v. Curtis Mathes Sales Co.,* 446 S.W.2d 577, 579 (Tex.Civ.App.1969).

> FN1. Even though termed a rule of evidence, and thus at first blush appears procedural, courts have long classified the parol evidence rule as substantive, so reference to Texas law is proper under *Erie R.R. Co. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See Wootton Hotel Corp. v. Northern Assur. Co.,* 155 F.2d 988, 990 (3d Cir.), *cert. denied,* 329 U.S. 758, 67 S.Ct. 111, 91 L.Ed. 654 (1946); *Commissioner v. Danielson,* 378 F.2d 771, 779 (3d Cir.1967).

The Distribution Agreement contains a merger clause. It states, in pertinent part: "All prior negotiations and agreements between the parties hereto with respect to the subject matter of this Agreement are hereby merged herein and no statement, agreement or understanding, oral or written, not contained herein will be recognized or enforced." (D.I. 1, ¶ VIII.E.) Thus, absent some ambiguity in paragraph VI (Area of Responsibility) of the Distribution Agreement, this Court must apply the parol evidence rule.

[9] Whether a contract is ambiguous is "a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983). "A contract is ambiguous when its meaning is genuinely uncertain and doubtful or when it is reasonably susceptible to more than one meaning." *Gold Kist,* 886 S.W.2d at 429. If a court can interpret a

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

contract's meaning with certainty, there is no ambiguity; and the construction of the contract becomes a matter of law. *Id.*

The language of paragraph VI could not be any clearer. Tandy did not grant Hionis an "exclusive territory within which the plaintiff's [*sic* ] would be protected." (D.I. 34 at 9.) Accordingly, this Court finds as a matter of law that Tandy did not breach any promise to protect Hionis from competition because it made no such promise. The parol evidence of Messrs. Hionis and Vafadari [FN2] is *273 irrelevant to this inquiry. [FN3]

> FN2. On October 4, 1994, this Court received a document from Hionis's counsel entitled "Plaintiff's Sur Reply to Defendant's Reply Brief in Support of Defendant's Motion for Summary Judgment." Such a filing is improper absent prior approval by the Court according to Local Rule 7.1.1.(c). No approval was sought or granted, therefore, Tandy's Reply Brief should have been the last filing on this motion.

> Aside from the fact that the Sur Reply should not have been filed, it couldn't be considered by this Court anyway. It contains the affidavit of Mr. Edward Kassab, Hionis's attorney who negotiated the agreements with Tandy. Mr. Kassab attests to his understandings of the agreements. The Court will not consider Mr. Kassab's statements as they are also barred by the parol evidence rule.

> FN3. Hionis also argues in its First and Second Claims that Tandy breached an implied covenant of good faith and fair dealing. This contractual obligation only arises in the course of performing one's duties under the contract. *See Adolph Coors, Co. v. Rodriguez,* 780 S.W.2d 477, 480–82 (1989). Since Tandy had no duty to protect Hionis's trade area, the good faith standard for performance is inapplicable.

[10] Hionis also contends that the interests of Tandy and InterTAN are so closely related that responsibility for InterTAN's actions should be attributed to Tandy, and when InterTAN began to supply Sakiotis, it was the same as Tandy supplying Sakiotis. Such a conclusion is unwarranted based on the present record. Hionis's support for its argument is virtually nonexistent. Rather than point to specific legally significant facts demonstrating a unity of identity between Tandy and InterTAN, Hionis attempts to show this relationship by referring to a loan agreement between Tandy and InterTAN executed in June of 1993 whereby Tandy became a creditor of InterTAN. (D.I. 34, Ex. C.) Hionis further argues that the existence of this agreement is evidence from which a jury could conclude that Tandy is responsible for InterTAN's actions. Hionis has not cited, nor is this Court aware of, any controlling authority which holds that such a loan agreement is sufficient evidence from which a jury could find a unity of identity between the creditor and debtor. Nor has Hionis cited any authority which supports its unstated assumption that whether Tandy is responsible for InterTAN's actions is a question of fact rather than law. This attempt falls short of the opposing party's burden under Rule 56(c). *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. Therefore, summary judgment for Tandy on the First and Second Claims is appropriate.

**B. *Third Claim***

[11] Hionis's Third Claim alleges that Tandy breached a fiduciary duty because of their "special and close" relationship. (D.I. 1, ¶ 24.) In support of this, Hionis points to a line of Texas insurance cases which recognize an implied covenant of good faith and fair dealing where a special relationship between the parties was created or governed by a contract. *E.g., Arnold v. National County Mut. Fire Ins. Co.,* 725 S.W.2d 165, 167 (1987). [FN4] Hionis argues that the Tandy/Hionis relationship is subject to the implied duty of good faith and fair dealing recognized in *Arnold.* This position is not supported in Texas law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

FN4. The *Arnold* court also recognized that the cause of action sounded in tort, not contract, even though the reason courts impose such a duty is because of a contractual relationship. The reason the duty exists and the remedy for its breach are two separate questions. The Court makes note of this point because the parties have merely assumed that Texas law still controls the tort causes of action in the Third Claim as well as the Fourth and Fifth Claims, even though the choice of law provision in the agreements only applies to the "interpretation" of those agreements. (D.I. 1, Ex. A, ¶ VIII.H & Ex. B, ¶ VI.H.) Since the parties don't disagree, the Court will continue to apply Texas law. The Court also notes that the choice of law analysis employed by Delaware courts for tort claims, as with contract claims, dictates the Restatement's (Second) most significant relationship test. *Travelers Indemnity,* 594 A.2d at 44–47. If pressed, this Court would find Texas has the most significant relationship. Thus, its law is the appropriate choice.

[12] The general rule in Texas is that the tort cause of action for breach of the duty of good faith and fair dealing does not apply to ordinary commercial contractual relationships. *Adolph Coors,* 780 S.W.2d at 481. Indeed, the *Coors* court refused to extend it beyond the insurer/insured context to the supplier/distributor relationship, arguably the relationship that existed between Tandy and Hionis. *Id.* Texas courts have also refused to extend it to the employer/employee, creditor/guarantor, mortgagor/mortgagee, and bank/borrower contexts. *Wheeler v. Yettie Kersting Mem. Hosp.,* 866 S.W.2d 32, 52 (Tex.Ct.App.1993) (collecting cases).

While ignoring the *Coors* decision, Hionis assumes without argument or citation to authority that Texas courts would find the Hionis/Tandy relationship is that of a franchisor*274/franchisee rather

than supplier/distributor. Such a characterization of the relationship could perhaps avoid the effect of the *Coors* holding. Hionis goes on to recognize, however, that Texas courts have yet to extend the duty of good faith and fair dealing to such a relationship. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 596 (1992); *Wheeler,* 866 S.W.2d at 52. Hionis attempts to distinguish this adverse precedent and argues the only reason the *Crim Truck* court did not extend the duty of good faith and fair dealing in that case was because the specific relationship of the parties was controlled by statute. (D.I. 34 at 14–15.) Hionis further argues that, absent this statutory scheme, Texas courts would find a special relationship similar to the *Arnold* insurance context and impose the duty of good faith and fair dealing on Tandy in this context. Hionis's first premise is only half right and their second premise is contradicted by *Crim Truck* itself.

While it is true the court found that a statutory scheme adequately protected the franchisee in *Crim Truck,* the court also addressed the contention that the duty of good faith and fair dealing should apply to all franchise contracts because franchisors necessarily have superior bargaining power over franchisees. The court rejected this broad proposition. 823 S.W.2d at 596 n. 8. It also found that there was no evidence in that case to support the claim that the "franchisor exerted control over its franchisee's business comparable to that exerted by an insurer over its insured's claims." *Id.* The insurer's control which the Texas Supreme Court in *Arnold* found sufficient to impose the duty of good faith and fair dealing included the ability to "arbitrarily deny coverage and delay payment of a claim with no more penalty than interest on the amount owed." *Arnold,* 725 S.W.2d at 167. Furthermore, "an insurance company has exclusive control over the evaluation, processing and denial of claims." *Id.* In light of the *Crim Truck* and *Coors* decisions, this Court is not convinced Texas courts would extend application of the duty of good faith and fair dealing and apply it for the first time in this context, whether

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

termed franchisor/franchisee or supplier/distributor. Accordingly, summary judgment for Tandy on the Third Claim is appropriate.

**C.** *Fourth Claim*

Tandy has moved for summary judgment against Hionis on the Fourth Claim, fraudulent misrepresentation. In its answering brief, Hionis has not argued anything in opposition to summary judgment on this claim. (D.I. 34.) Therefore, summary judgment for Tandy on the Fourth Claim is appropriate.

**D.** *Fifth Claim*

[13] Last, Hionis alleges that Tandy negligently misrepresented to Hionis that it would be the exclusive distributor in Greece for a period of three years.FN5 (D.I. 34, ¶ 16.) The Texas Supreme Court has stated the *prima facie* case for negligent misrepresentation:

> FN5. Hionis's claim was slightly different in the complaint in that it alleged that Tandy had negligently misrepresented that Hionis would have the exclusive use of the Radio Shack and Tandy trademarks for three years. (D.I. 1, ¶ 35.) This was a misrepresentation, so the complaint goes, because Tandy awarded an exclusive license to the Radio Shack and Tandy trademarks to Sakiotis. The uncontroverted facts now show that Tandy made no such award. (D.I. 23, ¶ 2.) In their answering brief, Hionis has abandoned this theory for the slightly different one discussed above.

(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Federal Land Bank Assoc. of Tyler v. Sloane,* 825

S.W.2d 439, 442 (1991) (citing *Restatement (Second) of Torts* § 552 (1977)). Hionis is unable to make out this *prima facie* case.

In particular, Hionis's claim is insufficient with regard to the second element. It argues that Tandy falsely represented to Hionis that it would be the exclusive distributor in **\*275** six cities in Greece, but that this was false because "Sakiotis was an existing dealer in Greece and Tandy most certainly should have known of his existence" at the time the two parties negotiated and executed the agreements. (D.I. 34 at 16.) The only evidence Hionis offers to support this claim is four pages comprising three documents from the Appendix To Opening Brief In Support Of Defendant's Motion For Summary Judgment. (D.I. 20 at A–36 to A–39.) The first document is a letter written by Ms. Ann Kothman of Tandy to Mr. Sakiotis on January 18, 1991, stating that Tandy would be open to discuss the possibility of Mr. Sakiotis becoming a Radio Shack dealer. (D.I. 20 at A–36.) The second is a letter to Mr. Sakiotis from Mr. Tony Aimone dated February 13, 1991, apparently in response to further inquiry from Mr. Sakiotis, outlining in slightly more detail the nature of the relationship Tandy envisioned with a dealer in Greece. (D.I. 20 at A–37.) The next two pages were included with Mr. Aimone's letter and comprise a *pro forma* invoice, not an actual invoice. No reasonable jury could find by a preponderance of the evidence that these documents prove Mr. Sakiotis was operating as a Tandy distributor when Hionis and Tandy executed their agreement. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512. Equally as important is Hionis's own admission in its complaint that Sakiotis did not commence operation as a Radio Shack store until December, 1992, one year *after* Hionis and Tandy executed their contract. (D.I. 1, ¶ 13.) This admission completely contradicts Hionis's allegation in its Answering Brief that Sakiotis was an existing dealer in Greece when Tandy and Hionis negotiated and executed their agreements. Accordingly, summary judgment for Tandy on the Fifth Claim is appropriate.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

867 F.Supp. 268
**(Cite as: 867 F.Supp. 268)**

**IV.** *CONCLUSION*

For the reasons set forth above, this Court will grant defendant Tandy's motion for summary judgment. A judgment will be entered forthwith in accordance with this opinion.

D.Del.,1994.

Hionis Intern. Enterprises, Inc. v. Tandy Corp.

867 F.Supp. 268

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

293 B.R. 650
United States Bankruptcy Court,
D. Delaware.

In re HARNISCHFEGER
INDUSTRIES, INC., et al., Debtors.
In re The Beloit Liquidating Trust, Debtors.

No. 99–2171 (PJW).   |   May 15, 2003.

Receiver for Chapter 11 debtor's wholly-owned indirect subsidiary sought to compel payment of administrative expense. On cross-motions for summary judgment, the Bankruptcy Court, Peter J. Walsh, Chief Judge, held that: (1) debtor's disclosure, in plan disclosure statement, of subsidiary's $7,091,686 claim against it, with no mention of debtor's own substantial claims against subsidiary, did not judicially estop debtor from later asserting such claims as setoff against subsidiary's claim; (2) genuine issue of material fact, on when goods or services were provided by debtor's subsidiary under executory prepetition agreements, whether pre- or postpetition, and on whether some of such goods and services were for benefit of entities other than Chapter 11 debtor-in-possession, precluded entry of summary judgment on subsidiary's claim to compel payment as administrative expense; and (3) internal affairs doctrine applied to resolve question of which sovereign's law governed the characterization of cash advances between closely-related corporate entities.

Motions denied.

West Headnotes (22)

**[1]**   **Bankruptcy**
 Orders

Scheduling order which specified that "all pretrial...memoranda of law in which no new issues [we]re raised [had to] be filed two weeks before trial" could not reasonably be interpreted to bar debtor from raising any new legal arguments as of date of order, prior to completion of discovery, and did not preclude debtor, in light of information learned during discovery, from asserting right of setoff in order to eliminate its obligation on subsidiary's

administrative expense claim. Bankr.Code, 11 U.S.C.A. §§ 503(b), 508.

Cases that cite this headnote

**[2]**   **Bankruptcy**
 Set-off against claim

**Estoppel**
 Claim inconsistent with previous claim or position in general

Chapter 11 debtor's disclosure, in plan disclosure statement, of subsidiary's $7,091,686 claim against it, with no mention of debtor's own substantial claims against subsidiary, did not judicially estop debtor from later asserting such claims as setoff against subsidiary's claim, where disclosure statement was completed before debtor had completed discovery on its claims against subsidiary and specifically indicated that any statements contained therein were not to be construed as admissions or stipulations; in failing to earlier spell out its claims against subsidiary, debtor was not attempting to play fast and loose with courts.

Cases that cite this headnote

**[3]**   **Estoppel**
 Claim inconsistent with previous claim or position in general

Judicial estoppel is judge-made doctrine that seeks to prevent litigant from asserting a position inconsistent with one that he has previously asserted in the same or in prior proceeding.

Cases that cite this headnote

**[4]**   **Estoppel**
 Claim inconsistent with previous claim or position in general

Doctrine of judicial estoppel is not intended to eliminate all inconsistencies, however slight or inadvertent, but is designed to prevent litigants from playing fast and loose with courts.

Cases that cite this headnote

**[5]**   **Estoppel**

👉 Claim inconsistent with previous claim or position in general

Litigant's mere assertion of inconsistent positions does not trigger application of judicial estoppel, unless litigant uses intentional self-contradiction as means to obtain unfair advantage.

Cases that cite this headnote

[6]    **Estoppel**
        👉 Claim inconsistent with previous claim or position in general

Doctrine of judicial estoppel does not apply where prior position was taken because of a good faith mistake, rather than as part of scheme to mislead the court.

Cases that cite this headnote

[7]    **Estoppel**
        👉 Claim inconsistent with previous claim or position in general

Inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing.

Cases that cite this headnote

[8]    **Estoppel**
        👉 Claim inconsistent with previous claim or position in general

Judicial estoppel is extraordinary remedy to be invoked when one party's inconsistent behavior will otherwise result in miscarriage of justice; it is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best, and there is no evidence of intent to manipulate or mislead courts.

Cases that cite this headnote

[9]    **Estoppel**
        👉 Claim inconsistent with previous claim or position in general

Judicial estoppel is not a sword to be wielded by adversaries, unless such tactics are necessary to secure substantial equity.

Cases that cite this headnote

[10]   **Bankruptcy**
        👉 Priorities

       **Bankruptcy**
        👉 Determination of priority

Priority claims are narrowly construed, and claimants who seek payment ahead of other unsecured claims have burden of showing their claim qualifies for priority status.

Cases that cite this headnote

[11]   **Bankruptcy**
        👉 Reorganization cases

       **Bankruptcy**
        👉 Time of accrual;  prepetition claims

       **Bankruptcy**
        👉 Presumptions and burden of proof

Creditor asserting an administrative expense claim must satisfy two-pronged test, and must demonstrate (1) that debtor-in-possession, not the prepetition debtor, entered into transaction or received the consideration on which claim is based; and (2) that transaction resulted in a direct benefit to debtor-in-possession. Bankr.Code, 11 U.S.C.A. § 503(b).

1 Cases that cite this headnote

[12]   **Bankruptcy**
        👉 Judgment or Order

Genuine issue of material fact, on when goods or services were provided by debtor's subsidiary under executory prepetition agreements, whether pre- or postpetition, and on whether some of such goods and services were for benefit of entities other than Chapter 11 debtor-in-possession, precluded entry of summary judgment on subsidiary's claim to compel payment as administrative expense. Bankr.Code, 11 U.S.C.A. § 503(b).

Cases that cite this headnote

**[13]    Bankruptcy**

   🔑    Reorganization cases

If debtor-in-possession elects to continue receiving the benefits from prepetition debtor's executory contract, pending a decision upon whether to assume or reject contract, then debtor-in-possession is obligated to pay for reasonable value of those services as administrative expense, notwithstanding that contract was executed prepetition. Bankr.Code, 11 U.S.C.A. § 503(b).

Cases that cite this headnote

**[14]    Contracts**

   🔑    Agreements relating to actions and other proceedings in general

Delaware law recognizes the validity of choice of law clauses contained in purchase orders.

Cases that cite this headnote

**[15]    Contracts**

   🔑    Agreement as to place of bringing suit; forum selection clauses

Under federal common law, forum selection clauses are prima facie valid and should be enforced.

Cases that cite this headnote

**[16]    Bankruptcy**

   🔑    Debtor's Contracts and Leases

Construction of debtor's contracts is usually a matter of state law, rather than federal common law.

Cases that cite this headnote

**[17]    Contracts**

   🔑    Agreement as to place of bringing suit; forum selection clauses

Forum selection clauses in purchase orders were valid and enforceable, and dictated which

state's law applied to disputes arising from such purchase orders.

Cases that cite this headnote

**[18]    Bankruptcy**

   🔑    Set-off against claim

Internal affairs doctrine applied to resolve question of which sovereign's law governed the characterization of cash advances between closely-related corporate entities, and whether Chapter 11 debtor could set off such advances, made to prop up its allegedly undercapitalized and wholly-owned subsidiary, against subsidiary's own claim against the Chapter 11 estate. Bankr.Code, 11 U.S.C.A. § 553.

Cases that cite this headnote

**[19]    Corporations and Business Organizations**

   🔑    Internal affairs doctrine in general

Internal affairs doctrine is conflict of law principle, which requires that law of state of incorporation should determine issues relating to internal corporate affairs.

2 Cases that cite this headnote

**[20]    Corporations and Business Organizations**

   🔑    Internal affairs doctrine in general

Internal affairs doctrine applies to matters peculiar to corporation, based on the recognition that only one state should have authority to regulate corporation's internal affairs.

2 Cases that cite this headnote

**[21]    Corporations and Business Organizations**

   🔑    Internal affairs doctrine in general

Internal affairs doctrine does not apply to resolve conflicts of law issues, simply because corporation is a transacting party; different conflicts principles apply when the rights of third parties external to corporation are at issue.

Cases that cite this headnote

[22]    **Corporations and Business Organizations**
       👉 Internal affairs doctrine in general

Internal affairs doctrine applies to resolve conflicts of law issues on matters such as steps taken in course of original incorporation, election or appointment of directors and officers, adoption of by-laws, issuance of corporate shares, the holding of directors' and shareholders' meetings, methods of voting, including any requirement for cumulative voting, and declaration and payment of dividends and other distributions. Restatement Second of Conflict of Laws § 302.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*652** James W. Staib, Morris, Nichols, Arsht & Tunnel, Wilmington, DE, James H.M. Sprayregen, Andrew R. Running, Angela Toscas Wilt, Kirkland & Ellis, Chicago, IL, Counsel for The Beloit Liquidating Trust.

Donald J. Detweiler, Saul Ewing, L.L.P., Wilmington, DE, Hackl, Timothy W. Walsh, Jonathan A. Damon, LeBoeuf, Lamb, Greene & MacRae, New York City, Counsel for Dr. Erhard as Receiver of Beloit Austria GmbH.

**Opinion**

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Pending before the Court are cross-motions for summary judgment. Dr. Erhard Hackl, the Receiver (the "Receiver") of Beloit Austria GmbH ("Beloit Austria") seeks judgment as a matter of law allowing an administrative expense claim totaling $3,445,605.46 (the "Receiver's Claim")  **\*653** (Doc.# 11951). [1] The Beloit Liquidating Trust (the "BLT") seeks summary judgment denying the Receiver's Claim or, in the alternative, partial summary judgment that § 558 of the Bankruptcy Code [2] applies to permit setoff of the amount of the Receiver's Claim with amounts owing from Beloit Austria to Beloit (Doc.# 11862). [3] For the reasons set forth below, I will deny both motions.

## BACKGROUND

**A. Beloit's Claim Against Beloit Austria**

Impco Voest Alpine, GmbH ("Impco") was a corporate entity organized and operating under the laws of Austria. BWRC, Inc. ("BWRC"), a Beloit Debtor in this case and a wholly-owned subsidiary of Beloit, purchased 99.99% of the stock of Impco, which then became known as "Beloit Austria." [4] Beloit Austria's role in the Beloit organization was to manage Beloit pulp and paper machine projects at various international locations, though primarily in Europe, and to provide certain goods and services to Beloit and Beloit subsidiaries in connection with pulp and paper machine projects. Beloit Austria operated as a separate corporate entity. The BLT asserts that Beloit Austria was strictly responsible for managing and controlling its own finances. The Receiver, however, asserts that Beloit Austria was under the control of Beloit and that Beloit was responsible for every significant decision, commitment, or economic undertaking. Additionally, the Receiver asserts that Beloit's cash management system swept up to the parent level all cash generated by Beloit Austria for whatever purpose Beloit desired, leaving Beloit Austria and its creditors totally dependent on Beloit.

Regardless of how much financial autonomy it actually had, Beloit Austria established a line of credit with a local bank in Austria. That local line of credit was intended to allow Beloit Austria to manage cash-flow problems resulting from shortfalls in collections or mistimed receipts and disbursements. By the end of March 1999, Beloit Austria was suffering from cash-flow problems. Beloit Austria was having difficulty meeting disbursement obligations and several of its vendors threatened to stop delivery or work at its project work sites if they were not paid. Reflecting Beloit Austria's cash-flow problems, at one point its CFO wrote to Beloit that "we do not expect to be allowed to utilize our [local] credit line this week." The Beloit Liquidating Trust's Memorandum in Support of its Motion for Summary Judgment Denying Dr. Erhard Hackl's Administrative Expense Claim, Or in the Alternative Request for Partial Summary Judgment as to the Applicability of § 558 of the Code, Ex. 9(a), (Electronic Correspondence, March 23, 1999, Doc. # OMA 4754) (Doc. # 11863). In order to meet its "most important **\*654** financial needs," Beloit Austria requested that Beloit make payments directly to its third-party vendors. *Id.*

Beginning on March 26, 1999, Beloit began making payments directly to Beloit Austria's vendors. The first payment was made by depositing $153,876 into Waterlink Hycor's bank account. Three days later, direct payments were made to Honeywell Austria in the amount of $288,928.85 and to DESA in the amount of $405,000. The final payment from Beloit to a third-party vendor of Beloit Austria was made on April 20, 1999 when $634,106.33 was remitted from Beloit to Cellier Groupe S.A. The total amount of the third-party vendor payments by Beloit is $1,481,911.18.

Beloit also made deposits directly into the bank account of Beloit Austria. A May 18, 1999 deposit in the amount of $1,570,000 was followed by a June 3, 1999 deposit in the amount of $3,211,800. The Debtors filed their Chapter 11 petitions on June 7, 1999 (the "Petition Date"). On June 25 1999 Beloit deposited $300,000 into Beloit Austria's account. The final deposit was made on September 22, 1999 in the amount of $616,486. [5] The amount directly deposited into Beloit Austria's account is $5,698,286. Accounting for both direct deposits and payments to third-party vendors, Beloit asserts that Beloit Austria owes it $7,180,197.18 (the "Beloit Claim"). Based on the dates of the transactions asserted above, $6,263,711.18 was transferred pre-petition.

Two months after the final deposit was allegedly made by Beloit into Beloit Austria's account, on November 19, 1999 Beloit notified Beloit Austria that it had decided to halt support for its European subsidiaries. That information was made public by Beloit on the same day. One week later, on November 26, 1999 Beloit Austria was placed into bankruptcy proceedings by order of the Commercial Court, Linz, Upper–Austria. [6]

### B. The Receiver's Administrative Claim Against Beloit

The Receiver has filed an administrative claim in the amount of $3,445,605.46 consisting of both performance induced post-petition and post-petition work on pre-petition purchase orders not rejected by Beloit. Beloit raises various objections to the validity of the Receiver's Claim, including an assertion that Beloit Austria cannot establish that the goods and/or services identified on the invoices were furnished post-petition. *See* The Beloit Liquidating Trust's Memorandum in Support of its Objection to Dr. Erhard Hackl's Motion for Summary Judgment (Doc. No. 12032), p. 32 ("BLT Objection"). Beloit also asserts that, even if the Receiver's Claim is valid, § 558 applies and permits Beloit to offset the

amount of the Receiver's Claim against the Beloit Claim. [7] *See id.* at 20.

## *655 DISCUSSION

### 1. Beloit's Setoff Defense

The initial issue that must be addressed is the Receiver's assertion that Beloit is precluded from raising the setoff defense. The Receiver makes two arguments in this regard. First, he argues that the defense is untimely raised and therefore violates this Court's June 17, 2001 Scheduling Order. *See* Memorandum of Law of the Receiver of Beloit Austria GmbH in Opposition to Debtors' Motion for Summary Judgment in Connection with Allowance of Administrative Claim (Doc. # 12025), pp. 7–8 ("Receiver's Opposition"). Second, he argues that Beloit is bound by its representations in the Third Amended Joint Plan and related Disclosure Statement ("Disclosure Statement"). *See id.* at 20.

### A. Scheduling Order

[1]  Specifically, the Receiver asserts that the setoff claim was not raised prior to the execution of the Scheduling Order, which requires that "all pretrial stipulations, pretrial memoranda of law in which no new issues are raised, and motions in limine be filed two weeks before trial." Stipulated Scheduling Order on Dr. Hackl's Amended Motion for Administrative Claim Against Beloit Corporation (Doc. # 11404), p. 3. The Receiver appears to read that provision as precluding Beloit from raising any new legal arguments as of the date of the Scheduling Order, but giving it until two weeks of the trial date to submit its memorandum of law. I do not agree with the Receiver's reading of the Scheduling Order.

The Scheduling Order is with regard to the Receiver's Amended Motion for Order Allowing and Compelling Payment of Administrative Claim, to which Beloit's Amended Objection was filed at the outset of discovery. The Scheduling Order required that the Receiver's brief in response to Beloit's objection be filed within one week of the completion of depositions (or after the close of discovery). It further provided deadlines to take depositions, to provide other discovery, and provided deadlines for disclosure of expert reports and rebuttals. It is simply inconceivable that, prior to the completion of discovery, the parties would be precluded from raising any legal arguments that might be warranted in light of information obtained during discovery.

Rather, the provision precludes the raising of new issues of law within the two-week period prior to trial.

According to the BLT, it is irrelevant whether the Receiver's reading of the Scheduling Order is correct as it disclosed the setoff defense prior to the execution of the Scheduling Order. *See* BLT Objection at 25–27 (Doc. # 12032). The Debtor's Supplemental Objection to Request for Payment By Dr. Erhard Hackl ("Supplemental Objection"), filed by the Debtors on March 28, 2001, contains a section entitled "Beloit Austria is a Net Debtor to Beloit and HII." [8] Supplemental Objection (Doc. # 9537), p. 7. That section indicates that Beloit Austria was extended in excess of $17.7 million in post-petition credit support and that, as a result, Beloit Austria is a net debtor to Beloit.[9] *See id.* at 7–8. The section concludes by asserting that "[t]his dollar value alone substantially off-sets the amounts described in the Claim." *Id.* at 8. One paragraph later, in its conclusion, Beloit again states "any amounts claimed by Dr. Hackl on behalf of the estate are off-  **\*656** set by the amounts Beloit Austria owes the Debtors." *Id.* at 9. As this issue was clearly raised prior to the execution of the Scheduling Order and the parties took discovery on it, Beloit Austria was clearly on notice of a defense of setoff. Beloit has therefore not raised the defense in an untimely manner and the Scheduling Order does not provide grounds to preclude the defense of setoff.[10]

**B. Disclosure Statement**

 [2]   [3]   [4]   The Receiver argues that Beloit is bound by its representations in the Disclosure Statement indicating that Beloit Austria is a net creditor of Beloit.[11] On February 2, 2000, Beloit Austria filed two proofs of claim totaling $7,091,686. Those claims were objected to in the 44th Omnibus Objection (Doc. # 6280). A stipulation was ultimately reached by the parties whereby Beloit withdrew the Objection without prejudice. Though the claims had not been resolved, this Court approved the Disclosure Statement on December 6, 2000. Schedule III(B)(7)(c) of the Disclosure Statement, entitled "Intercompany: Trade and Advances," indicates that, as of July 31, 2000, Beloit Austria was a Beloit creditor in the amount of $7,091,686. Schedule III(B)(7)(b), entitled "Intercompany: Loans," does not indicate that Beloit was claiming funds owing to it from Beloit Austria. Based on these facts the Receiver argues that the BLT is judicially estopped from asserting any setoff claim against Beloit Austria.

