if an entity has relationships with its customers through these types of contracts, the customer relationships also arise from contractual rights and therefore meet the contractual-legal criterion.

## Noncontractual customer relationships *

A42.  A customer relationship acquired in a business combination that does not arise from a contract may nevertheless be identifiable because the relationship is separable. Exchange transactions for the same asset or a similar asset that indicate that other entities have sold or otherwise transferred a particular type of noncontractual customer relationship would provide evidence that the noncontractual customer relationship is separable. For example, relationships with depositors are frequently exchanged with the related deposits and therefore meet the criteria for recognition as an intangible asset separately from goodwill.

## Examples illustrating customer contract and customer relationship intangible assets acquired in a business combination

A43.  The following examples illustrate the recognition of customer contract and customer relationship intangible assets acquired in a business combination.

a. Acquirer Company (AC) acquires Target Company (TC) in a business combination on December 31, 20X5. TC has a five-year agreement to supply goods to Customer. Both TC and AC believe that Customer will renew the agreement at the end of the current contract. The agreement is not separable. The agreement, whether cancelable or not, meets the contractual-legal criterion. Additionally, because TC establishes its relationship with Customer through a contract, not only the agreement itself but also TC's customer relationship with Customer meet the contractual-legal criterion.

b. AC acquires TC in a business combination on December 31, 20X5. TC manufactures goods in two distinct lines of business: sporting goods and electronics. Customer purchases both sporting goods and electronics from TC. TC has a contract with Customer to be its exclusive provider of sporting goods but has no contract for the supply of electronics to Customer. Both TC and AC believe that only one overall customer relationship exists between TC and Customer. The contract to be Customer's exclusive supplier of sporting goods, whether cancelable or not, meets the contractual-legal criterion. Additionally, because TC establishes its relationship with Customer through a contract, the customer relationship with Customer meets the contractual-legal criterion. Because TC has only one customer relationship with Customer, the fair value of

that relationship incorporates assumptions about TC's relationship with Customer related to both sporting goods and electronics. However, if AC determines that the customer relationships with Customer for sporting goods and for electronics are separate from each other, AC would assess whether the customer relationship for electronics meets the separability criterion for identification as an intangible asset.

c.  AC acquires TC in a business combination on December 31, 20X5. TC does business with its customers solely through purchase and sales orders. At December 31, 20X5, TC has a backlog of customer purchase orders from 60 percent of its customers, all of whom are recurring customers. The other 40 percent of TC's customers also are recurring customers. However, as of December 31, 20X5, TC has no open purchase orders or other contracts with those customers. Regardless of whether they are cancelable or not, the purchase orders from 60 percent of TC's customers meet the contractual-legal criterion. Additionally, because TC has established its relationship with 60 percent of its customers through contracts, not only the purchase orders but also TC's customer relationships meet the contractual-legal criterion. Because TC has a practice of establishing contracts with the remaining 40 percent of its customers, its relationship with those customers also arises through contractual rights and therefore meets the contractual-legal criterion even though TC does not have contracts with those customers at December 31, 20X5.

d.  AC acquires TC, an insurer, in a business combination on December 31, 20X5. TC has a portfolio of one-year motor insurance contracts that are cancelable by policyholders. Because TC establishes its relationships with policyholders through insurance contracts, the customer relationship with policyholders meets the contractual-legal criterion. Statement 142 applies to the customer relationship intangible asset.

### *Artistic-Related Intangible Assets*

A44.  Examples of artistic-related intangible assets are:

a.  Plays, operas, ballets #
b.  Books, magazines, newspapers, other literary works #
c.  Musical works such as compositions, song lyrics, advertising jingles #
d.  Pictures, photographs #
e.  Video and audiovisual material, including motion pictures or films, music videos, television programs. #

A45.  Artistic-related assets acquired in a business combination are identifiable if they arise from contractual or legal rights such as those provided by copyright. The holder can transfer a copyright, either in whole through an assignment or in part through a licensing agreement. An acquirer is not precluded from recognizing a copyright intangible asset and any related assignments or license agreements as a single asset, provided they have similar useful lives.

## Contract-Based Intangible Assets

A46. Contract-based intangible assets represent the value of rights that arise from contractual arrangements. Customer contracts are one type of contract-based intangible asset. If the terms of a contract give rise to a liability (for example, if the terms of an operating lease or customer contract are unfavorable relative to market terms), the acquirer recognizes it as a liability assumed in the business combination. Examples of contract-based intangible assets are:

    a.  Licensing, royalty, standstill agreements #
    b.  Advertising, construction, management, service or supply contracts #
    c.  Lease agreements (whether the acquiree is the lessee or the lessor) #
    d.  Construction permits #
    e.  Franchise agreements #
    f.  Operating and broadcast rights #
    g.  Servicing contracts such as mortgage servicing contracts #
    h.  Employment contracts #
    i.  Use rights such as drilling, water, air, timber cutting, and route authorities. #

### Servicing contracts such as mortgage servicing contracts #

A47. Contracts to service financial assets are one type of contract-based intangible asset. Although servicing is inherent in all financial assets, it becomes a distinct asset (or liability) by one of the following:

    a.  If the transfer of the servicer's financial assets met the requirements for sale accounting
    b.  Through the separate acquisition or assumption of a servicing obligation that does not relate to financial assets of the combined entity.

FASB Statement No. 156, *Accounting for Servicing of Financial Assets,* provides guidance on accounting for servicing contracts.

A48. If mortgage loans, credit card receivables, or other financial assets are acquired in a business combination with the servicing obligation, the inherent servicing rights are not a separate intangible asset because the fair value of those servicing rights is included in the measurement of the fair value of the acquired financial asset.

**Employment contracts #**

A49. Employment contracts that are beneficial contracts from the perspective of the employer because the pricing of those contracts is favorable relative to market terms are one type of contract-based intangible asset.

**Use rights #**

A50. Use rights such as drilling, water, air, timber cutting, and route authorities are contract-based intangible assets to be accounted for separately from goodwill. Particular use rights may have characteristics of tangible, rather than intangible, assets. For example, mineral rights, defined as the legal right to explore, extract, and retain at least a portion of the benefits from mineral deposits, are tangible assets. An acquirer should account for use rights based on their nature.

*Technology-Based Intangible Assets*

A51. Examples of technology-based intangible assets are:

   a. Patented technology #
   b. Computer software and mask works #
   c. Unpatented technology *
   d. Databases, including title plants *
   e. Trade secrets, such as secret formulas, processes, recipes. #

**Computer software and mask works #**

A52. Computer software and program formats acquired in a business combination that are protected legally, such as by patent or copyright, meet the contractual-legal criterion for identification as intangible assets.

A53. Mask works are software permanently stored on a read-only memory chip as a series of stencils or integrated circuitry. Mask works may have legal protection. Mask works with legal protection that are acquired in a business combination meet the contractual-legal criterion for identification as intangible assets.

### Databases, including title plants *

A54.  Databases are collections of information, often stored in electronic form (such as on computer disks or files). A database that includes original works of authorship may be entitled to copyright protection. A database acquired in a business combination that is protected by copyright meets the contractual-legal criterion. However, a database typically includes information created as a consequence of an entity's normal operations, such as customer lists, or specialized information, such as scientific data or credit information. Databases that are not protected by copyright can be, and often are, exchanged, licensed, or leased to others in their entirety or in part. Therefore, even if the future economic benefits from a database do not arise from legal rights, a database acquired in a business combination meets the separability criterion.

A55.  Title plants constitute a historical record of all matters affecting title to parcels of land in a particular geographical area. Title plant assets are bought and sold, either in whole or in part, in exchange transactions or are licensed. Therefore, title plant assets acquired in a business combination meet the separability criterion.

### Trade secrets such as secret formulas, processes, recipes #

A56.  A trade secret is "information, including a formula, pattern, recipe, compilation, program, device, method, technique, or process that (1) derives independent economic value, actual or potential, from not being generally known and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."[1] If the future economic benefits from a trade secret acquired in a business combination are legally protected, that asset meets the contractual-legal criterion. Otherwise, trade secrets acquired in a business combination are identifiable only if the separability criterion is met, which is likely to be the case.

---

[1]Melvin Simensky and Lanning Bryer, *The New Role of Intellectual Property in Commercial Transactions* (New York: John Wiley & Sons, 1998), 293.



1 of 1 DOCUMENT

AMALGAMATED INVESTMENT & PROPERTY CO. LTD. (IN LIQUIDATION) v
TEXAS COMMERCE INTERNATIONAL BANK LTD.

[1979 A No. 65]

[COURT OF APPEAL]

[1982] QB 84

**HEARING-DATES:** 31, October 1, November 3, 5, 6, 10, 12, 13, 17, 19, December
1979, 30, 31, January 16 May 1980, 30, June 1, 2, 3, 6, 7, 31 July 1981

31 July 1981

## CATCHWORDS:

Contract - Construction - Guarantee - Surrounding circumstances - Company guaranteeing loan by bank - Loan by
bank's subsidiary to company's subsidiary - Dealings on basis of company's liability - Whether company liable Estoppel
- Convention, by - Company's guarantee of bank loan - Loan by bank's subsidiary to company's subsidiary - Dealings on
basis of company's liability - Whether company estopped from denying liability - Estoppel as basis of cause of action

## HEADNOTE:

The plaintiffs, a property company registered in England, had a subsidiary company, A.N.P.P., registered in the
Bahamas. The defendant bank, who were registered in England had early in 1970 lent the plaintiffs U.S. $3,000,000
secured

by mortgages on properties in England By letter of September 23, 1970, the bank agreed to make a further loan of
U.S. $3,250,000 to A.N.P.P. to be secured by a mortgage on a building on property which A.N.P.P. owned at Nassau in
the Bahamas together with a guarantee from the plaintiffs for the sum loaned. On September 28, 1970, the plaintiffs
executed a guarantee to pay to the bank on demand all moneys which might at any time be due or owing to the bank by
A.N P.P. For exchange control purposes the bank arranged for the loan to A.N.P.P. to be channelled through Portsoken,
a subsidiary company which the bank acquired in the Bahamas. On December 31, 1970, A.N.P.P. executed a mortgage
on the Nassau building in favour of Portsoken to secure an advance of U.S. $3,250,000. That sum was entered in the
books of the bank and Portsoken respectively as a loan by the bank to Portsoken and then by Portsoken to A.N.P.P., but
the contemporary and subsequent negotiations and transactions between the parties in respect of the loans were upon the
basis that the guarantee relating to the Nassau loan of U.S. $3,250,000 made the plaintiffs liable to the bank in respect
of that loan. In reliance upon the parties' belief that under the guarantee the plaintiffs were bound to discharge any
indebtedness of A.N.P.P. to Portsoken in respect of the loan, the bank between 1974 and 1976 allowed the loans to
remain outstanding despite opportunities to call them in.

By 1976 the plaintiffs were in severe financial difficulties. The loan of U.S. $3,250,000 was not repaid and the

[1982] QB 84

Nassau building was sold for U.S. $2,500,000, leaving a deficit of $750,000 for which the guarantee was the only security. After the plaintiffs had defaulted on the English loan, the English properties were also sold leaving a surplus of about U.S. $750,000 which the bank purported to apply in discharge of the deficit on the Nassau loan.

The plaintiffs, who in May 1976 were ordered to be compulsorily wound up, acting through their liquidator claimed a declaration that they were under no liability to the bank either under the guarantee or otherwise in respect of the sums owing by A.N.P.P. under the loan to A.N.P.P. Robert Goff J. dismissed the plaintiff's claim holding that although the bank could not rely directly upon the guarantee the plaintiffs were estopped from contending that it did not cover A.N.P.P.'s liability in respect of the Nassau loan.

On appeal by the plaintiffs: -

Held, dismissing the appeal, (1) that the guarantee did not stand alone but had to be construed in the general setting of the negotiations between the parties regarding the Nassau loan which were finalised in December 1970; and that the correspondence and the guarantee clearly showed that the plaintiffs were contractually bound to the bank to discharge any indebtedness of A.N.P.P. to Portsoken (post, pp. 118G, 119A-B, F,123B-C, 124E, 128H - 129A, C-D).

Per Lord Denning M.R. As a wholly-owned subsidiary of the bank, Portsoken could be regarded as the bank's alter ego and the moneys owing to Portsoken as being accordingly covered by the guarantee (post, p. 119B).

(2) That further, since the parties had acted upon the agreed assumption that the plaintiffs were liable for the Nassau loan, the plaintiffs were estopped by convention from denying that they were bound to discharge any indebtedness of A.N.P.P. to

Portsoken (post, pp. 121D - E, 122C - D, 125D, 126A - B, D, 130C - D,131A - C).

Per curiam. When parties in their course of dealing in a transaction have acted upon an agreed assumption that a particular state of facts between them is to be accepted as true, each is to be regarded as estopped as against the other from questioning as regards that transaction the truth of the statement of facts so assumed (post, pp. 121C - E, 122C - D, 126A - B,130G - 131A).

Per Brandon L.J. A party cannot in terms found a cause of action upon an estoppel, but he may, as a result of being able to rely on an estoppel, succeed on a cause of action on which, without having been able to rely on that estoppel, he would have failed (post, pp. 131G - 132A).

Decision of Robert Goff J., post, p. 89H; [1981] 2 W.L.R. 554; [1981] 2 All E.R. 923 affirmed.

**INTRODUCTION:**

ACTION

By a writ dated January 9, 1979, the plaintiffs, Amalgamated Investment & Property Co. Ltd., in liquidation, brought an action against the defendants, Texas Commerce International Bank Ltd.

The plaintiffs alleged in their points of claim, that on or about December 31, 1970, Portsoken Properties Ltd., ("Portsoken"), a wholly owned subsidiary of the defendants, lent U.S. $3,250,000 to the plaintiffs' subsidiary, Amalgamated (New Providence) Property Ltd., ("A.N.P.P."), and that substantial sums were outstanding and owing by A.N.P.P. to Portsoken in respect of the loan; that prior to the making of the loan, negotiations had taken place with a view to the sum being lent to A.N.P.P. by the defendants and that the plaintiffs had executed a written guarantee dated September 28, 1970, under which they guaranteed, inter alia, the repayment by A.N.P.P. of any sums which might be lent to A.N.P.P. by the defendants; that no sums had been lent to A.N.P.P. by the defendants, and the plaintiffs had given no guarantee either to the defendants or to Portsoken in respect of the sum lent by Portsoken to A.N.P.P.; that the

defendants were in the process of selling, as mortgagees, various properties charged to them by the plaintiffs and/or subsidiaries of the plaintiffs other than A.N.P.P., in respect of advances made by the defendants to the plaintiffs wholly unconnected with the loan by Portsoken to A.N.P.P. and there would be a surplus in the hands of the defendants over and above what was due to them in respect of the advances; that notwithstanding the above matters, the defendants contended (a) that the loan to A.N.P.P. was made not by Portsoken but by the defendants; and (b) that the defendants were accordingly

entitled to enforce the guarantee and to hold the surplus and use it wholly or partly to discharge A.N.P.P.'s liability under the loan; that in the premises the defendants' contentions were misconceived and wrong.

The plaintiffs claimed a declaration that they were under no liability to the defendants either under the guarantee or in any other way in respect of the sums outstanding and owing by A.N.P.P. under the loan to A.N.P.P.

By fresh points of defence, served by the defendants pursuant to an order of Robert Goff J., under R.S.C., Ord. 20, r. 10, the defendants, inter alia, contended that the loan advanced on or about December 31, 1970, had been paid by the defendants; that there were substantial sums outstanding and owing by A.N.P.P. to the defendants in respect of the loan; that further or alternatively, if the loan was an advance made by Portsoken to A.N.P.P., the amounts of the principal and/or interest outstanding were moneys due or owing or payable to the defendants under the guarantee of September 28, 1970; that further or alternatively, if the amounts outstanding in respect of the loan were not moneys due or owing or payable to the defendants under the guarantee, then (1) the defendants had expressly and/or by their conduct made it obvious to the plaintiffs that they assumed that the guarantee covered and was applicable to the liability of A.N.P.P. in respect of the loan; (2) at all material times the plaintiffs encouraged and/or acquiesced in the defendants' assumption that the guarantee covered and was applicable to the liability of A.N.P.P. in respect of the loan; (3) in the premises and by reason of the facts relied on, the plaintiffs expressly or impliedly represented to the defendants that the plaintiffs were treating and would continue to treat the guarantee as covering and applicable to A.N.P.P.'s liability in respect of the loan; (4) in reliance on the plaintiffs' encouragement of and/or acquiescence in the defendants' assumption that the guarantee was applicable to A.N.P.P.'s liability in respect of the loan, or alternatively, upon the plaintiffs' representations that they were treating and would continue to treat the guarantee as applicable to A.N.P.P.'s liability in respect of the loan, the defendants acted to their detriment and to the plaintiffs' benefit; (5) in the premises the plaintiffs were estopped from contending that their guarantee did not cover the liability of A.N.P.P. in respect of the loan.

The facts are stated in the judgment.

APPEAL from Robert Goff J.

The plaintiffs appealed on the grounds (1) that the judge was wrong in law and/or in fact in holding that by reason of the conduct of the plaintiffs they were estopped from denying that they gave a binding and effective guarantee to the defendants of money owed by a subsidiary of the plaintiffs to a subsidiary of the defendants; (2) that in the light of the following facts (which were undisputed or were found to be facts by the judge) namely, (i) a loan was made by a subsidiary of the defendants named Portsoken Properties Ltd. ("Portsoken") to a subsidiary of the plaintiffs called Amalgamated (New Providence) Property Ltd. ("A.N.P.P."); (ii) no loan was made by the defendants to A.N.P.P.; (iii) no guarantee was

given by the plaintiffs to Portsoken that A.N.P.P. would repay the loan; (iv) no guarantee was given by the plaintiffs to the defendants that A.N.P.P. would repay the loan; (v) the only relevant form of guarantee which was ever signed by the plaintiffs was a form of guarantee addressed to the defendants at the time when it was anticipated that the defendants rather than Portsoken would make the loan to A.N.P.P. which guarantee in the events which occurred had no legal effect whatever, the judge was wrong in law and/or in fact in holding that by reason of the conduct of the plaintiffs they were estopped from denying that they were under a liability to the defendants equivalent to the liability they would have been under had there been a loan by the defendants to A.N.P.P. which had been guaranteed by the plaintiffs; (3) that the judge, having held that the defendants had an erroneous belief, that a guarantee was in existence under which

[1982] QB 84

the plaintiffs guaranteed the repayment by A.N.P.P. of the loan, which arose in the defendant's bank itself and did not derive its origin from anything said or done by any person acting on behalf of the plaintiffs but from documents held by the defendants or persons within the defendants, was wrong to hold that anything subsequently done by the plaintiffs amounted to a representation or encouragement to the defendants to hold that belief and/or that anything done by the plaintiffs had any material or causative or influencing effect on the continuance of that belief, which on the evidence would have continued to exist in full in any event; and was wrong to hold that a belief in which the defendants had no doubt was capable of reinforcement; (4) that having correctly held that an estoppel was not, as a contract was, a source of legal obligation the judge was wrong in law to give effect to the estoppel contended for by the defendants as creating a source of legal obligation on the part of the plaintiffs, and moreover a source of legal obligation for which there was no consideration and which equity would not have given effect to by way of any order for specific performance; (5) that the judge in holding that the conduct of the plaintiffs estopped them from claiming the declaratory relief sought in the statement of claim in effect gave the defendants pecuniary rights for innocent misrepresentation in a manner wrong and impermissible in law; (6) that the judge erroneously held that simply because there were certain authorities in which the plaintiffs were given causes of action where but for an estoppel there would have been no such cause of action, he was entitled to hold that an estoppel could create a contractual obligation out of a situation where there was in fact no contract at all and where any consideration for a contract was lacking; (7) that there was a fundamental difference between an alleged estoppel which would enlarge or reduce existing rights and an alleged estoppel which would have the effect of creating a wholly new contract where there were no existing rights and no existing contract and that the judge erroneously failed to make that distinction and that since on the facts of the case the estoppel pleaded by the defendants would have the effect not merely of enlarging existing rights but of creating a contract where no contract existed before, the judge ought to have given judgment in favour of the plaintiffs; (8) that the alleged estoppel relied upon the defendants was not capable of being enforced because there was

no reciprocity, because if the plaintiffs were estopped from asserting the validity of the guarantee the defendants would obtain the benefit thereof without the plaintiffs obtaining reciprocal rights such as subrogation which would otherwise have existed had the loan in fact been made by the defendants and the guarantee been given by the plaintiffs and the judge erroneously held that the estoppel alleged by the defendants could apply in the present case despite the absence of such reciprocity.

By a supplemental notice of appeal the plaintiffs relied on the additional ground that (9) the judge, having held that the plaintiffs represented to the defendants and encouraged the defendants to believe that the guarantee was binding and effective, was wrong to hold that the defendants were entitled to rely on such representation or encouragement so as to create an estoppel when, on evidence, such representation or encouragement had been induced by the defendants.

By a respondents' notice, the defendants contended that the judgment of Robert Goff J. should be affirmed on the following additional ground to those relied upon below, namely, that the sums owed by A.N.P.P. under the Nassau loan were moneys due or arising or payable to the defendants within clause 1 of the guarantee of September 28, 1970.

The facts are stated in the judgments.

**COUNSEL:**

Andrew Morritt Q.C. and John Phillips for the plaintiffs.

Anthony Colman Q.C., Konrad Schiemann and Mark Hapgood for the defendants.

Cur. adv. vult.

May 16.

Andrew Morritt Q.C. and Paul Walker for the plaintiffs. Two issues arise in the appeal: (1) was the loan of U.S. $3,250,000 covered by the guarantee? (2) are the plaintiffs precluded from claiming the surplus which was realised on

[1982] QB 84

the sale of the English properties?

It is plain on the words of the guarantee that there must be a liability on which to bite. No one considered the effect of the introduction of Portsoken to whom the defendant bank made the loan. It was up to the bank to make sure that it got the security that it wanted. No form of estoppel can be placed higher than reasonable business ethics require. There was no evidence that the loan or any payments were unlawful by the law of the Bahamas. The estoppel point was first raised half way through the trial. The bank made its own mistake. It was a common or mutual mistake.

In effect the bank are the plaintiffs and are suing upon the guarantee. An estoppel cannot be used as a sword. The alleged estoppel must be wrong because it is creating a cause of action. No estoppel arises from a mutual misunderstanding.

The notice of appeal sets out the grounds of appeal. [Leave was given to file an additional ground (9).] Ground (4) goes with ground (1). Ground (8) raises the reciprocity point, estoppels must be mutual. The case is either one of a contract between the bank and A.N.P.P. or not. The bank deliberately and for their own purposes made the loan through Portsoken.

As to the interpretation of the contract (issue (1)), see Robert Goff J.'s judgment, ante, p. 94B. The guarantee covers "all moneys which now are or shall... be due or owing or payable to you... by the principal," that is, moneys due or owing by A.N.P.P. to the bank. But the money was owing to Portsoken which was the lender, A.N.P.P. being

the borrower. If the bank were the real lenders, that was contrary to the local law. The intention was that A.N.P.P. should repay to Portsoken and the judge was right on issue (1). If the bank could not lend direct to A.N.P.P. themselves, they could not do it through an agent, but only by a genuine subsidiary in the Bahamas.

Estoppel cannot be used to create a contract where no contract exists. The bank did not base their claim on a contract or novation. Denning L.J. stated the basis of estoppel by conduct in Central Newbury Car Auctions Ltd. v. Unity Finance Ltd. [1957] 1 Q.B. 371, 379-380, citing Grundt v. Great Boulder Proprietary Gold Mines Ltd. (1937) 59 C.L.R. 641. The judge, ante, p. 103A, rejected the categorisation approach to the doctrine of equitable estoppel, but those two cases justify that approach. Sohio Petroleum Co. v. Weyburn Security Co. Ltd. (1970) 13 D.L.R. (3d) 340 was a case of mutual mistake. In McCathie v. McCathie [1971] N.Z.L.R. 58 it was held that a mistake of fact common to both parties in relation to a deed could not found an estoppel: see per Turner J. at p. 71 (lines 3-5), with whom North P. and Haslam J. agreed. McCathie v. McCathie is a clear decision that where each party is proceeding on a mutual mistake, not induced by the other, that does not give rise to an estoppel. See also Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd.; Old & Campbell Ltd. v. Liverpool Victoria Friendly Society (Note), post, p. 135A, perOliver J., who held there was common mistake. The principle of Ramsden v. Dyson (1866) L.R. 1 H.L. 129 requires knowledge of the mistake.

The judge, ante, p. 107G, drew the wrong inference as to the "numerous representations" by Mr. Foster, which did not influence the bank's belief. The creation of a contract by mutual mistake is a novel concept. The ultimate mistake made was that the guarantee covered the Nassau loan: that was a common mistake.

The judge relied on Edgington v. Fitzmaurice (1885) 29 Ch.D. 459 which was not a case of mutual or common mistake: see per Cotton L.J. at p. 480 and Bowen L.J. at p. 483.

A party who claims that the other party is estopped cannot rely upon conduct which he has induced: see Halsbury's Laws of England, 4th ed., vol. 16 (1976), para. 1598. See also Simm v. Anglo-American Telegraph Co. (1879) 5 Q.B.D. 188, 203 (per Bramwell L.J.), 208-212 (per Brett L.J.) and 213 (per Cotton L.J.). In Balkis Consolidated Co. Ltd. v. Tomkinson [1893] A.C. 396 the company were estopped from denying that the person named in their share certificate was the proprietor of the shares: see per Lord Herschell L.C. at pp. 405-406 and Lord Field at pp. 412-415. The last two authorities are relevant in that it was suggested that the bank were relying on their own mistake; they cannot say that the plaintiffs are estopped; the latter's conduct is not sufficient to ground an estoppel.

An estoppel does not arise where the facts are equally known to both parties: McCathie v. McCathie [1971] N.Z.L.R. 58 and Square v. Square (otherwise Bewicke) [1935] P. 120. A mutual or common mistake cannot found an estoppel: complaint cannot be made of that to which consent has been given. [Reference was made to Spencer Bower and Turner,

Estoppel by Representation, 3rd ed. (1977), PP. 154-155, para. 155.] The conclusion which the judge drew from the uncontested evidence cannot be supported. The bank relied on their own mistake and not on the plaintiffs' conduct.

An estoppel cannot create a cause of action. The principle of Ramsden v. Dyson, L.R. 1 H.L. 129 has been extended to property cases; but if it is transferred to contract the principles of offer and acceptance are missing. See also Crabb v. Arun District Council [1976] Ch. 179, per Lord Denning M.R. at p. 187D - E, per Lawton L.J. at pp. 191-192 and per Scarman L.J. at pp. 193-194 and Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd.; Old & Campbell Ltd. v. Liverpool Victoria Friendly Society (Note), post, p. 135A, per Oliver J. The limitations of the principle of proprietary estoppel are shown by Western Fish Products Ltd. v. Penwith District Council [1981] 2 All E.R. 204: see, in particular, Megaw L.J. giving the judgment of the court at pp. 216F - 217A. By estoppel you can create an interest to which force will be given, but you cannot by estoppel create a cause of action: you either have a contract which is a source of legal rights or not. An estoppel cannot be used to create a contract. In Combe v. Combe [1951] 2 K.B. 215, 219, Denning L.J. said that the "principle" of the high Trees case ([1947] K.B. 130) "does not create new causes of action where none existed before." In Canadian Superior Oil Ltd. v. Paddon-Hughes Development Co. Ltd. (1970) 12 D.L.R. (3d) 247 the plaintiff could not rely upon promissory estoppel because that doctrine assumed a legal relationship between the parties. In the present case the bank are converting a sum of money belonging to the plaintiffs. The real issue is the validity of the guarantee. In Spiro v. Lintern [1973] 1 W.L.R. 1002 the plaintiff had been induced by the first defendant's representation to act to his detriment, the latter was under a duty of disclosure to the plaintiff and was held to be estopped. Sarat Chunder Dey v. Gopal Chunder Laha (1892) 19 L.R. Ind.App. 203 was applied by Clauson L.J. in In re Eaves [1940] Ch. 109, 117-118, as authority for the proposition that where a party has acted in a way showing that he consented to a transaction he cannot be heard to question its legality as against those who have relied on his conduct even if he was acting without full knowledge or in error. [Reference was made to Simm v. Anglo-American Telegraph Co., 5 Q.B.D. 188, 206-207, per Brett L.J.] Calgary Milling Co. Ltd. v. American Surety Co. of New York [1919] 3 W.W.R. 98 was a plain case of the application of the principle of Hughes v. Metropolitan Railway Co. (1877) 2 App.Cas. 439, 448. De Tchihatchef v. Salerni Coupling Ltd. [1932] 1 Ch. 330 has nothing to do with creating a contract where none previously existed.

The cases on which the judge relied for saying that estoppel could create a cause of action other than one based on a proprietary right were wrong. In order to create an estoppel there must be reciprocity and mutuality: Ramsden v. Dyson, L.R. 1 H.L. 129, and Simm's case, 5 Q.B.D. 188. The bank seek to create through A.N.P.P. a cause of action against the plaintiffs who are a company in liquidation and whose creditors are affected. That would create an injustice.

In Ruben v. Great Fingall Consolidated [1906] A.C. 439 there was no estoppel and Lord Macnaghten's doubts in Balkis Consolidated Co. Ltd. v. Tomkinson [1893] A.C. 396, 411, were shared by Lord Davey. [Reference was made to Spencer Bower and Turner, Estoppel by Representation, 3rd ed., p. 154, para. 155, citing Simm's case, 5 Q.B.D. 188.] As to the principles upon which the Court of Appeal acts in appeals from judges' decisions of questions of fact, see R.S.C., Ord. 59, r. 1, and The Supreme Court Practice 1982, vol. 1, p. 919 (59/1/13). Spencer Bower and Turner, Estoppel by Representation, 3rd ed., p. 7, para. 5 states "emphatically" that estoppel "is not a cause of action in itself, nor does it create one" and cites (note 5) Lord Esher M.R., Lindley L.J. and Bowen L.J. as authority for this statement. In Syros Shipping Co. S.A. v. Elaghill Trading Co. [1980] 2 Lloyd's Rep. 390, 391-392, Lloyd J. held that equitable estoppel could not be relied upon as an independent cause of action, i.e., as a sword and not as a shield. As to reciprocity, see also Spencer Bower and Turner, Estoppel by Representation, 3rd ed., pp. 128-129, para. 129.

Anthony Colman Q.C. and Mark Hapgood for the defendant bank. By clause 1 of the guarantee of September 28, 1970, the plaintiffs unconditionally guaranteed and agreed with the bank to "pay to you on demand all moneys" owing or to be owed "to you" by A.N.P.P. [Counsel addressed the court on the facts and referred to the pleadings and the fresh

points of defence, ante, p. 89B-F.] In September 1970 there was a variation of the original agreement which was made in July 1969: A.N.P.P. were substituted for Gleniston, the loan was increased, the bank by letter of September 23, 1970, agreed "to make" the loan "available" to A.N.P.P., the plaintiffs' wholly-owned subsidiary, and the plaintiffs executed the guarantee.

A.N.P.P. were the wholly-owned subsidiary of the plaintiffs and Portsoken was the subsidiary company which the bank acquired for the purpose of channelling the loan to A.N.P.P. The court is entitled to lift the corporate veil and to look at the realities of the situation: see D. H. N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852, 857-858, 860, per Lord Denning M.R., and 861, per Goff L.J. Since the bank and Portsoken were so closely identified, the guarantee should be construed as a promise to pay "you or your nominee." Looking at the facts and reality of the situation the Nassau loan remained the Nassau loan and the plaintiffs were bound to the bank to repay any indebtedness of A.N.P.P. to Portsoken.

On estoppel, from 1974 to 1976, the plaintiffs and the bank conducted their negotiations on the basis and in the belief that the guarantee bound the plaintiffs to discharge any indebtedness of A.N.P.P. in respect of the Nassau loan: that assumption was mutual and directly material to the whole course of dealing between them. As a result of that assumption the bank took a number of steps which were to its detriment. The judge summarised the relevant facts on estoppel in his judgment, ante, pp. 99D - 101C.

M'Cance v. London and North Western Railway Co. (1864) 3 H. & C. 343 shows that in 1864 the principle of estoppel by acquiescence applied to moveable property as well as to land. As to the governing general principles

and the cases, see per Lord Denning M.R. in Moorgate Mercantile Co. Ltd. v. Twitchings [1976] Q.B. 225, 241-243, a case where the decision on the facts alone was reversed by the House of Lords ([1977] A.C. 890) who held that there was no representation, Those principles apply to estoppel by acquiescence as well as estoppel by representation.

In Grundt v. Great Boulder Proprietary Gold Mines Ltd., 59 C.L.R. 641, 656-659, Latham C.J. dealt with "the requirements of an effective estoppel." Dixon J. dealt with estoppel at pp. 674-678, saying (at p. 677) that "the parties adopted a conventional basis for the transaction" and that "By adopting... a common assumption as the basis of their working relations, the parties would each be precluded from denying it...." See also Hopgood v. Brown [1955] 1 W.L.R. 213, 223-225, per Sir Raymond Evershed M.R. and citing (at p. 223) Willmott v. Barber (1880) 15 Ch.D. 96, 105, a case of estoppel by acquiescence where mistake of fact was not the less ground for relief because the person mistaken had the means of knowledge. In the instant case the whole course of dealing was upon the agreed assumption that the plaintiffs were liable for the Nassau loan. [Reference was made to Oliver J. in Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd.; Old & Campbell Ltd. v. Liverpool Victoria Friendly Society, post, p. 135A, 155D ("all parties shared the common belief that there was a valid and enforceable option") and 157-158 in Habib Bank Ltd. v. Habib Bank A.G. Zurich [1981] 1 W.L.R. 1265, 1282-1287.] Combe v. Combe [1951] 2 K.B. 215 was a case where there was an attempt to bring an action on the husband's promise, made without consideration, alone: see per Denning L.J. at p. 219.

In Calgary Milling Co. Ltd. v. American Surety Co. of New York [1919] 3 W.W.R. 98 a representation as to the legal effect of an agreement was held to give rise to an estoppel relating to the effect of the agreement. That case was applied by Luxmoore J. in De Tchihatchef v. Salerni Coupling Ltd. [1932] 1 Ch. 330, 341-345, which was "for practical purposes almost the same" case. In Canadian Superior Oil Ltd. v. Paddon-Hughes Development Co. Ltd., 12 D.L.R. (3d) 247 there was nothing to constitute a representation. Megaw L.J. in Western Fish Products Ltd. v. Penwith District Council [1981] 2 All E.R. 204, 218H, said that the principle of proprietary estoppel might extend to "other forms of property" than to "rights and interests... over land." The underlying principles of estoppel, in particular estoppel by acquiescence, apply to contractual rights as to proprietary rights. In the instant case both the plaintiffs and the bank conducted negotiations and transactions on the basis that the plaintiffs were bound by the guarantee to discharge any indebtedness of A.N.P.P. to Portsoken in respect of the Nassau loan; and that as a result of that course of dealing the

[1982] QB 84

bank would be prejudiced if the plaintiffs were held not to be so liable.

Morritt Q.C. in reply. What is covered by the guarantee is the legal liability of A.N.P.P. to the bank and nothing else: "you" means only the bank. The D. H. N. Food Distributors Ltd. case [1976] 1 W.L.R. 852 was confined to its own facts: see per Lord Denning M.R. at p. 860D and in particular per Goff L.J. at p. 861D - E. To pierce the corporate veil in the present case would be to transfer legal liability from one company

to another for which a legal assignment under section 136 of the Law of Property Act 1925 is required. On estoppel, there was no evidence below as to estoppel by convention binding the companies by whom the English properties were charged and nothing about it was then said.

Cur. adv. vult.

July 31. The following judgments were read.

**PANEL:** Robert Goff J Lord Denning M.R., Eveleighand Brandon L.JJ

**JUDGMENTBY-1:** ROBERT GOFF J

**JUDGMENT-1:**

ROBERT GOFF J: read the following judgment. This case is concerned with the question whether the plaintiffs gave a binding and effective guarantee to the defendant bank or, alternatively, the question whether the plaintiffs are estopped from denying that they gave such a

guarantee. If either question is answered in the affirmative, the plaintiffs cannot complain that the defendant bank was not justified in appropriating, as it did, part of the proceeds of sale of certain mortgaged properties in satisfaction of such guarantee.

The plaintiffs, Amalgamated Investment & Property Co. Ltd., are a property company incorporated in this country. They are now in liquidation, being the subject of a compulsory winding up order dated May 3, 1976. They held, either directly or through subsidiaries, a substantial number of properties, both in this country and overseas. Among those properties was an office block in Nassau, which was owned by a wholly owned subsidiary of the plaintiffs incorporated in the Bahamas, Amalgamated (New Providence) Property Ltd. (which I shall refer to as "A.N.P.P."). The plaintiffs were controlled by a Mr. Gabriel Harrison, who was chairman of the plaintiffs. He died in October 1974. The secretary of the plaintiffs was at all material times a Mr. Noel Foster. Mr. Freeman was a director of the plaintiffs from May 1971 until January 1976. Shortly after joining, he was appointed assistant managing director; but he resigned as full-time director in June 1974, to become managing director of another company, though he remained a director in a non-executive capacity until January 1976.

The defendants are a merchant banking company incorporated in this country. I shall refer to the defendants as "the bank." The bank was originally called the Burston & Texas Commerce Bank Ltd., being partially owned by an English company controlled by a Mr. Burston, and partly by a Texan bank called the Texas Commerce Bank. In February 1975 the Texas Commerce Bank bought out the Burston interest, and the name of the bank was then changed to Texas Commerce International Bank Ltd. In February 1975 a Mr. Nolan became managing director of the bank, succeeding a Mr. Robinson. Mr. Nolan had been a director of the bank since 1972. He was succeeded as managing director by a Mr. Oldfield in February 1977. Mr. Oldfield had joined the bank in an administrative capacity in 1972, being concerned then with the loan portfolio; he became a manager in December 1973, and a director in June 1976.

The facts of the case are very largely undisputed. The story starts in 1969. At that time a wholly owned subsidiary of the plaintiffs, called Gleniston Garden Estate Ltd. (to which I shall refer as "Gleniston"), was developing a site which Gleniston owned in Nassau, erecting on the site an office building which was called the Harrison Building. Gleniston

[1982] QB 84

had charged the Harrison Building to their bankers, Barclays D.C. & O., to secure a bridging loan. On July 11, 1969, following negotiations, a Mr. Stokes, the then managing director of the bank, wrote to Mr. Harrison offering to make available to Gleniston a facility of $3m. for a period of five years, to be taken up in full by June 30, 1970, and to be secured by a mortgage on the Harrison Building and a guarantee by the plaintiffs. It was intended that the advance should be applied in discharge of Barclays' bridging loan, thereby ensuring that the bank would have a first charge over the Harrison Building. On July 15, 1969, Mr. Harrison accepted this offer, and exchange control permission was

obtained from the Bank of England and from the authorities in Nassau. On September 15, 1969, the plaintiffs executed a guarantee in favour of the bank in respect of all moneys due to the bank from Gleniston.

In January 1970 the plaintiffs entered into fresh negotiations with the bank for another advance, to be secured on properties in the United Kingdom. On January 27, the bank offered to make an advance of $2m. for a period of five years, secured on the relevant properties, the facility to be increased to $3m. if a revaluation of the secured properties indicated a sufficient margin; on February 2, the offer was accepted by the plaintiffs. The advance of $2m. was made, secured by a mortgage dated February 27; on March 20, 1970, following a revaluation of the properties, the advance was increased to $3m. I shall refer to this loan as the "U.K. loan," and to the loan in respect of the Harrison Building as the "Nassau loan."

Meanwhile the Nassau loan was proceeding. In the spring of 1970 Barclays agreed to extend the period of its bridging loan to Gleniston until December 31, 1970. In May 1970 Mr. Harrison expressed the desire to transfer the Harrison Building, together with the relevant loan facilities, from Gleniston to A.N.P.P. To this proposal Barclays agreed; and on September 23, 1970, the bank also agreed and, at the same time, agreed to increase the Nassau loan to $3,250,000 (following a valuation of the Harrison Building dated September 1, 1970, under which the building was valued at $5,100,000). On some date unknown to me the Harrison Building must have been transferred from Gleniston to A.N.P.P. In consequence of this change, on September 28, 1970, the plaintiffs provided the bank with a new form of guarantee securing advances to A.N.P.P., the previous guarantee securing advances to Gleniston being cancelled. This is the guarantee which is the subject matter of the present proceedings. It was in a standard form of the bank's. It was addressed by the plaintiffs (referred to in the guarantee as "the guarantor") to the bank (referred to in the guarantee simply as "you"); and it was expressed to be "in consideration of your from time to time making or contributing loans or advances to or otherwise giving credit or affording banking facilities" to A.N.P.P. (referred to in the guarantee as "the principal"). The crucial provision of the guarantee was in the following terms:

"The guarantor will pay to you on demand all moneys which now are or shall at any time or times hereafter be due or owing or payable to you on any account whatsoever by the principal..."

In November 1970 the bank agreed with Barclays to pay the Nassau loan direct to Barclays New York branch, for account of their branch in Nassau, for the credit of A.N.P.P., subject to the proviso that the mortgage on the Harrison Building had then been completed and was held by the bank's solicitors in escrow.

I come now to the event which is the source of all the difficulties in the present case. In November 1970 the bank had instructed lawyers in the Bahamas (Messrs. McKinney, Bancroft and Hughes) to act on their behalf in respect of the proposed loan. Shortly before December 14,

1970, the bank cabled these Bahamian lawyers to arrange for the mortgage to be in favour of "one of your unused companies, this company to be a wholly-owned subsidiary of our bank." The reason for this change was that Bahamian legislation did not permit a foreign bank to trade in the Bahamas without first obtaining permission to do so; and it was to avoid this complication that the bank decided to use the medium of a Bahamian subsidiary. So the lawyers took a company off the shelf. This became a wholly-owned subsidiary of the bank called Portsoken Properties Ltd. (to which I shall refer as "Portsoken"). They also set about amending the draft mortgage on the Harrison Building, so that it became a mortgage in favour of Portsoken. Exchange control permission was obtained from the Bahamian authorities permitting Portsoken to lend U.S. dollars without having to convert them into Bahamian dollars or into sterling, and permitting

them to repay U.S. dollars to the bank. Then at the end of the year the transaction was implemented. $3,250,000 were transferred by the bank to Barclays D.C. & O., New York, for account of their Nassau branch in favour of A.N.P.P. At the same time the bank opened an account in its books in the name of Portsoken (though this was at some time annotated in manuscript "A.N.P.P."); the opening debit in this account was in the sum of $3,250,000. The bank advised the plaintiffs and A.N.P.P. of a debit to A.N.P.P.'s account of $3,250,000; this communication was acknowledged by the plaintiffs. In the books of the bank it is plain that this transaction was treated as an advance by the bank to Portsoken, and a further advance by Portsoken to A.N.P.P. There was the account opened by the bank in the name of Portsoken, to which I have already referred; there is no evidence of any account being opened by the bank in the name of A.N.P.P. Likewise, the loan was treated by A.N.P.P. as being a loan to it by Portsoken, not by the bank. In the minutes of a board meeting of A.N.P.P. dated December 31, 1970, it was recorded that the meeting considered a report by the chairman that Portsoken had agreed to lend $3,250,000 to A.N.P.P. to be secured by a mortgage on the Harrison Building, and that the board approved the granting of the mortgage to Portsoken. In fact the mortgage, dated December 31, 1970, was duly executed under seal and was expressed to be between A.N.P.P. and Portsoken, the covenant to repay capital and interest being a covenant to repay Portsoken. In due course, arrangements were made for the interest to be paid into the account of Portsoken with the bank; though subsequently these arrangements were varied, and interest was paid through a bank in New York for the account of the bank. Since the interest payable by A.N.P.P. to Portsoken and by Portsoken to the bank was at the same rate, there was no differential; but the interest so received by the bank was always credited in the bank's books to the account of Portsoken with the bank. The audited accounts of the bank and of Portsoken are also consistent with a loan by the bank to Portsoken, and a further loan by Portsoken to A.N.P.P. But there was a crucial defect in these arrangements; the guarantee furnished by the plaintiffs to the bank was not amended, it remained a guarantee in respect of money due or owing or payable to the bank, not to Portsoken.

Although I shall have in due course to consider in some detail the events which occurred between 1970 and 1976, I propose at this stage to go straight to 1976. By this time the plaintiffs were in serious financial difficulties. The interest instalment due on the Nassau loan at the end of December 1975 had not been fully paid. On March 19, 1976, the bank appointed a receiver of the properties in the United Kingdom charged to the bank by the plaintiffs and their subsidiaries in respect of advances made by the bank; and five days later Portsoken appointed a receiver of the Harrison Building, which was the subject of the mortgage in Portsoken's favour. On May 3, 1976, the plaintiffs were ordered to be wound up compulsorily. At that date the bank had already called on the plaintiffs under their guarantee of September 28, 1970, to pay the unpaid balance of the Nassau loan, which was by then $2,750,000. Over a year later, on May 26, 1977, the liquidator of the plaintiffs replied asserting that, on the documents available to him, there was no liability on the plaintiffs under the guarantee in respect of the loan to A.N.P.P. Meanwhile, however, the Harrison Building had been sold, and the proceeds applied in discharge of the Nassau loan, leaving a balance outstanding of about $750,000. Likewise, the United Kingdom properties mortgaged to secure advances by the bank to the plaintiffs and their subsidiaries were also sold and applied in discharge of such advances; this left a balance in the bank's hands of approximately the same amount as the sum outstanding on the Nassau loan, and the bank purported to apply the credit balance in discharge of the balance of the Nassau loan. This course was challenged by the liquidator; and on January 9, 1979, a writ was issued by the plaintiffs (in liquidation) claiming a declaration that the plaintiffs were under no liability to the bank under the guarantee or otherwise in respect of the sums outstanding by A.N.P.P. under the loan to A.N.P.P.

A defence was served by the bank on February 12, 1979, in which it was contended that the loan to A.N.P.P. was a loan by the bank, and that therefore the plaintiffs were liable under their guarantee in respect of the unpaid balance of the loan. This defence was subsequently amended to allege that, if the loan was made by Portsoken, then Portsoken advanced the money as agent for the bank or, alternatively, that, on a true construction, the guarantee was applicable to the loan; or, finally, that the plaintiffs were estopped from contending that they were not liable under their guarantee in respect of the unpaid balance of the loan. On the basis of this defence, the trial began on October 31, 1979, but on the second day of the trial counsel for the bank informed me that substantial further documents were available on the issue of estoppel, and I acceded to an application by the bank for an adjournment of the hearing, on appropriate terms as to costs.

The trial was resumed on December 3, 1979. Entirely new points of defence had been served by the bank. The new defence maintained the contention that the Nassau loan had been made by the bank; but that contention was soon abandoned. In the outcome, two contentions alone were advanced by the bank. The first was that Portsoken "held the mortgage and its rights under the mortgage deed in respect of the payment

of principal and interest by A.N.P.P. to the order, use and benefit" of the bank and that, therefore, the principal and interest outstanding in respect of the loan were moneys due or owing or payable to the bank under the guarantee. The second was that the plaintiffs were estopped from contending that the guarantee did not cover the liability of A.N.P.P. in respect of the Nassau loan.

With the first of these two contentions I can deal quite shortly. In the course of argument, it transpired that the bank was not contending that Portsoken was in any way constituted a trustee for the bank; the contention was rather that, on a true construction, the guarantee should be held to be applicable to the loan made in the present case. The facts relied on by the bank were as follows: (1) Portsoken was simply a shell company acquired by the bank for the purposes of "channelling" the mortgage to the bank; (2) Portsoken was simply a fronting company, which made no profit; (3) Portsoken had no administrative function in relation to the loan to A.N.P.P.; (4) the bank exercised complete control over Portsoken; (5) in reality, Portsoken had no power to take any action in relation to the loan, save at the direction of the bank; and (6) if the bank had at any time called for an assignment of the debt, that assignment would have been forthcoming as and when required.

From these facts, submitted Mr. Colman, on behalf of the bank, the relationship between Portsoken and the bank was so close that the guarantee should be held applicable to the loan, really because Portsoken was no more than a nominee or fronting company or creature of the bank. I am bound to say that I find this argument unpersuasive. The words of the guarantee are clear, and under them the guarantee was applicable only to moneys due or owing or payable to the bank. It is plain, on the evidence before me, that the Nassau loan was advanced not by the bank, but by Portsoken; no part of the loan was ever due or owing or payable to the bank - the creditor was always Portsoken. I can see no reason for departing from the natural and ordinary meaning of the words of the guarantee; certainly, the facts relied upon by Mr. Colman in support of his contention do not justify any such departure. The fact that the bank chose, for its own purposes, to substitute Portsoken as the lender in a transaction under which it had originally been intended that the bank should be the lender does not enable the bank thereafter to say that a guarantee given previously, guaranteeing payment of sums due or owing or payable to the bank, was applicable to the changed transaction, however close the relationship between the bank and the new lender may have been. In truth, there is no substance in the point, and I have no hesitation in rejecting it.

I turn, therefore, to the estoppel point, which is what, in its developed form, the whole case is about. After the new pleadings and further discovery, this point assumed much more substantial dimensions; and before I can consider it, it is necessary for me to set out in some detail the facts, derived from the documents before the court and the oral evidence given by Mr. Freeman, Mr. Nolan and Mr. Oldfield upon which the bank sought to build its argument.

I have already referred to the fact that there were two major advances

by the bank or a subsidiary of the bank to the plaintiffs or a subsidiary of the plaintiffs: first, the loan of $3,250,000 by Portsoken to A.N.P.P. secured on the Harrison Building in Nassau, which I have called "the Nassau loan;" and second, the advance of $3m. by the bank to the plaintiffs secured on properties in the United Kingdom, which I have called "the U.K. loan." It was, of course, the Nassau loan to which the guarantee, which is the subject matter of these proceedings, was believed by all concerned to apply. However, the U.K. loan plays a substantial part in the story, because it was in relation to that loan that certain developments took place which show both parties, the plaintiff and the bank, acting in the common belief that the guarantee applied to the Nassau loan.

The story of these developments begins in June 1974. On June 27, the plaintiffs sought the bank's consent to the release of one of the U.K. properties (30/30A, St. George Street, Hanover Square, London W.1) in exchange for two

other properties. About a month later, on July 25, the bank agreed in principle to the substitution, but only after an up to date valuation of the proposed substitute properties. Next, in September 1974, the plaintiffs asked the bank for a further facility of $250,000 to finance a development in Toronto; the bank reacted favourably to this request, but subject to a revaluation of all properties available to secure all facilities. On September 25, 1974, a meeting took place at the bank, attended by Mr. Noel Foster, the secretary of the plaintiffs, and Mr. Nolan (then a director of the bank, though shortly thereafter, in February 1975, to become managing director). At the meeting, the bank agreed to the substitution and the further advance, subject to up to date valuations of the Harrison Building and the U.K. properties, and to further security being advanced exceeded two-thirds of the value of all the properties which were charged to the bank to secure the advances. This was in accordance with the bank's policy of requiring 150 per cent. cover for all such loans. About three weeks later, on October 18, 1974, the bank wrote to the plaintiffs formally offering the further facility of $250,000; but this was in fact never taken up. I should record that it was in October 1974 that Mr. Gabriel Harrison died.

On November 4, 1974, following a telephone conversation on November 1, Mr. Robinson (then the managing director of the bank) wrote to Mr. Foster agreeing to the release of the deeds of 30/30A, St. George's Street, against a cash deposit of oe500,000 (which was to come out of the proceeds of sale of the property). The letter continued:

"This money will be held in the name of Amalgamated Investment & Property Co. Ltd. as security for its own direct liabilities and its guarantee liabilities on account Amalgamated (New Providence) Property Co. Ltd. It is understood that the cash balance will be released as soon as we have established, by means of up to date valuations, that the liabilities of Amalgamated Investment & Property Co. Ltd. to ourselves, both direct and by way of guarantee, do not exceed 66.2/3 per cent. of the value of our security. To

the extent that there is any shortfall, we are conscious that you have agreed that you will provide additional deed security..."

The reference to the plaintiffs' "guarantee liabilities" can only have been a reference to the supposed guarantee of the loan of $3,250,000 to A.N.P.P. Mr. Oldfield told me that he was party to drafting the letter. His understanding of the situation, which originated from somebody else within the bank, was that although the charge on the Harrison Building had been provided to Portsoken, Portsoken having been interjected into the transaction simply as a vehicle for that purpose, the loan had been made by the bank itself to A.N.P.P. and the guarantee was therefore binding and effective. Four days later Mr. Foster returned a copy of Mr. Robinson's letter countersigned, confirming his approval of its terms. It is plain from this that Mr. Foster too understood the plaintiffs' guarantee of the loan to A.N.P.P. to be binding and effective.

On November 12, Mr. Foster sent the bank a valuation of the Harrison Building dated October 25, 1974, in the sum of $3,200,000. Although this was nearly equal to the amount of the Nassau loan, viz. $3,250,000, it followed that the property was by no means adequate to produce anything like the amount of the loan having regard to the very high cost of realising property in the Bahamas - on a sale at $3,200,000 the net recovery would only have been $2,700,000 to $2,800,000. Obviously, too, the valuation was far too low for a charge on this property alone to secure the Nassau loan, having regard to the bank's policy of having 150 per cent. On the same day, November 12, the sum of $500,000 was deposited by the plaintiffs with the bank, thus enabling the deeds of 30/30A, St. George's Street to be released.

On Christmas Eve, Mr. Foster telephoned the bank and informed them that the interest payment due on December 29 could not be paid. The bank agreed to accept $82,000 at that stage; the balance of $166,000 was to be paid later, and was not in fact paid until April 1975. This was not the first occasion on which interest had been paid late - there had been late payments of instalments of interest due in December 1972, June 1973, December 1973 and June 1974.

Then, on January 15, 1975, Mr. Oldfield discovered that the charges provided by the plaintiffs did not constitute security for the plaintiffs' supposed guarantee of the Nassau loan to A.N.P.P. This was drawn to his attention by a securities clerk at the bank. The bank required "all moneys" charges, that is, that each charge should secure all moneys

due to the bank. When he discovered this problem Mr. Oldfield telephoned Mr. Foster, and they agreed on the telephone to put the matter right. This agreement could only have been on the basis that both Mr. Oldfield and Mr. Foster believed that the plaintiffs' guarantee was binding and effective. Both of them were aware that at that time the bank was awaiting valuations of certain U.K. properties; their intention was that, as and when the bank took fresh charges, these should be H expanded to secure the plaintiffs' liability as surety for A.N.P.P. On January 27, 1975, Mr. Foster wrote to Mr. Oldfield, attaching further valuations of U.K. properties. The letter continued:

"I am attaching a summary of the 13 valuations submitted and, subject to your acceptance, would suggest that 83, Endell Street be added to the six properties already charged to secure the U.K. advance of U.S. $3 million and that Kingsley Lodge and Kirkgate, Wakefield be charged to support our guarantee of your advance of U.S. $3F1/4 million to our Bahamian subsidiary. Assuming the other properties meet with your approval, I would like to retain the three small properties" - these were specified - "which we now hope to sell... I look forward to hearing from you when you have considered the position."

Once again, this letter can only have been written on the basis that the plaintiffs' guarantee of the Nassau loan was binding and effective; and the letter is consistent with a belief on the part of Mr. Foster that the loan had been advanced by the bank itself.

During the first six months of 1975 there were numerous telephone conversations between Mr. Oldfield and Mr. Foster. A recurrent theme of these conversations was that Mr. Foster desired to recover the cash deposit of oe500,000 to relieve the plaintiffs' cash flow problems, but that the bank was adamant that it should not be released until the bank was satisfied with the securities, on the basis of up-to-date valuations. Furthermore, at the end of February 1975, the U.K. loan matured (the Nassau loan did not mature until the end of December 1975). Because of their liquidity problems, the plaintiffs were unable to repay the U.K. loan on its maturity date; and on March 25, Mr. Foster informed Mr. Nolan on the telephone that the plaintiffs could not repay the U.K. loan before June 1976 and the Nassau loan before 1978. On April 9, Mr. Foster attended a meeting at the bank. The meeting was called at his request, his purpose being to obtain release of the oe500,000 deposit and renewal of the U.K. loan. At this time Mr. Foster was well aware that the bank required 150 per cent. cover for its advances. The proposed all moneys charge (to cover in addition the plaintiffs' liability as surety for A.N.P.P.) was at least touched upon, as was a proposal by the bank to convert the U.K. loan into a sterling loan. Mr. Oldfield's note of the meeting contains the following passage (which I have every reason to believe is accurate):

"We have recently had discussions with the company with a view to switching the U.S. $3 million facility into sterling and agreement in principle has been reached, the repayment being approved by the Bank of England in its original letter of sanction dated January 16, 1970. As part of this exercise we have asked Messrs. Ziman & Co." - the bank's solicitors - "to prepare a draft supplemental deed to the present mortgage forms covering the properties charged as collateral so as to ensure that not only will this collateral be held in cover of the new sterling loan, but also may be looked to in support of the guarantee of A.I.P.C. for the New Providence loan."

The reference to the "New Providence loan" is clearly a reference to the Nassau loan. The meeting led to the formal extension of the U.K. loan, and agreement that it should be converted into sterling. On the

following day the new draft deed was sent by the bank to the plaintiffs. On June 16, 1975, the bank sent the plaintiffs a formal facility letter agreeing to an extension of the U.K. loan to April 30, 1976, on condition, inter alia, (1) that it would be switched into sterling; (2) that the bank would continue to have a first legal charge on certain properties, and would require a first legal charge on certain additional properties; and (3):

"the total market value (as determined by valuers acceptable to the bank) of all collateral held by the bank in regard to advances to either yourselves or your subsidiary, Amalgamated (New Providence) Property Ltd., will at all times remain in excess of 150 per cent. of the total amount of such outstanding advances. Subject to this condition you will be entitled to the release of part of the collateral."

[1982] QB 84

The valuations of the properties to be charged underline the fact that the bank was requiring security from the plaintiffs large enough to cover their guarantee liabilities in respect of the Nassau loan to A.N.P.P. A copy of the letter was returned countersigned by Mr. Foster. On June 23, the supplemented deed to the original charge was returned duly executed by the plaintiffs and their subsidiaries, signed by Mr. Freeman as director and Mr. Foster as secretary of each company. By the supplemental deed, all the properties were charged to secure not only the U.K. loan but also:

"all other amounts which now are or shall at any time or times hereafter be due or owing or payable to the bank on any account whatsoever by [the plaintiffs] either solely or jointly with any other person, firm or company and whether as principal debtor or as surety for any other person, firm or company."

The interest payment due at the end of June was again late, only part being paid on the due date, the remainder being paid later by agreement. On July 2, 1975, the plaintiffs and a subsidiary executed two further charges on two further properties, under which the subsidiary covenanted to pay to the bank "all such sums of money as now are or shall from time to time be owing" by the plaintiffs or by the plaintiffs "jointly with any other or others in partnership or otherwise and whether as principal or surety to the bank," and charged the property "by way of legal mortgage with the payment to the bank of all moneys payable to the bank hereunder."

Next on July 8 the bank, having received securities which on the basis of the valuations of the properties secured were sufficient to cover all the sums advanced to the plaintiffs and the plaintiffs' liability as surety for A.N.P.P., and, having received charges upon such properties expressed to cover all such liabilities of the plaintiffs, released the deposit of oe500,000 to the plaintiffs.

On August 1, 1975, the plaintiffs paid a first instalment of oe300,000 in reduction of the U.K. loan. On August 5, 1975, they asked for the release of a charge on property in Derby; and on September 8, 1975, a

meeting took place at the bank, attended by Mr. Foster and Mr. Freeman, in the course of which the repayment of the Nassau loan was discussed. The discussion obviously proceeded on the assumption that the bank had the plaintiffs' guarantee (duly secured) for the Nassau loan, since the discussion included a proposal that the Harrison Building might be sold for $2,600,000 (which, allowing for expenses, was far less than the amount of the Nassau loan). At the end of the meeting it was agreed, inter alia, that the Harrison Building should be put on the market, and that new valuations should be obtained of the U.K. properties charged to secure the bank's advances. Later, on October 22, 1975, Mr. Freeman confirmed to Mr. Nolan on the telephone that the sale of the Harrison Building was proceeding on the lines discussed at the meeting.

During the autumn of 1975 the financial position of the plaintiffs deteriorated. At a meeting held at the bank on October 30 a proposed moratorium was discussed. On November 3, a sum of $650,000 was received in part payment of the Nassau loan, and was credited by the bank to the account of Portsoken, leaving a balance of $2,585,000 outstanding. On December 5 Mr. Oldfield wrote to the plaintiffs agreeing to postponement of payment of outstanding principal and interest of the U.K. loan to December 19, 1975. The interest due at the end of December was not then paid; a quarter ($50,000) was paid on January 5, 1976, but the balance was never paid. In the spring of 1976 matters came to a head in the manner I have already described.

Such was the sequence of events between 1974 and 1976 upon which the bank relied in support of its plea of estoppel. Furthermore, on the basis of the documentary evidence and the oral evidence given by Mr. Freeman, Mr. Nolan and Mr. Oldfield, I make the following further findings of fact.

First, both organisations - the bank and the plaintiffs - were organisations of good repute and of integrity, each having complete trust in the other. All the witnesses who gave evidence were gentlemen of integrity, who gave their evidence with complete frankness; and I have no doubt that Mr. Foster was likewise a gentleman of integrity, who was most anxious to assist the bank in every way, and would never have been guilty of anything remotely resembling sharp practice vis-a-vis the bank.

[1982] QB 84

Second, both the officers of the bank directly concerned - Mr. Nolan and Mr. Oldfield - believed at all material times that the plaintiffs' guarantee was binding and effective and covered the liability of A.N.P.P. in respect of the Nassau loan. This was because they understood, mistakenly, that the money had been advanced by the bank to A.N.P.P., whereas it had in fact been advanced by Portsoken. The source of their error lay in the bank itself; the mistake of both Mr. Nolan and Mr. Oldfield derived its origin not from anything said or done by any person acting on behalf of the plaintiffs but from documents held by the bank or from persons within the bank.

Third, the officers of the plaintiffs most concerned, in particular Mr. Poster but also Mr. Freeman, believed that the plaintiffs' guarantee

was likewise binding and effective. Mr. Freeman's information about the transaction was somewhat sketchy; but Mr. Foster was much more directly concerned. In all probability, the basis of Mr. Foster's belief was that the money had in fact been advanced by the bank; in particular, the supplemental deeds entered into by the plaintiffs in June and July 1975 to provide charges on real property to secure the guarantee, appear to have been drawn up on the assumption that the advances had been made by the bank. There is no evidence which persuades me to hold that Mr. Freeman's or Mr. Foster's mistaken belief derived from anything said or done on behalf of the bank; it is more probable that their mistaken belief had an origin independent of the bank, though after the question of securities to support the plaintiffs' guarantee was raised by the bank in January 1975, the mistake of each - the bank and the plaintiffs - must have operated to reinforce the mistaken belief of the other.

Fourth, by their whole course of conduct the plaintiffs, and in particular Mr. Foster, represented to the bank and encouraged the bank to believe that the plaintiffs' guarantee was binding and effective and covered the Nassau loan with the effect that, after the supplemental deed of June 23, 1975, the guarantee was secured by charges on real property. The following incidents are particularly relevant as constituting such course of conduct. (1) On November 12, 1974, Mr. Foster returned to the bank countersigned Mr. Robinson's letter of November 4, 1974 - an action which, having regard to the terms of the letter (which I have already quoted) must have indicated Mr. Foster's understanding that the plaintiffs' guarantee in respect of the Nassau loan was binding and effective. (2) On January 15, 1975, in his telephone conversation with Mr. Oldfield, Mr. Foster agreed to arrange that the plaintiffs' guarantee of the Nassau loan should be secured by charges on real property. Again, Mr. Foster thereby indicated to the bank his understanding that the plaintiffs' guarantee was binding and effective. (3) Mr. Foster's letter of February 27, 1975, from which I have already quoted, was plainly to the same effect. (4) At the meeting on April 9, 1975, which I have already described, which led to the formal extension of the U.K. loan, there was a discussion of the supplemental deed to the existing mortgages to ensure that the collateral would, inter alia, secure the plaintiffs' guarantee of the Nassau loan. (5) In June 1975, Mr. Foster returned countersigned the bank's facility letter dated June 16, 1975, agreeing to an extension of the U.K. loan on terms which plainly presupposed that the plaintiffs' guarantee of the Nassau loan was binding and effective and would be secured by charges on real property. (6) On June 23, 1975, pursuant to the foregoing arrangements, the plaintiffs executed the draft supplemental deed which was in its terms wide enough for this purpose; on July 2, 1975, the plaintiffs executed two further deeds which were likewise so effective.

Fifth, although the bank's erroneous belief that the plaintiffs' guarantee was so binding and effective originated in their own office, I am satisfied that the plaintiffs' course of conduct influenced the bank, and in particular Mr. Oldfield, in the sense that it operated to confirm and

reinforce his mistaken belief. This is a point to which I shall return later in this judgment.

Sixth, encouraged by the conduct of the plaintiffs, the bank itself adopted a course of conduct which was detrimental to its interests. In particular, it allowed the loans to remain outstanding, despite opportunities to call them in, for example, when the interest payment on the Nassau loans was not duly paid at the end of December 1974 or at the end of June 1975, and when the U.K. loan matured in February 1975. Furthermore, it accepted the supplemental deeds as security for the Nassau loan, and on July 8, 1975, released to the plaintiffs the deposit of oe500,000 made in November 1974.

Seventh, if at any time before the winding up order the matter had come to light, I have no doubt whatsoever that Mr. Foster would immediately have arranged for the plaintiffs to put the matter right.

I come now to the submissions of the parties. In considering those submissions, I am conscious of the fact that the liquidator of the plaintiffs is adopting an attitude which, had the company not been in liquidation, would never have been adopted by the directors of the company. The point taken by the liquidator is a technical one, and to some extent unmeritorious. But persons in that position have duties to perform, and it is sometimes necessary for them to take points which others would be reluctant to take; and they are entitled, like all others, to have each point considered and decided in accordance with the established principles of law. To the submissions of the parties on the applicable principles I now turn.

For the bank, Mr. Colman relied upon a broad principle which he stated as follows. Where a defendant conducts his affairs in reliance on the plaintiff's active acquiescence in, or encouragement of, the defendant's assumption, made known to the plaintiff, that the defendant has certain contractual or other rights of a non-proprietary nature against the plaintiff, and it would be unjust or unconscionable for the plaintiff now to deny the existence of such rights, the plaintiff will be estopped from so doing. In the present case, he submitted, the words and conduct of the plaintiffs and in particular of Mr. Foster, constituted not merely acquiescence in, but encouragement of, the bank's known assumption that it had rights against the plaintiffs in the nature of a guarantee or indemnity, secured by a charge on real estate; and, having regard to the manner in which the bank was influenced by such encouragement, it would be unconscionable for the plaintiffs now to deny the existence of such rights. In the alternative, Mr. Colman put his case on the basis of representations by the plaintiffs to a like effect, on the faith of which the bank acted so that it would now be unconscionable for the plaintiffs to go back upon its representations.

For the plaintiffs, Mr. Morritt launched a frontal attack on Mr. Colman's submissions. He submitted that the first proposition formulated by Mr. Colman infringed three principles: it presupposed no contract of which equity could grant specific performance; it permitted the enforcement of a promise unsupported by consideration; and it gave a pecuniary remedy for innocent misrepresentation. He proceeded, after

 a meticulous examination of the authorities, himself to formulate the law relating to equitable estoppel in a series of five propositions, as follows. (1) Where either O encourages T to believe that he, O, will confer on T a certain interest in his, O's property, or O, knowing that T mistakenly believes that he, T, has a certain interest in property belonging to O, stands by and says nothing, and T in reliance on O's encouragement or his own mistaken belief respectively spends money on O's property, O may be estopped from asserting his strict legal rights: see Ramsden v. Dyson (1866) L.R. 1 H.L. 129 and other authorities. (2) Where O, having the right to object to a particular transaction which he knows T proposes to carry out, does not object and T carries it out, O is thereafter estopped from objecting because he assented to the act in question: see De Bussche v. Alt (1878) 8 Ch.D. 286, 314, per Thesiger L.J., and other authorities. (3) Where parties agree on a certain state of fact, for the purpose of a certain future specific transaction, then in an action to enforce that transaction neither can assert facts contrary to the agreement (though otherwise where the proceedings are not on the agreement). (4) Where O sees T acting in the mistaken belief that O is under some binding obligation to him, or in a manner consistent only with the existence of such obligation, and for reasons which are not within the knowledge of T but are within the knowledge or means of knowledge of O, O is not under that obligation, O is under a duty to T to disclose the nonexistence of that obligation. If O does not do so, and T acts to his detriment, O may be estopped: see Spiro v. Lintern [1973] 1 W.L.R. 1002. (5) Last, there is the familiar principle of promissory estoppel founded on Hughes v. Metropolitan Railway Co. (1877) 2 App.Cas. 439 and Central London Property Trust Ltd. v. High Trees House Ltd. [1947] K.B. 130. The principle was not formulated by Mr. Morritt. But I understand it to presuppose the existence of a legal relationship between the parties, one of whom represents to the other that he will not enforce his strict legal rights against the other under that relationship; if on the faith of that representation the representee so acts or desists from acting that it will be inequitable in all the circumstances for the representor to go back on his representation, he may be precluded from doing so.

Now, Mr. Morritt submitted that the present case fell within none of these categories of equitable estoppel. It did

not fall into the first category because the case was not concerned with property; furthermore, there was no suggestion that the plaintiffs ever encouraged the bank to believe that they would grant the bank a right in future, or that the plaintiffs were aware of the bank's mistake. Plainly, he said, the case fell into neither the second nor the third categories. It did not fall into the fourth category, which presupposes knowledge or means of knowledge of the mistaken party's mistake; nor did it fall into the fifth category, which presupposes an existing legal relationship between the parties - whereas here there was none - the so-called guarantee of the plaintiffs being no more than a piece of paper, an offer by the plaintiffs which never matured into a contract, because the bank itself never

made the advance which would, if given, have both constituted an acceptance and furnished the required consideration.

Now I have to say at once that, despite its meticulous scholarship, I find Mr. Morritt's approach difficult to accept. Of all doctrines, equitable estoppel is surely one of the most flexible. True, from time to time distinguished judges have enunciated statements of principle concerning aspects of the doctrine; as, for example, the statements of Lord Cranworth L.C. in Ramsden v. Dyson, L.R. 1 H.L. 129, 140-141; of Thesiger L.J. in De Bussche v. Alt, 8 Ch.D. 286, 314 and of Fry J. in Willmott v. Barber (1880) 15 Ch.D. 96, 105-106, concerning what is usually called the doctrine of acquiescence; the statement of Lord Kingsdown in Ramsden v. Dyson, at pp. 170-171, on what may be called the doctrine of encouragement; and the statement of Lord Cairns L.C. in Hughes v. Metropolitan Railway Co., 2 App.Cas. 439, 448, and Denning J. in Central London Property Trust Ltd. v. High Trees House Ltd. [1947] K.B. 130, 134, on promissory estoppel. But all these have been statements of aspects of a wider doctrine; none has sought to be exclusive. It is no doubt helpful to establish, in broad terms, the criteria which, in certain situations, must be fulfilled before an equitable estoppel can be established; but it cannot be right to restrict equitable estoppel to certain defined categories, and indeed some of the categories proposed are not easy to defend. Thus, in Snell's Principles of Equity, 27th ed. (1973), chapter 7, the editors isolate two categories of equitable estoppel, promissory estoppel and proprietary estoppel. It may be possible nowadays to identify the former with some degree of precision; but the latter is much more difficult to accept as a separate category. The cases concerned appear to derive from two distinct principles; the principle stated by Lord Cranworth L.C. in Ramsden v. Dyson, L.R. 1 H.L. 129, and the principle stated by Lord Kingsdown in the same case - the former being concerned with an estoppel precluding a person, who stands by and allows another to incur expenditure or otherwise act on the basis of a mistaken belief as to his rights, from thereafter asserting rights inconsistent with that mistaken belief (commonly called the doctrine of acquiescence); and the other being concerned with an estoppel precluding a person who has encouraged another to improve his, the encourager's, property in the expectation that he will receive an interest in it, from denying that he is entitled to that interest. It is to be observed that the first of these principles appears to be directed towards preventing a person from fraudulently taking advantage of another's error, whereas the latter appears to derive rather from encouragement or representation. As a separate category, proprietary estoppel may perhaps be regarded as an amalgam of doubtful utility; and it is not surprising to find that the use of this term has been the subject of some criticism: see, for example, Spencer Bower and Turner, Estoppel by Representation, 3rd ed. (1977), para. 308. Indeed there are cases, in particular cases concerned with the acquisition of easements, and with the legal effect of contracts, which are not easy to accommodate within any of the current classifications. It is not, therefore, surprising to discover a tendency in the more recent authorities to reject any rigid classification

of equitable estoppel into exclusive and defined categories. The authorities on the subject have recently been reviewed by Oliver J. in his judgment in two related actions, Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd. and Old & Campbell Ltd. v. Liverpool Victoria Friendly Society (Note), post, p. 135A; and on the basis of his analysis of the cases, which I gratefully adopt, he rejected an argument founded upon rigid categorisation. The argument was that a clear distinction must be drawn between cases of proprietary estoppel and estoppel by acquiescence on the one hand, and promissory estoppel or estoppel by representation (whether express or by conduct) on the other; and that in the former class of cases it was essential that the party alleged to be estopped himself knew the true position (that is, that he knew that the other party was acting under a mistake as to his rights), the fourth of the five criteria laid down by Fry J. in Willmott v. Barber, 15 Ch.D. 96, as necessary to establish estoppel by acquiescence. Oliver J., however, while

recognising that the strict Willmott v. Barber criteria may be necessary requirements in cases where all that has happened is that the party alleged to be estopped has stood by without protest while his rights have been infringed, concluded that the recent authorities supported a much wider jurisdiction to interfere in cases where the assertion of strict legal rights is found by the court to be unconscionable. The cases before him were concerned with a situation where both parties had proceeded on the same mistaken assumption; and he concluded that the inquiry which he had to make was simply whether, in all the circumstances of the cases before him, it was unconscionable for the defendants to seek to take advantage of the mistake which, at the material time, all parties shared.

In my judgment, in the case before me, the inquiry which I have to make is precisely the same. But before I turn to consider the facts of the case before me, there are certain general observations which I wish to make.

First, the case advanced before me by the bank is not one of simple acquiescence by the plaintiffs in the mistaken belief of the bank; it is founded upon active encouragement by the plaintiffs or representations by the plaintiffs - encouragement and representations which I have already found were in fact given and made by the plaintiffs to the bank. Now, in my judgment, where an estoppel is alleged to be founded upon encouragement or representation, it can only be unconscionable for the encourager or representor to enforce his strict legal rights if the other party's conduct has been influenced by the encouragement or representation.

Second, it is, in my judgment, no bar to a conclusion that the other party's conduct was so influenced, that his conduct did not derive its origin only from the encouragement or representation of the first party. There may be cases where the representee has proceeded initially on the basis of a belief derived from some other source independent of the representor, but his belief has subsequently been confirmed by the encouragement or representation of the representor. In such a case, the question is not whether the representee acted, or desisted from acting,

solely in reliance on the encouragement or representation of the other party; the question is rather whether his conduct was so influenced by the encouragement or representation (I take the word "influenced" from the judgment of Bowen L.J. in Edgington v. Fitzmaurice (1885) 29 Ch.D. 459, 481) that it would be unconscionable for the representor thereafter to enforce his strict legal rights. Such a conclusion appears to be consistent with the decision of Oliver J. in Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd.; Old & Campbell Ltd. v. Liverpool Victoria Friendly Society (Note), post, p. 135A. The point can also be illustrated by a hypothetical example. Let it be supposed that A and B are neighbours, and that A proposes to build a wall, on what is in fact B's land, though both parties mistakenly believe it to be A's. A invites B's co-operation in the building of the wall, for example, by providing a means of access over his land for the purposes of building work or by supporting an application for planning permission. B cooperates as requested, and the wall is built at A's expense. In such circumstances, it may well be unconscionable for B thereafter to assert his strict legal rights.

Third, it is in my judgment not of itself a bar to an estoppel that its effect may be to enable a party to enforce a cause of action which, without the estoppel, would not exist. It is sometimes said that an estoppel cannot create a cause of action, or that an estoppel can only act as a shield, not as a sword. In a sense this is true - in the sense that estoppel is not, as a contract is, a source of legal obligation. But, as Lord Denning M.R. pointed out in Crabb v. Arun District Council [1976] Ch. 179, 187, an estoppel may have the effect that a party can enforce a cause of action which, without the estoppel, he would not be able to do. This is not, of course, true of all estoppels. Thus a promissory estoppel derived from Hughes v. Metropolitan Railway Co., 2 App.Cas. 439, is concerned with a representation by a party that he will not enforce his strict legal rights; of its very nature such an estoppel cannot enable a party to enforce a cause of action. But in other cases an estoppel may do so, as, for example, in cases of estoppel by acquiescence. Moreover (subject to one limitation, to which I shall shortly refer) I can see no reason, in logic or in authority, why such a cause of action should not consist of a contractual right. Thus, in Spiro v. Lintern [1973] 1 W.L.R. 1002, a husband who had not authorised his wife to agree to sell his house, was held to be estopped from denying that his wife had such authority, with the effect that a purchaser from his wife was enabled to enforce against him a contract by his wife for the sale of the house. It is true that that case may be treated as a case of estoppel by acquiescence; but the Court of Appeal held that on the facts of the case the husband's failure to disclose to the purchaser that his wife had acted without his authority

[1982] QB 84

amounted to a representation by conduct that she had that authority. Furthermore, in two cases the Privy Council has held that a representation by a party as to the legal effect of an agreement can give rise to an estoppel, with the consequence that the representee's rights under the agreement are effectively enlarged: see Sarat Chunder Dey v. Copal Chunder Laha

(1892) 19 L.R. Ind.App. 203 and the Calgary Milling Co. Ltd. v. American Surety Co. of New York [1919] 3 W.W.R. 98, the latter of which was applied by Luxmoore J. in De Tchihatchef v. Salerni Coupling Ltd.[1932] 1 Ch. 330. I observe in passing that it is difficult to accommodate these cases within any of Mr. Morritt's five categories.

Fourth, however, what I have just said has to be reconciled with the general principle that a purely gratuitous promise is unenforceable at law or in equity. In law and in equity, generally speaking a promise is only enforceable as a contractual obligation if it is supported by consideration; and neither law nor equity will perfect an imperfect gift. Furthermore, even if a purely gratuitous promise is acted upon by the promisee, generally speaking such conduct will not of itself give rise to an estoppel against the promissor; such an estoppel would be inconsistent with the general principle that purely gratuitous promises will not be enforced: see Combe v. Combe [1951] 2 K.B. 215. It was suggested to me that that case provided authority that no cause of action in contract could be created by an estoppel. But that, in my judgment, is too sweeping a proposition; it is inconsistent with authorities I have already cited, in particular the two decisions of the Privy Council referred to in the preceding paragraph. Indeed, there are at least three groups of cases where estoppels may be enforced despite infringement of this general principle, and I do not suggest that this list is exhaustive. The basis of all these groups of cases appears to be the same - that it would, despite the general principle, be unconscionable in all the circumstances for the encourager or representor not to give effect to his encouragement or representation. The first group concerns cases where equity would regard it as fraudulent for the party against whom the estoppel is alleged not to give effect to his encouragement or representation; an example of such a case is where, on the principle stated by Lord Kingsdown in Ramsden v. Dyson, L.R. 1 H.L. 129, a party has encouraged another in the expectation that he shall have an interest in the encourager's land, and the other party has, on the faith of that encouragement, expended money on that land. The second group consists of cases concerned with promissory estoppel, in which one party represents to another that he will not enforce his strict legal rights under a legal relationship between the parties. The representation may be no more than a gratuitous promise; but it may nevertheless be unconscionable for the representor to go back upon it, because a representee may reasonably be expected to act in reliance upon such a forbearance, without going to the extent of requiring a contractual variation. The third group concerns cases where one party has represented to the other that a transaction between them has an effect which in law it does not have. In such a case, it may, in the circumstances, be unconscionable for the representor to go back on his representation, despite the fact that the effect is to reduce his rights or to enlarge his obligations and so give effect to what is in fact a gratuitous promise; for the effect of the representation may be to cause or contribute to the representee's error or continued error as to his true legal rights, or to deprive him of an opportunity to re-negotiate the transaction to render

it legally enforceable in terms of the representation. Illustrations of such cases are to be found in the two Privy Council cases, and the decision of Luxmoore J., which I have already cited. Such cases are very different from, for example, a mere promise by a party to make a gift or to increase his obligations under an existing contract; such promise will not generally give rise to an estoppel, even if acted on by the promisee, for the promisee may reasonably be expected to appreciate that, to render it binding, it must be incorporated in a binding contract or contractual variation, and that he cannot therefore safely rely upon it as a legally binding promise without first taking the necessary contractual steps.

My fifth observation is this. Where, as in cases of promissory estoppel, the estoppel is founded upon a representation by a party that he will not enforce his legal rights, it is of course a prerequisite of the estoppel that there should be an existing legal relationship between the parties. But where, for example, the estoppel relates to the legal effect of a transaction between the parties, it does not necessarily follow that the underlying transaction should constitute a binding legal relationship. In such a case the representation may well, as I have already indicated, give rise to an estoppel although the effect is to enlarge the obligations of the representor; and I can see no reason in principle why this should not be so, even if the underlying transaction would, but for the estoppel, be devoid of legal effect.

[1982] QB 84

Certainly the doctrine of consideration cannot of itself provide any insurmountable obstacle to this conclusion; for, whether the representation consists (as in the case of a promissory estoppel) of a forbearance, or consists of a representation as to the legal effect of a transaction, it will in any event constitute an inroad upon that doctrine. An example of an estoppel giving rise to a binding obligation when none before existed is to be found in Spiro v. Lintern[1973] 1 W.L.R. 1002, in which it was held that the purchaser could enforce a contract against the husband who would not, apart from the estoppel, have been under any obligation to him; and both Sarat Chunder Dey v. Gopal Chunder Laha, 19 L.R.Ind.App. 203, and Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd.; Old & Campbell Ltd. v. Liverpool Victoria Friendly Society (Note), post, p. 134A, provide illustrations of estoppels which rendered effective otherwise ineffective transactions.

In the light of these observations, I turn to examine the facts of the present case. First, as I have already held, there were numerous representations by Mr. Foster on behalf of the plaintiffs to the bank that the guarantee given by the plaintiffs constituted a binding and effective guarantee by the plaintiffs to the bank (which was ultimately secured by a charge on real property) covering the Nassau loan to their subsidiary, A.N.P.P.

Second, I am satisfied that the representations of Mr. Foster did indeed influence the bank in persisting in its conduct in relying upon the plaintiffs' guarantee as providing enforceable collateral for A.N.P.P.'s debt. True, the source of the bank's error lay in its own administration. Indeed, Mr. Oldfield frankly admitted in his evidence that, before Mr.

Foster made any representations to the bank, he was in no doubt that the Nassau loan was advanced to A.N.P.P. by the bank, not by Portsoken. However, later in his evidence he said that by reason of the conduct of the plaintiffs (he had in mind in particular his various conversations with Mr. Poster, and the plaintiffs' letter of January 27, 1975) his belief was reinforced. On the basis of this evidence, I asked counsel for the plaintiffs: what would the position have been if Mr. Foster, instead of being a man of complete integrity who shared Mr. Oldfield's mistake, had fraudulently confirmed Mr. Oldfield in his error? Would not a court be entitled to conclude that, having regard to the dealings between the parties, Mr. Foster's conduct had sufficiently influenced Mr. Oldfield's conduct to render him liable in deceit? To that question I received no satisfactory answer; and I am satisfied that the answer should have been in the affirmative, for it is surely sufficient that the representor's conduct contributed to lulling the representee into a state of false security. Likewise, in all the circumstances, I am satisfied that Mr. Foster's conduct, though of course completely innocent, so influenced Mr. Oldfield's conduct as to render it unconscionable on the part of the plaintiffs now to take advantage of the bank's error. Such a conclusion is, I would add, consistent with the decision of Oliver J. in Taylors Fashions Ltd. v. Liverpool Victoria Trustees Co. Ltd. (Note),post, p. 135A in which he held that the defendants were estopped from asserting the invalidity of an option, although (as I read the case) the error of the plaintiffs did not originally derive from the representations or encouragement of the defendants.

Third, I am satisfied that to hold that the plaintiffs are estopped from denying the invalidity of their guarantee is permissible, despite the general principle that neither law nor equity will enforce a purely gratuitous promise. For, by confirming the bank's erroneous belief that the guarantee was binding and effective and covered the Nassau loan, the plaintiffs contributed to the continuance of the bank's error as to the true legal effect or, rather, lack of legal effect of that document, and to the bank's failure to take the opportunity of putting matters right.

Fourth, it makes no difference, in my judgment, that the guarantee was not of itself, in law, a binding contract. I accept Mr. Morritt's analysis that in strict law it was of itself no more than a piece of paper, a standing offer which, unaccepted, had long since lapsed. But, for the reasons I have already given, I can see no reason why, in principle, a representation that such a non-contractual document has a certain contractual effect should be incapable of giving rise to an estoppel precluding the representor from thereafter going back upon that representation where, as in the present case, it would be unconscionable for him to do so.

There remains, however, one further argument advanced on behalf of the plaintiffs, with which I must deal. Mr. Morritt submitted on the basis of dicta of Lord Cranworth L.C. in Ramsden v. Dyson, L.R. 1 H.L. 129, 152, and of Bramwell L.J. in Simm v. Anglo-American Telegraph Co. (1879) 5 Q.B.D. 188, 203, that an estoppel will not be

[1982] QB 84

enforced unless there is reciprocity. Here, he said, there was none, because if

the plaintiffs were estopped from asserting the invalidity of the guarantee, the bank would obtain the benefit of the guarantee but the plaintiffs would not get the benefit of subrogation rights which they would have had if the money had in fact been advanced by the bank and the guarantee had been binding. Now I can understand the force of such an argument in certain cases. No doubt, he who comes to equity must do equity; and it might well be contrary to principle that a party should, by virtue of the doctrine of equitable estoppel, obtain the benefit of rights without incurring the burden of corresponding obligations which he would have incurred if the rights had been enforceable without the aid of the doctrine of estoppel. But I cannot see that this is so in the present case. If the guarantee had been binding, then any right of subrogation would have been to securities enforceable against the principal debtor, that is, against A.N.P.P. which could only have been the mortgage over the Harrison Building. But that security was in fact realised and the proceeds paid in partial discharge of the debt; so that no further benefit would have accrued to the plaintiffs by virtue of such right of subrogation, and I cannot therefore see that the lack of any such right on the part of the plaintiffs should preclude the bank from relying upon the estoppel against them.

For these reasons, I accept the bank's submission that the plaintiffs are estopped from contending that the guarantee does not cover the liability of A.N.P.P. in respect of the Nassau loan. It is, I understand, not in dispute that if this is so the plaintiffs are precluded from asserting that the bank were not entitled to apply the proceeds of sale of the U.K. properties, charged to them under the deeds I have referred to, in discharge of the plaintiffs' obligations to them under the guarantee. It follows that the plaintiffs are not entitled to the declaratory relief for which they ask.

**JUDGMENTBY-2:** LORD DENNING M.R

**JUDGMENT-2:**

LORD DENNING M.R: This case is complicated beyond measure by the existence of wholly-owned subsidiaries. These are the dramatis personae: a property company registered in England called Amalgamated Investment & Property Co. Ltd. (now in liquidation) are the plaintiffs. They had a wholly-owned subsidiary registered in the Bahamas called Amalgamated (New Providence) Property Ltd., whom I will call "A.N.P.P." The defendants are a merchant bank registered in England called Texas Commerce International Bank Ltd. (formerly the Burston & Texas Commerce Bank Ltd.) whom I will call the "bank." It had a wholly-owned subsidiary registered in the Bahamas called Portsoken Properties Ltd. I will call it "Portsoken."

Treating the wholly-owned subsidiaries as one with their parent companies, the facts in broad outline are these: there was a building site in the centre of Nassau in the Bahamas. It was ripe for development. The plaintiffs wanted to raise U.S. $3,250,000 in order to erect a building on the site. They borrowed it from the bank and mortgaged the property to the bank to secure the loan. As further security the plaintiffs gave a guarantee to the bank. It is on that guarantee that the whole case depends. I will call it the "guarantee." The loan was not repaid. The property was sold. It realised U.S. $2,500,000, leaving a deficit of U.S. $750,000 unpaid for which the guarantee was the only security.

The plaintiffs also owned properties in England which they had mortgaged to the bank. These were "all money" mortgages covering all moneys owing to the bank by the plaintiffs on any account whatever. These mortgages covered, not only the moneys advanced by the bank on the English properties, but also the moneys owing by the plaintiffs on the guarantee in the Bahamas.

The plaintiffs defaulted on the English loan. The English properties were realised. These more than covered the English loan. There was a surplus of $750,000 in the hands of the bank. The bank claimed to apply that surplus to wipe out the U.S. $750,000 unpaid on the guarantee.

A year later the plaintiffs went into liquidation. The liquidator looked into the papers. He contended that the guarantee did not cover the deficit of U.S. $750,000 on the Nassau loan. He said that the plaintiffs were entitled to the

surplus of U.S. $750.000 which was realised on the sale of the English properties. The liquidator claimed that it should be paid over to him.

The liquidator bases his case on the introduction into the story of wholly-owned subsidiaries. He says that the guarantee only covered the sums which A.N.P.P. owed to the bank: and that it did not cover the sums

which were owed by A.N.P.P. to Portsoken. The bank say that it didcover them: or alternatively that the plaintiffs were estopped from saying that it did not cover them.

The full facts are set out by Robert Goff J., ante, p. 89H in his judgment. I will only set out such details as are necessary for the points of law.

The execution of the guarantee

The guarantee was signed on September 28, 1970. It is to be construed together with two letters. On September 23, 1970, the bank wrote to A.N.P.P.:

"... we confirm that we will be pleased to make available to Amalgamated (New Providence) Property Ltd., a facility of U.S. $3,250,000 for a period of five years from the date that the borrowing is taken ... The borrowing will be secured by a legal mortgage in respect of the freehold property, the Harrison Building, Marlborough Street, Nassau, Bahamas, together with a guarantee for U.S. $3,250,000 from Amalgamated Investment & Property Co. Ltd...."

On September 28, 1970, the plaintiffs replied:

"Proposed Eurodollar Loan - U.S. $3,250,000 - Harrison Building - Amalgamated (New Providence) Property Ltd.

"Thank you for your letter of September 23 wherein you enclose a guarantee which has been completed and is returned herewith..."

The guarantee was on a printed form. It was addressed to the bank with blanks filled in in type (here shown in capitals):

"We, AMALGAMATED INVESTMENT & PROPERTY CO. LTD. 9-10 GRAFTON STREET, LONDON, W1X 4DA, (hereinafter called 'the guarantor'), in consideration of your from time to time making or contributing loans or advances to or otherwise giving credit or affording banking accommodation or facilities to AMALGAMATED (NEW PROVIDENCE) PROPERTY LTD. of P.O. BOX 868, NASSAU, BAHAMAS (hereinafter called 'the principal'), hereby unconditionally guarantee to and agree with you as follows:

"1. The guarantor will pay to you on demand all moneys which now are or shall at any time or times hereafter be due or owing or payable to you on any account whatsoever by the principal, either solely or jointly with any other person, firm or company, together with all... banking charges and expenses which you may in the course of your business as bankers charge against the principal... provided nevertheless that the total amount recoverable from the guarantor here-under shall not exceed U.S. $3,250,000...

"10. For all purposes including any legal proceedings a copy of the account of the principal in your books signed by any of your officers shall be accepted by the guarantor as conclusive evidence of the state of such account...

"17. This guarantee is to be governed by and construed according

to English law and the guarantor submit(s) to the jurisdiction of the English courts.

"Dated SEPTEMBER 28, 1970."

[1982] QB 84

At that date, September 28, 1970, as the covering letters show, the facilities were to be made available by the bank to A.N.P.P.

The interposition of a subsidiary

The judge, ante, p. 92A, described the introduction of a wholly-owned subsidiary of the bank. It was a Bahamian company called Portsoken Properties Ltd. ("Portsoken"). This was done for exchange control purposes. It was a channel through which money passed. The position was well stated in a letter by the bank's solicitors to the Controller of Exchange in the Bahamas on December 15, 1970. The wholly-owned subsidiary (Portsoken) was to:

"1. Receive the U.S. dollar funds from its parent company and lend them to Amalgamated (New Providence) Property Ltd. in U.S. dollars without conversion into Bahamian dollars or sterling. 2. Take a mortgage from Amalgamated (New Providence) Property Ltd. expressed in U.S. dollars. 3. Maintain a U.S. dollar bank account for the purpose of handling payments of principal and interest in connection with this back-to-back loan."

The transaction of December 31, 1970

On December 31, 1970, A.N.P.P. executed a mortgage on the Harrison Building in favour of Portsoken for securing U.S. $3,250,000. That sum was entered in the books as a loan by the bank to Portsoken and then as a loan by Portsoken to A.N.P.P. And likewise with interest paid by A.N.P.P. to Portsoken: and by Portsoken to the bank. On many occasions, however, the interest was paid direct by A.N.P.P. to the bank.

Note the important point. The guarantee was not touched. It still remained dated September 28, 1970. It still remained a guarantee of moneys owing by the principal to the bank. The judge considered this to be "a crucial defect." He said, ante, p. 92H:

"But there was a crucial defect in these arrangements; the guarantee furnished by the plaintiffs to the bank was not amended, it remained a guarantee in respect of money due or owing or payable to the bank, not to Portsoken."

Was it a crucial defect?

I take a different view from the judge. He has construed the guarantee in its strict literal sense - all by itself - without regard to the letters which accompanied it - and without regard to the surrounding circumstances - or the "factual matrix" to use the modern equivalent.

The guarantee of September 28, 1970, was of no effect by itself. It only took effect on December 31, 1970, when the sum of $3,250,000 was advanced. That sum of U.S. $3,250,000 is the connecting link which joins everything together. It was the "facility" which the bank promised on

September 23, 1970, to make available to A.N.P.P. and which was to be supported by a mortgage on the Harrison Building: and by a guarantee from the plaintiffs to the bank. It was the "banking facilities" contained in the guarantee itself. It was the "facility" which was in fact granted on December 31, 1970, and supported by a mortgage. The words of the printed form must, in my opinion, be subordinated to the express provisions of the correspondence which brought it into being. That correspondence shows, beyond doubt, that the guarantee was intended to cover the U.S. $3,250,000 lent by the bank to A.N.P.P., even though it was done through the channel of its wholly-owned subsidiary, Portsoken.

Apart from this, I think that this is one of those cases where a wholly-owned subsidiary is to be regarded as the alter ego of the parent company. We have often lifted the corporate veil so as to show forth the realities of company life. This wholly-owned subsidiary was the creature of the parent company. It did exactly what the parent company told it to do. It was nothing more nor less than a conduit pipe through which payments were made and received. It received no fees. It made no profits. It sustained no losses. Its transactions were all paper transactions - all book entries - recording the sums in and out. It was a puppet which danced to the bidding of the parent company just as Dr. Wallersteiner's companies did

[1982] QB 84

(see Wallersteiner v. Moir [1974] 1 W.L.R. 991, 1013) and as the "three in one" companies did in D. H. N. Food Distributors Ltd. v. Tower Hamlets London Borough Council [1976] 1 W.L.R. 852. If we regard Portsoken as the alter ego of the bank, the moneys owing by A.N.P.P. to Portsoken (a wholly-owned subsidiary) are moneys owing to the bank. They are, therefore, covered by the guarantee.

Then again there is the conduct of the parties at the time of the transaction. This may be very relevant: see Whitworth Street Estates (Manchester) Ltd. v. James Miller & Partners Ltd. [1970] A.C. 583, 611D - E, per Viscount Dilhorne. In this case just look at the time when the U.S. $3,250,000 was advanced by Portsoken to A.N.P.P. The parties must have thought that the guarantee covered the loan. Otherwise they would surely have amended the guarantee so as to cover it.

In my opinion, therefore, the guarantee given by the plaintiffs covered the moneys owing by A.M.P.P. to Portsoken which was the wholly-owned subsidiary of the bank. If this be correct, it is the end of the case. But as the judge thought the guarantee did not cover the loan, I go on to consider subsequent conduct.

Subsequent conduct

For many years I thought that when the meaning of a contract was uncertain you could look at the subsequent conduct of the parties so as to ascertain it. That seemed to me sensible enough. The parties themselves should know what they meant by their words better than anyone else. In this I was supported by a case of the Privy Council: Watchman v. Attorney-General of the East Africa Protectorate [1919] A.C. 533. It was decided in 1919 and it was applied repeatedly in my early days in the courts of common law. But it was always repudiated by the more logical minds in Chancery. Eventually the logicians prevailed. In 1970 in Whitworth Street

Estates (Manchester) Ltd. v. James Miller & Partners Ltd. [1970] A.C. 583 the House of Lords declared in Lord Reid's words, at p. 603:

"... it is not legitimate to use as an aid in the construction of the contract anything which the parties said or did after it was made. Otherwise one might have the result that a contract meant one thing the day it was signed, but by reason of subsequent events meant something different a month or a year later."

I can understand the logic of it when the construction is clear: but not when it is unclear. Still, we must accept it. Nevertheless, a way of escape was left open by Viscount Dilhorne in that very case when he said, at p. 611D - E: "... subsequent conduct by one party may give rise to an estoppel."

So here we have available to us - in point of practice if not in law - evidence of subsequent conduct to come to our aid. It is available - not so as to construe the contract - but to see how they themselves acted on it. Under the guise of estoppel we can prevent either party from going back on the interpretation they themselves gave to it.

The conduct here

The evidence is overwhelming to show that, from the very moment when the $3,250,000 was advanced to A.N.P.P., all the parties thought that it was secured - not only by the mortgage of the Harrison Building - but also by the guarantee of the plaintiffs. In pursuance of that belief the bank embarked on a course of conduct - rearranging their portfolio of investments - releasing properties and moneys to the plaintiffs - which they would not have done except on the basis that the guarantee of the plaintiffs covered the loan to A.N.P.P. The judge tells the story, ante, pp. 95B - 99D.

Now assuming that this belief was mistaken (and the judge thought it was but I do not) a question arises about the law of estoppel. The mistake by the bank was self-induced. They had overlooked the wording of the guarantee. They thought it applied to moneys owing to Portsoken as well as moneys owing to the bank. This was the bank's own mistake. It was not induced by the plaintiffs. Nor did the plaintiffs do anything to contribute to it, or to reinforce it - except this: that they did not contradict it. They did not tell the bank that it was mistaken. But then, it is said, how could

the plaintiffs be expected to contradict it, when they were under the same mistake? So runs the argument on behalf of the plaintiffs. The bank made a mistake of its own - everything it did followed from its own mistake. So it should put up with the consequences.

The judge put this telling point at p. 108B - C: Suppose that the plaintiffs knew that the bank were under a mistake - and did not tell the bank - but took advantage of it for their own benefit. Could the plaintiffs then take advantage of it? Clearly not. Then what difference does it make that the plaintiffs were under the same mistake?

Course of dealing

Although subsequent conduct cannot be used for the purpose of interpreting

a contract retrospectively, yet it is often convincing evidence of a course of dealing after it. There are many cases to show that a course of dealing may give rise to legal obligations. It may be used to complete a contract which would otherwise be incomplete; see Brogden v. Metropolitan Railway Co. (1877) 2 App.Cas. 666, 682, per Lord Hatherley. It may be used so as to introduce terms and conditions into a contract which would not otherwise be there (J. Spurling Ltd. v. Bradshaw [1956] 1 W.L.R. 461); Hardwick Game Farm v. Suffolk Agricultural Poultry Producers Association [1966] 1 W.L.R. 287, 308, 316, 317, C.A.; and [1969] 2 A.C. 31, 90, per Lord Morris of Borth-y-Gest; p. 104, per Lord Guest, and p. 113, per Lord Pearce, all disapproving the dictum of Lord Devlin in McCutcheon v. David Macbrayne Ltd. [1964] 1 W.L.R. 125, 134, and Hollier v. Rambler Motors (A.M.C.) Ltd. [1972] 2 Q.B. 71, 77-78, per Salmon L.J. If it can be used to introduce terms which were not already there, it must also be available to add to, or vary, terms which are there already, or to interpret them. If parties to a contract, by their course of dealing, put a particular interpretation on the terms of it - on the faith of which each of them - to the knowledge of the other - acts and conducts their mutual affairs - they are bound by that interpretation just as much as if they had written it down as being a variation of the contract. There is no need to inquire whether their particular interpretation is correct or not - or whether they were mistaken or not - or whether they had in mind the original terms or not. Suffice it that they have, by the course of dealing, put their own interpretation on their contract, and cannot be allowed to go back on it.

To use the phrase of Latham C.J. and Dixon J. in the Australian High Court in Grundt v. Great Boulder Proprietary Gold Mines Ltd. (1937) 59 C.L.R. 641, 657, 677, the parties by their course of dealing adopted a "conventional basis" for the governance of the relations between them, and are bound by it. I care not whether this is put as an agreed variation of the contract or as a species of estoppel. They are bound by the "conventional basis" on which they conducted their affairs. The reason is because it would be altogether unjust to allow either party to insist on the strict interpretation of the original terms of the contract - when it would be inequitable to do so, having regard to dealings which have taken place between the parties. That is the principle upon which we acted in Crabb v. Arum District Council[1976] Ch. 179, 187. It is particularly appropriate here - where the judges differ as to what is the correct interpretation of the terms of the guarantee. The trial judge interpreted it one way. We interpret it in another way. It is only fair and just that the difference should be solved by the course of dealing - by the interpretation which the parties themselves put upon it - and on which they conducted their affairs for years.

So I come to this conclusion: When the parties to a contract are both under a common mistake as to the meaning or effect of it - and thereafter embark on a course of dealing on the footing of that mistake - thereby replacing the original terms of the contract by a conventional basis on which they both conduct their affairs, then the original contract is replaced by the conventional basis. The parties are bound by the conventional

basis. Either party can sue or be sued upon it just as if it had been expressly agreed between them.

Conclusion

The doctrine of estoppel is one of the most flexible and useful in the armoury of the law. But it has become overloaded with cases. That is why I have not gone through them all in this judgment. It has evolved during the last 150 years in a sequence of separate developments: proprietary estoppel, estoppel by representation of fact, estoppel by

acquiescence, and promissory estoppel. At the same time it has been sought to be limited by a series of maxims: estoppel is only a rule of evidence, estoppel cannot give rise to a cause of action, estoppel cannot do away with the need for consideration, and so forth. All these can now be seen to merge into one general principle shorn of limitations. When the parties to a transaction proceed on the basis of an underlying assumption - either of fact or of law - whether due to misrepresentation or mistake makes no difference - on which they have conducted the dealings between them - neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so. If one of them does seek to go back on it, the courts will give the other such remedy as the equity of the case demands.

That general principle applies to this case. Both the plaintiffs and the bank proceeded for years on the basis of the underlying assumption that the guarantee of the plaintiffs applied to the $3,250,000 advanced by the bank for the Nassau Building. Their dealings in rearranging the portfolio, in releasing properties and moneys, were all conducted on that basis. On that basis the bank applied the surplus of $750,000 (on the English properties) in discharge of the obligations of the plaintiffs under the guarantee. It would be most unfair and unjust to allow the liquidator to depart from that basis and to claim back now the $750.000. That was ultimately the paramount reason why the judge rejected the liquidator's claim. He summed up his view in this one sentence, ante, p. 108C:

"... I am satisfied that Mr. Foster's conduct, though of course completely innocent, so influenced Mr. Oldfield's conduct, as to render it unconscionable on the part of the plaintiffs now to take advantage of the bank's error."

Later at p. 108G the judge speaks of it being "unconscionable" for the representor to go back on his representation.

In those phrases the judge is applying the general principle of estoppel which I have stated. I agree with his analysis of the cases and with his conclusion. I would dismiss the appeal.

**JUDGMENTBY-3:** EVELEIGH L.J

**JUDGMENT-3:**

EVELEIGH L.J: The obligations assumed by the plaintiffs and the defendants in my opinion clearly emerge from the correspondence between the parties. There would have been no problem had there not been injected into their agreement a standard banking form which has been treated in argument as being the guarantee. The phrase "being the guarantee" would be more appropriate in the case where the guarantor

has no other interest in the transaction than to guarantee the obligations of another. In such a case the document alone is treated as the agreement between the parties. As in all written contracts, however, it can embody terms previously agreed by other means. But to satisfy the Statute of Frauds 1677 it is put into writing as a written note or memorandum necessary for the enforcement of a contract of guarantee.

Where the guarantee does not stand alone but is part of a larger transaction, even an oral promise of guarantee is enforceable: see Sutton Co. v. Grey [1894] 1 Q.B. 285. Not unnaturally, however, businessmen like to have written evidence of their agreements whether the Statute of Frauds requires it or not.

I make these preliminary remarks because at times it seemed that we were in danger of treating the bank's printed form as though it stood alone and was to be construed in isolation as if it required the strictness of construction appropriate to commercial documents such as bills of lading which have a universally recognised character which is of importance to a number of people other than those concerned in the original contract.

The plaintiffs did not come into this matter simply as guarantors after the formation of a principal contract. They and the bank were the principal negotiators in reaching an agreement whereby the bank at the request of the plaintiffs agreed to provide money to be used in connection with property development in the Bahamas in which the plaintiffs had a great financial interest. The Harrison Building was charged to Barclays Bank. At the request of the plaintiffs the bank offered on July 11, 1969, to make available a facility of U.S. $3,000,000 for a period of five years to Gleniston Gardens

[1982] QB 84

Estate Ltd., a subsidiary of the plaintiffs. They wrote:

"The borrowing would be secured by a legal mortgage in respect of the freehold property, the Harrison Building, now in the course of erection at Marlborough Street, Nassau, Bahamas, together with a guarantee for the full amount of the facility from Amalgamated Investment Property Co. Ltd." They added: "Your company would be responsible for the bank's legal fees, stamp duty, etc."

It is not clear who actually owned the Harrison Building at that stage. It does not matter. The building was charged to Barclays Bank to secure a loan and the intention was that the defendant bank should provide facilities for Barclays to be paid off and for the balance of the agreed sum to be made available to Gleniston who would be the owners of the Harrison Building. The plaintiffs accepted the offer "on behalf of Amalgamated and the Gleniston Gardens Estate Ltd." They signed a standard guarantee, the printed terms of which were clearly appropriate.

The plaintiffs themselves were asking for the money. The bank was agreeing to provide it and to allocate it as the plaintiffs requested. The plaintiffs were clearly undertaking to see that the defendants were repaid.

Subsequently, the plaintiffs asked for A.N.P.P. to be substituted for Gleniston and for the loan to be increased to U.S. $3.250,000. The plaintiffs wrote to the bank on May 12, 1970:

"As discussed, I confirm that Mr. Harrison wishes to transfer the Harrison Building from The Gleniston Gardens Estate Ltd. to another wholly owned subsidiary of ours in the Bahamas, Amalgamated (New Providence) Property Ltd."

On September 23, 1970, the bank wrote confirming their agreement to the variation. In setting out the terms that had been agreed they stated that the borrowing would be secured by a legal mortgage in respect of the Harrison Building together with a guarantee from the plaintiffs. They stated that the guarantee completed in relation to Gleniston Gardens Estate Ltd. had been cancelled. The plaintiffs signed another standard guarantee form which, in so far as is material, read as follows:

"We, Amalgamated Investment and Property Co. Ltd... (hereinafter called 'the guarantor') in consideration of your from time to time making or contributing loans or advances to or otherwise giving credit or affording banking accommodation or facilities to Amalgamated (New Providence) Property Ltd... (hereinafter called 'the principal'), hereby unconditionally guarantee to and agree with you as follows... 1. The guarantor will pay to you on demand all moneys which now are or shall at any time or times hereafter be due or owing or payable to you on any account whatsoever by the principal...."

Then, for exchange control reasons and as the judge explains in detail, ante, p. 92A et seq., the bank, to use its own solicitor's word, "channelled" the loan through Portsoken Properties Ltd., a paper company brought into action soley for the purpose. No new standard form guarantee was signed.

Ignoring the existence of the guarantee form, in my opinion the agreement reached between the parties orally and evidenced by or contained in (it matters not) the correspondence was clearly to the effect that the plaintiffs would be responsible for seeing that the bank was repaid. The subsequent negotiations between the plaintiffs and the defendants after the money was made available on December 31, 1970, and up to 1976 in which the plaintiffs clearly recognised this obligation provides admissible and strong evidence of this. Are we driven to arrive at a different conclusion because of the existence of the standard guarantee form containing the name of A.N.P.P.?

It might have been possible to have approached this case upon the basis that the form was not introduced into the final contract. In that case the position would be as I have stated above. However, this case has been argued upon the basis that it formed part of the final agreement. In that case the undertaking by the guarantor must be construed in the general setting of the transaction. It was a document that had been used by the bank to secure its own position in relation to the facilities it was affording. I think that the reference to "all moneys... payable to you ... by the principal" (i.e., A.N.P.P.) can only refer to the facility which the bank was affording. In the context of the whole transaction, it

can, in my opinion, have no other meaning. The fact that the money could be legally demanded in the first instance by Portsoken does not rob it of its character of moneys payable to the bank, and the fact that Portsoken

would first receive it and hand it over to the bank does not rob it of the description of moneys payable by A.N.P.P. To deny this result by an analytical examination of the different legal liabilities engendered by the form which the transaction ultimately took is to deprive the words of the guarantee of a wider meaning which they are fully capable of bearing. It runs counter to all principles of construction to give the words a meaning that would defeat the clear intention of the parties as revealed by the rest of the relevant evidence of the agreement. I too am of the opinion that the plaintiffs' claim fails on this ground.

As the question of estoppel has been argued before this court, I think I should say a few words on that matter on the assumption that the guarantee was so worded as not to cover the transaction. After December 31, 1970, changes were made in the arrangements by which a number of properties had been charged to secure to the bank two separate loans, namely, one of U.S. $3,000.000 (called the U.K. loan) and one of $3,250,000 (the Nassau loan). These loans were quite independently secured, the U.K. loan by a number of properties and the Nassau loan by the Harrison Building. It seems probable that the bank at all times thought that the charges were related in that they supported an all moneys guarantee covering both loans. The negotiations which took place and the subsequent agreements arrived at were clearly based upon the common understanding that the guarantee in relation to A.N.P.P. made them liable to the bank in respect of the Nassau loan. In so far as it is said that the bank acted to its detriment relying upon that assumption, I find it difficult to say that the plaintiffs were responsible, therefore, simply upon the basis that their mistake might be said to have strengthened the bank's assumption. Furthermore, I find it difficult to see how the substitution of properties in the list of those charged to the bank and their revaluation was detrimental to the bank's interests. The only property charged to secure the Nassau loan was the Harrison Building. The revaluation showed that that building would no longer realise an amount sufficient to cover the loan. The bank required a 150 per cent. cover upon the joint value of the two loans. Variation in the list of properties was designed not only to release some at the request of the plaintiffs but also, upon the bank's insistence, to provide that 150 per cent. overall cover. Ex hypothesi, the A.N.P.P. guarantee being worthless, the only guarantee which the bank was entitled to enforce, namely, in respect of the U.K. loan, now became more firmly secured. Therefore, the guarantee position was more favourable to the bank than it had been. However, in the later stages of the negotiation the bank refrained from calling in the loan, and in particular the Nassau loan, at a time which might have been more favourable from its point of view and also extended the time for repayment so that increased interest charges were incurred. In this respect it can be said that the bank acted to its detriment. With some hesitation, I think it may be right to conclude that when the plaintiffs asked for further time they were asserting that they themselves were ultimately liable for the Nassau loan and can be said to have induced the defendants to act to their detriment partly as a result of their assertion, and, therefore, a case of

estoppel in pais can be made out. However, I would prefer to treat this case as one of estoppel by convention.

Counsel for the bank referred us to a passage in Spencer Bower and Turner, Estoppel by Representation, 3rd ed. (1977), p. 157:

"When the parties have acted in their transaction upon the agreed assumption that a given state of facts is to be accepted between them as true, then as regards that transaction each will be estopped against the other from questioning the truth of the statement of facts so assumed."

It is clear that the parties negotiated upon the agreed assumption that the plaintiffs guaranteed the Nassau loan. The detailed negotiations are set out in the judgment of the judge, ante, pp. 95 B - 99D. Suffice it to say that there came a time when the parties agreed that all the properties should be available to secure both the liability of the plaintiffs in respect of the U.K. loan and also their liability in respect of the Nassau loan, which latter liability was assumed to exist. The bank sold the properties. They claimed the right to appropriate the proceeds of both loans. As I have said, the proceeds of the Harrison Building would not satisfy the Nassau loan. The plaintiffs challenge this, saying that the properties were charged to secure their liability and that they were not liable under the guarantee for A.N.P.P. In my

opinion, they cannot be allowed to say this. The bank had been given the right to sell the properties and satisfy both loans upon the agreed assumption that the plaintiffs were liable for the Nassau loan. The bank sold and appropriated the proceeds upon that assumption. The plaintiffs cannot deny the truth of it.

It is important to appreciate that the transaction with which we are concerned is the realisation of the securities by the bank. We are not concerned to decide whether the plaintiffs would have had a defence to an action on the A.N.P.P. guarantee itself if the security had proved insufficient. For myself I do not think that the bank could have succeeded in a claim on the guarantee itself. Estoppel operates so as to prevent a party from denying a representation or an assumed state of facts in relation to the transaction supported by that representation or assumed state of facts. The estoppel does not go beyond the transaction in which it arose. The representation or assumed state of facts are not to be held irrefutable beyond the purpose for which the representation or assumption was made. In the present context the representation is not made for the purpose of establishing its own truth but as a part of the whole transaction. An assumption is not to be treated as having the effect of an assumpsit.

However, I too would dismiss this appeal.

**JUDGMENTBY-4:** BRANDON L.J

**JUDGMENT-4:**

BRANDON L.J: In this judgment I shall refer to the various parties concerned by the same abbreviations as those used by Robert Goff J.,ante, p. 89H, in his judgment. That is to say that I shall refer to Amalgamated Investment and Property Company Ltd. as the plaintiffs; to Gleniston Garden Estates Ltd. as "Gleniston"; to Amalgamated (New Providence) Property Ltd. as "A.N.P.P."; to Burston and Texas Commerce

Bank Ltd. (later renamed Texas Commerce International Bank Ltd.) as "the bank"; and to Portsoken Properties Ltd. as "Portsoken." I shall also, like the judge, refer to the two loans made by the bank as "the Nassau loan" and "the U.K. loan" respectively.

The nature of the action, and the circumstances out of which it arises, are set out in detail in the full and comprehensive judgment of the judge, ante, p. 89H, and no useful purpose would be served by my repeating his account of these matters in my own judgment. The important thing which I consider that it is necessary to do, in order to consider the appeal which is before us, is to formulate with as much precision as is possible the two questions which arise for decision in it.

Those two questions should, in my view, be formulated as follows. First, did the plaintiffs, by the contract which they made with the bank in relation to the Nassau loan, undertake to the bank that they would discharge any indebtedness of A.N.P.P. to Portsoken? Secondly, if the plaintiffs did not so undertake, are they nevertheless estopped from denying that they did so by reason of the basis, accepted by both the bank and the plaintiffs, on which the transactions between them were later conducted during the period from 1974 to 1976?

The first question is raised by the defendants' respondents' notice dated September 16, 1980. The second question is raised by the plaintiffs' notice of appeal dated August 26, 1980. It is, however, logical to examine the two questions in the order in which I have stated them.

The making of the contract between the plaintiffs and the bank in relation to the Nassau loan took place in four stages. At the first stage, which occurred in July 1969, it was agreed, first, that the amount of the loan should be U.S. $3,000,000; secondly, that the loan should be made directly by the bank to Gleniston, one of the plaintiffs' wholly-owned subsidiaries in the Bahamas; thirdly, that the full amount of the loan should be taken up by June 30, 1970; and, fourthly, that the loan should be secured in two ways, first by a mortgage on a property in Nassau known as the Harrison Building, and, secondly, by a guarantee to be given by the plaintiffs.

At the second stage, which occurred in April 1970, it was agreed that the date for taking up the loan in full should be postponed from June 30. 1970, to December 31, 1970.

At the third stage, which occurred between May and September 1970, it was agreed that the contract should be varied in two respects. The first variation was that there should be substituted for Gleniston as the borrower another wholly-owned subsidiary of the plaintiffs in the Bahamas, namely A.N.P.P. The second variation was that the amount of the loan should be increased from U.S. $3,000,000 to U.S. $3,250.000. At this third stage, on September 28, 1970, there was signed on behalf of the plaintiffs, by way of security for any indebtedness of A.N.P.P. to the bank, a standard printed form of the bank entitled "Guarantee."

At the fourth stage, which occurred in December 1970, it was agreed that, instead of the loan being made directly by the bank to A.N.P.P., it should be channelled by the bank through Portsoken, a wholly-owned subsidiary of the bank in the Bahamas. The effect of so channelling the

loan through Portsoken was that the bank first lent the money to Portsoken and Portsoken then re-lent it to A.N.P.P. The sole reason for this change was that, if the bank had made the loan directly to A.N.P.P. as previously arranged, it would under Bahamian law have been obliged to register itself as trading in the Bahamas, and this would have involved it in complications in which it was not willing to be involved. There was no other purpose whatever for the change.

When the fourth stage in the making of the contract just described occurred, it would have been sensible for the bank to have required the plaintiffs to have signed on its behalf a fresh guarantee, the express terms of which would have covered beyond doubt the indebtedness of A.N.P.P. to Portsoken instead of their indebtedness to the bank. It is quite clear that, if the bank had required the plaintiffs to do this, the plaintiffs would willingly have complied with such requirement. In fact, however, the matter was overlooked by the bank, and the original document entitled "Guarantee," which had been signed on behalf of the plaintiffs at the third stage on September 28, 1970, and which I shall call "the guarantee," remained, ostensibly at any rate, unchanged.

Following the fourth stage, the bank (by certain indirect methods which are not material) lent the sum of U.S. $3,250,000 to Portsoken and Portsoken immediately re-lent it to A.N.P.P. At the same time, by way of security for the loan made by Portsoken to A.N.P.P., A.N.P.P. mortgaged the Harrison Building, of which it had by that time become the freehold owner, to Portsoken. All these transactions took place on December 30 and 31, 1970.

The guarantee, which is addressed to the bank, provides so far as material as follows:

"We, Amalgamated Investment and Property Co. Ltd... (hereinafter called 'the guarantor'), in consideration of your from time to time making or contributing loans or advances to or otherwise giving credit or affording banking accommodation or facilities to Amalgamated (New Providence) Property Ltd... (hereinafter called 'the principal'), hereby unconditionally guarantee and agree with you as follows: 1. The guarantor will pay to you on demand all moneys which now are or shall at any time or times hereafter be due or owing or payable to you on any account whatsoever by the principal...."

It was contended on behalf of the liquidator of the plaintiffs in the court below that, having regard to the terms of the guarantee as set out above, the plaintiffs never became contractually bound to the bank to discharge the indebtedness of A.N.P.P. to Portsoken, but only the indebtedness of A.N.P.P. to the bank. Robert Goff J. accepted this contention as correct. In my opinion, for reasons which I shall develop, the judge was in error in the conclusion which he reached on this matter.

The contract between the bank and the plaintiffs did not reach its final form until the fourth stage in the negotiations in December 1970, when it was agreed that the loan should be channelled from the bank to A.N.P.P. through Portsoken. It follows from this that the guarantee,

which formed part of the contract, falls to be interpreted by reference to the situation which then existed, rather than

the situation which existed earlier when the guarantee was signed on behalf of the plaintiffs at the third stage on September 28, 1970.

What then was the situation which existed when the contract between the bank and the plaintiffs relating to the Nassau loan was at last finalised in December 1970? It was that it had been decided that the bank should not make the loan available directly to A.N.P.P. as originally arranged, but indirectly through the medium of its wholly-owned subsidiary Portsoken,in such a manner that any indebtedness of A.N.P.P. to Portsoken was accompanied by an exactly corresponding indebtedness of Portsoken to the bank. It is by reference to that situation that the words in paragraph I of the guarantee, "moneys... due or owing or payable to you on any account whatsoever by the principal," fall to be construed, In my opinion, when those words are construed by reference to the situation which I have just described, they are wide enough to include moneys due or owing or payable by A.N.P.P. to Portsoken, which Portsoken are then immediately required to pass on, without deduction of any kind, to the bank.

On that ground it is my view that the plaintiffs did become contractually bound to the bank, on the basis of the guarantee, to discharge any indebtedness of A.N.P.P. to Portsoken. I would, therefore, answer the first of the two questions which I formulated earlier in the affirmative.

I turn now to examine the second of the two questions which I formulated earlier. That question is whether, supposing my answer to the first question is wrong, and the plaintiffs did not, by the contract which they made with the bank in relation to the Nassau loan, undertake to the bank to discharge an indebtedness of A.N.P.P. to Portsoken, the plaintiffs are, nevertheless, estopped from denying having done so by reason of the basis, accepted by both the plaintiffs and the bank, on which the transactions between them were conducted during the period from 1974 to 1976.

The judge answered this question in the affirmative and dismissed the claim of the plaintiffs in liquidation on that account. He based his decision on the question of estoppel on three matters. The first matter was that, from 1974 to 1976, both the bank and the plaintiffs conducted the transactions which took place between them in what must for present purposes be regarded as the mistaken belief that the guarantee relating to the Nassau loan effectively bound the plaintiffs to discharge any indebtedness of A.N.P.P. to Portsoken in respect of that loan. The second matter was that, although it had originally been due to the bank's own error that it came to hold its mistaken belief, the plaintiffs, being under the same mistaken belief themselves, by their conduct encouraged and reinforced the mistaken belief held by the bank. The third matter was that the bank, in reliance on the mistaken belief concerned, accorded various indulgences to, and refrained from exercising various rights against. the plaintiffs in a way which, but for the bank's mistaken belief, it would never have done.

The judge has set out in detail in his judgment, ante, pp. 95B - 99D, all the primary facts relevant to the question of estoppel. In what follows

I shall adopt his account of those facts in its entirety, without doing more than is absolutely necessary by way of repeating or summarising such account.

The Nassau loan was not the only loan made by the bank at the request of the plaintiffs. Following negotiations between the plaintiffs and the bank which took place during January, February and March 1970 the bank made a loan to the plaintiffs in England of U.S. $3,000,000 for a period of five years (the U.K. loan). That loan was secured by mortgages or sub-mortgages on a large number of properties in England, the value of which was thought to be such as to comply with the general practice of the bank to require 150 per cent. security for any loans which it made.

Nothing significant with regard to the U.K. loan occurred until June 1974, when a series of developments relating to it began and continued until 1976. These developments are set out in detail by the judge, ante, pp. 95B - 99D. The account there given fully substantiates the judge's finding at p. 99F - G that from 1974 to 1976 the bank and the plaintiffs conducted transactions between them in relation to the overall liability of the plaintiffs in respect of the U.K. and Nassau loans in the mistaken belief, common to both of them, that the guarantee relating to the Nassau loan bound

[1982] QB 84

the plaintiffs to discharge any indebtedness of A.N.P.P. to Portsoken in respect of that loan. It further fully substantiates his finding at pp. 100H - 101B that the bank, in reliance of that mistaken belief, granted various indulgences to, and refrained from exercising various rights against, the plaintiffs in a manner which, but for such belief, it would never have done.

Two main arguments against the existence of an estoppel were advanced on behalf of the plaintiffs both before Robert Goff J. and before us. The first argument was that, since the bank came to hold its mistaken belief in the first place as a result of its own error alone, and the plaintiffs had at most innocently acquiesced in that belief which it also held, there was no representation by the plaintiffs to the bank on which an estoppel could be founded. The second argument was that, in the present case, the bank was seeking to use estoppel not as a shield, but as a sword, and that that was something which the law of estoppel did not permit.

I consider first the argument based on the origin of the bank's mistaken belief. In my opinion this argument is founded on an erroneous view of the kind of estoppel which is relevant in this case.

The kind of estoppel which is relevant in this case is not the usual kind of estoppel in pais based on a representation made by A to B and acted on by B to his detriment. It is rather the kind of estoppel which is described in Spencer Bower and Turner, Estoppel by Representation, 3rd ed. (1977), at pp. 157-160, as estoppel by convention. The authors of that work say of this kind of estoppel, at p. 157:

"This form of estoppel is founded, not on a representation of fact made by a representor and believed by a representee, but on an agreed statement of facts the truth of which has been assumed, by the convention of the parties, as the basis of a transaction into which they are about to enter. When the parties have acted in their transaction

upon the agreed assumption that a given state of facts is to be accepted between them as true, then as regards that transaction each will be estopped as against the other from questioning the truth of the statement of facts so assumed."

Applying that description of estoppel by convention to the present case, the situation as I see it is this. First, the relevant transactions entered into by the plaintiffs and the bank were the making of new arrangements with regard to the overall security held by the bank in relation to both the U.K. and Nassau loans. Secondly, for the purposes of those transactions, both the bank and the plaintiffs assumed the truth of a certain state of affairs, namely that the guarantee given in relation to the Nassau loan effectively bound the plaintiffs to discharge any indebtedness of A.N.P.P. to Portsoken. The transactions took place on the basis of that assumption, and their course was influenced by it in the sense that, if the assumption had not been made, the course of the transactions would without doubt have been different.

Those facts produce, in my opinion, a classic example of the kind of estoppel called estoppel by convention as described in the passage from Spencer Bower and Turner, Estoppel by Representation, which I have quoted above, and so deprive the first argument advanced on behalf of the plaintiffs of any validity which, if the case were an ordinary one of estoppel by representation, it might otherwise have.

I turn to the second argument advanced on behalf of the plaintiffs, that the bank is here seeking to use estoppel as a sword rather than a shield, and that that is something which the law of estoppel does not permit. Another way in which the argument is put is that a party cannot found a cause of action on an estoppel.

In my view much of the language used in connection with these concepts is no more than a matter of semantics. Let me consider the present case and suppose that the bank had brought an action against the plaintiffs before they went into liquidation to recover moneys owed by A.N.P.P. to Portsoken. In the statement of claim in such an action the bank would have pleaded the contract of loan incorporating the guarantee, and averred that, on the true construction of the guarantee, the plaintiffs were bound to discharge the debt owed by A.N.P.P. to Portsoken. By their defence the plaintiffs would have pleaded that, on the true construction of the guarantee, the plaintiffs were only bound to discharge debts owed by A.N.P.P. to the bank, and not debts owed by A.N.P.P. to Portsoken. Then in their reply the bank would have pleaded that, by reason of an estoppel arising from the matters discussed above, the plaintiffs were precluded from

[1982] QB 84

questioning the interpretation of the guarantee which both parties had, for the purpose of the transactions between them, assumed to be true.

In this way the bank, while still in form using the estoppel as a shield, would in substance be founding a cause of action on it. This illustrates what I would regard as the true proposition of law, that, while a party cannot in terms found a cause of action on an estoppel, he may, as a result of being able to rely on an estoppel, succeed on a cause of action

on which, without being able to rely on that estoppel, he would necessarily have failed. That, in my view, is, in substance, the situation of the bank in the present case.

It follows from what I have said above that I would reject the second argument against the existence of an estoppel put forward on behalf of the plaintiffs as well as the first. It further follows, from my rejection of both arguments against the existence of an estoppel, that I would answer the second of the two questions which I formulated earlier by holding that, if the plaintiffs did not, by the contract relating to the Nassau loan, undertake to the bank to discharge any indebtedness of A.N.P.P. to Portsoken, they are, nevertheless, estopped from denying that they did so by reason of the basis, accepted by both the bank and the plaintiffs, on which the transactions between them were later conducted during the period from 1974 to 1976.

Since I have, for the reasons which I have given, answered both the questions which I formulated earlier in my judgment in the affirmative, it follows that, in my opinion, the appeal of the plaintiffs in liquidation fails and must be dismissed.

[Reported by ISOBEL COLLINS, Barrister-at-Law]

A. H. B.

(C)2001 The Incorporated Council of Law Reporting for England & Wales

**DISPOSITION:**

Judgment for defendants.

Liberty to apply in relation to order for costs.

Appeal dismissed with costs in Court of Appeal and below.

Leave to appeal refused.

**SOLICITORS:**

Solicitors: Allen & Overy; Nabarro Nathanson.

Solicitors: Allen & Overy; Nabarro Nathanson.

December 10. The Appeal Committee of the House of Lords (Lord Diplock, Lord Keith of Kinkel and Lord Scarman) dismissed a petition by the plaintiffs for leave to appeal.

Copyright © 2001 The Incorporated Council of Law Reporting for England & Wales



18 of 19 DOCUMENTS

Crabb v Arun District Council

COURT OF APPEAL, CIVIL DIVISION

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

**HEARING-DATES:** 18, 21, 22, 23 JULY 1975

23 JULY 1975

**CATCHWORDS:**

Estoppel - Estoppel in pais - Estoppel by conduct - Conduct leading representee to act to his detriment - Knowledge that representee intending to act in that way - Right of way - Assurance by representor that he would grant right of way over his land to and from representee's land - Representor constructing gates to allow access to way - Representor doing nothing to indicate intention to resile from assurance - Representee selling adjoining plot of land without reserving right of way to retained land - Representee believing that he had or would be granted right of way over representor's land - Representor knowing of representee's intention to sell adjoining land but having no knowledge of actual sale - Effect of denial of right of way to deny representee access to retained land - Whether representor estopped from denying that representee entitled to right of way.

**HEADNOTE:**

In 1946 A purchased 5 1/2 acres of land south of a public highway.  A divided the land into two plots and erected commercial and industrial premises on the two acre plot adjoining the eastern boundary.  The northern portion of the two acre plot was adjacent to the highway, but the southern portion had no separate access to the highway.  A made a new road on the two acre plot connecting the front and rear portions.  In 1962, after A's death, his executors obtained planning permission to erect dwelling-houses on the remaining 3 1/2 acre plot.  The plan included a proposal to construct a new estate road running along the boundary between the 3 1/2 acre plot and the two acre plot.  The executors sold the two acre plot to the plaintiff in 1965.  In the conveyance the executors agreed to erect a fence along the boundary line between the two plots with a gap at a point ('point A') in the northern portion of the two acre plot which would allow access from the two acre plot on to the proposed new road.  The executors also granted the plaintiff a right of access at point A to the new road and a right of way along it to the highway.  In 1966 the executors sold the 3 1/2 acre plot to the defendants, the local district council, but expressly reserved the rights of access and way granted to the plaintiff.  The defendants undertook to erect the fence on the boundary line save for a gap at point A.  In 1967 the plaintiff decided to split up the two portions of the two acre plot and sell them off separately.  At a meeting with a representative of the defendants in July 1967 he explained his plan and pointed out that he would need access to the new road at another point ('point B') to serve the southern portion.  The defendants' representative gave the plaintiff an assurance that that would be acceptable to the defendants.  Although no formal grant was made to the plaintiff of any

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

access at point B or easement over the new road, the parties thereafter acted in the belief that he had or would be granted such a right.  In early 1968 the defendants erected the boundary fence and constructed gates at points A and B; the gates were clearly intended to be permanent.  In September 1968 the plaintiff agreed to sell the northern portion. However, in the belief that he had a right of access to the southern portion at point B, he did not reserve for himself as owner of the southern portion any right of way over the northern portion to point A.  In January 1969, however, the defendants removed the gates at point B and closed up the access by extending the fence across the gap.  They offered to grant a right of access and an easement on payment of £ 3,000 by the plaintiff.  The plaintiff was unwilling to pay and accordingly, without any access, the southern portion was rendered useless to him.  In 1971 he began proceedings claiming a declaration that he was entitled to a right of way from the southern portion along the new road and an injunction restraining the defendants from interfering with his enjoyment of the way.

Held - (i) The defendants were estopped from denying that the plaintiff had a right of access at point B and a right of way from point B to the public highway since by their words and conduct, i e by the assurance made by their representative at the July 1967 meeting, by the erection of the gates at point B and by their failure over a period of 13 1/2 months to give any indication that they might resile from their assurance, they had led the plaintiff to act to his detriment by selling the northern portion of the land without reserving a right of way over it from the southern portion. It was immaterial that the defendants had not had notice in September 1968 that the plaintiff was about to sell the northern portion since they had known all along that it was his intention to do so (see p 871 f, p 872 c to g, p 874 a b and j to p 875 a and p 879 a to f and h to p 880 a, post).

(ii) It followed that the plaintiff had in equity a right of access from point B to the highway and would be entitled to an injunction to enforce that right, which in normal circumstances would be granted on terms that he made a contribution to the cost of constructing the access.  However, since the southern portion had been rendered useless for a period of years as a result of the defendants' conduct, the plaintiff had suffered damage which exceeded any sum which he could reasonably have been expected to pay towards the cost.  Accordingly he was entitled to a right of access without making any payment to the defendants and would be granted the declaration and injunction sought (see p 872 h to p 873 b, p 875 a to c and p 880 d to h, post).

Ramsden v Dyson (1866) LR 1 HL 129, dictum of Fry J in Willmott v Barber (1880) 15 Ch D at 105, Inwards v Baker [1965] 1 All ER 446 and ER Ives Investments Ltd v High [1967] 1 All ER 504 applied.

**NOTES:**

For estoppel by conduct, see 15 Halsbury's Laws (3rd Edn) 235-243, paras 440-450, and for cases on the subject, see 21 Digest (Repl) 411-461, 1310-1601.

**CASES-REF-TO:**

Attorney-General to His Royal Highness the Prince of Wales v Collom [1916] 2 KB 193, 85 LJKB 1484, 114 LT 1121, 21 Digest (Repl) 453, 1553.
Bank Negara Indonesia v Philip Hoalim (1973) 2 MLJ 3, PC.
Beaufort (Duke) v Patrick (1853) 17 Beav 60, 1 Eq Rep 41, 22 LJCh 489, 21 LTOS 296, 17 Jur 682, 7 Ry & Can Cas 906, 51 ER 954, 21 Digest (Repl) 480, 1686.
Birmingham and District Land Co v London and North Western Railway Co (1888) 40 Ch D 268, [1886-90] All ER Rep 620, 60 LT 527, CA, 31 Digest (Reissue) 856, 7089.
Campbell Discount Co Ltd v Bridge [1961] 2 All ER 97, [1961] 1 QB 445, [1961] 2 WLR 596, CA; on appeal sub nom Bridge v Campbell Discount Co Ltd [1962] 1 All ER 385, [1962] AC 600, [1962] 2 WLR 439, HL, Digest (Cont Vol A) 648, 39a.
Central London Property Trust Ltd v High Trees House Ltd [1956] 1 All ER 256, [1947] KB 130, [1947] LJR 77, 175 LT 332, 21 Digest (Repl) 376, 1133.
Hughes v Metropolitan Railway Co (1877) 2 App Cas 439, [1874-80] All ER Rep 187, 46 LJQB 583, 36 LT 932, 42 JP

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

421, HL, 21 Digest (Repl) 392, 1221.

Inwards v Baker [1965] 1 All ER 446, [1965] 2 QB 29, [1965] 2 WLR 212, CA, Digest (Cont Vol B) 242, 1552a.

Ives (ER) Investments Ltd v High [1967] 1 All ER 504, [1967] 2 QB 379, [1967] 2 WLR 789, CA, Digest (Cont Vol C) 339, 1222a.

Moorgate Mercantile Co Ltd v Twitchings [1975] 3 All ER 314 [1975] 3 WLR 286, CA.

Plimmer v Mayor of Wellington (1884) 9 App Cas 699, [1881-85] All ER Rep 1320, 53 LJPC 105, 51 LT 475, PC, 11 Digest (Reissue) 129, * 98.

Ramsden v Dyson (1866) LR 1 HL 129, 12 Jur NS 506, HL, 21 Digest (Repl) 453, 1551.

Rickards (Charles) Ltd v Oppenheim [1950] 1 All ER 420, [1950] 1 KB 616, CA, Digest (Cont Vol A) 287, 2708a.

Siew Soon Wah (alias Siew Pooi Yong) v Young Tong Hong [1973] AC 836, [1973] 2 WLR 713, PC.

Willmott v Barber (1880) 15 Ch D 96, 49 LJCh 792, 43 LT 95; on appeal (1881) 17 Ch D 772, CA, 31(2) Digest (Reissue) 703, 5748.

**CASES-CITED:**

Ajayi (Emmanuel Ayodeji) (trading under the name and style of The Colony Carrier Co) v R T Briscoe (Nigeria) Ltd [1964] 3 All ER 556, [1964] 1 WLR 1326, PC.

City and Westminster Properties (1934) Ltd v Mudd [1958] 2 All ER 733, [1959] Ch 129.

Rochdale Canal Co v King (1853) 16 Beav 630.

Ward v Kirkland [1966] 1 All ER 609, [1967] Ch 194.

Woodhouse AC Israel Cocoa Ltd SA v Nigerian Produce Marketing Co Ltd [1972] 2 All ER 271, [1972] AC 741, HL.

**INTRODUCTION:**

Appeal. This was an appeal by the plaintiff, Victor Crabb, against the judgment of Pennycuick V-C dated 29th January 1974 dismissing the plaintiff's action against the defendants, Arun District Council (formerly Chichester Rural District Council), in which the plaintiff claimed (i) a declaration that he was entitled to a right of way along a roadway constructed by the defendants at Windmill Park, Hook Lane, Pagham in the county of Sussex and across a strip of land owned by the defendants, at a point marked 'B' on the plan annexed to the writ, to the plaintiff's property known as the rear building and land at Windmill Park and back over the way for himself, his servants and licensees on foot and with horses, carriages, motor vehicles and other conveyances at all times and for all purposes; (ii) an injunction restraining the defendants by themselves or by their servants or agents or otherwise from placing or allowing to be placed on the way anything substantially restricting, preventing or otherwise interfering with the reasonable enjoyment of the way by the plaintiff, his servants and licensees on foot and with horses, carriages, motor vehicles and other conveyances at all times and for all purposes and from doing any act whereby the plaintiff might be hindered or obstructed in the free use thereof; and (iii) damages. The facts are set out in the judgment of Lord Denning MR.

**COUNSEL:**

Peter Millett QC and Anthony Templement for the plaintiff. Gavin Lightman for the defendants.

**PANEL:** LORD DENNING MR, LAWTON AND SCARMAN LJJ

**JUDGMENTBY-1:** LORD DENNING MR.

**JUDGMENT-1:**

LORD DENNING MR. This case cannot be properly understood without a map, but I will try to explain it as best I can. Near Bognor Regis there is a village called Pagham. There is a road there called Hook Lane running east and west. On the south side of that road there is an area of land called Windmill Park. In 1946 a Mr Alford brought 5 1/2 acres of it. It formed a big square field with its north side next to the road. Now you must imagine that big field

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

divided into two parts by a ine running from north to south, with two acres on the eastern side of the line and 3 1/2 acres on the western side; and the two acres divided by a line horizontally into two halves, the front portion (one acre) being next to the road and the back portion (one acre) with no access to the road.  Mr Alford developed the two acres and left the other 3 1/2 acres undeveloped.  On these two acres Mr Alford put two industrial buildings.  On the front portion he erected offices and showrooms.  On the back portion he erected a building for the manufacture of caravans.  And he made a road on these two acres connecting the back to the front.

In 1962 Mr Alford died.  His executors decided to develop the remaining 3 1/2 acres on the western side of the field.  They obtained planning permission to erect dwelling-houses on it.  Under this proposal there was to be a new estate road made to give access from Hook Lane to the new housing estate.  It was to be made on the 3 1/2 acres, but was to run alongside the boundary line between the 3 1/2 acres and the two acres.  It was to be called Mill Park Road.  This road was to be to the advantage also of the buildings on the two acre portion because they could have access on to the near road.  The proposal at that time was, however, that there should be only one access from the two acres on to the new road.  This was to be at a point marked 'A' on the map, in the front portion, about half-way up from Hoo Lane.  It was thought at that time that one access would be sufficient because the whole of the two acres was in one occupation.  The vehicles from the back portion (where carvans were made) could go along their own existing road to the front portion (where caravans were made) could go along their own existing road to the front portion (where the offices and showrooms were), and then out at point A.  This was to be the only access to the two acres.  The previous access (from a side lane) was to be closed.

Planning permission was given for this development.  But the executors of Mr Alford did not carry it out themselves.  They sold the two acres to the plaintiff, Mr Crabb; and they sold the 3 1/2 acres to the defendants, Chichester Rural District Council ('the council').  The conveyances are of importance.  By a conveyance dated 1st September 1965 the executors of Mr Alford sold the whole of the two acres with the two industrial buildings to Mr Crabb, and in the conveyance they agreed to erect a fence 5 ft 6 ins high along the boundary line, save for the access gap at point A.  They also granted him a right of access at point A to Hook Lane.  By a conveyance dated 8th December 1966 the executors of Mr Alford sold the 3 1/2 acres to the council, but they expressly reserved the right (which they had already granted to Mr Crabb) for the owner of the two acres to have access at point A to the proposed new road and a right of way along it to Hook Lane.  In the same deed the council agreed to erect the fence 5 ft 6 ins high along the boundary line, save for the access gap at point A.

So on the conveyances the owners and occupiers of the two acres had a right of access along at one point, namely point A (halfway up the front portion).  It was shown on the map as a gap about 20 ft wide; and from that point they had a right of way along the the proposed newestate road, to get to Hook Lane.  The council were to erect a close-boarded fence 5 ft 6 ins high along the whole boundary between the two acres and the 3 1/2 acres, except for the 20 ft gap at point A.

In 1967 Mr Crabb had a new idea about his two acres.  He thought it would be dedesirable to split up the two portions and sell them separately for separate use.  The front portion (with the offices and showrooms) was clearly separated from the back portion (with the manufacturing).  But, if they were split up, he would need another access.  The access at point A would serve the front portion.  But he would need another access at another point (to be called point B) so as to serve the back portion, together with a right of way along the new estate road from point B to Hook Lane.

By this time Mr Crabb had engaged as his architect Mr Aford, who was the son of the original owner of the land.  On 2nd June 1967 Mr Alford, as architect for Mr Crabb, wrote this letter to the engineer of Chichester Council:

'For the attention of Mr. Stonier:

'Dear Sir...

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

'It would appear that Mr. Crabb may require two entraces off the new road, one to each of his two buildings.  If you could let me know when you hope to set this fence line out I would be glad of the opportunity of meeting a respresentative of your Department on the site so that these matters can be finally settled and the line of the fence agreed...'

In pursuance of that letter there was a meeting on 26th July 1967, which was attended by Mr Crabb and his architect, Mr Alford, and by a representative of the council.  There is no written note of what took place.  Both Mr Crabb and his architect, mr Alford, gave evidence about the meeting, but unfortunately the council gave no evidence about it.  The council undoubtedly had a representative there, but we do not know who it was.  The engineer, Mr Stonier, said that he himself was not present.  The only other person who might have represented the council was a Mr Queen.  He is in Canada and not available togive evidence.  But there is no doubt that they agreed the line of the fence which was to separate Mr Crabb's land from the council's land.  There is also no doubt that there was an agreement in principle that Mr Crabb should have, not only the access at point A, but also an additional access at point B, so as to give access from the back portion of his land on to the new estate road.  Mr Crabb said that the council's representative made a firm commitment for a second access at B, but the judge said that Mr Crabb was rather over-saguine.  The judge preferred the evidence of Mr Alford, who was rather more cautious.  Mr Alford said: 'I thought we had got final agreement in that there was to be access at point B, but I saw further processes beyond the meeting.' He foresaw, no doubt, that there might have to be a document drawn up between the solicitors.  Later on, in his evidence, Mr Alford was asked whether there was to be any payment for this additional access.  He said: 'The normal anticipation at that time would be that some consideration would be demanded.' But the council's representative did not ask for any payment.  Mr Alford said: 'My strong feeling is we would not be asked to pay that consideration when talking to the plaintiffs in 1967.'

Summing up the evidence, as accepted by the judge, the result of the meeting on 22nd July 1967 was that there was an agreement in principle that Mr Crabb should have an additional access at point B to the land, because it was envisaged that he would sell his two acres of land in two portions; the front portion with access at point A to the new road, and the back portion, with access at point B to the new road.  But the judge found there was no definite assurance to that effect; and, even if there had been, it would not have been binding in th absence of either writing or consideration.  In order to be binding, there would have to be the legal processes foreseen by Mr Alford.

As it happened, no legal processes were gone through.  The council made no formal grant to Mr Crabb of any access at point B or any easement over the new road.  Nevertheless the parties acted in the belief that he had or would be granted such a right.  During the winter of 1967 the council erected a fence along the line of the agreed boundary, but they left gaps at point A with access to the front portion of Mr Crabb's land and at point B with access to the back portion.  These two gaps were used by lorries which went in and out at points A and B as if they were exits and entrances.  It was creating such a mess and disturbance of Mr Crabbhs land that there was a meeting on the site on 31st January 1968, at which the council agreed that they would undertake a tidying-up operation; and they did so.

On 6th February 1968 there was an important development.  The council gave orders for gates to be constructed at points A and B, and they were in fact constructed.  We have before us the contractors' account dated 30th March 1968.  The contractors erected a fence 5 ft 6 in high all the way along the boundary, but they put gates in the fence at points A and B.  At point A they erected a pair of oak close-boarded gates 18 ft wide, 5 ft 6 ins high, complete with posts and fittings, at a cost of £ 117 5s 6d.  At point B they erected a similar pair 12 ft 3 ins wide and 5 ft 6 ins high, at a cost of £ 76 6s od.  The gateposts were set firmly in concrete at points A and B, and were clearly intended to be permanent.

Some months later, in the autumn of 1968, Mr Crabb agreed to sell the front portion of his land to a purchaser and assigned to the purchaser the right of access at point A.  But, here is the important matter, in the conveyance of the front portion of 4th October 1965, Mr Crabb did not reserve any right for himself (as the owner of the back portion) to go over the front portion so as to get out at point A.  Mr Crabb thought that he already had a right of access at point B (where gates had already been erected) and so he did not need to reserve any right to get to point A.  The judge found:

'... Mr Crabb believed that he had an assurance by the Council that he would have access at point B from the

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

Council's land and was content to rely on that assurance.  He did not reserve any right of access [across the front portion.  He] would not have been prepared to proceed with the sale of the [front portion to the purchaser] without reserving access over it... if he had not believed... that he would have access [at point B] over the Council's land.'  But then, in January 1969, there was a new development.  Mr Crabb put a padlock on the inside of the gate at point B.  The council were incensed by this, but they did not say a word to Mr Crabb.  They went on to his land.  They took down the gates at point B.  They pulled them out of the concrete.  They took them away and filled the gap with extra posts and a close-boarded fence to match the existing fence.  In short, they shut up the access at point B.  The judge said: 'The council gave no notice to Mr Crabb of its intention to take this step: It seems to me that it was a discourteous and high-handed act.'

It is that action, depriving Mr Crabb of his access, which has led to all the trouble.  Mr Crabb sought to settle the matter by agreement.  The council did not object to his having access at point B and an easement to serve the back portion of the land, but the council wanted £ 3,000 for it.  This was more than Mr Crabb was willing to pay.  So no agreement was reached.  In consequence this back portion of land has been rendered sterile.  Mr Crabb has been unable to sell it or make use of it because it has no outlet anywhere.

In June 1971 Mr Crabb brought this action claiming a right of access at point B and a right of way along the estate road.  He had no such right by any deed or conveyance or written agreement.  So, in strict law, on the conveyance, the council were entitled to their land, subject only to an easement at point A, but none at point B.  To overcome this strict law, Mr Crabb claimed a right of access at B on the ground of equitable estoppel, promissory or proprietary.  The judge held that he could not avail himself of any estoppel.  He said: 'In the absence of a definite assurance by the representative of the Council, no question of estoppel can arise, and that really concludes the action.' Mr Crabb appeals to this court.

When counsel for Mr Crabb said that he put his case on an estoppel, it shook me a little, because it is commonly supposed that estoppel is not itself a cause of action.  But that is because there are estoppels and estoppels.  Some do give rise to a cause of action.  Some do not.  In the species of estoppel called proprietary estoppel, it does give rise to a cause of acton.  We had occasion to consider it a month ago in Moorgate Mercantile Co Ltd v Twitchings n1 where I said n2 that the effect of estoppel on the true owner may be that --

    n1 [1975] 3 All ER 314, [1975] 3 WLR 286

    n2 [1975] 3 All ER at 323, [1975] 3 WLR at 297

'his own title to the property, be it land or goods, has been held to be limited or extinguished, and new rights and interests have been created therein.  And this operates by reason of his conduct -- what he has led the other to believe -- even though he never intended it.'
The new rights and interests, so created by estoppel, in or over land, will be protected by the courts and in this way give rise to a cause of action.  This was pointed out in Spencer Bower and Turner on Estoppel by Representation n3.

    n3 2nd Edn (1966), pp 279-282

The basis of this proprietary estoppel -- as indeed of promissory estoppel -- is the interposition of equity.  Equity comes in, true to form, to mitigate the rigours of strict law.  The early cases did not speak of it is 'estoppel'.  They spoke of it as 'raising an equity'.  If I may expand that, Lord Cairns said in Hughes v Metropolitan Railway Co n4: '... it is the first principle upon which all Courts of Equity proceed...' that it will prevent a person from insisting on his strict legal rights -- whether arising under a contract, or on his title deeds, or by statute -- when it would be inequitable for him to do so having regard to the dealings which have taken place between the parties.  What then are the dealings which will preclude him from insisting on his strict legal rights?  If he makes a binding contract that he will not insist on the strict legal position, a court of equity will hold him to his contract.  Short of a binding contract, if he makes a promise that he

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

will not insist on his strict legal rights -- even though that promise may be unenforceable in point of law for want of consideration or want of writing -- and if he makes the promise knowing or intending that the other will act on it, and he does act on it, then again a court of equity will not allow him to go back on that promise: see Central London Property Trust v High Trees House n5, Charles Rickards v Oppenheim n6. Short of an actual promise, if he, by his words or conduct, so behaves as to lead another to believe that he will not insist on his strict legal rights -- knowing or intending that the other will act on that belief -- and he does so act, that again will raise an equity in favour of the other, and it is for a court of equity to say in what way the equity may be satisfied. The cases show that this equity does not depend on agreement but on words or conduct. In Ramsden v Dyson n7 Lord Kingsdown spoke of a verbal agreement 'or what amounts to the same thing, an expectation, created or encouraged'. In Birmingham Land Co v London and North Ewestern Railway n8 Cotton LJ said that '... what passed did not make a new agreement but what took place... raised an equity against him'. And it was the Privy Council who said that 'the Court must look at the circumstances in each case to decide in what way the equity can be satisfied', giving instances: see Plimmer v Mayor of Wellington n9.

n4 (1877) 2 App Cas 439 at 448, [1874-80] All ER Rep 187 at 191

n5 [1956] 1 All ER 256, [1947] KB 130

n6 [1950] 1 All ER 420 at 423, [1950] 1 KB 616 at 623

n7 (1866) LR 1 HL 129 at 170

n8 (1888) 40 Ch D 268 at 277, [1886-90] All ER Rep 620 at 622

n9 (1884) 9 App Cas 699 at 713, 714, [1881-5] All ER Rep 1320 at 1325, 1326

Recent cases afford illustrations of the principle. In Inwards v Baker n10 it was held that, despite the legal title being in the plaintiffs, the son had an equity to remain in the bungalow 'as long as he desired to use it as his home'. Danckwerts J said n1: '... equity protects him so that an injustice may not be perpetrated.' In ER Ives Investments Ltd High n2 it was held that Mr High and his successors had an equity which could only be satisfied by allowing him to have a right of access over the yard, 'so long as the block of flats has its foundations on his land'. In Siew Soon Wah v Young Tong Hong n3 the Privy Council held that there was an 'equity or equitable estoppel protecting the defendant in his occupation for 30 years'. In Bank Negara Indensia v & Philip Hoalim n4 the Privy Council held that, despite the fact that he had no protection nder the Rent Acts, he had an equity to remain 'so long as he continued to practise his profession'.

n10 [1965] 1 All ER 446, [1965] 2 QB 29

n1 [1965] 1 All ER at 449, 450, [1965] 2 QB at 38

n2 [1967] 1 All ER 504, [1967] 2 QB 379

n3 [1973] AC 836

n4 (1973) 2 MLJ 3

The question then is: were the circumstances here such as to raise an equity in favour of Mr Crabb? True the council on the deeds had the title to their land, free of any access at point B. But they led Mr Crabb to believe that he had or would be granted a right of access at point B. At the meeting of 26th July 1967, Mr Alford and Mr Crabb told the council's representative that Mr Crabb intended to split the two acres into two portions and wanted to have an access at point B for the back portion, and the council's representative agreed that he should have this access. I do not think the council can avoid responsibility by saying that their representative had no authority to agree this. They entrusted him

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

with the task of setting out the line of the fence and the gates; and they must be answerable for his conduct in the course of it: see Attorney-General to His Royal Highness the Prince of Wales v Collom n5; Moorgate Mercantile Co Ltd v Twitchings n6.

n5 [1916] 2 KB 193 at 207

n6 [1975] 3 All ER at 324, [1975] 3 WLR at 298

The judge found that there was 'no definite assurance' by the council's representative, and 'no firm commitment', but only an 'areement in principle', meaning I suppose that, as Mr Alford said, there were 'some further processes' to be gone through before it would become binding. But if there were any such processes in the minds of the parties, the subsequent conduct of the council was such as to dispense with them. The council actually put up the gates at point B at considerable expense. That certainly led Mr Crabb to believe that they had agreed that he should have the right of access through point B without more ado.

The judge also said that, to establish this equity or estoppel, the council must have known that Mr Crabb was selling the front portion without reserving a right of access for the back portion. I do nt think this was necessary. The council knew that Mr Crabb intended to sell the two portions separately and that he would need an access at point B as well as point A. Seeing that they knew of his intention -- and they did nothing to disabuse him, but rather confirmed it by erecting gates at point B -- it was their conduct which led him to act as he did; and this raises an equity in favour against them.

In the circumstances it seems to me inequitable that the council should insist on their strict title as they did; and to take the high-handed action of pulling down the gates without a word of warning; and to demand of Mr Crabb £ 3,000 as the price for the easement. If he had moved at once for an injunction in aid of his equity -- to prevent them removing the gates -- I think he should have been granted it. But he did not do so. He tried to negotiate terms, but these failing, the action has come for trial. And we have the question: in what way now should the equity be satisfied?

Here equity is displayed at its most flexible: see Snellhs Equity n7 and the illustrations there given. If the matter had been finally settled in 1967, I should have thought that, although nothing was said at the meeting in July 1967, nevertheless it would be quite reasonable for the council to ask Mr Crabb to pay something for the access at point B, perhaps -- and I am guessing -- some hundreds of pounds. But, as counsel for the plaintiff pointed out in the course of the argument, because of the council's conduct, the back land has been landlocked. It has been sterile and rendered useless for five or six years; and Mr Crabb has been unable to deal with it during that time. This loss to him can be taken into account. And at the present time, it seems to me that, in order to satisfy the equity, Mr Crabb should have the right of access at point B free of charge without paying anything for it.

n7 27th Edn (1973), p 568

I would, therefore, hold that Mr Crabb, as the owner of the back portion, has a right of access at point B over the verge on to Mill Park Road and a right of way along that road to Hook Lane without paying compensation. I would allow the appeal and declare that he has an easement, accordingly.

**JUDGMENTBY-2:** LAWTON LJ.

**JUDGMENT-2:**

LAWTON LJ. In my judgment this appeal turns on the answer to one question. At the meeting on 26th July 1967 between the plaintiff and his architect, Mr Alford, on one side, and the representative of the defendants on the other, did the parties agree that the plaintiff should have access on to the road at point B? The learned judge decided that although

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

there had been what he called an agreement in principle, there had been no firm undertaking.  He then said in the course of his judgment: 'In the absence of a definite assurance by the representative of the [defendants], no question of estoppel can arise...' If he was justified in his finding on the evidence, I would agree.  Counsel for the plaintiff pointed out in the course of his submissions that his first task would be to satisfy this court that the learned judge was wrong in coming to the conclusion that he did.  At the trial the defendants by their counsel suggested that there had been no such agreement as was alleged about the right of access at point B.  The plaintiff gave evidence to the contrary effect.  He was definite that there had been such an agreement and he must, I think, be taken to have believed there was because his subsequent behaviour in selling without reserving any right of way would have been gross folly if he had not believed that he had been given a right of access at point B.  The architect, Mr Alford, gave evidence firmly to the same effect in examination-in-chief.  In cross-examination it was suggested to him that the arrangement about which he was testifying was unusual.  He made various answers accepting in part that an arrangement of this kind without documents and the intervention of solicitors would be unusual.  For me the problem has been whether, looking at his evidence as a whole, he resiled from the position which the plaintiff had taken up and he himself had taken up in his examination-in-chief.  In my judgment taking the evidence as a whole, he did not.  He was sure all the way through that, however informal the arrangement might have been, however much it would require to be formalised by solicitors, nevertheless there had been a clear undertaking by the defendants' representative that there would be granted to the plaintiff access at point B.  So I can start my judgment by saying that I am of the opinion that the learned judge was wrong in his assessment of the evidence.

The next problem is: what are the legal consequences of finding as I do that there had been a firm undertaking by the defendants that access would be granted at point B?  This necessitates considering principles of equity and applying them to the facts of this case.  Before doing so I have reminded myself of what Harman LJ said in Campbell Discount Co Ltd v Bridge n1:

n1 [1961] 2 All ER 97 at 103, [1961] 1 QB 445 at 459

'Equitable principles are, I think, perhaps rather too often bandied about in common law courts as though the Chancellor still had only the length of his own foot to measure when coming to a conclusion.  Since the time of LORD ELDON the system of equity for good or evil has been a very precise one, and equitable jurisdiction is exercised only on well-known principles.'
I start with a firm agreement between the plaintiff on one side, and the defendants' representative on the other, to the effect I have already indicated.  From then onwards there can be no doubt whatsoever that the plaintiff believed that he had got a firm undertaking from the defendants and he acted as if he had.  In so doing he prejudiced his own position greatly by selling off the front portion of his land and failing to retain a right of way over it.  It is also clear on the evidence, and was so found by the judge, that when the agreement was made the defendants knew that the plaintiff wanted access at point B because he intended to sell off part of his land.

What did the defendants believe had happened on 26th July 1967?  The facts speak for themselves.  In 1968 the defendants started to put up the fence between their own land and the plaintiff's land, as they were bound to do under the conveyance by which the plaintiff had transferred the land.  When they did put up the fence they left gaps for gates at points A and B.  Clearly they intended to provide a point of access at B.  This could only have been done because they knew their representative had given an undertaking that the plaintiff could have access at point B.  On 6th February 1968 they ordered gates for point B at a cost of £ 76.  They were laying out the ratepayers' money to provide gates.  Why should they have done that unless they had entered into an agreement to do it?  It was suggested at the trial that they were laying out the ratepayers' money in anticipation that at some future time the plaintiff would approach them for the purpose of entering into an agreement with regard to the provision of access.  That would not have been sensible.  Had there been doubt about what had been decided on 26th July 1967, I should have expected them to have written to the plaintiff asking whether he wanted them to erect gates and how much he would be willing to pay for the gates and a grant of access.  They did not write; they made no enquiries.  They erected the gates.  If they were behaving responsibly, the inference is that they put the gates where they did because they knew that there had been an

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

undertaking that they would put them there.  After the gates had been erected at point B the plaintiff altered his position in a way which proved disastrous for him in the short term.  Then the defendants behaved in a manner which the learned judge described in restrained terms as high-handed and discourteous.  I am surprised that a local authority should have behaved in the way this local authority did.  They had gone back on the firm undertaking which they had given through their representative to the plaintiff on 26th July 1967; and they had so behaved without a word of warning, explanation or apology.  Since then they have asked the plaintiff to pay a very substantial sum of money -- close on £ 4,000 -- in order to provide him with that which their representative had undertaken to provide on 26th July 1967.

I ask myself whether any principle of equity applies.  I am grateful to counsel for the defendants for having drawn our attention this morning to Ramsden v Dyson n1.  If there had been any doubt in my mind about the application of principles of equity to the facts as I have recounted them, that case would have dissipated it.  As was pointed out to counsel for the defendants in the course of the argument, if one changes the parties in a passage in the speech of Lord Cranworth LC n2 into the names of the parties in this case, one has a case for the intervention of equity which Lord Cranworth regarded with favour.  The passage to which I refer is in these terms:

n1 (1866) LR 1 HL 129

n2 LR 1 HL at 142

'... if I had come to the conclusion that Thornton, when he erected his building in 1837, did so in the belief that he had against Sir John as absolute right to the lease he claims, and that Sir John knew that he was proceeding on that mistaken notion, and did not interfere to set him right, I should have been much disposed to say that he was entitled to the relief he sought.'

The answer of counsel for the defendants was that the plaintiff had not got an absolute right to have the gates put up.  For the reasons I have stated, I am of the opinion that he had in the sense that he had been given a firm undertaking.  The defendants, knowing that the plaintiff intended to sell part of his land, stood by when he did so and, without a word of warning, allowed him to surround himself with a useless price of land from which there was no exit.  I would allow this appeal and grant relief in the terms indicated by Lord Denning MR.

In conclusion I should add this.  As the result of the defendants resiling from their undertaking, this piece of land which is designated for light industry has stood useless.  It might well have been profitable not only in the interests of the plaintiff but in the interests of other people living nearby.  In an area where employment for the young is not always easy to find, we have the spectacle of this piece of land next door to a housing estate being rendered useless at a time when it could have been of value to the community.  For that the defendants are solely to blame.

In the circumstances I agree with Lord Denning MR that they should not be paid anything for the right of way which they should have granted as long ago as 1967.

**JUDGMENTBY-3:** SCARMAN LJ.

**JUDGMENT-3:**

SCARMAN LJ.  I agree that the appeal should be allowed.

The plaintiff and the defendants are adjoining landowners.  The plaintiff asserts that he has a right of way over the defendants' land giving access from his land to the public highway.  Without this access his land is in fact landlocked, but, for reasons which clearly appear from the narration of the facts already given by Lord Denning MR and Lawton LJ, the plaintiff cannot claim a right of way by necessity.  The plaintiff has no grant.  He has the benefit of no enforceable contract.  He has no prescriptive right.  His case has to be that the defendants are estopped by their conduct from denying him a right of access over their land to the public highway.  If the plaintiff has any right, it is an equity arising

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

out of the conduct and relationship of the parties.  In such a case I think it is now well-settled law that the court, having analysed and assessed the conduct and relationship of the parties, has to answer three questions.  First, is there an equity established?  Secondly, what is the extent of the equity, if one is established?  And, thirdly, what is the relief appropriate to satisfy the equity?  See Duke of Beaufort v Patrick n1, Plimmer v Mayor of Wellington n2 and Inwards v Baker n3, a decision of this court, and particularly the observations of Lord Denning MR n4.  Such therefore I believe to be the nature of the enquiry that the courts have to conduct in a case of this sort.  In pursuit of that enquiry I do not find helpful the distinction between promissory an proprietary estoppel.  This distinction may indeed be valuable to those who have to teach or expound the law, but I do not think that, in solving the particular problem raised by a particular case, putting the law into categories is of the slightest assistance.  Nor do I think it necessary in a case such as this to enquire minutely into the law of agency.  These defendants could, of course, only act through agents, but, as I have already made clear, from the very nature of the case, there would be no question of grant, no question of legally enforceable contract.  We are in the realm of equity; and within that realm we find that equity, to its eternal credit, has developed an immensely flexible, yet perfectly clear, doctrine: see ER Ives Investments Ltd v High n5 per Danckwerts LJ.  The approach of equity, when there is a question of agency in a field such as this, must I think be a very simple one.  It will merely be that, within reasonable limits, those to whom a defendant entrusts the conduct of negotiations must be treated as having the authority, which, within the course of the negotiations, they purport to exercise.  I put it in that way in the light of the comments of Lord Denning MR in Moorgate Mercantile Co Ltd v Twitchings n6 -- comments which were themselves made on a judgment to the same effect in Attorney-General to the Prince of Wales v Collom n7.  I would add only one reservation to this broad proposition It is as follows.  The defendant, if he thinks that an agent has exceeded his instructions, can always so inform the plaintiff before the plaintiff acts to his detriment in reliance on what the agent has said or done.  If a defendant has done so, the plaintiff cannot then establish the equity, for the defendant will have intervened to prevent him acting to his detriment.  Nothing of that sort happened in this case.  After the meeting in July 1967, to which both Lord Denning MR and Lawton LJ have referred, the plaintiff was left to form his own conclusions as to the intentions of the defendants.

n1 (1853) 17 Beav 60

n2 (1884) 9 App Cas 699, [1881-5] All ER Rep 1320

n3 [1965] 1 All ER 446, [1965] 2 QB 29

n4 [1965] 1 All ER at 448, 449, [1965] 2 QB at 37

n5 [1967] 1 All ER 504 at 510, 511, [1967] 2 QB 379 at 399

n6 [1975] 3 All ER 314, [1975] 3 WLR 286

n7 [1916] 2 KB 193 at 203

I come now to consider the first of the three questions which I think in a case such as this the court has to consider.  What is needed to establish an equity?  In the course of an interesting addition to his submissions this morning, counsel for the defendants cited Ramsden v Dyson n1 to support his proposition that in order to establish an equity by estoppel, there must be a belief by the plaintiff in the existence of a right created or encouraged by the words or actions of the defendant.  With respect, I do not think that that is today a correct statement of the law.  I think the law has developed so that today it is to be considered as correctly stated by Lord Kingsdown in his dissenting speech in Ramsden v Dyson n2.  Like Lord Denning MR, I think that the point of dissent in Ramsden v Dyson n1 was not on the law but on the facts.  Lord Kingsdown's speech, insofar as it dealt wish propositions of law, has been often considered, and recently followed, by this court in Inwards v Baker n3.  Lord Kingsdown said n2:

n1 (1866) LR 1 HL 129 at 142

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

n2 LR 1 HL at 170

n3 [1965] 1 All ER 446, [1965] 2 QB 29

'The rule of law applicable to the case appears to me to be this: If a man, under a verbal agreement with landlord for a certain interest in land, or what amounts to the same thing, under an expectation, created or encouraged by the landlord [my italics], that he shall have a certain interest, takes possession of such land, with the consent of the landlord, and upon the faith of such promise or expectation, with the knowledge of the landlord, and without objection by him, lays out money upon the land, a Court of equity will compel the landlord to give effect to such promise or expectation.' That statement of the law is put into the language of landlord and tenant because it was a landlord and tenant situation with which Lord Kingsdown was concerned; but it has been accepted as of general application.  While Ramsden v Dyson n4 may properly be considered as the modern starting point of the law of equitable estoppel, it was analysed and spelt out in a judgment of Fry J in Willmott v Barber n5, a decision to which Pennycuick V-C referred in his judgment. I agree with Pennycuick V-C in thinking that the passage from Fry J's judgment n6 is a valuable guide as to the matters of fact which have to be established in order that a plaintiff may establish this particular equity.  Moreover, counsel for the defendants sought to make a submission in reliance on the judgment.  Fry J said n6:

n4 LR 1 HL 129

n5 (1880) 15 Ch D 96

n6 15 Ch D at 105, 106

'It has been said that the acquiescence which will deprive a man of his legal rights must amount to fraud, and in my view that is an abbreviated statement of a very true proposition.  A man is not to be deprived of his legal rights unless he has acted in such a way as would make it fraudulent for him to set up those rights.  What, then, are the elements or requisites necessary to constitute fraud of that description?  In the first place the plaintiff must have made a mistake as to his legal rights.  Secondly, the plaintiff must have expended some money or must have done some act (not necessarily upon the defendant's land) on the faith of his mistaken belief.  Thirdly, the defendant, the possessor of the legal right, must know of the existence of his own right which is inconsistent with the right claimed by the plaintiff.  If he does not know of it he is in the same position as the plaintiff, and the doctrine of acquiescence is founded upon conduct with a knowledge of your legal rights.  Fourthly, the defendant, the possessor of the legal right, must know of the plaintiff's mistaken belief of his rights.  If he does not, there is nothing which calls upon him to assert his own rights. Lastly [if I may digress, this is the important element as far as this appeal is concerned], the defendant, the possessor of the legal right, must have encouraged the plaintiff in his expenditure of money or in the other acts which he has done, either directly or by abstaining from asserting his legal right.'
Counsel for the defendants, in the course of an interesting and vigorous submission, drew the attention of the court to the necessity of finding something akin to fraud before the equity sought by the plaintiff could be established.  'Fraud' was a word often in the mouths of those robust judges who adorned the bench in the 19th century.  It is less often in the mouths of the more wary judicial spirits who sit today on the Bench.  But it is clear that whether one uses the word 'fraud' or not, the plaintiff has to establish as a fact that the defendant, by setting up his right, is taking advantage of him in a way which is unconscionable, inequitable or unjust.  It is to be observed from the passage that I have quoted from the judgment of Fry J n1, that the fraud or injustice alleged does not take place during the course of negotiation, but only when the defendant decides to refuse to allow the plaintiff to set up his claim against the defendant's undoubted right.  The fraud, if it be such, arises after the event, when the defendant seeks by relying on his right to defeat the expectation which he by his conduct encouraged the plaintiff to have.  There need not be anything fraudulent or unjust in the conduct of the actual negotiations -- the conduct of the transaction by the defendant.

n1 (1880) 15 Ch D at 105, 106

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

The court therefore cannot find any equity established unless it is prepared to go as far as to say that it would be unconscionable and unjust to allow the defendants to set up their undoubted rights against the claim being made by the plaintiff. In order to reach a conclusion on that matter the court has to consider the history of the case under the five headings to which Fry J n1 referred. I need not at this stage weary anyone with an elaborate statement of the facts. I have no doubt on the facts of this case that the first four elements referred to by Fry J exist. The question before the judge and now in this court is whether the fifth element is present: have the defendants, as possessor of the legal right, encouraged the plaintiff in the expenditure of money or in the other acts which he has done, either directly or by abstaining from asserting their legal rights? The first matter to be considered is the meeting on site of 26th July 1967. Pennycuick V-C made a finding of fact about the meeting, and for myself I am not prepared to dissent from his finding. But the substance of the finding of fact has to be regarded, not its phrasing. One must not be misled by words or phrases into misconstruing the nature of the finding. Pennycuick V-C found that there was no definite assurance given by the defendants' representative to the plaintiff and his architect. Like Lord Denning MR, I do not really know what the phrase 'definite assurance' means. If it means that no grant was there and then brought into existence, or that no binding contract was then entered into, I agree with Pennycuick V-C. If it means anything else, it is so imprecise that I disregard it, and I look at the rest of Pennycuick V-C's judgment to find what he did find. He accepted the evidence of Mr Alford, the plaintiff's architect; he summarised the effect of that evidence; and his summary is of importance because I think it contains the clue as to his substantial findings of fact. He quotes Mr Alford as having said in evidence:

'"The precise position [that is the position of the projected point of access, point B] was determined in the light of what I [that is the architect speaking] envisaged as future development; the reason for the second entrance was because we were going to treat the [front] and [back] land as separate for user; this was made clear to Mr Stonier and Mr Stonier [i e Mr Queen] had agreed the gate at B", and he said that Mr Stonier said nothing to suggest that he had no authority. In cross-examination he [Mr Alford] agreed that they were simply agreeing on the best position for an entrance and that the next step would be for their own solicitors to tie the matter up with the [defendants]; at the time he thought there were no problems, but basically they were agreeing the position, and he said [and now Pennycuick V-C quotes Mr Alford again] "I thought we had got final agreement but that it would then be a matter for the solicitors" and he foresaw further processes. [Then Pennycuick V-C says:] I accept the evidence of Mr Alford, but I think that [the plaintiff] was rather over sanguine in his interpretation of what was said by the [defendants'] representative and did not appreciate the difference between acceptance in principle and a firm commitment.'
That was a finding that there was acceptance in principle that there should be access and a right of way over the defendants' land at point B; and I am content to go no further and to base my judgment on what I believe to be that finding of Pennycuick V-C. Clearly the plaintiff and Mr Alford came away from that meeting in the confident expectation that a right would in due course be accorded to the plaintiff. Mr Alford did foresee 'further processes'. Of course there would be further processes. The nature of the lagal right to be granted had to be determined. It might be given by way of licence. It might be granted by way of easement. Conditions might be imposed. Payment of a sum of money might be required. But those two men, the plaintiff and his architect came away from the meeting in the confident expectation that such a right was granted on reasonable conditions. What happened? By August -- a month or less after the meeting -- posts for a fence were already on the ground, though not erected. There was already an indication at about that time, I think -- if not then, certainly soon after -- of the presence of a gap at point B, that being the point of access agreed in principle. During the latter months of 1967 nothing relevant transpired in the conduct of the negotiations between the plaintiff and the defendants. I accept the submission of counsel for the defendants that relationship as well as conduct is relevant; but during this period their relationship did not develop at all. They remained adjoining landowners, one of whom had agreed in principle at a meeting on the site that there should be a right of way from point B over his land to the public road. Yet, things were happening. In the later months of 1967 the defendants, who were the local authority, were busy developing on neighbouring land, which the plaintiff's predecessor in title had sold them, a council housing estate. Lorries were being used for carting building materials, removing debris and so forth; and these lorries were in fact going on the land of the plaintiff. Unfortunately materials on the land, the property of the plaintiff, were being pilfered. And so there came a meeting in January 1968, the point of which was to draw the attention of the defendants' officers to the situation which was developing. By the time the

meeting took place the fence, which the defendants were obliged under the conveyance of their estate to erect between their land and the plaintiff's land, was substantially in position with gaps at point A, the access to the northern land, and at point B, the access in dispute.  Nobody on behalf of the defendants gave the slightest indication to the plaintiff and his representatives at that meeting that there was going to be any difficulty, or was likely to be any difficulty, about access at point B.  The confident expectation with which the plaintiff and Mr Alford left the meeting in July remained remarkably undisturbed by the meeting of January 1968.  Indeed it was reinforced because there on the ground, plain for all to see, was a fence with gaps which accorded exactly with the agreement in principle reached in the previous July. Ten days later the defendants ordered gates, and by March the gates were installed.  I ask myself: as at March 1968 had the defendants encouraged the plaintiff to think that he had been or was going to be given a right?  To use the language of Fry J n1, had they done it directly or had they done it by abstaining from asserting a legal right?  Their encouragement of the belief in the mind of the plaintiff and Mr Alford was both direct and indirect.  It was indirect because ever since the July meeting they had abstained from giving the plaintiff or his architect any indication that they were standing on their rights, or had it in mind to go back, as, of course, they were entitled at that stage to go back, on the agreement in principle reached at that meeting.  And so matters proceeded until September 1968.  By now, be it observed, over a year had passed since that first meeting when there was agreement in principle.  Nothing had been done to disabuse the minds of the plaintiff and Mr Alford of the expectation reasonable induced by what the defendants' engineer then said; and there had been the direct encouragement of the gates.  In September 1968, without telling the defendants or giving them any notice, so far as I am aware, the plaintiff entered into a contract to sell the northern piece of land without reservation over that land of any right of way.  This was the act which was detrimental to the interests of the plaintiff.  He did it in the belief that he had or could enforce a right of way and access at point B in the southern land.  One of the points taken by counsel for the defendants is that the defendants had no notice of the sale, and therefore no opportunity to correct what on their case was a false belief in the mind of the plaintiff.  Counsel for the plaintiff in the course of his submissions conceded that he had not found in the books any case in which the sort of estoppel which we are here considering had arisen when the fact known to the defendants was an intention and not the realisation of that intention.  That is of course what differentiates this case from one such as ER Ives Investments Ltd v High n2.  There the party who was found to be estopped did have notice of what the other party was doing at the time he was doing it.  Therefore I think counsel for the defendants rightly invites us to face this question: does the fact that the defendants had no notice of the sale of the northern land before it was completed destroy the equity?  Counsel for the defendants will concede, as I undersstand this part of his argument, no more than this: that the plaintiff might have been able to establish an equity if he had referred to the defendants before binding himself to the purchase of the northern land, for that would have given the defendants an opportunity of disabusing the mind of the plaintiff before he acted to his detriment.  The point is worthy of careful consideration.  I reject it because inmy judgment, in this sort of proceedings, the court must be careful to avoid generalisation.  I can conceive of cases in which it would be absolutely appropriate for a defendant to say: 'But you should not have acted to your detriment until you had had a word with me and I could have put you right.' But there are cases in which it is far too late for a defendant to get himself out of his pickle by putting on the plaintiff that sort of duty; and this in my judgment is one of those cases.  If immediately following the July meeting the clerk to the defendants had written saying: 'I have had a report of the meeting with the assistant engineer and I must inform you that whether or not there is to be an easement or a licence is a matter which can only be decided by the council,' -- had this been done, then, the plaintiff would not now establish his equity; in selling the northern land without reservation of a right of way, he would have acted at his own risk.  But one has to look at the whole conduct of the parties and the developing relationship between them.  By September 1968, 13 1/2 months after the initial meeting, the plaintiff must really and reasonaly have been attaching importance to the abstention of the defendants from declaring to him in correspondence, or by telephone to his agent their true position, namely that there would be no acceptance in principle of a right until the matter had been considered by the defendants themselves.  By that time there had been the laying out of the fence, and the installing of the gates.  It is for those reasons -- the passage of time, the abstention and the gate -- that I think the defendants cannot rely on the fact that the plaintiff acted, without referring to the defendants, on his intention -- an intention of which they had had notice ever since their agent was informed of it at the meeting in July 1967. I think therefore an equity is established.

[1976] 1 CL 179, [1975] 3 All ER 865, [1976] Ch 179, [1975] 3 WLR 847, 32 P & CR 70.

n1 (1880) 15 Ch D at 105, 106

n2 [1967] 1 All ER 504, [1967] 2 QB 379

I turn now to the other two questions -- the extent of the equity and the relief needed to satisfy it.  There being no grant, no enforceable contract, no licence, I would analyse the minimum equity to do justice to the plaintiff as a right either to an easement or to a licence on terms to be agreed.  I do not think it is necessary to go further than that.  Of course, going that far would support the equitable remedy of injunction which is sought in this action.  If there is no agreement as to terms, if agreement fails to be obtained, the court can, in my judgment, and must, determine in these proceedings on what terms the plaintiff should be put to enable him to have the benefit of the equitable right which he is held to have.  It is interesting that there has been some doubt amongst distinguished lawyers in the past whether the court can so proceed.  Lord Kingsdown refers to those doubts in a passage, which I need not quote, in Ramsden v Dyson n1.  Lord Thurlow clearly thougt that the court did have this power.  Other lawyers of that time did not.  But there can be no doubt that since Ramsden v Dyson n2 the courts have acted on the basis that they have to determine not only the extent of the equity, but also the conditions necessary to satisfy it, and they have done so in a great number and variety of cases.  I need refer only to the interesting collection of cases enumerated in Snell on Equity n3.  In the present case the court does have to consider what is necessary now in order to satisfy the plaintiff's equity.  Had matters taken a different turn, I would without hesitation have said that the plaintiff should be put on terms to be agreed if possible with the defendants, and, if not agreed, settled by the court.  But, as already mentioned by Lord Denning MR and Lawton LJ, there has been a history of delay, and indeed high-handedness, which it is impossible to disregard.  In January 1969 the defendants, for reasons which no doubt they thought good at the time, without consulting the plaintiff, locked up his land.  They removed not only the padlocks which he had put on the gates at point B, but the gates themselves.  In their place they put a fence -- rendering access impossible save by breaking down the fence.  I am not disposed to consider whether or not the defendants are to be blamed in moral terms for what they did.  I just do not know. But the effect of their action has been to sterilise the plaintiff's land; and for the reasons which I have endeavoured to give, such action was an infringement of an equitable right possessed by the plaintiff.  It has involved him in loss, which has not been measured; but, since it amounted to sterilisation of an industrial estate for a very considerable period of time, it must surpass any sort of sum of money which the plaintiff ought reasonably, before it was done, to have paid the defendants in order to obtain an enforceable legal right.  I think therefore that nothing should now be paid by the plaintiff and that he should receive at the hands of the court the belated protecton of the equity that he has established.  Reasonable terms, other than money payment, should be agreed: or, if not agreed, determined by the court.  For those reasons I also would allow the appeal.

n1 (1866) LR 1 HL at 171

n2 LR 1 HL 129

n3 27th Edn (1973), pp 567-568, para 2(b)

**DISPOSITION:**

Appeal allowed.  Declaration and injunction as prayed in terms to be settled between counsel.  Liberty to apply.

**SOLICITORS:**

Devonshire & Co (for the plaintiff); Doyle, Devonshire, Box & Co (for the defendants).  D401:



15 of 21 DOCUMENTS

PATCHETT v. STERLING ENGINEERING COY. LD.

HOUSE OF LORDS

72 RPC 50

**HEARING-DATES:** 2, 6, 7, 8, 9 December 1954, 20 January 1955

20 January 1955

## CATCHWORDS:

Patent -- Master and servant -- Employee's claim in action to royalties or remuneration -- Employers' claim to patents -- Apportionment -- Res judicata -- Patents Act, 1949, Sec. 56 (1) & (2).

## HEADNOTE:

On 1st January, 1942, P. entered into the employment of S.E. Ld. as manager of their armaments department, and later became head of their design and development section dealing with domestic appliances.  In 1942 an agreement was made by which he was to receive payment of one-half per cent. of the selling price of all articles manufactured under patents for inventions made by him.  In 1943 and 1944 further agreements were made with regard to inventions for automatic weapons known as "Paraguns" and it was a term of the 1944 agreement that the agreement made in 1942 should be cancelled.  In 1947, at the time of P.'s transfer to the "domestic" department, there were further discussions as to the patent position, but these proved abortive.

The patents relating to "Paraguns" did not come into question in the proceedings mentioned below, which related only to patents for what the parties termed "domestic "inventions".

In 1951 P. commenced an action against S.E. Ld. in which he alleged (inter alia) that apart from the agreements mentioned above there had been an "agreement and understanding" made prior to his engagement that he should receive reasonable remuneration for any inventions made by him whilst in the service of S.E. Ld.  He also claimed rectification (on the ground of mutual mistake or alternatively of unilateral mistake) of that part of the agreement of 1944 which purported to cancel the agreement of 1942.  S.E. Ld. counterclaimed for an order for the transfer of the patents for the "domestic inventions", which had been taken out in the joint names of P. and of S.E. Ld. or of a subsidiary of that company.

Roxburgh, J., found that though there had been an "understanding" that P. should receive reasonable remuneration for inventions made by him, there was no concluded agreement to this effect.  He also found that there was no ground for rectification of the 1944 agreement.  Accordingly he dismissed the action, but stated that he did so without prejudice to the position with regard to the counterclaim.  +

72 RPC 50

+ See (1953) 70 R.P.C. 184.

After the dismissal of the action P. amended his defence to the counterclaim, claiming (inter alia) that the benefit of the inventions made by him should be apportioned under the provisions of Sec. 56 (2). {51}

The counterclaim was heard by Danckwerts, J., who made an order for the transfer of the patents to S.E. Ld.  With regard to Sec. 56 (2) he held that he was precluded by the order of Roxburgh, J., from holding that P. was entitled to any remuneration for the "domestic inventions", otherwise there might have been a case for apportionment.  *

* See (1953) 70 R.P.C. at p. 195.

P.  appealed to the Court of Appeal against the judgment of Danckwerts, J., on the counterclaim.  There was no appeal against the dismissal of the action by Roxburgh, J.

Held by the Court of Appeal (inter alia):

(1) That the 1944 agreement should not be held to have affected the "agreement and "understanding" between the parties alleged to have been arrived at in December, 1941.

(2) That though such "agreement and understanding" might not constitute a legally enforceable agreement, since it was of the nature of an agreement to make an agreement, it was sufficient to negative or qualify the ordinary presumption that an employer is equitably entitled to the whole benefit of inventions made by an employee in the course of his employment.

(3) That this entitled the Court to make an apportionment of the benefit of the patents under the provisions of Sec. 56 (2), and that in the circumstances the Court should do so.  +

+ See (1954) 71 R.P.C. 61.

Leave to the Defendants to appeal to the House of Lords was refused by the Court of Appeal, but was granted by the Appeals Committee of the House of Lords on the condition that the Appellants should pay the Respondent's costs of such appeal in any event.

Held by the House of Lords:

(1) That Sec. 56 (2) has no effect unless the tribunal is satisfied that neither party is solely entitled to the benefit of the invention.

(2) That it is an implied term in a contract of employment that an employee is a trustee for his employer of any invention made in the course of his duty as employee.

(3) That such implied term can only be displaced by an agreement having legal force to the contrary effect.

(4) That in the present case there was no such agreement, with the result that the employers were solely entitled to the benefit of the inventions.

(5) That the appeal should be allowed and the judgment of Danckwerts, J., restored.

Observations were made on the doctrine of res judicata.

In the Opinion of Viscount Simonds reference was made to Adamson v. Kenworthy (1932) 49 R.P.C. 57.

**INTRODUCTION:**

This appeal from the judgment of the Court of Appeal, reported at (1954) 71 R.P.C. 61, ++ came on for hearing before Viscount Simonds and Lords Porter, Reid, Tucker and Somervell of Harrow on 2nd December, 1954.

> ++ In the Courts below the title of the case was Patchett v. Sterling Engineering Coy. Ld.  § Counsel also discussed other points (especially res judicata) not material to this report.

**COUNSEL:**

Shelley, Q.C., and Guy Aldous appeared for the Appellants (Defendants).  Wilberforce, Q.C., and E. Irvine Goulding appeared for the Respondent (Plaintiff).

Shelley, Q.C.  § -- The Respondent here is saying: I will not assign the patents to you unless you pay a royalty for their use.  He relies upon Sec. 56 (2) of the Patents Act, but Sec. 56 (2) does not found a defence of that sort.  If it did, for Section 56 (2) to apply the Court must not be satisfied that the invention belongs to one party only.  Here the {52} inventions belong to the employer.  The Respondent made them in the course of his employment, and it is an implied term of the contract of employment that such inventions belong to the employer.  The Respondent relies on an "understanding and agreement" that he should be remunerated: but it has been held that there was not an agreement, and no "understanding" of contractual force.  The letters on which the Respondent relies mean just what they say: the parties hoped to reach agreement about these matters in due course.  The agreement reached did not cover these inventions.  The patents are in joint names, and this enables the Appellants to manufacture for their own benefit without accounting to the Respondent.  It is wrong that a claim for royalty (which would put the Appellants in a worse position than if the counterclaim failed and the patents stayed in joint names) should be raised as a defence to the counterclaim.  Lord Simonds. -- Is the rule that inventions belong to the employer an implied term?  Yes. Lord Simonds. -- Are you saying this, that the servant enters the employment knowing that unless the contrary is agreed this term will be implied; so it is implied?  Yes.  Counsel referred to: Triplex v. Scorah (1938) 55 R.P.C. 21; Vokes v. Heather (1945) 62 R.P.C. 135; British Celanese v. Moncrieff (1948) 65 R.P.C. 165.  Lord Reid. -- If the parties are not silent as to ownership of the employee's inventions, but say: we will settle this later, then prima facie this should exclude any implied term.  Shelley. -- The term is implied unless the parties, by agreement, exclude it.  In this case, there was no concluded agreement.

Aldous followed, on the meaning of "apportion".

Wilberforce, Q.C., for the Respondent. -- The correspondence between the parties was at least effective to exclude any implied term.  It follows that the implied term can only form part of the agreement if it was re-introduced in 1947, when the earlier agreements were cancelled; and only a further express agreement could so re-introduce it.  I say that as a result the implied term does not form part of the Respondent's contract of service, and the ownership of his inventions is not governed by contract at all.  Sec. 56 (2) must then apply, on any meaning of it.  There are three possible meanings of the subsection: 1. That it applies unless, after hearing the evidence, the Court can find on the basis of the existing law that one or other party is entitled to the invention to the exclusion of the other.  This excludes 95 per cent. of cases: it makes the subsection apply only where there is an agreement to share the inventions and the proportions are not specified.  Lord Reid. -- Would not Sec. 54 govern such a case?  Only where there is a patent in joint names.  Lord Tucker. -- Mr. Shelley mentioned another class of case: where it is difficult to ascertain on the facts who is the real inventor.  Lord Reid. -- No; for the subsection only applies where the invention was made by the employee.  Mr. Shelley also suggested a class of case, where the invention was made partly inside, partly outside the employment; but there the Court would have to decide: inside or outside.  2. The power under the subsection exists in doubtful cases where the matter is not expressly dealt with by contract: altering the law so that there is no longer any implication from the parties' failure to deal expressly with the point.  3. The subsection should be read as saying: "Unless in all the circumstances "of the case the Court thinks that one party is justly entitled to the exclusion of the other": giving a wide discretionary jurisdiction, even to over-ride an express contract.  Considering the mischief the subsection was intended

to remedy, one would expect meaning 3.; but on the language, 1. is the only acceptable meaning.  But it covers the present case in which there is an agreement to agree, not quantified.  If Sec. 56 (2) did not apply, the counterclaim would fail: for the implied term being excluded, and there being no legally enforceable agreement governing the position, the parties would be left to their rights under Sec. 54.  Lord Simonds. -- You must take yourself out of being trustee.  If the exclusive interest is not in the employer, it must be in you: and there is no enforceable agreement under which any of it can be in you.  Sec. 54 applies, if there is nothing to displace it.  I have only to show that the implied term has been excluded, not that it has been replaced by anything.  Lord Tucker. -- The Court must decide; all the materials are before it; it cannot simply say: I am not satisfied Lord Porter. -- You are saying that there was a contract between the parties to exclude the implied term; but Roxburgh, J., decided that there was no contract.  There was no contract upon which the Plaintiff could sue; but there was an understanding that the implied term should go.  Lord Porter. -- There would have to be a contract to wipe {53} out the implied term.  The Company must establish an implied obligation to hand over the inventions.  I need only show that there was no meeting of minds to that effect, or a meeting of minds to the contrary.  Lord Simonds. -- I doubt if this is an implied term in that sense; it is inherent in the contract of service.  I submit that it is an implied term: a purely contractual right.  Lord Reith. -- Inherent in the relationship the contract creates.  Lord Simonds. -- This is miles from the Moorcock * type of implication.  The force of the term must be contractual; and it follows that it can be excluded, as in any other case of implication.  Lord Simonds. -- You must put something in the place of the term you remove.  I have two answers: 1.  The term was qualified (by an obligation to agree a benefit) and not excluded.  2.  Although Mr. Patchett is not obliged to assign he is obliged to agree.  If the "understanding" has no effect whatever, only my third meaning for Sec. 56 (2) can help Mr. Patchett; but if it has any effect at all, he is entitled to apportionment on any meaning of the subsection.


* (1889) 14 P.D. 64.

Goulding followed.

Shelley, Q.C., replied. -- This is not an implied term in the ordinary sense, only in the sense that evidence may be needed to show the nature of the job the servant is employed to do.  Improvement of design being Mr. Patchett's job, no understanding inconsistent with that can be admitted unless so clear as to modify the nature of the job.  Here, there is no indication that the company would ever have contemplated that his designs should not belong to then: the only discussion related to extra remuneration, and his claim for extra remuneration is res judicata.

Ther report of the Appellate Committee was considered on 20th January, 1955.

**PANEL:** Before VISCOUNT SIMONDS and LORDS PORTER, REID, TUCKER and SOMERVELL OF HARROW

**JUDGMENTBY-1:** Viscount Simonds

**JUDGMENT-1:**

Viscount Simonds. -- My Lords, this appeal is brought by the Sterling Engineering Coy., Ld., whom I will call "the Company", from an order of the Court of Appeal which reversed an order of Danckwerts, J.  The Respondent is George William Patchett and the appeal relates to six inventions made by him while in the employment of the Company, which were the subject of patents registered in their joint names.

The Respondent in January, 1942, entered the employment of the Company as a production engineer at a salary of £ 1,200 a year.  The Company was then and for some time afterwards employed exclusively on armament.  In December, 1941, before any contract of service was made, there was an exchange of letters and an interview between the parties in regard to any patentable invention that the Respondent might make while in the Company's employment.  It is clear that no agreement was made, but throughout the proceedings, which have continued in an appeal to this House, it has been constantly alleged that an "understanding" was reached, and it is upon that understanding that the

72 RPC 50

Respondent has relied for the relief refused to him by Danckwerts, J., but granted by the Court of Appeal. At the outset I must admit that I find it difficult to appreciate how an understanding, which is admittedly not an agreement, can be made a ground of claim, though it may, I daresay, in certain circumstances be a shield. But the facts of the present case are so unusual, and the course which the action took so remarkable, that I must closely examine what this understanding was.

On the 11th December, 1941, after a previous exchange of letters and an interview to which I need not refer, the Respondent wrote a letter to the Company in which the following passage occurred: "Patents. This is always a delicate problem between employer and employee and I suggest the following two methods of dealing with this question: (a) Any invention for which I am responsible will be provisionally patented by me and be transferred to you for a sum payment to be mutually arranged at the time. (b) Any invention for which I am responsible will be patented by you in the name of the firm and myself. A sum to be paid as royalty will be fixed and a minimum yearly royalty decided on. In the event of the minimum royalty not being paid I shall be free to exploit the patent. Any exploitation of such patent will entail a participation of the proceeds by both patentees. This participation will also apply in any case where the manufacturing rights are granted to other persons" and the letter then dealt with so-called "special constructions" with which {54} we are not concerned. To this letter the General Manager of the Company, a Mr. Redgrave, replied on the 13th December, 1941, by a letter which contained the following passage relating to patents and no more: "Patents. I agree that this is always a problem but feel confident when we next meet we shall have no difficulty in making a mutually satisfactory settlement".

It does not appear that any further letters passed between the parties and it is certain that when they next met no arrangement of any kind was made. On the 1st January, 1942, the Respondent took up his duties as production engineer without any written service agreement. That no arrangement was made nor, as I think, in the meantime discussed in clear from the next letter to which I refer, for on the 31st July, 1942, the Respondent, having designed a gun in the course of his employment, which came to be called a "paragun", wrote to the Chairman of the Company as follows: "This gun was designed by me without any instructions from the Company and I think certain features are patentable. Before joining the Company the question of patents... was discussed but no definite arrangement made. I think this is a suitable opportunity for some arrangement to be arrived at".

The Company accepted this suggestion, and after an interview on the 5th August, 1942, an agreement which has conveniently been called the 1942 agreement was made. Its terms were contained in two letters of the 5th and 12th August, and provided (inter alia) that, where the Respondent was primarily responsible for any inventions which were patentable, patents should be applied for in the two names (i.e., of the Respondent and the Company) and that the Company should pay the Respondent a royalty of 1/2 per cent. on the sale price of any articles made by them which used any such patent. This agreement was general in its scope and extended beyond the invention which had been its immediate cuase. In 1943 the Respondent invented an automatic trigger mechanism for the purpose of the paragun, and in regard to the patent for this invention a specific agreement, known as the 1943 agreement, was made. I think it unnecessary to say more about it than that its terms were more favourable to the Respondent than those of the 1942 agreement.

In 1944 yet another agreement was made. The Respondent had made eight more patentable inventions in connection with the paragun and the new agreement in effect provided that these inventions and any further inventions which the Respondent might make during the term of his employment in relation to machine carbines should be comprised in the 1943 agreement. It also contained a term, which, as will be seen, came to be of great importance, that the 1942 agreement should be cancelled and of no further effect.

Some modification of the 1943 agreement was made in 1945, but no other arrangement was made and there the matter rested, when in 1947, the Company having turned to the arts of peace, the Respondent was offered and accepted the leadership of the department concerned with the design and development of domestic electrical appliances. It was not disputed that in this capacity it was his duty to put his inventive faculty and skill at the service of the Company. Between 1947 and 1950 the Respondent in the course of his employment made six inventions in connection with

domestic appliances (which I will call "the domestic inventions") in respect of which patents were applied for in the joint names either of the Respondent and the Company or of the Respondent and a company controlled by the Company, a variation which can for the purpose of this appeal be disregarded.  The applications were made at the expense of the Company, but the Respondent, as the inventor, was, until the Patents Act of 1949 came into force, a necessary party.  The 1942 agreement had been cancelled, the later agreements did not cover the domestic inventions and in these circumstances the Company refused the reiterated demands of the Respondent that some payment should be made to him in respect of them.

The Respondent accordingly commenced the action out of which this appeal has arisen, and I must trouble your Lordships with some details of the pleadings in the action and consequent counterclaim, for the form that they have taken has not been the least of the causes of trouble in this litigation.

The statement of claim (which was amended and reamended) opened with a plea that at the time of his employment it was "understood and agreed" between the Respondent and the Company that he should receive reasonable remuneration in respect of all inventions {55} made by him while in the employment of the Company which should be used by the Company.  It then set out the agreements of 1942, 1943 and 1944.  It specifically stated the cancellation clause in the 1944 agreement to which I have referred and alleged that this clause was inserted by mutual mistake.  In his formal claim the Respondent claimed a royalty of 1/2 per cent. on the selling price of all articles in which any of his inventions were made use of (other than those subject to the 1943 or 1944 agreements) or alternatively reasonable remuneration or royalties in respect thereof, and in the further alternative rectification of the 1944 agreement so as to exclude the cancellation clause or rescission of that agreement.  This is a puzzling plea: for what is meant by an "understanding and agreement"?  What is the efficacy of an understanding without an agreement, or what added force an understanding gives to an agreement, I do not understand.  But the action was allowed to go forward in this fashion after an ineffectual attempt had been made to discover upon an application for particulars what was the understanding, what the agreement?

The Company duly put in its defence, denying any such understanding or agreement as had been alleged and further denying that there had been such a mistake as to justify rectification or rescission of the 1944 agreement.  It also put in a counterclaim alleging that the domestic inventions had been made by the Respondent in the course of his employment, and that the Company was accordingly entitled to have the Respondent's interest in the relevant patents transferred to it, and claiming the appropriate declaration and order.

By his reply and defence to counterclaim the Respondent challenged the plea that he was employed to make inventions in connection with domestic appliances.  This was clearly contrary to the fact and does not appear to have been pursued.  He further alleged that in regard to any inventions other than those comprised in the 1943 or 1944 agreements it was the "intention of the parties" that the 1942 agreement should continue to operate "or alternatively should not be governed by any agreement and should accordingly remain the sole property of" the Respondent.  He further pleaded that the domestic inventions were not made in the course of his employment, a plea clearly incapable of being sustained.  Further pleas were made by amendment but I do not mention them yet, for the pleadings were in the form that I have outlined when the case came on for hearing before Roxburgh, J.  Before that learned Judge the case took a most unfortunate course, for owing to the exigencies of time or for some other reason it was found possible only to dispose of the action, the counterclaim being left over for hearing after the immediately ensuing vacation.  So far as the action was concerned, an order was made whereby it was dismissed with costs and that was all.  And it is clear that whatever else your Lordships may look at in the event of a plea of res judicata being raised, you are at least entitled to know what were the issues raised in the pleadings in the action, and you know therefore that the Respondent failed to establish his right to remuneration under any heading of claim or to rectification of the 1944 agreement.  This order was duly drawn up and the Respondent did not appeal from it.  I will only add here, since some reliance has been placed upon it and certainly some confusion has arisen out of it, that in the course of his judgment Roxburgh, J., said, "At the time of his engagement it was understood between the Plaintiff and the Defendant Company that the Plaintiff should receive a reasonable remuneration in respect of all inventions made by him while in the employment of the Defendant Company which should be used by the Defendant Company.  I have used the word 'understood' advisedly.  There is a

counterclaim, with which I am not yet in a position to deal, and I have used that vague word in order not in any way to prejudice the position with regard to the counterclaim".  The learned Judge having decided that there was no agreement for the payment of remuneration, it is difficult to see what effect in the law is to be found in an understanding -- particularly where the only plea had been of an "understanding and agreement".

Unfortunately, Roxburgh, J., had other duties in the following term and it fell to Danckwerts, J., to hear the counterclaim.  In the course of the hearing before him the defence to counterclaim was allowed to be amended by pleading once more the understanding and agreement alleged in Para. 1 of the statement of claim, and by this final plea which found favour with the Court of Appeal "In the alternative to the contentions herein set out the Plaintiff will claim that the benefit of the inventions referred to in the counterclaim be apportioned {56} under Section 56 (2) of the Patents Act 1949".  This amendment was, as I say, allowed and it is too late to protest that it should not have been pleaded by way of defence to counterclaim but, it raised at all, should have found a place in the statement of claim.

It is convenient at this stage to set out the subsection in question which was for the first time introduced into the patent laws by the Act of 1949.  It provides as follows: -- "Section 56 (2).  In proceedings before the court between an employer and a person who is or was at the material time his employee, or upon an application made to the comptroller under subsection (1) of this section, the court or comptroller may, unless satisfied that one or other of the parties is entitled, to the exclusion of the other, to the benefit of an invention made by the employee, by order provide for the apportionment between them of the benefit of the invention, and of any patent granted or to be granted in respect thereof, in such manner as the court or comptroller considers just".

The task of disentangling the real issues from these pleadings is not made easier by the plea strenuously urged by the Appellants that the doctrine of res judicata applied to bar the Respondent's defence to the counterclaim.  I will dispose of this matter very shortly, for I do not think that any decision upon it is necessary for the determination of this appeal.  I am glad to think so, for in a case like this where the whole matter in dispute, whether arising on claim or counterclaim, should and would, but for an unfortunate accident, have been disposed of at one and the same time, and where the learned Judge who heard the action made certain reservations with a view to their further consideration on the counterclaim, I should be very reluctant to apply the ordinary rules of res judicata.  I am not aware of any case in which such a thing has happened before, and may be permitted to hope that it will not happen again.  It is unnecessary to say more because it became clear to me as the case proceeded that the counterclaim must succeed, and that the same considerations which secured its success were fatal to a claim under Sec. 56 (2) of the Patents Act, 1949.

The patents in question stand in the joint names of the Company (or the company which it controls) and the Respondent, i.e. in the names of employer and employee.  It is elementary that, where the employee in the course of his employment (i.e. in his employer's time and with his materials) makes an invention which it falls within his duty to make (as was the case here) he holds his interest in the invention, and in any resulting patent, as trustee for the employer unless he can show that he has a beneficial interest which the law recognises.  Here the Respondent first asserted the "understanding and agreement" to which I have so often referred.  It was for reasonable remuneration and nothing else.  It failed: there was no "agreement" and "understanding" meant nothing.  If it had succeeded, it would still have afforded no defence to the counterclaim, though it might have supported a claim for other relief.  Then it was pleaded that the 1942 agreement still governed the situation.  This plea too failed, nor, had it succeeded, would it have afforeded a defence.  Next it was pleaded that it was the intention that the inventions should remain the sole property of the Respondent: this plea was wholly inconsistent with the first plea of an agreement for remuneration and does not appear to have been pressed at any stage of the proceedings.  Then it was pleaded that the inventions were not made by the Respondent in the course of his employment, a plea clearly unsustainable.  In this bewildering medley of pleas I find nothing to justify the view that the Respondent was not a trustee for the Company of his interest in the patents.  Ultimately, I think, the argument resolved itself into the proposition that the so-called understanding, though it did not create any legal obligation yet was sufficient to exclude any term of the employment by which inventions made by the employee would belong to the employer.  It was not clear what the result of this would be, but, as there is no ground for suggesting that the inventions were to be the exclusive property of the Respondent, I can only suppose there would be a deadlock until the parties could come to some agreement.  But I think that this argument is based on a radical fallacy.

It is true enough that the rule that inventions made by an employee belong to the employer is sometimes spoken of as an implied term of the contract of service. In a sense no doubt it is an implied term in that it is not written out in the contract of service, but it is a term which, given the conditions which are here present, namely, inventions made by the employee in the course of his employment which it was part of his duty to make, the law imports {57} into the contract. It appears to me that it is only an implied term in the same sense that it is an implied term, though not written at large, in the contract of service of any workman that what he produces by the strength of his arm or the skill of his hand or the exercise of his inventive faculty shall become the property of the employer. If the employment is of a designer that which he designs is thus the property of the employer which he alone can dispose of. If it is patentable it is for the employer to say whether it shall be patented, and he can require the employee to do what is necessary to that end. And if it is patented in their joint names, the employee holds his interest as trustee for the employer. See Adamson v. Kenworthy (1932) 49 R.P.C. 57. If this is, as I think it clearly is, the law, it can only be excluded by an express agreement that it shall be varied and some other legal relationship created. I will not go through the story again, but it appears to me impossible to rely on an understanding, which, vague enough in 1941, had, after it had been superseded by the agreements of 1942, 1943, 1944 and 1945, and after in 1947, the Respondent had substantially changed the area of his employment, become so tenuous as to be little more than an aspiration of the Respondent that he would receive some recognition beyond his salary for the work that he was paid to do. I find nothing in all this which would justify the Court in holding that the ordinary rule governing the relation of master and servant was displaced. I am therefore of opinion that the counterclaim should succeed, subject only to what may be said about Sec. 56 (2) of the Patents Act, 1949.

I turn then finally to that section. It may be said, if it has any application to the present case, to afford a defence in this limited sense. It would be a work of supererogation to reqire the Respondent to transfer his interest in the patents to the Company if the next step was to be an apportionment involving perhaps a retransfer. But in my opinion the subsection has no application. I will assume that the present action and counterclaim were proceedings before the Court between an employer and employee, in which its new and special jurisdiction might be invoked. But that jurisdiction only arises if the Court is not satisfied that one or other of the parties is entitled to the exclusion of the other to the benefit of an invention. The word "entitled" refers to legal right. The Court must therefore determine the legal rights just as it must determine them in any other case, and if the issue is, as it is here, whether one party is entitled to the exclusion of the other, it must decide that question "Aye" or "No" and, having decided it in the affirmative, it is not for the Court to say that it is not satisfied. So here, having examined every plea which has been adduced to support the contention that the Respondent has some beneficial interest in the patents and rejected them all, the Court must declare itself satisfied that the Company is entitled, to the exclusion of the Respondent, and decline the jurisdiction conferred by the subsection.

It was urged that this construction of the subsection reduces its operation to negligible proportions. This was denied by Counsel for the Company who gave your Lordships examples of cases where he said the section might still operate. I am not concerned to examine this question, for the scope of the section may be a matter of further debate and I would not prejudice any view of it. It is sufficient to determine, as I do, that it can have no operation in the present case. If, in the result, its scope is less wide than may have been expected, that is not the affair of the Courts. I may add that teh construction which I have adopted of Subsec. (2) is strongly supported by Subsec. (1) which refers to the "rights", meaning thereby the legal rights, of the parties.

In the result I move that the appeal be allowed and the order of the Court of Appeal discharged, except so far as it relates to costs, and the order of Danckwerts, J., restored. In accordance with the conditions imposed upon the granting of leave to appeal, the Company will pay the Respondent's costs of this appeal.

My Lords, my noble and learned Friend, Lord Porter, who is unable to be here, has asked me to say that he concurs in my Opinion and in the Motion which I make.

**JUDGMENTBY-2:**

Lord Reid

**JUDGMENT-2:**

Lord Reid. -- My Lords, Sec. 56 is a new section in the Patents Act, 1949.  It begins by providing a relatively cheap and speedy method for determining disputes between employer and employee.  It is I think clear that under Subsec. (1) what has to be determined is the legal right of the parties, and that this subsection confers no power to override legal rights {58} or to substitute for a decision on legal rights a determination of what may be thought just or fair in all the circumstances, but it was argued for the Respondent that Subsec. (2) does confer a power to do this.

Subsection (2) cannot be applied at all if the Court or Comptroller is "satisfied that one or other of the parties is entitled, to the exclusion of the other, to the benefit of an invention made by the employee," but if the tribunal is not so satisfied then it has power to apportion the benefit of the invention.  The ordinary meaning of the word "entitled" is entitled as a matter of legal right, and even if the word could in some contexts be held to mean fairly or justly entitled in all the circumstances, some very cogent reason for so construing it would be required to justify an inference that Parliament intended to take the very unusual course of subordinating the legal rights of the parties to the discretion of the Court or the Comptroller -- particularly as there is no indication of any considerations to which the tribunal should have regard in exercising its discretion.  But in the subsection I can see no more than a faint indication that such might have been the intention: to say that a Court must be satisfied of something is more appropriate with regard to a matter of fact or opinion than with regard to a matter of legal right.  But the phraseology creates no real difficulty if the subsection is held to refer to legal rights alone.  The only real difficulty is that on this basis the scope of the subsection is very limited.  In the absence of agreement I do not see how there can be a case where the one party is not entitled to the whole benefit to the exclusion of the other, and if that be right the subsection can only come into operation if there has been some agreement express or implied to share the benefit.  And, if there is such an agreement and the subsection gives no authority to override legal rights, the subsection cannot be used to give to either party more or less than that to which the agreement entitles him.  It is, I suppose, possible that the apportionment authorised by the section might in some cases afford a convenient method of working out the terms of the parties' agreement "in such manner as the Court or Comptroller considers just"; but that is such a small matter that one is tempted to guess that Parliament had some wider intention.  But what that intention may have been cannot in my judgment be found by any method of construction or interpretation which is open to us.  Even if it could be shown that there is no case to which on this interpretation the subsection could apply in practice I would still find myself unable to discovery any other meaning which could properly be given to it.

Accordingly before the Respondent can invoke this subsection he must point to something which would prevent the Court from being satisfied that the legal right to the benefit of the inventions with which this case is concerned belongs to the Appellants.  No doubt the Respondent was the inventor and in the ordinary case the benefit of an invention belongs to the inventor.  But at the time when he made these inventions he was employed by the Appellants as their Chief Designer and it is, in my judgment, inherent in the legal relationship of master and servant that any product of the work which the servant is paid to do belongs to the master: I can find neither principle nor authority for holding that this rule ceases to apply if a product of that work happens to be a patentable invention.  Of course, as the relationship of master and servant is constituted by contract, the parties can, if they choose, alter or vary the normal incidents of the relationship, but they can only do that by express agreement or by an agreement which can be implied from the facts of the case.  The question in the present case therefore is whether there is anything to justify a finding that the parties agreed to alter the normal incidents of the Respondent's contract of employment, for it was not disputed that if the ordinary rule applies the patents in question belong wholly to the Appellants.

There are cases where it has been said that the employer's right to inventions made by an employee in the course of his employment arises from an implied term in the contract of employment.  Strictly speaking, I think that an implied term is something which in the circumstances of a particular case the law may read into the contract if the parties are silent and it would be reasonable to do so: it is something over and above the ordinary incidents of the particular type of contract.  If it were necessary in this case to find an implied term in that sense I should be in some difficulty.  But the

phrase "implied term" can be used to denote a term inherent in the nature of the contract which the law will imply in every case unless the parties agree to vary or exclude it.  I think that it has probably {59} been used in that sense in the cases founded on by the Respondent, and I am of opinion that it is only in that sense that the Appellants' right in this case can be said to arise from an implied term.

The Respondent therefore could only succeed if he could establish some agreement -- express or to be implied -- by which the ordinary incidents of his contract of employment were altered.  But all that he has to rely on is a so-called "understanding".  I do not think that it can be put more favourably for the Respondent than that he and the Appellants agreed to try to reach agreement about this matter as soon as possible.  And in fact they did reach such an agreement in 1942: they agreed that the Respondent should receive a "royalty", the patents themselves remaining the property of the Appellants.  But that agreement was cancelled in 1944, and the new agreement for royalties which was then made did not cover the patents now in question; it only applied to certain other patents.  I cannot find any basis for any implied agreement wich would give to the Respondent any rights in respect of the patents now in question.  It appears to me that after the 1942 agreement was cancelled the position with regard to anything not covered by the 1944 agreement was that the ordinary rule inherent in the parties' relationship of master and servant must apply, and therefore the patents in question belong to the Appellants and the Respondent has no defence to their counterclaim.  I therefore agree that this appeal should be allowed.

**JUDGMENTBY-3:** Lord Tucker

**JUDGMENT-3:**

Lord Tucker. -- My Lords, I am in complete agreement with the Opinion that has just been delivered by my noble and learned friend on the Woolsack, and would desire to add only a word or two about the judgment of the Court of Appeal.

That Court held that the "understanding" of December, 1941, contemplated that any arrangement made would recognise the Defendants' right to the benefit of any invention, or patent granted in respect thereof, subject to payment of a sum to be agreed by the Defendants to the Plaintiff for its use or exploitation, but that as no agreement was ever reached as to the amount or nature of the payment to be made the Defendants -- apart from Sec. 56 -- would be entitled in accordance with the ordinary implication to the benefit of the inventions and patents without any obligation to make any payment in respect thereof to the Plaintiff, since the Court -- apart from Sec. 56 -- could not impose upon the parties terms to which they had never agreed.  The Court, however, reached the conclusion that Sec. 56 gave them this jurisdiction.  They said: "It seems to us that the language of the subsection necessarily implies that there may be cases in which the Court may not be satisfied that the benefit of a disputed invention belongs to one of the parties to the exclusion of the other, although there is no agreement between them defining the proportions or manner in which such benefit is to be shared".

For the reasons which have been stated by my noble and learned friend, I am unable to accept an interpretation of Sec. 56 which would enable the Court -- in the absence of express agreement -- to vary the terms which the law imports into the contract of service between master and servant.

**JUDGMENTBY-4:** Lord Somervell of Harrow

**JUDGMENT-4:**

Lord Somervell of Harrow. -- My Lords, I agree.

**DISPOSITION:**

It was ordered that the order appealed from should be reversed, except as to costs, and the judgment of Danckwerts,

72 RPC 50

J., restored, the Appellants to pay the Respondent's costs in the House of Lords.

**SOLICITORS:**

Cosmo Cran & Co; Gedge, Fisk & Co.



**Westdeutsche** Landesbank Girozentrale v Islington London Borough Council

HOUSE OF LORDS

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

**HEARING-DATES:** 10, 11, 12, 13 July 1995, 22 May 1996

22 May 1996

**CATCHWORDS:**

Contract -- Failure of consideration -- Recovery of money paid -- Lump sum payment made by bank to local authority under interest rate swap agreement -- Payments also made by local authority pursuant to agreement -- Agreement being ultra vires the local authority and void -- Balance of lump sum recovered by bank -- Whether local authority liable to pay compound interest on balance from date sum paid -- Whether local authority holding funds on resulting trust -- Whether bank entitled to simple interest only.

Contract -- Restitution -- Interest rate swap agreement -- Bank entering into interest rate swap agreement with local authority -- Agreement ultra vires the local authority -- Balance of lump sum recovered by bank -- Whether compound interest recoverable from date sum paid.

**HEADNOTE:**

The plaintiff bank entered into a ten-year interest rate swap agreement with the defendant local authority commencing on 18 June 1987. The interest payments, which were payable half-yearly, were calculated on a notional principal sum of £25m by reference to the difference between the fixed rate of interest (payable by the bank) and the floating London Inter-Bank Offered Rate (payable by the local authority). Additionally, the bank agreed to pay the local authority a lump sum of £2·5m on the commencement date as the first of the fixed rate payments. By June 1989 the local authority had made four payments to the bank under the swap agreement, totalling £1,354,474·707. However, on 1 November 1989 the Divisional Court of the Queen's Bench Division held, in an unrelated case subsequently upheld by the House of Lords in January 1991, that interest rate swap transactions were outside the powers of local authorities and void ab initio. Thereafter the local authority made no further payments. The bank subsequently brought an action against the local authority, claiming inter alia repayment of £1,145,525·793, being the amount of the initial lump sum payment of £2·75m less the payments made by the local authority, and interest as from 18 June 1987. The judge held that the bank was entitled to recover the principal sum plus compound interest from 1 April 1990. The Court of Appeal dismissed the local authority's appeal and allowed the bank's cross-appeal from the judge's decision that the interest should run from April 1990. The local authority appealed to the House of Lords against the award of compound interest.

Held -- (1) In the absence of agreement or custom the court had no jurisdiction to award compound interest either at law or under s 35A of the Supreme Court Act 1981 and therefore, in a common law action for money had and received, the bank was entitled to recover only simple interest under s 35A. Moreover, in the absence of fraud, the courts of

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

equity had never awarded compound interest except against a trustee or other person owing fiduciary duties in cases where the award was in lieu of an account of profits improperly made by the trustee. The local authority, as a recipient of money under a contract subsequently found to be void for mistake or as being ultra vires, did not hold the money under a resulting trust, and there was no other basis on which it could be regarded as owing fiduciary duties to the bank in relation to the upfront payment of £2.5m.

(2) (Lord Goff and Lord Woolf dissenting) A claim for money had and received under an ultra vires contract was a personal action based on the total failure of consideration; it was not based on an implied contract or on an equitable proprietary claim. Notwithstanding the strength of the bank's moral claim to receive full restitution, it would not be appropriate to develop the law and award compound interest on the ground that equity could act in aid of the common law; Parliament had twice considered what interest should be awarded on common law claims and had made it clear, both in s 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 and its successor, s 35A of the 1981 Act, that the award of compound interest was not authorised. It followed that the bank was entitled only to simple interest on the principal sum from the date of accrual of its cause of action (ie 18 June 1987) and not compound interest. The local authority's appeal would accordingly be allowed; President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773 applied; Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 102 considered; Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622 not followed.

Decision of the Court of Appeal [1994] 4 All ER 890 reversed.

**NOTES:**

For a local authority's power to incur expenditure, see 28 Halsbury's Laws (4th edn) paras 1245, 1247, and for cases on the subject, see 33 Digest (Reissue) 31-34, 96-104.

For the Law Reform (Miscellaneous Provisions) Act 1934, s 3, see 11 Halsbury's Statutes (4th edn) (1991 reissue) 789.

For the Supreme Court Act 1981, s 35A, see ibid 998.

**CASES-REF-TO:**

A-G v Alford (1855) 4 De GM & G 843, 43 ER 737, LC.
Afovos Shipping Co SA v Pagnan, The Afovos [1980] 2 Lloyd's Rep 469; rvsd [1982] 3 All ER 18, [1982] 1 WLR 848; affd [1983] 1 All ER 449, [1983] 1 WLR 195, HL.
Ames' Settlement, Re, Dinwiddy v Ames [1946] 1 All ER 689, [1946] Ch 217.
Armory v Delamirie (1722) 1 Stra 505, [1558-1774] All ER Rep 121, 93 ER 664.
Arnott v Redfern (1826) 3 Bing 353, 130 ER 549.
Atwool v Merryweather (1867) LR 5 Eq 464n.
Bankers Trust Co v Shapira [1980] 3 All ER 353, [1980] 1 WLR 1274, CA.
Barclays Bank Ltd v Quistclose Investments Ltd [1968] 3 All ER 651, [1970] AC 567, [1968] 3 WLR 1097, HL.
Barnes v Addy (1874) LR 9 Ch App 244.
Birch v Blagrave (1755) Amb 264, 27 ER 176, LC.
BP Exploration Co (Libya) Ltd v Hunt (No 2) [1982] 1 All ER 925, [1979] 1 WLR 783; affd [1982] 1 All ER 925, [1981] 1 WLR 232, CA; affd [1982] 1 All ER 925, [1983] 2 AC 352, [1982] 2 WLR 253, HL.
Burdick v Garrick (1870) LR 5 Ch App 233.
Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 1025, [1981] Ch 105, [1980] 2 WLR 202.
Childers v Childers (1857) 1 De G & J 482, 44 ER 810.
Comr of Stamp Duties v Livingston [1964] 3 All ER 692, [1965] AC 694, [1964] 3 WLR 963, PC.
Cook (decd), Re, Beck v Grant [1948] 1 All ER 231, [1948] Ch 212.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

De Havilland v Bowerbank(1807) 1 Camp 50, 170 ER 872, NP.

Diplock's Estate, Re, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465, CA; affd sub nom Ministry of Health v Simpson [1950] 2 All ER 1137, [1951] AC 251, HL.

Eddowes v Hopkins (1780) 1 Doug KB 376, 99 ER 242.

Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd [1942] 2 All ER 122, [1943] AC 32, HL.

Gittins v Steele (1818) 1 Swan 24, 199, 36 ER 283, 356, LC.

Goldcorp Exchange Ltd (in receivership), Re [1994] 2 All ER 806, [1995] 1 AC 74, [1994] 3 WLR 199, PC.

Hadley v Baxendale (1854) 9 Exch 341, [1843-60] All ER Rep 461, 156 ER 148.

Hallett's Estate, Re, Knatchbull v Hallett (1880) 13 Ch D 696, [1874-80] All ER Rep 793, CA.

Hazell v Hammersmith and Fulham London BC [1991] 1 All ER 545, [1992] 2 AC 1, [1991] 2 WLR 372, HL; rvsg [1990] 3 All ER 33, [1990] 2 QB 697, [1990] 2 WLR 17, 1038, DC and CA.

Hungerfords v Walker (1988) 171 CLR 125, Aust HC.

Johnson v R [1904] AC 817, PC.

Kleinwort Benson Ltd v South Tyneside Metropolitan BC [1994] 4 All ER 972.

Leslie (R) Ltd v Sheill [1914] 3 KB 607, [1914-15] All ER Rep 511, CA.

Lipkin Gorman (a firm) v Karpnale Ltd [1992] 4 All ER 512, [1991] 2 AC 548, [1991] 3 WLR 10, HL.

London, Chatham and Dover Rly Co v South Eastern Rly Co [1893] AC 429, HL.

McCormick v Grogan (1869) LR 4 HL 82.

Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1989] 3 All ER 14, [1990] 1 QB 391, [1989] 3 WLR 563, CA.

Montagu's Settlement Trusts, Re (1985) [1992] 4 All ER 308, [1987] Ch 264, [1987] 2 WLR 1192.

Moses v Macferlan (1760) 2 Burr 1005, [1558-1774] All ER Rep 581, 97 ER 676.

Muller, Re, Cassin v Mutual Cash Order Co Ltd [1953] NZLR 879, NZ SC.

Napier and Ettrick (Lord) v Hunter, Lord Napier and Ettrick v R F Kershaw Ltd [1993] 1 All ER 385, [1993] AC 713, [1993] 2 WLR 42, HL.

National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637, [1989] 3 WLR 1330, HL.

O'Sullivan v Management Agency and Music Ltd [1985] 3 All ER 351, [1985] QB 428, [1984] 3 WLR 448, CA.

Page v Newman (1829) 9 B & C 378, 109 ER 140.

Pavey & Matthews Pty Ltd v Paul (1987) 69 ALR 577, Aust HC.

President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773, [1985] AC 104, [1984] 3 WLR 10, HL.

Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana [1983] 2 All ER 763, [1983] 2 AC 694, [1983] 3 WLR 203, HL.

Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622, HL.

Stocks v Wilson [1913] 2 KB 235.

Vandervell v IRC [1967] 1 All ER 1, [1967] 2 AC 291, [1967] 2 WLR 87, HL.

Vandervell's Trusts, Re (No 2), White v Vandervell Trustees Ltd [1974] 3 All ER 205, [1974] Ch 269, [1974] 3 WLR 256, CA.

Vinogradoff, Re, Allen v Jackson [1935] WN 68.

Wadsworth v Lydall [1981] 2 All ER 401, [1981] 1 WLR 598, CA.

Wallersteiner v Moir (No 2) [1975] 1 All ER 849, [1975] QB 373, [1975] 2 WLR 389, CA.

West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts, Re [1970] 1 All ER 544, [1971] Ch 1, [1970] 2 WLR 848.

Woolwich Building Society v IRC (No 2) [1992] 3 All ER 737, [1993] AC 70, [1992] 3 WLR 366, HL.

**INTRODUCTION:**

Appeal

The defendant, Islington London Borough Council (the council), appealed with leave of the Appeal Committee of

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

the House of Lords granted on 23 May 1994 from the decision of the Court of Appeal (Dillon, Leggatt and Kennedy LJJ) ([1994] 4 All ER 890, [1994] 1 WLR 938) made on 17 December 1993, whereby inter alia it dismissed the council's appeal from the decision of Hobhouse J ([1994] 4 All ER 890) made on 12 February 1993 giving judgment for the plaintiff, Westdeutsche Landesbank Girozentrale (the bank), in the sum of £1,145,525793 with compound interest from 1 April 1990. The issue on appeal was whether the court had jurisdiction to award compound interest. The facts are set out in the opinion of Lord Browne-Wilkinson.

**COUNSEL:**

Trevor Philipson QC and Brian Doctor for the council; Jonathan Sumption QC and George Leggatt for the bank.

**JUDGMENT-READ:**

Their Lordships took time for consideration. 22 May 1996. The following opinions were delivered.

**PANEL:** LORD GOFF OF CHIEVELEY, LORD BROWNE-WILKINSON, LORD SLYNN OF HADLEY, LORD WOOLF, LORD LLOYD OF BERWICK

**JUDGMENTBY-1:** LORD GOFF OF CHIEVELEY

**JUDGMENT-1:**

LORD GOFF OF CHIEVELEY: My Lords, this appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by s 63 of the Financial Services Act 1986.

One form of interest rate swap involves what is called an upfront payment, ie a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure; and it was assumed that such transactions were within their powers. However, as is well known, in Hazell v Hammersmith and Fulham London BC [1991] 1 All ER 545, [1992] 2 AC 1 your Lordships' House, restoring the decision of the Divisional Court ([1990] 3 All ER 33, [1990] 2 QB 697), held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two were selected as test cases. These were the present case, Westdeutsche

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

Landesbank Girozentrale v Islington London BC, and Kleinwort Benson Ltd v Sandwell BC. Both cases came on for hearing before Hobhouse J ([1994] 4 All ER 890). Your Lordships are concerned only with the former case. In a powerful judgment Hobhouse J held that the plaintiff (the bank) was entitled to recover from the defendant (the council) the net balance outstanding on the transaction between the parties, viz the difference between the upfront payment of £275m paid by the bank to the council on 18 June 1987, and the total of four semi-annual interest payments totalling £1,354,474707 paid by the council to the bank between December 1987 and June 1989, leaving a net balance of £1,145,525793 which the judge ordered the council to pay to the bank. He held the money to be recoverable by the bank either as money had and received by the council to the use of the bank, or as money which in equity the bank was entitled to trace into the hands of the council and have repaid out of the council's assets. He decided that the bank's right to restitution at common law arose from the fact that the payment made by the bank to the council was made under a purported contract which, unknown to both parties, was ultra vires the council and so void, no consideration having been given for the making of the payment. The decision by the judge, which was affirmed by the Court of Appeal ([1994] 4 All ER 890, [1994] 1 WLR 938), raised important questions in the law of restitution, which are of great interest to lawyers specialising in this field. Yet it is an extraordinary feature of the present appeal to your Lordships' House that the judge's decision on the substantive right of recovery at common law does not fall for consideration by your Lordships' House. The appeal of the council is confined to one point only -- the question of interest.

The judge ordered that the council should pay compound interest on the sum awarded against them, calculated at six-monthly rests from 1 April 1990 to the date of judgment. The Court of Appeal affirmed the judge's decision to award compound interest but, allowing a cross-appeal by the bank, ordered that interest should run from the date of receipt of the upfront payment. Both the judge and the Court of Appeal held that they were entitled to invoke against the council the equitable jurisdiction to award compound interest, on the basis that the bank was entitled to succeed against the council in an equitable proprietary claim. The foundation for the bank's equitable proprietary claim lay in the decision of this House in Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622. Since that decision has for long been controversial, the Appellate Committee invited argument on the question whether the House should depart from the decision despite the fact that it has stood for many years.

THE SHAPE OF THE CASE

Once the character of an interest swap transaction has been identified and understood, and it is appreciated that, because the transaction was beyond the powers of the council, it was void ab initio, the basic question is whether the law can restore the parties to the position they were in before they entered into the transaction. That is, of course, the function of the law of restitution. I feel bound to say that, in the present case, there ought to be no difficulty about that at all. This is because the case is concerned solely with money. All that has to be done is to order that each party should pay back the money it has received -- or, more sensibly, to strike a balance, and order that the party who has received most should repay the balance; and then to make an appropriate order for interest in respect of that balance. It should be as simple as that. And yet we find ourselves faced with a mass of difficult problems, and struggling to reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these cases, I too have found myself struggling in this way. But in the end I have come to realise the importance of keeping my eyes on the simple outline of the case which I have just described; and I have discovered that, if one does that -- if one keeps one's eyes open above the thicket of case law in which we can so easily become enclosed -- the solution of the problem in the present case becomes much more simple. In saying this, I do not wish in any way to criticise the judges who have been grappling with the case at first instance and in the Court of Appeal, within the confines of the doctrine of precedent by which they are bound. On the contrary, they are entitled to our gratitude and respect. The masterly judgment of Hobhouse J, in particular, has excited widespread admiration. But it is the great advantage of a supreme court that, not only does it have the great benefit of assistance from the judgments of the courts below, but also it has a greater freedom to mould, and remould, the authorities to ensure that practical justice is done within a framework of principle. The present case provides an excellent example of a case in which this House should take full advantage of that freedom.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

THE THREE PROBLEMS

There are three reasons why the present case has become so complicated. The first is that, in our law of restitution, there has developed an understanding that money can only be recovered on the ground of failure of consideration if that failure is total. The second is that because, in particular, of the well-known but controversial decision of this House in Sinclair v Brougham, it has come to be understood that a trust may be imposed in cases such as the present where the incapacity of one of the parties has the effect that the transaction is void. The third is that our law of interest has developed in a fragmentary and unsatisfactory manner, and in consequence insufficient attention has been given to the jurisdiction to award compound interest.

I propose at the outset to devote a little attention to each of these matters.

(1) Total failure of consideration

There has long been a desire among restitution lawyers to escape from the unfortunate effects of the so-called rule that money is only recoverable at common law on the ground of failure of consideration where the failure is total, by reformulating the rule upon a more principled basis; and signs that this will in due course be done are appearing in judgments throughout the common law world, as appropriate cases arise for decision. It is fortunate, however, that in the present case, thanks (I have no doubt) to the admirable researches of counsel, a line of authority was discovered which had escaped the attention of the scholars who work in this field. This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to do so, by ascertaining the balance of the account between the parties, and ordering the repayment of the balance. Moreover, the form of action by which this was achieved was the old action for money had and received -- what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of failure of consideration. Hobhouse J thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not troubled by the question whether there had been a total failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well-known passage in the speech of Viscount Simon LC in Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd [1942] 2 All ER 122 at 129, [1943] AC 32 at 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular, it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J is contrary to principle and could, if accepted, lead to undesirable consequences (see Professor Birks 'No Consideration: Restitution after Void Contracts' (1993) 23 UWALR 195; W J Swadling in [1994] RLR 73; and Professor Burrows 'Swaps and the Friction between Common Law and Equity' [1995] RLR 15). However, since there is before your Lordships no appeal from the decision that the bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

(2) A proprietary claim in restitution

I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen whether the bank should also have the benefit of an equitable proprietary claim in the form of a resulting trust. The immediate reaction must be -- why should it? Take the present case. The parties have entered into a commercial transaction. The transaction has, for technical reasons, been held to be void from the beginning. Each party is entitled to recover its money, with the result that the balance must be repaid. But why should the plaintiff bank be given the additional benefits which flow from a proprietary claim, for example the benefit of achieving priority in the event of the defendant's insolvency? After all, it has entered into a commercial transaction, and so taken the risk of the defendant's insolvency, just like the defendant's other creditors who have contracted with it, not to mention other creditors to whom the defendant may be liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an equitable proprietary claim in the form of a trust should be made available to the bank in the present case, but for two things. The first is the decision of this House in Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622, which appears to provide authority that a resulting trust may indeed arise in a case such as the present. The second is that on the authorities there is an equitable jurisdiction to award the plaintiff compound interest in cases where the defendant is a trustee. It is the combination of those two factors which has provided the foundation for the principal arguments advanced on behalf of the bank in support of its submission that it was entitled to an award of compound interest. I shall have to consider the question of availability of an equitable proprietary claim, and the effect of Sinclair v Brougham, in some depth in a moment. But first I wish to say a few words on the subject of interest.

(3) Interest

One would expect to find, in any developed system of law, a comprehensive and reasonably simple set of principles by virtue of which the courts have power to award interest. Since there are circumstances in which the interest awarded should take the form of compound interest, those principles should specify the circumstances in which compound interest, as well as simple interest, may be awarded; and the power to award compound interest should be available both at law and in equity. Nowadays, especially since it has been established (see National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637) that banks may, by the custom of bankers, charge compound interest upon advances made by them to their customers, one would expect to find that the principal cases in which compound interest may be awarded would be commercial cases.

Sadly, however, that is not the position in English law. Unfortunately, the power to award compound interest is not available at common law. The power is available in equity; but at present that power is, for historical reasons, exercised only in relation to certain specific classes of claim, in particular proceedings against trustees for an account. An important -- I believe the most important -- question in the present case is whether that jurisdiction should be developed to apply in a commercial context, as in the present case.

EQUITABLE PROPRIETARY CLAIMS

I now turn to consider the question whether an equitable proprietary claim was available to the bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty. The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand, have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

distorted; and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and of identifying the proper role of the trust within that rubric of the law, they remain concerned that the trust concept should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships' House to rewrite the agenda for the law of restitution, nor even to identify the role of equitable proprietary claims in that part of the law. The judicial process is neither designed for, nor properly directed towards, such objectives. The function of your Lordships' House is simply to decide the questions at issue before it in the present case; and the particular question now under consideration is whether, where money has been paid by a party to a contract which is ultra vires the other party and so void ab initio, he has the benefit of an equitable proprietary claim in respect of the money so paid. Moreover, the manner in which this question has arisen before this House renders it by no means easy to address. First of all, the point was not debated in any depth in the courts below, because they understood that they were bound by Sinclair v Brougham to hold that such a claim was here available. But second, the point has arisen only indirectly in this case, since it is relevant only to the question whether the court here has power to make an award of compound interest. It is a truism that, in deciding a question of law in any particular case, the courts are much influenced by considerations of practical justice, and especially by the results which would flow from the recognition of a particular claim on the facts of the case before the court. Here, however, an award of compound interest provides no such guidance, because it is no more than a consequence which is said to flow, for no more than historical reasons, from the availability of an equitable proprietary claim. It therefore provides no guidance on the question whether such a claim should here be available.

In these circumstances I regard it as particularly desirable that your Lordships should, so far as possible, restrict the inquiry to the actual questions at issue in this appeal, and not be tempted into formulating general principles of a broader nature. If restitution lawyers are hoping to find in your Lordships' speeches broad statements of principle which may definitively establish the future shape of this part of the law, I fear that they may be disappointed. I also regard it as important that your Lordships should, in the traditional manner, pay particular regard to the practical consequences which may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of the availability of an equitable proprietary claim in a case such as the present. The argument advanced on behalf of the bank was that the money paid by them under the void contract was received by the council subject to a resulting trust. This approach was consistent with that of Dillon LJ in the Court of Appeal (see [1994] 4 All ER 890 at 962, [1994] 1 WLR 938 at 947). It is also consistent with the approach of Viscount Haldane LC (with whom Lord Atkinson agreed) in Sinclair v Brougham [1914] AC 398 at 420-421, [1914-15] All ER Rep 622 at 632.

I have already expressed the opinion that, at first sight, it is surprising that an equitable proprietary claim should be available in a case such as the present. However, before I examine the question as a matter of principle, I propose first to consider whether Sinclair v Brougham supports the argument now advanced on behalf of the bank.

Sinclair v Brougham

The decision of this House in Sinclair v Brougham has loomed very large in both the judgments in the courts below and in the admirable arguments addressed to the Appellate Committee of this House. It has long been regarded as a controversial decision, and has been the subject of much consideration by scholars, especially those working in the field of restitution. I have however reached the conclusion that it is basically irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck Permanent Benefit Building Society decided to set up a banking business, known as the Birkbeck Bank. The banking business was however held to be ultra vires the objects of the building society; and there followed a spate of litigation concerned with solving the problems consequent

upon that decision. Sinclair v Brougham was one of those cases.

The case has been analysed in lucid detail in the speech of my noble and learned friend Lord Browne-Wilkinson, which I have read (in draft) with great respect. In its bare outline, it was concerned with the distribution of the assets of the society, which was insolvent. There were four classes of claimants. First, there were two classes of shareholders -- the A shareholders (entitled to repayment of their investment on maturity) and the B shareholders (whose shares were permanent). Next, there was a numerous class of people who had deposited money at the bank under contracts which were ultra vires and so void. Finally, there were the ordinary trade creditors of the society. By agreement, the A shareholders and the trade creditors were paid off first, leaving only the claims of the depositors and the B shareholders. There were sufficient assets to pay off the A shareholders, but not the depositors and certainly not both. The question of how to reconcile their competing claims arose for consideration on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the depositors deposited their money at the bank were ultra vires and so void. That prevented them from establishing a simple contractual right to be repaid, in which event they would have ranked with the ordinary trade creditors of the society in the liquidation. As it was, they claimed to be entitled to repayment in an action for money had and received -- in the same way as the bank claimed repayment in the case now before your Lordships. But the House of Lords held that they were not entitled to claim on this ground. This was in substance because to allow such a claim would permit an indirect enforcement of the contract which the policy of the law had decreed should be void. In those days, of course, judges still spoke about the common law right to restitution in the language of implied contract, and so we find Lord Sumner saying in a much-quoted passage ([1914] AC 398 at 452, [1914-15] All ER Rep 622 at 648):

'To hold otherwise would be indirectly to sanction an ultra vires borrowing. All these causes of action are common species of the genus assumpsit. All now rest, and long have rested, upon a notional or imputed promise to repay. The law cannot de jure impute promises to repay, whether for money had and received or otherwise, which, if made de facto, it would inexorably avoid.'

This conclusion however created a serious problem because, if the depositors had no claim, then, in the words of Lord Dunedin ([1914] AC 398 at 436, [1914-15] All ER Rep 622 at 640):

'The appalling result in this very case would be that the society's shareholders having got proceeds of the depositors' money in the form of investments, so that each individual depositor is utterly unable to trace his money, are enriched to the extent of some 500 per cent.'

As a matter of practical justice, such a result was obviously unacceptable; and it was to achieve justice that the House had recourse to equity to provide the answer. It is, I think, apparent from the reasoning of the members of the Appellate Committee that they regarded themselves, not as laying down some broad general principle, but as solving a particular practical problem. In this connection it is, in my opinion, significant that there was a considerable variation in the way in which they approached the problem. Viscount Haldane LC, with whom Lord Atkinson agreed, did so on the basis that there arose in the circumstances 'a resulting trust, not of an active character' (see [1914] AC 398 at 421, [1914-15] All ER Rep 622 at 632). Lord Dunedin based his decision upon a broad equity of restitution, drawn from Roman and French law. He asked himself the question: 'Is English equity to retire defeated from the task which other systems of equity have conquered?' -- a question which he answered in the negative (see [1914] AC 398 at 435, [1914-15] All ER Rep 622 at 639). Lord Parker of Waddington attempted to reconcile his decision with the established principles of equity by holding that the depositors' money had been received by the directors of the society as fiduciaries, with the effect that the depositors could thereafter follow their money in equity into the assets of the society (see [1914] AC 398 at 441-442, [1914-15] All ER Rep 622 at 643). Lord Sumner considered that the case should be decided on equitable principles on which there was no direct authority. He regarded the question as one of administration, in which 'the most just distribution of the whole must be directed, so only that no [recognised] rule of law or equity be disregarded' (see [1914] AC 398 at 458, [1914-15] All ER Rep 622 at 651). Setting on one side the opinion of Lord Parker, whose approach I find very difficult to reconcile with the facts of the case, I do not discern in

the speeches of the members of the Appellate Committee any intention to impose a trust carrying with it the personal duties of a trustee.

For present purposes, I approach this case in the following way. First, it is clear that the problem which arose in Sinclair v Brougham, viz that a personal remedy in restitution was excluded on grounds of public policy, does not arise in the present case, which is not of course concerned with a borrowing contract. Second, I regard the decision in Sinclair v Brougham as being a response to that problem in the case of ultra vires borrowing contracts, and as not intended to create a principle of general application. From this it follows, in my opinion, that Sinclair v Brougham is not relevant to the decision in the present case. In particular it cannot be relied upon as a precedent that a trust arises on the facts of the present case, justifying on that basis an award of compound interest against the council.

But I wish to add this. I do not in any event think that it would be right for your Lordships' House to exercise its power under the Practice Statement (Judicial Precedent) [1966] 3 All ER 77, [1966] 1 WLR 1234 to depart from Sinclair v Brougham. I say this first because, in my opinion, any decision to do so would not be material to the disposal of the present appeal, and would therefore be obiter. But there is a second reason of substance why, in my opinion, that course should not be taken. I recognise that nowadays cases of incapacity are relatively rare, though the swaps litigation shows that they can still occur. Even so, the question could still arise whether, in the case of a borrowing contract rendered void because it was ultra vires the borrower, it would be contrary to public policy to allow a personal claim in restitution. Such a question has arisen in the past not only in relation to associations such as the Birkbeck Permanent Benefit Building Society, but also in relation to infants' contracts. Moreover there is a respectable body of opinion that, if such a case arose today, it should still be held that public policy would preclude a personal claim in restitution, though not of course by reference to an implied contract. That was the opinion expressed by Leggatt LJ in the Court of Appeal (see [1994] 4 All ER 890 at 968, [1994] 1 WLR 938 at 952) in the present case, as it had been by Hobhouse J; and the same view has been expressed by Professor Birks (see Birks An Introduction to the Law of Restitution (1985) p 374). I myself incline to the opinion that a personal claim in restitution would not indirectly enforce the ultra vires contract, for such an action would be unaffected by any of the contractual terms governing the borrowing, and moreover would be subject (where appropriate) to any available restitutionary defences. If my present opinion were to prove to be correct then Sinclair v Brougham will fade into history. If not, then recourse can at least be had to Sinclair v Brougham as authority for the proposition that, in such circumstances, the lender should not be without a remedy. Indeed, I cannot think that English law, or equity, is so impoverished as to be incapable of providing relief in such circumstances. Lord Wright, who wrote in strong terms indorsing the just result in Sinclair v Brougham, would turn in his grave at any such suggestion (see 'Sinclair v Brougham' [1938] CLJ 305). Of course, it may be necessary to reinterpret the decision in that case to provide a more satisfactory basis for it; indeed one possible suggestion has been proposed by Professor Birks in Law of Restitution p 396ff). But for the present the case should in my opinion stand, though confined in the manner I have indicated, as an assertion that those who are caught in the trap of advancing money under ultra vires borrowing contracts will not be denied appropriate relief.

THE AVAILABILITY OF AN EQUITABLE PROPRIETARY CLAIM IN THE PRESENT CASE

Having put Sinclair v Brougham on one side as providing no authority that a resulting trust should be imposed in the facts of the present case, I turn to the question whether, as a matter of principle, such a trust should be imposed, the bank's submission being that such a trust arose at the time when the sum of £2.5m was received by the council from the bank.

As my noble and learned friend Lord Browne-Wilkinson observes, it is plain that the present case falls within neither of the situations which are traditionally regarded as giving rise to a resulting trust, viz (1) voluntary payments by A to B, or for the purchase of property in the name of B or in his and A's joint names, where there is no presumption of advancement or evidence of intention to make an out-and-out gift; or (2) property transferred to B on an express trust which does not exhaust the whole beneficial interest. The question therefore arises whether resulting trusts should be extended beyond such cases to apply in the present case, which I shall treat as a case where money has been paid for a consideration which fails.

In a most interesting and challenging paper, 'Restitution and Resulting Trusts' in Equity and Contemporary Legal Developments, Papers Presented at the First International Conference on Equity (ed Goldstein, 1992) p 335, Professor Birks has argued for a wider role for the resulting trust in the field of restitution, and specifically for its availability in cases of mistake and failure of consideration. His thesis is avowedly experimental, written to test the temperature of the water. I feel bound to respond that the temperature of the water must be regarded as decidedly cold (see eg Professor Burrows 'Swaps and the Friction between Common Law and Equity' [1995] RLR 15 and W J Swadling 'A new role for resulting trusts?' (1996) 16 LS 110).

In the first place, as Lord Browne-Wilkinson points out, to impose a resulting trust in such cases is inconsistent with the traditional principles of trust law. For on receipt of the money by the payee it is to be presumed that (as in the present case) the identity of the money is immediately lost by mixing with other assets of the payee, and at that time the payee has no knowledge of the facts giving rise to the failure of consideration. By the time that those facts come to light, and the conscience of the payee may thereby be affected, there will therefore be no identifiable fund to which a trust can attach. But there are other difficulties. First, there is no general rule that the property in money paid under a void contract does not pass to the payee; and it is difficult to escape the conclusion that, as a general rule, the beneficial interest to the money likewise passes to the payee. This must certainly be the case where the consideration for the payment fails after the payment is made, as in cases of frustration or breach of contract; and there appears to be no good reason why the same should not apply in cases where, as in the present case, the contract under which the payment is made is void ab initio and the consideration for the payment therefore fails at the time of payment. It is true that the doctrine of mistake might be invoked where the mistake is fundamental in the orthodox sense of that word. But that is not the position in the present case; moreover the mistake in the present case must be classified as a mistake of law which, as at the law at present stands, creates its own special problems. No doubt that much-criticised doctrine will fall to be reconsidered when an appropriate case occurs; but I cannot think that the present is such a case, since not only has the point not been argued but (as will appear) it is my opinion that there is any event jurisdiction to award compound interest in the present case. For all of these reasons I conclude, in agreement with my noble and learned friend, that there is no basis for holding that a resulting trust arises in cases where money has been paid under a contract which is ultra vires and therefore void ab initio. This conclusion has the effect that all the practical problems which would flow from the imposition of a resulting trust in a case such as the present, in particular the imposition upon the recipient of the normal duties of trustee, do not arise. The dramatic consequences which would occur are detailed by Professor Burrows in 'Swaps and the Friction between Common Law and Equity' [1995] RLR 15 at 27: the duty to account for profits accruing from the trust property; the inability of the payee to rely upon the defence of change of position; the absence of any limitation period; and so on. Professor Burrows even goes so far as to conclude that the action for money had and received would be rendered otiose in such cases, and indeed in all cases where the payer seeks restitution of mistaken payments. However, if no resulting trust arises, it also follows that the payer in a case such as the present cannot achieve priority over the payee's general creditors in the event of his insolvency -- a conclusion which appears to me to be just.

For all these reasons I conclude that there is no basis for imposing a resulting trust in the present case, and I therefore reject the bank's submission that it was here entitled to proceed by way of an equitable proprietary claim. I need only add that, in reaching that conclusion, I do not find it necessary to review the decision of Goulding J in Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 1025, [1981] Ch 105.

INTEREST

It is against that background that I turn to consider the question of compound interest. Here there are three points which fall to be considered. These are (1) whether the court had jurisdiction to award compound interest; (2) if so, whether it should have exercised its jurisdiction to make such an award in the present case; and (3) from what date should such an award of compound interest run, if made.

It is common ground that in a case such as the present there is no jurisdiction to award compound interest at common law or by statute. The central question in the present case is therefore whether there is jurisdiction in equity to

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

do so. It was held below, on the basis that the bank was entitled to succeed not only in a personal claim at common law but also in a proprietary claim in equity, that there was jurisdiction in equity to make an order that the council should pay compound interest on the sum adjudged due. It was that jurisdiction which was exercised by Hobhouse J, whose decision on the point was not challenged before the Court of Appeal, on the basis that Sinclair v Brougham provided binding authority that a proprietary claim was available to the bank in this case. However since, in my opinion, Sinclair v Brougham provides no such authority, and no proprietary claim is available to the bank, the question now arises whether the equitable jurisdiction to award compound interest may nevertheless be exercised on the facts of the present case.

I wish however to record that Hobhouse J was in no doubt that, if he had jurisdiction to do so, he should award compound interest in this case. He said ([1994] 4 All ER 890 at 955):

'Anyone who lends or borrows money on a commercial basis receives or pays interest periodically and if that interest is not paid it is compounded . . . I see no reason why I should deny the plaintiff a complete remedy or allow the defendant arbitrarily to retain part of the enrichment which it has unjustly enjoyed.'

With that reasoning I find myself to be in entire agreement. The council has had the use of the bank's money over a period of years. It is plain on the evidence that, if it had not had the use of the bank's money, it would (if free to do so) have borrowed the money elsewhere at compound interest. It has to that extent profited from the use of the bank's money. Moreover, if the bank had not advanced the money to the council, it would itself have employed the money on similar terms in its business. Full restitution requires that, on the facts of the present case, compound interest should be awarded, having regard to the commercial realities of the case. As the judge said, there is no reason why the bank should be denied a complete remedy.

It follows therefore that everything depends on the scope of the equitable jurisdiction. It also follows, in my opinion, that if that jurisdiction does not extend to apply in a case such as the present, English law will be revealed as incapable of doing full justice.

It is right that I should record that the scope of the equitable jurisdiction was not explored in depth in the course of argument before the Appellate Committee, in which attention was concentrated on the question whether a proprietary claim was available to the bank in the circumstances of the present case. In other circumstances, it might well have been appropriate to invite further argument on the point. However, since it was indicated to the Committee that the council was not prepared to spend further money on the appeal, whereupon it took no further part in the proceedings, and since the relevant authorities had been cited to the Committee, I am satisfied that it is appropriate that the point should now be decided by your Lordships' House.

I wish also to record that I have had the opportunity of reading in draft the speech of my noble and learned friend Lord Woolf, and that I find myself to be in agreement with his reasoning and conclusion on the point. Even so, I propose to set out in my own words my reasons for reaching the same conclusion.

I shall begin by expressing two preliminary thoughts. The first is that, where the jurisdiction of the court derives from common law or equity, and is designed to do justice in cases which come before the courts, it is startling to be faced by an argument that the jurisdiction is so restricted as to prevent the courts from doing justice. Jurisdiction of that kind should as a matter of principle be as broad as possible, to enable justice to be done wherever necessary; and the relevant limits should be found, not in the scope of the jurisdiction, but in the manner of its exercise as the principles are worked out from case to case. Second, I find it equally startling to find that the jurisdiction is said to be limited to certain specific categories of case. Where jurisdiction is founded on a principle of justice, I would expect that the categories of case where it is exercised should be regarded not as occupying the whole field but rather as emanations of the principle, so that the possibility of the jurisdiction being extended to other categories of case is not foreclosed.

It is with these thoughts in mind that I turn to the equitable jurisdiction to award interest. In President of India v La

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

Pintada Cia Navegacion SA [1984] 2 All ER 773 at 779, [1985] AC 104 at 116 Lord Brandon of Oakbrook, delivering a speech with which the other members of the Appellate Committee agreed, described the equitable jurisdiction in the following words:

'Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position.'

Later, however, he said that courts of Chancery only awarded compound, as distinct from simple, interest in two special classes of case.

With great respect I myself consider that, if the jurisdiction to award compound interest is available where justice so demands, it cannot be so confined as to exclude any class of case simply because that class of case has not previously been recognised as falling within it. I prefer therefore to read the passage quoted from Lord Brandon's speech as Mason CJ and Wilson J read it in Hungerfords v Walker (1988) 171 CLR 125 at 148, as providing examples (ie not exclusive examples) of the application of the underlying principle of justice.

Now it is true that the reported cases on the exercise of the equitable jurisdiction, which are by no means numerous, are concerned with cases of breach of duty by trustees and other fiduciaries. In A-G v Alford (1855) 4 De GM & G 843, 43 ER 737, for example, which came before Lord Cranworth LC, the question arose whether an executor and trustee, who had for several years retained in his hands trust funds which he ought to have invested, should be chargeable with interest in excess of the ordinary rate of simple interest. It was held that he should not be chargeable at a higher rate. Lord Cranworth LC recognised that the court might in such a case impose interest at a higher rate, or even compound interest. But he observed that if so the court does not impose a penalty on the trustee. He said (4 De GM & G 843 at 851, 43 ER 737 at 741):

'What the court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he is estopped from saying that he did not receive it.'

In cases of misconduct which benefits the executor, however, the court may fairly infer that he used the money in speculation, and may, on the principle 'In odium spoliatoris omnia praesumuntur' assume that he made a higher rate, if that was a reasonable conclusion.

Likewise in Burdick v Garrick (1870) LR 5 Ch App 233, where a fiduciary agent held money of his principal and simply paid it into his bank account, it was held that he should be charged with simple interest only. Lord Hatherley LC applied the principle laid down in A-G v Alford, namely that --

'the court does not proceed against an accounting party by way of punishing him for making use of the Plaintiff's money by directing rests, or payment of compound interest, but proceeds upon this principle, either that he has made, or has put himself into such a position as that he is to be presumed to have made, 5 per cent., or compound interest, as the case may be. If the Court finds . . . that the money received has been invested in an ordinary trade, the whole course of decision has tended to this, that the Court presumes that the party against whom relief is sought has made that amount of profit which persons ordinarily do make in trade, and in those cases the Court directs rests to be made.' (See LR 5 Ch App 233 at 241-242.)

For a more recent case in which the equitable jurisdiction was invoked, see Wallersteiner v Moir (No 2) [1975] 1 All ER 849, [1975] QB 373.

From these cases it can be seen that compound interest may be awarded in cases where the defendant has wrongfully profited, or may be presumed to have so profited, from having the use of another person's money. The power to award compound interest is therefore available to achieve justice in a limited area of what is now seen as the

law of restitution, viz where the defendant has acquired a benefit through his wrongful act (see Goff and Jones Law of Restitution (4th edn, 1993) p 632ff; Birks Law of Restitution p 313ff; and Burrows Law of Restitution p 403ff). The general question arises whether the jurisdiction must be kept constrained in this way, or whether it may be permitted to expand so that it can be exercised to ensure that full justice can be done elsewhere in that rubric of the law. The particular question is whether the jurisdiction can be exercised in a case such as the present in which the council has been ordered to repay the balance of the bank's money on the ground of unjust enrichment, in a personal claim at common law.

At this stage of the argument I wish to stress two things. The first is that it is plain that the jurisdiction may, in an appropriate case, be exercised in the case of a personal claim in equity. In both Alford's case and Burdick v Garrick, the cases were concerned with the taking of an account, and an order for payment of the sum found due. In each case the accounting party was a fiduciary, who held the relevant funds on trust. But the jurisdiction is not limited to cases in which a proprietary claim is being made and an award of interest is sought as representing the fruits of the property so claimed. On the contrary, the jurisdiction is in personam, and moreover an award of interest may be made not only where the trustee or fiduciary has made a profit, but also where it is held that he ought to have made a profit and has not done so. Furthermore, in my opinion the decision of the Court of Appeal in Re Diplock's Estate, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465 provides no authority for the proposition that there is no jurisdiction to award compound interest where the claim is a personal claim. It is true that in that case the Court of Appeal decided not to award interest against a number of charities which had been held liable, in a personal claim in equity, to repay legacies which had been paid to them in error. But in so doing the court simply followed an old decision of Lord Eldon LC in Gittins v Steele (1818) 1 Swan 24, 199 at 200, 36 ER 283, 356 at 357, in which his judgment was as follows:

'Where the fund out of which the legacy ought to have been paid is in the hands of the Court making interest, unquestionably interest is due. If a legacy has been erroneously paid to a legatee who has no farther property in the estate, in recalling that payment I apprehend that the rule of the Court is not to charge interest; but if the legatee is entitled to another fund making interest in the hands of the Court, justice must be done out of his share.'

The Court of Appeal in Re Diplock's Estate can have had no desire to make an award of interest against the charities in the personal claim against them in that case, and they must have been very content to follow uncritically this old 'rule of court'. But it does not follow that the rule of court went to the jurisdiction of the court. It is more likely that it represented an established practice which, as Lord Eldon LC's brief judgment indicates, was subject to exceptions. In any event the Court of Appeal was there concerned only with simple interest; and in cases of the kind there under consideration, it seems unlikely that any question of an award of compound interest would ever have arisen.

I must confess that I find the reasoning which would restrict the equitable jurisdiction to award compound interest to cases where the claim is proprietary in nature to be both technical and unrealistic. This is shown by the reasoning and conclusion of Hobhouse J in Kleinwort Benson Ltd v South Tyneside Metropolitan BC [1994] 4 All ER 972, another swap transaction case, in which the plaintiff bank had no proprietary claim. The judge upheld the submission of the defendant council that, although they were under a personal liability to make restitution both at law and in equity, nevertheless the court had no jurisdiction to award compound interest on the sum adjudged due. He said (at 994):

'If . . . the plaintiff is only entitled to a personal remedy which will be the case where, although there was initially a fiduciary relationship and the payer was entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself.'

This reasoning is logical, assuming the restricted nature of the equitable jurisdiction to award compound interest. But if, as Lord Brandon in President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773 at 779, [1985] AC 104 at 116 stated, the jurisdiction is founded upon the demands of justice, it is difficult to see the sense of the distinction which Hobhouse J felt compelled to draw. It seems strange indeed that, just because the power to trace property has

ceased, the court's jurisdiction to award compound interest should also come to an end. For where the claim is based upon the unjust enrichment of the defendant, it may be necessary to have power to award compound interest to achieve full restitution, ie to do full justice, as much where the plaintiff's claim is personal as where his claim is proprietary in nature. Furthermore, I know of no authority which compelled Hobhouse J to hold that he had no jurisdiction to award compound interest in respect of the personal claim in equity in the case before him.

For these reasons I am satisfied that there is jurisdiction in equity to award compound interest in the case of personal claims as well as proprietary claims.

I turn next to the question whether the equitable jurisdiction can be exercised in aid of common law remedies such as, for example, a personal remedy in restitution, to repair the deficiencies of the common law. Here I turn at once to Snell's Principles of Equity (29th edn, 1990) p 28, where the first maxim of equity is stated to be that 'Equity will not suffer a wrong to be without a remedy'. The commentary on this maxim in the text reads:

'The idea expressed in this maxim is that no wrong should be allowed to go unredressed if it is capable of being remedied by courts of justice, and this really underlies the whole jurisdiction of equity. As already explained, the common law courts failed to remedy many undoubted wrongs, and this failure led to the establishment of the Court of Chancery. But [it] must not be supposed that every moral wrong was redressed by the Court of Chancery. The maxim must be taken as referring to rights which are suitable for judicial enforcement, but were not enforced at common law owing to some technical defect.'

To this maxim is attributed the auxiliary jurisdiction of equity. The commentary reads:

'Again, to this maxim may be traced the origin of the auxiliary jurisdiction of the Court of Chancery, by virtue of which suitors at law were aided in the enforcement of their legal rights. Without such aid these rights would often have been "wrongs without remedies." For instance, it was often necessary for a plaintiff in a common law action to obtain discovery of facts resting in the knowledge of the defendant, or of deeds, writings or other things in his possession or power. The common law courts, however, had no power to order such discovery, and recourse was therefore had to the Court of Chancery, which assumed jurisdiction to order the defendant to make discovery on his oath.'

The question which arises in the present case is whether, in the exercise of equity's auxiliary jurisdiction, the equitable jurisdiction to award compound interest may be exercised to enable a plaintiff to obtain full justice in a personal action of restitution at common law.

I start with the position that the common law remedy is, in a case such as the present, plainly inadequate, in that there is no power to award compound interest at common law and that without that power the common law remedy is incomplete. The situation is therefore no different from that in which, in the absence of jurisdiction at common law to order discovery, equity stepped in to enable justice to be done in common law actions by ordering the defendant to make discovery on oath. The only difference between the two cases is that, whereas the equitable jurisdiction to order discovery in aid of common law actions was recognised many years ago, the possibility of the equitable jurisdiction to award compound interest being exercised in aid of common law actions was not addressed until the present case. Fortunately, however, judges of equity have always been ready to address new problems, and to create new doctrines, where justice so requires. As Jessel MR said, in a famous passage in his judgment in Re Hallett's Estate, Knatchbull v Hallett (1880) 13 Ch D 696 at 710, [1874-80] All ER Rep 793 at 796:

'I intentionally say modern rules, because it must not be forgotten that the rules of Courts of Equity are not, like the rules of the Common Law, supposed to have been established from time immemorial. It is perfectly well known that they have been established from time to time -- altered, improved, and refined from time to time. In many cases we know the names of the Chancellors who invented them. No doubt they were invented for the purpose of securing the better administration of justice, but still they were invented.'

I therefore ask myself whether there is any reason why the equitable jurisdiction to award compound interest should

not be exercised in a case such as the present. I can see none. Take, for example, the case of fraud. It is well established that the equitable jurisdiction may be exercised in cases of fraud. Indeed, it is plain that, on the same facts, there may be a remedy both at law and in equity to recover money obtained by fraud (see Johnson v R [1904] AC 817 at 822 per Lord Macnaghten). Is it to be said that, if the plaintiff decides to proceed in equity, compound interest may be awarded; but that if he chooses to proceed in an action at law, no such auxiliary relief will be available to him? I find it difficult to believe that, at the end of the twentieth century, our law should be so hidebound by forms of action as to be compelled to reach such a conclusion.

For these reasons I conclude that the equitable jurisdiction to award compound interest may be exercised in the case of personal claims at common law, as it is in equity. Furthermore, I am satisfied that, in particular, the equitable jurisdiction may, where appropriate, be exercised in the case of a personal claim in restitution. In reaching that conclusion, I am of the opinion that the decision of Hobhouse J in Kleinwort Benson Ltd v South Tyneside Metropolitan BC [1994] 4 All ER 972 that the court had no such jurisdiction should not be allowed to stand.

I recognise that, in so holding, the courts would be breaking new ground, and would be extending the equitable jurisdiction to a field where it has not hitherto been exercised. But that cannot of itself be enough to prevent what I see to be a thoroughly desirable extension of the jurisdiction, consistent with its underlying basis that it exists to meet the demands of justice. An action of restitution appears to me to provide an almost classic case in which the jurisdiction should be available to enable the courts to do full justice. Claims in restitution are founded upon a principle of justice, being designed to prevent the unjust enrichment of the defendant (see Lipkin Gorman (a firm) v Karpnale Ltd [1992] 4 All ER 512, [1991] 2 AC 548). Long ago, in Moses v Macferlan (1760) 2 Burr 1005 at 1012, [1558-1774] All ER Rep 581 at 585, Lord Mansfield said that the gist of the action for money had and received is that 'the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money'. It would be strange indeed if the courts lacked jurisdiction in such a case to ensure that justice could be fully achieved by means of an award of compound interest, where it is appropriate to make such an award, despite the fact that the jurisdiction to award such interest is itself said to rest upon the demands of justice. I am glad not to be forced to hold that English law is so inadequate as to be incapable of achieving such a result. In my opinion the jurisdiction should now be made available, as justice requires, in cases of restitution, to ensure that full justice can be done. The seed is there, but the growth has hitherto been confined within a small area. That growth should now be permitted to spread naturally elsewhere within this newly recognised branch of the law. No genetic engineering is required, only that the warm sun of judicial creativity should exercise its benign influence rather than remain hidden behind the dark clouds of legal history.

I wish to add that I for my part do not consider that the statutory power to award interest, either under s 3 of the Law Reform (Miscellaneous Provisions) Act 1934 or under s 35A of the Supreme Court Act 1981 (which, pursuant to s 15 of the Administration of Justice Act 1982, superseded s 3 of the 1934 Act), inhibits the course of action which I now propose. It is true that s 3(1) of the 1934 Act, when empowering courts of record to award interest in proceedings for the recovery of any debt or damages, did not authorise the giving of interest upon interest. But I cannot see that it would be inconsistent with the intention then expressed by Parliament later to extend the existing equitable jurisdiction to award compound interest to enable courts to ensure that full restitution is achieved in personal actions of restitution at common law. It is of course common knowledge that, until the latter part of this century, the existence of a systematic law of restitution, founded upon the principle of unjust enrichment, had not been recognised in English law. The question whether there should be a power to award compound interest in such cases, in order to achieve full restitution, simply did not arise in 1934 and cannot therefore have been considered by Parliament in that year. To hold that, because Parliament did not then authorise an award of compound interest in proceedings the nature of which was not then recognised, the courts should now be precluded from exercising the ordinary judicial power to develop the law by extending an existing jurisdiction to meet a newly recognised need appears to me to constitute an unnecessary and undesirable fetter upon the judicial development of the law. It is not to be forgotten that there is jurisdiction in equity, as well as at common law, to order restitution on the ground of unjust enrichment; and I cannot see that s 3(1) of the 1934 Act would have precluded any extension of the existing equitable jurisdiction to award compound interest to enable full restitution to be achieved in such a case. Accordingly neither would s 3(1), which applied to all courts of record, have

precluded a similar extension of the jurisdiction to enable full restitution to be achieved in actions at common law. Section 35A of the 1981 Act no doubt perpetuated the position as established by s 3(1) of the 1934 Act, in that it too did not confer a power on the courts to award compound interest; but I cannot see that this affects the position. In so far as it is relevant to refer to the Law Commission's report, Law of Contract: Report on Interest (Law Com No 88) (1978), which preceded that enactment, it appears from the report that it was generally opposed to the introduction of any general power to award compound interest; but there was no intention of interfering with the equitable jurisdiction, and the problem which has arisen in the present case was not addressed. I wish to add that such an extension of the equitable jurisdiction as I propose would, in my opinion, be a case of equity acting in aid of the common law. There is in my opinion no need, and indeed no basis, for outlawing such a development as a case of equity acting in aid of the legislature simply because the legislature, in conferring upon courts the power to award simple interest, did not authorise the giving of compound interest.

It remains for me to say that I am satisfied, for the reasons given by Hobhouse J, that this is a case in which it was appropriate that compound interest should be awarded. In particular, since the council had the free use of the bank's money in circumstances in which, if it had borrowed the money from some other financial institution, it would have had to pay compound interest for it, the council can properly be said to have profited from the bank's money so as to make an award of compound interest appropriate. However, for the reasons given by Dillon LJ ([1994] 4 All ER 890 at 947-949, [1994] 1 WLR 938 at 947-949), I agree with the Court of Appeal that the interest should run from the date of receipt of the money.

CONCLUSION

For these reasons I would dismiss the appeal.

**JUDGMENTBY-2:** LORD BROWNE-WILKINSON

**JUDGMENT-2:**

LORD BROWNE-WILKINSON: My Lords, in the last decade many local authorities entered into interest rate swap agreements with banks and other finance houses. In Hazell v Hammersmith and Fulham London BC [1991] 1 All ER 545, [1992] 2 AC 1 your Lordships held that such contracts were ultra vires local authorities and therefore void. Your Lordships left open the question whether payments made pursuant to such swap agreements were recoverable or not. The action which is the subject matter of this appeal is one of a number in which the court has had to consider the extent to which moneys paid under such an agreement are recoverable.

An interest rate swap agreement is an agreement between two parties by which each agrees to pay the other on a specified date or dates an amount calculated by reference to the interest which would have accrued over a given period on a notional principal sum. The rate of interest payable by each party (on the same notional sum) is different. One rate of interest is usually fixed and does not change (and the payer is called 'the fixed rate payer'); the other rate is a variable or floating rate based on a fluctuating interest rate such as the six-month London Inter-Bank Offered Rate (LIBOR) and the payer is known as 'the floating rate payer'. Normally the parties do not make the actual payments they have contracted for but the party owing the higher amount pays to the other party the difference between the two amounts.

In the present case the swap contract was concluded between the respondent bank, Westdeutsche Landesbank Girozentrale, and the appellant, the council of the London Borough of Islington, on 16 June 1987. The arrangement was to run for ten years starting on 18 June 1987. The interest sums were to be calculated on a notional principal sum of £25m and were to be payable half-yearly. The bank was to be the fixed rate payer at a rate of 775% per annum and the local authority was to be the floating rate payer at the domestic sterling LIBOR rate. In addition, the bank was to pay to the local authority on 18 June 1987 a sum of £275m (the upfront payment) which payment was made. As a result of the provision of the upfront payment the rate of interest payable by the bank as the fixed rate payer was agreed to be lower than what would have been appropriate (9743%) if the upfront payment had not been made.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

Pursuant to the terms of the agreement, the following payments were made:

| Date | Payment by bank to council | Payment by council to bank |
|---|---|---|
| 18.06.87 | £2,500,000 | |
| 18.12.87 | | £172,345.89 |
| 20.06.88 | | £229,666.09 |
| 19.12.88 | | £259,054.56 |
| 19.06.89 | | £693,407.53 |
| Total | £2,500,000 | £1,354,474.07 |

Therefore the payments made by the bank to the local authority exceed those made by the local authority to the bank to the extent of £1,145,525793.

On 1 November 1989 the Divisional Court gave judgment in Hazell [1990] 3 All ER 33, [1990] 2 QB 697 declaring void swap transactions entered into by local authorities. The decision applied to the contract between the parties in the present case.

As will appear, it is of central importance to note the way in which the local authority dealt with the upfront payment of £275m made to it on 18 June 1987. The money was credited to a bank account of the local authority in which there were other moneys of the local authority, ie into a mixed account. That account itself became overdrawn overnight on several dates in June and July 1987. There was an overall debit balance on the account on 16 November 1987. The moneys in the mixed account were used by the local authority for its general expenditure. If the upfront payment had not been received, the local authority would have had to borrow more money if it could. The local authority had been, and was likely to be in the future, rate-capped and one of the attractions to the local authority in the swap agreement was that it obtained the upfront payment in a form which did not attract statutory controls.

The bank in this action sought recovery of the amounts paid by it under the void agreement together with interest. On 12 February 1993 Hobhouse J ([1994] 4 All ER 890) gave judgment in the Commercial Court for the bank ordering payment by the local authority to the bank of the balance together with compound interest on the balance as from 1 April 1990 with six-monthly rests.

The council appealed to the Court of Appeal against that order and the bank cross-appealed contending that compound interest should have been ordered as from the date of receipt of the principal sum, ie 18 June 1987.

On 17 December 1993 the Court of Appeal (Dillon, Leggatt and Kennedy LJJ) ([1994] 4 All ER 890, [1994] 1 WLR 938) dismissed the local authority's appeal and allowed the cross-appeal by the bank. It held that the bank was entitled to recover the balance at law as money had and received (see [1994] 4 All ER 890 at 962, 969, [1994] 1 WLR 938 at 946, 953 per Dillon and Leggatt LJJ). It also held that the bank was entitled to recover the balance in equity on the ground that the local authority held the upfront payment on a resulting trust and was therefore personally liable, as trustee, to repay the bank (see [1994] 4 All ER 890 at 962, 968, [1994] 1 WLR 938 at 947, 953 per Dillon and Leggatt LJJ). The Court of Appeal further held the local authority liable to pay compound interest on the balance from time to time outstanding as from the date of receipt of the upfront payment. The ability of the court to award compound, as opposed to simple, interest was founded on the equitable jurisdiction to award compound interest as against a trustee or other person owing fiduciary duties who is personally accountable and who has made use of the plaintiff's money (see [1994] 4 All ER 890 at 964-967, 969-670, [1994] 1 WLR 938 at 949-951, 953-955 per Dillon and Leggatt LJJ).

The local authority now accepts that it is personally liable to repay the balance to the bank. The local authority appeals to your Lordships only against the award of compound interest. But, as will appear, notwithstanding the narrow scope of the appeal it raises profound questions for decision by your Lordships.

COMPOUND INTEREST IN EQUITY

It is common ground that in the absence of agreement or custom the court has no jurisdiction to award compound interest either at law or under s 35A of the Supreme Court Act 1981. It is also common ground that in certain limited circumstances courts of equity can award compound interest. Mr Philipson QC, for the local authority, contends that compound interest can only be ordered on a claim against a trustee or other person owing fiduciary duties who, in breach of such duty, has used trust moneys in his own trade. He contends that compound interest cannot be awarded in this case since (a) the local authority never held the upfront payment as a trustee or in a fiduciary capacity and (b) in any event, the local authority did not use the upfront payment in its trade. Mr Sumption QC, for the bank, contends that compound interest can be awarded in equity whenever the defendant is liable to disgorge a benefit received whether or not he is a trustee or a fiduciary. Alternatively, Mr Sumption contends that the local authority did receive the upfront payment as a trustee and as such is in equity accountable for the benefits it has received, including the benefit of not having to borrow £275m on the market at compound interest.

In the absence of fraud courts of equity have never awarded compound interest except against a trustee or other person owing fiduciary duties who is accountable for profits made from his position. Equity awarded simple interest at a time when courts of law had no right under common law or statute to award any interest. The award of compound interest was restricted to cases where the award was in lieu of an account of profits improperly made by the trustee. We were not referred to any case where compound interest had been awarded in the absence of fiduciary accountability for a profit. The principle is clearly stated by Lord Hatherley LC in Burdick v Garrick (1870) LR 5 Ch App 233 at 241:

'. . . the Court does not proceed against an accounting party by way of punishing him for making use of the Plaintiff's money by directing rests, or payment of compound interest, but proceeds upon this principle, either that he has made, or has put himself into such a position as that he is to be presumed to have made, 5 per cent., or compound interest, as the case may be.'

The principle was more fully stated by Buckley LJ in Wallersteiner v Moir (No 2) [1975] 1 All ER 849 at 863, [1975] QB 373 at 397.

'Where a trustee has retained trust money in his own hands, he will be accountable for the profit which he has made or which he is assumed to have made from the use of the money. In A-G v Alford (1855) 4 De GM & G 843 at 851, 43 ER 737 at 741 Lord Cranworth LC said: "What the Court ought to do, I think, is to charge him only with the interest which he has received, or which it is justly entitled to say he ought to have received, or which it is so fairly to be presumed that he did receive that he is estopped from saying that he did not receive it." This is an application of the doctrine that the court will not allow a trustee to make any profit from his trust. The defaulting trustee is normally charged with simple interest only, but if it is established that he has used the money in trade he may be charged compound interest . . . The justification for charging compound interest normally lies in the fact that profits earned in trade would be likely to be used as working capital for earning further profits. Precisely similar equitable principles apply to an agent who has retained [moneys] of his principal in his hands and used them for his own purposes (Burdick v Garrick).'

In President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773, [1985] AC 104 Lord Brandon of Oakbrook (with whose speech the rest of their Lordships agreed) considered the law as to the award of interest as at that date in four separate areas. His third area was equity, as to which he said ([1984] 2 All ER 773 at 779, [1985] AC 104 at 116):

'Third, the area of equity. The Chancery courts, again differing from the common law courts, had regularly awarded simple interest as ancillary relief in respect of equitable remedies, such as specific performance, rescission and the taking of an account. Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position . . .

Chancery courts only in two special classes of case, awarded compound, as distinct from simple, interest.'

These authorities establish that in the absence of fraud equity only awards compound (as opposed to simple) interest against a defendant who is a trustee or otherwise in a fiduciary position by way of recouping from such a defendant an improper profit made by him. It is unnecessary to decide whether in such a case compound interest can only be paid where the defendant has used trust moneys in his own trade or (as I tend to think) extends to all cases where a fiduciary has improperly profited from his trust. Unless the local authority owed fiduciary duties to the bank in relation to the upfront payment, compound interest cannot be awarded.

WAS THERE A TRUST? THE ARGUMENT FOR THE BANK IN OUTLINE

The bank submitted that, since the contract was void, title did not pass at the date of payment either at law or in equity. The legal title of the bank was extinguished as soon as the money was paid into the mixed account, whereupon the legal title became vested in the local authority. But, it was argued, this did not affect the equitable interest, which remained vested in the bank (the retention of title point). It was submitted that whenever the legal interest in property is vested in one person and the equitable interest in another, the owner of the legal interest holds it on trust for the owner of the equitable title: 'the separation of the legal from the equitable interest necessarily imports a trust.' For this latter proposition (the separation of title point) the bank, of course, relies on Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622 and Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 1025, [1981] Ch 105.

The generality of these submissions was narrowed by submitting that the trust which arose in this case was a resulting trust 'not of an active character' (see Sinclair v Brougham [1914] AC 398 at 421, [1914-15] All ER Rep 622 at 632 per Viscount Haldane LC). This submission was reinforced, after completion of the oral argument, by sending to your Lordships Professor Peter Birks' paper 'Restitution and Resulting Trusts' in Equity and Contemporary Legal Developments, Papers Presented at the First International Conference on Equity (ed Goldstein, 1992) p 335. Unfortunately your Lordships have not had the advantage of any submissions from the local authority on this paper, but an article by William Swadling 'A new role for resulting trusts?' (1996) 16 LS 110 puts forward counter-arguments which I have found persuasive.

It is to be noted that the bank did not found any argument on the basis that the local authority was liable to repay either as a constructive trustee or under the in personam liability of the wrongful recipient of the estate of a deceased person established by Re Diplock's Estate, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465. I therefore do not further consider those points.

THE BREADTH OF THE SUBMISSION

Although the actual question in issue on the appeal is a narrow one, on the arguments presented it is necessary to consider fundamental principles of trust law. Does the recipient of money under a contract subsequently found to be void for mistake or as being ultra vires hold the moneys received on trust even where he had no knowledge at any relevant time that the contract was void? If he does hold on trust, such trust must arise at the date of receipt or, at the latest, at the date the legal title of the payer is extinguished by mixing moneys in a bank account: in the present case it does not matter at which of those dates the legal title was extinguished. If there is a trust two consequences follow: (a) the recipient will be personally liable, regardless of fault, for any subsequent payment away of the moneys to third parties even though, at the date of such payment, the 'trustee' was still ignorant of the existence of any trust (see Burrows 'Swaps and the Friction between Common Law and Equity' [1995] RLR 15); (b) as from the date of the establishment of the trust (ie receipt or mixing of the moneys by the 'trustee') the original payer will have an equitable proprietary interest in the moneys so long as they are traceable into whomsoever's hands they come other than a purchaser for value of the legal interest without notice. Therefore, although in the present case the only question directly in issue is the personal liability of the local authority as a trustee, it is not possible to hold the local authority liable without imposing a trust which, in other cases, will create property rights affecting third parties because moneys

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

received under a void contract are 'trust property'.

THE PRACTICAL CONSEQUENCES OF THE BANK'S ARGUMENT

Before considering the legal merits of the submission, it is important to appreciate the practical consequences which ensue if the bank's arguments are correct. Those who suggest that a resulting trust should arise in these circumstances accept that the creation of an equitable proprietary interest under the trust can have unfortunate, and adverse, effects if the original recipient of the moneys becomes insolvent: the moneys, if traceable in the hands of the recipient, are trust moneys and not available for the creditors of the recipient. However, the creation of an equitable proprietary interest in moneys received under a void contract is capable of having adverse effects quite apart from insolvency. The proprietary interest under the unknown trust will, quite apart from insolvency, be enforceable against any recipient of the property other than the purchaser for value of a legal interest without notice.

Take the following example. T (the transferor) has entered into a commercial contract with R1 (the first recipient). Both parties believe the contract to be valid but it is in fact void. Pursuant to that contract: (i) T pays £1m to R1 who pays it into a mixed bank account; (ii) T transfers 100 shares in X company to R1, who is registered as a shareholder. Thereafter R1 deals with the money and shares as follows: (iii) R1 pays £50,000 out of the mixed account to R2 otherwise than for value; R2 then becomes insolvent, having trade creditors who have paid for goods not delivered at the time of the insolvency. (iv) R1 charges the shares in X company to R3 by way of equitable security for a loan from R3.

If the bank's arguments are correct, R1 holds the £1m on trust for T once the money has become mixed in R1's bank account. Similarly R1 becomes the legal owner of the shares in X company as from the date of his registration as a shareholder but holds such shares on a resulting trust for T. T therefore has an equitable proprietary interest in the moneys in the mixed account and in the shares.

T's equitable interest will enjoy absolute priority as against the creditors in the insolvency of R2 (who was not a purchaser for value) provided that the £50,000 can be traced in the assets of R2 at the date of its insolvency. Moreover, if the separation of title argument is correct, since the equitable interest is in T and the legal interest is vested in R2, R2 also holds as trustee for T. In tracing the £50,000 in the bank account of R2, R2 as trustee will be treated as having drawn out 'his own' moneys first, thereby benefitting T at the expense of the secured and unsecured creditors of R2. Therefore in practice one may well reach the position where the moneys in the bank account of R2 in reality reflect the price paid by creditors for goods not delivered by R2: yet, under the tracing rules, those moneys are to be treated as belonging in equity to T.

So far as the shares in the X company are concerned, T can trace his equitable interest into the shares and will take in priority to R3, whose equitable charge to secure his loan even though granted for value will pro tanto be defeated.

All this will have occurred when no one was aware, or could have been aware, of the supposed trust because no one knew that the contract was void.

I can see no moral or legal justification for giving such priority to the right of T to obtain restitution over third parties who have themselves not been enriched, in any real sense, at T's expense and indeed have had no dealings with T. T paid over his money and transferred the shares under a supposed valid contract. If the contract had been valid, he would have had purely personal rights against R1. Why should he be better off because the contract is void?

My Lords, wise judges have often warned against the wholesale importation into commercial law of equitable principles inconsistent with the certainty and speed which are essential requirements for the orderly conduct of business affairs: (see Barnes v Addy (1874) LR 9 Ch App 244 at 251, 255 and Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana [1983] 2 All ER 763 at 768-769, [1983] 2 AC 694 at 703-704). If the bank's arguments are correct, a businessman who has entered into transactions relating to or dependent upon property rights could find that assets which apparently belong to one person in fact belong to another; that there are 'off balance sheet' liabilities of

which he cannot be aware; that these property rights and liabilities arise from circumstances unknown not only to himself but also to anyone else who has been involved in the transactions. A new area of unmanageable risk will be introduced into commercial dealings. If the due application of equitable principles forced a conclusion leading to these results, your Lordships would be presented with a formidable task in reconciling legal principle with commercial common sense. But in my judgment no such conflict occurs. The resulting trust for which the bank contends is inconsistent not only with the law as it stands but with any principled development of it.

THE RELEVANT PRINCIPLES OF TRUST LAW

(i) Equity operates on the conscience of the owner of the legal interest. In the case of a trust, the conscience of the legal owner requires him to carry out the purposes for which the property was vested in him (express or implied trust) or which the law imposes on him by reason of his unconscionable conduct (constructive trust).

(ii) Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, ie until he is aware that he is intended to hold the property for the benefit of others in the case of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience.

(iii) In order to establish a trust there must be identifiable trust property. The only apparent exception to this rule is a constructive trust imposed on a person who dishonestly assists in a breach of trust who may come under fiduciary duties even if he does not receive identifiable trust property.

(iv) Once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property, which proprietary interest will be enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal interest without notice.

These propositions are fundamental to the law of trusts and I would have thought uncontroversial. However, proposition (ii) may call for some expansion. There are cases where property has been put into the name of X without X's knowledge but in circumstances where no gift to X was intended. It has been held that such property is recoverable under a resulting trust (see Birch v Blagrave (1755) Amb 264, 27 ER 176, Childers v Childers (1857) 1 De G & J 482, 44 ER 810, Re Vinogradoff, Allen v Jackson [1935] WN 68 and Re Muller, Cassin v Mutual Cash Order Co Ltd [1953] NZLR 879). These cases are explicable on the ground that, by the time action was brought, X or his successors in title have become aware of the facts which gave rise to a resulting trust; his conscience was affected as from the time of such discovery and thereafter he held on a resulting trust under which the property was recovered from him. There is, so far as I am aware, no authority which decides that X was a trustee, and therefore accountable for his deeds, at any time before he was aware of the circumstances which gave rise to a resulting trust.

Those basic principles are inconsistent with the case being advanced by the bank. The latest time at which there was any possibility of identifying the 'trust property' was the date on which the moneys in the mixed bank account of the local authority ceased to be traceable when the local authority's account went into overdraft in June 1987. At that date, the local authority had no knowledge of the invalidity of the contract but regarded the moneys as its own to spend as it thought fit. There was therefore never a time at which both (a) there was defined trust property and (b) the conscience of the local authority in relation to such defined trust property was affected. The basic requirements of a trust were never satisfied.

I turn then to consider the bank's arguments in detail. They were based primarily on principle rather than on authority. I will deal first with the bank's argument from principle and then turn to the main authorities relied upon by the bank, Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622 and Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 1025, [1981] Ch 105.

THE RETENTION OF TITLE POINT

It is said that, since the bank only intended to part with its beneficial ownership of the moneys in performance of a valid contract, neither the legal nor the equitable title passed to the local authority at the date of payment. The legal title vested in the local authority by operation of law when the moneys became mixed in the bank account but, it is said, the bank 'retained' its equitable title.

I think this argument is fallacious. A person solely entitled to the full beneficial ownership of money or property, both at law and in equity, does not enjoy an equitable interest in that property. The legal title carries with it all rights. Unless and until there is a separation of the legal and equitable estates, there is no separate equitable title. Therefore to talk about the bank 'retaining' its equitable interest is meaningless. The only question is whether the circumstances under which the money was paid were such as, in equity, to impose a trust on the local authority. If so, an equitable interest arose for the first time under that trust.

This proposition is supported by Re Cook (decd), Beck v Grant [1948] 1 All ER 231, [1948] Ch 212, Vandervell v IRC [1967] 1 All ER 1 at 7, 11, [1967] 2 AC 291 at 311, 317 per Lord Upjohn and Lord Donovan, Comr of Stamp Duties v Livingston [1964] 3 All ER 692 at 699, [1965] AC 694 at 712 and Underhill and Hayton Law of Trusts and Trustees (15th edn, 1995) p 866.

THE SEPARATION OF TITLE POINT

The bank's submission, at its widest, is that if the legal title is in A but the equitable interest in B, A holds as trustee for B.

Again I think this argument is fallacious. There are many cases where B enjoys rights which, in equity, are enforceable against the legal owner, A, without A being a trustee, for example an equitable right to redeem a mortgage, equitable easements, restrictive covenants, the right to rectification and an insurer's right by subrogation to receive damages subsequently recovered by the assured: Lord Napier and Ettrick v Hunter, Lord Napier and Ettrick v R F Kershaw Ltd [1993] 1 All ER 385, [1993] AC 713. Even in cases where the whole beneficial interest is vested in B and the bare legal interest is in A, A is not necessarily a trustee, for example where title to land is acquired by estoppel as against the legal owner; a mortgagee who has fully discharged his indebtedness enforces his right to recover the mortgaged property in a redemption action, not an action for breach of trust.

The bank contended that where, under a pre-existing trust, B is entitled to an equitable interest in trust property, if the trust property comes into the hands of a third party, X (not being a purchaser for value of the legal interest without notice), B is entitled to enforce his equitable interest against the property in the hands of X because X is a trustee for B. In my view the third party, X, is not necessarily a trustee for B: B's equitable right is enforceable against the property in just the same way as any other specifically enforceable equitable right can be enforced against a third party. Even if the third party, X, is not aware that what he has received is trust property B is entitled to assert his title in that property. If X has the necessary degree of knowledge, X may himself become a constructive trustee for B on the basis of knowing receipt. But unless he has the requisite degree of knowledge he is not personally liable to account as trustee: Re Diplock's Estate and Re Montagu's Settlement Trusts (1985) [1992] 4 All ER 308, [1987] Ch 264. Therefore, innocent receipt of property by X subject to an existing equitable interest does not by itself make X a trustee despite the severance of the legal and equitable titles. Underhill and Hayton Law of Trusts and Trustees pp 369-370, whilst accepting that X is under no personal liability to account unless and until be becomes aware of B's rights, does describe X as being a constructive trustee. This may only be a question of semantics: on either footing, in the present case the local authority could not have become accountable for profits until it knew that the contract was void.

RESULTING TRUST

This is not a case where the bank had any equitable interest which predated receipt by the local authority of the upfront payment. Therefore, in order to show that the local authority became a trustee, the bank must demonstrate circumstances which raised a trust for the first time either at the date on which the local authority received the money or

at the date on which payment into the mixed account was made. Counsel for the bank specifically disavowed any claim based on a constructive trust. This was plainly right because the local authority had no relevant knowledge sufficient to raise a constructive trust at any time before the moneys, upon the bank account going into overdraft, became untraceable. Once there ceased to be an identifiable trust fund, the local authority could not become a trustee: see Re Goldcorp Exchange Ltd (in receivership) [1994] 2 All ER 806, [1995] 1 AC 74. Therefore, as the argument for the bank recognised, the only possible trust which could be established was a resulting trust arising from the circumstances in which the local authority received the upfront payment.

Under existing law a resulting trust arises in two sets of circumstances: (A) where A makes a voluntary payment to B or pays (wholly or in part) for the purchase of property which is vested either in B alone or in the joint names of A and B, there is a presumption that A did not intend to make a gift to B: the money or property is held on trust for A (if he is the sole provider of the money) or in the case of a joint purchase by A and B in shares proportionate to their contributions. It is important to stress that this is only a presumption, which presumption is easily rebutted either by the counter-presumption of advancement or by direct evidence of A's intention to make an outright transfer: see Underhill and Hayton pp 317ff, Vandervell v IRC [1967] 1 All ER 1 at 8, [1967] 2 AC 291 at 312ff and Re Vandervell's Trusts (No 2), White v Vandervell Trustees Ltd [1974] 1 All ER 47 at 63ff, [1974] Ch 269 at 288ff. (B) Where A transfers property to B on express trusts, but the trusts declared do not exhaust the whole beneficial interest: ibid and Barclays Bank Ltd v Quistclose Investments Ltd [1968] 3 All ER 651, [1970] AC 567. Both types of resulting trust are traditionally regarded as examples of trusts giving effect to the common intention of the parties. A resulting trust is not imposed by law against the intentions of the trustee (as is a constructive trust) but gives effect to his presumed intention. Megarry J in Re Vandervell's Trusts (No 2) suggests that a resulting trust of type (B) does not depend on intention but operates automatically. I am not convinced that this is right. If the settlor has expressly, or by necessary implication, abandoned any beneficial interest in the trust property, there is in my view no resulting trust: the undisposed-of equitable interest vests in the Crown as bona vacantia: see Re West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts [1970] 1 All ER 544, [1971] Ch 1.

Applying these conventional principles of resulting trust to the present case, the bank's claim must fail. There was no transfer of money to the local authority on express trusts: therefore a resulting trust of type (B) above could not arise. As to type (A) above, any presumption of resulting trust is rebutted since it is demonstrated that the bank paid, and the local authority received, the upfront payment with the intention that the moneys so paid should become the absolute property of the local authority. It is true that the parties were under a misapprehension that the payment was made in pursuance of a valid contract. But that does not alter the actual intentions of the parties at the date the payment was made or the moneys were mixed in the bank account. As the article by William Swadling, 'A new role for resulting trusts?' (1996) 16 LS 110 at 133 demonstrates, the presumption of resulting trust is rebutted by evidence of any intention inconsistent with such a trust, not only by evidence of an intention to make a gift.

Professor Birks 'Restitution and Resulting Trusts' in Equity and Contemporary Legal Developments p 335 at 360, whilst accepting that the principles I have stated represent 'a very conservative form' of definition of a resulting trust, argues from restitutionary principles that the definition should be extended so as to cover a perceived gap in the law of 'subtractive unjust enrichment' (p 368) so as to give a plaintiff a proprietary remedy when he has transferred value under a mistake or under a contract the consideration for which wholly fails. He suggests that a resulting trust should arise wherever the money is paid under a mistake (because such mistake vitiates the actual intention) or when money is paid on a condition which is not subsequently satisfied.

As one would expect, the argument is tightly reasoned but I am not persuaded. The search for a perceived need to strengthen the remedies of a plaintiff claiming in restitution involves, to my mind, a distortion of trust principles. First, the argument elides rights in property (which is the only proper subject matter of a trust) into rights in 'the value transferred' (see p 361). A trust can only arise where there is defined trust property: it is therefore not consistent with trust principles to say that a person is a trustee of property which cannot be defined. Second, Professor Birks' approach appears to assume (eg in the case of a transfer of value made under a contract the consideration for which subsequently fails) that the recipient will be deemed to have been a trustee from the date of his original receipt of money, ie the trust

arises at a time when the 'trustee' does not, and cannot, know that there is going to be a total failure of consideration. This result is incompatible with the basic premise on which all trust law is built, viz that the conscience of the trustee is affected. Unless and until the trustee is aware of the factors which give rise to the supposed trust, there is nothing which can affect his conscience. Thus neither in the case of a subsequent failure of consideration nor in the case of a payment under a contract subsequently found to be void for mistake or failure of condition will there be circumstances, at the date of receipt, which can impinge on the conscience of the recipient, thereby making him a trustee. Thirdly, Professor Birks has to impose on his wider view an arbitrary and admittedly unprincipled modification so as to ensure that a resulting trust does not arise when there has only been a failure to perform a contract, as opposed to total failure of consideration (see pp 356-359 and 362). Such arbitrary exclusion is designed to preserve the rights of creditors in the insolvency of the recipient. The fact that it is necessary to exclude artificially one type of case which would logically fall within the wider concept casts doubt on the validity of the concept.

If adopted, Professor Birks' wider concepts would give rise to all the practical consequences and injustices to which I have referred. I do not think it right to make an unprincipled alteration to the law of property (ie the law of trusts) so as to produce in the law of unjust enrichment the injustices to third parties which I have mentioned and the consequential commercial uncertainty which any extension of proprietary interests in personal property is bound to produce.

THE AUTHORITIES

Three cases were principally relied upon in direct support of the proposition that a resulting trust arises where a payment is made under a void contract.

(A) Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622

The case concerned the distribution of the assets of the Birkbeck Permanent Benefit Building Society, an unincorporated body which was insolvent. The society had for many years been carrying on business as a bank which, it was held, was ultra vires its objects. The bank had accepted deposits in the course of its ultra vires banking business and it was held that the debts owed to such depositors were themselves void as being ultra vires. In addition to the banking depositors, there were ordinary trade creditors. The society had two classes of members, the A shareholders who were entitled to repayment of their investment on maturity and the B shareholders whose shares were permanent. By agreement, the claims of the ordinary trade creditors and of the A shareholders had been settled. Therefore the only claimants to the assets of the society before the court were the ultra vires depositors and the B shareholders, the latter of which could take no greater interest than the society itself.

The issues for decision arose on a summons taken out by the liquidator for directions as to how he should distribute the assets in the liquidation. In the judgments, it is not always clear whether this House was laying down general propositions of law or merely giving directions as to the proper mode in which the assets in that liquidation should be distributed. The depositors claimed, first, in quasi-contract for money had and received. They claimed secondly, as the result of an argument suggested for the first time in the course of argument in the House of Lords ([1914] AC 398 at 404, [1914-15] All ER Rep 622), to trace their deposits into the assets of the society.

Money had and received

The House of Lords was unanimous in rejecting the claim by the ultra vires depositors to recover in quasi-contract on the basis of moneys had and received. In their view, the claim in quasi-contract was based on an implied contract. To imply a contract to repay would be to imply a contract to exactly the same effect as the express ultra vires contract of loan. Any such implied contract would itself be void as being ultra vires.

Subsequent developments in the law of restitution demonstrate that this reasoning is no longer sound. The common law restitutionary claim is based not on implied contract but on unjust enrichment: in the circumstances the law imposes an obligation to repay rather than implying an entirely fictitious agreement to repay: see Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Ltd [1942] 2 All ER 122 at 136-137, [1943] AC 32 at 63-64 per Lord Wright, Pavey

& Matthews Pty Ltd v Paul (1987) 69 ALR 577 at 579, 583, 603, Lipkin Gorman (a firm) v Karpnale Ltd [1992] 4 All ER 512 at 532, [1991] 2 AC 548 at 578 and Woolwich Building Society v IRC (No 2) [1992] 3 All ER 737, [1993] AC 70. In my judgment, your Lordships should now unequivocally and finally reject the concept that the claim for moneys had and received is based on an implied contract. I would overrule Sinclair v Brougham on this point.

It follows that in Sinclair v Brougham the depositors should have had a personal claim to recover the moneys at law based on a total failure of consideration. The failure of consideration was not partial: the depositors had paid over their money in consideration of a promise to repay. That promise was ultra vires and void; therefore the consideration for the payment of the money wholly failed. So in the present swaps case (though the point is not one under appeal) I think the Court of Appeal were right to hold that the swap moneys were paid on a consideration that wholly failed. The essence of the swap agreement is that, over the whole term of the agreement, each party thinks he will come out best: the consideration for one party making a payment is an obligation on the other party to make counter-payments over the whole term of the agreement.

If in Sinclair v Brougham the depositors had been held entitled to recover at law, their personal claim would have ranked pari passu with other ordinary unsecured creditors, in priority to the members of the society who could take nothing in the liquidation until all creditors had been paid.

The claim in rem

The House of Lords held that, the ordinary trade creditors having been paid in full by agreement, the assets remaining were to be divided between the ultra vires depositors and the members of the society pro rata according to their respective payments to the society. The difficulty is to identify any single ratio decidendi for that decision. Lord Haldane LC (with whom Lord Atkinson agreed) and Lord Parker of Waddington gave fully reasoned judgments (considered below). Lord Dunedin apparently based himself on some 'super-eminent' equity (not a technical equity) in accordance with which the court could distribute the remaining assets of the society (see [1914] AC 398 at 434, 436, [1914-15] All ER Rep 622 at 639, 640). The members (by which presumably he means the society) were not in a fiduciary relationship with the depositors: it was the directors, not the society which had mixed the moneys (see [1914] AC 398 at 439, [1914-15] All ER Rep 622 at 641). This indicates that he was adopting the approach of Lord Parker: yet he concurred in the judgment of Lord Haldane LC (see [1914] AC 398 at 439, [1914-15] All ER Rep 622 at 641). I can only understand his judgment as being based on some super-eminent jurisdiction in the court to do justice as between the remaining claimants in the course of a liquidation.

Lord Sumner ([1914] AC 398 at 459, [1914-15] All ER Rep 622 at 652) plainly regarded the case as a matter of doing justice in administering the remaining assets in the liquidation, all other claims having been eliminated. He said ([1914] AC 398 at 458, [1914-15] All ER Rep 622 at 651):

'The question is one of administration. The liquidator, an officer of the court, who has to discharge himself of the assets that have come to his hands, asks for directions, and, after hearing all parties concerned, the court has the right and the duty to direct him how to distribute all the assets . . . In my opinion, if precedent fails, the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded.'

Lord Haldane LC ([1914] AC 398 at 418, [1914-15] All ER Rep 622 at 630) treated the case as a tracing claim: could the depositors follow and recover property with which, in equity, they had 'never really parted'. After holding that the parties could not trace at law, he said that the moneys could be traced in equity 'based upon trust' (see [1914] AC 398 at 420, [1914-15] All ER Rep 622 at 632). The only passage in which he identifies the trust is:

'The property was never converted into a debt, in equity at all events, and there has been throughout a resulting trust, not of an active character, but sufficient, in my opinion, to bring the transaction within the general principle.'

He treats the society itself (as opposed to its directors) as having mixed the depositors' money with its own money, but says that such mixing was not a breach of fiduciary duty by the society but authorised by the depositors: it was

intended that 'the society should be entitled to deal with [the depositors' money] freely as its own' (see [1914] AC 398 at 422-423, [1914-15] All ER Rep 622 at 632-633). On that ground, he distinguished Re Hallett's Estate, Knatchbull v Hallett (1880) 13 Ch D 696, [1874-80] All ER Rep 793 (a trustee is taken to have drawn his own money first) and held that the mixed moneys therefore belonged to the depositors and members pro rata.

Like others before me, I find Lord Haldane LC's reasoning difficult, if not impossible, to follow. The only equitable right which he identifies arises under 'a resulting trust, not of an active character' which, as I understand it, existed from the moment when the society received the money. Applying the conventional approach, the resulting trust could only have arisen because either the depositors were treated as contributors to a fund (a resulting trust of type (A) above) or because the 'trust' on which the moneys were paid to the society had failed (a resulting trust of type (B)). Yet the finding that the society was not in breach of fiduciary duty because it was the intention of the parties that society should be free to deal with the money as its own is inconsistent with either type of resulting trust (see [1914] AC 398 at 423, [191415] All ER Rep 622 at 633). Such an intention would rebut the presumption of resulting trust of type (A) and is inconsistent with a payment on express trusts which fail, ie with a type (B) resulting trust. Therefore the inactive resulting trust which Lord Haldane was referring to was, as Professor Birks points out, not a conventional one: indeed there is no trace of any such trust in earlier or later authority. The question is whether the recognition of such a trust accords with principle and the demands of certainty in commercial dealings.

As to the latter, Lord Haldane LC's theory, if correct, gives rise to all the difficulties which I have noted above. Nor does the theory accord with principle. First, it postulates that the society became a trustee at a time when it was wholly ignorant of the circumstances giving rise to the trust. Second, since the depositors' money was intended to be mixed with that of the society, there was never any intention that there should be a separate identifiable trust fund, an essential feature of any trust. Third, and most important, if Lord Haldane LC's approach were to be applicable in an ordinary liquidation it is quite incapable of accommodating the rights of ordinary creditors. Lord Haldane LC's inactive resulting trust, if generally applicable, would give the depositors (and possibly the members) rights having priority not only to those of ordinary trade creditors but also to those of some secured creditors, for example the common form security for bank lending, a floating charge on the company's assets. The moneys of both depositors and members are, apparently, trust moneys and therefore form no part of the company's assets available to pay creditors, whether secured or unsecured. This seems to be an impossible conclusion. Lord Haldane LC appreciated the difficulty, but did not express any view as to what the position would be if there had been trade creditors in competition (see [1914] AC 398 at 421-422, [1914-15] All ER Rep 622 at 631-632).

Lord Parker analysed the matter differently. He held that the depositors had paid their money not to the society itself but to the directors, who apparently held the moneys on some form of Quistclose trust (see Barclays Bank Ltd v Quistclose Investments Ltd [1968] 3 All ER 651, [1970] AC 567): the money had been paid by the depositors to the directors to be applied by them in making valid deposits with the society and, since such deposit was impossible, the directors held the moneys on a trust for the depositors (see [1914] AC 398 at 441-442, 444, [1914-15] All ER Rep 622 at 642-643, 644). It is to be noted that Lord Parker does not at any time spell out the nature of the trust. However, he held that the directors owed fiduciary duties both to the depositors and to the members of the society. Therefore it was not a case in which a trustee had mixed trust moneys with his own moneys (to which Re Hallett's Estate would apply) but of trustees (the directors) mixing the moneys of two innocent parties to both of whom they owed fiduciary duties: the depositors and members therefore ranked pari passu.

I find the approach of Lord Parker much more intelligible than that of Lord Haldane LC: it avoids finding that the society held the money on a resulting trust at the same time as being authorised to mix the depositors' money with its own. In Re Diplock's Estate, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465 the Court of Appeal found the ratio of Sinclair v Brougham to lie in Lord Parker's analysis. But, quite apart from the fact that no other member of the House founded himself on Lord Parker's analysis, it is in some respects very unsatisfactory. First, the finding that the depositors' moneys were received by the directors, as opposed to the society itself, is artificial. Although it was ultra vires the society to enter into a contract to repay the moneys, it was not ultra vires the society to receive moneys. Second, Lord Parker's approach gives depositors and members alike the same priority over trade creditors as does that

of Lord Haldane LC. The fact is that any analysis which confers an equitable proprietary interest as a result of a payment under a void contract necessarily gives priority in an insolvency to the recovery of the ultra vires payment. Lord Parker too was aware of this problem: but he left the problem to be solved in a case where the claims of trade creditors were still outstanding. Indeed he went further than Lord Haldane LC. He appears to have thought that the court had power in some cases to postpone trade creditors to ultra vires depositors and in other cases to give the trade creditors priority: which course was appropriate, he held, depended on the facts of each individual case (see [1914] AC 398 at 444-445, [1914-15] All ER Rep 622 at 644-645). There is much to be said for the view that Lord Parker, like Lord Haldane LC and Lord Sumner, was dealing only with the question of the due administration of assets of a company in liquidation. Thus he says:

'. . . nor, indeed, am I satisfied that the equity to which effect is being given in this case is necessarily confined to a liquidation. It is, however, unnecessary for your Lordships to decide these points.' (See [1914] AC 398 at 449, [1914-15] All ER Rep 622 at 647.)

This makes it clear that he was not purporting to do more than decide how the assets of that society in that liquidation were to be dealt with.

As has been pointed out frequently over the 80 years since it was decided, Sinclair v Brougham is a bewildering authority: no single ratio decidendi can be detected; all the reasoning is open to serious objection; it was only intended to deal with cases where there were no trade creditors in competition and the reasoning is incapable of application where there are such creditors. In my view the decision as to rights in rem in Sinclair v Brougham should also be overruled. Although the case is one where property rights are involved, such overruling should not in practice disturb long-settled titles. However, your Lordships should not be taken to be casting any doubt on the principles of tracing as established in Re Diplock's Estate.

If Sinclair v Brougham, in both its aspects, is overruled the law can be established in accordance with principle and commercial common sense: a claimant for restitution of moneys paid under an ultra vires, and therefore void, contract has a personal action at law to recover the moneys paid as on a total failure of consideration; he will not have an equitable proprietary claim which gives him either rights against third parties or priority in an insolvency; nor will he have a personal claim in equity, since the recipient is not a trustee.

(B) Chase Manhattan Bank NA v Israel-British Bank (London) Ltd [1979] 3 All ER 1025, [1981] Ch 105

In that case Chase Manhattan, a New York bank, had by mistake paid the same sum twice to the credit of the defendant, a London bank. Shortly thereafter, the defendant bank went into insolvent liquidation. The question was whether Chase Manhattan had a claim in rem against the assets of the defendant bank to recover the second payment.

Goulding J was asked to assume that the moneys paid under a mistake were capable of being traced in the assets of the recipient bank: he was only concerned with the question whether there was a proprietary base on which the tracing remedy could be founded (see [1979] 3 All ER 1025 at 1029, [1981] Ch 105 at 116). He held that, where money was paid under a mistake, the receipt of such money without more constituted the recipient a trustee: he said that the payer 'retains an equitable property in it and the conscience of [the recipient] is subjected to a fiduciary duty to respect his proprietary right' (see [1979] 3 All ER 1025 at 1032, [1981] Ch 105 at 119).

It will be apparent from what I have already said that I cannot agree with this reasoning. First, it is based on a concept of retaining an equitable property in money where, prior to the payment to the recipient bank, there was no existing equitable interest. Further, I cannot understand how the recipient's 'conscience' can be affected at a time when he is not aware of any mistake. Finally, the judge found that the law of England and that of New York were in substance the same. I find this a surprising conclusion since the New York law of constructive trusts has for a long time been influenced by the concept of a remedial constructive trust, whereas hitherto English law has for the most part only recognised an institutional constructive trust: see Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1989] 3

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

All ER 14 at 56-58, [1990] 1 QB 391 at 478-480. In the present context, that distinction is of fundamental importance. Under an institutional constructive trust, the trust arises by operation of law as from the date of the circumstances which give rise to it: the function of the court is merely to declare that such trust has arisen in the past. The consequences that flow from such trust having arisen (including the possibly unfair consequences to third parties who in the interim have received the trust property) are also determined by rules of law, not under a discretion. A remedial constructive trust, as I understand it, is different. It is a judicial remedy giving rise to an enforceable equitable obligation: the extent to which it operates retrospectively to the prejudice of third parties lies in the discretion of the court. Thus for the law of New York to hold that there is a remedial constructive trust where a payment has been made under a void contract gives rise to different consequences from holding that an institutional constructive trust arises in English law.

However, although I do not accept the reasoning of Goulding J, Chase Manhattan may well have been rightly decided. The defendant bank knew of the mistake made by the paying bank within two days of the receipt of the moneys (see [1979] 3 All ER 1025 at 1028-1029, [1981] Ch 105 at 115). The judge treated this fact as irrelevant (see [1979] 3 All ER 1025 at 1028, [1981] Ch 105 at 114), but in my judgment it may well provide a proper foundation for the decision. Although the mere receipt of the moneys, in ignorance of the mistake, gives rise to no trust, the retention of the moneys after the recipient bank learned of the mistake may well have given rise to a constructive trust: see Snell's Equity (29th edn, 1991) p 193, Pettit Equity and the Law of Trusts (7th edn, 1993) p 168 and Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1989] 3 All ER 14 at 52-53, [1990] 1 QB 391 at 473-474.

(C) Re Ames' Settlement, Dinwiddy v Ames [1946] 1 All ER 689, [1946] Ch 217

In this case the father of the intended husband, in consideration of the son's intended marriage with Miss H, made a marriage settlement under which the income was payable to the husband for life and after his death to the wife for life or until her remarriage, with remainder to the issue of the intended marriage. There was an ultimate trust, introduced by the words 'If there should not be any child of the said intended marriage who attains a vested interest . . .' for an artificial class of the husband's next of kin. The marriage took place. Many years later a decree of nullity on the grounds of non-consummation had the effect of rendering the marriage void ab initio. The income was paid to the husband until his death which occurred 19 years after the decree of nullity. The question was whether the trust capital was held under the ultimate trust for the husband's next-of-kin or was payable to the settlor's estate. It was held that the settlor's estate was entitled.

The judgment is very confused. It is not clear whether the judge was holding (as I think correctly) that in any event the ultimate trust failed because it was only expressed to take effect in the event of the failure of the issue of a non-existent marriage (an impossible condition precedent) or whether he held that all the trusts of the settlement failed because the beneficial interests were conferred in consideration of the intended marriage and that there had been a total failure of consideration. In either event, the decision has no bearing on the present case. On either view, the fund was vested in trustees on trusts which had failed. Therefore the moneys were held on a resulting trust of type (B) above. The decision casts no light on the question whether, there being no express trust, moneys paid on a consideration which wholly fails are held on a resulting trust.

The stolen bag of coins

The argument for a resulting trust was said to be supported by the case of a thief who steals a bag of coins. At law those coins remain traceable only so long as they are kept separate: as soon as they are mixed with other coins or paid into a mixed bank account they cease to be traceable at law. Can it really be the case, it is asked, that in such circumstances the thief cannot be required to disgorge the property which, in equity, represents the stolen coins? Moneys can only be traced in equity if there has been at some stage a breach of fiduciary duty, ie if either before the theft there was an equitable proprietary interest (eg the coins were stolen trust moneys) or such interest arises under a resulting trust at the time of the theft or the mixing of the moneys. Therefore, it is said, a resulting trust must arise either at the time of the theft or when the moneys are subsequently mixed. Unless this is the law, there will be no right to recover the assets representing the stolen moneys once the moneys have become mixed.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

I agree that the stolen moneys are traceable in equity. But the proprietary interest which equity is enforcing in such circumstances arises under a constructive, not a resulting, trust. Although it is difficult to find clear authority for the proposition, when property is obtained by fraud equity imposes a constructive trust on the fraudulent recipient: the property is recoverable and traceable in equity. Thus, an infant who has obtained property by fraud is bound in equity to restore it: Stocks v Wilson [1913] 2 KB 235 at 244 and R Leslie Ltd v Sheill [1914] 3 KB 607, [1914-15] All ER Rep 511. Moneys stolen from a bank account can be traced in equity: Bankers Trust Co v Shapira [1980] 3 All ER 353 at 358, [1980] 1 WLR 1274 at 1282. See also McCormick v Grogan (1869) LR 4 HL 82 at 97.

Restitution and equitable rights

Those concerned with developing the law of restitution are anxious to ensure that, in certain circumstances, the plaintiff should have the right to recover property which he has unjustly lost. For that purpose they have sought to develop the law of resulting trusts so as to give the plaintiff a proprietary interest. For the reasons that I have given in my view such development is not based on sound principle and in the name of unjust enrichment is capable of producing most unjust results. The law of resulting trusts would confer on the plaintiff a right to recover property from, or at the expense of, those who have not been unjustly enriched at his expense at all, for example the lender whose debt is secured by a floating charge and all other third parties who have purchased an equitable interest only, albeit in all innocence and for value.

Although the resulting trust is an unsuitable basis for developing proprietary restitutionary remedies, the remedial constructive trust, if introduced into English law, may provide a more satisfactory road forward. The court by way of remedy might impose a constructive trust on a defendant who knowingly retains property of which the plaintiff has been unjustly deprived. Since the remedy can be tailored to the circumstances of the particular case, innocent third parties would not be prejudiced and restitutionary defences, such as change of position, are capable of being given effect. However, whether English law should follow the United States and Canada by adopting the remedial constructive trust will have to be decided in some future case when the point is directly in issue.

The date from which interest is payable

The Court of Appeal held that compound interest was payable by the local authority on the balance for the time being outstanding, such interest to start from the date of the receipt by the local authority of the upfront payment of £2.5m on 18 June 1987. Although, for the reasons I have given, I do not think the court should award compound interest in this case, I can see no reason why interest should not start to run as from the date of payment of the upfront payment. I agree with the judgment of Leggatt LJ in the Court of Appeal ([1994] 4 All ER 890 at 970, [1994] 1 WLR 938 at 955) that there is no good ground for departing from the general rule that interest is payable as from the date of the accrual of the cause of action.

Equity acting in aid of the common law

Since drafting this speech I have seen, in draft, the speeches of my noble and learned friends Lord Goff of Chieveley and Lord Woolf. Both consider that compound interest should be awarded in this case on the grounds that equity can act in aid of the common law and should exercise its jurisdiction to order compound interest in aid of the common law right to recover moneys paid under an ultra vires contract.

I fully appreciate the strength of the moral claim of the bank in this case to receive full restitution, including compound interest. But I am unable to accept that it would be right in the circumstances of this case for your Lordships to develop the law in the manner proposed. I take this view for two reasons.

First, Parliament has twice since 1934 considered what interest should be awarded on claims at common law. Both s 3(1) of the 1934 Act and its successor, s 35A of the 1981 Act, make it clear that the Act does not authorise the award of compound interest. However, both Acts equally make it clear that they do not impinge on the award of interest in equity. At the time those Acts were passed, and indeed at all times down to the present day, equity has only awarded

compound interest in the limited circumstances which I have mentioned. In my judgment, your Lordships would be usurping the function of Parliament if, by expanding the equitable rules for the award of compound interest, this House were now to hold that the court exercising its equitable jurisdiction in aid of the common law can award compound interest which the statutes have expressly not authorised the court to award in exercise of its common law jurisdiction.

Secondly, the arguments relied upon by my noble and learned friends were not advanced by the bank at the hearing. The local authority would have a legitimate ground to feel aggrieved if the case were decided against them on a point which they had had no opportunity to address. Moreover, in my view it would be imprudent to introduce such an important change in the law without this House first having heard full argument upon it. Although I express no concluded view on the points raised, the proposed development of the law bristles with unresolved questions. For example, given that the right to interest is not a right which existed at common law but is solely the creation of statute, would equity in fact be acting in aid of the common law or would it be acting in aid of the legislature? Does the principle that equity acts in aid of the common law apply where there is no concurrent right of action in equity? If not, in the absence of any trust or fiduciary relationship what is the equitable cause of action in this case? What were the policy reasons which led Parliament to provide expressly that only the award of simple interest was authorised? In what circumstances should compound interest be awarded under the proposed expansion of the equitable rules? In the absence of argument on these points it would in my view be imprudent to change the law. Rather, the whole question of the award of compound interest should be looked at again by Parliament so that it can make such changes, if any, as are appropriate.

For these reasons, which are in substance the same as those advanced by my noble and learned friend Lord Lloyd of Berwick, I am unable to agree with the views of Lord Goff of Chieveley and Lord Woolf.

CONCLUSION

I would allow the appeal and vary the judgment of the Court of Appeal so as to order the payment of simple interest only as from 18 June 1987 on the balance from time to time between the sums paid by the bank to the local authority and the sums paid by the local authority to the bank.

**JUDGMENTBY-3:** LORD SLYNN OF HADLEY

**JUDGMENT-3:**

LORD SLYNN OF HADLEY: My Lords, for the reasons given by my noble and learned friend Lord Browne-Wilkinson I agree that Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622 should be departed from and that it should be held that in this case the local authority was neither a trustee of, nor in a fiduciary position in relation to, the moneys which it had received from the bank, nor had it improperly profited from the use of those moneys. For the reasons which he gives no resulting trust could arise on the present facts.

It follows that if, as I think, Lord Brandon of Oakbrook in President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773 at 779, [1985] AC 104 at 116, was right to say that in the Court of Chancery the award of compound interest was limited to situations 'where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position,' Courts of Chancery would not have awarded compound interest in a case like the present.

It is common ground that compound interest could not have been awarded at common law as presently formulated nor under the statutory provisions in s 3 of the Law Reform (Miscellaneous Provisions) Act 1934 nor under s 35A of the Supreme Court Act 1981 as inserted by the Administration of Justice Act 1982.

But for the legislation I would have accepted that it was open to your lordships to hold that, in the light of the development of the law of restitution, the courts could award compound interest, either by modifying the common law rule or by resorting to equity to act in aid of the common law right to recover moneys paid under a void transaction. As

to whether it would have been right to do so in general terms, or whether it would have been right to limit the cases in which compound interest should be awarded, or whether compound interest should be awarded at all I am not, on the restricted arguments advanced in this case, prepared to comment.

I do not, however, consider that it would be right on this appeal to enlarge the cases in which compound interest can be awarded when Parliament has twice in relatively recent times limited statutory interest to simple interest. This is a matter which should be considered by Parliament when the merits or disadvantages of giving the courts power to award compound interest could be examined in a context wider than the present case.

Accordingly, in agreement with my noble and learned friends Lord Browne-Wilkinson and Lord Lloyd of Berwick, and despite the forceful reasoning of my noble and learned friends Lord Goff of Chieveley and Lord Woolf, I would allow the appeal and vary the judgment of the Court of Appeal so as to award simple interest from 18 June 1987.

**JUDGMENTBY-4:** LORD WOOLF

**JUDGMENT-4:**

LORD WOOLF: My Lords, this appeal raises directly only one issue of law. It is whether the courts have jurisdiction to make an order for the payment of compound interest ancillary to an order for restitution when a contract is ultra vires. All the judges in the courts below concluded that there was jurisdiction to do so.

In this case an order was made in favour of the respondent bank as against the appellant local authority which was the recipient of the ultra vires payment. There is no dispute that there was jurisdiction to make an order for the payment of simple interest. The dispute is limited to the order for compound interest.

It is accepted that if there is jurisdiction to make the order this is a case in which this achieves a just result. There is only one other issue raised by the appeal and that is as to the date from which the interest should be paid.

The transaction was a commercial transaction. The local authority in calculating the balance which it had to repay the bank was given credit for the sums which it had paid by way of notional interest under the contract prior to it being appreciated that the contract might be ultra vires. If the transaction had not taken place the local authority would have had to borrow (if it could find a way of lawfully doing so) the sum paid to it by the bank on terms which would be likely to involve compound interest being recoverable in proceedings for default. (Here see National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637 as to commercial transactions with banks.) The bank could have lent that sum on the same basis.

Hobhouse J, the judge at first instance, reflected the commercial justice of the situation in the passage in his judgment in which he set out succinctly why he considered compound interest was payable ([1994] 4 All ER 890 at 955):

'[The local authority] has kept that sum and has not made any restitution. In this situation I see no reason why I should not exercise my equitable jurisdiction to award compound interest. Simple interest does not reflect the actual value of money. Anyone who lends or borrows money on a commercial basis receives or pays interest periodically and if that interest is not paid it is compounded (eg Wallersteiner v Moir (No 2) [1975] 1 All ER 849, [1975] QB 373 and National Bank of Greece SA v Pinios Shipping Co No 1, The Maira [1990] 1 All ER 78, [1990] 1 AC 637). I see no reason why I should deny the plaintiff a complete remedy or allow the defendant arbitrarily to retain part of the enrichment which it has unjustly enjoyed. There are no special factors which have to be taken into account. No question of insolvency is involved nor is there any basis for any persuasive argument to the contrary.'

This being the situation I am relieved that I am of the opinion that the judges in the courts below were correct in concluding that in the circumstances of this case they were entitled to award compound interest. Any other decision would be inconsistent with the court's ability to grant full restitution. It would be a further unhappy aspect, from a

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

commercial standpoint, of the history of this case in particular and the swaps litigation as a whole. This commenced with the decision, to which I was a party at first instance, of Hazell v Hammersmith and Fulham London BC [1991] 1 All ER 545, [1992] 2 AC 1. It is no secret that the decision at first instance ([1990] 3 All ER 33, [1990] 2 QB 697) in that case, which was approved by this House, caused dismay among some of those concerned with the standing abroad of the commercial law of this country. That concern is likely to be increased if the outcome of this litigation is that this appeal has to be allowed by this House because the courts have no jurisdiction to grant compound interest.

The position is not improved by the fact that such is the confused state of English law as to the extent of its jurisdiction to award interest that the hearing before their Lordships involved four days of argument. Argument that could have lasted even longer but for counsel for the local authority courteously informing their Lordships that because of the costs which the local authority was incurring on the appeal he was required by his clients to curtail his argument.

The argument had been extended by their Lordships themselves raising the issue as to the correctness of a decision of this House of some 80 years' standing, Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622. That case does not directly involve the courts' equitable jurisdiction to award interest. Yet the issue as to whether the case was correctly decided still needed to be raised because the reasoning in that case was inconsistent with the submissions of the local authority. The fact that counsel was required to take the course of seeking to limit his argument does put in question whether the way appeals are managed before the House and the resources available to their Lordships are ideal for meeting both the contemporary needs of litigants and their Lordships' responsibilities for the proper development of the law.

I have had the considerable advantage of being able to read in draft the admirably reasoned speeches of Lord Goff of Chieveley and Lord Browne-Wilkinson. That reasoning convinces me that the bank is not entitled to proceed by way of an equitable proprietary claim and that the recipient of a sum of money paid under an ultra vires contract should not be regarded as owing either the duties of a trustee or fiduciary to the payer of that sum. Further than that it is not necessary for me to go. This avoids the dangers which Lord Browne-Wilkinson identifies could flow from the wholesale importation into commercial law of equitable principles. I am also in agreement with Lord Goff's reasoning as to compound interest being able to be awarded where one party is under a duty to make restitution to another, this being a consequence of the development of the law of restitution.

THE SIGNIFICANCE OF THE DIFFERENCE BETWEEN EQUITABLE PRINCIPLES AND REMEDIES

Such a wholesale importation is not necessarily the consequence of a finding that the courts have the equitable jurisdiction to make an order for the payment of compound interest in conjunction with the grant of a remedy of restitution. We are concerned here primarily not with equitable principles of substantive law but with the possible existence of an equitable remedy. Compound interest, if it is recoverable, will be recoverable in the circumstances of this case in equity because of the absence of any statutory or common law remedy which will prevent the local authority being unjustly enriched at the expense of the bank if compound interest is not payable.

The situation is one in which compound interest would be awarded because it would be unconscionable to allow the local authority to make a profit out of a contract which was void because it had exceeded its own powers. This is very much an analogous situation to those where equity has traditionally provided remedies. Perhaps the best example is provided by specific performance. It is unnecessary to inquire whether the right which is being enforced by an order of specific performance is one recognised by the common law or equity. What does matter is whether it is equitable to grant the remedy and whether an award of damages in lieu would be an adequate remedy.

In addition, if the contract had not been void and the local authority had failed to make the payments required the bank might well, as I will seek to show, have been fully protected by its remedy in damages at common law. Because there is no contract damages are not available. Here the situation is very much in keeping with those where equity traditionally mitigates the inadequacy of a common law remedy without having to invoke the substantive equitable law principles. This situation is described in Snell's Equity (29th edn, 1991) p 26:

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

'Between them, equitable interests, mere equities, floating equities and the great doctrines of equity cover most of the field of equity; and they are all concerned to a greater or lesser degree with the rights of property. Yet although the existence of such rights has long been an important factor in deciding whether equity will intervene, it is not essential. Equitable remedies, though often used in aid of property rights, are also often used in other cases. The underlying principle is the inadequacy of the common law remedy of damages. Thus the equitable remedies of rescission and injunction may be employed in relation to contracts for personal services; and injunctions are sometimes granted in cases of tort which involve no rights of property. In this sense there may be equities unrelated to property.'

In the same sense it can be said there may be equities unrelated to a breach of trust or fiduciary duty. I would add that equity does not only come to the aid of a claimant where damages are an inadequate remedy. It can also do so when one of the other common law remedies is inadequate. I would take as an example the remedy of an account. The advantages of the equitable remedy over the common law remedy have resulted in the latter remedy being supplanted by the former. It may well be that the editors of Snell's Equity did not have in mind the power to award interest when writing the paragraph I have set out. The paragraph is none the less of general application and there is no reason why it should not apply to the equitable remedy of awarding interest in the same way as it applies to other equitable remedies. The award of interest is only distinct from other remedies in that it is usually awarded as an ancillary to some other remedy.

I therefore accept Mr Sumption QC's submission on behalf of the bank that where there is a duty to make restitution equity can achieve full restitution by granting, when it is appropriate to do so, simple or compound interest in addition to requiring repayment of the principal sum. For this to be the position, the defendant must have made an actual or presumed profit or a profit which he is presumed to have derived from his having been the recipient of a principal sum which he has not repaid. The compound interest will not be payable as of right. The remedy of awarding interest, like other equitable remedies, will be discretionary. Interest will only be awarded when it accords with equitable principles to make the award.

I appreciate that Mr Sumption did not advance the argument in favour of the grant of compound interest on the basis that I have put forward. However, he came before your Lordships' House not expecting Sinclair v Brougham to be challenged. He had no reason in his printed case to do other than base his argument on the fact that the local authority was a fiduciary. Before your Lordships he made clear that while he was arguing that the local authority was a fiduciary he was also contending that, if there was power to order restitution, equity could, as I have already indicated, achieve full restitution. This is also clear from the statements in the bank's case to which I will refer shortly.

THE ABSENCE OF PREVIOUS AUTHORITY

There may be no clear previous authority to support this conclusion but this is not surprising where the relatively new jurisdiction of ordering restitution is involved. What is more important than the absence of clear support in the authorities for the grant of compound interest is the absence from the existing authorities of any statement of principle preventing the natural development of a salutary equitable jurisdiction enabling compound interest to be awarded. The jurisdiction is clearly desirable if full restitution in some cases is to be achieved. It is relevant here to repeat what is stated at the outset in the bank's case under the heading 'The Position in Principle':

'1. "Any civilised system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from another which it is against conscience that he should keep": Fibrosa Spolka Akcyjna v Fairbairn Lawson Combe Barbour Limited ([1942] 2 All ER 122 at 135, [1943] AC 32 at 61) (Lord Wright), approved in Woolwich Equitable Building Society v Inland Revenue Commissioners ([1992] 3 All ER 737 at 780, 785, [1993] AC 70 at 197, 202).'

Restitution is an area of the law which is still in the process of being evolved by the courts. In relation to restitution there are still questions remaining to be authoritatively decided. One question, which was still undecided until the decision on this appeal, is whether its legitimacy is derived from the common law or equity or both. In order to decide

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

whether compound interest is payable in this case I do not consider it is necessary to decide which is the correct answer to that question, but I am content to assume that the cause of action is one at common law. If the principal sum is repayable as money had and received rather than under some trust or because of the existence of a fiduciary duty it is still unconscionable for the local authority to retain the benefit it made from having received payment under a contract it purported to make which was outside its powers. The fact that, until the law was clarified by the decision in this case, the local authority may reasonably not have appreciated that it should make restitution is not critical. What is critical is that the payment of compound interest is required to achieve restitution. A defendant may perfectly reasonably not regard himself as having been a trustee until the court so decides but this does not effect the remedies which the court has jurisdiction to grant. The jurisdiction of the court to grant remedies has to be judged in the light of what the court decides.

As to the date from which the interest should run I am in agreement with Lord Browne-Wilkinson that the decision of the Court of Appeal should not be disturbed.

UNJUST ENRICHMENT CREATES THE REQUIRED RELATIONSHIP

There are a great many situations where interest as an equitable remedy has been awarded. Examples are conveniently set out in 32 Halsbury's Laws (4th edn) para 109. The principle which connects those examples is stated in the first sentence of the paragraph. It is the existence of a 'particular relationship . . . between the creditor and debtor'. The 'particular relationship' in this case arises out of the right of the bank to restitution and the fact that the local authority would be unjustly enriched if it retained what it had received. That made the local authority an accounting party. The bank had to give credit for the sums it had received and the local authority had to pay the balance which was still due of what it had received. What it had received included the use of the money. The approach is precisely that indicated in the passage of the judgment of Lord Hatherley LC in Burdick v Garrick (1870) LR 5 Ch App 233 at 241 already cited by Lord Browne-Wilkinson. It is the making of the award not as a punishment but to disgorge a profit made or presumed to have been made out of the payment of a sum of money which should not have been made. Here this was because the contract was void as being ultra vires. There would be no difference of principle if the contract was void for mistake.

NO DISTINCTION OF PRINCIPLE BETWEEN SIMPLE AND COMPOUND INTEREST

If the case is one where there is jurisdiction to award equitable interest then whether compound or simple interest is recoverable depends on the facts of the particular case. If it is not a situation where the defendant would have earned compound interest then as in Burdick v Garrick there would be no profit of compound interest so it will not be awarded. Simple interest will be awarded instead.

THE LAW COMMISSION'S APPROACH

In Law of Contract: Report on Interest (Law Com No 88) (1978), the Law Commission decided not to make any recommendations for change as to the equitable jurisdiction. It is, however, interesting to note the following paragraphs of the report:

'10. Thirdly, there is the equitable jurisdiction. Interest may be awarded as ancillary relief in respect of equitable remedies such as specific performance, rescission or the taking of an account. Furthermore, the payment of interest may be ordered where money has been obtained and retained by fraud, or where it has been withheld or misapplied by an executor or a trustee or anyone else in a fiduciary position . . .

(a) The equitable jurisdiction

21. The equitable jurisdiction to award interest and to fix the rate at which it should be paid is extensive. It includes, for example, the power to order the payment of interest where money has been obtained or withheld by fraud or where it has been misapplied by someone in a fiduciary position. In such cases the court has an inherent power to order the

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

payment of interest at whatever rate is equitable in the circumstances and may direct that such interest be compounded at appropriate intervals. Our view is that it would not be appropriate to impose statutory controls upon the exercise of the equitable jurisdiction to award interest, beyond those controls that are already in existence. We invited criticisms of this view in our working paper but no one disagreed with us. Accordingly, we make no recommendations for change in relation to the equitable jurisdiction.'

From what I have said already it is clear that I agree with the statements in those paragraphs in so far as the equitable jurisdiction to award interest is regarded as 'ancillary relief' but not in so far as they suggest that it is only equitable remedies in relation to which there can be the ancillary jurisdiction to award interest. The paragraphs are perfectly satisfactory as long as they are not regarded as exhaustive. It has to be remembered that the Law Commission were not intending to make any recommendations as to the equitable interest.

The fact that the paragraphs accept that compound interest is payable in the case of fraud perhaps suggests that it is not intended to limit the relief to situations which only give an entitlement to an equitable remedy. In many cases of fraud the appropriate remedy will be common law damages. It is true in the first of the only two cases referred to by the Law Commission, Johnson v R [1904] AC 817 at 821. The Privy Council appeared to think that interest was not payable in the case of an overpayment by mistake. However the authority relied on for this conclusion was London, Chatham and Dover Rly Co v South Eastern Rly Co [1893] AC 429. Lord Macnaghten ([1904] AC 817 at 821) regarded 'the law as settled by the judgment' of this House in that case. It is a case to which I will refer later but it was not concerned with the equitable jurisdiction to grant interest, only the common law jurisdiction. What is of interest is what Lord Macnaghten said as to the power to award interest if there had been fraud. He said (at 822):

'In order to guard against any possible misapprehension of their Lordships' views, they desire to say that, in their opinion, there is no doubt whatever that money obtained by fraud and retained by fraud can be recovered with interest, whether the proceedings be taken in a court of equity or in a court of law, or in a court which has a jurisdiction both equitable and legal, as the Supreme Court of Sierra Leone possesses under the Ordinance of November 10, 1881.' (My emphasis.)

Lord Macnaghten did not consider that it mattered whether the proceedings were based on a common law or equitable cause of action.

The other case referred to in the report is Wallersteiner v Moir (No 2) [1975] 1 All ER 849, [1975] QB 373. That case is a clear authority for the existence of an equitable jurisdiction and that it can be exercised where there is breach of a fiduciary duty but the court was not concerned with extent of that jurisdiction. It was accepted by all the members of the Court of Appeal that the jurisdiction was frequently exercised in the case of breach of trust and of a fiduciary duty but there is nothing in the judgments to suggest that the jurisdiction is limited to those situations. Indeed Lord Denning MR clearly did not regard it as being so limited. He said ([1975] 1 All ER 849 at 856, [1975] QB 373 at 388):

'The reason is because a person in a fiduciary position is not allowed to make a profit out of his trust: and, if he does, he is liable to account for that profit or interest in lieu thereof. In addition, in equity interest is awarded whenever a wrongdoer deprives a company of money which it needs for use in its business. It is plain that the company should be compensated for the loss thereby occasioned to it. Mere replacement of the money -- years later -- is by no means adequate compensation, especially in days of inflation. The company should be compensated by the award of interest. That was done by Sir William Page Wood V-C (afterwards Lord Hatherley) in one of the leading cases on the subject, Atwool v Merryweather (1867) LR 5 Eq 464n at 468-469. But the question arises: should it be simple interest or compound interest? On general principles I think it should be presumed that the company (had it not been deprived of the money) would have made the most beneficial use open to it: cf Armory v Delamirie (1722) 1 Stra 505, [1558-1774] All ER Rep 121. It may be that the company would have used it in its own trading operations; or that it would have used it to help its subsidiaries. Alternatively, it should be presumed that the wrongdoer made the most beneficial use of it. But, whichever it is, in order to give adequate compensation, the money should be replaced at interest with yearly rests, ie compound interest.'

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

This was a broader approach than that adopted by Buckley or Scarman LJJ.

There remains a further case to which I should make reference before leaving the authorities as to the equitable jurisdiction. It is President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773, [1985] AC 104. This is the leading case as to the common law and statutory jurisdictions to which I will return later. I refer to it for the leading speech of Lord Brandon of Oakbrook with which the other members of the House agreed. Lord Brandon reviewed the different jurisdictions to award interest. While doing so he made the following dicta about the equitable jurisdiction (see [1984] 2 All ER 773 at 779, [1985] AC 104 at 116). (Lord Brandon also referred to the equitable jurisdiction ([1984] 2 All ER 773 at 780-783, [1985] AC 104 at 118-121) but he was then dealing with the position as to interest in the Admiralty Court and I do not consider those references are of any help here):

'Third, the area of equity. The Chancery courts, again differing from the common law courts, had regularly awarded simple interest as ancillary relief in respect of equitable remedies, such as specific performance, rescission and the taking of an account. Chancery courts had further regularly awarded interest, including not only simple interest but also compound interest, when they thought that justice so demanded, that is to say in cases where money had been obtained and retained by fraud, or where it had been withheld or misapplied by a trustee or anyone else in a fiduciary position . . . The first point is that neither the Admiralty Court, nor Chancery courts, awarded interest, except in respect of moneys for which they were giving judgment. The second point is that the Admiralty Court never, and Chancery courts only in two special classes of case, awarded compound, as distinct from simple, interest.'

The House had been referred in the course of argument to the report of the Law Commission and I suspect that Lord Brandon restricted the jurisdiction of the courts to award interest to equitable remedies following what was stated in that report. Likewise as to the distinction which he drew between the jurisdictions to award simple and compound interest. According to the report of argument, counsel did not address the House on the limits of the equitable jurisdiction. Therefore, although any statement of Lord Brandon is entitled to the greatest respect, I do not regard these two dicta as indicating that Lord Brandon held a considered opinion inconsistent with my views, which I have set out above. It may well be that he was doing no more than describing the situations where in the past the equitable jurisdiction had been exercised.

THE POSITION WHERE THE CLAIM IS BASED ON A PERSONAL EQUITY

Lord Browne-Wilkinson, in his speech, points out that two arguments were not advanced on behalf of the bank. The first is that the local authority should be liable to make the repayments as a constructive trustee. There is no need for me to make any comment about this argument. The second argument which was not advanced is that the bank was entitled to repayment because of the existence of a personal equity based on the decision in Re Diplock's Estate, Diplock v Wintle [1948] 2 All ER 318, [1948] Ch 465. This is a point which it is necessary for me to consider because of the decision of Hobhouse J in Kleinwort Benson Ltd v South Tyneside Metropolitan BC [1994] 4 All ER 972, although the decision in Re Diplock's Estate dealt with very different circumstances from those which exist here. The court in Re Diplock's Estate was concerned with the personal equitable liability of a legatee to repay the executors of an estate of a deceased person a sum which was wrongly paid to them out of the estate. In the Kleinwort Benson case Hobhouse J decided that the existence of a personal equitable cause of action did not create a power to award compound interest. This conclusion is inconsistent with the view which I have expressed that there is a power to award compound interest in the circumstances of this case.

Personal equitable rights are not confined to the situation considered in Re Diplock's Estate. For example, a personal equitable right to contribution can exist between co-sureties. This is regarded as being an application of an equitable approach to restitution to a situation where the remedy at law is not normally satisfactory. It exists without there having to be any proprietary right which could give rise to the difficulties to which Lord Browne-Wilkinson has referred.

The Kleinwort Benson case also involved a local authority which had entered into a swap transaction which was

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

void. Hobhouse J distinguished the Kleinwort Benson case from the present case because in that case there was no reliance on an equitable proprietary claim for repayment of the sum which had been paid under the void swap contract. In the Kleinwort Benson case, the local authority accepted that prima facie they were under a personal liability to make restitution in law and in equity to the bank but argued it was not open to a court to award compound interest where only remedies in personam were established.

Hobhouse J decided that the local authority's submissions were correct. He said ([1994] 4 All ER 972 at 994-995):

'The position is therefore that if a plaintiff is entitled to a proprietary remedy against a defendant who has been unjustly enriched, the court may but is not bound to order the repayment of the sum with compound interest. If on the other hand the plaintiff is only entitled to a personal remedy which will be the case where, although there was initially a fiduciary relationship and the payer was entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself. The legal analysis which is the basis of the award of compound interest is not applicable. (It is possible that in some cases there might be an intermediate position where it could be demonstrated that the fiduciary had, over part of the period, profited from holding a fund as a fiduciary even though he no longer held the fund at the date of trial and that in such a case the court might make some order equivalent to requiring him to account for those profits; but that is not the situation which I am asked to consider in the present case.) Although the original equitable right in both situations is the same at the outset, that is to say at the time when the payment was made and received, the two situations do not continue to be the same and are not the same at the time of trial when the remedy comes to be given. The payee no longer has property of the payer. The payer is confined to personal rights and remedies analogous to those recognised by the common law in the action for money had and received. In such a situation only simple interest can be awarded even though the plaintiff is relying upon a restitutionary remedy. Simple interest was awarded in Woolwich Building Society v IRC (No 2) [1992] 3 All ER 737, [1993] AC 70 and in BP Exploration Co (Libya) Ltd v Hunt (No 2) [1982] 1 All ER 925, [1979] 1 WLR 783 and both those cases involved an application of restitutionary principles which carried with them remedies in personam (see also O'Sullivan v Management Agency and Music Ltd [1985] 3 All ER 351, [1985] QB 428.)'

The three cases cited by the judge to support his proposition that simple interest only could be awarded do not in fact assist to determine the question of principle which is at stake here. In both the Woolwich and the BP Exploration cases, the claim which was advanced was limited to statutory interest. The position as to compound interest was not considered. In O'Sullivan's case, it was conceded that in relation to part of the claim compound interest was payable and, in fact, it was awarded. Only simple interest was paid in relation to the balance of the claim, but this was not because of any lack of jurisdiction; it was because it was only appropriate to award simple interest in the circumstances of that case.

If Hobhouse J's reasoning is correct, then even if there had been an equitable claim in rem which would justify the award of compound interest, that would cease to be the situation if the right to trace were lost. That this would create an unsatisfactory state of affairs is demonstrated by the contrasting decisions to which the judge came in this case and in the Kleinwort Benson case. The power of the court to award compound interest would depend upon circumstances over which the claimant would have no control. This is inconsistent with the commercial realities to which the judge referred in the passage which I have cited from his judgment in this case.

Contrary to the view expressed by Hobhouse J, the rationale on which compound interest is awarded is independent of whether or not there is any property capable of being traced still in the payee's hands. The critical issue is whether, as has happened in this case, the authority was able to make a profit (which would include making a saving in the interest which it had to pay) from the fact it had received a sum of money to which it was not entitled. Even in the case of a claim in rem, the profit is distinct from the traceable property. If this were not the position the payee by returning the property to the payer prior to the proceedings could defeat the right which a claimant would otherwise have to compound interest.

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

Hobhouse J ([1994] 4 All ER 972 at 994) refers to Re Diplock's Estate in order to identify the distinction between personal and proprietary equitable remedies. He cites a passage from the very long judgment of the Court of Appeal ([1948] 2 All ER 318 at 347, [1948] Ch 465 at 521) in that case. However, although this is not clear, I would regard that passage as dealing only with equitable proprietary remedies. He also refers to a further passage in the judgment in Re Diplock's Estate, which he does not cite. He presumably refers to the sentence in the judgment which indicates the view of the Court of Appeal that --

'on their personal claims the plaintiffs are not entitled to any interest. The same may not, however, be true as regards the claims in rem, at least where the plaintiffs are able to "trace" their proprietary interest into some specific investment.' (See [1948] 2 All ER 318 at 345, [1948] Ch 465 at 517.)

It is therefore probable that Hobhouse J was influenced in coming to his decision by the judgment of the Court of Appeal in Re Diplock's Estate. However, that judgment provides a shaky foundation for Hobhouse J's decision. The passage to which he refers can, and should, in my judgment, be regarded as doing no more than indicating the decision on the merits of the situation which the Court of Appeal was considering in Re Diplock's Estate. A situation which is very different from that which exists here. There was no commercial relationship between the parties. The overpaid legatees' liability was secondary and they were charities. In those circumstances, if they had actually made a profit from the overpayment which could be traced, it would have been reasonable to award interest but if they had not it would not have been reasonable to do so. I would draw attention here to the following passage of the judgment of the Court of Appeal in Re Diplock's Estate [1948] 2 All ER 318 at 337, [1948] Ch 465 at 503, which indicates that court's general approach:

'Since the original wrong payment was attributable to the blunder of the personal representatives, the right of the unpaid beneficiary is in the first instance against the wrongdoing executor or administrator, and the beneficiary's direct claim in equity against those overpaid or wrongly paid should be limited to the amount which he cannot recover from the party responsible. In some cases the amount will be the whole amount of the payment wrongly made . . .'

I would also draw attention to the only passage of the Court of Appeal's judgment which gives any reason for their conclusion as to interest, which is in these terms ([1948] 2 All ER 318 at 339, [1948] Ch 465 at 506-507):

'We should add that . . . in our judgment, the defendants are liable under this head of their claim for the principal claimed only and not for any interest. This last result appears to follow from Gittins v. Steele ((1818) 1 Swan 199 at 200, 36 ER 356 at 357), cited in ROPER ON LEGACIES (4th edn, 1847, p 461), where the language of LORD ELDON, L.C., in the case, is cited: "If a legacy has been erroneously paid to a legatee who has no farther property in the estate, in recalling that payment I apprehend that the rule of the court is not to charge interest; but if the legatee is entitled to another fund making interest in the hands of the court, justice must be done out of his share."'

The judgment of Lord Eldon LC in Gittins v Steele is extremely short. The Court of Appeal has cited the whole of the judgment except the opening sentence, which reads: 'Where the fund out of which the legacy ought to have been paid is in the hands of the court making interest, unquestionably interest is due.'

In fact, interest was therefore ordered to be paid in that case at 4%. The short judgment of Lord Eldon LC was in proceedings which followed an earlier judgment ((1818) 1 Swan 25, 36 ER 24). Having examined the case in both reports, I find they provide no support for a general proposition that equity could not in an appropriate case award interest in support of a personal equitable claim. The case supports the contrary view. In the circumstances which Lord Eldon LC is considering, the legatee had, as far as one can tell, benefited financially from the early payment and, that being so, the decision is merely an example of the fact that if a payee has benefited financially from his being unjustly enriched, an order for interest will be made. It is relevant that as interest had been earned (in the hands of the court), interest was payable.

Before leaving Re Diplock's Estate it is important to note that the case was not concerned with whether compound

interest was payable; it was concerned with whether any interest, simple or compound, was payable. The view that no interest, not even simple, was payable was understandable on the facts but not otherwise.

While, therefore, it is not necessary on my approach to decide whether the sums paid by the bank are recoverable from the local authority in equity or in common law, it is necessary for me to indicate that Hobhouse J was wrong in his judgment in Kleinwort Benson in deciding that he would have no power to award compound interest if, as he thought was the case, the bank was entitled to a personal equitable remedy which would enable it to obtain judgment for the sums which had been paid.

There is one more aspect of Hobhouse J's judgment to which I should refer. In his review of the authorities, Hobhouse J drew attention to two lines of authority, one where simple interest is being awarded, and the second where compound interest is being awarded. In the former situation, the court, according to Hobhouse J, is concerned to compensate the party for what he has lost in consequence of not receiving the money to which he was entitled. In the latter situation the court is concerned with the benefit which the payee has derived as a result of the payment having been made. The distinction is a valid one if what is being considered is the right to interest on the one hand under the statute or common law and on the other in equity. The distinction is not valid if a different position is being considered, namely, whether simple or compound interest should be awarded in equity. Equity, in the case of both simple and compound interest, will look at the benefit which the payee has derived. If it is equitable so to do, the payee will be ordered to pay simple or compound interest depending upon the benefit which has resulted from the payment.

THE POSITION AT COMMON LAW AND BY STATUTE

I should now deal shortly with the situation as to interest at common law and by statute. At common law the power to award interest was linked to the power to award damages. While the equitable jurisdiction was concerned to prevent profit by the recipient of funds to which he was not entitled, the common law was concerned with the loss suffered by the payer of the funds. The statutory jurisdiction differed from the common law because initially there had to be a judgment for the payment of a debt or damages before interest could be awarded and the legislator was dealing with the generality of those situations.

As to the common law position a convenient starting-point is provided by the decision of this House in London, Chatham and Dover Rly Co v South Eastern Rly Co [1893] AC 429, which I have already cited. In that case Lord Herschell LC and the other members of this House came to the conclusion with considerable reluctance that at common law where there was no agreement or statutory provision which permitted the payment of interest a court had no power to award interest, whether simple or compound, by way of damages for the late payment of a debt. The view of the House was rather surprising because the members reluctantly followed a decision of Lord Tenterden CJ in Page v Newman (1829) 9 B & C 378, 109 ER 140, based on convenience, in preference to an earlier and more 'liberal' line of authorities, including a decision of Lord Mansfield in Eddowes v Hopkins (1780) 1 Doug KB 376, 99 ER 242, and Lord Ellenborough in De Havilland v Bowerbank (1807) 1 Camp 50, 170 ER 872. Lord Mansfield stated the position in these terms --

'that though by the common law, book debts do not of course carry interest, it may be payable in consequence of the usage of particular branches of trade; or of a special agreement [which of course is beyond question]; or, in cases of long delay under vexatious and oppressive circumstances, if a jury in their discretion shall think fit to allow it.' (See (1780) 1 Doug KB 376, 99 ER 242.)

Lord Ellenborough included among four categories of situations where interest was payable, that where the money had been actually used and interest made on it (see (1807) 1 Camp 50 at 51, 170 ER 872 at 873).

After the decision in the London, Chatham and Dover Rly Co case it was generally accepted that at common law, apart from statute and some limited exceptions, there was no power to award simple or compound interest for the late payment of a sum of money.

This situation which was regarded as unsatisfactory by this House in 1893 was ameliorated in 1934 by the intervention of the legislature. Section 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 considerably extended the power which was contained in the Civil Procedure Act 1833 (Lord Tenterden's Act). The 1934 Act, so far as relevant, provided:

'3. -- (1) In any proceedings tried in any court of record for the recovery of any debt or damages, the court may, if it thinks fit, order that there shall be included in the sum for which judgment is given interest at such rate as it thinks fit on the whole or any part of the debt or damages for the whole or any part of the period between the date when the cause of action arose and the date of the judgment: Provided that nothing in this Section -- (a) shall authorise the giving of interest upon interest; or (b) shall apply in relation to any debt upon which interest is payable as of right whether by virtue of any agreement or otherwise . . .'

It is to be noted that s 3 of the 1934 Act makes it abundantly clear that it does not authorise the giving of compound interest and that it confines the power to award interest to situations where there is a 'sum for which judgment is given.' The latter point was a cause of considerable injustice. It enabled a debtor to prevent a court exercising the power under s 3 of the 1934 Act by making a late payment but a payment prior to any judgment being given. To remedy that situation, the Supreme Court Act 1981 was amended by the Administration of Justice Act 1982 by adding a new section, s 35A. Section 35A is still the current relevant statutory provision. It makes clear: (a) that it is still only simple interest which is payable.; that it only applies to the recovery of a debt or damages and that interest is to be paid at 'such rate as the court thinks fit or as rules of court may provide' (sub-s (1)); (b) that the section does not apply when for whatever reason interest on a debt already runs (sub-s (4)); (c) that the section applies to payments made up to the date of the judgment (sub-s (1)(a)).

The 1982 Act followed the Report on Interest by the Law Commission, to which I have already referred. Parliament did not implement by the 1982 Act all the recommendations of the Law Commission as to changes which should be made. In particular, it did not accede to the suggestion of the Law Commission that there should be a statutory standard rate of interest for reasons of administrative convenience. Instead, it retained the court's existing wide statutory discretion.

There are two more cases to which I need to refer. The first is Wadsworth v Lydall [1981] 2 All ER 401, [1981] 1 WLR 598, and the second is President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773, [1985] AC 104, to which I have already referred. The decision in Wadsworth v Lydall received express approval in La Pintada. I refer to Wadsworth v Lydall for three reasons. The first is that it brings out clearly that despite the decision of this House in London, Chatham and Dover Rly Co v South Eastern Rly Co, there is no inherent common law bias against the award of compound interest at common law. What is required for compound interest to be payable is that the contract either expressly or impliedly provides for the payment of compound interest or there is a breach of the contract and the breach is such that compound interest will be regarded as flowing from the breach in accordance with the second limb of the principle laid down in Hadley v Baxendale (1854) 9 Exch 341, [1843-60] All ER Rep 461. The second reason is that while prior to the decision in Wadsworth v Lydall it could legitimately be thought that the situations where compound interest would be awarded at common law were necessarily of a commercial nature, this is not an essential requirement. The situations where it was clearly established that compound interest was recoverable (as, for example, in the case of bills of exchange or banking transactions) should be regarded not so much as independent exceptions to a general rule but as examples of the application of a general rule where in accordance with ordinary contractual principles compound interest should be recoverable. The third reason why I refer to Wadsworth v Lydall is that it clearly demonstrates that, notwithstanding the period which has elapsed since the decision in the London, Chatham and Dover Rly Co case in 1893, the courts will be prepared to limit the application of that decision where this can be done in accordance with principle and it is appropriate to do so.

Wadsworth v Lydall was a decision of the Court of Appeal. The facts were straightforward. The defendant and the plaintiff had an informal partnership agreement under which the partnership held an agricultural tenancy of a farm and the plaintiff lived in the farmhouse. When the partnership was dissolved the plaintiff and the defendant agreed that the

plaintiff would give up possession of the farm by a specified date when he would receive £10,000 from the defendant. On the strength of that agreement the plaintiff entered into a further agreement with a third party to purchase another property on terms which required him to pay the £10,000, which by then he should have received from the defendant, to the third party. Only part of the £10,000 was paid by the defendant to the plaintiff prior to his completing his transaction with the third party. The plaintiff therefore had to take out a mortgage from the third party for the balance. In an action which he brought against the defendant the plaintiff claimed as special damages the interest and costs he incurred due to his having to obtain the mortgage.

The trial judge disallowed those two items of special damage but the plaintiff succeeded in recovering them as a result of the decision of the Court of Appeal. In relation to the argument that the Court of Appeal were bound to conclude that the appeal failed because of the combined effect of the decision in the London, Chatham and Dover Rly Co case and because of the provisions of the 1934 Act, Brightman LJ said:

'In my view the court is not so constrained by the decision of the House of Lords. In London, Chatham and Dover Railway Co v South Eastern Rly Co [1893] AC 429 the House of Lords was not concerned with a claim for special damages. The action was an action for an account. The House was concerned only with a claim for interest by way of general damages. If a plaintiff pleads and can prove that he has suffered special damage as a result of the defendant's failure to perform his obligation under a contract, and such damage is not too remote on the principle of Hadley v Baxendale (1854) 9 Exch 341, [1843-60] All ER Rep 461, I can see no logical reason why such special damages should be irrecoverable merely because the obligation on which the defendant defaulted was an obligation to pay money and not some other type of obligation.' (See [1981] 2 All ER 401 at 405-406, [1981] 1 WLR 598 at 603.)

The facts of the President of India case are not important. Its significance is that the approach of this House was that Parliament had chosen to remedy some of the injustices caused by the common law rule as laid down in the decision in the London, Chatham and Dover Rly Co case, and the restrictive language of s 3(1) of the 1934 Act. Due deference to the intention of Parliament therefore prevented any further departure from the House's earlier decision in relation to interest. So the earlier decision would still apply to general damages.

In his speech, Lord Brandon of Oakbrook identified 'three cases in which the absence of any common law remedy for damage or loss caused by the late payment of a debt may arise' (see [1984] 2 All ER 773 at 783, [1985] AC 104 at 122). For convenience he described these cases as case 1, case 2 and case 3. Case 1 is where a debt is paid late, before any proceedings for its recovery have been begun. Case 2 is where a debt is paid late, after proceedings for its recovery have begun, but before they have been concluded. Case 3 is where a debt remains unpaid until, as a result of proceedings for its recovery being brought and prosecuted to a conclusion, a money judgment is given in which the original debt becomes merged.

Having examined the history and origins of the common law rule and the interventions by the legislature, Lord Brandon described qualification of the common law rule made in Wadsworth v Lydall as being important, and set out his conclusions as follows ([1984] 2 All ER 773 at 789, [1985] AC 104 at 129):

'First, an ideal system of justice would ensure that a creditor should be able to recover interest both on unpaid debts in case 1, and also in respect of debts paid late or remaining unpaid in cases 2 and 3. Secondly, if the legislature had not intervened twice in this field since the London, Chatham and Dover Rly Co case, first by the 1934 Act and more recently by the 1982 Act, and if the Court of Appeal had not limited the scope of that case by its decision in Wadsworth v Lydall [1981] 2 All ER 401, [1981] 1 WLR 598, I should have thought that a strong, if not an overwhelming, case would have been made out for your Lordships' House, in order to do justice to creditors in all three cases 1, 2 and 3, to depart from the decision in the London, Chatham and Dover Rly case [1893] AC 429. But, third, since the legislature has made the two interventions in this field to which I have referred, and since the scope of the London, Chatham and Dover Railway case has been qualified to a significant extent by Wadsworth v Lydall, I am of the opinion, for three main reasons, that the departure sought by the respondents would not now be justified.'

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

The first of the reasons Lord Brandon gave for his conclusion was that the greater part of the injustice has already been remedied by the intervention of the legislature and judicial qualification of the scope of the decision in London, Chatham and Dover Rly Co v South Eastern Rly Co. The second was that Parliament had given effect in legislation to some of the recommendations of the Law Commission, but had not given effect to further recommendations which meant that for the House to intervene would be to intervene in a manner which would conflict with the policy indicated by Parliament. The third reason was that the intervention would create for creditors a remedy as of right rather than a discretionary remedy which would be again contrary to the policy of Parliament as indicated in the 1934 and 1982 Acts. The reasoning in President of India does not apply to equitable interest.

In relation to that reasoning it is important to note that none of the three reasons directly apply to the issue at present before their Lordships. The first reason does not directly apply to the present case because neither the legislation nor the decision in Wadsworth v Lydall addresses the injustice demonstrated by the facts of this case. The injustice arises because, contrary to the intention of the parties, there is no contract. The inroads which have been made on the decision in the London, Chatham and Dover Rly Co case by Wadsworth v Lydall can only apply where there is a contract under which either interest is expressly payable or the situation is one where the second limb of the rule in Hadley v Baxendale applies to a breach of contract. The second reason given by Lord Brandon ([1984] 2 All ER 773 at 789, [1985] AC 104 at 129) does not apply because the Law Commission made no recommendation as to the equitable remedy of interest. The third reason does not apply because if the court has jurisdiction to award interest in equity, like other equitable remedies, the remedy will be discretionary.

I therefore do not find anything in Lord Brandon's reasoning which makes it inappropriate to extend the right in equity so that it extends to the recovery of compound interest ancillary to a restitutionary remedy. In this case this is particularly true because if there had been a contract and non payment of the sums due under the contract by the local authority the bank may well, if proceedings resulted, have received compound interest as special damages.

THE DESIRABILITY OF THE EQUITABLE JURISDICTION BEING EXTENDED

A decision in favour of the bank in this case will mark a further improvement in the powers of the English courts. An improvement, the need for which has so frequently been recognised. While the improvement is consistent with the decision of this House in President of India, it should be noted that that decision has not been free from criticism. In a typically closely reasoned article 'On Interest, Compound Interest and Damages' (1985) 101 LQR 30 the late Dr F A Mann was not impressed by the reasoning of the House. Dr Mann (at 34) found it difficult to understand, if interest, including compound interest, was recoverable under the second limb under the rule in Hadley v Baxendale --

'why it should not also be recoverable under the first limb, where damages are such "as may fairly and reasonably be considered arising naturally, ie according to the usual course of things" from the breach?'

As Dr Mann (at 34-35) pointed out, to say that interest considered as damages is too remote is an argument which at the present time is no longer realistic or persuasive and which can only be described as an 'empty phrase'. The modern test should be whether the debtor could reasonably foresee that in the ordinary course of things the loss was likely to occur or was on the cards. Who would refuse to impute such knowledge to a debtor? Who would venture to suggest that a defaulting debtor could not reasonably foresee interest as the creditor's loss flowing from the failure to pay?

Dr Mann did not distinguish between simple and compound interest. However, if what he said with regard to simple interest is true, then adopting the same approach it must equally apply to compound interest. Dr Mann's final comment was (at 47):

'The history of interest, particularly in the field of Admiralty, displays a lack of legal analysis and a degree of positivism and inflexibility which show the common law of England at its worst.'

In my judgment, their Lordships should avoid leaving the equitable jurisdiction of the English courts open to the same criticism.

Lord Browne-Wilkinson and Lord Lloyd of Berwick (whose speech I have also had the advantage of reading in draft) do not regard this as a case in which it would be appropriate to extend the law in the way I would wish. Their arguments, which are based on the legislative history as to interest and, in the case of Lord Lloyd, also based on President of India, I have dealt with already. However, as to the suggestion of usurpation of the role of Parliament, I do remind myself of the approach of Lord Brandon of Oakbrook in the passage of his speech in President of India [1984] 2 All ER 773 at 789, [1985] AC 104 at 129, which I have previously cited. Both Lord Browne-Wilkinson and Lord Lloyd also make the additional point that the local authority could feel aggrieved if this appeal were to be decided on the approach which Lord Goff and I would adopt. Here I take a different view. If their Lordships had not raised the issue of the correctness and scope of the decision in Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622, the bank would have succeeded. The local authority were only prepared to argue this point with reluctance. As I have indicated, the local authority also wanted the argument curtailed. In these circumstances they can hardly complain if they lacked the opportunity of dealing with the detail of your Lordships' reasoning.

In my recollection of his argument, Mr Sumption made it clear that his argument was not totally dependent on establishing that the local authority was a fiduciary. I have already set out how his case described the position in principle. I would also refer to para 13 of his case and the footnote thereto, where he said:

'13. Quite apart from the proprietary claim, the Bank also has a personal claim in equity to require Islington to account for its property: Snell's Equity (29th edn, 1991), pp 284-287.

[Footnote] In Sinclair v Brougham it was held that there was no personal claim in equity or at law, because to allow such a claim would be indirectly to enforced an invalid borrowing contract: see ([1914] AC 398 esp at 414, 418, [1914-15] All ER Rep 622 esp at 628, 630) (Lord Haldane). This part of the decision has been subjected to powerful and justified criticism by Lord Wright ((1938) 6 CLJ 805). But even if correct it has no application to a restitutionary claim, whether at law or in equity, arising out of a void swap contract since such restitution would not be legally or financially equivalent to enforcement of the contract itself.' (My emphasis.)

The passage in Snell refers to a personal claim in equity where there is a breach of trust. However, the footnote makes reasonably clear that Mr Sumption was applying the same approach as I would to a restitutionary claim 'whether at law or in equity'.

For these reasons I would dismiss the appeal.

**JUDGMENTBY-5:** LORD LLOYD OF BERWICK

**JUDGMENT-5:**

LORD LLOYD OF BERWICK: My Lords, it was common ground before your Lordships that the bank is entitled to recover the principal sum of £1,145,526 in a common law action for money had and received. Judgment for that sum would carry simple interest at the appropriate rate under s 35A of the Supreme Court Act 1981. Hobhouse J ([1994] 4 All ER 890) and the Court of Appeal ([1994] 4 All ER 890, [1994] 1 WLR 938) have held (albeit for different reasons) that the bank has an alternative claim to recover the principal sum in equity, and that the equitable cause of action entitles the bank to claim a discretionary award of compound interest, depending on the facts of the particular case. The issue in the appeal as it came before your Lordships was whether the courts below were right in this respect. Thus the bank's argument is stated succinctly in para 11 of its printed case as follows:

'The bank's submission in summary is that where money is paid either (i) pursuant to a contract which is void, or (ii) under a fundamental mistake of fact or law, the money is impressed in the hands of the payee with a trust in favour of the payer. The payee is then accountable to the payer not only for the principal but for the entire benefit which he has obtained from his possession of the principal in the intervening period.'

A little later it is said, in para 12(5): 'The separation of the legal from the equitable interest necessarily imports a

trust.' In support of his argument Mr Sumption QC relied, as he had in the courts below, on Sinclair v Brougham [1914] AC 398, [1914-15] All ER Rep 622. He also relied on the speech of Lord Brandon of Oakbrook in President of India v La Pintada Cia Navegacion SA [1984] 2 All ER 773 at 779, [1985] AC 104 at 116. It was not suggested in the bank's printed case that Lord Brandon's formulation of the equitable jurisdiction to award compound interest was incomplete, or insufficient for the bank's purposes. Nor was it suggested that the decision of Hobhouse J in the parallel decision of Kleinwort Benson Ltd v South Tyneside Metropolitan BC [1994] 4 All ER 972 (in which he declined to make an award of compound interest in favour of the bank, on the ground that the bank was in that case confined to its common law action for money had and received) was wrongly decided.

The local authority, in para 5.1 of the its case, stated the issue for decision in similar terms:

'Both parties accept that compound, as opposed to simple interest, is payable only if Islington received the money under the void interest rate swaps agreement as fiduciary: President of India v La Pintada Companía Navigacion S.A. ([1984] 2 All ER 773 at 779, [1985] AC 104 at 116).'

The whole thrust of the local authority's case was directed to showing that was not a fiduciary when it received the money and did not become a fiduciary thereafter. Sinclair v Brougham could be distinguished. It had never been suggested that the mere failure to pay back the principal sum rendered the local authority a fiduciary, otherwise 'every overdue debtor would be a fiduciary liable to compound interest' (para 6.12).

Both parties, therefore, came before your Lordships on the basis that Sinclair v Brougham was correctly decided, for whatever it did decide. But in the course of the argument your Lordships indicated that the House would be willing to reconsider the correctness of that decision. For the reasons given by my noble and learned friend Lord Browne-Wilkinson, I agree that Sinclair v Brougham was wrongly decided on both the points discussed in his speech, and should be overruled. I understand that all your Lordships are agreed that the bank has failed to make good its claim that it has an equitable cause of action against the local authority for breach of duty as trustee or fiduciary. It follows that the ground on which the courts below awarded compound interest cannot be supported. The local authority has succeeded on the only issue on which the parties came before your Lordships. Accordingly, I would be content to allow the appeal, and leave it at that.

But my noble and learned friend Lord Woolf is of the view that, even though the bank has failed to prove any breach of trust or fiduciary duty, it may nevertheless be entitled to claim compound interest by way of a general equitable remedy ancillary to its common law claim for money had and received; and his views receive the powerful support of my noble and learned friend Lord Goff of Chieveley.

I have naturally considered these views with the greatest care; for there is much force in the argument that the local authority ought, in justice, to pay compound interest, if it would have had to pay compound interest (as no doubt it would) on sums borrowed by way of more orthodox bank lending. But I regret that in my opinion the House cannot, or at any rate should not, hold that there is any such power in equity to make good the supposed defects of the common law remedy. I have come to that conclusion for three main reasons.

In the first place the point in question, which is one of great general importance, was scarcely argued. This was not the fault of counsel. The point only emerged from the background once it became apparent that Sinclair v Brougham might fall to be reconsidered. By then there was no time to develop the argument. Thus the decision of Hobhouse J in the Kleinwort Benson case, which would have to be overruled if the point is good, was only mentioned by Mr Philipson QC at the very end of his argument, and then only in connection with the date from which interest should run. The decision was never mentioned by Mr Sumption at all.

Nor did Mr Sumption seek to question the reasoning or conclusion of the House in President of India v La Pintada Cia Navegacion SA. On the contrary, he relied on Lord Brandon's speech as an accurate summary of the equitable jurisdiction to award compound interest in the two special classes of case to which Lord Brandon referred. I may be

wrong, but I do not recall any reference to the comments expressed by Mason CJ and Wilson J in Hungerfords v Walker (1988) 171 CLR 125. It is accepted that to decide the compound interest point in favour of the bank would mean breaking new ground, and would be extending the equitable jurisdiction to a field where it has never before been exercised. I do not think it right to take so momentous a course, involving such widespread ramifications, on the back of such inadequate argument. Above all I cannot regard it as fair to decide the case against the local authority on the alternative argument when through no fault of their own, they have not had a proper opportunity to deal with the argument.

Secondly, I have difficulty in reconciling an award of compound interest as an equitable remedy available in support of the common law claim for money had and received with the ratio decidendi of the House in President of India. The facts of that case were that the charterers were between two and six years late in paying sums due to the owners by way of freight and demurrage. The owners claimed interest in respect of the late payment. The question was referred to arbitration, and the umpire awarded compound interest in favour of the owners for the whole period of the delay. One of the questions of law for the court was whether the umpire had jurisdiction to award interest in respect of the late payment. Mr Saville QC launched a frontal attack on London, Chatham and Dover Rly Co v South Eastern Rly Co [1893] AC 429, in which it was held that a claim for interest by way of general damages will not lie at common law for late payment of a debt, in the absence of some custom binding on the parties, or some express or implied agreement. In giving the leading speech, Lord Brandon said that other things being equal there was 'a strong, if not an overwhelming, case' for departing from the decision in the London, Chatham and Dover Rly Co case in order to do justice to creditors (see [1984] 2 All ER 773 at 789, [1985] AC 104 at 129). But with regret he felt unable to take that course. I return to his reasons later. All the other noble Lords shared Lord Brandon's regret. Lord Roskill said ([1984] 2 All ER 773 at 775-776, [1985] AC 104 at 111):

'It has long been recognised that London, Chatham and Dover Rly Co v South Eastern Rly Co left creditors with a legitimate sense of grievance and an obvious injustice without remedy. I think the House in 1893 recognised those consequences of the decision, but then felt compelled for historical reasons to leave that injustice uncorrected.'

Like Lord Brandon, he felt unable to depart from the London, Chatham and Dover Rly case, and called for the injustice to be remedied by further legislation.

I quote these passages in order to make the point that if Mr Saville, for the owners, could have detected some way of supporting the umpire's award of compound interest, he would have found a ready ear. He pointed out in the course of his argument that the equitable jurisdiction to award compound interest had survived the passing of the 1934 Act, as had the Admiralty jurisdiction, and he argued that these 'exceptional' jurisdictions should be regarded as the rule, and not vice versa. But this argument did not prevail. When Lord Brandon ([1984] 2 All ER 773 at 779, [1985] AC 104 at 116) said that 'the Admiralty Court never, and Courts of Chancery only in two special classes of case' awarded compound, as distinct from simple, interest (my emphasis); he meant, I think, exactly what he said. Moreover, he regarded it as a point of importance. I cannot, therefore, agree that he was only giving examples of the application of a more general equitable jurisdiction to grant ancillary relief by way of compound interest. To my mind the immediate context, and the shape of the case as a whole, make quite clear that that was not his meaning.

It may be said that in President of India the claim was for payment of a debt due under a contract, whereas in the present case the claim is for money had and received. But why should that make any difference? It is true that the common law action for money had and received can be given a restitutionary label; and that 'restitution' may be said to be incomplete unless compound interest is included in the award. But the label cannot change the underlying reality. The cause of action remains a common law action for the return of money paid in pursuance of an ineffective contract. If compound interest cannot be recovered in a claim for debt due under a contract (in the absence of custom, or some express or implied agreement to that effect) I cannot see any reason in principle, or logic, why it should be recoverable in the case of money paid under a contract which turns out to be ineffective.

It is said, nevertheless, that the reasoning which led Lord Brandon to reject the owners' claim for compound interest

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

does not apply to the different facts of the present case. Lord Brandon identified three main reasons for his conclusion. It is to the second reason that I would draw attention. I will quote the reason in full:

'My second main reason is that, when Parliament has given effect by legislation to some recommendations of the Law Commission in a particular field, but has taken what appears to be a policy decision not to give effect to a further such recommendation, any decision of your Lordships' House which would have the result of giving effect, by another route, to the very recommendation which Parliament appears to have taken that policy decision to reject, could well be regarded as an unjustifiable usurpation by your Lordships' House of the functions which belong properly to Parliament, rather than as a judicial exercise in departing from an earlier decision on the ground that it has become obsolete and could still, in a limited class of cases, continue to cause some degree of injustice.' (See [1984] 2 All ER 773 at 789, [1985] AC 104 at 130.)

It is true that the Law Commission in its report, Law of Contract: Report on Interest (Law Com No 88) (1978) made no recommendation for changing the equitable jurisdiction to award interest, and so Parliament cannot be said to have taken a policy decision to reject any such recommendation. But the underlying objection remains. Parliament has on two occasions, first in 1934, and then in 1981, remedied injustices which had long been apparent in the power to award interest at common law. On the latter occasion it did so in the light of the view expressed by the Law Commission that the equitable jurisdiction to award interest was working satisfactorily and called for no change. To extend the equitable jurisdiction for the first time to cover a residual injustice at common law, which Parliament chose not to remedy, would, I think, be as great a usurpation of the role of the legislature, and as clear an example of judicial law-making, as it would have been in President of India. If it is thought desirable that the courts should have a power to award compound interest in common law claims for money had and received, then such a result can now only be brought about by Parliament.

My third reason for rejecting the bank's claim for compound interest is that I am by no means certain that the policy considerations all point in favour of change. It is presumably in commercial transactions that the discretionary power to award compound interest would most frequently be used, on the ground that the money received by the payee would otherwise have had to be borrowed at compound interest. But it is in just such transactions that the need for certainty is paramount. Disputes which would otherwise be settled on the basis of simple interest would be fought in the hope of persuading the court that an award of compound interest was appropriate. It is interesting to note that it was on this very ground that Lord Tenterden CJ rejected the solution proposed by Best CJ in Arnott v Redfern (1826) 3 Bing 353, 130 ER 549. In Page v Newman (1829) 9 B & C 378 at 380-381, 109 ER 140 at 141 Lord Tenterden CJ said:

'If we were to adopt as a general rule that which some of the expressions attributed to the Lord Chief Justice of the Common Pleas in Arnott v. Redfern would seem to warrant, viz. that interest is due wherever the debt has been wrongfully withheld after the plaintiff has endeavoured to obtain payment of it, it might frequently be made a question at Nisi Prius whether the proper means had been used to obtain payment of the debt, and such as the party ought to have used. That would be productive of great inconvenience.'

As one who has in the past attempted to keep open the availability of equitable remedies in commercial disputes, I am now conscious of the strength of the arguments the other way: see Scandinavian Trading Tanker Co AB v Flota Petrolera Ecuatoriana [1983] 2 All ER 763, [1983] 2 AC 694, disapproving dicta of Lloyd J in Afovos Shipping Co SA v Pagnan, The Afovos [1980] 2 Lloyd's Rep 469. It is, of course, true that even an award of simple interest lies in the discretion of the court, as does the rate of interest. But in the great majority of cases it is not difficult to predict the amount of simple interest which is likely to be awarded. Compound interest, on the other hand, is not so predictable. It presents wider room for disagreement. Disputes would be likely to end up in court, and this would, in the words of Lord Tenterden, 'be productive of great inconvenience'. Despite the weight which must attach to the views of my noble and learned friends Lord Goff of Chieveley and Lord Woolf, I would allow the appeal.

**DISPOSITION:**

[1996] AC 669, [1996] 2 All ER 961, 95 LGR 1

Appeal allowed.

**SOLICITORS:**

Nabarro Nathanson; Travers Smith Braithwaite.



46 of 189 DOCUMENTS

Butterworths UK Statutes
Copyright 2014, Butterworths Tolley UK
a division of Reed Elsevier, Inc.
All rights reserved.

*** These documents were last updated on 1 August, 2014 ***

**PATENTS ACT 1977**
**1977 CHAPTER 37**

**PART I NEW DOMESTIC LAW**
**Employees' inventions**
Royal Assent [29 July 1977]

Patents Act 1977, Ch. 37, s. 39 (Eng.)

**39 Right to employees' inventions**

(1) Notwithstanding anything in any rule of law, an inventionmade by an employee shall, as between him and his employer, be taken to belong to his employer for the purposes of this Act and all other purposes if--

(a) it was made in the course of the normal duties of the employee or in the course of duties falling outside his normal duties, but specifically assigned to him, and the circumstances in either case were such that an invention might reasonably be expected to result from the carrying out of his duties; or

(b) the invention was made in the course of the duties of the employee and, at the time of making the invention, because of the nature of his duties and the particular responsibilities arising from the nature of his duties he had a special obligation to further the interests of the employer's undertaking.

(2) Any other invention made by an employee shall, as between him and his employer, be taken for those purposes to belong to the employee.

[(3) Where by virtue of this section an invention belongs, as between him and his employer, to an employee, nothing done--

(a) by or on behalf of the employee or any person claiming under him for the purposes of pursuing an application for a patent, or

(b) by any person for the purpose of performing or working the invention,

shall be taken to infringe any copyright or design right to which, as between him and his employer, his employer is entitled in any model or document relating to the invention.]

1977 CHAPTER 37

**NOTES:**

**Initial Commencement**

    **To be appointed**

To be appointed: see s 132(5).

**Appointment**

Appointment: 1 June 1978: see SI 1978/586, art 2.

**Amendment**

Sub-s (3): inserted by the Copyright, Designs and Patents Act 1988, s 295, Sch 5, para 11(1).

**Modification**

This Act is modified in its application to the Isle of Man by the Patents (Isle of Man) Order 2013, SI2013/2602, art 2, Schedule.

# The Law Relating to Estoppel by Representation

*(ii)    Convention as to proprietary rights*

**VIII.6.2**    If the convention is as to the acquisition or existence of rights in or over property, then the consequence should, it is submitted, be the same as that of a proprietary estoppel: it constitutes a cause of action whose remedy is in the discretion of the court.[1] The constituent elements of a proprietary estoppel will have been established, and the estoppel by convention will, therefore, be a form of proprietary estoppel.

1    See eg *Valentine v Nash* [2003] EWCA Civ 915 invoking (at paras 55, 63) the dictum of Lord Denning MR in *Amalgamated Investment v Texas Commerce* para VIII.5.7, n 4 above at 122C–D, to the effect that the court has a discretion to give 'such remedy as the equity of the case demands' in *all* cases of estoppel by convention.

*(iii)    Convention as to law*

**VIII.6.3**    The difficult question, as noted above,[1] is as to the effect of an estoppel by convention as to a matter of law. A convention as to law (where the underlying facts are known to the parties) is, in substance, a convention as to the rights and obligations of the parties under the law. An estoppel by convention as to law, therefore, prevents one party from denying that the other has the legal rights they assumed he had. As discussed in Chapter II,[2] a proposition, or contention, as to the parties' mutual rights and obligations is promissory or factual according to whether it imparts an intention to affect or to describe those rights and obligations. If that distinction is to be applied, an estoppel by convention as to law is factual or promissory according to the apparent intent with which the convention was established: that is, whether it was descriptive or transformative. It is clearly desirable to avoid the necessity of drawing such a fine line if possible, yet if some distinction is not drawn, then the careful preservation of the doctrine of consideration against the incursion of the doctrine of promissory estoppel is undermined, as detrimental reliance on a shared and communicated assumption by parties that one is contractually bound to the other will render him so bound, notwithstanding the absence of consideration.

1    See paras VIII.2.3 ff above.
2    See paras VIII.6.1–VIII.6.3, VIII.8.8–VIII.8.11.

**VIII.6.4**    As the law stands, it cannot, therefore, be allowed that any estoppel by convention as to law (where the underlying facts are known to the parties) simply estops the parties from denying that the law is as they assumed. Further (as argued in Chapter II[1] in relation to representations as to rights and obligations) it seems undesirable that a 'factual' convention – e.g. that there is no doctrine of consideration – should have the consequences of an estoppel by representation of fact, whereas a promissory convention – that the parties should be bound notwithstanding the absence of consideration – should be subject to the restrictions on the deployment and consequences of promissory estoppel. It is simpler to take the view that a convention as to the law governing the mutual rights and obligations of the parties