# TAB 17

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 2 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

2008 ONCA 396
Ontario Court of Appeal

3869130 Canada Inc. v. I.C.B. Distribution Inc.

2008 CarswellOnt 2802, 2008 ONCA 396, [2008] O.J. No. 1947, 167
A.C.W.S. (3d) 82, 239 O.A.C. 137, 45 B.L.R. (4th) 1, 66 C.C.E.L. (3d) 89

# 3869130 CANADA INC. c.o.b. as I.C.B. DISTRIBUTION 2001, and 2794201 CANADA INC. c.o.b. as C.Y.R. DISTRIBUTIONS, and PIERRE CYR, personally (Plaintiffs / Appellants) and I.C.B. DISTRIBUTION INC., ROBERT CHENIER, and OTTAWA FREEZER SERVICES INC. (Defendants / Respondents)

ROBERT CHENIER (Plaintiff / Respondent) and 3869130 CANADA
INC. c.o.b. as I.C.B. DISTRIBUTION 2001 (Defendant / Appellant)

I.C.B. DISTRIBUTION INC. (Plaintiff / Respondent) and 3869130 CANADA INC. c.o.b. as I.C.B.
DISTRIBUTION 2001, and 2794201 CANADA INC. c.o.b. as C.Y.R. DISTRIBUTIONS (Defendants / Appellants)

R.A. Blair, R.G. Juriansz, H.S. LaForme JJ.A.

Heard: November 26-27, 2007
Judgment: May 20, 2008
Docket: CA C43970, C43971, C43972

Proceedings: affirming *3869130 Canada Inc. v. I.C.B. Distribution Inc.* (2005), 2005 CarswellOnt 3817, 45 C.C.E.L. (3d) 15 (Ont. S.C.J.)

Counsel: Richard R. Marks, Bruce D. Marks for Appellants, I.C.B. Distribution 2001, C.Y.R. Distributions, Pierre Cyr
Douglas G. Menzies for Respondents, I.C.B. Distribution Inc., Ottawa Freezer Services Inc., Robert Chenier

Subject: Labour and Employment; Public; Contracts; Torts; Corporate and Commercial; Estates and Trusts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Commercial law --- Trade and commerce — Restraint of trade — Restrictive covenants — Particular situations — Non-competition clause**

RC and PC discussed sale of RC's food distribution company ICB and his storage facility business OFS to PC, who incorporated ICB 2001 for that purpose — Parties entered into asset purchase agreement with vendor take back ("VTB") loan, evidenced by promissory note — RC was to operate business for two years pursuant to management consulting agreement — Asset purchase agreement closed and parties jumped ahead of paperwork — PC failed to meet financial disclosure requirements in share purchase agreement — When ICB 2001 was moved to back of freezer, PC moved it to another warehouse — RC's services were terminated — Share purchase agreement never closed — PC and his companies' action for breach of contract and fiduciary obligations was dismissed — Trial judge found that RC and his companies did not breach covenant not to compete contained in asset purchase agreement — Trial judge found that covenant did not stand alone and had to be read in context — Trial judge found that parties entered into mutual undertaking, which provided that OFS would provide ICB 2001 first right of refusal for all distribution contracts for its customers, which required distribution — Trial judge found that distribution work for major client GT was properly offered to ICB 2001

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 3 of 25

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

in accordance with mutual undertaking — Trial judge found that fact that OFS made profit thereon was irrelevant — PC and ICB appealed — Appeal dismissed — Although mutual undertaking not signed at same time as purchase agreement, committments contained were contemplated in purchase agreement and formed part of transaction — Court not limited to examining mutual undertaking, but other contracts as well — Trial judge did not reach improper conclusion in finding that mutual undertaking was put in place to give effect to asset purhcase and give ICB right of first refusal — Parties contemplated that transaction might not be completed, and right of first refusal created to allow for contingency — Non-competition covenant did not preclude OFS from dealing with client GT and ICB 2001 in manner that it did — OFS was not party to asset purchase agreement, or any other agreement except for mutual understanding — Parties could not reasonably have contemplated that if share purchase agreement was not exercised, then OFS would not be entitled to enter into contractual relation — RC's obligation not to compete with purchased business, ICB, was not breached.

### Business associations --- Creation and organization of business associations — Partnerships — Fiduciary obligations

RC and PC discussed sale of RC's food distribution company ICB and his storage facility business OFS to PC, who incorporated ICB 2001 for that purpose — Parties entered into asset purchase agreement with vendor take back ("VTB") loan, evidenced by promissory note — RC was to operate business for two years pursuant to management consulting agreement — Asset purchase agreement closed and parties jumped ahead of paperwork — PC failed to meet financial disclosure requirements in share purchase agreement — When ICB 2001 was moved to back of freezer, PC moved it to another warehouse — RC's services were terminated — Share purchase agreement never closed — PC and his companies' action for breach of fiduciary obligations was dismissed — Trial judge found that no fiduciary relationship existed between RC and PC, who were of equal strength and had similar business backgrounds — Trial judge found that PC and RC did not form effective partnership with common purpose — PC and ICB appealed — Appeal dismissed — RC did not have fiduciary obligation to promote interests of ICB — RC was not part of ICB's senior management — RC did not abuse his negotiating position or act in bad faith, and acted according to mutual understanding agreement — No conflict of interest existed on part of RC.

In 2000, RC and PC commenced discussions with respect to the sale of RC's food distribution company ICB and his storage facility business OFS, to PC. OFS operated its food storage facility out of leased premises. While the head lease provided for a ten-year extension to December 31, 2015, OFS was the subtenant with its term set to expire on December 31, 2005, with no provision for extension. PC owned C Distributions, also a food distribution business. In order to purchase ICB, PC incorporated ICB 2001. RC was the sole shareholder, director, and officer of ICB and OFS, and PC was the sole shareholder, director, and officer of C Distributions and ICB 2001.

The parties entered into an asset purchase agreement, which provided for a total sale price of $339,226.55, including a $93,725.86 vendor take back ("VTB") loan. The loan was evidenced by a promissory note singed by PC. RC was to operate the business for two years, in the ordinary course pursuant to a management consulting agreement. The parties executed a share purchase agreement that contemplated further financial disclosure from PC and that the parties would attempt to obtain an extension of the sublease. While the asset purchase transaction closed July 11, 2001, the parties jumped ahead of the paperwork and PC began to sign cheques for ICB and do bank deposits for the ICB business. RC began to act according to the management consulting agreement. PC advanced purchase monies to RC prior to the closing, and RC signed a promissory note for the monies advanced.

The relationship between the parties began to deteriorate in the fall of 2001. RC began to have concerns about PC's financial viability and his ability to run a business. ICB 2001 began to suffer financial losses. RC had previously agreed to accept one-half his entitlement under the management consulting agreement and interest only on the VTB loan. PC did not meet the 60-day financial disclosure requirement in the share purchase agreement. PC was advised on November 19, 2001 that ICB 2001 would be moved into the back freezer in order to accommodate GT wholesale's move to the front of the freezer. PC felt that he was being crowded out in the warehouse and that his use of the docks was being restricted, so he signed a lease for another warehouse facility on December 12, 2001. The parties contemplated that the share purchase transaction

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 4 of 25

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 Carswellont 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

would close October 1, 2001 or earlier or later, but not earlier than two weeks after the consent for extension of the sublease. The consent for the sublease extension was never obtained and the share purchase agreement never closed. By letter dated January 25, 2002, PC's lawyer gave notice that ICB 2001 would leave the facility, and it also detailed concerns about RC's performance pursuant to the management consulting agreement. RC ceased work for ICB 2001. C Distributions and ICB 2001 moved to their new facility.

RC alleged that PC breached the VTB loan by moving ICB 2001 from its original facility, as well as the management consulting agreement, by termination of RC's services thereunder. PC alleged that his companies were forced out of the original facility by RC's actions and that just cause existed for termination of RC's services. PC alleged that RC engineered the demise of the share purchase transaction so that he could take full advantage of a lucrative distribution contract with GT, which OFS negotiated in the fall of 2001 to the detriment of ICB 2001.

Three actions were commenced. RC claimed monies owing under the management consulting agreement (the "wrongful dismissal action"). ICB brought an action for the balance of the purchase price on the sale of assets transaction (the "loan action"). PC and his companies brought an action against RC, ICB, and OFS for breach of contract and fiduciary obligations (the "PC action"). The wrongful dismissal action and the loan action was allowed; the PC action was dismissed.

The trial judge found the employer failed to establish just cause for the termination of RC's services under the management consulting agreement. Pursuant to the agreement, RC was to advise, when requested, effective and prudent management practices, and assess, when requested, the market with a view to increasing sales and provide strategic advice on increasing sales and liaising with customers, and perform the routing of trucks and the scheduling of deliveries as requested. The Agreement clearly contemplated requests for service being made by PC. There was no evidence that any specific requests for services were made by PC of RC, which were not undertaken by RC. The trial judge found RC's alleged failure to attract new business was not supported by the evidence. RC's alleged failure to get along with PC's son, who managed warehouse delivery operations for ICB, did not constitute just cause for termination because he was never warned that the conflict might lead to termination. RC was not told of any problems with respect to his work performance prior to the letter by PC's lawyer on January 25, 2002. The trial judge found RC was not warned that his continued employment was in jeopardy and he was not then given the opportunity to improve his alleged poor performance.

The trial judge found RC was entitled to damages. RC was paid in full for the months of March through June 2001, but he agreed to temporarily accept one-half of the required amount for July and August, and he was so paid. RC also returned one-half of the monies received from March through June 2001, and he received nothing under the management consulting agreement after August 2001. The trial judge found that while it was known that RC had continued to work for OFS when he began working for ICB 2001, no consideration appeared to have been given in the agreement to splitting the consulting fee between the two companies. The trial judge found that even if there had been an agreement to forebear and accept only one-half of the monies owing, that agreement would have been vitiated by PC's failure to pay any monies since August 2001 although RC was working pursuant thereto until February 2002. Therefore, the trial judge found there was no binding agreement that RC would accept on a permanent basis one-half of the consulting fees under the management consulting agreement. RC was entitled to the full amount owing.

