# TAB 18

2008 TCC 220, 2008 CCI 220
Tax Court of Canada [General Procedure]

507582 B.C. Ltd. v. R.

2008 CarswellNat 1506, 2008 CarswellNat 5126, 2008 TCC 220, 2008 CCI 220, [2008]
G.S.T.C. 110, 168 A.C.W.S. (3d) 437, 2008 D.T.C. 3905 (Eng.), 2008 G.T.C. 550 (Eng.)

# 507582 B.C. Ltd., Appellant and Her Majesty the Queen, Respondent

John Frank Krmpotic, Appellant and Her Majesty the Queen, Respondent

Margeson J.

Heard: March 6, 2008
Judgment: May 20, 2008
Docket: 2006-2353(IT)G, 2006-2354(IT)G, 2006-2355(GST)I

Counsel: Alistair Campbell, for Appellants
Susan Wong, for Respondent

Subject: Estates and Trusts; Income Tax (Federal); Goods and Services Tax (GST)

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Tax --- Goods and Services Tax — Special rules — Bare trust

Taxpayer had control, through another corporation, of numbered company which developed properties — Development property at issue was condominium, of which all units except one were sold — Numbered company did not include cost of remaining unit on balance sheet at end of 2000 taxation year or beginning of 2001 taxation year — Financial statements and tax returns deducted cost of unit from income, as cost of sales — Amount deducted was $224,361 — Property later valued by province at $442,000 — Corporation purported to transfer ownership of remaining unit in trust to taxpayer's mother as bare trustee — Numbered company did not file annual reports and was dissolved — Minister assessed taxpayer and numbered company, adding assessed value of unit to taxpayer's income — Minster also assessed numbered company, including assessed value of unit as transfer of property and adjusting GST accordingly — Taxpayer and numbered company appealed — Appeals heard together — Appeals allowed — Unit was not disposed of, as bare trust document did not alter ownership of unit — Trust document stated that unit was held for numbered company and that mother had no legal interest — Section 104(1) of Income Tax Act excludes bare trust from concept of trust, and treats transferor as true owner — Deducting total cost of inventory despite fact that unit still owned by numbered company was accounting mistake, and not designed to gain advantage — Fact that trust document was unregistered and unsigned was not relevant — Trust was not sham or fraud — Excise Tax Act, R.S.C. 1985, c. E-15, ss. 123(1)"person", 155.

### Tax --- Income tax — Trusts — Bare trust

Taxpayer had control, through another corporation, of numbered company which developed properties — Development property at issue was condominium, of which all units except one were sold — Numbered company did not include cost of remaining unit on balance sheet at end of 2000 taxation year or beginning of 2001 taxation year — Financial statements and tax returns deducted cost of unit from income, as cost of sales — Amount deducted was $224,361 — Property later valued by province at $442,000 — Corporation purported to transfer ownership of remaining unit in trust to taxpayer's mother as bare trustee — Numbered company did not file annual reports and was dissolved — Minister assessed taxpayer

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

and numbered company, adding assessed value of unit to taxpayer's income — Minster also assessed numbered company, including assessed value of unit as transfer of property and adjusting GST accordingly — Taxpayer and numbered company appealed — Appeals heard together — Appeals allowed — Unit was not disposed of, as bare trust document did not alter ownership of unit — Trust document stated that unit was held for numbered company and that mother had no legal interest — Section 104(1) of Income Tax Act excludes bare trust from concept of trust and treats transferor as true owner — Deducting total cost of inventory despite fact that unit still owned by numbered company was accounting mistake, and not designed to gain advantage — Fact that trust document was unregistered and unsigned was not relevant — Trust was not sham or fraud.

## Table of Authorities

**Cases considered by *Margeson J.*:**

*Continental Bank of Canada v. R.* (1998), *(sub nom. Continental Bank Leasing Corp. v. Minister of National Revenue)* 229 N.R. 58, 1998 CarswellNat 1496, 1998 CarswellNat 1497, *(sub nom. Continental Bank Leasing Corp. v. Canada)* 163 D.L.R. (4th) 385, *(sub nom. Continental Bank Leasing Corp. v. R.)* 98 D.T.C. 6505, [1998] 4 C.T.C. 119, *(sub nom. Continental Bank Leasing Corp. v. Canada)* [1998] 2 S.C.R. 298 (S.C.C.) — referred to

*Dale v. R.* (1997), *(sub nom. Dale v. Canada)* [1997] 3 F.C. 235, 1997 CarswellNat 2710, 1997 CarswellNat 391, 97 D.T.C. 5252, *(sub nom. Dale v. Minister of National Revenue)* 211 N.R. 191, [1997] 2 C.T.C. 286 (Fed. C.A.) — referred to

*Franklin v. R.* (2002), 288 N.R. 30, 2002 CAF 38, 2002 CarswellNat 3257, 2002 FCA 38, 2002 CarswellNat 207, 2002 D.T.C. 6803, [2002] 2 C.T.C. 88 (Fed. C.A.) — referred to

*Friedberg v. R.* (1991), *(sub nom. R. v. Friedberg)* 92 D.T.C. 6031, *(sub nom. Friedberg v. Canada)* [1992] 1 C.T.C. 1, *(sub nom. Friedberg v. Minister of National Revenue)* 135 N.R. 61, 1991 CarswellNat 669 (Fed. C.A.) — referred to

*Hickman Motors Ltd. v. R.* (1997), [1997] 2 S.C.R. 336, *(sub nom. Hickman Motors Ltd. v. Minister of National Revenue)* 131 F.T.R. 317 (note), [1998] 1 C.T.C. 213, 1997 CarswellNat 3046, 1997 CarswellNat 3047, *(sub nom. Hickman Motors Ltd. v. Canada)* 148 D.L.R. (4th) 1, *(sub nom. Hickman Motors Ltd. v. Minister of National Revenue)* 213 N.R. 81, 97 D.T.C. 5363 (S.C.C.) — considered

*Lagueux & Frères Inc. v. Minister of National Revenue* (1974), 1974 CarswellNat 73F, [1974] C.T.C. 687, 74 D.T.C. 6569, 1974 CarswellNat 215, *(sub nom. R. v. Lagueux & Frères Inc.)* [1974] 2 F.C. 97 (Fed. T.D.) — referred to

*Long v. R.* (1997), [1998] 1 C.T.C. 2995, 1997 CarswellNat 1049, 98 D.T.C. 1420 (T.C.C.) — referred to

*Neuman v. Minister of National Revenue* (1998), *(sub nom. Neuman v. R.)* 98 D.T.C. 6297, 159 D.L.R. (4th) 1, 1998 CarswellNat 685, 1998 CarswellNat 686, [1998] 1 S.C.R. 770, [1998] 3 C.T.C. 177, 225 N.R. 190 (S.C.C.) — followed

*Sussex Square Apartments Ltd. v. R.* (1998), [1999] 2 C.T.C. 2143, 99 D.T.C. 443, 1998 CarswellNat 2543 (T.C.C.) — referred to

*Sussex Square Apartments Ltd. v. R.* (2000), 2000 CarswellNat 1947, [2000] 4 C.T.C. 203, *(sub nom. R. v. Sussex Square Apartments Ltd.)* 2000 D.T.C. 6548 (Fed. C.A.) — referred to

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

*Venne v. R.* (1984), [1984] C.T.C. 223, 84 D.T.C. 6247, 1984 CarswellNat 210 (Fed. T.D.) — considered

*Whistler Village Land Co. v. North Shore-Squamish Valley Area Assessor* (1981), 121 D.L.R. (3d) 284, 15 M.P.L.R. 192, 1981 CarswellBC 553 (B.C. S.C.) — referred to

*Will-Kare Paving & Contracting Ltd. v. R.* (2000), *(sub nom. Will-Kare Paving & Contracting Ltd. v. Canada)* 188 D.L.R. (4th) 242, [2000] 3 C.T.C. 463, *(sub nom. Will-Kare Paving & Contracting Ltd. v. Minister of National Revenue)* 255 N.R. 208, 2000 D.T.C. 6467 (Eng.), 2000 D.T.C. 6479 (Fr.), 2000 CarswellNat 3691, *(sub nom. Will-Kare Paving & Contracting Ltd. v. Canada)* [2000] 1 S.C.R. 915, 2000 CarswellNat 3700, 2000 SCC 36 (S.C.C.) — referred to

*1524994 Ontario Ltd. v. R.* (2006), 2006 G.T.C. 200 (Eng.), [2006] G.S.T.C. 20, 2006 TCC 87, 2006 CarswellNat 388, 2006 CCI 87, 2006 CarswellNat 6339 (T.C.C. [General Procedure]) — referred to

*1524994 Ontario Ltd. v. R.* (2007), 2007 FCA 74, 2007 CAF 74, [2007] G.S.T.C. 19, 2007 CarswellNat 1724, 361 N.R. 84, *(sub nom. 1524994 Ontario Ltd. v. Canada)* 278 D.L.R. (4th) 690, 2007 CarswellNat 336, *(sub nom. R. v. 1524994 Ontario Ltd.)* 2007 G.T.C. 1436 (Eng.) (F.C.A.) — referred to

**Statutes considered:**

*Business Corporations Act*, S.B.C. 2002, c. 57
  Generally — referred to

  ss. 355-358 — referred to

  s. 364 — referred to

  s. 422(1) — referred to

*Escheat Act*, R.S.B.C. 1996, c. 120
  Generally — referred to

  s. 4 — referred to

*Excise Tax Act*, R.S.C. 1985, c. E-15
  Pt. IX [en. 1990, c. 45, s. 12(1)] — referred to

  s. 285 [en. 1990, c. 45, s. 12(1)] — referred to

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
  Generally — referred to

  s. 56(2) — considered

  s. 66(2) — referred to

  s. 89(1)"taxable Canadian corporation" — referred to

  s. 104(1) — considered

  s. 125(7)"Canadian-controlled private corporation" — referred to

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-18    Filed 08/15/14    Page 5 of 25

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

s. 152(4)(a)(i) — considered

s. 153(4) — referred to

s. 163(2) — considered

s. 246(1) — referred to

*Land Title Act*, R.S.B.C. 1996, c. 250
Generally — referred to

s. 20 — considered

s. 20(1) — considered

s. 180 — referred to

s. 180(1) — considered

s. 180(2) — referred to

s. 180(3) — referred to

s. 180(4) — referred to

**Forms considered:**

*Land Title Act*, R.S.B.C. 1996, c. 250
Form A — referred to

APPEALS by taxpayer and numbered company from assessments by Minister of National Revenue, treating transfer of condominium unit by numbered company as taxable event for income tax and GST.

