# TAB 20

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 2 of 71
Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

2004 BCSC 1201
British Columbia Supreme Court

Adtronics Signs Ltd. v. Sicon Group Inc.

2004 CarswellBC 2148, 2004 BCSC 1201, [2004] B.C.W.L.D. 1226, [2004] B.C.J. No. 1885

# Adtronics Signs Ltd. and Adtronics Inc., Plaintiffs and Sicon Group Inc., 32262 B.C. Ltd., Armitage Holdings Ltd., Sign-O-Lite Plastics Ltd., Wallace Sign-Crafters West Limited and Donald Armitage, Defendants

Garson J.

Heard: January 26-30, 2004
Heard: February 2-6, 2004
Heard: February 9-13, 2004
Heard: February 16-19, 2004
Heard: March 1-3, 2004
Heard: March 8-9, 2004
Heard: March 22-25, 2004
Heard: April 5-8, 2004
Heard: April 13-14, 2004
Judgment: September 15, 2004
Docket: Vancouver C943436

Counsel: B.M. Shaw, for Plaintiffs
D.H. Clarke, for Defendants

Subject: Corporate and Commercial; Contracts

Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

Headnote

**Business associations --- Changes to corporate status — Amalgamations and takeovers — Amalgamations — Miscellaneous issues**

MA had successful electronic sign company A Ltd. — MA's father DA owned group of electronic sign companies known as S Group — From 1987 to 1993, A Ltd. operated under umbrella of S Group in amalgamation — Terms of operation were stipulated in September 1987 agreement — Under 1987 agreement, rent was not payable by A Ltd. but proportionate amount of all costs to operate building was payable — S Group had responsibility for all banking and accounting of group, which included A Ltd. — A Ltd. brought action against S Group for $10,055,244.43, alleging that S Group had, through improper accounting methods, miscalculated inter-corporate operating account in favour of S Group — Action allowed — Rent charged must be reversed and proportionate costs allocated on basis of agreed percentage of space used by A Ltd., which was 13.24 per cent — No agreement to use by DA of formula he called 30/40/30 formula to calculate charge to A Ltd. for administrative expenses — A Ltd. should not have been charged for management salaries, administration salaries, sales expenses and other general administrative charges on basis that S Group was only providing accounting services — Allocations between A Ltd. and S Group for period of September 1987 to September 1993 must be recalculated and judgment will issue against defendants in favour of A Ltd. for amount found due and owing to A Ltd.

**Contracts --- Construction and interpretation — Resolving ambiguities — Conduct of parties**

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 3 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Evidence of post-contractual conduct can be considered in event of ambiguity in contract.

## Table of Authorities

### Cases considered by *Garson J.*:

*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60, 1989 CarswellBC 4 (B.C. C.A.) — considered

*Bauer v. Bank of Montreal* (1980), [1980] 2 S.C.R. 102, 32 N.R. 191, 10 B.L.R. 209, 110 D.L.R. (3d) 424, 33 C.B.R. (N.S.) 291, 1980 CarswellOnt 141, 1980 CarswellOnt 638 (S.C.C.) — distinguished

*Brikom Investments Ltd. v. Carr* (1979), [1979] 1 Q.B. 467, [1979] 2 W.L.R. 737, [1979] 2 All E.R. 753 (Eng. C.A.) — considered

*Canacemal Investment Inc. v. PCI Realty Corp.* (1999), 1999 CarswellBC 2012 (B.C. S.C.) — referred to

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205, 1981 CarswellOnt 124 (Ont. C.A.) — referred to

*Conwest Exploration Co. v. Letain* (1963), [1964] S.C.R. 20, 41 D.L.R. (2d) 198, 1963 CarswellBC 209 (S.C.C.) — referred to

*Coupal v. Strata Plan LMS2503* (2002), 2002 BCSC 1444, 2002 CarswellBC 2348, 6 B.C.L.R. (4th) 372, 5 R.P.R. (4th) 77 (B.C. S.C.) — referred to

*Engineered Homes Ltd. v. Mason* (1983), [1983] 1 S.C.R. 641, 146 D.L.R. (3d) 577, 47 N.R. 379, 51 B.C.L.R. 273, 49 C.B.R. (N.S.) 257, 1983 CarswellBC 564, 1983 CarswellBC 726 (S.C.C.) — considered

*Gallen v. Allstate Grain Co.* (1984), 25 B.L.R. 314, 9 D.L.R. (4th) 496, *(sub nom. Gallen v. Butterley)* 53 B.C.L.R. 38, 1984 CarswellBC 104 (B.C. C.A.) — referred to

*Hawrish v. Bank of Montreal* (1969), [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673, 1969 CarswellSask 9 (S.C.C.) — distinguished

*John Burrows Ltd. v. Subsurface Surveys Ltd.* (1968), [1968] S.C.R. 607, 68 D.L.R. (2d) 354, 1968 CarswellNB 6 (S.C.C.) — considered

*Ossory Canada Inc. v. Wendy's Restaurants of Canada Inc.* (1997), 36 O.R. (3d) 483, 105 O.A.C. 321, 1997 CarswellOnt 4961, 16 R.P.R. (3d) 204 (Ont. C.A.) — referred to

*Pentagon Construction (1969) Co. v. United States Fidelity & Guaranty Co.* (1977), [1977] 4 W.W.R. 351, 77 D.L.R. (3d) 189, [1977] I.L.R. 1-889, 1977 CarswellBC 372, [1978] 1 Lloyd's Rep. 93 (B.C. C.A.) — referred to

*W.J. Alan & Co. v. El Nasr Export & Import Co.* (1972), [1972] 2 Q.B. 189, [1972] 2 All E.R. 127, [1972] 1 Lloyd's Rep. 313 (Eng. C.A.) — referred to

Case 09-10138-MFW   Doc 14225-20   Filed 08/15/14   Page 4 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*32262 B.C. Ltd. v. Companions Restaurant Inc.* (1995), 17 B.L.R. (2d) 227, 1995 CarswellBC 368 (B.C. S.C.) — referred to

**Statutes considered:**

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)

    Generally — referred to

    s. 85(1) — referred to

    s. 125 — referred to

    s. 194(4) — referred to

    s. 248 — referred to

ACTION for accounting with respect to amalgamation of companies.

*Garson J.*:

**1. Introduction**

1    At the age of twelve, Mark Armitage began working part-time in his father's sign manufacturing and leasing business. Now at the age of 50 he is the owner of a successful electronic sign company. Mark Armitage's development into the owner of an independent company has unfortunately been accompanied by a fractious relationship with his father, an acrimonious separation of their respective business interests, and the commencement and prosecution of this law suit which consumed 34 days at trial. Through his company, Mark Armitage sues his father and his father's companies for $10,055,244.43. He says that this amount is owing to the plaintiffs from the years 1986 to 1993, the years his companies operated under the umbrella of his father's companies, known as the Sicon Group. The Sicon Group had responsibility for all banking and accounting of the group, which included the Adtronics division. It is alleged by the plaintiffs that by the time of the separation in September 1993, the Sicon Group had, through improper accounting methods, miscalculated the inter-corporate operating account in favour of the Sicon Group in an amount which together with interest now equals in excess of $10 million.

2    Donald Armitage is 75. He began his adult working life as a sign painter. He started his own company in 1950. By the time of the events with which this law suit is concerned, his group of companies had gross revenues of about $15 million a year. Donald Armitage has always employed family members, sons, daughters, and sons-in-law in his business. Indeed today the general manager of his business is his son-in-law, Timothey MacLean, and another senior manager is his son, Tom Armitage. His older son, Michael Armitage, broke off his business associations with his father in 1985.

3    In 1987, for reasons concerning taxation and loan financing, Donald Armitage persuaded his son Mark Armitage to amalgamate Mark's electronic sign company with the Sicon Group. An agreement signed in September 1987 (the "September Agreement") was entered into. The Agreement stipulates a method by which the two corporate groups would share expenses and facilities and how they would account for this sharing. At issue in this lawsuit is the proper interpretation of this Agreement. The central controversy between the parties concerning the interpretation of the Agreement is put this way by the defendants: it is said that the Agreement was not adhered to by the parties but now that it is in issue, when properly interpreted, the accounting between the parties results in the plaintiffs owing the defendants the sum of $392,000 claimed in the counter-claim. The plaintiffs put the controversy this way: they say that the conduct of the parties during the currency of the Agreement is evidence of the correct interpretation of the Agreement or alternatively is evidence of subsequent agreements. It is said by the plaintiffs that an accounting performed according to a correct interpretation of the agreement results in the above-noted amount owing to the plaintiffs.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 5 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

4    Although this action could be described as an accounting between the parties, there are issues of contractual interpretation which overlie the minutia of the controversy between the parties and which concern items as small as office supplies and as large as hundreds of thousands of dollars in imputed income tax. I propose to address the larger contractual interpretation issues first because the disposition of the contractual issues will to some extent determine the outcome of the accounting for the numerous disputed charges. I will not in this judgment recalculate the accounts of the companies. As agreed by the parties at trial, if with these reasons for judgment they are unable to settle the accounting, they are at liberty to speak to the matters remaining in issue between them. Before turning to the contractual interpretation issues, I will describe in more detail the parties, the issues, and the factual background to this dispute.

## 2. The Parties

5    Adtronics Signs Ltd. is a British Columbia company. Mark Armitage owns 100% of the shares of the company. It was incorporated in 1978. When it was incorporated, Mark Armitage and his brother Michael were each 50% shareholders and Michael Armitage was president. Mark Armitage has been the president and sole shareholder of the company since 1983. Its business is to design and manufacture electronic messaging and picture signs (light bulbs which illuminate in a sequence creating word, picture or design messages), which it sells to wholesalers. It does not lease signs.

6    Adtronics Inc. was a United States company. Adtronics Signs Ltd. owned 100% of the shares of Adtronics Inc. This company was incorporated to employ sales personnel in the United States to sell Adtronics Inc.'s signs. It is no longer a registered company and all its assets were assigned to Adtronics Signs Ltd. in 1998.

7    The Sicon Group is a business name used by Donald Armitage to describe his entire corporate operation. The business of the Sicon Group is to manufacture, sell, and lease painted signs, neon tubing type signs, and plastic illuminated signs.

8    Armitage Holdings Ltd. is a company owned and controlled by Donald Armitage. This company owns 100% of the voting shares of Sicon Group Inc.

9    Sicon Group Inc. is a company in which Donald Armitage, through Armitage Holdings Ltd., holds the controlling voting shares, and in which four of Donald Armitage's children, including Mark Armitage, hold non-voting shares. At all material times, Sicon Group Inc. was the parent company of the co-defendants 32262 B.C. Ltd., Sign-O-Lite Plastics Ltd., and Wallace Sign-Crafters West Ltd. (now 150671 B.C. Ltd.).

10    32262 B.C. Ltd., Sign-O-Lite Plastics Ltd. and 150671 B.C. Ltd. are all companies owned and/or controlled by Donald Armitage.

## 3. Background Facts

11    The background facts which follow are not in dispute.

12    Mark Armitage began working part-time for his father at the age of twelve. He began doing what he describes as menial work and gradually learned all aspects of the sign business. He continued working part-time for his father's companies while he attended university; upon graduation in 1977, with a commerce degree, he joined the family business. He was then 23 years old. He began work in 1977 as production manager for Sign-O-Lite Plastics Ltd. Mark Armitage was then transferred to Toronto as production manager of Wallace Sign-Crafters West Ltd., another of his father's companies. He returned to Vancouver in 1980 as manager of the art department and estimating. For a short time he ran another of the companies at a different location in Vancouver. He then returned to Sign-O-Lite as an estimator. From about 1977 to 1982, Mark Armitage's older brother Michael Armitage was the general manager of the companies. Mark Armitage understood from his father that his father's long-term plan was to turn over the management of the Sicon Group to his two sons - Mark to run production and Michael to run the operations. In December 1982, Donald Armitage advised Mark Armitage that he had decided to turn the whole company over to Michael Armitage and because Michael did not want Mark to work for him as an employee, Mark's employment in the family business was terminated. Donald Armitage moved his own personal office out of the company premises and began some

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 6 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

property development work. Michael Armitage gifted his 50% ownership in Adtronics Signs Ltd. to Mark Armitage, making him the sole owner, and Mark was told by his father that he could develop the electronic sign business. There was no ongoing electronic sign business to take over, so Mark Armitage continued working at his old job for several months before the Sicon Group controller told him that he was not being paid. He then began the process of developing the electronic sign business, which ultimately has proven to be immensely successful.

13    Mark Armitage began to develop the business of Adtronics Signs Ltd., operating from the Sicon Group premises at 2771 Simpson Road in Richmond. He took over a Sign-O-Lite Plastics Ltd. employee and with that employee began to research the electronic sign business and to work out a marketing plan.

14    When Mark Armitage began developing the electronic sign business of Adtronics Signs Ltd., it had no assets, liabilities, nor revenues. Adtronics Signs Ltd. became profitable by 1985 according to Mark Armitage. Adtronics Signs Ltd. borrowed money from Michael Armitage's administration company, North American Sign Services Ltd., in order to develop and run Adtronics Signs Ltd.

15    By the end of 1983, Adtronics Signs Ltd. owed North American Sign Services Ltd. about $200,000 and by the end of 1984 it owed about $400,000. It paid interest on the accumulated debt.

16    Rather than pay for the use of space in the Simpson Road premises, Adtronics Signs Ltd. and North American Sign Services Ltd. agreed that North American Sign Services Ltd. would receive a 15% discount from Adtronics Signs Ltd. on any signs or components it purchased from that company. North American Sign Services Ltd. provided the use of its facilities and also handled the day to day bookkeeping and accounting for Adtronics Signs Ltd.

17    On March 31, 1985, disagreements between Michael and Donald Armitage came to a head and Michael Armitage separated his businesses from the companies in which Donald Armitage had an interest. For the purposes of this litigation, it is unnecessary to describe in detail this dispute except to say that much of the existing sign lease portfolio and many employees were taken out of the Sicon Group by Michael Armitage. Donald Armitage took back the management of the Sicon Group and had to rebuild the Sicon Group business after the departure of Michael.

18    The Adtronics' debt, which by the end of the 1985 fiscal year was $382,951, was assigned to a Donald Armitage-owned company, Wallace Sign-Crafters West Ltd., from Michael Armitage's company, North American Sign Services Ltd. Adtronics Signs Ltd. continued to pay interest on this debt at the same rate that the Sicon Group paid to its bank, Canadian Commercial Bank ("CCB").

19    Before the separation of Michael Armitage's companies from the Sicon Group, the whole group had been financed by CCB. In 1985 the balance of the loan owing to CCB was about $16 million. CCB eventually forced Michael Armitage and Donald Armitage to settle their differences over the split in order to regularize their loan. CCB went into receivership in 1985 and the receiver would not advance any additional funds to the Sicon Group. Donald Armitage began the process of seeking a new source of financing. In September 1987 he was successful in securing financing from Canadian Corporate Funding Limited ("CCFL").

20    In 1986 Adtronics Signs Ltd., at the request of Donald Armitage, began to pay rent for its use of the Simpson Road premises. Adtronics Signs Ltd. did not have its own bank account, but rather all deposits and payments were processed through the Sicon Group accounting system and bank account. Adtronics Signs Ltd. did its own invoicing and accounts payable and purchasing. For the years 1985 and 1986, Donald Armitage told Mark Armitage that he would allocate expenses between Adtronics Signs Ltd. and the Sicon Group. There was no specific formula for allocations discussed until the negotiation of the 1987 agreement, which I will describe in further detail below.

21    Mark Armitage testified, and it was not disputed, that he was entirely responsible for all aspects of the management of the Adtronics Signs Ltd. business except for the accounting and banking functions.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 7 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

22    In late 1986 and early 1987, Donald Armitage began discussions with Mark Armitage concerning an amalgamation of Adtronics Signs Ltd. with the Sicon Group. One reason that Donald Armitage suggested the merger take place was because two of the Sicon Group companies, Sign-O-Lite Plastics Ltd. and Wallace Sign-Crafters West Ltd., had accumulated unused capital cost allowance which could not be used because the Sicon Group companies were not then profitable, whereas Adtronics was profitable and therefore taxable. The proposed amalgamation would permit Adtronics Signs Ltd.'s profits to be sheltered, for income tax purposes, by offsetting the profits against the unused depreciation. There is a conflict between the evidence of Donald Armitage and Mark Armitage about other reasons for the amalgamation and I will consider that evidence later in these Reasons.

23    Mark Armitage did eventually agree to the merger and an agreement, drawn and negotiated between their respective lawyers, was signed on September 25, 1987, between Mark Armitage, Donald Armitage, their various companies, and other shareholders (the "September Agreement" or the "Agreement").

24    The corporate vehicle used to accomplish the merger was 32262 B.C. Ltd., a company that was owned by Sicon Group Ltd. The electronics sign business became a division of 32262 B.C. Ltd. but continued to carry on business as Adtronics. The first fiscal year of the merged entity under 32262 was 1987.

25    About once per year, Donald Armitage gave Mark Armitage a memorandum setting out the inter-corporate allocations. These allocations purported to show all the charges that the Sicon Group had made to the books of account between the Adtronics division and the Sicon Group for the sharing of services, facilities, and inter-corporate debt. Every year Mark Armitage complained about the allocations. The main issue between the parties in this action concerns the correctness of these allocations.

26    On September 22, 1993, Adtronics Signs Ltd. began business from a new location separate from the Sicon Group. It had re-acquired the business and assets of the Adtronics division of 32262 as was contemplated by the September Agreement.

27    The year before Adtronics moved out of the Sicon Group's facilities, Mark Armitage had hired a chartered accountant, Brenda Leung. She was hired as the controller of the Adtronics division and became the controller of Adtronics Signs Ltd. after the separation in 1993.

28    Mark Armitage asked her to examine the accounts between the done since 1986. Brenda Leung began an exhaustive examination of the accounts and on November 5, 1993, a copy of the report she prepared was delivered to Sicon. The report, prepared by Ms. Leung, contained two volumes of detailed schedules of accounts redoing the allocations between the Adtronics division and 32262 for the years 1986 to 1993. The report demanded payment to Adtronics Signs Ltd. from Sicon of $3,927,164.65.

29    The defendants have not paid the amount demanded and have counter-claimed for $392,000, which is the sum they say is owing to them as a consequence of their re-examination of the accounts in this litigation.

**4. The September Agreement**

30    The terms of the September Agreement are central to this dispute. Accordingly, I have reproduced the entire agreement and it appears as Appendix I to the Reasons.

31    The sections that are of particular importance for an understanding of the method by which the parties agreed to allocate expenses and share facilities begin with Recital F, which emphasizes the importance of Adtronics remaining a distinct and separate entity from the other business operations of the Sicon Group. By Clause 1, Adtronics Signs Ltd. transferred to 32262 B.C. Ltd. all its business and assets, other than the business and assets directly related to the manufacture of electronic signs and its shares in Adtronics Inc., and became the "Adtronics division" of 32262 B.C. Ltd. The Adtronics Group is defined as all aspects of the businesses carried on by the Adtronics division, Adtronics Signs Ltd., and Adtronics Inc. The Sicon Group

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

is defined as Sicon Group Inc. and all its subsidiaries as set out in Recital D; essentially it includes all the business that is not Adtronics.

32    Clause 9 of the September Agreement gave authority to Mark Armitage, as general manager of the Adtronics division, to operate the Adtronics division of 32262 as if it were still a separate entity. By Clause 9(c) Mark Armitage was given "sole and exclusive authority to .... [make] the decision whether to share administrative and accounting services provided by other members of the Sicon Group".

33    Sicon agreed by Clause 11 to continue to grant credit to the Adtronics division.

34    Clause 16 applies to common facilities or services. If the facility or service is not common, then Clause 16 is not applicable. Mr. Shaw says that step 1 of the allocation process is therefore a prior determination that the facility or service is shared. If it is, then the balance of the formula in Clause 16 is applied. So, for example, the salary of Mark Armitage is not a shared service and would not be subject to the allocation process.

35    Mr. Shaw says that Clause 16(a) is step 2 in the analysis. This step requires the parties to determine if the cost could "be specifically borne by [a] Group." If it could be, then it would be charged to that group. The one example cited in the September Agreement is long distance telephone charges. I would interpret this to mean that the long distance telephone service is a shared service, but the cost can be specifically attributed to the user Group.

36    Clause 16(b) requires that any costs that relate to the premises will be shared by each Group on the proportionate basis that each Group uses space. Two examples are given in the September Agreement: property taxes and electricity. In this action the parties agreed that the proportionate space ratio is 13.24%.

37    Clause 16(c) opens with the words "other overhead expenses." By this, I would interpret the clause to apply to those costs or expenses which: (1) are shared; (2) cannot be specifically attributed; and (3) do not relate to the operation of the premises.

38    Clause 16(c) must be interpreted with Clause 9(c) which, as I have described, gave Mark Armitage sole and exclusive authority to decide if Adtronics would share administrative and accounting services provided by other members of the Sicon Group. Clause 16(c) requires the two Groups "forthwith after execution of this Agreement" to identify facilities and services to be "paid for on a shared basis". It is common ground that this formal identification of shared services did not occur forthwith after execution of the September Agreement. There was never any formal process whereby the parties identified a list of shared services. Mr. Shaw says that Adtronics did from time to time (usually when engaged in discussions concerning the allocations) take positions that could be construed as an identification of a shared service.

39    Clause 16(c) continues. The clause specifies the formula for the sharing of the cost of shared facilities. Each Group is to pay a percentage of the cost, which percentage is calculated using the Adtronics Group's gross revenue as a numerator and the Sicon Group's gross revenue as a denominator. The parties have agreed on the fraction for each of the years 1988 to 1993. That is not to say they have agreed on the application of the formula. The application of the formula is a contested issue in this litigation.

40    Clause 16 continues with the statement that "No Group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service."

41    Finally, Clause 16 contains what the parties have called the "opt-out clause." It says that either Group may advise the other that it no longer wishes to use a service.

42    There are certain threshold issues arising from the interpretation of this agreement and the conduct of the parties, the disposition of which will resolve some of the disputed accounting in this litigation.

**5. Threshold Issues**

43    These threshold issues concern the following:

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 9 of 71
Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

• Is there an agreement to charge a specific amount for rent, as opposed to charging for the cost of the facility on the basis of the proportionate cost ratio?

• Is there an agreement to the use by Donald Armitage of a formula he called the 30/40/30 formula to calculate the charge to Adtronics for administrative expenses instead of the gross revenue formula specified in the September Agreement?

• Is there an agreement to the charge by Sicon to Adtronics for head office type administration charges as a shared cost on the basis that Sicon provided a variety of indirect services for the whole Group including external relationships, maintenance of the plants, supervision of the accounting function, etc.?

• Which party bears the onus of proof to prove that a charge made by Sicon to Adtronics was a breach of the September Agreement where Sicon has been unable to provide an explanation of the charge, owing to its destruction or loss of documentation?

44      Adtronics argues that I should consider the subsequent conduct of the parties as an aid to the interpretation of the September Agreement. For example, if it is not clear that the September Agreement contemplates the partition of an expense, such as the salary of the general manager, then I should consider the conduct of the parties, whereby Sicon's controller, Ester Gale, agreed during the currency of the September Agreement that the general manager's salary should be partitioned 5% to Adtronics and the balance to Sicon.

45      Sicon argues that I should approach the interpretation of the September Agreement as a "clean slate" and I should disregard the conduct of the parties during the currency of the September Agreement. So it is said by Sicon, in reference to the example given about the general manager, that the September Agreement does not contemplate the partitioning of a single expense and I should ignore what the parties did during the currency of the September Agreement, that is to charge Adtronics only 5%, but rather Adtronics should be charged for the general manager the pro-rata share based on the revenue sharing formula contained in the September Agreement. Sicon says that the parol evidence rule precludes consideration of extrinsic evidence to interpret the written agreement.

46      I begin an examination of the September Agreement by examining the history of the parties' association. The relevant history begins in early 1986. By this date Mark Armitage was operating the Adtronics business independently from a corporate perspective - that is Adtronics was a separate legal entity from the other companies in the Sicon Group - but was sharing the facilities of the Sicon Group, including its financing. There was no written agreement in place that would dictate how Adtronics would be charged for its use of shared services and facilities. The disagreement over the 1986 administration allocations was raised in about June 1987 in a conversation between Mark Armitage and Sicon's external auditor, Craig Wilson. Mark Armitage's complaints were communicated to Donald Armitage and Donald Armitage wrote a lengthy memorandum dated June 12, 1987, explaining the allocations from his perspective. Donald Armitage wrote, in the memorandum, that the charges would be put through as is on the financial statements then being prepared but that they could be adjusted later - "[i]f it turns out that there is something that has been done wrong." Mark Armitage continued to communicate his disagreement with the allocations over the summer of 1987, but Donald Armitage was understandably occupied with his attempts to refinance the Sicon Group. He asked Mark Armitage to stop complaining about the charges while the financing application was in a critical stage. In a memorandum dated July 30, 1987, he wrote to Mark "Quit rocking the bloody boat & when we've got everything in place we can discuss lots of things but don't disturb things now."

