# TAB 21

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 2 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

2012 ABQB 524
Alberta Court of Queen's Bench

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd.

2012 CarswellAlta 1438, 2012 ABQB 524, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676, 7 B.L.R. (5th) 142

**Alberta Oil Sands Pipeline Ltd. in its capacity as General Partner of Pembina Oil Sands Pipeline L.P., Plaintiffs/Defendants by Counterclaim and Canadian Oil Sands Limited, Imperial Oil Resources, Suncor Energy Oil & Gas Partnership, Sinopec Oil Sands Partnership, Nexon Oil Sands Partnership, Mocal Energy Limited and Murphy Oil Company Ltd., Defendants/Plaintiffs by Counterclaim**

B.E. Romaine J.

Judgment: August 17, 2012
Docket: Calgary 1001-18956

Counsel: John B. Laskin, Andrew A. Finkelstein, for Plaintiffs / Defendants by Counterclaim
Clarke Hunter, Q.C., Allison G. Kuntz, for Defendants / Plaintiffs by Counterclaim

Subject: Natural Resources; Civil Practice and Procedure; Corporate and Commercial; Public

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Natural resources --- Oil and gas — Statutory regulation — Pipelines**

From 1978 to 2008, company AOSPL transported production from oil sands project operated by defendants to refineries and tank farms using 22-inch pipeline, to which had been added some newer looping sections of 24 or 30 inch pipe — By expansion support amendment (ES Amendment), new 24 or 30 inch pipeline was to be segregated both commercially and operationally from old 22 inch pipeline — AOSPL did not complete last 4.1 kilometres of new 24 or 30 inch pipeline to service defendants — Defendants alleged that there was breach of ES Amendment and that certain invoices sent to it were objectionable — Defendants served AOSPL with notice of submission for arbitration — AOSPL brought action seeking declaration that defendants' claims were not subject to arbitration and were statute-barred — Hearing to determine whether certain claims that were subject of litigation were arbitrable claims under terms of pipeline services agreement — Claims at issue were stayed and referred to arbitration — It was unreasonable commercially to accept that intention of parties was to resort to two different forums for resolution of disputes about single aspect of pipeline tariff.

**Table of Authorities**

**Cases considered by *B.E. Romaine J.*:**

*Atco Electric Ltd. v. Alberta (Energy & Utilities Board)* (2004), 2004 ABCA 215, 31 Alta. L.R. (4th) 16, 361 A.R. 1, 339 W.A.C. 1, 2004 CarswellAlta 949, 18 Admin. L.R. (4th) 243, [2004] 11 W.W.R. 220 (Alta. C.A.) — referred to

*Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358, 95 D.L.R. (3d) 242, 1978 CarswellBC 525 (B.C. C.A.) — considered

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 3 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(*sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Hammer Pizza Ltd. v. Domino's Pizza of Canada Ltd.* (1997), 1997 CarswellAlta 1233 (Alta. Q.B.) — distinguished

*Huras v. Primerica Financial Services Ltd.* (2001), 2001 CarswellOnt 2848, 148 O.A.C. 396, 55 O.R. (3d) 449, 10 C.C.E.L. (3d) 239, 13 C.P.C. (5th) 108 (Ont. C.A.) — considered

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161, 1968 CarswellOnt 318 (Ont. H.C.) — considered

*Meduk v. Soja* (1958), [1958] S.C.R. 167, 1958 CarswellAlta 69, 12 D.L.R. (2d) 289 (S.C.C.) — considered

*New Era Nutrition Inc. v. Balance Bar Co.* (2004), 2004 ABCA 280, 2004 CarswellAlta 1200, 47 B.L.R. (3d) 296, 357 A.R. 184, 334 W.A.C. 184, 245 D.L.R. (4th) 107, 33 Alta. L.R. (4th) 1 (Alta. C.A.) — distinguished

*Ryan v. Moore* (2005), 254 D.L.R. (4th) 1, 334 N.R. 355, [2005] 2 S.C.R. 53, 2005 SCC 38, 2005 CarswellNfld 157, 2005 CarswellNfld 158, 247 Nfld. & P.E.I.R. 286, 735 A.P.R. 286, 25 C.C.L.I. (4th) 1, 32 C.C.L.T. (3d) 1, [2005] R.R.A. 694, 18 E.T.R. (3d) 163 (S.C.C.) — distinguished

*Scurry-Rainbow Oil Ltd. v. Kasha* (1996), 39 Alta. L.R. (3d) 153, 135 D.L.R. (4th) 1, 184 A.R. 177, 122 W.A.C. 177, 1996 CarswellAlta 402 (Alta. C.A.) — referred to

*Western Irrigation District v. Alberta* (2002), 2002 ABCA 200, 2002 CarswellAlta 1110, 33 M.P.L.R. (3d) 62, 312 A.R. 358, 281 W.A.C. 358 (Alta. C.A.) — referred to

**Statutes considered:**

*Arbitration Act*, R.S.A. 2000, c. A-43

    s. 7 — considered

    s. 17(2) — referred to

HEARING to determine whether certain claims that were subject of litigation were arbitrable claims under terms of pipeline services agreement.

***B.E. Romaine J.*:**

**Introduction**

1    The narrow issue in this application is whether certain claims that are the subject of litigation commenced in this Court are arbitrable claims under the terms of a pipeline services agreement between the parties. If so, the Defendants/Plaintiffs by Counterclaim submit they should be stayed and referred to arbitration.

**Relevant Facts**

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 4 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

2      From 1978 to 2008, Alberta Oil Sands Pipeline Ltd. ("AOSPL") transported production from the Syncrude oil sands project near Fort McMurray, Alberta operated by the Defendants/Plaintiffs by Counterclaim (the "Syncrude Participants") to refineries and tank farms near Edmonton using a 22-inch pipeline (the "Old 22 Inch Pipeline"), to which had been added some newer looping sections of 24 or 30 inch pipe.

