TAB 22

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 2 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

2008 WL 2037592
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
District of Columbia.

In re GREATER SOUTHEAST COMMUNITY
HOSPITAL CORP. I, et al., Debtors.
Sam J. Alberts, Trustee for The
DCHC Liquidating Trust, Plaintiff,
v.
HCA Inc., et al., Defendants.

Bankruptcy No. 02–02250.   |   Adversary
No. 04–10366.   |   May 12, 2008.

**Attorneys and Law Firms**

Dana Foster, Jeffrey E. Schmitt, Lucius B. Lau, Sam J. Alberts, White & Case LLP, Washington, DC, for Plaintiff.

Jeffrey W. Kilduff, Lani R. Miller, Stephen Dudley Brody, William T. Buffaloe, O'Melveny & Myers LLP, Washington, DC, for Defendants.

**Opinion**

*MEMORANDUM DECISION CONSTITUTING
THE COURT'S FINDINGS OF FACT
AND CONCLUSIONS OF LAW*

S. MARTIN TEEL, JR., Bankruptcy Judge.

## Table of Contents

I. FACTUAL AND PROCEDURAL BACKGROUND..............................................

II. JURISDICTION, VENUE, AND STANDING......................................................

III. THE MERITS OF ALBERTS' FRAUDULENT CONVEYANCE CLAIM...............

A.   Applicable Legal Standard........................................................................

B.   Findings of Fact..........................................................................................

  1.   Fair market value.....................................................................................

    a.   Market approach....................................................................................

      (i)   Guideline transactions.......................................................................

      (ii)   Guideline public companies...........................................................

    b.   Cost approach........................................................................................

      i.   Real property......................................................................................

        (1)   Highest and best use.......................................................................

          (A)   Highest and best use as vacant.

          (B)   Highest and best use as improved....................................

        (2)   Value...........................................................................................

          (A)   Value of Reese Hospital site as vacant......................................

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 3 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

(B)      Value of Reese Hospital site as
                         improved.....................................

ii.             Equipment...............................................................................................

iii.            Net working capital...................................................................................

iv.            Humana Contract......................................................................................

    (1)        There is no evidence that the Humana Contract existed on the Transfer Date............

    (2)        There is no evidence that the Humana Contract was assigned to Reese Corp..........

    (3)        The PAA should not be deducted from the value of Reese Hospital..........................

        v.             Summary....................................................................................

c.      Income approach......................................................................................................

i.             Projected earnings...................................................................................

                    (A)      M & P Projections......................

                    (B)      Reese Projections......................

    (I)        Timing of the projections..............................................................          91

    (II)       Starting point for projections.........................................................         102

    (III)      Problems at Reese Hospital..........................................................         110

    (IV)       Specific Assumptions.................................................................         114

                    (C)      Demchick Projections................

    (I)        Turnaround Scenario..................................................................         119

    (II)       Strategic Growth Scenario...........................................................         124

                    (D)      Modified projections...................

ii.            Net cash flow...........................................................................................

                    (A)      Depreciation and amortization...

                    (B)      Income taxes...............................

                    (C)      Net working capital....................

                    (D)      Capital expenditures..................

                    (E)      Final net cash flow.....................

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 4 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

iii.        Weighted average cost of capital.....................................................................................

       (A)      Discount rate (cost of equity).....

(I)      Risk-free rate.......................................................................  153

(II)     Equity risk premium...........................................................  154

(III)    Industry risk premium.......................................................  155

(IV)   Risk premium for size.......................................................  156

(IV)   Specific company risk premium.......................................  158

       (B)      After–tax cost of debt................

       (C)      Debt–to–equity ratio...................

       (D)      Final WACC calculation.............

iv.        Terminal value..............................................................................................................

v.         Present value of net cash flow and terminal value..........................................................

vi.        Non–operating and excess assets.....................................................................................

vii.       Final business enterprise value........................................................................................

d.     Other indications of value....................................................................................................

e.     Reconciliation......................................................................................................................

2.       Good faith...............................................................................................................

C.     Conclusions of Law................................................................................................

IV. CONCLUSION................................................................................................

Table of Contents I. FACTUAL AND PROCEDURAL BACKGROUND ..................................... 3 II. JURISDICTION, VENUE, AND STANDING .................................... 8III. THE MERITS OF ALBERTS' FRAUDULENT CONVEYANCE CLAIM .................. 16 A. Applicable Legal Standard .................................... 20 B. Findings of Fact ............................................... 22 1. Fair market value ........................................ 23 a. Market approach ........................................ 24 (i) Guideline transactions .......................... 25 (ii) Guideline public companies ..................... 30 b. Cost approach .......................................... 32 i. Real property ................................... 35 (1) Highest and best use ....................... 36 (A) Highest and best use as vacant .... 38 (B) Highest and best use as improved .. 45 (2) Value ..................................... 47 (A) Value of Reese Hospital site as vacant .......................... 47 (B) Value of Reese Hospital site as improved ........................ 49 ii. Equipment ....................................... 61 iii. Net working capital ............................. 66 iv. Humana Contract ................................. 69 (1) There is no evidence that the Humana Contract existed on the Transfer Date .... 71 (2) There is no evidence that the Humana Contract was assigned to Reese Corp ...... 77 (3) The PAA should not

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 5 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

be deducted from the value of Reese Hospital ..................
79 v. Summary .......................................... 80 c.
Income approach ........................................ 81 i. Projected
earnings ............................... 81 (A) M & P
Projections ................. 83 (B) Reese Projections .................
84 (I) Timing of the projections ....... 91 (II) Starting
point for projections ...... 102 (III) Problems at Reese
Hospital ......... 110 (IV) Specific Assumptions ...... 114
(C) Demchick Projections .............. 119 (I) Turnaround
Scenario 119 (II) Strategic Growth Scenario ......... 124
(D) Modified projections .............. 134 ii. Net cash
flow .................................... 142 (A) Depreciation and
amortization ..... 143 (B) Income taxes ......................
144 (C) Net working capital ............... 144 (D) Capital
expenditures .............. 145 (E) Final net cash flow ...............
149 iii. Weighted average cost of capital ................ 150
(A) Discount rate (cost of equity) .... 151 (I) Risk-free
rate ..... 153 (II) Equity risk premium 154 (III) Industry risk
premium .......... 155 (IV) Risk premium for size ...........
156 (IV) Specific company risk premium ..... 158 (B)
After"tax cost of debt ............ 159 (C) Debt"to"equity
ratio .............. 162 (D) Final WACC calculation ............ 162
iv. Terminal value ................................. 164 v. Present value
of net cash flow and terminal value ...........................................
169 vi. Non"operating and excess assets .................
172 vii. Final business enterprise value .................
175 d. Other indications of value ............................
176 e. Reconciliation ........................................ 178
2. Good faith ................................................ 180 C.
Conclusions of Law ............................................. 191 IV.
CONCLUSION ........................................................ 192

***1** The plaintiff Sam J. Alberts, trustee for the DCHC Liquidating Trust (the "Trust"), initiated this adversary proceeding to avoid and recover certain allegedly fraudulent transfers (the "Reese Transfers") from Michael Reese Medical Center Corporation ("Reese Corp."), as well as other debtors in this jointly administered bankruptcy case (collectively the "Debtors"), to defendants HCA Inc. ("HCA"), Galen Hospital Illinois, Inc. ("GHI"), and Western Plains Capital, Inc. ("Western," and collectively the "Defendants") under the Illinois Uniform Fraudulent Transfer Act, 740 Ill. Comp. Stat. 160/1 *et seq.* (1990) (the "IUFTA"), pursuant to 11 U.S.C. § 544. [1] The court heard testimony and received into evidence numerous exhibits and deposition excerpts over the course of a five-week long trial commencing on January 19, 2007. Having carefully considered the evidence presented by the parties, the controlling legal principles, and the court's prior rulings in this proceeding, the court concludes that final judgment should be entered in favor of the Defendants for the reasons that follow.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are no longer at issue. [2] Reese Corp. was formed as a wholly-owned subsidiary of Doctors Community Hospital Corporation ("DCHC"), a privately-held healthcare management company organized under the laws of Delaware. On July 8, 1998, Reese Corp. entered into an asset purchase agreement (the "APA") with GHI, a corporate subsidiary of fellow defendant HCA, for the purchase of Columbia Michael Reese Hospital and Medical Center ("Reese Hospital"). Also on July 8, 1998, Grant Hospital Corporation, another subsidiary of DCHC, signed a separate asset purchase agreement with Columbia Grant Hospital Inc. for the purchase of Grant Hospital.

On November 9, 1998, the parties signed the "Sixth Amendment" to the APA—the last such document signed prior to the purchase of the hospital. The sale of both hospitals closed on November 12, 1998 (the "Transfer Date"). At that time, various lenders to Reese Corp. wired funds to a Wachovia bank account owned by C/HCA Capital, LP (the "Capital LP"). The Capital LP consisted of a general partner, C/HCA Capital, GP, Inc. (the "Capital GP"), and a limited partner, Western. Western owned the Capital GP at the time of the Reese Transfers and merged into a single entity with the Capital GP in December of 2000. The Capital LP ceased to exist in that same month.

On November 20, 2002, DCHC filed for chapter 11 relief along with the other Debtors, including Reese Corp. After protracted proceedings lasting almost 18 months, the Debtors achieved confirmation of their second amended plan of reorganization (the "Plan") on April 5, 2004. Section 6.6 of the Plan provides for the creation of the Trust, which is charged with liquidating certain assets of the Debtors and distributing the proceeds to certain classes of creditors. Among the assets transferred to the Trust were fraudulent conveyance and other actions authorized under chapter 5 of the Bankruptcy Code.

***2** Acting in his capacity as trustee, Alberts initiated the instant adversary proceeding on November 18, 2004. After amending his complaint twice, Alberts moved for summary judgment on March 9, 2006. That motion was granted in part and denied in part in an oral decision dated April 4, 2006. The

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 6 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

court subsequently entered an order reciting that Reese Corp. transferred at least $66,048,840.00 towards the purchase of Reese Hospital.

Alberts filed a motion for partial summary judgment on July 27, 2006, on the discrete issue of whether the Second Amended Complaint was barred by the IUFTA's statute of repose. *See* 740 Ill. Comp. Stat. § 160/10 (extinguishing any action brought under § 160/5(a)(1) or § 160/5(a)(2) of the IUFTA that is not brought "within 4 years after the transfer was made or the obligation was incurred"). HCA and GHI responded by filing both an opposition and a cross-motion for summary judgment. The very next day, Alberts filed a motion to amend his complaint a third time to include Western as a defendant. The court granted Alberts leave to add Western as a party in a decision and order entered on October 12, 2006.

On December 6, 2006, the court entered a memorandum decision and accompanying order resolving in part the motion for partial summary judgment filed by Alberts and the cross-motion for summary judgment filed by HCA and GHI. *HCA I, supra* n. 2. The balance of those motions was decided in a memorandum decision and order entered on January 3, 2007, regarding the parties' responses to a separate order to show cause arising out of the court's earlier memorandum decision. *HCA II, supra* n. 2. The court entered yet another memorandum decision and order partially resolving a separate motion for summary judgment filed by GHI and HCA on January 3, 2007. *HCA III, supra* n. 2. In that decision, the court fixed the value of the Reese Transfers at $68,048,840.00, a $2 million increase over the court's prior oral decision. Also on January 3, 2007, the court entered a memorandum decision granting Alberts's motion to exclude certain expert reports furnished out of time by the Defendants, but denying Alberts's other motions *in limine. See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* 365 B.R. 315 (Bankr.D.D.C.2007).

The court heard argument on a variety of matters on January 3, 2007, and January 4, 2007, in an effort to resolve as many outstanding issues as possible prior to the commencement of trial. Of particular note, the court supplemented its January 3, 2007, memorandum decision by concluding that there was a genuine dispute of material fact as to the value of the property and rights received by Reese Corp. in return for the Reese Transfers. The court also denied a motion for summary judgment filed by Western and awarded summary judgment *sua sponte* to Alberts with respect to Western's affirmative defense under the IUFTA's statute of repose. *HCA*

*IV, supra* n. 2. Finally, the court denied the Defendants' motion to exclude one of Alberts' witnesses, Robert Wilson, from testifying and ordered further briefing and evidence with respect to their motion to exclude Alberts' other expert, Neil Demchick, insofar as that motion sought to prevent Demchick from testifying about a purchase accounting entry made by DCHC after Reese Corp.'s purchase of Reese Hospital to reflect losses anticipated on a provider contract with Humana purportedly assigned to Reese Corp. from GHI (the "Humana Contract").

**\*3** Trial commenced on January 19, 2007. Alberts called former DCHC president Paul Tuft, former DCHC vice-presidents Mel Redman, Erich Mounce, and Donna Talbot, and expert witnesses Robert Wilson and Neil Demchick to the stand. [3] The Defendants filed a motion for judgment on partial findings pursuant to Fed.R.Civ.P. 52(c) (as incorporated by Fed. R. Bankr.P. 7052) at the close of Alberts's case-in-chief, which the court denied without prejudice to renewal at the close of trial by way of oral decision. The Defendants presented only former HCA and GHI vice-president Gregg Gerken and expert witnesses Michael Kimmel, James Yerges, and Kevin Moss. [4] Over the course of the trial, the court also conducted an evidentiary hearing to determine whether Demchick should be permitted to testify as to the purchase accounting entry made by DCHC to reflect anticipated losses on the Humana Contract. The court ultimately concluded that he should not be allowed to testify on that discrete issue.

## II. JURISDICTION, VENUE, AND STANDING

The court has subject-matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), and the parties have expressly consented to the entry of a final order by this court. [5] This court is the appropriate venue for Alberts' suit pursuant to 28 U.S.C. § 1409(a).

The court has previously concluded that Alberts has standing to bring this suit as a representative of the estate pursuant to 11 U.S.C. §§ 544(b) and 1123. *HCA I,* 365 B.R. at 300–01. On the petition date, the Internal Revenue Service (the "IRS") held a contingent claim against DCHC that arose in 2002, long after the Reese Transfers were made. Standing in the shoes of the IRS as a creditor under 11 U.S.C. § 544(b), Alberts defeated the Defendants' statute of limitations

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 7 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

defense. *Id.* at 299–312. Notwithstanding the court's prior ruling that Alberts was acting as the representative of the bankruptcy estate, the Defendants argue for the first time in their post-trial brief that Alberts lacks standing under Article III of the Constitution to pursue this action because NCFE's bankruptcy was responsible for Reese Corp.'s insolvency at the time that the IRS's contingent claim arose. (Defs.Br.54–59.) [6] Their arguments in this regard are misguided.

" 'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' " *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). " 'Article III standing ... enforces [that] requirement.' " *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 126 S.Ct. 1854, 1861, 164 L.Ed.2d 589 (2006) (quoting *Elk Grove,* 542 U.S. at 11). "To meet the standing requirements of Article III, '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines,* 521 U.S. at 818 (quoting *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)) (emphasis supplied by the Court in *Raines* ). If, as the court concludes below, the Defendants' contention that NCFE's bankruptcy was the intervening cause of Reese Corp.'s insolvency is an affirmative defense, then the claims pled by Alberts satisfied Article III requirements. Even disregarding the issue of which party was responsible for addressing the issue in its pleading, the evidence shows that Alberts satisfied Article III requirements.

**\*4** A fraudulent transfer harms both existing and future creditors by reducing the amount of assets available for distribution to creditors where the debtor-transferor is insolvent and therefore unable to pay all creditors in full. *See Official Comm. of Asbestos Claimants of G–I Holding, Inc. v. Heyman,* 277 B.R. 20, 33 (S.D.N.Y.2002) (asbestos claimants' committee had standing to bring action to avoid and recover fraudulent transfer because claims reserve might not be sufficient to cover all asbestos claims, thereby causing such claimants to suffer "injury in fact"). Consequently, a creditor or estate representative usually establishes an injury "fairly traceable" to the challenged transfer by satisfying the elements of the applicable fraudulent transfer statute. *See* part III, *infra.* Once those elements are established, the burden shifts to the transferee to demonstrate that "the transfer did not (1) reduce the *res* that would have been available to

any creditor or creditors, (2) 'hinder, delay, or defraud' any creditor or creditors, [ ] *or* (3) have any other adverse impact on any creditor or creditors generally." *Bear, Stearns Sec. Corp. v. Gredd,* 275 B.R. 190, 196 (S.D.N.Y.2002) ( "*Bear Stearns* ") (emphasis added). [7]

If Reese Corp. *was* rendered insolvent by the Reese Transfers, the Defendants cannot carry their burden with respect to harm. There is simply no question that the Reese Transfers depleted assets of Reese Corp. that would have been available to pay other creditors had the transfers not taken place. Nor is there any question that if the assets acquired by Reese Corp. in exchange for the Reese Transfers had not been worth the purchase price, Reese Corp.'s insolvency in November of 2002 would have been a result of its decision to spend all of the money that it borrowed from NCFE and HCA towards the purchase of Reese Hospital. By transferring every asset at its disposal in return for a hospital whose worth did not match its price, Reese Corp. would have ensured its own insolvency for years to come. [8]

The motive for Reese Corp.'s decision to seek bankruptcy relief is irrelevant. The harm arising from a fraudulent transfer is the depletion of the debtor's assets at a time when the debtor cannot pay its creditors in full, not the response taken by the debtor in response to that inability. Even if Reese Corp. had never filed for chapter 11 relief, the IRS would still have had every right to bring an action under the IUFTA on November 20, 2002. Standing in the IRS's shoes, Alberts was entitled to assert his fraudulent conveyance claims for the benefit of the bankruptcy estate, and thus for the benefit of creditors other than just the IRS. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245 (3d Cir.2000).

Nor does it matter that the debt owed to the IRS might have been paid in a matter of weeks if not days had Reese Corp. avoided bankruptcy. Section 544(b) places the representative of the estate in the shoes of any unsecured creditor as of the petition date, *HCA I,* 365 B.R. at 300 n. 11, and the IRS could have brought an action under the IUFTA on November 20, 2002, notwithstanding the likelihood that its claim would be satisfied later and its (hypothetical) suit rendered moot as a consequence. "Even if the IRS ... claims had been paid in full mere hours after commencement of the case, that would not alter the estate representative's ability to invoke § 544(b)." *Id.* at 293 (citation omitted). Reese Corp.'s intention to pay the IRS does not alter the fact that the any fraudulent transfer made by Reese Corp. in acquiring Reese Hospital four years

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 8 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

prior deprived the IRS of the certainty of recovery on its contingent claim until it received payment.

**\*5** Alberts has standing to pursue this action. The Defendants' arguments to the contrary are without merit.

### III. THE MERITS OF ALBERTS'S FRAUDULENT CONVEYANCE CLAIM

The basis for Alberts's suit is 11 U.S.C. § 544(b), which provides in pertinent part that the representative of the debtor's estate "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." Alberts contends, and has endeavored to prove at trial, that the Defendants have violated § 5(a)(1) of the IUFTA (Counts I and II of the Complaint), 740 Ill. Comp. Stat. 160/5(a)(1) (addressing actual fraud against existing or future creditors), § 5(a)(2) of the IUFTA (Counts III and IV of the Complaint), *id.* at 160/5(a)(2) (addressing constructive fraud against existing or future creditors), and even § 6(a) of the IUFTA (Counts V and VI of the Complaint), *id.* at 160/6(a) (addressing constructive fraud against creditors whose claims arose prior to the allegedly fraudulent transfer).

The court has already decided many of the legal and factual questions raised in this adversary proceeding by way of memorandum and oral decision. These issues include:

- *Value of the Subject Transfers.* The value of the Reese Transfers is at least $68,048,840.00, of which $2,000,000.00 was transferred in exchange for Reese Corp.'s delay in closing on the purchase of Reese Hospital. *Id.* at 29.

- *Arm's–Length Negotiations.* The Reese Transfers were the result of arm's-length negotiations between the parties. *HCA III,* slip op. at 28–29.

- *Alberts's Standing as Representative of the Estate.* Alberts is a "representative of the estate" for purposes of 11 U.S.C. § 1123, which confers upon him the statutory authority to pursue causes of action under 11 U.S.C. § 544(b). *HCA I,* 365 B.R. at 300–01; *see also* n. 6, *supra.*

- *Existence of Unsecured Creditor on Petition Date.* The IRS held an unsecured contingent claim for taxes on wages to be paid to Reese Hospital employees as of the petition date, thus giving Alberts standing to pursue this action under § 544(b). *Id.* at 306–12; *HCA II,* 2007 WL 80812, at ——2–3; *see also* n.6, *supra.*

- *Statute of Repose.* The statute of repose set forth in § 10 of the IUFTA, 740 Ill. Comp. Stat. 160/10, does not apply in this case because Alberts derives his standing from a governmental creditor (the IRS), and the claims of governmental creditors cannot be extinguished by statutes of repose or limitation (other than those established by Congress) pursuant to the Supreme Court's ruling in *United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940). *HCA I,* 365 B.R. at 301–06; *HCA II,* 2007 WL 80812, at ——2–3. Moreover, Alberts's claims against Western relate back to the date of the filing of his first complaint against HCA and GHI because there is an identity of interests between the Defendants. *HCA IV,* 365 B.R. at 332–33.

**\*6** • *Counts V–VI of the Complaint.* Final judgment in favor of the Defendants is appropriate with respect to Counts V–VI of the Complaint. *HCA I,* 365 B.R. at 313–15.

Additionally, the court may now decide the following legal and factual issues addressed but not resolved in prior decisions and not contested at trial:

- *Initial Transferee.* In a prior memorandum decision, the court declined to grant summary judgment in favor of Alberts with respect to whether the Capital LP was the initial transferee of the Reese Transfers until Western had an opportunity to present evidence that GHI did not have a "positive daily cash balance" when the Capital LP credited its account for the Reese Transfers, and therefore was not contractually obligated to apply that credit towards amounts owed to the Capital LP. *HCA IV,* 365 B.R. at 328–31, 333, and n. 12. Western presented no evidence in this regard at trial; consequently, the court concludes as a factual matter that Western, as the successor-in-interest to the Capital LP, is the "initial transferee" of the Reese Transfers for purposes of 11 U.S.C. § 550 in accordance with the reasoning set forth in *HCA IV.*

- *Counts I, II, and IV of the Complaint.* In a prior memorandum decision, the court declined to grant summary judgment in favor of the Defendants with respect to Counts I, II, and IV of Alberts's second

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 9 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

amended complaint even though Alberts had not produced any evidence that Reese Corp. had engaged in actual fraud (an element of Counts I and II) or that Debtors other than Reese Corp. were involved in the Reese Transfers, as alleged in Counts II, IV, and VI of the second amended complaint, because the Defendants did not put Alberts on notice that he needed to address these issues in response to the Defendants' cross-motion for summary judgment. *HCA I*, 365 B.R. at 313 n. 40. [9] Alberts presented no evidence of actual fraud by Reese Corp. at trial, nor did he prove that any debtor other than Reese Corp. transferred any assets to the Defendants. Final judgment in favor of the Defendants is therefore appropriate with respect to Counts I, II, and IV of the Complaint. [10]

Based on these findings, the only count in the Complaint requiring further analysis by the court is Count III, which seeks to recover the Reese Transfers pursuant to § 5(a)(2) of the IUFTA. The statute reads in pertinent part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

**\*7** 740 Ill. Comp. Stat. 160/5(b).

As the plaintiff in this proceeding, Alberts has the burden of proving these elements by a preponderance of the evidence. *In re Zeigler,* 320 B.R. 362, 374 (Bankr.N.D.Ill.2005) ("The movant has the burden of proving fraud in law by a preponderance of the evidence."). Thus, to prevail on Count III of his Complaint, Alberts must show that (1) Reese Corp. did not receive "reasonably equivalent value" for the Reese Transfers and that (2) Reese Corp. was insolvent at the time of the Reese Transfers or as a result of the Reese Transfers. Because the court concludes that Alberts has failed

to demonstrate by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value for the Reese Transfers for the reasons set forth below, it need not rule with respect to the issue of insolvency.

**A.** *Applicable Legal Standard*

The court has expounded in prior decisions about the meaning of the term "reasonably equivalent value" for purposes of § 5(a)(2) of the IUFTA. As the court explained in *HCA III:*

"What constitutes 'reasonably equivalent value' for purposes of the [IUFTA] has not been defined by Illinois case law," *Helms v. Roti (In re Roti),* 271 B.R. 281, 303 (Bankr.N.D.Ill.2002). Consequently, "[r]easonably equivalent value is interpreted the same way under both [11 U.S.C.] § 548 and the [IUFTA] because the term, as used in the [IUFTA], is derived from § 548(a)(2)." *Official Comm. of Unsecured Creditors of Crystal Med. Products, Inc. v. Pedersen & Houpt (In re Crystal Med. Products, Inc.),* 240 B.R. 290, 300 (Bankr.N.D.Ill.1990).

"The test used to determine reasonably equivalent value in the context of a fraudulent conveyance [as contemplated by § 548] requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). In addition to comparing the fair market value of the challenged transfer against the fair market value of the consideration received in exchange for the transfer, courts determine whether these values are reasonably equivalent by looking for "the existence of an arm's-length relationship between the debtor and the transferee" and good faith on the part of the transferee. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 149 (3d Cir.1996). The issue "must be evaluated as of the date of the transaction." *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 75 (Bankr.N.D.Ill.2002).

*HCA III,* slip op. at 7–8.

Alberts argues that the Defendants' good faith in receiving the Reese Transfers is irrelevant to the court's determination as to whether Reese Corp. received "reasonably equivalent value" for those transfers. (Pl. Br. 27–32; Pl. Reply 32.) [11] The court agrees with Alberts that the "fair market value of the consideration received in exchanged for the transfer" is far and away the most important factor in determining whether the transferor received "reasonably equivalent value"

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 10 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

for the transfer, *see Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.),* 121 B.R. 983, 994 (Bankr.N.D.Ill.1990) ( "Fair market value at the time of the transfer should control."), but "the concept of 'reasonably equivalent value' under fraudulent transfer law is not, legally, identical to fair market value," *In re Commercial Fin. Services, Inc.,* 350 B.R. 559, 576 (Bankr.N.D.Okla.2005) (citing *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)). [12]  Good faith has a place in the court's consideration of the "totality of the circumstances" surrounding the Reese Transfers, albeit a minimal one.

## B. *Findings of Fact*

**\*8**  In a previous memorandum decision, the court held that there is no genuine dispute of material fact that the Reese Transfers were the result of arm's-length negotiations between the parties. *HCA III,* slip op. at 27–28. Thus, the only factual findings required by the court with respect to reasonably equivalent value are those concerning the fair market value of Reese Hospital as compared to the value of the Reese Transfers and the good faith of Reese Corp. and the Defendants in entering into the transaction that led to the Reese Transfers.

### 1. *Fair market value*

"The test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir.1997). The term "fair market value" refers to "the amount at which the property would change hands between a willing buyer and a willing seller, when the former is not under compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 201.4 (15th ed.2005) (quoting Internal Revenue Service Ruling 59–60). [13] There are three basic methodologies employed for determining the fair market value of a business: (1) the "market" approach, (2) the "net asset" or "cost" approach, and (3) the "income" approach. *Id.* at ¶ 203.2; Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies,* at 45 (4th ed.2000).

#### a. *Market approach*

Under the market approach, a company's value can be estimated by identifying and analyzing recent sales of comparable assets. Fishman et al., *supra,* ¶ 203.4. There are two distinct valuation methods: (1) the guideline transaction method and (2) the guideline public company method. *Id.* at ¶ ¶ 203.4, 600.3. The guideline transaction method values the subject company by comparing transactions involving companies with similar characteristics to the subject company. *Id.* at ¶ 600.4. The guideline public company method values the subject company using the market price of the common stock of publicly traded companies that have similar characteristics to the subject company. *Id.* at ¶ 600.4.

The market approach requires a thorough search for comparable transactions and companies and equally thorough analysis and adjustment of the guideline data. *Id.* at ¶ 203.4. Comparable transactions or comparable public companies need not be identical to the subject sale or subject company but must provide a reasonable basis for comparison to the subject company. The challenges are identifying "truly comparable" companies and transactions and obtaining adequate information about those companies and transactions. *Id.* at ¶ 600.8. (Trial Tr. 2184:17–24, Feb. 7, 2007 (Demchick, N.).) Even if true comparables can be identified, the market approach leads to reliable and accurate estimates of value only if adequate data on those comparables exist. Fishman et al., *supra,* ¶ 600.8.

**\*9**  After reviewing testimony and documentary evidence by Demchick on behalf of Alberts and by Moss on behalf of the Defendants, the court agrees with Alberts that there are no truly comparable transactions or public companies from which the court can derive an accurate and reliable fair market value for Reese Hospital using the market approach.

#### (i) *Guideline transactions*

The guideline transaction method values Reese Hospital by comparing transactions involving companies with similar characteristics to Reese Hospital. Characteristics or measurements used to determine comparability of transactions include (1) revenue, (2) income, (3) EBITDA (earnings before income taxes, depreciation and amortization), and (4) number of beds in the hospital. (Trial Tr. 2148:8–10, Feb. 7, 2007 (Demchick, N.).)

Demchick determined that there were inadequate comparable transactions from which he could calculate the market value for Reese Hospital. Demchick searched a number of databases, including Irving, Levin and Associates, Pratt Stats., BIZ Comps., and the IBA Database, to identify

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 11 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

potentially comparable private sales of hospitals. [14] (Trial Tr. 2185:6–13, Feb. 7, 2007 (Demchick, N.).) He "searched for hospital-related transactions or general and surgical hospitals between the years of 1996 and 1999, with revenues between 50 million and 300 million." (Trial Tr. 2185:9–13, Feb. 7, 2007 (Demchick, N.).) This range is sufficiently broad to cover any potentially comparable transactions.

This search yielded a pool of 329 transactions, which Demchick then reviewed for comparability. Demchick eliminated most of the hospital sales because one or more of the following factors was present: (1)the purchase price was not available; (2) the income of the purchased entity was not available; (3) the hospital was not in an urban area, (4) the purchase involved multiple entities rather than a single hospital; (5) the EBITDA measure was not available; or (6) the company had a positive EBITDA measure. (Trial Tr. 2188:3–2190–17, Feb. 7, 2007 (Demchick, N.).) EBITDA is a measure of profitability of a company. Demchick excluded transactions where the company's EBITDA measure was not available or was positive because Reese Hospital had a negative EBITDA measure at the time of the Reese Transfers.

After eliminating transactions on the basis of these measures, only one potentially comparable transaction remained, the purchase of Coney Island Hospital, which Demchick analyzed even though "it wouldn't be enough to really come to a meaningful conclusion related to market value." (Trial Tr. 2191:1–2, Feb. 7, 2007 (Demchick, N.).) Demchick ultimately excluded Coney Island as a comparable sale because the $67.1 million purchase price listed in Irving Levin and Associates actually included $25 million of capital improvements paid for by the buyer rather than the seller, thereby reducing the actual purchase price of Coney Island Hospital to $42.1 million, which is significantly lower than the $68,480,048 paid for the Reese Transfers.

 **\*10**  In contrast to Demchick, Moss determined that the market approach value of Reese Hospital as of November 12, 1998, was between $74 and $90 million. Like Demchick, he used private hospital sales data from Irving Levin and Associates and other private transaction databases to identify comparable transactions from which he estimated the market approach value of Reese Hospital as of November 12, 1998. But unlike Demchick, Moss determined that purchases of companies with positive EBITDA margins constituted comparable transactions even though Reese Hospital had a negative EBITDA at the time of transfer. [15]  According to Moss, purchases of positive

EBITDA companies were properly considered comparable transactions because hospital purchasers in 1998 were not as concerned with profitability as acquiring market share and revenue for future potential.

After identifying purportedly comparable transactions, Moss calculated a price-to-revenue multiplier for each transaction by dividing the purchase price by the revenue of the purchased entity. He then multiplied a range of these multipliers—from the 25th percentile to the 75th percentile—by Reese Hospital's approximately $150,000,0000 in revenue to calculate a range of values for Reese Hospital.

Moss also calculated price-to-revenue multipliers for purchases of companies of EBITDA margins of less than 2% of net revenue, on the basis that less than 2% EBITDA was an indication of poor financial performance. [16]  Moss testified that the .44 price-to-revenue multiple he calculated for the lower 25th percentile of those companies with EBITDA margins at less than 2 percent would be an appropriate revenue multiple to use to calculate a value for Reese Hospital. (Trial Tr. 3545:14–23, 3546:21–24, Feb. 20, 2007 (Moss, K.).) Moss also testified that his market approach value for Reese Hospital is based on a .45 to .55 revenue multiplier. [17]  (Trial Tr. 3547:21–24, Jan. 20, 2007 (Moss, K.).) Applying the .44 multiplier, the market approach value of Reese Hospital is $66,000,000 (or .44 x $150,000,000 revenues), well below Moss' $74 to $90 million estimate of the market approach value for Reese Hospital. [18]  A .5 price-to-revenue multiple would yield a $75 million market approach value for Reese Hospital.

The court does not credit Moss's market approach value because he failed to identify truly comparable transactions from which the court can derive a reliable value for Reese Hospital. The market approach does not require the identification of transactions identical to the sale of Reese Hospital in order to reliably calculate its market value. Indeed, identical transaction data would be difficult if not impossible to identify in such a specific context as this. But the guideline transactions used to calculate a value for Reese Hospital must involve companies with characteristics similar enough to Reese Hospital such that there is a reasonable basis for the comparison between the companies and there must exist adequate data about those transactions from which the court can derive a market approach value for Reese Hospital. Here, as Demchick determined, there are no hospital-related transactions which involve companies with characteristics sufficiently similar to Reese Hospital

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 12 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

to warrant a comparison under the market approach. By including sales of companies that had positive EBITDA measures in his analysis while Reese Hospital had a negative EBITDA, Moss used transactions that were not adequately comparable to the sale of Reese Hospital. The price-to-revenue multiples calculated by Moss are therefore not a reliable indicator of the market value of Reese Hospital.

**(ii)** *Guideline public companies*

 **\*11**  The guideline public companies method values the subject company using the market price of the common stock of publicly traded companies that have similar characteristics to the subject company. Proper guideline companies are companies that provide a reasonable basis for comparison to the company being valued.

