# TAB 25

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 2 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

621 F.3d 261
United States Court of Appeals,
Third Circuit.

Tolano ANDERSON; Cathy Anderson; Richard Wilkins; Brenda Wilkins; Lloyd Wheatley; Audria Wheatley, Appellants No. 09–2275
v.
WACHOVIA MORTGAGE CORPORATION; Wachovia Corporation, Appellants No. 09–2336.

Nos. 09–2275, 09–2336.   |   Argued Jan. 25, 2010.   |   Filed: Sept. 13, 2010.

**Synopsis**
**Background:** African-American mortgagors brought state court action against mortgagee, alleging racially-based lending discrimination. Action was removed. The United States District Court for the District of Delaware, Sue L. Robinson, J., 609 F.Supp.2d 360, granted partial summary judgment in favor of mortgagee. Parties cross-appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit Judge, held that:

[1] mortgagors failed to establish direct evidence of discrimination;

[2] mortgagors failed to establish that mortgagee's race-neutral reasons for actions were pretextual;

[3] district court did not err in dismissing breach of contract claim sua sponte;

[4] Delaware law did not allow tortious interference claim based on expensive or burdensome contractual performance;

[5] district court properly denied mortgagors' motion to compel responses to discovery requests; and

[6] district court properly remanded pendent good faith and fair dealing claim.

Affirmed.

West Headnotes (18)

[1]     **Civil Rights**
        Weight and Sufficiency of Evidence

Under § 1981, direct evidence of discrimination must be so revealing of discriminatory animus that it is unnecessary to rely on burden-shifting framework under which burden of proof remains with plaintiff. 42 U.S.C.A. § 1981.

23 Cases that cite this headnote

[2]     **Civil Rights**
        Presumptions, Inferences, and Burdens of Proof

Once plaintiff produces direct evidence of discrimination under § 1981, defendant has burden of producing evidence to show that it would have made same decision in absence of discriminatory animus. 42 U.S.C.A. § 1981.

22 Cases that cite this headnote

[3]     **Civil Rights**
        Weight and Sufficiency of Evidence

To qualify as direct evidence of discrimination under § 1981, evidence must be such that it demonstrates that decision-makers placed substantial negative reliance on illegitimate criterion in reaching their decision. 42 U.S.C.A. § 1981.

4 Cases that cite this headnote

[4]     **Civil Rights**
        Weight and Sufficiency of Evidence

To qualify as direct evidence of discrimination under § 1981, evidence must be: (1) strong enough to permit fact-finder to infer that discriminatory attitude was more likely than not motivating factor in defendant's decision, and (2) connected to decision being challenged by plaintiff. 42 U.S.C.A. § 1981.

4 Cases that cite this headnote

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 3 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

[5]   **Civil Rights**
       Weight and Sufficiency of Evidence

Any statements made by defendant's employees must be made at time proximate to challenged decision and by person closely linked to that decision to qualify as direct evidence of discrimination under § 1981. 42 U.S.C.A. § 1981.

3 Cases that cite this headnote

[6]   **Civil Rights**
       Property and housing

African-American mortgagors who sued mortgagee, alleging racially-based lending discrimination, failed to establish direct evidence of discrimination, as required to maintain claim under § 1981; loan officer's use of phrase "you people" in reference to mortgagors was not alone so revealing of discriminatory animus that it would enable fact-finder to conclude that discriminatory attitude was, more likely than not, motivating factor in decision to impose challenged loan conditions. 42 U.S.C.A. § 1981.

8 Cases that cite this headnote

[7]   **Civil Rights**
       Contracts, trade, and commercial activity

To make out prima facie case of lending discrimination under § 1981, plaintiff must show that: (1) he belongs to protected class; (2) he applied and was qualified for credit that was available from defendant; (3) his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions; and (4) some additional evidence exists that establishes causal nexus between harm suffered and plaintiff's membership in protected class, from which reasonable juror could infer, in light of common experience, that defendant acted with discriminatory intent. 42 U.S.C.A. § 1981.

32 Cases that cite this headnote

[8]   **Civil Rights**
       Weight and Sufficiency of Evidence

Plaintiff under § 1981 may rebut defendant's proffered non-discriminatory reasons for adverse action by: (1) discrediting proffered reasons, either circumstantially or directly, or (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not determinative cause of action. 42 U.S.C.A. § 1981.

22 Cases that cite this headnote

[9]   **Civil Rights**
       Loans and financing

African-American mortgagors who sued mortgagee, alleging racially-based lending discrimination, failed to establish that mortgagee's proffered race-neutral reasons for actions were pretextual, as required to maintain claim under § 1981; there was no evidence that first loan could have been approved without repairs to property, or that second loan could have been approved as conventional loan without repairs or as exception loan without 20 percent down payment and verification by accountant. 42 U.S.C.A. § 1981.

Cases that cite this headnote

[10]  **Federal Civil Procedure**
       Motion

District courts possess power to enter summary judgment sua sponte, so long as losing party was on notice that he had to come forward with all of his evidence. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

7 Cases that cite this headnote

[11]  **Federal Civil Procedure**
       Motion

Notice requirement for sua sponte dismissal on summary judgment is satisfied when case involves presence of fully developed record, lack of prejudice, and decision based on purely legal issue. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

5 Cases that cite this headnote

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 4 of 18

 [12]   **Federal Civil Procedure**
         Civil rights cases in general
         **Federal Civil Procedure**
         Motion

District court did not err in entering summary judgment sua sponte on breach of contract claim brought under Delaware law by African-American mortgagors against mortgagee in connection with alleged lending discrimination, since court had previously notified mortgagors that claim was inadequately pled, and mortgagors offered no explanation as to how they would have benefited from opportunity to submit further evidence or briefing on claim. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

3 Cases that cite this headnote

 [13]   **Torts**
         Injury and causation

Delaware law does not allow tortious interference claim based on allegation that defendant caused plaintiff's performance to be more expensive or burdensome.

2 Cases that cite this headnote

 [14]   **Federal Courts**
         Depositions and discovery

Court of Appeals reviews district court's discovery orders for abuse of discretion, and will not disturb such order absent showing of actual and substantial prejudice.

12 Cases that cite this headnote

 [15]   **Federal Civil Procedure**
         Sufficiency; supplementation of answers

District court did not abuse its discretion in denying African-American mortgagors' motion to compel mortgagee's responses to discovery requests in action alleging lending discrimination, where information sought by interrogatories was contained in documents produced to mortgagors, and discovery regarding mortgagee's approval rates was not crucial to mortgagors' prima facie case.

2 Cases that cite this headnote

 [16]   **Removal of Cases**
         Review

In determining whether district court abused its discretion in remanding pendent claim, court considers whether dismissal of claim best serves principles of judicial economy, convenience, fairness, and comity. 28 U.S.C.A. § 1367(c)(3).

3 Cases that cite this headnote

 [17]   **Contracts**
         Acts or Omissions Constituting Breach in General

Under Delaware law, party breaches implied covenant of good faith and fair dealing by engaging in arbitrary or unreasonable conduct which has effect of preventing other party to contract from receiving fruits of bargain, or by frustrating overarching purpose of contract by taking advantage of its position to control implementation of agreement's terms.

Cases that cite this headnote

 [18]   **Federal Courts**
         Effect of dismissal or other elimination of federal claims
         **Removal of Cases**
         Want of jurisdiction or of cause for removal

District court did not abuse its discretion in remanding pendent good faith and fair dealing claim brought under Delaware law by African-American mortgagors against mortgagee in connection with alleged lending discrimination, since court's dismissal of § 1981 claim was not fatal to state-law claim, and state court was adequately positioned to resolve all aspects of claim, including whether it was preempted by federal law. 28 U.S.C.A. § 1367(c)(3); 42 U.S.C.A. § 1981.

