TAB 26

## SUPREME COURT OF NOVA SCOTIA

**Citation:** *BC Rail Partnership* v. *Standard Car Truck Company*, 2009 NSSC 240

**Date:** 20090813
**Docket:**   Hfx No 220557
**Registry:** Halifax

2009 NSSC 240 (CanLII)

**Between:**

*BC Rail Partnership*

Plaintiff

v.

*Standard Car Truck Company, Trentonworks Limited*
and *Greenbrier Leasing Limited*

Defendant

---

### LIBRARY HEADING

---

| | |
|---|---|
| **Judge:** | The Honourable Justice Gregory M. Warner |
| **Heard:** | June 11 and 15, 2009, in Halifax, Nova Scotia |
| **Subject:** | Summary Judgment- 1972 *Civil Procedure Rule 13.01 and 13.02* |
| **Summary:** | On December 10, 1999, a BC Rail train derailed near Pemberton, British Columbia, resulting in the loss of one life, damage to BC Rail's track and equipment, loss of freight, and use of the track.  BC Rail claims that the derailment was caused by the improper design or manufacture of the stabilization system of the "truck" or undercarriage of one of the 155 new rail boxcars leased to it by Greenbrier Leasing Limited ("Greenbrier") a few weeks before.  The fatal trip was the first using the allegedly defective boxcar. |
| **Issue:** | Greenbrier applies for summary judgment under 1972 *Civil Procedure Rule 13.01* and *13.02* on the basis that under the Lease:<br><br>i    BC Rail agreed to obtain insurance for the benefit of both it and Greenbrier and had no right of subrogation against Greenbrier; and,<br><br>ii    BC Rail expressly waived any possible claims against Greenbrier, including of the type advanced in this action. |

Page: 2

| | |
|---|---|
| **Result:** | On application of the principles of contract interpretation to the Lease, the Court determined that: (1) interpreting the lease within its four corners, BC Rail's claims were not barred; (2) it could not make a determination without resorting to extrinsic evidence that was in dispute, as to whether the insurance provision in the Lease precluded a right of subrogation. A genuine issue existed. Summary Judgment denied. |

***THIS INFORMATION SHEET DOES NOT FORM PART OF THE COURT'S DECISION. QUOTES MUST BE FROM THE DECISION, NOT THIS LIBRARY SHEET.***

<u>**SUPREME COURT OF NOVA SCOTIA**</u>

**Citation:** *BC Rail Partnership* v *Standard Car Truck Company*, 2009 NSSC 240

**Date:** 20090813

**Docket:**   Hfx No 220557

**Registry:** Halifax

**Between:**

*BC Rail Partnership*

Plaintiff

v.

*Standard Car Truck Company, Trentonworks Limited*

and *Greenbrier Leasing Limited*

Defendant

2009 NSSC 240 (CanLII)

2009 NSSC 240 (CanLII)

**Judge:** The Honourable Justice Gregory M. Warner

**Heard:** June 11 and 15, 2009, in Halifax, Nova Scotia

**Written Decision:** August 13, 2009

**Counsel:** **A. Douglas Tupper, Q.C.** and **Kevin Gibson**, counsel for the applicant (defendant) **Greenbrier Leasing Limited**

**Alan Parish, Q.C.** and **David Hutt**, counsel for the respondent (plaintiff)

**Nancy Murray, Q.C.** and **Sarah Scott**, counsel for the defendant **Standard Car Truck Company,** watching brief.

**By the Court**:

A.      **Outline of Facts and Issue**

[1]      On December 10, 1999, a BC Rail train derailed near Pemberton, British Columbia, resulting in the loss of one life, damage to BC Rail's track and equipment, loss of freight, and use of the track for a time.  BC Rail claims that the derailment was caused by the improper design or manufacture of the stabilization system of the "truck" or undercarriage of one of the 155 new rail boxcars leased to it by Greenbrier Leasing Limited ("Greenbrier") a few weeks before.  The fatal trip was the first using  the allegedly defective boxcar.

2009 NSSC 240 (CanLII)

[2]     Standard Car Truck Company ("Standard") manufactured the "truck" or undercarriage with the stabilization system for the 155 cars, and supplied them to Trentonworks Limited ("Trentonworks") who assembled the 155 boxcars leased by Greenbrier to BC Rail.  BC Rail pleads that Trentonworks and Greenbrier are subsidiaries of Greenbrier Companies Inc., of Lake Oswego, Oregon. Greenbrier says this should be ignored; it says that, while Greenbrier retained sole ownership of boxcars, its role was simply to finance the acquisition of the use of the boxcars by BC Rail; it also says that it was a "bare lessor".

[3]     Greenbrier applies for summary judgment under 1972 *Civil Procedure Rule 13.01* and *13.02* on the basis that under the Lease:

        i        BC Rail agreed to obtain insurance for the benefit of both it and Greenbrier and had no right of subrogation against Greenbrier; and,

        ii       BC Rail expressly waived any possible claims against Greenbrier, including of the type advanced in this action.

[4]     Greenbrier says that this application involves the interpretation of the Lease between Greenbrier and BC Rail and is an issue of law alone; that is, no issue of fact, let alone of a disputed fact, need be determined. Greenbrier says that the Lease can be interpreted "within the four corners of the lease".  If extrinsic evidence is admissible, the parties disagree on what extrinsic evidence is relevant and admissible, as well as for what purpose.

[5]     This application highlights the nuances in the application of *Eli Lilly & Co.* v *Novapharm Ltd.*, [1998] 2 S.C.R. 129, and the possible evolution in the law of contract interpretation since.

B.      **The Lease**

[6]     The Lease Agreement was made as of September 16, 1999, but executed after the accident - by BC Rail on January 18, 2000, and by Greenbrier on February 1, 2000.

2009 NSSC 240 (CanLII)

[7]      As discussed in more detail below, the principles for interpretation of contracts mandate that the words of the contract be interpreted, at the first stage, in the context of the contract as a whole.  It is therefore with caution that I attach, as Appendix A to this decision, only some of the relevant portions of the lengthy Lease (which included exhibits, a schedule and certificate).

[8]      While the Lease as a whole remains central to the Court's interpretative process, Counsels' submissions focussed on the following provisions:

a)      In Clause 3(a):

The loading of any Car by Lessee, or at its direction, shall constitute acceptance thereof by Lessee, and shall be conclusive evidence of the fit and suitable condition thereof for the purpose of transporting the commodities then and thereafter loaded therein or thereon.

b)      In Clause 5 ("Warranties and Waiver"):

Lessee acknowledges, warrants and agrees that the Cars are of a size and capacity selected by Lessee and that Lessee is satisfied that the Cars are suitable for its purposes. Lessor warrants and acknowledges that as of the Commencement Date Lessor is the Owner of the Cars and that each of the Cars is suitable for the general transportation of freight by rail and meets all Association of American Railroad Standards for such service.  Except for Lessor's express warranty specifically set forth above, Lessee acknowledges and agrees that the Lessor is not a manufacturer of the Cars; LESSEE ACKNOWLEDGES THAT THE CARS ARE LEASED "AS IS" AND LESSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND RESPECTING THE CARS WHETHER STATUTORY, WRITTEN, ORAL OR IMPLIED AND LESSOR HAS NOT MADE AND DOES NOT HEREBY MAKE, . . . ANY REPRESENTATION OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE WORKMANSHIP IN, THE CARS, PARTS, MATERIALS, OR THE LIKE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED AND LESSOR SHALL NOT BE LIABLE, IN CONTRACT, TORT, OR STRICT LIABILITY FOR ANY LOSS OF BUSINESS OR OTHER CONSEQUENTIAL LOSS OR DAMAGES, TO ANY CARS, OR OTHERWISE, ON ACCOUNT OF ANY DEFECT, WHETHER HIDDEN, LATENT OR OTHERWISE DISCOVERABLE OR NONDISCOVERABLE RESPECTING ANY CARS.  Lessor hereby assigns to Lessee only during the Initial Term and any renewal . . . all the rights and benefits of the manufacturer's warranty, if any. . . .

c)      In Clause 7 ("Insurance"):

a)      During the term of this Agreement, Lessee shall keep or cause to be kept through BC Rail Captive Insurance Co. Ltd. . . . (1) Comprehensive general liability insurance, . . . (2) All risk property damage insurance . . .

d)      All insurance shall name Lessor as an additional insured and loss payee in respect of risks arising out of the condition, maintenance, use or ownership of the Cars and shall provide that losses, if any, shall be payable to the Lessee and Lessor as their respective interests may appear.

d)      In Clause 17 ("Indemnification"):

a)      Lessee does hereby assume liability for, and does hereby unconditionally agree to indemnify, protect, save and keep harmless Lessor . . . from and against and agrees to pay . . . any and all losses, damages, liabilities, . . . of whatsoever kind and nature in contract or tort, including but not limited to, Lessor's strict liability in tort, arising out of: the use, . . . operation, condition, repair, . . . of Cars, except for such losses and claims which arise from Lessor's sole active gross negligence or willful misconduct.

b)      In particular, Lessee shall defendant and hold harmless Lessor, . . . from and against any and all loss, damage, demand, cost, expense or liability . . . for personal injury, disease or death (including personnel of Lessee or Lessor) and loss or damage of property (including Lessee's property) . . .as may be recovered under applicable contract law directly or indirectly arising out of or in any manner connected with or related to Lessee's leasing of railcars or containers from Lessor to transport any material or substance. . . .

