# TAB 27

Baldwin Piano, Inc. v. Deutsche Wurlitzer GmbH, 392 F.3d 881 (2004)
73 U.S.P.Q.2d 1375

392 F.3d 881
United States Court of Appeals,
Seventh Circuit.

BALDWIN PIANO, INC., Plaintiff-Appellee,
v.
DEUTSCHE WURLITZER
GMBH, Defendant-Appellant.

No. 04-1617.    |    Argued Nov. 8, 2004.    |    Decided Dec. 16, 2004.

**Synopsis**
**Background:** Piano company sued trademark licensee under Lanham Act on the same day on which it canceled license, seeking injunction against licensee's use of mark in United States. The United States District Court for the Northern District of Illinois, James B. Zagel, J., 2004 WL 406792, granted summary judgment to piano company and issued injunction. Licensee appealed.

**[Holding:]** The Court of Appeals, Easterbrook, Circuit Judge, held that trademark license agreement granted licensee perpetual license.

Injunction vacated and case remanded with instructions.

West Headnotes (4)

[1]     **Trademarks**
         Persons Entitled to Assert Rights
         Multiple entities cannot own the same trademark for one field, such as music.

         Cases that cite this headnote

[2]     **Contracts**
         Reasonableness of Construction
         When there is a choice among plausible interpretations of a contract, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided.

         6 Cases that cite this headnote

[3]     **Contracts**
         Subject, Object, or Purpose as Affecting Construction
         Businesses are not compelled to make sensible bargains, but courts should not demolish the economic basis of bargains that would be sound if the contract were given a natural reading.

         5 Cases that cite this headnote

[4]     **Trademarks**
         Duration and Termination; Revocation
         Trademark license agreement executed in connection with parent corporation's spin-off of its jukebox business granted company which acquired jukebox business perpetual license, subject to agreement's provisions governing termination for material breach or act of default, and therefore license could not be canceled at will by licensor on ground that Illinois law allowed contracts for indefinite period to be terminated at will.

         3 Cases that cite this headnote

**Attorneys and Law Firms**

*881 Robert H. King (argued), Sonnenschein, Nath & Rosenthal, Chicago, IL, for Plaintiff-Appellee.

Brett A. August (argued), Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL, for Defendant-Appellant.

Before BAUER, EASTERBROOK, and KANNE, Circuit Judges.

**Opinion**

*882 EASTERBROOK, Circuit Judge.

[1]    The Wurlitzer Company, a producer of pianos, organs, jukeboxes, and other musical equipment throughout the world, was split up in 1985. Wurlitzer's direct descendent, and proprietor of its organ and piano businesses, is Baldwin Piano. One of Wurlitzer's former subsidiaries, Deutsche

Wurlitzer GmbH, was spun off to Nelson Group Holdings Pty Ltd., an Australian firm. Deutsche Wurlitzer makes and sells jukeboxes and associated products bearing the Wurlitzer name. Multiple entities cannot own the same trademark for one field, such as music. See *Forum Corp. v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir.1990).* The mark's ownership followed the parent company (and thus found its way to Baldwin Piano). Deutsche Wurlitzer received a license to use the mark in connection with jukeboxes and related gear. In 2003 Baldwin Piano told Deutsche Wurlitzer that the license was cancelled, effective immediately, and the same day filed this suit under the Lanham Act, 15 U.S.C. § 1114(1)(a), seeking an injunction against Deutsche Wurlitzer's use of the Wurlitzer mark in the United States. Baldwin Piano did not give any reason for taking these steps. The district court granted summary judgment to Baldwin Piano, 2004 U.S. Dist. LEXIS 114 (N.D.Ill. Jan. 5, 2004), and issued an injunction, 2004 U.S. Dist. LEXIS 2380 (N.D.Ill. Feb. 9, 2004), from which Deutsche Wurlitzer has appealed.

