# TAB 29

1998 WL 800344
United States District Court, E.D. Pennsylvania.

BENTLEY SYSTEMS, INCORPORATED, Plaintiff,
v.
INTERGRAPH CORPORATION, Defendant.

No. CIV. A. 98–3489.    |    Nov. 16, 1998.

**Opinion**

NEWCOMER.

### MEMORANDUM

*1 Presently before the Court is defendant's Motion for Summary Judgement, and plaintiff's response thereto. For the reasons that follow, said Motion will be denied.

**I.** *Background*

Bentley is a privately held family-managed software development firm in Exton, Pennsylvania, that was founded in 1984. Bentley develops and distributes a family of software products used in computer-aided design and engineering ("CAD"), of which the principal product is a software application called "MicroStation." Intergraph is a publicly held company based in Huntsville, Alabama, that was founded in 1969. Intergraph's primary business is to supply systems solutions (hardware and software) for computer aided design/computer aided manufacturing.

In 1987, Intergraph and Bentley entered into an agreement whereby Intergraph bought 50% of the shares of Bentley,[1] and was given a worldwide exclusive license to distribute MicroStation, and Bentley received a royalty payment for each copy of the licensed programs distributed to end users by Intergraph. This exclusive license arrangement ended on December 31, 1994.

MicroStation allows users to view, print and plot lines, arcs, circles and other geometrical figures contained in data files generated and used by MicroStation. The limitation on MicroStation relevant for purposes of the instant lawsuit is that the above-enumerated functions of MicroStation can only be done locally at the personal computer where MicroStation is being used. Additional software is needed to make it useful in a network environment.

In 1993, Intergraph developed plotting software that allowed a MicroStation user to send data files to a server and then to a network plotter while the MicroStation user could continue design work. Since 1987, Intergraph has had some form of plotting software. Plotting software produces plots from designs created on CAD (MicroStation) software. Plots are drawings, frequently architectural or engineering drawings. Once the plot is created, it is then printed on paper using hardware known as a plotter. It is also possible to store the plot on the computer on magnetic media.

The plotting software is unable to convert the MicroStation data into a format usable by the plotting software without the help of a "stroker." A stroker converts the MicroStation design data into a lower level format that can be used by the plotting software. According to Bentley, because they were constantly providing upgrades of MicroStation, Intergraph was having to work very hard at converting the MicroStation data for its plotting product to keep pace. Intergraph asked Bentley to produce for them a "stroker". The second version of the stroker Bentley produced was called PlotLib, whose copyright is the subject of the instant suit.

In July of 1993, Bentley licensed PlotLib to Intergraph for free to enable Intergraph to develop and sell network plotting products that made plotting more convenient for MicroStation users. This license was memorialized in July of 1993 as amendment 12 to the original 1987 licensing agreement (that expired in 1994). The last version of PlotLib Bentley produced for Intergraph was dated November 10, 1994. Intergraph originally incorporated PlotLib into its plotting software known as IPLOT, and later into InterPlot.

*2 Amendment 12 to the original licensing agreement expired with the agreement on December 31, 1994, but it continued in effect through a distribution agreement entered into between the parties. Much of this lawsuit comes down to the meaning of the language used in the agreements, the relevant portion of which is as follows,

> In connection with network plotting products, this library is not to be used for file viewing on graphic displays.

The interpretation of the phrase, "file viewing on graphic displays" is the subject of much debate between the parties. Bentley argues that this language was intended to have its broadest possible meaning, including that Intergraph could not develop a product that used PlotLib to assist in previewing

on the screen what is about to be sent to the printer for printing ("print preview"). Intergraph, on the other hand, contends that all that was proscribed was Intergraph developing a product that allowed the user to view actual MicroStation design files, and that a print preview is not the equivalent of viewing design files. [2]

