# TAB 30

455 F.3d 195
United States Court of Appeals,
Third Circuit.

BERCKELEY INVESTMENT GROUP, LTD.

v.

Douglas COLKITT; Shoreline Pacific
Institutional Finance, The Institutional
Division of Finance West Group; National
Medical Financial Services Corporation
Douglas R. Colkitt, Appellant.

No. 04–3844.    |    Argued Feb.
21, 2006.    |    Filed July 25, 2006.

**Synopsis**

**Background:** Buyer of convertible debentures brought action
against seller for breach of contract requiring it to convert
debentures into unregistered shares of stock. The United
States District Court for the Middle District of Pennsylvania
entered partial summary judgment in favor of buyer. The
seller's subsequent appeal was dismissed and the case
remanded. 259 F.3d 135. After remand, the United States
District Court for the Middle District of Pennsylvania,
James Focht McClure, Jr., J., entered an order certifying the
judgment as final, and seller again appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held
that:

[1] district court did not abuse its discretion in certifying
summary judgment order against seller as a partial final
judgment subject to immediate appeal;

[2] agreement requiring seller of convertible debentures to
convert debentures into unregistered shares of stock was not
subject to rescission on ground that buyer's downstream sales
of the unregistered shares would violate Securities Act; and

[3] summary judgment in favor of seller was precluded on its
claim to rescind agreement based on a violation of Section
10(b).

Affirmed in part, reversed in part, and remanded.

**West Headnotes (14)**

[1]    **Federal Courts**
     Multiple claims

    A decision to certify a final decision on some
    but not all claims for immediate appeal involves
    two separate findings: (1) there has been a
    final judgment on the merits, i.e., an ultimate
    disposition on a cognizable claim for relief; and
    (2) there is no just reason for delay. Fed.Rules
    Civ.Proc.Rule 54(b), 28 U.S.C.A.

    36 Cases that cite this headnote

[2]    **Federal Courts**
    Summary judgment

    District court did not abuse its discretion in
    certifying summary judgment order against
    seller on buyer's breach of contract claims as
    a partial final judgment subject to immediate
    appeal; determination on appeal could moot the
    unadjudicated derivative claims, case had been
    litigated by the parties for nearly ten years, it had
    been approximately six years since the district
    court entered its summary judgment order, and
    possibility existed that further delays could
    impair buyer's ability to execute the judgment.
    Fed.Rules Civ.Proc.Rule 54(b), 28 U.S.C.A.

    143 Cases that cite this headnote

[3]    **Securities Regulation**
    Contracts in violation of regulations

    Section of Securities Exchange Act making
    agreements in violation of the Act voidable
    does not define a substantive violation of the
    securities laws; rather, it is the vehicle through
    which private parties may rescind contracts that
    were made or performed in violation of other
    substantive provisions. Securities Exchange Act
    of 1934, § 29(b), 15 U.S.C.A. § 78cc(b).

    8 Cases that cite this headnote

[4]    **Securities Regulation**
    Contracts in violation of regulations

In order to void an agreement made in violation of Securities Exchange Act, a party must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with opposing party; and (3) he is in the class of persons that the securities acts were designed to protect. Securities Exchange Act of 1934, § 29(b), 15 U.S.C.A. § 78cc(b).

22 Cases that cite this headnote

**[5]**   **Securities Regulation**
    Contracts in violation of regulations

Agreement requiring seller of convertible debentures to convert debentures into unregistered shares of stock was not subject to rescission on ground that buyer's downstream sales of the unregistered shares would violate Securities Act; at the time the parties entered into the agreement, it could be performed without violating provisions of the securities laws and buyer's sales were too attenuated to establish a claim under Securities Act. Securities Exchange Act of 1934, § 29(b), 15 U.S.C.A. § 78cc(b).

2 Cases that cite this headnote

**[6]**   **Securities Regulation**
    Contracts in violation of regulations

Unlawful transactions made pursuant to lawful contracts do not fall within the ambit of section of Securities Exchange Act making agreements in violation of the Act voidable. Securities Exchange Act of 1934, § 29(b), 15 U.S.C.A. § 78cc(b).

Cases that cite this headnote

**[7]**   **Federal Civil Procedure**
    Securities cases in general

Material issues of fact existed regarding whether, at time of purchase agreement, buyer of convertible debentures intended to resell unregistered shares of converted stock back into the United States following the restricted period set forth in the agreement, whether buyer was aware that it was not entitled to an exemption from the registration requirements, whether

buyer made a misrepresentation of material fact regarding its intent to resell and its status as an underwriter in a resale, and whether buyer was reckless in its belief that it would be entitled to an exemption, precluding summary judgment in favor of seller on its claim to rescind agreement based on a violation of Section 10(b). Securities Exchange Act of 1934, §§ 10(b), 29(b), 15 U.S.C.A. §§ 78cc(b), 78j(b); Securities Act of 1933, § 4(1), 15 U.S.C.A. § 77d(1); 17 C.F.R. § 230.144(k).

47 Cases that cite this headnote

**[8]**   **Securities Regulation**
    Exempt Transactions

Because buyer of convertible debentures sold the unregistered shares in subsequent converted stock before even one year had elapsed, it could not take advantage of safe harbor allowing non-affiliate sellers to comply with exemption from registration requirement. Securities Act of 1933, § 4(1), 15 U.S.C.A. § 77d(1); 17 C.F.R. § 230.144(k).

3 Cases that cite this headnote

**[9]**   **Securities Regulation**
    Exempt Transactions

With respect to exemption from registration requirement, term "distribution" in Securities Act's definition of "underwriter" was synonymous with "public offering." Securities Act of 1933, § 2(a)(11), 15 U.S.C.A. § 77b(a)(11).

6 Cases that cite this headnote

**[10]**   **Evidence**
    Matters directly in issue

**Evidence**
    Custom or usage

**Evidence**
    Nature of Subject

In suit in which seller of convertible debentures sought to rescind purchase agreement on ground that buyer committed securities fraud by misrepresenting its intent to resell converted

shares of unregistered stock, experienced former counsel for Securities and Exchange Commission (SEC) with expertise in offshore could not give expert testimony as to whether buyer complied with legal duties that arose under the federal securities laws; however, her expert testimony regarding securities industry custom with respect to exemption from registration requirements was admissible as probative of buyer's scienter at the time of the agreement, but not outcome determinative. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Securities Act of 1933, § 4(1), 15 U.S.C.A. § 77d(1).

28 Cases that cite this headnote

**[11]    Securities Regulation**
   👈 Causation; existence of injury

In order to establish reliance, or transaction causation, a Section 10(b) securities fraud plaintiff must prove that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

14 Cases that cite this headnote

**[12]    Securities Regulation**
   👈 Causation; existence of injury

To prove loss causation, securities fraud plaintiff must demonstrate that the fraudulent misrepresentation actually caused the loss suffered. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

11 Cases that cite this headnote

**[13]    Securities Regulation**
   👈 Causation; existence of injury

A securities fraud plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

10 Cases that cite this headnote

**[14]    Securities Regulation**
   👈 Causation; existence of injury

Seller of convertible debentures failed to establish that buyer committed securities fraud by misrepresenting its intent to resell converted shares of unregistered stock since there is no connection between the price decrease in converted shares and buyer's unrelated alleged misrepresentation as to its intent to comply with registration requirements. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

1 Cases that cite this headnote

## Attorneys and Law Firms

**\*197** Peter Konolige, Andrew J. Kennedy (Argued), Marcy L. Colkitt & Associates, Indiana, PA, Attorneys for Appellant.

Joel Magolnick (Argued), Moscowitz, Moscowitz & Magolnick, Miami, FL, Attorney for Appellee Berckeley Investment Group, Ltd.

Morgan, Lewis & Bockius, San Francisco, CA, Attorney for Appellee Shoreline Pacific Institutional Finance.

Before McKEE, FISHER and ROTH, [*] Circuit Judges.

## Opinion

### OPINION OF THE COURT

FISHER, Circuit Judge.

In May 1996, Appellant Douglas Colkitt, M.D., entered into an "Offshore Convertible Securities Purchase Agreement" (the "Agreement") with Appellee Berckeley Investment Group, Ltd., an offshore financing entity based in the Bahamas. The Agreement provided that Colkitt would receive $2,000,000 from Berckeley in exchange for 40 convertible debentures, which Berckeley could convert after a specified time period into unregistered shares of stock held by Colkitt. The number of shares to be converted was controlled by a formula based on the current market value of the shares less a 17% discount for Berckeley.

The relationship between the parties quickly deteriorated, as Colkitt accused Berckeley of "short selling" in order to deflate the market price of the stock and thereby obtain more shares upon conversion. When the time came for Colkitt to convert the unregistered shares to repay his debt to Berckeley, he balked and ended up converting only a small percentage of the shares that Berckeley requested. Thereafter, each party filed suit against the other. There is no dispute that Colkitt breached his end of the bargain. Colkitt, however, asserts that he was justified in **198** not complying with the Agreement because Berckeley made material misrepresentations in the Agreement that violated federal securities laws and constituted common law fraud.

Following seven years of protracted litigation, including a previous appeal to this Court, *Berckeley Inv. Group, Ltd. v. Colkitt,* 259 F.3d 135, 137 (3d Cir.2001) *("Berckeley I"),* the District Court found in favor of Berckeley on the parties' cross-motions for summary judgment. The District Court awarded damages to Berckeley in the amount of $2,611,075.52. Colkitt appeals that decision on a number of grounds, primarily relating to the District Court's analysis of federal securities laws. For the reasons set forth herein, we will affirm in part, reverse in part, and remand the case to the District Court for further proceedings.

## I. BACKGROUND

Douglas Colkitt, M.D., is the Chairman of the Board and principal shareholder of National Medical Financial Services Corporation ("NMFS"), a corporation whose shares were traded on the NASDAQ stock exchange. Looking to obtain financing for an unrelated business venture, Colkitt sought out lenders who would be willing to lend him money in exchange for the right to convert his unregistered shares of NMFS stock. *See, e.g., GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 194–95 (3d Cir.2001).

In the spring of 1996, Colkitt entered into negotiations with Berckeley Investment Group, Ltd., a Bahamian corporation headquartered in Nassau, Bahamas. On May 30, 1996, the negotiations culminated in the Agreement between the parties. [1] Under the Agreement, Berckeley purchased 40 convertible debentures from Colkitt at $50,000 per debenture, for a total of $2,000,000. [2] Each debenture represented an unsecured loan for a one-year term, which also obligated Colkitt to pay to Berckeley six percent interest on a quarterly basis. In lieu of receiving repayment in cash per these terms,

however, Berckeley was entitled under the Agreement to convert its debentures into NMFS shares. The Agreement provided that, upon demand by Berckeley, Colkitt would issue unregistered shares of NMFS at a 17% discount off the then-prevailing market price of the stock. [3] Berckeley was entitled to convert up to one-half of the principal amount into unregistered NMFS shares one hundred (100) days after the closing of the Agreement, and the remaining principal amount one hundred twenty (120) days after the closing date.

