# TAB 31

65 Fed.Cl. 463
United States Court of Federal Claims.

BLACKSTONE CONSULTING, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 02–1728C.   |   March 25, 2005.

**Synopsis**
**Background:** Marine messhall contractor brought action against Government seeking to enforce settlement agreement with directed subcontract for two years, but Government claimed obligation was only to direct subcontract through specific date. Contractor and Government cross-moved for summary judgment.

**Holdings:** The Court of Federal Claims, [Firestone](#), J., held that:

[1] agreement obligated Government to provide directed subcontract only through date certain;

[2] Government's statement in settlement offer was recital and did not create obligation to provide contractor with opportunity to develop relationship with prime contractor;

[3] agreement impliedly obligated Government to do what was necessary to enable contractor to perform subcontract by awarding and performing prime contract without delay; but

[4] Government's performance of agreement was excused under doctrine of impossibility.

Summary judgment for Government.

West Headnotes (23)

### [1]    Federal Civil Procedure
    Contract cases in general

Contract interpretation is a question of law for the court and thus may be decided on summary judgment.

1 Cases that cite this headnote

### [2]    Contracts
    Ambiguity in general

The question of whether a contract term is ambiguous is a question of law.

Cases that cite this headnote

### [3]    Contracts
    Questions for Jury

The question of whether performance of a contract is factually impossible or commercially impracticable is a question of fact, not of law; however, the ultimate issue is one of law.

Cases that cite this headnote

### [4]    Contracts
    Existence of ambiguity

When a disagreement regarding the meaning of the words of a contract is presented to a court, the court must first determine whether an ambiguity exists.

1 Cases that cite this headnote

### [5]    Contracts
    Existence of ambiguity

A contract is "ambiguous" where it is susceptible to more than one reasonable interpretation, all of which fall within a zone of reasonableness.

Cases that cite this headnote

### [6]    Contracts
    Existence of ambiguity

That the parties differ in their respective interpretations of a contract term is not enough to show the contract is ambiguous.

Cases that cite this headnote

### [7]    Contracts
    Language of Instrument



Wherever possible, courts should look to the plain language of the contract to resolve any questions of contract interpretation.

Cases that cite this headnote

[8]   Contracts
       Language of contract
      Contracts
       Extrinsic circumstances

Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance.

Cases that cite this headnote

[9]   Contracts
       Subject, object, or purpose as affecting construction
      Contracts
       Construing whole contract together

In determining the intent of parties to contract, a court must construe the contract to effectuate its spirit and purpose, giving reasonable meaning to all parts of the contract.

1 Cases that cite this headnote

[10]  Contracts
       Construction as a whole

Contract interpretation giving reasonable meaning to all parts of a contract will be preferred to one which leaves a portion of the contract useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous.

Cases that cite this headnote

[11]  Contracts
       Language of contract

Court must endeavor to effectuate intent of parties to contract using plain language of the contract itself.

Cases that cite this headnote

[12]  Public Contracts
       Settlement, release, and waiver in general
      United States
       Settlement, release, and waiver in general

Settlement agreement between Government and Marine messhall contractor whose proprietary cost information was disclosed by Government in contract solicitation obligated Government to provide contractor with directed subcontract only through specific date, not for two-year period from commencement of contract, but also impliedly obligated Government to award contract without delay; Government's proposal and contractor's acceptance used language including date certain to define length of directed subcontract, and no reference was made to start date of prime contract.

Cases that cite this headnote

[13]  Contracts
       Intention of Parties
      Contracts
       Presumptions and burden of proof

While the goal of contract interpretation is ascertaining the parties' intent, the court should not inquire into the actual mental processes of the parties in entering into the particular contract, but rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest.

Cases that cite this headnote

[14]  Contracts
       Language of contract
      Contracts
       Presumptions and burden of proof

Where the language of a contract is clear, it is presumed that language conveys the parties' intent, and the court may not inquire into the subjective intentions of the parties.

