# TAB 32



1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

▶

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

Bowater Newfoundland Ltd. v. Newfoundland & Labrador Hydro

Bowater Newfoundland Limited Appellant v. Newfoundland and Labrador Hydro Respondent

Supreme Court of Newfoundland, Court of Appeal

Morgan, J.A., Gushue, J.A., Furlong, C.J.N.

Judgment: February 20, 1978
Docket: Doc. 299

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Leonard Martin, Q.C.* for the Appellant.

*P.J. Lewis, Q.C.* for the Respondent.

Subject: Contracts

Contracts --- Construction and interpretation — Resolving ambiguities

In interpreting a contract, the deed must be read as a whole in order to ascertain the true meaning of its several clauses. If a clause in a contract is followed by a later clause which destroys the obligation created by the earlier clause, the earlier clause prevails. But if the later clause does not destroy but only qualifies the earlier, the two must be read together. The rule that words must be construed in their ordinary popular sense has been departed from when that meaning would create some inconsistency with the rest of the contract or make a provision totally repugnant to the intention of the parties.

**Judgment of *Morgan, J.A.*:**

1      This is an appeal from the decision of Noel J. dated November 5th 1976 on a case stated by a Board of arbitrators pursuant to the Judicature Act R.S.N. 1970 Ch 187, Part VI, as amended by the Judicature (Amendment) Act 1974 Ch 57.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

2    By an agreement as of January 1st 1969 made between the parties hereto, wherein the respondent is described as the Commission and the appellant the Customer, the respondent agreed to supply and the appellant agreed to purchase 18,000 kilowatts of electrical power monthly for use in its paper mill facilities, subject to the terms and conditions set forth in the said agreement. A dispute having arisen as to the amount properly payable by the appellant in respect of the power and energy used by it during the month of December 1975, the matter was subsequently referred to the Trial Division of this Court for the opinion of the Court on the following question:

> Whether or not upon a proper construction of the said agreement the Customer is entitled to a reduction in the amount of the account submitted to it by the Commission for the month of December 1975.

3    The relevant facts, not in dispute, are as follows: On November 30, 1975 the appellant's mill operations were suspended in part by reason of a strike of its employees. As a result of the partial suspension of its operations the appellant did not require the full amount of 18000 kilowatts of electrical power during the month of December 1975 and requested the respondent to amend its billing account for that month to reflect the cost of the amount of electrical power actually used. This the respondent refused to do and the appellant paid the amount billed pending settlement of the dispute.

4    The appellant's claim to a reduction of the agreed monthly payment of $57,600.00 is based on the covenants contained in Clause 1 of the agreement, and Section J of Schedule "A".

5    Clause 1 of the agreement provides:

**1. AMOUNT OF POWER**

Subject to the other provisions hereof, the Commission agrees to deliver and the Customer agrees to purchase from the Commission eighteen thousand (18,000) kilowatts of electrical power.

Upon the expiration or determination of a contract for electrical power or energy to be supplied or provided directly or indirectly by a subsidiary or associated company of the Customer to any person, firm or corporation (hereinafter referred to as a "Purchaser") or the failure, neglect or refusal of a Purchaser either to renew or extend such a contract, or to enter into a new contract therefor, and the Commission shall as a result thereof thereafter supply or provide electrical power or energy directly or indirectly to such a Purchaser, then and as often as the same shall happen the Customer shall forthwith on notice given by the Customer to the Commission thereafter be relieved of the obligation to take and the liability to pay for an amount of electrical power or energy hereunder equal to the amount of any excess generating capacity of such subsidiary or associated company created as a result of the Commission supplying electrical power or energy to such a Purchaser.

6    Section J of Schedule "A" incorporated as part of the agreement by Clause 9, provides:

**J. TEMPORARY SUSPENSION OF AGREEMENT**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

> If, at any time during the term of this agreement, the operation of the works of either party is suspended in whole or in part by reason of war, rebellion, civil disturbance, strikes, serious epidemic, fire or other fortuitous event, then such party will not be liable to the other party to purchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed. In every such event, the party whose operations are so suspended shall use all reasonable diligence to remove the cause of the suspension.

7       When construed in isolation from the other provisions of the agreement, Section J of Schedule "A" would appear to relieve the appellant of its covenant to pay for 18000 kilowatts of power while its operations are suspended in whole or in part by reason of strikes. In that event it would only be required to pay for the power used during the strike period.

