# TAB 34

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 2 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

2000 CarswellOnt 4680
Ontario Superior Court of Justice

C.I. Covington Fund Inc. v. White

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504, 10 B.L.R. (3d) 173, 10 C.P.R. (4th) 49, 22 C.B.R. (4th) 183

# C.I. Covington Fund Inc., Applicant and Jeffrey A. White, Delta M3 Technologies Corporation, M3 Environmental Services Inc., Watertek Corporation, Fred Rossignol and LF Rossignol Development Corporation, Respondents

Swinton J.

Heard: November 17, 2000
Judgment: December 1, 2000
Docket: 00-CL-3830

Counsel: *David Chernos* and *M. Paul Michell*, for Applicant.
*John S. Curtis*, for Respondents White, M3 Environmental Services, Watertek.
*J. Arthur Cogan, Q.C.*, for Respondents Rossignol, LF Rossignol Development.

Subject: Intellectual Property; Insolvency; Corporate and Commercial; Property

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Bankruptcy --- Property of bankrupt — Patents**

Corporation developed waste water treatment technology — President of corporation was engineer who spent 75 per cent of his time on research and development — Patents for technology were filed in Canada and United States in name of president personally — President signed agreement granting corporation exclusive licence to use technology — Applicant lent money to, purchased shares in, and entered into shareholders agreement with corporation — Loan agreement confirmed sale and assignment of ownership of patents to corporation — Corporation defaulted on loan and filed for bankruptcy — President began to operate through new company — President assigned technology, patents and patent applications to new company — Applicant applied for oppression remedy pursuant to s. 248 of Business Corporations Act — Application granted — Corporation was declared beneficial owner of technology and related patents and patent applications — New company was ordered to cease using technology and to assign patents and patent applications to corporation — Applicant reasonably relied on representations that corporation owned technology when applicant advanced loan — Corporation could assert beneficial ownership of patents because president's predominant role in corporation was to develop technology — Business Corporations Act, R.S.O. 1990, c. B.16, s. 248.

**Corporations --- Borrowing — Rights and obligations of security holders — Remedies on default — Miscellaneous issues**

Corporation developed waste water treatment technology — President of corporation was engineer who spent 75 per cent of his time on research and development — Patents for technology were filed in Canada and United States in name of president personally — President signed agreement granting corporation exclusive licence to use technology — Applicant lent money to, purchased shares in, and entered into shareholder agreement with corporation — Loan agreement confirmed sale and assignment of ownership of patents to corporation — Corporation defaulted on loan and filed for bankruptcy —

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 3 of 12

**C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680**

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

President began to operate through new company — President assigned technology, patents and patent applications to new company — Applicant applied for oppression remedy pursuant to s. 248 of Business Corporations Act — Application granted — Corporation was declared beneficial owner of technology and related patents and patent applications — New company was ordered to cease using technology and to assign patents and patent applications to corporation — Applicant had standing as creditor because it sought to protect reasonable expectations about operation of corporation — Applicant reasonably relied on representations that corporation owned technology when applicant advanced loan — Corporation could assert beneficial ownership of patents because president's predominant role in corporation was to develop technology — Business Corporations Act, R.S.O. 1990, c. B.16, s. 248.

**Corporations --- Directors and officers — Fiduciary duties — Taking of corporate opportunity**

Corporation developed waste water treatment technology — President of corporation was engineer who spent 75 per cent of his time on research and development — Patents for technology were filed in Canada and United States in name of president personally — President signed agreement granting corporation exclusive licence to use technology — Applicant lent money to, purchased shares in, and entered into shareholder agreement with corporation — Loan agreement confirmed sale and assignment of ownership of patents to corporation — Corporation defaulted on loan and filed for bankruptcy — President began to operate through new company — President assigned technology, patents and patent applications to new company and completed one of corporation's contracts — Applicant applied for order that president was in breach of his fiduciary duty to corporation by carrying on new company using technology — Application granted — President and new company were ordered to account for profits made through use of technology — President had obligation not to pursue corporate opportunities available to corporation.

**Corporations --- Shareholders — Shareholders' remedies — Relief from oppression — Orders for relief — General**

Corporation developed waste water treatment technology — President of corporation was engineer who spent 75 per cent of his time on research and development — Patents for technology were filed in Canada and United States in name of president personally — President signed agreement granting corporation exclusive licence to use technology — Applicant lent money to, purchased shares in, and entered into shareholder agreement with corporation — Loan agreement confirmed sale and assignment of ownership of patents to corporation — Corporation defaulted on loan and filed for bankruptcy — President began to operate through new company — President assigned technology, patents and patent applications to new company — Applicant applied for oppression remedy pursuant to s. 248 of Business Corporations Act — Application granted — Corporation was declared beneficial owner of technology and related patents and patent applications — New company was ordered to cease using technology and to assign patents and patent applications to corporation — Applicant had standing to seek relief as shareholder — Applicant reasonably relied on representations that corporation owned technology when applicant advanced loan — Corporation could assert beneficial ownership of patents because president's predominant role in corporation was to develop technology — Business Corporations Act, R.S.O. 1990, c. B.16, s. 248.

