# TAB 35

2009 CarswellOnt 968
Ontario Superior Court of Justice

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC

2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

# Calloway REIT (Westgate) Inc., Applicant/Respondent by Cross-Application and Michaels of Canada, ULC, Respondent/Applicant by Cross-Application

Hoy J.

Heard: February 5, 2009
Judgment: February 24, 2009
Docket: CV-08-7862-00CL, CV-09-7946-00CL

Counsel: Peter H. Griffin, Pinta J. Maguire, for Applicant / Respondent by Cross-Application
Matthew J. Latella, David Gadsden, for Respondent / Applicant by Cross-Application

Subject: Property; Contracts

**Headnote**

   **Real property --- Landlord and tenant — Nature and elements of lease — Interpretation**

   **Real property --- Landlord and tenant — Term of lease — Commencement**


**Table of Authorities**

   **Cases considered by *Hoy J.*:**

   *Birch v. Union of Taxation Employees, Local 70030* (2008), 243 O.A.C. 6, 2008 CarswellOnt 7219, 2008 ONCA 809, 2009 C.L.L.C. 220-006, 93 O.R. (3d) 1 (Ont. C.A.) — followed

   *Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358, 95 D.L.R. (3d) 242, 1978 CarswellBC 525 (B.C. C.A.) — referred to

   *Canadian National Railway v. Canadian Pacific Ltd.* (1979), [1979] 2 S.C.R. 668, [1979] 6 W.W.R. 96, 105 D.L.R. (3d) 170, 1979 CarswellBC 712, 1979 CarswellBC 761 (S.C.C.) — referred to

   *Commercial Alcohols Inc. v. Bruce Power L.P.* (2006), 2006 CarswellOnt 457 (Ont. S.C.J.) — referred to

   *Commercial Alcohols Inc. v. Bruce Power L.P.* (2006), 2006 CarswellOnt 5504, 215 O.A.C. 190 (Ont. C.A.) — referred to

   *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    1

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 3 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — referred to

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.* (1986), 1986 CarswellNS 147, 1986 CarswellNS 147F, 171 A.P.R. 353, [1986] 1 S.C.R. 57, 25 D.L.R. (4th) 649, 65 N.R. 23, 71 N.S.R. (2d) 353 (S.C.C.) — referred to

*Infinite Maintenance Systems Ltd. v. ORC Management Ltd.* (2001), 139 O.A.C. 331, 5 C.P.C. (5th) 241, 2001 C.L.L.C. 210-021, 2001 CarswellOnt 59 (Ont. C.A.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — considered

*No. 163 Sail View Ventures Ltd. v. Century 21 Prudential Estates Ltd.* (1994), 40 R.P.R. (2d) 302, 1994 CarswellBC 811 (B.C. S.C.) — considered

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1705, 222 O.A.C. 102, 2007 ONCA 205, 29 B.L.R. (4th) 312, 85 O.R. (3d) 254, 56 R.P.R. (4th) 163 (Ont. C.A.) — referred to

*869163 Ontario Ltd. v. Torrey Springs II Associates Ltd. Partnership* (2005), *(*sub nom. *Peachtree II Associates-Dallas L.P. v. 857486 Ontario Ltd.)* 76 O.R. (3d) 362, 10 B.L.R. (4th) 44, 2005 CarswellOnt 2782, *(*sub nom. *Peachtree II Associates-Dallas L.P. v. 857486 Ontario Ltd.)* 200 O.A.C. 159, 256 D.L.R. (4th) 490 (Ont. C.A.) — referred to

*869163 Ontario Ltd. v. Torrey Springs II Associates Ltd. Partnership* (2006), *(*sub nom. *Peachtree II Associates-Dallas L.P. v. 857486 Ontario Ltd.)* 215 O.A.C. 399 (note), 2006 CarswellOnt 316, 2006 CarswellOnt 317, *(*sub nom. *Peachtree II Associates-Dallas L.P. v. 857486 Ontario Ltd.)* 350 N.R. 197 (note) (S.C.C.) — referred to

*3869130 Canada Inc. v. I.C.B. Distribution Inc.* (2008), 45 B.L.R. (4th) 1, 2008 CarswellOnt 2802, 2008 ONCA 396, 66 C.C.E.L. (3d) 89, 239 O.A.C. 137 (Ont. C.A.) — referred to

**Hoy J.**:

**Introduction and Conclusion**

1    The two applications before me — one by the Landlord, Calloway REIT (Westgate) Inc., and one by the Tenant, Michaels of Canada, ULC — turn on the interpretation of a shopping centre lease entered into on December 19, 2005 (the "Lease").

2    The Tenant has been open for business since July 5, 2007 and has not paid rent. Under the Lease, rent begins to accrue on the "Rental Commencement Date" and, as drafted, the Rental Commencement Date cannot occur before the "Completion Date". At issue on this Application is whether all buildings in the shopping centre must be constructed before the Completion Date can occur.

3    The Tenant submits that (1) the correct interpretation of the Lease is that it is not required to pay rent until all the buildings in the shopping centre in which its premises (the "Premises") are situate are constructed; (2) it is entitled to liquidated damages in the amount of $25,000 pursuant to Article 3.12 of Exhibit D of the Lease because the actual Completion Date under the Lease was after the "Contemplated Completion Date"; and (3) it is also entitled to liquidated damages in the form of an abatement

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 4 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

of rent once the shopping centre is finished pursuant to Article 3.6 of Exhibit D of the Lease because construction of all the buildings in the Shopping Centre was not completed when its Premises were completed.

4    The Landlord submits that (1) the Tenant's obligation to pay rent was triggered by the completion of the Tenant's Premises and a specified critical area, and commenced on June 29, 2007; (2) no liquidated damages are payable under Article 3.12 because the Completion Date was not after the Contemplated Completion Date; and (3) in any event, the liquidated damages clauses relied on by the Tenant constitute penalties, are unconscionable and are therefore unenforceable.

5    For the reasons that follow, I accept that all the buildings in the shopping centre need not be constructed before the Tenant has an obligation to pay rent, and conclude that Articles 3.6 and 3.12 of the Lease are enforceable. It appears to me, however, that the Completion Date may not be April 30, 2007, as the Landlord asserts, and that the Tenant's obligation to pay rent may have commenced sometime after June 29, 2007. As noted below, I will require additional submissions from the parties, if, with the benefit of these reasons, they are unable to agree on the actual Completion Date. Whether liquidated damages are payable under Article 3.12 will turn on whether or not the Completion Date was after April 30, 2007.

