# TAB 36

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 2 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

2004 NSCA 87
Nova Scotia Court of Appeal

Campbell-MacIsaac v. Deveaux

2004 CarswellNS 257, 2004 NSCA 87, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1, 224 N.S.R. (2d) 315

# Lombard Insurance Company (Appellant / Respondent by Cross-Appeal) v. Katherine Campbell-MacIsaac, Ronald MacIsaac, Chanelle Campbell-MacIsaac, Kielly Carlyn MacIssac and Lisa Deveaux (Respondents / Appellants by Cross-Appeal)

Chipman, Cromwell, Saunders JJ.A.

Heard: April 14-15, 2004
Judgment: June 23, 2004
Docket: C.A. 202471

Proceedings: varying *MacIsaac v. Deveaux* (2003), 2003 NSSC 111, 2003 CarswellNS 176, *(sub nom. Campbell-MacIsaac v. Deveaux)* 214 N.S.R. (2d) 129, *(sub nom. Campbell-MacIsaac v. Deveaux)* 671 A.P.R. 129, 49 C.C.L.I. (3d) 238 (N.S. S.C.)

Counsel: Michael E. Dunphy, Q.C. for Appellant
Robert L. Barnes, Q.C., Gavin Giles for Respondent

Subject: Insurance; Civil Practice and Procedure; Torts; Restitution

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Insurance --- Principles applicable to specific types of insurance — Underinsured motorist endorsement — Limit and extent of liability — Primary and excess insurance**

Insurance policy issued to dentist and husband by L Co. contained S.E.F. 44 endorsement which provided additional underinsured motorist coverage — Dentist suffered permanently disabling fracture to right ankle in motor vehicle accident which left dentist unable to return to practice — Dentist received long term disability benefits from C Co. — Dentist received Section B benefits — Action was brought against driver — Dentist was entitled to recover $3,758,550 from driver — Driver's insurer made payment to limits of policy — Trial judge concluded that L Co., dentist's insurer, was not entitled to deduct any past long term disability benefits received by dentist or present value of future long term disability benefits and Section B benefits to be received by dentist — L Co. appealed — Appeal allowed in part — Dentist's present and future long term disability benefits from C Co. as well as dentist's future Section B benefits should be taken into account to credit of L Co. when calculating its liability under the S.E.F. 44 endorsement.

**Damages --- Valuation of damages — Deductions — Insurance — General**

Insurance policy issued to dentist and husband by L Co. contained S.E.F. 44 endorsement which provided additional underinsured motorist coverage — Dentist suffered permanently disabling fracture to right ankle in motor vehicle accident which left dentist unable to return to practice — Dentist received long term disability benefits from C Co. — Dentist received Section B benefits — Action was brought against driver — Dentist was entitled to recover $3,758,550 from driver — Driver's insurer made payment to limits of policy — Trial judge concluded that L Co., dentist's insurer, was not entitled to deduct any past long term disability benefits received by dentist or present value of future long term disability benefits and Section B benefits to be received by dentist — L Co. appealed — Appeal allowed in part — Dentist's present and

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-36   Filed 08/15/14   Page 3 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

future long term disability benefits from C Co. as well as dentist's future Section B benefits should be taken into account to credit of L Co. when calculating its liability under the S.E.F. 44 endorsement.

**Damages --- Valuation of damages — Measure of damages — Personal injury — General**

Insurance policy issued to dentist and husband by L Co. contained S.E.F. 44 endorsement which provided additional underinsured motorist coverage — Dentist suffered permanently disabling fracture to right ankle in motor vehicle accident which left dentist unable to return to practice — Action was brought against driver — Dentist was entitled to recover $3,758,550 from driver — Driver's insurer made payment to limits of policy — Dentist's husband awarded $50,000 — L Co. appealed — Appeal allowed in part — Sum of $20,000 was fixed as appropriate for quantum meruit.

**Damages --- Damages in tort — Personal injury — Claim by family member**

Insurance policy issued to dentist and husband by L Co. contained S.E.F. 44 endorsement which provided additional underinsured motorist coverage — Dentist suffered permanently disabling fracture to right ankle in motor vehicle accident which left dentist unable to return to practice — Action was brought against driver — Dentist was entitled to recover $3,758,550 from driver — Driver's insurer made payment to limits of policy — Dentist's husband awarded $50,000 — L Co. appealed — Appeal allowed in part — Sum of $20,000 was fixed as appropriate for quantum meruit.

An insurance policy issued to a dentist and her husband by L Co. contained a S.E.F. 44 endorsement which provided additional underinsured motorist coverage. The dentist was also insured by C Co. for long term disability. The dentist was seriously injured in a motor vehicle accident, suffering a permanently disabling fracture to her right ankle. As a result of her injuries, the dentist was forced to sell her dental practice and lost her licence to practice dentistry.

The dentist, her husband and their children brought an action against the driver and against L Co. The liability of the driver was not in issue. The dentist was entitled to recover $3,758,550 from the driver. The driver's liability insurer had paid the dentist approximately $1 million, which was the limit of the driver's policy. The trial judge concluded that L Co. was only entitled to deduct the amount the dentist had received from the driver's insurer and the Section B weekly indemnity benefits already paid to the date of trial. The trial judge also held that L Co. was not subrogated to the dentist's rights against C Co. for the future long term disability benefits and was not entitled to an assignment of those rights. L Co. appealed.

**Held:** The appeal was allowed in part.

The specific terms of the S.E.F. 44 endorsement should be read in the context of the wording of the entire endorsement and not in isolation. The terms of the endorsement must be interpreted in light of its overall purpose, which was that it was "last ditch", "safety net" and "excess insurance". By treating the issue of set-off by L Co. as a matter involving an application of the collateral benefits rule the trial judge erred in law and the conclusion and disposition on this point must be overturned. The collateral benefits rule was not applicable. The dispute between L Co. and the dentist could only be resolved by undertaking a careful consideration of the contractual provisions binding the parties, which required particular regard to interpretive rules applicable to insurance contracts and the unique features of the S.E.F. 44 endorsement. It was indisputable that the dentist's Section B benefits and long term disability benefits fell within sources identified in the endorsement. The words "entitled to recover" in the endorsement must mean and were intended to include benefits payable to the insured in the future. Upon proof of present entitlement, the words "entitled to recover" encompassed both benefits payable to the insured in the future and equally to past benefits to which the insured was entitled but which had not yet been received. The dentist's present and future long term disability benefits from C Co. as well as the dentist's future Section B benefits should be taken into account to the credit of L Co. when calculating its liability to the dentist under the S.E.F. 44 endorsement. L Co. was entitled to both subrogation and to assignment, should such be necessary, in gaining to its credit the amount of future long term disability benefits.

The trial judge erred in mixing an inquiry into loss of income with an assessment of the merits of a claim for quantum meruit. The trial judge linked the dentist's husband's parallel claim for lost past income to a quite distinct award for quantum

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 4 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

meruit and considered the former to be a relevant factor when calculating the latter. The award of $50,000 was inordinately high. After taking into account the considerable care and attention the dentist's husband was required to provide the dentist following her injury until her condition had plateaued to the extent that she could look after her own needs, the sum of $20,000 was fixed as appropriate for quantum meruit. The awards for the cost of prescription drugs and severance paid to employees were expressed inaccurately. These awards were modified to $1,433 and $22,000 respectively.

## Table of Authorities

### Cases considered by *Saunders J.A.*:

*Binder v. Mardo Construction Ltd.* (1994), 129 N.S.R. (2d) 64, 362 A.P.R. 64, 1994 CarswellNS 431 (N.S. S.C.) — followed

*Boarelli v. Flannigan* (1973), [1973] 3 O.R. 69, 36 D.L.R. (3d) 4, 1973 CarswellOnt 872 (Ont. C.A.) — referred to

*Bradburn v. Great Western Railway* (1874), L.R. 10 Exch. 1, [1874-80] All E.R. Rep. 195 (Eng. Exch.) — referred to

*Canada (Director of Investigation & Research) v. Southam Inc.* (1997), 144 D.L.R. (4th) 1, 71 C.P.R. (3d) 417, [1997] 1 S.C.R. 748, 209 N.R. 20, 50 Admin. L.R. (2d) 199, 1997 CarswellNat 368, 1997 CarswellNat 369 (S.C.C.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176, 1979 CarswellQue 157, 1979 CarswellQue 157F (S.C.C.) — considered

*Cooper v. Miller* (1994), *(sub nom. Cunningham v. Wheeler)* [1994] 4 W.W.R. 153, *(sub nom. Cunningham v. Wheeler)* 23 C.C.L.I. (2d) 205, *(sub nom. Cooper v. Miller (No. 1))* 164 N.R. 81, *(sub nom. Cooper v. Miller (No. 1))* 66 W.A.C. 1, *(sub nom. Cunningham v. Wheeler)* 88 B.C.L.R. (2d) 273, *(sub nom. Cunningham v. Wheeler)* 2 C.C.P.B. 217, *(sub nom. Cunningham v. Wheeler)* 20 C.C.L.T. (2d) 1, *(sub nom. Cooper v. Miller (No. 1))* 41 B.C.A.C. 1, *(sub nom. Cunningham v. Wheeler)* 113 D.L.R. (4th) 1, 1994 CarswellBC 1235, [1994] 1 S.C.R. 359, 1994 CarswellBC 121 (S.C.C.) — referred to

*Doran v. Commercial Union Assurance Co. of Canada* (2000), 2000 CarswellNS 24, 17 C.C.L.I. (3d) 102, 182 N.S.R. (2d) 329, 563 A.P.R. 329, [2000] I.L.R. I-3854 (N.S. S.C. [In Chambers]) — not followed

*Founders Square Ltd. v. Nova Scotia (Attorney General)* (2001), 2001 NSCA 49, 2001 CarswellNS 110, 192 N.S.R. (2d) 127, 599 A.P.R. 127, 13 B.L.R. (3d) 44 (N.S. C.A.) — referred to

*Fraser v. Hunter Estate* (2000), 2000 NSCA 63, 2000 CarswellNS 137, 184 N.S.R. (2d) 217, 573 A.P.R. 217 (N.S. C.A.) — referred to

*Graham v. Rourke* (1990), 40 O.A.C. 301, 75 O.R. (2d) 622, 74 D.L.R. (4th) 1, 1990 CarswellOnt 2676 (Ont. C.A.) — followed

*Housen v. Nikolaisen* (2002), 2002 SCC 33, 2002 CarswellSask 178, 2002 CarswellSask 179, 286 N.R. 1, 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, [2002] 7 W.W.R. 1, 219 Sask. R. 1, 272 W.A.C. 1, 30 M.P.L.R. (3d) 1, [2002] 2 S.C.R. 235 (S.C.C.) — followed

*Kachur v. Kachur* (2000), 2000 ABQB 709, 2000 CarswellAlta 1112, [2001] 4 W.W.R. 294, 14 R.F.L. (5th) 98, 274 A.R. 323, 88 Alta. L.R. (3d) 234 (Alta. Q.B.) — referred to

*Keelty v. McDonald Estate* (2002), 2002 CarswellOnt 64, *(sub nom. Keelty v. Bernique)* 155 O.A.C. 20, *(sub nom. Keelty v. Bernique)* 209 D.L.R. (4th) 648, *(sub nom. Keelty v. Bernique)* 57 O.R. (3d) 803, 35 C.C.L.I. (3d) 256, *(sub nom. Keelty v. Bernique)* [2002] I.L.R. I-4074, 23 M.V.R. (4th) 1 (Ont. C.A.) — referred to

*Keizer v. Hanna* (1978), [1978] 2 S.C.R. 342, 82 D.L.R. (3d) 449, 19 N.R. 209, 3 C.C.L.T. 316, 1978 CarswellOnt 587, 1978 CarswellOnt 589 (S.C.C.) — considered

*Kern v. Steele* (2003), 2003 NSCA 147, 2003 CarswellNS 459, 220 N.S.R. (2d) 51, 694 A.P.R. 51, 21 C.C.L.T. (3d) 45 (N.S. C.A.) — followed

*Kuzyk v. Commercial Union Assurance Co. of Canada* (1991), 5 C.C.L.I. (2d) 38, 84 D.L.R. (4th) 745, 83 Alta. L.R. (2d) 221, 117 A.R. 391, 2 W.A.C. 391, [1992] I.L.R. 1-2811, 1991 CarswellAlta 194 (Alta. C.A.) — considered

*MacNeill v. Co-operators General Insurance Co.* (2003), 2003 PESCAD 9, 2003 CarswellPEI 33, 223 Nfld. & P.E.I.R. 199, 666 A.P.R. 199, *(sub nom. Prince Edward Island (Worker's Compensation Board) v. MacNeill)* 224 D.L.R. (4th) 385, 49 C.C.L.I. (3d) 10 (P.E.I. C.A.) — followed

*Myers Estate v. Zurich Insurance Co.* (1992), 118 N.S.R. (2d) 379, 327 A.P.R. 379, 16 C.C.L.I. (2d) 244, 1992 CarswellNS 122 (N.S. T.D. [In Chambers]) — considered

*Nance v. British Columbia Electric Railway* (1951), [1951] A.C. 601, 2 W.W.R. (N.S.) 665, [1951] 3 D.L.R. 705, 1951 CarswellBC 72, 67 C.R.T.C. 340, [1951] 2 All E.R. 448, [1951] 2 T.L.R. 137, 95 S.J. 543 (British Columbia P.C.) — referred to

*Olson v. General Accident Assurance Co. of Canada* (1998), 218 A.R. 310, 1998 CarswellAlta 433 (Alta. Q.B.) — referred to

*Olson v. General Accident Assurance Co. of Canada* (2001), 2001 ABCA 91, 2001 CarswellAlta 455, 281 A.R. 327, 248 W.A.C. 327 (Alta. C.A.) — referred to

