TAB 38

1993 CarswellOnt 251

Ontario Court of Justice (General Division), In Bankruptcy

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of)

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1,
23 C.B.R. (3d) 161, 44 A.C.W.S. (3d) 1303, 6 P.P.S.A.C. (2d) 5

# Re bankruptcy of JULIUS H. MELNITZER

CANADIAN IMPERIAL BANK OF COMMERCE v. PEAT MARWICK THORNE INC. (trustee in
bankruptcy of JULIUS MELNITZER), GRAND CANYON PROPERTIES LTD., 808756 ONTARIO INC.,
COOPERS & LYBRAND LIMITED, NATIONAL BANK OF CANADA and ROYAL BANK OF CANADA

Killeen J.

Heard: December 7-11, 1992
Judgment: November 26, 1993
Docket: Doc. 35-039665

Counsel: *F. Angeletti* and *I. Wallace*, for Canadian Imperial Bank of Commerce.
*A.G.J. VanKlink* and *D. Grace*, for 808756 Ontario Inc.
*R.F. Leach*, for Grand Canyon Properties Ltd.
*C. Osborne* and *J. Badley*, for Coopers & Lybrand Limited and National Bank of Canada.
*M. Neirinck*, for Royal Bank of Canada.
No one appearing for Peat Marwick Thorne Inc., trustee of estate of Julius Melnitzer.

Subject: Corporate and Commercial; Insolvency; Estates and Trusts; Property; Restitution

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Personal Property Security --- Perfection of security interest — Registration — Errors in completing financing statements — Wrong or incomplete name of debtor**

**Personal Property Security --- Perfection of security interest — Possession**

**Restitution**

Secured creditors — Personal property security — Perfection by possession — Bank holding collateral but allowing debtor to exchange collateral for new collateral — New collateral turning out to be worthless — Bank giving up possession only because of debtor's deceit and claiming that legal possession should be deemed to be continuous — Section 22 of Personal Property Security Act making no exception for loss of possession because of fraud — Bank making no inquiry at time of exchange — PPSA claim dismissed — Personal Property Security Act, R.S.O. 1990, c. P.10, s. 22.

Secured creditors — Personal property security — Defects — Name of debtor shown on financing statement — Where debtor foreign born, name shown on debtor's Canadian citizenship certificate to be used in financing statements.

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 3 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251
1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

Debtor and creditor — Constructive trust — In debtor-creditor relationship constructive trust to be imposed only where court sets aside agreement between parties — Where no reason to set aside agreement, no constructive trust remedy available.

Debtor and creditor — Constructive trust — Tracing remedy — No tracing remedy available where there is loan — In debtor-creditor relationship lender retaining no proprietary interest in money loaned.

In September 1984, JM set up an $800,000 line of credit at CIBC in order to buy shares in VT Co. In September 1988, the line of credit was increased to $3,150,000. In return for that increase, JM provided security in the form of stock in a family holding company, more stock in VT Co., a guarantee bond, and an undertaking from the family holding company. The line of credit was increased again in July 1989, to $7,150,000. That increase was made in order to fund JM's purchase of his father's remaining interest in the family holding company and the purchase of a substantial share in CC Ltd. for $2.5 million. JM agreed to assign the CC Ltd. shares to CIBC.

In February 1990, JM wanted to buy 500,000 Class G shares and 332 Class F shares in CC Ltd. for $2.5 million. He transferred $2.5 million from his line of credit to the trust account of his law firm in order to make the purchase. The share certificates were turned over to CIBC, and JM executed a power of attorney and a hypothecation agreement respecting the shares.

In 1990 and 1991, there were several amendments to the line of credit. Those amendments were supported by JM's proposal that he substitute "gilt-edged" public stock for the VT Co. and CC Ltd. shares. CIBC agreed to that proposal and on July 4, 1991, the exchange of shares took place. Later that month, JM asked that the line of credit be increased again, to $20 million; that increase was to be supported by the hypothecation of more "gilt-edged" shares. On August 2, another bank discovered that JM had given it forged stock certificates in return for loans. On August 3, a court order was obtained freezing all of JM's assets and appointing a receiver-manager. On August 14, CIBC registered a financing statement under the *Personal Property Security Act* (Ont.) ("PPSA").

In a trial of an issue arising out of JM's subsequent bankruptcy, CIBC, a numbered company and GC Ltd. each asserted equitable or security interest claims in the CC Ltd. shares.

**GC Ltd. claim:**

GC Ltd. was an investment vehicle for JM and his friend, AR, with each holding a 50-per-cent interest in the company. In 1990, JM and AR decided to buy a 20-per-cent share interest in CC Ltd. through GC Ltd. for $500,000. JM proposed to buy more shares personally. They agreed that each of them would put $250,000 into GC Ltd.'s account, and that GC Ltd. would then buy the shares. JM sent AR a cheque for $250,000 payable to GC Ltd. and asked that AR send him a $500,000 cheque payable to JM personally so that JM could buy the shares. After sending the $500,000 cheque, AR received a "Declaration of Trust", which he thought protected the GC Ltd. investment. AR argued that the Declaration of Trust gave GC Ltd. an equitable ownership interest in 20 per cent of the shares purchased by JM from CC Ltd. and that that vested equitable interest was prior to any other claim on that percentage of shares.

**Numbered company claim:**

In 1990, JM approached his partners with an opportunity to invest in a large investment property in Singapore that he said would generate huge profits. The partners were invited to contribute a total of $1.8 million, in return for which JM would provide security in the form of a "pledge" of 72 per cent of his shares in CC Ltd. and individual promissory notes and investment guarantee notes in favour of the individual lenders. The numbered company was a private company, with JM as president and sole shareholder, that would be the "vehicle" for the loan. An agreement between JM and the numbered

Case 09-10138-MFW   Doc 14225-38   Filed 08/15/14   Page 4 of 34

Canadian Imperial Bank of Commerce v. Meintzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

company was drawn up using the language of a share purchase. A Declaration of Trust was also drawn up and signed by JM. One of the partners involved testified that the agreement was subsequently abandoned and that the Declaration of Trust thereby became a "stand-alone" pledge. Two PPSA financing statements were registered on the basis of the Declaration of Trust: one on August 22, 1991, using one version of JM's name and one on August 29, 1991, using another version of the name.

**CIBC claim:**

CIBC claimed it had a prior interest in the CC Ltd. shares based on either (1) a constructive trust and the equitable doctrine of tracing, or (2) a perfected security interest in the shares under the PPSA.

CIBC argued that in February 1990 JM drew $2.5 million from the line of credit and transferred it to the law firm's trust account. Because the transfer was based on JM's fraudulent scheme, a constructive trust arose and the court could trace the funds and declare a proprietary interest in the subsequently purchased CC Ltd. shares. In the alternative, CIBC argued that it had a perfected security interest in the CC Ltd. shares because it had physically possessed them before JM's substitution of the fraudulent "gilt-edged" shares. Under s. 22 of the PPSA, physical possession of collateral results in a perfected security interest while the collateral is actually held by the creditor. CIBC argued that it was JM's fraud that caused it to give up physical possession of the CC Ltd. shares and that, therefore, the court should deem legal possession to be continuous. Otherwise, the PPSA would be used as an "instrument of fraud."

**Held:**

None of the claims succeeded.

*GC Ltd. claim*

JM did not use the GC Ltd. funds to purchase the CC Ltd. shares; he drew $2.5 million from his line of credit, transferred it to the law firm trust account and issued a certified trust cheque for $2.5 million to CC Ltd. to pay the full purchase cost of 500,000 Class G and 332 Class F shares. The evidence did not support AR's claim that the Declaration of Trust came into existence before the shares were pledged to CIBC. Further, a trust cannot be created without the existence of the three certainties, the first of which is certainty of intention. The evidence showed that JM had no intention of creating a trust in favour of GC Ltd. under the declaration or otherwise. JM intended to perpetrate, and succeeded in perpetrating, a fraud on his friend AR by taking his $250,000.

*Numbered company claim*

The numbered company had registered two financing statements, each using a different version of JM's name; the second version was in accordance with JM's Canadian citizenship certificate. Where a debtor is foreign-born, the most practical and rational way to proceed with a PPSA registration is to use the debtor's name as it is shown on his or her Canadian citizenship certificate, if one exists. Therefore, on its face, the second registration was free of defects.

The Declaration of Trust did not constitute a free-standing security interest that was protected by the PPSA registration. The numbered company failed to prove that it had been in existence as the investment vehicle for the $1.8-million loan before JM received the money and purportedly signed the Declaration of Trust. The evidence, while confusing and contradictory, tended to show that the organizational documents for the numbered company and the Declaration of Trust itself were signed and backdated by JM in 1991, after he had been charged with fraud. That was a desperate, after-the-fact attempt to create the appearance of a debtor-creditor relationship between JM and the numbered company, and a valid pledge of the CC Ltd. shares.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 5 of 34

Canadian Imperial Bank of Commerce v. Meintzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

Even given the deception involved in backdating the corporate records of the numbered company, the Declaration of Trust alone could not support the numbered company's claim. It was not a stand-alone pledge of shares. It was apparent that the declaration was intended to be part of the share agreement and could have no life apart from that agreement, which itself never came into existence. Further, the wording of the declaration was not sufficient to create a security interest under the PPSA.

The declaration and the subsequent PPSA registration also could not be enforced because the freezing order made on August 3, 1991 effectively prevented the numbered company, or any other creditor, from improving its priority position thereafter.

Finally, the declaration and the PPSA registration were invalid because the evidence showed that the investors had prior knowledge that a shareholders' agreement between JM and CC Ltd. provided that the CC Ltd. shares could not be transferred, pledged or otherwise dealt with by JM without the consent of the other shareholders. Such consent was never obtained. The case law indicated that the failure to comply with the restrictions on transfer meant that at best the numbered company could acquire only an equitable interest in the shares. However, the evidence showed bad faith and unclean hands on the part of the numbered company; therefore, the equitable jurisdiction of the court should not be exercised in its favour.

*CIBC claim*

The constructive trust argument failed because there was no unjust enrichment. In a debtor-creditor relationship, such as existed between CIBC and JM, a constructive trust can be imposed only where the agreement between the parties is set aside. Here, there was no reason to do so. The debtor-creditor relationship provided a "juristic reason" for the advance to and enrichment of JM. Further, JM may have been enriched, but there was no corresponding deprivation to CIBC. CIBC was found to have been lax to the point of negligence in its more than seven years of dealings with JM. With respect to the argument regarding the equitable tracing rules as a basis for the imposition of a constructive trust, no tracing remedy lies where there is a loan. In a debtor-creditor relationship, the lender retains no proprietary interest in the money loaned.

The PPSA claim failed because CIBC did not actually hold the CC Ltd. shares. The PPSA permits perfection of some security interests by possession as a limited alternative to registration. The language of s. 22 of the PPSA is broad but makes no exceptions for loss of possession caused by fraud. Further, CIBC had made a business judgment in making no inquiry when the exchange of shares took place. It should be called to account for that judgment.

As a result of the failure of the claims of CIBC, GC Ltd. and the numbered company, the CC Ltd. shares vested in JM's trustee in bankruptcy.

**Table of Authorities**

**Cases considered:**

*Becker v. Pettkus,* [1980] 2 S.C.R. 834, 19 R.F.L. (2d) 165, 8 E.T.R. 143, 117 D.L.R. (3d) 257, 34 N.R. 384 — *considered*

*Canadian Aero Service Ltd. v. O'Malley* (1973), [1974] S.C.R. 592, 40 D.L.R. (3d) 371, 11 C.P.R. (2d) 206 — *considered*

*Carson Restaurants International Ltd. v. A-1 United Restaurant Supply Ltd.* (1988), [1989] 1 W.W.R. 266, 8 P.P.S.A.C. 276, 72 Sask. R. 205 (Q.B.) — *distinguished*

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 6 of 34

Canadian Imperial Bank of Commerce v. McIntzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

*Condon, Re; Ex parte James* (1874), 9 Ch. App. 609, [1874-80] All E.R. Rep. 388 (C.A.) — *distinguished*

*Daly v. Sydney Stock Exchange Ltd.* (1986), 160 C.L.R. 371 (Aust. H.C.) — *referred to*

*Haasen, Re* (1992), 13 C.B.R. (3d) 94, 8 O.R. (3d) 489, 92 D.L.R. (4th) 204, 3 P.P.S.A.C. (2d) 250 (Bktcy.) — *referred to*

*Hawkes v. McArthur*, [1951] 1 All E.R. 22 (Ch. D.) — *distinguished*

*Hunter v. Hunter*, [1936] A.C. 222 (H.L.) — *considered*

*International Corona Resources Ltd. v. LAC Minerals Ltd.*, [1989] 2 S.C.R. 574, 6 R.P.R. (2d) 1, 44 B.L.R. 1, 35 E.T.R. 1, 69 O.R. (2d) 287, 26 C.P.R. (3d) 97, 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57 — *distinguished*

*Key State Bank v. Voz* (1989), 9 P.P.S.A.C. 37, 67 O.R. (2d) 709 (Dist. Ct.) — *distinguished*

*Lambert, Re* (1991), 11 C.B.R. (3d) 165, 2 P.P.S.A.C. (2d) 160 (Ont. Bktcy.) — *referred to*

*Lister & Co. v. Stubbs* (1890), 45 Ch. D. 1, [1886-90] All E.R. Rep. 797 (C.A.) — *referred to*

*M.C. United Masonry Ltd., Re* (1983), 44 C.B.R. (N.S.) 174, 40 O.R. (2d) 330, 21 B.L.R. 172, 2 P.P.S.A.C. 237, 142 D.L.R. (3d) 470 (C.A.) — *distinguished*

*McDonald, Re* (1971), 16 C.B.R. (N.S.) 244, [1972] 1 O.R. 363, 23 D.L.R. (3d) 147 (S.C.) — *referred to*

