# TAB 42

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

H

1995 CarswellOnt 31, 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210

Central Capital Corp., Re

Re CENTRAL CAPITAL CORPORATION; Re Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Re appeal from disallowance of claims of JAMES W. McCUTCHEON, CENTRAL GUARANTY TRUST COMPANY (as trustee for registered retirement savings plan of JAMES W. McCUTCHEON) and CONSOLIDATED S.Y.H. CORPORATION by PEAT MARWICK THORNE INC. (administrator of certain assets of CENTRAL CAPITAL CORPORATION)

Ontario Court of Justice (General Division — Commercial List)

Feldman J.

Judgment: January 9, 1995[FN*]
Docket: Doc. B28/93

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Bryan Finlay, Q.C.*, and *Jim Buhlman*, for James McCutcheon and Central Guaranty Trust Company.

*James Grout* and *Aida Van Wees*, for Consolidated S.Y.H. Corporation.

*T.J. O'Sullivan* and *P.G. Macdonald*, for unsecured creditors of Central Capital Corporation.

*N. Saxe*, for Peat Marwick Thorne Inc.

*G. Rubenstein*, for Central Capital Corporation (excused at opening of motion).

Subject: Corporate and Commercial; Insolvency

Bankruptcy --- Proving claim — Provable debts — Claims of director, officer or shareholder of bankrupt corporation

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Effect of arrangement — General

Corporations — Arrangements and compromises — Companies' Creditors Arrangement Act — Claims — Preferred shares having right of retraction — Company unable to redeem shares because of insolvency — Preferred shareholders claiming that right constituted debt and claim provable — Administrator denying claims and de-

cision upheld on appeal — Preferred shareholders having no claim under plan of arrangement — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

An order was made declaring that the *Companies' Creditors Arrangement Act* ("CCAA") applied to CCC and staying all proceedings against CCC. Under the reorganization, the most valuable assets of CCC were transferred to a new company. CCC's creditors were entitled to receive shares and debentures in the new company to reflect some of their outstanding debt. The balance of the debt and equity claimants, including the shareholders of CCC, received common shares in CCC, which now lacked its most valuable assets.

Some of the preferred shares had a right of retraction attached to them; that is, the shareholders had a right to require the company to redeem the shares at a fixed price and on a certain date; the company was then obliged to redeem, provided it met certain legislated solvency tests at that date. The appellants held those shares and argued that the retraction right constituted a future contingent liability of CCC and was, therefore, a debt provable in bankruptcy. Even though CCC was prohibited from making payment to redeem the shares because of insolvency, it was not relieved of its obligation to redeem. The administrator denied their claims and the preferred shareholders appealed.

**Held:**

The appeals were dismissed.

Since the preferred shares remained as shares until they were redeemed, the preferred shareholders were not creditors and had no claims provable. Under the right of retraction, CCC's obligation to pay all or part of the redemption price for deposited shares was contingent on compliance with applicable law, which in this case meant the solvency tests set out in the *Canada Business Corporations Act*. Since no payment could be made until the tests were met, until then, there was no present obligation to pay. CCC was obligated to retain the shares and redeem them if and when the tests were met. Until that time, there was no debt that could be enforced by court action that would result in a money judgment. The right of retraction also could not be considered a contingent claim. Until the shares were actually redeemed by payment, they remained outstanding shares.

The case turned on whether the right of retraction itself created a debt on the date the company became obligated to redeem, even if the company could not actually redeem by payment on that date, or a contingent future debt, and not on whether the preferred shares themselves with the right of retraction were actually debt documents. Even though a right of retraction at the option of the preferred shareholder is less common than the usual right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares; it does not, however, change the nature of those shares from equity to debt.

