# TAB 43

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

**H**

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Central Capital Corp., Re

Re CENTRAL CAPITAL CORPORATION; Re Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Re appeal from disallowance of claims of JAMES W. McCUTCHEON, CENTRAL GUARANTEE TRUST COMPANY, as trustee for Registered Retirement Savings Plan of JAMES W. McCUTCHEON and CONSOLIDATED S.Y.H. CORPORATION by PEAT MARWICK THORNE INC., Administrator of certain assets of CENTRAL CAPITAL CORPORATION

ROYAL BANK OF CANADA, BANCA COMMERCIALE ITALIANA OF CANADA, CREDIT LYONNAIS CANADA, DAI-ICHI KANGYO BANK (CANADA), PRUDENTIAL ASSURANCE COMPANY LIMITED, PRUDENTIAL GLOBAL FUNDING, INC., SANWA BANK CANADA, BANK OF TOKYO CANADA, TORONTO-DOMINION BANK, WESTDEUTSCHE LANDESBANK GIROZENTRALE, BACOB SAVINGS BANK s.c., BANCA NAZIONALE DEL LAVORO OF CANADA, BANCO DI ROMA (LONDON), COMMERZBANK INTERNATIONAL S.A., CREDIT COMMERCIAL DE FRANCE, CREDIT COMMUNAL DE BELGIQUE S.A., CREDIT SUISSE (LUXEMBOURG) S.A., DG BANK LUXEMBOURG S.A., KREDIETBANK NV (BELGIUM), NIPPON TRUST BANK LIMITED, OLFRN INVESTMENT (PANAMA) INC., PAUL REVERE LIFE INSURANCE, RBC FINANCE B.V., SCOR REINSURANCE COMPANY OF CANADA, SOCIÉTÉ GÉNÉRALE, BANK OF TOKYO, LTD., CHIBA BANK LTD., DAI-ICHI KANGYO BANK, LTD. (ATLANTA), HOKURIKU BANK LTD., JOROKU BANK LTD., KYOWA SAITAMA BANK (CHICAGO), LAURENTIAN BANK OF CANADA, LAURENTIAN GROUP CORPORATION AND IMPERIAL LIFE ASSURANCE COMPANY OF CANADA, LONG-TERM CREDIT BANK OF JAPAN, LTD., MARITIME LIFE ASSURANCE COMPANY, MITSUBISHI TRUST AND BANKING CORPORATION, SANWA BANK, LIMITED (LONDON), SHOKO CHUKIN BANK (NEW YORK) and TOHO BANK, LTD. v. CENTRAL CAPITAL CORPORATION

Ontario Court of Appeal

Finlayson, Weiler and Laskin JJ.A.

Heard: August 17, 1995
Judgment: February 7, 1996
Docket: Docs. CA C21479, C21477

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Bryan Finlay, Q.C.*, and *John M. Buhlman*, for James W. McCutcheon and Central Guaranty Trust.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

*James H. Grout* and *Anne Sonnen*, for Consolidated S.Y.H. Corporation.

*Terence J. O'Sullivan* and *Paul G. Macdonald*, for unsecured creditors of Central Capital Corporation.

*Neil C. Saxe*, for Peat Marwick Thorne Inc.

Subject: Corporate and Commercial; Insolvency

Corporations — Arrangements and compromises — Companies' Creditors Arrangement Act — Claims — Preferred shares having right of retraction — Company unable to redeem shares because of insolvency — Preferred shareholders claiming that right constituted debt and claim provable — Administrator denying claims and decision upheld on appeal — Preferred shareholders having no claim under plan of arrangement — Further appeal dismissed — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

An order was made declaring that the *Companies' Creditors Arrangement Act* applied to CCC and staying all proceedings against CCC. Under the reorganization, the most valuable assets of CCC were transferred to a new company. CCC's creditors were entitled to receive shares and debentures in the new company to reflect some of their outstanding debt. The balance of the debt and equity claimants, including the shareholders of CCC, received common shares in CCC, which now lacked its most valuable assets.

Some of the preferred shares had a right of retraction. The preferred shareholders argued that the right of retraction constituted a future contingent liability of CCC and was, therefore, a debt provable in bankruptcy. Even though CCC was prohibited by its insolvency from making payments to redeem the shares, it was not relieved of its obligation to redeem. The administrator denied their claims, and the preferred shareholders appealed. Their appeals were dismissed upon a finding that the preferred shares remained shares until they were redeemed; therefore, the preferred shareholders were not creditors and had no claims provable.

The preferred shareholders appealed.

**Held:**

The appeals were dismissed.

**Per Finlayson J.A. (dissenting)**

The preferred shares were the equivalent of vendor shares because they were received in exchange for the transfer of assets to CCC. By deferring the realization of the purchase price of their assets to the agreed dates, the preferred shareholders extended credit to CCC. In return for extending credit, the preferred shareholders agreed to receive dividends calculated in advance, but payable when declared by the board of directors. Therefore the substance of the transaction created a debt owed to the preferred shareholders. The fact that the preferred shareholders had rights as shareholders in CCC up to the time when the retraction clauses were exercisable did not affect their right to enforce payment of the retraction price when it became due. There was no reason why the preferred shareholders should not be treated as both shareholders and creditors.

**Per Weiler J.A.**

The trial judge was correct in determining that the relationship between the shareholders and CCC was a share-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

holder relationship. The shareholders continued to be shareholders after the retraction date and remained shareholders at the time of CCC's reorganization. The preferred shares were part of CCC's capital and were always shown as shareholders' equity on CCC's books.

Under s. 36 of the *Canada Business Corporations Act*, a corporation's ability to redeem its redeemable shares is subject to its articles and a solvency requirement. CCC's articles provided for the redemption of all preferred shares on or after the retraction date; however, they stated that the redemption could be carried out only if not "contrary to law." Because CCC could not comply with the solvency requirements of s. 36 on the retraction date, any redemption would be "contrary to law." Therefore, CCC's obligation to redeem its shares was not absolute.

Although there was a right to receive payment, the effect of the solvency provision meant that there was no right to enforce payment. Therefore, the promise to pay the amount owing on the shares in the retraction provision was not one that could be proved as a claim. The retraction amounts did not constitute a debt or liability within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*.

**Per Laskin J.A. (concurring)**

The relationship between the preferred shareholders and CCC had the characteristics of both debt and equity; however, in substance the preferred shareholders were shareholders and not creditors of CCC. Neither the existence nor the exercise of the retraction rights turned them into creditors. The preferred shareholders agreed to take preferred shares instead of another type of instrument, such as a bond or debenture, which clearly would have made them creditors. There was no evidence to support the preferred shareholders' contention that by taking the preferred shares they were extending credit to CCC by deferring payment of the purchase price. Further, the shares were recorded in the financial statements of CCC as "capital stock". The amount CCC might be required to pay upon the preferred shareholders' exercise of their retraction rights was not recorded as debt.

Under s. 36(2) of the *Canada Business Corporations Act*, an insolvent corporation is prohibited from redeeming shares. Further, the share conditions attached to the preferred shareholders' shares provided that they could not be redeemed if to do so would be "contrary to applicable law", that being s. 36(2) in this case. To find that the preferred shareholders had provable claims would defeat the purpose of s. 36(2).

**Cases considered:**

*By Finlayson J.A. (dissenting)*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, *(sub nom. Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *considered*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *considered*

*Exchange Banking Co., Re; Flitcroft's Case* (1882), 21 Ch. D. 519 (C.A.) — *referred to*

*Fairhall v. Butler*, [1928] S.C.R. 369, [1928] 3 D.L.R. 161 — *referred to*

*By Weiler J.A.*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. *Royal Bank v. Central Capital Corp.*) 88 O.A.C. 161

97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, *(sub nom. Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *distinguished*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *distinguished*

*Farm Credit Corp. v. Holowach (Trustee of),* 86 A.R. 304, 59 Alta. L.R. (2d) 279, [1988] 5 W.W.R. 87, 68 C.B.R. (N.S.) 255, 51 D.L.R. (4th) 501 (C.A.), leave to appeal to S.C.C. refused 100 A.R. 395 (note), 66 Alta. L.R. (2d) xlviii (note), [1989] 4 W.W.R. lxx (note), 73 C.B.R. (N.S.) xxviii (note), 60 D.L.R. (4th) vii (note), 102 N.R. 236 (note) — *considered*

*Imperial General Properties Ltd. v. R.*, *(*sub nom. *R. v. Imperial General Properties Ltd.)* [1985] 2 S.C.R. 228, 85 D.T.C. 5500, [1985] 2 C.T.C. 299, 31 B.L.R. 77, *(*sub nom. *Imperial General Properties Ltd. v. Minister of National Revenue)* 62 N.R. 137, *(*sub nom. *R. v. International General Properties Ltd.)* 21 D.L.R. (4th) 741 — *referred to*

*McClurg v. Minister of National Revenue,* [1991] 1 C.T.C. 169, 119 N.R. 101, 50 B.L.R. 161, *(sub nom. R. v. McClurg)* 91 D.T.C. 5001, [1991] 2 W.W.R. 244, *(sub nom. McClurg v. Canada)* 76 D.L.R. (4th) 217, [1990] 3 S.C.R. 1020 — *referred to*

*Nelson v. Rentown Enterprises Inc.,* 16 Alta. L.R. (3d) 212, 109 D.L.R. (4th) 608, [1994] 4 W.W.R. 579 (C.A.), affirming (1992), 5 Alta. L.R. (3d) 149, 96 D.L.R. (4th) 586, [1993] 2 W.W.R. 71, 7 B.L.R. (2d) 319, 134 A.R. 257 (Q.B.) — *referred to*

*Porto Rico Power Co., Re,* 27 C.B.R. 75, [1946] S.C.R. 178, *(sub nom. International Power Co. v. McMaster University)* [1946] 2 D.L.R. 81 — *considered*

*Reference re Debt Adjustment Act, 1937 (Alberta),* 24 C.B.R. 129, [1943] 1 W.W.R. 378, [1943] A.C. 356, [1943] 1 All E.R. 240, [1940] 2 D.L.R. 1 (P.C.) — *referred to*

*Vachon v. Canada (Employment & Immigration Commission),* [1985] 2 S.C.R. 417, 57 C.B.R. (N.S.) 113, 23 D.L.R. (4th) 641, *(*sub nom. *Vachon v. Canada Employment)* 63 N.R. 81 — *referred to*

*By Laskin J.A. (concurring)*

*Canada Deposit Insurance Corp. v. Canadian Commercial Bank,* 5 Alta. L.R. (3d) 193, 16 C.B.R. (3d) 154, 97 D.L.R. (4th) 385, 7 B.L.R. (2d) 113, [1992] 3 S.C.R. 558, *(sub nom. Canada Deposit Insurance Corp. v. Canadian Commercial Bank (No. 3))* 143 N.R. 321, 131 A.R. 321, 25 W.A.C. 321 — *distinguished*

*East Chilliwack Agricultural Co-op., Re* (1989), 42 B.L.R. 236, 74 C.B.R. (N.S.) 1, 58 D.L.R. (4th) 11 (B.C. C.A.) — *distinguished*

*Farm Credit Corp. v. Holowach (Trustee of),* 86 A.R. 304, 59 Alta. L.R. (2d) 279, [1988] 5 W.W.R. 87, 68 C.B.R. (N.S.) 255, 51 D.L.R. (4th) 501 (C.A.) [leave to appeal to S.C.C. refused 100 A.R. 395 (note), 66 Alta. L.R. (2d) xlviii (note), [1989] 4 W.W.R. lxx (note), 73 C.B.R. (N.S.) xxviii (note), 60 D.L.R. (4th) vii (note), 102 N.R. 236 (note)] — *referred to*

*Laronge Realty Ltd. v. Golconda Investments Ltd.* (1986), 7 B.C.L.R. (2d) 90, 63 C.B.R. (N.S.) 76 (C.A.) —

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

*referred to*

*Meade (Debtor), Re; Ex parte Humber v. Palmer (Trustee)*, [1951] 2 All E.R. 168, [1951] Ch. 774 (D.C.) — *referred to*

*Mountain State Steel Foundries, Inc. v. Commissioner*, 284 F.2d. 737, 60-2 U.S. Tax Cas. (CCH) P 9797, 6 A.F.T.R. 2d (P-H) P 5910 (4th Cir. 1960) — *referred to*

*National Bank für Deutschland v. Blucher*, (sub nom. *Blucher v. Canada (Custodian))* [1927] S.C.R. 420, [1927] 3 D.L.R. 40 — *distinguished*

*Nelson v. Rentown Enterprises Inc.* (1992), 5 Alta. L.R. (3d) 149, 96 D.L.R. (4th) 586, [1993] 2 W.W.R. 71, 7 B.L.R. (2d) 319, 134 A.R. 257 (Q.B.), affirmed 16 Alta. L.R. (3d) 212, 109 D.L.R. (4th) 608, [1994] 4 W.W.R. 579 (C.A.) — *referred to*

*Patricia Appliance Shops Ltd., Re* (1922), 2 C.B.R. 466, 52 O.L.R. 215, [1923] 3 D.L.R. 1160 (S.C.) — *referred to*

*Robinson v. Wangemann*, 75 F.2d 756 (5th Cir. Tex. 1935) — *considered*

*Trevor v. Whitworth* (1887), 12 App. Cas. 409, [1886-90] All E.R. Rep. 46 (H.L.) — *considered*

*Wolff v. Heidritter Lumber Co.*, 112 N.J. Eq. 34, 163 A. 140 (Ch. 1932) — *referred to*

**Statutes considered:**

Assignments and Preferences Act, R.S.O. 1990, c. A.33.

Bankruptcy Act, R.S.C. 1970, c. B-3 [R.S.C. 1985, c. B-3] —

s. 95(1) [R.S.C. 1985, c. B-3, s. 121(1)]

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 2 "claim provable in bankruptcy"

s. 2 "corporation"

s. 2 "creditor"

s. 95

s. 96

s. 101

s. 121

s. 121(1)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Canada Business Corporations Act, R.S.C. 1985, c. C-44 —

s. 2 "liability"

s. 25(3)

s. 34

s. 34(2)

s. 35

s. 36

s. 36(1)

s. 36(2)

s. 39

s. 40

s. 40(1)

s. 40(3)

s. 42

s. 173

s. 191

s. 191(7)

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 —

s. 12(1)

s. 20

Cooperative Association Act, R.S.B.C. 1979, c. 66.

Fraudulent Conveyances Act, R.S.O. 1990, c. F.29.

Law of Property Act, R.S.A. 1980, c. L-8.

Appeals from judgment reported at (1995), 29 C.B.R. (3d) 33, 22 B.L.R. (2d) 210 (Ont. Gen. Div. [Commercial List]) dismissing appeals from denial of claims by administrator under *Companies' Creditors Arrangement Act* plan of reorganization.

***Finlayson J.A.*** **(dissenting):**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

1     The appellant James W. McCutcheon and Central Guarantee Trust Company as Trustee for the Registered Retirement Savings Plan of James W. McCutcheon (hereinafter sometimes referred to collectively as "McCutcheon") and the appellant Consolidated S.Y.H. Corporation ("SYH") appeal from the order of The Honourable Madam Justice Feldman in the Ontario Court (General Division) dated January 9, 1995 [reported at 29 C.B.R. (3d) 33]. Feldman J. dismissed appeals from decisions dated January 20, 1993 and February 16, 1993 of the respondent Peat Marwick Thorne Inc., in its capacity as Interim Receiver, Manager and Administrator ("Administrator") of certain assets of Central Capital Corporation ("Central Capital"). The Administrator disallowed Proofs of Claim submitted by the appellants with respect to a Plan of Arrangement under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). Leave to appeal the order of Feldman J. was granted on March 17, 1995 by The Honourable Mr. Justice Houlden.

**Overview of the Proceedings**

2     These appeals arise out of the insolvency of Central Capital which in and prior to December 1991 defaulted under its obligations to various unsecured lenders, note holders and subordinated debt holders. In early December of 1991, Central Capital advised its creditors that, pending implementation of new financial arrangements, it had decided to discontinue payment of all interest and principal due under outstanding loans, with the exception of indebtedness due under secured notes issued to The Royal Trust Company. In an Agreed Statement of Facts, which was prepared by the parties for the purposes of appeals from the disallowances of the Administrator, it was agreed that at all material times since in or prior to December 1991, Central Capital was insolvent. It had a total unsecured debt of $1,577,359,000 and, among other things:

    (a) it was unable to pay its liabilities as they became due; and

    (b) the realizable value of its assets was less than the aggregate of its liabilities.

3     By Notice of Application issued June 12, 1992, thirty-nine of the creditors commenced an application pursuant to the *CCAA* for an order declaring the following: that Central Capital was a debtor company to which the *CCAA* applied; that Peat Marwick Thorne Inc. be appointed Administrator of the property, assets and undertaking of Central Capital; that a stay of proceedings against Central Capital, except with leave of the court, be granted and; that the applicants be authorized and permitted to file a plan of compromise or arrangement under the *CCAA*.

4     By order of Houlden J. made June 15, 1992, Central Capital was declared to be a company to which the *CCAA* applied and all proceedings against Central Capital were stayed. By further order of Houlden J. made July 9, 1992, it was provided, among other things, that:

    (a) Peat Marwick Thorne Inc. was appointed Administrator, Interim Receiver and Manager of such of the undertaking, property and assets of Central Capital as necessary for the pur pose of effecting the transaction described in the order pursuant to which specified significant assets of Central Capital would be transferred to a newly incorporated company called Canadian Insurance Group Limited ("CIGL");

    (b) the Administrator was authorized to enter into and carry out a Subscription and Escrow Agreement with creditors of Central Capital pursuant to which creditors of Central Capital would be entitled to elect to exchange a portion of the indebtedness owing to them by Central Capital for shares and debentures to be issued by CIGL;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(c) the Administrator was authorized and directed to supervise the calling for claims of creditors of Central Capital who elected to exchange a portion of the indebtedness from Central Capital for shares and debentures to be issued by CIGL as aforesaid; and

(d) Central Capital was authorized and permitted to file with the court a formal plan of compromise or arrangement with Central Capital's secured and unsecured creditors and shareholders in accordance with the *CCAA* and the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (the "*CBCA*"), which would provide for the restructuring and reorganization of the debt and equity of Central Capital in the manner set out in the said order.

5      According to the Agreed Statement of Facts, the order of Houlden J. was made without prejudice to the rights of the appellants to assert claims as creditors in the CIGL transaction. Pursuant to the terms of the July 9, 1992 order, all claims of creditors of Central Capital who wished to participate in CIGL were required to be submitted to the Administrator by September 8, 1992, or such other date fixed by the court. The Administrator received claims from various persons who wished to participate, including the claims submitted by the appellants herein.

6      The Administrator disallowed the claims of McCutcheon and SYH by Notices of Disallowance dated January 20, 1993 and February 16, 1993 in which various reasons were cited as to why the appellants did not qualify as creditors. The effect of this disallowance was that McCutcheon and SYH could participate only as shareholders in the plan of compromise and arrangement under the *CCAA* to be put forward by Central Capital. In dismissing the appeals from this disallowance, Feldman J. found that the appellants were not creditors because they did not have a claim provable under the *Bankruptcy Act* (Canada), R.S.C. 1985, c. B-3 ("*Bankruptcy Act*").

## Issue

7      The Agreed Statements of Facts set out the issue in the appeal in the following language:

Do the appellants, or any of them, have claims provable against CCC [Central Capital] within the meaning of the *Bankruptcy Act (Canada)*, as amended as of the date of the Restated Subscription and Escrow Agreement? If the appellants, or any of them, have provable claims, then the proof of claim of any appellant that has a claim provable is to be allowed as filed and the appeal from the disallowance allowed, and the appellants, or any of them, whose claim is allowed, are to participate in the Plan of Arrangement of Central Capital as a senior creditor.

