three times and is heated to the right level before emerging and being directed towards the boilers as a fuel.

Steam circulates in the exchangers, passing in through the left end immediately to the right of the tubular plate and emerging at the right end, just as it strikes the other tubular plate.

Each exchanger is sealed at each end by a lid.

As the exchanger measures fifteen feet and the tubes thirteen feet, it follows that a space of one foot remains at each end between the tubular plate and the lid closing the exchanger.

The whole apparatus forms a sealed unit, which it was established cannot be opened without causing a breakdown and considerable damage.

Due to the failure of these heat exchangers, the appellant was required to shut down part of their facilities and thereby suffered a loss which the parties have agreed amounted to $158,289.24. This sum is set out in the Plaintiff's Declaration and includes "Direct Damage Loss" of $15,604.44. The insurer resists the appellant's claim on the basis that the damage was caused by corrosion of the tubes inside the heat exchanger and this risk was specifically excluded from the coverage provided by the policy of insurance. The material provisions of the policy of insurance issued by the respondent are as follows:

### INSURING AGREEMENT

In consideration of the Premium the Company does hereby agree with the named Insured respecting loss from an Accident, as defined herein, as follows:

COVERAGE A—PROPERTY OF THE INSURED

1. ACTUAL CASH VALUE—To pay the Insured for loss of or damage to property of the Insured directly caused by such Accident to an Object, or if the Company so elects, to repair or replace such damaged property; and

The definition of accident as employed in the above excerpt is as follows:

As respects any Object covered under this Schedule, "Accident" shall mean any sudden and accidental occurrence to the Object, or a part thereof, which results in damage to the Object and necessitates repair or

replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material, (b) wear and tear, (c) leakage at any value, fitting, shaft seal, gland packing, joint or connection, (d) the breakdown of any vacuum tube, gas tube or brush, (e) the breakdown of any structure or foundation supporting the Object or any part thereof, nor (f) the functioning of any safety device or protective device.

The employees of the appellant became aware of the failure of the heat exchangers when small fuel oil spots were noticed on linerboard being produced in the mill. The source of the oil was traced to the boiler and hence to the heat exchangers where a number of ruptured tubes were discovered.

The appellant advanced two main submissions:

(a) that the damage was caused by hydraulic hammer effect; and,
(b) alternatively, that the damage was caused by corrosion and that the terms of the policy do not exclude damage thus occasioned.

The learned trial judge found that the damage was caused by corrosion and discusses the contribution of pressure changes as follows:

[TRANSLATION] There is no doubt that the damage occurred suddenly, but the phenomenon which led up to it, namely the chemical process of corrosion, was not of a sudden and accidental nature, so that it could not be regarded as an "accident".

On December 4, 1968 some occurrence, probably a fall in the steam pressure in the heat exchanger, caused a failure in certain oil tubes, which moreover apparently broke in a relatively short space of time.

The fact remains, however, that corrosion was the cause of the damage.

The majority of the Court of Appeal found the damage was the result of corrosion and thereby excluded from policy coverage. Turgeon J.A. dealt with the hydraulic hammer theory as follows:

[TRANSLATION] This was a possibility, not a probability, mentioned by appellant's expert witness Mahoney in his examination in chief. However, when he was

remplacement total ou partiel; mais accident ne signifie pas a) l'épuisement, la détérioration, la corrosion ou l'érosion du matériel, b) l'usure normale, c) la fuite d'un raccord, d'un calage, d'un joint d'étanchéité, d'un presse-étoupe, d'un joint ou d'un contact, d) l'avarie d'un tube à vide, d'un tube à gaz ou d'une brosse, e) l'avarie d'une structure ou d'une fondation soutenant l'objet ou une partie de celui-ci, ni f) le fonctionnement d'un dispositif de sécurité ou de sûreté.

Les employés de l'appelante se sont aperçus de la panne des échangeurs de chaleur lorsqu'ils ont remarqué des taches d'huile sur des feuilles de carton en voie de fabrication à l'usine. La source de l'huile a été retracée dans la chaudière et de là dans les échangeurs de chaleur où l'on a découvert un certain nombre de tuyaux fissurés.

Voici les deux prétentions principales de l'appelante:

a) que les dommages ont été causés par l'effet d'un coup de bélier; et,
b) subsidiairement, que les dommages ont été causés par la corrosion et que les termes de la police n'excluent pas les dommages ainsi causés.

