reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it

est venu devant cette Cour, que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne et de la fuite consécutive d'huile dans l'eau de condensation. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Si une cour devait accepter la prétention de l'intimée, que la perte subie par l'assurée en raison de la panne de la machinerie causée par l'usure normale et que l'immobilisation consécutive de l'usine étaient exclues par la définition d'accident, alors l'assurée n'aurait obtenu, par ses primes, aucune garantie pour ce qui peut bien être la source de perte la plus vraisemblable, ou certainement un risque constant dans presque toute l'usine. De même, interpréter la corrosion au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat. Il est possible que des assureurs prétendent que la prime sera fixée en fonction d'une garantie aussi limitée. Il n'y a aucune preuve à cet effet en l'espèce.

Il est également bien possible que l'industrie des assurances prétende qu'appliquer l'interprétation la plus favorable à cette disposition ambiguë va imposer un fardeau inutile et injuste à l'assureur. L'assureur en vertu de cette police peut invoquer au moins deux mécanismes de défense pour lui venir facilement en aide: premièrement, le droit d'inspection qui a été exercé en l'espèce, avant et pendant le contrat; et, deuxièmement le droit de mettre fin au contrat si l'assureur est d'avis que l'état de la machinerie est tel qu'il est impossible d'accorder la garantie de la manière stipulée au contrat.

Je suis donc d'avis d'accueillir le pourvoi, d'infirmer le jugement de la cour de première instance et l'arrêt de la Cour d'appel et d'ordonner que l'appelante a le droit de recouvrer $158,289.24 avec intérêt à compter du 1er avril 1969, tel que

1979 CanLII 10 (SCC)

1979 CanLII 10 (SCC)

being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs,* MARTLAND, RITCHIE *and* McINTYRE JJ. *dissenting.*

*Solicitors for the appellant: Desjardins, Ducharme, Desjardins & Bourque, Montreal.*

*Solicitors for the respondent: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montreal.*

demandé (soit la date du dépôt de la réclamation, date qui n'a été contestée devant aucune cour dans les présentes procédures), et les dépens dans toutes les cours. Si les parties ne s'entendent pas sur la question de savoir si les dommages-intérêts pour la «perte directe» au montant de $15,604.44 susmentionné s'appliquent en fait à la réparation des dommages causés par la corrosion et ne devraient donc pas être inclus dans les dommages-intérêts accordés, compte tenu des présents motifs, elles devront s'adresser à un juge de la Cour supérieure pour faire trancher cette question.

*Pourvoi accueilli avec dépens, les juges* MARTLAND, RITCHIE *et* McINTYRE *étant dissidents.*

*Procureurs de l'appelante: Desjardins, Ducharme, Desjardins & Bourque, Montréal.*

*Procureurs de l'intimée: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montréal.*

reached this Court, that corrosion of the tubes inside the heat exchanger, probably caused by the presence of sea water, was the effective cause of the breakdown of the heat exchanger, and the consequential release of oil into the processed steam. The insurer, as was its right, sought in the terms of the contract to limit its exposure to accidental loss and did so by seeking to confine the definition of accident. If a court were to accept the submissions of the respondent, that loss suffered by the insured by reason of the failure of a machine due to wear and tear and the consequential downtime of the plant was excluded by the definition of accident, then the insured would have purchased, by its premiums, no coverage for what may well be the most likely source of loss, or certainly a risk pervasive through much of the plant. Similarly, to interpret corrosion as that word is employed in the definition of accident in the manner sought by the respondent would be to eliminate from the insurance coverage any and all loss suffered by the insured mill operator by reason of the intervention of the condition of corrosion. Such an interpretation would necessarily result in a substantial nullification of coverage under the contract. It may well be argued by insurers that the premium will reflect such a narrowed coverage. There is no evidence that such is the case here.

It may also be argued by the insurance industry that applying the more favourable construction to this ambiguous provision will be to unnecessarily and unfairly burden the carrier. The carrier under this policy has at least two defensive mechanisms which it can readily call to its aid: firstly, the right of inspection which was exercised here both before and during the contract; and secondly, the right to terminate in the event the insurance carrier determines that the condition of the insured machinery is such as to make it impractical to extend coverage in the manner required by the contract.

I therefore would allow the appeal, set aside the judgment at trial and of the Court of Appeal and direct the entry of judgment in favour of the appellant in the amount of $158,289.24 with interest from the 1st of April, 1969, as claimed (it

est venu devant cette Cour, que la corrosion des tubes à l'intérieur des échangeurs de chaleur, probablement causée par la présence d'eau de mer, a été la cause réelle de leur panne et de la fuite consécutive d'huile dans l'eau de condensation. Comme il en a le droit, l'assureur a cherché dans les termes du contrat à limiter sa protection à la perte accidentelle, ce qu'il a fait en essayant de restreindre la définition d'accident. Si une cour devait accepter la prétention de l'intimée, que la perte subie par l'assurée en raison de la panne de la machinerie causée par l'usure normale et que l'immobilisation consécutive de l'usine étaient exclues par la définition d'accident, alors l'assurée n'aurait obtenu, par ses primes, aucune garantie pour ce qui peut bien être la source de perte la plus vraisemblable, ou certainement un risque constant dans presque toute l'usine. De même, interpréter la corrosion au sens où ce mot est employé dans la définition d'accident, comme le désire l'intimée, équivaudrait à éliminer de la protection de l'assurance toutes les pertes subies par l'assurée en raison de la présence de corrosion. Pareille interprétation entraînerait nécessairement la suppression d'une partie importante de la protection prévue au contrat. Il est possible que des assureurs prétendent que la prime sera fixée en fonction d'une garantie aussi limitée. Il n'y a aucune preuve à cet effet en l'espèce.

Il est également bien possible que l'industrie des assurances prétende qu'appliquer l'interprétation la plus favorable à cette disposition ambiguë va imposer un fardeau inutile et injuste à l'assureur. L'assureur en vertu de cette police peut invoquer au moins deux mécanismes de défense pour lui venir facilement en aide: premièrement, le droit d'inspection qui a été exercé en l'espèce, avant et pendant le contrat; et, deuxièmement le droit de mettre fin au contrat si l'assureur est d'avis que l'état de la machinerie est tel qu'il est impossible d'accorder la garantie de la manière stipulée au contrat.

Je suis donc d'avis d'accueillir le pourvoi, d'infirmer le jugement de la cour de première instance et l'arrêt de la Cour d'appel et d'ordonner que l'appelante a le droit de recouvrer $158,289.24 avec intérêt à compter du 1ᵉʳ avril 1969, tel que

1979 CanLII 10 (SCC)

1979 CanLII 10 (SCC)

being the date of submission of claim and which date has not been contested in any court in these proceedings), together with costs throughout. In the event the parties are in disagreement as to whether the "Direct Damage" in the amount of $15,604.44 mentioned above is, in fact, repairs of the actual corrosion damage and should not therefore, on the basis of these reasons be included in judgment granted, the matter shall be determined on application to a Judge of the Superior Court.

*Appeal allowed with costs,* MARTLAND, RITCHIE *and* McINTYRE JJ. *dissenting.*

*Solicitors for the appellant: Desjardins, Ducharme, Desjardins & Bourque, Montreal.*

*Solicitors for the respondent: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montreal.*

demandé (soit la date du dépôt de la réclamation, date qui n'a été contestée devant aucune cour dans les présentes procédures), et les dépens dans toutes les cours. Si les parties ne s'entendent pas sur la question de savoir si les dommages-intérêts pour la «perte directe» au montant de $15,604.44 susmentionné s'appliquent en fait à la réparation des dommages causés par la corrosion et ne devraient donc pas être inclus dans les dommages-intérêts accordés, compte tenu des présents motifs, elles devront s'adresser à un juge de la Cour supérieure pour faire trancher cette question.

*Pourvoi accueilli avec dépens, les juges* MARTLAND, RITCHIE *et* McINTYRE *étant dissidents.*

*Procureurs de l'appelante: Desjardins, Ducharme, Desjardins & Bourque, Montréal.*

*Procureurs de l'intimée: Martineau, Walker, Allison, Beaulieu, MacKell & Clermont, Montréal.*

TAB 46

CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)
91 U.S.P.Q.2d 1209

566 F.3d 1069
United States Court of Appeals,
Federal Circuit.

COREBRACE LLC, Plaintiff–Appellant,

v.

STAR SEISMIC LLC, Defendant–Appellee.

No. 2008–1502.     |     May 22, 2009.

**Synopsis**
**Background:** Owner of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings brought action against licensee of patent alleging breach of patent license agreement and patent infringement. The United States District Court for the District of Utah, Dale A. Kimball, J., dismissed owner's claims. Owner appealed.

**[Holding:]** The Court of Appeals, Lourie, Circuit Judge, held that licensee did not breach license by contracting with third parties to have the licensed products made for its own use.

Affirmed.

West Headnotes (6)

**[1]**     **Patents**
     🔑 Assignments and sublicenses
     Under Utah law, as predicted by the district court, licensee of patent directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings did not breach license granting it a nonexclusive right to "make, use, and sell" licensed products by contracting with third parties to have the licensed products made for its own use, even though the license stated that licensee could not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company, absent a clear intent in the contract to exclude "have made" rights.

     5 Cases that cite this headnote

**[2]**     **Courts**
     🔑 Particular questions or subject matter
     The question whether a motion to dismiss for failure to state a claim was properly granted in a patent infringement suit is a purely procedural question not pertaining to patent law, to which the Court of Appeals for the Federal Circuit applies the rule of the regional circuit.

     26 Cases that cite this headnote

**[3]**     **Contracts**
     🔑 What law governs
     The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract.

     Cases that cite this headnote

**[4]**     **Patents**
     🔑 Construction and Operation of Licenses
     Under Utah law, as predicted by the district court, the right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear indication of intent to the contrary.

     3 Cases that cite this headnote

**[5]**     **Contracts**
     🔑 Construction as a whole
     **Contracts**
     🔑 Language of contract
     Under Utah law, in construing a contract a court first looks to the plain language within the four corners of the agreement to determine the intentions of the parties, and attempts to harmonize the provisions in the agreement.

     Cases that cite this headnote

**[6]**     **Patents**
     🔑 Original utility
     7,188,452. Not Infringed.

     Cases that cite this headnote

91 U.S.P.Q.2d 1209

**Attorneys and Law Firms**

**\*1070** Charles L. Roberts, Workman Nydegger, of Salt Lake City, UT, argued for plaintiff-appellant. With him on the brief were L. David Griffin, Matthew A. Barlow, and Chad E. Nydegger. Of counsel on the brief was Mark E. Wilkey, Core–Brace, LLC, of West Jordan, UT.

H. Dickson Burton, TraskBritt, PC, of Salt Lake City, UT, argued for defendant-appellee. With him on the brief were Brick G. Power, and Casey K. McGarvey.

Before LOURIE, FRIEDMAN, and PROST, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

CoreBrace LLC ("CoreBrace") appeals from the judgment of the United States District Court for the District of Utah dismissing its claims for breach of a patent license agreement and for patent infringement. *See Corebrace LLC v. Star Seismic LLC*, No. 2:08–cv–11, 2008 U.S. Dist. Lexis 55471 (D.Utah July 18, 2008). Because the court did not err in concluding that Star Seismic LLC's ("Star's") license to make, use, and sell the patented product carried with it an implied license to have the product made by a third party, we affirm.

**BACKGROUND**

CoreBrace owns U.S. Patent 7,188,452 ("the #452 patent"), which is directed to a brace for use in the fabrication of earthquake-resistant steel-framed buildings. On June 10, 2007, Star and the inventor of the #452 patent entered into a "Non–Exclusive License Agreement" ("License"), by which Star received a license under the #452 patent; the inventor later transferred his interest to CoreBrace. The License grants Star a nonexclusive right to "make, use, and sell" licensed products. It does not explicitly provide a right to have the licensed product made by a third party. The License does state that Star may not "assign, sublicense, or otherwise transfer" its rights to any party except an affiliated, parent, or subsidiary company. It also reserves to CoreBrace "all rights not expressly granted to [Star]." However, it provides that Star owns any technological improvements "by a third party whose services have been contracted by [Star]."

Star used third-party contractors to manufacture licensed products for its own use. CoreBrace contends that such use of third parties was a breach of the License because Star lacked the right to have a third party make products for Star. On January 4, 2008, CoreBrace sent a letter to Star stating that the License was terminated. The License provides that it can be terminated if it is breached, after written notice of the breach and after a thirty-day opportunity to cure. CoreBrace has not alleged that it provided notice of a breach or that it gave Star thirty days to cure such breach.

On January 4, 2008, the same day that it sent the termination letter, CoreBrace sued Star for breach of the License due to Star's use of third-party contractors and for patent infringement based on Star's use of patented products under a terminated License. Star moved to dismiss the **\*1071** complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, and the district court granted Star's motion. The court held that Star did not breach the License by having third-party contractors make the licensed products. According to the court, under *Carey v. United States,* 164 Ct.Cl. 304, 326 F.2d 975 (1964), a patent licensee's right to "make" an article includes the right to engage others to do all of the work connected with its production. The court also relied on similar reasoning in *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 362, 36 Cal.Rptr.2d 581, 885 P.2d 994 (1994). The court further reasoned that, even when a license prohibits sublicensing, as in this case, "have made" rights are granted unless they are expressly prohibited. The court distinguished *Intel Corp. v. U.S. International Trade Commission,* 946 F.2d 821 (Fed.Cir.1991), as a case that was primarily about "foundry" rights, or a licensee's rights to make a product and sell it under a third party's name, and as having been based on the parol evidence of the parties' intent in that case not to grant such foundry rights. The court also examined the License and, based on its apparent acknowledgment of third-party manufacturers, concluded that nothing in the License precluded Star from having a third party manufacture the licensed product for Star. Thus, the court held that Star had the right to have a third party manufacture the licensed product for it.

The court then held that, even if Star had breached the License, CoreBrace did not properly terminate it because CoreBrace failed to follow the License's termination provisions. CoreBrace had conceded that it had not followed the termination provisions, but had argued that Star's breach of the License was incurable, so notice was not required prior to termination. According to the court, however, Star's

91 U.S.P.Q.2d 1209

alleged breach was not incurable, as CoreBrace could have notified Star that it should make the product itself, cease using a third party, or have the third party obtain a license. Such action, according to the court, would not have been impossible or futile. Furthermore, the court found that the alleged breach did not frustrate the purpose of the License, as the inventor collected a royalty from Star on each product, no matter who manufactured it. Thus, according to the court, CoreBrace should have followed the prescribed procedure for terminating the License, and the failure to properly terminate it meant that Star retained its rights under the License.

Finally, the court held that, because the License was neither breached nor terminated, Star could not have infringed the patent under which it was licensed. CoreBrace timely appealed the district court's dismissal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

 [1]   CoreBrace argues that the district court erred in holding that the License was not breached. The License reserves to CoreBrace all rights not expressly granted, and, according to CoreBrace, the district court found that "have made" rights were not expressly granted. CoreBrace also asserts that "have made" rights are not inherent in the right to make, use, and sell, as a licensee can make the product itself rather than having it made by a third party. Thus, CoreBrace argues that Star did not have the right to have a third party make the products.

CoreBrace also argues that the court improperly distinguished Intel and relied on *Advanced Micro* and *Carey* to hold that a prohibition on "have made" rights must be explicit. According to CoreBrace, in **\*1072** *Intel*, this court held that "have made" rights were restricted by the reservation of rights clause in the license. CoreBrace asserts that *Advanced Micro* is inapposite because the ruling was on appeal from an arbitrator. CoreBrace also argues that *Carey* is inapposite because the exclusive license in that case granted the right to sublicense, which, according to CoreBrace, includes the right to "have made."

Finally, CoreBrace argues that, although certain provisions in the License mention "third parties," the License also mentions specific third parties, not including third-party manufacturers. Thus, according to CoreBrace, the License would have mentioned third-party manufacturers if the parties had intended for such manufacturers to be permitted. Although the License mentions third parties in general whose services have been contracted for by Star, CoreBrace argues that those third parties might be architects, contractors, or others with a connection to Star, rather than manufacturers.

Star responds that the grant of a right to "make, use, and sell" inherently includes the right to have others make the product, as the Court of Claims held in *Carey.* Star also asserts that the facts of *Intel* differ from this case, as the question in *Intel* was whether the licensee could operate as a foundry, *i.e.,* make the product for a third party and sell it under the third party's name. Moreover, according to Star, the decision in *Intel* was based on strong parol evidence and applied the law of a different circuit. Furthermore, Star argues that the California Supreme Court later concluded in *Advanced Micro* that "have made" rights are included in a license to "make, use, and sell" unless they have been expressly excluded.

Star also argues that the License specifically provides that Star may contract with third parties to exercise its rights, which necessarily includes contracting with third-party manufacturers. Moreover, according to Star, the License requires Star to provide its supply and service contracts for inspection, implying that such supply and service contracts, including manufacturing contracts, are permissible.

 [2]   [3]   We conclude that in granting the 12(b)(6) motion the district court correctly determined that Star was entitled to have contractors make the licensed product and did not breach the patent license in doing so. "The question ... whether a Rule 12(b)(6) motion was properly granted is a purely procedural question not pertaining to patent law, to which this court applies the rule of the regional [ ] circuit," in this case the Tenth Circuit. *Gen. Mills, Inc. v. Kraft Foods Global, Inc.,* 487 F.3d 1368, 1373 (Fed.Cir.2007) (quotation marks omitted). "Because the sufficiency of a complaint is a question of law, [the Tenth Circuit] review[s] *de novo* the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court." *Sunrise Valley, LLC v. Kempthorne,* 528 F.3d 1251, 1254 (10th Cir.2008) (quotation marks omitted). "A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock,* 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). The appropriate law for construing the terms of a contract is the law of the jurisdiction identified in the contract, in this case Utah law. *See Rash v. J.V. Intermediate, Ltd.,* 498 F.3d 1201, 1206 (10th Cir.2007).

91 U.S.P.Q.2d 1209

**[4]**  **[5]**  Star did not breach the License by contracting with third parties to have the licensed products made for it. The right to "make, use, and sell" a product inherently includes the right to have it made by a third party, absent a clear **\*1073** indication of intent to the contrary. No Utah Supreme Court case has addressed the scope of a right to "make, use, and sell" a product. However, "[w]here the state's highest court has not addressed the issue presented, the federal court must determine what decision the state court would make if faced with the same facts and issue." *Id.* at 1206 (quotation marks omitted). Utah follows general principles of contract law, which we will apply here. *See Cent. Fla. Invs., Inc. v. Parkwest Assocs.,* 40 P.3d 599, 605 (Utah 2002). Under Utah law, "we first look to the plain language within the four corners of the agreement to determine the intentions of the parties, and we attempt to harmonize the provisions in the ... agreement." *Id.* In addition, other courts have addressed the scope of the right to "make, use, and sell" a product, and we will look to them to guide our decision.

In *Carey,* the Court of Claims, one of our predecessor courts, whose decisions bind us, *see South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982), held that a license to "produce, use, and sell" a product inherently includes the right to have it made by a third party. The court stated that a license to produce, use, and sell "is not restricted to production by the licensee personally or use by him personally or sales by him personally. It permits him to employ others to assist him in the production, and in the use and in the sale of the invention. Nor need he take any personal part in the production." *Carey,* 326 F.2d at 979. Thus, "his license permits him to engage others to do all the work connected with the production of the article for him." *Id.*; *see also Advanced Micro,* 36 Cal.Rptr.2d 581, 885 P.2d at 1009 n. 15 (" '[H]ave-made' rights—the right of a licensee to have a chip made for it by a third party foundry —were not expressly excluded under the 1982 contract, and in the absence of any finding by the arbitrator we cannot say they were not included in the contractual right to make and sell a licensed product."). Thus, one of our predecessor courts and the California Supreme Court have both persuasively held that a "have made" right is implicit in a right to make, use, and sell, absent an express contrary intent. We consider that the Utah Supreme Court would therefore likely arrive at the same conclusion were it to consider the issue.

CoreBrace argues that the situation in *Carey* was different from the situation in this case because that license was exclusive and included a right to sublicense, which itself

would inherently include a right to have the product made. We disagree. The court in *Carey* did not base its conclusion on exclusivity or the right to sublicense, but the right to "produce, use, and sell." The court specifically stated that "[a] licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others" to produce it for him. *Carey,* 326 F.2d at 979. None of that logic relies on the licensee's right to sublicense; in other words, a right to have made is not a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee. *See Cyrix Corp. v. Intel Corp.,* 77 F.3d 1381, 1387–88 (holding that Cyrix's exercise of its expressly granted "have made" rights did not amount to a sublicense). The contractor cannot make or use for anyone other than the licensee or sell to third parties. Similarly, regarding the distinction between having an exclusive and nonexclusive license, a nonexclusive licensee who could make, use, and sell would still be entitled to have a product made for itself by another party in order to use or sell the product without making it, even if **\*1074** the patent owner granted other licenses. The distinction between an exclusive license and a nonexclusive license has no relevance to how a licensee obtains the product it is entitled to make, use, and sell. Thus, the logic of the holding in *Carey* is not limited to exclusive licenses or licenses that include a right to sublicense.

We also agree with Star that *Intel* is inapposite to this case. *Intel* was a special facts case. There, Intel sued Atmel for patent infringement, as Atmel was using Sanyo, a licensee, as a foundry for an allegedly infringing product of Atmel's design, *i.e.,* Atmel had Sanyo manufacture the product, and Atmel sold it under Atmel's own name. Atmel argued that Intel's license to Sanyo included foundry rights, which would have allowed Atmel to sell the licensed product under its own name because it was manufactured by Sanyo. *Intel,* 946 F.2d at 826. Thus, the sole issue was whether the license to Sanyo granted such foundry rights. In determining that Sanyo did not have the right under the license to act as a foundry, we discussed two provisions of the license, a reservation of rights clause and Intel's grant to Sanyo of the right to make, use, and sell only "Sanyo" products. *Id.* at 826 n. 9. We determined that Sanyo had no foundry rights under the contract, holding that the addition of the word "Sanyo" to limit the products covered under the license was intended to exclude foundry rights. *Id.* at 826–28. Otherwise, it would be tantamount to granting Sanyo a right to sublicense, a right it did not have. All Sanyo had was the right to manufacture for its own purposes.

In determining that the "Sanyo" limitation excluded foundry rights, we addressed "have made" rights. Unlike in this case, both parties in *Intel* agreed that Sanyo's license excluded "have made" rights. *Id.* at 287, 36 Cal.Rptr.2d 581, 885 P.2d 994. However, the parties disputed the textual source for such exclusion: whether it was the "Sanyo" limitation or the reservation of rights clause. Atmel argued that the "Sanyo" limitation was intended to exclude only "have made" rights, rather than foundry rights. *Id.* The administrative law judge of the International Trade Commission found that "have made" rights were excluded, not because of the "Sanyo" limitation, but because of the reservation of rights clause. *Id.* at 827–28. After first acknowledging the administrative law judge's reasoning, we stated another reason for denying "have made" rights, *viz.,* that "have made" rights were also precluded by the "Sanyo" limitation, as were foundry rights. *Id.* at 828. Thus, we did not base our holding in *Intel* on a determination that the reservation of rights clause precluded "have made" rights, but instead on a determination that the entire contract, including the "Sanyo" limitation, precluded "have made" rights. Because *Intel* was a case about foundry rights, rather than "have made" rights, and because our holding relied on the "Sanyo" limitation, we do not find *Intel* persuasive or controlling in this case. Instead, the *Carey* holding and reasoning control here.

CoreBrace argues that the reservation of rights clause in the License precludes an interpretation that the License includes "have made" rights. According to CoreBrace, because the License reserves to CoreBrace "[r]ights not expressly granted to [Star]," the License could not have implicitly granted "have made" rights to Star. We disagree. Because the right to "make, use, and sell" a product *inherently* includes the right to have it made, "have made" rights are included in the License and not excluded by the reservation of rights clause. A grant of a right to "make, use, and sell" a product, without more, inherently includes a right to have a third party make the product. A clear intent **\*1075** shown in a contract to exclude "have made" rights can negate what would otherwise be inherent. In this case, however, CoreBrace has failed to show a clear intent to exclude "have made" rights from the License. In fact, other provisions of the License appear to contemplate that Star may have the product made by a third party. For example, the License provides that Star owns any improvements to the technology "by a third party whose services have been contracted by [Star]." Although, as CoreBrace argues, that third party might be other than a manufacturer, nothing in the License precludes it from being a third-party manufacturer. In

fact, a likely party to improve the licensed technology is the manufacturer, so a third party who improves the technology is likely to be a third-party manufacturer. Similarly, the License requires Star to allow an "audit of its books and records relating to manufacturing ... [and] supply contracts." Those provisions indicate that the parties contemplated that third parties might manufacture the licensed products and supply them to Star.

Most importantly, nothing in the License indicates an intent to exclude "have made" rights. CoreBrace argues that the License's provision requiring Star to indemnify CoreBrace for all claims "arising out of [Star's] manufacture" demonstrates an intent that no third party manufacture the products. According to CoreBrace, if "have made" rights had been intended, the License would have required indemnification for all claims arising out of third parties' manufacture as well. However, that vague reference does not show a clear intent to exclude "have made" rights, especially in light of the provisions indicating that third parties might be involved in supplying goods and improving the technology in order for Star to exercise its rights under the License. CoreBrace has not pointed to any provision in the License that shows a clear intent to exclude "have made" rights from its grant.

We therefore hold that Star did not breach the License by contracting with third parties to have the licensed products made for its own use. As for CoreBrace's argument that the district court erred in holding that CoreBrace had failed to adequately terminate the License, the issue is moot because the license was not breached. CoreBrace was not entitled to terminate the license, and thus the License has not been terminated. Thus, Star cannot have infringed CoreBrace's patent under which it was licensed.

We have considered CoreBrace's remaining arguments and find them unpersuasive.

## CONCLUSION

Accordingly, the judgment of the district court dismissing the case for failure to state a claim is affirmed.

*AFFIRMED*

**Parallel Citations**

91 U.S.P.Q.2d 1209

**CoreBrace LLC v. Star Seismic LLC, 566 F.3d 1069 (2009)**
91 U.S.P.Q.2d 1209

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 47

419 F.3d 195
United States Court of Appeals,
Third Circuit.

In re: OWENS CORNING, a Delaware
Corporation Credit Suisse First Boston, as Agent
for the prepetition bank lenders, Appellant.

No. 04–4080.    |    Argued Feb. 7,
2005.    |    Opinion filed Aug. 15, 2005.
|    As Amended Aug. 23, 2005, Sept. 2,
2005, Oct. 12, 2005 and Nov. 1, 2007.

**Synopsis**
**Background:** Chapter 11 debtor-parent corporation and its subsidiaries, the manufacturers of asbestos products, filed motion for substantive consolidation, and bank consortium objected. The United States District Court for the District of Delaware, John P. Fullam, J., 316 B.R. 168, granted motion for substantive consolidation, and appeal was taken.

**[Holding:]** The Court of Appeals, Ambro, Circuit Judge, held that lower court should not have permitted the "deemed" consolidation of Chapter 11 estates of corporate-debtor-borrowers and related corporate entities that guaranteed their loan obligations, to extent that consolidation was sought as sword, primarily to disadvantage lender by depriving it of guarantees for which it had bargained.

Reversed.

West Headnotes (22)

**[1]    Bankruptcy**
    Finality
Court of Appeals applies broader concept of finality when deciding whether order entered in bankruptcy proceeding is "final order," from which appeal will lie. 28 U.S.C.A. § 1291.

4 Cases that cite this headnote

**[2]    Bankruptcy**
    Decisions Reviewable
Four factors that Court of Appeals considers in deciding whether it should exercise jurisdiction over bankruptcy appeal are as follows: (1) impact on assets of bankruptcy estate; (2) necessity for further fact-finding on remand; (3) preclusive effect of Court's decision on merits of further litigation; and (4) interests of judicial economy. 28 U.S.C.A. § 1291.

5 Cases that cite this headnote

**[3]    Bankruptcy**
    Finality
As general rule, bankruptcy court order substantively consolidating different estates is "final order," from which appeal will lie as of right, as order which has profound effect on assets of consolidated entities, which appellate court can review without necessity of additional fact-finding, which clearly will have preclusive effect in subsequent litigation, and which is best reviewed immediately in order to serve interest of judicial economy. 28 U.S.C.A. § 1291.

6 Cases that cite this headnote

**[4]    Bankruptcy**
    Finality
District court's order substantively consolidating assets and liabilities of debtor-borrowers and the subsidiaries that guaranteed their obligations on loan, in anticipation of plan of reorganization that was to be filed in Chapter 11 case, was "final order," from which appeal would lie as of right, although order would be implemented only when plan was confirmed and payment became obligatory thereunder. 28 U.S.C.A. § 1291.

5 Cases that cite this headnote

**[5]    Bankruptcy**
    Transfer and Consolidation of Cases
**Bankruptcy**
    Equitable powers and principles
Substantive consolidation of bankruptcy estates is construct of federal common law, emanating from equity.

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 14 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

**[6]**    **Bankruptcy**

👉 Transfer and Consolidation of Cases

When debtors are substantively consolidated, they are merged into a single survivor which is left with all of the cumulative assets and liabilities, except for inter-entity liabilities, which are erased; result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.

21 Cases that cite this headnote

**[7]**    **Bankruptcy**

👉 Grounds and objections; factors considered

Substantive consolidation of debtors' estates cannot be justified vis-a-vis the claims of objecting creditor that relied on separateness of debtor entities.

5 Cases that cite this headnote

**[8]**    **Bankruptcy**

👉 Transfer and Consolidation of Cases

**Bankruptcy**

👉 Equitable powers and principles

Bankruptcy courts must respect entity separateness, absent compelling circumstances calling equity, and possibly substantive consolidation, into play.

4 Cases that cite this headnote

**[9]**    **Bankruptcy**

👉 Transfer and Consolidation of Cases

**Bankruptcy**

👉 Fraudulent conveyances in general

**Bankruptcy**

👉 Inequitable conduct

Harms that substantive consolidation addresses are nearly always those caused when debtors, and entities that they control, disregard separateness; harms caused by creditors typically are remedied by fraudulent transfer avoidance or equitable

subordination claims. Bankr.Code, 11 U.S.C.A. §§ 510(c), 548.

9 Cases that cite this headnote

**[10]**    **Bankruptcy**

👉 Grounds and objections; factors considered

Mere benefit to administration of bankruptcy case is insufficient basis for calling substantive consolidation into play.

Cases that cite this headnote

**[11]**    **Bankruptcy**

👉 Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise remedy, and court should employ this "rough justice" remedy only rarely and as matter of last resort after considering and rejecting other remedies.

2 Cases that cite this headnote

**[12]**    **Bankruptcy**

👉 Grounds and objections; factors considered

While substantive consolidation of bankruptcy estates may be used defensively in order to remedy identifiable harms caused by entangled affairs, it may not be used offensively, such as with primary purpose of disadvantaging tactically a group of creditors in plan process, or so as to alter creditor rights.

12 Cases that cite this headnote

**[13]**    **Bankruptcy**

👉 Grounds and objections; factors considered

What must be proven, absent consent, concerning the entities for whom substantive consolidation is sought is (1) that prepetition they disregarded separateness so significantly that their creditors relied on breakdown of entity borders and treated them as one legal entity; or (2) that postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 15 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

10 Cases that cite this headnote

**[14]    Bankruptcy**

👉 Grounds and objections;  factors considered

When substantive consolidation is ordered based
on debtor-entities' prepetition disregard of their
separateness, with result that their creditors
began to treat them as single entity, rationale
for consolidating debtors' estates is to protect
prepetition expectations of creditors.

15 Cases that cite this headnote

**[15]    Bankruptcy**

👉 Grounds and objections;  factors considered

When substantive consolidation is ordered based
on the scrambled nature of debtors' assets and
liabilities, rationale for consolidating debtors'
estates is at bottom one of practicality because,
without consolidation and in light of difficulties
of unscrambling assets and liabilities which have
been hopelessly commingled, all creditors will
be worse off, and there is threat that bankruptcy
case will be operated solely for benefit of
bankruptcy professionals.

2 Cases that cite this headnote

**[16]    Bankruptcy**

👉 Proceedings;  evidence

Proponents of substantive consolidation bear
burden of showing one of the two rationales on
which such consolidation may be premised.

Cases that cite this headnote

**[17]    Bankruptcy**

👉 Grounds and objections;  factors considered

**Bankruptcy**

👉 Proceedings;  evidence

Prima facie case exists for substantive
consolidation of bankruptcy estates where, based
upon parties' prepetition dealings, a proponent
proves corporate disregard creating contractual
expectations of creditors that they were dealing
with debtors as one indistinguishable entity;

creditor proponents of consolidation must
show that they actually and reasonably relied
on debtors' supposed unity, while creditor
opponents can defeat this prima facie showing if
they can prove that they are adversely affected
and actually relied upon debtors' separate
existence.

4 Cases that cite this headnote

**[18]    Bankruptcy**

👉 Particular cases

District court should not have substantively
consolidated Chapter 11 estates of corporate-
debtor-borrowers and related corporate entities
that guaranteed their loan obligations, where
lender had relied on debtors' separateness in
insisting on guarantees from affiliated entities
that, unlike debtor-borrowers, had no potential
exposure on asbestos claims, where there was
no hopeless commingling of debtors' assets and
liabilities but only the risk of some inaccuracies
in separating them, and where consolidation
that was sought was not true substantive
consolidation, but a deemed consolidation that
would operate primarily to disadvantage lender
by depriving it of guarantees for which it had
bargained.

12 Cases that cite this headnote

**[19]    Bankruptcy**

👉 Grounds and objections;  factors considered

Commingling of assets and liabilities of debtor-
entities justifies the substantive consolidation of
their estates only when separately accounting
for assets and liabilities of these distinct entities
will reduce recovery of every creditor, i.e.,
when every creditor will benefit from the
consolidation; moreover, this benefit should be
from cost savings that make assets available,
rather than from shifting of assets to benefit one
group of creditors at another's expense.

2 Cases that cite this headnote

**[20]    Bankruptcy**

👉 Grounds and objections;  factors considered

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 16 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Neither the impossibility of perfection in untangling affairs of debtor-entities nor likelihood of some inaccuracies in efforts to do so is sufficient to justify substantive consolidation of debtors' estates.

Cases that cite this headnote

[21]    **Bankruptcy**
👉 **Grounds and objections; factors considered**

Substantive consolidation of bankruptcy estates should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in plan negotiation process nor as "free pass" to spare debtors or any other group from proving challenges, like fraudulent transfer claims.

5 Cases that cite this headnote

[22]    **Bankruptcy**
👉 **Transfer and Consolidation of Cases**

**Bankruptcy**
👉 **Equitable powers and principles**

Substantive consolidation of bankruptcy estates is at its core an equitable remedy, and its exercise must lead to equitable result.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*198** Martin J. Bienenstock, (Argued), John J. Rapisardi, Richard A. Rothman, Timothy E. Graulich, Weil, Gotshal & Manges LLP, New York, NY, Ellen R. Nadler, Jeffrey S. Trachtman, Kenneth H. Eckstein, Philip S. Kaufman, Kramer, Levin, Naftalis & Frankel LLP, New York, NY, Roy T. Englert, Jr., Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC, Rebecca L. Butcher, Adam G. Landis, Richard S. Cobb, Landis, Rath & Cobb LLP, Wilmington, DE, for (Appellant) Credit Suisse First Boston Corp., as Agent for the prepetition bank lenders.

Alexandra A.E. Shapiro, Mitchell A. Seider, Alan Leavitt, Latham & Watkins LLP, New York, NY, Amanda P. Biles, Latham & Watkins LLP, Reston, Virginia, for (Amicus-

appellants) The Loan Syndications and Trading Association, Inc. and Clearing House Association L.L.C.

Richard M. Kohn, Andrew R. Cardonick, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz Ltd., Chicago, IL, Jonathan N. Helfat, Otterbourg, Steindler, Houston & Rosen, P.C., New York, NY, for (Amicus-appellant) Commercial Financial Association.

Robert K. Rasmussen, Milton Underwood Professor of Law, Vanderbilt Law School, Nashville, TN, for (Amicus-appellants) Robert K. Rasmussen, Barry Adler, Susan Block–Lieb, G. Marcus Cole, Marcel Kahan, Ronald J. Mann, and David A. Skeel, Jr.

Adam H. Isenberg, Saul Ewing LLP, Philadelphia, PA, Norman L. Pernick, J. Kate Stickles, Saul Ewing LLP, Wilmington, DE, Charles O. Monk, II, (Argued), Joseph M. Fairbanks, Henry R. Abrams, Dan Friedman, Saul Ewing LLP, Baltimore, MD, for (Appellee) Owens Corning, a Delaware Corporation; CDC Corp.; Engineered Yarns American Inc.; Exterior Systems Inc.; Falcon Foam Corp.; Fibreboard Corp.; HomeExperts; Integrex; Integrex Professional Services; Integrex Testing Systems; **\*199** Integrex Supply Chain Solutions LLC; Integrex Ventures LLC; Jefferson Holdings Inc.; Owens–Corning Fiberglass Technology Inc.; Owens–Corning HT, Inc.; Owens–Corning Overseas Holdings, Inc.; Owens–Corning Remodeling Systems, LLC; Soltech, Inc.

Elihu Inselbuch, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Nathan D. Finch, Walter B. Slocombe, Caplin & Drysdale, Chartered, Washington, DC, Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, for (Appellee) Official Committee of Unsecured Creditors.

Michael J. Crames, Jane W. Parver, Edmund M. Emrich, Andrew A. Kress, Kaye Scholer LLP, New York, NY, James L. Patton, Jr., Joseph M. Barry, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for (Appellee) James J. McMonagle, Legal Representative for Future Claimants.

J. Andrew Rahl, (Argued), John B. Berringer, John H. Doyle, III, Howard Ressler, Dennis J. Artese, Anderson, Kill & Olick, P.C., New York, NY, Francis A. Monaco, Jr., Monzack & Monaco P.A., Wilmington, DE, for (Appellee) Official Representatives of the Bondholders and Trade Creditors f/k/a Official Committee of Unsecured Creditors of Owens Corning.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 17 of 308

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

Howard A. Rosenthal, Alan R. Gordon, Pelino & Lentz P.C., Philadelphia, PA, Laurence J. Kaiser, Law Office of Laurence J. Kaiser, New York, NY, for (Amicus-appellee) Commercial Law League America.

Before ROTH, AMBRO and FUENTES, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

AMBRO, Circuit Judge.

We consider under what circumstances a court exercising bankruptcy powers may substantively consolidate affiliated entities. Appellant Credit Suisse First Boston ("CSFB") is the agent for a syndicate of banks (collectively, the "Banks")[1] that extended in 1997 a $2 billion unsecured loan to Owens Corning, a Delaware corporation ("OCD"), and certain of its subsidiaries. This credit was enhanced in part by guarantees made by other OCD subsidiaries. The District Court granted a motion to consolidate the assets and liabilities of the OCD borrowers[2] and guarantors in anticipation of a plan of reorganization.

The Banks appeal and argue that the Court erred by granting the motion, as it misunderstood the reasons for, and standards for considering, the extraordinary remedy of substantive consolidation, and in any event did not make factual determinations necessary even to consider its use. Though we reverse the ruling of the District Court, we do so aware that it acted on an issue with no opinion on point by our Court and differing rationales by other courts.

While this area of law is difficult and this case important, its outcome is easy with the facts before us. Among other problems, the consolidation sought is "deemed." Should we approve this non-consensual arrangement, the plan process would proceed as though assets and liabilities of separate entities were merged, but in fact they remain separate with the twist that the guarantees to the Banks are eliminated. From this we conclude that the **\*200** proponents of substantive consolidation request it not to rectify the seldom-seen situations that call for this last-resort remedy but rather as a ploy to deprive one group of creditors of their rights while providing a windfall to other creditors.

### I. Factual Background and Procedural History

#### A. Owens Corning Group of Companies

OCD and its subsidiaries (which include corporations and limited liability companies) comprise a multinational corporate group. Different entities within the group have different purposes. Some, for example, exist to limit liability concerns (such as those related to asbestos), others to gain tax benefits, and others have regulatory reasons for their formation.

Each subsidiary was a separate legal entity that observed governance formalities. Each had a specific reason to exist separately, each maintained its own business records, and intercompany transactions were regularly documented.[3] Although there may have been some "sloppy" bookkeeping, two of OCD's own **\*201** officers testified that the financial statements of all the subsidiaries were accurate in all material respects. Further, through an examination of the subsidiaries' books, OCD's postpetition auditors (Ernst & Young) have eliminated most financial discrepancies, particularly with respect to the larger guarantor subsidiaries.

#### B. The 1997 Credit Agreement

In 1997 OCD sought a loan to acquire Fibreboard Corporation. At this time OCD faced growing asbestos liability and a poor credit rating that hindered its ability to obtain financing. When CSFB was invited to submit a bid, it included subsidiary guarantees in the terms of its proposal. The guarantees gave the Banks direct claims against the guarantors for payment defaults. They were a "credit enhancement" without which the Banks would not have made the loan to OCD. All draft loan term sheets included subsidiary guarantees.

A $2 billion loan from the Banks to OCD closed in June 1997. The loan terms were set out primarily in a Credit Agreement. Among those terms were the guarantee provisions and requirements for guarantors, who were defined as "present or future Domestic Subsidiar[ies] ... having assets with an aggregate book value in excess of $30,000,000." Section 10.07 of the Agreement provided that the guarantees were "absolute and unconditional" and each "constitute[d] a guarant[ee] of payment and not a guarant[ee] of collection."[4] A "No Release of Guarantor" provision in § 10.8 stated that "the obligations of each guarantor ... shall not be reduced, limited or terminated, nor shall such guarantor be discharged

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

from any such obligations, for any reason whatsoever," except payment and performance in full or through waiver or amendment of the Credit Agreement. Under § 13.05 of the Credit Agreement, a guarantor could be released only through (i) the unanimous consent of the Banks for the guarantees of Fibreboard subsidiaries or through the consent of Banks holding 51% of the debt for other subsidiaries, or (ii) a fair value sale of the guarantor if its cumulative assets totaled less than 10% of the book value of the aggregate OCD group of entities.

CSFB negotiated the Credit Agreement expressly to limit the ways in which OCD could deal with its subsidiaries. For example, it could not enter into transactions with a subsidiary that would result in losses to that subsidiary. Importantly, the Credit Agreement contained provisions designed to protect the separateness of OCD and its subsidiaries. The subsidiaries agreed explicitly to maintain themselves as separate entities. To further this agreement, they agreed to keep separate books and financial records in order to prepare separate financial statements. The Banks were given the right to visit each subsidiary and discuss business matters directly with that subsidiary's management. The subsidiaries also were prohibited from merging into OCD because both entities were required to survive a transaction under § 8.09(a)(ii)(A) of the Credit Agreement. This provision also prohibited guarantor subsidiaries from merging with other subsidiaries unless there would be no effect on the guarantees' value.

## C. Procedural History

On October 5, 2000, facing mounting asbestos litigation, OCD and seventeen of its **202 subsidiaries (collectively, the "Debtors") filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq. [5] Twenty-seven months later, the Debtors and certain unsecured creditor groups (collectively, the "Plan Proponents") proposed a reorganization plan (as amended, the "Plan") predicated on obtaining "substantive consolidation" of the Debtors along with three non-Debtor OCD subsidiaries. [6] Typically this arrangement pools all assets and liabilities of the subsidiaries into their parent and treats all claims against the subsidiaries as transferred to the parent. In fact, however, the Plan Proponents sought a form of what is known as a "deemed consolidation," under which a consolidation is deemed to exist [7] for purposes of valuing and satisfying creditor claims, voting for or against the Plan, and making distributions for allowed claims under it. Plan § 6.1. Yet "the Plan would not result in the merger of or the transfer or commingling of any

assets of any of the Debtors or Non–Debtor Subsidiaries, ... [which] will continue to be owned by the respective Debtors or Non–Debtors." Plan § 6.1(a). Despite this, on the Plan's effective date "all guarantees of the Debtors of the obligations of any other Debtor will be deemed eliminated, so that any claim against any such Debtor and any guarantee thereof ... will be deemed to be one obligation of the Debtors with respect to the consolidated estate." Plan § 6.1(b). Put another way, "the Plan eliminates the separate obligations of the Subsidiary Debtors arising from the guarant[e]es of the 1997 Credit Agreement." Plan Disclosure Statement at A–9897.

The Banks objected to the proposed consolidation. Judge Alfred Wolin held a hearing on this objection. [8] He was subsequently recused from the Debtors' bankruptcy proceedings in light of In re Kensington Int'l Ltd., 368 F.3d 289 (3d Cir.2004), and Judge John Fullam was designated by the Chief Judge of our Court to replace him. Judge Fullam reviewed the transcripts and exhibits of the hearing, ordered additional briefing and on October 5, 2004, granted the consolidation motion in an order accompanied by a short opinion. In re Owens Corning, 316 B.R. 168 (Bankr.D.Del.2004).

Judge Fullam concluded that there existed "substantial identity between ... OCD and its wholly-owned subsidiaries." Id. at 171. He further determined that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors." Id. at 172. In Judge Fullam's view, it was "also clear that substantive consolidation would greatly simplify and expedite the successful completion of this entire bankruptcy proceeding. **203 More importantly, it would be exceedingly difficult to untangle the financial affairs of the various entities." Id. at 171. As such, he held substantive consolidation should be permitted, as not only did it allow "obvious advantages ... [, but was] a virtual necessity." Id. at 172. In any event, Judge Fullam wrote, "[t]he real issue is whether the Banks are entitled to participate, pari passu, with other unsecured creditors, or whether the Banks' claim is entitled to priority, in whole or in part, over the claims of other unsecured creditors." Id. But this issue, he stated, "cannot now be determined." Id.

CSFB appeals on the Banks' behalf.

## II. Appellate Jurisdiction

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 19 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

The Plan Proponents moved to dismiss the appeal of the District Court's order granting consolidation on the ground that it is not a "final decision" from which an appeal may be taken pursuant to 28 U.S.C. § 1291. [9] We denied that motion prior to oral argument in this case and noted that our reasoning would follow in this opinion.

[1]    Recognizing the "protracted nature of many bankruptcy proceedings, and the waste of time and resources that might result if immediate appeal [is] denied," *United States Trustee v. Gryphon at the Stone Mansion, Inc.,* 166 F.3d 552, 556 (3d Cir.1999), "[w]e apply a broader concept of 'finality' when considering bankruptcy appeals under § 1291 than we do when considering other civil orders under the same section." *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 470 (3d Cir.1998). *See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000) (noting that we impose a "relaxed standard" of finality because of unique considerations in bankruptcy cases); 16 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3926.2 at 274 (2d ed.1996) (describing the "Third Circuit's especially flexible approach to bankruptcy finality"). Particularly relevant to our case is that "[t]o delay resolution of discrete claims until after final approval of a reorganization plan ... would waste time and resources, particularly if the appeal resulted in reversal of a bankruptcy court order necessitating re-appraisal of the entire plan." *Clark v. First State Bank (In re White Beauty View, Inc.),* 841 F.2d 524, 526 (3d Cir.1988). We have also stressed that "issues central to the progress of the bankruptcy petition, those 'likely to affect the distribution of the debtor's assets, or the relationship among the creditors,' should be resolved quickly." *Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94, 98 (3d Cir.1988) (quoting *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech ),* 831 F.2d 410, 414 (3d Cir.1987)).

[2]    [3]    We consider four factors in determining whether we should exercise jurisdiction over a bankruptcy appeal: "(1) [t]he impact on the assets of the bankrupt estate; (2) [the][n]ecessity for further fact-finding on remand; (3) [t]he preclusive effect of [the Court's] decision on the merits of further litigation; and (4) [t]he interest of judicial economy." *Buncher,* 229 F.3d at 250. All four factors weigh heavily in favor of our jurisdiction to consider the appeal of an order granting substantive consolidation. We thus join the four Courts of Appeal that have exercised jurisdiction in this context. *Alexander v. Compton (In re Bonham ),* 229 F.3d

750, 762 (9th Cir.2000); *First Nat'l Bank of El* **\*204** *Dorado v. Giller (In re Giller ),* 962 F.2d 796, 797–98 (8th Cir.1992); *Eastgroup Props. v. S. Motel Ass'n,* 935 F.2d 245, 248 (11th Cir.1991); and *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.),* 860 F.2d 515, 516–17 (2d Cir.1988).

First, substantive consolidation has a profound effect on the assets of the consolidated entities. *See, e.g., Nesbit v. Gears Unlimited,* 347 F.3d 72, 86–87 (3d Cir.2003). Second, there is no need for additional fact-finding to assess the propriety of an order granting substantive consolidation. In this case, for example, Judge Fullam reached his decision after a thirteen-day evidentiary hearing was held by Judge Wolin, and after Judge Fullam reviewed "the transcript of the testimony, and ... the voluminous documentary record compiled in the course of the hearing, and [had] the benefit of post-trial briefing and argument." *In re Owens Corning,* 316 B.R. at 169. Third, a substantive consolidation order clearly has a preclusive effect on the merits of further litigation. In this case, the order precludes at least the Banks from asserting any right compromised or eliminated by virtue of the substantive consolidation. Last, the interests of judicial economy are best served by an immediate review of a substantive consolidation order. A later reversal of such an order risks rendering meaningless any proceedings premised on the viability of a plan that calls for a consolidation (even if for only a temporary period).

[4]    Having concluded that we generally have jurisdiction to review appeals of substantive consolidation orders, we inquire whether anything is "different" about this case. The Plan Proponents argue that

> [t]he District Court Order lacks finality because it will be implemented, if at all, only following approval of a disclosure statement, the solicitation and vote of creditors as to the terms of the Proposed Plan, and, assuming the requisite vote, final confirmation of the Proposed Plan, before which creditors other than the Bank Debt Holders shall be given the opportunity to contest substantive consolidation. [Bankruptcy Code] § 1129. Thus, the District Court Order is conditioned upon plan confirmation.... The District Court Order has no present impact

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 20 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

on the Debtors' estates and does not change the status quo.

Plan Proponents' Mot. to Dismiss at 10. In support of this contention, the Plan Proponents rely primarily on *In re A.S.K. Plastics, Inc.,* No. Civ. A. 04–2701, 2004 WL 1903322 (E.D.Pa. Aug. 24, 2004). Yet the conclusion that the Court lacked jurisdiction in *A.S.K. Plastics* was premised on the fact that "[u]nder no reasonable construction of the law could the Order's *conditional* consolidation be viewed as effect[ing] a 'practical termination' of anything." *Id.* at *2 (emphasis in original). That order "emphasized [that] ... [w]hen a final reorganization plan [was] submitted to the Bankruptcy Court, [the party appealing the order] [was] free to object to consolidation." *Id.* In effect, the *A.S.K. Plastics* order was designed to postpone consideration of the substantive consolidation issue until the plan confirmation stage.

That is not our case. For the Banks the District Court's determination is hardly conditional. It concluded "that substantive consolidation should be permitted." *In re Owens Corning,* 316 B.R. at 172. It made no provision for the Banks to reassert their objection to substantive consolidation at the plan confirmation stage; the order is final against them and is thus a practical termination of the substantive consolidation litigation.

**\*205** Lastly, we address the Plan Proponents' argument that a substantive consolidation order must immediately take effect in order to be final for purposes of our jurisdiction. What they ignore is that the order approving substantive consolidation is the foundation on which the Plan is built. To assert that the actual substantive consolidation can only be implemented in conjunction with the effectiveness of an approved plan puts form over function. As the Banks point out, "[t]here is no support for the proposition that final orders lose their finality because of a delay in implementation." CSFB Opp'n to Mot. to Dismiss at 13. Certainly, decisions resolving most disputes (notably, disputes over the validity and value of claims) are not implemented until a plan is confirmed and payment under the plan becomes obligatory. Yet we exercise jurisdiction to review many of these decisions before that "final" order issues. *See, e.g., Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.),* 405 F.3d 127 (3d Cir.2005). No reason exists for us to vary that routine here.

We conclude readily that we have appellate jurisdiction to consider the Banks' appeal under 28 U.S.C. § 1291.

## III. Substantive Consolidation

 **[5]** **[6]** Substantive consolidation, a construct of federal common law, emanates from equity. It "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005). Consolidation restructures (and thus revalues) rights of creditors and for certain creditors this may result in significantly less recovery.

While we have not fully considered the character and scope of substantive consolidation, we discussed the concept in *Nesbit,* 347 F.3d at 86–88 (surveying substantive consolidation case law for application by analogy to the Title VII inquiry of when to consolidate employers for the purpose of assessing a discrimination claim), and *In re Genesis Health Ventures,* 402 F.3d at 423–24 (examining, *inter alia,* whether a "deemed" consolidation for voting in connection with, and distribution under, a proposed plan of reorganization is a substantive consolidation for purposes of calculating U.S. Trustee quarterly fees under 28 U.S.C. § 1930(a)(6)). Other courts, including the Supreme Court itself in an opinion that spawned the concept of consolidation, have holdings more on point than heretofore have we. We begin with a survey of key cases, drawing from them when substantive consolidation may apply consistent with the principles we perceive as cabining its use, and apply those principles to this case.

### A. History of Substantive Consolidation

The concept of substantively consolidating separate estates begins with a commonsense deduction. Corporate disregard [10] as a fault may lead to corporate disregard as a remedy.

Prior to substantive consolidation, other remedies for corporate disregard were (and remain) in place. For example, where a subsidiary is so dominated by its **\*206** corporate parent as to be the parent's "alter ego," the "corporate veil" of the subsidiary can be ignored (or "pierced") under state law. Kors, *supra,* at 386–90 (citing as far back as I. Maurice Wormser, *Piercing the Veil of Corporate Entity,* 12 Colum. L.Rev. 496 (1912)). Or a court might mandate that the assets transferred to a corporate subsidiary be turned over to its

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

parent's trustee in bankruptcy for wrongs such as fraudulent transfers, Kors, *supra,* at 391, in effect bringing back to the bankruptcy estate assets wrongfully conveyed to an affiliate. If a corporate parent is both a creditor of a subsidiary and so dominates the affairs of that entity as to prejudice unfairly its other creditors, a court may place payment priority to the parent below that of the other creditors, a remedy known as equitable subordination, which is now codified in § 510(c) of the Bankruptcy Code. *See generally id.* at 394–95.

Adding to these remedies, the Supreme Court, little more than six decades ago, approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation. [11] *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941). In *Sampsell* an individual in bankruptcy had transferred assets prepetition to a corporation he controlled. (Apparently these became the corporation's sole assets.) When the bankruptcy referee ordered that the transferred assets be turned over by the corporation to the individual debtor's trustee, a creditor of the non-debtor corporation sought distribution priority with respect to that entity's assets. In deciding that the creditor should not be accorded priority (thus affirming the bankruptcy referee), the Supreme Court turned a typical turnover/fraudulent transfer case into the forebear of today's substantive consolidation by terming the bankruptcy referee's order (marshaling the corporation's assets for the benefit of the debtor's estate) as "consolidating the estates." *Id.* at 219, 61 S.Ct. at 907.

Each of these remedies has subtle differences. "Piercing the corporate veil" makes shareholders liable for corporate wrongs. Equitable subordination places bad-acting creditors behind other creditors when distributions are made. Turnover and fraudulent transfer bring back to the transferor debtor assets improperly transferred to another (often an affiliate). Substantive consolidation goes in a direction different (and in most cases further) than any of these remedies; it is not limited to shareholders, it affects distribution to innocent creditors, and it mandates more than the return of specific assets to the predecessor owner. It brings all the assets of a group of entities into a single survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Genesis Health Ventures,* 402 F.3d at 423. The bad news for certain creditors is that, instead of looking to assets of the subsidiary with whom they dealt, they now must share those assets with all creditors of

all consolidated entities, raising the specter for some of a significant distribution diminution.

Though the concept of consolidating estates had Supreme Court approval, Courts of Appeal (with one exception) were slow to follow suit. *Stone v. Eacho* (*In re Tip Top Tailors, Inc.*), 127 F.2d 284 (4th Cir.1942), *cert. denied,* 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), was the first to

**\*207** pick up on *Sampsell's* new remedy. [12] Little occurred thereafter for more than two decades, until the Second Circuit issued several decisions—*Soviero v. National Bank of Long Island,* 328 F.2d 446 (2d Cir.1964); *Chemical Bank New York Trust Co. v. Kheel* (*In re Seatrade Corp.*), 369 F.2d 845 (2d Cir.1966); *Flora Mir Candy Corp. v. R.S. Dickson & Co.* (*In re Flora Mir Candy Corp.*), 432 F.2d 1060 (2d Cir.1970); and *James Talcott, Inc. v. Wharton* (*In re Continental Vending Machine Corp.*), 517 F.2d 997 (2d Cir.1975)—that brought substantive consolidation as a remedy back into play and premise its modern-day understanding.

Other Circuit Courts fell in line in acknowledging substantive consolidation as a possible remedy. *See, e.g., FDIC v. Hogan* (*In re Gulfco Inv. Corp.*), 593 F.2d 921, 927–28 (10th Cir.1979); *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1092–93 (1st Cir.1983), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983); *Drabkin v. Midland–Ross Corp.* (*In re Auto–Train Corp.*), 810 F.2d 270, 276 (D.C.Cir.1987); *Eastgroup,* 935 F.2d at 248; *In re Giller,* 962 F.2d at 799; *First Nat'l Bank of Barnesville v. Rafoth* (*In re Baker & Getty Fin. Servs., Inc.*), 974 F.2d 712, 720 (6th Cir.1992); *Reider v. FDIC* (*In re Reider* ), 31 F.3d 1102, 1105–07 (11th Cir.1994); and *In re Bonham,* 229 F.3d at 771.

The reasons of these courts for allowing substantive consolidation as a possible remedy span the spectrum and often overlap. For example, *Stone* and *Soviero* followed the well-trod path of alter ego analysis in state "pierce-the-corporate-veil" cases. *Stone,* 127 F.2d at 287–89; *Soviero,* 328 F.2d at 447–48. *Accord In re Gulfco Inv. Corp.,* 593 F.2d at 928–29. *Kheel* dealt with, *inter alia,* the net-negative practical effects of attempting to thread back the tangled affairs of entities, separate in name only, with "interrelationships ... hopelessly obscured." 369 F.2d at 847. *See also, e.g., In re Augie/Restivo,* 860 F.2d at 518–19. *In re Continental Vending Machine* balanced the "inequities" involved when substantive rights are affected against the "practical considerations" spawned by "accounting difficulties (and expense) which may occur where the interrelationships of the corporate group are highly complex,

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

or perhaps untraceable." 517 F.2d at 1001. *See also, e.g., In re Auto–Train,* 810 F.2d at 276; *Eastgroup,* 935 F.2d at 249; *In re Giller,* 962 F.2d at 799; *In re Reider,* 31 F.3d at 1107–08. *See generally* Kors, *supra,* at 402–06.

Ultimately most courts slipstreamed behind two rationales—those of the Second Circuit in *Augie/Restivo* and the D.C. Circuit in *Auto–Train.* The former found that the competing "considerations are merely variants on two critical factors: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, **\*208** ... or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors...." *In re Augie/Restivo,* 860 F.2d at 518 (internal quotation marks and citations omitted). *Auto–Train* touched many of the same analytical bases as the prior Second Circuit cases, but in the end chose as its overarching test the "substantial identity" of the entities and made allowance for consolidation in spite of creditor reliance on separateness when "the demonstrated benefits of consolidation 'heavily' outweigh the harm." *In re Auto–Train,* 810 F.2d at 276 (citation omitted).

Whatever the rationale, courts have permitted substantive consolidation as an equitable remedy in certain circumstances. [13] No court has held that substantive consolidation is not authorized, [14] though there **\*209** appears nearly unanimous consensus that it is a remedy to be used "sparingly." *In re Augie/Restivo,* 860 F.2d at 518; *see also In re Bonham,* 229 F.3d at 767 (explaining that "almost every other court has noted [that substantive consolidation] should be used 'sparingly' ") (citing *In re Flora Mir,* 432 F.2d at 1062–63). [15]

**\*210  B. Our View of Substantive Consolidation**

[7]    Substantive consolidation exists as an equitable remedy. But when should it be available and by what test should its use be measured? As already noted, we have commented on substantive consolidation only generally in *Nesbit,* 347 F.3d at 86–88, and *In re Genesis Health Ventures,* 402 F.3d at 423–24. The latter nonetheless left little doubt that, if presented with a choice of analytical avenues, we favor essentially that of *Augie/Restivo. Id.* at 423. The *Auto–Train* approach (requiring "substantial identity" of entities to be consolidated, plus that consolidation is "necessary to avoid some harm or realize some benefit," 810 F.2d at 276) adopts, we presume, one of the *Augie/Restivo* touchstones for substantive consolidation while adding the low bar of avoiding some harm or discerning some benefit by consolidation. To us

this fails to capture completely the few times substantive consolidation may be considered and then, when it does hit one chord, it allows a threshold not sufficiently egregious and too imprecise for easy measure. For example, we disagree that "[i]f a creditor makes [a showing of reliance on separateness], the court may order consolidation ... if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." *Id.* at 276 (citation omitted); *see also Eastgroup,* 935 F.2d at 249. If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified *vis-à-vis* the claims of that creditor. [16]

In assessing whether to order substantive consolidation, courts consider many factors (some of which are noted in *Nesbit,* 347 F.3d at 86–88 nn. 7 & 9). They vary (with degrees of overlap) from court to court. Rather than endorsing any prefixed factors, in *Nesbit* we "adopt[ed] an intentionally open-ended, equitable inquiry ... to determine when substantively to consolidate two entities." *Id.* at 87. While we mentioned that "in the bankruptcy context the inquiry focuses primarily on financial entanglement," *id.,* this comment primarily related to the hopeless commingling test of substantive consolidation. But when creditors deal with entities as an indivisible, single party, "the line between operational and financial [factors] may be blurred." *Id.* at 88. We reiterate that belief here. Too often the factors in a checklist fail to separate the unimportant from the important, or even to set out a standard to make the attempt. *Accord* Br. of Law Professors [17] as *Amici Curiae* at 11–12. This often results in rote following of a form containing factors where courts tally up and spit out a score without an eye on the principles that give the rationale for substantive consolidation (and why, as a result, it should so seldom be in play). *Id.* **\*211** ("Differing tests with a myriad of factors run the risk that courts will miss the forest for the trees. Running down factors as a check list can lead a court to lose sight of why we have substantive consolidation in the first instance ... and often [to] fail [to] identify a metric by which [it] can ... [assess] the relative importance among the factors. The ... [result is] resort to ad hoc balancing without a steady eye on the ... [principles] to be advanced....").

[8]  [9]  [10]  [11]  [12]    What, then, are those principles? We perceive them to be as follows.

(1) Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[ ]." Kors, *supra,* at 410. As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial

markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2) The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness. [18] Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.*, fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3) Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4) Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5) While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).

**[13]    [14]    [15]**    The upshot is this. In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, [19] or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. [20]

**\*212 [16]    [17]**    Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation. The second rationale needs no explanation. The first, however, is more nuanced. A *prima facie* case for it typically exists when, based on the parties' prepetition dealings, a proponent proves corporate disregard creating

contractual expectations of creditors [21] that they were dealing with debtors as one indistinguishable entity. Kors, *supra*, at 417–18; Christopher W. Frost, *Organizational Form, Misappropriation Risk, and the Substantive Consolidation of Corporate Groups*, 44 Hastings L.J. 449, 457 (1993). Proponents who are creditors must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity. Kors, *supra*, at 418–19. Creditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence. [22]

## C. Application of Substantive Consolidation to Our Case

**[18]**    With the principles we perceive underlie use of substantive consolidation, the outcome of this appeal is apparent at the outset. Substantive consolidation fails to fit the facts of our case and, in any event, a "deemed" consolidation cuts against the grain of all the principles.

To begin, the Banks did the "deal world" equivalent of "Lending 101." They loaned $2 billion to OCD and enhanced the credit of that unsecured loan indirectly by subsidiary guarantees covering less than half the initial debt. What the Banks got in lending lingo was "structural seniority"—a direct claim against the guarantors (and thus against their assets levied on once a judgment is obtained) that other creditors of OCD did not have. This kind of lending occurs every business day. To undo this bargain is a demanding task.

## 1. NO PREPETITION DISREGARD OF CORPORATE SEPARATENESS

Despite the Plan Proponents' pleas to the contrary, there is no evidence of the prepetition disregard of the OCD entities' separateness. To the contrary, OCD (no less than CSFB) negotiated the 1997 lending transaction premised on the separateness of all OCD affiliates. Even today no allegation exists of bad faith by anyone concerning the loan. [23] In this context, OCD and the other Plan Proponents cannot now ignore, or have us ignore, the very ground rules OCD put in place. Playing by these rules means that obtaining the guarantees of separate entities, made separate **\*213** by OCD's choice of how to structure the affairs of its affiliate group of companies, entitles a lender, in bankruptcy or out, to look to any (or all) guarantor(s) for payment when the time comes. As such, the District Court's conclusions of "substantial identity" of OCD and its subsidiaries, and the

Banks' reliance thereon, are incorrect. For example, testimony presented by both the Banks and the Debtors makes plain the parties' intention to treat the entities separately. CSFB presented testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the value of the guarantees as partially derived from the separateness of the entities. As OCD concedes, these representatives "testified that the guarant[e]es were ... intended to provide 'structural seniority' to the banks," and were thus fundamentally premised on an assumption of separateness. Debtors Ans. Br. at 26.

In the face of this testimony, Plan Proponents nonetheless argue that the Banks intended to ignore the separateness of the entities. In support of this contention, they assert, *inter alia,* that because the Banks did not receive independent financial statements for each of the entities during the negotiating process, they must have intended to deal with them as a unified whole. Because the Banks were unaware of the separate financial makeup of the subsidiaries, the argument goes, they could not have relied on their separateness. [24]

This argument is overly simplistic. Assuming the Banks did not obtain separate financial statements for each subsidiary, they nonetheless obtained detailed information about each subsidiary guarantor from OCD, including information about that subsidiary's assets and debt. Moreover, the Banks knew a great deal about these subsidiaries. For example, they knew that each subsidiary guarantor had assets with a book value of at least $30 million as per the terms of the Credit Agreement, that the aggregate value of the guarantor subsidiaries was over $900 million and that those subsidiaries had little or no debt. Additionally, the Banks knew that Fibreboard's subsidiaries (including the entities that became part of ESI) had no asbestos liability, would be debt-free post-acquisition and had assets of approximately $700 million.

Even assuming the Plan Proponents could prove prepetition disregard of Debtors' corporate forms, we cannot conceive of a justification for imposing the rule that a creditor must obtain financial statements from a debtor in order to rely reasonably on the separateness of that debtor. Creditors are free to employ whatever metrics **\*214** they believe appropriate in deciding whether to extend credit free of court oversight. We agree with the Banks that "the reliance inquiry is not an inquiry into lenders' internal credit metrics. Rather, it is about the *fact* that the credit decision was made in reliance on the existence of separate entities...." CSFB Opening Br. at 31 (emphasis in original). [25] Here there is no serious dispute as to that fact.

## 2. NO HOPELESS COMMINGLING EXISTS POSTPETITION

There also is no meaningful evidence postpetition of hopeless commingling of Debtors' assets and liabilities. Indeed, there is no question which entity owns which principal assets and has which material liabilities. Likely for this reason little time is spent by the parties on this alternative test for substantive consolidation. It is similarly likely that the District Court followed suit.

[19]    The Court nonetheless erred in concluding that the commingling of assets will justify consolidation when "the affairs of the two companies are so entangled that consolidation *will be beneficial." In re Owens Corning,* 316 B.R. at 171 (emphasis added). As we have explained, commingling justifies consolidation only when separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of *every* creditor—that is, when every creditor will benefit from the consolidation. Moreover, the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another. Mere benefit to some creditors, or administrative benefit to the Court, falls far short. The District Court's test not only fails to adhere to the theoretical justification for "hopeless commingling" consolidation—that no creditor's rights will be impaired—but also suffers from the infirmity that it will almost always be met. That is, substantive consolidation will nearly always produce some benefit to some in the form of simplification and/or avoidance of costs. Among other things, following such a path misapprehends the degree of harm required to order substantive consolidation.

But no matter the legal test, a case for hopeless commingling cannot be made. Arguing nonetheless to the contrary, Debtors assert that "it would be practically impossible and prohibitively expensive in time and resources" to account for the voluntary bankruptcies of the separate entities OCD has created and maintained. Debtors Ans. Br. at 63. In support of this contention, Debtors rely almost exclusively on the District Court's findings that

> it would be exceedingly difficult to untangle the financial affairs of the various entities ... [and] there are ... many reasons for challenging the accuracy of the results achieved [in accounting efforts thus far]. For

In re Owens Corning, 419 F.3d 195 (2005)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 25 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

example, transfers of cash between subsidiaries and parent did not include any payment of interest; and calculations of royalties are subject to question.

*In re Owens Corning,* 316 B.R. at 171. Assuming *arguendo* that these findings are correct, they are simply not enough to establish that substantive consolidation is warranted.

[20]    Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation. We find *R 2 Investments, LDC v. World Access, Inc.* ( **\*215** *In re World Access, Inc.*), 301 B.R. 217 (Bankr.N.D.Ill.2003), instructive on this point. In *World Access* the Court noted that the controlling entity "had no uniform guidelines for the recording of intercompany interest charges" and that the debtors failed to "allocate overhead charges amongst themselves." *Id.* at 234. The Court held, however, that those accounting shortcomings were "merely imperfections in a sophisticated system of accounting records that were conscientiously maintained." *Id.* at 279. It ultimately concluded that "all the relevant accounting data ... still exist[ed]," that only a "reasonable review to make any necessary adjustments [was] required," and, thus, that substantive consolidation was not warranted. *Id.*

The record in our case compels the same conclusion. At its core, Debtors' argument amounts to the contention that because intercompany interest and royalty payments were not perfectly accounted for, untangling the finances of those entities is a hopeless endeavor. Yet imperfection in intercompany accounting is assuredly not atypical in large, complex company structures. For obvious reasons, we are loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy. And we find no reason to doubt that "perfection is not the standard in the substantive consolidation context." *Id.* We are confident that a court could properly order and oversee an accounting process that would sufficiently account for the interest and royalty payments owed among the OCD group of companies for purposes of evaluating intercompany claims—dealing with inaccuracies and difficulties as they arise and not in hypothetical abstractions.

On the basis of the record before us, the Plan Proponents cannot fulfill their burden of demonstrating that Debtors'

affairs are even tangled, let alone that the cost of untangling them is so high relative to their assets that the Banks, among other creditors, will benefit from a consolidation. [26]

## 3. OTHER CONSIDERATIONS DOOM CONSOLIDATION AS WELL

Other considerations drawn from the principles we set out also counsel strongly against consolidation. First of all, holding out the possibility of later giving priority to the Banks on their claims does not cure an improvident grant of substantive consolidation. Among other things, the prerequisites for this last-resort remedy must still be met no matter the priority of the Banks' claims.

[21]    Secondly, substantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group in the plan negotiation process (for example, by deeming assets redistributed to negate plan voting rights), nor a "free pass" to spare Debtors or any other group from proving challenges, like fraudulent transfer claims, that are liberally brandished to scare yet are hard to show. If the Banks are so vulnerable to the fraudulent transfer challenges Debtors have teed up (but have not swung at for so long), then the game should be played to the finish in that arena. [27]

 **\*216**  But perhaps the flaw most fatal to the Plan Proponents' proposal is that the consolidation sought was "deemed" (*i.e.,* a pretend consolidation for all but the Banks). If Debtors' corporate and financial structure was such a sham before the filing of the motion to consolidate, then how is it that post the Plan's effective date this structure stays largely undisturbed, with the Debtors reaping all the liability-limiting, tax and regulatory benefits achieved by forming subsidiaries in the first place? In effect, the Plan Proponents seek to remake substantive consolidation not as a remedy, but rather a stratagem to "deem" separate resources reallocated to OCD to strip the Banks of rights under the Bankruptcy Code, favor other creditors, and yet trump possible Plan objections by the Banks. Such "deemed" schemes we deem not Hoyle.

### IV. Conclusion

[22]    Substantive consolidation at its core is equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 26 of 308

In re Owens Corning, 419 F.3d 195 (2005)

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

hence equitable). But it is hardly so for those creditors who have lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities. *Accord Kheel,* 369 F.2d at 848 (Friendly, J., concurring) ("Equality among creditors who have lawfully bargained for different treatment is not equity but its opposite...."). No principled, or even plausible, reason exists to undo OCD's and the Banks' arms-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit—a $2 billion loan unsecured by OCD and guaranteed by others only in part. To overturn this bargain, set in place by OCD's own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip (if not area) codes away from anything resembling substantive consolidation," *In re Genesis Health Ventures,* 402 F.3d at 424—fails even to qualify for consideration. Moreover, it is here a tactic used as a sword and not a shield.

We thus reverse and remand this case to the District Court.

### Parallel Citations

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

### Footnotes

1    Though CSFB is the named appellant, the real parties in interest are the Banks (which include CSFB). Thus, unless the context requires otherwise, CSFB and the Banks are referred to interchangeably in this opinion.

2    For ease of reference, we refer hereinafter solely to OCD as the borrower.

3    For example, Owens–Corning Fiberglass Technology, Inc. ("OCFT") was created as an intellectual property holding company to which OCD assigned all of its domestic intellectual property. OCFT licensed this intellectual property back to OCD in return for royalty payments. OCFT also entered into licensing agreements with parties outside of the OCD family of companies. This structure served to shield OCD's intellectual property assets (valued at over $500 million) from liability. OCFT operated as an autonomous entity. It prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. OCFT had its own employees working at its Summit, Illinois plant, which contained machinery and equipment for research and development.

IPM, Inc. ("IPM") was incorporated as a passive Delaware investment holding company by OCD to consolidate the investments of its foreign subsidiaries. IPM shielded the foreign subsidiaries' investments from OCD liability and likewise shielded OCD from the liability of those foreign subsidiaries. OCD transferred ownership of its foreign subsidiaries to IPM and entered into a revolving loan agreement under which IPM loaned dividends from those subsidiaries to OCD. OCD paid interest on this revolving loan. IPM, like OCFT, entered into agreements with parties unaffiliated with the OCD group and operated as an autonomous entity. IPM also prepared its own accounting and financial records and paid its own expenses from its separate bank accounts. IPM's officers oversaw all investment activity and maintained records of investment activity in IPM subsidiaries.

Both OCFT and IPM operated outside of OCD's business units. Neither company received administrative support from OCD and both paid payroll and business expenses from their own accounts. Although summaries of their accounting ledgers were entered into OCD's centralized cash management system, the underlying records were created and maintained by the subsidiaries, not OCD. OCFT and IPM even had their own company logos and trade names.

Integrex was formed by OCD as an asbestos liability management company. For OCD's asbestos liability, Integrex ultimately processed only settled asbestos claims. The company also provided professional services (such as litigation management and materials testing) to the public. It had its own trade name and trademarked logo, its own business unit and its own financial team for business planning, and began several startup businesses that ultimately failed.

As discussed at Section I(B), *infra,* in 1997 OCD acquired Fibreboard Corporation. Subsequently, OCD formed Exterior Systems, Inc. ("ESI") as a separate entity after several subsidiaries of Fibreboard merged in 1999 in order to shield itself from successor liability for Fibreboard's asbestos products. Although the directors and managers of ESI and OCD overlapped, ESI observed corporate formalities in electing its directors and appointing its officers. In addition, it filed its own tax returns and kept its own accounting records. ESI held substantial assets, including over $1 billion in property, 20 factories, and between 150 and 180 distribution centers.

4    This standard guarantee term means simply that, once the primary obligor (here OCD) defaults, the Banks can proceed against the guarantors directly and immediately without first obtaining a judgment against OCD and collecting against that judgment to determine if a shortfall from OCD exists.

5    For convenience we refer hereinafter simply to "Bankruptcy Code § ___" when citing to a Code section.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 27 of 308

In re Owens Corning, 419 F.3d 195 (2005)
45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

6     As the Plan's consolidation provisions affected so significantly voting on the Plan and the manner of proceeding at any confirmation hearing, the Plan Proponents filed a motion for a ruling on consolidation in anticipation of those events. "While not a routine procedure, it is not at all unusual for a plan proponent, or a plan opponent, to seek a determination prior to the plan confirmation hearing as to the legitimacy of a particular provision of a proposed plan." *In re Stone & Webster, Inc.,* 286 B.R. 532, 542 (Bankr.D.Del.2002) (Walsh, J.).

7     "[A]ll assets and liabilities of each Subsidiary Debtor ... *will be treated as though* they were merged into and with the assets and liabilities of OCD...." Plan § 6.1(b) (emphasis added).

8     Pursuant to 28 U.S.C. § 157(d), Judge Wolin withdrew the reference of, *inter alia,* the consolidation motion to the Bankruptcy Court, thus making the District Court the judicial forum for the motion to proceed.

9     This provision, rather than 28 U.S.C. § 158(d), applies when the reference to a bankruptcy court is withdrawn.

10    A term used by Mary Elisabeth Kors in her comprehensive and well-organized article entitled *Altered Egos: Deciphering Substantive Consolidation,* 59 U. Pitt. L.Rev. 381, 383 (1998) (hereinafter "Kors").

11    The actual term was not used in a reported case until 1975. *See James Talcott, Inc. v. Wharton* (*In re Continental Vending Machine Corp.),* 517 F.2d 997, 1004 n.3 (2d Cir.1975).

12    Another case oft-mentioned, and preceding both *Sampsell* and *Stone,* is *Fish v. East,* 114 F.2d 177 (10th Cir.1940). Determining that a corporate subsidiary was simply the parent's "instrumentality," *id.* at 191, the Tenth Circuit affirmed the turnover of the subsidiary's assets to the parent. Though asserting that a "corporate entity may be disregarded where not to do so will defeat public convenience, justify wrong or protect fraud," *id.,* "consolidation" was not mentioned. Indeed, as creditors of the subsidiary in *Fish* were given first priority as to its assets, *id.,* a complete consolidation did not occur. *Accord* Kors, *supra,* at 391 ("true consolidation" occurs only when creditors of consolidated entities share *pari passu* ).

       A case from our Court—*In re Pittsburgh Rys. Co.,* 155 F.2d 477 (3d Cir.1946), *cert. denied sub nom. Phila. Co. v. City of Pittsburgh,* 329 U.S. 731, 67 S.Ct. 90, 91 L.Ed. 632 (1946)—cited *Stone, id.* at 484–85 n. 15, in granting the request of the City of Pittsburgh to exercise bankruptcy jurisdiction over non-debtor companies controlled by the debtor Pittsburgh Railways Company. While guided by the practical need to "strip [ ] off" corporate "cloak[s]," *id.* at 484, in reorganizing Pittsburgh's transportation system, our Court pointed out that "[t]he reorganization court cannot indefinitely be called upon to provide ... unification," *id.* at 481. In so doing, it emphasized that "we are in no way passing upon the fairness of any plan [of reorganization]." *Id.* at 485; *see also id.* at 481.

13    Indeed, they have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors, *see, e.g., In re Bonham,* 229 F.3d at 765 (explaining that "[c]ourts have permitted the consolidation of non-debtor and debtor entities in furtherance of the equitable goals of substantive consolidation") (citing *In re Tureaud,* 810 F.2d at 275; *In re Tureaud,* 59 B.R. 973, 974, 978 (N.D.Okla.1986); *In re Munford, Inc.,* 115 B.R. 390, 395–96 (Bankr.N.D.Ga.1990)); *Soviero,* 328 F.2d 446, and in some cases consolidation retroactively (known also as *nunc pro tunc* consolidation), *see, e.g., In re Bonham,* 229 F.3d at 769–71; *In re Baker & Getty Fin. Servs.,* 974 F.2d at 720–21; *Kroh Bros. Development Co. v. Kroh Bros. Management Co.* (*In re Kroh Bros. Development Co.),* 117 B.R. 499, 502 (W.D.Mo.1989); *see also Auto–Train,* 810 F.2d at 277 (acknowledging that *nunc pro tunc* consolidations can occur, though not in that case).

       In addition, though we do not permit the consolidation sought in this case, no reason exists to limit it under the right circumstances to any particular form of entity. (Indeed, this case involves corporations and limited liability companies.) *Accord* 2 *Collier on Bankruptcy* ¶ 105.09[1] [c] (15th rev. ed.2005).

14    *See In re Bonham,* 229 F.3d at 765 (explaining that "the equitable power [of substantive consolidation] undoubtedly survived enactment of the Bankruptcy Code" and noting that "[n]o case has held to the contrary"); *but see In re Fas Mart Convenience Stores, Inc.,* 320 B.R. 587, 594 n. 3 (Bankr.E.D.Va.2004) (noting "there is persuasive academic argument that there is no authority in bankruptcy law for substantive consolidation") (citing Daniel B. Bogart, *Resisting the Expansion of Bankruptcy Court Power Under Section 105 of the Bankruptcy Code: The All Writs Act and an Admonition from Chief Justice Marshall,* 35 Ariz. St. L.J. 793, 810 (2003); J. Maxwell Tucker, *Grupo Mexicano and the Death of Substantive Consolidation,* 8 Am. Bankr.Inst. L.Rev. 427 (2000) (hereinafter "Tucker")).

       Since the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (federal district courts lack the equitable power to enjoin prejudgment transfers of assets, as such an equitable remedy did not exist at the time federal courts were created under the Judiciary Act of 1789), some argue that substantive consolidation, judge-made law not expressly codified in the Bankruptcy Code adopted in the late 1970s, does not qualify as an available equitable remedy. *See, e.g.,* Tucker, *supra* at 442–45. This argument has two facets. The first is that bankruptcy courts are limited to exercising only the equitable remedies extant at the time of the adoption of the Judiciary Act of 1789. As substantive consolidation is a relatively recent remedy nowhere contemplated in 1789, *Grupo Mexicano* by analogy bars substantive consolidation just as it does prejudgment preliminary injunctions forbidding asset transfers. *Id.* The second (and corollary) facet of the argument is that, as substantive consolidation is not specifically authorized in the Bankruptcy Code, authority to confer it

In re Owens Corning, 419 F.3d 195 (2005)    Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 28 of 308

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

can exist, if at all, only in § 105(a) of the Bankruptcy Code (bankruptcy courts "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title"). Even if § 105(a) "constitutes a direct, fresh grant of supplemental power to the bankruptcy courts, independent of the judicial power granted to the federal courts under title 28 [of the United States Code]," *id.* at 447, it can only implement powers already expressed in the provisions of the Bankruptcy Code. *Id.* at 447–48. *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 236 (3d Cir.2004) ("The general grant of equitable power contained in § 105(a) ... must be exercised within the parameters of the Code itself."); *In re Kmart Corp.,* 359 F.3d 866, 871 (7th Cir.2004) ("[T]he power conferred by § 105 is one to implement rather than override."). But for joint spouse estates in Bankruptcy Code § 302, consolidation is permitted only in the context of a confirmed plan of reorganization and the requirements that entails. Tucker, *supra,* at 449 (citing to, *inter alia,* Bankruptcy Code § 1123(a)(5)(C)).

The first facet of the argument is, at the outset, premature. Consolidating estates (indeed, consolidating debtor and non-debtor entities) traces to the Supreme Court's *Sampsell* decision in 1941. 313 U.S. at 219, 61 S.Ct. 907. What the Court has given as an equitable remedy remains until it alone removes it or Congress declares it removed as an option. *See In re Stone & Webster,* 286 B.R. at 540 (quoting *Official Comm. of Asbestos Claimants v. G–I Holdings, Inc.* (*In re G–I Holdings, Inc.*), Adv. No. 01–3065(RG) (Bankr.D.N.J. March 12, 2001) (Hearing Tr. at 71–2)).

In addition, at the core of *Grupo Mexicano* was the extent of general, unarticulated equity authority in the federal courts (which, the Court held, can only be justified by reference to 1789 equity authority). It was *not* a bankruptcy case. The extensive history of bankruptcy law and judicial precedent renders the issue of equity authority in the bankruptcy context different to such a degree as to make it different in kind. Notably, in the only two instances in which the word "bankruptcy" appears in Justice Scalia's majority opinion in *Grupo Mexicano,* he uses the *existence* of court authority in the bankruptcy context as a reason to support the conclusion that the district court did not have the authority under generalized equity powers to implement the remedy it imposed. First, he pointed out that *"[t]he law of fraudulent conveyances and bankruptcy was developed to prevent [the] conduct [at issue];* an equitable power to restrict a debtor's use of his unencumbered property before judgment was not." *Grupo Mexicano,* 527 U.S. at 322, 119 S.Ct. at 1970 (emphasis added). Second, he stressed that finding the authority to justify the District Court's remedy in generalized equity power would "add[ ], through judicial fiat, a new and powerful weapon to the creditor's arsenal[;] the new rule could radically alter the balance between debtor's and creditor's rights *which has been developed over centuries through many laws-including those relating to bankruptcy, fraudulent conveyances, and preferences." Id.* at 331, 119 S.Ct. at 1974 (emphasis added). In short, the Court's opinion in *Grupo Mexicano* acknowledged that bankruptcy courts *do* have the authority to deal with the problems presented by that case. One way to conceptualize this idea is to recognize that, had the company in *Grupo Mexicano* been in bankruptcy, the bankruptcy court would have had the authority to implement the remedy the district court lacked authority to order under general equity power outside the bankruptcy context.

As for the argument's second facet, it begins with a concession. Bankruptcy Code § 1123(a)(5)(C)'s very words allow for "consolidation of the debtor with one or more persons" pursuant to a plan "[n]otwithstanding any otherwise applicable non-bankruptcy law." *Accord* Tucker, *supra,* at 448–49. *See also In re Stone & Webster,* 286 B.R. at 540–43. Whether § 105(a) allows consolidation outside a plan is an issue we need not address—though that arguably is what the Plan Proponents propose by moving for a "deemed" consolidation—because, as we note below, consolidation, no matter how it is packaged, cannot pass muster in this case.

In this context, we also need not address the argument, made in the *Amicus Curiae* Brief of the Commercial Finance Association, that substantive consolidation fails the "best interests test" of Bankruptcy Code § 1129(a)(7) (a requirement for plan confirmation that each creditor that does not vote to accept the plan must receive or retain property under the plan at least equal to its recovery in a Bankruptcy Code Chapter 7 liquidation). *See generally In re Stone & Webster,* 286 B.R. at 544–46.

15 Thus we disagree with the assertion of a "liberal trend" toward increased use of substantive consolidation—*e.g., Eastgroup,* 935 F.2d at 248 (describing "a 'modern' or 'liberal' trend toward allowing substantive consolidation") (citing *In re Murray Indus., Inc.,* 119 B.R. 820, 828 (Bankr.M.D.Fla.1990); *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407, 409 (Bankr.E.D.Va.1980)).

16 This opens the question whether a court can order partial consolidation (such a consolidation order "could provide that ... [a creditor relying on separateness] would receive a distribution equal to what [it] would have received absent consolidation and that the remainder of the assets and liabilities be consolidated.") Kors, *supra,* at 450–51. Because this theoretical issue is not before us—and in any event (i) facts bringing it to the fore are unlikely, *id.* at 451 ("If circumstances lead one party to rely on the single status of the one debtor, it is unlikely that other creditors are relying on the joint status of the two entities, especially as reliance must be reasonable."), and (ii) may present practical concerns depending on the facts of a particular case—we do not decide it in this case.

17 They are Robert K. Rasmussen of Vanderbilt Law School, Barry Adler of the NYU School of Law, Susan Block–Lieb of Fordham University School of Law, G. Marcus Cole of Stanford Law School, Marcel Kahan of the NYU School of Law, Ronald J. Mann of the University of Texas Law School, and David A. Skeel, Jr. of the University of Pennsylvania School of Law.

45 Bankr.Ct.Dec. 36, Bankr. L. Rep. P 80,343

18    Though creditors conceivably can cause debtors to conflate separate organizational forms, the specter of lender liability (which came to the fore in only the last two decades) makes this theoretical possibility all the more remote.

19    This rationale is meant to protect in bankruptcy the prepetition expectations of those creditors. *Accord* Kors, *supra,* at 419. The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one.

20    This rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled." *In re Gulfco Inv. Corp.,* 593 F.2d at 929; *In re Vecco Constr. Indus.,* 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise *Jarndyce and Jarndyce,* the fictional suit in Dickens' *Bleak House* where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy—enhancing the value of the assets available to creditors ...—often in a very material respect." Kors, *supra,* at 417 (citation omitted).

21    "[T]ort and statutory claimants, who, as involuntary creditors, by definition did not rely on anything in becoming creditors," Kors, *supra,* at 418, are excluded, leaving only those creditors who contract with an entity for whom consolidation is sought.

22    As noted already, *supra* n. 16, we do not decide here whether such a showing by an opposing creditor defeats totally the quest for consolidation or merely consolidation as to that creditor.

23    The bondholders do claim certain Banks misled them in purchasing OCD debt subsequent to the 1997 loan. But we know of no claim of wrong by the Banks in connection with the 1997 transaction.

24    Debtors make a similar argument on the basis of the Banks' failure to exercise their right to monitor the entities independently. For much the same reasoning that follows in the text, we reject that argument as well.

      We reject outright Debtors' claim that the Banks' alleged reliance on corporate separateness fails because they did not obtain a third-party legal opinion from counsel that substantive consolidation was unlikely to occur were OCD or the guarantors subject to bankruptcy. By custom and practice this type of counsel opinion is requested and given for newly formed entities whose "special purpose" is to obtain structured financing (*i.e.,* where "a defined group of assets ... [are] structurally isolated, and thus serve as the basis of a financing...." Committee on Bankruptcy and Corporate Reorganization of The Association of the Bar of the City of New York, *Structured Financing Techniques,* 50 Bus. Law. 527, 529 (1995)). It is customarily not given (nor even requested) for entities in existence for any significant period of time or set up for other than a structured financing transaction. *See* Tribar Opinion Committee, *Opinions in the Bankruptcy Context: Rating Agency, Structured Financing, and Chapter 11 Transactions,* 46 Bus. Law, 717, 726 & n. 42 (1991).

25    Further, a creditor's lack of diligence is relevant only insofar as it bears on the credibility of its assertion of reliance on separateness.

26    For example, we simply cannot imagine that it would cost Debtors even 1% of the Banks' asserted $1.6 billion claim to account for the allegedly incalculable intercompany interest and royalty payments.

27    The same sentiment applies to the argument of the bondholders that, subsequent to the 1997 loan to OCD, the Banks defrauded them in connection with a prospectus distributed with respect to a sale of OCD bonds underwritten by some of the Banks. If the bondholders have a valid claim, they need to prove it in the District Court and not use their allegations as means to gerrymander consolidation of estates.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 48

2012 ONSC 2125
Ontario Superior Court of Justice [Commercial List]

Crystallex International Corp., Re

2012 CarswellOnt 4577, 2012 ONSC 2125, 91 C.B.R. (5th) 169

# In Matter of the Companies' Creditors Arrangement Act, 1985, c.C-36 as Amended

And In the Matter of a Plan of Compromise or Arrangement of Crystallex International Corporation

Newbould J.

Heard: April 5, 2012

Judgment: April 16, 2012 [*]
Docket: CV-11-9532-00CL

Proceedings: affirmed *Crystallex International Corp., Re* (2012), 2012 ONCA 404 (Ont. C.A.)**Proceedings: additional reasons at *Crystallex International Corp., Re* (2012), 2012 ONCA 527 (Ont. C.A.)**

Counsel: Markus Koehnen, Andrew J.F. Kent, Jeffrey Levine for Crystallex International Corporation
Richard B. Swan, S. Richard Orzy, Emrys Davis for Computershare Trust Company of Canada
David R. Byers, Maria Konyukhova for Monitor, Ernst & Young Inc.
Shayne Kukulowicz for Tenor Special Situations Fund LP
John T. Porter for Juan Antonio Reyes
Robert Frank for Forbes & Manhattan Inc., Aberdeen International Inc.

Subject: Insolvency

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Miscellaneous**

C Corp. sought court approval for agreement with T LP providing debtor in possession (DIP) financing — Principal asset of C was US$3.4 billion arbitration claim against Venezuela arising from cancelled mining contract — Agreement with T provided for advances of $36 million and resulting entitlement to 35 per cent of net proceeds of arbitration award — T LP to have right to appoint two directors and right to agree on fifth independent director — Agreement was opposed by C's noteholders who proposed their own DIP financing — Agreement with T LP approved — Agreement was not "plan of arrangement" or "compromise" requiring vote — C had tried to find alternative financing — Return of 10 per cent PIK interest not unreasonable return for DIP lender because of the uncertainty of getting any return — Stay pending appeal by noteholders not appropriate as repayment of bridge financing due.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Grant of stay — Extension of order**

C Corp. sought court order extending stay contained in intial order — Stay continued — Motion unopposed and supported by monitor.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Arrangements — Approval by creditors**

C Corp. sought court approval for agreement with T LP providing debtor in possession (DIP) financing — Agreement was opposed by C's noteholders who proposed their own DIP financing — Agreement with T LP approved — Agreement was not "plan of arrangement" or "compromise" requiring vote.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Miscellaneous**

C Corp. sought court approval for agreement with T LP providing management incentive plan (MIP) — Agreement was opposed by C's noteholders who had own proposed plan — Agreement with T LP approved — Business judgment rule applicable — Provisions of the MIP approved by independent committee of board — Independent board members not participants in MIP — Existing stock options ultimately realized by participants of MIP would be deducted from any bonus awarded under the MIP — Approval of MIP was condition of DIP loan.


**Table of Authorities**

**Cases considered by *Newbould J.*:**

*Bennett v. Bennett Environmental Inc.* (2009), 2009 ONCA 198, 2009 CarswellOnt 1132, 94 O.R. (3d) 481, 53 B.L.R. (4th) 100, 308 D.L.R. (4th) 530, 264 O.A.C. 198 (Ont. C.A.) — considered

*Calpine Canada Energy Ltd., Re* (2007), 2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 415 A.R. 196, 33 B.L.R. (4th) 68 (Alta. Q.B.) — followed

*Calpine Canada Energy Ltd., Re* (2007), 35 C.B.R. (5th) 27, 410 W.A.C. 25, 417 A.R. 25, 2007 ABCA 266, 2007 CarswellAlta 1097, 80 Alta. L.R. (4th) 60, 33 B.L.R. (4th) 94 (Alta. C.A. [In Chambers]) — referred to

*Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 1998 CarswellOnt 3346, 5 C.B.R. (4th) 299, 72 O.T.C. 99 (Ont. Gen. Div. [Commercial List]) — considered

*Canwest Global Communications Corp., Re* (2009), 2009 CarswellOnt 6184, 59 C.B.R. (5th) 72 (Ont. S.C.J. [Commercial List]) — considered

*Canwest Publishing Inc./Publications Canwest Inc., Re* (2010), 63 C.B.R. (5th) 115, 2010 CarswellOnt 212, 2010 ONSC 222 (Ont. S.C.J. [Commercial List]) — considered

*Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 2008 BCCA 327, 2008 CarswellBC 1758, 83 B.C.L.R. (4th) 214, 296 D.L.R. (4th) 577, 434 W.A.C. 187, 258 B.C.A.C. 187, 46 C.B.R. (5th) 7, [2008] 10 W.W.R. 575 (B.C. C.A.) — distinguished

*Grant Forest Products Inc., Re* (2009), 2009 CarswellOnt 4699, 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) — considered

*Kerr v. Danier Leather Inc.* (2007), 2007 SCC 44, 2007 CarswellOnt 6445, 2007 CarswellOnt 6446, 87 O.R. (3d) 398 (note), 36 B.L.R. (4th) 95, 231 O.A.C. 348, 286 D.L.R. (4th) 601, [2007] 2 S.C.R. 331, 48 C.P.C. (6th) 205, 368 N.R. 204 (S.C.C.) — followed

*Nortel Networks Corp., Re* (2009), 2009 CarswellOnt 1330 (Ont. S.C.J. [Commercial List]) — referred to

*Reference re Companies' Creditors Arrangement Act (Canada)* (1934), [1934] 4 D.L.R. 75, 1934 CarswellNat 1, 16 C.B.R. 1, [1934] S.C.R. 659 (S.C.C.) — considered

*Royal Oak Mines Inc., Re* (1999), 1999 CarswellOnt 792, 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) — considered

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — followed

*Timminco Ltd., Re* (2012), 2012 ONSC 506, 95 C.C.P.B. 48, 2012 CarswellOnt 1263, 85 C.B.R. (5th) 169 (Ont. S.C.J. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    s. 123(4) — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    s. 11.2 [en. 1997, c. 12, s. 124] — considered

    s. 11.2(4) [en. 2005, c. 47, s. 128] — considered

    s. 11.2(4)(d) [en. 1997, c. 12, s. 124] — considered

    s. 11.2(4)(f) [en. 1997, c. 12, s. 124] — considered

    s. 11.5(1) [en. 1997, c. 12, s. 124] — considered

*Securities Act*, R.S.O. 1990, c. S.5
    Generally — referred to

**Words and phrases considered:**

**plan of arrangement**

A "plan of arrangement"or a "compromise" is not defined in the [Companies' Creditors Arrangement Act]. It is, however, to be an arrangement or compromise between a debtor and its creditors. The [applicant's] DIP facility is not on its face such an arrangement or compromise between [the debtor company] and its creditors. Importantly the rights of the noteholders are not taken away from them by the . . . DIP facility. The noteholders are unsecured creditors. Their rights are to sue to judgment and enforce the judgment. If not paid, they have a right to apply for a bankruptcy order under the BIA. Under the [Act], they have the right to vote on a plan of arrangement or compromise. None of these rights are taken away by the . . . DIP

MOTION by corporation for orders approving agreement for debtor in possession financing, management incentive plan, extension of stay, and approval of actions of Monitor.

***Newbould J.*:**

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

1    Crystallex moves for four orders, the first being an order approving DIP financing pursuant to a credit agreement between Crystallex and Tenor Special Situation I, LLC ("Tenor"), the second being an order extending the stay referred to in paragraph 16 of the Initial Order dated December 23, 2011 until July 16, 2012 or such further date as may be ordered, the third being an order approving a Management Incentive Plan ("MIP") and a Retention Advance Agreement in favour of Robert Fung and the fourth being an order to approve the actions of the Monitor referred to in the second and third reports of the Monitor.

2    The noteholders of Crystallex [1] oppose the Tenor DIP facility. They propose a DIP loan which they would make for a smaller amount and for a shorter term than the Tenor DIP facility. They also oppose the MIP. In order to preserve any appeal rights they may have and may want to assert, they do not consent to an order approving the actions of the Monitor in the second and third reports, but take no position in opposition to the order sought.

3    A shareholder, Mr. J.A. Reyes appeared on the motion to support the Tenor DIP facility and in principle the MIP, but has some concerns regarding the terms of the MIP.

4    Forbes & Manhattan Inc. and Aberdeen International Inc., creditors owed approximately $2.5 million by Crystallex, oppose the Tenor DIP facility and the MIP.

**Background to the Financing**

5    The history of the business of Crystallex and its mining project in Venezuela has been the subject of prior decisions in cases brought by the Noteholders. The evidence on the record before me indicates in summary as follows.

6    The principal asset of Crystallex was its right to develop the Las Cristinas gold project in Venezuela. Las Cristinas is one of the largest undeveloped gold deposits in the world containing measured and indicated gold resources of approximately 20.76 million ounces.

7    In September 2002 Crystallex obtained the right to mine the Las Cristinas project through a Mining Operation Contract (the "MOC") with the Corporacion Venezolana de Guayana (the "CVG"), a state-owned Venezuelan corporation. Crystallex complied with all of its obligations under the MOC. Neither the CVG nor the Government of Venezuela raised any material concerns about lack of compliance. The CVG confirmed on several occasions that the MOC was in good standing and that Crystallex was in compliance with it.

8    The Ministry of the Environment advised Crystallex in writing in April 2007 that Crystallex had completed all steps necessary to obtain the required environmental permit. Crystallex was shown a draft of the permit and was told that it would obtain the permit as soon as it had paid certain stamp duties and posted an insurance bond. Crystallex paid the duties, negotiated the bond with the Ministry and posted the bond.

9    On February 3, 2011, despite confirming on several occasions that Crystallex's right to mine the Las Cristinas property continued unchallenged, CVG purported to "unilaterally rescind" the MOC.

10    CVG rationalized its termination of the contract for reasons of "expediency and convenience" and because Crystallex had allegedly "ceased activities for over a year" on the project. Crystallex did not cease activities. It was maintaining the mining site in a shovel-ready state and was awaiting receipt of an environmental permit. Because of Venezuela's refusal to allow Crystallex to exploit Las Cristinas, Crystallex became unable to pay its debts as they became due effective December 23, 2011.

11    Crystallex has a number of liabilities, the most significant of which is a liability of approximately $100 million in senior unsecured notes that were issued pursuant to a Trust Indenture dated December 23, 2004. The notes were due on December 23, 2011. In addition, Crystallex has other liabilities of approximately CAD$1.2 million and approximately US$8 million.

12    The principal asset of Crystallex is its arbitration claim of US$3.4 billion against Venezuela. In addition, Crystallex has mining equipment with a book value of approximately $10.1 million and cash of approximately $2 million.

13    Crystallex asserts that the insolvency in which it finds itself is not attributable to poor business judgment by Crystallex but to the illegal conduct of the Venezuelan government in refusing to let Crystallex develop Las Cristina, even though Crystallex had the undisputed contractual right to do so.

**Arbitration proceedings**

14    On February 16, 2011 Crystallex filed a Request for Arbitration with the International Centre for the Settlement of Investment Disputes ("ICSID") against Venezuela pursuant to a Bilateral Investment Treaty between Canada and Venezuela. ICSID is a mechanism through which private investors can seek legal redress against a foreign government for conduct that might be otherwise immune from suit. In the arbitration, Crystallex seeks compensation of $3.4 billion plus interest as full compensation for the loss of its investment.

15    The Arbitration Tribunal held its first procedural meeting on December 1, 2011 in Washington, DC. At that hearing, the Tribunal established Washington, DC as the seat of the arbitration proceeding, and established a timetable for the arbitration. Pursuant to the timetable, Crystallex delivered its written case on February 10, 2012. Crystallex's written case comprises fourteen volumes of detailed witness statements, expert's reports, exhibits, law and argument. Its memorial summarizing the evidence, law and argument extends to 226 pages. Venezuela is required to respond to Crystallex's case by August 31, 2012. The hearing of the arbitration is scheduled for two weeks beginning on November 11, 2013.

16    The valuation evidence Crystallex submitted with its ICSID case claims damages of $3.4 billion plus interest. While the result of the arbitration is unknown, if it is successful, and the award is collected, there will be far more available than necessary to pay the outstanding debts of Crystallex. It is also clear that any meaningful recovery for the creditors and possibly shareholders will require some success in the arbitration, either by a collectible award or a settlement.

**DIP financing selection process**

17    In accordance with paragraph 12 of the Initial Order, Crystallex, with the assistance of its counsel and its financial advisor, commenced a process to seek DIP financing of $35 million with a term of December 13, 2014.

18    With the approval of the Monitor, Crystallex hired a financial advisor, Skatoff & Company, LLC based in New York City. Mr. Skatoff is an independent financial advisory firm focused on debt advisory services, financial restructuring advisory services, financing advisory services and M&A services.

19    Crystallex, in consultation with Mr. Skatoff and on its recommendation, prepared a set of bid procedures to govern the solicitation of bids to provide DIP financing to Crystallex. The bid procedures were approved by the Monitor. The bid procedures are referred to in some detail in my endorsement of January 25, 2012. They included a provision whereby the DIP lender could obtain a "back-end entitlement" of up to 49% of the arbitration proceeds.

20    The bid procedures provided that Crystallex would only consider bids from qualified bidders. A qualified bidder was one who, among other things, complied with certain participation requirements including the submission of a participation package.

21    As a result of the DIP financing auction, a small number of qualified bidders ultimately submitted proposals for the DIP financing. Among the bidders were the three hedge funds that hold approximately 77% of Crystallex's senior unsecured notes.

22    Ultimately Mr. Skatoff recommended, and the board of Crystallex agreed, to accept the terms of the Tenor DIP financing now before the court for approval.

**Proposed Tenor DIP financing**

23    The Tenor DIP facility contains the following material financial terms:

(a) Tenor will advance $36 million to Crystallex due and payable on December 31, 2016. This period for the loan is based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the arbitral tribunal and collection of the award.

(b) The advances will be in four tranches, being $9 million upon execution of the loan documentation and approval of the facility by court order in Ontario, the second being $12 million upon any appeal of the Ontario court order approving the facility being dismissed and upon a U.S court order approving the facility, the third being $10 million when Crystallex has less than $2.5 million in cash and the fourth being $5 million when Crystallex again has less than $2.5 million in cash.

(c) The loans are to be used to (i) repay an interim bridge loan of $3.25 million advanced by Tenor with court approval of January 20, 2012 and payable on April 16, 2012, (ii) fees and expenses in connection with the facility, (iii) general corporate expenses of Crystallex including expenses of the restructuring proceedings and of the arbitration in accordance with cash flow statements and budgets of Crystallex approved by Tenor from time to time.

(d) Crystallex will pay Tenor a $1 million commitment fee.

(e) $35 million of the loan amount will bear PIK interest (payment in kind, meaning it is capitalized and payable only upon maturity of the loan or upon receipt of the proceeds of the arbitration) at the rate of 10% per annum compounded semi-annually.

(f) Tenor will receive additional compensation equal to 35% of the net proceeds of any arbitral award or settlement, conditional upon the second tranche of the loan being advanced. Net proceeds of the award or settlement is defined as the amount remaining after payment of principal and interest on the DIP loan, taxes and proven and allowed unsecured claims against Crystallex, including the noteholders, the latter of which will have a special charge for the unsecured amounts owing. Alternatively, Tenor can convert the right to additional compensation to 35% of the common shares of Crystallex. This conversion right is apparently driven by tax considerations.

24    The Tenor DIP facility also provides for the governance of Crystallex to be changed to give Tenor a substantial say in the governance of Crystallex. More particularly:

(a) Crystallex shall have a reduced five person board of directors, being two current Crystallex directors, two nominees of Tenor and an independent director selected by agreement of Crystallex and Tenor.

(b) The independent director shall be chair of the board of directors and shall not have a second-casting or tie-breaking vote.

(c) The independent director shall be appointed a special managing director and shall have all the powers of the board of directors to (i) the conduct of the reorganization proceedings in Canada and in the U.S. and the efforts of Crystallex to reorganize the pre-filing claims of the unsecured creditors, (ii) any matters relating to the rights of Crystallex and Tenor as against the other under the facility, (iii) the administration of the MIP to the extent not otherwise delegated to the bonus pool committee under the MIP, and (iv) to retain any advisor in respect of these matters. The special manager shall first consult with a non-board advisory panel, consisting of the three Crystallex directors who will step down from the board, and consider in good faith their recommendations.

(d) With respect to matters that may not at law be delegable to the special managing director, he will be required to obtain board approval. If the Tenor nominees use their votes to block that approval, Tenor will forfeit its 35% additional compensation.

25    The Tenor DIP facility contains proscribed rights of Tenor in the event of default. Tenor may seize and sell assets other than the arbitration proceeding (i.e. any cash and unsold mining equipment). It may not sell the arbitration claim. If there is a default before any arbitration award, Tenor would have the right to apply to court to have the Monitor or a Canadian receiver and

manager appointed to take control of the arbitration proceedings. If such application were not granted, Tenor would be entitled to exercise the rights and remedies of a secured creditor pursuant to an order, the loan documentation or otherwise at law.

**Proposed Noteholders DIP Loan and Plan**

26    The noteholders propose a DIP loan of $10 million with a simple interest rate of 1% repayable on October 15, 2012. This was essentially the same as the interim bridge loan of $10 million with simple interest of 1% proposed by the noteholders that would have been repaid on April 16, 2012 that was not accepted by Crystallex. It is quite clear that the interest rate is far below market in the circumstances of Crystallex, and it is referred to in the noteholders factum as "exceptionally favourable".

27    During the process to find a DIP lender satisfactory to Crystallex and its advisors, the noteholders were asked to increase their proposed loan to $35 million but they refused. However, in his affidavit Mr. Mattoni on behalf of the noteholders stated that the noteholders would in the future be prepared under certain circumstances, if required by the court, to advance a DIP loan on the same terms as the Tenor DIP facility. He stated that the noteholders would do so in the event that prior to October 1, 2012, the court orders that such long-term financing is appropriate and necessary. The noteholders would reserve their ability as creditors to continue to oppose the need for such a loan and any stay extensions or attempts to secure such long-term financing outside of a plan of compromise. The $10 million which they provided in interim financing would be repaid from this financing such that the net effect of the financing would be the same as that of the Tenor DIP facility. During argument on this motion, Mr. Swan said that the noteholders were not prepared to agree to such a $35 million facility at this time but only at some future time as the $10 million facility they now proposed became due.

28    The noteholders have also now proposed a restructuring plan, said to be in response to the Tenor DIP and the MIP. This was first proposed by Mr. Mattoni in his affidavit of March 27, 2012 as a proposal of the noteholders. At that time, he did not have any internal authority from the QVT fund of which he is the investment manager, or from any of the other noteholders, to make such proposal. This was shored up as indicated in his further affidavit of April 4, 2012 served just before the hearing of this motion. The noteholders do not ask for approval of this plan on this motion, but put it forward as indicating a good faith intention to bargain for a plan. The noteholders plan would:

> a) provide $10 million at 1% interest in a single-draw to meet Crystallex's funding needs over the next several months while a plan is negotiated;
>
> b) provide $35 million to the Company in a straight exchange for 22.9% of Crystallex's equity;
>
> c) exchange all outstanding debt for equity;
>
> d) secure approximately 14% of the remaining equity for existing shareholders; and
>
> e) provide incentives to management at a lesser level than the MIP. It would be up to the post-emergence board to ensure that management is properly incentivized, which could involve other compensation as well.

**Management Incentive Plan**

29    In addition to approval of the DIP, Crystallex seeks approval of a Management Incentive Plan ("MIP") for certain of its key employees. The fundamental terms of the MIP are as follows:

> (a) An amount equal to up to 10% of the first $700 million in net proceeds of the arbitration award and an amount equal to up to 2% of the net proceeds in excess of $700 million will be reserved as a retention pool for key management employees.
>
> (b) The amount to be retained in this pool is the amount remaining after payment of the outstanding principal and interest on the DIP loan, outstanding operating and professional expenses, the unpaid claims of noteholders and other stayed unsecured creditors, together with post-filing interest and all taxes payable by the company on the award.

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

(c) The size of the pool shall not exceed 10% of the net proceeds of the arbitral award or one quarter of the amount that is available to shareholders of Crystallex after satisfaction of any additional compensation owing to Tenor under the loan agreement.

(d) A compensation committee consisting of three persons who are currently independent directors of Crystallex and who are expected to retire from the board in accordance with the governance provisions of the Tenor DIP facility, will determine the retention payment paid to each beneficiary of the MIP. The compensation committee will be entitled to distribute as much or as little of the retention pool as they see fit. Amounts remaining unpaid from the retention pool will be returned to Crystallex.

30      Crystallex also proposes that there be a MIP charge to secure the payments, the charge to be subordinate to the Administration Charge, the DIP Charge, the Directors' Charge and the Pre-filing Unsecured Creditors Charge.

31      Also sought for approval is a retention agreement for Mr. Fung which provides that at the end of each calendar quarter during 2012 and 2013 the board of Crystallex will pay a retention advance of $125,000 per quarter to Mr. Fung. The making of each payment will be at the discretion of the board but only to the extent that he remains properly engaged in the arbitration. Those payments are to be treated as if they were pre-payments of any payments that would otherwise be awarded to Mr. Fung from the retention pool under the MIP and therefore reduce any such amount he may receive from the retention pool.

**DIP loan approval analysis**

32      Section 11.2 of the CCAA provides that a court may provide security in favour of an interim or DIP lender who agrees to lend to the debtor company having regard to its cash-flow statement. Section 11.2 (4) provides:

(4) In deciding whether to make an order, the court is to consider, among other things,

(a) the period during which the company is expected to be subject to proceedings under this Act;

(b) how the company's business and financial affairs are to be managed during the proceedings;

(c) whether the company's management has the confidence of its major creditors;

(d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

(e) the nature and value of the company's property;

(f) whether any creditor would be materially prejudiced as a result of the security or charge; and

(g) the monitor's report referred to in paragraph 23(1)(*b*), if any.

33      Crystallex relies on the business judgment rule to support the decision of its board of directors to accept the Tenor DIP facility. It is clear that the business judgment rule can apply to a debtor in CCAA proceedings. In *Stelco Inc., Re* (2005), 9 C.B.R. (5th) 135 (Ont. C.A.), Blair J.A. stated in that CCAA proceeding:

65. ...It is well-established that judges supervising restructuring proceedings - and courts in general - will be very hesitant to second-guess the business decisions of directors and management. As the Supreme Court of Canada said in *Peoples*, *supra*, at para. 67:

Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making ...

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

34      The noteholders point to *Kerr v. Danier Leather Inc., [2007] 2 S.C.R. 331* (S.C.C.) per Binnie J. at para. 54 in which he stated that the business judgment rule could not be used to qualify or undermine the duty of disclosure required by the *Securities Act* and *Bennett v. Bennett Environmental Inc., 2009 ONCA 198* (Ont. C.A.) per Lang. J.A. in which she held that whether a director could be indemnified depended on the application of section 123(4) of the CBCA and not the business judgment rule.

35      I accept that in considering whether security under a DIP loan should be ordered, a court cannot ignore the factors directed to be considered in section 11.2 (4) of the CCAA and could not order such security if a consideration of those factors led to an opposite conclusion. But in my view those factors are not the only factors that can be considered, as section 11.2(4) directs a court to consider the listed factors "among other things". One of the considerations that in my view can be taken into account is the exercise or lack thereof of business judgment by the board of directors of a debtor corporation in considering DIP financing.

### (i) Consideration of the Tenor DIP facility

36      In this case, the Crystallex board took legal advice from its solicitors McMillan LLP and financial advice from Mr. Skatoff. I am satisfied that they carefully considered the relevant matters leading to the decision to accept the terms of the Tenor DIP financing, including giving consideration to the noteholders' proposed DIP financing of $10 million to October, 2012, and that they acted on an informed basis and in good faith with a view to the best interests of Crystallex and its stakeholders. See the affidavits of Mr. Fung at paras. 52 to 67 and the reply affidavit of Mr. van't Hof at paras. 9 to 12. That being said, I must consider the contentions of the parties and the factors as set out in section 11.2 (4).

37      The noteholders have made a number of objections to the Tenor DIP financing.

38      They contend that Crystallex should have sought sufficient financing to pay the noteholders in full, as was attempted prior to the CCAA filing. The evidence indicates, however, that Mr. Skatoff attempted to do so with the market but the message he received back consistently was that the market had no interest in paying out existing noteholders at 100 cents on the dollar in a context where the notes were trading at a significant discount to par. Mr. Mattoni himself said on cross-examination that he did not believe it would be possible to raise sufficient money on the market to pay out the noteholders, as did the noteholder's financial expert witness Mr. Glenn Sauntry.

39      Mr. Mattoni in his affidavit states that the Tenor DIP facility was a pre-ordained coronation rather than the result of a competitive bidding process. There is no evidentiary basis for this suggestion. It is clear from the evidence of Mr. Skatoff, Mr. Fung and Mr. van't Hof and from the Monitor's report that there was a robust competitive bidding process and that full consideration right up to the last minute was given to other bidders. The Monitor stated it its report that from its observation of the process, it saw no evidence that Tenor was afforded preferential treatment over other participants in the process. It is also clear that the noteholders' $10 million bid was considered by the board of Crystallex and, based on advice from its advisors, not accepted. Thus any complaint from the noteholders on this score could only be that the Tenor bid was higher than market pricing for the facility. They had no such evidence and on cross-examination their financial expert Mr. Sauntry acknowledged that he could not say that the Tenor bid was not reflective of market pricing.

40      The noteholders also complain that Mr. Skatoff did not undertake a valuation of Crystallex. The response of Crystallex is that it was not Mr. Skatoff's job to do that. In light of the fact that the main asset of Crystallex is the arbitration claim, Mr. Skatoff in my view would be in a poor position to value Crystallex.

41      Mr. Sauntry in his report attempted to value the arbitration claim in different ways. He is not a lawyer and has no knowledge of the treaties involved or of the merits of the arbitration claim. He made assumptions in his cash flow analysis that, based on the reply expert report of Mr. Dellepiane, which I have no reason to doubt as he was intimately involved in the preparation of the arbitration claim, indicate Mr. Sauntry's lack of knowledge of the basis of the claim. Regarding Mr. Sauntry's analysis in (i) implying a value to the arbitration claim from an analysis of the Tenor DIP proposal and stating that in substance that proposal is a sale of a percentage of Crystallex's assets to Tenor and (ii) using the market value of Crystallex's securities as a proxy for enterprise value, I accept the reply affidavit of Mr. Skatoff, and in particular paragraphs 34 to 41, as reason to doubt Mr.

Sauntry's analysis. As well, Mr. Sauntry's evidence on cross-examination, and in particular that referred to in paragraphs 8 to 12 of the Summary of Key Points From Cross-examinations, indicates little reliability should be placed on Mr. Sauntry's evidence.

42    In any event, in light of the lack of evidence from the noteholders that the Tenor bid was not above market, the contention that Mr. Skatoff did not undertake a valuation of Crystallex or of the arbitration claim is of little moment.

43    The noteholders also contend that whereas the bid process spelled out terms that must not be contained in a bid and provided that some terms were to be discouraged, the Tenor bid in the end contained some such terms. In those circumstances, the noteholders contend that Crystallex should have re-canvassed the market. Mr. Skatoff's evidence is that other bidders presented loan terms that would have resulted in similarly extensive changes to the loan document that accompanied the bid packages. The world of restructuring is not a perfect world. A company seeking DIP financing can tell the market what it wants, but cannot dictate its terms if the market tells it otherwise. The alternative is to walk away from the market. Regarding the changes sought by the market, the Monitor in its report states:

50. During the negotiations, all bidders requested amendments to the template version of the loan agreement posted on the Monitor's website as part of the CCAA Financing Procedures. The Monitor is of the view that such requests are typical in any bidding or investment raising process. The Monitor observed that all parties were provided with the template loan agreement and, as is common in processes such as the CCAA Financing Procedures, the final forms of the selected commitment letter and senior credit agreement deviate from the template agreement.

44    The noteholders take a fundamental objection to the Tenor DIP facility on the basis that it is inconsistent with the purposes of the CCAA and case law dealing with DIP loans. The noteholders say that it is not interim financing but a forced restructuring plan prejudicial to them and that it should not proceed without a vote as required by the CCAA for a plan of arrangement or compromise.

45    *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 46 C.B.R. (5th) 7 (B.C. C.A.) is authority for the proposition that a stay under the CCAA should not be continued if the debtor company does not intend to propose a compromise or arrangement to its creditors, and DIP financing should not be authorized to permit the debtor company to pursue a restructuring plan that does not involve an arrangement or compromise with its creditors. In that case, the debtor wanted to obtain financing to complete the construction of a golf course development without proposing an arrangement or compromise with its creditors.

46    The noteholders seize upon a statement made by Mr. Fung in his affidavit filed on the initial application leading to the Initial Order in which he said:

Crystallex strongly desires to pursue the arbitration and have stayed all claims against it until the arbitration has been settled or Crystallex has realized on an arbitration award, at which point Crystallex expects that all creditors would be paid in full to the extent of their proven claims.

47    While there is no doubt that Mr. Fung made that statement, I think it needs to be considered in light of the reality agreed by the parties that the only way any of the creditors will receive any substantial cash payment is from the proceeds of the arbitration. This would be the case whether a plan of arrangement could be agreed or not. Also Mr. Mattoni agreed on cross-examination that Crystallex's goal of pursuing the arbitration and using the proceeds to pay creditors in full did not prevent Crystallex from giving creditors some additional benefit in a plan of arrangement.

48    Moreover, often statements are made in CCAA proceedings about the intention of a party that later change. Mr. Koehnen made clear in argument that Crystallex has every intention to attempt to negotiate a plan of arrangement with the noteholders and that this has already been going on now on a without prejudice basis. He said the purpose of the stay to July 16, 2012 is to negotiate a compromise with the noteholders during that time period. I accept that statement. The situation is not the same as in *Cliffs Over Maple Bay*.

49    Is the Tenor DIP facility a plan of arrangement or compromise requiring a vote? In my view it is not.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

50      A "plan of arrangement" or a "compromise" is not defined in the CCAA. It is, however, to be an arrangement or compromise between a debtor and its creditors. The Tenor DIP facility is not on its face such an arrangement or compromise between Crystallex and its creditors. Importantly the rights of the noteholders are not taken away from them by the Tenor DIP facility. The noteholders are unsecured creditors. Their rights are to sue to judgment and enforce the judgment. If not paid, they have a right to apply for a bankruptcy order under the BIA. Under the CCAA, they have the right to vote on a plan of arrangement or compromise. None of these rights are taken away by the Tenor DIP.

51      I note that in this case the practical exercise of the rights of the noteholders is very problematical because of issues raised in Mr. Fung's confidential affidavit no. 2.

52      The noteholders contend that giving Tenor 35% of the arbitration proceedings will take away from Crystallex a substantial amount of equity making a compromise more difficult and less available for the unsecured creditors.

53      In *Calpine Canada Energy Ltd., Re* (2007), 35 C.B.R. (5th) 1 (Alta. Q.B.), leave to appeal denied (2007), 35 C.B.R. (5th) 27 (Alta. C.A. [In Chambers]), it was contended that a settlement of several claims in a complex cross-border restructuring constituted a plan of arrangement or compromise and thus required a vote under the CCAA by the creditors affected. It was contended that the settlement left less assets available for the Canadian unsecured creditors. In rejecting this contention, Romaine J. stated the following:

> 12. The primary objection is that the GSA [global settlement agreement] amounts to a plan of arrangement and, therefore, requires a vote by the Canadian creditors. The Opposing Creditors support their submissions by isolating particular elements of the GSA and characterizing them as either a compromise of their rights or claims or as examples of imprudent concessions made by the CCAA Debtors in the negotiation of the GSA. These specific objections will be analyzed in the next part of these reasons, but, taken together, they fail to establish that the GSA is a compromise of the rights of the Opposing Creditors for two major reasons:

> > (b) the Opposing Creditors blur the distinction between compromises validly reached among the parties to the GSA and the effect of those compromises on creditors who are not parties to the GSA. ... If rights to a judicial determination of an outstanding issue have not been terminated by the GSA, which instead provides a mechanism for their efficient and timely resolution, those rights are not compromised.

> 19 ... While settlements made in the course of insolvency proceedings may, in practical terms, result in a diminution of the pool of assets remaining for division, this is not equivalent to a compromise of substantive rights.

> 51. The GSA is not linked to or subject to a plan of arrangement. I have found that it does not compromise the rights of creditors that are not parties to it or have not consented to it, and it certainly does not have the effect of unilaterally depriving creditors of contractual rights without their participation in the GSA.

> 55. I am satisfied that the GSA is not a plan of compromise or arrangement with creditors. Under its terms, as agreed among the CCAA Debtors, the U.S. Debtors and the ULC1 Trustee, certain claims of those participating parties are compromised and settled by agreement. Claims of creditors who are not parties to the GSA either will be paid in full (and thus not compromised) as a result of the operation of the GSA, or will continue as claims against the same CCAA Debtor entity as had been claimed previously.

54      In refusing leave to appeal from the decision of Romaine J., O'Brien J.A. stated:

> 34. ... The GSA does not change its status as a creditor of those companies, nor does it bar the applicant from any existing claims against those companies.

> 35. ... the fact that the GSA impacts upon the assets of the debtor companies, against which the applicant may ultimately have a claim for any shortfall experienced by it, is a common feature of any settlement agreement and as earlier explained, does not automatically result in a vote by the creditors. The further fact that one of the affected assets of the debtor

companies is a cause of action, or perhaps, more correctly, a possible cause of action, does not abrogate the rights of a creditor albeit there may be less monies to be realized at the end of the day.

55    While this case is not binding on me, it is persuasive and makes sense. It is also consistent with authorities in Ontario that a sale of assets or a settlement in a CCAA before a plan of compromise is put forward may be authorized even if there will be insufficient assets to retire the creditor claims in full. See *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]).

56    In this case, it cannot be said that there will be insufficient assets coming from the arbitration to repay all of the outstanding notes in full, which at present is approximately $115 million. Even the valuation of Mr. Sauntry, which I do not accept as reliable, indicates far more than that as a possible outcome of the arbitration. While the outcome of the claim cannot be known at this stage, it is a claim for $3.4 billion dollars in circumstances in which Crystallex spent approximately $500 million on the development of the mine.

57    The fundamental purpose of the CCAA is well established, and indicates that flexibility is required in dealing with any particular case. In *Reference re Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659 (S.C.C.), the following was stated:

> ... the aim of the Act is to deal with the existing condition of insolvency in itself to enable arrangements to be made in view of the insolvent condition of the company under judicial authority which, otherwise, might not be valid prior to the initiation of proceedings in bankruptcy. *Ex facie* it would appear that such a scheme in principle does not radically depart from the normal character of bankruptcy legislation."

> The legislation is intended to have wide scope and allow a judge to make orders which will effectively maintain the status quo for a period while the insolvent company attempts to gain the approval of its creditors for a proposed arrangement which will enable the company to remain in operation for what is, hopefully, the future benefit of both the company and its creditors.

58    Since 1934, of course, there has been wide experience in dealing with the CCAA, and it has been an evolving experience. In *Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re*, Blair J. (as he then was) approved the sale of the assets of the debtor that would result in the estate having less than sufficient money to pay all of its creditors in full, and before a plan of compromise was put forward. He discussed the flexibility involved in these terms:

> 45. It is very common in CCAA restructurings for the Court to approve the sale and disposition of assets during the process and before the Plan if formally tendered and voted upon. ... The CCAA is designed to be a flexible instrument, and it is that very flexibility which gives it its efficacy. As Farley J. said in *Dylex, supra* (p. 111), "the history of CCAA law has been an evolution of judicial interpretation". It is not infrequently that judges are told, by those opposing a particular initiative at a particular time, that if they make a particular order that is requested it will be the first time in Canadian jurisprudence (sometimes in global jurisprudence, depending upon the level of the rhetoric) that such an order has made! Nonetheless, the orders are made, if the circumstances are appropriate and the orders can be made within the framework and in the spirit of the CCAA legislation. Mr. Justice Farley has well summarized this approach in the following passage from his decision in *Re Lehndorff General Partner* (1993), 17 C.B.R. (3d) 24, at p. 31, which I adopt:

>> The CCAA is intended to facilitate compromises and arrangements between companies and their creditors as an alternative to bankruptcy and, as such, is remedial legislation entitled to a liberal interpretation. It seems to me that the purpose of the statute is to enable insolvent companies to carry on business in the ordinary course or otherwise deal with their assets so as to enable plan of compromise or arrangement to be prepared, filed and considered by their creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors. See the preamble to and sections 4, 5, 7, 8 and 11 of the CCAA (a lengthy list of authorities cited here is omitted).

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

The CCAA is intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating or to otherwise deal with its assets but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA (citations omitted)

59    In that case, Blair J. considered the factors in *Soundair* in deciding whether to approve of the sale, being whether the receiver has made a sufficient effort to get the best price and has not acted improvidently; to consider the interests of the parties, to consider the efficacy and integrity of the process by which offers are obtained and to consider whether there has been unfairness in the working out of the process. Those factors are consistent with the factors to be taken into account in considering whether security for a DIP loan should be approved, and as the Tenor DIP facility involves a grant of a financial interest in part of the assets of Crystallex, being a percentage of the arbitration award, it seems to me that they can be looked at in this case.

60    It was contended by the noteholders that the size of a loan of $36 million, an amount calculated to complete and collect the arbitration, was not in accordance with the purposes of a DIP loan as it would take Crystallex beyond what is required before any reorganization. However this complaint regarding the size of the loan was not strenuously pursued in argument, no doubt because of the new position of the noteholders that it would fund that amount on the terms of the Tenor DIP loan if later required and because of the provision in the proposed plan of arrangement put forward by the noteholders that it would provide $36 million in funding in return for an equity stake in Crystallex. There seems no doubt that the parties agree that at least $36 million is required to pursue the arbitration.

61    The noteholders also contend that the term of the loan by Tenor is far too long and that it indicates an attempt by Crystallex to do an end run around the need to propose a plan of arrangement as the term would extend beyond the date of an anticipated award. I have already dealt with the issue of Crystallex proposing a plan of arrangement. The noteholders contend that the DIP loan, at least initially, should not extend beyond October, 2012 as by then a plan should have been negotiated. However, both sides agree that the only way that any substantial cash will be available to Crystallex or its creditors will be from the arbitration and that it will be necessary to prosecute the arbitration long after October, 2012. The proposed plan of the noteholders recognizes this as it proposes a $36 million injection for the purposes of prosecuting the arbitration. The $36 million figure is based on a projection of expenditures going far beyond 2012. That is, both sides agree that it will be necessary to have financing for the arbitration that will continue after October, 2012. The term of the Tenor DIP loan as to when the loan becomes due in itself is not an impediment to a restructuring.

62    In my view, the term of the loan is not the substantive issue, so long as Crystallex intends to negotiate if possible an acceptable plan of arrangement or compromise, which it has indicated it intends to do. One of the factors required to be considered under section 11.2(4) is the time during which Crystallex is expected to be subject to the CCAA proceedings. Like many cases, it is not clear when these proceedings may be over. However, as the $36 million financing is going to be required whether Crystallex is out from under the CCAA in a short or longer period, and as the expenditures are to last for a few years, this factor of the time during which Crystallex is expected to be subject to the CCAA proceeding is not a determinative factor.

63    The noteholders also contend that Tenor has been given control over Crystallex and the restructuring process by reason of the changes in the corporate governance required by the Tenor DIP facility. There is no doubt that Tenor has been given substantial governance rights, including the right to name two of the five directors and the right to agree on who the independent director shall be. An issue is whether the governance provisions are too intrusive for a DIP loan, which according to case law relied on by the noteholders should not be excessive or inappropriate. I note that there is no prohibition in the CCAA against the board of directors changing at the hands of the debtor. There is a provision allowing the court to remove directors, which I shall later discuss.

64    Any DIP lender wants to obtain as much control as possible over the affairs of the debtor during the term of the DIP financing, and terms are often imposed to that end. In this case, given the extreme hostility of the noteholders to the board and management of Crystallex over its actions over the few years prior to the arbitration being commenced, it is not surprising that

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

Tenor has demanded what it has. The fact that Tenor at the last minute changed the governance terms that it was prepared to live with, and that the Crystallex board was not happy with the change, does not in itself mean that those terms should not be approved.

65     To put up the financing and have it subject to change by the noteholders or Crystallex would make no economic sense to Tenor or to any other DIP lender in the circumstances of this case. Like the noteholders and shareholders, Tenor will only be able to have its loan repaid from the proceeds of the arbitration, and it has bargained for what it perceives to be necessary protection for that. I agree with the noteholders that the CCAA is not about protecting new DIP lenders. However, the issue is whether the protections negotiated in order to obtain the DIP loan from Tenor are reasonable or excessive.

66     Even if there were a prospect of money being raised by Crystallex in some fashion to pay out the noteholders prior to an arbitration award and settlement, which on the evidence I have referred to is not the case, including the issues referred to in Mr. Fung's confidential affidavit no. 2, and the opinion of Freshfields, as a practical matter this is not a case in which the noteholders have any realistic steps to try to cash out now before the arbitration claim is dealt with. [2] A restructuring under the CCAA, or any bankruptcy of Crystallex, is not going to change that. The market cap of Crystallex is far too small to repay the noteholders, even if they were given 100% of the equity of Crystallex.

67     The terms of the Tenor Dip facility give Tenor no right to conduct the reorganization proceedings in Canada and in the U.S. or interfere with the efforts of Crystallex to reorganize the pre-filing claims of the unsecured creditors. That will be in the hands of the independent/special managing director who will be required to consult with the non-board advisory panel consisting of the three directors of Crystallex who will step down from the board. With respect to matters that may not at law be delegable to the special managing director, he will be required to obtain board approval and if the Tenor nominees use their votes to block that approval, Tenor will forfeit its 35% additional compensation. Tenor is obviously not going to want to put itself in that position.

68     Tenor recognizes that it cannot conduct the arbitration proceeding. Under the terms of the Tenor DIP facility, if there is a default before any arbitration award, Tenor would have the right to apply to court to have the Monitor or a Canadian receiver and manager appointed to take control of the arbitration proceedings. Whether it would make such an application is a question mark, and likely would depend on whether Crystallex were put into bankruptcy. There would likely be no other reason for wanting someone other than the Crystallex board to have control over the conduct of the arbitration.

69     As a practical matter, the conduct of the arbitration will no doubt be in the hands of Freshfields who have the knowledge and expertise. Mr. Mattoni in his affidavit filed on behalf of the noteholders agreed that the arbitration is really in the hands of litigation counsel. As well, the management personnel of Crystallex that have been involved in the claim in presenting evidence and instructing counsel regarding the evidentiary issues are going to have to continue to be involved in order to prosecute the claim. Their failure to do so would compromise the claim.

70     If any director, whether nominees of Crystallex or of Tenor, is unreasonably impairing the possibility of a viable compromise, the court under s. 11.5(1) of the CCAA has the power to remove such director. That section provides:

> 11.5 (1) The court may, on the application of any person interested in the matter, make an order removing from office any director of a debtor company in respect of which an order has been made under this Act if the court is satisfied that the director is unreasonably impairing or is likely to unreasonably impair the possibility of a viable compromise or arrangement being made in respect of the company or is acting or is likely to act inappropriately as a director in the circumstances.

71     The noteholders point out that section 8.1(t) of the DIP facility makes it an event of default of the DIP loan if a Tenor nominee director is removed from the board without the consent of Tenor except "by reason of misconduct" of the director, and assert that "misconduct" is a considerably different standard from "unreasonably impairing" in section 11.5(1) of the CCAA, thus restricting a court's ability to remove a director for unreasonably impairing a compromise or arrangement. Of course, any application under the section would turn on the particular facts, but it would certainly be arguable that if a director were

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

unreasonably impairing a compromise or arrangement, that could constitute misconduct, particularly as the purpose of a CCAA proceeding is to encourage a consensual compromise or arrangement.

72     One of the factors required to be considered under section 11.2(4) is whether Crystallex's management has the confidence of its major creditors. There is no doubt from the prior litigation that the noteholders expressed extreme displeasure at the steps taken by its board and management to try to come to some accommodation with Venezuela to maintain the rights to the Las Cristinas mine project. The noteholders maintained that Crystallex should stop spending money and commence the arbitration. That of course is now water under the bridge and the only business of Crystallex is the arbitration that has been commenced. The noteholders did not previously take the position that the management should not be involved in the arbitration, nor do they now raise any such objection. The Monitor notes in its report that the noteholders' proposed plan contemplates keeping existing management. It is clear that the management who have been involved in the arbitration are going to be needed further, and this is not a situation in which the noteholders could want to insert themselves instead of management in the conduct of the arbitration. As Mr. Mattoni said, that is something in the hands of arbitration counsel.

73     Another factor to be considered under section 11.4(2) is how the company's business and financial affairs are to be managed during the proceedings. In my view, the management of the business and affairs of Crystallex under the provisions discussed, being the conduct of the arbitration and paying for it, are a reasonable compromise between Crystallex and Tenor designed to protect the interests of the stakeholders, including the noteholders. The Monitor, of course, will continue to have an important role to play as well in the oversight of matters. If the noteholders are unhappy with the expenditures for the arbitration claim being incurred in the future, and there is no indication so far that they are, they have the ability in the CCAA process to object to them.

74     The noteholders also contend that because a term of default of the Tenor loan is a refusal of the court to extend the section 11 stay, that term ties the court's hands on any stay extension application, thus creating an incentive for Crystallex not to bargain towards a consensual resolution. I do not accept that the court's hands will be tied in any way. One would expect in any CCAA case that on a refusal to extend the stay, a DIP lender's loan would become payable. This provision in the Tenor loan is not remarkable.

75     The noteholders make the same point about it being a term of default of the Tenor loan if the CCAA case is converted to a receivership, a proposal in bankruptcy or bankruptcy proceeding. Again, one would expect a DIP loan to become payable in these events. This is a normal provision in a DIP loan, as conceded by Mr. Swan in argument. If bankruptcy were appropriate, this provision would not prevent it.

76     The noteholders contend that the right of Tenor to 35% of the proceeds of the arbitration, convertible into equity at Tenor's discretion, should not occur as it will hamper any ability to reach any restructuring resolution. In the bid procedures approved by the Monitor, the market was told that any "back-end entitlement" could not exceed 49% of the equity of Crystallex. 35% is a very large block of the arbitration proceeds and obviously Crystallex would not have been happy to give that up. It eats into any recovery for the shareholders who are entitled to receive any proceeds of the arbitration only after the noteholders have been paid in full. However, 35% on the record does not appear excessive. The process undertaken by Mr. Skatoff indicates that the terms of the Tenor bid were the result of a reasonable market search. Mr. Sauntry, the financial expert for the noteholders, could not say that the Tenor bid did not reflect market pricing. He also said on cross-examination that a return of 10% PIK interest would not be a reasonable return for DIP lender in this case because of the uncertainty of getting anything because of the arbitration risk and risk of collecting on any award, and that a lender would require some additional amount such as the 35% to make it a reasonable deal.

77     The noteholders propose in their proposed plan that they receive 23% of equity for their infusion of the $36 million needed for the arbitration claim. There is no evidence as to how that 23% figure was arrived at. However, the plan also provides for the noteholders to be given approximately 58% of the equity in return for giving up their notes. Together this amounts to 81% of the equity, and it is artificial to say that the 23% for the $36 million infusion reflects a market indication of the value of the infusion. I realize that the plan of the noteholders is only a proposal, but it does reflect a recognition that someone financing the arbitration would require a considerable amount of any arbitration award in order to take the risk of financing it. If the

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

35% figure in the Tenor DIP facility is used by the noteholders for the $36 million infusion (which the noteholders say they would be prepared to lend for 35% of the equity if later required), the amount of equity to the noteholders in their plan in return for their notes would be 46% rather than 58%, indicating an interest in receiving that amount of equity for their notes. If the Tenor DIP facility is accepted, it would leave 65% of the equity available, less 10% if the MIP is approved, more than the noteholders propose in their plan.

78    The noteholders also rely on a statement in Mr. Sauntry's expert report that the Tenor DIP proposal will prevent any plan of arrangement. He states:

The Tenor DIP Proposal will prevent any plan of arrangement. In fact, it is the logical conclusion of a negotiation between the Company, which has stated that it does not want a CCAA plan prior to an Award or settlement arising from the Arbitration Claim, and Tenor, which may benefit from the Company's near-complete lack of flexibility, if future amendments are required.

79    Much of Mr. Sauntry's report is little more than legal argument in the guise of an expert's opinion. I view a good deal of his report in much the same light as Farley J. did of an expert report of Mr. Dennis Belcher in *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]), in which he stated "Mr. Belcher has set forth in essence his view of the CCAA situation; he should be regarded as a powerful advocate..." I see Mr. Sauntry being an advocate for the noteholders.

80    Some things fundamental to Mr. Sauntry's report are wrong. For example, he states that "This is a situation where a material asset could be sold to provide a significant recovery for creditors" and "It is demonstrably possible to sell a significant interest in the Company's business (i.e. the Arbitration Claim) for material proceeds." On cross-examination he acknowledged his understanding that the claim is not assignable. I have earlier referred to problems I have with Mr. Sauntry's attempts to value the arbitration claim.

81    I do not see the Tenor DIP facility preventing a plan of arrangement. The noteholders have no right to keep Crystallex's assets and equity static for the purposes of a plan of arrangement, so long as the DIP loan meets the criteria required for approval. The provisions in the Tenor DIP facility complained of are the result of market forces, and unless there is some other preferable DIP available, which for reasons I will deal with is not the case, the question is whether the Tenor DIP facility should be approved.

82    Reliance is placed by the noteholders on provisions of section 7.19 of the Tenor bid. It provides that Crystallex shall not without the consent of Tenor enter into an agreement with the noteholders that contains certain provisions, including:

(a) Paying any money to pre-filing creditors before Crystallex pays Tenor. The noteholders contend that this eliminated any realistic possibility of Crystallex being refinanced prior to the collection of an arbitral award or settlement. However, this is a normal provision in any DIP financing. Moreover, there is no realistic possibility of Crystallex being refinanced before an arbitration award or settlement, as previously discussed.

(b) Increasing interest payable to the pre-filing creditors above 15%. The reason for this provision was because under the Tenor bid, any post-filing interest to be paid to creditors is to be paid before the additional compensation of 35% is paid to Tenor, and Tenor negotiated to limit this amount. It perhaps is to be noted that on any bankruptcy of Crystallex, interest to the noteholders would be limited to 5%.

(c) Issuing any equity containing anti-dilution provisions, which the noteholders contend means that any new equity proposed to be issued as a compromise exchange for debt could immediately thereafter be completely devalued at the next moment. I am not clear why this was negotiated by Tenor. In reply Mr. Kent contended that the problem could be taken care of by issuing shares to the noteholders with a coupon or agreement that would lock in their right to a percentage of the arbitration award. As the equity in Crystallex is essentially the same as the proceeds of the arbitration, presumably this is something that could be taken care of in a plan. Whether Crystallex would ever attempt to later issue equity to a third party is of course completely unknown and speculative, but it were to be contemplated

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

during the course of the CCAA proceedings, presumably the Monitor would be aware of it and it would become known to the noteholders who would be able to apply to court for any appropriate relief.

83    I have previously discussed much of what is to be considered under s. 11.4 of the CCAA. Regarding (d), whether the loan would enhance the prospects of a viable compromise or arrangement, in my view it would. Crystallex requires additional financing to pay its expenses and continue the arbitration. A DIP loan allows the company to have the arbitration financed, which if it were not at this stage would impair the arbitration and perhaps the attitude of Venezuela towards the arbitration claim, and as such enhances the viability of a CCAA plan. I have not accepted the argument of the noteholders that the loan would prevent a plan of arrangement.

84    Regarding (f), whether any creditor would be materially prejudiced by the security, the noteholders are unhappy with the Tenor bid and say they are materially prejudiced, for the reasons that I have discussed and largely rejected. I think their complaints have to be looked at in the context of what the market is demanding for a DIP loan. There was a sufficient arm's length and open effort by Crystallex with the assistance of the Monitor to get the best pricing and terms for the loan and the process was carried out with integrity and fairness. The noteholders were asked during the process to increase their proposal but refused to do so. When at the last moment they indicated they would if later required lend on the same terms as the Tenor DIP facility, they made clear they would not agree to do so at this time. That, of course, is their choice. In all of the circumstances, I would not find that they have been materially prejudiced.

*(ii) Consideration of the noteholders' proposed DIP facility*

85    The noteholders' proposed DIP loan is for $10 million at 1% interest repayable on October 15, 2012. The term is said to give sufficient time to work out a plan of arrangement or compromise. Mr. Swan said in argument that the noteholders were not being altruistic in this proposal, but merely wanted to maintain the status quo while a plan is being negotiated.

86    The problem that the board of Crystallex had with this proposal was based on the advice of Mr. Skatoff. He advised the board that if Crystallex needed additional financing in October 2012, it would be difficult to return to the market for financing because there was only so much time and energy that bidders were willing to devote to a transaction. Having devoted the time and failed, bidders would be highly reluctant to spend additional time again. In his affidavit, Mr. Skatoff stated that if Crystallex accepted the $10 million DIP financing it would be highly challenged if not entirely impeded in any subsequent exercise to raise additional financing from parties other than the noteholders.

87    The noteholders contend that Mr. Skatoff's views on the difficulty of any future financing if the noteholders' proposed DIP loan is approved is "complete puffery" as he said on cross-examination that the parties with whom he negotiated never told him that they would absolutely not participate in a financing in the fall of 2012 if it were necessary. I think this is oversimplification and I do not accept it. Mr. Skatoff also said on cross-examination —

    I know what the facts are in terms of the financing market and how it views Crystallex. ...I believe that the company, if it were to accept a $10,000,000 financing, would need to go to the market in the very near term to start to address what happens if that $10,000,000 needed to be refinanced when... we reached October of 2012. And I believe in the construct of my experience with this situation over the last three months that if the company were to accept that $10,000,000, we would need to go back out to the market in the very near term to raise capital to possibly refinance that money in the event that $10,000,000 couldn't be extended, that the company would have a very difficult time in convincing potential financing parties to undertake to spend additional time and resources in evaluating potential financing, as we have been able to convince them to do over the last couple months.

88    I accept that evidence as reliable. Common sense would indicate that persons who spent time and energy on pursuing a $36 million facility for a three year term only to see a 6 month facility for $10 million being accepted would be very reluctant to go through the process again in the next few months.

89    This is particularly the case, in my view, when the proposed interest rate by the noteholders is only 1%, clearly below the market rate. [3] The market would see that rate, as would any reasonable observer, as being used for some purpose to further the ends of the noteholders. Hedge funds are not in the business of lending money at less than market rates. The rate no doubt was proposed to assist an argument that the court should accept the noteholders' proposed loan. Why would the noteholders propose that? The answer, I believe, is that it would assist in removing, or seriously eroding, the chance of Crystallex going to the market in time for a new loan by October and thus further make Crystallex beholden to the noteholders in October, as stated by Mr. van't Hof and Mr. Skatoff. I do not view the noteholders proposed loan as being a *bona fide* loan at market rates but rather a loan to gain tactical advantage.

90    Thus, I do not see the noteholders proposed $10 million 1% six month facility as maintaining the status quo. I accept the evidence of Mr. Skatoff that it would seriously erode the chances of Crystallex obtaining any third party financing in October.

91    Had the noteholders been prepared to lend now on the basis of the terms of the Tenor DIP facility, that would have been a preferable outcome, even if it was not made within the terms of the bid process approved by the Monitor, as it would not have involved the insertion of any third party into the process. Unfortunately, it was made clear during argument that the noteholders were not prepared at this time to do so. The uncertainty of a short six month loan when it is clear that financing for a much longer term is required by Crystallex to prosecute the arbitration is something to be avoided.

### (iii) Position of the Monitor

92    I have previously referred to portions of the Monitor's report. The Monitor concludes that on the basis that Crystallex, with assistance of Mr. Skatoff, conducted a canvas of the market and determined that the Tenor Bid was the best available bid generated out of the process to meet its objectives, the Monitor supports approval of the Tenor DIP Loan. This position of the Monitor is subject to this court's determination of the validity of the noteholders' legal arguments, on which the Monitor expresses no view as these are legal issues to be determined by the Court.

93    It is the case, as the Monitor points out, that the introduction of a third party, Tenor, with consent rights to certain actions will add complexity to the negotiation of a CCAA plan. I entirely agree with the Monitor that a mutually acceptable CCAA plan is preferable to continued expensive and protracted legal disputes between the Noteholders and Crystallex. However, in spite of the encouragement of the Monitor and of the court over the last while to see if a settlement could be reached, that has unfortunately not occurred.

### (iv) Conclusion on DIP loan

94    Taking into account all of the forgoing, I approve the Tenor DIP facility.

### (v) Request for stay

95    The noteholders ask that in the event that the Tenor DIP facility is approved, the order should be stayed pending an appeal to the Court of Appeal. The parties have already had discussion through the Monitor with the Court of Appeal which has agreed as I understand it to move as expeditiously as possible with any appeal from my decision.

96    A judge whose decision is to be appealed can stay the order on such terms as are just. On motions for stays, courts apply the *RJR Macdonald* test and will order stays in restructuring and insolvency proceedings to allow sufficient to for consideration of an appeal.

97    At first blush during the argument, I was inclined to agree with the noteholders that a stay would be appropriate pending an appeal, assuming that it could be dealt with expeditiously. However, argument from Crystallex gave me pause, particularly when the cash flow needs of Crystallex are considered. The cash flow projections as shown in the Monitor's report indicate that as of the end of the week ending April 13, 2012, Crystallex had only $346,000, and that during the following week, it had cash

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

requirements of approximately $6 million, including repayment of the bridge loan due on April 16. Crystallex does not have the luxury of waiting for the conclusion of a successful appeal.

98      The answer of the noteholders to this was that the problem would be solved if the court approved its $10 million DIP proposal rather than the Tenor bid. I understand that the noteholders would be prepared to lend the $10 million if an appeal to the Court of Appeal from an order approving the Tenor DIP facility were successful.

99      Under the Tenor DIP facility, the right of Tenor to the additional compensation of 35% of the proceeds of the arbitration does not arise until the second tranche of the loan of $12 million has been advanced, and this is not due until after any appeal to the Court of Appeal has been completed. As to concerns of the noteholders that Tenor might pre-pay the second tranche in order to fix its right to the additional compensation, I was advised during argument that Tenor has undertaken not to do so and Crystallex has undertaken as well not to draw on the second tranche without two weeks' notice to the noteholders.

100     Crystallex, and I assume Tenor as well, has agreed that pending the completion of an appeal to the Court of Appeal, the right of Tenor to convert its rights to 35% of the arbitration proceeds and the governance provisions for Crystallex would also be stayed.

101     In my view, and assuming that the first test of *RJR Macdonald* has been met, there should be no stay of my order approving the Tenor DIP facility, and this can be done in a manner that will protect the interests of the parties on the following basis:

> (i) The order approving the Tenor DIP facility shall be subject to the undertakings and agreements of Crystallex and Tenor as referred to.

> (ii) The Tenor DIP facility is approved on condition that in the event that the appeal to the Court of Appeal is successful, and the order approving the Tenor DIP facility is set aside in its entirety, the money advanced by Tenor on the first tranche shall be immediately repayable with interest at 1% per annum, in which case the Tenor DIP facility shall be terminated. Tenor shall have no right in that case to any commitment fee which, if already paid, shall be deducted from the repayment of the loan to Tenor.

> (iii) The noteholders shall in that event fund the repayment to Tenor by loan to Crystallex with interest at $1% per annum repayable on October 15, 2012 or at some other date as may be agreed or ordered by this court.

**Management Incentive Plan (MIP)**

102     The terms of the MIP are set out above. In sum, a pool of money, consisting of up to 10% of the net proceeds of the arbitration up to $700 million and 2% of any further net proceeds, after all costs and charges, including the amounts owing to noteholders, is to be set aside and money in this pool may be paid to the beneficiaries of the MIP, depending on the determination of an independent committee. The amounts to be allocated to participants by the compensation committee are discretionary and could be nil. No one will be entitled to any particular amount. Members of the compensation committee will not be eligible for any payments.

103     In exercising its discretion to consider whether and in what amount a payment should be made, the compensation committee will take the following factors into account:

> (a) The amount of money recovered by Crystallex in the arbitration.

> (b) The risks affecting the size of the retention pool including the quantum of the priority payments and the fact that others have influence on discussions relating to the settlement of the claim

> (c) How quickly the funds are recovered.

> (d) The impact the premature resignation of the individual from Crystallex would or could have had upon the results of the arbitration.

(e) The amount of time and energy spent by the individual on the arbitration.

(f) [Certain matters confidential to the parties.]

(g) The scale and scope of the balance of the compensation package provided by Crystallex to the individual.

(h) The opportunity cost to the individual in staying with Crystallex in terms of professional experience, money and the development of new opportunities.

(i) The amount of any severance payments the employee would receive on termination if such termination is reasonably foreseeable and will be accompanied by a severance payment.

(j) The extent to which the arbitration cost more than anticipated to prosecute and the degree to which it may be appropriate to reduce the bonus pool as a result.

(k) Any other relevant matter.

104     The noteholders disagree with Crystallex on the quantum and method for providing an incentive to management. They have also expressed concerns as to the timing of the MIP approval motion and inclusion of some MIP participants in the MIP. Under their proposed plan, management would receive 5% through an equity participation in any after tax award.

105     The Tenor DIP loan is conditional on the approval of a management incentive program acceptable to both Tenor and Crystallex. Tenor has not voiced any objection to the MIP proposal of Crystallex and I take it is in agreement with it. The requirement for a management incentive program acceptable to Tenor is a reflection, obviously, of the need to ensure the participation of the people necessary to pursue the arbitration to a satisfactory conclusion.

106     The reasons for the MIP are set out in the affidavit of Mr. van't Hof. See paras. 4 to 10 and 14 to 23 of his affidavit. In the circumstances of this arbitration, these reasons appear legitimate. They were considered so by the independent directors of Crystallex constituting the compensation committee and by Mr. Jay Swartz of Davies Ward Phillips & Vineberg LLP.

107     Mr. van't Hof states in his affidavit that because in past litigation the noteholders have criticized the independent directors of Crystallex as not being sufficiently independent because of prior business relationships with Robert Fung or companies with which Mr. Fung was associated, Crystallex retained Jay Swartz, a partner of Davies Phillips Vineberg, to determine, from the perspective of an independent director, what an appropriate MIP would be. In coming to that determination, Mr. Swartz was told he could retain such advisors as he saw fit and take such steps as he saw fit. Mr. Swartz' opinion of March 14, 2012 states that he was engaged on June 6, 2011 to negotiate the terms on which directors and members of management will be compensated for their ongoing duties. With the consent of Crystallex, Mr. Swartz retained Hugessen Consulting Inc., an independent national executive compensation consulting firm to provide expert advice with respect to compensation issues and to provide background information regarding compensation standards in circumstances which were analogous to the issues facing Crystallex. Mr. Swartz reviewed extensive documentation and carried out extensive discussions with various persons including the solicitors for Crystallex, counsel for the board and with Freshfields who are arbitration counsel.

108     Mr. Swartz concluded that the overall compensation proposal for the establishment of the bonus pool for the benefit of management of Crystallex was reasonable in the circumstances, for reasons expressed in his opinion. Included in his reasons was the following:

The current members of the Compensation Committee are granted substantial discretion to allocate, or not allocate, the bonus Pool and can do so in their discretion having regard to what actually occurs over time and the relative and absolute contributions of each party. In doing so, they are subject to fiduciary duties to Crystallex. In this regard, I note that there may be circumstances when the absolute amount of the bonus Pool may be very substantial in light of all of the factors to be considered by the Compensation Committee. In such circumstances, the Compensation Committee may have to carefully consider the absolute amounts to be paid to each member of a Management Group in order to satisfy its fiduciary duties.

109    Whether KERP provisions such as the ones in this case should be ordered in a CCAA proceeding is a matter of discretion. While there are a small number of cases under the CCAA dealing with this issue, it certainly cannot be said that there is any established body of case law settling the principles to be considered. In *Houlden & Morawetz Bankruptcy and Insolvency Analysis*, West Law, 2009, it is stated:

> In some instances, the court supervising the CCAA proceeding will authorize a key employee retention plan or key employee incentive plan. Such plans are aimed at retaining employees that are important to the management or operations of the debtor company in order to keep their skills within the company at a time when they are likely to look for other employment because of the company's financial distress.

110    In *Canadian Insolvency in Canada* by Kevin P. McElcheran (LexisNexis — Butterworths) at p. 231, it is stated:

> KERPs and special director compensation arrangements are heavily negotiated and controversial arrangements. ... Because of the controversial nature of KERP arrangements, it is important that any proposed KERP be scrutinized carefully by the monitor with a view to insisting that only true key employees are covered by the plan and that the KERP will not do more harm than good by failing to include the truly key employees and failing to treat them fairly.

111    In *Grant Forest Products Inc., Re* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]), I accepted these statements as generally being applicable to motions to approve key employee retention plans. See also *Canwest Global Communications Corp., Re* (2009), 59 C.B.R. (5th) 72 (Ont. S.C.J. [Commercial List]), *Nortel Networks Corp., Re* (Ont. S.C.J. [Commercial List]), *Canwest Publishing Inc./Publications Canwest Inc., Re* (2010), 63 C.B.R. (5th) 115 (Ont. S.C.J. [Commercial List]) and *Timminco Ltd., Re* (Ont. S.C.J. [Commercial List]).

112    I see no reason why the business judgment rule is not applicable, particularly when the provisions of the MIP have been approved by an independent committee of the board. See my comments in *Grant Forest Products Inc., Re*, in which the payments in question were approved by an independent committee of the board of the debtor, in which I said that the business judgment of the directors should rarely be ignored. See also Morawetz J. in *Timminco Ltd., Re*.

113    In this case, the qualifications of the independent board members, Messrs. Brown, Near and van't Hof, are impressive, and these people are non-conflicted as they will not participate in the MIP. They acted on advice from Mr. Swartz and had market information from Mr. Skatoff as noted in paras. 10 and 33 of Mr. van't Hof's affidavit. Their judgment was informed and I am in no position to say it was unreasonable.

114    There is no question that the judgment of Mr. Swartz is independent and informed, and I would not lightly ignore it without good reason.

115    The noteholders contend that the MIP is something that should await the negotiations of a plan. I can understand the logic of that position, particularly when as here the MIP is to be funded from the proceeds of the arbitration, which is the "asset" that will be the subject of the negotiations of a plan, whether that asset is called the proceeds of the arbitration or equity. However, I am hesitant to have the uncertainty of such a situation hanging over the heads of the people meant to be protected by the MIP. In *Grant Forest Products Inc., Re*, over the objection of a substantial creditor, and in *Canwest Global*, *Canwest Publishing* and *Timminco Ltd., Re*, employee retention plans were approved prior to any plan being negotiated, and it appears to be the practice today that these types of plans are generally approved at the time of the initial orders.

116    The noteholders do not contend that there should not be any MIP. As the Monitor's report notes, under the noteholders' proposed plan, management would receive 5% through an equity participation in any after tax award. While the numbers between the Crystallex MIP (a pool of up to 10% of an award up to $700 million and 2% over that) and the noteholders plan (5%) are different, it is possible that the end result would not be different depending on what the independent compensation committee decided to allocate after the results of the arbitration were known.

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

117    The noteholders contend that there are participants in the MIP that should not belong. That is a matter of judgment, and the independent committee has exercised its judgment on the matter. The participants were also known to Mr. Swartz who opined as to the reasonableness of the principles of the MIP. Having reviewed the evidence, including the affidavit of Mr. van't Hof and of Ms. Kwinter, I cannot say that any of the persons included in the MIP should not be there.

118    Mr. Tony Reyes is a shareholder of Crystallex. He in principle is supportive of the MIP. He raises two concerns regarding the MIP.

119    The first is the fact that some of the persons who may benefit already have stock options and it is not clear that the proposed MIP will replace and cancel those options. Thus, these persons could end up with more than the MIP proposes. In response to this, Crystallex advises that it will amend the MIP to provide that the value of any existing stock options ultimately realized by participants of the MIP will be deducted from the amount of any bonus awarded under the MIP on a tax neutral basis.

120    The second relates to the method of calculating the bonus pool. It is described by the Monitor as follows:

> 83. Mr. Reyes also raises a concern that the MIP treats the creation of and payment out of the MIP Pool as a secured debt and not an equity distribution. The MIP Pool is to be protected by a Court-ordered charge and will be created out of the net proceeds of the Arbitration Proceedings but before any payment to shareholders. Value to shareholders is after the repayment of the additional compensation to Tenor and the MIP, while the MIP is calculated based on the gross award before repayment of additional compensation. He notes that the method of calculating the MIP Pool also serves to increase the potential effective "equity participation" of the pool participants well above the rate of 10% relative to the participation rate of existing shareholders, to an effective rate of 18% or more. This is due to the dilutive effect of Tenor's additional compensation on existing shareholders.

121    The first sentence regarding this concern is not correct. The MIP is triggered by a receipt of funds, and the charge over that pool does not give any priority to the participants in the MIP. Regarding the remainder of the concern, it seems to me that this is something that could be taken into account by the compensation committee in determining what, if any, amount should be allocated to any particular person.

122    The Monitor has reviewed the MIP and the noteholders proposal. The Monitor does not expressly state that it supports the MIP as proposed by Crystallex being approved, but clearly does not oppose it. Monitor concludes:

> 130. The MIP is ancillary to the Tenor DIP Loan and approval of a management incentive program is a condition of the Tenors DIP Loan. The Noteholders and Mr. Reyes appear to accept the Company's position that a substantial incentive plan is appropriate in these unique circumstances. Mr Swartz, from the perspective of the independent director with advice from Hugessen Consulting Inc., concludes that the Applicant's proposed MIP is "reasonable in the circumstances". The Noteholders and Mr. Reyes' position, however, is that the terms of any incentive plan should be less favourable to the participants than the MIP proposed by Crystallex.

> 131. Although the percentage amounts and debt structure provide the potential for compensation to management that could be substantial, both relative to the recoveries of other stakeholders and in absolute dollar terms, it is subject to the discretion of the independent directors who have fiduciary duties that will provide a measure of balance in the implementation of the MIP.

123    Like the DIP issue, it is unfortunate that Crystallex and the noteholders have not been able to come to some agreement on an MIP. It would have been far more preferable for that to have occurred. However there has been no agreement and it falls for decision by the court.

124    In all of the circumstances, as discussed, I approve the MIP proposed by Crystallex with the changes regarding the stock options agreed to by Crystallex.

**Approval of Monitor's reports**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2125, 2012 CarswellOnt 4577, 91 C.B.R. (5th) 169

125    Approval is sought of the actions of the Monitor as disclosed in its second and third report. I have no hesitation in approving these actions. A Monitor plays a crucial role in any CCAA restructuring, and this is particularly so in this case. The Monitor is to be commended for the way in which it has participated and in its efforts to bring a consensual resolution of matters as they have arisen. This assistance is invaluable. I approve the actions of the Monitor as set out in its second and third report.

**Continuation of the stay**

126    Crystallex seeks a continuation of the stay until July 16, 2012 or such further date as may be ordered. No one opposes the stay to that date, and it is supported by the Monitor who recommends the continuation. Due to holiday considerations, I continue the stay to July 30, 2012.

*Order accordingly.*

Footnotes

*     Affirmed at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 7329, 2012 ONCA 404 (Ont. C.A.).

1     The noteholders in question are hedge funds that represent approximately 77% of the outstanding notes. It is they who have caused Computershare to take action on their behalf in the prior actions against Crystallex and in this CCAA proceeding.

2     The fact that the noteholders have an opinion questioning some of what Freshfields says does not change that.

3     The Monitor calculates the savings in interest over the Tenor loan to October 15, 2012 to be approximately $300,000.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 49

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 55 of 308

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

2012 ONCA 404
Ontario Court of Appeal

Crystallex International Corp., Re

2012 CarswellOnt 7329, 2012 ONCA 404, 216 A.C.W.S. (3d)
550, 293 O.A.C. 102, 4 B.L.R. (5th) 1, 91 C.B.R. (5th) 207

# In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c.C-36 as amended

And In the Matter of a Plan of Compromise or Arrangement of Crystallex International Corporation

D. O'Connor A.C.J.O., R.A. Blair, Alexandra Hoy JJ.A.

Heard: May 11, 2012

Judgment: June 13, 2012 [*]
Docket: CA C55434, C55435

Proceedings: affirming *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]); additional reasons at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 9479, 2012 ONCA 527 (Ont. C.A.)

Counsel: Richard B. Swan, S. Richard Orzy, Derek J. Bell, Emrys Davis for Appellant, Computershare Trust Company of Canada

Andrew J.F. Kent, Markus Koehnen, Jeffrey Levine for Respondent, Crystallex International Corporation

Barbara L. Grossman for Tenor Capital Management Company, L.P. and Affiliates

Robert Frank for Forbes & Manhattan Inc., Aberdeen International Inc.

David Byers for Monitor Ernst & Young Inc.

Subject: Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — General principles — Jurisdiction — Single judge**

Section 11.2 of the Companies Creditors Arrangement Act does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Appeals**

Corporation moved for approval of DIP financing and management incentive plan against wishes of noteholders — Supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without financing of arbitration which was corporation's biggest asset — Appeal by noteholders dismissed — Supervising judge was in the best position to balance the interests of all stakeholders — Appellate court should not interfere where question is one of weight to be given to particular factors rather than failure to consider factors or correctness.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Arrangements — Approval by creditors**

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

C Corp. sought court approval for agreement with T LP providing debtor in possession (DIP) financing — Agreement was opposed by C's noteholders who proposed their own DIP financing — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correct in finding agreement was not "plan of arrangement" or "compromise" requiring vote.

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Initial application — Miscellaneous**

C Corp. sought court approval for agreement with T LP providing management incentive plan (MIP) — Agreement was opposed by C's noteholders who had own proposed plan — Agreement with T LP approved — Appeal by noteholders dismissed — Supervising judge correctly held that independent committee had applied business judgment.

**Table of Authorities**

**Cases considered by *Alexandra Hoy J.A.*:**

*Air Canada, Re* (2004), 2004 CarswellOnt 469, 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]) — considered

*Calpine Canada Energy Ltd., Re* (2007), 2007 CarswellAlta 1050, 2007 ABQB 504, 35 C.B.R. (5th) 1, 415 A.R. 196, 33 B.L.R. (4th) 68 (Alta. Q.B.) — referred to

*Calpine Canada Energy Ltd., Re* (2007), 35 C.B.R. (5th) 27, 410 W.A.C. 25, 417 A.R. 25, 2007 ABCA 266, 2007 CarswellAlta 1097, 80 Alta. L.R. (4th) 60, 33 B.L.R. (4th) 94 (Alta. C.A. [In Chambers]) — referred to

*Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.* (2008), 2008 BCCA 327, 2008 CarswellBC 1758, 83 B.C.L.R. (4th) 214, 296 D.L.R. (4th) 577, 434 W.A.C. 187, 258 B.C.A.C. 187, 46 C.B.R. (5th) 7, [2008] 10 W.W.R. 575 (B.C. C.A.) — distinguished

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281, 2009 CarswellOnt 7997 (Ont. S.C.J. [Commercial List]) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2010), 70 B.L.R. (4th) 45, *(sub nom. Crystallex International Corp. v. Crystallex Corp.)* 263 O.A.C. 137, 2010 CarswellOnt 3374, 2010 ONCA 364 (Ont. C.A.) — referred to

*Computershare Trust Co. of Canada v. Crystallex International Corp.* (2011), 2011 CarswellOnt 10305, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]) — referred to

*Crystallex International Corp., Re* (2011), 2011 ONSC 7701, 2011 CarswellOnt 15034 (Ont. S.C.J. [Commercial List]) — referred to

*Grant Forest Products Inc., Re* (2009), 2009 CarswellOnt 4699, 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) — considered

*Imperial Oil Ltd. v. R.* (2006), *(sub nom. Imperial Oil Ltd. v. Minister of National Revenue)* 353 N.R. 201, [2007] 1 C.T.C. 41, 2006 SCC 46, 2006 CarswellNat 3176, 2006 CarswellNat 3177, *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6660 (Fr.), *(sub nom. Imperial Oil Ltd. v. Canada)* 2006 D.T.C. 6639 (Eng.), *(sub nom. Inco Ltd. v. Canada)* 273 D.L.R. (4th) 450, *(sub nom. Imperial Oil Ltd. v. Canada)* [2006] 2 S.C.R. 447 (S.C.C.) — considered

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

*Ivaco Inc., Re* (2006), 2006 C.E.B. & P.G.R. 8218, 25 C.B.R. (5th) 176, 83 O.R. (3d) 108, 275 D.L.R. (4th) 132, 2006 CarswellOnt 6292, 56 C.C.P.B. 1, 26 B.L.R. (4th) 43 (Ont. C.A.) — considered

*New Skeena Forest Products Inc., Re* (2005), 7 M.P.L.R. (4th) 153, [2005] 8 W.W.R. 224, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 210 B.C.A.C. 247, *(sub nom. New Skeena Forest Products Inc. v. Kitwanga Lumber Co.)* 348 W.A.C. 247, 2005 BCCA 192, 2005 CarswellBC 705, 9 C.B.R. (5th) 278, 39 B.C.L.R. (4th) 338 (B.C. C.A.) — considered

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — referred to

*Ted Leroy Trucking Ltd., Re* (2010), *(sub nom. Century Services Inc. v. Canada (A.G.))* [2010] 3 S.C.R. 379, [2010] G.S.T.C. 186, 12 B.C.L.R. (5th) 1, *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 G.T.C. 2006 (Eng.), *(sub nom. Century Services Inc. v. A.G. of Canada)* 2011 D.T.C. 5006 (Eng.), *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 503 W.A.C. 1, *(sub nom. Leroy (Ted) Trucking Ltd., Re)* 296 B.C.A.C. 1, 2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, 409 N.R. 201, *(sub nom. Ted LeRoy Trucking Ltd., Re)* 326 D.L.R. (4th) 577, 72 C.B.R. (5th) 170, [2011] 2 W.W.R. 383 (S.C.C.) — considered

*Timminco Ltd., Re* (2012), 2012 CarswellOnt 1466, 2012 ONSC 948, 95 C.C.P.B. 222, 86 C.B.R. (5th) 171 (Ont. S.C.J. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
   Generally — referred to

*Bankruptcy Code*, 11 U.S.C.
   Chapter 15 — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
   Generally — referred to

   s. 6(1) — referred to

   s. 11 — considered

   s. 11.2 [en. 1997, c. 12, s. 124] — considered

   s. 11.2(1) [en. 2005, c. 47, s. 128] — considered

   s. 11.2(4) [en. 2005, c. 47, s. 128] — considered

   s. 11.2(4)(a) [en. 2005, c. 47, s. 128] — considered

   s. 11.2(4)(d) [en. 2005, c. 47, s. 128] — considered

   s. 11.5(1) [en. 1997, c. 12, s. 124] — considered

*Interpretation Act*, R.S.C. 1985, c. I-21
   s. 14 — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   3

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

APPEALS from judgment reported at *Crystallex International Corp., Re* (2012), 2012 ONSC 538, 2012 CarswellOnt 968, 89 C.B.R. (5th) 303 (Ont. S.C.J. [Commercial List]) and *Crystallex International Corp., Re* (2012), 2012 ONSC 2125, 2012 CarswellOnt 4577 (Ont. S.C.J. [Commercial List]), granting orders approving agreement for debtor in possession financing, management incentive plan, extension of stay, and approval of actions of Monitor.

*Alexandra Hoy J.A.:*

## I. Overview

1     The primary issue in these appeals is the scope of financing the supervising judge can or should approve, without the sanction of creditors, while a company is under the protection of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA").

2     The respondent Crystallex International Corporation ("Crystallex") is a Canadian mining company. Its principal asset was the right to develop Las Cristinas in Venezuela, which is one of the largest undeveloped gold deposits in the world. Crystallex obtained this right through a contract with the Corporacion Venezolana de Guayana (the "CVG"), a state-owned Venezuelan corporation. On February 3, 2011, after Crystallex spent over $500 million on developing Las Cristinas, the CVG sent Crystallex a letter to "unilaterally rescind" the contract for reasons of "expediency and convenience". There is no suggestion in these proceedings that the rescission was due to any mismanagement by Crystallex.

3     As a result of the cancellation of the contract, Crystallex was unable to pay its $100 million in senior 9.375 per cent notes due December 23, 2011 (the "Notes"). It sought and, on December 23, 2011 obtained, protection under the CCAA.

4     At present, Crystallex's only asset of significance is an arbitration claim for US $3.4 billion against the government of Venezuela in relation to the cancellation of the contract. The arbitration claim is the "pot of gold" in the CCAA proceeding.

5     The appellant Computershare Trust Company of Canada, in its capacity as Trustee for the holders of the Notes (the "Noteholders"), appeals, with leave, three orders made by the supervising judge in the CCAA proceeding: (i) the January 20, 2012 CCAA Bridge Financing Order (with reasons released January 25, 2012 and reported at 2012 ONSC 538 (Ont. S.C.J. [Commercial List]) ) (the "Bridge Financing Reasons")) authorizing Crystallex to obtain bridge financing of $3.125 million (the "Bridge Loan") from the respondent Tenor Special Situations Fund, L.P. ("Tenor L.P."); (ii) the April 16, 2012 CCAA Financing Order authorizing Crystallex to obtain $36 million of what the supervising judge characterized as Debtor in Possession ("DIP") financing from Tenor Special Situation Fund I, LLC ("Tenor") (the "Tenor DIP Loan"); and (iii) the April 16, 2012 Management Incentive Plan Approval Order approving a Management Incentive Plan ("MIP") designed to ensure the retention of key executives until the arbitration is completed. The supervising judge's reasons for the CCAA Financing Order and Management Incentive Plan Approval Order are reported at 2012 ONSC 2125 (Ont. S.C.J. [Commercial List])) (the "DIP Financing Reasons").

6     Among other conditions, the Tenor DIP Loan, due December 31, 2016, entitles Tenor to 35 per cent of the net proceeds of the arbitration in addition to interest, provides governance rights that may continue after Crystallex exits from CCAA protection, and requires Tenor's approval to a range of options that might customarily be offered to unsecured creditors in seeking to negotiate a plan of compromise or arrangement.

7     Substantially all of the creditors opposed the approval of the Bridge Loan, the Tenor DIP Loan and the MIP. Crystallex represents that it hopes to negotiate a plan of arrangement or compromise with the Noteholders and other creditors before the current stay until July 30, 2012 expires.

8     The bulk of the $36 million Tenor DIP Loan comprises financing to pursue the arbitration claim, which may continue after the period of CCAA protection.

## II. The Legislative Framework

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

9    The CCAA was amended effective September 18, 2009 to add the following provisions regarding the grant of a charge to secure financing required by the debtor:

**Interim financing**

11.2 (1) On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge — in an amount that the court considers appropriate — in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard to its cash-flow statement. The security or charge may not secure an obligation that exists before the order is made.

. . .

**Factors to be considered**

(4) In deciding whether to make an order, the court is to consider, among other things,

　(a) the period during which the company is expected to be subject to proceedings under this Act;

　(b) how the company's business and financial affairs are to be managed during the proceedings;

　(c) whether the company's management has the confidence of its major creditors;

　(d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

　(e) the nature and value of the company's property;

　(f) whether any creditor would be materially prejudiced as a result of the security or charge; and

　(g) the monitor's report referred to in paragraph 23(1)(b), if any. [1]

Prior to the enactment of these provisions, the court relied on its general authority under the CCAA to approve DIP financing: see Lloyd W. Houlden, Geoffey B. Morawetz & Janis P. Sarra, *The 2012 Annotated Bankruptcy and Insolvency Act* (Toronto: Carswell, 2011), at p. 1175.

### III. The Background

#### A. Events Prior to the CCAA Filings

10    Crystallex has filed a Request for Arbitration pursuant to the Canada-Venezuela Bilateral Investment Treaty, claiming $3.4 billion plus interest for the loss of its investment in Las Cristinas. The hearing of the arbitration is scheduled for November 11, 2013.

11    Crystallex's most significant liability is its debt to the Noteholders. In addition to amounts owed to the Noteholders, Crystallex has other liabilities of approximately CAD $1.2 million and approximately US $8 million.

12    The current Noteholders are hedge funds, some of whom purchased Notes after Venezuela announced its intention to expropriate Las Cristinas at prices as low as 25 cents on the dollar.

13    The relationship between Crystallex and the current Noteholders is hostile. Crystallex and the Noteholders have been in litigation since 2008. Prior to the maturity date of the Notes, the Noteholders twice, unsuccessfully, brought court proceedings against Crystallex alleging that an event had occurred which accelerated Crystallex's obligation to pay the Notes. Those

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 60 of 308

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

proceedings were also heard by the supervising judge: see *Computershare Trust Co. of Canada v. Crystallex International Corp.* (2009), 65 B.L.R. (4th) 281 (Ont. S.C.J. [Commercial List]), aff'd 2010 ONCA 364, 263 O.A.C. 137 (Ont. C.A.); and *Computershare Trust Co. of Canada v. Crystallex International Corp.*, 2011 ONSC 5748 (Ont. S.C.J. [Commercial List]).

### B. Commencement of Proceedings under the CCAA and Chapter 15

14     On December 22, 2011, one day prior to the maturity of the Notes, Crystallex and the Noteholders filed competing CCAA applications. The Noteholders' application contemplated that all existing common shares would be cancelled, an equity offering would be undertaken, and if, or to the extent, the equity proceeds were insufficient to pay out the Noteholders, the Notes would be converted to equity.

15     Crystallex sought authority to file a plan of compromise and arrangement, the authority to continue to pursue the arbitration in Venezuela, and the authority to pursue all avenues of interim financing or a refinancing of its business and to conduct an auction to raise financing. In his supporting affidavit sworn December 22, 2011, Robert Fung, Crystallex's Chairman and Chief Executive Officer, indicated that Crystallex wished to have all claims stayed against it until the arbitration settled or Crystallex realized the arbitration award. Crystallex had already received an unsolicited offer of financing from Tenor Capital Management.

16     It was (and is) expected that, if the arbitration is successful and the award is collected, there will be more than enough to pay the creditors and a significant amount will be available to shareholders.

17     On December 23, 2011, the supervising judge made an order granting Crystallex's CCAA application (the "Initial Order"). In his reasons released December 28, 2011, he explained that the Noteholders' proposal was not a fair balancing of the interests of all stakeholders: 2011 ONSC 7701 (Ont. S.C.J. [Commercial List]), at para. 26. The Noteholders did not appeal the Initial Order.

18     Crystallex obtained an order under chapter 15 of the United States Bankruptcy Code from the United States Bankruptcy Court for the District of Delaware, among other things giving effect to the Initial Order in the United States as the main proceeding.

### C. Crystallex Develops a DIP Auction Process

19     Paragraph 12 of the Initial Order authorized Crystallex to pursue all avenues of interim financing or a refinancing of its business or property, subject to the requirements of the CCAA and court approval, to permit it to proceed with an orderly restructuring. It further provided:

> Without limiting the foregoing, the Applicant may conduct an auction to raise interim or DIP financing pursuant to procedures approved by the Monitor and using such professional assistance as the Applicant may determine with the consent of the Monitor. If such approved procedures are followed to the satisfaction of the Monitor then the best offer as determined by the Applicant pursuant to the approved procedures shall be afforded the protection of the *Soundair* principles so that it will be too late to make topping offers thereafter and such offers will not be considered by this Court.

20     Crystallex hired an independent financial advisory firm, Skatoff & Company, LLC, and developed a set of procedures to govern the solicitation of bids to provide financing to Crystallex. The Monitor, Ernst & Young Inc., approved the bid procedures. The bid procedures indicated that Crystallex's objective was to obtain financing of not less than $35 million, net of costs, that, on completion of the CCAA and U.S. Chapter 15 reorganization proceedings, would roll into financing maturing not sooner than December 31, 2014. The bid deadline was February 1, 2012.

### D. The Bridge Loan

21     On January 20, 2012, the supervising judge considered competing proposals from Tenor L.P. and the Noteholders to provide bridge financing. Tenor L.P. offered $3.125 million with interest at 10 per cent per annum. The Noteholders offered $3 million with interest at 1 per cent per annum.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

22    The board of Crystallex, taking into account advice received from Mr. Skatoff, recommended the Tenor L.P. offer. Mr. Skatoff was concerned that the Noteholders' objective may have been to defeat the larger DIP financing process so that they could ultimately impose financing terms on Crystallex. It was also his view that Crystallex should avoid entering into an important financial relationship with a hostile party.

23    The supervising judge approved Tenor L.P.'s offer.

### E. The Noteholders Object to the DIP Auction Process

24    On January 20, 2012, the Noteholders brought a cross-motion to modify the DIP auction process then underway, which they severely criticized. They objected to the amount sought, the term, and the lender back-end entitlement a successful DIP lender could acquire. In their view, Crystallex was inappropriately seeking financing in excess of amounts required until a compromise or plan of arrangement could be arrived at between Crystallex and its creditors. Given their existing position in Crystallex, the Noteholders also objected to being required to sign a non-disclosure agreement containing a standstill provision in order to be a qualified bidder.

25    The supervising judge held that if the Noteholders wished to be considered as a qualified bidder, they would have to sign a non-disclosure agreement: Bridge Financing Reasons, at para. 27. As to their other concerns, he wrote, at para. 29:

> In my view these objections are premature and it is not necessary for me to consider their strength at this stage. The time for filing bids from qualified bidders has not yet expired and what bids will be received is unknown. It is when a successful bidder has been chosen and the DIP facility is before the court for approval that these issues raised by the Noteholders would be more appropriately dealt with. Until then, there is no factual foundation for judgment to be passed on the bid procedures for the DIP facility for which Crystallex will seek approval.

### F. Competing DIP Financing Offers: The Tenor DIP Loan and the Noteholders' Offer

26    The bidders who responded to the request for DIP financing included three hedge funds that hold approximately 77 per cent of the Notes and Tenor.

27    Those hedgefund Noteholders proposed a loan of $10 million with a simple interest rate of 1 per cent repayable on October 15, 2012.

28    The supervising judge described Tenor's proposed terms in the DIP Financing Reasons:

[23] The Tenor DIP facility contains the following material financial terms:

(a) Tenor will advance $36 million to Crystallex due and payable on December 31, 2016. This period for the loan is based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the arbitral tribunal and collection of the award.

(b) The advances will be in four tranches, being $9 million upon execution of the loan documentation and approval of the facility by court order in Ontario, the second being $12 million upon any appeal of the Ontario court order approving the facility being dismissed and upon a U.S court order approving the facility, the third being $10 million when Crystallex has less than $2.5 million in cash and the fourth being $5 million when Crystallex again has less than $2.5 million in cash.

(c) The loans are to be used to (i) repay an interim bridge loan of $3.25 million advanced by Tenor with court approval of January 20, 2012 and payable on April 16, 2012, (ii) fees and expenses in connection with the facility, (iii) general corporate expenses of Crystallex including expenses of the restructuring proceedings and of the arbitration in accordance with cash flow statements and budgets of Crystallex approved by Tenor from time to time.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

(d) Crystallex will pay Tenor a $1 million commitment fee.

(e) $35 million of the loan amount will bear PIK interest (payment in kind, meaning it is capitalized and payable only upon maturity of the loan or upon receipt of the proceeds of the arbitration) at the rate of 10% per annum compounded semiannually.

(f) Tenor will receive additional compensation equal to 35% of the net proceeds of any arbitral award or settlement, conditional upon the second tranche of the loan being advanced. Net proceeds of the award or settlement is defined as the amount remaining after payment of principal and interest on the DIP loan, taxes and proven and allowed unsecured claims against Crystallex, including the noteholders, the latter of which will have a special charge for the unsecured amounts owing. Alternatively, Tenor can convert the right to additional compensation to 35% of the common shares of Crystallex. This conversion right is apparently driven by tax considerations.

[24] The Tenor DIP facility also provides for the governance of Crystallex to be changed to give Tenor a substantial say in the governance of Crystallex. More particularly:

(a) Crystallex shall have a reduced five person board of directors, being two current Crystallex directors, two nominees of Tenor and an independent director selected by agreement of Crystallex and Tenor.

(b) The independent director shall be chair of the board of directors and shall not have a second-casting or tie-breaking vote.

(c) The independent director shall be appointed a special managing director and shall have all the powers of the board of directors to (i) the conduct of the reorganization proceedings in Canada and in the U.S. and the efforts of Crystallex to reorganize the pre-filing claims of the unsecured creditors, (ii) any matters relating to the rights of Crystallex and Tenor as against the other under the facility, (iii) the administration of the MIP to the extent not otherwise delegated to the bonus pool committee under the MIP, and (iv) to retain any advisor in respect of these matters. The special manager shall first consult with a non-board advisory panel, consisting of the three Crystallex directors who will step down from the board, and consider in good faith their recommendations.

(d) With respect to matters that may not at law be delegable to the special managing director, he will be required to obtain board approval. If the Tenor nominees use their votes to block that approval, Tenor will forfeit its 35% additional compensation.

[25] The Tenor DIP facility contains proscribed rights of Tenor in the event of default. Tenor may seize and sell assets other than the arbitration proceeding (i.e. any cash and unsold mining equipment). It may not sell the arbitration claim. If there is a default before any arbitration award, Tenor would have the right to apply to court to have the Monitor or a Canadian receiver and manager appointed to take control of the arbitration proceedings. If such application were not granted, Tenor would be entitled to exercise the rights and remedies of a secured creditor pursuant to an order, the loan documentation or otherwise at law.

29      Mr. Skatoff recommended, and the board of Crystallex agreed, to accept the Tenor DIP Loan. Mr. Skatoff indicated, in an affidavit sworn March 20, 2012, that he had recommended that the board reject the Noteholders' offer of a $10 million loan for 6 months because Crystallex could not be assured that it could borrow the balance of the required funds at the expiry of that period on the same terms as the Tenor DIP Loan.

### G. The Noteholders' Further, Competing Offer to Allay Mr. Skatoff's Concerns

30      In his affidavit on behalf of the Noteholders, sworn March 27, 2012, Mr. Mattoni responded to Mr. Skatoff's concern by committing that the Noteholders would be prepared to,

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 63 of 308

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

... provide financing to Crystallex on the same terms as the [Tenor DIP Loan], in the event that prior to October 1, 2012, the Court orders that such long-term financing is appropriate and necessary. The Noteholders would reserve their complete and unfettered ability as creditors to continue to oppose stay extensions or attempts to secure such long-term financing outside of a Plan of compromise (including, specifically, financing to the extent contemplated by the Proposed Loan), but they will provide it if it is ordered by the Court on the same basis as currently proposed with Tenor...

### H. The Noteholders' Proposed Plan

31    Prior to the April 5, 2012 hearing, the Noteholders proposed a plan to indicate a good faith intention to bargain. They did not seek approval of this proposed plan at the April 5, 2012 hearing.

32    The plan's terms included that the Noteholders would provide a $10 million loan on the terms described above; exchange their debt for approximately 58 per cent of the equity; provide $35 million to Crystallex in exchange for 22.9 per cent of the equity; and provide incentives to management at a lesser level than the MIP. Their proposed plan left approximately 14 per cent of the equity for the existing shareholders.

### I. The Management Incentive Plan

33    The Noteholders had criticized the independent directors of Crystallex as not being sufficiently independent. As a result, the independent directors of Crystallex comprising the compensation committee retained Jay Swartz, a partner of Davies Phillips Vineberg, to determine, from the perspective of an independent director, what an appropriate MIP would be. He in turn retained an independent national executive compensation consulting firm to provide expert advice. Mr. Swartz opined that the overall compensation proposal for the establishment of the bonus pool for the benefit of Crystallex's management was reasonable in the circumstances. The independent directors of Crystallex comprising the compensation committee approved the MIP.

34    At para. 102 of the DIP Financing Reasons, the supervising judge described the MIP:

In sum, a pool of money, consisting of up to 10% of the net proceeds of the arbitration up to $700 million and 2% of any further net proceeds, after all costs and charges, including the amounts owing to noteholders, is to be set aside and money in this pool may be paid to the beneficiaries of the MIP, depending on the determination of an independent committee. The amounts to be allocated to participants by the compensation committee are discretionary and could be nil. No one will be entitled to any particular amount. Members of the compensation committee will not be eligible for any payments.

35    The MIP sets out a number of factors to be considered by the compensation committee in exercising its discretion. They include the amount and speed of recovery, the amount of time and energy expended by the individual, and the opportunity cost to the individual in staying with Crystallex.

36    In the view of the Noteholders, the MIP is too generous. They proposed that management receive 5 per cent through an equity participation in any after tax award. They also took issue with the range of persons eligible under the MIP.

### J. The April 5, 2012 motion

37    On April 5, 2012, Crystallex sought orders approving, among other things, the Tenor DIP Loan and the MIP. The Noteholders as well as Forbes & Manhattan Inc. and Aberdeen International Inc., creditors owed approximately $2.5 million by Crystallex, opposed both the Tenor DIP Loan and the MIP. The one shareholder who attended opposed the MIP.

38    The supervising judge approved the Tenor DIP Loan and the MIP.[2] He also extended the stay until July 30, 2012.

### K. Events since April 5, 2012

39    Tenor made the first, $9 million advance under the Tenor DIP Loan. The Bridge Loan was repaid out of the first advance.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

40    At the hearing of this appeal, the Monitor advised that Crystallex would require further funds before the anticipated release of this court's decision. Crystallex accepted Tenor's offer to advance a further $4 million to Crystallex, on the same terms as the first, $9 million tranche of the Tenor DIP Loan. Accordingly, this further advance does not entitle Tenor to participate in any arbitration proceeds, or trigger any change in the governance of Crystallex. If the Noteholders' appeal succeeds, the additional amounts advanced by Tenor are, like the first tranche, to be immediately repaid with interest at the rate of 1 per cent per annum, and the Noteholders shall fund the repayment. No commitment fee is payable in respect of this additional advance.

## IV. The Supervising Judge's Reasons

### A. The Bridge Loan

41    The supervising judge noted, at para. 5 of the Bridge Financing Reasons, that Tenor L.P.'s bridge financing proposal was "really short-term DIP financing". With respect to the boards' recommendation — based on Mr. Skatoff's advice — that Tenor L.P.'s proposal be approved, he wrote, at para. 12:

> This was a business judgment protected by the business judgment rule so long as it was a considered and informed judgment made honestly and in good faith with a view to the best interests of Crystallex. See *Re Stelco Inc.* (200[5]), 9 C.B.R. (5th) 135 (Ont. C.A.) regarding the rule and its application to CCAA proceedings. I see no grounds for concluding that the decision of Crystallex to prefer the Tenor bridge financing proposal is not protected by the business judgment rule or that I should not give it appropriate deference. [Citation corrected.]

42    The supervising judge noted, at para. 13, that "the Monitor has no basis to say that the business judgment exercised by the Crystallex board of directors was unreasonable". The supervising judge accordingly approved the Bridge Loan.

43    Mr. Skatoff expressed concern that the Noteholders' objective in offering bridge financing on such advantageous terms (interest at the rate of 1 per cent, as opposed to the 10 per cent in the Tenor L.P. offer) was to undermine the DIP auction process. The supervising judge observed, at para. 14:

> Whether Mr. Skatoff is correct in his concerns, it seems to me that the relatively minor extra cost involving the Tenor proposed bridge financing for at most a few months must be weighed against the risk of harm to the longer-term DIP financing auction process, and that for the sake of that process, it is preferable not to run the risks that Mr. Skatoff is concerned about.

### B. The Tenor DIP Loan

44    The substance of the supervising judge's reasons for approving the Tenor DIP Loan — as set out in the DIP Financing Reasons — may be summarized as follows.

> i. The exercise of business judgment by the board of directors of Crystallex in approving the Tenor DIP Loan is a factor that can be taken into account by the court in considering whether to make an order under s. 11.2(1) of the CCAA (at para. 35).

> ii. The Tenor DIP Loan did not amount to a plan of arrangement or compromise. Notably, it did not take away the rights of the Noteholders as unsecured creditors to apply for a bankruptcy order or to vote on a plan of compromise or arrangement. A vote of the creditors was therefore not required (at para. 50). In coming to this conclusion, the supervising judge relied on *Calpine Canada Energy Ltd., Re*, 2007 ABQB 504, 415 A.R. 196 (Alta. Q.B.), leave to appeal refused, 2007 ABCA 266, 417 A.R. 25 (Alta. C.A. [In Chambers])).

> iii. Crystallex intended to negotiate a plan of compromise or arrangement with the Noteholders during the stay extension until July 30, 2012 (paras. 48, 126). The Tenor DIP Loan is therefore distinguishable from the financing rejected by the court in *Cliffs Over Maple Bay Investments Ltd. v. Fisgard Capital Corp.*, 2008 BCCA 327, 296 D.L.R. (4th) 577 (B.C. C.A.), because in that case the debtor did not have an intention to propose an arrangement or compromise to its creditors.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

iv. Because the Tenor DIP Loan involves the grant of a financial interest in part of the assets of Crystallex, it is appropriate to consider the *Soundair* factors in deciding whether to approve it (at para. 59). Crystallex conducted a robust competitive bidding process (at para. 39).

v. Mr. Skatoff's evidence was that the Noteholders' proposed six month facility "would seriously erode the chances of Crystallex obtaining third party financing in October" (at para. 90). Counsel for Computershare had said during argument on the motion that the Noteholders "were not prepared to agree to such a $35 million facility at this time but only at some future time as the $10 million facility they now proposed became due" (at para. 27). While it would have been preferable if the Noteholders had been willing to lend on the basis of the terms of the Tenor DIP facility, "it was made clear during argument that the noteholders were not prepared at this time to do so" (at para. 91).

vi. As to the enumerated factors in s. 11.2(4):

(a) Given that Crystallex intends, if possible, to negotiate an acceptable plan of arrangement or compromise, the length of time during which Crystallex is expected to be subject to the CCAA proceedings is not a determinative factor. The financing will be required to pursue the arbitration (at para. 62) and, as the supervising judge noted, "the only way any of the creditors will receive any substantial cash payment is from the proceeds of the arbitration" (at para. 47);

(b) The management of the business and affairs of Crystallex "are a reasonable compromise between Crystallex and Tenor designed to protect the interests of the stakeholders, including the noteholders" (at para. 73). The fact that Tenor is given substantial governance rights does not in itself mean that the DIP Tenor Loan should not be approved. Tenor does not have the right to conduct the reorganization proceedings or the arbitration proceeding. Moreover, under s. 11.5(1) of the CCAA, the court may remove a director whom it is satisfied is unreasonably impairing or is likely to unreasonably impair the possibility of a viable compromise or arrangement being made. Arguably, a court could remove a Tenor nominee under this section without triggering an event of default under the Tenor DIP Loan (at paras. 63-71);

(c) While the Noteholders expressed "extreme displeasure" at Crystallex's management's delay in commencing arbitration proceedings, they do not oppose management having a continuing role in the arbitration (at para. 72);

(d) The Noteholders' argument that the terms of the Tenor DIP Loan — in particular, the fact that the refusal of the court to grant a stay or a bankruptcy are events of default, the grant of a 35 per cent interest in the arbitration proceeds, and the limits on the type of restructuring that can be concluded without the approval of Tenor — will effectively prevent any plan of arrangement was rejected (at paras. 74-82). While, as the Monitor points out, the introduction of a third party, Tenor, with consent rights to certain actions will add complexity to the negotiation of a CCAA plan (at para. 93), the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement (at para. 83):

... Crystallex requires additional financing to pay its expenses and continue the arbitration. A DIP loan allows the company to have the arbitration financed, which if it were not at this stage would impair the arbitration and perhaps the attitude of Venezuela towards the arbitration claim, and as such enhances the viability of a CCAA plan. I have not accepted the argument of the noteholders that the loan would prevent a plan of arrangement.

(e) The supervising judge noted that Crystallex's principal asset is its US $3.4 billion arbitration claim against Venezuela (at para. 12); and

(f) In considering the Noteholders' complaints of prejudice in the context of what the market is demanding for a DIP loan and in all the circumstances, the creditors have not been materially prejudiced by the Tenor DIP Loan (at para. 84).

*C. The Management Incentive Plan*

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

45    The supervising judge considered the Noteholders' objections to the quantum and method for providing an incentive to management, the inclusion of certain persons in the MIP, and the approval of the MIP before the negotiation of a plan.

46    In the DIP Financing Reasons, the supervising judge observed, at para. 109, that whether employee retention provisions should be ordered in a CCAA proceeding was a matter of discretion. He noted that the provisions of the MIP had been approved by an independent committee of the board of directors with impressive qualifications, relying on the opinion of Mr. Swartz. In providing that opinion, Mr. Swartz indicated that the absolute amount of the bonus pool could be very substantial and, in allocating it, the compensation committee "may have to carefully consider the absolute amounts to be paid to each member of the Management Group in order to satisfy its fiduciary duties": see DIP Financing Reasons, at para. 108. The supervising judge also noted that Mr. Swartz had retained an independent national executive compensation consulting firm to provide expert advice.

47    Citing *Grant Forest Products Inc. (Re)* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) (st]) and *Timminco Ltd., Re*, 2012 ONSC 948 (Ont. S.C.J. [Commercial List])), the supervising judge wrote, at para. 112 of the DIP Financing Reasons, "I see no reason why the business judgment rule is not applicable, particularly when the provisions of the MIP have been approved by an independent committee of the board." He further noted, at para. 115, what appears to be the practice of approving employee retention plans before any plan has been negotiated and, at para.105, that the Tenor DIP Loan was conditional on the approval of a MIP acceptable to Crystallex and Tenor.

48    As to who should be eligible to participate in the MIP, at para. 117, the supervising judge noted that the independent committee had exercised its business judgment on the matter and that the participants were known to Mr. Swartz. Having reviewed the evidence, the supervising judge could not "say that any of the persons included in the MIP should not be there".

## V. The Parties' Submissions

### A. The Noteholders' Submissions

49    The Noteholders frame their opposition to the Tenor DIP Loan on a number of bases.

50    They argue that s. 11.2, titled "Interim financing", only permits a supervising judge to approve financing to meet the debtor's needs while it is developing a plan to present to its creditors.

51    The Noteholders also argue that the supervising judge's finding that the Tenor DIP Loan would enhance the prospects of a viable compromise or arrangement was unreasonable because it resulted from an error of principle, namely an improper focus on the fact that it provided financing for the arbitration.

52    The Noteholders submit that the supervising judge misapprehended the evidence in finding that the Noteholders were not willing to match the Tenor DIP Loan, and this error affected the outcome of the motion.

53    They argue that the supervising judge erred in deferring to the business judgment of the directors of Crystallex in approving both the Bridge Loan and the Tenor DIP Loan. They argue that directors always make a recommendation and, if Parliament had thought this was a relevant factor, it would have specifically enumerated it in s. 11.2(4) of the CCAA.

54    They argue that the supervising judge erred in principle in focusing on what was the most expedient way to fund the arbitration (as opposed to Crystallex's needs while negotiating a plan with the Noteholders) and, in doing so, committed the same error as the motion judge in *Cliffs Over Maple Bay*.

55    The Noteholders' position is that the Tenor DIP Loan is effectively an arrangement, in the guise of a financing, and Crystallex is misusing the CCAA to impose a restructuring without the requisite creditor approval.

56    The Noteholders submit that this court should order Crystallex to accept the Noteholders' "matching" DIP loan offer.

57    They also renew their objections to the MIP.

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

## B. Crystallex's Submissions

58    Crystallex argues that the Noteholders' appeal with respect to the Bridge Loan is moot because the loan has been advanced, spent and repaid.

59    As to the Tenor DIP Loan, it argues that approving it was within the discretion of the supervising judge, the supervising judge exercised his discretion on a wide variety of findings of fact, capable of evidentiary support in the record, and there is no basis for this court to intervene. It relies on *Ted Leroy Trucking Ltd., Re*, 2010 SCC 60, [2010] 3 S.C.R. 379 (S.C.C.) [*Century Services*], which recently addressed the broad discretionary jurisdiction of a supervising judge under the CCAA. Crystallex also points to *Air Canada (Re)* (2004), 47 C.B.R. (4th) 169 (Ont. S.C.J. [Commercial List]), as an instance where exit financing was approved before a plan had been approved by creditors.

## C. Tenor's Submissions

60    Tenor argues that "interim financing" in the heading to s. 11.2 of the CCAA does not mean "short term", but rather refers to the interval between two points or events, and s. 11.2 does not contain anything that would fetter the discretion of the supervising judge to select an "end point" beyond the expected conclusion of a plan. It argues that the duration of the Tenor DIP Loan is tailored to Crystallex's unique circumstance: all stakeholders acknowledge that the arbitration must be pursued in order for there to be meaningful recovery. In any event, it argues, marginal notes, such as the heading "interim financing" in s. 11.2, are not part of the statute, and their value is limited when a court must address a serious problem of statutory interpretation, citing the *Interpretation Act*, R.S.C. 1985, c. I-21, s. 14, and *Imperial Oil Ltd. v. R.*, 2006 SCC 46, [2006] 2 S.C.R. 447 (S.C.C.), at para. 57.

61    Moreover, Tenor submits, the supervising judge was in the best position to perform the careful balancing of interests required to facilitate a successful restructuring.

## VI. Analysis

### A. The Appeal from the Bridge Financing Order

62    The Noteholders did not strongly pursue their appeal of the Bridge Financing Order. The relief sought at the conclusion of the hearing related to the Tenor DIP Loan and not the Bridge Loan. The Bridge Loan was disbursed, spent and repaid. I agree with the respondents that the Noteholders' appeal with respect to the Bridge Loan is moot. I will therefore confine my analysis to the Tenor DIP Loan and the MIP.

### B. The Appeal from the Tenor DIP Financing Order

#### (1) Century Services Inc. v. Canada (Attorney General)

63    The Supreme Court of Canada had occasion to interpret the CCAA for the first time in *Century Services*. It used that opportunity to make clear that the CCAA gives the courts broad discretionary powers. Those powers must, however, be exercised in furtherance of the CCAA's purposes: para. 59. Section 11, in particular, was drafted in broad language which provides that a supervising judge "may, subject to the restrictions set out in this Act ... make any order that it considers appropriate in the circumstances". [3] For the majority in *Century Services*, Deschamps J. wrote:

[69] The *CCAA* also explicitly provides for certain orders...

[70] The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

64    It is with the Supreme Court's interpretation of the scope of judicial discretion under the CCAA in mind that I turn to s. 11.2 and the question of whether it permits a supervising judge to approve financing that may continue for a significant period after CCAA protection ends, without the approval of creditors.

*(2) Section 11.2 of the CCAA*

65    Section 11.2 is headed "Interim Financing". Headings may be used as an aid in interpreting the meaning of a statute: R. Sullivan, *Sullivan on the Construction of Statutes*, 5th ed. (Markham: LexisNexis Canada Inc., 2008), at p. 394, "Interim" generally means temporary or provisional: *Canadian Oxford Dictionary*, 2d ed. The weight to be given to a heading depends on the circumstances.

66    I agree with the Noteholders that s. 11.2 contemplates the grant of a charge, the primary purpose of which is to secure financing required by the debtor while it is expected to be subject to proceedings under the CCAA. A further purpose, however, is to enhance the prospects of a plan of compromise or arrangement that will lead to a continuation of the company, albeit in restructured form, after plan approval.

67    Section 11.2(4)(a) directs the court to consider the period during which the debtor is expected to be subject to proceedings under the CCAA. It stops short of confining the financing to the period that the debtor is subject to the CCAA. Section 11.2(4)(d) directs the court to consider if the financing would enhance the prospects of a viable compromise or arrangement.

68    Having regard to the broad remedial purpose of the CCAA and the broad residual authority of a supervising judge described in *Century Services*, in my view section 11.2 does not restrict the ability of the supervising judge, where appropriate, to approve the grant of a charge securing financing before a plan is approved that may continue after the company emerges from CCAA protection. Indeed, although in very different circumstances, financing to be available on the debtor's emergence from CCAA protection (sometimes called "exit financing") was approved before a plan was approved in *Air Canada*.[4] Both *Century Services* and section 11.2, however, in my view, signal that it would be unusual for a court to approve exit financing where opposed by substantially all of the creditors. Exit or post-plan financing is often a key element, or a pre-requisite, of the plan voted on by creditors.

69    The question becomes whether the unique facts of this case permitted the supervising judge to approve "interim financing" that was of such duration and structure that it could well outlast the CCAA protection period. This court should not substitute its decision for that of the supervising judge. I must ask this question through the lens of the applicable standard of review.

*(3) Standard of review*

70    Appellate review of a discretionary order under the CCAA is limited. Intervention is justified only for an error in principle or the unreasonable exercise of discretion: *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108 (Ont. C.A.), at para. 71. An appellate court should not interfere with an exercise of discretion "where the question is one of the weight or degree of importance to be given to particular factors, rather than a failure to consider such factors or the correctness, in the legal sense, of the conclusion": *New Skeena Forest Products Inc., Re*, 2005 BCCA 192, 39 B.C.L.R. (4th) 338 (B.C. C.A.), at para. 26.

*(4) The supervising judge did not err in principle or unreasonably exercise his discretion*

71    As detailed below, I conclude that there is no basis for interfering with the supervising judge's exercise of discretion in approving the Tenor DIP Loan.

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

72    Most significantly, in this case, the supervising judge found there could be no meaningful recovery, and therefore no successful restructuring, without the financing of the arbitration. Although the Noteholders characterized the Tenor DIP Loan as "exit financing", it furthered the remedial purpose of the CCAA. To that extent, it is appropriate in the first sense used by Deschamps J. in *Century Services*, even though it may well outlast the period of CCAA protection. The supervising judge's focus on the fact that the Tenor DIP Loan provided financing for the arbitration was not, in the circumstances, an error of principle.

73    In my view, the Noteholders' real argument is that the *means* by which the Tenor DIP Loan was approved were not appropriate. Ideally, a CCAA supervising judge is able to assist creditors and debtors in coming to a compromise. The creditors and Crystallex have not "achieved common ground" on a very significant matter. Effectively, the Noteholders argue that the creditors have not been treated as advantageously and fairly as the circumstances permit. They are the senior creditors and their offer to provide DIP financing on terms they argue matched those of the Tenor DIP Loan was not accepted. With sufficient financing in place to fund the arbitration, their leverage in negotiating a share of the arbitration proceeds has been reduced. Moreover, the Noteholders argue, the supervising judge erred in applying the business judgment rule, and, contrary to *Cliffs Over Maple Bay*, involuntarily stayed their rights during what they characterize as a restructuring. I consider each of these arguments below.

**a. The Noteholders' competing DIP loan offer**

74    The Noteholders point to their affidavit on the April motion indicating they would submit to an order to advance funds on the same terms as the Tenor DIP Loan "in the event that prior to October 1, 2012, the Court orders that such longterm financing is appropriate and necessary". The supervising judge wrote that it would have been a preferable outcome if the Noteholders had been prepared to lend at the time of the April motion on the terms of the Tenor DIP facility: DIP Financing Reasons, at para. 91. The Noteholders argue that: they were prepared to advance funds on the terms of the Tenor DIP Loan, if so ordered; the supervising judge misapprehended the evidence; and, given the supervising judge's comment that it would have been preferable if the Noteholders had been prepared to lend, that misapprehension affected the outcome of the motion.

75    The supervising judge's comment at para. 91 of the DIP Financing Reasons makes his real concern clear. There, he stated that "at this time" the Noteholders were not prepared to lend on the terms of the Tenor DIP Loan. The Noteholders' view as of April 5, 2012 was that such long-term financing was not necessary, as the $10 million they offered to advance at that time met Crystallex's then cash requirements. The Noteholders reserved their rights to continue to oppose the approval of long term financing before they had come to an agreement with Crystallex about their entitlement, as creditors. Further hearings, and further arguments, were required. The supervising judge found, at para. 83 of the DIP Financing Reasons, that not putting sufficient financing in place to finance the arbitration "at this stage" would impair the arbitration. There was no suggestion from counsel for the Noteholders that on April 5, 2012 the Noteholders were prepared to waive the condition permitting them to continue to oppose the approval of long term financing. I am not satisfied that the supervising judge clearly misapprehended the evidence.

**b. Loss of leverage**

76    In Crystallex's view, a reduction of the Noteholders' leverage was desirable. It points to the Noteholders' competing CCAA application, seeking to cancel all of the shareholders' equity, which the supervising judge rejected as not fairly balancing the interests of all stakeholders. The Noteholders' plan, subsequently proposed, would entitle them to 46 per cent of the equity in return for giving up their Notes, which Crystallex also views as excessive. [5]

77    Crystallex argues that the Noteholders are not contractually entitled to convert their Notes to equity, and should therefore not be entitled to do so. Moreover, they argue, in the event of bankruptcy, the Noteholders would only be entitled to recover their principal and interest at the statutory rate of 5 per cent under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, and, if the arbitration is realized, they will be entitled to the higher rate of interest they are contractually entitled to under the Notes. As Deschamps J. noted at para. 77 of *Century Services*, participants in a reorganization "measure the impact of a reorganization against the position they would enjoy in liquidation".

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

78    The Noteholders counter that, contractually, they were entitled to be repaid on December 23, 2011 and, since they were not, and Crystallex proposes to defer repayment for several years and repay the Notes only if the arbitration is successful, the long delay entitles them to some equity participation. Moreover, contractually, Crystallex is restricted from incurring the Tenor DIP Loan, which will be senior to the Notes.

79    Crystallex points to the terms of the Initial Order, affording the "best offer" the protection of the *Soundair* principles, and providing that "topping offers" would not be considered by the court. Crystallex points out that the Noteholders did not appeal the Initial Order and argues that accepting the Noteholders' matching offer would offend the *Soundair* principles. In Crystallex's view, the Noteholders were treated fairly.

80    In turn, the Noteholders argue that the Initial Order authorized Crystallex to conduct an auction to raise *interim or DIP financing* pursuant to procedures approved by the Monitor. Since the outset, the Noteholders maintained their objection that the auction process sought more than interim or true DIP financing. The supervising judge deferred consideration of their objections until the DIP facility was before the court for approval.

81    The Noteholders are sophisticated parties. They pursued a strategy. It ultimately proved less successful than hoped. It appears that the supervising judge would have been prepared to approve the advance of funds to Crystallex by the Noteholders, on the terms of the Tenor DIP Loan, notwithstanding the *Soundair* principles, had the Noteholders agreed to do so, without condition, on April 5, 2012.

82    The facts of this case are unusual: there is a single "pot of gold" asset which, if realized, will provide significantly more than required to repay the creditors. The supervising judge was in the best position to balance the interests of all stakeholders. I am of the view that the supervising judge's exercise of discretion in approving the Tenor DIP Loan was reasonable and appropriate, despite having the effect of constraining the negotiating position of the creditors.

### c. The business judgment rule

83    The supervising judge held that in addition to the factors in s. 11.2(4) of the CCAA, he could take into account the exercise or lack thereof of business judgment by the board of directors of a debtor corporation in considering DIP financing: DIP Financing Reasons, at paras. 32-35. He cited *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (Ont. C.A.), as authority for this proposition. [6]

84    The fact that a debtor's board of directors recommends interim financing is not a determinative factor, and in some cases may not be a material factor, in considering whether to make an order under s. 11.2. It would be unusual if the board did not recommend the financing for which the debtor seeks approval.

85    *Stelco* should not be read as authority for the principle that the recommendation of the directors of a debtor under CCAA protection is entitled to deference in evaluating whether financing should be approved under s. 11.2 of the CCAA where the factors outlined in s. 11.2(4) have not been complied with. In *Stelco*, the debtor did not seek court approval of a recommendation of the board. In the case of interim financing, the court must make an independent determination, and arrive at an appropriate order, having regard to the factors in s. 11.2(4). It may consider, but not defer to, and is not fettered by, the recommendation of the board.

86    The weight given by the supervising judge to the business judgment of the board of directors of Crystallex in recommending the Tenor DIP Loan is not, however, a basis for this court to interfere with his decision: *New Skeena Forest Products Inc., Re*, at para. 26.

### d. Cliffs Over Maple Bay is distinguishable

87    In *Cliffs Over Maple Bay*, the debtor was the developer of a 300 acre site intended to include residential units, a golf course and a hotel. The debtor obtained protection under the CCAA and sought approval of financing that would permit it to

Crystallex International Corp., Re, 2012 ONCA 404, 2012 CarswellOnt 7329

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

complete material parts of the development. It believed that the proceeds generated from the sale of units thus completed would be sufficient to fund the remaining portions of the development and that, if the development were completed, there would be sufficient sale proceeds to satisfy all of the debtor's obligations.

88      The motion judge approved the financing; the mortgagees of the development appealed. The British Columbia Court of Appeal noted, at para. 35, that it was not suggested that the debtor intended to propose an arrangement or compromise to its creditors before embarking on its restructuring plan. The court allowed the appeal, writing:

> [37] ... DIP financing should not be authorized to permit the debtor company to pursue a restructuring plan that does not involve an arrangement or compromise with its creditors ...

> [38] ... What the Debtor Company was endeavouring to accomplish in this case was to freeze the rights of all of its creditors while it undertook its restructuring plan without giving the creditors an opportunity to vote on the plan. The CCAA was not intended, in my view, to accommodate a non-consensual stay of creditors' rights while a debtor company attempts to carry out a restructuring plan that does not involve an arrangement or compromise upon which the creditors may vote.

89      I agree with the supervising judge that this case can be distinguished from *Cliffs Over Maple Bay*, which turned on the court's finding that the debtor did not intend to negotiate a plan with its creditors.

90      While Mr. Fung initially indicated that Crystallex's plan was to stay creditors' claims until the arbitration was settled or realized, his more recent evidence was that approval of the Tenor DIP Loan does not preclude further discussions about a plan with the creditors. In submissions before the supervising judge, and again before this court, counsel for Crystallex reiterated that Crystallex intended to exit from CCAA protection as soon as a plan was negotiated with the creditors and approved, and that Crystallex intended to negotiate a plan by the expiry of the stay on July 30, 2012. The supervising judge found that Crystallex intended to negotiate a plan with its creditors. There is some basis in the record for such a conclusion.

*(5) The Tenor DIP Loan is not an arrangement*

91      An arrangement or compromise cannot be imposed on creditors unless it has been approved by a majority in number representing two thirds in value of the creditors: see s. 6(1) of the CCAA.

92      The supervising judge rejected the argument that the Tenor DIP Loan was a plan of arrangement or compromise and therefore required the approval of the creditors. He held, at para. 50 of the DIP Financing Reasons:

> A "plan of arrangement" or a "compromise" is not defined in the CCAA. It is, however, to be an arrangement or compromise between a debtor and its creditors. The Tenor DIP facility is not on its face such an arrangement or compromise between Crystallex and its creditors. Importantly the rights of the noteholders are not taken away from them by the Tenor DIP facility. The noteholders are unsecured creditors. Their rights are to sue to judgment and enforce the judgment. If not paid, they have a right to apply for a bankruptcy order under the BIA. Under the CCAA, they have the right to vote on a plan of arrangement or compromise. None of these rights are taken away by the Tenor DIP.

93      I agree. While the approval of the Tenor DIP Loan affected the Noteholders' leverage in negotiating a plan, and has made the negotiation of a plan more complex, it did not compromise the terms of their indebtedness or take away any of their legal rights. It is accordingly not an arrangement, and a creditor vote was not required. In this case it was within the discretion of the supervising judge to approve the Tenor DIP Loan.

**C. The Appeal from the Management Incentive Plan Approval Order**

94      In my view, the supervising judge did not err in principle or unreasonably exercise his discretion in approving the MIP. I see no basis for this court to intervene.

95      As the supervising judge noted, employee retention provisions are frequently authorized before a plan is negotiated. The supervising judge was alive to the exceptionally large amounts that might be paid to beneficiaries of the MIP (including Mr.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

Fung) in this case. The supervising judge took specific note of the issues that the Noteholders had raised in the past regarding the extent to which the independent committee of the board that recommended the MIP was truly independent, and the steps taken by that committee to address those concerns.

96    The recommendation of an independent committee of the board that has obtained expert advice is entitled to more weight in the consideration of a MIP than is the recommendation of the board in the consideration of whether financing should be approved under s. 11.2 of the CCAA. The CCAA does not list specific factors to be considered by the court in the case of a MIP. Moreover, the board would have the best sense of which employees were essential to the success of its restructuring efforts.

97    In addition to considering the recommendation of the independent committee of the board and Mr. Swartz, the supervising judge also reviewed the evidence to consider whether any persons had been included in the MIP who should not have been. He did not rely solely on the board's recommendation.

## VII. Disposition

98    Accordingly, I would dismiss the appeals of the CCAA Bridge Financing Order, the CCAA Financing Order, and the Management Incentive Plan Approval Order.

## VIII. Costs

99    If the parties cannot agree, I would order that Crystallex and Tenor provide their submissions on the issue of costs within 14 days, and that the Noteholders, if so advised, provide their submissions in response within 10 days thereafter. No reply submissions are to be provided without leave.

### D. O'Connor A.C.J.O.:

I agree

### R.A. Blair J.A.:

I agree

*Appeals dismissed.*

Footnotes

\*      Additional reasons at *Crystallex International Corp., Re* (2012), 2012 CarswellOnt 9479, 2012 ONCA 527 (Ont. C.A.).

1      Paragraph 23(1)(b) provides that the monitor shall "review the company's cash-flow statement as to its reasonableness and file a report with the court on the monitor's findings".

2      The MIP was approved subject to an amendment (agreed to by Crystallex) to provide that the value of any stock options ultimately realized by participants of the MIP would be deducted from the amount of any bonus awarded under the MIP on a tax neutral basis.

3      The full text of section 11 is as follows:

        11. Despite anything in the *Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

4      In *Air Canada*, Farley J. approved a "global restructuring agreement" which included a commitment of an existing creditor to provide exit financing of approximately US $585 million on the company's emergence from CCAA. DIP financing was in place; the financing at issue was clearly recognized as exit financing. The restructuring agreement was not opposed by substantially all of the creditors. Nor was it argued that it adversely affected the ability of the creditors and the debtor to negotiate a compromise or arrangement.

5      The Noteholders proposed that they receive 22.9 per cent of the equity for the $36 million needed for the arbitration and 58 per cent of the equity in return for giving up their Notes, for a total of approximately 81 per cent of the equity. Assuming that the Noteholders

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONCA 404, 2012 CarswellOnt 7329, 216 A.C.W.S. (3d) 550, 293 O.A.C. 102...

sought a maximum total entitlement of 81 per cent, if they advanced the $36 million on the terms of the Tenor DIP Loan, as they now seek to do, the amount of equity on conversion of their notes would be 46 per cent. See the DIP Financing Reasons, at para. 77.

6    An incorrect citation for *Stelco*  was given in the DIP Financing Reasons, at para. 33.

---

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    19

TAB 50

77 F.3d 1381
United States Court of Appeals,
Federal Circuit.

CYRIX CORPORATION, Plaintiff–Appellee,
and
SGS–Thomson Microelectronics,
Inc., Plaintiff–Appellee,
and
International Business Machines
Corporation, Plaintiff–Appellee,
v.
INTEL CORPORATION, Defendant–Appellant.

No. 95–1246.    |    March 5, 1996.
|    Rehearing Denied April 26, 1996.

Company which designed and sold microprocessors brought action against patentee seeking declaratory judgment that company did not infringe patents for computer technology, which patentee licensed to licensees who, in turn, made products for company. Licensees intervened. The United States District Court for the Eastern District of Texas, Paul N. Brown, J., granted judgment for company and licensees, 879 F.Supp. 672, and patentee appealed. The Court of Appeals, Lourie, Circuit Judge, held that: (1) first licensee's making of products for company was within scope of license agreement with patentee, and (2) second licensee acted within scope of its "have made" rights under licensing agreement by having foreign affiliate make products which licensee then sold to company.

Affirmed.

West Headnotes (7)

[1]    **Federal Courts**
       👈 Summary judgment
       Court of Appeals reviews de novo district court's grant of summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

       Cases that cite this headnote

[2]    **Federal Courts**

       👈 Contracts
       Interpretation of contract is question of law that Court of Appeals reviews de novo.

       3 Cases that cite this headnote

[3]    **Patents**
       👈 Construction and Operation of Licenses
       Licensee acted within scope of licensing agreement with patentee, regarding licensing of computer technology, when licensee acted as foundry, manufacturing products using patented technology for third party which designed and sold computers; although agreement referred to licensee's licensed products, such products, as defined by agreement, were not limited to products designed by licensee.

       8 Cases that cite this headnote

[4]    **Patents**
       👈 Construction and Operation of Licenses
       **Patents**
       👈 Rights, Remedies, and Liabilities of Licensees
       Provision in licensing agreement for patented computer technology allowing licensee to "have designed" semiconductor apparatus using such technology did not preclude licensee from manufacturing products for third party which designed and sold microprocessors; microprocessors met definition of "semiconductor apparatus," and provision contained no limitation to designs of any particular entity.

       9 Cases that cite this headnote

[5]    **Patents**
       👈 Construction and Operation of Licenses
       Provision in licensing agreement for patented computer technology allowing licensee to "have made" products using such technology only when designs were furnished by licensee did not limit licensee's right to make and have designed products which licensee sold to third party that designed and sold microprocessors; licensee did not "have made" products which

third party designed, and provision did not extend to products at issue.

3 Cases that cite this headnote

**[6]    Patents**
    👉 Construction and Operation of Licenses

Preamble in agreement between patentee and licensee regarding patented computer technology, which indicated that parties entered agreement expecting it would further research and development efforts of parties, did not preclude licensee from making products using patented technology for third party which designed and sold microprocessors; vague preamble could not limit rights clearly given to licensee under agreement.

6 Cases that cite this headnote

**[7]    Patents**
    👉 Construction and Operation of Licenses

Licensee acted within scope of its "have made" rights under licensing agreement with patentee by having licensee's foreign affiliate make products containing patented computer technology and then selling such products to company which designed and sold microprocessors; licensee's conduct did not create unauthorized sublicense, as affiliate was not authorized to make products for anyone but licensee.

4 Cases that cite this headnote

**\*1382**  Appealed from United States District Court Eastern District of Texas, Brown, Judge.

### Attorneys and Law Firms

Albert E. Fey, Fish & Neave, New York City, argued, for plaintiff-appellee Cyrix Corporation. With him on the brief were Laurence S. Rogers, Kelsey I. Nix and Elaine A. Drager.

Stephen E. Stein, SGS–Thomson Microelectronics, Inc., Carrollton, Texas, argued, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Frank Finn, Bruce S. Sostek, Jane Politz Brandt and Beverly Ray Burlingame, Thompson & Knight, Dallas, Texas, were on the brief, for plaintiff-appellee SGS–Thomson Microelectronics, Inc.

Richard W. Clary, Cravath, Swaine & Moore, New York City, argued, for plaintiff-appellee Intern. Business Machines Corp. With him on the brief were Evan R. Chesler and Robert H. Baron.

James J. Elacqua, Arnold, White & Durkee, Houston, Texas, argued, for defendant-appellant. With him on the brief were Thomas A. Miller, Richard L. Stanley and Amber L. Hatfield (Peter N. Detkin, Intel Corporation, Santa Clara, California, of counsel).

Before MICHEL, Circuit Judge, NIES, Senior Circuit Judge, and LOURIE, Circuit Judge.

### Opinion

LOURIE, Circuit Judge.

Intel Corporation appeals from the decision of the United States District Court for the Eastern District of Texas entering judgment in favor of Cyrix Corporation, SGS–Thomson Microelectronics, Inc. (ST), and International Business Machines Corporation (IBM), and holding that IBM and ST acted **\*1383** within the scope of their respective patent license agreements with Intel when IBM made, and ST had made, products for Cyrix. *Cyrix Corp. v. Intel Corp., 879 F.Supp. 672 (E.D.Tex.1995).* Because the district court correctly interpreted the IBM–Intel and ST–Intel agreements and hence did not err in rendering a declaratory judgment of noninfringement in favor of Cyrix, ST, and IBM, we affirm.

### BACKGROUND

Cyrix designed and sold microprocessors. Since it did not have its own facility for manufacturing the microprocessors it designed, it contracted with other companies to act as its foundries. Under such an arrangement, Cyrix provided the foundries with its microprocessor designs, and the foundries manufactured integrated circuit chips containing those microprocessors and sold them to Cyrix. Cyrix then sold the microprocessors in the marketplace under its own brand name.

It was Cyrix's practice to use manufacturing facilities of companies that were licensed under Intel's patents. IBM was such a company; it had obtained a license to Intel's patents in a patent license agreement dated October 1, 1989.[*] The granting clause of the IBM–Intel agreement provided as follows:

2.2 Subject to the provisions of Sections 2.7 and 3.3, INTEL, on behalf of itself and its Subsidiaries, hereby grants to IBM a worldwide, royalty-free, nonexclusive license under the INTEL Licensed Patents:

2.2.1 to make, use, lease, sell and otherwise transfer IBM Licensed Products and to practice any method or process involved in the manufacture or use thereof;

2.2.2 to have made and/or have designed Semiconductor Apparatus;

2.2.3 to have made IBM Licensed Products (other than Semiconductor Apparatus) by another manufacturer for the use, lease, sale or other transfer by IBM....

The agreement defined "IBM Licensed Products" as follows:

1.23 "IBM Licensed Products" shall mean IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus. Any such combination shall be considered an IBM Licensed Product even though its elements are leased, sold or otherwise transferred at different times.

Cyrix also used ST as a foundry. Initially, ST manufactured the chips, but when ST was unable to meet Cyrix's demand, ST requested its affiliate in Italy, SGS–Thomson Microelectronics S.r.L. (ST–Italy), to manufacture the needed chips, which ST then sold to Cyrix.

ST was operating under a license agreement between Mostek and Intel, which ST acquired by assignment. The agreement contains the following granting clause:

INTEL grants and agrees to grant to MOSTEK non-exclusive, non-

transferrable, world-wide licenses under INTEL PATENTS and INTEL PATENT APPLICATIONS to make, to have made, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS.

The agreement defined "LICENSED PRODUCTS" as follows:

"LICENSED PRODUCTS" shall mean any product manufactured, used or sold by either party covered by patents of the other party.

It is undisputed that ST–Italy is legally not a "subsidiary" of ST and is thus not licensed under the ST–Intel agreement. ST therefore relied upon its "have made" rights to obtain products from ST–Italy, which it then sold to Cyrix to fulfill its contractual obligation.

Cyrix filed a declaratory judgment action against Intel, alleging a "reasonable apprehension" that it would be sued for patent infringement. Cyrix sought a declaration that it did not infringe the Intel patents, **\*1384** claiming immunity on the ground that IBM and ST were both licensed under the patents. Cyrix's view was that because IBM and ST acted within the scope of their respective licenses from Intel, its sales of microprocessors were shielded from any holding of infringement, the microprocessors having been obtained from authorized licensees. See *Unidisco, Inc. v. Schattner,* 824 F.2d 965, 968, 3 USPQ2d 1439, 1441 (Fed.Cir.1987) ("Resale of the product by Unidisco could not infringe the patent if Unidisco purchased the product from an authorized seller."), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988).

IBM and ST intervened, seeking an adjudication of their rights under their respective agreements with Intel. On motions for summary judgment by Intel, IBM, and ST, the district court granted summary judgment for IBM and ST, and denied summary judgment for Intel. The district court also entered judgment for Cyrix.

The district court held that IBM had a right to act as a foundry in supplying microprocessors to Cyrix. It found that the definition of "IBM Licensed Products" in the IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM. The district court

distinguished *Intel Corp. v. U.S. Int'l Trade Comm'n,* 946 F.2d 821, 828, 20 USPQ2d 1161, 1167–68 (Fed.Cir.1991) ("*Atmel* ") (construing the term "Sanyo ... products" in a license agreement as limiting the grant of rights to Sanyo-designed and Sanyo-manufactured products). The district court concluded that, unlike the situation in *Atmel,* an internal conflict in the IBM–Intel agreement was not created by construing the license grant to cover products other than IBM–designed products. The court considered the facts to be more analogous to those in *ULSI, see infra,* rather than to those in *Atmel. See Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 27 USPQ2d 1136 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

The district court also held that ST had the right to have microprocessors made for it by any third party, including ST–Italy, and the right to sell those microprocessors to Cyrix. The district court found that the microprocessors were made for ST, not Cyrix, and that the supply agreement between ST and ST–Italy was not a sublicense that exceeded ST's rights under the ST–Intel agreement. The district court thus distinguished the case that Intel cited in support of its position, *E.I. du Pont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108, 1114–15, 227 USPQ 233, 237 (Del.1985) (holding that a third-party's manufacturing of a product for itself under a licensee's "have made" rights was a prohibited sublicense). This appeal followed.

### DISCUSSION

 **[1]**  **[2]**  Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77, 12 USPQ2d 1382, 1383 (Fed.Cir.1989). We review *de novo* a district court's grant of summary judgment. *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed.Cir.1994). Interpretation of a contract is a question of law that we also review *de novo. ULSI,* 995 F.2d at 1569, 27 USPQ2d at 1138; *see also Hoskins Lumber Co. v. United States,* 20 F.3d 1144, 1147 (Fed.Cir.1994).

It is accepted by all the parties that there are no issues of fact before us. The question is solely whether IBM's and ST's agreements with Intel entitled them to make or have made the microprocessor products in question and sell them to Cyrix. Intel states that the ST appeal raises an issue of first impression.

#### A. *IBM–Intel Agreement*

Intel argues that the IBM–Intel agreement does not support a grant of foundry rights. Intel relies upon the word "IBM" as modifying the term "licensed products" in arguing that this modifier is a so-called "Sanyo limitation," limiting the scope of the products licensed and indicating that the parties did not intend to provide foundry rights. *See Atmel,* 946 F.2d at 828, 20 USPQ2d at 1167–68 (discussing the limitation "Sanyo ... **\*1385** products" in a patent license agreement). Intel also asserts that the "have designed" provision in the license does not provide IBM with the right to act as a foundry in manufacturing products designed by Cyrix.

Cyrix and IBM argue that the plain language of the IBM–Intel agreement grants to IBM the right to make and sell to Cyrix microprocessors that Cyrix designed. They argue that the "IBM" modifier in section 2.2.1 of the agreement was intended to distinguish "IBM Licensed Products" from "Intel Licensed Products," and that "IBM Licensed Products" as defined in the agreement are not limited to those products specifically designed by IBM and made for itself. They argue that the term "IBM" used in the term "IBM Licensed Products" is not a "Sanyo limitation." *See id.* at 826 n. 9, 828, 20 USPQ2d at 1166 n. 9, 1167–68.

 **[3]**  We agree with the district court that IBM acted within the scope of the IBM–Intel agreement when it made and sold to Cyrix products designed by Cyrix. The agreement granted IBM the right to make and sell "IBM Licensed Products," which are defined elsewhere in the agreement and are not limited to products designed by IBM. Sections 2.2.1, which grants a license to sell "IBM Licensed Products," and 1.23, which defines "IBM Licensed Products," must be read together. When this is done, the granting provision essentially reads as follows:

> 2.2.1 to make, use, lease, sell and otherwise transfer *IHS Products, IHS Complexes, IHS Programs, Supplies and any combination of any, some or all of the foregoing and, also, Semiconductor Apparatus* and to practice any method or process involved in the manufacture or use thereof;

The products so defined are not limited to IBM-designed products. They include categories of products defined without the IBM prefix. The agreement defined these items as follows:

1.1 "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate, switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

1.2 "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; *provided, however,* that a Manufacturing Apparatus shall not be considered to be an IHS Product.

1.3 "IHS Program" shall mean a plurality of instructions capable of being executed by an IHS Product or Complex, whether or not such instructions are in a machine-readable form.

1.4 "Supply" shall mean, as to each party hereto, any article or matter designed for use in or by, and adapted to be effectively consumed in the course of operation of an IHS Product licensed herein to that party.

...

1.22 "Semiconductor Apparatus" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Memory and/or Integrated Circuit.

Accordingly, we conclude that the district court correctly held that "IBM Licensed Products" are not limited to products designed by IBM.

We also do not agree with Intel that the "IBM" modifier is analogous to the "Sanyo limitation" in *Atmel.* The agreement in *Atmel* contained the following provision:

Intel hereby grants and will grant to Sanyo an [sic] non-exclusive, world-wide royalty-free license without the right to sublicense except to its Subsidiaries, under Intel Patents which read on any *Sanyo* Semiconductor

Material, Semiconductor Device, Magnetic Bubble Memory Device, Integrated Circuit and Electronic Circuit products, for the lives of such patents, to make, use and sell *such products.*

*Atmel,* 946 F.2d at 826 n. 9, 20 USPQ2d at 1166 n. 9 (emphasis in original). We construed the term "Sanyo" to limit the products listed after that term. Such a construction was required because it gave meaning to the **\*1386** term "Sanyo" which was consistent with other provisions of the contract. *Id.* at 827–28, 20 USPQ2d at 1167–68. Otherwise, the term "Sanyo" would have lacked meaning, and a contract must be construed if possible to give meaning to all its provisions. In contrast, the term "IBM Licensed Products" is thoroughly defined in the IBM–Intel agreement to provide no Sanyo-type limitation. *See ULSI,* 995 F.2d at 1570, 27 USPQ2d at 1140 (distinguishing the "Sanyo ... products" limitation in *Atmel* because the agreement in *ULSI* contained no similar qualification to the product definition). Moreover, as argued by IBM, the "IBM" modifier is readily explained by its being distinguished from "Intel Licensed Products."

This case is more analogous to *ULSI* than *Atmel.* In *ULSI,* Hewlett–Packard Company (HP) acted as a foundry to make and sell math coprocessor chips to ULSI. HP obtained a license to Intel's patents under an agreement in which "each granted to the other an 'irrevocable, retroactive, nonexclusive, world-wide, royalty-free license[.]' " *Id.* at 1567, 27 USPQ2d at 1137. ULSI sought to be shielded from infringement of Intel's patents by purchasing the math coprocessor chips from HP, which was acting as an authorized seller. In concluding that HP's agreement with Intel provided HP with the right to act as a foundry for ULSI, we stated that, in contrast to the "Sanyo limitation" discussed in *Atmel,* "the licensing agreement between Intel and HP here contains no restriction on HP's right to sell or serve as a foundry." *Id.* at 1570, 27 USPQ2d at 1140. There was no "Sanyo limitation" in *ULSI.* The products that were licensed were defined broadly. Notwithstanding the presence of the modifier "IBM," the same is true here.

[4]  Intel also argues that the "have designed" provision of section 2.2.2 limits the products IBM is entitled to make to those designed for IBM, presumably meaning for IBM's sole use. We find no such limitation in the agreement. Section 2.2.2 by its plain terms granted IBM the right "to have made and/or have designed Semiconductor Apparatus[,]" defined in the agreement as "any Semiconductor Material,

Semiconductor Device, Semiconductor Memory and/or Integrated Circuit." The microprocessors in question surely meet the definition of "Semiconductor Apparatus." This provision contains no limitation to the designs of any particular entity. Therefore, the right to have designed, make, and sell Semiconductor Apparatus clearly entitled IBM to act as a foundry for Cyrix by making a product designed by Cyrix.

 [5]   Intel also argues that section 2.2.3, providing a right to "have made" products only when the designs are furnished by IBM, limits IBM's right to have products designed by Cyrix. IBM did not have the products made for it, and thus this provision does not limit its rights to make and have designed the products it sold to Cyrix. Moreover, 2.2.3 relates to products "other than Semiconductor Apparatus." We do not accept Intel's argument that section 2.2.3's limitations with respect to other products somehow cut back on unambiguous rights granted in sections 2.2.1 and 2.2.2 regarding the products in question. In summary, IBM properly made and sold microprocessors under section 2.2.1; IBM properly had microprocessors designed under section 2.2.2; and IBM did not "have made" microprocessors under the more limited section 2.2.3. Thus, IBM did not act outside the terms of the Intel agreement. The district court accordingly did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and IBM.

 [6]   Intel also makes a policy argument premised on a preamble clause in its agreement with IBM in which the parties stated that "each expects to continue a research and development effort which will produce further patents and each may require a nonexclusive license under such patents of the other." Intel argues that interpreting the agreement in favor of IBM would discourage the research the agreement was intended to foster. That argument totally misses the mark. The meaning of that clause is simply that the parties were entering into the agreement to facilitate their future research, *i.e.,* to provide themselves with patent freedom for the future. Even if Intel never intended IBM to act as a foundry, this vague preamble cannot be interpreted to give effect to that intention if doing so would override clear   **\*1387** operative language in the agreement. This agreement clearly gave IBM the right to make and sell to Cyrix microprocessors designed by Cyrix.

## B. *ST–Intel Agreement*

 [7]   Intel argues that the arrangement between ST and ST–Italy is in effect a sublicense, which it is clear is not

permissible under the ST–Intel agreement. In particular, it argues that under ST's "have made" rights, ST is only permitted to have products made for itself. Intel posits that the arrangement among ST, ST–Italy, and Cyrix was a mere paper transaction, *i.e.,* a "sham." *See E.I. du Pont,* 498 A.2d at 1116, 227 USPQ at 238 (holding that a third party made a product for itself, not for a licensee, when it made a product and sold it to the licensee, who simultaneously sold it back to the third party).

ST and Cyrix argue that ST was acting within the scope of its "have made" rights. ST denies that its arrangement with ST–Italy was a "sham" and claims that it was using ST–Italy to manufacture products for it in order to meet its obligation to supply microprocessors to Cyrix. They distinguish *du Pont* on its facts, noting that in *du Pont* the party manufacturing under the "have made" right was also using the product itself, whereas here the product made under the "have made" right was sent to and eventually sold by the licensee.

We start with the clear proposition that, under its agreement, ST had the right to have the product made for it and to sell that product to third parties. It relied upon that right to have the product made by ST–Italy and to sell it to Cyrix. The district court found that the arrangement was distinguishable from that in *du Pont.* In *du Pont,* Carbide sought a license under du Pont's patent to manufacture a product known as methomyl, but du Pont refused to grant Carbide a license. *Id.* at 1111, 227 USPQ at 234. Carbide then entered into an agreement with Shell, du Pont's licensee, whereby Carbide would manufacture methomyl for Shell under Shell's "have made" rights and Shell would sell it back to Carbide. *Id.* Carbide would then use it (or sell it) as it wished. The Supreme Court of Delaware, whose law governed that agreement, concluded that the two agreements, one to enable Carbide to manufacture methomyl for Shell and the other whereby Shell sold it back to Carbide, were two halves of a single business transaction. The net result was that they enabled Carbide to make and use the patented product. The court held that that was in effect a sublicense, which was prohibited under the Shell-du Pont agreement. *Id.* at 1115, 1117, 227 USPQ at 237–38.

The district court identified several important differences between the situation in *du Pont* and the arrangement among ST, ST–Italy, and Cyrix, and concluded in its Memorandum Opinion and Order as follows:

> The substance of the arrangement between Cyrix and ST and ST and

ST–Italy is that when Cyrix needs wafers, it issues a purchase order to ST. ST then either manufactures the wafers itself at its Carrollton, Texas, facility or arranges for ST–Italy to manufacture the wafers at its Italian facility. ST is selling wafers. It is not selling or receiving payment for the use of its license from Intel. It has not authorized St–Italy to make the wafers for or sell them to anyone other than ST. The production of the wafers is for the use of ST, the original licensee, and not for the use of ST–Italy. This is a valid exercise of the have-made rights granted under the License Agreement and does not constitute a sublicense.

*Cyrix Corp. v. Intel Corp.,* 879 F.Supp. 666, 671 (E.D.Tex.1995).

We agree with the district court that the facts here are thoroughly distinguishable from those in *du Pont.* In *du Pont,* the arrangement was a sham. The third-party (Carbide) acting under Shell's "have made" rights was manufacturing and selling the product to Shell and then buying it back in what was only a set of paper transactions. *E.I. du Pont,* 498 A.2d at 1111, 227 USPQ at 234. Here, however, the third-party (ST–Italy) properly manufactured microprocessors under ST's "have made" rights, and ST then properly sold the products to a different entity, Cyrix. The two agreements, one permitting ST–Italy to manufacture microprocessors **\*1388** for ST and the other providing for ST's sale of microprocessors to Cyrix, were separate business transactions. As the district court found, ST was using both its own facility and ST–Italy's to satisfy its obligation to provide microprocessors to

Cyrix. The products manufactured by ST–Italy were made for ST. If the facts in this case had been that Cyrix made the product for ST under ST's "have made" rights and then ST sold the product back to Cyrix, then they would have been analogous to those in *du Pont,* but those are not our facts. We accordingly conclude that the district court did not err in holding that the arrangements among ST, ST–Italy, and Cyrix were a valid exercise of ST's "have made" rights under its agreement with Intel. The district court thus did not err in granting a declaratory judgment of noninfringement in favor of Cyrix and ST.

We have considered the other arguments raised by Intel and conclude that they do not compel reversal of the district court's judgment.

## CONCLUSION

Judgment was properly entered in favor of Cyrix, IBM, and ST on their respective complaints. In particular, the district court did not err in concluding that the IBM–Intel agreement provided IBM with the right to make microprocessors designed by Cyrix and sell those microprocessors to Cyrix. The district court also did not err in concluding that ST acted within the scope of its "have made" right under the ST–Intel agreement when it had ST–Italy make the microprocessors and then sold them to Cyrix.

***AFFIRMED.***

**Parallel Citations**

37 U.S.P.Q.2d 1884

Footnotes
\*      The agreement was amended on January 1, 1994, but this amendment did not change the scope of the license granted in the original agreement.

End of Document          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.          7

# TAB 51

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

113 S.Ct. 2786
Supreme Court of the United States

William DAUBERT, et ux., etc., et al., Petitioners,

v.

MERRELL DOW PHARMACEUTICALS, INC.

No. 92–102.    |    Argued March
30, 1993    |    Decided June 28, 1993.

Infants and their guardians ad litem sued pharmaceutical company to recover for limb reduction birth defects allegedly sustained as result of mothers' ingestion of antinausea drug Bendectin. The United States District Court for the Southern District of California, 727 F.Supp. 570, granted company's motion for summary judgment, and plaintiffs appealed. The Court of Appeals, 951 F.2d 1128, affirmed. Plaintiffs filed petition for writ of certiorari, which was granted. The Supreme Court, Justice Blackmun, held that: (1) "general acceptance" is not necessary precondition to admissibility of scientific evidence under Federal Rules of Evidence, and (2) Rules assign to trial judge the task of ensuring that expert's testimony both rests on reliable foundation and is relevant to task at hand.

Vacated and remanded.

Chief Justice Rehnquist filed opinion concurring in part and dissenting in part in which Justice Stevens joined.

West Headnotes (36)

[1]     **Evidence**
        👉 Results of experiments
        Federal Rules of Evidence superseded *Frye* "general acceptance" test for admissibility of scientific evidence. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

        115 Cases that cite this headnote

[2]     **Federal Civil Procedure**
        👉 Rules of Court in General
        Supreme Court interprets legislatively enacted Federal Rules of Evidence as it would any statute.

18 Cases that cite this headnote

[3]     **Evidence**
        👉 Relevancy in general
        Basic standard of relevance under Federal Rules of Evidence is liberal one. Fed.Rules Evid.Rules 401, 402, 28 U.S.C.A.

        68 Cases that cite this headnote

[4]     **Evidence**
        👉 Results of experiments
        Rigid "general acceptance" requirement for admission of scientific evidence would be at odds with "liberal thrust" of Federal Rules of Evidence and their general approach of relaxing traditional barriers to "opinion" testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

        73 Cases that cite this headnote

[5]     **Evidence**
        👉 Results of experiments
        Trial judge is not disabled under Federal Rules of Evidence from screening purportedly scientific evidence. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

        8 Cases that cite this headnote

[6]     **Evidence**
        👉 Results of experiments
        Under Federal Rules of Evidence, trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

        668 Cases that cite this headnote

[7]     **Evidence**
        👉 Results of experiments
        "Scientific," within meaning of Federal Rule of Evidence stating that if "scientific," technical, or other specialized knowledge will assist trier of fact to understand evidence or to determine fact in issue an expert may testify thereto, implies

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

grounding in methods and procedures of science. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

575 Cases that cite this headnote

**[8]    Evidence**
👉 Matters involving scientific or other special knowledge in general

"Knowledge," within meaning of Federal Rule of Evidence stating that if scientific, technical, or other specialized "knowledge" will assist trier of fact to understand evidence or to determine fact in issue an expert may testify thereto, connotes more than subjective belief or unsupported speculation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

916 Cases that cite this headnote

**[9]    Evidence**
👉 Matters involving scientific or other special knowledge in general

Subject of scientific knowledge need not be "known" to certainty to permit expert testimony, since, arguably, there are not certainties in science. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

111 Cases that cite this headnote

**[10]    Evidence**
👉 Matters involving scientific or other special knowledge in general

Inference or assertion must be derived by scientific method to qualify as "scientific knowledge," within meaning of Federal Rule of Evidence stating that if scientific, technical, or other specialized knowledge will assist trier of fact to understand evidence or to determine fact in issue an expert may testify thereto. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

623 Cases that cite this headnote

**[11]    Evidence**
👉 Basis of Opinion

For scientific testimony to be admitted, proposed testimony must be supported by appropriate validation, in other words, "good grounds" based

on what is known. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

430 Cases that cite this headnote

**[12]    Evidence**
👉 Matters involving scientific or other special knowledge in general

Requirement under Federal Rule of Evidence that expert's testimony pertain to "scientific knowledge" establishes standard of evidentiary reliability. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

547 Cases that cite this headnote

**[13]    Evidence**
👉 Results of experiments

In case involving scientific evidence, evidentiary reliability will be based upon scientific reliability. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

83 Cases that cite this headnote

**[14]    Evidence**
👉 Results of experiments

Condition for admission of scientific evidence or testimony under Federal Rule of Evidence, that evidence or testimony assist trier of fact to understand evidence or to determine fact in issue, goes primarily to relevance. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

249 Cases that cite this headnote

**[15]    Evidence**
👉 Results of experiments

In determining admissibility of scientific evidence or testimony, scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

43 Cases that cite this headnote

**[16]    Evidence**

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)
113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

🔑 Results of experiments

"Helpfulness" standard under Federal Rule of Evidence for admissibility of scientific evidence or testimony requires valid scientific connection to pertinent inquiry as precondition to admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

126 Cases that cite this headnote

[17] **Evidence**

🔑 Matters of opinion or facts

Unlike ordinary witness, expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation. Fed.Rules Evid.Rules 701–703, 28 U.S.C.A.

182 Cases that cite this headnote

[18] **Evidence**

🔑 Matters involving scientific or other special knowledge in general

Presumably, relaxation under Federal Rules of Evidence of usual requirement of first-hand knowledge when there is testimony by expert is premised on assumption that expert's opinion will have reliable basis in knowledge and experience of his discipline. Fed.Rules Evid.Rules 701–703, 28 U.S.C.A.

931 Cases that cite this headnote

[19] **Evidence**

🔑 Matters involving scientific or other special knowledge in general

Faced with proffer of expert scientific testimony, trial judge must determine at outset whether expert is proposing to testify to (1) scientific knowledge that (2) will assist trier of fact to understand or determine fact in issue; preliminary assessment must be made of whether reasoning or methodology underlying testimony is scientifically valid and of whether reasoning or methodology properly can be applied to facts in issue. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

4827 Cases that cite this headnote

[20] **Evidence**

🔑 Determination of question of competency

Preliminary questions concerning qualification of person to be witness, existence of privilege, or admissibility of evidence should be established by preponderance of proof. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

29 Cases that cite this headnote

[21] **Evidence**

🔑 Results of experiments

Requirements for admissibility of scientific testimony or opinion under Federal Rule of Evidence do not apply specially or exclusively to unconventional evidence. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

12 Cases that cite this headnote

[22] **Evidence**

🔑 Scientific facts and principles

Scientific theories that are so firmly established as to have obtained status of scientific law, such as laws of thermodynamics, properly are subject to judicial notice. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

15 Cases that cite this headnote

[23] **Evidence**

🔑 Basis of Opinion

Definitive checklist or test does not exist in making preliminary assessment of whether reasoning or methodology underlying expert testimony is scientifically valid and whether that reasoning or methodology properly can be applied to facts in issue. Fed.Rules Evid.Rule 104(a), 28 U.S.C.A.

3227 Cases that cite this headnote

[24] **Evidence**

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

🖝 Matters involving scientific or other special knowledge in general

Ordinarily, key question to be answered in determining whether theory or technique is scientific knowledge that will assist trier of fact, and, thus, whether expert testimony is admissible, will be whether theory or technique can be, and has been, tested. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

1777 Cases that cite this headnote

[25]  Evidence
🖝 Matters involving scientific or other special knowledge in general

In determining whether theory or technique is scientific knowledge that will assist trier of fact, and, thus, whether expert testimony is admissible, is whether theory or technique has been subjected to peer review and publication. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

2405 Cases that cite this headnote

[26]  Evidence
🖝 Matters involving scientific or other special knowledge in general

Publication of theory or technique, which is but one element of peer review, is not sine qua non of admissibility of expert testimony; publication does not necessarily correlate with reliability, and, in some instances, well-grounded but innovative theories will not have been published. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

1181 Cases that cite this headnote

[27]  Evidence
🖝 Matters involving scientific or other special knowledge in general

Fact of publication of theory or technique, or lack thereof, in peer-review journal will be relevant, though not dispositive, consideration in assessing scientific validity of particular technique or methodology on which expert opinion is premised; submission to scrutiny of scientific community is component of "good science," in part because it increases likelihood

that substantive flaws in methodology will be detected. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

2744 Cases that cite this headnote

[28]  Evidence
🖝 Matters involving scientific or other special knowledge in general

In determining admissibility of expert opinion regarding particular scientific technique, court ordinarily should consider known or potential rate of error, and existence and maintenance of standards controlling technique's operation. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

2896 Cases that cite this headnote

[29]  Evidence
🖝 Matters involving scientific or other special knowledge in general

"General acceptance" of scientific theory or technique can have bearing in determining admissibility of expert testimony. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

211 Cases that cite this headnote

[30]  Evidence
🖝 Results of experiments

Widespread acceptance of scientific theory or technique can be important factor in ruling particular evidence admissible, and known technique that has been able to draw only minimal support within community may properly be viewed with skepticism. Fed.Rules Evid.Rules 104(a), 702, 28 U.S.C.A.

124 Cases that cite this headnote

[31]  Evidence
🖝 Results of experiments

Inquiry envisioned by Federal Rule of Evidence pertaining to admission of scientific testimony and evidence is flexible one. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

13 Cases that cite this headnote

[32]    **Evidence**
👈  Results of experiments

Overarching subject of Federal Rule of Evidence on admission of scientific testimony and evidence is scientific validity, and, thus, evidentiary relevance and reliability, of principles that underlie proposed submission. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

193 Cases that cite this headnote

[33]    **Evidence**
👈  Results of experiments

Focus of Federal Rule of Evidence on admission of scientific testimony and evidence must be solely on principles and methodology, not on conclusions that they generate. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

192 Cases that cite this headnote

[34]    **Evidence**
👈  Determination of question of competency

Judge assessing proffer of expert's scientific testimony under Federal Rule of Evidence on testimony by experts should also be mindful of other applicable rules, including rule on expert opinion based on otherwise inadmissible hearsay, rule allowing court to procure assistance of expert of its own choosing, and rule permitting exclusion of relevant evidence if its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues, or misleading jury. Fed.Rules Evid.Rules 403, 702, 703, 706, 28 U.S.C.A.

556 Cases that cite this headnote

[35]    **Federal Civil Procedure**
👈  Scintilla of evidence

**Federal Civil Procedure**
👈  Weight and sufficiency

In event that trial court concludes that scintilla of scientific evidence presented supporting a

position is insufficient to allow reasonable juror to conclude that position more likely than not is true, court remains free to direct verdict, and likewise to grant summary judgment. Fed.Rules Civ.Proc.Rules 50(a), 56, 28 U.S.C.A.; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

184 Cases that cite this headnote

[36]    **Federal Civil Procedure**
👈  Rules of Court in General

Federal Rules of Evidence are designed not for exhaustive search for cosmic understanding but for particularized resolution of legal disputes.

9 Cases that cite this headnote

**2789  *Syllabus* [*]

*579  Petitioners, two minor children and their parents, alleged in their suit against respondent that the children's serious birth defects had been caused by the mothers' prenatal ingestion of Bendectin, a prescription drug marketed by respondent. The District Court granted respondent summary judgment based on a well-credentialed expert's affidavit concluding, upon reviewing the extensive published scientific literature on the subject, that maternal use of Bendectin has not been shown to be a risk factor for human birth defects. Although petitioners had responded with the testimony of eight other well-credentialed experts, who based their conclusion **2790  that Bendectin can cause birth defects on animal studies, chemical structure analyses, and the unpublished "reanalysis" of previously published human statistical studies, the court determined that this evidence did not meet the applicable "general acceptance" standard for the admission of expert testimony. The Court of Appeals agreed and affirmed, citing *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014, for the rule that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community.

*Held:* The Federal Rules of Evidence, not *Frye,* provide the standard for admitting expert scientific testimony in a federal trial. Pp. 2792–99.

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

(a) *Frye's* "general acceptance" test was superseded by the Rules' adoption. The Rules occupy the field, *United States v. Abel,* 469 U.S. 45, 49, 105 S.Ct. 465, 467, 83 L.Ed.2d 450, and, although the common law of evidence may serve as an aid to their application, *id., at 51–52, 105 S.Ct., at 468– 469,* respondent's assertion that they somehow assimilated *Frye* is unconvincing. Nothing in the Rules as a whole or in the text and drafting history of Rule 702, which specifically governs expert testimony, gives any indication that "general acceptance" is a necessary precondition to the admissibility of scientific evidence. Moreover, such a rigid standard would be at odds with the Rules' liberal thrust and their general approach of relaxing the traditional barriers to "opinion" testimony. Pp. 2792–94.

(b) The Rules—especially Rule 702—place appropriate limits on the admissibility of purportedly scientific evidence by assigning to the trial 580 **\*580** judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. The reliability standard is established by Rule 702's requirement that an expert's testimony pertain to "scientific ... knowledge," since the adjective "scientific" implies a grounding in science's methods and procedures, while the word " knowledge" connotes a body of known facts or of ideas inferred from such facts or accepted as true on good grounds. The Rule's requirement that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" goes primarily to relevance by demanding a valid scientific connection to the pertinent inquiry as a precondition to admissibility. Pp. 2794–96.

(c) Faced with a proffer of expert scientific testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue. Many considerations will bear on the inquiry, including whether the theory or technique in question can be (and has been) tested, whether it has been subjected to peer review and publication, its known or potential error rate and the existence and maintenance of standards controlling its operation, and whether it has attracted widespread acceptance within a relevant scientific community. The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate. Throughout, the judge should also be mindful of other applicable Rules. Pp. 2796–98.

(d) Cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion under an uncompromising "general acceptance" standard, is the appropriate means by which evidence based on valid principles may be challenged. That even limited screening by the trial judge, on occasion, will prevent the jury from hearing of authentic scientific breakthroughs is simply a consequence of the fact that the Rules are not designed to seek cosmic understanding but, rather, to resolve legal disputes. Pp. 2798–99.

951 F.2d 1128 (CA9 1991), vacated and remanded.

**\*\*2791** BLACKMUN, J., delivered the opinion for a unanimous Court with respect to Parts I and II–A, and the opinion of the Court with respect to Parts II–B, II–C, III and IV, in which WHITE, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. REHNQUIST, C.J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post,* p. ——.

**Attorneys and Law Firms**

**\*581** Michael H. Gottesman, Washington, DC, for petitioners.

Charles Fried, Cambridge, MA, for respondent.

**Opinion**

582 **\*582** Justice BLACKMUN delivered the opinion of the Court.

In this case we are called upon to determine the standard for admitting expert scientific testimony in a federal trial.

**I**

Petitioners Jason Daubert and Eric Schuller are minor children born with serious birth defects. They and their parents sued respondent in California state court, alleging that the birth defects had been caused by the mothers' ingestion of Bendectin, a prescription antinausea drug marketed by respondent. Respondent removed the suits to federal court on diversity grounds.

After extensive discovery, respondent moved for summary judgment, contending that Bendectin does not cause birth

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

defects in humans and that petitioners would be unable to come forward with any admissible evidence that it does. In support of its motion, respondent submitted an affidavit of Steven H. Lamm, physician and epidemiologist, who is a well-credentialed expert on the risks from exposure to various chemical substances. [1] Doctor Lamm stated that he had reviewed all the literature on Bendectin and human birth defects—more than 30 published studies involving over 130,000 patients. No study had found Bendectin to be a human teratogen (*i.e.,* a substance capable of causing malformations in fetuses). On the basis of this review, Doctor Lamm concluded that maternal use of Bendectin during the first trimester of pregnancy has not been shown to be a risk factor for human birth defects.

583  ***583** Petitioners did not (and do not) contest this characterization of the published record regarding Bendectin. Instead, they responded to respondent's motion with the testimony of eight experts of their own, each of whom also possessed impressive credentials. [2] These experts had concluded that Bendectin can cause birth defects. Their conclusions were based upon "in vitro" (test tube) and "in vivo" (live) animal studies that found a link between Bendectin and malformations; pharmacological studies of the chemical structure of Bendectin that purported to show similarities between the structure of the drug and that of other substances known to cause birth defects; and the "reanalysis" of previously **\*\*2792** published epidemiological (human statistical) studies.

The District Court granted respondent's motion for summary judgment. The court stated that scientific evidence is admissible only if the principle upon which it is based is " 'sufficiently established to have general acceptance in the field to which it belongs.' " 727 F.Supp. 570, 572 (S.D.Cal.1989), quoting *United States v. Kilgus,* 571 F.2d 508, 510 (CA9 1978). The court concluded that petitioners' evidence did not meet this standard. Given the vast body of epidemiological data concerning Bendectin, the court held, expert opinion which is not based on epidemiological evidence 584 **\*584** is not admissible to establish causation. 727 F.Supp., at 575. Thus, the animal-cell studies, live-animal studies, and chemical-structure analyses on which petitioners had relied could not raise by themselves a reasonably disputable jury issue regarding causation. *Ibid.* Petitioners' epidemiological analyses, based as they were on recalculations of data in previously published studies that had found no causal link between the drug and birth defects, were

ruled to be inadmissible because they had not been published or subjected to peer review. *Ibid.*

The United States Court of Appeals for the Ninth Circuit affirmed. 951 F.2d 1128 (1991). Citing *Frye v. United States,* 54 App.D.C. 46, 47, 293 F. 1013, 1014 (1923), the court stated that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the relevant scientific community. 951 F.2d, at 1129–1130. The court declared that expert opinion based on a methodology that diverges "significantly from the procedures accepted by recognized authorities in the field ... cannot be shown to be 'generally accepted as a reliable technique.' " *Id.,* at 1130, quoting *United States v. Solomon,* 753 F.2d 1522, 1526 (CA9 1985).

The court emphasized that other Courts of Appeals considering the risks of Bendectin had refused to admit reanalyses of epidemiological studies that had been neither published nor subjected to peer review. 951 F.2d, at 1130–1131. Those courts had found unpublished reanalyses "particularly problematic in light of the massive weight of the original published studies supporting [respondent's] position, all of which had undergone full scrutiny from the scientific community." *Id.,* at 1130. Contending that reanalysis is generally accepted by the scientific community only when it is subjected to verification and scrutiny by others in the field, the Court of Appeals rejected petitioners' reanalyses as "unpublished, not subjected to the normal peer review process and generated solely for use in litigation." *Id.,* at 1131. The 585 **\*585** court concluded that petitioners' evidence provided an insufficient foundation to allow admission of expert testimony that Bendectin caused their injuries and, accordingly, that petitioners could not satisfy their burden of proving causation at trial.

We granted certiorari, 506 U.S. 914, 113 S.Ct. 320, 121 L.Ed.2d 240 (1992), in light of sharp divisions among the courts regarding the proper standard for the admission of expert testimony. Compare, *e.g., United States v. Shorter,* 257 U.S.App.D.C. 358, 363–364, 809 F.2d 54, 59–60 (applying the "general acceptance" standard), cert. denied, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 35 (1987), with *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (CA3 1990) (rejecting the "general acceptance" standard).

**II**

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

## A

In the 70 years since its formulation in the *Frye* case, the "general acceptance" test has been the dominant standard for determining the admissibility of novel scientific evidence at trial. See E. Green & C. Nesson, Problems, Cases, and Materials on Evidence 649 (1983). Although under increasing attack of late, the rule continues to be followed by a **\*\*2793** majority of courts, including the Ninth Circuit. [3]

The *Frye* test has its origin in a short and citation-free 1923 decision concerning the admissibility of evidence derived from a systolic blood pressure deception test, a crude precursor to the polygraph machine. In what has become a famous (perhaps infamous) passage, the then Court of Appeals for the District of Columbia described the device and its operation and declared:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages 586 **\*586** is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.*" 54 App.D.C., at 47, 293 F., at 1014 (emphasis added).

Because the deception test had "not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made," evidence of its results was ruled inadmissible. *Ibid.*

[1]  The merits of the *Frye* test have been much debated, and scholarship on its proper scope and application is legion. [4] 587 **\*587** Petitioners' primary attack, however, is not on the content but on the continuing authority of the rule. They contend that the *Frye* test was superseded by the adoption of the Federal Rules of Evidence. [5] We agree.

[2]  [3]  We interpret the legislatively enacted Federal Rules of Evidence as we would any statute. *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 163, 109 S.Ct. 439, 446, 102 L.Ed.2d 445 (1988). Rule 402 provides the baseline:

> "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, **\*\*2794** by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible."

"Relevant evidence" is defined as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401. The Rule's basic standard of relevance thus is a liberal one.

*Frye,* of course, predated the Rules by half a century. In *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), we considered the pertinence of background common law in interpreting the Rules of Evidence. We noted that the Rules occupy the field, *id.,* at 49, 105 S.Ct., at 467, but, quoting Professor Cleary, the Reporter, 588 **\*588** explained that the common law nevertheless could serve as an aid to their application:

> " 'In principle, under the Federal Rules no common law of evidence remains. "All relevant evidence is admissible, except as otherwise provided...." In reality, of course, the body of common law knowledge continues to exist, though in the somewhat altered form of a source of guidance in the exercise of delegated powers.' " *Id.,* at 51–52, 105 S.Ct., at 469.

We found the common-law precept at issue in the *Abel* case entirely consistent with Rule 402's general requirement of admissibility, and considered it unlikely that the drafters had intended to change the rule. *Id.,* at 50–51, 105 S.Ct., at 468–469. In *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), on the other hand, the Court was unable to find a particular common-law doctrine in the Rules, and so held it superseded.

[4]  Here there is a specific Rule that speaks to the contested issue. Rule 702, governing expert testimony, provides:

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 91 of 308

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Nothing in the text of this Rule establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye*, and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Beech Aircraft Corp. v. Rainey,* 488 U.S., at 169, 109 S.Ct., at 450 (citing Rules 701 to 705). See also Weinstein, Rule 702 of the Federal Rules of Evidence is 589 **\*589** Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991) ("The Rules were designed to depend primarily upon lawyer-adversaries and sensible triers of fact to evaluate conflicts"). Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention " 'general acceptance,' " the assertion that the Rules somehow assimilated *Frye* is unconvincing. *Frye* made "general acceptance" the exclusive test for admitting expert scientific testimony. That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials. [6]

**B**

[5]  [6]  That the *Frye* test was displaced by the Rules of Evidence does not mean, **\*\*2795** however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. [7] Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

[7]  [8]  [9]  [10]  [11]  [12]  [13]  The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific,* technical, or other specialized *knowledge will assist the trier of fact to*

understand the evidence or to determine a fact in issue" an expert "may testify *thereto.*" (Emphasis added.) The subject of an expert's testimony must 590 **\*590** be "scientific ... knowledge." [8] The adjective " scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Webster's Third New International Dictionary 1252 (1986). Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. See, *e.g.,* Brief for Nicolaas Bloembergen et al. as *Amici Curiae* 9 ("Indeed, scientists do not assert that they know what is immutably 'true'—they are committed to searching for new, temporary, theories to explain, as best they can, phenomena"); Brief for American Association for the Advancement of Science et al. as *Amici Curiae* 7–8 ("Science is not an encyclopedic body of knowledge about the universe. Instead, it represents a *process* for proposing and refining theoretical explanations about the world that are subject to further testing and refinement" (emphasis in original)). But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—*i.e.,* "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to " scientific knowledge" establishes a standard of evidentiary reliability. [9]

[14]  [15]  [16]  591 **\*591** Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. " Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702–18. See also *United States v. Downing,* 753 F.2d 1224, 1242 (CA3 1985) ("An additional consideration **\*\*2796** under Rule 702—and another aspect of relevancy —is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The consideration has been aptly described by Judge Becker as one of "fit." *Ibid.* "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. See Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702, 26 Jurimetrics J. 249, 258 (1986). The study of the phases of the moon, for example, may provide valid scientific

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

"knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" 592 **592 standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

[17]   [18]   That these requirements are embodied in Rule 702 is not surprising. Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. See Rules 702 and 703. Presumably, this relaxation of the usual requirement of firsthand knowledge—a rule which represents "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,' " Advisory Committee's Notes on Fed.Rule Evid. 602, 28 U.S.C.App., p. 755 (citation omitted)—is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

[19]   [20]   [21]   [22]   [23]   Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), [10] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. [11] This entails a preliminary assessment of whether the reasoning or methodology **593 underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.

[24]   Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." Green 645. See also C. Hempel, Philosophy of Natural Science 49 (1966) **2797 ("[T]he statements constituting

a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability") (emphasis deleted).

[25]   [26]   [27]   Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Publication (which is but one element of peer review) is not a *sina qua non* of admissibility; it does not necessarily correlate with reliability, see S. Jasanoff, The Fifth Branch: Science Advisors as Policymakers 61–76 (1990), and in some instances well-grounded but innovative theories will not have been published, see Horrobin, The Philosophical Basis of Peer Review and the Suppression of Innovation, 263 JAMA 1438 (1990). Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. See J. Ziman, Reliable Knowledge: An Exploration 594 **594 of the Grounds for Belief in Science 130–133 (1978); Relman & Angell, How Good Is Peer Review?, 321 New Eng.J.Med. 827 (1989). The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

[28]   Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, see, *e.g., United States v. Smith,* 869 F.2d 348, 353–354 (CA7 1989) (surveying studies of the error rate of spectrographic voice identification technique), and the existence and maintenance of standards controlling the technique's operation, see *United States v. Williams,* 583 F.2d 1194, 1198 (CA2 1978) (noting professional organization's standard governing spectrographic analysis), cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

[29]   [30]   Finally, "general acceptance" can yet have a bearing on the inquiry. A "reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." *United States v. Downing,* 753 F.2d, at 1238. See also 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42. Widespread acceptance can be an important factor in ruling particular evidence admissible, and "a known technique

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

which he has been able to attract only minimal support within the community," *Downing, 753 F.2d, at 1238,* may properly be viewed with skepticism.

[31] [32] [33]   The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. [12]   Its overarching subject is the scientific validity **\*595** and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

[34]   Throughout, a judge assessing a proffer of expert scientific testimony under Rule 702 should also be mindful of other applicable rules. Rule 703 provides that expert opinions based on otherwise inadmissible **\*\*2798** hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing. Finally, Rule 403 permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Judge Weinstein has explained: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D., at 632.

### III

[35]   We conclude by briefly addressing what appear to be two underlying concerns of the parties and *amici* in this case. Respondent expresses apprehension that abandonment of "general acceptance" as the exclusive requirement for admission will result in a "free-for-all" in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions. **\*596**  In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. See *Rock v. Arkansas, 483 U.S. 44, 61, 107 S.Ct. 2704, 2714, 97 L.Ed.2d 37 (1987).* Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to

allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed.Rule Civ.Proc. 50(a), and likewise to grant summary judgment, Fed.Rule Civ.Proc. 56. Cf., *e.g., Turpin v. Merrell Dow Pharmaceuticals, Inc., 959 F.2d 1349 (CA6)* (holding that scientific evidence that provided foundation for expert testimony, viewed in the light most favorable to plaintiffs, was not sufficient to allow a jury to find it more probable than not that defendant caused plaintiff's injury), cert. denied, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992); *Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307 (CA5 1989)* (reversing judgment entered on jury verdict for plaintiffs because evidence regarding causation was insufficient), modified, 884 F.2d 166 (CA5 1989), cert. denied, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990); Green 680–681. These conventional devices, rather than wholesale exclusion under an uncompromising "general acceptance" test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.

[36]   Petitioners and, to a greater extent, their *amici* exhibit a different concern. They suggest that recognition of a screening role for the judge that allows for the exclusion of "invalid" evidence will sanction a stifling and repressive scientific orthodoxy and will be inimical to the search for truth. See, *e.g.,* Brief for Ronald Bayer et al. as *Amici Curiae.* It is true that open debate is an essential part of both legal and scientific analyses. Yet there are important differences between the quest for truth in the courtroom and the quest 597 **\*597** for truth in the laboratory. Scientific conclusions are subject to perpetual revision. Law, on the other hand, must resolve disputes finally and quickly. The scientific project is advanced by broad and wide-ranging consideration of a multitude of hypotheses, for those that are incorrect will eventually be shown to be so, and that in itself is an advance. Conjectures that are probably wrong are of little use, however, in the project of reaching a quick, final, and binding legal judgment—often of great consequence—about a particular set of events in the past. We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic **\*\*2799** insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes. [13]

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

## IV

To summarize: "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

The inquiries of the District Court and the Court of Appeals focused almost exclusively on "general acceptance," as gauged by publication and the decisions of other courts. Accordingly, *598 the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Chief Justice REHNQUIST, with whom Justice STEVENS joins, concurring in part and dissenting in part.

The petition for certiorari in this case presents two questions: first, whether the rule of *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923), remains good law after the enactment of the Federal Rules of Evidence; and second, if *Frye* remains valid, whether it requires expert scientific testimony to have been subjected to a peer review process in order to be admissible. The Court concludes, correctly in my view, that the *Frye* rule did not survive the enactment of the Federal Rules of Evidence, and I therefore join Parts I and II–A of its opinion. The second question presented in the petition for certiorari necessarily is mooted by this holding, but the Court nonetheless proceeds to construe Rules 702 and 703 very much in the abstract, and then offers some "general observations." *Ante,* at 2796.

"General observations" by this Court customarily carry great weight with lower federal courts, but the ones offered here suffer from the flaw common to most such observations—they are not applied to deciding whether particular testimony was or was not admissible, and therefore they tend to be not only general, but vague and abstract. This is particularly unfortunate in a case such as this, where the ultimate legal question depends on an appreciation of one or more bodies of knowledge not judicially noticeable, and subject to different interpretations in the briefs of the parties and their *amici.*

Twenty-two *amicus* briefs have been filed in the case, and indeed the Court's opinion contains no fewer than 37 citations to *amicus* briefs and other secondary sources.

599 *599 The various briefs filed in this case are markedly different from typical briefs, in that large parts of them do not deal with decided cases or statutory language—the sort of material we customarily interpret. Instead, they deal with definitions of scientific knowledge, scientific method, scientific validity, and peer review—in short, matters far afield from the expertise of judges. This is not to say that such materials are not useful or even necessary in deciding how Rule 703 should be applied; but it is to say that the unusual subject matter should cause us to proceed with great caution in deciding more than we have to, because our reach can so easily exceed our grasp.

But even if it were desirable to make "general observations" not necessary to decide **2800 the questions presented, I cannot subscribe to some of the observations made by the Court. In Part II–B, the Court concludes that reliability and relevancy are the touchstones of the admissibility of expert testimony. *Ante,* at 2794–95. Federal Rule of Evidence 402 provides, as the Court points out, that "[e]vidence which is not relevant is not admissible." But there is no similar reference in the Rule to "reliability." The Court constructs its argument by parsing the language "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, ... an expert ... may testify thereto...." Fed.Rule Evid. 702. It stresses that the subject of the expert's testimony must be "scientific ... knowledge," and points out that "scientific" "implies a grounding in the methods and procedures of science" and that the word "knowledge" "connotes more than subjective belief or unsupported speculation." *Ante,* at 2794–95. From this it concludes that "scientific knowledge" must be "derived by the scientific method." *Ante,* at 2795. Proposed testimony, we are told, must be supported by "appropriate validation." *Ante,* at 2795. Indeed, in footnote 9, the Court decides that "[i]n a case involving scientific evidence, evidentiary *600 reliability will be based upon *scientific validity.*" *Ante,* at 2795, n. 9 (emphasis in original).

Questions arise simply from reading this part of the Court's opinion, and countless more questions will surely arise when hundreds of district judges try to apply its teaching to particular offers of expert testimony. Does all of this *dicta* apply to an expert seeking to testify on the basis of "technical or other specialized knowledge"—the other types of expert

Case 09-10138-MFW Doc 14225-45 Filed 08/15/14 Page 95 of 308

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

knowledge to which Rule 702 applies—or are the "general observations" limited only to "scientific knowledge"? What is the difference between scientific knowledge and technical knowledge; does Rule 702 actually contemplate that the phrase "scientific, technical, or other specialized knowledge" be broken down into numerous subspecies of expertise, or did its authors simply pick general descriptive language covering the sort of expert testimony which courts have customarily received? The Court speaks of its confidence that federal judges can make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Ante,* at 2796. The Court then states that a "key question" to be answered in deciding whether something is "scientific knowledge" "will be whether it can be (and has been) tested." *Ante,* at 2796. Following this sentence are three quotations from treatises, which not only speak of empirical testing, but one of which states that the " 'criterion of the scientific status of a theory is its falsifiability, or refutability, or testability,' " *Ante,* at 2796–97.

I defer to no one in my confidence in federal judges; but I am at a loss to know what is meant when it is said that the scientific status of a theory depends on its "falsifiability," and I suspect some of them will be, too.

I do not doubt that Rule 702 confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think 601 **\*601** it imposes on them either the obligation or the authority to become amateur scientists in order to perform that role. I think the Court would be far better advised in this case to decide only the questions presented, and to leave the further development of this important area of the law to future cases.

## Parallel Citations

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200, 23 Envtl. L. Rep. 20,979, 37 Fed. R. Evid. Serv. 1, Prod.Liab.Rep. (CCH) P 13,494

## Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1 Doctor Lamm received his master's and doctor of medicine degrees from the University of Southern California. He has served as a consultant in birth-defect epidemiology for the National Center for Health Statistics and has published numerous articles on the magnitude of risk from exposure to various chemical and biological substances. App. 34–44.

2 For example, Shanna Helen Swan, who received a master's degree in biostatistics from Columbia University and a doctorate in statistics from the University of California at Berkeley, is chief of the section of the California Department of Health and Services that determines causes of birth defects and has served as a consultant to the World Health Organization, the Food and Drug Administration, and the National Institutes of Health. *Id.,* at 113–114, 131–132. Stuart A. Newman, who received his bachelor's degree in chemistry from Columbia University and his master's and doctorate in chemistry from the University of Chicago, is a professor at New York Medical College and has spent over a decade studying the effect of chemicals on limb development. *Id.,* at 54–56. The credentials of the others are similarly impressive. See *Id.,* at 61–66, 73–80, 148–153, 187–192, and Attachments 12, 20, 21, 26, 31, and 32 to Petitioners' Opposition to Summary Judgment in No. 84–2013–G(I) (SD Cal.).

3 For a catalog of the many cases on either side of this controversy, see P. Giannelli & E. Imwinkelried, Scientific Evidence § 1–5, pp. 10–14 (1986 and Supp.1991).

4 See, *e.g.,* Green, Expert Witnesses and Sufficiency of Evidence in Toxic Substances Litigation: The Legacy of *Agent Orange* and Bendectin Litigation, 86 Nw.U.L.Rev. 643 (1992) (hereinafter Green); Becker & Orenstein, The Federal Rules of Evidence After Sixteen Years—the Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of Evidence, and Suggestions for Selective Revision of the Rules, 60 Geo.Wash.L.Rev. 857, 876–885 (1992); Hanson, James Alphonzo Frye is Sixty–Five Years Old; Should He Retire?," 16 West.St.U.L.Rev. 357 (1989); Black, A Unified Theory of Scientific Evidence, 56 Ford.L.Rev. 595 (1988); Imwinkelried, The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony, 67 N.C.L.Rev. 1 (1988); Proposals for a Model Rule on the Admissibility of Scientific Evidence, 26 Jurimetrics J. 235 (1986); Giannelli, The Admissibility of Novel Scientific Evidence: *Frye v. United States,* a Half–Century Later, 80 Colum.L.Rev. 1197 (1980); The Supreme Court, 1986 Term, 101 Harv.L.Rev. 7, 119, 125–127 (1987).

Indeed, the debates over *Frye* are such a well-established part of the academic landscape that a distinct term—"*Frye*–ologist"—has been advanced to describe those who take part. See Behringer, Introduction, Proposals for a Model Rule on the Admissibility of Scientific Evidence, 26 Jurimetrics J. 237, 239 (1986), quoting Lacey, Scientific Evidence, 24 Jurimetrics J. 254, 264 (1984).

**Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)**

113 S.Ct. 2786, 125 L.Ed.2d 469, 61 USLW 4805, 27 U.S.P.Q.2d 1200...

5    Like the question of *Frye*'s merit, the dispute over its survival has divided courts and commentators. Compare, *e.g.*, *United States v. Williams,* 583 F.2d 1194 (CA2 1978) (*Frye* is superseded by the Rules of Evidence), cert. denied, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979) with *Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1111, 1115–1116 (CA5 1991) (en banc) (*Frye* and the Rules coexist), cert. denied, 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992), 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[03], pp. 702–36 to 702–37 (1988) (hereinafter Weinstein & Berger) (*Frye* is dead), and M. Graham, Handbook of Federal Evidence § 703.2 (3d ed. 1991) (*Frye* lives). See generally P. Giannelli & E. Imwinkelried, Scientific Evidence § 1–5, at 28–29 (citing authorities).

6    Because we hold that *Frye* has been superseded and base the discussion that follows on the content of the congressionally enacted Federal Rules of Evidence, we do not address petitioners' argument that application of the *Frye* rule in this diversity case, as the application of a judge-made rule affecting substantive rights, would violate the doctrine of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

7    THE CHIEF JUSTICE "do[es] not doubt that Rule 702 confides to the judge some gatekeeping responsibility," *post,* at 2800, but would neither say how it does so nor explain what that role entails. We believe the better course is to note the nature and source of the duty.

8    Rule 702 also applies to "technical, or other specialized knowledge." Our discussion is limited to the scientific context because that is the nature of the expertise offered here.

9    We note that scientists typically distinguish between "validity" (does the principle support what it purports to show?) and "reliability" (does application of the principle produce consistent results?). See Black, 56 Ford.L.Rev., at 599. Although "the difference between accuracy, validity, and reliability may be such that each is distinct from the other by no more than a hen's kick," Starrs, *Frye v. United States* Restructured and Revitalized: A Proposal to Amend Federal Evidence Rule 702, 26 Jurimetrics J. 249, 256 (1986), our reference here is to *evidentiary* reliability—that is, trustworthiness. Cf., *e.g.*, Advisory Committee's Notes on Fed.Rule Evid. 602, 28 U.S.C.App., p. 755 (" '[T]he rule requiring that a witness who testifies to a fact which can be perceived by the senses must have had an opportunity to observe, and must have actually observed the fact' is a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information' " (citation omitted)); Advisory Committee's Notes on Art. VIII of Rules of Evidence, 28 U.S.C.App., p. 770 (hearsay exceptions will be recognized only "under circumstances supposed to furnish guarantees of trustworthiness"). In a case involving scientific evidence, *evidentiary reliability* will be based upon *scientific validity.*

10   Rule 104(a) provides:

      "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges." These matters should be established by a preponderance of proof. See *Bourjaily v. United States,* 483 U.S. 171, 175–176, 107 S.Ct. 2775, 2778–2779, 97 L.Ed.2d 144 (1987).

11   Although the *Frye* decision itself focused exclusively on "novel" scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence. Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended. Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201.

12   A number of authorities have presented variations on the reliability approach, each with its own slightly different set of factors. See, *e.g.*, *Downing,* 753 F.2d, at 1238–1239 (on which our discussion draws in part); 3 Weinstein & Berger ¶ 702[03], pp. 702–41 to 702–42 (on which the *Downing* court in turn partially relied); McCormick, Scientific Evidence: Defining a New Approach to Admissibility, 67 Iowa L.Rev. 879, 911–912 (1982); and Symposium on Science and the Rules of Evidence, 99 F.R.D. 187, 231 (1983) (statement by Margaret Berger). To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, all these versions may well have merit, although we express no opinion regarding any of their particular details.

13   This is not to say that judicial interpretation, as opposed to adjudicative factfinding, does not share basic characteristics of the scientific endeavor: "The work of a judge is in one sense enduring and in another ephemeral.... In the endless process of testing and retesting, there is a constant rejection of the dross and a constant retention of whatever is pure and sound and fine." B. Cardozo, The Nature of the Judicial Process 178, 179 (1921).

**End of Document**                     © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 52

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 98 of 308

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

2012 ONCA 480
Ontario Court of Appeal

Downey v. Ecore International Inc.

2012 CarswellOnt 8459, 2012 ONCA 480, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7, 294 O.A.C. 200

# Paul Downey, Plaintiff (Respondent / Cross-Appellant) and Ecore International Inc., Defendant (Appellant / Respondent to Cross-Appeal)

K. Feldman, Janet Simmons, E.A. Cronk JJ.A.

Heard: April 12, 2012
Judgment: July 6, 2012
Docket: CA C54648

Proceedings: reversing *Downey v. Ecore International Inc.* (2011), 2011 CarswellOnt 12487, 2011 ONSC 6617 (Ont. S.C.J.)

Counsel: L. David Roebuck, Mark Hines, for Appellant / Respondent to cross-appeal
Timothy M. Lowman, Patrick J. Cotter, for Respondent / Cross-appellant

Subject: Contracts; Public; Civil Practice and Procedure; Employment

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Contracts --- Consideration — General principles**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Appeal allowed — Consultancy and confidentiality agreements together constituted composite whole — Plaintiff would receive benefits arising from relationship with defendant whether directly or through the corporate vehicle — Mutual promises contained in provision constituted quid pro quo that formed basis for confidentiality agreement.

**Labour and employment law --- Employment law — Interpretation of employment contract — Particular covenants — Restrictive covenants — Miscellaneous**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Defendant's appeal allowed — Plaintiff's cross-appeal dismissed — Consultancy and confidentiality agreements together constituted composite whole — Plaintiff would receive benefits arising from relationship with defendant whether directly or through the corporate vehicle — Mutual promises contained in provision constituted quid pro quo that formed basis for confidentiality agreement — Material language of provision that confidentiality agreement to apply "during and after"

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 99 of 308

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459
2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

plaintiff's employment confirmed that plaintiff's confidentiality obligations were to survive termination of his relationship with defendant.

**Contracts --- Construction and interpretation — General principles**

Plaintiff was principal of company that entered into consulting agreement with predecessor of defendant — Consulting agreement was governed by laws of Ontario — Plaintiff's company was supposed to execute confidentiality agreement but plaintiff executed it in his personal capacity — Confidentiality agreement included forum selection clause stipulating disputes were to be heard in U.S. — Plaintiff commenced action in Ontario against defendant for damages for breach of assignment agreement or for rescission and accounting of profits — Defendant's motion for order dismissing action due to lack of jurisdiction dismissed on ground there was no consideration for confidentiality agreement — Appeal allowed — Aim of contractual interpretation is to determine intentions of parties in accordance with language used in document, having regard to context in which it was signed — Consultancy and confidentiality agreements together constituted composite whole — Intent of parties in entering into contractual arrangements was to require execution of confidentiality agreement that bound plaintiff personally — Motion judge's interpretation would deprive defendant of any protection of its proprietary information from recipient of that information.

**Table of Authorities**

**Cases considered by *E.A. Cronk J.A.*:**

> *Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — referred to

> *Salah v. Timothy's Coffees of the World Inc.* (2010), 2010 CarswellOnt 7643, 2010 ONCA 673, 74 B.L.R. (4th) 161, 268 O.A.C. 279 (Ont. C.A.) — followed

> *SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.* (2011), 2011 ONCA 616, 2011 CarswellOnt 10329, 282 O.A.C. 339 (Ont. C.A.) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 21 — referred to

**Words and phrases considered:**

**consideration**

In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for [plaintiff's] execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted [plaintiff], both personally and through [his company], to realize the benefits of the Consulting Agreement, benefits he would not have received without executing the Confidentiality Agreement to which he was personally bound.

APPEAL by defendant; CROSS-APPEAL by plaintiff from decision reported at *Downey v. Ecore International Inc.* (2011), 2011 CarswellOnt 12487, 2011 ONSC 6617 (Ont. S.C.J.), dismissing defendant's application for stay or dismissal of action.

*E.A. Cronk J.A.:*

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 100 of 308

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

## I. Overview

1    Ecore International Inc. ("Ecore") appeals from the dismissal of its motion for an order staying or dismissing an Ontario action commenced against it by the respondent, Paul Downey ("Downey"). Ecore requested that the action be dismissed for want of jurisdiction of the Ontario Superior Court of Justice based on a forum selection clause ("FSC") in favour of the Pennsylvania courts, as found in a written confidentiality agreement between the parties ("Confidentiality Agreement").

2    The narrow issue on appeal is whether the motion judge erred by concluding that the Confidentiality Agreement fails to bind Downey for lack of consideration. Should Ecore succeed on its appeal, Downey cross-appeals, contending that the Confidentiality Agreement is unenforceable because it applied only "during or after" his employment with Ecore. As Downey was never an employee of Ecore, he argues that a necessary precondition to the operation of the Confidentiality Agreement was not satisfied.

3    For the reasons that follow, I would allow the appeal and dismiss the cross-appeal.

## II. Facts

4    Ecore, formerly known as Dodge-Regupol Inc. ("DRI"), [1] is a Pennsylvania-based manufacturer of recycled rubber and a wide array of rubber-related products. Downey is a professional engineer licensed and resident in Ontario.

### (1) Genesis of the Contracts

5    In the 1990s, Downey was employed by one of Ecore's competitors in Toronto. By 1999, he was seeking a new position in a senior business development or sales and marketing position, with the hope of a later transition to general management.

6    In August and September 1999, Downey had discussions with the President of Ecore, Art Dodge, regarding a potential role for him with Ecore. On September 9, 1999, Dodge wrote to Downey, enclosing an "employment proposal" and offering him employment with Ecore in the position of "Business Development Manager — Industrial Products". The letter indicates that Dodge anticipated Downey relocating to Pennsylvania in early 2001 or sooner. The letter states: "given your history and industry knowledge, coincident with your joining the company and as a condition of your employment, we will require you to sign an Employee Confidentiality Agreement."

7    Downey responded to Dodge on September 10, 1999 with a counter-proposal. He suggested various changes to the compensation arrangements outlined by Dodge and proposed that the parties operate, "albeit temporarily for the next 12 - 18 months as a business-to-business relationship rather than an employer-employee one". Downey described this arrangement as "necessary given Canadian tax law". He included a draft consulting agreement prepared by his lawyer, which contemplated that Downey's services would be provided to Ecore through his company, CSR Industries Inc. ("CSR"). The draft agreement provided that CSR would execute a copy of Ecore's standard confidentiality agreement.

8    Dodge replied to Downey on the same day with a modified proposal that accepted some, but not all, of Downey's suggested compensation arrangements, and that accepted all other terms and conditions in Downey's counter-proposal.

### (2) Consulting Agreement

9    CSR and Ecore executed a consulting agreement on September 14, 1999 ("Consulting Agreement"). The agreement is between Ecore as the "Client" and CSR as the "Consultant". Downey is not a named party to the Consulting Agreement. However, as will be discussed below, he is described in the terms of the agreement as "a Key Person of the Consultant".

10    The Consulting Agreement provides that CSR will provide defined "Services", including acting as Ecore's "Manager Business Development — Industrial Products" and sitting as a member of Ecore's management team. Additional services to be provided by CSR include "the investigation and development of new business opportunities within industrial market segments".

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

11    Section 3 requires Ecore to pay CSR an annual fee of $132,000 CDN, payable in weekly amounts, for the Services provided under the Agreement, as well as various bonuses in 2000. After 2000, CSR would be considered for participation in all company-wide bonus distributions.

12    Section 5 of the Consulting Agreement describes the relationship between Ecore and CSR as follows:

The Consultant's relationship with the Client as created by this Agreement is that of an independent contractor for the purposes of the *Income Tax Act* (Canada) and any similar provincial taxing legislation. It is intended that the Consultant shall have general control and direction over the manner in which its services are to be provided to the Client under this Agreement. Nothing contained in this Agreement shall be regarded or construed as creating any relationship (whether by way of employer/employee, agency, joint venture, association or partnership) between the parties other than as an independent contractor as set forth herein.

13    Section 7 recognizes Downey's role as CSR's "Key Person":

7. Key Person

(a) The parties acknowledge that Paul Downey is a Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement. It is acknowledged by the Consultant that Paul Downey will perform all services of the Services, unless the Client otherwise consents in writing.

14    Section 8 requires CSR to execute a confidentiality agreement:

8. Confidential Information

The Consultant will execute a copy of the Client's standard confidentiality agreement, and said confidentiality agreement, upon execution, will form part of this agreement.

*(3) Confidentiality Agreement*

15    On Downey's first day of work with Ecore on October 4, 1999, Ecore asked him to sign its standard form confidentiality agreement, backdated to October 1, 1999. Downey executed the agreement in his personal capacity on or about October 4, 1999.

16    The Confidentiality Agreement is between Ecore, which is referred to as "Company", and Downey, who is referred to as "Employee". CSR is not a named party to the agreement and is not referenced in the document.

17    The preambles to the Confidentiality Agreement include this clause:

BACKGROUND: Company is prepared to engage Employee for employment with Company. Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [sic] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

18    Section 1 of the Confidentiality Agreement defines "Proprietary Information", while s. 2 obliges Downey to accept and hold all Proprietary Information as secret and confidential and not to use it for his own benefit, but only for the benefit of Ecore.

19    Section 3 of the Confidentiality Agreement contains the FSC at issue in this proceeding. The pertinent part of the FSC states:

Employee hereby consents to the exclusive jurisdiction in the courts of the Commonwealth of Pennsylvania and of the United States situate in the Commonwealth of Pennsylvania, in connection with any action or suit to enforce this Agreement, that relates to this Agreement, that arises out of or in any way relates to the Company's business relations with Employee.

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

20       Section 4 of the Confidentiality Agreement provides that "[a]ll inventions or discoveries which relate to [Ecore's] Proprietary Information shall be the exclusive property of the Company." This section obliges Downey to execute any instruments that Ecore deems necessary to confirm its exclusive rights to any invention or discovery under applicable intellectual property law.

21       Section 5 of the Confidentiality Agreement states:

This Agreement shall not constitute an employment agreement between Company and Employee, and, in the absence of written agreement to the contrary, Employee shall, at all times, be considered an employee at will. This Agreement shall apply during and after the Employee's employment with Employer.

*(4) Assignment Agreement*

22       Sometime in 2000, Downey invented a new form of impact sound insulation for use in the construction of flooring systems. He disclosed the inventions to Ecore in 2000. Downey believed that his inventions could lead to a new Ecore product line.

23       In a written agreement, dated October 10, 2001, Downey assigned all his rights, title and interest in the inventions to Ecore ("Assignment Agreement"). Downey acknowledged in the Assignment Agreement that he received "valuable consideration" from Ecore.

*(5) Subsequent Events*

24       In 2008, Ecore asked Downey to sign an "Amended and Restated Confidentiality Agreement" that sought to create joint and several obligations on the part of Downey and CSR. Downey declined to do so.

25       In February 2011, Downey commenced an action in Ontario against Ecore, alleging that it failed to honour an oral promise to "reasonably compensate" him for his assignment of the insulation inventions. Downey alleges in his claim that the inventions were made by him alone using public source materials information and without the use of any Proprietary Information of Ecore. Downey seeks damages or, in the alternative, rescission of his assignment of the inventions and an accounting of profits by Ecore.

26       In response to this action, Ecore terminated the Consulting Agreement effective July 2011. Ecore also moved under Rule 21 of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, to stay or dismiss Downey's action on the ground that the Pennsylvania courts have exclusive jurisdiction over it pursuant to the FSC in the Confidentiality Agreement.

### III. Motion Judge's Decision

27       The motion judge reviewed the circumstances leading to the execution of the Consulting and Confidentiality Agreements and the terms of both contracts. He found that, at Downey's request, the Consulting Agreement was between CSR and Ecore, rather than Ecore and Downey, because this structure was "advantageous to [Downey] from a Canadian tax perspective" and was "for his advantage" (at para. 30). He also found that while it was contemplated that "Downey's position or status might change to that of an employee of Ecore", this never happened.

28       As for the Confidentiality Agreement, the motion judge found that while CSR was obliged under the Consulting Agreement to execute the agreement, it did not do so. Instead, as requested by Ecore, Downey signed the Confidentiality Agreement in his personal capacity. The motion judge correctly held that Downey was bound by the FSC in the Confidentiality Agreement only if that agreement was a valid contract to which Downey was personally bound. He concluded, at para. 34, that the Confidentiality Agreement "fails for lack of consideration". The motion judge found that "it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation, pursuant to the terms of the agreement, was to flow to CSR".

29       The motion judge summarized his conclusion this way, at para. 37:

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 103 of 308

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

Downey never received consideration for executing the Confidentiality Agreement and is not personally bound by its terms, including the FSC contained therein. The jurisdiction of this court to hear Downey's action against Ecore is therefore not ousted by the FSC contained in the Confidentiality Agreement dated October 1, 1999.

30    Although this conclusion was dispositive of Ecore's motion, the motion judge went on to consider the other issues raised by the parties concerning the enforceability of the Confidentiality Agreement against Downey. He held that: (1) the subject matter of Downey's action against Ecore falls within the scope of the FSC in the Confidentiality Agreement since the action arises out of and relates to Ecore's business relations with Downey (at paras. 38-41); and (2) Downey failed to show sufficient strong cause to avoid the enforcement of the FSC in the Confidentiality Agreement (at paras. 42-45). Downey did not challenge these additional findings before this court.

31    The motion judge's reasons for dismissing Ecore's motion are summarized in this succinct passage from his reasons, at para. 46:

The FSC in the Confidentiality Agreement should be enforced, and the stay of proceedings would be granted, but for the finding that the Confidentiality Agreement fails to bind Downey personally for lack of consideration.

## IV. Issues

32    There is one issue on the appeal: did the motion judge err by concluding that the Confidentiality Agreement, including the FSC, is unenforceable against Downey for lack of consideration?

33    If the motion judge so erred, the only issue on the cross-appeal is whether the Confidentiality Agreement is unenforceable against Downey on the alternative basis that a necessary precondition to its operation — Downey's employment with Ecore — was never satisfied.

## V. Analysis

### (1) The Appeal

34    Ecore's basic position is that the motion judge erred by concluding that the Confidentiality Agreement is unenforceable against Downey by reason of a failure of consideration.

35    Ecore submits that s. 8 of the Consulting Agreement evidences the parties' intentions that Ecore was to receive a confidentiality covenant that bound Downey personally as the Key Person. In addition, Ecore argues that the consideration for signing the Confidentiality Agreement was provided by the monies and benefits that flowed through CSR to Downey. Ecore also submits that consideration is found in the expressed premise of the Confidentiality Agreement that Downey would be granted access to Ecore's confidential information and that he was entering into the agreement to grant Ecore protection in respect of that information.

36    For the reasons that follow, I agree with Ecore that the motion judge erred by holding that the Confidentiality Agreement "fails" and is unenforceable against Downey due to a lack of consideration.

### (i) Principles of Contractual Interpretation

37    I begin with the well-established principles of contractual interpretation. As the courts have repeatedly affirmed, the aim of contractual interpretation is to determine the intentions of the parties in accordance with the language used in the written document, having regard to the context in which the contract was signed: see *Dumbrell v. Regional Group of Cos.* (2007), 85 O.R. (3d) 616 (Ont. C.A.), at paras. 47-56; *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673, 268 O.A.C. 279 (Ont. C.A.), at para. 16; and *SeaWorld Parks & Entertainment LLC v. Marineland of Canada Inc.*, 2011 ONCA 616, 282 O.A.C. 339 (Ont. C.A.), at para. 16.

Case 09-10138-MFW Doc 14225-45 Filed 08/15/14 Page 104 of 308

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

38    The contours of the exact bargain between the parties may sometimes require consideration of more than one contract. Nonetheless, the same principles of contractual interpretation apply. In *Salah*, at para. 16, Winkler C.J.O. provided this instructive overview of the applicable principles:

> When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. *Where a transaction involves the execution of several documents that form parts of a larger composite whole — like a complex commercial transaction — and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.*

> [Citations omitted; Emphasis added.]

*(ii) The Wording of the Agreements and the Factual Matrix in this Case*

39    The motion judge's factual finding that CSR was the recipient of Ecore's Proprietary Information led to his conclusion that the Confidentiality Agreement fails for lack of consideration. In my view, this finding is not consistent with the wording of the Consulting and Confidentiality Agreements, having regard to the factual matrix in which these agreements were made. Nor, with respect, does the motion judge's interpretation of the effect of these agreements accord with sound commercial principles or good business sense.

40    From the outset of the parties' dealings, as revealed by Dodge's initial letter to Downey dated September 9, 1999, Ecore contemplated that Downey, personally, would join its "team" and sit as a member of its management group. Consistent with that view, Ecore's position was that Downey would be required to personally commit to protect Ecore's Proprietary Information as a condition of his relationship with Ecore.

41    There was no evidence on the motion to suggest that Ecore resiled from its initial position after Downey and his lawyer converted the original employment proposal into a proposed consulting arrangement with CSR. Indeed, both the wording of s. 5 of the Consulting Agreement and the motion judge's findings confirm that Downey proposed this arrangement solely as a means of advantaging his Canadian income tax position. The arrangement with CSR was simply a tax device that, in the motion judge's words, was implemented "at Downey's request and for his advantage" (at para. 30). This business reality is a critical component of the factual context in which the Consulting and Confidentiality Agreements were signed.

42    Moreover, the transaction between the parties was effected by the execution of both contracts. The Consulting Agreement was entered on the faith of the Confidentiality Agreement being executed. Consequently, these related contracts must be read together and, as Winkler C.J.O. explained in *Salah*, assistance in the interpretation of each agreement may be drawn from the other.

43    That the two agreements together constitute a composite whole is suggested by the language of the agreements themselves. Section 8 of the Consulting Agreement provides for the execution of Ecore's standard form confidentiality agreement by the Consultant. It further states that, upon execution, the confidentiality agreement would form part of the Consulting Agreement.

44    The Consulting Agreement does not specifically address the provision or protection of Ecore's Proprietary Information, nor does it refer to the intended recipient of that information. Instead, it confirms that Downey, in his personal capacity, is a "Key Person of the Consultant and is integral to the successful performance of the Services by the Consultant under this Agreement". CSR explicitly acknowledged that Downey would perform all Services, as defined in the Consulting Agreement, unless Ecore otherwise consented in writing.

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

45    The Confidentiality Agreement fills in the gaps in the Consulting Agreement about the provision and protection of Ecore's Proprietary Information. It specifically addresses the disclosure of this information, providing not only that Downey "will be granted access to [Ecore's] confidential and proprietary information" but, also, that Downey was entering into the Confidentiality Agreement to "grant to [Ecore] protections regarding [Ecore's] proprietary information". It confirms that Downey intended "to be legally bound by the covenants as set forth in this Agreement", which include the confidentiality covenants and acknowledgements set out in the body of the agreement.

46    It is true, as the motion judge recognized, that CSR never signed a confidentiality agreement and that it was not a named party to the Confidentiality Agreement signed by Downey. However, when the Consulting Agreement and Confidentiality Agreement are read together, the terms of these agreements reveal the parties' intentions that Ecore's Proprietary Information was to be protected in the hands of the person who was to actually receive that information — Downey. It was only reasonable for the parties to intend that Downey — who was then employed by a known competitor of Ecore — would be subject to the terms of the Confidentiality Agreement. He was the person defined in s. 7 of the Consulting Agreement as the actual provider of all the consulting services to Ecore. Indeed, Downey admitted in cross-examination that he was the person who would get Ecore's information if a contract was entered into with Ecore.

47    The motion judge erred in finding that Ecore accepted that CSR would receive both the Proprietary Information and the benefits flowing from Downey's relationship with Ecore. The wording of the agreements and the overall factual matrix reveals that the *de facto* relationship between the parties was between Ecore and Downey. It was Downey, not CSR, who committed to perform the consulting services. And it was Downey who would receive the benefits arising from the relationship with Ecore, whether directly or through the corporate vehicle of CSR.

48    Two further comments by the motion judge require mention. The motion judge observed, at para. 32, that the Consulting Agreement could have required that both CSR and Downey sign the Confidentiality Agreement. He also commented that it was "[o]f significance" that, in 2008, Ecore asked Downey to sign an amended Confidentiality Agreement that would have bound both CSR and Downey.

49    In my view, with respect, these observations are beside the point. The fact that the Consulting Agreement did not require both CSR and Downey to sign the Confidentiality Agreement is explained by the factual matrix in which the agreements were made. At least for the purposes of the Confidentiality Agreement, the parties understood and intended that CSR and Downey were one and the same.

50    In addition, I view the 2008 effort to restate the Confidentiality Agreement as nothing more than a failed attempt by Ecore to formally commit CSR to the contractual protections it already enjoyed with Downey under the Confidentiality Agreement.

51    An additional point telling against the motion judge's interpretation of the interaction between the Consulting Agreement and the Confidentiality Agreement is that it fails "to accord with sound commercial principles and good business sense, and [to] avoid commercial absurdity": *Salah*, at para. 16. On the motion judge's approach to the interpretation of the two agreements, the Confidentiality Agreement serves no meaningful purpose. The motion judge viewed CSR as the recipient of Ecore's Proprietary Information. If this were the case, it would have served no logical purpose for Ecore to ask Downey to personally commit to protect Proprietary Information that he never received.

52    Moreover, on the motion judge's findings, neither Downey nor CSR is bound by the Confidentiality Agreement. Downey is not bound because, in the motion judge's view, there was no consideration for the agreement. And CSR is not bound because it is not a party to the agreement. On this interpretation, Ecore is deprived of the very protection of its intellectual property for which it bargained.

53    Such a result is inconsistent with the parties' demonstrated intentions at the time they entered into the Consulting and Confidentiality Agreements. It is also inconsistent with sound commercial principles and good business sense. An interpretation of the Consulting and Confidentiality Agreements that occasions such a commercially absurd result is to be avoided: *Salah*, at para. 16.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    8

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

54    I therefore conclude that, properly interpreted, the intent of the parties in entering into their contractual arrangements was to require the execution of a confidentiality agreement that bound Downey personally. That s. 8 of the Consulting Agreement required CSR to execute such a confidentiality agreement does not relieve against the parties' joint objective. To conclude otherwise, as the motion judge did, would deprive Ecore of any protection of its Proprietary Information from the intended and actual recipient of that information. This unjust result would permit form to triumph over substance.

*(iii) Confidentiality Agreement is Supported by Valid Consideration*

55    It follows from this analysis that the motion judge erred by concluding that Downey's execution of the Confidentiality Agreement was unsupported by valid consideration. The motion judge rejected Ecore's suggestion that "the consideration received by Downey for executing the Confidentiality Agreement was the provision of confidential information by Ecore to the consultant, allowing the 'services' of the Consulting Agreement to be provided, thereby allowing the compensation contemplated in that agreement to flow" (at para. 34). According to the motion judge, at para. 35:

> [T]his submission overlooks the fact that it is CSR, not Downey, who is the party to the Consulting Agreement. The confidential information is provided to CSR, and the compensation ... was to flow to CSR. I am mindful that some of the funds owing to CSR pursuant to the Consulting Agreement were paid to Downey personally. However, [Ecore] cannot unilaterally change the parties to the Consulting Agreement by choosing who they pay. Further, the record suggests that these funds were treated by Downey as revenue of CSR.

56    In my opinion, the motion judge's conclusion that the Confidentiality Agreement fails for lack of consideration ignores the mutual promises contained in the Confidentiality Agreement. In particular, the motion judge failed to consider the "BACKGROUND" preamble to the Confidentiality Agreement, which reads:

> Employee will be granted access to confidential and proprietary information of the Company as part of his employment. Employee is entering into this Agreement to grant to the Company protections regarding the Company's proprietary information. The parties of [*sic*] this Agreement agree and intend to be legally bound by the covenants as set forth in this Agreement.

57    The mutual promises contained in this provision constitute a *quid pro quo* that formed the basis for the Confidentiality Agreement: Downey would be granted access to Ecore's Proprietary Information, which was necessary to allow him to perform the Services under the Consulting Agreement, and the information so disclosed would be subject to confidentiality protections in favour of Ecore. Contrary to the parties' original expectations, Downey never became an Ecore employee but instead continued to use his corporate vehicle for income tax purposes. However, the fact remains that Downey received Ecore's Proprietary Information.

58    In my view, the mutual promises contained in the Confidentiality Agreement afford good and valid consideration for Downey's execution of that agreement. This is sufficient to legally bind the parties in accordance with their express intentions as set out in the preamble to the agreement, quoted above. It was these promises and their fulfillment that permitted Downey, both personally and through CSR, to realize the benefits of the Consulting Agreement — benefits he would not have received without executing the Confidentiality Agreement to which he was personally bound.

*(iv) Conclusion*

59    I therefore conclude, contrary to the motion judge's ruling, that Downey's execution of the Confidentiality Agreement was supported by valid consideration. It follows that the Confidentiality Agreement, including the FSC, is fully enforceable against Downey.

## *(2) The Cross-Appeal*

60    On his cross-appeal, Downey invokes s. 5 of the Confidentiality Agreement, which provides in part: "This Agreement shall apply *during and after* the Employee's employment with Employer" (emphasis added). Downey submits that even if he did

Downey v. Ecore International Inc., 2012 ONCA 480, 2012 CarswellOnt 8459

2012 ONCA 480, 2012 CarswellOnt 8459, 219 A.C.W.S. (3d) 314, 24 C.P.C. (7th) 7...

receive valid consideration for entering into the Confidentiality Agreement, it is nonetheless unenforceable against him since he never became an Ecore employee. The motion judge did not need to consider this alternative argument, having accepted that the Confidentiality Agreement was unenforceable against Downey due to a lack of consideration.

61      I do not read s. 5 of the Confidentiality Agreement in the manner urged by Downey. The material language of this provision — that the Confidentiality Agreement was to apply "during and after" Downey's employment with Ecore — simply confirms that Downey's confidentiality obligations were to survive the termination of his relationship with Ecore. This makes commercial sense given the purpose of the agreed protections for Ecore's Proprietary Information. It was precisely when Downey's relationship with Ecore fell apart, that those protections would be needed by Ecore.

62      It is telling, in this regard, that the relevant language in s. 5 does not provide that the Confidentiality Agreement or Downey's confidentiality covenants were to apply *only* if Downey was an employee of Ecore or that his employment by Ecore was a condition precedent to the triggering of those covenants. This language also accords with common and business sense. If Ecore's Proprietary Information was disclosed to Downey — in any capacity — the protection of that information was of vital concern to Ecore.

## VI. Disposition

63      For the reasons given, I am persuaded that the motion judge erred in his interpretation of the Confidentiality Agreement. That agreement forms part of a single transaction between Ecore, Downey and CSR, constituted by both the Consulting and the Confidentiality Agreements. The interpretation of each agreement is informed by the other. It is only when the two agreements are read together, in accordance with the principles of contractual interpretation referenced above, that the intentions of the parties and the true business reality of their relationship emerge.

64      Accordingly, I would allow the appeal, dismiss the cross-appeal, set aside the motion judge's order and substitute in its stead an order staying Downey's Ontario action on the basis of the FSC in the Confidentiality Agreement.

65      Ecore is entitled to its costs of the appeal and the cross-appeal, in the agreed amount of $13,000, inclusive of all disbursements and taxes.

*K. Feldman J.A.*:

I agree

*Janet Simmons J.A.*:

I agree

*Appeal allowed; cross-appeal dismissed.*

Footnotes

1      Prior to 2008, Ecore carried on business under the name of DRI. For convenience, DRI is treated in these reasons as being one and the same as Ecore.

---

End of Document        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 53

2007 ONCA 59
Ontario Court of Appeal

Dumbrell v. Regional Group of Cos.

2007 CarswellOnt 407, 2007 ONCA 59, [2007] O.J. No. 298, 220 O.A.C. 64, 25
B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 55 C.C.E.L. (3d) 155, 85 O.R. (3d) 616

# J. MICHAEL B. DUMBRELL (Plaintiff / Respondent) and THE REGIONAL GROUP OF COMPANIES INC. and STEVEN H. GORDON (Defendants / Appellants)

Doherty, M.J. Moldaver, R.J. Sharpe JJ.A.

Heard: October 23, 2006
Judgment: January 31, 2007
Docket: CA C43885

Proceedings: reversing in part *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.)

Counsel: Benjamin Zarnett, Alexa Abiscott for Appellants
R.G. Slaght, Q.C. for Respondent

Subject: Employment; Public; Corporate and Commercial; Intellectual Property; Estates and Trusts; Contracts; Civil Practice and Procedure

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Labour and employment law --- Employment law — Interpretation of employment contract — Performance or breach**

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

in contract — Trial judge reached proper conclusion regarding entitlement to payment — Trial judge erred in awarding damages based on profits owed to third party investors — Third party investors were bona fide investors and not merely relatives of defendant's director.

**Business associations --- Nature of business associations — Nature of corporation — Distinct existence — From owner — Lifting the corporate veil**

Defendant was company involved in variety of different real estate services, including land development — Plaintiff was businessman with 25 years' experience in various aspects of real estate field — In 1998, company hired plaintiff as vice-president of commercial development — Employment agreement provided that plaintiff would receive no salary but fifty percent division of net profits of deals generated — During employment, plaintiff suggested investing in development of parcel of land in downtown Ottawa — Plaintiff spent most time in defendant's employ working on securing downtown land deal — Plaintiff resigned in late 1999 due to inability to earn money through employment agreement — Defendant's director finalized deal to invest in downtown land shortly after departure of plaintiff — Defendant and other investors made profit of one million dollars on investment — Plaintiff's action for payment of 50 percent of defendant's profit from deal was allowed — Plaintiff was awarded damages in amount of $500,000 — Trial judge found defendant breached employment contract by refusing to pay profit from deal — Trial judge found that through plaintiff's efforts and exertions that defendant learned of desirability and value of property — Trial judge found plaintiff's contacts made it possible for defendant to pursue deal — Trial judge found defendant's determined efforts to keep deal secret was indication of lack of good faith he brought to relationship with plaintiff — Trial judge found that fact that crystallization of deal occurred after plaintiff left employment was not relevant — Defendant appealed — Appeal allowed in part — Plaintiff entitled to half of profits from deal — Determining factor of entitlement to profits was terms of contract between parties — Contracts to be interpreted objectively with consideration of context in which contract was made — Parties were sophisticated business people who contemplated short relationship — Contract was clear that payment must be earned from profits made as direct result of plaintiff's involvement with corporation — Termination clause did not modify meaning of profits as set out in contract — Trial judge erred in finding director of defendant personally liable — Plaintiff did not claim liability against director — Director did not commit fraud — Trial judge ordered liability against director and corporation, which is not consistent with piercing corporate veil.

**Table of Authorities**

**Cases considered by *Doherty J.A.*:**

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321, 1994 CarswellOnt 234 (Ont. C.A.) — considered

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — considered

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — considered

*Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98, [1998] 1 W.L.R. 896 (U.K. H.L.) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 111 of 308

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — referred to

*Kepic v. Tecumseh Road Builders* (1987), *(*sub nom. *Kepic v Tecumseh Road Builders, division of Countryside Farms Ltd.)* 18 C.C.E.L. 218, 1987 CarswellOnt 917, *(*sub nom. *Kepic v Tecumseh Road Builders, division of Countryside Farms Ltd.)* 23 O.A.C. 72 (Ont. C.A.) — referred to

*Leading Investments Ltd. v. New Forest Investments Ltd.* (1986), *(*sub nom. *H.W. Liebig & Co. v. Leading Investments Ltd.)* [1986] 1 S.C.R. 70, 65 N.R. 209, *(*sub nom. *H.W. Liebig & Co. v. Leading Investments Ltd.)* 38 R.P.R. 201, *(*sub nom. *H.W. Liebig & Co. v. Leading Investments Ltd.)* 14 O.A.C. 159, *(*sub nom. *H.W. Liebig & Co. v. Leading Investments Ltd.)* 25 D.L.R. (4th) 161, 1986 CarswellOnt 671, 1986 CarswellOnt 1000 (S.C.C.) — referred to

*Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 129 D.L.R. (4th) 711, 9 C.C.L.S. 97, 23 B.L.R. (2d) 165, 87 O.A.C. 129, 1995 CarswellOnt 1203, *(*sub nom. *ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.)* 26 O.R. (3d) 481 (Ont. C.A.) — referred to

*Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.* (2001), [2001] NZCA 372 (New Zealand C.A.) — referred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1986] 2 Lloyd's Rep. 646, [1987] 1 All E.R. 81 (Eng. Q.B.) — referred to

*Pagnan SpA v. Tradax Ocean Transportation SA* (1987), [1987] 3 All E.R. 565 (Eng. C.A.) — referred to

*Prenn v. Simmonds* (1971), [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — referred to

*Said v. Butt* (1920), [1920] All E.R. Rep. 232, 90 L.J.K.B. 239, 124 L.T. 413, [1920] 3 K.B. 497 (Eng. K.B.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(*sub nom. *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Truckers Garage Inc. v. Krell* (1993), 3 C.C.E.L. (2d) 157, 68 O.A.C. 106, 1993 CarswellOnt 875 (Ont. C.A.) — referred to

APPEAL by defendant from judgment reported at *Dumbrell v. Regional Group of Cos.* (2005), 9 B.L.R. (4th) 26, 2005 CarswellOnt 2571, 42 C.C.E.L. (3d) 39 (Ont. S.C.J.), allowing plaintiff's action for breach of contract.

*Doherty J.A.*:

## I Overview

1    The respondent, J. Michael B. Dumbrell ("Dumbrell"), was employed by the appellant, the Regional Group of Companies Inc. ("Regional"), for about one year beginning in November 1998. The appellant, Steven H. Gordon ("Gordon"), was the president, CEO, and directing mind of Regional.

2    Dumbrell left Regional's employment in November 1999. He subsequently sued Regional and Gordon claiming he was owed fifty percent of the profit earned on a commercial real estate transaction referred to as the "Queen Street project". The

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

trial judge found that Dumbrell was entitled, under the terms of his employment contract, to fifty percent of the $1,000,000 profit earned on the Queen Street project.

3    Regional and Gordon appeal. Counsel raises three issues:

• Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit earned on the Queen Street project even though that profit was earned long after the termination of his employment contract?

• Even if Dumbrell was entitled to the profits under the terms of the employment contract, did the trial judge err in awarding him fifty percent of the profit earned by entities other than Regional or Gordon? [1]

• Did the trial judge err in holding Gordon personally liable?

4    I would allow Regional's appeal in part. I would hold Regional liable under the contract but only for commission on profits earned by Gordon's company and his wife and children. I would not hold Regional liable for commission on profits earned by other investors brought into the project by Gordon.

5    I would allow Gordon's appeal. Dumbrell alleged various causes of action against Regional and Gordon at trial. The trial judge found a breach of contract, but rejected the other claims made by Dumbrell. Dumbrell's contract was with Regional and only Regional. He could have no reasonable expectation of recovery upon breach of the contract from any entity other than Regional. I see no legal basis upon which Gordon could be found personally liable for a breach of the contract made between Dumbrell and Regional. Nor can Gordon be liable for inducing Regional's breach of contract. Dumbrell did not plead that cause of action and did not adduce evidence capable of establishing that Gordon induced a breach of contract.

## II The Facts

6    The trial lasted two weeks. The trial judge heard different versions of many events, some of which are not relevant to this appeal. I will summarize only those facts germane to the issues raised on appeal. My summary also reflects the trial judge's findings of fact and her credibility assessments. Neither are challenged on appeal. The trial judge preferred Dumbrell's version of events over Gordon's whose evidence she found to be unworthy of belief in many respects.

### (a) Dumbrell's Employment with Regional

7    In the summer of 1998, Dumbrell was living in British Colombia. He had spent most of his working life in the real estate development business and was looking for an opportunity to get back into that business in Ottawa where he had previously worked for many years.

8    Regional operated a large, well established real estate business in the Ottawa area. Gordon had been Regional's CEO since 1984. He held all the voting shares. Regional provided a variety of services, including property management, property appraisals, land acquisitions, land development, and consulting.

9    Regional would sometimes put together groups of investors or syndicates to purchase and develop properties. The properties would be located by Regional and purchased in trust by a shell company for the investors. Regional would earn various fees for arranging the purchase, syndication, management, and development of the property. Investors in the syndicate often were officers or employees of Regional or relatives of Gordon. Gordon sometimes took an equity position in these developments through Regional or various other corporate entities he controlled.

10    Gordon had the final say in respect of all facets of Regional's operation. He decided which projects in which Regional would become involved, the fees Regional would charge, which corporate entities would be used, the roles those entities would play in a transaction, and which investors would be invited to join which syndicates.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

11    Dumbrell met with an employee of Regional in the summer of 1998 to discuss the possibility of Dumbrell working with Regional. Dumbrell met with Gordon either at the same meeting or in a subsequent meeting shortly afterward. Dumbrell had considerable expertise in the commercial real estate field, an area in which Gordon wanted Regional to become more involved.

12    Gordon and Dumbrell agreed that Dumbrell would work for Regional and would have the title Vice-President, Commercial Development. Dumbrell understood that he would find commercial real estate projects, bring them to Regional and that Regional would then become involved in the purchase and development of those properties. Dumbrell would be paid a commission on the profits earned from the projects that he brought to Regional.

13    On Gordon's instructions, Regional's lawyer drafted an employment contract between Dumbrell and Regional. Three drafts were prepared and reviewed by Dumbrell, Gordon, and their respective lawyers. There were several changes made in the various drafts of the contract. Almost all of these changes reflected Gordon's and not Dumbrell's preferences. Eventually, in November 1998, they agreed on the terms and both signed the agreement. Gordon signed as president of Regional.

14    Some of the contract terms are set out in full below. Generally speaking, the contract provided that Dumbrell would be compensated exclusively on a commission basis. His commission would be calculated as a percentage of the profit generated from projects that he brought to Regional.

### (b) The Queen Street Property

15    Like most people familiar with the Ottawa real estate market, Dumbrell knew of the Queen Street property in November 1998. The property was owned by Canadian Real Estate Investment Trust ("CREIT"). It occupied a full downtown city block in Ottawa and in late 1998 was being used as a parking lot. It was zoned for use as office space. Dumbrell believed that the price of the property would increase dramatically in the immediate future as the need for office space increased in Ottawa. He also believed that the property was ripe for development in late 1998. The property was not on the market, but Dumbrell mentioned it to Gordon as a potential project for development by Regional. Gordon encouraged him to look into the possibility of acquiring the Queen Street property.

16    In early 1999, Dumbrell began to assemble a file on the Queen Street property. He received information from an employee of CREIT pertaining to possible development plans for the property and certain rent schedules. CREIT gave the information to Dumbrell on the undertaking that it would be kept confidential.

17    Shortly after Dumbrell acquired information from CREIT, he contacted an architect who had worked on development plans for that property some years earlier. Dumbrell and the architect spoke at length and the architect gave Dumbrell a great deal of background information pertaining to the property. Based on the information he had accumulated, Dumbrell concluded that the Queen Street property was under priced and presented an excellent opportunity for a profitable development as an office tower. Regional decided to proceed with efforts to acquire the Queen Street property.

18    In February 1999, on Gordon's instructions, Dumbrell prepared and submitted an offer to purchase the Queen Street property for $7,745,000. That offer was in the name of Canadian Gateway, a consortium of five companies, including Regional, that had been assembled by Gordon. CREIT was not interested in selling the property on the terms of the offer.

19    Gordon instructed Dumbrell to submit a second offer in February 1999. This offer, also in the name of Canadian Gateway in the amount of $9,000,000, was rejected by CREIT. In March 1999, a third offer, also at $9,000,000, but providing for a shorter due diligence period, was submitted by Dumbrell on Gordon's instructions. This offer was also rejected.

20    The trial judge described, at para. 35, Dumbrell's role in these three offers as follows:

   Mr. Dumbrell was the point man in these negotiations, drafting these offers at Mr. Gordon's direction and reporting back the reactions of Mr. Dansereau [the vendors' representative] who communicated only with Mr. Dumbrell.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 114 of 308

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

21     Some time after the third offer was rejected, some of the partners in Canadian Gateway decided they were no longer interested in purchasing the Queen Street property. In July 1999, Dumbrell, on Gordon's direction, prepared a fourth offer. This offer showed Regional as the purchaser at a purchase price of $9.3 million. It also provided for a $300,000 commission payable to Regional on closing by CREIT. The corporate identity of the purchaser was irrelevant to Dumbrell. As far as he was concerned, he was working on a "Regional" project and it was up to Gordon to decide what corporate entities would be used to effect the transactions and subsequent development of the property.

22     CREIT knew that Regional would not be the ultimate purchaser and developer of its property. It, therefore, wanted to know the identity of Regional's investors. Negotiations broke down when Regional could not or would not identify its investors. The July offer was rejected in August 1999.

23     In August, Gordon told Dumbrell that he was no longer interested in the Queen Street property. Dumbrell had spent most of his time since he commenced employment with Regional in November 1998 working on the Queen Street property. His interest in the property continued even after Gordon told him that he was no longer interested in the property.

24     In October 1999, Gordon spoke with a government official who told him that there would be a significant increase in the demand for downtown office space in Ottawa in the immediate future. This information made the Queen Street property more attractive.

25     In late October 1999, Mr. Samuel Grosz, a friend of Gordon's and a real estate developer whose Ottawa properties were managed by Regional, visited Ottawa primarily to look at his properties. Gordon showed Mr. Grosz the Queen Street property and gave him all of the information that Dumbrell had assembled, including the confidential information that had been provided to him by CREIT in January 1999. Mr. Grosz soon became interested in the Queen Street property.

26     Shortly after Gordon alerted Mr. Grosz to the possibility of purchasing the Queen Street property, Mr. Grosz learned that Philip Reichman and his company, O. & Y. Properties Inc. ("O. & Y."), were about to make an offer to purchase the Queen Street property. Mr. Grosz and Mr. Reichman knew each other well and decided to proceed by way of a joint venture with each holding a fifty percent interest in the Queen Street property if they were able to purchase it from CREIT.

27     By early November 1999, it was clear that the working relationship between Gordon and Dumbrell was not going to last. None of the projects that Dumbrell had worked on had produced any profit for Regional. Dumbrell had not received any remuneration in the year he had been at Regional. Gordon had refused Dumbrell's request for an advance on his commissions. Gordon was also systematically excluding Dumbrell from meetings and the decision-making process at Regional. On November 4, 1999, Dumbrell resigned effective November 22, 1999. He had decided to go into business for himself.

28     On November 19, 1999, after Dumbrell had tendered his resignation from Regional, but while he was still employed there, Mr. Grosz told Gordon that Mr. Grosz and O. & Y. were considering making an offer on the Queen Street property. Mr. Grosz asked Gordon to determine the status of the property. He also told Gordon that because Gordon had brought the property to his attention, he was prepared to allow Gordon to participate with he and O. & Y. in the joint venture. Mr. Grosz indicated that Gordon could purchase one-half of Mr. Grosz's fifty percent interest in the joint venture. This would mean that Gordon would have a twenty-five percent interest in the Queen Street property if the joint venture could acquire it.

29     Mr. Grosz and O. & Y. were respected and high profile participants in the Ottawa commercial real estate market. They did not need Regional's participation to complete the purchase. Gordon wanted to be involved in a joint venture with them. At Mr. Grosz's suggestion, Gordon prepared an offer to purchase the Queen Street property in the name of Regional. When he did so, he anticipated that Regional would purchase the property in trust for Mr. Grosz (twenty-five percent), Gordon or his corporate nominee (twenty-five percent), and O. & Y. (fifty percent).

30     The offer to purchase the Queen Street property prepared by Gordon in November 1999 was very similar to the offer prepared by Dumbrell in July 1999. Both offers provided for a purchase price of $9.3 million with a commission of $300,000

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

payable to Regional. The only significant difference between the two offers was that the July offer identified Dumbrell as the contact person at Regional and the November offer identified Gordon as the contact person.

31     The asking price for the Queen Street property had dropped by about $1 million since July when Regional had submitted its offer at $9.3 million. Unlike Dumbrell, Gordon was not familiar with the commercial real estate market in Ottawa and was unaware that the asking price for the property had gone down. Gordon did not speak to Dumbrell before preparing this offer. The offer prepared by Gordon was reviewed by his putative partners. Mr. Reichman of O. & Y. learned that the offer prepared by Gordon was about one million dollars more than the current asking price for the Queen Street property. He decided that he would take over any negotiations to purchase the Queen Street property. He submitted an offer in the name of O. & Y. at $8,000,000. That offer did not provide for any commissions payable to Regional.

32     The offer submitted by O. & Y. was accepted by CREIT on or about November 25, 1999. The transaction was completed on December 2, 1999 and closed on January 24, 2000. The Queen Street property was purchased in trust by a numbered company. The numbered company was owned fifty percent by O. & Y., and fifty percent by a numbered company owned equally by Mr. Grosz and a company controlled by Gordon. Gordon's company held its twenty-five percent interest in the property in trust for a syndicate assembled by Gordon. The syndicate consisted of Gordon, his wife and children, several cousins, and his lawyer. Gordon, his wife and his children owned 73.33 percent of the syndicate. In total, the syndicate advanced about $1,200,000 toward the project. Some of the payments went through Regional.

33     Gordon acknowledged in cross-examination that this was not a typical syndication for which Regional would charge a fee for bringing the investors together. Regional did all of the work that had to be done for the syndicate on the project, but did not charge any fees until it submitted an invoice in late May 2002 after the interest in the property was sold. The trial judge was dubious as to the *bona fides* of that invoice.

34     Early in 2000, Dumbrell learned through a contact at O. & Y., that O. & Y. had agreed to purchase the Queen Street property. Dumbrell spoke with Gordon and asked him about his or Regional's involvement in that purchase. Gordon lied to Dumbrell. He told him that he was unaware of the proposed purchase of the Queen Street property by O. & Y. and that neither Regional nor Gordon had anything to do with the purchase. Dumbrell subsequently learned of Gordon's involvement and commenced this lawsuit in October 2000. At that time, the syndicate put together by Gordon still held a twenty-five percent interest in the Queen Street property.

35     Under the terms of the agreement between O. & Y., Mr. Grosz and Gordon's syndicate, O. & Y. had an option to purchase the interests held by the other partners. In May 2002, O. & Y. exercised its option and bought out Gordon's syndicate. The syndicate's twenty-five percent interest was sold at a profit of slightly more than $1,000,000. Dumbrell amended his statement of claim and alleged that he was entitled to fifty percent of that profit.

### III Issue #1 — Did the trial judge err in holding that Dumbrell was entitled to fifty percent of the profit under the terms of the employment contract?

#### *(a) The trial judge's analysis*

36     The trial judge found that the potential value of the Queen Street property as a development was made known to Gordon and Regional through Dumbrell's efforts. She further held that it was through those efforts that Regional established contacts with CREIT, assembled a file containing a great deal of information on the property, and was in a position to provide that information to Mr. Grosz when he expressed an interest in the property in October 1999. Mr. Grosz in turn offered Regional/ Gordon a twenty-five percent interest in the property because of the information he had received from Gordon.

37     On the trial judge's findings, Dumbrell was directly responsible for the syndicate, under Gordon's direction and control, obtaining a twenty-five percent interest in the Queen Street property. The syndicate ultimately made a one million dollar profit from its involvement in the transaction.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

38      The trial judge rejected Gordon's evidence that he and Dumbrell had agreed that the Queen Street project would not be covered by the terms of Dumbrell's employment contract. She noted that it made no sense that Dumbrell would spend the vast majority of his time over several months trying to secure a property that was excluded from the terms of his employment contract. She then turned to the terms of that agreement.

39      The contract was between Regional and Dumbrell. It described Dumbrell as "an employee". The services to be provided to Regional by Dumbrell were described in Schedule "A" to the agreement:

> The Corporation and the Employee agree that the Employee will be charged with the responsibility <u>to provide the Corporation with Development, Acquisitions, Financing and Syndications and Consulting Services. Employee to research, investigate, report and recommend real property capital asset purchases suitable for development or syndication.</u> Employee shall not bind the Corporation to any contract or legal commitment without the prior written authority of the Corporation. [Emphasis added.]

40      The contract was for a term of six months with an expiry date of May 1, 1999 and provided for renewal for an additional term of six months on mutual agreement of the parties. Although the contract was not formally renewed, the parties agreed that it was renewed and was in effect when Dumbrell resigned in November 1999.

41      The agreement provided for termination "at the end of the Term hereof", and further provided that neither party could commence an action under the contract more than one year after the expiration of the term of the contract. Dumbrell commenced this action in October 2000, less than one year after he quit. This initial claim eventually developed into one for commission on a profit realized more than two years after the contract was terminated.

42      The provision of the contract governing Dumbrell's compensation is found under the heading "Employee Earnings":

> 1. <u>EMPLOYEE EARNINGS</u>
>
> The Corporation shall pay to the Employee the sum of <u>[as per the commissions payable as set out in Schedule "B" attached].</u> The Corporation is responsible for making source deductions, including payments on account of Canada Pension Plan and Employment Insurance. Employee shall be entitled to participate in Corporation's Health Benefit Package as exists as of the date hereof and as amended from time to time. [Emphasis in original.]

43      Schedule "B" referred to in the above clause reads as follows:

> <u>SCHEDULE "B"</u>
>
> <u>DESCRIPTION OF REMUNERATION PACKAGE TO EMPLOYEE</u>
>
> 1(1) [*] The remuneration package for the Employee will be based on performance of the Employee payable as follows:
>
> > (a) <u>For each project, *profits* to be split 50% to the Employee and 50% to the Corporation.</u>
>
> 1(2) For purposes of this Agreement, <u>"*profit*" shall include monies earned and actually received by the Corporation as completed Acquisition Fees, Development Fees and Syndication Fees earned as a result of the Employee's direct involvement for completed and closed projects in accordance with standard operating policy of the Corporation</u> on the following business activities:
>
> > (a) Development projects;
> >
> > (b) Syndication projects;
> >
> > (c) Special consulting and brokerage fees payable to the Division.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14225-45 Filed 08/15/14 Page 117 of 308

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

1(3) "*Profit*" shall be defined as the Gross Revenues received for a particular Project less expenses directly related to the negotiation, acquisition, development and sale of the project. All such expenses shall be deducted from Gross Revenues as would a prudent accountant applying generally accepted accounting principles. Expenses shall include, but not limited to:

> (a) Acquisition cost of the property;

> (a) Governmental and development fees;

> (a) Professional advice (accountants, engineers, lawyers, third party consultants);

> (a) Financing fees, brokers fees, interest and carrying charges;

> (a) Fees paid to investors for the project;

> (a) Costs and disbursements paid pursuant to any syndication agreement;

> (a) Realtor's fees; and

> (a) Construction costs and related site improvements.

> [Emphasis added.]

44     The trial judge did not find that the contract of employment provided for payment of commission to Dumbrell on profits earned after the termination of the employment agreement. Rather, she equated the relationship between Regional and Dumbrell with a principal-agent relationship. Relying on *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.), the trial judge held that since Regional accepted the benefit of the work done by Dumbrell regarding the Queen Street property, Regional was obligated to pay for that work in the absence of an agreement to the contrary. Next, she examined the language of the employment contract and concluded at para. 131:

> The fact that crystallization of the deal [the sale of the syndicate's interest in the Queen Street property], and the culminating events occurred after the employee left his employment, is not, in my view, relevant. ... The contract did not deal with this situation and therefore the entitlement is as set out in *Charles P. Rowen & Associates Inc. et al. v. Ciba-Geigy Canada Inc., supra.* [Emphasis added.]

45     I agree with the trial judge's conclusion that Dumbrell was entitled to compensation for profits earned after the termination of the agreement, but my analysis is somewhat different than hers. I do not regard *Charles P. Rowen*, *supra*, as controlling. In *Charles P. Rowen*, the court was faced with a true principal-agent relationship, the terms of which had not been reduced to writing by the parties. The reasoning of the majority blends notions of *quantum meruit* and implied terms of a contract to resolve a problem that the parties had not addressed when establishing their relationship.

46     In the present case, the parties did consider the nature of their working relationship. After considerable negotiation and legal assistance, they entered into an employment contract which described Dumbrell as an "employee" and addressed the nature of his compensation. In my view, the question of whether Dumbrell was entitled to commission on the profits earned on the Queen Street project depends on an interpretation of the language used in the contract. If he is entitled to commission on the profits from the Queen Street property, that entitlement must be found in the language of the agreement he entered into with Regional.

*(b) Contractual interpretation*

47     Judges spend most of their working time deciphering the meaning of various kinds of legal documents, including written contracts: see e.g. Lord Justice Johan Steyn, "The Intractable Problem of the Interpretation of Legal Texts" (2003) 25 Sydney L. Rev. 5; Sir Christopher Staughton, "How Do the Courts Interpret Commercial Contracts?" (1998) 58 Cambridge L.J. 303. Most Canadian judges faced with interpreting a written commercial contract, cite either or both of *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901, and *Eli Lilly & Co. v. Novopharm*

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

*Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at paras. 52-56. Professor Ruth Sullivan has observed that these two authorities can be read as advancing different notions of contractual intent. She observes that *Consolidated-Bathurst*, *supra*, arguably looks to the subjective intention of the contracting parties at the time the contract was made, while *Eli Lilly*, *supra*, looks to the intent as discerned from the words used in the written contract. Professor Sullivan refers to the former approach as the intentionalist approach, and the latter as the textualist approach: see Ruth Sullivan, "Contract Interpretation in Practice and Theory" (2000) 13 Sup. Ct. L. Rev. (2d) 369 at 375-86, 392.

48      In *Eli Lilly*, *supra*, at paras. 52-54, Iacobucci J. refers to *Consolidated-Bathurst*, *supra*, with approval. He clarifies, at para. 54, what is meant in *Consolidated-Bathurst* by "the true intent of the parties" for contractual purposes:

The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time.

49      On the approach taken in *Eli Lilly*, *supra*, the focus is on the meaning of the words used in the contract. Evidence of the subjective intention of the parties has "no independent place" in the interpretative process: *Eli Lilly*, at para. 54; see also Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 304-306; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society* (1997), [1998] 1 All E.R. 98 (U.K. H.L.) at 114-15.

50      In my view, when interpreting written contracts, at least in the context of commercial relationships, it is not helpful to frame the analysis in terms of the subjective intention of the parties at the time the contract was drawn. This is so for at least two reasons. First, emphasis on subjective intention denudes the contractual arrangement of the certainty that reducing an arrangement to writing was intended to achieve. This is particularly important where, as is often the case, strangers to the contract must rely on its terms. They have no way of discerning the actual intention of the parties, but must rely on the intent expressed in the written words. Second, many contractual disputes involve issues on which there is no common subjective intention between the parties. Quite simply, the answer to what the parties intended at the time they entered into the contract will often be that they never gave it a moment's thought until it became a problem: see Kim Lewison, *The Interpretation of Contracts*, 3d ed. (London: Sweet & Maxwell, 2004) at 18-31.

51      *Eli Lilly*, *supra*, instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties. In this sense, my approach is textualist. However, the meaning of the written agreement must be distinguished from the dictionary and syntactical meaning of the words used in the agreement. Lord Hoffmann observed in *Investors Compensation Scheme Ltd.*, *supra*, at 115:

The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.

52      No doubt, the dictionary and grammatical meaning of the words (sometimes called the "plain meaning") used by the parties will be important and often decisive in determining the meaning of the document. However, the former cannot be equated with the latter. The meaning of a document is derived not just from the words used, but from the context or the circumstances in which the words were used. Professor John Swan puts it well in *Canadian Contract Law* (Markham, Ont.: Butterworths, 2006) at 493:

There are a number of inherent features of language that need to be noted. Few, if any words, can be understood apart from their context and no contractual language can be understood without some knowledge of its context and the purpose of the contract. Words, taken individually, have an inherent vagueness that will often require courts to determine their meaning by looking at their context and the expectations that the parties may have had.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

53      The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement: see *BG Checo International Ltd. v. British Columbia Hydro & Power Authority*, [1993] 1 S.C.R. 12 (S.C.C.), at 23-24; *Leading Investments Ltd. v. New Forest Investments Ltd.*, [1986] 1 S.C.R. 70 (S.C.C.), at 80-81, La Forest J.; *Prenn v. Simmonds*, [1971] 1 W.L.R. 1381 (U.K. H.L.), at 1383-84; Staughton, "How Do the Courts Interpret Commercial Contracts?", *supra*, at 307-308.

54      A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 710-11.

55      There is some controversy as to how expansively context should be examined for the purposes of contractual interpretation: see Geoff R. Hall, "A Curious Incident in the Law of Contract: The Impact of 22 Words from the House of Lords" (2004) 40 Can. Bus. L.J. 20. Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at 363.

56      I would adopt the description of the interpretative process provided by Lord Justice Steyn, "The Intracticable Problem of the Interpretation of Legal Texts", *supra*, at 8:

> In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text, which they adopted. The aim is to determine the meaning of the contract against its objective contextual scene. By and large the objective approach to the question of construction serves the needs of commerce. [2] [Emphasis added.]

### (c) The interpretation of this contract

57      The context in which the written words used in this agreement must be understood begins with the parties who negotiated the agreement. Both were sophisticated, experienced, successful businessmen who could reasonably be expected to negotiate a commercially sensible and workable agreement. When they agreed to work together, it was anticipated that Dumbrell, whose expertise lay in finding commercial real estate projects, would investigate and, where appropriate, bring potentially profitable large-scale commercial developments to Regional. Regional had the ability to finance and develop these projects. It did so in various ways using whatever corporate vehicle Gordon deemed appropriate.

58      The agreement reached by the parties contemplated a relatively short working relationship of between six months and one year. It also contemplated that Dumbrell would receive nothing unless he brought projects to Regional which earned profits for Regional. If he did that, his compensation would be significant (fifty percent of the profits). In tying Dumbrell's compensation to profits as opposed to, for example, fees earned by Regional, the parties anticipated that Dumbrell's entitlement to commissions would not be known until a project was complete and Regional's net profit on the project could be determined.

59      Given Regional's business history, it could reasonably be anticipated when the employment agreement was made that when projects were brought to it by Dumbrell, Regional would be involved in various ways and that its involvement could yield profits through a variety of methods at different stages of Regional's involvement in any given project. On the findings made by the trial judge, Dumbrell was not taking employment with a company whose sole source of profits came through various forms of fees, but was taking employment with a company whose profits could come through various kinds of involvement in different projects.

60      I turn from the context in which the employment agreement was made to the words used in the agreement and in particular the words used in Schedule "B". Schedule "B" begins by stating that Dumbrell's remuneration will be based on his performance.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 120 of 308

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

He must produce to be paid. Schedule "B" then describes his remuneration as fifty percent of "profits" for each project. "Profits" are described in paras. 1(2) and 1(3).

61      Paragraph 1(2) makes it clear that profits must be earned as a result of Dumbrell's direct involvement in the project. In addition, the project must be "completed and closed ... in accordance with standard operating policy of the Corporation". The reference to "standard operating policy" is of no assistance as it is common ground that there was no such thing.

62      Paragraph 1(2) sets out certain kinds of fees that are included in the meaning of profits, such as acquisition fees, development fees, and syndication fees. The fees described in para. 1(2) are not an exhaustive list of the kinds of payments to Regional that can constitute profits. Lastly, para. 1(2) refers to business activities which constitute projects for the purpose of the calculation of profits, including "Syndication projects".

63      Paragraph 1(3) sets out a formula by which profits are to be determined by deducting certain expenses from "Gross Revenues". The reference in para. 1(3) to "Gross Revenues" and the types of expenses identified in that paragraph indicates two things. First, the question of whether Regional earned any profit and, if so, the amount of that profit may well not be determined until the end of Regional's involvement in a particular project. Second, Regional's involvement in projects could take forms other than a fee for service basis. The reference to "Gross Revenues" and many of the expenses described in para. 1(3) are consistent with Regional taking equity positions in a project and realizing a profit upon a sale of that equity position.

64      On my reading of Schedule "B", Dumbrell was entitled to a fifty percent commission on profits if:

• he was directly responsible for the project in that it was secured for Regional through his efforts;

• Regional had earned and actually received monies on the project;

• the project was "completed and closed", that is Regional's involvement was completed; and

• using the method described in para. 1(3), Regional had earned a profit.

65      Nothing in the language of Schedule "B" limits Dumbrell's potential remuneration to projects that are completed and closed as of the date of termination of his employment contract. The context in which the contract was made contraindicates imposing any such limitation on profits. Reasonable people in the position of Dumbrell and Gordon would have appreciated that Regional's involvement in the kind of complex large scale commercial projects that it was anticipated Dumbrell would bring to it may well not be completed within the relatively short time span contemplated by the employment contract. Similarly, the method used for calculating Dumbrell's compensation by reference to profit as calculated in para. 1(3) contemplates that the projects could well extend over a considerable period of time with the ultimate determination of whether any profit was made and, therefore, any remuneration owed to Dumbrell being based on events that occurred well after the relatively brief period of employment contemplated by the agreement. On my reading of Schedule "B", Dumbrell was entitled to fifty percent of Regional's profits even if the profits were made after the employment contract was terminated.

66      The appellants rely on the termination provision:

1.1 This contract shall terminate:

1.1.1 at the end of the Term hereof.

1.1 Upon termination or other expiration of this contract the Employee shall forthwith return to the Corporation all papers, materials, equipment and other properties of the Corporation held for the purpose of execution of the contract. In addition, each party will assist the other party in the orderly termination of the contract and the transfer of all aspects hereof, tangible and intangible, as may be necessary for the orderly, non-disrupted business continuation of the Corporation.

1.1 Neither party may commence an action under this contract more than one (1) year after the expiration of its term, or, in the event of default, more than one (1) year after the occurrence of said default. [Emphasis added.]

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

67    The termination provision does not assist in defining profits for the purpose of calculating Dumbrell's compensation. The first part of the termination clause speaks to the point at which the contractual relationship ends. It does not purport to terminate obligations that existed under the contract when the contract came to an end. If, as I would hold, profits as defined in Schedule "B" include profits earned and calculated after the termination of the contract, the obligation to pay those profits, when and if they arise, is an obligation that exists under the contract as of the date of termination albeit in an inchoate form.

68    The last paragraph in the termination clause is also a relevant consideration. That paragraph answers one of the arguments relied on by the appellants. They submitted that a definition of profits that included profits made after the termination date of the contract would create indefinite and potentially open-ended liability by Regional to Dumbrell for profits earned on projects many years down the road. The limitation provision in the termination clause excludes any claim by Dumbrell that is not advanced within one year of the termination of the contract. This provision effectively places limits on Regional's potential liability to Dumbrell. As it happens, the limitation clause does not assist Regional here because Dumbrell had commenced his action within the one year period.

69    In summary, like the trial judge, I conclude that Dumbrell was entitled to fifty percent of the profits earned by Regional on the Queen Street project. I reach that conclusion through a reading of Schedule "B" of the agreement in the context of the circumstances in which the agreement was made. I do not read the termination clause as modifying the meaning of profits in the agreement.

### IV Issue #2 — Was Dumbrell entitled to fifty percent of the profits earned by entities other than Regional/Gordon?

70    As outlined above, through Dumbrell's efforts, and at Mr. Grosz's invitation, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property early in 2000.

71    At Gordon's direction, the twenty-five percent interest in the Queen Street property was held by one of his companies in trust for a syndicate of investors. Another Gordon company (LPH), his wife and his children held 73.33 percent of the syndicate. Several of Gordon's cousins and his lawyer, who practised with one of the cousins, held the other 26.67 percent of the syndicate.

72    The accounting breakdown on the syndicate's investment in the Queen Street property, prepared at Gordon's request, but accepted by Dumbrell at trial, showed that the syndicate advanced about $1,200,000 on the Queen Street project and received about $2,200,000 on that project resulting in a profit of just over $1,000,000. The accounting records indicate that the funds were distributed in accordance with the percentage of ownership in the syndicate. Gordon and his immediate family received about $732,000 of the $1,000,000 profit earned by the syndicate.

73    In oral argument, Mr. Zarnett acknowledged that if Dumbrell was entitled to compensation on the Queen Street project under the terms of the employment contract, no distinction could be drawn between profits earned directly by Regional and profits earned by other corporate entities used by Gordon to generate the profit. I would extend the same reasoning to cover profits earned by Gordon's wife and children. On this approach, Dumbrell was entitled to fifty percent of the profits earned by LPH, Gordon's wife and Gordon's children.

74    Counsel submits, however, that profits earned by other investors in the syndicate cannot be treated as the same as Regional's profits. The accounting records demonstrate that profits were paid out to the other investors when the syndicate sold its twenty-five percent interest in the Queen Street property to O. & Y.

75    In her reasons, the trial judge accepted, at para. 158, that there were "third parties investing and risking money". I take this to mean that the trial judge accepted that Gordon's cousins and his lawyer were *bona fides* investors who helped finance the twenty-five percent interest in the Queen Street property. She went on to hold, however, that Gordon's resort to other investors could not affect the compensation owed to Dumbrell. She said, at paras. 159-60:

> In calculating damages, there is no evidentiary foundation of any kind on which to assess legitimate costs which might have been set off against this profit.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 122 of 308

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

Without a scintilla of such evidence, the court is unable to do other than order damages of $500,000, pursuant to the first part of the paragraph in the employment contract dealing with employee remuneration.

76      I cannot agree with this analysis. To the extent that the syndicate was owned by third parties who genuinely invested funds in the project, I do not see how profits payable to those investors can become the profits of Regional for the purposes of calculating Dumbrell's compensation. The accounting records do provide evidence that 26.67 percent of the profit realized on the sale of the twenty-five percent interest in the Queen Street project was paid to third party investors and not to Regional, Gordon, his companies, or his immediate family. The calculation of Dumbrell's compensation on the Queen Street project should not have extended to a percentage of the profits earned by third party investors. If my arithmetic is correct, Dumbrell should have received fifty percent of the profits realized by a 73.33 percent interest in the syndicate.

**V Issue #3 — Did the trial judge err in holding Gordon personally liable for breach of contract?**

77      In his statement of claim, Dumbrell alleged several causes of action against Regional and Gordon. At trial, he succeeded only on the breach of contract claim. In the statement of claim, Dumbrell alleged a breach of contract against only Regional. In her initial reasons for judgment, the trial judge found both Regional and Gordon liable for breaching the contract. She did not separately address Gordon's personal liability for breaching a contract to which he did not appear to be a party. Gordon's liability for breach of contract as distinct from Regional's liability was not addressed by counsel in closing argument.

78      After the trial judge released her initial reasons, and at the request of counsel for Regional and Gordon, she heard further argument on Gordon's personal liability for breach of contract. The trial judge gave additional reasons in which she confirmed her initial finding that Regional and Gordon were both liable for the breach of contract.

79      I have difficulty understanding the basis upon which the trial judge found Gordon liable for breach of contract. She spoke of "piercing the corporate veil" and described Regional as Gordon's agent for the purposes of the contract. However, she found both Regional and Gordon liable for breaching the contract. I agree with Mr. Zarnett's submission that if Regional acted as Gordon's agent for the purposes of the contract, only Gordon could be liable for breaching that contract. The trial judge's finding that Regional was liable along with Gordon for breaching the contract was also inconsistent with the trial judge's conclusion, at para. 187, that she should "pierce the corporate veil" and hold Gordon liable. Either Regional had a separate legal persona for the purposes of the contract or it did not.

80      The concepts of piercing the corporate veil and holding that a corporation acts as an agent for the individual who controls that corporation achieve the same result in that they both impose personal liability for what appear to be corporate actions. They achieve that result, however, in different ways. The agency relationship assumes that the corporation and the controlling mind are distinct, but that on the relevant facts the former acted as agent for the latter. Piercing the corporate veil ignores the legal persona of the corporation: Bruce L. Welling, *Corporate Law in Canada: The Governing Principles*, 2d ed. (Markham, Ont.: Butterworths, 1991) at 122-36.

81      There is no basis in this record for describing Regional as Gordon's agent for the purpose of entering into the employment contract with Dumbrell. Dumbrell did not plead that Regional acted as Gordon's agent. The terms of the contract offer no suggestion that Regional was acting in an agency capacity. Finally, Dumbrell's evidence does not suggest that he regarded Regional as Gordon's agent for the purposes of the contract.

82      Nor is any case made out for ignoring Regional's separate legal persona. There can be no doubt that Dumbrell contracted with Regional and only Regional in November 1998. The employment contract clearly describes Dumbrell as Regional's employee. Dumbrell's pleadings and his evidence do not suggest otherwise. Gordon's total ownership and control of Regional and the fact that he made all decisions on behalf of Regional in respect of its dealings with Dumbrell does not detract from Regional's standing as a separate and distinct legal entity. Corporations must necessarily act at the instance and under the direction of those fixed with the responsibility and authority to direct the affairs of the corporation: see *Montreal Trust Co. of Canada v. ScotiaMcLeod Inc.* (1995), 26 O.R. (3d) 481 (Ont. C.A.) at 492.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 123 of 308

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

83    The separate identity of a corporation can be ignored where the corporation is inserted into a transaction for a fraudulent or dishonest purpose. Corporations used in that way often have no assets, no corporate history, and no reason for existence other than facilitating a particular transaction. None of those indicia apply to Regional. Regional cannot be described as a shell or corporation of convenience put in place by Gordon for the purpose of entering into the contract with Dumbrell. As of November 1998, Regional had been a thriving well established corporate entity for many years. It participated in many different real estate transactions and employed many people. Dumbrell chose to become one of those employees. There is no suggestion in the evidence that the creation of the employer/employee relationship between Regional and Dumbrell was tainted by fraud or dishonesty on the part of Gordon. There is simply nothing to suggest that Gordon set out to deceive or trick Dumbrell when he and Dumbrell negotiated the employment contract which created the contractual relationship between Dumbrell and Regional, and not between Dumbrell and Gordon. Dumbrell knew full well he was contracting with Regional. He could only reasonably expect to look to Regional for compensation in the event of a breach of the terms of the contract.

84    The trial judge's reasons also suggest a second basis for holding Gordon liable. She referred to authorities that hold a directing mind of a company liable for inducing a breach of contract by that company: see e.g. *Said v. Butt*, [1920] 3 K.B. 497 (Eng. K.B.), at 504-506; *Truckers Garage Inc. v. Krell* (1993), 68 O.A.C. 106 (Ont. C.A.), at 114-15; *Kepic v. Tecumseh Road Builders* (1987), 23 O.A.C. 72 (Ont. C.A.) at 74.

85    Cases where an individual has been held liable for inducing a corporation's breach of contract have nothing to do with piercing the corporate veil or the concept of agency. These cases acknowledge the separate legal identity of the corporation and its directing mind. They hold the directing mind liable for the discrete tort of inducing the breach of contract and not for breach of contract itself. The measure of damages for inducing the breach of contract may or may not be the same as would apply to the breach of the contract.

86    Gordon cannot be liable for inducing a breach of the contract between Regional and Dumbrell. That cause of action was not pleaded. Nor do I understand counsel at trial or on appeal to have argued that Gordon's liability could be based on the separate tort of inducing a breach of contract. An allegation of inducing a breach of contract is very different from a claim that a person is liable for breaching the contract. In the absence of any pleading which expressly or impliedly alleges the tort of inducing a breach of contract, I do not think the principles underlying that tort can be relied on to render Gordon liable for the breached contract.

87    The difficulties inherent in transforming an allegation of a breach of contract into a finding of inducing a breach of that contract are apparent in the trial judge's reasons. To establish the tort of inducing a breach of contract by the directing mind of the contracting party, it must be shown, among other things, that the conduct of the directing mind was not *bona fides* in the best interest of the corporation. In the addendum to her reasons, the trial judge indicates that Gordon's conduct caused Regional to lose certain fees on the Queen Street property. She states, at para. 173:

> His [Gordon's] secretive and misleading conduct eventually caused a serious loss to his company when the company became unable to make the offer which would have resulted in another $300,000. - $400,000. fee.

88    I cannot agree that anything Gordon did caused Regional to act to its detriment in respect of the Queen Street property. The trial judge found that as a result of Dumbrell's efforts, Regional/Gordon acquired a twenty-five percent interest in the Queen Street property. That is the only interest that was available to Gordon in the joint venture that ultimately purchased the property. As the trial judge found, the calculation of Regional's profits and, therefore, Dumbrell's commission, did not depend on what part of the profits Regional described as fees. Had Gordon chosen to describe some of the profits generated for the syndicate from the sale of its interests as fees payable to Regional, it would not have increased the overall profit earned by the syndicate and would have had no effect on the quantification of Dumbrell's compensation. There is no evidentiary basis to hold that Gordon's conduct in respect of the Queen Street property cost Regional anything. On my reading of Gordon's cross-examination, it was not suggested to him that his conduct had somehow deprived Regional of profits that it would otherwise have earned. A finding that Gordon acted against Regional's best interests in connection with the profit earned on the Queen Street property has no foundation in either the pleadings or the evidence.

Dumbrell v. Regional Group of Cos., 2007 ONCA 59, 2007 CarswellOnt 407

2007 ONCA 59, 2007 CarswellOnt 407, [2007] O.J. No. 298, 220 O.A.C. 64...

## VI Conclusion

89      I would allow Gordon's appeal, set aside the trial judge's finding regarding Gordon's personal liability, and dismiss the action against Gordon. I would allow Regional's appeal in part and vary the trial order to provide that Dumbrell is entitled to fifty percent of the profit from the Queen Street project earned by LPH, Gordon's wife and Gordon's two daughters.

90      Counsel should make written submissions (no more than ten pages each) as to costs both at the trial and on appeal.

**M.J. Moldaver J.A.:**

I agree.

**R.J. Sharpe J.A.:**

I agree.

*Appeal allowed in part.*

Footnotes

1      In their factum, the appellants argued that under the terms of the employment contract, Dumbrell was entitled only to fifty percent of Regional's profits and that none of the profit from the Queen Street project was earned by Regional. In oral argument, counsel accepted that the terms of the employment contract would reach profits earned by Regional or other entities controlled by Gordon.

*      In the contract, all of the paragraphs in Schedule "B" are numbered "1". For ease of reference, I have added the numbers in parentheses.

2      Lord Steyn has taken the same approach in his judgments: see *Pagnan SpA v. Tradax Ocean Transportation SA* (1986), [1987] 1 All E.R. 81 (Eng. Q.B.), Steyn J., aff'd [1987] 3 All E.R. 565 (Eng. C.A.). See also *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 178 D.L.R. (4th) 634 (Ont. C.A.), at 639; Lewison, *The Interpretation of Contracts*, *supra*, at 5, 22-24; *Mount Joy Farms Ltd. v. Waipahi Dairy Farm Ltd.*, [2001] NZCA 372 (New Zealand C.A.) at para. 38.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 54

*Indexed as:*

# Duncombe Estate (Re)

### IN THE MATTER OF the Estate of T. W. Duncombe

[1902] O.J. No. 97

3 O.L.R. 510

2 O.W.R. 153

Ontario High Court of Justice

**Lount, J. (In Chambers)**

February 24, 1902

*Will -- Construction -- "Including" -- Estate -- Policies of Insurance -- R.S.O. 1897, ch. 203, sec. 2, sub-sec. 86, sec. 169.*

A testator bequeathed to his wife one-half his estate "including policies of insurance made payable to her upon my death." He left three policies on his life one expressed to be payable to his wife, the second expressed to be "for the benefit, of his wife ... the beneficiary" and providing for payment to his wife as beneficiary, of an annuity of $260, for twenty years, and the third payable at his death to "his legal heirs." The widow was the legal heir:

Held, that the third policy formed part of the testator's estate, but not the first two, for by them a trust was created in favour of his wife as a preferred beneficiary, and so remained until the testator's death.

Held, also, that the word "including" imported addition, that is indicated something in addition to and not to be included in the half of his estate.

---

**1**    THIS was a motion on an originating notice for the construction of the will of Thomas Wallace Duncombe under the circumstances set out in the judgment, and was argued before LOUNT, J., in

Chambers, on December 6th, 1901.

W. A. Wilson, for the executors.

J. M. Clark, K.C., for Mary Duncombe.

J. R. Cartwright, K.C., for the Attorney-General.

A. M. Stewart, for the official guardian.

M. F. Muir, for a legatee, and representing a class.

**2**    The following were referred to: Brainard v. Darling (1882), 132 Mass. 218; Stroud's Judicial Dictionary, sub voce "Namely."

**3**    February 24. LOUNT J.:-- Motion before me on an originating notice, under Rule 938, for the construction of the fifth clause of the will of Thomas Wallace Duncombe, who died without issue on October 2nd, 1901, leaving him surviving Mary Duncombe, his widow. The will is dated August 8th, 1900; probate was granted on November 7th, 1901.

**4**    Three policies of insurance upon the life of the testator are in question.

**5**    First, one for $1000, payable to his wife, Mary Duncombe, at his death, in the Order of Canadian Home Circles; [3 OLR Page511]

**6**    Second, for $5000 in the Mutual Life Insurance Company of New York, for the benefit of his wife, Mary Duncombe, the beneficiary; providing, however, that at his death an annuity of $250 per annum for twenty years shall be paid to his wife, the beneficiary;

**7**    Third, for $1000, payable at his death to his legal heirs, in the Canadian Order of Chosen Friends.

**8**    Besides these policies, there are other policies on his life, but they do not come in question here.

**9**    The fifth clause reads as follows:

>        "I give and bequeath unto my dear wife, Mary Duncombe, my household
>     furniture and one-half of my estate, including the policies of insurance made
>     payable to her upon my death."

**10**    On behalf of Mary Duncombe, the legatee's widow, it is contended that the moneys payable under these policies form no part of his estate, that such moneys are payable to her alone, she being

the sole and only preferred beneficiary living at the time the will was made or at the time of his death, there being no children, grandchildren, or mother living.

**11**    It is also contended in her behalf that the word "including" in the said clause does not in law mean, and was not in fact intended by the testator to mean, that part of his estate comprised in the moneys payable under these policies.

**12**    All the other parties before the Court, other than the executors, say the proper construction to place upon the word "including," as used in the clause is that the moneys payable under these policies form part of his estate, and his widow is entitled to one-half of his estate, the moneys payable under these policies forming part thereof.

**13**    Under these circumstances the executors ask for a construction of this clause.

**14**    From the best consideration I have been able to give to the matter, I am of the opinion that the third policy mentioned--the one for $1000 in the Canadian Order of Chosen Friends--forms part of his estate, and the moneys payable thereunder when received should go to and form part of his estate. It is payable to his legal heirs; it is not payable to her as a preferred beneficiary by name, nor to her as a preferred beneficiary by the designation of legal heirs; nor was it, in my opinion, by the testator so intended. [3 OLR Page512]

**15**    The Insurance Act, R.S.O. 1897, ch. 203, sec. 2, sub-sec. 36, defines legal heirs or lawful heirs to mean and include the wife or husband, if surviving the assured, but I do not understand by this that a policy payable to one thus described is payable to one classed as a preferred beneficiary. Sub-section 2, immediately preceding, is the one dealing with preferred beneficiaries; it names the preferred beneficiaries to be the husband, wife, children, grandchildren, and mother of the assured; all other beneficiaries are known as ordinary beneficiaries.

**16**    By sec. 159 of the Act, when the assured by the contract of insurance or by other means therein mentioned, declares the insurance money to be for the benefit of the wife of the assured, then such contract shall, subject to the right of the assured to apportion or alter, create a trust in favour of the beneficiary; and so long as the trust remains, the money payable under the contract shall not be subject to the control of the assured, or form part of his estate when the sum secured by the contract becomes payable.

**17**    Here, as to the two first policies, a trust was created in favour of his wife, a preferred beneficiary. This trust remained in her favour up to his death; it was not altered or changed in fact it could not be altered or changed, as the testator at the time he created the trust had no children, grandchildren, or mother living, and therefore the moneys payable under these two policies were not subject to his control and formed no part of his estate. At his death the moneys payable under these policies were and now are payable to her alone, and are no part of his estate.

**18**    The 160th section of the Act has no application to this case; there were no preferred

beneficiaries other than his wife in existence at the date of these two policies, nor afterwards. He, therefore, had no power to vary or alter the disposition of the moneys payable under these policies, for by this section his power is only to change or vary the disposition of moneys when an apportionment had already been made, and then only as to the preferred beneficiaries. There being in existence no preferred beneficiaries other than his wife, he could not alter or [3 OLR Page513] vary the apportionment he had already made, nor destroy the trust already created in her favour.

**19**    It is further contended by her that the proper construction to give to the word "including" in clause five imports addition, i.e., indicates something not to be included. I am of the opinion this is the proper interpretation to give to the word as used in this clause.

**20**    Jarman on Wills, 5th ed., vol. 2, p. 1090, in defining the meaning of the words "namely" and "including," says: "'Namely' imports interpretation, i.e., indicates what is included in the previous term, but 'including' imports addition, i.e., indicates something not included;" and in Stroud's Judicial Dictionary, p. 493, under the title "namely;" the same definition is given. It says: "'Including' imports addition, i.e., indicates something not included." This, I think, is the proper interpretation to be given to the word "including" as used in this clause.

**21**    I do not think it can be fairly argued that the testator had in mind, when considering this clause, that he was giving or intending to give to his wife that which he had already secured to her by the policies.

**22**    The other parties to this matter whose interests are in common, as opposed to this construction, contend on the other hand that it was the intention of this testator to place the money payable under these policies back again into his estate, and make it a condition that his wife should release her claim as a preferred beneficiary, and accept under the will as thus construed, and that the word "including" is evidence of this. I cannot agree with this contention; it would be reading into the will a meaning which, in my judgment, was never intended.

**23**    Judgment will therefore be declaring that as to the moneys payable under the policy or certificate of "The Canadian Order of Chosen Friends," it forms part of the estate of the testator; as to the moneys payable under the policy of "The Mutual Life Insurance Company of New York" and under the policy or certificate of "The Order of Canadian Home Circles," these moneys form no part of the testator's estate.

**24**    I give costs to all parties out of the said estate.

qp/s/qlcbk/qlajg

# TAB 55

498 A.2d 1108
Supreme Court of Delaware.

E.I. du PONT de NEMOURS AND COMPANY,
INCORPORATED, Plaintiff Below, Appellant,
v.
SHELL OIL COMPANY, Defendant Below, Appellee.

Submitted: Feb. 5, 1985.
| Decided: Aug. 21, 1985.

Patentee brought action for declaratory judgment that
prohibition on sublicensee and license agreement barred
toll manufacturer/sale-back arrangement between licensee
and party which had agreed to manufacture for, and to
buy back from, licensee patented product. The Court of
Chancery granted partial final declaratory judgment in favor
of licensee, and patentee appealed. The Supreme Court,
Horsey, J., held that: (1) prohibition against licensee's grant
of sublicense under license agreement affirmatively acted
to restrict licensee's otherwise unfettered ability to have
patented product made and to sell it; (2) toll conversion/
sale-back agreements formed one contract; and (3) toll
conversion agreement and purchase and sale agreement
equalled sublicense.

Reversed.

West Headnotes (21)

[1]    **Appeal and Error**
        Inferences from Facts Proved
       While Supreme Court must accept findings of
       fact of court of chancery, which are supported
       by record, it is not bound to accept inferences
       and deductions which are either not supported by
       record or are not product of orderly and logical
       deductive reasoning process.

       3 Cases that cite this headnote

[2]    **Appeal and Error**
        Review Dependent on Whether Questions
       Are of Law or of Fact

Supreme Court has plenary review over question
of construction and application of law to facts.

17 Cases that cite this headnote

[3]    **Patents**
        Construction and Operation of Licenses
       Fundamental rules of contract apply
       equally to construction of patent licenses.

       2 Cases that cite this headnote

[4]    **Contracts**
        Construction as a Whole
       In upholding intention of parties, court must
       construe agreement as whole, giving effect to all
       provisions therein.

       92 Cases that cite this headnote

[5]    **Contracts**
        Separate Clauses
       Meaning which arises from particular portion
       of agreement cannot control meaning of entire
       agreement where such inference runs counter to
       agreement's overall scheme or plan.

       32 Cases that cite this headnote

[6]    **Patents**
        Assignments and Sublicenses
       Nonexclusive patent license carries with it
       implied prohibition on sublicensing.

       2 Cases that cite this headnote

[7]    **Patents**
        Assignments and Sublicenses
       Prohibition against patent licensee's grant of
       sublicense under license agreement affirmatively
       acted to restrict licensee's otherwise unfettered
       ability to have patented product made and to sell
       it.

       6 Cases that cite this headnote

[8]    **Patents**

🔑 Assignments and Sublicenses

Nonexclusive patent license conveys certain indivisible rights under patent, which are personal to licensee, and as such, these rights are not susceptible to sublicensing, unless specific permission is given.

1 Cases that cite this headnote

**[9]** **Contracts**

🔑 Construction to Give Validity and Effect to Contract

Whenever possible, court should give effect to all contract provisions.

34 Cases that cite this headnote

**[10]** **Contracts**

🔑 Construction Against Party Using Words

Rule of contra proferentum is one of last resort, such that court will not apply it if problem in construction can be resolved by applying more favored rules of construction.

17 Cases that cite this headnote

**[11]** **Contracts**

🔑 Construction Against Party Using Words

Where all parties to contract are knowledgeable, there is no reason for imposing sanctions against party who drafted final provision.

14 Cases that cite this headnote

**[12]** **Contracts**

🔑 Construing Instruments Together

"Toll conversion agreement," whereby one company received fee to manufacture product for another company, and sale-back agreement formed one contract, where agreements were executed on same day, and covered same period of time, minimum quantities of patented product which manufacturer was required to make for licensee under "toll conversion agreement" and which manufacturer was then required to buy back from licensee under purchase and sale agreement were identical, and two agreements

worked in tandem with respect to ordering, delivery and payment.

14 Cases that cite this headnote

**[13]** **Patents**

🔑 Assignments and Sublicenses

It is overall effect of arrangements, rather than their precise label, which will determine whether arrangement amounts to sublicense.

Cases that cite this headnote

**[14]** **Patents**

🔑 Contracts for Making, Use, or Sale of Patented Articles

Toll conversion and purchase and sale agreements amounted to sublicense, where alleged sublicensee was producing patented product, not for licensee, but rather for itself, minimum amount of product which sublicensee was obligated to produce under toll conversion agreement was same amount which it was obligated to buy back from licensee under purchase and sale agreement, and licensee was assuming posture of middleman solely to bypass prohibition against sublicensing by virtue of some neatly tailored drafting.

12 Cases that cite this headnote

**[15]** **Patents**

🔑 Nature of License

**Patents**

🔑 Assignments and Sublicenses

Question of defining license or sublicense is not matter of measuring such arrangement against hard and fast indicia of licenses, but rather, is matter of determining relative rights of parties.

2 Cases that cite this headnote

**[16]** **Patents**

🔑 Construction and Operation of Licenses

In granting license, patentee can retain any of rights to make, sell and use, while conveying others.

Cases that cite this headnote

[17] **Patents**
👉 **Royalties**

Licensing agreement does not necessarily require particular royalty limitation.

Cases that cite this headnote

[18] **Patents**
👉 **Royalties**

License may be for any royalty.

Cases that cite this headnote

[19] **Patents**
👉 **Assignments and Sublicenses**

Fact that licensee would be collecting approximately 30% royalty in contrast to license royalties which were normally in five percent range did not preclude determination that transaction involving toll conversion and sale-back arrangements between licensee and manufacturer ultimate purchaser was in fact sublicensing agreement.

11 Cases that cite this headnote

[20] **Patents**
👉 **Royalties**

In world of bargained-for rights, no specific royalty percentage will automatically determine that particular transaction is, or is not, license.

Cases that cite this headnote

[21] **Patents**
👉 **Assignments and Sublicenses**

Agreement to pay licensee for use of its license rights under patent is sublicense.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1109** Richard L. Sutton (argued) and Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant.

**\*1110** E. Norman Veasey (argued), Allen M. Terrell, Jr., Stephen E. Herrmann, and John J. Schreppler, II, Richards, Layton & Finger, Wilmington, for appellee.

Before McNEILLY and HORSEY, JJ., O'HARA, BIFFERATO and TAYLOR, Judges, constituting the Court en Banc.

**Opinion**

HORSEY, Justice:

This appeal requires us to determine the limits of a licensee's right to manufacture and sell a product under grant of a nonexclusive license without right to sublicense. The license agreement expressly prohibited the licensee from sublicensing. It did permit the licensee to make the patented product or to "have [it] made" and to sell the product. We here consider whether a nonexclusive license agreement entered into between E.I. duPont de Nemours and Company, Inc. ("DuPont") and Shell Oil Company ("Shell") in 1968 bars licensee Shell from carrying out a 1981 arrangement made between Shell and a wholly-owned subsidiary of Union Carbide Company, Inc., Union Carbide Agricultural Corporation, Inc. ("Carbide"). Under the arrangement, Carbide would manufacture the patented product for sale in a quantity to meet Carbide's requirements and Shell bound itself to sell the same quantity to Carbide.

Plaintiff DuPont appeals from the Court of Chancery's grant of a partial final declaratory judgment in favor of defendant Shell. That Court construed Shell's arrangement with Carbide as permissible under the "have made" language of DuPont's 1968 Patent License Agreement ("the License Agreement"), even in light of the License Agreement's prohibition against Shell's grant of a sublicense. We cannot agree with the Vice Chancellor's construction of the Agreement; and, for the reasons which follow, we reach the contrary conclusion. We conclude that Shell's contractual arrangements with Carbide constitute, in essence, a sublicense. Accordingly, we reverse the Court of Chancery's finding to the contrary and direct entry of partial judgment for DuPont.

## I.

In the 1960's, both DuPont and overseas affiliates of Shell [1] independently developed the insecticide, methomyl. DuPont and SIRM filed patent applications on methomyl in various jurisdictions throughout the world. By 1967, it was apparent that DuPont had obtained the dominant patent position for methomyl in the United States, while Shell had obtained such position in most of the commercially important countries overseas.

DuPont's interest in a potential Australian market prompted negotiations with Shell concerning a possible cross-licensing agreement. Negotiations continued through the fall of 1967, and in 1968, Shell and DuPont executed a Patent License Agreement with reciprocal provisions. Shell and its affiliates granted DuPont a license to commercially exploit methomyl in foreign countries where SIRM held the patents. The reciprocal provision, at the heart of this litigation, gave Shell equivalent rights with respect to the marketing of methomyl in the United States. It provided:

> DuPont grants to Shell a nonexclusive license, without the right to sublicense, to become effective January 1, 1973, to make, have made, use and sell for use and resale METHOMYL and T-1642 [another chemical] and their formulations under the DU PONT PATENT RIGHTS.

Several years later during the 1970's, Carbide developed a product called Larvin, an insecticide which uses methomyl as an intermediate in its formulation. Therefore, in 1978, Carbide sought a ready supply of methomyl.

 **\*1111**  Carbide first requested a license to manufacture methomyl from Shell. Shell informed Carbide that it did not have the right to sublicense the manufacture of methomyl pursuant to its License Agreement with DuPont. Shell advised Carbide that only DuPont could grant a license for the domestic manufacture of methomyl.

As an alternative, Carbide investigated the possibility of buying from Shell quantities of methomyl sufficient to fill its needs. However, Carbide learned that the Shell plant, located near Denver, Colorado, did not have the necessary capacity to produce what Carbide required. In fact, the Denver plant had difficulty even in satisfying Shell's own needs for methomyl which it used to formulate another Shell product, Nudrin.

Shell then proposed the following arrangement: (1) Carbide would manufacture methomyl for Shell under the "have made" provision of its License Agreement with DuPont; and (2) exercising its right to "sell for use or resale," Shell would immediately sell the methomyl back to Carbide using a separate purchase and sale agreement. Carbide initially rejected the proposal.

Instead, Carbide approached DuPont directly seeking a license for the manufacture and use of methomyl. In addition to being able to make methomyl for its own use, Carbide saw another advantage to obtaining a license. Assuming a license were granted, Carbide anticipated tremendous economies of scale in the manufacture of methomyl at its plant, provided that it were also able to supply Shell with methomyl for its use and for sale to third parties.

Therefore, in May 1979, Carbide prepared two preliminary proposals. First, Carbide proposed that DuPont license Carbide to manufacture methomyl for its use in Larvin in return for Carbide's grant of a license to DuPont to sell Larvin. Second, believing that such license would be forthcoming, Carbide proposed to supply Shell with methomyl for sale to third parties.

DuPont rejected Carbide's proposal, because it had no interest in marketing Larvin. However, DuPont did offer to sell methomyl to Carbide at a favorable price for limited use in the formulation of Larvin. Carbide rejected this counteroffer.

Carbide then immediately contacted Shell about its earlier suggestion that Carbide manufacture methomyl for Shell and then buy it back from Shell. Shell and Carbide entered into a Methomyl Toll Conversion Agreement [2] and a Methomyl Purchase and Sale Agreement. The Agreements were negotiated, drafted and executed simultaneously. Both Agreements cover the same period of time, terminating in 1988 when DuPont's methomyl patent expires. Moreover, termination of the Toll Conversion Agreement terminates the Purchase and Sale Agreement.

In essence, the Agreements provided that Carbide would produce methomyl for Shell's account, simultaneously buying back from Shell some or all of the methomyl Carbide

manufactured. More specifically, the Agreements operated in tandem as follows:

Carbide was to construct a plant to manufacture 18 million pounds of methomyl per year. Carbide would then order from Shell the amount of methomyl it required. Shell would convey such information back to Carbide so that it could manufacture the required amounts. Carbide would send Shell a delivery schedule, with Shell relaying that information back to Carbide. Carbide would then place the methomyl in its own containers, simultaneously effectuating both delivery to Shell and redelivery to Carbide. Title was to remain in Shell until redelivery to Carbide. Carbide was to bear the risk of loss until delivery to Shell. Shell was obligated to sell to Carbide all of the methomyl which Carbide required both for use in making Larvin and for export *1112 sales. However, Shell was not obligated to sell unless Carbide performed its obligations under the Toll Conversion Agreement. Nor was Shell obligated to have any methomyl made in addition to that ordered by Carbide.

The drafters of these Agreements felt that the "have made" and "sale for use or resale" language of the DuPont License Agreement permitted the Toll Conversion and Purchase and Sale Agreements between Shell and Carbide. However, they were concerned by the License Agreement's express prohibition against sublicensing. Therefore, as the notes of one of Shell's lawyers reveal, counsel for Shell carefully structured the transaction so that, technically, it would not take the form of a license. Anticipating that DuPont would take legal action upon learning of the manufacture/sale-back arrangement, Shell's counsel noted:

To me it is essential that [the] transaction be structured to withstand scrutiny of a court. Must be a good faith exercise of our rights to "have made" and "sell back."

_____

The use of a separate toll conversion agreement and sales agreement is not merely "cosmetic." Each agreement should be able to stand on its own, i.e., one agreement is between Shell and Carbide as toll manufacturer, and the other between Shell and Carbide as a customer for methomyl.

And, in response to Carbide's suggestion that Shell establish different conversion fees for the methomyl eventually sold back to Carbide, as opposed to that sold to Shell's other customers, counsel continued:

Can't justify different toll conversion schedules for product we would keep and that we would sell back to Carbide. Inconsistent with our basic position. Therefore, we are recalculating Carbide's toll conversion fees and sell back price so as to have only one toll conversion fee schedule but still keep same approximate dollar value as proposal made to us by [Carbide].

DuPont responded as predicted. It filed an action in the Court of Chancery for a declaratory judgment that the prohibition on sublicensing in the 1968 License Agreement barred the toll manufacture/sale-back arrangement between Shell and Carbide. In an unreported Letter Opinion, the Vice Chancellor found that such arrangement fell within the scope of Shell's collective rights: (a) to have methomyl made for Shell by a third-party manufacturer (Carbide); and (b) to sell methomyl to a third party (Carbide) for its own use or for resale. Therefore, the Vice Chancellor concluded that the Shell-Carbide arrangement did not violate the DuPont's 1968 License Agreement with Shell. In support of this conclusion, the Vice Chancellor reasoned:

As a matter of fact, the License Agreement contains no language which could be construed as restricting Shell's right to sell methomyl or to have it made.

_____

To contend now that the prohibition against a sublicense is a restriction against Shell selling methomyl to its toll converter engrafts a restriction on Shell's otherwise unrestricted right to "sell." But nowhere in the negotiations or in the document itself is there to be found a restriction on Shell's right to sell.

The Court also concluded that the Shell-Carbide arrangement did not constitute a sublicense. While the Court acknowledged that Carbide "is getting all the methomyl it needs" or "desires," it concluded that the 1981 arrangement did not constitute a sublicense because Carbide's acquired rights did not include either the right to sell methomyl in the United States or the right to have third parties make methomyl for Carbide.

## II.

[1]   The question presented-whether the Shell-Carbide Toll Conversion Agreement coupled with the Purchase and Sale **\*1113**  Agreement is prohibited by the DuPont-Shell License Agreement-is apparently one of first impression in this country. It also involves a mixed question of fact and law. While this Court must accept findings of fact of the Court of Chancery, which are supported by the record, we are not bound to accept inferences and deductions which are either not supported by the record or are not the product of an orderly and logical deductive reasoning process. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972). *See also New York Trust Co. v. Riley,* Del.Supr., 16 A.2d 772, 783 (1940). [3] The dispute here is not over the facts, but rather, over the inferences and deductions to be drawn therefrom.

[2]   The question we must address is really one of construction and the application of law to the facts. Over such matters, we have plenary review. While we agree with the Vice Chancellor that the combination of the "have made" and "sell" rights would ordinarily sanction the toll conversion/sale-back arrangement, such conclusion cannot stand in the face of the License Agreement's explicit prohibition on sublicensing.

### A

In determining the scope of the "have made" rights under the License Agreement, we first must consider whether the prohibition against sublicensing in any way restricts those rights.

[3]   [4]   [5]   In so doing, we look to certain fundamental rules of contract construction, which apply equally to the construction of patent licenses. *4-One Box Machine Makers v. Wirebounds Patents Co.,* Me.Supr., 131 Me. 356, 163 A. 167 (1932); *accord Gronemeyer v. Hunter Manufacturing Corp.,* Del.Ch., 106 A.2d 519 (1954). The basic rule of contract construction gives priority to the intention of the parties. *Radio Corp. of America v. Philadelphia Storage Battery Co.,* Del.Supr., 6 A.2d 329 (1939). *See also Pennwalt Corp. v. Plough, Inc.,* 3rd Cir., 676 F.2d 77, 80 (1982); *DuPont v. Wilmington Trust Co.,* Del.Ch., 45 A.2d 510 (1946); *Restatement (Second) Of Contracts* § 202. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.  *State v.*

*Dabson,* Del.Supr., 217 A.2d 497 (1966); *Bamdad Mechanic Co. v. United Technologies Corp.,* D.Del., 586 F.Supp. 551 (1984). Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan. *Stemerman v. Ackerman,* Del.Ch., 184 A.2d 28, 34 (1962). *See also Bamdad Mechanic Co., supra* at 555; *Faw, Casson & Co. v. Cranston,* Del.Ch., 375 A.2d 463, 466 (1977).

As the Vice Chancellor noted below, it is clear that DuPont and Shell intended that the License Agreement permit Shell to have a third party make unlimited quantities of methomyl for Shell's benefit. Moreover, the parties did intend to give Shell the right to sell unlimited quantities of methomyl. However, we disagree with the Vice Chancellor that the parties did not intend to restrict the "have made" and "sell" rights in any way.

[6]   [7]   The parties included a specific provision to prevent Shell from sublicensing the right to make and sell methomyl. The intended importance of this prohibition is underscored by the fact that even if a prohibition had not been written in the agreement, Shell would not have been permitted by operation of law to issue a sublicense.  **\*1114**  In fact, Shell itself concedes that a nonexclusive patent license carries with it an implied prohibition on sublicensing. *See Providence Rubber Co. v. Goodyear,* 76 U.S. 788, 799, 19 L.Ed. 566 (1869); *Rock-Ola Mfg. Corp. v. Filben Mfg. Co.,* 8th Cir., 168 F.2d 919, 922, *cert. dismissed,* 335 U.S. 855, 69 S.Ct. 134, 93 L.Ed. 403 (1948); Walker on Patents § 408 (Deller ed. 1965). Therefore, reading the "have made" and "sell" rights together with the prohibition on sublicensing, we conclude that the prohibition against Shell's grant of a sublicense under the License Agreement affirmatively acts to restrict Shell's otherwise unfettered ability to "have [methomyl] made" and to sell it.

[8]   To hold otherwise would be to permit an inference arising from the "have made" and "sell" rights to negate the overall scheme of a nonexclusive patent license. *See Stemerman v. Ackerman, supra.* A nonexclusive patent license conveys certain indivisible rights under the patent, which are personal to the licensee. As such, these rights are not susceptible to sublicensing, unless specific permission is given. *Unarco Industries, Inc. v. Kelley Co.,* 7th Cir., 465 F.2d 1303, 1306 (1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973). No such permission was given here.

**[9]**   Moreover, were we to find that the prohibition against sublicensing did not limit Shell's "have made" and "sell" rights, we would in effect be reading such prohibition out of the License Agreement. To do so would be to violate the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions. *State v. Dobson, supra; Bamdad Mechanic Co., supra.*

**[10]   [11]**   And, unlike the Court below, we find that the rule of contra proferentum has no application here. In finding that Shell had an unrestricted right to "have made" and to "sell," the Vice Chancellor stated that the provision prohibiting sublicensing must be construed against the drafter, DuPont. We disagree with that approach. First, we note that the rule of contra proferentum is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction. *Schering Corp. v. Home Ins. Co.,* 2d Cir., 712 F.2d 4 (1983); *Saturn Oil & Gas Co. v. Northern Natural Gas Co.,* 8th Cir., 359 F.2d 297 (1966); *Interpetrol Bermuda, Ltd. v. Lloyd's Underwriters,* S.D.N.Y., 588 F.Supp. 1199 (1984). Moreover, the justification for applying such rule pales in a situation, like the instant one, where the terms of an agreement resulted from a series of negotiations between experienced drafters. *Spatz v. Nascone,* W.D.Pa., 368 F.Supp. 352, 354 (1973). Where all parties to a contract are knowledgeable, there is no reason for imposing sanctions against the party who drafted the final provision.

Therefore, we conclude that the prohibition against sublicensing does limit Shell's rights to "have [methomyl] made" and to "sell [it to a third party] for use or resale."

### B

We next consider whether the toll conversion/sale-back arrangement between Shell and Carbide, in effect, amounted to a "sublicense." In our view, such arrangement did constitute a sublicense in violation of the License Agreement.

#

In this case, we are dealing with what first appears to be two independent contracts. Indeed, were each contract to be considered in a vacuum, each would constitute a permissible exercise of Shell's rights under the License Agreement to enter into contracts to 1) have methomyl made and 2) to sell such methomyl for use or resale. However, because of the manner in which the parties entered into the Toll Conversion Agreement and the Purchase and Sale Agreement, it is obvious that these Agreements cannot be considered apart from one another and must be read together as two parts of the same business transaction.

***1115**   **[12]**   The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction. Both Agreements were entered into on the same date and cover the same period of time. Shell's obligations under the Toll Conversion Agreement are contingent upon Carbide's performance under the Purchase and Sale Agreement. Thus, the minimum quantities of methomyl which Carbide must make for Shell under the Toll Conversion Agreement and which Carbide must then buy back from Shell under the Purchase and Sale Agreement are identical. Further, the two agreements work in tandem with respect to ordering, delivery and payment. Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such. *Von Lange v. Morrison-Knudsen Co.,* M.D.Pa., 460 F.Supp. 643 (1978), *aff'd,* 609 F.2d 504 (3rd Cir.1979). *See also Lowell v. Twin Disc, Inc.,* 2d Cir., 527 F.2d 767, 769-70 (1975); *Stern & Co. v. State Loan & Finance Corp.,* D.Del., 238 F.Supp. 901 (1965).

3

Given that the two Agreements in question comprise parts of the same business transaction, we now address the crucial issue: Do the two Agreements, the Toll Conversion Agreement and the Purchase and Sale Agreement, equal a sublicense? We find that they do.

**[13]**   In considering this question, we note that it is the overall effect of such Agreements, rather than their precise label, which will determine whether such an arrangement amounts to a sublicense. *Waterman v. Mackenzie,* 138 U.S. 252, 256, 11 S.Ct. 334, 335, 31 L.Ed. 923 (1891); *Lindenberg v. First Federal Savings & Loan,* 11th Cir., 691 F.2d 974, 976 (1982).

In *Carey v. United States,* Ct.Cl., 326 F.2d 975, 164 Ct.Cl. 304, (1964), the Court of Claims looked to the substance of various agreements in differentiating the exercise of "have made" rights from the grant of a sublicense. In *Carey,* the United States had an exclusive license, including a right to sublicense, for a patented process used to produce titanium.

E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co., 498 A.2d 1108 (1985)

227 U.S.P.Q. 233

The United States entered into a series of agreements that permitted certain producers to avail themselves of the patented process to manufacture titanium. The United States claimed to be exercising its rights to grant sublicenses, which entitled it to share royalties with the licensor. The licensor, however, claimed that the United States was only exercising its "have made" rights under the license, and that therefore, the licensors were entitled to all of the royalties. In resolving this dispute, the Court distinguished "have made" rights from sublicenses:

A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.

Not so under a sublicense, unless the sublicensee is producing for the original licensee. To produce for his own use or for the use of someone else, the sublicensee may do so only under a sublicense. So the test is, whether the production is by or for the use of the original licensee or for the sublicensee himself or for someone else.

*Carey v. United States,* 326 F.2d at 979-980. *See also Southwire Co. v. United States International Trade Commission,* C.C.P.A., 629 F.2d 1332, 67 C.C.P.A. 141 (1980). In *Carey,* the Court of Claims found that in making the agreements, the United States was exercising its rights to make, use and sell under the license, because all titanium production inured to its benefit as the original licensee.

[14]    Applying the rule of *Carey* to the instant case, we find that the Toll Conversion **\*1116** and Purchase and Sale Agreements did amount to a sublicense because, ultimately, Carbide was producing methomyl, not for Shell, but rather for itself. The minimum amount of methomyl which Carbide was obligated to produce under the Toll Conversion Agreement was the same minimum amount of methomyl which Carbide was obligated to buy back from Shell under the Purchase and Sale Agreement. What we have here is a situation wherein Shell is assuming the posture of a middleman solely to by-pass the prohibition against sublicensing by virtue of some neatly tailored drafting. We cannot countenance such legerdemain whereby Shell sought to free itself from the contract language by which it agreed to be bound under the License Agreement with DuPont. *See Francklyn v. Guilford Packing Co.,* 9th Cir., 695 F.2d 1158 (1983) (A sale/leaseback

arrangement cannot be used to exploit a "shop right" under a patent, which would be otherwise unassignable.)

[15]    Instead of applying the rule in *Carey,* the Court of Chancery looked to certain "indicia" of licenses, such as custody, control and title, to determine whether Carbide was a sublicensee. To be sure, these rights are relevant, but only insofar as one compares Carbide's rights under the two Agreements with Shell's rights under the License Agreement, vis-a-vis the ultimate rights of DuPont as patentee. The question of defining a license or sublicense is not a matter of measuring such an arrangement against hard and fast indicia of licenses, but rather, it is a matter of determining the relative rights of the parties.

[16]    In considering whether such Agreements constituted a sublicense, the Court of Chancery found significant the fact that the Purchase and Sale Agreement prohibited Carbide from selling methomyl in the United States. This factor does not affect the determination as to whether a particular transaction constitutes a license. In granting a license, the patentee can retain any of the rights to make, sell and use, while conveying others. *United States v. General Electric Co.,* 272 U.S. 476, 490, 47 S.Ct. 192, 197, 71 L.Ed. 362 (1926). Therefore, the fact that the arrangement with Shell gave Carbide no right to exploit methomyl, other than to use it in making Larvin, has no bearing on whether the Shell-Carbide arrangement constituted a sublicense.

[17]    [18]    [19]    Nor, contrary to what the Court below assumed, does a licensing agreement necessarily require a particular royalty limitation. The Court of Chancery, looking only at the profits from the Purchase and Sale Agreement, found that Shell would be collecting approximately a 30% royalty in contrast to license royalties which are "normally in the 5% range." While it may be true that, in practice, most licensing arrangements carry 5% royalties, the fact that the margin of profit here may have been higher does not preclude a finding that the transaction into which Shell and Carbide entered was in fact a sublicense. A license may be "for any royalty." *United States v. General Electric, supra* at 489, 47 S.Ct. at 196.

[20]    [21]    In *W.L. Gore Associates, Inc. v. Carlisle Corp.,* 3d Cir., 529 F.2d 614, 623, 624 (1976), the Third Circuit considered whether a license proposal involving a 30% royalty was unreasonable. In finding such proposal reasonable, the Court stated:

The defendant's speculation as to the plaintiff's motives in offering a license at what the defendant considered an exhorbitant price, 30% of the defendant's gross sales of the patented product, we regard as irrelevant. The general rule is that, absent any overriding unlawful conduct, "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 95 (7th Cir.1971); *Carter-Wallace, Inc. v. United* **\*1117** *States,* 449 F.2d 1374, 1383, 196 Ct.Cl. 35 (1971).

*Id.* at 622-623. Therefore, in the world of bargained-for rights, no specific royalty percentage will automatically determine that a particular transaction is, or is not, a license. What Carbide bargained for was to pay Shell for use of its license rights under the DuPont patent. That is a sublicense.

\#

In summary, we conclude that the Court of Chancery committed legal error: (1) in finding that DuPont did not sustain its burden of proving that the License Agreement prevented Shell's toll conversion/sale-back arrangement with Carbide; (2) in construing Shell's "have made" and "sell" rights as overriding the License Agreement's prohibition against sublicensing; (3) in construing the Shell-Carbide 1981 arrangements as not tantamount to the grant of a sublicense; and (4) in elevating form over substance.

REVERSED.

## Parallel Citations

227 U.S.P.Q. 233

Footnotes

1    Shell Internationale Research Maatschappij, N.V. and Shell International Chemical Company (hereinafter collectively referred to as "SIRM") constitute service companies wholly owned by the Royal Dutch-Shell Group, an international enterprise which owns the majority of outstanding stock in Shell.

2    Under a toll conversion agreement, one company receives a fee to manufacture a product for another company.

3    Therein, Chief Justice Layton stated:
     The ultimate fact in issue is domicile. This is a question of law based on facts. The so-called finding of fact is a deduction, a process of reasoning or logical inference. In such case the reviewing court is as competent to judge of the correctness of the conclusion as is the lower court. *In re Dorrance,* 309 Pa. 151, 163 A. 303. As an appeal is a review of both law and fact, it is the duty of this court, in the instant circumstances, to draw its own inferences and to reach its own conclusions.
     16 A.2d at 783.

Westlaw Next © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 56

2009 FC 991, 2009 CF 991
Federal Court

Eli Lilly & Co. v. Apotex Inc.

2009 CarswellNat 3042, 2009 CarswellNat 6607, 2009 FC 991, 2009 CF 991,
[2009] F.C.J. No. 1229, 184 A.C.W.S. (3d) 489, 351 F.T.R. 1 (Eng.), 80 C.P.R. (4th) 1

# Eli Lilly and Company and Eli Lilly Canada Inc., Plaintiffs and Apotex Inc., Defendant

Apotex Inc., Plaintiff by Counterclaim (Defendant) and Eli Lilly and Company and Eli Lilly Canada Inc., Defendants by Counterclaim (Plaintiffs) and Shionogi & Co. Ltd., Defendant by Counterclaim

Johanne Gauthier J.

Heard: April 21 - December 9, 2008
Judgment: October 1, 2009
Docket: T-1321-97

Counsel: Mr. Anthony Creber, Mr. Patrick Smith, Mr. John Norman, Mr. William Vanveen, Ms Isabel Raash, for Plaintiffs / Defendants by Counterclaim
Mr. Harry Radomski, Mr. David Scrimger, Mr. Miles Hastie, Mr. Sandon Shogliev, Mr. Ben Hackett, Ms Bell Van, for Defendant / Plaintiff by Counterclaim
Mr. Steven Garland, Mr. Timothy Stevenson, Mr. Colin Ingram, Mr. A. David Morreau, for Defendant by Counterclaim

Subject: Criminal; Intellectual Property; Civil Practice and Procedure; Torts; Public; Evidence; Corporate and Commercial

## Related Abridgment Classifications
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote
### Intellectual property --- Patents — Actions for infringement — When infringement arises — Importation

Plaintiff pharmaceutical companies, E Companies, brought action against generic, A Inc., alleging infringement of eight patents relating to antibiotic, C, four of which (S patents) were assigned to E Companies by S Ltd. — A Inc. admitted using bulk drug imported from suppliers who used information and processes from S Ltd. to produce C — It was determined that patents were infringed, and issue arose as to whether English doctrine of infringement by importation or "Saccharin doctrine" (doctrine), which concluded that importation, use or sale of products made abroad by way of patented process, constituted infringement, was binding on court — Infringement by importation or doctrine was binding on court — Concept was settled question of law in 1800's — Despite differences, courts still looked to British law to inform analysis of Canadian intellectual property laws — Between 1966 and 1991, Exchequer Court and Federal Court considered it settled that doctrine applied in Canada — In recent Supreme Court of Canada decision, chief justice articulated principles relating to interpretation of Patent Act rights, several of which were relevant to issue of infringement by importation — With respect to principle of use, question of whether defendant's activity deprived inventor in whole or in part, directly or indirectly, of full enjoyment of monopoly conferred by law which court was to ask itself, was exactly question British cases meant to answer when concluding that importation, use or sale of products made abroad by way of patented process constitute infringement — Purpose and meaning of s. 42 of Act, as described in same decision, was in line with views adopted in earlier Federal Court decision rejecting argument that doctrine was inapplicable — US approach should not be preferred as legislative changes following much of US jurisprudence on issue sought to close gaps resulting from earlier decisions — European and US patent laws might be of assistance in analyzing Canadian laws but did not displace well-

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 142 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

settled jurisprudence on issue — Court could not and should not redefine and limit test — Had suppliers' process been carried out in Canada, it would have infringed S patents — Although there were other steps after obtaining compound prepared from patented process to make C, experts agreed there was no known method to make C without going through patented process, patented process was not trivial or unessential part of process, and S Ltd. and E Companies' processes were more efficient and cheaper than alternatives.

**Equity --- Equitable doctrines — Equitable set-off**

Plaintiff first person pharmaceutical companies, E Co. and E (Canada) Inc. (E Companies), brought action against generic pharmaceutical company, A Inc., alleging infringement of eight patents relating to antibiotic, C, four of which (S patents) had been assigned to E Companies by S Ltd. — A Inc. counterclaimed, alleging that assignment of S patents violated Competitions Act (Act) — E companies claimed damages, including equitable set-off — Issue arose as to whether, as contended by A Inc., E Companies' allegedly anticompetitive acts disentitled them to equitable or other relief — E Companies were not disentitled to equitable or other relief — Although A Inc.'s defence in main action included allegation with respect to disentitlement, there was no allegation with respect to equitable set-off and A Inc. presented no evidence in main action to establish defence under s. 45 of Act and had no agreement with E Companies that evidence filed in counterclaim would be entered by consent in main action — Even if evidence could be import between action and counterclaim, A Inc.'s counterclaim was without merit as it was timebarred and as A Inc. failed to prove loss from alleged anticompetitive conduct — If A Inc.'s competition claim could not stand in context of counterclaim, claim could not stand as defence to E Companies' claim in main action.

**Equity --- Equitable doctrines — Election**

Plaintiff first person pharmaceutical companies, E Co. and E (Canada) Inc. (E Companies), brought action against generic pharmaceutical company, A Inc., alleging infringement of eight patents relating to antibiotic, C, four of which (S patents) had been assigned to E Companies by S Ltd. — A Inc. counterclaimed, alleging that assignment of S patents violated Competitions Act (Act) — E companies requested election between damages or accounting — Issue arose as to whether, as A Inc. submitted, E Companies should be refused opportunity to elect between remedies — E Companies were permitted to elect between remedies — There was no good reason to limit E Companies' damages to reasonable royalty — Proper exercise of court's discretion was to afford E Companies right to elect between accounting of profits and damages — Alleged anti-competitive conduct was not valid basis for denying right to elect — Eleven-year delay in getting to trial was not excessive delay in circumstances — Requisite elements of misbehaviour in conduct of action to deny remedy sought could not be found — Any delay in getting present action to trial was somewhat irrelevant for purposes of accounting for profits as no infringing occurred after July 2000 when last of patents at issue expired — A Inc. knew or ought to have known as early as 1993 that E Companies would enforce their patent rights as that was when E Companies and S Ltd. opposed issuance of NOC for A Inc.'s generic C — Finally, court could not endorse A Inc.'s assertion that it had right to infringe at lowest possible cost.

**Intellectual property --- Patents — Actions for infringement — Practice and procedure — Parties and standing — Licensee's standing**

**Intellectual property --- Patents — Application for patent — Sufficiency of specification — Claims — Construction**

**Intellectual property --- Patents — Actions for infringement — Practice and procedure — Evidence — Admissibility**

**Intellectual property --- Patents — Actions for infringement — Practice and procedure — Discovery — General principles**

**Torts --- Spoliation**

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

**Intellectual property --- Patents — Actions for infringement — Practice and procedure — Evidence — Burden of proof**

**Administrative law --- General principles — Miscellaneous**

Applicability of judicial review principles to patent invalidity analysis.

**Intellectual property --- Patents — Actions for infringement — Defences — Invalidity of patent — Prior publication**

**Intellectual property --- Patents — Actions for infringement — Defences — Invalidity of patent — Obviousness**

**Intellectual property --- Patents — Actions for infringement — Defences — Invalidity of patent — General principles**

**Intellectual property --- Patents — Actions for infringement — Remedies — Accounting**

**Intellectual property --- Patents — Actions for infringement — Remedies — Damages**

**Civil practice and procedure --- Judgments and orders — Interest on judgments — Prejudgment interest — Rate of**

**Civil practice and procedure --- Costs — Particular orders as to costs — Costs on solicitor and client basis — Grounds for awarding — Misconduct**

**Civil practice and procedure --- Costs — Particular orders as to costs — Costs against solicitor personally — Misconduct of solicitor**

**Evidence --- Admissibility — Procedure — Presentation of evidence**

**Evidence --- Opinion — Experts — Weight of evidence — Miscellaneous**

**Commercial law --- Trade and commerce — Competition and combines legislation — Competition offences and reviewable practices — Conspiracy — Limiting competition unduly**

**Commercial law --- Trade and commerce — Competition and combines legislation — Competition offences and reviewable practices — General principles**

Limitation period.

**Intellectual property --- Patents — Transfer of interest — Assignment**

**Remedies --- Damages — Practice — Evidence — Burden of proof**

## Table of Authorities

**Cases considered by *Johanne Gauthier J.*:**

*Abbott Laboratories v. Canada (Minister of Health)* (2006), 2006 CarswellNat 2914, 2006 CAF 187, 56 C.P.R. (4th) 387, 350 N.R. 242, 2006 CarswellNat 1384, 2006 FCA 187 (F.C.A.) — considered

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 144 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Abbott Laboratories v. Canada (Minister of Health)* (2008), 2008 CF 1359, 71 C.P.R. (4th) 237, 2008 CarswellNat 5397, 337 F.T.R. 17 (Eng.), 2008 FC 1359, 2008 CarswellNat 4573 (F.C.) — considered

*Alberta (Minister of Public Works, Supply & Services) v. Nilsson* (2002), 2002 CarswellAlta 1491, 2002 ABCA 283, 14 C.C.L.T. (3d) 163, 320 A.R. 88, 288 W.A.C. 88, 8 Alta. L.R. (4th) 83, 220 D.L.R. (4th) 474, 77 L.C.R. 241, [2003] 2 W.W.R. 215, 5 R.P.R. (4th) 159 (Alta. C.A.) — considered

*AlliedSignal Inc. v. DuPont Canada Inc.* (1995), 1995 CarswellNat 699, 61 C.P.R. (3d) 417, *(sub nom. Allied Signal Inc. v. Du Pont Canada Inc.)* 184 N.R. 113, *(sub nom. Allied Signal Inc. v. Du Pont Canada Inc.)* 95 F.T.R. 320 (note) (Fed. C.A.) — considered

*AlliedSignal Inc. v. DuPont Canada Inc.* (1998), 142 F.T.R. 241, 78 C.P.R. (3d) 129, 1998 CarswellNat 271 (Fed. T.D.) — referred to

*American Cyanamid Co. v. Charles E. Frosst & Co.* (1965), [1965] 2 Ex. C.R. 355, 29 Fox Pat. C. 153, 47 C.P.R. 215, 1965 CarswellNat 11 (Can. Ex. Ct.) — considered

*Apotex Inc. v. Eli Lilly & Co.* (2004), *(sub nom. Eli Lilly & Co. v. Apotex Inc.)* 32 C.P.R. (4th) 195, 323 N.R. 180, 240 D.L.R. (4th) 679, 2004 CarswellNat 1831, 2004 FCA 232, 2004 CarswellNat 3477, 2004 CAF 232 (F.C.A.) — referred to

*Apotex Inc. v. Wellcome Foundation Ltd.* (1995), 1995 CarswellNat 119, 100 F.T.R. 320 (note), 60 C.P.R. (3d) 135, 187 N.R. 284 (Fed. C.A.) — referred to

*Apotex Inc. v. Wellcome Foundation Ltd.* (2000), 2000 CarswellNat 2643, 195 D.L.R. (4th) 641, [2001] 1 F.C. 495, 2000 CarswellNat 3414, 10 C.P.R. (4th) 65, 186 F.T.R. 274 (note), 262 N.R. 137 (Fed. C.A.) — considered

*Apotex Inc. v. Wellcome Foundation Ltd.* (2002), 2002 CarswellNat 3436, 2002 CarswellNat 3437, 2002 SCC 77, 219 D.L.R. (4th) 660, 21 C.P.R. (4th) 499, 296 N.R. 130, [2002] 4 S.C.R. 153, 235 F.T.R. 204 (note) (S.C.C.) — followed

*Athey v. Leonati* (1996), [1997] 1 W.W.R. 97, 140 D.L.R. (4th) 235, 81 B.C.A.C. 243, 132 W.A.C. 243, 203 N.R. 36, [1996] 3 S.C.R. 458, 31 C.C.L.T. (2d) 113, 1996 CarswellBC 2295, 1996 CarswellBC 2296 (S.C.C.) — considered

*Auer Incandescent Light Manufacturing Co. v. O'Brien* (1897), 5 Ex. C.R. 243, 1897 CarswellNat 1 (Can. Ex. Ct.) — considered

*Badische Anilin und Soda Fabrik v. Basle Chemical Works, Bindschedler* (1897), [1897] 2 Ch. 322, 14 R.P.C. 405 (Eng. C.A.) — referred to

*Badische Anilin und Soda Fabrik v. Hickson* (1905), [1905] 2 Ch. 495 (Eng. C.A.) — referred to

*Bank of America Canada v. Mutual Trust Co.* (2002), 287 N.R. 171, 211 D.L.R. (4th) 385, 49 R.P.R. (3d) 1, 159 O.A.C. 1, 2002 SCC 43, 2002 CarswellOnt 1114, 2002 CarswellOnt 1115, [2002] 2 S.C.R. 601 (S.C.C.) — considered

*Barker v. Montfort Hospital* (2007), 2007 CarswellOnt 2202, 2007 ONCA 282, 278 D.L.R. (4th) 215, 223 O.A.C. 201 (Ont. C.A.) — referred to

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 145 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Bayer AG v. Apotex Inc.* (2001), [2001] O.T.C. 2, 2001 CarswellOnt 24, *(sub nom. Bayer Aktiengesellschaft v. Apotex Inc.)* 10 C.P.R. (4th) 151 (Ont. S.C.J.) — referred to

*Bayer AG v. Apotex Inc.* (2002), 2002 CarswellOnt 127, *(sub nom. Bayer Aktiengesellschaft v. Apotex Inc.)* 155 O.A.C. 117, *(sub nom. Bayer Aktiengesellschaft v. Apotex Inc.)* 16 C.P.R. (4th) 417 (Ont. C.A.) — considered

*Beecham Group Ltd. v. Bristol Laboratories Ltd.* (1967), [1967] R.P.C. 406, [1967] F.S.R. 283 (Eng. C.A.) — considered

*Beloit Canada Ltée/Ltd. v. Valmet Oy* (1986), 1986 CarswellNat 588, *(sub nom. Beloit Can. Ltée/Ltd. v. Oy)* 64 N.R. 287, 7 C.I.P.R. 205, 8 C.P.R. (3d) 289 (Fed. C.A.) — considered

*Bowes v. Edmonton (City)* (2007), 2007 CarswellAlta 1851, 2007 ABCA 347, 42 M.P.L.R. (4th) 192, 425 A.R. 123, 54 C.C.L.T. (3d) 189, [2008] 5 W.W.R. 70, 86 Alta. L.R. (4th) 47, 418 W.A.C. 123 (Alta. C.A.) — referred to

*Brown v. Duchesne* (1856), 60 U.S. 183, 15 L.Ed. 595, 19 How. 183 (U.S.S.C.) — referred to

*C. (R.) v. McDougall* (2008), [2008] 11 W.W.R. 414, 83 B.C.L.R. (4th) 1, *(sub nom. F.H. v. McDougall)* [2008] 3 S.C.R. 41, 2008 CarswellBC 2041, 2008 CarswellBC 2042, 2008 SCC 53, 60 C.C.L.T. (3d) 1, *(sub nom. H. (F.) v. McDougall)* 297 D.L.R. (4th) 193, 61 C.P.C. (6th) 1, 61 C.R. (6th) 1, *(sub nom. F.H. v. McDougall)* 380 N.R. 82, *(sub nom. F.H. v. McDougall)* 439 W.A.C. 74, *(sub nom. F.H. v. McDougall)* 260 B.C.A.C. 74 (S.C.C.) — considered

*Cam-Net Communications v. Vancouver Telephone Co.* (1999), 1999 BCCA 751, 1999 CarswellBC 2808, 17 C.B.R. (4th) 26, 182 D.L.R. (4th) 436, 71 B.C.L.R. (3d) 226, 132 B.C.A.C. 52, 215 W.A.C. 52, 2 B.L.R. (3d) 118 (B.C. C.A.) — referred to

*Canada v. Pharmaceutical Society (Nova Scotia)* (1992), 15 C.R. (4th) 1, *(sub nom. R. v. Nova Scotia Pharmaceutical Society)* 93 D.L.R. (4th) 36, *(sub nom. R. v. Nova Scotia Pharmaceutical Society)* [1992] 2 S.C.R. 606, *(sub nom. R. v. Nova Scotia Pharmaceutical Society)* 43 C.P.R. (3d) 1, *(sub nom. R. v. Nova Scotia Pharmaceutical Society)* 74 C.C.C. (3d) 289, *(sub nom. R. v. Nova Scotia Pharmaceutical Society)* 10 C.R.R. (2d) 34, *(sub nom. R. v. Nova Scotia Pharmaceutical Society (No. 2))* 139 N.R. 241, *(sub nom. R. v. Nova Scotia Pharmaceutical Society (No. 2))* 114 N.S.R. (2d) 91, 1992 CarswellNS 15, 313 A.P.R. 91, 1992 CarswellNS 353 (S.C.C.) — considered

*Canada (Commissioner of Patents) v. Ciba Ltd.* (1959), [1959] S.C.R. 378, 19 Fox Pat. C. 18, 30 C.P.R. 135, 18 D.L.R. (2d) 375, 1959 CarswellOnt 41 (S.C.C.) — considered

*Cassell & Co. v. Broome* (1972), [1972] A.C. 1027, [1972] 2 W.L.R. 645, 116 Sol. Jo. 199, [1972] 1 All E.R. 801 (U.K. H.L.) — considered

*Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.* (1978), 39 C.P.R. (2d) 191, 1978 CarswellNat 693 (Fed. T.D.) — considered

*Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.* (1981), [1981] 1 S.C.R. 504, 56 C.P.R. (2d) 145, 35 N.R. 390, 122 D.L.R. (3d) 203, 1981 CarswellNat 582F, 1981 CarswellNat 582 (S.C.C.) — distinguished

*D.M.I. Inc. v. Deere & Co.* (1985), 755 F.2d 1570, 225 U.S.P.Q. 236 (U.S. Fed. Cir.) — considered

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 146 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Deepsouth Packing Co. v. Laitram Corp.* (1972), 32 L.Ed.2d 273, 92 S.Ct. 1700, 406 U.S. 518, 173 U.S.P.Q. 769 (U.S. La.) — referred to

*Dow Chemical Co. v. Canada (Attorney General)* (2007), 2007 CarswellNat 4985, 2007 CF 1236, 2007 CarswellNat 4137, 2007 FC 1236, 63 C.P.R. (4th) 89 (F.C.) — referred to

*Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.* (1915), 35 S.Ct. 221, 235 U.S. 641, 59 L.Ed. 398 (U.S.S.C.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (1995), 1995 CarswellNat 158, 63 C.P.R. (3d) 245, 101 F.T.R. 33 (Fed. T.D.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (1996), 199 N.R. 4, 112 F.T.R. 239 (note), 68 C.P.R. (3d) 126, 1996 CarswellNat 665 (Fed. C.A.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (2000), 2000 CarswellNat 1709, 8 C.P.R. (4th) 413 (Fed. T.D.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (2001), 2001 FCA 141, 12 C.P.R. (4th) 127, 2001 CarswellNat 924 (Fed. C.A.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (2003), 2003 FC 978, 2003 CarswellNat 2496, 2003 CarswellNat 4038, 238 F.T.R. 261, [2004] 1 F.C.R. 360, 2003 CF 978, 28 C.P.R. (4th) 509 (F.C.) — considered

*Eli Lilly & Co. v. Apotex Inc.* (2003), 2003 CarswellNat 3133, 2003 FC 1171, 2003 CF 1171, 28 C.P.R. (4th) 37, 2003 CarswellNat 4932 (F.C.) — referred to

*Eli Lilly & Co. v. Apotex Inc.* (2004), 2004 CF 1445, 2004 CarswellNat 5255, 262 F.T.R. 154, 2004 FC 1445, 2004 CarswellNat 3733, 35 C.P.R. (4th) 155, [2005] 2 F.C.R. 225 (F.C.) — referred to

*Elmslie v. Boursier* (1869), L.R. 9 Eq. 217 (Eng. Ch. Div.) — referred to

*Farbwerke Hoechst A.G. vormals Meister Lucius & Bruning v. Canada (Commissioner of Patents)* (1963), [1964] S.C.R. 49, 25 Fox Pat. C. 99, 41 C.P.R. 9, 1963 CarswellNat 51 (S.C.C.) — considered

*Farbwerke Hoechst A.G. Vormals Meister Lucius & Bruning v. Halocarbon (Ontario) Ltd.* (1974), *(sub nom. Halocarbon (Ont.) Ltd. v. Farbwerke Hoechst AG)* [1974] 2 F.C. 266, 1974 CarswellNat 92, 1974 CarswellNat 92F, *(sub nom. Halocarbon (Ont.) Ltd. v. Farbwerke Hoechst AG)* 15 C.P.R. (2d) 105 (Fed. T.D.) — considered

*Farbwerke Hoechst A.G. Vormals Meister Lucius & Bruning v. Halocarbon (Ontario) Ltd.* (1976), 1976 CarswellNat 37, *(sub nom. Halocarbon (Ont.) Ltd. v. Farbwerke Hoechst AG)* [1976] 2 F.C. 468, 1976 CarswellNat 37F, *(sub nom. Halocarbon (Ont.) Ltd. v. Farbwerke Hoechst AG)* 13 N.R. 330, *(sub nom. Halocarbon (Ont.) Ltd. v. Farbwerke Hoechst AG)* 28 C.P.R. (2d) 63 (Fed. C.A.) — referred to

*Farbwerke Hoechst A.G. Vormals Meister Lucius & Bruning v. Halocarbon (Ontario) Ltd.* (1979), 1979 CarswellNat 636, 104 D.L.R. (3d) 51, [1979] 2 S.C.R. 929, 1979 CarswellNat 636F, 27 N.R. 582, 42 C.P.R. (2d) 145 (S.C.C.) — considered

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 147 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Federal Commerce & Navigation Co. v. Molena Alpha Inc.* (1978), [1978] Q.B. 927, [1978] 3 All E.R. 1066, [1978] 3 W.L.R. 309, [1978] 2 Lloyd's Rep. 132 (Eng. Q.B.) — considered

*Federal Commerce & Navigation Co. v. Molena Alpha Inc.* (1978), [1979] A.C. 757, [1979] 1 All E.R. 307, [1979] 1 Lloyd's Rep. 201 (U.K. H.L.) — referred to

*Free World Trust c. Électro Santé Inc.* (2000), [2000] 2 S.C.R. 1024, *(sub nom. Free World Trust v. Électro Santé Inc.)* 9 C.P.R. (4th) 168, 2000 SCC 66, 2000 CarswellQue 2728, 2000 CarswellQue 2731, *(sub nom. Free World Trust v. Électro Santé Inc.)* 194 D.L.R. (4th) 232, *(sub nom. Free World Trust v. Électro Santé Inc.)* 263 N.R. 150 (S.C.C.) — followed

*Genencor International Inc. v. Canada (Commissioner of Patents)* (2008), 2008 CarswellNat 2892, 66 C.P.R. (4th) 181, 2008 CF 608, 329 F.T.R. 109 (Eng.), [2009] 1 F.C.R. 361, 2008 FC 608, 2008 CarswellNat 1423 (F.C.) — referred to

*General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.* (1972), [1972] R.P.C. 457, [1971] F.S.R. 417 (U.K. H.L.) — considered

*Generics (UK) Ltd. v. Daiichi Paharmaceutical Ltd.* (2009), 109 B.M.L.R. 78 (Eng. C.A.) — considered

*Generics (UK) Ltd. v. H. Lundbeck A/S* (2008), [2008] R.P.C. 19, 101 B.M.L.R. 52 (Eng. C.A.) — referred to

*Gosselin c. Canada (Procureur général)* (2006), *(sub nom. Gosselin v. Canada (Attorney General))* 289 F.T.R. 7, 2006 CF 3, 2006 CarswellNat 33, 2006 FC 3, 2006 CarswellNat 4049 (F.C.) — referred to

*Halford v. Seed Hawk Inc.* (2004), 2004 FC 88, 246 F.T.R. 1, 2004 CarswellNat 342, 31 C.P.R. (4th) 434 (F.C.) — considered

*Halford v. Seed Hawk Inc.* (2006), 353 N.R. 60, 54 C.P.R. (4th) 130, 275 D.L.R. (4th) 556, 2006 FCA 275, 2006 CarswellNat 2397, 2006 CAF 275, 2006 CarswellNat 4150 (F.C.A.) — referred to

*Hanke v. Resurfice Corp.* (2007), 69 Alta. L.R. (4th) 1, 404 A.R. 333, 394 W.A.C. 333, 2007 CarswellAlta 130, 2007 CarswellAlta 131, 2007 SCC 7, [2007] 4 W.W.R. 1, 45 C.C.L.T. (3d) 1, 278 D.L.R. (4th) 643, [2007] R.R.A. 1, 357 N.R. 175, [2007] 1 S.C.R. 333 (S.C.C.) — considered

*Harvard College v. Canada (Commissioner of Patents)* (2000), 189 D.L.R. (4th) 385, 223 F.T.R. 320 (note), 7 C.P.R. (4th) 1, 290 N.R. 320, 2000 CarswellNat 3934, 2000 CarswellNat 1575, *(sub nom. President & Fellows of Harvard College v. Canada (Commissioner of Patents))* [2000] 4 F.C. 528 (Fed. C.A.) — considered

*Harvard College v. Canada (Commissioner of Patents)* (2002), 2002 CarswellNat 3434, 2002 CarswellNat 3435, 2002 SCC 76, 219 D.L.R. (4th) 577, 21 C.P.R. (4th) 417, 296 N.R. 1, [2002] 4 S.C.R. 45, 235 F.T.R. 214 (note) (S.C.C.) — considered

*Henriksens Rederi A/S v. Rolimpex* (1973), [1974] Q.B. 233, [1973] 2 Lloyd's Rep. 333, [1973] 3 All E.R. 589 (Eng. C.A.) — referred to

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 148 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Hill v. Church of Scientology of Toronto* (1995), 25 C.C.L.T. (2d) 89, 184 N.R. 1, *(sub nom. Manning v. Hill)* 126 D.L.R. (4th) 129, 24 O.R. (3d) 865 (note), 84 O.A.C. 1, [1995] 2 S.C.R. 1130, 1995 CarswellOnt 396, 1995 CarswellOnt 534, *(sub nom. Hill v. Church of Scientology)* 30 C.R.R. (2d) 189, 1995 SCC 67 (S.C.C.) — referred to

*Hoffmann-La Roche Ltd. v. Apotex Inc.* (1983), 71 C.P.R. (2d) 20, 145 D.L.R. (3d) 270, 41 O.R. (2d) 84, 1983 CarswellOnt 871 (Ont. H.C.) — considered

*Hoffmann-La Roche Ltd. v. Apotex Inc.* (1984), 1 C.P.R. (3d) 507, 1984 CarswellOnt 1197, 47 O.R. (2d) 287 (Ont. C.A.) — referred to

*Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)* (1955), [1955] S.C.R. 414, 23 C.P.R. 1, 15 Fox Pat. C. 99, 1955 CarswellNat 1 (S.C.C.) — considered

*Hoffmann-La Roche Ltd. v. Mayne Pharma (Canada) Inc.* (2005), 2005 CF 814, 2005 CarswellNat 5176, 2005 CarswellNat 1941, 2005 FC 814, 41 C.P.R. (4th) 505 (F.C.) — considered

*J.M. Voith GmbH v. Beloit Corp.* (1997), *(sub nom. Voith (J.M.) GmbH v. Beloit Corp.)* 214 N.R. 85, *(sub nom. Voith (J.M.) GmbH v. Beloit Corp.)* 129 F.T.R. 319 (note), *(sub nom. Beloit Canada Ltd. v. Valmet-Dominion Inc.)* [1997] 3 F.C. 497, 1997 CarswellNat 719, *(sub nom. Beloit Canada Ltd. v. Valmet-Dominion Inc.)* 73 C.P.R. (3d) 321, 1997 CarswellNat 2712 (Fed. C.A.) — referred to

*Janssen-Ortho Inc. v. Novopharm Ltd.* (2006), 57 C.P.R. (4th) 58, 301 F.T.R. 166 (Eng.), 2006 FC 1234, 2006 CarswellNat 3249, 2006 CF 1234, 2006 CarswellNat 4811 (F.C.) — referred to

*Janssen-Ortho Inc. v. Novopharm Ltd.* (2007), 2007 FCA 217, 2007 CarswellNat 1556, 59 C.P.R. (4th) 116, 2007 CAF 217, 2007 CarswellNat 3072, 366 N.R. 290 (F.C.A.) — considered

*Jay-Lor International Inc. v. Penta Farm Systems Ltd.* (2007), 59 C.P.R. (4th) 228, 2007 CF 358, 2007 FC 358, 2007 CarswellNat 1218, *(sub nom. JAY-LOR International Inc. v. Penta Farm Systems Ltd.)* 313 F.T.R. 1 (Eng.), 2007 CarswellNat 6121 (F.C.) — considered

*Koch Marine Inc. v. d'Amica Societa di Navigazione arl (The "Elena d'Amico")* (1979), [1980] 1 Lloyd's Rep. 75 (Eng. Q.B.) — considered

*Laboratoires Servier v. Apotex Inc.* (2008), 2008 CarswellNat 3000, 2008 FC 825, 332 F.T.R. 193 (Eng.), 2008 CarswellNat 5245, 67 C.P.R. (4th) 241, 2008 CF 825 (F.C.) — considered

*Laboratoires Servier v. Apotex Inc.* (October 9, 2008), Norris J. (Eng. Ch. Div.) — referred to

*Laboratoires Servier v. Apotex Inc.* (2009), 2009 CarswellNat 1922, 2009 FCA 222, 75 C.P.R. (4th) 443 (F.C.A.) — considered

*Leesona Corp. v. Giltex Hosiery Ltd.* (1971), 2 C.P.R. (2d) 211, 1971 CarswellNat 436 (Fed. T.D.) — considered

*Lilly ICOS Ltd. v. Pfizer Ltd. (No. 1)* (2000), 59 B.M.L.R. 123, [2001] F.S.R. 16 (Eng. Ch. Div.) — considered

*Lubrizol Corp. v. Imperial Oil Ltd.* (1996), 1996 CarswellNat 2572, 67 C.P.R. (3d) 1, 112 F.T.R. 264 (note), [1996] 3 F.C. 40, 197 N.R. 241, 1996 CarswellNat 651 (Fed. C.A.) — considered

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 149 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*M.K. Plastics Corp. v. Plasticair Inc.* (2007), 2007 CarswellNat 4507, 2007 CF 574, 61 C.P.R. (4th) 1, 2007 CarswellNat 1451, 2007 FC 574, 313 F.T.R. 208 (Eng.) (F.C.) — referred to

*Mahurkar v. Vas-Cath of Canada Ltd.* (1988), 16 F.T.R. 48, 1988 CarswellNat 204, 18 C.P.R. (3d) 417 (Fed. T.D.) — considered

*McDougall v. Black & Decker Canada Inc.* (2008), 2008 CarswellAlta 1686, 61 C.C.L.T. (3d) 96, 97 Alta. L.R. (4th) 199, [2009] 1 W.W.R. 257, 2008 ABCA 353, 438 W.A.C. 235, 440 A.R. 253, 62 C.P.C. (6th) 293, 302 D.L.R. (4th) 661 (Alta. C.A.) — considered

*Merck & Co. v. Apotex Inc.* (2006), 2006 CarswellNat 1119, 2006 FC 524, 53 C.P.R. (4th) 1, 282 F.T.R. 161 (Eng.), 2006 CarswellNat 3801, 2006 CF 524 (F.C.) — referred to

*Merck & Co. v. Apotex Inc.* (2006), [2007] 3 F.C.R. 588, 2006 FCA 323, 2006 CarswellNat 3206, 55 C.P.R. (4th) 1, 2006 CarswellNat 5302, 2006 CAF 323, 354 N.R. 51, 276 D.L.R. (4th) 686 (F.C.A.) — considered

*Merrell Dow Pharmaceuticals v. H.N. Norton & Co.* (1995), [1996] R.P.C. 76, [1996] UKHL 14, 33 B.M.L.R. 201 (U.K. H.L.) — considered

*Micro Chemicals Ltd. v. Rhone-Poulenc S.A. (No. 1)* (1964), [1964] Ex. C.R. 819, 1964 CarswellNat 1, 25 Fox Pat. C. 134, 44 C.P.R. 193 (Can. Ex. Ct.) — considered

*Microsoft Corp. v. AT&T Corp.* (2007), 127 S.Ct. 1746, 550 U.S. 437, 167 L.Ed.2d 737, 75 U.S.L.W. 4307, 82 U.S.P.Q.2d 1400, 20 Fla. L. Weekly 232, 33 A.L.R.2d 745 (U.S.S.C.) — referred to

*Monsanto Canada Inc. v. Rivett* (2009), 2009 FC 317, 2009 CarswellNat 844 (F.C.) — considered

*Morriss v. British Columbia* (2007), 2007 CarswellBC 1370, 2007 BCCA 337, 92 L.C.R. 222, 246 B.C.A.C. 26, 406 W.A.C. 26, 281 D.L.R. (4th) 702, [2007] 10 W.W.R. 577, 69 B.C.L.R. (4th) 1 (B.C. C.A.) — considered

*National Justice Compania Naviera SA v. Prudential Assurance Co.* (1993), [1993] F.S.R. 563, *(sub nom. "Ikarian Reefer" (The))* [1993] 2 Lloyd's Rep. 68 (Eng. Q.B.) — considered

*New Brunswick (Board of Management) v. Dunsmuir* (2008), 372 N.R. 1, 69 Admin. L.R. (4th) 1, 69 Imm. L.R. (3d) 1, *(sub nom. Dunsmuir v. New Brunswick)* [2008] 1 S.C.R. 190, 844 A.P.R. 1, *(sub nom. Dunsmuir v. New Brunswick)* 2008 C.L.L.C. 220-020, D.T.E. 2008T-223, 329 N.B.R. (2d) 1, *(sub nom. Dunsmuir v. New Brunswick)* 170 L.A.C. (4th) 1, *(sub nom. Dunsmuir v. New Brunswick)* 291 D.L.R. (4th) 577, 2008 CarswellNB 124, 2008 CarswellNB 125, 2008 SCC 9, 64 C.C.E.L. (3d) 1, *(sub nom. Dunsmuir v. New Brunswick)* 95 L.C.R. 65 (S.C.C.) — considered

*No. 1 Collision Repair & Painting (1982) Ltd. v. Insurance Corp. of British Columbia* (1998), 1998 CarswellBC 524, 4 C.C.L.I. (3d) 135 (B.C. S.C.) — considered

*No. 1 Collision Repair & Painting (1982) Ltd. v. Insurance Corp. of British Columbia* (2000), 80 B.C.L.R. (3d) 62, 1 C.C.L.T. (3d) 1, 21 C.C.L.I. (3d) 1, 2000 CarswellBC 1641, 2000 BCCA 463, 141 B.C.A.C. 1, 231 W.A.C. 1 (B.C. C.A.) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 150 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Old Mac's Pty. Ltd. v. Cavallo Horse & Rider Inc.* (2007), 2007 BCSC 726, 2007 CarswellBC 1146 (B.C. S.C.) — referred to

*Pason Systems Corp. v. Canada (Commissioner of Patents)* (2006), 2006 FC 753, 2006 CarswellNat 1656, 54 C.P.R. (4th) 40, 295 F.T.R. 1 (Eng.), 2006 CarswellNat 3810, 2006 CF 753, [2007] 2 F.C.R. 269 (F.C.) — referred to

*Pfizer Canada Inc. v. Apotex Inc.* (2004), 2003 FC 1428, 2004 CarswellNat 109, 245 F.T.R. 243, 2003 CF 1428, 2004 CarswellNat 3539, 31 C.P.R. (4th) 214 (F.C.) — considered

*Pfizer Canada Inc. v. Apotex Inc.* (2005), 43 C.P.R. (4th) 81, 282 F.T.R. 8 (Eng.), 2005 CarswellNat 3288, 2005 FC 1421 (F.C.) — referred to

*Pfizer Canada Inc. v. Apotex Inc.* (2009), *(sub nom. Apotex Inc. v. Pfizer Canada Inc.)* 72 C.P.R. (4th) 141, 2009 CAF 8, 2009 CarswellNat 1151, 2009 FCA 8, 2009 CarswellNat 176, 385 N.R. 148 (F.C.A.) — referred to

*Pfizer Canada Inc. v. Canada (Minister of Health)* (2005), 2005 FC 1725, 2005 CarswellNat 4401, 46 C.P.R. (4th) 244, 285 F.T.R. 1 (Eng.) (F.C.) — followed

*Pfizer Canada Inc. v. Canada (Minister of Health)* (2007), 2007 FC 898, 2007 CarswellNat 3241, 2007 CF 898, 61 C.P.R. (4th) 137, 2007 CarswellNat 5003, 328 F.T.R. 41 (Eng.) (F.C.) — considered

*Pierce v. Canada Trustco Mortgage Co.* (2005), 2005 CarswellOnt 1876, 5 B.L.R. (4th) 178, 254 D.L.R. (4th) 79, *(sub nom. Canada Trustco Mortgage Co. v. Pierce)* 197 O.A.C. 369 (Ont. C.A.) — referred to

*Pozzoli SpA v. BDMO SA* (2007), [2007] F.S.R. 37 (Eng. C.A.) — considered

*Procter & Gamble Co. v. Kimberly-Clark of Canada Ltd.* (1990), 29 C.P.R. (3d) 545, 1990 CarswellNat 1104 (Fed. C.A.) — considered

*R. v. Aetna Insurance Co.* (1977), [1978] 1 S.C.R. 731, 20 N.S.R. (2d) 565, 15 N.R. 117, 34 C.C.C. (2d) 157, 75 D.L.R. (3d) 332, 30 C.P.R. (2d) 193, 1977 CarswellNS 54, 1977 CarswellNS 54F (S.C.C.) — considered

*R. v. Container Materials Ltd.* (1942), [1942] S.C.R. 147, 77 C.C.C. 129, [1942] 1 D.L.R. 529, 1942 CarswellOnt 107 (S.C.C.) — considered

*R. v. M. (R.E.)* (2008), [2008] 11 W.W.R. 383, 83 B.C.L.R. (4th) 44, [2008] 3 S.C.R. 3, 2008 CarswellBC 2037, 2008 CarswellBC 2038, 2008 SCC 51, 235 C.C.C. (3d) 290, 60 C.R. (6th) 1, 297 D.L.R. (4th) 577, 380 N.R. 47, 439 W.A.C. 40, 260 B.C.A.C. 40 (S.C.C.) — followed

*R. v. Mohan* (1994), 18 O.R. (3d) 160 (note), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 1994 CarswellOnt 1155, 1994 CarswellOnt 66 (S.C.C.) — followed

*R. v. Northern Electric Co.* (1955), [1955] O.R. 431, 111 C.C.C. 241, [1955] 3 D.L.R. 449, 1955 CarswellOnt 16, [1955] O.W.N. 499, 21 C.R. 45, 24 C.P.R. 1 (Ont. H.C.) — considered

*Riello Canada Inc. v. Lambert* (1986), 1986 CarswellNat 611, 3 F.T.R. 23, 9 C.P.R. (3d) 324, 8 C.I.P.R. 286 (Fed. T.D.) — referred to

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 151 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Saccharin Corp. v. Anglo-Continental Chemical Works Ltd.* (1900), [1901] 1 Ch. 414, 17 R.P.C. 307 (Eng. Ch. Div.)
— considered

*Saccharin Corp. v. Reitmeyer* (1900), [1900] 2 Ch. 659, 17 R.P.C. 606 (Eng. Ch. Div.) — considered

*Sands Motor Hotel Ltd. v. Edmonton (City)* (2005), 2005 ABCA 402, 2005 CarswellAlta 1725, 376 A.R. 365, 360
W.A.C. 365, 88 L.C.R. 206, 26 M.P.L.R. (4th) 23 (Alta. C.A.) — referred to

*Sanofi-Aventis Canada Inc. v. Apotex Inc.* (2008), 379 N.R. 383, 2008 CAF 175, 2008 FCA 175, 2008 CarswellNat
1396, 66 C.P.R. (4th) 6, 2008 CarswellNat 3501 (F.C.A.) — referred to

*Sanofi-Aventis Canada Inc. v. Apotex Inc.* (2009), 2009 CarswellNat 2579, 2009 FC 676 (F.C.) — considered

*Sanofi-Synthelabo Canada Inc. v. Apotex Inc.* (2008), 2008 SCC 61, 2008 CarswellNat 3844, 2008 CarswellNat 3845,
[2008] 3 S.C.R. 265, [2009] F.S.R. 7, 69 C.P.R. (4th) 251, 381 N.R. 125, 298 D.L.R. (4th) 385 (S.C.C.) — followed

*Saskatchewan Wheat Pool v. Feduk* (2003), [2004] 2 W.W.R. 69, 2003 SKCA 46, 2003 CarswellSask 369, 232 Sask.
R. 161, 294 W.A.C. 161 (Sask. C.A.) — considered

*Schwarzkopf v. McLaughlin* (2008), 2008 BCSC 730, 2008 CarswellBC 1185 (B.C. S.C.) — referred to

*Scinopharm Taiwan Ltd. v. Eli Lilly & Co.* (March 27, 2009), Kitchin J. (Eng. Patents Ct.) — considered

*Scott Paper Co. v. Minnesota Mining & Manufacturing Co.* (1981), 53 C.P.R. (2d) 26, 1981 CarswellNat 771 (Fed.
T.D.) — referred to

*Shell Oil Co. v. Canada (Patent Commissioner)* (1982), 142 D.L.R. (3d) 117, 44 N.R. 541, 1982 CarswellNat 487,
1982 CarswellNat 487F, [1982] 2 S.C.R. 536, 67 C.P.R. (2d) 1 (S.C.C.) — referred to

*Shire Biochem Inc. v. Canada (Minister of Health)* (2008), 2008 CF 538, 2008 CarswellNat 2815, 67 C.P.R. (4th)
94, 2008 CarswellNat 1240, 2008 FC 538, 328 F.T.R. 123 (Eng.) (F.C.) — considered

*Signalisation de Montréal Inc. v. Services de Béton Universels Ltée* (1992), 58 F.T.R. 230 (note), 46 C.P.R. (3d) 199,
[1993] 1 F.C. 341, 147 N.R. 241, 1992 CarswellNat 159, 1992 CarswellNat 159F (Fed. C.A.) — considered

*SmithKline Beecham Inc. v. Apotex Inc.* (2001), 197 F.T.R. 319 (note), 2001 CarswellNat 8, 10 C.P.R. (4th) 338, 267
N.R. 101 (Fed. C.A.) — considered

*SmithKline Beecham Pharma Inc. v. Apotex Inc.* (2001), 2001 FCT 770, 2001 CarswellNat 1472, 14 C.P.R. (4th) 76,
208 F.T.R. 105, [2001] 4 F.C. 518, 2001 CarswellNat 3107 (Fed. T.D.) — referred to

*SmithKline Beecham Pharma Inc. v. Apotex Inc.* (2002), 2002 CarswellNat 1196, 2002 CAF 216, 2002 CarswellNat
2368, 21 C.P.R. (4th) 129, 226 F.T.R. 144 (note), 2002 FCA 216, 291 N.R. 168, [2003] 1 F.C. 118, 219 D.L.R. (4th)
124 (Fed. C.A.) — referred to

*Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.* (1967), 55 C.P.R. 207 at 209, 1967 CarswellNat
22, 35 Fox Pat. C. 174 (Can. Ex. Ct.) — considered

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 152 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.* (1968), [1968] S.C.R. 950, 38 Fox Pat. C. 203, 69 D.L.R. (2d) 353, 1968 CarswellNat 33, 55 C.P.R. 207 (S.C.C.) — referred to

*Synthon BV v. Smithkline Beecham plc* (2005), [2005] UKHL 59, [2006] 1 All E.R. 685, [2006] R.P.C. 10 (U.K. H.L.) — considered

*Ticketnet Corp. v. Air Canada* (1997), 105 O.A.C. 87, 154 D.L.R. (4th) 271, 1997 CarswellOnt 4273 (Ont. C.A.) — referred to

*Toronto Auer Light Co. v. Colling* (1899), 31 O.R. 18 (Ont. C.A.) — considered

*Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.* (1995), 25 O.R. (3d) 106, 41 C.P.C. (3d) 75, 1995 CarswellOnt 1003 (Ont. Gen. Div.) — referred to

*Union Carbide Canada Ltd. v. Trans-Canadian Feeds Ltd.* (1966), [1966] Ex. C.R. 884, 32 Fox Pat. C. 145, 49 C.P.R. 29, 1966 CarswellNat 5 (Can. Ex. Ct.) — considered

*Volkswagen Canada Inc. v. Access International Automotive Ltd.* (2001), 2001 CarswellNat 621, 2001 CarswellNat 2430, [2001] 3 F.C. 311, 271 N.R. 363, 2001 FCA 79, 203 F.T.R. 123 (note) (Fed. C.A.) — considered

*Von Heyden v. Neustadt* (1880), 14 Ch. D. 230 (Eng. C.A.) — considered

*Wellcome Foundation Ltd. v. Apotex Inc.* (1991), 39 C.P.R. (3d) 289, 47 F.T.R. 81, 1991 CarswellNat 213 (Fed. T.D.) — followed

*Whirlpool Corp. v. Camco Inc.* (2000), 9 C.P.R. (4th) 129, [2000] 2 S.C.R. 1067, 2000 SCC 67, 2000 CarswellNat 2846, 2000 CarswellNat 2861, 194 D.L.R. (4th) 193, 263 N.R. 88, 186 F.T.R. 268 (note) (S.C.C.) — followed

*Whitehouse v. Jordan* (1980), [1981] 1 All E.R. 267, [1981] 1 W.L.R. 246 (U.K. H.L.) — referred to

*Whiten v. Pilot Insurance Co.* (2002), 156 O.A.C. 201, 35 C.C.L.I. (3d) 1, [2002] 1 S.C.R. 595, 2002 SCC 18, 2002 CarswellOnt 537, 2002 CarswellOnt 538, 283 N.R. 1, 20 B.L.R. (3d) 165, [2002] I.L.R. I-4048, 209 D.L.R. (4th) 257 (S.C.C.) — considered

*Wilderman v. F.W. Berk & Co.* (1925), [1925] 6 Ch. 116, 42 R.P.C. 79 (Eng. Ch. Div.) — considered

*Wobben v. Vestas-Celtic Wind Technology Ltd.* (November 14, 2007), Doc. HC 06 C01202 (Eng. Patents Ct.) — referred to

*351694 Ontario Ltd. v. Paccar of Canada Ltd./Paccar du Canada Ltée* (2004), 35 C.P.R. (4th) 257, 2004 CarswellNat 5690, 2004 FC 1565, 2004 CF 1565, 2004 CarswellNat 4004, 264 F.T.R. 12 (F.C.) — referred to

**Statutes considered:**

*Bank Act*, R.S.C. 1985, c. B-1
    Generally — referred to

    Sched. I — referred to

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Competition Act*, R.S.C. 1970, c. C-23
    s. 32(1)(c) — referred to

*Competition Act*, R.S.C. 1985, c. C-34
    Generally — referred to

    Pt. VI — referred to

    s. 7(1)(a) — referred to

    s. 9(1)(c) — referred to

    s. 10(1)(a) — referred to

    s. 10(1)(b)(iii) — referred to

    s. 36 — referred to

    s. 36(1) — referred to

    s. 36(3) — referred to

    s. 36(4) — referred to

    s. 36(4)(a)(i) — referred to

    s. 45 — referred to

    s. 45(1) — referred to

    s. 69(2)(c) — referred to

*Court Order Interest Act*, R.S.B.C. 1996, c. 79
    s. 2(c) — referred to

    s. 8 — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43
    s. 128(4)(g) — referred to

*Federal Courts Act*, R.S.C. 1985, c. F-7
    Generally — referred to

    s. 36 — referred to

    s. 36(2) — referred to

    s. 36(4)(b) — referred to

    s. 36(4)(f) — referred to

    s. 36(7) — referred to

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Interest Act*, R.S.C. 1985, c. I-15
>   s. 4 — referred to

*Judgment Interest Act*, R.S.A. 2000, c. J-1
>   s. 2(2)(b) — referred to

>   s. 2(2)(i) — referred to

*North American Free Trade Agreement Implementation Act*, S.C. 1993, c. 44
>   Generally — referred to

>   s. 189 — referred to

*Patent Act*, R.S.C. 1985, c. P-4
>   Generally — referred to

>   s. 2 "country" [en. 1994, c. 47, s. 141] — referred to

>   s. 2 "invention" — referred to

>   s. 8 — referred to

>   s. 19.1(4) [en. 1994, c. 47, s. 142] — referred to

>   s. 19.2 [en. 1993, c. 44, s. 191] — referred to

>   s. 20(15) — referred to

>   s. 27(5) — referred to

>   s. 29 — referred to

>   s. 34 — referred to

>   s. 41 — referred to

>   s. 42 — referred to

>   s. 43(2) — referred to

>   ss. 48.1-48.5 — referred to

>   s. 53 — referred to

>   s. 55(1) — referred to

>   s. 55.2 [en. 1993, c. 2, s. 4] — considered

>   s. 55.2(1) [en. 1993, c. 2, s. 4] — considered

>   s. 59 — referred to

>   s. 60(1) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*Patents Act*, 1949 (12, 13 & 14 Geo. 6), c. 87
    Generally — referred to

*Patents Act*, 1977, c. 37
    Generally — referred to

    s. 60(1)(c) — referred to

*Process Patent Amendment Act*, 35 U.S.C. 271
    Generally — referred to

*Trade-marks Act*, R.S.C. 1985, c. T-13
    s. 56 — referred to

*World Trade Organization Agreement Implementation Act*, S.C. 1994, c. 47
    Generally — referred to

    s. 141 — referred to

    s. 142 — referred to

**Rules considered:**

*Federal Courts Rules*, SOR/98-106
    R. 3 — referred to

    R. 232 — referred to

    R. 248 — referred to

**Tariffs considered:**

*Federal Courts Rules*, SOR/98-106
    Tariff B, Table, column III — referred to

    Tariff B, Table, column IV — referred to

    Tariff B, Table, column V — referred to

**Treaties considered:**

*Agreement on Trade-Related Aspects of Intellectual Property Rights*, (1994) 25 I.I.C. 209
    Generally — referred to

    Article 28 ¶1(b) — referred to

*North American Free Trade Agreement, 1992*, C.T.S. 1994/2; 32 I.L.M. 296,612
    Generally — referred to

    Article 1709 ¶ 5(b) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 156 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Article 1709 ¶ 11(a) — referred to

*European Patent Convention*, 1973
    Generally — referred to

    Article 64(2) — referred to

**Regulations considered:**

*Patent Act*, R.S.C. 1985, c. P-4
    *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

    Generally — referred to

    s. 4(1) — referred to

    s. 6(4) — referred to

**Words and phrases considered**

**new product**

Lilly says that the Courts have yet to interpret the meaning of "new product" [in the Patent Act after its amendment by the North American Free Trade Agreement Implementation Act] and it submits that [a new product] is a product that has not been sold on the market before. . . . The Court cannot accept this argument. As noted by Apotex, the words "product" and "substance" were used interchangeably by the Supreme Court of Canada in (*Harvard College v. Canada (Commissioner of Patents)*, 2002 SCC 76, [2002] 4 S.C.R. 45 (S.C.C.) (*Harvard College (2002)*). The word "product" must be given the same meaning as it received throughout the *Patent Act*. It is used in the definition of "invention." . . . In my view, by changing "substance" to "product", the legislator was simply ensuring that the Canadian provision would be applied in accordance with its obligations pursuant to *NAFTA*. "Substance" appears to be a more restrictive expression that could, for example, hardly apply to a new hairdryer, whereas the presumption is meant to apply to any new product.

ACTION by first person pharmaceutical companies alleging infringement of patents by generic; COUNTERCLAIM by generic pharmaceutical company alleging violation of Competitions Act by first person.

*Johanne Gauthier J.*:

1    The plaintiffs in this action claim that their rights under eight Canadian patents were infringed when Apotex Inc. (Apotex) imported bulk cefaclor into Canada for use in the various Apo-cefaclor dosage forms they sold after January, 1997. The plaintiff Eli Lilly and Company (Lilly U.S.) is the owner of these eight patents. Eli Lilly Canada Inc. (Lilly Canada) is a wholly owned subsidiary of Lilly U.S. incorporated under the laws of Ontario and it alleges that it has rights under the patentee, which is contested by Apotex. These plaintiffs will collectively be referred to as "Lilly".

2    Lilly sold dosage forms of cefaclor in Canada under the registered name of Ceclor®. This medicine was put on the market in 1980. [1]

3    The following four patents, all filed on February 1, 1979, were issued to, and were continuously owned by, Lilly U.S. (the Lilly patents):

    a. Canadian Letters Patent No. 1,133,007 ("the '007 Patent"), issued October 5, 1982, expired October 5, 1999;

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 157 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

b. Canadian Letters Patent No. 1,146,536 ("the '536 Patent"), issued May 17, 1983, expired May 17, 2000;

c. Canadian Letters Patent No. 1,133,468 ("the '468 Patent"), issued October 12, 1982, expired October 12, 1999; and,

d. Canadian Letters Patent No. 1,150,725 (the '725 Patent"), issued July 26, 1983, expired July 26, 2000. [2]

The patents referred to in paras. b, c and d will collectively be referred to as "the Lilly process patents".

4    The other four relevant patents were issued to Shionogi & Co. Ltd., a Japanese pharmaceutical company, (Shionogi) on the dates indicated below:

a. Canadian Letters Patent No. 1,095,026 ("the '026 Patent"), issued February 3, 1981, expired February 3, 1998;

b. Canadian Letters Patent No. 1,132,547 ("the '547 Patent"), issued September 28, 1982, expired September 28, 1999;

c. Canadian Letters Patent No. 1,136,132 ("the '132 Patent"), issued November 23, 1982, expired November 23, 1999; and,

d. Canadian Letters Patent No. 1,144,924 ("the '924 Patent"), issued April 19, 1983, expired April 19, 2000. [3]

While all have the same filing date of February, 1976 (when the original application was filed in Canada), three of these patents resulted from the filing of divisional applications, which will be further discussed below. These patents will be collectively referred to as the "Shionogi patents". Lilly U.S. became the owner of the Shionogi patents by way of assignment dated April 27, 1995 which was registered in Canada on August 24, 1995.

5    Although this action was instituted nearly twelve years ago, the dispute between the parties as to whether or not the sale by Apotex of a generic version of Ceclor® in Canada would infringe the patents at issue started earlier, with the filing of an application under the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133 (PM (NOC) Regulations) by Lilly and Shionogi on June 23, 1993. [4] Earlier, the issue had also been raised when Apotex sought a compulsory licence with respect to cefaclor and certain Lilly patents related thereto in 1986.

6    Despite the fact that for the most part of this period, the parties have been intensively litigating the matter, neither the discovery process nor any other steps taken in this long period of time succeeded in significantly reducing the number of issues involved or to focus the debate at trial.

7    Given the amount of evidence filed and the many issues involved, the parties' counsel made a real effort in attempting to consign all their arguments in writing. This entails that they filed nearly one thousand pages of submissions (including those filed with respect to the counterclaim), not counting the various submissions filed in respect of a number of objections which had to be taken under reserve to avoid delaying the trial. The Court thanks each counsel involved for their effort in reducing the number of those objections that remained outstanding in the end.

8    Despite all this goodwill, the Court was left with a daunting task. This is only partially reflected in these reasons which are, unfortunately, too long despite the fact that the Court could not really do justice to all the issues raised. It was simply not possible or even desirable to refer to all the evidence and the hundreds of cases put forth by the parties. [5]

9    At the end of the process, one must wonder where the system failed for the Court is convinced that there has to be a better way to achieve the objectives set out in section 3 of the *Federal Court Rules*, SOR/98-106 (the *Rules*), which seeks to achieve the just, most expeditious and least expensive determination of every proceeding on its merits.

### INDEX

| Heading | Para. No. |
|---|---|
| 1. General Background | 10 |
| 2. The Evidence | 16 |

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 158 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

3.     Lilly Canada's Lack of Standing                                                                    75
4.     Patent Construction                                                                                87
       4.1.   Person Skilled in the Art                                                                    91
       4.2.   Common General Knowledge (Principles)                                                        95
       4.3.   The '007 Patent                                                                             106
       4.4.   The Lilly Process Patents                                                                   144
              4.4.1. The '536 Patent                                                                      145
              4.4.2. The '725 Patent                                                                      164
              4.4.3. The '468 Patent                                                                      170
       4.5.   The Shionogi Patents                                                                        175
              4.5.1. Common Disclosure                                                                    177
              4.5.2. The '547 Patent                                                                      184
              4.5.3. The '924 Patent                                                                      188
              4.5.4. The '132 Patent                                                                      192
              4.5.5. The '026 Patent                                                                      199
5.     Infringement                                                                                       211
       5.1.   Burden                                                                                      211
       5.2.   Statutory and Common Law Presumptions                                                       212
       5.3.   Lupin Process                                                                               224
       5.4.   Kyong Bo Process                                                                            257
              5.4.1. Existence of a License                                                               263
       5.5.   Importation                                                                                 270
       5.6.   The Exception Under Subsection 55.2(1) of the Patent Act                                    342
6.     Invalidity                                                                                         347
       6.1.   Standard of Review and Burden of Proof                                                      348
7.     Inherency and Lack of Subject Matter                                                               371
       7.1.   Shionogi Patents                                                                            371
       7.2.   Lilly Patents                                                                               380
8.     Anticipation                                                                                       391
       8.1.   The Legal Test                                                                              391
       8.2.   The '007 Patent                                                                             399
       8.3.   The Lilly Process Patents                                                                   409
       8.4.   The Shionogi Patents                                                                        411
9.     Obviousness                                                                                        412
       9.1.   The Legal Test                                                                              412
       9.2.   The '007 Patent (Claim 17)                                                                  426
              9.2.1. The Person Skilled in the Art                                                        428
              9.2.2. Relevant Common General Knowledge                                                    429
              9.2.3. Rydon, Coe and Ramirez                                                               432
              9.2.4. The Inventive Concept                                                                438
              9.2.5. The Difference Between the Common General Knowledge and the Above-mentioned          439
                     Publications and the Inventive Concept
              9.2.6. Would these differences be obvious to the person skilled in the art?                 441
       9.3.   The Lilly Process Patents                                                                   476
              9.3.1. Identify the Skilled Addressee                                                       476
              9.3.2. The Relevant Common General Knowledge                                                477
              9.3.3. The Dreux Article and Other Prior Art                                                484
              9.3.4. The Inventive Concept                                                                489
              9.3.5. The Differences between the Prior Art Including Common General Knowledge and the     491
                     Inventive Concept of the Claims
              9.3.6. Do these differences constitute steps which would have been obvious or do they require any  496
                     degree of invention?
       9.4.   The Shionogi Patents                                                                        512
              9.4.1. The Person Skilled in the Art                                                        515
              9.4.2. Common General Knowledge                                                             516
              9.4.3. Contested Art                                                                        532
                     9.4.3.1. Cocker                                                                      533
                     9.4.3.2. Chauvette Application                                                       538

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 159 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | |
|---|---|---|
| | 9.4.3.3. *Kishi* | 539 |
| | 9.4.4. *The Inventive Concept* | 544 |
| | 9.4.5. *The Differences between the Prior Art and the Inventive Concept* | |
| | 9.4.5.1. *The '547 Patent* | 547 |
| | 9.4.5.2. *The '924 Patent* | 549 |
| | 9.4.5.3. *The '132 Patent* | 552 |
| | 9.4.5.4. *The '026 Patent* | 554 |
| | 9.4.6. *Are these differences inventive?* | 557 |
| 10. | *Lack of Utility — Sound Prediction — Inoperability* | 583 |
| | 10.1. *The Lilly Patents* | 585 |
| | 10.2. *The Shionogi Patents* | 604 |
| | 10.3. *Deficiency of Specification and Ambiguity* | 613 |
| 11. | *Remedies and Costs* | |
| | 11.1. *Disentitlement and Set-off* | 626 |
| | 11.2. *Remedies* | 646 |
| | 11.3. *Exemplary/Punitive Damages* | 657 |
| | 11.4. *Interest* | 665 |
| | 11.5. *Costs* | 676 |
| 12. | *Apotex's Counterclaim* | 683 |
| | 12.1. *Relevant Statutory Provisions* | 718 |
| | 12.2. *The Framework of Inquiry into Apotex's Counterclaim* | 720 |
| | 12.3. *Is Apotex's Counterclaim Time-Barred?* | 728 |
| | 12.4. *Apotex's Claim for Damages* | 754 |
| | 12.5. *The Applicable Evidentiary Standard* | 757 |
| | 12.6. *Background* | 771 |
| | 12.7. *Apotex's "But For" Scenarios with Respect to Causation* | 793 |
| | 12.7.1 *Scenarios 1 and 2: Apotex Obtains a Licence from Shionogi or Lilly* | 803 |
| | 12.7.2 *Scenario 3: Apotex Practices the Shionogi Process and is not sued* | 835 |
| | 12.7.3 *Scenarios 4 and 5: Apotex Practices the Shionogi and Lilly Processes and is Sued by Shionogi and Lilly* | 840 |
| | 12.8. *Is there a loss resulting from the assignment under the most likely "but for" world scenario?* | 842 |
| | 12.9. *Increased Cost of Legal Bulk Cefaclor* | 849 |
| | 12.10. *Infringement Liability* | 853 |
| | 12.10.1 *The Lilly Patents* | 855 |
| | 12.10.2 *The Shionogi Patents* | 861 |
| | 12.11. *Costs* | 882 |

# 1. General Background

10      It is not disputed that penicillin is the oldest of the [beta]-lactam compounds, having first been discovered in 1928. Semi-synthetic penicillin came later. The [beta]-lactam molecule per se is a small square molecule that is highly reactive, to which, in penicillin, a five-membered ring is attached, whereas in cephalosporin (which includes cefaclor) the [beta]-lactam is attached to a six-membered ring containing sulfur. There are different types of [beta]-lactam depending on their side-chain, such as penicillin V (Pen V) and penicillin G (Pen G).

11      Cephalosporins were first discovered in 1948. Semi-synthetic cephalosporins were prepared by altering the naturally produced compounds for greater anti-bacterial activity. Like penicillins, cephalosporins are bactericidal and exhibit similar modes of action. Cephalosporins are classified based on their generation. First generation cephalosporins, such as cephalexin (another Lilly product), have good activity against gram positive bacteria and more modest activity against gram negative. Second generation cephalosporins, such as cefaclor, have better activity against gram negative bacteria. Third generation cephalosporins, such as cephotaxim, ceftazidine and ceftriaxone, were less active than the first generation but have good activity against Enterobacteriaceae.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

12    Shortly after it was introduced in the market by Lilly, Ceclor® was a very successful drug. It remained so for several years, however, by 1997, when Apotex came to market, it was definitely in decline, having been overtaken by other antibiotics.

13    The basic patent on the compound Cefaclor or the class of second generation cephalosporins to which it belongs (7-x-aminoacyl-3-halo-3-cephem carboxylic acid or ester compound) is patent 1,016,537 (the '537 patent) filed on February 22, 1974 and issued in Canada on August 30, 1977. It expired August 30, 1994. It was also owned by Lilly U.S., having been discovered by Dr. Chauvette, a member of its [beta]-lactam research team. Cefaclor was specifically disclosed in an example and the process to prepare it, or an obvious chemical equivalent, was claimed. Other claims dealt with other 7-x-acylamino-3-chloro-3-cephem compounds prepared by those processes.

14    It is not disputed that although the disclosure of the '007 patent directly refers to the preparation of a cephalosporin compound using the kinetically controlled complexes claimed in the patent, the claims do not expressly refer to such use. Also, none of the claims in the Lilly process patents or the Shionogi patents are directly claiming a process to make cefaclor itself. As a matter of fact, and as will be explained in more detail later on, these patents more generally relate to the making of what all experts agree was a key intermediate compound (the 3-hydroxy-3-cephem compound) [6] if one were to make cefaclor. The steps required to make cefaclor from this key intermediate were disclosed in the '537 patent.

15    An important part of the debate relates to processes involved in the transformation of a penicillin molecule into a cephalosporin molecule. Penicillin molecules could be synthetically produced at very low cost whereas the original starting material used by Dr. Chauvette to make cefaclor or other second generation cephalosporins described in his patent was very expensive.

## 2. The Evidence

16    An important part of the evidence in this trial is a long list of facts agreed to by the parties that are applicable both to the main action and the counterclaim. To avoid excessive duplication, the Court will attempt to avoid repeating those admitted facts which are relevant to both actions, with the understanding that the totality of said facts were considered in the course of the determination of both actions.

17    In the infringement action Lilly produced six factual witnesses: Dr. Stephanie Parra, Mr. Thomas Lee Pytynia, Ms. Debbie Rassos, Dr. Larry Blaszczak, Dr. Robin Cooper and Mr. John Gardner.

18    Dr. Parra is acting manager of the general direct quality division one at Health Canada. Her division is responsible for evaluating data submitted to support the quality of drug submissions made to the department including chemistry and manufacturing data. Her testimony mainly served the purpose of entering into evidence, as well as offering a brief explanation of, documents filed in relation to Apotex's submission for its Apo-cefaclor product. [7] This included particularly the "open" and "closed" portions of the relevant Drug Master Files (DMFs) submitted by Apotex's suppliers, Lupin Laboratories Ltd. of India (Lupin) and Kyong Bo Chemical Ltd. of South Korea (Kyong Bo).

19    Various important exhibits discussed throughout the trial were put into evidence in the course of Dr. Parra's testimony, such as the Comprehensive Summary regarding Apo-cefaclor (TX-124), the open and closed portions of Kyong Bo's DMF (TX-126; TX-129), Apotex's notifiable change for new source (TX-157) and letters from the Department of Justice to Gowlings Lafleur Henderson LLP with information provided by Lupin attached (TX-167; TX-168).

20    Dr. Parra also explained the meaning of a "notifiable change" and the various levels ascribed thereto, which correspond to greater or lesser regulatory filing requirements. A change of supplier for example is classified as a level 2 notifiable change and will receive an objection letter if Health Canada has an objection to the proposed change. [8] In this matter, before approving the change of supplier notified by Apotex (from Kyong Bo to Lupin), Health Canada requested additional information by way of a document called a "Clarifax" (TX-152) to which Apotex replied by a letter dated June 21, 1997 with an attachment explaining the

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 161 of 308

source of the starting material and a full diagram representing the synthetic route used to make 7-amino-3-chloro-3-cephem-4-carboxylic acid esters (7-ACCA) (TX-150).

21    Mr. Pytynia was in-house counsel for Lilly U.S. between May 1977 and December 31, 2007. He testified mainly about the relationship between Lilly U.S. and Lilly Canada, including particularly their licensing and distribution agreements. He introduced various documents which will be referred to later on, such as the 1991 licensing agreement between Lilly U.S. and Lilly Canada (TX-109), the 1995 patent and trademark licence amendment (TX-110), the Master Supply and Distribution Agreement between the said two companies (TX-112) as well as the Authorization to grant sub-licences from Lilly U.S. to Lilly Canada (TX-113).

22    Ms. Rassos is the senior regulatory affairs manager at Lilly Canada, a position she has held for two and a half years. She had no direct knowledge of any of the events relevant to the proceedings and testified only to the documentation she found in Lilly Canada's regulatory records concerning cefaclor. She introduced in evidence, among other things, Lilly Canada's process information filed in relation to its New Drug Submission (NDS) (TX-208; TX-209) for Ceclor® as well as a portion of its 1979 NDS (TX-115). It was made clear during her cross-examination that her testimony with respect to the identity of Lilly Canada's supplier during the 1979 and 2000 period is solely based on the said documentation for she had no independent knowledge of such matters. [9]

23    Dr. Blaszczak is one of the inventors listed in the Lilly patents in suit, with the exception of the '536 patent. However, he did not testify in this capacity but rather to explain his relationship with a graduate student in chemistry from the University of Modena, Alberto Spaggiari. This student had solicited Dr. Blaszczak's supervision in conducting research in [beta]-lactam chemistry with the view of preparing dual action cephalosporins. This led to Dr. Blaszczak collaborating with Mr. Spaggiari as a co-author for a scientific article referred to here as the Spaggiari paper published in 2004. In the course of his testimony on this issue, Apotex formulated a number of objections to hearsay evidence. While the objections were largely justified in this regard, none of this evidence is relevant to the issues upon which this judgment turns.

24    On cross-examination, Dr. Blaszczak was referred to a 1978 cefaclor progress report (TX-211) and questioned as to his role in relation with it. He was also probed as to the process used by Lilly in the late 1970's, particularly the transition to triphenyl phosphite (TPP) chloride (Cl) complex and the comparative yields achieved. Finally, Dr. Blaszczak offered evidence as to how Lilly structured its research operations with regard to cefaclor, particularly the *de facto* merging of the process research and development and discovery groups (he was part of the latter) when Lilly requested that the discovery chemists thoroughly consider the problem posed by the production of cefaclor on a commercial scale.

25    Dr. Cooper was working with Lilly's research team at the relevant time. He was already a world-renowned expert in cephalosporin chemistry. He was presented as a factual witness to relate any attempts he made back in the early 1970's to cyclicize the thiazoline azetidinone compound he discovered (Cooper compound), which is used as starting material in the process described in the Shionogi patents. The content of his testimony will be discussed in more detail when assessing the allegations of invalidity of the Shionogi patents.

26    Mr. Gardner is a chemist who performed the experiment described in example nine of the '007 patent (characterised as a side chain cleavage using the tri-p-chloro phenyl phosphite chlorine complex) while at Lilly in the late summer, early fall of 1978. Although Lilly produced a copy of his thirty-year-old lab notebook (TX-1799), Apotex objected to this evidence being used to counter the arguments of Apotex's experts with regard to invalidity. Mainly, Apotex argues that Rule 248 of the *Federal Courts Rules* precludes this evidence from being introduced as Apotex sought to obtain all these lab notebooks during the discovery and its requests went unheeded. However, I fail to see how Rule 248 can apply when it is the Court which determined that the requested documents were not relevant. [10] That said, in order to avoid further peripheral debates, the Court does not consider this evidence to be necessary to reach its findings.

27    Subject to what I said about Ms. Rassos and my further comments in respect of Dr. Cooper, I accepted as credible the evidence of these witnesses.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 162 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

28      Apotex presented eight fact witnesses in the main action: Ms. Julie Carrière, Mr. Donald Barber, Mr. Gordon Fahner, Dr. Bernard Sherman, Mr. John Hems, Mr. Rajeev Patil, Mr. Vilas Satpute and Mr. Haracharan (Harry) Singh.

29      Ms. Carrière is Apotex's director of quality assurance and she testified about the regulatory context which requires Apotex to conduct tests and analyses of the bulk chemicals it uses in making pharmaceutical formulations. Her testimony was put forth in support of Apotex's defence pursuant to s. 55.2 of the *Patent Act*, R.S.C. 1985, c. P-4. In cross-examination, she explained that the related compounds which must be tested referred to the synthetic or degradation impurities which have been previously identified in the New Drug Submission or Notifiable Change. She also agreed that these related compounds may change from supplier to supplier, depending upon the processes used, which may create a need for different analytical techniques.[11] Finally, Ms. Carrière agreed that apart from the regulatory obligation, testing is beneficial to Apotex for it must ensure that the products it puts on the market are safe and of good quality, otherwise its sales might suffer.

30      Mr. Barber has been the formulation development manager at Apotex since 1998. He provided testimony on product development at Apotex. He explained in detail the various testing required to develop a commercially viable product, which includes the formulation stages, the scaling up of a process or formulation that is thought to be workable on an industrial scale and the testing or evaluation of the formulation so produced. The raw material testing is ongoing throughout the process.

31      He noted that whenever Apotex switches to a different supplier for an active pharmaceutical ingredient (API), evaluations, both chemical and physical, are repeated and a "good amount" of the formulation development work must also be repeated. Mr. Barber discussed how, with regard to cefaclor, such work started as early as 1991. He identified several exhibits relating to quantities of cefaclor which have not been sold or used for commercial purposes. Again, this testimony was offered in support of Apotex's defence pursuant to s. 55.2 of the *Patent Act*. On cross-examination, Lilly's counsel focused on the accuracy of records which are not relevant to the issues the Court must decide today, given that if infringement is established, the damages will be assessed by reference. The accuracy of Apotex's records in this regard can be contested at the reference stage, in accordance with the Court's reasons below on the proper scope of the exemption.

32      Mr. Fahner has been Apotex's Vice-President of Finance since 2003, having held the position of Director of Finance at the relevant period. He testified twice in the course of the main action. Firstly, Mr. Fahner testified as to the inventory tracking system at Apotex and the gradual evolution of this system from a paper-based system to an electronic SAP system in the 1999 to 2001 timeframe. The main purpose of Mr. Fahner's testimony was to introduce in evidence, and explain the significance of, spreadsheets (TX-1559; TX-1560; TX-1561) he prepared representing compilations of quantities of cefaclor which Apotex claims is covered by the defence provided for at s. 55.2 of the *Patent Act*. Also, Mr. Fahner explained the significance of another spreadsheet he prepared (TX-1759) which represents a summary of raw cefaclor quantities purchased by Apotex primarily for commercial use as well as prices paid for said cefaclor.

33      On cross-examination it became apparent that some of the material included in the spreadsheets was in fact material that had been acquired post-patent expiry and thus is not relevant for the purposes of this proceeding. On this basis, Apotex undertook to have Mr. Fahner revise said spreadsheets to ensure that they only include quantities relevant to the allegation of infringement. This was provided by Apotex on May 12, 2008. Inconsistencies were also identified with regards to the summary of raw cefaclor quantities (TX-1759) and various purchase orders, which again, in a context where a reference will take place, are not germane to the issues presently at hand. Finally, Mr. Fahner also identified a spreadsheet representing international sales of Apo-cefaclor (TX-1747) and confirmed that no sales had occurred in the United States.

34      Following the testimony of Mr. Singh, which will be discussed below, Apotex re-called Mr. Fahner to testify with regard to certain invoices emanating from Tektrade Ltd. (contained in Glopec-36) which called into question Mr. Fahner's earlier testimony. Mr. Fahner testified that the relevant invoices (# TTL-981006-02 and TTL-981006-3) were not in Apotex's records, that the cefaclor quantities represented therein had not been received by Apotex and that no payment had been made to Tektrade Ltd. in relation thereto. Lilly objected to Mr. Fahner being called back to testify, but on June 17, 2008, the Court ruled that it would exercise its discretion and allow said testimony, noting that Lilly did not suffer any prejudice in light of the bifurcation

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

order for the issue of the quantum of damages, save perhaps in losing what was indeed a very able cross-examination of Mr. Singh by counsel for Lilly.

35     Mr. Hems is the Director of Regulatory Affairs at Apotex. He testified as to the regulatory requirements which Apotex must meet in order to offer a drug on the market and the process used to meet these requirements. He oversaw the process for seeking approval for cefaclor, which began in 1993 with the filing of the original drug submission (TX-1761; TX-1762) and explained the analysis of the API which is necessary for such submissions. Mr. Hems also explained what a DMF contains and the portions of said files which Apotex may gain access to and how it may gain access to them.

36     Except for the issue relating to the Tektrade invoices in respect of which the Court will make no finding, the evidence of the aforementioned witnesses was accepted.

37     Dr. Sherman is the Chairman and Chief Executive Officer of Apotex. In this phase of the trial, he testified as to Apotex's practices with regard to the sourcing of APIs, particularly cefaclor. He explained that, around the time where Apotex received its NOC for cefaclor, it hired an in house lawyer named Brigitte Fouillade, who has since passed away. Her role was to advise Dr. Sherman as to intellectual property issues. Referring to correspondence addressed to Ms. Fouillade from Kyong Bo dated October 10, 1997 (TX-662), Dr. Sherman explained that Kyong Bo represented to Apotex that it had rights to use the Shionogi process.

38     With regard to Lupin, Dr. Sherman testified that while no formal agreement was entered into at first, it is his understanding that Ms. Fouillade attempted to ensure that the material supplied was not infringing. Ms. Fouillade developed a flow sheet for such a non-infringing process and, relying on correspondence between Ms. Fouillade and Mr. Singh (TX-679), explained that she was to ensure that this process was followed even if the cefaclor so produced was more costly, which is why Apotex then entered into a formal agreement.

39     On cross-examination, Dr. Sherman was led to explain the reasons for which Apotex limited its choice of Lilly patents in its compulsory licence application (TX-265) and the reason which led him to terminate said licence (TX-267). He was also questioned as to why the agreement with Lupin (TX-1656) was not in the original affidavit of documents he signed (TX-327) and why no Notifiable Change had been filed by Apotex for this new process. He was also thoroughly questioned with regard to his answers on discovery pertaining to Lupin process information and communications between Lupin and Apotex. Finally, he also attempted to explain price variations for bulk cefaclor purchased, from Lupin and Kyong Bo.

40     Generally, the Court has no problem with the credibility of Dr. Sherman's testimony in respect of matters where he was directly involved as opposed to those where others were directly involved such as Ms. Fouillade. It is obvious and understandable that Dr. Sherman did not recall factual details and appeared sometimes to be offering explanations based on common sense and written documentation. The Court was certainly surprised by his candour when he noted that he did not read correspondence from his lawyers (there was simply too much of it) and he entirely relied on them when signing affidavits (it is not clear if he even read them all). [12]

41     The testimonies of Mr. Singh, Mr. Patil and Mr. Satpute were heard under reserve of general objections (generally referred to as *voir dire* by the parties) which will be discussed in the section regarding infringement. Still, it is useful to briefly note what their testimonies relate to.

42     Mr. Singh is the owner of Glopec International Inc. (Glopec), a company which imports and distributes raw pharmaceutical ingredients in both Canada and the United States. Glopec represents Indian manufacturers, such as Lupin, taking care not only of selling their products in Canada but also filing their regulatory materials with Health Canada. With regard to cefaclor, a certain amount of such correspondence related thereto was introduced in the course of his testimony (Glopec 1-14; 28-33). Also, Mr. Singh had in his files a certain amount of correspondence between Glopec and Apotex (addressed to Ms. Fouillade) regarding the process used by Lupin in the summer of 1997 and the subsequent development with Lupin of a non-infringing process (Glopec 16-26), as well as related correspondence with Lupin (Glopec 27; 35). [13]

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 164 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

43      Mr. Singh also testified as to a big order of 7,500 kg of cefaclor passed by Apotex to be manufactured using the so-developed process. When Apotex was invoiced for bulk cefaclor manufactured by Lupin, these invoices were issued by Tektrade Ltd. (Glopec 36), a trading company owned by his in-laws in India and which Mr. Singh represents in Canada. Mr. Singh explained how the prices represented in these invoices were set and how payments are processed from Apotex through Tektrade Ltd. and finally to Lupin. While much of his cross-examination focused on these same points, counsel for Lilly was able to identify a rather large discrepancy between Tektrade Ltd. invoices and the data compiled by Apotex as to quantities received, which, as mentioned above, prompted Apotex to recall Mr. Fahner to testify on this point.

44      Mr. Patil is the Vice-President of Regulatory Affairs at Lupin. At the relevant period, he was a senior manager within the same department. He was tasked with the registration of the companies' products (DMFs), which include dosage form and API (bulk), the study of regulatory requirements in countries to which Lupin exports and compliance with these requirements. Mr. Patil testified as to how the registration and other requirements were performed at Lupin as well as what they generally entailed, with a particular focus on communications with Health Canada concerning cefaclor both directly from Lupin and via Glopec (which were tendered as Patil 1-6; TX-337; Glopec 4-5; 10). These documents came into the possession of Mr. Patil following a request made to Health Canada in 2008 to provide them as Lupin's records had been largely lost in a flood in 2005 (some files still existed at the Bombay office while others were salvaged).

45      Mr. Patil also testified as to the locations where cefaclor and 7-ACCA are manufactured. Correspondence between Lupin and Glopec was also tendered, for example Patil 8 (but also Patil 9; TX-158), which contained Mr. Patil's handwriting in the margins and which prompted testimony about the interaction Mr. Patil had with the research and development (R&D) department (the letter was addressed to Dr. Gutpa, the chief of the R&D department) of Lupin regarding Apotex's request for cefaclor produced using a third process. Concerning this third process, Mr. Patil testified as to a mix up in the correspondence in 1999, specifically an incorrect flow sheet depicting the manufacture of 7-ACCA appended thereto (see, for example, Patil 10).

46      Mr. Satpute is the Vice-President of API manufacturing at Lupin's Mandideep facilities. At the relevant period (1996-1999), he was the senior manager of Lupin's Ankleshwai facility, which manufactured ethambutol, vitamin B-6 and two intermediates, 7-ADCA and 7-ACCA. After 1999, he took up this same role but at the Mandideep facilities where cephalexin, cefadroxil, cefaclor, ceftriaxone and cefatoxime are manufactured. Mr. Satpute testified as to the process used at the Ankleshwai facility to manufacture 7-ACCA and its subsequent transformation to cefaclor at Mandideep and the delay this entails.

47      He testified that initially, in 1996, Lupin used a process which began with Pen V acid. Sometime in 1997, Lupin did trial batches and a few commercial ones to validate a new process starting with Pen G before reverting in 1998 to Pen V acid but using a third process which was slightly different from the one used in 1996 (particularly at what is described as step V in some of Lupin's documents) to fulfill what he qualified as a "one of the biggest orders we received". Mr. Satpute explained the implementation of this third process, the fact that it produced substantially lower yields (about 60 percent of the yields of the previous Pen V acid process used) and the use of chlorine (Cl) gas and TPP. Also when he was asked to find batch records for the 7-ACCA so produced, for which the plant manager and the R&D department would have created a template a few weeks before coming to Canada, he found that these documents no longer existed. It is not clear if anybody verified the files of the R&D department for the data relating to this process.

48      Once this order was filled, Mr. Satpute testified that Lupin reverted to the Pen G process validated in the latter part of 1997. Documents referred to in the course of Mr. Satpute's cross-examination were marked Satpute 1-3.

49      Finally, the parties filed by consent an affidavit of Leslie Sands, Director of regulatory affairs at Lupin Pharmaceuticals Inc., a subsidiary of Lupin operating in the United States (TX-340). This filing was made under reserve of an objection that the documents therein are not proof of their contents but rather only of the existence of such communications with the U.S. Food and Drug Administration. The Court agrees with Apotex in this respect.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 165 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

50      In the main action, the parties filed 33 expert reports dealing with the infringement and invalidity allegations. They are listed in Chart A [14] attached hereto with the names of the experts, dates, subject matter and exhibit numbers, together with their area of expertise and a brief summary of their qualifications.

51      On the question of infringement of the Shionogi patents by the use of the Kyong Bo process, Lilly called Dr. Anthony Barrett while Apotex responded with the evidence of Dr. Stephen Hanessian who touches on the issue of infringement of all the patents in issue mostly to support Apotex's arguments with regard to importation (A-10). Both experts were properly qualified to opine on these issues. Their evidence in that respect was not contradicted. The Court accepts the evidence of Dr. Barrett in respect of the Kyong Bo process. While the relevance of Dr. Hanessian's evidence will be discussed in the section dealing with importation.

52      A much more contentious issue concerns the infringement of the Lilly patents, particularly whether the Lupin process described in the Health Canada file fell within the scope of the monopoly of the plaintiffs. Lilly's main expert witnesses [15] in this respect were Drs. Miller and Baldwin. While Dr. Hunter [16] and Mr. Moraski reported and commented on the results of numerous experiments conducted by both sides in relation to this question, particularly with the use of $^{31}$P Nuclear Magnetic Resonance ($^{31}$P NMR) Spectroscopy. Apotex's experts on this question were Drs. Modro, McClelland and Cowley. Dr. Chase also testified about the tests he performed.

53      An inordinate amount of time was spent discussing the results of the various experiments performed by both sides as well as their respective alleged flaws. It is clear that most of these experiments involved a certain amount of subjectivity (for example, what is yellow vs. light or faint yellow, or what is cooled vs. ice cooled or cooled with ice salt, what is room temperature, etc.) and that really none of the tests performed were perfect. For various reasons, choices were made with respect to temperature and equipment. Many things can and do go wrong in laboratories (broken valves, etc.). The Court used considerable caution in assessing the weight to be given to this evidence, but in the end, considering the construction of the claims at issue adopted, most of these experiments and the comments relating thereto became somewhat irrelevant. With respect to those that remain relevant, such as reactions carried out on cephalosporin substrate with or without a halogen scavenger, individual tests were not considered in isolation, in the sense that the Court always looked to confirm if the results were supported by other evidence on the record.

54      The one positive aspect of the testing is that it led to the abandon of some of the arguments and helped focus the debate.

55      There was a lengthy debate about the admissibility of tests performed *ex parte* and how tests must be introduced in the evidence. In the end, these issues were settled without the need for a ruling. Nevertheless, it is important to note that pre-trial scheduling orders setting deadlines for the reporting of test results, absent an express indication to the contrary, must not be construed to constitute a waiver of any requirement that may exist regarding notice of testing to be performed pre-trial.

56      Also, with respect to the infringement of the Lilly process patents, the Court granted leave to both parties to file expert evidence on issues arising from the testimony of Mr. Satpute. Dr. Barrett (E-15), who had only previously been dealing with the Shionogi patents, and Dr. Hanessian (A-20) testified in respect of the various processes allegedly used by Lupin.

57      Turning now to the validity phase of the trial, Apotex relied on the evidence of Drs. McClelland, Hanessian and Martin in respect of the Shionogi patents while Lilly responded with the evidence of Dr. Barrett and that of Mr. Murphy, who focused on the prosecution of the Shionogi patents and the unity of invention practice of the Canadian Patent Office.

58      In respect of the Lilly patents, Drs. Modro, Chivers, Olah and McClelland discussed the validity of the '007 patent while Dr. McClelland also addressed issues relating to all the Lilly process patents and Dr. Olah opined in respect of the '536 patent. In response, Lilly relied upon the evidence of Dr. Baldwin who discussed all of the Lilly patents and Dr. Hunter who focussed on certain allegations in respect of the '007 patent. Mr. Murphy also discussed the prosecution of the Lilly patents and the unity of invention practice in relation thereto.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 166 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

59    In respect of infringement by the Lupin process, the Court found the evidence of Dr. Baldwin and Dr. Miller particularly helpful. Despite Apotex's attempts to challenge their credibility on the basis that they had worked as a consultants for Lilly from time to time and the university where Dr. Miller teaches received some grants from Lilly, the Court is satisfied that they gave their evidence in a straightforward, unbiased manner. In that respect, the Court notes that early in his testimony, Dr. Baldwin readily admitted that the kinetic complex must have formed when one carried out some of the experiments in the prior art.

60    In respect of the validity of the Lilly patents, like the House of Lords in *Synthon BV v. Smithkline Beecham plc*, [2005] UKHL 59, [2006] 1 All E.R. 685 (U.K. H.L.) (*Synthon*), who described him as one of the foremost organic chemists in the world, the Court found Dr. Baldwin to be particularly well qualified to opine on the issues of fact covered in his report. In fact, he was the only expert witness that was properly qualified to opine on the common general knowledge of the posita to whom the Lilly process patents were addressed and how said posita would read those patents or the relevant prior art.

61    Drs. Modro, Olah and McClelland were all properly qualified to opine in respect of the '007 patent. Generally the Court had no difficulties with their credibility although, the Court was more cautious with the evidence of Dr. McClelland because of his vast experience acting as an expert in patent cases he was somewhat less spontaneous than other Apotex experts.

62    It is obvious, and Drs. Modro and Martin readily admitted it, that Ivor Hughes and Dr. Stewart from his office played a very significant role in the drafting of the reports (presumably all of them except maybe for that of Dr. McClelland). Normally there is nothing wrong with being assisted by one's lawyer in drafting one's report but despite the Court's flexibility in that respect, one must not lose sight of the principle expressed in *National Justice Compania Naviera SA v. Prudential Assurance Co.* ("the Ikarian Reefer"), [1993] 2 Lloyd's Rep. 68 (Eng. Q.B.) to the effect that "expert evidence should be seen as the independent product of the expert uninfluenced as to form or *content* by the exigencies of litigation: *Whitehouse v. Jordan* (1980), [1981] 1 W.L.R. 246 (U.K. H.L.), at 256, per Lord Wilberforce" (emphasis added). Certainly the more the lawyers are involved the more careful an expert must be in reviewing the text proposed to ensure that it truly reflects his or her views. There was some evidence in this case that the review, by Apotex's experts particularly, was not as careful as one would expect.

63    Although the Court generally accepted the evidence of Dr. Hunter in respect of the testing performed and found his evidence credible in respect of the common general knowledge about $^{31}$ P NMR and the impact of various factors on the ppm chemical shift at the relevant time, his evidence was not as useful considering the construction of the claims at issue adopted by the Court. With respect to the validity of the '007 patent (E-18), the Court notes that Dr. Hunter's PhD is in inorganic chemistry. His evidence was given the same weight as that of Dr. Chivers' in respect of the said patent.

64    Again, in view of the construction of the claims at issue, most of the evidence of Dr. Cowley was not particularly useful. In respect of the view he expressed in para. 27 of his report (A-9), the Court preferred the opinion of Dr. Hunter which was corroborated by the tests performed, including those of Dr. Chase. The Court was unimpressed by his evidence with respect to the Spaggiari article. [17]

65    As mentioned, Dr. Chivers, like Dr. Hunter, has a PhD in inorganic chemistry [18] with particular expertise in chemistry involving various elements including phosphorus. He testified in a straightforward, clear and credible manner. It is evident that he had initially also been asked to comment on the validity of the '536 patent, a matter in respect of which he was clearly not qualified, but the report he filed when he took the stand was heavily redacted, probably in response to Lilly's objection that there was duplication. Only paragraph 6 now deals with the '536 patent, it describes the characteristics of the addressee of the patent. His evidence, in respect of the '007 patent, like that of Dr. Hunter, did not add much to that of the well-qualified organic or medicinal chemists relied upon by Apotex and Lilly.

66    Dr. Barrett and Dr. Hanessian are both well-qualified and have expertise in [beta]-lactams, particularly cephalosporin chemistry, even if the details as to exactly what Dr. Hanessian was doing in the late 1970s in respect of [beta]-lactams or cephalosporins are not as clear. [19] These two experts were equally credible which made the task of the Court particularly difficult considering that their evidence is often contradictory.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 167 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

67      My further comments in respect of Drs. Olah, McClelland and Martin's evidence in respect of the Lilly process patents and the Shionogi patents illustrate difficulties the Court faced in this case and which are unfortunately not uncommon.

68      Dr. Olah is an imminent scientist. Among his many outstanding achievements, he has won a Nobel Prize in 1994 for his work on positively charged compounds of carbons. However, he has no experience whatsoever with respect to [beta]-lactams or cephalosporin chemistry. Despite this, he was asked to opine on the validity of the '536 patent on the basis of publications provided to him by Ivor Hughes, one of Apotex's counsel at the time. Like other experts acting for Apotex, his report includes a description of the addressee of these patents which appear to be meant to fit his credentials.

69      In cross-examination, he could not name a reagent used in cephalosporin chemistry — the type of chemistry discussed in the '536 patent. This may explain why he appeared as a reluctant witness who even refused to answer some questions during his cross-examination until offered a choice between withdrawing his report and answering the questions put to him. It may also explain comments such as: "I wouldn't stick out my reputation one way or another to argue that the few ppm one way or the other is a fundamentally different situation." [20]

70      In such a case, it is easy to understand why the Court preferred Dr. Baldwin's evidence in respect of the '536 patent to that of Dr. Olah, and why time spent on examination and cross-examination of a witness that is not "the right expert for the job" is almost always time lost for all concerned.

71      Dr. McClelland's evidence in respect of the Lilly process patents and the Shionogi patents falls pretty much in the same category especially when one considers that he should know better given his vast experience in litigation.

72      This is a problem because one's willingness to offer an opinion without an appropriate basis to do so can impact on the overall credibility of a witness otherwise qualified to opine on another issue for it can raise some doubt as to the existence of a proper basis for the other portion of his opinion or as to whether the expert really understood his role. [21]

73      Dr. Martin is another distinguished organic chemist expert in his field which includes lactams but he has no experience whatsoever in [beta]-lactam chemistry let alone cephalosporin chemistry — a prerequisite of the posita to whom the Shionogi patents are addressed according to para. 12 of his report. In an attempt to compensate for his "obvious" inability to see through the eyes of such posita, Dr. Martin testified that in the claimed reactions in fact the [beta]-lactam molecule remains a spectator. The Court cannot agree and as argued by Lilly, this is a clear use of hindsight. This puts in question Dr. Martin's understanding of his role particularly as he also offered comments on other issues that appear to go beyond his expertise and personal knowledge (conferences given by Kishi and the invention not claimed in the Shionogi patents).

74      Another issue on which the parties presented expert evidence was on pharmaceutical regulatory affairs, particularly the filing of NDSs and DMFs and the requirements for keeping these filings up to date. For this purpose, Lilly called upon Ms. Azzarello who filed one report (E-7) and Apotex relied on the testimony of Ms. Wehner, who did likewise (A-11). This evidence provided some background for the debate on the evidentiary value of the information provided to Health Canada by the foreign suppliers of Apotex. It also brought to light that there may be a loophole in the regulations or at least in how they are applied. According to Ms. Wehner, it is known that foreign suppliers do not always abide by the regulations and file up-to-date information about their processes. Also changes are sometimes implemented before receiving Health Canada approval. I understand that this may have an impact on the ultimate safety of the product because the testing performed on the API by the Canadian sponsor may need to be adapted [22] to the process used to manufacture it. Clearly this is a matter for the regulator, not a Court dealing with an infringement action. That said, in the end, this evidence was not particularly useful.

### 3. Lilly Canada's Lack of Standing

75      Apotex argues that Lilly Canada has not proven its standing to sue. It alleges that a bare assertion of a corporate relationship is not sufficient. In that respect, it relies on two statements made by Justice Judith Snider in *Laboratoires Servier v. Apotex Inc.* (2008), 2008 FC 825, 67 C.P.R. (4th) 241 (F.C.) (*Laboratoires Servier*) that read as follows:

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

The test for who qualifies as a person claiming under a patentee is not simply whether the patentee has consented to the person being joined as a plaintiff in an action; nor is it enough to demonstrate that two parties are related. In each case, the facts must demonstrate a credible and legally sufficient basis for claiming under a patentee

[...]

As noted above, the mere existence of a corporate affiliation is not conclusive evidence of a right under s. 55(1) of the *Patent Act*. There must be something more. That something more has consistently been described in the jurisprudence as a license or some other arrangement (for example, a lease, an assignment, or a sale) that would give the affiliate the right to use the patent.

[paras. 70 and 82]

76     Lilly Canada does not disagree with the above-noted statements, it simply says that in this case it has not only established, through the testimony of Mr. Pytynia (Transcript Volume 7, pp. 56-63; 83-84) that Lilly Canada is a wholly owned subsidiary, but also that it had an express licence to both the Lilly and Shionogi Patents at issue in this case. It has also been admitted that Lilly Canada has been selling Ceclor® (cefaclor) in Canada since 1980. Lilly Canada made specific references to various exhibits filed during the hearing to support its position, particularly an agreement executed and effective as of January 1, 1991 between Lilly U.S. and Lilly Canada (TX-109) where:

Lilly represents and warrants that for Canada, it has the exclusive right to grant licenses to enable the licensee to make, have made, use and sell certain products, including the right to use within Canada, certain patents, trademarks

[...]

relating to such products and to their preparation, manufacture, processing and packaging.

77     In the said agreement, Lilly U.S. appoints Lilly Canada as its authorized distributor of all Lilly U.S. products in Canada (which includes Ceclor®) and at s. 1.2:

Lilly further grants to Lilly Canada a non-exclusive sublicense (without right of further sublicense except as further granted in writing by Lilly) under the Canadian patent applications and patents listed in Schedule "A"

[...]

to make, have made, use or sell, and/or import Lilly Products whose preparation is covered by the patent applications and patents.

78     At pp. 8 and 9 of Schedule A, the four Lilly patents at issue here are listed. Normally, it should thus not be contentious that Lilly Canada has proper standing pursuant to subs. 55(1) of the *Patent Act*, at least in respect of those patents.

79     Apotex, however, says that on January 1, 1995, the 1991 agreement was amended (TX-110) to delete the various schedules which, according to Mr. Pytynia, was done to avoid having to keep them up to date which was found to be difficult. According to Apotex, the result of this amendment is simply that licences to the Lilly or Shionogi patents were no longer granted to Lilly Canada.

80     This, according to Apotex, makes particular sense [23] in respect of the Shionogi patents, given that none of the material purchased by Lilly Canada was made by the processes protected thereunder and that Lilly Canada never actually made, purchased or sold any of the actual compounds claimed in the patents in suit. Apotex also discards the impact of the General Supply and Distribution Agreement, filed as TX-112, on the basis that Lilly Canada's role as distributor appears to be based on an agreement that says nothing about patent rights, nor does it characterize Lilly Canada as an agent and expressly disclaims any other rights flowing between the parties.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

81      The Court agrees with the plaintiff that such an interpretation of the 1991 agreement as amended through time leads to an absurd result and is simply incorrect. The January 1, 1995 agreement expressly states:

> WHEREAS the parties desire to maintain the rights, licenses and sublicenses granted by the AGREEMENT while also recognizing that the parties will receive full compensation under the Master Supply and Distribution and Manufacturing or other Agreements.

82      It is also worth noting that the 1991 agreement was further amended on April 9, 1998 (TX-113) giving Lilly Canada the right to further sub-licence a third party under some of the patents covered by the agreement, in conformity with s. 1.2 of the 1991 agreement. More particularly, the amendment refers to the licence granted under the 1991 agreement for cefaclor and:

> grants to Lilly Canada the right to sub-license the following licenses granted to it under the [1991] License Agreement (collectively, the "Licenses") for cefaclor: (i) licenses granted under patent rights of Lilly U.S. (including, without limitation, the patents listed in Schedule A hereto).

Said schedule made specific reference to three of the Lilly Patents in suit (the only ones missing are the '007 and '026, the latter having expired by that time).

83      Having considered all of the evidence, the Court is satisfied that Lilly Canada has properly established its standing based on an express licence from the patentee.

84      Before concluding on this issue, it is worth quoting a passage from the decision of the Federal Court of Appeal in *Apotex Inc. v. Wellcome Foundation Ltd.* (2000), [2001] 1 F.C. 495, 262 N.R. 137 (Fed. C.A.) (*Apotex (2000)*), where, after observing that the trial judge, Justice Howard Wetston, had committed no error in his analysis and conclusion, and that based on the unwritten licensing practices of the Glaxo Wellcome Inc. group of companies, Glaxo Wellcome Inc. had an unwritten licence to all the patents held by companies under the control of Glaxo Wellcome Inc. of the United Kingdom, Justice Marshall Rothstein noted, at para. 99, that:

> It is perhaps not uncalled for to observe that this is not a case in which the alleged licensee is alone in advancing its claim for the patent infringement. Here, the patentee is also before the Court as a co-Plaintiff supporting the claim of GWI. It is difficult to conceive of what more is necessary to prove the existence of a licence than to have the licensor and licensee both attesting to the validity of the license. Where both the patentee and the person claiming under the patentee are before the Court, are affiliated as being owned by the same parent and have an identity of interest in the litigation — with the patentee supporting the person claiming under the patentee — it is, to say the least, surprising that technical questions of status to sue would be advanced as a defence to infringement.

85      In fact, Lilly Canada argues that in the past, the Federal Court of Appeal has accepted less than an exclusive or non-exclusive licence as evidence of a right to claim under the patentee. For example, in *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée* (1992), [1993] 1 F.C. 341, 147 N.R. 241 (Fed. C.A.), the Court accepted that the plaintiff whose standing was contested was a sales representative of the patentee's product in Canada. The agreement between it and the patentee did not make any specific reference to the patents or rights of any kind thereunder, leading Justice Paul Rouleau to conclude that the plaintiff had no standing to sue for infringement. In reversing the decision of the trial judge, the Court of Appeal said, among other things, that:

> In my view, a person 'claiming under' the patentee is a person who derives his rights to use the patented invention, at whatever degree, from the patentee. The right to use an invention is one of the monopoly to which is conferred by a patent. When a breach of that right is asserted by a person who can trace his title in direct line back to the patentee that person is 'claiming under' the patentee. It matters not by what technical means the acquisition of the right to use may have taken place. It may be a straightforward assignment or a license. It may, as I have indicated, be a sale of an article embodying the invention. It may also be a lease thereof. What matters is that the claimant asserts a right in the monopoly in that the source of that right may be traced back to the patentee. This is the case with the appellant here.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

[Footnotes omitted, para. 24]

86    There is no doubt here that Lilly Canada derives its rights from the patentee, Lilly U.S.

### 4. Patent Construction

87    Before considering the allegations of infringement and invalidity, the Court must construe the claims at issue in this proceeding. The principles of construction are well-established. They are set out in *Free World Trust c. Électro Santé Inc.*, 2000 SCC 66, [2000] 2 S.C.R. 1024 (S.C.C.) (*Free World Trust*), and *Whirlpool Corp. v. Camco Inc.*, 2000 SCC 67, [2000] 2 S.C.R. 1067 (S.C.C.) (*Whirlpool*). Since those decisions were issued, much has been written by this Court on this topic. Be it sufficient to say that "[t]he key to purposive construction is therefore the identification by the court, with the assistance of the skilled reader, of the particular words and phrases in the claims that describe what the inventor considered to be the "essential" elements of his invention." [24] As to the further details of what date the claims are to be construed, using what criteria, what resources, through whose eyes and what is made of the resulting construction, the Court adopts and refers to paras. 32-48 of Justice Roger Hughes' decision in *Pfizer Canada Inc. v. Canada (Minister of Health)* (2005), 285 F.T.R. 1 (Eng.) (F.C.).

88    As noted in *Shire Biochem Inc. v. Canada (Minister of Health)* (2008), 2008 FC 538, 328 F.T.R. 123 (Eng.) (F.C.), at para. 21 (*Shire*), the Court "is not to construe a claim without knowing where disputes between the parties lie." This is particularly important in cases such as this one, where a large number of claims in eight distinct patents are at issue. As previously noted, all of the patents in this case were issued before October 1, 1989 and are thus subject to the pre October 1, 1989 version of the *Patent Act* (s. 29 of the post October 1, 1989 version of the *Patent Act*). They are to be construed as of their respective dates of issuance.

89    To these more general principles, one should also add that the Court adopts and will apply Justice Denis Pelletier's statement regarding claim differentiation in *Halford v. Seed Hawk Inc.* (2004), 2004 FC 88, 246 F.T.R. 1 (F.C.) (*Halford*), affirmed, 2006 FCA 275, 275 D.L.R. (4th) 556 (F.C.A.) at para. 110, where he quoted the following passage from *D.M.I. Inc. v. Deere & Co.* (1985), 755 F.2d 1570, 225 U.S.P.Q. 236 (U.S. Fed. Cir. 1985):

> The district Court said 'As a general rule a limitation cannot be read into a claim to avoid infringement'...Where, as here, the limitation sought to be 'read into' a claim already appears in another claim, the rule is far more than 'general.' It is fixed. It is long and well established. It enjoys an immutable and universally applicable status comparatively rare among rules of Law.

90    The Court will also rely on the following passage from *The Canadian Law and Practice Relating to Letters Patent for Inventions* by Harold G. Fox (*Fox*), [25] which was recently quoted by Justice Snider in *Hoffmann-La Roche Ltd. v. Mayne Pharma (Canada) Inc.* (2005), 2005 FC 814, 41 C.P.R. (4th) 505 (F.C.) (*Hoffmann (2005)*), at para. 43:

> Each part of the specification must be effectively construed and, <u>if it is at all possible, each claim must be construed independently of the others and be given an effective and distinct meaning</u>. The court will not be inclined to construe two claims in a specification as identical, for if one claim bears the same meaning as another it does not bear an effective meaning.

[Emphasis is in the original.]

### 4.1. Person Skilled in the Art

91    With respect to the '007 patent, although the disclosure discusses, among other things, the utility of the new class of halogenating compounds in the chemistry of cephalosporins, the Court is satisfied that the art to which the patent relates is wider than the chemistry of cephalosporins for the patent covers the kinetic complexes (compound by process claims) and processes to make them. Thus, the Court accepts Apotex's view that the addressee of the patent would have a Ph.D. in organic or medicinal chemistry with 3-5 years experience in carrying out organic transformations and knowledge of organophosphorus compounds as well as the use of $^{31}$P NMR (see para. 119 of Apotex's memorandum on infringement).

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 171 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

92    That said, with respect to the Shionogi patents and the Lilly process patents, the Court finds that the addressee is a person with a Ph.D. in organic or medicinal chemistry, with 3-5 years experience in organic synthesis and heterocyclic chemistry, particularly in [beta]-lactam chemistry and penicillin or cephalosporin compounds.[26]

93    Insofar as the Shionogi patents are concerned, there is little dispute between the parties in that respect even if Dr. Hanessian appears to prefer the word "focus" to describe the experience of the person skilled in the art in the [beta]-lactam antibiotic field. It is apparent that at the relevant time, this kind of chemistry was only conducted by, and of interest to, very specialized research teams. Dr. Baldwin, who was actively working in that field at the time, described those researchers in his testimony.[27]

94    The views of Apotex's experts such as Dr. Olah (with respect to the '536 patent) and Dr. McClelland (who deals with the Lilly process patents as well as the Shionogi patents)[28] regarding the particular addressee of the process patents appear to be designed to suit the particular characteristics of their own expertise, rather than that of the true addressee. The Court cannot accept the view that the addressee of the Lilly process patents is the same person to whom the '007 patent is addressed, but who "would in addition likely be interested in cephalosporin compounds."[29] That said, this finding will have little impact on the evaluation of their evidence, given that, as mentioned when discussing the weight given to the expert evidence, Apotex's experts who commented on the Lilly process patents would not meet either description as there is no evidence that any of them had a particular interest in cephalosporins prior to their involvement in this litigation. They have failed to establish in their affidavit the basis on which they are qualified to comment on how a person skilled in the art (hereinafter posita) at the relevant time would construe the patents and what common general knowledge these persons would possess.

### 4.2. Common General Knowledge (Principles)

95    During the trial, the Court noted on several occasions that there was little evidence to establish that the numerous publications, patents, applications relied upon by various experts were part of the common general knowledge of the posita at the relevant time. While this was to a certain extent cured through the cross-examinations, it remains that too little attention was given to such matters which are of prime importance, not only to construe the claims, but also to assess the prior art put forth to establish invalidity. This is particularly significant when, like in this case, one is considering older patents issued at a time when a posita did not have the benefit of electronic versions of scientific publications and could not use the internet or other sophisticated research tools to locate relevant information.

96    The very general statements made recently by the Supreme Court of Canada that "[c]ommon general knowledge means knowledge generally known by persons skilled in the relevant art at the relevant time" (*Sanofi-Synthelabo Canada Inc. v. Apotex Inc.*, 2008 SCC 61, [2008] 3 S.C.R. 265 (S.C.C.) (*Sanofi*)) or that a posita is expected to be "reasonably diligent in keeping up with advances in the field to which the patent relates" and that their common knowledge "undergoes continuous evolution and growth" (*Whirlpool*, para. 74) must be read together with other classic comments that are still applicable.[30]

97    As noted in *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.*, [1972] R.P.C. 457, [1971] F.S.R. 417 (U.K. H.L.) (*General Tire*) at pp. 482-483 (of the RPC):

The common general knowledge imputed to such an addressee must, of course, be carefully distinguished from what in patent law is regarded as public knowledge. This distinction is well explained in Halsbury's Law of England, Vol. 29, para. 63. As regards patent specifications it is the somewhat artificial (see per Lord Reid in the Technograph case [1971] F.S.R. 188 at 193) concept of patent law that each and every specification, of the last 50 years, however unlikely to be looked at and in whatever language written, is part of the relevant public knowledge if it is resting anywhere in the shelves of the Patent Office. On the other hand, common general knowledge is a different concept derived from a commonsense approach to the practical question of what would in fact be known to an appropriately skilled addressee — the sort of man, good at his job, that could be found in real life.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 172 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

The two classes of documents which call for consideration in relation to common general knowledge in the instant case were individual patent specifications and "widely read publications".

As to the former, it is clear that individual patent specifications and their contents do not normally form part of the relevant common general knowledge, though there may be specifications which are so well known amongst those versed in the art that upon evidence of that state of affairs they form part of such knowledge, and also there may occasionally be particular industries (such as that of colour photography) in which the evidence may show that all specifications form part of the relevant knowledge.

As regards scientific papers generally, it was said by Luxmoore, J. in British Acoustic Films (53 R.P.C. 221 at 250):

> In my judgment it is not sufficient to prove common general knowledge that a particular disclosure is made in an article, or series of articles, in a scientific journal, no matter how wide the circulation of that journal may be, in the absence of any evidence that the disclosure is accepted generally by those who are engaged in the art to which the disclosure relates. A piece of particular knowledge as disclosed in a scientific paper does not become common general knowledge merely because it is widely read, and still less because it is widely circulated. Such a piece of knowledge only becomes general knowledge when it is generally known and accepted without question by the bulk of those who are engaged in the particular art; in other words, when it becomes part of their common stock of knowledge relating to the art." And a little later, distinguishing between what has been written and what has been used, he said:

> It is certainly difficult to appreciate how the use of something which has in fact never been used in a particular art can ever be held to be common general knowledge in the art.

Those passages have often been quoted, and there has not been cited to us any case in which they have been criticised. We accept them as correctly stating in general the law on this point, though reserving for further consideration whether the words "accepted without question" may not be putting the position rather high: for the purposes of this case we are disposed, without wishing to put forward any full definition, to substitute the words "generally regarded as a good basis for further action."

98    In *Mahurkar v. Vas-Cath of Canada Ltd.* (1988), 16 F.T.R. 48, 18 C.P.R. (3d) 417 (Fed. T.D.), Justice Barry Strayer noted, at para. 27:

> In reviewing the prior art I have also been persuaded by counsel for the plaintiff that an objective test should be applied to determine whether the hypothetical skilled workman in the art could be reasonably assumed to have knowledge of such prior art. There appears to be adequate authority in the jurisprudence for such a test. No evidence was produced by the defendants to show that the ordinary skilled workman should be assumed to have been aware of all of this prior art. Frankly I find it difficult to believe that several of the items of prior art would have been present to the mind of the ordinary skilled workman in 1981.

> [Emphasis added]

99    Furthermore, as noted by Justice Karen Sharlow in *Janssen-Ortho Inc. v. Novopharm Ltd.*, 2007 FCA 217, 366 N.R. 290 (F.C.A.), at para. 25 (citing factors developed by Justice Hughes in *Janssen-Ortho Inc. v. Novopharm Ltd.* (2006), 301 F.T.R. 166 (Eng.) (F.C.) (*Janssen-Ortho (2006)*)):

> Not all knowledge is found in print form. On the other hand, not all knowledge that has been written down becomes part of the knowledge that a person of ordinary skill in the art is expected to know or find.

100    With respect to the proof required to establish common general knowledge, this passage from Simon Thorley et al., *Terrell on the Law of Patents*, 16th ed. (London: Sweet & Maxwell, 2006) (*Terrell*), at 6-39 is relevant:

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 173 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Proof of common knowledge is given by witnesses competent to speak upon the matter, who, to supplement their own recollections, may refer to standard works upon the subject which were published at the time and which were known to them. In order to establish whether something is common general knowledge, the first and most important step is to look at the sources from which the skilled addressee could acquire his information.

The publication at or before the relevant date of other documents such as patent specifications may be to some extent prima facie evidence tending to show that the statements contained in them were part of the common knowledge, but is far from complete proof, as the statements may well have been discredited or forgotten or merely ignored. Evidence may, however, be given to prove that such statements did become part of the common knowledge.

[Footnotes omitted.]

101      In the present case, most of the printed information cited by Apotex's experts was provided to them by the office of Ivor Hughes, one of Apotex's counsel. Originally, Dr. Sarkis from that office was scheduled to appear as a witness. However, he did not testify [31] and no evidence was given as to how the search for this literature was conducted. With the exception of one answer, given during Dr. Barrett's testimony, that *Chemical Abstracts* were not available in electronic form at the relevant time, the Court still does not know what research tools, if any, would have been available. This is particularly important when one considers that this information was used by experts, such as Drs. McClelland, Olah and Martin, [32] who did not work in the area relevant to the process patents at the relevant time, nor did they have a particular interest or focus on [beta]-lactam, let alone cephalosporin compounds. Such experts could not rely on their own experience and memories of these publications and they opined on the validity of various process patents at issue simply on the basis of the written material provided to them.

102     Even Dr. Hanessian, who was, to some extent, working in that field in the late 1970's, does not properly address the notion of common general knowledge and what search would normally be done at the time by the skilled addressee. He noted during one of his cross-examinations that he was aware of some of the materials given to him but did not specify when he had become aware of this material during his career. Was it only in the 1980's when he got more deeply involved with cephalosporins?

103      Certainly none of these experts describe the beliefs and biases commonly held by such an addressee at the relevant time that could not be expressed in printed form.

104      The distinction between common general knowledge and prior art which is part of the state of the art for the purpose of assessing anticipation and obviousness tends to diminish in modern times because of the sophistication of search engines and the availability of electronic publications and databases. Nevertheless, the degree to which a particular publication was "generally regarded as a good basis for further action" (*General Tire*, at p. 483) is still very relevant when one considers issues such as obviousness, where mosaicing is permitted in certain circumstances.

105     That said, the Court will now turn to the immediate task at hand, which is the construction of the individual patents.

### 4.3. The '007 Patent

106      The claims of the '007 patent that remain at issue are claims 1, 4 (dependent on claims 1, 2 or 3), 13 (dependent on claims 8, 9 or 10), 17 (dependent on claims 8, 9 or 10) and 18 (dependent on claims 8, 9 or 10). Claims 1 and 4 are compound claims, whereas claims 13, 17 and 18 are process claims. It is not necessary to reproduce all of these claims here; an example of each type will suffice.

107      The Court will use claims 1 and 17, as their construction has been a subject of dispute between the parties. These claims read as follows:

1. A halogenating compound of the general formula

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 174 of 308
Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...



**Graphic 1**

which is the kinetically controlled product of the reaction of equivalent amounts of a triaryl phosphite of the formula



**Graphic 2**

and chlorine or bromine in a substantially anhydrous inert organic solvent wherein in the above formulas Z is hydrogen, halo, $C_1$-$C_4$ alkyl or $C_1$-$C_4$ alkoxy, and X is Cl or Br.

17. The process of claim 8, 9 or 10 wherein the solvent is an aromatic hydrocarbon or halogenated hydrocarbon.

However, to better understand claim 17, one must look, for example, as to how it would read if one used the process described in claim 8. It would cover a process for preparing a halogenating compound of the general formula:



**Graphic 3**

which is the kinetically controlled product of the reaction of equivalent amounts of a triaryl phosphite of the formula:



**Graphic 4**

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 175 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

and chlorine or bromine in substantially anhydrous inert [aromatic hydrocarbon or halogenated hydrocarbon] wherein the above formulas Z is hydrogen, halo, $C_1$-$C_4$ alkyl or $C_1$-$C_4$ alkoxy, and X is Cl or Br.

108      It is also useful to reproduce claim 6 which, although not at issue, has been referred to by all parties when discussing the essential elements of claims 1 and 4 in particular.

6. A compound having the empirical formula



**Graphic 5**

which

(a) has a $^{31}$P nuclear magnetic resonance signal in methylene chloride at -3.7 ppm relative to that of phosphoric acid;

(b) has in, methylene chloride, an infrared spectrum which exhibits the following characteristic absorptions: 1120-1190 (very strong), 1070 (very strong), 1035 (strong), 1010 (very strong), 990 (very strong), 640 (medium), 625 (medium), 580 (weak), 510 (strong) and 465 (weak)

(c) reacts with water to give HCl and triphenyl phosphate; and

(d) reacts with n-butanol to give HCl n-butyl chloride, and triphenyl phosphate.

109      The common elements of claims 1, 4, 13, 17 and 18 are (1) a halogenating compound of the general formula described therein; (2) which is the kinetically controlled product; (3) of the reaction; (4) of equivalent amounts; (5) of triaryl phosphite;[33] (6) and Cl or bromine (Br);[34] (7) in a substantially anhydrous inert organic solvent.[35] It is not disputed that these seven elements (in the form covered by each claim) are essential elements of these claims.

110      The parties disagree, however, on whether or not the specific solvent described in claim 17 is an essential element of that claim. This will be discussed later. They also disagree as to the impact of the words "[a] halogenating compound" at the beginning of claim 1, for example. Is claim 1 a *Shell Oil* type claim (*Shell Oil Co. v. Canada (Patent Commissioner)*, [1982] 2 S.C.R. 536, 142 D.L.R. (3d) 117 (S.C.C.)), i.e. a claim for a new use of the kinetically controlled product of the reaction described therein, or is the reference to halogenating compounds simply a description of the nature or class of the compound described by formula I per se? There is also a dispute as to whether or not the term "kinetically controlled product" necessarily and implicitly includes the properties[36] described in Table 1 (p. 8 of the disclosure) as an essential element when the reaction is between TPP and Cl (i.e. where Z and X of the formula in claim 1 is H and Cl respectively).

111      It is undisputed that "substantially anhydrous inert organic solvent" means a solvent that is not going to react with the compound and that is substantially water-free or contains little water. The term substantially anhydrous, as used in the disclosure and the patent, is also defined at p. 14 to mean that:

although anhydrous organic solvents are generally preferred, trace amounts of water, such as that often found in commercially available solvents, can be tolerated. Although the kinetic products described herein will react with any water present in the solvent medium, additional amounts of reagents can easily be added to compensate for the loss. It

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042    Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 176 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

is preferred that conventional laboratory techniques be employed to dry the solvents employed and to exclude moisture from the reaction mixtures.

112    Although the disclosure describes suitable solvents that can be used in great detail at pp. 14 and 15 it is also stated that the "[p]referred solvents for the preparation of the [claimed] compounds are hydrocarbons, especially aromatic hydrocarbons, and halogenated hydrocarbon solvents", such as those specifically referred to in claim 17. In addition, "[t]he particular inert organic solvent employed as a medium for the preparation of the [...] triaryl phosphite-chlorine complex or as a medium for its use in halogenation processes is not critical".

113        With respect to the nature of the invention, the disclosure states, at p. 1, that it is "directed to a novel class of halogenating agents which are useful in preparing 3-halo-3-cephems." The said halogenating agents are described as "highly reactive halogenating compounds, having the structural formula [I]" [37] and "derived from the reaction of a triaryl phosphite and chlorine or bromine respectively." It then states that "[a] number of halogenating agents derived from halogens and phosphorus or phosphorus containing compounds have been described" in the prior art and that:

> [o]f those prior art compounds, those most closely related to the present compounds are the triphenyl phosphite dihalides which have an empirical formula identical to that of the present compounds. See, for example, D. G. Coe, S. R. Landauer, and H. N. Rydon, J. Chem. Soc., 2021 (1954) and H. N. Rydon and B. L. Tonge, J. Chem. Soc., 3043 (1956). [38]

114        At p. 3, the disclosure acknowledges that "the present halogenating compounds can be described *as intermediates, previously unrecognized, in the preparation of the prior art triaryl phosphite dihalides from triaryl phosphites and chlorine or bromine*." (Emphasis added.)

115        The disclosure also states that, although the prior art triaryl phosphite dihalide and the claimed triaryl phosphite-halogen compound have two discrete molecular forms (i.e. a kinetic form and a thermodynamically stable form described in the prior art), their exact molecular forms have not been established definitively. Therefore, the dot (•) in the general formula used for example in claims 1 and 17 (dependent on claim 8, 9, or 10):

> is used simply to designate that equivalent amounts of halogen and phosphite reagent are combined chemically and in a way that can be distinguished from that in the prior art compounds which typically have been drawn without the dot.

> [p. 4 of the disclosure]

The only further information with respect to the molecular form of the claimed compounds is that "physical-chemical data do indicate that the kinetic product is one wherein the phosphorus center acquires some cationic character." [39]

116        At p. 15, the specification also states that:

> the triaryl phosphite-halogen complexes of the present invention are potent halogenating agents. Like the prior art thermodynamically stable triaryl phosphite dihalide compounds, the present kinetic complexes react with aliphatic alcohols to provide the corresponding alkyl halides (with different by-products). Unlike the prior art triaryl phosphite dichlorides, however, the present compounds efficiently halogenate under mild conditions both enolic groups to form the corresponding vinyl halides and, in the presence of base, amido functions to form the corresponding imino halides.

> More particularly the present halogenating complexes can be used in preparing known 3-halo-cephem antibiotics of the formula [V].

> [Emphasis and footnote added; emphasis in the original omitted.]

117        However, as mentioned earlier, there is no specific reference to this use of the claimed compounds or processes in any of the claims.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

118    The disclosure discusses in some detail how the reaction should be carried out to maximize the formation of the kinetically controlled products and means for stabilizing those products. However, except for claims 18 and 8, where the reaction temperature for carrying out the process of the claims described therein is stated as "about -70 to about 0° C" and, to some extent, claims 17 and 27, which specifically refer to the solvent being an aromatic hydrocarbon or halogenated hydrocarbon [40], none of the claims include elements directed to stabilizing or improving the formation of the kinetically controlled product of the reaction described in the claims.

119    The disclosure describes in some detail how the kinetically controlled product converts to a corresponding thermodynamically stable prior art form at varying rates, depending on, among other things, the nature of the triaryl phosphite, the halogen, the solvent and the solution temperature (see pp. 6-11) and discusses the half-life of the kinetically controlled product as well as how to use [31] P NMR to determine the half-life of the product or its presence in solution. It also lists in Table 1 on p. 8 five indicia, or properties, differentiating the kinetically controlled product and the thermodynamically controlled product of the reaction of TPP and Cl. These are 1) a [31] P NMR shift in $CH_2Cl_2$; 2) the half-life in $CH_2Cl_2$; 3) infrared data; 4) the reaction products obtained when each compound is hydrolyzed; and, 5) the reaction products with N-Butanol (See also p. 7, lines 18 to 21; p. 2, line 20 to p. 3, line 3; p. 9, lines 1 to 8). Again, except for claims 6 and 7, there is no express reference to such characteristics in the claims.

120    The disclosure of the '007 patent includes 10 examples and only examples 1 and 2 provide corresponding [31] P NMR data to identify the kinetically controlled product obtained in methylene chloride from the reaction of TPP with Br (example 1) and TPP with Cl (example 2). In both instances, it appears that a +3.7 ppm shift was observed. [41] [42] The [31] P NMR for the thermodynamic product was described as -22.7 ppm. [43]

121    As noted, claim 6 (an independent claim) expressly refers to four properties of the product from the reaction of TPP and Cl listed in Table 1. This includes a [31] P NMR shift at +3.7 ppm (in $CH_2Cl_2$), IR data, by-products of hydrolysis and reaction with N-Butanol. Claim 7 covers the kinetically controlled product of the reaction of TPP with Br in methylene chloride and only refers to the [31] P NMR resonant signal at +3.7 ppm. [44] Although these two claims are not at issue, as mentioned in *Hoffmann (2005)* and *Halford*, they can be useful in construing the claims at issue.

122    Each claim is generally to be given a distinct and effective meaning. It is clear that claim 6 is more limited in scope than claim 1 because it covers only a subset of the compound, i.e. when Z = H and X = Cl. In my view, it is also evident that they have different essential elements given that these claims adopt a very different approach to delineate the monopoly they cover. In claim 1, the general formula representing the halogenating compound is only particularized by reference to the kinetically controlled nature of the product and the main features of the reaction producing it (i.e. how it can be obtained). Conversely, claim 6 defines its monopoly by reference to the empirical formula of the compound and the properties that further distinguish it from the prior art dihalides having a similar empirical formula (Table 1, p. 8).

123    Inasmuch as one could not construe claim 6 as including, as essential elements of the claim, the reaction of equivalent amounts of the materials described in claim 1 without rewriting the claim, one could not construe claim 1 as including as its essential elements the properties described in claim 6. If, by construing the claim, one were to limit or incorporate the elements of one independent claim into the elements of another independent claim, one would disregard the right of the inventors to adopt different ways of defining their monopoly and describing different aspects of an invention, which may or may not be too limited or too wide. [45]

124    Having considered the specification as a whole, the Court can now address the main issues raised by the parties (see para. 110, above).

125    The Court cannot accept Apotex's argument (summarized at paras. 151-160 of its memorandum on infringement [46]) that the expression "kinetically controlled product" in claim 1 would be read and understood by a posita as including as one

of its essential elements, a [31]P NMR shift of +3.7 ppm (or any other data included in claim 6) when applied to the kinetically controlled product of the reaction between TPP and Cl.

126    Among other things, the Court notes that the disclosure, at pp. 4 and 5, is quite specific as to the meaning of this term:

[H]erein, the terms "kinetic compound," "kinetic complex," "triaryl phosphite-halogen complex (compound)", "kinetically controlled halogenating compounds," and "kinetically controlled product (compound)" are used synonymously and likewise are to be distinguished from those triaryl phosphite dihalides of the prior art.

The term kinetically controlled product is a term of art which, when used in reference to reactions yielding two (or more) products, refers to the product formed faster, regardless of its thermodynamic stability.

127    There is evidence from Dr. McClelland that a skilled person would understand the meaning of "kinetically controlled product" without even consulting the disclosure preceding the claims.[47] In any event, after discussing various criteria contained in the disclosure, such as half-life and reactivity, which distinguish the claimed compound from the thermodynamic product, Dr. McClelland states that:

This is criteria, but the basic term, "kinetic complex," as used in the patent, indicates that it's not stable in regards to what its half-life is, and that it would convert to the thermodynamic complex with time.[48]

128    This is perfectly in line with the Court's understanding of the patent.

129    Given the uncertainty as to the molecular structure, Apotex's experts appear to focus on the need to better understand and identify the claimed compounds. For this purpose they use the properties described in Table 1 which in fact concern only one such compound.[49] The inventors did not wish to be tied down to a particular molecular structure and they used the formula with a dot (•) only to distinguish the claimed compounds from the thermodynamic compounds described in the prior art.[50] It is evident that the information given in Table 1 and elsewhere in the disclosure will enable the posita to more easily identify and use the claimed compounds and processes. This does not however answer the question of law as to whether these elements are included in claim 1 as essential elements of the monopoly described therein.

130    Also, Dr. McClelland clearly adds words to the disclosure when, in para. 15 of his affidavit (TX-1764) he states that:

[t]he skilled chemist would understand from the patent that these criteria such as the [31]P NMR chemical shift and the IR are to be employed to distinguish the <u>novel</u> kinetic product [...] claimed in the Patent from the prior art, i.e. from the thermodynamic product [...] <u>and other previously unrecognized halogenating compounds with the same empirical formula.</u>"[51]

[Emphasis added]

In fact, there is no mention in the specification that the inventors are trying to distinguish their claimed kinetic product from *previously unrecognized intermediates* made using Rydon. On the contrary, they clearly focus on distinguishing the kinetic products from the prior art dihalides, i.e. the thermodynamic form of the compounds disclosed in the prior art.[52]

131    The idea that a posita would try to determine what *novel* compound was claimed, meaning according to Dr. McClelland, what differentiated the previously made and unrecognized compound in Rydon versus the claimed compound, is not acceptable. Even the Courts had not specified that previously made but unrecognized compounds could prevent Lilly from claiming novelty in the '007 patent until the decision of the House of Lords in *Merrell Dow Pharmaceuticals v. H.N. Norton & Co.* (1995), 33 B.M.L.R. 201, [1996] R.P.C. 76 (U.K. H.L.) (*Merrell Dow Pharmaceuticals Inc.*) in 1995 and in Canada until the decision of the Federal Court of Appeal in *Abbott Laboratories v. Canada (Minister of Health)*, 2006 FCA 187, 350 N.R. 242 (F.C.A.) (*Abbott (2006)*).

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 179 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

132    The Court is not convinced that Apotex has established that Tseng and Michalski's articles, particularly the information the authors give about [31] P NMR shift of the substances discussed therein, were part of the common general knowledge available to the addressee of the patent at the date of issuance. That said, to avoid any collateral debate, the Court did in fact consider this information to determine if it would have any impact on the construction at issue and concluded that it would not. It is therefore not useful to elaborate further on this.

133    Also in respect of common general knowledge, the Court agrees with Apotex that Dr. Gorenstein's evidence, to the effect that it was well-known and part of the general common knowledge at the relevant time, that [31] P NMR shifts were susceptible to variations of several ppm (more than the ±1 ppm advanced by some of Apotex's experts) for a given compound as a result of very many variables, [53] was not proper reply evidence because Dr. Hunter had already addressed this very issue in a prior affidavit. But this conclusion is of no moment, given that the Court found Dr. Hunter's evidence credible in that respect and gave it much weight, but more importantly because this evidence has little impact, if any, on the Court's conclusion in respect of the construction of claims 1 and 4. Again, like the Tseng and Michalski articles, it may well have an impact on the construction of claim 6 but this claim is not at issue and the Court certainly does not need to decide what variant [54] , if any, would be covered by the express reference to a shift of +3.7 ppm.

134    Turning now to the second element in dispute, the Court must also reject Lilly's argument that claim 1 is a *Shell Oil*-type claim, where the invention is a new use of a previously unrecognized compound as opposed to a classic compound claim.

135    There is no mention in the patent that the previously unrecognized intermediate discussed in the disclosure was not a halogenating compound and should be distinguished in any way from the claimed compound on that basis.

136    However, as mentioned earlier, it is clearly stated in the disclosure that both the thermodynamic products and the kinetically controlled products of the reactions described in the claims are halogenating compounds. The only discussion of a new or distinct use of the kinetically controlled compound is in contradistinction with the prior art triaryl phosphite dihalides and it concerns their ability to efficiently halogenate under mild conditions both enolic groups and their "utility" in preparing known 3-halocephem antibiotics of the formula described on p. 15 of the patent. The words "a halogenating compound" cannot be meant to infer those distinctions. The Court is thus satisfied that the reference to "halogenating compounds" is simply descriptive of the class of compounds to which the claimed compounds pertain. [55] The invention as described and claimed is thus the compounds themselves and the processes to produce these compounds.

137    With respect to claim 17, the Court must determine whether or not the particular solvent (an aromatic or halogenated hydrocarbon) is an essential element of the claim. As noted earlier, the disclosure states that the particular inert organic solvent employed is not critical to the making of the claimed compounds so long as it is substantially anhydrous. On the other hand, it is undisputed that an anhydrous solvent is essential for the process to work and the only solvents in claim 17 are the preferred solvents described on p. 15 of the patent.

138    As a dependent claim, it covers a particular embodiment of the invention described in claim 8, 9 or 10. The solvent is its only distinguishing feature. Here it is worth pointing out again that one of the main purposes of establishing what is essential in that claim is to determine what element cannot be varied in an allegedly infringing product. In other words, could one infringe claim 17 without using an aromatic or halogenated hydrocarbon. To ask the question is to answer it, which answer is obviously no.

139    To say otherwise would mean that this claim is not distinct at all from claim 8, 9 or 10. As described in *Whirlpool* and *Free World Trust*, there are limits to how the Court may use the disclosure to construe the claims. The disclosure cannot be used to rewrite a claim. If an inventor has clearly limited his or her monopoly by making essential what is clearly not necessary to the proper working of the invention, he will suffer the consequences and will not be able to prevent a third party from using his invention for it will be able, with a simple variation, to avoid infringement.

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 180 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

140    To adopt Apotex's position that the solvent in claim 17 is a non-essential element would mean that this claim is essentially read out of the patent and has absolutely no meaning.

141    It may well be that the claim is invalid for lack of novelty or inventiveness or that it is not patentably distinct but that is not to be decided at this stage.

### 4.4. The Lilly Process Patents

142    It is not disputed that the applications for these three process patents were filed on the same day as the '007 patent. [56]

143    The Lilly process patents relate to the use of the kinetically controlled product discussed in the '007 patent, to effect, either alone or in any combination, the following steps: cephalosporin sulfoxide reduction, enol chlorination and imino halide formation. The schematic depictions of these steps are described in para. 18 or Dr. Baldwin's report (E-6) as follows:



**Graphic 6**



**Graphic 7**

144    Optionally, included within some of the claims of each of the Lilly process patents, is a subsequent alcoholysis (converting the imino halide intermediate to an amine) and salt formation steps. That said, and given that the construction of the claims in the patents raises no substantial issue, the Court will only discuss the '536 patent in some detail, for this is the most comprehensive, and will briefly deal with the other two patents.

### 4.4.1. The '536 Patent

145    The following are the claims being pursued at trial: 4-6, 8, 11, 14-18, 20-22, 27 and 30-34. They are all dependent claims.

146    The '536 patent is entitled "Cephalosporin reduction process". The specification starts by disclosing that "[c]ephalosporin sulfoxides are widely used intermediates in the synthesis of cephalosporin antibiotics." Several examples are provided and relevant prior art, such as two patents by Dr. Douglas C. Spry, one by Dr. Stjepan Kukolja and a couple of patents by Dr.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Robert R. Chauvette. [57] It states in particular at p. 2 that the "3-exomethylenecepham sulfoxides are useful intermediates in the preparation of the 3-halo substituted cephalosporins described by Chauvette [...] and in the synthesis of the 3-methoxy-3-cephem antibiotic compounds described by Chauvette [...]."

147     At p. 3, it is noted that "[p]rior to this invention one preferred method for reducing cephalosporin sulfoxide was that of Murphy et al., U.S. Pat. No. 3,641,014." It also deals with other reduction methods, disclosed by Drs. Lowell D. Hatfield, Kukolja and Spry in other patents. It continues by saying, at pp. 3-4, that:

> In view of the usefulness of cephalosporin sulfoxides in the synthesis of cephalosporin antibiotics, more efficient and more economical methods for sulfoxide reduction, have been the object of extensive research efforts. This invention provides a process for the reduction of cephalosporin sulfoxides. More particularly this invention is directed to a process for reducing cephalosporin sulfoxides using a recently discovered class of triaryl phosphite-halogen compounds, derived from the kinetically controlled reaction of equivalent amounts of triaryl phosphites and chlorine or bromine. The triaryl phosphite-halogen reducing compounds employed the present reduction process are useful for effecting other desirable chemical modifications (halogenation) of cephalosporin compounds. It is therefore another object of the present invention to provide processes for one step reduction/halogenation conversions of C-7 acylamino cephalosporin sulfoxides to 7-amino cephalosporins or depending on the cephalosporin starting materials and the amounts of reagents employed C-7 acylamino halogenated cephalosporins or C-7 amino halogenated cephalosporins.

Further, the invention is said to "also be directed to processes wherein the triaryl phosphite-halogen complex is utilized to effect multiple chemical conversions of the cephalosporin sulfoxide starting materials in one reaction mixture." [58]

148     On p. 5, the disclosure says that the "products formed in the present process are known antibiotic compounds or intermediates thereto."

149     As in the '007 patent, at p. 9 one can read that:

> The dot (•) in the general formula used to represent the kinetically controlled products employed in the present processes is used simply to designate that equivalent amounts of halogen and triaryl phosphite are combined chemically and in a way that can be distinguished from that in the thermodynamically stable derivatives that have been known in the art and which typically have been drawn without the dot [e.g. $(PHO)_3PCl_2$]. The exact molecular form of the triaryl phosphite-halogen kinetic complexes [...] has not been established definitively [...].

150     The specification then discusses in detail the preparation of the kinetically controlled products, the solvents to be used, the reaction conditions, some properties distinguishing the kinetic product and the thermodynamic product when TPP and Cl are reacted in methylene chloride, including the data found in Table 1 of the patent which is identical to the one discussed earlier in respect of the '007 patent. It deals with temperatures and preferred conditions for the formation of the kinetically controlled products and their stabilization in a tertiary amine base as well as details of temperatures for carrying out the processes and chemical reactions claimed in the patent. At p. 17, it also mentions that, because the reduction process claimed produces Cl or Br as a by-product, "[i]n order to prevent undesirable side reactions between the halogen by-product and the cephalosporin product, a halogen scavenger is used in the reaction mixture to react with or inactivate the chlorine or bromine as it is formed." The term "halogen scavenger" is defined and various such scavengers are discussed. Further details (such as quantities, etc.) as to how to use the kinetic product to effect one or a combination of the reactions claimed are also given.

151     On p. 35, there is a discussion of how "[t]he triaryl phosphite-halogen complexes utilized as reducing agents in the present process are also potent halogenating agents" and how "[t]he multiple reactivity of the triaryl phosphite-halogen kinetic complexes is exploited in each of several alternate embodiments of the present invention." At pp. 46-47, the inventor particularly mentions that:

> combining the [...] reduction/-enol-imino halogenation (Scheme III above [found on p. 36 of the patent]), using a triaryl phosphite-chlorine complex, with subsequent alcoholysis of the resulting imino chloride constitutes an improved method

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 182 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

of preparation of 7-amino-3-chloro-3-cephem-4-carboxylic acid esters [7-ACCA] from the corresponding 7-acylamino-3-hydroxy-3-cephem-4-carboxylic acid ester sulfoxides. Prior to this invention the total 3-function conversion was effected either in 3 separate steps, that is reduction, chlorination and side chain cleavage or in two steps, either combining reduction and chlorination (see U.S. Patent No. 4,115,643) with subsequent side chain cleavage or by combining chlorination and side chain cleavage after reduction of the sulfoxide entity, for example, using the method disclosed in U.S. Patent No. 4,044,002. With the discovery of the present process the reduction, chlorination and cleavage conversion can be executed in excellent yields in one reaction vessel without isolation of intermediates.

152    This is said to be of particular significance, given that the 3-halocephem nucleus ester "can be acylated using conventional acylation techniques and subsequently deesterified to provide known antibiotic compounds [particularly cefaclor]" (p. 47, lines 6-14).

153    After providing 96 examples, the 70-page disclosure concludes with a list of 52 claims.

154    For the purpose of considering what aspects of the construction of the claims are at issue here, it is sufficient to reproduce claims, 1, 9, 10 and 11.

155    Claim 1:

A process for reducing a cephalosporin sulfoxide to the corresponding cephalosporin which comprises reacting said cephalosporin sulfoxide with a triaryl phosphite-halogen complex of the formula



**Graphic 8**

wherein X is Cl or Br, and Z is hydrogen, halo, $C_1$-$C_4$ alkyl or $C_1$-$C_4$ alkoxy, which is the kinetically controlled product of the reaction of equivalent amounts of a triaryl phosphite of the formula



**Graphic 9**

and chlorine or bromine in an inert organic solvent,

in the presence of at least 1 equivalent of a halogen scavenger per equivalent of cephalosporin sulfoxide in a substantially anhydrous inert organic solvent at a temperature of about 30°C. or below;

provided that

(a) about 1.0 to about 1.3 equivalents of the triarylphosphite-halogen complex per equivalent of cephalosporin sulfoxide are employed when the reduction of the sulfoxide group is the only reaction desired,

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 183 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

(b) about 2 to about 3 equivalents of the triarylphosphite-halogen complex per equivalent of cephalosporin sulfoxide are employed when the cephalosporin sulfoxide is a 3-hydroxy cephalosporin sulfoxide and it is desired to simultaneously reduce the sulfoxide and halogenate the 3-position, or the cephalosporin sulfoxide is a 7-acylamino cephalosporin sulfoxide and it is desired to simultaneously reduce the sulfoxide group and convert the acylamino group to an imino halide group, and

(c) about 3 to about 5 equivalents of the triaryl phosphite-halogen complex per equivalent of cephalosporin sulfoxide are employed when the cephalosporin sulfoxide is a 3-hydroxy-7-acylamino cephalosporin sulfoxide and it is desired to simultaneously reduce the sulfoxide group, halogenate the 3-position, and convert the acylamino group to an imino halide group; and further provided that when the cephalosporin sulfoxide has a free amino, hydroxy or carboxy group on the C-7 substituent, those groups are first protected by conventional amino, hydroxy or carboxy protecting groups. [59]

156    There is no dispute as to the meaning of this claim and no issue as to whether or not certain elements described therein are essential. What is clear is that the claim requires the following elements: (i) cephalosporin sulfoxide; (ii) kinetic complex as defined by the formula and the reaction of equivalent amounts of the components described therein; (iii) at least one equivalent of halogen scavenger per equivalent of cephalosporin sulfoxide; (iv) an anhydrous inert organic solvent; (v) a temperature of 30° C or below; and, (vi) that certain quantities of kinetic complex be used depending on how many steps one wishes to perform.

157    Claim 4 is dependent on claims 1 and 3 and specifies the various substituents on the cephalosporin sulfoxide starting material involved in the reaction. Claim 5 is dependent on claims 1, 2 and 3 and limits the starting material to 3-cephem sulfoxide or 3-exomethylene cepham sulfoxide. Claim 6 is dependent on claim 1 but includes specific halogen scavengers. Claim 8 is dependent on claims 1 or 2 with a more specific temperature range.

158    Claims 9, 10 and 11 read as follows:

9. The process of claim 1 wherein X is Br.

10. The process of claim 9 wherein Z is hydrogen.

11. The process of claims 1, 2 or 10 wherein X is Cl.

159    There was an argument raised by Apotex as to how one could construe claim 11, given its reference to claim 10, which itself refers to claim 9, wherein X is Br, whereas according to claim 11, X is Cl. There is little doubt that a person skilled in the art *with a mind willing to understand* would simply disregard this apparent contradiction and would understand claim 11 to apply only to processes wherein X is Cl. The reference to claim 10 being understood to refer to the process where Z is hydrogen.

160    Claim 14 is dependent on claims 1, 12, and 13 "wherein the tertiary amine base is pyridine." Claim 15 is the process of claim 1 where the "solvent is an aromatic or halogenated hydrocarbon." Claim 16 is dependent on claims 1 and 15 but further limits the solvent to methylene chloride. Claim 17 is dependent on claims 1 and 3 but limits the acyl group $R_3$. Claim 18 covers a one step reduction process only using a TPP and Cl complex having the characteristic of +3.7 ppm signal (again, as per the new convention) and specific infrared data described in the claim. While claim 20 (dependent on claims 1 and 19) covers a two step process (reduction of sulfoxide/halogenation of the enol chlorination) using a TPP and Cl complex as a reagent, claim 21 (dependent on claims 1, 19 or 20) deals again with the two steps described above using the TPP and Cl complex but in the presence of a tertiary base. Claim 22 is another claim dependent on claims 1 and 19 which covers specific halogen scavengers.

161    Claim 27 is dependent on claims 1, 19, 20, or 25, which deals with situations where X is Cl and it appears to be somewhat redundant in respect of claim 20, which already refers to the use of TPP and Cl complexes. Claim 30 is dependent on the process of claim 1 for specific cephalosporins with the use of pyridine as a tertiary amine base. Claim 31 is dependent on claims 1 and 19 for specific cephalosporins wherein the inert organic solvent is an aromatic or halogenated hydrocarbon. Claim 32 (dependent on claims 19, 20, or 31 and thus, claim 1) further limits the solvent to methylene chloride. Claim 33 is

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 184 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

dependent on claims 19 or 20 and claim 1, with a specific acyl group. Claim 34,[60] like claim 18, includes a description of the characteristics of the TPP and Cl complex to be used in the process such as infrared data and [31] P NMR shift. It applies in the context of a two step process (or imino halide formation process).

162    As with the construction of claim 1 in the '007 patent, the Court does not find that the [31] P NMR shift of +3.7 ppm and presumably the IR data described in Table 1 of the '536 patent are essential elements of any of the claims which simply refer to the kinetically controlled product of the reaction of a triaryl phosphite and Cl or Br in an inert organic solvent. This is particularly clear when one considers that claim 18 (dependent on claim 1) only has two distinguishing features — these two properties.

163    From all of the above, the Court concludes that the invention is alternative or improved[61] processes as opposed to new processes for transforming cephalosporin sulfoxides. It consists mainly in the use of the kinetically controlled product described therein as the reagent and in the fact that said reagent may be used to make up to three reactions or steps in one pot.

*4.4.2. The '725 Patent*

164    The claims at issue here are claims 1 (the only independent claim in the patent), 16, 22 to 27 and 30. The patent is entitled "Process for Halogenation of [beta]-lactam Compounds". The '725 patent claims a process again requiring the use of the kinetically controlled product of the reaction of equivalent amounts of defined triaryl phosphite and Cl or Br as halogenating agents to convert the 3-hydroxy group at the 3-position of a cephem ring to a halo group as well as a process using the same kinetic product to convert a class of halides to corresponding amino halides (two of the three steps already described in respect of the '536 patent). Again, on p. 28, the specification notes that "[c]ombining the aforedescribed enol-halogenation/imino-halogenation process, where X is Cl, with subsequent alcoholysis of the resulting imino chloride constitutes an improved method of preparation of the 7-amino-3-chloro-3-cephem-4-carboxylic acid esters". It is then mentioned, on p. 29, that this is of particular significance given that the 3-halocephem nucleus esters "can be acylated using conventional acylation techniques and subsequently deesterified to provide known antibiotic[s]", such as cefaclor.

165    Forty-eight examples are then provided and the patent ends with 30 claims, some of which include the alcoholysis step after the formation of the imino chloride products is complete (see for example claim 27, a process claim dependent on claim 16). There is only one claim at issue (claim 30) that includes a reference to the various characteristics of the specific kinetically controlled product described therein (all the characteristics found in Table 1, reproduced at p. 8, except the half-life).

166    Claim 1 covers the process described previously using the kinetic complex made in a substantially anhydrous inert organic solvent at a temperature below about 30° C in a prescribed ratio depending if one desires to simply halogenate the enol of formula V (about 1.0 to about 1.3 equivalents of triarylphosphite-halogen complex per equivalent of cephalosporin starting material) or to also carry out imino-halogenation (about 2.0 to about 3.0 equivalents of triarylphosphite-halogen complex per equivalent of cephalosporin starting material). The imino-halogenation must also be carried out "in the presence of about 1.0 to about 1.2 equivalents of a tertiary amine base per equivalent of [kinetic complex]."

167    Claim 16 is dependent on claim 15 which covers the process of claim 1 for preparing 7-imino halide-3-halo-3-cephem from 7-acylamino-3-hydroxy-3-cephem. Claim 16 covers said process where the kinetic complex is TPP and Cl.

168    Claim 22 covers the process of claim 15 where X is Cl while claim 23 covers the same process but where Z is hydrogen and X can be either Cl or Br. Claims 24 and 25 depend on claim 15 but limit the type of solvents (aromatic or halogenated hydrocarbon and methylene chloride respectively). Claim 26 is dependent on claim 15 or 16 and specifies the acyl group.

169    For reasons already given in respect of claims 18 and 34 of the '536 patent, the Court does not need to determine the essential elements of claim 30, given that it will not deal with the issue of infringement for such claim. Furthermore, as there are no other disagreements as to the construction of any of the other claims at issue, there is little more to say other than this patent also relates to an alternative or improved process (one or two steps in one pot) where the key feature is the use of the kinetically controlled product of the reaction described therein as reagent.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*4.4.3. The '468 Patent*

170     This process patent is entitled "Process for Preparation of Penicillin and Cephalosporin Imino-Halides". The patent contains only two independent claims, i.e. claims 1 and 8. The claims at issue are dependent claims 2, 7 and 17-20, as well as claim 8.

171     The disclosure starts by making it clear that the process for "the cleavage of the C-6 or C-7 acylamino group to provide the corresponding C-6 or C-7 amino compounds which are reacylated [...]" is known. Thus, the specification states on p. 2 that "an object of the present invention [is] to provide a new process for preparing penicillin and cephalosporin imino halides", more precisely "to provide a high yielding method of preparing C-6 and C-7 imino halides of penicillin and cephalosporin respectively using novel triaryl phosphite-halogen kinetic complexes". As this is the last of the three steps covered in the '536 patent and of the two steps covered in the '725 patent, it contains many similar details about the process itself and about the reagent and its preparation. The disclosure gives thirty examples and ends with 20 claims. The Court will not review the specific wording of any of those claims as there is no dispute between the parties as to their construction.

172     Here again, and for reasons similar to those expressed in respect of the '007 patent, the Court does not consider the $^{31}$P NMR shift of the TPP and Cl complex (and the other properties described in Table 1) to be an essential element of claim 1 or its dependent claims that make no reference to such properties when describing the kinetic product to be used in the claimed processes. The only claims at issue that specifically referred to such properties are claim 8 and its dependent claims (one alternative in claims 17-20). As was noted in respect of claims 18 and 34 of the '536 patent, even if it is likely that these elements are essential elements of those claims, there was no argument presented in that respect. There is no need to make a judicial determination of this issue.

173     Claim 7 is dependent on claim 5 or 6 and includes the optional alcoholysis step discussed earlier. Claims 17-20 are all dependent on claim 1 or 8. Claim 17 specifies a particular range of temperature, while claim 18 includes specific types of solvents. Claim 19 is limited to certain types of cephalosporins and claim 20 specifies that the halogenating compound in claim 1 or 8 is stabilized by a tertiary amine base.

174     Once again, it is quite clear that the invention is an alternative or improved process, whose key feature is the use of the triaryl phosphite-halogen kinetic complex.

### *4.5. The Shionogi Patents*

175     Initially, Shionogi filed an application on February 9, 1976 to obtain a patent covering all the processes described therein, including the compounds obtained from some of these processes. This first application claimed a priority date based on the filing of the Japanese applications (February/March, 1975).

176     During the patent examination process, the Patent Examiner noted that the application contained more than one invention. He identified four distinct groups of claims and requested amendments. Thereafter, four divisional applications were filed on October 19 and 22, 1979, resulting in the issuance of the four patents at issue. Thus, they all have an identical disclosure; [62] only their claims vary as each now covers a separate portion of the overall synthetic pathway described in the specification which deals with the overall cyclization of the 6-membered ring structure with the concurrent introduction of an OH substituent at the 3-position of the ring that allows for the subsequent conversion of the substituent to Cl. Except in respect of the '026 patent where an issue of construction is raised, the content of such disclosure will only be discussed once. Also, because the construction of the claims at issue in each of these patents raises little dispute, my review will be brief. [63]

*4.5.1. Common Disclosure*

177     The disclosure starts with the following: "[t]his invention relates to the cyclization to form cephem ring, and the intermediates therefore. More specifically, it relates to a compound" of the formula:

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 186 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...



**Graphic 10**

where "the substituents can be combined to form an azetidinothiazoline bicyclic ring; and their enamine derivatives, and to the processes for the cyclization to form cephem ring through the said intermediates shown above by the reactions representable by the following reaction scheme":



**Graphic 11**

178    At p. 2 it is noted that:

Many trials for synthesizing 3-cephem ring in large scale have been reported, but no factory produce cephalosporins by synthesizing nucleus except for cephalexin. [64] This invention provides mild cyclization to form 3-hydroxy-3-cephem compounds through 4-mercaptoazetidinone derivatives.

Efforts to cyclize a type of compounds of the formula (2) or (3) where Y is other than hydroxy or a substituted amino resulted in unsatisfactory results. However, when Y is a group which promotes enolization to form a double bond toward the exo-position, the cyclization took place smoothly to form the objective 3-hydroxy-3-cephem compound (4).

The 3-hydroxy-3-cephem compound (4) is a useful intermediates for synthesizing useful cephem compounds (e.g. recently developed 3-methoxy-7-([alpha]-phenylglycinamido)-3-cephem-4-carboxylic acid [this is cefaclor], 3-chloro-7-([alpha]-phenylglycinamido)-3-cephem-4-carboxylic acid, 3-bromo-7-(2-thienylacetamido)-3-cephem-4-carboxylic acid).

179      On p. 17, line 23 to p. 18, line 14 of the disclosure, one finds that:

Halogenation of compounds representable by the formula (1) provided Y is other than amino took place smoothly in some cases and with difficulty in other cases. Main difficulty was the position where the halogen atoms was introduced. In other words, the priority of the desired position to other position in the molecule for halogenation was rather small, and it differs from a compound to other. Another factor which restrict Y to the scope given above is found not in the halogenation but in the following reactions, i.e. i) ease of deprotection to give a compound (I) where Y is hydroxy; and ii) ability to cyclize giving the desired cephem compound (4). The compounds representable by formula (1) provided Y is other than hydroxy cyclized unefficiently or insignificantly. From these observations, Y is restricted to include a hydroxy and substituted amino, as is explained above.

The deprotection 2) of the compound (2) can be carried out by treating the compound (2) with aqueous acid for the thiazolino-azetidine compound, and by treating the compound (2) where R is a carbonic acyl, with a Lewis acid.

The decomposition of the azetidinothiazoline compound with an aqueous acid is a new generic reaction for obtaining the 4-mercapto-3-carboxylic acylamino-2-oxoazetidine derivatives according to the reaction scheme

[Depicted on the said page.]

180      On p. 22 of the disclosure after discussing the reactions claimed in the '026 patent, [65] one finds that:

[t]he final product is a 3-hydroxy-3-cephem-4-carboxylic acid or 3-oxocepham-4-carboxylic acid (4). In some instances, the substituents at position 3 or 7 on the cephem ring change during the reaction or working up, and as a result, the corresponding substituents in the starting and produced materials differ each other. If desired, such substituents can be recovered or transformed into other required one by conventional methods. Such cases are also included in the scope of the present invention.

181      And at p. 23, also concerning the '026 patent, that:

The halogenation 1), deprotection 2). and cyclization 3) can be carried out in one pot, namely without isolating intermediates, and even without removing each reaction solvents. Therefore, the reactions practically be done as simply as one step reaction (see Examples 2(2) and (3), and Examples 9 to 17 of Part III Cyclization).

[See also p. 33, lines 6-12.]

182      The disclosure further indicates that the products of the claimed reactions (except for the 3-hydroxy or 3-oxo) are novel. The lengthy disclosure includes various details relevant to the carrying out of these processes and the preferred modes particularly the reasoning behind the choice of substituents and other products to be used such as acids, solvents, etc.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 188 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

183    One also finds the following statement at p. 33: "this invention provides the higher yielding and simpler process from less expensive penicillins to give valuable key intermediates, the 3-hydroxy-3-cephem-compounds." Numerous examples are given in respect of each of the processes claimed in the individual patents. As mentioned, given that sufficiency was not an issue in respect of these patents. It is not useful to discuss further these examples or the details given.

*4.5.2. The '547 Patent*

184    This patent, like the other three Shionogi patents, is entitled "Cyclization to Form Cephem Ring and Intermediates Therefore" and the disclosure ends with eight claims. The claims being pursued at trial are claims 1 (independent claim), 3, 5 and 7-8 (dependent claims).

185    Those claims are directed to processes [66] for preparing hydroxylated compounds from exomethylene compounds (penicillin derived compound, including the Cooper compound), via oxidative cleavage of the unsaturated bond of the exomethylene group and to the resulting compounds.

186    Claim 1 can be summarized as follows:

A process for preparing



**Graphic 12**

By subjecting [67]



**Graphic 13**

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    48

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 189 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

To oxidation followed by cleavage of the thus produced ozonide.

187    The target compound of claim 1 is the compound claimed in claim 8. Claim 3 is dependent on claims 2 and 1 and relates to the specific use of ozone as the oxidizing material. Claim 5 is dependent on claims 1 and 4, and covers the reduction of the ozonide using specific reducing agents described therein. Claim 7 is dependent on claims 6 and 1 and covers the process of claim 1 in the presence of the specific solvents described therein.

*4.5.3. The '924 Patent*

188    The claims at issue are 3-4, 8-9, 12, 27, 31 and 37. These claims are generally directed to processes for acylating azetidinone compounds and subsequently forming an enamine azetidinone.

189    Claim 1 can be simplified as follows. A process for preparing:



**Graphic 14**

by reacting



**Graphic 15**

with an acylating agent to introduce the $C_{2-12}$ carbonic acyl, the $C_{1-20}$ sulfonyl group, and if required, subjecting such compound to a $C_{2-20}$ disubstituted amine to give the amine compound.

190    Claim 3 is dependent on claims 2 and 1 and covers the process where the selected compound is treated with the sulfonylating reagent mentioned therein. Claim 4 (dependent on claims 2 and 1) covers the process for preparing an acylated or sulfonylated azetidinothiazoline. Claim 8 claims a process of further reacting the acylated or sulfonylated compound of claim 1 with dialkylamine, including piperidino and morpholino. Claim 9 is dependent on claim 8 and deals with a specific substituted

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 190 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

amino. Claim 12 (dependent on claims 10, 8 and 1) claims the same process wherein R' is benzyl, X includes the carboxy protecting group benzyhydryloxy and the substituted amine is morpholino.

191     Claim 27 covers a compound prepared by the process in claim 1 where specific functional groups are as defined in claim 1, whereas claim 31 covers a compound prepared by the process in claim 4 (which is dependent on claims 2 and 1) where specific functional groups are as defined in claim 4. Claim 37 covers a compound prepared by the process in claim 35 (which is dependent on claims 10, 8 and 1) wherein R' is benzyl; Y" is a morpholino and, when prepared by the process of claim 12 (dependent on claims 10, 8 and 1), X is a p-nitrobenzyloxy, 2,2,2-trichloroethoxy, benzyloxy.

### 4.5.4. The '132 Patent

192     The parties have agreed that the halogenation described in the '132 patent can generally be referred to as an allylic halogenation.

193     Of the 76 claims in this patent, only claims 15, 22, 29, 34, 38 and 58 are at issue. Claims 15 and 22 are dependent on claim 1. Claim 15 specifies that the halogenating reagent is Cl, Br or iodine, whereas claim 22 is the process of claim 1 but for preparing specific compounds described therein.

194     Claim 29 is a compound claim dependent on independent claim 24, which generally describes the compounds made using the process claimed in the previous claims (the formula in claim 24 is the same formula as in claim 1) with the same substituents. Claim 34 is another dependent claim, and, like claim 29, it claims a compound with specific substituents described therein.

195     Claim 38, which is dependent upon claim 36 (and claim 1), covers a specific process involving treating a compound shown in claim 36 with particular substituents with a halogenating reagent which includes Br. The said compound includes a thiazoline [beta]-lactam, in which the Y is a morpholino, the group R is benzyl and the group X may be benzhydryloxy.

196     Finally, claim 58 covers the compound according to claim 56 prepared by the process of claim 38, where Y is a morpholino, Hal is a Br and X is one of three compounds listed therein, which includes benzhydryloxy.

197     There was some dispute between the parties as to the meaning of "Hal" in the two independent claims, 1 and 24. Although this is not determinative in any way, given the specific wording of claims 29 and 58, which restrict the definition of "Hal" to a specific halogen other than fluorine, the issue is whether or not claims 1 and 24 would include fluorine as "Hal" in the formula described in the said claims. The disclosure is quite clear at p. 8 that "[h]alogen which may be represented by Hal in the formulae can be a chlorine, bromine, iodine, or fluorine, in which chlorine and bromine are most preferable."

198     Having considered the specification as a whole, including the various claims which specify which Hal is covered, the Court concludes that fluorine is included in the halogen (Hal) described in the formulas in claims 1 and 24, although it is evident that this is not the preferred halogen and would be so understood by a posita.

### 4.5.5. The '026 Patent

199     The '026 patent has five claims. Generally, the claims of this patent relate to the two steps described in the disclosure as the deprotection and cyclization. The claims being pursued at trial were claims 1, 2 and 4. Claim 1 covers a process for preparing a 3-hydroxy-3-cephem [68] (or its keto tautomer) (A and B below) and an azetidinone enol [69] (or its keto tautomer) (C and D below).

200     Claim 1 reads as follows:

1. A process for preparing a compound represented by the following formulas:

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 191 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...



**Graphic 16**



**Graphic 17**

Wherein A and B are, independently, hydrogen, substituted or unsubstituted alkanoyl, substituted or unsubstituted aralkanoyl or substituted or unsubstituted aroyl, which substituents are such as to not affect the cephem ring formation ability of the compound;

X is a hydroxy or carboxy-protecting group;

Hal is halogen; and R is hydrogen, alkoxycarbonyl, cycloalkyl-methoxycarbonyl, aralkoxycarbonyl, aryl-, benzothiazolyl-, furyl-, thienyl-, pyrryl-, oxazolyl-, isoxazolyl-, oxadiazolyl-, oxatriazolyl-, pyrazolyl-, imidazolyl-, triazolyl-, tetrazolyl-, pyridyl-, pyrimidyl-, pyrazinyl-, pyridazinyl-, or triazinylthio each being optionally substituted by halogen, alkyl containing from 1 to 3 carbon atoms, hydroxy, aminomethyl or alkoxy containing from 1 to 3 carbon atoms, which comprises:

    1) treating an enamine of a compound represented by the formula:



**Graphic 18**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

wherein A, B, R, X and Hal are defined above and the broken line between A and R constitutes a combining together of A, B and R when R and B are hydrogens and A is a carboxylic acyl with a disbustituted amino containing from 2 to 20 carbon atoms, with the action of an aqueous acid.

2) cyclizing a compound of the formula:



**Graphic 19**

wherein, A and B are as defined above by treating a selected compound of above formula × with an acid, base, or solvent, if required in the presence of a catalizer to prepare selected compounds of formulas (A) or (B).

201    The starting compound described therein (keto compound) can have a thiazoline ring present or not. In the absence of the thiazoline ring, the sulfur group is independently protected with a thiol substituent (R). In the disclosure, at p. 8, R is described as a thiol substituent which is "easily removable without adverse effect on the other part of the molecule *prior or during cyclization reaction*" (emphasis added). "It is needless to use the isolated starting material (3) for the reaction" (p. 20, lines 27-28, see also p. 33, lines 6-18).

202    As a first step, the enamine of the keto compound is treated with an aqueous acid, the result of which is the hydrolysis of the disubstituted enamine group (which is in effect the only reaction expressly described therein). Where a thiazoline ring is present, the experts are in agreement that the first step will also open the thiazoline ring leading to the formation of the compounds represented by C or D where R = H. When a thiazoline ring is not present, depending on the substituent used to independently protect the sulfur group, the first step may or may not result in the deprotection of the sulfur substituent. Where it does, the result is the same as above, that is compound C or D where R = H. Where it does not, R is unchanged.

203    The step described in para. 2 of claim 1 is the cyclization of the compound described therein (C or D where R=H). This takes place by reacting the said compound with either an acid, a base or a solvent (and optionally, a catalyst) to produce the key intermediate described in the disclosure, that is the 3-hydroxy-3-cephem (represented as A or B).

204    Dr. Hanessian, who is the only expert for Apotex qualified to opine on how a posita would read this claim, simply describes this as reacting an azetidinone-thiazoline with an aqueous acid to form an azetidinone enol, which is further reacted with an acid, base or solvent (with an optional catalyst) to give the 3-hydroxy-3-cephem compound. He does not raise any difficulty or issue with the construction of this claim.

205    Dr. McClelland, whom has no relevant experience with cephem compounds and cephalosporins, noted that Dr. Hanessian's was the literal interpretation he had first adopted but he felt this was not accurate on closer examination of the substances. Dr. McClelland testified to the effect that this cyclization step, on his interpretation of the claim, would not take place when R is a group that cannot be removed through treatment with an aqueous acid. This would mean that for such compound the ending material of the claimed process would be the compounds represented as C or D. [70]

206    Dr. Barrett, in the course of his cross-examination, agreed that in order to cyclize (second reaction covered in claim 1), R had to equal H. However, he noted that the disclosure contains examples where the R substituent in C or D does not equal H but can be removed effectively in a "one pot" or "two pot" [71] operation through treatment with acid [72] for the purpose of

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 193 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

cyclization. This would, as shown in example 2. — III, deprotect the sulfur group (with R becoming H) and allow for cyclization to take place (see also p. 18, lines 7-10, p. 19, line 28 to p. 21, line 19 of the disclosure).

207    There is no evidence of any allowed R substituent that would not permit cyclization when one considers the "one pot" or "two pot" method or the fact that the removal of the thiol substituent can be done during cyclization [73] as a preliminary reaction that will enable the R substituent to become H and thus arriving at compounds A or B.

208    Based on the evidentiary record before me and on my review of the patent, I conclude that a posita would understand that in all cases the processes claimed in the '026 patent can lead to compounds A or B.

209    In any event, this particular issue of whether or not the product of the reaction will be compounds A or B need only be determined in relation to Apotex's argument that the Shionogi patents lack subject matter and constitute improper divisional, [74] which for the reasons described below, are rejected.

210    Like the '132 patent, the "Hal" is halogen in claim 1 and would be understood by a person skilled in the art to include fluorine because of the definition on p. 8 of the disclosure. Although again it would be readily appreciated by such a person that this is not the preferred halogen to be used (leaving group in the reaction).

## 5. Infringement

### 5.1. Burden

211    It is not disputed that the Plaintiff must establish on a balance of probabilities that the processes used by Apotex's suppliers included all of the essential elements of one or more claims of the patents at issue.

### 5.2. Statutory and Common Law Presumptions

212    Lilly argues that in this particular case, they have the benefit of two presumptions. First, the presumption of infringement arising under s. 55.1 of the *Patent Act*, which reads as follows:

> 55.1 In an action for infringement of a patent granted for a process for obtaining a <u>new product</u>, any product that is the same as the new product shall, in the absence of proof to the contrary, be considered to have been produced by the patented process.
>
> [Emphasis added.]
>
> 55.1 Dans une action en contrefaçon d'un brevet accordé pour un procédé relatif à un <u>nouveau produit</u>, tout produit qui est identique au nouveau produit est, en l'absence de preuve contraire, réputé avoir été produit par le procédé breveté.

213    According to Lilly, the word "product" (« produit ») was substituted with the word "substance" (same in French) as a result of an amendment in 1993 [75] in order to give effect to para. 1709(11)(a) of the *North American Free Trade Agreement Between the Government of Canada, the Government of Mexico and the Government of the United States*, 17 December 1992, Can.T.S. 1994 No. 2, 32 I.L.M 289 (*NAFTA*). Lilly says that the Courts have yet to interpret the meaning of "new product" and it submits that it is a product that has not been sold on the market before. To that end, it refers to various dictionary definitions of the word "product." According to Lilly, cefaclor, which was first sold in Canada in 1980, [76] was thus not even a product when the Lilly and Shionogi patent applications were filed and they relate to processes for the production of such new products.

214    The Court cannot accept this argument. As noted by Apotex, the words "product" and "substance" were used interchangeably by the Supreme Court of Canada in (*Harvard College v. Canada (Commissioner of Patents)*, 2002 SCC 76, [2002] 4 S.C.R. 45 (S.C.C.) (*Harvard College (2002)*)). The word "product" must be given the same meaning as it received throughout the *Patent Act*. It is used in the definition of "invention."

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

215    In my view, by changing "substance" to "product", the legislator was simply ensuring that the Canadian provision would be applied in accordance with its obligations pursuant to *NAFTA*. "Substance" appears to be a more restrictive expression that could, for example, hardly apply to a new hairdryer, whereas the presumption is meant to apply to any new product.

216    None of the patents at issue are processes to make cefaclor per se. Thus, the Court could only apply the presumption to the making of the new compounds covered in the Shionogi patents or to the products claimed in the '007 patent.

217    As will be discussed, there is no need to apply this presumption to determine the merits of the infringement allegations in respect of the Kyong Bo process and the Shionogi patents. With respect to the '007 patent, for reasons given below under anticipation, the Court finds that these compounds are not new products.

218    Lilly also asked the Court to apply the common law presumption discussed in *Hoffmann-La Roche Ltd. v. Apotex Inc.* (1983), 41 O.R. (2d) 84, 145 D.L.R. (3d) 270 (Ont. H.C.) (aff'd (1984), 47 O.R. (2d) 287 (Ont. C.A.), 11 D.L.R. (4th) 320 (Alta. C.A.)), in which Justice Walsh confirmed Hoffmann-La Roche Ltd.'s assertion that the burden of proving what process was used by its supplier was on Apotex, as:

> at common law the rule has always been that when the subject matter of an allegation lies particularly within the knowledge of one of the parties that party must prove it, whether it be an affirmative or negative character.

> [para. 23]

219    In that case, there was evidence that Apotex had written to its supplier, asking it not to voluntarily give information to the plaintiff. Also, it had manoeuvred to ensure that all process information would be sent to its counsel directly with no copy being sent to Apotex.

220    According to Lilly, Lupin was actually willing to cooperate in this case and Apotex knew this, but did not disclose it to the plaintiffs or to the Court. Moreover, given the special contractual undertaking of Lupin to assist Apotex (see TX-1656), Apotex was in a much better position to provide admissible and credible evidence as to the process actually used by Lupin.

221    Had I been satisfied that Lilly had taken reasonable steps to obtain this information, for example by pursuing a motion to obtain further information about the process actually used once TX-1656 was produced (after the filing of their initial motion), rather than relying on an undertaking from Apotex to look through their file, the Court would have been willing to apply this presumption given the particular circumstances of this case. Contrary to what was argued by Apotex, the Court does not believe that it is necessary for a plaintiff to go around the world using means available under various foreign legal systems to obtain the information it can use in a case in order to benefit from the presumption. [77]

222    Apotex's failure to advise Lilly and the Court that Lupin was willing to disclose the details of its process subject to proper protection of the confidentiality of the information contained in the said documentation will be discussed further when assessing costs and the admissibility of certain evidence produced to defend the allegation of infringement.

223    Needless to say, even if Lilly cannot benefit from this common law presumption, it can still rely on inferences that can reasonably be made based on the evidence produced to establish certain facts. This is perfectly in line with the statement made in *Whirlpool*. [78]

### 5.3. *Lupin Process*

224    Apotex received cefaclor made by Lupin from about May 23, 1997 until at least October, 1998. Although the exact amount of material received from that supplier will be ascertained through the reference, it appears that Apotex imported at least 8,650kg and maybe as much as 10,000kg of cefaclor made by Lupin.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

225    Apotex admitted [79] that in respect of at least the receiving lot numbers described in the Request to admit, and except for the quantities used for testing and other regulatory purposes pursuant to subs. 55.2(1) of the *Patent Act*, the bulk cefaclor imported from Lupin was used in the manufacture of its Apo-cefaclor product.

226    In light of the Confidentiality Order issued in this matter, the Court will give few details of the processes used by Apotex's suppliers.

227    In his report (E-15), Dr. Barrett summarizes the various processes described in the evidence filed by the parties. I will use his nomenclature:

*Process "A"* — Process described in Lupin's filing with Health Canada. It is also described in the material filed by Lupin in 1996 with the Federal Drug Administration (FDA) (U.S. health authority). It is a process whereby cefaclor is synthesized from Pen V acid. The manufacturing process described in letters dated June 21, 1997 and August, 20, 1997 (TX-150; TX-158-TX-159) filed in response to a Health Canada request for clarification in respect of the process used by Lupin to make its 7-ACCA, is similar if not identical to the manufacturing process described by Lupin in its FDA filings in 1996. [Omitted.]

*Process "B"* — A process described in an update filed by Lupin with the FDA in November, 1997. It is a process whereby cefaclor is synthesized from Pen [omitted]. It appears from TX-167 and TX-168 filed by Dr. Parra of Health Canada, that in June, 1999, Lupin updated its DMF disclosing a process which is similar (if not identical) to the one described in the FDA filing of 1997. According to Dr. Barrett, this process infringes the Shionogi patents.

*Process "C"* — Another process described in a further update filed by Lupin with the FDA in 2000, which, according to Dr. Barrett uses both the Shionogi and the Lilly processes (a mixture). However, there is no indication that it was used at any time before the expiration of all the patents at issue.

*Process "D"* — Another process starting from Pen [omitted].

Whereas all those reactions were described simply as step V of Process "A" — they are now shown as step V(a) and step V(b). [Omitted.]

It is described in a document allegedly attached to various versions of a letter dated October 27, 1997 from Mr. Patil to Mr. Singh which was never filed by Mr. Singh with Health Canada. This letter and other documents similar to it were all produced under reserve of Lilly's objection (*voir dire*). According to Mr. Satpute, this process (or at least the new process used in 1998) was only used to produce one very large order sometime early in 1998.

*Process "E"* — A process described in the appendix to the contract for the sale and manufacture of cefaclor between Apotex and Lupin, dated March 15, 1998 (TX-1656). According to this schematic outline, it starts from Pen [omitted].

228    For reasons that follow, the Court has come to the conclusion that Lilly has established on a balance of probabilities that the cefaclor received by Apotex between May 23, 1997 and June 3, 1998 [80] infringes the following claims in the Lilly patents:

1. The '007 patent: claims 1, 4, 8-13, and 17-18.

2. The '536 patent: claims 1, 4, [81] 11, 14 and 16.

3. The '728 patent: claims 1, 15, 16, 20, and 25-27.

4. The '468 patent: claims 1, 2 and 7.

229    However, the plaintiffs have not met their burden in respect of the cefaclor shipped to Apotex as of June 4, 1998.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

230      In respect of the period ending on June 3, 1998, the Court is satisfied that the plaintiffs have established that Lupin was using Process "A", described above. Having carefully examined the arguments and the evidence referred to in Apotex's memorandum on infringement (part V) and considering its construction of the claims at issue, the Court is convinced (as was, apparently, Apotex's in-house counsel back in 1997) that Process "A" infringes the claims referred to above. The Court accepts and prefers the evidence of Drs. Baldwin and Miller who both concluded that Lupin was using a kinetic complex covered by the Lilly patents (as opposed to the thermodynamic product of the reactions between TPP and Cl in dichloromethane (methylene chloride)) to perform the reactions described in the Lupin process. [82]

231      Although TX-150, TX-158 and TX-159 do not specifically refer to the use of a halogen scavenger, the Court is persuaded that, as explained by Dr. Baldwin, [83] without such scavenger, the reactions in step V of Process "A" could not be successfully performed. As mentioned, the correspondence filed by Lupin with the FDA is not proof that what is represented to be used was effectively used to make the cefaclor shipped to Apotex. The Court notes, however, that what was represented to the FDA corroborates at least to some extent the evidence of Lilly's experts. Also, once the evidence of Mr. Satpute is considered, it becomes clear that except for the special order made in 1998, there was only one process which started from Pen V acid used at Lupin's plant in 1997. The Court understands from Mr. Satpute's evidence that apart from the special order referred to above, the plant used the same processes to fulfill all its orders.

232      With respect to Process "B" and Process "C", there is insufficient evidence for the Court to conclude that either was used to produce the cefaclor shipped to Apotex during the period between May 23, 1997 and October, 1998. The arguments presented by Lilly in that respect are purely speculative.

233      This conclusion remains true whether or not the Court accepts or rejects all or any of the evidence presented under reserve of Lilly's objections (*voir dire*).

234      It is clear that as of March 15, 1998, Lupin had agreed to change the process it had used until then to make cefaclor for Apotex. Apotex's position has always been that it presumed that Process "E" was used at least after that date.

235      I do not intend to refer to all the circumstances referred to in the parties' submissions. I will simply mention some salient points of the background relevant to this debate (*voir dire*).

236      On March 10, 2000, Lilly obtained an Order [84] from Justice James Hugessen enjoining Apotex to request from its suppliers and the Minister of Health copies of its suppliers' DMFs in support of its NDS for Apo-cefaclor and to provide an affidavit stating that it had made such requests. After writing to the Minister and to Lupin, Dr. Sherman swore such an affidavit stating that the Minister had refused to disclose the closed portion of the DMF, that he had received no response from Lupin and that Apotex did not have the ability to compel its suppliers to provide the said information.

237      Shortly thereafter, Lilly received an amended affidavit of documents from Apotex which included the 1998 agreement between Apotex and Lupin which expressly stipulates that the said supplier would assist Apotex in providing "information and evidence necessary to show that it has used the process of appendix A".

238      On May 4, 2000, Lilly filed another motion seeking an order compelling the Minister of Health to produce all portions of Apotex's NDS relating to Apo-cefaclor including any DMFs relating to Apotex's suppliers' processes for preparing cefaclor. Although Lilly specifically refers to Lupin's undertaking to provide Apotex with information and evidence in respect of the contract process (Process "E"), Lilly did not seek an order compelling Apotex to obtain such information on the basis that they were, as they now argue, under their possession and control.

239      Upon confirmation that no response had been obtained from Lupin, on July 5, 2000, Justice Hugessen issued an order enjoining the Minister to produce the materials sought by Lilly. As a result, Lilly became aware of the details of Process "A" and of the fact that no update had been filed by Lupin until 1999 (Process "B").

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

240    Thereafter, Lilly asked at each new session [85] of its examination for discovery whether Apotex had received any reply to its letter to Lupin and whether it had any information or documentation regarding the process they used. Dr. Sherman continued to say that he had received no response from Lupin and essentially that he assumed that they were using the contract process (Process "E").

241    In 2006 and thereafter, Apotex indicated in their trial chart(s) that they expected to present witnesses from Lupin. Lilly raised no particular issue or objection in that respect. However, it appears that at some stage, it took legal steps in the United States to obtain about the Lupin process from Lupin's American subsidiary. As a result, and among other things, it obtained copy of a letter from Lupin Laboratories to Ivor Hughes dated July 4, 2000 which indicates that Lupin knew of Lilly's motion which was set to be heard on July 5, 2000 [86] and understood that Lilly was seeking information concerning the process they used to make cefaclor. It also appears that Lupin thought that Apotex was already in possession of the closed portion of their DMF as well as the information exchanged in 1997 about the manufacture of the 7-ACCA (presumably TX-150; TX-158; TX-159). Thus the letter only enclosed information about the process developed by Lupin pursuant to the March 15, 1998 agreement. The letter also includes an authorization to use the said information upon certain conditions which included ensuring that it would be protected by a confidentiality order. This letter and its attachments never found their way into Apotex's affidavit of documents. They were not filed as exhibits in the trial, although a copy was shown to the Court and Lilly included the letter itself in its written submissions on the *voir dire*.

242    It is in this context that Lilly raised their objections in respect of the admissibility of any *viva voce* evidence and documentary evidence presented to establish what process was actually used by Lupin after March, 1998 or failed attempts by Lupin to update their Health Canada DMF. Essentially, Lilly relies on paras. 232 and 248 of the *Federal Courts Rules* as well as on the evidentiary principle of spoliation because the destruction of Lupin's manufacturing records [87] and of the files of Mr. Patil which were lost in a flood in 2005. [88]

243    As mentioned, the parties filed extensive submissions in respect of these objections. When the Court pointed out that Apotex could seek leave pursuant to Rule 232 to file the documents that according to Lilly were under its possession and control, Apotex indicated that it felt no need to do so. [89]

244    On the other hand, the Court offered [90] to Lilly to suspend the trial so that steps could be taken to obtain evidence in India if necessary. According to Lilly, this would be useless given that the best evidence — the documentation on the manufacturing of individual batches — were destroyed. Both parties thus remain entrenched in their initial position. It is in that context that leave was granted to file additional expert evidence from Dr. Barrett (E-15) and Dr. Hanessian (A-20).

245    The absence of evidence establishing that either Process "D" or Process "E" infringes on any of the patents at issue means that prior to gaining any knowledge of the July 4 letter or of the evidence presented under reserve, Lilly's only argument, with respect to the period after the signing of the March, 1998 contract, was that Process "E" was too inefficient to be commercially viable. Also, it appears that Lilly thought that the Health Canada filing would provide sufficient evidence in this case given that there were, according to them, only two commercially viable processes (the Shionogi and the Lilly patented processes) and Lupin had filed no updates with Health Canada. However, prior to trial, Lilly had not served on Apotex any expert report supporting this position including the inefficiency of Process "E". [91]

246    After learning of Process "D" Lilly's position remained that Process "E" and Process "D" were inefficient and not commercially viable and that there was no time to implement either processes in the timeframe discussed in TX-1671.

247    Thus, in my opinion, the main difference for Lilly between the case it thought it had to meet before trial and after it learned of the July 4, 2000 letter and the evidence taken under reserve is that, with respect to Process "D", which Dr. Barrett described as different from Process "E" while Dr. Hanessian described it simply as an improvement over Process "E", [92] Apotex could

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

now counter Lilly's allegations of inefficiencies by referring to Lilly's own NDS documentation submitted to Health Canada on June 23, 1978 to obtain its NOC for Ceclor® (TX-208).

248    Also, because of Apotex's failure to disclose the July 4, 2000 letter, Lilly was deprived of an opportunity to change its tactics and to use whatever means were available to obtain or verify what process Lupin effectively used after March, 1998. In that respect, however, the Court notes that given that it had failed to do so after learning of the contract and the undertaking in it, this remains only a possibility rather than a probability. Also, there is insufficient evidence before me to conclude that the manufacturing documentation, which Mr. Satpute could not find in 2008, would have all been available at that time. Evidently, the files of Mr. Patil should have remained intact until 2005.

249    Had Lilly lost their action because of this, I would have had no hesitation in awarding them all their costs on a solicitor-client basis as of July 5, 2000. That said, this is not what happens here and I do not believe that all the *viva voce* evidence objected to is inadmissible.

250    In effect, having carefully examined the relevant extracts from the transcripts of the examination for discovery, the Court cannot conclude that Rule 248 applies here.

251    In any event, even if the Court were to apply this rule, it would not mean that *all* the *viva voce* evidence of Mr. Singh, Mr. Satpute and Mr. Patil would become inadmissible. It could only affect the evidence relating to the details of the process used after March 15, 1998 that differs from Process "E".

252    In my view, it could not be used to exclude the evidence of Mr. Satpute that sometime in early in 1998 Lupin took the necessary steps to adopt a process different from Process "A" and Process "B" [93] to fulfill a very large order of the magnitude provided for in the March 15, 1998 contract of which he had no knowledge. It would not exclude his evidence that such process, although not as efficient as Process "A", still produced a yield than enabled them to fulfill this order. When the Court heard and saw this witness, it found his testimony very credible. The transcript of this evidence was read several times and this only confirmed my first impression. This evidence is, in itself, sufficient to convince me that the shipments made as of June 4, 1998, were not manufactured using Process "A" or Process "B". There is no need for the Court to determine which process (Process "D" or Process "E") was used.

253    Mr. Patil and Mr. Singh had no personal knowledge of the process actually used by Lupin and even if the documentary evidence they produced was admissible, it would have no probative value in respect of the process used by Lupin during that period. In effect, there is a contradiction between some of the correspondence, particularly the October 27, 1997 letter and Mr. Satpute's testimony, which I prefer. None of this evidence can have, or would have had, an impact on my findings.

254    In the circumstances, there is no need to discuss further the application of paras. 232 and 248 of the *Rules*.

255    Finally, with respect to spoliation and the residual discretion of the Court in such matters, the law is well summarized by the Alberta Court of Appeal in *McDougall v. Black & Decker Canada Inc.* (2008), 2008 ABCA 353, 62 C.P.C. (6th) 293 (Alta. C.A.). As noted at para. 18 of the said decision:

Spoliation in law does not occur merely because evidence has been destroyed. Rather, it occurs where a party has intentionally destroyed evidence relevant to ongoing or contemplated litigation in circumstances where a reasonable inference can be drawn that the evidence was destroyed to affect the litigation. Once this is demonstrated, a presumption arises that the evidence would have been unfavourable to the party destroying it. This presumption is rebuttable by other evidence through which the alleged spoliator proves that his actions, although intentional, were not aimed at affecting the litigation, or through which the party either proves his case or repels the case against him.

256    First, it is evident that spoliation could not apply to the destruction of the files of Mr. Patil which was clearly an act of God. With respect to the manufacturing data that was destroyed by Lupin (not Apotex), the Court is not persuaded that in the particular circumstances of this case a reasonable inference can be drawn that the destruction was meant to affect the

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MFW Doc 14225-45 Filed 08/15/14 Page 199 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

litigation.[94] I have not come to this conclusion lightly for the Court is obviously alive and alert to any tactic meant to revive the old "trial by ambush" concept. However, in this case I truly do not believe that it would be in the best interests of justice to totally put aside the *viva voce* evidence of Mr. Satpute. I would thus exercise any residual discretion I may have to admit this portion of the evidence if it were necessary.

### 5.4. Kyong Bo Process

257     Apotex ordered and received cefaclor from Kyong Bo from at least November, 1996 to at least September, 1997. Once again, there is some discrepancies as to the exact quantity involved, this will be dealt with in the second phase of the trial (reference).

258     Also, Apotex admitted [95] at least in respect of the receiving lot numbers described in the Request to admit, and except for the quantities used for testing and other regulatory purposes, pursuant to subs. 55.2(1) of the *Patent Act*, the bulk cefaclor imported from Kyong Bo was used by Apotex for the manufacture for its Apo-cefaclor product.

259     Lilly presented expert evidence from Dr. Barrett (A-1) who reviewed in detail the processes described in the closed portion of that manufacturer's file at Health Canada at the relevant time. In his cross-examination on his reply affidavit, Dr. Hanessian also confirmed that the processes described in that documentation were covered by the Shionogi patents.[96]

260     Although there is no direct evidence from a Kyong Bo representative that it indeed used the processes described in Health Canada's file to produce the material shipped to Apotex at the relevant time, the Court is satisfied that in this case, it can reasonably infer that it was so used.[97] From the correspondence between Ms. Fouillade and Kyong Bo, it is clear that Kyong Bo used the information and the processes it learned from Shionogi to produce the cefaclor sold to Apotex. In fact, this is why they initially alleged that they had been authorized by Shionogi to use the patented processes. It is also the basis of a defence raised by Apotex, which obviously implies that the processes covered by Shionogi patents were used.

261     Having carefully considered the evidence, I am satisfied that the cefaclor made by Kyong Bo for use by Apotex in Canada infringes all the claims in issue in the '547 patent. I have come to the same conclusion with respect to claims 3-4, 8-9, 12, 27, 31 and 37 of the '924 patent as well as claims 15, 22, 29, 34, 38 and 58 of the '132 patent. There again, not only are the steps in the patented process used but the starting and resulting compounds claimed (compound by process claims), for example, at claim 58 of the '132 patent, are necessarily produced during the Kyong Bo process. The Court is also satisfied that Lilly has met its burden on a balance of probabilities that the Kyong Bo process infringes claims 1, 2 and 4 of the '026 patent.

262     In fact, Apotex only raised two particular defences in respect of Lilly's allegation of infringement: the first one is based on the existence of a licence from Shionogi, implicit or express, and the second on the fact that Canadian law does not provide for infringement by importation and use in Canada and no infringement acts took place in Canada.

### 5.4.1. Existence of a Licence

263     With respect to the argument that Kyong Bo was licensed, very scant evidence was produced by Apotex. In fact, the Court expressed its surprise during the final argument that Apotex's counsel insisted on pursuing this issue.

264     Apotex relies on the testimony of Dr. Sherman, who said that he was informed by Ms. Fouillade that Kyong Bo's position was that it had the right to use the processes covered by the Shionogi patents because of a licence obtained from Shionogi itself.[98] In his testimony, Dr. Sherman also noted that he had instructed Ms. Fouillade to obtain clarification and appropriate evidence as to the alleged arrangement.

265     The only evidence produced as to how Ms. Fouillade obtained this information, i.e. that Kyong Bo would have been authorized by Shionogi to use their process, is a letter from Kyong Bo Senior Managing Director, Seung-Ho An, dated October 10, 1997 produced as TX-662. But what is more telling here is the answer received from Kyong Bo (TX-664) when Ms. Fouillade requested further details as to the arrangement referred to in that said letter.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 200 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

We do not have a kind of contract for the technology transfer. I think, a kind of sales contract was made by Mitsubishi with Shionogi in 1992. As a matter of fact, we do not have an authorized document to use specifically CP 1,095,026, CP 1,132,547, CP 1,136,132 and CP 1,144,924.

266     Shortly after this exchange, Apotex stopped buying cefaclor from Kyong Bo. [99]

267     Furthermore, it is an agreed fact that [100] "Shionogi did not license the Shionogi patents to any non-Lilly entity for the manufacture of cefaclor before April 27, 1995."

268     Without ever explaining or referring to the above admission, Apotex argued that the evidence of Dr. Sherman in TX-662 and TX-664 is sufficient to shift the burden of proof to Lilly who should present cogent evidence that no such licence existed. Apart from being contrary to an admitted fact, such position appears to be based on a misunderstanding of the nature of the present proceedings. This is an infringement action, not a PM (NOC) proceeding where Lilly has to prove that the allegations of Apotex, presumably put into play by means of this evidence, are unjustified. If, in its defence (paras. 15-17), Apotex alleges that it bought material from a licensed source, it must prove that fact on a balance of probabilities. It has failed to do so.

269     This is one of many arguments that the Court would have expected counsel to put aside at least in their final presentation of the case. Pursuing arguments that have little or no chance of success unduly lengthens the trial process, places an undue burden on the Court and increases costs for all concerned. More will be said in that respect later on.

### 5.5. Importation

270     Apotex's main defence [101] in respect of the allegations of infringement of the Shionogi patents [102] is that the importation and use of products in Canada which one made abroad by a process patented in Canada cannot constitute infringement under the Canadian *Patent Act*. Apotex recognizes that there is Canadian jurisprudence applying the English doctrine of "infringement by importation", but it submits that those cases do not bind the Court and should not be followed.

271     Not surprisingly, Lilly relies on this Canadian case law, which will be discussed later on, and states that infringement by importation and use in Canada has recently been reinforced by the Supreme Court of Canada's decision in *Monsanto Canada Inc.*, and that the so-called "*Saccharin* doctrine" was applied by Justice Snider in *Pfizer Canada Inc. v. Canada (Minister of Health) (2007), 2007 FC 898, 328 F.T.R. 41 (Eng.)* (F.C.)(*Pfizer*), in respect of product claims (as opposed to process claims).

272     The defendant advances two primary arguments as to why the existing case law on "infringement by importation" should be disregarded. First, the Court should conclude that Canadian courts were incorrect in following English precedents such as *Elmslie v. Boursier (1869), L.R. 9 Eq. 217* (Eng. Ch. Div.) (*Elmslie*), *Von Heyden v. Neustadt (1880), 14 Ch. D. 230* (Eng. C.A.) (*Von Heyden*), *Saccharin Corp. v. Anglo-Continental Chemical Works Ltd. (1900), 17 R.P.C. 307* (Eng. Ch. Div.) [103] (*Saccharin*) and *Wilderman v. F.W. Berk & Co. (1925), 42 R.P.C. 79* (Eng. Ch. Div.) (*Wilderman*), because of material differences between the Canadian *Patent Act* and the English patent legislation in force until 1977.

273     Instead, argues Apotex, given that our *Patent Act* was modeled on U.S. patent legislation, our Courts should have followed the American case law, which concluded that, in light of the territorial application of patent legislation, [104] an American process patent could not be infringed unless the process was actually used in the U.S. To adopt this approach would also be more in line with the Canadian view of the exclusive rights or the monopoly defined by the claims of a process patent, which do not cover the product made by such process unless so claimed.

274     Second, Apotex submits that, should the Court feel compelled to follow the general principles set out in the Canadian case law, it should at least restrict their application to cases that meet the statutory limitations now applicable in the United Kingdom *Patents Act 1977* (U.K.), 1977, c. 37, para. 60(1)(c), and the European Economic Community (EEC) as a result of the *European Patent Convention* [105] (EPC) and in the United States as a result of legislation adopted in 1988. [106]

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 201 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

275    This would mean, according to Apotex, that importation and use or sale of cefaclor in Canada could only amount to infringement if cefaclor was a product "obtained directly" by the process covered by the Canadian patents and used overseas or if the chemical compounds made by said patented processes (in this case, the 3-chloro-cephem or the 3-hydroxy-cephem compounds) were not "materially changed" by the subsequent steps used by Apotex's suppliers to make cefaclor and these compounds had not become a trivial or non-essential component of cefaclor.

276    To come to such conclusion, Apotex recognizes that it must also convince the Court that Justice Snider in *Pfizer* misread *Monsanto Canada Inc.* [107] and that the "creative compromise" she articulated at para. 90 of her decision was "inadequate and not based upon a sound legal foundation". [108]

277    Given the importance of this issue, and the fact that many of Apotex's arguments have not been recently canvassed by this Court, [109] I will address the issue of infringement by importation in more detail than may normally be required. Specifically, I will address how existing English and Canadian case law dispose of Apotex's arguments.

278     While there appears to be only a dozen or so Canadian cases dealing with this issue, the concept of infringement of a process patent (or process claims) by importation and use or sale in Canada of a product manufactured abroad was first described as a settled question of law more than a century ago.

279    In *Auer Incandescent Light Manufacturing Co. v. O'Brien* (1897), 5 Ex. C.R. 243 (Can. Ex. Ct.) (*Auer*), the Exchequer Court of Canada, granting an injunction to prevent further infringement of a process patent, noted, at para. 26:

> Before leaving this question of infringement I ought, perhaps, to refer to the contention made on behalf of the defendant that under any circumstances he would at least be entitled to import for use or sale illuminant appliances made in a foreign country in accordance with the process protected by the plaintiffs' patent. With that view, however, I cannot agree. I think that the law is well settled to the contrary, and I need only refer for this purpose to the cases cited by Mr. Hellmuth, viz.: *Elmslie v. Boursier*; *Wright v. Hitchcock*; *Von Heyden v. Neustadt*.

> [Footnotes omitted.]

280    The English cases cited above were again applied two years later by the Divisional Court of the Chancery Division of the Ontario High Court of Justice in *Toronto Auer Light Co. v. Colling* (1899), 31 O.R. 18, [1899] O.J. No. 65 (Ont. C.A.) (*Toronto Auer Light*). In that case, the Court was also dealing with a patent on a method for making incandescent devices (illuminant appliance). It is relevant here to review what passages of *Von Heyden* Justice Boyd, speaking for the Court, found to be of particular interest:

> In *Von Heyden v. Neustadt* (1880), 14 Ch. D. 230, James, L.J., said (adopting the conclusion arrived at in *Elmslie v. Boursier* (1869), L.R. 9 Eq. 217): "That the sole right ... to 'make, use ... and vend the invention' ... includes a monopoly of the sale ... of products made according to the patented process ... A person who ... sells the product here, is surely indirectly making, using, and putting in practice the patented invention. Any other construction," he adds, "would render ... the whole privilege ... futile," p. 233.

> [para. 31.]

281    Given that Apotex says that this reasoning, if applied in Canada, raises an issue of extraterritorial application of our *Patent Act*, it is also worth mentioning that this very same issue was considered in England more than a hundred years ago. In *Badische Anilin und Soda Fabrik v. Basle Chemical Works, Bindschedler*, [1897] 2 Ch. 322 (Eng. C.A.), a patent owner had obtained a declaration of infringement against a trader in England who had ordered goods made in Switzerland using a process protected by an English patent, but which were delivered to the Swiss post office (the Buyer) by whom they were then imported into England. The defendant appealed and the English Court of Appeal reversed the decision. The following passage from p. 342 of Lord Justice Lindley's brief reasons clearly shows that the Court was alert and alive to the argument now raised by Apotex:

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 202 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

[...] the defendant Bindschedler had done nothing which amounts to making, using, exercising, or vending the invention of the plaintiffs in this country. In other words, Bindschedler has not infringed the plaintiffs' patent. The patent is confined to this country, and does not extend to Basle, where all the acts done by Bindschedler were committed. It is true that [...] no one has a right to use [the goods so made] here. But what the defendants did in Basle was lawful and not unlawful; lawful by the law of Switzerland and not unlawful by the law of England, which has no application there.

282      But even with territoriality clearly in mind, Lord Justice Smith, with whom Lord Justice Lindley concurred, made it clear, at p. 344, that:

[...] if Bindschedler by himself or his agent had brought the infringing article into this country, or had it received her[e], he would have been liable, for he would then be, in this country, by himself or his agent, using, exercising or vending the infringing article. The cases of *Elmslie v. Boursier* and *Von Heyden v. Neustadt* shew this to be so.

[Footnotes omitted.]

This decision was affirmed by the House of Lords at [1898] AC 200; (see to the same effect *Badische Anilin und Soda Fabrik v. Hickson*, [1905] 2 Ch. 495 (Eng. C.A.), affirmed, [1906] A.C. 419 (U.K. H.L.).) [110]

283      As the *Saccharin* case is at the center of the debate, it is of interest to mention the decision in *Saccharin Corp. v. Reitmeyer*, [1900] 2 Ch. 659, 17 R.P.C. 606 (Eng. Ch. Div.). There, the patent owner, who had successfully obtained a declaration of infringement against the importer in the first *Saccharin* case, was seeking a similar declaration against the English commission merchant who had originally bought the saccharin in Germany and sold it to the English importer. The Court refused to do so, on the basis that the principles laid down in *Elmslie* and *Von Heyden* and applied in *Saccharin* could not be extended to a case where the defendant had neither imported into nor sold in England the product made abroad using the patented process. Justice Cozens-Hardy reached this conclusion on the basis that, "[n]ow, it is plain that a Patent is of local force. It cannot and does not profess to interfere with or control acts done abroad [...]" (p. 611, lines 40-41 of the R.P.C.).

284      It could not be clearer that English Courts felt bound by the very principle Apotex seeks to now rely upon. Contrary to Apotex's assertion, however, they focused only on the acts taking place within their jurisdiction to determine if there was any conduct which constituted infringement.

285      There are three other English decisions that must be briefly mentioned. The first, *Pfizer Corp. v. Ministry of Health (1965)*, [1965] A.C. 512, [1965] 1 All E.R. 450 (U.K. H.L.), simply because it was referred to in *Monsanto Canada Inc.* (albeit in a different context) and indicates that Lord Upjohn, after re-examining the validity of the doctrine both "on principle and on authority", concluded:

[...] where an importer imports into this country, articles manufactured abroad but in accordance with a British patent for the purpose of distributing them and selling them in this country, he quite plainly is using and exercising the patent, and he thereby infringes the appellant's patent [...]

[p. 469(D) of the All ER]

286      The other two decisions are *Beecham Group Ltd. v. Bristol Laboratories Ltd.*, [1967] R.P.C. 406, [1967] F.S.R. 283 (Eng. C.A.) and the final decision on the merits rendered nearly ten years later by the House of Lords ([1978] R.P.C. 153 (U.K. H.L.)) (*Beecham Group*). The latter is probably the last decision to apply the principles at issue given that, shortly after it was rendered, the *Patents Act, 1977* was adopted.

287      The English Court of Appeal (Lord Justice Alfred Thompson Denning writing the main reasons) reversed the decision of the High Court judge and issued an interlocutory injunction to prevent the importation of hetacillin. In the Court of Appeal's view, the plaintiff had established a *prima facie* case of infringement of his English patents protecting, in particular, the process

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 203 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

for making ampicillin, an intermediate compound which was then transformed into hetacillin by the addition of acetone (see particularly the concurring reasons of Lord Justice Russell, at p. 417 of the RPC).

288    The reasoning in this case is, in my view, particularly instructive because the defendants vigorously contested that the *Saccharin* case was still good law in light of the amendments to the *Patents Act, 1949* (U.K.), 12, 13 & 14 Geo. VI, c. 87, which clearly required that the claims define the scope of the invention. Thus, the defendants argued, only patents claiming a product could be infringed by importation of such products into England. As in the present case, it was also argued that the "*Saccharin* doctrine", if followed, had the potential to yield extraordinary results [111] and uncertainty, leaving competitors uncertain as to what they are entitled to do.

289    These arguments are remarkably similar to those made before me by Apotex; they were ultimately rejected on the merits, by Justice Falconer in the first instance, by the Court of Appeal and by the House of Lords.

290    Apotex noted that this case is not helpful because the Courts were really dealing with a colourable imitation of the patented product, ampicillin. That is true. The plaintiffs in *Beecham Group* also raised an argument based on the fact that hetacillin was a colourable imitation because once it was used by a potential patient as an antibiotic it reverted to ampicillin in the stomach. However, this was treated by all judges as a separate ground. In the decision of the House of Lords, Lord Diplock also made it clear that the doctrine of infringement by importation, applied in *Saccharin*, was not an extension of the pith and marrow doctrine. It was a distinct concept standing on its own (see p. 200-201).

291    The House of Lords also confirmed that the *Patents Act, 1949* did not contain any changes that justified setting aside the principles applied in *Saccharin* and *Wilderman*. Lord Diplock noted that the need to describe and ascertain the nature of the invention in the letters patent was made a condition of the grant from 1700 onwards. To end the specification with a distinct statement of the invention claimed was made statutory in 1883, at which point Lord Diplock noted the practice to have already become widespread (p.198).

292    Lord Diplock describes the reasoning behind *Elmslie* and *Von Heyden* as follows at p. 199:

The monopoly granted by a patent is limited territorially to the United Kingdom and the Isle of Man and the corresponding prohibition is limited to acts done within those territorial limits. The wide words of the grant and prohibition [112] were, however, treated as entitling the patentee to prohibit the obtaining from abroad and selling in this country an article manufactured abroad by the patented process, even though the article was of a kind that was not new and consequently of itself could not be, and was not, claimed as an invention in the specification.

[Emphasis added.]

293    With respect to the extraordinary results which would flow from the unbridled application of the "*Saccharin* doctrine", it appears that the House of Lords, like Lord Justice Denning in 1967, found comfort in the application of the limitations set out in *Wilderman*. Lord Diplock explained, at p. 201:

My Lords, if logic were the sole guide to the law of patents such an extension of the doctrine of infringing importation might be difficult to resist. In effect it would mean that in respect of any article sold in this country, anything done in the course of its manufacture which would constitute an infringement of a United Kingdom patent if done in this country would constitute a like infringement if before importation it had been done abroad. This extreme extension of the doctrine was, however, rejected by Tomlin, J. in *Wilderman v. F.W. Berk & Co. Ltd.* (1925) 42 R.P.C. 79, where in relation to a claim for the infringing importation of an article in the course of whose manufacture abroad a patented apparatus had been used, he expressed the view that the use of the patented process or apparatus must have played an important part in the manufacture of the imported article.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

294     Finally, it is interesting to note that in that case, the House of Lords refused to decide if the doctrine should also apply to pure product claims, which extension had been accepted by the trial judge and the Court of Appeal. The Court felt that it did not have the benefit of full arguments (see also the reasons of Lord Simon of Glaisdale on this point, p. 204).

295     Turning back now to Canadian jurisprudence on the matter. In 1955, in *Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)*, [1955] S.C.R. 414, 23 C.P.R. 1 (S.C.C.) (*Hoffmann-LaRoche*), the Supreme Court of Canada issued its well-known decision that, contrary to what was then the English practice, no product by process claim could be issued in Canada for a known product, even though the process itself was new. As this involved an appeal in respect of a decision of the Commissioner of Patents refusing to allow the proposed product by process claims, the Supreme Court of Canada was not required to discuss the issue of infringement of a pure process patent or process claims, by the importation of a product (not covered by the patent) made abroad using the patented process. Nevertheless, while dealing with the main issue before it, Chief Justice Patrick Kerwin, writing for the majority, considered the decision of the Court of Appeal of England and Wales in *Von Heyden*, as well as two Canadian decisions, *Auer* and *Toronto Auer Light* and expressly noted that "there seems to be no reason to doubt the correctness of these decisions." [113]

296     While accepting that Canadian patent law differs from British legislation, and that Canadian patent law was originally modeled on U.S. legislation, Apotex's argument that the distinctions between Canadian and British law should render British jurisprudence of little assistance on this issue is unpersuasive. Put plainly, notwithstanding the differences between Canadian and British patent laws, our Courts continue to look to British jurisprudence to inform the analysis of our intellectual property laws.

297     There is also little doubt that the Exchequer Court of Canada and the Supreme Court of Canada were fully aware of these differences between English and Canadian legislation. The best example of this is *Union Carbide Canada Ltd. v. Trans-Canadian Feeds Ltd.* (1966), [1966] Ex. C.R. 884 (Can. Ex. Ct.) (*Union Carbide*), where President Wilbur Jackett, [114] having reviewed the cases of *Elmslie* and *Von Heyden*, said at para. 13:

> I have been able to discover no such difference between the ambit of an English patent for an invention and the ambit of the monopoly granted under the Canadian Patent Act as would warrant reaching a conclusion when this question arises under the Canadian Act different from that reached in respect of an English patent.

298     The learned judge also noted that he was unable to ascertain any relevant difference between the Canadian legislation that was under consideration in *Auer* and he concluded based on comity that he should follow *Auer*, noting that it had also been the subject of the obiter mentioned above in *Hoffmann-LaRoche*.

299     President Jackett appeared unaware of the then recent decision of Justice Noël in *Micro Chemicals Ltd. v. Rhone-Poulenc S.A. (No. 1)* (1964), [1964] Ex. C.R. 819, 44 C.P.R. 193 (Can. Ex. Ct.) (*Rhone-Poulenc*), where, on the basis of the same authorities, the latter had concluded that the principle was now accepted by our Courts (para. 49). Also, although there is a reference to the *Badische Anilin und Soda Fabrik* decisions (see above) in the editorial note of the Canadian Patent Reporter for *Rhone-Poulenc*, at 194, it does not appear that these cases were brought to the attention of the Court.

300     The term "*Saccharin* doctrine" per se came to the forefront in *American Cyanamid Co.*. In that case, the Court had to determine if the "*Saccharin* doctrine" should be applied to the importation of tetracycline in Canada. This particular product was not covered by the patent at issue but it was made using a patented process for making chlortetracycline, [115] to which a dechlorination method was then applied to obtain tetracycline. Thus, the patented process was not the last step in making the product ultimately imported and used in Canada. The learned judge does not specifically refer to the decision in *Wilderman* (he says simply "there are also a number of cases", para. 41). But having expressed some concern in respect of the application of the doctrine to processes that are merely incidental, the learned judge did apply the "*Saccharin* doctrine", as he found that the product used as an intermediary *was of importance*.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

301    Between 1966 and 1991, it appears that the Exchequer Court of Canada and the Federal Court of Canada considered the issue quite settled. In *Société des usines chimiques Rhône-Poulenc v. Jules R. Gilbert Ltd.* (1967), 35 Fox Pat. C. 174 (Can. Ex. Ct.) (aff'd, [1968] S.C.R. 950, 69 D.L.R. (2d) 353 (S.C.C.)) (*Gilbert*), Justice Arthur Thurlow, after referring to the decision of President Jackett in *Union Carbide*, stated that in the absence of any expression of opinion to the contrary by the Supreme Court of Canada, he regarded the point as settled in this Court.

302    In *Leesona Corp. v. Giltex Hosiery Ltd.* (1971), 2 C.P.R. (2d) 211, [1971] F.C.J. No. 1006 (Fed. T.D.), Justice Roderick Kerr followed Justice Thurlow's decision in *Gilbert* and even issued an interlocutory injunction to prevent the importation into Canada of certain products made abroad according to patented processes. Reference was also made to the then recent decision of Lord Justice Denning in *Beecham Group*.

303    Nevertheless, three years later in *Farbwerke Hoechst A.G. Vormals Meister Lucius & Bruning v. Halocarbon (Ontario) Ltd.*, [1974] 2 F.C. 266, 15 C.P.R. (2d) 105 (Fed. T.D.), Justice Frank Collier again faced the same issue, where the Canadian defendant imported isohalothane, a product made in the United States by a process patented in Canada. It was then used to manufacture another product at the defendant's plant in Canada. Although Justice Collier did not go into the details of the arguments presented, he notes in his reasons, at para. 10, that the Court "was invited by Mr. Hughes [as he then was] to distinguish, on a number of grounds, the Union Carbide case and the cases referred to by Jackett P." but concludes that he does not "see any reasonable grounds for so doing." It is important to mention that in his decision, Justice Collier specifically echoed the comments of Justice Thurlow in *Gilbert* and stated that in the absence of any expression of opinion to the contrary by the Supreme Court of Canada, he regarded the point as settled.

304    This decision was reversed by the Federal Court of Appeal [*Farbwerke Hoechst A.G. Vormals Meister Lucius & Bruning v. Halocarbon (Ontario) Ltd.* (1976), 1976 CarswellNat 37 (Fed. C.A.)] and the plaintiff appealed to the Supreme Court of Canada, which allowed the appeal ([1979] 2 S.C.R. 929, 104 D.L.R. (3d) 51 (S.C.C.)) and specifically reinstated the decision of Justice Collier in respect of the impugned process claim. At p. 941 (of the S.C.R.), Justice Louis-Philippe Pigeon, who delivered the reasons for the majority, noted:

> At the hearing in this Court, counsel for the respondent raised the contention that the importation of a product manufactured outside Canada did not infringe a Canadian patent for the process whereby it is manufactured elsewhere, but counsel for the appellant was informed that no reply to that submission was required. It will therefore not be dealt with.

This strongly suggests that the Supreme Court considered the issue of infringement by importation settled by the existing jurisprudence.

305    Undeterred, Apotex mounted a new charge before Justice Andrew MacKay in *Wellcome Foundation Ltd. v. Apotex Inc.* (1991), 47 F.T.R. 81, 39 C.P.R. (3d) 289 (Fed. T.D.) (*Wellcome (1991)*), raising arguments very similar to those discussed at length in its memorandum before this Court. It contested the validity of the "*Saccharin*" doctrine" per se, based among other things on the differences between the English and Canadian patent statutes. [116] It also contested the findings of Justice Noël in *American Cyanamid Co.*, which it found questionable because of the absence of a direct reference to the limitation of the doctrine as set out in *Wilderman* .

306    Prompted by these arguments and the fact that this was indeed only the second reported case involving a process patent for an intermediate compound (B-methoxy-a-(3,4,5-trimethoxybenzylidene) propionitrile, or MTBP and B-anilino-a-(3,4,5-trimethoxybenzyl) acrylonitrile, or TAA), Justice MacKay addressed the point in more detail than his predecessors. Particularly, with respect to the basis of the doctrine in the Canadian legislation, the learned judge stated at para. 59:

> I also reject the defendant's submission that the differences in the Canadian Act from the English statute do not support the application of the Saccharin doctrine. The "exclusive right" of "vending" seems to me to be broad enough to encompass situations such as that in this case. This point as well was noted in American Cyanamid, at 168. The effect of the granting provision, now section 44 of the Patent Act, may be summarized, as it was by O'Halloran J.A. in *Skelding v. Daly* (1941),

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

1 C.P.R. 266 at 273 (B.C.C.A.), as intending that *"... any act which interferes with the full enjoyment of the monopoly granted to the patentee is an infringement"*.

[Emphasis added.]

307    Applying the "*Saccharin* doctrine" as qualified by *Wilderman*, the Court concluded that there was infringement of the process claims by the importation of trimethoprim. As mentioned by Apotex, there was evidence in that case that traces of MTBP and TAA (the intermediate compounds) were found in the final product sold by the defendant in Canada.

308    It is worth noting that Apotex appealed the decision of Justice MacKay, which was varied on an unrelated issue ((1995), 100 F.T.R. 320 (note), 60 C.P.R. (3d) 135 (Fed. C.A.)). Surprisingly, it seems that Apotex did not contest the application of the doctrine by Justice MacKay before the Court of Appeal even though this point was clearly determinative in respect of the findings of infringement.

309    These Canadian decisions are, in my view, sufficient for this Court to conclude that the "*Saccharin* doctrine" as qualified by *Wilderman* is applicable to the case at bar. However, more recent jurisprudence further undermines the argument advanced by Apotex.

310    In *Monsanto Canada Inc.*, the Supreme Court of Canada articulated broad principles related to the interpretation of the rights granted under the *Patent Act*. At para. 58, Chief Justice Beverly McLachlin and Justice Morris Fish, speaking for the majority, summarize seven such principles:

1. "Use" or "exploiter", in their ordinary dictionary meaning, denote utilization with a view to production or advantage.

2. The basic principle in determining whether the defendant has "used" a patented invention is whether the inventor has been deprived, in whole or in part, *directly or indirectly*, of the full enjoyment of the monopoly conferred by the patent.

3. If there is a commercial benefit to be derived from the invention, it belongs to the patent holder.

4. It is no bar to a finding of infringement that the *patented* object or *process* is a part of or composes a *broader unpatented* structure or *process*, *provided the patented invention is significant or important to the defendant's activities that involve the unpatented structure*.

5. Possession of a patented object or an object incorporating a patented feature may constitute "use" of the object's stand-by or insurance utility and thus constitute infringement.

6. Possession, at least in commercial circumstances, raises a rebuttable presumption of "use".

7. While intention is generally irrelevant to determining whether there has been "use" and hence infringement, the absence of intention to employ or gain any advantage from the invention may be relevant to rebutting the presumption of use raised by possession.

[Emphasis added.]

311    Several of these principles are relevant to the issue of infringement by importation. First, with regards to the question of "use", the Court must ask itself: "did the defendant's activity deprive the inventor in whole or in part, directly or indirectly, of full enjoyment of the monopoly conferred by law?" (Emphasis omitted, *Monsanto Canada Inc.*, para. 35; see also *Free World Trust*, para. 43). This is exactly the question all the British cases cited above, going back to *Elmslie*, *Von Heyden* and *Saccharin*, meant to answer when they concluded that the importation, use or sale of products made abroad by way of the patented process constitutes infringement.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

312    Moreover, the meaning and purpose of s. 42 of the *Patent Act*, as described at para. 34 of the *Monsanto Canada Inc.* decision, is perfectly in line with the views adopted by Justice MacKay in *Wellcome (1991)*:

> [t]he purpose of s. 42 is to define the exclusive rights granted to the patent holder. These rights are the rights to full enjoyment of the monopoly granted by the patent. Therefore, what is prohibited is "any act that interferes with the full enjoyment of the monopoly granted to the patentee": H. G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), at p. 349;

> [*Monsanto Canada Inc.*, para. 34.]

313    This approach to a patent's monopoly was discussed by the majority in *Monsanto Canada Inc.* with reference to British jurisprudence:

> Thus, in *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.), the court stated, at p. 319:

>> By the sale of saccharin, in the course of the production of which the patented process is used, the Patentee is deprived of some part of the whole profit and advantage of the invention, and the importer is indirectly making use of the invention.

> [para. 44]

314    It is also worth nothing that even the minority in *Monsanto Canada Inc.* appear to be in agreement with the "*Saccharin* doctrine". As Justice Louise Arbour stated, at para. 155:

> It is well established that the use or sale of unpatented subject matter may still infringe a patent where the unpatented subject matter is made employing a patented <u>process</u>: *Saccharin Corp. v. Anglo-Continental Chemical Works, Ld.* (1900), 17 R.P.C. 307 (H.C.J.); F. Hoffmann-Laroche, supra, at p. 415; *Wellcome Foundation Ltd. v. Apotex Inc.* (1991), 39 C.P.R. (3d) 289 (F.C.T.D.); *American Cyanamid Co. v. Charles E. Frosst & Co.* (1965), 29 Fox Pat. C. 153 (Ex. Ct.). This proposition does not assist the respondent, however. The appellants have not infringed the <u>process</u> claim because they have not used the claimed method to produce their canola crop.

> [Emphasis in the original.]

315    While mindful that *Monsanto Canada Inc.* did not specifically address the issue of territoriality, the principles laid out therein are of assistance in evaluating Apotex's argument.

316    Both Lilly and Apotex have raised various policy reasons in support of their respective positions with respect to the question of infringement by importation. There is no need to discuss them here except to say such arguments are matters for Parliament to consider, not this Court.

317    Apotex's argument that the U.S. approach to this issue should be preferred is not convincing. It is worth noting that much of the U.S. jurisprudence regarding this issue (which were considered by the Court), was followed by legislative changes seeking to close significant gaps resulting from these decisions.

318    In sum, the Court agrees with Lilly that it is now too late to turn back the clock on the application of the general principles set out in the above-mentioned Canadian case law. Importation of products made abroad that are the subject of patented process claims in Canada is prohibited. This prohibition is widely recognized and is well-settled law in Canada.

319    Apotex's second argument with respect to infringement by importation seeks to limit the application of the "*Saccharin*" doctrine" as qualified by *Wilderman* based on the U.S. *Process Patent Amendment Act* and/or the EPC, as well as the jurisprudence that has interpreted these instruments.

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 208 of 308

*Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042*

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

320    First, it is worth mentioning that even though Parliament has had opportunities to intervene in this respect, it appears never to have felt the need to do so even after Canada became a party to the *NAFTA* and the *Agreement on Trade-Related Aspects of Intellectual Property Rights* (*TRIPS*) [117] agreements.

321    In *NAFTA*, para. 1709(5)(*b*) reads:

> where the subject matter of a patent is a process, the patent shall confer on the patent owner the right to prevent other persons from using that process and from using, selling, or importing <u>at least</u> the product obtained directly by that process, without the patent owner's consent.

> [Emphasis added.]

Para. 28(1)(b) of *TRIPS* is nearly identical. It reads:

> where the subject matter of a patent is a process, [a patent shall confer on its owner the exclusive right] to prevent third parties not having the owner's consent from the act of using the process, and from the acts of: using, offering for sale, selling, or importing for these purposes <u>at least</u> the product obtained directly by that process.

> [Emphasis added.]

322    Parliament adopted two bills with respect to the implementation of these agreements. The first, *An Act to Implement the North American Free Trade Agreement*, S.C. 1993, c. 44, sets out at s. 189 and following, the changes to the *Patent Act* made necessary by this agreement. The second, *An Act to Implement the Agreement Establishing the World Trade Organization*, S.C. 1994, c. 47, deals with necessary modifications to the *Patent Act* at ss. 141 and 142. None of these changes address the issue before the Court.

323    It can be reasonably assumed that the legislator was well aware of the state of patent law in Canada before it presented these bills. The relevant law at that time was summarized in *Fox*, at pp. 391 and 392, as follows:

> In considering infringement it is well to remember that it is not only manufacture that is forbidden to others than the patentee, but use and sale as well. For this reason infringement is committed by the importation of infringing articles made abroad, as well as importation and use in the country of articles or products made abroad on a patented machine or by a patented process. This principle applies also where the process used abroad has not produced the finished product that is imported but an intermediate that falls within the claims of the patent. In other words, it is none the less an infringement that the article or substance produced and sold which is manufactured by the use of the patented process is subjected to certain other processes. But this concept must be considered with care: it does not apply in a case of *de minimis*. If there is an act committed in Canada by the defendant in derogation of the patentee's rights there is infringement.

> [Footnotes omitted.]

324    It is also reasonable to assume that Parliament was well aware of the relevant statutory provisions referred to by Apotex.

325    What Apotex seeks in this Court is a re-writing of Canadian patent laws in order to limit the application of over a century's worth of jurisprudence. While European and U.S. statutory provisions may be of assistance in analyzing Canadian laws, they cannot serve to displace the well-settled jurisprudence on infringement by importation.

326    As mentioned earlier, Justice Snider, in *Pfizer*, made a very useful summary of factors that a Court should consider to determine whether or not the patented process plays an important part in the manufacture of the imported products:

> • The importance of the product or process to the final product sold into Canada. Where the use is incidental, non-essential or could readily be substituted (such as the Italian scissors example), a Court might be less inclined to find infringement.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 209 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

• Whether the final product actually contains all or part of the patented product. Where the patented product can actually be identified in the product sold into Canada, there may be a strong case for a finding of infringement.

• The stage at which the patented product or process is used. For example, use of a process as a preliminary step of a lengthy production process may lead to a conclusion that the patentee has suffered little deprivation.

• The number of instances of use made of the patented product or process. Where the same patented product is used repetitively through the production of the non-patented end product, there may be clearer evidence that the advantage of the patentee has been impaired.

• The strength of the evidence demonstrating that, if carried out or used in Canada, the product or process would constitute infringement. On this point, my opinion would be that, where there is ambiguity in the evidence, the benefit of the doubt should go to the party using the product or process. This is, perhaps, simply another way of expressing the established principle that the patentee bears the burden of proving infringement.

[para. 90]

Justice Snider concludes that "[i]n sum, there must be a strong link established between the use of the patented process or product and the product sold into Canada." (para. 91.)

327    I do not take Justice Snider's list to be exhaustive or to limit in any way the test applicable in Canada. There is nothing in what she proposed that prevents the Court from also considering whether the imported product was obtained directly from the patented process or whether the compound made by the patented process was materially changed or has become a trivial or non-essential component of the imported product. In fact, these concepts are very close to those she used, her list is obviously more detailed as our test is more flexible and as mentioned, this is rightly so.

328    The value of our approach is that it can be adapted to new circumstances. The Courts in *Beecham Group* were able to conclude to infringement despite the fact that the final ingredient imported in England no longer contained the compound made using the patented processes. It was the flexibility of the test that enabled them to do so and to look at what happened in the stomachs of the patients who actually bought and used the pills made by the defendant.

329    For these reasons, not only do I conclude that the Court cannot redefine and limit the test applicable in Canada with respect to infringement by importation and use, but also that I should not do so. On this basis, I will now proceed to apply these principles to the facts of this case.

330    In respect of the Shionogi patents, it is not disputed that if the Kyong Bo process had been carried out in Canada, it would have infringed the Shionogi patents. [118]

331    It was also clear, in my view, that Lupin used the process covered by the Lilly patents until 1998. [119]

332    The only real difficulty in applying the test in this case arises from the fact that making cefaclor is a very complex process [120], involving more steps than what was required to make the various compounds previously discussed in the case law. But this alone should not prevent the application of the doctrine. Certainly technical complexity should not enable a party to deprive in whole or in part, directly or indirectly, of the full enjoyment of the monopoly conferred by a patent.

333    It is not disputed that there are other steps (chemical reactions) that take place after Lupin and Kyong Bo obtained either the 3-chloro-cephem or the 3-hydroxy-cephem compounds (which are the end compounds of the patented processes) to make cefaclor. Nor is it contested that the 3-chloro-cephem and the 3-hydroxy-cephem are changed into an ultimately different chemical compound (cefaclor) by these additional steps.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 210 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

334    All the experts agreed that there was no known method to make cefaclor without going through the 3-hydroxy-cephem compound.

335    None of the experts opine that either patented process was a trivial or unessential part of the processes used by Kyong Bo or Lupin (Process "A") to produce the cefaclor used by Apotex in Canada.

336    On the whole of the evidence, it is clear that the Shionogi and Lilly processes were more efficient (and therefore less costly) than any other alternative discussed in any of the publications referred to by the experts or used by Lupin. [121]

337    In fact, in respect of the Lilly process, there is clear evidence that to change what is described in Lupin's documentation simply as step V (although it involves three distinct reactions) resulted in an increase of almost 50% of the price of cefaclor. [122]

338    As discussed, the disclosure of the Lilly process patents expressly states that the inventions are particularly useful to make cefaclor. This is the very purpose for which their teachings were used here.

339    Apotex relied heavily on a 1978 progress report from Lilly's research team working on cefaclor (TX-211). Interestingly it states, at p. 3 that:

> The two most difficult steps in the cefaclor synthesis, in terms of time and effort expended, are the exomethylene ring expansion (Dr. T.S. Chou) and the enol chlorination (79284 [right arrow] 112069). Very few processes have been as extensively investigated as these two synthetic steps for cefaclor.

340    Having considered and weighed all the evidence, I conclude that, as a matter of fact, Lilly's patented process was an "important" part of the method used by Lupin to make the cefaclor that was used by Apotex in Canada.

341    I have also concluded that the Shionogi process was a crucial, thus obviously important, part of the Kyong Bo process for making cefaclor. Without it, Kyong Bo could not have used the total *synthetic* pathway described in its technical documentation filed with Health Canada.

### *5.6. The Exemption Under Subsection 55.2(1) of the Patent Act*

342    Subsection 55.2(1) provides:

> 55.2(1) It is not an infringement of a patent for any person to make, construct, use or sell the patented invention solely for uses reasonably related to the development and submission of information required under any law of Canada, a province or a country other than Canada that regulates the manufacture, construction, use or sale of any product.

> 55.2(1) Il n'y a pas contrefaçon de brevet lorsque l'utilisation, la fabrication, la construction ou la vente d'une invention brevetée se justifie dans la seule mesure nécessaire à la préparation et à la production du dossier d'information qu'oblige à fournir une loi fédérale, provinciale ou étrangère réglementant la fabrication, la construction, l'utilisation ou la vente d'un produit.

It is admitted that this defence was included in the particulars filed by Apotex but Lilly argues that the statement of defence was never amended and thus it was not properly pleaded. There is no dispute that Lilly was fully aware that Apotex would rely on this exemption. Although strictly speaking Lilly is correct, it is obvious that in the present circumstances there is no good reason to deprive Apotex of the right to raise this defence.

343    The only substantive argument advanced by Lilly is that, based on Ms. Carrière's testimony, the in-process sampling and the reserve samples were not set aside simply to meet government requirements but also for internal quality controls (which addresses business, not regulatory, imperatives). Lilly argues that in light of this dual purpose, the exemption cannot apply to such material. Lilly also says that Apotex has not established that its records are consistent and complete and that the quantities set out in the documentation prepared by Mr. Fahner were only used for the purposes set out in subs. 55.2(1) of the *Patent Act*.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 211 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

344     The argument that this exemption should be strictly construed has been rejected by the Federal Court of Appeal in *Merck & Co. v. Apotex Inc.*, 2006 FCA 323, [2007] 3 F.C.R. 588 (F.C.A.) (*Merck & Co. (FCA)*) (paras. 103-104). In that decision and in *Laboratoires Servier* the Courts did not limit the exemption solely to material actually provided to a regulator. What is critical here is that the Court is satisfied that the materials purported to have been used for research and development formulation, reserve samples and in-process sampling were not sold or used for any similar purpose. [123] The fact that these quantities could serve a dual purpose is, in my view, irrelevant.

345     As for the actual amount of bulk cefaclor covered by the exemption, the Court agrees that the exact quantities described in the document prepared by Mr. Fahner [124] as a result of his cross-examination and attached to a letter from counsel for Apotex dated May 12, 2008, shall be the subject of the reference in order to determine what quantities properly fall under the above-mentioned categories. This being, the amounts described in this document represent the maximum quantities which can be considered for the purpose of the exemption (187 kilos).

346     Both parties recognize that this is not a major issue in this case and thus there is nothing more to say.

## 6. Invalidity

347     It has been agreed that as all of the patents in suit have now expired, there is no need to deal with the portion of the counter-claim seeking a declaration that said patents are void. All findings concerning invalidity are thus made in the context of the main action.

### 6.1. Standard of Review and Burden of Proof

348     It is common ground between the parties that Apotex, as the party attacking the validity of Lilly's patents, bears the burden of proof with respect to invalidity. Such is the effect of subs. 43(2) and s. 59 of the *Patent Act*.

349     Nor do the parties disagree on the applicable standard of proof. As the Supreme Court of Canada recently confirmed, "there is only one civil standard of proof at common law and that is proof on a balance of probabilities." (*C. (R.) v. McDougall*, 2008 SCC 53, [2008] 3 S.C.R. 41 (S.C.C.), at para. 40).

350     While agreeing on the onus and the standard of proof with respect to invalidity, Lilly and Apotex disagree on what a party asserting invalidity must prove. Lilly argues that Apotex must prove that the decision of the Commissioner of Patents to approve the patents at issue was unreasonable. In support of this proposition, Lilly relies on the following passage from *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 (S.C.C.) (*Wellcome (2002)*):

> Unlike the *Harvard Mouse* case (*Harvard College v. Canada (Commissioner of Patents)*, [2002] 4 S.C.R. 45, 2002 SCC 76), released concurrently, these appeals are not limited to a question of law (i.e., the statutory limits of patentable subject matter). On that issue, the standard is correctness. The issue here is one of mixed fact and law, namely, was the Commissioner properly satisfied the claimed invention met the statutory test of utility? Fact finding generally commands deference, but here Parliament has provided an unfettered right of appeal to the Federal Court (*Patent Act*, s. 42).

> [...]

> In the circumstances, I think the appropriate standard of review of these issues, which largely raise mixed questions of law and fact, is reasonableness *simpliciter*, i.e., that the Commissioner's decision must withstand a somewhat probing examination (*Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748, at para. 56).

> [Emphasis added. Paras. 42 and 44. [125]

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

351     In effect, relying on *Wellcome (2002)*, Lilly argues that s. 59 of the *Patent Act* requires a party asserting invalidity to engage in a form of judicial review of the Commissioner's "decision" to grant an impugned patent. Furthermore, Lilly argues that deference is owed, and that the standard of reasonableness should apply.

352     In *Whirlpool*, the Supreme Court of Canada put plainly the task faced by a party asserting invalidity: "The burden was on the appellants to prove on a balance of probabilities, that the patent was invalid" (para. 92). In so doing, the party attacking validity must establish that the patent, or claims within a patent, do not meet the requirements for patentability under the *Patent Act* (i.e. obviousness, utility, etc.). This requires one to examine the claims of a patent, properly constructed, against the requirements of the *Patent Act* (see *Free World Trust* at paras. 24-27).

353     This is perfectly in line with the wording in s. 59 of the *Patent Act* which speaks of "any fact or default which by this Act or by law renders the patent void" and directs the Court to "take cognizance of that pleading and of the facts and decide accordingly."

354     The approach to validity, assessing claims against the requirements of the *Patent Act*, without reference to principles of administrative law, has been the standard judicial practice for more than a hundred years.

355     It cannot be presumed that just two years after *Free World Trust* and *Whirlpool*, the Supreme Court of Canada sought to drastically modify the law with respect to invalidity in an implicit fashion with its decision in *Wellcome (2002)*. One would expect such a shift to be done clearly and in express terms. The fact that the bulk of the jurisprudence since *Wellcome (2002)* has considered invalidity without resort to administrative law principles buttresses this conclusion. (See *Laboratoires Servier*, para. 225; *M.K. Plastics Corp. v. Plasticair Inc.* (2007), 2007 FC 574, 61 C.P.R. (4th) 1 (F.C.), para. 105.)

356     Although it is clear that in *Wellcome (2002)*, the Court was dealing with an action of infringement and a defence of invalidity in its administrative law analysis, the Supreme Court references s. 42 [126] (now s. 41) of the *Patent Act*, which deals with the right to appeal a decision of the Commissioner to refuse the grant of a patent to the Federal Court. The defence of invalidity and appeal from a refusal by the Commissioner to grant a patent implicates different actors (putative patentee v. alleged infringer) raising similar issues but in very different contexts.

357     Furthermore, despite having imported administrative law principles into the invalidity analysis, neither *Wellcome (2002)* and *Monsanto Canada Inc.* actually applies concepts such as the degree of deference owed to the decision of the Commissioner to grant the patents at issue. In fact, notwithstanding the above referenced paragraphs of these decisions, the term "reasonableness" is not even used in assessing invalidity.

358     A telling example of the unease created by those decisions can be found in *Jay-Lor International Inc. v. Penta Farm Systems Ltd.* (2007), 2007 FC 358, 59 C.P.R. (4th) 228 (F.C.), where Justice Snider was confronted with a patent infringement claim and defence of invalidity. In discussing the issue of validity, Justice Snider stated:

> Once a patent is issued, there is a presumption that, in the absence of evidence to the contrary, the patent is valid (*Patent Act*, s. 43(2)). The onus is thus on the Defendants to show that the Commissioner of Patents erred in allowing the patent (*Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34 at para. 24, [2004] 1 S.C.R. 902; *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 at paras. 43-44, 21 C.P.R. (4th) 499). In this case, the Defendants argue that the patent is invalid because it was both obvious and anticipated. I will consider each of these arguments.

> [para. 72]

Having made this observation, however, nowhere in her reasons does Justice Snider engage in anything resembling a reasonableness review akin to that which was set out in *New Brunswick (Board of Management) v. Dunsmuir*, 2008 SCC 9, [2008] 1 S.C.R. 190 (S.C.C.) (*Dunsmuir*). In fact, the words "deference" and "reasonableness" (in an administrative law sense) appear nowhere in the decision, nor is there any reference (beyond the above quote) to the decision of the Commissioner to grant the patent at issue. [127]

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042...

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

359     Such an attitude is understandable for there are a number of reasons why an administrative law approach to invalidity is almost impossible to apply without further guidance from Canada's highest Court.

360     In effect, it is unclear what would be the subject of this judicial review. A decision by the Commissioner to grant a patent comes with no reasons, no explanation, and no context. Indeed, a patent's prosecution history cannot be reviewed in construing the claims of a patent (*Merck & Co. (FCA)*, para. 53).

361     A reasonableness review involves determining whether a decision falls within a range of possible acceptable outcomes on the basis of the evidence before the original decision maker (*Dunsmuir*, para. 47). If, as *Wellcome (2002)* suggests, the Commissioner's decision to grant a patent is owed some matter of deference, how would a reviewing court assess reasonableness without access to the material considered by the decision-maker? Although the Supreme Court of Canada left the door open in *Free World Trust* (para. 67) as to whether prosecution history can be relevant for a purpose other than defining the scope of the grant of the monopoly, it has never been used for the purpose of deciphering the Commissioner's reasons for granting a patent.

362     A court engaged in judicial review, regardless of the standard applied, is usually limited to only considering the evidence that was before the decision-maker (*Gosselin c. Canada (Procureur général)* (2006), 2006 FC 3, 289 F.T.R. 7 (F.C.), paras. 12-13). This has not been the case when courts are engaged in examining allegations of invalidity, with respect to a patent.

363     There is no statutory requirement that the evidence before the Commissioner of Patents be provided to the Federal Court in the context of an infringement action. Furthermore, nothing in s. 59 of the *Patent Act* limits a party challenging the validity of a patent to the evidence that was put before the Commissioner of Patents.

364     Parties challenging validity have always been free, subject to the applicable rules of evidence, to put forth any evidence that may serve to undermine the validity of a patent's claims. Standards of review are neither useful nor designed to address situations where the evidentiary record before the Court is different than the one before another decision-maker.

365     In the *Harvard College (2000)* decision, Chief Justice Isaac referred by analogy to appeals from decisions of the Registrar of Trade-Marks under s. 56 of the *Trade-Marks Act*, R.S.C. 1985, c. T-13. In such cases, standards of review only apply where there is no new evidence that could have affected the decision of the Registrar. If the Court concludes that there is such evidence, then the Court must exercise its discretion *de novo*. It should be noted that the Registrar of Trade-Marks must give reasons for his or her decision, which can then be the subject of an assessment by the Court.

366     To be certain, administrative law principles have been applied to certain decisions of the Commissioner of Patents (See e.g. *Genencor International Inc. v. Canada (Commissioner of Patents)* (2008), 2008 FC 608, [2009] 1 F.C.R. 361 (F.C.) (reviewing a decision of the Commissioner on a re-examination under ss. 48.1 - 48.5 of the *Patent Act*); *Pason Systems Corp. v. Canada (Commissioner of Patents)* (2006), 2006 FC 753, [2007] 2 F.C.R. 269 (F.C.) (reviewing a decision of the Commissioner in respect of alleged clerical corrections under s. 8 of the *Patent Act*); and, *Dow Chemical Co. v. Canada (Attorney General)* (2007), 2007 FC 1236, 63 C.P.R. (4th) 89 (F.C.)).

367     With respect to some of the decisions of the Commissioner, a statutory right of appeal to the Federal Court is provided (see s. 19.2, subs. 20(15) and s. 41 of the *Patent Act*). However, where administrative law principles have been applied to decisions of the Commissioner of Patents, it has been in the context where these are amenable to judicial review and not pursuant to s. 59 and subs. 60(1) of the *Patent Act*.

368     It may very well be that the material effect or consequence of a finding of invalidity is that the Commissioner "erred" in granting a patent. But, in the context of an action for infringement where a defence of invalidity is raised, that is not the essential point of departure: the claims stand alone to determine if the monopoly granted meets the test set out in the Act, for example in respect of utility, novelty and inventiveness.

369     In sum, the importation of administrative law principles into the assessment of invalidity has not been thoroughly canvassed by appellate authorities and would constitute a significant departure from the Supreme Court of Canada's well-

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 214 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

established jurisprudence concerning pleas of invalidity. Absent further clarification on how the concept of deference is to be integrated into the established invalidity analysis, the Court is reluctant to employ administrative law principles in its analytic framework in this regard.

370    Thus, in these proceedings, the merits of Apotex's defence will be assessed on the basis that the defendant must establish on a balance of probabilities any fact which by virtue of the *Patent Act* or by law renders invalid the patents at issue, keeping in mind the applicable presumption as to their validity.

## 7. Inherency and Lack of Subject Matter

### 7.1. Shionogi Patents

371    Apotex argues that the Commissioner of Patents did not force Shionogi to file divisional applications during the prosecution of these patents. It also submits that the Shionogi patents lack subject matter and that if there is anything novel and inventive in the original application, it would be the overall synthetic pathway that was not claimed in any of the Shionogi patents under review. [128]

372    However, during the final argument, Apotex's counsel made it clear that if the Court concluded that as in *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504, 122 D.L.R. (3d) 203 (S.C.C.) (*Consolboard (1981)*), Shionogi was required by the Commissioner of Patents to divide this application, none of these divisional applications should be open to attack by reason only of the granting of the original patent, that is, for lack of subject matter for more than one patent (see *Consolboard (1981)*, at pp. 536-537 of the S.C.R.).

373    That said, it is not disputed that Shionogi's patent agent received an Examiner's Report (also referred to as an "Office Action") dated February 28, 1979, from the Patent Office where the Examiner indicated that:

The claims of this application are directed to four possible different subject matters as follows:

(1) Claims 1 to 10, 13 to16, 21 to 23, 38, 39 and 54 to 73.

(2) Claims 11, 12, 31 to 34 and 45 to 53.

(3) Claims 17 to 20 and 40 to 44, and

(4) Claims 24 to 30, 35 and 36.

Applicant must restrict his claims to a single subject matter under section 38 of the *Act*.

Amendment is required.

374    The exact wording of the Commissioner's letter in *Consolboard (1981)* is not reproduced in the Supreme Court of Canada's judgment. Apotex did bring to the Court's attention that in the trial decision, *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.* (1978), 39 C.P.R. (2d) 191, [1978] F.C.J. No. 305 (Fed. T.D.) (*Consolboard (1978)*), the said letter is described as follows:

The Commissioner of Patents took the view the application described and claimed more than one invention. He directed the applicant limit the claims to one invention only. Accordingly, on February 25, 1957, a divisional application was filed.

[para. 49]

375    It is not disputed that such description appears to support the view of Lilly's expert, Mr. Murphy, that like in the above case, the filing of divisional applications here was made at the direction of the Commissioner of Patents. In his report, Mr. Murphy also notes, at para. 37, that "[u]pon filing of a divisional application, the application is checked in the Patent Office

to ensure that it is entitled to divisional status." [129]  The expert concluded from his review of the relevant patent files that the Patent Office properly accepted the divisional status of these applications. (See also para. 40 of Mr. Murphy's affidavit (E-20))

376    Apotex did not file any expert affidavits on this subject and relies solely on its cross-examination of Mr. Murphy. The Court has considered the said cross-examination [130] and finds that there is insufficient evidence to conclude that this case is distinguishable from the one before the Supreme Court of Canada in *Consolboard (1981)*.

377    Beyond the issue of whether or not the Shionogi applications resulted from a proper divisional, there was some dispute between the parties as to what it means for a patent to "lack subject matter" [131] . *Fox* teaches that in a wider sense, the question of subject matter is directed to ascertaining whether a device or process "falls within those classes of things designed to be protected by the patent law." (p. 15) This was the main issue faced by the Supreme Court of Canada, for example, in *Harvard College*. According to Lilly, this is the way it understood Apotex's pleadings.

378    However, *Fox* also speaks of a more restrictive meaning which in sum directs the inquiry as to whether the production of the device or process "was obvious or involved the exercise of the inventive faculty. [...] This enquiry, in the English cases usually discussed under the heading of obviousness, is directed to ascertaining whether [...] its production was sufficiently important and worthy to entitle it to the grant of monopoly rights." (pp. 15-16) In that context, the Courts sometimes loosely refer to lack of subject matter when what was claimed was not inventive [132] but the Court finds that this expression should now be avoided. Even though it may be correct, strictly speaking, to say that there is no patentable subject matter if there is no invention, it is better to address the following aspects of a patentable invention — novelty, inventiveness, utility — under more specific headings and to reserve "lack of subject matter" as the heading under which one deals with whether or not the invention falls between those classes of things designed to be protected by the patent law.

379    Certainly, the heading which one chooses to present one's argument cannot change the fact that one cannot have "two kicks at the can" [133] by simply presenting its position under distinct headings. The Court has already reviewed the Apotex argument in respect of obviousness. [134]  As indicated when discussing obviousness, the Court is satisfied that there is at least one valid (unobvious) [135] claim at issue in each patent that is infringed. Thus, in my opinion, there is no need to say more here.

### 7.2. Lilly Patents

380    Apotex argues that the Lilly process patents lack "subject matter" as they claim nothing more than the inherent properties of a known compound. Also, as the usefulness of the kinetic complex in cephalosporin chemistry was disclosed in detail in the '007 patent (disclosure or specification only), there is no distinct "subject matter" supporting these process patents.

381    In respect of the first argument, having reviewed the case law submitted by Apotex, [136] the Court has no hesitation to conclude that it has no application whatsoever here. These cases were dealing with very different sets of facts.

382    Also, given that the only claim found valid in the '007 patent (claim 17) is a process claim, this argument appears to be moot.

383    The second point is also unsound. In effect, as explained earlier, although Apotex uses the expression "subject matter", to refer to the inventiveness, what Apotex is really saying is that there is only one invention, the allegedly new kinetic compound, and, by claiming it in the '007 patent, Lilly was not entitled to the Lilly process patents. In short, it should have put all the claims in a single patent. As mentioned, it is clear that the discovery of the kinetic complex itself is not the invention in any of the process patents.

384    In any event, the Court agrees with Lilly that this sounds like a modified double patenting argument coupled with an improper divisional argument. In my view, it also calls into question longstanding Patent Office practices. [137]

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

385      I say "modified double patenting" because Apotex ought to know that the '007 patent application, which was filed on the same day as the applications for the process patents (presumed date of the invention claimed given the absence of evidence in respect of an earlier date), is not prior art that can be used to support an argument of double patenting (obviousness). The defendant also ought to know that, as indicated by the Supreme Court of Canada in *Whirlpool* and *Sanofi*, the inquiry of double patenting is directed to the claims and not to the disclosure of the various patents under review. Comparing the claims of all the Lilly patents, it is evident that they do not overlap (anticipation). It is also clear, in my opinion, based on the evidence before me, that the process covered by claim 17 in the '007 patent (the only valid claim) does not render the use of the kinetic complex in each of the reactions claimed in the Lilly process patent obvious, nor, as mentioned in discussing obviousness, does the fact that the kinetic complex can be used for any one such reaction make it obvious that it can be used for the other two, or in "one pot".

386      There is uncontradicted expert evidence (Affidavit of Mr. Murphy (E-20)) to the effect that Lilly could not have included in a single patent, claim 17 ('007 patent), a claim to a combination of steps and claims to the individual steps covered in the '725, '468 and '536 patents. This would have been contrary to the unity of invention rule as defined and described in the *MOPOP*. Thus to accept Apotex's argument would mean that, because Lilly complied with this practice, instead of filing an application that would necessarily raise an objection and result in a request for amendment — the filing of divisional applications, its process patents can now be challenged on a basis that would not have otherwise been open to Apotex (*Consolboard (1981)*).

387      The Court notes that in *Merck & Co. (FCA)*, the Federal Court of Appeal reviewed, albeit in a different context, the question of an improper divisional and its consequences at paras. 40-50, and noted that such a divisional would not necessarily result in the loss of patent rights. In fact, it found that the concept of double patenting provides for an adequate remedy in the event that more than one patent is issued for the same invention.

388      At trial, Apotex confirmed that it was not arguing that there was double patenting in this case. [138]

389      There is no good reason why there should be a different remedy against patents issued following the Patent Office practices than when there is an improper divisional as is examined in *Merck (2006)*.

390      The valid claims of these patents do not overlap and as discussed under obviousness, there is at least one unobvious claim at issue in each of them.

## 8. Anticipation

### 8.1. The Legal Test

391      The law in respect of anticipation has been recently clarified by the Supreme Court of Canada in *Sanofi*, particularly at paras. 18 to 50.

392      In order to anticipate, a prior art document that is considered must meet both the requirements of disclosure and enablement. In that respect, the Supreme Court of Canada approved and endorsed the decision of the House of Lords in *Synthon*.

393      With respect to disclosure, Justice Rothstein made it clear that the prior art document must disclose subject matter which, if performed, would necessarily result in infringement of the patent being challenged.

394      That prior art document must be read by the person skilled in the art with an open mind, trying to understand what that prior art document meant. However, at this stage of the inquiry (disclosure), the skilled person is not allowed to conduct experimentation as there is no room for trial and error, the prior art is simply to be read for the purposes of understanding it. (see *Sanofi* at para. 25; *Abbott Laboratories v. Canada (Minister of Health)* (2008), 2008 FC 1359, 71 C.P.R. (4th) 237 (F.C.) (*Abbott (2008)*), para. 67).

395      The Court also understands that the law, as discussed in *Beloit Canada Ltée/Ltd. v. Valmet Oy* (1986), 64 N.R. 287, 7 C.I.P.R. 205 (Fed. C.A.) (*Beloit*), *General Tire* and *Free World Trust* is still relevant on the issue of disclosure, but the *Beloit* test has been refined in respect of enablement (see *Sanofi* paras. 20-22 and 28).

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

396    Surprisingly, there was a controversy at trial as to what exactly the prior art document must disclose. Must it reveal all the advantages or the details as to how to best use the patented invention disclosed in the patent or should it only describe the claimed invention? If the latter, should the prior disclosure include only the essential elements of the claim at issue or all of the elements described in the said claim? The parties wrote detailed submissions on this particular issue. Although these were duly considered, there is no need for a lengthy review of the authorities cited therein.

397    As mentioned, the inquiry the Court must carry out seeks to determine whether or not the matter performed in the prior art would necessarily constitute infringement. Such inquiry is thus necessarily directed at the invention as claimed, and only to the essential elements of the claim, properly construed. In that respect, the Court notes that this also appears to be the understanding of Justice Hughes in *Abbott (2008)*, at para. 76.

398    In line with its argument that the inquiry is directed to the patented invention only, Apotex also argued that once the patented invention (distinct from what is claimed) is disclosed in the prior art, all claims in the patent must fall for there is only one such invention and if it is not novel, [139] there should be no patent. This argument must also be rejected, not only because it is not in line with the inquiry at hand, but also because it leads to an absurd result. For example, if the broadest claim (such as claim 1) is invalid because it is too broad, having included a specific embodiment that has been made in the prior art, [140] the inventor would not be entitled to claim another aspect of the invention in a dependent claim which covers only a compound that has never been disclosed or made. This would render obsolete what has been described as "the art of claiming" (see Hayhurst) and is also contrary to the approach now mandated by subs. 27(5) of the *Patent Act* as amended.

### 8.2. The '007 Patent

399    The Court is satisfied that Apotex has established on a balance of probabilities that when one carries out the process disclosed at p. 3053 (triphenoxy-dichlorides (b)) of Rydon (Example B) which expressly provides for reacting TPP with Cl in hexane (an anhydrous inert solvent) in equimolar proportions, one would necessarily make a compound within the formula described in claim 1 and would thus infringe. The process would also necessarily infringe claim 8 (a process claim), which does not provide for a particular order of addition of the Cl and the TPP.

400    By the end of the trial, this fact was no longer disputed by Lilly. It was admitted by Dr. Baldwin quite early in his testimony that the kinetic complex would necessarily have been formed when Rydon did this particular experiment. [141]

401    Whether one knew that the kinetic compound was formed or not is irrelevant, as is the fact that this compound would disappear if not stabilized or used quickly. This is a perfect analogy and direct application of the principles established and applied by the Federal Court of Appeal in *Abbott (2006)* [142] at para. 22 and *Merrell Dow Pharmaceuticals Inc.* mentioned above.

402    There was a debate as to whether or not the claims could be anticipated if the prior art did not clearly disclose the fact that the fastest forming compound of this reaction was a halogenating compound. As mentioned, I do not construe claim 1 as a "use claim". But even if I were wrong in this regard, I would apply the principles stated and applied by my colleague Justice Hughes in *Abbott (2008)* at paras. 71-75, and conclude that claims 1 and 8 are nevertheless anticipated.

403    It is also relevant to further discuss what is disclosed in Coe and in Rydon in respect of halogenation. The Court finds that on the whole of the evidence (with particular consideration of the testimony of Dr. Baldwin), Apotex has not established that a compound covered by the claims of the '007 patent would necessarily participate in the halogenation process described in this prior art (particularly at p. 2285 of Coe and at p. 3049 of Rydon) if one were to follow the instructions given in those documents to prepare alkyl halides from the reaction of TPP, Cl and alcohol without solution (neat) and this even if the reaction was carried out *in situ*.

404    Despite this, the Court is also convinced that the kinetic complex formed using the process described in Rydon at p. 3053 (Example B), is as a matter of fact a halogenating compound.

405      The Court notes that in *Abbott (2006)*, the claims under review also described the compound found to have been anticipated as an antibiotic. This was not viewed as sufficient to save the claim. This, I believe, is because the claims in *Abbott (2006)*, like the claim here, are not "use" claims and the reference to halogen compounds or antibiotics is simply descriptive of the claimed compound.

406      The parties are agreed that if claims 1 and 8 are anticipated, the only other claim of the '007 patent which requires a determination is claim 17. I do not believe that Apotex disputes the fact that neither Coe nor Rydon disclose subject matter, which if performed, would infringe claim 17. In effect, it appears undisputable that one could not infringe that particular claim without using an aromatic or halogenated hydrocarbon solvent.

407      There is only one experiment in Rydon (at p. 3052) where chlorobenzene (an aromatic or halogenated hydrocarbon solvent) is used to carry out a reaction between Cl and TPP. However, in that experiment, the ratio of Cl to TPP was 1:2, and as such this process could not infringe the process described in claim 17, which requires the use of equivalent amounts of those two substances.

408      Apotex argued that the use of an aromatic of halogenated solvent is not inventive and that therefore, "there is no distinct patentable subject matter." It may well be that this essential element of claim 17 is not inventive, but that inquiry is distinct from the one being carried out to determine if the invention as claimed therein is novel. I conclude that this claim is not anticipated by what is disclosed in Coe or Rydon.

### 8.3. The Lilly Process Patents

409      In its memorandum on invalidity, at p. 57, Apotex appears to argue that the Lilly process patents were anticipated simply because the triaryl phosphite-halogen compound, which is one of the essential elements in all the claims in these patents, was not novel. [143] However, in its additional submissions dealing specifically with the implications of *Sanofi*, Apotex does not discuss at all these patents under the heading of anticipation. The Court understands from this that the argument that these process patents were anticipated has been abandoned.

410      In the event that this is not so, the Court has carefully reviewed all of the prior art cited in respect of the Lilly process patents as well as Apotex's expert reports and finds that there is not one single prior art document that discloses all the essential elements of the claims at issue in these process patents. Thus, none of the subject matter disclosed in any one single document, if performed, would necessarily infringe these patents.

### 8.4. The Shionogi Patents

411      Apotex has not argued that the Shionogi patents are not novel. It is acknowledged that the compound by process claims in three of those patents are indeed novel and that none of the processes described therein were ever carried out on the specific compounds described in the claims.

## 9. Obviousness

### 9.1. The Legal Test

412      We are dealing with patents subject to the pre-October 1, 1989 version of the *Patent Act*, in which there was no express statutory test for obviousness. Rather, as noted by Justice Rothstein in *Sanofi*, this doctrine was developed by necessary implication based on the requirement for an "invention" as defined in s. 2 of the *Patent Act*.

413      In *Sanofi*, the Supreme Court of Canada reviewed the legal principles applicable to obviousness and took the opportunity to provide practical guidelines as to the approach that should be adopted in an obviousness inquiry. At para. 67, Justice Rothstein explains that:

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 219 of 308
Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

It will be useful in an obviousness inquiry to follow the four-step approach first outlined by Oliver L.J. in *Windsurfing International Inc. v. Tabur Marine (Great Britain) Ltd.*, [1985] R.P.C. 59 (C.A.). This approach should bring better structure to the obviousness inquiry and more objectivity and clarity to the analysis. The Windsurfing approach was recently updated by Jacob L.J. in *Pozzoli SPA v. BDMO SA*, [2007] F.S.R. 37, [2007] EWCA Civ 588, at para. 23:

> In the result I would restate the Windsurfing questions thus:
>
> (1) (a) Identify the notional "person skilled in the art";
>
> (b) Identify the relevant common general knowledge of that person;
>
> (2) Identify the inventive concept of the claim in question or if that cannot readily be done, construe it;
>
> (3) Identify what, if any, differences exist between the matter cited as forming part of the "state of the art" and the inventive concept of the claim or the claim as construed;
>
> (4) Viewed without any knowledge of the alleged invention as claimed, do those differences constitute steps which would have been obvious to the person skilled in the art or do they require any degree of invention? [...]

It will be at the fourth step of the Windsurfing/Pozzoli approach to obviousness that the issue of "obvious to try" will arise.

[Emphasis in the original.]

When there is some difficulty in identifying the inventive concept or step, the English Court of Appeal's comments in *Pozzoli SpA v. BDMO SA* (2007), [2007] EWCA Civ 588 (Eng. C.A.) are useful, particularly at paras. 19-21:

> 19. In some cases the parties cannot agree on what the concept is. If one is not careful such a disagreement can develop into an unnecessary satellite debate. In the end what matters is/are the difference(s) between what is claimed and the prior art. It is those differences which form the 'step' to be considered at stage (4). So if a disagreement about the inventive concept of a claim starts getting too involved, the sensible way to proceed is to forget it and simply to work on the features of the claim.
>
> 20. In other cases, however, one need not get into finer points of construction — even without them the concept is fairly apparent — in Windsurfing, for instance, it was the 'free sail' concept. In yet other cases it is not even practical to try to identify a concept — a chemical class claim would often be a good example of this.
>
> 21. There is one other point to note. Identification of the concept is not the place where one takes into account the prior art. You are not at this point asking what was new. Of course the claim may identify that which was old (often by a pre-characterising clause) and what the patentee thinks is new (if there is characterising clause) but that does not matter at this point.

414    In *Sanofi*, the Supreme Court of Canada also closed the debate as to whether the "obvious to try" test should be applied in Canada and if so, in what circumstances (generally paras. 62-66 and 68). The Court will be guided in that respect by the principles set out in paras. 69-71 of the decision, which are relevant when one reaches the fourth step of the obviousness inquiry. [144]

415    The Court has already discussed the concept of common general knowledge which is relevant to the construction of the claim as well as to the obviousness inquiry. A claim can be obvious based on common general knowledge alone or by a publication read by a posita in the light of the common general knowledge.

416    Before turning to the application of the law to the patents at issue, it is worth saying a few words about "mosaicing" as this illustrates what one needs to establish before the Court can consider together individual prior art publications that are not necessarily part of the common general knowledge.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 220 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

417    In *Terrell*, [145] at 7-62, the authors note that:

> The "mosaicing" of individual documents or prior uses is not permissible, unless it can be shown that the skilled person, confronted with a particular citation, would turn to some other citation to supplement the information provided by the first. Whether he would do so is a question of fact.

418    It is also worth reproducing Justice Hugh Laddie's comment in *Lilly ICOS Ltd. v. Pfizer Ltd. (No. 1)* (2000), 59 B.M.L.R. 123, [2001] F.S.R. 16 (Eng. Ch. Div.) at para. 66:

> When any piece of prior art is considered for the purposes of an obviousness attack, the question asked is 'what would the skilled addressee think and do on the basis of this disclosure'?' He will consider the disclosure in the light of the common general knowledge and it may be that in some cases he will also think it obvious to supplement the disclosure by consulting other readily accessible publicly available information. This will be particularly likely where the pleaded prior art encourages him to do so because it expressly cross-refers to other material. However, I do not think it is limited to cases where there is an express cross-reference. For example, if a piece of prior art directs the skilled worker to use a member of a class of ingredients for a particular purpose and it would be obvious to him where and how to find details of members of that class, then he will do so and that act of pulling in other information is itself an obvious consequence of the disclosure in the prior art.

419    More recently, Justice David Kitchin, who was twice cited by the Supreme Court of Canada in *Sanofi*, [146] said, at paras. 83 and 84 of *Scinopharm Taiwan Ltd. v. Eli Lilly & Co.*, [2009] EWHC 631 (Eng. Patents Ct.), [2009] All ER (D) 282: [147]

> 83. There is one other matter it is convenient to mention at this stage. Scinopharm's case depends, in part, upon reading various items of prior art together. It contends it is permissible to do this if they are in the same technical field. I do not agree. In my judgment it is only permissible to read two documents together if it is obvious to do so, as the Court of Appeal made clear in *Smithkline Beecham v Apotex Europe* [2005] FSR 23 at [96]:
>
> > 96. I think the Judge erred in principle here. The skilled man has his common general knowledge — the mental tools of his trade — but no more. The law of obviousness supposes that he can be given any individual piece of prior art and read it with that knowledge. The piece of prior art forms part of the "state of the art". What he cannot do is to just link one piece of prior art with another, unless so to do would itself be uninventive. No-one disputes what Lord Reid said in *Technograph v Mills & Rockley* [1972] RPC 346 at p. 355:
> >
> > > In dealing with obviousness, unlike novelty, it is permissible to make a 'mosaic' out of the relevant documents, but it must be a mosaic which can be put together by an unimaginative man with no inventive capacity.
>
> 84. The question whether it is obvious to read two documents together is one to be considered in the light of the particular circumstances of each case. Relevant factors may include whether one document refers to the other or whether one or both documents would be found on a literature search of the kind the skilled person would routinely carry out before attempting to find a solution to the problem the patent addresses.

420    There was also some debate as to the use of post art, which warrants some comments.

421    It is evident that in certain specific circumstances, literature published after the filing date [148] can be considered as evidence of what was commonly known or what was part of the state of the art at the relevant time. For instance, the Sammes article, [149] which purports to review recent chemistry of the [beta]-lactam antibiotics, though published after the relevant date, could be used to establish what a diligent search in the relevant field would have uncovered. [150] In effect, it expressly states that the literature discussed therein was selected from what was published up to the beginning of 1974 [151] and was intended to complement recent books and reviews that were published well before the filing date (which were not all discussed by the

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 221 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

experts) [152] . At the end of the trial, the parties were agreed that the literature referred therein would be part of the common general knowledge of the addressee of all the process patents.

422    Apotex argues that Tseng and Michalski can be used to show what the posita would have learned from reproducing the experiments set out in Rydon and in Coe, with the benefit of [31] P NMR spectroscopy.

423    The Court agrees that this may constitute admissible evidence if introduced by an expert, but one must be careful not to cross the line and treat such art on the same footing as prior art. For example, one cannot simply assume that because there is no mention of the invention under review in the article, its author was unaware of such developments. Once a patent application is filed, inventors will often more freely discuss their findings with colleagues and friends outside of their institution and not necessarily in the context of public conferences. Thus, it may be very difficult to ascertain if indeed the author of a post art publication really did his work without knowledge of the invention. This was obviously one of the main considerations for setting the date of the invention as the relevant date for the obviousness inquiry in the pre-1989 era. [153]

424    Also, in the absence of evidence from or about the authors, how is the Court to know whether what they did was what a posita (objective test) would have done before the filing date? Were the authors super skilled? Were they inventive? Did they go beyond what would be routinely done by a posita? Did they have a special motivation to do the things they did? All this to say that the probative weight of this evidence will depend on the circumstances, particularly on the evidence of the expert using it and often on whether it is used simply to corroborate an opinion reached independently by an expert available for cross-examination by the other party.

425    The Court will now apply these principles to the patents under review.

### 9.2. The '007 Patent (Claim 17)

426    Apotex submits that it has established that the kinetic complex would necessarily be produced using the method described in Rydon, reacting one to one equivalents of Cl and TPP. [154] Thus, a posita practising the method of the prior art or routine variations of it with the benefit of [31] P NMR spectroscopy [155] would easily discover that it produces the so-called kinetic product.

427    Apotex adds that it would be more or less self-evident to a posita that aromatic or halogenated hydrocarbon solvents (such as methylene chloride or chlorobenzene) could successfully be used in such a process.

### 9.2.1. The Person Skilled in the Art

428    I shall use the definition of the posita found at para. 92.

### 9.2.2. Relevant Common General Knowledge

429    The Court is satisfied that it has been established that the posita would be familiar with the aromatic and hydrocarbon solvents discussed in claim 17, including methylene chloride and chlorobenzene. The posita would equally be aware of the properties of such solvents. [156]

430    A posita would also be familiar with [31] P NMR spectroscopy and would have a working knowledge of how to use it to identify phosphorus compounds, if and when necessary.

431    Disproportionation is a general type of chemical process which would be known to the posita.

### 9.2.3. Rydon, Coe and Ramirez

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 222 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

432     It is clear that Rydon and Coe are part of the relevant prior art, for these publications are expressly acknowledged as such in the patent. [157] Lilly, however, contests that they form part of the posita's common general knowledge because of the differences of opinion between the experts as to their meaning and exactly what they teach. The plaintiffs also argued that Apotex failed to provide any direct evidence in that respect. Given the admission contained in the patent, such debate is futile and it can have no impact on my conclusion regarding the obviousness inquiry.

433     Apotex and its experts spent much time explaining why they believe that what is called the thermodynamic product and described as a dihalide ($(PhO)_3PCl_2$) in the '007 patent is in fact, in their view, the monohalide ($(PhO)_4PCl$) discussed in Rydon, while the kinetic compound would be the dihalide. Drs. Modro and Olah also explained how they understood the various reactions taking place including how, in their view, the thermodynamic product resulted from a disproportionation of the kinetic product.

434     For our purposes, determining the stoichiometry of the thermodynamic product is a debate that need not be settled, especially when one considers that Dr. McClelland did not appear to agree with the views of Drs. Modro, Chivers and Olah and testified during his cross-examination that in any event, the nature of the thermodynamic is still not well understood today. Dr. Chivers also acknowledged that two experts could read Rydon differently. In that respect, Dr. Baldwin wisely said that he did not really know the answer. For him, these publications were difficult to read and understand and there is no indication that the authors recognized the significance of "first formed intermediate".

435     It is acknowledged by all that Rydon, Coe, Ramirez or any other publication that will be discussed in relation to the '007 patent, do not refer to, or even mention, disproportionation to explain the relationship between the monohalide and the dihalide described in Rydon. With respect to the various mechanisms at play, including the reaction between Cl and TPP, Dr. Hunter noted that one would need to do a Ph.D. on the subject to fully understand them.

436     For our purposes, it is sufficient to say that Rydon and Coe teach at least the following: [158]

• The reaction between Cl and TPP is quite complex and some mechanisms are still regarded as obscure or not well understood. (Rydon, p. 3044)

• Theoretically, [159] the system may contain as many as 45 species, most of which would be in equilibrium (covalent form/ionic form). [160] Depending on the conditions used for the reaction, including temperature, concentration and solvents, different species will be produced "while solubility will play a major role in determining the nature of the solid phase separating from solution." (Rydon, p. 3045)

• The authors reported on and tested nine crystalline solids, six of which were described in Coe as dihalides (see Rydon, p. 3043). Certain compounds prepared by the authors could not be prepared as purified specimens. [161]

• Whatever their true nature or stoichiometry, Rydon indicates that:

   i. The reaction of Cl/TPP in a ratio of 1 to 2 in chlorobenzene produces tetraphenoxy-chloride — a monohalide [162] (p. 3052).

   ii. The reaction of Cl/TPP in a ratio of 1 to 1 without solvent produces triphenoxy-dichloride — a dihalide. (p. 3053, Triphenoxy-dichlorides A)

   iii. The reaction of Cl/TPP in a ratio of 1 to 1 in hexane produces triphenoxy-dichloride — a dihalide. (p. 3053, Example B)

   iv. The reaction of Cl/TPP in a 1 to 1 ratio in acetonitrite produces triphenoxy-dichloride — a dihalide. (p. 3053, Triphenoxy-dichlorides C)

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 223 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

• With respect to halogenation, Coe only tested the product(s) from the reaction of Cl and TPP without solvent. [163] Rydon notes that the "monohalides may have some advantages over the dihalides previously employed for the preparation of alkyl halides." [164] (Footnote omitted, p. 3044)

437    I turn now to the article by Ramirez, who was described by Dr. Olah as a pioneer in [31]P NMR spectroscopy. In that article, it appears that the authors were trying to obtain an authentic sample of pentaphenoxyphosphorane and analyze it. In that respect, they were following work that started in 1927 and was pursued by other authors in 1959. Apparently, these attempts produced mixtures of dichlorotriphenoxyphosphorane and other materials, leading the authors to reinvestigate the previously reported mechanisms in Rydon. Though they give few details about their experiments, the Court finds that one can reasonably [165] infer from the reference to the addition of Cl to TPP in *hexane solution* for the purpose of reinvestigating previously reported synthesis of a triphenylphosphite dichloride (dichlorotriphenoxyphosphorane) [166] that they followed the procedure of Example B on p. 3053 of Rydon, which is the only synthesis known in hexane in evidence before the Court. The authors dried the precipitate obtained and tried in vain to purify it (not part of procedure in Example B). They note that:

All that can be said about this substance is that, in $CH_2Cl_2$ solution, it gives only one signal in the [31]P nmr spectrum. The chemical shift does not vary significantly in several solvents.

[p. 3509]

The said shift was at -22.8 [167] and the authors attributed it to what was "regarded as dichlorotriphenoxyphosphorane", which is the dihalide referred to in Rydon. [168]

*9.2.4. The Inventive Concept*

438    The inventive concept of claim 17 is that the reaction of equimolar amounts of triaryl phosphate and Cl or Br in a halogenated or aromatic hydrocarbon solvent produces an intermediate that is the faster forming product of the reaction: the so-called kinetic complex.

*9.2.5. The Differences between the Common General Knowledge and the above-mentioned Publications and the Inventive Concept*

439    In respect of equimolar quantities of Cl and TPP [169], the only solvent used in Rydon and Coe was hexane, which is not an aromatic or halogenated hydrocarbon solvent.

440    Although, as mentioned, it is evident that the reaction performed in Rydon and Ramirez produced a first formed intermediate, there is no recognition therein that the above-mentioned reaction produces such an intermediate or that such intermediate (first compound) will transform over time into a second compound (final compound).

*9.2.6. Would These Differences be Obvious to the Person Skilled in the Art?*

441    Apotex argues that the use of chlorobenzene or methylene chloride (aromatic or halogenated hydrocarbon solvent) was a worthwhile option and that it was self-evident that it ought to work, particularly to perform chemistry on cephalosporins.

442    According to the defendant, Rydon taught the use of chlorobenzene and the fact that the method used involved non-equivalent amounts of the reactants (a 2:1 ratio) is irrelevant. Choosing a particular solubilizing solvent is not inventive.

443    At first, the Court was sympathetic to this argument, but on a closer review of the evidence, the Court realized that it may well have been influenced by knowledge gained from the '007 patent. Hindsight is the one thing that is particularly important to avoid at this stage of the inquiry.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 224 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

444     Uncharacteristically, Apotex's oral and written arguments were extremely brief on this point (see para. 112 of their memorandum on validity; p. 7 of their representations on reply; and, paras. 60-62 of the submissions on the implications of *Sanofi*).

445     They rely essentially on their cross-examination of Dr. Baldwin, who said that one would know the solubility properties required for the use of solvents in cephalosporin chemistry. Also, Apotex's counsel noted that in Ramirez, whatever product was in the sample used for the $^{31}$ P NMR analysis was soluble in methylene chloride.

446     First, with respect to the skilled addressee's knowledge of solvents suitable for cephalosporin chemistry, given the definition of the skilled addressee in the '007 patent, it is not clear how this evidence would be relevant. How and why would a posita, as defined, come to use the kinetic product to perform chemistry on cephalosporins? Such use, according to the evidence of Dr. Baldwin, was inventive (see below discussion of Lilly process patents).

447     One would think that, if a solvent is obvious for any reason, it is sufficient to conclude the present inquiry in respect of this element of the inventive concept. Thus, Apotex did not need to show that the use of such solvents was obvious for this type of chemistry.

448     With respect to the second argument based on Ramirez, the Court notes that the actual reaction between Cl and TPP was carried out in hexane and that none of the experts testified that this publication taught them that the dihalide discussed in Rydon would be produced by carrying out the reaction in methylene chloride.

449     Apotex certainly did not explain how the Court should deal with the evidence of Dr. Modro, who commented on claim 17 in a manner that appears to contradict Apotex's current argument that Rydon taught the use of chlorobenzene or an aromatic hydrocarbon solvent to prepare a dihalide. In effect, with full knowledge of what was disclosed in Ramirez and Tseng, Dr. Modro said, at paras. 76 and 77 of his report (A-13), that based on the statement found at p. 3044 of Rydon and the fact that the actual reaction carried out therein resulted in the formation a monohalide (tetraphenoxyphosphorus chloride), this art taught that the use of chlorobenzene does not produce the kinetic product claimed in the '007 patent. [170]

450     Having carefully examined the evidence and considered the motivation for as well as the details of how the inventors made their discovery, the Court concludes that Apotex has not established on a balance of probabilities that it would be more or less self-evident that the use of an aromatic or halogenated hydrocarbon solvent to carry out the reaction described in at p. 3053 of Rydon (Example B) ought to produce the same compound as when done in hexane, particularly that it would produce the dihalide described in Rydon.

451     In my view, this is sufficient to conclude that claim 17 is not obvious. For whether or not one could actually identify the compound formed through the use of $^{31}$ P NMR spectroscopy is irrelevant if Rydon in fact taught away from the use of the claimed solvent.

452     However, as this matter may go further, it is worth reviewing the evidence in respect of what the posita would learn through the allegedly routine use of such technology. This is especially so considering that this evidence and my findings in this respect will be relevant to the inquiry into the obviousness of the Lilly process patents, particularly the aspect of the claimed invention relating to the stabilization of the kinetic product through the use of a tertiary base.

453     Obviously, Apotex's first hurdle is to explain the conclusion in Ramirez, which contradicts their argument that one could quickly identify the first formed intermediate of the reaction simply by using the $^{31}$ P NMR technology. [171]

454     For that purpose, they rely on the experiments carried out by Dr. Modro, as well as the experiments carried out in Tseng and Michalski.

455     To determine what weight should be attributed to such evidence (particularly the post art) the Court will quickly review how Apotex's experts used this information.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 225 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

456      Dr. Chivers concluded that a posita would be able to understand and identify the kinetic compound on the basis of the experiments done by Dr. Modro, who performed $^{31}$ P NMR tests and analyzed the evolution of the spectral information about the products in solution over 23 hours (see A-18, paras. 29-32). Dr. Chivers only referred to Tseng and Michalski to support his view that the thermodynamic compound has the empirical formula of (PhO)$_4$PCl (monohalide). Surprisingly, Dr. Chivers does not discuss the impact of Ramirez at all, even though it would have been part of the prior art available to the posita. [172]

457      Dr. Modro uses Tseng to confirm his view that: 1) the tetraphenoxyphosphorane (monochloride) is the thermodynamic product described in the '007 patent (by comparing the ppm shift obtained by Tseng and the ppm shift disclosed in the '007 patent for the thermodynamic product); and, 2) the equilibrium mechanism involved (ionic form versus covalent form which is quite distinct from the disproportionation mechanism discussed earlier). He refers to neither Michalski nor Ramirez. [173]

458      Dr. Olah is the only expert who refers to Ramirez. He affirms that based on the conclusion of Tseng and Michalski the authors of Ramirez were wrong. Dr. Olah does not explain why, without using the knowledge gained from the '007 patent, [174] it would be so evident that both Rydon and Ramirez were wrong in identifying the product of the experiment described at p. 3053 of Rydon (Example B) as a dihalide. As I said, in any event, the stoichiometry of the compounds is not particularly relevant here.

459      Dr. McClelland refers to the rapid equilibrium phenomenon which was disclosed in Rydon, further explained in Tseng and perfected in Michalski. This phenomenon explains, in his view, the difference in ppm shifts reported for the kinetic product. Again, this relates to the equilibrium between the ionic and the covalent form of the kinetic product, not to its transition to the thermodynamic form (disproportionation).

460      This evidence is not particularly helpful to determine if, through the use of this technology and by simply repeating the process set out in Rydon (Example B, p. 3053), one would have come to the conclusion that the reaction produces two products (a first, faster forming intermediate and a final product).

461      Dr. McClelland did say on cross-examination that reversing the order of addition of the reactants, as was done by Tseng, was a routine variation of Rydon's method (Example B, at p. 3053). The Court accepts this evidence and notes that it is somewhat corroborated by Dr. Blaszczak's evidence on discovery, when he discusses what was done by Mr. Fisher. [175]

462      However, there is no similar evidence in respect of the method and the temperature used by the authors of Michalski when they reacted the TPP with the halogen. This was clearly very different from the process disclosed in Rydon and there is no evidence that it was simply a variation that would routinely be carried out by a posita [176] before the date of filing. The Court is not prepared to assume that what was done in Michalski was what a posita would be expected to do if he simply wanted to identify the product formed by the Rydon method, as opposed to embarking on a full research project to elucidate the reaction mechanism of TPP and halogen. [177]

463      That said, there is no evidence that the method used ( $^{31}$ P NMR) for the experiments performed in Ramirez was not in accordance with the practice of positas as of the filing date. In fact, there is no evidence that there was any accepted practice as to when a spectra should be taken — such as before or after attempts to purify a product or within a certain time of having prepared a product.

464      Certainly, there is no evidence that a posita would, as a matter of routine, take and analyze $^{31}$ P NMR spectras of the product of the reaction over a period of 23 hours. In fact, this was not done in any of the publications before the Court.

465      As mentioned earlier, Dr. Modro did carry out this type of experiment on behalf of Apotex. These were done with full knowledge of the teachings of the '007 patent. The Court does not accept these experiments as proof of what a posita carrying out routine experimentation at the relevant time would have done.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 226 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

466    In fact, it appears that, to attribute a particular ppm shift to a specific compound, one needs to know with some certainty what species is in the sample being tested.

467    Ramirez, having failed to obtain a purified specimen, tentatively attributed the shift of -22.8 ($CH_2Cl_2$) to the product that was "regarded as" dichlorotriphenoxyphosphorane (triphenoxy-dichlorides in Rydon). Meanwhile, Tseng said that the -22.5 ppm shift (in deuterated chloroform) he obtained from the reaction of Cl and TPP without solvent was "likely to be" that of tetraphenoxyphosphorane because it was similar to the shift reported for that substance by Nesterov in what Dr. Baldwin described as an obscure Russian publication. In fact, Dr. Baldwin said that this method was quite suspect. Tseng certainly came to a conclusion in this respect that runs contrary to the teaching of Rydon.

468    There is also no evidence that Ramirez or Tseng [178] discuss the disproportionation mechanism referred to by Drs. Modro and Olah. There is no indication that they clearly and easily understood what these two experts suggested was obvious.

469    In fact, it is telling that Tseng, who reported a shift of +7.7 ppm for the compound resulting from the reaction of equivalent amounts of TPP and Cl, attributed the other two shifts he obtained (one of which was the -22.5 ppm shift) to "impurities," and not to a more stable form of the first compound he obtained.

470    With respect to motivation, although the work of Ramirez, Tseng and Michalski do support the view that there was an interest in identifying the compounds reported in Rydon, it is not clear that these authors were looking for a halogenating compound. None of their experiments are directed to halogenation or to the properties of the Rydon compounds as halogenating reagents. They more likely resemble those carried out by theoretical chemists interested in the mechanistical reaction of Cl and TPP reported in Coe and Rydon. That said, the Court is ready to assume a certain degree of motivation.

471    *Sanofi* teaches that in some circumstances, the means by which the inventor reached the invention may provide evidence in support of a particular conclusion on obviousness.

472    Such a review will indeed be useful when inquiring into the obviousness of the Lilly process patents. However, the path followed by the inventor does not shed much new light in respect of claim 17 of the '007 patent. It mostly corroborates Dr. Baldwin's view that, contrary to theoretical chemists, practicing synthesis chemists are more interested in the reactivity of compounds than using techniques such as [31] P NMR spectroscopy to characterize and identify compounds unless they are motivated to do so by reasons other than just looking for a halogenating compound.

473    In effect, it appears the inventors were not motivated to use [31] P NMR spectroscopy to characterize the products of the reaction of TPP and Cl until they encountered a problem reproducing the experiment where they had successfully chlorinated the enol on which they were working. [179] Until then, they were satisfied to work with whatever product resulted from reacting equivalent amounts of TPP and Cl in the solvent in which they were working on their cephalosporin substrate. Thus, it is the discovery that in certain circumstances the reagent produced by the reaction worked while it was inactive in others, which led to an in-depth study of the products, their stability, method of formation and structure-activity relationship.

474    Moreover, the use of TPP and Cl was not a step undertaken on the basis of knowledge gained from Coe and Rydon. In effect, the idea to try phosphite as a possible reagent came to a Lilly chemist working in a different department [180] after a discussion with a graduate student at Harvard, who was working on a totally different project but had noted that phosphites were more reactive than phosphines in his hands.

475    In view of the foregoing, Apotex has not established that by practicing the method described in Example B, p. 3053 of Rydon with the benefit of [31] P NMR spectroscopy, it would be more or less evident that the faster forming product of the reaction was an intermediate (of transient nature). It would thus not be more or less evident to the posita that it would be beneficial to stabilize this compound by using a tertiary base. [181]

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

### 9.3. The Lilly Process Patents

#### 9.3.1. Identify the Skilled Addressee

476    I shall use the definition of the posita found at para. 92.

#### 9.3.2. The Relevant Common General Knowledge

477    The common general knowledge described in respect of the '007 patent would be available to the skilled addressee of the Lilly process patents.

478    The disclosures of these process patents make it very clear that the particular steps or chemistry intended to be performed, i.e. the cephalosporin sulfoxide reduction, the enol chlorination and the imino halide formation were known in the prior art but were performed using other reagents.

479    It was also known in 1978 that various phosphorus compounds (including $PCl_5$) could reduce sulfoxides in general (as opposed to the more complex cephem cephalosporin sulfoxides under review).

480    There was a known reagent called the Vilsmeier reagent which was typically made by using $PCl_3$ to transform dimethylformamide. It was also known that $PCl_5$ as well as other compounds such as phosphine, oxalyl chloride and thionyl chloride could be used with dimethylformamide to generate the Vilsmeier reagent. The Vilsmeier reagent is a non phosphorus reagent.

481    In respect of cephalosporin synthesis, the posita generally knew how to change an OH at the 3-position to a Cl using the Vilsmeier reagent. It was known that this reagent could chlorinate an enol and reduce a sulfoxide. $PCl_5$ could then be used as reagent to cleave the 7-amino side chain. However, $PCl_3$ could not be used alone to perform such cleavage.

482    The Court is also satisfied that at the relevant time, the posita would naturally view non-cephalosporin publications with some caution. He or she would not simply accept chemical reactions or reagents used in other fields and on less complex molecules as being directly applicable.

483    With respect to sulfoxide reduction in particular, the natural caution described in Dr. Baldwin's affidavit would be heightened by the fact that the literature reported that usual methods for reducing sulfoxides would not work with cephalosporins. Dr. Baldwin's views in that respect are corroborated by a statement found in U.S. Patent No. 3,641,014. [182] This document indicates that:

> [t]here is a claim in the literature (J. Chem. Soc. (C), 1966, No. 13, p. 1142) that the usual methods for reducing sulfoxides will not reduce [delta] [3] — cephalosporin sulfoxides to the [delta] [3] — cephalosporin sulfides. We have corroborated this observation.

> [p. 2, lines 47-51]

#### 9.3.3. The Dreux Article and Other Prior Art

484    This article, entitled "Deoxygenation of Sulfoxides under Mild Conditions with a New Reducing Agent: 2-phenoxy-1, 3, 2-benzo-dioxaphosphole" by M. Dreux, Y. Leroux and Ph. Savignac, published in Synthesis, 1974 at 506 (TX-1601, Dreux) is referred to in Drabowicz's "Deoxygenation of Sulfoxide. A Review." published in Organic Preparations and Procedures Int., 1977 (TX-1602, Drabowicz). [183] There was some debate as to whether or not these would be part of the common general knowledge of the posita at the relevant time or even of the state of the art, given that they are not part of the cephalosporin or [beta]-lactam literature. [184]

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 228 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

485    Having carefully considered the content of these publications, the Court need not deal with this particular issue further, given that even if they were part of the common general knowledge, it would have no impact whatsoever on the final determination of the issue of obviousness as the Court accepts Dr. Baldwin's testimony regarding how it would be understood and used by the posita at the time.

486    As mentioned in Drabowicz, Dreux shows that dialkyl, alkyl, aryl and diaryl sulfoxides can be reduced with cyclic phospholane used with a catalytic amount of iodine. [185]

487    It is worth noting that Dreux specifically mentions that the cyclic phospholane "seems to be a better reducing agent than triphenyl phosphite, which according to the available data, [186] is itself an efficient reducing agent." (p. 506)

488    With respect to Drabowicz, [187] it is acknowledged that the only method described therein that applied directly to penicillins or cephalosporins is found at p. 78. It refers to a then-recent publication by R.G. Micetich. [188] Although it appears at first sight that the reduction of the sulfoxide was done with a phosphorus pentasulfide-pyridine system, Dr. Baldwin explained during his cross-examination that the reduction of the sulfoxide in such a case was not done by the phosphorus compound, but by the sulfur. According to him, it was known that sulfur compounds of this valent state were good reducing agents for such sulfoxides. The phosphorus only acts as a way of conveying the sulfur to the sulfoxide. [189]

### 9.3.4. The Inventive Concept

489    The inventive concept in each of the claims at issue [190] was the use of the kinetic complex — the fastest forming intermediate of the reaction of equivalent amounts of triaryl phosphite and Cl or Br — to execute the steps described in these various patents, i.e. the cephalosporin sulfoxide reduction, enol chlorination and imino halide formation.

490    In addition to this, some of the claims of the '468 patent (for example, claim 20) and the '536 patent (for example, claim 14), include the use of a tertiary amine base (including pyridine) to stabilize the kinetic complex. Also, with respect to the claims of the '536 patent, the inventive concept includes the use of a halogen scavenger to dispose of the halogen released during the formation of the kinetic complex to allow the reduction to take place.

### 9.3.5. The Differences between the Prior Art Including Common General Knowledge and the Inventive Concept of the Claims

491    There is no disclosure that any compound resulting from the reaction of equivalent amounts of TPP (or any other triaryl phosphite) and Cl or Br in a solvent — let alone the first formed intermediate compound [191] — is or would be useful in cephalosporin chemistry, including particularly cephalosporin enol halogenation. [192]

492    There is no disclosure in the prior art that a phosphorus containing reagent will halogenate a cephalosporin enol (the '725 patent), nor is there prior disclosure of the use of a pentavalent phosphorus reagent to effect sulfoxide reduction in cephalosporins (the '536 patent).

493    There is no prior disclosure of the use of the kinetic complex in sulfoxide reduction requiring concomitant use of a halogen scavenger.

494    There was no known or disclosed reagent that could perform all the steps described in the '536 patent — separately or in one pot (without the need to isolate).

495    There was no disclosure of the value of stabilizing or maintaining the first formed product of the above-mentioned reaction or of the means to do so, in order to facilitate their use in chemistry, including, in particular, cephalosporin chemistry.

### 9.3.6. Do these Differences Constitute Steps which would have been Obvious or Do they Require Any Degree of Invention?

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 229 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

496     It is here, according to *Sanofi*, that the "obvious to try" test might be appropriate. Apotex argues that, having regard to the type of reagent used to execute those transformations in the past, either in cephalosporin chemistry or in general organic chemistry, it would have been obvious to the posita to try the pentavalent phosphorus compound resulting from the reaction of TPP and Br or Cl disclosed in Rydon. It would have been more or less self-evident that it ought to work to perform the claimed chemical processes.

497     As noted by Dr. McClelland during one of his cross-examinations, generally, the less one knows about a reagent, the more difficult it is to predict if it can be used successfully in synthesis chemistry. [193]

498     Here again, the expert evidence adduced by Apotex to support its position in respect of the Lilly process patents has very little probative value, given that none of the experts who opined on these patents were qualified to discuss what a posita would have found obvious to try.

499     As noted previously when discussing Rydon, Coe, Ramirez and what one would learn through the use of $^{31}P$ NMR spectroscopy, the Court is not persuaded that the posita would know that the first formed product of the reaction disclosed in Rydon is an intermediate that transforms over time. The stabilization of the kinetic complex through the use of a tertiary base could not be self-evident to a posita who did not first appreciate the transient nature of the first formed product of the reaction of TPP and Cl in the claimed solvent.

500     Dr. Modro, when discussing the '007 patent observed that Rydon expressly taught the contrary (see para. 24(3) of his affidavit, A-13). There is no evidence as to why one would know or find it evident to use the (first formed) kinetic complex instead of the thermodynamic compound (final compound). [194]

501     The Court has very carefully considered Dr. Baldwin's cross-examination as Apotex's counsel tried very hard to obtain some useful admissions from this key witness to support their position. In my view, Dr. Baldwin's evidence was quite clear. None of the prior art (including the common general knowledge alone or considered with the prior art), would lead a posita to the use of the kinetic complex to effect any of the processes claimed in the Lilly process patents.

502     The Court was not persuaded by the expert evidence that either the thermodynamic or the kinetic product would be on the list of possible reagents to try.

503     The Court has assumed here that there was motivation to find an appropriate reagent to execute those steps given that there was vigorous research in the relevant field ([beta]-lactam and cephalosporin chemistry) at the time.

504     Certainly, Lilly was particularly motivated to find such a reagent, given that it wanted to commercialize cefaclor.

505     As mentioned, despite this, Dr. Hatfield and his team (particularly his lab technician, Mr. Fisher), [195] who were actively trying to improve the Chauvette process (particularly the chlorination of the enol), after trying several potential candidates on what Dr. Blaszczak called their "laundry list" [196] over a period of approximately two years, felt the need to send a general request to all research chemists in the [beta]-lactam group [197] at Lilly, seeking suggestions for reagents to be tried for the chlorination of the enol.

506     As noted earlier, Dr. Blaszczak (one of the inventors) conceived the idea of trying "phosphite" after a discussion with a Harvard graduate student who was experimenting with them in a completely different context. The idea did not come to him because of what was generally known or disclosed in the literature. [198]

507     When he mentioned it to Dr. Hatfield and Mr. Fisher, they were experimenting with triphenyl phosphine in carbon tetrachloride and triphenyl phosphine in chloride. This suggestion led them to change the phosphine in the reactions they were testing for a phosphite to see what would happen. [199]

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 230 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

508    Again, it is worth noting that the inventor of the '536 patent (sulfoxide reduction and the 3-step process) is not one of the inventors of the '468 and '725 patents. In effect, the inventors of the latter two patents did not appreciate that the kinetic complex could also be used to effect sulfoxide reduction. This is particularly significant when one considers that these inventors knew what the posita did not know at that time — that the kinetic complex could effect the enol halogenation and the imino halide formation. Clearly, they also did not appreciate that such reduction could only work in the presence of a halogen scavenger.

509    As mentioned, given that there was no other reagent known to be efficient enough to perform all three of these steps let alone in one pot, the Court is at a loss to understand how Apotex could say that the posita ought to expect that the said reagent would work to perform those three chemical reactions, that there is no synergistic result flowing from the possibility of carrying them all in one pot and that it was a mere aggregation of known steps. None of the experts contested the added value of being able to perform those three reactions in one pot. This evidently improved the cost and yields obtained. Even Dr. Hanessian referred to the kinetic complex as the "magic reagent." This echoed the comments of Dr. Baldwin, who noted that he had many ways of listing new discoveries and this one was in the highest category; the one that he wishes he had thought of. [200]

510    What happened at Lilly in reality certainly supports Dr. Baldwin's opinion. It points to a conclusion that: i) it was not obvious to try the product of the reaction of TPP and Cl, let alone the first formed intermediate; and, ii) it was not self-evident that such reagent would indeed be useful in one or more of the steps covered by the Lilly process patents.

511    In view of the foregoing, Apotex has failed to persuade the Court that the claims at issue were obvious.

### 9.4. The Shionogi Patents

512     Apotex's experts (Drs. Hanessian, Martin and McClelland) relied on various publications to opine that the chemistry disclosed in each of the Shionogi patents was well-known and obvious.

513    The Court acknowledges that the common general knowledge of organic chemists would be part of the common general knowledge of the posita. It is in that respect only that the evidence of Drs. McClelland and Martin was given weight. As noted earlier, because of their lack of expertise, or even focus on [beta]-lactams, these experts were not qualified to opine on how a posita would read the prior art or what common general knowledge (other than from his PhD formation in organic chemistry) he would possess. However, their evidence in respect of the common general knowledge of PhD in organic chemistry does not add anything to the evidence of Dr. Hanessian in that respect for he also included in his report the same general concepts.

514    Hence, the Court will only comment here on the prior art and common general knowledge relied upon by Dr. Hanessian. These would include the following:

   i. The '547 patent

      a. Ricardo Scartazzini & Hans Bickel, "Neue [beta]-Lactam-Antibiotika. Über Derivate der 3-Hydroxy-7-amino-ceph-3-em-4-carbonsäure. Modifikationen van Antibiotika, 10 Meitteilung" (1974) 57 Helvetica Chimica Acta 1919 (TX-1587, Scartazzini).

      b. Robert R. Chauvette & Pamela A. Pennington, "Chemistry of Cephalosporin Antibiotics XXIX. 3-Halo- and 3-Methoxy-3-cephems" (1974) 96 Journal of the American Chemical Society 4986 (TX-1585, Chauvette).

      c. R.D.G. Cooper, & F.L. José, "Structural Studies on Penicillin Derivatives. IX. Synthesis of Thiazoline-Azetidinones" (1972) 94 Journal of the American Chemical Society 1021 (TX-1581, Cooper 2).

   ii. The '924 patent

      a. Robert Thornton Morrison & Robert Neilson Boyd, *Organic Chemistry*, 2nd ed., (Boston: Allyn and Bacon, 1966) at 667. (TX-1606). [201]

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 231 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

b. "7-Alpha-Aminoacyl-3-Halogencephalosporine und Verfahren Zu Deren Herstellung", German Patent App. No. 2408698, published September 5, 1974 (Chauvette application).

iii. The '132 patent

a. "Delta-2 Cephalosporin Compounds", U.S. Patent No. 3637678, (13 January 1969) (TX-1583, Webber).

b. Douglas O. Spry, "Synthesis of C-2 — C-3-Tricyclic Cephalosporins" (1973) J.C.S. Chem. Comm. 671 (TX-1622, Spry).

iv. The '026 patent

a. R.B. Woodward *et al.*, "The Total Synthesis of Cephalosporin C [1] " (1966) 88 Journal of the American Chemical Society 852 (TX-1578, Woodward).

b. "Antibiotika", German Patent App. No. 2400165, published July 18, 1974 (TX-1586, Cocker).

c. W. Maas *et al.*, "Mechanism of Enamine Reactions. IV. The Hydrolysis of Tertiary Enamines in Acidic Medium" (1959) 32 Journal of Organic Chemistry IIII 5089 (TX-1607).

*9.4.1. The Person Skilled in the Art*

515    The posita to whom these patents are addressed was described earlier (see para 75).

*9.4.2. Common General Knowledge*

516    The parties are agreed [202] that all the publications discussed in Sammes were part of the literature that would have been commonly known to, and generally accepted by, the posita at the relevant time. This means that most of the above-mentioned publications (Scartazzini, Chauvette, Cooper 2, Spry, Webber, Woodward), as well as others discussed by Dr. Barrett (such as R.D.G. Cooper, "Structural Studies on Penicillin Derivatives VIII. A Possible Model Biosynthetic Route to Penams and Cephems" (1972) 94 Journal of the American Chemical Society 1018 (TX-1581, Cooper 1)), [203] are part of the common general knowledge. However, the experts disagree as to what some of these publications taught the posita. This will be discussed later on.

517    [beta]-lactams and cephalosporins were known to be polyfunctional and sensitive molecules that raised many issues relating to selectivity and reactivity. [204]

518    It was known to the posita that the most advantageous and economical method for producing a cephalosporin was to synthesize it from penicillin.

519    Such synthesis had been done for cephalexin, another cephalosporin antibiotic, which was a 3-methyl ($CH_3$) analog of cefaclor. It was prepared using the Morin [205] arrangement or chemistry (conversion of a penicillin sulfoxide ester). This Morin arrangement, discovered in the mid 1960's, was the commonly used method to open the 5-membered ring of the penicillin molecule to transform it into a 6-membered ring cephalosporin.

520    In the early 1970s, Dr. Cooper, building on the work of Dr. Morin, developed another method for opening the penicillin ring and made what has been referred to as the Cooper thiazoline compound. [206] However, at the relevant date, this compound, which is a penicillin derivative, had never been converted to a 6-membered ring cephalosporin.

521    The 3-hydroxy cephalosporin molecule, the target compound of the so-called Shionogi synthetic pathway, [207] had been disclosed in two then relatively recent publications, Chauvette and Scartazzini. At the time of these publications the patent on cefaclor (product by process) had not yet been published, the only known way of making this 3-hydroxy compound was

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 232 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

to functionalize an existing cephalosporin structure. As of February, 1975 no one had made the 3-hydroxy compound from a penicillin molecule.

522    Ozonolysis, sulfonylations, aminations, allylic halogenations [208], acylations, hydrolysis and bonds forming through nucleophilic substitution were known chemical processes, commonly used in general organic chemistry in 1975.

523    Both Drs. Chauvette and Scartazzini used ozonolysis on a cephalosporin compound (a fully cyclicized 6-member ring structure) when they made the 3-hydroxy cephalosporin molecule described above.

524    In Cooper 1 at p. 1019, Dr. Cooper indicates that ring closure to a cephem from his thiazoline azetidinone would involve an oxidative cyclization. Consequently, he had investigated the oxidation of compound 4 (which is compound 7 in Cooper 2) under various conditions in an effort to chemically duplicate this biosynthetic postulate. He explicitly notes that "[t]he isopropenyl double bond of *4* is generally inert to electrophilic reagents, [209] it being recovered in high yield from reactions with bromine and permaleic acid." He then went on to report on the isomerisation of the double bond of the Cooper thiazoline compound, followed by ozonolysis, which resulted in the formation of a new compound described therein. [210]

525    In Cooper 2, (the reference used by Dr. Hanessian), Drs. Cooper and José discussed other chemistry but refer to their earlier reported ozonolysis of the isomerized version of the Cooper thiazoline.

526    There is no evidence from Dr. Hanessian on how a posita would construe the comment found in Cooper 1 with respect to the isopropenyl double bond. There is in fact no evidence that this expert was even aware of, or remembered (assuming he had read it sometime before in his career), this comment given that the article he uses in his report was provided to him by Apotex's counsel (see A-15, para 5(f)(3)).

527    Having carefully considered the extensive cross-examination of Dr. Barrett, the Court accepts Dr. Barrett's views as to how a posita would understand Dr. Cooper's comment in respect of the isopropenyl double bond. Among other things, the posita would understand that the reactivity of the thiazoline compound had far from normal reactivities associated with an alkene and was quite different from the reactivity profile of the product obtained from the isomerisation discussed in Cooper 2. [211]

528    It was also known that Dr. Spry used a 2-substituted cephem to generate novel tricyclic cephalosporins. [212] In that context, he performed allylic bromination of a cephem. It is to be noted, however, that at p. 672 of Spry, the author makes the following comments: "[a]ttempts to functionalize C-3' further *via* the allylic bromination of (4) resulted in C-2 derivatization giving the C-2 bromo-derivative." Again, the Court accepts Dr. Barrett's evidence as to how this would be understood by a posita.

529    It was also known and generally accepted that, in the context of transforming a penicillin molecule into a cephalosporin, Dr. Webber performed an allylic bromination after migrating the double bond from [delta]3 to [delta]2. Dr. Webber worked on a compound with a methyl ($CH_3$) at the 3-position.

530    Also part of the common general knowledge was the fact that in 1966, Dr. Woodward had opened a thiazol*idine* ring through hydrolysis in an acid.

531    Retrosynthesis [213] was used in 1975 as a general method for planning chemical synthesis in general organic chemistry. The Court accepts Dr. Barrett's evidence that this was not commonly used in the field of cephalosporin chemistry and research related thereto at the relevant time. [214]

### 9.4.3. Contested Art

532    Lilly disputes the assertion that the three following publications would have been found by a diligent posita. It contends that these were not part of the common general knowledge and that no evidence was presented as to why they would be considered either alone or together by a posita, when faced with the problem solved in the Shionogi patents.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 233 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

### 9.4.3.1. Cocker

533     This document is a German patent application, of which there was no available English translation at the relevant time. [215] However, it was established that a short English abstract (number 120652H) was published in volume 81 of the 1974 *Chemical Abstracts*.

534     Lilly notes that Cocker is not described in the Sammes review, despite the fact that it was published in July, 1974 with the abstract being published sometime in December, 1974. As the Sammes review refers to some patents, this could indeed indicate that this was not considered to be part of the relevant art; however, it may also be that it was simply not reviewed because of the language of the original and the fact that the English abstract was published at a date which was too close to the date on which the revised draft was submitted for publishing.

535     Also, Lilly submits that the compound described in Cocker is not a cephalosporin (it lacks the 4-carboxylic function) and one would thus have had to search all [beta]-lactam references to locate it. There is little evidence that such an extensive search would be undertaken by a posita, especially considering that there was no motivation to carry out the reaction, given that the compound in the Shionogi patent on which it is carried out was not known. It was also not known that this could be useful in the overall Shionogi process.

536     As mentioned earlier, the lack of evidence on Apotex's part as to how, and through what means, this document was found is troubling. However, the Court is prepared to consider that at least what was described in the abstract was part of the relevant state of the art. That said, it has not been established that this would be part of the common general knowledge.

537     The Court will consider that a posita reviewing Cocker would understand that its author performed a hydrolysis of a thiazoline ring in acidic conditions with the resulting compound being transformed into a cephem derivative through a nucleophilic substitution where the sulfur attacks the 3-membered oxirane (a different group than in the '026 patent) to form a new carbon sulfur bond.

### 9.4.3.2. Chauvette application

538     This is another German patent application that was allegedly published in September, 1974 with no English version being provided to the Court. Although Apotex tried to establish through cross-examination that an abstract could have been published in *Chemical Abstracts*, its failure to refer to such an abstract in the evidence of its experts raises a reasonable inference that it was not so-published at the relevant time. [216] It has not been established that it would be part of the common general knowledge. The Court also notes that Dr. Martin indicated in his cross-examination that he had not been able to find one of the two German patent applications he referred to. The Court will not consider the evidence based on this document as there is insufficient evidence that it would even have been available to the posita at the relevant time. In any event, having carefully examined this art and the conflicting expert evidence related thereto, the Court does not believe that consideration of this publication [217] would have altered the overall conclusion on the obviousness of the claims at issue in the '924 patent.

### 9.4.3.3. Kishi

539     On June 24-28, 1974 Dr. Kishi made a presentation at the 9th International Conference on the Chemistry of Natural Products in Ottawa, Canada and another at International Union of Pure and Applied Chemistry (IUPAC) conference on organic synthesis on August 26-30, 1974 in Louvain-la-Neuve, Belgium. A paper was later published in the *Journal of the American Chemical Society* in 1975 as well as in two IUPAC publications, also in 1975. [218] It was admitted by Dr. Martin, who was asked to find details of the presentation given at the conference, that the above mentioned publications could not have been found at the relevant time. The particular sections used by Apotex's experts as a basis for their opinions are found well into the paper (drawings relating to the allylic bromination of compound 54 as well as the conversion of compounds 67 to 72).

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 234 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

540    All Apotex's experts who commented on the Shionogi patents initially relied on the work of Dr. Yoshito Kishi described above to conclude that the claims of the '132 patent and the '026 patent were obvious.

541    When Dr. Hanessian testified, the paragraphs dealing with this art were deleted and he indicated that this deletion had no impact on his conclusion. Given that I have found the evidence of Drs. McClelland and Martin in respect of the Lilly process patents to be of little weight given their lack of experience in [beta]-lactam or cephalosporin chemistry, it is almost superfluous to discuss this publication, which they alone discuss. Nevertheless, to avoid further debate I will simply comment as follows:

542     During his cross-examination, Dr. Martin admitted that ordinarily presenters did not read the paper that was later published. There is absolutely no evidence that the particular segments or reactions used by these experts to support their opinions were shown or mentioned by Dr. Kishi during his presentations. [219] None of Apotex's experts attended those conferences or reviewed slides, (if any were actually used at the conferences) or other information.

543     In the circumstances, the Court is not satisfied that Apotex has established that the information used by its experts was indeed available to the public at the relevant time and should be considered for the purpose of assessing the obviousness of the Shionogi patents.

*9.4.4. The Inventive Concept*

544     Although it is very clear that the inventive concept is to be assessed in respect of each claim at issue for each patent under review, the Court is satisfied that the issues raised by Apotex can be properly addressed without a full description of the inventive concept of each of the claims. It suffices to describe the relevant elements of the inventive concept of most of the claims at issue in each patent. As mentioned, infringement of one valid claim is sufficient for Lilly to succeed in this action.

545     Apotex agreed that if there is any inventive concept in these patents (which it denied), it would be the overall synthetic pathway which is not claimed per se. However, even if it is clear from the disclosure [220] of each patent that the overall synthetic pathway, which enables the addressee of each patent to cyclicize a penicillin derivative compound (the Cooper thiazoline compound) into a 6-membered ring cephalosporin, where a hydroxyl is already in place at the 3-position, is included in the inventive concept of at least one claim at issue in each patent; it is not the only relevant element thereof.

546    In effect, the inventive concept of the claims at issue in the following patents also includes:

i. The '547 patent

   a. The conversion of the Cooper thiazoline compound (an exomethylene compound) to new hydroxyl derivatives through ozonolysis.

ii. The '924 patent

   a. That the new hydroxyl derivatives described therein can be activated (in claims 8 and 9, this is done by sulfonylation), that this process can be followed by amination (in claims 12 and 37, the amine is morpholino) to produce useful novel compounds. [221]

iii. The '132 patent

   a. That the new compounds described therein can be halogenated to produce other new useful compounds.

iv. The '026 patent

   a. That the new halogenated compounds described therein (still penicillin derivatives) can be deprotected (hydrolysis) to form an azetidinone enol (or its ketotautomer) and that the new compounds can be cyclicized to form a 3-hydroxy-3-

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 235 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

cephem (or its ketotautomer), this enabling the production of the desired antibiotics referred to in the disclosure, which include cefaclor.

*9.4.5. The Differences between the Prior Art and the Inventive Concept*

### 9.4.5.1. The '547 Patent

547    There was no prior disclosure as to how the claimed reaction or process and the resulting compounds are useful in the synthesis of the desired 3-hydroxy cephalosporin.

548    There is no prior disclosure of the ozonolysis of the isopropenyl bond in the Cooper thiazoline, which is one of the main starting compounds of the Shionogi process.

### 9.4.5.2. The '924 Patent

549    With respect to the '924 patent, both the starting material and the final product of the claimed reaction were unknown.

550    There was no prior disclosure as to how the claimed transformation could be useful in the synthesis of 3-hydroxy cephalosporins.

551    There was no prior disclosure of a 2-step reaction involving sulfonylation of a hydroxyl group followed by amination of the sulfonylated product in penicillin derivative compounds (open ring structure).[222]

### 9.4.5.3. The '132 Patent

552    With respect to the '132 patent, there was no prior disclosure of the starting material or the final product of the claimed reaction.

553    There was no prior disclosure as to how the claimed reaction could be useful in the synthesis of 3-hydroxy cephalosporin.

### 9.4.5.4. The '026 Patent

554    With respect to the '026 patent, there was no disclosure of the starting material of the claimed reaction or the intermediate species formed after the first step.

555    There was no prior disclosure of the ring closure of a thiazoline to form a cephalosporin (a [beta]-lactam having 4-carboxylic acid function); there was no prior disclosure of how the new starting compound could be converted to give a 3-hydroxy cephalosporin or a compound which could be converted to such a compound.

556    There was no prior disclosure of a 2-step reaction of a thiazoline having substituents similar to those used in the '026 patent or where an enamine is converted *in situ* to the desired functional group, that is hydroxy.

*9.4.6. Are these Differences Inventive?*

557    I will first deal with the inventiveness of at least one of the claims at issue in each patent, based on the idea of the overall Shionogi synthetic process described in the disclosure.[223] Apotex has not met its burden of establishing that this overall pathway was obvious. Dr. Hanessian, the only expert Apotex qualified to comment on what a posita would have known or would have found self-evident at the relevant time, did not opine at all on this point.[224] He simply looked at each individual step; never considering the global process per se. Dr. Martin (though he was not really qualified to discuss this issue) submits that the one "invention" in all these patents is the overall process. In the context of his report this can only mean that, in his opinion, this overall process was not something that a posita as a matter of fact would have known or have found a trivial variation of what was known.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

558    Only Dr. McClelland [225] , who, as mentioned earlier, outside of the present proceedings has no real experience, focus or particular interest with regard to [beta]-lactam, let alone cephalosporin, chemistry, made the point in the two last paragraphs of his report (A-12, paras. 209-210) that the Shionogi pathway would have been self-evident if one used retrosynthesis.

559     As mentioned, the opinion of Dr. McClelland has no probative weight in order to establish that a posita would have used retrosynthesis for this purpose in 1975.

560    Furthermore, Dr. McClelland's discussion of retrosynthesis is based on the premise that the posita would know that the process should go from the target 3-hydroxy compound (compound D) to the Cooper compound (compound B) in order to get to a penicillin, the desired starting compound (compound A). There is no doubt that the 3-hydroxy compound would be a self-evident target compound, if the problem to be solved was to find a way to make cefaclor from penicillin. Indeed, there was no way to make cefaclor without going through this specific intermediate.

561     However, here again, Dr. McClelland was not qualified to say that the Cooper compound (compound B) would be the obvious way to get from compound D to compound A. This is especially so when one considers that at that time, the only known method to make the 3-hydroxy compound was through the 3-methylene cephalosporin, a pathway which leads away from the Shionogi process and the use of the Cooper compound.

562    Dr. Barrett testified that, at the relevant time, it was more likely that the posita would start with, or go through, the Morin arrangement, which was the reliable method used for opening the penicillin ring to make a cephalosporin.

563    That one could go through the exomethylene (compound 4 in W-17), to go back to compound A (which would include a penicillin sulfoxide) is corroborated by what Dr. Kukolja (another Lilly chemist) did when he discovered another process to make the 3-hydroxy from penicillin after 1975.

564     Retrosynthesis is a purely visual thought process which would have produced many possible pathways. Although the fact that very many options were open is obviously not in and of itself sufficient to conclude that an invention is not obvious. It is still an element to consider in the overall analysis. In his cross-examination, Dr. Hanessian agreed that all the pathways proposed by Dr. Barrett in his report were reasonable, even if some appear to have a better chance of success than others. Interestingly, he added that "[t]here may be even more." [226]

565     Moreover, retrosynthesis does nothing more than provide a list of avenues to try. Execution, that is testing, is the next step. Thus, as noted in *Sanofi*, Apotex also had to establish that it would be more or less evident to the posita that the overall Shionogi pathway (assuming here that it would be part of the various retrosynthesis pathways one would have thought of) ought to work. The Defendant has simply not met its burden in this respect either, which is especially evident when one considers other factors relevant to the obviousness inquiry.

566     There is little doubt that there was a general motivation in the industry to find methods to make cephalosporins from penicillin. Lilly chemists were particularly motivated to find a synthetic pathway that would enable them to make cefaclor from penicillin. [227] As of February, 1975, Lilly had yet to find a way to efficiently produce its new antibiotic on a large scale.

567    Dr. Cooper, one of the most prominent chemists in the field of cephalosporins and the inventor of the compound used as starting material for the Shionogi process, testified that he tried in earnest to close the ring of this thiazoline but simply could not do it. Thus, the Cooper compound was at the bottom of the list when looking for a way to make cefaclor from penicillin.

568    Apotex argued that this evidence has little weight because Dr. Cooper's job at Lilly was to find new compounds (he was on the [beta]-lactam research team [228] as opposed to the process team). The defendant also suggested, based on Kukolja, that one could assume that the Lilly chemists were busy looking at other avenues.

569     Despite these arguments and an effort to challenge Dr. Cooper's credibility in the course of his cross-examination, the Court finds his evidence credible. It only made good sense that he would try to find such a use for "his" compound. Although this

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

evidence is not determinative per se, it certainly supports Dr. Barrett's conclusion that the solution (overall pathway) proposed by Shionogi was not self-evident to the posita.

570     Although there is no evidence on which the Court could conclude that cefaclor was "the" priority at Lilly, it was certainly important enough for Lilly to go to Shionogi for help. Lilly was willing to pay for this research and to disclose its private information. Dr. Cooper met with Shionogi scientists; this provided him with another opportunity to turn his skilled mind to the problem. There is no evidence that the solution disclosed in the Shionogi patents became evident to him during that process.

571     In view of the foregoing, and having considered all the evidence presented, the Court concludes that the Shionogi synthetic pathway was not obvious.

572     It is not disputed that the compounds by process claims in the various Shionogi patents constitute an invention, only if their utility was disclosed in the patent. In that respect, the overall Shionogi process provides the inventiveness supporting at least one such claim in each patent (except the '026 patent which contains no such claim). [229] The case law is clear that in such a case, there is no need to claim the utility of the compounds in the claims. [230]

573     Here, the overall Shionogi process also provides inventiveness to at least one process claim at issue in each of the patents. The concept that an idea (overall synthetic pathway) can provide inventiveness to a claimed process or claimed product is not new. It is a basic tenet of patent law. (See *Terrell*, at paras. 7-8, on p. 276) [231] There is no legal requirement that it be included in the said claims.

574     That said, it is worth mentioning that in any event, Apotex has not met its burden of establishing that each individual step disclosed in the patent was obvious per se.

575     It is here that Dr. Barrett and Dr. Hanessian are at opposite ends. Dr. Hanessian's approach is quite simple — Lilly referred to it as simplistic. Reduced to its most basic expression, Dr. Hanessian's position can be summarized as follows: the chemical reactions claimed in the Shionogi patents were generally known in organic chemistry. They each had been used at least once on similar compounds without destroying the [beta]-lactam molecule (although the yields may have been very low). Thus, a posita would expect them to successfully work on the compounds described in the patents at issue even those that had never been made before.

576     Dr. Barrett also acknowledges that these generic reactions (except maybe for one) were known and often used in general organic chemistry but he says that this would provide no comfort to the posita because of the delicate nature of the compounds at issue and the serious issues of selectivity they raised. Also, for Dr. Barrett to focus on some isolated examples which involved, according to him, compounds quite different from the ones at issue, ignores all the prior art references dealing with failures or unsatisfactory results obtained in other so-called similar compounds. Thus, in his view, it would not be plain nor self-evident at the relevant time to a posita that these reactions ought to work on penicillin derivatives, especially those that were not even known to exist.

577     As mentioned earlier, Dr. Hanessian was a credible witness but the weight of his evidence was diminished by the fact that his opinion only refers to publications given to him by Apotex's counsel. There is no specific reference or mention in his opinion of any bias or beliefs held at the time by the posita. There is no reference to the well-known literature of the time which summarized the advances in the field like the articles of Dr. Flynn or Sammes. [232] In fact, there is no real evidence that he took into account any art outside that which was provided to him. It appears that he was given no specific instructions in this case against the use of hindsight and despite him mentioning that he had heard of the concept in a previous case, the Court is uncertain about his methodology. In cross-examination, when asked about the difficulty of transforming an exomethylene cephem at the relevant time, Dr. Hanessian that this involved a simple allylic bromination where everything has to do with its timing. [233] However, he had to acknowledge that there was nothing about this in the relevant literature and that it was fair to say that in 1975, there was no known method to do so.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 238 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

578     On the other hand, Dr. Barrett was subjected to more than one long and skilful cross-examination and the weight of his evidence was diminished by the fact that some of the points made in his report were shown to have been somewhat overstated (see for example the evidence in respect of para. 115 of E-14). However, the weight of his evidence was still such that the Court could not conclude that there was a preponderance of evidence in favour of Apotex. [234]

579     This is especially true when one considers that the common general knowledge — Cooper 1, properly understood by the posita [235] — would lead away from the process claimed in the '547 patent. Although the Court acknowledges that this paper shows that the Cooper thiazoline was stable in the conditions described therein, the Court does not agree that this would have been the only concern for the skilled person. The Court is simply not persuaded by Apotex's evidence that the posita would be motivated to try this process on the Cooper compound [236] and certainly not that the ozonolysis of this open-ring structure would be expected to work.

580     In respect of the '924 and the '132 patents, none of Apotex's experts explained how one would be motivated to even try such a process given that all the compounds involved were not known. It is also difficult to accept the proposition that these chemical reactions would be expected to work on compounds that were not even known.

581     Apotex argued that the Court must assume that the posita knows of the overall Shionogi process so that it is placed in the same position as the inventor. I disagree. When considering obviousness, the posita is only assumed to possess common general knowledge and the public information disclosed in the prior art. The Shionogi process was not part of this. It was a solution only known to the inventors.

582     In respect of the '026 patent, after reviewing the evidence several times, the Court had to conclude that it was equally unconvinced by both sides. The Court is simply not persuaded that even if a posita had been motivated to carry out this process (which is doubtful given that the starting compound was not known) it would have been evident that it would succeed. Thus the party bearing the burden on this issue fails.

## 10. Lack of Utility — Sound Prediction — Inoperability

583     Apotex argues that several of the claims in the patents at issue are overbroad; they allegedly include claimed embodiments that are inoperable. Although the defendant argues in its memorandum that the patentee had to establish utility at the relevant time or that he could soundly predict that all the embodiments claimed would be useful, it is evident that, as with any other arguments presented to invalidate the patents, the burden of proof here is on the defendant.

584     With respect to sound prediction, the tripartite test to be applied was set out by the Supreme Court of Canada in *Wellcome (2002)*, at para. 70. More particularly there must be: i) a factual basis for the prediction; ii) an articulable sound line of reasoning; and, iii) proper disclosure.

### *10.1. The Lilly Patents*

585     In their affidavits, Drs. Modro and McClelland [237] stated that the '007 patent discloses and claims reaction conditions for the formation of a kinetic complex of the general formula where X is Cl or Br and Z is hydrogen, halo, $C_1$-$C_4$ alkyl or $C_1$-$C_4$ alkoxy. [238] As there are no restrictions on the position of the Z substituent on the benzene ring [ortho (-o-), meta (-meta-), or para (-p-)], [239] they say that some of the Z variants other than hydrogen, such as tri-p-chlorophenyl phosphite and Cl and tri-p-methoxyphenyl [240] phosphite and Cl and other similar members would be inactive, thus not work as claimed in the patent.

586     Given that many of the claims at issue are limited to Z = H, [241] such as claims 20, 21, 27, and 11 (the alternative based on claim 10) of the '536 patent, claims 16, 23, 26, 27 and 30 of the '725 patent, and claims 8, 17, 19 and 20 of the '468 patent, it was not clear at all how such argument could be determinative. The Court sought Apotex's counsel's views on this point and as appears from the transcript of November 11, 2008, after reflecting upon it for quite some time, the said counsel

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 239 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

advised the Court that "it is really complex to try to discern if such argument could be determinative" and thus noted the Court should decide the issue.

587    In an abundance of caution, the Court has thus decided to review the evidence on this issue but this should not be taken as implying that such argument could be determinative in any way of the findings in respect of all the claims which were found to be infringed. In fact, I do not believe that it is.

588    Apotex's experts' views are not based on any experiment done by Dr. Modro [242] or anybody else on behalf of Apotex. Except in respect of variants at the ortho position, [243] these views are mostly based [244] on what was reported in TX-211, a 1978 progress report which states:

> The complexes formed from triphenyl phosphite and tri-o-tolyl phosphite behave identically, but the compound from tri-p-chlorophenyl phosphite and chlorine is inactive. This suggests that even small electronic factors are very important in order to obtain the correct compound. These data prompted speculation that the ionic complex, $(ArO)_3P^{\pm}Cl\ Cl^-$, was in fact the active complex and therefore substitution on the aromatic ring that would stabilize the positive charge on phosphorus should in turn provide a more stable, active reagent. With this in mind tri-p-methoxyphenyl phosphite was prepared and reacted with chlorine in methylene chloride at -15°. However, the compound was just too reactive with chlorine, either because of decomposition or aromatic ring chlorination, such that the endpoint in complex formation was extremely difficult to determine. The complex that did form was active in both chlorination and cleavage but low yields were obtained. A more extensive series of phosphites and resulting complexes with chlorine will be prepared.

[Emphasis added pp. 7-8.]

589    As mentioned, TX-211 was introduced during the testimony of Dr. Blaszczak, who had read that report at the time it was circulated. Although he indicated that he had no reason to believe that the results reported therein were not accurate, it is clear that he was not personally involved in the experiments discussed, particularly those at the passages referred to by Apotex's experts.

590    The '007 patent, as well as the Lilly process patents, do contain examples where the tri-p-chlorophenyl phosphite and chlorine complex was used to perform chemistry on a cephalosporin substrate (see examples 9 and 10 in the '007 patent, example 48 in the '725 patent, example 27 in the '468 patent, and examples 72 and 89 in the '536 patent). There are also many examples where a kinetic complex formed from tri-p-methoxyphenyl phosphite was used to perform the claimed reaction (see examples 68, 75, 90, and 94 of the '536 patent, and example 7(G) of the '007 patent). The patent also contains examples where a Z substituent other than H is used on the ortho position (see example 7(F) of the '007 patent).

591    The weight of Apotex's experts' opinions were greatly diminished by way of cross-examination. [245] It became clear that, in respect of the para and meta substituents, Dr. Modro was expressing mere concerns as to the yields that would be obtained using some of these substituents rather than the fact that said compounds would be inactive. It also became clear that the said experts had no more reason to rely on what was reported in TX-211 than what was reported in the various patents. Dr. McClelland insinuated that he could not rely on the examples in the patents because he had not seen the actual lab notebooks concerning these experiments. However, it is clear that he had not seen any lab notes relating to the experiments reported in TX-211 either.

592    In his affidavit (E-19, paras. 57-59), Dr. Baldwin indicates that, based on the examples of the preparation and use of ortho and para derivatives, there was no reason to believe that meta-substituted compounds could not also be similarly prepared and used. He also noted that he would not be concerned about steric effects since only a single, relatively small ($C_4$ alkyl or alkoxy) substituent is permitted. [246] The Court prefers the evidence of Dr. Baldwin who, although he had not seen any lab notebooks with respect to the examples, represents what a posita would have expected based on the data disclosed in the patents.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 240 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

593      When Lilly attempted to introduce direct evidence of the work carried out in the patent in respect of example 9 of the '007 patent, Apotex objected to the evidence of Mr. Gardner on the basis that Lilly had refused to reply to questions relating to all the experiments disclosed in the patents based on Justice Hugessen's decision in these proceedings dated August 9, 2000 reported in *Eli Lilly (2000)*, particularly where he stated, at para. 4:

> I equally accept the plaintiffs' position with respect to the plea that there was no sound basis for prediction of utility of the claims or some of them as pleaded in the defence. Inutility as pleaded here is a form of overclaiming and, equally in my view, must be tested against an objective standard, namely do the claims go beyond what could have been predicted, thereby claiming more than what was invented; I accept that what was said by Mr. Justice MacGuigan in *Merck v. Apotex*:
>
>> ... <u>section 34 is not concerned with the sufficiency of the inventor's knowledge. Rather, the issue is whether the information provided in the specification is sufficient to explain the functioning of the invention to a person skilled in the art. In other words, the analysis centres on what the inventor expressed in the specification, not on what the inventor knew</u>.
>
> [Footnote omitted; emphasis added.]

This description of the law was expressly confirmed by the Federal Court of Appeal in *Eli Lilly (2001)* where Justice Rothstein indicated that the Court was not persuaded of any error of law in his reasons.

594      In my view, there is no need to even rule on this objection for, after carefully reviewing the evidence, the Court is simply not satisfied that Apotex has met its burden of establishing on a balance of probability that any of the above mentioned compounds were inactive or that their ability to perform the claimed reactions could not be soundly predicted [247] based on the factual data (the examples) disclosed in the patents and the common general knowledge of the posita at the relevant time. [248]

595      The Court finds that there was no positive burden on Lilly to independently prove the experiments disclosed in its patents for Apotex abandoned its challenge of their accuracy pursuant to s. 53 of the *Patent Act*. Obviously, the evidence of Mr. Gardner would have strengthened Lilly's case but it does not improve Apotex's. [249]

596      This leaves two further issues to be discussed — the orthomethoxy derivative and para. 111 of Dr. McClelland's affidavit (A-12). [250]

597      Dr. McClelland indicates, at para. 111 of his affidavit (A-12) that, according to TX-211, the inventors knew that the triphenylphosphite-chlorine complex employed to perform sulfoxide reduction ('536 patent), halogenation of the 3-OH to 3-Cl ('725 patent), and the acylamino conversion ('468 patent) must be formed at -10° Celsius or lower to work and must be used quickly. Nevertheless, the inventors claim the use of such complexes and included in their claims temperatures of up to 30° Celsius.

598      In the course of cross-examination, Dr. McClelland admitted that the passage cited in his report was in fact missing a part which is essential to understanding the passage relied upon in his report. In effect, at p. 7 of TX-211 it is indicated that:

> The complex must be formed at -10° or lower and used as quickly as possible, since it becomes essentially inactive after standing at room temperature for several hours.

599      Dr. McClelland agreed that, read in context, this sentence means simply that the kinetic complex must be used before it transforms after sitting at room temperature for several hours. [251] Dr. McClelland acknowledged that it is clear that a kinetic complex can be formed at room temperature but still questioned how it would react with cephalosporins at such temperature. He noted that he didn't know because there were no experiments, at least that he recalled. In fact, example 8(B), on p. 27 at the '007 patent used a kinetic complex at room temperature to perform imino-halide formation producing a yield of 85.4% (as compared to 91.6% at 10° to 15° Celsius). [252]

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

600    Turning to the last argument, here again, it is to be noted that Dr. Modro does not opine on whether, based on the experiment disclosed in the '007 patent (7(F) using tri-o-tolyl to transform a cephalosporin substrate) the inventor could have soundly predicted the usefulness of these other Z substituents at the ortho position.

601    Dr. Baldwin indicated in his report that in an earlier article (exhibit E-19 G), Dr. Gloede had clearly shown the formation of a kinetic complex. [253] Although this does not appear clearly from his affidavit as drafted, Dr. Modro said that the issue was more precisely whether the kinetic complex — an intermediate which by nature is unstable — would be able, for example, to chlorinate the enol before it reacted further with the chlorine as described in Gloede. There is no evidence before the Court that the allegedly competing reaction shown in Gloede ($OZ = OCH_3$) was known to the inventor or to a posita at the relevant time. [254]

602    In respect of both of these issues the following comments of Justice MacKay in *Wellcome (1991)* are particularly apposite:

> The Defendant raises doubt about the operability of certain of the reactions when particular reactants are utilized; however, there is no clear proof that any of the reactions will not proceed. That might have been demonstrated by attempting to carry out the claimed processes for particular reactions and documenting those which were found inoperable. I appreciate that there is no obligation on the Defendant to undertake any such experimental work to support a submission that processes claimed are inoperable, but the Defendant does have the onus of establishing invalidity of a registered patent. Despite doubts the Defendant raises I am not persuaded that the onus on the Defendant is met. I find that the Defendant has not established that any of the process claims are simply inoperable.

603    In this case the Court is not satisfied that Apotex has provided evidence of sufficient weight to support its allegation that the '007 patent or the Lilly process patents contain embodiments that are not useful or whose usefulness could not be soundly predicted by the inventor on the basis of the various experiments described in the patents and the relevant common general knowledge. They have simply not met their burden.

### 10.2. The Shionogi Patents

604    Apotex raises no issue under this heading with respect to the '547 patent. In respect of the '924 patent, Dr. McClelland raises certain issues with respect to some compounds in which both A and B or R are hydrogen atoms. [255] However, this is only relevant to claims 3, 8, 9, and 27. Thus, even if the Court were to accept Apotex's point of view, this would not be sufficient to avoid the findings of infringement made in respect of the Kyong Bo process. [256]

605    In respect of the '132 patent, Drs. McClelland and Martin (see paras. 94-95 of the affidavit of Dr. Martin (A-17); para. 168 of the affidavit of Dr. McClelland (A-12)) testified about issues including "difficulties" that would be encountered with compounds covered by claims 15, 22, 29, and 34 when Y is hydroxy (OH). Also in respect of other claims, such as 1 and 2, [257] Apotex says that based on Drs. McClelland and Hanessian's evidence, [258] it appears that, as of 1975, there was no reliable method that allowed for allylic fluorination reactions to occur and no reagents were listed in the patent to assist the skilled person. Dr. McClelland also notes that there are no examples of halogen in the patents other than Br.

606    As noted above, the Kyong Bo process infringes claims 38, 58 and 15, the validity of which cannot be affected by these arguments. [259]

607    It is not clear why Apotex's counsel insisted on arguing all of the above mentioned issues given that it was clear that certain claims at issue, which would obviously be infringed if their argument with respect to importation was not accepted, would not be affected by such arguments.

608    This brings us to the last patent, the '026 patent where all the claims at issue would be affected by the matters raised by Drs. Hanessian (para. 120-123 of A-15) and McClelland (paras. 199-200 of A-12). This is dealt with in a single paragraph of Apotex's memorandum (para. 365) where it is summarized as follows:

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 242 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

[W]hen "Hal" is equal to fluorine, the cyclization reaction (step two of the claimed process) will not occur since fluorine is a poor leaving group in all substitution reactions.

[Footnote omitted.]

In that respect, both Drs. McClelland and Hanessian rely on Jerry March's 1968 book *Advanced Organic Chemistry* provided to them by Apotex's counsel. [260] During his testimony, Dr. Hanessian said that he himself had noted that the patent contained only examples with Br and few with Cl [261] but that there were no examples where iodine or fluorine were used.

609    Both experts confirmed that Apotex never tried fluorine in the many experiments performed by Dr. Modro or Dr. Chase. However, despite the lack of examples in respect of iodine and fluorine and the lack of detailed information about chlorine, Dr. McClelland indicated in the course of his cross-examination that one would expect no problems with Cl or iodine as a leaving group. [262]

610    Although Dr. McClelland [263] indicated that the cyclization through substitution discussed in step two of claim 1 was an easy reaction, Dr. Hanessian states in his affidavit that it requires a good leaving group. In fact, it is on that basis that Dr. Hanessian concludes that fluorine, which is not a good leaving group, would not work. Dr. Hanessian does not discuss why the use of a catalizer would not assist cyclization in this case even if he found it doubtful that fluorine alone would be an appropriate leaving group for this type of reaction.

611     Dr. McClelland said "I can't say unequivocally that it's not going to work. I can say that it is not a reaction that a chemist would view as particularly facile." [264] At para. 154-156 of his report (E-14), Dr. Barrett indicates that fluorine is not the worst leaving group provided for in the table referred to by Dr. McClelland. He also notes that, although a posita would not likely choose fluorine because of the inherent danger linked to the use of such halogen, — "[y]ou might destroy your co-workers. It's a dangerous element" [265] — in his view a cyclicized 3-hydroxy cephalosporin would be formed by the use of fluorine particularly where a catalyst is utilized. [266]

612    Having carefully considered all of the evidence, the Court is not satisfied that Apotex has established on a balance of probability that the use of fluorine in claim 1, particularly with the use of a catalizer [267] to assist cyclization, would not work or that such process could not be soundly predicted on the basis of the experiments described in the patent and the common general knowledge about fluorine as a leaving group.

*10.3. Deficiency of Specification and Ambiguity*

613    Under this heading, Apotex raises several complaints to support its argument that the disclosure of the '007 patent (the only patent to which this argument applies) is deficient and does not contain all the information necessary to enable the posita to practice and use the invention claimed. These complaints and *all* the evidence on which Apotex relies are fully described in its memorandum on validity at paras. 121-134.

614    As the Court has already indicated that the only valid claim left at issue at this stage is claim 17, these arguments will only be considered in respect of the invention claimed therein, that is, the process to make the kinetic complex in an aromatic hydrocarbon or halogenated hydrocarbon solvent.

615     The applicable principles are well-known. Be it sufficient to say here that the then applicable s. 34 of the *Patent Act* provided that the specification (the disclosure and the claims) i) correctly and fully describe the invention, ii) set out clearly the various steps of the process claimed at claim 17 in full, clear, concise and exact terms so as to enable the posita to use the invention, and iii) distinctly claim the "thing" that the inventor regards as his invention.

616    The case law (including those cases cited by Apotex at para. 122) is clear that the patent must "disclose everything that is *essential* for the invention to function properly".

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

617    In a nutshell, Apotex argues that the '007 patent fails to disclose the need i) to avoid excess TPP, ii) to make the kinetic complex or use it at -10 °C, iii) to use the kinetic complex quickly, and iv) that it fails to give sufficient details about the particular species falling within the scope of the claims. [268]

618    During its final presentation, Apotex conceded that this line of defence is not a major argument. In fact, the Court is somewhat surprised that it was pursued given the paucity of the evidence supporting it and the fact that all the experts who tried to make the kinetic complex, following the instructions of the '007 patent, succeeded the very first time they tried (such as Dr. Modro and Dr. Chase on behalf of Apotex) and had no difficulty differentiating the kinetic complex from the thermodynamic product. [269]

619    There is thus no need to say much more than that Apotex has failed to convince the Court that a posita armed with all the information contained in the '007 patent and its common general knowledge would not be able to use the process described at claim 17 successfully to make kinetic complexes. In other words, the evidence relied upon is simply insufficient to meet that burden.

620    For example, the passage of TX-220 relied upon to support the view that it was essential to instruct the posita not to use excess TPP was read out of context and without full consideration of the information actually disclosed in the '007 patent. The passage reproduced in Tab 168 is from a paragraph starting with "[i]nitially". It describes, as I mentioned it earlier, the discovery process. The inventors had difficulties reproducing their first successful experiment. In their attempts to reproduce it, they noted that the reagent having stood overnight at 0° C became inactive and that the addition of one equivalent of Cl to two equivalents of TPP also produced a product that was inert — could not be used to transform a cephalosporin substract. At that time, the inventors clearly had little understanding of the product(s) made by the reaction of TPP and Cl.

621    The examples 3, 4, 5 and 8 do not teach the use of excess TPP of the magnitude discussed in TX-220. In such experiments the two reactants are mixed together until a yellow colour, indicative of *excess* Cl persisted, *which colour is then discharged* by the addition of further TPP. This is in line with the preferred mode described at p. 11, line 30 to p. 12, line 7. The '007 patent makes it clear at p. 11, lines 23-27, that TPP itself reacts to some extent with its kinetic reaction product with Cl or Br effectively increasing the rate of conversion to the corresponding thermodynamic product (see also p. 6, lines 24-27).

622    Obviously one must never lose sight of the fact that claim 17 expressly covers the use of *equivalent* amounts of triaryl phosphite and Cl or Br and in one of its alternatives (claim 10) it covers wherein *an excess of Cl* is maintained during the reaction of the triaryl phosphite and Cl. [270]  Clearly, a posita using a 2(TPP):1(Cl) [271] ratio or an excess of TPP of similar magnitude would not be practicing the invention.

623    With respect to the need to use the kinetic complex quickly and to make it or use it at -10° C or less, the Court has already reviewed, discussing the issue of utility, the passages of TX-211 relied upon by Apotex, and Dr. McClelland's views in that respect.

624    On p. 5, line 24 of the disclosure, the posita is told that:

To underline maximize the production and stability of the kinetically controlled product, reaction conditions are selected so as to minimize the potential for thermodynamic equilibrium of the initial product of the reaction. Most simply conditions for kinetic control are achieved both by lowering the reaction temperature and the temperature of the kinetic product after it is formed, and by minimizing [the] time allowed for thermodynamic equilibrium, such as by utilizing the kinetic product in a subsequent reaction immediately after it has been prepared.

[Emphasis added.]

It is difficult to see how a posita would not fully understand how to practice the invention.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

625    Finally, with respect to the need to further identify the kinetic complex by reference, for example, to a specific or more precise chemical formula. Given the construction adopted by the Court and the Court's previous findings, the Court accepts Dr. Baldwin's views on the matter. He was very clear that the specification *easily* provides sufficient chemical information to distinguish the kinetic complex from the latter formed product, that is, the thermodynamic product. [272] The Court certainly agrees with Lilly's submissions that there is a preponderance of evidence that with knowledge of what is disclosed in the '007 patent, it is relatively simple to observe the conversion of the kinetic complex to the thermodynamic product using [31] P NMR analysis.

## 11. Remedies and Costs

### 11.1. Disentitlement and Set-off

626    In its written submissions and at oral argument, Apotex argues that Lilly's conduct in respect of the Shionogi patents should disentitle Lilly from any relief (equitable or otherwise) from its claim of infringement in respect of all the patents at issue. Apotex also argues that, even if its claims under the *Competition Act*, R.S.C. 1985, c. C-34, are time barred, Lilly's otherwise anticompetitive acts should excuse Apotex from liability for patent infringement under the doctrine of equitable set-off.

627    First, it is important to note that although the defence in the main action does include an allegation with respect to disentitlement, there is no allegation with respect to equitable set-off. Moreover, Apotex presented no evidence to establish a s. 45 offence in the main action. It did not agree with the plaintiffs (as was done with respect to some evidence filed by consent in the counterclaim to avoid repetition) that the evidence filed in the context of the counterclaim would be entered by consent in the main action.

628    When Lilly raised the absence of such allegation in the defence, Apotex argued that this was simply a procedural error which caused no prejudice to Lilly for they knew from the allegation at para. 112 of the counterclaim [273] that the defendant was seeking set-off.

629    That said, even if it were possible for the Court to import, as suggested, the evidence filed in the counterclaim, which includes evidence by Shionogi who is not a party to the main action, the Court is of the view that Apotex's counterclaim is without merit because it is time-barred and Apotex failed to establish that it suffered a loss arising from the alleged anti-competitive conduct.

630    If Apotex's competition claim cannot stand in the context of its counterclaim, it cannot stand as a defence to Lilly's claim in the main action.

631    However, in the event I have erred with respect to the merits of Apotex's counterclaim, but am correct in respect of my conclusion that the competition counterclaim is time-barred, it may be open to Apotex to introduce its competition counterclaim as a defence to Lilly's infringement action. Defences raised under the doctrine of equitable set-off are not subject to the expiration of limitations periods (see *Pierce v. Canada Trustco Mortgage Co.* (2005), 254 D.L.R. (4th) 79, 197 O.A.C. 369 (Ont. C.A.) (*Trustco*) at para. 4). No case law was provided on this point in respect of disentitlement.

632    The assertion of equitable set-off and disentitlement by Apotex seeks to weigh Lilly's conduct vis-à-vis Shionogi against Lilly's claims for infringement under the *Patent Act*. For the reasons that follow, I am of the view that in this particular case, Apotex cannot invoke its allegations of anticompetitive behaviour to evade its liability for infringement through disentitlement or equitable set-off.

633    The nature of disentitlement was discussed by Justice Sharlow in *Volkswagen Canada Inc. v. Access International Automotive Ltd.*, 2001 FCA 79, [2001] 3 F.C. 311 (Fed. C.A.), where she concluded that, in order for disentitlement to be operative a defendant must establish a link between "the alleged *unlawful behaviour and the equitable remedy* sought by the patent holder that could support an unclean hands defence." (at para. 25; emphasis added, see also *Sanofi-Aventis Canada Inc.*

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 245 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*v. Apotex Inc.*, 2008 FCA 175, 66 C.P.R. (4th) 6 (F.C.A.), paras. 14-16) A similar conclusion was reached by Justice Hugessen in *Procter & Gamble Co. v. Kimberly-Clark of Canada Ltd.* (1990), 29 C.P.R. (3d) 545, [1990] F.C.J. No. 58 (Fed. C.A.):

> For past conduct to be relevant to <u>a refusal of equitable relief</u>under the "clean hands" doctrine, relief to which the party would otherwise be entitled, <u>such conduct must relate directly to the subject matter of the plaintiff's claim</u>, in this case their patent.
>
> [At 546; emphasis added.]

634    Justice Rothstein (as he then was), framed the relevant inquiry into disentitlement as follows:

> It is apparent that it is not any alleged inappropriate conduct of a party that may be relevant in the consideration of <u>whether or not to grant equitable relief</u>. The inappropriate conduct must <u>relate directly to the subject matter of the plaintiff's claim</u>.
>
> [*Visx Inc. v. Nidek Co.* (1994), 87 F.T.R. 96, 58 C.P.R. (3d) 51 (F.C.) (*Visx*), para. 5, emphasis added.]

635    Thus, the Court cannot agree with Apotex that the defence of disentitlement could be a total bar to the claim of Lilly given that its rights to sue for infringement are based on a statute and not solely on equity. In my view, it could only be considered in respect of Lilly's right to elect as this is an equitable form of relief.

636    In contrast, equitable set-off constitutes a substantive defence to a claim, and would (if successful) vitiate any relief, equitable or otherwise, sought by a plaintiff (see *Trustco* paras. 43-46, citing *Henriksens Rederi A/S v. Rolimpex*, [1973] 3 All E.R. 589 (Eng. C.A.) (per Lord Justice Denning)).

637    The principles underlying equitable set-off, including relevant Canadian and English authorities, were canvassed by the Saskatchewan Court of Appeal in *Saskatchewan Wheat Pool v. Feduk*, 2003 SKCA 46, [2004] 2 W.W.R. 69 (Sask. C.A.) :

> The starting point is Holt v. Telford where Wilson J., for the Court, quoted a statement of the applicable principles for equitable set-off found in *Coba Industries Ltd. v. Millie's Holdings (Canada) Ltd. et al*:
>
> 1. The party relying on a set-off must show some equitable ground for being protected against his adversary's demands: *Rawson et al v. Samuel* (1841), Cr. & Ph. 161, 41 E.R. 451.
>
> 2. <u>The equitable ground must go to the very root of the plaintiff's claim before a set-off will be allowed</u>:British Anzani.
>
> 3. A cross-claim must be so clearly connected with the demand of the plaintiff that it would be <u>manifestly unjust</u> to allow the plaintiff to enforce payment without taking into consideration the cross-claim: Federal Commerce & Navigation Ltd.
>
> 4. The plaintiff's claim and the cross-claim need not arise out of the same contract: *Bankes v. Jarvis*, [1903] 1 K.B. 549; British Anzani.
>
> 5. Unliquidated claims are on the same footing as liquidated claims: the Newfoundland case.
>
> [Footnotes omitted, emphasis added.]

638    The Saskatchewan Court of Appeal went on to cite Lord Justice Denning in *Federal Commerce & Navigation Co. v. Molena Alpha Inc.*, [1978] 3 All E.R. 1066 (Eng. Q.B.) (*Federal Commerce*), aff'd on other grounds [1979] A.C. 757 (U.K. H.L.), where the following test was articulated in respect of claims of equitable set-off:

> This question must be asked in each case as it arises for decision; and then, from case to case, we shall build up a series of precedents to guide those who come after us. But one thing is quite clear: it is not every cross-claim which can be deducted. It is only cross-claims that arise out of the same transaction or are closely connected with it. <u>And it is only cross-</u>

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

claims which go directly to impeach the plaintiff's demands, that is, so closely connected with his demands that it would be manifestly unjust to allow him to enforce payment without taking into account the cross-claim.

[Emphasis added.]

(at 1078; see also *Old Mac's Pty. Ltd. v. Cavallo Horse & Rider Inc.* (2007), 2007 BCSC 726, 157 A.C.W.S. (3d) 944 (B.C. S.C.), para. 39; *Cam-Net Communications v. Vancouver Telephone Co.*, 1999 BCCA 751, 182 D.L.R. (4th) 436 (B.C. C.A.), paras. 46-49).

639     While the scope of disentitlement and equitable set-off are different, both defences ask a common question which both *Federal Commerce* and *Visx* frame in similar ways: does the unacceptable or unlawful conduct of Lilly go to the root or otherwise serve to impeach its claim and in such circumstances should the liability of Apotex be excused?

640     There is no dispute in this litigation that Lilly is the owner of all eight patents at issue. Nothing in the *Patent Act* prevents a patent holder from assigning their rights to another party. While such an assignment can give rise to anti-competitive effects (see prior decision of the Federal Court of Appeal in this case on the summary judgment motions (2005 FCA 361, [2006] 2 F.C.R. 477 (F.C.A.)), at para. 27), such an outcome does not otherwise impeach ownership rights in a patent. Put plainly, the anticompetitive consequences of an assignment of patent rights do not in and of themselves undermine or undo a lawful assignment of patent rights. Obviously, they can have no effect on the ownership of the Lilly patents.

641     While Apotex's allegations of anticompetitive behaviour against Lilly are related to the assignment of Shionogi's patent rights, they do not in my view impeach Lilly's title to any of these patents.

642     The Court is convinced that there is no relationship between the infringing acts of Apotex, which are the subject of the main action, and the alleged unlawful behaviour. Apotex would have infringed the Shionogi patents, whoever owned them. This will be explained in more detail in my reasons dealing with the counterclaim.

643     Even assuming that an anticompetitive act could go to the root of a patent infringement claim, I would decline in this case to exercise my discretion to allow Apotex access to the equitable set-off or disentitlement. First, because of the evidentiary issue discussed earlier. Second, because, as mentioned, in my view, it is most likely that Apotex would have infringed the Shionogi patents regardless of who owned them and it would not be unjust in this case to impose on Apotex the payment of the damages arising from its illegal actions.

644     Thirdly, it cannot go unstated that the *Patent Act* and the *Competition Act* are distinct statutory regimes. What Apotex seeks to do vis-à-vis its disentitlement and equitable set-off claims is resurrect its time-barred claim under the *Competition Act* and give it new life in the context of a patent infringement action. Such a result cannot be countenanced. It could not have been Parliament's intent in enacting the *Competition Act* that its "special remedies" provisions would serve as a defence to a patent infringement action or to otherwise interfere with the remedies flowing from a finding of infringement.

645     To reiterate, an assignment of patent rights may give rise to anti-competitive consequences. However, to the extent they do so, such claims must be adjudicated within the confines of the *Competition Act*. If judgment is obtained, it can then be set-off against any judgment dealing with infringement damages. To allow otherwise would allow for a fusion of two statutory regimes whose object and purpose are fundamentally distinct.

### *11.2. Remedies*

646     I will now examine the appropriate remedy. Lilly has requested the following:

• An election between its damages or an accounting of Apotex's profits

• Exemplary/punitive damages

• Pre and post judgment interest at a rate of 9% per year, compounded

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 247 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

647    With regard to the remedy of an accounting of profits, the Federal Court of Appeal has recently reiterated the well established principle that "a trial judge has complete discretion in deciding whether or not to grant this equitable remedy" (*Merck & Co. (FCA)*). It is equally well established that a successful plaintiff in a patent case does not automatically benefit from this remedy. In *AlliedSignal Inc. v. DuPont Canada Inc.* (1995), 95 F.T.R. 320 (note), 184 N.R. 113 (Fed. C.A.), Justice Alice Desjardins held that "the choice between the two remedies [damages or accounting of profits] cannot be left entirely to the successful plaintiff." (para. 77)

648    In past cases, the right to elect has been denied for a variety of reasons; delay in bringing forward the action for infringement (*Consolboard (1978)*); "misconduct on the part of the patentee" and "the good faith of an infringer" (*J.M. Voith GmbH v. Beloit Corp.*, [1997] 3 F.C. 497, 214 N.R. 85 (Fed. C.A.), paras. 111 and 119); and, where "the Plaintiffs essentially threw in the towel and left this action to proceed in a leisurely fashion" (*Merck & Co. v. Apotex Inc.* (2006), 2006 FC 524, 282 F.T.R. 161 (Eng.) (F.C.), (*Merck & Co. (FC)*) para. 229). Obviously, all of these cases are very fact specific and quite distinguishable from the present situation. Still, they are useful with respect to factors to be considered in the course of the exercise of this Court's discretion.

649    Apotex submits that Lilly does not come before this Court with clean hands, given the evidence of its anti-competitive conduct in acquiring title to the Shionogi patents and in attempting to prevent generic entry into the market for dosage form cefaclor. Fundamentally, Apotex also argues that the right to elect should be denied as Lilly has not diligently prosecuted this action, which took nearly eleven years to come to trial and is inherently complex. Finally, Apotex submits that the fact that the type of infringement, that is by importation, should be considered by this Court and lead it to deny the right to elect.

650    Apotex argues forcefully against the awarding of the right to elect and advocated that damages be assessed only in accordance with a reasonable royalty. Then Apotex performs an intellectual *volte-face* to argue that should the Court refuse to limit damages to the equivalent of a reasonable royalty, then Lilly should only be entitled to an accounting of profits, which represents less than the amount of general damages which would be payable.

651    Although Apotex does not appear to make a distinction between the infringement of the Lilly and the Shionogi patents, the issue of royalties can only apply to the Shionogi patents. Also, a reasonable royalty is only acceptable as a measure of damages for sales made by the infringer that would not have been made by the plaintiff.[274] Although Lilly was not practicing the Shionogi patents per say, it had a product on the market, the sale of which was allegedly harmed by Apotex's entry with an infringing product.

652    In such circumstances, the Court sees no good reason to limit Lilly's damages to a reasonable royalty. Having considered and evaluated the circumstances of this case overall, the Court is satisfied that the proper exercise of its discretion is to afford Lilly the right to elect between an accounting of profits and damages. Should Lilly elect for damages, it should be clear that they will have to establish what sales were directly lost as a result of Apotex's infringement.

653    With respect to the alleged anti-competitive conduct, as mentioned above, the Court does not believe that in this case such allegations are valid basis for denying Lilly the right to elect.

654    As for the alleged delay, while this action did indeed take nearly eleven years to get to trial, the Court is not of the opinion that this constitutes an excessive delay in the circumstances[275] and does not find elements of misbehaviour in the course of the conduct of the action by Lilly that would justify denying the remedy sought. It should also be noted that in this case, the last of the patents at issue expired on July 26, 2000. As such, any delay in getting the present action to trial after this date is somewhat irrelevant for the purposes of an accounting for profits as no infringing act occurred thereafter.[276]

655    In addition, Apotex was aware that Lilly and Shionogi opposed the issuance of an NOC for Apo-cefaclor as soon as 1993, date at which the PM (NOC) proceedings were instituted against it. As soon as Apotex entered the market, Lilly instituted an action for infringement.[277] While it was discontinued, the second action came shortly thereafter, in June, 1997. Apotex knew or ought to have known that Lilly would enforce its patent rights.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

656     Rather, Apotex's insistence that the Court deny Lilly the right to elect and limit damages to a reasonable royalty is consistent with its assertion that it has the right to infringe at the lowest possible cost. As will be reiterated in the reasons dismissing Apotex's counterclaim, the Court cannot endorse such an approach.

### 11.3. Exemplary/Punitive Damages

657     In *Lubrizol Corp. v. Imperial Oil Ltd.*, [1996] 3 F.C. 40, 197 N.R. 241 (Fed. C.A.) the Federal Court of Appeal, citing the Supreme Court of Canada in *Hill v. Church of Scientology of Toronto* (1995), [1995] 2 S.C.R. 1130, 24 O.R. (3d) 865 (note) (S.C.C.), held that "the Court cannot decide whether exemplary damages are required until after it decides whether the general damages were insufficient for punishment and deterrent purposes. In other words, the Court must first assess the general damages." (para. 36) Therefore, the Court cannot award punitive damages at this stage as the question of general damages has been bifurcated.

658     However, the Court may rationally determine if the circumstances here "warrant the addition of punishment to compensation in a civil action" (*Whiten v. Pilot Insurance Co.*, 2002 SCC 18, [2002] 1 S.C.R. 595 (S.C.C.), para. 67 (*Whiten*)). In this case, the addition of punishment is not warranted and punitive damages will not be awarded, irrespective of the result arrived at concerning the quantification of damages or the amount of profits.

659     In crafting the appropriate remedy, Lord Diplock in *Cassell & Co. v. Broome*, [1972] A.C. 1027 (U.K. H.L.) opined that Courts must strive to determine "how, *in particular*, an award would further one or other of the objectives of the law" (emphasis in the original, para. 71). The objectives of punitive damages have been established as "punishment (in the sense of retribution), deterrence of the wrongdoer and others, and denunciation" (*Whiten*, para. 68).

660     Given that punitive damages are used to attain these objectives when general damages are insufficient to do so, the conduct which attracts such an award must be rationally connected to the conduct for which compensation is awarded. Lilly bases its claim for punitive damages on Apotex's conduct in the course of the prosecution of this action. This has nothing to do with the conduct for which compensation is awarded, which is infringement. Applying these principles, the Court concludes that this conduct is more properly dealt with in the context of an award for costs.

661     This position is consistent with that taken by Prothonotary Roza Aronovitch in a decision dealing with proposed amendments to Lilly's statement of claim in 2003. At the time, Lilly sought to add allegations pertaining to Apotex's conduct in prosecuting the action as a basis for its claim of punitive damages. Leave in this regard was denied as the conduct alleged in the amended plea, which is of the same nature than that which is advanced today, "is not conduct that can ground an award of punitive or exemplary damages." (*Eli Lilly & Co. v. Apotex Inc.* (2003), 2003 FC 978, [2004] 1 F.C.R. 360 (F.C.), para. 14)

662     In support of this conclusion, Prothonotary Aronovitch explains that:

> The underlying action, is on account of patent infringement. Apotex's alleged failure to disclose relevant documents such as to needlessly prolong the prosecution of this action and cause the plaintiffs to incur expense, is not a means, aggravation or continuation, of the alleged infringement. Any delay and additional expense Lilly incurred in prosecuting the action can be compensated by an award of costs.

> [para. 14]

663     There is some basis for arguing that since Apotex had full knowledge of all the facts and nonetheless chose to engage in conduct which infringed on Lilly's patent rights, its conduct is in fact particularly egregious, warranting an award of punitive damages. However, this element has already been weighted in affording Lilly with the right to elect for an accounting of Apotex's profits. Thus, the comments of the Supreme Court of Canada in *Whiten* to the effect that "it is rational to use punitive damages to relieve a wrongdoer of its profit where compensatory damages would amount to nothing more than a licence fee to earn greater profits through outrageous disregard of the legal or equitable rights of others" (para. 72) do not apply to the case at bar.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

664    While the awarding of punitive damages to Lilly was contested on the merits by Apotex, it was also submitted that Lilly's statement of claim did not adequately support its claim in this respect. In order to remedy this situation, Lilly sought leave to amend its statement of claim on December 19, 2008. Lilly's motion raises concerns with regards to whether it constitutes a collateral attack on the 2003 decision of Prothonotary Aronovitch cited above. Despite this, the Court has examined the merits of Lilly's claim for punitive damages without regard to the question as to whether or not such claim was properly pleaded. Given the Court's conclusion on the merits in this respect, Lilly's motion is entirely academic. The claim for punitive damages would fail irrespective of whether leave to amend was granted or not.

### *11.4. Interest*

665    When a cause of action arises outside of, or in more than one, province, subs. 36(2) of the *Federal Courts Act*, R.S.C. 1985, c. F-7, applies, giving jurisdiction to this Court to include an award of prejudgment interest, at a rate it considers reasonable in the circumstances, on a sum of money representing damages. Unless the Court is awarding interest pursuant to para. 36(4) (f) of the *Federal Courts Act* (such as interest awarded in equity) or exercising its admiralty jurisdiction, [278] Apotex's position that pre-judgment interest awarded on an award for damages cannot be compounded is correct.

666    By operation of para. 36(4)(b) of the *Federal Courts Act*, interest cannot be awarded by virtue of subs. 36(2) on interest accruing under s. 36. This, the Courts have determined, precludes prejudgment compound interest from being awarded on damages (*Merck & Co. (FCA)*).

667    However, that is not to say that the reference which will deal with the quantification of damages or profits (depending on Lilly's election) cannot award compounded pre-judgment interest (even at an elevated rate) as an element of compensation, provided it is adequately proven by Lilly. When so awarded, interest becomes part of a damage award and is not itself an award of interest.

668    In *Bank of America Canada v. Mutual Trust Co.*, 2002 SCC 43, [2002] 2 S.C.R. 601 (S.C.C.) (*Bank of America Canada*), Justice John Major held that "[c]ompound interest is now commonplace. [...] It is for reasons such as these that the common law now incorporates the economic reality of compound interest. The restrictions of the past should not be used today to separate the legal system from the world at large." (para. 44)

669    Justice Major recognized that "the court has the jurisdiction to award compound interest under the court's general equitable jurisdiction" (para. 42). This right is such as what is covered by para. 128(4)(g) of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, the equivalent of para. 36(4)(f) of the *Federal Courts Act*, which is also mirrored at para. 2(2)(i) of Alberta's *Judgment Interest Act*, R.S.A. 2000, c. J-1.

670    *Bank of America Canada* is a contract case and on that basis the Ontario Court of Appeal had concluded that equity did not apply and thus there was no interest payable "by a right other than under [s. 128]" and the prohibition of an award of interest on interest provided for at para. 128(4)(b) of the *Courts of Justice Act* [279] applied. However, the Supreme Court of Canada held that para. 128(4)(g) of the *Courts of Justice Act* does not exist purely to provide for the right to receive compound interest in equity. A common law right of interest can be an "other right" which avoids the application of the above-mentioned statutes. This decision has led the Courts to re-examine the issue of compound interest.

671    For example, the Alberta Court of Appeal in *Alberta (Minister of Public Works, Supply & Services) v. Nilsson*, 2002 ABCA 283, 220 D.L.R. (4th) 474 (Alta. C.A.) concluded that "Bank of America mandates a common law availability where compound interest is necessary to compensate accurately for the proven damages." (para. 185) [280] This is justified in its view as:

> [N]otions of commercial fairness favoured an award of compound interest, as did the principle of restitutio in integrum. It recognized that if the plaintiffs were not awarded compound interest, they would suffer incompensable loss [...]

> [para. 183]

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 250 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

672    What is more, the reasoning of *Bank of America Canada* has even been applied in British Columbia, where the relevant legislation, the *Court Order Interest Act*, R.S.B.C. 1996, c. 79, s. 2, does not have a proviso for the exemption of the statute where interest is payable by virtue of an "other right". For example, in *Morriss v. British Columbia*, 2007 BCCA 337, 281 D.L.R. (4th) 702 (B.C. C.A.), the British Columbia Court of Appeal held that "where compound interest is required to provide full compensation, an award of compound interest generally should not be discretionary. In that context, the plaintiff is entitled to compound interest as a matter of law." (para. 37)

673    In the present circumstances, the Court is not in a position to evaluate whether or not Lilly is entitled to pre-judgment interest as part of its damages for, as mentioned, "any question as to damages suffered by [Lilly]" has been bifurcated pursuant to the November 29, 1999 order of Justice Hugessen. [281] Thus, in the course of the reference, Lilly has the opportunity to attempt to establish that an award of compound interest is required to provide full compensation, as well as the appropriate rate of interest to achieve this aim. If this is established, the interest so payable is by a right other than under subs. 36(2) of the *Federal Courts Act* and para. 36(4)(f) of this Act would prevent the Court from awarding pre-judgment interest under its subs. 36(2).

674    There is not real doubt that pre-judgment interest can and should be awarded in this case but the Court is unable, for the reasons just explained, to determine which provision of the *Federal Courts Act* is applicable. Therefore, in order to ensure that a form of pre-judgment interest is awarded irrespective of the outcome of the reference, the Court will grant simple pre-judgment interest at the rate to be calculated separately for each year since the infringing activity began at the average annual bank rate established by the Bank of Canada as the minimum rate at which the Bank of Canada makes short-term advances to the banks listed in Schedule 1 of the *Bank Act*, R.S.C. 1985, c. B-1. However, this award is conditional upon the reference judge not awarding interest under para. 36(4)(f) of the *Federal Courts Act*.

675    As for the question of post-judgment interest, it is well established that the appropriate rate is 5%, not compounded, as established by s. 4 of the *Interest Act*, R.S.C. c. I-15 (*Janssen-Ortho (2006)*, para. 166; *Merck & Co. (FC)*, para. 241; and, *Laboratoires Servier*, para. 513).

### *11.5. Costs*

676    Lilly made detailed representations seeking to establish that Apotex's conduct in the course of this action warrants the grant of solicitor-client costs. Among these elements, Lilly cites the failure to provide proper documents relating to manufacturing processes, late discovery productions, wasteful experiments rendered necessary by Apotex's failure to provide proper discovery, lack of notice for testing conducted by Apotex, deficient pleadings, lack of pre-trial cooperation, unnecessary duplication of expert's evidence and especially the failure to disclose, even to the Court (Justice Hugessen), communications with Lupin concerning its manufacturing processes. The Court also notes that while hundreds of prior art references were initially mentioned, Apotex failed to include many of those which were relied upon by its own experts, forcing Apotex to seek leave to amend in the course of the trial.

677    In respect of the failure to disclose Lupin information and communications, Apotex has chosen not to present any evidence as to how it happened and why this failure was not or could not have been discovered earlier. It is difficult to imagine that the file would not have been closely revised in preparation for trial, regardless of whether the July 4, 2000 letter from Lupin was inadvertently filed by a clerk without bringing it to the attention of the lawyers concerned. No good explanation was given as to why the documents in possession of Mr. Singh, as well as the case of documents sent to Lilly mere weeks before the trial could not have been obtained in a timelier manner.

678    There is also no doubt that the pleadings, including the list of prior art, should have been revised before trial and that Apotex's failure to produce translations of some of its prior art and to come to an agreement on a joint book of documents comprising most of the documents used at trial resulted in a loss of time and efforts by all involved, including the Court. Also, as mentioned earlier, Apotex has chosen to pursue many arguments which should, in my view, have been abandoned, at the very least during final arguments.

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 251 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

679    On the whole, and after considering Apotex's arguments, the Court finds that Apotex acted in a way which unnecessarily lengthened the duration of the proceedings and there is no doubt that an elevated award of costs is appropriate here. However, the personal sanctions against counsel for Apotex sought by Lilly are not.

680    That said, how much more is the real question. While costs on a solicitor-client scale would be justified in respect of certain services directly related to the behaviour, for example the motions leading to the order of Justice Hugessen dated August 5, 2000 and the last minute examinations of the boxes of documents received shortly before trial, it would be excessive to simply grant the costs of the whole proceeding on this basis.

681    At this stage, there is simply not enough information before the Court to give detailed directions as to costs. For this reason, the Court will issue a more detailed order after giving an opportunity to the parties to make further submissions in respect of the amount of costs only. Lilly's submissions should include a ballpark figure of costs assessed in accordance with the top of the scale of column V of Tariff B as well as solicitor-client costs for all the services related to the activities mentioned above.

682    In any event, the plaintiffs shall be entitled to assess costs of two counsel as well as reasonable expert witness fees and disbursements for the expert witnesses who testified at trial except for Dr. Gorenstein.

**12. Apotex's Counterclaim**

683    On March 9, 2001, Apotex brought a counterclaim against Lilly, seeking damages pursuant to s. 36 of the *Competition Act*. On November 25, 2002, Apotex amended this counterclaim, adding Shionogi as a defendant. Apotex alleges that:

> Shionogi knowingly conspired, combined, agreed, or arranged with Eli Lilly and Company, Eli Lilly Canada, Inc. (collectively, "Lilly") or both, to allow Eli Lilly and Company to acquire the Canadian patents and patent rights granted to Shionogi under Canadian Letters Patent Nos. 1,095,026, 1,132,547, 1,136,132 and 1,144,924 (the "Shionogi Patents") for the purpose, and with the result, of preventing or impeding other manufacturers from producing or acquiring cefaclor, and so prevent or impede competition in the Canadian market for cefaclor. [282]

Such conduct is alleged to be contrary to s. 45 of the *Competition Act*.

684    At trial, Apotex called 4 fact witnesses. The first of these witnesses was Dr. Sherman, who as mentioned is and was at the relevant time the Chairman of the Board and Chief Executive Officer of Apotex. He testified as to his knowledge of the Canadian pharmaceutical industry, Apotex's practices and strategies generally as well as specifically in relation to cefaclor. He also testified about two meetings he allegedly had with representatives of Lilly Canada in July, 1994 and February, 1996. Dr. Sherman could not remember the name of the people he met except for that of Terry McCool. The parties to the counterclaim also agreed to include the transcript of Dr. Sherman's testimony in the main action as part of the evidence in the counterclaim. [283]

685    Dr. Sherman's testimony was supplemented by that of two other Apotex employees, Mr. Jack Kay and Mr. Gordon Fahner. Since 1995, Mr. Kay has been the President and Chief Operating Officer of Apotex, having previously held the position of Executive Vice-President. Mr. Fahner has been Apotex's Vice-President of Finance since 2003, having held the position of Director of Finance at the relevant period.

686    Mr. Kay, like Dr. Sherman, testified as to his knowledge of the Canadian pharmaceutical industry generally as well as the competitive landscape for cefaclor particularly. He also testified about the meetings he had with Lilly Canada representatives. Mr. Fahner, meanwhile, testified as to accounting practices at Apotex, its financial systems as well as costing practices. The last point was the subject of an objection but it is not instrumental in any way to the points upon which this decision turns. Mr. Fahner also touched on Apotex's rebate practices and the transcript of his testimony in the main action was also included as evidence in the counterclaim by consent of the parties.

687    The last fact witness called by Apotex was Mr. Barry Fishman, who is the President and Chief Executive Officer of Novopharm but was, from 1992 to 1997, Vice-President of Marketing at Lilly Canada. Mr. Fishman testified as to the marketing

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 252 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

of cefaclor at Lilly as well as the agreement entered into by Lilly with Pharmascience. Many objections were formulated with regard to his testimony. The Court did not find any of his evidence determinative or even particularly relevant with regard to any of the issues dealt with in these reasons and thus these objections need not be considered further.

688    Lilly and Shionogi called 6 fact witnesses. The first Lilly witness was Mr. Thomas L. Pytinia, a former Lilly employee who started with the company in 1974. Among other things, Mr. Pytinia served as general counsel for Lilly's pharmaceutical division between 1994 and 1998. From 1989 to 1994 he was counsel and secretary for Lilly International Corporation.

689    Mr. Pytinia's testimony consisted of identifying documents from Lilly's records, including the agreements of 1975 and 1995 between Lilly and Shionogi. Also, he testified as to the timing of negotiations between Shionogi and Lilly leading up to the assignment of the Shionogi patents and to his belief that prior to this assignment Lilly held an exclusive licence under these patents. He also testified as to the agreements entered into by Lilly with suppliers of bulk cefaclor, including confidentiality agreements, with respect to which he was involved in negotiations and draftings.

690    Shionogi's first witness was Mr. Takayuki Wada, who testified with the help of an interpreter. Mr. Wada is a retired Shionogi employee, who worked there from 1955 to 1992. At retirement, he was a member of Shionogi's patent department, having previously been a researcher within its research department up until 1965, when he was transferred to the patent department.

691    He testified as to his involvement with the research team working on the development of three halo cephalosporins from penicillin. He appears to have been a *de facto* leader of the group and as such he met with Shionogi scientists on a daily basis. He also stated that Shionogi became involved in this research as a result of a visit from Dr. Marvin Gorman of Lilly in July, 1974. He testified that the Shionogi scientists (not identified particularly) had conveyed the results of their research to Lilly with respect to the subject matter of the Shionogi process starting in November, 1974. He explained his understanding of the 1975 agreement that was circulated within the patent department at the relevant time. He also indicated that he was personally involved in the matter when the joint research project was terminated in 1976.

692    Objections were formulated with respect to this testimony, particularly in respect of matters where Mr. Wada was not personally involved such as the June, 1974 meeting and the alleged telephone conversation between the Shionogi and Lilly scientists. The Court agrees with Shionogi's arguments as expressed in their submission dated October 28, 2008,[284] except in respect of the communication of their research results to Lilly. To determine whether more detailed reasons about this conclusion were necessary, the Court considered the issues on which this decision is based with and without the benefit of Mr. Wada's testimony. As the result would remain unchanged, it is not necessary to comment further on the objection.

693    Mr. Wada, who drafted the Shionogi patent applications filed in Japan, also testified as to the patent filings both in Japan and abroad and the input provided by Lilly in this regard. Despite the fact that Apotex challenged Mr. Wada's credibility based on the fact that he was still receiving a pension from Shionogi and had also acted as a consultant for Lilly in respect of Japanese patent filings after his retirement, the Court finds Dr. Wada to be a very credible witness.

694    Lilly's next witness was Ms. Mary Anne Tucker, a former employee of Lilly (U.S.), now an attorney at Tucker Law Offices in Brownsburg, Indiana. Ms. Tucker started her career at Lilly in 1967 as a chemist. After obtaining her law degree, she worked as a tax attorney (1973) and then in the International Patent Group of Lilly's patent law department beginning in or around 1976. She testified as to the communications that she had in the latter capacity with Dr. Kanazawa and Mr. Wada at Shionogi in the course of the cooperation between Lilly and Shionogi regarding the filing of the foreign patent applications for the 3-halo-cephem project. Although Ms. Tucker was directly involved in some of the correspondence filed in this respect, she had little independent recollection of these events.

695    Lilly then called Mr. Terry McCool,[285] director of corporate affairs at Lilly Canada since 1991. He testified as to the meetings he had with Mr. Kay when Lilly was attempting to deal with the impending loss of patent protection on a number of molecules (including cefaclor) by seeking partnership with generic drug companies in Canada. This testimony is in direct

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 253 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

contradiction with that of Dr. Sherman given that Mr. McCool denied having ever met Dr. Sherman. On the other hand he acknowledged meeting with Mr. Kay and his recollections were more in line with the latter's description of the events.

696     It is worth mentioning that the meetings between Apotex and Lilly, discussed by Mr. Kay and Mr. McCool, were first alluded to in the testimony of Dr. Sherman. Those facts were not pleaded and no discovery took place in that respect. Apotex argues that this was not necessary as the evidence of the meetings only served to establish Lilly's intent to lessen competition. In the Court's view, all relevant facts must be pleaded whatever they are meant to establish. In any event, and even if this evidence was admissible, in light of the contradictory evidence in this regard, including as to what exactly was said at this (or these) meetings, the Court would not have been prepared to draw any conclusion on this basis.

697     The second witness for Shionogi was Mr. Sachio Tokaji, the senior executive officer of the company. As for Mr. Wada, Mr. Tokaji was aided in his testimony by an interpreter. Mr. Tokaji joined Shionogi's marketing department in 1970, moving to the accounting department in 1975 and rising through the ranks to eventually become a director of the company. In 2007, he was promoted to the position of executive officer before being appointed to his current position in April, 2008.

698     Mr. Tokaji had little personal knowledge of the relevant events. He testified as to Shionogi's marketing of third-party products in Japan, particularly Lilly products, including cefaclor. He also offered evidence as to Shionogi products being sold through licensing arrangements, particularly with Lilly and Schering-Plough. Mr. Tokaji also explained the nature of Shionogi and Lilly's long-standing relationship (one hundred years). Although his evidence adds very little to the evidence already included in A-29 and the admitted facts, his testimony was the subject of many objections from Apotex.

699     Again none of the contested evidence is determinative. To avoid any further debate the Court disregarded the evidence that was the subject of the objection particularly in respect of the factors which were considered by Shionogi in decisions concerning licensing (those were made by the board of directors of the company at the time when Mr. Tokaji was not involved).

700     In the course of the cross-examination of Mr. Tokaji, Apotex sought to introduce in evidence a series of correspondence between Lilly and Shionogi (TX-252 to 259) of which he had no personal knowledge. However, Mr. Tokaji was able to identify the names of the persons within Shionogi to whom these letters were circulated as well as various markings which represented departments within Shionogi which had received said letters (mostly translation of the Japanese characters).

701     The last witness for Lilly was Mr. Peter Stringer, who in 1994 was the Director of International Patents at Lilly (U.S.) in charge particularly of the enforcement of said patents outside of the U.S. Mr. Stringer indicated how and why it was at his request that the Canadian patent be included in a 1995 agreement. The sole purpose of his testimony was to shed light on the context of correspondence between Lilly and Shionogi just prior to the assignment which Apotex sought to enter as evidence in the course of the cross-examination of Mr. Tokaji (TX-252 to 259). This was the subject of an objection by both Lilly and Shionogi and Mr. Stringer's evidence was heard under reserve pending the determination of these objections.

702     With regard to TX-252 to 259, the Court has come to the conclusion that these exhibits are not admissible in evidence. In arguing for their inclusion as evidence in these proceedings, Apotex relied on para. 69(2)(c) of the *Competition Act*:

   (2) In any proceedings before the Tribunal or in any prosecution or proceedings before a court under or pursuant to this Act,

      (c) a record proved to have been in the possession of a participant or on premises used or occupied by a participant or in the possession of an agent of a participant shall be admitted in evidence without further proof thereof and is *prima facie* proof

         (i) that the participant had knowledge of the record and its contents,

         (ii) that anything recorded in or by the record as having been done, said or agreed on by any participant or by an agent of a participant was done, said or agreed on as recorded and, where anything is recorded in or by the record as having been done, said or agreed on by an agent of a participant, that it was done, said or agreed on with the authority of that participant, and

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 254 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

(iii) that the record, where it appears to have been written by any participant or by an agent of a participant, was so written and, where it appears to have been written by an agent of a participant, that it was written with the authority of that participant.

(2) Dans toute procédure engagée devant le Tribunal ou dans toute poursuite ou procédure engagée devant un tribunal en vertu ou en application de la présente loi:

c) s'il est prouvé qu'un document a été en la possession d'un participant, ou dans un lieu utilisé ou occupé par un participant, ou en la possession d'un agent d'un participant, il fait foi sans autre preuve et atteste:

(i) que le participant connaissait le document et son contenu,

(ii) que toute chose inscrite dans le document ou par celui-ci enregistrée comme ayant été accomplie, dite ou convenue par un participant ou par l'agent d'un participant, l'a été ainsi que le document le mentionne, et, si une chose est inscrite dans le document ou par celui-ci enregistrée comme ayant été accomplie, dite ou convenue par l'agent d'un participant, qu'elle l'a été avec l'autorisation de ce participant,

(iii) que le document, s'il paraît avoir été écrit par un participant ou par l'agent d'un participant, l'a ainsi été, et, s'il paraît avoir été écrit par l'agent d'un participant, qu'il a été écrit avec l'autorisation de ce participant.

703    The Court is of the view that this provision only applies to evidence tendered in the course of a party's case in chief. Here, Apotex sought to tender the evidence after having closed its case in chief and in the course of the cross-examination of a witness for Shionogi. Furthermore, the Court is not faced here with an evidentiary problem which causes injustice to Apotex. Rather, it is an evidentiary problem largely created by Apotex.

704    Indeed, these documents were known to Apotex well before it attempted to have them entered into evidence on September 22, 2008. The documents were a subject of examinations for discovery. Apotex and Shionogi had agreed as to read-ins of said discovery, which Apotex decided finally not to pursue. The documents could have been properly introduced in evidence in this fashion; Apotex chose not to. It is not as if Apotex was not aware, prior to the commencement of this trial, of the significance of these documents — the reports of its own experts refer to them. What is more, Apotex was offered the opportunity by the Court to re-open its case to allow for the proper introduction into evidence of these documents. This offer was declined.

705    Taking into account the totality of these circumstances, the Court finds the authorities cited by Apotex in support of its attempt to tender the documents to be readily distinguishable. The documents marked TX-252 to 259 are not admissible in evidence. This being said, the Court has examined the issues relevant to its determination of the counterclaim both with and without said evidence. Either way, the conclusions arrived at remain unchanged.

706    Turning now to the experts, Apotex called six expert witnesses and Lilly and Shionogi collectively called two experts witnesses.[286] Among the experts testifying on Apotex's behalf, three of them, Aidan Hollis, Jeffrey Church and Thomas Ross, were economists (see details of their qualifications in Chart A). Although it is clear that these experts have experience in applying tests with respect to anti-competitive behaviour under the *Competition Act*, the latter two do not have any particular knowledge or expertise in respect of the pharmaceutical industry.

707    The first, Dr. Hollis, was tasked with defining the relevant market for bulk cefaclor in order to determine whether or not the assignment of the Shionogi patents to Lilly would have had an effect on Lilly's market power. Dr. Church and Dr. Ross then sought to establish the competitive effects of the transfer of Shionogi's patent rights to Lilly and the harm suffered by Apotex as a result of this transfer given its position as a bulk purchaser of cefaclor.

708    A part of the proposed qualification of Dr. Hollis, which included expertise in prescribing practices, elicited an objection. As the herein decision does not turn in any way on evidence of physician prescribing practices, this issue need not be decided.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 255 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

709     Other experts testifying on Apotex's behalf included Dr. Robert McClelland, a chemist; Mr. Stephen Cole, a chartered accountant and business valuator; and, Dr. Marvin Gans, a physician specialised in paediatrics. Dr. McClelland, who had testified in the main action, filed a report explaining the distinction between the Lilly and Shionogi patents and processes and as to whether or not, as of 2003, there existed other publicly known commercially viable processes that could be used to make bulk cefaclor. His testimony sought to establish one of the main, if not the most important, premises for the economists' opinions, particularly those of Dr. Church, [287] which is that only two processes were known to exist for making cefaclor.

710     At first the Court was somewhat puzzled by Apotex's position in the counterclaim given that in the main action it had adamantly defended its position that it used a non-infringing process. Dr. McClelland also indicated in cross-examination that he had reached the same conclusion when asked by Apotex to carry out the same research in the late 1990's (1997 or 1998) and that, although not mandated by Apotex to do so, in 1985 anybody carrying out the same research would have probably come to the same conclusion.

711      Mr. Cole filed a report on how the damages of Apotex should be calculated and gave some indication as to the licensing rate that should have applied had Shionogi licensed Apotex for the use of its patented processes. Lilly objected to the qualification of Mr. Cole as an expert on the grounds that his opinion did not offer an estimate of damages, which is all an accountant may do in an expert report. Further, Lilly objected to Mr. Cole providing an opinion as to the setting of royalty rates, as Mr. Cole had no expertise in this regard. Indeed, the portion of Mr. Cole's evidence dealing with royalty rates would have had very little weight, for the comparables he used were questionable and insufficient, and he has little expertise dealing with such matters. That said, the level of royalties was not an issue on which the Court reached a conclusion.

712      Finally, Dr. Gans offered evidence as to how physicians select the medicines they prescribe to patients, particularly antibiotic medication. This evidence was put forth by Apotex to contest the defendants by counterclaim's position that the relevant market for the purpose of a s. 45 inquiry was that of dosage form antibiotics of the same class as cefaclor, as opposed to that of bulk cefaclor. Given the basis of my decision this question has not been considered at all; nor has Dr. Gans' evidence.

713     Experts testifying on Lilly and Shionogi's behalf included one economist, Dr. Iain Cockburn and a physician specialised in microbiology, Dr. Donald Low. Dr. Cockburn, who has more expertise than Apotex's experts with respect to certain pharmaceutical products and licensing practices in the pharmaceutical industry, set out to provide an opinion on the impact of the 1995 Assignment Agreement between Lilly and Shionogi on competition and on Apotex particularly. Dr. Cockburn commented on the main reports of Apotex's three experts on economics.

714      Dr. Low provided an opinion concerning antibiotics, particularly cefaclor and its related or competing products and their use in Canada in the treatment of bacterial infections. Once again this evidence was not relevant to the matters on which this decision stands.

715     The expert evidence was the subject of many objections. The Court will only comment on those that were relevant to the findings on which this decision turns.

716     In weighing this expert evidence, the Court applied the factors set out by the Supreme Court of Canada in *R. v. Mohan* (1994), [1994] 2 S.C.R. 9, 114 D.L.R. (4th) 419 (S.C.C.) (*Mohan*). As explained by Justice John Sopinka, speaking for the Court, "[a]dmission of expert evidence depends on the application of the following criteria: (a) relevance; (b) necessity in assisting the trier of fact; (c) the absence of any exclusionary rule; (d) a properly qualified expert." (para. 17) For example, the Court does not need expert evidence on issues such as the proper interpretation of the 1975 agreement based on an expert's analysis of the circumstantial evidence. Nor were any of those expert economists qualified to opine on such matters.

717      Much of the "expert" evidence given by the economists was really no more than arguments presented in the form of expert evidence. The three economists testifying on behalf of Apotex seemed particularly anxious to ensure that this be the first case substantively putting into play the Intellectual Property Enforcement Guidelines recently developed by the Competition

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Bureau. For reasons that follow there will be no need in this case to comment on the appropriate test to be used in the course of a s. 45 analysis nor on said guidelines.

*12.1. Relevant Statutory Provisions*

718      The right of Apotex to seek a remedy before the Federal Court arises under s. 36 of the *Competition Act*, which reads as follows:

36. (1) Any person who has suffered loss or damage as a result of

(a) conduct that is contrary to any provision of Part VI, or

(b) the failure of any person to comply with an order of the Tribunal or another court under this Act, may, in any court of competent jurisdiction, sue for and recover from the person who engaged in the conduct or failed to comply with the order an amount equal to the loss or damage proved to have been suffered by him, together with any additional amount that the court may allow not exceeding the full cost to him of any investigation in connection with the matter and of proceedings under this section.

[...]

(3) For the purposes of any action under subsection (1), the Federal Court is a court of competent jurisdiction.

(4) No action may be brought under subsection (1),

(a) in the case of an action based on conduct that is contrary to any provision of Part VI, after two years from

(i) a day on which the conduct was engaged in, or

(ii) the day on which any criminal proceedings relating thereto were finally disposed of, whichever is the later;

36. (1) Toute personne qui a subi une perte ou des dommages par suite:

a) soit d'un comportement allant à l'encontre d'une disposition de la partie VI;

b) soit du défaut d'une personne d'obtempérer à une ordonnance rendue par le Tribunal ou un autre tribunal en vertu de la présente loi, peut, devant tout tribunal compétent, réclamer et recouvrer de la personne qui a eu un tel comportement ou n'a pas obtempéré à l'ordonnance une somme égale au montant de la perte ou des dommages qu'elle est reconnue avoir subis, ainsi que toute somme supplémentaire que le tribunal peut fixer et qui n'excède pas le coût total, pour elle, de toute enquête relativement à l'affaire et des procédures engagées en vertu du présent article.

[...]

(3) La Cour fédérale a compétence sur les actions prévues au paragraphe (1).

(4) Les actions visées au paragraphe (1) se prescrivent:

a) dans le cas de celles qui sont fondées sur un comportement qui va à l'encontre d'une disposition de la partie VI, dans les deux ans qui suivent la dernière des dates suivantes:

(i) soit la date du comportement en question,

(ii) soit la date où il est statué de façon définitive sur la poursuite;

719      The only other relevant provision of the *Competition Act* (particularly part VI) is s. 45 which reads as follows:

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 257 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

45. (1) Every one who conspires, combines, agrees or arranges with another person

(a) to limit unduly the facilities for transporting, producing, manufacturing, supplying, storing or dealing in any product,

(b) to prevent, limit or lessen, unduly, the manufacture or production of a product or to enhance unreasonably the price thereof,

(c) to prevent or lessen, unduly, competition in the production, manufacture, purchase, barter, sale, storage, rental, transportation or supply of a product, or in the price of insurance on persons or property, or

(d) to otherwise restrain or injure competition unduly, is guilty of an indictable offence and liable to imprisonment for a term not exceeding five years or to a fine not exceeding ten million dollars or to both.

45. (1) Commet un acte criminel et encourt un emprisonnement maximal de cinq ans et une amende maximale de dix millions de dollars, ou l'une de ces peines, quiconque complote, se coalise ou conclut un accord ou arrangement avec une autre personne:

a) soit pour limiter, indûment, les facilités de transport, de production, de fabrication, de fourniture, d'emmagasinage ou de négoce d'un produit quelconque;

b) soit pour empêcher, limiter ou réduire, indûment, la fabrication ou production d'un produit ou pour en élever déraisonnablement le prix;

c) soit pour empêcher ou réduire, indûment, la concurrence dans la production, la fabrication, l'achat, le troc, la vente, l'entreposage, la location, le transport ou la fourniture d'un produit, ou dans le prix d'assurances sur les personnes ou les biens;

d) soit, de toute autre façon, pour restreindre, indûment, la concurrence ou lui causer un préjudice indu.

## *12.2. The Framework of Inquiry into Apotex's Counterclaim*

720     Apotex's counterclaim was the subject of summary judgment proceedings before trial, resulting in two decisions by the Federal Court of Appeal, which ultimately dismissed the motions for summary judgment. [288] The main conclusions discussed by the Federal Court of Appeal in its reasons can be summarized as follows:

1. An assignment of patent rights can implicate s. 45 of the *Competition Act*;

2. The question of whether Apotex's counterclaim is statute-barred was a matter for trial; and

3. The issue of whether Apotex suffered damages under s. 36 of the *Competition Act* was a matter to be determined at trial;

4. The assignment of the Shionogi patents to Lilly lessened competition, though whether such lessening was "undue" was a matter for trial; [289]

721     In arguing its counterclaim at trial, Apotex focused first and foremost on proving that the assignment of Shionogi's process patents to Lilly constituted a violation of s. 45 of the Act. In response, Lilly and Shionogi contested this assertion and continued to assert that Lilly had an exclusive licence under the Shionogi patents under the terms of the 1975 research and development agreement between them. All of this is perhaps understandable given this passage of the reasons of the Federal Court of Appeal, delivered by Justice John Evans:

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 258 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

The question for trial is whether the lessening of competition resulting from the assignment is sufficiently significant as to be undue: see *R. v. Nova Scotia Pharmaceutical Society*, supra at 646 and following. [290]

722     As a consequence, and despite extensive evidence presented by Apotex as to elements establishing lessening of competition in itself, let alone undue lessening, a full day of argument was entertained by the Court on the impact of this decision. The dispute centered on whether a judgment totally dismissing a motion for summary judgment can nevertheless be dispositive in part of the issues to be determined at trial, especially when such determination is not part of the order.

723     Nevertheless, nothing in the Federal Court of Appeal's decision suggests that determining whether or not Lilly and Shionogi's conduct would unduly lessen competition is either the logical or natural starting point for assessing the merits of Apotex's counterclaim. In the Court's view, assessing the s. 45 element of Apotex's counterclaim *first* is neither desirable, logical, nor in keeping with the framework of the *Competition Act*.

724     The administration and enforcement of the *Competition Act* is the responsibility of the Commissioner of Competition (the Commissioner). [291] The Commissioner causes an inquiry to be made in relation to an alleged breach of s. 45 where: i) six persons apply for such an inquiry, based on the belief that such an offence has or is about to committed; [292] or, ii) the Commissioner has reason to believe the same. [293]

725     The right of action for recovery of damages provided for in s. 36 of the *Competition Act* is a special remedy, contained in a part so labelled. Inquiries into the actions of third parties in the context of applying the substantive provisions of the Act, which is usually the purview of the Commissioner, are thus to take place only in cases where it is clear that allegedly anti-competitive conduct *has caused a person to suffer loss or damage*. The purpose of s. 36 of the Act is not to encourage persons to take the place of the Commissioner and provoke inquiries into the conduct of others. Rather, its serves the purpose of providing a means of indemnification to victims of anti-competitive conduct. [294]

726     Hence, Apotex must first prove, in accordance with s. 36 of the *Competition Act*, that it has suffered loss or damage as a result of the conduct which it alleges to be in violation of s. 45 of the Act. If Apotex cannot do so, the Court has no reason, nor jurisdiction, to inquire as to whether or not Lilly and Shionogi have conspired to unduly lessen competition. As noted by Prothonotary Roza Aronovitch:

> As a matter of law, proof of loss or damages is an essential element of the cause of action to fix civil liability for breaches of the *Competition Act: Price v. Panasonic Canada Inc.* (2002) 22 C.P.C. (5 [th]) 379 at paras. 27-28; *Culhane v. ATP Aero Training Products Inc.*, (2005), 39 C.P.C. (4 [th]) 20 at paras. 1-2; and *Eli Lilly and Co. v. Apotex* (2004), 32 C.P.R. (4 [th]) 195 at para. 6. The issues of liability and damages in respect of the conspiracy allegations are intertwined, and may not be severed. Absent proof of damages, therefore, Apotex cannot make out its civil liability claim under sections 36 and 45 of the *Competition Act*. [295]

[Emphasis added]

727     Thus, before assessing the merits of Apotex's counterclaim, the Court must first be satisfied that the counterclaim is not time-barred. Then the Court will proceed to examine if Apotex has established that it has suffered a loss or damage, and whether any such injury flows from the alleged anticompetitive acts of Lilly and Shionogi. For the reasons that follow, the Court concludes not only that the counterclaim is time-barred but also that Apotex has not established either damage or causation. As such, an analysis as to whether the 1995 assignment is contrary to s. 45 of the *Competition Act* is not required.

### 12.3. Is Apotex's Counterclaim Time-Barred?

728     As no criminal proceedings have been brought in relation to Lilly and Shionogi's alleged anti-competitive behaviour, subpara. 36(4)(*a*)(i) of the *Competition Act* is operative. As such, the Court must determine what constitutes the last day on

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 259 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

which conduct alleged to be contrary to s. 45 of the *Competition Act* was engaged in (*Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.* (1995), 25 O.R. (3d) 106, 41 C.P.C. (3d) 75 (Ont. Gen. Div.), para. 23).

729    Lilly and Shionogi both rely on the decision of Justice Judith Snider in *Laboratoires Servier* where she held that "when we come to the limitation set out in s. 36(4), the provision refers to the day on which the agreement or conspiracy was entered into." (para. 482). Thus, given that Lilly and Shionogi entered into an agreement for the assignment of patent rights on April 27, 1995, the applicable limitation period expired in 1997. [296]

730    Even if the discoverability principle, which Lilly and Shionogi argue does not apply to subs. 36(4) of the *Competition Act*, were applied in the present case, Apotex was aware of the assignment no later than 1997, at which point the agreement was pleaded in Lilly's statement of claim. Therefore, the limitation period cannot have expired any later than 1999. [297]

731    Apotex counters that the Court must consider the elements of the offence proscribed by subs. 45(1) of the *Competition Act* when interpreting its subs. 36(4), an exercise which Justice Snider failed to embark upon in *Laboratoires Servier* and which leads to the conclusion "that the two year limitation period will run, at the earliest, from conduct flowing from the agreement which constitutes an undue lessening of competition." [298]

732    In Apotex's view, the limitation period should run only from the moment when "Apotex was provided notice that every alternate process that Apotex had employed was asserted by Lilly to be infringing." [299] This, in its view, occurred only in January, 2001, when Lilly amended its statement of claim to add allegations of infringement of the Lilly patents with regards to bulk cefaclor obtained from Lupin. [300]

733    Alternatively, Apotex submits that subs. 36(4) of the *Competition Act* contemplates ongoing conduct. For Apotex, "Lilly's impugned conduct continues to occur on every day thereafter that Lilly asserted against Apotex patent rights obtained pursuant to the agreement between Shionogi and Lilly and when competition was unduly lessened thereby." [301] As Lilly continues to assert rights under the Shionogi patents in the main action, the conduct contrary to s. 45 of the *Competition Act* is ongoing to this day and thus the limitation period has not expired.

734    This position was explained by Justice Evans in the context of the Federal Court of Appeal's second decision concerning a motion for summary judgment in respect of Apotex's counterclaim:

Apotex's case is that the assignment must be seen in its context: its enhancement of Lilly's market power, that is, Lilly's additional ability to act independently of the market by virtue of its ownership of the patents for all known, commercially viable processes for manufacturing cefaclor. On this view, the conspiracy continued as long as the assignment had competition-lessening effect. Because of the evidential questions to be resolved, this is not the kind of issue on which it would be appropriate to grant summary judgment. [302]

735    The assertion that anti-competitive conduct and its effects continue beyond the filing of a statement of claim in an action for infringement and until such time as the Court renders judgment in such action simply does not merit further comment.

736    This being said, the Court is prepared to accept that conduct contrary to Part VI of the *Competition Act* may "be an isolated incident or can be ongoing", [303] depending on which offence is in play in the circumstances. However, in the Court's view, ongoing conduct can only be qualified as ongoing for the purposes of subs. 36(4) so long as it continues to constitute an offence under Part VI of the *Competition Act*.

737    Thus, crucial to the determination of the applicable limitation period is the question of what conduct may form the basis of the offence which is complained of by Apotex, in this case the offence of conspiracy to unduly lessen competition provided for in s. 45 of the *Competition Act*.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 260 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

738    In *Canada v. Pharmaceutical Society (Nova Scotia)* (1992), [1992] 2 S.C.R. 606, 93 D.L.R. (4th) 36 (S.C.C.) (*Nova Scotia Pharmaceutical Society*), Justice Charles Gonthier, writing for the Court, held that an offence under the predecessor to s. 45 of the *Competition Act* (para. 32(1)(*c*) of the *Combines Investigation Act*, R.S.C. 1970, c. C-23) comprised two material elements:

(1) an agreement entered into by the accused ("Every one who conspires, combines, agrees or arranges with another person"); and

(2) an undue prevention or lessening of competition flowing from this agreement ("to prevent, or lessen, unduly, competition in the production, manufacture, purchase, barter, sale, storage, rental, transportation or supply of a product, or in the price of insurance upon persons or property..."). [304]

739    The inquiry that must be conducted to ascertain whether the elements of the offence are met is twofold: (i) market structure, "to ascertain the degree of market power of the parties to the agreement"; [305] and, (ii) behaviour of the firms. Given that for the purposes of determining the starting point of the limitation period the Court is concerned with conduct, it is the latter element which is of interest here.

740    The question of behaviour, however, is not examined from the standpoint of what effects an agreement actually has, but rather what, at the time at which it is entered into, is its object and what are the likely effects of that object on competition. As Justice Gonthier explains, "[t]he object of the agreement is without doubt the most important behavioural element of the inquiry". [306]

741    Justice Gonthier approvingly cites an earlier decision of the Ontario High Court, *R. v. Northern Electric Co.*, [1955] 3 D.L.R. 449 (Ont. H.C.), in which Chief Justice James McRuer held that:

[i]n considering whether the agreement or conspiracy comes within the statute, one does not judge the unlawfulness by what was done pursuant to the agreement (although this may be evidence of the agreement) but, as I have said, one examines the nature and scope of the agreement as proved and decides whether that agreement, if carried into effect, would prejudice the public interest in free competition to a degree that in fact would be undue. To paraphrase what was said by Duff C.J.C. in the *Container Materials* case, [1942], 1 D.L.R. 529, S.C.R. 147, 77 Can.C.C. 129, and to adapt the language of Kerwin J., one examines the agreement arrived at, no matter whether anything was done under it or not, and determines as a question of fact upon a common sense view the direct object of the arrangement complained of and determines whether that object, if put into effect, would result in an undue prevention or lessening of competition. Persons or corporations might well enter into an unlawful agreement which by reason of enforced circumstances they could not carry out; it would nevertheless be an indictable offence.

[Emphasis added, p. 469-470]

742    Chief Justice McRuer relies on the decision of the Supreme Court of Canada in *R. v. Container Materials Ltd.*, [1942] S.C.R. 147, [1942] 1 D.L.R. 529 (S.C.C.), where Justice Kerwin held that:

[o]nce an agreement is arrived at, whether anything be done to carry it out or not, the matter must be looked at in each case as a question of fact to be determined by the tribunal of fact upon a common sense view as to the direct object of the arrangement complained of. The evidence in these cases of what was done is merely better evidence of that object than would exist where no act in furtherance of the common design had been committed.

[Emphasis added, p. 159.]

743    These cases stand for the proposition that the conduct does not include anything subsequent to the actual conclusion of the agreement, which in this case is nothing other than the assignment concluded by Lilly and Shionogi on April 27, 1995. Effects may be examined for the purposes of determining whether or not this agreement was likely to unduly lessen competition, but it does not extend the period during which such conduct occurred. The strongest evidence of this is that, even if no subsequent

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

actions had been taken pursuant to an agreement, the act of entering into it would still constitute an offence if the other requirements were met.

744    The Supreme Court of Canada's decision in *R. v. Aetna Insurance Co.* (1977), [1978] 1 S.C.R. 731, 75 D.L.R. (3d) 332 (S.C.C.) (*Aetna*) does not contradict this. Writing for the majority, Justice Roland Ritchie held that the burden that fell upon the crown was to prove "that that conspiracy, combination, agreement or arrangement *if* it were carried into effect would prevent or lessen competition unduly" (emphasis in the original, p. 748).

745    The question therefore is not whether the conspiracy indeed *had* this effect but rather only whether or not this conspiracy *would have* this effect. Behaviour subsequent to the agreement is of no relevance in determining whether there has been an offence and thus cannot be of any relevance for the purposes of limitations under subs. 36(4) of the *Competition Act*.

746    The dissenting reasons of Chief Justice Bora Laskin in *Aetna* make this point in a perhaps more forceful fashion:

[the trial judge] asserted that in order to determine whether the offence charged against the appellants had been committed he was obliged to determine "whether or not there has been any undue lessening of competition". <u>This ignores the fact that the charge is one of conspiracy. It is not an ingredient of the offence that proof must be made that competition was in fact lessened unduly.</u> Even assuming (although the judge nowhere says so) that proof of an actual lessening of competition might provide support for a finding that there was a conspiracy to that end and that it was directed to an undue lessening, <u>the absence of any proof of actual lessening of competition, let alone of an undue lessening, does not conclude the matter against the Crown.</u>

[Emphasis added, p. 739.]

747    Thus, for the purposes of evaluating the limitation period under subs. 36(4), the Court need not be concerned with the effects of any alleged conspiracy. This approach was recently adopted by the Supreme Court of British Columbia in *No. 1 Collision Repair & Painting (1982) Ltd. v. Insurance Corp. of British Columbia* (1998), 4 C.C.L.I. (3d) 135, 78 A.C.W.S. (3d) 834 (B.C. S.C.), where Justice Alexander Henderson held that "[a] claim for damages under s. 45 of the Competition Act must be brought within two years from the day upon which the conduct was engaged in: Competition Act, supra, s. 36(4)(a) (i). The conspiracy alleged here was at an end by April 1, 1993." [307]

748    The significance of this is ascertained by examining the facts underlying this decision. April 1, 1993 was the date upon which the defendant, the Insurance Corporation of British Columbia, altered a procedure in a way which was fatal to the plaintiff's business. All of the anti-competitive effects complained of by the plaintiff occurred after this date. Nevertheless, the point from which the limitation period was to be calculated was deemed to be April 1, 1993, and this again, despite the fact that no anti-competitive effects had yet been felt by the plaintiff.

749    There is absolutely no evidence that suggests that Shionogi took part in any decision with regard to the enforcement of its patents in the present proceedings. Apotex does not allege any actions on Shionogi's part following the assignment which could be properly described as forming the basis for an allegation of a conspiracy.

750    The Court is satisfied that, in this case, the relevant conduct took place on April 27, 1995. Even assuming *arguendo* that the concept of discoverability was to operate in the context of subs. 36(4) of the *Competition Act*, Apotex was aware of the assignment (the conduct) no later than 1997 and the limitation period would have thus expired well before it instituted its counterclaim.

751    Even if I were wrong, as noted earlier, Apotex has raised only one discoverability issue here. It is that it did not know that Lilly asserted every alternate process employed by Apotex to be infringing until Lilly filed its amended statement of claim. Apotex has filed no evidence as to how it construed the amendments made in January, 2001 and how they had come to the vague conclusion referred to in their submission. [308] It is apparent from the correspondence of Ms. Fouillade with Lupin that Apotex had on its own come to the conclusion in September, 1997 that the Lupin process described in the Health Canada material

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 262 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

infringed the Lilly patents. How could Apotex doubt at that time that Lilly would enforce its patents? Is that not the very reason why they tried to develop a non-infringing process with Lupin?

752    If the argument is meant to refer to the third process ("contract process"), there is no mention of that process in the amended statement of claim. Moreover, the argument is surprising, given that Lilly's position has always been that there were only two methods [309] actually used by Apotex's suppliers to make cefaclor. Lilly never alleged or asserted that the "contract process" was infringing. Apotex has thus not established that it could only have discovered the relevant elements of the offence in January, 2001.

753    As mentioned in my reasons in the main action, Apotex argued that time limitations do not affect its right to claim equitable set-off against Lilly's claim for infringement damages. The Court agrees with Lilly that equitable set-off is a defence; it cannot be raised in the context of a counter-claim. I have already dealt with this defence to the main action and need not say anything further here.

### 12.4. Apotex's Claim for Damages

754    In its Reply to demand for particulars, dated December 10, 2002, Apotex pleaded that:

[t]he injuries sustained by Apotex as a consequence of the Plaintiffs' anti-competitive activity include (a) any monetary liability in respect of the Shionogi Patents, (b) the difference between cost to Apotex of acquiring bulk cefaclor in the absence of Lilly's anti-competitive actions, and the costs it actually incurred, (c) the litigation costs incurred in this proceeding, and in the proceeding under the *Patented Medicines (Notice of Compliance) Regulations* in respect of the Shionogi Patents, and (d) the lost profits associated with the delay in entering the Canadian and international market for finished dosage forms of cefaclor.

755    Very late in the course of the trial, Apotex sought and obtained leave to amend these pleadings with respect to item (a), in order to add any monetary liability in respect of the Lilly patents. [310] At trial, Apotex did not pursue its claim for the litigation costs incurred in the proceeding under the PM (NOC) Regulations, nor with respect to the claim under item (d), given that it is an admitted fact that Apotex faced no such delay. [311]

756    Pursuant to the bifurcation order of Justice Hughes dated May 8, 2007, Apotex is not required to quantify its loss with respect to potential infringement liability. As mentioned in the judgment on the main action, such liability is to be quantified at a later stage. Apotex must nonetheless prove its entitlement to a set-off against Lilly's claim of infringement as well as its actual loss with respect to the other heads of damages claimed.

### 12.5. The Applicable Evidentiary Standard

757    Apotex argues that assessing damages and causation requires application of an evidentiary standard that assigns probabilities of occurrence to all events which "are not merely speculative" [312] and for which only the sum of the probabilities assigned to each need cross the balance of probabilities threshold of more than 50%.

758    This, Apotex argues, is necessary because the determination of causality and quantification of loss requires a comparison between occurrences in the actual world and a hypothetical "but for world". For Apotex, this "but for world" encompasses a number of scenarios in which the Shionogi patents have not been assigned to Lilly. [313]

759    In support of its position, Apotex relies on the decision of the Supreme Court of Canada in *Athey v. Leonati*, [1996] 3 S.C.R. 458, [1996] S.C.J. No. 102 (S.C.C.) (*Athey*), where Justice Major, at para. 27 of the judgment of the Court, held that:

[h]ypothetical events (such as how the plaintiff's life would have proceeded without the tortious injury) or future events need not be proven on a balance of probabilities. Instead, they are simply given weight according to their relative likelihood

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

760    The above-mentioned passage, however, arose in the context of the Court examining adjustments for contingencies, which are future uncertain consequences of a tortious act. The Supreme Court of Canada expressly held that this approach was limited to the evaluation of potential future or hypothetical events for the purpose of assessing quantum of damages.

761    None of the losses complained of by Apotex are potential or hypothetical events in that sense. First, infringement liability has been assessed in the main action and the fact that the quantum will be assessed at a future date does not render this a future and uncertain development. Second, the cost differential for bulk cefaclor concerns only purchases made in the past, more precisely from November, 1996 to October, 1998. As explained by Justice Major in *Athey*, past events "cannot be addressed in terms of probabilities" (para. 30). As such, this passage cannot apply to Apotex's alleged injuries, for which there is no relevant future event.

762    Instead of standing for the proposition that the Court should apply a relaxed evidentiary standard, *Athey* stands for the proposition that the well-settled "but for" test is applicable to evaluating causation. In this action, Apotex must prove using the normal civil standard, that "but for" the assignment of the Shionogi Patents to Lilly, it would have avoided the claimed losses (regardless of quantum).

763    There is an alternative, but it is not what Apotex argues that the Court should apply here. It is the "material contribution" test, defined in *Athey* as where the plaintiff must show, again on a balance of probabilities, that an act was a contributing factor, outside the *de minimis* range, to an injury. Although this is the most relaxed standard of proof for causation which is recognized at law, its application is limited to very particular circumstances.

764    As explained by Chief Justice McLachlin, speaking for the Court in *Hanke v. Resurfice Corp.*, 2007 SCC 7, [2007] 1 S.C.R. 333 (S.C.C.) (*Resurfice Corp.*), its application is only open to plaintiffs for which it is impossible, due to factors that are outside their control, to prove causation by way of the "but for" test. Further:

it must be clear that the defendant breached a duty of care owed to the plaintiff, thereby exposing the plaintiff to an unreasonable risk of injury, and the plaintiff must have suffered that form of injury. [314]

765    As Chief Justice McLachlin concludes, its application is exceptional, and is limited to cases where "it would offend basic notions of fairness and justice to deny liability by applying a "but for" approach." (para. 25)

766    Such special circumstances are not present here. The impossibility of proving the required elements for the application of s. 36 of the *Competition Act* has not been established by Apotex, who bears the burden of doing so (*Barker v. Montfort Hospital* (2007), 2007 ONCA 282, 278 D.L.R. (4th) 215 (Ont. C.A.), para. 53). Again, Apotex has not argued that this should be applied here.

767    Further, as will be discussed below, the fundamental evidentiary problem (see *Bowes v. Edmonton (City)* (2007), 2007 ABCA 347, 42 M.P.L.R. (4th) 192 (Alta. C.A.), para. 235) in this case concerns Apotex's conduct in the "but for world", which, even if it constitutes an impossibility, is clearly not one outside Apotex's control.

768    Relying on *Schwarzkopf v. McLaughlin* (2008), 2008 BCSC 730, 168 A.C.W.S. (3d) 787 (B.C. S.C.), *Ticketnet Corp. v. Air Canada* (1997), 154 D.L.R. (4th) 271, 105 O.A.C. 87 (Ont. C.A.) and *Laboratoires Servier v. Apotex Inc.* (Eng. Ch. Div.), Apotex argues "that if the nature of the harm results in it being hard to prove, that should not redound to the detriment of the harmed party. The court has to do the best it can, with what it has, to come to the findings." [315]

769    By relying on these cases, Apotex is putting the cart before the horse. These cases all deal exclusively with assessment of damages, causation having already been established. They grapple with the question of assessing the level of compensation required to restore the plaintiff to the position it would have been in the "but for world". The Court here is concerned with a different question, which is the impact of the assignment on Apotex's position, in order to determine whether such restorative action is even warranted. These authorities do not assist the Court in the present circumstances.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

770    Therefore, the Court will apply the normal test for causation, keeping in mind the comments on the breadth of the burden to be satisfied as articulated by Justice Major in *Athey*: [316]

> Causation need not be determined by scientific precision; as Lord Salmon stated in *Alphacell Ltd. v. Woodward*, [1972] 2 All E.R. 475, at p. 490, and as was quoted by Sopinka J. at p. 328, it is "essentially a practical question of fact which can best be answered ordinary common sense".

### *12.6. Background*

771    As noted above, Apotex's arguments in respect of causation focus on a comparison between the actual conduct of the parties, and a "but for world" as encompassed in a number of hypothetical scenarios, in all of which Shionogi has not assigned its patents rights to Lilly. In order to assess these various "but for world" scenarios, the Court will first look at the actions of the parties in the actual world which are relevant to these scenarios (as opposed to damages or the s. 45 offence proper).

772    As early as 1986, Apotex appears to have had an interest in producing the drug cefaclor. In March, 1986, Apotex applied for a compulsory licence with respect to three Lilly Canadian patents, '537; '532; and '725. [317] The '725 patent is one of the four Lilly patents that was still in force at the date of the assignment. [318] As such, it forms part of what Apotex alleges as Lilly's post-assignment monopoly over production processes for bulk cefaclor.

773    In 1988, Apotex is granted a compulsory licence, the terms of which provide for a royalty of 4% of the net selling price to be paid by Apotex to Lilly. [319] In granting the licence, the then Commissioner of Patents specifically references an objection by Lilly to the granting of the licence, as Apotex did not request the inclusion of patents which Lilly deemed essential for the manufacture of the drug cefaclor, particularly, but presumably not limited to, the '536 patent, another of the four Lilly patents which comprised Lilly's alleged monopoly.

774    This objection is dealt with by the Commissioner of Patents with reference to arguments advanced by Apotex. According to Apotex, the other patents were not essential for the manufacture of cefaclor, which implied that Apotex was content with the patents that it had chosen in its licence application. What is intriguing from this fact is that Apotex, in 1986, had the opportunity to request a compulsory licence for all four of the Lilly patents at issue in this case.

775    Apotex specifically chose to obtain a licence that did not include all of Lilly's patents related to the production of bulk cefaclor. [320] It did so notwithstanding Lilly's objection. Had it done so, the assignment of the Shionogi patents would have had absolutely no effect on Apotex's ability to lawfully obtain bulk cefaclor for formulation and eventual sale in the form of Apo-cefaclor, at least until it served notice of termination of this licence on December 6, 1996. [321]

776    In May, 1993, Apotex served on Lilly a Notice of Allegation (NOA) pursuant to s. 5 of the PM (NOC) Regulations in which it alleged that it would not infringe any of the patents listed in the Form IV Patent List submitted by Lilly as Apotex: (i) held a compulsory licence with respect to certain patents listed; and, (ii) it would not infringe the others by making, constructing, using or selling cefaclor capsules or oral suspensions as these patents contain no claim for cefaclor itself nor for its use. [322] It is important to note that in this Form IV Patent List, [323] referred to by Apotex in its NOA, Lilly had listed the Shionogi patents that were assigned to Lilly in 1995.

777    Following this NOA, Lilly and Shionogi instituted proceedings against Apotex seeking an order prohibiting the Minister of National Health and Welfare from issuing Notices of Compliance (NOC) to Apotex in connection with a variety of cefaclor capsules and oral suspension dosages until the expiration of both the Lilly and Shionogi process patents (the PM (NOC) proceedings). [324]

778    The PM (NOC) application was dismissed by Justice Sandra Simpson on September 12, 1995 (*Eli Lilly & Co. v. Apotex Inc.* (1995), 101 F.T.R. 33, 63 C.P.R. (3d) 245 (Fed. T.D.)). [325] In essence, the application was dismissed because the listing

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 265 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

of the process patents in the Form IV Patent List was not in accordance with s. 2 of the Regulations as they do not contain claims for a medicine or a new use for a medicine.

779    In the course of the PM (NOC) proceedings, Lilly and Shionogi asserted,[326] relying on expert evidence,[327] that it was not possible for Apotex to manufacture cefaclor without infringing the patents that had been listed in Lilly's Form IV Patent List and for which Apotex did not hold a compulsory licence. At para. 9 of her decision, Justice Simpson notes that this evidence is uncontradicted and that as such it is "reasonable to infer that Apotex plans to infringe the Patents by copying Lilly's production methodology" and that if this did transpire "it [would] be open to Lilly to seek remedies for infringement at common law."

780    On April 27, 1995, just prior to the determination of Lilly and Shionogi's application for a prohibition order, Lilly and Shionogi concluded the assignment of Shionogi's process patents to Lilly, along with a concurrent licence-back in favour of Shionogi.[328]

781    In light of the decision of Justice Simpson and its confirmation by the Federal Court of Appeal, Harry B. Radomski, counsel for Apotex, indicated in an affidavit that, as of late 1996, it was expected that Apotex would obtain an NOC with respect to cefaclor and advised that it would have to be prepared to face an infringement action brought by Lilly should it enter the market.[329]

782    At some point in time between the institution of these proceedings and its final resolution, somebody at Lilly met with representatives of Apotex[330] to extend the offer of entering into a relationship in respect of cefaclor as well as other products. Although the terms and conditions are not clear, this would probably have been an arrangement similar to the one Lilly entered into with Pharmascience on June 30, 1995, which concerned the distribution by Pharmascience of Lilly-manufactured dosage form cefaclor.[331] It should be noted that another agreement entered into by Lilly with a Canadian generic drug manufacturer is in evidence, this time with Novopharm on June 22, 1998 and relating to the supply of bulk cefaclor.[332]

783    On December 6, 1996, Dr. Sherman wrote to Lilly to provide the required three-months notice of termination of its compulsory licence.[333]

784    Kyong Bo had represented to Apotex, by way of letter dated December 16, 1996 addressed to its intermediary, Pacific High Tech Canada, that its process for manufacturing bulk cefaclor did not use the teachings of Canadian patents '611, '536 and '725, all of which belonged to Lilly.[334] This letter is seemingly a result of investigations carried out by Apotex starting, at the latest, in December, 1996 into the processes used by its suppliers of bulk cefaclor and whether said processes infringed the Lilly or Shionogi patents.[335]

785    On January 17, 1997, Apotex obtained its NOC[336] and promptly began selling dosage-form cefaclor on the Canadian market. Apotex was not delayed in any way by the assignment in its entry into the market. Apotex had received, from a variety of suppliers, experimental quantities of bulk cefaclor as early as March, 1991.[337] In addition, it had already received two shipments of commercial quantities of bulk cefaclor from Kyong Bo.[338]

786    As predicted, Lilly quickly commenced an infringement action. Its first action was launched on January 23, 1997 but was subsequently discontinued.[339] The present action was commenced on June 18, 1997. In both actions, Lilly alleged infringement of the Shionogi patents.[340] The latter action specifically referred to the Kyong Bo process.[341]

787    In May, 1997, Apotex began sourcing commercial quantities of bulk cefaclor from another supplier, Lupin.[342] The evidence before the Court indicates that shortly thereafter, in July, 1997, Apotex began inquiring with Lupin as to the processes used to manufacture bulk cefaclor delivered to Apotex.[343] As mentioned earlier, based on Lupin's responses to these inquiries, Brigitte Fouillade, Apotex's legal counsel for intellectual property, appears to have come to the conclusion, by September, 1997, that the process employed by Lupin infringed the Lilly patents.[344]

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 266 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

788    Accordingly, discussions began between Apotex and Lupin with the aim of modifying the process employed by Lupin to avoid infringement of the Lilly patents. Ms. Fouillade suggested that Lupin employ the teachings of a series of expired patents. [345] Lupin agreed that this was indeed feasible, and had in some respects already been done on an experimental scale, but would result in lower yields and thus bulk cefaclor produced in this fashion would be more expensive. [346]

789    By October 1997, a new process had been worked out by Lupin and Apotex and, accepting that it would be more costly, Apotex asked Glopec, the intermediary between Apotex and Lupin, to provide a price estimate for bulk cefaclor made according to this process. [347] A supply agreement regarding the use of this new process was concluded between Apotex and Lupin in March, 1998. [348]

790    By October, 1997, at the latest, Apotex appears to have made additional inquiries as to the process employed by Kyong Bo to produce bulk cefaclor delivered to Apotex, particularly in respect of the Shionogi patents. In response, Kyong Bo represented that it employed the Shionogi process, technology which it acquired from Shionogi in 1992 for the production of HCA, an intermediate which is used to produce Ceftibuten, another drug. Kyong Bo also represented that its rights to use the Shionogi process had not been affected by the assignment. [349]

791    Apotex requested that Kyong Bo provide evidence of the authorization to use the Shionogi patents, [350] which Kyong Bo was not able to provide. [351] Apotex, who had not received supply from Kyong Bo since September, 1997, never again sourced bulk cefaclor from Kyong Bo. [352]

792    It is an admitted fact that Apotex, aside from its compulsory licence application in the 1980's, never sought any form of licence for bulk cefaclor from either Shionogi or Lilly, nor has it ever requested its suppliers to do so. [353] Shionogi never licensed any non-Lilly entity for the use of its patents for the production of bulk cefaclor before 1995. [354]

### 12.7. Apotex's "But For" Scenarios with Respect to Causation

793    Against this factual background, Apotex asserts six possible scenarios in a "but for world" where Shionogi did not assign its patents to Lilly:

    1. Apotex is licensed, directly or indirectly, by Shionogi;

    2. Apotex is licensed, directly or indirectly, by Lilly;

    3. Apotex practises the Shionogi patents, without a licence, and is not sued for infringement;

    4. Apotex practises the Shionogi patents, without a licence, and is sued for infringement;

    5. Apotex practises the Lilly patents, without a licence, and is sued for infringement;

    6. Apotex practises the Lilly patents, without a licence, and is not sued for infringement

794    Apotex argues that scenarios 1 and 2 together would have been most likely in a "but for world". [355] The other four options, while possible, would not therefore, in Apotex's view, cross the "but for" threshold. Finally, Apotex argues that scenarios 3 and 4 are more likely than scenarios 5 and 6, the latter being the least likely. [356] At the outset, the Court finds that the need for so many scenarios, which each have various sub-scenarios, is indicative of the degree of speculation required to find that Apotex has been harmed by the assignment.

795    Before getting into the actual assessment of these proposed scenarios, it is important to note that one must exercise caution when presented with expert evidence based on assumptions provided by counsel and first ensure that these have been

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

fully established independently and that general economic theories are applicable to the factual scenario at bar. One such general theory relied upon by Apotex's expert is that firms will normally not reject opportunities to make profits.

796    The assumptions upon which Apotex's experts rely can be challenged on at least three counts. First, they assume that Apotex would be seeking a licensed source of bulk cefaclor before taking any risk of entering the market with infringing material. For reasons that will be explained, based on the evidence presented by Apotex's own Chief Executive Officer, this is not a correct assumption in this case.

797    Second, with respect to the applicability of general economic theory, Mr. Kay made it clear that Apotex's general corporate policy was to shun what is commonly referred to as "authorized generics" agreements. In the course of his cross-examination Mr. Kay was asked whether this attitude would prevail no matter how much profit could be had and his answer was "[m]ore likely than not". [357]

798    Thirdly, Dr. Church made it clear, and this also appears from the written reports of Apotex's experts, that a fundamental assumption was that there were only two publicly known legal sources for bulk cefaclor and that all players, including potential buyers (i.e. generic manufacturers) would be aware of that fact. [358] Again such an assumption doesn't appear to be borne out by the actual facts. Indeed, Dr. Sherman testified that, despite the fact that Apotex was arguably best informed of the situation in the marketplace given its early involvement in attempting to come to market and the obstacles it had faced in this attempt, [359] he didn't know that he needed a licence and was not looking for licensed supply or even inquiring about which process was being used by its supplier initially.

799    The Court also notes that Apotex's expert's own evaluation of the duopoly price in the "but for world" [360] includes an assumption that the $1,500.00 paid by Apotex was the price of potentially non-infringing bulk cefaclor. It would thus be a third source of legal supply which on its face appears to be contrary to the assumption described by these experts. It certainly contradicts the basic premise which Dr. Church indicated as being necessary to his opinion.

800    It also appears that the experts were not made aware of the fact that Apotex also argued in the main action that Lilly itself knew of the existence of a third viable process given that it had included it in its own NDS file. [361] It is also important to note that, despite Dr. McClelland's opinion in the present counterclaim, once Apotex's own in-house counsel had concluded that the cefaclor they were buying was indeed infringing, Apotex was able to source non-infringing cefaclor within a few months.

801    Even so, as will be explained, the Court does not agree with Apotex's evaluation of the likelihood of occurrence of the proposed scenarios. The evidence does not support that it is more likely than not that Apotex would have been licensed by either Shionogi or Lilly in the "but for world". Nor does the evidence support the assertion that scenario 3, Apotex practising the Shionogi process without being sued, is the next most likely scenario. These scenarios are nothing more than mere possibilities; they do not amount, even taken together, to a real or substantial possibility.

802    At best, the evidence supports a conclusion that an amalgam of scenarios 4 and 5, which is to say that Apotex, in the "but for world", would have practised both the Shionogi and Lilly processes and would have been sued by both companies. Furthermore, the Court agrees with Apotex that scenario 6 on its own is so unlikely that it does not merit examination. [362]

*12.7.1. Scenarios 1 and 2: Apotex Obtains a Licence from Shionogi or Lilly*

803    Scenarios 1 and 2 are simply two alternatives under a single hypothesis, which is that Apotex would have been licensed in some way in the "but for world". Dr. Church testified that, "[i]n the absence of the transfer of patent rights, there would have been competition between Lilly and Shionogi, or more accurately its licensee, to supply bulk cefaclor into Canada." [363]

804    Dr. Thomas Ross also opines that such competition would occur because, following the expiry of the Canadian patent covering the compound cefaclor, in August, 1994, "Shionogi would have had a strong financial incentive to licence another firm to use its patents to produce bulk cefaclor for the Canadian market." [364] In response to Shionogi's entry into this market,

Case 09-10138-MEW  Doc 14225-45  Filed 08/15/14  Page 268 of 308
Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

Lilly would also proceed with licensing, resulting in profit-maximizing behaviour by each of these players whom "would find it profitable to licence/supply all licensees who request a licence." [365]

805    Dr. Cockburn disagreed with the competitive licensing scenario advanced by Apotex's experts, countering that, even if one assumed that Shionogi would have licensed a third party, which was not admitted, [366] "Shionogi and Lilly would have powerful incentives to limit the number of competitors in the finished dosage form market. [...] [T]hey would have licensed or supplied at most one generic each." [367] In such a scenario, it is uncertain that Apotex would be one of the two beneficiaries of such a licence.

806    While contesting this position, Apotex's experts counter that, should Shionogi and Lilly each have licensed only one generic in the "but for world", Apotex would have been the most likely recipient of such a licence:

As the leading distributor of generics, Apotex would easily have been the most attractive partner for Shionogi to licence. Consequently, even if Shionogi restricted itself to a single licence, it could easily have been to supply Apotex. [368]

807    It should be noted that neither Dr. Ross nor Dr. Church have any expertise with regard to Japanese firms in general and had very limited information as to Shionogi's business practices in particular. In addition, no evidence was presented to the effect that anyone was interested in offering Shionogi any such financial incentive. Presumably Shionogi would not offer licences unless there was a demand for them.

808    In that respect Dr. Sherman, who can be expected to know a lot more about the industry and this particular market than expert economists unfamiliar with the pharmaceutical industry, testified that cefaclor was a less competitive drug than others "because Novopharm would be the only other one with the capability to make it in Canada". [369] Also, it was not a major product. [370] There is no evidence that Novopharm was interested in making this product at any time prior to the conclusion of its licensing and supply agreement with Lilly in 1998.

809    Further, as explained by Dr. Sherman, companies such as Pharmascience would not be in the market for bulk cefaclor for want of manufacturing capacity. If Pharmascience had been interested in any way to this drug, they would have needed a supplier of dosage form cefaclor. [371]

810    Dr. Sherman certainly indicates that, had Apotex not entered the market, it may well have been that, regardless of the patent situation, [372] no other generic would have been interested in manufacturing dosage form cefaclor. In the circumstances, one cannot simply assume that what Lilly did to counteract the "illegal" entry of Apotex in the market for dosage form cefaclor is a simple reflection of what it would have done had there been competition from Shionogi in the bulk cefaclor market.

811    In effect, Lilly's active marketing and their willingness to enter into authorized generic agreements for several drugs (cefaclor being only one of them) may well explain delayed entry of other generics into the market. It appears that Apotex's experts never considered these issues as they did not even seem to have been aware of these facts and certainly did not acknowledge in their reports that there was limited capacity to manufacture or even interest in offering that drug for sale in Canada.

812    That said, there are two major reasons why the Court cannot conclude that these scenarios are anything other than a mere possibility: (i) Shionogi's belief that it was bound by an exclusive licence arrangement with Lilly; and, (ii) the fact that Apotex was not seeking to obtain a lawful source of supply.

813    In assessing the evidence in respect of Shionogi's beliefs, the Court does not need the assistance of an expert for a trier of fact is obviously capable of evaluating the relevant circumstantial evidence. [373] (*Mohan*) It must also be noted that Dr. Church, for example, offers such an evaluation which is based on selective information and as such is incomplete in any event.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 269 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

814    Shionogi says that it would not have licensed anyone in the "but for world" because it is a brand-name drug company which has no history of licensing generic drug manufacturers, be it directly or indirectly. Shionogi has never directly carried out any business outside of Japan, let alone Canada, and there is no evidence that at any time it received a request for licence or that it licensed anyone for the use of its patented process to manufacture bulk cefaclor. Moreover, Shionogi points to its 100 year old relationship with Lilly which it would not wish to jeopardize for the sake of licensing its process patents.

815    These are indeed reasons that could well lead the Court to conclude that it is unlikely that Shionogi would have licensed anyone in the "but for world" unless it was actively solicited and offered significant financial incentive to do so. [374]

816    What is of greater significance here is the fact that Dr. Hollis acknowledged that it would indeed be difficult for Shionogi to licence anyone even if it had a mere *belief* that it was already bound by an exclusive licence agreement with Lilly. [375]

817    At this stage and for the purpose of assessing the likelihood of the present scenario, it is not necessary to settle the debate between the parties as to how one should construe the 1975 agreement. The Court's analysis focuses on the subjective state of mind of Shionogi in the "but for world". Once again, Shionogi's beliefs in the actual world can be used to inform what such belief would have been in the "but for world".

818    The Court carefully examined all of the admissible evidence put forth by the parties to establish the facts they rely upon in their arguments. [376] There are many such facts, and it is not useful to list them all here. It is sufficient to say that in the actual world, there is evidence that Shionogi held such a belief and acted upon it within months of the signature of the agreement.

819    In effect, Dr. Kanazawa, who personally negotiated the 1975 agreement on behalf of Shionogi, wrote to Lilly, asking them where the patent applications regarding the "3-Halocephem Project" should be filed. Apotex, when asked by the Court how this could mean anything other than that Shionogi believed that Lilly had rights in respect of these patents, suggested that Lilly's advice could have been sought simply because of its longstanding relationship with Shionogi and Lilly's expertise in this area. The evidence of Dr. Wada, which the Court accepts as credible and who was particularly knowledgeable in that respect, having personally drafted the letter signed by Dr. Kanazawa, does not support Apotex's views that it would have been Shionogi's general practice to seek such advice.

820    It is also quite significant that Shionogi actually went to court on the basis of that belief. In its letter to Gowlings LLP, dated June 22, 1993, [377] authorizing the latter to act on its behalf in the PM (NOC) proceedings in respect of the Shionogi patents listed on Lilly's Form IV patent list, Shionogi mentions that the patents at issue were "licensed to Eli Lilly & Co. in respect of intermediates to cefaclor". [378]

821    In an abundance of caution, although the Court has ruled that TX-251 to 259 are not in evidence, the Court has considered their impact and whether they would have lead the Court to conclude differently with respect to Shionogi's belief. The Court is satisfied that this is simply not so.

822    There is no good reason to conclude that in the "but for world" Shionogi's belief would have been any different than the belief it held in the actual world. Presumably the only thing that would be different is that there would have been no correspondence between Lilly and Shionogi in respect of the potential assignment.

823    Although this is more relevant to other scenarios that will be discussed later on, the Court is also convinced that this belief was held by Lilly in the actual world. The evidence in that respect is particularly strong. [379]

824    The Court also considered whether or not Apotex would have accepted a licence if one were available. In effect, Lilly and Shionogi argued that the evidence shows that in any event, Apotex was not interested in obtaining licensed supply. The Court shares this view.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

825    In effect, it is worth noting that Apotex's experts never inquired with Apotex as to its past licensing practices. As noted earlier, they have simply assumed that Apotex would seek such a licence if it was available from Shionogi.

826    Apotex's experts also tried to explain the fact that they had not considered that Shionogi had not licensed any non-Lilly entity, including Apotex, before it assigned its patents in 1995, by arguing that the cefaclor patent itself was a barrier to entry. [380]  Obviously, they failed to consider that Apotex held a compulsory licence under the '536 patent, the patent on the compound cefaclor, from 1988. That is to say that for roughly six years prior to the expiry of this patent, Apotex could have sought to obtain licensed supply of bulk cefaclor from Shionogi, or even Lilly for that matter, but never did so.

827    Apotex did not present any evidence that outside of the compulsory licence system, it ever sought a licence in respect of process patents that might apply to a product it wished to commercialise in the Canadian market. [381]  Additionally, there is no evidence that Apotex was even genuinely concerned with obtaining lawful supply with respect to bulk cefaclor.

828    It is true that Apotex made inquiries of its various suppliers to determine whether these suppliers were making use of processes patented in Canada. [382]  However, there is little evidence as to discussions with Kyong Bo aside from a letter dated December 16, 1996 addressed to Pacific High Tech Canada (a Kyong Bo agent), which discloses Apotex's concerns about infringing the Lilly patents, and the correspondence of October, 1997, exchanged in the context of defending the infringement suit already instituted by Lilly. That in December, 1996 Apotex would only inquire with Kyong Bo as to infringement of the Lilly patents is surprising given that Apotex knew of the Shionogi patents and the fact that Lilly was asserting rights under them since 1993, when the PM (NOC) proceedings were commenced.

829    Be that as it may, when Apotex chose Kyong Bo as its supplier, its choice was not predicated on Kyong Bo's use of the Shionogi process. As Dr. Sherman testified, Apotex made this choice "not because we were specifically looking for material made by Shionogi's process." [383]

830    Nor was it made on the belief that Kyong Bo had a licence:

> THE COURT: Did you choose that supplier because it had a licence?

> [DR. SHERMAN]: No.

> [...]

> THE COURT: [...] Were you looking for a manufacturer that had a licence?

> [DR. SHERMAN]: No.

> [...]

> [W]e were not looking for a manufacturer with a licence. At the time we were simply looking for sources that could supply. We did not know that one was needed. [384]  At the time we were simply looking for sources that could supply. This particular source appeared to be a good supplier and was offering material and told us that they had an arrangement with Shionogi, but it is not because we were specifically looking for material made by Shionogi's process. [385]

831    The Court notes that Dr. Sherman's recollection about having been told that they had an arrangement with Shionogi appears to be slightly out of synch. In effect, the correspondence and Dr. Sherman's own previous testimony indicates that such representations were made much later, that is in October, 1997. As soon as it was further investigated by Mrs. Fouillade, at the request of Dr. Sherman, it was quickly realized that this was not so.

832    In any event, the approach that would have been taken by Apotex at the time is described by Dr. Sherman, when he testified on discovery that "[t]he most likely scenario would be that we simply would have used the [Shionogi] processes

without any royalty at all or any discussion." [386] While this was not as eloquently repeated by Dr. Sherman at trial, it was not contradicted. In fact, Dr. Sherman testified that:

> to the extent that there were other patentees with other processes, <u>there would generally not be a need to deal with them</u>, because one would expect they would not be enforced in Canada or would be available for licensing. [387]

> [Emphasis added]

Again this defies the fact that, independently of the assignment, Lilly was asserting rights under these patents, which is a fact which Dr. Sherman should have been aware of.

833      In any event, it appears that Apotex was not prepared to pay much for such a licence. Dr. Sherman explained that if Shionogi would have tried to charge Apotex more than a few percent, Apotex would have resisted, sending the parties to litigation: [388]

> if they wanted to enforce the patent to try and get a higher royalty, they would have been faced with the prospect of litigation with us and perhaps having their patents invalidated at litigation, and it wouldn't have been worth very much to them under those circumstances. [389]

834      This evidence suggests that for Apotex, obtaining a licence for bulk cefaclor was an option of last resort. At trial, Dr. Sherman testified that "[i]f and when it became necessary, we could get a license, if that were appropriate." [390] This evidence is simply not sufficient for the Court to conclude that "but for" the assignment of the Shionogi patents, Apotex would have sought licensed supply.

*12.7.2. Scenario 3: Apotex Practises the Shionogi Process and is not sued*

835      This scenario poses a number of evidentiary difficulties. First, and most obvious, Apotex's conduct demonstrates that it was willing to obtain bulk cefaclor without regard to the method used to produce it. As noted above, the decision to source Kyong Bo was not dependent on the fact that it was practising a particular method. In addition, there is little evidence before the Court as to what led Apotex to begin sourcing bulk cefaclor from Lupin in May, 1997 other than because they had likely been approached by Lupin. [391]

836      It is clear that Apotex inquired about Lupin's process in July, 1997, at which point it had already received at least three shipments of bulk cefaclor. The Court cannot conclude that Apotex believed Lupin to be using the Shionogi process or again that such facts had become important or relevant in Apotex's mind.

837      The Court does not find it credible that, absent the assignment, Apotex would have made a conscious effort to source only bulk cefaclor made using the Shionogi process. The evidence supports the conclusion that Apotex was interested in supply, not supply manufactured using a particular process.

838      Had the Court concluded differently in this respect, this scenario would still not be deemed more likely than not as the Court is not convinced that the evidence supports Apotex's claim that the exclusive use of the Shionogi process would not attract an action for infringement.

839      Specifically, there is absolutely no evidence or explanation offered to support the proposition that, in the "but for world", enforcement of Shionogi's patent rights would have not proceeded in precisely the same fashion as it did in the course of the PM (NOC) proceedings. As mentioned, the evidence is overwhelming that Lilly believed (again, rightly or wrongly) that it had an exclusive licence to the patents at issue and no good reason was offered to assert that Shionogi would be any less of a willing partner in their enforcement. The Court can only conclude that in the "but for world", Apotex would have also faced an action for infringement, the only difference being that this action would be brought by both Lilly and Shionogi, just as with the PM (NOC) proceedings.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 272 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

*12.7.3. Scenarios 4 and 5: Apotex Practises the Shionogi and Lilly Processes and is Sued by Shionogi and Lilly*

840     As explained above, the Court cannot conclude that in the "but for world" it would be likely that Apotex would have sourced bulk cefaclor manufactured using only one process, be it Shionogi's or Lilly's. Thus, scenarios four or five cannot represent what would have occurred in the "but for world" as they are premised on Apotex practising only one of the processes.

841     Most likely is a "but for world" where Apotex practised both the Shionogi and Lilly processes to varying degrees, exactly as what has transpired in the actual world. Apotex has admitted that it is very unlikely that in the "but for world" Lilly would not seek to enforce its patent rights. As explained above, there is no evidence that would lead the Court to conclude that such an action would not be conducted in the same fashion as the PM (NOC) proceedings with regard to infringement of the Shionogi patents.

**12.8. Is there a loss resulting from the assignment under the most likely "but for world" scenario?**

842     Based on the foregoing, the only difference between the actual world and the only likely "but for world" scenario is that Shionogi is also a party to the action for infringement. Apotex's submissions in respect of its loss in such a scenario (see scenarios 4 and 5 in Chart B) are not particularly clear. [392] When read together with paras 282 and 283 of its memorandum, it appears that Apotex alleges:

i) That should the Court set the "but for" price for bulk cefaclor at anything less than US$1,500.00 [393] , it paid more for its bulk cefaclor in the actual world than in the "but for world"; and,

ii) That its potential liabilities as a result of infringement are greater in the actual world than in the "but for world";

For the reasons that follow, the Court cannot conclude that Apotex suffered any damage as a result of this assignment.

843     Before looking specifically at the evidence relied upon by Apotex to support the above allegations, it is important to look at what Apotex's experts had to say in cross-examination about potential losses in a scenario where Apotex did not seek or obtain a licence in the "but for world" from Shionogi (directly or indirectly).

844     First, Dr. Church said "[...] what I would agree with is that [if] you can establish that in the "but for" world, Apotex would not have received supply from either Shionogi or from Lilly then Apotex would not have been harmed." [394]

845     This was also the view of Dr. Ross:

[Counsel for Lilly]: You will agree with me that if it chose another company to license and not Apotex then there would have been no impact on Apotex as a result of the 1995 agreement?

[Dr. Ross]: I think that is right. Let us just be clear. Absent the '95 agreement, they would have licensed someone else?

[Counsel for Lilly]: Right.

[Dr. Ross]: Now you bring in the '95 agreement so there is nobody licensed, what is the effect of Apotex. That is correct.

[Counsel for Lilly]: So you agree there would have been no impact on Apotex?

[Dr. Ross]: Right. [395]

846     As for Mr. Cole, he was asked to assume that the Court found that there was anti-competitive conduct and that Apotex had infringed and as such was liable to pay damages. He was then asked to consider the scenario where this Court also held that in the "but for world", Apotex would not enter into a licensing agreement. In his view, "under that logic or that assumption, there would be no damages, I think. There would be no damages. [...] That is a fair assumption." [396]

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

847    Despite this evidence, Apotex nonetheless maintains that it has suffered a loss measured against scenarios 4 and 5, where it is evident that it would not be a licensee of either Shionogi or Lilly.

848    The court will first examine whether or not Apotex has established a loss in respect of the costs paid for the bulk cefaclor, given that, in accordance with Justice Hughes' judgment referred to earlier, the Court must be in a position to quantify Apotex's loss in that respect.

### 12.9. Increased Cost of Legal Bulk Cefaclor

849    The Court is not satisfied that Apotex has established by any standard that it would have contracted for its bulk cefaclor in the "but for world" at any price less than it paid in the actual world. In effect the price it paid for infringing material (all but the cefaclor produced by Lupin in 1998) could not be affected by the prices for legal bulk cefaclor whatever they may have been in the "but for world". The Court understands that it is exactly for that reason that Apotex's experts made the admissions referred to above and concluded that Apotex suffered no loss in said context.

850    The Court knows that in any event even if the price of the legal bulk cefaclor in the "but for world" was relevant here, Apotex has failed to provide the Court with sufficient evidence to conclude that it has suffered a loss.

851    Apotex's experts only address the issue of price differential between the monopoly price [397] and the duopoly price in the "but for world". It appears that they were never asked to precisely determine if there was a difference between the actual price paid and the duopoly price in the "but for world" for they appear content with a mere range of possible prices for legal bulk cefaclor in the "but for world": US$ 860.00 to US$ 1,500.00. [398]

852    While in reply to the testimony of Dr. Cockburn, Dr. Church and Dr. Hollis submitted that the price of US$ 1,150.00 charged by Lilly to Novopharm could be a more precise estimate, they did not renege on their initial proposition. During oral argument, Apotex's counsel suggested that the Court should adopt the price of $1,150.00 which is very near the mid-range used by its own experts. The Court is not satisfied that it should do so. Apotex had the burden of establishing its loss; it could have easily asked its experts to do so. Considering their testimony, one can reasonably infer that it did not do so because, according to the experts, Apotex would not have suffered any loss.

### 12.10. Infringement Liability

853    Apotex argues [399] that allowing Lilly to retain damages that it could only recover by virtue of rights that were unlawfully obtained would amount to an unjust enrichment or unjustified benefit. However, it is crucial to remember that, pursuant to s. 36, the inquiry is directed to the actual damage suffered by the plaintiff, who can only recover "an amount equal to the loss or damage proved to have been suffered by him." [400]

854    In respect of the Shionogi patents, Apotex says that in the "but for world" it would only be liable to pay damages that would be "no greater than a reasonable royalty rate." [401] Apotex also argues that in respect of the Lilly patents, although they were not the subject of the assignment, its potential liability would still have been less in the "but for world" given that Lilly would have faced competition from Shionogi. Thus, the lost profit Lilly would be claiming would be less. [402]

### 12.10.1. The Lilly Patents

855    Little evidence was presented to support Apotex's argument aside from a single page from a single report of a single expert, Dr. Church, [403] which is barely answered by Shionogi and Lilly. Therein, Dr. Church offers a formula, $[p^m - p]q_A$, wherein $p^m$ "is the price Lilly lost as a monopolist"; [404] $p$ "is the price Lilly would have charged for bulk cefaclor had there been competition"; [405] and, $q_A$ is Apotex's quantity of sales (dosage form).

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 274 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

856      When asked by the Court to explain the relevance of this formula and how it could be used, Dr. Church volunteered what the Court has come to realize are some very serious limitations to his approach:

[The Court]: So you are telling me you could have calculated this precisely but you didn't because you weren't asked.

[Dr. Church]: No, <u>I was not asked and I couldn't</u> — you know, <u>perhaps I might have</u> been able to calculate these things, but you know, <u>it was not part of the remit</u>. It was just what I was asked to do is come up with a framework.

[The Court]: Why do you say "might"? It is just, you know, you might? How will I do it if you say you might?

[Dr. Church]: My lady, I apologize. I mean, I wasn't asked to do that.

[The Court]: Okay, that is fine. So your answer is you haven't, you could have or you might have been able to do it, but you weren't asked.

[Dr. Church]: Right, right. I mean, what I have is a framework to show that they <u>could</u> have been damaged. [406]

[Emphasis added]

857      First, the Court finds this to be a particularly obscure part of the evidence of this expert and Apotex made no effort whatsoever to explain para. 283 of its memorandum. It appears to be predicated on an assumption that Lilly's profit on bulk cefaclor is relevant to the quantification of the infringement damages in the main action.

858      Second, as mentioned earlier, this framework is inconsistent with positions taken at trial by Dr. Church himself as well as other Apotex experts. It therefore cannot have been intended to apply in the only plausible "but for world" scenario here, which does not involve any licensing by Shionogi.

859      In any event, Dr. Church's proposed framework only serves the purpose of establishing that Apotex *could* have been harmed, not that it was in fact the case. Even though the assessment of the quantum was bifurcated, Apotex still had the burden of establishing that it did suffer damages, not simply that it "could" have suffered damages. Apotex has done nothing more than offer speculation to the Court in that respect.

860      The Court is not ready to reach any conclusion based on this evidence.

*12.10.2. The Shionogi Patents*

861      In the "but for world" Shionogi and Lilly would be co-plaintiffs and they would advance, like they did in the actual world, that Lilly is licensed or at the very least has rights under the patentee, pursuant to subs. 55(1) of the *Patent Act*.

862      The Court has not been persuaded that there is even a real or substantial possibility that Shionogi, in such a scenario, would agree to settle for the low royalty fee alluded to by Dr. Sherman in his testimony and this in the eventuality that Apotex deemed it appropriate to present such an offer. [407]

863      This means that the only argument left is the same one that was raised in the actual world against Lilly. That is, Apotex should only pay a reasonable royalty because the Shionogi patents were not used or commercialized in Canada. [408] It was rejected despite a thoroughly developed presentation.

864      Presumably, although this was not argued, for Apotex, it has more strength in the "but for world" because Lilly would have had to establish that it indeed had rights under the patentee.

865      This brings us back to the 1975 agreement and the relationship between the two plaintiffs in a "but for world" and requires that the Court speculate as to what decision a Court would render in the "but for world".

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

866     I say "speculate" because, had there not been an assignment, the evidence before the Court would probably be very different. For example, there would likely not exist any correspondence between Lilly and Shionogi in respect of a possible assignment. [409] Shionogi could well have been involved in the U.S. proceedings with Lilly and there could even be a judgment dealing with the issue. There would also likely be little evidence, if any, with respect to agreement(s) entered into by Shionogi and Lilly with third parties, as in the "but for world" Apotex would probably not have been entitled to make inquiries in that respect. [410]

867     Although this also calls for speculation, one could assume that the Court in the "but for world" would have the benefit of an evidentiary record similar to the one in the main action but adding elements of the counterclaim. For example, there would also be evidence in the "but for world" that Dr. Gorman of Lilly sought Shionogi's help in developing "a method to economically synthesize the 3-halo cephalosporin," [411] in June, 1974 and that prior to the presumed date of invention (February, 1975) Dr. Cooper met with Shionogi's research team to give them details of Lilly's research including details of the so-called Cooper thiazoline compound which is a starting material for the Shionogi process.

868     The Court in the "but for world" would apply the general principles discussed in the main reasons, including the following comments of Justice Rothstein in *Apotex (2000)*, at para. 99:

> It is perhaps not uncalled for to observe that this is not a case in which the alleged licensee is alone in advancing its claim for patent infringement. Here, the patentee is also before the Court as a co-plaintiff supporting the claim of GWI. It is difficult to conceive of what more is necessary to prove the existence of a licence than to have the licensor and licensee both attesting to the validity of the licence.

869     In the context of such an infringement action it is, in my view, as likely as not that the Court would conclude that Lilly does indeed have rights under the patentee.

870     Thus, even if the Court was entitled to speculate as much as Apotex suggests it should, the Court has not been persuaded that Apotex would not be exposed to exactly the same conclusions that were reached in the main action.

871     Moreover, even if one were to assume that Lilly had no such rights, Shionogi could very well be entitled to an accounting of profits from Apotex. In such a case, the measure of restitution is the defendant's gain, rather than the plaintiff's loss (*Monsanto Canada Inc. v. Rivett* (2009), 2009 FC 317, [2009] F.C.J. No. 410 (F.C.), para. 21 (*Monsanto Canada Inc. v. Rivett*) and *Bayer AG v. Apotex Inc.* (2001), 10 C.P.R. (4th) 151 (Ont. S.C.J.); aff'd (2002), 16 C.P.R. (4th) 417 (Ont. C.A.) (Ont. C.A., where the Court rejected Apotex's argument that the wronged party should not be unjustly enriched by awarding it a sum in excess of its actual loss).

872     As noted by Justice Russel Zinn in *Monsanto Canada Inc. v. Rivett*, if this option was not open to Shionogi "it would be too easy for a defendant to say "Catch me if you can." If caught, the defendant would be required to pay the sum he would have paid to use the patent in any event. When not caught, he is left with a windfall". (para. 23) When one considers Dr. Sherman's evidence, this reasoning rings particularly true in the case at hand.

873     Furthermore, Apotex has not provided any evidence whatsoever indicating that the profits it would have had to disgorge would likely be less than the damages which could be awarded to Lilly had it elected to seek damages instead of an accounting of profits.

874     In sum, even if the Court was satisfied that any part of Apotex's infringement liability is the result of the assignment which will now be discussed, Apotex has not met its burden of establishing that its infringement liability in the "but for world" would likely be different than in the actual world.

875     The Court now turns to Shionogi and Lilly's argument that Apotex is seeking to "have its cake and eat it too". In addition, they submit that to recognize the type of argument put forth here by Apotex would amount to providing it with an insurance policy covering its acts of infringement. This, according to Lilly and Shionogi, would be unconscionable given that

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 276 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

such liability is in fact the result of Apotex's decision to infringe rather than the result of the assignment of the patents. In reply, [412] Apotex notes that these concerns fail to take into account the fact that Apotex only had to enter the market at risk because of the unlawful arrangement between Shionogi and Lilly. The Court does not accept this last statement.

876    Indeed, the evidence established that Apotex made a business decision to purchase its bulk cefaclor without inquiring into whether or not it infringed any patent it knew, or ought to have known, was being asserted by Lilly and Shionogi as relevant to the manufacture of bulk cefaclor. This decision was not based on the fact that the Shionogi process would be less costly to infringe. Had Apotex turned its mind to this, given that the Shionogi patents were on Lilly's patent list, it could only have concluded that it was likely that Lilly would assert rights in respect of those patents.

877    Thus, even if Apotex had established a loss in respect of its infringement liability, the Court would not have been persuaded that it arose as a result of the assignment. [413]

878    Finally, one must not lose sight of the fact that the *Competition Act* was adopted to protect the public interest. Its goal is not to protect the rights of those who choose to act in a manner contrary to the law. What Apotex argues here is that it has the right to infringe at the lowest possible cost.

879    It was made very clear when the Court, trying to clarify Apotex's position, solicited its view on the following hypothetical scenario: what if a patentee, a small company with little means to enforce its patents, decides to sell at fair-market value its patent to a bigger company whose policy is to strictly enforce its patents. Would Apotex say that it suffered a loss because it is now exposed to being sued for infringement? To this, counsel for Apotex responded that "the answer would be yes". [414]

880    This simply cannot be right.

881    After careful consideration, I have come to the conclusion that it would be inappropriate to comment on the other issues raised in this case, particularly whether or not there was a violation of s. 45 of the *Competition Act.* This raises some important novel questions that should not be answered by way of *obiter* comments. [415]

### *12.11. Costs*

882    Lilly and Shionogi made extensive representations to support their claim for solicitor-client costs in this case. Having considered all the arguments and the factors set out in Rule 400, the Court has concluded that this is not a case where solicitor-client costs are warranted. It is clear, however, that certain circumstances referred to in the above mentioned representations warrant an award of costs beyond what is normally provided for. Thus, costs of all services rendered prior to trial will be assessed on the basis of the top of the scale of Column III of Tariff B while services rendered after the trial started will be assessed on the basis of the top of the scale of Column IV of the said Tariff.

883    The defendants by counterclaim are entitled to assess costs of two counsel as well as reasonable expert witness fees and disbursements for the expert witnesses who testified at trial.

### Judgment

For the Reasons set out herein, following the trial of this action, *this Court adjudges and declares as follows*:

1. At least one valid claim in each of the following patents:

    a. Canadian Letters Patent No. 1,133,007;

    b. Canadian Letters Patent No. 1,146,536;

    c. Canadian Letters Patent No. 1,133,468;

    d. Canadian Letters Patent No. 1,150,725;

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 277 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

    e. Canadian Letters Patent No. 1,095,026;

    f. Canadian Letters Patent No. 1,132,547;

    g. Canadian Letters Patent No. 1,136,132;

    h. Canadian Letters Patent No. 1,144,924;

have been infringed by the defendant, Apotex Inc. by their importation, manufacture, export, sale and offers for sale of cefaclor in Canada;

2. The plaintiffs are entitled to elect either an accounting of profits of the defendant or all damages sustained by reason of sales directly lost as a result of the infringement by the defendant of the above-mentioned claims of the Lilly patents ('007, '536, '468, '725 patents) or Shionogi patents ('026, '547, '132, '924 patents). Such damages will be assessed by reference preceded by discovery if requested;

3. The defendant shall be entitled to deduct up to a maximum of 187 kilos of bulk cefaclor pursuant to subs. 55.2(1) of the *Patent* Act. The exact quantity to be assessed by reference in accordance with my reasons;

4. The plaintiffs are entitled to pre-judgment interest on the award of damages (if elected), not compounded, at a rate to be calculated separately for each year since infringing activity began at the average annual bank rate established by the Bank of Canada as the minimum rate at which it makes short-term advances to the banks listed in Schedule 1 of the *Bank Act*, R.S.C. 1985, c. B-1. However, such award is conditional upon the reference judge not awarding interest under paragraph 36(4)(f) of the *Federal Courts Act*;

5. In the event that the plaintiffs elect an accounting of profits, interest shall be determined by the reference judge;

6. The plaintiffs are entitled to post-judgment interest, not compounded, at the rate of five percent (5%) per annum, as established by s. 4 of the *Interest Act*, R.S.C. c. I-15. This interest shall commence upon the final assessment of the monetary damage amount or profits amount, until then pre-judgment interest shall prevail;

7. The plaintiffs are entitled to their costs which will be the subject of a distinct order. The parties shall within thirty (30) days hereof make submissions as to the amount of said costs in the manner set out in my reasons;

8. The defendant's counterclaim is hereby dismissed, with costs to be assessed in accordance with my reasons.

**Chart "A"**

**INFRINGEMENT**

| Name | Subject Matter | Date | Exhibit number | Terms of qualification | Brief Bio Note |
|---|---|---|---|---|---|
| 1   Anthony G.M. Barrett | Lilly infringement in chief — Kyong Bo process | October 19, 2007 | E-1 | Expert in chemistry, organic chemistry, in particular beta-lactam chemistry including cephalosporins and penicillins; chemistry research techniques, organic and medicinal compound synthesis, manufacturing, manipulation and antibiotic mechanisms and activity; | Dr. Anthony Barrett is Professor of organic chemistry and synthetic chemistry at Imperial College of Science, Technology and Medicine (UK). He obtained his PhD in 1975. Over the course of his career, he has also taught at Northwestern University and Colorado State. He was named a Fellow of the Royal Society (UK) in |

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | experimental and analytical chemistry testing, techniques and interpretation, including analysis and interpretation and chemical compound properties, compound and structure analysis and identification. | 2003. He is a specialist in the synthesis of beta-lactams and has studied penicillins and cephalosporins since the 1970's. He has published extensively in this field over three decades. He is the author of over 330 publications. |
|---|---|---|---|---|---|---|
| 2 | Marvin Miller | Lilly infringement in chief — Lupin process (experiments) | October 8, 2007 | E-2 | Expert in: 1) chemistry, organic chemistry, medicinal chemistry, in particular beta-lactam chemistry including cephalosporins and penicillins; 2) chemistry research techniques, organic and medicinal compound synthesis, manufacturing, manipulation and antibiotic mechanisms and activity; 3) experimental and analytical chemistry testing, techniques and interpretation, including NMR, IR and LC/MS, analysis and interpretation and chemical compound properties, compound and structure analysis and identification. | Professor and former Chair of the Department of Chemistry and Biochemistry at the University of Notre Dame, Indiana. PhD in bio-organic chemistry, Cornell University, 1976. Post-doctoral research at UC Berkeley. Extensive experience in the organic chemistry and synthesis of beta-lactams. Has been Editor for a variety of research journals. Author or co-author of over 225 peer-reviewed publications. |
| 3 | Marvin Miller | Lilly infringement in chief — Lupin process | October 19, 2007 | E-3 | See above. | See above. |
| 4 | Garrett Moraski | Lilly infringement in chief — Lupin process — experiments (Testing) | October 19, 2007 | E-4 | Expert in experimental and analytical chemistry research techniques, practices, instruments and documentation, and NMR and IR analysis. | Hold a B.Sc in chemistry (1997) from the University of Notre Dame. He is currently Research Technician and Lab Manager in the laboratory of Dr. Miller at the University of Notre Dame. Four years experience as a research assistant at Pfizer and several more years as a researcher at a pharmaceutical start-up. Has actively participated in Dr. Miller's research activities and been listed as co-author in several peer-reviewed publications. |
| 5 | Brian Hunter | Lilly infringement in | October 22, 2007 | E-5 | A chemist with a focus on the utilization of | Emeritus professor of chemistry and chemical |

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 279 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | chief — Lupin process — P NMR and IR spectra data regarding kinetic complex | | | nuclear magnetic resonance and infrared spectroscopy to study molecular behaviour in a variety of systems. | engineering at Queen's University, Kingston. Ret'd 2001. PhD obtained from University of Western Ontario, 1969. National Research Council Fellow at University College in London 1969-1971. Research and teaching specialty in the utilization of nuclear magnetic resonance (NMR) spectroscopy, including phosphorous NMR, to study molecular behavior. Has provided advice in the interpretation of NMR spectra across all fields of chemistry. Author of a textbook entitled *Modern NMR Spectroscopy: a Guide for Chemists* (2{nd} ed. 1993). |
| 6 | Jack Baldwin | Lilly infringement in chief — Lupin process | October 19, 2007 | E-6 | Expert in: 1) chemistry, organic chemistry, medicinal chemistry, in particular beta-lactam chemistry including cephalosporins and penicillins; 2) chemistry research techniques, organic and medicinal compound synthesis, in particular beta-lactam synthesis, manufacturing, manipulation and antibiotic mechanisms and activity; 3) experimental techniques and interpretation as used by chemists in this field in the course of their work. | Sir Baldwin is Professor of Chemistry at Oxford University (ret'd. 2005) and was Professor of Chemistry at the Massachusetts Institute of Technology from 1972-1978. He obtained his PhD from Imperial College in 1964. He has been a Fellow of the Royal Society since 1978, and was recognized for contribution to chemistry with a Knighthood in 1997. Throughout his distinguished career he has been particularly interested in the synthesis of beta-lactam antibiotics, especially penicillins and cephalosporins, and is familiar with industrial work in this area. |
| 7 | Diane Azzarello | Lilly infringement in chief — Health Canada regulatory requirements | October 19, 2007 | E-7 | Expert in regulatory affairs, including preparation and filing of new drug submissions and any other matter covered within her report. | Ms. Azzarello is an Ontario-licensed pharmacist with over two decades experience in the pharmaceutical industry in clinical research, sales, and regulatory affairs. She is a past Director of regulatory affairs for Upjohn Canada, and has acted since 1996 as President of Market Access Strategic Regulatory Services Inc., a consultancy, where she advises innovator and generic companies on the |

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | filing of drug submissions with Health Canada. See above. |
|---|---|---|---|---|---|---|
| 8 | Garrett C. Moraski | Lilly infringement reply — testing of February 21, 2008 in response to Dr. Cowley and Dr. McClelland (Under reserve of a general objection) | February 28, 2008 | E-8 | See above. | See above. |
| 9 | Garrett C. Moraski | Lilly infringement reply — Dr. Hunter and Miller testing. Completed by new exhibit E-9a on June 20, 2008 | January 18, 2008 | E-9 | See above. | See above. |
| 10 | Garrett C. Moraski | Lilly infringement reply — Re Dr. Chase testing | April 19, 2008 | E-10 | See above. | See above. |
| 11 | David Gorenstein | Lilly infringement reply — Lupin process (Under reserve of a general objection) | March 19, 2008 | E-11 | Expert with respect to the development and application of NMR spectroscopy to biological systems, and an expert chemist who has carried out extensive research in the chemistry of phosphorous compounds and organophosphorous chemistry. | Dr. Gorenstein is Associate Dean of Research at the School of Medicine of the University of Texas. He is also a Professor in the Departments of Biochemistry and Molecular Biology, and Neurosciences and Cell Biology. His research interests include the development and application of NMR spectroscopy to biological systems (including {31}P NMR), and he is Director of the Gulf Coast Consortium in Magnetic Resonance, an NMR facility shared by several regional universities and Dow Chemical. For nearly two decades he has served as editor of the journal published by the International Society of Magnetic Resonance and also edits on online NMR textbook. He is the author of over 245 publications including a 1984 article entitled "Phosphorous-31 NMR Principles and Applications," and has extensive teaching and training experience in |

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | NMR spectroscopy. He has also conducted extensive research into the chemistry of phosphorous compounds over the past 40 years. |
| 12 | Anthony G.M. Barrett | Lilly sur-reply — infringement — Lupin process — (by leave but under reserve of objection — with respect to certain paragraphs) | June 15, 2008 | E-15 | See above. | See above. |
| 13 | Brian K. Hunter | Lilly reply — infringement Lilly patents — reply to McClelland report of January 18, 2008 and Cowley report of January 17, 2008 (Under reserve of objection: see TX-343 to TX-344) | March 20, 2008 | E-17 | See above. | See above. |
| 14 | Brian K. Hunter | Lilly supplemental reply — infringement — Apotex April 2008 testing at University of Toronto (Dr. Chase) | April 20, 2008 | E-16 | See above. | See above. |
| 15 | Tomasz A. Modro | Apotex infringement responding — P NMR spectra testing in South Africa | May 7, 2008 | A-6 | An expert in organic chemistry of phosphorous, sulfur and silicon, as well as in the area of physical organic chemistry, and an expert in carrying out experimental reactions involving the chemistry of phosphorous. | Dr. Tomasz Modro received his PhD in Organophosphorous Chemistry in 1962 from the Polish Academy of Sciences and his *Habilitation* from the University of Lodz in 1969. In 1974, he joined the Department of Chemistry of the University of Toronto, as Lecturer and later Assistant Professor. In 1979, he joined the Department of Chemistry at the University of Cape Town and in 1987 he joined the University of Pretoria as Professor of Chemistry and Director of the Centre for Heteroatom Chemistry, where he has been Professor Emeritus since 2002. Dr. Modro specializes in the area of heteroatom chemistry |

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 282 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | involving the organic chemistry of phosphorous, sulfur and silicon, and the synthesis and use of novel organophosphorous compounds in chemical transformations. He has been recognized as an international leader in his field by the National Research Foundation (South Africa) and is a member of both the Royal Society (South Africa) and the South African Academy of Sciences. He has published over 210 papers. |
| 16 | Preston Allen Chase | Apotex infringement responding - Testing at the University of Toronto | April 11 and 17, 2008 | TX-1626 C, D, E, F, G, H. | An expert in organophosphorous chemistry, the chemistry of reactions involving organic compounds. | Dr. Chase is a Research Associate at the University of Toronto. He received PhD in April 2003 from the University of Calgary and is past NSERC fellowship holder. After obtaining his PhD, he undertook post-doctoral research at the University of Utrecht (Netherlands). From 2006 to 2008, he has been at the University of Windsor, where he focuses on chemistry related to his PhD work as well as phosphorous and nitrogen chemistry. He has extensive experience carrying out reactions involving organophosphorous compounds and has published a number of papers dealing with such compounds. |
| 17 | Robert A. McClelland | Apotex infringement responding — Lupin process | January 18, 2008 | TX-1764 | Expert in physical, organic, biological and medicinal chemistry including the synthesis properties and use of organophosphorus compounds in chemical reactions. | Dr. McClelland is Professor Emeritus at the University of Toronto. He obtained his PhD in chemistry from the University of Toronto in 1969 and has been a faculty member there since 1973. His research activities are in the areas of physical organic, biological and medicinal chemistry. He is a Fellow of the Royal Society (Canada) and has received awards from the Canadian Society for Chemistry for his work in organic chemistry. |

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 | Robert A. McClelland | Apotex infringement responding — Testing at the University of Toronto | May 6, 2008 | TX-1765 | See above. | See above. |
| 19 | Alan H. Cowley | Apotex infringement responding — '007 patent and addressee of '536 patent | January 17, 2008 | A-9 | Research chemist with expertise in the preparation, structures and patterns of reactivity of compounds of the non-metallic elements, phosphorous chemistry and the use and evaluation of {31}P NMR spectroscopy. | Dr. Cowley is a Fellow of the Royal Society (UK) and occupies the Robert J. Welch Chair in Chemistry at the University of Texas at Austin. He was awarded a PhD in inorganic chemistry from the University of Manchester, UK, in 1958. He joined the faculty at the University of Texas (Austin) in 1962 and was made full professor in 1970. His major research interests have been the preparation, structure and patterns of reactivity of compounds of the non-metallic elements, with a focus on phosphorous chemistry. |
| 20 | Stephen Hanessian | Apotex infringement responding — General comments | January 22, 2008 | A-10 | Expert in organic, bio-organic and medicinal chemistry, including specifically the chemistry of synthetic penicillins and beta-lactam antibiotic compounds and the development of synthetic chemical processes. | Dr. Stephen Hanessian is the McConnell Professor of Chemistry at the University of Montreal, where he joined the Faculty in 1969, and has been since 2000 Adjunct Professor in Chemistry and Chemical Biology at the University of California, Irvine, where he directs a graduate program in pharmaceutical sciences and medicinal chemistry. Dr. Hanessian's research interests are in the total synthesis of natural products, including the synthesis of amonoglycoside antibiotics and synthetic penicillins, as well as medicinal chemistry, drug design and the development of new synthetic methods. He has published over 465 papers in these fields. His contributions have been recognized by a Fellowship in the Royal Society (Canada) and membership in the Order of Canada. |
| 21 | Stephen Hanessian | Apotex responding | July 2, 2008 | A-20 | See above. | See above. |

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 284 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | to E-15 — (by leave) - infringement — Lupin processes | | | | |
|---|---|---|---|---|---|---|
| 22 | Sue E. Wehner | Apotex infringement responding — Health Canada regulatory requirements | January 22, 2008 | A-11 | Expert in pharmaceutical regulatory affairs, including the preparation and filing of new drug submissions; the evaluation of drug master files; and the regulatory practices and procedures, guidelines, policies and requirements of Health Canada regarding pharmaceutical practice. | Ms. Wehner is the founder and President of Med-Script Associates, a consultancy specializing in regulatory affairs in Canada, the US, and Europe, as well as R&D in product development and clinical and bioequivalence studies. She has over 30 years experience in this area and has filed new and abbreviated drug submissions for many drugs. |
| | *VALIDITY* | | | | | |
| 23 | Robert A. McClelland | Apotex in chief — validity | October 19, 2007 | A-12 | See above. | See above. |
| 24 | Tomasz A. Modro | Apotex in chief — validity of '007 patent | October 19, 2007 | A-13 | See above. | See above. |
| 25 | Tomasz A. Modro | Apotex in chief — validity — affidavit concerning testing (TX-1774 A to M, L and M being under reserve of objection) | June 2, 2008 | A-14 | See above. | See above. |
| 26 | Stephen Hanessian | Apotex in chief — validity — Shionogi patents | October 19, 2007 | A-15 | See above. | See above. |
| 27 | Stephen F. Martin | Apotex in chief — validity — Shionogi patents | October 19, 2007 | A-17 | Expert in synthetic organic chemistry, heterocyclic chemistry and bio-organic chemistry, including specifically the design and development of synthetic models and their application to the synthesis of heterocyclic compounds including lactams and the total synthesis of complex natural products. | Dr. Martin is the M. June and J. Virgil Waggoner regents Chair of Chemistry at the University of Texas at Austin, where he has been on faculty since 1974. He is also Adjunct Professor at the University of Texas School of Medicine. He obtained a PhD from Princeton University in 1972, where he specialized in heterocyclic chemistry. Over the course of his career Dr. Martin has been extensively engaged in the design and development of synthetic methods and their application to the synthesis of heterocyclic compounds and the total |

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 285 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | synthesis of natural products. He is the author of over 250 publications in the fields of synthetic organic chemistry and heterocyclic chemistry, some of which deal with lactams (not including [beta]-lactam) and pre-date 1975. |
| 28 | Tristram Chivers | Apotex in chief — validity — Lilly '007 patent | October 19, 2007 | A-18 | Expert in inorganic synthetic chemistry, particularly the chemistry involving the elements sulfur and phosphorous, and in the use of {31}P NMR spectroscopic techniques. | Dr. Chivers obtained his PhD in chemistry from the University of Durham (UK) in 1964 and has been a faculty member in the Department of Chemistry, University of Calgary, since 1969. His research has focused on inorganic chemistry, particularly as it involves the elements sulfur, selenium, tellurium, boron, and phosphorous. He is the author of over 300 journal articles. His work has been recognized through various awards and he was made a Fellow of the Royal Society (Canada) in 1991. |
| 29 | George Andrew Olah | Apotex in chief — invalidity of Lilly '536 and '007 patents | October 18, 2007 | A-19 | Expert in the area of organic and organosulfur chemistry as well as the area of physical organic chemistry including the synthesis of novel ionic organic compounds and their use in other chemical transformations, as well as hydrocarbon chemistry and synthetic reagents and methods. | Dr. Olah is Director of the Loker Hydrocarbon Research Institute and Distinguished Professor of Organic Chemistry at the University of Southern California, Los Angeles, where he has been a faculty member since 1977. He obtained his PhD in chemistry from the Technical University in Budapest (1949) and is a past head of the Department of Organic Chemistry at the Institute of the Hungarian Academy of Sciences, past Professor at the Western Reserve University (now Case Western). He was also a research scientist with Dow for 7 years. His research activities are in the areas of organic and organosulfur chemistry and the synthesis of novel ionic organic compounds and their use in other chemical transformations, as well as hydrocarbon chemistry and synthetic reagents and methods. He has published |

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | over 1300 peer-reviewed articles and is a member of numerous learned societies. He was awarded a Nobel Prize in 1994 for his work on positively charged compounds of carbons. |
| 30 | Anthony G.M. Barrett | Lilly responding — validity — Shionogi patents | January 21, 2008 | E-14 | See above. | See above. |
| 31 | Brian K. Hunter | Lilly responding — validity of Lilly patents — reply to Drs. Modro, McClelland, Olah and Chivers | January 21, 2008 | E-18 | See above. | See above. |
| 32 | Jack Baldwin | Lilly responding — validity of Lilly patents | January 18, 2008 | E-19 | See above. | See above. |
| 33 | Kevin P. Murphy | Lilly responding — validity of Lilly and Shionogi patents — improper divisional allegation | January 21, 2008 | E-20 | Expert in Canadian patent prosecution, in particular chemical, pharmaceutical and materials science patents, and the analysis of contents of Canadian patents, patent applications, and file histories, in particular chemical, pharmaceutical and material science patents as well as in the practice, procedures, rules and requirements of the Canadian patent office, including the Manual of Patent Office Practice. | Mr. Murphy is a patent agent and senior partner with the firm Ogilvy Renault in Montreal. He became a registered Canadian and United States patent agent in 1972. Prior to that he was a patent agent in the UK, where he obtained a B.Sc. in chemistry (1968) from the University of Southampton. He has prosecuted thousands of Canadian patent application through the Canadian Patent Office and specializes in chemical, pharmaceutical, and materials sciences patents. |
| | *COMPETITION* | | | | | |
| 34 | Aidan Michael Hollis | Apotex in chief — competition market | December 7, 2007 | A-22 | Expert in microeconomics, and the economics of competition law and policy, with particular expertise in the structure and economics of pharmaceutical markets and the Canadian pharmaceutical industry, drug pricing, prescribing practices (under objection), and the competitive effects | Dr. Hollis is an Associate Professor of Economic at the University of Calgary. He obtained his PhD in Economics from the University of Toronto in 1996. He is a Research Fellow of the Institute for Advanced Policy Research and has been a Research Fellow of the Institute of Health Economics. Dr. Hollis has previously held the T.D MacDonald Chair in industrial economics at the Competition Bureau, from 2003 to 2004. His |

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | associated with drug genericization. | major research interest is the economics of pharmaceutical markets. He has also published articles on pharmaceutical market and has acted as referee for many journals. He has consulted in the pharmaceutical industry mainly with respect to issues in Canada. |
| 35 | Robert A. McClelland | Apotex in chief — Existence of other commercially viable processes to make cefaclor | December 14, 2007 | A-23 | See above. | See above. |
| 36 | Jeffrey Church | Apotex in chief — Effect of the transfer of Shionogi's patent rights to Lilly | April 19, 2008 | A-24 | Expert in microeconomics, industrial organization, strategic competition, network economics, and entry deterrence, with particular expertise in the economics of competition law and policy, including the interaction of competition law and intellectual property rights, and has studied the economics of various markets. | Dr. Church is currently a Professor in the Department of Economics and the Institute for Advanced Policy Research at the University of Calgary. He obtained his PhD from University of California, Berkeley in 1989. Dr. Church has previously held the T.D MacDonald Chair in industrial economics at the Competition Bureau, from 1995 to 1996. He participated, as one of the three external drafters, to the drafting of the Intellectual Property Enforcement Guidelines. His research interests are focused on industrial organization, economics of regulation and competition policy. Since its incorporation in 1992, he is also president of Church Economic Consultants Ltd., a firm which provides economic consulting services. |
| 37 | Stephen Cole | Apotex in chief — Determination of recoverable damages | December 14, 2007 | A-25 | Expert in business valuation and forensic accountancy, with particular expertise in the computation and quantification of damages associated with the assertion of intellectual property rights under reserve of an objection given that he has no experience with regards to royalty rates, which equates | Dr. Cole is the principal of Cole Valuation Partners Limited, a Toronto-based firm practicing exclusively in the following fields: business valuation, financial damage quantification, investigative and forensic accounting as well as transfer pricing. He has a BA from the University of Toronto. He became a Chartered Accountant in 1975 and a Chartered Business Valuator |

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | to the fact that he has no experience with the assertion of intellectual property rights, and that while the expert is qualified as an accountant to estimate damages, as he does not provide an estimate in this report he is not qualified to give any opinions. | in 1979. He is a Fellow of the Canadian Institute of Chartered Accountants since 1996 and a Fellow of the Canadian Institute of Chartered Business Valuators since 2000. He also co-authored two publications on damages calculations and accounting of profits calculations in Intellectual Property cases and acted as lecturer at professional organizations. |
| 38 | Marvin Gans | Apotex in chief — Prescribing practices of physicians | December 13, 2007 | A-26 | Physician and educator with extensive experience in the treatment of pediatric patients with infectious diseases, and clinical prescribing practices. | Dr. Gans is a professor of pediatrics at the University of Toronto and practices pediatrics in private practice. He obtained his medical degree from the University of Toronto in 1963 and was admitted to the Royal College of Physicians as a specialist in pediatrics in 1969. He has been an active staff and attending staff physician to the infectious disease unit (1969-1997), had a major part time appointment to the department of pediatrics (1997-2005) and was Director of Post-graduate medical education at the department of pediatrics (2005-2006) at the Hospital for Sick Children of Toronto. He was a consultant pediatrician from 1969-1997. He authored or co-authored six publications on subjects relating to: infant development, parents reactions to children's illness, child advocacy and parenting. |
| 39 | Thomas Ross | Apotex in chief — Effect of the transfer of Shionogi's patent rights to Lilly | December 14, 2007 | A-27 | Expert in microeconomics, industrial organization, the economics of competition law and policy, and the evaluation and assessment of the economic harm associated with various price-fixing activities. | Dr. Ross is the Associate Dean (Research) and UPS Foundation Professor of Regulation and Competition Policy at the Sauder School of Business of the University of British Columbia. He obtained his PhD in Economics from the University of Pennsylvania in 1981. Dr. Ross has previously held the T.D MacDonald Chair in industrial economics at |

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | the Competition Bureau, from 1990 to 1991. He has published over 70 papers. See above. |
| 40 | Aidan Michael Hollis | Apotex reply — Reply to affidavits of Dr. Cockburn of February 27, 2008, Dr. Low of February 28, 2008 | March 28, 2008 | A-30 | See above. | |
| 41 | Jeffrey Church | Apotex reply — Reply to affidavits of Dr. Cockburn of February 27, 2008 | March 31, 2008 | A-31 | See above. | See above. |
| 42 | Donald E. Low | Lilly and Shionogi responding — Use of antibiotics | February 28, 2008 | S-1 | Expert medical doctor with particular expertise in relation to the use of antibiotics including cefaclor. | Dr. Low is Microbiologist-in-chief at Mount Sinai Hospital in Toronto. He is also Head of the Department of Laboratory Medicine and Pathobiology and teaches at the Department of Medical Genetics and Microbiology of the University of Toronto. He obtained his medical degree from the University of Manitoba in 1972. He is a fellow of the Royal College of Physicians and Surgeons of Canada and a fellow of the American Academy of Microbiology. He is the author or co-author of over 400 publications and contributed to over 700 presentations worldwide. |
| 43 | Iain Cockburn | Lilly and Shionogi responding — Impact of the 1995 Assignment between Lilly and Shionogi | February 27, 2008 | E-22 | Expert in economics, with a particular focus on the economics of pharmaceutical and health sciences; of intellectual property including licensing and partnering, and the competition issues related thereto as well as the economics of technological change. | Dr. Cockburn is Professor of Finance and Economics at the School of Management of the Boston University. He obtained his PhD in Economics from Harvard University in 1990. His research interests include economics of technical change, competitive strategy, industrial organization, pharmaceutical and health economics and applied econometrics. He has been a co-editor or referee for academic journals in economics and management. He acted as an expert in 25 cases before various courts in Canada in United States. He |

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 290 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

published over 25 articles and
contributed to over 15 edited
volumes.

## Chart "B"



**Graphic 20**

**Graphic 21**

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 291 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...



**Graphic 22**



**Graphic 23**

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 292 of 308

**Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042**

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...



**Graphic 24**



**Graphic 25**

*Action allowed; counterclaim dismissed.*

Footnotes

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

1   See facts agreed to by the parties, LRTA # 21(a).

2   *Ibid.*, LRTA # 1 and 51.

3   *Ibid.*, LRTA # 9 and 50.

4   The application was dismissed because the patents did not meet the criteria set out in the PM (NOC) regulations applicable at that time.

5   Having considered all the evidence and the case law submitted, including all the prior art, the Court was guided by the comments of the Supreme Court of Canada in *R. v. M. (R.E.)*, 2008 SCC 51, [2008] 3 S.C.R. 3 (S.C.C.), particularly at para. 43.

6   And then the 3-chloro-3-cephem compound in the case of the Lilly process patents.

7   See Facts agreed to by the parties, LRTA # 81.

8   Transcript of April 21, 2008 contains a typographical error at p. 179, line 2.

9   That said, this issue is not relevant to the present findings.

10  See *Eli Lilly & Co. v. Apotex Inc.* (2000), 8 C.P.R. (4th) 413, 99 A.C.W.S. (3d) 319 (Fed. T.D.) (*Eli Lilly (2000)*), aff'd, 2001 FCA 141, 12 C.P.R. (4th) 127 (Fed. C.A.) (*Eli Lilly (2001)*). Request made by Apotex after these decisions were issued should have been the subject of a motion to obtain an answer if there were valid reasons to argue that there was no *res judicata*.

11  In this case there is no evidence that those responsible for such testing at Apotex were aware of the fact that Lupin allegedly changed its process in 1998 or at any other time.

12  At this point, it must be said that the parties used different versions of the transcripts in their submissions. Also, the Court initially worked using the electronic version of the revised transcripts until it was found that as these were not in PDF format pagination was not reliable. In footnotes to these reasons I refer to the paper version of the revised transcript but there may still be some inaccuracies. See Cross-examination of Dr. Sherman, May 6, 2008, p. 157 line 2 to p. 158, line 1; cross-examination of Dr. Sherman, September 3, 2008, p. 90, line 24 to p. 91, line 17, p. 95, lines 3-12, and p. 96, line 5 to p. 97, line 16.

13  It should be noted that this should not be described as complete files given that Singh indicated that he did not archive or keep his files intact.

14  Chart A also includes under the heading Competition the eight expert reports filed in the counterclaim.

15  In reply, Lilly also presented the evidence of Dr. Gorenstein but as will be discussed later on, this expert evidence was not considered by the Court.

16  The paragraphs objected to in E-17 (see TX-343; TX-344) were not considered by the Court at all. Simply to avoid any further collateral debate on this issue, the Court found that this evidence was not necessary to make the findings relevant to the issues to be determined.

17  A. Spaggiari, L.C. Blaszczak & F. Prati, "Low-Temperature Deacylation of N-Monosubstituated Amides" (2004) 6 *Organic Letters* 3885.

18  This appears to be in direct contradiction with the description of the addressee of the '007 patent adopted by Apotex in their memorandum. But given that neither Apotex nor Lilly raised this issue in respect of both experts maybe because of their particular knowledge of phosphorus compounds, the Court gave some weight to their evidence.

19  Although the Court is not persuaded that either expert qualified as posita in the 1970s, they certainly qualified shortly thereafter. Also, Dr. Barrett was working, as of 1976, under the supervision of a posita — Sir Derek Barton — and he studied cephalosporin chemistry earlier in the 1970s (see examination of Dr. Barrett, April 22, 2009, p. 15, lines 18-23 and p. 19, lines 1-19).

20  Cross-examination of Dr. Olah, June 24, 2008, p. 92, line 18 to p. 93, line 1. Unlike Dr. McClelland and Dr. Chivers, Dr. Olah does not say in his report that a difference of more than one ppm means different kinetic complexes.

21  Given the very special circumstances surrounding the filing of the two reports of Drs. Hanessian and Barrett (A-20 and E-15, respectively), the weight of the evidence of those two experts in respect of issues within their expertise, has not been diminished by the fact that they accepted to opine on matters on which it is not clear they had the necessary expertise (manufacturing practices).

22  Here it appears that nobody at Apotex verified if any such changes were necessary despite the fact that Apotex knew that Lupin was bound to change its process by contract.

23  Apotex did not explain how this would make any sense in respect of the Lilly patents, simply stating that Lilly and Lilly Canada "muffed up" when they made this amendment and must suffer the consequences.

24  See *Whirlpool* at para. 45, and *Free World Trust* at para. 31(e).

25  4 th ed. (Toronto: Carswell, 1969) at 219.

26  See, among other things, Affidavit of Dr. Hanessian (A-10; A-15), para. 7; Affidavit of Dr. Martin (A-17), para. 12; Apotex's memorandum on infringement, para. 172.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 294 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

27    See transcript of April 28, 2008, p. 231 line 23 to p. 232 line 4. Although Dr. Baldwin made these comments while discussing the Lilly process patents, they obviously apply more generally.

28    For Dr. Olah, see A-19, para. 8 and for Dr. McClelland, see A-12, para. 7. See also Dr. Chivers (A-18) at para. 6.

29    See Apotex memorandum on infringement at para. 120.

30    In *Generics (UK) Ltd. v. Daiichi Paharmaceutical Ltd.* (2009), [2009] EWCA Civ 646 (Eng. C.A.) (*Daiichi*), at paras. 23-28, the Court of Appeal of England and Wales felt the need to review the law as to the common general knowledge of the posita.

31    No explanation was given for this, even if the Court has expressed its keen interest in hearing his version of the events that will be discussed when reviewing the evidence in respect of infringement of the Lupin material and *voir dire*.

32    Who only had expertise in lactams, not [beta]-lactams.

33    In the case of claims 4 and 13, specifically the TPP.

34    In the case of claim 4, Cl only.

35    In the case of claim 17, specifically an aromatic or halogenated hydrocarbon solvent.

36    Although Apotex focused its argument only on the [31]P NMR shift given for this kinetically controlled product in methylene chloride (CH$_2$Cl$_2$), its position should in theory apply to all the other characteristics (except half-life) found in table 1 for the kinetically controlled product and included claim 6.

37    See claim 1.

38    This prior art is in evidence here, the proper citations (and exhibit numbers) being D.G. Coe, S.R. Landauer & H.N. Rydon, "The Organic Chemistry of Phosphorous. Part II.* The Action of Triphenyl Phosphite Dihalides on Alcohols: Two Further New Methods for the Preparation of Alkyl Halides." (1954) J. Chem. Soc. 2281 (TX-1562, hereinafter "Coe") and H.N. Rydon & B.L. Tonge, "The Organic Chemistry of Phosphorus. Part III.* The Nature of the Compounds of Triaryl Phosphites and the Halogens." (1956) J. Chem. Soc. 3043 (TX-1564, hereinafter "Rydon").

39    The evidence does not establish that the person skilled in the art would understand the general formula with a • or this reference to a cationic character to mean that the formula limits the nature of the chemical bonding between the triaryl phosphite and the halogens in any particular way or that it limits itself to a particular covalent form or ionic form or a particular equilibrium mixture, if any.

40    See para. 10 of Affidavit of Dr. Baldwin (E-19).

41    See the note at the bottom of Table 1, p. 8 of the '007 patent. In the patent and in some of the prior art, such as the articles by Ramirez (F. Ramirez, A.J. Bigler & C.P. Smith, "Pentaphenoxyphosphorane" (1968) 90 J. Am. Chem. Soc. 3507 (TX-1596)), Tseng (Chien K. Tseng, "Reinvestigation of Diahalotriphenoxyphosphoranes" (1979), 44 J. Org. Chem. 2793 (TX-1764C)) and Michalski (Jan Michalski, Marek Pakulski & Aleksandra Skowronski, "Reaction of Triphenyl Phosphite with Elemental Bromine and Chlorine" (1980) 45 J. Org. Chem. 3122 (TX-1764D)), the authors used an old convention and refer to -3.7 or -7 or -4.5 and +22. Since then, the convention has changed and in this judgment the figure of +3.7 and -22 ppm will be used throughout the evidence presented to the Court.

42    Dr. McClelland testified that he was surprised that the [31]P NMR shift was the same and felt this to be inconsistent (Examination of Dr. McClelland, May 27, 2008, p. 123, line 18 to p. 124, line 17), see also the affidavit of Dr. Chivers (A-18), para. 22).

43    Once again Table 1, p. 8 of the patent refers to +22.7 ppm but, as noted above, this convention was changed and the new convention is adopted in these reasons.

44    Because the unstable or transient nature of the claimed compound is already conveyed by the reference to the kinetically controlled product, which is defined as the fastest forming compound of the reaction, as well as the • in the formulas included in various claims, there is no mention of the half-life in any of these claims.

45    See William L. Hayhurst, Q.C., "The Art of Claiming and Reading a Claim" in Gordon F. Henderson *et al.*, eds., *Patent Laws of Canada* (Scarborough: Carswell, 1994) 177 (Hayhurst).

46    Having particularly reviewed and weighed the evidence singled out by Apotex in the footnotes of their memorandum and during their oral arguments, the Court notes, among other things, that not all of this evidence can be given weight or can even be considered for the purpose of construction. Certainly, explanations as to the subjective understanding of the inventor are not relevant. This is particularly so when the Court is not even satisfied that the quotes referred to (see exhibit A-16 — extracts of Blaszczak discovery) are properly used or understood.

47    Although this is a somewhat surprising statement, see cross-examination of Dr. McClelland, May 12, 2008, p. 149, lines 14-18, this passage was specifically referred to in Lilly's closing arguments and no request for amendment was made in that respect. It corroborates the statement in the disclosure that this is a term of the art.

48    Cross-examination of Dr. McClelland, May 12, 2008, p. 158, lines 4-8.

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 295 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

49 As did Apotex's counsel in their cross-examination of Lilly's experts. Dr. McClelland agreed that chemical shift values at +6 ppm indicates the presence of the kinetically controlled product claimed in claim 1. It is interesting that in his affidavit on validity (A-12), Dr. McClelland states at para. 38, "[t]he negative signal at -6.3 ppm is clearly due to the unstable "kinetic product" claimed as being a novel compound in the '007 patent. The peaks at +22 to +23 that grow in as this unstable compound reacts are clearly the thermodynamic product." In that respect, he appears to have absolutely no difficulty understanding claim 1 and applying it to a kinetic complex, which is not characterized by a signal at +3.7 ppm.

50 See p. 5, lines 1 and 2: "are used synonymously and likewise are to be distinguished from those triaryl phosphite dihalides of the prior art".

51 See also examination in-chief of Dr. McClelland, May 8, 2008, p. 174, line 25 to p. 176 line 18.

52 See '007 patent p. 2, line 25 to p. 3, line 14; p. 4, lines 20-28; p. 7, lines 18-21; and, p. 9, lines 1-5.

53 His affidavit, E-11, and all evidence relating thereto have not been considered.

54 It is clear from the evidence of Dr. McClelland that in fact a small difference of about 5% in the amount of covalent versus ionic species in the equilibrium represented by the weighted average given by the $^{31}$P NMR would explain the distinction between a +3.7 ppm reading and a +7 or +8 ppm reading.

55 Were it not for the (•) in the general formula and the reference to kinetically controlled products, these words, per se, could apply to the thermodynamic compounds or the so-called prior art triaryl phosphite dihalides.

56 Although still included in the final version of the statement of defence, during the trial Apotex abandoned the argument it had initially raised in respect of the filing of improper divisional applications. It would certainly be good practice to amend pleadings before trial to ensure that they truly reflect each party's position.

57 It appears that all these inventors were part of Lilly's [beta]-lactam research group.

58 Also referred to later in these reasons as "one pot".

59 This is the one pot (one reaction) process where the kinetic complex is used to sequentially modify the groups at positions 1, 3, and 7 of the cephalosporin system (see Affidavit of Dr. Baldwin (E-6), paras. 64-68).

60 The parties did not present any arguments in respect of the construction of claims 18 and 34, particularly as to whether or not the specific characteristics described therein would be essential elements of those claims. The Court does not have to make a determination in that respect, given that the Court only needs to find that one of the claims is infringed for Lilly to succeed. For reasons that will be explained later on, the Court is satisfied that other claims were infringed, there is thus no need to discuss claims 18 and 34 any further.

61 The expression "improved processes" is used here in the sense of s. 2 of the *Patent Act* where "invention" is defined. It is not referring to an "improvement" of a patented process dealt with at s. 32 of the Act.

62 It appears, however, that Dr. Hanessian failed to realize this even after having examined the patents (cross-examination of Dr. Hanessian, May 15, 2008, p. 76 line 25 to p. 84 line 13).

63 Also Apotex did not raise any issue with respect to the sufficiency of the disclosure.

64 It should be noted that this is likely a rough translation of the Japanese application.

65 Other parts of this common disclosure in effect concern only one of the patents: p. 8, lines 5-15 ('026); p. 9, line 21 ('026); p. 10, lines 19-20 ('026); p. 14, lines 25-29 ('026); p. 15, lines 15-17 ('547); p. 15, lines 17-19 ('924); p. 15, line 23 to p. 18, line 6 ('132); p. 18, line 7 to p. 23, line 11 ('026); p. 23, line 21 to p. 35, line 12 ('547); p. 35, line 13 to p. 47, line 7 ('132); p. 51, line 1 to p. 66, line 26 ('026); p. 67 ('026); and, p. 69, line 24 to p. 76 ('547).

66 Both the process and compound by process claims include several variants.

67 Certificate of correction was issued to add the dotted line representing the thiazoline.

68 Figures A and B represent the same compound, which are in equilibrium between the enol and keto forms.

69 Again, C and D represent the same compound or an equilibrium mixture of the two.

70 This was confirmed by Dr. Barrett on cross-examination, June 19, 2008, p. 61, lines 9-22.

71 *Ibid.*, p. 61, line 9 to p. 62, line 10.

72 It is clear that the acids used to cyclicize include the Lewis acids which will remove R substituents other than H described in the disclosure before proceeding to cyclicize the compounds.

73 Inasmuch as para. 1 does not expressly refer to the opening of the thiazoline ring when present by the aqueous acid used to treat the enamine, there was no need to refer to the removal of any remaining thiol substituent other than H prior to cyclization through the use of appropriate acid. In my view, both would be understood by the posita, especially given the explicit reference to same in the disclosure.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 296 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

74    See correspondence from counsel for Lilly dated November 18, 2008 and its reply from counsel for Apotex dated November 25, 2008; argument in chief of counsel for Apotex, October 31, 2008, p. 161, line 2-19; p. 179, line 22 to p. 180, line 3; argument in reply of counsel for Apotex, November 4, 2008, p. 69, line 5 to p. 70, line 5.

75    According to s. 78.2 of the *Patent Act*, it appears that the version of its s. 55.1 amended by s. 193 of the *North American Free Trade Agreement Implementation* Act, S.C. 1993, c. 44 is applicable to patents issued before 1989.

76    See Facts agreed to by the parties, LRTA # 44(e).

77    See para. 239 of Apotex's memorandum on infringement; the Court does not agree that *SmithKline Beecham Inc. v. Apotex Inc.* (2001), 267 N.R. 101, 10 C.P.R. (4th) 338 (Fed. C.A.), at para. 33 or *Pfizer Canada Inc. v. Apotex Inc.* (2004), 2003 FC 1428, 245 F.T.R. 243 (F.C.), at para. 15, stand for this proposition.

78    See Lilly memorandum, para. 102.

79    Request to admit LRTA # 115, Trial Record, Tab 24, p. 34.

80    See TX-1671 and TX-1654.

81    The Court disregarded the evidence based on the Ladas & Parry letter (June 12, 1996) which was not entered in evidence. Thus, I have decided not to make any conclusions with respect to claim 6 which deals with specific halogen scavengers having a six-ring carbon atoms such as cyclohexene.

82    An experiment by Dr. Modro also confirms that the thermodynamic product could not perform these reactions.

83    See also Dr. Miller's report (E-3).

84    Lilly's motion included a request for the production of a better and further affidavit including documentation regarding the processes by which Apotex's cefaclor was manufactured but it appears that this request was abandoned upon Apotex's undertaking to look for whatever additional documentation within its power, possession and control fell in certain categories described in the Order.

85    At one such session, Ivor Hughes was present.

86    In fact, Lupin's counsel was present at the hearing on July 5, 2000.

87    It appears that Lupin did not keep its manufacturing data for more than two years after the production of the material.

88    Some papers were recovered and an attempt was made to reconstruct part of those files.

89    Despite the Court urging that they file evidence to explain the non-filing of the letter, Apotex's counsel only provided a verbal explanation — a secretary in the counsel office filed the letter thinking that it had been seen by the lawyers concerned. Unfortunately, Mr. Sarkis, from Ivor Hughes office, was deleted from Apotex's list of witnesses.

90    Although it is clear that the manufacturing plant documentation was destroyed, it has not been established to my satisfaction that there was no relevant documents in the files of the R&D department.

91    For this reason, the Court did not consider the portions of E-15 dealing with the viability of Process "E" (objection 61A granted)

92    Two reagents for two-pot process instead of three reagents and a three-pot process.

93    Given that it started from Pen V.

94    Given the exculpatory nature of the schematic outline attached to the July 4, 2000 letter, Lilly proposed an explanation that the Court cannot accept for it is purely speculative.

95    Request to admit LRTA # 84, Trial Record, Tab 24, p. 33.

96    Cross-examination of Dr. Hanessian, May 15, 2008, p. 163, line 1 to p. 164, line 8.

97    In addition to the presumption of good faith, Kyong Bo was legally obliged to disclose the process it used to produce the cefaclor sold in Canada and had to update its file in that respect whenever changes were to be made.

98    Lilly objected to this evidence on the basis that it constitutes double hearsay and, although Ms. Fouillade is deceased, there is no evidence that a person with personal knowledge from Kyong Bo, such as Seung-Ho An, could not testify.

99    Although it would not be sufficient in law to prove that Apotex believed that Kyong Bo had a licence, the Court is not satisfied that Apotex has even established that much.

100   See Facts agreed to by the parties, ARTA # 295. All the parties confirmed that these agreed facts applied to both the main action and the counterclaim.

101   More than 30 pages were devoted to this argument in Apotex's memorandum and it was the one argument on which Apotex's counsel spent the most time in its oral argument.

102   It also applies to the Lilly patents but as discussed in respect of those patents, Apotex also vigorously contested that its supplier used the patented processes abroad.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 297 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

103    The first English case where a Court found that a defendant had infringed an English patent covering a process for making an intermediate compound (ortho-toluene-sulpho-chloride) when it imported and sold in England a final product (saccharin) manufactured abroad. See also *Beecham Group v. Bristol Laboratories Ltd.* (1978), [1978] R.P.C. 153, [1977] F.S.R. 215 (U.K. H.L.) at p. 184, where Lord Justice Patrick Russell, on behalf of the English Court of Appeal, said "[i]n our judgment, this extension of the principles laid down in *Elmslie v. Boursier* and *Von Heyden v. Neustadt* was sound and correct. (We should however mention in passing that the reference to ortho-toluene-sulpho-chloride being "contained in" saccharin at p. 319, line 3, is a loose phrase, in that, after the further chemical reaction, it did not have a separate existence in terms of its chemical structure, as Buckley, J. plainly appreciated.)"

104    To this effect, Apotex cites *Brown v. Duchesne* (1856), 60 U.S. 183, 15 L.Ed. 595 (U.S.S.C. 1856) (1856); *Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.* (1915), 235 U.S. 641, 35 S.Ct. 221 (U.S.S.C. 1915) (1915); *Deepsouth Packing Co. v. Laitram Corp.* (1972), 406 U.S. 518, 92 S.Ct. 1700 (U.S. La. 1972) (1972); and, *Microsoft Corp. v. AT&T Corp.* (2007), 550 U.S. 437, 127 S.Ct. 1746 (U.S.S.C. 2007) (2007).

105    5 October 1973, subs. 64(2).

106    *Process Patent Amendment Act*, 35 U.S.C. § 271(g).

107    See footnote 11 of Apotex's memorandum on infringement.

108    See para. 104 and following of Apotex's memorandum on infringement. The Court notes that Apotex did try to intervene in the appeal of Justice Snider's decision, however, their motion was dismissed and the appeal was ultimately abandoned.

109    Apotex suggests that this has in fact never occurred and that there is a need for a thorough analysis.

110    In this decision, it is interesting to note that Lord Atkinson, while concurring with the majority, wrote separate reasons with respect to whether to construe the exclusive right or privilege of the patentee in a process patent, as to include the exclusive right to sell articles made by others situated elsewhere. This entails that the arguments now proposed by Apotex were considered by the Lordships before they rendered their majority decision confirming the Court of Appeal.

111    The example referred to at trial was the use of a hammer made according to a patented process for the assembly of a railway car could be found to be infringing. In *Pfizer*, Justice Snider referred to the use of patented scissors to cut the cloth of an Italian suit imported into Canada.

112    The grant and prohibition is summarized by Lord Diplock as follows: "The grant is of "full power, sole privilege and authority" to "make, use, exercise and vend the said invention within our United Kingdom..." and to "have and enjoy the whole profit and advantage from time to time accruing by reason of the said invention." The corresponding prohibition is the observation of the grant. It is expressed to be imposed "that the patentee may have and enjoy the sole use and exercise and the full benefit of the invention..."; and commands all Her Majesty's subjects in the United Kingdom "that they do not at any time ... either directly or indirectly make use of or put in practice the said invention nor in anywise imitate the same."" (p.198).

113    This was very clearly interpreted by Justice Noël in *American Cyanamid Co. v. Charles E. Frosst & Co.* (1965), [1965] 2 Ex. C.R. 355, 47 C.P.R. 215 (Can. Ex. Ct.) (*American Cyanamid Co.*), at para. 40, as meaning that the sale of a product made in accordance with a patented process would infringe a process patent even though the patent contained no claim to the product.

114    It should be noted that among all the judges confronted with these issues, President Jackett appears to have been the most sympathetic to arguments similar to those raised by Apotex in respect of territoriality and the limited monopoly granted by a process claim.

115    This was the only product covered by a Canadian patent. But, by the time it was imported into Canada, it had been transformed into tetracycline.

116    See paras. 55-57.

117    Annex 1C of the *Marrakesh Agreement Establishing the World Trade Organization*, 15 April 1994.

118    Given that Kyong Bo infringed at least one claim in each of the Shionogi patents, the Court will simply use the expression "Shionogi process" to refer to all these infringed claims in each of the patents.

119    Here again the Court will use the expression "the Lilly process" given that the Lupin process infringes all of the Lilly process patents including particularly the '536 patent (triple combination). It is important to note here that although the Court is satisfied that claim 17 of the '007 patent was infringed, this finding is not very relevant here given that the infringement of the process patents per se is sufficient. In fact, infringement of the '536 patent would be sufficient to support the Court's reasoning here.

120    Both the Kyong Bo and Lupin processes have been described by the experts in a variety of depictions, more or less grouping various chemical reactions. For example, see, for the Kyong Bo process, TX-129, the closed portion of Kyong Bo's DMF, versus the one in the Kyong Bo process chart (W-18).

121    To make the cefaclor shipped to Apotex as of June, 1998.

Case 09-10138-MEW   Doc 14225-45   Filed 08/15/14   Page 298 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

122   Using either the prices of $840 and $1250 per kg or the disputed invoice prices of $1070 versus $1500 per kg (see TX-1671; TX-1759; TX-1050; TX-1062; TX-1082; TX-1105; TX-1123; TX-1126; TX-1131; TX-1134; TX-1137; TX-1144; TX-1151; TX-1156; TX-1161; TX-1166; TX-1171; TX-1180; TX-1193).

123   Such as samples to pharmacists or doctors.

124   The Court is not satisfied that the details of the quantities were sufficiently explored during the trial for it to make a final determination in this respect.

125   See also *Monsanto Canada Inc.*, where the Supreme Court of Canada held: "Monsanto's patent has already been issued, and the onus is thus on Schmeiser to show that the Commissioner erred in allowing the patent: *Apotex Inc. v. Wellcome Foundation Ltd.*, [2002] 4 S.C.R. 153, 2002 SCC 77 (S.C.C.), at paras. 42-44. He has failed to discharge that onus. We therefore conclude that the patent is valid." (para. 24)

126   It is worth mentioning that none of the parties in *Wellcome (2002)* presented any arguments on this issue. On the other hand, the standard of review applicable to an appeal under s. 42 was the subject of debate in *Harvard College (2002)*. It was an issue on which the majority of the Federal Court of Appeal and the dissenting Chief Justice Julius Isaac disagreed. (*Harvard College v. Canada (Commissioner of Patents)* (2000), [2000] 4 F.C. 528, 223 F.T.R. 320 (note) (Fed. C.A.), (*Harvard College (2000)*) see paras. 43-63; paras. 179-186). The decision of the Supreme Court of Canada in that case was issued on the same day as its decision in *Wellcome (2002)*. This could explain the Court's comments in the latter case.

127   More recently, in *Sanofi-Aventis Canada Inc. v. Apotex Inc.* (2009), 2009 FC 676 (F.C.), at paras. 75-76, Justice Snider noted that the burden on defendants such as Apotex in infringement cases "is not one that can easily be defined by judicial review standards" and that "[f]or the most part, the decision of the Commissioner is simply not relevant to the determination before [her]."

128   In respect of Dr. McClelland's views that there exists a disconnect between the various patents, as mentioned, there is no need to discuss it in any detail. I note, however, that the Court is satisfied that the target compounds of the '547 patent can be used as starting compounds for the '924 patent, which is not disputed. The Court is also satisfied that the target compounds of claims 31 and 37 (claims 4 and 12 cover the first step) of the '924 patent can be used as starting compounds for the process in the '132 patent. The compounds of claim 58 (made using the process of claim 38) of the '132 patent can be used as starting compounds to carry out the reactions covered in the '026 patent, which, as mentioned, lead to 3-hydroxy-3-cephem.

129   See *Farbwerke Hoechst A.G. vormals Meister Lucius & Bruning v. Canada (Commissioner of Patents)* (1963), [1964] S.C.R. 49 (S.C.C.) (*Farbwerke*) where indeed the Commissioner's decision refusing the filing of divisional applications was the subject of the appeal.

130   Although Shionogi could have chosen to claim all of the steps in a single application and restrict itself to one patent only, it is evident that it would not have been able to claim the compounds produced by processes that it claims in its divisional applications or to include dependent claims covering each of the steps. It would have been left with a limited monopoly that could easily be designed around. As always, this is the difficult choice that all applicants face when filing amendments required by the *Manual of Patent Office Practice (MOPOD) (see Ch. 10* of its 1979 version, discussed in Mr. Murphy's affidavit (E-20), at paras. 11-22).

131   See correspondence from counsel for Lilly dated November 18, 2008 and its reply from counsel for Apotex dated November 25, 2008.

132   As noted, there was no specific statutory provision dealing with obviousness in the old act and Courts used the definition of "invention" to add inventiveness as a requirement to qualify as an invention.

133   Albeit in a different context, see *Laboratoires Servier v. Apotex Inc.*, 2009 FCA 222, [2009] F.C.J. No. 821 (F.C.A.) (*Servier (2009)*) at para. 69.

134   In my view, *Consolboard (1981)* teaches that patents resulting from the forced filing of divisional applications cannot be challenged on the basis of double patenting. This may explain why Apotex abandoned its allegations of double patenting.

135   No case law was cited to support the principle that two inventions are identical simply because they derive their inventiveness from the same idea.

136   *Riello Canada Inc. v. Lambert* (1986), 3 F.T.R. 23, 8 C.I.P.R. 286 (Fed. T.D.); *Scott Paper Co. v. Minnesota Mining & Manufacturing Co.* (1981), 53 C.P.R. (2d) 26, [1981] F.C.J. No. 5 (Fed. T.D.); and, *Pfizer Canada Inc. v. Apotex Inc.* (2005), 2005 FC 1421, 282 F.T.R. 8 (Eng.) (F.C.) .

137   For example, Rule 60(1) of the *Patent Regulations* (as in force at the time) provided that a patent that does not contain a claim broader in scope than any other claim in the application was deemed to be directed at more than one invention.

138   Opening statement on validity of counsel for Apotex, June 2, 2008, p. 32 lines 18-22; p. 33 lines 14-23 (Lilly patents); p. 41 lines 14-16 (Shionogi patents).

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 299 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

139    In *Merrell Dow Pharmaceuticals Inc.*, even though there was only one invention, it is evident that the Court was prepared to invalidate the product claims but not the process claims. The Court even granted a certain delay to the applicant to amend its process claims to take into account what it had decided in respect of the product claims. See also the comments in *Servier (2009)* at para. 63.

140    Claim 1 includes all triaryl phosphites mixed with Br or Cl while the prior art document on which Apotex relies only deals with triphenyl phosphite and Cl.

141    Examination-in-chief of Dr. Baldwin, June 25, 2008, p. 28, line 19 to p. 29, line 1.

142    As in *Abbott (2006)*, stabilization or maintenance of the compound in solution is not an essential element of any of the claims of the '007 patent.

143    Again, this appears to be based on the notion that the inquiry in respect of anticipation is directed to the patented invention or inventive concept as opposed to what is covered by the claims at issue.

144    See also *Pfizer Canada Inc. v. Apotex Inc. (2009), 2009 FCA 8, 72 C.P.R. (4th) 141* (F.C.A.) at para. 29.

145    This oft-cited publication was expressly referred to by Justice Ian Binnie in *Free World Trust* to define common general knowledge at para. 44.

146    For his review of the law of enablement in *Wobben v. Vestas-Celtic Wind Technology Ltd., [2007] EWHC 2636* (Eng. Patents Ct.) and for having been affirmed by the Court of Appeal of England and Wales, particularly with regard to the "obvious to try" test in *Generics (UK) Ltd. v. H. Lundbeck A/S* (2008), *[2008] EWCA Civ 311, 101 B.M.L.R. 52* (Eng. C.A.).

147    See also the Court of Appeal of England and Wales' comments in *Daiichi* (at paras. 26-28).

148    In the pre-October 1, 1989 Act, the key date for obviousness was the date of the invention, which in the absence of evidence establishing an earlier date was presumed to be the priority filing date, if any, or the filing date.

149    Peter G. Sammes, "Recent Chemistry of the [beta]-Lactam Antibiotics" (1976) 76 Chemical Reviews 113 (TX-194).

150    Obviously, that does not mean that anything not found in Sammes would necessarily be excluded from the common general knowledge or from the state of the art.

151    However, an addendum was added. It is clear that the article now refers to publications in 1974, with some even dated 1975, presumably published before the revised manuscript was received on January 28, 1975.

152    This included Edwin H. Flynn, ed., *Cephalosporins and Penicillins; Chemistry and Biology*, (New York: Academic Press, 1972), although some chapters were attached to Dr. Barrett's report (E-14) (see also TX-196).

153    Again, the filing date (including that of the priority application, if any) is just a presumed date of the invention in the absence of evidence to the contrary.

154    One must remember that a claim can be anticipated but not obvious. See for example *SmithKline Beecham Pharma Inc. v. Apotex Inc. (2001), 2001 FCT 770, [2001] 4 F.C. 518* (Fed. T.D.), aff'd *SmithKline Beecham Pharma Inc. v. Apotex Inc. (2002), 2002 FCA 216, [2003] 1 F.C. 118* (Fed. C.A.) particularly at para. 22 of the FCA.

155    Lilly noted that it was not clear that experimentation was allowed in this context. The Court need not address this issue here given the findings made on the overall issue.

156    As the posita does not have to have any particular knowledge of [beta]-lactam or cephalosporin chemistry, the Court does not accept that such person would know which solvents are suitable for chemistry on cephalosporin substrates (see also cross-examination of Dr. Olah, June 24, 2008, p. 205 line 1 - p. 206 line 17).

157    *Shire*, at para. 24: "[t]he patent begins by acknowledging that certain things are already known and constitute, in patent language, prior art. Such an acknowledgement by the patentee is considered a binding admission as to prior art [...]."

158    The Court will include here all information that could be relevant not only to the '007 patent but to the Lilly process patents in order to review these publications only once.

159    Dr. Olah noted however that this was speculative and was never established. Cross-examination of Dr. Olah, June 24, 2008, p. 142, lines 9-15.

160    For example, "the covalent triphenoxy dihalide may be expected to be in equilibrium with all or any of the six possible ionic forms." (Rydon, p. 3045)

161    None of the experts who tested the reaction of TPP and Cl succeeded in crystallizing pure specimens of the kinetic complex. The '007 patent indicates that the kinetic complex could not be isolated.

162    The method used by the authors to mix Cl and TPP in all their experiments was to slowly pass Cl gas through TPP (bubbling through).

163    One experiment was performed *in situ*, diluting TPP in alcohol.

164    According to Dr. Modro, this teaching is contrary to what is taught in the '007 patent.

Case 09-10138-MFW   Doc 14225-45   Filed 08/15/14   Page 300 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

165    See Dr. Hunter report (E-18) at para. 33 where he says that this is how he understood Ramirez. The Court did consider his cross-examination on June 23, pp. 198-200 on this point. See also the cross-examination of Dr. Chivers, June 11, 2008, p. 97 to p. 98, line 4.

166    Apotex did not point to any experiment in Richard Anschütz & William O. Emery, "Ueber die Einwirkung von Phosphortichlorid auf Salicylsäure und auf Phenol" (1889) 253 Annalen der Chemie 105, which is cited (in German only) where Cl and TPP are mixed in a hexane solution. The Court infers from this that there was no such experiment.

167    Following the new convention.

168    A form of triphenylphosphite dichloride, cross-examination of Dr. Hunter, June 23, 2008, at p. 203, lines 11-15. Cross-examination of Dr. Chivers, June 11, 2008, p. 96, line 17 to p. 97, line 1.

169    The order of addition is not relevant to claim 17, although for the purpose of enablement, one can gather from the disclosure that the preferred method is to add TPP to Cl.

170    The Court notes that Dr. Chivers' original report was amended to address Lilly's objection about duplicate evidence. In particular, paras. 49 and 50, which were to the same effect as those Dr. Modro referred to above were deleted. Dr. Chivers had apparently reached that conclusion with full knowledge of Tseng and Michalski's work.

171    As mentioned, the Court did not accept Apotex's proposed construction that all claims were limited to a complex exhibiting a +3.7 ppm shift. However, the Court did not understand that this argument applied only if the ppm shift of the kinetic complex was an essential element of the claim properly construed.

172    Again, this shows that this expert did not carry out research in that respect and simply acted on the basis of documents provided to him (listed at para. 3(d) of his affidavit). There is no explanation for why Apotex did not give him that publication which was obviously available to Dr. Olah.

173    Again, these were not among the publications provided to him by Apotex's counsel.

174    There is no indication that Dr. Olah was told not to use such knowledge.

175    A-21, tab 33, p. 124 and tab 35, p. 147.

176    Dr. Chivers was careful to describe the work in Michalski as simply being "similar" to the Rydon process.

177    See other publications which also bear Dr. Michalski's name, listed in footnotes 3a) and b) of TX-1764D. It is also somewhat surprising that Dr. Modro did not refer to Dr. Michalski's work considering that they worked closely and published together earlier in the former's career.

178    The authors confirmed Rydon's views with respect to equilibria (ionic versus covalent forms) of species involved in the reaction.

179    See Lilly Process Research and Development Division Progress Report (TX-211), p. 7; and L.D. Hatfield *et al.* "Application of Phosphorus-Halogen Compounds in Cleavage of the 7-Amide Group of Cephalosporins" in G.I. Gregory, ed., *Recent advances in the chemistry of [beta]-Lactam Antibiotics* (London: The Royal Society of Chemistry, 1980) 109 at 118 (TX-221, also reproduced in a different form in TX-220).

180    In 1976, a general request for help and suggestions of possible reagents to try was sent by Dr. Hatfield's team (see A-21, tab 21, p. 97).

181    As mentioned, these findings are relevant to the next inquiry in respect of the Lilly process patents.

182    "Reduction of [delta]³ Cephalosporin Sulfoxides", (3 October 1968) (TX-1584). A patent discussed in the disclosure of the '536 patent, expressly relied upon by Apotex's experts and which, according to the defendant, forms part of the common general knowledge.

183    The only two other phosphites mentioned in this review are TPP (used alone), which was found to reduce the dimethyl sulfoxides at elevated temperatures and chlorophospholane.

184    Although Drabowicz is cited in "Cephalosporin Reduction Process", U.S. Patent No. 4223133 (1 February 1979) (TX-1783A), it is not clear if this was art which was cited by the examiner or the inventor as there is no reference to this publication in the disclosure of this patent per se.

185    One crystal.

186    This was established by E.H. Amonodo-Neizer, *et al.* in an article published in 1965 (J. Chem. Soc.) 4296, where the reduction was done at an elevated temperature. Dr. Baldwin testified that a posita would be quite weary of heating cephalosporin sulfoxide.

187    TX-1783A.

188    (1976) Tetrahedron Lett. 971.

189    Cross-examination of Dr. Baldwin, June 25, 2009, p. 218, line 16; p. 219, line 7.

190    Rather than going through each claim individually, the Court describes the general inventive concept of the claims in the process patents. It is well understood that the exercise should normally be carried out for each claim at issue but the Court is satisfied having done the exercise that the results here would be the same.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 301 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

191   Dr. Modro's experiments confirmed that the thermodynamic compound or final product of this reaction cannot perform the three steps covered in the '536 patent. The disclosure of the patents also makes it clear that the thermodynamic cannot perform the other reactions set out in the '725 and the '468 patents.

192   Coe and Rydon only discuss halogenation of simple alcohols.

193   Although this comment appears to apply to general organic chemistry (Dr. McClelland has no experience in [beta]-lactam chemistry), it is still relevant.

194   Dr. Modro's own experiment confirmed that the thermodynamic cannot be used instead of the kinetic complex in the cephalosporin chemistry described in the process patents.

195   These scientists were very experienced in the chemistry of cephalosporins. (A-21, tab 6, p. 149, lines 1 and 2.)

196   See A-21, tab 32.

197   See A-21, tab 21, p. 97 and A-16, tab 4.

198   See A-21, tab 19, p. 91.

199   See A-21, tab 80; TX-211, TX-220 and TX-221.

200   Cross-examination of Dr. Baldwin, April 28, 2008, p. 219, lines 12-15.

201   This is only relevant to the choice of base employed in the claimed reaction. As this is not controversial, it will not be discussed further.

202   As per their final written submissions.

203   See affidavit of Dr. Barrett (E-14), paras. 42-51 and 116.

204   See examination-in-chief of Dr. Barrett, April 22, 2008, p. 42, line 19 to p. 43, line 24; cross-examination of Dr. Barrett, June 18, 2008, p. 71, lines 18-20; cross-examination of Dr. Barrett, June 17, 2008, p. 50, lines 3-12; affidavit of Dr. Barrett (E-14), paras. 27, 29 and 40.

205   Dr. Morin, like Dr. Cooper, was a research chemist at Lilly.

206   See patent, TX-147.

207   Common disclosure p. 2.

208   Allylic bromination is a specific type of allylic halogenation.

209   Ozone is a electrophilic agent.

210   Dr. Barrett indicated that this compound was not suitable for the type of chemistry described in the Shionogi process. It could only be used to make a compound that did not require a side chain.

211   See cross-examination of Dr. Barrett, June 18, 2008, p. 54, lines 8-13.

212   See Sammes, p. 143.

213   It is generally agreed that retrosynthesis means moving backward from the desired molecule by sequentially breaking key bonds and/or changing functionality in a stepwise process that ultimately leads to the desired precursor molecule.

214   Apotex objected to this evidence on the basis that it constituted hearsay. The Court rejects this for it is exactly what expert evidence, in this context, seeks to provide. In any event, if Dr. Barrett's views were not considered, the Court would be left with a void as there would be insufficient evidence for me to conclude that retrosynthesis was commonly used by the posita in this context. Dr. McClelland's views were given no weight in that respect.

215   Apotex did not provide a translation of this document or of the two other German publications its experts relied upon. Obviously, this is contrary to the rules of the Court and to an adverse direction given at one of the trial management conferences. The weight of the experts' opinion based on those documents is diminished by the fact that the Court could not properly review the documents. The English documents used by Dr. Barrett are not the same as the German ones.

216   From the evidence presented, it appears that there could be a delay of 5 months, if not more, between the publication of an application for a patent and its reporting in *Chemical Abstracts*, depending on the amount of material to be abstracted in the given period.

217   Dr. Chauvette reacted a 3-hydroxy cephem (the target compound of the overall synthetic process) with a sulfonyl Cl and then used a fluoride salt to effect a substitution to form a 3 fluoro cephem.

218   See TX-1610 and TX-1611 which were filed under reserve of an objection. These documents are both inadmissible.

219   The content of footnote 22 in TX-1609 is hearsay. Its content is contrary to the practice described by Dr. Martin and his own belief as to whether Dr. Kishi reads his lectures. The Court is not persuaded that this paper was read in its entirety at any of these conferences.

220   See *Servier (2009)* (at para. 58) which confirms that the Court can refer to the disclosure to determine the inventive concept when same is not readily discernable from the claims.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 302 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

221    The usefulness or utility of the new compounds referred to in all the Shionogi patents, including compounds A, B, C, and D of the '026 patent is not contested, except for certain substituents that will be discussed in a distinct section.

222    If one had to consider the Chauvette application, for reasons given when discussing Dr. Hanessian's evidence, the Court prefers Dr. Barrett's evidence that the 3-hydroxy cephem would not be considered by the posita as a compound that would give relevant information about the reactivity of the Shionogi starting compounds (open ring structure).

223    It is not disputed that said disclosure gives sufficient detail to enable the posita to use each claimed step in the context of this overall pathway. See also footnote 128.

224    During his cross-examination, he simply acknowledged that if one of his graduate students came up with such a scheme he would deserve a raise (June 19, 2008, p. 152). In fact, his answer at p. 129, lines 5-12 (June 19, 2008) that "if someone skilled in the art *were given* the final compound and the starting material and was said devise a synthetic method, *it's not unreasonable* or *unlikely* that amongst many approaches that this [the Shionogi process] could *perhaps* be one of the approaches that a person could come up with", appears to seriously weaken, if not directly contradict, Apotex's position.

225    Interestingly even if it presumably relates to his field of expertise, Dr. McClelland admitted that he was not aware of any of the Lilly patents (or the kinetic complex) before getting involved in a litigation for Apotex sometime in 1996/1997.

226    Cross-examination of Dr. Hanessian, June 19, 2008, p. 145, line 21 to p. 146, line 5; The Court notes that there is no evidence as to the obviousness or expectation of success of all these reasonable approaches which presumably all involved known chemical reactions. What if, following Dr. Hanessian's reasoning, they were thus all trivial variations but only one did work?

227    This is evident from the fact, among other things, that Dr. Kukolja continued to search for a solution even after Shionogi had developed its process at Lilly's request and expense.

228    As was Dr. Blaszczak.

229    See footnote 128.

230    See *Canada (Commissioner of Patents) v. Ciba Ltd.*, [1959] S.C.R. 378 (S.C.C.) where the reasoning applied to product claims was applied to process claims. In the same manner, a compound that was not made, although it was disclosed as part of a class, can be subsequently claimed if the patent discloses in its regard a certain advantage over the other members of the class. Such advantage need not be claimed in order for it to support the inventiveness of what is actually claimed (*Sanofi*, para. 31).

231    That very same principle was applied in a modified way in *Shell Oil* (at pp. 550-552 of the S.C.R.). In that case, the only reason for which the use had to be included in the claim was that the compound per se was not novel; had its use not been claimed, it would have been anticipated.

232    In contrast, see for example the answer given by Dr. Barrett in his cross-examination on June 18, 2008, p. 28, line 9 to p. 29, line 4.

233    Cross-examination, June 5, 2008, p. 244, line 4 to p. 245, line 6.

234    I truly believe that the use of hot tubbing would have been particularly useful here.

235    The Court accepts here the views of Dr. Barrett.

236    As opposed to the isomerized compound described in Cooper 2.

237    Dr. McClelland's argument also appears to apply to the Lilly process patents but, as mentioned earlier, little weight, if any, was given to this portion of his evidence. The Court also agrees with Lilly that this argument was not properly pleaded in the defence in respect of the Lilly process patents. See para. 61 of his affidavit (A-12), when he refers to the quantities of reactants or the reaction conditions under which they are combined. In this context, it is evident that what Dr. McClelland is referring to is the nature of the reactant not what he refers to in para. 61. However, his para. 62 which deals with sound prediction i.e. for the compounds which are not the subject of examples in the patent the wording of 62 is wide enough to encompass this argument.

238    With respect to Dr. Modro's opinion, one must note that the '007 patent in addition to the examples discussed earlier, contains examples in respect of all the Z variants — Z = H, see examples 1, 2, 3, 4, 6, 7A-E; Halo, see examples 9 and 10; Chloro, $C_1$-$C_4$ alkyl, see examples 5 and 7F; $C_1$-$C_4$ alkoxy, see example 7G.

239    According to Dr. Modro, those substituents could introduce new effects because of their close proximity to the reaction centre. They could "block the reaction centre, slow down the reaction, or even trigger some completely new reactions." (examination-in-chief of Dr. Modro, June 4, 2008, p. 89, line 20 to p. 90, line 4)

240    The Z equals $OCH_3$ in para position.

241    See para. 275 of Lilly's memorandum on validity. From this it seems that the validity of claim 17 of the '007 patent could be impacted.

242    Even if, since 2001, Dr. Modro did perform about 60 experiments in respect of those patents.

243    In that respect, Dr. Modro particularly referred to an article from Dr. Gloede published in 1994 (J. Gloede, "Halogenation of *ortho*-Substituted Aryl Phosphites" (1994) 64 Russian Journal of General Chemistry 1203, TX-1592 (Gloede))

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 303 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

244    Dr. Modro said that he had concerns that were confirmed by what was reported in TX-211. Amazingly he did not mention the experiments disclosed in the '007 patent that directly deal with many of those substituents.

245    For Dr. McClelland, see June 9, 2008, p. 78-91. For Dr. Modro, see June 5, 2008, p. 80, line 10 to p. 89, line 24.

246    Although Dr. Baldwin acknowledged that the tert-butoxy and tert-butyl groups would be the bulkier substituent and that the bulkier the group, the more likely its steric effect. He did not change his view that this was a relatively small substituent.

247    Although Drs. Modro and McClelland questioned the operability of some of the compounds, they never directly addressed the issue of whether or not, at the relevant time, on the basis of the examples found in the patents, the inventors could objectively predict the utility of all the meta, para, and ortho Z substituents claimed in the patents.

248    It is worth noting that throughout these proceedings, Apotex argues that the higher yields provided by the preferred compounds were not to be considered by the Court as these higher yields were not claimed. The defendant cannot here state that the compounds were inoperable if they provided yields lower than the preferred embodiments.

249    The evidence provided by Apotex's experts may have been sufficient to put an allegation of invalidity in play in the context of an NOC proceeding but it is certainly not sufficient to meet the burden of proving on a preponderance of evidence that these compounds were not useful or that their usefulness could not be soundly predicted. Many of the cases referred to by Apotex were decisions made in the context of NOC proceedings.

250    The argument with respect to the reversed order of addition will not be dealt with given that the Court has found that the kinetic complex would form using the process described in Coe and Rydon and Dr. McClelland indicated during his cross-examination that this would simply reduce the yields and would not make the compound inactive.

251    See cross-examination of Dr. McClelland, June 9, 2008, p. 108, line 20 to p. 109, line 1.

252    Dr. McClelland has agreed that there is no reason to believe that the kinetic complex cannot be prepared at room temperature. This was further corroborated by the evidence of Mr. Moraski who introduced experiments performed where the kinetic complex was actually prepared at room temperature and 0° Celsius. (Examination-in-chief of Mr. Moraski, June 20, 2008, p. 16, line 24 to p. 18, line 5; E-9)

253    In any event, Dr. Modro admitted during his cross-examination that the formation of a kinetic complex was not the issue as it would necessarily form. In para. 70 of his affidavit (A-13), he only deals with the final product (the thermodynamic).

254    Dr. Baldwin noted that considering the data disclosed in Gloede without testing, one could not say for certain which reaction would happen first but this presumes that one knows that this further reaction takes place. (See examination-in-chief of Dr. Baldwin, June 25, 2008, p. 14, line 6 to p. 15, line 18)

255    See paras. 354-358 of Apotex memorandum on validity; paras. 151-153 of Dr. McClelland's affidavit (A-12).

256    As noted during the examination of Dr. Barrett, there is no issue with respect to the argument when thiazoline is in place such as in claims 4, 10, 12, 31, 35, and 37. See also cross-examination of Dr. McClelland, June 9, 2008, p. 177, line 20 to p. 178, line 20.

257    Apotex, in its memorandum on invalidity, at para. 363, refers to claims 22 and 34 but there appears to be no evidence from their experts in relation to these two claims.

258    Affidavit of Dr. McClelland (A-12), paras. 167-170; affidavit of Dr. Hanessian (A-15), para. 94.

259    See cross-examination of Dr. McClelland, June 9, 2008, p. 211, lines 5-11; p. 219, line 13 to p. 220, line 5.

260    Jerry March, *Advanced Organic Chemistry: Reactions, Mechanisms, and Structure* (New York: McGraw-Hill, 1968) at 294 (TX-1618).

261    Cross-examination of Dr. Hanessian, June 19, 2008, p. 141, lines 1-9.

262    Cross-examination of Dr. McClelland, June 10, 2008, p. 37, lines 6-22.

263    *Ibid.*, p. 38, lines 6-12.

264    Cross-examination of Dr. McClelland, June 10, 2008, p. 39, lines 17-20.

265    Cross-examination of Dr. Barrett, June 18, 2008, p. 322, lines 7-8.

266    The Court understands here that normally only persons having specialized knowledge of fluorine would use such product. Such persons would know how to manipulate the product to avoid its inherent danger.

267    See claim 1 as well as the disclosure, p. 20, line 21 to p. 21, line 8.

268    It is not clear if this last issue is now moot given that only one process claim remains.

269    Considering the construction adopted by the Court, this is the only differentiation that remains relevant.

270    As mentioned earlier, the one alternative in claim 17 referring to claim 10 is to be considered a stand-alone claim which could not be affected, in any event, by the argument advanced.

271    In Rydon, which is discussed in the disclosure, the authors report that such a 2:1 ratio will only produce a monochloride.

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MFW    Doc 14225-45    Filed 08/15/14    Page 304 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

272    See paras. 18-21 of E-19.

273    Para. 112(b) reads as follows: "The Defendant, Plaintiff by Counterclaim therefore claims: [...] b) damages pursuant to section 36 of the *Competition Act* to be paid to Apotex and/or in the alternative to be set-off against any award of damages awarded against Apotex;"

274    See *AlliedSignal Inc. v. DuPont Canada Inc.* (1998), 142 F.T.R. 241, 78 C.P.R. (3d) 129 (Fed. T.D.), at paras. 21 and 24.

275    This matter proceeded twice before the Federal Court of Appeal on summary judgment motions as well as once with regard to an appeal of an order of a Prothonotary.

276    In fact, two of the Lilly patents expired after all of the Shionogi patents had expired.

277    see TX-686.

278    See subs. 36(7) of the *Federal Courts Act*.

279    The equivalent of para. 36(4)(b) of the *Federal Courts Act*, para. 2(2)(b) of the *Judgment Interest Act* and subs. 2(c) of the *Court Order Interest Act*.

280    See also *Sands Motor Hotel Ltd. v. Edmonton (City)*, 2005 ABCA 402, 376 A.R. 365 (Alta. C.A.), paras. 31-32.

281    See its para. 1(b).

282    Apotex's second fresh as amended statement of defence and counterclaim, para. 110

283    This agreement was consigned in a letter addressed to the Court from counsel for Apotex, dated October 22, 2008.

284    Among other things, those present at the meeting in June, 1974 were deceased and this fact was conveyed to Mr. Wada contemporaneously and in the course of his employment.

285    Because of the late disclosure of the allegation of meetings between Lilly and Apotex, and the fact that no other participant was clearly identified, Lilly was not in a position to call witnesses other than Mr. McCool to rebut Apotex's evidence in this regard (i.e. the testimony of Dr. Sherman and Mr. Kay).

286    Apotex agreed that Shionogi would not have to call its own expert economists and could rely on Dr. Cockburn even if this expert was originally appointed only by Lilly. This had the impact of shortening the trial.

287    See transcript of October 6, 2008, p. 183, line 18 to p. 184, line 3.

288    2003 FC 1171, 28 C.P.R. (4th) 37 (F.C.) , reversed on appeal (2004 FCA 232, 240 D.L.R. (4th) 679 (F.C.A.)) and sent back before the Federal Court: 2004 CF 1445, [2005] 2 F.C.R. 225 (F.C.), decision again reversed on appeal (2005 FCA 361, [2006] 2 F.C.R. 477 (F.C.A.)).

289    This was in fact held to have been a finding of Justice James Hugessen in the decision being appealed to the Federal Court of Appeal (2004 CF 1445, [2005] 2 F.C.R. 225 (F.C.), para. 22) that was presumed by the Court of Appeal to have been made in light of both the 1995 and 1975 agreements, despite the comments of Justice Hugessen to the effect that there was both conflict and lack of clarity in the evidence as to the forseeability and reach of the 1975 agreement which could only be resolved after a full trial (2004 CF 1445, [2005] 2 F.C.R. 225 (F.C.), para. 25)

290    2005 FCA 361, [2006] 2 F.C.R. 477 (F.C.A.) para. 39.

291    *Competition Act*, para. 7(1)(*a*).

292    *Ibid.*, paras. 9(1)(*c*) and 10(1)(*a*).

293    *Ibid.*, c. 10(1)(b)(iii); In this case it is under the latter provision that an investigation could have been prompted following a complaint which was filed by Apotex in September, 2002. In addition, one of the experts testifying on Apotex's behalf, Dr. Church, contacted the Competition Bureau following the first decision of Justice Hugessen on the summary judgment motions to alert them of this decision which he felt was inconsistent with the positions expressed by the Competition Bureau in its Intellectual Property Enforcement Guidelines (Cross-examination of Dr. Church, September 9, 2008, p. 73, line 3 to p. 77, line 12). The Commissioner did not cause such an inquiry to be made in this regard.

294    This is in addition to other remedies available to such a plaintiff at common law and which are subject to different time limitations. It is important to be reminded that for proceedings conducted under the *Competition Act*, somewhat exceptional tools are provided for under that Act (see subs. 69(2)). The central role of the Commissioner is also demonstrated by the fact that the 2-year limitation under s. 36 will only start to run the day original proceedings are finally disposed of when such proceedings are instituted.

295    *Eli Lilly and Co. et al. v Apotex Inc.* (December 21, 2006), Ottawa T-1321-97 (F.C.); confirmed on appeal, 2007 FC 367, 156 A.C.W.S. (3d) 807 (F.C.); The Court notes that in addition to the cases cited by Prothonotary Aronovitch, this same principle was re-affirmed by two more recent cases: *Harmegnies v. Toyota Canada*, 2007 QCCS 539 (Que. S.C.), J.E. 2007-842 (affirmed on appeal, 2008 QCCA 380 (Que. C.A.) J.E. 2008-584), paras. 38; 50-51 and *A.P.I. Alarm Inc. v. D'Arterio*, [2009] O.J. No. 1599 (B.C. Master), para. 20.

296    Written submission of Eli Lilly and Company and Eli Lilly Canada, Inc. (Competition Phase), paras. 292, 295-297; memorandum of argument of the defendant by counterclaim, Shionogi & Co. Ltd. (Re: Competition), paras. 118; 121-124.

Case 09-10138-MEW Doc 14225-45 Filed 08/15/14 Page 305 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

297    *Ibid.*, Lilly paras. 298-303, Shionogi paras. 125-130.

298    Memorandum of argument of the defendant, Apotex Inc. (*Re: Competition*), para. 302.

299    *Ibid.*, para. 306.

300    Lilly amended statement of claim, January 11, 2001, para. 28.

301    Memorandum of argument of the defendant, Apotex Inc. (*Re: Competition*), para. 313.

302    2005 FCA 361, [2006] 2 F.C.R. 477 (F.C.A.), para. 52.

303    See *351694 Ontario Ltd. v. Paccar of Canada Ltd./Paccar du Canada Ltée* (2004), 2004 FC 1565, 264 F.T.R. 12 (F.C.), para. 18.

304    *Nova Scotia Pharmaceutical Society*, para. 72.

305    *Ibid.*, para. 99.

306    *Ibid.*, para. 106.

307    Varied on appeal but not on this point as it was not pursued by the appellant, 2000 BCCA 463, 141 B.C.A.C. 1 (B.C. C.A.).

308    Memorandum of argument of the defendant, Apotex Inc. (*Re: Competition*) para. 306.

309    Lilly's information as to the process actually used by Lupin was based on the closed portion of the Health Canada file it had received pursuant to an order of Justice Hugessen.

310    See ruling contained in the transcript of the hearing held December 9, 2008.

311    See Facts admitted to by the parties, LRTA # 82.

312    Memorandum of argument of the defendant, Apotex Inc. (*Re: Competition*), para. 155.

313    *Ibid.*, para. 273.

314    *Resurfice Corp.*, at para. 25

315    Oral submissions of counsel for Apotex, November 6, 2008, p. 20 lines 14-18.

316    At para. 16.

317    See Facts agreed to by the parties, LRTA # 150 and SRTA # 15(a); TX-265.

318    *Ibid.*, LRTA # 51.

319    *Ibid.*, LRTA # 151, SRTA 15(b); TX-266.

320    Dr. Sherman testified that this choice was probably made by Apotex's counsel at the time. (Cross-examination of Dr. Sherman, May 6, 2008 p. 125, lines 11-20) In the cross-examination of Dr. McClelland, Lilly pursued a line of questioning which could explain this decision (Cross-examination of Dr. McClelland, September 8, 2008, p. 52, line 18 to p. 53, line 19).

321    See Facts agreed to by the parties, LRTA # 155, SRTA 15(c); TX-267.

322    *Ibid.*, SRTA # 17(b); TX-241.

323    *Ibid.*, LRTA 156; TX-118.

324    *Ibid.*, SRTA # 19(a); LRTA 160; TX-645; TX-246; TX-247.

325    *Ibid.*, SRTA # 19(c); confirmed on appeal, (1996), 199 N.R. 4, 68 C.P.R. (3d) 126 (Fed. C.A.).

326    The applicant in these proceedings was Eli Lilly Canada Inc. Eli Lilly and Company and Shionogi & Co. Ltd, the owners of the Lilly and Shionogi patents, were joined to the proceedings pursuant to subs. 6(4) of the Regulations, having previously consented to the inclusion of their patents on the Form IV patent lists filed by Eli Lilly Canada Inc. pursuant to subs. 4(1) of the Regulations.

327    See Facts agreed to by the parties, SRTA # 19(b); TX-644, Affidavit of Thomas L. Emmick sworn June 17, 1993.

328    *Ibid.*, ARTA # 220, LRTA # 205, SRTA # 48; TX-227 and TX-228.

329    See Affidavit of Harry B. Radomski, sworn November 13, 2003 (TX-641), para. 4.

330    Although there is a controversy as to whether or not Dr. Sherman ever met with Mr. McCool, it is uncontradicted that at least one such meeting took place between Mr. McCool and Mr. Kay.

331    See TX-1684.

332    See TX-261.

333    The Court notes that Dr. Sherman testified that presumably it is assurances from Kyong Bo that it did not use the Lilly process that prompted Apotex to terminate the compulsory licence. (Cross-examination of Dr. Sherman, May 6, 2008, p. 132, line 22 to p. 133, line 12) However, the only evidence the Court has as to these assurances are contained in the letter from Pacific High Tech Canada, which is dated 10 days later than the notice of termination of the compulsory licence (see next para.).

334    See TX-662; Facts agreed to by the parties, LRTA # 1; TX-334.

335    See Facts agreed to by the parties, SRTA # 83(a) and (b).

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 306 of 308

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

336    *Ibid.*, LRTA 46; TX-119.

337    *Ibid*, LRTA # 82; TX-651.

338    *Ibid.*, LRTA # 83, SRTA # 31; TX-1759.

339    See TX-686.

340    See Facts agreed to by the parties, SRTA # 70(a) and (c).

341    See Statement of Claim dated June 18, 1997, para. 26.

342    See Facts agreed to by the parties, LRTA # 83, SRTA # 31; TX-1759.

343    See Glopec-16; Glopec-17.

344    See Glopec-20.

345    *Ibid.*; Glopec-23.

346    See Glopec-22; Glopec-25.

347    See TX-679.

348    See TX-1656; While the agreement is silent on pricing, Apotex appears to have paid US$ 1 500 per kilogram of bulk cefaclor manufactured under it (see TX-1759), versus US$ 860 — 1 150 earlier. The cost for the bulk cefaclor contained in a 500 mg dose sold amounts, in the Court's calculation, to US$ 0.75, compared with US$ 0.43 when the price was US$ 860 per kilogram. Such a dose would be sold in Canada by Apotex at a price of approximately CAN$ 1.50 (or between US$ 1.12 and US$ 0.97, calculated using the highest and lowest average monthly exchange rates posted for the November, 1996 to October, 1998 period) and distribution costs at Apotex represent 2 to 3 % of sales (Examination of Dr. Sherman, September 3, 2008, p. 40 lines 22-23; Re-examination of Mr. Fahner, September 3, 2008, p. 247 lines 8-9).

349    See TX-662.

350    See TX-663.

351    See TX-664.

352    See TX-1759.

353    See Facts agreed to by the parties, LRTA # 93, 94, 95, 96, 100, 101, 103, 104, 108; SRTA # 72, 73, 74(b), 74(f), 75(a), 75(c), 76(a), 77(a).

354    *Ibid.*, ARTA 295.

355    Submissions of Counsel for Apotex, November 6, 2008, p. 39 lines 5-12.

356    *Ibid.*, p. 39 line 14 — p. 40 line 21.

357    Cross-examination of Mr. Kay, September 3, 2008, p. 214 line 4.

358    See transcript of October 6, 2008, p. 183, line 12 to p. 184, line 3.

359    Such as the PMNOC proceeding and the opinion of Mr. Radomski that an infringement suit would be imminent upon market entry.

360    A price reflecting competition between Lilly and Shionogi in the bulk cefaclor market.

361    See memorandum of the defendant Apotex Inc. (*Re: infringement*), para. 453.

362    Submissions of Counsel for Apotex, November 6, 2008, p. 36 lines 20-23; p. 40 lines 12-14.

363    Report-in-chief of Dr. Church. dated December 14, 2007 (Exhibit JC-2 of his affidavit of April 19, 2008 (A-24)), p. 29.

364    Affidavit-in-chief of Dr. Ross, sworn December 14, 2007 (A-27), para. 34.

365    Reply report of Dr. Church, dated March 28, 2008 (Exhibit JC-1 of his affidavit of March 31, 2008 (A-31)), para. 52; see also Affidavit-in-chief of Dr. Ross, *Ibid.*, para. 34.

366    It should be noted that the assignment concerns only Shionogi's Canadian and U.S. patents (TX-228), while the evidence shows that patent applications were filed in other jurisdictions (see TX-233; Examination in chief of Mr. Takayuki Wada, September 15, 2008, p. 192, line 14 to p. 193, line 7), the Court has not been presented any evidence pertaining to Shionogi's licensing behaviour in jurisdictions unaffected by the assignment.

367    Responding affidavit of Dr. Cockburn, sworn February 27, 2008 (E-22), para. 111.

368    Reply report of Dr. Church, dated March 28, 2008 (Exhibit JC-1 of his affidavit of March 31, 2008 (A-31)), para. 49; see also Affidavit-in-chief of Dr. Ross, sworn December 14, 2007 (A-27), para. 59.

369    Re-examination of Dr. Sherman, September 3, 2008, p. 166 lines 19-22; see also Cross-examination of Dr. Sherman, September 3, 2008, p. 133 lines 17-25.

370    The demand for dosage form cefaclor, by the time generic entry occurred, was in decline.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-45    Filed 08/15/14    Page 307 of 308

Eli Lilly & Co. v. Apotex Inc., 2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

371   This is not the market that Apotex experts thought was relevant nor is it the basis of their opinion.

372   In his view, "[t]he patents are irrelevant." (Cross-examination of Dr. Sherman, September 3, 2008 p. 134 line 7).

373   In the same manner, even if the experts had the necessary expertise, which is contested, no such expert evidence is necessary to construe the decision of the Federal Court of Appeal in these proceedings or the 1975 agreement.

374   One must not forget that their business for selling dosage cefaclor in Japan was worth approximately US$ 900 million annually.

375   Cross-examination of Dr. Hollis, September 5, 2008, p. 95 lines 14-21.

376   See memorandum of argument of the defendant, Apotex Inc. (*Re: competition*) paras. 242-269; written submission of Eli Lilly and Company and Eli Lilly Canada Inc. (competition phase) paras. 117-126; memorandum of argument of the defendant by counterclaim, Shionogi & Co. Ltd. paras. 25-43.

377   TX-244.

378   *Ibid.*

379   See, for example, the examination of Mr. Pytynia, September 15, 2008, p. 17, lines 14-17; TX-237, 238, 240.

380   Thereafter Dr. Ross simply assumed that Shionogi immediately pursued the opportunity offered by Lilly to assign its patents. If one accepts the assumption that Shionogi would be eager to commercialize its patents, it would have made good sense for Shionogi to start planning or to take steps before the expiration of the cefaclor patent and certainly immediately upon its expiration. In fact, Lilly approached Shionogi only several months later.

381   Obviously, this comment applies to patents owned by parties other than the originator or innovator, who was on the Canadian market with a competing product, given that, "[t]he corporate policy at Apotex was not in favour of licensing in branded generics because our success was predicated on our ability to develop all of these generics independently." (Examination of Jack Kay, September 3, 2008, p. 183 lines 8-12)

382   See Facts agreed to by the parties, SRTA # 83(a) and (b).

383   Examination of Dr. Sherman, September 3, 2008, p. 30 lines 6-8. This despite Dr. Sherman's professed preference for a process whose patent holder is not the originator: "if there were patents in the hands of other people, such as Shionogi, which is often the case, and they were not the originator in Canada, if we wanted to use material made by that process, it would stand to reason that either they would have no reason to object or they would be glad to licence it" (Examination of Dr. Sherman, September 3, 2008, p. 32 lines 7-13).

384   It is worth mentioning that Dr. Church, when asked to explain why and if it was truly important for his opinion that there would be only two known commercial processes, made it clear that it was crucial in the scenario he assumed as a basis for his opinion that all buyers of cefaclor know that there were only two commercially viable processes to make bulk cefaclor. (See Transcript of October 6, 2008, p. 183, line 18 to p. 184, line 2.)

385   Examination of Dr. Sherman, September 3, 2008, p. 29 line 5 — p. 30 line 8.

386   Discovery of Dr. Sherman, July 11, 2006, p. 342 line 24 - p. 343 line 1.

387   Cross-examination of Dr. Sherman, September 3, 2008, p. 67, lines 18-23.

388   This seems to diminish the value of Dr. Ross's theory as to Shionogi's financial incentives to licence companies like Apotex. It is certainly clear that Dr. Ross did not consider this.

389   Discovery of Dr. Sherman, July 11, 2006, p. 343 lines 7-11.

390   Examination of Dr. Sherman, September 3, 2008, p. 33 lines 20-21.

391   Along with many other suppliers whom had also submitted samples to Apotex (see Facts agreed to by the parties, LRTA #82).

392   Counsel for Apotex, November 6, 2008 p. 114, line 15 to p. 134, line 6.

393   See the tables at para. 294 of Apotex's memorandum.

394   Cross-examination of Dr. Church, September 9, 2008, p. 149, lines 17-21.

395   Cross-examination of Dr. Ross, September 11, 2008, p. 160, lines 6-19.

396   Cross-examination of Mr. Cole, September 10, 2008, p. 111 lines 15-25.

397   A price Apotex never had to pay given that it bought infringing bulk cefaclor until 1998 at which time the legal bulk cefaclor was obtained from a third source (Lupin).

398   Examination of Dr. Church, September 9, 2008, p. 31, lines 4-7; cross-examination of Dr. Church, September 9, 2008, p. 160, lines 7-8 and p. 232, lines 22-24.

399   See memorandum of argument of the defendant, Apotex Inc. (*Re: Competition*), para. 287.

400   Other common law remedies exist where unjust enrichment may be more relevant.

401   *Ibid.*, para. 282.

2009 FC 991, 2009 CF 991, 2009 CarswellNat 3042, 2009 CarswellNat 6607...

402    This would obviously only apply if Lilly elected to seek damages based on its own profits instead of seeking an accounting of Apotex's profits.

403    Report-in-chief of Dr. Church, December 14, 2007 (Exhibit JC-2 of his affidavit of April 19, 2008 (A-24)), p. 31.

404    *Ibid.*

405    *Ibid.*

406    Cross-examination of Dr. Church, September 9, 2008, p. 215, line 18 to p. 216, line 12.

407    The Court infers from Dr. Sherman's qualified statement in that respect that Apotex would make an assessment at that stage.

408    Memorandum of argument of the defendant, Apotex Inc. (*Re: competition*), para. 282.

409    Such as the correspondence Apotex sought to have admitted as evidence (TX-252 to 259).

410    There would be no counterclaim under the *Competition Act* in the "but for world".

411    Examination of Mr. Wada, September 15, 2008, p. 165, lines 17-18.

412    Memorandum of argument of the defendant, Apotex Inc. (*Re: competition*), para. 287.

413    In fact, albeit in a different context, Apotex's decision is analogous to what was characterized by Justice Goff in *Koch Marine Inc. v. d'Amica Societa di Navigazione arl (The "Elena d'Amico")* (1979), [1980] 1 Lloyd's Rep. 75 (Eng. Q.B.) as a decision which results in the rupture of the causal link between a breach and a loss: "an independent decision, independent of the breach, made by the buyer on his assessment of the market. It is perfectly true that his decision is made in the context of a pre-existing breach of contract by the seller, in the sense that the breach of contract provided the occasion upon which the buyer makes his market judgment; *but even if there had been no breach at all it would have still been possible for the buyer to have made the same decision."* (emphasis added, p. 89).

414    Transcript of November 13, 2008, p. 201 line 19-20.

415    The Court will keep all the material necessary to determine these issues until the rights of appeal have been exhausted in order to stand ready to determine them should it become necessary to do so.

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.