Judicial estoppel, sometimes called the doctrine against the assertion of inconsistent positions, is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing fast and loose with the courts. *In re Chambers Development Co., Inc.,* 148 F.3d 214, 229 (3d Cir.1998) (citation omitted).

 [5]   [6]   [7]   [8]   [9]   However, "[a]sserting inconsistent positions does not trigger the application of judicial estoppel unless intentional self-contradiction is used as a means of obtaining unfair advantage. Thus, the doctrine of judicial estoppel does not apply when the prior position was taken because of a good faith mistake rather than as part of a scheme to mislead the court." *Ryan Operations, G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir.1996) (citations and internal quotations omitted). "An inconsistent argument sufficient to invoke judicial estoppel must be attributable to intentional wrongdoing." *Id.* In sum, judicial estoppel is an:

> extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. It is not meant to be a technical defense for litigants seeking to derail potentially meritorious claims, especially when the alleged inconsistency is insignificant at best and there is no evidence of intent to manipulate or mislead the courts. Judicial estoppel is not a sword to be wielded by adversaries unless such  **\*657** tactics are necessary to secure substantial equity.

*Id.* at 365 (citations and internal quotations omitted).

In response, Beloit asserts that it has not asserted inconsistent positions by virtue of raising its setoff defense. *See* BLT Objection at 28 (Doc. # 12032). It also avers that it has in no way played fast and loose with this Court. *See id.* at 30. Beloit states that the Schedules attached to its Disclosure Statement simply reflect the dollar value of the claims asserted by each relevant subsidiary Debtor to other HII-related Debtors as of the Petition Date, and in no way "admit" the validity of those claims. *See id.* at 28. In that regard, the BLT points out that,

the Disclosure Statement states, in bold, capital letters on page 2 that:

**"THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ... AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS ADMISSIONS OR STIPULATIONS, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS."** Thus, Beloit cannot be said to have admitted the validity of the Receiver's Claim merely by publishing it in Schedule III(B)(7)(c).

Additionally, Beloit notes that both the Order Approving The Debtors' Disclosure Statement ("Disclosure Order") (Doc. # 7894) and the Order Confirming Third Amended Joint Plan of Reorganization ("Reorganization Order") (Doc. # 10512) expressly reserve the Debtors' rights to pursue any claims or causes of action not provided for in the Schedules. [12] *See* BLT Objection at 29. The Disclosure Order, signed on December 20, 2000, states at ¶ 31 that the Debtors' "failure to identify any claim or Cause of Action in the Disclosure Statement and the Retained Actions Schedules may not be used as a basis to assert that Debtors are barred by res judicata, collateral estoppel, or otherwise from pursuing or defending any such claim or Cause of Action." (Doc. No. 7894), p. 12. More specifically, the Confirmation Order, signed on May 18, 2001, states that:

> Unless a claim or Cause of Action against a Creditor or other person or entity is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order, the Debtors retain such claim or Cause of Action for later adjudication ... No preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims or Causes of Action....
(Doc. # 10512), p. 24.

As the Schedules were intended to provide information regarding the debts owed by each subsidiary Debtor to other HII-related entities as of the Petition Date, they contain accurate and necessary information. Beloit was an HII subsidiary and thus a subsidiary Debtor as that term is used in the Disclosure Statement. Beloit Austria is an HII-related entity as it is an indirect subsidiary of Beloit. Beloit was indebted to Beloit Austria in an amount slightly over $7 million, which is reflected in Schedule III(B)(7)(c). However,

Beloit Austria is *not* a debtor and thus the fact that it allegedly owes Beloit slightly less than $7.2 million was properly omitted from the Schedules showing debts owed by subsidiary Debtors to other HII-related **\*658** entities. Even absent language expressly reserving all claims not identified in the Disclosure Statement, Beloit's non-disclosure of its claim against Beloit Austria would therefore not suffice to bind Beloit to being a net debtor to Beloit Austria.

To the extent that Beloit's silence with respect to its claims against Beloit Austria forms a basis for judicial estoppel, I find that Beloit is clearly not trying to play fast and loose with this Court. Beloit asserts that its claim against Beloit Austria was confirmed through discovery and notes that discovery had not yet commenced when the Disclosure Statement was completed. *See* BLT Objection at 29 (Doc # 12032). The Confirmation Order reserved the Debtors' right to prosecute claims or Causes of Action including, without limitation, those not specifically identified in the Plan or those with regard to which the Debtors were not yet aware of all pertinent facts.

I find the Receiver's reliance on the Third Circuit's *Chambers* decision to be misplaced. *Chambers* involved a petition for a writ of mandamus. In a prior ruling in that case, the Third Circuit vacated the district court's grant of summary judgment, concluding that the agreement at issue was "enigmatic" and "susceptible to more than one interpretation." *Chambers,* 148 F.3d at 221. After instructing the district court to interpret the agreement, the Third Circuit remanded "with the privilege to Chambers to amend its complaint to enable it to present the case in its current status." *Id.* Chambers then filed an amended complaint seeking interpretation of the agreement. *See id.* at 222. Rather than do so, the district court concluded that, as Chambers had previously represented it was not seeking to have the court interpret the agreement, judicial estoppel required dismissal of the amended complaint. *See id.* at 222–23. The Third Circuit issued a writ of mandamus and again vacated the grant of summary judgment after concluding that the district court's interpretation of Chambers' amendments as playing fast and loose with the court and consequent invocation of the doctrine of judicial estoppel was "clearly error" as the Third Circuit had expressly granted Chambers the privilege of seeking interpretation of the agreement. *Id.* at 231–32.

Much like in *Chambers,* the Disclosure Order and especially the Confirmation Order extend Beloit the privilege of prosecuting claims or Causes of Action not expressly

disposed of in the Plan or in any final order without being barred by judicial estoppel. Neither Order places any limits on what future claims or Causes of Action can be prosecuted. In fact, the Confirmation Order specifically states that those claims and Causes of Action include, without limitation, those involving facts not yet known to the Debtors, *i.e.* those facts which had not yet been discovered. Beloit asserts it was not able to confirm its claim against Beloit Austria prior to discovery. Barring Beloit from filing a claim or Cause of Action on judicial estoppel grounds, after expressly granting it the privilege to raise that claim or Cause of Action without being barred by judicial estoppel would be inconsistent. There are thus no grounds to preclude Beloit from raising its setoff defense.

## 2. Validity of the Receiver's Administrative Claim

[10]    Priority claims affect two important bankruptcy concerns: minimizing administrative costs during Chapter 11 to preserve the debtor's scarce resources and thus encouraging rehabilitation, *General Am. Transp. Corp. v. Martin (Mid Region Petroleum, Inc.),* 1 F.3d at 1130, 1132 (10th Cir.1993), and obtaining maximum **\*659** and equitable distribution of estate assets to creditors. *See, e.g., BFP v. Resolution Trust Corp.,* 511 U.S. 531, 563, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Therefore, priority claims are narrowly construed. *Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 865 (4th Cir.1994). Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status. *See, e.g., Dobbins,* 35 F.3d at 865; *Mid Region Petroleum, Inc.,* 1 F.3d at 1132; *In re Hemingway Transp., Inc.,* 954 F.2d 1, 5 (1st Cir.1992); *In re Columbia Gas Syst., Inc.,* 224 B.R. 540, 549 (Bankr.D.Del.1998); *In re Smith Corona Corp.,* 210 B.R. 243, 245 (Bankr.D.Del.1997).

[11]    [12]    Determining whether a creditor has an administrative claim is a two-prong test: "first, [the claimant] must show either that the debtor-in-possession (not the pre-petition entity) incurred the transaction on which the claim is based, or that the claimant furnished the consideration to the debtor-in-possession (not the pre-petition entity). Second, it must show that the transaction resulted in a direct benefit to the debtor-in-possession." *In re CIS Corp.,* 142 B.R. 640, 643 (S.D.N.Y.1992). *See also Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.),* 66 F.3d 1091, 1094 (9th Cir.1995); *General Am. Transp. Corp. v. Martin,* 1 F.3d at 1133; *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 954 (1st Cir.1976); *In re Unidigital, Inc.,* 262 B.R.

283, 288 (Bankr.D.Del.2001). In this case, genuine issues of material fact are in dispute concerning the first prong of the test, precluding the entry of summary judgment in favor of either the Receiver or Beloit.

[13]    In support of his Motion, the Receiver proffers numerous invoices, identified in depositions of various Beloit Austria employees, reflecting services performed on various Beloit projects after the Petition Date. Those invoices involved work performed based on pre-petition purchase orders. Despite the purchase orders being issued pre-petition, "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Thus, if the work in question was performed post-petition, the two-prong administrative claim test is satisfied as the required consideration would have been provided to the debtor-in-possession and the debtor-in-possession would presumably have benefitted from having the projects it had financed completed.

However, Beloit asserts, based on the testimony of a Beloit Austria employee, that without supporting documentation it is impossible to determine the date on which goods and services forming the basis of the invoices were requested. *See* BLT Objection at 36–40 (Doc. # 12032). Additionally, with regard to some of the invoices, it is impossible to determine when the goods or services were provided. *See id.* Beloit also asserts that some invoices involve goods or services allegedly provided by Beloit Austria on a project that was halted about one year prior to the Petition Date. *See id.* Further, Beloit asserts that some charges represent amounts arising from transactions with entities other than the various Beloit Debtors. *See id.* Finally, Beloit asserts that over $1.5 million of the claimed invoices represent "back charges" that were never negotiated. [13]  **\*660**  *See id.* Based on those factual disputes, it is not possible to grant summary judgment in favor of either party with respect to the amount of the Receiver's Claim.

## 3. Choice of Law

Having concluded that Beloit is not precluded from raising its setoff defense and that the amount of the Receiver's Claim cannot be determined at this time as a matter of law, the next issue that must be addressed is whether Austrian or

United States law governs the issue of setoff. The Receiver asserts that Austrian law applies. According to the Receiver, the internal corporate affairs doctrine ("internal affairs doctrine"), which "involves those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders," is applicable and "requires that the law of the state of incorporation," which is Austria, govern. *See* Receiver's Opposition at 14–17 (Doc. # 12025), *citing McDermott Inc. v. Lewis,* 531 A.2d 206, 214–215 (Del.1987). In response, Beloit asserts that United States law is controlling as the transactions at issue do not implicate the internal affairs doctrine. *See* The Beloit Liquidating Trust's Memorandum in Support of its Reply to Dr. Erhard Hackl's Objection to the Beloit Liquidating Trust's Motion for Summary Judgment (Doc. # 12195), p. 5 ("BLT Reply"). Additionally, Beloit asserts that United States law applies as the purchase orders forming the basis of the Receiver's Claim contain choice of law provisions making either the law of Massachusetts or Wisconsin applicable. *See id.* at 3–4.

[14] [15] [16] The parties have allegedly agreed on what law governs claims arising out of the purchase orders. Specifically, the purchase orders at issue contain a provision selecting either the law of Massachusetts or Wisconsin, depending on where the purchase order was issued. In determining whether to apply a forum selection clause contained in a purchase order, it must be noted that "[t]here is substantial disagreement among the courts as to whether or not a federal court exercising bankruptcy jurisdiction must follow the choice-of-law rules of the state in which it sits or the federal common law choice-of-law rules." *T. Frederick Jackson, Inc. v. Pepper, Hamilton & Scheetz, LLP (In re Olsen Industries, Inc.),* 2000 WL 376398, *12 (D.Del. March 28, 2000). However, as in *Olsen,* "it matters not which choice-of-law rule is applied." *Id.* Delaware law recognizes the validity of choice of law clauses contained in purchase orders. *See Falcon Tankers, Inc. v. Litton Systems, Inc.,* 380 A.2d 569, 582 (Del.Super.Ct.1977). To the extent that federal common law applies, forum selection clauses are "*prima facie* valid and should be enforced." The *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). [14]

**\*661** Beloit argues that the validity of the forum selection clauses mandates the application of Wisconsin and/or Massachusetts law, which, according to Beloit, both permit setoff. Beloit further asserts that the internal affairs doctrine is inapplicable. The Receiver asserts, however, that a "choice

of law clause printed on the back of a purchase order cannot change these more fundamental policy issues [whether the internal affairs doctrine applies]—even assuming someone actually saw it—because parties cannot consent to *ultra vires* acts." Sur–Reply of Dr. Erhard Hackl in Opposition to the Reply Memorandum Submitted by the Beloit Liquidating Trust In Support of the Beloit Liquidating Trust's Motion for Summary Judgment (Docket # 12383), p. 9 ("Sur–Reply"). [15] The Receiver therefore asserts that even if the forum selection clause in the purchase orders is valid, the internal affairs doctrine overrides the choice of law clause.

[17] Both Beloit and Beloit Austria appear to premise their arguments on the assumption that the choice of law analysis can be made under a single determination. However, I believe that the choice of law analysis actually consists of two separate determinations: the law governing the disputes arising from the purchase orders and the law governing the monetary advances from Beloit to Beloit Austria. With respect to the first, I agree with Beloit that the forum selection clauses contained in the purchase orders are valid and enforceable. Thus, I conclude that disputes arising from the performance of those agreements are governed by either the law of Wisconsin or Massachusetts.

[18] [19] [20] [21] However, whether the monetary advances from Beloit to Beloit Austria, either direct or indirect, constitute an equity investment is an issue separate from the purchase order disputes. At this juncture it is therefore necessary to determine whether the Receiver is correct in his assertion that the internal affairs doctrine applies to the dispute concerning those contributions. [16] As noted above, the internal affairs doctrine is a conflict of law principle, requiring that "the law of the state of incorporation should determine issues relating to internal corporate affairs." *McDermott,* 531 A.2d at 215. The internal affairs doctrine applies to matters "peculiar" **\*662** to a corporation based on the recognition that "only one State should have the authority to regulate a corporation's internal affairs ... because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Of course, it does not apply simply because a corporation is a transacting party. "Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*emphasis in original* ).

[22]    The internal affairs doctrine generally applies to such issues as:

> steps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, the declaration and payment of dividends and other distributions, charter amendments, mergers, consolidations, and reorganizations, the reclassification of shares and the purchase and redemption by the corporation of outstanding shares of its own stock.

*Restatement Second of the Conflict of Laws* § 302, comment e (hereinafter the "*Restatement* ").

The *Restatement* goes on to state that matters such as those listed above "must be contrasted with the acts dealt with in § 301, which include, for example, the making of contracts, the commission of torts and the transfer of property. There is no reason why corporate acts of the latter sort should not be governed by the local law of different states." *Id.* Comment b to section 301 of the *Restatement* states, in similar language, that many acts "can be done both by corporations and by individuals. Thus, corporations and individuals alike make contracts, commit torts and receive and transfer assets. Issues involving acts such as these when done by a corporation are determined by the same choice-of-law principles as are applicable to non-corporate parties." *Restatement,* § 301(b).

The parties cite no cases concerned with the internal affairs doctrine that are similar to the facts here and independent research has failed to disclose any. However, despite having limited guidance, it appears that *Restatement* section 301(b) is inapplicable. *Restatement* section 301 is titled "Rights and Liabilities to Third Persons" and reads in its entirety: "The rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties." *Restatement,* § 301. Comment a states that "as used in this Section, 'third persons' are persons other than ... stockholders of the corporation." *Id.,* cmt. a. Here, however,

the dispute is between one corporation and the corporate parent that is its shareholder. [17] There is no "third party" in the sense envisioned by the drafters of the *Restatement.*

Though the issue here is not one that is enumerated in the Comments to *Restatement* § 302, and though Beloit seeks to frame the issue as a mere contract dispute, the facts support an application of the internal affairs doctrine. Beloit Austria is a wholly-owned indirect subsidiary of Beloit.
 **\*663** Beloit exercised sufficient control over Beloit Austria that dealings between the two entities were not at arms-length. The monetary advances with which Beloit is attempting to offset the Receiver's Claim were made because Beloit Austria had severe cash flow problems, arguably because it was undercapitalized by Beloit. The Receiver asserts that Beloit made all significant economic decisions affecting Beloit Austria, whose cash was swept up to the parent level on a daily basis. *See* Sur–Reply at 9 (Doc. # 12383). The Receiver also asserts that Beloit Austria lacked discretion to refuse entering into contracts that Beloit wished to undertake. *See id.* According to the Receiver, it was those contracts that Beloit Austria entered into, despite ailing financially, that caused it to require an infusion of monies from Beloit. Thus, the Receiver argues that undercapitalizing a subsidiary and forcing it to incur debt while the parent entity benefits from agreements not negotiated at arms-length is something uniquely related to the internal affairs of a corporation. *See id.* at 8–9.

I agree with the Receiver's assertion that the internal affairs doctrine applies to the question of what law governs the treatment of the monetary advances from Beloit to Beloit Austria. The central issue here is the characterization of these advances. Thus, the issue here involves something "peculiar" to a corporation and its shareholder and it involves the internal governance, *i.e.* the transfer of funds from the controlling shareholder to its subsidiary resulting from the performance of contracts directly involving not just the subsidiary but also the controlling shareholder, which contracts apparently were initiated, if not dictated, by the controlling shareholder. Finding that the internal affairs doctrine applies, I now turn to the issue of setoff under Austrian Law.

### 4. Setoff Under Austrian Law
The Receiver has retained an Austrian lawyer, Dr. Peter Lambert, who opines that Austrian law holds that "shareholder contributions of almost any kind (direct contributions, loans, guarantees for the loan of third party,

etc.) to a company in financial crisis are not subject to set-off." Receiver's Opposition, Exhibit 1 (Doc. # 12025). Thus, he concludes that Beloit has no setoff rights with respect to the Receiver's Claim. Dr. Lambert relies on cases in which the Austrian courts adopted the German doctrine of "Eigenkapitalersatz," which essentially states that if a shareholder contributes funds to a corporation when a prudent merchant would not have made it a loan, the shareholder may not assert a claim for repayment in an insolvency proceeding. *See id.* Beloit's Austrian lawyer, Dr. Nicholas Simon, predictably opines that Austrian law does permit setoff in situations such as here. *See* BLT Reply, Exhibit A (Doc. # 12195). Dr. Simon asserts that the Austrian courts have established a number of conditions that must be met in order for Eigenkapitalersatz to apply, conditions which have not been met in this case. *See id.* Dr. Simon then notes that Austria does not recognize the concept of *stare decisis,* meaning that none of the cases cited by either expert have any relevance. *See id.* According to Dr. Simon, Eigenkapitalersatz has not yet been codified into Austrian law, which makes it unclear on what grounds any Austrian court has applied it. As it is not codified but yet has been applied, it is Dr. Simon's view that "there is no legal basis for [Eigenkapitalersatz] in Austrian law." *Id.*

I find the declaration submitted by Dr. Simon to be better-reasoned and more persuasive than that submitted by Dr. Lambert. As such, I am not inclined to accept Dr. Lambert's conclusion that setoff **\*664** rights do not exist under Austrian law on the facts before me. However, I do not believe that I can rule at this time that setoff rights do exist on the facts before me because the Austrian lawyers' declarations do not sufficiently articulate the relevant facts

at issue here. [18]  This is particularly so with respect to Dr. Simon's declaration which posit a fact about Beloit's "*de minimis* " shareholder interest in Beloit Austria that I do not agree with. It seems to me that the relevant facts may best be articulated at a trial on the merits and then the Austrian law applied thereto. Alternatively, if the parties were able to agree upon a detailed statement of facts regarding the relationship and dealings between the two corporations and have their respective Austrian lawyers opine on those specific facts then the Court might be in a position to rule on the issue prior to trial. While I have doubts about this alternative, at counsels' election we could have a brief conference to discuss the feasibility of this approach to the setoff issue.

## CONCLUSION

For the reasons stated above, the cross-motions for summary judgment are denied.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, both the Beloit Liquidating Trust's Motion for Summary Judgment Denying Dr. Erhard Hackl's Administrative Expense Claim, Or in the Alternative Request for Partial Summary Judgment as to the Applicability of § 558 of the Code (Doc. # 11862) [*] and The Motion of the Receiver of Beloit Austria GmbH for Summary Judgment on Allowance of His Administrative Expense Claim Against the Beloit Debtors (Doc. # 11951) [*]  are denied.

Footnotes

1    The Receiver's Claim was initially filed against all the debtors in these administratively consolidated Chapter 11 cases. However, all supporting evidence is connected solely to what are referred to as the Beloit Debtors. Other debtors, referred to as the Reorganizing Debtors, have been dismissed from the case pursuant to a stipulation between the parties filed on December 12, 2001 (Doc. # 12031).

2    The Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* is hereinafter referred to as "§ _____."

3    Pursuant to the Plan of Reorganization confirmed on May 18, 2001 (Doc. # 7902), the BLT is the successor entity to the Beloit Debtors. "Beloit" refers to the Beloit Corporation, the parent entity of the Beloit companies. The terms "Beloit" and the "BLT" will be used interchangeably in this Opinion in reference to the positions they have taken.

4    The remaining .01% of the stock was owned by Beloit.

5    It is disputed whether this money ever went to Beloit Austria. Beloit asserts that the money was deposited into a French bank account, but the Receiver asserts that no evidence exists that Beloit Austria had any bank accounts in France. Nevertheless, Beloit accounts for both disputed amounts in its claim. For present purposes, it is irrelevant whether they are properly claimed.

6   Despite asserting that Beloit Austria owes it slightly over seven million dollars, Beloit has no claim against Beloit Austria in the Austrian bankruptcy proceedings. A claim was initially made, but was withdrawn after the Receiver filed an objection. The claim was never reasserted, and Beloit is now apparently time-barred from doing so.

7   Section 558 provides: "The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses." 11 U.S.C. § 558.

8   "HII" refers to Harnischfeger Industries, Inc., of which Beloit was a subsidiary.

9   Beloit has apparently abandoned its claim that it advanced Beloit Austria in excess of $17.7 million and instead asserts its claim for slightly less than $7.2 million.

10  As the setoff defense was raised in the Amended Objection, Beloit Austria is incorrect in its assertion that it was not raised until the parties participated in mediation on September 19, 2001. To the extent it is relevant, Beloit asserts it extensively briefed the issue in its mediation submission. September 19, 2001 was clearly more than two weeks prior to trial, which was originally scheduled for December 14, 2001.

11  The Disclosure Statement (Doc. # 7902) is dated December 26, 2000.

12  Beloit asserts in its Memorandum in Support of its Objection to Dr. Erhard Hackl's Motion for Summary Judgment that language to that effect can also be found on page 2 of the Disclosure Statement. However, I find no such language on page 2.

13  "Back charges" essentially refers to cost overruns for services provided by, in this case, Beloit Austria that Beloit Austria believed were the responsibility of the other party, in this case Beloit. Apparently, the standard practice was for the parties to negotiate whether the claimed back charge was proper in scope and amount. For example, a back charge of 474,573 British pounds could be negotiated down 400,000 or even 350,000 pounds. The parties dispute whether the invoices relating to back charges have been negotiated and thus whether the amount claimed is proper. More importantly, the parties disagree as to whether back charges were negotiated with regard to contracts between Beloit and Beloit Austria.

14  It is unlikely that federal common law is applicable as the construction of contracts "is usually a matter of state, not federal common law." *General Engineering Corp. v. Martin Marietta Alumina, Inc.,* 783 F.2d 352, 356 (3d Cir.1986).

    Federal courts are able to create federal common law only in those areas where Congress or the Constitution has given the courts the authority to develop substantive law, as in labor and admiralty, or where strong federal interests are involved, as in cases concerning the rights and obligations of the United States. Only rarely will federal common law displace state law in a suit between private parties. As the Court in *Miree v. DeKalb County, Georgia,* 433 U.S. 25, 31, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977), observed, in a suit between private parties where federal common law is sought to be applied, "normally the guiding principle is that a *significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown.*"

    *Id.* at 356–57 (citations omitted) (emphasis added by *Miree* Court).

15  Though the Receiver does not specify what *ultra vires* conduct exists to mandate voiding the choice of law clause, it appears from his Sur–Reply that he is referring to, in his words, Beloit's decision to incorporate Beloit Austria in Austria, to undercapitalize it at incorporation, to control its finances, sweep its cash up to the parent level on a daily basis, and drive it into insolvency, thereby harming its creditors. *See id.*

16  No choice of law analysis is necessary as all potentially governing jurisdictions, Delaware, Wisconsin, and Massachusetts, as well as federal common law, apply the internal affairs doctrine when warranted. *See McDermott, Inc. v. Lewis,* 531 A.2d 206, 215 (Del.1987); *NCR Corp. v. Wisconsin Department of Revenue,* 112 Wis.2d 406, 332 N.W.2d 865, 867 (App.1983); *Harrison v. NetCentric Corp.,* 433 Mass. 465, 744 N.E.2d 622, 628–29 (2001); *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982).

17  As noted above, technically BWRC owns 99.99% of Beloit Austria and Beloit owns the remaining .01%. However, BWRC is a wholly-owned subsidiary of Beloit.

18  Furthermore, whether by reason of poor translations or because of the difficulty in reconciling Austrian legal concepts with United States legal concepts, I have considerable difficulty understanding the translated Austrian decisions attached to Dr. Lambert's declaration.

*   The Doc. # references are to Case No. 99–2171(PJW)

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

788 A.2d 134
Superior Court of Delaware,
New Castle County.

LIGGETT GROUP INC., et al., Plaintiffs,

v.

AFFILIATED FM INSURANCE
COMPANY, et al., Defendants.

C.A. No. 00C-01-207 HDR.    |    Submitted:
Dec. 22, 2000.    |    Decided: May 15, 2001.

Cigarette manufacturer and parent corporation brought action against liability insurers to establish duty to defend and coverage for claims in connection with more than one-thousand tobacco health-related lawsuits nationwide. On choice of law issue, the Superior Court, New Castle County, Ridgely, President Judge, held that: (1) law of North Carolina, rather than New York, applied, and (2) "service of suit" clause in some policies required application of the whole law of New York, including choice of law rules, which favored North Carolina law.

So ordered.

West Headnotes (10)

[1]    **Insurance**
 Products liability coverages or exclusions

Under New York and Delaware law, the law of North Carolina where cigarette manufacturer's corporate offices were located for approximately nineteen of the twenty-eight years of coverage, rather than New York where policies were delivered and some insurers were located, applied to question of products liability coverage for nationwide tobacco-related injuries; since the case involved more than one hundred policies arising out of negotiations in at least eight states, the place of contracting was difficult to determine, the manufacturer and its parents used brokers in both states, the manufacturer's risk management department was located with its headquarters, its tobacco manufacturing operations and marketing functions were located in North Carolina,

and both states shared the same general policy regarding insurance coverage disputes. Restatement (Second) Conflict of Laws §§ 6, 188, 193.

5 Cases that cite this headnote

[2]    **Action**
 What law governs

The "most significant relationship test" of the Restatement (Second) Conflict of Laws determines which state's law to apply. Restatement (Second) Conflict of Laws §§ 188, 193.

3 Cases that cite this headnote

[3]    **Insurance**
 Significant relationship test

Under "most significant relationship" test, choice of law questions involving insurance coverage disputes are resolved by an analysis of contacts including the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, the principal location of the insured risk, and the domicile, residence, nationality, place of incorporation, and place of business of the parties. Restatement (Second) Conflict of Laws §§ 188, 193.

12 Cases that cite this headnote

[4]    **Insurance**
 Choice of Law Rules

In complex cases involving large numbers of insurers and policies with contacts in various states, a court ruling on a choice of law question cannot ignore the practical consequence of monumental, very expensive, time-consuming discovery and legal research facing the litigants.

Cases that cite this headnote

[5]    **Action**
 Moot, hypothetical or abstract questions

Completion of discovery and briefing made the choice of law issue ripe for determination

in complex litigation over products liability coverage involving large numbers of insurers and policies with contacts in various states.

1 Cases that cite this headnote

**[6]    Insurance**
   🔑 **Products liability coverages or exclusions**

Tobacco-related injuries in the underlying product liability claims against cigarette manufacturers were the "insured risks" within the meaning of a Restatement provision stating that a court should apply the local law of the state understood to be the principal location of the insured risk during the term of the policy; thus, because the injuries spanned forty-nine states and the District of Columbia, there was no principal location of the risks. Restatement (Second) Conflict of Laws § 193.

3 Cases that cite this headnote

**[7]    Action**
   🔑 **What law governs**

A court ruling on a choice of law issue may not simply tally the contacts between jurisdictions, but must evaluate the contacts according to their relative importance with respect to the particular issue and the principles concerning the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states; the relative interests of those states in determination of the particular issue; the protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability, and uniformity of result; and ease in the determination and application of the law to be applied. Restatement (Second) Conflict of Laws §§ 6, 188.

4 Cases that cite this headnote

**[8]    Insurance**
   🔑 **Choice of Law Rules**

Where insurers are located in many different states, the insured's principal place of business naturally assumes a greater significance in a

conflict of laws analysis. Restatement (Second) Conflict of Laws § 188.

Cases that cite this headnote

**[9]    Contracts**
   🔑 **Place of making contract**

For purposes of a choice of law analysis, the place of contracting is the place where the last act occurred that was necessary to give the contract binding effect. Restatement (Second) Conflict of Laws § 188(2)(a).

1 Cases that cite this headnote

**[10]    Insurance**
   🔑 **Contractual or policy clauses; agreements**

The phrase "law and practice of State of New York" in a "service of suit" clause in a liability policy requiring determination of policy matters in accordance with New York law encompassed the whole law of New York, including choice of law rules; the clause was thus not a choice of law provision.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*135** Michael D. Goldman, John E. James, Richard L. Horwitz and William R. Denny of Potter Anderson & Corroon LLP, Wilmington, and Robert L. Carter, Jr., Andrew M. Reidy, Daniel G. Jarcho, and John M. Clerici of McKenna & Cuneo, L.L.P., Washington, D.C., for Plaintiffs Liggett Group Inc. and Brooke Group Holding Inc.

Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, as Liaison Counsel for Defendants.