The trial judge found ICB 2001's move from the original premises was an act of default under the VTB loan for the asset purchase transaction and that as such the loan became immediately due and payable at the instance of the lender. PC's contention that ICB 2001 and was essentially forced out of the premises and that RC manipulated the circumstances in such a way as to make it impossible for PC to fulfil the term that ICB 2001 remain at the premises, was not made out in the evidence. PC planned to move both ICB 2001 and C Distributions from the original facility. The plan was formulated prior to PC being given notice of the move of ICB 2001 to the back freezer and was not caused by RC allegedly pushing him out of the facility or making it impossible for him to operate ICB 2001. The trial judge found the context surrounding the move included a serious disintegration of the parties' relationship, PC must have been aware that the extension to the sublease had not been obtained, and the deal to purchase OFS was going off the rails. PC went on with his plans to ensure

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 5 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

the continued viability of his companies. However, leaving the original premises was an event of default under the loan agreement which triggered the calling of the loan. ICB was therefore entitled to its damages.

The trial judge found PC alleged that RC represented FB and BR were important customers of ICB, but he failed to reveal the fact that both customers had terminated their relationship with ICB. PC further alleged that the failure to provide that information was a deliberate and significant misrepresentation by RC intended to induce ICB 2001 to complete the closing of the asset purchase transaction. However, neither customers were listed with contracts set out in the schedule of the asset purchase agreement signed April 19, 2001, and they were also not listed with contracts in the schedule to the bill of sale signed May 22, 2001. Furthermore, all revenue from ICB went to PC as of March 1, 2001, PC or his son did the banking, and PC's son worked every day at the original facility running the distribution side of the business so that he would have been aware that no work was being done for FB or BR during that period of time. The trial judge found the asset purchase agreement did not require the vendor to warrant or make undertakings with respect to sales figures or revenues. The issue of the absence of the two customers was not raised in any correspondence between counsel after August 2001 and appeared to be first raised on the evidence in the PC action issued in February 2003. In any event, PC failed to prove damages as there was no evidence presented with respect to the profit generated from those customers.

The trial judge found that while the share purchase agreement required financial statements for five years to be delivered within 60 days of July 11, 2001, they were not delivered until November 30, 2001 on the closing date with the closing documentation. Only four years were provided and they were marked "draft". Income tax returns were only provided on November 30. A second financial statement prior to the ICB closing was not provided until November 21 and it failed to disclose a $250,000 debt to L bank. The trial judge found that PC ignored the financial disclosure requirements set out in the share purchase agreement. Providing disclosure on the date of closing with the tender documents did not suffice. The trial judge found PC breached the condition set out in sub-paragraph 8.3(e) of the share purchase agreement with respect to disclosure, and that condition was not waived by the vendor.

The trial judge found that sub-paragraph 8.3(e) of the share purchase agreement provided that the purchaser was to have executed in a form and with collateral sufficient in the opinion of the vendor's counsel and acceptable to the purchaser's counsel to permit the vendor to obtain adequate security for the VTB financing. The trial judge found that the VTB loan documentation was only provided to RC's lawyer on the date of closing, such that he did not have the opportunity to review it to determine the sufficiency of collateral, and it was in fact devoid of any security whatsoever. Sub-paragraph 8.3(e) also provided for a hypothec in the amount of $250,000, but the hypothec provided was a blank document and of no worth. The security documents were not in an acceptable form, that there was no reference to collateral in the security documentation. The trial judge found that PC breached the condition with respect to loan and security documents, and that condition was not waived by the vendor. RC's concerns with respect to the disclosure provided and the security for the OFS transaction were reasonable. RC could not be faulted for refusing to waive the conditions at sub-paragraph 8.3(e), or refusing to close the OFS transaction on November 30, 2001.

The trial judge found that under s. 9.1 of the share purchase agreement between RC and C Distributions, entitled "condition precedent", the vendor and purchaser undertook to obtain, if possible, (a) an extension of the sublease for an additional ten years, (b) to obtain the head lease and (c) the vendor's $50,000 GIC shall be transferred to the purchaser and the purchaser shall pay the vendor $50,000. Sub-paragraphs 9.1(a) and (b) were true conditions precedent. They required the extension of the sublease or obtaining of the head lease, which was a future uncertain event upon which the parties' rights and obligations depended. The obtaining of the extension, or the head lease, was dependant entirely on the will of a third party. Sub-paragraphs 9.1(a) and (b) were set out in clear terms, and the condition was to be met by November 30, 2001. While sub-paragraph 9.1(c) was not dependant entirely on the will of a third party, but rather on the actions of the vendor and the purchaser, that did not mean that the rest of 9.1 was not a condition precedent, as sub-paragraphs 9.1(a) and (b) were severable from 9.1(c) and there was no juristic reason for not so severing.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 6 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

The trial judge found that pursuant to s. 9.1, both parties were under an obligation to pursue the lease extension or the head lease. RC and PC retained the services of K to assist them in obtaining the sublease extension, and they shared equally in paying his fee. However, the evidence demonstrated that PC and his companies were taking the position that it was RC's obligation alone, as neither PC nor his solicitors ever contacted K directly for updates. The trial judge found that PC's failure to contact K during November 2001 was not reasonable behaviour in the circumstances. PC simply bided his time and then cast blame on RC alleging that he had not done everything he could do to obtain the lease extension. Despite his allegations, PC was not shut out of the efforts made to extend the sublease. Therefore, RC did not fail to make a good faith effort to obtain the lease extension. The trial judge found that sub-paragraphs 9.1(a) and 9.1(b) of the share purchase agreement were true conditions precedent which could not be waived unilaterally by PC. RC and his companies were not in breach of contract for the sale of the shares of OFS.

The trial judge found that PC and his companies alleged that RC and his companies breached the covenant in the share purchase agreement not to compete. The covenant did not stand alone and had to be read in context. In the face of the covenant not to compete, the parties turned their minds to distribution work and entered into a mutual undertaking, with the understanding and intent that any distribution work which OFS might obtain from its customers would be first offered to ICB 2001. The mutual undertaking provided that OFS would provide ICB 2001 a first right of refusal, in writing for all distribution contracts for its customers for which same required distribution. The trial judge found that the mutual undertaking contemplated that OFS could obtain distribution contracts. The distribution work for GT was properly offered to ICB 2001 in accordance with the mutual undertaking. The fact that OFS made a profit thereon was irrelevant. The trial judge found that RC and his companies did not breach the covenant not to compete contained in the asset purchase agreement.

The trial judge found that no fiduciary relationship existed. RC did not fail to act in good faith in his dealings with PC. The parties to the commercial transaction were of equal strength, they had similar business backgrounds, and there was no imbalance or dependency in their relationship. While PC alleged that RC was the expert, the difference in their expertise related mainly to the products they distributed. The trial judge found that PC and RC did not form an effective partnership with a common purpose. The fact that OFS made a profit on the GT distribution work was not relevant with respect to the issue of whether a fiduciary duty existed or not.

PC and IBC appealed.

**Held:** The appeal was dismissed.

The trial judge did not err in interpretating the mutual undertaking. The contracts, including the mutual understanding, were entered into in order to give effect to an arrangement whereby operations were to be transferred. Although the mutual understanding was not signed at the time of the purchase, it formed part of the same transaction.

Read together, the documentation was capable of more than one meaning. As the trial judge's interpretation was reasonable, it should not be overturned on appeal. The trial judge properly found that the undertaking was created to give effect to s. 8.1(i) of asset purchase agreement, whereby ICB 2001 agreed to obtain a committment by OFS to not change distribution services. ICB 2001, therefore, had a right of first refusal for all distribution contracts, as per the parties' intentions. It insured that OFS would continue to use ICB services for distribution, and gave ICB 2001 the right to operate at the premises for five years. The fact that the arrangement called for the charge for the use of the premises to drop if the deal was not completed was significant. The parties were aware that the deal was subject to several contingencies and that the sale might not be completed. The right of first refusal was the mechanism chosen by the parties to give effect to the asset purchase agreement, which required ICB to get OFS onside to continue to use the services of the purchasing company for distribution in respect of OFS customers. ICB 2001 paid a considerable sum for goodwill, but it was not entitled to acquire all future distribution contracts by OFS. Rather, it was entitled only to acquire existing contracts at the time of sale.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

Although the purchase agreement and mutual understanding did not make any statements regarding distribution, the trial judge's interpretation was most faithful to their language, and to actual events and the conduct of the parties. The agreements in place could not be interpreted to prevent RC from using OFS, indirectly, to derive a benefit for himself from the distribution portion of OFS contracts.

The non-competition covenant did not preclude OFS from dealing with GT and ICB 2001 in the manner that it did. OFS was not a party to the asset purchase agreement, or any other agreement except for the mutual understanding. The parties could not reasonably have contemplated that if the share purchase agreement was not exercised, then OFS would not be entitled to enter into a contractual relation. RC's obligation not to compete with the purchased business, ICB, was not breached. Given the circumstances, the parties could not have intended that the non-competition clause extended to RC's activities in OFS. The terms of the agreement did not prevent RC from negotiating with GT without the permission of PC.

When all documentation was read together, the non-competition agreement did not prevent OFS from dealing with GT. The subcontract distribution arrangement did not constitute competition as understood by the agreement. The agreement between the parties was that OFS would continue to enter into distribution contracts with with customers, and that ICB would be given the right to bid on distribution services arising out of the contracts. It was not realistic to assume that OFS would not be able to subcontract out work if ICB declined its right of first refusal. The parties knew that if the share purchase agreement was not completed that the companies would operate at arms' length.

RC did not have a fiduciary obligation to promote the interests of ICB. RC was not part of ICB's senior management. The parties to the contract were of equal strength and expertise. RC did not abuse his negotiating position or act in bad faith, and acted according to the mutual understanding agreement. No conflict of interest existed on the part of RC.

The trial judge reached the proper conclusion regarding the VTB loan action. it was open for the trial judge to find that ICB had not been pushed out of the premises. The trial judge made clear findings of credibility in favour of RC. RC did not attempt to frustrate the agreement to keep GT business for himself.

The appeal from the wrongful dismissal action was dismissed. The trial judge made no palpable and overriding error.