*Margeson J.*:

1    The parties agreed that all of these cases would be heard on common evidence.

2    The parties agreed upon a Partial Agreed Statement of Facts as follows:

**PARTIAL AGREED STATEMENT OF FACTS**

For the purposes of these appeals, the parties agree to the facts in this partial statement of facts. The parties agree that other evidence may be introduced by either party, to the extent that such evidence is not inconsistent with the following facts:

1. The Appellant 507582 B.C. Ltd. ("507582") is a company incorporated under the laws of British Columbia and is a Canadian-controlled private corporation as defined in subsection 125(7) of the *Income Tax Act* (the "Act").

2. At all relevant times, 507582's fiscal taxation year ended on May 31.

3. With respect to the Goods and Services Tax ("GST");

(a) 507582 was registered under the *Excise Tax Act* effective June 1, 1996, and was assigned GST registration number 89419 1451;

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14225-18 Filed 08/15/14 Page 6 of 25

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

(b) 507582 files GST returns and reported total GST collectible of nil and total input tax credits ("ITCs") of nil, in respect of the period from June 1, 1997, to May 31, 2002 (the "Period").

4. At all relevant times, the sole shareholder of 507582 was Kuna Enterprises Ltd. ("Kuna Enterprises"), a British Columbia company and a "taxable Canadian corporation" as defined in subsection 89(1) of the Act.

5. At all relevant times, the sole shareholder of Kuna Enterprises was Kuna Holdings Ltd. ("Kuna Holdings"), a British Columbia company and a "taxable Canadian corporation" as defined in subsection 89(1) of the Act.

6. At all relevant times, the sole shareholder of Kuna Holdings was the Appellant John Frank Krmpotic, an individual resident in Canada for the purposes of the Act.

7. At all relevant times, John Frank Krmpotic was one of two officers and directors of 507582. The other officer and director was his father, John Ivan Krmpotic.

8. At all relevant times, John Frank Krmpotic was one of two directors of Kuna Holdings. The other director was John Ivan Krmpotic.

9. At all relevant times, John Frank Krmpotic was one of two officers and directors of Kuna Enterprises. The other officer and director was John Ivan Krmpotic.

10. Mrs. Betty Krmpotic is an individual resident in Canada for the purposes of the Act. Mrs. Krmpotic is the mother of John Frank Krmpotic.

11. At all relevant times, 507582 carried on the business of residential real estate development, construction and sales.

12. In 1996, 507582 purchased real property in Whistler, British Columbia having the civic address of 4405 Blackcomb Way, Whistler, B.C. In 1996 and 1997, 507582 constructed a condominium/townhouse development on this property called Granite Court (the "Development").

13. In approximately July 1997, 507582 began settling units of the Development.

14. 507582 reported sales of all the units of the Development other than the Property in its tax returns for the taxation years in which the units were sold.

15. 507582 did not include the cost of the Property on its balance sheet at the end of its 2000 taxation year or on its opening balance sheet for its 2001 taxation year.

16. In preparing 507582's financial statements and corporate income tax returns for the taxation year ended May 31, 2000, 507582's external accountants deducted the cost of the Property from 507582's income as cost of sales. The amount deducted as cost of sales was $224,361.

17. In 2001, the British Columbia Assessment Authority valued the Property at $442,000.00.

18. 507582 ceased to file annual reports with the British Columbia Corporate and Personal Property Registries after November 2001 and was dissolved for failure to file.

19. On April 21, 2005, the Minister of National Revenue (the "Minister") reassessed John Frank Krmpotic's 2000 taxation year to add the amount of $442,000.00 to his income as a benefit with respect to the transfer of the Property, and to levy a gross negligence penalty under subsection 163(2) of the Act.

20. The "normal reassessment period" in respect of John Frank Krmpotic's 2000 taxation year ended on June 7, 2004. He did not file a waiver in prescribed form within the normal reassessment period in respect of that year.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-18    Filed 08/15/14    Page 7 of 25

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

21. On July 19, 2005, the Minister reassessed 507582's 2001 taxation year to include proceeds of disposition in the amount of $442,000.00 with respect to the transfer of the Property, and to levy a gross negligence penalty under subsection 163(2) of the Act.

22. On March 21, 2006, the Minister assessed 507582 for net GST in the amount of $30,940.00, penalties in the amount of $18,121.76, and interest in the amount of $4,516.30 with respect to the transfer of the Property during the Period. The penalty amount included a gross negligence penalty of $7,735.00 assessed under section 285 of Part IX of the *Excise Tax Act*.

23. The Appellants filed Notices of Objection to the above assessments, which were subsequently confirmed by the Minister.

DATED at the City of Vancouver, the Province of British Columbia, this 5 th day of March, 2008.

This Partial Agreed Statement of Facts sets out the assessments appealed from.

3    In addition to the Partial Agreed Statement of Facts, evidence was given on behalf of the Appellant by John Frank Krmpotic. He testified that he was the sole shareholder of Kuna Holdings Ltd. ("Kuna Holdings") and he was one of two officers and directors of 507582 B.C. Ltd. (the "Company"). He indicated that all relevant times, the Company carried on the business of residential real estate development, construction and sales. Between 1996 and 2000, the Company built 38 town homes at Whistler, British Columbia, commonly referred to as Granite Court (the "development"). The civic address was 4405 Blackcomb Way, Whistler, British Columbia (the "property"). He had a background in building and construction.

4    In 1996, he saw opportunities at Whistler, viewed the property and purchased it, it was zoned and developed. He identified the auditor's working paper found in Exhibit R-1 at Tab 1 which is with respect to 2001 taxation year. He referred to this as the sales record on this complex.

5    In 1997, they had reached their pre-sales requirements for this complex. They took it off of the market as people were flipping them. As they reached the end, they put them back on the market. The second last unit was sold for $299,000 as shown at Tab 1. They had one unit left and they wanted to keep it as an investment for later on. It helped with the financing. Unit 102 was a second and third floor unit. It was used as a show room so that it contained furniture.

6    He identified Tab 27 of Exhibit R-1 which was the Freehold Transfer document for unit 102. It was indicated on the document that it was executed on September 1, 1999 but the witness said that he executed this document in advance. The document was registered on December 1, 2000.

7    The property was transferred to his mother Betty Krmpotic who was described as a business woman in Burnaby, British Columbia.

8    He wanted to dissolve the Company because he did not want to pay for annual reports and other expenses if the Company continued in operation. He also cut down on his liability. By transferring the property to his mother he would still have an asset. If he dissolved the Company any property that it owned would be forfeited to the Crown. He had 10 years to revive the company. It was dissolved in November 2001.

9    He identified the trust document found at Exhibit R-1, Tab 14 as a true copy of the original trust document executed by Betty Krmpotic in favour of the Company with respect to unit 102, 4405 Blackcomb Way, Whistler, British Columbia. This trust document declared that Betty Krmpotic was holding the property in trust for the Company. It further declared that she had no interest whatsoever in the said unit and would transfer it to the Company for $1 when requested to do so.

10    This document was created by this witness on December 1, 2000 and it was signed by his mother. He had received no legal advice with respect to the document.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

11    He explained the document to his mother who acted as the secretary of the Company. She was familiar with the Granite project. She understood it.

12    The document was in error in that it referred to 4450 Blackcomb Way, whereas it should have read 4405 Blackcomb Way. The Company never owned 4450 Blackcomb Way. The property had never been used or rented. No one in the Company used it for personal purposes.

13    He identified the T-2 return and schedule information found at Exhibit R-1, Tab 15 for the period ending May 31, 2000. Likewise he identified the T-2 return and schedule information found at Exhibit R-1, Tab 16 as at May 31, 2000. This document showed zero inventory of land and work in progress. Further, this was an error as the Company still held property in trust. He was not in the country at the time these documents were prepared by the Company's accountants.

14    He did not sign the T-2 return and financial documents at Exhibit R-1, Tab 15 because he was not in the country. He was in Croatia.

15    He admitted that the total cost of inventory was deducted in spite of the fact that they continued to hold the property in question in his inventory. This was a mistake by the accountants.

16    In cross-examination, he was referred to Exhibit R-1, Tab 27 which was the Freehold Transfer under the *Land Title Act* and he said that when he was given a batch of documents on September 1, 1999 to sign and there may have Strata documents and other documents.