47      Negotiations over the terms of the amalgamation between the Adtronics Group and the Sicon Group occupied the balance of the summer of 1987 and continued into October. The next exchange of memoranda regarding the allocations commenced in March 1988 and concerned the 1987 allocations. In Donald Armitage's memorandum of March 28, 1988, he explains that he was using what has been called the "30/40/30" formula. By this he meant that he considered that 30% of Sicon's administration costs concerned lease costs (almost all of Sicon's signs were leased), and 40% of Sicon's administrations costs concerned administration of Sicon's leases, and 30% of Sicon's administration costs concerned Sicon's cash sales. Adtronics had only cash sales. Donald Armitage assumed that about 50% of the cash sales of the whole combined group was attributable to

Case 09-10138-MFW   Doc 14225-20   Filed 08/15/14   Page 10 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148...
2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Adtronics after deducting Adtronics' administration expenses. He therefore charged Adtronics 50% of 30% of the Sicon Group administration costs.

48    Mark Armitage responded in a memorandum dated March 31, 1988. He stated, "The agreement we have with the Sicon Group specifically states how admin is to be divided, a copy attached, and it states that only shared services and facilities that cannot be directly allocated are to be paid for on a shared basis. This is not what is being done."

49    On November 28, 1988, Donald Armitage sent a memorandum to Mark Armitage concerning the allocations. He opened the memorandum with the statement, "Throughout the year we have been trying to arrive at a division of costs that you would find equitable." He noted that the Adtronics Group had been charged $2,612 per month for rent and said that he presumed Mark was satisfied with that. He said that he was trying to do what was equitable. I conclude from this memorandum that he was not following Clause 16 of the September Agreement. Mark Armitage replied by memorandum on December 12, 1988, that he did not agree to the rent Adtronics was being charged.

50    On July 4, 1989, Mark Armitage's solicitor, Doug Morley, wrote to Craig Wilson, the Sicon Group Auditor, objecting to Sicon's failure to adhere to Clause 16. In his letter, Mr. Morley writes, in part:

    Section 16 was introduced to the Management Agreement because the Sicon Group had been preparing journal entries at the end of each year which charged the Adtronics Group for a portion of the common expenses. The amount borne by the Adtronics Group had been arbitrarily established and was believed to be excessive. Section 16 was inserted to establish a reasonable basis for allocating common expenses. It is the belief of the Adtronics Group that they continue to be charged excess amounts.

51    Mr. Wilson replied to Mr. Morley's letter on July 13, 1989. He enclosed schedules of the 1988 administration expense allocations. He wrote, in part:

    We appreciate your concern over Section 16 of the management agreement, however, at least on the surface it appeared to us that the accounting department had made every effort to comply with the agreement in allocating costs. While Mr. Armitage has verbally indicated some displeasure with the allocations to the writer, he has not ever, to the best of our knowledge, laid out in writing what costs are excessive or what costs are acceptable in our over three years of involvement. We appreciate the difficulty in arriving at costs that are acceptable to all managers in the organization, however, the method of charging these costs to the Adtronics Group appears to have been reasonably consistent from year to year. We note that some costs previously of concern to Mr. Armitage have not been charged (e.g. collection costs).

52    On September 12, 1989, Mr. Morley responded to Sicon's new auditor, Mike Essex. He re-iterated that Adtronics required Sicon to comply with Clause 16. He wrote, in part:

    There has been no agreement as required by paragraph 16(c) to identify the overhead facilities and services whose costs are to be shared. Without this agreement, Sicon Group is not entitled to charge overhead expenses which it has incurred to the Adtronics Group (or vice versa). An agreement as to which costs are to be shared is required first.

53    Attached to Mr. Morley's letter was a detailed schedule setting out Adtronics' position on the allocations. In particular, the schedule noted that Adtronics had never agreed to the basic rental charge, and Adtronics agreed to pay only 5% of Deo Zabat-Fran's salary. (Deo Zabat-Fran is Donald Armitage's son-in-law and was then the Sicon Group general manager.)

54    On November 8, 1989, Donald Armitage replied to Mr. Morley. The gist of his reply is that it was his view that Adtronics was being treated fairly. He complained bitterly that Mark Armitage failed to respond to information in a timely way. He suggested that Mark Armitage's accountant meet with the Sicon controller to work out the allocations.

55    This latest exchange illustrated the two vastly different methods the two Groups adopted to their financial relationship. Adtronics expected Sicon to adhere to Clause 16 of the September Agreement, whereas Donald Armitage considered that he was treating the Adtronics Group fairly and that Mark should stop complaining. Other fundamental disagreements began to emerge.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 11 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

One such disagreement was concern over the amount to be charged for senior management, although both Groups seemed to agree it was appropriate to partition expenses such as the general manager. Another is Donald Armitage's application of the 30/40/30 formula to sharing administration expenses which is a departure from the September Agreement. Still another is the charge to Adtronics for head office type expenses, such as Donald Armitage's travel and expenses in Toronto to meet with his lenders, and the maintenance of an office for Donald Armitage and his assistant in a separate building.

56    In Mr. Morley's response letter of January 5, 1990, he reiterated Adtronics' position that Sicon was contravening Clause 16 of the September Agreement. Mr. Morley noted that according to Clause 16, Adtronics need only pay for services and facilities that it used. Mr. Morley advised that Adtronics intended to commence litigation for an accounting of the amount owing by the Adtronics Group since September 30, 1987. Mr. Morley said that legal action would not be commenced before January 22, 1990, in order to give Sicon the opportunity to recalculate the accounts in accordance with the September Agreement.

57    Exchange of correspondence between Adtronics accountants and Donald Armitage or his accountants continued in the same vein for the balance of 1990, 1991, 1992 and into 1993. In each letter or memorandum Adtronics complained about excessive charges and Sicon's failure to adhere to Clause 16 of the September Agreement. Donald Armitage generally responded by attacking the competence of Adtronics' lawyers and accountants for failing to understand the facts, Mark for failing to understand how to operate a business, and both for failing to appreciate that what he was doing was ultimately "fair" for Mark.

58    In a letter dated January 2, 1992, Mark Armitage's accountant, Doug Reid, suggested hiring an independent consultant to review the accounts. In a letter dated February 10, 1992, Donald Armitage wrote to Doug Reid acknowledging that the allocations were not done in accordance with the September Agreement, but that they had been done according to Ester Gale's opinion as to what was fair. This statement was misleading because at the examination for discoveries of Donald Armitage and Ester Gale, they both admitted that Donald Armitage would decide annually what amount the allocation to Adtronics should total and then it was left to Ester Gale to work backwards from that number and create allocations that would equal the number already selected by Donald Armitage.

59    On February 21, 1992, Doug Reid wrote to Donald Armitage setting out in some detail the categories of dispute and offering to meet and discuss them.

60    In a letter dated March 17, 1992, Donald Armitage wrote to Doug Reid that in those instances where Sicon was not following the September Agreement, Sicon was charging Adtronics less than would be charged if Sicon followed the September Agreement. This statement was also misleading. On December 13, 1991, Perry Munton, Sicon's auditor, prepared a letter reviewing, at Donald Armitage's request, the reasonableness of the administrative expenses charged to Adtronics and their compliance with Clause 16 of the September Agreement. The allocations then under review were for 1990. Mr. Munton prepared an opinion dated December 18, 1991, noting, "While Sicon's calculations may not be in strict compliance with Section 16 of the Management Agreement, the various methods of calculating the allocations appear to achieve a reasonable result." Donald Armitage forwarded this opinion to Mark Armitage as support of the position that he was being treated fairly. However Perry Munton had prepared an earlier letter dated December 13, 1991 (not sent to Adtronics), which concluded that if the formula in Clause 16 of the September Agreement was followed, Adtronics' share would be $118,866, not the $175,888 that was charged to Adtronics. Accordingly, it was misleading for Donald Armitage to assert that following the September Agreement would result in a higher charge to Adtronics. Donald Armitage testified that he could not remember looking at the two Munton letters.

61    In April 1992 Mark Armitage objected to the 1991 allocations. He wrote to Donald Armitage, "As in past years, you have made these allocations without consulting with or having prior agreement from us and we are not prepared to accept any charges from the Sicon Group under these circumstances."

62    In a memo dated January 25, 1993, Mark wrote to his father concerning Adtronics' efforts to find financing for Adtronics' move to its own premises and noted that Adtronics had not yet agreed to the cost allocations for "each of the past 6 years."

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 12 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

63    Donald Armitage replied to the January 25, 1993, memo on February 3, 1993. He wrote that he had noted Mark's comment about the six years of allocations still not agreed, and advised Mark that when Mark moved Adtronics to its own premises and separated the companies Sicon would demand a general release before paying any money owed to Adtronics.

64    Relationships between the Adtronics Group personnel and the Sicon Group personnel continued to deteriorate throughout 1993. Donald Armitage wrote a letter to Mark attempting to persuade him to remain in the Sicon Group, but Adtronics moved into separate premises on September 22, 1993.

65     Adtronics and Mark Armitage refused to sign a release as demanded by Sicon, and Sicon refused to pay the balance owing under the Agreement to Adtronics on the operating account, which even by Sicon's calculations was then thought to be about $500,000.

66    Unbeknownst to Sicon or Donald Armitage, Brenda Leung had, since the commencement of her employment at Adtronics on January 1, 1993, examined the allocations between Adtronics and the Sicon Group. On November 5, 1993, Adtronics delivered to the Sicon Group her report regarding the allocation of expenses. Her report calculated that Sicon owed Adtronics Signs Ltd. $3,391,321.86.

67    From this summary of correspondence between the parties, I conclude that there was no agreement not to be bound by the terms of the September Agreement. Mark Armitage never agreed to the 30/40/30 formula for the sharing of administration expenses. He never agreed to the flat amount being charged for rent. However, there is evidence about objections made by Mark Armitage, over the years, to specific items in the administrative allocations which the plaintiffs say in some cases resulted in certain amendments to the annual allocations. The plaintiffs say that the Sicon Group, through Ester Gale or Donald Armitage, agreed with some of Adtronics' objections and changed the particular allocation accordingly. It is asserted by the plaintiffs that these changes to the allocations which were then carried forward each year may be characterized as so-called "mini-agreements," or alternatively are evidence of the parties' interpretation of the September Agreement. Examples of these are: charitable donations, collection department expenses and salaries, courier expenses, Donald Armitage's separate office (the "Shellbridge office"), the U.S. Office Rent, sales expenses, and service costs. The plaintiffs submit that these mini-agreements (or the conduct of ceasing to charge for certain expenses after receiving complaints) constitute evidence of the defendants' belief that these expenses were not "shared facilities or services." I will consider if these so called mini-agreements are binding on the parties when I consider the individual allocations because the facts and circumstances vary with each item.

68    I now return to the threshold issues I identified above.

• *(a) Is there an agreement to charge a specific amount for rent as opposed to charging for the cost of the facility on the basis of the proportionate cost ratio?*

69    The defendants say that there is no agreement on rent. Mr. Clarke contends that, "There is no basis at law for the Court to interfere to establish rent. If there is a mini-agreement on rent its terms are that Don [Armitage] fixes the rent. On the agreement property costs are allocated on a space percentage."

70    The plaintiffs contend that there is an agreement to pay rent plus the proportionate facility costs that were charged during the currency of the Agreement. The plaintiffs say that the amount of rent charged was excessive and the court should accept its experts' opinion as to a reasonable rent. I infer from this argument that Mr. Shaw contends that this court should find as a fact that the parties agreed that Adtronics would pay a reasonable amount of rent.

71    The September Agreement is not ambiguous on its terms concerning the payment for use of the physical facility. Rent is not payable under the September Agreement but a proportionate amount of all costs to operate the building are payable by Adtronics.

72    The question is whether the conduct of the parties evidences an agreement, where the written Agreement is not ambiguous.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

73     On December 12, 1988, Mark Armitage wrote to Donald Armitage concerning the allocations. In part he stated:

> I do not agree with the costs you are charging for rent and services. I don't know how you arrived at the rate of $2612/ month for rent but I think its [*sic*] high for this part of Richmond considering the area of plant and office space I use.

74     About a year later, on September 12, 1989, Mark Armitage's solicitor wrote to Sicon's accountant, stating in part:

> This basic rental charge has never been agreed to by Adtronics and we have always claimed it to be excessive.

75     Although the evidence seems clear that Mark Armitage did not object in principle to being charged rent, I can find no evidence that he ever agreed as to the amount.

76     Essentially the facts come to this. Both parties agreed in principle that Adtronics would pay rent notwithstanding the written agreement to the contrary but on the evidence I cannot find that this alleged contract was certain as to the amount of rent or the manner in which rent would be calculated or settled. The amount of rent in a lease is an essential term of the lease and it cannot be left to the court to substitute for the parties a term that they did not agree upon. (*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250 (Ont. C.A.), at 258-259; *Ossory Canada Inc. v. Wendy's Restaurants of Canada Inc.* (1997), 36 O.R. (3d) 483 (Ont. C.A.), at 489.)

77     In the absence of such a binding agreement, the parties must be bound by the September Agreement and consequently share the proportionate cost of the facility as specified in that agreement. The rent charge must be reversed and proportionate costs allocated on the basis of the agreed percentage of space used by Adtronics, which is 13.24%. Below in these reasons I will make findings concerning what specific facility charges may be allocated to Adtronics.

**• *(b) Is there an agreement to the use by Donald Armitage of a formula he called the 30/40/30 formula to calculate the charge to Adtronics for administrative expenses instead of the gross revenue formula specified in the September Agreement?***

78     The defendants argue that the plaintiffs did not complain about the gross revenue percentage used by Sicon and an estoppel will arise to prevent them from complaining about it now. I disagree. I can find no evidence that Mark Armitage ever agreed to the 30/40/30 formula. I conclude from the correspondence chronicled above and the testimony of the parties that Mark Armitage objected to the use of the 30/40/30 formula and demanded on numerous occasions that Sicon adhere to the September Agreement. In the face of his repeated objections, there can be no defence based on estoppel. It is alleged by Adtronics that even in the application of the formula, Sicon removed certain items from cash sales or charged certain expenses before applying the formula, always in favour of Sicon. It is unnecessary to consider this evidence because I have concluded that the 30/40/30 formula was never agreed to and the parties are bound to apply the gross revenue formula in the September Agreement.

79     However, the defendants also say:

> [T]he plaintiffs are estopped from now asserting that the proper gross revenue percentage can be utilized against all the other interpretative assumptions, calculations, pro-rations, concessions and other calculations found in the allocation working papers. If the gross revenue percentage is to be utilized, it must be utilized against a fresh calculation under the agreement. To utilize that revenue percentage against a series of mini agreements, concessions and prorations works a hardship on the defendants because it gets to the wrong number....

80     I will consider this argument below as I consider individual items and whether the alleged mini-agreements were premised on assumptions that have now been shown to be inapplicable.

81     At trial, the parties agreed on the appropriate percentage for each year and the allocations must be redone for the years in question with the agreed percentage.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 14 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

**• (c) Is there an agreement to the charge by Sicon to Adtronics for head office type administration charges as a shared cost on the basis that Sicon provided a variety of indirect services for the whole Group including external relationships, maintenance of the plants, supervision of the accounting function, etc.?**

82     The defendants argue that indirect costs which are in the nature of "head office" type costs are for the benefit of the whole organization and must be borne on a pro rata basis by the Adtronics Group.

83     In his letter of February 21, 1992, Doug Reid wrote, in part:

*Financing Costs*:

We believe that the amortization of the financing costs should be borne entirely by Sicon Group. You have previously advised that Mark's group had come to the table on the basis that the financing might not proceed without his participation. In that he agreed to the arrangement for the good of the overall organization, he should not have to contribute to the refinancing which was primarily for the benefit of the Sicon Group.

However, to the extent that he shares any portion of these costs, his sharing of costs should be limited to the pro rata share of the total borrowing. Recall that Mark is pretty well self financed except for a requirement to use a small portion of the revolving line of credit. To suggest that Mark should bear an allocation based on percentage of sales is unreasonable and certainly not in accordance with the agreement. The measurement of the use of borrowing is already calculated since you allocate interest expense on that basis.

*Managerial Sales Expenses*:

This relates to your travel on "Sicon Group" business and administration. It does not pertain to Mark or his company's and he should not be charged any portion thereof. Those services are provided to Sicon Group and do not relate to the administration of Adtronics.

*Management Expense*:

It is inappropriate that Mark's group bear any portion of management salaries. These costs relate to the administration of the business of Sicon Group, not to the business of Adtronics Group. Recall that Mark is to pay only for services that he uses.

84     In Mr. Selman's expert report prepared for the Sicon Group, he recalculated the allocations using a number of assumptions. Two of those assumptions are stated by Mr. Selman in this way:

As Sicon's management provided a variety of indirect services for the Group, including external relationships, maintenance of the plant, supervision of the accounting function, etc., general management costs are a shared cost.

The Group made commitments to specific courses of action that resulted in ongoing costs. Where those costs are initially shared under the agreement, they continue to be shared in subsequent years unless notice was given under the opting out provision of the agreement. This applies in particular to financing fees and interest.

85     The September Agreement includes the provision that Mark Armitage had the sole and exclusive authority to decide if Adtronics would share administrative and accounting services provided by other members of the Sicon Group (Clause 9). Clause 16 includes a provision that no Group shall be obliged to share in any cost incurred by the other Group in respect of a service if it does not use the service. Either Group can opt out of a service on reasonable notice.

86     In the letter forwarded to Donald Armitage on March 25, 1988 concerning the 1987 allocations (part of which period predate the written agreement), Adtronics objected to being charged for management salaries, administration salaries, sales expenses and other general administrative charges, on the basis that essentially Sicon was only providing accounting services. Donald Armitage replied, in part, that management salaries were justified because of his time and his assistant's time devoted

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 15 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

to the 1997 refinancing and reorganization, and that other members of management supervised the accounting staff. As noted above, Mark Armitage replied by memo on March 31, 1988, attaching a copy of the September Agreement, and continued to object to charges which I have now called indirect head office type charges.

87     Mark Armitage wrote a memorandum dated December 12, 1988, to Donald Armitage in which he said, in part:

As far as other charges I do not think Adtronics gains any advantage by sharing in the Groups overall costs. I get charged for services I don't use or don't need and then your charges for those I do use seem to be as high or higher than what it would cost me to provide the same services myself. I don't know how you can expect to come up with an equitable division of costs without first discussing it with myself and my accountant.

88     The defendants' argument is premised on the assumption that it is *fair* to charge an overall or head office type administrative cost to a division. The defendants may be correct, but that is not the test under the September Agreement. It is in Mark Armitage's sole discretion as to whether he will use a service, and in his sole discretion as to whether he will opt out of a service. His correspondence, beginning within eight months of the signing of the September Agreement, makes his position very clear. He did not consider Adtronics liable to pay any part of the overall administration costs of the Sicon Group that he did not use. He was entitled to take such a position under the September Agreement. Such an interpretation of the September Agreement is consistent with the overall arrangement, which is described, in part, in Recital F where it is agreed that Adtronics will remain a distinct and separate entity from the other business operations of Sicon.

89     I therefore conclude that Adtronics should be charged only for those head office type services it used directly. In other words, Adtronics should not be charged for indirect administration expenses on the basis that such expenses are chargeable only when they are incurred for the maintenance of the overall group. So, for example, Donald Armitage's business trips to Toronto should not be charged to Adtronics as a shared expense. Donald Armitage's Shellbridge office and telephone should not be charged to Adtronics. Legal work in other provinces associated with security for the overall financing of the Group should not be charged to Adtronics as a shared expense; such legal work could also be considered specifically related to Sicon's lease business and so for that reason is not a shared cost. Below when I consider the individual items of account, I will detail those charges that should be reversed on the basis I have described as indirect head office charges.

*(d) Which party bears the onus of proof to prove that a charge made by Sicon to Adtronics was a breach of the September Agreement where Sicon has been unable to provide an explanation of the charge, owing to its destruction or loss of documentation?*

90     It is common ground that a number of accounting documents belonging to Sicon and pertaining to the 1986 to 1988 period were lost or destroyed by Sicon after 1993. When Adtronics left the Sicon group, Donald Armitage requested a release of claims from Mark Armitage. Mark Armitage refused to provide the requested release. Donald Armitage stated in a memorandum at the time that he anticipated a legal claim. This action was commenced on June 17, 1994. Brenda Leung's report was delivered in November 1993. I conclude that Sicon was aware in 1993, if not earlier, that the allocations for the years 1986 to 1993 would probably be the subject of a legal action. Sicon's explanation at trial for the loss or destruction of these documents is that they were destroyed in a general office cleanup performed by the office manager Sheila Roell. Ester Gale's evidence (at Discovery) was that Sheila Roell could not remember why or when she destroyed the documents. During her preparation of her report between January and September of 1993, Brenda Leung copied many documents from Sicon's accounting records. Some of these same copied documents were then lost or destroyed by Sicon. I therefore conclude that the documents were destroyed after 1993. I have concluded that Sicon should have preserved the documents given its knowledge of the claim.

91     What, if any, result follows in respect to the burden of proof?

92     Adtronics contends that the burden of proof should shift to Sicon where it is shown that a document has been lost or destroyed by Sicon.

93     The burden of proof to show that the charges made by Sicon were in breach of the Agreement lies with the plaintiff. However, once Adtronics has raised a reasonable challenge to a charge and Adtronics is unable from its own sources to explain

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 16 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the charge, in my view it is appropriate that an inference be drawn that the charge was improper unless Sicon adduces evidence to support it. I reach this conclusion regardless of the destruction of documents, although the destruction of documents is a secondary ground for drawing an inference adverse to Sicon. Below I return to this issue in respect to the specific circumstances of the individual claims.

## 6. Discrete Issues

94      There are a number of claims made by the plaintiffs that are not part of the dispute over allocations. These claims are as follows:

    1. $70,000 Scientific Research and Tax Credit loan.

    2. 1986 Extraordinary Loss.

    3. The inducement agreement.

### (a) The $70,000 Scientific Research and Tax Credit Loan

95      Adtronics Signs Ltd. had been carrying out scientific research and development after April 19, 1983, in respect of which it incurred at least $70,000 in expenses. Adtronics Signs Ltd. was entitled to claim a scientific research tax credit on its tax return ("SRTC"). The combined federal and provincial SRTC available to Adtronics Signs Ltd. was 50% of the expenses, or $35,000. Adtronics Signs Ltd. was not in a position to utilize the SRTC in 1983 or 1984 because it had cumulative losses in those years.

96      In 1984, Donald Armitage approached Mark Armitage with a tax plan that had been recommended by Campbell Sharp, his accountants. The tax plan required a transfer of the SRTC from Adtronics Signs Ltd. to Donald Armitage personally in exchange for a $70,000 loan from Donald Armitage to Adtronics Signs Ltd.

97      The essential elements of the tax plan (as implemented) were as follows:

    1. Donald Armitage loaned $70,000 to Adtronics Signs Ltd. for 5 years;

    2. In February 1984, Adtronics Signs Ltd. executed and delivered to Donald Armitage a promissory note evidencing the $70,000 loan;

    3. The promissory note stated that Adtronics Signs Ltd. would pay interest on the $70,000 loan at an interest rate of 5% per annum for the 5-year term;

    4. Adtronics Signs Ltd. paid interest on the $70,000 loan at an interest rate of 5% per annum for the 5-year term;

    5. In February 1984, Adtronics Signs Ltd. designated the expenditures in favour of Donald Armitage, and filed the required documents under subsection 194(4) of the *Income Tax Act* as it was required to do;

    6. Donald Armitage's cost for income tax purposes of the $70,000 loan was $35,000, or 50% of the amount designated under subsection 194(4) of the *Income Tax Act*;

    7. Donald Armitage received a $35,000 SRTC as a result of Adtronics Signs Ltd.'s designation of the expenditures in favour of Donald Armitage; and

    8. Donald Armitage realized a personal income tax savings of $35,000 in 1984 by applying the SRTC on filing his 1983 income tax return before April 30, 1984.

98      The plaintiffs say that the uncontradicted evidence of the agreement Mark Armitage made on behalf of Adtronics Signs Ltd. with his father was that at the end of the 5-year term of the $70,000 loan, Adtronics Signs Ltd. would be required to re-

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148...

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

pay $35,000 of the $70,000 loan and the remaining $35,000 was to be forgiven by Donald Armitage. The defendants disagree and say the entire amount is owing.

99    Mark Armitage's evidence (under cross-examination) on the SRTC agreement is as follows:

Q: So Don calls you down to the office and Mary Powers is there and maybe somebody else.

A: Right.

Q: Mary Powers explains the deal, right?

A: Right.

Q: Mary Powers has the documents all ready to roll, right?

A: Yes.

Q: And you sign up and leave?

A: Yeah.

Q: And Don didn't say to you, Mark, you only have to repay $35,000 of this"?

A: Yes, he did.

Q: Well —

A: He said it was going to be a great deal and that's why — it wasn't costing anything, it was just — it was a wash.

Q: But it's Mary Powers who told you about how the deal would work, right?

A: Well, she explained the accounting side of it, why I would have to keep it to five years and —

Q: Why do you have to keep it for five years?

A: Well, because if I had — if it hadn't been for five years it would have been forgiveness of debt problem.

Q: What would the forgiveness of debt problem be?

A: Well, it would be like a taxable gain, I guess, that if —

Q: A taxable gain to Adtronics, right?

A: Um, yes, because we would have gotten $70,000 and only paid 35 back.

Q: Right?

A: That's why they felt it should go for five years.

Q: But you signed the $70,000 note on Adtronics's behalf and you made no contemporaneous memorandum with Don to the effect that the note really didn't mean what it appeared to mean, right?

A: Well, he had said to me that he was — that, you know, the end of the term I only had to pay back 35 and I believed him at the time.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 18 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

100    Mark Armitage created a contemporaneous memorandum of that agreement, in a handwritten note that he made in the meeting with Donald Armitage and the accountant, Mary Powers, on the second page of the tax plan which says, "Don to be paid $35,000 in settlement of note".