3      The original agreement relating to the construction and operation of the pipeline was superseded by a 1993 Pipeline Agreement which, among other things, mandates the process for the invoicing, payment, and audit of the pipeline tariff (also known as the "Cost of Service").

4      By a 2005 Expansion Support Amendment (the "ES Amendment"), AOSPL committed to build additional sections of 24 or 30 inch pipe so as to complete a new pipeline to service the requirements of Syncrude Participants (the "New 24/30 Inch Pipeline"). Once completed, the New 24/30 Inch Pipeline was to be segregated both commercially and operationally from the Old 22 Inch Pipeline. The Old 22 Inch Pipeline would then be used to service the requirements of the Horizon oil sands project operated by Canadian Natural Resources Ltd. ("CNRL").

5      However, AOSPL did not complete the last 4.1 kilometers of the New 24/30 Inch Pipeline to service the Syncrude Participants. AOSPL instead used the Old 22 inch Pipeline for that segment and dedicated the last segment of the New 24/30 Inch Pipeline to CNRL, using different routing.

6      The Syncrude Participants allege that AOSPL imposed this arrangement on them on July 1, 2008 by commencing segregated operation of the two pipelines - one for Syncrude and one for CNRL. For Syncrude shipments, AOSPL used the New 23/30 Inch Pipeline except for the last 4.1 km. near Edmonton in an area known as Pipeline Alley. There it continued to use the Old 22 Inch Pipeline. The Syncrude Participants allege that this is a breach of the ES Amendment.

7      AOSPL takes the position that the Syncrude Participants should accept the last 4.1 km. of the Old 22 Inch Pipeline as compliant with the ES Amendment on the basis that it is functionally equivalent to the New 23/30 Inch Pipeline. The Syncrude Participants do not agree.

8      After July 1, 2008, the parties continued to engage in discussions with a view to resolving this issue. Under the ES Amendment, AOSPL was to sell the line fill in the Old 22 Inch Pipeline and credit the sales proceeds to the capital asset account, which affects calculation of the pipeline tariff. AOSPL did sell the line fill and obtained proceeds of nearly $60 million. During the period of time that AOSPL and the Syncrude Participants were negotiating the 4.1 km. issue, and while the Syncrude Participants were continuing to refuse to accept that situation, AOSPL did not credit the $60 million to the capital asset account. AOSPL takes the position that the "In-Service Date" under the ES Amendment could not occur unless and until the Syncrude Participants confirmed the acceptability of the last 4.1 km. The In-Service Date is defined as being "the first day the [new pipeline construction] has been completed, is available to be commissioned, and is found to be acceptable by the Syncrude Participants to provide service for Products on the 24/30 Inch Pipeline."

9      On June 11, 2009, the parties entered into a Tolling and Pipeline Severance Agreement ("the TPSA"). The stated purpose of the TPSA was to preserve the rights of the parties to any claims or defences in respect of the allegations that AOSPL breached the ES Amendment, while "avoiding any need to commence Litigation to prevent the expiry of limitation periods." "Litigation" was defined as including an action or arbitration.

10      The TPSA provided for the application of the line fill credit to the capital asset account as of June 11, 2009, but preserved the Syncrude Participants' claim that the line fill credit ought to have been credited at an earlier date or dates.

11      At about the same time, AOSPL increased the pipeline tariff to the Suncrude Participants by including a charge for a notional capital gains tax on the line fill proceeds as of the dates on which the line fill sales actually took place, with a resulting increase in the tariff. The Syncrude Participants allege that the inclusion of any capital gains tax in the tariff is contrary to the 1993 Pipeline Agreement and the ES Amendment, and is inconsistent with the economics projections that AOSPL provided to the Syncrude Participants when they were considering the ES Amendment.

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 5 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

12     Under the 1993 Pipeline Agreement, AOSPL calculates and invoices the Syncrude Participants for the Cost of Service in two phases: (i) the Provisional Cost of Service; and (ii) the actual Cost of Service.

13     The Provisional Cost of Service is defined as "a written good faith estimate identified as such and prepared each Year by AOSPL, setting out the estimated Cost of Service for the following Year". AOSPL invoices the Syncrude Participants for the Provisional Cost of Service on a monthly basis, and the Syncrude Participants are required to pay the invoices within ten days of receipt.

14     The actual Cost of Service is calculated for any given year on or before February 15th of the following year, crediting all amounts paid by the Syncrude Participants pursuant to the Provisional Cost of Service invoices and any other amounts that AOSPL is required to credit to the Syncrude Participants pursuant to the 1993 Pipeline Agreement. To the extent that payment of the Provisional Cost of Service invoices results in either an overpayment or an underpayment by the Syncrude Participants in respect of the actual Cost of Service, a credit from or a further payment to AOSPL is required.

15     The Syncrude Participants submit that the Provisional Cost of Service invoices do not provide sufficient detail for them to conduct any meaningful review of the amounts charged therein. Accordingly, they say, it has become their standard practice to pay those invoices with minimal review and as a matter of course, and instead to conduct a thorough assessment of the amounts charged through the audit process provided by the 1993 Agreement.

16     AOSPL disagrees about the detail of the invoices, and submits that the AOSPL invoices do provide sufficient detail for the Syncrude Participants to conduct a meaningful review of the amounts charged. For the purpose of this application, and given my interpretation of Article 18 and Article 19.3 of the 1993 Pipeline Agreement and the interplay among these provisions, nothing turns on this difference of views.

17     Article 18.2 of the 1993 Pipeline Agreement provides as follows:

> [The Syncrude Participants] shall have the right, at their expense, to inspect, examine and audit, at all reasonable times, but not more than once each Year, the books of accounts and records of AOSPL which relate to the Operations to the extent necessary to verify the accuracy of all amounts used in the calculation of the Cost of Service and all invoices and bills hereunder.
>
> (emphasis added)

18     This audit right can be exercised within two years of any particular tariff year. The Syncrude Participants exercise their audit rights once every two years.