Alberts again contends that there are insufficient comparables from which to derive a value for Reese Hospital under the market approach. According to the Defendants and Moss, the market value of certain publicly traded guideline companies provides an understanding of the upper boundary for pricing in the market. But Moss selected seven publicly traded companies for his guideline company analysis that have no similar characteristics to Reese Hospital and are therefore inadequate comparables. These companies include HCA, Tenet Healthcare, Healthcare Management Associates, Universal Health Services, Quorum Healthgroup, Paracelsus Healthcare, and Province Healthcare. [19]

These companies, which are among the largest hospital companies in the nation, are not even remotely comparable to Reese Hospital. Their revenues range from $585 million to $20.6 billion, and they are diversified companies that own non-hospital operations. Moreover, each had positive EBITDA measures during the relevant time period, and collectively averaged an EBITDA margin of 16.7%. Most experienced positive trends in revenue and net income between 1997 and 1998. Reese Hospital, in contrast, was a single hospital operation with a negative EBITDA and operating losses at the time of the transfer. It had revenues of just $150 million in 1998. The court concludes that none of the publicly traded companies analyzed by Moss share similar characteristics with Reese Hospital. Thus, there are no public companies that are sufficiently comparable to Reese Hospital to provide adequate guideline data for calculating the market value of Reese Hospital as of the Transfer Date.

Because no comparable guideline transactions or guideline companies exist, the court concludes that the market approach does not lead to an accurate or reliable value for Reese Hospital.

**b.** *Cost approach*

The cost approach value of a business is based on the net aggregate value of its underlying assets. Fishman et al., *supra,* ¶ ¶ 203.21, 701.1. This approach focuses on the value of a company's assets in a hypothetical sale rather than on a company's earnings potential, which is the focus of the income approach. Fishman et al., *supra,* ¶ 701.2. One of two valuation methods generally applies: (1) going concern value (which assumes that fair market value would be paid for the assets), or (2) liquidation value. *Id.* at ¶¶ 701.3, 701.6. The value of the business is determined by adjusting the company's assets and liabilities to their appraised fair market values or appraised liquidation values, depending on the valuation method used. *Id.* at ¶ 203.22.

 **\*12**  As a preliminary matter, the court concludes that going concern value, and not the liquidation value, is the proper measure of Reese Hospital's value under the cost approach. A company's net asset value under the going concern approach is the sum of the fair market values of each of its underlying assets. Fishman et al., *supra,* ¶¶ 203.21, 701.1. Liquidation value equals the present value of "the net proceeds from liquidating the company's assets and paying off liabilities." Fishman et al., *supra,* ¶ 701.1. Liquidation value is appropriate when the company's current and projected net cash flows from continuing operations "are low compared to net assets, and the company is worth more *dead* than *alive* " or "are low enough that its liquidation value is almost equal to its going concern value." Fishman et al., *supra,* ¶ 701.6 (emphasis in original).

Alberts contends that Reese Hospital was on its deathbed and that therefore Reese Hospital's liquidation value applies under the cost approach. [20] Reese Hospital's accurate cost approach value is not its liquidation value, but the value of the assets as part of a going concern. Pursuant to established principles of business valuation, a liquidation analysis should be used only when the company would be worth more dead than alive. Fishman et al., *supra,* ¶ 701.6. Reese Hospital, despite declining revenues, was not on its deathbed on November 12, 1998. Reese Hospital was worth more as a going concern than in liquidation, as is demonstrated by the income approach discussed later.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 13 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

Accordingly, a hypothetical prospective purchaser of Reese Hospital, utilizing the cost approach to valuation, would have looked to the value of the assets in place as part of a going concern that would continue. In other words, such a hypothetical purchaser would ask what it would cost to replicate the assets it was purchasing, namely, the fair market values of the assets, not what the purchaser would receive if it liquidated the assets.

The court calculates that under the going concern cost approach, the value of what Reese Corp. acquired in purchasing Reese Hospital was approximately $57,985,984 as of November 12, 1998. The assets included in this calculation are: (i) real property ($25,307,763); (ii) equipment ($12,000,000); and (iii) net working capital ($20,678,221) (which includes a right to a refund to which Reese Corp. was entitled should the amount it paid for net working capital exceed the actual net working capital). The court also concludes as a factual matter that $24,700,000 should *not* be deducted from the value of Reese Hospital as a result of a purchase accounting adjustment made by Reese Corp. and DCHC in connection with the Humana managed care contract. The derivations of the values of Reese Hospital's real estate, equipment, and net working capital, and the basis for rejecting the Humana contract accounting adjustment are set forth below.

### i. *Real property*

 **\*13**  To calculate the value of the real estate of Reese Hospital under the cost approach, the court compared the highest and best use of the property as if it were vacant to the highest and best use of the property as improved to determine which use held more value. The highest and best use is that which generates the largest income for the property or earns the highest price in the market. The court estimated values for Reese Hospital's real property at its highest and best use as vacant and as improved. The court then assumed that the property would be put to the use that yielded the highest value. In summary:

- Reese Hospital could be used for its highest and best use in a vacant state (residential development) only if the existing improvements were first demolished. Because the costs of demolition exceeded the amount that would be paid for the land after such demolition, a purchaser would not buy Reese Hospital to put it to that use.

- The value of Reese Hospital as improved, put to its highest and best use of continued institutional use, was determined by examining what it would cost a hypothetical rational purchaser to replicate the hospital improvements on comparable land that could be acquired at the cheapest price for such institutional use.

These approaches and conclusions are discussed in greater detail below.

To calculate the values for the property at its highest and best use as vacant and as improved, the court reviewed and relied on the written expert reports and testimony of Robert A. Wilson from Real Estate Counselors, International, Inc. ("RECI") and Matthew W. Kimmel of Deloitte Financial Advisory Services LLP ("Deloitte"). In addition to the testimony and expert reports prepared by Wilson and Kimmel, the court also reviewed and relied on two written appraisals performed by David S. Felsenthal of Valuation Counselors Group, Inc. ("Valuation Counselors"). [21]

### (1) *Highest and best use*

The highest and best use of the land as vacant and as improved must satisfy four criteria. The highest and best use must be (1) physically possible, (2) legally permissible, (3) financially feasible, and (4) maximally productive. Appraisal Inst., *The Appraisal of Real Estate* 307 (12th ed.2001). These criteria are typically considered sequentially. *Id.* This means that the court must consider whether a use is physically possible and legally permissible before considering whether a use is financially feasible and maximally productive. *Id.* A financially feasible use cannot be the highest and best use of a property if that use is legally prohibited. *Id.*

The highest and best use of land must be physically possible. Whether a use is physically possible depends on the physical characteristics of the site that might affect its highest and best use. *Id.* at 313. Uses may be limited by physical characteristics such as size, shape, accessibility, topography, and availability of utilities. *Id.* To test the physical possibility of a property's use as improved, the court must also consider the size, design, location and function of the improvements. *Id.* at 317.

 **\*14**  The highest and best use of land must also be legally permissible. Whether a use is legally permissible turns on the zoning, deed restrictions, building codes and environmental restrictions. *Id.* at 311. The court may consider the reasonable

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 14 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

probability that the zoning of a property could be changed in order to achieve the highest and best use of the property. *Id.* To test the highest and best use of the property as improved, the court also considers whether Reese Hospital as improved conforms with existing legal requirements. *Id.* at 316.

A proposed or existing use must also be financially feasible in order to qualify as the highest and best use. Financially feasible uses are physically possible and legally permissible uses which produce an income or return to the owner of the subject property equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization. *Id.* at 313–314. The court tests the financial feasibility of Reese Hospital as improved by considering whether there is market demand for Reese Hospital in its current state and whether the existing use has a positive return on the investment. *Id.* at 318.

Finally, the highest and best use must be the maximally productive use of the subject property. A maximally productive use as vacant and as improved is the financially feasible use which produces the highest price or value to the property. *See id.* at 314 ("Of the financially feasible uses, the highest and best use is the use that produces the highest residual land value consistent with the market's acceptance of risk and with the rate of return warranted by the market for that use."). Possible highest and best use conclusions for improved property include continued use, renovation, addition, conversion and demolition.

### (A) *Highest and best use as vacant*

The court concludes that the highest and best use of the Reese Hospital site as vacant as of the Transfer Date was residential use. Residential use was physically possible, legally permissible, financially feasible and maximally productive on November 12, 1998.

Wilson testified on behalf of the Trust that the highest and best use of the land as vacant on the Transfer Date was continued use as a hospital, primarily because of his opinion that it would be highly unlikely that a developer could successfully re-zone the property from institutional use to residential use. Kimmel testified on behalf of the Defendants that residential use was the highest and best use of the Reese Hospital site as vacant on the Transfer Date.

The physical attributes of the Reese Hospital property, as vacant, permit a broad range of physically possible uses, including residential use. Reese Hospital is located on a large parcel of land. According to the Plat of Survey prepared by the National Survey Service, the Reese Hospital property is 1,625,293 square feet or about 37.3116 acres.[22] The site consists of multiple lots separated by streets. The property also has generally level terrain. And its urban location and proximity to major roads provide good accessibility. All utilities including gas, electricity, water, sewage and telephone are readily available. These physical attributes are all favorable for residential development. The court therefore concludes that residential use of the Reese Hospital site as vacant was physically possible as of the Transfer Date.

**\*15** Residential use must also be legally permissible in order to qualify as the highest and best use of the Reese Hospital property as vacant. The Defendants contend that residential development was legally permissible on the Transfer Date under existing zoning at the Reese Hospital site limited only by the minimum green space, maximum land coverage, and 1.5 floor-to-area ("FAR") restrictions.[23] Alberts disagrees, asserting that the zoning permitted general residential development only for purposes of housing nurses and medical interns and residents.[24]

The court concludes as a factual matter that the existing zoning permitted residential development only for housing certain hospital employees. Before October 11, 1962, the Reese Hospital site was zoned "General Residential District." On October 11, 1962, the zoning was reclassified to "Residential Planned Development (Institutional)" and permitted housing expressly for nurses, interns, and medical residents. (Pl.Ex. 223 at TRUST/HCA–02119.) On June 6, 1984, the city reclassified the zoning to "Michael Reese Hospital and Medial Center, Institutional Planned Development No. 1," which was the zoning in place on November 12, 1998. (*Id.* at TRUST/HCA–021132.) The zoning permitted hospitals, medical offices, administrative buildings and residential developments. Notably, the city removed the word "residential" from the title of the most recent amendment to the zoning, perhaps to eliminate confusion about permissible land uses on the Reese Hospital site. The Reese Hospital site has never had residences other than for nurses, interns and medical residents, and there has never been any general residential development on the property. The city could have specifically included general residential development as a permissible land use in the zoning documents had it intended for the Reese Hospital site to be used in that way.

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 15 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Even though the existing zoning did not permit residential use, the court may consider for purposes of a highest and best use determination whether "there [was] a reasonable probability that the zoning could be changed" at for the Reese Hospital site to permit residential use. Appraisal Inst., *supra,* at 311. Consideration of a zoning change includes an analysis of the surrounding properties and their existing zoning classifications and land uses. *Id.*

The Defendants argue that a change in zoning for the Reese Hospital site to permit residential development was reasonably probable because the city was re-zoning land classified for other uses to permit residential use. (Trial Tr. 3253:22–25, Feb. 15, 2007 (Kimmel, M.) ("We did see, when looking at comparable transactions that land was being re-zoned from either manufacturing or other classes of zoning to residential.").) Alberts disagrees, relying on Wilson's testimony that reclassification of the Reese Hospital site to permit residential development, while possible, would be highly unlikely because (1) city approval of such changes has been historically low; (2) the city would be opposed to non-institutional development of the site as result of political pressures; and (3) the cost of securing the zoning change would be more than the increase in the value of the land. The court finds Wilson's opinion less persuasive than Kimmel's because Wilson did not research or rely on the results of actual re-zoning applications. (Trial Tr. 1355:23–25, Jan. 29, 2007 (Wilson, R.).) Rather, he relied on what he could recollect anecdotally from newspaper reports over the years and two projects with which his company was involved. (Trial Tr. 1356:1–1356:23, Jan. 29, 2007 (Wilson, R.).) [25]

**\*16** A zoning change would have been reasonably probable, assuming the Reese Hospital property were vacant. Surrounding properties to the south and west of the Reese Hospital site were zoned for residential use as of the Transfer Date. There was, moreover, an increasing demand for residential development in the neighborhood on or around the Transfer Date. The court therefore concludes that residential use was a legally permissible use of the Reese Hospital site as vacant as of November 12, 1998, given the reasonable probability of obtaining a reclassification of the zoning to permit residential development.

Residential development must be a financially feasible use and the maximally productive use of the Reese Hospital site, as vacant. According to Kimmel, a financially feasible and maximally productive use of the Reese Hospital site as vacant would be residential development given the strong demand

for residential development in the neighborhood. (Defs. Ex. JZ (Expert Report of Matthew G. Kimmel, Exhibit 3, at 25, Aug. 16, 2006).) The demand for commercial construction or a hospital facility in November 1998 was insufficient to justify either commercial or institutional use as maximally productive. *Id.*

Wilson disagreed. He testified that the unusually large size of the Reese Hospital site would require five to ten years to develop and sell for residential purposes such that the costs to a residential developer of carrying this land until fully developed were too large to justify residential development as a financially feasible and maximally productive use. According to Wilson, office, retail, and industrial uses were likewise not financially feasible due to lack of market demand in the area. In 1998, the neighborhood was an inferior location, as compared with other areas in the city, for office, retail and industrial space. In Wilson's view, there would have most likely been interest from institutional users given the large size of the site but he could not quantify market demand from institutional users or the financial feasibility of any hospital project at the Reese Hospital site. (*See* Pl.Ex. 210 (Appraisal of Robert A. Wilson, Real Estate Counselors International, Inc. p. 61)(Jul. 21, 2006).)

Based on market data and land development trends in the area, the court concludes there would have been a strong interest in developing the Reese Hospital site, if vacant, for residential use as of November 12, 1998. The court also concludes that there was not sufficient demand to develop the Reese Hospital site as a hospital as compared with the demand for residential development at the time. Residential use was therefore not only a financially feasible use but also the maximally productive use of the Reese Hospital site, if vacant.

Having determined that, if the property *were* vacant, residential use is physically possible, legally permissible, financially feasible and the maximally productive use of the Reese Hospital site, the court concludes that the highest and best use of the Reese Hospital site as vacant as of the Transfer Date was residential use.

**(B)** *Highest and best use as improved*
**\*17** The court must next determine the highest and best use of the Reese Hospital site, as improved, as of November 12, 1998, again considering the four criteria described above. The highest and best use of a property as improved may be continuation of the existing use. Appraisal Inst., *supra,*

at 315. Both Kimmel and Wilson testified that the highest and best use of the Reese Hospital site as improved as of November 12, 1998, was continued use as a hospital and medical center. The court agrees. The use of the land as a hospital and medical center was physically possible on the Transfer Date. Reese Hospital was also a legally permissible use on the Transfer Date. The existing zoning permitted institutional development, including use of the property as a hospital and medical center. All plans for development of the land were submitted to and approved by the city before construction. Reese Hospital was thus a legally conforming use of the underlying land as of November 12, 1998.

The use of the site, as improved, was also financially feasible and maximally productive on the Transfer Date. Reese Hospital has been treating patients for decades. Its long-term existence demonstrates a reasonably certain level of financial feasibility and continued demand for its improvements' use as a hospital and medical center. Its neighborhood, as compared with other areas in the city, was an inferior location for other uses, such that the continued use of the improvements as a hospital and medical center is also maximally productive. Because the continued use of Reese Hospital as a hospital and medical center was physically possible, legally permissible, financially feasible and maximally productive as of November 12, 1998, the highest and best use of the Reese Hospital property as improved was continued use as a hospital and medical center.

**(2)** *Value*

Having determined the highest and best use of Reese Hospital's real property as vacant (residential use) and as improved (current use as a hospital and medical center), the court must next estimate values for the use of the Reese Hospital site, as vacant and as improved. Assuming the property would be put to use at its highest value, the value of Reese Hospital's land for purposes of the cost approach is the higher of the values of the land as vacant and as improved.

**(A)** *Value of Reese Hospital site as vacant*

The value of the Reese Hospital site as vacant is equal to the value of the land less the costs of any demolition and abatement. *See* Appraisal Inst., *supra*, at 309 n. 3. Comparable land sales are used to estimate the value of the land. Proper comparable land sales should have the same highest and best use as vacant as the subject property. [26] Because the Reese Hospital site's highest and best use as vacant is residential use, proper comparable land sales are those purchased for

residential development. The value calculation is based on sales price per square foot, the most common measure of price and value in the market. The price per square foot multiplied by the total number of square feet of the Reese Hospital site is equal to the value of the Reese Hospital site as vacant.

**\*18** The value of the land after being rendered vacant and put to residential use as of November 12, 1998 was $11.70 per square foot or $19,016,000 (rounded) ($11.70 per square foot x 1,625,293 total square feet). This is derived by utilizing Kimmel's calculation that the land was worth $11.70 per square foot (a figure that favors Alberts), without deciding whether Wilson's higher figure was more accurate, and utilizing Wilson's calculation that the land consisted of 1,625,293 square feet.

The court must next estimate the costs of demolition and abatement necessary to vacate the Reese Hospital site and deduct those costs from the value estimated for the land if vacant for residential use. Kimmel did not think it necessary to calculate and deduct costs of demolition or environmental abatement. The court disagrees.

Valuation of the highest and best use of the land as vacant necessarily assumes that any physical impediments to such use (for example, a gorge running through the property) have been eliminated. Eliminating existing improvements must be taken into account, otherwise the contemplated highest and best use of the property as vacant would not be physically possible. Costs of demolition as well as the cost of curing any environmental problems, *e.g.,* the removal of underground storage tanks, the abatement of asbestos, should be deducted from the value that results once the property is vacant. *See* Appraisal Inst., *supra*, at 309 n. 3.

Felsenthal estimated the costs of demolition and asbestos abatement. (Pl.Ex. 107 at CBIZ2999 (An Appraisal of Michael Reese Hospital and Medical Center by David Felsenthal, Valuation Counselors Group).) Felsenthal projected that building demolition and asbestos abatement would cost $22,790,000 in total, $4,800,00 for building demolition (or $3.00 per square foot x 1, 610, 695 square feet in gross building area) and $17,990,000 for asbestos abatement. The court credits Felsenthal's estimation because his analysis of these costs is thorough and conservative in comparison to the alternatives. After deducting costs in the amount of $22,790,000, the value of the Reese Hospital site for residential use is a negative $3,774,000.

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 17 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

**(B)** *Value of Reese Hospital site as improved*

To determine the value of the Reese Hospital property as improved as of November 12, 1998, the court estimates the value of the land and the value of the improvements as of that date. The value of the land as vacant for institutional use is estimated using comparable land sales. The value of the improvements is estimated by calculating the cost to replace the existing improvements as of the valuation date, or the replacement cost of new improvements, plus entrepreneurial profit, less depreciation. The value of the land plus the value of the improvements equals the value of the real estate.

The value of the land as vacant for institutional use (without adjusting for the costs of immediately making the land vacant because the existing improvements would continue in place) [27] is the appropriate land value (when deriving the value of the property *as improved* ), and that value is derived by using comparable sales of land for institutional use (not pricier sales of land for residential use). The court credits the testimony of Wilson that the land as vacant *for institutional use* should be valued at $5.85 per square foot or $9,500,000 (rounded), [28] based on roughly comparable land sales. [29]

**\*19** Defying common sense, Kimmel opined that the value of the land as if it were vacant and put to residential use (without adjusting that value for the costs of demolition) should be utilized as the land value, even though the value of the site as improved and used for institutional purposes is what is being considered in this branch of the valuation analysis. A rational purchaser thinking of buying Reese Hospital would have explored how much it would cost to buy a comparable alternative site for hospital use and to put in place comparable hospital improvements. If that purchaser intended to use Reese Hospital as improved, he would rely on the cost of land for comparable purposes, and disregard the value of land for residential purposes: he would not pay more than what he would pay for replicating a comparable hospital elsewhere. [30] Kimmel explained that the buildings would eventually become obsolete and be demolished, and so it was appropriate to use the value of the land as vacant for residential purposes. But in an interim use approach, the property put to an interim use before being converted to highest and best use must take into account "different anticipated demolition costs" that apply to the subject property. *See* Appraisal Inst., *supra*, at 324. Kimmel's approach, as already noted, did not take into account demolition costs.

After estimating the value of the land, the court estimates the current cost of replacing the improvements on the Reese Hospital site. The improvements include buildings, a parking garage, and site improvements. To calculate the value of the improvements to the land, the court made a preliminary determination as to the replacement cost of each improvement on the property (including site improvements), added in projected entrepreneurial profit, then made a preliminary determination as to the amount of depreciation for each improvement and subtracted the amount of depreciation from the replacement cost for each improvement to arrive at a final value for each improvement.

The replacement cost for improvements is estimated using the Marshall Valuation Service, which is a tool used to estimate building costs for a particular point in time and depreciation rates over a given period of time. Wilson, Kimmel, and Felsenthal all relied on the Marshall Valuation Service in deriving figures for the replacement costs and depreciation rates. Their replacement cost and depreciate rate calculations based on the Marshall Valuation Service are not universally identical, but this is not unusual. (Trial Tr. 1403:19–21, Jan. 29, 2007 (Wilson, R.) ("[ N] o two appraisers [ are] going to look at these same buildings and same information and come up with the exact same calculation.").) So the court analyzed the sets of replacement cost figures and depreciation rates as follows.

In determining the replacement cost of each building, the court compared three sets of figures: the figures contained within the Wilson Report, the figures contained within the Kimmel Report, and the figures contained within the two Felsenthal Reports. These were the only appraisal reports that set forth a calculation for each individual improvement.

**\*20** In comparing these figures to determine the replacement cost for each improvement, the court concludes that the figures derived by Felsenthal are more accurate than the figures derived by both Wilson and Kimmel for several reasons. First, Felsenthal's analysis is much more contemporaneous with the valuation date than either Wilson's or Kimmel's. Felsenthal completed his reports on March 5, 1998, and February 11, 1999, whereas Wilson completed his report on June 21, 2006, and Kimmel completed his report on August 16, 2006.

Felsenthal's figures for the improvements are also more reliable than Wilson's figures because Felsenthal used the same value for the individual improvements in two separate

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 18 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

reports—one for HCA and one for DCHC—thus refuting the suggestion made by Alberts at trial that Felsenthal inflated his value of the property to ensure that the value matched the purchase price of Reese Hospital (at least with respect to the property's improvements). Wilson, on the other hand, has a strong incentive to provide the lowest value for the improvements in support of Alberts's case.

Felsenthal's figures for the improvements are more accurate than Kimmel's for a number of additional reasons. Felsenthal used cost replacement values from the 1998 edition of the Marshall Valuation Service, whereas Kimmel used various editions of the service from later years and then used a primitive regression analysis to arrive at a conclusion as to the value of the improvements in 1998. Kimmel used a variety of multipliers (*e.g.,* local area multiplier, height multiplier, area multiplier) that were not used by any other appraisers, thus calling into question the propriety of this practice. And finally, the cost replacement value for improvements as calculated by Kimmel is much higher than any other calculation of value, suggesting that it is a statistical outlier and should not be credited. His calculation is 186% higher than Wilson's calculation, 36% higher than Felsenthal's calculation, and 51% higher than the average of the other three reports surveyed.

In comparing these figures to determine the replacement cost for each improvement, the court also assumed that the figures derived by Wilson were more accurate than the figures derived by Kimmel because (1) Wilson's conclusions were much closer to those reached by Felsenthal than the conclusions reached by Kimmel (Wilson's total replacement cost value was 18% lower than that of Felsenthal, whereas Kimmel's total replacement cost value was 36% higher than that of Felsenthal); (2) Wilson's conclusions were much closer to those reached in the other reports surveyed than the conclusions reached by Kimmel (Wilson's total replacement cost value was 3% lower than the mean of the conclusions reached in the other reports, whereas Kimmel's total replacement cost value was 51% higher than the mean of the conclusions reached in the other reports); and (3) Kimmel's methodology differs in significant ways from the methodology used in every other report.

 **\*21**  Consequently, in determining the replacement cost for those improvements that were appraised by Wilson and Kimmel but not by Felsenthal, the court credits the conclusions of value reached by Wilson, but applied a multiplier of 1.18 to account for the anticipated discrepancy

between the value reached by Wilson and the value that would have been reached by Felsenthal.

In deciding the amount of entrepreneurial profit to add to the cost replacement value of the improvements, the court concludes as a factual matter that the profit rate should be 10% of the cost replacement value of the improvement, per Kimmel's testimony, because this appears to be the rate used in other appraisal reports surveyed. Wilson's testimony that the rate should be 3% of the cost replacement value of the improvement due to the non-profit nature of most hospitals is not credible for a number of reasons. First, Michael Reese was a for-profit hospital. Second, Alberts fails to suggest any logical reason why a contractor would be willing to accept less of a profit based on the level of profitability of the enterprise serving as her client. Finally, other appraisal reports surveyed applied an entrepreneurial profit rate of 10% of the replacement cost of the improvements at the property. Based on the foregoing conclusions of fact, the court's replacement cost calculations inclusive of entrepreneurial profit but before depreciation are set forth below. [31]

In determining the rate of depreciation for each improvement, the court applies the rates used by Wilson, Kimmel, and Felsenthal where they agree with each other, the rates used by Wilson and Kimmel where they agree with each other but not with Felsenthal's rates, the rates used by Wilson and Felsenthal where they agree with each but not Kimmel's rates, and the rates used by Kimmel and Felsenthal where they agree with each other but not Wilson's rates. When all three reports differed as to the depreciation rate for a particular improvement, the court, in all but one instance, applies the rate used by Kimmel because his depreciation analysis was more thorough than that of Wilson (*e.g.,* Wilson used the *chronological age* of an improvement in determining its life expectancy rather than its *effective age* ) and the rates used by Felsenthal tended to be lower than any other depreciation analysis conducted by other appraisers. [32] The lone exception to this rule was with respect to the parking deck, where the court credits Felsenthal's depreciation rate (52%) instead of the depreciation rate used by Kimmel (47%) because Kimmel admitted under cross-examination at trial that he did not consider the functional obsolescence of the parking garage caused by its excess number of lots. (Trial Tr. 3616:12–3620:11, Feb. 21, 2007 (Kimmel, M.).) Wilson did not provide a depreciation rate for the parking deck.

Based on the foregoing factual conclusions, the court's findings regarding the value for each improvement are below.

| Building | Replacement Cost | Depreciation | Net Value |
|---|---|---|---|
| Power Plant | $759,330.00 | 96% | $30,373.20 |
| Laundry Building | $1,241,460.00 | 100% | $0.00 |
| Bensinger General Services | $3,896,640.00 | 94% | $233,798.40 |
| Main Hospital | $36,992,340.00 | 100% | $0.00 |
| Linear Accelerator | $3,937,158.50 | 96% | $157,486.34 |
| Klein & Kundstadter Building | $29,476,260.00 | 86% | $4,126,676.40 |
| Meyer House | $10,873,170.00 | 100% | $0.00 |
| Florsheim Professional Building | $2,347,290.00 | 100% | $0.00 |
| Rothschild Center | $20,161,350.00 | 100% | $0.00 |
| Mandel Clinic | $6,661,710.00 | 100% | $0.00 |
| Siegel Institute | $2,662,110.00 | 90% | $266,211.00 |
| Florsheim Library | $2,067,120.00 | 100% | $0.00 |
| Cummings Research Pavilion | $3,190,770.00 | 96% | $127,630.80 |
| Linear Accelerator Addition | $1,218,356.02 | 91% | $109,652.04 |
| Kaplan Surgical Wing | $10,971,180.00 | 93% | $767,982.60 |
| Kaplan Pavilion | $18,776,340.00 | 98% | $375,526.80 |
| Singer Pavilion | $9,478,260.00 | 98% | $189,565.20 |
| Friend Pavilion | $2,654,190.00 | 98% | $53,083.80 |
| Levinson Building | $4,134,240.00 | 98% | $82,684.80 |
| Blum Pavilion | $6,703,290.00 | 81% | $1,273,625.10 |
| Wexler Pavilion | $1,194,930.00 | 96% | $47,797.20 |
| Baumgarten Pavilion | $19,094,130.00 | 96% | $763,765.20 |
| Dreyfus Research Lab | $11,291,940.00 | 91% | $1,016,274.60 |
| Laz Chapman | $1,849,320.00 | 94% | $110,959.20 |
| Acute Care Center | $1,573,313.50 | 80% | $314,662.70 |
| Bensinger Park Field House | $153,259.70 | 96% | $6,130.39 |

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 20 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | | |
|---|---|---|---|
| Administrative Center | $4,944,060.00 | 77% | $1,137,133.80 |
| Parking Deck | $8,324,800.00 | 52% | $3,995,904.00 |
| Other Site Improvements | $2,586,798.50 | 76% | $620,831.64 |
| Total | $229,215,116.22 | 93% | **$15,807,755.21** |

**\*22** Finally, the value of the land is added to the value of the improvements to calculate a final valuation for the real estate of Reese Hospital. Here the value of the Reese Hospital site as improved for institutional use is $25,307,763 ($9,500,000 + $15,807,755).

The court concludes as a factual matter that the highest and best use of the land is as improved because the value of Reese Hospital as improved is greater than the value of the land as vacant. The value of Reese Hospital as improved is $25,307,763. The value of Reese Hospital as vacant is -$3,774,000, after subtracting the costs of demolition and asbestos abatement. The highest and best use of the Reese Hospital site as of November 12, 1998, was continued use as a hospital and medical center because that use returns a higher price in the market and is therefore the maximally productive use of the land. The court therefore finds that the real estate at Reese Hospital under the cost approach was worth $25,307,763 on November 12, 1998.

**ii.** *Equipment*
Reese Hospital's equipment (which includes furniture) is the second asset included in the computation of Reese Hospital's net asset value under the cost approach. The court finds as a factual matter that the fair market value of Reese Hospital's equipment as of November 12, 1998, was $12,000,000. The parties could be viewed as having stipulated that Reese Hospital's equipment was worth $12,000,000 on the Transfer Date, Pl. Facts ¶ 213; Defs. Facts ¶ 216; Defs. Br. at 20 ("both sides estimate the value of the equipment at $12,000,000"), and the court thought that issue had been put to rest in the parties' closing arguments in open court. However, after the trial, the Defendants have contended that the record supports a finding of a $19,000,000 value for the equipment. (Defs. Facts ¶¶ 169–170, 176–177; Defs. Rebuttal at 126.) The court views the evidence supporting a $19,000,000 value as not persuasive in the face of overwhelming evidence supporting the $12,000,000 value.

Both Alberts and the Defendants introduced documentary evidence at trial that supports a finding that Reese Hospital's equipment was worth $12,000,000 on the Transfer Date. (Pl.Ex. 214 at TRUST/HCA–029153 (Memo from Donna Talbot to Lance Poulson Re: Orderly Liquidation Value —Reese/Grant Orderly Liquidation Appraisals)(Sept. 18, 1998); Pl.Ex. 233 at CBIZ2167 (An Appraisal of Michael Reese Hospital and Medical Center as of November 30, 1998) (Feb. 11, 1999); Defs. Ex. WJ (An Appraisal of Michael Reese Hospital and Medical Center as of November 30, 1998) (Feb. 11, 1999).)

Neither Alberts nor the Defendants presented independent valuations of Reese Hospital's equipment, choosing instead to rely primarily on existing equipment appraisals by Felsenthal and Valuation Counselors. However, both parties presented testimony that clearly pointed to $12,000,000 as being the accurate appraised value of the equipment as of the Transfer Date. Demchick testified on behalf of the Trust that $12,000,000 appeared to be the "appropriate amount to use" for the fair market value of the equipment when calculating the value of Reese Hospital under the cost approach. (Trial Tr. 1871:3–1873:8, Feb. 1, 2007 (Demchick, N.); Trial Tr.1941:6–1946:25, Feb. 6, 2007 (Demchick, N.).) Equipment appraisals by Felsenthal at Valuation Counselors and Ernst & Young form the basis of Demchick's conclusion. (Trial Tr.1941:6–1946:25, Feb. 6, 2007 (Demchick, N.); Pl. Facts ¶ 213 n. 66.) I n a letter dated September 16, 1998, Felsenthal appraised the orderly liquidation value of Reese Hospital's equipment as of June 1, 1998, at $12,000,000. (Pl.Ex. 214 at TRUST/HCA–029153; Trial Tr.1942:6–12, Feb. 6, 2007 (Demchick, N.).) By orderly liquidation value, Felsenthal did not mean that $12,000,000 is the value the equipment would earn in a 30–day liquidation sale. Rather, he meant that $12,000,000 is the value the equipment would earn in a sale that would occur within six to twelve months from the valuation date, which is a typical fair market value period. In a report dated February 11, 1999, Felsenthal estimated the market value of Reese Hospital's equipment as of November 30, 1998, at $12,000,000. (Pl.Ex. 233 at CBIZ2167.)

**\*23** Demchick also noted that a document from Valuation Counselors' production in this litigation denotes an original cost of equipment totaling approximately $19,000,000 and

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 21 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

a reproduction cost totaling approximately $12,000,000. (Pl.Ex. 403 at CBIZ1098; Trial Tr.1942:13–1943:7, Feb. 6, 2007 (Demchick, N.).) Finally, Demchick considered a memo prepared by Ernst & Young during an audit of Reese Hospital which estimates the fair market value of the equipment at $10.8 million and which is dated December 31, 1998.[33] (Pl.Ex. 12 at EY 794 (DCHC–Grant and Reese Sale Leaseback Memo)(Dec. 31, 1998); Trial Tr.1945:14–24, Feb. 6, 2007 (Demchick, N.).) After considering all of these valuations of Reese Hospital's equipment, Demchick testified that $12,000,000 "seemed most appropriate" as the fair market value of Reese Hospital's equipment.

Moss, on behalf of the Defendants, likewise testified that the fair market value of Reese Hospital's equipment was $12,000,000. (Trial Tr. 3548:15–22, Feb. 20, 2007 (Moss, K.); Trial Tr. 3817:18–20, Feb. 22, 2007 (Moss, K.).) Kimmel, also on behalf of the Defendants, conducted a technical review of Valuation Counselors' appraisal of Reese Hospital as of November 30, 1998, and determined that "the methodology used to value the [equipment] of Michael Reese as of November 30, 1998, was acceptable and consistent with industry peers." (Defs. Ex. JZ at 22–24 (Expert Report of Matthew G. Kimmel).) And like Demchick, neither Moss nor Kimmel conducted any independent valuation of the equipment, relying instead on information contained in existing appraisal documents. (Trial Tr. 3569:16–18, Feb. 20, 2007 (Moss, K.).); Trial Tr. 3236:11–17, Feb. 15, 2007 (Kimmel, M.); Defs. Ex. WJ (showing that the fair market value of Reese Hospital's equipment as of November 30, 1998, at $12,000,000).)