2 Cases that cite this headnote



Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 5 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

**Attorneys and Law Firms**

**\*264** [John S. Grady](), Esq. **[ARGUED],** Grady & Hampton, Dover, DE, for Appellants Cross Appellees.

[Michael J. Barrie](), Esq., Benesch, Wilmington, DE, [Stephen A. Fogdall](), Esq. **[ARGUED],** Schnader Harrison Segal & Lewis LLP, Philadelphia, PA, for Appellees Cross Appellants.

Before: [RENDELL]() and [JORDAN](), Circuit Judges, and PADOVA, District Judge [*]().

**Opinion**

**OPINION OF THE COURT**

[RENDELL](), Circuit Judge.

This case is brought by three African–American couples who, in 2004, purchased adjacent houses in a Dover, Delaware, community known as "Silver Lake." Plaintiffs received mortgages from Wachovia Mortgage Corporation, but only after Wachovia imposed several conditions on the approvals of these mortgages. Plaintiffs allege that these conditions were racially motivated, and brought suit against Wachovia under [42 U.S.C. § 1981]() and various state law causes of action.

This appeal requires us to identify, as a matter of first impression, the elements of a prima facie case of lending discrimination under [§ 1981](). Whether plaintiffs have made out a prima facie case of discrimination is a close call, but even if they have, they have not undermined Wachovia's legitimate reasons for imposing the conditions it did. Thus, we conclude that they have not shown that the mortgage conditions were imposed for discriminatory reasons. The District Court therefore properly granted summary judgment to Wachovia on the [§ 1981]() claim. We also conclude that the District Court correctly granted summary judgment on plaintiffs' breach of contract and tortious interference claims, and that it acted within its discretion in denying plaintiffs' motion to compel certain discovery. Finally, we find that the District Court acted within its discretion in remanding plaintiffs' good faith and fair dealing claim to Delaware state court. We will therefore affirm the District Court's orders and judgment.

**I.**

**A.**

Plaintiffs Tolano and Cathy Anderson, Richard and Brenda Wilkins, and Lloyd and Audria Wheatley purchased adjacent houses in the Silver Lake community from an individual named Peter Aigner. On **\*265** June 18, 2004, plaintiffs agreed to go to settlement on August 6, and agreed that if the houses were not purchased by that date they would forfeit their joint deposit of $40,000 on the total purchase price for all three homes of $800,000. After reaching this agreement, plaintiffs contacted Wachovia to arrange financing.

Several individuals at Wachovia were involved with plaintiffs' loans. J.D. Hogsten was assigned as plaintiffs' loan officer, and appears to have had the most contact with them. Colleen Fazzino acted as the underwriter for the Anderson and Wheatley loans, George Akerley acted as the underwriter for the Wilkins loan, and Terri Hamm acted as an "exception officer" to address issues specific to the Wheatley loan.

Each of the couples' loans was subject to a unique set of conditions. With respect to the Anderson loan, plaintiffs claim that Wachovia mandated extensive, pre-sale repairs to the house's drywall, insulation, and plumbing, after an independent appraiser informed Hogsten that the property could not be appraised without such repairs. The Andersons contend that these repairs were especially challenging both because of the accelerated timetable and because they needed to obtain permission from Aigner to make repairs before purchasing the house. Nonetheless, the repairs were completed, and the sale closed on schedule.

Wachovia imposed several conditions on the Wheatley loan. It initially denied his application for a non-income-verification loan, which would have required a 15% down payment, because Mr. Wheatley's credit score was too low for that type of loan. [1] The Wheatleys then changed their application to a "stated income loan," JA488, for which the credit score was sufficient, and which would have required a 10% down payment. [2] Wachovia, however, then found the property's condition to be inadequate and required repairs to the house's roof, heating system, pipes, and floors. After those repairs were completed and an appraiser submitted a completion certificate, Wachovia required the Wheatleys to submit an additional completion certificate from a roofing

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 6 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

specialist showing that the necessary repairs to the roof had been completed. The Wheatleys were not told of this new requirement until the day of closing, preventing the closing from occurring on schedule. (Aigner granted an extension of the sale deadline, however, and the Wheatley sale closed on August 13.) In addition, after conditionally approving the Wheatleys for the loan requiring only a 10% down payment, Wachovia reclassified the loan as an "exception loan" and required them to provide a 20% down payment. When the Wheatleys attempted to use funds from their small business toward the down payment, Wachovia required them to have an accountant verify details of the business's tax filings.

Finally, Wachovia challenged the Wilkinses' use of a convenience check issued by their credit card company to pay their earnest money deposit to Aigner. However, once the underwriter learned that Mr. **\*266** Wilkins had obtained a secured loan and used its proceeds to pay the balance due on his credit card, he determined that this issue had been resolved.

### B.

Plaintiffs attempt to support their claims that Wachovia imposed discriminatory conditions on their loans with the following three types of evidence.

First, plaintiffs provide anecdotal evidence of the racial makeup of the Silver Lake community to support their contention that Wachovia imposed the mortgage conditions to prevent them, as African–Americans, from moving into a predominantly Caucasian neighborhood. They testified that the Silver Lake community is "almost exclusively ... white," and that they believed that the community "desired that it remain that way." JA369. They also presented an affidavit from a Dover insurance agent stating that it was common knowledge that the homes in Silver Lake "were almost all owned by white families." JA191. Mr. Anderson testified that Deanne Wicks, a Wachovia employee who was not involved in these transactions, told him that " '[t]here are a lot of people that are not happy with you all purchasing homes on Silver Lake,' " and that " 'Silver Lake is an exclusive lily white community and now here you guys come.' " JA384–85.

Second, plaintiffs offer comparative evidence based on their experiences. They claim that the banks in their prior real estate transactions, which involved purchases of property in minority neighborhoods, did not impose such stringent conditions. Mr. Anderson testified that Wachovia itself had not imposed similar requirements when it financed his prior purchases of several investment properties and an unimproved lot. Mr. Wheatley testified that he had not experienced difficulties in real estate transactions involving other banks. Mr. Wilkins testified that he had never been questioned about the source of his earnest money deposits in prior real estate transactions, although he conceded that he had never used a credit card convenience check for such a purpose before.

Third, plaintiffs testified to a number of comments made by Hogsten that they believe demonstrated discriminatory animus. According to Mr. Anderson, Hogsten said to him, " 'you people don't understand how the process works,' " which Anderson believed indicated racial prejudice. JA387. Mr. Wheatley also testified that Hogsten said to him that "you people don't understand the loan process"; Wheatley "infer[red]" that this was a reference to "the Afrocentric race." JA448. Mr. Anderson further testified that Hogsten said, " 'I'm getting a lot of pressure on this transaction' " and " 'a lot of heat.' " JA398. Although Hogsten did not identify who was pressuring him, Anderson construed his comments to mean that "people did not want this deal to go through and he was being pressured to cause it to collapse." JA398. Mr. Wheatley also testified that Hogsten said "that I'm getting a lot of pressure and there are people who do not want you all to buy these properties." JA442. According to Mr. Wilkins, Hogsten had "a nasty attitude" and was "unprofessional." JA520–21. [3]

### C.

This case was initially filed in Delaware state court, and was removed by Wachovia **\*267** to federal court. Plaintiffs then amended their complaint, asserting that Wachovia had violated [42 U.S.C. § 1981](), had breached a contract with plaintiffs, had breached the covenant of good faith and fair dealing, and had tortiously interfered with plaintiffs' contracts with Aigner. Wachovia moved to dismiss the amended complaint. The District Court granted the motion with respect to the breach of contract and tortious interference claims but denied it with respect to plaintiffs' [§ 1981]() and good faith and fair dealing claims. *[Anderson v. Wachovia Mortg. Corp. ("Anderson I"),](*) [497 F.Supp.2d 572 (D.Del.2007).]()

After discovery was nearly complete, plaintiffs filed a second amended complaint, which asserted essentially the same legal

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 7 of 18

claims as in the first amended complaint but slightly adjusted the supporting factual allegations.[4] Wachovia moved for summary judgment, and the District Court granted summary judgment on the § 1981, breach of contract, and tortious interference claims. However, the Court remanded the case to state court for consideration of the good faith and fair dealing claim. *Anderson v. Wachovia Mortg. Corp. ("Anderson II"),* 609 F.Supp.2d 360 (D.Del.2009). Plaintiffs now appeal the grant of summary judgment, as well as an earlier order denying plaintiffs' motion to compel certain discovery. Wachovia cross-appeals the remand of the good faith and fair dealing claim.