[9]     The parties do not appear to dispute that the "Commencement Date" (Schedule No. 1, ¶ 3) was the 1st day of December 1999 - being the first month following the date that the last car was delivered.

[10]     The parties dispute whether the "Certificate of Acceptance of Railway Cars" (Exhibit "A" to the Lease) constituted acceptance by BC Rail of the cars as of November 16, 1999.  The Certificate was executed by BC Rail on May 31, and/or June 1, 2000, after Greenbrier had repaired or replaced the stabilization system on all of the leased cars.  On the issue of acceptance, the applicant relies upon the portion of Clause 3(a) of the Lease Agreement to the effect that loading of a car constituted conclusive evidence of the fit and suitable condition of the cars.

2009 NSSC 240 (CanLII)

2009 NSSC 240 (CanLII)

## C.    Summary Judgment - The Test

[11]    1972 *CPR 13.02* permits a Court to grant summary judgment at the close of pleadings on the grounds that (per *13.01(a)*) there is no arguable issue to be tried with respect to the claim.

[12]    In *Guarantee Co. of North America* v *Gordon Capital Corp.,* [1999] 3 S.C.R. 423, the Court wrote with respect to an appeal of a summary judgment granted under Ontario's *Rule 20*:

> 27    The appropriate test to be applied on a motion for summary judgment is satisfied when the applicant has shown that there is no genuine issue of material fact requiring trial, and therefore summary judgment is a proper question for consideration by the court. . . .  Once the moving party has made this showing, the respondent must then "establish his claim as being one with a real chance of success."

> 28    The limitation period defence raises mixed questions of fact and law.  O'Brien J. found that the only disputes were on the application of the law. . . .

> 31    Gordon objected that the various affidavits of Bailey raised a credibility issue sufficient to require a trial.  O'Brien J. disagreed. . . .

> 33    Gordon also argues that the question of law is uncertain. . . .

> 35    We agree that there is no legal issue to be resolved at trial.  The application of the law as stated to the facts is exactly what is contemplated by the summary judgment proceeding.

[13]    The Nova Scotia Court of Appeal has endorsed and frequently moulded this test to various factual matrices.  In *United Gulf Developments Ltd* v *Iskandar*, 2004 NSCA 35, ¶¶ 6 to 9, the Court expressly accepted the *Guarantee* test and held that there was no appreciable difference between the standard of no genuine issue and no arguable case.  See also:  *Selig* v *Cook's Oil Co.*, 2005 NSCA 36 and *Cherubini Metal Works Ltd.* v. *Nova Scotia (Attorney General)*, 2007 NSCA 38 at ¶ 8.  In *Cherubini*, Cromwell, J.A. went on in ¶ 10 to state:

> . . . one must determine the "essential character" of the dispute which underlies the court action . . . There are, in this case, no factual questions requiring trial . . .  The essential character of the

dispute is determined by examining the respondent's claims, not assessing what it can prove.  The ambit of the collective agreement (the document essential to the litigation in *Cherubini*) is determined by construing the agreement.  In short, the relevant legal considerations do not depend on disputed facts.

[14]    In *Eikelenboom* v *Holstein Assn. of Canada*, 2004 NSCA 103, Saunders J.A. stated at ¶ 28 that where the Chambers' judge had determined that the material facts were not in dispute and that the law of waiver was clear, she ought to have then applied the law to those facts and determined the matter before her.  He further stated at ¶ 31, citing the Supreme Court of Canada decisions in *Hercules Management Ltd.* v *Ernst & Young*, [1997] 2 S.C.R. 165, and *Guarantee*, " . . . while such an analysis may well be difficult and contentious, neither complexity nor controversy will exclude a proper case from the rigours of summary judgment."

[15]    In *Huntley* (Litigation Guardian of) v *Larkin*, 2007 NSCA 75, Roscoe J.A. succinctly canvassed the law (¶¶ 29 to 39) highlighting two points that circumscribe the extent of the analysis by the Court:

(1)    In a motion for summary judgment, the Court will never assess credibility, weigh the evidence, or find facts (citing *Dawson* v *Rex Craft Storage and Warehousing Inc*., 1998 CarswellOnt 3202 (OCA)); and,

(2)    The focus of the first part of the *Guarantee* test is whether a genuine issue of fact exists.  The essence of the second part is whether a real chance of success exists on the facts that are not in dispute.

[16]    Some insight into the subtlety of the analysis is explained in **Guy J Pratte**, **Nadia Effendi** & **Paul Taylor**, *Summary Judgment Motions: Recent Judicial Developments*, (2008) 35 The Advocates' Quarterly 114.  The fairly generous use of Ontario's summary judgment Rule 20, evidenced in *Vaughan* v *Warner Communications Inc*. (1986) 56 OR (2d) 242 (OCA), narrowed considerably with a series of appellate decisions culminating in 1998 and 1999 (including the *Dawson* decision cited in *Huntley*).  Since then the Ontario Court of Appeal appears to have broadened the opportunities to use the Rule, permitting some review of the

evidence,  in *High-Tech Group* v *Sears Canada* [2001] O.J. No. 33, *Franco* v *White* [2001] O.J. No.847, *Rozin* v *Ilitcher* [2003] O.J. No. 3158, ¶¶ 8, and *Goldman* v  *Devine* [2007] O.J. No. 1491.

[17]    Greenbrier says that its application involves the interpretation of the Lease, which, on a plain reading of the relevant clauses, in the context of the lease as a whole, unambiguously bars BC Rail's claims against it. No resort to extrinsic evidence is therefore necessary or permissible (per *Eli Lilly*).  It submits that the necessary facts are undisputed and the issue can be decided by reference to the pleadings and the Lease Agreement alone.

[18]    BC Rail also claims that on a plain reading of the Lease as a whole its claims against Greenbrier are not barred; however, with respect to the interpretation of the insurance provisions relied upon by Greenbrier, it says the terms used to describe the type of coverage (including "comprehensive general liability insurance" and "additional insured") are technical terms that are ambiguous without resorting to expert opinion evidence.  BC Rail filed the affidavits of two "experts" offering opinion as to their meaning.  Greenbrier objects to the admission of the opinions: first, on the basis of the lack of qualifications and bias of the experts; second, because they constitute extrinsic evidence and the words of the lease are unambiguous without resorting to extrinsic evidence; and third, because the opinions are directly contradictory to the plain words of the Lease.

[19]    Part of the exercise of this application is to determine the intentions of the parties as reflected in the words of the Lease in the context of the Lease as a whole.  If ambiguity remains after that exercise, and resort may be made to extrinsic evidence, the issue becomes the admissibility (and, if admissible, the weight) that should be given to the expert opinions that BC Rail relies upon.  The Court understands that the position of Greenbrier is that if the Court gets to this stage in the interpretative process - i.e., resort to extrinsic evidence, the issue is not one resolvable by summary judgment.

D.      **Interpreting Contracts - The Principles**

2009 NSSC 240 (CanLII)

[20]    While the theory of contract creation is sometimes debated, the principles are not complicated.  A contract consists of a promise or promises given by a person in exchange for the promise or promises made by the other person.  Its existence is a voluntary legally-recognized bargain that gives rise to express and implied enforceable obligations.  There must exist, on an objective analysis, a meeting of the minds or consensus *ad item*.

[21]    The principles or precepts for interpretation of contracts are usefully summarized in innumerable texts.  Those relied upon in this decision include:  **John Swan**, *Canadian Contract Law*, 1st Edition (Markham: LexisNexis, 2006) c. 8 and **G.H.L. Fridman**, *The Law of Contract in Canada*, 5th Edition (Toronto: Carswell, 2006) c. 12, and **Geoff R. Hall**, *Canadian Contractual Interpretation Law*, 1st Edition (Markham:  LexisNexis, 2007) c. 2.

[22]    **John Swan** writes that the process of interpretation focuses almost exclusively on what a reasonable person in the position of the offeree would understand by what the offerror said, even though that understanding might be quite different from what the offeror actually meant.  Interpretation usually refers to the process by which a Court gives effect to what the parties have said or done as they attempted to set out their relationship.  Few, if any, words can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract.  Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties might have had.

[23]    The jurisprudence in Canada is set out in *Eli Lilly* where, at ¶ 54 and 56, the Court wrote:

> 54      The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time.  In my view, this approach is not quite accurate.  The contractual intention of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.  Evidence of one party's subjective intention has no independent place in this determination.

> . . .