Deutsche Wurlitzer contends that the 1985 license is terminable only for cause. It relies on these two paragraphs:

> 13. Except as herein provided, and as provided in Article 14 hereof, this Agreement shall continue in force without limit of period but may be cancelled by the Licensor for material breach. In the event of Licensee's material breach of this Agreement, Licensor shall notify Licensee of the breach and Licensee shall have ninety (90) days to cure the breach or to request arbitration by a single arbitrator in accordance with the then current rules of the American Arbitration Association. If (i) the decision of the arbitrators is in favor of Licensor or (ii) the material breach has not been cured within the ninety (90) day period and Licensee has not requested arbitration, the Agreement shall terminate upon thirty (30) days notice by Licensor. Licensor shall be entitled to withdraw any notice of breach hereunder.

> 14. Licensee hereby agrees that (a) if it makes any assignment of substantially all of its assets or business to an unaffiliated third party without Licensor's consent, which consent shall not be unreasonably withheld if the new owner has a demonstrated ability to meet the financial responsibilities and quality control provisions required of Licensee under this Agreement, or for the benefit of creditors, or (b) if a trustee or receiver is appointed to administer or conduct its business or affairs, or if it is finally adjudged to be either a voluntary or involuntary bankrupt, then the rights granted herein shall forthwith cease and terminate upon thirty (30) days notice by Licensor.

Relying on *Jespersen v. Minnesota Mining & Manufacturing Co.,* 183 Ill.2d 290, 233 Ill.Dec. 306, 700 N.E.2d 1014 (1998), the district court held this language insufficient to overcome the rule of Illinois law (which the parties agree controls) that contracts for an indefinite period may be terminated at will. (The documents that accomplish the 1985 spinoff do not include a choice-of-law clause, a puzzling omission in a deal that restructures a global business; and the parties do not contend that the Lanham Act governs the duration of trademark licenses.) In response to the argument that treating the license as ended whenever Baldwin Piano pleases would **\*883** render all of this language pointless, the district judge concluded that the provisions in ¶ 13 for cure and arbitration still apply if Baldwin Piano contends that there has been a *breach* by Deutsche Wurlitzer; then damages and other remedies would be at issue and would require procedures to resolve. When the licensor is content to sever the relation cleanly, however, these provisions are unnecessary. With respect to ¶ 14, which Deutsche Wurlitzer insists limits the circumstances that would allow termination without material breach, the district court was silent. Both Baldwin and the district court treat ¶ 14 as surplusage.

Interpreting contracts so that major clauses fall out usually is not a sensible way to understand the parties' transaction. See *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995); *Emergency Medical Care, Inc. v. Marion Memorial Hospital,* 94 F.3d 1059, 1061 (7th Cir.1996) (Illinois law). Baldwin Piano's view makes ¶ 14 pointless and leaves one wondering what role the first sentence of ¶ 13 could serve. Why specify that "[e]xcept as herein provided" the license continues unless cancelled for "material breach", unless such a breach (or an act of default under ¶ 14) is indispensable to cancellation? A phrase beginning "except" implies that the following language limits the parties' options; otherwise it is a waste of ink and paper. See *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1012 (7th Cir.1985); *Consolidated Laboratories, Inc. v. Shandon Scientific Co.,* 413 F.2d 208, 211-12 (7th Cir.1969). More than that: the 1985 transaction as a whole is hard to understand unless Deutsche Wurlitzer received an enduring rather than evanescent interest in using the Wurlitzer mark on jukeboxes. The Wurlitzer Company decided to spin off the Wurlitzer jukebox business; to get a price reflecting this product line's going-concern value (as opposed to the physical value of the subsidiary's assets), the seller had to let the buyer use the Wurlitzer mark.

 **[2]**  A sale subject to a provision such as "The Wurlitzer Company reserves the right to end your use of the trademark, and thus abrogate all going-concern value of this product line, at any time and for no reason" would not have been commercially viable, unless Deutsche Wurlitzer's assets were being sold for scrap value only. The transaction makes economic sense as the sale of a line of business only if Nelson Group (the buyer, recall) enjoys protection against opportunistic behavior by Deutsche Wurlitzer's former parent. When there is a choice among plausible interpretations, it is best to choose a reading that makes commercial sense, rather than a reading that makes the deal one-sided. "To interpret a contract or other document, it is not enough to have a command of the grammar, syntax, and vocabulary of the language in which the document is written. One must know something about the practical as well as the purely verbal context of the language to be interpreted. In the case of a commercial contract, one must have a general acquaintance with commercial practices. This doesn't mean that judges should have an M.B.A. or have practiced corporate or commercial law, but merely that they be alert citizens of a market-oriented society so that they can recognize absurdity in a business context." *Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 860 (7th Cir.2002). See also, e.g., *Gerow v. Rohm & Haas Co.,* 308 F.3d 721 (7th Cir.2002); *Metro East Center for Conditioning and Health v. Qwest Communications International, Inc.,* 294 F.3d 924 (7th Cir.2002); *National Tax Institute, Inc. v. Topnotch at Stowe Resort & Spa,* 388 F.3d 15 (1st Cir.2004).