On July 25, 1994, at Intergraph's request, executives from Bentley and Intergraph met to discuss various issues relating to Intergraph's plotting products. At this meeting, Intergraph informed Bentley that it had used the PlotLib software in Intergraph's plotting software (IPLOT, which it was already selling) to perform file previews on screen. This file viewing feature was only capable of previewing the plot, and not to perform any other functions on the plot such as pan or zoom. According to Bentley, Keith Bentley, the President of the company, was not present at the meeting initially but sent a message that he rejected the idea of allowing Intergraph to offer a plot preview function, saying that it should be done using MicroStation. After personally coming to the meeting later in the day at Intergraph's request, Keith Bentley told Intergraph that, although the terms of the license prohibited file viewing altogether, Bentley would not object to Intergraph's use of PlotLib in IPLOT to perform plot previews, *but only if the user was operating IPLOT on a machine on which a licensed copy of MicroStation was also installed.* Keith Bentley insists in his sworn affidavit that he never gave unconditional consent to use PlotLib for file viewing. Intergraph remembers this meeting differently, and argues that Bentley representatives (including Keith Bentley) said that the plot preview was appropriate and not what was meant to be prohibited by the language in the agreement. Intergraph further contends that Keith Bentley also said that the reason for the file display language in the agreement was to prevent Intergraph from using PlotLib to develop a design file viewer product like MicroStation Review. Bentley vigorously disputes this, and both sides have submitted excerpts of depositions and sworn affidavits in support of their respective positions.

Bentley, through the affidavit of Mr. Church, argues that they restated their position on the appropriate use of PlotLib in IPLOT in an e-mail message.

**\*3** In 1996, Intergraph released Version 8 of IPLOT. The press release described IPLOT as having a file preview capability, and never mentioned the necessity of using IPLOT in conjunction with MicroStation. An exchange of letters between the companies took place, revealing their differing recollections about what transpired in the July 25, 1994 meeting. On October 14, 1996 Bentley requested a copy of IPLOT Version 8, and on May 15, 1997, Intergraph sent Bentley a copy.

In April, 1998, Intergraph released InterPlot Version 9.0, the next and latest version of its family of plotting software. According to Intergraph, the significant differences between IPLOT Version 8 and InterPlot Version 9.0 is that InterPlot can plot data other than MicroStation, and InterPlot permits the archiving and distribution of digital plots on the World Wide Web. Bentley's chief complaint about Version 9.0 of InterPlot is the same as its complaint about Version 8.0 of IPLOT, that it permits the users to view the engineering data files created by MicroStation on a computer monitor without using or licensing from Bentley a copy of MicroStation, violating section 5.08 of the distribution agreement and, as they recall it, the extremely limited permission extended by Bentley in the July 1994 meeting relating to plot previews. Intergraph believes that it is acting within the scope of the license, and that this is merely a ploy by Bentley because Bentley is trying to develop their own network plotting software.

In their Amended Complaint, Bentley is claiming copyright infringement, breech of contract, and a breech of the duty of good faith and fair dealing. They are seeking a permanent injunction against Intergraph's commercial use of Version 8 of IPLOT and Version 9.0 of InterPlot, and damages. Intergraph has moved the Court for summary judgement on all three counts of the Amended Complaint.

**II.** *Summary Judgement Standard*

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). [3] In deciding the motion for summary judgment, it is not the function of the Court to decide disputed questions of fact, but only to determine whether genuine issues of fact exist. *Id.* at 248–49.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings and designate specific facts, by use of affidavits, depositions, admissions, or answers to interrogatories, showing that there is a genuine issue for trial. *Id.* at 324. Moreover, when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex,* 477 U.S. at 322). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White,* 862 F.2d at 59 (quoting *Celotex,* 477 U.S. at 322).

### III. *Discussion*

**A.** *Counts I and II.*

**\*4** Intergraph puts forth numerous arguments why it believes it is entitled to summary judgement on Bentley's copyright infringement claim, and summarily relies on the same arguments for summary judgement on Bentley's breach of contract claim. These arguments are dealt with in turn.

First, Intergraph argues that their use of PlotLib is within the scope of the license. Intergraph bases much of its argument on the language used by Bentley in their Amended Complaint, such as in ¶ 26 of the Amended Complaint where Bentley alleged,

> The use, reproduction and public distribution by defendant of the PlotLib software products within its own products *enable users to view MicroStation design files on graphic displays* are unauthorized and without permission or consent from Bentley. These activities are beyond the scope of the limited license granted by Bentley to defendant in the Distribution Agreement, and constitute infringements of the exclusive rights owned by Bentley under copyright in and to each version of PlotLib registered by Bentley.

(Emphasis added.) Intergraph is arguing that what Bentley really believes violates the license is the ability of IPLOT and InterPlot, through the use of PlotLib, to view design files on graphic displays. Intergraph claims that what is being viewed is plot files, not design files, and they go to great length to distinguish the two. According to Intergraph, a design file is the engineering data base, the actual file on which the user has created the design. A plot is a picture of the design, and contains substantially less data than a design file. There are products that allow viewing of the design file,[4] which permits the viewer to shrink or enlarge windows, zoom and pan in and out of specific areas, and to interact with the design file. Since their products do not view design files, they argue, they are not infringing Bentley's copyright.