Several of the contractual provisions in the Agreement are key to an understanding **199** of the dispute between the parties. The parties acknowledged that the Agreement was entered into pursuant to Regulation S of the Securities Act of 1933, 17 C.F.R. §§ 230.901–.04, and that it would be "governed by and interpreted according to the law of the State of New York." In paragraph 2.5 of the Agreement, Berckeley warranted that all subsequent offers or sales of the debentures or shares would be undertaken in accordance with the registration requirements of the 1933 Securities Act:

> All subsequent offers and sales of the Debentures or the Shares will be made (a) outside the United States in compliance with Rule 903 or 904 of Regulation S, (b) pursuant to registration of the Debentures or the Shares, respectively, under the Securities Act, or (c) pursuant to an exemption from such registration. Buyer understands the conditions of the exemption from registration afforded by Section 4(1) of the Securities Act and acknowledges that there can be no assurance that it will be able to rely on such exemption. In any case, Buyer will not resell the Debentures or the Shares to U.S. Persons or within the United States until after the end of the forty (40) day period commencing on the date of completion of the Offering (the "Restricted Period").

Berckeley further represented that it was aware that Colkitt was relying upon the accuracy of its representations regarding federal and state securities laws, and that its "purchase of the Debenture or the Shares pursuant to this Agreement is not part of a plan or scheme to evade the registration provisions of the Securities Act." For his part, Colkitt represented that he

would "take no action, including but not limited to the further sale of securities pursuant to Regulation S of [NMFS] that are held by [Colkitt], that will affect in any way the running of the Restricted Period or the ability of Buyer to freely resell the debentures or the Shares in accordance with applicable securities laws and this Agreement." In addition, Colkitt agreed to place 300,000 shares of NMFS stock in escrow to cover the $2,000,000 aggregate amount of the debentures. He further agreed that "[i]f the price has decreased so that the shares in escrow are insufficient for the conversion of all outstanding Debentures, [Colkitt] agrees to place in escrow additional shares representing that number of shares necessary for the conversion of all outstanding Debentures plus an additional 100,000 shares."

Berckeley upheld its end of the Agreement when it wired $2 million via Shoreline to Colkitt. Colkitt, however, did not. Following the expiration of the one hundred day period, Berckeley began making demands on Colkitt to convert the debentures into NMFS stock. Berckeley made five such demands on Colkitt during September 1996 to convert $300,000 worth of the debentures into 40,133 shares of stock.[4] On each occasion, Colkitt failed to comply with the conversion demands. Following repeated requests for conversion, Colkitt finally converted 18,230 shares on November 5, 1996.[5] Colkitt, however, refused to **200 convert any additional shares, including $160,000 worth of the debentures demanded by Berckeley on November 6, 1996.[6] Colkitt further refused to make required quarterly interest payments that were due on the debentures under the Agreement, and to repay the balance due on the Debentures at the end of the term.

## II. PROCEDURAL HISTORY

Berckeley filed suit in the District Court on August 13, 1997, alleging that Colkitt breached the Agreement by failing to convert the debentures.[7] After the District Court made several procedural rulings,[8] Colkitt filed a second amended counterclaim complaint containing five counts against Berckeley for violations of federal securities laws and the Pennsylvania Securities Act, common law fraud, and breach of contract. Following discovery, both parties filed cross-motions for summary judgment. In a decision dated December 7, 1999, the District Court granted Berckeley's motion and denied Colkitt's motion. The District Court recognized in the order that there were three remaining issues

for its consideration: (1) the amount of damages to which Berckeley was entitled on its breach of contract claim against Colkitt; (2) Berckeley's breach of contract and breach of fiduciary claims against Shoreline; and (3) Shoreline's cross-claims against Colkitt for breach of contract and contractual indemnity. The District Court stated that it would defer the entry of a final judgment pending disposition of the remaining claims, and it requested the parties to file a statement "suggesting how the court shall proceed with the remaining claims/issues."

Berckeley and Shoreline suggested that Berckeley be permitted to file a motion for entry of final judgment against Colkitt, thus staying proceedings involving Shoreline for one year, because satisfaction of Berckeley's judgment against Colkitt would dispose of any remaining claims by or against Shoreline. In contrast, Colkitt stated his intention to seek leave for immediate appeal of the District Court's summary judgment decision pursuant to Fed.R.Civ.P. 54(b) and/or 28 U.S.C. § 1292(b). The District Court sided with Berckeley, which subsequently filed a motion for entry of final judgment against Colkitt. Berckeley and Shoreline then moved to stay Berckeley's claims against Shoreline and Shoreline's claims against Colkitt. On March 30, 2000, the District Court granted Berckeley's and Shoreline's motions and entered judgment in the amount of $2,611,075.52 against Colkitt.

Colkitt appealed the decision of the District Court. On appeal, however, Colkitt argued that we lacked appellate jurisdiction because the District Court had failed to comply with Rule 54(b) and indicate expressly that there was no "just reason" for delaying Colkitt's appellate rights. On July 26, 2001, we issued an opinion agreeing with Colkitt that we lacked appellate jurisdiction, and we remanded the matter back to the District Court. See Berckeley I, 259 F.3d at 146. On August 23, 2001, Berckeley filed with the District Court a motion to amend the judgment so that it comported with the requirements of **201 Rule 54(b). Colkitt opposed the motion. On September 8, 2004, the District Court granted Berckeley's motion and entered an order certifying the judgment as final.[9] This appeal followed.

## III. STANDARD OF REVIEW

We have jurisdiction over Colkitt's appeal from the order of the District Court pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's entry of summary judgment in favor of Berckeley. Morton Int'l, Inc.

Fed. Sec. L. Rep. P 93,904

*v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 679 (3d Cir.2003). We therefore apply the summary judgment standard set forth in Federal Rule of Civil Procedure 56(c). Under that standard, we will affirm the judgment of the District Court "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

In deciding the motion for summary judgment, our job is to ascertain solely whether there is a dispute of material fact:

> we are not permitted to make factual findings, which remains the province of the jury. *See Bragen v. Hudson County News Co.,* 278 F.2d 615, 618 (3d Cir.1960). When determining whether there are any genuine issues of material fact, we draw all inferences in favor of the non-moving party. *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005) (citations omitted). Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact. *Id.* (citing Fed.R.Civ.P. 56(e)). In this respect, summary judgment is essentially "put up or shut up" time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument. *See Jersey Cent. Power & Light Co. v. Lacey Twp.,* 772 F.2d 1103, 1109–10 (3d Cir.1985). In addition, if the non-moving party has the burden of proof at trial, that party must set forth facts "sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

### A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE ORDER AGAINST COLKITT AS A PARTIAL FINAL JUDGMENT PURSUANT TO RULE 54(b)

The threshold issue confronting the Court is whether the District Court abused its discretion in certifying the order against Colkitt as a partial final judgment pursuant to Rule 54(b). Rule 54(b), which governs the certification of final decisions in multiple-claim actions, provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties *only upon an express determination* *202 *that there is no just reason for delay* and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

Fed.R.Civ.P. 54(b) (emphasis added). We have explained that the rule was designed in an attempt "to strike a balance between the undesirability of piecemeal appeals and the need for making review available at a time that best serves the needs of the parties." *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521 F.2d 360, 363 (3d Cir.1975) (citations omitted).

[1]    A decision to certify a final decision under Rule 54(b) involves two separate findings: (1) there has been a final judgment on the merits, i.e., an ultimate disposition on a cognizable claim for relief; and (2) there is "no just reason for delay." *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). The parties do not dispute that the District Court's decision entering summary judgment in favor of Berckeley on all claims against Colkitt constituted a final judgment. The dispute lies over whether the District Court abused its discretion in certifying that judgment for immediate appeal under Rule 54(b) on the basis that there was "no just reason for delay."

Fed. Sec. L. Rep. P 93,904

The Supreme Court has analogized the function of district courts under Rule 54(b) as akin to a "dispatcher": district courts are to consider judicial administrative interests, as well as the equities involved in the case, in order to determine whether discrete final decisions in multiple-claim actions are ready for appeal. *Curtiss–Wright Corp.,* 446 U.S. at 8, 100 S.Ct. 1460. Recognizing that the District Court is "most likely to be familiar with the case and with any justifiable reason for delay," we apply an abuse of discretion standard of review to the District Court's determination that there is no just cause for delay. *Berckeley I,* 259 F.3d at 140 n. 4, 145.[10] We apply as a benchmark against the District Court's exercise of discretion whether that discretion was applied in the "interest of sound judicial administration." *Curtiss–Wright Corp.,* 446 U.S. at 10, 100 S.Ct. 1460. Our proper role in this regard "is not to reweigh the equities or reassess the facts but to make sure that the conclusions derived from those weighings and assessments are juridically sound and supported by the record." *Id.* As a result, we "should disturb the trial court's assessment of the equities only if we can say that the judge's conclusion was clearly unreasonable." *Id.*

[2] Our decision in *Berckeley I* is illustrative of this general principle. In *Berckeley I,* we determined that there were three principal defects in the District Court's original order entering judgment in favor of Berckeley. First, contrary to the explicit requirement of Rule 54(b), the District Court's opinion did not contain an express determination that there was "no just reason for delay." *Berckeley I,* 259 F.3d at 141. We concluded that such an express determination was a jurisdictional prerequisite required by Rule 54(b), and thus declined to adopt Berckeley's position that "general references to the necessity of **\*203** expedition" were sufficient. *Id.* (citation omitted).

Second, the District Court's original order stated only that it was granting "final judgment" with respect to the claims between Berckeley and Colkitt; it did not cite, or even discuss, Rule 54(b). Thus, it was unclear whether the District Court intended to enter a partial final judgment in accordance with Rule 54(b). Although stopping short of holding that citing to Rule 54(b) is a jurisdictional prerequisite, we concluded that "where there is a concurrent failure to make an express determination of no just cause for delay, we cannot reasonably conclude that the District Court intended to enter a partial final judgment pursuant to that Rule." *Id.* at 144.

Finally, we noted that the District Court did not discuss in its opinion any factors relevant to whether there was a just reason for delay. We have set forth several factors that courts should consider when assessing that there is a "just reason for delay" under Rule 54(b):

> (1) the relationship between the adjudicated and unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time;
>
> (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final;
>
> (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like.

*Allis–Chalmers Corp.,* 521 F.2d at 364. Although the factors set forth in *Allis–Chalmers* are not jurisdictional prerequisites—but instead constitute "a prophylactic means of enabling the appellate court to ensure that immediate appeal will advance the purpose of the rule," *Carter v. City of Philadelphia,* 181 F.3d 339, 345 (3d Cir.1999)—the District Court's original order did not contain any statement of reasons as to why there was no just cause for delay. *Berckeley I,* 259 F.3d at 145. We held that this omission, when combined with the other two omissions in the order and our inability to ascertain the propriety of the certification from the record, precluded us from exercising appellate jurisdiction over the merits of Colkitt's appeal. We thus dismissed the appeal for lack of jurisdiction and remanded the case to the District Court. *Id.* at 146.