Cases that cite this headnote

[15]  Public Contracts

 Settlement, release, and waiver in general

United States
 Settlement, release, and waiver in general

Construing settlement agreement between Government and Marine messhall contractor whose proprietary cost information was disclosed by Government in contract solicitation to obligate Government to provide contractor with directed subcontract only to date certain, not for first two years of prime contract's performance, did not render portion of agreement meaningless, where Government's offer stated two reasons for directed subcontract limited in time of mitigating competitive harm caused by release of information until cost information became dated and of providing contractor opportunity to build relationship with prime contractor, and those reasons were consistent with date certain.

Cases that cite this headnote

[16]  Public Contracts
 Patent ambiguity doctrine;  duty to inquire before bidding

United States
 Representations and specifications misleading contractor

Contractor whose proprietary cost information was disclosed by Government in contract solicitation had duty to inquire into any ambiguity as to length of time that directed subcontract would last at time contractor entered into settlement agreement with Government, if Government drafted the agreement and there were any ambiguity as to duration of subcontract in terms of date certain or time after prime contract's performance commenced.

Cases that cite this headnote

[17]  Public Contracts
 Settlement, release, and waiver in general

United States
 Settlement, release, and waiver in general

Government's statement in settlement offer to contractor whose proprietary cost information was disclosed in contract solicitation, that

Government hoped contractor's performance of directed subcontract to date certain would be of such quality that prime contractor would desire to continue relationship beyond date certain, was a "recital" and did not create obligation on Government's part to provide contractor with opportunity to develop relationship with prime contractor separate from obligation to provide directed subcontract through the date certain.

Cases that cite this headnote

[18]  Contracts
 Recitals

A formal statement explaining the reasons upon which a transaction is founded in a contract is a "recital," one type of which is called a "whereas clause."

1 Cases that cite this headnote

[19]  Public Contracts
 Settlement, release, and waiver in general

United States
 Settlement, release, and waiver in general

Government's settlement agreement with Marine messhall contractor whose proprietary cost information was disclosed in contract solicitation, under which contractor was to receive directed subcontract to date certain, impliedly obligated Government to do what was necessary to enable contractor to perform subcontract by awarding and performing prime contract without delay, although the settlement agreement did not provide contractor with right to two-year subcontract.

Cases that cite this headnote

[20]  Contracts
 Terms implied as part of contract

A promisee must not only not hinder his promisor's performance, but also must do whatever is necessary to enable him to perform, and that implied obligation is as binding as if it were spelled out.

Cases that cite this headnote

[21]  **Public Contracts**
 🔑 Settlement, release, and waiver in general

**United States**
 🔑 Settlement, release, and waiver in general

Government's performance of settlement agreement with Marine messhall contractor that provided for awarding contractor directed subcontract to date certain was excused under doctrine of impossibility, where numerous bid protests were filed that delayed award and performance of prime contract, Government was prohibited from awarding contract while protests were pending, contractor did not argue that performance could have commenced sooner, and contractor agreed that neither Government nor contractor could have anticipated protests or resultant delay when settlement agreement was entered into.

Cases that cite this headnote

[22]  **Contracts**
 🔑 Discharge by Impossibility of Performance

For the non-performance of a contractual obligation to be excused by the doctrine of impossibility, the non-performing party must show (1) a supervening event made performance impossible, (2) the non-occurrence of the event was a basic assumption on which the contract was based, (3) the occurrence of the event was not the non-performing party's fault, and (4) the non-performing party did not assume the risk of occurrence.

Cases that cite this headnote

[23]  **Contracts**
 🔑 Discharge by Impossibility of Performance

Non-performing party to contract must show that occurrence of event which made performance impossible was not foreseeable at the time parties entered into contract, to excuse non-performance of contractual obligation under doctrine of impossibility, as if event were foreseeable, it would be implied that non-performing party

assumed the risk and was potentially liable for breach of contract.

Cases that cite this headnote

**Attorneys and Law Firms**

 **\*465**  Kevin M. Cox, Auburn, NY, for plaintiff.

Christian J. Moran, U.S. Department of Justice, Washington, DC, with whom were Peter D. Keisler, Assistant Attorney General and Director David M. Cohen, for defendant. Julius Rothlein, U.S. Department of the Navy, Washington, DC, of counsel.