8       It is unquestionable that the object of interpretations of all written instruments is to ascertain the intention of the parties thereto as expressed in the instrument itself. To ascertain the true intention of the parties, however, one must look at each provision in the context in which it is found and, in construing it, regard must be had to the language used in that and other parts of the document to avoid inconsistency. As stated by Lord Watson in *Chamber Collier Co. v. Troyerould* (1915) 1 Ch. 268 at p. 272:

> The deed must be read as a whole in order to ascertain the true meaning of its several clauses, and the words of each clause should be so interpreted as to bring them into harmony with the other provisions of the deed if that interpretation does no violence to the meaning of which they are naturally susceptible.

9       In Clause 1 the appellant covenants to purchase (18000) kilowatts of power. Under Section J the appellant is relieved of its liability to purchase that amount of power in whole or in part in the event its operations are suspended by reason of a strike. In view of the language used in other parts of the agreement the meaning to be given the word 'purchase' is of importance in construing these two provisions.

10      The ordinary or commercial meaning of "Purchase" is "to obtain or acquire by payment of money or its equivalent". This implies a twofold obligation, the one - to take, the other - to pay for. This distinction is noted in the second paragraph of Clause 1 wherein it is provided that on the happening of certain specified events, the customer (appellant) shall be "*relieved of the obligation to take and the liability to pay for*", certain amounts of power. Thus it is clear that by agreeing to *purchase* (18000) kilowatts of power as stated in the first paragraph of Clause 1 the appellant undertook to take and pay for that amount of power, subject however to any reductions within the provisions of paragraph 2 of the same clause and other later sections.

11      To expound the true purport of Section J regard must be had to the language used in the agreement as a whole and more specifically in Clause 4 of the agreement and Section K of Schedule "A" as well as that used in Clause 1 (supra).

12      Clause 4 and Section K read as follows:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

**4. MINIMUM MONTHLY PAYMENT**

Subject to any reductions by virtue of Article 1 hereof, and calculated pursuant to Articles 2 and 3 hereof, the minimum monthly payment shall be fifty seven thousand six hundred dollars ($57,600.00) during each and every month of the term of this agreement. This payment is to be made for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not, provided that the provisions of Article K of Schedule A shall only apply when the Commission is unable to deliver power and energy under the terms of this agreement.

**K. REBATES**

If the supply of power and energy hereunder is interrupted or curtailed in accordance with Articles H, I, or J hereof, and such interruption or curtailment lasts for a period of one (1) hour or longer, the Commission shall, on the request of the Customer, allow a proportionate reduction in the payment for the right to use and for the use of the Commission's power service. The reduction in payment shall be determined in the following manner:

> 1. For total interruption the amount used as basis shall be the amount of the billing demand for the month on which the Customer would otherwise be required to pay.
>
> 2. For partial interruptions the amount used as basis shall be the amount of the said billing demand less the average amount in kilowatts of power taken by the Customer during the interruption.
>
> 3. In every case the kilowatts to be used for adjustment shall be the amounts used as basis averaged over the whole month in the ratio of the length of time of the interruption to the total time in the month.

13     Other than the language used in Clause 1 the agreement is silent with respect to the appellant's obligation to take the agreed amount of power. In subsequent clauses provision is made for payment, not for the taking of the power, but for "the right to use and the use of the Commission's power service". For this service the appellant is called upon to make a minimum monthly payment of $57,600.00 or such lesser amounts as may be calculated in accordance with the provisions of Clause 1. It is specifically provided by Clause 4 that this minimum amount is to be paid "*for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not*".

14     The answer to the question under consideration, then, turns on the meaning to be given the word "purchase" as used in Section J.

15     That Section provides inter alia, that if the appellant's operations are suspended by reason of strikes it shall not be liable to purchase power and if the respondent's operations are likewise suspended it shall be under no liability to supply power. In the latter event provision is made by Section K for a "proportionate reduction in the payment for the right to use and for the use of the Commission's power and service". The basis on which such a reduction is to be calculated is also provided. However Section K contains no provision for a reduction in payment if the appellant's operations are suspended and the provisions of that section are specifically excluded therefrom. It is significant that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

Section K contemplates a rebate or "reduction in payment" only in the event of an interruption in the supply of power by the respondent even though Section J is referred to therein along with Section H and I.