**Intellectual property --- Patents — Transfer of interest — Licence — General**

Corporation developed waste water treatment technology — President of corporation was engineer who spent 75 per cent of his time on research and development — Patents for technology were filed in Canada and United States in name of president personally — President signed agreement granting corporation exclusive licence to use technology — Applicant lent money to, purchased shares in, and entered into shareholders agreement with corporation — Loan agreement confirmed sale and assignment of ownership of patents to corporation — Corporation defaulted on loan and filed for bankruptcy — President began to operate through new company — President assigned technology, patents and patent applications to new company — Applicant applied for oppression remedy pursuant to s. 248 of Business Corporations Act — Application granted — Corporation was declared beneficial owner of technology and related patents and patent applications — New company was ordered to cease using technology and to assign patents and patent applications to corporation — Applicant reasonably relied on representations that corporation owned technology when applicant advanced loan — Corporation could assert beneficial ownership of patents because president's predominant role in corporation was to develop technology — Business Corporations Act, R.S.O. 1990, c. B.16, s. 248.

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 4 of 12

*C.I. Covington Fund Inc. v. White*, 2000 CarswellOnt 4680
2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

**Table of Authorities**

    **Cases considered by** *Swinton J.***:**

        *Classic Organ Co. v. Artisan Organ Ltd.* (1997), 35 B.L.R. (2d) 285 (Ont. Gen. Div.) — considered

        *Loveridge Holdings Ltd. v. King-Pin Ltd.* (1991), 5 B.L.R. (2d) 195 (Ont. Gen. Div.) — considered

        *Neri v. Finch Hardware (1976) Ltd.* (1995), 20 B.L.R. (2d) 216 (Ont. Gen. Div. [Commercial List]) — considered

        *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 113 O.A.C. 253, *(*sub nom. *Maple Leaf Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 44 B.L.R. (2d) 115 (Ont. C.A.) — applied

        *SCI Systems, Inc. v. Gornitzki Thompson & Little Co.* (1997), 147 D.L.R. (4th) 300, 36 B.L.R. (2d) 192, 1 C.B.R. (4th) 164, 29 O.T.C. 148 (Ont. Gen. Div.) — considered

        *SCI Systems, Inc. v. Gornitzki Thompson & Little Co.* (1998), 110 O.A.C. 160 (Ont. Div. Ct.) — referred to

        *Seanix Technology Inc. v. Ircha*, 78 C.P.R. (3d) 443, 38 B.L.R. (2d) 279, [1998] 10 W.W.R. 688, 53 B.C.L.R. (3d) 257 (B.C. S.C.) — considered

        *Sidaplex-Plastic Suppliers Inc. v. Elta Group Inc.* (1995), 131 D.L.R. (4th) 399, 25 B.L.R. (2d) 179 (Ont. Gen. Div. [Commercial List]) — considered

        *Sidaplex-Plastic Suppliers Inc. v. Elta Group Inc.* (1998), 162 D.L.R. (4th) 367, 111 O.A.C. 106, 40 O.R. (3d) 563, 43 B.L.R. (2d) 155 (Ont. C.A.) — referred to

        *Soulos v. Korkontzilas*, 212 N.R. 1, 9 R.P.R. (3d) 1, 46 C.B.R. (3d) 1, 32 O.R. (3d) 716 (headnote only), 146 D.L.R. (4th) 214, 100 O.A.C. 241, 17 E.T.R. (2d) 89, [1997] 2 S.C.R. 217 (S.C.C.) — applied

        *Techform Products Ltd. v. Wolda* (2000), 5 C.P.R. (4th) 25, 1 C.C.E.L. (3d) 118, 5 B.L.R. (3d) 111 (Ont. S.C.J.) — considered

        *Themadel Foundation v. Third Canadian Investment Trust Ltd.* (1998), 107 O.A.C. 188, *(*sub nom. *Themadel Foundation v. Third Canadian General Investment Trust Ltd.)* 38 O.R. (3d) 749 (Ont. C.A.) — applied

        *Turbocristal Inc. c. Handfield*, [1991] R.J.Q. 2898, 41 C.P.R. (3d) 540 (Que. S.C.) — considered

    **Statutes considered:**

    *Business Corporations Act*, R.S.O. 1970, c. 53
        Generally — referred to

    *Business Corporations Act*, R.S.O. 1990, c. B.16
        s. 248 — pursuant to

        s. 248(2) — considered

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 5 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

    s. 248(3) — considered

*Patent Act*, R.S.C. 1985, c. P-4
    Generally — considered

    s. 27(1) — considered

    s. 49 — considered

APPLICATION for oppression remedy against president of bankrupt corporation and for order that president was in breach of fiduciary duty.