**The Background**

6    The Tenant is a specialty retailer, selling arts and crafts materials through over 900 stores across North America. Its stores are typically located in commercial shopping centres.

7    The shopping centre in issue (the "Shopping Centre") is an open-air or unenclosed centre located in Mississauga, designed for what are commonly referred to as "big box" retailers. It includes large, open parking areas, and customers enter the stores directly from the parking areas, as opposed to from an internal, covered mall area.

8    The Shopping Centre follows a phased development plan where, as leased, portions of the Shopping Centre are built out to the tenant's specifications.

9    The Landlord engaged a leasing agent, Smart Centres Inc. ("Smart Centres"). Smart Centres is a major commercial retail developer and operator, developing and managing large scale unenclosed shopping centres across Canada.

10    Smart Centres acts as leasing agent and manager for thirteen other shopping centres in which the Tenant is a tenant. The Tenant dealt with Smart Centres with respect to the Lease and thirteen leases for other similar locations. Nine of the thirteen leases are in the same Tenant's standard form as the Lease and were entered into before the Lease. The other four leases were on the standard form of lease previously used by the Tenant.

11    For the nine locations utilizing the same form of lease as the Lease, the Tenant began paying rent well before all of the buildings and common areas of the shopping centres were fully built out. For each of these locations, the shopping centres were operational (in that tenants were open and carrying on business with the public) when the Tenant accepted delivery of its premises, opened for business to the public and began paying rent, although portions of the shopping centre lands were still being developed, and other portions remained vacant for future development.

12    Wal-Mart was the Shopping Centre's first tenant. It opened for business on January 25, 2001.

13    The parties entered into the Lease on December 19, 2005, nearly five years after Wal-Mart opened. Pursuant to the Lease, Wal-Mart was the only other tenant required to have opened in order to trigger the obligation to pay rent.

14    As noted above, the Lease is the Tenant's standard form lease. It was reviewed by in-house counsel for Smart Centres, and some of its provisions were negotiated.

15    Under the Lease, the target date for completion of the Tenant's premises — defined in Article 1 of Exhibit D of the Lease as the "Premises Completion Date" — was March 31, 2007.

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 5 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

16     In February of 2007, the Tenant asserted the position that the entire Shopping Centre had to be built out before it would have to pay rent.

17     Article 3.9.2 of the Lease requires the Landlord to give the Tenant at least 60 days' written notice of the contemplated "Completion Date". On March 2, 2007, Smart Centres provided 60 days notice to the Tenant indicating that the contemplated Completion Date under the Lease would be April 30, 2007.

18     The Landlord takes the position that the Premises were "substantially complete" on April 30, 2007. On May 30, 2007, the Tenant accepted keys to the Premises.

19     On June 29, 2007 — 60 days after what the Landlord says is the Completion Date — the Landlord began charging the Tenant rent.

20     On July 5, 2007, the Tenant opened for business.

21     As at November 2008, the entire Shopping Centre was about 90% complete. [1] The Shopping Centre is not yet fully complete and the Tenant has not paid any rent.

22     The Landlord attempted to arrive at a compromise with the Tenant. The Landlord ultimately commenced this Application on November 21, 2008, and the Tenant brought its cross-Application on January 13, 2009.

**Applicable Principles of Contract Interpretation**

23     A commercial contract is to be interpreted:

> (1) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

> (2) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;

> (3) with regard to objective evidence of the factual matrix underlying the negotiation of the contract (what *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 (Ont. C.A.) at para. 25 refers to as "the general context that gave birth to the document"), but without reference to the subjective intention of the parties; and

> (4) to the extent there is any ambiguity in the contract, in a fashion that accords with good business sense, and that avoids a commercial absurdity.

*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 85 O.R. (3d) 254 (Ont. C.A.), para. 24; *3869130 Canada Inc. v. I.C.B. Distribution Inc.*, [2008] O.J. No. 1947 (Ont. C.A.) at para. 31.

24     The factual matrix clearly extends to the genesis of the agreement, its purpose and the commercial context in which it was made: *Dumbrell v. Regional Group of Cos.*, [2007] O.J. No. 298 (Ont. C.A.), para. 55.

25     To the extent there is ambiguity after applying principles (1) through (3) above, the court is also entitled to consider the subsequent conduct of the parties as evidence of their intention at the time that the contract was executed: *Canadian National Railway v. Canadian Pacific Ltd.* (1978), [1979] 1 W.W.R. 358 (B.C. C.A.) at para.48; affirmed (1979), 105 D.L.R. (3d) 170 (S.C.C.).

26     When all other rules of construction fail to enable the court to ascertain the meaning of a document, the language of the contract will be construed against its author in accordance with the *contra proferentem* rule. The *contra proferentem* rule applies where the other party had no opportunity to modify its wording. See: *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.); *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1

S.C.R. 888 (S.C.C.), at p. 901; and *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd., [1986] 1 S.C.R. 57* (S.C.C.). See *Commercial Alcohols Inc. v. Bruce Power L.P., [2006] O.J. No. 322* (Ont. S.C.J.), para. 37, aff'd [2006] O.J. No. 3637 (Ont. C.A.).

**The Relevant Provisions of the Lease**

27    The Lease is comprised of the Basic Lease Provisions and Exhibits A through K to the Basic Lease Provisions.

28    I have bolded a few of the key definitions and phrases in portions of the Lease excerpted below for ease of reference; no language is in bold text in the Lease itself.

29    Under the Lease, rent begins to accrue on the "Rental Commencement Date". Section 2.1.2 of Exhibit C, reproduced below, defines Rental Commencement Date with reference to the "Completion Date". As drafted, the Rental Commencement Date cannot occur before the Completion Date.