*Parry v. Cleaver* (1969), [1970] A.C. 1, [1969] 1 Lloyd's Rep. 183, [1969] 1 All E.R. 555, [1969] 2 W.L.R. 821 (U.K. H.L.) — referred to

*Parsons v. Parker* (1997), *(sub nom. Parker v. Parsons)* 160 N.S.R. (2d) 321, *(sub nom. Parker v. Parsons)* 473 A.P.R. 321, 1997 CarswellNS 286 (N.S. C.A.) — referred to

*Rattenbury v. Rattenbury* (2000), 2000 CarswellBC 954, 2000 BCSC 722 (B.C. S.C.) — referred to

*Ratych v. Bloomer* (1990), 30 C.C.E.L. 161, [1990] 1 S.C.R. 940, 69 D.L.R. (4th) 25, 107 N.R. 335, 39 O.A.C. 103, 3 C.C.L.T. (2d) 1, 1990 CarswellOnt 644, 73 O.R. (2d) 448 (note), [1990] R.R.A. 651, 1990 CarswellOnt 995 (S.C.C.) — referred to

*Rayner v. Knickle* (1991), 88 Nfld. & P.E.I.R. 214, 274 A.P.R. 214, 1991 CarswellPEI 105 (P.E.I. C.A.) — referred to

*Scarlett v. Scarlett* (1993), 47 R.F.L. (3d) 130, 1993 CarswellBC 613 (B.C. S.C.) — referred to

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 6 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

Schrump v. Koot (1977), 18 O.R. (2d) 337, 4 C.C.L.T. 74, 82 D.L.R. (3d) 553, 1977 CarswellOnt 454, 82 D.L.R. 553 (Ont. C.A.) — referred to

Somersall v. Friedman (2002), [2002] 3 S.C.R. 109, 2002 SCC 59, 2002 CarswellOnt 2550, 2002 CarswellOnt 2551, 25 M.V.R. (4th) 1, 39 C.C.L.I. (3d) 1, (sub nom. Scottish & York Insurance Co. v. Somersall) 215 D.L.R. (4th) 577, 292 N.R. 1, [2002] I.L.R. I-4114, 163 O.A.C. 201, [2002] R.R.A. 679 (S.C.C.) — followed

Spath v. Anglo Canada General Insurance (1994), 17 O.R. (3d) 507, [1994] I.L.R. 1-3073, 5 M.V.R. (3d) 317, 1993 CarswellOnt 73 (Ont. Gen. Div.) — referred to

Stein v. "Kathy K" (The) (1975), [1976] 2 S.C.R. 802, 6 N.R. 359, 62 D.L.R. (3d) 1, 1975 CarswellNat 385, [1976] 1 Lloyd's Rep. 153, 1975 CarswellNat 385F (S.C.C.) — considered

Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital (1994), [1994] 2 W.W.R. 609, 87 B.C.L.R. (2d) 1, 18 C.C.L.T. (2d) 209, [1994] 1 S.C.R. 114, 110 D.L.R. (4th) 289, (sub nom. Toneguzzo-Norvell v. Savein) 162 N.R. 161, (sub nom. Toneguzzo-Norvell v. Savein) 38 B.C.A.C. 193, (sub nom. Toneguzzo-Norvell v. Savein) 62 W.A.C. 193, (sub nom. Toneguzzo-Norvell v. Savein) [1994] R.R.A. 1, 1994 CarswellBC 101, 1994 CarswellBC 1232 (S.C.C.) — considered

Zollinger v. Kong (2003), 2003 BCSC 1932, 2003 CarswellBC 3170 (B.C. S.C.) — referred to

APPEAL by dentist's insurer from judgment reported at MacIsaac v. Deveaux (2003), 2003 NSSC 111, 2003 CarswellNS 176, (sub nom. Campbell-MacIsaac v. Deveaux) 214 N.S.R. (2d) 129, (sub nom. Campbell-MacIsaac v. Deveaux) 671 A.P.R. 129, 49 C.C.L.I. (3d) 238 (N.S. S.C.), allowing action in part.

**Saunders J.A.:**

1     This appeal and cross-appeal principally concern the proper quantification of a very substantial loss suffered by the respondent who was badly injured in a motor vehicle accident, and the extent to which her own motor vehicle insurer may be able to claim as a setoff, certain past and future disability benefits the respondent received and is expected to receive from a different disability insurer with which she contracted privately.

**Introduction**

2     The respondent, Dr. Campbell-MacIsaac, a dentist, was seriously injured in a motor vehicle accident in Moncton on May 7, 1995. The collision resulted from the negligence of Ms. Lisa Deveaux, whose vehicle crossed the centre line of the highway in slippery conditions and collided head-on with the vehicle being driven by Dr. Campbell-MacIsaac. Dr. Campbell-MacIsaac was wearing her lap and shoulder belt. The driver's side air bag deployed in the crash. She suffered a permanently disabling fracture to her right ankle.

3     A defence was filed on behalf of the tortfeasor, Ms. Deveaux. Her representatives acknowledged fault about a month prior to trial and paid their full policy limits to Dr. Campbell-MacIsaac.

4     Because of her injuries and permanent disabilities Dr. Campbell-MacIsaac was not able to return to the practice of dentistry. Her efforts to keep her dental practice going using replacement dentists proved unsuccessful. As a result of her own professional inactivity she lost her license to practice. She was then forced to sell her dental practice about a year after the accident. Medical evidence at trial confirmed that with her physical limitations as they were, the likelihood of her ever regaining her license and resuming a dental practice was practically nonexistent.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

5    Of the $1,000,000.00 "limits" paid-in by Ms. Deveaux's insurer, Dr. Campbell-MacIsaac received $972,826.00 in partial settlement of her tort claims. The balance was paid in property damage and to compensate Dr. Campbell-MacIsaac for an $8,000.00 payout to the landlord of her office premises.

6    Following the withdrawal of Deveaux and her insurer from the litigation, the principal cause of action at trial related to the respondents' respective claims to indemnity under their own motor vehicle insurance policy issued to Dr. Campbell-MacIsaac and her husband by the appellant, Lombard Insurance Company. That policy contained a so-called SEF 44 Family Protection Endorsement ("SEF 44 Endorsement") which provided additional underinsured motorist coverage.

7    Pursuant to the SEF 44 Endorsement, Lombard Insurance undertook to indemnify the respondents for the amounts of their claims to damages to whatever extent those damages exceeded the amounts available under Ms. Deveaux's own liability policy, subject to certain limitations. The coverage available to the respondents pursuant to their own SEF 44 Endorsement was further enhanced by the appellant's issuance to them of a so-called Personal Umbrella Liability policy ("the umbrella policy"). This umbrella policy increased the limits available to the respondents under their own SEF 44 Endorsement from $2,000,000.00 to $6,000,000.00.

8    At the time of the accident Dr. Campbell-MacIsaac had a long term disability policy with Canada Life ("the LTD policy"). That policy provided a monthly disability benefit in the amount of $5,400.00 per month (indexed) for the duration of the disability, as defined in the policy, or until Dr. Campbell-MacIsaac reaches the age of 65. By the time of trial the benefit had increased to $7,388.00 per month (or $88,656.00 per year) as a result of indexing. The LTD policy contains an "own occupation rider" entitling her to benefits as long as she is unable to practice dentistry. In other words, if she is unable to work as a dentist, but is able to earn some or even greater income from some other occupation, she is still entitled to receive LTD benefits from Canada Life without reduction.

9    From the date of the accident until the date of trial, Dr. Campbell-MacIsaac received a total of $567,514.00 in LTD benefits from Canada Life. These benefits were tax free.

10    Dr. Campbell-MacIsaac has also received Section B weekly indemnity benefits from the appellant, Lombard Insurance. From the date of the accident until the date of trial, Dr. Campbell-MacIsaac received $55,720.00 in Section B weekly indemnity benefits.

11    In the result, since the accident Dr. Campbell-MacIsaac's source of funds have been from Lisa Deveaux's insurer, her own Section B benefits and her Canada Life LTD benefits. She has received a total of $1,596,060.00 from these sources:

| | |
|---|---:|
| Deveaux's Insurer | $972,826.00 |
| Section B Weekly Indemnity Benefits | $ 55,720.00 |
| Canada Life LTD Benefits | $567,514.00 |
| TOTAL: | $1,596,060.00 |

12    Dr. Campbell-MacIsaac has received her LTD benefits continuously until the date of trial. Canada Life has been aware that Dr. Campbell-MacIsaac advanced a claim against both the tortfeasor Deveaux and Lombard but has not, at any time, asserted any claims to the fruits of the litigation received, or to be received, by the respondents. Canada Life has not asserted subrogation rights at any time. The Canada Life policy does not contain a subrogation clause. Dr. Campbell-MacIsaac was never asked for, nor ever agreed to sign any type of reimbursement agreement in favour of Canada Life.

13    Expert evidence at trial established a present value of Dr. Campbell-MacIsaac's future Canada Life LTD benefits to be $1,216,643.00. The present value of Dr. Campbell-MacIsaac's future Section B weekly indemnity benefits were calculated to be $79,741.00. Thus, the present value of these two sources of benefits was said to be $1,296,384.00.

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

14    At trial the appellant, Lombard argued that pursuant to its SEF 44 endorsement, it was entitled to deduct, from the amount of damages awarded by the trial judge in favour of Dr. Campbell-MacIsaac, the amounts the respondents had recovered from Deveaux's insurer, being $972,826.00; together with the amounts received to the date of trial in Canada Life LTD benefits, being $589,167.00; together with the present value of her future Canada Life LTD benefits, being $1,216,643.00; as well as the present value of her future Section B weekly indemnity benefits of $79,741.00. Alternatively, if it were decided that it was not appropriate to deduct the present value of such future benefits in calculating its liability pursuant to the SEF 44 endorsement, Lombard said that it was entitled to be subrogated to Dr. Campbell-MacIsaac's rights as against Canada Life, and to an assignment of those future LTD benefits.

15    The trial judge, Nova Scotia Supreme Court Justice David W. Gruchy, disagreed. He held that Lombard was only entitled to deduct the amount the respondents had received from Deveaux's insurer ($972,826.00) *and* the Section B weekly indemnity benefits *already paid* to the date of trial ($55,860.00). Gruchy, J. held that Lombard was not entitled to deduct any of the past LTD benefits received by Dr. Campbell-MacIsaac ($567,514.00) or the present value of the future LTD benefits to be received by Dr. Campbell-MacIsaac ($1,216,643.00), or the present value of the future Section B benefits ($79,741.00).

16    Further, the trial judge held that Lombard was not subrogated to Dr. Campbell-MacIsaac's rights against Canada Life for the future LTD benefits and was not entitled to an assignment of those rights.

17    A litany of errors on the part of the trial judge, both in fact and in law, are alleged by the appellant. Its assertions are vigorously rebutted by the respondents who, in all but one respect forming their cross-appeal, say that the trial judge's findings and ultimate disposition ought not to be disturbed.

18    Stripped to their essential parts, their respective positions may be described as follows:

**Appellant's Position**

19    Lombard says the trial judge committed a serious error in refusing to permit it to deduct as a credit or set-off against its own liability to Dr. Campbell-MacIsaac, both the past and future benefits she received and was to receive from her disability insurer, Canada Life. Alternatively, it says the trial judge erred in refusing it the right of subrogation or assignment pursuant to articles 9 and 10 of the SEF 44 endorsement. Lombard says the judge wrongly applied the collateral benefits rule from tort law to this, a first party dispute in contract.

20    Further, Lombard says the judge's interpretation is contrary to the leading authorities and at odds with the plain meaning of the contract and the objectives of the SEF 44 endorsement. The appellant rejects the judge's finding that there was an ambiguity in the language of the contract, such that it ought to be interpreted in favour of the respondents. The result of these various errors with respect to the SEF endorsement enable Dr. Campbell-MacIsaac to "profit" from her insurance, thereby effecting a "double recovery," resulting in a grossly unfair, unlawful and inordinately high damage award.

21    The second principal argument advanced by the appellant is that the judge ignored or misunderstood key evidence concerning retirement trends among dentists practicing in Nova Scotia and that this mistake, coupled with the judge's failure to take a proper account of certain negative contingencies, resulted in setting too late a date for the respondent's expected retirement from dentistry at age 65, which in turn resulted in a far too generous award for loss of future earnings.

22    Lombard's third principal complaint has to do with a variety of other alleged errors, including the assertion that the judge took an improper view of the evidence which caused him to exaggerate the extent of Dr. Campbell-MacIsaac's disability thus colouring his approach and his assessment of damages. The judge is said to have mis-stated the evidence in calculating the award for the cost of future drugs; to have erroneously concluded that Lombard was liable for severance paid to the respondents' employees; to have wrongly awarded Mr. MacIsaac $50,000.00 on a *quantum meruit* basis, or in any event granting an award out of all proportion to the leading authorities; and to have erred both in fact and in law in quantifying past loss of income; and in allowing the respondents to claim for lost profits from their management company, Cairdeas, when such was not authorized by law.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

**Respondents' Position**

23      At the hearing of this appeal counsel for the respondents conceded that past LTD benefits ought to be deducted, to Lombard's credit. But for that concession the respondents say the SEF 44 endorsement is a poorly drafted contract resulting in an ambiguous document that the trial judge was right to interpret in a way that favoured the insured, Dr. Campbell-MacIsaac. The judge was not wrong to consider the collateral benefits rule in interpreting what he properly viewed as a contractual dispute between insurer and insured.