*Rathwell v. Rathwell*, [1978] 2 S.C.R. 436, [1978] 2 W.W.R. 101, 1 E.T.R. 307, 1 R.F.L. (2d) 1, 83 D.L.R. (3d) 289 — *followed*

*Sorochan v. Sorochan*, [1986] 2 S.C.R. 38, [1986] 5 W.W.R. 289, 46 Alta. L.R. (2d) 97, 2 R.F.L. (3d) 225, 29 D.L.R. (4th) 1, 69 N.R. 81, 23 E.T.R. 143, [1986] R.D.I. 448, [1986] R.D.F. 501, 74 A.R. 67 — *referred to*

*Sperry Inc. v. Canadian Imperial Bank of Commerce* (1985), 55 C.B.R. (N.S.) 68, 50 O.R. (2d) 267, 4 P.P.S.A.C. 314, 8 O.A.C. 79, 17 D.L.R. (4th) 236 (C.A.) — *followed*

*Syncrude Canada Ltd. v. Hunter Engineering Co.*, [1989] 1 S.C.R. 426, [1989] 3 W.W.R. 385, 35 B.C.L.R. (2d) 145, 92 N.R. 1, 57 D.L.R. (4th) 321 — *referred to*

*Takhtalian, Re* (1982), 2 P.P.S.A.C. 90 (Ont. S.C.) — *applied*

*Weber, Re* (1990), 78 C.B.R. (N.S.) 224, 73 O.R. (2d) 238, 1 P.P.S.A.C (2d) 36, 48 B.L.R. 1 (S.C.) — *referred to*

*Westpac Banking Corp. v. Markovic* (1985), 82 F.L.R. 7  (Aust. S.C.) — *referred to*

**Statutes considered:**

Change of Name Act, R.S.O. 1990, c. C.7 —

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 7 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

s. 2

s. 2(1)(a)

Criminal Code, R.S.C. 1985, c. C-46 —

s. 725 [am. R.S.C. 1985, c. 27 (1st Supp.), s. 158]

Personal Property Security Act, R.S.O. 1990, c. P.10 —

s. 1(1) "security interest"

s. 22

s. 23

s. 46(4)

s. 72

**Regulations considered:**

Personal Property Security Act, R.S.O. 1990, c. P.10 —

General Regulation,

O. Reg. 372/89,

s. 16(1)

Trial of issue regarding competing equitable and security interest claims in shares purchased by bankrupt.

*Killeen J.*:

1    This case is the trial of an issue arising out of the bankruptcy of a prominent London lawyer, Julius H. Melnitzer. Much litigation has been spawned by this bankruptcy and its attendant circumstances. In this case, the plaintiff, CIBC, and two of the defendants, 808756 Ontario and Grand Canyon are asserting equitable or security-interest claims in shares purchased by Melnitzer in a company known as Champion Chemtech Limited. The defendants, the Royal Bank and National Bank, are unsecured creditors of Melnitzer and are challenging the validity of the alleged interests of the three aforementioned parties. Finally, Coopers & Lybrand, the former court-appointed Receiver of Melnitzer, joins the Royal Bank and National Bank in challenging the equitable and security-interest claims but also asserts a court-created charge for its fees and disbursements against the Chemtech shares.

**I. The Evidence**

*A. The CIBC Involvement*

2    In the first few days of August, 1991, representatives of the National Bank uncovered facts showing that Melnitzer had perpetrated a massive fraud involving well over 20 million dollars. Victims of the fraud included several of Canada's major banks, some private companies and personal investors and even some of Melnitzer's law partners.

3    Mr. Thomas Kahnert was called as a witness by the CIBC. He was the account manager of the London corporate banking centre from January, 1990, up to October, 1992, and was responsible for Melnitzer's account. He produced bank records with

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 8 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

respect to Melnitzer's account going back to September, 1984, when the seeds of Melnitzer's fraudulent activities had their approximate birth.

4      On September 27, 1984, Melnitzer applied to the CIBC for an $800,000 line of credit for the ostensible purpose of buying shares in the Vanguard Trust Company. Exhibit 7 (CIBC's Brief of Documents, Book II) dramatically shows at Tab 79 and 80 how this $800,000 credit facility was extended and increased over the ensuing years.

5      Tab 79 indicates that, on September 28, 1988, Melnitzer applied for a revised and increased credit line of $3,150,000. The internal bank assessment of the application indicates that Melnitzer was providing security for the line in the form of stock in a Melnitzer family holding company, Melfan Investments, additional stock in Vanguard Trust and a guarantee bond and undertaking from Melfan Investments. The bank assessor thought that these securities were worth $11,740,000. Of course, all of these apparently strong securities instruments were later found to be largely worthless or fraudulent or both.

6      A critically important change in the credit arrangements occurred under a July 21, 1989, credit application submitted by Melnitzer. He was now asking that the credit line be increased sharply to $7,150,000: see ex. 6, tab 3, CIBC Book of Documents, Book 1. The bank assessment records indicate that, on this occasion, Melnitzer wanted the $4,000,000 increase for 2 purposes, namely, (1) to purchase for $1,500,000 his father's remaining interest in Melfan Investments and (2) to purchase for $2,500,000 a substantial share interest in Champion Chemtech. These records also show that, by this time, the bank felt it already had securities worth about $16,239,000 from Melnitzer and that, now, Melnitzer would be assigning the additional Melfan and Champion Chemtech shares he was planning to buy.

7      Mr. Kahnert testified that, on about February 9, 1990, he was called by Melnitzer who advised that he needed to activate the increased credit line immediately to buy 500,000 Class G shares and 332 Class F shares in Champion Chemtech for $2,500,000. Mr. Melnitzer transferred the $2,500,000 from his personal account, no. 64-10716, to the CIBC trust account of the Cohen, Melnitzer law firm. Then, on February 12, a $2,500,000 cheque was issued on the law firm's account in favour of Champion Chemtech for the shares.

8      Mr. Melnitzer received the two share certificates covering the two classes of shares on March 2. His acknowledgment of receipt is on the back of the certificates: (ex. 6, tabs 16-17). He then turned these certificates over the Mr. Kahnert on March 6 in accordance with the credit commitment of July 21, 1989. Mr. Kahnert, in turn, immediately lodged the certificates for safekeeping with the security department of the CIBC.

9      The final step in the pledge of these shares occurred on May 17 when Melnitzer executed both a power of attorney and hypothecation agreement covering them. On the surface of things, at least, these shares were legally in the possession of the CIBC as part of the package of collateral security held for the credit line.

10     The form of the credit line did not remain static after the hypothecation of the Champion Chemtech shares was completed. Throughout the balance of 1990 and into 1991 the line was amended several times. An application on April 22, 1991, included a proposal by Melnitzer that he provide replacement "gilt-edged" public stock in substitution for the Vanguard Trust and Champion Chemtech shares. This application and its component proposal for an exchange of shares was quickly approved by CIBC on April 25. The actual exchange of shares took place on July 4 when Mr. Kahnert drove from London and met Melnitzer at his Toronto residence at around 6:45 a.m. Mr. Melnitzer turned over to Kahnert a share certificate in his own name for 98,435 shares of IBM and, in turn, Kahnert handed over the previously hypothecated shares in Vanguard Trust and Champion Chemtech. The exchange was sealed, as it were, with a letter agreement (ex. 6, tab 54) signed by both Melnitzer and Kahnert, reading as follows:

Re: Release of Assigned Shares of Champion Chemtech Limited and Vanguard Trust of Canada Limited

Further to our Terms Letter dated April 16, 1991, we hereby release the following listed shares (registered in your name) which have been hypothecated as part of the security package in support of your line of credit.

| Name of Company | No. of Shares | Share Certificate Number |
|---|---|---|

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 9 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

```
Vanguard Trust of
Canada Limited             200,000 Common              A-393
                           300,000 Common               86-C
                           200,000 Common              A-027
                            55,000 Common              A-014
Champion Chemtech
Limited                    332 Class 'F' Preferred F-1
                           500 Class 'G' Preferred G-1
```

Following your acknowledgement of receipt of the above shares on the attached duplicate copy of this letter, we confirm that the respective

Hypothecation and Power of Attorney Forms held by the Bank regarding the above mentioned shares will be cancelled.

Yours very truly,

```
                                        "T.G. Kahnert"
TGK/                                     T.G. Kahnert
                                        Account Manager
                                        Corporate Bank
```

```
I hereby acknowledge receipt of the above shares
Date: "July 4/91"                    "Julius Melnitzer"
      -----------                    ------------------
                                     Julius Melnitzer
                                     ----------------
```

11      The last amendment to Melnitzer's credit line occurred under an application submitted on July 15, 1991. Mr. Kahnert said that, at this time, Melnitzer was complaining about the "restraints" on his then line of credit and wanted the line increased from $8,850,000 to $20,000,000 in exchange for the hypothecation of more gilt-edged securities in public companies such as Exxon, Canadian Pacific, McDonald's, BCE Inc. and IBM. The CIBC quickly approved this application on July 19, noting in its internal assessment of the loan proposal that the shares offered by Melnitzer were worth $29,413,647. The hypothecation agreements and powers for Melnitzer's newly pledged shares were all signed and delivered by Melnitzer by July 30.

12      The next development was the discovery by National Bank, on August 2, that it had received forged stock certificates for loan arrangements it had just made with Melnitzer. This discovery led the National Bank to apply, on Saturday, August 3, to Keenan J. for a broad Mareva-like order which had the effect of freezing all of Melnitzer's assets and appointing Coopers & Lybrand as receiver-manager of his affairs and assets.

13      On August 14, CIBC registered a Financing Statement under the *Personal Property Security Act* in an attempt to perfect an alleged security interest in the Champion Chemtech shares.

14      By this time Melnitzer had been arrested and charged under a 43-count fraud indictment. He later pleaded guilty to the charges in the indictment on December 19 and on February 10, 1992, was sentenced to 9 years in penitentiary, concurrent, on the 43 counts.

15      Having provided some largely undisputed general facts and those relating to CIBC, I now move on to an analysis of the involvement of the defendants, Grand Canyon and 808756 Ontario, in this complex web of deceit.

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

### B. The Grand Canyon Involvement

16    Prior to the bankruptcy of Melnitzer, Grand Canyon was an investment vehicle for Melnitzer and Allan Richman. Each held 50% of the shares in the company with Richman's 50% interest being held in the name of Forward Properties, another investment company wholly owned by Richman.

17    Mr. Richman testified that in early 1990 he and Melnitzer were planning to buy what he thought would be a 20% share interest in Champion Chemtech through Grand Canyon. As he understood the deal, the cost of the shares would be $500,000 and Grand Canyon was to have title to the share purchased. Under the arrangement made with Melnitzer, each of them was to advance $250,000 into Grand Canyon's coffers and these funds were then to go out to make the $500,000 investment in Champion Chemtech shares.

18    He said that he trusted Melnitzer completely because of their long business association and relied upon him to handle the transaction in an appropriate way. He also indicated that Melnitzer said that he planned to make a personal investment in Champion Chemtech shares beyond the shares he was to purchase for the account of Grand Canyon. Mr. Richman said he received a handwritten note of instructions from Melnitzer sometime in February, 1990. Attached to it were photocopies of the front portions of 2 share certificates showing Melnitzer to be the holder of (1) 332 Chemtech Class F shares and (2) 500,000 Class G shares. Near the bottom of each certificate is a line indicating that these shares were signed by the signing officers of Champion Chemtech on February 12. The body of Melnitzer's note, which is undated, reads as follows:

*Allan*

Attached are (1) copies of Champion shares.

Trustee agreement to follow.

(2) statements from Theatre Corp. (3) cheque for 250,000 to GC. Please send me cheque for 500,000 payable to me personally ASAP

(4) I will bill GC for 20% of legal fees at end of Feb. send to office

Att'n Helen Pollock

19    Mr. Richman thought that he must have received Melnitzer's note just prior to or on February 20 because he issued a Grand Canyon cheque, dated February 20, for $500,000 payable to Melnitzer. This cheque was negotiated by Melnitzer through the Royal Bank on February 21.

20    Later, on March 9, Richman received an invoice, dated February 28, from the Cohen, Melnitzer law firm for $8,892.90, purportedly representing 20% of the legal charges for the overall Champion Chemtech share purchase. Mr. Richman also produced another cheque of Grand Canyon, dated May 29, for $8,892.90, payable to Cohen, Melnitzer and covering the above account.

21    Mr. Richman received a "Declaration of Trust" document from Mr. Melnitzer: ex. 12, tab 4. It is dated February 12 but Richman could only say that he thought he got this from Melnitzer in late February or perhaps early March. There is no receipt stamp on this document although there is, interestingly, a receipt stamp on the February 28 invoice showing it to have been received on March 9.

22    The net effect of Richman's evidence is this. He says he got the Declaration of Trust sometime after he issued the $500,000 cheque and never asked Melnitzer any further questions. He thought the Declaration of Trust protected the Grand Canyon investment. He conceded in cross-examination that he thought that the $500,000 investment was getting Grand Canyon a 20% interest in the entire Champion Chemtech company although other undisputed evidence shows that Melnitzer's total holdings

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

(332 Class F and 500,000 Class G) only represented about 25% of Champion Chemtech's outstanding shares. Also, in cross-examination, he admitted that he had no idea where the proceeds of the $500,000 cheque actually went.

23      Some other problems should be mentioned here about the Grand Canyon investment. One must recall that the CIBC documents demonstrate, beyond challenge, the following things: (1) Melnitzer drew $2,500,000 on his CIBC line of credit on February 9, transferring that sum to the Cohen, Melnitzer trust account; (2) on February 12, Melnitzer issued a Cohen, Melnitzer cheque for $2,500,000 payable to Champion Chemtech to cover the full cost of the shares issued to him; (3) the backing sheets of the two share certificates, as shown in the records of the CIBC, indicate that Melnitzer only received the share certificates on March 2; (4) the share certificates were personally turned over to Mr. Kahnert of CIBC on March 6.