**Cases considered:**

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558, 16 C.B.R. (3d) 14, 5 Alta. L.R. (3d) 193, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, *(*sub nom. *Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 2))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *considered*

*East Chilliwack Agricultural Co-operative, Re* (1989), 74 C.B.R. (N.S.) 1, 42 B.L.R. 236, 58 D.L.R. (4th) 11 (B.C. C.A.), reversing (1988), 70 C.B.R. (N.S.) 52, 39 B.L.R. 20 (B.C. S.C.) — *distinguished*

*Olympia & York Developments Ltd., Re* (1993), *(*sub nom. *Olympia & York Developments Ltd. v. Royal Trust Co.)* 18 C.B.R. (3d) 176, 102 D.L.R. (4th) 149 (Ont. Gen. Div.) — *referred to*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

**Statutes considered:**

Bankruptcy Act, R.S.C. 1985, c. B-3 —

s. 121

Canada Business Corporations Act, R.S.C. 1985, c. C-44 —

s. 34

s. 35

s. 36

s. 40

s. 40(3)

s. 42

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Cooperative Association Act, R.S.B.C. 1979, c. 66 —

s. 15

Appeals from denial of claims by administrator under *Companies' Creditors Arrangement Act* plan of reorganization.

*Feldman J.*:

1      As part of a plan of arrangement of Central Capital Corporation under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, the most valuable assets of the company were transferred to a Newco, and creditors of Central Capital were entitled to receive shares and debentures in Newco to reflect the quantity of their outstanding debt. Under the plan, the balance of the debt and equity claimants including shareholders of Central Capital received common shares in Central Capital, now minus the most valuable assets.

2      The appellants in this matter were holders of millions of dollars worth of preferred shares of Central Capital, which shares had attached to them a right of retraction, meaning a right to require the company to redeem the shares at a fixed price and on a certain date, which the company is obliged to do essentially as long as it meets certain legislated solvency tests at that date. The appellants made a claim to the administrator to participate in Newco on the basis that their preference shares with the retraction right constituted a debt owed by the company, and they are therefore creditors entitled to claim and participate in Newco. The administrator denied the claims, leaving them as common shareholders of Central Capital.

3      On this motion, the issue is whether the appellants were creditors of Central Capital on June 15, 1992, the effective date, and therefore entitled to participate with other creditors in Newco.

**Facts**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

4     The facts for the purpose of this motion are set out in an agreed statement of facts.

5     Mr. McCutcheon and his R.R.S.P. received Series "B" Senior Preferred Shares of Central Capital as part of the consideration for the sale to the company of Class "B" Voting Shares of Canadian General Securities Limited in 1987. The sale price for 161,000 shares of Canadian General Securities Limited was $400 per share, plus for each share, 7 Series "B" Senior Preferred Shares of Central Capital, or if they could not be authorized in time, an additional $175 per share. When Mr. McCutcheon deposited his Series B Senior Preferred Shares for retraction on July 1, 1992, the redemption amount including the redemption price of $25 per share plus accrued dividends from July 1, 1991 was $10,913,593.69. The redemption amount for the shares in his R.R.S.P. was $697,526.68.

6     Consolidated S.Y.H. Corporation (formerly Scottish and York Holdings Limited) sold to Central Capital the shares of Central Canada Insurance Services Limited, Eaton Insurance Company, Scottish & York Insurance Co. Limited and Victoria Insurance Company of Canada in consideration of the issuance of 60,116,000 Junior Preferred Series A Shares and 9,618,560 Junior Preferred Series B Shares. In its proof of claim submitted to the administrator, Consolidated S.Y.H. claimed the amount of $72,388,836 as the amount that would be owing to it on the date of retraction of its shares.

7     The provisions attaching to the Series B Senior Preferred Shares are contained in a certificate of amendment of the articles of the company, and include a preferred dividend and a right of retraction. The retraction right for the Series "B" Senior Preferred Shares is set out in art. 4 of the Provisions of those shares as follows:

**Retraction Privilege**

*4.1 Retraction of Series B Senior Preferred Shares*

Each holder of Series B Senior Preferred Shares shall be entitled, subject to and upon compliance with the provisions of this Section 4, to require the Corporation to redeem all or any part of the Series B Senior Preferred Shares registered in the name of that holder on July 1, 1992 (the "Retraction Date") at a price equal to $25.00 per share, plus all accrued and unpaid dividends thereon calculated to but excluding the Retraction Date (the whole being referred to for the purpose of these provisions as the "Retraction Price").