8      The determination of this issue was deferred by Houlden J.'s order of October 27th, 1992. He ordered therein that preferred shareholders who had filed claims against Central Capital as creditors were not permitted to vote at the meeting of creditors called to consider the Plan of Arrangement "... but such is without prejudice to the rights of those claimants to prosecute their claims as filed". The last paragraph in the order ended:

For greater certainty, the validity of any claim filed by a preferred shareholder shall not be affected by the terms of this paragraph.

## Overview of the Restructuring of Central Capital

9      The order of Houlden J. of July 9, 1992 directed the restructuring of Central Capital under the *aegis* of the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

court. The order, and others that would follow, contemplated that the restructuring would take place in two stages. The first stage involved the transfer to the Administrator of certain major assets of Central Capital to a company to be incorporated called Central Insurance Group Limited (CIGL). This company is frequently referred to in the documentation and the reasons of Feldman J. as "Newco". CIGL was then to be owned by those Central Capital creditors who chose to participate in the reorganization by accepting a reduction in their debts due from Central Capital and exchanging this reduced indebtedness for debentures in CIGL. Subscription for debentures by this means additionally entitled the creditors to subscribe for shares in CIGL. Our understanding from counsel is that the assets transferred to CIGL included the assets acquired by Central Capital from the appellant in purchase agreements described later in these reasons.

10    The court approved a Subscription and Escrow Agreement setting out this arrangement. In order to participate, the creditors were required to file with the Administrator of Proof of Claim in the prescribed form along with other documents confirming the creditor's intention to reduce its claim against Central Capital and to subscribe for debentures and shares of CIGL. Claims were to be based on Central Capital's indebtedness to creditors as of June 15, 1992, the date of the court-ordered stay of proceedings. This transaction was completed on October 1, 1992 and resulted in CIGL being owned by the creditors of Central Capital in exchange for a reduction in Central Capital's unsecured debt in the amount of $603,000.000.

11    The second stage of the restructuring involved a Plan of Arrangement under the *CCAA*. That plan as put forward by Central Capital recognized four classes of creditors, only one of which, namely that of "Senior Creditors", could apply to the appellants. The Plan of Arrangement, as amended, provided that Central Capital would issue to Senior Creditors *pro rata* on the basis of their senior claims of secured promissory notes in the aggregate principal amount of $20,000,000 of secured debt, which were to be known as first secured notes. A similar arrangement was made for the issuance of $1,000,000 of second secured promissory notes to subordinated creditors. Senior and subordinated creditors included any creditor whose claim had been allowed under the CIGL claims procedure in the first stage, to the extent of that creditor's reduced claim.

12    The Plan of Arrangement also called for the creation of a new class of shares in Central Capital to be called the Central New Common Shares. Central Capital would issue to the above Senior and Subordinated Creditors ninety percent of the new share capital of Central Capital in extinguishment of the balance of their debt. The Central Capital shareholders of all classes would have their existing shares converted into the remaining ten percent of the Central New Common Shares. All of the existing preferred and common shares would be cancelled upon implementation of the plan.

13    The amended Plan of Arrangement was ultimately voted on and approved by all four classes of creditors of Central Capital. On December 18, 1992, Houlden J. sanctioned this plan of arrangement under the *CCAA*. He authorized and directed Central Capital to apply for Articles of Reorganization pursuant to s. 191 of the *CBCA*, so as to authorize the creation of the Central New Common Shares for implementation of the amended Plan of Arrangement. He also lifted the stays of proceedings affecting Central Capital and its ability to carry on business as of January 1, 1993.

14    The effect of the amended Plan of Arrangement after approval was that all remaining debts and obligations owed by Central Capital to its creditors on or before June 15, 1992 were extinguished and all outstanding and unissued shares of any kind in Central Capital were cancelled and replaced by Central New Common Shares. Central Capital was then free to carry on business. It was no longer insolvent.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

### Facts as They Relate to the Claim of McCutcheon

15      By a Share Purchase Agreement dated June 15, 1987 between Central Capital and Gormley Investments Limited ("Gormley") and Heathley Investments Limited ("Heathley"), Central Capital agreed to purchase all Class "B" Voting Shares of Canadian General Securities Limited ("CGS") that were owned by Gormley and Heathley. James W. McCutcheon and his brother, who were the sole shareholders of Gormley, represented to Central Capital that CGS owned substantially all of the shares of Canadian Insurance Sales Limited, which in turn owned substantially all of the shares in a number of operating insurance, credit and trust companies. The consideration for the purchase of the CGS shares was $575 per share. The vendors were to be paid $400 per share in cash on closing and were to receive seven Series B Senior Preferred Shares of Central Capital. These shares contained a retraction clause entitling the holder to retract each preferred share on July 1, 1992 for $25. Failing issuance of the shares by Central Capital, the vendors were to receive an additional $175 for each CGS share. The Share Purchase Agreement and later the Articles of Central Capital further provided that the holders of Series B Senior Preferred Shares were entitled to receive dividends as and when declared by the directors of Central Capital out of monies of the corporation properly applicable to the payment of dividends and in the amount of $1.90625 per share per annum (being 7 5/8% per annum on the stated capital of $25 per share) payable in equal quarterly payments. No dividends were in fact declared.

16      The Certificate of Amendment for Central Capital dated July 30, 1987, and the Articles of Amendment setting out the provisions attaching to the Series B Senior Preferred Shares contain all the terms and conditions governing the said shares. I am setting out below a description of those that are relevant to this appeal.

17      Pursuant to Article 4.1 of the Senior Series B Provisions, each holder of Series B Senior Preferred Shares was entitled, subject to and upon compliance with the provisions of Article 4, to require Central Capital to redeem all or any part of the Series B Senior Preferred Shares registered in the name of that holder on July 1, 1992 at a price equal to $25 per share, plus all accrued and unpaid dividends thereon, calculated to but excluding the Retraction Date.

18      Article 4.2 of the Senior Series B Provisions sets out the procedure for retraction of the shares. Article 4.3 of the Senior Series B Provisions provides that if the redemption by Central Capital of all of the Series B Senior Preferred Shares required to be redeemed on the Retraction Date would be contrary to applicable law or the rights, privileges, restrictions and conditions attaching to any shares of Central Capital ranking prior to Series B Senior Preferred Shares, then Central Capital shall redeem only the maximum number of Series B Senior Preferred Shares which it determined was permissible to redeem at that time. Article 4.3 provides the mechanism for a *pro rata* redemption from each holder of the tendered Series B Senior Preferred Shares and redemption of the tendered Series B Senior Preferred Shares by Central Capital at further dates.

19      Article 4.4(a) provides that subject to Section 4.4(b), the election of any holder to require Central Capital to redeem any Series B Senior Preferred Shares shall be irrevocable upon receipt by the transfer agent of the Certificates for the shares to be redeemed and the signification of election of the holder of the Series B Senior Preferred Shares.

20      Article 4.4(b) of the Senior Series B Provisions provides that if the retraction price is not paid by Central Capital, Central Capital shall forthwith notify each holder of the Series B Senior Preferred Shares who has not received payment for his deposited shares of the holder's right to require Central Capital to return all (but not less than all) of the holder's deposited Share Certificates and the holder's rights under Article 4.3 outlined above.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

21    Article 4.5 of the Senior Series B Provisions provides that the inability of Central Capital to effect a redemption shall not affect or limit the obligation of Central Capital to pay any dividends accrued or accruing on the Series B Senior Preferred Shares from time to time not redeemed and remaining outstanding.

22    Article 7 of the Series Senior B Provisions provides that in the event of the liquidation, dissolution or winding-up of Central Capital, whether voluntary or involuntary, or any other distribution of assets of Central Capital among its shareholders for the purposes of winding up its affairs, the holders of the Series B Senior Preferred Shares shall be entitled to receive, from the assets of Central Capital, $25 per Series B Senior Preferred Shares, plus all accrued and unpaid dividends thereon, to be paid prior to payment to junior ranking shareholders. Upon payment of such amounts, the holders of the Series B Senior Preferred Shares shall not be entitled to share in any further distribution of assets of Central Capital.

23    A Notice of Retraction Privilege was sent by Central Capital to the holders of Series B Senior Preferred Shares with a cover letter dated April 23, 1992. The letter stated, among other things, that Central Capital would not redeem any shares because the redemption of such shares would be contrary to applicable law in the context of Central Capital's then current financial situation. McCutcheon and Central Guaranty Trust deposited for redemption 406,800 and 26,000 Series B Senior Preferred Shares, respectively, in accordance with the Senior Series B Provisions and the Notice of Retraction Privilege. The shares were deposited on May 28, 1992, with Montreal Trust Company of Canada, pursuant to the Notice of Retraction Privilege. The shares were properly tendered for redemption in the manner and within the time required by Central Capital's Articles of Amendment.

24    Central Capital did not pay the redemption price on July 1, 1992 and on July 20, 1992 it notified each holder of Series B Senior Preferred Shares of its right to require Central Capital to return all of the holder's deposited Share Certificates as required by Article 4.4(b) of the Senior Series B Provisions. McCutcheon and Central Guaranty Trust did not exercise that right.

25    Pursuant to the terms of Houlden J.'s order of July 9, 1992 directing the restructuring of Central Capital, McCutcheon submitted to the Administrator, as a creditor of Central Capital, Proofs of Claim dated September 3, 1992 and September 4, 1992, respectively. McCutcheon claimed the amount of $10,913,593.69 in respect of his Series B Senior Preferred Shares tendered for redemption. Central Guaranty Trust claimed the amount of $697,526.68 in respect of its tendered 26,000 Series B Senior Preferred Shares. McCutcheon also executed and submitted the Restated Subscription and Escrow Agreement and other documents electing to participate in CIGL. These claims were completed and submitted in the prescribed form and within the time required by Houlden J.'s order.

26    As was previously noted, these claims were disallowed by the Administrator. The substance of the Administrator's reasons for disallowance was that the ability of Central Capital to redeem these preference shares is restricted by the provisions of the *CBCA* and it would be contrary to applicable law to redeem the shares in the context of Central Capital's financial position. The relevant provision of the *CBCA* provides:

**Redemption of shares.**

*36.* (1) Notwithstanding subsection 34(2) or 35(3), but subject to subsection (2) and to its articles, a corporation may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption price thereof stated in the articles or calculated according to a formula stated in the articles.

**Limitation.**

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

(ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

Evidently, the Administrator equated redemption by the corporation with the right of retraction by the preferred shareholder. It agreed with Central Capital's position that once it became insolvent in December of 1991, Central Capital no longer had the ability to redeem the shares tendered for retraction and thus McCutcheon was restricted to exercising what rights it might have as a shareholder.

**Facts as They Relate to the Claim of SYH**

27    Pursuant to an Agreement of Purchase and Sale made as of June 30, 1989, as amended, Scottish & York Holdings Limited (the predecessor to SYH) sold to Central Capital the shares of Central Canada Insurance Services Limited, Eaton Insurance Company, Scottish & York Insurance Co. Limited and Victoria Insurance Company of Canada (collectively the "Insurance Companies"), except for certain preference shares held by the directors of those corporations. In consideration of this transfer, Central Capital issued to Scottish & York Holdings Limited 60,116,000 Series A Junior Preferred Shares and 9,618,560 Series B Junior Preferred Shares.

28    The Articles of Central Capital provided that it would pay on each dividend payment date prior to the fifth anniversary of this issue, as and when declared by the directors out of the assets of the corporation properly applicable to the payment of dividends, a dividend of $.08 for each outstanding Series A Junior Preferred Share. The dividend was payable quarterly by the issuance of .02 Series Junior Preferred Shares for every outstanding Series A Junior Preferred Share. No dividends were in fact declared.

29    The Articles also provided that Central Capital was obligated to retract the Series A Junior Preferred Shares and Series B Junior Preferred Shares, at the option of the holders of those shares, on the fifth anniversary of their issuance. The retraction price was $1.00 per share plus all accrued and unpaid dividends. Payment of the retraction price of these shares by Central Capital was subject to the provisions of the *CBCA*, which governs the affairs of Central Capital. For the purposes of this appeal, I believe that we can treat the balance of the provisions relating to these preferred shares as being the same as those governing the McCutcheon Series B Senior Preferred Shares.

30    Given that the operative date for proving claims against Central Capital was June 15, 1992, the retraction date governing the preferred shares of SYH was some two years removed. Notwithstanding, on September 8, 1992 SYH executed and delivered to the Administrator a Proof of Claim, a Counterpart of the Restated Subscription and Escrow Agreement, an initial Share Subscription and an Instrument of Claims Reduction Form, all in the prescribed form and within the time required. The claim was that SYH was holding or entitled to hold the following shares of Central Capital:

(a) 60,116,000 Junior Preferred Series A shares;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(b) 9,618,560 Junior Preferred Series B shares;

(c) 4,611,095 Junior Preferred Series B shares accrued to June 15th, 1992 but not yet issued to SYH;

for a total of 74,345,655 shares, each having a retraction value of $1.00. However, because of some adjustments in favour of Central Capital to the purchase price of the shares sold by SYH to Central Capital under the June 30, 1989 Agreement of Purchase and Sale, the net claim as of June 15, 1992 was reduced from $74,345,655 to $72,388,836.

31      By Notice of Disallowance dated January 20, 1993, the Administrator disallowed the claim by SYH to subscribe for debentures and common shares to be issued by CIGL. The reasons for the disallowance are similar to those provided for disallowing the claims of McCutcheon. The Administrator found that SYH's right to re-quire Central Capital to retract the Series A and B Junior Preferred Shares only arose on the expiry of the fifth anniversary of their issuance and that Central Capital was precluded from retracting those shares by virtue of its insolvency and the provisions of the *CBCA*. Hence SYH, like McCutcheon, was limited to exercising what other rights it might have as a shareholder.

**Analysis**

32      Although the factual groundwork is necessary for putting in perspective the sole issue before the court, the final question confronting us is a narrow one. Did the retraction clauses in the appellants' shares create a debt owed by Central Canada as of June 15, 1992 within the meaning of the *Bankruptcy Act*? I think that they did.

33      It is agreed that the operative section of the *Bankruptcy Act* is s. 121(1). It reads as follows:

*121*.(1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bank-ruptcy or to which he may become subject before his discharge by reason of any obligation in curred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

There was no bankruptcy in this case and thus the relevant date was agreed to be June 15, 1992. The obligations of Central Capital to the appellants were incurred before that date, and so the only question becomes whether the obligations created a debt between the appellants and Central Capital.

34      What then is a debt? All the parties turn to *Black's Law Dictionary*, quoting different editions. The fol-lowing is from the Sixth Edition (1990), at p. 403:

**Debt.**

A sum of money due by certain and express agreement. A specified sum of money owing to one person from another, including not only the obligation of debtor to pay but right of creditor to receive and enforce payment. ...

A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future.

35      The above is consistent with what is defined as a debt by *Jowitt's Dictionary of English Law*, 2nd ed. (1977), at p. 562:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

A debt exists when a certain sum of money is owing from one person (the debtor) to another (the creditor). Hence "debt" is properly opposed to unliquidated damages; to liability, when used in the sense of an incho-ate or contingent debt; and to certain obligations not enforceable by ordinary process. "Debt" denotes not only the obligation of the debtor to pay, but also the right of the creditor to receive and enforce payment.

And finally, *The Shorter Oxford Dictionary*, 3rd ed. (1973), at p. 497:

**Debt**

*1.* That which is owed or due; anything (as money, goods or service) which one person is under obligation to pay or render to another.

*2.* A liability to pay or render something; the being under such liability.

36    I have no difficulty in finding that the claims of the appellants in the case under appeal fall within all of the above definitions. As will be discussed herein, concern was expressed in this case over whether or not the appellants as creditors were entitled to "receive and enforce payment" on the "debt" because of the insolvency of Central Capital on June 15, 1992. I will deal with the specific arguments relating to the effect of insolvency on this particular indebtedness in due course, but for the moment I am content to observe that the above definitions contemplate only that the creditor's right to recover is the reciprocal of the debtor's obligation to pay. For every debtor there must be a creditor. There may be cases where it is difficult to identify the person who in law may receive and enforce payment, but this is not such a one.

37    With great respect to the judge of first instance and to the submissions of counsel for the unsecured cred-itors, I believe that the fundamental error that has been made in these proceedings arises from the conception that the preferred shares in question can either be debt instruments or equity participation instruments, but they cannot have the attributes of both. Feldman J. had this to say at p. 48 of her judgment:

Although the right of retraction at the option of the preferred shareholder may be less common than the usu-al right of the company to redeem at its option, that right is one of the incidents or provisions attaching to the preferred shares, but does not change the nature of those shares from equity to debt. The parties have characterized the transaction as a share transaction. The court would require strong evidence that they did not intend that characterization in order to hold that they rather intended a loan.

In my view, this case turns on whether the right of retraction itself creates a debt on the date the company becomes obligated to redeem even if it cannot actually redeem by payment on that date, or a contingent fu-ture debt on the same analysis, not on whether the preferred shares themselves with the right of retraction are actually debt documents.

Because the preferred shares remain in place as shares until the actual redemption, the appellants are not creditors and have no claim provable under the *Bankruptcy Act* (Canada), and the appeals are therefore dis-missed.

38    As I read these reasons, the learned judge is in effect stating that these instruments are preferred shares in the corporation because the parties have so described them. In the first place, I do not think that describing the documents as preferred shares is conclusive as to what instrument the parties thought they were creating. In the second place, it is not what the parties call the documents that is determinative of their identity, but rather it is

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

what the facts require the court to call them. The character of the instrument is revealed by the language creating it and the circumstances of its creation. Although these instrument may "remain in place as shares" until they are actually redeemed, they also contain a specific promise to pay at a specified date. This is the language of debt. I cannot accept the proposition that a corporate share certificate cannot create a corporate debt in addition to the certificate holder's rights as a shareholder.

39    The rules relating to the competing rights of shareholders and creditors of an insolvent corporation have become so regulated by governmental action that one can readily lose sight of the common law basis for making a distinction. To understand the difference in treatment, we must re-examine what a share of a corporation represents. Initially, a share is issued by the corporation to raise share capital. The price of the share is money or the promise of money. Accordingly, an individual share is one of a number of separate but integral parts of the authorized capital of a corporation. Even though it is the shareholders who contribute to the capital of the corporation, the capital remains the property of the corporation. The shareholders, however, as owners of the shares of capital, effectively control the corporation. They have the responsibility of managing its affairs through their control over the board of directors and in popular terminology are considered to be the owners of the corporation. However, the corporation is a separate entity in law, and if in the course of carrying out its business it incurs debts to third parties, those debts are those of the corporation. A corporation is an intangible and its capital therefore represents its substance to third parties having business dealings with the corporation. A preferred share is simply a share of a class of issued shares which contains a preference over other classes of shares, whether preferred or common: see Sutherland, *Fraser and Stewart on Company Law of Canada*, 6th ed. (1993), at pp. 157 and 195 for further discussion.

40    The rights of shareholders are conveniently summarized by R.M. Bryden in his chapter, "The Law of Dividends", contained in Ziegel ed., *Studies in Canadian Company Law* (1967), at p. 270:

> The purchaser of a share in a business corporation acquires three basic rights: he is entitled to vote at shareholders' meetings; he is entitled to share in the profits of the company when these are declared as dividends in respect of the shares of the class of which his share forms a part, and he is entitled, upon the winding-up of the corporation, to participate in the distribution of the assets of the company that remain after creditors are paid. A fourth right which should be noted is the right to transfer ownership in his share, whereby the owner for the time being may realize upon the increase in value of the company's assets, or its favourable prospects, by selling his share at a price reflecting the buyer's estimation of the value of the rights he will acquire. Unless the shareholder chooses to sell his share, he can realize a return upon his investment only through receipt of dividends or by the return of his capital upon an authorized reduction of capital or winding up.