Le savant juge de première instance a jugé que les dommages avaient été causés par la corrosion et discute ainsi de l'effet de la chute de pression:

Que le dommage se soit manifesté de façon soudaine, cela ne fait aucun doute, mais le phénomène qui l'a entraîné c'est-à-dire le processus chimique de la corrosion ne s'est pas réalisé de façon soudaine et accidentelle, de sorte qu'on ne peut dire qu'il y a eu «accident».

Le 4 décembre 1968, un événement, vraisemblablement la chute de pression de vapeur d'eau dans l'échangeur de chaleur, a provoqué la rupture de certains tubes d'huile, qui se seraient d'ailleurs rupturés à plus ou moins brève échéance.

Mais il n'en reste pas moins que la cause du dommage a été la corrosion.

La majorité de la Cour d'appel a jugé que les dommages avaient été causés par la corrosion et qu'ils étaient donc exclus de la protection de la police. Le juge Turgeon a traité ainsi de la théorie du coup de bélier:

Il s'agit là d'une possibilité invoquée par l'expert Mahoney de l'appelante à son interrogatoire en chef, non d'une probabilité. Cependant, lorsqu'il fut contre-

cross-examined, he admitted that he could not provide any direct evidence that a "hydraulic hammer" effect was produced, or that there was excessive pressure, or that the safety valves did not operate effectively.

Dissenting from the majority, Kaufman J.A. appears to have adopted in part the hydraulic hammer theory as being a "trigger" which precipitated the leaks in the tubes. The learned justice went on to state:

But where, as here, the pressure suddenly increased, it will not do for the insurer to point to the corrosion and say that, sooner or later, the tubes would have burst anyway.

Thus it will be seen that in both courts below the cause of the damage was found to be corrosion of the tubes which both courts went on to conclude was a risk or peril not covered by the insurance contract.

The issue is simply, therefore, whether the admitted loss suffered by the appellant and which was occasioned by the corrosion of the heat exchangers is a loss recoverable under the above-quoted terms of the policy of insurance issued by the respondent to the appellant. This leaves the alternative submission advanced by the appellant, namely that the term of the contract of insurance covers the damages suffered by the appellant. The heart of this argument is that while the definition of accident does not include the event of corrosion or similar events such as "wear and tear, deterioration, depletion, or erosion of material", the definition does include, in the appellant's submission, events which succeed and which may be due to the event of corrosion. Thus the insurer would not be liable under the contract for the cost of repairing or replacing any insured property damaged by "depletion, deterioration, corrosion, wear and tear, etc.", but would be responsible for any consequential loss to the insured following the sudden rupture of the heat exchanger whether or not it be due to "corrosion" or "wear and tear", etc.

In the preliminary provisions setting up the coverage under the policy of insurance, the definition of accident is, of course, fundamental, and strip-

interrogé, il a admis qu'il ne pouvait fournir aucune preuve directe qu'il se serait produit un «hydraulic hammer» ni qu'il y avait eu une pression excessive, ni enfin que les valves de sécurité n'avaient pas fonctionné adéquatement.

Le juge Kaufman, dissident, a retenu en partie la théorie que le coup de bélier a joué comme «déclic» qui a accéléré les fuites dans les tubes. Le savant juge a poursuivi:

[TRADUCTION] Mais lorsque, comme en l'espèce, la pression augmente soudainement, l'assureur ne peut accuser la corrosion et dire que, dans un avenir plus ou moins rapproché, les tubes auraient éclaté de toute façon.

Il est donc clair que les deux cours d'instance inférieure ont conclu que la cause des dommages était la corrosion des tubes qui, selon elles, n'est pas un risque ou un péril garanti par le contrat d'assurance.

Donc, la question est simplement de savoir si la perte que l'on admet avoir été subie par l'appelante et qui a été causée par la corrosion des échangeurs de chaleur est une perte garantie par les clauses précitées de la police d'assurance délivrée par l'intimée à l'appelante. Ceci laisse la prétention subsidiaire de l'appelante, savoir, que les clauses du contrat d'assurance garantissent les dommages qu'elle a subis. Le cœur de cet argument est que bien que la définition du mot accident ne comprenne pas le cas de la corrosion ou des cas semblables tels que «l'usure normale, la détérioration, l'épuisement ou l'érosion du matériel», la définition inclut, aux dires de l'appelante, ce qui suit la corrosion et qui peut en résulter. Ainsi, l'assureur ne serait pas responsable en vertu du contrat du coût des réparations ou du remplacement d'un bien assuré endommagé par «épuisement, détérioration, corrosion, usure normale etc.», mais le serait de toute perte indirecte subie par l'assurée après la rupture soudaine de l'échangeur de chaleur, qu'elle soit ou non causée par la «corrosion» ou «l'usure normale» etc.