**Opinion**

## CHOICE OF LAW OPINION

RIDGELY, President Judge.

Plaintiffs Liggett Group, Inc. ("Liggett") and Brooke Group Holding, Inc. ("Brooke") have filed this civil action against

Affiliated FM Insurance Company and thirty-two other insurance companies [1] **136** to determine Plaintiffs' rights and Defendants' obligations under more than one-hundred liability insurance policies sold to the plaintiffs (and/or their parent companies) by the thirty-three defendants from 1970 until 1998. Plaintiffs seek both defense and indemnification coverage for underlying claims that have arisen in connection with more than one-thousand tobacco health-related lawsuits filed against Plaintiffs throughout the United States.

From 1970 to 1974, Liggett was a Delaware corporation operating numerous businesses throughout the country with its headquarters in New York. Liggett then moved its headquarters to Durham, North Carolina in 1974, where it remained until 1979 when the headquarters was moved to Montvale, New Jersey. In 1983, Liggett was acquired by GrandMet USA, Inc. ("Liggett/GrandMet"), another corporate conglomerate headquartered in New York, and in 1986, Liggett/GrandMet sold the Liggett tobacco business to a company controlled by Bennett S. LeBow, which later became Brooke Group Holding Inc. Brooke, a Delaware corporation, maintained its principal place of business in New York until 1992. From 1992 to the present, Brooke's headquarters have been located in Miami, Florida. Liggett's headquarters have been located in Durham, North Carolina since the 1986 sale of its tobacco business. Although Liggett's headquarters has moved as noted, all of its tobacco manufacturing has been based in Durham, North Carolina throughout the policy periods.

Defendants are thirty-three insurance companies that sold Plaintiffs (or their parent companies) liability insurance for twenty-eight years, from 1970 until 1998. Defendants' principal places of business are located in at least nine different states. [2] They deny coverage in this case on various grounds including late notice, expected or intended harm, known loss, and the terms of specific exclusions within the policies.

## I. THE ISSUE

**[1]**   The present issue before the Court is the choice of the governing substantive law to be applied in this case. Plaintiffs assert that universal principles of insurance law should apply to the duty to defend issues, and further advocate that the **137** determination regarding choice of law for the duty to indemnify is not yet ripe for adjudication. Alternatively, Plaintiffs argue that North Carolina law should apply because

Plaintiffs' operations in North Carolina are the common thread among insureds, insurers and policies during the majority of the relevant time period. Defendants answer that a decision on choice of law should be made now and that New York contacts predominate over any other state's contacts for the majority of the time and transactions between the parties. For the reasons which follow, the Court concludes that this issue is ripe for adjudication and that the substantive law of North Carolina will be applied in this case.

## II. DISCUSSION

### A. The Need for a Global Choice of Law

**[2]**   **[3]**   Delaware has adopted the Restatement's "most significant relationship test" for determining which state's law to apply. [3] Choice of law questions involving insurance coverage disputes are resolved by an analysis of the contacts set forth in Restatement (Second) Conflict of Laws Section 188 and Section 193. [4] These contacts must also be evaluated in light of the related principles of Section 6. [5]

**[4]**   **[5]**   At the outset, the Court recognizes that the Restatement (Second) contemplates first an issue-by-issue approach to determining choice of law. [6] However, in complex cases, such as this, involving large numbers of insurers and policies with contacts in various states, the Court cannot ignore the practical consequence of "monumental, very expensive, time-consuming discovery and legal research" [7] facing the litigants. Indeed, the parties agree that in the interests of economy, ease of application, and uniformity of result, the Court should require the application of one state's law, but only disagree as to whether North Carolina or New York law should apply. Choice of law is a threshold issue in complex litigation. The Case Management Order contemplates a decision on choice of law at this stage after discovery and briefing on that issue. Because that discovery and briefing is complete, the choice of law is ripe for determination now.

### B. The Significance of Nationwide Product Liability Risks

**[6]**   Section 193, titled "Contracts of Fire, Surety or Casualty Insurance," specifically addresses choice of law in insurance

coverage disputes. Restatement (Second) Section 193 states that the Court should apply the "local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy" unless another state has a more significant relationship under the principles stated in Section 6. The potentially "insured risks" in this case are the tobacco-related injuries in the underlying claims, which span 49 states and **138** the District of Columbia. Because nationwide product liability claims are involved, there is no principal location of these risks in this case. Restatement (Second) Section 193 comment (b) recognizes that this section assumes less significance "where the policy covers a group of risks that are scattered throughout two or more states." That is exactly the situation here. Consequently, this Court will follow the principles enumerated in Section 188 in the light of the related principles of Section 6 to determine which state's law to apply.

### C. Section 188 Conflict of Laws Principles

Section 188 provides, in pertinent part, that:

> In the absence of an effective choice of law by the parties, the contacts to be taken into account ... include (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

[7]   The Court may not simply tally the contacts between jurisdictions but must evaluate the contacts according to their relative importance with respect to the particular issue and the principles listed in Section 6. [8]

### 1. The Domicile, Residence, Nationality, Place of Incorporation and Place of Business of the Parties

[8]   This Court has held that the most significant factor for conflict of laws analysis in a complex insurance case with multiple insurers and multiple risks is the principal place of business of the insured because it is "the situs which link[s] all the parties together." [9] This Court has reasoned

that "[k]nowing the potential for claims in any number of states, common sense would dictate that the parties would consider the insured's principle [sic] headquarters as the one jurisdiction that ties all potential parties together." [10] Indeed, where, as here, the insurer defendants are located among many different states, the insured's principal place of business naturally assumes a greater significance in the Court's conflict of laws analysis.

The insurance coverage in issue here spans twenty-eight years. Liggett's corporate offices have been located in North Carolina for approximately nineteen of the twenty-eight years. Liggett's corporate offices were in New York from 1970 to 1974 and in New Jersey from 1979 until 1986, but apart from these two short time **139** periods, Liggett's corporate offices have been located in Durham, North Carolina. [11]

Defendants contend that North Carolina is not a significant contact because Liggett had its principal place of business in two other states during the policy periods at issue and Liggett's corporate parents were also located in other states when they secured their insurance policies. However, the Defendants' argument focuses on only eleven of the twenty-eight years of policies at issue and only a handful of the more than one-hundred policies that cover Liggett as a subsidiary. This Court has concluded that where an insured's place of business has been located in a single state for nearly the entire duration of the relevant policy periods, that state is the principal place of business for choice of law analysis. [12] Although some policies have only limited or no contacts with North Carolina, the unifying contact among the parties and policies with Liggett's headquarters in North Carolina weighs heavily in the Court's analysis.

Defendants further argue that applying North Carolina law would give dispositive effect in choosing the governing law to Liggett's post-policy move of its headquarters to North Carolina. They contend this thwarts the reasonable expectations of the parties that issued policies while Liggett was in New York and New Jersey. Again, Defendants focus on eleven years while the Court must balance contacts spanning the entire twenty-eight year period at issue. This Court is not faced with a situation where an insured moved its principal place of business after spending the majority of its time in another state and now seeks to have its new location provide the governing law for all of its policies. Rather, Liggett's current principal place of business has been located in North Carolina for the majority of the policy periods.

Liggett's tobacco manufacturing operations and marketing functions that are alleged to have created the insured risks have been located exclusively in North Carolina from the beginning of the period at issue until at least 1997. I find that North Carolina is the situs which links all of the parties together.

## 2. The Place of Contracting

 **[9]**    Under Section 188(2)(a), the Court must consider the importance of the place of contracting with regard to the insurance coverage dispute. The place of contracting is the place where the last act occurred that was necessary to give the contract binding effect. [13] While Delaware courts have not defined the final act necessary to form a binding insurance contract here, other courts have defined it as "the approval of an insurance application, the signing and deposit of the insurance policy in the mail, the receipt of the premium by the insurer, and the countersignature by **\*140** the insurer's agent." [14]

Defendants argue that New York is the place of contracting because delivery of the policies took place in New York when the policies were delivered to Liggett/GrandMet's New York brokers, namely Frank B. Hall and the JLS Group. Furthermore, Defendants point out that the policies issued to Liggett/GrandMet, Intercontinental Hotels, and the LeBow entities were prepared and signed by underwriters based in New York.

This Court has recognized that the place of contracting is a relatively insignificant contact and "will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract." [15] This case involves more than one-hundred contracts between Liggett and its corporate parents and their insurers. It is difficult to determine the last act that made each contract binding and where that act occurred. Defendants have identified at least eight different states where at least some contract negotiations took place. Given the circumstances of this case, I am not persuaded that New York's contact is of greater significance simply because the policies were delivered to Liggett's New York brokers. Any approval of the insurance contracts by Liggett would have had to have been authorized in North Carolina, [16] where Liggett's Insurance and Risk Management Department has resided for the majority of the twenty-eight year period at issue. Because negotiations have occurred in

a variety of states and the final acts necessary to form each binding contract are not readily ascertainable, the place of contracting is not a significant contact.

## 3. The Place of Negotiation of the Contract

Under Restatement (Second) Section 188(2)(b), the Court must determine and weigh the significance of the place of negotiation of the contract. Restatement (Second) Comment (e) states that "where the parties negotiate and agree on the terms of their contract is a significant contact [as] such a state has an obvious interest in the conduct of the negotiations and in the agreement reached." [17]

Defendants argue that this factor favors New York law because Liggett used New York brokers during the early 1970s and from 1981 to 1988. From 1981 to 1986, Liggett's insurance broker, Frank B. Hall, conducted negotiations with insurers on behalf of Liggett in New York. From 1986 to 1988, Liggett used brokers from JLS Group, who like Frank B. Hall, negotiated policy terms and conditions on behalf of Liggett in New York. Similarly, the policies issued to Intercontinental Hotels and the LeBow entities were negotiated in New York by Frank B. Hall.

Liggett's use of New York brokers, however, is of little significance and is outweighed by the location of Liggett's Insurance and Risk Management Department for several reasons. First, whatever **\*141** weight should be accorded to the location of Liggett's New York brokers is counter-balanced by the fact that Liggett also had brokers in North Carolina from 1975 to 1981 and from 1988 to 1998-sixteen of the twenty-eight years at issue. Additionally, this Court has held that the use of brokers as intermediaries "significantly diminishes the importance of the location of the brokers." [18] Indeed, it appears that the function of Frank B. Hall and JLS Group was limited to working out details with insurers based on specifications given by Liggett's Insurance and Risk Management Department. It was Liggett's Insurance and Risk Management Department that planned the substance of the policies and that Department has been located in North Carolina for twenty-three of the twenty-eight years in issue. Prior decisions of this Court have recognized that the roles of brokers, which lack "authority to enter into binding contracts without prior express or specific approval from [the insured]," "pale in comparison and significance to ... [the role of the insured], who would necessarily have been actively involved

in the negotiation and planning of all contracts to which it was a party." [19]

Overall, the place of negotiation plays a relatively less significant role in the Court's analysis in this case. In *E.I. du Pont v. Admiral Ins. Co.,* this Court recognized that "the place of negotiation is not as important when no one single place of negotiation and agreement exists." [20] Indeed, depending on which insurer Liggett was negotiating with, negotiations took place in a variety of states, including North Carolina, New York, Massachusetts, New Jersey, Connecticut, Georgia, California, and Illinois. Nonetheless, to the extent the place of negotiation is a significant contact where negotiations take place in several states, the largely singular place of the insured's Insurance and Risk Management Department is the more significant contact.

### 4. The Place of Performance

The place of performance is also a contact to be considered under the Restatement as "[t]he state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform." [21] The place of performance has been defined as the state from which the insured makes its premium payments and the state from which the insurer mailed premium invoices or paid claims. [22]

Defendants argue that the contacts with regard to the place of performance favor New York law. Defendants note that in the early 1970s one of Liggett's insurers, the Home Insurance Company, sent its premium invoice to Liggett's New York office, and during the period from September 1981 to October 1988, the insurers sent their bills to the New York brokers, who then paid the premiums on behalf of Liggett. Liggett also gave notice of claims through its New York brokers during this time period, and while Liggett's headquarters were in New Jersey, Liggett did not mail the payments directly to the insurers, but instead sent them to brokers in New York.

**\*142** Defendants have focused on only a portion of the policies and the time period at issue. Even so, Liggett's use of New York brokers is not the decisive factor in determining the place of performance. The New York brokers acted only as intermediaries in the payment process; they received payment from Liggett and then passed it on to the insurers. The brokers are not parties to the contracts or this action. They served as a conduit in the payment process.

Even if the location of Liggett's brokers is the place of performance, their location would still favor North Carolina law in this case. Liggett's insurance brokers were located in North Carolina for eighteen of the twenty-eight years at issue, as compared with the seven-year period the brokers were in New York. Furthermore, Liggett's Accounts Payable Department made premium payments almost exclusively from North Carolina. Defendants, in contrast, were located and performed their duties in several states. Thus, under this analysis, the place of performance favors North Carolina. [23]

### 5. The Location of the Subject Matter of the Contract

Lastly, the subject matter of the contract is a factor to be considered as "[t]he state where the thing or risk is located will have a natural interest in the transactions affecting it." [24] This Court has held in environmental insurance coverage cases that the location of the subject matter is the location of the sites where the environmental damage or injury occurred. [25] In this case, there is no particular location of the subject matter because the lawsuits filed in 49 states and the District of Columbia allege injury to individuals that occurred throughout the country. I conclude that this factor sheds no meaningful light on the choice of law to be made in this case.

### D. Section 6 Choice of Law Principles

The application of North Carolina law in this case is consistent with the conflict of laws principles in Restatement (Second) Section 6. While the Section 6 principles underlie all of the principles discussed above and "vary somewhat in importance from field to field and from issue to issue," [26] the Court finds the principles in Sections 6(c) and 6(d) worth discussing separately.

### 1. The Relative Interests and Policies of the Competing States

Under Restatement Section 6(c), the Court must consider "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue." Comment (f) states that "it is fitting that the state whose interests are most deeply affected should have its local law applied." North Carolina is an interested state because

it is the chief location of Liggett's tobacco operations and Liggett's principal place of business. Thus, North Carolina has a legitimate interest in governing the rights of its domestic businesses to insurance coverage. New York is also an interested state as it is where the parties entered into a number **\*143** of contractual relationships and the home of at least five of the insurer defendants. Accordingly, New York has an interest in applying its law to govern the conduct of parties within its borders and the obligations of its insurers to defend or indemnify claims.

Ultimately, however, the Court finds that the relative interests of New York and North Carolina are not in conflict as both states share the same general policy interests in promoting insurance coverage and resolving ambiguities in favor of policyholders. Thus, even though interpretation of policy language may differ among states, this Court finds that any potential conflict is inconsequential because the states share the same general policy regarding insurance coverage disputes. [27]

## 2. The Protection of Justified Expectations

It is important to contracting parties that the uncertainty associated with entering into commercial transactions be reduced by applying the state's law that the parties anticipated would apply. [28] Notwithstanding this principle, parties to insurance contracts often do not include a choice of law provision. Most "Comprehensive General Liability" insurance policies contain similar, standard-form insurance policy language. In theory, at least, a standard-form insurance contract should be interpreted the same in every jurisdiction. [29] More likely, however, the insurers simply chose not to insert a choice of law provision in their contracts. As this Court stated in *National Union v. Rhone-Poulenc:*

> One reason, perhaps, that they choose not to do so is that certainty with regard to the application of a jurisdiction's law does not mean that the law itself remains static. In this case, for instance, much in the law has changed in the 20 year interval since many of the policies at issue were entered (including Delaware's rejection of the *lex loci contractus*). The insurers may believe that given the volatility in the law their interests are better served by the lack of a choice of law provision, which allows them to argue the application of the law of that jurisdiction most favorable to them at the time of suit.

Whatever the reason, however, it ill behooves sophisticated contracting parties like the insurers, who fail to enter a choice of law provision in a contract, to argue that they are suffering from uncertainty or that the choice of a particular jurisdiction's law does not comport with their expectations upon contracting. [30]

In any event, the location of Liggett's headquarters, tobacco operations, and marketing operations were known or should have been known to the parties at the time of contracting. Given the nationwide scope of the potential tobacco health-related claims, the parties should have expected that North Carolina would be an important location for choice of law analysis for these claims. Thus, in the absence of a choice of law provision, the application **\*144** of North Carolina law serves to protect that justified expectation.

## E. The Reliance Policies' Service of Suit Provisions

**[10]** Defendants argue that the "Service of Suit" provisions contained in Liggett's policies with Reliance Insurance Company of Illinois ("Reliance") mandate application of New York law. Liggett agreed to service of suit provisions in two of its policies (1994-1996) from Reliance. The provisions state the following:

> *Service of Suit:* It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, and Insured, will submit to the jurisdiction of State of New York, and will comply with all the requirements necessary to give such Court jurisdiction. All matters arising hereunder shall be determined in accordance with the law and practice of State of New York.
>
> Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured, or any beneficiary hereunder arising out of this Policy.

This Court has held that service of suit clauses do not constitute choice of law provisions because they have been interpreted to demand application of the forum's whole law. [31] The whole law of a state includes its choice of law

rules, which when applied may direct the court to apply a different state's substantive law.[32] This Court has explained that "if the drafters of the clause had intended the local law of the forum chosen by the insured to apply ... they would have included the terms 'local law' or 'substantive law' in the service of suit clause."[33]

Consistent with the precedent of this Court,[34] I am satisfied that the service of suit provisions in the Reliance policies refer to the whole law of New York, not solely its substantive law. The phrase "the law and practice of [the] State of New York" is a broad declaration that by its plain language encompasses the whole law of New York, including choice of law rules. Accordingly, the Court will consider the choice of law rules of New York for guidance on which state's law should apply to the Reliance policies.

New York uses a "center of gravity" or "grouping of contacts" approach to analyze choice of law questions in contract cases.[35] The purpose of this approach is "to establish which state has the most significant relationship to the transaction and the parties."[36] Thus, New York has effectively adopted the Restatement's "most significant **145** relationship test"

for determining which state's law to apply. Indeed, New York courts cite to the Restatement (Second) of Conflict of Laws and analyze the same contacts as suggested by Restatement Sections 188 and 6 in contract cases.[37] Thus, the Reliance policies require the same analysis which the Court has already done. That analysis favors the law of North Carolina because that state has the "most significant relationship" to the parties and policies at issue in this case for the reasons I have already stated.

### III. CONCLUSION

The interests of economy, ease of application, and uniformity of result favor a global choice of law in this case at this time. North Carolina has the "most significant relationship" to the transactions and the parties at issue in this case. The Court therefore concludes that the rights and duties of the parties with respect to the policies at issue in this case shall be determined by the law of North Carolina.

**IT IS SO ORDERED.**

## Footnotes

1    The defendants are: Affiliated FM Insurance Company, Ace Property and Casualty Insurance Company, A.I.U. Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Commercial Union Insurance Company, Continental Casualty Company, Continental Insurance Company, Federal Insurance Company, First State Insurance Company, Hartford Accident and Indemnity Company, Hartford Casualty Insurance Company, Hartford Insurance Company of the Midwest, Home Indemnity Company, The Home Insurance Company, International Insurance Company, Lexington Insurance Company, National Union Fire Insurance Company of Pittsburgh, PA, New England Insurance, Northbrook Excess and Surplus Insurance Company, Old Republic Insurance Company, Pacific Insurance Company, Ltd., Reliance Insurance Company of Illinois, Royal Indemnity Company, Royal Insurance Company of America, Seaboard Surety Insurance Company, St. Paul Mercury Insurance Company, Transcontinental Insurance Company, Transportation Insurance Company, Travelers Casualty and Surety Company, Twin City Fire Insurance Company, Vigilant Insurance Company, Westport Insurance Company, and Zurich Insurance Company.

2    Defendants' principal places of business include California (for Defendant Harbor), Connecticut (for Defendants Hartford Accident, Hartford Casualty, Hartford Midwest, Pacific, Twin Cities and Westport), Hawaii (for Defendant Pacific), Illinois (for Defendants Northbrook, Royal Insurance Company of America, Transcontinental and Transportation), Massachusetts (for Defendants Commercial Union, First State, Lexington and New England), New Jersey (for Defendants Federal and Vigilant), New York (for Defendants AIU, Birmingham Fire, Home, National Union and Seaboard), North Carolina (for Defendant Royal Indemnity), Pennsylvania (for Defendant Old Republic), and Rhode Island (for Defendant Affiliated FM).

3    *Hoechst Celanese Corp. v. National Union Fire Ins. Co.,* Del.Super., C.A. 89C-SE-35, 1994 WL 721651, Gebelein, J. (Mar. 28, 1994), Mem. Op. at 10.

4    *Id.* at 10, 11.

5    *Id.*

6    *See, e.g.,* Restatement (Second) Conflict of Laws § 188 (1971) (stating that "[t]he rights and duties of the parties with respect to *an issue* in contract are determined by the local law of the state which, with respect to *that issue,* has the most significant relationship to the transaction and the parties") (emphasis added).

7    *Sequa Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 89C-AP-1, 1995 WL 465192, Herlihy, J. (July 13, 1995), Mem. Op. at 14.

8    There are seven principles to be considered under *Restatement (Second) of Conflict of Laws § 6 (1971)*:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in determination of the particular issue,

    (d) the protection of justified expectations,

    (e) the basic policies underlying the particular field of law,

    (f) certainty, predictability, and uniformity of result, and

    (g) ease in the determination and application of the law to be applied.

9    *Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C-JA-118, Poppiti, J. (Oct. 29, 1991), Order at 9; *See also Hoechst Celanese* at 15.

10   *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.,* Del.Super., C.A. No. 89C-AU-99, 1991 WL 236943, Poppiti, J. (Oct. 22, 1991), Order at 19 (citing *CPC International, Inc. v. Northbook Excess & Surplus Ins. Co.,* D. R.I., 739 F.Supp. 710, 715 (1990)).

11   Defendants have referred the Court to a Liggett affidavit filed in a New Jersey case describing "three co-equal company headquarters in New Jersey, Texas and North Carolina" for its "sales and marketing operations, the backbone of its discount cigarette business" since 1997. Given the choices here between North Carolina and New York, Liggett's "co-equal headquarters" in Texas and New Jersey for these operations during one year of the policy periods does not diminish the overall significance of the North Carolina contacts.

12   *Hoechst* at 15 (stating that "New Jersey has only been HCC's principal place of business since February of 1987, during only two years of the policy periods relevant to this litigation. In contrast, New York is the state in which HCC was headquartered and had its principal place of business from 1978 through 1987, nearly the entire duration of the relevant policy periods").

13   *Restatement (Second) of Conflict of Laws § 188* cmt. e (1971).

14   *North American Philips Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C-JA-155, 1994 WL 555399, Bifferato, J. (Sept. 2, 1994), Mem. Op. at 4 (citing *Appleman, Insurance Law and Practice* § 7080 (1981)).

15   *E.I. du Pont* at 14 (citing *Restatement (Second) of Conflict of Laws § 188* cmt. e (1971)).

16   *See, e.g., E.I. du Pont* at 9 (stating that "[d]espite the fact that du Pont may have utilized the services of various brokers, these brokers had no authority to enter into binding contracts without prior express or specific approval from du Pont. In contrast, the responsibilities of the defendant insurers were divided among numerous states").

17   *Restatement (Second) of Conflict of Laws § 188* cmt. e (1971).

18   *Monsanto* at 7 (citing *CPC International v. Northbrook Excess & Surplus Ins. Co.,* D. R.I., 739 F.Supp. 710, 712 (1990)).

19   *E.I. du Pont* at 9.

20   *E.I. du Pont* at 15; *See also North American Philips Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C-JA-155, 1994 WL 555399, Bifferato, J. (Sept. 2, 1994), Mem. Op. at 5.

21   *Id.*

22   *North American Philips* at 2.

23   *See North American Philips* at 6 (stating that "[s]ince NAPC was located in New York and was performing there and Defendants were located in several states and were performing there, [it][sic] is apparent that the majority of performance occurred in New York").

24   *Restatement (Second) of Conflict of Laws § 188* cmt. e (1971).

25   *North American Philips* at 3.

26   *Sequa Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. 89C-AP-1, Herlihy, J. (May 21, 1992), Mem. Op. at 8.

27   *North American Philips* at 11 (concluding that the relative interests of states are not in conflict when they share the same policy in promoting insurance coverage and resolving ambiguities in favor of policyholders).

28   *Restatement (Second) of Conflict of Laws § 6* cmt. f (1971).

29   *See, e.g., Keene Corp. v. Insurance Co. of N. Am.,* D.C.Cir., 667 F.2d 1034, 1041 n. 10 (1981) (holding that there was no choice of law question because the insurance policies were standard-form policies and general principles of insurance law are the same in virtually every state).

30   *National Union* at 12-13.

31   *Hoechst* at 4.

32   *Id.* at 4.

33   *Id.* at 4.

34   *See Hoechst* at 4; *North American Philips* at 1; *Monsanto Co. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 88C-JA-118, Poppiti, J. (Jan. 19, 1990), Order at 9; *Sequa Corp. v. Aetna Cas. & Sur. Co.,* Del.Super., C.A. No. 89C-AP-1, 1992 WL 147994, Herlihy, J. (May 21, 1992); *Chesapeake Utilities Corp. v. American Home Assurance Co.,* D. Del., 704 F.Supp. 551 (1989).

35   *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.,* N.Y. Ct.App., 84 N.Y.2d 309, 618 N.Y.S.2d 609, 642 N.E.2d 1065, 1068 (1994).

36    *Id.*
37    *Id.*

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

531 A.2d 206
Supreme Court of Delaware.

McDERMOTT INCORPORATED, a Delaware
Corporation, Defendant Below, Appellant,
v.
Harry LEWIS and Nina Altman,
Plaintiffs Below, Appellees.

Submitted: Dec. 9, 1986.
| Decided: Sept. 16, 1987.

Shareholders of Delaware subsidiary filed suit seeking to enjoin or rescind a reorganization under which the subsidiary became a majority owned subsidiary of a Panamanian corporation and under which the subsidiary owned approximately ten percent of the parent corporation's common stock. The Court of Chancery, New Castle County, granted partial summary judgment in favor of the shareholders. Appeal was taken. The Supreme Court, Moore, J., held that: (1) the issue of whether a Delaware subsidiary of Panamanian corporation may vote the shares it holds in its parent company under circumstances which are prohibited by Delaware law, but not Panama law, could be decided, even though the factual circumstances rendered the issue moot; (2) the subsidiary could vote the shares it held in the parent company under Panamanian law, even though Panamanian law did not expressly permit that action; and (3) Delaware conflicts of law principles and the Constitution mandated application of the internal affairs doctrine, under which Panamanian law governed the issue.

Judgment reversed.

West Headnotes (16)

[1]    **Action**
       👉 Moot, hypothetical or abstract questions

Although change in circumstances would have rendered moot issue of whether Delaware subsidiary of Panamanian corporation could vote shares it held in its parent corporation under circumstances which were prohibited by Delaware law, but not by Panamanian law, issue could be decided where it was of public importance and its impact on law was real.

13 Cases that cite this headnote

[2]    **Corporations and Business Organizations**
       👉 Right to Vote in General

Panamanian law permitted subsidiary corporation to vote shares of its parent corporation where parent corporation was not required to register, nor had it registered, with Panama National Securities Commission and where parent's shares were not "sold on the market.".

Cases that cite this headnote

[3]    **Corporations and Business Organizations**
       👉 Right to Vote in General

Panamanian law did not prohibit subsidiary from voting shares held in its parent corporation, even though Panama law did not expressly permit such corporate action; uncontroverted evidence clearly and unambiguously rejected contention that Panamanian law would prohibit all conduct not otherwise expressly permitted.

Cases that cite this headnote

[4]    **Corporations and Business Organizations**
       👉 Right to Vote in General

Fact that Panama would not apply its prohibition against subsidiary's voting its shares in parent corporation in those situations in which parent corporation was not registered in Panama National Securities Commission and parent corporations whose shares were not sold on market did not establish that Panama would decline jurisdiction over parent corporation so as to render Delaware law applicable to conduct which would otherwise be permitted in Panama. 8 Del.C. § 160(c).

1 Cases that cite this headnote

[5]    **Corporations and Business Organizations**
       👉 Subjection to General Laws and Policy of State

Choice of law decisions relating to corporate activity such as entering contracts, committing

torts, and dealing in personal and real property, are usually determined after consideration of facts of each transaction; choice of law determination often turns on whether corporation had sufficient contacts with forum state, in relation to act or transaction in question, to satisfy constitutional requirements of due process. U.S.C.A. Const.Amends. 5, 14.

2 Cases that cite this headnote

[6]    **Corporations and Business Organizations**
👈 Property and Conveyances

**Corporations and Business Organizations**
👈 Contracts and Indebtedness

**Corporations and Business Organizations**
👈 Torts

Internal affairs doctrine has no applicability to choice of law questions relating to corporate activities such as entering contracts, committing torts, and dealing in personal and real property; rather, internal affairs doctrine governs choice of law determinations in matters peculiar to corporations, that is, those activities concerning relationships inter se of corporation, its directors, officers and shareholders. U.S.C.A. Const.Amends. 5, 14.

10 Cases that cite this headnote

[7]    **Corporations and Business Organizations**
👈 Internal affairs doctrine in general

Internal affairs doctrine requires that law of state of incorporation should determine issues relating to internal corporate affairs.

27 Cases that cite this headnote

[8]    **Corporations and Business Organizations**
👈 Corporate governance in general

Delaware's well-established conflict of laws principles required application of Panamanian law, as forum of incorporation, to govern dispute involving Delaware subsidiary's right to vote its parent corporation's shares.

2 Cases that cite this headnote

[9]    **Constitutional Law**
👈 Trade or Business

With existence of multistate and multinational organizations, directors and officers have significant right, under Fourteenth Amendment's due process clause, to know what law will be applied to their actions. U.S.C.A. Const.Amend. 14.