## Table of Authorities

### Cases considered by *R.A. Blair J.A.*:

*Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 1994 CarswellOnt 233, 13 C.L.R. (2d) 185, *(sub nom. Andersen (Arthur) Inc. v. Toronto Dominion Bank)* 71 O.A.C. 1, 17 O.R. (3d) 363, 14 B.L.R. (2d) 1 (Ont. C.A.) — referred to

*Bradscot (MCL) Ltd. v. Hamilton-Wentworth Catholic District School Board* (1999), 42 O.R. (3d) 723, *(sub nom. Bradscot (MCL) Ltd. v. Board of Education (Roman Catholic Separate) of Hamilton-Wentworth)* 116 O.A.C. 257, 44 C.L.R. (2d) 1, 1999 CarswellOnt 57 (Ont. C.A.) — followed

*Cadbury Schweppes Inc. v. FBI Foods Ltd.* (1999), 235 N.R. 30, 83 C.P.R. (3d) 289, 42 B.L.R. (2d) 159, 117 B.C.A.C. 161, 191 W.A.C. 161, 59 B.C.L.R. (3d) 1, [1999] 5 W.W.R. 751, [1999] 1 S.C.R. 142, [2000] F.S.R. 491, 167 D.L.R. (4th) 577, 1999 CarswellBC 77, 1999 CarswellBC 78 (S.C.C.) — referred to

*Canadian Aero Service Ltd. v. O'Malley* (1973), [1974] S.C.R. 592, 40 D.L.R. (3d) 371, 11 C.P.R. (2d) 206, 1973 CarswellOnt 236, 1973 CarswellOnt 236F (S.C.C.) — referred to

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 8 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co. (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — considered

Dumbrell v. Regional Group of Cos. (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201 (Ont. C.A.) — considered

Eli Lilly & Co. v. Novopharm Ltd. (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

Frame v. Smith (1987), 1987 CarswellOnt 969, 78 N.R. 40, [1987] 2 S.C.R. 99, 42 D.L.R. (4th) 81, 23 O.A.C. 84, 42 C.C.L.T. 1, [1988] 1 C.N.L.R. 152, 9 R.F.L. (3d) 225, 1987 CarswellOnt 347 (S.C.C.) — considered

Hawrish v. Bank of Montreal (1969), [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673, 1969 CarswellSask 9 (S.C.C.) — referred to

Hodgkinson v. Simms (1994), 57 C.P.R. (3d) 1, 5 E.T.R. (2d) 1, [1994] 3 S.C.R. 377, 95 D.T.C. 5135, 97 B.C.L.R. (2d) 1, 117 D.L.R. (4th) 161, 171 N.R. 245, 1994 CarswellBC 438, 1994 CarswellBC 1245, [1994] 9 W.W.R. 609, 49 B.C.A.C. 1, 80 W.A.C. 1, 22 C.C.L.T. (2d) 1, 16 B.L.R. (2d) 1, 6 C.C.L.S. 1 (S.C.C.) — referred to

Housen v. Nikolaisen (2002), 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, 286 N.R. 1, [2002] 7 W.W.R. 1, 2002 CarswellSask 178, 2002 CarswellSask 179, 2002 SCC 33, 30 M.P.L.R. (3d) 1, 219 Sask. R. 1, 272 W.A.C. 1, [2002] 2 S.C.R. 235 (S.C.C.) — considered

International Corona Resources Ltd. v. LAC Minerals Ltd. (1989), 44 B.L.R. 1, 35 E.T.R. 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 69 O.R. (2d) 287, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* [1989] 2 S.C.R. 574, 6 R.P.R. (2d) 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.)* 26 C.P.R. (3d) 97, 1989 CarswellOnt 126, 1989 CarswellOnt 965 (S.C.C.) — referred to

MacDougall v. MacDougall (2005), 2005 CarswellOnt 7257, 205 O.A.C. 216, 262 D.L.R. (4th) 120 (Ont. C.A.) — referred to

Mechanical Pin Resetter Co. v. Canadian Acme Screw & Gear Ltd. (1970), [1971] S.C.R. 628, 1970 CarswellOnt 258, 1970 CarswellOnt 259, 65 C.P.R. 150, 15 D.L.R. (3d) 475 (S.C.C.) — considered

Montreal Trust Co. of Canada v. Birmingham Lodge Ltd. (1995), 46 R.P.R. (2d) 153, 1995 CarswellOnt 541, 125 D.L.R. (4th) 193, 24 O.R. (3d) 97, 82 O.A.C. 25, 21 B.L.R. (2d) 165 (Ont. C.A.) — considered

Read v. Cole (1915), 9 W.W.R. 1137, 26 D.L.R. 564, 52 S.C.R. 176, 1915 CarswellBC 210 (S.C.C.) — referred to

SimEx Inc. v. IMAX Corp. (2005), 2005 CarswellOnt 7297, 206 O.A.C. 3, 11 B.L.R. (4th) 214 (Ont. C.A.) — referred to

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust (2007), 2007 CarswellOnt 1705, 222 O.A.C. 102, 2007 ONCA 205, 29 B.L.R. (4th) 312, 85 O.R. (3d) 254, 56 R.P.R. (4th) 163 (Ont. C.A.) — considered

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 9 of 25

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

APPEAL by plaintiff purchaser from judgment reported at *3869130 Canada Inc. v. I.C.B. Distribution Inc.* (2005), 2005 CarswellOnt 3817, 45 C.C.E.L. (3d) 15 (Ont. S.C.J.), dismissing plaintiff's action for breach of contract and fiduciary obligations, allowing vendor's action for balance of purchase price on sale of assets transaction and allowing action by consultant for monies owing under management consulting agreement.

*R.A. Blair J.A.*:

**Overview**

1    The issues on this appeal have their genesis in a business deal involving the sale of two Ottawa businesses owned by the respondent, Robert Chenier. The appellant, Pierre Cyr — acting through his companies — was the intended purchaser. One of the transactions closed. The other did not.

2    Three lawsuits ensued. The first (the "VTB Loan Action") involved a claim by one of the Chenier vendor companies for the balance of the purchase price on the sale of its assets. The second (the "Wrongful Dismissal Action") was by Mr. Chenier for monies owing under a management consultant agreement entered into with respect to that asset transaction. The third (the "Cyr Action") was brought by Mr. Cyr and his companies claiming damages from Mr. Chenier and his companies for breach of contract, breach of fiduciary duty, breach of good faith, and breach of a duty to avoid conflict of interest.

3    After a four week trial, Justice Polowin allowed the Chenier claims in the Loan Action and the Wrongful Dismissal Action and dismissed the Cyr Action. The Cyr appellants now seek to set aside those judgments.

4    For the reasons that follow, I would dismiss the appeals.

**Facts**

5    Mr. Chenier owned a food distribution company, I.C.B. Distributions Inc. ("I.C.B."), based in Ottawa. He also owned a freezer and cold storage business carried on through Ottawa Freezer Services Inc. ("O.F.S.") in premises located at 400 Industrial Ave. in that city. Mr. Chenier had had some health problems and wished to semi-retire and work fewer hours.

6    Mr. Cyr owned an unrelated food distribution company that carried on business as C.Y.R. Distributions. [1] It rented cooler and freezer space from O.F.S. in the latter's premises at 400 Industrial Ave. and, as a result, Mr. Cyr had some exposure to Mr. Chenier's businesses. He felt there was a potential synergy between those operations and his own and, in particular, that the wider territory served by I.C.B. and its access to distribution business flowing from the O.F.S. storage contracts presented an opportunity to expand the scope of C.Y.R. Distributions' undertaking (which, at that point in time had become saturated in Ottawa).

7    When their mutual interests surfaced in September or October 2000, Mr. Chenier and Mr. Cyr began to have discussions about the possible acquisition of I.C.B. and O.F.S. by Mr. Cyr. The deal they negotiated contemplated the purchase of the assets of I.C.B. by I.C.B. Distribution 2001 ("I.C.B. 2001") [2] for approximately $362,500, and of the shares of O.F.S. by C.Y.R. Distributions for approximately $500,000.

8    Several agreements were entered into thereafter to give effect to these intentions. They included the following in relation to the acquisition of I.C.B.'s assets:

(a) an Asset Purchase Agreement, which contained two important promises for the purposes of this appeal, namely:

(i) a covenant by I.C.B. and Mr. Chenier not to compete with the purchased business for a period of five years, or to permit anyone on their behalf to do so (s. 7.5); and

**WestlawNext**® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 10 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

(ii) an undertaking by I.C.B. and Mr. Chenier to obtain the commitment of O.F.S. to continue to use the services of the Purchaser for distribution services in respect of O.F.S.'s customers and to permit the Purchaser to operate from the O.F.S. premises at 400 Industrial Ave. in Ottawa (s. 8.1(i));

(b) a Management Consulting Agreement pursuant to which Mr. Chenier was to provide consulting services as requested during a transitional period; and

(c) a Vendor Take-Back Loan Agreement respecting the loan portion of the asset purchase price.

9    The I.C.B. asset purchase closed on July 11, 2001. No share purchase agreement with respect to O.F.S. had been executed at that point, however, and Mr. Cyr refused to complete the asset purchase without one being in place. As a result, there were intense negotiations during the evening and night of the closing, which resulted in two further agreements being prepared and signed by the parties prior to the asset purchase closing. They were:

(a) a Share Purchase Agreement between Mr. Chenier as vendor of the O.F.S. shares and Mr. Cyr and C.Y.R. Distributions as purchasers; and

(b) a Mutual Undertaking between I.C.B. 2001 and O.F.S., giving effect to the covenant in Section 8.1(i) of the Asset Purchase Agreement whereby O.F.S. agreed to provide to I.C.B. 2001 (as the Purchaser of the assets of I.C.B.) a right of first refusal for its customers' distribution contracts and the right to operate from the I.C.B. premises.

10    The provisions of the Mutual Undertaking are central to the issues on this appeal. It is a one page document. I set it out in full:

MUTUAL UNDERTAKING

BETWEEN 3869130 CANADA INC. ("PURCHASER") and OTTAWA FREEZER SERVICES INC.

Re: Purchase of certain assets of ICB Food Distributions Inc. pursuant to an asset purchase agreement dated the 19 [th] day of April, 2001, by 3869130 CANADA INC. (the "Purchaser") and continuing operations from 400 Industrial Avenue, Ottawa

WHEREAS:

1. The Vendor has entered into an agreement of purchase and sale (the "Purchase Agreement") effective the 28 [th] day of February, whereby the Vendor agrees to sell certain assets of ICB Food distributions Inc. (the "Business");

2. And whereas, as a condition of the completion of the said sale of the Business, it was agreed that the Purchaser would provide its written commitment to operate exclusively from the Ottawa Freezer Service's premises from which the Vendor operated prior to the Closing Date at 400 Industrial Ave. (the "Premises") until December 28, 2005, or until the early termination of the Ottawa Freezer Services sub-lease by the Sub-Landlord of the Premises, whichever is earlier.