17    He was questioned about his answers given on examination for discovery and he said that his answer to question 61 was not complete and he also should have indicated that one of the reasons why he wanted to wind up the Company was because of liability. He also said that he did not indicate that there was a concern that the Crown might be able to take the property over because they never got into that matter. Consequently, his answer to question 61 and questions 64 to 74 were not complete. He had 10 years to accomplish his purposes.

18    He was referred to the trust document and he said that it was drawn up in 2000 but it was not submitted to Canada Revenue Agency ("CRA") until 2006, after the Objection was filed. He did not know why this was so. He was in and out of the country because he finished working in Croatia in the year 2001. Mr. Desai was doing the accounting but he did not have the trust document. This witness did not provide it to anyone to give to CRA. He did not know why the corporation did not sign the trust document as well as his mother.

19    He referred to the document in Exhibit R-1, Tab 16 and he said that he did not sign the T-2 return for the year 1999. He was not in the country as far as he could remember. When he was in the country he would sign documents. The reason that he did not sign the documentation for the other years was because he would be out of the country, and probably in Croatia. He did not advise Mr. Desai, his accountant, that the corporation was going to hold on to unit 102. Mr. Desai still does the Company's returns and his own return.

20    He was asked again why he wanted to hold on to unit 102. He said that it was one of the larger units, it was in the right position and it was near a helicopter pad. He decided to hold onto unit 102 when he sold the second last unit. The mortgage was paid off and the Company was in good shape.

21    Mr. Desai had been doing the Company's returns and financial documents since the Company was incorporated. He had been doing his personal returns before that. He also did the statements and returns for Kuna Enterprises Ltd.

22    The witness had a grade 12 education and had taken courses in construction, surveying and planning. He had been involved in 8 to 9 different real estate and construction projects. He had no accounting background.

23    When asked why he did not get legal advice for the drafting of the trust document, he said that he felt safe doing it himself with his mother.

WestlawNext.CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

24    In redirect, he said that he incorporated the Company because it was an easier way of doing the project. He also wanted to avoid liability.

25    Betty Krmpotic testified that she was the mother of John Krmpotic. She was familiar with the Company in question. It was owned by her son and he had developed condos at Whistler. She is not an officer the Company. She does filing, delivers papers to the accountant, does bank transfers and has signing authority for the Company. She had no involvement with the Granite Court project. She was aware of it, had received invoices for and paid bills for it while the project was being completed.

26    With respect to unit 102, she had been in it one or two times. It was a showroom. The title was registered in her name, in trust, to hold for the Company until they decided what to do with it. She signed the trust document after John brought it to her. She had discussed it with him beforehand. She was holding the property for the Company. She never signed such a document before. She signed it in her own home. She never had personal use of the unit. She does not own it.

27    In cross-examination, she reaffirmed that she held the property in trust and believed that her son had a lot of reasons for transferring the property to her in trust until he did something with it. It was just a matter of signing the trust document as far as she was concerned.

28    She delivered all of the cancelled cheques, stubs, transfers and banking documents to Mr. Desai on behalf of the Company. She gave no instructions about preparing the Company documents. She did not keep a copy of the trust document for herself.

29    Manoharlal Desai testified that he was a chartered accountant. He was the accountant for both Appellants since 1990. He provides accounting services to small clients, including personal and corporate services.

30    Between 1996 and 2001, his office prepared monthly statements, GST returns and any returns required to be presented to CRA on behalf of the Company. He had access to sales information, bank statements, cheque stubs, deposit books, statements of assessments for various properties, was familiar with the net amount of receipts and disbursement of funds for the Appellant. This information comes from Mrs. Betty Krmpotic. The information is entered into their software programs and into the general ledger. He was familiar with the project at Whistler.

31    He was questioned with respect to the various financial statements prepared by his office with respect to the Company touching upon the present matter. He was very familiar with these documents and he had access to statements of adjustments for the various properties when each unit was sold.

32    He identified Exhibit A-1, which was a copy of the general ledger trial balance for the Company dated November 30, 1999. He confirmed the statement of facts set out in paragraphs 15 and 16 of the Partial Agreed Statement of Facts and explained that he had thought that the sale of the last lot had taken place and it had not. There was still one unit which was left after the year end and that was the property in question.

33    He was referred to Exhibit R-1, Tab 15, which is a T-2 return and schedule information for the Company for the taxation year ending May 31, 2000. The balance sheet indicated that there were no units left and the inventory was listed as zero. He also identified Exhibit A-2, which was an excerpt from the general ledger for the year ending May 31, 2000. He said that the general ledger summarizes all transactions of the Company for that period of time. He was referred to page 3 of the document which showed the cost of purchases of $224,361.45. With respect to the unit in question, he agreed that the Company had understated income because the total cost of the last unit was written-off when it should not have been.

34    He confirmed that he had not received the statement of adjustments with respect to the property in question and he believed that all units had been sold. He was referred to Exhibit R-1, Tabs 12 and 13 which were the Company's returns for the periods ending May 31, 2001 and May 31, 2002. He said that if there is no inventory then they do not prepare financial statements. In the return dated May 31, 2001, the only income was for mortgages that the Company owned. With respect to the period of May 31, 2002, there were no financial statements because there was no income or expenses and the only assets were shown as cash of $3,310. None of these documents were signed by John Krmpotic but Mr. Desai still filed the returns.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

35    In cross-examination, he said that his office employed three chartered accountants and a staff of 10 people. The staff prepared the statements and they were reviewed by the accountants. Most of the time, if he was in the office when the materials were brought in, he would meet with the person who delivered them. The Company normally does not sign its returns.

36    He was referred to the trust document and he said that he just saw it recently. He had not seen it when he prepared the 2000 and 2001 returns. When the auditor made the enquiries, Mr. Krmpotic showed him the documents. His office did not give the Company or Mr. Krmpotic any advice or information with respect to the trust arrangement. His office did not contact the Company before completing the financial statements which give rise to the present actions. He never had a statement of adjustments with respect to unit 102 and he never went back and tracked the units but assumed that they were all sold.

37    He identified Exhibit A-3 which was a BC Company Summary for the Company showing its reactivation with an expiry date of October 4, 2009.

38    Jason Brown was an auditor for CRA. He has 10 years experience. He issued the income tax reassessment in this case. The GST reassessments were issued under another name that flowed from his reassessment.

39    He was referred to his working paper contained at Exhibit R-1, Tab 1. He said that his work came about as a result of another audit that he had been working on. He decided that the Appellant Company and John Krmpotic were related shareholders of the Company under audit. He looked up the company and found it to be involved in the construction business. He looked through their data base for transfers of property out of the Company and noticed a property transfer from the Company to Mrs. Krmpotic for $1. He contacted the accountant for the company in November 2004. The accountant told him that all sales are properly recorded by the Company. He asked for related documents to confirm the returns. When there was no response he contacted them again and there was no response.

40    In January 2005, he contacted the accountant and asked for the Company's documentation for 1998, 1999, 2000 and 2001. He gave them one to two weeks. By the end of January he still had no documents from the corporation. He told them that he needed the vendor's statement of adjustments with respect to unit 102. He did not receive it by the end of January. He created his working paper from what had been recorded for tax purposes. He was trying to reconcile what had been reported for sales.

41    He found that in the year 2000 there was one transfer, which was for the property in question, for the consideration of $1. He found out that Mrs. Krmpotic was still the registered owner of the property in question.

42    He was referred to Exhibit R-1, Tab 6 which is the Title Search printout with respect to the property in question. It showed the registered owner as Betty Krmpotic. He presumed that the entire inventory had been disposed of and recorded even though unit 102 was still held.

43    He wrote to their real estate appraisers and was told that the assessed figure would suffice for a value of the property of unit 102. He compared it to three other properties that the Company sold most recently and unit 102 was the highest. He also obtained the corporate information that he needed to determine who controlled the corporation.

44    He concluded that the property was transferred to a non-arm's length party for inadequate consideration and that it should have been included in income. He received the trust document after the reassessment. He received no documentation from the corporation for the audit. The Company filed an Objection and that was when the trust document was filed.

45    The reassessment was confirmed. The reason was that the bare trust agreement was not accepted by CRA. According to him it was not signed, it was not witnessed and the Company had not signed it. Also, the claimed beneficial owner had zero inventory as of 2001 according to the Company's files with CRA.

46    He was asked for reasons for the penalties levied and he said that the amount in question was one of the reasons. This was the only property sold in 2001 at a value of $442,000. He considered Mr. Krmpotic's history in the business and in other companies. He also knew that the Company had been audited for GST in the late 1990s, Kuna Enterprises had been audited also and Mr. Krmpotic was reviewed at that time. He believed that Mr. Krmpotic and the Company should have been aware

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

of what was going on. Further, he never received any information from the accountant for the Company and so he concluded that the records might not support the filings.

47    He was referred to Exhibit R-1, Tab 7, which was the letter dated January 31, 2005 that he wrote to the Company through its accountant, Manu Desai. This was referred to as a proposal letter. He indicated that he proposed to revise the taxable income by adding $441,911 to the income. He asked if there was any other information that the Company might have to support another amount.

48    He talked to Mr. Nick Smith, a lawyer, and asked him to respond to the proposed letter. By April he had received no response so he advised the Company that he was going to make the adjustment for the Company and Mr. Krmpotic and that they could appeal the assessment.