101    The plaintiffs argue that if Donald Armitage actually denies telling his son that he would forgive $35,000 of the $70,000 loan, presumably he would have testified to that effect. He did not. The tax plan was not a topic in his direct examination.

102    The plaintiffs also argue that the documentary evidence does not support the defendants' version of events. On or about October 5, 1984, Campbell Sharp responded to some questions posed by Donald Armitage regarding the tax plan. Campbell Sharp recommended that Donald Armitage hold the promissory note for five years. They go on to say: "If you do not Adtronics may face an approximate $25,000 to $30,000 forgiveness of debt problem". The plaintiffs assert that the only way Adtronics could face a $25,000 to $30,000 forgiveness of debt problem would be if Donald Armitage was anticipating forgiving part of the debt.

103    Mark Armitage testified about the agreement. Under cross-examination he said that he would not have agreed to the tax plan if he was giving up the $35,000 tax benefit for nothing. The defendants rely on the fact that in Brenda Leung's November 1993 report she claimed $25,000 and not $35,000 as repayment. In other words, Brenda Leung appeared to take the position that $25,000 should be forgiven and not $35,000. Mr. Clarke argues that if Mark Armitage was so certain that he had the agreement of Donald Armitage to forgive $35,000, he would have told Brenda Leung of the agreement and would not have authorized the November 1993 report to say otherwise. As already mentioned, Donald Armitage did testify at trial, but he gave no testimony concerning the SRTC. If he had a different version of events than that given by Mark concerning the obligation to repay the SRTC loan, I would have expected him to testify about it.

104    The plaintiffs' expert accountant, Mr. Harder, testified that in order to implement the tax plan recommended by Sicon and Donald Armitage's accountants in such a way that Donald Armitage would not make money on the transaction (which was Mark Armitage's evidence regarding the intent of the parties), Adtronics Signs Ltd. would have to re-pay only $35,000 of the $70,000.

105    The defendants also argue that Mark Armitage's evidence is parol evidence insofar as it contradicts the express written terms of the promissory note. The facts in this case are distinguishable from the case of *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515, 2 D.L.R. (3d) 600 (S.C.C.), and *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102, 110 D.L.R. (3d) 424 (S.C.C.). In those cases the agreements in issue, the bank guarantees, were in writing and constituted the whole agreement between the parties. Here there is no suggestion that the promissory note was the whole agreement between the parties. The promissory note was security for the promise to repay the loan, but the whole agreement included: an agreement to transfer the SRTC, an agreement to make the necessary income tax elections, an agreement to document the transfer and loan in accordance with the *Income Tax Act* and an agreement specifying the repayment terms of the loan. Accordingly, the parol evidence rule is inapplicable. (*Gallen v. Allstate Grain Co.* (1984), 53 B.C.L.R. 38, 9 D.L.R. (4th) 496 (B.C. C.A.).)

106    I accept the uncontradicted evidence of Mark Armitage and I find that he and Donald Armitage agreed that Donald Armitage would forgive $35,000 of the SRTC loan. If Donald Armitage did not agree he ought to have testified to that. I infer from his silence on this topic that he could not truthfully testify otherwise. Accordingly, I find that the defendants were not entitled to charge Adtronics the full $70,000 in February 1989 when the note became due, but rather $35,000 as was agreed.

*(b) Extraordinary Loss on Termination of Management Agreement*

107    In 1986, pursuant to a settlement terminating a management agreement between the Sicon Group and National Signcorp Investments Ltd., a company owned by Michael Armitage, the Sicon Group was unable to collect the full amounts due from National Signcorp Investments Ltd., resulting in an extraordinary loss to the Sicon Group on termination of the management contract.

108    The Adtronics Group was profitable in 1986, so Adtronics and Sicon agreed to transfer $179,914 of this extraordinary loss to the Adtronics Group to reduce taxes payable, with a provision that the Sicon Group would credit back to the Adtronics Group

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 19 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

$4,200 per month until the full $179,914 had been repaid. This $179,914 loss was reflected in the 1986 Financial Statements of Adtronics Signs Ltd. There is no dispute about the terms of this agreement.

109     Only $50,400 ($4,200/month from January 1986 to December 1986) of this $179,914 was credited to the Adtronics Group by the Sicon Group, leaving a balance of $129,514 owing to the Adtronics Group.

110     Mr. McLean prepared a chart on or about March 4, 2004, in an attempt to demonstrate that the $129,514 owing by the Sicon Group to the Adtronics Group was arguably "repaid" because the administration allocations in 1988 and 1989 were collectively $153,732 less than the average administration allocations in other years.

111     It is submitted by the plaintiffs that Mr. McLean's chart should be disregarded because:

(a) Donald Armitage did not testify that he had attempted, or intended, to repay the $129,514 owing by the Sicon Group to the Adtronics Group by using this procedure. Presumably, if he had intended to do so, he would have testified to that effect;

(b) Mr. McLean only prepared the chart the Thursday before giving evidence at trial;

(c) Ester Gale was examined for discovery on this topic in 2000 and admitted that the $129,514 was still owing.

112     Donald Armitage did not testify about the extraordinary loss. In closing submissions, the defendants do not attempt to explain why the payments stopped, but only take issue with what they say is a lack of particularization by the plaintiffs of how much is owing. No plausible explanation was given in evidence as to why the payments stopped. Tim McLean's evidence on this matter is entirely implausible and in any event not corroborated by Donald Armitage. I find that Sicon repaid only $50,400 of the original $179,914 and there remains the sum of $129,514 owing to Adtronics which according to the agreement made between the parties on this issue was to be repaid at $4,200 per month from January 1987 to July 1989.

*(c) The Inducement Agreement - Corporate Income Tax*

113     There were two main reasons for the 1987 amalgamation between the Sicon Group and the Adtronics Group. The first related to the re-financing and the second related to income tax. There is no doubt that Mark Armitage was reluctant to amalgamate his companies with his father's companies for a variety of reasons, some personal and some financial. In the course of Donald Armitage's efforts to persuade his son to amalgamate the companies, it is alleged by the plaintiffs that he offered an inducement to Adtronics. The alleged inducement was an offer to give Adtronics the benefit of Sicon's unused depreciation/capital cost allowance for income tax purposes, which in turn would shelter Adtronics income from income tax for several years. The amount of tax that Adtronics could save by this method was estimated to be in excess of $1 million. Mark Armitage says that he was unaware until 1993 that after the amalgamation, on an annual basis, Sicon's accountants estimated the amount of tax that Adtronics would have paid if it had not used the Sicon Group's capital cost allowance, and then charged that amount to the Adtronics Group in the inter-company account along with the other allocations charges. In essence, the defendants charged the plaintiffs a fee for using the Sicon Group's capital cost allowance. The total amount that was credited to Sicon's account was $1,066,000. Sicon disputes that it ever agreed Adtronics would not have to pay its tax and says that the inducement offered was to benefit the group as a whole by saving on income tax.

114     The September Agreement is silent on this issue. Or put a different way, the September Agreement does not authorize Sicon to allocate an income tax cost as it purported to do.

115     In a memorandum dated August 28, 1992, Donald Armitage took a retrospective look at the reasons for the amalgamation, writing to Mark Armitage:

You know Mark, we used to be pretty good friends at one time and you used to talk to me about things and we would discuss things and I can really pinpoint the date that changed, I don't know if you can.

It was October or November of 1986 when I suggested to you that it looked like you were going to become very profitable and we should consider putting your company in with ours so we could protect your profits with our depreciation and do

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148...

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

so, so that you would have effective control and could leave when it was necessary, or you weren't having your promise protected anymore because we ran out of depreciation. At that point you perceived that I wanted to steal your business and as I have told you before, I don't want your business, I don't know anything about it and I wouldn't have given it to you in the first place if I had wanted to keep it. I have said before, I do think that you have taken advantage of my generosity by wanting to have Adtronics all to yourself and still keep $^1/_4$ of Sicon. ... Anyway, this estrangement, if that is the term, was strengthened when in December of 1986 CCFL insisted on this as part of the conditions under which they would seek a loan for us.

116      In a memorandum dated March 19, 1993, Donald Armitage wrote to Brenda Leung:

As you know we have protected his income from taxation with our depreciation over the last number of years, but when he goes on his own that can't happen. That is, he will have to find his own money for taxes.

117      Mr. Clarke argues that there was no necessity to induce Adtronics to amalgamate with the Sicon Group from the perspective of the Sicon Group. I do not agree with this submission. I conclude from the evidence that Donald Armitage put out his financing proposals including Adtronics in the group. Adtronics was presented in that way as a profitable division of the overall enterprise. He did not seek nor receive Mark Armitage's consent to his doing so. When CCFL, who brokered the loan, put out the financing package to all their clients, the proposal included Adtronics. CCFL then said that they could not backtrack and rewrite the loan proposal without Adtronics. This was a particularly sensitive matter because of the history of Michael Armitage's withdrawal from the group. Donald Armitage perceived Adtronics' participation in the amalgamation as critical to a successful refinancing. Donald Armitage's accountant wrote to Mark Armitage's accountant on September 14, 1987 that "funding will be lost to all parties" in the absence of advice that week that Adtronics would consent to the amalgamation. Sicon's accountant also wrote a memo to Adtronics advising that Sicon's attempt to keep Adtronics out of the financing package "were met with complete disapproval by CCFL."

118      Donald Armitage testified as to his understanding of the arrangement at his examination for discovery, read in at trial:

Q: You go to say: In effect nothing would happen during this period — Now, you're referring to the next four or five years, right?

A: Right, yeah.

Q: After 1987?

A: Yeah.

Q: — other than you would not pay tax. That was your intention?

A: Yeah.

Q: That Mark's companies would not pay tax?

A: Right, yeah.

. . .

Q: One of the benefits of this arrangement was that you were able to use the group's depreciation — which was your — a depreciation of capital cost allowance in your companies, correct?

A: Yeah.

Q: — five to seven years earlier than you otherwise would have been able to use that capital cost allowance deduction?

A: Yeah, but it was no gain to us. It was a saving to Mark —

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

. . .

> Q: But one of the arrangements that you're proposing was that Mark would not pay tax?
>
> A: That's right, he could then use the money to grow with.
>
> Q: And you go on to say: The above was my original proposal and my only reason for it was for taxes. Is that true?
>
> A: That's true.
>
> Q: And you say: If you don't — you do not want to go along with it then you are not as smart as I give you credit for.
>
> A: Yeah.
>
> Q: You said that to your son?
>
> A: That's to Mark, right.
>
> Q: All right. And that's because in your view this was such a favourable proposal to Mark that he would be crazy not to go along with it?
>
> A: Correct.
>
> Q: You're essentially offering to him that he could come and become part of the group and for the next four or five years not pay any tax?
>
> A: Right. Right.

119    The plaintiffs submit that it is nonsensical for the Sicon Group to say that the Adtronics Group would not pay any tax, and at the same time require that the Adtronics Group pay "dollar for dollar" for every tax dollar saved. They say there simply would be no benefit to the Adtronics Group in that scenario. The plaintiffs submit that the truth is that the Sicon Group offered its tax losses to the Adtronics Group (without any fees attached) because Donald Armitage was desperate for Mark's commitment to the re-organization, which the plaintiffs say was critical to the financing.

120    The plaintiffs characterize the fee charged as secretive. They say the fee was never disclosed in the annual allocations. The fee was recorded in the general ledger as a "deferred tax adjustment". It was not shown to Adtronics until Ester Gale gave Mark Armitage a memorandum on June 8, 1993, setting out the amount of the adjustments for the previous years. No evidence was tendered as to why the "deferred tax adjustment" was not disclosed together with the annual allocations.

121    Mr. Clarke says that there never was an agreement about the use by Adtronics of Sicon's tax losses. He relies particularly on the fact that when Brenda Leung prepared her report and delivered it to Sicon in November of 1993 the claim for credit arising from the income tax charges was framed not in terms of an objection to the charge but as a question of fairness. She said in her report:

> The corporate income taxes as calculated by Smythe Ratcliffe & Associates for each of the years are calculated properly if Adtronics Division of 32262 B.C. Ltd. were taxed separately, however, as the Adtronics Group and the Sicon Group were amalgamated so the Sicon Group could use the cash savings from the Adtronics Group using the tax losses of the Sicon Group, the tax savings are benefited by both groups and hence the tax should be discounted. Tax losses usually sell on the open market for 5 to 10 cents on the dollar at the low end and 20 - 25 cents on the dollar at the high end. As the Sicon Group has enjoyed the cash flow of the Adtronics Group tax savings, the tax savings should be split 50/50.

122    Ms. Leung was acting on Mark Armitage's instructions when she prepared and delivered her report. She explained the failure to demand full repayment of the tax charges taken by Sicon on the grounds that she could not in 1993 find the

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

memorandum from Donald Armitage in support of Mark's assertion that he was to be charged nothing for corporate tax, that these memoranda (some quoted above), became available later, and that in the absence of supporting documentation she did not feel it was appropriate as a chartered accountant to advance the position that the full charges should be reversed. Mark Armitage testified to the same effect.

123    I conclude that Sicon needed Adtronics to participate as a member of its group to obtain financing. It matters not whether this was because Adtronics was profitable and Sicon was not, or whether the need for Adtronics' participation developed out of Donald Armitage's ill-conceived decision to include Adtronics in his first proposals to CCFL without first obtaining Mark's concurrence. The fact is that by 1997 Sicon desperately needed Adtronics to participate. Mark Armitage was at first resolute that he would not join the Sicon Group. He was persuaded by his father to join after receiving a number of strongly worded memoranda and by promises that he would save income taxes in excess of a million dollars. As Donald Armitage expressed it, he would be stupid not to go along with that kind of benefit. I accept Mark Armitage's evidence that he was induced to amalgamate by a promise of the tax saving. It is implausible that Mark Armitage would have agreed to be charged a dollar for every dollar saved, so as to exclusively benefit the Sicon Group. I do not accept that Mark Armitage was motivated to join the Sicon Group in order to extend such generosity to his father. I conclude that the full amount of the charges for corporate income taxes must be paid to the plaintiffs. Sicon promised the tax credits to Adtronics in consideration for Adtronics amalgamating with it. Sicon breached the September Agreement by charging imputed tax.

124    I now turn to the individual items in the allocations.

## 7. Allocations

125    In this part of my judgment I will follow the plaintiffs' numbering system and the plaintiffs' descriptions of individual items from the plaintiffs' opening and closing arguments and Scott Schedule.

### Audit Expenses — Section A

126    The plaintiffs' position with respect to audit expenses is as follows:

(b) The only expense that should be included in the audit pool for allocation to the plaintiffs are the invoices related to the year-end audit.

(c) Invoices other than those related to the year-end audit in the audit pool should have been classified as professional fees (Section B).

(d) Generally accepted accounting principles ("GAAP") of matching and the accrual basis of accounting should apply to the audit expenses.

(e) To the extent that any cost can be specifically attributed to one Group (as per Clause 16(a) of the September Agreement), that should be done first before applying the gross revenue percentage.

127    The difficulty in allocating the audit fees clearly illustrates, as Mr. Clarke puts it, the fault line between the parties. The plaintiffs' position is that Ester Gale allocated a percentage of audit fees that was specifically attributable to the Sicon Group every year. To the resulting figure she then applied a gross revenue percentage.

128    The plaintiffs argue that because Ester Gale agreed every year to specifically allocate a portion of the audit fee, this forms an agreement that is now binding on the parties. The defendants argue several propositions:

• The audit fee is one expense and under the September Agreement it cannot be partitioned. They argue that it is an incorrect use of the word "specifically" in Clause 16(a) of the September Agreement to use an estimate to partition a unitary cost. That they say is not a specific attribution, but an estimated attribution.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

• The correct approach, they say, is to apply the now agreed gross revenue percentage to the whole of the audit fee as contemplated by the September Agreement.

• They say it is "cherry picking" to accept Ester Gale's specific allocation for each year, i.e. the 50% or 70%, but not the revenue percentage which she used. The defendants acknowledge that the revenue percentage used by Ester Gale was not the revenue percentage calculation specified in the September Agreement, but they say the revenue percentage calculation she used was part and parcel of her estimate of the fair attribution of the audit fee to Adtronics.

129    I disagree with the defendants that Ester Gale's agreement to use the percentage shown at line two of Brenda Leung's chart, below, was part and parcel of her estimate of an attribution to Adtronics. The evidence is that Donald Armitage had a fairly good idea of the amount of administration resources devoted to each part of his company. He consistently said that administration resources devoted to leases and East cash sales should not be considered in the calculation of shared resources.

130    The plaintiffs also argue that even if Ester Gale's estimate of the allocation shown in line two of Brenda Leung's chart, below, is not a binding agreement, it is nevertheless evidence that audit fees are in part capable of specific allocation under Clause 16 of the September Agreement. In other words, Ms. Gale with the approval of Donald Armitage, was able to estimate from year to year the amount of the audit that related to leases and was unrelated to the business of Adtronics.

131    The reason that the parties specifically allocated a portion of the audit fee is that Adtronics (from an auditing perspective) has a relatively simple business. Adtronics manufactured and sold electronic signs. Compared to Sicon its annual sales were relatively few in number; probably less than 50 per year. Each transaction compared to Sicon was large in the dollar sense. On the other hand, Sicon had hundreds of transactions per year; 70% of its transactions were leases; its business involved collections, lease renewals, and the appropriate entries on the balance sheet; it had offices in several provinces and in the United States; it had numerous subsidiary companies; and it had significant assets. It is not difficult to understand that the greater portion of the audit fee related to the Sicon divisions other than the Adtronics division, as Ester Gale acknowledged. Line two of the following chart prepared by Brenda Leung illustrates the historical annual allocations made by Ester Gale on Donald Armitage's instructions. The following charts also illustrate the difference in approach of the parties to the treatment of this expense.

| | *1986* | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *Jan-Sep 1993* |
|---|---|---|---|---|---|---|---|---|
| Audit Fee Specifically Attributed to Sicon Group | 45,075.00 70% | 69,227.00 70% | 51,461.00 50% | 70,000.00 45% | 81,180.54 50% | 63,000.00 50% | 63,000.00 50% | 45,000.00 100% |
| Net pool Gross Revenue | 13,522.50 11.95% | 20,768.10 16.02% | 25,730.50 16.64% | 38,500.00 25.28% | 40,590.27 19.66% | 31,500.00 19.35% | 31,500.00 34.51% | 0.00 27.21% |
| Allocation subtotal | 1,615.94 | 3,327.05 | 4,281.56 | 9,732.80 | 7,980.05 | 6,095.25 | 10,870.65 | 0.00 |
| Direct Charges to be (reversed) or added | | 408.00 | | | | | | (2,500.00) |
| Total audit Charges to the Plaintiffs | 1,615.94 | 3,735.05 | 4,281.56 | 9,732.80 | 7,980.05 | 6,095.25 | 10,870.65 | (2,500.00) |
| $6,624.00 invoice to be allocated | | | | | | 1,281.74 (6624.00 × 19.35%) | | |
| Total Charges to the | 1,615.94 | 3,735.05 | 4,281.56 | 9,732.80 | 7,980.05 | 7,376.99 | 10,870.65 | (2,500.00) |

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Plaintiffs

132      Brenda Leung has calculated the defendants' position in this litigation on the allocation of the audit expenses in a comparable form as follows:

| | *1986* | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *Jan-Sep 1993* |
|---|---|---|---|---|---|---|---|---|
| Audit Expense as per General Ledger | does not address 1986 | does not address 1987 | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $50,250 |
| Trial Exhibit #130 | | | | | | | | $5,000 |
| Audit expense pool | | | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $55,250 |
| Specifically Attributed to Sicon Group | | | 0% | 0% | 0% | 0% | 0% | 0% |
| Net pool | | | $86,048 | $70,000 | $70,000 | $68,100 | $123,970 | $55,250 |
| Gross Revenue | | | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Allocation Total | | | $14,318 | $17,696 | $13,762 | $13,177 | $42,782 | $15,034 |

133      Although Mark Armitage testified that in his opinion the allocation to Sicon was too low, I can find no evidence that for the 1987 to 1992 annual allocations he communicated his disagreement to Ester Gale or Donald Armitage.

134      In this litigation he seeks a further concession. Mark Armitage says that the correct allocation to Sicon is larger than used by Ester Gale historically. In this litigation, the defendant contends that there should *not* be a specific allocation, but rather that the whole audit fee should be considered a shared expense to which the gross revenue formula should be applied. Sicon's position would result in a charge that is greater than that which Sicon agreed to charge during the currency of the Agreement.

135      Adtronics argues that the parties' interpretation of the Agreement as evidenced by their conduct should govern the interpretation of the Agreement. Adtronics also says that this method of apportioning could be considered a mini-agreement and is enforceable as such.

136      Sicon further contends that there was no "mini-agreement" because the parties did not agree on the amount of the allocation each year, or in other words, because there was no consensus. According to Sicon the Court should ignore the conduct of the parties over the years and literally apply the September Agreement which results in the application of the gross revenue formula to the audit fee for each year in question.

137      I begin by observing that the September Agreement has two phases. First is the formulaic part of the Agreement entered into in September 1987. Second is the implementation stage which is an ongoing annual process requiring the parties to interpret the Agreement and apply it to the changing circumstances of their business relationship. Looked at from this perspective, it is important to examine what the parties did agree was the correct interpretation of the Agreement.

138      There were three people involved in the implementation phase of this Agreement - Ester Gale, Donald Armitage and Mark Armitage. Based on all the evidence including testimony, Ester Gale's working papers, the memorandum and written communications between the parties, I conclude that these three people agreed that a correct interpretation of the implementation

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 25 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148
2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

phase of the Agreement was to first specifically allocate a portion of the audit fee related only to Sicon. I find that their conduct in doing so is evidence of their intention as to how the Agreement should be interpreted. That portion of Clause 16 says:

> ...to the extent that any cost can be specifically attributed to one Group or another it shall be specifically borne by such Group (e.g. long distance telephone calls)

139    Mr. Clarke also points out that there was no agreement as to the amount of the audit that should have been specifically allocated to Sicon, therefore, the Court should apply a strict interpretation of this clause of the Agreement and refuse to apportion a unitary cost.

140    There are several approaches the court could take to this problem. First would be to apply what Sicon says is the strict literal interpretation of the Agreement and ignore the historical conduct of the parties. Second would be to interpret the Agreement in a manner consistent with the conduct of the parties, accepting that the parties' conduct is evidence of their contractual intention. Third would be to consider that the parties entered into a collateral, or mini-agreement, or amendment to the Agreement. Fourth would be to consider that Sicon is estopped by its conduct from relying on the strict terms of the contract.

141    If the Agreement is looked at as a whole, the idea that one cost could, in part, be specifically allocated to one party is consistent with the central formula of the Agreement which is that the allocation process would reflect the parties' respective use of the shared services or facilities.

142    "The law is clear that in Canada evidence of post-contractual conduct can be considered in the event of an ambiguity in the contract." (*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60, [1989] B.C.J. No. 39 (B.C. C.A.)).

143    The question of the evidentiary value of subsequent conduct in the interpretation of a contract is discussed by E.H.L. Fridman, in *The Law of Contract in Canada* 4th ed. (Scarborough: Carswell, 1999) at 489:

> Canadian courts have adopted the view that subsequent conduct can be a useful guide to the interpretation of a written contract. Cases before the decision of House of Lords in the *Whitworth* case permitted the admission of such evidence as long as it did not add to, or vary the document to be interpreted but simply helped the court to arrive at a conclusion as to the true intent and meaning of the words used in the document. The effect of such conduct was, in a sense, to *fix* the interpretation of the language of the document. In one case, which was concerned with whether a restrictive covenant in a contract was personal to the parties or went with the land, Thomson J. of the Supreme Court of Saskatchewan, said than in cases involving an ambiguity in an agreement, "there is no better way of determining what the parties intended than to look to what they did under it." There is much to be said for this approach, as many Canadian judges have declared. In the words of Lord Denning, when the contract is unclear, the parties "are themselves the very best guides to the way in which it was used." This did not appeal to Lord Reid, who referred to the possibility that a contract might mean one thing the day it was signed, but by reason of subsequent events mean something different a month or a year later. This may be an over-reaction, in that the dangers of shifting meaning may have been exaggerated by Lord Reid and others. When the matter came before the Manitoba Court of Appeal and was thoroughly canvassed, the judges in that court found no difficulty in rejecting the more rigid approach of the House of Lords and accepting the admissibility of subsequent conduct in an appropriate case, where there is ambiguity. [internal footnotes deleted]

144    Mr. Clarke contends that there is no ambiguity. I do not agree. Given that the central purpose of the whole contract was to allocate costs to the user, there is an ambiguity when considering whether the words "to the extent that any cost can be specifically attributed" in clause 16 means, the whole cost or a portion of the cost.

145    If the contract is not ambiguous and Sicon's interpretation is the correct one, I would nevertheless reach the same result on the basis of estoppel.

146    Two potential versions of estoppel may be applicable here. The first is promissory estoppel, which applies where a party has made a representation to another party indicating that it will not claim its full rights under the contract. Where the promisee relies upon that representation to its detriment, the promisor will not be allowed to enforce its full rights under the

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 26 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

contract. The elements of promissory estoppel may be summarized in the following way (E.H.L. Fridman, *The Law of Contract in Canada*, 3d ed. (Scarborough: Carswell, 1994) at 129-136):

(a) The parties must have been in an existing legal relationship at the time that the statement was made.