19     Pursuant to Article 18.3 of the 1993 Pipeline Agreement, any "discrepancies" identified in AOSPL's invoices as a result of an audit must be dealt with as follows:

> (a) The Syncrude Participants must submit any audit claims to AOSPL within 60 days of the completion of the audit field work;
>
> (b) AOSPL must respond in writing to the audit claims within 60 days of receipt;
>
> (c) Any audit claims that remain unresolved after 180 days from the day on which they were made "shall be submitted to Arbitration unless both AOSPL and the [Syncrude] Participants agree to an extension" of the said 180 day period.

20     The Syncrude Participants began their audit of AOSPL's 2008 tariff in the fourth quarter of 2009, after having received the actual Cost of Service invoice for 2008 in February 2009.

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 6 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

21     The Syncrude Participants allege that the 2009 audit revealed a number of substantial discrepancies in respect of the Cost of Service in 2008. As a result, they submitted a number of what they characterize as Audit Claims within the meaning of Article 18.3 to AOSPL on April 26, 2010. The claims that remain outstanding and form the basis for this application are as follows:

(a) *The Proceeds Claim*, which concerns the issue of the line fill having been sold in 2008, but AOSPL not having credited the capital assets account (also referred to as the "Capital Disposals Account") with the $60 million in line fill sales proceeds until June 11, 2009.

(b) *The Tax Claim*, which concerns AOSPL's inclusion in the 2008 Cost of Service of what the Syncrude Participants describe as a theoretical capital gains tax of $6,508,140 in respect of the line fill sales, which the Syncrude Participants allege is not authorized by either the 1993 Pipeline Agreement or the ES Amendment and is contrary to the reasoning in a 2005 arbitration decision with respect to a different tax charge imposed by AOSPL.

(c) *The Maintenance Claims*, which concern a number of charges for work relating to the Old 22 Inch Pipeline undertaken shortly before the expansion, which the Syncrude Participants allege provided no benefit to them.

22     Another Audit Claim related to an alleged discrepancy between the amount of the proceeds of the sale of the line fill and the amount of the line fill credit to the capital assets account. AOSPL acknowledges that this claim is a proper Audit Claim and arbitrable under the 1993 Pipeline Agreement.

23     AOSPL responded to the Audit Claims on June 25, 2010, exactly 60 days after they were submitted by the Syncrude Participants, conforming with the timing prescribed by Article 18.3 of the 1993 Pipeline Agreement. For each issue, AOSPL inserted its "Operator Response" into the "Audit Query" document that had been submitted on behalf of the Syncrude Participants.

24     The Syncrude Participants replied to AOSPL's June 25, 2010 responses in July and September 2010, providing AOSPL with further information in support of the Audit Claims. This was within the 180 day period specified by Section 18.3 before the claims had to be submitted to arbitration.

25     On November 4, 2010, when the claims had remained unresolved for 180 days, the Syncrude Participants served AOSPL with a Notice of Submission for Arbitration and a Statement of Claim (collectively, "the Notice of Arbitration").

26     On December 22, 2010, AOSPL commenced an action by way of Statement of Claim seeking declarations that the Proceeds Claim and the Tax Claim were not subject to arbitration and were statute-barred (the "Audit Claim Action"). AOSPL later amended its Statement of Claim to seek the same declarations with respect to the Maintenance Claims. On December 29, 2010, the Syncrude Participants filed a Statement of Defence alleging that the claims were subject to arbitration and seeking a stay of the action. They also filed an application for a stay of the Audit Claim Action and a referral of the disputes to arbitration.

27     On March 9, 2011, AOSPL gave the Syncrude Participants 60 days notice of the termination of the TPSA. In response, the Syncrude Participants commenced an action for declarations and damages resulting from AOSPL's breach of the ES Amendment in failing to complete the last 4.1 km. of the New 24/30 Inch Pipeline (the "4.1 km Action"). The parties agree that this claim is not an "Audit Claim" relating to the pipeline tariff and that it is not arbitrable under the 1993 Pipeline Agreement. AOSPL has filed a cross-motion to consolidate the Audit Claim Action and the 4.1 km Action.

28     The Syncrude Participants concede that if the stay application fails, AOSPL's crossmotion to consolidate the Audit Claim and the 4.1 km Action should be allowed. They submit, however, that as the claims advanced in the 4.1 km Action are not arbitrable under the 1993 Pipeline Agreement, the cross-motion necessarily fails if the stay application succeeds. They suggest that it would then be for the parties to consider whether to agree to include the 4.1 km Action in the arbitration.

**Issues**

a) *Are the Audit Claims subject to the audit and arbitration provisions of the 1993 Pipeline Agreement?*

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 7 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

b) *If so, should they be stayed and referred to arbitration, or should this Court allow them to be resolved in conjunction with the 4.1 km Action?*

**Analysis**

*a) Are the Audit Claims subject to the audit and arbitration provisions of the 1993 Pipeline Agreement?*

*General Principles of Interpretation*

29      Contracts are to be construed as a whole and in accordance with the intentions of the parties as expressed by the written document. A court should search for the interpretation that would appear to promote or advance the true intent of the parties at the time of entry into the contract: *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at p. 11.

30      Each term of the contract must be interpreted harmoniously with other terms of the agreement. If possible, effect should be given to all provisions: John D. McCamus, *The Law of Contracts*, Irwin Law Inc., 2005 at page 717-719.

31      If the contract is clear and unambiguous on its face, it is unnecessary to consider any extrinsic evidence: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para 55. The court is not searching for the subjective intention of the parties at the time the contract was made, but is making an objective judgment of the intention of the parties based on the material before it: *Atco Electric Ltd. v. Alberta (Energy & Utilities Board)*, 2004 ABCA 215 (Alta. C.A.) at para. 77.

32      Where a contract may bear two interpretations, the more reasonable one, "that which produces a fair result", should be adopted as promoting the intention of the parties: *Consolidated-Bathurst* at p. 11.