In suggesting that the evidence also supports a finding by the court that the equipment was worth as much as $19,000,000. Defendants point to an appraisal of the equipment prepared by Valuation Counselors on July 9, 1998, appraising the fair market value of the equipment at $19,160,000 as of June 1, 1998. (Defs. Ex. PW at TRUST/HCA–171734–TRUST/HCA171736 (Appraisal of Equipment at Michael Reese Hospital and Medical Center)(Jul. 9.1998).) Defendants' suggestion conflicts not only with their experts' testimony but also with their contemporaneous stipulation that the equipment was worth $12,000,000 on the transfer date. (Defs. Facts ¶ 216.)

The court agrees with the analyses of the witnesses at the trial that of all the equipment appraisals in the record, Felsenthal's report dated February 11, 1999, most accurately values Reese Hospital's equipment as of the Transfer Date out of all the equipment appraisals in the record. (Pl.Ex. 233 at CBIZ2167.) This particular appraisal values the equipment as worth $12,000,000 as of November 30, 1998, which is closest in time to the Transfer Date, and does so utilizing an appropriate cost approach. (Kimmel's technical review of this appraisal approves the valuation methodology applied by Felsenthal in this appraisal.) In contrast, Valuation Counselors' report dated July 9, 1998, values the equipment as of June 1, 1998, more than five months prior to the Transfer Date, and is therefore too remote in time to be an accurate indicator of the fair market value of Reese Hospital's equipment as of the Transfer Date. Moreover, it is not clear that the July 9, 1998, report utilized an appropriate cost approach methodology (as it defined fair market value in continued use as "including installation and assuming earnings support the value reported," a definition not employed in other reports, thus suggesting that it may have not have been a pure cost approach valuation, but instead a hybrid approach that takes into account the value of future income). Finally, the report is inconsistent with a document prepared by Valuation Counselors in February 1999 (Pl.Ex.403) totaling the original cost of the equipment as slightly over $19,000,000 (a value that would not likely have continued after acquisition because of depreciation, as indicated by the same document's estimate that reproduction cost would be only $12,452,440.

**\*24** The July 9, 1998, appraisal report was prepared for DCHC, not the Defendants, and, accordingly, the $19,000,000 valuation in that report would have no bearing on the issue of whether the Defendants proceeded in good faith in the sale of Reese Hospital (other than that they permitted DCHC to have access to permit an appraisal to be conducted). However, it is evidence that Reese Corp. may have viewed the equipment as worth $19,000,000 in deciding to purchase Reese Hospital, and thus bears on its good faith.

In conclusion, the value of the equipment as of the Transfer Date was $12,000,000 under a cost approach.

### iii. *Net working capital*

Net working capital acquired by Reese Corp. is the third asset included in the computation of the net value, under the cost approach, of the assets acquired by Reese Corp. in exchange for the Reese Transfers. As discussed in more detail below, under the terms of the APA, the parties arrived at an estimated value of approximately $20,600,000 for the net working capital of Reese Hospital, and GHI agreed to pay Reese Corp. for any shortfall in that estimate.[34] That obligation is part

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 22 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of the value the Defendants transferred to Reese Corp. in exchange for the Reese Transfers, and, accordingly, it must be included as part of the net working capital received by Reese Corp. When it is included, the combined value of Reese Hospital's actual net working capital and the value of GHI's obligation to refund any shortfall equals $20,678,221.

Alberts argues that the value of the net working capital was approximately $14,400,000. (Pl. Facts ¶ 213; Trial Tr.1940:12–25, Feb. 6, 2007 (Demchick, N.).) Defendants contend that the correct fair market value of the net working capital was approximately $20,600,000, which is the amount Reese Corp. paid for net working capital on November 12, 1998. (Pl.Ex. 10 at HCA/MR–05072 (Closing Statement—Purchase and Sale of Michael Reese Hospital and Medical Center)(Nov. 12, 1998)("Closing Statement"); Defs. Facts ¶ 339; Defs. Br. at 20.) Reese Hospital's actual net working capital, as determined post-closing by PriceWaterhouseCoopers ("PWC"), was approximately $14,400,000, which is $6.2 million short of the $20,600,000 estimate contained in the APA.[35] Because the Defendants were obligated to refund that $6.2 million, and that obligation is a category of working capital acquired by Reese Corp. in exchange for the Reese Transfers, the Defendants are correct that the net working capital acquired by Reese Corp. equals approximately $20,600,000.[36]

The question is not whether the $6.2 million should be included in the calculation of the value of *Reese Hospital's* net working capital acquired by Reese Corp. The net working capital received by Reese Corp. in exchange for the Reese Transfers includes both *Reese Hospital's* net working capital and *Reese Corp.'s* new item of net working capital, namely, GHI's obligation to make up any shortfall in the estimated value of Reese Hospital's net working capital. The court finds that the fair market value of the net working capital acquired by Reese Corp. on the Transfer Date includes the value of GHI's obligation to refund $6.2 million to Reese Corp. as a result of PWC's post-closing reconciliation. The fair market value of the net working capital acquired by Reese Corp. on November 12, 1998, was thus $20,678,221, the amount stated on the closing statement for the purchase of Reese Hospital.

### iv. *Humana Contract*

**\*25** At the time of Reese Hospital's acquisition in November 1998, GHI and Reese Hospital served patients covered by Humana insurance in connection with a managed care provider contract between Humana and GHI (the "Humana Contract"). After Reese Corp. acquired Reese Hospital on November 12, 1998, Reese Hospital continued to treat Humana patients, operating under the terms of the Humana Contract. (Trial Tr. 536:16–5376:1, Jan. 23, 2007 (Mounce, E.).)

The Humana Contract was important to Reese Hospital's operations because it constituted a significant component of Reese Hospital's business. (Trial Tr. 544:6–9, 551:10–12, Jan. 23, 2007 (Mounce, E.); Trial Tr. 2790:7–9, Feb. 12, 2007 (Gerken, G.); Trial Tr. 931:18–20, Jan. 25, 2007 (Talbot, D.).) But the cost to treat a Humana patient exceeded the reimbursement Reese Hospital would receive from Humana. (Trial Tr. 931:25–932:15, Jan. 25, 2007 (Talbot, D.).) The reimbursement rates were so low that Reese Hospital sustained ongoing losses as a result of the contract. (Trial Tr. 579:6–580:23, Jan. 23, 2007 (Mounce, E.); Trial Tr. 931:25–932:15, Jan. 25, 2007 (Talbot, D.).)

DCHC made a $24.7 million purchase accounting adjustment ("PAA") with respect to Reese Corp. in its financial statements for the year ending December 31, 1998, to reflect losses anticipated as a result of treating Humana patients according to the terms and rates of the Humana Contract. (Pl.Ex. 100 (Audited Consolidated Financial Statements of DCHC for the years ending December 31, 1997 and 1998) ("The excess over fair value of the net assets for Michael Reese in the amount of $24.4 million was provided for as an impairment of long-lived assets under FAS 121 in 1998."); *see also* Pl.Ex. 163 (Work papers for the audited consolidated financial statements for DCHC for the years ending December 31, 1997 and 1998)(same).) Those financial statements were audited by Ernst & Young (although no formal audit opinion ever issued). On January 30, 2007, this court granted in part Defendants' motion *in limine* to exclude Alberts's expert, Neil H. Demchick, from opining that the $24.7 million PAA taken by DCHC should be deducted from the value of Reese Hospital. (Trial Tr. 1567:14–1576:25, Jan. 30, 2007 (Teel, J.).)

Alberts persists in arguing that $24.7 million should be deducted from the value of Reese Hospital as a result of the PAA made by DCHC and Reese Corp. to account for losses on the Humana Contract. (Pl. Facts ¶ 223.) The court disagrees. The court concludes as a factual matter that: (1) there is no evidence that the Humana Contract was still in existence at the time of the transfer; (2) there is no evidence in the record that the Humana Contract was assigned to Reese Corp. as part of the transfer; and (3) blind reliance should

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 23 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

not be placed on the adjustment (even if it had been valid) when there is no persuasive evidence that a hypothetical purchaser of Reese Hospital on the Transfer Date (in contrast to a green shade-wearing accountant focused on arcane accounting procedures) would have viewed the accounting adjustment as reflecting a dollar-for-dollar reduction in the value of Reese Hospital.

**(1) *There is no evidence that the Humana Contract existed on the Transfer Date***

**\*26** There is no evidence that the Humana Contract was still in existence on November 12, 1998. By the terms of the contract and a subsequent amendment, the contract expired on or about September 30, 1998, and therefore did not exist on the Transfer Date. Reese Corp. could not assume an expired contract. The testimony of DCHC's Mounce that the Humana Contract had not expired was ambiguous at best and reveals that DCHC and Reese Corp. decided to continue to operating under the terms of the Humana Contract, without any proof that the contract still existed, as part of its strategy to negotiate more favorable reimbursement rates with Humana.

The original contract executed by Humana and GHI contained a three-year term commencing on March 1, 1993. (Pl.Ex. 1128 at TRUST/HCA 011607–TRUST/HCA 011608 (Hospital Services Agreement between GHI and Humana § 4.1).) Humana and GHI executed subsequent amendments to the original contract, most of which amended service rates. (Pl.Ex. 1130 at TRUST/HCA 011588–TRUST/HCA–011591(Amendment to Hospital Services Agreement between Humana and GHI, effective Jan. 1, 1995); Pl.Ex. 1129 at TRUST/HCA 011587 (Amendment to Hospital Services Agreement between Humana and GHI, effective Aug. 1, 1995); Pl.Ex. 1132 at TRUST/HCA 011584–TRUST/HCA 011586(Amendment to Hospital Services Agreement between Humana and GHI, effective Sept. 1, 1995), Pl Ex. 1131 at TRUST/HCA 011582–TRUST/HCA 011583(Amendment to Hospital Services Agreement between Humana and GHI, effective Feb. 1, 1997).)

One amendment to the Humana Contract executed by Humana and GHI extended the original contract term for two years beginning on January 1, 1996. [37] The factual record also indicates that the Humana Contract provided for a "runoff period" of nine months after expiration or termination of the contract, during which Reese Hospital, still owned by GHI, would continue to provide services to Humana patients under the contract's terms. (Pl.Ex. 1128 at TRUST/HCA 011607–TRUST/HCA 011608 (Hospital Services Agreement between GHI and Humana § 4.3).) Both Gregg Gerken, Vice President of Development for HCA, and Erich Mounce, Senior Vice President of Corporate Development at DCHC and DCHC's due diligence coordinator for the acquisition of Reese Hospital, affirmatively testified that the Humana Contract provided for such a "runoff period." (Trial Tr. 2925:1–6, 2926:20–2927:1, Feb. 14, 2007 (Gerken, G.); Trial Tr. 692:15–693:2, Jan. 24, 2007 (Mounce, E.).)

Based on the original contract and its subsequent amendment, the court concludes that the Humana Contract expired on or about January 1, 1998, and that the runoff period ended on or about September 30, 1998. The court further concludes that the written evidence indicates that the contract had expired on or about September 30, 1998, and therefore did not exist on the Transfer Date. Reese Corp. could not assume an expired contract.

But even if the evidence does not identify with certainty the exact date of the contract's expiration, the record does not show that the Humana Contract existed on the Transfer Date. Testimony by Mounce reveals that DCHC and Reese Corp. decided to continue to operating under the terms of the Humana Contract, without any proof that the contract still existed, as part of its strategy to negotiate more favorable reimbursement rates with Humana.

**\*27** While conducting due diligence, DCHC repeatedly requested documentation from HCA in support of a valid, unexpired contract between GHI and Humana. [38] But DCHC never received proof of a valid, unexpired contract between GHI and Humana as of the Transfer Date. (Trial Tr. 612:24–613:19, Jan. 23, 2007 (Mounce, E.).)

HCA and DCHC executives provided conflicting testimony as to whether the contract expired. Gerken of HCA testified that the Humana Contract had expired by November 12, 1998, when DCHC and Reese Corp. acquired Reese Hospital. (Trial Tr. 27906:5–8, Feb. 12, 2007 (Gerken, G.).) He further testified that Reese Hospital continued to see Humana patients and operate under the terms of the contract after it had expired. (Trial Tr. 2796:13–18, Feb. 12, 2007 (Gerken, G.).)

Mounce of DCHC testified that Reese Corp. operated under the Humana contract post-acquisition. (Trial Tr. 537:20–25; 536:16–537:1, Jan. 23, 2007 (Mounce, E.).) According to Mounce's initial and somewhat unclear testimony, DCHC received substantiation of an unexpired contract between

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 24 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

GHI and Humana prior to closing. (Trial Tr. 542:19–546:19, Jan. 23, 2007 (Mounce, E.).) Although the Humana Contract expired at the end of 1998, it was somehow "assigned" to DCHC in January 1999, only meaning that Reese Corp. continued to operate under the terms of that contract on a month-to-month basis until a new one could be negotiated,(Trial Tr. 611:23–612:1, Jan. 23, 2007 (Mounce, E.)). However, Mounce clarified that in fact DCHC did not receive a document showing an unexpired contract; rather, DCHC received comfort that Reese Hospital could continue to operate under existing terms of Humana's expired contract with GHI until a new contract could be negotiated:

> Q: You have never seen, putting aside the belief, you have never seen a document that said—other than your early due diligence where you found expired contracts, you never found a contract that said it hadn't expired after the date set forth in your earlier memo, which was #97 or into #98, Early #98, January #98. You have never seen that document have you?
>
> A: Let's see I'm pretty confident that I have seen documents renewing it up through the end of #97 and pricing moving on to #98, but to cover the period between the close and the 12/31/99, I just don't remember seeing the document.
>
> Q: Isn't it fact that you got comfort that Humana would continue the relationship informally until such time as you could negotiate as the new owner a new managed care contract. Isn't that what happened?
>
> A: I think that we got comfort that the pricing would stay in place through the end of #98 and they would assign the old contract to us in #99 and we would operate under that contract until we renegotiated a new contract.

(Trial Tr. 612:24–613:19, Jan. 23, 2007 (Mounce, E.).)

The court finds as a factual matter that DCHC never received proof of an existing, unexpired contract between GHI and Humana. Rather, DCHC decided to continue operating under the terms of the Humana Contract as part of its strategy to attempt to negotiate more favorable reimbursement rates from Humana. (Trial Tr. 551:19–555:1, Jan. 23, 2007 (Mounce, E.); Trial Tr. 2796:13–24, Feb. 12, 2007 (Gerken, G.); *see also* Trial Tr. 987:3–8, Jan. 25, 2007 (Talbot, D.) (noting that DCHC hoped to renegotiate the Humana Contract).)

 *28 Humana was a significant component of Reese Hospital's business, but because the reimbursement rates for Humana patients were so low, DCHC claims it was faced with the decision either to refuse to operate under the Humana Contract rates and therefore lose additional business or to renegotiate it. (Trial Tr. 552:1–24, Jan. 23, 2007 (Mounce, E.).) DCHC was reluctant to cease operating under the terms of the Humana Contract notwithstanding the low reimbursement rates because the lost business would be significant and extend beyond Humana patients. (*Id.*) Mounce testified that had DCHC ceased operating under the terms of the Humana Contract, some overhead costs of the hospital that were covered would no longer be covered. (*Id.*) In addition, there was the likely possibility that Reese Hospital would not only lose the physicians treating Humana patients, but also any other business those physicians had at Reese Hospital. (*Id.*) DCHC viewed the existing relationship between Humana and Reese Hospital as an opportunity to negotiate higher reimbursement rates, which would in turn improve Reese Hospital's operation results and increase its revenues. (Trial Tr. 580:16:23, Jan. 23, 2007 (Mounce, E.); Trial Tr. 608:6–11, Jan. 24, 2007 (Mounce, E.).) Indeed DCHC and Reese Corp. representatives contacted Humana to begin negotiating increased rates before the Transfer Date. (Trial Tr. 726:22–728:12, Jan. 24, 2007 (Mounce, E.).) DCHC therefore continued to operate under the terms of the expired Humana Contract not because it was contractually obligated to do so but because it hoped to leverage existing business with Humana in its negotiations with Humana for better reimbursement rates.

**(2)** *There is no evidence that the Humana Contract was assigned to Reese Corp.*

There is no evidence that the contract was assigned to Reese Corp. as part of the transfer. Pursuant to section 3.03 of the APA, HCA was required to list all contracts assigned to Reese Corp. on Schedule 3.03. (Trial Tr. 2795: 1–5, Feb. 12, 2007 (Gerken, G.); Defs. Ex. JY at HCA/MR–04556 (APA § 3.03).) Section 3.03 of the APA, entitled "Contracts," provides:

> Schedule 3.03 sets forth a *complete and accurate* list of all Contracts. There are no other contracts to which Seller is a party or by which Seller or the Assets are bound that are material to the condition (financial or other), business or results of operation of the Business or the Assets. Seller has delivered to Buyer true, correct and complete copies of all of the Contracts

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 25 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

listed on Schedule 3.03, including all amendments and supplements thereto.

(Defs. Ex. JY at HCA/MR–04556 (APA § 3.03)(emphasis added).) The Humana Contract was not listed on Schedule 3.03 to the Reese Hospital APA. [39] (Defs. Ex. JY at HCA/ MR–4629 to HCA/MR–4683 (APA Schedule 3.03); Trial Tr. 2795:1–2796:8; 2798:17–2800:24, Feb. 12, 2007 (Gerken, G.).) The plain terms of the APA therefore do not show that HCA assigned the Humana Contract to Reese Corp. To the contrary, it appears that HCA did not assign the Humana Contract to Reese Corp., likely because that contract had already expired and no longer existed.

**\*29** Although Mounce testified that Reese Corp. acquired the Humana Contract and continued to operate under the terms of that contract, (Trial Tr. 549:14–19, Jan. 23, 2007 (Mounce, E.), Trial Tr. 551:19–25, Jan. 23, 2007 (Mounce, E.)), he could not mean that it was assumed as a legally binding contract on both parties. It was never established that an unexpired contract between Humana and GHI was assigned to Reese Corp. or that Reese Corp. legally assumed a Humana Contract. Rather, Reese Hospital merely continued to operate under the terms of an expired Humana Contract post-acquisition on a month to month basis. That contract was acquired or assigned to Reese Corp. only in that colloquial sense. The court therefore concludes as a factual matter that the evidence does not show that the Humana Contract was assigned to Reese Corp.

**(3) *The PAA should not be deducted from the value of Reese Hospital***

Finally, the court concludes as a factual matter that the $24.7 million PAA recorded in the unaudited consolidated financial statements for the year ending December 31, 1998 for DCHC and Reese Corp. should not be deducted from the value of Reese Hospital.

Financial accounting standards permit a company to account for losses on a long-term contract that would be sustained over a number of years in year one. (Taylor Dep. 155:22– 156:9, May 31, 2006)0; Trial Tr. 940:16–941:25, Jan. 25, 2007 (Talbot, D.).) The losses are recorded as a purchase accounting adjustment. A purchase accounting adjustment is permitted under financial accounting standards if three requirements are satisfied: (1)the contingency existed on the purchase date; (2) the losses were likely to occur in the future; and (3) the losses could be reasonably estimated.

DCHC and Reese Corp. recorded the PAA in connection with losses anticipated as a result of operating under the terms of the Humana Contract at Reese Hospital. Because this court has determined that there is no evidence that the Humana Contract existed on the Transfer Date, the first requirement, that the contingency existed on the purchase date, is not satisfied.

The $24.7 million deduction, moreover, is just an accounting adjustment that does not reflect the assets of Reese Hospital from the perspective of a hypothetical purchaser and as such, should not be part of the net asset value calculation for Reese Hospital. From an accounting perspective, the accounting entry may or may not have been appropriate (assuming the contract was in existence and was assumed by Reese Corp.), but from the perspective of a hypothetical purchaser, the old expired Humana contract terms under which Reese Hospital was operating on November 12, 1998, was a factor affecting future cash flows, and the income approach to valuation is the appropriate vehicle for determining the effect of the existing relationship with Humana on the value of Reese Hospital.

The court therefore concludes that the PAA should not be deducted from the value of Reese Hospital under the cost approach.

**v. *Summary***

**\*30** Based on the foregoing findings, the court concludes that the total cost approach value of Reese Hospital as of the Transfer Date using the net asset value method is $57,985,984, or the sum of its underlying assets: real estate as improved ($25,307,763); equipment ($12,000,000); and net working capital ($20,678,221).

**c. *Income approach***

"Under the income approach, the [valuation consultant] estimates the future ownership benefits and discounts those benefits to present value using a rate suitable for the risks associated with realizing those benefits." Fishman et al., *supra,* ¶ 203.3. There are two possible methods for reaching such an estimate: the "discounted future returns" or "discounted cash flow" method, and the "capitalized returns method." *Id.* ¶ ¶ 203.9–203.11. "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method." *Lippe v. Bairnco Corp.,* 288 B.R. 678, 689 (S.D.N.Y.2003).

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 26 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

### i. *Projected earnings*

The first step in determining the value of a business enterprise under a DCF analysis is projecting the earnings before interest and taxes ("EBIT") of the business in question. Fishman et al., *supra,* ¶¶ 500.2, 505.27. These projections must be reasonable and based on reliable data. *Id.* ¶ 505.2. Moreover, the "forecasts ... should not be used to demonstrate earnings capacity or cash-generating ability far in excess of what the company has actually been able to realize in the past." *Id.* ¶ 505.26.

In reaching its findings of fact with respect to the reasonably projected earnings for Reese Corp. as of the Transfer Date, the court considered five sets of projections: two versions of a set of projections prepared by McGladrey & Pullen, LLP in the early part of 1998 (the "M & P Projections"), (Pl.Ex.224), that was supplemented and amended in part by a report prepared in April of 1998 (the "M & P Report"), (Pl.Ex.236), a set of projections prepared by Donna Talbot on September 20–21, 1998 (the "Reese September Projections"), (Pl.Ex.300), a second set of projections prepared by Talbot on October 22, 1998 (the "Reese October Projections," [40] and collectively with the Reese September Projections the "Reese Projections"), (Pl.Ex.222), and two sets of projections prepared by Neil Demchick in connection with his expert report rendered in this proceeding (collectively the "Demchick Projections"). (Pl.Ex.209.) Kevin Moss, the Defendants' expert witness on this issue, relied upon the Reese October Projections in determining a business enterprise value for Reese Hospital. (Trial Tr. 3494:24–3495:2, Feb. 20, 2007 (Moss, K.).)

The court carefully reviewed all of these projections, as well as the testimony pertaining thereto by Talbot, Demchick, Moss, and James Yerges, the Defendants' expert witness on the issue of insolvency, and the deposition testimony of former Reese Hospital chief executive officer Kenneth Bauer. Having done so, the court concludes as a factual matter that none of these projections offer a totally realistic picture of the reasonably anticipated future earnings for Reese Corp. as of November 12, 1998. Each set of projections suffers from one or more serious defects that prevents the court from taking them at face value.

### (A) *M & P Projections*

**\*31** The M & P Projections provide arguably the most objective assessment of Reese Corp.'s future earnings because these projections were prepared by outside consultants and

not in connection with this litigation. (*See* Trial Tr. 3017:2–3018:3, Feb. 14, 2007 (Yerges, J.) (describing the M & P Report as "a very thoughtful and detailed plan")); Pl. Rebuttal ¶ 384 ("[p]laintiff does not dispute that the M & P Report was 'detailed and thoughtful' ").) Unfortunately, the projections suffer from two glaring deficiencies. First, they are based on Reese Hospital's financial performance through 1997, and do not take into account the massive downturn in revenue that occurred in 1998 prior to the sale. (Trial Tr.2072:4–2073:2, Feb. 6, 2007 (Demchick, N.).) This renders the projections hopelessly outdated.

Second, the M & P Projections do not provide the level of detail necessary to ensure their accuracy. Donna Talbot identified this weakness in the M & P Projections in her testimony:

> As I recall, we had several meetings with RGAG, DCHC, and McGladrey and Pullen representatives as we reviewed their business plan; and I didn't like the way that their financial model was building revenue because I didn't think it was detailed enough and I wanted to build the revenue from the bottom up looking at the different reimbursement methodologies and the different pay [o]rs.

(Trial Tr. 971:19–25, Jan. 25, 2007 (Talbot, D.).) [41] Similarly, Paul Tuft criticized the McGladrey Report for containing "pretty basic, almost hospital management–101 type stuff." (Trial Tr. 109:21–23, Jan. 19, 2007 (Tuft, P.).)

In short, the M & P Projections and the McGladrey Report are too far removed from the Transfer Date and too generalized to provide a reasonable forecast of Reese Corp.'s earnings as of the Transfer Date. These documents are useful only insofar as they provide information that supports or contradicts other projections submitted to the court.

### (B) *Reese Projections*

Donna Talbot created the Reese Projections based on the financial model provided by the M & P Projections and the M & P Report. (Trial Tr. 973:2–6, Jan. 25, 2007 (Talbot, D.).) These projections incorporated the historical data presented in those earlier documents, (Trial Tr. 973:2–4, Jan. 25, 2007 (Talbot, D.)), but were more specific than the M & P Projections. (Trial Tr. 971:19–25, Jan. 25, 2007 (Talbot,

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 27 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

D.).) The Reese Projections also made adjustments to reflect changes to the business plan for Reese Hospital made by DCHC, NCFE, and RGAG (the "Reese Management Team"). (Trial Tr. 973:7–12, 978:8–13, Jan. 25, 2007, 1718:10–1719:3, Jan. 30, 2007 (Talbot, D.).)

These projected business changes, the so-called "Strategic Assumptions," were last set forth in a November 4, 1998, document prepared by Donna Talbot (Pl.Ex.115). The Strategic Assumptions fall into three basic categories. The first category consists of assumptions that volume in particular departments or units at Reese Hospital would increase as a result of capital expenditures. These assumptions included:

**\*32** • An assumption that a new emergency room ("ER") would be built, [42] leading to an increase in ER volume of 25%, (Trial Tr. 980:4–18, Jan. 25, 2007, 1714:25–1715:8, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115); [43]

• An assumption that the pediatric unit would grow 10% per year and the obstetrics/gynecology ("OB/GYN") department would grow 5% per year as a result of increased marketing, (Trial Tr. 982:18–983:2, Jan. 25, 2007, 1716:9–13, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013437), [44] and

• An assumption that the hospital would purchase new cardiac catheterization equipment, [45] which would double the cardiac catheterization volume at Reese Hospital. (Trial Tr. 984:9–11, Jan. 25, 2007, 1715:25–1716:4, Jan. 30, 2007 (Talbot.D.); Pl.Ex. 115). [46]

The second category of assumptions centers around the recruitment of physicians, which would presumably drive up patient volume and revenue. These assumptions include:

• An assumption that ambulatory surgeries would increase by 14.4%, or 698 additional surgeries per year, (Trial Tr. 981:6–19, Jan. 25, 2007; 1596:18–1597:5, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013435–TRUST/HCA–013436); and

• An assumption that the rehabilitation exempt unit at Reese Hospital would increase 15% per year up to a 90% occupancy rate. (Trial Tr. 1092:16–1093:7, Jan. 25, 2007, 1597:6–16, 1674:11–16, 1714:7–8, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 1015 at TRUST/HCA–013438.) [47]

In addition to these very specific assumptions, the Reese Management Team assumed that total patient days at Reese Hospital would be at most 91% of total patient days at the hospital for 1996 for the balance of 1998, 97.82% of the 1996 figures in 1999, 105% of the 1996 figures in 2000, 112% of the 1996 figures in 2001, and 119% of the 1996 figures in 2002. (Trial Tr. 1580:24–1581:12, 1734:5–19, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115.) [48]

The third category of assumptions relates to proposed operational or management changes that would either cut costs or improve the rate of return on Reese Hospital's charges. These assumptions include:

• An assumption that the ratio of employees, full-time equivalents ("FTEs"), to adjusted patient stay would be reduced, such that salaries and wages, benefits, and contract labor expenses would constitute no more than 42% of net patient revenue effective January 1, 1999, (Trial Tr. 878:2–13, 973:25–974:9, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115);

• An assumption that improved training in and oversight of coding techniques would result in a higher Medicare case mix index of 1.4, (Trial Tr. 1586:7–1588:20, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 115, 300 at TRUST/HCA–007589; [49]

• An assumption that the psychiatric unit at Reese Hospital would be bifurcated into a "geri-psych cost[-]based unit" and a diagnosis-related group ("DRG") unit, thereby resulting in an increase in disproportionate share ("DSH") payments, (Trial Tr. 1093:11–22, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115; Defs. Ex. QH at TRUST/HCA–175847); and

**\*33** • An assumption that certain costs incurred by HCA, including management fees, "MIS" costs, insurance costs, bad debt collection expense recovery costs, and costs associated with HCA's "national branding campaign" could be reduced or eliminated altogether, (Trial Tr. 870:8–11, 974:10–19, 1069:18–1070:22, Jan. 25, 2007, 1698:2–11, Jan. 30, 2007 (Talbot, D.); Pl. Exs. 144A at TRUST/HCA–007667, 1016 at TRUST/HCA–007175, TRUST/HCA–007629). [50]

Alberts concedes that most of these assumptions are reasonable in the abstract. (Pl. Rebuttal ¶¶ 399–401, 410.)

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 28 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Instead, he argues, first, that the *timing* of the assumptions is unreasonable because it appears from the Reese October Projections [51] that all of the assumptions—including those dependent on capital contributions—are projected to go into effect as of the Transfer Date. (Pl. Facts ¶¶ 173–74, 180–81; Pl. Rebuttal ¶¶ 399–401, 410.) [52] Moreover, he contends that the Reese Management Team failed to account for the steep decline in revenue at the hospital in 1998. (Pl. Facts ¶ 172.) Alberts further asserts that the Reese Projections failed to take into account "the existing problems and challenges at Reese Hospital," (*Id.* ¶ 175), including the hospital's "reliance on declining government reimbursement rates, certain third-party managed care providers with ever-reducing reimbursement rates, union labor, as well as increased competition," (*Id.* ¶ 176). Finally, Alberts challenges the reasonableness of two specific assumptions: the assumption that the case-mix index for Medicare coding could be improved to 1.4, (Pl. Rebuttal ¶ 401(g)), and the assumption that salaries and wages, benefits, and contract labor expenses would account for only 42% of net patient revenue by January 1, 1999, (Pl. Facts ¶ 177). [53]

### (I) *Timing of the projections*

The court agrees with the first criticism made by Alberts. Donna Talbot testified that at least one strategic assumption (namely, the assumption that salaries and wages, benefits, and contract labor would cost no more than 42% of net patient revenue by January 1, 1999) was "phased" into the Reese Projections, (Trial Tr. 1585:14–22, Jan. 30, 2007 (Talbot.D.)), and the Reese September Projections suggest that other strategic assumptions were "phased" in as well, (Pl.Ex. 300 at TRUST/HCA–007585). But she provided no rationale as to how the Reese Management Team determined the amount of improvement that would be made in the last forty-nine days of 1998, nor did she explain why the baseline for volume at Reese should be calculated as a percentage of 1996 patient days as of the Transfer Date when volume was much smaller in 1998.

In any event, the Reese September Projections, which served as the basis for the Reese October Projections, clearly project immediate increases in volume based on operational changes that could not have gone into effect in 1998. (Pl.Ex. 300 at TRUST/HCA–007585.) Neil Demchick hit this particular nail on the head in his trial testimony:

**\*34** [T]here are a number of strategic assumptions that suggested that there were things that were going to be done to [ ] improve the revenue position at [Reese Hospital], and the linear accelerator was an example of one, the moving of the emergency room is [an] example of another, cardiac cath lab is another, and that even though those would all take time to put into place, the revenue was included in the projections immediately from the time of the transaction, beginning in 1998 and carried forward through 1999.

(Trial Tr. 4313:7–18, March 1, 2007 (Demchick, N.).)

The Defendants assert that the volume increases projected by the Reese Management Team could have been accomplished without any capital expenditures notwithstanding the Reese Management Team's conclusions to the contrary. [54] They rely almost exclusively on the testimony of expert witness Kevin Moss to support this dubious proposition. (Defs. Rebuttal ¶¶ 174A–174G.) Moss testified at trial that the volume increases projected by the Reese Management Team could be accomplished quickly because "the main drivers in the cash flow" are "the volume of what the physicians admit to the facilities" and "controlling the expenses that are being incurred on the ancillaries," and "[t]hose two things can occur very quickly." (Trial Tr. 3527:1–4, 22–23, Feb. 20, 2007 (Moss, K.).) There are many problems with this testimony. First and foremost, Moss is *not* an expert in hospital operations. (Trial Tr. 3400:14–20, 3401:4–8, Feb. 20, 2007, 3711:10–23, Feb. 21, 2007, 3869:6–13 (Moss, K.).) Although Moss testified that he performed the same type of analysis that an operations consultant would have performed in ascertaining the reasonableness of the Reese Projections, (Trial Tr. 3869:14–22, Feb. 22, 2007 (Moss, K.)), he was not qualified as an expert in hospital operations, (*see* Trial Tr. 3406:3–5, Feb. 20, 2007 (Moss, K.) (qualifying Moss "as an expert in the area of valuation of hospitals" generally)), [55] and the court does not credit his testimony to the extent that he purports to be one. [56]

Second, Moss did not actually testify that the inevitable delay caused in implementing those Strategic Assumptions requiring capital expenditures would have no effect on the Reese Projections. To the contrary, Moss acknowledged on

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 29 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

the witness stand that "[t]here would be a small timing difference" caused by the delay between Reese Corp.'s takeover of the hospital and the effectuation of the Reese Management Team's business plan, (Trial Tr. 3526:6–7, Feb. 20, 2007 (Moss, K.)), but did not adjust the Reese Projections because he "didn't have the information to calculate" the effects of that difference, (Trial Tr. 3526:7, Feb. 20, 2007 (Moss, K.)). Moss further testified that even though certain Strategic Assumptions, such as the strategic assumption regarding ER volume, required capital expenditures to go into effect, (Trial Tr. 3528:6–21, Feb. 20, 2007 (Moss, K.)), and even though he did not know when those strategic assumptions would go into effect, (Trial Tr. 3529:6–18, Feb. 20, 2007 (Moss, K.)), he accepted the Reese Projections at face value because "the projections were done annually" and he couldn't "pinpoint when in the year" any of the Strategic Assumptions would go into effect, (Trial Tr. 3529:3–5, Feb. 20, 2007 (Moss, K.)). This does not suggest that the Reese Projections were correct, but rather that Moss lacked the information necessary to correct them. [57]

**\*35**  Third, the court does not believe that Reese Hospital could have swelled the ranks of its physicians to the degree contemplated by the Reese Projections within six weeks of the Transfer Date. Kenneth Bauer testified at his deposition that Reese Hospital had long suffered from "town-and-gown issues" because the hospital "had a long history of being an academic center that was dominated by the academic physicians." (Bauer Dep. 42:17–22, June 14, 2006.) [58] Bauer specifically criticized the notion that ambulatory surgery volume would increase immediately by 698 surgeries per year:

> Q. No. 5 says "Reese Ambulatory Surgeries will increase 698 surgeries per year or 14.4%. ASU represents 24.79 percent of 1997 outpatient revenue." Are you familiar with that assumption?
>
> A. Yes.
>
> Q. Was that reached?
>
> A. I don't believe that it was. And if you'll recall the previous discussion we had about the inadequate primary care base and the need for that to ultimately channel patients to surgeons, and the low surgery volume of the institution, all of those factors play into this situation here.