The District Court had jurisdiction over plaintiffs' claims under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 1291.

## II.

We exercise plenary review of a District Court's grant of summary judgment, using the same standard applied by the district courts. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994). Under this standard, the movant must demonstrate that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). "In reviewing the grant of a motion for summary judgment, we (i) resolve conflicting evidence in favor of the nonmovant, (ii) do not engage in credibility determinations, and (iii) draw all reasonable inferences in favor of the nonmovant." *Fuentes,* 32 F.3d at 762 n. 1.

Plaintiffs' discrimination claims are brought under 42 U.S.C. § 1981, which provides, as relevant here, that "[a]ll persons ... shall have the same right in every State and Territory to make and enforce contracts." § 1981(a). "The term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b).

We have previously applied the tests used to evaluate employment discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* to employment discrimination claims brought under § 1981, since "the substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.,* 581 F.3d 175, 181–82 (3d Cir.2009). Thus, both the direct evidence test introduced by **\*268** *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting framework introduced by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), may be used to determine whether an employer has discriminated against a plaintiff in violation of § 1981. *See Brown,* 581 F.3d at 182; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 796–97 (3d Cir.1990). This too is a case brought under § 1981, and we deem it best to employ the same frameworks in the context of claims of discriminatory lending under § 1981. We thus hold that the direct evidence and *McDonnell Douglas* tests should be applied to lending discrimination claims brought under § 1981.[5]

In doing so, we part ways with the Court of Appeals for the Seventh Circuit, which opined in *Latimore v. Citibank Federal Savings Bank,* 151 F.3d 712 (7th Cir.1998), that *McDonnell Douglas* should be applied only where there is a "basis for comparing the defendant's treatment of the plaintiff with the defendant's treatment of other, similarly situated persons," and thus not in lending discrimination cases, which typically do not involve a "competitive situation" between different borrowers. *Id.* at 714. In *Latimore,* the court indicated that a plaintiff can still "try to show in a conventional way, without relying on any special doctrines of burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue." *Id.* at 715. We disagree with this approach, as the *McDonnell Douglas* burden-shifting framework has generally been used in § 1981 discrimination cases and it would be a significant departure, we think, from litigants' settled expectations about the applicable law to single out cases involving alleged discriminatory lending practices for different treatment. We will apply a variation of the *McDonnell Douglas* test that requires plaintiffs to show "additional evidence" under the fourth prong of the test for establishing a prima facie case.

As addressed in greater detail below, we do not agree that *McDonnell Douglas* is limited to cases where a plaintiff can produce evidence of a defendant's treatment of directly comparable individuals. The burden of a § 1981 plaintiff is to "prove purposeful discrimination," and the *McDonnell Douglas* framework assists in this endeavor by structuring the evidence on the issue of "whether the defendant intentionally discriminated against the plaintiff." *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), *superseded in part by* 42 U.S.C. § 1981(b). Although comparative **\*269** evidence is often highly probative of discrimination, it is not an essential

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 8 of 18

element of a plaintiff's case. *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 353 (3d Cir.1999). Instead, the permissible evidence under this framework "may take a variety of forms," including, for example, "evidence of [a defendant's] past treatment of" a plaintiff. *Patterson,* 491 U.S. at 187–88, 109 S.Ct. 2363.

### A.

Plaintiffs contend that they have direct evidence of discrimination and thus need not resort to a *McDonnell Douglas* analysis. We disagree.

**[1]** **[2]** Direct evidence of discrimination must be "so revealing of [discriminatory] animus that it is unnecessary to rely on the [*McDonnell Douglas* ] burden-shifting framework, under which the burden of proof remains with the plaintiff." *Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 512 (3d Cir.1997). Once a plaintiff produces such evidence, the defendant has the burden of producing evidence to show that it would have made the same decision in the absence of discriminatory animus. *Id.* at 512–13.

**[3]** **[4]** **[5]** To qualify as direct evidence, "the evidence must be such that it demonstrates that the 'decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.' " *Walden,* 126 F.3d at 513 (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775) (O'Connor, J., concurring)). Thus, direct evidence must satisfy two requirements. First, the evidence must be strong enough "to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the [defendant's] decision." *Id.* (internal quotation marks and alteration omitted). Second, the evidence must be connected to the decision being challenged by the plaintiff. *Id.* at 515–16. Specifically, any statements made by a defendant's employees must be made at a time proximate to the challenged decision and by a person closely linked to that decision. *Id.* at 513–16. We have referred to these requirements as creating a "high hurdle" for plaintiffs. *Id.* at 513.

**[6]** Plaintiffs have not cleared this hurdle. For the direct evidence test they rely exclusively on Hogsten's alleged comments that "you people don't understand how the process works," JA387, and that "you people don't understand the loan process," JA448.[6] We are skeptical that Hogsten's use of the phrase "you people" in this context is, alone, so revealing of discriminatory animus that it would enable a factfinder to conclude that a discriminatory attitude was, more likely than not, a motivating factor in the decision to impose the challenged loan conditions. Although plaintiffs cite various cases in support of their argument that the phrase "you people" should be considered direct evidence, none of these cases actually support their position. *See, e.g., Whitley v. Peer Review Sys., Inc.,* 221 F.3d 1053, 1056 (8th Cir.2000) (using the phrase "you people" as evidence in a *McDonnell Douglas* analysis, and finding its use "innocuous"); *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 923, 924 (11th Cir.1990) (finding that the use of the phrase "you people" was a "stray remark" that would not satisfy the direct evidence test). Instead, several courts have determined that the phrase "you people" is too ambiguous to constitute direct evidence of discrimination when used in isolation, as it was here. *See, e.g., Estate of Daramola v. Coastal Mart, Inc.,* 170 Fed.Appx. 536, 547 (10th Cir.2006) ("After **\*270** all, they are your people."); *Clay v. Interstate Nat'l Corp.,* No. 95–3430, 1997 WL 452316, at \*1, \*3 (7th Cir. Aug.7, 1997) ("You people are causing problems."); *Steinhauser v. City of St. Paul,* 595 F.Supp.2d 987, 1004 (D.Minn.2008) ("I don't think you people deserve to be in this country."); *Kishaba v. Hilton Hotels Corp.,* 737 F.Supp. 549, 566 (D.Haw.1990) ("I don't know how you people run things down here ...." and "Why can't you people get things organized?").

Even if we were persuaded that the use of the phrase "you people" in this context could constitute direct evidence, however, plaintiffs have not shown that Wachovia's decisionmakers—Fazzino, Hamm, and Akerley—relied on plaintiffs' race in imposing the challenged loan conditions. According to the evidence offered by Wachovia, it was not Hogsten who decided to impose the challenged conditions on plaintiffs' loans. Rather, Hogsten denied imposing any of these conditions. With respect to the Anderson loan, Hogsten testified that he told Mr. Anderson that "we were going to have problems getting a sufficient appraisal unless there [were] some ... renovations to the property to get a decent appraisal." JA457. However, since Hogsten did not underwrite loans, he testified that "[w]hat I did for Mr. Anderson is tell him what is normally done, and an underwriter would then make the decision as to what if anything would be done." JA460. With respect to the Wheatley loan, Hogsten testified that after being told by the underwriter that the appraisal indicated problems with the habitability of the Wheatley property and that the Wheatleys' down payment would need to be increased, he communicated those problems to Mr. Wheatley.