56      When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative.  Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interest of the parties, if the goal is to ascertain the true contractual intent.  However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.  This is consistent with the following dictum of this Court, in *Joy Oil Co.* v *R.,* [1951] S.C.R. 624 (S.C.C.):

> . . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

[24]    **Canadian Encyclopedic Digest Contracts IX.2(a)** succinctly notes:

> §562      "Ambiguity" is a term of art, which refers neither to uncertain breadth of language, nor to an inaccuracy, a novel result, or a difficulty in interpretation, nor to clear contractual wording that does not say what one of the parties intended it to say.  An ambiguous contractual provision is one that is reasonably capable of more than one meaning. . . .  "ambiguity" implies that the parties knew fundamentally what they were contracting for or about, but did not express it clearly. . . .

> §563      Correspondingly, a cardinal principle of contractual interpretation is that, if the language of a contract is capable of only one meaning, read objectively in the context of the contract as a whole and its surrounding circumstances, the court is required to give effect to that meaning.  A court will not resort to subsidiary rules of construction or interpretation unless the words used by the parties are reasonably capable of more than one meaning.

[25]    I take guidance from these principles (being mostly a precis of Fridman's analysis):

a)      the primary source of knowledge of the parties' intention is the written word, and effect must be given to their express language.  The true meaning of a document must be given without doing undue violence to the language used, unless this would result in an absurdity.  Words of ordinary use must be construed in their ordinary and natural sense; the paramount test of meaning is the parties' intention determined, in the operative sense, by reference to the surrounding circumstances of signing of the contract.  (**Fridman**, pp.  440-441)

b)      the common law recognizes circumstances in which evidence other than the express written contract may be admitted to discover the nature and extent of the contractual obligations, as aides to interpreting the intrinsic meaning of the language.  The parol evidence rule and its exceptions recognize the impossibility in some circumstances of confining persons to the language used.  Underlying this concern, that an injustice not be done, is that the contract should be understood in the way the language would appear to the ordinary, reasonable person looking at it objectively, but with an exception for language sometimes used in a special sense because of past dealings, idiosyncracies of a trade or business, or custom and practice. (**Fridman**, pp.  442-443)

c)      the basic rule respecting parol evidence is that if the written contract is clear and unambiguous, no extrinsic evidence may be admitted to alter, vary or interpret the written words. For example, extrinsic evidence may not be admitted to contradict the written contract. See: *Hawrish* v *Bank of Montreal*, [1969] S.C.R. 515, followed in *Bauer* v *Bank of Montreal*, [1980] 2 S.C.R. 102.  (**Fridman**, pp.443-444)

d)      exceptions exist, in general terms, to explain incomplete documents, prove an unfulfilled condition precedent and assist to ascertain the parties' intentions; and in particular:

i)      to prove that the contract was obtained by fraud, misrepresentation, mistake or other mitigating conduct by the other party (technically not to interpret, but to invalidate the contract).  (**Fridman**, p.445)

ii)      where the contract is ambiguous on its face, to admit evidence of surrounding circumstances to resolve the ambiguity.  (**Fridman**, p.446)

iii)      without contradicting the contract, to explain the contract language, especially to fill in a gap when the parties have plainly omitted something.  (**Fridman**, p.447-448)

iv)      in some limited circumstances, and subject to some dispute in the case law, to establish an oral collateral agreement that modifies, qualifies or explains the contract so long as it does not contradict or significantly impact on the contractual obligations. Different approaches (that are difficult to reconcile) are evident in, for example, *Sinclair* v *Brady*, 1991

2009 NSSC 240 (CanLII)

CarswellNS 527 (NSSC, Roscoe J, as she then was) at ¶¶ 10-12, and *Gutierrez* v. *Tropic International Ltd.*, [2002] O.J. 3079 (OCA) at ¶¶ 19 and 20.  (**Fridman**, pp. 448-451)

e)      admissible sources of parol or extrinsic evidence to explain ambiguous terms of a contract include:

i)      conduct, including statements, made prior to the contract, such as earlier dealings between the parties, and the contents of a prior (but not contradictory) agreement.  The extent of prior conduct and statements is not without some controversy.  While some courts have held that prior negotiations leading to the execution of the agreement or contract are admissible, not to change the terms of a written contract but as a surrounding circumstance to aid in interpretation, in accord with *Chisholm v. Chisholm* (1915) 49 NSR 174 at 181 (NSCA) and the principles enunciated by the House of Lords in *Prenn* v *Simmonds*, [1971] 3 AER 237 and *Reardon Smith Line* v *Hansen-Targen*, [1976] 3 AER 570, other Canadian courts appear to follow the opposite admonition of  Estey, J. in *Indian Molybdenum Ltd.* v. *The King*, [1951] 3 DLR 497 at pp. 502-503.

ii)      conduct contemporaneous with the making of the contract; that is, 'the state of facts and circumstances as known to and affecting the parties at the time.' "The language used . . . must be interpreted, wherever possible, in the sense which the parties understood it." (**Fridman**, p. 452).

iii)      conduct and statements after the agreement is put in writing. **Fridman** writes that while such conduct and statements are not admissible in England, they are clearly admissible in Canada on the basis that there is no better way of determining what parties intended than to look at what they did under the contract.

[26]    **Geoff Hall's** useful cannons or precepts can be summarized as follows:

a)      Contractual interpretation is all about giving proper meaning to the words selected by the parties themselves to govern their relations, understood in the context in which those words are used.

Page: 14

b)      A contract is to be construed as a whole with meaning given to all of its provisions.  This is the first aspect of context.  Disputed language is interpreted in the context of the language of the agreement as a whole.

c)      The factual matrix is the second aspect of context. Disputed agreements are interpreted within the context of the factual matrix (surrounding circumstances) that gave rise to the contract.  It is in this second aspect of context that most controversy arises in the case law.  It is clear that the subjective intentions of the individual parties, and prior or collateral oral agreements that contradict the written contract are not admissible.  It appears that evidence of the negotiations between the parties is not part of the factual matrix.  (See *Prenn v. Simmonds*, p. 241; *Indian Molybdenum*, pp. 502-503).  Evidence is restricted to evidence of the factual background known to the parties at or before the date of the contract including evidence of the genesis and objectively the aim of the transaction.

d)      Interpretation is an objective exercise.  Contractual interpretation seeks to give effect to what the parties objectively manifested by the words they used, not what they subjectively intended.

e)      Commercial contracts are to be interpreted in a manner that promotes commercial efficacy, determined on an objective basis. This requires contextual evidence that places the court in the position of the parties. The corollary of the promotion of good business sense is the avoidance of what is commercially absurd.

f)      Every effort should be made to find a meaning.  Court should be loath to hold contracts void for uncertainty. It should be assumed that the parties clearly intended to be legally obligated, even if they used inarticulate, imprecise or incomplete language to express their joint intention.

g)      A contract is to be interpreted as of the date it was made.  Unlike statutes and the constitution whose interpretation may change over time, the meaning of a contract does not change or evolve after the date of formation.

h)      The parol evidence rule is a holdover from an era in which context and surrounding circumstances did not have nearly the importance they have today.  The basic concept is that evidence extrinsic to a contract is not admissible to add to, subtract from, vary or contradict a written agreement.  It does not apply where the written agreement is incomplete or there is a collateral oral agreement or where there is an ambiguity in the written document.  In essence, it only applies to preclude evidence of subjective intention and evidence that directly contradicts the written contract. Many Canadian trial and appellate decisions seem to have gone beyond the restrictions to the resort to parol evidence set out in *Eli Lilly* ,as has English case law, as evidenced by *Prenn*, *Reardon Smith Line*, and most importantly *Investors Compensation Scheme* v *West Bromwich Building Society*, [1998] 1 WLR 896 (HL).  (See *J&P Reid* v *Branch Tree Nursery*, 2006 NSSC 226,at ¶¶ 62-65, and *Gates* v *Croft*, 2009 NSSC 184 at ¶¶ 33-41). While more astute attention is being paid to context (in the sense of the document as a whole and surrounding factual matrix) in the interpretation of language, Geoff Hall may be optimistic in suggesting, absent a reassessment of *Eli Lilly* by the Supreme Court, that resort to parol evidence, when no ambiguity exists, is less circumscribed than in the past.

i)      The *contra preferentem* rule is another rule whose significance and applicability are narrowed to those circumstances where parties are of unequal bargaining power (guarantees and insurance policies) and only in circumstances where an ambiguity exists.

E.      **Analysis**

*E.1      General*

[27]    The analysis must begin with an interpretation of the terms of the Lease and the characterization of that Lease by the parties.

[28]    Its relationship to the other parties and the role of Greenbrier is a relevant contextual circumstance.  Greenbrier's argument is that while BC Rail pleads that Greenbrier and

Trentonworks are allegedly affiliated and are subsidiaries of Greenbrier Companies Inc., "a large rail industry conglomerate", the Court should ignore this.

[29]     On the one hand Greenbrier orally submits that it was simply financing the transaction between Trentonworks and BC Rail and at the same time says it was a "bare lessor".  I have some difficulty with this characterization.  The position of a "bare lessor" differs from that of a party who is financing a transaction for either the seller or the purchaser.  Nowhere in the Lease is there a provision indicating that BC Rail is acquiring any interest in any of the cars.  No term in the Lease, directly or through possible collateral agreements or implicitly, suggests that the role of Greenbrier was to finance the transaction in the context that financial institutions do in the respect of the purchase and sale of goods.