 **[3]**  Businesses are not *compelled* to make sensible bargains, but courts should  **\*884**  not demolish the economic basis of bargains that would be sound if the contract were given a natural reading. Baldwin Piano acknowledges this principle but says that Nelson Group would retain some value even if Baldwin Piano has the unilateral right to pull the rug out from under the Wurlitzer-brand jukebox business. This is so, Baldwin Piano contends, because the contract gives Deutsche Wurlitzer a perpetual, non-terminable right to use the word "Wurlitzer" in its corporate name. That is not a valuable right, however, if Deutsche Wurlitzer cannot tell customers who is selling the products. As if to underline this flaw in its appellate argument, Baldwin Piano has asked the district court to hold Deutsche Wurlitzer in contempt for including its corporate name on its own web site and advertising. After the injunction Deutsche Wurlitzer rebranded its jukeboxes with labels such as "One More Time"; it includes its corporate name in its promotions. See <*http:// www.deutsche-wurlitzerusa.com />*.

To display the corporate name in connection with jukeboxes, Baldwin Piano insists, is to use it as a trademark and thus to transgress both the Lanham Act and the injunction-even though the corporate name is much smaller than the product name. See 2004 U.S. Dist. LEXIS 11145 (N.D. Ill. June 15, 2004) (granting Baldwin Piano's motion for an order to show cause and suggesting that the only proper use of the corporate name would be in tiny type placed so that consumers would be unlikely to see it or recognize who is offering the jukeboxes for sale). So Baldwin Piano effectively wants Deutsche Wurlitzer to change its corporate name as a condition of remaining in the jukebox business. On Baldwin Piano's view of the 1985 transaction, all Deutsche Wurlitzer received that it could call its own was the physical assets, and that would paint Nelson Group as a sucker.

So does Illinois law really compel an unnatural reading of the contract, the better to strip Nelson Group of the benefit of its bargain? *Jespersen,* the centerpiece of Baldwin Piano's position, dealt with a distribution agreement that could be ended for a number of listed reasons. The list was open-ended, beginning with the statement that the manufacturer "may, upon not less than thirty (30) days notice to the Distributor, terminate this agreement for any of the following reasons". The Supreme Court of Illinois posed the question as whether, "where the parties specifically provide that their contract *may* be terminated for enumerated instances of material breach, is the contract indefinite as to duration and terminable at will, *or* is it terminable only for cause?" 183 Ill.2d at 291-92, 233 Ill.Dec. 306, 700 N.E.2d 1014 (emphasis in original). The court answered that a non-exclusive list of reasons for termination makes the term indefinite and permits termination for other reasons as well. It distinguished decisions such as *Lichnovsky v. Ziebart International Corp.,* 414 Mich. 228, 324 N.W.2d 732 (1982), as dealing with contracts that had comprehensive lists of reasons for termination and stated that dealers or distributors under such contracts could not be cut off without cause. The court summed up: "where the parties have drafted a contract that is otherwise indefinite in duration and terminable at will, the delineation of instances of material breach in the context of a permissive and nonexclusive termination provision will not alone create a contract terminable for cause." 183 Ill.2d at 296, 233 Ill.Dec. 306, 700 N.E.2d 1014.

The structure of the contract between The Wurlitzer Company and Deutsche Wurlitzer is much closer to the one discussed in *Lichnovsky* than it is to the one in *Jespersen.* The enumeration in Articles 13 and 14 is exclusive rather than illustrative.