Bentley argues that their loose use of the descriptive phrase "design files" should not govern the case, but the language of the Distribution Agreement itself, which proscribes "file viewing on graphic displays" should control. Further, Bentley points to several instances in the complaint (¶¶ 12, 18, 2(prayer for relief p. 10), and 2(prayer for relief p. 11) where Bentley refers to the prohibited file viewing much more broadly than merely as "design files." There is also evidence that the differences between a plot file and a design file is not as great or as clear cut as Intergraph suggests. (Aff. of Keith Bentley ¶ 19). Finally, Bentley argues that, since the purpose of PlotLib is to take the design data contained in MicroStation design files and convert that data into another file format appropriate for plotting, there would never be a direct view of a design file but instead a view of reformatted data in a different file called a plot file. Presumably, this argument leads to the conclusion that the use of the phrase "deign files" in the Amended Complaint could never have been intended to mean what Intergraph suggests to the Court because it is simply not possible to view design files in the context Intergraph is suggesting with PlotLib. While the Court does believe that the Amended Complaint was carelessly plead, such carelessness is not fatal. Viewing the facts in the light most favorable to Bentley, including the language of the Distribution Agreement, reading the Amended Complaint as a whole, and considering the purpose of PlotLib, the Court concludes that there is a genuine material issue of fact for trial

as to whether or not Intergraph's use of the PlotLib is within the scope of the license.

**\*5** Next, Intergraph argues that a proper construction of the distribution agreement (which says that file viewing on graphic displays is prohibited) leads only to the conclusion that what was intended by the phrase file viewing was that the viewing of "design files" is all that is prohibited. Without addressing the merits of the argument, the Court finds that there is direct and contradictory evidence on this issue presented by both sides, making summary judgement inappropriate. This issue is better resolved at trial.[5]

Next, Intergraph argues that even if their use of PlotLib was outside the scope of the license in the Distribution Agreement, Bentley granted Intergraph an oral, non-exclusive license in connection with the plot preview function of IPLOT and InterPlot. They argue that this permission was granted at the July, 1994 meeting. As has been demonstrated above, however, exactly what was said at that meeting is vigorously contested by both sides through affidavits and excerpts of deposition testimony. Viewing the evidence in the light most favorable to Bentley, the Court finds that there is a genuine issue of material fact as to the existence of an oral license for Intergraph to use PlotLib in the manner they have.

Finally, Intergraph argues that Bentley is estopped from claiming infringement. The elements of estoppel are:

> (1)[T]he party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to this injury.

*Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.), *cert. denied,* 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960). Intergraph claims that, based on the July 25, 1994 meeting, it is clear that BSI knew how PlotLib was being used and that it included a plot preview function, that Bentley advised Intergraph that Bentley did not consider this use to be infringing, and that Intergraph relied on this. The Court has already addressed the parties differing views of the July 24, 1994 meeting. Further, Bentley has produced evidence that they disapproved of Intergraph's use of PlotLib and made this known to them on several occasions, undermining the second and fourth elements of estoppel. Viewing the evidence in the light most favorable to Bentley, this evidence is sufficient to defeat Intergraph's motion.

For the foregoing reasons, Intergraph's motion for summary judgement on Bentley's copyright infringement claims and breech of contract will be denied.[6]

**B.** *Count III*

In Count III of the Amended Complaint, Bentley alleges that Intergraph's conduct in using PlotLib in IPLOT and InterPlot "to enable users to view MicroStation design files on graphic displays constitutes a violation of defendant's duty of good faith and fair dealing under the Distribution Agreement." Intergraph argues that they are entitled to summary judgement because Bentley has failed to state a claim for a breach of the duty of good faith and fair dealing as a matter of law.

**\*6** There is no dispute that under Delaware law,[7] the implied covenant of good faith and fair dealing exists in every contract. *See e.g., Merrill v. Crothall–American, Inc.,* 606 A.2d 96, 102 (Del.1992). The purpose of this implied covenant is to protect the reasonable expectations of parties to a contract. *Pierce v. Int'l Ins. Co. Of Ill.,* 671 A.2d 1361, 1366 (Del.1996). "[T]he legal test for implying contractual obligations [is] whether it was clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith and fair dealing had they thought to negotiate the matter." *Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Sys. Co.,* 708 A.2d 989, 992 (Del.1998). Based on this articulation, the Court will impose an implied contractual term when the parties express agreement does not specifically address the act complained of, but the act complained of upsets their reasonable expectations, and it is clear that the parties would have agreed to proscribe the act as a violation of the implied covenant had they considered it in their original negotiations.