On remand, the District Court addressed each of the *Allis–Chalmers Corp.* factors to determine whether to enter a final judgment with respect to all claims between Berckeley and Colkitt. First, the District Court concluded that the adjudicated claims between Berckeley and Colkitt and the outstanding unadjudicated claims did not conflict because "the other pending claims may easily be resolved upon execution of the order of final judgment against Colkitt." (App. VI at 5.) Second, the court stressed that the procedural posture of this case presented the possibility that immediate appellate review might actually moot the remaining proceedings in front of the District Court, which were wholly derivative of the claims on appeal. *(Id.)* Whether Shoreline will owe damages to Berckeley and whether Colkitt will be required to indemnify Shoreline depends

upon Colkitt's underlying liability to Berckeley and Colkitt's ability, if applicable, to satisfy the judgment. Third, the District Court stated that it was unlikely that the remaining claims between Berckeley and Colkitt could be revisited a second time on appellate review because the remaining claims did not involve **\*204** Berckeley and Colkitt. *(Id.* at 6.)* Finally, the District Court mentioned two judicial economy considerations weighing in favor of certification: (1) depending upon the result on appeal, immediate appellate review could shorten the time for trial or eliminate the need for a trial altogether; and (2) any further delay in the lengthy proceedings could prejudice Berckeley's ability to execute the judgment. *(Id.)*

Colkitt has once again appealed the District Court's certification decision on the basis that we lack appellate jurisdiction. Colkitt's primary argument is that the District Court abused its discretion in certifying the judgment under Rule 54(b) because the adjudicated claims are factually and legally intertwined with the non-adjudicated claims. A close review of the District Court's September 2004 order, however, reveals that all of the defects in the original order certifying judgment have been remedied. The District Court's decision rested upon pragmatic considerations, particularly the fact that a final appellate determination could moot the remaining derivative claims existing between the parties. Although the *Allis–Chalmers Corp.* analysis was framed by the converse scenario, i.e., in which appellate review might be mooted by further developments in the district court, the District Court's evaluation of the procedural posture of this case was reasonable. The remaining claims in this case are wholly derivative of the claims between Berckeley and Colkitt, arising from separate agreements entered into between each of those parties and Shoreline. Practically, however, if the summary judgment decision of the District Court is upheld and Berckeley is able to execute on the full amount of the judgment, Shoreline's indemnity claim against Colkitt would become moot and Berckeley would no longer be compelled to continue its claims against Shoreline.

These considerations are amplified when we take into account the miscellaneous factors addressed by the District Court. This case has been litigated by the parties for nearly ten years, and it has been approximately six years since the District Court entered its summary judgment order. In addition, Colkitt's shares of NMFS stock have experienced a steep decline over the past decade, to the point that they are practically worthless. Under these circumstances, it was reasonable for the District Court to take into consideration the

possibility that any further delays might impact Berckeley's ability to execute on the judgment. *See Curtiss–Wright Corp.,* 446 U.S. at 11–12, 100 S.Ct. 1460 (finding that the difference between statutory and market interest rates, combined with the reality that the prevailing party would not be able to execute the judgment for many years due to the complexity of the litigation and the other party's declining financial position, was an appropriate basis to certify the judgment under Rule 54(b)); *see also Allis–Chalmers Corp.,* 521 F.2d at 367 (Gibbons, J., dissenting) (referencing as a factor the "ingenuity of debtors in devising reasons for not paying liquidated indebtedness").

Taking all of these factors into consideration—the possibility that our determination on appeal might moot the remaining claims, the derivative nature of the remaining claims, the length of the litigation, and the possibility that further delays might impair Berckeley's ability to execute the judgment—we find that the decision of the District Court to certify the order as a partial final judgment was not "clearly unreasonable." *Curtiss–Wright Corp.,* 446 U.S. at 10, 100 S.Ct. 1460. As a result, we conclude that we have appellate jurisdiction over the present appeal and proceed to address the merits of the dispute.

## **\*205  B. SECTION 29(B) OF THE SECURITIES ACT OF 1934**

[3]   Colkitt contends that he is entitled to rescind the Agreement under Section 29(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Section 29(b) provides in pertinent part that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, ... [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

15 U.S.C. § 78cc(b). Section 29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions. *See National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199, 206 n. 4 (2d Cir.1989). Although the word "void" is contained in the statute, the Supreme Court has read Section

29(b) to be "merely voidable at the option of the innocent party." *Mills v. Elec. Auto–Lite Co.,* 396 U.S. 375, 387–88, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

**[4]**    In order to void the Agreement under Section 29(b), Colkitt must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with Berckeley; and (3) Colkitt is in the class of persons that the securities acts were designed to protect. *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir.1982). *See also Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.,* 794 F.Supp. 1265, 1288 (S.D.N.Y.1992). Colkitt must demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be "inseparable from the performance of the contract" rather than "collateral or tangential to the contract." *GFL Advantage Fund, Ltd.,* 272 F.3d at 201.

In this case, Colkitt asserts that the Agreement was made "in violation of" Section 10(b) and Rule 10b–5 of the Exchange Act, and that the "performance" of the contract violated Section 10(b), Rule 10b–5, and Section 5 of the Securities Act of 1933 (the "Securities Act") because Berckeley perpetuated securities fraud in violation of the statutes. We consider each of these arguments below.

### 1. Colkitt cannot advance a Section 29(b) rescission claim pursuant to Section 5 of the 1933 Securities Act

**[5]**    Colkitt asserts that he is entitled to rescind the Agreement under Section 29(b) of the Exchange Act based upon a violation of Section 5 of the Securities Act. The District Court determined that Colkitt could not rescind the Agreement under Section 29(b) because the contract did not involve a prohibited transaction. According to the District Court, Colkitt's Section 5 claim asserted that a subsequent transaction was unlawful, and "Section 29(b) does not reach into the future to void a subsequent contract."

We recently addressed the scope of Section 29(b) regarding downstream securities transactions in *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189 (3d Cir.2001). In that case, we considered a virtually identical financing transaction that Colkitt entered into with GFL. Colkitt argued that he was entitled to rescind the agreement between the parties because subsequent short sales made by GFL following the agreement violated Section 10(b). Before concluding that the short sales did not constitute market manipulation in violation of Section 10(b), we addressed first whether Colkitt could

even maintain a Section **\*206** 29(b) rescission claim based upon the subsequent short sales. Surveying the applicable case law on the subject, we took a narrow view of the phrases "made in violation of" and "the performance of which involves the violation of" contained in Section 29(b). The test, as we applied it in *GFL Advantage Fund,* is whether the securities violations are inseparable from the underlying agreement between the parties. *Id.* at 201. If an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under Section 29(b). *Id.* at 202. Thus, we held that:

> Despite the theory of Colkitt's case, however, GFL's short sales are completely independent of the parties' respective obligations under the terms of the notes—namely, GFL's obligation to lend Colkitt a total of $13,000,000, and Colkitt's obligation to repay the loans at GFL's option with shares of National Medical and EquiMed stock. In the end, GFL's alleged unlawful activity *(i.e.,* its short sales) is too attenuated from the parties' valid, lawful contracts *(i.e.,* the National Medical and EquiMed notes) or GFL's performance thereunder. Therefore, we conclude that the notes were neither made nor performed in violation of any federal securities laws as is required for rescission under Section 29(b).

*Id.*

Two cases we discussed in *GFL Advantage Fund* and relied upon by Colkitt in the instant appeal confirm that Colkitt's Section 5 claim cannot proceed under Section 29(b). In *Grove v. First National Bank of Herminie,* 489 F.2d 512 (3d Cir.1974), a debtor obtained a series of loans from a bank to purchase registered securities. Regulation U, promulgated under the Exchange Act, provided that such loans were limited to set percentages of the value of the stock to be purchased. The bank, however, failed to inform Grove of the Regulation U margin requirements and loaned him the money. We held that Section 29(b) precluded the bank from recovering a loan deficiency because the loans were made in direct violation of Regulation U. Similarly, in *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,* a securities broker entered into an agreement with the

principals of several limited partnerships to market the limited partnerships for a fee. 678 F.2d 552 (5th Cir.1982). It turned out that the broker, a former New York lawyer who had been disbarred, failed to register as a broker dealer as required by Section 15(a)(1) of the Exchange Act. The Fifth Circuit determined that the broker's performance of the agreement was a prohibited transaction under Section 29(b) because the agreement, although lawful on its face, could not have been performed by the unregistered broker without violating the securities laws.

As we explained in *GFL Advantage Fund,* the key in both of those cases was that neither agreement could be performed without violating the securities laws. 272 F.3d at 202. In contrast, in *GFL Advantage Fund* the downstream short sales were neither connected to nor "inseparable" from the agreement between the parties. Thus, we determined that the transactions at issue in that case could not support a claim under Section 29(b), regardless of whether they violated Section 10(b). *Id.*

[6]  In this case, although the Agreement contains references to Section 5 that allegedly induced Colkitt to enter into the Agreement, Berckeley's downstream sales were tangential to the parties' basic obligations under the Agreement: Berckeley's **\*207** obligation to loan Colkitt $2,000,000 and Colkitt's obligation to provide Berckeley with convertible debentures. [11]  At the time the parties entered into the Agreement, the Agreement could be performed without violating provisions of the securities laws. *Id.* As we observed in *GFL,* "unlawful transactions made pursuant to lawful contracts" do not fall within the ambit of Section 29(b). *Id.* at 200 (quoting *Slomiak v. Bear Stearns & Co.,* 597 F.Supp. 676, 682 (S.D.N.Y.1984)). Thus, to the extent that a trier of fact determines that Berckeley's downstream sales of unregistered NMFS shares violated Section 5, those sales are too attenuated to establish a claim under Section 29(b). *See id.* at 202. [12]

For these reasons, we will uphold the District Court's decision to grant summary judgment in favor of Berckeley as to Colkitt's Section 29(b) claim premised on a violation of Section 5 of the Securities Act. [13]

## 2. The District Court erred in dismissing Colkitt's Section 29(b) claim premised on a violation of Section 10(b)

Section 10(b) of the Exchange Act, 15 U.S.C. § 77(b), makes it unlawful for any person to employ "manipulative or deceptive" conduct "in connection with the purchase or sale of any security." *In re Phillips Petroleum Sec. Lit.,* 881 F.2d 1236, 1243 (3d Cir.1989). When the Exchange Act was passed in 1934, Congress granted the Securities and Exchange Commission the authority in Section 10(b) to develop rules and regulations to prevent such conduct "as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77(b). The Commission responded in 1948 by promulgating Rule 10b–5, which establishes that manipulative or deceptive conduct includes, *inter alia,* making an untrue statement of material fact or omitting to state a material fact in connection with the purchase or sale of securities. [14]

**\*208**  As a private party, Colkitt must establish each of the following elements to prove that Berckeley violated Section 10(b) and Rule 10b–5: (1) Berckeley made a misstatement of material fact, (2) with scienter, (3) in connection with the purchase or sale of a security, (4) upon which Colkitt reasonably relied, and (5) that Colkitt's reliance was the proximate cause of his injury. *In re Ikon Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002). [15]  A Section 29(b) rescission claim premised on a Section 10(b) violation, however, differs from a private damages action brought under Section 10(b). In the Section 29(b) context, a plaintiff seeking rescission does not have to establish reliance and causation. *See GFL Advantage Fund,* 272 F.3d at 206 n. 6. [16]  Because Colkitt's Section 29(b) and standalone Section 10(b) claims overlap, we will consider the initial three Section 10(b) elements in our disposition of his Section 29(b) claim.