**Opinion**

### OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

FIRESTONE, Judge.

Pending before the court are the parties' cross-motions for summary judgment. At issue is the interpretation of a settlement agreement between the parties and whether the government has breached that agreement. The plaintiff, Blackstone Consulting, Inc. (the "plaintiff"), argues that the parties agreed that the defendant, the United States ("government" or "defendant"), would provide the plaintiff with a directed subcontract for two years and that the government has breached this agreement. The government argues that the parties agreed that the government would direct a subcontract to the plaintiff only through September 30, 2002 and that the government has either performed its obligation or that any non-performance is excused by the doctrine of impossibility. For the reasons that follow, the government's motion for summary judgment is **GRANTED**. The plaintiff's cross-motion for summary judgment is **DENIED**.

### BACKGROUND

The following facts are not in dispute. On January 7, 2000, the U.S. Marine Corps issued a solicitation for "all management, personnel, supervision, subsistence and other items stated to perform Full Food Service, Management and Mess Attendant, and Brig Messhall Management and Food Preparation tasks

at various west coast Marine Corps Installations." Compl. ¶ 4. The contract term was for eight years, beginning October 1, 2000 and ending September 30, 2008 (FY01–FY08). The solicitation sought a contractor to manage all tasks on a regional basis. Contracts for various tasks at Marine Corps messhalls had previously been awarded on a local basis but, under the new contract, the regional prime contractor would subcontract with local firms.

**\*466** Inadvertently included with the solicitation was a cost proposal submitted by the plaintiff for one of the messhall facilities in Yuma, Arizona for FY00. The plaintiff was the incumbent local prime contractor for the two dining facilities at the Marine Corps Air Station in Yuma, Arizona ("MCAS–Yuma") at the time the solicitation was issued. Its contract was scheduled to terminate when performance on the new regional contract began.

On March 20, 2000, Contracting Officer Paul Sando ("Sando") sent a letter to the plaintiff acknowledging the disclosure of proprietary information and proposing remedial action in the form of attempting to retrieve the information from other contractors. Not satisfied with this remedy, the plaintiff filed a protest on March 24, 2000 seeking either that the solicitation be cancelled and re-issued without its proprietary information or that a sole source subcontract award be made to it for the Yuma facilities for the full eight year term of the regional contract. The protester argued that the first remedy would not adequately address the competitive disadvantage it suffered due to the disclosure.

On March 27, 2000, Sando sent an email to the plaintiff and others that read in relevant part:

> We are tentatively delaying the closing date for all elements of the proposal ... until 26 June 2000. This slip will effect later target dates, with the end result being a projected delay in the date of commencement of performance on both regional contracts from 1 October 2000 to 1 January 2001. Firm dates will appear in the amendment.

Def.App. at 26.

On April 3, 2000, Sando sent a letter to the plaintiff offering to settle the plaintiff's pending protest. He opened by stating, "The basis of the protest, as we understand it, is that Blackstone Consulting, Inc. is unable to compete on an equal basis with other prospective subcontractors under the solicitation, due to our inadvertent release of your cost data in the regional solicitation documents." Def.App. at 28. He went on to agree that cancelling and re-issuing the solicitation would not adequately address the plaintiff's competitive disadvantage and therefore he "propose[d] including in the West Coast solicitation a provision requiring the prime contractor to subcontract with Blackstone for required services at MCAS Yuma through September 30, 2002, with additional performance beyond that date at the discretion of the prime contractor." Def.App. at 28–29. He explained that his reasons for limiting the directed subcontract to that time frame were "twofold." First, a subcontract through FY02 would:

> serve to mitigate the competitive harm caused by our inadvertent release. By FY03, the FY00 rates exposed will be sufficiently dated so as to be of far less help to competitors than they would be today .... Second, we would assume and hope that Blackstone's performance will be of such quality that the prime contractor would desire to maintain the contractual relationship beyond FY02. If, for whatever reason, the relationship is not successful, we would not want to be contractually required to force the prime contractor to remain in an untenable situation.

Def.App. at 29.