16     If Section J were construed as meaning that, in the event of a strike, causing a suspension of operations, the appellant would not be liable to take or to pay for power, then, such a construction would make Section J inconsistent with Clause 4. That clause unequivocally states that payment is to be made whether the services are used or not. Thus the provision of Section J, coming after Clause 4, would have to be rejected. This principle was enunciated by Lord Wrenbury in *Forbes v. Git* (1922) 1 AC 256 at p. 259:

> If in a deed an earlier clause is followed by a later clause which destroys altogether the obligation created by the earlier clause, the later clause is to be rejected as repugnant and the earlier clause prevails. ...But if the later clause does not destroy but only qualifies the earlier, then the two are to be read together and effect is to be given to the intention of the parties as disclosed by the deed as a whole.

17     The rule that words must be construed in their ordinary popular sense has been departed from when that meaning would create some inconsistency with the rest of the instrument or make a provision totally repugnant to the real intention of the parties as gathered from the instrument as a whole. This rule of construction was enunciated by Lord Wensleydale in *Grey v. Pearson* (1857) 6 HL Cas 61; (1843-60) All Eng Rep 21 at p. 36:

> I have been long and deeply impressed with the wisdom of the rule, not I believe universally adopted - at least, in the courts of law in Westminster Hall, that in construing wills, and indeed statutes, and all written instruments, the grammatical and ordinary sense of the words is to be adhered to, unless that would lead to some absurdity or some repugnance or inconsistency with the rest of the instrument, in which case the grammatical and ordinary sense of the words may be modified so as to avoid that absurdity or inconsistency, but no further.

18     It is apparent then that the rule as to repugnancy is to be applied only as a last resort when there is no reasonable way to construe the offending provision so as to bring it into harmony with the true intention of the parties as gathered from the document as a whole.

19     In this case the clear intention of the parties as gathered from the agreement as a whole was to provide for a minimum monthly payment by the appellant to the respondent whether or not any power was used. If the word "purchase" found in section J were to be given its ordinary commercial meaning of "to take and pay for", that section would have to be construed so as to relieve the appellant of its obligation to take and its liability to pay for power in the event its operations were suspended by reason of a strike. Such a construction would make section J wholly inconsistent with and repugnant to the clear unequivocal language found in clause 4.

20     By adopting the rule enunciated by Lord Wensleydale in *Grey v. Pearson*, supra, that repugnancy can be avoided by modifying the meaning to be attributed to the word "purchase" in that context. Clearly the concept of "liability to pay for" was not meant by the parties and a more restricted meaning should be given that word. To bring section J into harmony with the other provisions of that deed and thus give effect of the intentions of the parties as gathered from the agreement as a whole the word purchase has to be interpreted as referring to the acquisition or taking only. This interpretation does not do violence to the meaning of which that word is naturally susceptible.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

21      For the above reasons I respectfully agree with the learned trial Judge that the appellant is not entitled to the reduction sought.

22      I would accordingly dismiss the appeal with costs.

**Judgment of** *Gushue, J.A.***:**

23      I have perused the judgment of my brother Morgan and agree, for the reasons stated by him, that the appeal must be dismissed. While at first glance Section J appears to be an overriding provision of the contract available to both parties, study of the agreement as a whole makes it apparent that to construe it as such would obviously do far more violence to the otherwise expressed intent of the parties than to place the more restrictive interpretation on it.

24      It is clear that the intent of the agreement was to ensure that the appellant would receive each month 18,000 kilowatts of electrical power without any reduction so as to further ensure that the operation of its paper mill would not be adversely affected. A clearly beneficial rate for this power was agreed upon and, as set out in Clause 4, payment for this *right to receive* the power was to be made whether the power was used or not. Clause 2 also refers to "the right to use and for the use of the Commission's power service", and that payment by the appellant "entitled" it to take energy up to 18,000 kilowatts. Further the reference in Clause 4 to the provisions of Article K, i.e., "Rebates", only applying when the respondent was unable to deliver power, even though Article J is mentioned along with Articles H & I in Article K, is in my view most significant.