*Swinton J.*:

1    C.I. Covington Fund Inc. ("Covington"), as a creditor and shareholder of Delta M$_3$ Technologies Corporation ("Delta"), has brought an application for an oppression remedy against the respondents pursuant to s. 248 of the *Ontario Business Corporations Act*, R.S.O. 1990, c. B.16. The application arises following the bankruptcy of Delta and the claim by Jeffrey White, president and controlling shareholder of Delta, that certain intellectual property belongs to him personally, rather than to the corporation.

**The Facts**

2    In July, 1997, Covington lent $2 million to Delta and purchased $500,000.00 worth of Delta's common shares. The loan was secured by a general security agreement over Delta's assets. Covington is one of four secured creditors of Delta, the others being the Bank of Montreal, the Business Development Bank of Canada ("BDC"), and the Ontario Development Corporation (formerly Innovation Ontario Corporation - "IOC").

3    Delta is an Ontario corporation. Its predecessor, J.A. White & Associates, was formed in 1965 and incorporated under the *Ontario Business Corporations Act* in 1977. In June, 1997, it changed its name to Delta. Its business was the engineering and design of snowmaking and waste water treatment systems. Sometime in the early 1980s, Delta began to explore the possible use of a freeze crystallization process in the treatment of liquid waste. It subsequently developed the AFC-Snowfluent technology, a cold weather waste water treatment system, which works by pumping liquid waste through a snow making system to purify it and then spraying it onto fields, where it melts in the spring.

4    Jeffrey White is a professional engineer, who is Delta's president and chief executive officer. Between his direct and indirect shareholdings, he is Delta's controlling shareholder. He was responsible for the day to day management of Delta until its assignment into bankruptcy on July 7, 2000. As well, about 75% of his time was spent on research and development. White is also the sole director of the respondents M$_3$ Environmental and Watertek. The latter company currently employs the former employees of Delta, and it has taken on the completion of one of Delta's projects in Westport, Maine using the Snowfluent technology.

5    Delta spent over $10,000,000.00 in developing the Snowfluent technology. A Canadian patent application for the technology was filed on October 11, 1995, and a U.S. patent application on October 25, 1995. The U.S. patent was issued March 10, 1998. No Canadian patent has yet been issued. These patent applications, and those pending in other countries, have all been made in the name of White, personally, as the inventor and owner. According to the *Patent Act*, R.S.C. 1985, c. P-4, s.1, the applicant for a patent includes an inventor and the legal representative of the inventor, and a patent application is to be granted to the inventor or his legal representative (s. 27(1)), unless there has been an assignment or bequest of the right to another person (s. 49; *Techform Products Ltd. v. Wolda* (2000), 5 C.P.R. (4th) 25 (Ont. S.C.J.), at 31).

6    It is White's position that he owns the Snowfluent patent and technology. However, Delta has an exclusive licence to use the process of Atomizing Freeze Crystallization Technology/Snowfluent, because of an agreement signed by him personally and on

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 6 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680
2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

behalf of the company dated October 16, 1995. The licence agreement gives Delta an exclusive licence to use the subject matter, defined as "the continued developments patenting in the name of the Licensor/Inventor Jeffrey A. White, P. Eng., together with the sale and marketing of the technology, atomizing freeze crystallization, as systems, partial systems, services, installations et. al., for the treatment of aqueous wastewaters." No royalties were payable except in certain circumstances such as the sale of the company, and the licensing agreement was said to terminate on the bankruptcy or insolvency of the company.

7      Delta had successfully obtained financing from IOC in 1994 and BDC in 1995. In 1997, Delta sought further capital to market and develop the Snowfluent technology. Covington provided the loan of $2,000,000.00, and also paid $500,000.00 to Delta for 30,834 common shares and entered into a shareholders agreement with Delta and its other shareholders.