> 2.1.2 <u>Rental Commencement Date Defined</u>. The "**Rental Commencement Date**" means the later of (i) the earlier of (a) the date on which Tenant initially opens its store in the Premises for business with the public, or (b) the date which is **sixty (60) days after the Completion Date**, or (ii) the date on which the following conditions precedent are met: (a) the "Other Required Lessee" of the Shopping Centre enumerated in Paragraph 8 of the Basic Lease Provisions has opened (or will open simultaneously with Tenant) its store for business with the public in the premises designated for its occupancy on Exhibit B of this Lease (the "Initial Co-Tenancy Requirement"), and (b) each of the conditions precedent in Section 2.1.1 of this Exhibit C are met. Notwithstanding anything contained in this Lease to the contrary, Tenant will not be required to pay Minimum Rent, Common Area Charges, Real Estate Taxes, or any other charges due from Tenant under this Lease, in the event the Rental Commencement Date falls during the period from the first day of October of any calendar year through the last day of March of the succeeding calendar year (said period being the "Rent Deferral Period"), and in such event, the Rental Commencement Date shall be extended for all purposes under this Lease to the first day of April of the succeeding calendar year. Notwithstanding the foregoing, if Tenant opens its store in the Premises for business with the public during the Rent Deferral Period, with all of the conditions precedent to the Rental Commencement Date as set forth above being satisfied, then the Rent Deferral Period shall not apply and the Rental Commencement Date shall be the date of Tenant's opening.

30    With respect to 2.1.2(ii) (a), the only Other Required Lessee enumerated in Paragraph 8 of the Basic Lease Provisions is Wal-Mart, which, as indicated above, was a tenant before the Lease was signed.

31    Section 2.1.1 of Exhibit C defines Completion Date as the date on which five conditions are fulfilled. At issue on these Applications is whether the first part of the third of those conditions (highlighted below) has been fulfilled:

> 2.1.1. <u>Completion Date Defined</u>. Subject to the provisions of Article 3.9 of Exhibit D to this Lease, the "**Completion Date**" will be the date upon which all of the following conditions precedent have been fulfilled by Landlord: (i) the "Leasehold Improvements", as such term is defined in Exhibit D of this Lease, are substantially complete and a certificate of occupancy (or the local jurisdictional equivalent) for same has been issued by the appropriate governmental authority subject to the remainder of this Section 2.1.1, (ii) Landlord has delivered possession of the Premises to Tenant, (iii) **the requirements of Article 2 of Exhibit D are fully satisfied and the Common Areas within the "Initial Required Common Areas" as shown on Exhibit B are open for public use, including paved driveways and parking areas within the Initial Required Common Areas**, (iv) Landlord has completed paved driveways shown on Exhibit B of this Lease from adjoining public streets around the front and rear of the Premises, and (v) all security lights on the building within which the Premises is located and all light standards in the parking areas within the Initial Required Common Areas are installed and operating.

32    Article 2 of Exhibit D provides as follows:

> 2. <u>Construction of Shopping Centre</u>. Landlord will, if any of the same have not already been constructed and without expense to Tenant, **construct the Shopping Centre with all buildings, sidewalks, service drives, parking aisles, driveways, streets, curbs, parking areas, traffic controls, signs including pylon and monument signs and related**

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 7 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

electrical wiring to Tenant's cabinet, and related improvements in substantially the configurations, locations and sizes shown for such improvements on Exhibit B of this Lease, subject to any changes permitted by Sections 4.5 and 4.6 of Exhibit C.

33    *Exhibit B* is a site plan for the entire Shopping Centre. A handwritten legend on the site plan co-relates the Premises, and what are called the Initial Required Common Areas and Critical Area with specifically marked areas on the site plan. (The Premises are the area identified by cross-hatching; the Initial Required Common Areas are denoted by diagonal lines and the Critical Area, which is co-extensive with the Initial Required Common Areas, is identified by dots.) The Initial Required Common Areas and Critical Area extend to what appears to be a fairly broad area surrounding the wing of the Shopping Centre where the Premises are located, in which parking and walkways were to be constructed, and driveways within the Shopping Centre connecting to public roads providing access to the Shopping Centre.

34    Section 1.1 of Schedule C defines "Shopping Centre" and "Premises":

1.1 <u>Location</u>. The term "**Shopping Centre**" means the land described in Exhibit A of this Lease, together with all buildings and other improvements constructed or **to be constructed** thereon, together with all rights, privileges, easements, and appurtenances pertaining thereto. The term "**Premises**" means that portion of the Shopping Centre cross-hatched and labeled "Premises" on Exhibit B of this Lease. There are appurtenant to the Premises rights, privileges, easements, and appurtenances as described herein.

35    The *Initial Required Common Areas* and the *Critical Area* are defined in sections 2.1.1 and 4.2 of the Lease, respectively, as the areas shown as such on Exhibit B.

36    Sections 4.5 and 4.6 of Exhibit C provide as follows:

4.5 <u>Configuration of Common Areas</u>. Landlord will not change the size, location or configuration of the driveways, parking areas, and parking aisles in the Critical Area, as shown on Exhibit B of this Lease. Landlord will not change the size, location or configuration of the driveways, parking areas, and parking aisles outside the Critical Area in any way which would (a) reduce the parking ratio for the Shopping Centre below the ratio required by Section 4.3 above, or (b) adversely affect access to the Premises (front or rear).

Landlord hereby represents and warrants to Tenant that there will be commercially reasonable access to the rear loading areas adjacent to the Premises (including adequate turn-around room) for Tenant's large tractor trailer delivery vehicles, having a sleeper cab plus 53' trailer, via the driveway which runs to the north of the Premises. If Landlord's representation and warranty in the preceding sentence is incorrect, Landlord shall take such action as is necessary or appropriate to allow such commercially reasonable access throughout the Lease Term.

4.6 <u>Restrictions on Construction</u>. Landlord will not create out parcels or pad sites in the Critical Area, in addition to the out parcels or pad sites shown on Exhibit B of this Lease.

No building or improvements constructed on any out parcel or pad site shown on Exhibit B shall exceed one story in height, or the height of the existing buildings (as shown on Exhibit B) as of the date of Tenant's execution of this Lease. The roof line and parapet wall of any other premises in the "Tenant's Wing" as shown on Exhibit B shall not be higher than the height of the roof line and parapet wall of the Premises. The height of the premises within the Wal-Mart Wing shall not be higher than the height of each such premises as of the date of Tenant's execution of this Lease, so long as Landlord controls the height of such premises or has the right to consent to any increase in the height of such premises. The foregoing sentence shall not prevent Landlord from consenting to any increase in the height of the Wal-Mart premises, so long as such premises is owned or controlled by Wal-Mart, if the increased height is consistent with the height of the majority of Wal-Mart stores. This paragraph shall not apply to the premises of any other tenants located within Tenant's Wing so long as the parapet of the Premises is at least as high as the parapet of the premises of any other tenants located within Tenant's Wing.