24      Further, the respondents deny any double recovery. Such a characterization is, they say, a fallacy. At common law, a right of subrogation only arose in cases involving indemnity insurance. It did not apply to non-indemnity contracts of insurance such as Dr. Campbell-MacIsaac's LTD policy with Canada Life. There is nothing in the SEF 44 endorsement to support the argument that it was intended to alter the common law. In any event such a variation would have to be clearly explained in unambiguous terms. Lombard's failure to do so in this contract is said to be a bar to any claim of set-off or deduction on the part of the insurer. Lombard should not be entitled to claim to itself a credit for the value of future disability benefits acquired by Dr. Campbell-MacIsaac through foresight, careful insurance planning and at a substantial annual premium.

25      The respondents say that the evidence called by the appellant at trial concerning general retirement patterns among dentists in Nova Scotia was properly seen by the trial judge to have no relevance or application to Dr. Campbell-MacIsaac's circumstances. He was right to reject it. Based on evidence called by the respondents that was relevant to her personal situation, the judge was correct to establish her retirement date at age 65, and calculate her loss of income claim on that basis.

26      The respondents submit that much of the present appeal is a veiled attack on the judge's strong factual findings and that the appellant is attempting to re-try the case. They say the trial judge's findings of fact or inferences drawn from facts have not been shown to have occurred from palpable or overriding error and must be left undisturbed.

27      Accordingly, so the respondents assert, but for a single issue, there is no basis in law to interfere with the trial judge's principal findings or ultimate disposition.

28      The only reversible error made by the trial judge in the respondents' submission arose in assigning to Dr. Campbell-MacIsaac a residual earning capacity of $50,000.00 per year for ten years. This, they say, is totally inconsistent with every other finding made concerning her injury and disability. His award for residual earning capacity ought to be significantly reduced both in terms of amount and duration. Lombard responds that the judge's findings under this head of damage were factually driven, did not arise from palpable and overriding error, and are therefore immutable.

**Issues**

29      Somewhat redefined and reorganized, the various grounds of appeal and issues that arise in their consideration may be more conveniently presented and addressed as follows:

> **Part I SEF 44 Endorsement**
>
> 1. Interpretation of the contract
>
> 2. Entitlement to set-off
>
> 3. Entitlement to subrogation
>
> 4. Entitlement to assignment
>
> 5. Conclusion
>
> **Part II Contingencies**

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

1. The appellant's challenge to the loss of future earning capacity

2. The principles that apply

3. Trial judge's approach

4. Conclusion

**Part III Miscellaneous Grounds**

1. Award for past loss of income

2. Loss upon sale of her dental practice

3. The family trust — Cairdeas Management Inc.

4. Cost of orthotics

5. Cost of prescription drugs

6. Severance paid to employees

7. Quantum meruit

8. Section B benefits

9. Denied appellant a fair trial

10. Conclusion

**Part IV Cross-Appeal**

**Part V Costs**

**Part VI Disposition**

30    Before turning to a detailed analysis of these subjects, I will first consider the appropriate standard of review.

**Standard of Review**

31    The issues raised in this appeal entail a review of the trial judge's findings and conclusions. The standard of review will depend on how those findings and conclusions ought to be characterized: whether as a question of fact, or an inference drawn from facts, or a question of law, or mixed law and fact, or an assessment of damages.

32    In *Stein v. "Kathy K" (The)* (1975), 62 D.L.R. (3d) 1 (S.C.C.), the Supreme Court of Canada (per: Ritchie, J.) held, at pp. 3-5 that:

> . . . the accepted approach of a court of appeal is to test the findings made at trial on the basis of whether or not they were clearly wrong rather than whether they accorded with that court's view of the balance of probability.

> In this regard, reference may be had to the case of *S.S. Hontestroom (Owners) v. S.S. Sagaporack (Owners)*, where Lord Sumner said, at pp. 47-8:

>> . . . not to have seen the witnesses put appellate judges in a permanent position of disadvantage as against the trial judge, and, unless it can be shown that he has failed to use or has palpably misused his advantage, the higher court ought

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

not to take the responsibility of reversing conclusions so arrived at, merely on the result of their own comparisons and criticisms of the witnesses *and of their own view of the probabilities of the case*.

. . .

. . . We must, in order to reverse, not merely entertain doubts whether the decision below is right, but be convinced that this is wrong.

. . .

The authorities are not to be taken as meaning that the findings of fact made at trial are immutable; but rather that they are not to be reversed <u>unless it can be established that the learned trial judge made some palpable and overriding error which affected his assessment of the facts</u>. While the Court of Appeal is seized with the duty of re-examining the evidence in order to be satisfied that no such error occurred, it is not, in my view a part of its function to substitute its assessment of the balance of probability for the findings of the Judge who presided at the trial. (underlining mine)

33    The principles of deference set out in *Stein*, supra, have been restated many times. Examples include the Supreme Court of Canada decision in *Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital* (1994), 110 D.L.R. (4th) 289 (S.C.C.) and the decision of this court in *Founders Square Ltd. v. Nova Scotia (Attorney General)* (2001), 192 N.S.R. (2d) 127 (N.S. C.A.).

34    As a result a trial judge's findings of fact are not to be disturbed unless it can be shown that they are the result of some palpable and overriding error.

35    The deference owed such factual findings, given the trial judge's unique advantage in presiding over the whole of the trial and seeing and hearing the witnesses was emphasized by the Court in *Toneguzzo-Norvell*, supra. At issue there was an appeal court's substitution of its own assessment of an infant plaintiff's life expectancy, for that determined by the trial judge. In rejecting the approach taken by the appeal court, the Supreme Court of Canada (McLachlin, J., as she then was) held at pp. 292-293:

It is by now well established that a Court of Appeal must not interfere with a trial judge's conclusions on matters of fact unless there is palpable or overriding error. In principle, a Court of Appeal will only intervene <u>if the judge has made a manifest error, has ignored conclusive or relevant evidence, has misunderstood the evidence, or has drawn erroneous conclusions from it</u>:

. . . . .

A Court of Appeal is clearly not entitled to interfere merely because it takes a different view of the evidence. <u>The finding of facts and the drawing of evidentiary conclusions from facts is the province of the trial judge, not the Court of Appeal</u>.

. . . . .

. . . <u>the weight to be assigned to the various pieces of evidence is under our trial system essentially the province of the trier of fact, in this case the trial judge</u>. [underlining mine]

36    This same emphasis placed upon the deference owed to trial judges in factual matters was repeated most recently by the Court in *Housen v. Nikolaisen*, [2002] 2 S.C.R. 235 (S.C.C.). There the majority (per: Iacobucci and Major, JJ.) held (commencing at ¶ 10) as follows:

The standard of review for findings of fact is that such findings are not to be reversed unless it can be established that the trial judge made a "palpable and overriding error": *Stein v. The Ship* "Kathy K", [1976] 2 S.C.R. 802, at p. 808; *Ingles v. Tutkaluk Construction Ltd.*, [2000] 1 S.C.R. 298, 2000 SCC 12, at para. 42; *Ryan v. Victoria (City)*, [1999] 1 S.C.R. 201, at para. 57. While this standard is often cited, the principles underlying this high degree of deference rarely receive

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

mention. We find it useful, for the purposes of this appeal, to review briefly the various policy reasons for employing a high level of appellate deference to findings of fact.

A fundamental reason for general deference to the trial judge is the presumption of fitness — a presumption that trial judges are just as competent as appellate judges to ensure that disputes are resolved justly.

. . . . .

With respect to findings of fact in particular, in Gottardo Properties, supra, Laskin J.A. summarized the purposes underlying a deferential stance as follows (at para. 48):

> Deference is desirable for several reasons: to limit the number and length of appeals, to promote the autonomy and integrity of the trial or motion court proceedings on which substantial resources have been expended, to preserve the confidence of litigants in those proceedings, to recognize the competence of the trial judge or motion judge and to reduce needless duplication of judicial effort with no corresponding improvement in the quality of justice.

Similar concerns were expressed by La Forest J. in Schwartz, supra, at para. 32:

> It has long been settled that appellate courts must treat a trial judge's findings of fact with great deference. The rule is principally based on the assumption that the trier of fact is in a privileged position to assess the credibility of witnesses' testimony at trial... . Others have also pointed out additional judicial policy concerns to justify the rule. Unlimited intervention by appellate courts would greatly increase the number and the length of appeals generally. Substantial resources are allocated to trial courts to go through the process of assessing facts. The autonomy and integrity of the trial process must be preserved by exercising deference towards the trial courts' findings of fact; [authorities omitted]

37   Other notable advantages enjoyed by trial judges which seem especially apt to the circumstances of this case were stressed:

> . . . Appellate court judges are restricted to reviewing written transcripts of testimony. As well, appeals are unsuited to reviewing voluminous amounts of evidence. Finally, appeals are telescopic in nature, focussing narrowly on particular issues as opposed to viewing the case as a whole. (at para. 14)

38   The standard of review applicable to inferences drawn from fact is no less and no different than the standard applied to the trial judge's findings of fact. Again, such inferences are immutable unless shown to be the result of palpable and overriding error. If there is no such error in establishing the facts upon which the trial judge relies to draw an inference, then it is only when palpable and overriding error can be shown in the inference drawing process itself that an appellate court is entitled to intervene. This was made clear by the Court in *Housen*, supra, at ¶ 21, *et seq:*

> . . . First, in our view, the standard of review is not to verify that the inference can be reasonably supported by the findings of fact of the trial judge, but whether the trial judge made a palpable and overriding error in coming to a factual conclusion based on accepted facts, which implies a stricter standard.

> Second, with respect, we find that by drawing an analytical distinction between factual findings and factual inferences, the above passage may lead appellate courts to involve themselves in an unjustified reweighing of the evidence. Although we agree that it is open to an appellate court to find that an inference of fact made by the trial judge is clearly wrong, we would add the caution that where evidence exists to support this inference, an appellate court will be hard pressed to find a palpable and overriding error. As stated above, trial courts are in an advantageous position when it comes to assessing and weighing vast quantities of evidence. In making a factual inference, the trial judge must sift through the relevant facts, decide on their weight, and draw a factual conclusion. Thus, where evidence exists which supports this conclusion, interference with this conclusion entails interference with the weight assigned by the trial judge to the pieces of evidence.

> We reiterate that it is not the role of appellate courts to second-guess the weight to be assigned to the various items of evidence. If there is no palpable and overriding error with respect to the underlying facts that the trial judge relies on to draw the inference, then it is only where the inference-drawing process itself is palpably in error that an appellate court can

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

interfere with the factual conclusion. The appellate court is not free to interfere with a factual conclusion that it disagrees with where such disagreement stems from a difference of opinion over the weight to be assigned to the underlying facts. As we discuss below, it is our respectful view that our colleague's finding that the trial judge erred by imputing knowledge of the hazard to the municipality in this case is an example of this type of impermissible interference with the factual inference drawn by the trial judge.

39    Thus, we are to apply the same standard of review in assessing Justice Gruchy's findings of fact, and the inferences he drew from those facts.

40    On questions of law the trial judge must be right. The standard of review is one of correctness. There may be questions of mixed fact and law. Such matters involve applying a legal standard to a set of facts. See, for example, *Housen*, supra, and *Canada (Director of Investigation & Research) v. Southam Inc.*, [1997] 1 S.C.R. 748 (S.C.C.), at ¶ 35. Where warranted it may be necessary to probe further and decide whether, in certain circumstances, an error on a question of mixed fact and law will, upon further reflection, constitute a pure error of law thus attracting a correctness standard. Matters of mixed fact and law fall along a spectrum and because they involve applying a legal standard to a given set of facts, it is subject to a more stringent standard. See *Housen*, supra, generally at paras. 19-28.

41    Finally, in cases involving the assessment of damages a trial judge's award of damages should not be disturbed unless it can be demonstrated that the judge applied a wrong principle of law or has set an amount so inordinately high or low as to be a wholly erroneous estimate. See, for example, *Nance v. British Columbia Electric Railway*, [1951] A.C. 601 (British Columbia P.C.); *Toneguzzo-Norvell*, supra, at pp. 121-122; *Parsons v. Parker* (1997), 160 N.S.R. (2d) 321 (N.S. C.A.) at para. 18; and *Fraser v. Hunter Estate* (2000), 184 N.S.R. (2d) 217 (N.S. C.A.) at paras. 8-10.

42    I will now proceed to a consideration of the various issues raised in this appeal and cross-appeal as identified earlier at para. 29.

**Part I SEF 44 Endorsement**

*1. Interpretation of the contract*

43    As noted earlier, the main cause of action in this case developed as one involving the respondents' various claims to indemnity under their own motor vehicle insurance policy with Lombard. Their policy provided standard protection for third party liability; accident benefits and loss or damage to their own vehicle. In addition, the policy contained a so-called SEF 44 family protection endorsement ("SEF 44 Endorsement") which provided additional underinsured motorist coverage.

44    Pursuant to the SEF 44 endorsement, Lombard undertook to indemnify the respondents in damages to whatever extent those damages exceeded the amounts available under the tortfeasor Deveaux's liability policy, subject to certain limitations. Such added protection was acquired by the respondents for an additional premium of approximately $30.00, annually.

45    The extended coverage available to the respondents pursuant to their SEF 44 endorsement was further enhanced by Lombard's issuance to them of a so-called Personal Umbrella liability policy. The effect of this Personal Umbrella policy was to increase the limits available to the respondents under the appellant's SEF 44 endorsement from $2,000,000.00 to $6,000,000.00.

46    As noted earlier, Lombard claimed at trial the right to set-off, as against its own liability to the respondents, the value of any past and future benefits paid or to be paid Dr. Campbell-MacIsaac through private disability insurance she acquired with Canada Life. The cost of that LTD policy was substantial with premiums exceeding $4,000.00 annually.

47    This question of set-off, or credit, is obviously significant to both sides since the value of both past and future LTD benefits under the Canada Life policy was calculated at trial to be worth almost $2,000,000.00.