24      I will necessarily revisit these problems later in these reasons.

### C. The 808756 Ontario Involvement

25      The last factual piece in the overall puzzle of this case relates to 808756 Ontario. I now attempt to sketch the contours of this piece.

26      The evidence put before me on behalf of 808756 Ontario came primarily from 3 former law partners of Melnitzer, namely, Ronald Delanghe, Russell Raikes and Kenneth McGill.

27      The gist of Mr. Delanghe's evidence was as follows. Mr. Melnitzer approached Delanghe and his other law partners in the sum mer of 1990 and offered them a golden opportunity to participate in what has become known in the lore of this case as "the Singapore Deal". He told them that he had a large investment in a Singapore property which was scheduled to be sold in mid-1993 at a guaranteed profit of gargantuan proportions. His then co-investor wished to withdraw and he invited his law partners and a few other friends to contribute investment loans up to a figure of $1,800,000 to replace and pay out the withdrawing co-investor. He asked Delanghe to act as a sort of collector for him, seeking out investors amongst the law partners and a small circle of other friends of Melnitzer in London.

28      Mr. Melnitzer told Delanghe and the others that the "funding" or collection date for the $1,800,000 had to be November 23, 1990, and that the funds were to be paid into the trust account of the Cohen, Melnitzer law firm on or before that date. Melnitzer apparently wished to be in a position to move the funds to Singapore on December 1.

29      Rather remarkably, this broad-gauged loan or investment proposal was never put in writing by Melnitzer. However, as best as I can, I draw the following terms from Delanghe's evidence: (1) the subscribing lender-investors would receive an interim interest rate of 10% per annum, payable quarterly (working out to $180,000 per annum); (2) the ultimate maturity date for the loans would be July 31, 1993, when the Singapore property was to be sold at a very large profit; (3) a bonus equal to 125% of the $1,800,000 gross loan figure was to be paid in mid-1993 along with the gross loan amount itself; this bonus works out to $2,340,000; (4) Melnitzer would provide security for the loans in the form of a "pledge" of 72% of the shares he owned in the Champion Chemtech company along with individual promissory notes and investment guarantee notes in favour of the individual lenders.

30      In the early fall of 1990, Melnitzer allegedly told his law partners that he would prefer their using a private company as the "vehicle" for the loan: this would simplify interim interest payments and the ultimate payments for him and might lead to tax advantages for the lenders.

31      He was the president and sole shareholder of 808756 Ontario and offered this company to the lenders as the investment vehicle. Delanghe said that the prospective lenders agreed to this latter suggestion about the employment of 808756 Ontario.

32      Delanghe said he prepared the notes and investment guarantees about 2 or 3 weeks before the funding date of November 23 and immediately gave them to Melnitzer for his signatures. He thought these documents were signed and given back to him by Melnitzer on or before November 23.

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

33    At the opening of trial, 808756 Ontario filed an exhibit book marked as ex. 8. Tab 22 of ex. 8 purports to contain photocopies of these notes and investment guarantees.

34    An analysis of the notes and investment guarantees at tab 22 creates some immediate concerns about the manner in which this entire loan transaction was carried out. Mr. Delanghe explained that the investment guarantee note represented the actual loan advance of each lender whereas the promissory note represented the bonus of 125%. Yet the notes and guarantees in tab 22 are a confusing mixture which, at the very least, raises serious questions about *when* they were prepared and the *haste* with which they were prepared.

35    The following is a summary table I have prepared of these notes and guarantees included at tab 22:

| Lender | Investment Guarantee | Promissory Note |
|--------|----------------------|-----------------|
|        | Amount/Date          | Amount/Date     |
| Jaimie Watt | $ 25,000 undated | $ 31,250 undated |
| Iva Klouda | $100,000 undated | $125,000 Nov. 30 |
| Barry Parker | -- | $562,500 Nov. 30 |
|  |  | $450,000 Dec. 1 |
| Kenneth McGill | $150,000 Nov. 30 | $187,500 Nov. 30 |
| Fletcher Dawson | -- | $125,000 Nov. 30 |
| Paul Vogel | $ 50,000 Dec. 1 | $ 62,500 Nov. 30 |
| Ronald Delanghe | $75,000 Nov. 30 | -- |
| Bonnie Delanghe | $500,000 - | -- |
|  | $125,000 Nov. 30 |  |
| Totals | $1,025,000 | $1,543,750 |

36    There are innumerable discrepancies and inconsistencies in these documents: (1) if the guarantees represent the face amount of the advances, they only add up to a total advance of $1,037,500 and not $1,800,000; (2) the total of the promissory notes amounts to $1,531,250, a figure well below the 125% bonus on $1,800,000; (3) On Mr. Watt's promissory note the amount of the note is written in words as "one hundred and twenty-five thousand" and in figures as "31,250"; (4) there is no consistency in the execution date on the documents: 3 of the guarantees are undated along with 1 note; the rest are signed on either November 30 or December 1; (5) no guarantees appear for Barry Parker and Fletcher Dawson; (6) no notes appear for Ronald and Bonnie Delanghe; (7) seemingly, Barry Parker received *two notes* for the respective amounts of $562,500 and $450,000 when it must have been intended that he was to sign a note and guarantee for these amounts; (8) if, as Delanghe claims, he got all of these documents back from Melnitzer by November 23, why did he apparently fail to notice these serious discrepancies and missing documents and not do something to correct the situation immediately?

37    The balance of Delanghe's evidence was an attempt to demonstrate that the investment vehicle, 808756 Ontario, had, in fact, been put into operation on or before the funding date of November 23 and that, therefore, 808756 Ontario became the lawful holder of a pledge of the Chemtech shares under a Declaration of Trust document allegedly signed by Melnitzer on November 23.

38    He claimed that the partners had, "several weeks" before November 23, consulted an accountant, Morey Watson, of Deloitte Touche, who advised them on the form of the transfer of the loans from the individual lenders to the corporate entity. He also claimed that, well before November 23, the lenders had agreed to use 808756 Ontario. The result was that the company was effectively transferred from Melnitzer to the lenders on or before the November 23 collection date.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

39      Delanghe went on to identify a series of resolutions, subscriptions and share certificates at tabs 4-21 of ex. 8 under which he claimed the transfer took place. These documents appear to show that, on November 23, a series of resolutions were signed under which (a) Melnitzer resigned as president and gave up his shares (b) Ronald Delanghe was appointed as president, Barry Parker as vice-president, Kenneth McGill as secretary and Iva Klouda as treasurer and (c) each of the lenders became subscribing shareholders in the restructured shares of the company for payments equivalent to the loans they had agreed to advance Melnitzer.

40      Once again, a close examination of the subscription records (tab 10) reveals inconsistencies and discrepancies, both internally and when compared with other documents: (1) they all purport to indicate that signatures were affixed on November 23; this is puzzling when one considers, for example, that other evidence reveals that Mr. Watt had not committed himself to participate until early December; (2) both the Vogel and Watt subscriptions are unsigned; (3) the McGill subscriptions are in three documents with Margaret McGill a subscriber in two of them; (4) the Delanghe subscriptions are in 3 documents with another Delanghe — Gail Delanghe — introduced in one of them and her document is unsigned.

41      It may be pointed out that some of the subscription records are either inconsistent with the share allotment resolution included at tab 11 or with the investment guarantees and promissory notes already referred to and included at tab 22. For example, we know from other evidence that Mr. Watt paid his advance on December 7 (tab 23) yet his unsigned subscription at tab 10 is dated November 23. Also, Margaret McGill appears amongst the subscribers on *two* of the signed subscriptions yet there are no investment guarantees or promissory notes in her name. In short, these various documents in ex. 8 — signed and unsigned, dated and undated — are a chaotic mess at best.

42      Mr. Delanghe went on to explain other critically important features of the alleged utilization, in November, of the corporate vehicle for the loans. He said that he had collected all but Watt's contribution by November 23 and that the monies were placed in the Cohen, Melnitzer trust account at the CIBC on that day. On the same day the law firm issued a cheque to cover the $1,800,000 advance to Melnitzer personally. He rather airily explained the failure of the $1,800,000 to go through the bank account of 808756 Ontario by stating that he had received "verbal" authorization from the lenders to do this, adding that the law firm was receiving the funds for the company.

43      Mr. Delanghe next moved on to identify and discuss two other documents, namely, (1) a Declaration of Trust document, signed by Melnitzer and dated November 23 (tab 3), and (2) an agreement between 808756 Ontario and Melnitzer, purportedly signed by Melnitzer on November 23 but not signed at all by the company (tab 20). Mr. Delanghe said that he thought Kenneth McGill, another partner at Cohen, Melnitzer, had prepared these and he also thought that McGill might have witnessed Melnitzer's signatures on both. In fact, there are *no witnesses* to Melnitzer's signatures on either of these documents.

44      As I have said already, Delanghe described the Declaration of Trust document as a "pledge" document. It reads this way:

**Declaration of Trust**

I hereby declare that 239 Class F shares and 360,000 Class G shares in the capital of Champion Chemtech Limited registered in my name are held by me as nominee of 808756 Ontario Inc., and I hereby agree to deal with the said 239 Class F shares and the said 360,000 Class G shares in accordance with written instructions received from 808756 Ontario Inc. subsequent to August 31, 1993 save and except if the trust hereby created no longer exists.

I hereby undertake and agree to pay to or to the order of the said 808756 Ontario Inc. all dividends, including stock dividends or other distributions, whether of capital or income, that may from time to time be payable on the said Class F shares and the Class G shares of Champion Chemtech Limited.

DATED as of the 23rd day of November, 1990

        "J.M. Melnitzer"

        Julius H. Melnitzer

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

45    Mr. Delanghe could not say who received this document, or exactly when, but he was confident that the firm must have received it after the notes and guarantees and probably on or before November 23. In any event, he was firm that his pledge or collateral security document was "worked out" a few weeks before November 23.

46    The agreement document (between Melnitzer and 808756 Ontario) represents a strange and rather anomalous part of the overall picture. Its recitals state, first, that 808756 Ontario "wishes to acquire beneficial title to 239 Class F and 360,000 Class G shares" in Champion Chemtech, a number which worked out to 72% of Melnitzer's gross shareholding. The agreement is couched in the language of a share purchase with the company being called "purchaser" throughout the document. The last paragraph of the agreement states that the "purchase price for the shares" is $1,799,900, thus tying the agreement to the gross loan amount.

47    There are 2 serious difficulties with this so-called agreement: (1) it was only signed by Melnitzer and (2) there is a perplexing clause in the body of it reading as follows:

      The Vendor shall on even date herewith execute and deliver to the Purchaser a declaration of trust in the form of the declaration of trust attached hereto as Schedule A.

48    Unfortunately, the copy of this document produced by 808756 Ontario as tab 20 has no Schedule A attached to it and no original of the document was produced at trial. Of course, the Declaration of Trust document marked as tab 3 was produced but Delanghe attempted to distance this latter document from the agreement even though it is also dated November 23 and seems the only logical candidate for characterization as the Schedule A document.

49    Mr. Delanghe was strongly pressed in cross-examination on the interrelationship of these two documents. He insisted the agreement was being negotiated as part of the roll-over of the deal to 808756 Ontario in an effort to protect the 10% interim interest payments under the loans as dividends of the company.

50    He then went on to claim that, at some unknown point, this agreement was abandoned but that the Declaration of Trust continued as a "stand-alone" pledge notwithstanding its obvious linkage to the concededly abandoned agreement which, as noted, was only signed by Melnitzer.

51    In the final portion of Delanghe's evidence he identified two financing statements which were registered under the PPSA on the strength of the Declaration of Trust document above. The first of these registrations was made on August 22, 1991, against the name "Julius H. Melnitzer". The second was registered on August 29 against the name "Herman J. Melnitzer".

52    He also acknowledged here that at the end of July in 1991, just before the whistle was blown on Melnitzer's fraudulent activities, he received two large personal cheques from Melnitzer — both postdated to August 31, 1991. As he recalled them, one was payable to himself for $3,500,000 and the other was payable to 808756 Ontario for an accelerated full payout of the $1,800,000 loan, including the bonus and interest. Other evidence was later put into the trial record which showed some deficiencies in Delanghe's recollection of these cheques. In fact, the cheque payable to Delanghe personally was for $1,600,000 and the second cheque was payable to another numbered company *931755 Ontario Limited*, for $5,000,000: see ex. 24, a statement by Iva Klouda to the R.C.M.P.

53    Kenneth McGill, also called by 808756 Ontario, gave important evidence in this case. It must be said at the outset that his evidence collided with that of Delanghe in several ways but its total impact was to shed light in some dark corners.

54    Mr. McGill joined Cohen, Melnitzer in 1988 along with Delanghe and became a partner in 1989. He became an investor in the Singapore Deal to the tune of $150,000.

55    Mr. McGill was a specialist in corporate and commercial law. He started his evidence by saying that the original structure of the loans to Melnitzer was changed in the fall of 1990 to provide for the insertion of 808756 Ontario between the individual investors and Melnitzer. The original Minute Book of 808756 Ontario was introduced at the opening of his evidence and he confirmed that he had done all of the resolutions, share transfer documents and even the agreement and Declaration of Trust

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

already identified by Delanghe. In his examination in chief, he, like Delanghe, was confident that all the documentation relating to the roll-over of the deal to the company was done before or contemporaneously with the November 23 funding date.

56    He did, however, make 2 startling revelations in chief which impact on the entire case put forward by the company.

57    The first such revelation related to incidents which occurred on the evening of Monday, August 5, at Cohen, Melnitzer law office. It is to be remembered that this was *after* the frauds were discovered and Melnitzer had been charged.