*4.2 Procedure*

(a) The Corporation shall itself or through the transfer agent for the time being of the Series B Senior Preferred Shares, at least 60 and not more than 90 days prior to the Retraction Date, give written notice of the right provided for in Section 4.1 to each person who is at the date of the giving of such notice a registered holder of Series B Senior Preferred Shares. Such notice shall set out the Retraction Price, the particulars of the procedure to be followed by any holder wishing to exercise such right, including the date (the "Deposit Date"), which shall be not later than the close of business on the date 30 days prior to the Retraction Date, on or before which any shares to be redeemed must be tendered, the place and manner of exercise of such right as hereinafter set out. Such notice shall also contain a brief statement of the terms, if any, on which any Series B Senior Preferred Shares may be converted into shares of Additional Series as provided in Section 5, a description of the material attributes of such additional shares and the place or places at which the holders of Series B Senior Preferred Shares may present and surrender such shares for conversion. Each holder of Series B Senior Preferred Shares who elects to require the Corporation to redeem all or any Series B Senior Preferred Shares registered in the name of that holder must, following receipt of such notice and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

prior to the close of business on the Deposit Date, deposit the certificate or certificates representing the Series B Senior Preferred Shares which that holder desires to have redeemed with the Corporation, with the retraction panel on the certificates duly completed and signed, at its registered office, at any place where the Series B Senior Preferred Shares may be transferred or at such other place or places in Canada as shall be specified in writing by the Corporation to the holders of the Series B Senior Preferred Shares in the aforementioned written notice. Any such certificates received by the Corporation at its registered office or otherwise deposited in accordance with such notice at any place other than a transfer office of the transfer agent shall be forthwith delivered to the transfer agent.

(b) If a holder of Series B Senior Preferred Shares wishes to tender pursuant to the above retraction privilege a part only of the Series B Senior Preferred Shares represented by any share certificate or certificates, the holder may deposit the certificate or certificates with the Corporation, with the retraction panel on the certificates duly completed and signed. If less than all of the Series B Senior Preferred Shares represented by any certificate or certificates so endorsed are to be redeemed, the Corporation shall issue and deliver to such holder, at the expense of the Corporation, a new share certificate representing the Series B Senior Preferred Shares which are not being tendered for redemption.

*4.3 Redemption Subject to Applicable Law*

(a) If the redemption by the Corporation of all Series B Senior Preferred Shares required to be redeemed on the Retraction Date under this Section 4 would be contrary to applicable law or the rights, privileges, restrictions and conditions attaching to any shares of the Corporation ranking prior to the Series B Senior Preferred Shares, the Corporation shall redeem only the maximum number of Series B Senior Preferred Shares (rounded to the next lower multiple of 1,000 shares) which the Corporation determines it is then permitted to redeem. Such redemption will be made pro rata (disregarding fractions of shares) from each holder of tendered Series B Senior Preferred Shares according to the number of Series B Senior Preferred Shares tendered for redemption by each such holder and the Corporation shall issue and deliver to each such holder a new share certificate, at the expense of the Corporation, representing the Series B Senior Preferred Shares not redeemed by the Corporation. Thereafter, the Corporation shall redeem at the Retraction Price on each succeeding Dividend Payment Date such further number of Series B Senior Preferred Shares which have been deposited by holders thereof in accordance with Section 4.1 (excluding the provisions thereof as to the timing of deposit) on or before the 30th day preceding each such Dividend Payment Date, which is the lesser of (i) the number of Series B Senior Preferred Shares so deposited, and (ii) the maximum number of such Series B Senior Preferred Shares (rounded, except for the final redemption of any number of shares less than 1,000, to the next lower multiple of 1,000 shares and selected pro rata (disregarding fractions of shares) from each holder of Series B Senior Preferred Shares so tendered according to the number of Series B Senior Preferred Shares so tendered by each such holder) which the Corporation determines it is then permitted to redeem, and so on until all Series B Senior Preferred Shares which have been deposited for redemption under this Section 4 have been redeemed. The Corporation shall be under no obligation to give any notice to the holders of Series B Senior Preferred Shares in respect of the redemptions provided for in this Section 4.3 except for the notice provided for in paragraph (b) of Section 4.4.