41    Shareholders are variously characterized as entrepreneurs, investors or risktakers and as such they have the opportunities of benefitting from the successes of the corporation and suffering from its failures. While the corporation is an operating entity, the shareholders receive their rewards, if they are any, through the payment of dividends declared from time to time by the board of directors. While the source of these dividends is not restricted to surplus funds, the result of the payment of the dividend must not result in a return of capital to the shareholders. The classic justification for this rule was stated by Sir George Jessel, Master of the Rolls in *Re Exchange Banking Co.; Flitcroft's Case* (1882), 21 Ch. D. 519 (C.A.), at 533-4:

> The creditor has no debtor but that impalpable thing the corporation, which has no property except the assets of the business. The creditor ... gives credit to that capital, gives credit to the company on the faith of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

the representation that the capital shall be applied only for the purposes of the business, and he has therefore a right to say that the corporation shall keep its capital and not return it to the shareholders. ...

42     Creditors, on the other hand, do not have an ownership or equity interest in the corporation. They are third parties who have loaned money or otherwise advanced credit to the corporation. They look to the company for payment in accordance with the terms of the contract creating the indebtedness. They are also restricted in their recovery to the amounts stipulated in the terms of indebtedness. They are entitled to payment regardless of the financial circumstances of the debtor corporation and accordingly are not restricted to receiving payment of the debt from surplus. They can be paid out of assets or through the creation of further indebtedness. It is immaterial how the corporation records this indebtedness in its internal books. In some circumstances the indebtedness could properly reflect the acquisition of property from a creditor as a capital asset. This does not, however, convert the creditor into an investor. The vendor of the property remains a creditor and retains priority over shareholders in the event of a bankruptcy or insolvency.

43     In my view, the reasons under appeal do not reflect a sensitivity to the circumstances which gave rise to the issuance of the preference shares. The shares were not issued by Central Capital to the general public in order to raise capital and do not represent an investment by the public in the capital of the corporation. They were issued to specific persons as payment for the acquisition of specified assets. While the corporation was authorized by its Articles of Incorporation to issue preferred shares generally, the shares issued to the appellants were structured to meet the requirements of the appellants as vendors of the controlling interest in the operating companies that Central Capital was acquiring. In my view, these preference shares are the equivalent of vendor shares in that the appellants received them in exchange for the transfer of assets to Central Capital.

44     In the case of McCutcheon, the retraction provision in the preferred shares represented only partial payment of an agreed value for the assets, but in the case of SYH, they represented the full value. In both cases, the agreed value as reflected in the retraction price was guaranteed by Central Capital to be retractable at a fixed price at a predetermined date. By postponing the obligation to pay the purchase price in this way, Central Capital was using the retraction provisions of the preference shares as a vehicle for the financing of its expanding asset base. The appellants, for their part, deferred the realization of the purchase price of their assets to the agreed dates and thereby extended credit to the corporation. In return for extending credit for some or all of the selling price, the appellants agreed to receive dividends calculated in advance but payable as and when declared by the board of directors.

45     Thus, in looking at the substance of the transaction that led to the issuance of the preference shares, it appears to me that the retraction clauses were promises by Central Capital to pay fixed amounts on definite dates to the appellants. They evidenced a debt to the appellants. The fact that the appellants as holders of the preference shares had rights as shareholders in the corporation up to the time when the retraction clauses were exercisable did not affect their right to enforce payment of the retraction price when it became due.

46     The validity of an analysis directed to the substance of the transaction is supported by *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558, a judgment of the Supreme Court of Canada delivered by Iacobucci J. The case involved a number of corporations constituting a support group which entered into an arrangement to provide emergency financial assistance to Canadian Commercial Bank ("CCB"). On the ultimate failure of the bank, the issue arose as to whether the monies advanced to CCB under this support arrangement were in the nature of a loan or in the nature of a capital investment. I find instructive to our situation Iacobucci J.'s observation at pp. 590-1:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

As I see it, the fact that the transaction contains both debt and equity features does not, in itself, pose an insurmountable obstacle to characterizing the advance of $255 million. Instead of trying to pigeonhole the entire agreement between the Participants and CCB in one of two categories, I see nothing wrong in recognizing the arrangement for what it is, namely, one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship. Financial and capital markets have been most creative in the variety of investments and securities that have been fashioned to meet the needs and interests of those who participate in those markets. It is not because an agreement has certain equity features that a court must either ignore these features as if they did not exist or characterize the transaction on the whole as an investment. There is an alternative. It is permissible, and often required, or desirable, for debt and equity to co-exist in a given financial transaction without altering the substance of the agreement. Furthermore, it does not follow that each and every aspect of such an agreement must be given the exact same weight when addressing a characterization issue. Again, it is not because there are equity features that it is necessarily an investment in capital. This is particularly true when, as here, the equity features are nothing more than supplemen tary to and not definitive of the essence of the transaction. When a court is searching for the *substance* of a particular transaction, it should not too easily be distracted by aspects which are, in reality, only incidental or secondary in nature to the main thrust of the agreement. [Emphasis in original.]

47    I have no difficulty in finding that the appellants' preferred shares with their retraction clauses are of "a hybrid nature, combining elements of both debt and equity". As to the equity component, the appellants are shareholders prior to exercising their retraction rights in that they have the right to vote in certain circumstances and have a right to receive dividends when and if they are declared by the board of directors. The debt component is more significant however. The shares were not issued to investors, but to vendors of property. The vendors were entitled to receive a fixed sum at a specified time in payment therefor. Pending payment, the vendors were entitled to receive dividends which were the equivalent of interest on the unpaid balance.

48    I can think of no reason why the holders of these preferred shares should not be treated as both shareholders and creditors. It does not concern me that these appellants act as shareholders before their retraction rights are exercisable. Nor do I see any hardship to other creditors of Central Capital arising from the ability of these appellants to claim as creditors in the restructuring of the company given that the appellants are unpaid with respect to substantial assets sold to the corporation and now transferred on the restructuring to GIGL.

49    Much was made in argument of the fact that the retraction amounts could not be paid on the retraction dates. In the case of McCutcheon, the corporation was insolvent and subject to court administration on the due date of July 1, 1992. In the case of SYH, the retraction date did not arrive before the reorganization was complete.

50    The narrow issue of the effect of insolvency on a debt has been dealt with by the British Columbia Court of Appeal in *Re East Chilliwack Agricultural Co-op.* (1989), 74 C.B.R. (N.S.) 1. In this case, the appellants were one-time members of three co-operative associations. The rules of the co-operatives permitted a member to withdraw upon written notice to the board of directors to that effect. The member was entitled to elect to have his shares redeemed either in equal instalments over five years or in one payment with interest at the end of five years. In April of 1987, the superintendent of co-operatives, under the authority of the *Cooperative Association Act*, R.S.B.C. 1979, c. 66, suspended the co-operatives' right to redeem their shares until their financial situation was no longer impaired. The three co-operatives subsequently went bankrupt and a two-fold issue came before the bankruptcy court: (1) whether those members whose notices of withdrawal had been accepted by the board of directors but who had not yet received the value of the shares were entitled to rank as unsecured creditors,

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

and (2) whether those who had delivered notices that had not been accepted were to be treated as unsecured creditors. The court of first instance found that the members were shareholders and answered both questions in the negative. That judge was reversed on appeal with the majority of the court deciding that the answer to both questions was yes. Hutcheon J.A. for the majority stated at p. 13:

> I shall use Mr. Neels [a co-operative member] as my example. According to R. 3.06 he ceased to be a share-holder in May 1983. In May 1984 the Agricultural Co-operative owed him the first of five payments, or $686.40. I know of no principle of law that would support the proposition that Neels could not sue for that amount if the Agricultural Co-operative failed to pay in May 1984. Of course, the superintendent of co-operatives has power under s. 15(2) to suspend payments if, in his opinion, the financial position of the co-operative was impaired. Subject to that power, the position of Neels and the Agricultural Co-operative would be that of ordinary creditor and debtor. In my opinion, the order made by the judge cannot be sustained on the first ground.

From this case, I extract the proposition that the fact of an insolvency, whether declared or not, does not change the nature of the relationship between debtor and creditor. It continues notwithstanding the inability of the debtor to pay or the creditor to collect.

51     It appears to me, with deference, that the issue of the effect of Central Capital's insolvency on the character of the retraction payments is something of a red herring. The contest in this appeal is between those who are conceded to be unsecured creditors and those whose claim to such status is contested. In both cases, any right to payment was suspended by Central Capital's announcement in December of 1991 that it was insolvent and that it had suspended all payments of principal and interest to unsecured creditors. This course of action was not freely chosen but was required by law. Any payments to creditors after the date of insolvency would be voidable at the instance of creditors on the basis that they were fraudulent preferences. In addition to ss. 95 and 96 of the *Bankruptcy Act* dealing with fraudulent preferences generally, there is provincial legislation in the form of the *Fraudulent Conveyances Act*, R.S.O. 1990, c. F.29, and the *Assignments and Preferences Act*, R.S.O. 1990, c. A.33, that would be applicable. Counsel for the unsecured creditors maintains that the right to redeem shares, including preference shares was postponed by s. 36(2) of the *CBCA, supra*. I am not certain that s. 36(2) applies to the retraction provisions of the appellants' preference shares as opposed to the redemption privileges of Central Capital, but in my opinion the point is irrelevant to this appeal. Once Central Capital acknowledged its insolvency, it could neither redeem its shares nor honour its retraction obligations. The whole purpose for the creditors applying to the court for a stay of Central Capital's obligations, including those of the acknowledged unsecured creditors, was to arrange for a scheme of payments to all creditors that could not be subject to attack as preferences. There is no suggestion on the evidence before us that the claims of unsecured creditors accepted by the Administrator were claims that had crystallized prior to the insolvency of Central Capital. Nor is it suggested that any creditors were rejected because some or all of their claims were not payable until after the date of the insolvency. The fact of insolvency, by itself, does not provide a rational basis for distinguishing the claims of the appellants from those of other unsecured creditors.

52     Much also was made of the provision in the Articles authorizing the shares in question, which states that if the obligation to redeem "would be contrary to applicable law", then Central Capital "shall redeem only the maximum number of [shares] it is then permitted to redeem". Counsel for the unsecured creditors submits that the reference to "applicable law" is to s. 36 of the *CBCA*. The reference certainly embraces the *CBCA*, but it is not restricted by its terms to that statute. For example, "applicable law" would also capture s. 101 of the *Bankruptcy Act*, which provides for penalties against directors and shareholders where insolvent companies redeem

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

shares or pay dividends.

53       There was no evidence led as to why this provision was placed in the Articles and the share certificates. It appears to be a standard clause in all the preference shares issued by the corporation and not just those that were adapted to the appellants' situations where specific retraction clauses were drafted to satisfy the particular asset acquisitions. For my part, I have difficulty in understanding how a consideration of this provision assists the process of determining the underlying character of the retraction obligations. The statement is so self-evident that it is almost banal. I can only assume that the statement was included in the share provisions of a corporation marketing its securities world-wide so as to inform purchasers that legal restrictions in this jurisdiction apply to the company's right to redeem shares.

54       In summary then regarding the insolvency argument, these various statutes prohibit payments of any kind to shareholders by an insolvent company. As I understand it, counsel does not question that when a dividend has been lawfully declared by a corporation, it is a debt of the corporation and each shareholder is entitled to sue the corporation for his proportion: see *Fraser and Stewart, supra*, at p. 220 for a list of authorities. However, once a company is insolvent it cannot make payments to shareholders or creditors so long as it continues to be insolvent. On the other hand, nowhere in the *CBCA* or else where will we find authority for the proposition that once a corporation is insolvent, it is no longer obliged to pay its debts. The obligation is postponed until the insolvency is corrected or the corporation makes an accommodation with its creditors and obtains a release with or without the assistance of the various statutes dealing with insolvency.

55       The existence of provisions prohibiting payment to shareholders and creditors on insolvency does not in anyway assist the determination of whether the retraction obligations at issue in this appeal constitute a debt or a return of capital at the time they are payable. Speaking of the obligation to honour the retraction in terms of the corporation redeeming its shares also introduces the wrong emphasis. The corporation is not redeeming the shares at its option as contemplated by most redemptions. It is being forced to redeem them because of a prior contractual obligation for which the preferred shareholder gave good consideration. It is for this reason that I question whether s. 36 of the *CBCA* is the appropriate reference point. This is not the type of payment which concerned Jessel M.R. in *Flitcroft's Case, supra*.

56       At the risk of over simplifying this case, it appears to me that many of the arguments made against the appellants' claims to be creditors of Central Capital are impermissible in the context of the Agreed Statement of Facts. The issue in appeal is frozen in time by the stipulation that the court is to determine if these retraction clauses created a debt within the meaning of the *Bankruptcy Act* on June 15, 1992. The arguments against the appellants' claims also ignore that debts under s. 121(1) of the *Bankruptcy Act* need not be payable at the date of the bankruptcy (or June 15, 1992 in our scenario). They need only come beneath the broad umbrella of "debts and liabilities, present and future, to which [Central Capital] is subject" on June 15, 1992. The fact that the debts could not be paid after June 15, 1992, does not mean that they were not provable claims pursuant to s. 121 of the *Bankruptcy Act*. Moreover, assuming the retraction clauses created a debt payable on a future date, neither the order of Houlden J. nor the restrictions in the Articles creating the shares themselves purported to extinguish that debt.

57       There is nothing in either the Articles of Central Capital or in the law that excuses the obligation to pay the retraction amounts. Rather, discharge of the obligation is simply postponed until the cessation of the disabling event of insolvency. Article 4.3 of the Senior Series B Provisions provides the mechanism for future redemption of tendered shares that are not redeemed because such redemption would be contrary to law. Article

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

4.5 provides that the inability to effect a redemption does not affect the obligation to pay dividends accrued or accruing on the unredeemed shares.

58    So far as SYH is concerned, the retraction price was not payable until the fifth anniversary of the June 1989 sale of assets. Therefore, no issue of the effect of insolvency arose in 1992. The orders of Houlden J. of June 15 and July 9, 1992 changed the rules of the game. If this appellant is a creditor, it does not have to wait until the retraction date. It can claim as a creditor now. It did and the claim was disallowed. However, if this court holds that the claim should have been allowed, then in accordance with the narrow issue put to us, SYH is entitled to be accepted as a full creditor in the entire reorganization of Central Capital.

59    An additional factor raised by counsel during argument was that Article 7, *supra*, provides that in the event of the liquidation, dissolution or winding-up of Central Capital, whether voluntary or involuntary, or any other distribution of assets among its shareholders for the purpose of winding up its affairs, the holders of these preferred shares are entitled to recover "from the assets of Central Capital" the retraction price plus all accrued and unpaid dividends thereon. Such amount is to be paid prior to payment to junior ranking shareholders. The Article further provides that "[u]pon payment of such amounts, the holders of [the preferred shares] shall not be entitled to share in any further distribution of assets of [Central Capital]". Because it is trite law that sharehold-ers are entitled to recover from assets only after all ordinary creditors have been paid in full, counsel for the un-secured creditors submits that the fact that the clause contemplates priorities between shareholders on a winding up or a liquidation of assets is clear evidence that they were shareholders only.

60    I have two responses to this submission. The first is the obvious, that we are not dealing with this con-templated event. We are dealing with a reorganization in which the parties have put a single question to the court: are the appellants creditors? Consideration of issues of priority or the valuation of claims have been taken away by the narrow scope of the agreed question. If the answer to the question posed is yes, then in accordance with the Agreed Statement of Facts, the appellants are entitled to have their claims as creditors allowed under the Subscription and Escrow Agreement and to participate in the Amended Plan of Arrangement as Senior Cred-itors. If the answer is no, they are to be treated as the Administrator has treated them: they are not creditors at all and are restricted to receiving Central New Common Shares under the Amended Plan of Arrangement.

61    My second response is that counsel for the unsecured creditors misses the significance of the clause. He assumes that there will be a deficiency in all circumstances leading up to a liquidation, dissolution or winding up that will necessitate a *pro rata* distribution, first to creditors and then to shareholders of all classes. However, the clause does not say that those with retraction rights are not creditors. It says that the retraction amounts are to be paid out of assets, not suplus. Once the retraction amounts have been paid in full, the appellants are not en-titled to share in any further distribution. This contemplates a surplus after all creditors, including the appellants, have been paid in full. Accordingly, far from classifying the appellants as shareholders, the clause provides that they are not entitled to be treated as shareholders under a winding up or liquidation but only as creditors.

62    Finally, with respect to SYH's claims, it was submitted that these claims were so contingent as to be vir-tually non-existent. The claims anticipate a retraction date that as of June 15, 1992 was some two years into the future. Upon approval of the Amended Plan of Arrangement of December 18, 1992, the shares of SYH were cancelled and replaced by a new issue of shares, the Central New Common Shares. Counsel relied upon the find-ing of Feldman J. that there was then no discernable basis upon which the retraction could occur. Once again, with respect, this conclusion misses the point. Following the final order of Houlden J. approving the Amended Plan of Arrangement, all the shares *and* all the debts of Central Capital disappeared. There was thereafter no dis-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

cernable basis upon which any event contemplated by any debt or share instruments could occur. We are only concerned with the status of shareholders and creditors as of June 15, 1992.

63      Based on the reasons set out above, I have concluded that the retraction amounts do fall within the definition of debts and liabilities, present or future, to which Central Capital was subject on June 15, 1992. This does not apply to undeclared dividends however, because until a dividend is declared no action on behalf of a shareholder lies to enforce its payment: see *Fairhall v. Butler*, [1928] S.C.R. 369 at 374. If undeclared dividends have been claimed by any of the appellants they should be disallowed. In all other respects the claims should be allowed.

64      Accordingly, I would allow the appeals, set aside the order of Feldman J. and order that the appellants have provable claims that are to be allowed by the Administrator. The record does not disclose what order if any Feldman J. made as to costs. Certainly the appellants are entitled to their costs of this appeal. If the parties are unable to agree with respect to any other disposition of costs, I would suggest that they submit their positions to the court in writing.

**Weiler J.A.:**

65      I have had the benefit of reading the reasons of Finlayson J.A. and for the reasons which follow I respectfully disagree with his conclusion that the appellants are entitled to prove a claim pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "*CCAA*").

66      Section 12(1) of the *CCAA* requires that persons wishing to participate in a reorganization have claims which would be provable in bankruptcy. Section 121(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, states that "[a]ll debts and liabilities, present or future ... shall be deemed to be claims provable in proceedings under this Act."

67      In order to decide whether the obligation of Central Capital to redeem the preferred shares of the appellants is a claim provable in bankruptcy, it is necessary to characterize the true nature of the transaction. The court must look to the surrounding circumstances to determine whether the true nature of the relationship is that of a shareholder who has equity in the company or whether it is that of a creditor owed a debt or liability by the company: *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558. In this case, the decision is not an easy one. Where, as here the agreements between the parties are reflected in the articles of the corporation, it is necessary to examine them carefully to characterize the true relationship. It is not disputed that if the true nature of the relationship is that of a shareholder-equity relationship after the retraction date and at the time of the reorganization, then the appellants do not have a claim provable in bankruptcy. Consequently, they will not have a claim under the *CCAA*.