Dans les dispositions préliminaires sur la garantie accordée par la police d'assurance, la définition d'accident est, bien sûr, fondamentale et, si l'on ne

Case 09-10138-MFW    Doc 14225-44    Filed 08/15/14    Page 4 of 8

898    CONSOLIDATED-BATHURST v. MUTUAL BOILER    *Estey J.*    [1980] 1 S.C.R.

ping out the words not here relevant, the definition reads as follows:

Accident shall mean a sudden and accidental occurrence to the object ... but accident shall not mean ... corrosion ...

Some light may be thrown on this interpretation difficulty by reference to a latter portion of the policy of insurance headed "Exclusions". The following excerpts illustrate the drafting technique employed in the policy where risks are to be excluded from its coverage:

EXCLUSIONS

This policy does not apply to

1. **WAR DAMAGE**—Loss from an Accident <u>caused directly or indirectly</u> by

   (a) Hostile or warlike action, including action in hindering, combating or defending against an actual, impending or expected attack, by

   . . .

2. **NUCLEAR HAZARDS**—Loss, <u>whether it be direct or indirect, proximate or remote</u>,

   (a) From an Accident <u>caused directly or indirectly</u> by nuclear reaction ...

   (b) From nuclear reaction, nuclear radiation or radioactive contamination, all whether controlled or uncontrolled, <u>caused directly or indirectly by, contributed to or aggravated by an Accident</u>;

   . . .

3. **MISCELLANEOUS PERILS**—Loss under Coverages A and B from

   (b) An Accident <u>caused directly or indirectly by fire</u> or from the <u>use of water or other means to extinguish fire</u>;

   . . .

   (d) Flood <u>unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident</u>;

   . . .

(Emphasis added.)

Thus it may be argued that when the draftsman wished to exclude consequences from an event, the words "directly or indirectly" were employed. Had

retient que les mots pertinents à l'espèce, la définition devient:

Accident signifie un événement soudain et accidentel touchant l'objet ... mais accident ne signifie pas ... la corrosion ...

L'examen d'un chapitre de la police que l'on trouve plus loin et qui est intitulé «Exclusions» peut jeter un peu de lumière sur cette difficulté d'interprétation. Les extraits suivants illustrent la technique de rédaction utilisée dans la police lorsque des risques en sont exclus:

[TRADUCTION]
EXCLUSIONS

Cette police ne s'applique pas aux

1. **AVARIES CAUSÉES PAR LA GUERRE**—La perte résultant d'un accident <u>causé directement ou indirectement</u> par

   a) une action hostile ou belliqueuse, comprenant une manœuvre de diversion, de combat ou de défense contre une attaque réelle, imminente ou prévue, par

   . . .

2. **DANGERS NUCLÉAIRES**—La perte, <u>qu'elle soit directe ou indirecte, immédiate ou éloignée</u>,

   a) résultant d'un accident <u>causé directement ou indirectement</u> par une réaction nucléaire ...

   b) résultant d'une réaction nucléaire, d'une radiation nucléaire ou d'une contamination radioactive, qu'elles soient ou non contrôlées, <u>causées directement ou indirectement, entraînées ou aggravées par un accident</u>;

   . . .

3. **RISQUES DIVERS**—La perte en vertu des garanties A et B résultant

   b) d'un accident <u>causé directement ou indirectement par le feu</u> ou l'usage de l'eau ou d'un autre moyen d'extinction du feu;

   . . .

   d) l'inondation, <u>à moins qu'un accident s'ensuive, et la Compagnie sera alors seulement responsable de la perte résultant d'un tel accident subséquent</u>;

   . . .

(C'est moi qui souligne.)

On peut donc prétendre que lorsque le rédacteur a voulu exclure les conséquences d'un événement, il a employé les mots «directement ou indirecte-

this technique been adopted in the primary coverage provisions excerpted above, it would have read;

Accident does not mean that which directly or indirectly results from corrosion.

Alternatively, if the consequences of corrosion were intended by the parties to be beyond the protection of the contract, such circumstances would have been included under the heading "Exclusions" as a subparagraph comparable to one of those set out above.

At best, one must conclude that the definition of accident, including as it does the reference to corrosion, leaves two clear alternative interpretations open. Firstly, the definition may not include an event relating to corrosion. Secondly, the definition may exclude only the cost of making good the corrosion itself.