2 Cases that cite this headnote

[10]    **Constitutional Law**
👈 Corporations and limited liability companies

Stockholders had Fourteenth Amendment right to know by what standards of accountability they could hold those managing corporation's business and affairs, particularly where, by overwhelming choice, stockholders in Delaware subsidiary received shares in Panamanian parent corporation and thereby selected Panama law to govern inter se corporate relations between themselves, parent corporation, its directors, officer and agents. U.S.C.A. Const.Amend. 14.

7 Cases that cite this headnote

[11]    **Commerce**
👈 Subjects and regulations in general

Under commerce clause, state has no interest in regulating internal affairs of foreign corporations and, therefore, court or state which attempts to displace internal affairs doctrine carries heavy burden to justify its actions. U.S.C.A. Const. Art. 1, § 8, cl. 3.

6 Cases that cite this headnote

[12]    **Commerce**
👈 Subjects and regulations in general

Commerce clause mandated application of internal affairs doctrine to determining whether law of forum of incorporation governed whether Delaware subsidiary of Panamanian corporation could vote shares it held in its parent corporation under circumstances which were prohibited by Delaware law, but not by Panamanian law.

U.S.C.A. Const. Art. 1, § 8, cl. 3; 8 Del.C. § 160(c).

22 Cases that cite this headnote

**[13]    States**

☞ **Full faith and credit in each state to the public acts, records, etc. of other states**

Full faith and credit clause commands application of internal affairs doctrine except in rare circumstances in which national policy is outweighed by significant interest of forum state in corporation and its shareholders. U.S.C.A. Const. Art. 4, § 1.

1 Cases that cite this headnote

**[14]    Corporations and Business Organizations**

☞ **Subjection to General Laws and Policy of State**

Application of Delaware statute, prohibiting majority-owned subsidiary from voting in stock in parent corporation, to Panamanian parent corporation would unfairly and unconstitutionally subject those intimately involved with management of parent to Delaware law. 8 Del.C. § 160(c); U.S.C.A. Const.Amend. 14.

1 Cases that cite this headnote

**[15]    Commerce**

☞ **Subjects and regulations in general**

Application of Delaware statute, prohibiting majority-owned subsidiary from voting its shares in parent corporation, to Panamanian parent corporation would violate commerce clause; for Delaware to interfere in internal affairs of Panamanian corporation having no relationship to Delaware clearly implied that Panamanian parent corporation could be subject to differing laws of all 50 states on various matters respecting its internal affairs. 8 Del.C. § 160(c); U.S.C.A. Const. Art. 1, § 8, cl. 3.

7 Cases that cite this headnote

**[16]    Corporations and Business Organizations**

☞ **Subjection to General Laws and Policy of State**

Public policy did not mandate application of Delaware law to issue of whether Delaware subsidiary of Panamanian corporation could vote shares it held in its parent corporation under circumstances which were prohibited by Delaware law, but not by Panamanian law, where parent corporation had no contact with Delaware and where ten percent voting interest placed in subsidiary, with stated principal purpose being for tax advantages, and timing of transaction indicated that reorganization was not scheme designed solely to entrench existing management. 8 Del.C. § 160(c).

Cases that cite this headnote

**\*208**   Upon appeal from the Court of Chancery. REVERSED.

**Attorneys and Law Firms**

Charles F. Richards, Jr., Esquire, of Richards, Layton & Finger, Wilmington, Richard F. Nolan (argued), and Dennis E. Glazer, of Davis Polk & Wardwell, New York City, of counsel, for appellant.

Norman M. Monhait, of Morris & Rosenthal, Wilmington, Mordecai Rosenfeld (argued), of Mordecai Rosenfeld, P.C., New York City, and A. Arnold Gershon, of A. Arnold Gershon, P.C., New York City, of counsel, for appellees.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

**Opinion**

MOORE, Justice:

We confront an important issue of first impression-whether a Delaware subsidiary of a Panamanian corporation may vote the shares it holds in its parent company under circumstances which are prohibited by Delaware law, but not the law of Panama. Necessarily, this involves questions **\*209** of foreign law, and applicability of the internal affairs doctrine under Delaware law.

Plaintiffs, Harry Lewis and Nina Altman, filed these consolidated suits in the Court of Chancery in December,

1982 seeking to enjoin or rescind the 1982 Reorganization under which McDermott Incorporated, a Delaware corporation ("McDermott Delaware"), became a 92%-owned subsidiary of McDermott International, Inc., a Panamanian corporation ("International"). Lewis and Altman are stockholders of McDermott Delaware, which emerged from the Reorganization owning approximately 10% of International's common stock. Plaintiffs challenged this aspect of the Reorganization, and the Court of Chancery granted partial summary judgment in their favor, holding that McDermott Delaware could not vote its stock in International.

We conclude that the trial court erred in refusing to apply the law of Panama to the internal affairs of International. There was no nexus between International and the State of Delaware. Moreover, plaintiffs concede that the issues here do not involve the internal affairs of McDermott Delaware. Thus, we decline to follow *Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255 (2d Cir.1984)*, which prohibited a similar device involving a Panamanian subsidiary seeking to vote the shares it held in its Panamanian parent. Accordingly, we reverse. In so doing, we reaffirm the principle that the internal affairs doctrine is a major tenet of Delaware corporation law having important federal constitutional underpinnings.

## I.

International was incorporated in Panama on August 11, 1959, and is principally engaged in providing worldwide marine construction services to the oil and gas industry. Its executive offices are in New Orleans, Louisiana, and there are no operations in Delaware. International does not maintain offices in Delaware, hold meetings or conduct business here, have agents or employees in Delaware, or have any assets here.

McDermott Delaware and its subsidiaries operate throughout the United States in three principal industry segments: marine construction services, power generation systems and equipment, and engineered materials. McDermott Delaware's principal offices are in New Orleans.

Following the 1982 Reorganization, McDermott Delaware became a 92%-owned subsidiary of International. The public stockholders of International hold approximately 90% of the voting power of International, while McDermott Delaware holds about 10%.

The stated "principal purpose" of the reorganization, according to International's prospectus, was to enable the McDermott Group to retain, reinvest and redeploy earnings from operations outside the United States without subjecting such earnings to United States income tax. The prospectus also admitted that the 10% voting interest given to McDermott Delaware would be voted by International, "and such voting power could be used to oppose an attempt by a third party to acquire control of International if the management of International believes such use of the voting power would be in the best interests of the stockholders of International." An exchange offer, and thus the Reorganization, was supported by 89.59% of McDermott Delaware stockholders. [1]

The applicable Panamanian law is set forth in the record by affidavits and opinion letters of Ricardo A. Durling, Esquire, and the deans of two Panamanian law schools, to support the claim that McDermott Delaware's retention of a 10% interest in International, and its right to vote those shares, is permitted by the laws of Panama. Significantly, the plaintiffs have not offered any contrary evidence.

**\*210** Mr. Durling, an expert on Panamanian corporate law, [2] stated:

7. Article 35 of Panamanian Cabinet Decree No. 247, dated July 16, 1970, which amended the General Corporation Law of Panama, added provisions which are applicable only to certain corporations incorporated under the laws of Panama. Article 35 states:

> "Shares of a corporation owned by [an]other corporation in which the former corporation owns the majority of shares shall not be entitled to vote at Meetings of Shareholders nor shall be deemed as issued and outstanding shares for purposes of quorum."

8. Article 37 of Panamanian Cabinet Decree No. 247 specifically limits the prohibition on voting contained in Article 35 to those corporations registered with the National Securities Commission of Panama or those corporations whose shares are sold to the public within Panama. Article 37 states:

"The provisions contained in the foregoing Articles 34, 35 and 36 shall be applicable to corporations registered in the National Securities Commission and those whose shares are sold on the market, even though such corporations do not offer their own shares to the public."

Article 37 of Cabinet Decree No. 247 of 1970, as amended by cabinet Decree No. 30 of 1972.

9. I have examined a Certificate issued by the National Securities Commission (of Panama) to the effect that International is not registered with that Commission, and have therefore ascertained that International is not registered with that Commission. Accordingly, the prohibition set forth in Article 35 of Cabinet Decree No. 247 does not apply to International unless its stock is sold on the market in Panama. No Panamanian corporation, except one whose shares are either (a) registered with the National Securities Commission or (b) sold on the Panama market, is subject to the limitations of Article 35 of Cabinet Decree No. 247.

10. There is no general public policy of the Republic of Panama in favor of precluding Panamanian corporations from selling or issuing stock to their subsidiaries or precluding a subsidiary from voting any stock held of its Panamanian corporate parent, except for those corporations falling within the scope of Article 37. *It is generally accepted by Panamanian counsel that, with the exceptions described above, subsidiaries may vote the stock held in their parent corporations.*

11. A recent opinion of the General Attorney of Panama, dated May 2, 1984, has interpreted the proviso of Article 37 relating to shares "sold in the market," to mean that if a corporation's shares are sold in a private manner in Panama to a number of persons not exceeding 10 per year, such shares will not be considered to have been "sold in the market." ... To the best of my knowledge, none of International's securities has been sold to primary or secondary purchasers in Panama.

12. Based upon the foregoing, I am of the opinion that:

(a) McDermott Delaware can lawfully vote its shares in International at any of International's shareholders meetings;

(b) the provisions contained in Section 17 of Panama's General Corporation law are not applicable to shares held by McDermott Delaware, one of International's subsidiaries; and

(c) the retention by McDermott Delaware of a 10% interest in the voting power of International pursuant to the reorganization is lawful under applicable Panama law.

Appendix to Appellant's Opening Brief at A-178 to A-181. (Emphasis added).

Bonifacio Diez Fernandez, Dean of the Law School of the Catholic University, agreed that McDermott Delaware could vote its shares of International stock:

**\*211** Regarding the second item of your consultation, the Corporation Law of Panama, Law 32 of February 26, 1927, does not contain any provision prohibiting a Panamanian corporation to vote the shares owned by another corporation in which the first corporation owns the majority of the shares.

————————————

It is a principal of law that in matters of public law one can only do what is expressly allowed by the law; while in private law all acts not prohibited by law can be performed. This principal is acknowledged by Law 32 of 1927, numeral 11 Artile [sic] 19, when it states that the corporation may perform all types of legal businesses even if they are not contained in the objects of the corporation, specified in its Articles of Incorporation or its Amendments.

I have already stated in the preceding paragraphs that Article 35 of Cabinet Decree No. 247 is not applicable to corporations in general, but only to those registered with the National Securities Commission and to those who sell their shares within the national territory, in accordance to the provisions of Article 37 of said Decree No. 247.

*Therefore, I am of the opinion that, in the absence of an expressed prohibition, a Panamanian corporation may vote the shares owned by another corporation in which the first owns the majority of shares.*

Appendix to Appellant's Opening Brief at A-200 to A-201 (original) and A-206 to A-207 (English translation) (Emphasis added).

Finally, Dr. Edgardo Molina Mola, Dean of the Law School of the National University of Panama (Universidad de Panama), opined that McDermott Delaware could vote its International shares:

> In item 2 of your letter, you consult me if the corporation law of Panama forbids Panamanian corporations to vote the shares owned by another corporation in which the first owns the majority of shares.
>
> I have examined in detail the provisions of Law 32 of February 26, 1927 which regulates the formation of corporations in Panama, and have not found any expressed prohibition which may be applicable to the situation presented by you. I do find some provisions, as that of Article 15, which allow corporations to acquire their own shares, which may be kept or sold by the corporation, or redeemed by the agreement of the Board of Directors, pursuant to Article 16. The only prohibition I have found is that contained in Article 17, but the same refers to those cases when the corporation acquires its own shares of stock. In these cases, such shares cannot be directly or indirectly represented in the Stockholders meetings.

———————————

> Therefore, I must conclude that, in the absence of an express prohibition by the law, a Panamanian corporation may vote the shares owned by another corporation in which the first owns the majority of the shares.

Appendix to Appellant's Opening Brief at A-212 (original) and A-217 (English translation).

 **[1]**    This evidence of Panamanian law is uncontroverted. Plaintiffs have offered no proof whatever on the subject. Instead, they rely on *Norlin.* By letter dated March 9, 1987, McDermott informed the Court of a postargument change in the facts relevant to this appeal. McDermott International has recently registered with the National Securities Commission of Panama, thereby making Article 35 of Panamanian Cabinet Decree No. 247 applicable to the company. Thus, McDermott Delaware cannot now vote its International shares. This change in circumstances technically renders the appeal moot. Normally, we decline to decide moot issues. *Sannini v. Casscells,* Del.Supr., 401 A.2d 927, 930 (1979). However,

where the question is of public importance, and its impact on the law is real, this Court has recognized an exception to the above rule. *Darby v. New Castle Gunning Bedford Educ. Ass'n.,* Del.Supr., 336 A.2d 209, 209 n. 1 (1975). **\*212** See also *Bailey v. State,* Del.Supr., No. 292, 1986, slip op. at 3-4 (April 20, 1987 [525 A.2d 582 (table) ] (Christie, C.J., for the Court *en banc* ). Given the importance of this matter to Delaware corporation law, and the state in which it otherwise would be left, we are compelled to decide this case based on the facts presented to the trial court.

## II.

We note at the outset that if International were incorporated either in Delaware or Louisiana, its stock could not be voted by a majority-owned subsidiary. 8 *Del.C.* § 160(c) [3] ; La.Rev.Stat.Ann. § 12:75(G). [4] No United States jurisdiction of which we are aware permits that practice.

Relying on *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255 (2d Cir.1984), the Court of Chancery concluded that Panama in effect would refrain from applying its laws under the facts of this case. On that basis, the trial court then concluded that since both Delaware and Louisiana law prohibit a majority-owned subsidiary from voting its parent's stock, the device was improper. We consider this an erroneous application of both Delaware and Panamanian law.

Our analysis requires a two-step inquiry. First, we must determine if Panamanian law, in the factual context addressed by the Court of Chancery, permits International to vote its own shares through the device of McDermott Delaware's ownership. If it does not, then the inquiry ends. However, if Panamanian law permits the practice, we must consider the multifaceted issues inherent in the application of the internal affairs doctrine.

### A.

 **[2]**    It is apparent that under limited circumstances the laws of Panama permit a subsidiary to vote the shares of its parent. Article 35 of Panamanian Cabinet Decree No. 247 of July 16, 1970, which is part of the General Corporation Law of Panama, restricts the exercise of voting rights on shares of certain Panamanian corporations, but Article 37 limits the scope of Article 35 to "corporations registered in

the National Securities Commission [of Panama] and those whose shares are sold on the market ...” Opinion of Ricardo A. Durling, *supra* p. 5. Based on the facts before the Court of Chancery, it is undisputed that International was not required to register, nor had it registered, with the National Securities Commission. Further, International's shares were not “sold on the market,” as that term is defined by the Attorney General of Panama. [5] Reading Articles 35 and 37 together, it is apparent that Article 35's prohibition did not apply to International.

### B.

**[3]**   Plaintiffs argue that McDermott Delaware may not vote shares held in International, since Panama law does not expressly permit such corporate action. Further, they contend, and the Vice Chancellor ruled, that Article 37 simply provides “that where a Panama corporation's shares are not registered in Panama and not publicly **\*213** traded in Panama (i.e., such as the shares of International at bar) the laws of Panama will not be imposed on that corporation.” According to plaintiffs, this means that Panama has “declined to assert its own jurisdiction and laws on Panamanian corporations that choose to limit their contact with Panama.”

We cannot accept either of those propositions. The uncontroverted evidence clearly and unambiguously rejects the contention that Panamanian law prohibits all conduct not otherwise expressly permitted. All three legal experts agreed that McDermott Delaware could vote the shares it held in International. Further, Dean Fernandez specifically stated that it “is a principle of law that in matters of public law one can only do what is expressly allowed by the law; while in private law all acts not prohibited by law can be performed.” This fully accords with basic principles of Delaware corporate law. *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946, 957 (1985); *See Providence and Worcester Co. v. Baker,* Del.Supr., 378 A.2d 121, 123-24 (1977).

### C.

**[4]**   We also reject plaintiffs' contention that Article 37 articulates Panama's intent to decline jurisdiction over corporations which are neither registered with the National Securities Commission nor sell shares on the Panamanian “market.” Were this the intent of the Panamanian Cabinet Decree, the language of Article 37 would not expressly limit its applicability to Articles 34, 35 and 36.

While offering no proof on this point, plaintiffs cite *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255 (2d Cir.1984) for the proposition that:

> In this case, Panama apparently would refrain from applying its own law to the transactions under scrutiny, because appellant does not meet the criteria of Article 37, as interpreted by the General Attorney. In essence, Panama has made a determination that its interest in Norlin's affairs is insufficient to warrant the application of Panamanian law to this dispute.

744 F.2d at 264.

The *Norlin* decision, however, provides no rationale for this result, nor does it analyze the express limitation of applicability, contained in the opening clause of Article 37, to Articles 34, 35 and 36. Such analytical omissions materially undermine its persuasive effect. Moreover, the facts of *Norlin* are quite different from those here. Norlin Corp., confronted by a hostile takeover bid from Piezo Electric Products, Inc., transferred 828,395 shares of voting stock to its wholly-owned subsidiary. Both Norlin and the subsidiary were incorporated in Panama. Piezo alleged that the stock transfer violated, *inter alia,* Panama and New York law. Evidently applying a “cluster of significant contacts” theory, the Second Circuit, *interpreting New York law,* determined that an automatic application of the internal affairs doctrine was inappropriate:

> Norlin's contacts with the State of New York are far from insubstantial. The company's principal place of business is located within the state, and its board of directors meets here. The resolution approving the contested stock issuances were adopted in this state, and the company stock has been traded on the NYSE. Whether these contacts are sufficient for a New York court to apply New York law is in our view, a question that does not lend itself to a simple answer. We need not, however, grapple with it to resolve the present inquiry. The principals compelling a foreign state

to apply foreign law come into play only when a legitimate and substantial interest of another state would thereby be served .... Conversely, when the interest of only one state are truly involved, the purported conflict is purely illusory. Thus, there is no reason why the law of the foreign state should not control ....

*Norlin,* 744 F.2d at 263-64 (citations omitted).

To buttress the application of a New York statute prohibiting the issuance of voting stock to a majority-owned subsidiary, **\*214** the Second Circuit concluded that Panama would refrain from applying its own law to the transaction. *Id.*

We decline to follow *Norlin* for several reasons. First, we reject the notion that Panamanian law is inapplicable on the basis of some factually unsupported theory of abstention. *Cf. Hart v. General Motors Corp.,* N.Y.App.Div., 129 A.D.2d 179, 517 N.Y.S.2d 490 (1987). Second, *Norlin* applies the law of New York because of the defendants' substantial contacts with that State. [6] Third, *Norlin* neither cited nor distinguished the earlier contrary decision of *Hausman v. Buckley,* 299 F.2d 696 (2d Cir.), *cert. denied,* 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962), although both opinions were authored by the same member of the Court. *Hausman* holds that the right of shareholders to bring a derivative action on behalf of a corporation is determined by the laws of the state of its incorporation. The Second Circuit rejected an argument that New York courts would refuse to apply the internal affairs doctrine for reasons of public policy. *Id.* at 705. Significantly, *Hausman* recognized that the doctrine was "well established" and had been applied "repeatedly" to determine matters governing the relations of stockholders and corporations *inter se. Id.* at 702. The failure to even mention *Hausman* can only further undermine *Norlin's* persuasiveness.

Finally, *Norlin* arose in the context of a hostile takeover threat. The *Norlin* board issued over 800,000 shares of voting stock to a subsidiary, as the final step in a series of transactions designed to place 49% of the voting power in the friendly hands of the board of directors, and with the clear intention of thwarting any hostile bids for control of the company. [7] In contrast, McDermott Delaware emerged from the Reorganization holding only 10% of International's voting power, and there is no serious suggestion that this circumstance, alone, would thwart a determined bidder.

Given the uncontroverted evidence of Panamanian law, establishing that a Panamanian corporation may place voting shares in a majority-owned subsidiary under the limited circumstances provided by Article 37, we turn to the fundamental issues presented by application of the internal affairs doctrine. [8]

## III.

Internal corporate affairs involve those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders. *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982). *Restatement (Second) of Conflict of Laws § 313,* Comment a (1971). It is essential to distinguish between acts which can be performed by both corporations and individuals, and those activities which are peculiar to the corporate entity.

[5]  [6]  Corporations and individuals alike enter into contracts, commit torts, and deal in personal and real property. Choice of law decisions relating to such corporate **\*215** activities are usually determined after consideration of the facts of each transaction. *See* Reese and Kaufman, *The Law Governing Corporate Affairs: Choice of Law and the Impact of Full Faith and Credit,* 58 Column.L.Rev. 1118, 1121 (1958) (hereinafter "Reese and Kaufman"). In such cases, the choice of law determination often turns on whether the corporation had sufficient contacts with the forum state, in relation to the act or transaction in question, to satisfy the constitutional requirements of due process. The internal affairs doctrine has no applicability in these situations. Rather, this doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders.

[7]  The internal affairs doctrine requires that the law of the state of incorporation should determine issues relating to internal corporate affairs. *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983). Under Delaware conflict of laws principles and the United States Constitution, there are appropriate circumstances which mandate application of this doctrine.

## A.

[8]    Delaware's well established conflict of laws principles require that the laws of the jurisdiction of incorporation-here the Republic of Panama-govern this dispute involving McDermott International's voting rights. *Beard v. Elster,* Del.Supr., 160 A.2d 731, 735 (1960); *Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 224-25 (1953); *Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, Inc.,* Del. Ch., 49 A.2d 603, 607 (1946), modified, Del.Supr., 53 A.2d 441 (1947); *Mau v. Montana Pacific Oil Co.,* Del.Ch., 141 A. 828, 831 (1928); *Bruch v. National Guarantee Credit Corp.,* Del.Ch., 116 A. 738, 744 (1922).[9]

The traditional conflicts rule developed by courts has been that internal corporate relationships are governed by the laws of the forum of incorporation. *See* Macey & Miller, *Toward an Interest-Group Theory of Delaware Corporate Law,* 65 Tex.L.Rev. 469, 495 (1987). As early as 1933, the Supreme Court of the United States noted:

> It has long been settled doctrine that a court-state or federal-sitting in one state will, as a general rule, decline to interfere with, or control by injunction or otherwise, the management of the internal affairs of a corporation organized under the laws of another state but will leave controversies as to such matters to the courts of the state of the domicile ....

*Rogers v. Guaranty Trust Co. of New York,* 288 U.S. 123, 130, 53 S.Ct. 295, 297, 77 L.Ed. 652 (1933) (citations omitted).

However, in *Western Air Lines, Inc. v. Sobieski,* Cal.App., 191 Cal.App.2d 399, 12 Cal.Rptr. 719 (1961), a California court upheld an order of the California Commissioner of Corporations directing a Delaware corporation having major contacts with California to follow the cumulative voting requirements imposed by California law. After the *Western Air* decision, commentators noted that the case signaled the alleged start of a "conflicts revolution." *See* Kozyris, *Corporate Wars and Choice of Law,* 1985 Duke L.J. 1 (hereinafter "Kozyris"); Kaplan, *Foreign Corporations and Local Corporate Policy,* 21 Vand.L.Rev. 433 (1968) (hereinafter "Kaplan"). The "new" conflicts theory weighs the interests and policies of the forum state in determining whether the law of the forum-lex fori-should be applied. *See Restatement (Second) of Conflict of Laws, §§ 302-06, 309 (1971).* Thus, the *Western Air Lines* *216 case "was to be the harbinger of a new conflicts approach in corporate law that would limit or perhaps discard the lex incorporationis." Kozyris, *supra* at 17.

A review of cases over the last twenty-six years, however, finds that in all but a few, the law of the state of incorporation was applied without any discussion. *Id.* at 17-18. In fact, twenty-six years after *Western Air* the following statement remains apt:

> The umbilical tie of the foreign corporation to the state of its charter is usually still religiously regarded as conclusive in determining the law to be applied in intracorporate disputes. The fundamental reexamination of the nature of conflict of laws over the past few years has virtually left foreign corporation matters remaining as a pocket of the past in a subject area which has otherwise been characterized by free inquiry, change and flux.

Kaplan, *supra* at 464.[10]

The policy underlying the internal affairs doctrine is an important one, and we decline to erode the principle:

> Under the prevailing conflicts practice, neither courts nor legislatures have maximized the imposition of local corporate policy on foreign corporations but have consistently applied the law of the state of incorporation to the entire gamut of internal corporate affairs. In many cases, this is a wise, practical, and equitable choice. It serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships. The lex incorporationis, unlike the lex loci delicti, is not a rule based merely on the priori concept of territoriality and on the desirability of avoiding forum-shopping. It validates

the autonomy of the parties in a subject where the underlying policy of the law is enabling. It facilitates planning and enhances predictability. In fields like torts, where the typical dispute involves two persons and a single or simple one-shot issue and where the common substantive policy is to spread the loss through compensation and insurance, the preference for forum law and the emphasis on the state interest in forum residents which are the common denominators of the new conflicts methodologies do not necessarily lead to unacceptable choices. By contrast, applying local internal affairs law to a foreign corporation just because it is amenable to process in the forum or because it has some local shareholders or some other local contact is apt to produce inequalities, intolerable confusion, and uncertainty, and intrude into the domain of other states that have a superior claim to regulate the same subject matter....

Kozyris, *supra* at 98.

### B.

 **[9]**     **[10]**     Given the significance of these considerations, application of the internal affairs doctrine is not merely a principle of conflicts law. It is also one of serious constitutional proportions-under due process, the commerce clause and the full faith and credit clause-so that the law of one state governs the relationships of a corporation to its stockholders, directors and officers in matters of internal corporate governance. The alternatives present almost intolerable consequences to the corporate enterprise and its managers. With the existence of multistate and multinational organizations, directors and officers have a significant right, under the fourteenth amendment's due process clause, to know what law will be applied to their actions. **\*217** Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs. That is particularly so here, given the significant fact that

in the McDermott Group reorganization, and after full disclosure, 89.59% of the total outstanding common shares of McDermott Delaware were tendered in the exchange offer. *Compare Norlin.* Thus, by an overwhelming choice those stockholders received shares in International, and thereby selected the laws of Panama to govern *inter se* the corporate relations between themselves, International, its directors, officers and agents. (*See* note 1, *supra*.) Such issues have been the subject of litigation and scholarly discussions for decades. However, an attitude has developed in some quarters which exalts local interests over more fundamental doctrines. We approach such teachings with reservations.

 **[11]**     Under the commerce clause *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970), determined that a state may regulate interstate commerce indirectly, but emphasized that the burden placed upon interstate commerce may not be excessive in relation to the local interests served by the regulation. In *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), the Supreme Court ruled that under the commerce clause a state "has no interest in regulating the internal affairs of foreign corporations." *Id.* at 645-46, 102 S.Ct. at 2642. If that is so, then a court or state which attempts to displace the internal affairs doctrine carries a heavy burden to justify its actions.

 **[12]**     The recent decision in *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), (reversing 794 F.2d 250), seems to support this interpretation of *MITE:*

> This Court's recent Commerce Clause cases also have invalidated statutes that adversely may affect interstate commerce by subjecting activities to inconsistent regulations ... The Indiana Act poses no such problem. *So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one state.* No principal of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations, including the authority to define the voting rights of shareholders ... This beneficial free market system depends at its core upon the fact that *a corporation-except*

*in the rarest situations-is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the state of its incorporation.*

CTS Corp., 481 U.S. at ----, 107 S.Ct. at 1649 (citations omitted) (emphases added). [11]

Thus, we conclude that application of the internal affairs doctrine is mandated by constitutional principles, except in "the rarest situations." [12]

**\*218** **[13]** In the early part of the twentieth century, the internal affairs doctrine was deemed to have constitutional support under the full faith and credit clause. [13] *See Broderick v. Rosner,* 294 U.S. 629, 643, 55 S.Ct. 589, 593, 79 L.Ed. 1100 (1935); *Converse v. Hamilton,* 224 U.S. 243, 256-57, 32 S.Ct. 415, 418-19, 56 L.Ed. 749 (1912). However, in 1935 the Supreme Court developed a balancing test to be used when evaluating whether full faith and credit was applicable. *Alaska Packers Ass'n v. Industrial Accident Comm'n,* 294 U.S. 532, 55 S.Ct. 518 (1935). A party bringing a full faith and credit claim thereafter bore the burden of establishing that conflicting interests of a foreign state were superior to those of the forum state. *Id.* at 547, 55 S.Ct. at 523-24.

*Order of United Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947) is the last Supreme Court decision which mandates application of the law of the state of organization to an entity's internal dealings under the full faith and credit clause. In *Wolfe,* the Supreme Court held that full faith and credit required that a dispute involving the internal affairs of a fraternal benefit society be governed by the laws of the state where the society was formed. *Id.* at 623-25, 67 S.Ct. at 1373-74. Although we recognize that there are lingering uncertainties concerning the vitality of *Wolfe,* [14] we believe that full faith and credit commands application of the internal affairs doctrine except in the *rare* circumstance where national policy [15] is outweighed by a significant interest of the forum state in the corporation and its shareholders. Reese and Kaufman, *supra* at 1141.

**[14]** Addressing the facts originally presented to the trial court and to us, we must conclude that due process and the commerce clause, in addition to principles of Delaware conflicts law, mandate reversal. Due process requires that directors, officers and shareholders be given adequate notice

of the jurisdiction whose laws will ultimately govern the corporation's internal affairs. Under such circumstances, application of 8 Del.C. § 160(c) to International would unfairly and, in our opinion, unconstitutionally, subject those intimately involved with the management of the corporation to the laws of Delaware.