3. And whereas, it was further agreed between the Vendor and the Purchaser that the gross annual charge payable by the Purchaser for the right to operate from the Premises shall be $120,000.00, annually, for each year of operation to December 28, 2005.

IN CONSIDERATION of the sum of $2.00 the receipt of which is hereby acknowledged, Ottawa Freezer Services does hereby undertake and agree to provide to the Purchaser a first right of refusal, in writing for all distribution contracts for its customers for which the same require distribution and general trucking and delivery services and the right to operate from the Premises for a period of five years from the date hereof, except that, should the sale of shares of Ottawa Freezer Services Inc. to Pierre Cyr and 2794209 Canada Inc. pursuant to a Share Purchase Agreement dated the 11 [th] day of July, 2001, not be completed by November 30 [th], 2001, the aforementioned gross annual charge

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

shall not exceed NINETY THOUSAND DOLLARS ($90,000.00), without deduction or set-off whatsoever to Ottawa
Freezer Services Inc.

11    Regrettably, the relationship between Mr. Cyr and Mr. Chenier — which had started out very cordially and positively
after the Letters of Intent were signed in February — began to fragment in the Fall of 2001, and eventually ruptured in early
2002. The share purchase transaction never closed, principally because the parties were not able to obtain an extension of the
sublease from Loeb or a new head-lease for the O.F.S. premises (a condition precedent to closing) and because Mr. Chenier
and his lawyer were not satisfied with the disclosure and security that Mr. Cyr was providing respecting the share purchase
(a condition in favour of the vendor). Thus, instead of controlling both the former I.C.B. distribution business and the O.F.S.
storage facility, Mr. Cyr found himself controlling only the former. Instead of being semi-retired and working on a part-time
consulting basis for his old business, Mr. Chenier found himself still controlling and directing the O.F.S. storage undertaking.
The business relationship could not, and did not, survive.

12    Differences arose during the Fall of 2001 over the use of the storage premises at 400 Industrial Ave., the amount of
space allotted to the Cyr companies, and their access to the loading docks. Some of these differences were attributable to a new
arrangement entered into between O.F.S. and one of its major customers — the wholesaler of frozen and fresh food products,
Giant Tiger Stores Limited — with respect to the storage, warehousing and distribution of Giant Tiger products. As a result
of this arrangement, the Giant Tiger operations took over most, if not all of O.F.S.'s large 15,000 sq. ft. front freezer. O.F.S.'s
other customers, including I.C.B. 2001 and C.Y.R. Distributions, were relocated to a smaller 4,900 sq. ft. area at the back. The
increased Giant Tiger presence contributed to congestion in the loading dock area and to inefficiencies in the use of that area,
which were a further irritant to everyone.

13    Mr. Cyr was not happy about the storage facility difficulties. In November 2001 he negotiated to lease other space from
someone else at 800 Belfast Rd. in Ottawa and formalized the agreement in mid-December. Mr. Chenier was not aware of this,
but on December 28, 2001, O.F.S. nonetheless — because of space issues — gave proper notice to C.Y.R. Distributions to
vacate the premises at 400 Industrial Ave. by March 1, 2002. No such notice was given to I.C.B. 2001. Indicating that this is
what he had been waiting for, Mr. Cyr gave notice at the end of January 2002 that he was moving the operations of *both* C.Y.R.
Distributions and I.C.B. 2001 to 800 Belfast Rd. The move took place at the end of February. Mr. Chenier took the position
that the move of I.C.B. 2001 from the premises was a breach of the Loan Agreement and the Mutual Undertaking. The Loan
Action was commenced shortly thereafter.

14    In the meantime, Mr. Chenier had been working for I.C.B. 2001 pursuant to the Management Consulting Agreement. He
was also managing and operating O.F.S. The trial judge found that by October 2001 the relationship between Mr. Cyr and Mr.
Chenier had seriously deteriorated, and that the parties were treating each other at arm's length and dealing with each other
as two separate companies throughout the Fall of 2001.

15    On January 25, 2002, Mr. Cyr's lawyers wrote to Mr. Chenier's lawyers complaining, amongst other things, of Mr.
Chenier's performance under the Management Consulting Agreement and purporting to give six months notice of termination
in accordance with its terms. Mr. Chenier took this as a breach of the Management Consulting Agreement. He commenced the
Wrongful Dismissal Action shortly thereafter.

16    Hovering over both of the foregoing disagreements, and central to the commencement of the Cyr action some time later,
was the shadow of Giant Tiger. The Giant Tiger operations had been consuming more and more of the O.F.S. storage facilities
— by mid-2000 it was occupying approximately 12,000 sq. ft. of the front freezer area — and negotiations respecting a new
and larger Giant Tiger storage and distribution contract between it and O.F.S. had begun in late Spring 2001. This increasing
Giant Tiger presence was the source of much of the chafing over the storage area and the loading facilities, and the potential
new contract was a focal point of much of Mr. Chenier's attention throughout the Fall of 2001.

17    Negotiations respecting this contract had begun much earlier in the year. In June 2001, Mr. Cyr and his financial advisor,
Mr. Luigi, attended a meeting with Mr. Chenier and representatives of Giant Tiger in which a proposal was made by the Chenier/
Cyr group to Giant Tiger. Under this proposal — which was contained in a letter dated June 26, 2001, signed by Mr. Chenier,

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

but drafted by Mr. Luigi — O.F.S. was to receive 68¢ per case for delivery of the Giant Tiger product. Giant Tiger was by this time occupying about 12,000 sq. ft. in the freezer and the trial judge found that Mr. Cyr must have been aware by as early as June, 2001 that if they were successful in wrestling the Giant Tiger business away from its existing service provider, Giant Tiger would be occupying about 15,000 ft. in the freezer.

18    There is no doubt that Mr. Chenier carried the negotiations with Giant Tiger. The Cyr parties complain that he negotiated with Giant Tiger in secret, deliberately keeping the details of the negotiations from Mr. Cyr so that he could personally benefit from the Giant Tiger arrangement. The trial judge found, however, that although Mr. Chenier did not disclose the particulars of the Giant Tiger contract — she held that a contractor had no obligation to disclose such details to a subcontractor — Mr. Cyr was aware that Mr. Chenier was negotiating with Giant Tiger for a comprehensive contract and that the distribution work would be contracted out. Mr. Cyr admitted in evidence that he never asked Mr. Chenier about the particulars of the contract with Giant Tiger.

19    I.C.B. 2001 was offered a first right of refusal with respect to the delivery services arising out of the O.F.S./Giant Tiger contract. On October 5, 2001, Mr. Cyr wrote to Mr. Chenier confirming I.C.B. 2001's "agreement to act as Ottawa Freezer's agents in distributing Giant Tiger's frozen and cooled products" at a cost to O.F.S. of 30¢ a case. After further exchanges the bid was re-submitted on October 31, 2001 stipulating a price of 35¢ a case for the same services, i.e., for "[acting] as Ottawa Freezer's agents in distributing Giant Tiger's frozen and cooled products." A formal agreement was executed between O.F.S. and Giant Tiger as of November 2, 2001. It provided for distribution services at 65¢ per case. A formal Distribution Agreement was executed between O.F.S. and I.C.B. 2001 on December 14, 2001 at a delivery tariff of 35¢ per case.

20    The discrepancy between these two prices is the principal bone of contention between the parties in the Cyr action. Mr. Cyr contends that it was not open to Mr. Chenier and O.F.S. to take a profit on the distribution end of the Giant Tiger contract by subcontracting that work to I.C.B. 2001 for a lower price than that obtained by I.C.B..

## Issues

21    The principal questions on the appeal evolve around the Giant Tiger transaction in relation to the Cyr Action. Other issues are raised with respect to the VTB Loan Action and the Wrongful Dismissal Action, but they were not pressed as forcefully in oral argument as were the matters arising in connection with the Cyr Action.

22    The issues may be summarized as follows:

*With Respect to the VTB Loan Action*

(a) Whether I.C.B. 2001 breached the VTB Loan Agreement by voluntarily leaving the O.F.S. storage premises at 400 Industrial Ave. or whether they were "pushed out" by Mr. Chenier for his own purposes, as alleged by the Cyr parties;

*With Respect to the Wrongful Dismissal Action*

(b) Whether the trial judge erred in accepting Mr. Chenier's claim that the Agreement had been improperly terminated without just cause;

*With Respect to the Cyr Action*

(c) Whether the trial judge erred in failing to find that Mr. Chenier breached his covenant not to compete with the Purchased Business — and, in particular, whether she erred:

(i) In her contractual interpretation of the Mutual Undertaking and the other related contractual documentation; and

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 13 of 25

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

(ii) By holding, in effect, that the Mutual Undertaking amended the Asset Purchase Agreement, which the parties did not intend to do and, in any event, could not do contractually without a specific amendment and no such amendment exists;

(d) In drawing a number of mistaken inferences from the evidence;

(e) Whether Mr. Chenier was disqualified from competing with the purchased business, and from causing O.F.S. to take a profit on the distribution component of the Giant Tiger contract, by reason of (i) a fiduciary obligation, (ii) a duty of loyalty and good faith, and (iii) a duty to avoid conflicts of interest, owed by him to I.C.B. 2001 under the Management Consulting Agreement; and

(f) Whether — if they do not succeed on the foregoing grounds — the trial judge erred in failing to accept the damage claim of I.C.B. 2001 and Mr. Cyr, as put forward by their financial advisor, Mr. Luigi.

**Analysis**

23    As the primary focus of the appeal was on the issues touching the Cyr Action, I shall deal first with the grounds of appeal relating to the VTB Loan Action and the Wrongful Dismissal Action because they can be disposed of shortly.

*The VTB Loan Action*

24    The appellants submit that C.Y.R. Distributions and I.C.B. 2001 did not voluntarily leave the storage premises at 400 Industrial Ave. but, rather, were "pushed out" by Mr. Chenier for his own purposes. This did not constitute a breach of the VTB Loan, they say, and the trial judge erred in determining that the Cyr parties had done so.