49    Again, with respect to penalties, he said that they were confirmed at the objection stage for the same reasons. He added that the bare trust agreement was given to the appeals division and not to the auditor. He concluded that the property was transferred through Mr. Krmpotic's direction. The reasons were the same for rendering penalties against Mr. Krmpotic and the Company.

50    The penalties were confirmed by the appeals division.

51    In cross-examination he said that he did not know why Mr. Desai had not provided the information he requested. Both letters were sent to Mr. Desai as that was the Company's address provided on their data base.

52    He indicated that he had done the title search and found the registered owner to be Betty Krmpotic. He was referred to paragraph 10(o) of the Reply and was asked what was the basis for concluding that the beneficial and legal ownership was transferred to Mrs. Krmpotic. He replied that the accountant had said that all of the sales were reported and he assumed that total ownership had passed to Mrs. Krmpotic. The bare trustee agreement was not accepted by the appeals division.

53    When asked why they had applied gross negligence penalties he replied:

1. Materiality of the amount ($442,000.).

2. Mr. Krmpotic's background in business and related construction business.

3. The Company had been audited in the past (that was all that he knew about it).

4. Kunar Enterprises had been audited for income tax (that was all he knew about it).

5. Information requested from the Company had not been provided.

54    With respect to Mr. Krmpotic's personal gross negligence penalties, he said that he should have assessed himself and added it to his income.

55    In redirect he identified Exhibit R-3 as a Memo to File T2020, with respect to his conversation with the Company and its representatives.

**Argument on Behalf of the Appellant**

56    Counsel for the Appellant stated that the facts disclosed that the declaration of trust was executed on December 1, 2000 by Mrs. Betty Krmpotic in the presence of John Krmpotic. This declaration of trust evidenced a legally effective bare trust relationship by which Mrs. Krmpotic held legal title to the property in trust for the Company. However, the corporation remained the beneficial owner of the property. This was confirmed by the evidence of John Krmpotic and Betty Krmpotic.

57    There was no evidence whatsoever that the declaration of trust was a sham or a fraud or that it was created or executed at some other date than December 1, 2000. These facts were established by the testimony of John Krmpotic and Betty Krmpotic.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

58      On December 1, 2000, they transferred title of the property to Mrs. Krmpotic. This document was registered in the British Columbia Land Title Office as confirmed by the testimony of John Krmpotic. A copy of the *Land Title Act* Form A is contained in Exhibit R-1, Tab 27.

59      From December 1, 2000 onwards, Mrs. Betty Krmpotic held legal title to the property although the Company remained the beneficial owner of the property at all times. This was confirmed by the testimony of John Krmpotic and Betty Krmpotic as well as the trust document itself found in Exhibit R-1, Tab 14.

60      The consideration for the transfer of the property was $1. The Company considered itself to be the beneficial owner of the property all of the time.

61      Both John Krmpotic and Manu Desai confirmed information contained in the financial documents filed with CRA, including the financial statements. In preparing the financial statements Mr. Desai reflected the costs of the development, including the costs of the land, permits, surveys, construction costs, et cetera in the balance sheet in the line item "inventory of the land and work in progress."

62      When the Company sold units of the development, Mr. Desai wrote down the cost of the "inventory of the land and work in progress" in the corporation's financial statements to reflect the disposition of those units. This was confirmed by the testimony of Manu Desai and the financial statements.

63      In determining the net income or loss to the corporation for each fiscal period, Mr. Desai reflected the cost of the units sold as "cost of sales" in the statement of earnings and deficit for the Company.

64      Mr. Desai testified that on or about October 20, 1999, the Company sold a unit in the development having the address 310 - 4405 Blackcomb Way, Whistler, B.C. This was the last sale of any units in the development.

65      On September 19, 2000, Mr. Desai completed the financial statements for the taxation year ending May 31, 2000 of the Company. At that time, Mr. Desai mistakenly believed that the unit sold on October 20, 1999 was the last remaining unit in the development that was held by the Company. Mr. Desai believed that the development had been completed and all units sold to purchasers.

66      This was confirmed in the financial statements found at Tab 15 and in Mr. Desai's oral testimony.

67      In preparing the balance sheet for the taxation year ended May 31, 2000, Mr. Desai wrote down the cost of the "Inventory of land and work in progress" line item to nil to reflect the fact that the corporation no longer held any further interest in the development of the underlying property. This is confirmed in the financial statements at Tab 15 and in the testimony of Mr. Manu Desai.

68      Further, Mr. Desai reflected the remaining cost of development in the "cost of sales" line item in the statement of earnings and deficit. As a result, the cost of the property was deducted in calculating the income of the Company for the taxation year ending May 31, 2000. These facts are indicated in the testimony of Mr. Manu Desai and in the financial statements at Tab 15.

69      Mr. Desai wrote down the cost of the corporation's "inventory of the land and work in progress" and deducted the cost of the development in the "cost\ of sales" based on his mistaken belief that the corporation had sold the last remaining unit in the development in the taxation year ending May 31, 2000. If Mr. Desai had known that the Company continued to hold the property after May 31, 2000, he would not have written down the cost of inventory and deducted the cost of the property in calculating the corporation's income for the year.

70      The testimony of Manu Desai confirms this position. Mr. Desai further testified that on October 3, 2007, the Company was restored to the corporate register as a corporation in good standing. This is confirmed by Appellant's Exhibit A-3.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-18    Filed 08/15/14    Page 13 of 25

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

71     Consequently, in accordance with the evidence adduced, on December 1, 2000, the Company transferred legal title to the property only to Mrs. Betty Krmpotic. Since that time, Mrs. Krmpotic has held title to the property as bare trustee only. At all relevant times the Company has remained the beneficial owner of the property.

72     As a result, the fair market value of the property transferred by the Company to Mrs. Krmpotic on December 1, 2000 (that is, the legal title to the property) had a fair market value of no greater than $1.

73     As a result, the Company realized proceeds of disposition of $1 in the transfer on December 1, 2000 and not proceeds of disposition of $442,000 as assessed by the Minister under the *Income Tax Act* ("*Act*").

74     Further, the Goods and Services Tax ("GST") is payable on the $1 fair market value of the consideration payable by Mrs. Krmpotic in respect of the supply of legal title to the property and not of the deemed consideration of $442,000 as assessed by the Minister under the *Excise Tax Act*.

75     Further, Mr. John Krmpotic did not confer any benefit to Mrs. Krmpotic under subsection 56(2) of the *Act* in respect of the transfer of legal title to the property by the Company to Mrs. Krmpotic in 2000 and so was not liable to any income tax in respect of that transfer.

76     No penalties are applicable under the *Act* or the *Excise Tax Act* as there was no additional income tax or GST payable by the Company or John Krmpotic in respect of the transfer of legal title to the property by the Company to Mrs. Krmpotic in the year 2000.

77     With respect to the bare trust that was created in favour of Mrs. Krmpotic, the usual accepted meaning of the term "bare trust" is a trust where the trustee holds property without any duty to perform except to convey it to the beneficiary or beneficiaries on demand. See D. Waters, *The Law of Trusts in Canada* (3 rd Ed.), (Toronto: Carswell, 2005) at page 32.

78     In British Columbia, legal title to real property may be registered in the name of the trustee or agent while the real property is beneficially owned by another party (the beneficiary). See *Whistler Village Land Co. v. North Shore-Squamish Valley Area Assessor* (1981), 121 D.L.R. (3d) 284 (B.C. S.C.) (at pages 285-287).

79     The *Land Title Act* does not cause unregistered interests to be ineffective as against the parties to the instrument even where the instrument is not registered on title. *Land Title Act*, R.S.B.C. 1996, c.250, s.s. 20(1).

80     The *Land Title Act* does not require that land that vests in a trustee or personal representative be registered on title. It provides that if land vests in a personal representative or trustee, that person's title may be registered, but particulars of a trust created or declared in respect of that land must not be entered in the registry. The language of the legislation is permissive. It does not require all trust interests to be registered on title to property. The *Land Title Act*, R.S.B.C. 1996, c.250, s.s. 180(1).

81     Accordingly, it was open to the Company to register the transfer of legal title of the property to Mrs. Krmpotic under the *Land Title Act* while the corporation continued to beneficially own the property. There was no requirement that the trust document executed by Mrs. Krmpotic be registered on title to the property.

82     With respect to the application of the *Income Tax Act* and the *Excise Tax Act* to a bare trust, counsel argued that these Acts rely on private and commercial law concepts to determine particular income tax consequences. One must first determine the nature of the relevant legal relationship before one can determine how the *Act* applies. *Lagueux & Frères Inc. v. Minister of National Revenue* (1974), 74 D.T.C. 6569 (Fed. T.D.) ; *Dale v. R.*, [1997] 2 C.T.C. 286 (Fed. C.A.); *Sussex Square Apartments Ltd. v. R.*, [2000] 4 C.T.C. 203 (Fed. C.A.) affirming (1998], [1999] 2 C.T.C. 2143 (T.C.C.).

83     The Supreme Court of Canada has recognized the interrelation between general law or commercial law and the operation of the *Act*. See *Continental Bank of Canada v. R.*, [1998] 2 S.C.R. 298 (S.C.C.). See also P. W. Hogg, J. E. Magee and T. Cook, *Principles of Canadian Tax Law* (3 rd ed. 1999), at p. 2 where the authors note:

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

The *Income Tax Act* relies implicitly on the general law, especially the law of contract and property. ... Whether a person is an employee, independent contractor, partner, agent, beneficiary of a trust or shareholder of a corporation they usually have an effect on tax liability and will turn on concepts contained in the general law, usually provincial law.