(b) There must have been a clear promise or representation made by the party against whom the estoppel is raised that establishes that party's intent to be bound by the representation. (*Conwest Exploration Co. v. Letain* (1963), [1964] S.C.R. 20, at 28, (1963), 41 D.L.R. (2d) 198 (S.C.C.) )

The representation can be expressed through either words or conduct. In *Engineered Homes Ltd. v. Mason* (1983), 146 D.L.R. (3d) 577, at 581, [1983] 1 S.C.R. 641 (S.C.C.) McIntyre J. cited Ritchie J. in *John Burrows Ltd. v. Subsurface Surveys Ltd.* (1968), 68 D.L.R. (2d) 354, at 360, [1968] S.C.R. 607 at 615 (S.C.C.), who stated:

It seems clear to me that this type of equitable defence cannot be invoked unless there is some evidence that one of the parties entered into a course of negotiation which had the effect of leading the other to suppose that the strict rights under the contract would not be enforced, and I think that this implies that there must be evidence from which it can be inferred that the first party intended that the legal relations created by the contract would be altered as a result of the negotiations.

(c) The promissee must have relied upon the statement or conduct of the party against whom the estoppel was raised.

Lord Denning in *Brikom Investments Ltd. v. Carr*, [1979] 2 All E.R. 753, [1979] 2 W.L.R. 737 (Eng. C.A.) suggested that reliance can be proven by showing that the promissee altered his position on the faith of the representation, by going ahead with a transaction then under discussion, or by any other way of reliance.

(d) The party to whom the representation was made must have acted upon it to his detriment.

Fridman indicates that this element is a matter of dispute. Some courts have stated that when a party alters its position due to the representation, this is enough (e.g. *W.J. Alan & Co. v. El Nasr Export & Import Co.*, [1972] 2 Q.B. 189, at 213, [1972] 2 All E.R. 127 (Eng. C.A.) (*per* Lord Denning)). Other courts have indicated in *obiter dicta* that there is a requirement that the representee establish detriment (e.g. *Pentagon Construction (1969) Co. v. United States Fidelity & Guaranty Co.* (1977), 77 D.L.R. (3d) 189, [1977] 4 W.W.R. 351 (B.C. C.A.)).

(e) The representee must have acted equitably.

147    In this case, the first and fifth elements are uncontroversial. The parties clearly were in a contractual relationship at the time of the alleged promise, and there is nothing to indicate that the representee did not act equitably.

148    The evidence of Sicon's conduct in apportioning the audit fee establishes the second element (clear representation or promise). In the implementation phase of the Agreement, Sicon agreed to apportion the audit fee before applying the gross revenue formula to the balance. This inevitably resulted in a lesser charge to Adtronics for this expense. This pattern of conduct can be characterized as a repeatedly renewed, clear promise not to implement the Agreement in allocating this expense in the same way as the Agreement was implemented for other expenses.

149    The third and fourth elements — detriment and reliance — are also established by the evidence. Because of Sicon's promise to apportion the audit fee, Mark Armitage altered his own conduct to his detriment by refraining from objecting to an allocation he otherwise would have made annually.

150    Given that all of these elements are made out, Sicon would, on the basis of promissory estoppel, be barred from returning to the "clean slate" of the Agreement.

151    The second form of estoppel that may apply is estoppel by convention. Estoppel by convention operates when the parties rely on an agreed state of facts or a common apprehension of fact or law which has been assumed, by convention of

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 27 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the parties, to be the basis of the transaction they are about to enter. When parties have acted on the agreed assumption that a given set of facts is to be accepted, this prevents the other from questioning the truth of the statement of facts so assumed (*32262 B.C. Ltd. v. Companions Restaurant Inc.*, [1995] B.C.J. No. 342, 17 B.L.R. (2d) 227 (B.C. S.C.), per Esson C.J.; *Coupal v. Strata Plan LMS2503*, 2002 BCSC 1444, [2002] B.C.J. No. 2313 (B.C. S.C.) ). In order to rely on the defence of estoppel by convention, a party must establish that they relied on the assumed set of facts to their detriment (much like in promissory estoppel) (*Canaceal Investment Inc. v. PCI Realty Corp.*, [1999] B.C.J. No. 2029 (B.C. S.C.)).

152    In this case it could be said that the way in which the agreement was applied with respect to audit fees was an apprehension of fact or law that amounted to an convention shared by the parties. The parties' conduct indicates that they were both operating under the understanding that the way to implement the agreement with respect to this expense was to divide it on a pro rata rather than gross formula basis. As indicated above in the analysis of promissory estoppel, Adtronics relied upon this common understanding to its detriment. According to the doctrine of estoppel by convention, Sicon should therefore be prevented from now questioning this common assumption.

153    I therefore conclude that Sicon cannot rely on what it now says was the correct interpretation of the contract to the detriment of Adtronics when it never applied the contract in that way during the administration of the contract. If Sicon had interpreted the contract as it now contends for, Adtronics would have objected at the time and utilized the mechanism provided by the contract for either party to refuse to share in a service or facility. Consequently Adtronics must be taken to have relied on Sicon's interpretation of the Agreement to permit specific allocation of a portion of one expense category.

154    The evidence is compelling that the parties agreed to apportion the audit fee. Either on an estoppel analysis or the interpretation of the Agreement based on subsequent conduct I reach the same result which is that the parties agreed to apportion the audit fee.

155    Accordingly, with respect to the Audit expense, I order that the allocation be calculated for the years 1987 to 1992 as a shared expense in accordance with the now agreed upon gross revenue percentages for each of those years, using the historical allocation shown at line two of Brenda Leung's table shown above. (The 1993 audit expense is *not* a shared expense, because plaintiffs/defendants did their own year ends in 1993.)

156    Under the heading of Audit Expenses, Sicon included its other professional fees (including other accounting fees). All other professional fees should be classified as professional fees and I will consider the allocations for those fees when I consider professional fees.

157    Brenda Leung separated the year end audit fees in her analysis in the chart above. I accept her evidence that line one of her chart is an accurate summary of the fees for the year end audits and it is those numbers to which the shared services formula in the September Agreement should be applied. All the other accounting fees will be considered below.

158    That leaves the issue concerning the application of GAAP to the calculation of the audit allocations. There is no doubt that a correct application of GAAP requires that the expense be matched in a temporal sense to the income to which the expense relates. For example, audit fees incurred to audit the 1990 year end should be expensed in the 1990 financial statements. Because the audit is done after the fiscal year end and invoiced and paid several months later, Sicon charged the audit fee in the following year. So in the example above, the 1990 financial statements included the 1989 audit fee and the 1991 financial statements, included the 1990 audit fee. Sicon's accountants corrected the company's practice in this regard for the fiscal year ending in 1992.

159    The issue in this action is whether for the purposes of calculating the audit allocations the correction should be backdated. It is important to the plaintiffs because its revenue relative to the Sicon Group revenue became proportionately larger in later years and thus it would pay a proportionately larger share of the audit fee.

160    The September Agreement contains two references to GAAP. The first is in Clause 2 and relates to Adtronics' transfer of its business and assets to 32262. The second concerns the redemption of the preference shares issued to Adtronics (Clause 13). There is no specific reference to GAAP in Clause 16 of the September Agreement. The issue is whether the September Agreement should be read to imply a term that shared expenses will be allocated in the year in which they are incurred.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 28 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

161    The plaintiffs argue that because the sharing of expenses is tied to a formula that specifically incorporates a fraction based on the parties' revenue, the September Agreement should be interpreted to mean that the shared expense should be matched to the revenue for the same time period.

162    The contrary argument is that Sicon was responsible for its own accounting and that if it chose to account for the audit fees on a cash rather than accrual method, that is, something that is within Sicon's discretion under the September Agreement. I agree that it is not necessary for a company to comply with GAAP for matters that are entirely internal and have no impact on the financial statement for external users, but in this case the proportionate revenue sharing formula makes no sense unless there is a matching of revenue and expenses incurred to earn that revenue. Accordingly I would imply into the September Agreement a term requiring the matching of expenses and revenue incurred and earned in the same fiscal period.

### Professional Fees - Section B

163    Most of the professional fees can be allocated on the following basis. I will consider all fees associated with the 1987 financing under the heading "deferred financing costs". Part of the professional fees have been considered under the Audit section. The majority of the remainder of the professional fees that are in issue relate to what I have earlier described as head office costs and which I have already concluded are not costs which should be shared by Adtronics. At trial the defendants conceded that many of the items included as shared professional fees should not have been so included. I will indicate in this section which items were conceded by the defendants. As one further general comment I have found that Adtronics should not be charged professional fees related to the 1993 Royal Bank financing. The defendants contend that this financing was to be used in part to pay out Adtronics. For reasons which I expand upon below, I find that that is not a compelling argument. I have for the convenience of the parties referred to each disputed item by the same numbering description used by the parties in the Scott Schedule.

*(a) A 1990 professional fee expense in the sum of $3,180.23 described at Trial Exhibit #10, Tab 196 (which was originally specifically attributed to the Adtronics Group) should have been included in the professional fee allocation pool for location to both the Sicon Group and the Adtronics Group*

164    The parties now agree this item should not have been allocated to Adtronics but should have been a shared expense.

*(b) A 1990 professional fee expense in the sum of $249.00 described at Trial Exhibit #10, Tab 197 (which was originally specifically attributed to the Adtronics Group)*

165    In 1990, an invoice of the Sicon Group's lawyers, Mullholland Webster, in the sum of $249.00 was charged directly (100%) to the Adtronics Group. This invoice relates to legal advice obtained by Donald Armitage with respect to a dispute with Mark Armitage. I find this invoice is a head office expense and should not be included in the pool as contended by the defendants. It should be attributed to Sicon.

*(c) A 1993 professional fee expense in the sum of $2,500.00 at Trial Exhibit #10, Tab 242 (which was originally included in the allocation pool)*

166    The plaintiffs contend this invoice should have been specifically attributed 50% to the Sicon Group, and 50% to the Adtronics Group. At trial the defendants agreed with the plaintiff's position and it is so ordered.

### Specific Invoices Charges from 1986-1993

### *1986*

167    All 1986 allocations will be considered below.

### *1987*

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 29 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(a) Jan-87 MiniFin 151884Rep - $30.00*

168      This charge was for the Minister of Finance for the filing of the Sicon Group Inc. annual report with the corporate registry. This is a head office charge for Sicon and should be allocated directly to Sicon.

*(b) Feb-87 MiniCom Late Fee - $15.00 and Feb-87 MiniCom Late Fees - $45.00*

169      This charge relates to corporate filing fees and should be charged directly to Sicon as a head office type charge. Furthermore, the defendants have not produced any back-up documentation for these items.

*(c) Mar-87 Clarkson Gordon 251236 - $3,270.00*

170      This item is part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs. I will consider this below (Section Z).

*(d) Mar-87 ElliJon 1490 - $609.19*

171      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(e) Apr-87 ElliJon 1490 - $127.50*

172      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(f) Apr-87 MontPur 52043 - $10.34*

173      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(g) Jun-87 ThomRog 69/643 - $1,787.05 re Wallace Sign-Crafters v Strohmer & Branstone*

174      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(h) Jun-87 MontPur - 0006015 USX #26075 - $8.64*

175      At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(i) Jun-87 Reverse 86 Accrual Fee 86/87 ($5,500.00)*

176      This item is to reverse a 1986 accrual fee. Mark Armitage testified that he does not know anything about this item, and the defendants have not provided any documentation for this item. The defendants destroyed the documentary back-up for this item. In my view this is one of those instances in which the onus shifts to the defendants to justify the charge. They have not done so and the charge should be reversed.

*(j) Jul-87 ElliJon 1490/61987 - $117.00*

177      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(k) Aug-87 ElliJon 1490/61987 - $78.00*

178      At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(l) Aug-87 CampMur 24575 - $1,607.20*

179      Mark Armitage testified that this account is for a law firm called Campney & Murphy, from which the Adtronics Group did not seek services in 1987, and the defendants have not provided any documentation for this item. In the absence of

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 30 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

documentary or *viva voce* evidence from the defendants on this point, I accept Mark Armitage's testimony that there is no basis to allocate this item to the shared expense pool. I order that this item be allocated to Sicon.

*(m) Aug-87 ElliJon wrong acct - $702.00*

*(n) Sep-87 ElliJon File 1490 - $52.36*

*(o) Sep-87 Mulholland Webster 11,367 - $175.00 re C.M.G. Neon Sign Crafters*

180      At trial the defendants conceded that these three items should be allocated to Sicon and I so order.

*(p) Sep-87 Mulholland Webster FL#9960 (19445) - $288.56 re change of name from 151884 B.C. Limited to Sicon Group Inc. (Trial Exhibit #10, Tab 200)*

181      The defendants contend that this item is properly a shared expense. Mark Armitage testified that this invoice relates to legal services provided by Mulholland Webster to change Sicon's registered name from the numbered company to Sicon Group Inc. This legal service was associated with the refinancing and reorganization of the companies in 1987. Mark Armitage testified that professional fees would properly be shared if they related to the cancellation of the CCB loan, or the 1987 corporate reorganization. Mark Armitage agreed to the amalgamation so inferentially he must have agreed to share in the cost of accomplishing it. I therefore conclude that this invoice relates to the 1987 corporate reorganization and is properly a shared expense. Below in Section Z I have found that the deferred financing costs, as differentiated from the corporate re-organization costs, are not a shared expense but rather a specifically allocatable expense based on the amount of the financing used by each party.

*(q) Oct-87 Mulholland Webster Sept Stmt - $21,108.44 re refinancing & reorganization required by the lenders therefor*

182      To the extent that this legal fee relates to the corporate re-organization it is a shared cost. Legal services related to refinancing as opposed to corporate re-organization, should be considered below under the heading of deferred financing costs (Section Z).

*(r) Oct-87 Mulholland Webster 10502 - $427.08 re Michael Armitage, Sign-O-Lite & Adtronics - portion of $1227.08 bill re telephone conference with Don Armitage re Bank of Nova Scotia & goods held; revise letter to M. Paine*

183      At trial the defendants agreed that this item should be charged directly to Sicon and I so order.

*(s) Oct-87 Mulholland Webster 11467 (10147) - $4,231.31 re Sign-O-Lite Plastics vs. Beverley Walker display rental agreement #010-14811*

184      The plaintiff says in its closing submission that this expense is part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs. This expense relates to a law suit with one of Sicon's lease customers. It should not be classified as deferred financing but should be charged directly to Sicon. It is not a shared expense.

*(t) Oct-87 MiniCor Annual Rpt - $20.00 and Oct-87 MiniCor Annual Report - $20.00*

185      Mark Armitage testified that these two items should not have been included in the pool for allocation because they appear to be related to the filing of the annual report and Mark Armitage paid for his own filings. The defendants characterized this item as services to the parent company and contended that it should be shared. I find that this is a head office charge and should be allocated to Sicon.

*(u) Oct-87 Clarkson Gordon 87228 - $17,434.00 re bank financing - Bank of B.C., National Trust*

*(v) Oct-87 Clarkson Gordon 87085 - $4,800.00 re lease contracts receivable @ Nov 24/86 per Bank of Nova Scotia re accuracy & reasonability of lease portfolio (Trial Exhibit #10, Tab 202)*

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 31 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(w) Oct-87 Clarkson Gordon 87088 - $10,500.00 bank proposals - CCF, TD Bank, Bank of Nova Scotia, Bank of B.C. re bank financing*

186    These items are part of the $217,961.51 that has been reclassified by the defendants as deferred financing costs and I will consider them below (Section Z).

*(x) Oct-87 CK Legal & L of C 0010009 - $3,591.05*

187    Mark Armitage testified that he has no idea what this item is, but that it appears to refer to a letter of credit. He testified that no letter of credit was obtained for Adtronics in 1987, and no back-up documentation was ever provided by the defendants for this item. In the absence of documentary or *viva voce* evidence from the defendants on this point I accept the testimony of the plaintiffs. Accordingly this item should be allocated to Sicon.

*(y) Nov-87 Mulholland Webster 11,367B - $19.83 re C.M.G. Neon Sign Crafters (Trial Exhibit #10, Tab 203)*

188    At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(z) Nov-87 Mulholland Webster 11467-06 - $11,036.46 re Sicon Group reorganizing & refinancing*

*(aa) Nov-87 Mulholland Webster 11467-406 - $12,000.00 re Sicon Group reorganizing & refinancing*

*(bb) Nov-87 Mulholland Webster 11467/406 - $12,000.00 re Sicon Group reorganizing & refinancing*

189    In Sicon's books of accounts the defendants reclassified these amounts as deferred financing costs. Consequently they should be allocated as such in section Z below. As already mentioned, to the extent that these fees relate to the corporate re-organization they should be considered a shared cost.

*(cc) Nov-87 TheLaw legal fees - $955.00*

190    Mark Armitage testified that he does not know what this item is. He said Adtronics did not authorize this expenditure for legal fees in November of 1987, and the defendants have not produced any documentary back-up for this charge. In the absence of documentary or *viva voce* evidence on this point, I accept the plaintiffs' evidence and conclude that this item should be allocated to Sicon.

*(dd) Nov-87 CanaCor Dep Tfr 0011029 - $10,000.00*

*(ee) Nov-87 CanaCor Jun Dep Trf 0011029 - $25,000.00*

*(ff) Nov-87 Tfr Blake Cassels 0011031 - $69,160.00*

*(gg) Dec-87 Mulholland Webster Jan Stmt - $22,221.30 re reorganization, CCB and Bancorp claim for commission on refinancing*

191    These items will all be considered below as deferred financing charges (Section Z).

*1988*

*(a) Jan-88 MiniFll A/C 1365 - $250.00 to bring cash balance up for Sign-O-Lite re its search fee account #1365 with Minister of Finance (Trial Exhibit #10, Tab 204)*

192    Mark Armitage testified that this expense was for the Sicon collection department to do company searches on individual businesses through the registry in Victoria, and relates to Sicon's lease business. Mark Armitage said he specifically refused to use the Sicon credit department. Timothey McLean testified that the Sicon Group maintained a search fee account with the Ministry of Finance in Victoria to do credit checks on future proposed clients. I find that this fee is specifically allocable to Sicon.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 32 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(b) Feb-88 ElliRoad 1490G1987 - $65.00 review proposed cash sale agreement (Trial Exhibit #10, Tab 205)*

193      At trial the defendants conceded that this expense should be allocated to Sicon and I so order.

*(c) Feb-88 JoanMcM Per Joan $16,000.00*

194      At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(d) Mar-88 BourCon 3073 - $238.55 re Sign-O-Lite Signs & Mam Pizza (Millwoods) Ltd. (Trial Exhibit #10, Tab 206)*

195      This item is an invoice from the law firm Bourassa, Conway & Company in Calgary. This appears to be a dispute between the Sicon Group, or Sign-O-Lite Signs Ltd. specifically, and a Mam Pizza in Millwoods, Calgary. I conclude that this item should be attributed to Sicon.

*(e) Jun-88 Mulholland Webster 11,889 - $709.75 re Bancorp claim for commission on refinancing (Trial Exhibit #10, Tab 207)*

196      This invoice relates to the issue of deferred financing, which I will deal with below (Section Z).

*(f) Jul-88 Mulholland Webster 12,202 - $753.78 re Roylease Limited - search of vehicles in Alberta & B.C. (Trial Exhibit #10, Tab 208)*

197      At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(g) Aug-88 Mulholland Webster 12,202 - $126.00 re Royal Bank of Canada financing (Trial Exhibit #10, Tab 209)*

198      This invoice is from Mulholland Webster in regards to the Royal Bank financing. Mark Armitage said that Adtronics did not use the any part of the Royal Bank financing. The defendants contend that this expense relates to the operating line of credit for the whole business and is therefore a shared expense. I conclude that this expense relates to Sicon's head office expense and should be charged to Sicon.

*(h) Aug-88 ElliRoa 1490/A - $65.00 re Rick Austin and his termination & withholding of company vehicle & assets (Trial Exhibit #10, Tab 210)*

199      At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(i) Nov-88 Mulholland Webster 9960 (21,043) - $634.45 re Don Armitage re control to avoid delay in redemption of preference shares on his death, shareholdings in Sicon by 258374, increase directors in Sicon, Armitage & Neasden, alternative directors of Sign-O-Lite Plastics & Wallace (Trial Exhibit #10, Tab 211)*

200      This invoice from Mulholland Webster concerns the manner in which Donald Armitage's shares will be handled when he passes away, the settlement with Signcorp, the assignment of leases and other corporate matters. I conclude that this is a head office expense and should be charged to Sicon.

*(j) Dec-88 Mulholland Webster 11,889 - $3,082.15 re Bankcorp Mortgage Limited v Sicon Group Inc. et al.*

201      This is an invoice from Mulholland Webster with the reference to litigation styled as *Bankcorp Mortgage Limited v. Sicon Group Inc.* Donald Armitage had hired Bankcorp to find financing. When Donald Armitage found financing through the CCFL, he refused to pay Bankcorp their commission, so Bankcorp sued the Sicon Group. I agree with the plaintiffs' contention that this is a head office cost for which Sicon is wholly responsible.

*(k) Dec-88 1988 A/P Accruals 0012059 - $593.00 (Trial Exhibit #10, Tab 213)*

202      This entry corresponds to an invoice of Clarkson Gordon addressed to 32262 B.C. Ltd. Mark Armitage testified that the expense should not have been included in the pool for allocation because the expense relates to a Revenue Canada assessment

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 33 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148...
2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

of the Sicon Group for late payment or remittance of payroll deductions. The assessment arose out of errors in the Sicon payroll department. Mark Armitage testified that he did not think he should share in the cost of mistakes made by the Sicon payroll department. I agree that penalties, fines and expenses of that nature are a head office type expense and cannot under the September Agreement become the liability of Adtronics.

*(l) Dec-88 MuhlWeb Apr-88 - $3,221.05 re Royal Bank financing to review commitment letter, security documents, debenture, declaration of value, directors resolutions, statutory declarations, opinion letter (Trial Exhibit #10, Tab 214)*

203      This is a legal expense from Mulholland Webster concerning the Royal Bank financing that has nothing to do with Adtronics and was not used by Adtronics. This expense should therefore be characterized as a head office expense and allocated to Sicon.

*1989*

*(a) Mar-89 SincPit 210502 RRM - $195.84 re Sicon Group of Companies re discharge of 6 debentures (Trial Exhibit #10, Tab 215)*

204      This is an invoice from a Calgary law firm, Sinclair Pittman, incurred for the purpose of discharging debentures. This is a head office type expense and should be charged to Sicon.

*(b) Mar-89 SincPit 210582 RRM - $126.15 re Sicon Group of companies re discharge of 6 debentures (Trial Exhibit #10, Tab 216)*

205      This is also an invoice from Sinclair Pittman incurred for the purposes of discharging debentures and should be characterized as a head office type expense and charged to Sicon.

*(c) May-89 MulhWeb 9960 (21832) - $344.50 re bank & fraudulent endorsements on cheques & statutory declaration re Adtronics (Trial Exhibit #10, Tab 217)*

206      This is an invoice from Mulholland Webster for legal services. Mark Armitage contends that it should not be included as a shared expense because it appears to relate to legal advice Donald Armitage obtained from his lawyers concerning Adtronics. He points to line items in the invoice that particularize communications with Adtronics' solicitor at Davis & Company. No one, including Mark Armitage, gave evidence from which I can draw any conclusions about the nature of the legal services invoiced. The burden of proof is on the plaintiffs. Evidence was available as to the nature of the legal services and accordingly I decline to make any order altering the original allocation of this item. It is not for the Court to speculate about the nature of the expense.

*(d) May-89 KellTre 8245JT - $811.25 (Trial Exhibit #10, Tab 218)*

207      At trial the defendants conceded this expense should be charged to Sicon, and I so order.

*(e) Jul-89 NewmMac 88\2509\he - $195.65 re discharge of financing statements (Trial Exhibit #10, Tab 219)*

208      This is an invoice from a Winnipeg law firm, Newman MacLean, to Mulholland Webster. Mark Armitage testified that this should not have been included in the pool for allocation because Adtronics did not carry on any business in Winnipeg, and the legal services relate to the discharge of financing statements. The defendants contend that this expense related to the original CCB financing. I conclude that this is an indirect head office type expense and should be charged to Sicon.

*(f) Sep-89 SincPit 210502 - $60.24 re Alberta corporate registry*

209      This is an invoice from Sinclair Pittman, a Calgary law firm, referring to legal research and attending at the central registry in Alberta. This invoice relates to the extra-provincial registration of the Sicon companies and is a necessary component of the Sicon business because it is doing business and securing financing in other provinces. I conclude that under the September Agreement such head office expenses are specifically attributable to Sicon or are indirect head office type expenses.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 34 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*(g) Oct-89 HlecKan 12602 - $240.78 re Saskatchewan personal property registry (Trial Exhibit #10, Tab 221)*

210    At trial the defendant conceded that this expense should be charged to Sicon, and I so order.

*(h) Dec-89 0012009 Prof Fees - $5,000.00*

211    Mark Armitage testified that he has no idea what this expense is for and the defendants have not provided any back-up for this item. The defendants made no submissions concerning this item. There is no documentary evidence as to the nature of the expense that was charged. As noted above, the evidentiary onus shifts in this instance to the defendants and they have not discharged that onus. The defendants have not provided any explanation as to why the plaintiff was so charged. Accordingly I find that the expense is attributable to Sicon.