33      Where there are reasonable alternative interpretations of a contract, "evidence of the subsequent conduct of the parties is admissible as an aid to resolving the ambiguity if the conduct is more consistent with one interpretation than the other": *Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358, 95 D.L.R. (3d) 242 (B.C. C.A.), cited in *Western Irrigation District v. Alberta*, 2002 ABCA 200 (Alta. C.A.) at para. 21; *Scurry-Rainbow Oil Ltd. v. Kasha* (1996), 184 A.R. 177 (Alta. C.A.) at para. 45. As a general rule, evidence of prior agreements is of limited assistance: *McCamus* at pages 711-713.

34      The same rules of contractual interpretation that govern any clause in a contract apply to the interpretation of an arbitration clause, including that "the governing consideration ... must be the precise terms of the language in which the arbitration clause is framed": *Huras v. Primerica Financial Services Ltd.*, [2001] O.J. No. 3318 (Ont. C.A.) at para. 11.

*Applied to These Provisions*

35      The Syncrude Participants submit that interpreting Articles 18.2 and 18.3 of the 1993 Pipeline Agreement in accordance with their plain meaning and purpose mandates that the Audit Claims be referred to arbitration. They note that Article 18.2 of the 1993 Pipeline Agreement gives the Syncrude Participants the right of audit "*to the extent necessary to verify the accuracy of all amounts used in* the calculation of the Cost of Service and *all invoices and bills hereunder*" (emphasis added). They submit that verifying the accuracy of AOSPL's invoices necessarily requires a determination that they conform with the terms of the 1993 Pipeline Agreement. How else, they say, could an invoice be regarded as "verified" if the amounts used in the calculation of the Cost of Service are in violation of the terms of the agreement?

36      AOSPL submits that Article 18.2 gives the Syncrude Participants only a limited right of audit, confined to verifying that the amounts used in the calculation of the Cost of Service were mathematically accurate or in accordance with acceptable accounting principles, and not extending to issues of contractual interpretation. It submits that only disputes about inconsistencies (or "discrepancies") are arbitrable under the 1993 Pipeline Agreement, referring to the words of Article 18.3 relating to the submission of "claims of discrepancies" resulting from the audit.

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 8 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

37      AOSPL relies on the American case of *S. Joseph Co. v. Golde* 185 F. Supp. 521(1960) for its narrow interpretation of the meaning of "claims of discrepancies". The issue in that case was whether a clause submitting to arbitration "all discrepancies which might eventually arise from this contract" included a dispute involving the repudiation or rescission of the contract before any goods had been delivered. In a brief judgment, the Court concluded that the arbitration clause did not cover a dispute that arose prior to the performance of the contract. In the course of reaching this conclusion, the Court agreed with the restrictive interpretation of "discrepancies" put forward by one party, being that this term simply referred to a variation between contractual standards and the character of product actually delivered, and not to a repudiation of the contract before it could be performed.

38      Given the nature of its facts, the case is not persuasive. The dispute in this case arises from the operation of a contact, not from its repudiation before performance. The reference to "discrepancies" in Section 18.3 takes its meaning from that context.

39      AOSPL also submits that the interpretation it puts forward is supported by two other terms of the 1993 Pipeline Agreement: Article 18.6 and Article 19.3.

40      Article 18.6 provides that items established to be inaccurate as a result of an audit shall be rectified as soon as possible after completion of the audit and credited with interest "as provided in Article 19 of this Agreement". This, submits AOSPL, is an indiction that Section 18.2 only refers to accounting type corrections that address any problems with mathematical calculation of the Cost of Service, and not problems arising from differences in contractual interpretation. I fail to see how a reference to timely rectification and interest would narrow the scope of what could be an "Audit Claim". AOSPL submits that the use of the word "inaccurate" implies a narrow audit right, but that stretches plain meaning. However, the reference to "interest" gives rise to a review of Article 19.3.

41      Article 19.3 provides that if a Syncrude Participant disagrees with any charge or amount shown in an invoice or statement of account, it shall advise AOSPL by prompt written notice and "shall nevertheless pay the full amount of the invoice or statement of account on or before the required date for payment." The article then provides for AOSPL to conduct a review to determine whether the charge or amount in dispute is correct. If it is determined that the amount was incorrectly paid, AOSPL is to immediately refund the overpayment with interest. There is no reference in the article to arbitration, and the article is not among those listed in Article 21.1 of the 1993 Pipeline Agreement which provides for submission of issues to arbitration.

42      AOSPL submits that the effect of the interpretation of the 1993 Pipeline Agreement advanced by the Syncrude Participants would be to extend the audit provisions of Article 18 with its arbitration provision to all disputes about amounts charged, and that this interpretation would render Article 19.3 meaningless.

43      I cannot accept this submission. The purpose of Article 19.3 is to ensure that AOSPL is paid promptly in accordance with the invoices and statements of account it issues during the period in which it conducts a review of any concerns or complaints raised by a Syncrude Participant. If such a review results in an outcome that is satisfactory to both the Syncrude Participant and AOSPL, that is the end of it. If not, either party may resort to litigation over the result of the review, or a Syncrude Participant may chose to rely on its audit rights set out under Section 18.2. This does not render Section 19.3 meaningless, as it creates in AOSPL's favour an absolute obligation of payment pending a review of complaints by Syncrude Participants that arise from a particular invoice or statement of account. It creates a process that is an alternative to the independent audit envisaged by Section 18.2 and creates a right to interest on any refund that is found to be due and owing as a result. I agree with the Syncrude Participants that Section 19.3 is complementary to Section 18.2, and not inconsistent with it.