> Q. So was this a reasonable assumption to make?
>
> A. It's a reasonable assumption if you can expand the primary care base. *Can you do that in the course of two months? No. Over time can you do that? Yes.*
>
> Q. How much time?
>
> A. *I would say a couple of years.*

(Bauer Dep. 98:12–99:4, June 14, 2006 (emphasis added).) Dr. Enrique Beckmann also noted the "difficulty in recruiting and retention of qualified personnel" at Reese Hospital. (Beckmann Dep. 44:4–5, Apr. 12, 2006.) This was just one component of "a steady ratcheting down" of the hospital's condition "over the course of two-and-a-half decades." (Beckmann Dep. 71:6–7, Apr. 12, 2007.) [59] Beckmann noted that it was impossible for Reese Hospital to expand its outpatient volume because the hospital had lost its network of clinics years earlier when Reese Hospital was sold by Humana, (Beckmann Dep. 74:15–75:9, Apr. 12, 2007) [60]—testimony consistent with the testimony of Kenneth Bauer, (Bauer Dep. 37:10–38:2, June 14, 2006). [61]

Moreover, even those Strategic Assumptions regarding physician recruitment depended at least in part on capital expenditures. Again, this point was made by Kenneth Bauer in his deposition testimony:

> If you were trying to attract a community physician to bring his patients to your hospital and he has a choice of going to Michael Reese or Mercy Hospital, which is within half a mile, or two or three other hospitals that are within two to three miles, a number of factors come into play as to why he chooses to go to one place or another. Some of the primary ones are can he get in, see his patients, and get out really quickly so that he minimizes his time investment because his time is his revenue.

> Another factor is if he sends patients to a particular institution and he ends up getting nothing but complaints from those patients, he runs the risk of losing those patients for his practice because he took them one place or another. And so it's a matter of institutions competing against each other to create an environment where physicians can care for their patients timely, efficiently, and with good patient satisfaction in the outcome.

**\*36**  (Bauer Dep. 51:8–52:1, June 14, 2006.)

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 30 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

In contrast to the firsthand knowledge of Reese Hospital's situation at the time of the Transfer Date held by Bauer and Beckmann, Moss lacked the information necessary to draw any conclusions as to how quickly Reese Hospital could recruit physicians:

> THE COURT: How would you ascertain, if you were assigned the task of forming an opinion, as to whether the volume projections were reasonable?

> THE WITNESS: Are you asking me what I would do in a situation where it was not a valuation back in 1998, but if today, I were going into a facility?

> THE COURT: No, in 1998.

> THE WITNESS: Okay. The difficult thing about 1998 is we can look at the market environment. I can look at the information in the McGladrey report. I can look at how many physicians can admit to the hospital, and I know that we are in a large market, but I can't actually go in and talk to the doctors. I can't do a ZIP code analysis on the hospital and look at case rates per thousand for different types of health issues that people have and figure out where am I losing patients in my service area and where are they going to another hospital because I don't have that level of detail. When you have that level of detail, you can identify very quickly where you can go to get more volume, because you know who the important physicians are based on that analysis; but in this case, what we have is we just have a large market with ample opportunity to pick up revenue if the management team does focus on the physicians themselves and taking care of their physician relationships.

> ...

> THE COURT: Is there anything additional you could have done to ascertain the reasonableness of the volume projections in preparing your report? Could you have turned to your operational folks at Deloitte and had them give you assistance in evaluating the reasonableness of the projections?

> THE WITNESS: The problem had to do with the time period that has passed. The operational people would want more detail than was available. They would want billing information, and I didn't have that type of billing information.

(Trial Tr. 3867:15–3868:14, 3869:3–13, Feb. 22, 2007 (Moss, K.).)

Moss could only determine that in November of 1998 there was "a large market with ample opportunity to pick up revenue," (Trial Tr. 3868:12, Feb. 22, 2007 (Moss, K.)), by "look[ing] at the size of the market and the number of doctors and the capacity within the facility to provide that volume," (Trial Tr. 3869:15–17, Feb. 22, 2007 (Moss, K.)).[62] But the mere fact that a hospital *could* recruit physicians and cut costs does not mean that it is reasonable to project that this particular hospital *would* have done so as a result of any specific operational changes, let alone those changes actually planned by the Reese Management Team.

Tellingly, the Defendants' own expert witness on the issue of insolvency, James Yerges, testified that a turnaround of a hospital's operations "doesn't happen overnight," (Trial Tr. 3069:13, Feb. 14, 2007 (Yerges, J.)), and that the turnaround plan at Reese Hospital would "take what remains in 1998 and all of 1999," (Trial Tr. 3069:16, Feb. 14, 2007 (Yerges, J.)). The court does not credit the testimony of Moss insofar as he asserts that Reese Hospital could have reached the cash flow figures set forth in the Reese Projections in six weeks.[63]

**(II)** *Starting point for projections*

**\*37** The court also agrees with Alberts that the Reese Projections are defective because they do not account for the severe downturn in revenue at Reese Hospital in 1998. Implicit in the court's conclusion that the Reese Projections should have accounted for the delay in implementing the Reese Management Team's turnaround plan is the notion that the projections should have used the actual profits and losses for the hospital in 1998 as a baseline from which volume, revenue, and cash flow would "ramp up" as the turnaround plan went into effect. The Reese Projections did not do this: they used the historic figures for the hospital as a "starting off point," (Trial Tr. 1718:16, Jan. 30, 2007 (Talbot, D.)), modified those figures to reflect the Reese Management Team's Strategic Assumptions, (Trial Tr. 978:4–13, Jan. 25, 2007, 1718:17–18, Jan. 30, 2007 (Talbot, D.)), and, in an attempt to account for the downturn in 1998, then "capped" the total number of patient days arising out of those assumptions by a percentage of the actual patient days for the hospital in 1996, (Pl.Ex.300).[64]

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 31 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Alberts asserts, and Neil Demchick testified at trial, that the Reese Management Team used Reese Hospital's financial performance in 1997 as the starting point for its projections, (Pl. Facts 172; Trial Tr.2065:10–2066:9, Feb. 6, 2007 (Demchick, N.)), but Donna Talbot testified that the Reese Management Team "took the three year historical data that we got from HCA and then the stump period data ... through August of 1998" as the "starting point" for the Reese Projections, (Trial Tr. 1666:21–23, Jan. 30, 2007 (Talbot, D.)). [65] These positions are not as irreconcilable as they might seem. The 1998 patient days total projected in the Reese September Projections corresponds to 90.81% of the patient days at the hospital in 1996, [66] reflecting the Strategic Assumption to that effect by the Reese Management Team. (Pl. Exs. 115, 300 at TRUST/HCA–0075883–TRUST/HCA–0075885.) [67] This "cap" of 91% was set based on the Reese Management Team's consideration of the patient day data for the months leading up to Transfer Date and was intended to reflect the drop-off in volume at the hospital in 1998. (Trial Tr. 1581:5–19, 1735:6–9, Jan. 30, 2007 (Talbot, D.).) In that sense, Talbot is correct when she states that the Reese Projections incorporate the "stump period data" for 1998.

At the same time, all of the figures set forth in the Strategic Assumptions reference 1997 data. For example, the Strategic Assumption that the rehabilitation unit at Reese Hospital would "increase 15% per year" translates into a projection that there will be 360 Medicare cases in 1998 on an annualized basis, a 15% increase over the 313 Medicare cases at the hospital in 1997. (Pl.Ex. 300 at TRUST/HCA–007584.) Similarly, the Strategic Assumptions regarding growth in inpatient and outpatient volume are converted into percentages of growth over 1997 figures and then applied to those figures to arrive at annualized projections for 1998. (Pl.Ex. 300 at TRUST/HCA–007583–TRUST/HCA–007585.) In other words, the Reese Management Team used 1997 data as a jumping off point for all of their projections, and then curtailed those projections only to the extent that the figures projected exceeded the cap on patient days.

*38 Such a process is obtuse under the best of circumstances. It would be defensible to the extent that the cap placed on the projections accurately reflects the state of affairs at the hospital as of the Transfer Date, but the cap does not do so. In this case, the percentage of 1996 patient days used as a cap in the Reese Projections for 1998(91%) actually results in a *higher* figure than the actual number of patient days for Reese Hospital in 1997 (92,192 days, or 86.10% of the 1996 figure of 107,075). (Pl.Ex. 300 at TRUST/HCA–

007585.) Moreover, the cap on patient days does not affect any projections regarding outpatient cases, which outstrip the actual number of inpatient cases in both 1996 and 1997. (Pl.Ex. 300 at TRUST/HCA–007583–TRUST/HCA–007585.) [68] Consequently, the Reese Projections forecast net revenue at Reese Hospital in the days immediately following Reese Corp.'s takeover of the hospital that, annualized, would have exceeded not only Reese Hospital's actual performance in 1997, but its performance in 1996 as well. [69]

These assumptions are unreasonable. Assuming that the "cap" on patient days reflects the average of the inpatient, rehabilitative, and psychiatric volume as of November 1, 1998, and the projected volume in those units on December 31, 1998 (to account for the "ramp up" in volume over that period of time), and that the Reese Management Team anticipated that volume would be stable throughout 1999, [70] the annualized number of patient days at Reese Hospital as of November 1 would have to equal 83.80% of the patient days total for 1996—a figure almost identical to the patient days total of 1997 (86% of the patient days for 1996). [71] Given that the Reese Management Team knew "[t]hat the volumes were declining" at Reese Hospital as the year progressed and knew "that the [patient] days were continuing to decline even though [the team] didn't have the financial statements," (Trial Tr. 865:6–7, Jan. 25, 2007, 1720:18–19, Jan. 30, 2007 (Talbot, D.); *see also* 1735:8–9, Jan. 30, 2007 (Talbot, D.) ("I think we knew where the days were going.")), it makes no sense for the team to have assumed that patient days would be almost if not precisely at 1997 levels upon Reese Corp.'s arrival.

Similarly, if one assumes that the annualized projected number of outpatient cases at Reese Hospital for 1998 represents the average of the actual number of cases in 1998 pre-transfer and the annualized projected number of cases as of December 31, 1999, then the actual number of cases at Reese Hospital prior to November 1, 1998, would have been 104,161 (the result of (108,519*2)–112,877), [72] or 2,150 cases more than Reese Hospital had in 1997. Even more disturbing, applying the same methodology to the projected net patient service revenue figures for the hospital results in a "starting point" in net patient service revenue of $166,043,698.81—approximately $15 million more than the actual annualized net patient service revenue figure for Reese Hospital as of November 1, 1998.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 32 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

**\*39**  These numbers are damning to any defense of the Reese Projections' reasonableness. Either the Reese Management Team assumed full operational turnaround at the hospital as of Reese Corp.'s first day in control of the hospital—a self-evidently absurd notion—or they assumed that the numbers would "ramp up" from figures that do not remotely reflect the realities at Reese Corp. as of the Transfer Date. Either way, the Reese Projections are flawed in their inception and cannot be taken at face value.

### (III) *Problems at Reese Hospital*

Alberts argues that the Reese Projections did not take into account certain looming obstacles for success at Reese Hospital, such as a decline in governmental reimbursement rates due to the Balanced Budget Act of 1997, Pub.L. No. 105–33, 111 Stat. 251 (1997) (the "BBA"), a decline in reimbursement rates in certain third-party insurance contracts, union difficulties, and increased competition. He is correct in one respect: the Reese Projections do not predict any decrease in the reimbursement rates for its contract with Humana, and, in one instance, appear to predict an increase in the reimbursement rate. (Pl.Ex. 300 at TRUST/HCA–007620–TRUST/HCA–007621.) [73] The Reese Projections are unreasonable to the extent that they predict an increased reimbursement rate for outpatient services performed on Humana patients because Reese Corp. lacked the necessary leverage to negotiate a better contract with Humana. (Trial Tr. 440:23–442:14, Jan. 23, 2007 (Redman, M.) ("we had no negotiating power").) Although a hypothetical purchaser would likely have assumed that there was some chance of renegotiating the Humana terms, the court assumes in Alberts's favor that the purchaser would not have utilized an increased reimbursement rate for outpatient services performed on Humana patients in its projections of revenues because Humana would always have the upper-hand in any negotiations with Reese Hospital due to its relationship with Mercy Hospital. (This assumption results in understating the value of Reese Hospital because a hypothetical purchaser would likely assign some value to the chance of renegotiating the Humana terms, [74] but, even so, the value the court ultimately determines for what Reese Corp. received exceeds the Reese Transfers. Accordingly, for ease of analysis, the court assigns zero value to the prospect of renegotiating the Humana terms, without actually deciding what value that prospect would have.)

The other criticisms levied by Alberts are unfounded. The Reese September Projections predict lower reimbursement rates for inpatient services performed on Medicare patients, thereby reflecting the predicted effects of the BBA. (*See* Pl.Ex. 300 at TRUST/HCA–007589 (projecting decline from \$355.23 to \$304.78 for capital diagnostic related group ("DRG") code of 1.0).) [75] And while Donna Talbot testified that Reese Hospital did not improve its collection practices as much as expected due in part to the difficulties involved with dealing with a group of unionized employees, (Trial Tr. 987:19–990:16, Jan. 25, 2007 (Talbot, D.)), she also testified that hospital management could have fired those employees and used outside contractors with much better results at the outset of Reese Corp.'s management but decided not to do so because management wanted to be "compassionate" to Reese Hospital's employees, (Trial Tr. 1073:13–1075:9, Jan. 25, 2007 (Talbot, D.)). [76] Finally, the court has already reviewed the testimony of Kevin Moss regarding the potential for volume increases in the market, which suggests that Reese Hospital could have met its volume and revenue targets if it had executed an operationally sound turnaround plan. (Trial Tr. 3868:8–14, Feb. 22, 2007 (Moss, K.) ("what we have is ... a large market with ample opportunity to pick up revenue").)

### (IV) *Specific assumptions*

**\*40**  Alberts challenges the reasonableness of the Reese Management Team's Strategic Assumptions that Reese Hospital could improve its Medicare case mix index from 1.36 to 1.4 and that salary-related expenses could be limited to an amount not exceeding 42% of net patient revenue by January 1, 1999. (Pl. Facts ¶ 177; Pl. Rebuttal ¶ 401(g).) [77] The projected improvement in the Medicare case mix index was premised on the notion that new management could teach Reese Hospital employees better coding techniques. (Trial Tr. 1586:5–1588:20, Jan. 30, 2007 (Talbot, D.); Bauer Dep. 96:15–97:1 (June 14, 2006).) This assumption does not strike the court as unreasonable on its face, and Alberts points to no evidence suggesting to the contrary. The court therefore finds as a factual matter that this was a reasonable assumption (subject to the court's earlier findings regarding the manner in which this assumption was implemented in the Reese Projections).

The Strategic Assumption regarding salary-related expenses is a different story. As Neil Demchick pointed out at trial, the percentage of revenue allocated for such expenses in the

Reese Projections is lower than that allocated in the M & P Projections, and the M & P Report noted that the level of FTEs at Reese Hospital was already below industry standards and that management would expect, at best, to achieve only modest cost savings related to staffing level changes. (Trial Tr.2054:17–2055:2, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 236 at TRUST–HCA–027715.) Kenneth Bauer poured more cold water on this assumption:

> If you look at the comparative statistics across the industry, if you look at salaries, wages and benefits on a hospital-wide basis, 42 percent allocated to salaries, wages and benefits is the absolute low end of the range. It is representative of the most efficient operating institutions in the country. Many of the Columbia HCA hospitals operate at near that level. The range extends from 42 percent to more typically into the 48, 49 percent with a number of institutions even operating at the 52 to 55 percent range.

> Specifically[,] when you're looking at a 45–acre campus and 27–some buildings in a very inefficient environment, my observation would be to go to the most efficient operating pattern in the space of six weeks of operation is not a realistic assumption.

(Bauer Dep. 95:4–18, June 14, 2006.)

Bauer was not the only witness to testify about the unique inefficiencies plaguing Reese Hospital. Donna Talbot testified at length about the unique challenges presented by the size of Reese Hospital's campus and its impact on the Reese Management Team's salary-related Strategic Assumptions:

> Q. Was there anything that you found unique about the campus of that Michael Reese Hospital?

> A. It was a huge campus. It was very odd to me that, you know, you had all these overhead functions, like medical records, IT, accounting, that literally were a mile from the main hospital building where administration was. They had several different buildings stretched out through the campus where patient care was related, and you know, you would have, like, central supply and pharmacy downstairs into one of those tunnels, and they would have to distribute all of these things, you know, to all these different buildings. It was really unlike anything I had ever seen before. Just from a size perspective.

> **\*41** ...

> Q. Did that layout cause problems once the hospital was purchased?

> A. Yes, it did.

> Q. What were those problems?

> A. It was a lot more costly than we had anticipated. We had had a plan to consolidate the campus and ran into some problems with that. Some of the old buildings had asbestos in it, which obviously is a concern. But I don't think we really realized the impact on the number of full-time equivalents that would be required because of the sheer size of the campus. From a security perspective, a housekeeping perspective, you know. It was really, I think more than we had imagined.

> Q. So those problems were not realized until after the sale occurred, is that correct?

> A. That's—I mean, we obviously recognized it was a huge campus. I just don't think—I think as we looked at, you know—one of our big assumptions was we were going to reduce the number of full-time equivalents so that the ratio of salaries to net revenue was more comparable to what you would see in the industry. And as we looked at reducing these FTEs, you know, we would make reductions in housekeeping, security, I don't think we realized how many people we would have to keep on board simply because of the size of the facility.

> I mean, you just think about transporting patients to X-ray and lab, you know, in a facility that size, you know, there are costs associated with that, having the place cleaned. I don't think we really understood the true cost of that.

(Trial Tr. 876:25–878:13, Jan. 25, 2007 (Talbot, D.).)

Talbot returned to this issue later in her testimony:

> First of all, as I indicated before, the cost of operating at Michael Reese far exceeded what we estimated. We understood that, you know, we had a big campus and it was sprawled over, but I don't think we really understood, you know, how many more FTEs it took to run a campus of that size.

> ...

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 34 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Q. When you were creating the strategic assumptions, Ms. Talbot, were you taking into account, at that point in time, that this is a very large campus?

A. We understood it was a very large campus. I don't think we—what we didn't understand was we knew it would add cost. We didn't understand how much it would add cost. I don't think that we adequately factored in the size of the campus and what that would do; the fact that it required more FTEs than a majority of the departments, just by how far they had to travel to get from one place to another.

(Trial Tr. 987:12–17, Jan. 25, 2007, 1728:10–20, Jan. 30, 2007 (Talbot, D.).)

Taken together, this testimony suggests that a reasonable purchaser would have known of the difficulties in cutting the FTE-to-patient ratio at Reese Hospital as a result of the size of the hospital's campus and the sprawl of its facilities, but that the Reese Management Team failed to take these difficulties into account fully in preparing the Reese Projections. The court therefore agrees with Alberts that the Reese Management Team's Strategic Assumption regarding salary-related expenses is unreasonable.

**(C) *Demchick Projections***

**\*42** Finally, the court rejects the Demchick Projections. Demchick provided two very different set of projections. The first set assumed that Reese Hospital would only be able to return to its 1996 level of performance after one year (the "Turnaround Scenario"). The second, more optimistic set of projections is based on the assumption that Reese Hospital could reach the revenue figures projected by the Reese Management Team after a year's delay (the "Strategic Growth Scenario"). These projections are largely not rooted in any kind of operational reality; consequently, neither set of projections carries any weight with the court.

**(I) *Turnaround Scenario***

Demchick's Turnaround Scenario differs from the Reese Projections in four ways:

- It eliminates all of the capital expenditures included in the Strategic Assumptions, leaving only $2.5 million to be spent in 1998 and $9 million to be spent in 1999 for computer upgrades, (Trial Tr. 2108:8–16, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 61(b));

- It uses the projected personnel expenses set forth in the M & P Projections; *i.e.,* 45% of net patient service revenue, (Trial Tr.2083:12–14, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 61(a)(2));

- It projects that Reese Corp. will be able to return Reese Hospital to 1996 revenue levels by 2000, (Trial Tr.2083:14–21, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 60(a)); and

- It projects fixed expenses totaling $26,375,000.00 for 1999, (Trial Tr. 2106:18–25, Feb. 6, 2007 (Demchick, N.)).

With the possible exception of the use of the M & P projected personnel expenses, none of these "adjustments" improve the Reese Projections in any way. Given that Demchick himself concedes that the Reese Management Team's Strategic Assumptions are reasonable in the abstract, it makes no sense to pretend that those strategies for growth would not be available to a hypothetical purchaser, as the Turnaround Scenario appears to contemplate. [78] Nor does it make any sense to project fixed expenses for 1999 simply by "look[ing] and focus [ing]" on the historic averages at Reese Hospital and picking "whichever was the lower amount on the averages of 1995 to 1998 or 1995 to 1997," as Demchick testified. (Trial Tr. 2101:16–18, Feb. 6, 2007 (Demchick, N.).) [79]

Indeed, the Turnaround Scenario is flawed in its very conception because it assumes that Reese Hospital would return to its 1996 level of performance by the year 2000 when, in fact, such a "scenario" is highly unlikely. [80] If, as the Turnaround Scenario contemplates, a hypothetical purchaser would not infuse capital into Reese Hospital, it stands to reason that the hospital would *never* be able to return to its 1996 level of performance because the same conditions that led to the decline in the hospital's performance (the changed emphasis in the health care industry from inpatient to outpatient care, the drift of Humana-associated physicians to Mercy, the deterioration of the facilities on campus, *etc.*) would persist. A hypothetical purchaser might be able to implement cost-cutting measures that would stem or even partially reverse the negative cash flow at Reese Hospital in the months immediately preceding the sale of the hospital, but it could not have stopped the "steady ratcheting down"

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 35 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of the hospital's condition "over the course of two-and-a-half decades." (Beckmann Dep. 71:6–7, Apr. 12, 2007.)

**\*43** On the other hand, if a hypothetical purchaser were able to expend new capital in the service of a sound turnaround plan, one would not expect the revitalized hospital, with new management, a different business plan, and improved facilities and equipment, to post earnings exactly or even approximately equal to the earnings posted by the hospital years prior except by coincidence. The hospital's net earnings might be more or less than the totals from 1996, but they would be different one way or the other because the hospital itself would be different. Either way, Demchick's use of 1996 figures is arbitrary. [81]

Demchick could have allayed the court's concerns by demonstrating that there was an operational basis for concluding that the revenue projected for Reese Hospital in 1999 should match the revenue collected in 1996. But Demchick is, if anything, even less credible than Kevin Moss in terms of operational expertise. Aside from "a bit of consulting work that related not to actual turnarounds but to some strategic restructuring initiatives at two other hospitals," (Trial Tr. 2369:13–16, Feb. 8, 2007 (Demchick, N.)), Neil Demchick has no experience whatsoever in the area of hospital operations, (Trial Tr. 2369:11–2370:1, Feb. 8, 2007 (Demchick, N.)). Demchick's lack of operational expertise in the hospital arena makes his arbitrary decision to project a return to 1996 revenue levels even more suspect.

The Turnaround Scenario is really nothing more than a thought-experiment. Its assumptions are arbitrary and its projections unrealistic. The court finds as a factual matter that the projections arising from the Turnaround Scenario are unreasonable and unreliable for purposes of determining the fair market value of Reese Hospital as of the Transfer Date.

**(II)** *Strategic Growth Scenario*
The differences between the Reese Projections and Demchick's Strategic Growth Scenario are more extensive. They include:

- An adjustment to the projected amount of capital expenditures whereby such expenditures are spread out evenly over the course of 1999 and 2000, (Trial Tr. 2127:10–2128:3, Feb. 7, 2007 (Demchick, N.));

- An adjustment to the projected amount of revenue increases and expense decreases whereby the increases

and decreases projected to occur in 1999 in the Reese Projections occur in 2000, with 1999 serving as a mid-point, (Trial Tr.2084:7–12, Feb. 6, 2007 (Demchick, N.));

- An adjustment of projected salary-related expenses whereby such expenses are projected to consume 45% of total net revenue at Reese Hospital instead of 42% of net patient service revenue as projected by the Reese Management Team, (Trial Tr.2092:13–15, Feb. 6, 2007 (Demchick, N.));

- An adjustment to projected sales and use tax expenses whereby such taxes are projected to consume 1.2% of net patient service revenue, (Trial Tr.2096:7–2097:25, Feb. 6, 2007 (Demchick, N.));

- An adjustment to the projected amount of bad debt whereby such expense is projected to consume 3.6% of net patient service revenue, (Trial Tr.2098:22–24, Feb. 6, 2007 (Demchick, N.));

**\*44** • An adjustment to projected costs for repairs and maintenance, rents and leases, and utilities whereby such expenses are projected to be lower than the figures set forth in the Reese Projections, (Trial Tr. 2101:16–2103:24, Feb. 6, 2007 (Demchick, N.)); and

- An adjustment to projected other operating expenses whereby such expenses are projected to consume $3.2 million in 1999, (Trial Tr. 2105:13–16, Feb. 6, 2007 (Demchick, N.)).

Unlike his Turnaround Scenario, Demchick's Strategic Growth Scenario is rooted in a sound premise. The evidence in the record overwhelmingly indicates that it would take at least a year for Reese Corp. to implement the Reese Management Team's turnaround plan and begin to reap the benefits of that plan. Donna Talbot "believed it was going to take at least a year" for the operations at the hospital to turn around. (Trial Tr. 973:10–14, Jan. 25, 2007 (Talbot, D.); *see also* Trial Tr. 1084:5–8, Jan. 25, 2007 (Talbot, D.) ("It was my belief, based on what we were trying to accomplish that, *over the period of a year,* we would be able to implement our turn around plan, positively cash flow and begin rebuilding it to what it used to be." (emphasis added.)); Trial Tr. 1666:13–16, Jan. 30, 2007 (Talbot, D.) ("Q. Now, in your mind, at this period in time, how long did you think it would take to turn around the hospital again? A. As I recall, it was about a year.").) Mel Redman "believed it would take us two or three years to effect any kind of turn around," but

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 36 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

admitted that "[i]n Scottsdale, in our corporate office, we would close the doors and doubt it if we could ever do that...." (Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.).) James Yerges, the Defendants' own expert witness, testified that "it is reasonable to expect that it would take 14 months for this turn around to be complete." (Trial Tr. 3214:12–14, Feb. 15, 2007 (Yerges, J.).) [82]

The court agrees with Demchick that the benefits of the Strategic Assumptions should have been spread out over the course of 1999 to account for the inevitable delay in implementing the Reese Management Team's business plan. But the manner in which this delay has been incorporated into the Reese Projections by Demchick in his Strategic Growth Scenario is too imprecise to be accepted wholesale. Demchick did not attempt to parse the Reese Projections unit-by-unit to adjust the volume projections that drive the projected revenue figures for Reese Hospital, nor did he distinguish between Strategic Assumptions that could be accomplished quickly (such as improvements in Medicare case mix coding or bifurcation of the psychiatric unit) [83] and those that could not (such as relocation of the ER). He simply took the revenue figures projected by the Reese Management Team for 1999, determined the rate of growth from an annualized 1998 figure to that projected rate and the rate of reduction in variable expenses as a percentage of net patient service revenue using the same two sets of figures, and divided the rate of growth in revenue and reduction in variable expenses as a percentage of net patient service revenue in half to reach projected figures for 1999 and assumed 100% of that growth would be accomplished in 2000. (Trial Tr. 2126:15–2127:3, Feb. 6, 2007, 2476:3–2477:25, Feb. 8, 2007 (Demchick, N.); Pl.Ex. 209 ¶ 62(b).)

**\*45** There are two major problems with this practice. The first is that it fails to provide for any improvement at Reese Hospital whatsoever in 1998. [84] This is a major oversight because, as Donna Talbot testified at trial, much of the downturn in cash flow at the hospital over the course of 1998 was caused by the fact that the hospital had been on the market for so long. (Trial Tr. 869:2–9, 1084:23–1086:5, Jan. 25, 2007 (Talbot, D.).) Indeed, the Reese Management Team used 1996 figures as the starting point for their patient day projections precisely because they believed that Reese Hospital's year in ownership limbo artificially depressed the hospital's performance in late 1997 and 1998.

This analysis is reasonable. As Kevin Moss explained in his direct testimony:

> The hospital facility was up for sale, it can create uncertainty with respect to the doctors and that can cause declines within the facility. And that's something that is very commonly seen within the industry and it's something that certainly was having an impact on this hospital facility at that point in time.

(Trial Tr. 3433:2–9, Feb. 20, 2007 (Moss, K.).) [85] The court has little regard for Moss's testimony that Reese Hospital could have reached the revenue figures set forth in the Reese Projections, but that does not mean that a hypothetical purchaser of Reese Hospital should not have expected to make *any* improvements in the hospital's operations during the "stump period" of 1998.

The second major flaw in Demchick's Strategic Growth Scenario is that it assumes that a twelve-month delay in reaching the Reese Management Team's Strategic Assumptions would translate into a twelve-month delay in reaching the revenue and expense figures (as modified by Demchick) set forth in the Reese Projections. This is not necessarily so, particularly with respect to variable expenses. For example, there is no reason why it would take a full year for Reese Corp. to improve the collection practices at Reese Hospital to the point where bad debts would consume only 3.6% of net patient service revenue as opposed to the 6.2% figure projected by Demchick. (Pl.Ex. 209 at Ex. H–1.) For that matter, there is no reason why all of the expenses labeled "variable" by Demchick should be calculated as a percentage of net patient service revenue when the Reese Projections contain much more detailed formulae for calculating many of those expenses at an operational level. (Pl.Ex. 300 at TRUST/HCA–007628, TRUST/HCA–007630.) [86]

The court also disagrees with Demchick's adjustment of the Reese Management Team Strategic Assumption regarding salary-related expenses from the 42% figure (as a percentage of net patient service revenue) assumed by the Reese Management Team to a much higher figure for 2000 (45% of total net revenue, or 47.07% of net patient service revenue). [87] By simply declining to hire new FTEs in 1999 and 2000, [88] the hospital would have projected salaries totaling $68,162,245.73, [89] contract labor totaling $2,105,655.00 (using Demchick's percentage

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 37 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

of total net revenue),[90] and employee benefits totaling $13,632,449.15,[91] for a grand total of $83,900,349.88. That amounts to 41.68% of net patient service revenue or 39.85% of total net revenue, figures right in line with the Reese Management Team's expectations.

**\*46** The court does not mean to suggest that Reese Hospital could have increased its volume to the levels projected by the Reese Management Team or even by Demchick without hiring additional FTEs. Indeed, the court agrees with Demchick that the Strategic Assumption regarding salary-related expenses as a percentage of net patient service revenue is unreasonable. But that does not mean that the court accepts Demchick's 45% figure as reasonable, either. If HCA had been able to limit Reese Hospital's salary-related expenses to 45% of net patient service revenue, as it did in 1996, (Pl. Exs. 137 at HCA/MR 08017; 219 at Ex. J), it stands to reason that a well conceived, properly executed turnaround plan would eventually produce even better results.

Demchick's Strategic Growth Scenario has some good ideas (delay the growth projected by the Reese Management Team to account for the delay in implementation of the team's turnaround plan, adjust projected salary-related expenses to reflect more reasonable expectations, *etc.*), but it executes those ideas in very poor fashion. Some of the adjustments, such as the decision to project bad debts as 6.2% of total net revenue in 1999 or the decision to project salary-related expenses as 45% of total net revenue for 2000, seem more the product of a desire to achieve a lower projected EBITDA figure for the hospital than an objective analysis of the reasonableness of the Reese Management Team's Strategic Assumptions. The court finds that the projections derived from this scenario are unreasonable and should not be used in determining the business enterprise value of Reese Hospital as of the Transfer Date.

**(D)** *Modified projections*

The court's findings of fact with respect to the M & P, Reese, and Demchick Projections leave it with two options. First, the court could conclude that there are no credible projections from which it can derive a business enterprise value, and that the court's conclusion with respect to the fair market value of Reese Hospital on November 12, 1998, under the income approach should be that no such value can be ascertained. The court would then be left to determine the hospital's fair market value using the "cost" and "market" approaches to valuation, or to rule that a hypothetical purchaser would have

relied largely on a discounted cash flow valuation, and that, absent a reliable DCF valuation, Alberts has not proven what a hypothetical purchaser would have paid for Reese Hospital.

The more arduous choice would be to credit the Reese Projections in part and then modify the projections consistent with the evidence presented at trial—to attempt, as best the court can, to correct the Reese Management Team's mistakes. This approach is fraught with peril, for the court is a simple factfinder, not a hospital operations expert, and the Reese Projections "ha[ve] a lot of detail behind them." (Trial Tr. 3479:19–20, Feb. 20, 2007 (Moss, K.).) The court is not an appraiser and has no desire to play that role for purposes of this proceeding.

**\*47** Nevertheless, the court finds that it can and should make certain adjustments to the Reese Projections in this instance. It would be inappropriate for the court to rule against Alberts on this dispositive factual issue simply because it is time consuming for the court to make proper factual findings. And the projections, while dense, are intelligible and susceptible to modification; *i.e.,* the court can incorporate its factual findings with respect to the Strategic Assumptions that informed the projections into the projections themselves. Under the circumstances, modifying the Reese Projections to reflect the court's factual findings with respect to the Reese Management Team's Strategic Assumptions yields the fairest and most honest factual findings that the court can make.

The court therefore finds as a factual matter that the Reese Management Team Strategic Assumptions are reasonable subject to the specific factual findings listed below in summary form, and adopts the Reese Projections as reasonable business projections for Reese Hospital as of the Transfer Date as modified below:

- For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point for its projections.