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 9 of 18

Hogsten's testimony is corroborated by the testimony of his supervisor, Joseph Skowronski, who testified that loan officers like Hogsten do not impose conditions on loans, although they may discuss with customers the conditions imposed by others. He described Hogsten's role as limited to selling loans and communicating requirements to customers. According to Skowronski, it is the underwriters, not loan officers like Hogsten, who impose loan conditions. Fazzino also testified that Hogsten was not a decisionmaker, and that Hogsten repeatedly urged her to approve the Wheatley loan without the conditions that she and Hamm had imposed. This indicates that Hogsten lacked the authority to impose (or remove) the conditions himself. Fazzino also testified that she and Hamm imposed the challenged conditions on the Wheatley loan, and Akerley submitted an affidavit indicating that he flagged the potential problem with the Wilkins loan.

Plaintiffs have offered no evidence to refute this testimony. Although they contend that Hogsten *acted as if* he were the decisionmaker when communicating Wachovia's requirements to them, this contention does not create a genuine issue of fact regarding the salient question of whether Hogsten *actually was* a decisionmaker who imposed the conditions. Since plaintiffs do not contend that Fazzino, Hamm, or Akerley harbored discriminatory intent—and there is no evidence that they did—the District Court properly rejected plaintiffs' claims to the extent that they rely on the direct evidence test.

**B.**

In the absence of direct evidence of discrimination, we consider a plaintiff's claims under *McDonnell Douglas.* This familiar framework requires the following three-step analysis.

The plaintiff must first establish a prima facie case of discrimination. In *Burdine,* the Supreme Court explained that "[t]he **\*271** burden of establishing a prima facie case of disparate treatment is not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The goal at this stage is to "eliminate [ ] the most common nondiscriminatory reasons" for the defendant's actions; by doing so, the prima facie case creates an inference that the defendant's actions were discriminatory. *Id.* at 254, 101 S.Ct. 1089.

If a plaintiff makes out a prima facie case, then the "burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action." *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 974 n. 2 (3d Cir.1998). The defendant satisfies its burden at this step "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable [action]." *Fuentes,* 32 F.3d at 763. The defendant need not even prove that the tendered reason was the actual reason for its behavior. *Id.*

At the third step, "the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the [defendant's] explanation is pretextual." *Id.* At this stage, a plaintiff may defeat a motion for summary judgment by either discrediting the defendant's proffered reasons or adducing evidence that discrimination was "more likely than not a ... determinative cause of the adverse ... action." *Id.* at 764.[7] "[T]hroughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* at 763.

**1.**

We have not previously identified the elements of a prima facie case of lending discrimination in a suit brought under § 1981. The District Court therefore applied a prima facie test containing the following three elements: "(1) Plaintiffs were members of a protected class; (2) Plaintiffs applied for and were extended credit from Defendant; and (3) Defendant treated Plaintiffs differently than others outside of the protected class who were otherwise similarly situated." *Anderson II,* 609 F.Supp.2d at 369.[8] The Court determined that plaintiffs satisfied the first two elements of this test, but not the third. The Court also found that, even if plaintiffs had made out a prima facie case, Wachovia had proffered legitimate nondiscriminatory reasons for its actions, and that plaintiffs had not adequately rebutted those reasons so as to show them to be pretextual.

Although we agree with the District Court's ultimate conclusion that plaintiffs did not carry their burden as to pretext, we disagree as to the nature of the showing to be made to establish a prima facie case in a case such as this. The District **\*272** Court required plaintiffs to produce evidence that they were treated differently from similarly situated mortgage applicants. However, the critical question in this case is not simply whether plaintiffs were subjected to

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MFW    Doc 14225-25    Filed 08/15/14    Page 10 of 18

different conditions than white mortgage applicants; rather, the allegation is more layered. Granted, it is, in part, whether they were subjected to more onerous conditions because of their race—that is, because they were African–Americans—but, also, because they intended to move into a "white" community. Notably, plaintiffs had previous borrowing experience with Wachovia without incident, so it is this latter aspect that distinguishes this situation, and calls for an approach to the last prong that is tailored to the nature of the claim. The issue is, were barriers put in their way because of their race in order to dissuade them from moving into a "white" community? Given this, and given the noncompetitive nature of the lending business—an applicant does not lose a loan to another applicant—comparisons among borrowers do not get to the heart of the matter. Moreover, requiring plaintiffs to ferret out, and the bank to produce, evidence as to others with myriad different factual situations in order to find "similar" borrowers, goes beyond what is required for a prima facie case.

We have repeatedly stated that comparative, or competitive, evidence is not a necessary component of a discrimination plaintiff's prima facie case. As we have said in the context of employment discrimination, "a plaintiff need not prove, as part of her prima facie case, that she was replaced by someone outside of the relevant class," since an inability to make this showing "is not necessarily inconsistent with her demonstrating that the employer treated her less favorably than others because of her race, color, religion, sex, or national origin." *Pivirotto,* 191 F.3d at 353 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (internal quotation marks and alteration omitted)); *see also Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 939 (3d Cir.1997) ("By holding that favorable treatment outside the protected class is an 'alternative' element to a prima facie case, we [have] made clear that this element can be present but by no means must be present."). [9] This precedent is controlling. [10]

As noted above, a plaintiff's burden at the prima facie stage is not intended to be "onerous"; rather, the purpose of the prima facie test is to "eliminate [ ] the most *273 common nondiscriminatory reasons" for the defendant's actions. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089. Thus, we have stated that the fourth prong of the prima facie case should be "relaxed in certain circumstances." *Pivirotto,* 191 F.3d at 357 (quoting *Torre v. Casio, Inc.,* 42 F.3d 825, 831 (3d Cir.1994)). Requiring plaintiffs to produce comparative evidence in cases involving the lending process would not be productive due to the discrete and varying circumstances inherent in individual loan applications and approvals.

Indeed, *McDonnell Douglas* itself did not require a showing as to "similarly situated" individuals. In *McDonnell Douglas,* the Court held that a prima facie case of racial discrimination in an employment discrimination case generally requires a plaintiff to show "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, ... the employer continued to seek applicants from persons of complainant's qualifications." 411 U.S. at 802, 93 S.Ct. 1817. The Court also noted that this test should be tailored to conform "to differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. 1817.

When invoking *McDonnell Douglas* for lending discrimination claims brought under § 1981, the first three things a plaintiff must show at the prima facie stage are (1) that he belongs to a protected class, (2) that he applied and qualified for available credit from the defendant, [11] and (3) that his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions. [12] In the employment context, we have held that the fourth prong of the prima facie case may be established by satisfying the original fourth prong articulated in *McDonnell Douglas,* or, as an alternative to the original fourth prong, by showing that similarly situated individuals outside the plaintiff's class were treated more favorably. *Matczak,* 136 F.3d at 939–40; *Olson v. Gen.* *274 *Elec. Astrospace,* 101 F.3d 947, 951 (3d Cir.1996).

However, as plaintiffs rightly point out, "[t]his is not an employment case where it is frequently easy to identify similarly situated individuals." Appellants' Op. Br. at 33. Further, requiring evidence of similarly situated individuals in the lending context would be overly burdensome during discovery because it would require banks to turn over hundreds of loan applications—once confidentiality issues are addressed—and the parties would likely have considerable difficulty determining which applicants are similarly situated. Thus, we agree with plaintiffs that they should not be required to satisfy the fourth prong of the *McDonnell Douglas* prima facie case as it has been articulated in the employment context, so long as in some other way they are able to show "circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

Case 09-10138-MFW    Doc 14225-25    Filed 08/15/14    Page 11 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

The question, then, is what will suffice to satisfy the last prong of the prima facie case in the lending discrimination context. The Court of Appeals for the Sixth Circuit had occasion in *Lindsay v. Yates,* 578 F.3d 407 (6th Cir.2009), to consider a discrimination claim in connection with a real estate transaction. The seller had terminated the agreement of sale within a few days after meeting the buyers—who happened to be African–American—twelve days after signing the agreement, deciding not to sell the house " 'for sentimental reasons.' " *Id.* at 412. The court noted the flexibility of *McDonnell Douglas* and the fact that in *Shah v. General Electric Co.,* 816 F.2d 264 (6th Cir.1987), an employment discrimination case, it had previously indicated that it was enough if a plaintiff could adduce " 'some additional evidence' " to establish the " 'inference of discrimination.' " *Id.* at 416 (quoting *Shah,* 816 F.2d at 269). In *Shah,* the court had concluded that the fact that a position did not remain available was not fatal to the claim, as long as there existed " 'additional evidence' from which a reasonable juror could find an inference of discrimination." *Lindsay,* 578 F.3d at 416 (quoting *Shah,* 816 F.2d at 269). While noting that "comparative evidence" could constitute "additional evidence," the court stated that *McDonnell Douglas* and its progeny do not *require* this. *Id.* at 417. The inquiry "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Id.* (internal quotation marks and citation omitted). The court then reasoned:

> A prima facie case is established whenever the actions taken by the property owner lead one to reasonably infer, if such actions remain unexplained, that it is more likely than not that such actions were based on discriminatory criterion such as race. Keeping this ultimate inquiry in mind, we find that so long as "additional evidence" exists—beyond showing the first three elements of the *McDonnell Douglas* test—that indicates discriminatory intent in "light of common experience," the required "inference of discrimination" can be made in satisfaction of the prima facie case. This holds true even if the plaintiff is not necessarily able to identify similarly-situated individuals outside of the relevant protected group who were treated more favorably.
>
> The "additional evidence" which can be relied upon to establish a prima facie claim depends on the attendant facts and circumstances. In this case, the suspicious timing of the termination of the purchasing agreement provides the evidentiary basis for inferring the [defendants] **\*275** acted with discriminatory motives.

*Id.* at 417–18 (internal quotation marks and citations omitted).

[7]  We adopt this approach. In order to make out a prima facie case of lending discrimination in a § 1981 case, a plaintiff must show (1) that he belongs to a protected class, (2) that he applied and was qualified for credit that was available from the defendant, (3) that his application was denied or that its approval was made subject to unreasonable or overly burdensome conditions, and (4) that some additional evidence exists that establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent.

Here, all of the plaintiffs are African–American, applied for types of mortgage loans being offered by Wachovia, and were qualified for these loans. [13] Thus, they satisfy the first and second prongs of the prima facie case. Whether the plaintiffs have satisfied the third and fourth prongs is a closer call.

As to the third prong, with respect to the Wilkinses, we are not persuaded that it was unduly burdensome for Wachovia to have required them to use their own assets, rather than assets effectively borrowed from their credit card issuer, to fund their escrow payment. However, with respect to the Andersons and the Wheatleys, we agree that it may be unreasonable or overly burdensome to require a borrower to make improvements to a property he does not own, and to double the amount of the borrower's down payment at the last minute. [14]

As to the fourth prong, the evidence that would connect the conditions to racial animus is not that clear. Plaintiffs have produced some evidence that the conditions may have been imposed because they were African–Americans moving into a predominantly Caucasian neighborhood. A Wachovia employee, Deanne Wicks, told Mr. Anderson that "[t]here are a lot of people that are not happy" with plaintiffs' purchase of homes in Silver Lake, which she described as a "lily white community." JA384–85. Hogsten allegedly said that he was "getting a lot of pressure on this transaction" and referred to plaintiffs as "you people," JA387, JA398, potentially corroborating Wicks's statements. Moreover, plaintiffs had not experienced similar treatment when purchasing homes, using Wachovia financing, in other neighborhoods. Together,

Case 09-10138-MFW    Doc 14225-25    Filed 08/15/14    Page 12 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

this evidence may be sufficient to support at least an inference that Wachovia imposed the conditions it did for racially discriminatory reasons. On the other hand, the timing of the sellers' change of heart in *Lindsay* certainly supplies a stronger nexus between the complained-of conduct and the plaintiffs' race.

Regardless of whether plaintiffs have in fact satisfied the third and fourth prongs, the conditions were grounded in applicable regulations, as we explain below, so even if plaintiffs could convince us that they had made out a prima facie case, they must **\*276** clear an additional hurdle at the third stage of the *McDonnell Douglas* analysis.

**2.**

Wachovia urges that it carried its burden of production at the second stage of *McDonnell Douglas* by tendering nondiscriminatory reasons for all of its actions, because all of the conditions it imposed were driven by its underwriting guidelines and by the requirements imposed by Fannie Mae (which parallel Wachovia's own guidelines). Wachovia sells most of its residential mortgages to Fannie Mae, and Fannie Mae will not purchase loans that do not comply with its requirements. Thus, Wachovia contends that its underwriters are obligated to ensure that these requirements are satisfied before approving a loan.

According to Wachovia, the repair requirements for the Anderson and Wheatley properties were necessitated by underwriting guidelines that require a home to be inhabitable and an appraisal to be completed before a mortgage can be issued. Under these guidelines, a property may not "have any physical deficiencies or conditions that would affect its livability." JA302. When there are such problems, "the property must be appraised subject to completion of the specific alterations or repairs," and Wachovia "must obtain a certificate of completion from an appraiser before it delivers the mortgage to the investor." JA302.

The appraiser retained by Wachovia to evaluate the Anderson property, John Mullens, informed Hogsten that he could not appraise the property because there were significant problems with its livability. Mullens stated that there was "extensive water damage," some missing drywall, mold on some of the remaining drywall, and exposed, water-damaged insulation. JA352. He explained that because of these problems, he "determined that he could not appraise the property" without,

at a minimum, an assessment by a mold specialist, a plumbing certification, certifications that the water had not damaged the structure or electrical systems, and an estimate from a contractor of the costs to repair the damage. JA352–53. Mullens also stated that he "knew of no comparable properties in the Dover area that were in a similar state of disrepair and in a similar location," and thus could not appraise the property without the repairs. JA353.

An appraiser was able to determine the value of the Wheatley property, but stated in his appraisal report that there was no heat on the second floor, that the roof needed repair, that the second floor landing needed a " 'finished floor covering,' " and that some of the basement pipes appeared to be wrapped with asbestos. JA428–29. According to Fazzino, these problems raised concerns about the livability of the property and necessitated repairs. On August 4, the appraiser sent a certificate to Fazzino stating that the repairs had been completed. However, the report indicated that the appraiser was relying on a contractor's statement that the "roof was in adequate condition with no known leakage," which the appraiser had "assumed to be accurate." JA321. Fazzino determined that she could not rely on this assumption, and therefore required the Wheatleys to obtain a roofing certificate to show that the property was inhabitable.

According to Wachovia, the other conditions imposed on the Wheatley loan resulted from an effort to approve the loan despite the livability problems, in light of Aigner's mandate that all three transactions settle at one time. An "exception loan" was eventually approved for the Wheatleys by an "exception officer" named Terri Hamm, in part because Mr. Wheatley **\*277** was a "five star customer." JA469. This meant that the Wheatley loan would be maintained in Wachovia's own portfolio, without being sold to Fannie Mae, and could thus be approved under different guidelines. However, reclassifying the loan as an exception loan triggered a new requirement under the underwriting guidelines, which specify that an exception loan may only be issued if the customer makes a 20% down payment; thus, the Wheatleys would no longer be permitted to make a 10% down payment as they had planned. The Wheatleys decided to obtain the additional 10% from the assets of their business, but that triggered another requirement under the underwriting guidelines: that an accountant "confirm that the borrower files the business on the Schedule C" of his tax return. JA308.

These reasons suffice to satisfy Wachovia's burden of production, which demands only that it "introduc[e] evidence

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 13 of 18

which, taken as true, would permit the conclusion that there was a nondiscriminatory reason" for the adverse action. *Fuentes,* 32 F.3d at 763. Although plaintiffs argue that Wachovia failed to meet its burden at the second stage of this analysis, it appears that this argument is actually directed at the issue of pretext, and we will consider it in that context.