[30]     An examination of the Lease itself, which includes Schedule No. 1, suggests that the transaction was not a financing arrangement but rather a straightforward lease.  Clause 2(b) and Clause 12 state that the Lessee leases 155 Cars, for a term of 35 months at a basic rent of $625USD per car per month (Schedule No. 1, Paragraph 3), with an obligation upon the Lessee to return the cars to the lessor at the end of the term in the same condition as received, except for ordinary wear and tear. (Although Clause 14 of the Lease and Paragraph 9 of Schedule No. 1 do not, on their face, contain the same provisions respecting the condition that the cars must be in upon return to the lessor, the difference does not affect the relationship of the parties).  Clause 1 (b) reads:  "It is the intent of the parties . . . that Lessor shall at all times be and remain the owner and lessor of all Cars and that no agency, joint venture or partnership is being created. Lessee's interest in the Cars shall be that of lessee only."

[31]     In the end, I understood Greenbrier's position to be that it was a true or simple lessor and BC Rail was a true or simple lessee for a fixed three years term, as appears from a plain reading of the Lease - that the Lease was not a sale, dressed up as a Lease.  The lessee gets possession of the lessor's asset for a fixed term in exchange for a fixed monthly fee, and no more; ownership remains with the lessor. The allocation of risk between the lessor and lessee, and the analysis, differs as between, on one hand, parties who are simply lessor and lessee, and, on the other, those whose relationship is more complex and involves a financing aspect.

2009 NSSC 240 (CanLII)

[32]     Clause 6 describes the maintenance obligations of the lessor and lessee.

[33]      Clause 6(a)  provides that the lessor, at its expense, shall perform inspections, maintenance, repairs to and servicing of the cars "necessary to maintain the Cars in good operating condition as specified in AAR Interchange, FRA and Transport Canada rules and regulations, and to meet all requirements of the United States Department of Transportation and other United States and Canadian government authorities". These obligations are at the lessee's expense in only three circumstances:

    a)      if the maintenance necessary is due to "unfair usage conditions",  or

    b)      where Interchange Rules would assign responsibility to the lessee, or

    c)      as may be specified in any schedule to the Lease. (None are specified.)

The lessee shall make "Running Repairs" at the lessor's expense. The lessee is obligated to use its best efforts to minimize damage.

[34]     Clause 6(b) gives the lessor the right to perform "Non-Routine Repairs" at the lessor's expense.  These are defined as repairs other than "Running Repairs".

[35]     Clause 6(c) gives the lessor, Greenbrier, the duty to use reasonable efforts to fulfill its maintenance obligations.

[36]     Clause 6(d) provides that if the agencies that regulate equipment operation safety and use require the lessor to modify the Cars, the lessee agrees to pay an additional monthly charge for each car to cover the modification costs.

2009 NSSC 240 (CanLII)

[37]    This characterization of the lessor-lessee arrangement, and the maintenance obligation, are important relevant contextual circumstances, from within the four corners of the Lease, that affect the interpretation of the terms in dispute.

[38]    Greenbrier submits that it is clear from the words of the Lease themselves:

    1.    That once BC Rail accepts the cars, Greenbrier is off the hook for any liability or obligation that might arise in respect of the condition and use of the cars at the time of delivery, that is, its warranty is satisfied, and,

    2.    To the extent that Greenbrier might have any liability or obligation to BC Rail or any third parties,  BC Rail had an obligation to insure and indemnify Greenbrier against such liabilities or obligations.

[39]    Greenbrier says that Clauses 3(a), 5, 7, and 17 work in harmony to clearly establish this interpretation.  First, Clause 3(a) balances the parties' rights. By giving the lessee a right or opportunity to inspect the cars, there is no unfairness in interpreting the lessor's warranty as satisfied and barring subsequent recourse against the lessor.  Second, while Clause 5 provides a warranty as of delivery, this is complemented by an exclusion of liability provision written in the broadest of terms.  Third, Clause 7 requires the lessee to obtain insurance that covers both parties' respective interests - BC Rail's interest in maintenance and use, and Greenbrier's interest in ownership and condition. Implicitly, the lessee has waived any right of subrogation against the lessor.  Finally, by Clause 17 the lessee indemnifies the lessor from third party claims.  (The words in Clause 17 read: ". . . indemnify from all losses and liability of every kind in contract and tort . . ." - and is not expressly limited to third party claims.)  Greenbrier argues that this broad indemnity against third party claims of any kind (except gross negligence or wilful misconduct) reinforces the general intent of the parties to extend to the lessor the same protection as the warranty and waiver, and insurance, provisions.

[40]    BC Rail submits with equal vigour that the words in the disputed terms of the Lease, taken individually, and in the context of the Lease as a whole, clearly demonstrate that

2009 NSSC 240 (CanLII)

Greenbrier remains liable both in contract law for supplying cars that may have a latent defect, and in tort law for negligently or falsely representing to BC Rail the condition of the Cars which they knew or ought to have otherwise known were defective either by design or manufacture.

[41]     The disputed terms of the Lease, read in the context of the Lease as a whole, without reference to any permissible extrinsic evidence, do not provide clarity, at least on a balance of probabilities, as to the true intentions of the parties, assessed on an objective basis, respecting the allocation of the risk between the parties, in contract law, in tort law, or in respect of the insurance obligation.

**Greenbrier's First Argument: BC Rail released it from all liabilities**

[42]     Relevant to the interpretation of Clause 5 (Warranty and Waiver) is the issue of when the Lease commenced.  This involves an analysis of Clause 3, Schedule No. 1 and the related "Certificate of Acceptance".

*Clause 3*

[43]     Clause 3 of the Lease provides that each car is deemed delivered at the point of tender unless the lessee declares in writing, within either 10 or 20 days (the difference is not relevant for this analysis) that a car is unacceptable as not meeting the specifications.  Clause 3 states that:   "The Lessee approves the specifications for the Cars described in "Exhibit C.1 of the applicable Schedule".  There is no Exhibit C.1 attached to the Lease or to the only schedule (Schedule No. 1,Tab D, Tupper affidavit of September 16, 2008).  The only description of the cars is in Schedule No. 1, Paragraph 2.  This description contains no reference to the "truck" or stabilization system or their specifications. In my view, this is an important omission.

[44]     The third and fourth sentences in Clause 3 impose on BC Rail an obligation forthwith after inspection and acceptance of each car to sign and deliver a Certificate of Acceptance and if it fails to do so within three days after its inspection, the cars are deemed delivered and deemed

to be fit and suitable for the lessee's use and in conformity with the specifications.  The absence of an Exhibit C.1 to the applicable schedule leaves in doubt what the cars' specifications are (at least with respect to the "truck")`.  Two copies of a "Certificate of Acceptance of Railroad Cars", one signed May 31, 2000, and another signed June 1, 2000, were attached to Schedule No. 1. They list the delivery date for each car and certify the fitness and suitable and unconditional acceptance of the cars listed.  Because the delivery dates of the cars are all between October 21, 1999, and November 16, 1999 - all more than 20 days before the accident - Greenbrier initially argued that the certificates were conclusive evidence of the fitness and suitability of the cars and of BC Rail's unconditional acceptance of the cars at a date before the accident.  It abandoned this submission during oral arguments because of BC Rail's submission that the Certificates were signed and delivered by BC Rail after Greenbrier had replaced all of the allegedly defective parts on the cars.  Instead, Greenbrier relies upon the last sentence in Clause 3 to the effect that the loading of any car by the lessee shall constitute acceptance thereof by the lessee and shall be conclusive evidence of the fit and suitable condition thereof for the purpose of transporting the commodities then and thereafter loaded.

[45]    Greenbrier submits that the loading of a car constituted acceptance of that car and conclusive evidence of its fit and suitable condition for the purpose of transporting commodities, and any express or implied warranty it gave for the car was "satisfied".

[46]    In effect, Greenbrier states that the Lease provides two alternative routes by which BC Rail could be found to have accepted the cars (that is, acknowledge  acceptance of each car as fit and suitable for the purpose of transporting commodities) - by the execution of a Certificate of Acceptance, or, alternatively, by loading the car.

[47]    I agree that it is clear from a reading of Clause 3 that the loading of the car that allegedly caused the derailment constituted an acceptance of the car by the Lessee and "conclusive evidence of the fit and suitable condition thereof the purpose of transporting commodities". Clause 3 does not define the term "fit and suitable condition for Lessee's use and in conformance with the specifications" (where acceptance is affected by the first alternative in Clause 3(a) - certificate of acceptance) or "fit and suitable condition thereof for the purpose of transporting the

commodities" (where acceptance is effected by loading), nor does it contain the warranty relied upon by the lessee nor the exclusion clause relied upon by the lessor. It is not at all clear, from reading Clauses 3 and 5 together or the Lease as a whole, what the intention of the parties was with respect to the significance of the use of the terms "acceptance", and "fit and suitable condition"(in either of its two iterations) in Clause 3(a) in relation to the lessor's warranties and the exclusion clause in Clause 5.