So if we take the language of the state's highest court at face value, Deutsche Wurlitzer must prevail. See also *Mor-Cor Packaging Products, Inc. v.* **\*885** *Innovative Packaging Corp.,* 328 F.3d 331, 333 (7th Cir.2003). Baldwin Piano says that we should look more closely at the contract that led to *Jespersen*-language recited in the opinion of the state's intermediate appellate court but not mentioned by the supreme court. Section 2.05 of that contract provided: "Unless terminated as hereinafter provided in Article IV, this Agreement ... shall continue in force indefinitely". *Jespersen v. Minnesota Mining & Manufacturing Co.,* 288 Ill.App.3d 889, 893, 224 Ill.Dec. 85, 681 N.E.2d 67, 70 (1997). According to Baldwin Piano, this is functionally the same as the first sentence of Article 13 of the Deutsche Wurlitzer license, so *Jespersen* compels us to hold that the license is terminable at will. Not at all. Section 2.05 of the contract in *Jespersen* is best read as a procedural rule, ensuring that the distributor receives the notice provided in Article IV. That's why the Supreme Court of Illinois did not mention the language, which does not help us understand whether there were *substantive* limits on the reasons for termination. Article 13 of the Deutsche Wurlitzer license, by contrast, does establish substantive restrictions.

Quite apart from linguistic differences in the termination provisions, and reinforcing the conclusion we have expressed, are fundamental economic differences between the transactions. *Jespersen* reflects a belief that most businesses don't want to be locked into a perpetual relation. " 'Forever' is a long time and few commercial concerns remain viable for even a decade. Advances in technology, changes in consumer taste and competition mean that once-profitable businesses perish regularly. Today's fashion will tomorrow or the next day inevitability fall the way of the buggy whip, the eight-track tape and the leisure suit. Men and women of commerce know this intuitively and achieve the flexibility needed to respond to market demands by entering into agreements terminable at-will." 183 Ill.2d at 295, 233 Ill.Dec. 306, 700 N.E.2d 1014. The presumption of terminability allows separation in the business world, unless the parties clearly provide otherwise. It is the business equivalent of no-fault divorce, with the possibility of covenant marriage if the parties make the necessary declarations.

Like other clear-statement rules, the one expressed in *Jespersen* depends on context. Allowing the businesses to part ways is especially important in distribution contracts and other forms of partial vertical integration, where the firms must coordinate their conduct over an extended period to deliver a product. Terminability means that, if the firms' goals or methods diverge, either side may get out. It also means that both sides have a credible threat to walk away, and this threat may induce the other side to compromise. Because these long-term relations produce continuing profits for both sides, both have something to lose by taking the exit option without trying to work out differences first. See Alan Schwartz, *Relational Contracts in the Courts,* 21 J. Legal Studies 271 (1992); Charles J. Goetz & Robert E. Scott, *Principles of Relational Contracts,* 67 Va. L.Rev. 1089 (1981); Benjamin Klein, Robert G. Crawford & Armen E. Alchian, *Vertical Integration, Appropriable Rents & the Competitive Contracting Process,* 21 J.L. & Econ. 297 (1978). A combination of the need for flexibility in relational contracts and the fact that both sides have an ongoing interest in accommodating the other makes a presumption of terminability sensible.

**[4]** This trademark license differs from a distribution contract. These parties are not locked together in a form of partial integration by contract-as, for example, when a distribution partner serves as a substitute for vertical integration into warehousing and sales. The 1985 contract was designed to *partition* the Wurlitzer **\*886** music empire, giving Deutsche Wurlitzer a line of business that would henceforth operate independently of its former parent. Baldwin Piano and Deutsche Wurlitzer do not need to coordinate their activities in order to produce or deliver a product; all they need do is manage their businesses so as not to *injure* the other (as, for example, by diluting the trademark's value by attaching it to inferior goods). There is no need to facilitate renegotiation. Nor were the stakes reciprocal, as in distribution contracts. Baldwin Piano yanked Deutsche Wurlitzer's license with no loss to itself, and with a potential for gain if it then went into the jukebox business or licensed another firm to use the trademark.

Thus both linguistic and economic contexts favor treating the 1985 license as perpetual, subject to the provisos in Articles 13 and 14. Illinois law does not upset the parties' transaction. The injunction is vacated, and the case is remanded with instructions to enter judgment in favor of Deutsche Wurlitzer.

**Parallel Citations**

73 U.S.P.Q.2d 1375

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.