In the instant case, the Court will impose the implied covenant if the Court finds that the Distribution Agreement, which forbids Intergraph from using PlotLib for "file viewing on graphic displays" does not contemplate Intergraph offering a print preview function in their plotting products that use PlotLib, and had the parties contemplated the issue, Intergraph in fact would not have been allowed to offer the print preview function.

Intergraph argues that the implied covenant is inoperative in this case based on the fact that the express language in the contract forbidding the use of PlotLib for "file viewing on graphic displays" explicitly addresses the subject of the alleged wrong, namely the manner in which Intergraph has used PlotLib, relying on *Moore Business Forms, Inc. v. Cordant Holding Corp.,* 1995 Del. Ch. LEXIS 134.

The weakness in Intergraph's position is that, based on the arguments of both sides, it is unclear at the present time what "file viewing on graphic displays" actually means. Since the Court is unable to determine what the plain language of the above phrase means, and therefore must consider it in the context of the parties negotiations and understanding, which are highly contested, it is impossible to determine whether or not "file viewing on graphic displays" is meant to cover Intergraph's use of PlotLib in IPLOT Version 8 and InterPlot Version 9.0. Bentley argues that if the Court ultimately concludes that said language does not address Intergraph's use of PlotLib, they are entitled to recovery under this theory. The Court is hard pressed to see how it could conclude that the language in the distribution agreement does not address Intergraph's use of PlotLib based on the arguments of the parties in the present motion. However, since the Court is not clear what is meant by the language in the Distribution Agreement, it seems unwise at the present time to preclude recovery under this theory. The logical force of Bentley's position requires the Court to at least consider whether or not they can sustain their claim beyond the summary judgement stage. Viewing the evidence in the light most favorable to Bentley, they have amply demonstrated through the sworn affidavit of Keith Bentley that their reasonable expectations of limiting Intergraph's use of PlotLib to the narrowest possible scope in the license agreement would be upset, and that they would have insisted on a provision preventing Intergraph from using PlotLib in conjunction with another program to perform plot previews, had they considered the issue when they negotiated the language.

 *7  IV. *Conclusion*

In conclusion, this Court determines that there are genuine issues of material fact on each of plaintiff's claims that can only be resolved at trial. Accordingly, defendant's motion for summary judgement will be denied. [8]

An appropriate Order follows. Clarence C. Newcomer, J.

### ORDER

AND NOW, this day of November, 1998, upon consideration of defendant's Motion for Summary Judgement, and plaintiff's response thereto, and consistent with the foregoing Memorandum, it is hereby ORDERED that said Motion is DENIED.

AND IT IS SO ORDERED.

**Parallel Citations**

1999 Copr.L.Dec. P 27,842

---

Footnotes

1   Intergraph's exact stock ownership is between 49 and 49.9 percent.
2   Both parties have submitted affidavits in support of their respective positions on the meaning of the language in the amendment based on, among other things, differing recollections of the 1993 negotiations that went into creating the language.
3   Although this is a bench trial, the Court's role on summary judgement is no different. *In re: Unisys Savings Plan Litigation,* 74 F.3d 420, 433 n. 10 (3d. Cir.), *cert. denied,* 519 U.S. 810 (1996).
4   MicroStation Review and DM/View are two.
5   Conversely, Bentley argues that the language "file viewing on graphic displays" is unambiguous and that they are entitled to summary judgement on the issue of whether or not Intergraph's use of PlotLib violates the limited license they granted to Intergraph. Not only is there sufficient evidence in the record for Intergraph to survive the summary judgement stage, Bentley's own use of the phrase "design files" throughout their pleadings creates ambiguity sufficient that the Court is uncertain at this stage what the plain meaning of "file viewing on graphic displays" actually is.
6   Intergraph also argues that several members of the IPLOT family do not use PlotLib at all or in such a way as Bentley claims is infringing. Unfortunately, they do not point the Court to any evidence in support of their contention. If this is in fact true, perhaps this is something the parties could stipulate to prior to trial.
7   Delaware law governs this case per the Distribution Agreement of the parties, at section 11.08.

**Bentley Systems, Inc. v. Intergraph Corp., Not Reported in F.Supp.2d (1998)**
1999 Copr.L.Dec. P 27,842

8      Defendant also argues for an award of costs and attorney's fees, but since they did not prevail on this motion, the Court need not consider their request.

---

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.