Colkitt's case does not present the "typical" fact pattern seen in securities violations brought under Section 10(b). As we have noted, the customary Section 10(b) claim concerns "fraudulent material misrepresentation[s] or omission[s] that affect[ ] a security's value." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 173 (3d Cir.2001) ("*Newton II*") (collecting cases). In this case, Colkitt's theory of liability is not based upon an alleged material misrepresentation relating to the value of NMFS stock, but rather a misrepresentation regarding Berckeley's intent to comply downstream with the registration requirements contained in the Securities Act. Colkitt's argument in favor of establishing Berckeley's liability proceeds as follows:

- Section 5 of the Securities Act of 1933 requires a registration statement to be in effect as to a security in

order to (1) sell the security in interstate commerce; or (2) cause to be carried through interstate commerce any such security for the purpose or sale or for delivery after sale, unless the security is exempt from registration. [17]

• Berckeley represented in Paragraph 2.5 of the Agreement that all subsequent sales of converted shares would be made in accordance with the registration requirements of the Securities Act of 1933.

  • Berckeley's later-acknowledged sale of 18,320 unregistered NMFS shares violated Section 5 and, therefore, the Agreement because the shares were not registered and Berckeley was an "underwriter" not entitled to an exemption under Section 4(1). Because Berckeley was not exempt under Section 4(1), it knowingly engaged in a scheme and artifice to defraud *at the time it entered into the agreement.*

  • Colkitt relied upon Berckeley's representation to enter into the Agreement, **\*209** which resulted in Berckeley receiving 18,320 unregistered shares of NMFS at a 17% discount.

  • Colkitt suffered the following damages that were proximately caused by Berckeley's material misrepresentation:

  (1) he sold shares to Berckeley at a 17 % discount from their market value; (2) he became liable under the Agreement to pay interest and penalties; and (3) his NMFS share holdings, placed in escrow, lost value and became practically worthless.

There is no dispute between the parties that the Agreement was made "in connection" with the purchase or sale of a security, and Berckeley's argument that Colkitt suffered no reliance damages essentially addresses whether Colkitt's reliance was the proximate cause of his injury. Thus, the misrepresentation, scienter, and causation prongs of the Rule 10b–5 case are in dispute between the parties. [18]

### a. Material issues of fact exist regarding Berckeley's intent to resell unregistered shares and its status as an underwriter

[7] At the outset, we examine whether there is sufficient evidence in the record to create a material issue of fact that Berckeley made a misrepresentation in paragraph 2.5

of the Agreement. Colkitt bases his Section 10(b) claim on the argument that Berckeley intentionally misrepresented in Paragraph 2.5 of the Agreement that all subsequent sales of converted shares would be made in accordance with the registration requirements of the Securities Act of 1933. [19] To ultimately prove a misrepresentation, Colkitt must demonstrate that, at the time Berckeley entered into the Agreement, it intended to violate federal securities laws by reselling unregistered shares of NMFS stock back into the United States without entitlement to an exemption. Colkitt's theory breaks down into two discrete subissues as to which he must point to a dispute of material fact: (1) that there is evidence in the record that Berckeley intended at the time the Agreement **\*210** was executed to sell shares back into the United States without registering them, and (2) Berckeley was aware at the time of the Agreement that it would be reselling the shares as an "underwriter," i.e., the company knew that it was not entitled to an exemption from the registration requirement under Section 4(1) of the Securities Act of 1933.

### (1) There is sufficient evidence that Berckeley intended to resell NMSF shares back into the United States without registering them

We first examine whether there is evidence in the record that Berckeley intended at the time it entered into the Agreement with Colkitt to resell unregistered NMSF shares back into the United States. On the basis of three affidavits, two judicial admissions, and the structure of the deal itself, we conclude that there is sufficient evidence to create a material issue of fact that Berckeley intended to resell NMSF shares back into the United States without registering them.

The first affidavit was submitted by Martin Douglas Ho, Berckeley's Connecticut-based investment advisor. Ho participated in negotiating and closing the transaction between Berckeley and Colkitt, and he also was involved in the delayed conversion and attempted conversions of the debentures. (App. at 1173.) Ho stated in his supplemental affidavit that he sought legal advice and provided investment advice in connection with the transaction. Regarding the advice he provided to Berckeley, Ho stated the following:

  After thoroughly investigating the appropriateness and legality of the transaction, I advised Berckeley that, pursuant to the terms of the Agreement and subject Debentures, and applicable federal securities laws, including Regulation S promulgated under the Securities Act of 1933, and exemptions therefrom, after the expiration of 40 days and certainly after the expiration of 100 days

—the initial restricted period—Berckeley was *permitted to sell the common stock of National Medical in the United States that was to be delivered by Colkitt.*

I, on behalf of Berckeley, sought and obtained legal advice which confirmed my understanding of Regulation S and related exemptions and my advice to Berckeley regarding the transaction *and its ability to resell the converted shares in the United States after the expiration of 40 days or, in this case, commencing after the initial restricted period under the Agreement.*

(App. at 1175 (emphasis added).) Specifically referencing Paragraph 2.5 of the Agreement, which is at the crux of the dispute between the parties, Ho stated the following:

> All of the representations contained in Paragraph 2.5 were true and correct at the time that they were made by Berckeley and continue to be true and correct in that, among other things, *Berckeley intended to sell the converted shares pursuant to an exemption from registration and, in good faith, believed that it could do so based upon the advice it obtained from me as well as its counsel.* No shares were sold prior to the Restricted Period. The only shares of Colkitt's that were ever sold were the approximately 18,320 shares he converted in November 1996. No securities violation can be alleged as to this sale.

(App. at 1176–77 (emphasis added).)

Berckeley directors Milton Morales and Carlos Mijares also submitted supplemental affidavits. Those affidavits, which were identical, provided the following pertinent averments:

> Prior to executing the Agreement, Berckeley was advised by Mr. Ho that **\*211** he conducted a complete investigation as to the appropriateness and legality of the transaction, that, pursuant to the terms of the Agreement and Debentures, and applicable federal securities laws, including Regulations promulgated under the Securities Act of 1933, and exemptions therefrom, the transactions did not violate any laws and, that *after the expiration of 100 days—the initial restricted period—Berckeley was*

*permitted to sell the common stock of National Medical in the United States that was to be delivered by Colkitt.*

\* \* \* \*

Berckeley merely intended to convert the Debentures into National Medical Shares after 100–120 days and slowly sell the stock thereafter....

\* \* \* \*

All of the representations contained in paragraph 2.5 were true and correct at the time that they were made by Berckeley and continue to be true and correct in that, among other things, *Berckeley intended to sell the converted shares pursuant to an exemption from registration* and, in good faith, believed that it could do so based upon the advice that it obtained from Mr. Ho, as well as its counsel. No shares were sold prior to the Restricted Period. The only shares of Colkitt's that were ever sold were the approximately 18,320 shares he converted in November 1996.

(App. at 1181–83; 1187–89 (emphasis added).)

In addition to these affidavits, Berckeley made two binding judicial admissions in its complaint and in its brief on appeal. [20] Berckeley stated unequivocally in its complaint that "[i]t was always Berckeley's intent to exercise its conversion rights as to all of the debentures as quickly as possible, selling the National Medical stock in the market as quickly as reasonably possible, and thereby maximizing its return." Furthermore, Berckeley stated in its brief on appeal to us that its "intention was ... to convert the Debentures into shares of National Medical stock after a period of 100–120 days and then proceed slowly to sell the stock in a reasonable manner as an investment objective." (Appellee's Br. at 31.)

Finally, the structure of the deal, as well as a lack of evidence of any viable offshore market for the shares, *see infra,* raises an inference that Berckeley intended to resell the converted shares back into the United States. The deal provided Berckeley with the unilateral option to convert one-half of the debentures into NMFS shares 100 days from closing and the remaining debentures 120 days from closing. In addition, the Agreement provided **\*212** that any unredeemed debentures would be automatically converted into NMFS shares within one year. Thus, in all likelihood Berckeley knew that it would be holding a large number of unregistered shares within one year of the Agreement. These

timetables built into the Agreement are even more important when we consider that, for all practical purposes, Berckeley could only receive the maximum return on its investment (the 17% premium it received from Colkitt as part of the deal) if it resold the unregistered NMFS shares back into the United States. The affidavits and the admissions referenced above confirm that it was Berckeley's intent from the outset to resell at least a portion of the unregistered NMFS shares "as quickly as reasonably possible ... thereby maximizing its return." As discussed more fully below, Berckeley has not shown that there was any real marketplace for the unregistered NMFS shares other than in the United States, thus adding to the inference at this stage of the litigation that Berckeley intended to resell unregistered shares back into the United States.

For these reasons, we find that there is sufficient evidence at this stage of the proceedings to create a material issue of fact that Berckeley intended, at the time of the Agreement, to resell the converted shares back into the United States following the Restricted Period set forth in the Agreement.

**(2) Material issues of fact exist as to whether Berckeley was aware it was not entitled to an exemption under Section 4(1)**

In order to establish a Section 5 violation, Colkitt must point to evidence that: (1) no registration statement was in effect as to the securities; (2) Berckeley sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce. *See Hill York Corp. v. American Int'l Franchises, Inc.,* 448 F.2d 680, 686 (5th Cir.1971), *distinguished on other grounds by Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). It is undisputed that there are sufficient facts in the record for Colkitt to establish the first two elements, and our finding above that there is a factual dispute as to whether Berckeley intended at the time of the Agreement to resell the securities back into the United States is sufficient at this stage to satisfy the third element. As a result, our next step is to determine whether there are facts in dispute as to whether Berckeley was aware it was not entitled to an exemption from the registration requirement under Section 4(1) of the Securities Act.

The burden of proving entitlement to an exemption rests with the party claiming the entitlement. *SEC v. Ralston Purina Co.,* 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494 (1953). The District Court did not address whether Berckeley satisfied the definition of a "statutory underwriter," and there is no indication that the parties or the District Court were aware that the burden of demonstrating an entitlement to the exemption

rested with Berckeley. Instead, the District Court determined that Berckeley did not make a misrepresentation because, based upon uncertainties in the securities industry as to the applicability of the exemption in 1996, "the illegality of the transaction simply was not apparent." (App. at 43.)

Section 4(1) exempts from the registration requirements under Section 5 "transactions by any person other than issuer, underwriter, or dealer." 15 U.S.C. § 77d(1). At issue here is whether Berckeley was an "underwriter," as there is no dispute that Colkitt was an "issuer" and that Berckeley purchased unregistered **\*213** securities from Colkitt. Section 2(a)(11) of the Securities Act defines the term "underwriter" in pertinent part as "any person who has purchased from an issuer with a view to ... the distribution of any security...." 15 U.S.C. § 77b(a)(11). Because the burden of proving entitlement to the exemption rests with Berckeley, it can establish that it is entitled to the exemption if it proves that: (1) the acquisition of the unregistered shares through conversion was not made "with a view to" distribution; or (2) the sale of the 18,320 shares was not made in connection with a "distribution." *See Ackerbey v. Johnson,* 892 F.2d 1328, 1336 (8th Cir.1989).