He concluded by saying that this arrangement would provide "sufficient time for all parties involved to determine whether continuing the relationship is the most prudent course of action." Def.App. at 29. The offer went on to propose methods for removing the plaintiff's information from the solicitation and implementing the subcontract. *Id.* On April 5, 2000, the plaintiff sent a letter to "accept [Sando's] proposal requiring the prime contractor to subcontract with [the plaintiff] for required services at the two dining facilities at MCAS–Yuma through September 30, 2002." Def.App. at 32.

On April 28, 2000, Sando issued an amendment to the solicitation requiring the prime contractor to subcontract with the plaintiff for services at the facilities at Yuma for a "term ... through September 30, 2002." Def.App. at 36. In a cover letter accompanying the amendment, he explained: "Establishing

a directed subcontract for this limited period will serve to mitigate the competitive harm resulting from our release of Blackstone's ***467** proprietary data, while still affording the prime contractor the flexibility to assess whether the relationship should be continued beyond FY02." Def.App. at 34.

Beginning in July 2000, other potential contractors began filing bid protests before the General Accounting Office ("GAO") challenging the solicitation. Def. Prop. Find. Uncontr. Fact ¶ 15; Pl. Prop. Find. Uncontr. Fact ¶ 15. The first of these was denied in December 2000. Def.App. at 42. The protests were eventually resolved and the contract was awarded on March 14, 2001.

The contract was awarded to Sodexho Marriot with a performance commencement date of July 1, 2001. The plaintiff had partnered with a competing offeror and thus did not receive a subcontract for the entire eight year term of the prime contract, as it would have had its partner won the prime contract. On March 22, 2001, the plaintiff emailed Sando to inquire as to "how the logistics of our current operation at Yuma which is guaranteed to our firm through 9/30/02 gets melded into the upcoming Sodexho Marriot contract." Def.App. at 48. Sando responded: "The plan as of now, barring protests, is for performance to commence under the regional contracts on 1 July .... If we receive one or more protests, that schedule may or may not be affected, depending on the nature and timing of the protest(s)." *Id.* The plaintiff then sent an email thanking Sando for the update and did not seek further clarification at that time. Def.App. at 49.

There were then additional delays in beginning performance of the contract due to protests by other offerors, many of which were filed with the GAO. The first of these was filed on March 26, 2001 and was sustained by the GAO in July 2001. Def.App. at 43–44. Additional protests were then filed in February 2002 following a U.S. Marine Corps request for a second final proposal revision from offerors, and these protests were finally resolved in April 2002. Def.App. at 44–45. As a result of these protests, final proposals were due on March 7, 2002 and performance commencement was rescheduled for October 1, 2002. Def. Prop. Find. Uncontr. Fact ¶ 22; Pl. Prop. Find. Uncontr. Fact ¶ 22. The parties have agreed that "[n]either the government nor Blackstone could have anticipated the protests or the delay they caused at the time the parties entered into the settlement agreement." Def. Prop. Find. Uncontr. Fact ¶ 16; Pl. Prop. Find. Uncontr. Fact ¶ 16.

On February 27, 2002, the plaintiff wrote to Sando requesting an amendment to the solicitation to reflect that the prime contractor would be required to subcontract with Blackstone until September 30, 2004—the first two years of the contract from the new scheduled start date. The plaintiff explained: "This amendment will reflect the true intent of the settlement of April of 2000." Def.App. at 50. Sando responded on May 24, 2002 by rejecting the plaintiff's request, explaining that "my intent in the agreement and the solicitation amendment was to provide for exactly what was stated, Blackstone Consulting, Inc. support at MCAS Yuma through September 30, 2002. Had my intent been to offer, agree to, or direct a firm two-year subcontract commencing whenever regional contract performance might begin, the documentation would have so stated." Def.App. at 53. He also stated that "if the terms of the agreement, as was stated at the time, 'should, from a timing standpoint, serve to mitigate the competitive harm caused by our inadvertent release', it is unclear why the delay in performance under the regional contract would necessitate additional mitigation (to protect your competitive position through FY04 due to release of your FY00 rates)." *Id.*

On July 3, 2002, the government awarded the solicitation to Sodexho Marriott without a directed subcontract for the plaintiff. Performance began on October 1, 2002. The plaintiff continued to provide services at the Yuma facilities as the incumbent local contractor through September 30, 2002.