25      Thus, to place the normal meaning of "taking and paying for" on the word "purchase" in Clause J would obviously make this clause directly contradictory to the various other sections of the agreement already referred to and to the intent of the parties as it otherwise appears throughout the contract. I agree that this should not be the case.

26      The appeal is dismissed, with costs.

**Judgment of** *Furlong, C.J.N.***:**

27      On January 1, 1969 the Newfoundland and Labrador Power Commission entered into an agreement with Bowater Newfoundland Limited for the supply of electrical power and energy for its paper mill. The Commission agreed to deliver and Bowaters agreed to purchase 18,000 kilowatts of electrical power.

28      The contract calls for the payment of $3.20 per kilowatt per month for 18,000 kilowatts or a total monthly payment of $57,600.00. On November 30, 1975 Bowaters' operations were interrupted because of a strike and they consequently reduced the amount of power taken from the Commission by one half, that is to 9,000 kilowatts per month. The appellant formally notified the respondents on the 17th of December, 1975 of the interruption in its operations, claiming a reduction in its monthly account by virtue of clause J of Schedule A of the agreement to which I will refer in greater detail. The respondent refused to agree to the reduction in payment and on January 16, 1976 the appellant paid the monthly amount of $57,600.00 but disclaiming its obligation to do so and requesting a return of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

$28,800.00.

29     A dispute having arisen between the parties, it was submitted to arbitration under the terms of the agreement. Before the arbitration proceedings commenced the parties obtained from Mr. Justice Noel an order referring the matter by way of a case stated for the opinion of the Court. The question upon which the opinion of the Court was sought was "whether or not upon a proper consideration of the said agreement the customer is entitled to a reduction in the account of the amount submitted to it by the Commission for the month of December 1975". Mr. Justice Noel found that Bowaters was not entitled to a reduction and directed that judgment be entered for the plaintiff accordingly.

30     It is from this judgment that Bowaters Nfld. Ltd. now appeal claiming in essence that the learned trial Judge erred in law in construing the agreement between the parties to mean that clause "J" of Schedule A, or any other conditions did not relieve the appellant of its obligation to take and pay for a minimum amount of electrical energy at a specified rate.

31     The only clauses of the agreement pertinent to this appeal are as follows:

**1. AMOUNT OF POWER**

Subject to the other provisions hereof, the Commission agrees to deliver and the Customer agreed to purchase from the Commission eighteen thousand (18,000) kilowatts of electrical power.

Upon the expiration or determination of a contract for electrical power or energy to be supplied or provided directly or indirectly by a subsidiary or associated company of the Customer to any person, firm or corporation (hereinafter referred to as a "Purchaser") or the failure, neglect or refusal of a Purchaser either to renew or extend such a contract, or to enter into a new contract therefor, and the Commission shall as a result thereof thereafter supply or provide electrical power or energy directly or indirectly to such a Purchaser, then and as often as the same shall happen the Customer shall forthwith on notice given by the Customer to the Commission thereafter be relieved of the obligation to take and the liability to pay for an amount of electrical power or energy hereunder equal to the amount of any excess generating capacity of such subsidiary or associated company created as a result of the Commission supplying electrical power or energy to such a Purchaser.

**2. PRICE OF POWER AND ENERGY**

The price to be paid each month for the right to use and for the use of the Commission's power service as covered by this Agreement shall be three dollars and twenty cents ($3.20) per kilowatt per month. The above payment shall entitle the Customer to take energy up to one hundred per cent (100%) monthly load factor without additional charge therefor.

**4. MINIMUM MONTHLY PAYMENT**

Subject to any reductions by virtue of Article 1 hereof, and calculated pursuant to Articles 2 and 3 hereof, the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

minimum monthly payment shall be fifty seven thousand six hundred dollars ($57,600.00) during each and every month of the term of this agreement. This payment is to be made for the right to use the Commission's power service and the Customer agrees to make this payment whether it uses the service or not, provided that the provisions of Article K of Schedule A shall only apply when the Commission is unable to deliver power and energy under the terms of this agreement.

**9. SCHEDULE "A"**

Schedule "A" attached hereto applies to all power and energy hereunder and forms part of this agreement.

**J. TEMPORARY SUSPENSION OF AGREEMENT**

If, at any time during the term of this agreement, the operation of the works of either party is suspended in whole or in part by reason of war, rebellion, civil disturbance, strikes, serious epidemic, fire or other fortuitous event, then such party will not be liable to the other party to purchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed. In every such event, the party whose operations are so suspended shall use all reasonable diligence to remove the cause of the suspension.