8      Prior to making the loan and investment, Covington conducted due diligence with regard to Delta's business. According to Timothy Leitch of Covington Capital Corporation, Delta was asked for and provided relevant documents, which he and others at Covington reviewed. Copies of a 1994 shareholders agreement with IOC, a 1995 collateral assignment to BDC, the 1997 audited financial statements, and Delta's 1997 Business Plan were all provided and reviewed. The licence agreement was never provided nor disclosed.

9      In the Investment Agreement between Delta and Covington, dated July 21, 1997, Delta made the following representation and warranty:

> 4.1.12 **Patents, Licences, etc.** Schedule C accurately shows for each patentable invention of the Corporation a brief description thereof and the status of any application for a patent in all countries where application has been made. The Corporation owns, free and clear of any lien, other than Permitted Encumbrances, all trade names, patents, licences and permits, including those shown on Schedule C, ("Rights") which are necessary for the conduct of its business as presently conducted or proposed to be conducted. Such Rights are in full force and effect....

"Permitted encumbrances" is a defined term, and has no bearing in this application. Schedule C contains the heading "J.A. White & Associates Ltd. Waste Water Treatment Method and Apparatus". Below that, there is a chart, listing countries, the date on which a patent application was filed, and its status. The U.S. and Canadian patent applications for Snowfluent are found in this chart.

10     Delta also warranted in Article 4.1.14 that the corporation has provided to Covington "all material information relating to the financial condition, business and prospects of the Corporation and all such information is true, accurate and complete in all material respects and omits no material fact necessary to make such information not misleading."

11     As part of the closing, White provided an officer's certificate to Covington in which he stated that the "representations and warranties of the Corporation contained in each of the Agreements are true and correct on the date hereof".

12     A review of the documents provided to Covington is instructive. The audited financial statements make reference to Delta's patents - for example, "The company has capitalized costs in regards to the development of *its* specialized sewage treatment technology" (emphasis added). Similarly, the 1997 Business Plan contains a number of references to the Snowfluent technology which leave the impression that Delta is its owner - for example, "Delta's proprietary wastewater process, AFC[TM] - Snowfluent[TM]". Near the end, on p. 87 of the plan, it is stated,

> In arriving at a value for the going business of Delta Engineering, an investor should consider the following: The Snowfluent[TM] technology is unique, proprietary and all indications are that the company will successfully achieve world patent rights for its major claims.

13     Covington also reviewed a 1994 Intellectual Property Assignment to Delta that is part of a shareholders agreement with IOC, given in order to obtain a loan and investment from IOC. According to Article 11.1,

> <u>Intellectual Property Assignment</u>. In consideration of the sum of one dollar ($1.00) and other valuable consideration, the receipt of all of which is hereby acknowledged, Jeffrey A. White (the "Assignor") hereby confirms that he has sold and

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 7 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

> assigned, and does hereby sell and assign to the Company, as assignee, all right, title and interest, for Canada, the United States and all other countries, all intellectual property developed by or originating from them, including without limitation: all inventions; all patents or patent applications... The Assignor agrees that he will without further consideration do all such things and execute all such documents as may be necessary or desirable to obtain and maintain patents, ... and to vest title thereto in the Company...".

14    Delta also provided Covington with a copy of a collateral assignment of patents and trademarks to BDC, dated September 1, 1995, which was signed by White & Associates and Vector Technology Inc. That document was provided in relation to BDC's loan and investment in shares, and states in article 3.4:

> J.A. White is the sole and exclusive owner of the entire and unencumbered right, title and interest in and to each of the Patents and Trademarks, free and clear of any voluntary or involuntary lien, charges or encumbrances ... except as specifically set forth in the Loan Documents and those licences and sublicences which are existing as of the date hereof and those licences and sublicences which may be entered into after the date hereof in the ordinary course of the Assignor's business.

"J.A. White" is defined as the corporate entity. "Patents and trademarks" are defined as

> all presently existing and hereafter acquired or arising patents and trademarks, including, without limitation, the trademark applications and trademarks listed in Schedule A attached hereto and the trademark registrations identified therein, and the patent applications and patents listed in Schedule B attached hereto....

That list of trademarks includes Snowfluent. Schedule B refers only to existing patents for snowmaking technology, as the patent applications for Snowfluent had not yet been made at the time this document was signed.

15    Leitch has given evidence that Covington would not have made the loan or investment if Delta did not own the intellectual property related to Snowfluent. It is his position that he never saw the licence agreement, although Covington asked for all material contracts to which Delta was a party. No evidence contradicts this.

16    Following Covington's loan and investment, the financial statements of Delta made further reference to Delta's ownership of the intellectual property. For example, the 1999 audited financial statements include the statement, "The company has capitalized costs in regards to the development of its specialized sewage treatment technology". In copies of correspondence from Delta's patent counsel that were provided to Covington, references are made to Delta's patent and patent applications.