Landlord will not construct, or allow any other party to construct, other buildings or improvements in the Critical Area. Landlord will not construct or allow any other party to construct, other buildings or Improvements outside of the Critical Area if such new building or improvement would (a) reduce the parking ratio for the Shopping Centre below the ratio required by Section 4.3 above, or (b) materially and adversely affect access to the Premises (front or rear) or (c) materially and adversely affect the visibility of the Premises or any of Tenant's monument or pylon signage.

37    Article 2.2 of Exhibit D specifically permits changes to the configuration of the Shopping Centre — including to the size, configuration or location of the buildings — during planning and construction, subject to Sections 4.5 and 4.6 of Exhibit C.

38    The Parties refer to sections 2.7 and 4.1 of Exhibit C, dealing with Common Areas, in support of their positions:

2.7 Completion of Common Areas Outside Initial Required Common Areas. **If all of the Common Areas are not completed as of the "Completion Date" (i.e., Landlord only completes the Common Areas within the Initial Required Common Areas pursuant to Section 2.1.1 of Exhibit C), then in connection with the construction and completion of the Common Areas outside of the Initial Required Common Areas, Landlord shall** (a) use good faith and diligent efforts to minimize any interference with Tenant's use of the Premises or access to the Premises (front or rear), (b) ensure that there is no blockage of any portion of the Initial Required Common Areas, and (c) utilize good and safe construction practices, including without limitation, the posting of warning signs, roping off of construction areas and the erection of barricade (but no such "roping off" or "erection of barricades" may interfere with the use of the Initial Required Common Areas).

. . .

4.1 Common Areas Defined. The term the "**Common Areas**" as used in this Lease means those parts of the Shopping Centre provided by Landlord for the common use of all tenants, including, among other facilities, parking areas, driveways within the Shopping Centre and to public roads adjoining the Shopping Centre, sidewalks, landscaping, loading areas, private streets and alleys, lighting facilities, drinking fountains, and public toilets, **exclusive of** (i) buildings and associated truck ramps, wells and trash compactors exclusively for the use of one tenant, (ii) any outside sales area contained within an individual building area, and (iii) **any future buildings, when and if same are actually constructed**.

39    Leasehold Improvements, referred to in section 2.1.1(i) of Exhibit C are defined in Article 3 of Exhibit D:

3. Construction of Leasehold Improvements. Landlord will, at Landlord's sole cost and expense, construct improvements to the Premises (the "Leasehold Improvements") in accordance with plans and specifications prepared at the cost of Landlord by an architect licensed in the Province where the Shopping Centre is located, which plans and specifications must substantially comply with the Program Drawings.

40    Section 2.1 of Exhibit C provides that the Initial Term of the Lease commences on the Completion Date, and section 2.3 defines "*Lease Term*" to mean the Initial Term and any Extension.

2.1 Initial Term. The "Initial Term" (herein so called) of this Lease will begin on the Completion Date (below defined) and continue through the Expiration Date set forth in Paragraph 4 of the Basic Lease Provisions.

41    Articles 3.6 and 3.12 of Exhibit D — the alleged penalty clauses — provide as follows:

3.6 Outside Dates. Landlord warrants that Landlord will commence construction of the Leasehold Improvements (i.e., pour the foundation for the Leasehold Improvements) on or before the Premises Start Date and will diligently pursue and complete the construction of the Leasehold Improvements and achieve the Completion Date on or before the Premises Completion Date. Landlord will notify Tenant in writing that construction has commenced on the Leasehold Improvements within one (1) week after the commencement of such work. Subject to Section 17.17 of Exhibit C, if the Completion Date does not occur on or before the Premises Completion Date, then Tenant may deduct as liquidated damages from the obligations to pay Minimum Rent one (1) day's rent (calculated based on a thirty (30) day month) for each day beyond the

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 9 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

Premises Completion Date until the Completion Date occurs. Both parties acknowledge that if the actual Completion Date does not occur on or before the Premises Completion Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs. The liquidated damages provided for in this Article 3.6 shall not accrue during any period of time when the liquidated damages described in Article 3.12 of this Exhibit D are accruing.

. . .

3.12 <u>Liquidated Damages</u>. In the event the Completion Date (as defined in Section 2.1.1 of Exhibit C) occurs more than five (5) days after the Contemplated Completion Date (as defined in Article 3.9.2 of this Exhibit D), Landlord will pay to Tenant, as liquidated damages, the sum of Five Thousand and No/100 Dollars ($5,000.00) per day for the first five (5) days of delay occurring after the Contemplated Completion Date. Both parties acknowledge that if the actual Completion Date does not occur on the Contemplated Completion Date, Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by Tenant, including, but not limited to, additional costs incurred for lost sales and profits, storage, rescheduling, payroll, advertising, inventory, and carrying costs. Landlord's failure to pay liquidated damages payable under this Lease within thirty (30) days of demand therefor shall entitle Tenant to offset said damages from the next payments due under the Lease from Tenant to Landlord. The foregoing right shall not be Tenant's exclusive remedy for failure of Landlord to pay same nor shall said right be deemed an agreement for Landlord to withhold payment of damages.

42      Article 3.9.2 of Exhibit D requires the Landlord to give the Tenant written notice of the contemplated Completion Date:

3.9.2 <u>Notice of the Completion Date</u>. Landlord will notify Tenant in writing of the contemplated Completion Date (the "Completion Notice") at least sixty (60) days prior to the contemplated Completion Date (the "**Contemplated Completion Date**"). If Landlord fails to deliver the Completion Notice at least sixty (60) days prior to the then Contemplated Completion Date, then the Completion Date will in any event be extended to at least the sixtieth (60th) day following the delivery of the Completion Notice.

43      Article 3.9.1 of Exhibit D provides for the Landlord and the Tenant to inspect the Premises together not earlier than three days before the Contemplated Completion Date and produce what they call a "punch list" of remaining construction items. Article 3.9.1 further provides that the Tenant shall not be required to accept the Premises until they are substantially complete (as defined in the Lease) or prior to the Completion Date.

**The Rental Commencement Date Issue**

*The Parties' Positions*

44      The Landlord submits that having regard to the lease as a whole, and the factual matrix, Article 2 of Exhibit D, which requires the Landlord to "construct the Shopping Centre", must be interpreted as requiring the Landlord to have completed the construction of the Premises, the Initial Required Common Areas (the "IRCA") and the Critical Area and permitting the Landlord to commence or continue construction outside these areas on buildings depicted on the site plan past the Completion Date.