48    This important question obliged the judge to consider the nature of the contractual relationship between the parties and to interpret the material provisions of that contract.

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 14 of 34
Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

49    I begin by observing that this appeal involves a first-party claim, that is, a contest between an insurer and its insured with respect to the coverage afforded pursuant to the terms of their contract. This is a key feature which distinguishes this case from those where the main action is one of negligence, prompting a third-party claim by an insured against a tortfeasor and the tortfeasor's liability insurer. I think it important in any case involving a consideration of the SEF 44 endorsement that this critical distinction be kept in mind.

50    Section 1 of the SEF 44 endorsement is the *Definitions* section. There was never any dispute that Dr. Campbell-MacIsaac was an "insured person sustaining bodily injury" and therefore fell within the term "eligible claimant." Other provisions within the *Definitions* section pertinent to this appeal include:

> (d) The words "Family Protection Coverage" mean the insurance as provided by this form of endorsement and any other coverage provided by virtue of a contract of insurance providing indemnity similar in nature to the indemnity provided by this endorsement, whether described as underinsured motorist coverage or not.

> (e) The term "inadequately insured motorist" means:

>> (i) the identified owner or identified driver of an automobile with respect to which the total motor vehicle liability, insurance or provided bonds, cash deposits or other financial guarantees as required by law in lieu of insurance, of the owner and driver less than the Limit of Family Protection Coverage,

>> . . . . .

> where an eligible claimant is entitled to recover damages from an inadequately insured motorist and the owner or operator of any other automobile, then for the purpose of 1(e)(i) above and for the purpose of determining the Insurer's limit of liability under paragraph 3 of this endorsement, the limits of motor vehicle liability insurance shall be deemed to be the aggregate of all limits of motor vehicle liability insurance and all bonds, cash deposits or other financial guarantees as required by law in lieu of such insurance, with respect to all of the said automobiles,

>> . . . . .

>> (j) The term "the policy" means the policy to which this endorsement is attached.

51    As much of the dispute between the parties centres around various parts of the endorsement and because in my opinion it is important to consider these provisions in their context and not in isolation, I will here reproduce the balance of the provisions in their entirety.

### 2. INSURING AGREEMENT

In consideration of the premium charged and subject to the provisions hereof, it is understood and agreed that the Insurer shall indemnify each eligible claimant for the amount that such eligible claimant is legally entitled to recover from an inadequately Insured motorist as compensatory damages in respect of bodily injury or death sustained by an insured person by accident arising out of the use or operation of an automobile.

### 3. LIMIT OF COVERAGE UNDER THIS ENDORSEMENT

> (a) The Insurer's maximum liability under his endorsement, regardless of the number of eligible claimants, or number of insured persons injured or killed, or number of automobiles insured under the policy shall be the amount by which the limit of Family Protection Coverage exceeds the total of all limits of motor vehicle liability insurance, or bonds, or cash deposits, or other financial guarantees as required by law in lieu of such insurance, of the inadequately insured motorist and of any person jointly liable therewith.

> (b) Where this endorsement applies as excess, the Insurer's maximum liability under this endorsement is the amount determined in accordance with paragraph 3(a) less the amounts available to eligible claimants under any first loss insurance as referred to in paragraph 7 of this endorsement.

## 4. AMOUNT PAYABLE PER ELIGIBLE CLAIMANT

(a) The amount payable under this endorsement to any eligible claimant shall be ascertained by determining the amount of damages the eligible claimant is legally entitled to recover from the inadequately insured motorist and deducting from that amount the aggregate of the amounts referred to in paragraph 4(b), but in no event shall the Insurer be obliged to pay any amount in excess of the limit or coverage as determined under paragraph 3 of this endorsement.

(b) The amount payable under this endorsement to any eligible claimant is excess to any amount actually recovered by the eligible claimant from any source (other than money payable on death under a policy of insurance) and is excess to any amounts the eligible claimant is entitled to recover (whether such entitlement is pursued or not) from:

(i) the insurers of the inadequately insured motorist, and from bonds, cash deposits or other financial guarantees given on behalf of the inadequately insured motorist;

(ii) the insurers of any person jointly liable with the inadequately insured motorist for the damages sustained by an insured person;

(iii) the Regie de l'assurance automobile du Quebec;

(iv) an unsatisfied judgment fund or similar plan of which would have been payable by such fund or plan had this endorsement not been in effect;

(v) the uninsured motorist coverage of a motor vehicle liability policy;

(vi) any automobile accident benefits plan applicable in the jurisdiction in which the accident occurred;

(vii) any policy of insurance providing disability benefits or loss of income benefits or medical expense or rehabilitation benefits;

(viii) any Worker's Compensation Act or similar law of the jurisdiction applicable to the injury or death sustained;

(ix) any Family Protection Coverage of a motor vehicle liability policy;

(c) In the event the Insurer is presented with claims by more than one eligible claimant and the total of the amounts payable to the eligible claimants exceeds the limit of the Insurer's liability under the endorsement as set out in paragraph 3, the insurer may pay to each eligible claimant a pro rata portion of the amount otherwise payable to each eligible claimant. In the event that payments are made to eligible claimants under this endorsement prior to the receipt of actual notice of any additional claim, then the limits of this endorsement as referred to in paragraph 3 of this endorsement shall be the amount determined in paragraph 3 less the amounts paid to the prior eligible claimants.

## 5. DETERMINATION OF THE AMOUNT AN ELIGIBLE CLAIMANT IS LEGALLY ENTITLED TO RECOVER

(a) The amount that an eligible claimant is legally entitled to recover shall be determined in accordance with the procedures set forth for determination of the issues of quantum and liability by the uninsured motorist coverage provisions of the policy.

(b) In determining the amount an eligible claimant is legally entitled to recover from the inadequately insured motorist, issues of quantum shall be decided in accordance with the law of the province governing the policy and issues of liability shall be decided in accordance with the law of the place where the accident occurred.

(c) In determining any amounts an eligible claimant is legally entitled to recover, no amount shall be included with respect to pre-judgment interest accumulating prior to notice as required by this endorsement.

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

(d) In determining any amounts an eligible claimant is legally entitled to recover, no amount shall be included with respect to punitive, exemplary, aggravated or other damages the award of which is based in whole or in part on the conduct of the inadequately insured motorist or person jointly liable therewith, to the extent that the said damages are not for the purpose of compensating the eligible claimant for actually incurred losses.

(e) In determining any amounts an eligible claimant is legally entitled to recover from an inadequately insured motorist as defined in paragraph 1 (e) (i), no amount shall be included with respect to costs.

(f) No findings of a Court with respect to issues of quantum or liability are binding on the Insurer unless the insurer was provided with a reasonable opportunity to participate in those proceedings as a party.

## 6. PROCEDURES

(a) The following requirements are conditions precedent to the liability of the Insurer to the eligible claimant under this endorsement:

(i) the eligible claimant shall promptly give written notice, with all available particulars, of any accident involving injury or death to an insured person and of any claim made on account of the accident;

(ii) the eligible claimant shall, if so required, provide details of any policies of insurance, other than life insurance, to which the eligible claimant may have recourse,

(iii) the eligible claimant and the insured person shall submit to examination under oath, and shall produce for examination at such reasonable place and time as is designated by the Insurer or its representative, all documents in their possession or control that relate to the matters in question, and they shall permit extracts and copies thereof to be made.

(b) Where an eligible claimant commences a legal action for damages for bodily injury or death against any other person owning or operating an automobile involved in the accident, a copy of the Writ of Summons or other initiating process shall be delivered or sent by registered mail immediately to the chief agency or head office of the Insurer in the province together with particulars of the insurance and loss.

(c) Every action or proceeding against the Insurer for recovery under this endorsement shall be commenced within 12 months from the date upon which the eligible claimant or his legal representatives knew or ought to have known that the quantum of the claims with respect to an Insured person exceeded the minimum limits for motor vehicle liability insurance in the jurisdiction in which the accident occurred. No action which is commenced within 2 years of the date of the accident shall be barred by this provision.

## 7. MULTIPLE COVERAGE

Subject to the provisions hereof, where an eligible claimant is entitled to payment under Family Protection Coverage under more than one policy and the insured person

(a) is an occupant of an automobile, such insurance on the automobile in which the insured person is an occupant is first loss insurance and any other such insurance is excess;

(b) is not an occupant of an automobile, such insurance in any policy in the name of the insured person is first loss insurance and any other such insurance is excess.

All applicable first loss Family Protection Coverage shall be apportioned on a pro rata basis but in no event shall the aggregate payment under all such insurances exceed the highest limit of coverage provided by any one of such first loss insurances. The applicable first loss insurance shall be exhausted before recourse is made to excess insurances. All

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 17 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

applicable excess Family Protection Coverage shall be similarly apportioned on a pro rata basis but in no event shall the aggregate payment under all such insurances exceed the highest limit of coverage as defined in paragraph 3(b) thereof, provided by any one of such excess insurances.

## 8. ACCIDENTS IN THE PROVINCE OF QUEBEC

This endorsement does not apply to an accident occurring in the Province of Quebec for which compensation is payable under the Automobile Insurance Act of Quebec or by virtue of an agreement referred to in that Act.

## 9. SUBROGATION

Where a claim is made under this endorsement, the Insurer is subrogated to the rights of the eligible claimant by whom a claim is made and may maintain an action in the name of that person against the inadequately insured motorist and the persons referred to in paragraph 4(b).

## 10. ASSIGNMENT OF RIGHTS OF ACTION

Where a payment is made under this endorsement, the Insurer is entitled to receive from the eligible claimant, in consideration thereof, an assignment of all rights of action whether judgment is obtained or not, and the eligible claimant undertakes to cooperate with the Insurer, except in a pecuniary way, in the pursuit of any subrogated action or any right of action so assigned.

## 11. MISCELLANEOUS PROVISIONS

If more than one automobile is insured under the policy, this endorsement shall apply only to the automobile(s) against which S.E.F. No. 44 is designated in the schedule of automobiles forming part of the policy. If S.E.F. No. 44 is designated with respect to more than one automobile in the schedule of automobiles forming part of this policy, then the coverages provided shall be construed as if provided by separate policies of insurance with respect to each automobile to which endorsement S.E.F. no. 44 is applicable, subject always to the provisions of paragraph 7 hereof.

This endorsement is attached and forms part of the policy and shall be effective from the local time and effective date of the policy or renewal thereof, or if added to the policy during the policy period, from the local time and effective date of the endorsement specifying the addition of this coverage.

Except as otherwise provided in this endorsement, all limits, terms, conditions, provisions, definitions and exclusions of the policy shall have full force and effect.

52      The primary issue raised on this appeal concerns the interpretation of clauses 4, 9 and 10 of the SEF 44 endorsement. Before undertaking an analysis of those provisions, it would be useful to recall some of the leading authorities in contractual interpretation, especially in the context of insurance contracts, and more particularly, special endorsements such as the SEF 44 in this case.

53      In the recent case of *Somersall v. Friedman*, [2002] 3 S.C.R. 109 (S.C.C.), the Court had to make certain findings regarding the interpretation of the SEF 44. In its analysis the Court considered the nature of the coverage and its objective. The Court found the SEF 44 was a policy of indemnity, such that an insured is to receive no more and no less than full indemnity thus limiting the insurer's liability to the actual loss proved and denying an insured "profit" or overcompensation under the policy. In my opinion these are important principles to be applied when interpreting the whole of the SEF 44 and those of its provisions engaged in this case.

54      While the specific issue under consideration in *Somersall* was whether a limits agreement entered into between the injured insured claimants and the tortfeasor precluded a claim by the claimants for compensation under their SEF 44 endorsement against their own insurer, the analysis and observations of the Court are most instructive and in my opinion apposite in this appeal.

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

55      It has been consistently recognized by the courts that SEF 44 coverage is "last ditch" or "safety net" coverage. It is, as its own provisions make clear, "excess" insurance. The principle that SEF 44 protection is "excess" coverage only and ought not to provide a "windfall" or double recovery was recognized by Glube, C.J.S.C., (as she then was) in *Myers Estate v. Zurich Insurance Co.* (1992), 118 N.S.R. (2d) 379 (N.S. T.D. [In Chambers]) where at ¶ 24, she observed:

> . . . The amount payable by Zurich is excess to amounts actually recovered from any source. The Policy only pays "excess" amounts to any amounts actually recovered. The estate has actually recovered amounts from Omaha and MSI. The only amount unrecovered is the remainder of the funeral expenses. This is an action to indemnify persons as a result of a loss suffered because there was an under insured motorist. The estate is not entitled to receive any amounts for expenses which have been paid in full by others. This is not a case of excusing a tortfeasor from his or her wrongdoing, but rather, payment would result in a windfall to the applicants and would be contrary to the contract between the parties. If Zurich had to pay these amounts, it would be contrary to the clear language of the Policy and in particular the sections in the Endorsement.

56      In *Kuzyk v. Commercial Union Assurance Co. of Canada* (1991), 84 D.L.R. (4th) 745 (Alta. C.A.) the court was considering the nature of the SEF 44 coverage. In referring to ¶ 4 (b) of the endorsement, the court stated at p. 750:

> Nevertheless, because of this argument, I judge it prudent to deal also with a defence under the policy offered by the insurer. It is said that the policy excludes any claims already paid by other insurers, or by government agencies. Clause 4(b) provides that a claim under the policy by an eligible claimant is excess to any amount the claimant recovers "... from any source ...". This underlines the last-ditch or "safety net" nature of the policy, and raises a serious doubt about the status of the Minister. (underlining mine)

For similar characterizations see *Spath v. Anglo Canada General Insurance* (1994), 17 O.R. (3d) 507 (Ont. Gen. Div.) and *Keelty v. McDonald Estate* (2002), 57 O.R. (3d) 803 (Ont. C.A.).