58    Mr. McGill said he was at the office on this night with most of his partners. During their discussions a phone call was apparently received from a London lawyer who was representing Melnitzer in respect of the criminal charges. Mr. McGill could not remember who answered the phone but his recollection was that whoever answered told the assembled partners that Melnitzer was at the criminal lawyer's office and was prepared to sign any documents which needed to be signed for the Singapore Deal. Mr. McGill says that the result was that he and another partner Russell Raikes, went over to the criminal lawyer's office with the Minute Book of 808756 Ontario with them.

59    Mr. McGill says that, before they left the Cohen, Melnitzer office, he thinks he tabbed a few pages of "organizational resolutions" in the Minute Book which he somehow discovered had not been signed by Melnitzer after the company was incorporated in 1988.

60    He says that when they got to the other office they met the criminal lawyer who told them that Melnitzer was in another room. They then gave the Minute Book to this lawyer, who, in turn, left the room to attend upon Melnitzer elsewhere in the office. He claims that the lawyer returned in a few minutes with the Minute Book and that the so-called organizational resolutions were signed. They then left the lawyer's office with the Minute Book and returned to their own office. He claims that they never saw Melnitzer during this visit and was adamant Melnitzer did not then sign any of the Minute Book documents relating to the Singapore Deal or any other documents such as the agreement or Declaration of Trust.

61    The second of these revelations related to numbered company, 931755 Ontario, which had not been mentioned in the evidence of Delanghe although, clearly, he had received a post-dated cheque from Melnitzer in favour of that company for $5,000,000 at the end of July.

62    During his testimony about the Minute Book of 808756 Ontario McGill was confronted by a spate of resolutions apparently signed on April 25-26, 1991, which seemed to transfer the company back into the hands of Melnitzer. These resolutions and associated transfer documents were in disarray but their net effect, leaving aside deficiencies, was to make Melnitzer the sole shareholder and officer once again.

63    Mr. McGill's explanation for this strange turn of events was that, in about the month of March, 1991, Melnitzer approached him and the other lenders and indicated he wanted 808756 Ontario back for other purposes and thus it was decided that 931755 Ontario would be incorporated to take over the role of the other company.

64    The Minute Book for the new company was produced for the first time during McGill's evidence. It shows that the company was incorporated on May 1 and the organizational resolutions show McGill as president and secretary. The Minute Book shows many draft and unsigned documents, including some draft, unsigned promissory notes between the companies, but it was conceded that this company had not got off the ground. Mr. McGill really had no explanation as to why so many of the transfer documents in the 808756 Ontario Minute Book were dated on either April 25 or 26 when the new company was not incorporated until May 1.

65    Because of the late production of the Minute Books and the rather startling revelations in McGill's evidence in chief, McGill was subjected to searching cross-examination. His confidence about when the roll-over resolutions and related documents for 808756 Ontario were signed quickly evaporated.

66    He was strongly pressed about some correspondence between two accountants and the Cohen, Melnitzer firm in November and December, 1990. It will be recalled that Delanghe had given evidence that the law firm had consulted with Morey Watson

of Deloitte Touche several weeks before the funding date of November 23, leaving the clear implication that his advice had been acted upon.

67      Ex. 29 was an advisory letter from the accountant, Morey Watson, to Delanghe, dated November 19, 1990, containing a complex and convoluted proposal as to how a private company could take over the Melnitzer loans. Mr. McGill conceded that Watson's advice was regarded as impractical and was not acted upon.

68      Mr. McGill also identified a December, 1990 exchange of letters between himself and a new accountant, Garth Howes of Ernst & Young. Mr. McGill's letter to Howes, dated December 7, (ex. 30) outlines the general contours of the roll-over to 808756 Ontario but it is compellingly clear from this letter that the transaction had not been carried out by the date of the letter.

69      The beginning portion of the letter reads as follows:

Further to our discussion in connection with the captioned matter, I would put forth the following for your information and comment:

1. I propose to use 808756 Ontario Inc. as Investco.

2. The company was incorporated December 9th, 1988 and has been an inactive shell ever since.

Currently the G.L. is the holder of 100 common shares in the capital of 808756 Ontario Inc. and is the sole director, shareholder and officer thereof.

70      The letters "G.L." used in this passage refer to a nickname or acronym which Melnitzer's partners used in describing him in this period — the "Great Leader". It is obvious from this passage and what follows that the roll-over to 808756 Ontario was a mere concept in early December and had not been implemented on paper or otherwise.

71      Later in the letter he asks Howes for advice on whether Melnitzer should remain a shareholder or not. Then, he discloses to Howes a plan to acquire about 10% of a Canadian-controlled private company, presumably meaning Champion Chemtech.

72      At p. 2 of the letter McGill makes reference to what can only be the planned purchase by 808756 Ontario of shares in Champion Chemtech:

The question I have is whether the G.L. should remain a shareholder or should he transfer his shares to one of the new shareholders. This point arises again subsequently.

808756 Ontario Inc. will then acquire more (but only slightly more) than 10% of a Canadian controlled private corporation.

There will be a trust agreement restricting the voting of the shares held by 808756 Ontario Inc. in the Canadian controlled private corporation.

Particulars of the Canadian controlled private corporation are not yet available, but will be forwarded to you immediately upon the information becoming available.

What is the impact of holding not less than 10% of the Canadian controlled private corporation?

73      The letter later talks about a "shareholder agreement" between the shareholders of 808756 Ontario to set out their rights inter se — something that was concededly never prepared or executed at any time.

74      Mr. Howes' reply to McGill, dated December 10, (ex. 31) reviews McGill's proposals and answers some of McGill's concerns. He says, for example, that Melnitzer probably should not continue as a shareholder. Also, he discusses the pros and cons of the proposed purchase of shares in the so-called Canadian-controlled private company. It is clear that he has some grave concerns about the viability of this proposal from a tax perspective.

Case 09-10138-MFW   Doc 14225-38   Filed 08/15/14   Page 17 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

75    In cross-examination, McGill was clearly physically distressed by the dates of these letters and their contents. He seemed at a loss to explain how they could have been written in December when he thought his memory otherwise told him that the 808756 Ontario roll-over had been completed in all aspects by not later than November 23, 1990.

76    His distress heightened when, in cross-examination, he was presented with his statement, dated August 2, 1991, given to R.C.M.P. investigators during their investigation of Melnitzer (ex. 25), and another similar statement (ex. 26) given by Barry Parker, one of the other investors.

77    In his statement, McGill clearly states at p. 3 that the roll-over to 808756 Ontario was not done until after the accountant, Garth Howes, was brought into the picture:

I then contacted Garth Howes at Ernst & Young, a friend of mine and asked him to advise on the transaction. We had 2 or 3 meetings on the matter and finally decided to structure the transaction by means of a corporate structure. At least one letter was received from Mr. Howes who was also present at least one meeting with a group of the proposed shareholders.

78    He also acknowledged, at p. 4 of the statement, that he prepared the agreement with respect to the Chemtech shares and the attendant Declaration of Trust. This passage also contains a devastating admission that he had seen the Champion Chemtech shares, knew that they contained a broad prohibition against transfers or pledging and had told his partners about this prohibition:

I do not recall how the decision to take the Champion Chemtech shares as security arose. I believe it originated in discussions between Julius Melnitzer and Ron Delanghe as the first time I heard about it I believe was in Mr. Delanghe's office with Julius being present. Julius agreed to give us the shares as security as long as it did not involve going to the other shareholders in Champion Chemtech Inc.

I met with Julius in his office one afternoon and he told me how many shares he had and how many should be put into trust for us. Julius did the calculations because, as he stated, he always trusted his own numbers more than anyone else's. I prepared an agreement between the parties and a trust declaration. I reviewed the share certificates of Champion Chemtech Inc. and the shareholder's agreement which Marlene McGrath of our offices had as she was involved in the acquisition by Julius of his position in that company. I was aware and made Julius, Ron Delanghe, Barry Parker, Iva Klouda and I believe Fletcher Dawson all of whom were involved in the transaction also aware that what Julius proposed to do with the shares was not provided for in the existing shareholder's agreement (between Champion Chemtech & Julius) as I read it. However, because of the fact we were dealing with Julius Melnitzer we all chose to ignore this matter. The agreement between Champion Chemtech and shareholders did not allow for the shareholder to pledge the shares.

79    The statement of Parker was also put to McGill. The following passages in it are pertinent:

80    (1) *At p. 8:*

BP: I think the first meeting was before the money went in. and then we went to another accountant and I know the other guy got involved after the money had been paid into the law firm. And the deal ... then a company was set up to properly, at that point, even though it was after the fact, secure our investment and to document this whole matter.

81    (2) *At p. 11*:

RP: When did this company actually get formed? Was it after the money had already been invested in the fall of 1990?

BP: Yah. The paper work got done later on — it would have been in early 1991.

82    Mr. McGill conceded in cross-examination that his memory was better in August, 1991, when he gave his statement to the R.C.M.P. He thought that anything in that statement was true and accurate. He felt that, in light of that statement and the correspondence with Howes, he must be mistaken about the "time-frame" of the events incidental to the preparation of the roll-over documents into 808756 Ontario.

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 18 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

83    I now proceed to deal with the many legal issues which arise in this case.

**II. Resolution of the Issues**

*A. The Claim of CIBC*

84    Messrs. Angeletti and Wallace, counsel for CIBC, presented 2 alternative arguments in favour of their position that CIBC held a prior interest in the shares over other claimants: (1) their first argument was based on constructive trust principles and the equitable doctrine of tracing; (2) their alternative position was that the CIBC held a perfected security interest in the shares under the PPSA and that this security interest remains valid to the present time.

85    These arguments are complex and I propose to consider each of them in detail.

86    It is undisputed that on February 9, 1990, Melnitzer drew $2,500,000 on his credit line with the CIBC and placed this sum in his law firm's trust account at the same bank. Then, on February 12, he issued a certified trust cheque for the same sum and delivered it to Champion Chemtech in payment for 500,000 Class G and 332 Class F shares.

87    Mr. Angeletti argued that because this transaction was based on a fraudulent scheme on Melnitzer's part, a constructive trust arose on February 9. At that time an unjust enrichment and deprivation occurred for which there was no juristic reason. Assuming the trust is imposed, he submitted that this is a case where the equitable doctrine of tracing enables the court to trace the funds and declare a proprietary interest in the shares.

88    In broad outline, Mr. Angeletti is relying on a network of 6 principles or rules of law in support of his position:

1. The constructive trust is an equitable remedy, granted to prevent unjust enrichment.

2. There are 3 elements to the remedy: (a) unjust enrichment (b) a deprivation (c) the absence of any juristic reason for the enrichment.

3. The constructive trust must be the appropriate remedy in the circumstances.

4. In Canada at least, it is not necessary to show a fiduciary relationship between the parties.

5. The equitable rules of tracing allow the beneficiary to trace into substituted property.

6. If 2 or more parties claim a beneficial interest in the property, the rule is that the first in time has priority.

89    With all respect for the remarkably well-developed structure of Mr. Angeletti's argument, I cannot agree that the CIBC has shown there has been an unjust enrichment and that a constructive trust should be imposed on the shares.

90    Since 1978, the Supreme Court of Canada has released a series of landmark judgments outlining and refining the limits of the equitable remedial doctrine of constructive trust: see *Rathwell v. Rathwell*, [1978] 2 S.C.R. 436, 83 D.L.R. (3d) 289; *Becker v. Pettkus*, [1980] 2 S.C.R. 834, 117 D.L.R. (3d) 257 [hereinafter *Pettkus*]; *Sorochan v. Sorochan*, [1986] 2 S.C.R. 38, 29 D.L.R. (4th) 1; *International Corona Resources Ltd. v. LAC Minerals Ltd.*, *(sub nom. LAC Minerals Ltd. v. International Corona Resources Ltd.)* [1989] 2 S.C.R. 574, 61 D.L.R. (4th) 14; *Syncrude Canada Ltd. v. Hunter Engineering Co.*, [1989] 1 S.C.R. 426, 57 D.L.R. (4th) 321.

91    It is now clear in Canada that the principle of unjust enrichment is fully recognized as a general basis for liability along with tort, contract and so on. The constructive trust is an equitable remedy which may be granted in order to prevent the unjust enrichment of a person.

92    The history of the evolution of the doctrine of constructive trust is usefully reviewed in Professor Fridman's *Restitution*, 2nd ed. (1992), at pp. 434-446. He says this at pp. 436-437:

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

A doctrine that was designed to deal with misbehaving express trustees eventually was employed to prevent others who were con sidered to be fiduciaries even though they were not express trustees from making use of their positions and the opportunities made available by their occupation of those positions to gain an advantage for themselves when they ought to have been using their situation, knowledge, and abilities and exploiting their opportunities for the benefit of those in respect of whom they were fiduciaries. Equity spun the web of constructive trust around such persons and constrained their freedom to act for themselves to the detriment of those to whom they owed duties of fidelity. Among those who were treated in this way were agents, solicitors, bankers, directors of companies, who were regarded in equity as owing fiduciary duties to their principals, clients, customers, and corporations ...

The constructive trust thereby became an important tool in the armoury of the law. In Canada, it came to be recognised and accepted as more than just a relationship that could be imposed by the law on parties not originally trustee and beneficiary. It was turned into a method whereby, whenever an unjust enrichment occurred, the situation could be rectified by using the constructive trust as a remedy to enforce the recovery of that enrichment from the defendant. For this to happen, it was necessary that situations where a fiduciary profited for himself rather than the person properly entitled to the advantage in question should be considered to be instances of unjust enrichment. [Footnotes omitted.]

93     Professor Fridman points out the broadened and perhaps uniquely Canadian version of the constructive trust had its seeds in the judgment of Laskin J. in *Canadian Aero Service Ltd. v. O'Malley* (1973), [1974] S.C.R. 592, 40 D.L.R. (3d) 371 where he held, at p. 392 D.L.R., that money awarded to the plaintiff on the ground that the ex-employees had exploited an opportunity that came to them only because of their position as senior officials of the plaintiff company could be viewed "as an accounting of profits, or, what amounts to the same thing, as based on unjust enrichment".