(b) If the directors of the Corporation have acted in good faith in making any of the determinations referred to above as to the number of Series B Senior Preferred Shares which the Corporation is permitted at any time to redeem, the Corporation shall have no liability in the event that any such determination proves inaccurate.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

*4.4 Election Irrevocable*

(a) Subject to paragraph (b) of this Section 4.4, the election of any holder to require the Corporation to redeem any Series B Senior Preferred Shares shall be irrevocable upon receipt by the transfer agent for the Series B Senior Preferred Shares of the certificates for the shares to be redeemed and the signification of election of the holder as aforesaid.

(b) To the extent that payment of the Retraction Price is not made by the Corporation on or before the Retraction Date, the Corporation shall forthwith after that date notify each holder who has not received payment for his deposited Series B Senior Preferred Shares of the holder's right to require the Corporation to return all (but not less than all) of the holder's deposited share certificates to the holder (and the Corporation shall return such certificates on the request of the holder) and of the holder's rights under Section 4.3 hereof.

*4.5 Not affecting Dividends*

The inability of the Corporation to effect a redemption in whole on the Retraction Date or a subsequent Dividend Payment Date shall not affect or limit the obligation of the Corporation to pay any dividends accrued or accruing on the Series B Senior Preferred Shares from time to time not redeemed and remaining outstanding.

*4.6 Payment and Retraction Procedure*

Subject to Section 4.3, the Corporation shall redeem on the Retraction Date all of the Series B Senior Preferred Shares tendered pursuant to the above retraction privilege at the Retraction Price and except as otherwise specifically provided in this Section 4, redemptions under this Section 4 shall comply with and be subject to those provisions of paragraphs (b) to (f) inclusive of Section 3.3 not inconsistent herewith.

8     Article 3 is the provision for redemption at the option of the company. Article 3.3(e), which by art. 4.6 is made applicable to retractions if not inconsistent with art. 4, provides:

3.3(e) From and after the date fixed for redemption, the Series B Senior Preferred Shares called for redemption shall cease to be entitled to dividends or any other participation in the assets of the corporation and the holders thereof shall not be entitled to exercise any of their other rights as shareholders in respect thereof unless payment of the price fixed for redemption shall not be made upon presentation and surrender of the share certificates representing such shares in accordance with the foregoing provisions, in which case the rights of such holders shall remain unaffected.

9     One of the rights of the Series B Senior Preferred Shares is the right to vote for the election of two directors in the event that the company fails to make eight quarterly dividends. By art. 4.5 specifically, dividends continue to accrue on shares not redeemed in accordance with the retraction and "remaining outstanding".

10     Finally by art. 7 of the Provisions, on liquidation, dissolution or winding up of the corporation, the holders of the Series B Senior Preferred Shares are entitled to receive from the assets $25 per share plus all unpaid dividends in priority to lower ranking shareholders, and are not entitled to any further distribution of assets.

11     The provisions attaching to the Series A and B Junior Preferred Shares are essentially similar to those for the Series B Senior Preferred except that the retraction date is any time after September 27, 1994.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

12     All of the retraction privileges are made subject to applicable law, which for the purposes of Central Capital, a *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 corporation, means subject to s. 36 of the CBCA which provides:

36.(1) [Redemption of shares.] Notwithstanding subsection 34(2) or 35(3), but subject to subsection (2) and to its articles, a corporation may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption price thereof stated in the articles or calculated according to a formula stated in the articles.

(2) [Limitation.] A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

(ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

Section 42 similarly restricts the declaration or payment of dividends:

42. [Dividends.] A corporation shall not declare or pay a dividend if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities and stated capital of all classes.

13     In December 1991, Central Capital stopped paying interest and principal on its unsecured loans, and from that time it was insolvent.

14     On April 23, 1992, Central Capital gave the required 60-day notice to the Series B Senior Preferred shareholders of their right to redeem on July 1, 1992, but advised that although they could tender their shares by May 29, 1992, the company would not be redeeming as any such redemption would be contrary to law in light of the current financial position of the company.