68      As I see it, three main questions need to be addressed:

(1) Was Feldman J. correct in characterizing the relationship between Central Capital and the companies owned by James McCutcheon ("McCutcheon"), and between Central Capital and Scottish and York Holdings Limited (the predecessor of S.Y.H., hereinafter referred to as "SYH"), as a shareholder relationship?

(2) Did the nature of the relationship change after the retraction date for redeeming the shares of McCutcheon or, in the case of SYH, at the time of the reorganization?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(3) If the nature of the relationship is not a shareholder-equity relationship, are the appellants entitled to prove a claim under the *CCAA*.?

69      In addition, the appellants raise the question of whether they have a right to prove a claim for dividends, which have accrued but have not yet been declared payable. The price to be paid by Central Capital to Mc-Cutcheon on the retraction date, July 1, 1992, was $25 per share plus *all accrued and unpaid dividends thereon*. The dividends are therefore part of the retraction price. Similar provisions apply to SYH.

70      The reasons of Finlayson J.A. contain a comprehensive statement of the background to the litigation and I will therefore only refer to the facts in a summary fashion.

71      James McCutcheon and his brother sold their shares in Central Guarantee Trust Company to Central Capital Corporation ("Central Capital"), a trust company, for $575 a share. They received $400 per share in cash. The balance of $175 owing on each share was paid through the issue of seven preferred shares in Central Capital, with each share having a par value of $25. Following this transaction, McCutcheon purchased his brother's shares. These preferred shares, known as Senior Series B Preferred Shares, were to be listed on the Toronto Stock Exchange. These shares carried with them a retraction privilege. The shareholder had the right to have his shares redeemed by Central Capital on July 1, 1992, for $25 a share, provided that such redemption would not be "contrary to law in the context of the Corporation's current financial position." McCutcheon chose not to sell his shares.

72      Scottish & York Holdings Limited (the predecessor to SYH) sold its shares in certain insurance companies which it owned to Central Capital. Central Capital paid for these shares by the issue of Series A Junior Preferred Shares. These shares were not listed on a stock exchange. SYH had the right to have its shares redeemed by Central Capital on or after September 1994 at a price of $1 per share, subject to the provisions of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 (the "*CBCA*").

73      It should be noted that the right of retraction was not unique to these two classes of shareholders. Even common shareholders had the right to have their shares retracted under certain circumstances.

74      By December 1991, Central Capital was unable to pay its liabilities as they became due and its total liabilities greatly exceeded the value of its assets. As a result, the various banks and subordinated debtholders, collectively referred to as the lenders, had a choice to make. Inasmuch as the definition of a corporation in s. 2 of the *Bankruptcy and Insolvency Act* precludes a creditor from bringing a petition against a trust company, they could either wind up Central Capital under the *Winding-up Act*, R.S.C. 1985, c. W-11, or they could try to restructure Central Capital under the *CCAA*. In a winding up or liquidation, the trustee would sell the company's assets, either piecemeal or as a going concern, to third parties. The proceeds from the sale would then be distributed to those who proved a claim according to set priority rules. In a reorganization, existing fixed amounts owed to Central Capital's creditors would be traded for new claims and ownership interests in the reorganized corporation which would remain a going concern. The lenders chose to reorganize.

75      Two transactions were involved. In the Consolidated Insurance Group Limited transaction, or "CIGL transaction", Central Capital transferred some of its significant assets to a newly incorporated company, CIGL. Thirty-nine creditors of Central Capital then elected to exchange a portion of Central Capital's debt owing to them for equity in this newly incorporated company. In the second transaction, common shares were issued for the remaining assets of Central Capital. The creditors of Central Capital were given 90 per cent of the common shares of the reorganized company. The balance of 10 per cent was allocated to the shareholders of Central Cap-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

ital. All of the preferred, common and subordinate voting shares in Central Capital were then converted into these "new" common shares. The reorganization was subsequently approved by the creditors and sanctioned by the Court as required by the Act, but this approval was given without prejudice to any claims that McCutcheon and SYH might have.

76    McCutcheon's position was that the right to have his shares retracted accrued before the reorganization, and that his exercise of this right of retraction in May 1992 constituted a present debt or liability entitling him to rank as a creditor in the CIGL transaction and in the reorganized Central Capital. SYH's position was that the right to have its shares retracted in 1994 created a future debt or liability and thus a provable claim. The administrator of Central Capital disallowed both claims. McCutcheon and SYH appealed the administrator's decision to Feldman J. In dismissing their appeals, she held that the appellants were shareholders and that the right of retraction attaching to the shares did not change the nature of the shares from equity into debt.

**1. Was Feldman J. correct in characterizing the agreement between Central Capital and the companies owned by McCutcheon, and between Central Capital and SYH, as creating a shareholder relationship between the parties?**

77    Feldman J. analyzed the transaction and came to the conclusion that it was an equity transaction.

78    Finlayson J.A. is of the opinion that the nature of this transaction is different and that Feldman J. erred in not showing sensitivity to the fact that she was dealing with the sale of a business by its owners. He is of the opinion that the shares issued by Central Capital are the equivalent to "vendor shares" in that the appellants received them in exchange for the transfer of assets to Central Capital. He does not see the transaction as being either a contribution to capital by McCutcheon and SYH or as a return of capital. Although the transaction has debt and equity features, Finlayson J.A. is of the opinion that the true nature of the transaction is that of a debt owing by Central Capital to McCutcheon and SYH for the shares in their companies.

79    My analysis of the transaction is that when McCutcheon sold his shares in Central Guaranty and took back preferred shares in Central Capital as part payment, he transferred part of his capital investment from a smaller entity to a larger entity. Similarly, SYH transferred its investment in the shares of the insurance companies for shares in the larger entity of Central Capital. Both appellants could look to a larger asset base than before to generate a return on their capital. Until the retraction date, McCutcheon chose to take the risk of continuing his investment in Central Capital, which offered the prospect of a stable, yet relatively high, annual return through the receipt of 7-5/8 per cent dividends. Because the shares traded on the Toronto Stock Exchange, he would have had the option of realizing upon his investment by selling his shares for what they would bring on the open market, but he did not do so. In the case of SYH, although these shares were not required to be publicly listed, the corporation's articles did not restrict their transfer. The corporation's articles indicate that these shares had some preference over other shares with respect to the right to receive dividends and in the distribution of assets after creditors are paid on a liquidation. As preferred shareholders, McCutcheon and SYH did not have a voice in company affairs unless the company failed to pay the dividends it had promised to pay. This is quite typical: see Welling, *Corporate Law in Canada*, 2nd ed. (1991) at p. 604; Ziegel et al, *Cases and Materials on Partnership and Canadian Business Corporations*, 2nd ed. (1989) at p. 1198. Risk taking, profit sharing, transferability of investment, and the right to participate in a share of the assets on a liquidation after the creditors have been paid are the hallmarks of a shareholder: see R.M. Bryden, "The Law of Dividends" contained in Ziegel ed., *Studies in Canadian Company Law* (1967) at p. 270. In my opinion, Feldman J. was correct that the true nature of the relationship between the parties initially was that of an equity transaction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

**2. Did the nature of the relationship change after the retraction date for McCutcheon's shares and did the reorganization trigger a right of redemption respecting SYH's shares?**

80      Ordinarily, shareholders cannot realize on their investment in a company except by transferring their shares. The retraction privilege attaching to the shares gives the preferred shareholders the option of realizing on their investment other than by transferring their shares to a third party.

81      Feldman J. found that McCutcheon continued to be a shareholder after the retraction date and that he remained a shareholder at the time of the reorganization. She found SYH's claim to be too remote inasmuch as the retraction date not yet arrived at the time of the reorganization.

82      The appellants argue that Feldman J. erred in this conclusion. They submit that although McCutcheon and SYH may have been shareholders initially, this relationship changed. Upon McCutcheon's exercise of his right to have the corporation pay him the retraction price of his shares, he ceased to be a shareholder. When Central Capital failed to pay him, he became a creditor of the corporation. In the case of SYH, it is submitted that when the lenders opted to reorganize the company, they, in effect, triggered the obligation to redeem SYH's shares.

*(a) Nature of the transaction's relationship to the capital structure of the corporation*

83      Section 25(3) of the *CBCA* states that shares shall not be issued until the consideration for the shares is fully paid either in cash or with property having a fair market value equivalent to the shares issued. Therefore, by issuing preferred shares with a fixed par value, Central Capital paid McCutcheon for his shares of Central Guaranty and paid SYH for the shares of the insurance companies that Central Capital received. Central Capital could not issue preferred shares *except* as full payment for the shares it received. The preferred shares were part of the capital of Central Capital and the preferred shares were always shown as shareholders' equity on Central Capital's books. The capital of the corporation is representative of the assets available to pay creditors. If, on the date for redemption of McCutcheon's shares, or on the date of reorganization in the case of SYH, the shares are redeemed, the amount paid must be deducted from the stated capital of the corporation s. 39 *CBCA*. Consequently, the total assets that Central Capital will have available to pay the lenders and other creditors outside the corporation will be reduced. A reduction of capital by the redemption of redeemable shares is permitted under the *CBCA* but only where the requirements of s. 36 are met.

*(b) Section 36 of the CBCA*

84      Section 36 of the *CBCA* makes the ability of a corporation to redeem its redeemable shares subject to (1) its articles and (2) a solvency requirement. For ease of reference s. 36 is reproduced below.

*36.*(1) Notwithstanding subsection 34(2) or 35(3) [both of which deal with a corporation's acquisition of its own shares in other circumstances], but *subject to subsection (2) and to its articles*, a corporation may purchase or redeem any redeemable shares issued by it at prices not exceeding the redemption price thereof stated in the articles or calculated according to a formula stated in the articles.

(2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

(*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

(i) its liabilities, and

(ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of shares to be purchased or redeemed. [Emphasis added.]

85     There is no dispute that Central Capital was unable to redeem McCutcheon's shares on the retraction date. Nor could it redeem SYH's shares on the date of the reorganization. The appellants agree that the effect of s. 36 renders the agreement between themselves and Central Capital unenforceable. It is the position of the appellants, however, that s. 36 does not extinguish a debt or liability which they say has been created. The appellants rely on the decision in *Re East Chilliwack Agricultural Co-op.* (1989), 74 C.B.R. (N.S.) 1 (B.C. C.A.) in support of their position that a debt or liability is created notwithstanding the solvency requirements of s. 36 respecting payment. The appellants' submission does not take into consideration the major differences between the decision in *East Chilliwack* and the present situation relating to the timing, effect of the solvency requirements and the provisions in the articles governing the relationship of the parties.

1) In *East Chilliwack*, farmers who owned shares in an agricultural co-operative gave notice to the co-op of their intention to have their shares redeemed. After the notices had been given, the superintendent of co-operatives suspended the right of the co-op to redeem its shares. Here, the request to redeem the shares by McCutcheon and the retraction date occurred after Central Capital had sent out a notice that it would not be able to redeem the shares due to its financial position. SYH had no right to demand that its shares be retracted until the retraction date, which was some two years after the date of Central Capital's insolvency.

As in the instant case, the issue in *East Chilliwack* was whether the farmers were entitled to rank with the creditors of the co-op. Hutcheon J.A., with Toy J.A. concurring, held that they were entitled to be treated as creditors.

At the outset of his reasons, Hutcheon J.A. noted, at p. 11, that the effect of the superintendent's suspension on the farmers' rights was not argued on appeal and that the court had been asked to determine the status of the farmers without regard to the suspension.

Here, the effect of Central Capital's inability to redeem its shares due to insolvency is very much in issue and cannot be ignored. Although the articles provide for the redemption of all of the shares held by McCutcheon and SYH on or after the retraction date, the articles also state that Central Capital will only redeem so many of its shares as would not be "contrary to law." Pursuant to s. 36(1) of the *CBCA*, a corporation may purchase or redeem redeemable shares, but the corporation is prohibited from doing so if the corporation is unable to pay its liabilities as they become due or if the assets of the corporation are less than the total of its liabilities and the amount required for the redemption. Because Central Capital could not comply with the solvency requirements, redemption would be "contrary to law."

2) In *East Chilliwack, supra*, at p. 13, the rules of the co-op provided that upon the giving of a notice of redemption, the farmer giving it ceased to be a shareholder. Central Capital's articles do not state that a request for redemption of the holder's shares terminates his status as a shareholder. McCutcheon continued to have the right to receive dividends pursuant to Article 4.5 while his shares were not redeemed. In effect, so long as Central Capital was unable to redeem the shares but had profits, McCutcheon continued to be en-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

titled to a share of the profits through the declaration of dividends. If the dividends remained unpaid for eight consecutive quarters then, pursuant to Article 8, McCutcheon had the right to receive notice of, and to attend, each meeting of shareholders at which directors were to be elected and was entitled to vote for the election of two directors. The articles relating to the preferred shares held by SYH contain a similar provision. The result of insolvency as envisaged by the articles was that McCutcheon and SYH would continue as shareholders.

3) In *East Chilliwack, supra*, Hutcheon J.A. held, at p. 13, that, subject to the power of the superintendent of co-operatives, the farmer's position would be that of an ordinary creditor.

Here, the terms attaching to McCutcheon's shares do not give him that right. Instead, he is given the right to continue to receive dividends so long as the company cannot pay him. The articles relating to the shares held by SYH contain a similar provision. In addition, Article 4.3(b), respecting the retraction of the shares, indicates that if the directors have acted in good faith in making a determination that the number of shares the corporation is permitted to redeem is zero, then the *corporation* is not liable in the event this determination proves inaccurate. This would hardly be the position *vis à vis* an ordinary creditor.

4) Article 8 and a similar provision in the articles relating to the shares held by SYH provide that upon a sale of all or a substantial part of the company's undertaking, the preferred shareholders have a right to receive notice of and to be present at the meeting called to consider this sale. The farmers in *East Chilliwack* do not appear to have had any similar right.

5) Article 7 provides that in the event of a liquidation, dissolution or winding-up of the Corporation the preferred shareholders have a right to receive $25 per Series B Senior Preferred Share before the corporation pays any money or distributes assets to shareholders in any class subordinate or junior to the Series B Senior Preferred Shares. Similarly, SYH, as the holder of Series A and B Junior Preferred shares has the right, upon the dissolution or winding up of the corporation, to receive a sum equivalent to the redemption amount for each series junior preferred share. This right is subject to the rights of shares ranking in priority to the shares of these series, but is ahead of the rights of the holders of common shares.

Nothing in the articles concerning the retraction date affects the right of McCutcheon and SYH to participate in Central Capital's liquidation. The participation of the farmer in *East Chilliwack* ceased once he had given notice to redeem. Article 4.4 of Central Capital provides that once the shares have been tendered for retraction this election is irrevocable on the part of the holder. In the event that payment of the retraction price was not made, however, the holder had the right to have all deposited share certificates returned. Central Capital offered to return McCutcheon's shares to him, but he refused. Because McCutcheon retained all the rights and privileges of a preferred shareholder after the retraction date, the fact that he refused to take back his share certificates cannot alter the true nature of the relationship. The refusal was merely evidence of a dispute concerning what the relationship was. SYH also retained its full status as a shareholder until the date of the reorganization. This was not the situation in *East Chilliwack*.

86      By way of summary, on the date of the reorganization McCutcheon and SYH had not ceased to be preferred shareholders of Central Capital. The rights attaching to their retractable preferred shares entitled them to continue to share in the profits of the company when these were declared as dividends, to vote at shareholders meetings to elect directors so long as dividends remained unpaid for a specified period of time, and, on a winding up of the company, to participate in the distribution of assets that remained after the creditors were paid ac-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

cording to the ranking of the series of their shares. The company's obligation to redeem its shares was not absolute. Instead, the articles provided for what was realistically a "best efforts" buy-back based on solvency and continuation as a shareholder to the extent a buy-back could not take place. In *East Chilliwack*, because the farmer ceased to be a shareholder, the articles do not appear to make any provision for continued participation or for the postponement of payment depending on the solvency of the co-op.

### (c) Evidence of a debtor-creditor relationship is lacking in the articles

87      Looked at another way, after the retraction date and at the time of the reorganization, the common features of a debtor-creditor relationship are not in evidence in Central Capital's articles. The agreements between the parties contain no express provisions that the redemption of the shares is in repayment of a loan. The corporation was not obliged to create any fund or debt instrument to ensure that it could redeem the shares on the retraction date. There is no indemnity in the event that the money is not repaid on the retraction date. There is no provision for the payment of any interest after the retraction date in the event that the money is not repaid on the retraction date. There is no provision that after the retraction date and in the event of insolvency, the appellants would have the right to have the company wound up. (See *Imperial General Properties Ltd. v. R., (sub nom. R. v. Imperial General Properties Ltd.)* [1985] 2 S.C.R. 288, for a case where the articles of the company contained this right.) There is no provision that upon a winding up or insolvency the parties are entitled to rank *pari passu* with the creditors as was the case in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank, supra*.

### (d) The effect of the reorganization

88      Finlayson J.A. is of the view that it is immaterial that the articles provide, in the event of the liquidation, dissolution or winding-up of the company, that the appellants are only entitled to rank after the creditors but ahead of the junior ranking shareholders. In his view, this provision is irrelevant because we are not dealing with a liquidation but with a reorganization. He finds it significant that, like debtors, the preferred shareholders are not entitled to participate in any surplus once they have been paid. I am of the view that this provision in the articles is significant. It represents a clear indication that the holders of the retractable shares were not to be dealt with on the same footing as ordinary creditors even after the retraction date. Instead, they were to be dealt with as shareholders, albeit an elevated class. Under the *CBCA* all shares carry equal rights. Words used in the articles to differentiate a class of shares are nothing more than authorized deviations from this statutory position of equality: Welling, *supra*, at p. 683.

89      The appellants submit that a winding-up or liquidation is not the same as a reorganization. This is true. Both, however, are methods of dealing with insolvency. Both are methods for secured creditors to enforce their claims by seizing the assets in which they hold security interests. If the value of the corporation as a going concern exceeds the liquidation value of the assets, it is in the interest of all the debt holders that the corporation be preserved as a going concern. The purpose of both a liquidation and a reorganization is to permit the rehabilitation of the insolvent person unfettered by debt: *Vachon v. Canada (Employment & Immigration Commission)*, [1985] 2 S.C.R. 417. By virtue of s. 20 of the *CCAA*, arrangements under the Act mesh with the reorganization provisions of the *CBCA* so as to affect the company's relations with its shareholders. Shareholders have no right to dissent to a reorganization: s. 191(7), *CBCA*. On a reorganization, among other things, the articles may be amended to alter or remove rights and privileges attaching to a class of shares and to create new classes of shares: s. 173, *CBCA*. These statutory provisions provide a clear indication that, on a reorganization, the interests of all shareholders, including shareholders with a right of redemption, are subordinated to the interests of the creditors. Where the debts exceed the assets of the company, a sound commercial result militates in favour

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

of resolving this problem in a manner that allows creditors to obtain repayment of their debt in the manner which is most advantageous to them.

90     The similarities between a liquidation and a reorganization, together with the express statement in the articles of Central Capital with respect to what is to happen on a winding-up, dictate that the interests of the holders of retractable shares, McCutcheon and SYH, are subordinated to the creditors and they are not entitled to claim under the *CCAA* equally with the creditors. This position is also consistent with the provisions of the *Bankruptcy and Insolvency Act* and the *Winding-up Act*. In the case of an insolvency where the debts to creditors clearly exceed the assets of the company, the policy of federal insolvency legislation appears to be clear that shareholders do not have the right to look to the assets of the corporation until the creditors have been paid.

**Dividends**

91     Although dividends were payable on the shares of McCutcheon and SYH, no dividends were in fact declared. The appellants contend that the dividends, which have accrued but which were not declared, are a debt or liability because they were stipulated to be part of the retraction price.