Insurance contracts and the interpretative difficulties arising therein have been before courts for at least two centuries, and it is trite to say that where an ambiguity is found to exist in the terminology employed in the contract, such terminology shall be construed against the insurance carrier as being the author, or at least the party in control of the contents of the contract. This is, of course, not entirely true because of statutory modifications to the contract, but we are not here concerned with any such mandated provisions. Meredith J.A. put the proposition in *Pense v. Northern Life Assurance Co.*[3] at p. 137:

There is no just reason for applying any different rule of construction to a contract of insurance from that of a contract of any other kind; and there can be no sort of excuse for casting a doubt upon the meaning of such a contract with a view to solving it against the insurer, however much the claim against him may play upon the chords of sympathy, or touch a natural bias. In such a contract, just as in all other contracts, effect must be given to the intention of the parties, to be gathered from the words they have used. A plaintiff must make out from the terms of the contract a right to recover; a defendant must likewise make out any defence based upon the agreement. The onus of proof, if I may use such a term in reference to the interpretation of a writing, is, upon each party respectively, precisely the same. We are all, doubtless, insured, and none insurers,

---

[3] (1907), 15 O.L.R. 131.

ment». Si cette technique avait été adoptée dans les dispositions de garantie de base citées précédemment, le texte aurait été:

Accident ne signifie pas ce qui résulte directement ou indirectement de la corrosion.

Subsidiairement, si les parties ne désiraient pas que les conséquences de la corrosion soient visées par le contrat, ces circonstances auraient été incluses sous le tire «Exclusions» dans un alinéa comparable à l'un de ceux que j'ai cités.

Au mieux, il faut conclure que la définition d'accident, qui mentionne effectivement la corrosion, laisse deux interprétations possibles évidentes. Premièrement, la définition peut n'inclure aucun événement relié à la corrosion. Deuxièmement, la définition peut exclure seulement ce qu'il en coûte pour réparer la corrosion elle-même.

Les contrats d'assurance et les difficultés d'interprétation qu'ils posent ont été examinés par les cours depuis au moins deux siècles, et c'est un truisme de dire que lorsque l'on conclut que le texte du contrat est ambigu, il doit être interprété contre l'assureur qui est l'auteur, ou du moins la partie qui a la haute main sur le contenu du contrat. Ceci n'est pas entièrement vrai, bien sûr, à cause des modifications au contrat imposées par la loi, mais aucune de ces dispositions imposées n'est en litige ici. Dans l'arrêt *Pense v. Northern Life Assurance Co.*[3] à la p. 137, le juge Meredith de la Cour d'appel a formulé la proposition que:

[TRADUCTION] Il n'y a aucune raison valable pour appliquer à un contrat d'assurance une règle d'interprétation différente de celle applicable à un contrat d'une autre nature; et il ne peut y avoir aucune sorte d'excuse pour jeter le doute sur le sens de pareil contrat en vue de l'interpréter contre l'assureur, quel grand que soit le parti pris naturel ou la sympathie que peut éveiller la demande d'indemnité qu'on lui adresse. Dans ce contrat, tout comme dans tous les autres, il faut donner effet à l'intention des parties qui se dégage des mots qu'elles ont employés. Un demandeur doit pouvoir établir son droit de recouvrer une indemnité d'après les termes du contrat; un défendeur doit de même établir une défense fondée sur la convention. Le fardeau de la preuve, si je peux utiliser cette expression à l'égard de l'interprétation d'un écrit, est exactement le même pour chaque

---

[3] (1907), 15 O.L.R. 131.

and so, doubtless, all more or less affected by the natural bias arising from such a position; and so ought to beware lest that bias be not counteracted by a full apprehension of its existence.

(Adopted in this Court in 1908[4].)

Such a proposition may be referred to as step one in the interpretative process. Step two is the application, when ambiguity is found, of the *contra proferentem* doctrine. This doctrine finds much expression in our law, and one example which may be referred to is found in *Cheshire and Fifoot's Law of Contract* (9th ed.), at pp. 152-3:

> If there is any doubt as to the meaning and scope of the excluding or limiting term, the ambiguity will be resolved against the party who has inserted it and who is now relying on it. As he seeks to protect himself against liability to which he would otherwise be subject, it is for him to prove that his words clearly and aptly describe the contingency that has in fact arisen.