**[15]** Moreover, application of Section 160(c) to International would violate the commerce clause. Delaware and Panama law clearly differ in their treatment of a subsidiary's voting rights under the facts originally presented here. For Delaware now to interfere in the internal affairs of a foreign corporation having no relationship whatever to this State clearly implies that **\*219** International can be subjected to the differing laws of all fifty states on various matters respecting its internal affairs. Such a prohibitive burden has obvious commerce clause implications, and could not pass constitutional muster. The substantial effect that would impose on interstate commerce triggers the *Pike v. Bruce Church, Inc.* balancing test. Since a state has no interest in regulating the internal affairs of a foreign corporation under *MITE,* Delaware has nothing left with which to counterbalance the burden that application of Section 160(c) on International would impose on interstate commerce. Given all the circumstances, the trial court's ruling cannot stand. [16]

**IV.**

**[16]** Plaintiffs protest the issuance of voting stock to McDermott Delaware on public policy grounds, relying on the following statement from *Norlin:*

[The] statutes seek to safeguard minority shareholders from management attempts at self-perpetuation. If cross-ownership and cross-voting of stock between parents and subsidiaries were unregulated, officers and directors could easily entrench themselves by exchanging a sufficient number of shares to block any challenge to their autonomy....

744 F.2d at 262 (citation omitted).

In that regard, Delaware law prohibits cross-voting of stock by majority-owned subsidiaries of Delaware corporations. 8 Del.C. § 160(c). But here, we are called upon to apply the laws

of Panama to a Panamanian corporation having no contacts with Delaware. We are not altering existing law governing Delaware corporations.

On the record before the Court of Chancery, we are not faced with some "Draconian" measure for the effectuation of a scheme designed solely to entrench existing management to the detriment of the corporation's shareholders. See *Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946, 955 (1985). The facts here do not support an entrenchment claim. The size of the voting interest placed in McDermott Delaware, its stated principal purpose being for tax advantages, and the timing of the transaction, all sustain this conclusion. In short, there was no threat of any kind which implicated the policies discussed by us in *Unocal. Id.*

at 954-59. If such issues should arise in a takeover context, they can be addressed in a proper way and at the proper time. *See Moran v. Household International, Inc.,* Del.Supr., 500 A.2d 1346, 1357 (1985).

In conclusion, the trial court erred as a matter of law in ignoring the uncontroverted Panamanian law, and in applying Delaware and/or Louisiana law to the internal affairs of International contrary to established Delaware law and important constitutional principles. Accordingly the judgment of the Court of Chancery is REVERSED.

### Parallel Citations

56 USLW 2179

Footnotes

1    After expiration of the exchange offer, McDermott announced that a preliminary count of the McDermott Delaware common shares tendered totalled approximately 33,740,000, or approximately 89.59% of the total number of outstanding shares. Of these, 30,000,000 shares were ultimately accepted for exchange pursuant to the terms of the Exchange Offer.

2    Mr. Durling has been a practicing lawyer in Panama since 1955 and is currently completing what will be the first treatise on the subject of Panama Corporate Law.

3    8 *Del.C.* § 160(c) provides:
     Shares of its own capital stock belonging to the corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the corporation, shall neither be entitled to vote nor be counted for quorum purposes. Nothing in this section shall be construed as limiting the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

4    La.Rev.Stat.Ann. § 12:75(G) provides:
     Neither (1) treasury shares, nor (2) unissued shares, nor (3) shares of a parent corporation held by a subsidiary corporation in which the parent holds a majority of the shares entitled to vote for the election of directors, shall be voted, or counted in calculating the voting power of shareholders of a corporation.

5    An opinion of the Executive Director of the National Commission of Securities of Panama, dated May 2, 1984, states that the phrase "sold on the market" requires that shares of a Panamanian corporation be made in Panama to more than ten persons annually. None of International's shares had been so traded. Appendix to Appellant's Opening Brief at A-185 to A-188 (original) and A-189 to A-192 (English translation).

6    Putting aside the question whether Delaware would apply a grouping of contacts or most significant relationship test in other areas of the law, International has no contacts whatever with Delaware. Given that circumstance, and Delaware's long adherence to the internal affairs doctrine, there is no basis for us to impose our own law upon a foreign corporation.

7    While International cites some rather insubstantial federal tax savings as the motivating factor for issuing voting shares to McDermott Delaware, we recognize the potential of McDermott Delaware's voting interest to aid International in a hostile fight for control. However, we do not rest our decision solely on the justifications urged by International, i.e., the possible tax savings provided by the reorganization.

8    Regarding proof of foreign law, Rule 202(e) of the Delaware Uniform Rules of Evidence provides:
     A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under these rules. The court's determination shall be treated as a ruling on a question of law.
   This rule has no counterpart in either the Federal Rules of Evidence or the Uniform Rules of Evidence.

9    As the Supreme Court of the United States just recently observed:

It thus is an accepted part of the business landscape in this country for States to create corporations, to prescribe their powers, and to define the rights that are acquired by purchasing their shares. A State has an interest in promoting stable relationships among parties involved in the corporations it charters....

*CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 107 S.Ct. 1637, 1650-51, 95 L.Ed.2d 67 (1987) (reversing 794 F.2d 250).

10 For an excellent discussion of the post-*Western Airlines* application of the internal affairs doctrine in the context of takeover litigation, see Kozyris, *supra* at 18-19. Since Professor Kozyris' article was published prior to the release of the *Norlin* opinion, the author did not have the opportunity to note that *Norlin* is the only known case which ignored the internal affairs doctrine in the context of corporate takeover litigation. Suffice it to say that in many leading cases the internal affairs doctrine was treated as axiomatic. *See Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 565-68 (6th Cir.1982); *Dan River, Inc. v. Icahn,* 701 F.2d 278, 280-83, 291-92 (4th Cir.1983); *Lewis v. Knutson,* 699 F.2d 230, 235 (5th Cir.1983); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 277-78, 293 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Wylain, Inc. v. TRE Corp.,* Del.Ch., 412 A.2d 338, 344 (1980).

11 *See United Air Lines, Inc. v. Illinois Commerce Commission,* Ill.Supr., 32 Ill.2d 516, 207 N.E.2d 433, 437-38 (1965) (commerce clause prohibits Illinois from requiring that a Delaware corporation comply with various requirements concerning a stock issuance); *United Air Lines, Inc. v. Nebraska State Ry. Comm'n,* Neb.Supr., 172 Neb. 784, 112 N.W.2d 414, 422 (1961); *State ex rel Utilities Comm'n v. Southern Bell Tel. and Tel. Co.* N.C.Supr., 288 N.C. 201, 217 S.E.2d 543, 549 (1975); *Panhandle Eastern Pipe Line Co. v. Public Util. Comm'n,* Ohio Supr., 56 Ohio St.2d 334, 383 N.E.2d 1163, 1169-70 (1978).

12 *CTS Corp. v. Dynamics Corp. of America,* provides strong support for a conclusion that the commerce clause mandates that a state apply the internal affairs doctrine to disputes involving corporations organized under the laws of a sister state. *CTS Corp.* involved a challenge to Indiana's second generation corporate takeover statute. The Indiana statute applies only to Indiana corporations, and is thus distinguishable from the first generation of statutes struck down in *Edgar v. MITE Corp.,* which purported to govern the internal affairs of foreign corporations. In *MITE,* the Supreme Court held that Illinois violated the commerce clause by burdening interstate commerce when regulating the internal affairs of a foreign corporation. In *CTS Corp.,* the Court ruled that a state does not violate the commerce clause, notwithstanding heavy burdens imposed upon interstate commerce, if a state is merely regulating the internal affairs of its own corporations.

13 This clause directs that "Full Faith and Credit shall be given in each State to the Public Acts, Records, and judicial Proceedings of every other State ..." U.S. Const. art. IV, § 1.

14 *See Allstate Insurance Co. v. Hague,* 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *Wilson v. Louisiana-Pacific Resources, Inc.,* Cal.App., 138 Cal.App.3d 216, 187 Cal.Rptr. 852, 856-58 (1982) (contra). *See also* Kaplan, *Foreign Corporations and Local Corporate Policy,* 21 Vand.L.Rev. 433, 446-47 (1968). However, Professor Kaplan relies on *Clay v. Sun Insurance Office, Ltd.,* 377 U.S. 179, 84 S.Ct. 1197, 12 L.Ed.2d 229 (1964) to support his assertion that *Wolfe* will not be extended to general business corporations. In *Clay,* plaintiff purchased an insurance policy which contained a one year statute of limitations clause enforceable under existing Illinois law. The Supreme Court held that a Florida statute requiring a minimum five year statute of limitations period was applicable, in an action brought in Florida, thus striking the one year limitation period provided by the Illinois contract. Petitioner was not a "shareholder" of respondent insurance company, and this case in no way involves the internal affairs of an organization- i.e., those matters peculiar to the officers, directors and shareholders of an organization acting in such capacities. In stark contrast, *Wolfe* involved the rights of a member of a fraternal benefit society, in his capacity as a member (shareholder) as against the benefit society (corporation). The Supreme Court held that the full faith and credit clause required that the law of the state wherein the benefit society was established be applied in litigation between the member and the society.

15 *See, e.g.,* Kozyris, *supra* at 34: "Elementary considerations of predictability, practicality, and equality call for both corporate governance and the common rights and obligations of shareholders to be subject to a single law. Full faith and credit gives primacy to the statute chosen by the parties with the consent of the state of incorporation.

16 However, we recognize that as a Panamanian corporation, McDermott International's rights here do not derive from the full faith and credit clause, which applies only to the laws of American states.

---

End of Document                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

34 A.3d 1074
Supreme Court of Delaware.

SAGARRA INVERSIONES,
S.L., Plaintiff Below, Appellant,
v.
CEMENTOS PORTLAND VALDERRIVAS,
S.A., et al., Defendants Below, Appellees,
Uniland Acquisition Corporation,
Nominal Defendant.

No. 425, 2011.   |   Submitted: Nov.
23, 2011.   |   Decided: Dec. 28, 2011.

**Synopsis**
**Background:** Shareholder of Spanish corporation brought derivative action in Delaware court challenging transaction on behalf of Spanish corporation's wholly owned Delaware subsidiary. The Court of Chancery, Noble, Vice Chancellor, 2011 WL 3371493, granted Spanish corporation's motion to dismiss. Shareholder appealed.

**Holdings:** The Supreme Court, en banc, Jacobs, J., held that:

[1] law of Spain governed presuit demand requirements in shareholder's derivative action, and

[2] shareholder failed to satisfy standing requirements to bring derivative action.

Affirmed.

West Headnotes (8)

[1] **Appeal and Error**
    👈 Cases Triable in Appellate Court
    Supreme Court reviews a trial court's grant of a motion to dismiss de novo.

    Cases that cite this headnote

[2] **Corporations and Business Organizations**

👈 Persons Entitled to Sue or Defend;
Standing

If derivative standing requirements are satisfied, a shareholder of a parent corporation may stand in the shoes of the parent and prosecute, on the parent's behalf, claims that formally belong to the parent's wholly owned subsidiary.

1 Cases that cite this headnote

[3] **Corporations and Business Organizations**
    👈 Persons Entitled to Sue or Defend;
    Standing
    Derivative standing principles are the same, for purposes of an action whereby a shareholder of a parent corporation attempts to prosecute a claim that formally belongs to the parent's wholly owned subsidiary, whether the subsidiary whose claim is being enforced falls within the second tier below the parent, or even further down the corporate hierarchical chain, separated from the parent by one or more intermediate subsidiaries.

    1 Cases that cite this headnote

[4] **Corporations and Business Organizations**
    👈 Persons Entitled to Sue or Defend;
    Standing
    A shareholder that holds shares only in a parent corporation must establish its standing to proceed derivatively at the parent level in order to claim standing to enforce, on the parent's behalf, a claim belonging to that parent's subsidiary.

    1 Cases that cite this headnote

[5] **Corporations and Business Organizations**
    👈 Derivative actions
    Law of Spain governed presuit demand requirements in shareholder's derivative action in Delaware court against Spanish corporation challenging transaction on behalf of Spanish corporation's wholly owned Delaware subsidiary, where shareholder's claim necessarily derived from its ownership of shares in Spanish corporation.

1 Cases that cite this headnote

**[6]**  **Corporations and Business Organizations**
👉 **Internal affairs doctrine in general**

The term "internal affairs," for purposes of internal affairs doctrine requiring that law of jurisdiction of incorporation governs internal affairs of corporation, encompasses those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders.

5 Cases that cite this headnote

**[7]**  **Corporations and Business Organizations**
👉 **Demanding Action and Refusal of Corporation, Directors, or Officers to Act**

**Corporations and Business Organizations**
👉 **Derivative actions**

Shareholder of Spanish corporation failed to satisfy standing requirements to maintain derivative action in Delaware court challenging transaction on behalf of Spanish corporation's wholly owned Delaware subsidiary, where shareholder failed to satisfy presuit demand requirements of Spanish law governing internal affairs of Spanish corporation.

3 Cases that cite this headnote

**[8]**  **Corporations and Business Organizations**
👉 **Persons entitled to sue; standing**

A Delaware court has no power to intervene in a corporation's affairs unless and until the plaintiff's standing to invoke its jurisdiction is established.

1 Cases that cite this headnote

**\*1075** Court Below: Court of Chancery of the State of Delaware, C.A. No. 6179.

Upon Appeal from the Court of Chancery. **AFFIRMED.**

**Attorneys and Law Firms**

Arthur L. Dent and Scott Czerwonka, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; Of Counsel: John Fornaciari (argued), Robert Disch and Jeremy Keim, Esquires, of Baker Hostetler L.L.P., Washington, D.C.; for Appellant.

Paul J. Lockwood (argued) and Rachel J. Barnett, Esquires, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Of Counsel: Jay B. Kasner, Esquire, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York; for Appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

**Opinion**

JACOBS, Justice:

The appellant, Sagarra Inversiones, S.L. ("Sagarra"), a Spanish corporation, is a minority shareholder of Corporación Uniland S.A. ("Uniland"), also a Spanish corporation. Sagarra brought a Court of Chancery action to rescind the sale, by Cementos Portland Valderrivas ("CPV"), of Giant Cement Holdings, Inc. ("Giant"), to Uniland. CPV was the controlling stockholder of both Giant and Uniland. Sagarra purported to sue derivatively on behalf of a wholly-owned Delaware subsidiary of Uniland, Uniland Acquisition Corp. ("UAC"), which was specifically created as the vehicle to acquire Giant. Sagarra claimed that the transaction was unfair and the product of self-dealing and, therefore, a breach of fiduciary duty owed under to UAC under Delaware law by UAC's directors, who were aided and abetted by CPV and Uniland.

The defendants moved to dismiss the complaint on the ground that Sagarra lacked standing to enforce a claim on behalf of UAC. The Court of Chancery held that Sagarra's standing to sue (specifically, its obligation to make a pursuit demand on UAC's parent company board) was governed by Spanish law, because Uniland—the only entity in which Sagarra owns stock—was incorporated in Spain. Because Sagarra failed to satisfy the demand requirements of Spanish law, the Court of Chancery dismissed Sagarra's action. We uphold the Court of Chancery's reasoning and judgment, and affirm.

### I. *FACTUAL AND PROCEDURAL BACKGROUND* [1]

#### A. *The Parties*

Uniland is a business entity formed under Spanish law. CPV, a Spanish entity **\*1076** that is Uniland's majority (74%) stockholder, controls Uniland's board of directors (the "Board"). Sagarra is the sole minority (26%) stockholder of Uniland, and has one director that represents its interests on the Uniland board. As noted, CPV was also the controlling shareholder of Giant, the corporation Uniland acquired (through UAC) in the transaction at issue in this lawsuit.

Two Uniland subsidiaries were involved in the Giant transaction. The first was Uniland International B.V. ("Uniland B.V."), a Dutch holding company that was wholly owned by Uniland. The second was UAC, a wholly-owned Delaware subsidiary of Uniland B.V. UAC was the acquisition vehicle for the Giant transaction. Thus, and as illustrated by the chart on the following page, within this hierarchy UAC was a third-tier subsidiary of Uniland. [2]



#### B. *The Giant Acquisition*

In 2009, Giant and its controlling stockholder, CPV, found themselves in financial distress. To improve its financial picture, CPV attempted to dispose of Giant for $270 million and sought out potential acquirers at that price, but without success. **\*1077** During this period, Uniland's intermediate subsidiary, Uniland B.V., realized approximately $188 million from the sale of certain of its businesses. Sometime thereafter, CPV decided that Uniland would acquire Giant. Sagarra claims that CPV's motivation for that decision was that the sale would enable CPV to access Uniland B.V.'s $188 million for itself, while simultaneously forcing Uniland's

minority shareholder, Sagarra, to share the risk of Giant's financial distress.

In September 2010, CPV proposed to Uniland's Board of Directors that Uniland B.V. acquire Giant for $278 million. Sagarra's Board representative opposed CPV's proposal. Presumably in an effort to placate Sagarra, the investment bank, UBS, was retained to perform an independent valuation of Giant. But, CPV later directed UBS to suspend its valuation, and instead provided Sagarra a March 2010 PricewaterhouseCoopers ("PWC") study that valued Giant at $700 million. Sagarra's representative objected to the PWC study as overstating Giant's value. Evidently that objection

was not fanciful: UBS later rendered an opinion that an appropriate purchase price would fall within a range between $66 million and $151 million.

CPV eventually ceased its efforts to obtain Sagarra's assent to its proposal and, on December 28, 2010, caused the acquisition of Giant to proceed. The next day, over the opposition of Sagarra's lone Board representative, a majority of Uniland's Board (who represented CPV's interests) approved the transaction at a price of $279 million, payable in installments. On December 30, 2010, a stock purchase agreement ("SPA") was executed to document the terms of the transaction. The record discloses that at least two of the four installment payments required by the SPA have been made; the third payment is scheduled to occur in January 2012.

## C. *Sagarra Challenges The Giant Transaction*

Sagarra then attempted to halt the Giant transaction in litigation that Sagarra brought in both Spain and Delaware. In January 2011, Sagarra filed a special statutory proceeding in the Spanish courts to nullify the Board's vote approving the acquisition of Giant. According to Sagarra, if that lawsuit ultimately succeeds, then under Spanish law, Sagarra must prosecute a second action to rescind the SPA. Sagarra estimates that these Spanish legal proceedings (including any appeals) may not be finally resolved until 2020.

In February 2011, Sagarra filed this action in the Delaware Court of Chancery, purporting to assert both "multi-tier" derivative claims, and two direct claims, all frontally challenging the validity of the Giant transaction. In an August 5, 2011 Opinion and Order, the Vice Chancellor dismissed all of Sagarra's derivative claims on the ground that Sagarra lacked standing under Spanish law to sue derivatively. As for Sagarra's two direct claims, the court held that one was actually derivative in nature, and therefore was dismissed for lack of standing. The other direct claim was dismissed on *forum non conveniens* grounds, under *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Engineering Co.* ("*McWane*"). [3] The dismissal of the direct claim under *McWane* is not challenged on this appeal.

Addressing whether Sagarra had standing to assert its claims derivatively, the Court of Chancery determined that Spanish law governed that issue, and that Sagarra lacked standing under Spanish law, which required Sagarra to request the Uniland Board to convene a meeting of its **\*1078**

shareholders to decide whether Uniland should bring suit against its own Board. If Sagarra made that request but no shareholders' meeting were called, then Sagarra would have standing to proceed derivatively on Uniland's behalf. But, because Sagarra had never requested the Uniland Board to schedule a shareholders' meeting, the court held that Sagarra had not satisfied the Spanish law standing requirements for proceeding derivatively. On that basis, the court dismissed all the derivative claims. [4]

This appeal followed.

# II. *ANALYSIS*

## A. *Sagarra's Claims Of Error*

Sagarra's principal claim on this appeal is that the Court of Chancery erred in determining that Spanish law governed the derivative standing requirements applicable to Sagarra. Instead, Sagarra contends, the Court of Chancery should have applied Delaware law, specifically Delaware's presuit demand jurisprudence including its "demand futility" doctrine. Sagarra advances three, somewhat overlapping, reasons for this position. First, Sagarra contends that it is suing to enforce a right possessed by UAC, which is a Delaware corporation. Although Sagarra concedes that UAC is a third-tier subsidiary of the entity in which Sagarra holds stock (Uniland), Sagarra urges that Delaware "tailor[s] ... multi-tier derivative" standing based on "equitable" principles, to "ensure that breaches of duty by directors of a Delaware subsidiary cannot escape judicial review." Second, Sagarra argues that a proper application of the internal affairs doctrine requires the application of Delaware's derivative standing rules, because the right Sagarra seeks to enforce "is not a right created in any way by Spanish law." Rather, that right "arose [under Delaware law] when Uniland SA incorporated a subsidiary in Delaware.... [The] Delaware subsidiary's board [therefore] breached their [fiduciary] duties in effectuating that transaction." [5] Third, Sagarra urges that sound public policy compels the result it asks us to reach here.

[1]  This Court reviews a trial court's grant of a motion to dismiss *de novo.* [6] We conclude, as did the Court of Chancery, that Sagarra lacks standing to assert these claims. Sagarra seeks to enforce claims of UAC, a wholly-owned subsidiary of which Uniland is (for purposes of this case) the ultimate parent. Sagarra, however, owns no shares of

UAC. It holds shares only in Uniland. To have standing to assert Uniland's claim "triple" derivatively on behalf of UAC, Sagarra must first satisfy the derivative standing requirements that apply to the parent entity in which Sagarra owns shares—here, Uniland. Because the standing issue is one that involves Uniland's "internal affairs," that makes applicable the internal affairs doctrine, which requires a Delaware court to apply the law of Uniland's state (or, in this case, country) of incorporation—here, Spain. It therefore is Spanish law that prescribes the standing requirements that apply to Sagarra, and it is undisputed that Sagarra failed to satisfy those requirements.

**\*1079  B. *The Application Of Delaware's "Double Derivative" Standing Jurisprudence***

[2]    [3]    Delaware law has long recognized that a shareholder of a parent corporation may bring suit derivatively to enforce the claim of a wholly owned corporate subsidiary, where the subsidiary and its controller parent wrongfully refuse to enforce the subsidiary's claim directly. [7] Such actions are commonly referred to as "double derivative" actions. This case, however, goes one step beyond being double derivative, because it involves an additional, intermediate subsidiary. Actions of that latter kind have been described as "multi-tier" or "multiple" derivative litigation. [8] Although the terminology used to describe these kinds of multi-tier derivative actions may change, under Delaware law the applicable principles of derivative standing remain constant. If those standing requirements are satisfied, a shareholder of the parent corporation may "stand in the shoes" [9] of the parent, and prosecute, on the parent's behalf, claims that formally belong to the parent's wholly owned subsidiary. [10] Those standing principles are **\*1080** the same, whether the subsidiary whose claim is being enforced falls within the second tier, or even further down the corporate hierarchical chain, separated from the parent by one or more intermediate subsidiaries.

**C. *Parent Level Standing Is Required To Enforce A Subsidiary's Claim Derivatively***

[4]    Sagarra's standing to sue derivatively on behalf of UAC must necessarily derive from its ownership of shares of Uniland, because Uniland is the only corporation in which Sagarra owns shares. Without that ownership stake, Sagarra would have no basis to claim standing to sue on behalf of any entity within the Uniland corporate hierarchy. Under Delaware law, a shareholder that holds shares only in a parent

corporation must establish its standing to proceed derivatively at the parent level, in order to claim standing to enforce, on the parent's behalf, a claim belonging to that parent's Delaware subsidiary. [11]

On that point our law is settled. As we recently held in *Lambrecht v. O'Neal,* where "the wholly-owned subsidiary pre-existed the alleged wrongdoing ... and the plaintiff owns stock only in the parent ... [a demand can] only be made—and a derivative action [can] only be brought—at the parent, not the subsidiary, level." [12] As *Lambrecht* recognized, the underlying basis for double derivative standing is the parent's ability to "enforce [the subsidiary's] claim by the direct exercise of [the parent's] 100 percent control" of the subsidiary. [13] Applying that principle here, Sagarra's standing to sue derivatively, including its presuit demand obligations, is **\*1081** governed by the derivative standing rules that apply at the parent (Uniland) level. [14]

**D. *Standing Requirements Governed By The Internal Affairs Doctrine***

[5]    That brings us to the next issue, which is: what body of standing law applies at the parent company level—the law of Delaware (as Sagarra claims) or Spain (as the Vice Chancellor held)? That question must be resolved under the governing choice of law principle, which in Delaware is the internal affairs doctrine. [15] Under that doctrine and in this context, the rule of decision is that of the jurisdiction of incorporation of the entity in which the plaintiff owns shares—here, Spain. Sagarra does not dispute that principle. Instead, it contends that the presuit demand requirement should not be deemed an "internal affair" of Uniland that falls within the scope of the internal affairs doctrine. Our law holds precisely the contrary.

[6]    In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle. [16] An important rationale for the doctrine is that, **\*1082** "in order to prevent corporations from being subjected to inconsistent legal standards, the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions." [17] The term "internal affairs" encompasses "those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders." [18] The doctrine requires that the law of the state (or, in this particular case,

Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A., 34 A.3d 1074 (2011)

the sovereign nation) of incorporation must govern those relationships. [19]

The presuit demand requirement is quintessentially an "internal affair" that falls within the scope of the internal affairs doctrine. As this Court explained in *Aronson v. Lewis,* the presuit demand requirement serves a core function of substantive corporation law, in that it allocates, as between directors and shareholders, the authority to sue on behalf of the corporation. [20] "[T]he entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." [21] "The decision to bring a lawsuit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation." [22] The United States Supreme Court echoed that principle in *Kamen v. Kemper Fin. Serv. Inc.* There, the Court stated that "the contours of the demand requirement— when it is required, and when excused—determine *who* has the power to control corporate litigation ... [and] relates to the allocation of governing powers within the corporation." [23]

Those "contours of the demand requirement" fall firmly within the gravitational pull of the internal affairs doctrine, and thus are determined by the law of the jurisdiction of incorporation of the entity on whose board a presuit "demand" is required. In this case, the law of Spain governs the presuit demand requirements that Sagarra must satisfy to sue derivatively on Uniland's behalf, to enforce the claim of Uniland's ultimate Delaware subsidiary, UAC. [24]

**E. *Public Policy Does Not Displace The Internal Affairs Doctrine***

[7] [8] Sagarra's final argument is that that rule should be set aside in this specific **\*1083** case for policy reasons. Sagarra contends that Delaware has a strong interest in preventing its corporations from being used for abusive purposes, such as the Giant transaction. That argument, although correct in the abstract, overlooks the fact that policy interest is already served by the General Assembly having conferred jurisdiction on Delaware's courts to police

fiduciary breaches committed through a misuse of the Delaware corporate form. For Delaware courts to fulfill that role, however, their power to act must first be properly invoked. A Delaware court has no power to intervene unless and until the plaintiff's standing to invoke its jurisdiction is established. [25] The policy interest that Sagarra invokes does not, and cannot, operate as a protean ethic that trumps, on an *ad hoc* basis, settled choice of law rules that govern the right of a stockholder to enforce, derivatively, claims that belong to the corporation in which it owns shares.

When Sagarra took ownership of its Uniland shares, it did so with presumed knowledge that its ownership interest was subject to the legal rights conferred, and the restrictions imposed, by the Spanish legal regime. [26] Whatever legal rights Sagarra initially contracted for to challenge a transaction whose terms were determined and structured at the Uniland level would necessarily be defined by Spanish law. For this Court to disrupt the internal affairs of a Spanish corporation by displacing Spanish derivative standing rules with those of Delaware, would serve no legitimate Delaware interest and would violate the principle of comity. As the Vice Chancellor rightly noted in his Opinion, "[a]lthough a Delaware entity may be involved in the corporate structure, the Court is mindful of the important interest of affording comity to foreign business law governing the internal affairs of a foreign corporation." As we have recognized, "comity" is the "recognition [of] ... the legislative, executive, or judicial acts of another nation ... [in] due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." [27] If any principle of public policy should apply here, it is that of comity. That principle compels that we reaffirm the analysis and result reached by the Court of Chancery.

*CONCLUSION*

For the above reasons, the judgment of the Court of Chancery is affirmed.

Footnotes

1    The facts recited herein are derived from Sagarra's complaint and from the Opinion of the Court of Chancery.

2    In this Opinion, and unless otherwise indicated, the term "parent corporation" refers only to the corporate entity in which the plaintiff shareholder actually holds shares (here, Uniland), and the term "subsidiary" refers to the last inferior corporate entity in the

hierarchical chain (here, UAC). Any subsidiary interposed between the parent and the ultimate subsidiary is sometimes referred to as an "intermediate" subsidiary (here, Uniland B.V.).

3    263 A.2d 281 (Del.1970).

4    Because the Court of Chancery correctly held that Spanish law governs the standing issue, we do not reach the Appellees' alternative contention that the claims were also properly dismissed under *McWane.*

5    Sagarra describes the "issue presented in this case" as "a matter of first impression" for this Court.

6    *Ramirez v. Murdick,* 948 A.2d 395, 399 (Del.2008); *Vanderbilt Income and Growth Associates L.L.C. v. Arvida/JMB Managers, Inc.,* 691 A.2d 609, 612 (Del.1996).