25    The trial judge rejected the appellant's claim that C.Y.R. Distributions and I.C.B. 2001 had been "pushed out" of 400 Industrial Ave. by a scheming Mr. Chenier who had decided to frustrate the completion of the Share Purchase transaction and to acquire the expanded and profitable Giant Tiger contract for O.F.S. and for himself. She found that Mr. Cyr had decided in November 2001 to pull both of his companies' operations out of the O.F.S. premises and to move them to new space at 800 Belfast Road. She made clear findings of credibility in Mr. Chenier's favour in rejecting Mr. Cyr's testimony on these issues — holding, in fact, that he had attempted to deceive the court with his evidence — and there was ample basis in the record for these findings.

26    I see no basis for interfering with her disposition of the VTB Loan Action.

*The Wrongful Dismissal Action*

27    Section 3.3 of the Management Consulting Agreement required six months advance notice in writing for termination, except in the event of just cause. The trial judge accepted Mr. Chenier's claim that the Agreement had been improperly terminated without just cause. She concluded that the Agreement was an integral part of the parties' "deal" for the purchase of I.C.B. and found that a part of the purchase price Mr. Chenier expected to receive was reflected in his annual salary of $40,000 for two years under it. She rejected the Cyr parties' contention that Mr. Chenier was to play a key management role with I.C.B. 2001 and found that the consulting arrangement contemplated Mr. Chenier performing only those services requested by Mr. Cyr. Specifically, the trial judge rejected the particular breaches of the Management Consulting Agreement relied on by the appellants, namely:

(a) The alleged failure to advise Mr. Cyr of the cancellation of contracts that O.F.S. had with two customers, Baskin Robbins and Farm Boy (she found that the loss of those contracts was well-known to all of the parties before the closing of the Asset Purchase Agreement);

(b) The alleged failure to keep Mr. Cyr informed of the progress of the negotiations with Giant Tiger;

(c) The alleged diversion of profits and competing with I.C.B. 2001 and Mr. Cyr;

**WestlawNext**® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

(d) The alleged failure to arrange for the contract for the distribution services to Giant Tiger to be entered into between I.C.B. 2001, or the assignment of that contract opportunity to Mr. Cyr's companies, or at least all the benefits from it, without diverting the profits of it to himself through O.F.S.;

(e) the alleged failure to attract new business; and

(f) the alleged misdirection of monies relating to writing cheques.

28    The trial judge made factual findings against Mr. Cyr and the Cyr companies, and in favour of Mr. Chenier and the Chenier companies, with respect to all of these allegations, in arriving at her disposition of the Wrongful Dismissal Action. She made no palpable and overriding error in making those findings. They are supported on the record. There is no basis for interfering with them.

29    I turn, now, to the principal issues on the appeal, which revolve around the Giant Tiger arrangement.

***The Cyr Action***

*Contractual Interpretation*

**Principles of Contractual Interpretation**

30    The appellants say the trial judge erred in her contractual interpretation of the Mutual Undertaking and the other related documentation, including her interpretation of the interplay between the Non-Competition covenant and the Mutual Undertaking. She did so, they contend, by failing to find that the obligation of O.F.S. was to provide to I.C.B. 2001 the opportunity to perform the delivery service for its customers on the same terms as O.F.S. negotiated with those customers, including receiving the whole of the payment to be made for distribution services. Moreover, they argue, the Non-Competition covenant precluded Mr. Chenier, personally, from causing O.F.S. to do otherwise.

31    In *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (Ont. C.A.) at para. 24, this Court summarized the principles applying to the interpretation of commercial contracts as follows:

Broadly stated ... a commercial contract is to be interpreted,

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective; [3]

(b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said; [4]

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; [5] and (to the extent there is any ambiguity in the contract),

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoids a commercial absurdity. [6]

See also *SimEx Inc. v. IMAX Corp.* (2005), 11 B.L.R. (4th) 214 (Ont. C.A.) at paras. 19-23; and *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.) at para. 55.

32    In addition, where the language of a written contract is unambiguous, extrinsic evidence is not admissible to alter, vary, interpret, or contradict the words used in the contract: see *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.); *Mechanical Pin Resetter Co. v. Canadian Acme Screw & Gear Ltd.* (1970), [1971] S.C.R. 628 (S.C.C.), at 636; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para. 55; and G.H.L. Fridman, *The Law of Contract in Canada*, 5 [th]

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 15 of 25

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

ed. (Toronto: Thomson Carswell, 2006) at 443-444. Regardless of any ambiguity, however, as noted above, the courts may always have regard to the context and to the objective evidence of the surrounding circumstances underlying the negotiations. As Doherty J.A. noted in *Dumbrell* at paras. 52-56:

[52] No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

[53] The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12, [1993] S.C.J. No. 1, at pp. 23-24 S.C.R.; *H.W. Liebig & Co. v. Leading Investments Ltd.*, [1986] 1 S.C.R. 70, [1986] S.C.J. No. 6, at pp. 80-81 S.C.R., La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381, [1971] 3 All E.R. 237 (H.L.), at pp. 1383-84 W.L.R.; Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-08.

[54] A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

[55] There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see *Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20.* Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd. v. Scott's Food Services Inc.*, [1998] O.J. No. 4368, 114 O.A.C. 357 (C.A.), at p. 363 O.A.C.

[56] I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intractable Problem of the Interpretation of Legal Texts", *supra*, at 8:

In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. *The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce.*

[Emphasis in original. Citation omitted.]

33     To those principles, I would add the following in the present context. The Cyr parties and the Chenier parties entered into a series of contracts in order to give effect to the "deal" whereby Mr. Cyr was to acquire both the I.C.B. and O.F.S. operations. While the Mutual Undertaking was not signed at the same time as the Asset Purchase Agreement, the commitments it contains were contemplated in the latter Agreement and formed part of the same global transaction. In these circumstances, the court must have regard not only to the language of the particular contract that is being interpreted (the Mutual Undertaking or the

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

Non-Competition covenant), taken as a whole, but to the surrounding contracts as well. As Professor John D. McCamus notes in *The Law of Contracts* (Toronto: Irwin Law Inc., 2005) at 715:

> Many transactions, especially large commercial transactions such as the purchase and sale of a large and complex business, may involve the execution of several agreements. In such contexts, it is an interesting question, then, whether in the interpretation of one of the agreements, regard may be had to the others. *The basic principle is that such regard may be had only where the agreements essentially form components of one larger transaction. Where each agreement is entered into on the faith of the others being executed and where it is intended that each agreement form part of a larger composite whole, assistance in the interpretation of any particular agreement may be drawn from the related agreements.* [Emphasis added. Citation omitted.]

34    In *Mechanical Pin Resetter Co.*, for example, the Supreme Court of Canada read four interrelated agreements together in order to ascertain the geographical scope of a licence to manufacture set out in one of them. Here, in my view, the Non-Competition covenant in the Asset Purchase Agreement and the provisions in the Mutual Undertaking must be considered together in order to determine the true intention of the parties as to their individual and combined meaning and effect, as expressed in the language they used.

**The Principles Applied**

35    Historically, when O.F.S. had customers who needed delivery services, it simply collected the payments from the customers and then paid the amount relating to the delivery services over to I.C.B., its sister company. The appellants submit that the trial judge should have interpreted to words "*to continue* to use the services of the Purchaser" [emphasis added] in s. 8.1(i) of the Asset Purchase Agreement to encompass a proviso that the relationship would continue to operate in such a fashion after the asset purchase transaction, and even if the share purchase transaction were not completed. They argue that this opportunity was the "goodwill" of the business purchased by I.C.B. 2001 for which it agreed to pay $192,500.

36    Read in this light, the appellants contend, the Mutual Undertaking — coupled with the Non-Competition covenant — precludes Mr. Chenier from using O.F.S., indirectly, to derive a benefit for himself and his company from the distribution portion of the O.F.S. contracts. In their view, Mr. Chenier should not be permitted to circumvent his obligations under the Asset Purchase Agreement not to compete for that business. In particular, they insist, he was prohibited from dealing with the Giant Tiger contract in the fashion that he (and O.F.S.) did.

37    The appellants maintain that the agreements are clear and unambiguous. The Non-Competition covenant precluded Mr. Chenier from competing with I.C.B. 2001 for distribution business, and from causing any of his companies to do so. The Mutual Undertaking — through the use of the words "*to continue to use* the services of the Purchaser" — make it clear that the old inter-corporate arrangements were to continue.

38    I do not agree. Read together, the various agreements are capable of more than one interpretation, in my opinion.

39    This interpretation advanced by the appellants may have been open to the trial judge. But it is not the one she chose. Based on the principles of contractual interpretation recited above — which the trial judge properly applied, in my view — and on her application of those principles in the context of the transactions, the interpretation she chose ought not to be interfered with on appeal. In this respect, I agree with the following comment of Laskin J.A. in *Bradscot (MCL) Ltd. v. Hamilton-Wentworth Catholic District School Board* (1999), 42 O.R. (3d) 723 (Ont. C.A.) at 728-729:

> Faced with two interpretations [of the tender instructions], either of which is reasonable, and no error in the application of the relevant legal principles, in my view this court should defer to the finding of the trial judge.

40    This view is consistent with the weight of the post-*Housen* [7] jurisprudence on the standard of review in cases involving the interpretation of contracts. A trial judge must apply the proper principles of contractual interpretation, and a failure to do so is an error of law attracting review on the standard of correctness. To the extent that the contract interpretation involves a

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

consideration of extensive evidence or a determination of the factual matrix, or a question of mixed fact and law, however, a more deferential standard may apply. See *MacDougall v. MacDougall* (2005), 262 D.L.R. (4th) 120 (Ont. C.A.) at paras. 23-32.

41    Here, the trial judge found (i) that the Non-Competition covenant did not stand alone and had to be read in light of the Mutual Undertaking, and (ii) that the Mutual Undertaking was the mechanism created by the parties to give effect to s. 8.1(i) of the Asset Purchase Agreement whereby I.C.B. and Mr. Chenier agreed to obtain O.F.S.'s commitment to continue to use the services of the Purchaser for O.F.S.'s distribution services to its customers. She concluded that the Mutual Undertaking gave to I.C.B. 2001 a right of first refusal for all distribution contracts for O.F.S.'s customers requiring distribution, trucking, and delivery services, and held that I.C.B. 2001 was provided with such a right of first refusal with respect to the Giant Tiger contract. [8] She held further that the right of first refusal contemplated a subcontracting arrangement between O.F.S. and I.C.B. 2001 and that it was accordingly irrelevant whether O.F.S. made a profit on the subcontracting arrangement. Moreover, the trial judge reasoned that the conduct of the parties following the execution of the Mutual Undertaking was in harmony with, and reinforced, her conclusions.