See *Will-Kare Paving & Contracting Ltd. v. R.*, [2000] 1 S.C.R. 915 (S.C.C.) at paragraph 31.

84      Counsel argued that in the present appeal the tax liability of the Appellants turns on the legal effect of the transaction involving the transfer of the property on December 1, 2000. The evidence is clear that the legal title of the property was registered in the name of Mrs. Krmpotic on that date but the Company continued to be the beneficial owner of the property because Mrs. Krmpotic held title to the property as bare trustee only.

85      Accordingly, the Company did not transfer anything of value to Mrs. Krmpotic on December 1, 2000 and so it cannot be deemed to have disposed of the property for its fair market value in order to realize proceeds of disposition of $442,000. Similarly, Mr. Krmpotic cannot be said to have conferred a benefit on Mrs. Krmpotic under subsection 56(2) of the *Act* because the registration of the title to the property in Mrs. Krmpotic's name under the bare trust did not result in the conferral of any benefit to Mrs. Krmpotic.

86      Further, subsection 104(1) of the *Act* excludes a bare trust from the concept of a "trust" for income tax purposes. Subsection 104(1) provides that "a trust is deemed not to include an arrangement under which the trust can reasonably be considered to act as agent for all the beneficiaries under the trust with respect to all dealings with all of the trust's property". He also takes the position that the Minister's long standing administrative policy with respect to bare trusts is that where property is held by a bare trustee, the Minister will ignore the trust for income tax purposes and will consider the transferor/settlor to be the owner of the property for all purposes of the *Act*. The Minister has stated that it generally views a trust under common law to be a bare trust when:

a. the trustee has no significant powers or responsibilities, and can take no action without instructions from the settlor;

b. the trustee's only function is to hold legal title to the property; and

c. the settlor is the sole beneficiary and can cause the property to revert to him or her at any time.

See *Income Tax Technical News* No. 7 (February 21, 1996). All of these criteria are present in the current situation. Mrs. Krmpotic had no significant power or responsibility and took no action with respect to the property. Mrs. Krmpotic's only function was to hold title to the property. The Company was the sole beneficiary and could cause the property to revert to it at any time.

87      Counsel argued that the Appellant has introduced unchallenged and uncontradicted evidence with respect to the trust document which "demolishes" the Minister's assumptions in accordance with the facts set out in the Supreme Court of Canada in *Hickman Motors Ltd. v. R.* (1997), [1998] 1 C.T.C. 213 (S.C.C.) at paragraphs 91 to 97. In these appeals, the Appellants have met the burden of proof by demolishing the Minister's assumptions while the Minister has failed to adduce evidence to support its assumptions.

88      The key assumptions of fact made by the Minister in the Reply at paragraphs 10(o), (p) and (v) have been demolished by the Appellants through the evidence adduced at the hearing of these appeals.

89      Mr. Krmpotic's understanding of the law of British Columbia regarding the dissolution of a corporation and the forfeiture of real property to the province was correct. See *Business Corporations Act*, S.B.C. 2002, c. 57, sections 422(1), 355 to 358 and 364 and the *Escheat Act*, R.S.B.C. 1996, c.120, s. 4.

90      The Appellants have made out a *prima facie* case that the Company did not transfer anything other than bare legal title to the property to Mrs. Krmpotic on December 1, 2000. The Appellant's evidence regarding the execution of the trust deed and

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

the intention that Mrs. Krmpotic would hold the property as a bare trustee is unchallenged and uncontradicted evidence and so "demolishes" the Minister's assumptions.

91     Consequently the onus shifted to the Minister to rebut the *prima facie* case made out by the taxpayer and the Minister must prove the assumptions. The only evidence the Minister adduced in this regard was the testimony of the Minister's auditor, Mr. Jason Brown and the accounting records of the Company.

92     Mr. Brown testified that he assumed that the Company had transferred its entire interest in the property to Mrs. Krmpotic on the basis of his review of information found in the British Columbia property transfer tax records and British Columbia Assessment Authority records which showed a transfer of title to the property to Mrs. Krmpotic.

93     There is no doubt that the Appellants did transfer title to the property to the name of Mrs. Krmpotic on December 1, 2000. However, there was undisputed and unchallenged evidence that beneficial ownership at all times remained with the Company and the only title that passed was legal title. Mr. Brown could not provide any evidence regarding beneficial ownership of the property other than his assumption that it was transferred to Mrs. Krmpotic at the same time that title was registered in her name.

94     The Minister adduced the financial statements for the taxation year ending May 31, 2000 which evidenced in the balance sheet that the "inventory of the land and work in progress" was reduced to nil as at May 31, 2000 and in the statement of earnings, that the cost of all remaining units in the property was deducted in calculating net income for the year ending May 31, 2000.

95     However, Mr. Manu Desai testified that he wrote down the costs of the corporation's "inventory of the land and work in progress" and deducted the cost of the development in the "costs of sales" based on his mistaken belief that the corporation had sold the last remaining unit in the development in its taxation year ending May 31, 2000. If Mr. Desai had known that the Company continued to hold the property after May 31, 2000, he would not have written down the cost of inventory and deducted the cost of the property in calculating the corporation's income for that year.

96     Clearly, tax is not assessed under the *Act* on the basis of accounting entries but on the actual transactions that took place. The Federal Court of Appeal has held that accounting errors and incorrect entries do not confer shareholder benefits. See *Franklin v. R.*, [2002] 2 C.T.C. 88 (Fed. C.A.) at paragraph 7.

97     The same reasoning applies in the present appeals. The books of the Company do not reflect the facts. The financial statements for the year ending May 31, 2000 reflected that the corporation did not hold any further units in the development as at that date. This is clearly incorrect because at that time the Company continued to hold both legal title and beneficial ownership of the property (since the title to the property was not registered in Mrs. Krmpotic's name until December 1, 2000).

98     Since the books of the Company do not reflect the actual facts, they cannot form the basis of an assessment for tax. See *Long v. R.* (1997), [1998] 1 C.T.C. 2995 (T.C.C.).

99     In conclusion, counsel argued that these appeals should be allowed and the reassessments under appeal be vacated on the basis that the Company transferred legal title to the property only to Mrs. Betty Krmpotic on December 1, 2000, and such legal title was held by Mrs. Betty Krmpotic as bare trustee only and that the fair market value of the property transferred was not in excess of $1.

**Argument on Behalf of the Respondent**

100     Counsel for the Respondent took the position that under the *Land Title Act*, *supra*, sections 180(2), (3) and (4) the trust instrument must be filed with the Registrar with the application for registration of title. Once the trustee decides to register title he must comply with these provisions. Section 20, according to her, is merely a protective provision for when unregistered instruments come into play. It is not intended to be the way that parties conduct business and the way that the Land Title Registry expects parties to conduct business. If you are going to register on title you have to follow all the provisions.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

101      Counsel for the Appellant referred to section 20. This is merely a protective provision which applies when unregistered instruments come into play. It may well be a common practice to avoid the property purchase tax in this way when registering against title. However, it appears to be contrary to law.

102      She took the position that the numbered company had transferred the property to Betty Krmpotic in "fee simple". So far as the world at large is concerned, Betty Krmpotic holds fee simple title. This can be seen from the document and the title search. When she considers various legal definitions of "fee simple" she ultimately concludes that what was transferred from the numbered company to Betty Krmpotic was everything.

103      Having done so the Appellant cannot now assert the trust because what they are attempting to accomplish is to represent to the world at large that the entire interest in the property, an interest in fee simple, has been transferred to Betty Krmpotic while retaining a beneficial interest in the corporation.

104      She asks the question, did the Appellants accomplish what they set out to accomplish in light of the provisions of the *Escheat Act*, *supra*, because section 4 of that *Act* determines that if a corporation is dissolved, the land owned by the corporation or to which the corporation is entitled at the time of the dissolution escheats to the Crown?

105      Further, if the trust document had been registered, it would have been clear to the world at large that the beneficial interest remained in the corporation. If the corporation then sought to dissolve, either by commencing dissolution or by failing to file annual returns, as is the case here, would that beneficial interest have escheated to the provincial government? The only way to accomplish both was to do what the Appellant did, which was not to register the trust document, and have it appear to the world that fee simple had been transferred to Betty Krmpotic so that the property would not escheat.

106      She referred to the case of *Friedberg v. R.* (1991), 92 D.T.C. 6031 (Fed. C.A.) in support of the position that if one is taking steps to make something look like it is real, it becomes real. A person cannot create a contractual fiction which is designed to misrepresent a legal relationship, take advantage of it and later disavow it to avoid the tax disadvantages.

107      In the case at bar there was a transfer of title on December 1, 2000 to Betty Krmpotic in fee simple. There was no evidence of a trust. As far as the world at large was concerned she held title in "fee simple". There was no evidence led that the property escheated to the provincial Crown, so it appears that the Appellant accomplished what it set out to do. However, the consequence of that is that it cannot now assert a trust. In the end result if you show to the world that what you created is one situation, then for your own advantage, when taxed and assessed, you cannot assert that the contract was never intended to create that result. If the trust document is accepted then the Appellants have that problem.