*(i) Dec-89 MulhWeb 11,559 - $733.80 re Blundell No. 2 Road Shopping center - Macy Neon (Trial Exhibit #10, Tab 222)*

212    At trial the defendants conceded that this expense should be attributed to Sicon and I so order.

**1990**

*(a) Jan-90 ElliRoad 1490/A - $169.37*

213    At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(b) Feb-90 MulhWeb 9960 - $353.75 re shareholder agreement re redemption of shares (Trial Exhibit #10, Tab 223)*

214    This is an invoice from Mulholland Webster for general corporate work on behalf of Sicon. As I have determined, head office type charges should be allocated to Sicon.

*(c) Apr-90 BurchMac Annual Stmt - $80.78 (Burchell MacAdam Hayman)*

215    No particulars of this charge, which relates to filing an annual statement, have been provided to the plaintiffs and it should be charged to Sicon.

*(d) Apr-90 TomArm Rep/Course - $160.00 (Trial Exhibit #10, Tab 224)*

216    This item relates to a training course taken by Tom Armitage. Tom Armitage was a Sicon executive responsible for the collection department. This is a head office type charge. Also, Adtronics specifically elected not to use the collection department. For both reasons, I find that this expense should be charged to Sicon.

*(e) Apr-90 TomArm Rep/Course - $41.95 (Trial Exhibit #10, Tab 224)*

217    This item relates to a textbook for Tom Armitage. This item should be charged to Sicon for the same reasons as the item above.

*(f) May-90 PittLav 210502 JWC- $105.68 to file discharge of debenture with Corp registry (Trial Exhibit #10, Tab 225)*

218    This invoice is from a Calgary law firm and relates to the discharge of security in Alberta. It is specifically attributable to Sicon's lease business or alternately is a head office type charge. For both reasons, I find that it should be charged to Sicon.

*(g) May-90 ElliRoad L-Tec - $2,116.25*

219    At trial the defendants conceded that this item should be charged to Sicon and I so order.

*(h) Dec-90 MulhWeb 130,11 - $3,067.00 re Bancorp Mortgage Limited v Sicon Group Inc. (Trial Exhibit #10, Tab 228)*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 35 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

220     This invoice is from Mulholland Webster, regarding the litigation mentioned at item (j) in 1988, *Bancorp Mortgage Limited v. Sicon Group Inc.* Again, I will consider this item under deferred financing (Section Z).

*(i) Dec-90 MulhWeb 14,438 - $562.80 re sale & lease of equipment from Roylease (Trial Exhibit #10, Tab 229)*

221     At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*(j) Dec-90 0012042 Half Signcorp - $27,713.56 Adtronics directly charged $27,713.56*

222     At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*1991*

*(a) Jun-91 CGA Ester Due - $529.65 (Trial Exhibit #10, Tab 230)*

223     This expense is for Ester Gale's membership in the Society of Certified General Accountants. Ester Gale provided services directly to Adtronics. Her professional membership was a reasonable part of her compensation package and I find that Adtronics should share in that expense.

*(b) Nov-91 MulhWeb 15805 - $180.55 re Sicon Group re Chandry, registration of Sicon in Ontario (Trial Exhibit #10, Tab 231)*

224     This is an invoice from Mulholland Webster for legal services for acting as agent for Sicon concerning various Ontario legal matters. I would characterize this account as head office type charges and I conclude that they should be charged to Sicon.

*(c) Dec-91 BiamCai 7079 - $99.00*

225     Mark Armitage testified that he does not know what the acronym BIAMCAI stands for, and he has never received any information from the defendants with respect to this item. The defendants have not provided any explanation for this account. The defendants have not provided any documentary back-up other than the entry on the company' books. Accordingly, I find that the charge should be allocated to Sicon.

*(d) Dec-91 HlecKan C4476 - $103.60 (Trial Exhibit #10, Tab 232)*

226     This is an invoice from the Saskatchewan law firm of Hleck Kanuka Thuringer. The invoice states that the legal services provided were for extra-provincial registration. Donald Armitage testified that the reason why the Sicon Group extra-provincially registered was because one must be extra-provincially registered in the jurisdictions in which one wishes to sue and maintain a court action. Such expenses relate directly to Sicon's lease business. I have already found that such a head office charge should be specifically allocated to Sicon.

*1992*

*(a) Jan-92 Annual Fee - $50.00 annual return fee - Minister of Finance - Saskatchewan (Trial Exhibit #10, Tab 233)*

227     This item is a cheque requisition payable to the director of the corporations branch in Regina, Saskatchewan and is a head office type charge, chargeable to Sicon. It is not a shared expense.

*(b) Mar-92 BurcMac 1008479 - $80.84 (Trial Exhibit #10, Tab 234)*

228     This invoice is from the Nova Scotia law firm of Burchell MacAcam & Hayman. The legal services provided are to register the Sicon business name in that province. Similar to the two preceding items, this charge should be specifically allocated to Sicon as a head office charge.

*(c) Mar-92 AltmKah 15545 - $113.50*

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 36 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

229     The plaintiffs challenge this account and the defendants have not provided any explanation as to why this expense was included as a shared expense. The defendants lead no evidence and made no specific submissions on this account. Accordingly, I find that it should be allocated to Sicon.

*(d) Jun-92 James Wong 8227 - $4,882.00 (Trial Exhibit #10, Tab 235)*

230     This is an invoice from James Wong, chartered accountant. Mark Armitage testified that the portion of the invoice relating to reviewing life insurance for Donald Armitage should not have been included in the pool for allocation. The defendants contend that life insurance for the C.E.O. of an organization is a legitimate business expense. In my view, it may be a legitimate business expense but it is a head office type charge and should be allocated to Sicon. The remaining portion related to Donald Armitage's capital cost allowance should, according to Mark Armitage, be included in the pool for allocation and accordingly, it is so ordered.

*(e) Jul-92 ElliRoa 1490\1 - $152.04*

231     This invoice is for Sicon's account collection lawyers, Ellis Roadburg. Mark Armitage testified that he does not know anything about the expense. The defendants have not provided any explanation for this expense. In the absence of any explanation or documentary back-up, I find that this item should be charged to Sicon.

*(f) Sep-92 TreaOntExta Prov - $50.00 (Trial Exhibit #10, Tab 236)*

232     This is a cheque requisition for the Ontario Registrar for extra-provincial corporations. I have already held that such extra-provincial registration expenses should be allocated to Sicon.

***1993***

*(a) Jan-93 MiniFin AnnuRep - $30.00*

233     This expense is for the Minister of Finance regarding an annual report. Mark Armitage testified that he was always billed directly for annual reports for his company and paid for them directly. I find that this general corporate expense should be charged to Sicon.

*(b) Jan-93 MiniSask Annual - $50.00 Saskatchewan annual report (Trial Exhibit #10, Tab 238)*

234     This is a cheque requisition for the Minister of Finance in Saskatchewan for an extra-provincial annual return. As above, I find that this should be charged to Sicon.

*(c) Feb-93 MulhWeb 12,602 - $59.90*

235     This item appears in the shared expense category on the accounts, but neither the plaintiffs nor the defendants know what it is for. Accordingly, in the absence of any evidence from the defendants, I find that this charge should be allocated to Sicon.

*(d) Feb-93 0002015 Tfr to Prof Fee - $4,812.15 A/C 272 - deferred financing costs (Trial Exhibit #10, Tab 239: $4,812.13 made up of three invoices: A. $2,838.87 (McMillan Binch) + B. $1,673.60 (Milner Fenerty) + C. $299.66 (Royal Bank))*

236     The defendants say that these three accounts concern the Royal Bank financing, and should be shared. I have already held that Sicon should be charged for all expenses concerning the Royal Bank financing. This financing was secured by Sicon to replace the CCFL funding, which in turn had been obtained to replace the financing from CCB. Adtronics had no involvement in the Royal Bank financing. The argument that some of the money obtained was to be used for the purposes of paying Adtronics what it was owed is not a compelling reason to saddle Adtronics with a portion of the cost of obtaining the funding.

*(e) Feb-93 0002015 Adj Ppd/Accrual- $19,700.00 A/C 183.003 relates to consulting re Tim McLean, Tom Armitage, Shirley and Smythe Ratcliffe audit fee (Trial Exhibit #10, Tab 240-244)*

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*A. Tab 241 ($16,000 less $2,500 related to audit = $13,500 remaining)*

237     This is an invoice from Smythe Ratcliffe in the amount of $16,000, of which $2,500 has been posted to audit; leaving a balance of $13,500 posted to professional fees. A review of this invoice discloses that it relates to assets in Eastern Canada "as requested by Ontario Courts", discussions about internal matters, discussions about employee compensation under the *Income Tax Act* and the possible use of holding companies by key employees to reduce U.I.C. payments, special investigations regarding share valuations of various Sicon companies, estate planning, review of B.C. capital tax information, and tax planning. All these services are general corporate head office services and I find that they should be allocated to Sicon.

*B. Tab 242 ($10,700 less $5,500 related to audit = $5,200 remaining)*

238     This is an invoice from Smythe Ratcliffe in the amount of $10,700, of which $5,500 has been posted to audit; leaving a balance of $5,200 posted to professional fees. Of this $5,200 remaining balance, Mark Armitage testified that the $2,500 entry relating to the U.S. audit of affiliated companies should be allocated between the Adtronics Group and the Sicon Group. This $2,500 has been accounted for by Adtronics. The remaining account is stated to be for estate planning and cannot be considered an appropriate shared expense. I find that it should be charged to Sicon.

*C. Tab 243 ($5,500 less $4,500 related to audit = $1,000 remaining)*

239     This is an invoice from Smythe Ratcliffe in the amount of $5,500, of which $4,500 has been posted to audit, leaving a balance of $1,000 posted to professional fees. The $1,000 balance relates to accounting services for share valuations of various Sicon companies and should be considered to be a head office expense and allocated to Sicon.

*(f) Feb-93 0002020 Tfr fr 06 - $1,000.00 deferred financing costs (Trial Exhibit #10, Tab 246)*

240     At trial the defendants conceded that this item should be allocated to Sicon and I so order.

*(g) Apr-93 BurcMac 1008479 Ann - $71.29 (Trial Exhibit #10, Tab 247)*

241     This is an invoice from the Halifax law firm of Burchell MacAdam & Hayman, for legal services related to business name registration, and I find that it should be charged to Sicon.

*(h) Jun-93 0006004 Smytrat to 18 - ($2,250.00)*

242     This journal entry is a transfer of $2,250.00 in costs from the Sicon professional fees to the Adtronics division, and is made up of two entries:

| | | |
|---|---|---|
| (i) | $1,800.00 | (part of $4,800.00 from *Exhibit 10, Tab 248*), and |
| (ii) | $ 450.00 | (part of $2,500.00 from *Exhibit 10, Tab 189*). |
| | *$2,250.00* | *Total* |

These two costs are part of the next two items, (i) and (j), and are discussed below.

*(i) Jun-93 SmytRat 4331 - $4,800.00 see Doc 3361 - relates to 1992 T-1 personal tax returns for Tom and Monica Armitage, Lynn Muirhead, Mr. Muirhead and Mr. MacDonald; review in change of lease to achieve max tax benefits; tfr of Simpson Road property among related parties (Trial Exhibit #10, Tab 248: $4,800.00 = $1,800.00 + $1,300.00 + $950.00 + $750.00)*

*A. $1,800.00 entry*

243     At trial the defendants conceded that this amount should be charged to Sicon and I so order.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 38 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*B. $1,300.00 entry*

244    At trial the defendants conceded that this amount should be charged to Sicon and I so order.

*C. $950.00 entry*

245    This $950.00 entry relates to various meetings and discussions regarding transferring of the Simpson Road property among related parties, possible split off of Adtronics at some further date, and other corporate matters. The defendants contend that this relates to general corporate matters. I agree that it does and as such it should be charged to Sicon.

*D. $750.00 entry*

246    This $750.00 entry relates to the preparation of the 1992 personal tax returns for individuals Thomas and Monica Armitage, Lynn Muirhead, Mr. Muirhead and Mr. MacDonald. Mark Armitage says this should be charged directly to the Sicon Group because none of these people worked for the Adtronics Group, and Mark Armitage was charged directly for his own personal tax return preparation. As above this item relates to general corporate matters and I find that it should be charged to Sicon.

*(j) Jun-93 SmytRat 4596 $2,500.00 (Trial Exhibit #10, Tab 189: $2,500.00 = $500.00 + $1,000.00 + $450.00 + $550.00)*

*A. $500.00 entry*

247    At trial the defendants conceded that this expense should be charged to Sicon and I so order.

*B. $1,000.00 entry*

248    The $1,000.00 entry relates to the various discussions regarding the possible split of Adtronics from the Sicon Group including preparation of draft taxes payable of the Adtronics division from 1987 through 1992. This expense relates to Sicon's general corporate position regarding the split with Adtronics. It should be specifically allocated to Sicon, or alternatively considered general head office corporate accounting. In either event, I find that it is chargeable to Sicon.

*C. $450.00 entry*

249    At trial the plaintiffs conceded that this expense should be charged to Adtronics and I so order. The $450.00 entry relates to continued discussions, correspondences and planning with regard to the current IRS audit of Adtronics Inc. Mark Armitage testified that this should be charged directly to the Adtronics Group as Smythe Ratcliffe was acting on Mark Armitage's behalf.

*D. $550.00 entry*

250    At trial the defendants conceded that this item should have been charged to Sicon and I so order.

*(k) Jul-93 0006014 Rev Adj - $3,000.00 JE adjustment only (Trial Exhibit #10, Tab 190)*

251    Mark Armitage testified that he does not know anything about this item. The defendants lead no evidence (other than the journal entry) specifically on this charge. In the absence of an explanation as to why this was charged to Adtronics, I order that the expense be reversed and charged to Sicon.

*(l) Jul-93 CampPou Appraisal - $250.00 appraisal (Trial Exhibit #10, Tab 249*

252    This item is for an appraisal invoice and cheque requisition for Campbell & Pound. Ester Gale testified that the appraisal relates to an update valuation of 2771 Simpson Road and believes it was done in connection with the financing that was put in place for Donald Armitage's companies in 1993. I have already said that expenses related to the 1993 Royal Bank refinancing are head office charges and should be charged to Sicon. As already stated, the fact that Adtronics hoped to be repaid from

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the financing does not, as the defendants contended in respect to this item, mean that it must share in the cost of obtaining the financing.

*(m) Aug-93 MiniFin 151884 - $30.00 (Trial Exhibit #10, Tab 250)*

253      This expense is for the annual report for the Sicon Group's numbered company, 151884, to the Minister of Finance. I find that this general corporate expense should be charged to Sicon.

*(n) Sep-93 SymtRat 5058 - $2,500.00 (Trial Exhibit #9, Tab 130)*

254      At trial the defendants conceded that this item should be excluded and charged to Sicon, and I so order.

**Property Insurance - Section C**

255       In the original allocations, Sicon included automobile insurance under the classification of property insurance. Both parties now agree that it should not have been included in the property insurance allocation and both parties further agree that Sicon should be charged directly for its own motor vehicle insurance.

256      Sicon included the property insurance for all its buildings in the calculation of the historical allocations. The Agreement states in ¶ 16(b):

> To the extent that any costs relate to the operation of premises (e.g. property taxes, electricity) the costs shall be borne by each Group in proportion to the space used by each Group at such premises.

257      In a memorandum dated December 6, 1988, Donald Armitage wrote to Ester Gale concerning the allocation of property insurance as follows:

> Common costs consist of property and business taxes, light, heat and water, repairs and maintenance, insurance for the B.C. building, tenant improvements. Adtronics is supposed to pay 15.39% of these cost for B.C., and then common costs shared by everybody based on the volume which I will give you later. Common costs everybody shares in liability insurance everywhere, ....

258      There is no difficulty in interpreting clause 16 of the Agreement in conformity with Donald Armitage's understanding; that is that property insurance for the B.C. building would be charged on the proportionate space formula. I also have no difficulty finding that liability insurance is a shared "common cost" and ought to have been charged to Adtronics in accordance with the formula in Clause 16(c). The difficulty arises because Ms. Gale did not purchase insurance on a separate basis. Rather she purchased insurance coverage for casualty and liability for the whole Sicon operation.

259       I agree with the plaintiffs when they say that only the insurance for the building and operations in British Columbia and third party liability coverage are shared services or facilities.

260       The plaintiffs contend that the property insurance expense pool includes insurance for buildings in Ontario, Calgary, Edmonton and B.C., and Sicon did not separate the cost of insurance for the buildings from the cost of the third party liability coverage. Similarly, the Sicon Group did not provide a breakdown by jurisdiction of the insurance costs for each of the properties in the various jurisdictions. The Plaintiff says that only the insurance coverage for the Building (in B.C.), and third party liability coverage, could be characterized as shared services or facilities. The plaintiffs say that owing to the aforesaid lack of information, they have used the more conservative allocation percentage - the gross revenue percentage on the entire pool of insurance expenses (as opposed to using the proportionate space percentage for the B.C. Building insurance, and excluding the insurance for the Ontario and Alberta buildings.)

261       I do not agree with the defendants when they say that this is an example of pro-rating a single expense. The insurance should have been priced for the facility used by the plaintiff; because it was not, the defendant can hardly complain that to do so is pro-ration.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 40 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

262     Accordingly I find that the best evidence of the cost of insurance is as calculated by the plaintiff as follows:

| | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *1993* |
|---|---|---|---|---|---|---|---|
| Total Pool Specifically attributed to Defendants - auto insurance | $971.00 | $10,290.00 | $19,498.00 ($3,115.00) | $18,896.00 | $19,984.00 | $18,245.00 | $16,022.97 |
| Specifically attributed to Defendants - 12% not related | | | ($1,965.96) | | | | |
| Net pool | $971.00 | $10,290.00 | $14,417.04 | $18,896.00 | $19,984.00 | $18,245.00 | $16,022.97 |
| Gross Revenue % | 16.02% | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Total Charges to the Plaintiff | $155.55 | $1,712.26 | $3,644.63 | $3,714.95 | $3,866.90 | $6,296.35 | $4,359.85 |

### *Donations- Section D*

263     The defendants state in their submissions the following:

> A donation is a cost incurred by the head office within the managerial discretion of the CEO, and inconsequential to boot. It is significant how little there is; no apparent attempt by Don Armitage to build himself up at other peoples' expense; just neighbourhood donations.

264     The following facts are relevant to the issue concerning donations. Although Sicon made donations in all years in question, it was only in 1992 and 1993 that it allocated the cost to Adtronics. The only way these expenses could be allocated to Adtronics is as a shared service, yet donations are clearly not a shared facility. Donations are a personal choice - it is not a service that was used by Adtronics. Furthermore, it is easily capable of specific attribution under clause 16(a). The defendants contend that donations are a reasonable head office expense, but I have already found that that argument is not a reason for an allocation. Accordingly all the donations must be charged to Sicon.

### *Miscellaneous Government Taxes - Section E*

265     Between the years 1986 and 1991 Sicon allocated small amounts of miscellaneous government taxes to the shared expense pool and in some cases directly to Adtronics.

266     The defendants have not produced any documentation other than the accounting entries themselves to explain the nature of the tax. The only evidence on the issue is the evidence of Mark Armitage who testified (and was not challenged on this point) that Adtronics paid PST, federal sales tax and Washington State taxes, all of which were charged and paid directly by Adtronics. In regards to the $4,396.45 that is the subject of this dispute, Mark Armitage says no other taxes were payable by Adtronics and therefore it cannot be allocatable to him.

267     Mr. Clarke contends that the plaintiff cannot prove what the payment is for and therefore is not entitled to "a money judgment for this sum".

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

268    I disagree. Mark Armitage gave uncontradicted evidence that it could not have been a tax for which Adtronics is taxable, and the defendants having charged it to Adtronics have failed to provide particulars of the purpose of the payment. I conclude that this amount must be charged to Sicon.

### Consulting Fees - Section F

269    The first issue to decide under this section is the correct amount of Timothey McLean's consulting fees. The defendants have made no submission disputing the plaintiffs' correction to the accounting records. The review of the records conducted by Brenda Leung appears to be correct, and accordingly I find that Timothey McLean's actual income in 1992 was $73,914.97 and in 1993 January to September is $65,050.51.

270    The second issue raised by the plaintiffs in this section concerns the appropriateness of reclassifying Timothey McLean and other senior executives as consultants as opposed to employees. I agree with the defendants that the classification has no pecuniary consequence and I do not consider this an issue that is necessary for me to decide.

271    The third issue concerns the correct allocation of Timothey McLean's salary as between Sicon and Adtronics. Timothey McLean's salary is deducted by the plaintiffs from the classification of consulting fees and added back as management salaries. Timothey McLean was the general manager and I will consider the appropriate allocation of his salary under management salaries. The plaintiffs have also reversed the consulting fee for Tom Armitage, manager of the collection department, and included Tom Armitage's salary under the collection department. I will do likewise. The only other large item under consulting fees is a 1989 severance payment to Deo Zabat-Fran and his wife Valerie Armitage (Donald Armitage's daughter). Before 1989 Deo Zabat-Fran was the general manager of Sicon. In 1989 he quit and moved to California. Originally this severance allowance was not charged to Adtronics in the annual allocations, but in this litigation the defendants say that Adtronics should bear a portion of this cost on the basis that this severance allowance is a shared cost as is the salary of the general manager. The defendants say that this court should not second-guess management's decision to pay this severance. Donald Armitage admitted in discovery testimony read in at trial that Deo Zabat-Fran quit for personal reasons and returned to California. There was no evidence of any corporate purpose for which the payment was made. I conclude, as did Mark Armitage, that the payment was made as a generous gesture by Donald Armitage to help Deo Zabat-Fran and Valerie Armitage to resettle in California. Consequently, it should be reallocated to Sicon as it was originally.

272    The remaining payments in dispute in this section could collectively be described as professional fees, course fees, and professional books provided as a benefit to the various senior managers and assistants at Sicon. To the extent that Adtronics shares in the costs of the particular staff member as a shared service, I do not consider that these modest amounts should be excluded from the calculation of Adtronics share in their respective compensation packages, provided that any particular item can be proven to be linked to an individual providing a shared service.

### Collection Department - Section G

273    The first issue under this section is the proper allocation of $556.00 charged to Adtronics in 1987 and $437 charged to Adtronics in 1988 in connection with a law suit styled *Sign-O-Lite v. Pachena*. The law suit had nothing to do with Adtronics. In a memorandum, Donald Armitage acknowledged that the charges were an error. They were never reversed. These two amounts should be charged to Sicon.

274    The second issue in this section concerns Adtronics use of the collection department. I have considered all the evidence concerning the alleged use by Adtronics of the collection department and I find that Adtronics made no use of the collection department from 1987 onward. I further find that Mark Armitage specifically said that he would not use the collection department. On March 25, 1988, Adtronics' accountant wrote to Sicon concerning objections to the 1987 allocations:

The charge of 15% of the total collection department salaries and benefits is excessive. Adtronics does not make any use of that department and, accordingly, no charge should be levied. Rather, if use is made of the department a specific charge should be made for the service provided at the time it is provided.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

275    Mr. Clarke says that "shared use equals occasional use." Donald Armitage complained about Adtronics' receivables and to no avail pressed Mark Armitage to use Sicon's collection department. I am satisfied that there was no use at all made of the collection department by Adtronics after 1987 and that Mark Armitage gave adequate notice in the March 1988 memorandum pursuant to clause 16, the relevant portion of which states:

> No group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service. Either Group may at any time advise the other on reasonable notice that it no longer wishes to use a facility or service provided by the other in which event it shall no longer be obliged to share in the cost.

276    I therefore conclude that there should be no allocation to Adtronics for the cost of the collection department for the years 1987 to 1993.

*Office Salaries - Section H*

277    This section covers office staff (not management salaries) except Ester Gale, the controller, and Sheila Roell, the office manager, who are included in this section on the Scott Schedule and the submissions. I will do likewise.

278    The defendants' position is stated thus:

> This is another example of pro-ration. The whole office was shared. Ester Gale broke it out in the course of not observing the Agreement ...the office generally was a shared service.

279    The first issue I must address in this section is the effect of Ester Gales' conduct over the course of administering the agreement. Ester Gale charged Adtronics, as shared services, the cost of employees who performed services for Adtronics. She did not charge the costs of the entire office staff for inclusion as a shared service as the defendants contended at trial.

280    Mark Armitage testified that his company was basically self-sufficient except for reception, payroll, and maintenance of the general ledger and banking. Adtronics did all its own purchasing, invoicing, and computer entry of invoices on Sicon's computer system.

281    Over the years 1988 to September 1993, Ester Gale allocated as a shared expense the cost of the following positions; controller, office manager, payroll clerk, accounts payable clerk, receptionist. In 1988 only, she allocated the cost of a billing customer service clerk to Adtronics as a shared expense, and in 1992 and 1993 only, she allocated as a shared expense the cost of the executive secretary.

282    At trial the defendants expert included all office salaries, some of whom he was not able to identify, either by name or position.

283    At trial the plaintiffs' position is that the payroll clerk and Donald Armitage's executive secretary should not be included as a shared expense.

284    I accept the plaintiffs' estimate or calculations of the salaries of the office staff. In some cases T4 slips were not available but I conclude that the estimates are reasonable and I do not believe that the defendants' dispute the calculation of the salaries for each individual; rather, their objection is the principled objection that the office staff must be treated as one indivisible whole.