44      The Syncrude Participants submit that AOSPL's argument that Articles 18 and 19.3 establish mutually exclusive processes for resolving disputes of different types was refuted by a decision in a arbitration between AOSPL and the Syncrude Participants (as they then were) in December, 2005. The arbitrator in that decision dealt with a question of interpretation of Article 18.6 and Article 19 in the context of an interest calculation dispute. The issue before him was which sub-article of the Article 19 regime was intended to be referred to in Article 18.6 when it provided that interest on items established to be inaccurate as a result of an Article 18.6 audit shall be "credited appropriately with interest as provided in Article 19 of this Agreement." The arbitrator commented as follows on page 19 of the decision:

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 9 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

> Reading all of the relevant provisions described above in the context of the entire 1993 Agreement leads me to the conclusion that the audit rights of Article 18 are intended (as stated in Article 18.2) to allow the [Syncrude Participants] to verify the work that AOSPL does in tracking the costs that are included in the Cost of Service and the invoices and bills submitted by AOSPL. This is necessary because obviously one cannot verify the correctness of amounts included in an invoice without access to the data on which they are based.

> In the similar circumstances of a disputed amount where a Shipper is able to ascertain from an invoice that an incorrect amount has been wrongly included (for example, where an invoice contained an amount which clearly related to work done on the Scotford Lateral), the parties have clearly indicated in Article 19.3 that interest accrues from the time of payment by a [Syncrude Participant] of the successfully disputed amount.

45      Following from this, the arbitrator found that interest on settled audit claims arising from Article 18.6 accrues from the date of payment of the invoice that contained the amount subject to the audit claim, as contemplated by Article 19.3, rather than from the date of settlement, as argued by AOSPL. While the decision of an arbitrator, even in a case involving the same parties, is not binding on this Court, I agree with the implicit recognition by the arbitrator that Articles 18 and 19 are complementary.

46      AOSPL during oral submissions agreed that Article 18.3 and Article 19.3 are complementary, but suggested that Article 19.3 is a broader provision covering any kind of dispute over billing, and that Article 18.3 deals only with a subset of what Article 19.3 encompasses. This is an overly tortuous interpretation that finds no support in the words of the two provisions.

47      AOSPL also suggests that the Syncrude Participants are in essence putting forward an interpretation of Section 18.2 that would entitle it to conduct audits "to the extent necessary to determine whether the Syncrude Participants are being billed in accordance with the Agreement", and that this is somehow unreasonable. It is not unreasonable that the parties would provide for a periodic right of audit of Cost of Service billings to ensure that they are in compliance with the agreement generally, and not just mathematically correct.

48      On this issue, AOSPL points out that the audit right in Article 18 is not expressed in terms of a "compliance audit" as such term is defined in the National Energy Board's online reference document entitled Pipeline Tolls and Tariffs: A Compendium of Terms. It submits that, therefore, the audit right does not extend to issues of contractual interpretation. This document relates to publicly-regulated pipelines, and what it has to say about a term of art in that regard in a 2012 web posting is of little or no assistance to the interpretation of provisions in a contract relating to a private pipeline drafted in 1993, even as they have been amended from time to time. The choice of the word "accuracy" to describe the purpose of the audit, instead of "compliance", is not determinative of the interpretation of these provisions.

49      There is no significance to the fact that neither the ES Amendment nor the TPSA contains an arbitration clause. The ES Amendment is expressly an amendment to the 1993 Pipeline Agreement, which contains the arbitration clauses in issue. The TPSA is an interim agreement that allowed the continuation of negotiations while allowing the parties to preserve their rights. The TPSA does not form the primary basis for any of the Audit Claims, although it may be relevant factually to the Proceeds Claim.

50      The intrinsic factors that AOSPL submits support its narrow interpretation do not do so when the 1993 Pipeline Agreement is viewed as a whole, in its reasonable commercial context. AOSPL, however, refers to extrinsic factors that it submits supports its interpretation.

*Extrinsic Aids to Interpretation*

51      AOSPL submits that the arbitration provisions of the predecessor agreement to the 1993 Pipeline Agreement assist in interpreting the 1993 Pipeline Agreement.

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 10 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

52      It submits that the previous agreement contained a much broader arbitration provision, referring to "any dispute or discrepancy with respect to the rights or obligation of the Parties", and the change to narrower language in the 1993 Pipeline Agreement is thus instructive.

53      The Syncrude Participants concede that the arbitration provisions of the 1993 Pipeline Agreement are more restrictive than the previous agreement, but submit that this does not help with the question of whether the audit rights set out in Article 18 include issues of contractual interpretation of the proper calculation of Cost of Service. I must agree. The Syncrude Participants do not suggest that all issues among the parties with respect to the 1993 Pipeline Agreement are subject to referral to arbitration. In fact, they point to the 4.1 km Action as an example of an issue that is not arbitrable under the agreement.

54      The difference between the broad referral language of the previous agreement and the more restrictive language of the 1993 Agreement is not helpful in the more subtle question of whether all issues relating to the calculation of Cost of Service and billings, including issues of contractual interpretation, are included under Section 18.3.

55      AOSPL submits that the fact that the Syncrude Participants seek a series of declarations rather than a mathematical rectification of specific numbers is a sign that the Audit Claims are not arbitrable. However, the Syncrude Participants seek declarations that would result, if successful, in such changes to the Cost of Service calculation.

56      I see nothing in the way the relief sought is framed that would indicate arbitrability one way or another, and note that an arbitral tribunal may determine questions of law that arise during the arbitration: Section 17(2) of the *Arbitration Act*, R.S.A. 2000, c. A-43.

57      It is unreasonable commercially to accept that the intention of the parties was to resort to two different forums for the resolution of disputes about a single aspect of the pipeline tariff: whether the Cost of Service has been calculated correctly. As noted by the Syncrude Participants, the position of AOSPL about this particular dispute illustrates the problems of that approach. AOSPL accepts that the issue of the correct amount of the line fill proceeds credit is arbitrable, but says that the question of when that amount should be credited must be litigated in the courts. It is not difficult to imagine that there are a myriad of such questions that could be characterized as being both issues of calculation and issues of interpretation. If the parties wished to parse their ability to refer disputes to arbitration in the manner suggested by the AOSPL, the contractual language could have done this clearly. The existing words do not support this interpretation, and it lacks commercial sense.