- Based on the testimony of Donna Talbot and Kevin Moss, the court finds as a factual matter that a well-conceived, properly executed turnaround plan put into effect on November 12, 1998, would have returned Reese Hospital to its 1997 level of volume by the end of the "stump period" in 1998. (Trial Tr. 869:2–9, 1084:23–1086:5, Jan. 25, 2007 (Talbot, D.); 3433:2–9, 3435:22–3436:14, Feb. 20, 2007 (Moss, K.).) The court therefore

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 38 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

finds as a factual matter that a hypothetical purchaser would have projected net patient service revenue at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on the last 1998 data available before the Transfer Date, the October 31, 1998, year-to-date data) and the actual figures from 1997. [92]

• Based on the testimony of Donna Talbot, Mel Redman, and James Yerges, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to volume growth except insofar as volume growth was predicated on the relocation of the ER. (Trial Tr. 973:10–14, 1084:5–8, Jan. 25, 2007, 1666:13–16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12–14, Feb. 15, 2007 (Yerges, J.).) The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

    • For the reasons set forth in the court's discussion of the Reese Projections, the court finds as a factual matter that it would have taken one year from January 1, 1999, for Reese Corp. to have relocated the ER. *See* part III.B.1.c.i.(B), *supra*. The court therefore finds as a factual matter that a hypothetical purchaser would not have included the upward adjustments for volume anticipated to occur as a result of the ER relocation until 2000.

    ***48** • For the reasons set forth in the court's discussion of the Reese Projections, *see* part III.B.1.c.i.(B), *supra*, the court finds that it was unreasonable for the Reese Management Team to have expected to be able to renegotiate its payment arrangement with Humana at better rates. The court therefore finds as a factual matter that a hypothetical purchaser would not have projected an increased reimbursement rate for Humana cases in the outpatient unit.

    • Based on the deposition testimony of Ken Bauer, the court concludes as a factual matter that a reasonable purchaser would not have spent any money on marketing Reese Hospital during the "stump period" of 1998. (Bauer Dep. 104:5–22,

June 14, 2006.) The court therefore finds that a hypothetical purchaser would not have projected any expenses for marketing in the "stump period" of 1998.

• As a corollary to the findings set forth above, the court finds as a factual matter that a reasonable purchaser would have spent the amounts contemplated in the Reese Management Team Strategic Assumptions for marketing over an eighteen-month period beginning on January 1, 1999. The court therefore finds that a hypothetical purchaser would project marketing expenses for 1999 equal to a prorated amount of the expenses set forth in the Reese Management Team Strategic Assumptions and for 2000 would have projected an average of the prorated amount of such expenses and the monthly expenses projected by the Reese Management Team to occur in 2000.

• Based on the lack of any evidence presented at trial suggesting that Reese Corp. could have renegotiated the costs of the insurance contracts held by Reese Hospital for the "stump period" of 1998, the court finds as a factual matter that the insurance rates for the hospital would have remained the same during that time frame. The court therefore finds that a hypothetical purchaser would not have projected lower insurance rates for Reese Hospital during the "stump period" of 1998.

• For the reasons set forth above, the court finds as a factual matter that a hypothetical purchaser would use (properly) annualized 1998 figures as the starting point in determining the number of projected equivalent inpatient days ("EIPDs") for 1998. Given the absence of any evidence in the record that would allow the court to calculate an annualized figure of EIPDs for 1998, the court finds as a factual matter that the most accurate estimation of the annualized number of EIPDs at Reese Hospital as of the Transfer Date is a figure reflecting 87.25% of the EIPDs for 1997. [93] The court therefore finds as a factual matter that a hypothetical purchaser would use 87.25% of the actual 1997 EIPD figures for Reese Hospital as its starting point in determining projected EIPDs for 1998.

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 39 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

• For the reasons set forth above, the court finds as a factual matter that it would have taken eighteen months from January 1, 1999, for Reese Hospital to have achieved the Reese Management Team's Strategic Assumptions with respect to EIPD growth. (Trial Tr. 973:10–14, 1084:5–8, Jan. 25, 2007, 1666:13–16, Jan. 30, 2007 (Talbot, D.); Trial Tr. 439:20–440:4, Jan. 23, 2007 (Redman, M.); Trial Tr. 3214:12–14, Feb. 15, 2007, Yerges, J.).) The court therefore finds as a factual matter that a hypothetical purchaser would have reduced the volume increases projected by the Reese Management Team to account for this eighteen-month delay.

**\*49** • For the reasons set forth in the court's discussion of the Reese Projections, *see* part III.B.1.c.i.(B), *supra,* the court finds as a factual matter that a well-conceived, properly executed turnaround plan would have been able to reduce variable expenses at Reese Hospital, but that this plan would not have been fully effective until January 1, 1999. The court therefore finds as a factual matter that a hypothetical purchaser would have reasonably projected any decrease in costs-per-patient at Reese Hospital for the "stump period" of 1998 as a prorated average of the annualized figures for 1998 (based on year-to-date figures as of October 31, 1998) and the Reese September Projections for the last three months of 1998.

• For the reasons set forth in the court's discussion of the Reese and Demchick Projections, the court finds as a factual matter that a well conceived, properly executed turnaround plan could have reduced the FTE-to-patient ratio at Reese Hospital to a greater extent than that projected by McGladrey & Pullen, but to a lesser extent than that

projected by the Reese Management Team, *see* part III.B.C.1.i.(B)-(C), *supra,* and that the salaries for any given year would never be less than the cost of maintaining the salaries of the existing number of FTEs as of the Transfer Date in any event. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project that once the turnaround plan was fully implemented, salaries and wages at Reese Hospital would be the larger of (1) 35.31% of net patient service revenue or (2) the costs of maintaining, as of the anticipated transfer date, the number of FTEs set forth in the Reese September Projections at the hours per pay period and wage rate per hour (plus periodic inflation) set forth in those same projections. (Pl.Ex. 300 at TRUST/HCA–007627). [94]

• For the reasons set forth in the court's discussion of the Reese and Demchick Projections, the court finds as a factual As a corollary to this finding, the court finds as a factual matter that projected salaries for the "stump period" in 1998 would match the salaries projected for the last three months in 1998 in the Reese September Projections once those projections were prorated for the shorter "stump period" in 1998.

Based on these specific factual findings, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following revenue for Reese Hospital from November 12, 1998, through December 31, 2002: [95]

**\*50** Further, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following expenses for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| **Fixed Costs** | | | | | |
| Repairs & Maintenance | $698,672.94 | $4,830,090.24 | $4,974,992.95 | $5,124,242.74 | $5,277,970.02 |
| Rents & Leases | $400,391.09 | $3,071,979.12 | $3,164,138.49 | $3,259,062.65 | $3,356,834.53 |
| Utilities | $649,887.30 | $5,382,047.55 | $5,543,508.97 | $5,709,814.24 | $5,881,108.67 |
| Other Professional Fees | $33,483.33 | $256,899.17 | $264,606.14 | $272,544.33 | $280,720.66 |

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 40 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | | | | |
|---|---|---|---|---|---|
| Marketing Expense | $0.00 | $1,442,000.00 | $831,725.00 | $178,190.00 | $183,535.70 |
| Other Taxes (Real Estate) | $ 193,229.03 | $1,482,539.85 | $1,527,016.05 | $1,572,826.53 | $1,620,011.33 |
| Insurance | $1,147,723.29 | $4,202,400.00 | $4,397,255.40 | $4,602,083.47 | $4,817,431.00 |
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Other Operating Expenses | $5 66,960.63 | $4,276,492.50 | $4,567,270.48 | $4,871,957.72 | $4,950,447.21 |
| Total Fixed Expenses | $6,885,147.61 | $34,027,448.43 | $35,922,513.48 | $36,710,721.67 | $37,954,059.10 |
| Variable Costs | | | | | |
| Salaries & Wages | $8,704,816.44 | $66,176,937.60 | $68,162,245.73 | $71,567,842.03 | $75,771,054.67 |
| Contract Labor | $597,047.68 | $2,965,946.75 | $3,302,514.89 | $3,697,745.36 | $3,914,915.66 |
| Employee Benefits | $1,784,922.61 | $13,235,387.52 | $13,632,449.15 | $14,313,568.41 | $15,154,210.93 |
| Professional Fees | $1,682,837.25 | $12,140,340.00 | $13,970,585.96 | $15,981,141.90 | $17,593,340.68 |
| Supplies & Other | $2,742,195.97 | $23,798,567.97 | $26,227,299.52 | $28,783,622.88 | $30,599,332.50 |
| Other Taxes (Sales & Use) | $119,317.72 | $915,455.76 | $942,919.43 | $971,207.02 | $976,033.81 |
| Contract Services | $3,046,059.83 | $20,594,805.75 | $22,640,133.19 | $24,715,409.65 | $26,221,712.32 |
| Bad Debts | $1,306,567.77 | $5,749,399.46 | $6,401,826.77 | $7,167,969.27 | $7,588,947.43 |
| Total Variable Costs | $19,983,765.28 | $145,576,840.81 | $155,279,974.64 | $167,198,506.51 | $177,819,548.00 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |

Combining these projections, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following EBIT for Reese Hospital from November 12, 1998, through December 31, 2002:

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |
| Total Operating Expenses | $26,868,912.89 | $179,604,289.24 | $191,202,488.12 | $203,909,228.18 | $215,773,607.11 |
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 41 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

### ii. *Net cash flow*

 **\*51**  The second step in determining the enterprise value of a business is to ascertain its net cash flow for each of the years in which projections are made. To arrive at this figure, the factfinder must add projected depreciation and amortization to and subtract projected income taxes, net working capital expenditures, and capital expenditures from the projected EBIT. Fishman et al., *supra*, ¶¶ 505.25, 505.39–505.43 & Ex. 5–20. (Trial Tr. 2120:18–2121:12, Feb. 6, 2007 (Demchick, N.); Defs. Ex. JV at Ex. 2–8–2–9.) The court addresses each of these components of the net cash flow equation in turn.

#### (A) *Depreciation and amortization*

Moss and Demchick provided different projections for depreciation and amortization in their respective DCF analyses. Moss adopted the Reese Management Team projected figures as his own; Demchick created his own figures supposedly "based upon Reese projections," (Pl.Ex. 209 at Ex. I n. 5), but they are actually much smaller in amount, (Pl.Ex. 209 at Ex. I (projecting $5,894,390.00 in depreciation and amortization for 1999 as compared with the $9,056,000.00 projected by the Reese Management Team)). In the absence of any evidence in the record as to the lack of reasonableness of the Reese Projections with respect to depreciation and amortization, [97] the court finds as a factual matter that these projections are reasonable and adopts them for purposes of the court's findings of fact with respect to the projected net cash flow at Reese Hospital.

#### (B) *Income taxes*

"The company's expected federal and state tax rates should be used" in projecting income taxes for the business subject to valuation. Fishman et al., *supra*, ¶ 505.25. The Illinois corporate income tax during the years for which the court's projections have been made was 4.8%, 35 Ill. Comp. Stat. 5/201 (1990), and the federal rate was 34% for taxable income between $335,000.00 and $10,000,000.00 and 35% for taxable income between $10,000,000.00 and $15,000,000.00. Fishman et al., *supra*, at Ex. 5–18. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project state and federal income taxes totaling 38.80% of the projected EBIT for Reese Hospital in 2002. [98]

#### (C) *Net working capital*

Both Moss and Demchick provided projections for capital that would need to be invested at Reese Hospital to ensure a sufficient amount of net working capital to finance accounts receivable, inventory, and the like on a forward-going basis. (Trial Tr. 2121:2–7, Feb. 6, 2007 (Demchick, N.).) (Neither expert reduced the projected net working capital requirements by the approximately $20,600,000 net working capital that Reese Hospital. purchased from HCA. That $20,600,000 is taken into account by the court in the reconciliation process.) Demchick based his projections for net working capital off of the historic average of net working capital required as a percentage of total net revenue. (Pl.Ex. 209 at Ex. O.) Moss used a percentage of total net revenue "based on [the] guideline companies median level." (Defs. Ex. JV at Ex. 2– Ex. 6.) Moss gives no explanation as to which companies he used as a guideline, and in any event Demchick's method of determining the projected net working capital demands of the hospital reflects more faithfully the idiosyncracies of Reese Hospital. The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project net working capital infusions to be the difference between the prior year's net working capital and 10% of the total net revenue for the year in which the projection of net working capital is made.

#### (D) *Capital expenditures*

 **\*52**  Demchick and Moss also differed with respect to projected capital expenditures to made over the course of the five years following the Transfer Date. Moss's projections, "based on projections from Doctors Community Healthcare Corporation," (Defs. Ex. JV at Ex. 6 n. 3), contemplate $9,730,000.00 in capital expenditures in the "stump period" of 1998, $15,800,000.00 in capital expenditures in 1999, and $4,000,000.00 in annual expenditures thereafter. (Defs. Ex. JV at Ex. 2–Ex. 6.) Demchick projects capital expenditures in the amount of $3,036,986.00 in 1998, $19,350,000.00 in 1999, $10,350,000.00 in 2000, and $4,000,000.00 in the years thereafter, (Pl.Ex. 209 at Ex. N–1).

Neither of these projections strike the court as reasonable. Added together, Moss's projected capital expenditures total $37,530,000.00. This is $6.67 million *less* than the capital expenditures contemplated in the Reese Management Team Strategic Assumptions. [99] Even if one were to assume that Reese Corp. would not make an expenditure of $4 million in 1998, the capital expenditures projected by Moss do not meet the requirements of the Strategic Assumptions.

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 42 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

Demchick's projections are no better. His Turnaround Scenario assumes that, except for computer upgrades, all capital expenditures will be spent evenly over the course of 1999 and 2000. (Trial Tr. 2127:11–2128:21, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. N–1.) This projection is unreasonable: a hypothetical purchaser with sufficient capital to purchase Reese Hospital would expend capital as quickly as possible to achieve operational turnaround more quickly, and would presumably prioritize some projects (*e.g.,* purchasing new cardiac catheterization equipment) over others (*e.g.,* the construction of an SNF unit). The Strategic Assumptions contain just this sort of prioritization. (*See* Pl.Ex. 115 (assuming that some expenditures will be made in 1998 and others in 1999).)

Moreover, both Moss and Demchick project capital expenditures for projects that were not included in the Reese Projections without modifying those projections to account for the benefits one would expect from the omitted projects. (Trial Tr. 3485:19–3486:17, Feb. 20, 2007 (Moss, K.) ("Q.... [D]id you include the six million as part of the capital expenditures on Exhibit 6 to your report? A. The six million is in there. Q.... [D]o the ... DCHC projections account for the increased revenue resulting from that capital expenditure? A. No, you do not see those projections."); *compare* Pl.Ex. 209 at Ex. N–1 (projecting expenditures for, *inter alia,* 25–bed SNF unit) *with* Trial Tr. 4249:20–4250:5, March 1, 2007 (Demchick, N.) ("For the skilled nursing facility, the strategic assumptions are silent as to whether it's included or not. But if we look through the projections, there does not appear to be any indication that it is included.").) This is manifestly unreasonable. A hypothetical purchaser would not want to expend capital on projects so speculative that the purchaser cannot even project any benefits arising from those projects. Capital expenditures of this nature should have been removed from the expert witness' projections.

 **\*53**  The court therefore finds as a factual matter that neither Kevin Moss nor Neil Demchick accurately projected the capital expenditures that a hypothetical purchaser would reasonably project for the years following the Transfer Date. Instead, the court finds that the expenditures contemplated in the Strategic Assumptions are reasonable and has created its own projections for capital expenditures based on those assumptions with the following modifications:

- For the reasons set forth above, the court finds as a factual matter that a hypothetical purchaser would not reasonably project capital expenditures towards the acquisition of a linear accelerator and 25–bed SNF unit

in 1999. *See* discussion, *supra.* Therefore, the court does not include these expenditures in its calculation of projected capital expenditures.

- The court finds as a factual matter that it would have taken until the end of 1999 for a hypothetical purchaser to relocate the ER at Reese Hospital because a project of that size and complexity would take approximately one year to complete at a minimum. (*See* Bauer Dep. 53:19–25, June 14, 2006 (describing the ER relocation project as a project that "would have required a major renovation of existing space").) The court therefore finds as a factual matter that a hypothetical purchaser would reasonably project capital expenditures totaling the amount contemplated in the Strategic Assumptions to be spread out over the "stump period" of 1998 and all of 1999.

- For the same reason, the court finds as a factual matter that it would have taken until the end of 1999 for a hypothetical purchaser to complete cosmetic enhancements to Reese Hospital, and therefore finds as a factual matter that a hypothetical purchaser would reasonably project capital expenditures totaling the amount contemplated in the Strategic Assumptions to be spread out over the "stump period" of 1998 and all of 1999. *See* discussion, *supra.*

- Based on the agreement of the parties that the Reese Management Team contemplated annual capital expenditures of $4 million in addition to the expenditures listed in the Strategic Assumptions, (Defs. Ex. JV at Ex. 2–Ex.6; Pl.Ex. 209 at Ex. N1), the court finds as a factual matter that a hypothetical purchaser would reasonably project miscellaneous capital expenditures equal to the prorated amount projected by the Reese Management Team for 1998 ($536,986.30) and miscellaneous expenditures totaling the amount projected by the team ($4,000,000.00) thereafter.

Based on the Reese Management Team's Strategic Assumptions as modified above, the court finds as a factual matter that a hypothetical purchaser would have projected capital expenditures totaling $4,769,595.00 in 1998, [100] $16,967,391.30 in 1999, [101] and $4,000,000.00 every year thereafter.


(E) *Final net cash flow*

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 43 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Based on the specific factual findings set forth above, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following net cash flow adjustments for Reese Hospital from November 12, 1998, through December 31, 2002:

|  | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Depreciation & Amortization | $3,194,800.00 | $9,083,000.00 | $10,652,000.00 | $11,120,000.00 | $11,586,000.00 |
| Income Taxes | $0.00 | $0.00 | $0.00 | $0.00 | -$4,139,258.31 |
| Net Working Capital | -$21,937.09 | -$1,442,264.86 | -$2,016,133.32 | -$2,270,930.85 | -$1,240,245.90 |
| Capital Expenditures | -$4,769,595.00 | -$16,967,391.30 | -$4,000,000.00 | -$4,000,000.00 | -$4,000,000.00 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |

**\*54** Combining these figures to the projected EBIT for Reese Hospital calculated above, *see* part III.B.1.c.i, *supra*, the court finds as a factual matter that a hypothetical purchaser would reasonably project the following net cash flow at Reese Hospital from November 12, 1998, through December 31, 2002:

|  | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| EBIT | -$5,826,292.58 | -$8,435,591.36 | $127,543.00 | $10,130,111.47 | $10,668,191.52 |
| Total Cash Flow Adjustments | -$1,596,732.09 | -$9,326,656.17 | $4,635,866.68 | $4,849,069.15 | $2,206,495.79 |
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |

### iii. *Weighted average cost of capital*

The next step in the court's determination of the business enterprise value of Reese Hospital under the income approach is to determine the appropriate discount rate to apply to the projected net cash flow set forth above. "[A] discount rate represents the total expected rate of return (stated as a percentage) that a buyer (or investor) would demand on the purchase price of an ownership interest in an asset (such as U.S. Treasury bills) given the level of risk inherent in that ownership interest." Fishman et al., *supra*, ¶ 501.2. "A company's forecasted net cash flows or earnings are discounted to a present value at the discount rate." *Id.* ¶ 501.3.

Both Demchick and Moss went beyond formulating a discount rate to apply to the projected net cash flow at Reese Hospital by considering both the cost of equity (the discount rate) and the cost of debt to arrive at a weighted average cost of capital, or "WACC." As Neil Demchick explained at trial, "[i]f you were doing an equity value, you would only look at the cost of the equity, but because we are doing a business enterprise value, it is the weighted average cost of capital, which is a weighing of the cost of equity and the cost of debt." (Trial Tr. 2109:5–9, Feb. 6, 2007 (Demchick, N.).) The cost of debt must be adjusted by the applicable tax rate to arrive at an after-tax cost of debt. Shannon P. Pratt et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* 185 (4th ed.2000). The cost of capital and after-tax cost of debt is then weighted and averaged to arrive at the WACC. *Id.*

### (A) *Discount rate (cost of equity)*

"[T]here are two primary techniques for determining a company's discount rate—the build-up method and the [capital asset pricing model ('CAPM') ] method, which is based on guideline company data." Fishman, et al., *supra*, ¶ 502.1. Demchick used the buildup method to derive a discount rate; Moss chose the CAPM method. (*See* Trial Tr. 2108:17–2119:16, 2129:15–2130:13, Feb. 6, 2007 (Demchick, N.) (explaining the process whereby Demchick

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 44 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

arrived at his discount rate); Trial Tr. 3500:14–3502:12, Feb. 20, 2007 (Moss, K.) (explaining the process whereby Moss arrived at his discount rate); *see also* Pl.Ex. 209 at Ex. M–1 (showing the calculations made by Demchick to reach a discount rate); Defs. Ex. JV at Ex. 2–Ex. 8 (showing the calculations made by Moss to reach a discount rate).) The build-up method is "[t] he most commonly used method for the smaller, closely held company," Fishman et al., *supra,* ¶ 502.1, whereas "[a] method based on guideline company data [*i.e.,* the CAPM method] should be used instead of the build-up method whenever valid guideline company data can be found," *Id.* ¶ 503.1.

**\*55** In this case, the build-up method is the appropriate method to determine the discount rate to be applied to the projected net cash flow at Reese Hospital because the companies used by Moss as guidelines for his CAPM method are not truly comparable to Reese Hospital. The build-up method requires the valuation consultant to determine the appropriate risk-free rate of return for a hypothetical investor, add a premium for extra risk assumed by the investor in purchasing equity, then add or subtract risk premiums from the resultant average market return for the business's industry and size, as well as for any other relevant risk factors. *Id.* ¶ 502.1, Ex. 5–7.

**(I)** *Risk-free rate*

"The risk-free rate of return is the return an investor could obtain from a low-risk guaranteed investment." *Id.* ¶ 502.4. Demchick used a risk-free rate of 5.50% in calculating his discount rate. (Pl.Ex. 209 at Ex. M–1.) Moss used a risk-free rate of 5.46% in calculating his discount rate using the CAPM method. (Defs. Ex. JV at Ex. 2–Ex. 8.) [102]

"Most consultants use the 20–year U.S. Treasury yield to maturity as of the valuation date as the risk free rate because it most closely corresponds to the time horizon of many equity holders in closely held companies." *Id.* The risk-free rate of return for the 20–year Treasury Bill, Constant Maturity Rate as of November 12, 1998, was 5.46%. Federal Reserve Statistical Release H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/19981116/. The court therefore finds as a factual matter that the appropriate risk-free rate in calculating a discount rate is 5.46 percent. [103]

**(II)** *Equity risk premium*

"The equity risk premium is the extra return earned by an average equity investor in excess of the return on long-term Treasury securities." Fishman et al., *supra* ¶ 502.7. Demchick used an equity risk premium of 7.80% . (Pl.Ex. 209 at Ex. M–1.) Moss used an equity risk premium of 5.88% in calculating his discount rate using the CAPM method. (Defs. Ex. JV at Ex. 2–Ex. 8.) Demchick arrived at his equity risk premium by relying on data set forth in *Stocks, Bonds, Bills and Inflation 1998 Yearbook,* Ibbotson Associates, Inc. (1998) (the "Ibbotson 1998 Yearbook"). (Trial Tr. 2110:21–2111:12, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. M–1 n. 2.) Moss arrived at his equity risk premium by relying on internal rates used at his accounting firm, Deloitte Financial Advisory Services, LLP. (Defs. Ex. JV at Ex. 2–Ex. 8.)

As Neil Demchick correctly noted at trial, the Ibbotson yearbook "is sort of the Bible," (Trial Tr. 2111:10, Feb. 6, 2007 (Demchick, N.)), for determining equity risk premiums. *See* Fishman et al, *supra,* ¶ 502.7 (recommending use of the Ibbotson yearbook). Moss himself relies on data provided by the Ibbotson 1998 Yearbook in determining the appropriate size premium to use in calculating the discount rate. *See* part III.B.1.c.iii.A.(IV), *infra.* The court prefers "the most used well-known and widely used" source for determining equity risk premiums, Fishman et al., *supra,* ¶ 502.7, over the internal rates used at Kevin Moss's place of employment. The court therefore finds as a factual matter that the appropriate equity risk premium to be used in calculating the discount rate is 7.80 percent.

**(III)** *Industry risk premium*

**\*56** Having determined the risk-free rate of return and the equity risk premium, the court must now determine the extent to which the average market return obtained by adding those rates should be adjusted to account for an industry risk premium. Fishman et al., *supra,* ¶ 502.18. "Industry risk represents the risks in the company's industry compared to the market as a whole." *Id.* ¶ 502.20. The industry risk premium takes into account the fact that "some industries have higher-than-average risk for investors, and other industries have lower-than-average risk." *Id.*

Demchick adjusted his average market return by subtracting 3.63% as a size premium. He explained that he reduced his average market return by this amount because "the health care industry is actually an industry that is not seen as [being as] risky as other industries or as the market as a

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 45 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

whole," (Trial Tr. 2112:24–2113:1, Feb. 6, 2007 (Demchick, N.)), and specifically took the figure of 3.63% from the Ibbotson 1998 Yearbook, (Trial Tr. 2113:1–10, Feb. 6, 2007 (Demchick, N.)). Moss did not provide an industry risk premium adjustment as part of his CAPM analysis. *See* n. 98, *supra.*

Demchick's analysis is sound, contradicts his client's interest in inflating the discount rate as much as possible, and is not disputed by any evidence in the record. The court therefore finds that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be reduced 3.63% to account for the appropriate industry risk premium.

### (IV) *Risk premium for size*

The average market return should also be adjusted for a risk premium relating to the size of the company that is being valued. Fishman et al., *supra,* ¶ 502.18. Both Demchick and Moss cited Ibbotson as the source for their respective size adjustments, but they arrived at different figures. Demchick used a size premium adjustment of 3.30%, (Pl.Ex. 209 at Ex. M–1), whereas Moss used a size premium adjustment of 5.40% in calculating his discount rate using the CAPM method, (Defs. Ex. JV at Ex. 2–Ex. 8).

The court agrees with both experts that the Ibbotson 1998 Yearbook is "[a] good starting point for determining a risk premium for the size of a company." Fishman et al., *supra,* ¶ 502.26. The Ibbotson 1998 Yearbook provides size premiums for companies according to the amount of their market capitalization. Ibbotson 1998 Yearbook, *supra,* at Table 7–6. Different size premiums are used depending upon the decile of market capitalization into which the company being valued falls. *Id.* The tenth, or lowest, decile assigned a size premium is reserved for companies with $130,402,000.00 in market capitalization or less. *Id.* at Table 7–5.

The Reese Management Team anticipated that Reese Hospital would receive equity contributions in the amount of $10 million in 1999. (Pl.Ex.115.) Although it is logical to assume that a hypothetical purchaser with more capital would be willing to invest more money than that in the hospital, it is not reasonable to assume that such a purchaser would invest more than twice the hospital's purchase price anytime soon after purchasing it. The court therefore finds as a factual matter that the average market return calculated by adding the

appropriate risk-free rate of return to the appropriate equity risk premium should be increased 5.36% to account for the appropriate risk premium for size. [104]

### (V) *Specific company risk premium*

**\*57** The final adjustment that the court needs to make is for risk factors specific to Reese Hospital. Fishman et al., *supra,* ¶ 502.19. "The determination of other risk factors ... that should be considered in building up a ... discount rate involves a great deal of judgment—perhaps more so than any other rate component." *Id.* ¶ 502.33. Based on the projections arising from his Strategic Growth Scenario, Demchick used a specific company risk premium of 12% to create a discount rate for his Turnaround Scenario. (Trial Tr. 2129:15–2130:11, Feb. 6, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. M–1.) [105] Moss used a specific company risk premium of 23% to create a discount rate for the DCHC Projections using the CAPM method. (Defs. Ex. JV at Ex.2–Ex.8.)

Moss's specific company risk premium of 23% reflects the comparatively higher probability that Reese Hospital would fail to meet the projections made by the Reese Management Team, whereas Demchick's lower premium of 12% reflects his modification to those projections by delaying revenue growth and expense reductions over the course of one year. The court's findings of fact with respect to projected EBIT at Reese Hospital are even more conservative than Demchick's Strategic Growth Scenario in most respects (*e.g.,* the court finds as a factual matter that it would have taken Reese Hospital eighteen months to reach the volume levels projected by the Reese Hospital Team, whereas Demchick assumed that it would take the hospital one year to reach the revenue), but are less conservative in others (*e.g.,* the court finds as a factual matter that Reese Hospital would have been able to reduce its salary-related expenses to lower levels than those assumed by Demchick). Given that Demchick testified that his specific company risk premium was probably too low, (Trial Tr. 2130:8–9, Feb. 6, 2007 (Demchick, N.)), the court finds as a factual matter that the average market return calculated by adding the appropriate risk-free rate of return to the appropriate equity risk premium should be increased by 13.50%, slightly more than the adjustment made by Demchick, to account for the appropriate specific company risk premium.

### (B) *After-tax cost of debt*

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 46 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

The court has already found as a factual matter that the appropriate income tax rate to be applied to the cost of debt is 0% for the years 1998–2001 and 38.8% for 2002. *See* part III.B.1.c.ii.B, *supra.* The only remaining question is whether the pre-tax cost of debt should be the 12.00% figure used by Demchick, (Pl.Ex. 209 at Ex. M–1), the 7.30% figured used by Moss, (Defs. Ex. JV at Ex. 2–Ex. 8), or a different figure altogether.

The court finds as a factual matter that the 7.30% figure used by Moss is the appropriate pre-tax cost of debt to use in calculating the WACC. This figure is based on Moody's Baa corporate bond rate on November 12, 1998. (Defs. Ex. JV at Ex. 2–Ex. 8.) Demchick, in contrast, admitted under cross-examination that he based his cost of debt on the interest rate charged by NCFE. (Trial Tr. 2313:7–10, Feb. 7, 2007 (Demchick, N.) ("Q.... Now your pretax cost of debt, that I believe you selected based on the NCFE lending rate? A. Yes."); *see also* Pl.Ex. 209 at Ex. 54 (describing the cost of debt as "based upon" the "NCFE interest rate").) [106] Demchick's use of the actual interest rate charged by NCFE was in error, as Kevin Moss explained at trial:

**\*58**  Q. Simply focusing on the borrowing rate, what is reflected there is 7.3 percent and the source is Moody's B corporate bond rate as of November 12, 1998. Why did you select that borrowing rate for your cost of debt capital?

A. When doing the analysis, we are looking at what the typical buyer would do. We are looking at the financing of the typical buyer in the market. The discount rate is a blending of the equity rate and the debt rate. In this case, the market data shows that the companies that were capitalized out there, the public companies were 60 percent equity, 40 percent debt.

So, this 7.3 percent is based on somebody coming in and capitalizing this business with 40 percent debt.

Q. Why did you choose the Moody's B rate?

A. The Moody's B rate represents a rate that is not a junk quality of debt, but still a good quality debt rate. If you look at these assets, just to give you a feel for the Reese business, what this implies is a 40 percent debt load on the facility.

So, let's just say the facility is worth $80 million. That is the enterprise value for the facility, okay. An $80 million facility, it is easy to do the math on 40 percent debt on

that. That is going to be $32 million. So, four times the eight gets you to [$]32 million in debt. So, what the valuation analysis implies here and what is used in the capital structure is it assumes that the typical buyer, they pay an $80 million price. They finance it [$]32 million with debt and the rest is financed with equity.

Now, can they put [$] 32 million in debt on this facility at a B double A rate?

Well, the facility has [$]29 million in accounts receivable. It has roughly another five million in supplies [and] inventory and then you get to the personal property and the real estate values. So, there is ample collateralizable value there to have a B double A rate for somebody looking at purchasing the facility.

(Trial Tr. 3512:15–3513:25, Feb. 20, 2007 (Moss, K.))

The court has already found as a factual matter that the fair market value of the net assets at Reese Hospital approximates $57,985,984. *See* part III. B.1.b.v, *supra.* This implies that the assets at Reese Hospital could have been used as collateral to support a purchase price as high as $134,002,320.19. [107] Any purchaser with a reasonable amount of investment capital could afford to purchase the hospital; therefore, the court finds as a factual matter that the Moody's Baa rate as of November 12, 1998, is the appropriate cost of debt to be used in calculating the WACC to be applied to the projected net cash flow at Reese Hospital.

### (C) *Debt-to-equity ratio*

Demchick and Moss used similar, though not identical, debt-to-equity ratios in crafting their respective WACCs. Demchick relied on "levels of the industry during the time period per www.estatementstudies.com" to arrive at an applicable debt-to-equity ratio of 43.1% to 56.9 percent. (Pl.Ex. 209 at Ex. M–1.) Moss relied on "comparable company research" to arrive at a similar ratio of 40% to 60 percent. (Defs. Ex. JV at Ex. 2–Ex. 8.) In the absence of any evidence in the record as to which companies Moss used as his guidelines in formulating his debt-to-equity ratio, the court finds as a factual matter that Demchick's ratio of 43.1% debt to 56.9% equity is appropriate.

### (D) *Final WACC calculation*

**\*59**  Based on the foregoing factual findings, the court finds as a factual matter that the following calculation represents the appropriate cost of equity to apply to the projected net

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 47 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | |
|---|---|
| Risk–Free Rate | 5.46% |
| Equity Risk Premium | + 7.80% |
| Average Market Return | 13.26% |
| Industry Premium Adjustment | −3.63% |
| Size Premium Adjustment | 5.36% |
| Specific Company Risk Premium Adjustment | + 13.50% |
| Cost of Equity | 28.49% |

The court further finds as a factual matter that the following calculation represents the appropriate after-tax cost of debt to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|
| Pre–Tax Cost of Debt | 7.30% | 7.30% |
| Income Tax Rate | x (1—0.00%) | x (1—38.80%) |
| After Tax Cost of Debt | 7.30% | 4.47% |

Applying the appropriate debt-to-equity ratio to the cost of equity and after tax cost of debt, the court finds as a factual matter that the following calculation represents the appropriate equity portion of WACC and debt portion of WACC to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|
| Cost of Equity | 28.49% | 28.49% |
| Percent of Equity | x 56.90% | x 56.90% |
| Equity Portion of WACC | 16.21% | 16.21% |
| After Tax Cost of Debt | 7.30% | 4.47% |
| Percent of Debt | x 43.10% | x 43.10% |
| Debt Portion of WACC | 3.15% | 1.93% |

Combining these weighted figures, the court finds as a factual finding that the following calculation represents the appropriate WACC to apply to the projected net cash flows at Reese Hospital from the "stump period" of 1998 through 2002:

| | 11/13/98–2001 | 2002 |
|---|---|---|

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 48 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

| | | |
|---|---|---|
| Equity Portion of WACC | 16.21% | 16.21% |
| Debt Portion of WACC | + 3.15% | + 1.93% |
| WACC | 19.36% | 18.14% |

#### iv. *Terminal value*

The fourth step in the court's determination of the business enterprise value of Reese Hospital using the income approach is to ascertain a terminal value for the hospital. Fishman et al., *supra*, ¶¶ 505.3, 505.45, Ex. 5–20. The terminal value of a company is the value of the company as of "the first full year after the company reaches a stabilized level of growth and sustainable profit margins." *Id.* ¶ 505.45. Although "[s]everal methods can be used to estimate the value of a company during the terminal year," *id.* at ¶ 505.46, "the one that is most often used by valuation consultants[ ] is the capitalization of the terminal year operations based on the Gordon Model." *Id.* The Gordon Model derives the terminal value of a company by dividing the terminal net cash flow (the first net cash flow resulting from a stabilized level of growth) by the discount rate less long-term growth. *Id.* at ¶¶ 505.46.