### 3.

 **[8]**  At the third stage of the *McDonnell Douglas* analysis, a plaintiff "may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, *or* (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a ... determinative cause of the adverse ... action." *Fuentes,* 32 F.3d at 764. The plaintiff can discredit the proffered reasons by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal quotation marks, alteration, and citations omitted). Alternatively, to show that discrimination was the likely cause of the adverse action, a plaintiff can show, for example, that the defendant had previously subjected the same plaintiff to "unlawful discriminatory treatment," that it had "treated other, similarly situated persons not of his protected class more favorably," or that it had "discriminated against other members of his protected class or other protected categories of persons." *Id.*

 **[9]**  We conclude that plaintiffs have not offered sufficient evidence of pretext to survive summary judgment. Plaintiffs have produced no evidence to support their contention that Wachovia's reliance on its underwriting guidelines and the Fannie Mae requirements was pretextual. There is no evidence that the Anderson loan could have been approved without repairs to the property, or that the Wheatley loan could have been approved as a conventional loan without repairs to the property or as an exception loan without a 20% down payment and verification by an accountant. Despite plaintiffs' contentions to the contrary, the underwriting guidelines are consistent with all of these requirements. Although plaintiffs do note that the Fannie Mae guidelines were inapplicable to the Wheatley loan because it was ultimately approved as an "exception loan," this does not undermine Wachovia's reliance on its underwriting

guidelines; the reclassification as an exception loan occurred very late in the process, after Wachovia had already indicated that it could not approve the Wheatley loan without **\*278** repairs. Plaintiffs do not dispute that the repairs required by Wachovia were necessary to make the Anderson and Wheatley properties livable; in fact, Mr. Wheatley conceded this as to his property during his deposition.

Plaintiffs argue that Wachovia's reliance on its underwriting guidelines is pretextual because Wachovia deviated from its procedures by allowing Hogsten (rather than Fazzino, Akerley, and Hamm) to impose the loan conditions on plaintiffs. We have recognized that "[a] violation of company policy can constitute a pretext for unlawful discrimination" under certain circumstances. *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 322 (3d Cir.2000). Here, however, there is no evidence that any Wachovia procedures were violated, since there is no evidence that Hogsten improperly imposed loan conditions. Indeed, as discussed in more detail above with regard to the direct evidence test, the evidence showed that Fazzino, Akerley, and Hamm—not Hogsten—actually imposed the conditions, while Hogsten communicated them to plaintiffs. Plaintiffs have not offered any evidence to refute this or to otherwise demonstrate that Wachovia deviated from its policies.

Plaintiffs also compare their experiences in the Silver Lake transaction with their experiences in other real estate transactions. They claim that Wachovia and other banks did not impose similar conditions on their loans in the other transactions, which assertedly did not involve property located in a predominantly Caucasian neighborhood. However, those transactions are not readily comparable to the Silver Lake transaction: they appear not to have involved a requirement that three sales happen simultaneously, on an accelerated timetable, and many involved investment properties, which are not subject to the Fannie Mae requirements. Moreover, plaintiffs have offered no demographic evidence to substantiate their claims that the racial makeups of the communities involved in those other transactions were meaningfully different from that of the Silver Lake area. These anecdotal comparisons are thus not probative of discrimination in this case.

Plaintiffs also suggest that Hogsten is not credible because he testified that he did not know the racial makeup of the Silver Lake community, but, according to an affidavit submitted on plaintiffs' behalf, "[a]nyone who has ever lived for any period of time in Dover would know that ...

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 14 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

the homes around Silver Lake in Dover were almost all owned by white families." JA191. However, this affidavit is unsupported by any data or other evidence, and does nothing more than recite the personal viewpoint of one member of the Dover community. It is also inconsistent with census data in the record, which show that 29.6% of the 544 residents of the "census tract" in which plaintiffs' houses were located were African–American. JA263. [15] Accordingly, the affidavit would not suffice to convince a reasonable factfinder that Wachovia's proffered reasons were unworthy of credence, especially in the face of Fazzino's testimony and the clear language of the underwriting guidelines, both of which corroborated Hogsten's explanations of why Wachovia imposed the conditions that it did. Nor are we persuaded by plaintiffs' argument that Fazzino lacked credibility because she could not remember **\*279** certain details of the Silver Lake transactions during her deposition. That claim is belied by the record, as Fazzino was able to testify in considerable detail after refreshing her recollection with notes and other documents.

Finally, plaintiffs cite Hogsten's unfriendly attitude, use of the phrase "you people," and the comment that he was receiving "pressure" regarding the transactions. [16] They also point to the comment by Wicks that "a lot of people ... are not happy" with the Silver Lake sale, apparently because plaintiffs were moving into "an exclusive lily white community." JA384, 385. When we give plaintiffs the benefit of any inferences that can be drawn, as we must when reviewing a grant of summary judgment, these comments, taken together, might hint at discrimination. However, a rational jury could not say they are sufficient to show, by a preponderance of the evidence, "that discrimination was more likely than not a ... determinative cause of" Wachovia's actions. *Fuentes,* 32 F.3d at 764. Nor do they suffice to discredit the nondiscriminatory reasons proffered by Wachovia by demonstrating such weaknesses in those reasons that a reasonable juror could rationally find them unworthy of credence. *Id.* at 765. Moreover, the loans were ultimately approved and the sales did close. While not conclusive, this tends to detract from a finding of purposeful discrimination.

It was therefore proper for the District Court to enter summary judgment in Wachovia's favor on the § 1981 claim. [17]

### III.

Plaintiffs argue that the District Court inappropriately granted summary judgment on their breach of contract claim. As noted above, we exercise plenary review of a district court's grant of summary judgment.

The District Court initially dismissed this claim in deciding Wachovia's motion to dismiss. The Court concluded that plaintiffs had not satisfied the requirement of Delaware law that a breach of contract claim identify the contractual provision that was allegedly breached. *Anderson I,* 497 F.Supp.2d at 581. Plaintiffs then filed a second amended complaint, which retained the breach of contract claim. The only changes plaintiffs made to this claim in the second amended complaint were to replace the phrase "[b]reach of contract for a mortgage" with the phrase "[b]reach of the mortgage application contract" and to adjust the amount of damages that they claimed. JA616, JA620, JA624.

**\*280** Wachovia then moved for summary judgment. Although the motion did not explicitly address the breach of contract claim, it did indicate that Wachovia was seeking judgment on what it said were the only two claims remaining in the case (the § 1981 and good faith and fair dealing claims), and it was not styled as a motion for partial summary judgment. Even though Wachovia had not specifically requested dismissal of the breach of contract claim in this motion, the Court dismissed the claim, noting that it had been "previously dismissed ... for failure to identify 'any express contract provision that was breached,' " and that plaintiffs had "again fail[ed] to identify an express contract provision that was breached." *Anderson II,* 609 F.Supp.2d at 366 (quoting *Anderson I,* 497 F.Supp.2d at 581). Plaintiffs argue that it was improper for the Court to have granted judgment on this claim, since Wachovia had not explicitly sought summary judgment.

[10] [11] We disagree. "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The notice requirement is satisfied when a case involves "the presence of a fully developed record, the lack of prejudice, [and] a decision based on a purely legal issue." *Gibson v. City of Wilmington,* 355 F.3d 215, 224 (3d Cir.2004).

[12] Plaintiffs here were on adequate notice that this claim was subject to dismissal. The District Court entered summary

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 15 of 18

judgment on this claim as a matter of law on the ground that it was inadequately pled, for the same reasons stated in the Court's previous decision. Plaintiffs have offered no explanation as to how they would have benefitted from an opportunity to submit further evidence or briefing on this claim; indeed, they appear to have essentially disregarded the District Court's earlier admonition explaining why the claim was inadequately pled. [18] Although we reiterate that "the *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims," *Gibson,* 355 F.3d at 224, we find no error in the District Court's disposition of the breach of contract claim in this case. [19]

### IV.

Plaintiffs argue that the District Court erred in dismissing their claim that Wachovia tortiously interfered with their contracts with Aigner by requiring unnecessary repairs. As stated above, we exercise plenary review of a district court's grant of summary judgment.