[48]    Absent Exhibit C.1 or any specifications in the Lease (or any related document) that specifies or describe the "truck" or stabilization system, there is no basis for the court to reasonably conclude (or infer) that the lessee accepted any "specifications" respecting the aspect of the car that allegedly caused the derailment. How can the lessee be held to have declared as "unacceptable as not meeting the specifications" (clause 3(a),second sentence), and therefore unfit and not suitable for their intended purpose, cars for which the relevant specifications (that allegedly caused the derailment) are not set out in the contract?

***Clause 5***

[49]    Clause 5, on its face, contains apparently contradictory provisions.

[50]    The first sentence -  that the lessee acknowledges that the cars are of a size and capacity it selected and that the lessee is satisfied that the cars are suitable for its purposes - does not constitute a warranty or agreement, as of September 16, 1999 (the date of the Lease) or as of delivery, or the date of actually execution, that BC Rail accepts the condition of each car as to any latent or patent defect. The acknowledgment is limited to size, capacity, and suitability, not to the condition of the cars.  Reading this first sentence, in the context of clause 5 and the Lease as a whole, does not broaden the reach of the acknowledgment.

[51]    The meaning of the second sentence is disputed, and in my view is ambiguous whether read alone or in the context of the Lease as a whole.

2009 NSSC 240 (CanLII)

[52]    Greenbrier argues that the phrase "as of the Commencement Date" refers to  all Greenbrier's warranties and acknowledgments: (1) the lessor is the owner of the cars, and (2) each of the cars is (i) suitable for the general transportation of freight and (ii) meets all AAR Standards for such service.

[53]    BC Rail says the phrase "as of the Commencement Date" refers only to the first warranty and acknowledgment - that the lessor is the owner of the Cars.

[54]    Based on Schedule No. 1, both parties submit that the "Commencement Date" is December 1, 1999, being the first day of the month following the delivery of the last car.  I agree with counsel's interpretation of the definition of  "Commencement Date".

[55]    Reading the second sentence in Clause 5 alone, I agree with BC Rail's interpretation: that the use of the word "that" in front of each of the two clauses in the sentence: "that as of the Commencement Date Lessor is the Owner of the Cars and that each of the Cars is suitable . . ." does, as a matter of strict English grammar, suggest that the modifying phrase, "as of the Commencement Date" applies only to the first part of the sentence, and not the second part of the sentence.  I refer to the grammar rule that the word "and" before "that each of the Cars..." is a co-ordinating conjunction joining two independent clauses, each of which begins with the word "that", which word is used twice, as a subordinating conjunction, to introduce two separate clauses.  Subject to the interpretation of Clause 3, this would mean that the lessor's warranties in the second part of the sentence are continuing or ongoing warranties - that they survive the Commencement Date of December1, 1999.  I have already concluded that clause 3 does not constitute "acceptance" of  a specification of a car that is omitted from the agreement (even though it was contemplated that whatever specifications were relevant to the parties would be included in an Exhibit C.1).

[56]    That, however, does not end the interpretative process.  The Court's duty is to interpret the words in the context of the Lease as a whole, and in harmony with the other provisions, if possible.

2009 NSSC 240 (CanLII)

[57]     If the interpretation of Clause 5 and the Lease, in their respective entireties, demonstrate that the grammatical interpretation of the second sentence should restrict Greenbrier's warranty as to the Cars' suitability and compliance with all AAR Standards, to the Commencement Date only, then such is the proper interpretative priority. Greenbrier does not argue that its warranties are limited to the Commencement Date, or ceases to exist thereafter; it argues that the warranties are "satisfied" when BC Rail either delivers the Certificate of Acceptance, or, in this case, loads the car.

[58]     I therefore interpret Greenbrier's warranties as continuing warranties that survive the Commencement Date.

[59]     The third sentence in Clause 5 is long and convoluted.  The first two lines - up to the semicolon, are in ordinary print and read: "Except for Lessor's express warranty specifically set forth above, Lessee acknowledges and agrees that Lessor is not a manufacturer of the Cars".  I have difficulty understanding the connection between the lessor's express warranty contained in the second sentence and an acknowledgment that the lessor is not the manufacturer.  It is already acknowledged (clause 1(b)) that Greenbrier is the owner of the Cars and a "bare" or "true" lessor.  Because  interpretative principles mandate that I make every effort to give meaning to all the provisions (*Marquest Industries* v *Willows Poultry Farms* (1968) 1 DLR (3d) 513 (BCCA) at bottom 517-top518, and *Hillas & Co* v *Arcos Ltd* [1932] AER Rep.494 (HL) at bottom 503), I conclude that this sentence means no more than that Greenbrier is the owner and not the manufacturer, and whatever liability it has is that of the owner of the cars, not as a manufacturer; said differently, the law of product liability does not apply as between Greenbrier and BC Rail. This interpretation is consistent with the fourth and fifth sentences; in them the lessor assigns all manufacturers' warranties to the lessee for the term of the Lease, so long as the lessee is not in default.  This interpretation is not without some ambiguity because the terminology being used after the semicolon in the third sentence - merchantability, fitness for a purpose, design, condition and quality of workmanship, and the reference to latent defects is terminology reserved for agreements of sale of goods by manufacturers and sellers to buyers, usually in the context of product liability.  (No manufacturer's warranties were identified in the documents or placed before the Court.)

2009 NSSC 240 (CanLII)

[60]    The part of the third sentence that follows the semicolon, all in capital letters, contains (1) an acknowledgment that the Cars are leased "as is", (2) a statement that the lessor makes no representations or warranties of any kind (nor is deemed to have made any) respecting the merchantability, fitness, design, condition, or quality of workmanship, of the Cars, and (3) a statement that the lessor shall not be liable "in contract, tort, or strict liability" for any loss or damage from any defect "whether hidden, latent or otherwise discoverable or nondiscoverable". Greenbrier acknowledged that the phrase: "Except for Lessor's express warranty specifically set forth above," applies to the part of the sentence after the semicolon. I agree and find that, on a grammatical reading of the third sentence, the "Except" phrase applies to the words after the semicolon. This part of the third sentence, read alone, is a clear renunciation, usually found in a manufacturer's or seller's agreement of sale, of any liability for anything, except for the lessor's warranties set out in the second sentence.

[61]    The key to this application are the words that follow the semicolon in the third sentence. I have difficulty reconciling the lessor's warranties in the second sentence with the exclusion of liability in the part of the third sentence after the semicolon. On their respective faces, they are irreconcilable. The phrase "except for Lessor's express warranty specifically set forth above," must be given some meaning. Its natural meaning is that the exclusion of liability provision is subject to the lessor's warranties in the second sentence.

[62]    My grammatical reading of the words after the semicolon is that these words purport to constitute a complete release of the lessor of any liability or obligation in respect of the cars of any kind whatsoever. If BC Rail is correct that the phrase in the second sentence, "as of the commencement date" relates only to ownership (which is the proper grammatical interpretation), then clearly Greenbrier's second warranty ('suitable . . . and meets all . . .standards') appears on first glance to be in direct conflict with the ' as is . . and not liable' clause after the semicolon. Even if the "as of the commencement date" phrase modifies Greenbrier's second warranty (which Greenbrier recoiled from during oral argument), it is difficult to reconcile a warranty that the cars are suitable for general transportation and meet all AAR Standards for rail freight

2009 NSSC 240 (CanLII)

transportation as of December 1,1999,  with a agreement that the lessee takes the cars "as is" and without any warranty or recourse of any kind.

[63]    Greenbrier's oral submission, in rebuttal to BC Rail's argument the Greenbrier's position was that the lessor's warranties ceased to exist as of the Commencement Date, was that they existed but were "satisfied" by the lessee's act of loading the car under Clause 3(a). This submission conflicts with the clear words after the semicolon in the third sentence; the words are to the effect that the lessee is leasing the cars "as is", without any representations or liability on the lessor (that is, no warranty or liability ever existed) - not that warranties exist and are satisfied by inspection and acceptance (or loading).

[64]    I am required to reconcile these conflicting clauses, if possible, and in the first instance without resort to extrinsic or parol evidence, but cognizant of the business setting (**Geoff Hall**'s first context).  It is not possible to reconcile an express warranty that a car is suitable for rail freight transportation and meets all AAR Standards, with an express exemption from all liability for defects (in this case an alleged defect that was in the car at the Commencement Date and at the time of delivery), unless the exemption clause is interpreted as exempting liability for anything other than that which is expressly warranted. Without the "Except for" phrase at the beginning of the third sentence, the lessor's warranties clause and the exclusion of liability clause are irreconcilable on any reasonable (as opposed to strained) interpretation of Clause 5. I therefore conclude that the only reasonable (objectively analyzed) interpretation of the parties' intentions, as written in clause 5, is that the limitation on the lessor's liability in the third sentence is subject to the lessor's warranties in the second sentence. Those warranties are only "accepted" (per clause 3(a)) to the extent that the specifications are described in the Lease or Schedules. As noted above, the Lease and Schedules contain no specifications respecting the "truck" or the stabilization system that contained the alleged defect that caused the derailment.