Whether Berckeley's acquisition of the unregistered shares was made "with a view to" distribution focuses on Berckeley's investment intent at the time of the conversion. *See* 1 Thomas Lee Hazen, *The Law of Securities Regulation* 482 (5th ed.2005) (collecting cases). Because it is difficult to discern a party's intent at the time of purchase with respect to downstream sales of unregistered shares, courts and commentators have typically focused on the amount of time a security holder holds on to shares prior to reselling them. *Id.; see Ackerbey,* 892 F.2d at 1336 (stating that "the courts look to whether the security holder has held the securities long enough to negate any inference that his intention at the time of acquisition was to distribute them to the public"). Over time, courts have developed the general presumption that a two-year holding period is sufficient to negate the inference that the security holder did not take the securities with a "view to distribute." *Ackerbey,* 892 F.2d at 1336.

**[8]**   Seizing upon the difficulty of determining a party's subjective intent at the time of purchase, the SEC adopted Rule 144, which creates an objective safe harbor to allow non-affiliate sellers to comply with the Section 4(1) exemption. A non-affiliate seller may fall within the Rule 144 safe harbor, and not be deemed an "underwriter," under two sets of circumstances. First, the SEC has generally removed all

restrictions from the sale of securities by a non-affiliate who has held onto the securities for a period of at least two years from the date the securities were acquired from the issuer or an affiliate of the issuer. 17 C.F.R. § 230.144(k). If the non-affiliate seller has not held the securities for a period of at least two years, the seller may fall within the Rule 144 safe harbor if it complies with the following five criteria:

(1) adequate current public information about the securities is available, i.e., the company must have complied with the reporting requirements of the Exchange Act or with Exchange Act Rule 15c2–11;

(2) at least one year has lapsed "between the later of the date of the acquisition of the securities from the issuer or from an affiliate of the issuer, and any resale of such securities";

(3) the amount of securities sold may not exceed the greater of (a) one percent of the outstanding class, or, (b) if traded on a national exchange, the average weekly volume of trading in the securities over the past four weeks preceding the filing of notice as required Rule 144(h);

(4) the securities must be sold in "brokers' transactions" or in transactions with a "market maker," and the seller is prohibited from soliciting or arranging for solicitation orders to buy securities in anticipation or in connection with such transaction; and

(5) if the seller is going to sell more than 500 shares, or the aggregate sale price is greater than $10,000, the seller must file a notice of the sale with the SEC.

**\*214** 17 C.F.R. § 230.144(c)-(h). The seller must comply with each of the elements in order to gain the benefit of the safe harbor. *Id.* § 230.144(b).

Each safe harbor set forth under Rule 144 requires the seller to have held on to the unregistered shares for a specified time period, either one or two years. Because it is undisputed that Berckeley sold the unregistered shares in this case before even one year had elapsed, Berckeley cannot take advantage of the Rule 144 safe harbor. In addition, Berckeley's quick turnaround sale of the converted shares at least creates an issue of fact as to whether Berckeley acquired the shares with a "view to distribution" under the statutory exemption as well. *See Gilligan, Will & Co. v. Securities and Exchange Comm'n,* 267 F.2d 461, 467–68 (2d Cir.1959) (finding that ten-month holding period was sufficient to support SEC finding that security holder bought shares "with a view to distribution"). [21]

**[9]**   Berckeley, however, can still demonstrate that it did not act as an "underwriter" if the sale of the 18,320 shares was not made in connection with a "distribution." The registration requirements of the 1933 Securities Act are "design[ed] ... to protect investors by promoting full disclosure of information thought necessary to [make] informed investment decisions." *Ralston Purina,* 346 U.S. at 124, 73 S.Ct. 981. The legislative history of the term "underwriter" reveals "that the congressional intent was to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public." 1 Hazen, *The Law of Securities Regulation* 476; *see Van Dyke v. Coburn Enter., Inc.,* 873 F.2d 1094, 1097 (8th Cir.1989) (stating **\*215** that "[t]he design of the Act is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions"). As a result, the focus of the term "underwriter" is on the concept of "distribution." *Ackerberg,* 892 F.2d at 1337.

Although we have not yet had the occasion to interpret the Section 4(1) statutory exemption, those courts interpreting the exemption have uniformly concluded that the term "distribution" is synonymous with "public offering" as set forth under Section 4(2). *See Geiger v. SEC,* 363 F.3d 481, 484 (D.C.Cir.2004); *Ackerberg,* 892 F.2d at 1337; *SEC v. Dolnick,* 501 F.2d 1279, 1282 (7th Cir.1974); *Quinn & Co. v. SEC,* 452 F.2d 943, 946 (10th Cir.1971); *Gilligan, Will & Co.,* 267 F.2d at 466; *Neuwirth Inv. Fund, Ltd. v. Swanton,* 422 F.Supp. 1187, 1194–96 (S.D.N.Y.1975); *see also* II Louis Loss and Joel Seligman, *Securities Regulation* 1138.47 n. 580 (2d ed.1999) (collecting authorities). We agree with the rationale of those courts and similarly hold that the term "distribution" in § 2(a)(11) is synonymous with "public offering."

In the landmark decision of *SEC v. Ralston Purina,* the United States Supreme Court explained that whether an issuance of stock is a "public offering" turns on the need of the offerees for the protections of the securities laws:

Since exempt transactions are those as to which "there is no practical need for the (the bill's) application," the applicability of [the Section 4(2) private placement exemption] should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction not involving any public offering.

346 U.S. at 125, 73 S.Ct. 981 (internal punctuation omitted). *See also Van Dyke,* 873 F.2d at 1098; *Sorrell v. SEC,* 679 F.2d 1323, 1326 (9th Cir.1982) (stating that the "offeree's access to financial information about the investment, similar to what would be found in a registration statement, is crucial"); *Neuwirth Inv. Fund,* 422 F.Supp. at 1198. The percentage of outstanding shares distributed to the public is not determinative, as the application of the Section 4(1) exemption does not turn on the percentage of the shares sold, even where the resales constitute extremely small percentages of the outstanding stock. *Geiger,* 363 F.3d at 484. Rather, the key inquiry for the court is whether the security holder can demonstrate that the sales were made to individuals or entities that did not require the registration protections of the Securities Act. *Id.*

For example, in *Geiger* the United States Court of Appeals for the District of Columbia determined that the resale of unregistered shares comprising only 0.50% of all outstanding shares constituted a "distribution" because the shares made their way into the hands of the investing public. 363 F.3d at 484. There, the D.C. Circuit was guided by an earlier decision of the Ninth Circuit which upheld the SEC's finding that the sale of 0.25% of shares of unregistered stock violated Section 5 of the Securities Act. *See Pennaluna & Co. v. SEC,* 410 F.2d 861, 865 (9th Cir.1969). In contrast, in *Ackerberg* the Eighth Circuit determined that the sale of 12,500 shares of unregistered stock did not constitute a "distribution" because the shares were sold to a single sophisticated investor who had received detailed information about the company prior to purchasing the securities. *Ackerberg,* 892 F.2d at 1329, 1336–37. Similarly, the United States District Court for the District of New York concluded in *Neuwirth Inv. Fund, Ltd.* that the sale of 18,000 unregistered shares was not a "distribution" because the unregistered stock was sold to **\*216** two identifiable purchasers who were sophisticated and experienced investors and who had asked for and received information from the corporation prior to purchasing the shares. 422 F.Supp. at 1199.

On the basis of the record we have before us, Berckeley has not adduced any evidence to meet its burden that it is entitled to an exemption under § 4(1). The record is clear that Berckeley intended to resell a quantity of the shares within two years. As stated in Berckeley's complaint, "[i]t was always Berckeley's intent to exercise its conversion rights as to all of the debentures as quickly as possible, selling the National Medical stock in the market as quickly as possible." Berckeley has not advanced any evidence that there was

any "market" for NMFS shares outside the United States, particularly considering that Berckeley placed the 18,320 shares for sale with a United States broker. Inferring from these facts that the only market for NMFS shares was in the United States, Berckeley did not bring forward any evidence that the NMFS shares would be sold *solely* to sophisticated investors who do not need the protections of the registration requirements of the securities laws. To the contrary, placing the 18,320 shares with a broker suggests that those shares would be sold to the highest bidder without regard to the bidder's level of investing acumen. *See* Loss and Seligman, *Fundamentals of Securities Regulation* 327 (noting that "a sell order given to a stock exchange broker results in an offer to the highest bidder in the world, which is certainly a 'public offering' "). For these reasons, we find that Berckeley failed to meet its burden to show it was entitled to an exemption under Section 4(1).

Accordingly, we conclude that the record contains sufficient evidence that Berckeley made a misrepresentation of material fact regarding its intent to resell and its status as an underwriter in a resale.

*b. Material issues of fact exist regarding whether Berckeley was reckless in its belief that it would be entitled to the Section 4(1) exemption*

Because there is a factual dispute regarding whether Berckeley intended at the time of the agreement to resell illegally the converted shares back into the United States, we must next determine whether Colkitt can point to sufficient evidence that Berckeley had the requisite scienter to violate the Section 5 registration requirement at the time it entered into the Agreement.

A plaintiff can "plead scienter by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.' " *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534–35 (3d Cir.1999) (quoting *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir.1997)) (additional citation omitted). Recklessness can be shown by a statement or action " 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979)).

Fed. Sec. L. Rep. P 93,904

In concluding that Colkitt failed to produce sufficient evidence to demonstrate Berckeley's scienter, the District Court relied upon an affidavit from Nancy Van Sant, a former SEC lawyer reputed to have experience with offshore transactions and the availability of exemptions in connection with those transactions as of May **\*217** 1996. Based on assumed facts concerning Berckeley's conduct, Van Sant drew multiple legal conclusions. Particularly relevant here was her conclusion that it was reasonable for Berckeley to have believed at the time of the Agreement that it would be entitled to the Section 4(1) exemption if and when it sold any shares. Van Sant reached this conclusion after a fairly substantial legal analysis of the Section 4(1) exemption as applied to the facts she assumed:

> In my experience as a securities litigator, and as an attorney giving securities advice, in 1996, Regulation S shares were routinely purchased offshore, held for the restricted forty day period and then resold in the United States pursuant to the Section 4(1) exemption. This was common and accepted practice in the securities industry in 1996. Given the common practice and the confusion generated by the SEC's adoption of the Regulation S forty day restricted period, it would not have been unreasonable for persons acquiring shares in offshore transactions exempt under Regulation S, or specifically the shareholders of Berckeley, to believe that their resale of Regulation S shares into the United States marketplace upon the expiration of the Regulation S restricted period (which was considerably shorter than the contractual provisions restricting the timing of the conversion of the shares); in brokers transactions; and, in small amounts that would not adversely affect the National Medical trading market, was in compliance with applicable securities law.

(App. at 1436–37.) The District Court explained that the above paragraph (paragraph 18) was the "operative portion" of the affidavit, and that the "remainder of the affidavit

simply explain[ed] the development of the law and why it was reasonable to rely on the exemption under § 4(1)." (App. at 43.)