The plaintiff filed a claim with Sando for $251,763.06, representing lost costs and profit for two years of directed subcontract work, on August 16, 2002. The claim was denied on November 20, 2002. The plaintiff filed this suit for breach of contract on November 26, 2002, arguing that the settlement agreement obligated the government to direct a subcontract for the first two years of the ***468** West Coast Regional Contract. The government moved for summary judgment on July 9, 2004. The plaintiff cross-moved for summary judgment on September 23, 2004. The court heard oral argument on the parties' motions on March 16, 2005.

### DISCUSSION

**A. Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court conducts "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. "[A] party seeking summary judgment always bears the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must, in order to defeat summary judgment, identify evidence beyond the mere pleadings demonstrating a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548.

[1] [2] [3] Contract interpretation is a question of law for the court and thus may be decided on summary judgment. *NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004). Furthermore, the question of whether a contract term is ambiguous is a question of law. *Id.* However, the question of "[w]hether performance of a contract is factually impossible or commercially impracticable is a question of fact, not of law; however, the ultimate issue is one of law." *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1292 (Fed.Cir.2002).

**B. The Settlement Agreement Unambiguously Obligated the Government to Direct a Subcontract to the Plaintiff Only Through September 30, 2002 and Impliedly Obligated the Government to Award the Prime Contract Without Delay**

In this case, the parties disagree on whether the settlement agreement obligated the government to direct a subcontract through September 30, 2002, or whether the government was obligated to direct a subcontract for two years. The government argues that the settlement agreement is plain on its face and by its terms only obligated the government to direct a subcontract through September 30, 2002. The plaintiff contends that the settlement agreement is ambiguous and that the government's reading is unreasonable because it ignores the government's obligation to provide the plaintiff with an opportunity to develop a relationship with the prime contractor.

[4] [5] [6] "When a disagreement regarding the meaning of the words of the contract is presented to the court, ... [t]he court must first determine whether an ambiguity exists." *M.A. Mortenson Co. v. United States,* 29 Fed.Cl. 82, 96 (1993). A contract is ambiguous where it is "susceptible to more than one reasonable interpretation," all of which "fall within a 'zone of reasonableness.' " *Metric Constr., Inc. v. NASA,* 169 F.3d 747, 751 (Fed.Cir.1999) (quoting *WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 876 (1963)). However, "[t]o show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term." *Id.* Furthermore, "an interpretation which is merely possible is not necessarily reasonable." *Ceccanti, Inc. v. United States,* 6 Cl.Ct. 526, 528 (1984).

[7] [8] [9] [10] [11] In interpreting a contract, a court begins with its "plain language." *M.A. Mortenson Co. v. Brownlee,* 363 F.3d 1203, 1206 (Fed.Cir.2004). "Wherever possible, courts ***469** should look to the plain language of the contract to resolve any questions of contract interpretation." *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993). "Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance." *United States v. Winstar Corp.,* 518 U.S. 839, 911, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In determining the parties' intent, the court "must construe the contract 'to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.' " *M.A. Mortenson,* 363 F.3d at 1206 (quoting *Hercules, Inc. v. United States,* 292 F.3d 1378, 1381 (Fed.Cir.2002)). Such an interpretation "will be preferred to one which leaves a portion of [the contract] useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 395, 351 F.2d 972, 979 (1965). Thus, the court must endeavor to effectuate the parties' intention using the plain language of the agreement itself.

[12] Applying these principles, this court finds that the settlement agreement at issue obligated the government to provide the plaintiff with a directed subcontract only through September 30, 2002, but that the agreement also impliedly obligated the government to award the contract without delay.