**K. REBATES**

If the supply of power and energy hereunder is interrupted or curtailed in accordance with Articles H, I or J hereof, and such interruption or curtailment lasts for a period of one (1) hour or longer, the Commission shall, on the request of the Customer, allow a proportionate reduction in the payment for the right to use and for the use of the Commission's power service. The reduction in payment shall be determined in the following manner:

   1. For total interruption the amount used as basis shall be the amount of the billing demand for the month on which the Customer would otherwise be required to pay.

   2. For partial interruptions the amount used as basis shall be the amount of the said billing demand less the average amount in kilowatts of power taken by the Customer during the interruption.

   3. In every case the kilowatts to be used for adjustment shall be the amounts used as basis averaged over the whole month in the ratio of the length of time of the interruption to the total time in the month.

**L. PAYMENT OF ACCOUNTS**

The Commission will render its accounts monthly and the Customer shall make payment in lawful money of Canada at the Commission's office in St. John's, Newfoundland, or in such other place as the Commission may designate, within twenty (20) days of the date of rendering such accounts, without deduction for any claim or counterclaim which the Customer may have or claim to have against the Commission arising under this agreement or otherwise. All payments in arrears after the said twenty days (20) shall bear interest at the rate of six (6%)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

per cent per annum.

If the Customer is in default for over thirty (30) days in paying any amount due the Commission hereunder, then, without prejudice to its other recourses and without liability therefor, the Commission shall be entitled after ten (10) days written notice to the Customer of its intention to do so, to suspend the supply of power and energy to the Customer until the said amount is paid. If the supply is so suspended, the Customer shall not be relieved of its obligation hereunder, including the payment of the minimum monthly payment as stipulated in Article 4 of the agreement.

32     Martin, Q.C., counsel for the appellant, submitted that in determining the merits of the appeal there are two principal questions to be decided by us: - whether or not the full amount of the December 1975 account was properly due under the terms of the contract; and if this amount was not properly due should the appellant be shut off from the reduction in the amount under Article 4 because of the restriction of the provisions of clause K are only applicable when the respondent is unable to supply the power. Should it be found that the full amount was properly due then of course the second question, that is the entitlement to rebate will not arise.

33     The appellant's case rests heavily on Clause J which provides that either party whose operations have been suspended by reason of, inter alia, strikes, "from liability to the other party to pruchase or, as the case may be, to supply power and energy hereunder until the cause of such suspension has been removed". The appellant's argument is that the governing Article in the contract is Article 1 and specifically the introductory phrase "subject to the other provisions hereof". Counsel claims that this was substantially disregarded by the learned trial Judge who simply took Article 1 as being an agreement to supply power on the one hand and to purchase the power on the other hand. It is argued that the separation of these mutual obligations tends to over simplify the position and to obscure the application of the other provisions of the contract. Specifically the other provisions which Mr. Martin refers to are of course clause J in the schedule and Article 4 in the contract itself.

34     In other words the sum and substance of the appellant's argument it seems to me is that because Bowaters are said to have agreed to 'purchase' power from the Commission that in event of the suspension, such as the one that occurred in November 1975 they are entitled to all the benefits in clause K by way of rebates for the power which they were unable to use because of the suspension of their works.

35     In his judgment Noel, J. very properly in my view, pointed out the declaration in Article 4 that "This payment is to be made for the right to use the Commission's power service and the customer agrees to make this payment whether it uses the service or not..."

36     In reply to all this P.J. Lewis, Q.C. argued succinctly that the document must speak for itself and that if read together there is no conflict whatsoever between the articles in the contract and the clauses in the schedule. He further said that Article 1 does not lend itself to any modification as any modification would do violence to the contractual obligations of the parties. He claims that Article 4 calls for a minimum monthly payment irrespective of any other circumstance. Mr. Lewis asks us to accept his description of the agreement as a "take and pay" contract arguing that this type of contract was a reasonable one and not unusual in the Hydro Electric world providing a stability of income favourably looked upon by finance houses who are invited to provide large sums of money for the construction of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

these expensive undertakings.