17    The licence agreement first came to light in May, 2000, after Delta went into default under its loan agreement with Covington. There is affidavit evidence from Darcy Killeen, Chief Financial Officer of Delta from March, 1997 until 1999, that he had never seen the licence agreement while employed there, and was unaware of its content. While White states that the licence agreement was kept in the same filing cabinet as the patent applications at head office, Killeen had never seen it in that cabinet. Nor had the agreement been seen by Kevin Carton, the lawyer acting on the patent applications, who was working for the company and White by October 11, 1995 at the latest - that is, prior to the date of the licence agreement.

18    Since the bankruptcy, White has been operating through a new company, Watertek, using the Snowfluent technology and Delta's former employees, and completing at least one of Delta's contracts, with Westport, Maine. After this litigation commenced, White assigned the Snowfluent technology and related patent and patent applications to the respondent LF Rossignol Development Corporation in July, 2000. Fred Rossignol is a former director of Delta and the principal of LF Rossignol Development, a South Carolina company. On cross-examination, White indicated that Rossignol was aware of the litigation and took the patents as a form of collateral for a loan.

19    The value of Delta's assets, excluding the intellectual property, is $348,000.00. Covington is owed at least $2,195,398.05, and there are other secured creditors. There is in evidence a letter of intent from EBI Securities to the Receiver of Delta, indicating an interest in purchasing the intellectual property and related assets for $3,150,000.00.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    6

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 8 of 12

**C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680**

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

**Oppression Remedy Claim**

20     Covington takes the position that the Snowfluent technology is owned by Delta, and that White's and Rossignol's conduct is oppressive within s. 248 of the *OBCA*. It seeks an order that Delta is the owner, or that the property is held in trust for it.

21     To obtain an oppression remedy, a complainant must show that the business or affairs of the corporation in question are or have been carried on in a manner that is oppressive, or is unfairly prejudicial to or unfairly disregards the interests of a security holder or creditor. The oppression remedy protects the "reasonable expectations" of a corporate stakeholder, having regard to the particular facts (*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.), at 201). Bad faith is not necessary to a finding that there has been conduct that unfairly disregards or is unfairly prejudicial to the interests of a security holder or creditor.

22     In this case, the applicant seeks relief both as a shareholder and a creditor. The courts have held that in an appropriate case, a creditor can be granted standing as a complainant (see, for example, *Sidaplex-Plastic Suppliers Inc. v. Elta Group Inc.* (1995), 131 D.L.R. (4th) 399 (Ont. Gen. Div. [Commercial List]) at 403, rev'd on other grounds (1998), 40 O.R. (3d) 563 (Ont. C.A.)). In my view, this is such a case, for the creditor seeks to protect reasonable expectations about the way in which the corporation should have been operated. As well, Covington has standing to seek relief as a shareholder.

23     The respondents argue that there has been no unfair disregard of the applicant's interests or conduct prejudicial to its interests. First, they argue that there was no misrepresentation in the 1997 Investment Agreement, since there was no clear statement that the corporation, rather than White, owned the patents. At most, they suggest that there may have been some ambiguity, and, if so, the contract should be construed *contra proferentem*. In my view, the argument based on *contra proferentem* must fail, as the Investment Agreement was a document drafted in a process in which both parties were represented by experienced counsel.

24     The respondents then take the position that the applicant did not make reasonable efforts at due diligence prior to making the loan and investment. They argue that the applicant could have determined the ownership of the patents and patent applications by the exercise of reasonable diligence - specifically, through an inspection of the public records of the Canadian and U.S. Patent Offices, which would have disclosed White's name as owner in the patent applications. In *Sidaplex*, *supra*, Blair J. observed that the extent to which the acts complained of were unforeseeable or the creditor could reasonably have protected itself from the acts were factors to be considered in determining whether there was oppression (*supra*, at 405). The respondents argue that it was a condition precedent to the Investment Agreement that Covington assure itself of the adequacy of title. Having failed to do so, Covington can not now complain because White has title to the patents. Therefore, they argue that there is no oppression here.

25     The primary position asserted by the applicant rested on the conclusion that the intellectual property rights in the Snowfluent technology had been assigned by White to the corporation in 1994 by the shareholders agreement between White and others and the IOC, quoted above. Therefore, the representation in Article 4.1.12 of the Investment Agreement with Covington that the patentable inventions in Schedule C were those of the corporation was true because of the earlier assignment. According to this line of reasoning, the inventions continue to be the property of Delta, even though White purported to transfer them as owner to Rossignol Development.