45      It also submits that, should I be unable to ascertain the meaning of Article 2 of Exhibit D utilizing the customary rules of contractual interpretation, this is a case in which the *contra proferentem* rule applies, and the Lease should be construed against the Tenant.

46      The Landlord argues that if the Shopping Centre was required to be fully built out before the Rental Commencement Date is triggered, there would be no need to distinguish between the IRCA, the Critical Area and Common Areas, nor would there be a need to provide for construction of the Common Areas outside the IRCA past the Completion Date under section 2.7

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 10 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

of Exhibit C in the Lease, or limit construction outside of the Common Areas and Critical Areas under sections 4.5 and 4.6 of Exhibit C. A fully built out Shopping Centre would have the Common Areas, IRCA and Critical Area already fully completed.

47      The Landlord submits that its interpretation is supported by section 1.1 of Exhibit C. That section, which defines Shopping Centre, refers to "all buildings and other improvements constructed or to be constructed thereon" [emphasis added]. That wording, and the reference to "*any future buildings, when and if same are actually constructed*" [emphasis added] as one of the exclusions from the definition of Common Areas in section 4.1 of Exhibit C, indicate, it argues, that "Shopping Centre" in Article 2 of Exhibit D is a fluid concept, with different meanings at different points in time. It points to Article 2.2 of Exhibit D, which makes clear that the Landlord can make changes to the Shopping Centre during planning and construction.

48      The Landlord submits that the relevant factual matrix is that the Shopping Centre was being developed in phases, a practice familiar to the Tenant, and includes the fact that the Tenant paid rent before the entire shopping centre was complete under nine leases negotiated with Smart Centres containing identical wording to Article 2 of Exhibit D and section 2.1.1.of Exhibit C before it took the position under this Lease that these provisions require the entire shopping centre to be completed before it has an obligation to pay rent. The evidence of Mr. Nobre, the Senior-Vice President of Leasing for Smart Centres, is that many of these nine locations continue to have ongoing phased development, with part of the shopping centre still to be lease up and built out.

49      The Tenant counters that the wording of Article 2 of Exhibit D is clear: it requires that the entire Shopping Centre be constructed. The word "construct" is not modified by "substantially". It refers to "all" buildings, service drives, and so on. That being said, the Tenant concedes that construction of Common Areas outside of the IRCA is not required to be completed. The Tenant argues, however, that section 2.7 of Exhibit C indicates that the construction of the Common Areas outside of the IRCA is the only caveat to the requirement that the Landlord construct the Shopping Centre and does not otherwise affect the obligation of the Landlord to construct the Shopping Centre. Sections 4.5 and 4.6 of Exhibit C, it submits, do not suggest otherwise.

50      The Tenant submits that the "to be constructed" wording in section 1.1 of Exhibit C referred to by the Landlord was required because at the time the Lease was executed the Shopping Centre had not been fully constructed and, pursuant to Article 2 of Exhibit D, was required to be constructed in accordance with the site plan in Exhibit B, subject to changes permitted by sections 4.5 and 4.6 of Exhibit C.

51      The Tenant further argues that the words chosen by the parties are paramount, and that the Landlord argues for an interpretation that would improperly result in the factual matrix overwhelming, or varying, the clear wording of the Lease.

52      Moreover, the Tenant argues, this case is in any event different than the nine other situations that the Landlord points to. The Tenant argues that the delay between completion of its premises and the completion of the shopping center in which they were situated was not as great in those instances. [2]

53      The Tenant also submits that the factual matrix is not what the Landlord asserts. In his affidavit, Mr. Sullivan, a consultant to the Tenant, points to one of the nine leases referred to by the Landlord — that dated December 7, 2001 pertaining to a shopping centre in Regina, Saskatchewan. In that case, the site plan forming part of the lease specifically identified certain buildings as "not required to be complete as of the Completion Date" and other areas as "planned to be built in 2002, but not required as a condition precedent to the Completion Date". This shows, the Tenant argues, that its leases require that all buildings in a shopping centre of which it is to be a tenant be completed as a condition precedent to the commencement of rent obligations unless the lease contains express language to the contrary.

54      In response to this last submission, Mr. Nobre, of Smart Centres, provided evidence that no one at Smart Centres dealt with Mr. Sullivan with respect to this lease and that this was a unique situation. In this one case the buildings not required to be built out were so identified because the municipality was in the process of building a new road prior to the Regina lease being executed. The former street was to be closed and transferred by the City to the landlord. As the municipality was in the process of constructing the new road, Smart Centres had no control over the timing of the closing and transfer of that property.

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 11 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

Mr. Nobre says that the notations to the site plan were made to recognize these unique circumstances. Mr. Sullivan did not provide any further evidence in response.

*Analysis and Conclusion*

55     Article 2 of Exhibit D cannot be interpreted in isolation; a commercial contract is to be interpreted as a whole. I have carefully read the entire Lease.

56     The Landlord's argument that section 2.7 of Exhibit C indicates that the Shopping Centre did not have to be fully built out before the Completion Date is persuasive.

57     It is clear, and indeed conceded, that, interpreting the Lease as a whole, the requirements of Article 2 of Exhibit D of the Lease are fully satisfied for the purposes of section 2.1.1.of Exhibit C before the entire Shopping Centre is constructed.

58     Given that the Shopping Centre need not be fully constructed, the issue is to what extent the Shopping Centre must be constructed for the requirements of Article 2 of Exhibit D to be "fully satisfied" for the purpose of section 2.1.1 of Exhibit C.

59     The Common Areas, defined in section 4.1 of Exhibit C of the Lease, are clearly an integral part of the Shopping Centre. The Common Areas include the parking areas. Numerous provisions in the Lease highlight the importance of parking. For example, in section 4.3 of Exhibit C the Tenant specifically bargains for a specified number of parking spots in the Critical Area, and section 4.5 of Exhibit C prohibits the Landlord from changing the parking in the Critical Area. The parking area in the Critical Area (which is co-extensive with the IRCA) appears from my visual assessment of the site plan to amount to about 1/6 of the total planned parking for the Shopping Centre. The Common Areas also include the driveways in the Shopping Centre providing access to the public roads.

60     The significance of the Common Areas to the Shopping Centre as a whole leads me to conclude that all of the buildings are not required to be constructed before the requirements of Article 2 of Exhibit D of the Lease are fully satisfied for the purposes of section 2.1.1.of Exhibit C, and that section 2.7 is not the only exception to what is otherwise an obligation to fully construct the Shopping Centre.