57      From these and other authorities, I conclude that the SEF 44 endorsement is an indemnity policy which is intended to cover Dr. Campbell-MacIsaac up to the extent of her loss, such that she is to receive no more and no less than full indemnity. She can in no way profit from the insurance. Any analysis and interpretation of the SEF 44 endorsement and its provisions must be consistent with those principles, that is that an insured is not to profit from the insurance and therefore is not entitled to double recovery.

58      In addition, I hold the view that the specific terms of the SEF 44 endorsement should be read in the context of the wording of the entire endorsement and not in isolation. As well, the terms of the endorsement must be interpreted in light of its overall purpose, that it is "last ditch," "safety net" and "excess insurance."

59      In *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), Estey, J., explained the rules of interpretation that apply to insurance contracts at pages 901-902:

> Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract. (underlining mine)

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 19 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

60    A similar expression is found in *Liability Insurance Law in Canada*, 3 <sup>rd</sup> ed. (Toronto: Butterworths, 2001) where the author Gordon Hilliker states at pages 27-28:

> The requirement that words are to be construed in accordance with their plain, ordinary and popular sense <u>does not mean that one ignores the context in which the words are found</u>. Rather, it is a cardinal rule that a contract of insurance <u>should be considered in its entirety</u> and be constructed liberally so as <u>to give effect to the purpose in which it was written</u>. (underlining mine)

61    In the text, *Insurance Law in Canada*, Craig Brown, 2002, Thompson Canada Limited, Volume 1, pp. 8-15, the author states the following with respect to the interpretation of insurance contracts:

> Note that the reference is to the reasonable expectations of the *parties*, not just the insured. In this there are echoes of Estey, J. in *Consolidated Bathurst* and Sopinka, J. in *Brissette*, <u>both of whom made it clear that an interpretation should avoid windfalls for insureds as much as insurers</u>. (underlining mine)

62    In the result, particular words and phrases should not be lifted from the contract and considered in isolation. They must be interpreted within the context, scheme and objectives of the entire endorsement which is to provide "last ditch," "safety net" and "excess" protection to Dr. Campbell-MacIsaac that is "no more and no less than full indemnity" and without profit or windfall or double recovery, all in keeping with "the mutual obligations created by the SEF 44" endorsement (*Somersall*, supra, at ¶ 33).

## *2. Entitlement to set-off*

63    As noted, the trial judge rejected Lombard's position that it was entitled to set-off as a credit against its own liability to Dr. Campbell-MacIsaac, the value of both present and future LTD benefits from Canada Life. In dismissing Lombard's assertion the trial judge took the view that the issue triggered an application of the collateral benefits rule whereby Lombard would be prohibited from acquiring unto itself any "benefits" achieved by Dr. Campbell-MacIsaac through her own foresight in purchasing private long term disability insurance. Having expressed this view, the trial judge then embarked on a lengthy review of many of the leading authorities pertaining to the rule, including *Bradburn v. Great Western Railway* (1874), L.R. 10 Exch. 1 (Eng. Exch.); *Parry v. Cleaver* (1969), [1970] A.C. 1 (U.K. H.L.); *Boarelli v. Flannigan* (1973), 36 D.L.R. (3d) 4 (Ont. C.A.); *Ratych v. Bloomer,* [1990] 1 S.C.R. 940 (S.C.C.); and *Cooper v. Miller,* [1994] 1 S.C.R. 359 (S.C.C.), among others.

64    After describing Lombard's position, the trial judge then expressed his approach to the problem:

> [198] As this is a case of determining the deductibility of collateral benefits it is helpful to review the basics of the subject.
>
> . . . . .
>
> [206] While *Boarelli*, supra, dealt with collateral benefits granted under welfare legislation, the decision explains and adopts the principles of non-deductibility of private insurance benefits.
>
> . . . . .
>
> [211] Thus, I conclude that while the policy of the law in Canada is against the concept of double recovery, proceeds from private insurance are excepted from such a rule.
>
> . . . . .
>
> [226] Lombard has referred extensively to and relied upon *Somersall v. Friedman* 2002, S.C.C. 59, a decision of the Supreme Court of Canada concerning S.E.F. 44. It has, to some extent, fastened on the possibility of overcompensating the plaintiff. But if the rationale of such cases as *Boarelli* and *Cunningham v. Wheeler* and their English precedents remains the law of Canada, and I believe it does, the compensation received from private accident and sickness benefits are not to be considered in that context. The plaintiff will not "profit" from an insurance benefit for which she has paid her premiums; the

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

proceeds are hers. S.E.F. 44 contemplates compensatory damages; the proceeds of the Canada Life policy are contracted benefits — bought and paid for.

. . . . .

[228] I do not consider that the *ratio* of the majority decision in *Somersall* is to the effect that an S.E.F. insurer has the right to appropriate privately insured accident and sickness benefits as claimed herein by Lombard.

. . . . .

[230] If I assume that Lombard is correct in its position that it is entitled to deduct the collateral benefit of the proceeds of the Canada Life policy then I would have to conclude that S.E.F. 44 amounts to a contractual abrogation of or exception to the common law as represented by such cases as *Boarelli.*

65    In my respectful view, by treating this issue as a matter involving the application of the collateral benefits rule, the trial judge erred in law and his conclusion and disposition on this point must be overturned.

66    The collateral benefits rule sees its application in cases arising in tort. Generally speaking, the tortfeasor is not entitled to claim to its credit the value of private insurance benefits obtained by the injured plaintiff through its own insurer. Thus the common law recognized the non-deductibility of private insurance benefits. This became known as the collateral benefits rule. The rule has no application in this case which involves a first-party dispute in contract between Lombard and its own insured. The matter can only be resolved by undertaking a careful consideration of the contractual provisions that bound these two parties, which in the circumstances of this case, require particular regard to interpretative rules applicable to insurance contracts, and the unique features of the SEF 44 endorsement.

67    For the purposes of this analysis the operative words (omitting those that are not important) are found in s. 4(a) and (b) as follows:

### 4 Amount Payable Per Eligible claimant

(a) The amount payable . . . shall be ascertained by determining the amount of damages the . . . claimant is legally entitled to recover from the inadequately insured motorist and deducting from that amount the aggregate of the amounts referred to in paragraph 4(b), . . .

(b) The amount payable . . . is excess to any amount actually recovered by the . . . claimant from any source . . . and is excess to any amounts the . . . claimant is entitled to recover (whether such entitlement is pursued or not) from:

(vi) any automobile accident benefits plan applicable . . .

(vii) any policy of insurance providing disability benefits or loss of income benefits or medical expense or rehabilitation benefits;

. . . . .

68    The intent of these provisions is, as the heading makes clear, to determine the amount payable for any eligible claimant, in this case Dr. Campbell-MacIsaac. The first step is to decide the total amount of damages she is entitled to recover from the underinsured motorist, Deveaux. Once that step is taken one then deducts from that amount, the sum of any amounts referable to the sources listed in paragraph 4(b).

69    The risk or promise undertaken by Lombard, the SEF 44 insurer, is to pay to its insured the "amount payable" under the endorsement. That cannot be calculated without first determining the total amount of damages the insured is entitled to recover from the underinsured motorist and then as a separate step accounting for whatever other sources of payment might arise by deducting any one or more of the sources specified in s. 4(b).

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

70    It seems to me indisputable that Dr. Campbell-MacIsaac's own Section B benefits fall within the source identified as (vi) and that her long term disability benefits with Canada Life fall within the source mentioned in (vii). The major contention between the parties on this ground of appeal is the meaning intended by the word "aggregate" and whether any ambiguity arises (which then ought to be interpreted against the insurer) from the words chosen by Lombard in the text of paragraph 4(b).

71    At the hearing before us, counsel for the respondents finally conceded that Lombard is entitled to have taken into account to its credit the amount paid to Dr. Campbell-MacIsaac as past LTD payments. Such a concession seems hardly surprising in light of the words "excess to any amount actually recovered . . .".

72    However, the respondents argue that the same "credit" ought not to apply to future LTD benefits because the contract only speaks in the *present* tense ". . . and is excess to any amounts the eligible *is* entitled to recover . . . ." Were the SEF 44 insurer entitled to claim as a credit future LTD benefits, the respondents argue it would have been a very easy matter for them to have expressed such an intention clearly, using appropriate language of the *future* tense. The respondents say it would have been simple enough to draft a provision in the endorsement providing for the assignment of future benefits from other sources to the SEF 44 insurer. They proposed a provision that read:

> Where a payment is made under this endorsement, the insurer is entitled to receive from the eligible claimant an assignment of all benefits accrued or accruing in the future to the claimant from the persons referred to in paragraph 4(b) and the insurer shall be entitled to maintain any right of action necessary to give effect to this assignment.

73    I disagree. The fact that future automobile accident benefits under (vi) or future long term disability benefits under (vii) may not be calculable in precise terms by virtue of the fact that they are received as a future stream of payments and perhaps subject to certain conditions or other periodic review, does not mean that they are not to be taken into account, and must be excluded, as a part or parts of the "aggregate" of amounts stipulated in 4(a). The word "aggregate" is commonly seen as a total, or whole, or sum of the parts. *Black's Law Dictionary* (7 [th] ed.) defines "aggregate" as:

> An assemblage of particulars; formed by combining into a single whole or total; to collect into a whole.

The *Oxford English Dictionary* (2 [nd] ed.) defines "aggregate" as:

> Collected into one body; collected sum; sum total.

74    Simply because certain stipulated benefits are not received by the claimant until a point in the future cannot mean that they are not to be accounted for as part of the aggregate. To hold otherwise would strip the word "aggregate" of any practical meaning and would defeat the objectives of the endorsement to provide indemnity against loss through excess insurance but without double recovery. The fact that the final amount ultimately payable as a future stream of accident benefits or of long term disability benefits may not be precisely ascertainable at the time the trial judge fixes damages will not exclude such future benefits from the aggregate, when calculating the extent of the SEF 44 insurer's liability for the "amount payable" to its insured.

75    Secondly and with great respect to those who take a different view, I see no ambiguity in the operative provisions I have quoted. The whole endorsement should be read in its entirety and its text construed in light of its objective which is to provide Dr. Campbell-MacIsaac with a safety net of last ditch coverage, that is excess to that which she is able to recover from Deveaux.

76    As 4(b) makes clear, Lombard's promise to cover the "amount payable" under the endorsement is considered to be "excess" to whatever amounts are "actually recovered" or might spring from sources from which she is "entitled to recover." Remembering the objective of the endorsement, the words "entitled to recover" must mean and are intended to include benefits payable to the insured in the future. The inclusion of the words, in brackets "(whether such entitlement is pursued or not)" immediately after "is entitled to recover" suggests that even if the insured had not pursued the other listed sources of payment by time of trial, the insurer was nonetheless entitled to have such sum enure to the insurer's future benefit. The fact that by their very nature, accident benefits identified as a source under (vi) and long term disability benefits mentioned as a source

under (vii) are payable in future, confirm the view that they are caught by the prospective meaning I attach to the words "is entitled to recover" in 4(b).

77      To conclude on this point, leaving aside sums to be set off as falling into the category of "actually recovered" and about which, accordingly, there may be no dispute, I am of the opinion that upon proof of present entitlement, the words "entitled to recover" encompass both benefits payable to the insured in future, and equally to past benefits to which the insured was entitled, but which have not yet been received.

78      Such an interpretation reflects the excess coverage protection intended by the SEF 44 endorsement for damages not recoverable from the inadequately insured motorist, but not in a way that would enable the plaintiff to obtain a profit or windfall at the insurer's expense. Any other interpretation would in my view render meaningless and would not reflect the true intent of the parties when they entered into this contract of insurance. Accordingly, I would direct that the earlier decision of Wright, J., for the Nova Scotia Supreme Court in *Doran v. Commercial Union Assurance Co. of Canada* (2000), 182 N.S.R. (2d) 329 (N.S. S.C. [In Chambers]), decided without benefit of the Supreme Court of Canada's subsequent decision in *Somersall*, supra, is wrongly decided and is therefore overruled.

79      Before leaving the question let me say that I share the point made by Webber, J.A., in *MacNeill v. Co-operators General Insurance Co.* (2003), 224 D.L.R. (4th) 385 (P.E.I. C.A.) when, in considering the application of the SEF 44 endorsement in that case, she said at ¶ 61:

> Therefore, there is no basis upon which to distinguish between benefits paid up to the date of any particular judgment of the court and benefits to be paid after the date of that judgment. The legal entitlement to those benefits existed at the date of the accident and encompasses all benefits flowing from the accident.

80      In summary then, I find that the stream of LTD benefits to which Dr. Campbell-MacIsaac is entitled at the time of judgment, staggered as it is over time, must upon receipt by Dr. Campbell-MacIsaac, be factored to the credit of Lombard in calculating its liability to Dr. Campbell-MacIsaac under the SEF 44 endorsement.

81      The next question is the mechanism by which that accounting in favour of the SEF 44 insurer ought to be conducted.

82      One method would be to attempt to calculate the present value of future benefits and permit the insurer Lombard to deduct that sum from Dr. Campbell-MacIsaac's total damage award at trial. In my opinion there are problems with such an approach. Under the terms of her contract with Canada Life, Dr. Campbell-MacIsaac is entitled to a future stream of long term disability benefits to age 65 for loss of income due to disability for as long as she continues to meet the policy definitions and requirements. In her case, by virtue of the "own occupation rider," Dr. Campbell-MacIsaac's "disability" and therefore entitlement to future benefits is defined as:

> You are unable to perform the important duties of your regular occupation whether or not this results in a Loss of Earned Income.