94      From this holding the Supreme Court moved on in such cases as *Rathwell, Pettkus* and *Sorochan* to deal with the proprietary rights of husband and wives, and then cohabiting men and women, and established a fresh set of principles along with a method whereby the women in question could obtain a share in the wealth achieved through joint efforts during the period of cohabitation.

95     In a now famous statement in *Rathwell, supra*, Dickson J. explained the requirements to be satisfied before an unjust enrichment could be said to exist in this fashion at p. 306 D.L.R.:

... for the principle to succeed, the facts must display an enrichment, a corresponding deprivation, and the absence of any juristic reason — such as a contract or disposition of law — for the enrichment.

96     The later case of *Pettkus, supra*, made it clear that the principle and its remedial adjunct, the constructive trust, would not be confined to matrimonial or related cases. As he said at p. 276 D.L.R.:

The equitable principle on which the remedy of constructive trust rests is broad and general; its purpose is to prevent unjust enrichment in whatever circumstances it occurs.

97     The facts of this case disclose that Melnitzer and the CIBC had a contractual debtor-creditor relationship going back at least to 1984. The evidence shows an almost endless series of credit lines being granted to Melnitzer under contractual arrangements of the parties. Those lines were undergirded by pledges of shares and other forms of security and it is conceded that almost all of these various forms of security were fraudulently created by Melnitzer and were worthless.

98      The $2,500,000 advanced by CIBC on February 9, 1990, was actually part of a credit line negotiated and concluded in July, 1989 when Melnitzer's credit limit was raised from $3,150,000 to $7,150,000: see ex. 7, tab 79. When Melnitzer made his July 21, 1989 application for a $4,000,000 increase in his line of credit he disclosed that he wished to use $2,500,000 to buy the Champion Chemtech shares. The internal bank records show that the immediate security for the loan was the pledging of $16,239,000 in shares of Melfan Investments and Vanguard Trust together with the usual overdraft lending agreement: see ex. 6, tabs 3 and 4. The ostensible purpose of the increase was to enable Melnitzer to buy out his father's last share in Melfan Investments for $1,500,000 and to purchase a $2,500,000 interest in Champion Chemtech.

Case 09-10138-MFW   Doc 14225-38   Filed 08/15/14   Page 20 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

99    Mr. Kahnert stated that the CIBC placed no specific lending value on the Champion Chemtech shares until after the disclosure of Melnitzer's fraud in August, 1991. The internal assessment officer of the bank, K.R. Willoughby, who wrote up the background approval for the loan increase (ex. 6, tab 3), said this at p. 7 of his report:

> Although we are not placing any significant value on the shares, we are confident in Melnitzer's investment activities and his business sense, and that the investment should prove lucrative for Melnitzer.

100    The fact of the matter is, however, that the bank insisted in its commitment that Melnitzer assign the Champion Chemtech shares as additional security, when they were purchased, as part and parcel of the increase in the credit line.

101    Mr. Melnitzer was permitted by CIBC to draw down the $2,500,000 on February 9 on the strength of its existing security package which had been in place since July, 1989. It only received possession of the shares on March 6, 1990, and the follow-up hypothecation agreement and power of attorney on May 19.

102    Mr. Angeletti argued that all 3 requirements for an unjust enrichment were established on the facts. The deprivation was the advance of the $2,500,000 and the corresponding enrichment was the receipt of the moneys by Melnitzer, traceable into the shares. The third element — no juristic reason for the enrichment — was, he argued, also made out because there was simply no intervening legal justification for the enrichment.

103    There are, I think, a multiplicity of factual and legal reasons why CIBC has failed to meet the requirements for an unjust enrichment and consequential constructive trust relief. First, while Melnitzer was arguably enriched on February 9 I cannot see that CIBC suffered a true deprivation. The fact of the matter is that the February 9 advance was part of a contractual commitment by the bank that went back 6 months in time. Also, the CIBC got exactly what it expected in the form of possession of the Champion Chemtech shares within a matter of 1 month, backed up by the hypothecation agreement and power of attorney. The CIBC is essentially trying to argue that a fraud which had occurred incidental to the credit commitment in July, 1989 and, for that matter, cascading back in time through to 1984, should somehow be compressed into a neat and small time capsule on February 9 and lead to an unjust enrichment finding. Fraud there was well prior to February 9 but I cannot conclude there was a true deprivation on and after February 9. The designated purpose of the $2,500,000 advance was fulfilled through Melnitzer's purchase of the shares on February 12 and the CIBC actually received a possessory security interest in these shares which was contemplated under the contractual loan commitment going back as far as July, 1989. The fact that the CIBC later gave up possession of the shares on July 4, 1991, does not change the picture in February, 1990.

104    The second reason why the CIBC position must be rejected arises under the third requirement for unjust enrichment, namely, that there was no juristic reason for the enrichment.

105    In *Rathwell*, as I have noted, Dickson J. explains that juristic reasons would include "a contract or disposition of law". Here the evidence shows that there was a contractual debtor-creditor relationship between Melnitzer and the CIBC at all times. Both parties maintained their commercial lending arrangements over the years with their eyes fully open and each of them obviously saw the arrangement as commercially advantageous. The fact that Melnitzer provided fraudulent security documents to the CIBC throughout the years does not, per se, vitiate ab initio the contractual explanation for the flow of loan advances and the counter-flow of interest and capital repayments. In my view, then, the contractual nature of the relationship between the parties provides a "juristic reason" for the advance to and enrichment of Melnitzer such that the CIBC cannot satisfy the third essential requirement for an unjust enrichment finding.

106    There is support for my finding on this point both in the case authorities and scholarly commentaries. Professor Fridman, in his work on *Restitution, supra*, neatly summarizes the point I make this way at p. 441:

> A further requirement for the imposition of a constructive trust in such instances is that there be no juristic reason for the enrichment. Therefore, where the relationship between the parties was that of debtor and creditor under a contract between them, the granting of a constructive trust would have entailed setting aside the contract. This would seriously

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

infringe the efficacy of contracts as a whole. Hence, there was a good juristic reason for denying the application of the constructive trust doctrine.

107     Professor Hayton's article, "Constructive Trust: Is the Remedying of Unjust Enrichment a Satisfactory Approach?", Youdan ed., *Equity, Fiduciaries and Trusts* (1989), is to the same effect. He says this at p. 215:

> Voidable transfers of property need to be distinguished from voidable loan transactions intended merely to create a debtor/ creditor relationship. In the former case, the plaintiff has a proprietary right sufficient to justify tracing, though, it seems, with priority depending on the rules for mere equities as opposed to full equitable interests. In the latter case, the plaintiff has an *in personam* claim, so that on the bankruptcy of the defendant debtor the plaintiff only has a personal claim having no priority over other creditors. [Footnote omitted.]

108     It may be pointed out here that not only does the CIBC have an *in personam* claim against Melnitzer but it has already asserted that claim. At the time of Melnitzer's sentencing, on February 10, 1992, Maloney J. issued a compensation order in the CIBC's favour for $8,392,629.10 under s. 725(1) of the *Criminal Code* (ex. 7, tab 81). That order is unaffected by Melnitzer's bankruptcy so that, to that extent, it puts the CIBC claim in a somewhat preferred position vis-à-vis Melnitzer's general body of creditors.

109     The most recent authoritative statement of the issue at stake is found in the *LAC Minerals* case, *supra*. There, the Supreme Court ended up concluding, in a closely divided decision, that there was no unjust enrichment but that the defendant had committed a breach of confidence, justifying the imposition of a constructive trust on the property in dispute. In the course of the dispositive judgment of La Forest J., that learned justice made it clear that, when a restitutionary claim had been made out, the trial court must move on to decide whether the constructive trust is "the appropriate remedy" in all the circumstances of the case. He said this at p. 51 D.L.R.:

> I do not countenance the view that a proprietary remedy can be imposed whenever it is "just" to do so, unless further guidance can be given as to what those situations may be.
>
> . . . . .
>
> Much of the difficulty disappears if it is recognized that in this context the issue of the appropriate remedy only arises once a valid restitutionary claim has been made out. The constructive trust awards a right in property, but the right can only arise once a right to relief has been established. In the vast majority of cases a constructive trust will not be the appropriate remedy. Thus, in *Hunter, supra*, had the restitutionary claim been made out, there would have been no reason to award a constructive trust, as the plaintiff's claim could have been satisfied simply by a personal monetary award; *a constructive trust should only be awarded if there is reason to grant to the plaintiff the additional rights that flow from recognition of a right of property*. Among the most important of these will be that it is appropriate that the plaintiff receive the priority accorded to the holder of a right of property in a bankruptcy.

> (Emphasis added)

110     This holding of La Forest J. is of critical importance in cases such as the present one where the assertion of the proprietary remedy is made in a commercial contract framework.

111     Even if I had held that the CIBC had made out a valid unjust enrichment claim, I would hold that the facts of this case do not support the imposition of a constructive trust remedy.

112     La Forest J.'s holding dictates caution, generally, in using the constructive trust vehicle in restitutionary cases. He also points to a concern about the appropriateness of the given plaintiff receiving what amounts to a priority interest otherwise accorded to a secured creditor in a bankruptcy. Here, if I awarded the constructive trust remedy, the CIBC would be given, retrospectively, a priority property interest over the other property-interest claimants as well as the general creditors of Melnitzer.

113     There are many evidentiary factors, I think, which would make it unjust and inappropriate to grant the remedy here.

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

114    (1) There is the debtor-creditor relationship of the parties, going back to 1984.

115     (2) There is the fact that the CIBC has its normal contractual remedies and has already asserted these by obtaining a compensation order.

116     (3) The CIBC took a valid security interest in the shares through the possessory pledge of the shares. The later release of the shares on July 4, 1981, cannot change the fact that security was given for the advance on February 9.

117    (4) The CIBC and its officials were lax to the point of negligence over a period of 7 years in their dealings with Melnitzer. Let me identify some of the indefensible carelessness on the part of the CIBC:

118    a) Mr. Kahnert admitted that, as far back as November, 1985, the bank was concerned about Melnitzer's holdings in Vanguard Trust but really made no independent inquiry. At this time the Vanguard stock was pledged to the bank to support a line of credit of $1,320,000 and the reality was that Melnitzer's true holding in this stock was almost worthless.

119    b) The same point can be made about Melfan Investments, the Melnitzer family investment company in Montreal. From 1984 onwards, Melnitzer was able to bamboozle a myriad of CIBC officials into thinking that this was a hugely successful private company. He was also able to make them believe that he had a substantial stake in this company with his father.

120     By September, 1988, the bank was putting a value of $11,742,000 on Melnitzer's alleged interests in Vanguard and Melfan. There is no evidence in the CIBC records showing that the CIBC ever took the trouble, at any time, to check with the other principals of these companies to ascertain Melnitzer's true interests. Always, the bank relied on Melnitzer's word and their "belief" in his worth and character along, in some instances, with some forged letters or records of third parties, such as Melnitzer's accounting firm, Marcus & Associates.

121     By mid-1990, Melnitzer had charmed Kahnert into believing that Melfan had $4,500,000 worth of term deposits at the Bank of Montreal: see ex. 6, Tabs 27 and 55. These term deposits were supposed to support a new Melnitzer loan commitment made on April 12, 1990. Mr. Kahnert admitted, in cross-examination, that he tried to contact the Bank of Montreal about these deposits and that Melnitzer himself put roadblocks in his path during his abortive inquiries. Yet he never followed up, in these suspicious circumstances, with reasonable efforts to get direct proof that the deposits existed.

122    c) There is also the case of the Champion Chemtech shares. Kahnert admitted he saw the warning notice of the face of the two share certificates on March 6, 1990, and acknowledged that he asked Melnitzer to produce the shareholders' agreement. Yet, once again, he let the matter drop without further inquiries.

123    d) In the early spring of 1991 Melnitzer was being pressed by some of his creditors and was attempting to increase his credit lines with CIBC and other banks. In late March, Kahnert prepared a financial statement on Melnitzer's net worth (ex. 6, tab 41). Rather incredibly, it showed his gross assets at *$66,750,000* and his net worth at $55,350,000 making him, on paper, one of Canada's richest men. He admitted that he relied, virtually totally, in preparing this statement, on Melnitzer's word and on scraps of paper provided by Melnitzer: see, for example, ex. 7, tab 78.

124     There are figures in the "assets" column of this statement which literally boggle the mind yet there is essentially no evidence in the record that CIBC did any reasonable check of the figures set out in it. I have no doubt that a due diligence check of the figures produced by Melnitzer in March, 1991, would have brought a quick end to Melnitzer's frauds. But the bank had blinded itself in its desire for Melnitzer's business and plunged on with a new credit line for him.

125    e) The final credit line granted to Melnitzer shows the height — or nadir — of the bank's folly.

126     The first step was Melnitzer's proposal that he exchange blue-chip IBM stock for the already pledged Vanguard and Champion Chemtech shares. This proposal was included in Melnitzer's credit application of April 25, 1991, and was approved by the bank on the next day.

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 23 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

127    The share exchange was to occur after July 2 if Melnitzer complied with other terms of the April 26 credit commitment: see ex. 6, tab 28 (April 26 CIBC credit commitment letter, p. 3).

128    Finally, on July 4, Kahnert met Melnitzer in Toronto and the share exchange took place: the CIBC now had a forged IBM share certificate (ex. 6, tab 56) purporting to represent 98,435 shares having a worth of $11,098,054 in exchange for the Champion Chemtech shares.

129    Mr. Kahnert once again admitted that CIBC did nothing to check the authenticity of this share certificate even though a simple call to the transfer agent would have shown it to be a forgery and of no value.