15     James McCutcheon and Central Guaranty deposited their shares as required.

16     On application of its lenders, an order was made in this court on June 15, 1992 declaring that the *Companies' Creditors Arrangement Act* applied to Central Capital and staying all proceedings against the company. On July 9, 1992, a further order was made whereby certain significant assets of the company would be transferred to Canadian Insurance Group Limited (CIGL), a newco, and the administrator was authorized to enter into a Subscription and Escrow Agreement with creditors of Central Capital whereby they could exchange a portion of their indebtedness for shares and debentures to be issued by CIGL. The administrator was to supervise the calling for claims of creditors. Central Capital was authorized to file a plan of arrangement with its secured and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

unsecured creditors and with its shareholders to provide for the restructuring of its debt and equity in accordance with the order. In respect of Central Capital shares, the order provided that the CCAA plan would provide for the conversion of all outstanding preference, common and subordinated voting shares into 10% of a new class of common shares to be created with the remaining 90% to be held by creditors of Central Capital. The July 9 order was made without prejudice to the rights of these appellants to claim as creditors of Central Capital.

17      No preferred shares were redeemed on July 1, 1992, and on July 20 Central Capital notified the holders of the Series B Senior Preferred Shares of their right to require the company to return the share certificates. James McCutcheon and Central Guaranty did not exercise that right.

18      On July 31, 1992, a further order of this court set June 15, 1992 as the date as at which all claims of creditors would be made and approved the proof of claim form. The claim is defined in the Restated Subscription and Escrow Agreement as follows:

> "Claim" means any indebtedness, liability or obligation of any kind of CCC that, if unsecured, would be a debt provable in bankruptcy within the meaning of the Bankruptcy Act (Canada), as amended as of the date hereof.

19      Consolidated SYH did not have an opportunity to deposit its preferred shares for redemption because the earliest date for doing so in September, 1994 was well after the completion of the implementation of the plan of arrangement.

20      All of the appellants submitted claims to the administrator by the designated date, and their claims were denied. These appeals were brought in accordance with an order of September 22, 1992 approving the first report of the administrator which contained the appeal procedure.

21      By order of December 18, 1992, the CCAA plan was approved by the court and was made binding on all shareholders. On or about January 1, 1993, articles of reorganization in the form authorized by the sanction order were filed and a certificate of reorganization was issued. Pursuant to those articles, all common and preferred shares including those owned by the appellants were converted to a new class of common shares and the existing common and preferred shares were deleted from the Articles of Incorporation of Central Capital.

**The Positions of the Parties**

*1. James McCutcheon and Central Guaranty*

22      These appellants deposited their Series B Senior Preferred Shares for redemption in accordance with art.4 of the Provisions attaching to those shares before May 29, 1992. The deposit was irrevocable, and on July 1, 1992, the company was obliged to redeem those shares at the fixed redemption price. The company was restricted from actually paying for the shares on that date because it did not meet the solvency requirements of the CBCA, and therefore of art.4, which makes the retraction right "subject to applicable law", but the inability of the company to pay does not derogate from its obligation to pay and therefore from the characterization of that obligation on that date as a debt.

23      Furthermore, in assessing the nature of the entire transaction whereby the preference shares were issued in partial consideration for the sale of the shares of the insurance company to Central Capital, that transaction should be characterized as a loan, and not as an investment in capital. The loan earned a return in the form of the

quarterly cumulative dividends attached to the shares, and was repayable if called by the lender, on July 1, 1992.

*2. Consolidated S.Y.H.*

24     This appellant's position is that its right to require Central Capital to retract its Series A and B Junior Preferred Shares on or after September 27, 1994 is a "claim provable" within the meaning of s.121 of the *Bankruptcy Act*, R.S.C. 1985, c.B-3 in accordance with the definition of "claim" in the Restated Subscription and Escrow Agreement.

25     Section 121 provided:

121(1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bankruptcy or to which he may become subject before his discharge by reason of any obligation incurred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

(2) The court shall, on the application of the trustee, determine whether any contingent claim or any unliquidated claim is a provable claim, and, if a provable claim, it shall value the claim, and the claim shall after that valuation be deemed a proved claim to the amount of its valuation.