92     Article 7 of Central Capital respecting McCutcheon's shares states that in the event of liquidation, dissolution or winding up of the corporation, the shareholders are entitled to receive not only the $25 per Series B preferred share, but "all accrued and unpaid dividends thereon, whether or not declared ... before any amount is paid by the Corporation or any assets of the Corporation are distributed to the holders of any shares ... ranking as to capital junior to the Series B Senior preferred Shares."

93     It is trite law that a dividend may only be declared if a company is solvent. For corporations governed by the *CBCA*, it appears that the common law tests for solvency have all been subsumed or overruled: *McClurg v. Minister of National Revenue, (sub nom. R. v. McClurg)* [1991] 2 W.W.R. 244 (S.C.C.) at 259, 260.

94     Section 42 of the *CBCA* provides:

A corporation shall not declare or pay a dividend if there are reasonable grounds for believing that

(*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

(*b*) the realizable value of the corporation's assets would thereby be less than the aggregate of its liabilities and stated capital of all classes.

95     Section 42 prevents the corporation from declaring or paying a dividend when it does not meet certain solvency requirements. There was no declaration of a dividend in the present case. Any obligation to pay a dividend as part of the retraction price cannot therefore be enforced when the company is insolvent. Dividends which have accrued but which are unpaid are not considered to be a debt because, on reading the articles as a whole, the provision for payment is not one which is made independant of the ability to pay: see Welling, *supra*, at p. 689, citing *Re Porto Rico Power Co.,* [1946] S.C.R. 178, where it was held there was no guarantee of payment and hence the accrued but unpaid dividends were not a debt. Instead, accrued but unpaid dividends are considered to be akin to a return of capital. Making these accrued dividends part of the retraction price does not alter this.

96     By way of analogy to the treatment of dividends, it could be said that until the company has declared it will redeem the shares which are tendered to it the obligation to redeem them is not a debt or liability. The

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

promise to pay in the articles of Central Capital is not made independent of any ability to pay.

97      In the event that I am wrong in my conclusion that the true nature of the relationship is one of equity, I shall now consider the position in the event that a debt has been created.

**3. If the nature of the relationship is not an equity relationship are the appellants entitled to be claimants under the CCAA.?**

98      The parties agree that the effect of s. 36 renders the agreement to redeem their preferred shares unenforceable. It is the position of the appellants, however, that s. 36 does not extinguish Central Capital's obligation to repay them. Their position is that Central Capital's obligation to repay them is a contingent liability and therefore gives them a claim provable in bankruptcy, bringing them under s. 12(1) of the *CCAA*.

**The Meaning of Debt**

99      Debt is defined in a very broad manner in *Black's Law Dictionary*, 6th ed. (1990) at p. 403. It is the position of the appellants that this definition of "debt" is broad enough to include McCutcheon's right to have Central Capital redeem his shares. In the case of SYH, it is submitted that the right to redemption constitutes a future liability. It is the appellants' position that Feldman J. erred in holding that to have a provable claim, McCutcheon and Central Capital must be able to obtain a judgment against Central Capital for the retraction price and be entitled to seek payment on the judgment. Finlayson J.A. agrees with the appellant's position.

100      Debt is defined in *Black's Law Dictionary, supra*, as:

A sum of money due by certain and express agreement. A specified sum of money owing to one person from another, including not only obligation of debtor to pay but right of creditor to receive and enforce payment.

A fixed and certain obligation to pay money or some other valuable thing or things, either in the present or in the future. In a still more general sense, that which is due from one person to another, whether money, goods, or services. In a broad sense, any duty to respond to another in money, labour, or service; it may be even a moral or honorary obligation, unenforceable by legal action. Also, sometimes an aggregate of separate debts, or the total sum of the existing claims against person or company. Thus we speak of the "national debt", the "bonded debt" of a corporation, etc.

101      It will be readily apparent that in *Black's* the term "debt" is defined in two distinct ways. In order to constitute a debt as defined in the first paragraph, the obligation must be enforceable. In the second paragraph debt is defined more broadly as any duty or obligation even if unenforceable by legal action. Feldman J. considered the first portion of the definition in her reasons. If the first portion of the definition applies, no debt is created because the obligation is not enforceable under the *CBCA*. The appellants rely on the second portion of the definition. They also rely on the definition of of the word "liability" in *Black's* which is also defined very broadly.

102      In one sense, support for the position of the appellants is found in s. 40 of the *CBCA*. Section 40 states that a contract with a corporation providing for the purchase of shares of the corporation is specifically enforceable against the corporation except to the extent that the corporation cannot perform the contract without being in breach of ss. 34 or 35. Section 34 contains the solvency requirements concerning the redemption by a com-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

pany of its own shares other than those carrying a right of redemption. Section 35 deals with shares which have been issued to settle or compromise a debt. In s. 2, "liability" is defined as including "a *debt* of a corporation arising under section 40 ... ."

103      Section 40 does not include any reference to the obligation of a company to repurchase redeemable shares under s. 36. As a result s. 36 is not incorporated by reference into the definition of liability. While it might be suggested that this is a legislative oversight, the omission is also consistent with the position that only the articles of the corporation govern the relationships between the company and the holders of the retractable shares under s. 36. I have already stated my opinion that the articles of Central Capital do not make the obligation to redeem the shares a debt or, for that matter, a liability. Moreover, even if a provision like s. 40 is implied with respect to redeemable preferred shares, it would also be necessary to imply a provision like s. 40(3) which states that in the event of liquidation where the company has not performed its contract to redeem, the other party is entitled to be ranked subordinate to the rights of creditors but in priority to the shareholders. This is a clear expression of legislative intention that on insolvency the claim of those entitled to have their shares redeemed should not be placed on the same footing with the claims of creditors but should rank subordinate to them: see *Nelson v. Rentown Enterprises Inc.*, [1994] 4 W.W.R. 579 (Alta. C.A.), adopting the reasons of Hunt J. at (1992), 96 D.L.R. (4th) 586 (Alta. Q.B.). Policy reasons would again militate in favour of the result being the same on a reorganization.

### Claims in Bankruptcy

104      Even if the broader definitions of a debt or liability in *Black's* are adopted, the appellants still do not have a claim provable in bankruptcy.

105      Persuasive authority already exists to the effect that in order to be a provable claim within the meaning of s. 121 of the *Bankruptcy and Insolvency Act* the claim must be one recoverable by legal process: *Farm Credit Corp. v. Holowach (Trustee of)*, [1988] 5 W.W.R. 87 (Alta. C.A.) at 90, leave to appeal to the Supreme Court of Canada dismissed at [1989] 4 W.W.R. lxx (note).

106      In *Holowach*, the seven members of the court were dealing with a situation in which some persons borrowed money from a mortgagee and mortgaged certain lands as security for repayment of the loan. The mortgagors then made an assignment in bankruptcy. The mortgagee filed a proof of claim for the full amount of the deficiency, that is, the amount of the indebtedness less the value of the land which the mortgagee was permitted to purchase. The Alberta *Law of Property Act*, R.S.A. 1980, c. L-8, precluded deficiency claims against individuals in foreclosure actions, although the effect of the legislation was not to extinguish or satisfy the debt. The mortgagee argued that it had a claim provable in bankruptcy under s. 95(1), now s. 121(1), of the *Bankruptcy and Insolvency Act*. The court rejected this argument, holding that a provable claim must be one recoverable by legal process. In coming to its conclusion, the court relied on *Reference re Debt Adjustment Act, 1937 (Alberta)*, [1943] 1 All E.R. 240 (P.C.), and a number of decisions at the trial level which are collected at p. 91 of the decision.

107      Here, the contract to repurchase the shares, while perfectly valid, is without effect to the extent that there is a conflict between the corporation's promise to redeem the shares and its statutory obligation under s. 36 of the *CBCA* not to reduce its capital where it is insolvent. As was the case in the *Holowach* decision, this statutory overlay renders Central Capital's promise to redeem the appellants' preferred shares unenforceable. Although there is a right to receive payment, the effect of the solvency provision of the *CBCA* means that there is

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

no right to enforce payment. Inasmuch as there is no right to enforce payment, the promise is not one which can be proved as a claim.

108    It could be suggested that the decision in *Holowach* can be distinguished from the instant case on the basis that in *Holowach* the claim is made unenforceable forever by statute whereas under the *CCAA* the claim is unenforceable only so long as the corporation does not meet the solvency requirements of s. 36 of the *CBCA*. I do not believe this is a valid distinction for three reasons. First, the relevant date for determining any contingent liability is not the future but the past, namely, September 8, 1992, the date by which proofs of claim had to be submitted. On that date, Central Capital was insolvent. Second, it is only because the lenders were willing to convert their debt obligations into equity in the reorganization that Central Capital is now solvent. Central Capital is not the same company and its liabilities are not the same. The redeemable shares no longer exist. Third, in order to be profitable, the assets of a company must be managed. Any value in the assets after the insolvency of the company is, in this case, due to the new management and not to the preferred shareholders extending credit to the company by having their claim for redemption postponed.

109    Even if Central Capital's obligation to redeem the shares of the appellants created a debt or liability, the appellants do not have a claim provable within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*.

## Conclusion

110    I would dismiss the appeal. For the reasons I have given, the retraction amounts do not constitute a debt or liability within the meaning of s. 121 of the *Bankruptcy and Insolvency Act*. Even if I am wrong in my conclusion and a debt or liability is created, it is not a claim within the meaning of the *CCAA*. This is a case of first impression. For these reasons, I would not award any costs of this appeal.

*Laskin J.A.* (concurring):

111    I have read the reasons of my colleagues Justice Finlayson and Justice Weiler. Like Justice Weiler, I would affirm the decision of the motions judge, Feldman J., and dismiss these appeals. I prefer, however, to state my own reasons for upholding the position of the unsecured creditors of Central Capital Corporation.

## The Issue

112    The application was argued before Madam Justice Feldman on an agreed statement of facts. My colleagues have summarized the relevant facts and important provisions of the documents. Each appellant holds preferred shares of Central Capital and each appellant's shares contain a right of retraction — a right to require Central Capital to redeem the shares on a fixed date and for a fixed price. The retraction date for the appellants James McCutcheon and Central Guarantee Trust Company (collectively McCutcheon) was July 1, 1992, and before that date McCutcheon exercised his right of retraction and tendered his shares for redemption. The retraction date for the appellant S.Y.H. Corporation was September 1994 and although it could not render its shares for redemption, it did file a proof of claim with the Administrator of Central Capital. The Administrator disallowed each appellant's claim and Feldman J. dismissed appeals from the Administrator's decisions.

113    The issue on these appeals is whether McCutcheon and S.Y.H. Corporation "have claims provable against Central Capital Corporation within the meaning of the *Bankruptcy Act (Canada)* as amended as of the date of the Restated Subscription and Escrow Agreement." Under the *Bankruptcy Act*, R.S.C. 1985, c. B-3, s. 2,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

a claim provable "includes any claim or liability provable in proceedings under this Act by a creditor" and a creditor "means a person having a claim, preferred, secured or unsecured, provable as a claim under this Act." Section 121(1) of the *Bankruptcy Act* further defines claims provable as follows:

> *121.* (1) All debts and liabilities, present or future, to which the bankrupt is subject at the date of the bankruptcy or to which he may become subject before his discharge by reason of any obligation incurred before the date of the bankruptcy shall be deemed to be claims provable in proceedings under this Act.

114      The date of the Restated Subscription and Escrow Agreement is May 1992.[FN1] By then, and indeed since December 1991, Central Capital had been insolvent and therefore was prohibited by s. 36(2) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, from making any payment to redeem the appellants' shares.

115      On June 15, 1992, Houlden J. provided that Central Capital could be reorganized under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 and he stayed proceedings against it. Houlden J.'s order of July 9, 1992, which approved the restructuring of Central Capital, was made without prejudice to the right of the appellants to assert claims as creditors. Thus the question for this court is whether the appellants' retraction rights created debts of Central Capital in May, 1992. In other words were McCutcheon and S.Y.H. Corporation creditors of Central Capital in May, 1992? If they were creditors, then like the other unsecured creditors of Central Capital, they can elect to take shares in the newly incorporated company, Canadian Insurance Group Limited; if they were not creditors, then they remain shareholders of Central Capital under the restructuring plan.

116      This is a question of characterization. I will address the question first, by considering the "substance" of the relationship between each appellant and the company; and second by considering s. 36(2) of the *Canada Business Corporations Act, supra*. In brief I conclude:

> (1) Although the relationship between each appellant and the company has characteristics of debt and equity, in substance both McCutcheon and S.Y.H. Corporation are shareholders, not creditors of Central Capital. Neither the existence of their retraction rights nor the exercise of those rights converts them into creditors;

> (2) Finding that the appellants were creditors of Central Capital would defeat the purpose of s. 36(2) of the statute.

### I. The Relationship between the Appellants and Central Capital

117      Preferred shares have been called "compromise securities" and even "financial mongrels": Grover and Ross, *Materials and Corporate Finance* (1975), at p. 49. Invariably the conditions attaching to preferred shares contain attributes of equity and, at least in an economic sense, attributes of debt. Over the years financiers and corporate lawyers have blurred the distinction between equity and debt by endowing preferred shareholders with rights analogous to the rights of creditors. One example is the right of redemption — the right of the corporation to compel preferred shareholders to sell their shares back to the corporation. Another example, and it is the case before us, is the right of retraction — the right of shareholders to compel the corporation to buy back their shares on a specific date for a specific price.

118      I acknowledge, therefore, that redeemable or retractable preferred shares are somewhat different from conventional equity capital. What makes the appeals before us difficult is that although the appellants appear to hold equity, their right of retraction appears to be a basic characteristic of a debtor-creditor relationship. See

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

Grover and Ross, *supra*, at pp. 47-49; Buckley, Gillen and Yalden, *Corporations: Principles and Policies*, 3rd ed. (1995), at pp. 938-940.

119     If the certificate or instrument contains features of both equity and debt — in other words if it is hybrid in character — then the Court must determine the "substance" of the relationship between the holder of the certificate and the company. This is the lesson of Justice Iacobucci's judgment in *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, [1992] 3 S.C.R. 558. In that case the Supreme Court of Canada had to determine whether the financial assistance given by several lending institutions to try to rescue the Canadian Commercial Bank was "in the nature of a loan" or "in the nature of a capital investment." Justice Iacobucci discussed his approach to the problem at pp. 590-591 of his judgment:

> As I see it, the fact that the transaction contains both debt and equity features does not, in itself, pose an insurmountable obstacle to characterizing the advance of $255 million. Instead of trying to pigeonhole the entire agreement between the Participants and CCB in one of two categories, I see nothing wrong in recognizing the arrangement for what it is, namely, one of a hybrid nature, combining elements of both debt and equity but which, in substance, reflects a debtor-creditor relationship. Financial and capital markets have been most creative in the variety of investments and securities that have been fashioned to meet the needs and interests of those who participate in those markets. It is not because an agreement has certain equity features that a court must either ignore these features as if they did not exist or characterize the transaction on the whole as an investment. There is an alternative. It is permissible, and often required, or desirable, for debt and equity to co-exist in a given financial transaction without altering the substance of the agreement. Furthermore, it does not follow that each and every aspect of such an agreement must be given the exact same weight when addressing a characterization issue. Again, it is not because there are equity features that it is necessarily an investment in capital. This is particularly true when, as here, the equity features are nothing more than supplementary to and not definitive of the essence of the transaction. When a court is searching for the *substance* of a particular transaction, it should not too easily be distracted by aspects which are, in reality, only incidental or secondary in nature to the main thrust of the agreement.

120     In determining the substance of the relationship, as in any other case of contract interpretation, the court looks to what the parties intended. In *CDIC v. CCB, supra*, Iacobucci J. put this proposition as follows at p. 588:

> As in any case involving contractual interpretation, the characterization issue facing this Court must be decided by determining the intention of the parties to the support agreements. This task, perplexing as it sometimes proves to be, depends primarily on the meaning of the words chosen by the parties to reflect their intention. When the words alone are insufficient to reach a conclusion as to the true nature of the agreement, or when outside support for a particular characterization is required, a consideration of admissible surrounding circumstances may be appropriate.

121     In these appeals what the parties intended is reflected mainly in the share purchase agreements and the conditions attaching to the appellants' shares, but also in the articles of incorporation and in the way Central Capital recorded the appellants' shares in its financial statements. These documents indicate that in substance the appellants are shareholders of Central Capital, not creditors. I rely on the following considerations to support my conclusion:

122     (i) Both appellants agreed to take preferred shares instead of some other instrument — for example, a bond or debenture — that would obviously have made them creditors. The appellant McCutcheon sold shares of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

one corporation (Canadian General Securities Limited) for cash and for shares of another corporation (Central Capital). Neither the share purchase agreements nor the share conditions support McCutcheon's contention that in taking preferred shares he was extending credit to Central Capital by deferring payment of the purchase price. He made an investment in the capital of Central Capital, no doubt because of the attractive dividend rate, the income tax advantages of preferred shares and "sweeteners" such as conversion privileges. Unlike Finlayson J.A., I place little weight on what he termed "the unique nature of the transaction". McCutcheon transferred assets to acquire his preferred shares rather than acquiring them with cash. But he nonetheless decided to invest in Central Capital and to take the risk and the profits (through dividends) of his investment.

123       Similarly, S.Y.H. Corporation exchanged its equity investment in four insurance companies for an equity investment in Central Capital. It too chose equity not debt. None of the contractual documents indicates that the appellants' retraction rights were intended to trigger an obligation on the part of Central Capital to repay a loan. Moreover, as Weiler J.A. points out, neither the share purchase agreements nor the share conditions provides for interest if Central Capital fails to honour its retraction obligations.

124      (ii) The senior preferred shares and junior preferred shares that the appellants own were part of the authorized capital of Central Capital before the appellants acquired them.

125       (iii) The appellants' shares were recorded in the financial statements of Central Capital as "capital stock," along with the company's issued and outstanding common shares, class "A" shares and warrants. The amount Central Capital might be obligated to pay the appellants if they exercised their retraction rights was not recorded as debt (even contingent debt) in the company's financial statements.

126      (iv) Both appellants had the right to receive dividends on their shares and McCutcheon had the right to vote his shares for the election of directors of Central Capital if dividends remained unpaid for a specified time. These rights — to receive dividends and to vote — are well recognized rights of shareholders. And these rights continue, even after the retraction dates, until the appellants' shares are redeemed.

127      (v) The preferred share conditions provide that on a liquidation, dissolution or winding up, the holders rank with other shareholders and therefore, implicitly, behind creditors. The appellant McCutcheon, who holds senior preferred shares, would rank behind creditors but ahead of the holders of subordinate classes of shares; the appellant S.Y.H. Corporation, which holds junior preferred shares, would rank behind senior preferred shareholders but ahead of common shareholders.

128       These provisions in the preferred share conditions also state that on payment of the amount owing to them the appellants "shall not be entitled to share in any further distribution of assets of the corporation." Finlayson J.A. interprets this to mean that the appellants "are not entitled to be treated as shareholders under a winding up or a liquidation but only as creditors." I disagree. These are typical preferred share provisions, which limit the recovery of the holders but do not treat them as creditors: *Sutherland et al., Fraser & Stewart Company Law of Canada*, 6th ed. (1993), at p. 198. At least on a liquidation, dissolution or winding up, the preferred share conditions evidence that the appellants would be treated not as creditors but as shareholders. In *CDIC v. CCB, supra*, Iacobucci J. placed considerable weight on a provision in the Participation Agreement stating that each participant "shall rank *pari passu* with the rights of the depositors." No such provision exists in this case. Indeed the share conditions I have referred to state the opposite.