This Court applied the doctrine in *Indemnity Insurance Company of North America v. Excel Cleaning Service*[5] where at pp. 179-180 it was stated:

> It is, in such a case, a general rule to construe the language used in a manner favourable to the insured. The basis for such being that the insurer, by such clauses, seeks to impose exceptions and limitations to the coverage he has already described and, therefore, should use language that clearly expresses the extent and scope of these exceptions and limitations and, in so far as he fails to do so, the language of the coverage should obtain
> ... Furthermore, the language of Lord Greene in *Woolfall & Rimmer, Ltd.* v. *Moyle*, [1942] 1 K.B. 66 at 73, is appropriate. He there states:
>
>> I cannot help thinking that, if underwriters wish to limit by some qualification a risk which, prima facie, they are undertaking in plain terms, they should make it perfectly clear what that qualification is.

As has already been stated, this is, of course, the second phase of interpretation of such a contract. Cartwright J., as he then was, stated in *Stevenson*

---

[4] (1908), 42 S.C.R. 246.
[5] [1954] S.C.R. 169.

v. *Reliance Petroleum Limited; Reliance Petroleum Limited v. Canadian General Insurance Company*[6] at p. 953:

The rule expressed in the maxim, *verba fortius accipiuntur contra proferentem*, was pressed upon us in argument, but resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document.

Lindley L.J. put it this way:

In a case on the line, in a case of real doubt, the policy ought to be construed most strongly against the insurers; they frame the policy and insert the exceptions. But this principle ought only to be applied for the purpose of removing a doubt, not for the purpose of creating a doubt, or magnifying an ambiguity, when the circumstances of the case raise no real difficulty.

*Cornish v. Accident Insurance Company*[7], at p. 456.

Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result. It is trite to observe that an interpretation of an ambiguous contractual provision which would render the endeavour on the part of the insured to obtain insurance protection nugatory, should be avoided. Said another way, the courts should be loath to support a construction which would either enable the insurer to pocket the premium without risk or

Stevenson *c. Reliance Petroleum Limited; Reliance Petroleum Limited c. Canadian General Insurance Company*[6] à la p. 953:

[TRADUCTION] Les plaidoiries ont insisté sur la règle exprimée dans la maxime *verba fortius accipiuntur contra preferentem*, mais il faut recourir à cette règle seulement lorsque aucune autre règle d'interprétation ne permet à la Cour de s'assurer du sens d'un document.

Le lord juge Lindley l'a dit en ces termes:

[TRADUCTION] Dans un cas limite, lorsqu'il y a un doute réel, il faut interpréter la police de façon plus stricte contre les assureurs; ils conçoivent la police et introduisent les exceptions. Mais ce principe ne doit être appliqué que pour écarter un doute et non pour en créer un ou grossir une ambiguïté, lorsque les circonstances de l'affaire ne soulèvent aucune difficulté réelle.

*Cornish v. Accident Insurance Company*[7], à la p. 456.

Même indépendamment de la doctrine *contra proferentem* dans la mesure où elle est applicable à l'interprétation des contrats, les règles normales d'interprétation amènent une cour à rechercher une interprétation qui, vu l'ensemble du contrat, tend à traduire et à présenter l'intention véritable des parties au moment où elles ont contracté. Dès lors, on ne doit pas utiliser le sens littéral lorsque cela entraînerait un résultat irréaliste ou qui ne serait pas envisagé dans le climat commercial dans lequel l'assurance a été contractée. Lorsque des mots sont susceptibles de deux interprétations, la plus raisonnable, celle qui assure un résultat équitable, doit certainement être choisie comme l'interprétation qui traduit l'intention des parties. De même, une interprétation qui va à l'encontre des intentions des parties et du but pour lequel elles ont à l'origine conclu une opération commerciale doit être écartée en faveur d'une interprétation de la police qui favorise un résultat commercial raisonnable. C'est un truisme de faire remarquer que l'on doit éviter une interprétation d'une clause contractuelle ambiguë qui rendrait futile l'effort déployé par l'assuré pour obtenir la protection d'une assurance. En d'autres mots, les cours devraient être réticentes à appuyer une interprétation qui permettrait soit à l'assureur de toucher une prime sans risque soit à l'assuré d'obtenir une

---

[6] [1956] S.C.R. 936.
[7] (1889), 23 Q.B. 453 (C.A.).

[6] [1956] R.C.S. 936.
[7] (1889), 23 Q.B. 453 (C.A.).