7    *See Sternberg v. O'Neil,* 550 A.2d 1105, 1107 n. 1 (Del.1988) (defining a "double derivative" action as "a derivative action maintained by the shareholders of a parent corporation or holding company on behalf of a subsidiary company."). *See also, Levine v. Milton,* 219 A.2d 145, 146 (Del.Ch.1966); *Leibert v. Grinnell Corp.,* 194 A.2d 846, 847 (Del.Ch.1963) ("[Plaintiff] apparently proceeds on a double derivative theory."). The precise significance of the "double" in "double derivative" actions appears to vary over time and jurisdiction. The unifying thread, however, is simple: two layers (or "tiers") of corporate entities are implicated in the suit. *See, e.g., Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Florida, Inc.,* 140 F.3d 898, 910 n. 5 (11th Cir.1998) ( "[A] double-derivative action ... rests upon the idea that the injury to plaintiffs' corporation results from injuries to another corporation."); *In re Imperial Corp. of Am.,* 92 F.3d 1503, 1510 n. 10 (9th Cir.1996) ( "The shareholder is, in effect, maintaining a derivative action on behalf of the subsidiary, since the holding or parent company has derivative rights to the cause of action possessed by the subsidiary.") (citation omitted); *U.S. Lines v. U.S. Lines Co.,* 96 F.2d 148, 151 (2d Cir.1938) ("The justification for allowing a double derivative suit like the present to be maintained is that *both* [the parent and subsidiary] ... were in the *control* of those charged with inflicting the corporate injury.") (emphasis added); Note, *Remedies of Stockholder of Parent Corporation for Injuries to Subsidiaries,* 50 Harv. L.Rev. 963, 964–65 (1937) (conceiving of "double derivative" suit as an "an extension of ... the *Benedict* case," which addressed concerns over "double liability") (citing *General Rubber Co. v. Benedict,* 215 N.Y.18, 109 N.E. 96 (N.Y.Ct.App.1915)). *See also, Saltzman v. Birrell,* 78 F.Supp. 778, 783 (S.D.N.Y.1948) ("There is no sound reason why, if a double derivative [action] is permissible, a triple derivative [action] should not be...."); 13 Fletcher Cyc. Corp. § 5977 ("A triple derivative action may be brought to enforce a cause of action of a subsidiary of a subsidiary.") (citing *Tomran, Inc. v. Passano,* 159 Md.App. 706, 862 A.2d 453, 454 (2004) (terming a suit to enforce a claim through three tiers of entities to be "triple derivative")).

8    *See, e.g., In re Sunstates Corp. S'holder Litig.,* 2001 WL 432447, at *1 (Del.Ch. Apr. 18, 2001) ("The premise of [defendants'] argument is that the claims at issue do not belong to Sunstates Corporation but to one or more of its foreign subsidiaries and may only be asserted in a double or multiple derivative suit."). *But see supra* note 7 (citing authorities using term 'triple derivative').

9    *Lambrecht v. O'Neal,* 3 A.3d 277, 289 (Del.2010).

10    As we observed in *Lambrecht,* some courts in other jurisdictions have recognized a double derivative right in the case of a less-than-wholly-owned subsidiary, but Delaware courts have not yet ruled on that issue. 3 A.3d at 283, n. 14. We do not reach that issue in this Opinion, since all of the relevant corporate subsidiaries here are wholly owned.

11    *Rales v. Blasband,* 634 A.2d 927, 932–35 (Del.1993); *Lambrecht,* 3 A.3d at 282.

12    *Id.*

13    *Id.* at 288–91. We take this occasion to correct three pronouncements in *Hamilton Partners, L.P. v. Englard,* 11 A.3d 1180 (Del.Ch.2010), in which the Court of Chancery suggested, by way of dictum, that from a "corporate technician ['s]" standpoint, some language in *Lambrecht* is inconsistent with provisions of the Delaware General Corporation Law. *Id.* at 1203–05. Those assertions warrant comment, lest this Court's silence be regarded as tacitly blessing *Hamilton Partners'* characterization of *Lambrecht* as containing "technical missteps." *Id.* at 1206.

First, the *Hamilton Partners* court—presumably addressing a supposed contrary suggestion in *Lambrecht*—asserts that where a corporation is acquired in a reverse triangular merger, "[p]ost-merger, only the board of directors *of the subsidiary* has statutory authority over the [corporation's] derivative claim[s]." *Id.* at 1204–05 (citing *8 Del. C.* § 141(a)) (emphasis in original). That statement, as phrased, is incorrect. Although the subsidiary's board has the sole statutory authority to decide whether or not to cause the subsidiary to assert the acquired claim *directly*, it is not accurate to say that the board has *exclusive* post-merger authority "over the *derivative* claim." By definition a derivative claim implicates the equitable right of a shareholder to assert the claim on the subsidiary's behalf. The subsidiary's board has the statutory "authority *to choose* whether [or not] to pursue the litigation," *Zapata Corp. v. Maldonado,* 430 A.2d 779, 786 (Del.1981) (emphasis added), but in the *derivative* context that authority is not exclusive, because where a shareholder has legitimate standing to proceed derivatively, the board's managerial decision not to sue will "not [be] respected." *Id.*

Second, and relatedly, *Hamilton Partners* implies that *Lambrecht* stands for the "statutorily incorrect" proposition that a parent corporation may assert (post-merger) a subsidiary's claim directly. 11 A.3d at 1205 (stating that a parent corporation in a triangular merger "does not receive the right to sue as a result of the merger and cannot assert directly the right of the subsidiary"). *Lambrecht*

stands for no such proposition: it states only that the parent, as a practical matter and by virtue of its 100% control, can cause its wholly owned subsidiary to enforce its claim directly. *Lambrecht,* 3 A.3d at 288 (describing the "direct exercise of ... 100 percent control").

Third, *Hamilton Partners,* citing *Lewis v. Anderson,* 477 A.2d 1040 (Del.1984), suggests that because the acquired claim is a statutory "asset" of the subsidiary and is subject to the subsidiary's board's managerial authority, the parent has no property interest in that claim. *Hamilton Partners,* 11 A.3d at 1204 (asserting that *Lambrecht* "is inaccurate to cite a 'legal precept, confirmed in *Lewis v. Anderson* ... that as a result of [a reverse triangular] merger, [the acquired subsidiary's] claim becomes the property of [the parent] as a matter of statutory law."). That suggestion misreads *Lewis,* where this Court stated that "[t]he Chancellor ruled that plaintiff [shareholder's] ... underlying claim [post-merger] thereby became the exclusive property right of [the subsidiary] *and its sole shareholder,* [the parent corporation]. We agree...." 477 A.2d at 1042 (emphasis added).

The "parent-has-no-property-interest" conclusion that *Hamilton Partners* attributes to *Lewis,* is also a *non-sequitur.* In *Lewis,* after the triangular merger the resulting subsidiary became the sole statutory "owner" of the acquired corporation's claim. But that fact did not (nor could it) operate to negate or extinguish any interest in that claim that the corporate parent (as 100% owner of the resulting subsidiary) acquired. Post-merger, the parent had an indirect property interest or right in that claim that it did not have before the merger. *See Buechner v. Farbenfabriken Bayer Aktiengesellschaft,* 154 A.2d 684, 686–87 (Del.1959) (describing parent corporation's property interest in subsidiary's corporate assets as an "indirect interest" which creditors of parent cannot reach directly, absent fraud). The significance of the subsidiary's exclusive ownership of the claim—for double derivative standing purposes—is not that it negates any property interest of the parent. Rather, its significance is that the parent's indirect property interest in the claim is subject to the subsidiary's board's discretionary power to decide whether to enforce that claim. But, even so, as we recognized in *Lambrecht* (and the Court of Chancery recognized in *Hamilton Partners*), as a practical matter the parent can always use its 100% controlling position to cause the subsidiary to enforce its claim, even though that claim is, statutorily speaking, the "property" of the subsidiary.

14  *See also, Sternberg v. O'Neil,* 550 A.2d 1105, 1122–23 (Del.1988) (acknowledging that because parent corporation "is an Ohio corporation, Ohio law must be applied to one aspect of [the plaintiff's] ... double derivative action."); *Kostolany v. Davis,* 1995 WL 662683, at *3 (Del.Ch. Nov. 7, 1995) ("Delaware does have a strong interest in protecting minority stockholders of Delaware corporations. However, plaintiff is a stockholder of the Dutch parent, not of the Delaware subsidiaries.").

15  *McDermott Inc. v. Lewis,* 531 A.2d 206, 215 (Del.1987) ( "Delaware's well established conflict of laws principles require that the laws of the jurisdiction of incorporation ... govern this dispute involving [the internal affairs of the corporation].").

16  *Id.* at 216–17 ("The alternatives [to the internal affairs doctrine] present almost intolerable consequences to the corporate enterprise and its managers.... Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs."). Under our case law the doctrine is also a rule of constitutional law. *Id.* at 217–19 ("[W]e conclude that application of the internal affairs doctrine is mandated by constitutional principles, except in 'the rarest situations.' ").

17  *VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1112 (Del.2005).

18  *Id.* at 1113. *See also, McDermott,* 531 A.2d at 214 (defining internal affairs as "matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders").

19  *VantagePoint Venture Partners,* 871 A.2d at 1113.

20  473 A.2d 805, 811–12 (Del.1984).

21  *Id.* at 812.

22  *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990). Nor were these principles new at the time *Aronson* and *Spiegel* were decided. As early as 1966, the Court of Chancery in *Levine v. Milton* concluded that "[i]f derivative actions on behalf of [a corporation incorporated in a foreign jurisdiction] ... are not permitted under the law of [that foreign jurisdiction], then I am satisfied that plaintiff's suit would have to be dismissed on that ground." 219 A.2d 145, 147 (Del.Ch.1966).

23  500 U.S. 90, 101, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991).

24  Once standing to proceed derivatively is established, Delaware substantive law applies to adjudicate the Delaware subsidiary's claims against its directors. *See Sternberg v. O'Neil,* 550 A.2d 1105, 1123–24 (Del.1988) (holding that internal affairs doctrine "mandates the application of Delaware law to the internal operation of [a subsidiary incorporated in Delaware]").

25  *Id.* at 1125 ("Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of its domestic corporations. Delaware has an obligation to provide such a forum.").

26  *McDermott Inc. v. Lewis,* 531 A.2d 206, 217 (Del.1987) ( "Stockholders also have a right to know by what standards of accountability they may hold those managing the corporation's business and affairs.").

27  *Taylor v. LSI Logic Corp.,* 715 A.2d 837, 842 (Del.1998).

Westlaw.

OWNER                                                                                              Page 1

Black's Law Dictionary (9th ed. 2009)

# OWNER

**owner.** (bef. 12c) One who has the right to possess, use, and convey something; a person in whom one or more interests are vested. • An owner may have complete property in the thing or may have parted with some interests in it (as by granting an easement or making a lease). See OWNERSHIP.

*adjoining owner.* (18c) A person who owns land abutting another's; ABUTTER. [Cases: Adjoining Landowners ⟨⟨1.]

*beneficial owner.* (18c) **1.** One recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else; esp., one for whom property is held in trust. — Also termed *equitable owner*. [Cases: Trusts ⟨⟨139.] **2.** A corporate shareholder who has the power to buy or sell the shares, but who is not registered on the corporation's books as the owner. [Cases: Corporations ⟨⟨135 .] **3.** *Intellectual property.* A person or entity who is entitled to enjoy the rights in a patent, trademark, or copyright even though legal title is vested in someone else. • The beneficial owner has standing to sue for infringement. A corporation is typically a beneficial owner if it has a contractual right to the assignment of the patent but the employee who owns the patent has failed to assign it. Similarly, a patent or copyright owner who has transferred title as collateral to secure a loan would be a beneficial owner entitled to sue for infringement.

*copyright owner.* See COPYRIGHT OWNER.

*equitable owner.* See *beneficial owner* (1).

*general owner.* (18c) One who has the primary or residuary title to property; one who has the ultimate ownership of property. Cf. *special owner.*

*legal owner.* (17c) One recognized by law as the owner of something; esp., one who holds legal title to property for the benefit of another. See TRUSTEE (1). [Cases: Trusts ⟨⟨133.]

*limited owner.* (1836) A tenant for life; the owner of a life estate. See *life estate* under ESTATE (1). [Cases: Life Estates ⟨⟨1.]

*naked owner.* *Civil law.* A person whose property is burdened by a usufruct. • The naked owner has the right to dispose of the property subject to the usufruct, but not to derive its fruits. See USUFRUCT. [Cases: Estates in Property ⟨⟨1.]

*owner of record.* See *record owner.*

*owner pro hac vice* (proh hahk **vee**-chay). See *bareboat charter* under CHARTER (8)).

*record owner.* (1863) **1.** A property owner in whose name the title appears in the public records. **2.** STOCK-HOLDER OF RECORD.

*sole and unconditional owner.* (1871) *Insurance.* The owner who has full equitable title to, and exclusive interest in, the insured property. [Cases: Insurance ⟨⟨2992(2).]

*special owner.* (18c) One (such as a bailee) with a qualified interest in property. Cf. *general owner.*

© 2009 Thomson Reuters

Bryan A. Garner, Editor in Chief

END OF DOCUMENT

# TITLE

**title.** (15c) **1.** The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property; the legal link between a person who owns property and the property itself <no one has title to that land>. Cf. OWNERSHIP; POSSESSION. **2.** Legal evidence of a person's ownership rights in property; an instrument (such as a deed) that constitutes such evidence <record your title with the county clerk>. "Though employed in various ways, [*title*] is generally used to describe either the manner in which a right to real property is acquired, or the right itself. In the first sense, it refers to the conditions necessary to acquire a valid claim to land; in the second, it refers to the legal consequences of such conditions. These two senses are not only interrelated, but inseparable: given the requisite conditions, the legal consequences or rights follow as of course; given the rights, conditions necessary for the creation of those rights must have been satisfied. Thus, when the word 'title' is used in one sense, the other sense is necessarily implied." Kent McNeil, *Common Law Aboriginal Title* 10 (1989).

**aboriginal title.** **1.** Land ownership, or a claim of land ownership, by an indigenous people in a place that has been colonized. — Also termed *native title*. **2.** INDIAN TITLE. [Cases: Indians ⬢151.]

**absolute title.** (17c) An exclusive title to land; a title that excludes all others not compatible with it. See *fee simple absolute* under FEE SIMPLE. [Cases: Estates in Property ⬢5.]

**adverse title.** (18c) A title acquired by adverse possession. See ADVERSE POSSESSION. [Cases: Adverse Possession ⬢106.]

**after-acquired title.** (1810) Title held by a person who bought property from a seller who acquired title only after purporting to sell the property to the buyer. See AFTER-ACQUIRED-TITLE DOCTRINE. Cf. *title by estoppel*. [Cases: Vendor and Purchaser ⬢8.]

**apparent title.** See COLOR OF TITLE.

**bad title. 1.** See *defective title*. **2.** See *unmarketable title*.

**clear title.** (17c) **1.** A title free from any encumbrances, burdens, or other limitations. [Cases: Vendor and Purchaser ⬢130(2), 133.] **2.** See *marketable title*. — Also termed *good title*.

**defeasible title.** (17c) A title voidable on the occurrence of a contingency, but not void on its face. [Cases: Estates in Property ⬢6.]

**defective title.** (17c) A title that cannot legally convey the property to which it applies, usu. because of some conflicting claim to that property. — Also termed *bad title*. [Cases: Vendor and Purchaser ⬢129.]

**derivative title.** (17c) **1.** A title that results when an already existing right is transferred to a new owner. **2.** The general principle that a transferee of property acquires only the rights held by the transferor and no more. [Cases: Vendor and Purchaser ⬢210.]

**dormant title.** (17c) A title in real property held in abeyance.

**doubtful title.** (17c) A title that exposes the party holding it to the risk of litigation with an adverse claimant. See *unmarketable title*. [Cases: Vendor and Purchaser ⬢129(1), 130(2).]

**equitable title.** (17c) A title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title. • Before the Statute of Uses (1536), an equitable title was enforceable only in a court of chancery, not of law. Cf. *legal title*. [Cases: Vendor and Purchaser ⬢54.]

**good title.** (16c) **1.** A title that is legally valid or effective. [Cases: Vendor and Purchaser ⬢130(2), 133.] **2.** See *clear title* (1). **3.** See *marketable title*.

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***imperfect title.***(18c) A title that requires a further exercise of the granting power to pass land in fee, or that does not convey full and absolute dominion.

***Indian title.***See INDIAN TITLE.

***just title.***In a case of prescription, a title that the possessor received from someone whom the possessor honestly believed to be the real owner, provided that the title was to transfer ownership of the property. [Cases: Adverse Possession ☞69.]

***legal title.***(17c) A title that evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest. • Before the Statute of Uses (1536), a legal title was enforceable only in a court of law, not chancery. Cf. *equitable title*. [Cases: Vendor and Purchaser ☞54.]

***lucrative title.****Civil law.* A title acquired without giving anything in exchange for the property; title by which a person acquires anything that comes as a clear gain, as by gift, descent, or devise. • Because lucrative title is usu. acquired by gift or inheritance, it is treated as the separate property of a married person. Cf. *onerous title*.

***marketable title.***(18c) A title that a reasonable buyer would accept because it appears to lack any defect and to cover the entire property that the seller has purported to sell; a title that enables a purchaser to hold property in peace during the period of ownership and to have it accepted by a later purchaser who employs the same standards of acceptability. — Also termed *good title*; *merchantable title*; *clear title*. [Cases: Vendor and Purchaser ☞130.]

"One definition of a marketable title which has been put forward repeatedly is one free from all reasonable doubt. Stated another way, a marketable title is one which does *not* contain any manner of defect or outstanding interest or claim which may conceivably operate to defeat or impair the interest which is bargained for and is intended to be conveyed. This negative concept of marketability has become an implied invitation for courts to declare titles unmarketable if an examiner has entertained any doubt whatever with respect to them. The digests attest the painful truth that claims of a bygone era cling like barnacles to land titles and encumber them long after they should have been scraped clean.... We need to replace this negative approach by a positive one which will make the marketability of titles depend solely upon their state during some recent interval of time rather than upon their entire history." Paul E. Basye, *Clearing Land Titles* § 371, at 539 (1953).

***native title.***See *aboriginal title* (1).

***nonmerchantable title.***See *unmarketable title*.

***onerous title*** (**on**-‹schwa›r-‹schwa›s).**1.***Civil law.* A title acquired by giving valuable consideration for the property, as by paying money or performing services. **2.** A title to property that is acquired during marriage through a spouse's skill or labor and is therefore treated as community property. Cf. *lucrative title*.

***original title.***A title that creates a right for the first time.

"The catching of fish is an original title of the right of ownership, whereas the purchase of them is a derivative title. The right acquired by the fisherman is newly created; it did not formerly exist in any one." John Salmond, *Jurisprudence* 345 (Glanville L. Williams ed., 10th ed. 1947).

***paper title.***See *record title*.

***paramount title.***(18c) **1.***Archaic.* A title that is the source of the current title; original title. **2.** A title that is superior to another title or claim on the same property.

***particular title.****Civil law.* A title acquired from an ancestor by purchase, gift, or inheritance before or after the ancestor's death.

***perfect title.*** **1.**FEE SIMPLE. **2.** A grant of land that requires no further act from the legal authority to constitute an absolute title to the land. **3.** A title that does not disclose a patent defect that may require a lawsuit to defend it. **4.** A title that is good both at law and in equity. **5.**A title that is good and valid beyond all reasonable doubt.

***presumptive title.***(17c) A title of the lowest order, arising out of the mere occupation or simple possession of property without any apparent right, or any pretense of right, to hold and continue that possession.

(c) 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**record title.**(18c) A title as it appears in the public records after the deed is properly recorded. — Also termed *title of record*; *paper title*. [Cases: Vendor and Purchaser ☞132, 231(1).]

**singular title.**(17c) The title by which one acquires property as a singular successor.

**tax title.**(1831) A title to land purchased at a tax sale. [Cases: Taxation ☞3060–3082.]

**title by descent.**(17c) A title that one acquires by law as an heir of the deceased owner.

**title by devise.**(1819) A title created by will.

**title by estoppel.**Title acquired from a person who did not have title at the time of a purported conveyance with a warranty but later acquired the title, which then inures to the benefit of the grantee. Cf. *after-acquired title*.

**title by prescription.**(17c) A title acquired by prescription. See PRESCRIPTION (5). [Cases: Adverse Possession ☞106.]

**title defective in form.**(1836) A title for which some defect appears on the face of the deed, as opposed to a defect that arises from circumstances or extrinsic evidence. • Title defective in form cannot be the basis of prescription. See PRESCRIPTION (5). [Cases: Vendor and Purchaser ☞129.]

**title of entry.**(16c) The right to enter upon lands.

**title of record.**See *record title*.

**universal title.**(17c) A title acquired by a conveyance causa mortis of a stated portion of all the conveyor's property interests so that on the conveyor's death the recipient stands as a universal successor.

**unmarketable title.**(18c) A title that a reasonable buyer would refuse to accept because of possible conflicting interests in or litigation over the property. — Also termed *bad title*; *unmerchantable title*; *nonmerchantable title*. [Cases: Vendor and Purchaser ☞130(2).]

**3.** The heading of a statute or other legal document <the title of the contract was "Confidentiality Agreement">. [Cases: Contracts ☞152; Statutes %4E109.2.]

**general title.**A statute's name that broadly and comprehensively identifies the subject matter addressed by the legislature. Cf. *restrictive title*. [Cases: Statutes %4E109.2.]

**long title.**The full, formal title of a statute, usu. containing a brief statement of legislative purpose.

"The first Acts of Parliament did not have titles. The first time that an Act of Parliament was given a title was about 1495. Even when the long title came to be added to each Act of Parliament as a matter of course, as it did from about 1513, the long title was not regarded as part of the Act of Parliament itself. Today, however, the position is different: the long title is part of the Act of Parliament." D.J. Gifford & John Salter, *How to Understand an Act of Parliament* 19 (1996).

"Because Parliament's clerks, rather than Parliament, provided the titles of acts, the traditional rule has been that the title could not be used for interpretive purposes.... This is no longer the practice in most English-speaking jurisdictions, for the long title, and often a short title as well, are part of the legislative bill from the very beginning. In the United States, most state constitutions require the legislative enactment to have a title that gives accurate notice of the contents of the law." William N. Eskridge Jr. & Elizabeth Garett, *Legislation* 831 (2001).

**short title.**The abbreviated title of a statute by which it is popularly known; a statutory nickname.

**4.** A subdivision of a statute or code <Title IX>.

**restrictive title.**A statute's name that narrowly identifies the particular subject matter addressed by the legislature. Cf. *general title*. [Cases: Statutes %4E109.2.]

**5.** The name by which a court case or other legal proceeding is distinguished from others; STYLE (1).**6.** An appellation of office, dignity, or distinction < after the election, he bore the title of mayor for the next four years>.

© 2009 Thomson Reuters

Bryan A. Garner, Editor in Chief

Restatement (Second) of Conflict of Laws § 6 (1971)

Restatement of the Law - Conflict of Laws

Database updated June 2014
Restatement (Second) of Conflict of Laws

Chapter 1. Introduction

§ 6 Choice-of-Law Principles

Comment on Subsection (1):
Reporter's Note
Case Citations - by Jurisdiction

**(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.**

**(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include**

**(a) the needs of the interstate and international systems,**

**(b) the relevant policies of the forum,**

**(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,**

**(d) the protection of justified expectations,**

**(e) the basic policies underlying the particular field of law,**

**(f) certainty, predictability and uniformity of result, and**

**(g) ease in the determination and application of the law to be applied.**

---

**Comment on Subsection (1):**

*a. Statutes directed to choice of law.* A court, subject to constitutional limitations, must follow the directions of its legislature. The court must apply a local statutory provision directed to choice of law provided that it would be constitutional to do so. An example of a statute directed to choice of law is the Uniform Commercial Code which provides in certain instances for the application of the law chosen by the parties (§ 1-105(1)) and in other instances for the application of the law of a particular state (§§ 2-402, 4-102, 6-102, 8-106, 9-103). Another example is the Model Execution of Wills Act which provides that a written will subscribed by the testator shall be valid as to matters of form if it complies with the local requirements of any one of a number of enumerated states. Statutes that are expressly directed to choice of law, that is to say, statutes which provide for the application of the local law of one state, rather than the local law of another state, are comparatively few in number.

*b. Intended range of application of statute.* A court will rarely find that a question of choice of law is explicitly covered by statute. That is to say, a court will rarely be directed by statute to apply the local law of one state, rather than the local law of another state, in the decision of a particular issue. On the other hand, the court will constantly be faced with the question whether the issue before it falls within the intended range of application of a particular statute. The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally

be given effect. If the legislature intended that the statute should be applied to the out-of-state facts involved, the court should so apply it unless constitutional considerations forbid. On the other hand, if the legislature intended that the statute should be applied only to acts taking place within the state, the statute should not be given a wider range of application. Sometimes a statute's intended range of application will be apparent on its face, as when it expressly applies to all citizens of a state including those who are living abroad. When the statute is silent as to its range of application, the intentions of the legislature on the subject can sometimes be ascertained by a process of interpretation and construction. Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.

---

**Comment on Subsection (2):**

*c. Rationale.* Legislatures usually legislate, and courts usually adjudicate, only with the local situation in mind. They rarely give thought to the extent to which the laws they enact, and the common law rules they enunciate, should apply to out-of-state facts. When there are no adequate directives in the statute or in the case law, the court will take account of the factors listed in this Subsection in determining the state whose local law will be applied to determine the issue at hand. It is not suggested that this list of factors is exclusive. Undoubtedly, a court will on occasion give consideration to other factors in deciding a question of choice of law. Also it is not suggested that the factors mentioned are listed in the order of their relative importance. Varying weight will be given to a particular factor, or to a group of factors, in different areas of choice of law. So, for example, the policy in favor of effectuating the relevant policies of the state of dominant interest is given predominant weight in the rule that transfers of interests in land are governed by the law that would be applied by the courts of the situs (see §§ 223- 243). On the other hand, the policies in favor of protecting the justified expectations of the parties and of effectuating the basic policy underlying the particular field of law come to the fore in the rule that, subject to certain limitations, the parties can choose the law to govern their contract (see § 187) and in the rules which provide, subject to certain limitations, for the application of a law which will uphold the validity of a trust of movables (see §§ 269- 270) or the validity of a contract against the charge of commercial usury (see § 203). Similarly, the policy favoring uniformity of result comes to the fore in the rule that succession to interests in movables is governed by the law that would be applied by the courts of the state where the decedent was domiciled at the time of his death (see §§ 260 and 263).

At least some of the factors mentioned in this Subsection will point in different directions in all but the simplest case. Hence any rule of choice of law, like any other common law rule, represents an accommodation of conflicting values. Those chapters in the Restatement of this Subject which are concerned with choice of law state the rules which the courts have evolved in accommodation of the factors listed in this Subsection. In certain areas, as in parts of Property ( Chapter 9), such rules are sufficiently precise to permit them to be applied in the decision of a case without explicit reference to the factors which underlie them. In other areas, such as in Wrongs ( Chapter 7) and Contracts ( Chapter 8), the difficulties and complexities involved have as yet prevented the courts from formulating a precise rule, or series of rules, which provide a satisfactory accommodation of the underlying factors in all of the situations which may arise. All that can presently be done in these areas is to state a general principle, such as application of the local law "of the state of most significant relationship", which provides some clue to the correct approach but does not furnish precise answers. In these areas, the courts must look in each case to the underlying factors themselves in order to arrive at a decision which will best accommodate them.

Statement of precise rules in many areas of choice of law is made even more difficult by the great variety of situations and of issues, by the fact that many of these situations and issues have not been thoroughly explored by the courts, by the generality of statement frequently used by the courts in their opinions, and by the new grounds of decision stated in many of the more recent opinions.

The Comments which follow provide brief discussion of the factors underlying choice of law which are mentioned in this Subsection.

*d. Needs of the interstate and international systems.* Probably the most important function of choice-of-law rules is to make the interstate and international systems work well. Choice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them. In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states. Rules of choice of law formulated with regard for such needs and policies are likely to commend themselves to other states and to be adopted by these states. Adoption of the same choice-of-law rules by many states will further the needs of the interstate and international systems and likewise the values of certainty, predictability and uniformity of result.

*e. Relevant policies of the state of the forum.* Two situations should be distinguished. One is where the state of the forum has no interest in the case apart from the fact that it is the place of the trial of the action. Here the only relevant policies of state of the forum will be embodied in its rules relating to trial administration (see Chapter 6). The second situation is where the state of the forum has an interest in the case apart from the fact that it is the place of trial. In this latter situation, relevant policies of the state of the forum may be embodied in rules that do not relate to trial administration.

The problem dealt with in this Comment arises in the common situation where a statute or common law rule of the forum was formulated solely with the intrastate situation in mind or, at least, where there is no evidence to suggest that the statute or rule was intended to have extraterritorial application. If the legislature or court (in the case of a common law rule) did have intentions with respect to the range of application of a statute or common law rule and these intentions can be ascertained, the rule of Subsection (1) is applicable. If not, the court will interpret the statute or rule in the light of the factors stated in Subsection (2).

Every rule of law, whether embodied in a statute or in a common law rule, was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state in the decision of a particular issue. If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made. On the other hand, the court is under no compulsion to apply the statute or rule to such out-of-state facts since the originating legislature or court had no ascertainable intentions on the subject. The court must decide for itself whether the purposes sought to be achieved by a local statute or rule should be furthered at the expense of the other choice-of-law factors mentioned in this Subsection.

*f. Relevant policies of other interested states.* In determining a question of choice of law, the forum should give consideration not only to its own relevant policies (see Comment *e*) but also to the relevant policies of all other interested states. The forum should seek to reach a result that will achieve the best possible accommodation of these policies. The forum should also appraise the relative interests of the states involved in the determination of the particular issue. In general, it is fitting that the state whose interests are most deeply affected should have its local law applied. Which is the state of dominant interest may depend upon the issue involved. So if a husband injures his wife in a state other than that of their domicil, it may be that the state of conduct and injury has the dominant interest in determining whether the husband's conduct was tortious or whether the wife was guilty of contributory negligence (see § 146). On the other hand, the state of the spouses' domicil is the state of dominant interest when it comes to the question whether the husband should be held immune from tort liability to his wife (see § 169).

The content of the relevant local law rule of a state may be significant in determining whether this state is the state with the dominant interest. So, for example, application of a state's statute or common law rule which would absolve the defendant from liability could hardly be justified on the basis of this state's interest in the welfare of the injured plaintiff.