42    The trial judge's interpretation of the contractual documentation entered into by the parties — and particularly of the interplay between the Mutual Undertaking and the provisions of ss. 7.5 and 8.1(i) of the Asset Purchase Agreement — is the proper one, in my view. On the contractual principles canvassed above, the two documents are to be read and interpreted together, not in isolation.

43    Neither the Asset Purchase Agreement nor the Mutual Undertaking make any reference to the terms on which I.C.B. 2001 is to provide distribution services to O.F.S.'s customers, including the price. However, the trial judge's interpretation is the most faithful to the language of the documentation, having regard to the factual matrix in which the contracts were made, and makes commercial sense. Indeed, her view is in keeping with the appellants' theory that the purpose of s. 8.1(i) was to protect the goodwill purchased by I.C.B. 2001, although not necessarily in the fashion the appellants contend.

44    Whether characterizing the relationship between O.F.S. and I.C.B. 2001 as one of "contractor/subcontractor" is the most apposite approach is not really important. The notion that O.F.S. would enter into a comprehensive arrangement with its customers and subsequently in some fashion contract out the distribution component of that arrangement to others — affording I.C.B. 2001 the first right of refusal on that work — is clearly what the parties had in mind in the Asset Purchase Agreement, as given effect to by the Mutual Undertaking. The Non-Competition covenant must be given effect in that context. I reach these conclusions for the following reasons.

45    First — and to reiterate — the specific obligation of I.C.B. and Mr. Chenier under s. 8.1(i) of the Asset Purchase Agreement was to obtain O.F.S.'s two-fold commitment (a) "to continue to use the services of the Purchaser ... for distribution services in respect of Ottawa Freezer Services Inc. customers", and (b) "to permit the Purchaser ... to operate from [the O.F.S. premises]." These obligations were mutually beneficial. The right to bid on the distribution services in respect of O.F.S.'s customers was of considerable importance to the Cyr parties, as purchasers, and the ability to operate from the O.F.S. premises would enable them to do so more efficiently and at less cost. [9] Further, having I.C.B. 2001 as a tenant of its storage facilities and available to provide the distribution services for its customers was advantageous to O.F.S.

46    The Mutual Undertaking gave effect to both of these requirements. It adopted the device of a right of first refusal to ensure that O.F.S. would continue to use the services of I.C.B. 2001 for the distribution services required by its customers. And it gave I.C.B. 2001 the right to operate from the O.F.S. premises at 400 Industrial Ave. for a period of five years. Of some significance — because it indicates the parties recognized the share transaction might not close, and because it reflects the benefits flowing from having the distribution operations running from the O.F.S. storage premises — the Mutual Undertaking provides for a reduction in the gross annual charge for the use of the premises from the $120,000 agreed to in the Asset Purchase Agreement to $90,000 in the event the transaction was not completed.

47    Secondly, while I accept that I.C.B. 2001 paid a considerable sum for the "goodwill" of I.C.B., I do not agree with Mr. Marks' submission that what I.C.B. 2001 was entitled to acquire in this respect were all of the distribution contracts entered into by O.F.S. in the future — even if the share purchase transaction were not completed — including all of the revenues generated

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

by that component of the O.F.S. contracts. Mr. Marks focuses on two provisions in the Asset Purchase Agreement in support of this argument: s. 2.1(f) incorporates "contracts to provide goods or services entered into after February 28[th], 2001" as part of the assets purchased, and s. 3.2(c) allocates $192,500 of the purchase price to the "[g]oodwill of the ... business as set out in section 2.1(f) hereof".

48    This interpretation reflects a misreading of s. 2.1(f) and its purpose, however. A review of s. 2.1 as a whole demonstrates that the purpose of subsection 2.1(f) is to catch all contracts for goods and services entered into *by I.C.B.*, the asset vendor, between the date of the Letter of Intent (February 28, 2001) and the date the asset transaction closed (July 11, 2001). It has nothing to do with future contracts entered into *by O.F.S.*[10]

49    Thirdly, the circumstances surrounding the execution of the Mutual Undertaking — the factual matrix — support the trial judge's interpretation of the contractual framework between the parties. To begin with, the parties contemplated that the share transaction might not be completed. It was subject to several covenants for the benefit of either of the vendor or purchaser which could be waived and, most importantly, a true condition precedent which neither party could waive, namely, obtaining the consent of Loeb to extend the 400 Industrial Ave. sublease or obtaining a new head-lease. I note as well that the Mutual Undertaking specifically contemplated a reduction in annual rent from I.C.B. 2001 if the share transaction did not close. In that event, the distribution company (I.C.B. 2001, as purchaser of the I.C.B. assets) and the freezer/cold storage company (O.F.S.) would no longer be part of the same business enterprise and would be operating at arm's length. This would result in a situation quite different from that which prevailed when I.C.B. and O.F.S. were sister companies in the same corporate family.

50    Moreover, the right of first refusal itself contemplates that there may be distribution contracts for O.F.S. customers that I.C.B. 2001 may not take up. What could the parties have intended would happen in the event that the share transaction failed to close but I.C.B. 2001 declined to accept a distribution contract for one of O.F.S.'s storage customers? Mr. Marks conceded that, if the appellants are correct in their interpretation of the effect of the Non-Competition covenant, O.F.S. would simply be barred from contracting the declined distribution work out to someone else as long as Mr. Chenier remained its operating mind. This interpretation makes no commercial sense. O.F.S. would be left with mounting inventories of perishable products in its cold storage/freezer premises with no ability to move them or to honour its distribution commitments to its customers. At best, O.F.S. would be left in a disadvantageous position in obtaining cold storage/freezer business because it would be at the mercy of I.C.B. 2001 before it could bind itself to furnish distribution services to its customers. It is absurd that the parties would have intended such a result.

51    Nor does it make any commercial sense that, if the share transaction failed to close, Mr. Chenier and O.F.S. would simply agree to turn over to I.C.B. 2001 — on a sort of turn-key basis — the distribution portion of the their customers' contracts as negotiated. Parties negotiating a multi-faceted agreement may be more concerned about the overall price arrived at than they are about the individual components of that price. It may suit a customer to have a lower storage price component and a higher distribution price component to the contract, or it may suit them to have the reverse. Why should I.C.B. 2001 benefit from the former situation at O.F.S.'s expense when those two entities are operating at arm's length just because O.F.S. is obliged to give it a right of first refusal to provide the distribution services in relation to that particular contract?

52    Further, even if O.F.S. could theoretically benefit from negotiating an unduly high storage price and an unduly low distribution price, the evidence in this case suggests that it did not. O.F.S. offered to and contracted with I.C.B. 2001 for the Giant Tiger distribution contract at a rate of 35¢ per case. Despite the fact that O.F.S. had contracted with Giant Tiger at a rate of 65¢ per case, the fact remains that 35¢ per case for distribution services was reasonable. The trial judge notes at para. 420:

> Moreover, it seems to me that the best indicator to the Court that the 35 cents per case rate was not outside the realm of the reasonable herein was that when Mr. Cyr refused to undertake the distribution work for Giant Tiger for 2003, although offered to him at 40 cents a case pursuant to the right of refusal, S & M Delivery Service contracted for that work at 38 cents a case, and still performs same today, now at 40 cents a case.

This suggests that O.F.S.'s offer of first refusal on the distribution contract at 35¢ per case was a *bona fide* business opportunity.

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

53 As Estey J. observed in *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901:

> ... [T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere... Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

54 Finally — in relation to the surrounding circumstances and the specific context of the Giant Tiger situation — negotiations towards a new Giant Tiger arrangement had already begun before the closing of the asset purchase on July 11, 2001. Mr. Cyr attended a meeting with Mr. Chenier and Giant Tiger representatives in June 2001 at which he was introduced as the potential purchaser of O.F.S., and at which a new proposal was presented to Giant Tiger. This proposal was reflected in a letter dated June 26, 2001, signed by Mr. Chenier on behalf of O.F.S., *but drafted by Mr. Cyr's financial advisor, Mr. Luigi*. The letter clearly indicated that O.F.S. was proposing to provide the distribution services to Giant Tiger at a per-case price of 68¢. Mr. Cyr therefore knew prior to the negotiation and execution of the Mutual Undertaking — or, at least, his representative did — what O.F.S. and Mr. Chenier proposed to charge Giant Tiger for distribution. Indeed, the trial judge found at para. 421 of her reasons that "Mr. Cyr himself was aware, or had to have been aware, that O.F.S. was making money on the Giant Tiger distribution work." This finding is amply supported in the evidence.

55 The parties' conduct in giving effect to the Mutual Undertaking in relation to the Giant Tiger contract bears out the trial judge's interpretation of the agreements and is consistent with their awareness of the foregoing circumstances. Under modern Canadian law, the subsequent actions of the parties may be helpful in explaining the true meaning and intent of their agreement. In *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.* (1995), 24 O.R. (3d) 97 (Ont. C.A.) at 168 Laskin J.A. said:

> Moreover, I think that the respondent's subsequent conduct resolves any doubt about the extent of the appellants' liability under art. 10.1. Subsequent conduct may be used to interpret a written agreement because "it may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date": S.M. Waddams, *The Law of Contracts*, 3rd ed. (1993), at para. 323. Often, as Thomson J. wrote in *Bank of Montreal v. University of Saskatchewan* (1953), 9 W.W.R. (N.S.) 193 at p. 199 (Sask. Q.B.): "there is no better way of determining what the parties intended than to look to what they did under it".

See also *Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 17 O.R. (3d) 363 (Ont. C.A.) at 372.

56 Here, after formally being offered the right of first refusal for the Giant Tiger distribution work, as required by the Mutual Undertaking, Mr. Cyr wrote to Mr. Chenier on two occasions confirming his company's agreement "*to act as Ottawa Freezer's agents* in distributing Giant Tiger's frozen and cooled products." [Emphasis added.] This language is not consistent with an understanding that O.F.S. would simply be turning over the distribution portion of O.F.S.'s contracts with their customers, price and all.