108      The trust document itself is fraught with a few 7problems. It was provided to the Minister approximately five years after the fact, in 2006. This is after the assessment took place. Further, the document is dated December 1, 2000. The freehold transfer was executed on September 1, 1999, 15 months in advance of the date of the trust document. The trust document is dated the same as the date on which the freehold transfer was ultimately registered at the Land Title Office. She asked the question, why does it not correspond with the date of signing of the freehold transfer, rather than the date of registering at the Land Title Office? This would appear to her to be peculiar. However, she admitted that she did not ask Mr. Krmpotic in cross-examination as to any reasoning for this.

109      Further, the document is not signed by the two contracting parties and she described this as atypical. Further there are no witnesses recorded on the trust document. It lacks some of the formalities of an ordinary contract or agreement.

110      She took the position that what the Company did in their books and records reflects what actually happened. Mr. Desai might have made a mistake in the records and he might not have. However, this is of little consequence because if the trust document transferred anything more than legal title it would not matter whether Mr. Desai made a mistake or not. She did suggest that Mr. Desai's evidence about why he believes that all of the land was transferred because he believed that he had received the last statement of adjustments appears to be contrary to his practice with respect to the other units. He presumed that it was the last lot even though it is clear that he did not receive a statement of adjustments for the lot in question.

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

111    She addressed the issue of the benefits relating to Mr. Krmpotic under section 56(2) of the *Act*. She referred to *Neuman v. Minister of National Revenue*, [1998] 1 S.C.R. 770 (S.C.C.) but agreed that even though the facts were not particularly pertinent, what was pertinent were the four preconditions that must be met in order for subsection 56(2) to apply:

(1) that payment must be to a person other than the reassessed taxpayer;

(2) the allocation must be at the direction or with the concurrence of the reassessed taxpayer;

(3) the payment must be for the benefit of the reassessed taxpayer or for the benefit of another person whom the reassessed taxpayer wished to benefit; and

(4) the payment would have been included in the reassessed taxpayer's income if it had been received by him or her.

112    Precondition (1) has been met as the payment was to Betty Krmpotic. Precondition (2) has been met because the allocation was at the direction or with the concurrence of Mr. Krmpotic, as per the Partial Agreed Statement of Facts, the transfer would have been made at the direction of Mr. Krmpotic because of his connection to the numbered company. Precondition (3) has been met because the payment would have been for the benefit of Mrs. Krmpotic. Precondition (4) has been met because if the property had been transferred directly to Mrs. Krmpotic subsection 246(1) would apply and he would have had to include it in his income.

113    On the final issue of gross negligence penalties, counsel referred to the decision of *Venne v. R.* (1984), 84 D.T.C. 6247 (Fed. T.D.). This case sets out what the Court views as a test for the Minister to apply gross negligence and also a test for the Minister to be able to open up a statute-barred year. That is what happened in the case at bar.

114    The appropriate provision is paragraph 152(4)(i). Under that provision, the taxpayer must have made "any misrepresentation that is attributable to neglect, carelessness or wilful default or has committed any fraud in filing the return or supplying any information under [the] *Act*". However, the application is 163(2) which provides that "Every person who, knowingly, or under circumstances amounting to gross negligence, has made or has participated in, assented to or acquiesced in the making of, a false statement omission in a return, form, certificate, statement ... is liable to a penalty ..." and then the calculation of the penalty continues in the rest of the provision. She then referred to page 6 of the *Venne*, *supra*, decision where the Court said "I am satisfied that it is sufficient for the Minister, in order to invoke the power under sub-paragraph 152(4)(a)(i) of the Act to show that, with respect to any one or more aspects of his income tax return for a given year, a taxpayer has been negligent. Such negligence is established if it is shown that the taxpayer has not exercised reasonable care. This is surely what the word 'misrepresentation that is attributable to neglect' must mean, particularly when combined with other grounds such as 'carelessness' or 'wilful default' which refer to a higher degree of negligence or to intentional misconduct. Unless these words are superfluous in the section, which I am not able to assume, the term 'neglect' involves a lesser standard of deficiency akin to that used in other fields of law such as the law of tort."

115    In this case, counsel submitted that the lowest test of negligence has certainly been met and it is arguable that some of the higher degrees may have been met. If a Court accepts that the Respondent's version of events is correct, that the land title transfer was executed as it was intended to be executed, the trust document was kept veiled, as it was intended to be kept veiled, and if all of those circumstances are found by the Court to be fact, and then the test set out by subsection 153(4) has been met, and the Minister is entitled to open the statute barred year.

116    There remains the issue of gross negligence. Again counsel referred to *Venne*, *supra*, at page 11 where it said,

'Gross negligence' must be taken to involve greater neglect than simply a failure to use reasonable care. It must involve a high degree of negligence tantamount to intentional acting, an indifference as to whether the law is complied with or not. ...

In this regard, if the Court finds that the Respondent's version of the events is correct then the test for gross negligence has been met. It was more than a failure to use reasonable care in that event, it would be a high degree of negligence in all likelihood that occurred, and tantamount to an intentional act and indifference as to whether the law was complied with. If the Respondent's

Case 09-10138-MFW   Doc 14225-18   Filed 08/15/14   Page 18 of 25

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

version of events is accepted by the Court as fact, the Respondent submits that there is not indifference as to whether the law was complied with or not, there was intention that the law would not be complied with.

117     Counsel submitted that the assessment should be upheld and the appeal should be dismissed with costs.

118     She agreed that the GST informal procedure appeal would follow from the income tax appeals because the GST assessed to the Appellant was GST arising from the transfer of unit 102.

**Rebuttal**

119     In rebuttal counsel said that he was surprised that counsel for the Respondent did not think it was of significance that Manoharlal Desai wrote down the inventory when he did so. He was called as a witness and gave an explanation. He had financial statements with a cost of $208,000 and he has not received any more statements of adjustments for a year. That is the reason why he assumed that the last unit had been disposed of. That is a reasonable explanation for him believing that all of the properties had been transferred. This was reasonable even though, in answer to a question by the Court, he admitted that he had not gone back and compared the inventory and matched up the statements of adjustment with the different properties.

120     The Appellant's submission is that if those statements are incorrect, as the Minister indicates they were, and as Mr. Desai said they were, then why doesn't the Minister reassess the company for those taxation years and assess the additional tax payable? It was open for the Minister to do that and it is still open for the Minister to do that. That is for another year. That is for the 2000 taxation year.

121     Counsel argued that the Minister seemed to be thinking that the fact that these properties were written down somehow had a connection to the disposition of the property but the dates are completely different. Mr. Desai wrote down the cost as of May 31, 2000. The registration of title to Mrs. Krmpotic was only in December of 2000 so there was no connection between the two. It cannot be alleged that Mr. Desai knew about the sale and he wrote it down thinking that there had been a true sale to Mrs. Krmpotic. That never could have occurred. It would not be consistent with those financial statements. The financial statements really do not add anything to the determination of what actually happened.

122     Mr. Brown was asked when he testifying as to what the Minister's position was. Counsel now asks, what is the Minister's position here? Is he saying that the agreement that was entered into was signed on dates other than the dates on the document? Was he saying that the parties entered into that document but it was not legally effective? Was he saying that it was a sham? Was he saying that they made up this document after the fact to cover their tracks? Mr. Brown was unable to tell the Court what the Minister's position was.

123     Counsel for the Respondent appears to be trying to have it both ways because she raised some issues with respect to the agreement. She questioned the validity of the trust deed.

124     One of the points raised by counsel for the Respondent was that the document was not signed by the two contracting parties. However, this was not a contract. It was a trust declaration. No one ever said that it was a contract. It was a bare trust. The question here is whether a bare trust exists. That is the fundamental question.

125     Counsel for the Respondent raised the issue that there were no witnesses and that normally there are witnesses in ordinary contractual arrangements or agreements. Again, this is not a contract. Contract features are not going to be present in this document. It has nothing to do with being a contract. The only person making the declaration is Mrs. Krmpotic. She is the one who signed it.

126     Counsel for the Respondent also raised the issue of the date of the signing the registration document. However, she asked no question about this in cross examination of any of the witnesses. The document was signed on September 1, 1999 even though it was registered on December 1, 2000. It is not appropriate for counsel for the Respondent to be casting aspersions now on the witnesses' testimony in terms of tying into the document when she did not ask them any questions about it when they were on the stand.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

127    Further, no one ever suggested there was an oral trust except counsel for the Respondent.

128    Counsel referred to the text book entitled, *The Law of Evidence in Canada*, 2 nd Edition, by John Sopinka, paragraph 16.147 in support of his position that if counsel is going to be challenging a witness's credibility on extrinsic evidence or a document, she should have put that document to him when he or she was on the stand.

129    The rule applies not only to contradictory evidence, but to closing arguments as well. But to the extent that counsel for the Respondent is arguing that the trust declaration is somehow a sham or a fraud, there is no evidence to that effect. In fact the uncontradicted evidence is that the document was signed on the date that the parties said it was signed and the parties believed it had a binding effect on them.

130    He argued that the case of *1524994 Ontario Ltd. v. R.* [2006 CarswellNat 388, [2006] G.S.T.C. 20 (T.C.C. [General Procedure])], * *supra*, as quoted by counsel for the Respondent has nothing whatsoever to do with the factual situation in this case. In that case, the parties had an agreement that they carried on under, and then they tried to disavow it. In the case at bar, the Appellants had a declaration of trust which was executed and kept, and the parties behaved consistently with that and are not attempting to disavow that agreement. This case and others cited by the Respondent are actually helpful to the Appellant's position.

131    The legal relationship in this case was a trust relationship. There was no evidence to the contrary that there was not a trust relationship between Mr. Krmpotic and his mother with respect to the property. The deed of trust has been presented, it has been executed, the Court has received testimony on it. It meets all of the requirements of a deed of trust.