285    The fact that Ester Gale allocated the cost of only the office staff that performed services for Adtronics has some relevance. Clause 16 of the agreement requires that the parties share only identified expenses. Although not in a formal way, the parties did over the years identify which office positions were to be shared. If Sicon had identified the whole office staff, Adtronics would have had an opportunity under Clause 16 to give notice that it did not wish to use a particular service. However, as the parties were ad idem on at least the question of which positions were shared, it cannot now be suggested that the office can be considered an indivisible entity.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

286    Accordingly, I find that Adtronics' calculation of the shared portion of office staff for the years 1987 to September 1993 is correct. I can see no justification for the 1992 and 1993 inclusion of Donald Armitage's executive secretary. She had never been included before and I heard no evidence that there was a change in services shared that would justify her inclusion.

287    The correct calculation of the office expense pool is set out by the plaintiffs in their submission as follows:

|  | *1987* | *1988* | *1989* | *1990* | *1991* | *1992* | *Jan-Sep 1993* |
|---|---|---|---|---|---|---|---|
| Controller | $41,524 | $43,600 | $52,320 | $49,936 | $52,332 | $55,286 | $43,953 |
| Office Manager | $24,914 | $26,160 | $32,700 | $21,358 | $35,456 | $38,669 | $31,239 |
| Payroll Clerk | $21,177 | $22,236 | $23,544 | $23,799 | $25,171 | $26,634 | $21,174 |
| Receptionist | $12,457 | $13,080 | $17,004 | $17,004 | $18,312 | $19,620 | $15,696 |
| Net Pool | *$100,072* | *$105,076* | *$125,568* | *$113,405* | *$132,579* | *$140,209* | *$112,062* |
| Gross Revenue % | 16.02% | 16.64% | 25.28% | 19.66% | 19.35% | 34.51% | 27.21% |
| Total Charges to the Plaintiff | *$16,031.53* | *$17,484.64* | *$31,743.59* | *$22,295.42* | *$25,654.04* | *$48,386.13* | *$30,492.07* |

288    I have considered the evidence concerning Adtronics' use of Sicon's office located in the United States. I will discuss this in somewhat more detail below, but I have concluded that no charge to Adtronics should be made for shared services of U.S. office staff.

*Office Expenses - Section J*

289    The type of expenses included in this category are general office supplies, stationery, office equipment, coffee, magazine subscriptions and similar expenses.

290    Many of the expenses could have been specifically allocated to Sicon or Adtronics at the time they were incurred. Adtronics did pay directly for some of its own office expenses. However, Ester Gale did not allocate each item but rather, once per year, she took a percentage of the total as a rough estimate and removed that amount from the pool. One obvious example of an expense that could have been specifically attributed to Sicon was the maintenance agreement for a fax machine in the Calgary office. It is not possible now to review all office expenses for the years 1988 to 1993. Many of the documents are no longer available and it is not practical from an economic point of view to perform such an exercise.

291    The plaintiffs contend that the estimated specific allocations that Sicon used for each year should be used. The agreed gross revenue percentage should then be applied to the remainder.

292    The defendants disagree. They say that:

This is another example of pro-ration. The whole of office expense was shared. Ester Gale broke it out in the course of not observing the agreement. ... The plaintiffs [acquiescence] in the defendants' [historical] percentage [is] a tacit admission that there is no scientific or contractual basis for it. The plaintiffs have not put forward anything else. It would follow that the defendants' revenue basis of allocating costs should be allowed. This is the theory of estoppel by convention.

293    There is no doubt that the agreement was not followed by the parties in dealing with the allocation of office expenses, and as I have said, there is no way of calculating the specific attribution now. I do not agree with the defendants' contention that this is pro-ration. Office expense is not one expense; it is a large number of individual items each of which could have been individually identified (pursuant to Clause 16 of the September Agreement) at the time as either specifically attributable to Sicon or Adtronics, or shared.

294    What is the legal effect of the parties' conduct in annually estimating the specific attribution? From my review of the exchange of memoranda over the life of the September Agreement, I conclude that the parties agreed to the method of estimating

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 44 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

the specific attribution, rather than reviewing the attribution item by item. That agreement is evidenced by the conduct of both parties. That agreement is enforceable against or at the behest of either party. I therefore agree with the plaintiffs' calculation.

### Postage - Section K

295      On June 1, 1991, Adtronics acquired its own postage meter. That acquisition and notice of the acquisition to Sicon is tantamount to notice under Clause 16 of the September Agreement that Adtronics would no longer share the cost of postage service. Up to that date Sicon made an allocation of postage in accordance with the 30/40/30 formula. My review of the memoranda concerning the allocations leads me to conclude that there was never any agreement concerning the appropriate allocation of postage expenses. Accordingly, up to June 1, 1991, postage should be considered entirely a shared expense and then divided in accordance with the revenue formula in the September Agreement. I recognize that this results in Adtronics likely paying more than its fair share of the postage. Sicon's business consumed a far larger proportion of the cost of postage than did Adtronics. Sicon had about 2000 leases on its books whereas Adtronics sold only to wholesalers and those sales were cash, not lease, sales. However, this is not an exercise in determining what is fair. That would be wrongly imposing upon the Court the task of rewriting the agreement. The Court's task is to apply the contract to the accounting, or where appropriate, to apply oral variations.

### Telephone - Section L

296      The only issue under this section is whether the cost of Donald Armitage's separate telephone line at the Shellbridge office is a shared service. For the period from September 25, 1987, to October 15, 1992, Adtronics and Sicon did not identify the cost for the separate telephone line as a shared expense as contemplated in Clause 16 of the September Agreement and in this litigation Adtronics now says that cost should be specifically attributed to Sicon.

297      I agree with the defendants that it is not the task of the Court to second-guess management. The Court does not have any role in assessing the merits of management decisions made by Donald Armitage.

298      The only issue is whether the cost of the telephone line to the Shellbridge office is specifically attributable to Sicon. The only basis upon which it is contended that the Shellbridge telephone line is a shared service is on the basis that Adtronics shares in head office costs. I have already decided that the September Agreement cannot be so interpreted and therefore the cost of the separate Shellbridge telephone line must be allocated to Sicon.

### Fax - Section M

299      At trial the defendants agreed that the expense for the fax line should be based on the correct revenue formula and I so order.

### Computer Expenses - Section N

300      In Ms. Gale's 1988 allocations she wrote:

Computer Expense - [total] 38,850.19 - 40% (Lease) - 10.1% (East Cash sales) - [Adtronics share] $6,552.55

301      In her 1989 allocations she wrote:

Computer Expense - [total] 35,551 - 40% Lease - 5% East cash [Adtronics portion] $10,754

302      In the 1990 allocations, Ms. Gale wrote:

Computer - Maintenance $910 per month × 12 = 10,920. Depreciation 559.79 per month × 12 = 6,717.48 = 17,637.48 × 40.1% = 7,072.63

303      In the 1991 allocations, Sicon's memorandum states:

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 45 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Computer: Allocation to Adtronics is based on the monthly maintenance charge plus depreciation times their percentage of total revenue. No programming costs have been allocated to Adtronics.

. . .

The allocation for 1988 and 1989 were based on similar rationale as the above.

304    The plaintiffs say that the allocation methods are evidence of agreement that only computer maintenance and depreciation would be considered a shared service or facility under the September Agreement. The plaintiffs say that Mark Armitage agreed with this method, and therefore had no reason to refuse to share in any computer services because none were being charged to him.

305    In this litigation the defendants now seek to charge to Adtronics a variety of other computer-related expenses including: third party software, computer hardware and software purchases for the Sicon Group's art department and collections department, and other unidentified items. The defendants say that the plaintiff's argument is another example of pro-ration. I disagree. "Computer expenses" is a designation for a variety of expenses related to a number of different computers. Sicon was able to specifically attribute some of the computer expenses, such as the art department McIntosh computers, to Sicon during the currency of the September Agreement. There is no basis upon which I would construe the September Agreement as prohibiting the specific attribution that Ms. Gale determined was appropriate at the time. Accordingly, I accept the plaintiffs' calculations of the computer expenses.

### Courier Expenses - Section O

306    During the currency of the September Agreement the parties specifically attributed courier expenses to the user of the service. In this litigation, Sicon argues that courier expenses should be considered a shared service.

307    I agree with the plaintiffs that the courier expenses were capable of specific attribution to the party using the courier, and that there should be no allocation of the Sicon Group's courier costs to Adtronics.

308    Accordingly, I accept the plaintiffs' calculations as correct.


### Property Leases/Property Costs and Rent - Section Q

309    I have already concluded that there was no agreement to pay rent [see ¶ 69 and following above]. Consequently, Clause 16 of the September Agreement governs the allocation of property costs between the parties. The parties agreed at trial on the amount of the square footage used by Adtronics and therefore the ratio to be used under Clause 16 of the September Agreement is agreed, at 13.24%.

310    Mr. Selman calculated the property costs in his report on the basis that there was no basic rent. During the currency of the September Agreement the property costs were treated akin to a triple net lease. That is, Adtronics was charged the basic rent plus its proportionate share of insurance, property taxes, utilities, repairs and maintenance, and parking. At trial, Sicon said that if the September Agreement is to govern the allocation of property costs, then Adtronics should also be responsible for its share of mortgage interest and building depreciation. Mortgage interest and building depreciation were not charged during the currency of the September Agreement.

311    Adtronics introduced expert evidence as to the market rate for rental costs of similar buildings in a similar location. This evidence is irrelevant to the issues I must decide. It is not for the Court to write an agreement for the parties. I must, in construing the September Agreement, determine what costs can properly be described as "costs relat[ing] to the operation of premises". I look to the conduct and expectation of the parties in my interpretation of this clause. (*B.C. Hydro & Power Authority v. Cominco Ltd.* (1989), 34 B.C.L.R. (2d) 60 (B.C. C.A.)). Clearly Adtronics never contemplated that its contribution

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 46 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

to the "operation of the premises" would be limited to the allocations that were made during the currency of the September Agreement but without any payment for rent. That would represent a windfall to Adtronics. In June 1987, Mark Armitage wrote to Donald Armitage to complain about the property cost allocation for 1986. This was before the September Agreement was drawn. But it is instructive to note that even then, Mark Armitage's expectation was that he would be charged rent, although he objected to the amount as well as the proportionate costs. The fact that the September Agreement is silent as to rent is somewhat puzzling. I expect that the parties did contemplate that Mark Armitage would continue to pay rent, however, because I cannot on the evidence find that agreement was reached on the amount of rent, all costs relating to the operation of the premises must be included in the pool to calculate Adtronics' share. I would include in this pool mortgage interest and building depreciation.

312     There are some other issues relating to this category of expenses.

313     The next issue is whether Adtronics should have been charged over and above the other charges for the parking area adjacent to the Simpson Road building. Having concluded that there was no agreement concerning rent, the plaintiffs' argument that rent should include parking is not of assistance. The defendants did charge Adtronics $39,000 for parking lot rent. This is puzzling in light of Donald Armitage's testimony at discovery that Adtronics was not charged rent for the parking lot. The September Agreement does not provide for parking lot rental in a fixed amount. I therefore order that the allocation of parking lot rental to Adtronics be reversed. It is not a property cost *per se*.

314     At trial the defendants agreed that the Shellbridge office costs for the separate office for Donald Armitage should not be charged to Adtronics and accordingly I order that that cost be reversed.

315     The next property cost issue is the U.S. office.

316     I heard evidence from John Temple, Adtronics' salesman for the U.S., and from Donald and Mark Armitage concerning Adtronics' use of the U.S. office. I am satisfied from that evidence that any use Adtronics did make of the U.S. office was trivial. The fact that Adtronics used old letterhead which erroneously indicated a U.S. office does not satisfy me that Adtronics used the U.S. office. Accordingly, all charges for the U.S. office should be allocated to Sicon.

317     The next issue pertains to the U.S. and Mexican condominiums owned by Sicon for company and employee use. Mark Armitage says that he and his employees did use the vacation condominiums and Adtronics paid the agreed $500 fee. He objects to paying a proportionate share of the costs over and above the fees. He also objects to Sicon's expert's calculation of the costs which fails to net out the $500 user fee.

318     I agree that the condominiums are a shared facility. Adtronics and its employees enjoyed the benefit of these accommodations. But clearly the cost allocated to Adtronics must be net of the $500 user fees. I did not understand Mr. Selman to disagree with this proposition.

### Property and Business Taxes - Section R

319     I agree with the defendants that the property taxes for the parking lot are expenses that relate to the operation of the premises. The parking lot was used for parking and for access and also storage. Accordingly, Adtronics is liable for its proportionate share of the property taxes for the parking lot. However, the lot rented to Winfield has nothing to do with the Adtronics sign business and should be excluded from the calculations as agreed by the defendants at trial.

### Light, Heat and Water - Section S

320     Any charges for utilities for rental signs should be charged directly to Sicon, as agreed at trial.

### Repairs and Maintenance - Section T

321     The plaintiffs say that a landlord would not normally charge a tenant for the cost of re-roofing a building. I agree, but in this case the September Agreement governs a relationship that is not a "normal" landlord and tenant relationship. In my view, re-roofing is a cost of operating the building in the sense that repairs and maintenance are a cost of operating the building. The

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

plaintiffs' expert testified that the proper accounting treatment of the expense of a major roof replacement is to amortize it over the useful life of the roof, about 30 months.

322    Mr. Selman testified that sometimes it is difficult from an accounting perspective to decide if a repair is betterment to a capital asset, in which case it should be depreciated over the life of the asset, or is simply a replacement, in which case it could be charged as repairs and maintenance in one year. In this case the expense of $28,813 was a substantial re-roofing of a large part of the building. As Mr. Selman says, some costs could be described as "hybrid" situations, and it is difficult to definitively say one way or the other if it should be expensed in one year or capitalized. Mr. Selman was not permitted to opine on the particular cost because it was not mentioned in his report.

323    At the time Sicon chose somewhat of a compromise and capitalized the re-roofing expense over 30 months. I would not alter Sicon's allocation of that expense or the treatment of the 1990 roof repair of $7,527.60.

324    However, extraordinary renovation expenses are in the nature of capital improvements and cannot under the September Agreement cannot be charged to Adtronics. Therefore, I find that all expenses related to the renovations commenced in November 1992 should be charged to Sicon.

325    Any double charges identified by Adtronics in this section should be reversed and attributed to Sicon.

### Sundry Expenses - Section U

326    Between 1987 and 1991 Sicon specifically attributed the following amounts to Adtronics as sundry expenses:

| | |
|---|---|
| 1987 | $14,276 |
| 1988 | $357 |
| 1989 | $2,577 |
| 1990 | $70 |
| 1991 | $9 |

327    In the year-end allocation for 1987, Sicon charged Adtronics 15% of the sundry expenses. On March 25, 1988, Mark Armitage objected to charges for any portion of the 1987 sundry expenses without being provided with any information as to the content of that account.

328    On March 28, 1988, within a detailed response by Donald Armitage to all the objections about the 1987 accounts, Donald Armitage wrote:

   He is entirely correct that a greater review should be made of everything before any statements are made, similar to the ones commented on above.

329    Sicon did not provide Adtronics with any particulars of the "sundry account" for any of the years in question.

330    At trial Sicon argued that, "These are apparently regular administrative expenses - 'a small administrative expense that couldn't properly be located elsewhere'".

331    On February 7, 1992, Donald Armitage wrote, "Sundry Expens: [*sic?*] No allocation To Adtronics ... The allocation for 1988 and 1989 were based on similar rational as the above."

332    I conclude from this exchange of memoranda that Sicon agreed not to charge Sundry expenses to Adtronics. I see no basis under the September Agreement for it to do so now. Adtronics objected to the charge. Sicon agreed not to impose the charge. No explanation was ever given by Sicon as to what the charge was for.

333    Sundry expenses should be specifically allocated to Sicon for the years in question, 1987 to 1991, under the September Agreement.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*Sales Expense, Miscellaneous Advertising, Condominium and Managerial Sales Expenses - Section V*

334    In the original accounts of Sicon, the U.S. condominium expenses were included in this account. I have considered the condominium expense above in Section Q in accordance with the Scott Schedule.

335    The remaining accounts in Section V are for Donald Armitage's travel expenses, the cost of an advertising brochure, and the costs associated with the Sicon sales force.

336    Sicon says these expenses should be included as shared expenses because:

> The Sicon sales people offered the Adtronics product for sale. That was the reason for the creation and funding of the division in the first place. The brochure described the Adtronics product. Getting the two sides promoted in common - that is why they made the presentation together to the Gateway Theatre. Sales by Sicon is a shared expense.

337    Historically Donald Armitage did not charge sales expenses to Adtronics. In his March 28, 1988, memorandum concerning the allocations, Donald Armitage wrote that "sales expense" has nothing to do with Adtronics and Adtronics had not been charged with sales expense.

338    In the 1988 and 1889 allocation memoranda given to Mark Armitage, the sales expense was not allocated or charged to Adtronics. In a memorandum prepared by Ester Gale for Donald Armitage and given to Mark Armitage concerning the 1990 allocations, it is noted that 25% of Donald Armitage's travelling expense is a shared cost because that is the amount that pertains to the CCFL meetings and it is noted that "no other unattributed costs accumulated in this account ... are allocated to Adtronics."

339    At trial Sicon argued that sales expenses should be shared and should include: advertising, car allowances, general sales expenses, managerial sales expenses, sales travel expenses, and managerial travel expenses. I see no basis upon which such an argument can succeed. As Donald Armitage said during the currency of the agreement, sales expenses had nothing to do with Adtronics. The September Agreement stipulates that Mark Armitage "shall be sole responsibility and exclusive authority to manage all of the aspects of the [Adtronics] businesses", specifically including marketing (Clause 9). Sicon marketing had nothing to do with Adtronics except that Sicon did sell a product which they called 'The Sicon 5000', an electronic sign that they usually sourced from Adtronics. The fact that Sicon sold a product sourced from Adtronics was not joint marketing, particularly because Mark Armitage had no involvement in the Sicon marketing program and specifically did not authorize, use, or agree to pay for the brochure. The Adtronics' salesman testified that he did not use the Sicon brochure, and his testimony was not challenged on this point.

340    I conclude that all sales expenses are specifically attributable to Sicon. The expense for Donald Armitage's travel is an indirect head office cost that should not be charged to Adtronics.

*Service Costs - Gas & Oil, Auto & Truck Repairs - Section W*

341    The charges at issue in this section are the costs for the gas, oil, automobile and truck costs, and repairs and maintenance on the automotive fleet that the Sicon Group had for servicing signs.

342    In Sicon's original working papers for the years 1988 to 1993 all service costs were specifically attributed to Sicon. This is not surprising because of the nature of the business of Sicon and Adtronics. Sicon serviced, delivered, and installed its signs. Adtronics did not need or use any service vehicles.

343    Because no charge was ever identified or allocated under this account to Adtronics, no objection was ever made during the currency of the September Agreement. Sicon cannot now impose the charge having never identified the charge during the currency of the September Agreement. In any event, on the evidence I heard there could be no basis for concluding that this charge was not specifically allocable to Sicon.

344    I therefore order that this expense be specifically allocated to Sicon.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 49 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

### Miscellaneous Income - Section X

345    There is no provision in the September Agreement to share income and it was an error for Sicon to do so. I order that the income should be attributed to Sicon.

### Bank Charges, Interest Income and Interest Expense - Section Y

#### Interest Income and Expense

346    I shall first consider Adtronics' submission that it is owed interest on the inter-corporate account for the period during which the September Agreement was in effect as well as following the termination of the September Agreement in 1993. Section Y does not deal with interest charged by the bank. I consider bank and financing charges below.

347    The September Agreement contains provisions relating to the inter-corporate operating account:

11. *Financial Assistance*

Sicon also agrees not to require unreasonable repayment of the intercompany debt from time to time owing by Adtronics during the term of this Agreement and further agrees to continue the credit arrangements currently in effect.

. . .

18. *Term*

... In the event there is an intercompany debt outstanding between a member of the Adtronics Group and a member of the Sicon Group at the time of the purchase, (including a debt arising from the change in the redemption price contemplated by this paragraph) such debt shall be repaid in four equal annual instalments commencing on the date of purchase. The debt shall bear interest at the rate per annum from time to time charged by Sicon's bankers on its operating form.

348    The plaintiffs say that the correct operating account balance cannot be calculated until this Court determines all the other allocations and claims between the parties. Adtronics' calculation of the operating account balance after adjustments it says should be made, including interest, is $4,968,725.43 as at September 1993. Without adjustment for interest, Adtronics' calculation of the operating account is $1,801,746.84.

349    Mark Armitage testified that in 1985 and 1986, the Adtronics' debt to Sicon was recorded in the operating account balance, and was represented by the monthly operating account balance for Adtronics Signs Ltd. He also testified that interest was calculated and charged monthly on Adtronics Signs Ltd.'s negative operating account balance at the Sicon Group's external borrowing rate from the CCB. Mark Armitage testified that he had specific discussions with his father as to how interest would be charged on any negative monthly operating account balance and credited on any positive operating account balance. His testimony was as follows:

Q: Now, in 1986 we've seen that you were — your companies were in a debit position in terms of the intercompany operating account that is you owed money to the Sicon Group; correct?

A: Yes.

Q: And you've indicated that you were paying interest on that money monthly?

A: Yes.

Q: Now, did you have any discussions with your father about the basis upon which interest would be paid or credited in the intercompany operating account on the balance in the intercompany account?

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 50 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

A: Yes. Umm, interest was to be paid or charged monthly based on the balance in the intercompany operating account. If you owed money umm, which is what I did in that year, I was paying interest based on the rate that the Sicon Group was borrowing from their external bankers, and if I was — if money had been owed to me I would have been — received interest at bank rates as well.

Q: And were those arrangements acceptable to you?

A: Yes.

350    Donald Armitage admitted to the interest arrangement in his examination for discovery read in at trial:

**XFD Donald Armitage September 27/99 - Q2999-3000**

2999 Q: No, I mean there's an intercompany account where a record was kept as to whether your companies owed monies to Mark's companies or vice versa?

A: I believe it's correct.

3000 Q: And was it part of your arrangement, can you recall, part of your arrangement was that you would pay interest to Mark's companies if you owed money to Mark's companies and he would pay interest to your companies if he owed money to your companies?

A: I believe that's correct.

**XFD Donald Armitage September 28/99 - Q3516-3518**

3516 Q: You remember yesterday we were talking about at the beginning of the day the state of the inter-company balance between your companies and Mark's companies. And I was asking you about the payment of — or the crediting of interest on the inter-company balance. And you remember we discussed how if your companies owed money to Mark's companies that he would be credited interest?

A: Yeah. That's generally correct, as far as I know, yeah. It goes both ways.

3517 Q: You remember we discussed that yesterday?

A: Yes.

3518 Q: And vice versa, if Mark's companies owed money to your companies that you would be credited interest?

A: Right.

3519 Q: And we also discussed the amount of that interest and I think your evidence was that the credit would be at least the amount that you're paying to your lending institution?

A: Right.

**XFD Ester Gale Feb 15/99 — Q 649 — 651**

650 Q: For example, was interest a factor in that if one company owed money to the other was interest credited or debited?

A: It was, yes.

Q 651 Q: Was that for your whole tenure from the time you were there from 1988 through 1993?

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

A: Yes.

351      Donald Armitage confirmed again at Examination for Discovery questions 3889 — 3899 that interest would be paid at 11% to any division with a positive operating account balance, or charged if the division had a negative operating account balance.

352     Donald Armitage's understanding of this arrangement is further confirmed in a memo to Ester Gale written in November 1988.

353     On August 28, 1991, Ester Gale wrote to Mark Armitage's accountant, Doug Reid, concerning inter-corporate allocations. In that letter he wrote:

The interest for each company is based on the balances of the following accounts:

Intercompany account — Division 38 is paid 11% interest on its debit balance

Accounts receivable

Inventory

Fixed assets

354     The accounting records of Sicon included a working paper titled "The Sicon Group Interest & Bank Allocation". On this working paper Sicon calculates the operating account balance for Adtronics for every month between May 1989 and September 1983. The working paper also calculates the interest owed (either credit or debit) on the operating account.

355      The original calculation of the operating account balance, agreed to by Ester Gale, included interest credits and debits on the operating account as between Sicon and Adtronics.

356      Adtronics argues that these documents and the testimony noted above of Mark and Donald Armitage and Ester Gale is evidence that there was an agreement that Sicon would pay or charge interest on the operating account balance due to or from Adtronics during the currency of the September Agreement.

357      In its written submission Sicon acknowledges that it was the "practice" to calculate interest on the inter-corporate account balances. But Sicon says that despite the practice of calculating the interest on a current basis, there was no agreement to do so any more than there are enforceable agreements on the question of the percentage to be applied for expense allocations. If I correctly understand Sicon's argument on this point, it is that the September Agreement is silent on the point and a consistent application of the September Agreement would result in no interest payable on the intercorporate account during the currency of the September Agreement. Sicon further says that Adtronics should be charged for its share of the bank interest based on the gross revenue formula in the September Agreement.

358      Both Mark and Donald Armitage did testify (in Donald's case at discovery) that there was such an interest agreement. Donald Armitage did not testify otherwise at trial. I accept Mark Armitage's testimony that he and Donald Armitage did agree interest would be paid on the inter-corporate account. In any event, Clause 11 of the September Agreement requires Sicon to continue the existing credit arrangements, that is, those that existed before the September Agreement.