58      In summary, I agree with the interpretation of Articles 18.2 and 18.3 put forward by the Syncrude Participants, and find that the language of the articles is clear and unambiguous and broad enough to include issues of contractual interpretation relating to the accuracy of the invoices and bills rendered by AOSPL. I find that the interpretation promoted by AOSPL ignores the language of Section 18.2 that refers to verify the accuracy of "all invoices and bills" and concentrates too narrowly on the language that refers to verifying the accuracy of "amounts used".

59      I am satisfied that Articles 18.2 and 18.3 were intended to enable the parties to determine through arbitration the issue of whether they were being billed correctly and in conformity with the 1993 Pipeline Agreement, as amended. Thus, the Audit Claims in issue are arbitrable claims.

*Subsequent Conduct of the Parties*

60      If I am incorrect, and Articles 18.2 and 18.3 are reasonably susceptible of more than one meaning, I may take into account the subsequent conduct of the parties as an aid to resolving any ambiguity.

61      The Syncrude Participants point out that at no time during the audit process or the communications regarding the Audit Claims did AOSPL raise any issue with respect to whether the claims were properly the subject of audit queries or arbitration under Article 18.3 of the 1993 Pipeline Agreement. AOSPL first raised this issue shortly after the Syncrude Participants issued their Notice to Arbitrate. They submit further that AOSPL's own records show that during the audit process and later discussions up to the Notice to Arbitrate, AOSPL considered the Audit Claims to be arbitrable, referring to Minutes of a Meeting of the

Audit Committee of Pembina (the limited partnership of which AOSPL is the general partner) dated May 5, 2010, which refer to the "audit queries" of the Syncrude Participants, and state that "[i]n the event that [the Syncrude Participants] are not satisfied with our response, these issues are likely to proceed to arbitration."

62      The Syncrude Participants also refer to notes taken by one of AOSPL's in-house counsel at a meeting of the parties held on October 5, 2010, which state that "linefill, timing, interest and capital gains tax - likely we will be going to arbitration on this."

63      The Syncrude Participants refer to Minutes of the Audit Committee of Pembina dated November 2, 2010 which note a "potential arbitration with Syncrude for $11.6 million".

64      AOSPL does not deny this course of conduct during the 2009 audit, nor these references in its own documents, but merely submits that there was no "common assumption" that the subject claims were arbitrable, without addressing the specific conduct that appears to suggest otherwise.

65      The Syncrude Participants also submit that the conduct of the parties with respect to previous audits and arbitrations with respect to such audits support their interpretation of Article 18.2 and Article 18.3. They submit that the subject claims are consistent in nature with claims that the parties have agreed in the past were proper audit claims subject to arbitration under the 1993 Pipeline Agreement.

66      The Syncrude Participants refer to the following events:

1. In 2001, they issued a Statement of Claim in respect of a large number of claims that had accumulated for the 1994 - 2001 tariff years in order to ensure that no limitation period expired for prosecuting them. They point out that AOSPL itself then referred the claims to arbitration under the audit provisions of the 1993 Pipeline Agreement. The Syncrude Participants agreed that the issues were arbitrable, and their action was stayed on consent.

2. The Syncrude Participants submit that in the subsequent 2002 arbitration, AOSPL took the position that some of the 1994 - 2001 Audit Claims were beyond the jurisdiction of the arbitrators. It did so on the basis that the 1993 Pipeline Agreement had not "conferred regulatory jurisdiction over AOSPL's affairs" upon the arbitrators, nor had it "created a just and reasonable' toll-making regime, and arbitral powers associated with such regime." AOSPL took the position that the arbitrators were limited to applying the provisions of the 1993 Pipeline Agreement.

The Syncrude Participants submit that, consistent with that position (with which they agree), AOSPL conceded that issues that "raise questions about the correct interpretation of the Agreements" are proper audit claims, and that the audit rights in the 1993 Pipeline Agreement were inserted "to provide the Syncrude Participants with an opportunity to determine that they were properly billed for service". AOSPL disagrees with that interpretation of its position in the 2002 arbitration, and submits that it took the position, consistent with that taken in this proceeding, that the arbitration rights are limited to dealing with the verification of the accuracy of amounts used in the calculation of the Cost of Service.

Having examined the arguments made to the arbitrators at the time, I must agree that AOSPL conceded in that arbitration that questions of contractual interpretation were properly the subject of audit claims, while arguing that the arbitrators were restricted to determining the Cost of Service as set out in the 1993 Pipeline Agreement, rather than substituting an amount not contemplated or authorized by the agreement. As the 1994-2001 Audit Claims were eventually settled, there is no arbitration decision to refer to.

3. The Syncrude Participants acknowledge that in December, 2003, they included the cash tax issue that was later the subject of the 2005 arbitration referred to previously in this decision in litigation that was commenced to preserve their rights in respect of certain other contingent claims that were clearly beyond the scope of the arbitration provisions in the 1993 Pipeline Agreement. However, they point out that their Statement of Claim specifically recognized that the cash tax and other audit issues raised therein were likely subject to arbitration. They engaged with AOSPL in negotiations to resolve the issue, and they point out that it was AOSPL that issued the Notice of Arbitration when negotiations failed,

referring to arbitration a claim that was clearly one of contractual interpretation and similar to the claims at issue here. What the Syncrude Participants say is unequivocal is AOSPL's position that a similar claim was arbitrable.

4. In the 2005 arbitration, the principal issue was whether, on a proper interpretation of the 1993 Pipeline Agreement, AOSPL was entitled to include in the tariff an allowance for "cash taxes" which it did not in fact pay after its acquisition by an income trust.

The Syncrude Participants submit that, like the Proceeds Claim and the Tax Claim in issue here, the cash tax issue in the 2005 arbitration was based entirely on contractual interpretation rather than mere accounting or mathematics. They submit that this is clear from the arbitration award. I agree.