**\*60**  Kevin Moss used a different method for determining the terminal value of Reese Hospital. He multiplied the terminal EBITDA by a market multiple of five to arrive at a terminal value. (Trial Tr. 2502:23–3503:1, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2–9, Ex. 2–Ex. 6.) Moss explained his decision to use an EBITDA multiple as follows:

> I know that normally in an income approach, people think of, well, you have the discount rate that goes the whole period of the cash flows. The terminal value is the discount rate minus some growth assumption and that is the value of the business. But the problem you have in a business like this is it's looking very different four years from now. If I used a high discount rate over the life of the entire business, you come up with a value that doesn't make sense in 2002 for the business.
>
> ...
>
> From amongst the three methods you can use in the income approach, in this situation, I think it was preferable to do it this way and that's why I did it like this. The multiples in the market are very well known. I guess one important thing that people miss in a multiple is a market multiple is just the inverse of that cap rate that I mentioned. So,

market multiples are impacted by risk and growth. Cap rates are just that. They are risk and growth. Those are the two factors that go into the cap rate.

So, when you develop your cap rate, you use your market data. A cap rate would be the economic information showing the three percent growth. You would be calculating a discount rate using [CAPM] and [CAPM] is driven off of market data. Your growth is driven off of market data. A market multiple is the same thing. It's working off of market data. What are investors paying and what are their views with respect to risk and growth?

On a hospital, in a hospital that is a profitable hospital facility, it's generating a decent margin like the rest of the industry, which is what we show Reese doing in 2002. You can get a five times EBITDA multiple on this facility.

So, I did it that way because it is a cleaner depiction of value.

(Trial Tr. 3504:4–12, 3509:5–3510:3, Feb. 20, 2007 (Moss, K.).)

While the court recognizes that the market multiple method is a procedure "commonly used to estimate the terminal value," Pratt et al., *supra*, at 186, it finds as a factual matter that the market multiple method is not the appropriate way to determine the terminal value in this particular case. First, "[t]he market multiple brings a major element of the market approach into the income approach," *id.* at 187, and "[m]any valuation analysts prefer to keep the income approach and market approach as discrete from each other as possible," *id.* Moreover, Moss testified that "a market multiple is just the inverse of [a] cap[italization] rate," (Trial Tr. 3509:9–10, Feb. 20, 2007 (Moss, K.)), and that a market multiple has to be adjusted to capture the risk in attaining the terminal net cash flow, (Trial Tr. 3510:4–15, Feb. 20, 2007 (Moss, K.) ("A hospital that is profitable from the get go would be seven times EBITDA for a big, profitable hospital. The hospital that we have here in 2002 was valued using a five times EBITDA multiple. So, there is a 30 percent discount in value right there."). This suggests that a market multiple is really

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 49 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

just an easier way of making the same calculation performed (with more rigor) by the Gordon Model. (*See, e.g.,* Trial Tr. 3511:10–3512:10, Feb. 20, 2007 (Moss, K.) (explaining that the "five times EBITDA multiple" used by Moss was the standard multiple that he personally used when advising investment bankers in the late 1990s); Defs. Ex. JV at Ex. 2–9 (explaining that EBITDA multiple was based on "observed EBITDA multiples for publicly traded healthcare providers and private hospital transactions").)

**\*61**  The court therefore finds as a factual matter that the Gordon Model is the appropriate method for determining the terminal value of Reese Hospital. The court does, however, recognize the point made by Moss that the market multiple method has value as a "sanity check" for the figure derived through the Gordon Model. (Trial Tr. 3511:25–3512:4, Feb. 20, 2007 (Moss, K.).) The court therefore finds as a factual matter that it is appropriate to determine the implied EBITDA multiple arising from the terminal value calculated using the Gordon Model as a "sanity check" on the Gordon Model approach.

Unlike Moss, Neil Demchick used the Gordon Model to arrive at his terminal value. (Trial Tr. 2314:23–2316:22,

Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at Exs. G, H.) He assumed long-term growth of five percent for his Strategic Growth Scenario. (Trial Tr. 2482:23–2483:5, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at Ex. H.) However, the court has already found that the long-term growth in volume projected in the Reese October Projections provides a more accurate gauge of the long-term growth to be expected at Reese Hospital. *See* part III.B.1.c.i.(D), *supra.* The court has therefore calculated long-term growth of EBIT based on the 7% long-term growth in volume projected by Reese Corp. Compared to 2001, the terminal year 2002 shows approximately a 5.31% growth in EBIT, representing the presumed long-term growth in revenues. As noted previously, in calculating the terminal value, the terminal net cash flow must be divided by the discount rate less long-term growth. Accordingly, the court reduced the WACC figure (of approximately 18.14%) by the presumed long-term growth of revenues (of approximately 5.31%), to arrive at a rate of 12.82 % to be used in computing the terminal value.

Based on these findings of fact, the court finds as a factual matter that the following calculation represents the appropriate terminal value for Reese Hospital:

| | |
|---|---:|
| Terminal Net Cash Flow | $12,874,687.31 |
| Adjusted Discount Rate for Terminal Net Cash Flow | ÷ 12.82% |
| Terminal Value | $100,390,116.02 |

### v. Present value of net cash flow and terminal value

The penultimate step in determining the business enterprise value of Reese Hospital as of the Transfer is to determine the present value of the projected net cash flows and projected terminal value of the hospital. Fishman et al., *supra,* ¶¶ 505.3, 505.50, Ex. 5–20. The present value is determined by dividing the full value (*i.e.,* the discounted projected net cash flows and capitalized terminal value) by 100% of that net cash flow or terminal value plus the applicable discount or capitalization rate raised to a pre-determined discount period exponentially. *Id.* ¶ 505.51. "Whenever a company's terminal value is estimated using the Gordon Model, ... it should be discounted back to a present value using the same term as the last year of the forecast." *Id.* ¶ 505.52.

**\*62**  Demchick calculated his discount period by dividing the days in the "stump period" of 1998(49) by the total number of days in the year (365) and then adding one period for every

year thereafter. (Trial Tr. 2316:24–2317:11, Feb. 7, 2007 (Demchick, N.).) Moss, on the other hand, used a mid-year discounting convention to arrive at a discount period. (Trial Tr. 3740:24–3741:11, Feb. 21, 2007 (Moss, K.).) This method "assumes that annual cash flows or earnings are received, on average, at the middle of each period." Fishman et al., *supra,* ¶ 505.58.

The court finds as a factual matter that it is appropriate to use a mid-year discounting convention in determining the present value of the projected net cash flow and terminal value for Reese Hospital. As Kevin Moss pointed out at trial, "[t]he cash flows in a hospital facility are fairly evenly distributed throughout the year." (Trial Tr. 3844:16–17, Feb. 21, 2007 (Moss, K.).) The most effective way to reflect this steady stream of cash is to use the mid-year convention. Fishman et al., *supra,* ¶ 505.58.

Case 09-10138-MFW Doc 14225-22 Filed 08/15/14 Page 50 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

The court does not, however, adopt Moss's discount period methodology *in toto.* Moss applied his mid-year convention to a terminal value derived from a market multiple, *see* part III.B.1.c.iv, *supra,* whereas the court has found as a factual matter that the Gordon Model is the appropriate way to determine the terminal value for Reese Hospital. *Id.* The use of a mid-year convention requires that the court alter its calculation of the terminal value because the Gordon Model "assumes that cash flows will be received at the end of each year, which is inconsistent with the preceding mid-year discounting technique." Fishman et al., *supra,* ¶ 505.61. The calculation should be modified by multiplying the terminal net cash flow by 100% plus the WACC raised to the ½ power before dividing the resulting figure by the WACC less long-term growth.

The court therefore finds as a factual matter that the appropriate discount period to be applied to the calculation for determining the present value of the net cash flow and terminal value projected for Reese Hospital is .07 for the "stump period" in 1998, [108] .64 for 1999, [109] 1.64 for 2000, 2.64 for 2001, 3.64 for 2002, and 4.14 for the terminal value. The court further finds that the following calculation represents the terminal value at Reese Hospital using the modified Gordon Model:

Combining these findings, the court finds as a factual matter that the following calculation represents the present value of the projected net cash flows at Reese Hospital from November 13, 1998, through December 31, 2002:

| | 11/13/98–12/31/98 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Net Cash Flow | -$7,423,024.67 | -$17,762,247.53 | $4,763,409.68 | $14,979,180.61 | $12,874,687.31 |
| Discount Factor | $\div (1 + 19.36\%)^{0.07}$ | $\div (1 + 19.36\%)^{0.64}$ | $\div (1 + 19.36\%)^{1.64}$ | $\div (1 + 19.36\%)^{2.64}$ | $\div (1 + 18.14\%)^{3.64}$ |
| Present Value of Net Cash Flows | -$7,331,646.61 | -$15,860,431.89 | $3,563,581.79 | $9,388,766.96 | $7,018,763.88 |

**\*63** The court further finds as a factual matter that the following calculation represents the present value of the terminal value:

| | |
|---|---|
| Terminal Value (under modified Gordon Model) | $109,114,564.17 |
| Discount Factor | $\div (1 + 18.14\%)^{4.14}$ |
| Present Value of Terminal Value | $54,728,670.52 |

### vi. *Non-operating and excess assets*

The last step in determining the final business enterprise value of Reese Hospital under the income approach is to add the non-operating and excess assets purchased by Reese Corp. in exchange for the Reese Transfers. *Id.* ¶ 505.65. Moss anticipated income from the sale of excess land at the Reese Hospital campus in the amount of $6.65 million based upon the valuation performed by Kimmel. (Trial Tr. 3516:1–10, Feb. 20, 2007 (Moss, K.); Defs. Ex. JV at Ex. 2–Ex. 6). Demchick estimated the value of excess land at the Reese Hospital campus to be at most $5 million. (Trial Tr. 2178:18–2179:5, Feb. 7, 2007 (Demchick, N.); Pl.Ex. 209 at 60.)

The court does not credit either witness's testimony in this regard. As Robert Wilson explained in his expert testimony, any unused land at the Reese Hospital campus would ordinarily be classified as "surplus," *i.e.,* unsaleable land, "because it's all ... under [the] institutional zoning classification [used] to run [the] hospital facility." (Trial Tr. 1273:3–6, Jan. 26, 2007 (Wilson, R.); *see also* Trial Tr. 1275:24–1276:13, Jan. 26, 2007 (Wilson, R.) ("[F]or land to be excess ..., it has to be ... something that we can market ... and they'll recognize it as valuable land and pay something for it.... Surplus land is just ... a little extra acre maybe in the back of the property or to the side that nobody

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 51 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

would be interested in....").) Nor could the surplus land at the Reese Hospital campus be re-zoned into separate parcels for residential use, for such a procedure would almost certainly cause the remainder of the institutionally-zoned property at the Reese Hospital campus to be in violation of the green-space and "footprint" requirements of that zoning. (*See* Trial Tr. 1253:15–20, Jan. 26, 2007 (Wilson, R.) (explaining that "the actual footprints of the buildings" on the developed part of the Reese Hospital campus "probably cover[ed] ... almost 25 percent of the site, and then with [the] parking area it's probably over 50 percent").) A purchaser seeking to sell surplus land at Reese Hospital would therefore need to both parcel out the surplus land under a residential zoning scheme and alter the zoning restrictions on the remainder of the property to realize any income through the sale of the surplus property—a process which strikes the court as unlikely given the difficulties and delays appurtenant to the rezoning process. (*See* Trial Tr. 1254:4–1255:12, Jan. 26, 2007 (Wilson, R.) (describing the zoning process in Chicago as "a nine-step process of review" several plans and studies that can take anywhere from "194 days ... up to five years" to complete).)

**\*64** But if Moss and Demchick erroneously swelled the business enterprise value of Reese Hospital by considering the surplus real estate at the Reese Hospital campus as an asset to be sold, they committed a far greater error to the detriment of the hospital's value by failing to consider the assets purchased by Reese Corp. in the form of the net working capital sold to Reese Corp. at the time of the hospital's purchase. *See* part III.B.1.b.iii, *supra*. The court has already concluded that this net working capital, when considered in tandem with the Defendants' reconciliation guarantee, necessarily equaled the amount paid for the net working capital, *i.e.,* $20,678,221. *Id.* These assets must be added to the value of Reese Hospital as if normally capitalized to fully reflect the business enterprise value of the hospital. Fishman et al., *supra* ¶ 505. 65(e). [110]

### vii. *Final business enterprise value*

Based on these findings, the court finds as a factual matter that the following calculation represents the final business enterprise value for Reese Hospital using the income approach:

| | |
|---|---|
| Present Value of 11/13/98–12/31/98 Net Cash Flow | -$7,331,646.61 |
| Present Value of 1999 Net Cash Flow | -$15,860,431.89 |
| Present Value of 2000 Net Cash Flow | $3,563,581.79 |
| Present Value of 2001 Net Cash Flow | $9,388,766.96 |
| Present Value of 2002 Net Cash Flow | + $7,018,763.88 |
| Total Present Value of Projected Net Cash Flows | -$3,220,965.87 |
| Present Value of Modified Terminal Value | + $54,728,670.52 |
| Value As If Normally Capitalized | $51,507,704.65 |
| Non–Operating and Excess Assets | $20,678,221.00 |
| Total Business Enterprise Value | $72,185,925.65 |

#### d. *Other indications of value*

The court concludes that the offer made by Physicians, Hospitals and Healthcare Centers, Inc. ("PHHC") to purchase

Reese Hospital is not reliable indicator of value for Reese Hospital.

PHHC, through Dr. Roberto Diaz, a physician and owner and officer of PHHC, offered to purchase both Reese Hospital and

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 52 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Grant Hospital for $95 million plus net working capital on or about February 18, 1998. [111] This figure is not a reliable indicator of value for Reese Hospital because the court cannot accurately derive a separate value for Reese Hospital from PHHC's combined offer to purchase both hospitals.

Moreover, PHHC, was never actually interested in purchasing Reese Hospital, and the offer lacks reliability as a value for Reese Hospital on this basis as well. Diaz emphasized in deposition testimony that PHHC only bid on Reese Hospital because it wanted to buy Grant Hospital, and the two hospitals were a package deal. (Diaz Dep. 38:1–5, Dec. 6, 2005 ("[W]hat I remember of this deal is my main interest was Grant Hospital. However, if I remember correctly, they would not sell Grant Hospital as an individual hospital. It was a package deal."); Diaz Dep. 38:12–14, Dec. 6, 2005 ("[G]iven the nature of how the bid process was, you couldn't really separate the two.").)

**\*65** An October 22, 1998 proposal from Zevco Enterprises, Inc. ("Zevco") for the sale and leaseback of all of Reese Corp.'s and Grant Corp.'s assets, purportedly for the purpose of providing a cash infusion to Reese Corp. and Grant Corp., is likewise an unreliable value indicator. (Pl.Ex.213.) Zevco proposed to purchase both hospitals' real property and improvements as well as equipment and personal property for $48 million, $9 million of which was attributable to Grant Hospital assets. Zevco's $39 million sale/leaseback proposal for Reese Hospital's assets does not imply a negative value for Reese Hospital because Zevco did not intend by its proposal to establish a value for Reese Hospital. The purpose of the proposal was to provide a cash infusion to Reese Corp. and does not purport to present a value for Reese Hospital. The court therefore concludes as a factual matter that Zevco's financing offer should not be relied upon in formulating a value for Reese Hospital.

### e. *Reconciliation*

"The process of reconciliation is the analysis of the alternative valuation indications in order to arrive at a final value estimate." Pratt et al., *supra*, at 439. The court has determined that the value of Reese Hospital was approximately $57,895,984 using the cost approach, *see* part III.B.1.b.v, *supra,* and approximately $72,186,000 (rounded to the nearest thousandth) using the income approach, *see* part III.B.1.c.vii, *supra*. Although there is an approximate gap of $14,431,000 between these two conclusions, the values are not unduly inconsistent with each other. Even

"[e]xperienced analysts expect to derive a range of value indications when alternative valuation approaches are used." Pratt et al., *supra*, at 441. "These alternative indications, then, imply the reasonable range of values for the subject business," *id.,* and "provide mutually supportive evidence as to the final value estimate," *id.*

"An intuitively appealing method of concluding the value estimate" is "(1) to use a subjective but informed judgment and decide on a percentage weight to assign to the indications of each meaningful valuation approach or method and (2) to base the final value estimate on a weighted average of the indications of the various methods." *Id.* at 445. "If the income available for distribution to the business owner is the primary value driver, then it may be appropriate that one or more methods within the income approach dominate the value conclusion." *Id.* at 443. In this case the court finds as a factual matter that it is appropriate to give greater weight to its income approach determination than to its cost approach determination precisely because a hypothetical purchaser would reasonably expect to earn income based on the hospital's operation rather than accumulate wealth through the acquisition of its assets. Kevin Moss summed this point up nicely in his trial testimony:

> The cost approach is something that, if you look at the valuation texts, often refers to it as a floor on the value. So if the cost approach value comes out lower than the income and market approach, what it implies is that the income and market approach are more appropriate indicators of value.

**\*66** So, for instance, a technology company, to use an extreme example, you could have a cost approach that indicated they just had a few hard assets and nothing more, but on a market and income approach, they could be worth millions of dollars. In that case, you would not look at the cost approach. You would look at your earnings driven approach as the income and market approaches.

So, part of the reconciliation of approaches is to look at the income and market approach and see if they are in excess of the cost approach. If they are in excess of the cost approach, it just indicates that there is potentially some type of intangible asset in the business like work force, physician relationships, certificates of need, or it could also indicate that, you know, there is something wrong in the values in your cost approach. Maybe it didn't come up with a correct value on one of the hard asset categories.

(Trial Tr. 3588:8–3589:4, Feb. 20, 2007 (Moss, K.).)

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 53 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Based on the trial testimony of Kevin Moss and the guidelines for reconciliation set forth above, the court finds as a factual matter that it is appropriate to explicitly weight its determinations of value for Reese Hospital heavily in favor of the income approach. The court therefore finds as a factual matter that the following calculation represents the fair market value of Reese Hospital as of the Transfer Date:

($57,985,984 x .25) + ($72,185,925.65 x .75) = $68,635,940.24

Thus, the court finds as a factual matter that the fair market value of Reese Hospital as of the Transfer Date is **$68,635,940.24.**

### 2. *Good faith*

As explained above, the good faith component of reasonably equivalent value has a place in the court's consideration of the "totality of the circumstances" surrounding the purchase of Reese Hospital. This court has already determined that the APA was the result of arm's length negotiations between the parties. *HCA III,* slip op. 27–28 (Bankr.D.D.C. Jan. 3, 2007). The remaining question is whether Reese Corp. and the Defendants acted in good faith in entering into the APA.

Alberts contends that the Defendants acted in bad faith in connection with the sale of Reese Hospital while the Defendants maintain that there is no evidence of bad faith. The court concludes as a factual matter that the purchase of Reese Hospital was conducted in good faith, and that Alberts has failed to offer any evidence of bad faith.

Alberts argues that the Defendants intentionally failed to disclose to Reese Corp. the magnitude of Reese Hospital's financial losses, specifically by failing to provide financial information for Reese Hospital after August 1998 and by restricting DCHC's ability to conduct due diligence in late September 1998. According to Alberts, if DCHC could have had access to Reese Hospital's financial information for September and October 1998, DCHC would have known that the financial condition of the hospital had further declined and may have decided not to buy Reese Hospital.

**\*67** The court concludes that there is no evidence demonstrating that the Defendants concealed or otherwise failed to disclose financial and operating information for Reese Hospital in bad faith. DCHC executives testified that they were aware of the financial condition of Reese Hospital

and the fact that Reese Hospital was sustaining losses in 1998. DCHC bought Reese Hospital because it was an under-performing hospital. (Trial Tr. 193:11–25, Jan. 22, 2007 (Tuft, P.); Trial Tr. 72:4–6, Jan. 19, 2–7 (Tuft, P.)("The mission of DCHC was to acquire hospitals, primarily in urban areas, and primarily hospitals that were underperforming.").) DCHC executives had a business plan for turning around Reese Hospital and were confident that they understood what it would take to improve the hospital's financial performance.

That the financial performance of Reese Hospital may have further declined before the transaction closed is not unusual and did not surprise DCHC representatives. DCHC executives testified that uncertainty associated with a pending sale may have an adverse effect on many aspects of hospital operations, including the financial performance of a hospital. (Trial Tr. 201:15–19, Jan. 22, 2007 (Tuft, P.); Trial Tr. 1085:2–6 Jan. 25, 2007 (Talbot, D.); *see also* Trial Tr. 3433–3437, 3796:1–11, Feb. 20, 2–7 (Moss, K.).) Because there were closing delays, it is no surprise then that uncertainty about the future of Reese Hospital may have resulted in additional financial losses.

Although Reese Hospital's financial information for September and October may have revealed additional losses, there is no evidence that HCA concealed or refused to provide such information. To the contrary, DCHC executives Talbot and Mounce testified that HCA never refused their requests for information. Talbot, who coordinated DCHC's financial review of Reese Hospital, does not recall specifically asking HCA for Reese Hospital's financials for September of 1998. (Trial Tr. 1670:4–5, 24–25, Jan. 30, 2007 (Talbot, D.).) And DCHC likely would not have received October financials before closing due to an approximately fifteen-day period between the closing of the month and the availability of financials for the prior month. [112] Additionally, there is no evidence indicating that DCHC would have decided not to buy Reese Hospital had DCHC reviewed the September and October financials.

There is also no evidence indicating that DCHC or Reese Corp. were denied access to Reese Hospital's financial and operating information during due diligence or otherwise. HCA granted DCHC full access to information about Reese Hospital from execution of the letter of intent in February of 1998 through closing on November 12, 1998, consistent with the requirements in the APA. (*See* Pl.Ex. 2 (APA § 5.01).) [113] And Reese Corp. represented and warranted to GHI that it had full access to and had inspected and investigated to its

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 54 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

satisfaction the financial and operating information of Reese Hospital. (*See* Pl.Ex. 2 (APA § 4.08).) [114]

**\*68** The initial due diligence period commenced sometime in February of 1998 and was complete when the parties signed the APA in July of 1998. After securing the necessary regulatory approvals for the sale by the end of August, NCFE asked to refresh its due diligence regarding the accounts receivable and assets of the hospital. This due diligence occurred in September of 1998. DCHC also requested information from HCA beyond the initial due diligence period.

DCHC executives had full access to the hospital and its management, employees, doctors, and documents during this entire time period. Mounce and Talbot testified that they always received the information they requested of HCA, and that they were never denied information. (Trial Tr. 624:5–7, Jan. 24, 2007 (Mounce, E.) ("QUESTION: And ultimately you believe that you had obtained everything you had asked for? ANSWER: Correct, I do, sir."); Trial Tr. 1670:6–8, Jan. 30, 2007 (Talbot, D.)("THE COURT: You don't recall being refused anything either? THE WITNESS: No, I don't."); Trial Tr. 670: Jan. 24, 2007 (Mounce, E.) ("But if I ever needed something, I'm sure that I could have gotten it from Greg Gerken or I did, because I was never specifically told, 'You couldn't have ..., something'").) And the record does not show that HCA ever provided DCHC false information. (Trial Tr. 138:18–21, Jan. 22, 2007 (Tuft, P.) ("THE COURT: [ D] id you ever determine that any of the information that had been given to you by HCA was false information? THE WITNESS: I never did."); Trial Tr. 624:8–10, Jan. 24, 2007 (Mounce, E.) ("QUESTION: You don't believe you were ever provided any false information correct? ANSWER: No, Sir.").)

The record indicates that beginning in late September 1998, HCA did exercise a greater degree of control over *how* DCHC accessed information about Reese Hospital. On September 29, 1998, DCHC told HCA it would be unable to close on September 30, 1999 as required by an amendment to the APA. HCA was uncertain whether the transaction would ever close, and according to Gerken, that uncertainty combined with DCHC's unfettered access to Reese Hospital was interfering with management of the hospital. (Trial Tr. 2771:4–12, Feb. 12, 2007 (Gerken, G.).) So HCA asked DCHC to run due diligence requests through Gerken's office. Gerken also asked the then-CEO of Reese Hospital to stop providing information to DCHC employees and representatives absent Gerken's authorization. (Pl.Ex. 998 (E-mail from Gregg Gerken to Rich

West, Scott Winslow re: Sale of Hospitals to DCHC, Sept. 29, 1998).) This request was in place for only a short period of time until HCA and DCHC negotiated another extension of time for closing. HCA continued to grant DCHC requests for information during this time and up to closing. (Trial Tr. 2962:13–2963:15, Feb. 14, 2007 (Gerken, G.).)

In this instance, HCA justifiably wanted to exercise some control over how DCHC accessed information about Reese Hospital. Closing had already been delayed, and HCA did not have full confidence that the sale would go through. DCHC had previously enjoyed more than full access to information about Reese Hospital; it had enjoyed unfettered access. (Trial Tr. 670:19–20, Jan. 25, 2007 (Mounce, E.) ("We didn't have free access like we did, the willy-nilly thing that we talked about before.").) HCA was not restricting access to or preventing disclosure of critical financial information. HCA was simply trying to bring order to the manner in which DCHC requested information about Reese Hospital in an effort to minimize any negative consequences the ongoing due diligence and pending sale had on the management and operation of Reese Hospital. The court therefore concludes that the factual record does not support a finding of lack of good faith on the basis that HCA withheld or concealed financial information from DCHC or restricted DCHC's access to information.

**\*69** Alberts additionally argues that the Defendants acted in bad faith by insisting on an inflated amount of net working capital in order to receive a higher purchase price for Reese Hospital. The court declines to find any absence of good faith here because HCA and DCHC acted at all times in accordance with the APA's procedures for finalizing net working capital. GHI and Reese Corp. contractually agreed to postpone a final determination of net working capital until after closing, and GHI and Reese Corp. followed the post-closing procedures set forth in the APA. They submitted their dispute over the amount of net working capital to PWC for a final determination. PWC determined that Reese Corp. overpaid by $6.2 million. GHI refunded the excess amount to Reese Corp. as expressly required by the APA. The fact that HCA and DCHC may have disagreed over the amount of net working capital transferred or the methodology for calculating the accounts receivable component of net working capital does not equate to bad faith. Whatever concerns existed over the appropriateness of applying one calculation methodology or another are irrelevant, as the APA bound the parties to a course of action which involved review of the net working capital calculation by an independent third

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 55 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

party. And the Defendants could not have been motivated to artificially inflate the net working capital because the APA provided for the refund to Reese Corp. of any overpayment. The court therefore concludes as a factual matter that Alberts has failed to show that the net working capital was not calculated in good faith.

Alberts additionally argues that the Defendants took advantage of DCHC's relative inexperience in purchasing and running a hospital as large as Reese Hospital in bad faith. The court concludes as a factual matter that the record does not support a finding of bad faith on this basis. Although Reese Hospital may have been the largest hospital purchased by DCHC at that time in terms of size and revenues, DCHC executives were sophisticated and experienced professionals in the healthcare industry, some having worked in the field for decades. DCHC executives had successfully turned around distressed hospitals and were confident they could do the same with Reese Hospital. Throughout due diligence, Reese Corp. was represented by outside counsel at two major law firms, advised by independent consultants McGladrey & Pullen, and assisted by investment banking firms. Thus, whatever new challenges DCHC faced due to the size of Reese Hospital, DCHC executives were not naive and inexperienced in matters of finance and acquisitions or in the industry such that HCA could have taken advantage of them.

Finally, Alberts asserts that HCA entered into the transaction with DCHC in bad faith knowing that DCHC had difficulty securing financing for the purchase. The court again declines to find any lack of good faith. First, DCHC and Reese Corp. represented and warranted to GHI that it had the financial ability to consummate the transaction. (Pl.Ex. 2 (APA § 4.06).) [115] Although NCFE, which was providing most of the purchase financing to Reese Corp., was characterized by Tuft as "more expensive" than other potential lenders, it was nonetheless highly-rated by Duff & Phelps Credit Rating Co., a nationally recognized debt-rating agency. And NCFE conducted due diligence and committed to financing the purchase. [116] HCA reasonably believed that Reese Corp. would be able to close the deal based on financing Reese Corp. obtained from NCFE, at least as of July 1998 when the APA was signed. Gerken of HCA testified that HCA was generally aware that NCFE was financing Reese Corp.'s purchase of Reese Hospital. Gerken also testified that he believed NCFE was a "well regarded financing institution primarily providing financing in the health care sector" whose "securities were investment grade rated by certain rating

agencies including Duff & Phelps." (Trial Tr. 2779:12–16, Feb. 12, 2007 (Gerken, G.).)

**\*70**  HCA was more than likely not aware that DCHC would have any challenges or issues financing the purchase of Reese Hospital until after the APA was signed in July 1998. HCA did know that Reese Corp.'s closing delays in September and October were connected to financing issues. Gerken testified that HCA was aware that Reese Corp. was unable to close at the end of September at least in part because NCFE was still raising funds to finance the purchase. (*See* Pl.Ex. 943 (Letter from Greg Gerken to Paul Tuft)(Sept. 30, 1998) ("Confirming our conversation yesterday afternoon, you have advised me that you are experiencing further additional delays with respect to your financing and will not be able to fund your acquisition of [Reese Hospital] today, September 30, 1998, as required under the [APA]."); Pl Ex. 1072.) Gerken also testified that he held a favorable view of NCFE as a financing institution at that time and that his view did not change despite the closing delays.

In response to Reese Corp.'s closing delays, HCA acted in good faith. HCA agreed to provide extensions to DCHC upon learning that DCHC would be unable to close at the end of August, at the end of September, and again at the end of October. The court has already concluded that $2 million of the value of the Reese Transfers was in exchange for Reese Corp.'s delay in closing on the purchase of the hospital. HCA also agreed to provide $17,500,000 worth of seller financing for the Reese Transfers, $14,000,000 of which is attributable to the purchase of Reese Hospital, upon learning from DCHC that the financing it had secured from NCFE was insufficient. (*See* Defs. Ex. CS (Promissory Note Secured by Mortgages (Grant and Michael Reese Properties) Nov. 12, 1998); Defs. Ex. DT at HCA/MR–20626 (Fifth Amendment to the Asset Purchase Agreement between Reese Corp. and GHI, Sept. 30, 1998)(amending section 2.01 to provide for $14,000,000 in seller financing).) But this does not constitute bad faith. Seller financing is not unusual, and HCA loaned to Reese Corp. on fair and reasonable terms. HCA's loan included a fixed 8.5% interest rate and was secured by mortgages on the property. (*See* Defs. Ex. DT at HCA/MR–20626 (Fifth Amendment to the Asset Purchase Agreement between Reese Corp. and GHI, Sept. 30, 1998).)

The totality of the evidence demonstrates that the Defendants acted in good faith. The court concludes that HCA afforded DCHC full access to financial and operating information and fulfilled all requests for such information up through

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 56 of 69

*In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)*

closing. The evidence does not indicate that HCA concealed information or provided false information about state of Reese Hospital's financial affairs. The court also finds that there is no evidence that the Defendants acted in bad faith by extending the closing date and by providing seller financing on reasonable terms to allow DCHC and Reese Corp. to secure sufficient financing to close the deal. Given the lack of evidence of bad faith, the court concludes that the sale was conducted in good faith.

### C. *Conclusions of Law*

**\*71** Based on the foregoing findings of fact, the court concludes as a matter of law that Reese Corp. received reasonably equivalent value for the Reese Transfer. All three of the factors used to make this determination—whether the transaction was made at arm's length, the fair market value of the property received as compared to the value of the property transferred, and the intentions of the parties in making the transfers—favor the Defendants. If anything, the court's findings of fact with respect to the fair market value

of Reese Hospital as of the Transfer Date suggest that Reese Corp. received *more* than reasonably equivalent value for the Reese Transfers, not less. The court's findings of facts are complex, but the legal conclusion to be drawn from those findings is not difficult. Alberts has not demonstrated by a preponderance of the evidence that Reese Corp. did not receive reasonably equivalent value in exchange for the Reese Transfers. His sole remaining count in this proceeding is therefore infirm, and judgment must be rendered in favor of the Defendants.

### IV. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court will award final judgment with costs in favor of the Defendants.

Final judgment follows.

### Footnotes

1   The allegations underlying this proceeding are set forth in their final form in the Third Amended Complaint. (D.E. No. 259, filed November 1, 2006 (the "Complaint" or "Compl.").) The affirmative defenses and counterclaims raised by the Defendants are pled in their final form in Defendant Galen Hospital Illinois, Inc.'s Answer to Second Amended Complaint; Counterclaims for Damages and Set Off, (D.E. No. 61, filed August 5, 2005); Defendant HCA Inc.'s Answer to Second Amended Complaint; Counterclaims for Damages and Set Off, (D.E. No. 62, filed August 5, 2005); and Defendant Western Plains Capital, Inc.'s Answer to Third Amended Complaint. (D.E. No. 327, filed December 4, 2006. The affirmative defenses raised by Alberts in response to the Defendants' counterclaims are pled in their final form in the Plaintiff's Reply to Counterclaims of Galen Hospital Illinois, Inc., (D.E. No. 63, filed August 23, 2005); and Plaintiff's Reply to Counterclaims of HCA, Inc. (D.E. No. 64, filed August 23, 2005).

In addition to these foundational pleadings, the court reviewed the following documents in arriving at its findings of fact and conclusions of law: the Defendants' Revised Pre–Trial Statement, (D.E. No. 449, filed January 17, 2007); the Plaintiff's Amended Pretrial Statement, (D.E. No. 450, filed January 17, 2007); the Plaintiff's Proposed Findings of Fact, (D.E. No. 538, filed April 10, 2007 (the "Pl. Facts")); the Plaintiff's Amended Post–Trial Brief Addressing Legal Issues and Proposed Conclusions of Law, (D.E. No. 540, filed April 10, 2007 (the "Pl. Br.")); the Defendants' Post–Trial Brief, (D.E. No. 557, filed May 24, 2007 (the "Defs. Br.")); the Defendants' Proposed Findings of Fact, (D.E. No. 558, filed May 24, 2007 (the "Defs. Facts")); the Defendants' Rebuttal of Plaintiff's Proposed Findings of Fact, (D.E. No. 559, filed May 25, 2007 (the "Defs. Rebuttal")); the Plaintiff's Reply to Defendants' Post–Trial Brief, (D.E. No. 573, filed July 6, 2007 (the "Pl. Reply")); and the Plaintiff's Rebuttal to Defendants' Proposed Findings of Fact, (D.E. No. 575, filed July 9, 2007 (the "Pl. Rebuttal")).