Plaintiffs' tortious interference claim is grounded in § 766A of the Restatement (Second) of Torts, which states as follows:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

**\*281** The key difference between § 766A and the more traditional form of a tortious interference claim, which is embodied in § 766 of the Restatement and has been expressly adopted by Delaware courts, *see Irwin & Leighton, Inc. v. W.M. Anderson Co.,* 532 A.2d 983, 992 (Del.Ch.1987), [20] is that a § 766A claim can rest on an allegation that the plaintiff's "performance [was caused] to be more expensive or burdensome." Thus, unlike a § 766 plaintiff, a § 766A plaintiff is not required to show that the defendant caused the *breach* of the plaintiff's contract.

The District Court dismissed this claim because "no state court in Delaware has ever recognized a cause of action under § 766A," noting that we had predicted in *Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile Insurance Co.,* 40 F.3d 63, 66 (3d Cir.1994), that Pennsylvania would not recognize § 766A as a cause of action because allowing such a claim would be "too speculative and subject to abuse." *Anderson I,* 497 F.Supp.2d at 583–84.

Plaintiffs contend that the District Court erred in this determination. They argue that § 766A has been incorporated into Delaware law by two decisions: *DeBonaventura v. Nationwide Mutual Insurance Co.,* 419 A.2d 942, 947 (Del.Super.Ct.1980), and *Nelson v. Fleet National Bank,* 949 F.Supp. 254, 260 (D.Del.1996). However, nothing in *DeBonaventura* indicates that the Court intended to adopt § 766A as part of Delaware law. Nor does *Nelson* offer any support for plaintiffs, since it is a decision issued by a federal court without any analysis of whether Delaware courts would recognize § 766A.

[13] We are aware of no cases in which the Delaware courts have adopted § 766A, and plaintiffs offer no argument as to why Delaware would recognize § 766A as a new cause of action. We explained at some length in *Windsor Securities, Inc. v. Hartford Life Insurance Co.,* 986 F.2d 655, 661–63 (3d Cir.1993), why Pennsylvania courts would be unlikely to adopt § 766A, and we relied on this analysis in *Gemini* to predict that Pennsylvania courts would not adopt § 766A. We similarly believe that Delaware courts would not allow a tortious interference claim based on an allegation that the defendant caused the plaintiff's performance to be more expensive or burdensome, since such an allegation would be "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Gemini,* 40 F.3d at 66 (internal quotation marks and citation omitted). We therefore hold that the District Court properly dismissed the tortious interference claim.

### V.

[14] Plaintiffs argue that the District Court erred by denying their motion to compel responses to certain discovery requests. We review a district court's discovery orders for abuse of discretion, and will not disturb such an order absent a showing of actual and substantial prejudice. *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1032 (3d Cir.1997); *Hewlett v. Davis,* 844 F.2d 109, 113 (3d Cir.1988).

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 16 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Plaintiffs moved to compel responses to two categories of discovery requests. The first category comprised interrogatories **\*282** regarding plaintiffs' loan applications, such as the names of various people involved in the approval process and the dates on which certain events occurred. The second category sought information regarding Wachovia's approval rates of mortgages for African–American applicants. The District Court denied the motion on the ground that the discovery sought was unduly burdensome or irrelevant. With respect to the first category, the Court accepted Wachovia's representations that the responsive information was available in plaintiffs' loan files (which amounted to about 1000 pages and had already been produced to plaintiffs), and that plaintiffs were in as good a position to compile the information as Wachovia. The Court therefore instructed plaintiffs to review the documents they had received and to notice depositions if necessary to obtain additional information. With respect to the second category, the Court noted that information regarding approval rates would not be meaningful unless it was evaluated in the context of all of the criteria used by Wachovia to approve or deny specific mortgages. However, the Court determined that this additional information could be obtained only through a detailed review of application files, which would constitute "an incredible invasion of privacy." JA19.

Wachovia's principal argument on appeal is that plaintiffs were required to file an affidavit under Federal Rule of Civil Procedure 56(f) in order to preserve their challenge to the discovery order. We disagree. Nothing in Rule 56(f) or the cases cited by Wachovia supports this argument. While a Rule 56(f) affidavit must be filed to preserve an argument that *summary judgment* was improperly granted because they were denied discovery, that requirement does not prevent plaintiffs from challenging the District Court's *discovery order* itself.

[15] Nonetheless, in light of plaintiffs' failure to show any prejudice from the discovery order, we believe that the District Court acted within its discretion in denying plaintiffs' motion. According to Wachovia's unrefuted representations, the information sought by plaintiffs' interrogatories was contained in the documents produced to plaintiffs. Nor is there any basis for us to conclude that the District Court abused its discretion in denying discovery regarding the approval rates, since this information was not crucial to plaintiffs under the prima facie case that we have set forth above, [21] and since compiling meaningful statistics about Wachovia's approval rates would have been highly burdensome and would have entailed a substantial invasion of the privacy of other Wachovia customers.

## VI.

After granting summary judgment on plaintiffs' other claims, the District Court remanded their good faith and fair dealing claim to Delaware state court. Wachovia argues that this was an abuse of discretion, principally because the dismissal of the § 1981 claim was fatal to the good faith and fair dealing claim, and the District Court could thus have easily disposed of the state law claim. Wachovia also contends that the good faith and fair dealing claim is preempted by federal law, and **\*283** that the District Court had greater expertise to resolve that issue.

[16] We review a district court's decision to remand a claim under 28 U.S.C. § 1367(c)(3) for abuse of discretion. *Lazorko v. Pa. Hosp.,* 237 F.3d 242, 247 (3d Cir.2000). In determining whether the district court abused its discretion, we consider "whether the dismissal of the pendent claims best serves the principles of judicial economy, convenience, fairness, and comity." *Annulli v. Panikkar,* 200 F.3d 189, 202 (3d Cir.1999), *abrogated on other grounds, Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).

[17] [18] Under Delaware law, a party breaches the implied covenant of good faith and fair dealing by engaging in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain," or by "frustrat[ing] the overarching purpose of the contract by taking advantage of [its] position to control implementation of the agreement's terms." *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005). Plaintiffs' good faith and fair dealing claim thus raises different issues from their § 1981 claim. Even if Wachovia did not act with discriminatory intent, a jury might find that Wachovia had acted arbitrarily or had taken advantage of its position to control the implementation of any contract between Wachovia and the plaintiffs. [22] Thus, the disposition of the § 1981 claim was not fatal to the good faith and fair dealing claim. Contrary to Wachovia's contention, the state court is adequately positioned to resolve all aspects of this claim, including the issue of whether it is preempted by federal law. We therefore find no abuse of discretion in the District Court's decision to remand this claim, and we need not reach Wachovia's arguments regarding its merits.

Case 09-10138-MFW   Doc 14225-25   Filed 08/15/14   Page 17 of 18

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

|  | |
|---|---|
| **VII.** | For the foregoing reasons, we will affirm the orders and judgment of the District Court. |