[65]    As noted, Greenbrier argues that the last sentence in Clause 3 should be interpreted so that when BC Rail loaded a car, any warranty given by Greenbrier was "satisfied".  I do not agreed.  Loading may constitute acceptance of the car, but that has no bearing on Greenbrier's warranty in Clause 5.  It is a possible interpretation of that sentence that loading is conclusive

2009 NSSC 240 (CanLII)

evidence that the car is fit and suitable for the purpose of transporting commodities, but
Greenbrier's warranty was that the car was not only "suitable for general transportation of
freight" but also that each car met all AAR Standards for that service.  Nothing in the last
sentence in Clause 3 expressly or, by reasonable inference, constitutes evidence that each car
meets all AAR Standards.

[66]     Greenbrier's submission that its warranties with respect to the condition and use of the
cars were satisfied as of the date that each car was loaded is inconsistent with the maintenance
obligation Greenbrier undertook in Clause 6 of the Lease.

[67]     It makes no sense that the parties would enter into a 35-month Lease for new  cars, the
condition of which is that BC Rail accept them "as is" and for which Greenbrier assumes no
liability of any kind whatsoever, in circumstances where the lessor accepts the obligation to
effect the repairs and maintenance of the cars at its expense.  (In those circumstances where the
lessee has the obligation of repair, it is at the expense of the lessor [except in three limited
instances specifically described in Clause 6]).

[68]     The fact that the Lease contained insurance clauses in which BC Rail was obligated to
obtain certain types of insurance coverage and to add Greenbrier as "additional insurer" to the
policies, is not suggestive of a complete release of Greenbrier from any ongoing obligation or
liability to BC Rail in respect of any loss or damage suffered by it in respect of the use of the
Cars.

[69]     One of the rules or precepts of statutory interpretation is that contracts are to be
interpreted in a manner to promote commercial efficacy, the corollary of which is that an
interpretation which is commercially absurd is to be avoided.  This was clearly enunciated in
*Consolidated-Bathurst Export Ltd*. v *Mutual Boiler & Machinery Insurance Co.*, [1980] 1SCR
888, *Hillis Oil and Sales* v *Wynn's Canada Ltd*., [1986] 1 S.C.R. 57 at ¶ 15, and *Eli Lilly*, and
applied in *Scanlan* v *Castle Point Development Corp.*, 1982 CarswellOnt 633 (OCA) at ¶ 88,
*Kentucky Fried Chicken Canada* v *Scott's Food Services Inc.*, 1998 CarswellOnt 4170 (OCA) at ¶
27, and *Campeau v. Desjardins Financial Security Life Assurance*, 2005 CarswellMan 473

(MCA) at ¶¶ 34-35.  In my view it is not a commercial absurdity to allocate the risk of an alleged defect in a car leased by a lessor to a lessee, in circumstances of a true (or to use Greenbrier's words, "bare") lease, to either the lessor or lessee.  In this case, where the lessor continues to assume the responsibility to repair and maintain the Cars during the term of the Lease, and remains the sole owner of the cars throughout, it is incongruous that the lessor is completely absolved of any liability to the lessee for the condition (including defects, and in particular latent defects) of the Cars.  This interpretative factor favours the lessee, not the lessor.

[70]    I conclude, interpreting clauses 3 and 5 in the context of the lease as a whole, that Greenbrier's warranties in the second sentence in clause 5, as applicable to the defective part of the "truck" or stabilization system, continue to exist, and were not "satisfied" by the loading of the car with the defect. BC Rail's claims are not barred on this basis.

**Greenbrier's Second Argument: BC Rail was obligated to insure and indemnify Greenbrier against its claims**

[71]    Greenbrier submits that a plain reading of Clause 7 establishes a contractual obligation on BC Rail to insure for the benefit of Greenbrier.  BC Rail, for a subrogating Insurer (in this case, an in-house insurer) is bringing this action in BC Rail's name to recover its outlay for losses and damages incurred by BC Rail and, in respect of the death of an employee, a statutory claim from British Columbia's Workers' Compensation Board.

[72]    Greenbrier submits that the subrogated insurer is entitled to no greater claim against Greenbrier that BC Rail itself.  It cites case law, which case law is not disputed by BC Rail, to the effect that a covenant to obtain insurance bars a subrogated claim against the party in whose favour the covenant is made. *Bow Helicopters* v *Bell Helicopters Textron* , 1981 CarswellAlta 56 (ACA); *Cummer-Yonge Investments* v *Agnew-Surpass Shoe Stores*, 1975 CarswellOnt 304 (SCC); *Ross Southward Tire* v *Pyrotech Products*, 1975 CarswellOnt 303 (SCC); *T. Eaton Co*. v *Smith*, 1977 CarswellOnt 491 (SCC), and *Greenwood Shopping Plaza* v *Beattie*, 1980 CarswellNS 26 (SCC).

2009 NSSC 240 (CanLII)

2009 NSSC 240 (CanLII)

[73]    Greenbrier further argues that the lessee's covenant to insure will result in immunity on the part of the lessor for insured perils, whether the claims are subrogated or not. *Bow Helicopters, supra.,* and *Majestic Theatres* v *N.A. Properties*, 1985 CarswellAlta 1 (ACA).

[74]    Finally, citing *Commonwealth Construction* v *Imperial Oil*, 1976 CarswellAlta 124 (SCC), Greenbrier submits that an insurer may not advance a claim against its own insured.

[75]    In the case at bar, Greenbrier submits that it is an insured; its, as well as BC Rail's, interests are inseparably connected; therefore, Greenbrier is immune from the subrogated claim because of BC Rails' express covenant in the Lease to insure for the benefit of both contracting parties.  The intention to be immune need only be "adequately expressed" (*Sooter Studios* v *74963 Manitoba Ltd.*, 2006 CarswellMan 21 (MCA) at ¶ 29).

[76]    BC Rail's response is that the first step in the analysis of the cases cited by Greenbrier is to determine what acts or events were required to be insured against.  In each case, the Courts found that the obligation to insure was in respect of the event, loss or damage that was the subject of the litigation.  BC Rail submits that it was not required in this Lease to insure for the benefit of Greenbrier in respect of the claim it advances against Greenbrier.

[77]    Clause 7(a) required BC Rail to keep comprehensive general liability insurance, including contractual coverage, for the liabilities assumed in the Lease, and all risk property damage insurance.  It submits that the event leading to the loss claimed by it against Greenbrier in this action is not covered by comprehensive liability insurance.  Such insurance only provides protection to a named insured for consequences to a third party caused by the named insured's negligence.  BC Rail submits that its claim is not in respect of a third party claim arising out of BC Rail's negligence.

[78]    Further, BC Rail argues that Clause 7(d) only requires that: all insurance name the lessor as an "additional insured and loss payee in respect of risks arising out of the condition, maintenance, use or ownership of the Cars".  It submits that coverage for the benefit of the lessor,

2009 NSSC 240 (CanLII)

as an "additional insured", as contracted in the Lease, only covers Greenbrier for costs and liabilities incurred by it as a direct consequence of the negligence of the underlined named insured; that is, BC Rail.

[79]    In this case, it is not alleged that BC Rail was negligent.  In other words, the CGL Policy does not cover the event leading to the loss claimed in this action.

[80]    BC Rail's argument is supported by two expert opinions filed by it in this application. Greenbrier argues that the Court cannot resort to these expert opinions for two reasons: first, they are extrinsic evidence and the Court must first determine whether or not there is an ambiguity in the Lease with respect to the insurance provision, and only if there is an ambiguity may it resort to extrinsic evidence;  second, if this Court finds an ambiguity that cannot be resolved without resorting to extrinsic evidence, Greenbrier challenges the expert opinions for several reasons: One is their qualification; another arises out of conflict of interest as one of the opinions is from the president of BC Rail's own in-house insurance company (that is, the insurer making the subrogated claim).  Greenbrier submits that if the Court cannot interpret the insurance provisions without resorting to extrinsic evidence, summary judgment should not be granted and the matter must go to trial to be resolved on the basis of a *bona fide* dispute between the parties.

[81]    BC Rail further submits that the parties removed a clause from a prior draft of the lease, in which clause BC Rail waived its right of subrogation against Greenbrier.  It submits that this extrinsic evidence, as to a prior draft of the lease and the negotiations between the parties, clarifies what is ambiguous within the four corners of the Lease.  Greenbrier argues that the weight of the law in Canada is that prior drafts or versions of a lease, arising out of negotiations, are not admissible extrinsic evidence even if the Court is unable to interpret the insurance provisions within the four corners of the lease.  I believe that the law in Canada on this point is unsettled. It is not necessary that I wade into this unsettled issue to determine whether evidence of the exchanges during negotiations are admissible extrinsic evidence. If I did, I would find that while evidence of either parties intentions (whether communicated to the other party or not) would not be admissible, evidence of an agreement to include or exclude a specific provision should be admissible.