The District Court has discretion to determine whether expert testimony will help the trier of fact. *United States v. Agnes,* 753 F.2d 293, 303 (3d Cir.1985), *abrogated on other grounds by Smith v. Borough of Wilkinsburg,* 147 F.3d 272 (3d Cir.1998).[22] In utilizing that discretion, however, the District Court must ensure that an expert does not testify as to the governing law of the case. Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that "embraces an ultimate issue to be decided by the trier of fact," an expert witness is prohibited from rendering a legal opinion. *United States v. Leo,* 941 F.2d 181, 195–96 (3d Cir.1991).[23] Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury. *First National State Bank v. Reliance Elec. Co.,* 668 F.2d 725, 731 (3d Cir.1981) (per curiam).

**\*218** Notwithstanding this admonition, the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties. Two of our decisions in this area provide guidance. In *First National State Bank,* the district court permitted an expert on the Uniform Commercial Code to testify as to the established custom in the banking industry and to provide background information to help the jury determine whether the bank's conduct warranted status akin to a holder in due course. *Id.* at 731. The district court did not, however, permit the expert to "give his opinion as to the legal duties arising" from the industry custom as to whether the bank "lacked good faith and/or had notice of claims, thereby denying it holder-in-due course status." *Id.* On appeal, we rejected the bank's argument that the expert testified to a legal conclusion, and we agreed with the district court that the expert's testimony was admissible.

Similarly in *Leo,* we held that the district court did not abuse its discretion in permitting an expert in the field of governmental contracting to testify as to the custom and practices of the defense industry regarding the Armed Services Procurement Act in a criminal fraud prosecution. 941 F.2d at 196–97. We stated that the expert's testimony was admissible because it was limited to an explanation of business custom, i.e., that defense contractors generally provided updated cost and pricing data to the government

during contract negotiations. *Id.* Key to our determination
was that the expert did not give his opinion as to what was
required under the law, or whether the defendant complied
with the Act. Rather, the testimony was permissible because
the expert "testified, based upon his experience in the defense
industry, as to how firms such as [the defendant's] operated
when performing contracts governed by the Act." *Id.* at 197.

 **[10]**    This is a case in which we find that Van Sant's
background testimony could be helpful to the jury. She is
an experienced former counsel for the SEC with expertise
in offshore securities transactions. The customs and business
practices in the securities industry at the time the parties
entered into the Agreement provides an important context
which will aid the jury in determining whether Berckeley
had the requisite scienter at the time to evade the registration
requirements.

In accordance with *First National State Bank* and *Leo,*
however, Van Sant cannot testify as to whether Berckeley
complied with legal duties that arose under the federal
securities laws. Thus, Van Sant's testimony that Berckeley's
sales of NMFS stock were exempt from registration
requirements, and any testimony as to the legal effect of
the various SEC pronouncements regarding Rule 144 and
Regulation S, are inadmissible as improper legal opinions.
Similarly, the portion of paragraph 18 of the affidavit,
opining that in light of the apparent routine industry practice
it was reasonable for Berckeley to have believed that it
was entitled to the Section 4(1) exemption, is inadmissible
because it concerns Berckeley's legal duties resulting from
the various SEC pronouncements. *Leo,* 941 F.2d at 197. As
to the remainder of the testimony considered by the District
Court, we conclude that the District Court did not abuse
its discretion in admitting Van Sant's testimony regarding
securities industry custom with respect to the Section 4(1)
exemption.

Based solely on Van Sant's opinion regarding industry
practices, the District Court concluded that, given the state
of affairs in the securities industry in May **\*219** 1996, "the
illegality of the transaction simply was not apparent." (App.
at 43.) Van Sant's testimony regarding industry practice
and custom, however, is not determinative as to Berckeley's
state of mind. Such an inference would run counter to our
determination in *Newton v. Merrill, Lynch, Pierce, Fenner
& Smith,* 135 F.3d 266 (3d Cir.1998) *("Newton I")*. In
that case, the defendants submitted multiple affidavits from
investment brokers explaining that the brokers followed

the same allegedly fraudulent investment practices as the
defendants. The defendants argued that the universal industry
custom established as a matter of law that the defendants did
not have the requisite scienter to violate Section 10(b). We
rejected the defendants's claim that evidence of a "widely,
if not almost universally followed" practice in the securities
industry was determinative as to their state of mind. We
explained that "[e]ven a universal industry practice may
still be fraudulent [,]" and that "ultimate responsibility for
construction and enforcement of the securities laws must rest
with the court." *Id.* at 274 (citations omitted).

The touchstone of our decision in *Newton I* was that universal
industry practices are not "outcome determinative." *Id.* at
273. In the present case, we read the District Court's opinion
as finding that the Van Sant affidavit on industry custom
was "outcome determinative" as to Berckeley's state of mind
regarding its qualification for the Section 4(1) exemption.
Under *Newton I,* that conclusion cannot stand. Our decision
in *Newton I,* however, did not preclude the defendants from
introducing the proffered evidence of industry custom and
practice to demonstrate that they had not acted with the
requisite scienter. *See id.* (stating that "any evidence, derived
from knowledge of industry practice or elsewhere, that the
plaintiffs were generally aware of the defendants' exclusive
reliance on the [allegedly fraudulent practices] would, of
course, be quite probative of whether the plaintiffs had the
expectations they claim"). Similarly in this case, Van Sant's
testimony regarding securities industry practices in May 1996
will be probative of Berckeley's scienter at the time of the
Agreement, but not determinative.

Because the Van Sant affidavit, standing alone, is insufficient
to establish that Berckeley did not have the requisite scienter,
we must examine the record to determine whether there
is any other evidence regarding Berckeley's state of mind
concerning its qualification for the Section 4(1) exemption
at the time it entered into the Agreement. In order to defeat
summary judgment, Colkitt must point to evidence in the
record creating an issue of fact regarding whether Berckeley
was reckless in its belief that it would be entitled to an
exemption under Section 4(1) of the Securities Act of 1933.
Colkitt relies on several Rules, Regulations, and Interpretive
Guidances issued by the SEC to argue that the law in 1996
was clear that no exception to the Section 5 registration
requirement existed under Section 4(1) for unregistered
securities acquired in offshore transactions. (Appellant's Br.
at 42.) We agree that the authorities cited by Colkitt create
an issue of fact as to whether Berckeley's belief that it could

freely resell the securities after the holding period in the Agreement without otherwise complying with Section 4(1) was reckless.

Important to our conclusion is an understanding of the interrelationship among Rule 144, which gives guidance on "underwriter" status under Section 4(1); Regulation S; which was adopted in 1990 to clarify the extraterritorial application of the 1933 Act; and an interpretive release issued by the SEC on June 10, 1995, entitled "Problematic Practices Under Regulation S." We examined the Rule 144 safe harbor in **\*220** detail, *supra,* and concluded that Berckeley could not fall under the safe harbor because it resold the securities back into the United States within one year of converting the debentures. *See* 17 C.F.R. § 230.144.

Regulation S was enacted in 1990 to provide generally that an offer or sale of a security that occurs outside the United States is not subject to the registration requirements under Section 5 of the Securities Act. *See* 17 C.F.R. §§ 230.901–.05. Under that regulation, "[s]ecurities acquired overseas, whether or not pursuant to Regulation S, may be resold in the United States only if they are registered under the Act or an exemption from registration is available." Offshore Offers and Sales, 55 Fed.Reg. 18306, 18322 (May 2, 1990). 17 C.F.R. § 230.904, preliminary note 6. Regulation S contains two non-exclusive safe harbor provisions, Rule 903 and Rule 904. Under Rules 903 and 904, an offer or sale of securities is deemed to occur outside the United States if: (1) the offer or sale is made in an offshore transaction; (2) no directed selling efforts are made in the United States; and (3) additional considerations listed in Rule 903(b) and/ or 904(b) are satisfied. *See* 17 C.F.R. §§ 230.903—.04. Both safe-harbor rules contain a 40–day "distribution compliance period" under which resales of unregistered shares may not be made in any event. *See id.* The SEC interpretive release issued in connection with Regulation S explained that Regulation S did not alter the availability of the Section 4(1) exemption for the resale of securities. Notice of Adoption of Rule 144, SEC. Release No. 5223, 55 Fed.Reg. 18319 (January 11, 1972). The interpretive release further stated that Regulation S did not apply to "any transaction or series of transactions that, although in technical compliance with the rules, is part of a plan or scheme to evade the registration provisions of the Securities Act." 55 Fed.Reg. at 18320.

In June 1995, in response to "a number of problematic practices [that] ... developed involving unregistered sales of equity securities of domestic reporting companies

purportedly in reliance upon Regulation S," the SEC published an interpretive release entitled "Problematic Practices Under Regulation S." *See* Problematic Practices Under Regulation S, SEC Release No. 33–7190, 60 Fed.Reg. 35663 (July 10, 1995). That publication stated that the safe harbors under Rules 903 and 904 were not available "for a transaction or series of transactions that, although in technical compliance with the regulation, is part of a plan or scheme to evade the registration requirements of the Securities Act." *Id.* The publication was concerned primarily with so-called "parking transactions," under which domestic issuers or distributors sold securities to offshore shell entities to hold for the forty-day restricted period, after which such securities were sold back into the United States. In the end, proceeds from the sales would make their way, directly or indirectly, back to the domestic issuer or distributer. *Id.* at 35664. The SEC made clear in the release that the forty-day restricted period could not be used for this purpose, i.e., to "wash off" resale restrictions such as the 2–year holding requirement under Rule 144. The release concluded by stating that "any distributions by a statutory 'underwriter' must be registered pursuant to Section 5" unless subject to a statutory exemption. *Id.*

The net effect of all of these Rules and interpretive releases is to create an issue of fact as to whether it would have been reckless for Berckeley to rely *solely* on the forty-day restricted period to foreclose any possibility that it was an "underwriter" at the time it entered into the Agreement **\*221** with Colkitt. Berckeley argues that it was not reckless as a matter of law because the 1995 interpretive release only solicited comments as to whether Regulation S should be amended, and that it was not until February 1997—almost one year after the parties' transaction—that the SEC formally proposed changes to Regulation S in order to stop certain abusive practices. *See* Offshore Offers and Sales, SEC Release No. 33–7392, 62 Fed.Reg. 9258 (Feb. 28, 1997). We view Berckeley's argument as a distinction without a difference. Although the SEC did not propose formal Regulation S rule changes until February 1997, the 1995 interpretive release was clearly directed to stop abusive practices relating to the sale of unregistered securities. When the SEC finally adopted amendments to Regulation S in February 1998, the Commission explained that it first "acted to stem abuses of Regulation S" in the June 1995 interpretive release. Offshore Offers and Sales, SEC Release No. 33–7505, 63 Fed.Reg. 9362 (Feb. 25, 1998). The SEC further referenced eight enforcement proceedings it had instituted against participants in abusive Regulation S transactions between June 5, 1992,

and May 6, 1996, each of which took place prior to the date of the Agreement on May 30, 1996.