[13] [14] Beginning with the plain language, the government's settlement offer proposed "including in the

West Coast solicitation a provision requiring the prime contractor to subcontract with Blackstone for required services at MCAS Yuma through September 30, 2002, with additional performance beyond that date at the discretion of the prime contractor." Def.App. at 28–29. The plaintiff's acceptance used similar language, acknowledging that the government would be "requiring the prime contractor to subcontract with our company for required services at the two dining facilities at MCAS–Yuma through September 30, 2002." Def.App. at 32. Thus, both parties used a date certain, September 30, 2002, to define the length of the directed subcontract. Neither party referenced the start date of the prime contract in the settlement agreement, neither party has alleged a trade usage or custom, and there is no other indication that "through September 30, 2002" was to be given anything other than its plain and ordinary meaning. In such circumstances, the unambiguous date certain used by the parties may not be altered by this court. [1]

 [15]  The plaintiff argues that giving the term "through September 30, 2002" its plain and ordinary meaning would render a portion of the contract meaningless, and therefore this court must give the term the meaning espoused by the plaintiff. Specifically, the plaintiff argues that if it is only entitled to subcontract work through September 30, 2002, then the language referring to the plaintiff's opportunity to work with the prime contractor to build a relationship would be rendered meaningless because performance on the prime contract did not begin until October 1, 2002. If, however, the settlement agreement obligated the government to provide the plaintiff with a directed subcontract for the first two years of the prime contract, then the plaintiff would have an opportunity to build a relationship with the prime contractor. As this is the only interpretation that gives reasonable meaning to all parts of the contract, the plaintiff argues, this court must adopt it.

 [16]  The plaintiff's argument is without merit. The plaintiff's interpretation does not, in fact, give reasonable meaning to all **\*470** parts of the settlement agreement. The government's offer contained a paragraph stating two reasons for limiting the time period of the directed subcontract. The first was to "serve to mitigate the competitive harm caused by our inadvertent release. By FY03, the FY00 rates exposed will be sufficiently dated so as to be of far less help to competitors than they would be today ...." Def.App. at 29. Indeed, the plaintiff's interpretation of the term "through September 30, 2002" to mean "for the first two years of the prime contract" is not consistent with this first explanation for the settlement

agreement. [2] Rather giving "through September 30, 2002" its plain and ordinary meaning is consistent with both of the reasons articulated in the settlement agreement: it limits the length of the subcontract to the period during which the plaintiff was competitively disadvantaged by the disclosure of its pricing information, and it presumably would have given the plaintiff time to develop a relationship with the prime contractor had no bid protests been filed. The court finds that both of the reasons given for the agreement were intended to be satisfied before September 30, 2002.

 [17]  The plaintiff also argues that the government's statement in its offer that "we would assume and hope that Blackstone's performance will be of such a quality that the prime contractor would desire to maintain the contractual relationship beyond FY02" created a separate and independent obligation for the government to provide the plaintiff with an opportunity to work with the prime contractor, apart from the government's obligation to provide a subcontract through September 30, 2002. The government argues in response that it did not assume an obligation to provide an opportunity to develop a relationship with the prime contractor separate from the obligation to provide a subcontract through September 30, 2002; the quoted statement was part of a section of the agreement that is equivalent to a "whereas clause" that does not create separate or additional rights.

 [18]  The court agrees with the government. A "formal statement ... in order to explain the reasons upon which the transaction is founded" in a contract is a "recital," one type of which is called a "whereas clause." Black's Law Dictionary 879, 1101 (West abridged 6th ed.1991). A "whereas clause ... is not an essential part of the operating portions of the contract." *Id.* at 1101. While "recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties", *KMS Fusion, Inc. v. United States,* 36 Fed.Cl. 68, 77 (1996), "it is standard contract law that ... [they] cannot create any right beyond those arising from the operative terms of the document." *Grynberg v. Federal Energy Regulatory Comm'n,* 71 F.3d 413, 416 (D.C.Cir.1995).

In the contract at issue here, the statement referring to the "hope" that the plaintiff would be able maintain the subcontract beyond FY02 resided in a paragraph that began: "The reasons for establishing this timeframe [through September 30, 2002] are twofold." Although the provision did not use the word "whereas," the introduction to the paragraph

plainly indicated that the purpose of the paragraph was to "explain the reasons upon which the transaction [was] based." As such, the recitals that followed could not and did not create separate additional obligations.