37      At the outset of his argument Mr. Martin disagreed with this concept of a "take and pay" contract and suggested that the Court should reject Mr. Lewis's arguments as being totally irrelevant and in fact not supported by any evidence.

38      I find this point unimportant in arriving at the true intention of the parties to the contract. If that intention was to provide for minimum payment and this is viewed with favor by the financiers or if the intention of the party was less favourable on monies and consequently less attractive to the financial world it makes no difference in the proper interpretation of what the parties have attempted to express in specific language. That they failed in their attempt to be specific, at all events to be sufficiently specific to enable each party to clearly understand what its obligation is, is clear. It is this inability to reconcile their opposing views that brings the matter into this arena at all.

39      It goes without saying that this contract must be read as a whole and any effort to sever one part from the other must be rejected. The Schedule is as much a part of the agreement between the parties as is the main contract. For example Paragraph 1 can only be read, because of its introduction if for no other reason, to show that the specific obligations of the Commission to provide electrical power and the coordinate obligation of Bowaters to take this power is the core of the agreement. I have purposely at this stage used the phrase 'to take the power' rather than to use the word 'purchase' which has been the cause of much of this dispute and which I will deal with. Martin, Q.C. has said that the case depends on Clause J but whilst one can agree with this one cannot pluck a single clause out of the agreement as though it had an existence all of its own in no way dependent upon the other provisions of the contract.

40      If one reads the contract as a whole one can gradually fit the several clauses together rather as one completes a jigsaw puzzle. No one clause, or piece of the puzzle, can stand on its own but all must fit together so as to form a complete contract or a complete picture as the case may be.

41      In endeavouring to complete this jigsaw puzzle I have examined each and every article of the contract and clause of the schedule carefully to see whether or not they are necessary to express what I believe to have been the intention of the parties. For my part I have reached the conclusion that the simple intention of the parties is this; that the Hydro Commission would provide Bowaters with electrical power and energy and that Bowaters would pay for this and that that payment was for the actual electrical power (as though it were a commodity) and for the use of the production and transmission facilities of the Commission. I have come to the opinion that Bowaters agreed to make a minimum monthly payment and that this payment was only to be reduced if the Commission took over from Bowaters or its subsidiary companies power which Bowaters was selling them and this sale to be reflected in the amount which they would have to pay the Commission.

42      It seems to me that this whole action has been bedeviled by the unfortunate use of the word "purchase" for which many meanings can be found and we are asked to endorse several different meanings. With some daring I venture to express a view as to what the word means in this present context. The learned trial Judge took the view that purchase as used by the parties meant "to accept", "to acquire" or "to receive" the electrical power. He expressed the view that it was used in contrast to the other word "supply" which of course was the obligation of the Commission. I think that Mr. Justice Noel was right in his conclusion that the agreement provided for supply and acceptance of power

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1978 CarswellNfld 26, 15 Nfld. & P.E.I.R. 301

by the respective parties though I am not wholly in agreement with his definition of the word "purchase".

43     I am satisfied that the ordinary meaning of the word "purchase" implies an act of sale on the part of a vendor and acceptance on the part of a vendee and that simple buying and selling must of necessity include the giving of consideration from one to the other. What I am saying is that there must be some element of payment either in money or other consideration passing between the parties. If there was no such consideration the transaction is transformed into a gift when wholly different considerations come into play.

44     I am unable to agree with the argument advanced by Mr. Martin that a fair reading of Clause J would show a clear intention that, in the event of a strike and close down of the operations of Bowaters, Bowaters would be under no obligation to make the minimum monthly payment under the agreement. I think all of this means that Bowaters though obliged to pay their minimum monthly payment for the use of the facilities of the Commission, are under no obligation to receive into their distribution system any electrical energy or power which they are unable to use.

45     I think the agreement between the parties can simply be reduced to an agreement that as long as the Commission is not prevented by outside events from supplying power the customer has to pay a minimum monthly amount of $57,600.00. If the customer does suffer a work suspension it makes no difference to its liability to pay the minimum amount and as Bowaters are excluded from the benefits of Clause K in these circumstances then a suspension of its operations does not relieve it of its liability and it is not entitled to any reduction, or to the rebate it now claims.

46     I am satisfied that the learned trial Judge arrived at the right conclusion even though he and I might have proceeded on the journey to it by different routes. This appeal must be dismissed with costs.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works