26     Counsel for White argued that the clause in the 1994 shareholders agreement with respect to inventions does not clearly capture the Waste Water Treatment Method and Apparatus that was the subject of the patents filed in 1995, and, therefore, there has been no assignment of the process covered by the patent applications.

27     At the time of the 1994 agreement, no patent applications had been made with respect to this technology, and the agreement does not clearly state that it is an assignment of future patents and patent applications. The clause does make reference to the assignment of all intellectual property, including "inventions", but I have a dearth of evidence before me about the content of the Snowfluent technology in 1994, and there is no evidence to show the invention as it existed in 1994 was the same as the subject matter of the 1995 patent applications. It is true that Delta's 1997 business plan, as well as White's affidavit, indicate that

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 9 of 12

**C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680**

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

the Snowfluent technology was under development from the 1980's, and the Snowfluent technology was clearly what interested the IOC, as revealed by other terms of its investment agreement with Delta. But the fact that the technology existed in 1994 does not turn the 1994 agreement into an assignment of future patents for a process as it may have developed over time. Therefore, on the evidence before me, I can not conclude that the clause in the 1994 agreement assigned to the company the patents and patent applications which followed for the Snowfluent technology.

28     Nevertheless, the 1994 agreement is of significance, given that it was one of the documents provided by Delta to Covington in an effort to obtain funds from Covington in 1997. In my view, it is one of a series of representations by the corporation, made with White's participation, respecting the corporation's ownership of the Snowfluent technology, upon which lenders and investors were expected to rely and reasonably did rely when they decided to advance funds to Delta.

29     Most telling, in my view, is the representation made by Delta about its ownership of the intellectual property in Article 4.1.12 of the Investment Agreement, quoted above. It stated that "Schedule C accurately shows for each patentable invention *of the Corporation* a brief description thereof and the status of any application" (emphasis added). Schedule C lists the patent applications under the name of "J.D. White & Associates Ltd.", not Jeffrey White. The only reasonable inference from that article is that Delta owns the invention that is the subject of the proceedings in Schedule C - that is, the Snowfluent waste water treatment technology.

30     Counsel for the respondents argued that this first sentence, read with the one which follows, should be understood as a representation that the corporation has the rights necessary to conduct its business - and because of the licence agreement, that is a correct representation with respect to Delta's operations. The problem with that argument is that it ignores the wording of the first sentence of the article, which, in my view, states that Delta owns the patents included in Schedule C.

31     Moreover, when that clause is read with the other documents provided to Covington, the reasonable conclusion is that the Snowfluent technology and the related intellectual property belong to Delta, not White. I have already made reference to the 1994 shareholders agreement with IOC, which stated that all intellectual property, including inventions, was assigned to Delta. That agreement remained in force until July 18, 1997, well after the patent applications for the Snowfluent technology were made in White's name. The logical inference is that at least some rights in the technology had been assigned to the company, and there is no evidence that they were re-assigned to White. The fact that the shareholders agreement terminated does not automatically create such a re-assignment.

32     In addition, the BDC agreement confirms the corporation's ownership of existing and future patents. This agreement was entered into in September of 1995, very shortly before the first patent applications were filed. Again, the logical inference was that the corporation would be the owner of any Snowfluent patents, given their importance to the company's operations. While they are not mentioned in the list of patents in Schedule B, since no applications had yet been made, the Snowfluent trademark is listed in Schedule A. It strains credulity that one is to interpret this as leaving White with the right to hold the patent for the technology, while the company would have the trademark that controlled use of its name.

33     These conclusions are further buttressed by the many references in the Business Plan that suggest Delta owns the Snowfluent technology, as well as the financial statements of the company described earlier in these reasons. All of these representations lead to the conclusion that Delta is the owner of the technology. Given the impression left by all these documents, it is telling that no one from Delta, particularly White, disclosed the existence of the licence agreement to Covington.

34     The oppression remedy protects the reasonable expectations of corporate stakeholders. In *Themadel Foundation v. Third Canadian Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 (Ont. C.A.), the Court of Appeal stated (at 753):

> The public pronouncements of corporations, particularly those that are publicly traded, become its commitments to shareholders within the range of reasonable expectations that are objectively aroused.

While we are dealing here with a small, closely held company rather than one that is publicly traded, the same logic applies. Investors and lenders should be able reasonably to rely on public statements of a corporation made in various legal and corporate documents. In particular, the representations by Delta with respect to its ownership of the Snowfluent technology and related

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 10 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680
2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

intellectual property can reasonably be relied upon by a shareholder and investor such as Covington when making a decision whether to invest in the company, whose principal asset is that technology and the ability to exploit it.