61     There appear to be two reasons why a tenant might bargain for a shopping centre to be fully constructed before it is obligated to pay rent. First, if the tenant relied on other occupants to generate cross-over traffic, it would want to ensure that the shopping centre was completed and the other tenants were operational before being obligated to pay rent (or at least full rent.) Second, the tenant might be of the view, as the Tenant here says it is, that on-going construction, outside of its own premises and the parking and other common areas contiguous to and serving its premises, would be aesthetically unappealing or otherwise a deterrent to its own customers.

62     It is clear from the Lease that the Tenant did not bargain for cross-over traffic.

63     If a completed Shopping Centre capable of generating cross-over traffic for the Tenant was a condition of the lease, then construction of the Common Areas would not have been carved out in section 2.7. Realistically, a tenant on the other side of the Shopping Centre would not open if reasonably contiguous parking and access, from that tenant's premises, to the public roadways had not been constructed.

64     This interpretation is buttressed by the fact that the Tenant only required that the one tenant open for business at the time the Lease was signed, namely Wal-Mart, have opened for business as a condition of the Tenant's obligation to pay rent.

65     As to the second of the two reasons, while the evidence of Mr. Sullivan, a consultant to the Tenant, was that it was important to the Tenant not to be in a partially completed shopping centre featuring unsightly mounds of dirt where buildings were supposed to be, unsightly mounds of dirt, and weeds, could just as easily be located where the extensive Common Areas were to be constructed. Were this in fact the case, the Common Areas would not have been carved out.

66      I do not find the "to be constructed" language, or sections 4.5 and 4.6 helpful in construing the language in the Lease at issue.

67      As noted above, section 2.1 of Exhibit C provides that the Initial Term of the Lease commences on the Completion Date, and section 2.3 defines "Lease Term" to mean the Initial Term and any Extension. On the Tenant's interpretation, while it has been open for business since July 5, 2007, the Lease Term has not yet commenced. A number of the parties' rights and obligations under the Lease are defined with reference to the Lease Term. For example, under section 4.2, the Tenant's customers have the right to use the Common Areas (which include the parking in the Critical Area) during the Lease Term. On the Tenant's interpretation, its customers do not currently appear to have the right to park at the Shopping Centre. By way of a further example, under section 4.4, the Landlord has an obligation to provide snow clearance, lighting and otherwise maintain the Common Areas only during the Lease Term, which, according to the Tenant, has not yet commenced. Section 16.5, which sets out the prohibited uses of the Premises, applies during the Lease Term. The interpretation of Article 2 of Exhibit D that the Tenant urges does not give effect to the various rights and obligations which appear from the Lease to have been clearly intended to commence no later than when the Tenant was in a position to be operational in its Premises.

68      The Tenant's interpretation would also result in a significant extension of the expiry date of the Lease.

69      In my view, Article 3.9 further supports the interpretation that the shopping centre does not have to be fully completed before the Completion Date occurs. That Article deals with both the inspection of the Premises, and the provision of written notice of the contemplated Completion Date. The juxtaposition of these two concepts in a single Article indicates to me that the completion requirement relates to the Premises, and the Common Areas within the Initial Required Common Areas specifically referenced in section 2.1.1 of Exhibit C.

70      The factual matrix supports the interpretation that the Shopping Centre did not have to be fully constructed.

71      The factual matrix includes that the Shopping Centre was proceeding as a phased development project. Mr. Nobre provided undisputed evidence to that effect. Moreover, at the time the Lease was signed, Wal-Mart was the only tenant, and, Wal-Mart was the only tenant that the Tenant required be open for business as a condition of the Tenant's obligation to pay rent. It is obvious that the project was one of phased development.

72      The factual matrix also includes that, under nine other leases that the Tenant had negotiated with Smart Centres in respect of phased development projects, containing the same provisions as sections 2.1.1., 2.1.2 and 2.7 of Exhibit C and Article 2 of Exhibit D of the Lease, the Tenant had commenced paying rent well before all of the buildings and common areas of the shopping centres were fully built out. [3]

73      The charts prepared by the Landlord in support of its Application set out the completion date under each of the nine leases. [4] As counsel for the Tenant noted, the charts do not set out the precise date that the Tenant began paying rent under each of the leases. However, having regard to Mr. Nobre's undisputed evidence that the Tenant commenced paying rent under all nine leases well before all of the buildings and common areas were fully built out, the completion dates indicated on the chart for the nine leases, and the evidence elicited on the cross-examination of Mr. Nobre with respect to the liquidated damages payable on the late delivery of the Tenant's Edmonton and Cambridge premises and IRCA, which signals when the rental payment obligations would have begun, it is clear that rental payment would have been triggered under many if not most of them before the Lease was executed. This is also part of the factual matrix.

74      Mr. Nobre's evidence as to the unique circumstances addressed by the additional language in the Regina lease is undisputed. In any event, the evidence is clear that in each of the eight leases containing the same provisions as section 2.1.1. of Exhibit C and Article 2 of Exhibit D, with no additional handwritten notations, the Tenant had commenced paying rent well before the shopping centre was fully built out.

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 13 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

75     The length of the delay between the completion of the Premises and Shopping Centre was not part of the commercial context when the Lease was entered into and does not form part of the factual matrix. Moreover, the evidence of Mr. Nobre is that many of the nine locations continue to have ongoing phased development, with parts of the shopping centres still to be leased up and built out.

76     The interpretation urged by the Tenant does not accord with good business sense. It permits the Tenant to occupy the Premises, rent-free, until the Shopping Centre is fully completed, despite itself being fully operational and having the benefit of the areas it designated under the Lease as the Critical Area, and, pursuant to Article 3.6 of Exhibit D, would result in the Tenant being entitled to a further rent-free period once the Shopping Centre is fully completed equal to its fully operational, rent-free period before completion.

77     In my view, it is not in this case necessary to consider subsequent conduct. If considered, it does not affect my conclusion. The Tenant argues that the fact that the Landlord delayed in commencing its Application until November 2008 suggests that it accepted that the Tenant's position was correct, and therefore supports the Tenant's interpretation. It appears to me that the delay resulted because the Landlord hoped to resolve this matter outside of court.