Thus, Dr. Campbell-MacIsaac's LTD benefits will continue as long as Canada Life is satisfied or, in the event of a dispute between Canada Life and Dr. Campbell-MacIsaac, a court determines, that her condition and on-going disability satisfy the policy requirement. We were advised at the hearing that this entails an on-going assessment apparently subject to at least semi-annual reviews undertaken by Canada Life officials and its medical advisors.

83      Thus, while under those circumstances just described, Dr. Campbell-MacIsaac is entitled to a future stream of long term disability benefits, she is by no means entitled to "the present value" of such a stream. Put simply, she would have no right to insist that Canada Life provide her with a cheque representing the present value of her LTD benefits payable to age 65. If Dr. Campbell-MacIsaac has no such immediate entitlement to such an amount, it can hardly be right that Lombard could seek to acquire to its benefit that same present value, a very significant amount of money.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

84    Other problems surround the required standard of proof if one were to adopt such an approach. These were noted by McQuaid, J.A., in separate reasons in *MacNeill v. Co-operators*, supra (to which part the majority concurred) where he said at paragraphs 89-91:

89 Because of the wording of the question posed, the issue of the onus of proof was not argued before us. The question appears to imply the Co-operators may deduct the present value of the future stream of benefits he "might" be entitled to receive. This may be setting the degree of probability within the civil standard of proof at too low a level.

90 It is well accepted there are degrees of probability within the civil standard of proof. Some events are more probable than others and the consequences which flow from some decisions are more important than others. See: *Director of Child Welfare v. Victor and Victor* (1984), 47 Nfld. & P.E.I.R. 81 (P.E.I.S.C.A.D.); *Prince Edward Island (Director of Child Welfare) v. N.W.* (1997), 156 Nfld. & P.E.I.R. 241 at para 10 (P.E.I.S.C.A.D.).

91 When a defendant seeks to deduct from the amount he is presently obligated to pay a plaintiff, the present value of the future stream of benefits to which the plaintiff may be otherwise entitled, courts have required the defendant to prove the plaintiff's future entitlement on a very high degree of probability. See: *Chrappa v. Ohm* (1997), 38 O.R. (3d) 651; and *Bannon et al. v. McNeely et al.* (1997), 38 O.R. (3d) 659. At this time, I would not be prepared to decide whether the same high degree of probability is required where an S.E.F. insurer seeks to deduct from the amount of excess insurance due and payable the present value of the future stream of workers compensation benefits. However, I am also not prepared to simply say the standard is proof on a balance of probabilities.

85    Similarly, in this case the question of standard of proof was neither argued fully before us, nor did it feature prominently in the reasons of the trial judge, given the approach he took in applying the collateral benefits rule.

86    Other uncertainties militate against such an approach. All actuarial calculations contain assumptions about the future which may or may not prove to be accurate and therefore introduce the risk that the amount set off as a present value will not reflect the amount ultimately received. There is no reason arising from the text of the endorsement, or in policy, to expose Dr. Campbell-MacIsaac to this risk.

87    I would reject Lombard's suggestion that in assigning to its credit Dr. Campbell-MacIsaac's LTD benefits there should also be an allowance for interest in its favour. Lombard obtains to its credit what its insured is entitled to receive, nothing more. Interest is not to be included.

88    It may be that there are certain tax or other advantages to Dr. Campbell-MacIsaac depending upon the way in which future benefits are taken into account in calculating amounts payable by her SEF 44 insurer. One assumes that she currently receives her Canada Life benefits tax free. Innovative approaches such as structuring future payments may be a way to shelter from encroachment. The record here does not enable us to properly deal with such considerations nor decide what approach might be most appropriate and fair to the parties. This then is a matter I would return to the trial judge for hearing, thus giving the parties the opportunity to make further submissions or call evidence if necessary on how Dr. Campbell-MacIsaac's future long term disability benefits with Canada Life might best be taken into account in assessing the liability of Lombard to provide excess coverage for damages not recoverable from the tortfeasor.

89    I turn next to a consideration of both subrogation and assignment. It may be that once the parties assess their positions in light of these reasons, a further hearing before the trial judge such as I have just proposed will not prove to be necessary.

### 3. Entitlement to Subrogation

90    Although referring to the subrogation clause and the assignment clause found in the SEF 44 endorsement, the trial judge did not address those claims advanced by Lombard. He said:

[195] In the circumstances of the case before me and on the basis of my findings and conclusions I need not consider the matters of subrogation and assignments.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

91    Paragraph 9 of the SEF 44 endorsement deals with subrogation and I will repeat it here for ease of reference.

**9. SUBROGATION**

Where a claim is made under this endorsement, the Insurer is subrogated to the rights of the eligible claimant by whom a claim is made and may maintain an action in the name of that person against the inadequately insured motorist and the persons referred to in paragraph 4(b).

92    I cannot accept the respondents' submission that because her policy with Canada Life is a non-indemnity policy, and whereas at common law a right of subrogation only attached to indemnity insurance, that therefore ¶ 9 does *not* entitle Lombard to claim by way of subrogation those future LTD benefits. The SEF 44 endorsement makes no distinction between indemnity or non-indemnity contracts. Its wording is straight forward. Dr. Campbell-MacIsaac's claim against Lombard arises in contract under the endorsement. By the clear operation of its terms, Lombard is subrogated to her rights and may maintain an action in her name against Deveaux ("the inadequately insured motorist") as well as, for example, against Canada Life being one of "the persons referred to in paragraph 4(b)." In choosing to exercise its rights of subrogation Lombard would step into the shoes of Dr. Campbell-MacIsaac thereby acquiring no less and no more than whatever rights she has against, *inter alia*, Canada Life. How, when and by what means Lombard chooses to exercise its subrogation rights under the policy is a matter that need not concern us.

*4. Entitlement to Assignment*

93    Section 10 of the endorsement provides:

**10. ASSIGNMENT OF RIGHTS OF ACTION**

Where a payment is made under this endorsement, the Insurer is entitled to receive from the eligible claimant, in consideration thereof, an assignment of all rights of action whether judgment is obtained or not, and the eligible claimant undertakes to cooperate with the Insurer, except in a pecuniary way, in the pursuit of any subrogated action or any right of action so assigned.

94    In my view this provision permits Lombard, in the circumstances described, to acquire an assignment from Dr. Campbell-MacIsaac and thereby pursue its rights against *inter alia*, Canada Life, by an assigned right of action or pursuit of any subrogated action, as Lombard might choose. This clause provides a separate and additional mechanism by which Lombard might acquire to its credit payments received by Dr. Campbell-MacIsaac from the sources listed in the endorsement, to the extent of Lombard's liability to pay.

*5. Conclusion*

95    In summary, the trial judge erred in law in refusing to permit Lombard, the SEF 44 insurer, to take into account Dr. Campbell-MacIsaac's future LTD benefits when calculating Lombard's liability pursuant to the terms of the endorsement. Lombard is entitled to both subrogation and to assignment, should such be necessary, in gaining to its credit the amount of such future LTD benefits. Finally, should it be suggested that it would be more advantageous to Dr. Campbell-MacIsaac if the present value of her future LTD benefits were precisely calculated, and the certainty of her future receipt of such benefits established to the appropriate standard of proof, then such a determination is best left to the trial judge upon convening a further hearing for argument and such evidence as may be required.

**Part II Contingencies**

*1. The appellant's challenge to the loss of future earning capacity*

96    The appellant's main argument with respect to the trial judge's treatment of contingencies relates to his assessment of Dr. Campbell-MacIsaac's loss of future earning capacity. Justice Gruchy calculated Dr. Campbell-MacIsaac's loss of future

Case 09-10138-MFW    Doc 14225-36    Filed 08/15/14    Page 25 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

earning capacity at $2,047,750.00. At the time of trial she was 51 years of age. In arriving at that sum, the trial judge began with the respondents' expert Paul Bradley's calculation of gross loss of income in the amount of $2,483,000.00. This represented a *present* value of a loss of $240,000.00 per year from the date of trial until age 65, with a 10% reduction in each of the three years before retirement.

97    From this sum of $2,483,000.00 the trial judge deducted $435,250.00, which amount represented the trial judge's valuation of the victim's residual earning capacity, based on the trial judge's finding that Dr. Campbell-MacIsaac was capable of earning $50,000.00 per year, commencing in 2004, for a period of 10 years. These calculations led the trial judge to award $2,047,750.00 as her loss of future working capacity.

98    This substantial award is attacked by the appellant on a number of fronts, all of which may be reduced to three principal arguments. Lombard says the trial judge erred in his treatment of contingencies, more particularly that he failed to take into account or apply negative contingencies for the possibility of Dr. Campbell-MacIsaac's early retirement, or disability, or slow-down caused by such factors as her own health, or her family's health, or changes in their lifestyle. Lombard asserts that had the trial judge conducted a proper assessment of contingencies, he would have reduced the award under this head of damage by at least 40% for the possibility of retirement before age 65, and urges this court to impose the same reduction. The appellant complains that the trial judge erred in law in giving little if any weight to the evidence of experts called to give evidence on the sale of dental practices and which ought to have persuaded the trial judge to choose a much earlier retirement date for Dr. Campbell-MacIsaac. Lastly Lombard says the trial judge made palpable and overriding errors in his assessment of the evidence, in particular that Dr. Campbell-MacIsaac could only walk 40 minutes per day and that such an allegedly erroneous conclusion led the trial judge to overestimate her disability and thus overcompensate her for damages.

99    In my opinion there is no merit to any of the appellant's assertions. I have concluded that from the record before the trial judge in this case there is no basis for disturbing the amount awarded for Dr. Campbell-MacIsaac's loss of future working capacity.

### 2. The principles that apply

100    Whenever we speak of contingencies in the context of calculating an award of damages for future loss, one is obliged to measure, by way of estimate, the chances that a particular thing will occur or would have occurred and then reflect those chances, whether they are positive or negative in calculating the damage award. This engages the trier of fact in an exercise of prediction, based not on guesswork but on proper proof and requires a careful consideration of the evidence and a healthy dose of common sense.

101    The analysis undertaken by Justice Oland in *Kern v. Steele*, 2003 NSCA 147 (N.S. C.A.) beginning at ¶ 56, is most instructive. Her approach, together with the authorities upon which she relies, may be briefly summarized. When assessing contingencies the court is engaged in the exercise of examining possibilities, probabilities and chances against the likelihood that they might prevail in any given factual situation. The evidence upon which such estimations are based must be "cogent evidence and not evidence which is speculative" (*Schrump v. Koot* (1977), 82 D.L.R. (3d) 553 (Ont. C.A.)). Evidence which supports a contingency must show a "realistic as opposed to a speculative possibility" (*Graham v. Rourke* (1990), 75 O.R. (2d) 622 (Ont. C.A.)). Justice Oland also endorsed the approach in *Graham*, supra, which was to distinguish general contingencies from special ones. Into the category of general contingencies fall those features of human experience that are likely to be common to all of us, things like the aging process, sickness, or promotions at work; whereas circumstances falling into the category of special contingencies are peculiar to that particular claimant. For example, remarkable talents, education, a unique illness or a poor employment history would be characterized as special contingencies.

102    As was noted in *Graham*, supra, and endorsed by Oland, J.A., in *Kern*, the impact of general contingencies may not be easily susceptible to formal proof. A trial judge has a discretion whether to adjust an award for future pecuniary loss in order to take into account general contingencies, but any such adjustment ought to be a modest one. Where, however, a party relies upon a specific contingency, whether negative or positive, there must be sufficient proof on the record which would support an allowance for that type of contingency. At all events, as noted by Oland, J.A., the overall approach is that which

best achieves fairness between the parties (*Keizer v. Hanna*, [1978] 2 S.C.R. 342 (S.C.C.), wherein Dickson, J. (as he then was)) held at page 351 that:

> . . . At the end of the day the only question of importance is whether, in all the circumstances, the final award is fair and adequate. Past experience should make one realize that if there is to be an error in the amount of an award it is likely to be one of inadequacy.

103      Fairness and adequacy are concepts rooted in fact and also to some extent in inferences drawn from facts. As such, in the assessment of fairness and adequacy, considerable deference is owed to the findings of a trial court.

### 3. Trial judge's approach

104      A review of the record and the evidence offered by the appellant's expert, David Harris, especially following a very effective cross-examination by counsel for the respondents, clearly left the trial judge unimpressed with the early retirement theory advanced by Lombard. The limitations in Mr. Harris' data and conclusions were exposed on cross-examination. He agreed that his samples of sales within the dental profession generally did not represent the population of dentists in Nova Scotia. He did not know the ages of all of those dentists with whom he consulted who were selling their practices and going into retirement or semi-retirement. He did not know their family circumstances. He did not know whether they were married, or whether or not they had spouses who could and would continue to earn an income. He did not know anything about their children or whether they required financial support for university or private schooling. Many other shortcomings were mentioned by the trial judge. Most notably, Mr. Harris made no assessment of the personal affinity for the practice of those dentists with whom he had consulted. His direct answer to the question posed was that:

> [He thought they] were looking forward to unburdening themselves of the responsibility of running a practice.

105      Dr. Campbell-MacIsaac had no such intent. She absolutely "loved" her practice, was evidently revered in her community, intended to carry on, and had no desire to "unburden herself" of practice responsibilities. On the evidence, it could be said that it was Dr. Campbell-MacIsaac's intention to seek greater practice opportunities, most notably in the field of cosmetic dentistry, were it not for the severe injury she suffered in this accident. From the testimony of Mr. William Tingley, an expert called by the respondents, it was equally apparent that the retirement age of dentists varies depending upon individual circumstances and personality and passion for the work.