130    The last chapter of the CIBC's corporate naïveté and blindness occurred on July 19 when it increased Melnitzer's line of credit to $20,000,000 on the basis of Melnitzer's pledge of shares in IBM, Canadian Pacific, Exon, McDonald's and BCE Inc. having an alleged value of $29,413,647.

131    The forged share certificate for these shares were turned over to the bank in late July and, in turn, the bank released all of the earlier securities it was holding, including the Melfan shares and guarantees. Mr. Kahnert acknowledged that the bank had done no checking on the validity of these share certificates prior to Melnitzer's arrest on August 4.

132    I am acutely appreciative of the reasons which led the Supreme Court to forge a new path for the principle of unjust enrichment and its corollary remedial mechanism, the constructive trust, in family cases or family-like cases. *LAC Minerals* provides an example of a commercial situation where the uniqueness of the Williams mining property dictated the imposition of a constructive trust after an equitable cause of action had been established. The facts of the case at hand fall squarely on the other side of the line and do not justify the use of the constructive trust.

133    My final point here relates to the use of equitable tracing rules as a basis for the imposition of the constructive trust. My reading of the applicable cases and commentaries leads me to conclude, in any event, that these tracing rules could not be used to trace the $2,500,000 advance into the Champion Chemtech shares.

134    The equitable rules are admittedly somewhat technical and vague in their scope and effect but one such rule is that tracing should not be permitted where the claim arises out of a debtor-creditor relationship. The rule is set out in *Kerr on Fraud and Mistake*, 7th ed. (1952) at p. 587:

> It should be noted that equity does not any more than common law permit tracing where the relationship is merely that of debtor and creditor. Thus an agent who takes a bribe may be liable to account for it to his principal, but he does not hold that money on trust for his principal and the principal can only claim to be a creditor for the amount of the bribe and cannot trace the money.

135    Professor Hayton makes essentially the same point in his article, *supra*, at p. 209, footnote 23, where he says: "Normally, no tracing remedy will lie where there is a loan, since there will be a mere debtor-creditor relationship, the lender retaining no proprietary interest". Melnitzer, here, admittedly gave a possessory security interest to the CIBC with the delivery of the shares on March 6, 1990, but he came back into possession on July 4, 1991, and, on the evidence, continued in personal possession until the receivership order of August 3: the shares were found in later August in a personal documents envelope kept by Melnitzer in the Cohen, Melnitzer law firm's vault.

136    The rule may appear harsh but there is logic and common sense behind it. A contract based on fraud is *voidable* not void, and the tracing order, if allowed, would often permit one creditor to gain an unfair advantage over the general body of creditors of a bankrupt after the bankruptcy has intervened. See, also *Lister & Co. v. Stubbs* (1890), 45 Ch. D.1 (C.A.); *Daly v. Sydney Stock Exchange Ltd.* (1986), 160 C.L.R. 371 (Aust. H.C.); *Westpac Banking Corp. v. Markovic* (1985), 82 F.L.R. 7 (Aust. S.C.).

137    Mr. Wallace conceded that the CIBC registration of its financing statement, based on possession of the Champion Chemtech shares could not be relied upon. This registration (ex. 6, tab 67) was made on August 14, 1991 against the name, "Julius H. Melnitzer". In making this concession Mr. Wallace admitted 2 things: (1) that the registration was against the wrong

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

name, because Melnitzer's birth certificate from Germany showed his legal name as "Hermann Julius Melnitzer" (ex. 2); (2) that, in any event, the order of Keenan J. dated August 3, 1991, prohibited such registration and prevented any creditor from improving its position in terms of priorities after August 3.

138      His position was, however, that the registration defect did not matter because the CIBC received a perfected security interest in the shares through continuous possession on and after March 6, 1990, and that this possessory security interest was not lost on July 4, 1991, when the exchange of shares occurred between Kahnert of the CIBC and Melnitzer.

139      This argument put forward by Mr. Wallace has several interlocking parts and requires careful analysis. His starting point is s. 22 of the PPSA, reading as follows:

[Perfection by possession or repossession]

22. Possession or repossession of the collateral by the secured party, or on the secured party's behalf by a person other than the debtor or the debtor's agent, perfects a security interest in,

(*a*) chattel paper;

(*b*) goods;

(*c*) instruments;

(*d*) securities;

(*e*) negotiable documents of title; and

(*f*) money,

but only while it is actually held as collateral.

140      As to that section, Mr. Wallace says that, clearly, the CIBC became a perfected holder of a security interest on March 6, 1990, when Kahnert received the shares as additional collateral for the $2,500,000 advance. Mr. Wallace candidly admitted that the last clause of s. 22 — "but only while it is actually held as collateral" — appears to be a serious stumbling block for his client's security interest after July 4, 1991, when Kahnert exchanged the shares for the forged IBM share certificate. He submitted, however, that Melnitzer's fraud caused his client to give up *physical* possession of the shares and that, in equity, the court should deem the client's legal possession to be continuous because, otherwise, the court would be permitting the PPSA to be used as an "instrument of fraud". Mr. Wallace made reference here to s. 72 of the Act:

[Application of principles of law and equity]

72. Except in so far as they are inconsistent with the express provisions of this Act, the principles of law and equity, including the law merchant, the law relating to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake and other validating or invalidating rules of law, shall supplement this Act and shall continue to apply.

In support of this point, he relied on 2 cases, namely, *Carson Restaurants International Ltd. v. A-1 United Restaurant Supply Ltd.* (1988), 8 P.P.S.A.C. 276 (Sask. Q.B.) and *Key State Bank v. Voz* (1989), 9 P.P.S.A.C. 37 (Ont. Dist. Ct.).

141      The *Carson Restaurants* case involved an extraordinarily convoluted fact situation relating to conflicting registered security interests against the chattels of a franchised restaurant business incorporated under the name Yorktown Restaurant & Deli Ltd. The entirely innocent party was A-1 which received a purchase-money security interest from the restaurant company but which, unfortunately, registered against the slightly wrong corporate name, Yorktown Restaurant Supply Ltd. A-1 later amended its financing statement but, in the interim, a financing statement had been registered by the franchisor, Carson Restaurants. Grotsky J. found that one Dennis Skuter was the evildoer of the piece. Skuter was the sole controlling force of both

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

Carson Restaurants and the Yorktown Restaurant Company. He had knowledge of the A-1 interest and had even fraudulently intervened to cause A-1 to delay asserting its rights. Thus, Grotsky J. applied the Saskatchewan Act's equivalent of s. 72 to prevent Carson Restaurant from asserting its security interest ahead of that of A-1. He said this at p. 286:

> Well over 100 years ago in *McCormic v. Grogan*, (1869-70) L.R. 4 H.L. 82 at p. 97, Lord Westbury is reported as follows:

> > The Court of Equity has, from a very early period, decided that even an Act of Parliament shall not be used as an instrument of fraud; and if in the machinery of perpetrating a fraud an Act of Parliament intervenes, the Court of Equity, it is true, does not set aside the Act of Parliament, but it fastens on the individual who gets a title under that Act, and imposes upon him a personal obligation, because he applies the Act as an instrument for accomplishing a fraud. In this way the Court of Equity has dealt with the *Statute of Frauds*, and in this manner, also, it deals with the *Statute of Wills*.

> Fraud is not here alleged against Mr. Skutor. Notwithstanding, the principles enunciated by Lord Westbury commend themselves to me on the facts material to this application. To permit Carson to take advantage of A-1 in the circumstances outlined, would be to permit it, through Skutor, to use the Act as an instrument to defeat a claim of which he was not only aware, but which he deceitfully delayed by his representations to A-1 when it was pursuing its security interest against Yorkton Restaurant & Deli Ltd. on or about July 18, 1987.

One can hardly quarrel with the result arrived at in the *Carson Restaurants* case. However, close examination of the facts reveals that Grotsky J. pierced the corporate veil of the Carson Restaurants company to prevent its controlling mind, Skutor, from using the statute and registration as instruments of fraud.

142     The *Key State* case presents another highly unusual factual situation. Here, one Voz had a possessory security interest in a car but lost possession when the R.C.M.P. seized the vehicle under the Customs Act as a result of prior illegalities committed by the owner of the car in bringing it into Canada. A priority contest developed between Voz and the U.S. Key State Bank.

143     In these circumstances, Vannini D.C.J. held that Voz had priority because his perfected possessory interest, which was prior in time, was not defeated by an *involuntary* loss of possession through the Customs' seizure. In effect, Judge Vannini deemed Voz's possessory interest to have continued on and after the seizure because he did not intend to give up his rights nor did the Customs officials treat him as having lost such rights.

144     In my view, these cases cannot assist the CIBC here. The *PPSA* permits perfection of carefully defined security interests by possession as a limited alternative to the registration system otherwise provided for in its provisions: see ss. 22-23. The last line of s. 22 makes it clear that once possession is gone, the security interest is gone: "but only while it is actually held as collateral". This language is broad and makes no exceptions for losses of possession arising from fraud. Even assuming that Vannini J.'s ruling in *Key Bank* was correct in deeming possession to continue where the physical loss occurred through an involuntary act such as a lawful seizure under Customs legislation, I cannot conclude that what occurred here was in any way analogous to such a seizure.

145     Mr. Wallace also relied heavily during argument on application of the rule in *Re Condon; Ex parte James*, [1874-80] All E.R. 388 (C.A.). There can be no doubt that the rule in *Ex parte James* is a well-established rule of equity which, in appropriate situations, can aid an innocent but aggrieved party in a bankruptcy context. There are, however, two insuperable difficulties with its application to this case. First, it is my view that its application here would contravene the injunction in s. 72 itself that the principles of law and equity cannot be applied if "inconsistent with the express provisions of this Act". Section 22's language is absolute in the sense that it expressly states that a possessory security interest is only perfected so long as the collateral is "actually held" by the secured party. I really cannot imagine clearer and more imperative language than that. Section 72 was enacted to fill in the gaps of the PPSA in the sense of supplementing and augmenting its purposes when a specific provision, or provi sions, was silent on an interstitial point. However, the Act, in s. 22, is not silent but commanding and I do not see how I can ignore its express dictate by a specious resort to a clearly inconsistent rule of equity. As it seems to me, the drafters of the PPSA did not intend to have its perfection-of-interests system overridden or emasculated by an endless series of ad hoc

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

rulings in individualized settings. Respect must be maintained for the perfection system no matter how harsh its application may appear to be in a given isolated case.

146      In any event, I do not feel that the facts of this case support the invocation of *Ex parte James*. *Ex parte James* was a case where an execution creditor made a mistake of law in paying back funds already recovered prior to the bankruptcy to the trustee. James L.J. said this at p. 390:

> As to the other point the principle that money paid voluntarily with a knowledge of the facts, but under a mistake of law, cannot be recovered, must not be pressed too far. A trustee in bankruptcy is in truth an officer of the court. The moneys in his hands are trust moneys, and when the court finds the certain moneys in his hands really belong in equity to some one else, the court ought to do equity just as anyone else would be bound to do, and to order the money to be paid to the persons entitled to it.

147      From this passage, the rule of *Ex parte James* has evolved. In essence, the rule says that a trustee in bankruptcy, as an officer of the court, should do the fullest equity and, even if the trustee had a legal right to certain property, the Bankruptcy Court will not permit the trustee to exercise that right if it would be inconsistent with natural justice to do so. It has been called a "prerogative of mercy" reposing in the Bankruptcy Court to alleviate cases of unusual hardship in which a strict regard for legal or even equitable rights would work a manifest injustice; see, also, *Re McDonald* (1971), 16 C.B.R. (N.S.) 244 (Ont. S.C.). I cannot view the facts surrounding the pledge and later release of the Champion Chemtech shares as justifying the application of this extraordinary equitable relief in favour of CIBC. The CIBC had its eyes open in July, 1991, when it chose to exchange the Champion Chemtech shares for the ostensibly more valuable IBM shares. In failing to make any inquiry at that time, it made a business judgment for its own reasons and, as it seems to me, it should be called to account for that judgment and not permitted to cry wolf after the fact.

### B. The Claim of Grand Canyon

148      Mr. Leach, counsel for Grand Canyon, relied heavily on the Declaration of Trust document, dated February 12, 1990, (ex. 12, tab 4) which Allan Richman received from Melnitzer. This document reads as follows:

**DECLARATION OF TRUST**

I hereby declare that 66.4 Class F shares and 100,000 Class G shares in the capital of Champion Chemtech Limited registered in my name are held by me as nominee of GRAND CANYON PROPERTIES LTD., and I hereby consent to the transfer of 66.4 of the said Class F shares and 100,000 of the said Class G shares to GRAND CANYON PROPERTIES LTD. at any time upon its direction.

I hereby authorize and direct you to pay to or to the order of the said GRAND CANYON PROPERTIES LTD. all dividends, including stock dividends or other distributions, whether of capital or income, that may from to [sic] time be payable on the said Class F shares and Class G shares of Champion Chemtech Limited.

DATED the 12th day of February, 1990.

```
"J. Melnitzer"
--------------
Julius H. Melnitzer
```

149      He argues that the Declaration of Trust gave Grand Canyon an equitable ownership interest in 20% of the shares purchased by Melnitzer from Champion Chemtech and that this vested equitable interest is prior to any other claim on this percentage of the shares.

150      Mr. Leach's argument is premised on the following evidence. Sometime in early 1990 Melnitzer made a proposal to Richman that they use their jointly controlled company, Grand Canyon, to invest $500,000 in shares of Champion Chemtech.

Case 09-10138-MFW    Doc 14225-38    Filed 08/15/14    Page 27 of 34

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

Mr. Richman agreed and authorized Melnitzer to make the purchase on behalf of the company and handle the legal work required to complete the transaction. Then, on February 20, Richman, following Melnitzer's handwritten instructions in ex. 14, issued a Grand Canyon cheque for $500,000 payable to Melnitzer personally to cover the apparent purchase price. Later, Richman received the Declaration of Trust purportedly confirming the purchase and 20% share interest in the share certificates which had been issued in Melnitzer's name.