(3) A creditor may prove a debt not payable at the date of the bankruptcy and may receive dividends equally with the other creditors, deducting only thereout a rebate of interest at the rate of 5 per cent per annum computed from the declaration of a dividend to the time when the debt would have become payable according to the terms on which it was contracted.

(4) Where a proposal is made before a bankruptcy, the claims provable shall be determined as of the date of the filing of the proposal.

26     The appellant's position is that the retraction right constitutes a future contingent liability of the company and is therefore a debt provable in bankruptcy. Although the company is prohibited from making payment to redeem the shares, the company is not relieved of its obligation to redeem. This appellant also says that the restrictions on redemption based on solvency are not applicable in the context of a restructuring.

*3. The Unsecured Creditors*

27     The unsecured creditors oppose the position that the appellants as preferred shareholders should be entitled to claim as creditors and thereby share in the significant assets together with the creditors. Their position is that the retraction right does not create a debt provable in bankruptcy. Furthermore, the appellants' interest in the company is in the nature of an investment in capital and therefore an equity interest, not a loan or debt interest.

28     In the case of Consolidated S.Y.H., because Central Capital was reorganized before the retraction date, no obligation to retract ever arose nor was it triggered. In the alternative, if the retraction rights amount to a claim, they are contingent claims only which must be valued at 0 because no payment can be made on them if the company is insolvent, and there is no prospect of the company becoming legally obligated to pay such claim, or in the further alternative, the appellants are at most "subordinated creditors" as defined in the Restated Subscription and Escrow Agreement.

29     These last two alternative submissions are somewhat problematic in light of the agreed statement of facts, para.2:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

**Issue**

2. Do the Appellants, or any of them, have claims provable against CCC within the meaning of the Bankruptcy Act (Canada), as amended as of the date of the Restated Subscription and Escrow Agreement. If the Appellants or any of them have provable claims, then the proof of any claim of any Appellant that has a claim provable is to be allowed as filed and the appeal from the disallowance allowed, and the Appellants, or any of them, whose claim is allowed, are to participate in the Plan of Arrangement of CCC as a senior creditor.

*4. The Administrator*

30      The administrator took no position before the court but had taken its position by denying the claims of the appellants.

**Analysis**

*Is there a debt provable in bankruptcy?*

31      A definition of "debt" in *Black's Law Dictionary*, 1990, 6th ed., at p.409 is:

A sum due by certain and express agreement. A specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment.

32      The retraction right is clearly created in such a way that the obligation of the company to pay all or any part of the redemption price for deposited shares is contingent on compliance with applicable law which means the solvency tests set out in the CBCA. Because no payment can be made by the company unless the solvency requirements are met, until then there is no present obligation to pay.

33      The company's obligation is to retain the shares that have not been returned to the holder at its request, and to redeem them by paying the redemption price when and if the solvency conditions are met. Until that time there is no debt that can be enforced by action resulting in a money judgment.[FN1] The only action that might be brought would be for a declaration of the obligation of the company to make payment in accordance with the terms of the share provisions.

34      The retraction right cannot be considered to be a contingent claim because until the shares are actually redeemed by payment, they remain outstanding as shares. This is clear from the terms of the share provisions including art.4.5 which refers to the shares not redeemed "and remaining outstanding" as maintaining their rights to dividends, and art.4.6 which incorporates art.3.3(e) which provides that unredeemed shares maintain all of their rights unaffected.

35      Counsel for Mr. McCutcheon submitted that art.3.3(e) is inconsistent with art.4 and therefore inapplicable to the retraction procedure, because the election to deposit the shares for retraction is irrevocable by the preferred shareholders, therefore they have irrevocably given up their rights as shareholders. However, the effect of the irrevocable election is that the shares remain deposited and will be redeemed as soon as such redemption is not contrary to law. That does not affect their status in the interim which is governed by art.3.3(e).