129       Of course, Central Capital was reorganized, not liquidated, dissolved or wound up and the preferred share conditions are silent about what occurs on a reorganization. Still these conditions shed light on what the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

parties intended on the reorganization. Section 12(1) of the *Companies' Creditors Arrangement Act, supra*, defines claim as "any indebtedness, liability or obligation of any kind that, if unsecured, would be a debt provable in bankruptcy within the meaning of the *Bankruptcy Act*." The question the court has been asked to answer is the same question that would arise on a liquidation. It is illogical to conclude that the appellants could claim only as shareholders on a liquidation and yet can claim as creditors on the reorganization. Whether Central Capital's financial difficulties led to a liquidation or a reorganization, the issue is the same and the analysis and the result should also be the same.

130    The appellants argue, however, that they are shareholders only until they exercise their retraction rights but once they exercise these rights they become creditors. I do not agree with this argument. The share conditions provide that even after exercising their retraction rights, the appellants continue to be entitled to dividends and to vote until their shares are redeemed. In other words, they continue to enjoy the rights of shareholders. Moreover, if when the appellants exercised their retraction rights the company were insolvent and were to be subsequently liquidated (or dissolved or wound up), the appellants would rank as shareholders on the liquidation. And as I have indicated above the result should be no different on the reorganization.

131    It seems to me that these appellants must be either shareholders or creditors. Except for declared dividends, they cannot be both. Once they are characterized as shareholders, their rights of retraction do not create a debtor-creditor relationship. These rights enable them to call for the repayment of their capital on a specific date (and at an agreed upon price) provided the company is solvent. Ordinarily shareholders have to recoup their investment by selling their shares to third parties. If they have retraction rights, however, they can compel the company (if solvent) to repay their investment at a given time for a given price. But the right of retraction provides for the return of capital not for the repayment of a loan. Certainly the *Canada Business Corporations Act* treats a redemption of shares as a return of capital because s. 39 of the statute requires a company on a redemption to deduct from its stated capital account an amount equal to the value of the shares redeemed. The shares redeemed are then either cancelled or returned to the status of authorized but unissued shares.

132    Putting it differently, a preferred shareholder exercising a right of retraction on the terms that exist here must rank behind the company's creditors. Grover and Ross make this point more generally in their *Materials and Corporate Finance, supra*, at pp. 48-49:

On the other hand, the company cannot issue "secured" preferred shares in the sense that shares cannot have a right to a return of capital which is equal or superior to the rights of creditors. Preferred shareholders are risk-takers who are required to invest capital in the business and who can look only to what is left after creditors are fully provided for. Thus, in the absence of statutory authorization, the claims of shareholders cannot be secured by a lien on the corporate assets. They rank behind creditors but before com mon shareholders (if specified) on a voluntary or involuntary dissolution of the company.

133    Admittedly there is little authority in Canada on the issue confronting this court. Some of the cases that the respondent relies on — for example, *Re Patricia Appliance Shops Ltd.* (1922), [1923] 3 D.L.R. 1160 (Ont. S.C.), *Laronge Realty Ltd. v. Golconda Investments Ltd.* (1986), 63 C.B.R. (N.S.) 76 (B.C. C.A.), and even *Re Meade (Debtor); Ex parte Humber v. Palmer (Trustee)* [1951], 2 All E.R. 168 (P.C.) — are of limited assistance because the shareholders in those cases did not have retraction rights.

134    Perhaps the closest case — and the appellants rely heavily on it — is the judgment of the British Columbia Court of Appeal in *Re East Chilliwack Agricultural Co-op.* (1989), 74 C.B.R. (N.S.) 1. In that case a

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

majority of the court (Craig J.A. dissenting) held that a withdrawing member of a co-operative association who elected to have his shares redeemed in instalments over a five-year period should be treated on the subsequent bankruptcy of the association as an ordinary creditor rather than as a shareholder. I decline to apply *East Chilliwack* for three reasons. First, because the case was decided in 1989, the British Columbia Court of Appeal did not have the benefit of the Supreme Court of Canada's reasons in *CDIC v. CCB, supra*. In *East Chilliwack* Hutcheon J.A., writing for the majority did not focus on what the parties intended when the member contracted with the co-operative. Instead he only considered the relationship between the member and the co-operative after the member had withdrawn. I do not think his approach is consistent with Justice Iacobucci's judgment in *CDIC v. CCB, supra*.

135      Second, there are important factual differences between *East Chilliwack* and the appeals before us. Justice Weiler has referred to these factual differences in her reasons. The most important of these differences are the following: in *East Chilliwack* the rules of the association provided that a member had to withdraw from the association to trigger the right of redemption, whereas the appellants' share conditions provide that they continue to be shareholders of Central Capital until their shares are redeemed; in *East Chilliwack* the member elected to withdraw and redeem his shares when the association was solvent whereas when the appellant McCutcheon exercised his right of retraction Central Capital was insolvent; and in *East Chilliwack* Hutcheon J.A. expressly stated that he was not considering the effect of the superintendent's power to suspend payments if the financial position of the co-operative was impaired, whereas the effect of the statutory prohibition against Central Capital making payment, found in s. 36(2) of the *Canada Business Corporations Act*, is in issue in these appeals.

136      Third, the decision in *East Chilliwack* is at odds with most of the American case law and I favour the American approach. When a company repurchases shares by instalment and bankruptcy intervenes, the prevailing American position is that the shareholder's claim is deferred to the claims of ordinary creditors. The decision of the Fifth Circuit Court of Appeals in *Robinson v. Wangemann*, 75 F.2d 756 (Tex. 1935) is frequently cited. The facts of that case are virtually identical to the facts in *East Chilliwack*. A company had agreed to repurchase a stockholder's stock by instalments. Although the company was solvent when the agreement was made it went bankrupt before the repurchase was completed. The stockholder sought to prove as an ordinary creditor for the unpaid purchase price. Foster, Circuit Judge, writing for a unanimous court rejected the stockholder's claim at p. 757:

> A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder. The assets of a corporation are the common pledge of its creditors, and stockholders are not entitled to receive any part of them unless creditors are paid in full. When such a transaction is had, regardless of the good faith of the parties, it is essential to its validity that there be sufficient surplus to retire the stock, without prejudice to creditors, at the time payment is made out of assets.

137      At the heart of *Robinson v. Wangemann* is the finding that the selling stockholder is not a creditor in the sense of a person who loans money to a corporation, and therefore is not entitled to parity with the general creditors. The principle in *Robinson v. Wangemann* seeks to protect creditors by refusing to permit selling stockholders, who were risk investors, to withdraw their capital on the same terms as general creditors in the event of insolvency. Section 40(3) of the *Canada Business Corporations Act* — a section to which I shall return when considering s. 36(2) of the same statute — codifies the principle in *Robinson v. Wangemann* for share repurchases,

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

though not for share redemptions. See also Blumberg, *The Law of Corporate Groups* (1989), at pp. 205-210 and see *contra* Wolff v. Heidritter Lumber Co., 163 A. 140 (N.J. Ch. 1932).

138      Quite apart from the instalment purchase price cases, American courts have often grappled with the question whether preferred stockholders can claim as creditors of the corporation. Although there are cases going both ways, most appear to come to the same conclusion as I do. The American cases are collected in Bjor and Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* (1995), revised vol. 11 and in Bjor and Reinholtz, *Fletcher Cyclopedia of the Law of Private Corporations* (1990), revised vol. 15A. In volume 11 the authors of the text indicate — as did the Supreme Court of Canada in *CDIC v. CCB* — that "[w]hether or not the holder of a particular instrument or certificate is to be regarded as a shareholder or a creditor is a question of interpretation, and depends on the terms of the contract as evidenced by the instrument, the articles of incorporation, and the statutes of the state. The nature of the transaction is to be determined by the real substance and effect of the contract rather than by the name given to the obligations or its form ..." (at p. 566).

139      And in volume 15A the authors state at pp. 290 and 292 that even the arrival of a fixed redemption date does not change a preferred stockholder into a creditor:

> Holders of preferred stock of a corporation, in the absence of express provision to the contrary, are stockholders and not creditors of the corporation, except for dividends declared. They have no lien upon, and are not entitled to, any of the assets of the corporation when it becomes insolvent, until all debts are paid. Furthermore, there is authority that the status of a preferred stockholder is not changed to that of creditor, even though a dividend is guaranteed. Indeed it is beyond the power of a corporation to issue a class of stock, the holders of which are entitled to preference over general creditors.

> . . . . .

> Even where preferred stock has a fixed redemption date, arrival of that date does not change the status of a preferred stockholder to that of a creditor. (pp. 290, 292)

140      I agree with these statements. I therefore conclude first that the appellants, in substance, were shareholders of Central Capital not creditors; and second that neither the existence nor the exercise of their retraction rights turned them into creditors.

## II. Provable Claims and Section 36(2) of the Canada Business Corporations Act

141      In May 1992 Central Capital was insolvent. It was unable to pay its liabilities as they became due and the realizable value of its assets was less than the aggregate of its liabilities. Because it was insolvent it was prohibited by s. 36(2) of the *Canada Business Corporations Act* from redeeming the appellants' shares. Section 36(2) of the statute provides:

> (2) A corporation shall not make any payment to purchase or redeem any redeemable shares issued by it if there are reasonable grounds for believing that

> (*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or

> (*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of

> (i) its liabilities, and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

> (ii) the amount that would be required to pay the holders of shares that have a right to be paid, on a redemption or in a liquidation, rateably with or prior to the holders of the shares to be purchased or redeemed.

142    As well, the appellants' share conditions provide that they are not permitted to redeem their shares if to do so would be "contrary to applicable law," in this case s. 36(2) of the statute.

143    To hold that the appellants have provable claims would defeat the purpose of s. 36(2) of the *Canada Business Corporations Act*. At common law a company could not repurchase its own shares on the open market or in the language of *Trevor v. Whitworth* (1887), 12 App. Cas. 409 (H.L.), a company could not "traffick in its own shares." The obvious reason was to prevent companies from using their assets to destroy the claims of their creditors. Modern corporate statutes, such as the *Canada Business Corporations Act*, modified the rule in *Trevor v. Whitworth* to permit repurchases provided the company's creditors would not be prejudiced. Thus the legislation insisted that the company could not repurchase its own shares unless it satisfied stated solvency tests. And so, s. 34(2) of the *Canada Business Corporations Act* provides:

> (2) A corporation shall not make any payment to purchase or otherwise acquire shares issued by it if there are reasonable grounds for believing that
>
> (*a*) the corporation is, or would after the payment be, unable to pay its liabilities as they become due; or
>
> (*b*) the realizable value of the corporation's assets would after the payment be less than the aggregate of its liabilities and stated capital of all classes.

144    In *Nelson v. Rentown Enterprises Inc.* (1992), 96 D.L.R. (4th) 586 (Alta. Q.B.), affirmed (1994), 109 D.L.R. (4th) 608 (Alta. C.A.), Hunt J. of the Alberta Queen's Bench wrote at p. 589:

> The policy behind the s. 34(2) limitation upon a corporation's power to purchase its own shares seems obvious. It is intended to ensure that one or more shareholders in a corporation do not recoup their investments to the detriment of creditors and other shareholders. It has been observed that:
>
> > Corporate power to purchase its own stock has been frequently abused. Done by corporations conducting faltering businesses, it has been employed to create preferences to the detriment of creditors and of the other stockholders.
>
> (*Mountain State Steel Foundries, Inc. v. C.I.R., supra, at p. 741* [284 F.2d 737 (1960)].*)
>
> Modern business statues permit these share purchases to take place provided that the position of creditors and other shareholders is protected, by virtue of the application of the s. 34(2) tests.

145    Redemptions of preferred shares, unlike repurchases, were always permitted at common law as long as they were not made in contemplation of bankruptcy. But the solvency test in s. 36(2) of the *Canada Business Corporations Act* has the same purpose as the solvency test in s. 34(2): to prevent redemptions if they would allow the company to prejudice the claims of creditors. See Buckley *et al., Corporations: Principles and Policies, supra*, at pp. 968-71. To hold that the appellants' retraction rights gave rise to provable claims in the face of s. 36(2), thereby allowing the appellants to rank equally with the unsecured creditors, would undermine the purpose of the section. If a claim in a bankruptcy or reorganization proceeding is unenforceable under the statute, the claim is not entitled to recognition on a parity with the claims of unsecured creditors: See *Blumberg, supra*, at pp. 205-6; and *Farm Credit Corp. v. Holowach (Trustee of)* (1988), 68 C.B.R. (N.S.) 255 (Alta. C.A.).

1996 CarswellOnt 316, 38 C.B.R. (3d) 1, 26 B.L.R. (2d) 88, 132 D.L.R. (4th) 223, 27 O.R. (3d) 494, (sub nom. Royal Bank v. Central Capital Corp.) 88 O.A.C. 161

146    I draw comfort in this conclusion from s. 40 of the *Canada Business Corporations Act*. Section 40(1) provides that a contract with a corporation for the purchase of its shares is specifically enforceable against the corporation "except to the extent that the corporation cannot perform the contract without thereby being in breach of section 34 ..." Section 40(3) then states:

> (3) Until the corporation has fully performed a contract referred to in subsection (1), the other party retains the status of a claimant entitled to be paid as soon as the corporation is lawfully able to do so or, in a liquidation, to be ranked subordinate to the rights of creditors but in priority to the shareholders.

147    In other words, the section recognizes that if a company contracts to repurchase its shares but is prohibited from doing so because it is insolvent, the vendor of the shares is not a creditor and on a liquidation ranks subordinate to the rights of creditors. The shareholder cannot be repaid at the expense of the company's creditors. Although s. 40 does not expressly apply to s. 36, I think that the rationale for s. 40(3) applies to redemptions as well as to repurchases. Whether a repurchase or a redemption, the shareholder is not a creditor and is subordinate to the rights of creditors. More simply the shareholder does not have a provable claim.

148    The appellants rely on *National Bank für Deutschland v. Blucher, (*sub nom. *Blucher v. Canada (Custodian))* [1927] 3 D.L.R. 40 (S.C.C.), but in my view this case does not assist them. In *Blucher* dividends were declared on stock but payment of the dividends was suspended during World War I. The Supreme Court of Canada held at p. 43 that "[t]he right of recovery was in suspense during the war, but the debt nevertheless existed." In that case, however, the dividend was declared before the suspension of payment took place. Moreover, as Justice Finlayson points out in his reasons, courts have always accepted the proposition that when a dividend is declared it is a debt on which each shareholder can sue the corporation.

149    Holding that the appellants do not have provable claims accords with sound corporate policy. On the insolvency of a company the claims of creditors have always ranked ahead of the claims of shareholders for the return of their capital. Case law and statute law protect creditors by preventing companies from using their funds to prejudice creditors' chances of repayment. Creditors rely on these protections in making loans to companies. Permitting preferred shareholders to be turned into creditors by endowing their shares with retraction rights runs contrary to this policy of creditor protection.

150    I would dismiss these appeals. I would not make any cost order. I am grateful to all counsel for their assistance on this interesting and difficult problem.

*Appeals dismissed.*

FN1 There is a discrepancy in the materials before this court on the relevant date for establishing a claim provable against Central Capital: S.Y.H. Corporation used May, 1992, the date of the Restated Subscription and Escrow Agreement whereas McCutcheon and the unsecured creditors of Central Capital Corporation used June 15, 1992, the date of the court-ordered stay of proceedings against Central Capital. I have used the May 1992 date but nothing turns on the use of this date as opposed to the June 15, 1992 date.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 44

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

2011 ONSC 5748

Ontario Superior Court of Justice [Commercial List]

Computershare Trust Co. of Canada v. Crystallex International Corp.

2011 CarswellOnt 10305, 2011 ONSC 5748, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

## Computershare Trust Company of Canada, in its capacity as Trustee for the Holders of 9.375% Senior Unsecured Notes of Crystallex International Corporation due December 23, 2011, Applicant and Crystallex International Corporation, Respondent

Newbould J.

Heard: September 7, 2011
Judgment: September 29, 2011
Docket: CV-11-9276-00CL

Counsel: Jeffrey S. Leon, Derek J. Bell, Emrys Davis, for Applicant
Markus Koehnen, Jeffrey Levine, for Respondent

Subject: Corporate and Commercial; Estates and Trusts

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Business associations --- Specific matters of corporate organization — Shares — Miscellaneous**

Repurchase of shares under terms of contract — Shareholders held shares in C Corp. with interest in certain mining claims in Venezuela — Claim was held by Venezuelan company CVG, with whom C Corp. had agreement — Agreement stated that shares could be redeemed for 102 per cent of value in event that control of project changed — Project could not gain required environmental permit — Hearing was held in which it was found that threat of expropriation by Venezuelan government and refusal of permit were not change in control of project — CVG claimed that it was rescinding control of mine as it had been dormant for one year and not developed by C Corp. — C Corp. began arbitration proceedings — Trust for shareholders brought application for declaration that control of project had changed and that C Corp. was required to purchase shares — Application dismissed — Transaction had not occurred as required by agreement — Actions of CVG were not transaction but rather purported unilateral rescission of CVG contract — Taking something without owner's consent is not transaction — CVG could not rely on portion of contract stating that if activity ceased for one year that contract could be rescinded — CVG had confirmed existence of contract in good standing — Failure to appeal was not rescission, as C Corp. had opted for arbitration — Aiding in transfer of property under threat of Venezuelan military was not transaction — C Corp. did not cease to own majority shares — Agreement was silent regarding consequences of expropriation as regards rescission.

### Table of Authorities

#### Cases considered by *Newbould J.*:

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281, 2009 CarswellOnt 7997 (Ont. S.C.J. [Commercial List]) — referred to

Case 09-10138-MFW    Doc 14225-43    Filed 08/15/14    Page 43 of 56

Computershare Trust Co. of Canada v. Crystallex..., 2011 ONSC 5748,...

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

*Plan Group v. Bell Canada* (2009), 2009 CarswellOnt 3807, 2009 ONCA 548, *(sub nom. Bell Canada v. The Plan Group)* 96 O.R. (3d) 81, 81 C.L.R. (3d) 9, 62 B.L.R. (4th) 157, 252 O.A.C. 71 (Ont. C.A.) — considered

*Rawluk v. Rawluk* (1990), 1990 CarswellOnt 217, 1990 CarswellOnt 987, 23 R.F.L. (3d) 337, [1990] 1 S.C.R. 70, 65 D.L.R. (4th) 161, 36 E.T.R. 1, 103 N.R. 321, 71 O.R. (2d) 480, 38 O.A.C. 81 (S.C.C.) — considered

**Words and phrases considered**

**transaction**

The taking of something by a person without the owner's consent can hardly be said to be a transaction in the normal sense of the word.

APPLICATION by shareholders for declaration that change had occurred in control of project, allowing for forced purchase of shares.

*Newbould J.*:

1      Computershare Trust Company of Canada in its capacity as trustee for the holders of 9.375% Senior Unsecured Notes of Crystallex International Corporation ("Crystallex") applies for declaratory relief that there has been a "Project Change of Control" as defined in the Note indentures. The result of such a declaration would be that Crystallex would be required to immediately purchase the Notes at a price of 102% of par value plus accrued interest. The Notes by their terms become payable on December 23, 2011. This is the second time that the trustee has brought such an application. The first was dismissed on December 16, 2009 [*Computershare Trust Co. of Canada v. Crystallex International Corp.*, 2009 CarswellOnt 7997 (Ont. S.C.J. [Commercial List])].