Case 09-10138-MFW    Doc 14225-44    Filed 08/15/14    Page 8 of 8

902    CONSOLIDATED-BATHURST v. MUTUAL BOILER    *Estey J.*    [1980] 1 S.C.R.

the insured to achieve a recovery which could neither be sensibly sought nor anticipated at the time of the contract.

The *Cornish* case, *supra*, illustrates a course generally taken when such contracts reach the courts. There the court was interpreting an insurance contract in the light of the death of the insured while crossing a railway track. The policy included an exception from insured risks resulting from "exposure of the insured to obvious risk of injury". Lindley L.J., in the course of judgment, stated:

> The words are "exposure of the insured to obvious risk of injury." These words suggest the following questions: Exposure by whom? Obvious when? Obvious to whom? It is to be observed that the words are very general. There is no such word as "wilful," or "reckless," or "careless"; and to ascertain the true meaning of the exception the whole document must be studied and the object of the parties to it must be steadily borne in mind. The object of the contract is to insure against accidental death and injuries, and the contract must not be construed so as to defeat that object, nor so as to render it practically illusory. A man who crosses an ordinary crowded street is exposed to obvious risk of injury; and, if the words in question are construed literally, the defendants would not be liable in the event of an insured being killed or injured in so crossing, even if he was taking reasonable care of himself. Such a result is so manifestly contrary to the real intention of the parties that a construction which leads to it ought to be rejected. But, if this be true, a literal construction is inadmissible, and some qualification must be put on the words used. (at p. 456)

An example of the application of the same principles is found in the *Indemnity Insurance Company of North America v. Excel Cleaning Service*, *supra*, where, at pp. 177-8, it was concluded:

> Such a construction [as advanced by the insurer] would largely, if not completely, nullify the purpose for which the insurance was sold—a circumstance to be avoided, so far as the language used will permit.

The appellant, as the owner and operator of a large forest products facility, sought insurance protection of the machinery employed in the plant in its industrial processes. There is no dispute that the heat exchangers in question were covered by the insurance contract. There is also no serious dispute, at least by the time the litigation had

indemnité que l'on n'a pas pu raisonnablement rechercher ni escompter au moment du contrat.

L'arrêt *Cornish*, précité, illustre la ligne de conduite généralement suivie lorsque pareils contrats sont soumis aux tribunaux. La cour y interprète un contrat d'assurance dans le contexte du décès de l'assuré survenu alors qu'il traversait une voie ferrée. La police comportait une exception aux risques assurés en cas de [TRADUCTION] «risques évidents de blessures pris par l'assuré». Dans le cours de son jugement, le lord juge Lindley a dit:

> [TRADUCTION] Les mots sont «risques évidents de blessures pris par l'assuré». Ces mots suggèrent les questions suivantes: Risques pris par qui? Évidents: quand et pour qui? Il faut remarquer que ces mots sont très généraux. Il n'y a aucun mot tel que «intentionnel» ou «téméraire» ou «négligent»; et pour s'assurer du sens réel de l'exception, il faut examiner le document dans son ensemble et garder toujours à l'esprit l'objet qu'avaient les parties à ce contrat. L'objet du contrat est d'assurer contre la mort ou les blessures accidentelles, et le contrat ne doit pas être interprété d'une manière telle qu'il détruise cet objet, ou le rende pratiquement illusoire. Un homme qui traverse une rue ordinairement encombrée s'expose à des risques évidents de blessures; et, si l'on interprète littéralement les mots en question, les défendeurs ne seront pas responsables si l'assuré est tué ou blessé en traversant, même s'il a été raisonnablement prudent. Pareil résultat est si manifestement contraire à l'intention réelle des parties que l'on doit rejeter une interprétation qui y mène. Mais, si cela est vrai, une interprétation littérale est irrecevable et il faut assortir les mots employés de certaines réserves. (à la p. 456)

On trouve un exemple de l'application des mêmes principes dans *Indemnity Insurance Company of North America c. Excel Cleaning Service*, précité, où l'on a conclu aux pp. 177 et 178:

> [TRADUCTION] Une telle interprétation [celle de l'assureur] annulerait en grande partie, sinon totalement, l'objet de l'assurance—une situation qui doit être évitée, dans la mesure où les termes employés le permettent.

L'appelante, en qualité de propriétaire et d'exploitant d'une grande usine de produits forestiers, a voulu assurer la machinerie utilisée dans l'usine à des fins industrielles. Il n'est pas contesté que les échangeurs de chaleur en question sont protégés par le contrat d'assurance. Il n'est pas non plus sérieusement contesté, du moins lorsque le litige