*g. Protection of justified expectations.* This is an important value in all fields of the law, including choice of law. Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state. Also, it is in part because of this factor that the parties are free within broad limits to choose the law to govern the validity of their contract (see § 187) and that the courts seek to apply a law that will sustain the validity of a trust of movables (see §§ 269- 270).

There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied. In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question.

*h. Basic policies underlying particular field of law.* This factor is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules. In such instances, there is good reason for the court to apply the local law of that state which will best achieve the basic policy, or policies, underlying the particular field of law involved. This factor explains in large part why the courts seek to apply a law that will sustain the validity of a contract against the charge of commercial usury ( § 203) or the validity of a trust of movables against the charge that it violates the Rule Against Perpetuities ( §§ 269- 270).

*i. Predictability and uniformity of result.* These are important values in all areas of the law. To the extent that they are attained in choice of law, forum shopping will be discouraged. These values can, however, be purchased at too great a price. In a rapidly developing area, such as choice of law, it is often more important that good rules be developed than that predictability and uniformity of result should be assured through continued adherence to existing rules. Predictability and uniformity of result are of particular importance in areas where the parties are likely to give advance thought to the legal consequences of their transactions. It is partly on account of these factors that the parties are permitted within broad limits to choose the law that will determine the validity and effect of their contract (see § 187) and that the law that would be applied by the courts of the state of the situs is applied to determine the validity of transfers of interests in land (see § 223). Uniformity of result is also important when the transfer of an aggregate of movables, situated in two or more states, is involved. Partly for this reason, the law that would be applied by the courts of the state of a decedent's domicil at death is applied to determine the validity of his will in so far as it concerns movables (see § 263) and the distribution of his movables in the event of intestacy (see § 260).

*j. Ease in the determination and application of the law to be applied.* Ideally, choice-of-law rules should be simple and easy to apply. This policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results. The policy does, however, provide a goal for which to strive.

*k. Reciprocity.* In formulating common law rules of choice of law, the courts are rarely guided by considerations of reciprocity. Private parties, it is felt, should not be made to suffer for the fact that the courts of the state from which they come give insufficient consideration to the interests of the state of the forum. It is also felt that satisfactory development of choice-of-law rules can best be attained if each court gives fair consideration to the interests of other states without regard to the question whether the courts of one or more of these other states would do the same. As to whether reciprocity is a condition to the recognition and enforcement of a judgment of a foreign nation, see § 98, Comment *e*.

States sometimes incorporate a principle of reciprocity into statutes and treaties. They may do so in order to induce other states to take certain action favorable to their interests or to the interests of their citizens. So, as stated in § 89, Comment *b*, many States of the United States have enacted statutes which provide that a suit by a sister State for the recovery of taxes will be entertained in the local courts if the courts of the sister State would entertain a similar suit by the State of the forum. Similarly, by way of further example, some States of the United States provide by statute that an alien cannot inherit local assets unless their citizens in turn would be permitted to inherit in the state of the alien's nationality. A principle of reciprocity is also sometimes employed in statutes to permit reciprocating states to obtain by cooperative efforts what a single state could not obtain through the force of its own law. See, e.g., Uniform Reciprocal Enforcement of Support Act; Uniform (Reciprocal) Act to Secure Attendance of Witnesses from Without a State in Criminal Proceedings; Interpleader Compact Law.

*h. Reference is to "local law" of selected state.* The reference is to the "local law" of the state of the applicable law and not to that state's "law," which means the totality of its law including its choice-of-law rules (see § 4). Values of certainty of result and of ease of application dictate that the forum should apply the local law of the selected state and not concern itself with the complications that might arise if that state's choice-of-law rules were applied. There is also no basis for supposing that fairness requires the forum to apply the choice-of-law rules of the selected state. To the extent that they may give thought to the possible consequences before engaging in conduct which may be tortious, persons would probably expect that the local law of the state selected by application of the present rule would be applied.

On the other hand, in judging a state's interest in the application of one of its local law rules, the forum should concern itself with the question whether the courts of that state would have applied this rule in the decision of the case. The fact that these courts would have applied this rule may indicate that an important interest of that state would be served if the rule were applied by the forum. Conversely, the fact that these courts would not have applied this rule may indicate that no important interest of that state would be infringed if the rule were not applied by the forum (see § 8, Comment *k*). It should be reiterated that in the torts area the forum will not apply the choice-of-law rules of another state. The forum will consult these rules, however, for whatever light these rules may shed upon the extent of the other state's interest in the application of its relevant local law rule.

> **Illustration:**
> **Illustration:**
>
> 3. In state X, A shoots at a bird and hits B, who is standing in state Y. B, who is domiciled in Y, brings suit against A in state Z. If the Z court determines that Y is the state of most significant relationship, the Z court will apply Y local law. In determining whether Y is the state of most significant relationship, the Z court may consider whether the Y courts would have applied their own local law or the local law of another state in deciding the particular issue.

---

**Comment:**

*i. When rule of two or more states is the same.* When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state.

> **Illustration:**
> **Illustration:**
>
> 4. By conduct in state X, A injures B in state Y. X and Y have the same local law rules with respect to liability in tort for causing personal injuries. The case will be treated for the purposes of this Section as if conduct and injury had taken place in one state.

---

Restatement (Second) of Conflict of Laws § 188 (1971)

Restatement of the Law - Conflict of Laws

Database updated June 2014
Restatement (Second) of Conflict of Laws

Chapter 8. Contracts

Topic 1. Validity of Contracts and Rights Created Thereby

Title A. General Principles

§ 188 Law Governing in Absence of Effective Choice by the Parties

Comment:
Reporter's Note
Case Citations - by Jurisdiction

**(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.**

**(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:**

**(a) the place of contracting,**

**(b) the place of negotiation of the contract,**

**(c) the place of performance,**

**(d) the location of the subject matter of the contract, and**

**(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.**
**These contacts are to be evaluated according to their relative importance with respect to the particular issue.**

**(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189- 199 and 203.**

---

**Comment:**

*a. Scope of section.* The rule of this Section applies in all situations where there has not been an effective choice of the applicable law by the parties (see § 187).

---

**Comment on Subsection (1):**

*b. Rationale.* The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the transaction and the parties. The factors

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 73 of 102

§ 188Law Governing in Absence of Effective Choice by..., Restatement (Second)...

listed in Subsection (2) of the rule of § 6 can be divided into five groups. One group is concerned with the fact that in multistate cases it is essential that the rules of decision promote mutually harmonious and beneficial relationships in the interdependent community, federal or international. The second group focuses upon the purposes, policies, aims and objectives of each of the competing local law rules urged to govern and upon the concern of the potentially interested states in having their rules applied. The factors in this second group are at times referred to as "state interests" or as appertaining to an "interested state." The third group involves the needs of the parties, namely the protection of their justified expectations and certainty and predictability of result. The fourth group is directed to implementation of the basic policy underlying the particular field of law, such as torts or contracts, and the fifth group is concerned with the needs of judicial administration, namely with ease in the determination and application of the law to be applied.

The factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field and from issue to issue. Thus, the protection of the justified expectations of the parties is of considerable importance in contracts whereas it is of relatively little importance in torts (see § 145, Comment *b*). In the torts area, it is the rare case where the parties give advance thought to the law that may be applied to determine the legal consequences of their actions. On the other hand, parties enter into contracts with forethought and are likely to consult a lawyer before doing so. Sometimes, they will intend that their rights and obligations under the contract should be determined by the local law of a particular state. In this event, the local law of this state will be applied, subject to the qualifications stated in the rule of § 187. In situations where the parties did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said, subject perhaps to rare exceptions, that they expected that the provisions of the contract would be binding upon them.

The need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result. For unless these values are attained, the expectations of the parties are likely to be disappointed.

Protection of the justified expectations of the parties by choice-of-law rules in the field of contracts is supported both by those factors in Subsection (2) of § 6 which are directed to the furtherance of the needs of the parties and by those factors which are directed to implementation of the basic policy underlying the particular field of law. Protection of the justified expectations of the parties is the basic policy underlying the field of contracts.

Protection of the justified expectations of the parties is a factor which varies somewhat in importance from issue to issue. As indicated above, this factor is of considerable importance with respect to issues involving the validity of a contract, such as capacity, formalities and substantial validity. Parties entering a contract will expect at the very least, subject perhaps to rare exceptions, that the provisions of the contract will be binding upon them. Their expectations should not be disappointed by application of the local law rule of a state which would strike down the contract or a provision thereof unless the value of protecting the expectations of the parties is substantially outweighed in the particular case by the interest of the state with the invalidating rule in having this rule applied. The extent of the interest of a state in having its rule applied should be determined in the light of the purpose sought to be achieved by the rule and by the relation of the transaction and the parties to that state (see Comment *c*).

Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof. By and large, it is for the parties themselves to determine the nature of their contractual obligations. They can spell out these obligations in the contract or, as a short-hand device, they can provide that these obligations shall be determined by the local law of a given state (see § 187, Comment *c*). If the parties do neither of these two things with respect to an issue involving the nature of their obligations, as, for example, the time of performance, the resulting gap in their contract must be filled by application of the relevant rule of contract law of a particular state. All states have gap-filling rules of this sort, and indeed such rules comprise the major content of contract law. What is important for present purposes is that a gap in a contract usually results from the fact that the parties never gave thought to the issue involved. In such a situation, the expectations of the parties with respect to that issue are unlikely to be disappointed by application of the gap-filling rule of one state rather than of the

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 74 of 102

§ 188 Law Governing in Absence of Effective Choice by..., Restatement (Second)...

rule of another state. Hence with respect to issues of this sort, protection of the justified expectations of the parties is unlikely to play so significant a role in the choice-of-law process. As a result, greater emphasis in fashioning choice-of-law rules in this area must be given to the other choice-of-law principles mentioned in the rule of § 6.

*c. Purpose of contract rule.* The purpose sought to be achieved by the contract rules of the potentially interested states, and the relation of these rules to the transaction and the parties, are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its contract rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the transaction and the parties. So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. And a state where a contract provides that a given business practice is to be pursued has an obvious interest in the application of its rule designed to regulate or to deter that business practice. On the other hand, the purpose of a rule and the relation of a state to the transaction and the parties may indicate that the state has little or no interest in the application of that rule in the particular case. So a state may have little interest in the application of a rule designed to protect a party against the unfair use of superior bargaining power if the contract is to be performed in another state which is the domicil of the person seeking the rule's protection. And a state may have little interest in the application of a statute designed to regulate or to deter a certain business practice if the conduct complained of is to take place in another state.

Whether an invalidating rule should be applied will depend, among other things, upon whether the interest of the state in having its rule applied to strike down the contract outweighs in the particular case the value of protecting the justified expectations of the parties and upon whether some other state has a greater interest in the application of its own rule.

Frequently, it will be possible to decide a question of choice of law in contract without paying deliberate attention to the purpose sought to be achieved by the relevant contract rules of the interested states. This will be so whenever by reason of the particular circumstances one state is obviously that of the applicable law.

*d. The issue involved.* The courts have long recognized that they are not bound to decide all issues under the local law of a single state. Thus, in an action on a contract made and to be performed in a foreign state by parties domiciled there, a court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties, and the administration of the trial (see Chapter 6), while deciding other issues—such as whether the defendant had capacity to bind himself by contract—by reference to the law selected by application of the rules stated in this Chapter. The rule of this Section makes explicit that selective approach to choice of the law governing particular issues.

Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states.

---

**Comment on Subsection (2):**

*e. Important contacts in determining state of most significant relationship.* In the absence of an effective choice of law by the parties (see § 187), the forum, in applying the principles of § 6 to determine the state of most significant relationship, should give consideration to the relevant policies of all potentially interested states and the relative interests of those states in the decision of the particular issue. The states which are most likely to be interested are those which have one or more of the following contacts with the transaction or the parties. Some of these contacts also figure prominently in the formulation of the applicable rules of choice of law.

*The place of contracting.* As used in the Restatement of this Subject, the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect, assuming, hypothetically, that the local law of the state where the act occurred rendered the contract binding.

Case 09-10138-MFW Doc 14177-1 Filed 08/07/14 Page 75 of 102

§ 188Law Governing in Absence of Effective Choice by..., Restatement (Second)...

Standing alone, the place of contracting is a relatively insignificant contact. To be sure, in the absence of an effective choice of law by the parties, issues involving the validity of a contract will, in perhaps the majority of situations, be determined in accordance with the local law of the state of contracting. In such situations, however, this state will be the state of the applicable law for reasons additional to the fact that it happens to be the place where occurred the last act necessary to give the contract binding effect. The place of contracting, in other words, rarely stands alone and, almost invariably, is but one of several contacts in the state. Usually, this state will be the state where the parties conducted the negotiations which preceded the making of the contract. Likewise, this state will often be the state of the parties' common domicil as well. By way of contrast, the place of contracting will have little significance, if any, when it is purely fortuitous and bears no relation to the parties and the contract, such as when a letter of acceptance is mailed in a railroad station in the course of an interstate trip.

*The place of negotiation.* The place where the parties negotiate and agree on the terms of their contract is a significant contact. Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached. This contact is of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiations from separate states by mail or telephone.

*The place of performance.* The state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform. So the state where performance is to occur has an obvious interest in the question whether this performance would be illegal (see § 202). When both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance. And this is even more likely to be so if, in addition, both parties are domiciled in the state.

On the other hand, the place of performance can bear little weight in the choice of the applicable law when (1) at the time of contracting it is either uncertain or unknown, or when (2) performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue.

It is clear that the local law of the place of performance will be applied to govern all questions relating to details of performance see § 206).

*Situs of the subject matter of the contract.* When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment, the location of the thing or of the risk is significant (see §§ 189- 193). The state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

*Domicil, residence, nationality, place of incorporation, and place of business of the parties.* These are all places of enduring relationship to the parties. Their significance depends largely upon the issue involved and upon the extent to which they are grouped with other contacts. So, for example, when a person has capacity to bind himself to the particular contract under the local law of the state of his domicil, there may be little reason to strike down the contract because that person lacked capacity under the local law of the state of contracting or of performance (see § 198). The fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business. As stated in § 192, the domicil of the insured is a contact of particular importance in the case of life insurance contracts. At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state.

**Illustrations:**

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 76 of 102

§ 188Law Governing in Absence of Effective Choice by..., Restatement (Second)...

**Illustrations:**

1. A, who is domiciled in state X, is declared a spendthrift by an X court. Thereafter, A borrows money in state Y from B, a Y domiciliary, who lends the money in ignorance of A's spendthrift status. Under the terms of the loan, the money is to be repaid in Y. A does not pay, and B brings suit in state Z. A would not be liable under X local law because he has been declared a spendthrift; he would, however, be liable under the local law of Y. The first question for the Z court to determine is whether the interests of both X and Y would be furthered by application of their respective local law rules. This is a question that can only be determined in the light of the respective purposes of these rules (see Comment *c*). The purpose of the X local law rule is obviously to protect X domiciliaries and their families. Hence the interests of X would be furthered by application of the X spendthrift rule. On the other hand, Y's interests would be furthered by the application of its own rule, which presumably was intended for the protection of Y creditors and also to encourage persons to enter into contractual relationships in Y. Since the interests of X and Y would each be furthered by application of their respective rules, the Z court must choose between them. Among the questions for the Z court to determine are whether the value of protecting the justified expectations of the parties and the interest of Y in the application of its rule outweigh X's interest in the application of its invalidating rule. Factors which would support an affirmative answer to this question, and which indicate the degree of Y's interest in the application of its rule, are that A sought out B in Y, that B is domiciled in Y, that the loan was negotiated and made in Y and that the contract called for repayment in Y (see § 195). If it is found that an X court would not have applied its rule to the facts of the present case, the argument for applying the Y rule would be even stronger. For it would then appear that, even in the eyes of the X court, X interests were not sufficiently involved to require application of the X rule (see § 8, Comment *k*).

2. A, a married woman, who is domiciled in state X, comes to state Y and there borrows money from B. The loan contract provides that the money is to be repaid in Y. A does not pay, and B brings suit in state Z. A defends on the ground that under Y local law married women lack capacity to bind themselves by contract; they do have such capacity, however, under the local law of X. It is questionable in this case whether the interests of either X or Y would be furthered by application of their respective rules. Y's rule of incapacity was presumably designed to protect Y married women. On the other hand, X's rule of capacity was presumably designed, at least primarily, to protect X transactions. It seems clear in any event that the value of protecting the justified expectations of the parties is not outweighed in this case by any interest Y may have in the application of its rule of incapacity. Under the circumstances, the contract should be upheld on the issue of A's capacity by application of the X rule.

---

**Comment on Subsection (3):**

*f. When place of negotiation and place of performance are in the same state.* When the place of negotiation and the place of performance are in the same state, the local law of this state will usually be applied to govern issues arising under the contract, except as stated in §§ 189- 199 and 203. A state having these contacts will usually be the state that has the greatest interest in the determination of issues arising under the contract. The local law of this state should be applied except when the principles stated in § 6 require application of some other law. As stated in Comment *c*, the extent of a state's interest in having its contract rule applied will depend upon the purpose sought to be achieved by that rule.

*g.* For reasons stated in § 186, Comment *b*, the reference is to the "local law" of the state of the applicable law and not to that state's "law" which means the totality of its law including its choice-of-law rules.

*h.* As to the situation where the local law rule of two or more states is the same, see § 186, Comment *c*.

---

Restatement (Second) of Conflict of Laws § 222 (1971)

Restatement of the Law - Conflict of Laws

Database updated June 2014

Restatement (Second) of Conflict of Laws

Chapter 9. Property

Topic 1. Property in General

§ 222 The General Principle

Comment:
Case Citations - by Jurisdiction

**The interests of the parties in a thing are determined, depending upon the circumstances, either by the "law" or by the "local law" of the state which, with respect to the particular issue, has the most significant relationship to the thing and the parties under the principles stated in § 6.**

---

**Comment:**

*a. Scope of section.* The rule of this Section states a principle applicable to all things, to all interests in things and to all issues involving things. Topic 2 ( §§ 223- 243) deals with interests in immovables and Topic 3 ( §§ 244- 266) with interests in movables.

*b. Rationale.* The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the thing and the parties. The factors listed in Subsection (2) of the rule of § 6 can be divided into five groups. One group is concerned with the fact that in multistate cases it is essential that the rules of decision promote mutually harmonious and beneficial relationships in the interdependent community, federal or international. The second group focuses upon the purposes, policies, aims and objectives of each of the competing local law rules urged to govern and upon the concern of the potentially interested states in having their rules applied. The third group involves the needs of the parties, namely the protection of their justified expectations and certainty and predictability of result. The fourth group is directed to implementation of the basic policies underlying the particular field of law, such as torts, contracts or property, and the fifth group is concerned with the needs of judicial administration, namely with ease in the determination and application of the law to be applied.

The factors listed in Subsection (2) of the rule of § 6 vary somewhat in importance from field to field. In contrast to torts (see § 145, Comment *b*), protection of the justified expectations of the parties is of considerable importance in the field of property. Parties enter into property transactions with forethought and are likely to consult a lawyer before doing so. They will expect certain legal consequences to ensue from a given transaction and, in the absence of strong countervailing considerations, their expectations should not be disappointed. The relative importance of a person's expectations will vary with the circumstances. When transfers of interests in things are based upon consideration, such as in the case of the sale of land or of chattels, the expectations of the transferor and of the transferee are of equal importance. In the case of gratuitous transfers, such as by will or inter vivos trust, the expectations of the transferor assume particular significance.

The need for protecting the expectations of the parties gives importance in turn to the values of certainty, predictability and uniformity of result. For, unless these values are attained, the expectations of the parties are likely to be disappointed.

Protection of the justified expectations of the parties by choice-of-law rules in the field of property is supported by those factors in Subsection (2) of § 6 which are directed to the furtherance of the needs of the parties and, usually as well, by those factors which are directed to implementation of the basic policy underlying the particular field of law. Protection of the justified expectations of the parties is a basic policy underlying most areas of the field of property.

Other factors listed in Subsection (2) of the rule of § 6 are the relevant policies of all potentially interested states and the relative interests of those states in the determination of the particular issue. The extent of the interest of a state in having its rule applied should be determined in the light of the purpose sought to be achieved by the rule and by the relation of the thing and the parties to that state (see Comment *c*).

In the case of issues involving transfers of interests in immovables, the factors listed in Subsection (2) of the rule of § 6 lead to the application of the law that would be applied by the courts of the situs (see §§ 223- 243). The situs likewise plays an important role in the determination of the law governing the transfer of interests in tangible, as opposed to intangible, movables (see §§ 244- 266).

*c. Purpose of property rule.* The purpose sought to be achieved by the property rules of the potentially interested states and the relation of those states to the thing and the parties are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the thing and the parties. So the state where the land in question is situated has an obvious interest in the application of a rule limiting the period during which the power to alienate the land may be suspended. On the other hand, the state where the land is may have comparatively little interest in the application of a rule limiting the portion of an estate that a testator may leave to charity in a situation where the testator, the natural objects of his bounty and the charity involved are all most closely related to another state.

Frequently, it will be possible to decide a question of choice-of-law in a case involving property without paying deliberate attention to the purpose sought to be achieved by the relevant rules of the interested states. This will be so whenever by reason of the particular circumstances one state is obviously that of the applicable law.

*d. The issue involved.* The courts have long recognized that they are not bound to decide all issues under the local law of a single state. Thus, in an action involving the transfer of interests in land situated in a foreign state by parties domiciled there, a court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties and the administration of the trial (see Chapter 6), while deciding other issues—such as whether the transferor had the capacity to make the transfer—by reference to the law selected by application of the rules stated in this Chapter. The rule of this Section makes explicit that selective approach to the choice of the law governing particular issues.

Each issue is to receive separate consideration if it is one which would be resolved differently under the local law of two or more of the potentially interested states.

*e. Whether reference is to "law" or to "local law" of selected state.* In the case of immovables, the reference is to the "law" of the state where the immovable is, for reasons stated in § 223, Comment *b*. The reference, in other words, is to the totality of the law, including the choice-of-law rules, of this state (see § 8), and the task of a court sitting in some other state is to arrive at the same result as a court of this state would have arrived at upon the actual facts of the case.

In the case of movables, the rule varies from situation to situation. So, for example, an issue involving the transfer of a chattel as between the parties to the transfer is determined by the "local law" of the state which, as to the particular issue, has the most significant relationship to the thing and the parties under the principles stated in § 6 (see e.g., §§ 244, 251). In such a case, the forum will not apply the choice-of-law rules of the selected state and will not have the primary objective of arriving at the same result a court of this state would have done upon the actual facts of the case. On the other hand, in judging a given state's interest in the application of one of its local law rules, the forum should concern itself with the question whether the courts of

that state would have applied this rule in the decision of the case. The fact that these courts would have applied this rule may indicate that an important interest of that state would be served if the rule were applied by the forum. Conversely, the fact that these courts would not have applied this rule may indicate that no important interest of that state would be infringed if the rule were not applied by the forum (see § 8, Comment *k*).

There are situations, however, in the case of movables where the reference is to the "law" of the selected state and where the objective of the forum should be to arrive at the same result a court of this state would have arrived at upon the actual facts of the case. This will usually be so, for example, in the case of an issue involving the effect of a transfer of a chattel upon the interests of persons who were not both parties to the transfer (see, e.g., §§ 245, 253). This will also be so of issues involving succession to interests in movables (see §§ 260- 266).

*f. When rule in two or more states is the same.* When certain contacts involving a thing and the parties are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if the contacts were grouped in a single state.

> **Illustration:**
> **Illustration:**
>
>     1. In state X, A gives B a security interest on an automobile situated in state Y. X and Y have the same local law rule on the subject of the debtor's right of redemption. As to the issue of the debtor's right of redemption, the case will be treated for choice-of-law purposes as if the security interest had been given and the automobile situated in one state.

---

**Comment:**

*g. Characterization.* A thing will be classified as either an immovable or a movable and words comprising a rule of law will be defined in accordance with the law selected by application of the principles stated in § 7.

---

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 80 of 102

§ 291Relationship of Principal and Agent, Restatement (Second) of Conflict of Laws §...

Restatement (Second) of Conflict of Laws § 291 (1971)

Restatement of the Law - Conflict of Laws

Database updated June 2014

Restatement (Second) of Conflict of Laws

Chapter 12. Agency and Partnerships

Topic 1. Agency

§ 291 Relationship of Principal and Agent

Comment:
Reporter's Note
Case Citations - by Jurisdiction

**The rights and duties of a principal and agent toward each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction under the principles stated in § 6. This law is selected by application of the rules of §§ 187- 188.**

---

**Comment:**

*a.* An agency relationship can give rise to three choice-of-law problems: namely, what law should be applied to determine the rights and duties as between (1) the principal and agent, (2) the principal and some third person on account of one or more acts by the agent, and (3) the agent and the third person. The first of these questions is dealt with in this Section and the second in §§ 292 and 293. The third question is not dealt with in this Chapter because the law governing the respective rights and duties of an agent and the third person with whom he dealt is the same as that which would be applied if no agency were involved and is selected by ordinary choice-of-law rules (see Chapters 7 and 8).

*b. Scope of section.* An agency relationship exists if there has been a manifestation by the principal to the agent that the agent may act on the principal's account, and the agent has either acted pursuant to the manifestation or has agreed so to act. Such a relationship will usually result from a contract between the parties. On occasion, however, an agency relationship may exist even though there is no contract between the parties and even though the agent is not to receive compensation (see Restatement of Agency (Second), §§ 15-16). When the agency relationship is created otherwise than by contract, the obligations of the principal and agent to each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction. This state is selected by a process essentially similar to that employed in the case of a contract.

The law selected by application of the rule of this Section determines what the agent is authorized to do on the principal's behalf. It likewise determines the rights and obligations of the parties toward each other, such as the circumstances under which either the principal or agent can put an end to their relationship, the amount of compensation, if any, to which the agent is entitled, and the liability of the agent to the principal for an unauthorized act.

*c. Rationale.* The principles stated in § 6 underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, of the potentially interested states to the parties and the transaction. For a discussion of the five groups into which the factors listed in Subsection (2) of the rule of § 6 can be divided, see § 188, Comment *b*. What is said in the Comments to § 188 is applicable here.

---

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 81 of 102

§ 291 Relationship of Principal and Agent, Restatement (Second) of Conflict of Laws §...

Of the factors listed in Subsection (2) of the rule of § 6, those which come to the fore in the area under discussion are protection of the justified expectations of the parties and implementation of the relevant policies of the state with the dominant interest in the determination of the particular issue. Sometimes, the principal and agent will intend that their rights and duties toward each other should be determined by the local law of a particular state. If so, the local law of that state will be applied, subject to the qualifications stated in the rule of § 187. In situations where the principal and agent did not give advance thought to the question of which should be the state of the applicable law, or where their intentions in this regard cannot be ascertained, it may at least be said, subject perhaps to rare exceptions, that they expected that the provisions of their agreement would be binding upon them. The expectations of the principal and agent should not be disappointed by application of the local law rule of a state which would strike down their agreement, or a provision thereof, unless the value of protecting those expectations is substantially outweighed in the particular case by the interest of the state with an invalidating rule in having this rule applied. The extent of the interest of a state in having its rule applied should be determined in the light of the purpose sought to be achieved by the rule and of the relation of the parties and the transaction to the state (see Comment *d*).

Protection of justified expectations plays a less significant role in the choice-of-law process with respect to issues that involve the nature of the obligations imposed by a contract upon the parties rather than the validity of the contract or of some provision thereof. If the principal and agent have not spelled out in their agreement the nature of their obligations with respect to a particular issue or, in the alternative, if they have not provided that their obligations should be determined by the local law of a given state, it is probable that they did not have any precise expectations with respect to that issue. It is unlikely in any event that any expectations the principal and agent might have with respect to that issue would be disappointed by application of the local law rule of one state rather than of the rule of another state.

*d. Purpose of rule.* The purpose sought to be achieved by the relevant local law rules of the potentially interested states, and the relation of those states to the transaction and the parties, are important factors to be considered in determining the state of most significant relationship. The interest of a state in having its rule applied in the determination of a particular issue will depend upon the purpose sought to be achieved by that rule and upon the relation of the state to the transaction and the parties. So the state where the agent is domiciled and conducts his business has an obvious interest in the application of a rule designed to protect the agent against the unfair use of superior bargaining power. And a state where under the provisions of the agreement the agent is to engage in a certain course of conduct has an obvious interest in the application of its rule designed to regulate or to deter that course of conduct. On the other hand, the purpose of a rule and the relation of a state to the transaction and the parties may indicate that the state has little or no interest in the application of the rule in the particular case. So a state may have little interest in the application of a rule designed to protect the agent against the unfair use of superior bargaining power if the state is the domicil of the principal and not the domicil of the agent. And a state may have little interest in the application of a rule designed to deter or to regulate a given course of conduct if the conduct in question is to take place in another state.

*e. The issue involved.* The courts have long recognized that they are not bound to decide all issues under the local law of a single state. Thus, in an action on a contract made and to be performed in a foreign state by parties domiciled there, a court under traditional and prevailing practice applies its own state's rules to issues involving process, pleadings, joinder of parties, and the administration of the trial (see Chapter 6), while deciding other issues—such as whether the defendant had capacity to bind himself by contract—by reference to the law selected by application of the rules stated in Chapter 8. The rule of this Section makes explicit that selective approach to the choice of the law governing particular issues.

Each issue is to receive separate consideration if it is one which would be resolved differently under the local law of two or more of the potentially interested states.