57 Moreover, the terms of the formal Distribution Agreement executed by I.C.B. 2001 and O.F.S. on December 14, 2001 reflect an arrangement that contemplates both separate contracts between O.F.S. and its customers, on the one hand, and I.C.B. 2001 and O.F.S. on the other hand, and a difference in price for those services. For example, the recitals of that Distribution Agreement state:

> WHEREAS

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

A. OFS has agreed to provide commercial freezer storage space for frozen and fresh food products owned by Giant Tiger Stores Limited;

B. OFS has granted a right of first opportunity to ICB [11] to provide trucking and general deliveries for OFS on behalf of its customers; and

C. Whereas OFS and ICB wish to provide for the terms and conditions for the distribution of frozen and fresh food products on behalf of OFS' Customer Giant Tiger Stores Limited on the terms and conditions that are set out herein.

58    The Distribution Agreement then goes on to provide that I.C.B. 2001 will deliver the frozen food products designated in accordance with a prescribed delivery schedule and for the tariff set out in s. 5 of the agreement. That tariff was 35¢ per case, subject to an increase to 38¢ if I.C.B. 2001 is denied access to 400 Industrial Ave. through no fault of its own. Section 5 contains the following addition which, in my view, is significant in relation to the interpretation of these agreements:

ICB shall be paid *commissions* for deliveries made twenty-one days after providing the deliveries to OFS's Customer, providing that the deliveries have been in accordance with clause two of this agreement. *If OFS is able to negotiate with its Customer Giant Tiger an increased delivery rate for the Goods at any time during the terms of this contract, OFS shall share one-half of the increase in the delivery rate with ICB....* [Emphasis added.]

59    There is a disconnect between the concept of "commissions for deliveries" and the view that O.F.S.'s obligation under the Mutual Undertaking was simply to turn over its customers' distribution contracts to I.C.B. 2001 at the price O.F.S. and its customer negotiated for delivery. At the same time, the notion that any increase in delivery rates is to be split 50/50 is entirely consistent with the recognition that some of the revenue from the distribution portion of O.F.S.'s contract with its customer is to go to O.F.S. Indeed, the 50/50 division is not far from the 30¢/35¢ apportionment that characterized the Giant Tiger arrangement.

60    Mr. Marks submitted that the excess sharing provision could equally be interpreted to support his argument that O.F.S. was not entitled to take anything for distribution; it shows that O.F.S. needed specific authorization to do so, and this provision was inserted to provide an incentive to O.F.S. to negotiate a better deal. I do not think the language supports this contention, however. If Mr. Marks were correct, the provision would not have said that "*OFS shall share one-half of the increase in the delivery rate with ICB*". [12] [Emphasis added.] It would have said that *ICB* would split the increase with *OSF*, because it would be I.C.B. 2001 that was contractually entitled to the full amount but for the excess sharing provision.

61    The appellants raise a further argument, in addition. The trial judge erred, they submit, by, in effect, amending the Asset Purchase Agreement through her interpretation process when the parties did not intend to do so and when the Asset Purchase Agreement itself expressly provides that any amendments must be in writing.

62    I do not accept this submission either. The trial judge did not "amend" the Asset Purchase Agreement. Rather, she correctly interpreted and read the Asset Purchase Agreement and the Mutual Undertaking together, and in their appropriate contexts. She concluded that the right of first refusal in the Mutual Undertaking was simply the mechanism chosen by the parties to give effect to the provisions of the Asset Purchase Agreement which required I.C.B. and Mr. Chenier to get O.F.S. onside "to continue to use the services of the Purchaser [I.C.B. 2001] for distribution services in respect of Ottawa Freezer Service's customers". However, there is nothing in the Asset Purchase Agreement or the Mutual Undertaking — or in any of the other contractual documentation entered into between the parties — requiring O.F.S. "to continue to use the services" in accordance with the same inter-company arrangements that were in place when O.F.S. and I.C.B. were sister companies in the same business enterprise. For the reasons I have expressed above, it makes no commercial sense that that should be the case in circumstances where — as everyone recognized might be the case — the share purchase transaction failed to close and I.C.B. 2001 and O.F.S. were operating at arm's length.

63    The appellants also submit that the trial judge drew various erroneous inferences of fact from the evidence which led her into the error of finding that the Mutual Undertaking had modified the provisions of the Asset Purchase Agreement. The

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

precise inferences complained of are not easy to ascertain from the appellants' argument, but they appear to include findings such as the following:

> (a) Mr. Chenier was not negotiating the Giant Tiger arrangement for I.C.B. 2001 but for O.F.S.;

> (b) O.F.S. was entitled to make a profit on the distribution component of the Giant Tiger contract;

> (c) Mr. Cyr had gone to Giant Tiger himself during the Fall of 2001 to attempt to contract for the distribution work; and

> (d) Paragraph 5 of the Distribution Agreement between O.F.S. and I.C.B. 2001 confirmed an understanding that O.F.S. was entitled to compete with I.C.B. 2001.

64      In my view, however, the appellants' attacks on these inferences — to the extent they were inferences drawn by the trial judge — are essentially an attempt to re-try the case. With the possible exception of the finding that Mr. Cyr had gone to Giant Tiger himself to attempt to negotiate a distribution contract and was rebuffed — an inference which I think played little role in her overall conclusions — the findings of fact that she made and the inferences she drew from those facts were all open to her on the record. Specifically, her finding at para. 421 that "Mr. Cyr himself was aware, or had to have been aware, that O.F.S. was making money on the Giant Tiger distribution work", cited earlier in these reasons, is amply justified by the evidence, also canvassed earlier in these reasons.

65      Accordingly, I would not give effect to the appellants' contractual interpretation ground of appeal.

*The Non-Competition Covenant*

66      Nor do I accept the argument that Mr. Chenier's Non-Competition covenant precludes O.F.S. from dealing with Giant Tiger and with I.C.B. 2001 in relation to the Giant Tiger contract in the way that it did, or that it precludes Mr. Chenier from causing O.F.S. to do so in the circumstances.

67      O.F.S. is not a party to the Asset Purchase Agreement, or to any other agreement respecting the Chenier/Cyr "deal" other than the Mutual Undertaking. Mr. Chenier did covenant not to compete with the Purchased Business, however. So far as it is relevant, s. 7.5 of the Asset Purchase Agreement states:

**7.5 Non-Competition**

The Vendor and Robert Chenier each covenants and agrees with the Purchaser that he and it will not, nor will either of them permit anyone on their behalf for a period of five years from the Closing Date, either alone or in conjunction with any person, firm, corporation, association, partnership, syndicate, trust or other entity, whether as principal, agent, shareholder or in any other capacity whatsoever, to:

> (a) carry on, or be engaged in, concerned with or have any financial or other interest in, directly or indirectly, any undertaking which is in whole or in part competitive with the Purchased Business during such period ...

68      I.C.B. — the "Purchased Business" — was a food distribution business, with some emphasis on cooled and frozen food products. On its face, and in isolation, the Non-Competition covenant might be read as an impediment to the contract entered into between O.F.S. and Giant Tiger and the subsequent Distribution Agreement between O.F.S. and I.C.B. 2001. As the trial judge observed at para. 406, however, "[t]he non-competition provision contained in subparagraph 7.5 of the Asset Purchase Agreement does not stand alone." It must be read and construed in the context of the asset and share purchase transactions, and the various agreements entered into in connection with them viewed as a whole. When that is done, it is apparent the trial judge's finding that the Chenier parties were not in breach of the Non-Competition covenant is supported on the record.

69      The reasons for this have been canvassed above in relation to the contractual interpretation point. Given the commercial reality that the parties had entered into *two* different but related transactions, either one of which might not close, the wording of the Non-Competition covenant is completely inconsistent with the view that it was aimed at the activities of O.F.S., or

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

Mr. Chenier's activities in relation to O.F.S., at all. The parties could not have expected both (i) that if the share transaction did not close, Mr. Chenier would continue to operate O.F.S. and to enter into comprehensive storage/distribution contracts with its customers, and (ii) that he would not be entitled to "carry on, or be engaged in, concerned with or have any financial or other interest in, directly or indirectly, any undertaking which is *in whole or in part competitive* with the Purchased Business." [Emphasis added.]

70     To the contrary, what the parties clearly contemplated, in my opinion, was that O.F.S. would continue to enter into distribution contracts with its customers, in conjunction with its storage contracts, and that I.C.B. 2001 would be given the right to bid on the distribution services arising out of those contracts. O.F.S. has no trucks and has never done delivery and distribution work. The parties could not have intended — in the event the share purchase transaction was not completed — that O.F.S. would not be able to service those contracts by subcontracting to someone else if I.C.B. 2001 declined to take up its right of first refusal.

71     The appellants argue that the delivery business available from Giant Tiger constituted "the business" of I.C.B. 2001 that it had purchased from I.C.B. and with respect to which Mr. Chenier had contractually bound himself not to compete. They therefore submit that, without the permission of Mr. Cyr, Mr. Chenier was not in a position to negotiate the transaction with Giant Tiger for the delivery of its products and to benefit personally from that transaction. As such, they rely on *Read v. Cole* (1915), 52 S.C.R. 176 (S.C.C.) and submit that he should have been held to be a trustee of this business for I.C.B. 2001.

72     I do not accept this line of reasoning, either. I.C.B. 2001 did not purchase "the delivery business available from Giant Tiger" as the appellants' submit. It purchased the promise of Mr. Chenier and I.C.B. to obtain the commitment of O.F.S. to use the services of I.C.B. 2001 for distribution services in respect of O.F.S.'s delivery contract with Giant Tiger.

73     The trial judge summarized her conclusions with respect to the appellant's arguments about the Non-Competition covenant in the following passage at para. 422 of her reasons:

> The covenant not to compete as contained in the Asset Purchase Agreement does not stand alone in this case. It must be read in context. In the face of the covenant not to compete, the parties turned their minds to distribution work and entered into the Mutual Undertaking, with the understanding and intent that any distribution work which O.F.S. might obtain from its customers would be first offered to I.C.B. 2001. The Mutual Undertaking contemplated and provided that O.F.S. would subcontract out this work to I.C.B. 2001 pursuant to the right of first refusal. It stated that O.F.S. would provide I.C.B. 2001 "a first right of refusal, in writing for all *distribution contracts* for its customers for which same require distribution ..." (emphasis mine). The Mutual Undertaking contemplated that O.F.S. could obtain distribution contracts. [Emphasis in original.]