132    Counsel for the Respondent assumed the position that what the Appellant did was unlawful. That is absolutely incorrect. Section 20 is clear authority that there can be unregistered instruments that can affect title between the parties to those instruments. The fact that the trust was not registered on title does not somehow invalidate the trust. Subsection 20(1) basically is the authority for that provision. The register only trumps the trust with respect to unaffiliated third parties.

133    With respect to section 180 of the *Land Title Act*, counsel took the position that whether or not you state that you are a trustee is an optional matter. It is optional whether the trust relationship is registered on title or not. Even if the position of the Respondent is correct then what the parties have done here is that they have failed to comply with the *Land Title Act*. That does not mean that they voided their legal relationship. That means that they failed to technically comply with the land title registration system in British Columbia. The trust deed sets out the relationship and it is not trumped by the *Land Title Act* because of section 20.

134    There are many documents that are not registered on title but they are still binding between two parties. In other words, counsel took the position that subsection 180(3) of the *Land Title Act* is a mandatory provision for the registrar. The other effect is that the registration may be ineffective for registration under the *Land Title Act* but it does not vitiate the trust agreement.

135    Subsection 20(1) of the *Land Title Act* includes the words "except as against the person making it" then if it did not include those words what was registered under the *Land Title Act* would trump any private agreements. Those words basically say that two parties who enter into a contract or an agreement or have an instrument between them, they are still binding on those parties, notwithstanding what appears on title.

136    With respect to the *Escheat Act*, Mr. Krmpotic had some knowledge about its effect but he did not seek any legal advice on it. However, it really showed what was in his mind when he entered into the trust agreement and what he was trying to accomplish. This was his motive in acting as he did. However, there can be no question that the trust agreement was entered into. The witnesses were not challenged and the document was not challenged. One must look to the document itself to see what legal relationship was created. This is what a bare trust is. The Appellant has met the criteria for a bare trust as referred to in the Appellant's argument.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

137    The Respondent is basically arguing that the Appellant registered title in Mrs. Krmpotic's name and it cannot now claim that she did not own it. However, this is what the declaration of trust said. She had only legal title and not beneficial title. It is true that they did not tell Mr. Desai about it but there is no obligation to people who enter into a trust agreement to notify anyone about it. In any event it was not asked at cross-examinations by counsel for the Respondent.

138    Since counsel for the Respondent did not ask any questions of the witnesses about why the document was not presented to CRA before or given to the accountant they cannot during the context of the trial or after suggest that there is something suspicious about it.

139    With respect to the statute-barred year and the gross negligence penalties, counsel took the position that these are not relevant issues because there is no tax payable on the transaction. However, if the Court accepts the Crown's theory, that even though Mr. Krmpotic and his mother entered into a trust agreement, because they registered title in Mrs. Krmpotic's name, that the trust agreement has no validity now. How is Mr. Krmpotic supposed to know that, as a lay person? How is that a misrepresentation on his part? As far as he knows, and as far as he testified in Court, he has always believed that the trust agreement was valid. So how can CRA say that he made a misrepresentation attributable to neglect or carelessness? He always believed that the trust agreement was the governing instrument. He did not believe that he conferred a benefit on his mother. He had no reason to do so.

140    Counsel's submission with respect to the personal income tax return for Mr. Krmpotic was that it was statute-barred. Again, the onus is on the Crown to open up the statute-barred year. The question is, what evidence did they lead to suggest that Mr. Krmpotic knowingly or even carelessly understood that that trust agreement that he signed was not valid and instead that this land title document, the land title registration was the way to go? But they had not introduced any evidence to that effect. The same argument applies to the gross negligence penalties.

141    There would be no gross negligence or negligence unless the parties were creating a sham. Even if the Court accepted the Respondent's position that the document was superseded by what was on title. How was that negligent for Mr. Krmpotic? He always understood that the trust agreement was binding. There was no evidence that he understood that what was registered on title should govern, he had the trust agreement. He was entitled to rely on that. So what the auditor, Mr. Brown said was that he should have included the $442,000 in income, under subsection 66(2). He was expecting an ordinary taxpayer to know that the trust deed that he entered into, that his company entered into with his mother is not valid, for some legal technical problem, and that what he should have done back in 2000 was include the $442,000 in his income. That is not what is expected of an ordinary taxpayer.

142    Again, with respect to the gross negligence penalties counsel agreed that "Gross negligence must be taken to involve greater neglect that simply the failure to use reasonable care. It must involve a high degree of negligence tantamount to intentional acting, and indifference as to whether the law is complied with or not". That is the standard so there has to be intention or gross negligence. He was prepared to admit that if the document was fraudulent, or made after the fact or back-dated, that was intentional acting and would be gross negligence. However, if as he suggested, it was a *bona fide* legal relationship, and somehow there was a technical problem that prevented the document from being capable of being acted on, how could that be gross negligence? The onus of proving gross negligence is on the Crown and there has been no evidence adduced regarding the state of mind of the Appellant, either Mr. Krmpotic or his company.

143    Clearly neither Mr. Krmpotic nor the Company had any reason to believe that their trust document was not valid and that it was incapable of transferring any beneficial title to the Company. There is no other evidence to the contrary.

144    At the end of the day, counsel's position was that the trust agreement was valid and therefore there was no transfer of funds, there was no taxable amount. There cannot be any penalties, there cannot be anything owing by the Appellants.

145    If the Court should find that the document was legally ineffective then the appeal of the Appellant Company should be dismissed except for gross negligence penalties. What the Company really did was to transfer property with a fair market value of $442,000 to Mrs. Krmpotic.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

146    Further, no gross negligence penalties should be applicable to the Company. For Mr. Krmpotic individually, he is statute-barred because he was not negligent in failing to report that income or that benefit he conferred on his mother and there should be no gross penalties against Mr. Krmpotic.

**Analysis and Decision**

147    There is no real dispute with respect to the facts in this case. The facts are substantially set out in the Partial Agreed Statement of Facts and complimented by the evidence of the three witnesses called on behalf of the Appellants and, to a lesser extent, the evidence given by the witness called on behalf of the Respondent.

148    The evidence of John Krmpotic, Manu Desai and Betty Krmpotic were basically undisputed. Both Mrs. Betty Krmpotic and John Krmpotic appeared to be truthful witnesses who gave their testimony in a straight-forward manner based upon their own knowledge of the facts, their evidence was not questioned in any material particularly during cross-examination and the Court is satisfied that it can believe that evidence.

149    Manu Desai also testified in a very straight-forward manner and his evidence was undisputed in cross-examination or by any other evidence. Consequently the Court accepts the evidence that he gave.

150    The Court does have some difficulty in understanding why Mr. Desai concluded that all of the inventory of the Company had been disposed of even though he did not have a statement of adjustments for the property in question here. It may very well have been that because of the passage of time from the receipt of the last statement of adjustment and the lack of activity on behalf of the Company during that period of time, it could reasonably be concluded that the Company had disposed of all of its inventory. In any event, his testimony was undisputed and the Court concludes that in completing the statements as he did, he merely made an error in drawing the conclusion that he did. There was no deliberate attempt by him or anyone else to mislead CRA in filing the returns on behalf of the Company.

151    The Court accepts that Mr. Desai made an honest mistake in concluding as he did and that neither the company nor John Krmpotic under the circumstances, knew or should have known that this mistake was made, until the matter was addressed by CRA during the assessment process.

152    The Court is satisfied that if Mr. Desai has known that the Company continued to hold the property after May 31, 2000, he would not have written down the costs of inventory and deducted the costs of the property in calculating the corporation's income for the year. His actions were based upon his mistaken belief that the corporation had sold the last remaining unit in the development in this taxation year ending May 31, 2000. Even though, as the Court indicated, it has some difficulty in satisfying itself that he should have reached this conclusion based only upon the fact that he had not received a statement of adjustments for any of the properties for some period of time. However, he did say that he had not been notified that the last property had been sold. He readily admitted that this was a mistake on his behalf.

153    In the end result, the Court can only conclude from the reasons he gave, that this conclusion was justified based upon his experience with the parties involved and based upon his experience as an accountant over many years.

154    The trust document was a simple declaration that Betty Krmpotic was holding the property 102 - 4405 Blackcomb Way in trust for the Company. She further declared that she had no interest whatsoever in the said unit and she transferred it to the Company for $1 when requested to do so. She said that the document was signed on the date shown on the document, which was December 1, 2000. There was no contradiction of this evidence in any way. Any insinuation to the contrary is unsupported by the evidence.

155    In evidence both John Krmpotic and Betty Krmpotic testified that the intention of the trust document was to transfer only legal title of the property to Mrs. Krmpotic for the $1 consideration and the beneficial ownership of the property remained with the Company. Again, there was no contradiction of this testimony. This was the intention and the document was executed by Betty Krmpotic.

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

156     No evidence was given that would suggest that anything else had to be done to make the document legal as between Betty Krmpotic and the Company after it was signed. On the face of it the document appears to transfer legal title only to the bare trustee, leaving beneficial ownership in the Company.

157     According to the evidence of Betty Krmpotic and John Krmpotic this is what the document was intended to do. John Krmpotic gave evidence as to why he wanted to transfer the property in this way and Mrs. Betty Krmpotic gave evidence that John Krmpotic had reasons of his own for executing this document. She did not dispute those reasons. Even though John Krmpotic did not receive legal advice with respect to the drafting of this document and its legal effect, on the face of it, it appears to have accomplished the purposes for which it was drafted.