359     From the testimony and the documents I have referred to, I conclude that Donald and Mark Armitage agreed before and during the currency of the September Agreement that interest was payable at 11% (or whatever the rate paid by Sicon from time, to its bankers) on the inter-corporate account balance. I see no reason why such an agreement should not be enforceable. In any event, such an agreement is not in conflict with, but is contemplated by, the September Agreement, and the "interest agreement" was performed during the currency of the September Agreement.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 52 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

360      Ester Gale offset the interest payable to Adtronics by a calculation of the net asset values. This resulted in Adtronics owing interest on the inter-corporate account. For example, in 1992 Sicon calculated that Adtronics owed to it $72,250. I accept Mark Armitage's testimony that he did not agree to this method of calculating interest and that it was never explained to him. From an accounting perspective it makes no sense, and indeed at the trial Sicon did not contend that this calculation was agreed to or provided for under the Agreement. Sicon's position is simply that there is no express provision in the September Agreement to pay interest and there was no oral or other agreement to do so. I have already found that the September Agreement should be interpreted to provide that interest is payable or alternatively that the parties agreed to do so.

361      Consequently, I order that the calculation of the inter-company accounts reflect payment of interest owed by or to Adtronics at the rates used by Sicon's bank during the currency of the September Agreement.

*Bank Charges*

362      Section Y also includes miscellaneous bank charges, excluding bank interest. Sicon and Adtronics have agreed that a number of these charges specifically attributed to Adtronics should be reversed and included in the shared expense pool. The remaining disputes concerning bank charges are set out in Adtronics' written submission which for convenience I reproduce here:

**USEX 1809 SOLSGN INC $6.80 (1987)**

(a) This was a US exchange on a cheque for Sign-O-Lite Signs Inc.,

(b) It should have been attributed directly to Sign-O-Lite Signs Inc., and

(c) Similar exchanges on Adtronics cheques were charged directly to the Adtronics Group.

**USEX 1805 SOLSGN SER $12.80 (1987)**

(d) This is a US exchange for Sign-O-Lite Services,

(e) It should have been attributed directly to Sign-O-Lite Services, and

(f) Similar exchanges on Adtronics cheques were charged directly to the Adtronics Group.

**OVERDRAFT INTEREST $7,937.59 (1988); $909.55 (1989); $646.17 (1990); $43.07 (1991); $71.11 (1992)**

(a) The Adtronics Group had a positive balance in the operating account during this period of time.

Ester Gale says that when the Sicon Group went over the limit on the operating line of credit with the bank, an overdraft interest charge was put through the bank statement rather than the regular monthly interest payment.

**UNITED PARCELS US EX $25.00 (1988)**

(a) It appears to be a charge for United Parcel Service, maybe US exchange on the cheque,

(b) United Parcel Service is a courier company, and

(c) courier should not be in bank charges.

**LETTER OF CREDIT CHARGE $227.70 (1989); $279.64 (1990)**

(a) Mark Armitage did not obtain a letter of credit in these two years.

**LOAN FEE $500.00 (1990); $678.50 (1991); $1,585.25 (1993)**

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 53 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

(a) The Adtronics Group had a positive balance in the operating account during this period of time.

Ester Gale says she does not know what the $1,585.25 was for and it appears to be a standby fee. A standby fee is a fee on the amount of money that is available to be borrowed but have not borrowed. [*sic*]

**BC ON LINE $544.35 (1992); $1,879.26 (1993)**

(a) This is for B.C. Online; where one could get corporate information on companies,

(b) The Sicon credit department used B.C. Online to check credit on individuals, and

(c) the Adtronics Group did not use the collection department in 1992 and 1993.

Ester Gales [*sic*] says the $1,879.26 B.C. Online was used on a sign lease where the financial status of the customer is unknown to the Sicon Group, depending on whether or not they signed personally on the contract, how long they have been in business, et cetera. B.C. Online was also used after the fact as part of the collection process.

**COURIER $4.28 (1993)**

(a) courier charges should not be in bank charges, and

(b) Mark Armitage paid directly for courier charges related to the Adtronics Group.

**TRAVEL CHARGES $50.00 (1987)**

(a) travel charges should not be in bank charges, and

(b) Mark Armitage paid directly for any travel charges he incurred.

**SEARCH SERVICE CHARGE $469.00 (1988)**

(a) Mark Armitage did not use any search services through the bank, and

(b) Mark Armitage is only guessing that this would be bank searches for credit or something.

**CCFL#1 J & T LATE CHARGES $1,365.65 (1986); $13.30 (1987)**

(a) Mark Armitage is not sure what this charge is for,

(b) the 1986 entry is prior to the CCFL loan being in place,

(c) Mark Armitage was borrowing from CCB, not CCFL, in 1986, and

(d) no backup was ever provided with respect to these items.

The Defendants destroyed their 1987 and 1987 [*sic*] documents as well.

**PAP SERVICE CHARGES (PREAUTHORIZED PMTS) $978.03 (1986); $1,456.25 (1987); $874.51 (1988); $2,424.15 (1989); $1,066.53 (1990); $622.11 (1991)**

(a) The Sicon Group for their leases, had a preauthorized payment program set up so that people who had monthly payments could have it come directly off their bank account and remit it to Sicon's bank account, and

(b) Mr. Clarke confirms that this has been conceded.

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

As per Don Selman's Report, ... these amounts have been removed from the bank charge pool as per *Trial Exhibit #59, page 6, assumption 5.01 (t)*:

all pre-authorized payment service charges relate to lease payments and are Sicon costs

**PERMIT ACCOUNT SERVICE CHARGE $133.12 (1986); $121.66 (1987); $151.51 (1988); $38.74 (1989); $29.22 (1990); $28.63 (1991)**

(a) The Sicon Group had to get sign permits in order to install electric signs. Each sign required a permit, and because there were many of them and they were small amounts, the permit department had a separate bank account for paying sign permits.

(b) Mark Armitage did not use this service at all.

**CREDIT REPORT $141.40 (1990); $40.00 (1991)**

(a) Mark Armitage did not ever obtain credit reports, and

(b) Mark Armitage did not use the collection department in these years.

**PST - MINFIN $5,047.38 (1990)**

(a) The Adtronics Group would only charge PST if they sold a sign directly to the end user, which was rare. If the Adtronics Group did collect the PST, it would be remitted directly to the provincial government and charged directly to the Adtronics Group.

**SALES TRAVEL EXPENSE $2,160.44 (1991)**

(a) The Sicon sales expense has nothing to do with the Adtronics Group.

As per Don Selman's Report, *Trial Exhibit #59, Appendix 3, Schedule Y,* this amount has been removed from the bank charge pool and not added back to *Trial Exhibit #59, Appendix 3, Schedule V (Sales Expenses)*.

**PAP SERVICE CHARGES (PREAUTHORIZED PMTS) $68.80 (1993)**

(a) The Sicon Group for their leases, had a preauthorized payment program set up so that people who had monthly payments could have it come directly off their bank account and remit it to Sicon's bank account, and

(b) Mr. Clarke confirms that this has been conceded.

As per Don Selman's Report, *Trial Exhibit #59, Appendix 3, Schedule Y,* these amounts have been removed from the bank charge pool as per *Trial Exhibit #59, page 6, assumption 5.01 (t)*:

all pre-authorized payment service charges relate to lease payments and are Sicon costs

**PERMIT ACCOUNT SERVICE CHARGE**

(a) The Sicon Group had to get sign permits in order to install electric signs. Each sign required a permit, and because there were many of them and they were small amounts, the permit department had a separate bank account for paying sign permits.

(b) Mark Armitage did not use this service at all.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 55 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

363    Mr. Clarke did not make specific submissions concerning these charges, nor was there evidence refuting the evidence of Mark Armitage that the disputed charges have nothing to do with the business of Adtronics and under the September Agreement should have been specifically allocated to Sicon.

364    On the basis of the evidence and submissions before me, I conclude that the disputed bank charges should be allocated to Sicon as claimed by Adtronics.

### Amortization of Financing Costs — Section Z

365    The threshold issue that the Court must decide is whether the charges by Sicon for financing costs should be considered a commitment of Adtronics for the duration of the September Agreement in the absence of Adtronics opting out of that expense. Here I consider both deferred financing costs and direct interest costs.

366    I have stated above that many items, particularly those classified originally as professional fees, were reclassified by Sicon in its accounts as deferred financing costs. In these Reasons for Judgment I will not make orders with respect to each of those specific items. If the parties are unable with these Reasons to determine the treatment of each item, they have leave to re-appear before me to make further submissions.

367    The operating account prepared by Sicon (Tab 448) shows that by November 1987 Adtronics was no longer borrowing from Sicon. The plaintiffs assert that the accounts when corrected will result in Adtronics being in a credit position earlier in 1987 and therefore not using the financing at all. Adtronics says that it should not share in the financing costs at all.

368    Sicon's position is set out in its written submissions and 1 quote therefrom:

The Don Selman report treats all of the interest expense as a shared cost because the financing with C.C.F.L. was a shared facility. The plaintiffs have reiterated many times that there should be no interest charge because "Mark wasn't borrowing any money." In fact at the time that Mark Armitage agreed to go forward with the reorganization Adtronics was in deficit in its intercorporate account and its future was uncertain. On the terms of the agreement it was entered into to secure financing for the Group. Interest is a shared expense.

Reasons why interest is a shared expense:

1. The financing was part of the programme and in contemplation of all parties at the time the Agreement was drafted. The initial purpose for the creation of Adtronics was for Sicon to obtain a source of supply of message centres for leased signs. The group had worked on the project for year [*sic*] before the Agreement was made and were in deficit at that time;

2. Sicon made the investment for the purpose of buying the message centres interdivisionally and leasing them out;

3. Without the large financial burden there would be no CCA, which was "bought" in a manner of speaking with the financing that C.C.F.L. replaced. On Mark Armitage's version of events the entire benefit of that would flow to Adtronics and all of the burden to Sicon. In fact at the outset the availability of the CCA affected the joint cash flow. It was occasioned by the use of the loan and was a shared expense;

4. The plaintiffs claim that the line-of-credit borrowing was only utilized by Sicon. The stated reason was that the intercorporate account was in surplus. In fact that logic would apply only if the financial burden of the inventory, work-in-progress and accounts receivable was less than the intercorporate account;

5. Also it could not have been known at any time that sales of message centres might be in the offing with a potential immediate need for financing via the lease portfolio;

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

6. Thus even if it were possible to specifically allocate interest expense (as the expression "specifically allocate" is used in the Agreement) there is no means of ascertaining what the number should be;

7. The result is that the interest expense short and long term falls to be distributed in accordance with the gross revenue percentage.

369     If interest is a shared expense then Adtronics would pay its share of the interest on the CCFL loan of $13 million regardless of its use of that loan. So for example in 1992, a year in which Adtronics' gross revenues were 34.51% of Sicon's revenue, Adtronics would be paying 34.51% of Sicon's interest charges even when, by Sicon's own calculations, Adtronics was not using any credit and was then owed at various times in the year up to $1 million. Sicon calculates the shared portion of its bank interest charges for 1992 at $791,812.

370     In my view, that interpretation of the September Agreement results in an absurdity. I conclude that a proper interpretation of the September Agreement is to consider bank interest as specifically allocatable under Clause 16 of the September Agreement. During the currency of the September Agreement the yearly allocations did not include interest and thus there was no basis for Mark Armitage to object to the allocation. I would not attribute interest costs to Adtronics, except to the extent that Adtronics used financing, in which case it should be specifically attributed. That is, Adtronics should be charged interest on any portion of the financing that it used. That calculation cannot be done until all the accounts are revised based on these Reasons for Judgment. Furthermore, the charging of direct interest cannot duplicate the charging of interest on the inter-corporate account. Because Sicon agreed to allow Adtronics to use Sicon's credit facility, Sicon can either charge direct bank interest or inter-corporate interest at the same rate, but not both.

371     The yearly allocations did disclose that Adtronics was being charged annually on the revenue formula for an amount called "amortization of financing costs."

372     Sicon incurred $297,961.51 in financing costs when the business of Adtronics and Sicon was consolidated and financing was arranged through the CCFL. These costs were the fees for arranging for and placing financing, including brokerage fees and professional fees. These fees were originally recorded as "professional fees" in 1987, but were then capitalized and amortized in an account as "Amortization of Financing Costs" over approximately the 5-year term of the CCFL loan.

373     In March 1988, Adtronics, in the context of the ongoing allocation dispute, agreed that a direct charge to Adtronics for financial assistance was appropriate. At the time Adtronics was informed by Sicon that Adtronics owed money to Sicon through its inter-corporate account.

374     In the exchange of memoranda and correspondence that continued over the years to 1993 concerning the allocation dispute, there is no specific agreement between Adtronics and Sicon that Adtronics should pay the deferred financing costs.

375     The burden of Sicon's argument is similar to its argument that Adtronics should share in the cost of indirect head office expenses. Or put another way, the argument is that what is good for the whole Sicon organization is good for Adtronics and Adtronics should not get a 'free ride'. As I have already said, this is not an exercise in determining what is fair. The parties' relations are for the most part governed by the September Agreement. The financing costs are capable of being specifically ascertained on the basis of use of the financing. If, when the accounts are recalculated, Adtronics used the financing, then it must bear its proportionate share of that specifically allocatable cost. In other words, if Adtronics used, for example, 5% of the financing, then it must bear 5% of the whole cost of obtaining that financing. I do not consider that the financing costs are a shared cost.

376     However, that does not entirely dispose of the allocation of all professional fees included as deferred financing costs. Some of these fees were incurred for the purpose of the corporate re-organization. As I have said above, that 1987 cost is a shared cost. The parties must therefore examine the professional account (primarily the legal accounts) to ascertain which portions of those accounts relate to the corporate re-organization. That portion should then be treated as a shared cost and allocated accordingly.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

### Depreciation - Equipment - Section AA

377      During the currency of the September Agreement, Sicon made no allocation to Adtronics for the cost of depreciation of office equipment. In this litigation Sicon contends that depreciation of office equipment is a shared expense. Sicon has not separated the accounts as to equipment that is shared and equipment that is not shared. Adtronics owned its own desks, chairs, filing cabinets, computer equipment, printers, and calculators. There is also no doubt that Adtronics shared the photocopier, the fax machine, the postage machine (until June 1, 1990), and the telephone system. Under the Agreement, Adtronics would share in the cost of depreciation of that furniture and equipment listed above that it used as a shared expense but because Sicon did not identify this as a shared cost in the allocations during the currency of the Agreement, Adtronics had no opportunity to object to the charge and it cannot now be charged.

### Building Depreciation - Section BB

378      I have already decided that there was no agreement as to the amount of rent and therefore the September Agreement should govern. In the absence of an agreement to pay rent, depreciation is properly a cost of operating the building occupied by Adtronics, that is the Simpson Road building. I accept that the correct amount of building depreciation to be charged to Adtronics is set out at Table D, page 592 of Adtronics' closing submissions.

### Management Salaries - Section CC

379      There are two issues to determine with respect to management salaries. The first issue is which managers' salaries are shared. The second issue is the basis upon which Adtronics should share in the salary expense.

380      Adtronics says that either under the September Agreement or as a collateral agreement, certain expenses may be apportioned. Sicon refutes this suggestion. Sicon contends that the September Agreement does not contemplate the apportioning of one expense and consequently the contractual revenue formula should be applied to the management salary expenses.

381      Earlier in these Reasons for Judgment, I have alluded to the alleged agreement to charge Adtronics 5% of the general manager's salary rather than the proportionate share based upon the revenue sharing formula (see ¶ 74).

382      Adtronics agrees that it should pay a portion of the salaries of Donald Armitage, Deo Zabat-Fran, Timothey McLean, and Joan MacDonald. Adtronics does not agree that Tom Armitage's salary is a shared expense. Sicon contends that management is a shared resource and all management salaries should be shared on a gross revenue basis.

383      I have already found that Adtronics does not share in the cost of the collection department, therefore it does not have to share in the cost of the expense of its manager, Tom Armitage. (e.g. see ¶ 190, 191, 166.)

384      In its written submissions, Adtronics has calculated the correct *quantum* of the salaries. Sicon does not dispute those figures and I accept Adtronics' calculations of the quantum of the salaries and benefits.

385      I turn to a review of the evidence on the question of management salaries.

386      In a June 12, 1987 memorandum, Donald Armitage wrote to Mark Armitage concerning Mark's complaints about the allocations, stating:

> Management salaries - you were charged with approximately $35,000 and your drawings alone are worth more than that. You were not charged for my time or Joan's time.

387      This memorandum was written before the parties entered into the September Agreement and reflects an approach that was more in the nature of estimation than formulaic.

388      In reply Mark Armitage wrote:

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

There is little or no crossover of management between Sicon and Adtronics and this should at least be increased to full value of my salary.

389    In a further memorandum dated July 20, 1987, Mark Armitage wrote to Donald Armitage:

If you want to hire and support friends, relatives and dead wood you pay for it. If you want to grossly overpay your so called management staff (and I mean Tim and Tom) why the hell should I have to pay. I don't object to them getting a fair wage based on their experience, ability, and contribution but you pay Tom more than I earn.

390    In 1988, Adtronics' accountant wrote to Sicon disputing the allocation in respect to management salaries and suggesting a charge of 15% of management salaries was appropriate. Adtronics noted that Adtronics made almost no use of Sicon management.

391    In a reply dated March 28, 1988, Donald Armitage pointed out the considerable work performed by him with respect to the reorganization and refinancing. He also pointed out the work done by the general manager directing the office staff who processed Adtronics' accounting.

392    Mark Armitage replied to Donald Armitage and attached a copy of the September Agreement and requested compliance with that agreement. He said:

The Agreement we have with the Sicon Group specifically states how admin is to be divided, a copy attached, and it states that only shared services and facilities that cannot be directly allocated are to be paid for on a shared basis. This is not what is being done.

393    In an enclosure to a letter dated September 12, 1989 to Sicon concerning the allocations, Mark Armitage wrote:

Adtronics has been allocated 16.9% Don's salary, 33.8% Joan's salary and 11.42% Deo's salary, none of whom normally provide services to Adtronics.

Don normally divides his time between renewals, existing accounts, Macey Neon and Seattle. I have not discussed Adtronics business with Don for more than two years. I do not visit with him socially. For any of Don's time to be charged I would expect an itemized account of the hours spent working [on] Adtronics behalf.

Joan does not work in this office but she does from time to time deal with the accountants on Adtronics' behalf. I would be surprised if Joan spends as much as 5% of her time acting on Adtronics' behalf and a charge of 33.8% is totally unacceptable. This charge should be reduced accordingly.

Deo was General Manager of the Sicon Group during 1988. He did not normally expend any time on Adtronics behalf and he has told me that to his own estimation less than 5% of his time could reasonably be chargeable. He will be providing Adtronics with a letter confirming this.

394    The 1991 allocation records contain a note:

The allocations are based on the actual amount of time certain individuals spend on Adtronics, rather than just allocating a percentage of the total Management Salaries based on revenue. These individuals are as follows: Don Armitage - 20%, Joan MacDonald 50% (due to inordinate time spent on Signcorp case during 1990), Tim McLean - 5%, Ester Gale - 20% and Sheila Roell - 20%.

395    The actual allocations made by Ester Gale varied somewhat from year to year. However, it appears that Sicon did not generally apply the contractual revenue formula, but rather estimated a percentage of the management salary attributable to Adtronics based upon Sicon's view of the amount of time the manager spent on Adtronics business. For example Ester Gales's

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 59 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

working papers show that in respect to the General Manager she included as a shared cost the following percentage of the manager's salary:

| | | |
|---|---|---|
| 1988 | - | 33.8% |
| 1989 | - | 50% |
| 1990 | - | 5% direct allocation |
| 1991 | - | 5% direct allocation |
| 1992 | - | application of gross revenue percentage of |
| 35.69% to 50% of his salary | | |
| 1993 | - | application of gross revue percentage of |
| 29.36% to 50% of his salary | | |

396     Adtronics argues that the parties' interpretation of the Agreement, as evidenced by their conduct, should govern. Adtronics says that the parties interpreted the Agreement so as to allocate a portion of a single expense (the managers' salaries) to Sicon and Adtronics or in some years to allocate a portion to Sicon and treat the remainder as a shared expense to which the gross revenue formula applied. I considered this argument - that a unitary expense cannot be apportioned - above in respect to the Audit allocations.

397     As with audit, there were three people involved in the implementation phase of this Agreement - Ester Gale, Donald Armitage and Mark Armitage. Based on all the evidence, I conclude that these three people agreed that a correct interpretation of the implementation phase of the Agreement was to first specifically allocate a portion of the managers' salary that applied only to Sicon.

398     Mr. Clarke also points out that there was no agreement as to the portion of the managers' salary that should have been specifically allocated to Sicon; therefore, the Court should apply a strict interpretation of this clause of the Agreement and refuse to apportion a unitary cost.

399     There is also the difficulty of determining what the apportionment should have been in each year because in many years Adtronics expressed its disagreement with the apportionment Sicon chose. Should this court award damages based on a *quantum meruit* argument, that is, a sum representing the value of the services rendered by Sicon to Adtronics?

400     The evidence is compelling that the parties agreed to apportion the salaries of the general manager, Donald Armitage and Joan MacDonald. Either on an estoppel analysis, or the interpretation of the Agreement based on conduct, I reach the same result, which is that the parties agreed to apportion salaries. I therefore conclude that the managers' salaries should be apportioned.

401     Ester Gale agreed for at least two years that the apportionment of the General Manager's salary should be 5% as a direct allocation (not 5% in the pool to then be shared). There was no evidence that the general manager's duties changed insofar as management of Adtronics was concerned. I find that 5% of the general manager's salary should be directly attributed to Adtronics in each of the years in question.

402     Donald Armitage chose 20% or 30% as the correct apportionment of his own salary, but he included in that estimate duties that he described as benefiting the whole of Sicon. I have found that head office type charges should not be charged to Adtronics. Adtronics estimated the appropriate amount at 5%. I would place the estimate at 33% for 1987, and 20% thereafter on a *quantum meruit* basis.

403     Joan MacDonald was Donald Armitage's executive secretary. Adtronics agrees to a 50% allocation in 1990 owing to special services she provided to it. Otherwise, Adtronics says that it notified Sicon in respect to the 1988 allocations that it would only pay 5% of her salary. I accept Adtronics' estimate of the value of her services at 5% to the date of her retirement.

***Section DD - Corporate Income Tax of the Scott Schedule is Above at ¶ 113***

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

*Section FF - Extraordinary Loss of the Scott Schedule is Above at ¶107*

*Section GG - $70,000 Scientific Research and Development Tax Credit of the Scott Schedule is Above at ¶95*

*Section HH - Directors' Fees*

404    From 1986 to 1993 Sicon did not charge directors' fees as a shared administrative expense. Mark Armitage testified that he agreed with Sicon's original allocation of zero for directors' fees.

405    Sicon now contends that directors' fees are a shared expense.

406    I agree with Adtronics that the 1992 and 1993 fees paid to Joan MacDonald and entered in the company's accounts as directors' fees were in fact a retiring allowance for Joan MacDonald.

407    I find that the directors' fees should be charged directly to Sicon. First, they were not charged during the currency of the September Agreement and therefore Mark Armitage had no opportunity to object, and second, part of the amount claimed has been mischaracterized as directors' fees.

*Profit Sharing - Section II*

408    The 1992 payment by Sicon to the four Armitage children of $12,000 each as a dividend cannot, in my view, be characterized as a shared expense and should be attributed directly to Sicon.

## 8. Accounting for the 1986 Fiscal Periods

409    As will be readily apparent from these Reasons, the September Agreement does not apply to 1986 fiscal periods allocations. Sicon made the 1986 allocations at the end of the 1986 fiscal period and Adtronics continued to complain about the allocations even after the September Agreement was executed.

410    Adtronics admits that based on the evidence, the parties never actually came to an agreement on how the 1986 expenses would be allocated prior to entering into the September Agreement.

411    Adtronics argues that I should construe an implied agreement between the parties that expenses for common services or facilities were to be allocated by Sicon on such basis as the parties specifically agreed and failing agreement, on a reasonable basis measured by relative use of the service or facility.

412    The parties did not agree on the amount or method of allocating the 1986 expenses and an implied agreement that payment be made on a reasonable basis is equivalent to a *quantum meruit* analysis.

413    I cannot on the evidence before me discern the precise terms of an oral agreement covering 1986 that this Court could enforce for the 1986 fiscal periods. In fact, I conclude that the September Agreement was drafted and concluded in part because Adtronics was not satisfied with the allocation process then in existence. Mark Armitage complained that he was overcharged for the year 1986. He was charged 11.8% of the total of Sicon's administration charges. In the absence of any agreement, the only basis upon which I could alter the accounts is on a *quantum meruit* type basis. In other words, I would have to assess whether, in respect to each disputed item of account, Adtronics received fair value. On the evidence before me I can determine that the parties have opposing views about the fairness of the charges, but the evidence is insufficient for me to determine that the charges made in those years were not a reasonable payment for the service provided, considered on a *quantum meruit* basis. Accordingly, I make no order in respect to the 1986 fiscal periods.

## 9. Accounting for the 1987 Fiscal Period

414    The September Agreement is silent as to the effective date of the Agreement. The parties did immediately put the agreement into effect upon executing it on September 25, 1987 in the sense that they immediately amalgamated the corporate

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 61 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

entities. After the 1987 fiscal period concluded, both parties addressed the 1987 allocations as if the Agreement applied to it (at least to the extent that Sicon ever followed the mechanisms in the Agreement). In this trial, Sicon never addressed either the 1986 or 1987 allocations. I assume Sicon's exclusion of the 1987 allocations was based on its interpretation that the Agreement was inapplicable. Considering the conduct of the parties subsequent to December 31, 1987, I find that they then considered the Agreement did apply. I would therefore apply the Agreement to the 1987 allocations.