Again, AOSPL submits that it took the position that the arbitration rights were limited to dealing with the verification of the accuracy of the amounts used in the calculation of the Cost of Service, but this cannot be sustained, given that the arbitrator specifically noted in his decision that:

> (a) his jurisdiction over the dispute arose from the 1993 Pipeline Agreement and from AOSPL's Notice of Arbitration;
>
> (b) both parties had either expressly or by implication asserted that each of the disputed matters were an issue of contractual interpretation; and
>
> (c) he agreed that the disputes were issues of contractual interpretation.

67     The Syncrude Participants submit that all of this conduct, both in the course of the 2009 Audit and with respect to previous disputes involving the 1993 Pipeline Agreement, is important for two reasons:

> a) to aid in the interpretation of Articles 18.2 and 18.3, and
>
> b) to prevent AOSPL from denying that the subject claims are arbitrable.

As an aid to interpretation, I am satisfied that this conduct helps to resolve any ambiguity in favour of an interpretation that would include the Audit Claims in the category of arbitrable claims. Despite AOSPL's submissions to the contrary, this conduct is unequivocal and signals a clear intention to treat claims such as the subject Audit Claims as arbitrable, whether or not they involve issues of contractual interpretation.

68     AOSPL submits that the conduct in question must also be shown to be intentional, citing *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), 3 D.L.R. (3d) 161 (Ont. H.C.) at p. 237. While it is not clear what the term "intentional" means in these circumstances, nor whether such an additional gloss on the concept of "unequivocal" is necessary, there is nothing to indicate that these acts of AOSPL were anything but intentional. Taken together, they show a pattern of behaviour.

69     AOSPL also points out that the 1993 Pipeline Agreement contains the usual contractual provisions regarding waiver. While this is so, the issue is whether the conduct aids in resolving an ambiguity in the contractual language, not whether AOSPL agreed to waive any of the terms of the agreement.

70     With respect to whether AOSPL is prevented by this conduct from denying that the claims are arbitrable, the Syncrude Participants rely on estoppel by representation as described by the Supreme Court of Canada in *Meduk v. Soja,* [1958] S.C.R. 167 (S.C.C.), at 175 as follows:

> Where one has either by words or conduct made to another a representation of fact, either with knowledge of its falsehood, or with the intention that it should be acted upn, or has so conducted himself that another would, as a reasonable man, understand that a certain representation of fact was intended to be acted on, and that the other has acted on the representation and thereby altered his position to his prejudice, an estoppel arises against the party who made the representation, and he is not allowed to aver that the fact is otherwise than he represented it to be.

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 13 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

71     AOSPL submits that the Syncrude Participants have put forward no evidence of any positive representations made by AOSPL that the subject claims are arbitrable with the intention that such a representation be acted on, and that thus the doctrine of estoppel by representation is inapplicable here.

72     The test set out by the Supreme Court is not limited to positive representations, although it is arguable that AOSPL's insertion of "Operator's Responses" into the "Audit Claims" as submitted by the Syncrude Participants may fall within that category. Estoppel by representation includes representation by conduct; a party conducting itself in a manner that another would reasonably understand that such representation was intended to be acted on. There is certainly evidence of this in the conduct of AOSPL in the course of the 2990 Audit, evidence of more than just a passive course of conduct. The conduct and words of AOSPL led the Syncrude Participants to conclude that the audit procedure that they had commenced in accordance with Article 18.3 was not disputed. With respect to the issue of whether the Syncrude Participants acted on such representations and altered their position to their prejudice, they note that, if AOSPL had advised them that it considered the subject claims to be outside the audit and arbitration process, they could have immediately issued a Statement of Claim and avoided the limitations issue now raised by AOSPL in the litigation before this Court.

73     AOSPL submits that the estoppel argument fails because an estoppel by representation cannot arise from silence unless a party is under a duty to speak: *Ryan v. Moore*, [2005] 2 S.C.R. 53 (S.C.C.) at paras. 26. The short answer is that AOSPL's conduct amounted to more than silence. The parties had a contractual relationship that set out a process to be followed with respect to audit claims, and AOSPL by its conduct followed the time-lines and requirements of that process to the point of referral to arbitration. AOSPL responded to the audit queries not just in compliance with the contractual time limits set out in Article 18.3 but with content consistent with the audit claims documentation prepared by the Syncrude Participants in accordance with the mandated process.

74     *Ryan* is distinguishable, in that the case did not involve a contractual relationship between the parties. Here, there was a contractual duty to respond and AOSPL complied with tha duty.

75     AOSPL also submits that, if estoppel by representation does not apply, neither does estoppel by convention. Given that I have found that the Syncrude Participants have established estoppel by representation, it is not necessary that I address estoppel by convention. If I am wrong about estoppel by representation, however, I note that while estoppel by convention requires a mutual assumption, that mutual assumption can be established by either statement or conduct, and there is clear evidence of conduct here: *Ryan* at para. 58.

76     I note that the Syncrude Participants do not allege that AOSPL was hiding its position, but that it changed it after the Syncrude Participants issued the Notice to Arbitrate, and that, until then, AOSPL was operating under the same shared assumption.

77     In conclusion, if I am wrong regarding the interpretation of Article 18, I would find that AOSPL is estopped by its conduct from denying that the subject claims are arbitrable.

*b) Should the Audit Claims be stayed and referred to arbitration, or should this Court allow them to be resolved with the 4.1 km Action?*

78     Pursuant to section 7 of the *Arbitration Act*, the Court must stay an action where the parties and subject matter of the dispute are governed by an arbitration agreement.

79     AOSPL submits that, in the particular circumstances of this case, I have the discretion to refuse a stay, and should exercise that discretion. It submits that the issues that arise from the Audit Claims and the issues in the 4.1 km Action are inter-twined and should be heard together.