2   Unless otherwise noted, the facts set forth above are either deemed to be admitted or were found to be subject to summary judgment pursuant to various memorandum decisions entered by the court in December of 2006 and January of 2007. *See generally Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* 365 B.R. 293 (Bankr.D.D.C.2006) ( "*HCA I*"); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* Case No. 02–02250, Adv. Pro. No. 04–10366, 2007 WL 80812 (Bankr.D.D.C. Jan.3, 2007) ("*HCA II* "); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* Case No. 02–02250, Adv. Pro. No. 04–10366 (Bankr.D.D.C. Jan. 3, 2007) ("*HCA III* "); *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* 365 B.R. 322 (Bankr.D.D.C.2007) ("*HCA IV* ").

3   Alberts also introduced excerpts from the deposition testimony of the following witnesses: Carl George (Senior Vice President of Development, HCA); David Hill (Legal Counsel for Development, HCA); Tom Ramsey (Senior Real Estate Consultant, HCA); Benjamin Burns (Litigation Counsel, HCA); Jim Childress (Assistant Vice President of Tax, HCA); Dr. Roberto Diaz (President of Physicians Hospitals and Health Care Centers, Inc.); Laurie Taylor (Principal, Ernst & Young); David Felsenthal (formerly with

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 57 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

Valuation Counselors Group); Thomas Barry (Cain Bros.); Dr. Enrique Beckmann (CEO of Michael Reese Hospital); and Ken Bauer (former CEO of Michael Reese Hospital).

4    The Defendants also introduced excerpts from the deposition testimony of the following witnesses: Carl George (Senior Vice President of Development, HCA); David Hill (Legal Counsel for Development, HCA); Tom Ramsey (Senior Real Estate Consultant, HCA); Benjamin Burns (Litigation Counsel, HCA); Jim Childress (Assistant Vice President of Tax, HCA); Dr. Roberto Diaz (President of Physicians Hospitals and Health Care Centers, Inc.); Laurie Taylor (Principal, Ernst & Young); Lance Poulsen (President and founder of NCFE); Cindy Sehr (Outside Counsel for DCHC); David Felsenthal (formerly with Valuation Counselors Group); Thomas Barry (Cain Bros.); Dr. Enrique Beckmann (CEO of Michael Reese Hospital); and Ken Bauer (former CEO of Michael Reese Hospital).

5    Arguably, the parties retained their right to Article III adjudication of the "private right" causes of action at issue here even though Congress has designated fraudulent transfer actions as "core" proceedings, *see Granfinanciera, S.A. v. Nordberg,* 492 U.S. 31, 36, 40–64 (1989) (Seventh Amendment right to jury trial applies to fraudulent conveyance actions brought by chapter 11 trustee "notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings' "); *In re Tex. Gen. Petroleum Corp.,* 52 F.3d 1330, 1336 (5th Cir.1995)* ( "Whether an Article III court is necessary involves the same inquiry as whether a litigant has a Seventh Amendment right to a jury trial."), although the matter is complicated by the Defendants' decision to file counterclaims in this adversary proceeding, *see Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (defendant submits itself to equity jurisdiction of bankruptcy court by filing proof of claim, thereby depriving itself of Seventh Amendment right to jury trial); *Peachtree Lane Associates, Ltd. v. Granader,* 175 B.R. 232, 236–38 (N.D.Ill.1994) ("Several well reasoned, post-*Langenkamp* opinions have held that the filing of a counterclaim in an adversary proceeding instituted by a chapter 11 trustee or debtor-in-possession qualifies as filing a 'claim[,]' thereby triggering the 'public rights' process of allowance and disallowance of claims and the restructuring of the debtor-creditor relationship."). *But see Beard v. Braunstein,* 914 F.2d 434, 441–42 (3d Cir.1990) (defendant did not waive right to jury trial by filing mandatory counterclaim); *NDEP Corp. v. Handl–It, Inc. (In re NDEP Corp.),* 203 B.R. 905, 909–13 (D.Del.1996) ("this [c]ourt finds that a party does not waive its right to a jury trial or its right to object to jurisdiction and venue when it brings counterclaims that ... are permissive"). To resolve this potential problem, the court entered an order on August 9, 2007, directing the parties to file a joint statement indicating whether they unanimously consented to the entry of a final judgment by this court and, if no such consent can be reached, to file supplemental post-trial briefs addressing the issue. (D.E. No. 578.) The parties entered a joint statement of consent one week later. (D.E. No. 580, filed August 16, 2007.)

6    Alberts argues that the court's prior determination that he is a representative of the estate constitutes the law of the case with respect to standing. (Pl. Reply 8.) He is mistaken. There are really "two strands" of federal standing jurisprudence: "Article III standing, which enforces the Constitution's case-or-controversy requirement, ... and prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.' " *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) ("*Elk Grove* ") (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). "[T]he prudential principles of standing under Article III and the trustee's powers under the [B]ankruptcy [C]ode are coextensive...." *In re Cannon,* 277 F.3d 838, 853 (6th Cir.2002). Thus, "if a trustee [or other representative of the estate] has no power to assert a claim because it is not one belonging to the bankrupt estate [or a claim conferred upon the representative of the estate by another provision of the Bankruptcy Code], then he also fails to meet the prudential limitation that the legal rights asserted must be his own." *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991).

The Defendants' prior arguments about standing revolved around whether Alberts could invoke § 544(b) as a legal and equitable matter, *i.e.,* whether Alberts had "prudential" standing in this case. That specific issue was resolved in Alberts's favor by the court's memorandum decision entered on December 6, 2006. *HCA I,* 365 B.R. at 300–01. The instant dispute concerns "Article III" standing, a jurisdictional question which the court must consider even at this extremely late stage in the case. *Steffan v. Perry,* 41 F.3d 677, 697 n. 20 (D.C.Cir.1994).

7    *Bear Stearns* concerned an avoidance action brought pursuant to § 548 of the Bankruptcy Code, but the same basic principle (*i.e.,* that the transferee bears the burden of showing that some other event caused the injury of a depleted *res* and an inability to pay creditors in full once proximate cause is established by the estate representative) applies with equal force under Illinois case law. *See Wehmeier v. UNR Indus., Inc.,* 213 Ill.App.3d 6, 157 Ill.Dec. 251, 572 N.E.2d 320, 337–38 (Ill.App.Ct.1991) (holding that the assertion of an intervening event is an affirmative defense); *Mich. Ave. Nat'l Bank v. State Farm Ins. Companies,* 83 Ill.App.3d 507, 39 Ill.Dec. 42, 404 N.E.2d 426, 431 (Ill.App.Ct.1980) ("the burden [is] on the defendants to raise and prove [an] affirmative defense").

8    One could argue that Reese Corp. would have been rendered insolvent just by borrowing money from NCFE and HCA because it was so thinly capitalized that the fees and interest arising from the debt owed to these lenders would have exceeded Reese Corp.'s assets (less the amounts borrowed from the lenders, which is offset against the assets, as the initial debt owed, to compute net assets before such fees and interest). Arguably, the incurrence of these obligations by Reese Corp. constituted fraudulent transfers in their own right. But any nominal insolvency that might have resulted from the fees and interest charged by Reese Corp.'s lenders would

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 58 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

not have displaced any insolvency arising upon Reese Corp.'s acquisition of Reese Hospital. Subsequent debts arising as a result of the purchase of Reese Hospital were "reasonably foreseeable" consequences of the purchase and therefore not intervening events absolving the participants in any underlying fraudulent transfer of wrongdoing. *Parsons v. Carbondale Twp.,* 217 Ill.App.3d 637, 160 Ill.Dec. 454, 577 N.E.2d 779, 786 (Ill.App.Ct.1991); *see also Coan v. Andersen (In re Andersen),* 166 B.R. 516, 525 n. 10 (Bankr.D.Conn.1994) (recognizing "the right of a future creditor to set aside a constructively fraudulent conveyance if the debtor's then-existing debts were not paid before the future creditor's obligation was created, or if then-existing debts were paid off by the incurring of additional debt rather than from the debtor's earnings").

9   The counts in the Complaint (the third amended complaint) mirror the counts listed in the second amended complaint.

10   This analysis furnishes an additional basis for dismissing Count VI (dismissed on other grounds already as mentioned above).

11   Alberts suggests that the framers of the Uniform Fraudulent Transfer Act intended to do away with any inquiry into the good faith of the transferee when they drafted their model statute, (Pl.Br.29–30), yet the drafters intentionally lifted the phrase "reasonably equivalent value" from the Bankruptcy Code. Uniform Fraudulent Transfer Act, prefatory note (1984). "If anything is clear from the various uses of the word 'value' in the Code, it is that Congress did not mean fair market value when it used the term reasonably equivalent value." *Bundles v. Baker,* 856 F.2d 815, 824 (7th Cir.1988), *abrogated in part on other grounds by BFP v. Resolution Trust Corp.,* 511 U.S. 531, 540, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

12   The court's position with respect to this issue is well within the norm. *See, e.g., Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.),* 444 F.3d 203, 213 (3d Cir.2006) (holding that determination of "reasonably equivalent value" requires court to look to the 'totality of the circumstances,' including ... the transferee's good faith"); *Creditor's Comm. of Jumer's, Castle Lodge, Inc. (In re Jumer's Castle Lodge, Inc.),* 338 B.R. 344, 354 (C.D.Ill.2006) (same); *Grochocinski v. Knippen (In re Knippen),* 355 B.R. 710, 726 (Bankr.N.D.Ill.2006) (same); *Pereira v. Wells Fargo Bank, N.A. (In re Gonzalez),* 342 B.R. 165, 173 (Bankr.S.D.N.Y.2006) (same); *Kapila v. WLN Family Ltd. P'ship (In re Leneve),* 341 B.R. 53, 56–57 (Bankr.S.D.Fla.2006) (same); *Kaler v. Red River Commodities, Inc. (In re Sun Valley Products, Inc.),* 328 B.R. 147, 156–57 (Bankr.D.N.D.2005) (same); *Jones v. Williams (In re McDonald),* 265 B.R. 632, 636 (Bankr.M.D.Fla.2001) (same); *Salven v. Munday (In re Kemmer),* 265 B.R. 224, 232 (Bankr.E.D.Cal.2001) (same); *Cohen v. Un–Ltd. Holdings, Inc. (In re Nelco, Ltd.),* 264 B.R. 790, 813–14 (Bankr.E.D.Va.1999) (same); *Samson v. U.S. West Communications, Inc. (In re Grigonis),* 208 B.R. 950, 956 (Bankr.D.Mont.1997) (same).

13   In an order entered on April 30, 2007, the court took judicial notice of, *inter alia,* the *sixteenth* edition to PPC's Guide to Business Valuations. (D.E. No. 546.) Unfortunately, the court was unable to obtain a copy of that more recent edition, and must use the *fifteenth* edition instead. To the extent the sixteenth edition differs materially from the fifteenth edition with respect to any of the valuation principles discussed herein, the court will reconsider its findings of fact and conclusions of law at the appropriate time.

14   Irving Levin and Associates is a firm that specializes in gathering and publishing information about hospital-related transactions. Pratt Stats., BIZ Comps., and the IBA databases gather information related to sales of closely-held businesses.

15   *See* Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at 10, Aug. 16, 2006)(9.6% is the median EBITDA of Moss's pool of comparable transactions).

16   *See* Defs. Ex. JV (Expert Report of Kevin B. Moss, CFA at 14, Aug. 16, 2006)("I have included a summary of price to revenue multiples from transactions where the purchased hospitals have EBITDA margins of less than 2.0 percent of net revenue. Michael Reese had negative EBITDA margins in 1998 and slightly negative EBITDA margins in 1997. I have included transactions where the target had slightly positive EBITDA margins as comparable indications of hospitals with poor financial performance.").

17   Moss's expert report and testimony indicate that he used a .4 to .6 multiplier range based on his combined analysis of the guideline public companies approach (discussed later) and the guideline transactions approach, and that the appropriate EBITDA multiplier under the guideline transactions method is .45 to .55.

18   Moss testified that the guideline public company valuation method provides the upper boundary for pricing of Reese Hospital under the market approach.

19   Moss calculated that the market prices for these companies was on average 1.2 times revenue. He calculated this multiplier by (1) calculating the market value of invested capital ("MVIC") for each company, (2) dividing the MVIC for each company by its revenue, and (3)calculating the average multiplier after excluding Health Management Associates (4.99 MVIC/revenue) and Province Healthcare (2.68 MVIC/revenue) as too high to include in the calculation. To calculate the MVIC of these companies, Moss first calculated the market value of their equity by multiplying stock price by the number of shares outstanding. He then added their debt to the market value of equity to calculate MVIC. MVIC divided by revenue yields the multiplier for each company. (Trial Tr. 3541:9–14 (Moss, K.).)

20   Pl. Br. at ¶ 75, *citing Heilig–Meyers Co. v. Wachovia Bank, N.A. (In re Heilig–Myers Co.),* 319 B.R. 447, 457–58 (Bankr.E.D.Va.2004); *Gillman v. Scientific Research Prods. Inc. of Delaware (In re Mama D'Angelo, Inc.),* 55 F.3d 552, 555–56 (10th Cir.1995) (noting that a company is on deathbed if only "nominally extant"); *Fryman v. Century Factors, Factor For New Wave*

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 59 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

*(In re Art Shirt Ltd., Inc.),* 93 B.R. 333, 341 (E.D.Pa.1988) (determining that a company is on deathbed if it is "wholly inoperative, defunct or dead on its feet"); *cf. In re Taxman Clothing Co., Inc.,* 905 F.2d 166, 170 (7th Cir.1990) (holding that the company was not on its deathbed because "the assets that it could realize on in the ordinary course of its business exceeded the expenses of realizing on them, plus its (other) liabilities").

21   The court reviewed other appraisals of the property in the record, specifically those prepared by First Real Estate Services, Ltd., Wellspring Valuation, Ltd., Prime Appraisal, LLC, and a separate appraisal prepared by Real Estate Counselors, Inc. on July 18, 2003, but concludes that these reports were either too generalized to be useful or too remote in time to be relied upon in formulating values of the real estate at Reese Hospital.

22   Wilson and Kimmel disagree over the exact square footage of the Reese Hospital site. Wilson relied on a Plat of Survey prepared by the National Survey Service, Inc. on April 17, 1998, which describes the size of the site as 1,625,293 square feet. Kimmel relied on assessment records provided by the Cook County Assessor Office which describe the size of the site at 1,659,142 square feet. The court credits the Plat of Survey prepared by the National Survey Service and concludes that Reese Hospital is 1,625,293 square feet or about 37.3116 acres.

23   The existing zoning on November 12, 1998 contained the following restrictions: (1)a minimum green space requirement of 30%; (2) a maximum land coverage restriction of 31% on average; and (3) a 1.5 maximum floor-to-area ("FAR") ratio restriction for the property. The 1.5 FAR restriction means that the total square footage of any buildings on the property can constitute only 1.5 times the square footage of the entire parcel. (Pl.Ex. 233 at TRUST/HCA 21137.)

24   Kimmel testified that re-zoning of the site for residential purposes was not necessary because the existing zoning classification permitted limited residential development. (Trial Tr. 3256:13–18 (Kimmel, M.).) But Kimmel did not verify whether the residential development permitted by the existing zoning classification was limited to residences for nurses, medical residents and other medical staff at Reese Hospital. (Trial Tr. 3671:17–3672:1, Feb. 21, 2007 (Kimmel, M.))("THE COURT: But doesn't it connote that the property, if used for residential, will be used for an institutional residential purpose? THE WITNESS: I guess one could interpret it that way. THE COURT: And you didn't get an opinion from a lawyer as to what this zoning would be interpreted as meaning, is that correct? THE WITNESS: I did not get an opinion from an attorney.").)

25   Wilson also conceded that a zoning change for the Reese Hospital site as of the Transfer Date was *possible,* but that does not necessarily equate to *reasonably probable.* (Trial Tr. 1357:14–24, Jan. 29, 2007(Wilson, R.).)

26   *See* Appraisal Inst., *supra,* at 334 ("Regardless of how physically similar a potential comparable sale is to the subject site, if the comparable site does not have the same highest and best use as though vacant as the subject, the transaction does not qualify as a comparable sale and should be dismissed from further consideration in the analysis of the subject property.").

27   Both experts assumed that the property would be used indefinitely for institutional purposes, and made no prediction as to when the improvements would eventually be demolished. They thus made no adjustment for the costs of demolition in valuing the property *as improved.* Contrary to Kimmel's testimony, the court concludes that in appraising real estate, such costs are a relevant factor if there is a likelihood of eventual demolition. All other things being equal, a purchaser would likely be willing to pay slightly more for Hospital X if it were exactly comparable to Reese Hospital except that future demolition costs of Hospital X's improvements would be lower and would not come close to exceeding the value of the land once rendered vacant. But that does not materially affect the valuation analysis of the Reese Hospital property, *as improved,* because the existing improvements (whether at Reese Hospital or an alternative site) would likely be used indefinitely. The time value of money renders the costs of demolition in the distant future relatively insignificant compared to the costs that demolition as of the date of purchase would entail, and the uncertainty on this record of when there would be reason to demolish the improvements makes the issue too speculative to make any precise adjustment to value based on this consideration. If the property continued to be used for institutional purposes, it is not clear that all buildings would have to be demolished. In any event, such an adjustment to value would not affect the court's conclusion that it should generally reject the cost approach valuation of Reese Hospital in favor of the higher income approach valuation.

28   Wilson's report indicates that the market price of the land as vacant for institutional use should be **$5.75** per square foot, resulting in a rounded total value of $9,350,000. (Pl.Ex. 210 (Appraisal of Michael Reese Hospital and Medical Center as of November 12, 1998 at 73(Jul. 21, 2006)).) But at trial, Wilson testified that after correcting a mathematical error made while adjusting one of the comparable land sales, the market price of the land as vacant for institutional use should be **$5.85** per square foot, resulting in a rounded total value of $9,500,000. (Trial Tr. 1300:1–12, Jan. 29, 2007 (Wilson, R.); Pl.Ex. 1140.)

29   In searching for comparable land sales, Wilson found no sales with institutional zoning, and resorted to sales of property zoned for industrial and commercial use (with adjustments as warranted). That approach is acceptable under principles of real estate appraisal. Appraisal Inst., *supra,* at 437.

30   To quote Kimmel, "[ t] he Cost Approach is based on the principle of substitution, which states that no rational buyer would pay more for a property than the amount for obtaining a comparable site and constructing improvements of equal desirability and utility, assuming no undue delay." Defs. Ex. JZ at 28 (Expert Report of Matthew G. Kimmel). Such a purchaser would not pay

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 60 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2006)

residential-purpose-zoned land prices for land to construct a hospital when cheaper institutional-purpose-zoned land is available. That a purchaser of Reese Hospital might realize that Reese Hospital's land could be converted to residential use once the improvements were demolished would not result in a higher price: as already discussed, it would cost more to demolish the improvements than the land would be worth when vacant and zoned residential.

31   The court's replacement cost calculations do not include an additional 5% to account for "soft costs," contrary to Kimmel's testimony, because the Marshall Valuation Service already accounts for most "soft costs" and the remaining costs identified by Kimmel under cross-examination are of a de minimis character. (Trial Tr. 3607:11–3608:16, Feb. 21, 2007 (Kimmel, M.).)

32   Felsenthal calculated the overall depreciation rate at Michael Reese to be 87% of the value of the improvements. Wilson and Kimmel calculated the overall depreciation rate to be 92%, and the other three appraisal reports calculated depreciation rates ranging from 90–95%, with a mean of 91.67 percent. These figures strongly suggest that Felsenthal's depreciation rate was unduly low.

33   The court gives that appraisal no weight. DCHC sold equipment to NCFE under a sale/leaseback agreement for $10.8 million as part of the financing arrangement for Reese Hospital. (Pl.Ex. 12 at EY 793 (DCHC–Grant and Reese Sale Leaseback Memo)(Dec. 31, 1998).) The proceeds from the sale financed the acquisition of Reese and Grant Hospitals. The memo analyzes the proper means for accounting for the sale/leaseback transaction and indicates a fair market value of the equipment of $10.8 million. Nothing in the record suggests how Ernst & Young arrived at that value, and thus that valuation is not worthy of consideration.

34   The closing statement for the purchase of Reese Hospital reflects $20,678,221 in estimated Net Working Capital.

35   Net accounts receivable were the most significant component of the net working capital calculation for the purchase of Reese Hospital, as they were the largest of Reese Hospital's current assets at the time. (Trial Tr. 880:24–881:11, Jan. 25, 2007 (Talbot, D.).) The $14,400,000 of actual working capital may not have been collected immediately, but the record does not permit a finding regarding the amount of delay. Even if it did, the lower value arising from a presumably relatively short collection delay (that is, the lesser value as of the date of closing of dollars collected in the future versus dollars acquired at closing) would not materially affect the outcome. Alberts bore the burden of proof in this regard, and failed to adduce evidence to show the appropriate reduction.

36   On November 24, 1999, within eight days of the final determination by PWC, GHI paid amounts due to Reese Corp. via wire transfer after offsetting part of the amount due for payment owed by Reese Corp. to GHI for ongoing information technology services that GHI provided to Reese Hospital in the year after the transfer. The value of GHI's refund obligation ought to be lowered slightly, from the precise amount of $6,249,437.00, to account for the time value of money based on the foreseeable delay in the PWC reconciliation process and the receipt of the refund, but the adjustment would not materially affect the valuation analysis. Utilizing a generous 6% discount rate, for example, and applying that to an estimated one-year period for PWC to complete the reconciliation process and the refund to be received, would result in a reduction of the value of the refund obligation by less than $400,000, a figure that would not materially alter the overall value of what Reese Corp. acquired for the Reese Transfers. In any event, Alberts bore the burden of proof, but did not introduce evidence as to the appropriate amount of the reduction of value.

37   (Pl.Ex. 1090 at Trust/HCA–192–062 to TRUST/HCA–192–067(Amendment to Agreement between Humana and GHI)("The effective date of this Amendment shall be January 1, 1996 and it shall remain in effect for two years, subject to the termination provisions of the Agreement); see also Defs. Ex. BL at HCA/MR 10042 (Letter to Ms. Sandra McRee, Vice President of Operations, HCA and Mr. Ronald Dedic, Chief Financial Officer, Reese Hospital)(Sept. 20, 1996)(noting that the Humana Contract runs through the end of 1997).)

38   (Trial Tr. 602:12–24, Jan. 23, 2007 (Mounce, E.); Trial Tr. Feb. 12, 2007 (Gerken, G.); Defs. Ex. UH at TRUST/HCA–005502 and TRUST/HCA–005509)(Memo from Erich Mounce to Gregg Gerken re: Reese due diligence follow-up))(Apr. 2, 1998)(noting that the current Humana contract provided by HCA to DCHA for due diligence purposes shows that it expired as of January 27, 1998); Defs. Ex. UG at TRUST/HCA–005493 to TRUST/HCA–005494 (Letter from Eric Mounce to Gregg Gerken re: outstanding due diligence issues)(Apr. 14, 1998)("Still awaiting ... receipt of copy of any Humana contract that has not expired."); Defs. Ex. UF at TRUST/HCA005486–TRUST/HCA–005487 (Memo from Erich Mounce to Gregg Gerken re: Reese due diligence follow-up)(Apr. 21, 1998)(noting second request for an unexpired Humana contract).)

39   Further, DCHC did not include the Humana Contract on its final listing of contracts to review prior to assumption by Reese Corp. (Defs. Ex. VP (Memo from Erich Mounce to Gregg Gerken re: final listing of contracts)(Jun. 25, 1998)(final listing of contracts that DCHC had to review prior to assumption did not include the Humana Contract).)

40   There are actually two sets of Reese October Projections: one that assumes the sale of Grant Hospital and Reese Hospital's home health agency by December 31, 1998, and one that does not. (Compare Pl.Ex. 144A at TRUST EXPERT 010791 with id. at TRUST EXPERT 010797.) Given that even the Defendants' expert witness was unwilling to adopt the former projections, (Trial Tr. 3493:3–21, Feb. 20, 2007 (Moss, K.)), the court finds as a factual matter that it would be unreasonable for a hypothetical purchaser to use these projections in placing a value on Reese Hospital. The court's references to the Reese October Projections are therefore meant to refer only to those projections assuming no sale of Grant or the hospital's home health agency by December 31, 1998.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 61 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

41    Talbot later criticized the M & P Projections for failing to "break ... out" the various sources of revenue identified in the Reese September Projections. (Trial Tr. 1590:24–1591:2, Jan. 30, 2007 (Talbot, D.).)

42    The cost of the new ER was estimated between $2.5 million, (Pl. Ex. 115), and $5.5 million. (Trial Tr. 569:8–12, Jan. 23, 2007 (Mounce, E.).)

43    There is some indication in the record that ER volume could be increased in part simply by decreasing patient wait times. (Bauer Dep. 49:2–50:4, June 14, 2006; Pl. Exs. 236 at TRUST–HCA–027738, 1015 at TRUST/HCA–013434.) But the primary cause of the ER's perceived inefficiency was its distant location, and the prerequisite for any meaningful growth in volume was its relocation. (Bauer Dep. 53:9–17, June 14, 2006; Trial Tr. 980:4–18, Jan. 25, 2007, 1714:25–1715:8 (Talbot, D.) (basis for projected 25% increase in ER volume "was that through the relocation of the emergency room, that it would be a place that would, you know, [become] medically more appealing to the consumer to come to and also for the ambulance drivers"); Pl. Exs. 236 at TRUST–HCA–027745, TRUST–HCA–027749, 1015 at TRUST/HCA–013434.)

44    Former Reese Corp. president Bryan Breckenridge also testified before the Illinois Health Facilities Planning Board (the "Illinois Health Board") that Reese Corp. would increase the volume of its OB/GYN program in part because of the "present recruiting activities of two new OB[/]GYNs." (Pl.Ex. 1015 at TRUST–HCA–013437.) Breckenridge further testified that pediatric volume would increase in part because Reese Corp. had initiated "discussions with a large tertiary provider or two in [the] marketplace about enhancing the pediatric services at Michael Reese," (Pl.Ex. 1015 at TRUST–HCA–013437–TRUST/HCA–013438), and that providing "clinics into the community to reach out to the young families" there "would also be a factor" in the company's assumption that pediatric volume would increase. (Pl.Ex. 1015 at TRUST–HCA–013438.) Donna Talbot made clear at trial, however, that growth in both the OB/GYN and pediatric programs would be driven primarily if not exclusively by "a marketing program that would try to attract pregnant women into the facility." (Trial Tr. 982:18–983:2, Jan. 25, 2007 (Talbot, D.); see also Trial Tr. 1716:10–13, Jan. 30, 2007 (Talbot, D.) ("The OB/GY[N], pediatrics was related to the increased marketing dollars focused on bringing the mothers into Michael Reese, the expectant mothers.")

45    The Defendants baldly assert that "the Reese Projections do not specifically tie immediate cardiac cath volume increases to the capital expenditure in 1998," (Defs. Rebuttal ¶ 174G), but the Strategic Assumptions and testimony by Donna Talbot and Dr. Enrique Beckmann suggest otherwise. (Trial Tr. 984:9–11, Jan. 25, 2007 (Talbot, D.) (assumption that cardiac catheterization volume would double was based on feeling that "if we purchased a new piece of cardiac cath equipment, [ ] the physicians would be more attracted to Michael Reese because of the new equipment"); Beckmann Dep. 72:13–1, Apr. 12, 2006 (goal of increased cardiac catheterization volume in 1998 was not met "[b]ecause that required a capital outlay that was never implemented"); Pl.Ex. 300 ("$1,200,000 will be spent at Reese on Cardiac Cath equipment, Reese Cardiac Catheterization volume will double").)

46    Other assumptions of this nature not included in the Reese Projections were that (1) a new linear accelerator would be built in 1999, increasing revenue by 10 percent, (Trial Tr. 1716:4–5, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 115), (2) Reese Hospital would open a twenty-five-bed skilled nursing facility ("SNF") in the second quarter of 1999, (Trial Tr. 1081:16–18, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115), and (3) Reese Corp. would develop assisted and senior living on the hospital's campus, (Trial Tr. 1081:3–9, Jan. 25, 2007 (Talbot, D.); Pl.Ex. 115). The court concludes as a factual matter that it would be unreasonable to project any future returns from these expenditures based on the Reese Management Team's calculation that the projects were too costly and time-consuming to implement right away. (Trial Tr. 1676:14–1677:4, Jan. 30, 2007 (Talbot, D.).)

47    Another assumption of this nature not included in the Reese Projections was that Reese Corp. would "[r]ecruit two neurosurgeons from the University of Illinois," which would "double [the] current volume" in neurosurgery. (Pl.Ex.115.) The court concludes as a factual matter that it would be unreasonable to project any future returns from the recruitment of these neurosurgeons because such a projection was evidently too speculative for the Reese Management Team to include such returns in the Reese Projections.

48    Plaintiff's Exhibit 115, prepared November 14, 1998, lists the percentage of 2006 revenues to be achieved for 2000 through 2002 as 1.05%, 1.12%, and 1.19%. Obviously what was meant was that revenues would increase by factors of 1.05, 1.12, and 1.19.

49    There is a potential discrepancy between the Strategic Assumptions and the Reese Projections with respect to this assumption. The Strategic Assumptions list the case mix index for Reese Hospital as of April of 1998 as 1.29, whereas the Reese Projections list the case mix index for Reese Hospital as 1.36 for 1998. (Pl. Exs. 115, 300 at TRUST/HCA–007589.) The court finds as a factual matter that the case mix index listed in the Reese Projections is the better indicator of the actual case mix index at Reese Hospital as of the Transfer Date because the projections appear to incorporate financial information received by Reese Corp. after April of 1998. (Trial Tr. 1580:15–17, Jan. 30, 2007 (Talbot, D.).)

50    Other assumptions of this nature not included in the Reese Projections were that (1) Reese Corp. would successfully convert its contractual arrangement with Humana (based on the fallacious assumption that such a contract was in place and assigned to Reese Corp. into a "global risk contract," (Trial 585:5–21, Jan. 23, 2007 (Mounce, E.); Pl.Ex. 115), (2) Reese Hospital would decrease its ancillary utilization of Humana patients, (Trial Tr. 649:22–650:20, Jan. 23, 2007 (Mounce, E.); Pl.Ex. 115), and that (3) the hospital would "[t]rim back teaching programs based on analysis of high cost programs," (Pl.Ex. 115).

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 62 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

51    The Reese September Projections posit a hypothetical 1998 in which Reese Corp.'s turnaround plan was in effect as of January 1, 1998. (Trial Tr.2065:10–2066:9, Feb. 6, 2007 (Demchick, N.).) Presumably, this is why Kevin Moss and James Yerges relied on the Reese October Projections even though the Reese September Projections were much more detailed.

52    In point of fact, the projections assume operational growth at Reese Hospital as of November *1*, 1998; *i.e.*, eleven days before Reese Corp. assumed control of the hospital. Although it would have made sense for the Reese Management Team to project earnings for the entire month of November at the time that the Reese Projections were made, the projections should have at least been modified by Kevin Moss and James Yerges to reflect the actual Transfer Date.

53    Alberts also disputes the reasonableness of the Reese Management Team's assumption that it could renegotiate its managed care contract with Humana, (Pl. Facts ¶¶ 182–86), but this assumption was not (with one minor exception discussed below) factored into the Reese Projections, (Trial Tr. 1663:15–1664:7, 1703:15–1704:2, 1706:2–15, 1741:15–18, Jan. 30, 2007 (Talbot, D.); Pl.Ex. 300), which renders Alberts's objection moot. The Court discusses the contract between HCA and Humana at greater length in its findings of fact with respect to the "cost approach" to valuation. *See* part III.B.1.b.iv, *supra*.

54    The Defendants also assert that "there is not, in any event, a 25% increase in emergency room revenue calculated in the projections for 1998," (Pl. Rebuttal ¶ 174B), that "there is no 25% increase in ambulatory surgery revenue calculated in the projections for 1998," (*Id.* ¶ 174C), and that "there is no 15% increase in rehabilitation exempt unit revenue calculated in the projections for 1998," (*Id.* ¶ 174D), but all of these assumptions concerned growth in *volume*, not growth in *revenue*, (Pl.Ex.300).

55    Moss clarified the scope of his expertise during his direct examination as follows:

> So ... I've done a lot of work with respect to joint ventures, whether it's surgery centers and for those types of things. But really, pairing up with the consulting people[,] and it's going in and looking at someone's business operations and do you improve them, and what should they change and what's the economic benefit. *And my side of that is the financial side. It's looking at the cash flows and does it make sense for the entity to go through this process, to do the transformation.*

(Trial Tr. 3401:2–10, Feb. 20, 2007 (Moss, K.) (emphasis added).)

56    There is very little evidence in the record concerning the operational analysis that went into the Strategic Assumptions. Donna Talbot identified Dr. Enrique Beckmann and Cheryl LaCoste as the members of the Reese Management Team with the strongest operational background, (Trial Tr. 1688:20–21, Jan. 25, 2007, 1756:4–16, Jan. 30, 2007 (Talbot, D.)), yet neither of these witnesses appeared at trial, and LaCoste was apparently never even deposed. Moreover, Beckmann was a career physician who had never risen higher than department head at Reese Hospital prior to his participation in the Reese Management Team, (Trial Tr. 1688:1–22, Jan. 30, 2007 (Talbot, D.); Beckmann Dep. 14:8–15:4, Apr. 12, 2006), and who had only "a somewhat removed view of what was ... happening at the hospital," (Beckmann Dep. 48:7–8, Apr. 12, 2006). The idea that Beckmann served as the *de facto* operations expert for the team only undermines the court's confidence in the Strategic Assumptions that underlie the Reese Projections.

57    Moss "could not tell" if volume increases predicated on the construction of a new ER were included in the Reese Projections for 1998, (Trial Tr. 3529:21, Feb. 20, 2007 (Moss, K.)), even though it is plain from the face of the Reese September Projections that they were, (Pl.Ex. 300 at TRUST/HCA–007585). Moss attempted to excuse his ignorance on this point by opining that "[t] he cash flows in [19] 98 from a valuation standpoint were not that material," (Trial Tr. 3530:6–7, Feb. 20, 2007 (Moss, K.)), but even if that were true, the court would still expect a more careful analysis from an expert witness of his pedigree.