Footnotes

| | |
|---|---|
| \* | Honorable John R. Padova, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation. |
| 1 | Non-income-verification loan applicants are not required to provide certain financial information, such as their income, as part of the application process. JA488, JA500. Non-income-verification loans with a loan-to-value ratio over 75% were only available to applicants with a credit score at a level that the Wheatleys' credit score did not reach. JA681. |
| 2 | In some instances, a "stated income" loan can be acquired with a lesser down payment than a non-income-verification loan, but applicants are required to provide financial information and show that they have sufficient assets and annual income for their desired loan. JA308, JA488, JA501–02. |
| 3 | As noted later in connection with our discussion of pretext, Hogsten explains that his statements about "pressure" in the loan process were based on the expedited time frame, the combined nature of the three sales, and constant calls from plaintiffs. |
| 4 | Plaintiffs had also asserted a claim in the first amended complaint under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, which they voluntarily dismissed with prejudice prior to the District Court's decision on the motion to dismiss. *See Anderson I,* 497 F.Supp.2d at 574 n. 1. Plaintiffs omitted this claim from the second amended complaint. |
| 5 | We note that other courts of appeals have similarly applied the *McDonnell Douglas* framework to claims of discrimination in the extension of credit brought pursuant to the ECOA. *See Mays v. Buckeye Rural Elec. Coop., Inc.,* 277 F.3d 873, 876 (6th Cir.2002) ("Given the similar purposes of the ECOA and Title VII, the burden-allocation system of federal employment discrimination law provides an analytical framework for claims of credit discrimination."); *Mercado–Garcia v. Ponce Fed. Bank,* 979 F.2d 890, 893 (1st Cir.1992); *Thompson v. Marine Midland Bank,* No. 99–7051, 1999 WL 752961, at \*2 (2d Cir. Sept.16, 1999). In addition, we and the Court of Appeals for the Eighth Circuit have identified prima facie tests for ECOA claims that mirror the elements of the *McDonnell Douglas* prima facie test. *See Chiang v. Veneman,* 385 F.3d 256, 259 (3d Cir.2004) ("To establish a prima facie case under ECOA [a plaintiff] must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit."); *Rowe v. Union Planters Bank of Se. Mo.,* 289 F.3d 533, 535 (8th Cir.2002) ("[Plaintiff] must demonstrate that (1) she was a member of a protected class, (2) she applied for and was qualified for a loan with the Bank, (3) the loan was rejected despite her qualifications, and (4) the Bank continued to approve loans for applicants with similar qualifications."). |
| 6 | Hogsten was not asked about these statements during his deposition. |
| 7 | *Fuentes* speaks of a "motivating or determinative cause," but, to be precise, the terminology of "motivating" causes is inapt when discussing the burden-shifting framework in a pretext case such as this. *See Watson v. SEPTA,* 207 F.3d 207, 211 (3d Cir.2000) (holding that the 1991 Civil Rights Act did not affect "the distinction between the standards of causation applicable in, on the one hand, so-called 'mixed-motive' cases, in which ... a defendant may be held liable upon a showing that an illegitimate factor was a 'motivating' factor in the adverse action and, on the other hand, so-called 'pretext' cases, in which ... a defendant may be held liable upon a showing that an illegitimate factor was a 'determinative' factor in the adverse action"). |
| 8 | The District Court borrowed this test from *Visconti v. Veneman,* No. 01–cv–5409, 2005 WL 2290295, at \*4 (D.N.J. Sept.20, 2005), a case brought under the ECOA and "based not on [the plaintiffs'] application for (and denial of) credit but, rather, on the [defendant's] collection efforts regarding credit that had already been extended." |
| 9 | Indeed, we have traced our suggestions that comparative evidence might be required to "occasionally imprecise language in dicta in certain cases." *Pivirotto,* 191 F.3d at 357. |
| 10 | Wachovia relies in part on our decision in *Ezold v. Wolf, Block, Schorr & Solis–Cohen,* 983 F.2d 509, 527 (3d Cir.1992), in which we considered comparative evidence to evaluate the plaintiff's claims. *Ezold* does not support Wachovia's argument. First, we only considered the comparative evidence proffered by the plaintiff in *Ezold* at the final stage of the *McDonnell Douglas* analysis, in order to determine whether the defendant's asserted nondiscriminatory reasons were pretextual. Second, even at the pretext stage of the analysis, we did not *require* comparative evidence. To the contrary, we recognized, for instance, that "sufficiently strong evidence of an employer's past treatment of a plaintiff may prove pretext." 983 F.2d at 539. This is consistent with the Supreme Court's statement in *Patterson,* 491 U.S. at 187–88, 109 S.Ct. 2363, that "[t]he evidence which [a plaintiff] can present in an attempt to establish that [a defendant's] stated reasons are pretextual may take a variety of forms," and its acknowledgment in *McDonnell Douglas,* 411 U.S. at 804–05, 93 S.Ct. 1817, that evidence of pretext could include the defendant's "treatment of [the plaintiff] during his prior term of employment; [and the defendant's] reaction, if any, to [the plaintiff's] legitimate civil rights activities." |

Anderson v. Wachovia Mortg. Corp., 621 F.3d 261 (2010)

Case 09-10138-MEW    Doc 14225-25    Filed 08/15/14    Page 18 of 18

11  We note that whether a plaintiff is "qualified" for a loan under the third prong should focus on the general form of credit and qualifications for such credit rather than on every possible condition that might need to be fulfilled to proceed to closing. Just as in the employment context "qualifications" are the minimum prerequisites, and do not include every conceivable trait that an employer desires in an employee, here, the qualifications should encompass minimum requirements. For instance, a plaintiff who applied for a home mortgage offered by the defendant only to borrowers of a certain income level should be required to establish that the defendant was issuing home mortgages, and that the borrower satisfied the income requirement established by the lender for that type of loan.

12  Wachovia contends that denial of the loan is necessary to give rise to an inference of discrimination, and thus that only borrowers whose loan applications are denied can make out a prima facie case. It urges that the imposition of restrictive conditions by a lender cannot support "a prima facie case of discrimination as traditionally understood." Appellees' Opening Br. at 34. We disagree. Section 1981 specifically brings discriminatory conditions into its ambit by defining "the term 'make and enforce contracts' [to] include[ ] ... the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." § 1981(b). Thus, § 1981 is violated not only when a lender discriminatorily rejects applicants, but also when the lender engages in other conduct that amounts to discrimination with respect to the "terms" and "conditions" of the borrower's contractual relationship with the lender. Indeed, in the employment context we have modified the third prong of the McDonnell Douglas prima facie case to require evidence of an adverse employment action, as opposed to outright rejection. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 411 (3d Cir.1999). We see no reason why a similar modification should not be made to the third prong in the credit context.

13  Although Mr. Wheatley's credit score was not sufficient to qualify him for the non-income-verification loan he initially sought, it appears that the Wheatleys were qualified for the stated income loan and the exception loan that they subsequently pursued.

14  The third prong could also be satisfied by evidence that the complained-of conditions, even if facially reasonable, were not applied evenhandedly among individuals of different races. Such conditions are per se unreasonable and/or unduly burdensome for purposes of the McDonnell Douglas analysis. Here, there is no such evidence.

15  The same data show considerable variation in the racial composition of the other areas bordering Silver Lake. Although a small area bordering the Silver Lake waterfront falls in the demographic category of "0–7.7%" African–Americans, and another area falls into the "8.3–24.5%" category, the majority of the waterfront is made up of over 24.9% African–Americans. JA263.

16  Hogsten did not recall referring to "pressure" in conversations with plaintiffs, but explained that the comment may have referred to the pressure of "getting all [the plaintiffs] to the settlement table all at the same time," and given such a short time frame, which was especially difficult because of "the properties" and the bank's "guidelines." JA459. In other words, "the pressure was from the underwriter," and "from Mr. Anderson because he was the spokesman for all three of the loan applications" and was calling Hogsten every day about them. JA459. Hogsten denied having received any pressure from any members of the Silver Lake community. However, he was not asked during his deposition to comment on his alleged use of the phrase "you people."

17  Plaintiffs also argue that the entry of summary judgment was inappropriate because they had been denied discovery about Wachovia's mortgage approval rates. Since, as we discuss above, plaintiffs should not have been required to produce comparative evidence, this argument is moot. In any event, we would not consider such an argument in light of plaintiffs' failure to file an affidavit under Rule 56(f). See, e.g., Bradley v. United States, 299 F.3d 197, 207 (3d Cir.2002).

18  Plaintiffs do not appear to argue that the disposition of this claim was wrong on the merits, and, in any event, we agree with the District Court that plaintiffs failed to plead the breach of contract claim adequately.

19  We do not accept Wachovia's argument that plaintiffs waived this cause of action simply by informing the Court that the claims in the second amended complaint would not require additional discovery.

20  Section 766 provides as follows:

  One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

21  Moreover, in light of plaintiffs' allegation that Wachovia discriminated against them specifically because they wished to purchase homes in the Silver Lake community, we are not persuaded that a general breakdown along racial lines of Wachovia's approval rates "in Delaware or nationally," JA255–56, would have been probative of plaintiffs' claims.

22  We of course express no opinion regarding the merits of this claim.

---

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.