2009 NSSC 240 (CanLII)

[82]    Finally BC Rail argues that the claim arises out of a latent defect in the Cars, and not the "condition, maintenance, use or ownership of the Cars".  Greenbrier was to be named an "additional insured" in respect of risks arising out of the condition, maintenance, use or ownership of the cars, none of which are relevant to BC Rail's claims arising from a latent defect in the design or manufacture of the car and negligent advice by Greenbrier to BC Rail in respect of that defect.

[83]    Initially Greenbrier submitted that the interpretation of the Lease is an issue of law alone. It submitted that no matter how difficult the analysis, this Court was obligated to interpret the Lease.  When counsel for BC Rail submitted the expert opinion evidence in respect of the insurance provision, Greenbrier modified its submission.  It argued that this opinion evidence was inadmissible extrinsic evidence and that if the Court found an ambiguity after attempting to interpret the insurance provisions within the four corners of the Lease, the issue of the interpretation of the insurance provisions was a genuine issue that should be left for trial. I believe that interpretation of a contract usually involves issues of mixed fact and law, but as noted by Cromwell J.A. (as he then was) in Cherubini (¶ 13 of this decision), it is first necessary to determine the essential character of the dispute. In this case, it appears that the parties not only dispute what extrinsic evidence is admissible (a question of law), but also what that extrinsic evidence is. As Roscoe J.A. writes in Huntley (¶ 15 of this decision), the summary judgment process does not involve assessment of credibility or finding facts. Counsel for Greenbrier says that is what is involved in considering the affidavit evidence of BC Rail's experts. I agree.

[84]    Furthermore, I asked both counsel whether the Court could resort to legal texts and case law on insurance law, not cited by counsel, to interpret the insurance provisions in Clause 7 of the Lease.  Both counsel appeared to suggest that such was not permissible, and would constitute resort to extrinsic evidence in any event.  This suggests that, whether the interpretation of the Lease is a matter of law alone (as originally submitted by Greenbrier) or not, if there is an arguable issue of law or fact that cannot be resolved without resort to extrinsic evidence, then there exists a genuine issue for trial and  summary judgment should not be granted.

2009 NSSC 240 (CanLII)

[85]    I conclude that: (a) the scope of the lessee's obligation as to the risks contracted to be insured, and (b) the extent of the lessee's obligation to protect the interests of the lessor, and (c) the resulting implication from those obligations on the lessee's insurer's right of subrogation, are not at all clear, either within Clause 7 or within the context of the Lease read as a whole.  The indemnity clause (Clause 17) suggests that, at a minimum, the lessee is obligated to insure for the benefit of the lessor against third party claims of any kind, in contract or tort, arising out of the use, possession, storage, operation, condition, repairs, etc. of the cars, except for the lessor's gross negligence or willful misconduct. BC Rail submits that the affidavit evidence it filed in the application can support a claim that the lessor was grossly negligent (even if gross negligence was not expressly pleaded). It might. This leaves an arguable issue not appropriate for determination by summary judgment.

[86]    The terms: "comprehensive general liability insurance" and "additional insured", are not terms of ordinary use.  They have special meaning or meanings in the context of the insurance industry.  The parties to this Lease are sophisticated businesses that should be presumed to use these terms in accordance with their meaning or meanings in the insurance industry.  Any conclusion that the Court might reach as to the scope or extent of the insurance coverage contracted for by the parties, and the consequential right of subrogation, would be mere speculation without access either to the extrinsic evidence of the experts and the texts and case law respecting their meaning, neither of which are before the Court (and which counsel submit are  beyond the scope of a summary judgment application), or a determination of facts that are genuinely and legitimately in dispute..

[87]    I conclude that the insurance provisions of the Lease cannot be interpreted without resorting to extrinsic evidence.  Based on counsel's submissions, that leaves a genuine issue to be resolved by trial.

F.    **Conclusion**

2009 NSSC 240 (CanLII)

[88]    With regards to Greenbrier's first submission that the terms of the Lease unambiguously demonstrate an objective intention of the parties to absolve it from all warranties and liabilities of any kind whatsoever upon the lessee loading the car, I disagree.  Clause 5 of the Lease, read in the context of the Lease as a whole, and in particular Clauses 1, 3, 6, 7 and 17, demonstrate an intention that the exclusion of liability provisions after the semi-colon in the third sentence of Clause 5 are subject to the lessor's express warranties in the second sentence. The Court does not have evidence before it as to the AAR Standards for such service and how they relate to the alleged defective stabilization system on the car that caused the derailment.

[89]    The Court does not accept Greenbrier's suggested interpretation for the last sentence in Clause 3(a).  The absence of an exhibit or schedule setting out the specifications for the car, as they relate to the defect in the truck or stabilization system, suggests that any acceptance of the cars by BC Rail was not for the purpose of releasing Greenbrier from any defect in the truck or stabilization system, the specifications for which are not clearly "accepted" by the lessee.

[90]    With respect to Greenbrier's second claim, that BC Rail was obligated to insure against the losses contained in this action for the benefit of Greenbrier and therefore waived any right of subrogation, I find Clause 7, interpreted in the context of the Lease as a whole, to be ambiguous and, on the basis of the representations of both counsel, resorting to extrinsic evidence is a matter in contest between the parties which contest creates a genuine issue for trial, and is not summary judgment.

[91]    If counsel are unable to agree on the issue of costs, I ask them to make submissions to the Court within thirty days.

J.

**Appendix A**

**LEASE AGREEMENT**

. . .

1.      *Scope of this Agreement.*

a)      Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor, upon the terms and conditions set forth herein and in the Schedule(s) attached hereto, a number of items of equipment bearing the reporting marks and of the type, construction and other description set forth in any Schedule attached hereto and executed by the parties concurrently herewith or hereafter.  The word "Schedule" includes the Schedules executed herewith and any Schedules and amendments which are subsequently executed by both parties hereto.  Schedules may include exhibits which shall be distinct from exhibits to this Agreement and identified as "Exhibit A.1", "Exhibit B.1", etc. or "Exhibit A.2", "Exhibit B.2", etc.  Letters distinguish each Exhibit and numbers name the corresponding Schedule,  When any such Schedule or amendment is so executed it shall become part of this Agreement.  "Cars" shall mean all items of equipment subject to this Agreement and "Car" shall mean an individual item of equipment.  The terms and provisions of each Schedule shall control, as to the Cars listed on such Schedule, over any inconsistent or contrary terms and provisions in the body of this Agreement.

b)      . . . Lessor shall at all times be and remain the owner and lessor of all Cars and that no agency, joint venture or partnership is being created.  Lessee's interest in the Cars shall be that of lessee only.  . . .

. . .

3.      *Supply Provisions*.

a)      The Lessee hereby approves the specification for the Cars described in Exhibit C.1 of the applicable Schedule.  Each Car shall be deemed delivered and subject to the terms and

2009 NSSC 240 (CanLII)

provisions of this Agreement on the date each Car is delivered to Lessee . . . at the point of tender as set out in each Schedule . . . provided, however, that if within . . . 10 days of Delivery [if Delivery] occurs on the Lessee's lines, Lessee declares in writing a Car unacceptable as not meeting the specifications.  . . .  Lessee shall forthwith after inspection and acceptance of each Car execute and deliver to Lessor a Certificate of Acceptance in the form of Exhibit A.  If Lessee fails to provide such Certificate of Acceptance within 3 days after Lessee's inspection, each Car will be deemed Delivered and subject to the terms and provisions of this Agreement and will further be deemed to be fit and suitable for Lessee's use and in conformance with the specifications.  The loading of any Car by Lessee, or at its direction, shall constitute acceptance thereof by the Lessee, and shall be conclusive evidence of the fit and suitable condition thereof for the purpose of transporting the commodities then and thereafter loaded therein or thereon.

. . .

5.    *Warranties and Waiver.*

Lessee acknowledges, warrants and agrees that the Cars are of a size and capacity selected by Lessee and that Lessee is satisfied that the Cars are suitable for its purposes.  Lessor warrants and acknowledges that as of the Commencement Date Lessor is the Owner of the Cars and that each of the Cars is suitable for the general transportation of freight by rail and meets all Association of American Railroad Standards for such service.  Except for Lessor's express warranty specifically set forth above, Lessee acknowledges and agrees that Lessor is not a manufacturer of the Cars; LESSEE ACKNOWLEDGES THAT THE CARS ARE LEASED "AS IS" AND LESSOR MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND RESPECTING THE CARS WHETHER STATUTORY, WRITTEN, ORAL OR IMPLIED AND LESSOR HAS NOT MADE AND DOES NOT HEREBY MAKE, NOR SHALL IT BE DEEMED BY VIRTUE OF HAVING LEASED THE CARS PURSUANT TO THIS AGREEMENT TO HAVE MADE, ANY REPRESENTATIONS OR WARRANTY AS TO THE MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, DESIGN OR CONDITION OF, OR AS TO THE QUALITY OF THE WORKMANSHIP IN, THE CARS, PARTS, MATERIALS, OR THE LIKE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED

AND LESSOR SHALL NOT BE LIABLE , IN CONTRACT, TORT, OR STRICT LIABILITY FOR ANY LOSS OF BUSINESS OR OTHER CONSEQUENTIAL LOSS OR DAMAGES, TO ANY CARS, OR OTHERWISE, ON ACCOUNT OF ANY DEFECT, WHETHER HIDDEN, LATENT OR OTHERWISE DISCOVERABLE OR NONDISCOVERABLE RESPECTING ANY CARS.   Lessor hereby assigns to Lessee only during the Initial Term and any renewal hereunder as defined hereunder, unless an Event of Default exists, all the rights and benefits of the manufacturer's warranty, if any.  Upon an Event of Default or expiration of the Initial Term or any renewal term, all such rights and benefits shall automatically, without notice or any further action, become the rights and benefits of Lessor.