Based upon all the information available to Berckeley at the time it entered into the Agreement, we conclude that there is an issue of fact as to whether Berckeley was reckless in its belief that the resale of securities back into the United States would not violate Section 5 of the Securities Act. [24] This issue must be resolved by the trier of fact, which may or may not accept Berckeley's explanation that the law was so unclear at the time to dispel **\*222** Colkitt's contention that it acted with scienter. Accordingly, we will reverse the District Court's grant of summary judgment on Colkitt's Section 29(b) claim premised on a violation of Section 10(b) and remand the case for a trial on the merits.

## C. COLKITT'S SECTION 10(B) CLAIM

As we explained, *supra*, a party proceeding under a Section 29(b) rescission claim has a lesser burden because it is not necessary in that context to establish reliance and causation. *See GFL Advantage Fund,* 272 F.3d at 206 n. 6. In this case, however, Colkitt has also alleged a stand-alone claim under Section 10(b). The remaining issue for our consideration under that claim is whether Colkitt has produced sufficient evidence to create an issue of fact that Berckeley's alleged misrepresentation caused his injury.

Causation in the securities context is strikingly similar to the familiar standard in the torts context, but with different labels. In the securities realm, "but for" causation is referred to as "reliance, or transaction causation," and "proximate cause" is known as "loss causation." *See Newton II,* 259 F.3d at 172–73; *see also Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683 (7th Cir.1990) (stating that "what securities lawyers call 'loss causation' *is* the standard common law fraud rule ... merely borrowed for use in federal securities law cases") (emphasis in original); *3 Hazen, The Law of Securities Regulation,* § 12.11[1].

 [11]  In order to establish reliance, or transaction causation, a Section 10(b) plaintiff must prove that "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Newton II,* 259 F.3d at 172. Stated differently, the plaintiff must prove that "but for the wrongful conduct, the transaction would not have gone through, at least in the form that it eventually took." *3 Thomas Lee Hazen, The Law of Securities Regulation,* § 12.11[2] (5th ed.2005); *see also Suez Equity Investors, L.P., Sei Assocs. v.*

*Toronto–Dominion Bank,* 250 F.3d 87, 95–96 (2d Cir.2001) ( "Transaction causation is based upon the plaintiff's reliance upon the defendant's deceptive statements or omissions; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.").

 [12]   [13]  Loss causation is a more exacting standard for a Section 10(b) plaintiff to meet. To prove loss causation, the plaintiff must demonstrate "that the fraudulent misrepresentation actually caused the loss suffered." *Newton II,* 259 F.3d at 173. Similar to the concept of proximate cause in the tort context, loss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff. *Suez Equity Investors,* 250 F.3d at 96. Thus, "[t]he loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." *Id.* The United States Court of Appeals for the Seventh Circuit has succinctly explained that the loss causation element requires the plaintiff to prove "that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 648 (7th Cir.1997) (citing *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 931 (7th Cir.1988)). In the typical Section 10(b) case, a party can meet this burden by showing that the price of a security was inflated due to a fraudulent misrepresentation. *Semerenko v. Cendant Corp.,* 223 F.3d 165, 184 (3d Cir.2000); *Hayes v. Gross,* 982 F.2d 104, 107 (3d Cir.1992); **\*223** *Scattergood v. Perelman,* 945 F.2d 618, 624 (3d Cir.1991). In such a case, there is a direct causal nexus between the misrepresentation and the plaintiff's economic loss. *Semerenko,* 223 F.3d at 184. Similarly, the loss causation element is satisfied where a fraudulent misrepresentation or omission induces the plaintiff to enter into the challenged transaction. *See Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir.1984) (stating that "[t]he plaintiff ... should not have to prove loss causation where the evil is not the price the investor paid for a security, but the broker's fraudulent inducement of the investor to purchase the security"), *as cited in* 3 Hazen, The Law of Securities Regulation, § 12.11[3]. In contrast, a plaintiff does not meet the loss causation element if he fails to prove that the drop in the value of a security is related to the alleged misrepresentation. *Semerenko,* 223 F.3d at 185; *Robbins v. Koger Properties, Inc.,* 116 F.3d 1441, 1446–49 (11th Cir.1997). In that situation, it cannot be said "that the alleged misrepresentation proximately caused the decline in the security's value to satisfy the element of loss causation." *Id.*

 **[14]**   Colkitt's complaint asserts that his NMFS share holdings lost value as a proximate cause of Berckeley's alleged misrepresentation.[25] (App. at 955.) We disagree. Based on the record before us, there is absolutely no connection between the price decrease in NMFS shares and Berckeley's unrelated alleged misrepresentation as to its intent to comply with offshore registration requirements. In fact, Colkitt himself has attributed the drop in the price of NMFS shares solely to repercussions resulting from Berckeley's short sales of NMFS stock, a practice that the District Court determined did not violate Section 10(b) or Rule 10b–5.[26] For example, the following exchange took place during Colkitt's deposition regarding the reasons why he never repaid the loan amount to Berckeley:

Q. Is the only reason that you did not repay Berckeley in one form or another these allegations that have been made in this lawsuit that you believe that Berckeley was involved in the short-selling of National Medical Stock?

A. Yes.

Q. There is no other reason that you have for not repaying the loan made by Berckeley?

A. *Well, obviously, the short-selling helped collapse totally the price of the stock, which obviously made my liquidity—inability to pay, it was a downward cycle, made it much more difficult.*

\* \* \* \*

Q. You don't have any other reason for failing to repay this loan from Berckeley other than the allegations that you have made in this case that Berckeley was somehow involved in short-selling National Medical stock **\*224** and the repercussions of those allegations; is that correct?

A. Yeah, and the repercussions, that's correct.

Q. Okay. Included in those repercussions is your contention that there's now some issue of inability to repay?

A. Correct.

Q. Okay. Is there any other reason that you have for not repaying this loan?

A. No.

(App. at 1018–19 (emphasis added).)

Once we strip away the short selling allegations, the alleged misrepresentations in this case have no connection to the decrease in the value of NMFS shares in the open market. That misrepresentation simply did not affect the value of NMFS stock. Accordingly, Colkitt cannot recover damages for the decrease in value of his stock that was held in escrow because that decrease was not proximately caused by Berckeley's alleged misrepresentation.

In summary, we will reverse the decision of the District Court with respect to Colkitt's Section 10(b) claim on limited grounds. We hold that Colkitt failed to set forth sufficient facts that the precipitous loss in value in his NMFS share holdings was proximately caused by Berckeley's alleged misrepresentation. There is no evidence in the record that the decline in the price per share of NMFS stock was connected in any manner to alleged misrepresentations regarding Berckeley's intent to evade Section 5 registration requirements, and we will affirm the decision of the District Court relating to this category of damages.[27] For these reasons, we will reverse in part, affirm in part, and remand Colkitt's remaining Section 10(b) claim to the District Court for trial.[28]

## D. CALCULATION OF DAMAGES

Having determined that Colkitt has adduced sufficient facts to survive summary judgment on his Section 29 rescission **\*225** claim premised on a violation of Section 10(b), we must necessarily vacate the District Court's damages award in favor of Berckeley. Colkitt will have the opportunity at trial to prove that he is entitled to rescind the Agreement.[29]

## V. CONCLUSION

Based upon the foregoing reasons, we will affirm in part, reverse in part, and remand the case to the District Court for further proceedings consistent with this opinion.

**Parallel Citations**

Fed. Sec. L. Rep. P 93,904

Footnotes

| | |
|---|---|
| \* | The Honorable Jane R. Roth assumed senior status on May 31, 2006. |
| 1 | Defendant–Appellant Shoreline Pacific Institutional Finance ("Shoreline") brokered the Agreement between Colkitt and Berckeley. *Berckeley I*, 259 F.3d at 137. |
| 2 | A debenture is a debt secured only by the debtor's earning power, not by a lien on any specific asset. A convertible debenture is one that the holder may change into some other security, such as stock. *See* Black's Law Dictionary 430 (8th ed.2004). |
| 3 | For example, suppose that Berckeley wanted to convert $1,000,000 of the debentures into NMFS shares, and that the current market price for NMFS stock was $25 per share. The conversion price would be $20.75 per share ($25 per share * 0.83). At a rate of $20.75 per share, Berckeley would be entitled under the Agreement to 48,192.77 shares of NMFS stock. |

> The 17% discount received by Berckeley represented, in part, the fact that "the National Medical shares held by Colkitt for the transaction were not registered with the Securities and Exchange Commission, as would be required for sales of those shares within the United States by Section 5 of the Securities Act of 1933." *See Berckeley I*, 259 F.3d at 137 (internal citation omitted).

| | |
|---|---|
| 4 | Berckeley specifically made the following demands on the following dates in September 1996: |

| Date | Face Value | Conversion Price | Shares Due (truncated) |
|---|---|---|---|
| 9/13/96 | $ 80,000 | 7.6152 | 10,505 |
| 9/16/96 | $ 60,000 | 7.6775 | 7,815 |
| 9/19/96 | $ 90,000 | 7.5115 | 11,981 |
| 9/26/96 | $ 20,000 | 7.1795 | 2,786 |
| 9/26/96 | $ 50,000 | 7.0965 | 7,046 |
| | $300,000 | | 40,133 |

| | |
|---|---|
| 5 | That figure represented Berckeley's conversion demands made on September 13, 1996, and September 16, 1996. |
| 6 | The conversion price for the $160,000 demand made on November 6, 1996, does not appear in the record. |
| 7 | Berckeley also sued NMFS for breach of contract, and Shoreline for breach of contract and breach of fiduciary duty. The District Court dismissed NMFS as a party to the action, and the merits of Berckeley's claims against Shoreline are not at issue on appeal. |
| 8 | The lengthy procedural history in the District Court is summarized in our decision in *Berckeley I*, 259 F.3d at 138. |
| 9 | The record is unclear as to why there was a thirty-eight month delay between the date of our opinion remanding the case back to the District Court and the District Court's subsequent order. |
| 10 | We subject questions of law concerning the interpretation of the requirements of Rule 54(b) to plenary review. *Berckeley I*, 259 F.3d at 140 n. 4. |
| 11 | The distinction between this claim and the Section 29(b) claim premised on a violation of Section 10(b) is readily apparent. The Section 10(b) claim alleges that Berckeley made material misrepresentations that induced Colkitt to enter into the Agreement. If Colkitt is able to prove that claim, then the Agreement was "made in violation of" Section 10(b). The misrepresentations that induced Colkitt to enter into the Agreement would be "inseparable from the underlying agreement between the parties." *GFL Advantage Fund*, 272 F.3d at 202. |
| 12 | We agree with the District Court that the SEC's administrative decision in *In re GFL Fund Ltd.*, 64 S.E.C. Docket 1958, 1997 WL 330419 (June 18, 1997), does not compel a different conclusion. In that case, the SEC brought administrative proceedings against GFL for reselling unregistered securities back into the United States. The SEC's administrative ruling was concerned solely with GFL's resale of the unregistered shares, not with any contracts GFL had entered into with other parties. In fact, the SEC did not even mention Section 29(b) in the administrative ruling. Thus, there was no finding that the underlying contracts that enabled GFL to obtain the unregistered shares violated Section 29(b). As such, we do not find *In re GFL Fund Ltd.* helpful to our disposition of the present case. |
| 13 | We therefore need not determine whether Section 29(b) can ever support a rescission claim founded on a violation of the 1933 Securities Act. |
| 14 | Employment of Manipulative and Deceptive Devices, 13 Fed.Reg. 8183 (Dec. 22, 1948), *amended by* 16 Fed.Reg. 7928 (Aug. 11, 1951). The full text of Rule 10b–5 provides: |

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statements of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

15   Under the Private Securities Litigation Reform Act of 1995, Congress codified the common law loss causation requirement as a statutory element of a Section 10(b) private cause of action. *See* 15 U.S.C. § 78u–4(b)(4) (stating that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages").