[19] The plaintiff is correct, however, that the government was obligated to do something more than simply amend the solicitation ***471** to reflect a directed subcontract through September 30, 2002. The plaintiff's performance of the subcontract was necessarily dependent on award and performance of the prime contract prior to September 30, 2002. If amending the solicitation was the government's only obligation, then the government could have amended the solicitation and then withdrawn it, or otherwise deliberately failed to award the prime contract, without fear of breach of contract liability. Such an agreement would confer upon the government a valuable benefit (settlement of the plaintiff's bid protest claim) without imposing any meaningful burden.

[20] Indeed, it is well established that there is an "implied provision of every contract, whether it be one between individuals or between an individual and the government, that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance." *George A. Fuller Co. v. United States,* 69 F.Supp. 409, 411, 108 Ct.Cl. 70, 94 (1947); *see also C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1542 (Fed.Cir.1993) ("The government must avoid actions that unreasonably cause delay or hindrance to contract performance."); *Malone v. United States,* 849 F.2d 1441, 1445 (Fed.Cir.1988) (holding that subterfuges, evasions, lack of diligence, and failure to cooperate in the other party's performance violate the implied obligation of good faith and fair dealing); *Lewis–Nicholson Inc. v. United States,* 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977) (holding that government delay breached the implied obligation of good faith and fair dealing). Furthermore, "[the promisee] must not only not hinder his promisor's performance, he must do whatever is necessary to enable him to perform.... The implied obligation is as binding as if it were spelled out." *Kehm Corp. v. United States,* 119 Ct.Cl. 454, 93 F.Supp. 620, 623 (1950). Reading the contract at issue in conjunction with the long-recognized implied obligation of good faith and fair dealing, the court can come to no other conclusion than that the government was impliedly obligated to do what was necessary to enable the plaintiff to perform by awarding and performing the prime contract without delay.

Considering the plain language of all parts of the agreement, in conjunction with the implied obligation of good faith and fair dealing, this court concludes that the settlement agreement is plain on its face and reasonably susceptible to only one interpretation: that the government was obligated to amend the West Coast solicitation to require the prime contractor to subcontract with the plaintiff through September 30, 2002, and that the government was impliedly obligated to award the prime contract without delay. The settlement agreement did not provide the plaintiff with a right to a two year subcontract.

## C. The Government's Failure to Meet All of Its Obligations Under the Agreement is Excused by the Doctrine of Impossibility

Given the court's interpretation of the settlement agreement as explained above, the court now turns to the government's contention that it fully performed its express obligations under the settlement agreement and is excused from performance of its implied obligations by the doctrine of impossibility.

[21] The government argues that it fulfilled the express obligation in the settlement agreement when it amended the solicitation and directed a subcontract through September 30, 2002. The government's compliance with this obligation is not in dispute. With regard to the government's implied obligation to award the prime contract without delay, the government argues that even if its failure to award the contract in time to allow the plaintiff to perform the subcontract work constituted non-performance, that non-performance is excused by the doctrine of impossibility. The court agrees that the government is excused from its implied contractual obligations under the doctrine of impossibility.

[22] [23] In order for the non-performance of a contractual obligation to be excused by the doctrine of impossibility, the non-performing party must show: (1) a supervening event made performance impossible; (2) the non-occurrence of the event was a basic assumption on which the contract was based; **472** (3) the occurrence of the event was not the non-performing party's fault; and (4) the non-performing party did not assume the risk of occurrence. *Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1294 (Fed.Cir.2002); *see also United States v. Winstar Corp.,* 518 U.S. 839, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). In order to show that the non-occurrence was a basic assumption and that the non-performing party did not assume the risk of occurrence, the non-performing party must show that the occurrence of the

event was not foreseeable at the time the parties entered into the contract. *Seaboard,* 308 F.3d at 1295. If the event was foreseeable, then it will be implied that the non-performing party assumed the risk. *Id.* In such circumstances the non-performing party would be potentially liable for breach of the agreement.