35    Counsel for the respondents argued that the applicant could have easily determined that White held the patent applications in his name. By the terms of the Investment Agreement, legal counsel for the corporation was to provide a legal opinion with respect to a number of items, as set out in Article 5.1.5, as a condition precedent to closing. The respondents argue that the omission of an opinion with respect to title to the intellectual property in that article meant that this issue was left to examination by the applicant's own legal counsel. If that opinion has turned out to be deficient, that risk should lie on the applicant.

36    In fact, counsel for the applicant has stated that there was no opinion from legal counsel for Covington on the ownership of the intellectual property. Whether such an opinion should have been obtained is not the issue here. This is not a case of professional negligence, nor of negligent misrepresentation in tort involving non-contracting parties, where reasonableness of reliance would be an issue. Here, Delta expressly represented in the Investment Agreement that the patent applications were those of the corporation, and the company had provided other documents that led to the same conclusion. White had certified that the representations were true. At the same time, White and Delta had failed to disclose the licence agreement which purported to circumscribe the corporation's property rights to Covington. Even the Chief Financial Officer of Delta at the time of the investment did not know of the agreement. Indeed, he gave evidence that had he known of the licensing agreement, he would have informed the auditor who prepared the financial statements. In my view, the applicant could reasonably rely on Delta's representations to conclude that the patents were the property of the company, as suggested by Schedule C.

37    Therefore, we are left with the situation where the corporation made certain representations about its ownership of the intellectual property pertaining to Snowfluent, but the patents and patent applications were issued in White's name. Without doubt, that state of affairs is prejudicial to the applicant's interests. The question is whether there is unfairness if Delta's ownership interest is not recognized.

38    The applicant argued that I should find the patents and patent applications are the property of the company, because White developed those inventions while he was an employee of Delta. There is a presumption at common law that an employee is the owner of his or her inventions, unless there is an express contract to the contrary, or the person was employed for the express purpose of inventing or innovating (*Techform*, *supra*, at 32). In particular, courts will find that the employer is the owner of an invention where an employee is hired precisely to design or develop a product (*Seanix Technology Inc. v. Ircha* (1998), 78 C.P.R. (3d) 443 (B.C. S.C.), at 445).

39    White was not in the position of the usual employee, who works for another person in a business. White is the principal shareholder and director of a small, closely held company, where he mixes the roles of manager, employee and inventor. Nevertheless, if one looks at the employment aspect of his relationship, one finds that 75% of his time was spent on research and development. Indeed, the company applied for tax credits based on the fact that he spent 75% of his time on research. There is no dispute that his role in the company was to develop the Snowfluent technology, and that was a predominant focus of his work for many years. Therefore, this is a case where at common law, the employer - here, Delta - could assert that it was the beneficial owner of the patents because of the employment situation.

40    No steps were taken by the corporation to assert an ownership interest against White, however, because of the reality that this is a small, closely held company, and it was in White's personal interest not to assign the ownership to the corporation. However, White was not only an employee, but also a director of the corporation. Thus, he had a fiduciary duty to act in the best interests of the corporation, which obligated him not to take advantage of opportunities available to the corporation (*Classic Organ Co. v. Artisan Organ Ltd.* (1997), 35 B.L.R. (2d) 285 (Ont. Gen. Div.) at 291). White used the facilities and funds of the corporation, totaling over $10 million, to develop the Snowfluent technology and to advance the patent process, but he retained the benefit of the technology developed with those resources for himself, even though the nature of his employment relationship would normally allow the corporation to claim ownership.

41    A number of oppression cases turn on the fact that there has been conduct by directors or majority shareholders that amounts to self-dealing at the expense of the corporation or other corporate stakeholders (*SCI Systems, Inc. v. Gornitzki Thompson &*

**C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680**

2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

*Little Co.* (1997), 36 B.L.R. (2d) 192 (Ont. Gen. Div.)), aff'd (1998), 110 O.A.C. 160 (Ont. Div. Ct.)).; *Neri v. Finch Hardware (1976) Ltd.* (1995), 20 B.L.R. (2d) 216 (Ont. Gen. Div. [Commercial List]); *Loveridge Holdings Ltd. v. King-Pin Ltd.* (1991), 5 B.L.R. (2d) 195 (Ont. Gen. Div.)). For example, in *SCI*, there was oppression because the directors unfairly removed assets from the corporation so as to prevent the payment of a corporate debt and to benefit themselves.