78     As the Lease was negotiated by sophisticated parties with the assistance of in-house counsel, I am doubtful that the *contra proferentem* rule would apply in this case. I also note that section 17.6 of Exhibit C to the Lease provides that, "This Lease will be construed with equal weight for the rights of both parties, the terms hereof having been determined by fair negotiation with due consideration for the rights and requirements of both parties." In any event, it is unnecessary in this case to resort to it to ascertain the meaning of the Lease.

**The Enforceability of Articles 3.6 and 3.12 of Exhibit D**

79     The Landlord's argument that Articles 3.6 and 3.12 are unenforceable penalty clauses appears to be a response to the Tenant's position that the Completion Date under the Lease does not occur until all the buildings in the Shopping Centre are completed. Given that I have not accepted the Tenant's position with respect to the Completion Date, the issue of the enforceability of Articles 3.6 and 3.12, while not moot, is clearly of relatively minor significance to the parties.

80     The Completion Date, on either the Landlord's or the Tenant's interpretation, was after the Premises Completion Date of March 31, 2007. In such instance, Article 3.6 of Exhibit D entitles the Tenant to, "deduct as liquidated damages from the obligations to pay Minimum Rent one (1) day's rent (calculated based on a thirty (30) day month) for each day beyond the Premises Completion Date until the Completion Date occurs."

81     The Completion Date, on the Tenant's interpretation of the Lease, occurred after the Contemplated Completion Date of April 30, 2007. I also understand the Tenant to submit that even on the Landlord's interpretation of the Lease, the Completion Date occurred after the Contemplated Completion Date. The Landlord asserts that the Completion Date in fact occurred on April 30, 2007. Where the Completion Date occurs after the Contemplated Completion Date, Article 3.12 requires the Landlord to, "pay to Tenant, as liquidated damages, the sum of Five Thousand and No/100 Dollars ($5,000) per day for the first five (5) days of delay occurring after the Contemplated Completion Date."

82     Article 3.6 provides that in the event the Completion Date does not occur before the Premises Completion Date, the Tenant's damages will be difficult, if not impossible, to ascertain and the amount of liquidated damages set forth above is a reasonable estimate of the damages which would be suffered by a tenant, including, but not limited to, lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs."

83     Article 3.12 contains almost identical language.

*Applicable Law*

84     Common law and equity have similar, but distinct, rules with respect to remedy clauses requiring the payment of money that is out of all proportion to the damage suffered.

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 14 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

85     The common law rule against penalties involves an assessment of the remedy clause at the time the contract was formed. If the stipulated remedy represents a genuine attempt to estimate the damages that the innocent party would suffer in the event of a breach, it will be enforced. If the sum stipulated is "extravagant and unconscionable in amount in comparison with the greatest loss that could be conceivably proved to have followed from the breach" it is a penalty. The common law doctrine does not provide for any discretion to be exercised because of circumstances that exist at the time of the breach. *869163 Ontario Ltd. v. Torrey Springs II Associates Ltd. Partnership,* [2005] O.J. No. 2749 (Ont. C.A.) at para.24, leave to appeal to the S.C.C. refused, (2006), [2005] S.C.C.A. No. 420 (S.C.C.).

86     The onus of establishing that the clause is a penalty clause rests upon the party attempting to set the clause aside. *Infinite Maintenance Systems Ltd. v. ORC Management Ltd.* [2001 CarswellOnt 59 (Ont. C.A.)], 2001 CanLII, at para. 13.

87     Equity also requires that the sum forfeited be out of all proportion to the damage before it will intervene. However, in contrast with the common law penalty rule, equity focuses on the time of the breach rather than the time the contract was entered into and considers whether it is unconscionable for the innocent party to retain the money forfeited. *Peachtree II*, para. 25

88     While declining to sound the death knell for the common law rule against penalties, the Court of Appeal has highlighted the importance of the general principle of freedom of contract. It has clearly signalled that not all stipulated remedy clauses having penal consequences are unenforceable and that the courts should, whenever possible, favour an analysis on the basis of equitable principles and unconscionability over the strict common law rule pertaining to penalty clauses. *Peachtree II*, paras. 32 and 36, *Birch v. Union of Taxation Employees, Local 70030,* [2008] O.J. No. 4856 (Ont. C.A.), paras.26 and 37.

89     A determination of unconscionability requires a finding of inequality of bargaining power and a finding that the terms of an agreement have a high degree of unfairness. *Birch*, para. 45.

*The Parties' Positions*

90     The Landlord submits that Articles 3.6 and 3.12 are true penalty clauses, in that they do not represent a genuine attempt to estimate damages suffered by the Tenant in the event of a breach. The Landlord argues that in a case where, as here, the Tenant is occupying the Premises, the types of damages envisaged by these articles — lost sales, lost profits, and additional costs incurred for storage, rescheduling, payroll, inventory, advertising and carrying costs — would not arise. The Landlord points to the refusal of the Tenant to provide any documentation with respect to the Tenant's actual revenues, so that its actual loss might be calculated. The Landlord submits that from this I should make an adverse inference that the documentation would have demonstrated that the damages claimed are not genuine pre-estimates.

91     The Landlord also argues that it would be unconscionable to enforce Articles 3.6 and 3.12 because they are contained in the Tenant's standard form lease, these particular clauses were not the subject of negotiation, and the Tenant demonstrates unconscionability by insisting that the Completion Date has not yet occurred and claiming liquidated damages and a day-for-day abatement of rent, while continuing to fully operate the Premises.

92     The Tenant submits that the equitable test of unconscionability, and not the common law rule against penalties, should be applied but that in any event the clauses are not penal in nature. The Tenant points to what it submits is the modest amount of the daily penalty under Article 3.12. As to Article 3.6, the Tenant refers me to No. 163 *No. 163 Sail View Ventures Ltd. v. Century 21 Prudential Estates Ltd.,* [1994] B.C.J. No. 1870 (B.C. S.C.) which found that a $2,000 per day per diem charge for late completion of premises, agreed to in a situation where the tenant was unable to occupy the premises, was not a penalty. The Tenant also notes that a leading text on shopping centre leases, Harvey M. Haber, *Shopping Centre Leases*, 2 ed. (Aurora: Canada Law Book, 2008) at 342 to 343, comments that a tenant may negotiate certain penalties, including a reduction of rent, where despite the pre-conditions to the tenant's obligation to open not being met, the tenant nevertheless opens for business. This, the Tenant submits, speaks to the reasonableness of the Article 3.12.