106      The trial judge was well aware of the issues to be addressed under this head of damage and was in a most advantageous position to assess the strength or otherwise of the evidence before him. He said:

> [104] Counsel for both parties have agreed that it is a question of fact when Dr. Campbell MacIsaac would have retired if the accident had not occurred. Lombard unsuccessfully looked for statistics to show the average retirement age of dentists in Canada or in Nova Scotia. It adduced some evidence of the average years of practice of a few dentists at the time of the sale of their practices, but which evidence I do not find helpful. There was no evidence before me to show what had prompted those sales, the ages of the dentists involved, the financial conditions of the dentists, their health, or whether they continued to practice in the same practice, retired or moved elsewhere.

> [105] The decision of a self-employed professional to retire is a subjective one. Relevant statistics may be helpful, but are not enough to supplant persuasive, acceptable and credible evidence. It is therefore logical, as a first step in this process, to examine the evidence of Dr. Campbell MacIsaac. In testimony before me she said:

>> I had absolutely zero plans. My Lord, I loved dentistry. Dentistry wasn't a job. I was a dentist, Dr. Kate was who I was. I loved what I did. I enjoyed the interaction with my patients. In a small town your patients become your friends. I used to call it my third baby. I just really liked what I did. I used to say I have the best job in Canada. It probably looked hectic and busy to the patients who would come in but it was organized. I loved it....

> [106] I accept this statement as truthful.

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

[107] When asked if she would retire at age 58 she replied that retirement had never been discussed and, "financially-retirement wasn't there." She said she and her husband had a good lifestyle and wanted to keep it.

[108] Ronald MacIsaac was asked about a possible time frame for his wife's retirement. He said it had not been considered. His wife was in the prime of her life — and retirement was not in their plans.

[109] It is also helpful to consider other evidence surrounding retirement plans. A major reason for not considering early retirement given by Mr. MacIsaac and Dr. Campbell MacIsaac was that they had spent a lot of their income on living and education expenses. As mentioned above, Lombard had been critical of the plaintiffs for not being precise in the amount of money spent for the children's education — a criticism which I emphatically reject. I accept as fact that Dr. Campbell MacIsaac and Mr. MacIsaac spent approximately $192,000 for education alone and that the main source of those funds was Dr. Campbell MacIsaac's registered retirement savings plan. It was also clear that Dr. Campbell MacIsaac and her husband did not stint on the expenses of their lifestyle.

[110] These and other factors persuade me that the most likely scenario for Dr. Campbell MacIsaac's retirement was that she would phase down her practice by 10% per year from age 62 and then sell her practice and retire at age 65.

107    I am not persuaded that the trial judge erred either in his assessment of the evidence or in his treatment of the contingencies relevant to ascertaining Dr. Campbell-MacIsaac's likely retirement date. It was certainly open to the trial judge to conclude that the evidence offered by the appellant was not helpful and to therefore place significant weight upon Dr. Campbell-MacIsaac's own evidence, together with the substantial body of other evidence surrounding her and her husband's lifestyle, significant contribution towards their children's education and the other financial choices they had made both in business and personal matters.

108    In my view, the trial judge's conclusion that Dr. Campbell-MacIsaac would likely have retired at age 65 was amply supported by the evidence. Much of the appellant's complaints seem an attempt to persuade this court to retry the issues and adopt the retirement models put forward by the appellant's experts which the trial judge had found to be so wholly unrealistic and vague, anecdotal or inapplicable as to not be of any value. That is not the role of this court.

109    The evidence offered by Dr. Campbell-MacIsaac and her husband, which was accepted by the trial judge, was that before she was injured they had given little thought to retirement. At that point she and her husband had limited RRSP savings, and two teenage daughters, aged 16 and 18, who still required substantial financial support.

110    The evidence revealed that Dr. Campbell-MacIsaac loved her work. She ran a lucrative and hugely successful dental practice arguably one of the busiest in the province. She was highly regarded in her community and had every intention of continuing in her profession. Given their financial obligations and the expectations she and her husband shared for a comfortable retirement, it seems perfectly reasonable for the trial judge to have concluded that there was simply no prospect for early retirement. Accordingly, I see no basis for interfering in the trial judge's conclusion that there was no conceivable possibility that Dr. Campbell-MacIsaac would or could have contemplated a retirement model of the sort proposed by the appellant.

### 4. Conclusion

111    These circumstances were unique to Dr. Campbell-MacIsaac. Justice Gruchy was in the best position to consider and give appropriate weight to the evidence surrounding these specific contingencies. He clearly addressed his mind to those issues. In approaching the evidence with respect to her loss of future income, the trial judge first rejected the methodology urged by the appellant's expert, finding that it was so tied to unsustainable and unreasonable assumptions as to be practically worthless in the assessment. Again, the trial judge's decision in this respect is entitled to great deference. The trial judge found as a fact that Dr. Campbell-MacIsaac's income was ascending. He then carefully weighed Mr. Bradley's numerous loss of future income calculation approaches and chose to adopt the one that pegged retirement at age 65 with a sequential wind-down at the rate of 10% per year starting at the age of 62. In adopting this approach, the trial judge allowed for a negative contingency in the appellant Lombard's favour of $94,000.00 to take into account the possibility of variability in Dr. Campbell-MacIsaac's

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

selection of a retirement date and ultimate mode of retirement. This, too, was well within the trial judge's advantaged position and I see no basis on this record to disturb it.

112    When one reads the trial judge's decision as a whole it cannot be seriously suggested that he misapprehended her ability to ambulate, or her levels of pain, or the extent of her significant and permanent disability following the accident. There is no merit to the appellant's suggestion that error on the part of the trial judge in his assessment of this evidence caused him to exaggerate Dr. Campbell-MacIsaac's injuries and disability, thus overcompensating her in damages. It is indisputable that Dr. Campbell-MacIsaac suffered a very severe injury. Her right talus was fractured and displaced. The talus is the bone that connects the leg to the foot. It is a ball joint which allows the foot to move in various directions. This fracture was especially serious. It was compound and the talus had been twisted 180°. She underwent numerous surgical operations ultimately leading to a first attempt at fusion which proved unsuccessful and then to a second fusion. During the course of these procedures the skin on her foot broke down and she developed ulcers. Skin grafting was required. Justice Gruchy described her situation in these words:

[36] In October, 1998, Dr. Gross performed another surgical operation to fuse the ankle. . . . ultimately successful in the sense that the ankle did eventually fuse solidly. . . . however, it was recognized that the operation would not permit her to return to the practice of dentistry but might have the effect of giving her some mobility and relieving pain.

. . . . .

[42] Dr. Campbell MacIsaac now leads a sedentary life in Halifax. . . . She experiences two types of pain; one from the fracture site from walking or moving about while weight bearing and the other from sitting with her foot in a dependant position.

. . . . .

[43] The medical doctors have found it difficult to assign a specific cause for the pain from having her leg in a dependent position, but do not dispute its existence. . . . She will have both sources of pain and disability for the rest of her life. She takes certain drugs to alleviate the pain, but does not wish to become drug dependent.

. . . . .

[178] Dr. Campbell MacIsaac is now 51 years of age and is a crippled former dentist. Her physical capabilities are severely limited by pain and by the immobility of her ankle and foot. She has explored the possibility of taking university studies and has abandoned that as unrealistic. She has not abandoned the idea of going into some small business.

The evidence clearly supports Justice Gruchy's findings.

113    Finally, I see no error on the part of the trial judge in his treatment of the issue of mitigation or in his rejection of the appellant's assertion that certain of Dr. Campbell-MacIsaac's actions or choices in lifestyle, or medications or use of orthotics ought to have been seen as a failure to mitigate.

**Part III Miscellaneous Grounds**

*1. Award for past loss of income*

114    Justice Gruchy calculated Dr. Campbell-MacIsaac's loss of past earnings to time of trial to be $1,412,100.00. This award is challenged by the appellant on the basis that the trial judge ought to have applied a negative contingency of "at least 15%" to account for the likelihood of an early departure from the practice of an associate, Dr. Paul Cameron. The appellant also complained that the trial judge erred by relying upon "hearsay" evidence to infer that any such negative contingency would be offset if Dr. Campbell-MacIsaac were to have engaged a dental hygienist, someone seen to be "more profitable" to the business than hiring a replacement associate dentist.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

115    I see no merit to the appellant's submissions. Justice Gruchy applied a 10% contingency to reflect any negative result associated with Dr. Paul Cameron's early departure from the dental practice. There was ample evidence from both Dr. Campbell-MacIsaac and her husband's experience in running the dental practice to support the trial judge's reasonable inference concerning the likely efficiency and potential savings in hiring a dental hygienist, as opposed to replacing Dr. Cameron with another dentist. The trial judge did not have to resort to any impugned "hearsay" in order to arrive at such a conclusion. In any event, there is no basis for acceding to Lombard's request that we increase the trial judge's reduction for negative contingencies from 10% to 15%. Such an adjustment on this record and in the context of these damage awards would be nothing more than tinkering.

### 2. Loss upon sale of her dental practice

116    The appellant complains that the trial judge ignored or was confused about the difference between "asking price" and the ultimate "selling price" which, but for the error, would have justified a reduction of 10% in calculating the respondent's loss on the sale of her dental practice, thus reducing the quantification for the loss on sale from $115,000.00 to $88,454.00, a difference of $26,546.00.

117    The record confirms the trial judge's very careful analysis of the evidence offered by the appellant and the respondents on this issue. He preferred the respondents' experts whose testimony provided a sound basis for the trial judge to conclude, as he did, that Dr. Campbell-MacIsaac's practice "had to be sold at a distressed price." This was a forced sale. She was unable to run the practice on account of the severe injury suffered in the accident. There is no proof that her practice would have been inherently difficult to market at a time of her choosing, in perhaps far more favourable market conditions, 20 years later.

118    Consequently, I see no basis for disturbing the trial judge's award of $115,000.00 as representing the loss on the sale of her dental practice.

### 3. The Family Trust — Cairdeas Management Inc.

119    Here, the appellant alleges error on the part of the trial judge in his treatment of the respondents' family trust Cairdeas Management Inc. At trial and again on appeal, Lombard asserts that Dr. Campbell-MacIsaac had no claim for any loss by the management company, as she did not have any legal or beneficial interest in its shares and was not entitled to any of its profits. Lombard relies upon such authorities as *Scarlett v. Scarlett* (1993), 47 R.F.L. (3d) 130 (B.C. S.C.); *Kachur v. Kachur* (2000), 2000 ABQB 709 (Alta. Q.B.); and *Rattenbury v. Rattenbury*, [2000] B.C.J. No. 889 (B.C. S.C.).

120    The trial judge considered these cases and found that they were not helpful in the present circumstances. He referred to the testimony offered by the respondents and the limited service agreement between Cairdeas and Dr. Campbell-MacIsaac which enabled her to terminate the arrangement by notice or by deciding to "starve" the trust. The trial judge found that the setup of this company and family trust was a legitimate means of tax avoidance allowing her to transfer some of her professional income through the management company to the trust and thereby fund her children's education costs. The arrangement, as found by the trial judge,

> . . . regardless of share ownership, was always subject to cancellation or starvation by Dr. Campbell-MacIsaac . . . [80] The arrangement was, in effect, a method of dividing a family 'pot' . . .

121    I see no basis for disturbing the trial judge's characterization of this arrangement or his disinclination to treat it as a kind of technical roadblock thwarting Dr. Campbell-MacIsaac's recovery of damages. As he noted at ¶ 82:

> Even if I were to accept Lombard's position, Ronald MacIsaac and the two children are plaintiffs herein and if the losses of income claimed by Dr. Campbell MacIsaac were in some manner prejudiced by the existence of the company/trust arrangement, the loss so prejudiced could be recovered by the shareholders and the ultimate beneficiaries of this trust. I choose not to avail myself of that circuitous route. The losses of revenue and income suffered by Dr. Campbell MacIsaac, subject to quantification below, were real and tangible; they will not be defeated by the existence of the management company.

Case 09-10138-MFW   Doc 14225-36   Filed 08/15/14   Page 30 of 34

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

Justice Gruchy's approach finds considerable support in the recent authorities, for example, *Personal Injury Damages in Canada*, Cooper-Stephenson, K., Personal Injury Damages in Canada (Toronto: Carswell) 1996 at pp. 158-159 under the heading (iii) *Family Businesses*; *Olson v. General Accident Assurance Co. of Canada*, [1998] A.J. No. 544 (Alta. Q.B.) (varied on appeal with respect to quantum, but on other grounds not related to family trust, (2001), 281 A.R. 327 (Alta. C.A.)); and *Zollinger v. Kong*, [2003] B.C.J. No. 2916 (B.C. S.C.). Given the clear and sound findings of the trial judge with respect to the unique financial arrangements developed by the respondents in this case, I see no reason to interfere with his award.

### 4. Cost of Orthotics

122    The trial judge awarded $56,000.00 for past and future costs of acquiring orthotic footwear. There is no real challenge to the amount. Rather, Lombard complains, under the issue of mitigation, that the trial judge ought to have found Dr. Campbell-MacIsaac failed to mitigate her loss by choosing the type of shoes she has worn since her ankle fusions.

123    This assertion is without merit. Dr. Campbell-MacIsaac was not obliged to accept the treatment urged by one of the appellant's experts as to the precise type of "rocker" orthotic shoe she ought to wear. Evidently Dr. Campbell-MacIsaac preferred the kind of benefits both in function and in comfort achieved through the shoes she was wearing. Mr. Freeman Churchill was called as a rebuttal witness by Dr. Campbell-MacIsaac. He is a certified pedorthist, involved in such work for more than 20 years who by the time of Dr. Campbell-MacIsaac's trial had made several pairs of orthopaedic shoes and orthotics for her, over the previous five years. The trial judge carefully considered the evidence offered by both the appellant and the respondent on the design and construction of her shoes and ultimately resolved those issues in favour of Dr. Campbell-MacIsaac. He found that she was not required to follow every suggestion or chase down every lead to satisfy the requirement that she act reasonably with respect to mitigation in the circumstances. The trial judge held:

> Dr. Campbell-MacIsaac is entitled to accept and rely on the medical advice she received from her own doctors. She is not obligated to accept or experiment with alternatives suggested by Lombard's specialists in an attempt to lessen the Defendant's liability.