151     In my view there are serious evidentiary and legal weaknesses in Mr. Leach's submission.

152     It is an indisputable fact that Melnitzer did *not* use the Grand Canyon funds to purchase the Champion Chemtech shares. The uncontroverted evidence shows, as I have noted earlier, that Melnitzer drew down $2,500,000 from his credit line with CIBC on February 9, 1990, and had this sum placed in the Cohen, Melnitzer trust account on that day. This transaction was followed, on February 12, by Melnitzer's issuance of a Cohen, Melnitzer certified trust cheque for $2,500,000 to Champion Chemtech to pay the full share purchase cost of 500,000 Class G shares and 332 Class F shares.

153     Mr. Richman thinks he must have got ex. 14 (the undated note of instruction from Melnitzer) around February 20 because he issued a cheque, dated February 20, to Melnitzer for $500,000 representing the proposed Grand Canyon investment in the Champion Chemtech shares. As to when he later received the Declaration of Trust itself, he could only say in examination in chief that he thought it was received in late February. In cross examination, he conceded he might have received it sometime in early March. There was no date stamp on the Declaration and he was obviously relying on unaided memory in giving these estimates of the time of receipt.

154     There is other evidence in the record which throws considerable doubt on when this Declaration was created or delivered to Richman. If the Declaration had been executed by Melnitzer on February 12, as it purports to be, one may legitimately ask why he did not attach the Declaration to his note to Richman. After all, he had attached photocopies of the front sides of the 2 share certificates to this note.

155     There is, as well, evidence in the CIBC's Document Brief which raises further questions. Mr. Kahnert testified that he received the 2 original share certificates from Melnitzer on March 6. This evidence must be accurate because it is supported by a receipt letter from Kahnert to Melnitzer of March 6 (ex. 6, tab 18) as well as an internal CIBC memorandum (ex. 6 tab 19).

156     This CIBC Document Brief also contains, at tabs 16 and 17, 2 true photocopies of the actual original share certificates received from Melnitzer on March 6. These photocopies show that Melnitzer only received the originals on March 2: he has signed the originals on their backing sheets confirming actual receipt of the share certificates on that date.

157     On all of this confusing and sometimes conflicting evidence, I am not persuaded, on a balance of probabilities, that the Declaration was executed by Melnitzer prior to March 6, the date when Mr. Kahnert came into possession of the share certificates as additional security for the CIBC loan facility to Melnitzer. The burden of persuasion on this issue is on Richman and his evidence was too vague to persuade me that the Declaration actually came into existence before the shares were actually pledged to the CIBC.

158     In any event, there are other compelling reasons why the Grand Canyon Declaration cannot pass muster as creating an equitable interest in the shares.

159     It must be remembered that Melnitzer purchased the Champion Chemtech stock on February 12, 1990, when he turned over the certified trust cheque to Champion Chemtech. It is clear that when Melnitzer got the Grand Canyon cheque for $500,000 from Richman, on or shortly after February 20, the share purchase was already complete and that no part of the Grand Canyon funds were used by Melnitzer to complete the purchase.

160     I conclude that Melnitzer perpetrated a callous fraud on his old friend and business associate, Richman, when he approached him in early 1990 and suggested that they each put $250,000 into the coffers of Grand Canyon and then use the resultant $500,000 to invest in Champion Chemtech. On the evidence there can be no doubt that Melnitzer planned to defraud Richman of his $250,000 with the story that he would use the combined monies to purchase Champion Chemtech stock. When

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

Melnitzer received the Grand Canyon cheque on or about February 20, he had already used the CIBC loan advance to buy the stock and he simply pocketed the proceeds of the $500,000 Grand Canyon cheque. The secret as to what was done with the $500,000 remains with Melnitzer who did not testify in this proceeding. Most clearly, these funds were not used to purchase the Champion Chemtech stock.

161    It is long-settled law that a lawful trust may only be set up where three "certainties" exist, namely, certainty of intention, certainty of subject-matter and, finally, certainty of objects: see Waters, *Law of Trusts in Canada*, 2nd ed. (1984), at Chapter 5, pp. 107-117.

162    On the facts of this case, the Declaration of Trust document cannot pass the first certainty of intention. It is clear that Melnitzer had no intention, at any time, of creating a trust in favour of Grand Canyon under the Declaration or otherwise. What he really intended to do was to defraud Richman of $250,000 and re-capture his own $250,000 which he had contributed to the coffers of Grand Canyon as part of the fraudulent scheme. At no time did Melnitzer ever intend to grant Grand Canyon a true interest in the Champion Chemtech shares nor did he intend to create a true trust with this document.

163    Since Melnitzer had no intention to create a trust, this document is void and of no effect. Regrettably, a fraudulent scheme must defeat the trust argument of the dupe. It is an irony of this case that one of Melnitzer's few straightforward intentions was reflected in his dealings with the CIBC regarding the Champion Chemtech shares after he got his credit line increased in July, 1989. At that time he indicated that one of the reasons for the increased line was to purchase these shares and it was agreed that, when he did, he would pledge the shares as part of the security package in favour of the CIBC. He followed his agreement with the bank on this one transaction but in July, 1991, also defrauded the bank by exchanging the forged IBM share certificate for the sound Champion Chemtech shares.

164    Thus, the Grand Canyon claim under this Declaration of Trust document must inevitably fail. This document was created as part and parcel of a planned share purchase which never took place and which Melnitzer never intended to take place. In the result, it is worthless and cannot be enforced.

### *The Claim of 808756 Ontario Inc.*

165    Mr. Grace, counsel for 808756 Ontario, argued that his client held a valid PPSA security interest in 72% of the Champion Chemtech shares under the Declaration of Trust document purportedly signed by Melnitzer on November 23, 1990 (ex. 8, tab 3). He pointed to 2 financing statements registered by his client on August 22 and 29 respectively, each of which purported to perfect the security interest in question (ex. 8, tabs 26-27).

166    I propose to deal with the technical facial position of these registered security instruments under PPSA before moving on to more substantive questions about the Declaration itself.

167    The August 22 financing statement named "Julius H. Melnitzer" as debtor, the second named "Herman J. Melnitzer" as debtor. The reason for the second registration was that rumours were apparently floating through the London legal community after August 22 that Melnitzer's first name was not Julius, as was commonly believed, but Herman.

168    Melnitzer was born in Germany on October 5, 1947. He came to Canada in childhood and settled in Quebec for several years before coming to Ontario. His German birth certificate shows his full name to be "Hermann Julius Melnitzer". His later Canadian citizenship shows his name to be "Herman J. Melnitzer". The second "n" in Hermann has disappeared in the Canadian citizenship certificate.

169    Mr. Grace conceded that the August 22 registration is bad because Melnitzer's name on it — " Julius H. Melnitzer" — conformed neither with his original German birth certificate nor his Canadian citizenship certificate. However, he argued that the second registration must be held valid because Melnitzer's name on it exactly conforms with the Canadian citizenship certificate.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

170    The PPSA is somewhat vague on the subject of the correct name of a debtor for registration purposes. Section 46(4) says this about errors in general:

(4) A financing statement or financing change statement is not invalidated nor is its effect impaired by reason only of an error or omission therein or in its execution or registration unless a reasonable person is likely to be misled materially by the error or omission.

171    On the other hand, s. 16(1) of O. Reg. 372/89, passed under the PPSA, specifies this:

16.-(1) The name of a debtor who is a natural person shall be set out in the financing statement to show the first given name, followed by the initial of the second given name, if any, followed by the surname.

172    One might have thought that the *Change of Name Act*, R.S.O. 1990, c. C.7 might be helpful on the question of correct names but it, too, seems wanting in some respects. Section 2 of this Act, reads, in part, this way:

2.-(1) For all purposes of Ontario law,

(*a*) a person whose birth is registered in Ontario is entitled to be recognized by the name appearing on the person's birth certificate or change of name certificate, unless clause (c) applies;

(*b*) a person whose birth is not registered in Ontario is entitled to be recognized by,

(i) the name appearing on the person's change of name certificate, if the person's name has been changed under this Act or a predecessor of it, or

(ii) in all other cases, the name recognized in law in the last place with which the person had a real and substantial connection before residing in Ontario,

. . . . .

173    It might be said that s. 2(1)(*a*) above provides a useful guide for persons born in Ontario by saying that the name on the Ontario birth certificate is recognized for "all purposes of Ontario law". However, for a person like Melnitzer, born out of Ontario, one is directed to the law of the last place with which the person had a real and substantial connection. This rule is of no real assistance because I have no evidence before me as to Melnitzer's legally recognized name in Quebec, where he resided for many years before coming to Ontario in young adulthood.

174    Mr. Grace argued, relying on *Re Takhtalian* (1982), 2 P.P.S.A.C. 90 (Ont. S.C.), that, for foreign-born citizens, it should be sufficient to use the name of the debtor on his Canadian citizenship certificate.

175    While, perhaps, a respectable argument can be made for the position that, in the case of foreign-born persons, their original birth-certificate name should be used, I think, on balance, that it is practical and rational to opt for the name on a Canadian citizenship certificate, if one exists. The entire subject of correct names on a registration should probably be revisited by the legislature to staunch the flow of cases into the courts: see such cases as *Re Weber* (1990), 73 O.R. (2d) 238, 1 P.P.S.A.C. (2d) 36 (Ont. S.C.); *Re Lambert* (1991), 2 P.P.S.A.C. (2d) 160 (Ont. Bktcy.) and *Re Haasen* (1992), 8 O.R. (3d) 489 (Ont. Bktcy.).

176    Since, then, the August 29 registration contains the correct name of the debtor in accordance with Melnitzer's Canadian citizenship certificate, I conclude that it is facially free from disabling defects.

177    I now move on to consider more substantive questions about the Declaration.

178    The balance of Mr. Grace's argument was an attempt to show that the Declaration constituted a free-standing security interest which was protected by the registration under the PPSA.

179     I am afraid that I must reject the complete thrust of Mr. Grace's able submissions. I have concluded that the loans advanced to Melnitzer by the 8 or so individual investors were made in circumstances of almost total blind faith in the integrity, financial acumen and worth of Melnitzer. The blind faith was disastrously misplaced, as subsequent events have shown.

180     In original form, there is little doubt that the structure of the total investment commitment was to be by way of individual loans as backed up by the promissory notes and investment guarantees. However, 808756 Ontario has totally failed to convince me that even this first stage of the investment structure was properly put in place before November 23, 1990. I have already pointed to the general disarray and discrepancies within the promissory notes and guarantees at ex. 8, tab 22. Similar problems exist with virtually all of the corporate records of 808756 Ontario included in ex. 8. A simple example suffices: at tab 9, one finds a resolution of the Board purporting to authorize the transfer of Melnitzer's shares to Delanghe. This resolution is jointly signed by Delanghe, McGill and Barry Parker as directors; the date of execution is shown as November 23. Yet Parker's later statement to the R.C.M.P. confirms that these corporate records were signed in 1991 and did not exist in November.

181     808756 Ontario bears the burden of proof on the issue of the legitimacy of the alleged transaction which it says led to 808756 Ontario becoming the investment vehicle for the $1,800,000 on or before November 23, 1990. I conclude that it has failed to meet this burden.

182     I found the evidence of both Delanghe and McGill singularly unpersuasive and unhelpful on this issue, save where their evidence tended to satisfy me that the company's position was untenable and incredible.

183     Delanghe gave me the impression of one who was playing fast and loose with the truth in an effort to buttress the theory that 808756 Ontario had actually been put into existence as the true investment vehicle by November 23. What he did not tell me was more revealing that what he told me. I regret that I can only conclude he lied in attempting to say that 808756 Ontario was put in place before the $1,800,000 in loans went into Melnitzer's hands.

184     These events only took place in late 1990 and the Cohen, Melnitzer partners, including Delanghe, have always had control of the relevant records. Delanghe could not have been confused about these events or their sequence. He had to know that the efforts to transfer the loans advances to the company were only in an embryonic stage as of late December, 1990, and that the documents, such as they were, were being signed in 1991. Also, he had to know about the second company, 931755 Ontario, which was only incorporated on May 1, 1991. He received a cheque from Melnitzer payable to this company on July 31, 1991 for $5,000,000 yet he conveniently had a memory lapse about this company's very existence.

185     At one point in cross-examination he rather desperately attempted to justify the direct payment of the loans into the Cohen, Melnitzer trust account, without passing through 808756's account, by saying that he had verbal authorization to do so. This was nonsense. These moneys went where they did because all of the lenders were in thrall of Melnitzer and were essentially unconcerned about security for their loans.

186     McGill began his evidence in as confident a mood about the legitimacy of the 808756 Ontario lending vehicle as Delanghe. His attitude changed quickly when confronted with the corporate minute books for 808756 Ontario and 931755 Ontario along with the R.C.M.P. statements and his own exchange of correspondence with the second accountant, Garth Howes.

187     The final nail in the coffin for the 808756 Ontario lending theory is reflected in the sad spectacle of a group of Melnitzer's ex-partners meeting on August 5 and agreeing to send two of their number — Raikes and McGill — over to see Melnitzer at another lawyer's office in an effort to rectify deficiencies in corporate records by backdating certain documents.

188     I find it almost unimaginable that a group of ex-partners of a lawyer who they have just learned has defrauded them and others of millions of dollars would send emissaries to that man to have him sign corporate documents of any kind. The events described by McGill have the appearance of events occurring in a second-rate imitation of a John LeCarré spy novel. We are told by McGill that he and Raikes never saw Melnitzer at the other office but that they passed on the 808756 Ontario Minute Book so that he could merely sign and backdate to 1988 a few insignificant early "organizational resolutions".