36      If this were a contingent claim in the sense of a future debt provable in bankruptcy, then any preferred shareholder whose shares have a fixed value on wind-up or dissolution of the company could be said to have a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

contingent claim to the value of those shares, contingent on a wind-up and on the company having sufficient funds on wind-up to redeem those shares. This is directly contrary to the principle referred to in Houlden and Morawetz, *Bankruptcy and Insolvency Law of Canada*, 3rd ed., vol.1, p.5-34 [G§28]:

> If a person contributes capital to a business, even though that person is not a partner in the business and may have received no share of the profits, he cannot prove his claim in bankruptcy in competition with the creditors of the business. Although such a claimant may have a valid claim for the return of the investment funds, he cannot rank *pari passu* with the unsecured creditors. He would likely have an equitable right to share in the distribution of the assets but only at such time as the remaining unsecured creditors have been paid in full. It is of the utmost importance to determine the basis of the infusion of the monies: *Canada Deposit Insurance Corp. v. Cdn. Commercial Bank* (1987), 67 C.B.R. (N.S.) 136, reversed on other grounds, ... [1992] 3 S.C.R. 558 ..., applying *Laronge Realty Ltd. v. Golconda Investment Ltd.* (1986), 63 C.B.R. (N.S.) 76 ... (C.A.).

37     It is the two factors: (1) the solvency condition precedent to the obligation of the company to redeem, together with (2) the continued life of the shares as shares until the actual redemption takes place, which distinguish this case from *Re East Chilliwack Agricultural Co-operative* (1989), 74 C.B.R. (N.S.) 1 (B.C. C.A.), a case relied on by the appellants as determinative of the case at bar.

38     There the appellants had been members of a co-operative association. The co-operatives were governed by legislation. Pursuant to s.15 of the *Cooperative Association Act*, an association could redeem its own shares subject to its rules. The Agricultural Co-operative provided in its rules that a member could withdraw from the co-op by giving notice in writing. Then [at p.5] "[u]pon notice of withdrawal being given *membership in the Co-op shall cease* (emphasis added) and thereupon the shares of such member shall be redeemed, provided that the proceeds of redemption of such shares and any loans owing to such member arising from the operation of Rule8.09, may be held for a period not exceeding five (5) years."

39     The members had two payment options upon redemption, the first to be paid in five equal instalments over the succeeding five years, the second to be paid at the end of five years with interest. At the date of the proposal in that case there were 156 members with shares under redemption.

40     The chambers judge had found that the redeeming shareholders were only entitled to money if the co-op had earnings. However, the Court of Appeal majority could find no authority in support of this finding and rejected it. The only possible reference may be the fact noted by the dissenting Justice in the Court of Appeal that dividends could only be declared out of profits.

41     The majority relied on the fact that the appellants ceased to be shareholders when they delivered the notice of withdrawal, and that thereafter their only interest in the co-op was for payment of the redemption amount. Therefore when the payments became due, they were owed by the co-operative and the appellants could sue for them if the co-operative failed to pay. The court held that the appellants were entitled to rank as unsecured creditors of the co-op.

42     In this case, the company is precluded from making payment unless the solvency tests are satisfied, plus the appellants remain shareholders of Central Capital until the shares are actually redeemed by payment. They retain their right to accruing dividends, and other rights. These two critical differences distinguish the present case from the decision in *East Chilliwack*, where the shareholders' status changed when they delivered their notices of redemption from shareholders to creditors. In this case, the status of the preferred shareholders does not

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

change until they are redeemed by payment, at which time they have no further relationship with Central Capital.

43     The appellants also submit that the purpose of the CBCA restrictions on redemption is to prevent a preference in an insolvency situation, but that that concern is overridden once the court is involved in a restructuring or reorganization of the entire capitalization of the company allowing the company to carry on and not be wound up. Therefore in a restructuring situation the solvency restrictions for redemption can be ignored. This was done by Blair J. in *Re Olympia & York Developments Ltd.* (1993), 102 D.L.R. (4th) 149 (Ont. Gen. Div.) at p.163, where certain shares were to be redeemed by an insolvent company as part of a larger arrangement approved by the court. However, this is quite different from ignoring conditions specifically attaching to preference shares for the purpose of interpreting the nature of the rights contained in those shares.

44     The appellants are concerned that their right of retraction attaching to the preferred shares was eliminated by the orders implementing the Restated Subscription and Escrow Agreement and the Plan of Arrangement. However, any remedy for that concern would have been in the proceedings resulting in those orders, including any appeals.