2      Crystallex is a publicly traded Canadian company whose shares are traded on the TSX and were, until recently, traded on the NYSE Amex exchange. Until recently, it had the uncontested right to exploit the Las Cristinas mine property in Venezuela under a mining operation agreement made with Corporacion Venezolana de Guayana ("CVG") a wholly owned Venezuelan government corporation. The CVG contract was for twenty years and contemplated two further ten-year extensions.

**Las Cristinas Project**

3      In early 1991, CVG called for bids to develop the Las Cristinas deposits. Placer Dome Inc. was the winning bidder and entered into a joint venture agreement with CVG through a joint venture company to explore and develop the gold mineral in the deposits. No gold was produced by the joint venture. In July 2001, Placer assigned its interest in the joint venture to Vannessa Ventures Ltd. In November 2001, CVG terminated the joint venture contract for cause and took possession of the Las Cristinas deposits and related assets. In March 2002, the Ministry of Energy and Mines declared the joint venture contract terminated and it repossessed the assets on behalf of Venezuela. In April 2002, by presidential decree, the Venezuelan government reserved for itself through the Ministry of Energy and Mines the direct exploration and exploitation rights of the gold mineral in the Las Cristinas deposits and granted to the Ministry the right to contract with CVG for the work required to carry out such exploration and exploitation.

4      In May 2002, the Ministry of Energy and Mines and CVG entered into an agreement pursuant to which the Ministry granted to CVG the rights to explore and exploit the Las Cristinas deposits and enter into operation agreements with third parties for such purposes.

5      On September 17, 2002, Crystallex and CVG executed an agreement ('the CVG contract") under which CVG authorized Crystallex:

Computershare Trust Co. of Canada v. Crystallex..., 2011 ONSC 5748,...

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

... to make all the investments and works necessary to reactivate and execute in its totality the Mining Project of CRISTINA 4, CRISTINA 5, CRISTINA 6 and CRISTINA 7, design, construct the plant, operate it, process the gold material for its subsequent commercialization and sale ....

6    Under Venezuelan mining law, all mineral deposits belong to Venezuela and are assets of public domain. Crystallex did not have any property rights in the lands or mineral deposits. Crystallex's interests were derived from the CVG contract, a mine operation agreement.

**Issuance of Notes**

7    In December 2004 Crystallex raised US $100 million to be used in the development of the Las Cristinas project by selling units consisting of a senior unsecured $1,000 note and 65 common shares. The Notes mature on December 23, 2011.

8    The Notes are direct unsecured obligations of Crystallex ranking senior to debt which is convertible into common shares of the corporation, junior to project indebtedness incurred with respect to the Las Cristinas project and equally with all unsecured and unsubordinated indebtedness of Crystallex.

**Change of Control Issue**

*(i) Trust provisions*

9    There are two trust indentures, being a Trust Indenture and a First Supplemental Trust Indenture, both made as of December 23, 2004. They are to be read together. The First Supplemental Trust Indenture contains a change of control provision in article 4.2, which requires Crystallex to purchase the Notes at 102% of par upon the occurrence of a Project Change of Control if requested to do so by a Noteholder. A Project Change of Control is defined as:

**Project Change of Control** means the occurrence of any transaction as a result of which the Corporation ceases to beneficially own, directly or indirectly, at least a majority interest in the Las Cristinas Project assets.

10    The "Las Cristinas Project assets" is not a defined term.

11    The Trust Indenture defines the Las Cristinas Project as follows:

**Las Cristinas Project** means the acquisition, exploration, development and exploitation of the mineral deposits located in the areas of the gold mineral concession known as Cristinas 4, 5, 6, and 7 in the Municipality of Sifontes, Bolivar State, Venezuela

*(ii) Steps by Venezuela and CVG to expropriate*

12    In the previous application, the Noteholders contended that as a result of the refusal of the applicable Ministry to issue a required environmental permit and events that followed, including the threat of Hugo Chavez, the president of Venezuela, to take back or expropriate the Las Cristinas project, there had been a transaction as a result of which there has been a Project Change of Control requiring their Notes to be acquired under article 4.2. It was held in the previous application that these events did not result in a Project Change of Control.

13    Since then, however, matters have changed. On February 3, 2011 CVG issued a resolution which stated that because Crystallex had ceased activities at the mine for over a year, it was resolved "to unilaterally rescind for reasons of opportunity and convenience" the CVG contract. The resolution further stated that as a result of the unilateral rescinding of the CVG contract, Crystallex was ordered to transfer to CVG all prior inventory, installations, permanent structures and their improvements, accessories, equipment as well as real estate, furnishings tangible and intangible that were part of the Project.

14    On the same day, the President of CVG (and Venezuelan Minister of Mines) Jose Khan wrote to Crystallex advising that in accordance with Venezuelan law, CVG was unilaterally rescinding the CVG contract. The letter further stated:

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-43    Filed 08/15/14    Page 45 of 56

Computershare Trust Co. of Canada v. Crystallex..., 2011 ONSC 5748,...

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

[I]f you consider that this decision violates your rights, you may exercise an Appeal before this Office, within 15 days of receipt of this notification under the provisions of Article 94 of the Organic Law of Administrative Procedures.

15    Crystallex took advice and decided not to appeal the decision, but rather to commence arbitration. The site was subsequently taken over by Venezuela by the National Guard. Crystallex has no employees remaining at Las Cristinas. Crystallex is no longer performing any obligations under the CVG Contract.

16    Crystallex advised CVG that it considered the resolution to be null and void and that its surrender of property was made without prejudice to Crystallex's rights under the Canada-Venezuela Bilateral Investment Treaty.

17    That Treaty entitles Crystallex to commence an ICSID arbitration, which Crystallex has done. In that arbitration, Crystallex seeks as its primary claim the restitution of its rights to Las Cristinas. In the alternative to restitution, Crystallex seeks damages in excess of $3.8 billion.

18    The noteholders take the position that as a result of these actions by CVG and the steps taken by Crystallex in response, there has been a Project Change of Control as defined in the trust indenture.

**Analysis**

19    In order for there to be a Project Change of Control, there must be (i) "the occurrence of a transaction", (ii) "as a result of which Crystallex ceases to beneficially own, directly or indirectly", (iii) a majority interest in the "Las Cristinas Project assets".

20    A trust indenture is a contract and normal principles of contract interpretation apply to its construction. In interpreting a contract, the goal is to determine the intent of the parties by reference to the words that they chose. The plain meaning of the words is to be given effect, read harmoniously and in the context of other provisions of the contract, and in light of the factual matrix as a whole. Interpretations that give effect to all the terms of a contract should be preferred over interpretations that render one or more terms superfluous or ineffective. A commercial contract should be interpreted in a manner that accords with sound commercial principles, good business sense and that does not result in absurdities. See generally *Plan Group v. Bell Canada* (2009), 96 O.R. (3d) 81 (Ont. C.A.), at para. 37. In that case, it was also stated at para. 38:

> ...each word in an agreement is not to be "placed under the interpretative microscope in isolation and given a meaning without regard to the entire document and the nature of the relationship created by the agreement." Courts should not strain to dissect a written agreement into isolated components and then interpret them in a way that - while apparently logical at one level - does not make sense given the overall wording of the document and the relationship of the parties.

*(a) Occurrence of a transaction*

21    In my earlier decision on the first application by the trustee, I held that the ordinary meaning of the word transaction requires more than one party to the action in question and that the denial of a permit necessary to operate the mine could not amount to a transaction. On the appeal to the Court of Appeal, the Court stated that it would make no comment on that issue. On this application, Mr. Leon for the trustee does not quarrel with my statement in the first application. He said that the trustee agrees that in order for there to be a transaction, there must be two parties to it.

22    The trustee takes the position however that the transaction need not be voluntary on the part of Crystallex. Reliance is placed on the words "occurrence of a transaction" and it is contended that the passive nature of the word "occurrence" is an indication of the lack of a requirement of voluntariness. It is contended that the transaction need not be entered into in the normal sense between two parties but only that the transaction needs to occur or happen. Reference is made to provisions in the trust indenture, such as the provision that Crystallex shall not "enter into a transaction" involving a Change of Control unless certain conditions are met, as being in contrast to the language of the definition of Project Change of Control requiring "the occurrence" of a transaction. It is contended that there is no basis to conclude that the parties intended that Project Change of Control would occur only in instances in which Crystallex "entered into" a particular transaction.

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

23    In my view the actions of CVG cannot be considered to have been a transaction but rather a purported unilateral rescission of the CVG contract and expropriation of property. The taking of something by a person without the owner's consent can hardly be said to be a transaction in the normal sense of the word.

24    The noteholders contend that many transactions are the result of unilateral exercise of powers conferred by a contract, such as a banking transaction in which a customer unilaterally keys in a request to an ATM. I cannot accept that. Obtaining cash from an ATM is no different from the person presenting a request for cash to a teller over the counter and obtaining cash that way. It is a transaction between two persons. The fact that an ATM rather than a teller is used does not change the substance of the transaction as the bank has agreed that cash deposited by a customer can be obtained from the bank in one of its ATMs. The same analysis pertains to the other examples relied upon by the noteholders. In each case the transaction is in substance between two parties.

25    The noteholders refer in *Black's Law Dictionary*, 9th ed to a definition of transaction that includes "The act or an instance of conducting business or other dealings; esp., the formation performance or discharge of a contract." and contend that what occurred was a discharge of the contract. I do not think this assists the noteholders. The same dictionary defines a "discharged contract" as "A contract that has been fully performed. Also termed discharged contract." What occurred was not the full performance of the CVG contract.

26    The noteholders also contended that in rescinding the CVG contract, CVG relied upon article 24 of the CVG contract which permitted CVG to rescind the contract. Thus it is argued that what occurred was with the agreement of Crystallex. Article 24 provides:

> This contract may be unilaterally rescinded by the Corporation with no indemnification whatsoever for Crystallex, in the event of delay in commencement, suspension of any of the activities, or breach of contract for a period of one year without a duly justified reason.

27    While Crystallex may have agreed to a termination in the event that it acted contrary to article 24, it certainly cannot be said on the record before me that CVG clearly had grounds to rely upon article 24 or that it was acting in good faith. That article requires that any delay, suspension or breach by Crystallex must continue for at least one year before termination is justified. The resolution of CVG purporting to rescind the CVG contract alleged that Crystallex had ceased activities at the mine for over one year, yet CVG confirmed the continued existence of the CVG contract in good standing as late as August 2010. One also cannot lose sight of the earlier refusal of Venezuela to issue the required permits. As put by Crystallex, it did not agree to an illegal expropriation. While the issue of whether CVG breached its contractual provisions in purporting to rescind the CVG contract is a matter for the arbitration, the noteholders have not established that CVG had grounds to act under article 24 and thus have not established that by reason of article 24, Crystallex agreed to the recession.

28    The noteholders contend that because Crystallex waived its rights to appeal to CVG, the party that purported to rescind the contract, Crystallex has agreed to the rescission and thus there has been a transaction. I cannot agree. Not appealing does not make Crystallex a party to the rescission. Crystallex commenced arbitration instead. It is a condition precedent to an ICSID arbitration that Crystallex waive any rights to redress in Venezuela and commencing arbitration was clearly not any agreement to the rescission.

29    The noteholders further contend that there was a transaction because Crystallex transferred property to Venezuela and took steps to have an inventory taken of what was to be handed over and had it confirmed by Venezuelan government officials. They contend that Crystallex effectively confirmed or accepted the rescission in so doing. I do not agree. Crystallex surrendered property pursuant to a resolution of CVG ordering Crystallex to do so in circumstances in which Venezuela used its military to seize operations of foreign investors and did so in this case. As the noteholders contend, referring to the surrender of property at the barrel of a gun as a "transaction" would hardly be consistent with the ordinary meaning of the word.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-43    Filed 08/15/14    Page 47 of 56

Computershare Trust Co. of Canada v. Crystallex..., 2011 ONSC 5748,...

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

30     The noteholders could have negotiated a provision in the trust indentures providing some relief in the event of actions of Venezuela amounting to expropriation of rights. The prospectus clearly disclosed the risks of expropriation and the deprivation of contractual rights and taking of property and these risks were also well publicized in the media. Mr. Nicholls, the noteholders bond expert, agreed on cross-examination that these risks were well known to institutional bondholders and that there were a variety of mechanisms known that could protect against expropriation and termination of key contracts. Plain language could have been negotiated to protect against these risks, but that was not done. The noteholders attempt to stretch the meaning of the word "transaction" in the definition of Project Change of Control is in my view not supportable.

31     Thus in my view the noteholders have not established on the facts before me that there was a transaction and thus have not established that there was a Project Change of Control.

### (b) Ceases to beneficially own a majority interest in the Las Cristinas Project assets

32     In the original application it was held that the rights of Crystallex under the CVG contract were the assets referred to in the Projected Change of Control provisions. I do not see any grounds to now contend, as Crystallex does, that the assets are more than the CVG contract. Thus the issue is whether Crystallex ceased to beneficially own a majority interest in the CVG contract.

33     The noteholders contend that Crystallex does not beneficially own the CVG contract today and that at best Crystallex has a claim in the arbitration that it is entitled to beneficially own it. The noteholders say that exercising treaty arbitration rights is not operating under the contract.

34     In the arbitration Crystallex has claimed against Venezuela an order for restitution of its investments, including the reinstatement of the CVG contract. Under the treaty between Canada and Venezuela, the arbitral tribunal is entitled to award restitution of property, which presumably includes intangible property such as contractual rights. The treaty, which is designed to encourage and protect investments in each country, defines an investment to include rights conferred under a contract. The noteholders point out that the treaty provides that in the event of an award of restitution of property, Venezuela would have the right to pay monetary damages in lieu of restitution and thus there is no assurance that even if successful, restitution of the contractual rights will be achieved.

35     Crystallex contends that it cannot lose its beneficial interest in the CVG contract by an unlawful action of CVG and that under Canadian law, which governs the trust indentures, its beneficial interest does not arise only after a judicial determination that the beneficial interest exists, but exists now. Crystallex relies upon cases such as *Rawluk v. Rawluk*, [1990] 1 S.C.R. 70 (S.C.C.) in which it was stated:

> The beneficial interest in the property is from the beginning in the person who has been wronged. The constructive trust arises from the situation in which he is entitled to the remedy of restitution, and it arises as soon as that situation is created...it would seem that there is no foundation whatever for the notion that a constructive trust does not arise until it is decreed by a court. It arises when the duty to make restitution arises, not when that duty is subsequently enforced.

36     Crystallex thus contends that its beneficial interest in the CVG contract exists now and it would only be lost on an arbitral award that did not provide for restitution or on a decision by Venezuela to pay money in lieu of arbitral award ordering restitution.

37     While it is not necessary to deal with these competing contentions in light of my decision that there was no "transaction", I am inclined to accept the position of Crystallex that it still has a beneficial interest in the CVG contract in spite of the fact that CVG has purported to unilaterally rescind the contract. Whether it will lose its beneficial interest remains to be seen.

### Conclusion

38     The application is dismissed. Crystallex is entitled to its costs. If costs cannot be agreed, Crystallex may make brief written submissions as to the quantum, along with a proper cost outline, and the noteholders may make brief written reply submissions.

*Application dismissed.*

Westlaw Next® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2011 ONSC 5748, 2011 CarswellOnt 10305, 207 A.C.W.S. (3d) 696, 97 B.L.R. (4th) 303

---

**End of Document**       Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 45

1979 CanLII 10 (SCC)

**Consolidated-Bathurst Export Limited**
(*Plaintiff*)  *Appellant*;

and

**Mutual Boiler and Machinery Insurance Company** (*Defendant*)  *Respondent*.

1979: March 13; 1979: December 21.

Present: Martland, Ritchie, Pigeon, Dickson, Beetz, Estey, and McIntyre JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR QUEBEC

*Insurance — Interpretation of insurance contracts — Definition of accident — Direct and consequential damages.*

The appellant, a manufacturer of paper products, was required to shut down part of its facilities because of the failure of three heat exchangers and thereby suffered a loss of $158,289.24 of which $15,604.44 was direct damage to the tubes in the heaters. The respondent is the insurer under a policy issued in respect of certain property of the appellant including these heat exchangers. The respondent resists the appellant's claim for the above mentioned loss on the basis that the damage was caused by corrosion of the tubes inside the heat exchangers and this risk was specifically excluded from the coverage provided by the policy of insurance. This position was adopted in both the Superior Court and the Court of Appeal. Hence the appeal of the plaintiff to this Court.

*Held* (Martland, Ritchie and McIntyre JJ. dissenting): The appeal should be allowed.

*Per* Pigeon, Dickson, Beetz and Estey JJ.: The issue is whether the loss occasioned by the corrosion of the heat exchangers is recoverable under the terms of the policy. The heart of the argument is that while the definition of accident in the policy does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material" the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion.

In interpreting an insurance contract, effect must first be given to the intention of the parties, to be gathered from the words they have used, just as in any other contract. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine by which any doubt as to the meaning and scope of the excluding or limiting term is to be resolved against the party who has inserted it and who is now relying on it. Even apart from

**Exportations Consolidated Bathurst Limitée**
(*Demanderesse*)  *Appelante*;

et

**Mutual Boiler and Machinery Insurance Company** (*Défenderesse*)  *Intimée*.

1979: 13 mars; 1979: 21 décembre.

Présents: Les juges Martland, Ritchie, Pigeon, Dickson, Beetz, Estey et McIntyre.

EN APPEL DE LA COUR D'APPEL DU QUÉBEC

*Assurance — Interprétation des contrats d'assurance — Définition d'accident — Dommages directs et indirects.*

L'appelante, un fabricant de produits du papier, a dû fermer une partie de son usine en raison de la panne de trois échangeurs de chaleur, ce qui lui a occasionné une perte de $158,289.24, dont $15,604.44 de dommages directs aux tubes des échangeurs. L'intimée est l'assureur aux termes d'une police relative à certains biens de l'appelante, y compris ces échangeurs de chaleur. L'intimée conteste la réclamation de l'appelante pour la perte susmentionnée au motif que les dommages résultent de la corrosion des tubes à l'intérieur des échangeurs de chaleur et que ce risque est spécifiquement exclu de la protection offerte par la police d'assurance. La Cour supérieure et la Cour d'appel ont toutes deux adopté cette position. La demanderesse se pourvoit donc devant cette Cour.

*Arrêt* (les juges Martland, Ritchie et McIntyre sont dissidents): Le pourvoi est accueilli.

*Les juges Pigeon, Dickson, Beetz et Estey:* La question est de savoir si la perte causée par la corrosion des échangeurs de chaleur est garantie par les clauses de la police. Le cœur de l'argument est que bien que la définition du mot accident ne comprenne pas le cas de la corrosion ou des cas semblables tels que «l'usure normale, la détérioration, l'épuisement ou l'érosion du matériel», la définition inclut, aux dires de l'appelante, ce qui suit la corrosion et qui peut en résulter.

Dans l'interprétation d'un contrat d'assurance, tout comme dans n'importe quel autre contrat, il faut d'abord donner effet à l'intention des parties qui se dégage des mots qu'elles ont employés. La deuxième étape est l'application, lorsqu'il y a ambiguïté, de la doctrine *contra proferentem*; elle prévoit que le doute quant au sens et à la portée de la clause d'exclusion ou limitative sera résolu contre la partie qui l'a introduite et

Case 09-10138-MFW    Doc 14225-43    Filed 08/15/14    Page 51 of 56

1979 CanLII 10 (SCC)

this doctrine the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. There is no dispute that the heat exchangers were covered by the insurance contract. There is also no serious dispute that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. To interpret "corrosion" as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract.

*Per* Martland, Ritchie and McIntyre JJ., *dissenting*: While the policy here covers damage to property other than the object itself, the coverage is limited to indemnity in respect of loss or damage to property of the insured <u>directly</u> caused to an object by an accident as that word is defined in the policy. Therefore an interpretation which would result in affording coverage to the insured for <u>consequential</u> damages whether it was due to corrosion or otherwise cannot be adopted. The only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of . . . material".