*f. Important contacts in determining state of most significant relationship.* In the absence of an effective choice of law by the parties (see § 187), the forum, in applying the principles of § 6 to determine the state of most significant relationship, should give consideration to the relevant policies of all potentially interested states and the relative interests of those states in the decision of the particular issue. The states which are most likely to be interested are those which have one or more of the contacts discussed

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 82 of 102

§ 291Relationship of Principal and Agent, Restatement (Second) of Conflict of Laws §...

in Comment *e* to § 188 with the parties or the transaction. What is said in that Comment is applicable here. Of these contacts, that which will usually be of greatest importance is the place, if such a place exists, where under the provisions of the agreement the agent is to act, or principally to act, in the principal's behalf.

Agency relationships may be placed into two broad categories. The first category comprises situations where the agent is to serve the principal for a period of time and is to do a number of acts on the principal's behalf. Situations where the agent is to do a single act on the principal's behalf fall into the second category. In either case, the state where performance by the agent is to take place will usually be given the greatest weight, in the absence of an effective choice of law by the parties (see § 187), in determining what law governs the rights and duties owed by the principal and agent to each other.

When the agent is employed to do a number of acts on the principal's behalf in a single state, the local law of this state will usually determine the rights and duties owed by the principal and agent to each other in the absence of an effective choice of law by the parties. This will be so except possibly in a case where the agent is to do only a relatively few acts on the principal's behalf and where all, or at least the great majority, of the other relevant contacts, such as the domicil, residence and place of business of the principal and agent, are grouped in another state.

Situations will arise where the agent's activity is to be confined primarily to one state but where he is to do one or more acts on the principal's behalf in another state. So an agent employed to manage the principal's business in state X may in the course of his duties enter into a contract on the principal's behalf in state Y. In such a situation, the local law of the state where the agent is to do the great majority of his acts will usually determine what rights and duties are owed by the principal and agent to each other as the result of an act done by the agent on the principal's behalf in another state.

Situations will arise where, although the major portion of the agent's activity is to take place in one state, he is to engage in substantial activity in another state. So an agent may be employed to represent the principal in both states X and Y with the understanding that he is to spend most of his time in state X. In this situation, the local law of the state where the agent is to do most of the acts will usually determine what rights and duties are owed by the principal and agent to the other as the result of an act, or acts, done by the agent on the principal's behalf in the other state. As the number of acts that the agent is to perform in another state increases in relation to the number of acts the agent is to perform in the state of his principal activity, the relative importance of the latter state in the selection of the governing law decreases proportionately and increasingly greater weight must be given to other contacts.

Finally, there will be situations where the agent's activity on behalf of the principal is to be divided more or less among two or more states. In such a case, little weight can usually be given to the places of the agent's activity in determining the state of the applicable law. If, however, the agent's activity is to take place in two or more states which have the same local law rule with respect to the issue involved, the case will be treated for choice-of-law purposes as if the agent's performance were to take place in a single state (see Comment *h*).

The rule is essentially the same in situations where the agent is to do a single act on the principal's behalf. Usually, the state where the agent is to act will be the state whose local law determines what rights and duties are owed by the principal and agent to each other as a result of the act. On some occasions, however, the place of the agent's act may be outweighed by the grouping in another state of such contacts as the domicil, residence and place of business of the principal and agent and the location of the subject matter of the contract entered into by the agent. Finally, little weight can be given to the place of the agent's act in situations where, under the terms of the agent's agreement with the principal, the agent can do the act in any one of a number of states with different local law rules. If, however, the act is to be done in two or more states which have the same local law rule with respect to the issue involved, the case will be treated for choice-of-law purposes as if the agent's performance was to take place in a single state (see Comment *h*).

**Illustrations:**
**Illustrations:**

Case 09-10138-MFW    Doc 14177-1    Filed 08/07/14    Page 83 of 102

§ 291Relationship of Principal and Agent, Restatement (Second) of Conflict of Laws §...

1. In state X, A, the agent, sells and delivers the horse of P, the principal, to T, a third person. P sues A, claiming that A was authorized only to sell P's cow. Whether A did lack authority, as against P, to sell the horse will be determined by the law selected by application of the rule of this Section. On the other hand, whether T has obtained title to the horse will be determined by the law selected by application of the rule of § 292.

2. P, domiciled in state X, engages A, domiciled in state Y, to try to find a purchaser in Y for P's land in X in return for a stated commission. A finds such a purchaser and now sues P in state Z to recover his commission. P would not be liable under X local law because A had not been issued in X a real estate broker's license. P would, however, be liable under the local law of Y. The first question for the Z court to determine is whether the interests of both X and Y would be furthered by application of their respective local law rules. This is a question that can only be determined in the light of the respective purposes of these rules (see Comment *d*). Y's interests would be furthered by application of its rule if, as seems probable, this rule was intended to protect Y domiciliaries acting as brokers in Y. Whether X's interests would be furthered by application of its rule is more problematical. X's interests would be furthered if the purpose of its rule was to deter persons from seeking anywhere to sell X land without an X license. On the other hand, X's interests would not be furthered if the purpose of its rule was only to deter persons lacking an X license from seeking to sell X land in X. If X's interests would not be furthered by application of the X rule, the Z court should find for A by application of the Y rule. On the other hand, if the interests of X and Y would each be furthered by application of their respective rules, the Z court must choose between them. Among the questions for the Z court to determine are whether the value of protecting the justified expectations of the parties and the interest of Y in the application of its rule outweigh X's interest in the application of its invalidating rule. Factors which would support an affirmative answer to this question, and which indicate the degree of Y's interest in the application of its rule, are that A is domiciled in Y and that the contract called for performance by A in Y. If it is found that an X court would not have applied its rule to the facts of the present case, the argument for applying the Y rule would be even stronger. For it would then appear that, even in the eyes of the X court, X interests were not sufficiently involved to require application of the X rule (see § 8, Comment *k*).

---

**Comment:**

*g. Reference is to "local law" of selected state.* For reasons stated in § 186, Comment *b*, the reference is to the "local law" of the state of the applicable law and not to that state's "law" which means the totality of its law including its choice-of-law rules (see § 8).

On the other hand, in judging a state's interest in the application of one of its local law rules, the forum should concern itself with the question whether the courts of that state would have applied this rule in the decision of the case. The fact that these courts would have applied this rule may indicate that an important interest of that state would be served if the rule were applied by the forum. Conversely, the fact that these courts would not have applied this rule may indicate that no important interest of that state would be infringed if the rule were not applied by the forum (see § 8, Comment *k*).

*h. When rule of two or more states is the same.* When certain contacts are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if the contacts were grouped in a single state.

---

NO. 299-A | DECEMBER 2007

# Financial Accounting Series

# Statement of Financial Accounting Standards No. 141

## (revised 2007)

### Business Combinations



## Financial Accounting Standards Board
of the Financial Accounting Foundation

For additional copies of this Statement and information on applicable prices and discount rates contact:

Order Department
Financial Accounting Standards Board
401 Merritt 7
PO Box 5116
Norwalk, Connecticut 06856-5116

*Please ask for our Product Code No. S141R.*

FINANCIAL ACCOUNTING SERIES (ISSN 0885-9051) is published monthly by the Financial Accounting Foundation. Periodicals—postage paid at Norwalk, CT and at additional mailing offices. The full subscription rate is $205 per year. POSTMASTER: Send address changes to Financial Accounting Standards Board, 401 Merritt 7, PO Box 5116, Norwalk, CT 06856-5116.

# Summary

## Why Is the FASB Issuing This Statement?

The objective of this Statement is to improve the relevance, representational faithfulness, and comparability of the information that a reporting entity provides in its financial reports about a business combination and its effects. To accomplish that, this Statement establishes principles and requirements for how the acquirer:

    a. Recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree
    b. Recognizes and measures the goodwill acquired in the business combination or a gain from a bargain purchase
    c. Determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination.

## What Is the Scope of This Statement?

This Statement applies to all transactions or other events in which an entity (the acquirer) obtains control of one or more businesses (the acquiree), including those sometimes referred to as "true mergers" or "mergers of equals" and combinations achieved without the transfer of consideration, for example, by contract alone or through the lapse of minority veto rights. This Statement applies to all business entities, including mutual entities that previously used the pooling-of-interests method of accounting for some business combinations. It does not apply to:

    a. The formation of a joint venture
    b. The acquisition of an asset or a group of assets that does not constitute a business
    c. A combination between entities or businesses under common control
    d. A combination between not-for-profit organizations or the acquisition of a for-profit business by a not-for-profit organization.

## How Will This Statement Improve Current Accounting Practice?

This Statement replaces FASB Statement No. 141, *Business Combinations*. This Statement retains the fundamental requirements in Statement 141 that the acquisition method of accounting (which Statement 141 called the *purchase method*) be used for

all business combinations and for an acquirer to be identified for each business combination. This Statement defines the acquirer as the entity that obtains control of one or more businesses in the business combination and establishes the acquisition date as the date that the acquirer achieves control. Statement 141 did not define the acquirer, although it included guidance on identifying the acquirer, as does this Statement. This Statement's scope is broader than that of Statement 141, which applied only to business combinations in which control was obtained by transferring consideration. By applying the same method of accounting—the acquisition method—to all transactions and other events in which one entity obtains control over one or more other businesses, this Statement improves the comparability of the information about business combinations provided in financial reports.

This Statement retains the guidance in Statement 141 for identifying and recognizing intangible assets separately from goodwill. The main features of this Statement and the more significant improvements it makes to how the acquisition method was applied in accordance with Statement 141 are described below.

## Recognizing and Measuring the Identifiable Assets Acquired, the Liabilities Assumed, and Any Noncontrolling Interest in the Acquiree

This Statement requires an acquirer to recognize the assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree at the acquisition date, measured at their fair values as of that date, with limited exceptions specified in the Statement. That replaces Statement 141's cost-allocation process, which required the cost of an acquisition to be allocated to the individual assets acquired and liabilities assumed based on their estimated fair values. Statement 141's guidance resulted in not recognizing some assets and liabilities at the acquisition date, and it also resulted in measuring some assets and liabilities at amounts other than their fair values at the acquisition date. For example, Statement 141 required the acquirer to include the costs incurred to effect the acquisition (acquisition-related costs) in the cost of the acquisition that was allocated to the assets acquired and the liabilities assumed. This Statement requires those costs to be recognized separately from the acquisition. In addition, in accordance with Statement 141, restructuring costs that the acquirer expected but was not obligated to incur were recognized as if they were a liability assumed at the acquisition date. This Statement requires the acquirer to recognize those costs separately from the business combination. Therefore, this Statement improves the relevance, completeness, and representational faithfulness of the information provided in financial reports about the assets acquired and the liabilities assumed in a business combination.

This Statement also requires the acquirer in a business combination achieved in stages (sometimes referred to as a *step acquisition*) to recognize the identifiable assets and liabilities, as well as the noncontrolling interest in the acquiree, at the full amounts of their fair values (or other amounts determined in accordance with this Statement). In accordance with Statement 141 and related interpretative guidance, an entity that acquired another entity in a series of purchases (a step acquisition) identified the cost of each investment, the fair value of the underlying identifiable net assets acquired, and the goodwill on each step. Statement 141 did not provide guidance on measuring the noncontrolling interest's share of the consolidated subsidiary's assets and liabilities at the acquisition date. The result of applying Statement 141's guidance on recognizing and measuring assets and liabilities in a step acquisition was to measure them at a blend of historical costs and fair values—a practice that provided less relevant, representationally faithful, and comparable information than will result from applying this Statement. In addition, this Statement's requirement to measure the noncontrolling interest in the acquiree at fair value will result in recognizing the goodwill attributable to the noncontrolling interest in addition to that attributable to the acquirer, which improves the completeness of the resulting information and makes it more comparable across entities.

### *Assets and Liabilities Arising from Contingencies*

This Statement improves the completeness of the information reported about a business combination by changing the requirements for recognizing assets acquired and liabilities assumed arising from contingencies. Statement 141 permitted deferred recognition of preacquisition contingencies until the recognition criteria for FASB Statement No. 5, *Accounting for Contingencies,* were met. This Statement requires an acquirer to recognize assets acquired and liabilities assumed arising from *contractual contingencies* as of the acquisition date, measured at their acquisition-date fair values. An acquirer is required to recognize assets or liabilities arising from all other contingencies (*noncontractual contingencies*) as of the acquisition date, measured at their acquisition-date fair values, only if it is **more likely than not** that they meet the definition of an asset or a liability in FASB Concepts Statement No. 6, *Elements of Financial Statements.* If that criterion is not met at the acquisition date, the acquirer instead accounts for a noncontractual contingency in accordance with other applicable generally accepted accounting principles, including Statement 5, as appropriate.

This Statement provides specific guidance on the subsequent accounting for assets and liabilities arising from contingencies acquired or assumed in a business combination that otherwise would be in the scope of Statement 5. It requires that an acquirer continue to report an asset or a liability arising from a contingency recognized as of the acquisition date at its acquisition-date fair value absent new information about the

possible outcome of the contingency. When new information is obtained, the acquirer evaluates that new information and measures a liability at the higher of its acquisition-date fair value or the amount that would be recognized if applying Statement 5, and measures an asset at the lower of its acquisition-date fair value or the best estimate of its future settlement amount.

## Recognizing and Measuring Goodwill or a Gain from a Bargain Purchase

This Statement requires the acquirer to recognize goodwill as of the acquisition date, measured as a residual, which in most types of business combinations will result in measuring goodwill as the excess of the consideration transferred plus the fair value of any noncontrolling interest in the acquiree at the acquisition date over the fair values of the identifiable net assets acquired.

Statement 141 also required goodwill to be recognized and measured as a residual. However, as described below, this Statement improves the way in which an acquirer's obligations to make payments conditioned on the outcome of future events (often called *contingent consideration*) are recognized and measured, which in turn improves the measure of goodwill. This Statement also includes in the definition of contingent consideration arrangements that give the acquirer the right to the return of previously transferred consideration if specified conditions are met.

This Statement requires the acquirer to recognize contingent consideration at the acquisition date, measured at its fair value at that date. Under Statement 141, in contrast, contingent consideration obligations usually were not recognized at the acquisition date. Rather, they usually were recognized when the contingency was resolved and consideration was issued or became issuable. In addition, the issuance of additional securities or distribution of additional cash or other assets upon resolution of contingencies based on reaching particular earnings levels was recognized as an adjustment to the accounting for the business combination, but issuance of shares or distribution of assets upon resolution of contingencies based on security prices was recognized differently. This Statement therefore improves the representational faithful-ness and completeness of the information provided about an acquirer's obligations and rights under contingent consideration arrangements.

### *A Bargain Purchase*

This Statement defines a *bargain purchase* as a business combination in which the total acquisition-date fair value of the identifiable net assets acquired exceeds the fair value of the consideration transferred plus any noncontrolling interest in the acquiree, and it requires the acquirer to recognize that excess in earnings as a gain attributable to

iv

the acquirer. In contrast, Statement 141 required the "negative goodwill" amount to be allocated as a pro rata reduction of the amounts that otherwise would have been assigned to particular assets acquired. This Statement therefore improves the representational faithfulness and completeness of the information provided about both the acquirer's earnings during the period in which it makes a bargain purchase and the measures of the assets acquired in the bargain purchase.

## What Other Changes Does This Statement Make to Existing Accounting Pronouncements?

This Statement makes significant amendments to other Statements and other authoritative guidance. For example, this Statement supersedes FASB Interpretation No. 4, *Applicability of FASB Statement No. 2 to Business Combinations Accounted for by the Purchase Method,* which required research and development assets acquired in a business combination that have no alternative future use to be measured at their acquisition-date fair values and then immediately charged to expense. Therefore, the acquirer will recognize separately from goodwill the acquisition-date fair values of research and development assets acquired in a business combination, which improves the representational faithfulness and completeness of the information provided in financial reports about the assets acquired in a business combination.

This Statement amends FASB Statement No. 109, *Accounting for Income Taxes,* to require the acquirer to recognize changes in the amount of its deferred tax benefits that are recognizable because of a business combination either in income from continuing operations in the period of the combination or directly in contributed capital, depending on the circumstances. (Such changes arise through the increase or reduction of the acquirer's valuation allowance on its previously existing deferred tax assets because of the business combination.) Previously, Statement 109 required a reduction of the acquirer's valuation allowance because of a business combination to be recognized through a corresponding reduction to goodwill or certain noncurrent assets or an increase in so-called negative goodwill. This Statement therefore improves the representational faithfulness of the information provided about the effect of a business combination on both the acquirer's deferred tax assets and the related valuation allowance and the goodwill and noncurrent assets acquired in the business combination.

This Statement makes various other amendments to the authoritative literature intended to provide additional guidance or to conform the guidance in that literature to that provided in this Statement. For example, this Statement amends FASB Statement No. 142, *Goodwill and Other Intangible Assets,* to, among other things, provide guidance on the impairment testing of acquired research and development intangible assets and assets that the acquirer intends not to use.

This Statement also eliminates many EITF issues and other interpretative guidance on accounting for business combinations and incorporates the parts of that guidance that remain pertinent. Therefore, in addition to improving the guidance provided about accounting for a business combination in the authoritative literature, this Statement makes that guidance easier to use.

## What Is the Effect of This Statement on Convergence with International Reporting Standards?

This Statement, together with the IASB's IFRS 3, *Business Combinations* (as revised in 2007), completes a joint effort by the FASB and the IASB to improve financial reporting about business combinations and to promote the international convergence of accounting standards. Statement 141 and IFRS 3 (as issued in 2004) both required use of the acquisition method rather than the pooling-of-interests method to account for business combinations. In this Statement and the revised IFRS 3, the Boards in large part achieved their goal of reaching the same conclusions on the more significant issues involving application of the acquisition method of accounting for a business combination. Appendix G describes the substantive differences between this Statement and IFRS 3 (as revised in 2007). One significant difference is the measurement requirements for a noncontrolling interest in an acquiree. This Statement requires an acquirer to measure a noncontrolling interest at its acquisition-date fair value. IFRS 3 (as revised in 2007) provides the acquirer a choice for each business combination to measure a noncontrolling interest either at its fair value or on the basis of its proportionate interest in the identifiable net assets of the acquiree. The Boards' requirements for recognizing at the acquisition date assets and liabilities arising from contingencies also differ, in part because the IASB decided to carry forward IFRS 3's requirements for those assets and liabilities on an interim basis, pending completion of its project to revise IAS 37, *Provisions, Contingent Liabilities and Contingent Assets.*

## What Is the Effective Date of This Statement?

This Statement applies prospectively to business combinations for which the acquisition date is on or after the beginning of the first annual reporting period beginning on or after December 15, 2008. An entity may not apply it before that date. The effective date of this Statement is the same as that of the related FASB Statement No. 160, *Noncontrolling Interests in Consolidated Financial Statements.*

# Statement of Financial Accounting Standards No. 141
## (revised 2007)

Business Combinations

December 2007



**Financial Accounting Standards Board**
of the Financial Accounting Foundation
401 MERRITT 7, PO BOX 5116, NORWALK, CONNECTICUT 06856-5116

Copyright © 2007 by Financial Accounting Standards Board. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or other-wise, without the prior written permission of the Financial Accounting Standards Board.

**Statement of Financial Accounting Standards No. 141 (revised 2007)**

**Business Combinations**

**December 2007**

# CONTENTS

|  | Paragraph Numbers |
|---|---|
| Objective | 1 |
| Standards of Financial Accounting and Reporting: | |
| Scope | 2 |
| Key Terms | 3 |
| Identifying a Business Combination | 4–5 |
| The Acquisition Method | 6–59 |
| Identifying the Acquirer | 8–9 |
| Determining the Acquisition Date | 10–11 |
| Recognizing and Measuring the Identifiable Assets Acquired, the Liabilities Assumed, and Any Noncontrolling Interest in the Acquiree | 12–33 |
| Recognition Principle | 12–19 |
| Recognition Conditions | 13–16 |
| Classifying or Designating Identifiable Assets Acquired and Liabilities Assumed in a Business Combination | 17–19 |
| Measurement Principle | 20–21 |
| Exceptions to the Recognition or Measurement Principles | 22–33 |
| Exception to the Recognition Principle | 23–25 |
| Assets and Liabilities Arising from Contingencies | 23–25 |
| Exceptions to Both the Recognition and Measurement Principles | 26–30 |
| Income Taxes | 26–27 |
| Employee Benefits | 28 |
| Indemnification Assets | 29–30 |

Paragraph
Numbers

Exceptions to the Measurement Principle.............................. 31–33
    Reacquired Rights ................................................... 31
    Share-Based Payment Awards...................................... 32
    Assets Held for Sale ................................................. 33
Recognizing and Measuring Goodwill or a Gain from a Bargain
  Purchase ............................................................... 34–46
  A Bargain Purchase .................................................. 36–38
  Consideration Transferred .......................................... 39–46
    Contingent Consideration ......................................... 41–42
    Acquirer Share-Based Payment Awards Exchanged for Awards
      Held by the Acquiree's Employees................................ 43–46
Additional Guidance for Applying the Acquisition Method to
  Particular Types of Business Combinations ....................... 47–50
  A Business Combination Achieved in Stages ...................... 47–48
  A Business Combination Achieved without the Transfer of
    Consideration...................................................... 49–50
  Measurement Period ................................................. 51–56
  Determining What Is Part of the Business Combination Transaction... 57–59
    Acquisition-Related Costs ......................................... 59
Subsequent Measurement and Accounting.......................... 60–66
  Reacquired Rights ................................................... 61
  Assets and Liabilities Arising from Contingencies ............... 62–63
  Indemnification Assets............................................... 64
  Contingent Consideration ........................................... 65
  Other Statements That Provide Guidance on Subsequent
    Measurement and Accounting.................................... 66
Disclosures ............................................................. 67–73
Effective Date and Transition........................................ 74–77
  Income Taxes......................................................... 77

|  | Paragraph Numbers |
|---|---|
| Appendix A: Implementation Guidance | A1–A134 |
| Appendix B: Basis for Conclusions | B1–B444 |
| Appendix C: Background Information | C1–C36 |
| Appendix D: Continuing Authoritative Guidance | D1–D14 |
| Appendix E: Amendments to FASB Pronouncements | E1–E46 |
| Appendix F: Amendments to Other Authoritative Literature | F1–F40 |
| Appendix G: Differences between FASB Statement No. 141 (revised 2007), *Business Combinations,* and IFRS 3, *Business Combinations* (as revised in 2007) | G1–G3 |

FASB Statement No. 141 (revised 2007), *Business Combinations,* is set out in paragraphs 1–77 and Appendixes A and D–F. All paragraphs have equal authority. Paragraphs in **bold type** state the main principles.

**Statement of Financial Accounting Standards No. 141 (revised 2007)**

**Business Combinations**

**December 2007**

## OBJECTIVE

1. The objective of this Statement is to improve the relevance, representational faithfulness, and comparability of the information that a reporting entity provides in its financial reports about a business combination and its effects. To accomplish that, this Statement establishes principles and requirements for how the acquirer:

  a. Recognizes and measures in its financial statements the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree
  b. Recognizes and measures the goodwill acquired in the business combination or a gain from a bargain purchase
  c. Determines what information to disclose to enable users of the financial statements to evaluate the nature and financial effects of the business combination.

## STANDARDS OF FINANCIAL ACCOUNTING AND REPORTING

## SCOPE

2. This Statement applies to a transaction or other event that meets the definition of a *business combination* in paragraph 3(e). This Statement does not apply to:

  a. The formation of a joint venture
  b. The acquisition of an asset or a group of assets that does not constitute a business (paragraphs D2–D7)
  c. A combination between entities or businesses under common control (paragraphs D8–D14)

1

    d. A combination between not-for-profit organizations or the acquisition of a for-profit business by a not-for-profit organization.

# KEY TERMS

3. This Statement uses the following terms with the specified definitions:

    a. The *acquiree* is the business or businesses that the acquirer obtains control of in a business combination.

    b. The *acquirer* is the entity that obtains control of the acquiree. However, in a business combination in which a variable interest entity is acquired, the primary beneficiary of that entity always is the acquirer.

    c. The *acquisition date* is the date on which the acquirer obtains control of the acquiree.

    d. A *business* is an integrated set of activities and assets that is capable of being conducted and managed for the purpose of providing a return in the form of dividends, lower costs, or other economic benefits directly to investors or other owners, members, or participants.

    e. A *business combination* is a transaction or other event in which an acquirer obtains control of one or more businesses. Transactions sometimes referred to as "true mergers" or "mergers of equals" also are business combinations as that term is used in this Statement.

    f. *Contingent consideration* usually is an obligation of the acquirer to transfer additional assets or equity interests to the former owners of an acquiree as part of the exchange for control of the acquiree if specified future events occur or conditions are met. However, contingent consideration also may give the acquirer the right to the return of previously transferred consideration if specified conditions are met.

    g. *Control* has the meaning of *controlling financial interest* in paragraph 2 of Accounting Research Bulletin No. 51, *Consolidated Financial Statements,* as amended.

    h. The term *equity interests* is used broadly to mean ownership interests of investor-owned entities and owner, member, or participant interests of mutual entities.

    i. *Fair value* is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (FASB Statement No. 157, *Fair Value Measurements,* paragraph 5).

    j. *Goodwill* is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized.

2

k. An asset is *identifiable* if it either:
   (1) Is separable, that is, capable of being separated or divided from the entity and sold, transferred, licensed, rented, or exchanged, either individually or together with a related contract, identifiable asset, or liability, regardless of whether the entity intends to do so; or
   (2) Arises from contractual or other legal rights, regardless of whether those rights are transferable or separable from the entity or from other rights and obligations.

l. An *intangible asset* is an asset (not including a financial asset) that lacks physical substance. As used in this Statement, the term *intangible asset* excludes goodwill.

m. A *mutual entity* is an entity other than an investor-owned entity that provides dividends, lower costs, or other economic benefits directly to its owners, members, or participants. For example, a mutual insurance company, a credit union, and a cooperative entity are all mutual entities.

n. *Noncontrolling interest* is the equity in a subsidiary not attributable, directly or indirectly, to a parent (ARB 51, as amended).

o. The term *owners* is used broadly to include holders of equity interests of investor-owned entities and owners, members of, or participants in, mutual entities.

## IDENTIFYING A BUSINESS COMBINATION

4. **An entity shall determine whether a transaction or other event is a *business combination* by applying the definition in this Statement, which requires that the assets acquired and liabilities assumed constitute a *business*. If the assets acquired are not a business, the reporting entity shall account for the transaction or other event as an asset acquisition.**

5. Paragraphs A2–A9 in Appendix A provide guidance on identifying a business combination and the definition of a business. Paragraphs D2–D7 describe the typical accounting for an asset acquisition.

## THE ACQUISITION METHOD

6. **An entity shall account for each business combination by applying the acquisition method.**

3

7. Applying the acquisition method requires:

   a. Identifying the acquirer
   b. Determining the acquisition date
   c. Recognizing and measuring the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree
   d. Recognizing and measuring goodwill or a gain from a bargain purchase.

## Identifying the Acquirer

8. **For each business combination, one of the combining entities shall be identified as the acquirer.**

9. The guidance in ARB 51, as amended, shall be used to identify the acquirer—the entity that obtains control of the acquiree. If a business combination has occurred but applying the guidance in ARB 51 does not clearly indicate which of the combining entities is the acquirer, the factors in paragraphs A11–A15 shall be considered in making that determination. However, in a business combination in which a variable interest entity is acquired, the primary beneficiary of that entity always is the acquirer. The determination of which party, if any, is the primary beneficiary of a variable interest entity shall be made in accordance with FASB Interpretation No. 46 (revised December 2003), *Consolidation of Variable Interest Entities,* as amended, not by applying either the guidance in ARB 51 or that in paragraphs A11–A15.

## Determining the Acquisition Date

10. **The acquirer shall identify the acquisition date, which is the date on which it obtains control of the acquiree.**

11. The date on which the acquirer obtains control of the acquiree generally is the date on which the acquirer legally transfers the consideration, acquires the assets, and assumes the liabilities of the acquiree—the closing date. However, the acquirer might obtain control on a date that is either earlier or later than the closing date. For example, the acquisition date precedes the closing date if a written agreement provides that the acquirer obtains control of the acquiree on a date before the closing date. An acquirer shall consider all pertinent facts and circumstances in identifying the acquisition date.

4

## Recognizing and Measuring the Identifiable Assets Acquired, the Liabilities Assumed, and Any Noncontrolling Interest in the Acquiree

### Recognition Principle

12. **As of the acquisition date, the acquirer shall recognize, separately from goodwill, the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree. Recognition of identifiable assets acquired and liabilities assumed is subject to the conditions specified in paragraphs 13 and 14.**

### *Recognition Conditions*

13. To qualify for recognition as part of applying the acquisition method, the identifiable assets acquired and liabilities assumed must meet the definitions of assets and liabilities in FASB Concepts Statement No. 6, *Elements of Financial Statements,* at the acquisition date. For example, costs the acquirer expects but is not obligated to incur in the future to effect its plan to exit an activity of an acquiree or to terminate the employment of or relocate an acquiree's employees are not liabilities at the acquisition date. Therefore, the acquirer does not recognize those costs as part of applying the acquisition method. Instead, the acquirer recognizes those costs in its postcombination financial statements in accordance with other applicable generally accepted accounting principles (GAAP).

14. In addition, to qualify for recognition as part of applying the acquisition method, the identifiable assets acquired and liabilities assumed must be part of what the acquirer and the acquiree (or its former owners) exchanged in the business combination transaction rather than the result of separate transactions. The acquirer shall apply the guidance in paragraphs 57–59 to determine which assets acquired or liabilities assumed are part of the exchange for the acquiree and which, if any, are the result of separate transactions to be accounted for in accordance with their nature and the applicable GAAP.

15. The acquirer's application of the recognition principle and conditions may result in recognizing some assets and liabilities that the acquiree had not previously recognized as assets and liabilities in its financial statements. For example, the acquirer recognizes the acquired identifiable intangible assets, such as a brand name, a patent, or a customer relationship, that the acquiree did not recognize as assets in its financial statements because it developed them internally and charged the related costs to expense.