74     I agree with these comments. The Mutual Undertaking shows that the parties intended that O.F.S. would enter into distribution contracts with its customers. The parties contemplated that the share purchase transaction might not close. They recognized that O.F.S. would be operating at arm's length to I.C.B. 2001 if that were the case. They knew that O.F.S. was Mr. Chenier's company. In this context, Mr. Chenier's covenant not to compete ought not to be interpreted in a manner that would preclude O.F.S. from entering into its storage and distribution contract with Giant Tiger.

75     In the end, I do not see the subcontract between O.F.S. and I.C.B. 2001 regarding the Giant Tiger distribution work as creating a state of affairs in which Mr. Chenier or his company are *competing* with I.C.B. 2001. If the Chenier parties are disqualified from entering into such an arrangement with I.C.B. 2001, in my view, it must be because the contractual documentation did not permit it — an interpretation I have rejected for the reasons set out above — or because they were prevented from doing so by Mr. Chenier's breach of his fiduciary obligation or an obligation of good faith and loyalty to I.C.B. 2001 under the Management Consulting Agreement.

76     I will now turn to these latter allegations.

*Fiduciary Obligation, Good Faith, and Avoidance of Conflict of Interest*

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802**

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

77    The appellants contend that Mr. Chenier was disqualified from competing with I.C.B. 2001 by causing O.F.S. to take a profit on the distribution component of the Giant Tiger contract by reason of a fiduciary obligation, a duty of loyalty and good faith, and a duty to avoid putting himself in a position where his interests conflicted with those of I.C.B. 2001. In the context of this case, these three allegations may be dealt with together. They are in substance an allegation that Mr. Chenier owed a fiduciary duty to I.C.B. 2001 that required him to act in good faith and without a conflict of interest towards it.

78    Whether Mr. Chenier owed a fiduciary duty to I.C.B. 2001 depends primarily on his relationship with that company under the Management Consulting Agreement.

79    Based upon the trial judge's findings — to which I will come — no such duty arises, in my view, from the arm's length nature of the relationship between Mr. Chenier and I.C.B., as vendors, and Mr. Cyr and his companies, as purchasers, in relation to the commercial transaction itself. Courts are reluctant to impose fiduciary consequences on commercial interactions between arm's length parties pursuing their own self interest: see *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377 (S.C.C.) at 381, and *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 (S.C.C.) at para. 30.

80    The appellants argue that Mr. Chenier was the equivalent of "top management" with an obligation to promote the business interests of I.C.B. 2001. Accordingly, they contend, he was precluded from putting himself in a position of conflict of interest with I.C.B. 2001 and from, in effect, stealing a corporate opportunity from I.C.B. 2001 by skimming 30¢ per case off the price obtained from Giant Tiger for distributing its products. In this respect they rely upon the decision of the Supreme Court of Canada in *Canadian Aero Service Ltd. v. O'Malley* (1973), [1974] S.C.R. 592 (S.C.C.).

81    The trial judge rejected this argument. She concluded that the relationship between Mr. Chenier and the Chenier parties did not meet the criteria for a fiduciary relationship. Many authorities have dealt with those criteria, but the common characteristics of a fiduciary relationship as enumerated by Wilson J. in dissent in *Frame v. Smith*, [1987] 2 S.C.R. 99 (S.C.C.) have since been accepted by the Supreme Court of Canada as setting out a rough and ready guide for the existence of such a relationship: see *International Corona Resources Ltd v. LAC Minerals Ltd.*, [1989] 2 S.C.R. 574 (S.C.C.) at 577-578, Sopinka J.; and *Hodgkinson v. Simms* at 379. At p. 136 in *Frame v. Smith*, Wilson J. said:

> Yet there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not the imposition of a fiduciary obligation on a new relationship would be appropriate and consistent.

> Relationships in which a fiduciary obligation has been imposed seem to possess three general characteristics:

> (1) The fiduciary has scope for the exercise of some discretion or power.

> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.

> (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

82    The trial judge found that the parties to the Cyr/Chenier commercial transaction were of equal strength and expertise. There was no imbalance, dependency, or vulnerability in the relationship between them. She rejected the submission that Mr. Cyr and Mr. Chenier were partners, finding that there was nothing in the various agreements entered into that would support the existence of such a relationship. The trial judge found as well that Mr. Chenier was not part of I.C.B. 2001's senior management as a result of his association with I.C.B. 2001 under the Management Consulting Agreement. Instead, she concluded, he was retained as a consultant to perform certain duties at the request of Mr. Cyr, and the duties he was retained to perform did not place him in a fiduciary relationship with the appellants. These factual determinations are all supported on the record and are dispositive of the fiduciary argument, in my opinion.

83    The appellants argue that Mr. Chenier was given complete discretion and control over the negotiations with Giant Tiger, thus creating the unilateral exercise of discretion/vulnerability dynamic that is generally characteristic of a fiduciary

relationship. Mr. Chenier abused that position, they contend, when he caused O.F.S. to enter into the distribution component of the Giant Tiger agreement at a rate of 65¢ per case and then to subcontract that work to I.C.B. 2001 at 35¢ per case. In my view, however, the trial judge properly rejected this position, having regard to the Mutual Undertaking the parties had negotiated. She correctly noted at para. 440:

> ... Mr. Chenier did not negotiate with Giant Tiger on behalf of I.C.B. 2001. Mr. Chenier negotiated a comprehensive agreement with Giant Tiger for O.F.S. and for its benefit. It was always understood that the distribution aspect of that comprehensive agreement would be subcontracted out.

84      Under the Mutual Undertaking the parties had specifically agreed that I.C.B. 2001 would be given a first right of refusal "for all distribution contracts for its [O.F.S.'s] customers". The distribution contracts referred to must be contracts between O.F.S. and its customers, not contracts between I.C.B. 2001 and O.F.S.'s customers negotiated through the auspices of Mr. Chenier acting on behalf of I.C.B. 2001. As Mr. Cyr's correspondence tendering the bid for the Giant Tiger distribution work demonstrates, Mr. Cyr was well aware that I.C.B. 2001 was acting "as Ottawa Freezer's agents in distributing Giant Tiger's frozen and cooled products."

85      In the end, the trial judge disposed of the corporate opportunity and conflict of interest arguments with this summary at paras. 446-447 of her reasons:

> The Cyr parties submitted the proposition that where a person has a role in the business which is beyond that of a mere obedient servant, then such person stands in a fiduciary relationship requiring loyalty, good faith and avoidance of a conflict of duty and self-interest. It is submitted that the relationship will include a prohibition against the party acquiring for himself the opportunity sought by the party for whom he is negotiating. *Canadian Aero*, *supra*, is cited for this proposition, along with *Schauenburg Industries Ltd. v. Borowski* (1979), 25 O.R. (2d) 737. The case at hand can be clearly distinguished from the two cited. Mr. Chenier was not a senior officer of I.C.B. 2001, nor part of its top management. This is not a case of an employee acquiring for himself either secretly or without the approval of the company, any property or business advantage belonging to the company or for which he has been negotiating.

> I repeat, Mr. Chenier was acting pursuant to the Mutual Undertaking.

86      I agree.

87      For similar reasons, and because of the nature of the contractual relationship between the parties as outlined above, the appellants' claim that Mr. Chenier is in breach of a duty to avoid conflicts of interest also fails.

88      Finally, the trial judge dismissed all of the Cyr parties' allegations that Mr. Chenier had acted in bad faith in his dealings with Mr. Cyr. Those allegations included the following:

> (a) that, in respect of the VTB Loan Action, Mr. Chenier had manipulated the circumstances and orchestrated the Cyr departure from 400 Industrial Ave. in order to make more freezer space available to Giant Tiger at a favourable price;

> (b) that he had misrepresented the continued existence of the Baskin Robbins and Farm Boy accounts;

> (c) that he had taken advantage of his position in order to keep Mr. Cyr in the dark concerning the Giant Tiger negotiations with a view to obtaining a personal benefit;

> (d) that he had acted in bad faith in refusing to close the share purchase transaction by not making good faith efforts to obtain the lease extension; and

> (e) that he was simply manipulating events in an attempt to frustrate the share purchase transaction so that he could keep the lucrative Giant Tiger contract for himself.

Case 09-10138-MFW    Doc 14225-17    Filed 08/15/14    Page 25 of 25

3869130 Canada Inc. v. I.C.B. Distribution Inc., 2008 ONCA 396, 2008 CarswellOnt 2802

2008 ONCA 396, 2008 CarswellOnt 2802, [2008] O.J. No. 1947, 167 A.C.W.S. (3d) 82...

89     The trial judge's factual findings, amply supported in the record, dispose of the appellants' argument with respect to bad faith.

90     In the end, I would not give effect to the appellants' ground of appeal relating to the Cyr Action.

*Damages*

91      In view of the foregoing conclusions it is not necessary to deal with the appellants' grounds of appeal dealing with the damage issues.

**Disposition**

92     For the reasons outlined above, I would dismiss the appeals.

93     The respondents are entitled to their costs of the appeals, fixed at $75,000 inclusive of disbursements and GST.

***R.G. Juriansz J.A.:***

I agree.

***H.S. LaForme J.A.:***

I agree.

*Appeal dismissed.*

Footnotes

1      2794201 Canada Inc. c.o.b. as C.Y.R. Distributions.

2      3869130 Canada Inc. c.o.b. as I.C.B. Distribution 2001. This company was incorporated by Mr. Cyr for the purpose of purchasing I.C.B.

3      *B.G. Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 at 770 (C.A.).

4      *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 at para. 403 (Ont. Gen. Div.), aff'd (1999), 45 O.R. (3d) 417 (C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) at para. 26 (C.A.); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at 166-68.

5      *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 25-27 (C.A.).

6      *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901; *Kentucky Fried Chicken, ibid.*

7      *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 (S.C.C.).

8      I.C.B. 2001 chose to exercise that right for an initial term of one year but not to do so thereafter.

9      Indeed, the Distribution Agreement subsequently entered into between O.F.S. and I.C.B. 2001 for the distribution of Giant Tiger products specifically called for an increase in the price I.C.B. 2001 would receive per case in the event that it was required to provide the services from other premises through no fault of its own.

10     It may well be that the reference to "section 2.1(f)" in s 3.2(c) is a typographical error, since it is s 2.1(e), the section dealing with the purchase price, that refers to "goodwill". However, there does not appear to have been any evidence led on this point.

11     In this context, "ICB" refers to I.C.B. 2001.

12     In this context the reference to "I.C.B." is to I.C.B. 2001, not to Mr. Chenier's company I.C.B. Distribution Inc.

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.