158     The Court does not accept any argument by the Respondent and the suggestion by Jason Brown that the document has to be in any other form, contain the names of any other persons or be witnessed by anyone in order to make it a valid document, accomplishing what it purported to accomplish.

159     One has to bear in mind, as counsel for the Appellant argued, what was being drafted was a bare trust agreement and not some form of contract. What was being attempted was rather simplistic and that was the transfer of the legal title to the property to the trustee for $1 consideration and the Court concludes that the document contained the necessary wording to accomplish that purpose.

160     Whether or not Mr. Krmpotic's reasons for acting as he did were sufficient for him to accomplish all that he intended, the results that he sought would have no import here. He believed that the effect of the document would be to leave beneficial ownership of the property in the Company while conveying the legal title to his mother, until such time as the corporation decided to sell the property when the beneficial ownership would be transferred back to the Company.

161     According to the document itself, Mrs. Krmpotic had no other interest in the property and was bound to transfer the beneficial interest back to the Company when the Company requested her to do so. The Court is satisfied that Mr. Krmpotic prepared the trust document himself, that he discussed with Mrs. Krmpotic the registration of title of the property in her name and reviewed the terms of the trust document with her. The Court is satisfied that Mrs. Krmpotic executed the trust document on December 1, 2000 at her home in the presence of Mr. Krmpotic. The Court is satisfied that both Mrs. Krmpotic and the Company always considered that the true owner of the property at all relevant times was the Company. The Court is satisfied that Mrs. Krmpotic understood the terms of the trust deed and she considered herself to be bound by it at all times.

162     Further, Mrs. Krmpotic did not use the property for any personal purposes. She had only been in the property a couple of times herself to attend to its maintenance and gained no personal advantage from doing so.

163     Whether Mr. Krmpotic's understanding of the law of British Columbia regarding the dissolution of a corporation and the forfeiture of real property to the province was correct or not is immaterial to the Court's consideration of the issues here. The Court is satisfied that he did appear to have a reasonable understanding of the *Business Corporations Act* and to some extent the *Escheat Act* when he took the action that he did.

164     The Court is satisfied that the fact that the document was not signed by the two parties is not relevant. It was not a contract. It was a trust declaration.

165     Counsel for the Appellant argued, that question here is whether a bare trust exists. Some issue has been made of the fact that the land title document, deed of transfer, was dated September 1, 1999 but not registered until December 1, 2000. That was the same date, December 1, 2000, that appeared on the trust document as the date of execution thereof. However, no issue was made of this during the examination of the witnesses, so the Court is satisfied that nothing turns on these dates and so no issue can be made of the timing of the execution or registration of any of the documents.

**WestlawNext.** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

166    There is no evidence before the Court that would suggest that the trust declaration was a sham or a fraud. In fact, the evidence was to the contrary. It appeared that the document was signed on the date that the parties said it was signed and the parties believed that it had a binding effect upon them.

167    The Minister, in its Reply to the Notice of Appeal, in paragraphs 10(o) and (p) presumed that the Appellant transferred legal and beneficial ownership of the last unit in the development being unit 102 - 4405 Blackcomb Way to Mrs. Krmpotic for $1 and that at all material times Mrs. Krmpotic's was the beneficial owner of the property.

168    Mr. Brown was on the stand to confirm this assumption based upon his review of information found in the British Columbia Property Transfer Tax Records and the British Columbia Assessment Authority Records. This was only on the basis that a transfer of title to the property to Mrs. Krmpotic was shown. However, these assumptions were addressed in the evidence of John Krmpotic and Betty Krmpotic. They testified that beneficial ownership at all times remained in the Company. Mr. Brown could not provide any evidence regarding beneficial ownership of the property other than his assumption that it was transferred to Mrs. Krmpotic at the same time that title was registered in her name as shown on the record.

169    He further indicated in his evidence that he concluded that the property was transferred between non-arm's length parties for inadequate consideration and that the real value of the property was $442,000. He concluded that this amount should be included in income.

170    He did not see the trust document until after the reassessments were added and he confirmed that the bare trust document was not accepted. He said that it was not signed, it was not witnessed and the beneficial ownership of the land appeared to be contrary to the documents filed by the corporation. He never received the information he sought from the accountant or the Company and so he concluded that the records might not support the filing.

171    The Court is satisfied that in the absence of some statutory provision which would prevent the bare trust document from being effective, the evidence has established that the document in question meets the requirements of a "trust" because the trustee in this case, Mrs. Krmpotic, held the property without any duty to perform except to convey it to the beneficiary or beneficiaries on demand. She received legal title to the property only. She held title to the property as bare trustee only and at all relevant times the Company remained the beneficial owner of the property.

172    It is trite to say that subsection 104(1) of the *Act* excludes a bare trust from the concept of a "trust" for income tax purposes. The Minister's administrative policy with respect to bare trusts is that the Minister will ignore the trust for income tax purposes and will consider the transferor or settlor to be the owner of the property for all purposes of the *Act*. The trust in question here appears to meet all of the Minister's requirements in that:

    a. the trustee has no significant powers or responsibilities, and can take no action without instruction from the settlor;

    b. the trustee's only function is to hold legal title to the property; and

    c. the settlor is the sole beneficiary and can cause the property to revert to him or her at any time.

173    Counsel for the Respondent took the position that the trust document in question is ineffective because it did not comply with the *Land Title Act*, and in particular, section 180 thereof. She took the position that in the actions of the Appellant here were not within the law. She opined that as far as the world at large was concerned Betty Krmpotic held fee simple title to the land, that is, all interest in the land, according to her definition. Consequently Mrs. Krmpotic cannot now assert, after she represented to the world at large that the Company conveyed the entire interest of the corporation, that the Company retained a beneficial interest.

174    The question arises as to whether or not the beneficial interest would escheat to the provincial government in spite of the intention of the Appellant that this not happen. The only way to accomplish both was to do what the Appellant did, and not register the trust document, have it appear to the world that fee simple had been transferred to Mrs. Krmpotic so that the

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

property would not escheat. But, such questions were not put to any of the witnesses when they testified and the Court is unable to draw such conclusions from the evidence.

175    The Court is satisfied that what the Appellants did in this case was not unlawful or contrary to section 20 of the *Land Title Act*. The fact that the trust was not registered on title does not invalidate the trust. The Court accepts counsel for the Appellant's argument that section 20 is clear authority for the proposition that unregistered instruments can affect title between the parties to those instruments. Clearly the fact that the trust is not registered on title does not invalidate the trust. Registration may be paramount with respect to unaffiliated third parties.

176    The Court does not accept counsel for the Respondent's interpretation of section 180 of the *Land Title Act*. The Court is satisfied that this section makes it optional whether or not the trust relationship is registered on title. Even if that is not so then the parties had merely failed to comply with the *Land Title Act*. That does not mean that the relationship that was created by the trust document is invalid. Failure to comply technically with the provisions of the *Act* does not invalidate the trust agreement.

177    Counsel for the Appellant was not prepared to suggest what the affect of failing to comply with the *Act* would be and this was not discussed by counsel for the Respondent. Rather, if that were the case then Mrs. Krmpotic might have held no title at all and the registration itself might have been deemed to be invalid.

178    At the end of the day even if the words "in trust" did not appear on the title document and the Appellants were offside section 180 of the *Land Title Act*, the registration might be invalid. But this still does not change the legal relationship between the company and Mrs. Krmpotic.

179    As far as the Court is concerned the provisions of section 180 are mandatory with respect to the duties of the registrar. It requires him to effect registration in the name of the personal representative, and make an endorsement containing any additional information that the registrar considers necessary to identify the estate of the testate, and make a reference by number to the trust instrument. This has no legal effect on the validity of the bare trust document.

180    In the case at bar there was nothing on the document to indicate the trust provisions and the end result may very well be that the registration might at some time be declared to be invalid for the purpose of the *Land Title Act*. However that does not vitiate the trust document.

181    The Court is satisfied that the effect of section 20 of the *Land Title Act*, where it includes the words "except as against the person making it" is to confirm that the document is still binding on the parties who have signed it, notwithstanding what appears on title. In any event the Court is further satisfied that the bare trust document is not vitiated as a result of any statutory provision. It is binding upon the parties to it. It had the effect of transferring legal title only to the trustee with the beneficial ownership remaining at all times in the Company.

182    In the end result the Court is satisfied that the Appellants have met the burden of proof upon them of satisfying the Court that the Minister's assessments were incorrect. Consequently, the onus shifted to the Minister to rebut the *prima facie* case made out by the taxpayer and to prove the assumptions. As already indicated, the Court is satisfied that the Minister has not done that either through cross-examination or by any testimony that was given to the Court.

183    The Court is satisfied that the trust agreement was valid, set out the true relationship between the parties. There was no transfer of property and there was no taxable amount. There cannot be any penalties or interest owing.

184    The appeals are allowed and the reassessments are vacated. The Appellants shall have their costs to be taxed.

*Appeals allowed.*

Footnotes

*Sic.* Should be "152(4)(a)(i)" — ed.

\*                                                                Reversed at [2007] G.S.T.C. 19 (F.C.A.) — ed.

**507582 B.C. Ltd. v. R., 2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506**

2008 TCC 220, 2008 CCI 220, 2008 CarswellNat 1506, 2008 CarswellNat 5126...

---

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.