## 10. Court Order Interest or Contractual Interest

415    Issues remain outstanding concerning the correct calculation of interest. Once the parties have recalculated the accounts the parties may make submissions concerning interest if they are unable to agree. I will require further submissions concerning the issue of compound interest in this action as well as the associated action #C930042. The parties should contact the registry to arrange a brief hearing to address my concerns concerning the claims for compound interest in both actions.

## 11. Personal Guarantee of Donald Armitage

416    Donald Armitage personally covenanted the performance of Sicon under the September Agreement. He does not dispute that he is liable to Adtronics to the same extent as the corporate defendants are liable to the plaintiffs.

## 12. Disposition

417    In accordance with these Reasons for Judgment, the allocations between the Adtronics division of Sicon and Sicon for the period September 1987 to September 1993 must be recalculated and there will be judgment against all defendants in favour of Adtronics Signs Ltd. for the amount found due and owing to Adtronics.

418    The counter-claim in respect to the years 1986 and 1987 should be dismissed because Sicon tendered no evidence concerning those years. The balance of the counter-claim as calculated by Sicon's expert, Mr. Selman, is $391,236.06. Although I have not recalculated the accounts of the companies, the plaintiffs have been largely successful and will be entitled to payment from Sicon of the recalculated amounts. Adtronics will not owe money to Sicon, therefore, the counter-claim is dismissed. I have not addressed the issue of Adtronics withholding its receivables from Sicon during 1993. That may be relevant to the interest claim and I will hear further submissions on that issue.

419    I order that Adtronics prepare the revised accounts within 30 days of the date of these Reasons for Judgment and deliver those revised accounts with the appropriate explanatory working papers to Sicon's solicitor. Sicon shall have a further 30 days to advise Adtronics of its agreement or disagreement on each category of account. If Sicon disagrees with Adtronics' calculations, it shall provide Adtronics with the appropriate working papers explaining the basis of its disagreement with respect to each item of account that is not agreed, within the stipulated 30-day period.

420    If the parties are unable to agree as to any calculations, they have liberty to apply for a further hearing. Both parties have liberty to apply to seek clarification of these Reasons if the Reasons for Judgment are insufficient to enable the parties to recalculate the accounts. The parties also have liberty to speak to any items of account that I may have inadvertently overlooked.

421    The parties are at liberty to speak to the question of costs once the accounts have been finalized and may contact the Court Registry to arrange a convenient time to do so.

*Action allowed.*

## Appendix I

THIS AGREEMENT made the day of September, 1987.

BETWEEN:

MARK ARMITAGE, businessman of 13933 -
34th Avenue, White Rock, B.C.
(hereinafter called "Mark")

OF THE FIRST PART

AND:

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 62 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| DONALD ARMITAGE, businessman, of 1076 Jackson Way, Delta, B.C. (hereinafter called "Don")                                          | OF THE SECOND PART     |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| ADTRONICS SIGNS LTD., a body corporate with a registered office at 2771 Simpson Road, Richmond, B.C. (hereinafter called "Adtronics") | OF THE THIRD PART      |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| ADTRONICS INC., a body corporate with an office at 7020 - 196th Street, Lynnwood, Washington (hereinafter called "Adtronics U.S.")   | OF THE FOURTH PART     |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| ARMITAGE HOLDINGS LTD., a body corporate with an office at 2771 Simpson Road, Richmond, B.C. (hereinafter called "Armitage")        | OF THE FIFTH PART      |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| SICON GROUP INC., a body corporate with a registered office at 2771 Simpson Road, Richmond, B.C. (hereinafter called "Sicon")       | OF THE SIXTH PART      |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| 32262 BRITISH COLUMBIA LTD., a body corporate with a registered office at 2271 Simpson Road, Richmond, B.C. (hereinafter called "32262") | OF THE SEVENTH PART    |

AND:

|                                                                                                                                    |                        |
|------------------------------------------------------------------------------------------------------------------------------------|------------------------|
| TOM ARMITAGE, of 1044 Jackson Way, Delta, B.C., VALERIE ZABAT-FRAN, of 5591 Jaskow, Richmond, B.C. and JANICE MCLEAN of 1220 Morris Crescent, Delta, B.C. (hereinafter called "Other Shareholders") | OF THE EIGHTH PART     |

WHEREAS:

A. Adtronics is in the business of manufacturing and marketing electronic signs in Canada and elsewhere either directly or through its wholly-owned U.S. subsidiary Adtronics U.S.

B. Mark owns 2000 Common Shares in the capital of Adtronics representing all the issued and outstanding shares of Adtronics.

C. Mark is the Chief Operating Officer of Adtronics and Adtronics U.S.

D. Armitage Holdings Ltd. is or will be the registered owner of all of the voting shares of Sicon Group Inc. which in turns owns or will own all the issued and outstanding shares of:

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 63 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Sign-O-Lite Signs Inc.

32262

Sign-O-Lite Plastics Ltd.,

Wallace Sign Crafters West Ltd.

E. Sicon and its subsidiaries including those companies identified in the immediately preceding recital (hereinafter collectively referred to as the "Sicon Group") are proposing to arrange financing with Canadian Corporate Funding Limited ("CCFL") and it is a term of the financing that the assets and business of Adtronics including the shares of Adtronics U.S. are to be transferred from Mark to the Sicon Group either by a transfer of the assets, a transfer of shares or a combination thereof in order that its assets and revenues can form part of the security for the proposed loan.

F. Mark will consent to the proposed arrangement subject to the strict condition that;

(a) the assets and business of Adtronics and Adtronics U.S. remain within the sole and exclusive management and control of Mark;

(b) that Adtronics and Adtronics U.S. remain distinct separate entities from the other business operations of the Sicon Group;

(c) the assets of Adtronics and Adtronics U.S. not be encumbered by Sicon or any other member of the Sicon Group except to the extent required to obtain the proposed financing with CCFL;

(d) Mark is entitled to reacquire its [*sic*] ownership in the assets and business of Adtronics and Adtronics U.S. at the earliest possible date.

G. In order to facilitate the financing arrangements it is proposed to transfer all of the business operations of Adtronics other than the manufacture of electrical signs and the shares of Adtronics U.S. to 32262.

H. Mark is the registered and beneficial owner of one half of the shares in the capital stock of Mimar Holdings Ltd. which he wishes to sell and Sicon wishes to purchase on the terms set out in this Agreement.

J. [*sic*] The Other Shareholders together with Mark are the holders of all of the participating shares in the capital of Sicon.

K. The parties wish to make arrangements for the purchase and sale of their respective goods and services and the sharing of common facilities and services between the respective business operations.

NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the sum of $1.00 paid by each person who is a party to this Agreement to each other person (the receipt of which and the sufficiency of which is hereby acknowledged) and mutual covenants and agreements, the parties hereto agree as follows:

**A. Transfer of Assets and Business**

*1. Transfer*

Adtronics hereby transfers to 32662 all of its business and assets other than:

(a) the business of the manufacture of electronic signs and the assets directly related to that business; and

(b) its shares in Adtronics Inc.

the business and assets transferred hereunder shall hereinafter be referred to as the "Adtronics Division".

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

## *2. Purchase Price*

The purchase price paid to Adtronics shall be 100 non-voting preference shares in the capital of 32262. The preference shares shall be redeemable or retractable for an amount equal to the sum of the fair market value of the assets transferred under paragraph 1 and the net income after taxes of the Adtronics Division (computed in accordance with generally accepted accounting principles) subsequent to the transfer less all dividends issued in respect of such shares. The shares shall have a priority as to dividends to the extent the redemption amount at the time of any dividend distribution exceeds the initial redemption amount of such shares.

The parties agree to cause 32262 to forthwith establish the class of preference shares contemplated by this Agreement (subject to the approval of Mark as to form) and immediately thereafter issue 100 of the shares to Mark as required by this paragraph 2.

## *3. Election*

32262 and Adtronics agree to execute and file in the prescribed form and within the prescribed time an election under Section 85(1) of the *Income Tax Act* whereby the proceeds of disposition to Adtronics and the cost to 32262 for each of the assets transferred hereunder will be equal to the cost amount of such assets as defined under section 248 of the *Income Tax Act* (Canada).

## *4. Option to Repurchase*

Adtronics shall have the right to purchase the Adtronics Division from 32262. The purchase shall occur on a date 30 days after Adtronics has delivered a written notice to 32262 exercising its right. The purchase price shall be the redelivery to 32262 of the share consideration received by Adtronics at the time of the purchase of the Adtronics Division by 32262 pursuant to this Agreement, subject to an adjustment equal to the amount of the difference between the redemption price at the time of [*sic*] preference shares were issued and the redemption price at the time of repurchase. The amount of the adjustment shall be due & [*sic*] owing at the time of repurchase.

The procedure and method of repurchase shall be determined by Mark and Mark agreed to give consideration to income tax consequences to all parties in selection the appropriate procedures.

## B. Transfer of Shares

## *5. Reorganization*

Adtronics agrees to reorganize its capital structure to create two new classes of shares:

(a) Class "A" common shares (Voting Shares") *[sic]* which have the right to vote at meetings of the shareholders of Adtronics and to execute a resolution of the shareholder in lieu of a meeting but no right to participate in dividends;

(b) Class "B" common shares ("Participating Shares") which have the right to participate in dividends but no right to vote at meetings or execute a resolution of shareholders in lieu of a meeting.

## *6. Escrow Agreement*

Prior to the completion of the reorganization Mark agrees to transfer the voting rights with respect to his voting shares of Adtronics to Sicon on the terms and conditions of the escrow agreement attached as Schedule A.

## *7. Post-Reorganization Arrangements*

As part of the reorganization, Sicon agrees to subscribe for 100 Voting Shares and Mark agrees to exchange his common shares of Adtronics for 100 Participating Shares. Adtronics agrees to issue the Voting Shares to Sicon and Participating Shares to Mark.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Sicon agrees that it shall not cause Adtronics to issue any further shares in the capital of Adtronics without the consent of Mark.

## C. Management of Adtronics

### 8. Appointment as General Manager

32262, Adtronics and Adtronics U.S. agree to appoint Mark to be general manager of the Adtronics Division, Adtronics and Adtronics U.S. respectively. Adtronics and Adtronics U.S. also agree to appoint Mark as president of their respective companies.

### 9. Duties

As general manager, Mark shall have sole responsibility and exclusive authority to manage all of the aspects of the businesses carried on by the Adtronics Division, Adtronics and Adtronics U.S. (collectively referred to as the "Adtronics Group") including without restricting the generality of the foregoing:

(a) marketing including authority to determine products and services to be marketed and authority to license any other party to sell, either on a wholesale or retail basis, the products or services;

(b) manufacturing including authority to determine the products to be manufactured and authority to contract with any other person for the manufacture of such products;

(c) administration including sole and exclusive authority to deal with every facet of the administration of each member of the Adtronics Group including the expenditure of money, either of a capital or a current nature (the use of funds other than those generated through the operations of Adtronics will be subject to availability), the use of the assets of the Adtronics Group as security for any loans of a capital or current nature (other than the security required to be provided under the CCFL financing or security required to finance operating loans required by the CCFL financing), the purchase and sale of any of the assets and the decision whether to share administrative and accounting services provided by other members of the Sicon Group;

(d) employee relations including exclusive jurisdiction to hire and terminate employees of the Adtronics Group and to determine the duties to be performed by such employees;

It is understood and agreed that the authority granted to Mark as general manager shall not include the authority to sell or wind-up any business carried on by the Adtronics Group.

### 10. Capital Budget

Mark agrees to prepare a capital budget for each fiscal year for each member of the Adtronics Group prior to the commencement of such fiscal year and submit it for approval by the Board of Directors of Adtronics and Sicon.

Adtronics and Sicon agree to approve the budgets as submitted by Mark provided that the amount of the budget does not exceed the Adtronics Group's percentage of the total capital budget available to the Sicon Group and the Adtronics Group for such fiscal period. Timing of the capital expenditures shall be as determined by Mark provided however that Mark shall use his reasonable efforts to coordinate the costs with the cash flow of operations.

The Adtronics Group's percentage of the total capital budget for a particular fiscal period will be equal to the percentage of the total combined gross revenue for the most recently completed fiscal period of the Sicon Group and the Adtronics Group represented by the total gross revenues of the Adtronics Group during such fiscal period.

### 11. Financial Assistance

Sicon also agrees not to require unreasonable repayment of the intercompany debt from time to time owing by Adtronics during the term of this Agreement and further agrees to continue the credit arrangements currently in effect.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 66 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

In the event that Adtronics Group requires additional working capital to finance expansion, etc., Sicon agrees to continue the existing financial arrangements and to use its best efforts to assist in arranging financing from other sources.

### 12. Remuneration

As consideration for his service as president and general manager of Adtronics and Adtronics U.S., Mark shall receive such compensation as is determined from time to time by Mark.

In the event Mark elects to increase the compensation payable to him he agrees that one of the matters he shall take into consideration in making such election is the effect such increased compensation may have on CCFL financing arrangements.

It is understood and agreed that the compensation paid to Mark may be in the form of salary, dividends or benefits as Mark shall in his sole discretion determine to be appropriate. Adtronics agrees to cause such cash dividends to be issued on account of compensation as may be reasonably requested by Mark provided that unless otherwise agreed the maximum amount available for dividends shall be a percentage of the maximum dividends permitted by the CCFL financing (presently $300,000 per year). The percentage shall be equal to the percentage that the net income after tax of the Adtronics Group bears to the combined net income after tax of the Adtronics Group and Sicon Group.

### 13. Redemption Value of Preference Shares

32262 agrees to determine the net income (or net loss) of the Adtronics Division within 6 months of the end of each fiscal year to 32662 [*sic*] and that the redemption value of the preference shares acquired by Adtronics pursuant to paragraph 2 of this Agreement shall increase (or decrease) by an amount equal to the net income (or net loss) after taxes (calculated in accordance with generally accepted accounting principles) of the Adtronics Division in the immediately preceding fiscal year.

In the event that the preference shares are redeemed or retracted, the parties also agree, immediately prior to such redemption or retraction, to adjust the redemption or retraction price of the shares to include the net income (or net loss) after taxes up to the date of redemption or retraction.

### 14. Directorship

Sicon agrees to cause Mark to be appointed as a director of 32262 and as the sole director of Adtronics. Armitage agrees to cause Mark to be a director of Sicon and Adtronics agrees to cause Mark to be the sole director of Adtronics U.S.

The parties acknowledge and agree that CCFL may not consent to Mark being a director of Sicon. Armitage covenants and agrees to use its best efforts to obtain the consent of CCFL to Mark's appointment as a director of Sicon. If CCFL refuses to give such consent, Mark shall not be entitled to be a director of Sicon but Mark shall be entitled to attend all directors' meetings and to view all resolutions of directors prior to passing or execution thereof as the case may be and to review all such information of Sicon as he would be entitled to review if he were a director of Sicon. Upon the request of Mark, Armitage will again, from time to time request such consent from CCFL and in the event CCFL gives such consent, Armitage shall cause Mark to be appointed a director of Sicon forthwith thereafter.

### D. Relationship with Sicon Group

### 15. Disability of Mark

In the event that Mark should die or be unable to perform his duties as general manager due to a mental or physical disability for a period of 90 days or more, a new general manager for the Adtronics Group shall be appointed. The new general manager shall be selected by a committee consisting of a representative of Sicon and a representative of Mark (appointed by Mark's executor (in the case of Mark's death) or Marilyn Armitage or other person having control of Mark's assets (in the case of Mark's disability)). In such event the directorship of Adtronics and Adtronics U.S. shall be increased to 2 persons consisting of a representative of Sicon and a representative of Mark (appointed in the manner described above).

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148...

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

The cessation of Mark as general manager due to death or disability shall not constitute a termination of Mark for the purposes of paragraph 18.

In the event that Mark is subsequently able to resume the duties contemplated by this Agreement, the parties agree to immediately reappoint him as general manager of the Adtronics Group and as sole director of Adtronics and Adtronics U.S.

### 16. Sharing of Facilities and Services

To the extent that the Sicon Group and the Adtronics Group shall *[sic]* common facilities or services, each Group shall bear its proportionate share of such facilities or services.

The allocation of proportionate costs shall be as follows:

(a) to the extent that any cost can be specifically attributed to one Group or another it shall be specifically borne by such Group (e.g. long distance telephone calls);

(b) to the extent that any costs relate to the operation of premises (e.g. property taxes, electricity) the costs shall be borne by each Group in proportion to the space used by each Group at such premises;

(c) other overhead expenditures - forthwith after execution of this Agreement the Sicon Group and Adtronics Group agree to identify all other facilities and services which are to be paid for on a shared basis. Each Group agrees to pay a percentage of the cost of such shared facilities and services provided to such Group by the other Group; the percentage shall be equal to the percentage that the gross revenue of the Group receiving the facilities or services is of the gross revenue of both Groups. If one Group wishes to use the facilities or services of the other and there has been no agreement to pay for same on a shared basis, the Group wishing to use such facility or service will, prior to the use of same, pay such amount as is agreed upon between the Groups.

No Group shall be obliged to share in any cost incurred by the other in respect of a facility or service if it does not use such facility or service. Either Group may at any time advise the other on reasonable notice that it no longer wishes to use a facility or service provided by the other in which event it shall no longer be obliged to share in the cost. In determining reasonable notice the parties agree that an important criteria is the length of the time required for the person providing such facility or service to reduce the additional costs it has incurred to be able to provide such cost or service to the other Group as well as itself.

### 17. Transfer Pricing

Mark agrees to provide a price schedule of the products supplied by the Adtronics Group setting out a purchase price for such products by the Sicon Group. Adtronics shall be entitled to revise the schedule from time to time provided the prices shall not at any time exceed the prices which it charges other customers for such products. In the event that the Sicon Group wishes to pay a lower price than the price set out in the schedule (whether as a result of a reduced return to the Sicon Group due to pricing competition or otherwise) it must negotiate such price with the Adtronics Group prior to ordering same. If a reduced price has not been agreed upon at the time of the order, the price set out in the schedule shall be applicable.

### E. Term

### 18. Term

This agreement shall remain in force and effect until the earlier of:

(a) the parties mutually agree to terminate the agreement;

(b) the Sicon Group is no longer required by its financing arrangements to maintain ownership and control of the assets and business of Adtronics; or

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-20    Filed 08/15/14    Page 68 of 71

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

(c) delivery of notice by Mark or Sicon terminating this Agreement which will only be exercisable if Mark is terminated as general manager of a member of the Adtronics Group as President of Adtronics or Adtronics U.S. or there is any other material breach of the terms of this agreement.

In the event of termination of this Agreement Mark shall purchase the Adtronics shares from Sicon. The consideration shall be the delivery by Mark of the shares in the capital stock of Sicon received by Mark under this Agreement.

In the event that Mark is entitled to purchase hereunder Adtronics shall purchase and 32262 shall sell the Adtronics Division. The purchase price shall be the delivery of the shares which Adtronics received pursuant to this Agreement at the time of sale of the Adtronics Division to 32262. In the event that the redemption price at the date of sale is greater or less than the redemption price at the time of purchase, the amount of the difference will be due and owing by the appropriate party at the time of sale. The method of repurchase (e.g. redemption of shares, use of nominee company, etc.) shall be determined by Mark. In the event there is an intercompany debt outstanding between a member of the Adtronics Group and a member of the Sicon Group at the time of the purchase, (including a debt arising from the change in the redemption price contemplated by this paragraph) such debt shall be repaid in four equal annual instalments commencing on the date of purchase. The debt shall bear interest at the rate per annum from time to time charged by Sicon's bankers on its operating form.

### 19. Preservation of Assets

Except as specifically provided by the CCFL financing arrangement, Sicon agrees that it will not transfer, assign or pledge any of the Adtronics shares and 32262 agrees it will not transfer, assign or pledge any of the business or assets of the Adtronics Division. Adtronics agrees that it will not transfer, assign or pledge any of the Adtronics U.S. shares without the prior written consent of Mark. It is understood and agreed that the share certificates representing the common shares of Adtronics shall specifically state that the assignment or other transfer is subject to the consent of Mark.

Neither Adtronics nor Adtronics U.S. will allot or issue any addition [*sic*] shares in their capital without the written consent of Mark.

### F. Mimar Holdings Ltd.

### 20. Assets to be Sold

Mark or his assignee hereby agrees to sell and Sicon agrees to purchase the shares owned by Mark in the capital stock of Mimar Holdings Ltd. representing $1/2$ of the issued and outstanding capital stock.

### 21. Purchase Price

The purchase price of the shares will be for the sum of $140,000 payable on execution of this Agreement. Mark agrees or shall cause his Assignee to agree to advance the full amount of the purchase proceeds to Adtronics to be applied against its intercompany debt to Sicon.

### G. General

### 22. Covenant by Donald Armitage

Donald hereby personally covenants and agrees that Sicon and any other companies in the Sicon Group shall perform each of the obligations contemplated by this Agreement and that he shall not take any steps either personally or in his capacity as an officer, director or shareholder of any company in the Sicon Group which is inconsistent with this Agreement.

### 23. Covenant by Mark Armitage

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

Mark hereby personally covenants and agrees that Adtronics and the Adtronics Group shall (to the extent that Mark is in control of same) perform each of the obligations contemplated by this Agreement and he shall not take any steps either personally or in his capacity as officer, director or shareholder of any company in the Adtronics Group or in any company which is a party to this Agreement which is inconsistent with this Agreement.

### 24. Covenant by Other Shareholders

The Other Shareholders by execution of this Agreement acknowledge that they are aware of the terms and conditions and agree that they will use their best efforts to assist in the implementation of this Agreement in accordance with its terms.

### 25. Allocation of Small Business Deduction

Sicon agrees to cause an equal share of the small business deduction under section 125 of the *Income Tax Act* to be allocated to each of the companies or groups of companies that enjoyed a separate small business deduction prior to the reorganization arising from the CCFL financing arrangements. In the event that any company or group of companies is unable to utilise all or part of its share of the small business deduction in any fiscal year, the unused portion shall be allocated equally between the other companies or groups of companies.

### 26. Enurement

This agreement shall enure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

### 27. Shareholder Agreement

Mark, the Other Shareholders, Holdings & [*sic*] Don agree that they shall further negotiate and execute an agreement between themselves with respect to their respective interests as shareholders in Sicon.

### 28. Sicon Shares

It is understood and agreed that except for the preferred shares in the capital of Sicon presently held by Mark, the Other Shareholders and Mark shall each hold the same number of equity shares in the capital of Sicon and each of the shares shall have the same terms and conditions.

### 29. CCFL Financing Arrangements

It is understood and acknowledged by the parties that certain of the terms and conditions of this Agreement may require the consent of the lenders under the CCFL financing in order to be implemented or may be inconsistent with the CCFL financing arrangements. Except for paragraph 18, the provisions of and rights and obligations contained in this Agreement (including specifically the rights and obligations in paragraphs 2, 4, 12 and 13) will be subject in all respects to any agreement which forms part of the CCFL financing arrangement and will not be effective to the extent they are contrary to the CCFL financing arrangement. If any term or condition of this Agreement requires consent of the lenders Sicon agrees to use its best efforts to obtain such consent from time to time as required. If any term or condition of this Agreement is inconsistent with the CCFL financing arrangements Sicon agrees to use its best efforts as required from time to time to obtain approval to carry out such term or condition notwithstanding the provisions of the financing arrangements. Mark and the Adtronics Group agree to provide all assistance to Sicon as may be reasonable or necessary to obtain such consent or approval.

The provisions of paragraph 18 relating to the right of Mark to repurchase the Adtronics shares and of Adtronics to repurchase the Adtronics Division will, in the event of the termination of Mark, be in full force and effect notwithstanding that it may contravene the CCFL financing arrangement and may cause an event of default under such arrangements.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

| | | |
|---|---|---|
| Signed, Sealed and Delivered | ) | |
| by MARK ARMITAGE in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | [Signed] |
| Name | ) | MARK ARMITAGE |
| | ) | |
| | ) | |
| Address | ) | |
| | ) | |
| | ) | |
| Occupation | ) | |
| Signed, Sealed and Delivered | ) | |
| by DONALD ARMITAGE in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | [Signed] |
| Name | ) | DONALD ARMITAGE |
| | ) | |
| | ) | |
| Address | ) | |
| | ) | |
| | ) | |
| Occupation | ) | |
| The Corporate Seal of | ) | |
| ADTRONICS SIGNS LTD. was | ) | |
| hereunto affixed in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |
| The Corporate Seal of | ) | |
| ADTRONICS INC. was hereunto | ) | |
| affixed in the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |
| The Corporate Seal of | ) | |
| ARMITAGE HOLDINGS LTD. was | ) | |
| hereunto affixed in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |

Adtronics Signs Ltd. v. Sicon Group Inc., 2004 BCSC 1201, 2004 CarswellBC 2148

2004 BCSC 1201, 2004 CarswellBC 2148, [2004] B.C.W.L.D. 1226...

| | | |
|---|---|---|
| The Corporate Seal of SICON | ) | |
| GROUP INC. was hereunto | ) | |
| affixed in the presence of: | ) | |
| | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |
| The Corporate Seal of | ) | |
| 32262 BRITISH COLUMBIA LTD. | ) | |
| was hereunto affixed in the | ) | |
| presence of: | ) | |
| | ) | |
| | ) | |
| [Signed] | ) | c/s |
| Authorized Signatory | ) | |
| | ) | |
| [Signed] | ) | |
| Authorized Signatory | ) | |

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.