80     AOSPL relies on *New Era Nutrition Inc. v. Balance Bar Co.*, 2004 ABCA 280 (Alta. C.A.), an odd case in which New Era had filed both a Statement of Claim for damages and a Notice to Arbitrate. New Era conceded that the issues overlapped,

Case 09-10138-MFW    Doc 14225-21    Filed 08/15/14    Page 14 of 15

Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd., 2012 ABQB 524, 2012...
2012 ABQB 524, 2012 CarswellAlta 1438, [2013] A.W.L.D. 392, 220 A.C.W.S. (3d) 676...

but it was clear that the litigation was necessary because New Era was seeking relief against other parties involved in related transactions outside the scope of the agreement that included an arbitration clause. The same concern, that of the rights of defendants in litigation that are involved in a cause of action but not privy to a contract that is subject to an arbitration clause, was raised in *Hammer Pizza Ltd. v. Domino's Pizza of Canada Ltd.*, [1997] A.J. No. 67 (Alta. Q.B.). These cases are distinguishable on their facts. No third parties are involved in the 4.1 km Action and the Syncrude Participants submit, and I am satisfied from a review of the pleadings, that the Audit Claims and the 4.1 km Action are fundamentally different. While arising from the same background facts, the 4.1 km Action claims future or potential damages arising from the alleged breach of an agreement to provide an entirely new and segregated pipeline. The Audit Claims would be unaffected by whether the 4.1 km Action succeeds or fails.

81     AOSPL submits that the acceptability of the last 4.1 km of pipeline as constructed is at issue in both proceedings. However, the issue in the Process Claim is not the same. The central question in that claim is when the In-Service Date occurred, and when the line fill proceeds should have been credited to the Capital assets account. I am not satisfied that there is any real risk of inconsistent verdicts, nor any manifest unfairness to AOSPL if these issues are determined in separate forums.

82     There is, however, an issue of prejudice to the Syncrude Participants if I were to refuse a stay even though I have found that the Audit Claims are arbitrable. AOSPL raises a limitations defence in the litigation, which the Syncrude Participants submit is one of its motives for seeking to resolve the subject issues through litigation rather than through arbitration. AOSPL denies this as a motive and submits that it would raise the limitations defence even if the subject claims are arbitrable and the issues are dealt with in an arbitration. It is, however, apparent that AOSPL's limitations defence would be more difficult to establish if the subject claims are resolved through arbitration in accordance with Articles 18.2 and 18.3, since the parties have complied with the time limits set out in those sections.

83     To the extent that I have any discretion to refuse the stay despite my decision that the Audit Claims are arbitrable, I see no reason to exercise that discretion in this case.

**Conclusion**

84     The Audit Claims in question are subject to the audit and arbitration provisions of the 1993 Pipeline Agreement. To the extent that I would have any jurisdiction to refuse a stay in the circumstances and order that the Audit Claims be resolved in conjunction with the 4.1 km Action in this Court, I decline to do so. The claims are stayed and referred to arbitration. Given my conclusion on this issue, the cross-application to consolidate the Audit Claim and the 4.1 km Action necessarily fails.

85     If the parties are unable to agree on costs, they may submit written argument on that issue within 60 days.

**Schedule A — 1993 Pipeline Agreement**

**Article 18 Audit**

. . . . .

18.2 *Audit* Shippers shall have the right, at their expense, to inspect, examine and audit, at all reasonable times, but not more than once each Year, the books of accounts and records of AOSPL which relate to the Operations to the extent necessary to verify the accuracy of all amounts used in the calculation of the Cost of Service and all invoices and bills hereunder. Shippers will make reasonable efforts to conduct such audit jointly or simultaneously with Other Shippers so as to minimize any inconvenience to AOSPL.

18.3 *Audit Claims* Any Shipper performing an audit shall submit any claims of discrepancies within sixty (60) Days of completion of audit field work to AOSPL (the "Audit Claim"). AOSPL shall respond in writing to such claims within sixty (60) Days of receipt of such claims. Upon expiration of a one-hundred and eighty (180) Day period, following the submission by any Shipper for an Audit Claim, AOSPL shall forthwith credit the Shippers with the full amount of any claims to which AOSPL has failed to respond unless AOSPL has obtained the approval of the Shippers for a time extension. Claims remaining

unanswered by AOSPL after the said time extension shall be credited forthwith to the Shippers account as originally submitted. Claims remaining unresolved after a period of one-hundred and eighty (180) Days following the submission of any Audit Claim by any Shipper shall be submitted to Arbitration unless both AOSPL and the Participants agree to an extension to said one-hundred and eighty (180) Day period.

. . . . .

18.6 *Corrections* Items established to be inaccurate as a result of any audit shall be rectified as soon as possible after completion of such audit and credited appropriately with interest as provided in Article 19 of this Agreement.

**Article 19 Late Payment**

. . . . .

19.3 *Disputes* If a Shipper disagrees with any charge to amount shown in any invoice or statement of account submitted by AOSPL under this Agreement, then the Shipper shall so advise AOSPL by prompt written notice and shall nevertheless pay the full amount of the invoice or statement of account on or before the required date for payment. After receipt of such written notice, AOSPL shall promptly conduct a review to determine the correctness of the charge or amount in dispute. If it is determined that such charge or amount or any portion thereof, was incorrectly paid by the Shipper then AOSPL shall immediately refund to the Shipper the amount of any overpayment, together with interst as provided in Article 19.2, from the date of payment by Shippers of the invoice or statement of account to the date the refund is paid in full.

**Article 21 Arbitration**

21.1 *General* AOSPL or the Participants may by written notice to the other submit to Arbitration, in accordance with the provisions of this Article 21, any dispute or disagreement with respect to the rights or obligations of the Parties under Articles 8.1, 8.2(f), 14.4, 15, 16.6(e) and Articles D4.2 of Schedule "D" of this Agreement, or any other Articles or Schedules of this Agreement containing therein reference of any dispute to Arbitration.

*Order accordingly.*

**End of Document** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.