58    The Defendants object to the admission of this testimony into evidence on the grounds that the witness lacks personal knowledge of the events described in his testimony and that the document referred to in the testimony is hearsay. This objection is overruled because Bauer testified based on his own personal recollection, not Exhibit 1 to his declaration, and because Bauer, the former CEO of Reese Hospital, (Bauer Dep. 17:6, June 14, 2006), testified that he "made very overt efforts to work with community physicians," (Bauer Dep. 43:2–3, June 14, 2006), thereby demonstrating personal knowledge and laying a foundation for his testimony regarding the problems with physician recruitment at Reese Hospital. (The Defendants' objection to Bauer's testimony that he was CEO at Reese Hospital as irrelevant is overruled because the testimony is obviously relevant, else the court would not have cited it.)

59    The Defendants object to the admission of this testimony into evidence, but do not provide any grounds for their objection. The objection is overruled.

60    The Defendants object to the admission of this testimony into evidence on the grounds that the testimony is irrelevant. It is not, and the objection is overruled.

61    The Defendants object to the admission of this testimony into evidence on the grounds that the question preceding the testimony calls for speculation and that the answer lacks foundation and is hearsay. These objections are overruled as moot because the court cites Bauer's testimony only to show that the testimony is not contrary to Beckmann's explanation.

62    An earlier colloquy between the court and Moss reinforces this conclusion:

> THE COURT: The bottom line is you did not attempt to go into the projections that were made by Doctors Community Healthcare Corporation.... You did not attempt to determine their reasonableness beyond general familiarity with what had occurred in the market with which you had familiarity.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 63 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

THE WITNESS: Your Honor, in looking at the projections, I benchmarked the projections against the industry data to determine if the relative ratios were consistent with the industry information.

So, that would be testing things like the salaries expense, you know, wages and payroll, looking at the other items, the other line items they had on the income statement. So, I did that.... The projections themselves, though, most of the line items in those projections drive, somehow, off of the volume that is in the projections.

THE COURT: And it is as to the volumes that you assumed that the projections were reasonable on the part of DCHC?

THE WITNESS: That is correct, Your Honor.

...

THE COURT: ... [Y]ou explain that based on an analysis, none of the revenues as a function of inpatient and outpatient volumes appear unreasonable.

THE WITNESS: That is correct.

THE COURT: So, you did not attempt to ascertain whether the inpatient and outpatient volumes were reasonable. You simply looked at those volumes and tested the revenues as a function of those and determined that the revenue projections were reasonable, and you tested the expenses as a function of revenues and determined that the expenses were a reasonable projection; correct?

THE WITNESS: Correct.

(Trial Tr. 3865:2–3867:10, Feb. 22, 2007 (Moss, K.).) 101

63    In support of his position that the Reese Projections could be reached in a matter of weeks, Moss provided the following example:

There is actually an example of that within the industry, Allegheny East, which were the Pittsburgh hospitals of Allegheny. My recollection is that I saw some information where they were losing roughly 25 million a month is what I recall, so a substantial loss. Those facilities were purchased about the time of this transaction with Reese. In the 10K of the buyer, which would have been only a month and a half later, in their 10K, they disclosed that they had already had the facilities operating at break even.

(Trial Tr. 3527:10–19, Feb. 20, 2007 (Moss, K.).)

Assuming for the moment that Moss's offhand "recollection" is accurate, the court does not see how the fact that one other hospital apparently went from monthly losses of $25 million to break even in a six-week period establishes the reasonableness of projecting that this particular hospital would have done the same. The question Moss was supposed to address was whether the Reese Projections were reasonable, not whether they were possible.

64    The Reese Management Team used the 1996 patient days figure instead of the 1997 figure because "the hospital announced their intention to sell [Reese Hospital] in 1997 and this announcement had a negative impact on volume." (Pl.Ex. 115; Trial Tr. 1582:2–7, Jan. 30, 2007 (Talbot, D.).) But the sale of Reese Hospital was announced in *December* of 1997, by which time any impact of the announcement on the volume at Reese Hospital for that year would have been marginal at best. (Pl. Facts ¶ 23; Defs. Rebuttal ¶ 23.) The use of 1996 data when 1997 data regarding patient days was available is yet another flaw in the Strategic Assumptions and Reese Projections.

65    Talbot could not recall or explain why she did not incorporate the Reese Hospital financial statement for September of 1998 into the Reese Projections, (Trial Tr. 1670:21–1671:1, 1735:10–1736:3, Jan. 30, 2007 (Talbot, D.)), but she agreed that she was "not too focused" on the performance of Reese Hospital in "the most immediate several months" preceding the Transfer Date because she "had the history upon which [she] would be relying before the uncertainty that arose upon the announcement of the sale of Michael Reese," (Trial Tr. 1735:10–15, Jan. 30, 2007 (Talbot, D.)).

66    The total number of patient days projected for 1998 in the Reese September Projections is 97,220, or 90.80% of the 107,075 patient days experienced in 1996; however, when the patient days projected for each unit in Reese Hospital are added together, they yield a slightly larger number of 97,238, or 90.81% of the 1996 patient day total.

67    Similarly, the 1999 patient days projected in the Reese September Projections total 97.82% of the patient days at Reese Hospital in 1996 as stated in the Strategic Assumptions. (Pl.Ex.115.)

68    The court reached the conclusion that the patient days totals for 1996 and 1997 and patient days projections for 1998 and 1999 do not include outpatient cases by adding the patient days totals and projections for each unit in Reese Hospital. Presumably, patient days are not recorded for outpatient services because outpatient services are by definition events of less than one day.

69    The court determined that the Reese September Projections forecast an annualized net patient service revenue figure of $178,883,210.94 by replicating the unit-specific worksheets created as part of those projections and adding the values produced by those worksheets. The actual net patient service revenues for the hospital in 1996 and 1997 were $171,435,208.00 and $155,125,064.00, respectively. (Pl. Exs. 137 at HCA/MR 08017 (listing total net revenue for 1996 at $174,299,798.00, of which all but $2,864,590.00 came from net patient service revenue); 136 at HCA/MR 08014 (listing total net revenue for 1997 at $157,855,735.00, of which all but $2,730,671.00 came from net patient service revenue).) The court's calculations for 1998 of $178,883,210.94 in projected annualized revenues based on projected post-acquisition performance vary somewhat from the total net patient service

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 64 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

revenue figures set forth in the Reese Projections, (Pl.Ex. 300 at TRUST/HCA–007580 (projecting net patient service revenue of $45,063,000.00 for the last three months of 1998, or $182,755,500.00 annualized)); Pl.Ex. 144A at TRUST EXPERT 010801 (projecting net patient service revenue of $30,042,000 for the last two months of 1998, also $182,755,500.00 when annualized)), but the differences relate to minor computational discrepancies within the Reese Projections, not differences in methodology or underlying assumptions, and the court finds as a factual matter that the projections are unreasonable to the extent that they project excessive amounts of revenue as a result of computational errors or because the Reese Management Team rounded up sub-totals of revenue.

70 The Strategic Assumptions increase the cap for projected patient days by seven percent every year beginning in 2000, presumably to account for long-term growth at the hospital. This suggests that the Reese Management Team believed that the 97.82% cap assumed for 1999 is intended to reflect a consistent volume of patients throughout 1999: if the 1999 cap merely represented an average between a lower figure at the beginning of the year and a higher figure at the end of the year, the cap for 2000 would be seven percent above the later (and higher) value, not the average of the two figures. The fact that the end value for 1999 is the same as the average for 1999 necessarily means that the Reese Management Team anticipated that the start value, end value, and average value in 1999 would all be the same.

71 The court arrived at the percentage of 83.80% by reversing the normal process for arriving at an average. The process may be represented by the following equation: $x=(y*2)-z$, where "x" equals annualized total patient days for 1998 (using November 1, 1998 projected volume)expressed as a percentage of 1996 patient days, "y" equals annualized projected total patient days for 1998 (using average volumes for November and December 1998) expressed as a percentage of 1996 patient days, and "z" equals 1999 patient days (the volume projected to be reached by December 31, 1998) expressed as a percentage of 1996 patient days.

72 In that calculation, 108,519 is the annualized projected number for 1998, and 112,877 is the projected number at December 31, 1999. When 104,161 and 112,877 are averaged, the result is 108,519.

73 Neil Demchick also testified that the Reese Projections were unreasonable in part because they did not take into account the competition from nearby Mercy Hospital, (Trial Tr. 2385:19–24, Feb. 8, 2007 (Demchick, N.)), but as Dr. Enrique Beckmann noted in his deposition, "if they've [*i.e.,* Mercy Hospital and Reese Hospital] been able to exist for 125 years, side by side, both of them providing very valuable services to the community and being viable enough to stay longer than most institutions can stick around in the world, then I don't know that the argument is valid," (Beckmann Dep. 169:1–9, Feb. 1, 2007).

74 Erich Mounce testified that the Reese Management Team "believed that we would be able to renegotiate [the Humana] contract to a much higher *per diem* and obtain some [carve] outs," (Trial Tr. 580:19–21, Jan. 23, 2007 (Mounce, E.)), because he "had been very successful in renegotiating contracts," (Trial Tr. 580:18–19, Jan. 23, 2007 (Mounce, E.)). *See also* Trial Tr. 583:5–16, Jan. 23, 2007 (Mounce, E.) ("[W]e believed under a new ownership ... that we would be able to get it up to that market rate. We had been very successful before doing that ..." and there is no "reason to believe that a buyer in the market of this hospital would have taken any different view ... of what could be achieved with respect to the Humana contracts."); Trial Tr. 614:3–7, Jan. 23, 2007 (Mounce, E.) (felt Reese Corp. could negotiate new rates very quickly after November 12, 1998). (Donna Talbot testified similarly.) But the court finds this belief somewhat unreasonable because, as Melvin Redman made clear in his direct testimony, Humana always had the upper-hand in any negotiations with Reese Corp. due to its relationship with Mercy Hospital, Reese Hospital's nearby neighbor and primary competitor. (Trial Tr. 475:23–476:11, Jan. 23, 2007 (Redman, M.).) A hypothetical purchaser of Reese Hospital would likely have realized that Humana would have the upper-hand in any negotiations due to that relationship with Mercy Hospital, and would have taken that into account in projecting future revenues. It is difficult to say, however, whether a purchaser would ascribe absolutely no value to the chance of successful renegotiations with Humana. Both Talbot and Mounce had experience in the health field, and the court is not inclined to treat their view of the possibility of renegotiation with Humana as totally unreasonable.

75 It is difficult for the court to assess whether the Reese September Projections adequately reflect the changes wrought by the BBA given the admission by Neil Demchick under cross-examination that he had not quantified the expected effect of the BBA. (Trial Tr. 2377:15–20, Feb. 8, 2007 (Demchick, N.).) As the burden of proof with respect to this issue rests with Alberts, the court finds as a factual matter that the adjustments made to DRG coding rates in the Reese September Projections adequately address the changes reasonably predicted to occur as a result of the BBA. For the same reason, the court rejects Demchick's testimony that, in part, the Reese Projections were unreasonable because they did not take into account the costs of operating as a teaching hospital. (Trial Tr.1904:11–17, Feb. 1, 2007 (Demchick, N.).)

76 Alberts argues that the Reese Management Team should not have projected increased collections because the team did not plan to outsource the collections department at the outset of the ownership transfer, but rather believed unreasonably that it could improve the collections practices of in-house employees. (Pl. Rebuttal ¶ 422(i)(iv) (citing Trial Tr. 990:20–24, Jan. 25, 2007 (Talbot, D.)).) Ultimately, it does not matter whether the strategy to reach this projection adopted by the Reese Management Team was reasonable so long as the projection was reasonable based on what an objective purchaser with a reasonable strategy for improving collections practices at Reese Hospital could have achieved. In this case, a reasonable purchaser would have adopted Talbot's outsourcing

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 65 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

strategy from the beginning, thereby improving the collections practices at Reese Hospital in a manner commensurate with the Reese Projections.

77    In his rebuttal testimony, Neil Demchick asserted that the Reese Projections included volume increases in the rehab unit that could only be explained by recourse to the Reese Management Team's Strategic Assumption that a new linear accelerator would be purchased, thereby increasing volume in the rehab unit by 10% per year, even though this projected growth was supposed to be omitted from the Reese Projections. (Trial Tr. 4249:15–25, March 1, 2007 (Demchick, N.).) Demchick bases this opinion on the 10.65% increase in outpatient Medicare and Humana net patient service revenue from 1997 to 1999 in the Reese September Projections. (Trial Tr. 4251:18–23, March 1, 2007 (Demchick, N.).) This projected increase of 10.65% is actually the result of separate assumptions made by the Reese Management Team regarding growth in outpatient volume as a result of the relocation of the ER and projected increase in the number of ambulatory surgeries at Reese Hospital, and has nothing to do with the omitted Strategic Assumption regarding the procurement of a linear accelerator. (See Pl.Ex. 300 at TRUST/HCA–007585 (projecting 10.65202% increase in outpatient revenue in 1999 as a result of increases in ER volume and ambulatory surgeries).)

78    Neil Demchick states in his expert report (the "Demchick Report") that the Turnaround Scenario "best reflect[s] a valuation of the hospital that is being purchased, Reese, before significant changes to operations planned by DCHC beyond simply the 'turnaround.' " (Pl.Ex. 209 ¶ 61(a).) That is not the appropriate way to project earnings for a business enterprise where a reasonable purchaser would make operational changes (at least some of which would almost always require the infusion of capital) to the business once the purchaser assumed control of the business. See Fishman et al., supra ¶ 505.6 (explaining that the business projections used in determining the enterprise value of a business using the DCF approach should be "based on the actual conditions that exist now and that are expected to exist in the future").

79    Demchick testified that he used the lowest historical average because he "tried to be more conservative" in his approach, (Trial Tr. 2101:20–21, Feb. 6, 2007 (Demchick, N.)), but the net effect of his approach—focusing solely on historic expense totals with respect to fixed expenses while using different historic information in projecting revenue and variable expenses—is to create an arbitrary mishmash of numbers that does not and could not reflect the market conditions in the area surrounding the hospital at the time of the Reese Transfers or the operational reality of the hospital as of the Transfer Date.

80    Demchick indicated at trial and in his expert report that he used Reese Hospital's 1996 figures as the target revenue for his Turnaround Scenario because he assumed that Reese Hospital would "be able to return to the level that HCA was operating the hospital at in 1996, which was before the decline started, or even to the 1997 level plus about 3 percent per year in patient revenues." (Trial Tr.2083:12–21, Feb. 6, 2007 (Demchick, N.); see also Pl.Ex. 209 ¶ 61(a).) As the court previously indicated, the sale of Reese Hospital was not announced until December of 1997, so any effect that the announcement of the sale would have had on the hospital's performance that year would be minuscule at best. The point is moot in any event because a hypothetical purchaser armed with the Reese Management Team turnaround plan would not have decided by fiat that revenue at the hospital would reach a specific total from a prior year and then reverse engineer its projections to reach that goal, but rather would have projected increases in volume and cuts in expenses based on operational assumptions and calculated net earnings accordingly.

81    Demchick admitted at trial that he created the Turnaround Scenario under the assumption that the purchaser of the hospital would not undertake many of the turnaround strategies devised by the Reese Management Team because it would lack the cash to do so and because "that would be new things that [the purchaser] would do." (Trial Tr. 1897:3–18, Feb. 1, 2007 (Demchick, N.).) But a reasonable purchaser lacking sufficient capital to turn Reese Hospital into a profitable business would not have purchased the hospital in the first place, which is why a valuation expert should not consider whether the purchaser would be able to fund those capital expenditures that would make the hospital profitable. (Trial Tr. 2483:9–19, Feb. 20, 2007 (Moss, K.).) Rather, the capital expenditures necessary to make the purchased business profitable are subtracted from the business' projected EBITDA as part of the calculation of a projected net cash flow for the business, which is then discounted and added to the business' discounted terminal value to arrive at a final business enterprise value. See part III.B.1.c.ii.(D), infra.

82    Paul Tuft, the former DCHC and Reese Corp. CEO who negotiated the purchase of Reese Hospital, gave the most optimistic assessment as to how quickly the Reese Management Team's turnaround plan would take. He felt that it would take six to 12 months to turn the hospital around. (Trial Tr. 94:14–22, 148:15–19, Jan. 19, 2007, 226:5–8, Jan. 22, 2007 (Tuft, P.).)

83    As the Defendants correctly point out, there is no evidence in the record suggesting that it was unreasonable for the Reese Management Team to assume that the bifurcation of the psychiatric unit could occur as soon as the transfer of ownership to Reese Hospital was complete. (Defs. Rebuttal ¶ 174A.) Ken Bauer testified that the bifurcation of the unit did not occur until May of 1999, (Bauer Dep. 97:8–15, June 14, 2006), but that means only that Reese Corp. did not implement this part of its turnaround plan for six months, not that a hypothetical purchaser could not have implemented this strategy right away.

84    Demchick assumed that Reese Corp. would not be able to improve the operations at Reese Hospital during the "stump period" in 1998, so he ascribed a pro rata portion of Reese Hospital's actual profits and losses from January 1, 1998, through November 12, 1998, to that time period. (Trial Tr. 1850:22–1851:25, Feb. 1, 2007 (Demchick, N.).) He testified that he made this assumption because that

Case 09-10138-MFW    Doc 14225-22    Filed 08/15/14    Page 66 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

period coincides with "the holidays, and we didn't expect that a lot would be happening during the last 7 week period." (Trial Tr. 2120:8–10, Feb. 6, 2007 (Demchick, N.).) This assumption is unreasonable. A reasonable purchaser would implement its turnaround plan as soon as possible because of the financial situation at the hospital as of the Transfer Date. A purchaser would not have waited until the new year to make those changes necessary to improve the hospital's performance.

Demchick also erred in annualizing Reese Hospital's 1998 profits and losses by using data that would not have been available to a hypothetical purchaser as of the Transfer Date. (Trial Tr. 1853:19–1854:3, Feb. 1, 2007 (Demchick, N.).) He should have annualized the hospital's performance through October 31, 1998, and then used a *pro rata* amount of that annualized number for his projections. (Trial Tr. 1854:1–3, Feb. 1, 2007 (Demchick, N.).) Demchick's flawed methodology reduced the annualized total net revenue at Reese Hospital by approximately $5 million. (*Compare* Trial Tr. 1850:22–1851:9, Feb. 1, 2007 (Demchick, N.) ("Q. [H]ow did you come up with the annualized revenue of [$]145,200,000? A. What we did is, ... [ w ] e decided the most appropriate way to annualize it was to look at December 31st, 1998, and then basically back down to November 12th.") *with* Trial Tr. 2469:12–15, Feb. 8, 2007 (Demchick, N.) ("Q. Well, let's look at the—if you do that math, [$]125,466,154 times 365 over 304, I'll represent to you that you get [$]150,641,928. A. Okay.").) Demchick attempted to justify his use of a lower annualized revenue figure for 1998 by asserting that "December is a slower month" for Reese Hospital than the rest of the year, (Trial Tr. 2469:3–11, Feb. 8, 2007 (Demchick, N.)), but the court does not find this unsupported *post hoc* explanation credible for the reasons set forth above.

85    Moss expanded on this point later on in his testimony:

> When it's known that a facility is on the market, typically, a transaction can occur fairly quickly when a hospital is put on the market. And as you can see by the large volume of transactions that have been out there, it was an active market, so you could put a hospital up for sale and move out of it fairly quickly and so you could have a seamless transition with your physicians. When we've had a protracted sale, the physicians become concerned. Physicians are people that, you know, they want to know where they're admitting their patients, how they're going to be cared for, what equipment and support will be provided for them. They want to make sure it's a good place for their patients and a good place for them to operate.
>
> And during the time period when you have uncertainty with these facilities, they have admitting rights at other hospitals and they can send their patients to other facilities. And that's what happens to hospitals when you have this protracted sales process, it can damage volume.

(Trial Tr. 3435:22–3436:14, Feb. 20, 2007 (Moss, K.).)

86    Demchick noted that the Reese Management Team calculated bad debt as a percentage of accounts receivable rather than as a percentage of net patient service revenue, a practice that he "questioned ... a little bit," (Trial Tr.2098:17, Feb. 6, 2007 (Demchick, N.)), but given Demchick's lack of operational expertise in the health care arena and the extensive operational experience of the Reese Management Team, (*see* Trial Tr. 2370:2–2373:16, Feb. 8, 2007 (Demchick, N.) (establishing the eighty-six years of cumulative healthcare experience held by the Reese Management Team)), the court questions whether Demchick is really in a position to critique the Reese Projections in this manner. Moreover, the percentage of accounts receivable that the Reese Management Team used in calculating bad debts was 20%, which amounts to 3.4% of Reese Hospital's net patient service revenue, or 0.02% less than the bad debt expense calculated by Demchick. (Trial Tr.2098:11–12, 22–24, Feb. 6, 2007 (Demchick, N.).) The difference is so minuscule as to be irrelevant.

87    Demchick calculated variable expenses as a percentage of total net revenue (*i.e.,* net patient service revenue plus other operating revenue) rather than as a percentage of net patient service revenue. (Trial Tr.2088:18–2089:11, Feb. 8, 2007 (Demchick, N.; Pl.Ex. 209 at Ex. J.) He provided no explanation for this deviation from the methodology employed by the Reese Management Team.

88    It is unclear whether the Reese Management Team intended to lay off FTEs upon the transfer of Reese Hospital or simply believed that they could maintain the same number of FTEs as there were on the Transfer Date after patient volume started to grow. (*Compare* Trial Tr. 878:5–11, Jan. 25, 2007 (Talbot, D.) ("one of our big assumptions was we were going to reduce the number of full-time equivalents") *with* Pl.Ex. 300 at TRUST/HCA–007627 (projecting salaries for 1998 and 1999 using the 1997 figure for total FTEs at Reese Hospital).)

89    The court arrived at this figure by using the methodology set forth in the Reese September Projections, (Pl.Ex. 300 at TRUST/HCA–007627), with inflation added for the year 2000.

90    The Reese September Projections do not set forth a discernible methodology for calculating contract labor, forcing the court to use Demchick's method instead.

91    The court used the Reese Management Team's methodology for calculating employee benefits rather than Demchick's method. Demchick projected employee benefits as totaling $14,739,587.00 in 2000, (Pl.Ex. 209 at Ex. H), which would lead to a revised total of $85,007,487.73. That amounts to 42.23% of net patient revenue as projected by Demchick for 2000 or 40.38% of total net revenue as projected by Demchick for 2000.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 67 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

92    The court would have preferred to craft projections averaging the volume levels at Reese Hospital between the Transfer Date of November 12, 1998, year-to date figure annualized for 1998, and 1997, but the Transfer Date year-to-date numbers were not included in the record, and likely would not have been available to a hypothetical purchaser.

93    The court arrived at the discount percentage of 87.25% as follows. First, the court determined the difference between 1996 EIPDs totals and 1997 EIPDs totals as a percentage decrease: the result of this calculation is 11.59 percent. The court then multiplied this figure by 110% to account for the increasingly steep decline of the hospital's performance in 1998. (This latter percentage was determined by calculating the decline in net patient service revenue from 1996 to 1997, comparing the difference in revenue to the difference in EIPDs totals for the two years, and then using the same ratio of percentage decline in net patient service revenue to percentage decline in EIPDs totals from 1996 to 1997 to arrive at an estimated percentage decline in EIPDs in 1998 using the percentage decline in net patient service revenue from 1997 to the annualized figure for 1998.) The court subtracted the result (12.75%) from 100 to arrive at a percentage (87.25%) of 1997 EIPDs totals for 1998.

94    The 35.31% figure represents the average of the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the second version of the M & P Projections (approximately 36.87%) and the percentage of net patient service revenue projected to be consumed by salaries and wages in 1999 in the Reese October Projections (33.75%).

95    The calculations made by the court to arrive at the figures listed below were made on Excel spreadsheets that are not easily appended to the pdf version of this memorandum decision that is being signed electronically for entry by the clerk. The court will therefore list only the final results of those calculations in these findings of fact and conclusions of law, but will transmit to the parties the spreadsheets and will direct the clerk of the court to maintain a disk containing the spreadsheets as an exhibit in the proceeding (incorporated by reference into this memorandum decision), and to post the spreadsheets on the court's website so that they are available to the public for viewing.

| | 11/12/98–12/31/98 | 1999 | 2000 | 2001 | 2002 [96] |
|---|---|---|---|---|---|
| Net Patient Service Revenue | $20,005,551.26 | $162,587,960.45 | $181,038,031.12 | $202,703,867.02 | $214,608,759.36 |
| Other Operating Revenue | $1,037,069.04 | $8,580,737.42 | $10,292,000.00 | $11,335,472.63 | $11,833,039.26 |
| Total Net Revenue | $21,042,620.31 | $171,168,697.88 | $191,330,031.12 | $214,039,339.64 | $226,441,798.62 |

96    Projections should be made only "until a stabilized level of operations (growth and sustainable profit margins) is achieved." Fishman et al., supra, ¶ 505.27. "This level will usually be reached when future operations are not expected to differ from normal operations ... except as a result of normal growth." Id. Under the court's projections, that year is 2001. However, the court must also calculate a terminal value and a terminate net cash flow for Reese Hospital, which requires the projection of revenue and expenses for the year following the first year of stabilized operations at the hospital, i.e., 2002. See part III.B.1.c.iv., infra.

97    Demchick never explained why he deviated so sharply from the Reese Projections, though he did describe his projections as an "averaging" that "is not really relevant to the ultimate answer" of Reese Hospital's business enterprise value because "when you look at the valuation, it is not a cash flow item, so it gets added back." (Trial Tr. 2104:16–20, Feb. 6, 2007 (Demchick, N.).) This answer is not entirely correct: depreciation and amortization is considered a fixed expense that is deducted from a business's total net revenue as part of the EBIT calculation, so the lower the depreciation and amortization, the higher the business's EBIT will be, which, in turn, means that the income taxes on that EBIT (assuming the EBIT is positive) will be higher, as well. See part IIIB.1.c.ii.E, infra.

98    There are no projected income taxes for Reese Hospital in the years 1998–2001 because there are projected net operating losses for the hospital in 1998 and 1999 that carry over through 2001. (See Trial Tr. 2120:18–24, Feb. 6, 2007 (Demchick, N.) (explaining that net operating losses are carried over from one year to the next in determining whether there is taxable income for a particular year).

99    The Reese Management Team assumed that $1.2 million would be spent on cardiac catheterization equipment in 1998, $2.5 million would be spent on computer upgrades in 1998 and $9 million spent in 1999, $6 million would be spent on a linear accelerator in 1999, $2.5 million would be spent to relocate the ER in 1998, $1 million would be spent on a 25–bed SNF unit in 1999, $2 million would be spent on cosmetic enhancements in 1998, and $4 million would be spent each year for miscellaneous needs. (Pl.Ex. 115; see also Trial Tr. 1890:12–15, Feb. 1, 2007 (Demchick, N.) (explaining that the Reese Management Team projected $4 million in capital expenditures every year in addition to the expenditures contemplated in the Strategic Assumptions); Defs. Ex. JV at Ex. 2–Ex.6 (projecting $4 million in annual expenditures every year after 1999).) These expenditures total $44.2 million (1.2+2.5+9+6+2.5+1+2+4+4+4+4+4=44.2).

100    The court reached this figure by adding $1,200,000.00 projected for cardiac catheterization equipment, $2,500,000.00 projected for computer upgrades, $295,893.72 projected for relocation of the ER (as modified by the court), $236,714.98 projected for cosmetic enhancements (as modified by the court), and $536,986.30 for miscellaneous expenditures (as modified by the court).

101    The court reached this figure by adding $9,000,000.00 projected for computer upgrades, $2,204,106.28 projected for relocation of the ER (as modified by the court), $1,763,285.02 projected for cosmetic enhancements (as modified by the court), and $4,000,000.00 for miscellaneous expenditures.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 68 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

102   The CAPM method "is applied in almost the same manner as the build-up method except that adjustments are made based on comparing the company being valued to the average guideline company rather than to the average S & P 500 company." Fishman et al., *supra*, ¶ 503.5. This adjustment is made by multiplying the equity risk premium, discussed later, by a beta value that reflects market volatility. *Id.* ¶ 503.10, Ex. 5–12. Consequently, there is no need for an industry adjustment (discussed later) to the average return derived from adding the risk-free investment rate to the modified equity risk premium, as there often is when using the build-up method. *Id.* ¶ 502.21.

103   Demchick testified at trial that his risk-free rate of 5.50% "relates to the ten year treasury bond rate," (Trial Tr. 2110:11–13, Feb. 6, 2007 (Demchick, N.)), but his expert report cites the 20–year rate as its source even though it uses the percentage provided by the ten year rate, (Pl.Ex. 209 at Ex. M1). This suggests that Demchick either rounded up the 20-year rate or accidentally calculated his discount rate using the ten year rate instead.

104   Demchick asserted in his expert report that he used a 3.3% size premium because he expected capitalization at Reese Hospital to be "below $261 million." (Pl.Ex. 209 at Ex. M–1.) He therefore used a size premium assigned to the aggregation of the ninth and tenth deciles by Ibbotson. Ibbotson 1998 Yearbook, *supra*, at Table 7–6. But there is no reason why Demchick should have expected capitalization to rise above the tenth decile, and as a consequence no reason why he should not have used the size premium for that decile rather than the size premium for the aggregated ninth and tenth deciles.

      As best the court can tell, Moss simply rounded up the size premium for companies in the tenth decile in the Ibbotson 1998 Yearbook to arrive at his size premium of 5.4 percent. The court sees no reason why the number should have been rounded up in such fashion, and declines to do so in finding the appropriate size premium as a factual matter.

105   Demchick used a specific company risk premium of 8% in determining a discount rate for use in his Turnaround Scenario. (Trial Tr. 2113:15–2114:20, Feb. 6, 2007 (Demchick, N.).) He used a higher premium for purposes of his Strategic Growth Scenario because that scenario assumed greater revenue growth and net cash flows than the Turnaround Scenario, and therefore was less likely to occur. (Trial Tr. 2130:2–11, Feb. 6, 2007 (Demchick, N.; Pl.Ex. 209 at Ex. M.)

106   Demchick suggested at trial that his 12% cost of debt reflected the lack of assets at the hospital. (Trial Tr. 2551:17–2552:16, Feb. 9, 2007 (Demchick, N.).) Even if the court were willing to credit this change in his approach, it would still reject the cost of debt selected by Demchick because the assets held by Reese Hospital would be more than sufficient to finance the purchase of the hospital assuming that the purchaser was able to invest a reasonable (*i.e.*, market average) amount of capital. *See* discussion, *infra*.

107   The court ascertained this amount by dividing the value of Reese Hospital's net assets by the percentage of the purchase price that a reasonable purchaser would finance through debt (in this case, 43.1% of the purchase price (*see* part III.B.1.c.iii.(C), *infra* )).

108   The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) ÷ 2 (to account for the mid-year convention). (Trial Tr. 3520:4–10, Feb. 20, 2007 (Moss, K.))

109   The court arrived at this figure by means of the following calculation: 49 (representing the number of days in the "stump period" of 1998) ÷ 365 (representing the number of days in the year) + .5 (to account for the mid-year convention). (Trial Tr. 3520:11–14, Feb. 20, 2007 (Moss, K.).)

| | |
|---|---|
| Terminal Net Cash Flow | $12,874,687.31 |
| WACC | x (1 + 18.14%)½ |
| Modified Terminal Net Cash Flow | $13,993,567.80 |
| Capitalization Rate ÷ 12.82% | |
| Terminal Value (under modified Gordon Model) | $109,114,564.17 |

110   Theoretically, the net working capital purchased by Reese Corp. could be included in the income stream for the projections used by the court to determine the value of Reese Hospital as if it were normally capitalized. After all, a reasonable purchaser would not expect to collect the revenues generated from its post-transaction operations immediately, but rather would depend on the income stream from the net working capital until post-transaction revenues began to trickle in. Alternatively, it could be argued that the net working capital purchased by Reese Corp. as a non-operating asset, should be considered separately as the court has done, but that as a consequence the court should project no revenue whatsoever for Reese Hospital until the hospital began to collect on its accounts receivables.

      Ultimately, neither approach is feasible. There is no information in the record from which the court can ascertain the average delay in the hospital's collection of accounts receivables, and thus no way to incorporate the income stream from the net working capital into the court's projections. Further, financial projections used to calculate a discounted cash flow must be made in compliance with generally accepted accounting principles, Fishman et al., *supra* ¶ 505.8, and those principles require that income be recorded on an accrual basis rather than on a cash basis. Finally, if the court were to project Reese Hospital's income on a collection (as opposed to an accrual) basis, it would need to include additional projected value in the form of the (uncollected) accounts receivable held by Reese Hospital's owner at the end of the terminal year, which would cancel out any shortfall in initial income for the hospital's owner.

Case 09-10138-MFW   Doc 14225-22   Filed 08/15/14   Page 69 of 69

In re Greater Southeast Community Hosp. Corp. I, Not Reported in B.R. (2008)

111   HCA did not accept PHHC's offer because they had already signed a letter of intent from DCHC on February 17, 1998. (Trial Tr. 2753:8–13, 2756:13–23, Feb. 12, 2007 (Gerken, G.).)

112   HCA, moreover, was obligated by the APA to provide monthly financials within thirty, not fifteen, days of the end of the prior month.

113   GHI agreed in section 5.01 of the APA to provide Reese Corp. full and complete access to the books and records of Reese Hospital until the closing date. Section 5.01 provides:

> Between the date of this Agreement and the Closing Date, Seller shall afford to the officers and authorized representatives and agents of Buyer full and complete access to and the right to inspect the plant, properties, books and records of Seller relating to the Assets, and will furnish Buyer with such additional financial and operating data and other information as to the business and properties of Seller relating to the Assets as Buyer may from time to time reasonably request without regard to where such information may be located.

114   Section 4.08 of the APA provides: "Buyer has had full and free access to and has inspected and investigated to its satisfaction the Business of Seller, the Assets, and the Hospital." (Pl Ex. 2.)

115   Section 4.06 of the APA provides: "Buyer has or will have by Closing the financial ability to consummate the transactions contemplated by this Agreement." (Pl.Ex. 2 (APA § 4.06).)

116   NCFE financed the majority of Reese Corp.'s purchase of Reese Hospital. Of the $68,048,840 purchase price, NCFE provided Reese Corp. approximately $43,308,357 in accounts receivable financing and approximately $10,800,000 for equipment sale/leaseback financing.

---

**End of Document**     © 2014 Thomson Reuters. No claim to original U.S. Government Works.