6.      *Maintenance*

. . .

a)      Except as otherwise provided herein, Lessor shall, at is expense, perform or have performed all inspections of, maintenance and repairs to, and serving of the Cars as shall be necessary to maintain the Cars in good operating condition as specified in AAR Interchange, FRA and Transport Canada rules and regulations and to meet all authorities; provided, however, that such inspections, repairs, maintenance and servicing ("Maintenance") shall be performed at Lessee's expense in the event that such Maintenance (1) was necessary due to unfair usage conditions as outlined in the Interchange Rules, or (2) arises in any instance in which the applicable Interchange Rules would assign responsibility to Lessee for the loss, damage, destruction or liability requiring such maintenance for cars not bearing Lessee's reporting marks; or (3) is specifically made Lessee's responsibility as may be stated in any Schedule to this Agreement.  At Lessor's expense, except as stated in (1), (2) and (3) above, Lessee shall be required to preserve the Cars in good operating condition and in conformation with AAR, FRA and Transport Canada rules governing the Interchange of freight cars at all times while the Cars are covered by this Agreement.   . . . Lessee, or its agent, may make Running Repairs, at Lessor's expense. . . .

2009 NSSC 240 (CanLII)

2009 NSSC 240 (CanLII)

b)      Lessor shall have the right to perform "Non-Routine Repairs", which shall be defined as all repairs other than Running Repairs . . .  Non-Routine Repairs shall be at Lessor's sole cost and expense; . . .

c)      Lessor agrees to use reasonable efforts to make arrangements necessary to reasonably fulfill its maintenance obligations under this Section.

. . .

7.    *Insurance*

a)      During the term of this Agreement, Lessee shall keep or cause to be kept through BC Rail Captive Insurance Co. Ltd. (or other insurance companies acceptable to Lessor): (1) Comprehensive general liability insurance, including contractual coverage for the liabilities assumed herein, including bodily injury, death, environmental restoration, and property damage in a combined single limit of not less than $5,000,000.00 per occurrence, and Lessee shall provide to Lessor certificates of insurance to evidence Lessee's compliance.  (2) All risk property damage insurance on the Cars in amounts not less than that shown in the applicable Stipulated Loss Value Schedule (SVL) attached to each Schedule, or if such SVL schedule does not exist, then in amounts and with insurance companies which both are reasonable in light of industry practice for such Cars and Lessee shall provide to Lessor certificates of insurance to evidence Lessee's compliance.

b)      In the event any Car is not covered by the insurance described in Subparts a (1) and a (2) above, Lessor shall have the right, at its option, to purchase coverage and recover all premiums for such insurance from Lessor, and/or declare this Agreement in default and proceed in accordance with Section 13.

c)      The insurance requirements of Subparts a (1) and a (2) above may be satisfied in whole or in part through self-insurance by Lessee provided, however, that (1) Lessee remains a

qualified self-insurer under the applicable laws of the states or provinces under which it operates and, (2) such self-insurance must be consistent with prudent industry practice.  In addition, Lessor shall be named as an additional insured and loss payee on any umbrella or excess insurance coverage which becomes effective when any self-insured retention (SIR) amount is exceeded, and Lessee shall provide appropriate certificates of insurance to evidence Lessees compliance.

d)      All insurance shall name Lessor as an additional insured and loss payee in respect of risks arising out of the condition, maintenance, use or ownership of the Cars and shall provide that losses, if any, shall be payable to Lessee or Lessor as their respective interests may appear.

e)      All insurance maintained pursuant to this section shall provide that: (1)  Thirty (30) days prior written notice of expiration or termination shall be given to lessor and (2) Proceeds of any property damage policy shall be payable notwithstanding any breach of warranty of Lessee.

. . .

12    ***Possession and Use.***

. . .

e)      Lessor shall not be liable for any loss of, or damage to, commodities, or any part thereof, loaded or shipped in the Cars, however such loss or damage shall be caused, or shall result, except if caused by Lessor's sole active gross negligence or willful misconduct.  The Lessee agrees to assume responsibility for, and to indemnify Lessor against, and to save it harmless from, any such loss or damage or claim, including, but not limited to reasonable attorney fees and costs, therefor.

. . .

2009 NSSC 240 (CanLII)

2009 NSSC 240 (CanLII)

17.    *Indemnification*

a)    Lessee does hereby assume liability for, and does hereby unconditionally agree to indemnify, protect, save and keep harmless Lessor and its successors, assigns, representatives, directors, officers, employees and agents from and against and agrees to pay, when due, any and all losses, damages, liabilities, obligations, penalties, fines, interest, payments, charges, demurrage claims, actions, suits, costs, expenses and disbursements, including reasonable legal expenses, of whatsoever kind and nature in contract or tort, including but not limited to, Lessor's strict liability in tort, arising out of: the use, possession, storage, operation, condition, repair, replacement, reconstruction, removal, return or other disposition of Cars, except for such losses and claims which arise from Lessor's sole active gross negligence or willful misconduct.

b)    In particular, Lessee shall defend and hold harmless Lessor, its officers, directors, agents and employees from and against any and all loss, damage, cost, expense or liability (including attorney fees, cost and other expenses of defense) for personal injury, disease or death (including personnel of Lessee or Lessor) and loss or damage of property (including Lessee's property), air, subsurface or ground water pollution, environment impairment or any other costs of any required or necessary repair, cleanup or detoxification of any land and the preparation and implementation of any closure, remedial or other required plans and such consequential damages as may be recovered under applicable contract law, directly or indirectly arising out of or in any manner connect with or related to Lessee's leasing of railcars or containers from Lessor to transport any material or substance.  It is the intention of the parties that Lessee shall indemnify Lessor for any loss Lessor may incur when the materials or substances are being transported or stored in the equipment leased to Lessee by Lessor and any time any loss is incurred due in whole or in part to the presence of hazardous substances, hazardous materials, toxic substances or solid waste (as defined in CERCLA, RCRA, the HMTA and any corresponding Canadian legislation) in the material being transported or stored.

c)    All of Lessor's rights privileges and indemnities contained in this Section shall survive the expiration or other termination of the Agreement and the rights, privileges and

indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**SCHEDULE NO. 1**

THIS SCHEDULE NO. 1 ("Schedule") to that certain Lease Agreement (the "Agreement") dated as of September 16, 1999, is made as of September 16, 1999, between GREENBRIER LEASING LIMITED, or its assignee, as lessor ("Lessor"), and BC RAIL PARTNERSHIP, successor in interest to BC Rail Ltd., as lessee ("Lessee").

Lessor and Lessee agree as follows:

. . .

3.       The Term of the Agreement with respect to each Car described in this Schedule shall be thirty-five (35) months (the "Initial Term").  The Initial Term shall commence (the "Commencement Date") on the first of the month following the date that the last Car has been delivered.  . . .

2009 NSSC 240 (CanLII)

## Certificate of Acceptance of Railroad Cars

This Certificate relates to the railroad cars listed below, leased by Greenbrier Lease, Ltd to BC Rail Partnership under that certain Schedule No. 1 dated as of September 16, 1999 to the Lease Agreement dates as of September 16, 1999 between Greenbrier Leasing Limited and BC Rail Partnership (the "Agreement").

Carss Accepted: 155

Description of Cars:    [boxcars described]

Commencement Date:        12/01/99

Car Mark                Delivery
& Number                Date

            [each of the 155 box cars is described by a serial number and date
            of delivery, the dates of delivery commence October 21, 1999, and
            continue to and including November 16, 1999]

Lessee hereby certifies the fitness and suitability and its unconditional acceptance of the railroad Cars listed herein and hereby leases and subjects said Cars to the said Agreement as of the date each Car was tendered, shown above as the Delivery Date.

Lessee hereby certifies that the representative and warranties of Lessee contained in this Agreement are true and correct as of the date below written and that no Event of Default of Lessee exists or with the passage of time would exist with regard to the Agreement.

Lessee hereby certifies that the undersigned office signing on behalf of the Lessee is duly authorized to execute and deliver this Certificate.

2009 NSSC 240 (CanLII)

Page: 41

Lessee: BC Rail Partnership

By:        "A Name"

Title:    "VP Operations & Mtce"

Date:     "June 1, 2000"

2009 NSSC 240 (CanLII)