16   Similarly, the SEC does not have to establish those elements in an enforcement proceeding. *See Graham v. SEC,* 222 F.3d 994, 1001 n. 15 (D.C.Cir.2000).

17   *See* 15 U.S.C. § 77e(a).

18   We will examine the misrepresentation and scienter issues as part of our resolution of the Section 29(b) claim, and we will consider separately the causation prong in part IV.C, *infra.*

19   In the District Court, the primary argument advanced by Colkitt to establish that Berckeley violated Section 10(b) was that Berckeley had engaged in short selling in violation of the Agreement. The District Court determined that Berckeley did not engage in short selling, and Colkitt has not advanced this issue on appeal.

We note that our recent decision in *GFL Advantage Fund,* 272 F.3d at 202, addressed the effect of short sales in a nearly identical financing transaction that Colkitt entered into with GFL. We held that GFL's short selling did not support Colkitt's Section 10(b) claim. In rejecting Colkitt's argument that the short selling constituted market manipulation, we stated that "[t]he fact that these short sales may have contributed to a decline in the stocks' prices is not evidence of deceptive or manipulative conduct, for there is no reason to believe these prices were depressed artificially." *Id.* at 207. We concluded that "short selling, even in large volumes, is not in and of itself unlawful and therefore cannot be regarded as evidence of market manipulation." *Id.* at 209. We further explained: "That short selling may depress share prices, which in turn may enable traders to acquire more shares for less cash (or in this case, for less debt), is not evidence of unlawful market manipulation, for they simply are natural consequences of a lawful and carefully regulated trading practice." *Id.* at 209–10. Rather, short selling could only form a basis for a Section 10(b) claim if done "in conjunction with some other deceptive practice that either injected inaccurate information into the market or otherwise artificially affected the price of the stock." *Id.* at 207.

20   Judicial admissions are concessions in pleadings or briefs that bind the party who makes them. *See Parilla v. IAP Worldwide Serv., VI, Inc.,* 368 F.3d 269, 275 (3d Cir.2004) (finding that the plaintiff was bound because she "expressly conceded those facts in her complaint.") (citing, *inter alia, Soo Line R.R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) (noting the "well-settled rule that a party is bound by what it states in its pleadings"); *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972) (noting that unequivocal "judicial admissions are binding for the purpose of the case in which the admissions are made[,] including appeals")). *See also Karkoulis's, Inc. v. Dohany,* 409 F.3d 279, 283 (6th Cir.2005) (finding that the plaintiff's "admissions of statutory compliance by defendants in its briefs" constituted " 'judicial admissions' that estop [plaintiff] from raising a statutory non-compliance argument in this appeal.") (citation omitted); *Gospel Missions of America v. City of Los Angeles,* 328 F.3d 548, 557 (9th Cir.2003) (stating that court of appeals has discretion whether to treat a concession in a pleading or brief as a binding judicial admission).

21   In the initial years following the passage of the Securities Act, resellers of unregistered securities frequently made the argument that they were not underwriters because "although they had the requisite investment intent at the time of purchase, subsequent changes in their personal situations necessitated the resale of securities." *See* 1 Hazen, *The Law of Securities Regulation* 484. This highly fact-specific inquiry became known as the "change in circumstances" exception. *See generally Vohs v. Dickson,* 495 F.2d 607, 620– 21 (5th Cir.1974); *see also Neuwirth Inv. Fund, Ltd. v. Swanton,* 422 F.Supp. 1187, 1197 (S.D.N.Y.1975) (finding that change in circumstances exception applied and that security holder did not take stock with a view to distribution where fifteen months passed between purchase and resale and where stock was sold only after security holder was forced into liquidation).

Although the SEC has taken the position that the "change in circumstances" exception is no longer applicable after the passage of Rule 144, commentators have expressed doubt that the exception can be read out of the definition of an "underwriter" under § 2(a)(11). *See* 1 Hazen, *The Law of Securities Regulation* 485 ("To the extent that the change in circumstances defense is a valid interpretation in terms of the section 2(a)(11) statutory definition of one who purchases with an intent to redistribute, the SEC cannot by administrative fiat change the meaning of the statute."); Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 325 n. 241 (5th ed.2004) (noting that, although the "law largely has made a transition from the subjectivity of the statutory standard to more objective rule enforcement, ... the statutes still exist and it still can be argued ... that the wording of § 2(a)(11) compels some sort of change in circumstances doctrine."). In addition, Rule 144 is generally considered to be non-exclusive, and sellers such as Berckeley may still seek to invoke the statutory Section 4(1) exemption. *See* 1 Hazen, *The Law of Securities Regulation* 490; Loss and Seligman, *Fundamentals of Securities Regulation* 325 n. 241; Marc I. Steinberg, *Understanding Securities Law* 139 (3d ed 2001); II Louis Loss and Joel Seligman, *Securities Regulation* 1138.47 n. 580 (2d ed.1999).

Because the parties have not addressed the application of the "change in circumstances" exception to this case, however, we need not decide whether that exception remains a viable method of refuting "underwriter" status under § 2(a)(11).

**22** We review the District Court's decision to admit expert testimony for abuse of discretion. *In re Unisys Savings Plan Litig.,* 173 F.3d 145, 163 (3d Cir.1999).

**23** The Advisory Committee Notes to Rule 704 explain that, although a witness may give an opinion as to an ultimate issue, Rules 701, 702, and 403 "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria." As the committee notes further explain:

> [T]he question, "Did T have capacity to make a will?" would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural object of his bounty and to formulate a rational scheme of distribution?" would be allowed.

> *See* Fed.R.Evid. 704, advisory committee notes.

**24** We note that we are *not* determining that the failure to follow an SEC interpretive release is *per se* reckless for purposes of finding liability under the securities laws. An interpretive rule is "one issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Chrysler Corp. v. Brown,* 441 U.S. 281, 302 n. 31, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (citation omitted). An interpretive rule is not binding upon a court. *Dismas Charities, Inc. v. United States Dept. of Justice,* 401 F.3d 666, 681 (6th Cir.2005). Indeed, the SEC itself has recognized that "no-action and interpretive responses by the staff are subject to reconsideration and should not be regarded as precedents binding on the Commission." *See* SEC Release No. 33–5089, 1970 WL 10582 (Oct. 29, 1970). Our decision in this case does not elevate SEC interpretive releases to the force of law; rather our focus is on Berckeley's state of mind when it entered into the Agreement. The sheer weight of the interpretive releases and the eight enforcement proceedings instituted by the SEC against participants in abusive Regulation S transactions between June 5, 1992, and May 6, 1996, creates an issue of fact that Berckeley intended to undertake an unlawful course of conduct.

> Berckeley has evidence at its disposal to counter the interpretive releases, including the Van Sant testimony and evidence that it sought out the advice of counsel prior to entering into the Agreement. On the latter piece of evidence, we realize that the record is sparse as to the nature of the advice Berckeley received from its counsel. (App. at 1175–77, 1187–89.) For purposes of the remand to the District Court, we remind the parties that the attorney-client privilege cannot be used as both a "shield" and a "sword": Berckeley cannot rely upon the legal advice it received for the purpose of negating its scienter without permitting Colkitt the opportunity to probe the surrounding circumstances and substance of that advice. *See Livingstone v. North Belle Vernon Borough,* 91 F.3d 515, 537 (3d Cir.1996) ("The attorney client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that: (a) the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.") (quoting *Restatement of the Law Governing Lawyers* § 130(1) (Final Draft No. 1, 1996)).

**25** Colkitt also alleges that he suffered two other categories of damages as a direct and proximate cause of Berckeley's alleged misrepresentation: (1) the sale of NMFS shares to Berckeley at a 17% discount from their market value, and (2) the possible requirement to pay interest and penalties on the outstanding debentures under the Agreement. The current record, as we have examined it, is unclear as to whether these expenses would have been part of the cost of *any* deal Colkitt could have made to obtain the financing in light of NMFS's precarious financial position at the time it entered into the deal.

> *See Berckeley I,* 259 F.3d at 137 & *supra* note 3. We invite the District Court upon remand to determine in the first instance the nature of these expenses and their relationship, if any, to the alleged misrepresentation.

**26** Colkitt has not appealed that ruling and is thus bound by it.

**27** In this respect, our decision represents only a Pyrrhic victory for Colkitt, who will not be able to recover his largest category of damages from Berckeley, which is the drop in stock prices connected to NMFS stock held in escrow. We note for the record that Colkitt recognized the inherent possibility that market forces might cause the share price of NMFS stock to decrease when he agreed, in the Agreement, to place additional shares of NMFS stock into escrow if the stock price decreased.

**28** As a result, to the extent we have determined that Colkitt has stated a claim under Section 10(b), we will also reinstate Colkitt's claim that Berckeley's conduct committed common law fraud under New York law. We conclude that the Agreement, which contains a choice of law clause in Paragraph 6. 1, is governed solely by New York law. *See Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 56 (3d Cir.1994) (stating that the parties freely bargained for a choice of law provision and that Pennsylvania courts "will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests"). As Colkitt fails to set forth any public policy interest to invalidate the choice of law provision entered into between two parties that freely bargained for the terms of the Agreement, we find that the choice of law provision bars Colkitt from proceeding under the Pennsylvania Securities Act and Pennsylvania common law fraud. Accordingly, Colkitt will have to prove that Berckeley's conduct constituted fraud under New York law. *See Computerized Radiological Services v. Syntex Corp.,* 786 F.2d 72, 76 (2d Cir.1986) (stating that under New York law, a plaintiff must prove the following elements of fraud: "(1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity, (8) to his injury") (citation omitted).

29    We note that the record is unclear as to what damages Berckeley would be entitled to for its "buy-in loss" should it ultimately be successful at trial. Those damages represent the losses that Berckeley allegedly suffered when it was forced to buy NMFS shares on the open market to cover for existing delivery obligations after Colkitt failed to follow through on his duty to convert shares under the Agreement. As set forth in note 4, *supra,* Berckeley made conversion demands on five occasions in September 1996. Colkitt honored only two of the conversion demands and converted 18,320 shares. At around the same time in September 1996, Berckeley entered into sales agreements to sell 10,680 NMFS shares. Berckeley then purchased 10,680 shares on the open market in February 1997 to cover for its existing delivery obligations from September. What is unclear to us from the existing record is why Berckeley would have had to purchase the shares on the open market when it already held 18,320 shares that would have covered the outstanding delivery obligations. The answer may be that Berckeley sold a certain number of shares, and that the 10,680 outstanding shares represent the remaining shares upon which Berckeley still owed delivery obligations. The parties' current submissions, however, are far from clear on this issue, and the parties should address this unanswered question on remand.

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.