Here, however, the plaintiff has not disputed that the government's performance was actually and literally impossible due to the filing of bid protests that delayed award and performance of the prime contract until October 1, 2002. The plaintiff has not disputed the government's contention that this impossibility was not the government's fault because the government was legally prohibited from awarding contracts while bid protests are pending at the GAO. *See* 31 U.S.C. § 3553(c)(1). Finally, the plaintiff does not dispute that these bid protests were not foreseeable, and that thus the risk of them occurring was not assumed by the government.

More specifically, the undisputed record shows that numerous bid protests were filed between contract award and October 1, 2002, and that these were not resolved until April 2002. Def.App. at 43–45. It is undisputed that the U.S. Marine Corps was prohibited from awarding the contract while GAO protests were pending. The plaintiff does not contend that the bid protests were the government's fault. One month after the bid protests were resolved, the government requested clarification of the second final proposal revisions from the offerors. Def.App. at 45. The prime contract was then awarded to Sodexho Management Inc. on July 5, 2002 with a performance commencement date of October 1, 2002.

Def. Prop. Find. Uncontr. Fact ¶ 25; Pl. Prop. Find. Uncontr. Fact ¶ 25. The plaintiff does not argue that performance could have commenced prior to that date.

In addition, the plaintiff agrees that "[n]either the government nor Blackstone could have anticipated the protests or the delay they caused at the time the parties entered into the settlement agreement." Def. Prop. Find. Uncontr. Fact ¶ 16; Pl. Prop. Find. Uncontr. Fact ¶ 16. Thus, the plaintiff agrees that the bid protests were not foreseeable, and therefore that their absence was a basic assumption on which the contract was based. Accordingly, the government did not assume the risk of bid protests delaying the award of the prime contract. In such circumstances, the court must conclude on this undisputed record that the government has shown all elements of the defense of impossibility. Therefore, the government is not liable for breach of the settlement agreement, and the government's motion for summary judgment must be granted. [3]

## CONCLUSION

For the foregoing reasons, the government's July 9, 2004 motion for summary judgment is **GRANTED**. The plaintiff's September 23, 2004 cross-motion for summary judgment is **DENIED**. The Clerk shall enter judgment for the defendant. Each party to bear its own costs.

**IT IS SO ORDERED.**

Footnotes

1   Although the plaintiff argues that the settlement agreement is latently ambiguous as to the length of the subcontract, and that there is a factual dispute as to the true intent of the parties, a date certain simply cannot be ambiguous—it is clear on its face. If the parties truly intended to provide the plaintiff with subcontract work for the first two years of the prime contract, then they should have plainly stated that in the agreement. While the goal of contract interpretation remains ascertaining the parties' intent, "the court should not inquire into the actual mental processes of the parties in entering into the particular contract; rather the law presumes that the parties understood the import of their contract and that they had the intention which its terms manifest." 11 Williston on Contracts § 31:4 (4th ed.). Thus, where the language is clear, it is presumed that it conveys the parties' intent and the court may not inquire into the subjective intentions of the parties.

2   The plaintiff also argues that this statement is factually incorrect, and thus should not be given weight in determining the parties' intent. The time to dispute the fact, however, was at the time of contract formation. If the provision did not accurately express the plaintiff's intention, then the plaintiff should not have allowed it to be included in the settlement agreement. In this connection, the court agrees with the government that if the government drafted the agreement and if there was any ambiguity regarding the date, it was clear from the face of the agreement and therefore the plaintiff had a duty to inquire at the time of contracting. *See Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1475 (Fed.Cir.1997) (holding that where "contract ambiguities ... are judged so 'patent and glaring' that it is unreasonable for a contractor not to discover and inquire about them" a contractor has a duty to inquire); *Fortec Constructors*

|   |   |
|---|---|
|   | *v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985) ("The existence of a patent ambiguity in a contract raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation."). |
| 3 | Although this may appear to be a harsh result for the plaintiff, the court notes that while the numerous bid protests were pending the plaintiff continued to work as the incumbent contractor at MCAS–Yuma through September 30, 2002. Thus, the plaintiff did in fact receive two years of work from the government beyond the intended term of its local prime contract. Although the plaintiff did not receive the opportunity to develop a relationship with the prime contractor as expected, as the court held above there was no separate obligation for the government to provide such an opportunity. |

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.