42     Here, White's failure to put the patents in the name of the company is analogous to the diversion of assets seen in these cases, because it constitutes a form of self-dealing, when all the facts are considered. He chose to use the corporation to solicit funding and to use that funding to develop the Snowfluent technology, but having done that, he sought to keep for himself personally the benefit of that corporate investment in the technology despite his duty of good faith to the corporation. Given the representations about ownership that led Covington to invest in the company, the fact that White's principal employment obligation was research and development with respect to the Snowfluent technology, and White's use of the corporation's resources to develop the technology, Delta should properly be regarded as the owner of the patents and patent applications. In light of all the facts, White's failure to assign the intellectual property to Delta is an unfair disregard of Covington's interests as a creditor and shareholder that is unfairly prejudicial, as Covington had a reasonable expectation that Delta owned the technology and related intellectual property.

43     The fact that White personally invested funds in the corporation does not give him any right to claim as his what is properly a corporate asset. Nor can the licence agreement protect White's claim to ownership, given that it was never disclosed to Covington. It is a further example of a conflict of interest where White preferred his personal interests over those of the corporation to which he had a fiduciary duty.

44     The facts of this case bear some resemblance to *Turbocristal Inc. c. Handfield* (1991), 41 C.P.R. (3d) 540 (Que. S.C.), although this was not an oppression remedy case. There, the Quebec Superior Court found that the founder of a company, who resigned as a director and employee, had effectively ceded the ownership of patents to the company through his statements and conduct. While there was in that case an ambiguous document suggesting that there had been either a transfer or licence, the Court did not rest its decision on that document, but looked at the factual context, including government grants to the corporation to support research, ownership of a trademark by the company, and the use of large amount of corporate funds for development.

45     Similarly here, when all the facts are considered, White represented that he had ceded the ownership of the Snowfluent technology to Delta. Having regard to his employment and his duty to the corporation as an officer and director, the failure to assign ownership to Delta constitutes conduct unfairly prejudicial to the applicant's interests contrary to s. 248(2) of the *OBCA*.

**The Appropriate Remedy**

46     Section 248(3) of the *OBCA* confers a broad discretion on the Court in determining an appropriate remedy, including "any interim or final order it thinks fit". The purpose of the remedy is to rectify the oppression. The provision has been used to make compensation orders against individual directors where their conduct has been found oppressive in small, closely held corporations such as Delta, and they have personally benefited - for example, by the removal of assets from the corporation (see, for example, *SCI*; *Sidaplex*, *supra*).

47     In this case, Delta has represented that the patents and patent applications for the Snowfluent technology are the property of the corporation, and White, as a principal of the corporation, was behind those representations. The corporation has a right to claim beneficial ownership at common law. This is not a case where a monetary award against White will adequately protect the interests of the stakeholders, especially given his evidence that he faces financial difficulties personally. If Delta's proprietary interest is not protected, the corporation will be denied the value of the patents, both in terms of possible licensing fees for their use and their value if they can be sold. Clearly, the creditors will be in a better position to recoup some of their funds if the patents are assets of the corporation which can be sold.

48     In *Soulos v. Korkontzilas*, [1997] 2 S.C.R. 217 (S.C.C.), the Court stated that a constructive trust may be awarded in two categories of cases: where there has been a breach of a fiduciary obligation or duty of loyalty, and where there has been unjust enrichment through the wrongful acquisition of property. Given White's fiduciary obligations to the company, this is a case

Case 09-10138-MFW    Doc 14225-34    Filed 08/15/14    Page 12 of 12

C.I. Covington Fund Inc. v. White, 2000 CarswellOnt 4680
2000 CarswellOnt 4680, [2000] O.J. No. 4589, 101 A.C.W.S. (3d) 504...

where a constructive trust is the necessary remedy to protect the corporation's proprietary right and to provide a remedy to the applicant for the oppressive conduct. Therefore, I declare that Delta is the beneficial owner of the Snowfluent technology and related patents and patent applications, and I order that these patents and patent applications are to be assigned to it. Rossignol was aware of the Covington litigation prior to the assignment of the patents, and there was no dispute that it can take no better title than White. Therefore, LF Rossignol Development, Rossignol and White are ordered to cease using the Snowfluent technology and to assign the patents and patent applications to Delta.

49      The applicant also sought an order that White was in breach of his fiduciary duty to Delta by carrying on the Westport business and using the Snowfluent trademark. As a fiduciary of Delta, White had an obligation not to pursue corporate opportunities available to Delta. Therefore, he and Watertek are ordered to account for profits made through the use of the technology. If there is a dispute about this, I will remain seized. Similarly, the applicant asked that I remain seized with respect to the appointment of a receiver, and I do so.

50      If the parties wish to speak to costs, they may make written submissions or make an appointment with my secretary.

*Application granted.*

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.