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 15 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

93     The Tenant submits that based on the sophistication of the Landlord, including that it was represented by in-house legal counsel, the Landlord's familiarity with and past implementation of the "penalty" clauses, it cannot be said that an inequality of bargaining power exists in the present circumstances or that the terms agreed to contained a high degree of unfairness.

94     As acknowledged by Mr. Nobre on his cross-examination, liquidated damages were paid to the Tenant under Articles 3.6 and 3.12 as a result of the late-delivery of the Tenant's premises and/or initial required common areas under three of the nine leases that the Landlord has referred to in argument: those in respect of St. Catherines and Cambridge, Ontario, and Edmonton, Alberta.

*Analysis and Conclusion*

95     Article 3.6 is not, in my view, penal. It addresses (on my interpretation of "Completion Date") the consequences of the Landlord's failure to complete the Premises by the date agreed to in the Lease. The Landlord has not satisfied me that equating the damages to the Tenant of not being able to obtain possession of the Premises when planned because the Premises were not completed to the amount of daily minimum rent payable under the Lease is "extravagant and unconscionable in amount in comparison with the greatest loss that could be conceivably proved to have followed from the breach".

96     Nor, in my view, is Article 3.12 penal in nature. Article 3.9.2 requires the Landlord to give the Tenant at least sixty days' notice of the contemplated Completion Date. Presumably, in reliance on such a notice, given relatively shortly before the anticipated Completion Date, the Tenant would take steps in anticipation of completion of the Premises on that date. The Landlord has not satisfied me that Five Thousand Dollars ($5,000) a day, for a maximum of five days, is "extravagant and unconscionable in amount in comparison with the greatest loss that could be conceivably proved to have followed from the breach".

97     In any event, on an analysis on the basis of equitable principles, the inequality of bargaining power required pursuant to *Birch* for a determination of unconsionability is not present in this case. Here, a sophisticated tenant negotiated with a sophisticated leasing agent and commercial real estate developer. As the Tenant argues, the Landlord was familiar with the operation of these clauses in circumstances where the premises and/or initial required common areas were not completed by the Completion Date and the Contemplated Completion Date under the Lease.

**What is the Completion Date? When Did the Obligation to Pay Rent Begin?**

98     In this case, the Landlord gave a Completion Notice, as contemplated by Article 3.9.2 of Exhibit D, on March 2, 2007, 60 days before the Contemplated Completion Date of April 30, 2007. The Completion Date was therefore not extended beyond the actual date of completion by the operation of Article 3.9.2. as a result of a failure to give at least 60 days' notice of the Contemplated Completion Date.

99     The evidence of Mr. Nobre is that the Landlord was prepared to deliver the Premises to the Tenant on April 30, 2007, but the Tenant requested that the inspection of the Premises contemplated by Article 3.9.1 occur on May 2, 2007. Mr. Nobre's further evidence is that the Tenant and a representative from Smart Centres met for an inspection of the Premises on May 2, 2007. By letter dated May 4, 2007, the Tenant sent the Landlord a "punch list" of outstanding construction items based on the May 2, 2007 inspection. The Tenant took the position that the Leasehold Improvements (as defined in the Lease) were not "substantially complete" on May 2, 2007.

100     On May 17, 2007, Smart Centres revised the punch list provided by the Tenant to confirm that all of the punch items noted by the Tenant were completed.

101     The Tenant accepted keys to the Premises on May 30, 2007, and opened for business on July 5, 2007.

102     Pursuant to section 2.1.1(i) of Exhibit C, one of the conditions precedent that must be fulfilled for the Completion Date to occur is that the Leasehold Improvements must be substantially complete, and pursuant to section 3.9.1 the Premises are not

Case 09-10138-MFW    Doc 14225-35    Filed 08/15/14    Page 16 of 16

Calloway REIT (Westgate) Inc. v. Michaels of Canada ULC, 2009 CarswellOnt 968
2009 CarswellOnt 968, [2009] O.J. No. 761, 175 A.C.W.S. (3d) 553

substantially complete unless, among other things, there are no items of construction to the Leasehold Improvements remaining that would in any way restrict the Tenant from commencing any and all of its pre-opening activities.

103     While the Landlord takes the position that the Completion Date is April 30, 2007, from the Tenant's May 4, 2007 letter, referred to above, it appears that the Leasehold Improvements may not have been substantially complete on April 30, 2007, and the Completion Date may therefore not be the April 30, 2007 date asserted by the Landlord.

104     While section 2.1.1(iii) of Exhibit C only requires that paved areas be open for public use, there also appears to be an issue between the Landlord and the Tenant as to whether a second, top coat of asphalt had to be applied to the parking lot in the IRCA.

105     In their submissions, the parties focused on whether all of the buildings within the Shopping Centre had to be built before the Rental Commencement Date could occur, and not on what the actual Completion Date was, if the Landlord's position on that key issue was accepted. Should the parties be unable, with the benefit of these reasons, to resolve the issue of what the actual Completion Date is, I will require additional submissions from the parties to determine that issue, and they should contact me to schedule same.

**Costs**

106     If the parties are able to resolve the issue of the actual Completion Date without the need for supplemental submissions, the Landlord shall provide brief written costs submissions within the two weeks following the release of these reasons, and the Tenant shall provide its submissions in response within 10 days thereafter. If the parties are of the view that this timetable is not workable, I may be spoken to. No reply costs submissions shall be provided without leave.

Footnotes

1       This calculation is a visual assessment of the portions of shopping centre shown as completed, based on a site plan for the shopping centre attached to the affidavit of Peter Nobre, Senior Vice-President of Leasing for Smart Centres sworn November 20, 2008.

2       I had understood the Tenant to argue, at the hearing, that here there is an issue as to whether the Landlord achieved what the Landlord says is the Completion Date before the date established by the Landlord as the Contemplated Completion Date and that in the nine other cases pointed to by the Landlord, the Landlord achieved the "Completion Date" by the "Contemplated Completion Date". I noted following the hearing, however, that the Tenant established in its cross-examination of Mr. Nobre that in the case of the Edmonton shopping centre, one of the nine leases pointed to, what the Landlord says is the Completion Date, namely the date the premises were completed, was not on or before the Contemplated Completion Date. Hence, the alleged distinction is not valid. Even if it were, like the length of delay, it is a subsequent event and was not part of the commercial context when the lease was executed.

3       This is the undisputed evidence of Mr. Nobre.

4       See Mr. Nobre's cross-examination, Q 535.

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.