124    In arriving at that conclusion the trial judge recognized and applied the proper legal principles. His conclusion should not be disturbed.

### 5. Cost of Prescription Drugs

125    Here the judge awarded $3,700.00 for past and future cost of drugs. It is admitted that through oversight a wrong figure was used in calculating this award. In cross-examination Dr. Campbell-MacIsaac acknowledged that a dollar figure mentioned in an exhibit for a particular prescription cost was not accurate, with the result that the actual cost for her medications in 2002 was 60% less than was stated in the documentation. The trial judge ought to have used this lower figure in calculating the total cost of past and future prescription drugs. I do so now. Rather than the $3,700.00 awarded at trial, the amount should be reduced by 60% resulting in an award of $1,443.00 under this head of damage.

### 6. Severance Paid to Employees

126    Here the appellant Lombard complains that the respondents made a gratuitous payment of $24,000.00 to their employees when they shut down the dental practice. This, Lombard argues, is not a claim for which it should be held liable under the SEF 44 endorsement.

127    The rationale for this particular award is dealt with rather sparingly in the trial judge's lengthy judgment. It arises in two places, first in the context of the trial judge's rejection of Lombard's assertion that an adverse inference be drawn against the claimants on account of their failure to call certain witnesses or adduce certain evidence, and later in a very brief commentary allowing $24,000.00 under this head of "damage." The essence of the trial judge's disposition may be gleaned from these passages:

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

[73] The plaintiffs made it possible by taking funds from Mr. MacIsaac's registered pension plan to pay severance to former employees at the time of the sale of the practice. They paid their staff approximately $24,000. I do not have precise details of those payments, but I <u>accept as a fact they were paid and justified</u>. I will not draw an adverse inference against the plaintiffs for such a gesture. At worst it was evidence of thoughtfulness performed in other than a careful manner.

. . . . .

[150] . . . For the reason stated I will allow the amount of $24,000 for this item. . . . although the wages component of Cairdeas is not sufficiently precise to form a firm conclusion on an amount appropriate for separation payment, I am led to the conclusion that $24,000 would have been less than two months' staff salary, having deducted the salary paid to Ronald MacIsaac. I therefore conclude that the amount paid for separation allowance was <u>reasonable and is recoverable</u>. (underlining mine)

128    While the issue is a novel one, and not without sensible yet problematic considerations on both sides of the argument, I am not persuaded that the trial judge committed any reversible error of law or of fact in allowing the claim. At the hearing on appeal Lombard urged that the award ought to be disallowed in that there was no "legal obligation" upon the respondents to pay "severance" and that this was nothing more than a gratuitous gesture to their former employees for which Lombard ought not to be held accountable. It would appear, however, that Justice Gruchy adopted a test of "reasonableness" as urged by the respondents and then concluded on the evidence that their payout of $24,000.00 to their employees constituted an actual loss recoverable from their SEF 44 insurer.

129    Whether a test of "reasonableness" or "necessary" or "necessary and reasonable" (such as might be applied to claims for special damages, or more specifically, out of pocket expenses) or some other test ought to apply to similar circumstances in a subsequent case need not be decided here. There was evidence, particularly from the respondent Ronald MacIsaac, sufficient to enable the judge to conclude that at least in the claimants' eyes, as well as viewed objectively, the forced sale of the dental practice arose so quickly as to prevent their giving proper notice of termination to their loyal staff, thus justifying the severance payout.

130    The majority of decisions and academic writing on the subject of special damages focus on the recoverability of damages incurred for the treatment, care and recovery of the claimant. Ordinarily, a test of reasonableness would be applied when deciding the recoverability of expenses incurred *for the care of* the plaintiff. For example, Klar et al. in *Remedies in Tort*, looseleaf, (1987), Volume 4, put forward reasonableness as the appropriate test for recovery of out of pocket expenses at chapter 27, ¶ 51:

¶ 51 All special damages will be allowed if they are reasonable. The determination as to what is reasonable depends on the circumstances surrounding the decision to incur the expenditure. If the plaintiff honestly and reasonably decides that an expenditure will improve his or her physical health, compensation will be allowed for the expenses. It is irrelevant if the expenditure was not, in fact, effective in improving the plaintiff's health.

Thus, for out of pocket expenses incurred to assist in the plaintiff's recovery after an injury, the test becomes whether the expense was reasonable. Reasonableness will then likely be viewed as relative to the belief that the expense will improve the claimant's health. This same notion of *reasonableness* also arises when deciding the question of mitigation. Obviously serious questions arise if one attempts to extend the principle of the recoverability of medical expenses or post-injury care and treatment based on a notion of reasonableness, to business or other out of pocket expenditures incurred as a result of that injury, or its effects. That is not to say that such losses should not be compensable or that they should not be compensable on the basis of reasonableness, but in my view courts will be cautious in applying a principle of recoverability based only on reasonableness, to any and all expenses allegedly arising. However, without detailed argument and analysis in an appropriate case, it seems to me that to urge a more stringent test — one that would limit an SEF 44 insurer's liability to expenses for which its insured was legally obligated to pay — is a question best left for another day.

131    In disposing of the claim as he did, upon this record, I am not prepared to say that the trial judge was wrong. The figure of $24,000.00 reflected in the damages awarded to Dr. Campbell-MacIsaac is, however, incorrect. Her husband's evidence was

Campbell-MacIsaac v. Deveaux, 2004 NSCA 87, 2004 CarswellNS 257

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

that their actual loss in paying severance to their employees was $22,000.00. Justice Gruchy's award under this head of damage should be modified to reflect this difference.

### 7. Quantum Meruit

132      Here Lombard complains that the trial judge erred in awarding Mr. MacIsaac the sum of $50,000.00 for the care he provided to this wife following her accident. First, Lombard says a claim for *quantum meruit* was never pleaded. Further, the appellant submits that the trial judge erred in apparently basing the award upon an inquiry into a parallel claim advanced by Mr. MacIsaac for loss of income. It is also argued that the amount of the award is inordinately high.

133      I begin by observing that a claim for *quantum meruit* was not pleaded in the claimants' statement of claim (either initially or as amended) and that the more acceptable manner in which to present such a claim is for the injured party to make a claim for special damages on behalf of the caregiver, which would then enable the court, subject to proof, to make an award to the plaintiff, in trust, for the caregiver. See, for example, *Rayner v. Knickle*, [1991] P.E.I.J. No. 26 (P.E.I. C.A.). It might also have been the subject of a formal request to amend the statement of claim at trial. However, in view of the manner in which the various losses claimed by Mr. MacIsaac were characterized in the amended statement of claim, that further particulars were not demanded, and that the factual basis for a claim in quantum meruit was addressed by the respondents' counsel in written submissions to the court, I am not persuaded that the omission in this case would curtail the trail judge's consideration of that claim as being properly before him for disposition. That said, I agree with the appellant that this award must be set aside. In my respectful opinion the judge erred in mixing an inquiry into loss of income with an assessment of the merits, if any, of a claim for *quantum meruit*. The trial judge said:

[245] Undoubtedly, during that period the degree of care which Mr. MacIsaac gave his wife fluctuated from time to time, depending on the operations Dr. Campbell MacIsaac underwent. In these circumstances it is impossible to be precise in calculating compensation for him. He has claimed $32,000 annually for four and a half years or $144,000. While the period of four and a half years is probably reasonable, during that time there must have been periods when he was doing no more than to assist her than he had always done for which he can hardly claim compensation from the tortfeasor.

[246] In a very imprecise manner I award Mr. MacIsaac the sum of $50,000 for the care he rendered to his wife and which was the result of her injury.

134      It appears that the judge linked Mr. MacIsaac's parallel claim for lost past income to a quite distinct award for quantum meruit and considered the former to be a relevant measure or factor when calculating the latter. Such an inquiry is, with respect, irrelevant. The award of $50,000.00 seems inordinately high in light of the circumstances of this case and prevailing jurisprudence, and I would set it aside on that basis as well.

135      After carefully reviewing the record and taking into account the not unexpected but considerable care and attention Mr. MacIsaac was required to provide his wife following her injury until such time as her condition had plateaued to the extent that she could look after her own needs, I would fix the sum of $20,000.00 as appropriate for quantum meruit in the circumstances.

### 8. Section B Benefits

136      Dr. Campbell-MacIsaac has also received Section B weekly indemnity benefits from the appellant Lombard Insurance. From the date of the accident until the date of trial she received $55,720.00 in Section B weekly indemnity benefits. The trial judge recognized (at ¶ 196 of his decision) that no challenge was advanced by Dr. Campbell-MacIsaac to Lombard's assertion that it had the right to reduce its liability under the SEF 44 endorsement by the amounts she actually recovered in Section B benefits. Thus, a sum of $55,860.00 (based on 399 weeks at $144.00 per week, up to and including January 28, 2003) was taken into account in the trial judge's final calculations of the damage award.

137      However, no credit was given to Lombard for Dr. Campbell-MacIsaac's future Section B weekly indemnity benefits. In my view, the preferred approach in reckoning such a credit is to direct that Dr. Campbell-MacIsaac hold all future Section

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

B payments in trust for Lombard as was done in *Binder v. Mardo Construction Ltd.* (1994), 129 N.S.R. (2d) 64 (N.S. S.C.), an approach recently endorsed by this court in *Kern*, supra, at ¶ 36.

### 9. Denied Appellant a Fair Trial

138    There is no basis whatsoever for suggesting that the appellant was denied a fair trial. This case was vigorously presented and defended by able and experienced senior counsel. Strong positions were taken which obliged the judge to conduct a thorough review of the evidence and the issues on a broad range of topics and to make clear findings in favour of one party or the other. It cannot be seriously suggested that any of the trial judge's findings or conclusions, nor the manner in which he chose to characterize certain arguments or positions, showed a disinclination to fairly consider both sides. I would therefore dismiss each of the arguments advanced by Lombard on appeal suggesting that they were denied a fair trial.

### 10. Conclusion

139    I now summarize my conclusions concerning all grounds of appeal advanced by Lombard. With respect, the trial judge erred in refusing to permit as a set-off against its own liability to Dr. Campbell-MacIsaac under the SEF 44 endorsement, her present and future LTD benefits from Canada Life as well as her future Section B benefits. These sums should be taken into account to the credit of Lombard when calculating its liability to Dr. Campbell-MacIsaac under the SEF 44 endorsement. Further, Lombard should also enjoy a right of subrogation, and entitlement to assignment, pursuant to the provisions of the policy.

140    Inadvertence resulted in inaccurate figures expressed as the awards for the cost of prescription drugs and severance paid to employees. Those two awards should be modified to accurately reflect the evidence.

141    The judge erred in awarding $50,000.00 to Mr. Ronald MacIsaac in *quantum meruit*. That award should be reduced to $20,000.00.

142    In all other respects, the trial judge's findings and awards should not be disturbed.

### Part IV Cross-Appeal

143    Dr. Campbell-MacIsaac alleges a single error on the part of the trial judge in finding it appropriate to assign to her a residual earning capacity of $50,000.00 per year for 10 years. This award, she argues, is totally inconsistent with every other finding made by the trial judge with respect to her injuries and disability, and is unsupported by the evidence.

144    I disagree. Evidently, as is apparent from the record, Justice Gruchy was impressed by Dr. Campbell-MacIsaac's intelligence, drive, and courage and the many other qualities which led to her sustained success as a professional. He concluded, after a careful assessment of the evidence, that given such skills and initiative, it would be fair to assess a residual earning capacity to the extent of $50,000.00 annually, for a period of 10 years. In my view these are factual findings and inferences, supported by the evidence, and clearly within the domain of the trial judge. I am not at all persuaded that his conclusions in this respect were in any way based on palpable and overriding error. His assessment of what was fair and appropriate should not be disturbed.

### Part V Costs

145    We were advised at the hearing that costs at the trial level have yet to be resolved. Obviously these reasons may have an impact on any award of costs both at trial and on appeal. Once costs of trial have been assessed, counsel will be in a position to determine the effect, if any, of these reasons upon the extent of or liability for costs. I would propose that counsel may then, if so advised, file written submissions with the panel on the issue of costs, following a schedule for filing that can easily be arranged by communicating with the panel through the Registrar.

### Part VI Disposition

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2004 NSCA 87, 2004 CarswellNS 257, [2004] N.S.J. No. 250, 11 C.C.L.I. (4th) 1...

146     In conclusion I would propose the following disposition:

(a) Lombard is entitled to set-off against its own liability to Dr. Campbell-MacIsaac under the SEF 44 endorsement, the present and future LTD benefits from Canada Life, as well as her future Section B benefits;

(b) Lombard enjoys both a right of subrogation, and entitlement to an assignment with respect Dr. Campbell-MacIsaac's LTD benefits, to the extent of its liability to her;

(c) the award for past and future prescription drugs is reduced from $3,700.00 to $1,443.00;

(d) the award for severance paid to employees is reduced from $24,000.00 to $22,000.00;

(e) the award to Mr. Ronald MacIsaac in quantum meruit is reduced from $50,000.00 to $20,000.00;

(f) in all other respects the appeal is dismissed;

(g) the respondents' cross-appeal is dismissed;

(h) costs be reserved until such time as costs at trial have been decided and counsel are then in a position to assess the impact of these reasons upon the ultimate resolution of all matters between the parties, and whether any further submissions to this court with respect to costs will be required.

*Appeal allowed in part.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.