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

189    This evidence has no ring of truth whatsoever. Why bother having Melnitzer sign a few insignificant resolutions under the cover of secrecy and through the intermediary, Melnitzer's criminal lawyer?

190    I am driven to conclude that more than mere organizational documents were signed that night. The strong possibility is that many important corporate documents, including the Declaration of Trust document, was passed to Melnitzer that night for his signature. In any event, I am satisfied beyond doubt that someone attempted in the spring and summer of 1991 to backdate a whole raft of corporate and other records to create the appearance that Melnitzer had gone into a debtor-creditor relationship with 808756 Ontario by November 23, 1990, and that 808756 Ontario therefore held a valid stand-alone pledge of the Champion Chemtech shares. This after-the-fact attempt to create an untrue picture of Melnitzer's legal obligation with respect to the repayment of the $1,800,000 was an act, or set of acts, of deception and undoubted desperation.

191    Leaving aside the course of deception involved in backdating so many corporate records, the Declaration document itself could have no life of its own in any event. It was clearly not a stand-alone security pledge of shares.

192    In his evidence, Delanghe tried to say that, before November 23, 1990, this document somehow shifted from being part of the Champion Chemtech share-sale agreement between Melnitzer and 808756 into a separate stand-alone pledge of these shares. I am satisfied that evidence was untrue. This document was definitely not signed in 1990 at all and was part of someone's efforts in 1991 to remake the Declaration into something it was never intended to be. Paragraph 1 of the share agreement says this about the Declaration:

   1. The Vendor shall on even date herewith execute and deliver to the Purchaser a declaration of trust in the form of the declaration of trust attached hereto as Schedule A.

Nothing can be clearer than this language in showing that the Declaration was part and parcel of the share agreement and enjoyed no life apart from an agreement which was never alive itself. Certainly, counsel for 808756 Ontario did not suggest that there was a *second* Declaration of Trust document.

193    It may also be said about this so-called stand-alone pledge that it probably is not a valid security pledge under the PPSA. Mr. Wallace neatly took this point during argument by referring to the definition of "security interest" in s. 1(1) of the Act:

   "security interest" means an interest in personal property that secures payment or performance of an obligation, and includes, whether or not the interest secures payment or performance of an obligation, the interest of a transferee of an account or chattel paper; ("sûreté")

194    Mr. Wallace pointed out that this Declaration makes no reference to a specific debt, an interest rate or any repayment date. Some, of course, of the riddles inherent in this document are answered by looking at the share-sale agreement and that latter document never got off the ground. As this Declaration reads, it is quite difficult to see how it creates an interest in personal property that secures payment or performance of an obligation within the statutory definition. What it more obviously seems to do is create an ownership interest of sorts in favour of 808756 with a rider that the ownership is postponed until after August 31, 1993. This document is very similar to the Grand Canyon Declaration of Trust, reproduced earlier, with the exception of the peculiar language limiting 808756 Ontario's ownership powers until after August 31, 1993. On its own terms, then, I am not persuaded that it creates a security interest within the PPSA.

195    There are two other equally compelling reasons why this Declaration and its attendant financing statement of August 29 cannot be enforced.

196    First, the freezing order of Keenan J. made on August 3, 1991, effectively prevented 808756 Ontario, or any other creditor, from improving its priority position thereafter.

197    Paragraph 9 of this order made Coopers & Lybrand the receiver of the "assets, undertakings and businesses of Melnitzer" and prevented, by necessary implication, any secured or unsecured creditor from improving its position after August 3.

**Canadian Imperial Bank of Commerce v. Melnitzer (Trustee of), 1993 CarswellOnt 251**

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

198    It is true that no specific provision of the order expressly addresses the question of attempted steps to perfect security interests after August 3 but the entire tenor of the order leads to that conclusion. For example, paragraph 6 reads as follows:

> THIS COURT ORDERS that the Royal Bank of Canada, Canadian Imperial Bank of Commerce, Toronto-Dominion Bank, Bank of Montreal, Canada Trustco, Scotia McLeod Inc. and Cohen, Melnitzer be and they are hereby restrained from transferring, accepting instructions for transfer, cashing or issuing any cheques or negotiable instrument or otherwise dealing with any property whether real or personal and any assets of any nature of kind whatsoever of the defendants Melnitzer, Melfan Investments and Melissa in their possession save and except with the permission of and by Order of this Honourable Court.

And paragraph 15 reads this way:

> THIS COURT ORDERS that the Receiver may from time to time pass its accounts and pay the balances in its hands as this Court or the Master may direct and for this purpose the accounts of the Receiver are hereby referred to the Master of the Ontario Court (General Division) and at the time of the passing of such accounts, the Master shall fix the remuneration of the Receiver. The fees and disbursements of the Receiver shall be a first charge on all the undertakings and assets of Melnitzer and Melfan Investments. Prior to the passing of the accounts, the Receiver shall be at liberty from time to time to apply reasonable amounts from the monies in its hands against its fees for services rendered either monthly or at such longer intervals as it deems appropriate and such amount shall constitute advances against its remuneration when fixed.

199    There is no doubt that by the return date for continuation of Keenan J.'s order on August 9, all interested parties were aware of the order and its terms, including the Cohen, Melnitzer firm members and others who invested in the Singapore Deal.

200    The 2 financing statements of 808756 Ontario were registered by another law firm, McCarthy, Tétrault, but it cannot be seriously argued that the McCarthy, Tétrault firm were not, in turn, acting as agents for the Cohen, Melnitzer group who were reinstated under paragraph 6. *Form cannot override substance.*

201    I conclude that the registrations were effected by the Cohen, Melnitzer group who were restrained by this paragraph of the order from "otherwise dealing with any property whether real or personal and any assets of any nature" of Melnitzer. In any event, I conclude that 808756 Ontario rights came into "conflict" with those of other creditors on August 3 when the Receiver, Coopers & Lybrand, took over control of the assets of Melnitzer and, under the rule laid down in *Sperry Inc. v. Canadian Imperial Bank of Commerce* (1985), 4 P.P.S.A.C. 314 (Ont. C.A.), 808756 Ontario's then unperfected interest is prevented from acquiring a higher status by later acts such as the August 29 registration.

202    A final reason for invalidation relates to the common prior knowledge of the investor group that the Champion Chemtech shares could not be transferred, pledged or otherwise dealt with by Melnitzer without the consent of the other shareholders.

203    It was conceded at trial that Melnitzer had not obtained a prior approval for any form of dealing with these shares. Thus, leaving aside whatever else may be said negatively about the Declaration, it was plainly issued in violation of the shareholders agreement and the investor group, along with 808756 Ontario, must be fixed with knowledge that it was created in violation of the agreement's express terms and conditions. Mr. McGill, both in cross-examination and in his prior statement to the R.C.M.P., acknowledged that the investor group was well aware of the prohibitions and simply took a chance, based on a misguided faith in Melnitzer's integrity and business acumen.

204    The question, then, arises whether the Declaration could be relied upon by 808756 in any event, having regard to its creation in *knowing* violation of the constitutive terms and conditions of the shares: clearly, Melnitzer knew of its frailties and so, also, did the recipients of its alleged benefits.

205    There are apparently conflicting decisions of the Ontario Court of Appeal and House of Lords bearing on this issue and I must address them.

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

206    *Hunter v. Hunter*, [1936] A.C. 222 (H.L.) is a complicated case whose principles tend to be rather difficult to discern. In *Hunter*, two companion actions were brought by shareholders in a private company to challenge the right of Lloyds Bank to take security on company shares, have the shares transferred into its nominees' names and then sell such shares in purported satisfaction of its claim. The shareholder whose shares were pledged advised the bank that there was a stringent transfer limitation in the articles of association of the company but the bank pressed on with its insistence on taking the shares as security. Later, as part of an effort to shore up its position, the bank insisted on the shares being registered in its nominees' names and, ultimately, the shares were sold to pay down the debt. This case is complicated factually and its difficulties are compounded because one of the two closely connected actions ended in the Court of Appeal. Also, the House of Lords was divided even though all five sitting judges agreed upon the result.

207    The House seems to have agreed that (1) there was no effective sale of the shares because the restrictions in the articles had not been observed and (2) the shareholder was not estopped from claiming rectification of the share register in his favour and (3) the shareholder could seek redemption of the shares under the original pledge of the shares as security.

208    The decision of the House is fact-driven *in extremis* although it is fair to say that 4 members of the House concluded that a valid sale of the shares could only be concluded by following the articles, and not otherwise.

209    It is interesting to note what another English judge — Vaisey J. — said about *Hunter* in *Hawks v. McArthur*, [1951] 1 All E.R. 22 (Ch. D.).

210    *Hawks* was a case of a director of a private company, who had been asked to resign and sold his shares in the company in separate blocks to 2 remaining officers. The company's articles contained the usual strict provisions restricting the transfer of shares and it was clear these provisions had not been complied with. Later, a third party obtained a judgment and charging order against the retiring director and a priority contest developed between the 2 officers who had purchased the shares and this third party. Vaisey J. distinguished *Hunter* by saying, at p. 27, that,

> ... in *Hunter v. Hunter*, the sale was by a mortgagee. That essential difference is emphasized in *Re Hafner*, in which BLACK, J., in the court of first instance in Ireland, considered that the fact that *Hunter v. Hunter* was dealing with a sale by a mortgagee was of the first importance ... [Citations omitted.]

211    I remain skeptical about the legitimacy of Vaisey J.'s attempt to distinguish *Hunter* on the basis of Lloyds Bank being a mortgagee. In the end, Vaisey J. concluded that an equitable interest in the shares had passed to the 2 purchasers which was enforceable as prior in time and equity to that of the party with the charging order. His rationale for his holding also appears at p. 27:

> On general principles, in such circumstances as those of the present case where a man who has an interest in shares in a company receives something for the sale of those shares and executes under seal a transfer of those shares for that purpose, I cannot bring myself to suppose that *Hunter v. Hunter* constrains me to hold that everything done in that transaction is a complete nullity ... The one thing, however, which seems to me to be important is that they paid Mr. McArthur the money, and I cannot bring myself to suppose that they got nothing by their bargain and that the whole property in the shares remained in Mr. McArthur, notwithstanding the transfers which had been executed and the money which he received. [Citations omitted.]

212    *Re M.C. United Masonry Ltd.* (1983), 40 O.R. (2d) 330 saw the Ontario Court of Appeal grapple with a similar case. Here, an accounting firm entered into a rough written agreement with its client, M.C. United, under which it received a guarantee of payment of past and future fees and a pledge of shares in another company as security. The accounting firm actually received possession of the pledged shares. Later, M.C. United went bankrupt and the inevitable contest developed between the trustee and the accounting firm because the letters patent of the company contained a restricted-transfer proviso which had not been complied with. Houlden J.A. concluded that (1) the transfer by pledge of the shares created an equitable interest in favour of the accounting firm and (2) the pledge constituted a valid and prior possessory security interest under s. 22 of the PPSA. In so doing, he drew the following rule from the *Hawks* case, *supra*, at p. 336 of his judgment for the court:

1993 CarswellOnt 251, [1993] O.J. No. 3021, 1 E.T.R. (2d) 1, 23 C.B.R. (3d) 161...

... if shares in a corporation are transferred without complying with restrictions on transfer, the *transferee acquires an equitable interest* in the shares: *Harrold v. Plenty*, [1901] 2 Ch. 314; *Hawks v. McArthur et al.*, [1951] 1 All E.R. 22. (Emphasis added)

213      In my view, none of these cases cited to me are strongly helpful in assessing the legitimacy of the alleged pledge of shares through the Declaration of Trust document. Whatever its origins, the Declaration of Trust document was created in circumstances where the full investor group and their alleged investment vehicle, 808756 Ontario, were fully apprised by Mr. McGill, one of their members, that the Declaration would be void if no consent, as called for, was obtained from the other shareholders of Champion Chemtech. Nevertheless, they cynically and deliberately took a chance and forged ahead. As McGill recorded Barry Parker's reaction, "if we have to worry about that, we'll have far bigger problems". Evidentiary factors of that negative character were lacking in the *M.C. United* and *Hawks* cases.

214      It is quite clear from these cases that, at best, 808756 Ontario could only acquire an "equitable interest" in the shares because there was a failure to comply with the restrictions on transfer: see *Re M.C. United*, supra, at p. 336. To me the *conduct* of the investor group must be a decisive factor in deciding whether the declaration could have any force. As the ancient axiom of equity says, "One who seeks equity, must do equity". It would be a travesty of justice to breathe life into this Declaration in the circumstances in which 808756 Ontario, through its own witnesses, asserts that it was created. 808756 Ontario must be fixed with bad faith and unclean hands through the mouth of its own witness, McGill, and cannot be allowed to enforce this document in a court exercising equitable jurisdiction.

## III. Consequential Relief

215      I have found the claims of CIBC, Grand Canyon and 808756 Ontario all must fail as a result of fatal defects in their equitable or security-interest positions.

216      This leaves the question outstanding as to who now has title to the Champion Chemtech shares and whether any other interests arise in the shares or their proceeds, if they are disposed of.

217      The answer to this question is, fortunately, easy. In virtue of the bankruptcy of Melnitzer, as reflected in my granting of a Receiving Order on September 26, 1991, the shares must be held to be vested in the Trustee in Bankruptcy, Peat Marwick Thorne Inc., for the benefit of the general creditors.

218      The Trustee's title must be subject to a priority charging order in favour of Coopers & Lybrand to reflect the proviso in Keenan J.'s order of August 3, 1991, which protected the unsatisfied fees and disbursements of that firm as Receiver of the assets of Melnitzer. If any issue arises as to quantum of the first-charge entitlement of Coopers & Lybrand, I will, of course, remain seized of this action for resolution of that or related issues.

219      I may be spoken to on costs and any other ancillary matters within the next 30 days at a time convenient to all counsel.

*Order accordingly.*

End of Document                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.