45     Once the claims procedure was approved by the court, then the nature of the claim of each claimant is to be considered based on the facts applicable to that claim. There is no basis to ignore or read out the condition precedent for payment of the redemption price on retraction contained in the Provisions attaching to the preferred shares, for the purpose of determining the nature and extent of the retraction right and whether it constitutes a claim provable in bankruptcy.

46     Analyzing in another way whether the appellants have a contingent claim, the concept of a contingent claim should be considered in the context of the *Bankruptcy Act* in which it is found. It is difficult to postulate that a future obligation to pay which can only arise if the company is solvent at a point in time in the future could be a legitimate contingent future claim under the *Bankruptcy Act*, which in most cases is invoked because of the insolvency of the debtor, and crystallizes that insolvent state. In other words such a contingency is so remote as to be virtually non-existent. That was certainly the case with Central Capital in June, 1992.

47     The remoteness of the contingency is the basis for the alternative submission on behalf of the creditors that if the appellants do have a claim it can have no value. Because I have held that they have no claim, there is no need to deal with this alternative.

48     Finally, both sides put strong reliance on the Supreme Court of Canada decision in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558 which dealt with the characterization of the interest of certain institutions which provided funds to the Canadian Commercial Bank to try to prevent its failure. When the bank ultimately had to be wound up, the character of the interest of those institutions as debt or equity had to be determined in order to rank their claim in the winding up of the bank as either creditors or investors.

49     In that case, the documentation which was put in place when the monies were provided did not state specifically whether the monies were a loan or an infusion of capital. The circumstances surrounding the transaction were unique. However, the court recognized that it had characteristics of both debt and equity, which "duality is apparently quite common in loan participation agreements." (p.589) The court identified the arrangement as "one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship." (p.590)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

50     The various series of preferred shares of Central Capital are clearly characterized as preferred shares and the provisions applicable to them are set out in the articles of the company.

> Preferred shares have been called "compromise securities" as having an intermediate position between common shares and debt. The hope has been that preferred would take on some of the characteristics of both debt and common shares, and theoretically at least, this can be achieved. ... the company cannot issue "secured" preferred shares in the sense that shares cannot have a right to a return of capital which is equal or superior to the rights of creditors. Preferred shareholders are risk-takers who are required to invest capital in the business and who can look only to what is left after creditors are fully provided for. ... In short, a preferred shareholder always remains a shareholder.

> Grover and Ross, *Materials on Corporate Finance*, p.47/48/49, ch.11 Equity.

Although the right of retraction at the option of the preferred shareholder may be less common than the usual right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares, but does not change the nature of those shares from equity to debt. The parties have characterized the transaction as a share transaction. The court would require strong evidence that they did not intend that characterization in order to hold that they rather intended a loan.

51     In my view, this case turns on whether the right of retraction itself creates a debt on the date the company becomes obligated to redeem even if it cannot actually redeem by payment on that date, or a contingent future debt on the same analysis, not on whether the preferred shares themselves with the right of retraction are actually debt documents.

52     Because the preferred shares remain in place as shares until the actual redemption, the appellants are not creditors and have no claim provable under the *Bankruptcy Act* (Canada), and the appeals are therefore dismissed. The parties may address the issue of costs either orally or in writing if they are not able to agree on that matter.

*Appeals dismissed.*

FN* The corrigenda issued by the court on January 16 and 24, 1995 have been incorporated herein.

> FN1 It is interesting to compare the scheme set out in s.40 of the CBCA for purchase of its shares by a corporation pursuant to a contract. Such a contract is specifically enforceable, subject to the defence by the company that to buy the shares would put it in breach of similar solvency tests set out in ss.34 and 35 dealing with a corporation's ability to purchase its own shares. Section 40(3) deals with the status of the contracting party pending enforcement of the contract:(3) [Status of contracting party.] Until the corporation has fully performed a contract referred to in subsection (1), the other party retains the status of a claimant entitled to be paid as soon as the corporation is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors but in priority to the shareholders.

The contracting party is not made a creditor, but is entitled to be paid out ahead of shareholders because of the outstanding contract claim.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works