[*Indemnity Insurance Company of North America v. Excel Cleaning Service*, [1954] S.C.R. 169, followed; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, aff'd (1908), 42 S.C.R. 246; *Stevenson v. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. v. Canadian General Insurance Co.*, [1956] S.C.R. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.) referred to.]

APPEAL from a judgment of the Court of Appeal of Quebec affirming a judgment of the Superior Court. Appeal allowed, Martland, Ritchie and McIntyre JJ. dissenting.

qui cherche maintenant à l'invoquer. Même indépendamment de cette doctrine, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Il n'est pas contesté que les échangeurs de chaleur sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Interpréter la «corrosion» au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat.

*Les* juges Martland, Ritchie et McIntyre, *dissidents*: Bien que la police en l'espèce garantisse les dommages à des biens autres que l'objet lui-même, la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux dommages subis par eux résultant <u>directement</u> d'un accident au sens donné à ce mot par la définition de la police. En conséquence, on ne peut adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la corrosion ou par autre chose. Les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du . . . matériel», et l'excluent de la garantie.

[Jurisprudence: *Indemnity Insurance Company of North America c. Excel Cleaning Service*, [1954] R.C.S. 169, arrêt suivi; *Pense v. Northern Life Assurance Co.* (1907), 15 O.L.R. 131, conf. par (1908), 42 R.C.S. 246; *Stevenson c. Reliance Petroleum Ltd.; Reliance Petroleum Ltd. c. Canadian General Insurance Co.*, [1956] R.C.S. 936; *Cornish v. Accident Insurance Co.* (1889), 23 Q.B. 453 (C.A.).]

POURVOI à l'encontre d'un arrêt de la Cour d'appel du Québec qui a confirmé un jugement de la Cour supérieure. Pourvoi accueilli, les juges Martland, Ritchie et McIntyre étant dissidents.

1979 CanLII 10 (SCC)

*Guy Desjardins, Q.C.,* for the appellant.

*Marcel Cinq-Mars, Q.C.,* for the respondent.

The reasons of Martland, Ritchie and McIntyre JJ. were delivered by

RITCHIE J. (*dissenting*)—This is an appeal from a judgment of the Court of Appeal of the Province of Quebec affirming the judgment rendered at trial by Mr. Justice Bisson and dismissing the claim of the appellant against its insurer for damage sustained to its property located at a plant which it operated at New Richmond in the Province of Quebec, where it was engaged in the manufacture of paper and paper and wood products.

By reason of their malfunction, direct damage was caused to several tubes in the heaters employed for the heating of bunker "C" fuel with the consequence that temporary closing of the plant became necessary. The appellant's claim in this action encompasses not only the direct damage done to the tubes, but the consequential loss allegedly sustained because of the breakdown of the tubes.

I have had the privilege of reading the reasons for judgment prepared for delivery by my brother Estey in this case, but as I reach a different conclusion concerning the risk insured against by the policy in question, I have found it necessary to express my views separately.

The appellant's claim is made pursuant to the terms of an insurance agreement with the respondent which was in force at the time of the events above referred to whereby the respondent agreed

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

. . .

1.   ... To pay the Insured for loss or damage to property of the Insured directly caused by such Accident *to an Object*, or if the Company so elects, to repair or replace such damaged property;  ...

(The italics are my own.)

The objects covered by the policy are defined in the 1st Schedule thereof as follows:

*Guy Desjardins, c.r.,* pour l'appelante.

*Marcel Cinq-Mars, c.r.,* pour l'intimée.

Version française des motifs des juges Martland, Ritchie et McIntyre rendus par

LE JUGE RITCHIE (*dissident*)—Il s'agit d'un pourvoi à l'encontre d'un arrêt de la Cour d'appel de la province de Québec qui confirme le jugement rendu en première instance par le juge Bisson et rejette la réclamation de l'appelante contre son assureur pour dommages à ses biens situés dans une usine qu'elle exploite à New Richmond dans la province de Québec, où elle fabrique du papier et des sous-produits du papier et du bois.

Suite à leur mauvais fonctionnement, des dommages directs ont été causés à plusieurs tubes dans les échangeurs de chaleur utilisés pour chauffer du mazout lourd de catégorie «C», ce qui a nécessité la fermeture temporaire de l'usine. La réclamation de l'appelante dans cette action comprend non seulement les dommages directs aux tubes, mais la perte indirecte présumément subie suite à l'avarie des tubes.

J'ai eu l'avantage de lire les motifs de jugement préparés par mon collègue le juge Estey dans cette affaire mais, puisque je parviens à une conclusion différente quant au risque assuré par la police en question, j'ai jugé nécessaire d'exposer mon point de vue séparément.

La réclamation de l'appelante est fondée sur un contrat d'assurance qu'elle a conclu avec l'intimée et qui était en vigueur au moment des événements susmentionnés et aux termes duquel l'intimée

[TRADUCTION] Eu égard au paiement de la prime la Compagnie convient par la présente avec l'Assurée désignée, relativement à la perte résultant d'un accident, tel que défini dans la présente:

. . .

1. ... D'indemniser l'Assurée pour la perte de ses biens ou les dommages subis par eux, résultant directement d'un accident *à un objet* ou, si la Compagnie le préfère, de réparer ou de remplacer lesdits biens endommagés;
. . .

(Les italiques sont de moi.)

Les objets protégés par la police sont définis comme suit dans la première annexe:

The Objects covered under this Schedule are of the type designated as follows:

1. Any metal fired or metal unfired pressure valve; and

2. Any piping, on or between premises of the Insured, connected with such vessel and which contains steam or other heat transfer medium or condensate thereof, air, refrigerant, or boiler feedwater between the feed pump or injector and a boiler, together with the valves, fittings, separators and traps on all such piping.

What is insured against by this agreement in my opinion is damage to the property of the insured "directly caused to an "object" by an "accident" as that word is defined in the policy. While the policy covers damage to property other than the object itself, it only covers that damage when it has been directly caused by "accident" to an "object". I am satisfied that the tubes were "objects" within the meaning of the above definition and that damage directly caused to the tubes would have been covered by the insurance agreement had it not been for the terms of the definition of "accident" contained therein which reads as follows:

C. Definition of Accident—As respects any Object covered under this Schedule, 'Accident' shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) *depletion, deterioration, corrosion, or erosion of material*, (b) wear and tear (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protection device.

(The italics are my own.)

Both the trial judge and the Court of Appeal were satisfied that the damage to the tubes was occasioned by corrosion and this conclusion is supported by the fact that quantities of salt water did flow through the pipes. Expert evidence was called on behalf of the appellant directed to supporting the submission that the damage was caused by an hydraulic hammer effect of sudden

[TRADUCTION] Les objets protégés par cette annexe sont de la catégorie désignée comme suit:

1. Toute soupape de métal soumise ou non soumise à la flamme; et

2. Toute tuyauterie dans l'usine de l'assurée ou entre ces bâtiments, reliée à un tel récipient et qui contient de la vapeur ou un autre moyen d'échange de chaleur ou condensat de celle-ci, air, réfrigérant ou eau d'alimentation de chaudière entre la pompe d'alimentation ou l'injecteur et une chaudière, ainsi que les soupapes, accessoires, séparateurs et purgeurs de toute ladite tuyauterie.

A mon avis, sont assurés par cette convention les dommages aux biens de l'assurée «causés directement» à un «objet» par un «accident» au sens donné à ce mot par la définition de la police. Bien que la police garantisse les dommages à des biens autres que l'objet lui-même, elle ne les garantit que lorsqu'il ont été causés directement par un «accident» à un «objet». Je suis convaincu que les tubes sont des «objets» au sens de la définition susmentionnée et que les dommages directement causés aux tubes auraient été garantis par le contrat d'assurance n'eût été les termes de la définition d'«accident» y contenue dont voici le texte:

[TRADUCTION] C. Définition d'accident—En ce qui concerne un objet garanti par cette Annexe, «accident» signifie un événement soudain et accidentel touchant l'objet, ou une partie de celui-ci, qui l'endommage et en nécessite la réparation ou le remplacement total ou partiel; mais accident ne signifie pas a) *l'épuisement, la détérioration, la corrosion ou l'érosion du matériel*, b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

(Les italiques sont de moi.)

Le juge de première instance et la Cour d'appel étaient convaincus que les dommages aux tubes ont été causés par la corrosion et cette conclusion est confirmée par le fait qu'une grande quantité d'eau salée a circulé dans les tuyaux. Un témoin expert a été cité par l'appelante pour appuyer la prétention que les dommages ont été causés par un effet de coup de bélier d'origine soudaine qui a

Case 09-10138-MFW    Doc 14225-43    Filed 08/15/14    Page 54 of 56

892         CONSOLIDATED BATHURST v. MUTUAL BOILER    *Ritchie J.*        [1980] 1 S.C.R.

1979 CanLII 10 (SCC)

origin which placed an inordinate strain on the pipes and tubes causing them to break. This evidence was, however, not accepted either at trial or in the Court of Appeal and I do not find it necessary to discuss it. In the result it has been concurrently found at trial and on `appeal that corrosion was the cause of the damage to the tubes and pipes and it follows from the terms of the "definition of accident" that this damage is not insured against by the policy in question.

It was contended also that even if the coverage afforded by the policy did not include damage by "depletion, deterioration, corrosion" or "wear and tear" within the meaning of the definition of "accident", it was nevertheless effective to make the insurer responsible for consequential loss suffered by the insured as a result of a sudden rupture of the heat exchanger, whether due to corrosion or not. In view of the fact that the coverage is limited to indemnity in respect of loss or "damage to property of the insured <u>directly</u> caused by such accident to an Object", I cannot adopt an interpretation which would result in affording coverage to the insured for <u>consequential</u> damage whether it was due to "corrosion" or otherwise. In my opinion, the only "direct" damage to any object in the appellant's plant was the damage to the tubes themselves and the plain language of the insuring agreement in defining "accident" appears to me to contemplate and exclude from coverage the very event which happened here, namely, damage being caused to an object which was the property of the insured as a result of "corrosion of . . . material".

It has been suggested that the language employed in the policy should be construed against the insurance company which was the author of it in accordance with the *contra proferentem* rule which is frequently invoked in the construction of insurance contracts when it is found that all other rules of construction fail to assist the Court in determining the true meaning of the policy.

In this regard my brother Estey has made reference to the reasons for judgment of Cartwright J., as he then was, in *Stevenson v. Reliance Petroleum Limited; Reliance Petroleum Limited*

imposé une pression excessive dans les tuyaux et les tubes, causant leur rupture. Cependant, cette preuve n'a pas été acceptée en première instance ni en Cour d'appel et je n'estime pas nécessaire de l'examiner. Finalement, il a été jugé en première instance et en appel que la corrosion était la cause des dommages aux tubes et aux tuyaux et il découle des termes de la «définition d'accident» que ces dommages ne sont pas assurés par la police en question.

On a également prétendu que même si la protection accordée par la police ne comprenait pas les dommages causés par «l'épuisement, la détérioration, la corrosion» ou «l'usure normale» au sens de la définition d'«accident», elle rendait néanmoins l'assureur responsable de la perte indirecte subie par l'assurée suite à la rupture soudaine de l'échangeur de chaleur, qu'elle ait ou non été causée par la corrosion. Étant donné que la garantie est limitée à une indemnité relativement à la perte des biens de l'assurée ou aux «dommages subis par eux résultant <u>directement</u> d'un accident à un objet», je ne peux adopter une interprétation qui protégerait l'assurée des dommages <u>indirects</u> qu'ils aient été causés par la «corrosion» ou par autre chose. À mon avis, les seuls dommages «directs» à un objet quelconque dans l'usine de l'appelante sont ceux subis par les tubes eux-mêmes et les termes clairs employés dans le contrat d'assurance pour définir le mot «accident» prévoient, selon moi, l'événement même qui s'est produit ici, savoir, les dommages causés à un objet appartenant à l'assurée suite à la «corrosion du . . . matériel», et l'excluent de la garantie.

On a avancé que les termes employés dans la police devraient être interprétés contre la compagnie d'assurances qui en est l'auteur, conformément à la règle *contra proferentem* qui est fréquemment invoquée dans l'interprétation des contrats d'assurance lorsque la cour arrive à la conclusion qu'aucune autre règle d'interprétation ne lui permet d'établir le sens réel de la police.

A cet égard, mon collègue le juge Estey a fait référence aux motifs du juge Cartwright, alors juge puîné, dans *Stevenson c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian*

*v. Canadian General Insurance Company*[1] where he said at p. 953:

> The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

It will however be seen from what I have said that I do not find it necessary to resort to this rule in the interpretation of the policy here at issue.

My brother Estey has, however, adopted the view that in construing the policy and particularly the definition of accident contained therein in the manner adopted in these reasons and in those of the majority of the Court of Appeal, the result is to "largely, if not completely, nullify the purpose for which the insurance was sold" which is "a circumstances to be avoided so far as the language used will permit". In this regard reliance is placed on the judgment of this Court in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[2], at pp. 177-178, but with the greatest respect I am unable to relate the circumstances of that case to those with which we are here concerned.

The *Excel Cleaning Service* case was one in which an "on location cleaning service" business was covered by a property damage liability policy insuring it for damage to property caused by accident arising out of its work. This policy however contained an exclusion relating "to damage to or destruction of property owned, rented, occupied or used by or in the care, custody and control of the insured", and the insurer contended that a wall to wall carpet fixed to the floor of a house where the insured was employed which was damaged was "in the care, custody and control of the insured" and therefore excluded from the coverage. Consistent with this reasoning all of the customer's belongings on which the insured was working were similarly exclusions which would have meant that the policy afforded no coverage whatever for the business of the insured. It was in this connection that this Court said, at pp. 177-178:

*General Insurance Company*[1] où il est dit à la p. 953:

> [TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra proferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Ce que j'ai dit indique toutefois que je n'estime pas nécessaire de recourir à cette règle pour interpréter la police examinée ici.

Toutefois, mon collègue le juge Estey est d'avis qu'en interprétant la police et en particulier la définition du mot accident y contenue de la manière adoptée dans les présents motifs et dans ceux de la majorité de la Cour d'appel, on [TRADUCTION] «annulerait en grande partie, sinon totalement, l'objet de l'assurance» ce qui constitue «une situation qui doit être évitée, dans la mesure où les termes employés le permettent». A cet égard, on s'appuie sur l'arrêt de cette Cour, *Indemnity Insurance Company of North America c. Excel Cleaning Service*[2], aux pp. 177 et 178, mais, avec égards, je ne puis établir un rapport entre les circonstances de cette affaire et celles de la présente.

Dans l'affaire *Excel Cleaning Service* une entreprise de «service de nettoyage à domicile» était protégée par une police d'assurance responsabilité civile pour les dommages matériels causés par un accident survenant dans l'exécution de ses travaux. Cette police contenait cependant une exclusion relative [TRADUCTION] «aux dommages ou à la destruction des biens appartenant à l'assurée, loués, occupés, utilisés par celle-ci ou sous sa responsabilité, sa garde et son contrôle». L'assureur a prétendu qu'une moquette couvrant le plancher d'une maison où l'assurée avait travaillé et qui avait été endommagée était sous «sa responsabilité, sa garde ou son contrôle» et donc exclue de la garantie. Selon ce raisonnement, tous les biens du client sur lesquels l'assurée travaillait étaient aussi exclus, ce qui aurait signifié que la police n'offrait absolument aucune protection à l'entreprise de l'assurée. C'est à ce sujet que la Cour a dit aux pp. 177 et 178:

[1] [1956] S.C.R. 936.

[2] [1954] S.C.R. 169.

[1] [1956] R.C.S. 936.

[2] [1954] R.C.S. 169.

1979 CanLII 10 (SCC)

CONSOLIDATED-BATHURST *v.* MUTUAL BOILER   *Ritchie J.*   [1980] 1 S.C.R.

1979 CanLII 10 (SCC)

Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

I am respectfully of the opinion that this case involves a very different situation from the one with which we are here concerned. The construction sought to be placed on the Excel Cleaning Service Policy would have meant that although it purported to be a property damage liability policy covering the insured's business, it in fact insured nothing whereas the present policy affords insurance "for loss or damage to property of the insured" directly caused by an accident as defined therein. The meaning assigned to the word "accident" in the policy does not constitute an exclusion from the coverage but is rather a part of the definition of the risk insured against.

For all these reasons, as well as for those stated by Mr. Justice Turgeon, I would dismiss this appeal with costs.

The judgment of Pigeon, Dickson, Beetz and Estey JJ. was delivered by

ESTEY J.—The appellant operates a manufacturing facility for the production of paper products, including paper boxes, at New Richmond, Quebec, and the respondent is the insurer under a policy of insurance issued in respect of certain property of the appellant including the property with which this action is concerned, being three heat exchangers. The heat exchangers in question are described by the trial judge as follows:

[TRANSLATION] The parts of this system with which we are particularly concerned are three heat exchangers, a type of pipe measuring fifteen feet long with an interior diameter of ten inches.

Within each of these three exchangers there are 102 tubes thirteen feet long, with an exterior diameter of 5/8 inch and a metal casing measuring 1/16 inch, or .065 inch.

Inside each exchanger at the ends the 102 pipes pass through a tubular metal plate one inch thick.

Further, the 102 tubes of each exchanger are themselves divided into three groups of 34 tubes each, so that oil flowing in the tubes passes around the exchanger

[TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

Je suis respectueusement d'avis que cette affaire-là porte sur une situation très différente de celle qui nous occupe ici. L'interprétation qu'on a voulu donner à la police d'Excel Cleaning Service aurait signifié que, bien qu'elle se veuille une police d'assurance responsabilité civile pour les dommages matériels protégeant l'entreprise de l'assurée, cette police n'assurait en fait rien, alors que la présente police offre une assurance à [TRADUCTION] «l'assurée pour la perte de ses biens ou les dommages à eux causés» résultant directement d'un accident suivant la définition de ce mot dans la police. Le sens donné au mot «accident» dans la police ne constitue pas une exclusion de la garantie mais est plutôt une partie de la définition du risque assuré.

Pour tous ces motifs, de même que pour ceux énoncés par le juge Turgeon, je suis d'avis de rejeter ce pourvoi avec dépens.

Version française du jugement des juges Pigeon, Dickson, Beetz et Estey rendu par

LE JUGE ESTEY—L'appelante exploite une usine de fabrication de produits du papier, y compris des boîtes de carton, à New Richmond (Québec) et l'intimée est l'assureur aux termes d'une police d'assurance relative à certains biens de l'appelante, y compris les biens qui font l'objet de cette action, savoir, trois échangeurs de chaleur. Le juge de première instance décrit les échangeurs de chaleur en ces termes:

Les pièces qui nous intéressent plus particulièrement dans ce système sont trois échangeurs de chaleur, sorte de tuyaux mesurant quinze pieds de long avec un diamètre inférieur de dix pouces.

A l'intérieur de chacun des ces trois échangeurs, on retrouve 102 tubes de treize pieds de longueur, d'un diamètre extérieur de 5/8 de pouce et dont la paroi métallique mesure 1/16 de pouce ou .065 pouce.

A chacune de leurs extrémités, à l'intérieur de l'échangeur, les 102 tuyaux pénètrent dans une plaque tubulaire métallique d'un pouce d'épaisseur.

D'autre part, les 102 tubes de chaque échangeur sont eux-mêmes divisés en trois groupes de 34 tubes chacun, de façon à ce que l'huile s'écoulant dans les tubes fasse