TAB 57

1998 CarswellNat 1061
Supreme Court of Canada

Eli Lilly & Co. v. Novopharm Ltd.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129, [1998] S.C.J.
No. 59, 152 F.T.R. 160 (note), 161 D.L.R. (4th) 1, 227 N.R. 201, 80 C.P.R. (3d) 321

# Novopharm Limited, Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc., Respondents and The Minister of National Health and Welfare, Respondent

Apotex Inc., Appellant v. Eli Lilly and Company and Eli Lilly Canada Inc.,
Respondents and The Minister of National Health and Welfare, Respondent

L'Heureux-Dubé, Gonthier, Cory, McLachlin, Iacobucci, Major, Bastarache JJ.

Judgment: July 9, 1998
Docket: 25402, 25348

Proceedings: reversing (1996), 197 N.R. 291 (Fed. C.A.); reversing (1995), 60 C.P.R. (3d) 181 (Fed. T.D.); and reversing (1996), 195 N.R. 378 (Fed. C.A.); affirming (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)

Counsel: *Harry B. Radomsky*, *Richard Naiberg* and *David Scrimger*, for the appellant Apotex Inc.
*Donald N. Plumley, Q.C.*,*Mark Mitchell* and *Stephanie Chong*, for the appellant Novopharm Limited.
*Anthony G. Creber* and *David Watson, Q.C.*, for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Subject: Intellectual Property; Property; Family; Civil Practice and Procedure

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Patents --- Transfer of interest — Licence — General

Sublicence versus supply agreement — What constitutes sublicence — N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N — N and A, respectively, appealed from decisions which found that supply agreement conferred sublicence — Appeals were allowed — For N to have granted sublicence to A, it must have granted, expressly or impliedly, right to do something which A would otherwise be prohibited from doing, and which N was permitted to do only by virtue of its compulsory licence — Essence of sublicence is that unlicensed party is permitted to exercise licensed rights independently of licensed party — Regardless of level of control that might be exercised by A over arranging and facilitating acquisition of licensed materials for its own benefit, no actual acquisition would be possible without N's involvement — Fact that agreement required licensed party to comply with terms of its licence suggested that parties did not intend to grant sublicences — Agreement did not on its face or in its actual legal effect amount to sublicence.

### Brevets --- Cession — Licence — En général

Sous-licence par opposition à accord d'approvisionnement — Ce qui constitue une sous-licence — N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 3 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061
1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

conformité à A et N — N et A, respectivement, se sont pourvues à l'encontre de ces décisions qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Pour que N ait accordé une sous-licence à A, elle doit avoir, expressément ou implicitement, accordé à A le droit de faire quelque chose qu'il lui aurait par ailleurs été interdit de faire, et que N n'aurait été autorisée à faire qu'en vertu de sa licence obligatoire — Essence de la sous-licence est que la partie non titulaire d'une licence a le droit d'exercer les droits conférés par la licence indépendamment de la partie qui en est titulaire — Peu importe l'importance du contrôle que A pourrait exercer sur les mesures prises pour organiser et faciliter l'acquisition à son propre profit des substances brevetées, aucune acquisition réelle n'est possible sans la participation de N — Fait que l'accord d'approvisionnement exige que la partie titulaire d'une licence se conforme aux conditions de sa licence suggère que les parties n'avaient pas l'intention d'accorder des sous-licences — Accord ne constituait une sous-licence ni à première vue ni en vertu de son effet juridique réel.

### Patents --- Transfer of interest — Licence — Compulsory licence — Practice and procedure — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — N and A each independently applied for notice of compliance for 150mg and 300mg capsules of nizatidine — E, holder of Canadian patents for nizatidine, obtained prohibition orders preventing issuance of notice of compliance to A and N, and purported to exercise its option to terminate N's compulsory licence on basis that N breached terms of its licence by granting sublicence to A — N and A appealed respective decisions which found that supply agreement conferred sublicence — Appeals were allowed — Appropriate date for assessing notice of allegation where prohibition order is sought by patentee is date of hearing and not date on which notice was issued — As of date of hearing, seven years had expired since first notice of compliance was issued to E so pursuant to s. 39.14, N was entitled to use patented invention for production of medicine and therefore had a valid non-infringing way to obtain bulk nizatidine — As of hearing date, N's notice of allegation was not premature — Since supply agreement was not sublicence, E was not justified in terminating N's compulsory licence — N's request for declaratory relief was denied — Given nature of inquiry on these judicial review proceedings, it was not appropriate for court to make binding declaration, for purposes other than appeal on hand, that agreement did not constitute sublicence or transfer of compulsory licence from N to A — Patent Act, R.S.C. 1985, c. P-4, s. 39.14.

### Brevets --- Cession — Licence — Licence obligatoire — Pratique et procédure — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — N et A ont déposé séparément une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu des ordonnances interdisant la délivrance d'un avis de conformité à A et N, et a voulu exercer sa faculté d'annuler la licence obligatoire de N pour le motif que N avait violé les conditions de sa licence en accordant une sous-licence à A — N et A se sont pourvues à l'encontre des décisions respectives qui concluaient que l'accord d'approvisionnement avait conféré une sous-licence — Pourvois ont été accueillis — Date appropriée pour évaluer un avis d'allégation lorsqu'une ordonnance d'interdiction est demandée par le breveté est celle de l'audition et non celle du dépôt de l'avis — À la date de l'audition, sept années s'étaient écoulées depuis la délivrance du premier avis de conformité à E, en vertu de l'art. 39.14, N avait le droit de fabriquer le médicament elle-même et disposait en conséquence d'un moyen valide n'emportant pas contrefaçon d'obtenir de la nizatidine en vrac — À la date de l'audition, l'avis d'allégation de N n'était pas prématuré — Comme l'accord d'approvisionnement ne constituait pas une sous-licence, E n'était pas fondée d'annuler la licence obligatoire de N — Demande de jugement déclaratoire présentée par N a été rejetée — En raison de la nature limitée des présentes procédures de contrôle judiciaire, il ne convenait pas que la Cour déclare péremptoirement, et à des fins autres que celles des présents pourvois, que l'accord d'approvisionnement ne constituait ni une sous-licence ni une cession de la licence obligatoire de N à A — Loi sur les brevets, L.R.C. 1985, c. P-4, art. 39.14.

### Patents --- Actions for infringement — When infringement arises — General

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for nizatidine would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

E's patent — A's appeal against prohibition was dismissed — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit, so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

### Patents --- Transfer of interest — Licence — Compulsory licence — Food and medicine — Medicine

N, holder of compulsory licence for nizatidine, agreed to supply A with specified quantities of nizatidine — A applied for notice of compliance for 150mg and 300mg capsules of nizatidine and issued notice of allegation alleging that no claim for nizatidine would be infringed — E, holder of Canadian patents for nizatidine, obtained prohibition order preventing issuance of notice of compliance to A on ground that reformulation of nizatidine for consumption in Canada would infringe E's patent — A's appeal against prohibition was dismissed — A appealed dismissal — Appeal allowed — In absence of express conditions to contrary, purchaser of licensed article is entitled to deal with article as he sees fit, so long as such dealings do not infringe rights conferred by patent — Reformulation of nizatidine into final dosage form would not create new substance but is more akin to repackaging substance into commercially usable form — Bulk medicine produced by patentee or licensee remains unchanged throughout reformulation process and exists in same chemical form in final dosage product as in bulk product — In absence of express prohibition in compulsory licence, right to reformulate should be seen as inherent to purchaser's right to deal with licensed material as he or she sees fit — Reformulation of nizatidine by A into final dosage form would not infringe patent held by E.

### Brevets --- Actions en contrefaçon — Survenance d'une contrefaçon — En général

N, titulaire d'une licence obligatoire pour la nizatidine, a accepté d'approvisionner A en certaines quantités déterminées de nizatidine — A a déposé une demande d'avis de conformité pour les gélules de 150 mg et de 300 mg de nizatidine et a déposé un avis d'allégation prétendant qu'aucune revendication pour la nizatidine ne serait contrefaite — E, détentrice des brevets canadiens relatifs à la nizatidine, a obtenu une ordonnance interdisant la délivrance d'un avis de conformité à A au motif que la préparation de la nizatidine sous une autre forme pour fins de consommation au Canada violerait les brevets de E — Appel de A à l'encontre de l'ordonnance d'interdiction a été rejeté — A s'est pourvue à l'encontre de cette décision — Pourvoi accueilli — En l'absence de conditions contraires expresses, l'acheteur d'un article breveté a le droit d'en disposer à son gré pourvu que, ce faisant, il ne viole pas les droits conférés par le brevet — Préparation de

Case 09-10138-MEW   Doc 14225-46   Filed 08/15/14   Page 5 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

la nizatidine sous forme posologique définitive n'aurait pas pour effet de créer une nouvelle substance mais s'apparente plutôt à un nouveau conditionnement de la substance sous une forme commercialement utilisable — Médicament en vrac produit par le breveté ou le titulaire d'une licence demeure inchangé pendant tout le processus de préparation sous une autre forme et existe dans le produit sous forme posologique définitive sous la même forme chimique que dans le produit en vrac — En l'absence d'interdiction expresse dans la licence obligatoire, le droit de préparation sous une autre forme devrait être considéré comme inhérent au droit de l'acheteur de disposer à son gré de la substance brevetée — Préparation de la nizatidine par A sous forme posologique définitive ne violerait pas le brevet détenu par E.

**Table of Authorities**

**Cases considered by/Jurisprudence citée par *Iacobucci J.*:**

*Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605, 75 L.J. Ch. 411, 94 L.T. 367, 22 T.L.R. 326 (Eng. Ch. Div.) — applied

*Betts v. Willmott* (1871), 6 Ch. App. 239, 25 L.T. 188, 19 W.R. 367 (Eng. C.A.) — referred to

*Carey v. United States* (1964), 164 Ct. Cl. 304, 326 F.2d 975 (U.S. Cl. Ct.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*Cyrix Corp. v. Intel Corp.* (1996), 77 F.3d 1381, 37 U.S.P.Q.2d 1884 (U.S. Fed. Cir.) — considered

*E.I. Du Pont de Nemours & Co. v. Shell Oil Co.* (1985), 498 A.2d 1108, 227 U.S.P.Q. 233 (U.S. Del.) — distinguished

*Eli Lilly & Co. v. Apotex Inc.* (1996), 195 N.R. 378, 66 C.P.R. (3d) 329, 111 F.T.R. 80 (note) (Fed. C.A.) — referred to

*Gillette v. Rea* (1910), 15 O.W.R. 345, 1 O.W.N. 448 (Ont. Ch.) — referred to

*Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129, 134 F.T.R. 220 (Fed. T.D.) — considered

*Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519, 40 Sol. Jo. 32, 12 T.L.R. 28 (Eng. Ch. Div.) — referred to

*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.) — referred to

*Intel Corp. v. ULSI System Technology Inc.* (1993), 27 U.S.P.Q.2d 1136, 995 F.2d 1566 (U.S. Fed. Cir.) — considered

*Joy Oil Co. v. R.*, [1951] S.C.R. 624, [1951] 3 D.L.R. 582 (S.C.C.) — considered

*Lampson v. Quebec (City)* (1920), 28 R.L. 6, [1921] 1 A.C. 294, 54 D.L.R. 344 (Quebec P.C.) — applied

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.* (1968), [1969] 1 Ex. C.R. 529, [1969] 1 C.L.R. 440, 40 Fox Pat. C. 149, 57 C.P.R. 155 (Can. Ex. Ct.) — referred to

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Libbey-Owens-Ford Glass Co. v. Ford Motor Co.,* [1970] S.C.R. 833, 62 C.P.R. 223, 14 D.L.R. (3d) 210 (S.C.C.) — referred to

*Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133, 88 F.T.R. 260 (Fed. T.D.) — referred to

*Merck & Co. v. Apotex Inc.,* 60 C.P.R. (3d) 356, 180 N.R. 373, [1995] 2 F.C. 723, 95 F.T.R. 160 (note) (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302, 169 N.R. 342 (Fed. C.A.) — considered

*Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), 25419 (S.C.C.) — applied

*National Phonograph Co. of Australia v. Menck,* [1911] A.C. 336 (Australia P.C.) — applied

*Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), 58 C.P.R. (3d) 209, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* 176 N.R. 48, *(sub nom. David Bull Laboratories (Canada) Inc. v. Pharmacia Inc.)* [1995] 1 F.C. 588, [1995] 1 C.F. 588 (Fed. C.A.) — referred to

*Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 6 C.I.P.R. 137, 7 C.P.R. (3d) 294 (Fed. T.D.) — referred to

**Statutes considered by / Législation citée par *Iacobucci J.*:**

*Patent Act/Loi sur les brevets,* R.S.C./L.R.C. 1985, c. P-4
   Generally/en général — referred to

   s. 39 — considered

   s. 39(4) — considered

   s. 39.11 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

   s. 39.11(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

   s. 39.11(2)(c) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

   s. 39.14 [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — considered

   s. 39.14(1) [en./ad. R.S.C./L.R.C. 1985, c. 33 (3rd Supp.), s. 15] — referred to

   s. 56 — referred to

*Patent Act Amendment Act, 1992/Loi sur les brevets, Loi de 1992 modifiant la* , S.C./L.C. 1993, c. 2
   Generally/en général — considered

   s. 11(1) — referred to

**Regulations considered by/Règlements cités par *Iacobucci J.*:**

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061
Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 7 of 310

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

*Food and Drugs Act*, R.S.C./L.R.C. 1985, c. F-27
    *Food and Drug Regulations*, C.R.C. 1978, c. 870

    s. C.08.004

*Patent Act*, R.S.C./L.R.C. 1985, c. P-4
    *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

    Generally/en général

    s. 3

    s. 4

    s. 4(1)

    s. 5

    s. 5(3)

    s. 5(3)(b)

    s. 6

    s. 6(1)

    s. 6(2)

    s. 7

    s. 7(2)(b)

**Words and phrases considered**

**Contra proferentum**

*Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471

**Termes et locutions considerés**

**Contra proferentem**

Cette règle [contra proferentem] a pour effet de protéger une partie à un contrat contre les conditions ambiguës ou déroutantes introduites d'une façon détournée par l'autre partie, en privilégiant une interprétation de l'ambiguïté au détriment de la partie qui les a rédigées. Toutefois, lorsque les deux parties s'entendent sur la façon d'interpréter le contrat, il n'est pas loisible à un tiers d'affirmer que la règle *contra proferentem* devrait être appliquée pour interpréter le contrat au détriment des *deux* parties contractantes. En fait, un tiers n'a aucune raison d'invoquer la règle *contra proferentem* :voir G.H.L. Fridman, *The law of Contract in Canada* (3e éd. 1994), à la p. 471.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

APPEAL by appellant from judgment reported at (1996), 197 N.R. 291 (Fed. C.A.), allowing appeal from (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) dismissing application for prohibition order; APPEAL by appellant from judgment reported at (1996), 195 N.R. 378 (Fed. C.A.) dismissing appeal from (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) prohibiting issuance of notice of compliance.

POURVOI de l'appelante à l'encontre du jugement publié à (1996), 197 N.R. 291 (Fed. C.A.), accueillant l'appel du jugement publié à (1995), 60 C.P.R. (3d) 181 (Fed. T.D.) lequel a rejeté la demande d'une ordonnance d'interdiction; POURVOI de l'appelante à l'encontre du jugement publié à (1996), 195 N.R. 378 (Fed. C.A.) qui a rejeté l'appel du jugement publié à (1995), 60 C.P.R. (3d) 206 (Fed. T.D.) interdisant la délivrance d'un avis de conformité.

**Iacobucci J.:**

1    A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "*Novopharm*" and "*Apotex #1*", reasons in *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (July 9, 1998), Doc. 25419 (S.C.C.) ("*Apotex #2*") are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

2    Owing to the intertwining nature of the lower court decisions in *Novopharm* and *Apotex #1*, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

**I. Background**

**A. The patents and the compulsory licence**

3    Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the *Patents Act*, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> **39**....
>
> (4)...
>
>> (*a*) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or production of which the invention has been used or sell any medicine in the preparation or production of which the invention has been used, or
>>
>> (*b*) where the invention is other than a process, to import, make, use or sell the invention for medicine or for the preparation or production of the medicine...

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the applicant a licence to do the things specified in the application unless there existed a good reason not to grant such licence.

4    These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the process by which the medicine is made. On December 31, 1987, the Department of National Health and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"), pursuant to s. C.08.004 of the *Food and Drug Regulations*, C.R.C., c. 870, thereby permitting Eli Lilly

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 9 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

5    On January 17, 1990, Novopharm applied under s. 39(4) of the *Patent Act* for a compulsory licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly, but, it was found that none of the objections constituted a valid reason to refuse the application and the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make nizatidine for the preparation or production of medicine, and to import and/or sell medicine made by the process. It also permits Novopharm to make, use, sell and import either or both of the invention for medicine and the invention for the preparation or the production of medicine. The royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final dosage form is fixed at 6% of the selling price. Commissioner of Patents, in a decision dated October 21, 1991, found that the licence is not restricted to the forms of medicine listed by Novopharm in its application, as such "would place unnecessary limits on [Novopharm's] operations under the licence."

6    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1 contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to arm's length purchasers and contemplates the sale of the medication by Novopharm in both final dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling prices and royalty computations resulting from the operations of arm's length purchasers of the medicine, non-arm's length purchasers of the medicine in final dosage form, and any subsequent non-arm's length purchasers from the latter.

7    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence."

### B. The supply agreement between Novopharm and Apotex

8    On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the *Patent Act*, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

>    WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

>    AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

>    AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

>    AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

>    AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1. At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2. In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3. In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4. In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5. In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6. The licensed party shall comply with the terms of the licence.

7. The licensed party shall not be excused from performing any act as directed by the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence had remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8. For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9. The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10. Neither party will engage in preventing or blocking the accessibility [*sic*] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11. This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

12. Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licences [*sic*] prior to December 20, 1991, then this agreement shall be terminated.

13. Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994 advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

9    On February 15, 1993, most of the provisions of the *Patent Act Amendment Act, 1992*, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the *Patented Medicines* (*Notice of Compliance*) *Regulations*, SOR/93-133, (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in *Glaxo Wellcome Inc. v. Canada (Minister of National Health & Welfare)* (1997), 75 C.P.R. (3d) 129 (Fed. T.D.) at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the *Food and Drug Regulations*, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the *Patent Act Amendment Act, 1992*, ... (the "*Patent Act*") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the *Regulations*.

. . . . .

In effect, under Subsection 5(3) of the *Regulations*, in a "Notice of Allegation", the generic drug manufacturer, the "second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the *Regulations*, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the *Regulations*, the Minister compiles the patent lists into a public document called the "Patent Register".

10    As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

11    Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(*b*) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

12    The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

13      Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the *Patent Act*, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in *Apotex #1*, upon which I shall elaborate shortly.

14      On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

*C. The Novopharm proceeding*

15      On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court-Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

16      Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court-Trial Division to grant the relief sought, but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be sufficient to justify an order prohibiting the Minister from issuing a NOC.

17      On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

18      Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the *Patent Act* which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 13 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

19     McGillis J. of the Federal Court-Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in *Apotex #1, infra*, held that a sublicence had in fact been conferred by virtue of the supply agreement.

### D. The Apotex #1 proceeding

20     In cross-examination on the hearing of the application for a prohibition order in *Apotex #1*, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents, given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

21     Relying on her analysis in *Novopharm*, McGillis J. of the Federal Court-Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

22     The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final dosage form would not have infringed the patents.

## II. Relevant statutory provisions

23     *Patent Act*, R.S.C., 1985, c. P-4

**39.11** (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

(*a*) where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

(*b*) where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

(2) The prohibition under subsection (1) expires in respect of a medicine

. . . . .

(*c*) ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

**39.14** (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 14 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(*a*) where the invention is a process, to use the invention for the preparation or production of medicine, or

(*b*) where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

**Patented Medicines (Notice of Compliance) Regulations, SOR/93-133**

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

    (*a*) state that the person accepts that the notice of compliance will not issue until the patent expires; or

    (*b*) allege that

        (i) the statement made by the first person pursuant to paragraph 4(2)(*b*) is false,

        (ii) the patent has expired,

        (iii) the patent is not valid, or

        (iv) no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(*b*) or subsection (2) the person shall

    (*a*) provide a detailed statement of the legal and factual basis for the allegation; and

    (*b*) serve a notice of the allegation on the first person and proof of such service on the Minister.

6.(1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(*b*), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2)The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

    (*a*)the expiration of 30 days after the coming into force of these Regulations,

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

(*b*)the day on which the second person complies with section 5,

(*c*)subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(*d*)subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(*e*)subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(*f*)the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(*e*) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(*a*)the patent has expired; or

(*b*)the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(*c*), (*d*) and (*e*) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(*e*) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(*e*) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

## V. Judicial history

### A. Novopharm Ltd. v. Eli Lilly and Co.

#### (1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 181 (Fed. T.D.)

24      As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the *Regulations* is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to *Pharmacia Inc. v. Canada (Minister of National Health & Welfare)* (1994), [1995] 1 F.C. 588 (Fed. C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

25      Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novophar's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

26      Relying on the decision of this Court in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract." She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted was inadmissible

on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

27    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex." In her view, at p. 199, the true nature of the agreement was that of "'a supply agreement dressed up to look like a sublicence'". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

28    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

29    Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on *Consolidated-Bathurst, supra*. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

30    As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in *Pharmacia Inc., supra*, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

*(2) Federal Court of Appeal (1996), 67 C.P.R. (3d) 377 (Fed. C.A.)*

31    In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in *Apotex #1, infra*, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

32    The court held that, while the previous decision was not *res judicata*, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in *Apotex #1* was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in *Apotex #1* could therefore be applied to *Novopharm*. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

### B. Apotex Inc. v. Eli Lilly and Co

*(1) Federal Court-Trial Division (1995), 60 C.P.R. (3d) 206 (Fed. T.D.)*

33    In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

34    In concluding in *Novopharm, supra*, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in *Novopharm* that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in *Novopharm* applied equally to the case at bar.

35    Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in *Merck & Co. v. Apotex Inc.* (1994), 59 C.P.R. (3d) 133 (Fed. T.D.) and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier."

36    Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

*(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329 (Fed. C.A.)*

*(a) MacGuigan J.A. (Robertson J.A. concurring)*

37    In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

38    MacGuigan J.A. noted that the conclusion of McGillis J. in *Novopharm* as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 18 of 310

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: *see Consolidated-Bathurst, supra*.

39    MacGuigan J.A. relied on the decision of the Delaware Supreme Court in *E.I. Du Pont de Nemours & Co. v. Shell Oil Co.*, 227 U.S.P.Q. 233 (U.S. Del.1985) ("*Du Pont*"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on *Carey v. United States* 326 F.2d 975 (U.S. Cl. Ct. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

40    In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to look like a supply agreement." While he recognized that the *subjective* intention of the parties was to avoid creating a sublicence, he found that this was at odds with the *objective* intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

41    MacGuigan J.A. also found that, in accordance with his reading of *Consolidated-Bathurst, supra*, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the *contra proferentum* doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

42    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

*(b) Pratte J.A., dissenting*

43    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement." In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

44    Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it." He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore,

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 19 of 310

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

## IV. Issues

45      As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

46      Specifically, in the *Novopharm* proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in *Apotex #1* to the *Novopharm* appeal, whether as *res judicata* or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In *Apotex #1*, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

## V. Analysis

### A. The agreement between Apotex and Novopharm

47      The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

### (1) The nature of a sublicence

48      Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a licence": see Leslie W. Melville, *Forms and Agreements on Intellectual Property and International Licensing* (3rd ed. 1997), at §3.18.

49      To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. <u>A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done.</u> [Emphasis added.]

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

50     Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, *Howard & Bullough Ltd. v. Tweedales & Smalley Ltd.* (1895), 12 R.P.C. 519 (Eng. Ch. Div.), at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

51     For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

*(2) Contractual interpretation and the intentions of the parties*

52     In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In *Consolidated-Bathurst, supra*, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

53     From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of *contra proferentem. Contra proferentem* operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that *contra proferentem* should be applied to interpret the contract against *both* contracting parties. Indeed, a third party has no basis at all upon which to rely upon *contra proferentem*: see G. H. L. Fridman, *The Law of Contract in Canada* (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

54     The trial judge appeared to take *Consolidated-Bathurst* to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In

my view, this approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

55    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in *Lampson v. Quebec (City) (1920), 54 D.L.R. 344* (Quebec P.C.):

> ...the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses...."

56    When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in *Joy Oil Co. v. R.*, [1951] S.C.R. 624 (S.C.C.):

> ...in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

57    In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the *Patent Act*, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

58    More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see *Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-503.

59    Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

60    Therefore, I am of the opinion that the trial judge erred, in the *Novopharm* proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in *Apotex #1*, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

61    Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to *act* pursuant to the licence.

62    Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: 4% of the cost of the material sold. In this way, the royalty does no more than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

63    It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention *not* to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

64    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... *on the grounds that there is doubt as to whether or not the licence ... permits the requested acts* ..." (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

65    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party *to enable the unlicensed party to enjoy the use of the licence* to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only *indirect* enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

66    In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

*3. The legal effect of the supply agreement*

67    Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

*(i) Sublicence versus purchase and sale*

68    By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the *Patent Act*, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

69    As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": *Badische Anilin und Soda Fabrik v. Isler*, [1906] 1 Ch. 605 (Eng. Ch. Div.), at p. 610; see also *Gillette v. Rea* (1910), 1 O.W.N. 448 (Ont. Ch.); *Betts v. Willmott* (1871), 6 Ch. App. 239 (Eng. C.A.), at 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

70    But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see *Intel Corp. v. ULSI System Technology Inc.* 995 F.2d 1566 (U.S. Fed. Cir. 1993).

71    Thus, practically speaking, the rights of use and alienation can only be *determinative* of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

72    In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73    A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in *Intel, supra*, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself would have constituted a sublicence.

74    In the instant appeals, the Federal Court of Appeal relied on *Du Pont, supra*, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view *Du Pont* as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In *Du Pont*, it was more significant that the unlicensed party actually *manufactured* the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

75    But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal *personnae*, and legitimate transfers of property do, in fact, take place. In *Cyrix Corp. v. Intel Corp.* 77 F.3d 1381 (U.S. Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished *du Pont, supra*, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

76    In my view, *Cyrix* is much more closely analogous than *Du Pont* to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in *Cyrix* the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed 4% royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

77    Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in *Du Pont*. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement

expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, *inter alia*, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

78     Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and *de facto* transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would *necessarily* render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

79     As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

*(4) The agency argument*

80     In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

81     To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

*(5) Conclusion as to the nature of the supply agreement*

82     The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

83    That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in *Du Pont, supra*. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the *Patent Act* or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

84    Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts: a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

## B. Other issues in the Novopharm appeal

### (1) Did the Federal Court of Appeal err in applying its decision in Apotex #1 to its decision in Novopharm?

85    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the *Novopharm* appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in *Apotex #1* may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in *Apotex #1* if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in *Novopharm* and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

86    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as *res judicata* or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

### (2) Was Novopharm's notice of allegation premature and therefore not justified?

87    Even the unequivocal conclusion as to the character of the supply agreement does not put the *Novopharm* matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

88    Pursuant to s. 39.11(2)(c) of the *Patent Act*, Novopharm was prohibited from importing, under its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the *Patent Act Amendment Act, 1992*, s. 11(1) of that Act provides that licences

granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

89    A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

90    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the *Patent Act*. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

91    Pursuant to s. 39.14 of the *Patent Act*, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

92    In *Apotex #2*, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the *Patent Act* by obtaining the medicine either from a Canadian supplier or not at all.

*(3) Jurisdiction to grant declaratory relief*

93    The final issue to be determined with respect to the *Novopharm* appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

94    In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

95    As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In *Merck Frosst Canada Inc. v. Canada (Minister of National Health & Welfare)* (1994), 55 C.P.R. (3d) 302 (Fed. C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(*b*) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding. [Emphasis added.]

96      This point was reinforced more recently by Strayer J.A. in *Pharmacia Inc., supra*, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

97      While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the *Novopharm* appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

### C. Other issues in the Apotex #1 appeal

*(1) Would the reformulation of nizatidine by Apotex into final-dosage form infringe the patent held by Eli Lilly?*

98      Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

99      In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

> If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession,

Eli Lilly & Co. v. Novopharm Ltd., 1998 CarswellNat 1061

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 29 of 310

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, <u>by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.</u>

<u>The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions.</u> It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

100      Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see *Badische Anilin und Soda Fabrik v. Isler, supra*. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see *National Phonograph Co. of Australia v. Menck,* [1911] A.C. 336 (Australai P.C.).

101      Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

102      No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in *Merck & Co. v. Apotex Inc., supra*, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the *Patent Act*, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

103      However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723 (Fed. C.A.). At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: *any form* of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

statement of Hall J. in *Libbey-Owens-Ford Glass Co. v. Ford Motor Co.*, [1970] S.C.R. 833 (S.C.C.), at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at (1968), [1969] 1 Ex. C.R. 529 (Can. Ex. Ct.)):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] *if the owner could not put it to the only use for which it is usable without being liable for infringement*. [Emphasis added.]

104    Accordingly, MacGuigan J.A. concluded, at p. 741, that

> The use and sale of the product of a machine, particularly if production is the only possible use of the machine, is accorded protection under s. 56 as a use of the machine itself... In my view, use must be given the same sense in the case of a chemical invention. [Emphasis added.]

105    The *Merck v. Apotex* decision highlights the fact that there is really no commercial use for bulk medicine other than its reformulation into final-dosage form, for consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things produced with the article, though reached in the specific context of a s. 56 defence, applies with equal force to the case at bar. That is, the right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar, the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right.

106    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an examination of Novopharm's compulsory licence, which specifically contemplates the sale of the licensed material in bulk form by providing a formula for calculating royalties on product thus sold. As I see it, because there is no other practical use for bulk medicine, this must also be taken to contemplate and implicitly permit the reformulation of the product by the purchaser into final dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated royalty rates are based on the amounts received by subsequent purchasers in consideration of the sale of final dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain such use of the medication, he would have provided for this expressly, or, at least, would not have specifically delineated the procedure that is to compensate the patentee for such use.

107    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the right to reformulate is premised on the inherent right of an owner of property to deal with that property as he or she sees fit. In the absence of some express term in the compulsory licence, prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

108    I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, *Rucker Co. v. Gavel's Vulcanizing Ltd.* (1985), 7 C.P.R. (3d) 294 (Fed. T.D.) Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

1998 CarswellNat 1061, 1998 CarswellNat 1062, [1998] 2 S.C.R. 129...

109      In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

## VI. Disposition

### A. Novopharm Ltd. v. Eli Lilly and Co.

110      For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court - Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

### B. Apotex Inc. v. Eli Lilly and Co.

111      Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.

*Appeals allowed.*

*Pourvois accueillis.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   30

TAB 58

1960 CarswellOnt 124, [1960] O.R. 583, 25 D.L.R. (2d) 737

1960 CarswellOnt 124
Ontario Court of Appeal

Elliott v. Billings (Township) Board of Education

1960 CarswellOnt 124, [1960] O.R. 583, 25 D.L.R. (2d) 737

# Elliott v. Billings Twp. S. Bd.

Porter, C.J.O., Schroeder and Morden, JJ.A.

Judgment: October 31, 1960

Counsel: *W. J. Anderson, Q.C.*, for the board appellant.
*R. N. Starr, Q.C.*, for the plaintiff.

Subject: Contracts

*Schroeder, J.A.*:

1    The plaintiff, a garage operator who resided at Kagawong, Manitoulin, had entered into a contract in writing bearing 20th September 1955, under the terms of which he had agreed to provide a school bus and driver for the transportation of pupils residing in a school area under the jurisdiction of the defendant board, driving them from Kagawong school to the Gore Bay high school, and returning them to the said area on each school day within a specified period of the year. For this service the defendant agreed to compensate the plaintiff at the rate of $478.60 for each month in which the said transportation services were provided.

2    The plaintiff's claim against the defendant was for the recovery of damages for breach of contract. He alleged that while the contract was still in force the defendant entered into another contract with the owner and operator of another bus and hereby deprived him of the right to earn the compensation which he would have earned but for the alleged breach.

3    The defence presented at the trial was that the contract was, by its terms, fully completed and ended 30th June 1956, and that the new contract made with the plaintiff's successor was entered into only after the contractual relationship between the parties had ceased to exist. Other defences were pleaded and urged at the trial but they are not now relied upon and need not be mentioned.

4    Prior to the date of the contract in question, earlier contracts having the same object had been entered into between the parties commencing in the year 1949. Between that year and 1954 the agreements were in substantially the same terms. A printed form which was evidently provided by the department of education was used for the purpose. In 1954, a new form was introduced and was adapted by the parties for their use in connection with the contract for the year 1954-5, as well as the year 1955-6. It is the latter contract with which we are concerned in the case at bar. The relevant clauses are 1, 2, 3, 4 and 13. I refer first to cll. 1, 3 and 4, which relate specifically to the services which the plaintiff had undertaken to provide

  1. The operator shall transport to and from Kagawong school and Gore Bay high each school day all pupils designated by the board, from the section of high school district who are in attendance at the school during the period covered by this contract, the estimated number being 20 pupils.

  3. The operator shall use a motor vehicle properly licensed and insured as required by the Public Vehicles Act and the regulations thereunder.

  4. The operator shall follow a route of 22 miles, being a total daily mileage of 88 miles, described as follows ....

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1960 CarswellOnt 124, [1960] O.R. 583, 25 D.L.R. (2d) 737

5    The substantial issue between the parties is as to the period of duration of the contract. Clauses 2 and 13 are relevant to this issue and are reproduced hereunder

> 2. This contract shall commence 6th September 1955, and terminate 30th June 1956.

> 13. This agreement shall be deemed to continue in force until terminated as follows ....

>> (b) on the 31st December in any year or on the 31st August in any year provided that written notice to that effect be given by either party to the other at least one month prior to the date of such termination; or

6    Before entering into the agreement the defendant board passed a resolution 30th November 1954, in the following terms

> That F. Elliott's bus be hired for 3 years on year to year contract.

The defendant did not at any time purport to give a notice of termination in accordance with the provisions of cl. 13 and the plaintiff therefore contends that when the defendant board entered into an agreement with the third party, the agreement upon which he bases his claim was in full force and effect. The conclusions of the learned trial Judge were expressed in the following passage extracted from his reasons for judgment.

> I think that its true interpretation and meaning is that in the first instance it is for a fixed term, from 6th September 1955 to 30th June 1956; and that upon the termination thereof and thereafter it was to continue in force indefinitely and until terminated in the manner and by the means alternatively provided by cl. 13. I conclude further that it could not be terminated pursuant to cl. 13(*b*) during the fixed term, but that it could at any time be brought to an end under (*a*) and (*c*).

The disposition of the present appeal depends upon the proper construction to be placed upon the words of the contract under review.

7    It is a cardinal rule of construction that a contract is to be construed with reference to its object and the whole of its terms. It follows that the intention of the parties is to be ascertained from a consideration of the whole context, and the construction which produces the greatest harmony and the least inconsistency is that which ought to prevail: *A.-G. v. Sillem* (1864), 2 H. & C. 431, at pp. 515-6-7. The latter case involved the construction of a statute but the same rule of interpretation is applicable to contracts. Further, a contract like a statute ought to be so construed that if it can be prevented, no clause, sentence or word shall be superfluous, void or insignificant: *Reg. v. Oxford* (*Bp.*) (1879), 4 Q.B.D. 245, at p. 261, applied by Robertson, C.J.O., in *Brown Brothers Ltd. v. Popham* (1939), [1940] O.R. 102, [1939] O.W.N. 599, [1939] 4 D.L.R. 662 (C.A.).

8    In *Barton v. Fitzgerald* (1812), 15 East. 530, Lord Ellenborough, C.J., stated

> It is a true rule of construction that the sense and meaning of the parties in any particular part of an instrument may be collected *ex antecedentibus et consequentibus*; every part of it may be brought into action in order to collect from the whole one uniform and consistent sense, if that may be done. We can only look, however, to the sense and meaning of the parties as they are to be collected from the deed itself.

It is the contention of the appellant that the contract was for a fixed period, terminating 30th June 1956, as provided in cl. 2, and that the provisions of cl. 13 should be construed as providing for termination of the agreement in certain events prior to the said date of termination. It is argued on its behalf that the construction placed upon the agreement by the learned trial Judge was open to the objection that the effect which he gave to cl. 13 created a repugnancy between that paragraph and the provisions of cl. 2, and required the interpolation into cl. 13 of the word thereafter or a word of similar signification. Counsel for the appellant further submitted that these 2 clauses could be construed without rejecting any part of the agreement or adding anything thereto, if the view to be taken that the contract was for a fixed period terminating 30th June 1956, and that the provisions of cl. 13 were designed to devise a method of determining the contract in certain events which might occur prior to 30th June 1956. This construction, however, is open to the criticism that it leaves unresolved the term contained in cl. 13 (*b*) providing for termination of the contract by a written notice to be given by either party to the other at least one month prior to the 31st August *in any*

1960 CarswellOnt 124, [1960] O.R. 583, 25 D.L.R. (2d) 737

*year*. If the contract was for the fixed period extending from 6th September 1955 to 30th June 1956, the power to terminate the agreement by a written notice given one month prior to the 31st December, would be meaningful, but not so the provision enabling the agreement to be brought to an end by notice given one month prior to the 31st August, hence it would appear to have been contemplated that the agreement might extend beyond the 30th June 1956. Furthermore the words *in any year* would have to be rejected as surplusage.

9      As stated, the agreement between the parties was expressed on a printed form which was evidently made available to school boards by the department of education. This form contains, on the second page, columns for the insertion of information required by the department for grant purposes and they do not concern the person who undertakes to provide transportation for the pupils. It would seem that such grants are made by the department on a yearly basis, and this may account for the fact that the parties entered into separate agreements for the years 1954-5 and for the years 1955-6. It is *nihil ad rem* that the incongruity mentioned above would not arise if the period covered by cl. 2 had not been for approximately 10 months but for a substantially longer time. Be that as it may, that clause refers to a specific period commencing 6th September 1955 and ending 30th June 1956, and whatever its true effect may be, the entire agreement must be construed in the light of that express stipulation.

10      The immediate object of the agreement was to provide for the transportation of pupils attending the schools specified therein and who were under the jurisdiction of the defendant board during the period of the 1955-6 school year, namely, between the 6th September 1955, and the 30th June 1956. It is not without significance that the document is described on its face as an agreement for transportation. In cl. 13 it is again referred to as this agreement. In references to the document on p. 2 the word agreement is again used. As contrasted with this term in cl. 2 the word contract is employed. It is contended by counsel for the respondent that the word contract was not used in its strict technical legal sense but rather more loosely to designate the contract period, or more precisely, the period during which the transportation services, undertaken by the plaintiff, were to be performed; and that a period corresponding with the school year was to be equally applicable to any subsequent year covered by the parties' agreement.

11      During the argument of the appeal this construction commended itself to my mind as a highly reasonable one, and further reflection has not altered my opinion. The fact that the dates mentioned in cl. 2 correspond with the opening and closing dates of the school year as defined by the High Schools Act, s. 61, strongly supports this contention. If cl. 2 be so construed then the period of duration of the contract can be determined by resorting to the provisions of cl. 13 only. The contract can then be looked upon as one which came into force on the date of its execution and delivery and which was to continue in force until terminated in accordance with the terms of cl. 13, subject, of course, to the terms of cl. 2 which provide for the commencement of the transportation services on the 6th September 1955. As to that provision, the contract was intended to have and would have a retrospective effect. The agreement can thus be interpreted as a harmonious whole without doing violence to any of its terms and without the interpolation or elimination of any of them. It is true that the school year would begin and end on different dates in subsequent years but that creates no difficulty. There can be no doubt that the pupils were only to be conveyed on school days during the school year, the precise period of which would be readily ascertainable by reference to the High Schools Act, s. 61.

12      In the result, therefore, I have reached the conclusion that judgment in appeal was right and I would dismiss the appeal with costs.

**Morden, J.A.:**

13      I have read the reasons given by my brother Schroeder for dismissing this appeal but with every respect for his views, I cannot agree with his conclusions.

14      The issue between the parties is a narrow one — involving the proper construction of a written agreement for transporting pupils attending a high school under the jurisdiction of the defendant board. The parties, beginning in 1949, executed somewhat similar agreements annually. The minute book of the board contains a resolution, which was passed 30th November 1954, in these words

That F. Elliott's bus be hired for 3 years on year to year contract.

The written agreement for the previous year was dated the same date as this resolution. The agreement in question, except for the dates, is in the same terms as agreement dated 30th November 1954. Its provisions so far as they are material to the issue are set out in my brother's reasons. It is evident, and undisputed, that the parties did not enter into a 3 year agreement upon a year to year basis, whatever that may mean.

15      In view of the argument advanced in this Court by the respondent's counsel, it is important to examine with care the allegations made by the parties in their pleadings with respect to proper interpretation of termination provision of the agreement. The plaintiff pleaded that the agreement was for one school year and thereafter unless terminated pursuant to terms of cl. 13 of the said contract. In its statement of defence, the board alleged that the contract was by its terms terminated and fully completed and ended 30th June 1956, and thereafter no relationship, contractual or otherwise, existed between the plaintiff and the defendant. The learned trial Judge, for considered reasons, accepted the interpretation pleaded by the plaintiff.

16      Upon the argument of this appeal, the plaintiff's counsel advanced a new interpretation — that the agreement continued in force until terminated in accordance with cl. 13 and only by way of alternative argument did he support the interpretation stated in his pleading which had found favour with the learned trial Judge. As I read my brother Schroeder's reasons, he accepts what I term the new interpretation. Rule 147 provides that

> Where the contents of any document are material, it shall be sufficient in any pleading to state the effect thereof as briefly as possible, without setting out the whole or any part thereof.

The effect of the corresponding English Rule (O. XIX, r. 21) is described by *Odgers, Pleading & Practice*, 14th ed., p. 159, as follows

> Wherever the contract sued on is contained in a written instrument, the pleader should shortly state what he conceives to be its legal effect; . . . It will be for the defendant, if he disputes the legal effect attributed to it by the plaintiff, to state his own version of the document.

Bramwell, L.J., in *Philipps v. Philipps* (1878), 4 Q.B.D. 127, at p. 131, in discussing the objects of the rules of pleading stated one of them in these words

> It is that the plaintiff may state what his case is for the information of the defendant, and that the plaintiff may be tied down to it and not spring a new case on the defendant.

Counsel for the appellant did not raise any objection to this departure from the statement of claim and I will therefore assume that the plaintiff is entitled at this late stage to advance for the first time a new interpretation of the agreement. However in these circumstances, a Court should consider it with caution and perhaps with some scepticism.

17      In my considered opinion the agreement was to continue for a fixed period — the term mentioned in cl. 2 — from 6th September 1955, until 30th June 1956, but was subject to earlier termination during that period by the operation of cl. 13. This interpretation gives full effect to the plain and ordinary meaning of the language of cl. 2 which I conceive to be expressed intention of the parties. Mr. Starr, in his able presentation, submitted, first, that this construction made superfluous the words in cl. 13 providing for termination by one month's notice on the 31st August in any year. I agree with that statement but not the conclusion he asks us to draw from it. There was no legal obstacle to the parties entering into a contract for a period of more than 10 months. They could have made a transportation contract for, say, 2 or 5 or 10 years. If they had, there would have been a period or periods at which the words which were admittedly superfluous to this contract would have been applicable. There is ample authority justifying a Court in rejecting words, provided that the intention of the parties is plain, notwithstanding their presence in the written document. In *Gwyn v. Neath Canal Nav.* (1868), L.R. 3 Ex. 209, Kelly, C.B., said, at p. 215

> The result of all the authorities is, that when a Court of law can clearly collect from the language within the 4 corners of the deed, or instrument in writing, the real intentions of the parties, they are bound to give effect to it by supplying anything

1960 CarswellOnt 124, [1960] O.R. 583, 25 D.L.R. (2d) 737

necessarily to be inferred from the terms used, and by rejecting as superfluous whatever is repugnant to the intention so discerned.

This general principle is particularly applicable to documents which are in a printed form and there is a possible conflict between the written and printed terms. The agreement which was the subject of debate upon this appeal is on a printed form prepared by the department of education and distributed, I assume, to hundreds of school boards in this Province. But if it is said (and I do not agree) that the written dates appearing in cl. 2 conflict with the printed dates in cl. 13, then I say that more weight is to be given to the written words because they were selected by the parties themselves than to the printed words which were provided not only for these parties but for all other similar bodies entering transportation contracts, even to the extent of disregarding these printed words: *Glynn v. Margetson & Co.*, [1893] A.C. 351, *Templin v. Alles*, [1944] O.W.N. 96, [1944] 1 D.L.R. 733 (C.A.), *Addis v. Burrows*, [1948] 1 K.B. 444, at p. 449, *Metal Stampings Ltd. v. Standard Life Assurance Co.*, [1951] O.W.N. 625 (H.C.), *Elliott v. Dobson*, [1954] O.R. 185, [1954] 2 D.L.R. 510 (H.C.) and *Sze Hai Tong Bk. v. Rambler Cycle Co.*, [1959] A.C. 576, at p. 587.

18     If the termination date is to be ascertained without any reference to cl. 2, then, as Mr. Starr appreciated, some meaning and effect must be given to that paragraph. He submitted that it only described the period of carriage of the pupils and in support of this he referred us to the use of the word contract in some parts of the document which he contrasted with the word agreement used in other parts and argued that they had different meanings. In legal and lay parlance these words are commonly used to mean the same thing. With all respects to the skill of the unknown draughtsman, I would hesitate a long time before I would attribute to him and to the parties to this agreement an intention to employ these words in the same document, which was apparently in general use throughout Ontario, with different meanings.

19     There are several serious objections in my view to interpreting cl. 2 as defining merely the period of carriage of the pupils in any year. First, several words would have to be read into this paragraph to give it this special meaning. Secondly, the words each school day during the period covered by this contract appearing in cl. 1 clearly define the period of carriage. Another objection to this interpretation of cl. 2 is the fact that the dates appearing in it apply to only one school year, the one ending 30th June 1956. They could not properly describe any subsequent school year. If the paragraph was intended to describe the period of carriage in all the years included in a contract of this nature, very different language would have been used. The school year and holidays for high schools are defined with precision by the High Schools Act, s. 61.

20     In my opinion, cl. 2 sets by its very language the beginning and end of the operation of this agreement. If the contrary view is to be accepted, then operators and school boards who wished to fix a definite termination date at the time the agreement was made, would have to make several important alterations in the printed parts of this general form. If the agreement is to be interpreted as the respondent now contends, then it would never come to an end by its own terms, but require for its termination some subsequent action by one or both of the parties under cl. 13. Bearing in mind the general use of this form, such an interpretation would have, in my respectful opinion, results surprising and perhaps highly inconvenient to the parties. I cannot accept the view that the department by distributing this form intended that all transportation contracts were to be of indefinite duration.

21     For these reasons, I would allow the appeal and dismiss the action, both with costs.

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 59

52 Fed.Cl. 774
United States Court of Federal Claims.

FIRST FEDERAL SAVINGS
BANK OF HEGEWISCH, Plaintiff,
v.
The UNITED STATES, Defendant.

No. 93–162C.    |    Originally Filed July 3,
2002.    |    Reissued for Publication July 8, 2002.

Savings and loan brought suit against the United States,
alleging that passage of the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 (FIRREA) breached
agreements it made with the government in connection
with the acquisition of a failing thrift. Government
filed counterclaims asserting special plea in fraud claim
and claim for rescission. On cross-motions for summary
judgment on contractual liability, plaintiff's motion to dismiss
counterclaims and affirmative defenses, and defendant's
cross-motion for summary judgment as to its counterclaims
and affirmative defenses, the Court of Federal Claims,
Futey, J., held that: (1) contract was formed between the
government and thrift, whereby thrift could use purchase
method of accounting and record supervisory goodwill
for merger with ailing thrift, and contract was breached
by passage of FIRREA; (2) government did not establish
special plea in fraud claim based on defalcation and alleged
misrepresentations of plaintiff's chief financial officer; and
(3) government was not entitled to rescission.

Plaintiff's motion for partial summary judgment grant;
plaintiff's motion to dismiss granted in part and denied in part;
defendant's cross-motions denied.

West Headnotes (13)

[1]    **Building and Loan Associations**
       👉 Rights, powers, duties, and liabilities of
       receiver in general

       Merger agreement, assistance agreement, and
       certain documents incorporated by integration
       clause formed a contract between the
       government and thrift, whereby thrift could
       use purchase method of accounting and record
       supervisory goodwill for merger with ailing

thrift, and contract was breached by passage of
the Financial Institutions Reform, Recovery, and
Enforcement Act of (FIRREA) which precluded
use of supervisory goodwill for regulatory
reporting purposes. Federal Deposit Insurance
Act, § 2[1] et seq., 12 U.S.C.A. § 1811 et seq.

5 Cases that cite this headnote

[2]    **United States**
       👉 Tolling

       The doctrine of equitable tolling allows the court
       to abate the effect of a statute of limitations when
       the proper circumstances require such an action.

       1 Cases that cite this headnote

[3]    **United States**
       👉 Tolling

       Unique circumstances of *Winstar* litigation, and
       special case management procedures identified
       in the omnibus case management order (CMO),
       warranted equitable tolling of any statute of
       limitations that might apply to government's
       special plea in fraud counterclaim in *Winstar*
       case.

       2 Cases that cite this headnote

[4]    **United States**
       👉 Making or Presentation of False Claims and
       Other Offenses Relating to Claims

       To establish special plea in fraud that claimant
       committed fraud during the performance of
       a contract, government must establish: (1)
       misrepresentation of a material fact; (2) intent
       to deceive or a reckless state of mind; (3)
       justifiable reliance on the misrepresentation by
       the government; and (4) injury to the government
       through reliance. 28 U.S.C.A. § 2514.

       11 Cases that cite this headnote

[5]    **Corporations and Business Organizations**
       👉 Corporation acts through officers or agents

       Generally, a corporation can only act through
       its agents, and when they are clothed with

the authority to act for it, the corporation is responsible for their acts.

Cases that cite this headnote

**[6]**    **Corporations and Business Organizations**
👉 Acting within scope of employment or authority

If a corporate employee is acting outside of his or her actual or apparent authority, the corporation is generally not liable for employee's actions.

2 Cases that cite this headnote

**[7]**    **Corporations and Business Organizations**
👉 Fraud

Generally, the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment and (2) for the benefit of the corporation.

3 Cases that cite this headnote

**[8]**    **United States**
👉 Making or Presentation of False Claims and Other Offenses Relating to Claims

Defalcation by chief financial officer of thrift, which consisted of embezzlement, misappropriated funds through unauthorized loans, and extortion, could not be imputed to thrift for purposes of government's special plea in fraud counterclaim in *Winstar* suit, where thrift did not benefit from the defalcation in any way. 28 U.S.C.A. § 2514.

1 Cases that cite this headnote

**[9]**    **Building and Loan Associations**
👉 Rights, powers, duties, and liabilities of receiver in general

Although assistance agreement and other documents which governed supervisory merger did not expressly require that acquiring thrift operate acquired thrift in a safe and sound manner, it was inherent in agreement between the government and acquiring thrift that acquired thrift be managed in such a way.

1 Cases that cite this headnote

**[10]**    **United States**
👉 Penalties and actions therefor

Government failed to establish special plea in fraud counterclaim against thrift which brought *Winstar* suit, based on defalcation or alleged misrepresentations by thrift's chief financial officer; defalcation could not be imputed to thrift, and government failed to prove that officer misrepresented a material fact. 28 U.S.C.A. § 2514.

2 Cases that cite this headnote

**[11]**    **Cancellation of Instruments**
👉 Nature and scope of remedy
**Contracts**
👉 Contracts subject to rescission

The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed.

1 Cases that cite this headnote

**[12]**    **Contracts**
👉 Contracts subject to rescission
**Contracts**
👉 Restoration of former status of parties

Rescission as a contract remedy is limited to situations where it is possible to return the parties to the status quo ante.

1 Cases that cite this headnote

**[13]**    **Building and Loan Associations**
👉 Rights, powers, duties, and liabilities of receiver in general

Government was not entitled to rescission of supervisory merger agreement on ground that fraud perpetrated by acquiring thrift render assistance agreement void ab initio; government did not establish any fraud, and even if it had, rescission involving dissolution of merger would be impossible and wholly irresponsible.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*775** Theodore A. Shapero, Chicago, Illinois, attorney of record for plaintiff and Mark A. Rabinowitz, co-counsel, Chicago, Illinois.

Edward P. Sullivan, Department of Justice, Washington, D.C., with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Cohen, Director, and Jeanne E. Davidson, Assistant Director. Jeffrey T. Infelise, Trial Attorney.

**Opinion**

*OPINION and ORDER* [1]

FUTEY, Judge.

This *Winstar*-related case is before the court on the parties' cross-motions for summary judgment on contractual liability, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses, and defendant's cross-motion for summary judgment as to its counterclaims and affirmative defenses. Defendant's counterclaims are based on the special plea in fraud statute and rescission.

With respect to contractual liability, plaintiff maintains that agreements it made with defendant during plaintiff's acquisition of a failing thrift created a contract that allowed plaintiff to utilize certain favorable accounting principles. Plaintiff maintains defendant breached this contract when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA). Notwithstanding **\*776** the United States Supreme Court's (Supreme Court) decision in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), defendant argues it never entered into a contract with plaintiff because their negotiations were regulatory in nature, not contractual. Defendant also alleges that plaintiff's actions pre- and post-FIRREA did not reflect a contractual relationship between the parties.

In addition, defendant asserts plaintiff's complaint should be dismissed because plaintiff perpetrated fraud against the government for a nine-year period. Said fraud is premised

on a defalcation committed by one of plaintiff's employees. Defendant also asks the court to rescind any contract it had with plaintiff and to order plaintiff to return the $2 million it received as assistance when it acquired the failing thrift. Plaintiff seeks dismissal of defendant's counterclaims because defendant filed them after the statute of limitations expired. Plaintiff also contends defendant cannot satisfy the requisite elements necessary for proving fraud and rescission. Moreover, plaintiff believes defendant's affirmative defenses should be stricken because they are wholly conclusory.

*Factual Background*

Plaintiff is a savings and loan association located in Chicago, Illinois, the accounts of which are insured by the Savings Association Insurance Fund (SAIF) as administered by the Federal Deposit Insurance Corporation (FDIC). Prior to May 1982, plaintiff was a state-chartered savings and loan institution, which operated on the southeast side of Chicago. In May 1982, plaintiff became a federally insured, mutual savings and loan association or "thrift."

As this case is considered a "*Winstar*-related" case, it is unnecessary to revisit the history of the savings and loan crisis. This has been exhaustively done in prior opinions such as *Winstar* itself. *See, e.g., Winstar,* 518 U.S. at 843–856, 116 S.Ct. 2432; *Bluebonnet Sav. Bank, F.S.B. v. United States,* 47 Fed.Cl. 156, 158 (2000) (*Bluebonnet II*), *aff'd, in part,* 266 F.3d 1348, 1354–55 (Fed.Cir.2001). Only the facts relevant to this particular case, therefore, are set forth here.

**I. The Lansing Acquisition**

Lansing Federal Savings & Loan Association (Lansing) was a federally chartered mutual association located in Lansing, Illinois. In 1982, Lansing was a failing thrift institution insured by the Federal Savings and Loan Insurance Corporation (FSLIC). During the summer of 1982, a FSLIC supervisory agent contacted at least ten associations in the Chicago area, including plaintiff, concerning a possible assisted merger with Lansing. Plaintiff's attorney sent the supervisory agent a letter dated May 25, 1982, expressing plaintiff's interest in merging with Lansing on the condition that: (1) the acquisition be accomplished under the purchase method of accounting and Lansing's assets be "marked to market;" [2] (2) for a period of thirty-five years, the Federal Home Loan Bank Board (FHLBB) would forbear from including operating losses on acquired assets, capital losses

upon disposition of acquired assets and acquired scheduled items, and liabilities for the net worth calculation; (3) for a period of one year, FHLBB would forbear from including Lansing's liquidity deficiency and aggregate net withdrawals in the liquidity calculation; and (4) for a period of five years, FSLIC would indemnify plaintiff for expenses and attorney's fees incurred in connection with any litigation challenging the merger or arising from Lansing's undisclosed liabilities or scheduled items. After further discussions with FSLIC, plaintiff submitted a bid to FHLBB for the proposed acquisition of Lansing on August 23, 1982. The cover letter attached to this bid stated, in pertinent part:

**\*777** First Federal Savings of Hegewisch hereby submits its bid to acquire Lansing Federal Savings and Loan Association, utilizing purchase accounting method of acquisition and FSLIC capital assistance. [3]

On December 13, 1982, plaintiff entered into a merger agreement (Merger Agreement) with Lansing. On December 16, 1982, FSLIC's Director, H. Brent Beesley, issued a memorandum to FHLBB recommending the approval of the merger between Lansing and plaintiff. FHLBB approved the merger by resolution on December 20, 1982. Plaintiff entered into an assistance agreement (Assistance Agreement) with FSLIC and Lansing on December 30, 1982. The effective date of the merger was January 7, 1983.

The Assistance Agreement, in Paragraph D of the Recitals, stated:

The CORPORATION [FSLIC] has decided, pursuant to § 406(f) of the National Housing Act, as amended, 12 U.S.C. § 1729(f), to provide financial assistance as set forth in this Agreement, having determined that the MERGING ASSOCIATION [Lansing] is in danger of default and that the amount of such assistance would be less than the losses the CORPORATION would sustain upon the liquidation of the MERGING ASSOCIATION through a receivership accompanied by the payment of insurance of accounts. [4]

Section 19 added, in part:

This Agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties ... in connection herewith, excepting only the Merger Agreement and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or the CORPORATION, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Merger Agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of the CORPORATION are concerned. [5]

Section 19 of the Assistance Agreement contained an integration clause which incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff that guaranteed certain accounting forbearances with respect to the intangible assets that could be recognized in the transaction.

On December 30, 1982, FHLBB adopted Resolution No. 82–891, which included, in pertinent part:

for purposes of regulatory reporting, Hegewisch shall account for the merger as a purchase using one of the following methods of accounting: 1) regulatory accounting principles prescribed for insured institutions, in which case any goodwill or similar item resulting from the merger shall be amortized over a period of no more than 35 years under the straight line method; or 2) generally accepted accounting principles, consistently applied, in use in the savings and loan industry at the time of the bid proposal on August 23, 1982.

....

RESOLVED FURTHER, That the Bank Board finds that the merger of Lansing with and into Hegewisch is instituted for supervisory reasons. [6]

In addition, FHLBB Memorandum 31b expressly provided that the goodwill resulting from the merger could be recognized as an asset subject to amortization.

Plaintiff elected to use the purchase method of accounting for the merger with Lansing. Plaintiff's auditors at the time, Ernst & Whinney, concluded that Lansing's liabilities exceeded its assets by $8,543,277 on a marked to market basis. Pursuant to the purchase method of accounting, therefore, plaintiff recorded $8,543,277 in supervisory **778 goodwill, which it planned to amortize over thirty-five years on a straight line basis. Plaintiff actually amortized the supervisory goodwill from 1983 until the enactment of FIRREA on August 9, 1989.

When enacted, FIRREA: (1) abolished FSLIC and transferred its functions to other agencies; (2) created SAIF, managed by FDIC; (3) abolished FHLBB; and (4) created the Office of Thrift Supervision (OTS) in the Department of Treasury. It also provided, in part, that tangible capital cannot include supervisory goodwill, and that only limited amounts of core capital may consist of supervisory goodwill. These amounts would be phased out by 1994. It further stated that supervisory goodwill must be amortized for a period not to exceed twenty years.

On November 8, 1989, OTS published minimum capital regulations pursuant to FIRREA that excluded supervisory goodwill from capital for regulatory reporting purposes. As a result of the provisions of FIRREA and the OTS capital regulations, plaintiff argues it can no longer satisfy the mandatory minimum capital requirements and cannot come into compliance with said requirements in the foreseeable future.

## II. David Orchowski's Defalcation

At the time of the Lansing negotiations, David J. Orchowski was the son-in-law of plaintiff's chairman of the board, Vincent Ginalski, and the husband of the president, Ann Capanna. From 1986 to 1991, he served as plaintiff's chief financial officer and executive vice president. He also served as vice president, controller and treasurer of plaintiff for several years prior to 1986.

In September 1991, Mr. Orchowski turned himself in to the Federal Bureau of Investigation (FBI) in Chicago, Illinois, admitting that he had defrauded plaintiff over a period of nine years, beginning in mid–1982. His fraudulent activity began several months prior to FSLIC's execution of the Assistance Agreement and the completion of FHLBB's September

1982 regulatory examination of plaintiff. The total amount he embezzled during his fraud scheme was approximately $100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from Mr. Orchowski's actions neared $10 million. Plaintiff subsequently recovered all of these losses from the customers involved, bonding company, auditors, and Mr. Orchowski.

Mr. Orchowski was charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 (1990 Supp.) for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. In conjunction with his guilty plea, he entered a plea agreement where he admitted the following: (1) beginning in approximately June 1982, he made no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of the loans were extended to individuals who had applied to plaintiff for loans but had been turned down due to reasons relating to credit risk, loan purpose, or plaintiff's loan policies; (3) he failed to obtain properly executed loan documentation for many of the unauthorized loans; and (4) he failed to perfect plaintiff's security interest in collateral for the loans. As a result of his guilty plea, he was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. On November 9, 1991, plaintiff filed a civil action against Mr. Orchowski alleging, among other things, a breach of fiduciary duty.

Mr. Orchowski's activities caused the OTS to implement several enforcement actions against him. For example, the OTS issued a "Stipulation and Consent to Issuance of Order of Prohibition" to Mr. Orchowski barring him from further participation, in any manner, in plaintiff's affairs. He also was prohibited from acting as a director or officer in any other financial institution without the prior written approval of the Regional Director of the Central Region of the OTS. In addition, the OTS issued a Cease and Desist Order (C & D Order) against plaintiff [7] requiring it to complete a comprehensive analysis **779 and assessment of its management structure and staffing requirements. The OTS required this study because, after conducting a formal investigation of the defalcation, it concluded that a lack of proper oversight by the board of directors and plaintiff's senior management contributed, in part, to Mr. Orchowski's ability to carry out his fraud over a sustained period of time. The OTS also cited the negligence of plaintiff's accountant,

Deloitte & Touche, as a significant contributing factor in plaintiff's failure to detect the defalcation.

## III. Pending Litigation

Plaintiff filed a complaint on March 22, 1993, listing seven counts against the government including breach of contract, Fifth Amendment takings and due process violations, as well as requesting damages and restitution. On October 29, 1997, plaintiff filed a short-form motion for partial summary judgment in accordance with the court's omnibus case management order (CMO). Defendant filed a motion to dismiss Counts I, III, IV, V, VI and VII on November 15, 1999, and filed a cross-motion for summary judgment with respect to Count I on December 6, 1999. There is also a series of short briefs that were filed in response to the court's order to show cause why summary judgment should not be entered in this case, in light of the court's decision in *California Fed'l Bank, FSB v. United States,* 39 Fed.Cl. 753 (1997). The court appended an order to that opinion requiring defendant to respond in all cases where the plaintiffs had filed a motion for summary judgment. This generated a series of responsive briefs.

Judge Loren Smith transferred this case to the undersigned judge on December 15, 2000. In a departure from the CMO, which asked defendant to not file answers and counterclaims in the *Winstar* cases until after the short-form motions for partial summary judgment were decided, the court allowed defendant to file its answer and counterclaim in an order dated June 7, 2001. Defendant filed this document under seal on June 13, 2001. Defendant's counterclaim is based on the defalcation involving approximately $10 million in unauthorized loans and misappropriations committed by Mr. Orchowski. Defendant's counterclaim contains two counts— Count I is a special plea in fraud claim based on 28 U.S.C. § 2514 (1994) and Count II is a claim for rescission of the Assistance Agreement in response to the alleged fraud. On August 8, 2001, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. Defendant responded by filing a cross-motion for summary judgment on Counts I and II.

Also on August 8, 2001, plaintiff moved for leave to amend its complaint to include a reliance damages theory.[8] The court granted this request on October 17, 2001. Plaintiff filed its first amended complaint on January 16, 2002, to include factual allegations necessary to establish reliance damages for its breach of contract claim. The damages that plaintiff

now seeks are: (1) lost profits; (2) the costs of substituting replacement capital for the supervisory capital it lost when defendant breached the contract; (3) restitution of defendant's benefit or restitution of plaintiff's cost of performance under the contract; and (4) reliance damages.

Defendant filed an answer to plaintiff's first amended complaint on February 12, 2002. This document included the same counterclaims defendant set forth in its first answer. On March 1, 2002, plaintiff filed a motion to dismiss Counts I and II of defendant's counterclaim. This motion was just a reiteration of plaintiff's previous motion to dismiss these counts, which it filed on August 8, 2001. An oral argument addressing the breach of contract issues and defendant's counterclaims was held on May 15, 2002, in Washington, D.C.

### *Discussion*

The court presently has before it plaintiff's motion for partial summary judgment on liability, defendant's corresponding cross-motion, plaintiff's motion to dismiss the two counts of defendant's counterclaim, and defendant's corresponding cross-motion for summary judgment as to its counterclaims **\*780** and affirmative defenses.[9] The two main issues are contractual liability and defendant's special plea in fraud claim. As this court has previously discussed, "it is ultimately impossible to divorce the two." *Anderson v. United States,* 47 Fed.Cl. 438, 442 (2000). They are intertwined because the scope of the contract is critical to the issue of whether the court should grant defendant's summary judgment motion based on fraud. *Id.*

### I. Contractual Liability

[1] Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Sec'y, DHHS,* 998 F.2d 979 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact,

the burden then shifts to the opposing party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show that there is an absence of evidence to support the opposing party's case, the burden then shifts to the opposing party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

Plaintiff maintains the Merger Agreement, Assistance Agreement and certain documents incorporated by the integration clause formed a contractual relationship with defendant. Plaintiff contends its bid to merge with Lansing specifically proposed to FHLBB that plaintiff would use the purchase method of accounting and would record supervisory goodwill for the merger. Plaintiff asserts that throughout the entire negotiation process with Lansing, FSLIC and FHLBB it was understood and articulated, orally and in writing, that plaintiff would be able to record as supervisory goodwill the amount by which the market value of Lansing's liabilities exceeded the market value of its assets. Plaintiff argues it was also agreed that it could amortize this goodwill over a long period of time, such as thirty to forty years, as reflected in the bid. Plaintiff maintains that no acquirer would have merged with Lansing without financial assistance from FSLIC and FHLBB. In addition, plaintiff asserts defendant is raising arguments that the Supreme Court specifically rejected in *Winstar.*

Defendant contends the Assistance Agreement, by its terms, did not promise that purchase method accounting could be used or **\*781** that special regulatory treatment would be afforded to plaintiff for the supervisory goodwill that resulted from the Lansing acquisition. Defendant also asserts the Assistance Agreement did not provide plaintiff with direct cash assistance from FSLIC. Instead, FSLIC agreed that plaintiff could debit certain amounts from a special reserve account established by FSLIC to offset current or future liabilities associated with Lansing's operations. Plaintiff debited nearly $2 million from this account. Defendant further maintains that all documents integrated into the Assistance Agreement, such as the Merger Agreement and certain resolutions by FHLBB, did not contain any contractual guarantees to plaintiff with respect to the purchase method of accounting or the regulatory treatment of supervisory goodwill.

## A. *The Winstar scenario*

Since this case has been characterized as *Winstar*-related, it is necessary to review the Supreme Court's decision in that seminal case. [10] Three separate causes of action were heard by the Supreme Court at that time, with *Winstar* serving as the lead case. Glendale Federal Bank, FSB (Glendale) and The Statesman Group, Inc. were the two other thrifts involved. *Winstar,* 518 U.S. at 858, 116 S.Ct. 2432. Plaintiff asserts the facts of Glendale's acquisition are most closely related to the present case. [11]

First Federal Savings and Loan Association of Broward County (Broward) approached Glendale in September 1981 about a possible merger. *Id.* at 861, 116 S.Ct. 2432. At the time, Broward had liabilities exceeding its assets by over $734 million. *Id.* Glendale was both profitable and well-capitalized, with a net worth of $277 million. *Id.* After preliminary negotiations, Glendale submitted a merger proposal to FHLBB that "assumed the use of the purchase method of accounting to record supervisory goodwill arising from the transaction, with an amortization period of 40 years." *Id.* FHLBB ratified the merger's "Supervisory Action Agreement" (SAA), on November 19, 1981. *Id.*

The SAA said nothing about supervisory goodwill, but it did contain an integration clause incorporating contemporaneous resolutions and letters, as well as the merger agreement. *Id.* One of the incorporated documents was Resolution 81–710, which referred to two additional documents including:

(1) a letter from Glendale's accountant identifying the use of goodwill and amortization periods to be recorded in Glendale's books and (2) a stipulation that goodwill would be amortized in accordance with Memorandum 31b. *Id.* Memorandum 31b allowed Glendale to use the purchase method of accounting and to recognize goodwill as an asset subject to amortization. *Id.*

The Supreme Court in *Winstar* concluded that these documents were enough to create a contractual relationship between Glendale and the government. Indeed, the court commented that "[w]e accordingly have no reason to question the Court of Appeal's conclusion that 'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.' " *Id.* at 864, 116 S.Ct. 2432 (quoting *Winstar,* 64 F.3d 1531, 1540 (Fed.Cir.1995)); *see also Bluebonnet Sav. Bank, F.S.B. v. United States,* 43 Fed.Cl. 69 (1999) (*Bluebonnet I*).

The Glendale acquisition, therefore, consisted of four basic elements that the Supreme Court believed formed a contractual relationship: (1) a merger proposal that indicated purchase method accounting to record supervisory goodwill; (2) an assistance agreement, which said nothing about supervisory goodwill; (3) an integration clause in the assistance agreement that incorporated contemporaneous resolutions, letters, and the merger agreement; and (4) the actual contemporaneous resolutions and letters that indicated purchase method accounting for supervisory goodwill and amortization periods. **\*782** All four of these elements exist in the present case.

Specifically, plaintiff sent FSLIC's supervisory agent a letter concerning the merger that expressed plaintiff's desire to use the purchase method of accounting. Plaintiff then entered into an assisted transaction with FSLIC and Lansing. The Assistance Agreement did not specifically mention supervisory goodwill, however, Section 19 contained an integration clause that incorporated by reference the Merger Agreement, certain contemporaneous resolutions issued by FHLBB, and a letter from FHLBB to plaintiff guaranteeing certain accounting forbearances. One of the FHLBB resolutions included was No. 82–891, which allowed plaintiff to use either regulatory accounting principles or GAAP. Plaintiff elected to use the purchase method of accounting under GAAP so it could record $8,543,277 in supervisory goodwill, which it planned to amortize over thirty-five years on a straight-line basis. This supervisory goodwill

helped plaintiff satisfy the mandatory regulatory capital requirements. But for defendant's enactment of FIRREA, plaintiff could have continued to satisfy these requirements. The court believes this case is exactly like the scenario set forth in *Glendale* and explained in *Winstar.* [12]

## B. *Defendant's attempt to distinguish this case from the Winstar scenario*

Defendant provides an extensive list of reasons, however, as to why plaintiff did not enter a contractual relationship with the government in spite of the *Winstar* decision: (1) the government did not make contractual guarantees; (2) the government's actions refute the notion of a contract; (3) regulatory action alone does not create contractual rights; (4) plaintiff did not evince contractual intent; (5) plaintiff's actions prior to FIRREA showed no indication of a contractual relationship; (6) plaintiff's actions subsequent to FIRREA revealed no indication of a contractual relationship; (7) it was not irrational for plaintiff to acquire Lansing absent a contract with the government; and (8) any agreement with the government terminated before the enactment of FIRREA. [13] Some of these arguments were expressly rejected by the Supreme Court in *Winstar,* or by decisions of the United States Court of Appeals for the Federal Circuit (Federal Circuit). *See, e.g., California Fed'l Bank, 39 Fed.Cl. at 762–63* (rejecting the argument that any contractual relationship terminated when the assistance agreement expired, which was prior to FIRREA). Indeed, defendant admits that some of the issues it raises "may be deemed decided by previous decisions of this Court." [14] Because the **\*783** court believes the present case fits squarely within the *Winstar* scenario, the court will only briefly address defendant's arguments and its attempt to relitigate what the Supreme Court has already established.

First, defendant maintains that nowhere in the four corners of the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement is plaintiff promised the right to count supervisory goodwill for regulatory capital purposes and to use the purchase method of accounting. Instead, defendant argues that all it guaranteed was that plaintiff could debit FSLIC's special reserve account for: (1) capital loss coverage on real estate operations of Lansing up to $1.6 million; (2) capital loss coverage on Lansing's service corporation investment up to $1.4 million; and (3) $100,000 maximum coverage for undisclosed liabilities of Lansing. Defendant seems to ignore, however, Resolution 82–891 and FHLBB Memorandum

31b. Resolution 82–891, which was incorporated into the Assistance Agreement, states that regulatory accounting principles allow goodwill to be amortized over thirty-five years. Memorandum 31b expressly provides that the goodwill resulting from the merger could be recognized as an asset subject to amortization. [15] The Supreme Court concluded in *Winstar* that Memorandum 31b permits the use of "the purchase method of accounting and to recognize goodwill as an asset subject to amortization." 518 U.S. at 862, 116 S.Ct. 2432. Defendant's argument is therefore unconvincing.

Defendant also contends that its promise to permit plaintiff to use supervisory goodwill for regulatory capital compliance purposes, was regulatory in nature, not contractual, because there are no internal memoranda from the regulators discussing any contracts with plaintiff. Defendant adds that the performance of a regulatory function does not create a contract. The Supreme Court expressly rejected this argument in *Winstar* as "fundamentally implausible" because the integration clause in the Assistance Agreement incorporated the FHLBB resolutions and letters "not as statements of background rules, but as part of the 'agreements and understandings' between the parties." *Id.* at 863, 116 S.Ct. 2432. The Supreme Court also rejected defendant's additional argument that plaintiff assumed the risk of any change in regulatory capital requirements. The Supreme Court stated "it would have been irrational ... for [plaintiffs] to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment." *Id.* at 863, 116 S.Ct. 2432. The court does not agree with defendant's argument.

In addition, defendant maintains that plaintiff's actions pre- and post-FIRREA did not evince contractual intent or a contractual relationship. This argument too is unpersuasive because plaintiff made clear at the time of the negotiations that it wanted to use the purchase method of accounting and that the recording of supervisory goodwill was key to the transaction. After the merger, plaintiff began amortizing the goodwill, and defendant allowed plaintiff to treat it as an asset when calculating regulatory capital. [16] Also, contrary to defendant's assertions, plaintiff's conversion from a federal savings bank to a state-chartered bank four years after the enactment of FIRREA is not convincing evidence that plaintiff had no contractual relationship with defendant. [17]

**\*784**  With respect to the rationality of plaintiff's acquisition of Lansing, defendant asserts that it was completely reasonable for plaintiff to enter the transaction without a

contractual commitment from defendant for the regulatory treatment of goodwill. Defendant emphasizes the special reserve account established by FSLIC and the small amount of goodwill-a "mere" $8 million-to support this claim that the Lansing purchase was attractive even without contractual guarantees. It seems, however, that the reserve account served only as a means of reimbursement for any losses plaintiff experienced from the disposition of Lansing's assets. It was not simply a "direct cash payment" that lowered the risk of the transaction, thus making the acquisition more appealing as defendant has argued.

Also, defendant's claim that the Lansing transaction did not result in much supervisory goodwill and, therefore, did not create a significant risk to plaintiff ignores the facts of this particular case. The "mere" $8 million may seem small and insignificant compared to the approximately $798 million of supervisory goodwill in *Glendale Federal Bank, FSB v. United States,* 43 Fed.Cl. 390, 405 (1999). The acquiring bank in *Glendale,* however, was large with a net worth of $277 million at the time of its merger with a failing thrift. *Id.* at 393. Prior to the merger in the present case, plaintiff had a net worth of only approximately $2.6 million, and it was a small, family-owned financial institution. The amount of supervisory goodwill at stake should be considered in light of the size and assets of the acquiring institution. What may seem insignificant to a large bank like Glendale could be deemed quite expensive and a significant risk for a small institution like plaintiff. Defendant's argument is therefore unconvincing. [18]

Finally, defendant contends that any contractual relationship between the parties terminated in 1985 when the Assistance Agreement expired. Defendant admits, however, that this particular argument "may conflict with previous decisions of this Court in other cases." [19] Defendant is correct that this argument has been previously rejected. *See Winstar,* 64 F.3d at 1542; *California Fed'l Bank,* 39 Fed.Cl. at 762–63. Defendant's promise to permit plaintiff to treat goodwill as a capital asset was not founded solely upon the Assistance Agreement, because it was also reflected in the FHLBB resolutions. The contractual relationship, therefore, did not end with the termination of the Assistance Agreement.

Defendant's attempt to distinguish this case from the *Winstar* scenario fails. The circumstances of the Lansing acquisition are exactly like the transaction involved in *Glendale.* The court concludes that the present case falls within the *Winstar* scenario and that the parties were bound by a

contract premised on the Assistance Agreement, the Merger Agreement, and the documents integrated into the Assistance Agreement, including the FHLBB resolution. Said contract allowed plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes.

## II. Defendant's Counterclaims

Plaintiff and defendant, therefore, were bound by a contractual relationship. Defendant is liable for breaching this contract when it enacted FIRREA unless it can establish that Mr. Orchowski's fraudulent activities preclude plaintiff from asserting a claim against the government. Defendant raises two counterclaims based on Mr. Orchowski's actions: (1) special plea in fraud and (2) rescission. Defendant also asserts numerous affirmative defenses it believes justify dismissing plaintiff's complaint. Plaintiff has responded by filing a motion to dismiss the **\*785** special plea in fraud claim because the statute of limitations has expired. Plaintiff also believes that both of defendant's counterclaims fail to state a claim upon which relief may be granted. With respect to the affirmative defenses, plaintiff asks the court to strike them because they are not sufficiently plead and are wholly conclusory. Defendant has cross-moved for summary judgment on its counterclaims and affirmative defenses.

### A. *Plaintiff's motion to dismiss*

Plaintiff moves to dismiss Count I of defendant's counterclaims for lack of subject-matter jurisdiction [20] and both Counts for failure to state a claim upon which relief may be granted. The distinction between the two has been established by the Federal Circuit. *See Gould, Inc. v. United States,* 67 F.3d 925 (Fed.Cir.1995); *Spruill v. Merit Systems Protection Board,* 978 F.2d 679 (Fed.Cir.1992); *Do–Well Machine Shop, Inc. v. United States,* 870 F.2d 637 (Fed.Cir.1989). "A dismissal for lack of subject matter jurisdiction essentially means that the subject-matter of the dispute is one that the court is not empowered to hear and decide." *McAfee v. United States,* 46 Fed.Cl. 428, 431 (2000) (citing *Gould, Inc.,* 67 F.3d at 929). "In contrast, a dismissal for failure to state a claim is a decision on the merits which focuses on whether the complaint contains allegations that, if proven, are sufficient to entitle a party to relief." *Id.* In order to determine whether the allegations state a cause of action upon which relief may be granted, and to decide issues of fact arising in the controversy, the court must assume jurisdiction over a claim. *Id.* (citing *Do–Well Machine Shop, Inc.,* 870 F.2d at 639.).

In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the court must accept as true the counterclaim's undisputed factual allegations and construe them in a light most favorable to defendant. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Hamlet v. United States,* 873 F.2d 1414, 1415 (Fed.Cir.1989); *Farmers Grain Co. v. United States,* 29 Fed.Cl. 684, 686 (1993). If the undisputed facts reveal any possible basis on which defendant may prevail, the court must deny the motion. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988). If the motion challenges the truth of the jurisdictional facts alleged in the complaint, however, the court may consider relevant evidence in order to resolve the factual dispute. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed.Cir.1991). "The court should 'look beyond the pleadings and decide for itself those facts, even if in dispute, which are necessary for a determination of [the] jurisdictional merits.' " *Farmers Grain,* 29 Fed.Cl. at 686 (citing *Raymark Industries, Inc. v. U.S.,* 15 Cl.Ct. 334, 335 (1988)). Defendant bears the burden of establishing subject-matter jurisdiction for its counterclaims. *KVOS, Inc. v. Associated Press,* 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183 (1936); *Rocovich,* 933 F.2d at 993.

The court will dismiss defendant's counterclaims under RCFC 12(b)(6) for failure to state a claim upon which relief may be granted only if it appears beyond a doubt that defendant has not alleged facts sufficient to support its claim. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Mostowy v. United States,* 966 F.2d 668, 672 (Fed.Cir.1992). Also, the court must accept as true the counterclaim's undisputed factual allegations and should construe them in a light most favorable to defendant. *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (citing *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). Furthermore, all that is required to withstand a motion to dismiss is " 'a short and plain statement of the claim' that will give the [plaintiff] fair notice of what [defendant]'s claim is and the grounds upon which it rests." *Gould, Inc.,* 935 F.2d at 1276 (citing *Conley,* 355 U.S. at 47, 78 S.Ct. 99).

### 1. Statute of limitations

Plaintiff contends defendant's special plea in fraud claim should be dismissed because the six-year statute of limitations for filing **\*786** such a counterclaim has expired. Plaintiff

asserts that defendant knew of the defalcation since 1991, but did not file its counterclaim until ten years later in June 2001. Plaintiff believes the applicable statute of limitations is set forth in 28 U.S.C. § 2501 (1994). Defendant argues that its special plea in fraud claim is not subject to any statute of limitations, especially the one established in 28 U.S.C. § 2501. Defendant maintains that 28 U.S.C. § 2415 can be interpreted as stating that there is no statute of limitations for a special plea in fraud counterclaim.

Section 2501 provides, in pertinent part:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

28 U.S.C. § 2501. The Court of Federal Claims has issued inconsistent decisions on whether a special plea in fraud counterclaim is subject to this statute of limitations. In *SGW, Inc. v. United States,* 20 Cl.Ct. 174, 181 (1990) and *TS Infosystems, Inc. v. United States,* 36 Fed.Cl. 570, 574 (1996) this court concluded that 28 U.S.C. § 2501 does apply to a special plea in fraud claim asserted by the government, and, therefore, the statute of limitations is six years. This court came to the opposite conclusion, however, in various other cases where it found that a special plea in fraud claim is not subject to *any* statute of limitations. *Jana, Inc. v. United States,* 34 Fed.Cl. 447, 452 (1995); *Erie Basin Metal Prods., Inc. v. United States,* 138 Ct.Cl. 67, 75, 150 F.Supp. 561 (1957); *Goggin v. United States,* 138 Ct.Cl. 279, 284, 152 F.Supp. 78 (1957). The Federal Circuit has not decided this issue.

This conflict in the caselaw is not problematic because the court believes that under either view defendant's claim is not barred by a limitations period. Of course, if the court agrees with *Jana* and its predecessors, no statute of limitations would apply because this court concluded that a special plea in fraud claim is not subject to a filing period. If the court follows *SGW* and *TS Infosystems,* the statute of limitations would presumably have expired in 1997, *if* no other factors were involved. [21] Defendant did not file until June 6, 2001.

This conclusion would ignore, however, the unique circumstances this court established to administer the approximately 120 *Winstar*-related cases. For example, this specific case was stayed from April 27, 1993 until 1996, when the Supreme Court rendered its opinion in *Winstar.* Following

this decision, then Chief Judge Smith issued the CMO to create special case management procedures for the *Winstar*-related cases. The CMO stated, in part:

> This Order applies to all *Winstar*-related cases ("*Winstar* cases" or "cases"), including any claims, *special pleas in fraud,* defenses, affirmative defenses, setoffs, *counterclaims,* or any other issues raised in those cases ....
>
> ....
>
> This Order is intended to supplement, and not to replace, any Rule of the United States Court of Federal Claims, *except as inconsistent with this Order.*
>
> ....
>
> Following the exchange of core documents, any plaintiff may file a motion for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, regarding two liability-related issues only .... The defendant need not identify any defenses of any kind, counterclaims, setoffs, pleas in fraud, etc. ("defenses") in responding to the motions, and the failure to assert those defenses in its response will not constitute a waiver.
>
> ....
>
> *The defendant shall not file an answer to the complaint in any case, and no defenses or arguments of any kind shall be deemed waived by reason of the defendant's not having filed an answer to any complaint.* In addition, no allegation shall be deemed admitted, nor shall defendant be estopped from denying any allegation, **\*787** by reason of not having filed an answer to any complaint. [22]

The court interprets the CMO to specifically grant defendant the opportunity to withhold filing its answer and counterclaims until after the short-form motions for partial summary judgment are decided. Indeed, defendant sought permission from the court to be released from this requirement so that it could file its answer and counterclaim. The court granted defendant this relief in an order dated June 7, 2001. [23]

**[2]** **[3]** The doctrine of equitable tolling allows the court to abate the effect of a statute of limitations when the proper circumstances require such an action. *TS Infosystems,* 36 Fed.Cl. at 573 (citing *Bailey v. Glover,* 21 Wall. 342, 88 U.S. 342, 347–48, 22 L.Ed. 636 (1874)); *see also Tyger Constr. Co. v. United States,* 28 Fed.Cl. 35, 51 (1993). The court

believes the unique circumstances of the *Winstar* litigation, and the special case management procedures identified in the CMO, permit the court to equitably toll any statute of limitations that may apply to defendant's special plea in fraud counterclaim. The court relies on two previous *Winstar*-related cases when formulating this conclusion. Both *Anderson* and *Landmark Land Co., Inc. v. United States,* 46 Fed.Cl. 261 (2000) (*Landmark II*) contained special plea in fraud counterclaims. [24] These two cases do not specifically address the connection between the CMO and a possible tolling of the statute of limitations, nevertheless, they do provide circumstantial support for the court's conclusion.

In *Landmark,* the alleged fraud was perpetrated between 1986 and 1991. 46 Fed.Cl. at 274–75. The plaintiff filed its case in 1995. The defendant did not file its counterclaim until 1999. This court had to grant the defendant leave to file said counterclaim, presumably in response to the requirements of the CMO. *Landmark Land Co., Inc. v. United States,* 44 Fed.Cl. 16, 18 (1999) (*Landmark I*). In *Anderson,* the alleged fraud occurred in 1989. 47 Fed.Cl. at 447. The plaintiffs filed their complaint in 1991. This court granted the defendant leave to file its answer and special plea in fraud counterclaim on April 22, 1998. Both of these cases addressed fraud that occurred in the late 1980's, a complaint filed in the early 1990's, and a counterclaim filed by this court's leave at the end of the 1990's.

The plaintiffs evidently did not assert a statute of limitations defense in *Landmark* and *Anderson.* The court believes, however, that the relationship between the time of the fraud and the filing of the complaints and counterclaims, as well as the fact that the defendant asked for leave to file its answers and counterclaims, is significant. Indeed, it seems to indicate that the CMO made filing the counterclaims unnecessary until after the short-form motions were decided, thus tolling any statute of limitations that may have applied. [25]

Moreover, the court believes that applying a six-year statute of limitations to the government's special plea in fraud claim would greatly restrict this important defense designed to protect the government from fraudulent claims. Such a limitation would allow plaintiffs to wait until the six-year time period expired before filing their fraudulent **\*788** claims. The government would then be precluded from asserting a valid special plea in fraud defense. Indeed, the government can not assert this counterclaim before there is a claim against it. *See* 28 U.S.C. § 2514 ("A *claim against the United States shall be forfeited* ... by any person who corruptly practices ...

fraud against the United States ...."). The court believes that 28 U.S.C. § 2514 was not designed to be limited by a statute of limitations, which plaintiffs could strategically manipulate. *See O'Brien Gear & Machine Co. v. United States,* 219 Ct.Cl. 187, 210, 591 F.2d 666 (1979) (concluding that the special plea in fraud statute intended for every suit brought in the Court of [Federal] Claims to be subject to the forfeiture provided, on commission of the specified fraud). The court concludes, therefore, that defendant's counterclaim in the present case is timely.

In addition, plaintiff's briefs do not make clear whether it believes defendant's rescission claim should also be restricted by a six-year statute of limitations. The court asked plaintiff's counsel this question at oral argument, and he indicated that the rescission claim is subject to the six-year period. [26] For the reasons just discussed referencing the CMO and the special circumstances surrounding the *Winstar*-related cases, the court concludes that defendant's rescission claim is not time barred. The court further discusses the timeliness of defendant's rescission claim below.

### 2. Failure to state a claim

Plaintiff also argues that Counts I and II of defendant's counterclaim fail to state a claim upon which relief may be granted. Defendant disagrees and has filed a cross-motion for summary judgment as to its counterclaims and affirmative defenses. Plaintiff relies on numerous documents when discussing its failure to state a claim argument and when challenging defendant's cross-motion.

RCFC 12(b) provides that a motion to dismiss for failure to state a claim may be treated as a motion for summary judgment under RCFC 56 if "matters outside the pleading are presented to and not excluded by the court." RCFC 12(b); *Rockefeller Center Properties v. United States,* 32 Fed.Cl. 586, 589 n. 6 (1995). Plaintiff has submitted a detailed appendix with its reply brief to supplement the already voluminous appendix filed by defendant. Plaintiff relies upon these appendices many times when presenting its arguments for failure to state a claim. For example, plaintiff directs the court to various questionnaires and letters when challenging defendant's claim that plaintiff made numerous misrepresentations to the government. [27] Plaintiff also cites documents to prove that it recovered all of its losses from the defalcation. [28] In addition, plaintiff emphasizes examination

reports prepared by the OTS. [29]  All of these citations are set forth in the section of plaintiff's brief discussing its motion to dismiss for failure to state a claim. Since plaintiff clearly relies on more than just the pleadings, and for efficiency reasons, the court chooses to treat plaintiff's motion to dismiss for failure to state a claim as a motion for summary judgment. The court will consider plaintiff's arguments below in conjunction with defendant's cross-motion for summary judgment.

### 3. Defendant's affirmative defenses

Defendant lists numerous affirmative defenses in its answer to plaintiff's complaint: (1) fraud in the performance of the contract; (2) common law fraud; (3) forfeiture; (4) failure to satisfy material conditions precedent; (5) estoppel; (6) unjust enrichment; (7) illegality and violation of public policy; (8) prior material breach; (9) failure to mitigate damages; (10) failure of consideration; (11) unclean hands; (12) laches; and (13) assumption of risk. Plaintiff moves to strike all of these defenses because they are wholly conclusory and insufficiently plead.

**\*789**  The United States Court of Federal Claims requires only notice pleadings pursuant to RCFC 8. This rule is identical to its counterpart under the federal rules, which is equally applicable to the pleading of affirmative defenses. Fed.R.Civ.P. 8; *Conley,* 355 U.S. at 47, 78 S.Ct. 99; *Int'l Fidelity Ins. Co. v. United States,* 27 Fed.Cl. 107, 110 (1992); *Harris v. Sec'y, U.S. Dept. of Veterans Affairs,* 126 F.3d 339, 343 (D.C.Cir.1997). Defenses may be plead in general terms and provide merely fair notice of the nature of the defense. RCFC 8, Fed.R.Civ.P. 8; *see also Al–Kurdi v. United States,* 25 Cl.Ct. 599, 604 (1992). The "fair notice" pleading requirement is met if defendant sufficiently articulates the defense so that plaintiff is not a victim of unfair surprise. *Int'l Fidelity,* 27 Fed.Cl. at 110.

Even under the liberal notice pleading of the federal rules, however, "an allegation must include either direct or inferential allegations respecting all material elements of the claim asserted." *MAN Roland, Inc. v. Quantum Color Corp.,* 57 F.Supp.2d 576, 579 (N.D.Ill.1999) (citing *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991)). Thus, "[i]f an affirmative defense is insufficient on its face or comprises no more than 'bare bones conclusory allegations,' it must be stricken." *Codest Eng'g v. Hyatt Int'l Corp.,* 954 F.Supp. 1224, 1228 (N.D.Ill.1996).

After carefully reviewing defendant's affirmative defenses, the court concludes that they satisfy the liberal pleading requirements established by RCFC 8. Plaintiff's request to strike said defenses is therefore denied.

### B. *Summary judgment*

Defendant moves for summary judgment on its special plea in fraud and rescission counterclaims, as well as on some of its affirmative defenses. The court is treating plaintiff's motion to dismiss defendant's counterclaims for failure to state a claim as a motion for summary judgment.

### 1. Special plea in fraud

[4]  Defendant's special plea in fraud counterclaim is premised on 28 U.S.C. § 2514, which states:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof.

> In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

In general, the government asserts this counterclaim to challenge the presentment of a fraudulent claim, however, a special plea in fraud is not confined to this scenario. *Anderson,* 47 Fed.Cl. at 444. Defendant may also assert its special plea in fraud if the alleged fraud was practiced during the performance of the contract at issue. *Id.; UMC Electronics Co. v. United States,* 43 Fed.Cl. 776, 790 (1999); *Supermex v. United States,* 35 Fed.Cl. 29, 39–40 (1996). Defendant must prove its fraud claim by clear and convincing evidence. *Glendale Fed'l Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed.Cir.2001) (quoting *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998)).

The parties dispute the elements that defendant must establish when asserting its special plea in fraud counterclaim. Defendant believes it only needs to show that plaintiff made fraudulent statements or omissions, and that it intended to deceive the government. Plaintiff maintains that defendant must prove justifiable reliance and actual damages in addition to showing fraudulent statements and an intent to deceive. Plaintiff therefore believes defendant must establish the four elements of common law fraud, which are: (1) misrepresentation of a material fact; (2) intent to deceive

or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II,* 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys. v. United States,* 38 Fed.Cl. 109, 128 (1997) (citations omitted)).

It is understandable that the parties dispute the elements of a special plea in fraud counterclaim because the Court of Federal **\*790** Claims has not settled on an established rule. Sometimes this court has held that defendant only must prove plaintiff's knowledge of fraudulent statements and an intent to deceive. *Crane Helicopter Services, Inc. v. United States,* 45 Fed.Cl. 410, 432 (1999); *Glendale,* 43 Fed.Cl. at 400; *Supermex,* 35 Fed.Cl. at 42. In other cases this court has required defendant to prove all four elements of common law fraud. *Landmark II,* 46 Fed.Cl. at 274; *BMY–Combat Sys.,* 38 Fed.Cl. at 128; *Communication Equip. & Contracting Co., Inc. v. United States,* No. 72–88C, 1991 WL 288912, at \*6 (Cl.Ct. Aug. 23, 1991). In at least one case, this court has not discerned any clear elements for proving a special plea in fraud claim. *Anderson,* 47 Fed.Cl. at 438.

Considering the type of fraud at issue-either in the presentment of a claim or during the performance of a contract-does not clear up this discrepancy. The decisions of this court have not consistently found that fraud in the presentment of a claim requires only two elements, for example, and fraud during the performance of a contract requires four. The Federal Circuit has stated on two different occasions, however, that when alleging fraud in the presentment of a claim, defendant only needs to prove an intent to deceive and plaintiff's knowledge that the submitted claims were false. *Glendale,* 239 F.3d at 1379; *Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042 (Fed.Cir.1994). The Federal Circuit has not commented on whether the same is required to prove fraud that occurred during the performance of a contract.

Defendant relies heavily on *Supermex* to establish that it only must prove plaintiff's intent to deceive and knowledge of a fraudulent statement, however, this case makes clear the discrepancy just described:

> While it is apparent that the elements of knowledge and intent to deceive are prerequisites to a Special Plea in Fraud, it is not clear that the elements of justifiable reliance and actual damages are also prerequisites to establishing a Special Plea in Fraud

pursuant to 28 U.S.C. § 2514. This court believes that *in the instant case,* 28 U.S.C. § 2514 can be invoked without the need to prove either justifiable reliance by the sovereign or specific evidences of injury to the sovereign.

35 Fed.Cl. at 42 (emphasis added).

After careful consideration of the parties' arguments and the uncertainty in the existing case law, the court concludes that the circumstances of the existing case require defendant to prove all four elements of common law fraud to assert its special plea in fraud claim. The court reaches this conclusion because defendant is alleging fraud that occurred during the performance of the contract, not in the presentation of a claim. As the Federal Circuit seems to have concluded, when the alleged fraud is related to the presentment of a claim, all defendant needs to prove is that plaintiff knew the submitted claim was false and that plaintiff intended to defraud the government by submitting the claim. *Glendale,* 239 F.3d at 1379. This makes sense because it is the claim itself that is allegedly fraudulent, so it is important to discern plaintiff's state of mind for making such a claim. There is no need to establish the government's reliance in this instance because it is the claim itself that is being examined. This is unlike the situation where the fraud occurs during the performance of a contract, and defendant relies on this fraud as assurance that plaintiff is properly adhering to the contract. The harm government incurs from the presentment of a fraudulent claim is plaintiff's breach of the public trust. *Supermex,* 35 Fed.Cl. at 42.

In contrast, fraud that is committed during the performance of the contract is not necessarily as obvious or well-defined. Finding said fraud depends more on the court's interpretation of the relevant circumstances. Under this scenario, it seems necessary to have defendant prove its reliance on the alleged fraud and an injury related to it. Otherwise defendant could avoid numerous contractual claims by citing potentially fraudulent events occurring during performance that are completely unrelated to the contract, even though in reality said fraud was never directed towards defendant and defendant in no way suffered from it. The court believes this loose interpretation of the special plea in fraud statute might deter private parties **\*791** from filing valid claims, thus tarnishing the integrity of the procurement process. The court is not willing to adopt such an interpretation.

Defendant must therefore prove the four elements of common law fraud to establish its claim that plaintiff committed fraud during the performance of the contract. Again, these elements are: (1) misrepresentation of a material fact; (2) intent to deceive or a reckless state of mind; (3) justifiable reliance on the misrepresentation by the deceived party; and (4) injury to the party deceived through reliance. *Landmark II,* 46 Fed.Cl. at 274 (quoting *BMY–Combat Sys.,* 38 Fed.Cl. at 128 (citations omitted)). In its attempt to establish its counterclaim, defendant maintains that Mr. Orchowski's defalcation deceived federal regulators and breached the terms of the Assistance Agreement. Defendant believes Mr. Orchowski's fraudulent actions should be imputed to plaintiff. In addition, defendant argues that plaintiff's failure to discover Mr. Orchowski's defalcation proves that it did not operate Lansing in a safe and sound manner.

Plaintiff contends the court should not impute Mr. Orchowski's activities to it because his actions were adverse to its interests. Plaintiff also asserts that defendant cannot prove its special plea in fraud claim because it cannot show how the government was harmed by Mr. Orchowski's actions. Furthermore, plaintiff emphasizes that it recovered all of the money it lost from Mr. Orchowski's actions, and that it was back in compliance with the regulatory capital requirements within a year after discovering the defalcation.

### a. Imputation

Before addressing the specific elements of defendant's special plea in fraud claim, the court must examine the underlying issue related to all four elements-whether Mr. Orchowski's actions can be imputed to plaintiff. Defendant argues that they should, while plaintiff maintains it is not responsible for his actions because they were adverse to plaintiff's interests. Defendant relies heavily on this court's decisions in *Anderson,* 47 Fed.Cl. 438, and *Wagner Iron Works v. United States,* 146 Ct.Cl. 334, 174 F.Supp. 956 (1959) to support its assertions.

**[5]** **[6]** In general, a corporation can only act through its agents, "and when they are clothed with the authority to act for it, the corporation is responsible for their acts." *Id.,* 146 Ct.Cl. at 337–38, 174 F.Supp. 956 (citing *Gleason v. Seaboard Air Line Ry. Co.,* 278 U.S. 349, 49 S.Ct. 161, 73 L.Ed. 415 (1929); *Standard Surety & Cas. Co. of New York v. Plantsville Nat'l Bank,* 158 F.2d 422 (2d Cir.1946); *Ralston Purina Co. v. Novak,* 111 F.2d 631 (8th Cir.1940)). This does not mean, however, that every action an employee takes is

automatically imputed to the corporation. If the employee is acting outside of his or her actual or apparent authority, for example, the corporation is generally not liable for said actions. *Id.* In addition, many courts follow the rule that if the employee's actions are adverse to the corporation's interests, and the corporation does not benefit from said actions, the corporation is not liable for them. *See, e.g., Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 359 (3d Cir.2001); *In re Payroll Express Corp.,* 186 F.3d 196, 207 (2d Cir.1999); *Martin Marietta Corp. v. Gould, Inc.,* 70 F.3d 768, 771–72 (4th Cir.1995). Indeed, the Restatement (Second) of Agency § 282 (1957) provides:

> (1) A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes, except as stated in Subsection (2).
>
> (2) The principal is affected by the knowledge of an agent who acts adversely to the principal:
>
> (a) if the failure of the agent to act upon or to reveal the information results in a violation of a contractual or relational duty of the principal to a person harmed thereby;
>
> (b) if the agent enters into negotiations within the scope of his powers and the person with whom he deals reasonably believes him to be authorized to conduct the transaction; or
>
> (c) if, before he has changed his position, the principal knowingly retains a benefit **\*792** through the act of the agent which otherwise he would not have received.

**[7]** The above-stated principles have led courts to conclude that the general rule of imputation is that the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was "(1) in the course of his employment and (2) for the benefit of the corporation." *Official Comm. Unsecured Creditors,* 267 F.3d at 358. *See also Vitale v. Aetna Cas. & Sur. Co.,* 814 F.2d 1242, 1247 (8th Cir.1987); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 884 (3d Cir.1975); *Standard Oil Co. of Tex. v. United States,* 307 F.2d 120, 127 (5th Cir.1962); *In re Cendant Corp. Securities Litigation,* 109 F.Supp.2d 225, 233 (D.N.J.2000). The court believes this is a good summary of the law for imputation and will therefore follow this test. [30]

Defendant alleges in its briefs two types of fraudulent conduct that Mr. Orchowski performed that it believes the court should impute to plaintiff. This conduct is: (1) the defalcation

itself and (2) alleged misrepresentations Mr. Orchowski made to the government to conceal his illegal activities.

### 1.) Defalcation

[8]    With respect to the defalcation, Mr. Orchowski plead guilty for his conduct related to this fraudulent act. Specifically, he turned himself in to the FBI in September 1991, admitting that he had defrauded plaintiff over a period of nine years. The total amount he embezzled from plaintiff was approximately $100,000. He also misappropriated other funds, primarily through his activities involving the making of unauthorized loans. In addition, he altered existing loans and paid extortion to borrowers who threatened to reveal his unlawful activities. Plaintiff's total losses from his actions neared $10 million. He was subsequently charged in a criminal information proceeding with a violation of 18 U.S.C. § 1344 for one count of bank fraud. He plead guilty in 1992 to willfully misapplying funds belonging to, and under the custody and control of, plaintiff. He entered a plea agreement where he admitted the following: (1) making no less than sixty unauthorized loans with funds belonging to plaintiff; (2) many of these loans were extended to individuals who plaintiff previously had denied based on their credit risk, loan purpose, or plaintiff's loan policies; (3) failing to obtain properly executed loan documentation for many of the unauthorized loans; and (4) failing to perfect plaintiff's security interest in collateral for the loans. He was sentenced to thirty-one months in prison and ordered to pay restitution to plaintiff. Plaintiff recovered all losses it incurred as a result of the defalcation.

Arguably, some of these actions were performed in the course of business because Mr. Orchowski made loans, albeit unauthorized ones, which plaintiff is in the business of doing. Nevertheless, clearly none of the activities Mr. Orchowski plead guilty to benefitted plaintiff, which is the second aspect of the imputation test the court has adopted. The court does not believe that embezzlement, misappropriated funds through unauthorized loans, and extortion benefitted plaintiff in any way. [31] Defendant's argument that the defalcation should be imputed to plaintiff, therefore, is unpersuasive. [32]

**\*793**  This conclusion is premised on the court's belief that plaintiff should not be held liable for Mr. Orchowski's actions when said actions were adverse to plaintiff's interests. In response to this theory, which plaintiff espoused in its briefs and at oral argument, defendant contends this court made

clear in *Anderson* that this jurisdiction does not recognize the adverse interest exception. [33]  Defendant relies on a sentence in the *Anderson* decision that states "this circuit has not traditionally recognized the exception." 47 Fed.Cl. at 448. Defendant is interpreting this phrase to mean much more than it actually does.

Indeed, a previous decision in this court is not binding precedent on a latter case. *Tech. For Communications Int'l v. United States,* 22 Cl.Ct. 711, 713 (1991). The fact that this court did not choose to apply the adverse interest exception in *Anderson,* therefore, does not prohibit the court from deciding otherwise in the present case. The Federal Circuit, whose decisions bind this court, has never expressly stated that it refuses to adopt the adverse interest exception. Instead, it seems that based on the facts of each particular case, this court has not utilized said exception. For example in *Wagner,* which defendant cites heavily throughout its briefs, this court stated that "[i]f Wagner alone had been guilty of fraud, there might be some merit in plaintiff's argument." 146 Ct.Cl. at 338, 174 F.Supp. 956. This court was referring to the president and majority stockholder of the plaintiff corporation, Mr. A.A. Wagner, and the fact that his fraudulent actions alone may not have been enough to grant the defendant's special plea in fraud claim, because his acts were committed against the company. *Id.* The same is true in *Anderson* where this court stated that the main reason it was not adopting the adverse interest exception was because "although some of the criminal acts were done to benefit Mr. Paul personally, other fraudulent acts, including lying to federal banking regulators, were done ostensibly to advance the criminal schemes being carried out *to benefit the bank.*" 47 Fed.Cl. at 448 (emphasis added). The court believes that in the present case, Mr. Orchowski was the lone fraudulent actor and his conduct in no way benefitted the bank. The court chooses to adopt the adverse interest exception, therefore, and concludes that Mr. Orchowski's defalcation cannot be imputed to plaintiff. [34]

### 2.) Misrepresentations

Moreover, defendant alleges that Mr. Orchowski made knowing misrepresentations to the government to conceal his illegal activities, including: (1) providing false information to regulators when preparing plaintiff's responses to management questionnaires that were part of its annual regulatory examination; (2) submitting false reasons as to why the so-called Harris Bank NOW account could not be reconciled according to an annual audit; (3) providing

material misrepresentations to OTS concerning the status of a loan for one of plaintiff's customers; and (4) possibly inflating and distorting plaintiff's balance sheet with respect to goodwill. Defendant also argues that Mr. Orchowski was the "point man" for negotiations to acquire Lansing, and that he purposefully concealed his fraud so he could persuade defendant that plaintiff was a safe and sound institution. Defendant believes all of these actions are imputable to plaintiff.

With respect to the management questionnaires plaintiff submitted to FHLBB, Mr. Orchowski was not the person who actually prepared them. Indeed, Mr. Ginalski was responsible for their completion. Defendant alleges that Mr. Orchowski "initialed" them so they are fraudulent, since he did not mention his defalcation. The court does not agree with this argument.

**\*794** Since the questionnaires were not actually filled out by Mr. Orchowski, the court would have to conclude that the actual preparer, Mr. Ginalski, intended to hide the defalcation in order for them to serve as misrepresentations to the government. A review of the documents reveals that this did not occur. One of the questionnaires requested the identity of "any director, officer, employee, attorney, or agent, who has since the last examination, embezzled, abstracted, misapplied or otherwise misused, any funds or other assets for which the institution was accountable." [35] Plaintiff answered "None" to this question when it was submitted in 1984. Defendant argues this was deceptive because Mr. Orchowski was committing fraud at that time, however, defendant is misinterpreting this query. The question plainly seeks to identify improprieties that plaintiff had discovered. Plaintiff did not learn of Mr. Orchowski's fraud until 1991. Defendant has conceded this fact. [36]

Defendant also refers to plaintiff's responses to two other questionnaires requesting plaintiff to describe: (1) "details of each oral or written agreement not recorded on the institution's permanent records which affects the financial condition of the institution"; and (2) "any current or former director, officer, employee, attorney, or agent of the institution who has (or has been suspected of having) misused, embezzled, abstracted, or wilfully misapplied any funds or property, real or personal, of the institution or subsidiaries." [37] Defendant emphasizes that the answers to these questions were "N/A." Again, defendant seems to misinterpret the meaning of these questions. Clearly they ask

for information known to plaintiff at that time, and they do not serve as a warranty that no such circumstances existed.

As for plaintiff's letter to the Federal Home Loan Bank of Chicago regarding the reconciliation of the Harris NOW Account, defendant alleges it contains misrepresentations of why the account could not be reconciled. The letter states, in part:

> The bank account in question was the Harris Bank NOW Clearing Account. It was found that this account was being charged for cash letter items which did not belong to First Federal Savings of Hegewisch.

> First Federal Savings of Hegewisch personnel with the help of Accounts people at Harris Bank, have identified this problem and have taken the necessary steps to prevent such occurrences from happening in the future.

> WE, the Board of Directors of First Federal Savings of Hegewisch, hope that we have addressed fully the comment that has been brought forth in the Management letter from Deloitte, Haskins, and Sells and assure you that the necessary steps have been taken to correct the problem. Comments or recommendations by the Federal Home Loan Bank of Chicago would be welcomed. [38]

The court does not believe this statement was misleading at the time it was made, based on the fact that plaintiff was not aware of the defalcation at that time. Therefore, the letter did not serve as a misrepresentation to defendant.

In regards to the letter Mr. Orchowski purportedly sent to OTS regarding a loan transaction, the copy of the letter before the court is a mere draft and is unsigned. [39] There is nothing in the documents presented to the court that indicates this letter was actually sent to OTS. In addition, the letter does not appear to contain any misrepresentations concealing Mr. Orchowski's fraudulent activities. This document also does not serve as proof that misrepresentations were made.

Defendant also relies on a statement by plaintiff's vice president that Mr. Orchowski may have inflated the Lansing goodwill figure **\*795** through his unauthorized activities. This statement in no way proves that the figure was indeed inflated. Moreover, it does not reflect an actual misrepresentation made to the government. Defendant's citation to this statement is unpersuasive because it is founded wholly on speculation.

Finally, defendant asserts that Mr. Orchowski was the "point man" for negotiations with the government during the Lansing acquisition. Defendant maintains that he concealed his defalcation at the time, and lead defendant into believing that plaintiff operated in a safe and sound manner. Defendant believes he was acting on behalf of plaintiff and that this misrepresentation should be imputed to plaintiff.

Defendant has provided some evidence that Mr. Orchowski was a contact person for plaintiff during the Lansing acquisition,[40] however, defendant has not established Mr. Orchowski's actual involvement in the negotiations. It is apparent that the negotiations were mainly handled by Mr. Ginalski, plaintiff's chairman of the board at the time. Defendant also has not stated what exact misrepresentations Mr. Orchowski made to defendant about the safety and soundness of plaintiff.[41] Thus, just as the court concluded with the various misrepresentations discussed above, it is unnecessary to determine whether Mr. Orchowski's actions should be imputed for these instances because defendant cannot show that these misrepresentations were actually made.[42]

Accordingly, the court concludes that Mr. Orchowski's fraudulent actions cannot be imputed to plaintiff because his fraud was committed against plaintiff, not the government. In no way did plaintiff benefit from said fraud. In addition, defendant has not established that Mr. Orchowski misrepresented information to the government.[43]

### b. Scope of the contract

[9]  Another central issue the court needs to address before examining the specific elements of fraud is whether the contract between the parties required plaintiff to operate Lansing in a safe and sound manner. In their briefs and at oral argument, the parties disputed whether the contract between them explicitly required plaintiff to manage Lansing in this way. Defendant cited various provisions of the Assistance Agreement to support its claim that plaintiff was contractually bound to do so.[44]

The court has concluded that the scope of the contract was to allow plaintiff to use the purchase method of accounting to record supervisory goodwill and to include said goodwill for regulatory capital compliance purposes. After careful review of the Assistance Agreement and the other documents

in which the contract is comprised, the court does not believe that the contract *expressly* required plaintiff to operate Lansing in a safe and sound manner. Nevertheless, the court believes it was inherent in the agreement between the parties that plaintiff manage Lansing in this way. Indeed, plaintiff agrees that it should operate safely and **\*796** soundly.[45] Therefore, the court agrees with defendant that there was a safety and soundness requirement, which must be taken into account when examining the specific elements for fraud.[46]

### c. Analysis of elements of fraud

[10]  The court's conclusion on imputation simplifies the analysis of the four elements of fraud defendant must establish to prove its claim. The first element is a misrepresentation of material fact. The court determined in the above analysis that Mr. Orchowski did not provide misrepresentations to the government. The court also decided that plaintiff was not liable for Mr. Orchowski's defalcation. Defendant, therefore, cannot prove by clear and convincing evidence that plaintiff made a misrepresentation of material fact related to Mr. Orchowski's actions.

In addition, defendant argues that, not only did Mr. Orchowski individually deceive the government during the negotiations for the Lansing acquisition,[47] but plaintiff also lead defendant into believing that it had strong management and was operated in a safe and sound manner. Defendant alleges it never would have approved plaintiff for the Lansing merger if it knew the defalcation was occurring. Defendant ignores the fact, however, that plaintiff was unaware of the defalcation at the time of the negotiations.[48] Also, Mr. Orchowski's actions are not imputable to plaintiff. In addition, the court believes that plaintiff did have strong management and was operated in a safe and sound manner, as evident in plaintiff's typically favorable OTS ratings and the fact that plaintiff is still an existing thrift, even after the enactment of FIRREA. Indeed, as discussed below, the negative OTS rating plaintiff received after the discovery of the defalcation quickly rebounded the following year to a favorable mark. Also, plaintiff was able to recover the money it lost from the defalcation. The court finds defendant's argument unconvincing.

The second element is an intent to deceive the government. Defendant fails to satisfy this requirement too because it has not shown that Mr. Orchowski misrepresented information to

the government and that his actions are imputed to plaintiff. Defendant also has not established any separate intent by plaintiff to conceal Mr. Orchowski's actions. Defendant has conceded that plaintiff was unaware of the defalcation. [49]

The third element for a special plea in fraud claim is justifiable reliance on the misrepresentations by the deceived party. As just discussed, defendant has not established any misrepresentations, so this element fails for that reason alone. Defendant also claims that it relied on plaintiff to run the thrift in a safe and sound manner and that plaintiff failed to do so. Again, this argument has already been rejected by the court.

The final element defendant must prove is an injury it received based on the reliance. Defendant is unable to establish any harm because it was plaintiff and its customers who were subjected to Mr. Orchowski's fraud, not defendant. Also, the contract between the parties is to ensure the continuing success of Lansing, which was a failing thrift. Plaintiff merged with Lansing to guarantee its survival. Even during Mr. Orchowski's defalcation plaintiff was a viable thrift, and it remains so today. In addition, after plaintiff learned of the defalcation, it was able to **\*797** recover the full amount of its losses from Mr. Orchowski's activities.

Moreover, defendant admits that "the Lansing branches have consistently been Hegewisch's most profitable branches." [50] Also, contrary to defendant's assertions, it appears that plaintiff did not fall out of compliance with the regulatory capital requirements as a result of the defalcation. [51] The FDIC did give plaintiff the lowest safety rating after the defalcation was discovered, but prior to this, and within a year after it, plaintiff enjoyed very favorable examination reports and ratings. Indeed, the OTS Examination Report dated August 21, 1992, which is less than one year after the defalcation's discovery, commented that plaintiff's "overall financial condition has stabilized and is considered satisfactory." [52] It also stated that plaintiff's "board of directors ... and management have demonstrated effective supervision and administration of the institution's affairs since the defalcation." [53] Thus, the court concludes defendant was not harmed by the defalcation. [54]

Defendant has therefore failed to show by clear and convincing evidence that: (1) Mr. Orchowski made misrepresentations to the government; (2) plaintiff would be responsible for any such misrepresentations; (3) plaintiff intended to deceive the government; (4) defendant relied

on Mr. Orchowski's fraudulent acts; and (5) defendant was harmed by the defalcation. Defendant is unable to establish its special plea in fraud claim.

**2. Rescission**

Defendant's second counterclaim is for rescission of the Assistance Agreement, an action that would return the $2 million FSLIC paid plaintiff from the special reserve account. Defendant believes the Assistance Agreement is void *ab initio* because plaintiff defrauded the government. Plaintiff argues that defendant's rescission claim is untimely because it was filed ten years after defendant learned of the defalcation. Plaintiff also maintains that a contract should not be rescinded if both parties cannot be returned to the *status quo ante.*

**[11]  [12]** "The remedy of rescission allows a party to seek disaffirmance of a contract and the return to the status quo that existed before the transaction was executed." *First Hartford Corp. Pension Plan & Trust v. United States,* 42 Fed.Cl. 599, 616 (1998) (citing *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 850 F.Supp. 1199, 1212 (S.D.N.Y.1994), *aff'd* 57 F.3d 146 (2d Cir.1995)). Rescission is "limited to situations where it is possible to return the parties to the *status quo ante.*" *Dairyland Power Coop. v. United States,* 27 Fed.Cl. 805, 813 (Fed.Cl.1993).

With respect to plaintiff's timeliness issue, this fails for the same reasons discussed above for plaintiff's argument that defendant's special plea in fraud claim is time barred. The defalcation occurred in 1991. Plaintiff filed its complaint on March 22, 1993. On April 27, 1993, this court stayed the proceedings in this case pending the disposition of *Winstar.* The CMO entered on September 18, 1996, after the disposition of *Winstar,* clearly stated that defendant need not raise defenses or counterclaims until after plaintiff's short-form motion for partial summary judgment is decided. The court excepted defendant from this requirement in an order dated June 7, 2001. Thus, defendant's rescission counterclaim cannot be disregarded merely because it was filed in 2001.

**\*798  [13]**  Defendant's rescission claim does fail, however, for other reasons. Defendant argues that the fraud perpetrated by plaintiff renders the Assistance Agreement void *ab initio.* Defendant contends the ordinary rules of rescission, such as returning the parties to the *status quo ante,* do not apply when there is fraud. It is true that generally, "a Government contract tainted by fraud or wrong-doing, is void *ab initio,*" rather than merely voidable. *Godley v. United States,* 5 F.3d 1473, 1475 (Fed.Cir.1993) (citing *J.E.T.S.,*

*Inc. v. United States,* 838 F.2d 1196, 1200 (Fed.Cir.1988), cert. denied, 486 U.S. 1057, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988)). Nevertheless, defendant has not established any fraud committed by plaintiff. Defendant's argument is therefore legally insufficient.

Moreover, even if defendant could establish fraud, the court believes it is impossible to return the parties to the *status quo ante* at this point. Plaintiff could feasibly repay defendant the $2 million debited from the special reserve account. It would be impossible and wholly irresponsible, however, to dissolve the merger between plaintiff and Lansing-an action rescission also mandates in this case. *See Dairyland Power,* 27 Fed.Cl. at 813 (rescission requires returning both parties to the *status quo ante*). Plaintiff has successfully operated Lansing since its acquisition. Such an action would not be in the best interest of the parties involved.

**3. Arguments based on defendant's affirmative defenses**

Defendant discusses three of its affirmative defenses in its cross-motion for summary judgment, all of which are premised on defendant successfully proving its special plea in fraud claim. As just discussed, the court concludes that defendant cannot establish this claim. This decision precludes defendant's assertion set forth in these three affirmative defenses. The court will, therefore, only briefly describe these defenses.

**a. Federal common law fraud**

Defendant argues that plaintiff's fraud (premised on the belief that Mr. Orchowski's actions can be imputed to plaintiff) frustrated strong public policy. Specifically, defendant maintains that when a contractor misrepresents its status or condition to procure a government contract or to cause the government to perform pursuant to a pre-existing contract, as plaintiff allegedly did here, and the misrepresentation frustrates the public policy objectives of the government, the contract is voidable or subject to voidness. Defendant's public policy argument lacks merit because, in the absence of actual fraud, the alleged violation of some vague public policy does not render a contract void. *J.E.T.S., Inc.,* 838 F.2d at 1199–1201. Without proving fraud, defendant cannot assert this public policy argument.

**b. Common law conflict of interest principles**

Defendant also asserts that OTS concluded during its special examination of plaintiff in 1991 that Mr. Orchowski's actions constituted a violation of the conflict of interest principles. Defendant maintains the OTS determined that his personal financial interests were in direct contravention to OTS's paramount interest in the prevention and elimination of practices and conditions that adversely affected the thrift's safety and soundness. Defendant believes its contract with plaintiff is unenforceable because Mr. Orchowski's conflict of interest is imputed to plaintiff. As discussed above, defendant's imputation argument is unpersuasive. Thus, its conflict of interest argument is also unconvincing.

**c. Prior material breach**

In addition, defendant argues that Mr. Orchowski's fraud began prior to defendant's enactment of FIRREA, and thus, plaintiff is precluded from asserting defendant's breach of contract because plaintiff was the first to breach. Again, this argument fails because Mr. Orchowski's actions cannot be imputed to plaintiff. Also, defendant is unable to establish the fraud upon which plaintiff's supposed material breach is founded.

*Conclusion*

For the above-stated reasons, plaintiff's short-form motion for partial summary judgment on contractual liability is GRANTED because the parties had a contractual relationship that allowed plaintiff to use the purchase **\*799** method of accounting and to include supervisory goodwill for regulatory capital compliance purposes. The enactment of FIRREA breached this contract. Defendant's corresponding cross-motion for summary judgment on Count I of plaintiff's complaint is DENIED.

In addition, plaintiff's motion to dismiss defendant's counterclaims and affirmative defenses consists of three arguments: (1) lack of subject-matter jurisdiction because the statute of limitations has expired; (2) failure to state a claim upon which relief may be granted; and (3) a request to strike defendant's affirmative defenses because they are insufficiently plead and wholly conclusory. The part of plaintiff's motion that addresses subject-matter jurisdiction is

DENIED because there is no statute of limitations that applies to defendant's counterclaims. With respect to plaintiff's failure to state a claim argument, the court has decided to treat this part of plaintiff's motion as a motion for summary judgment, because plaintiff relies on more than just the pleadings. This part of plaintiff's motion is GRANTED because defendant has failed to establish the elements of its special plea in fraud and rescission counterclaims. Plaintiff's request to strike defendant's affirmative defenses, however, is DENIED because defendant has sufficiently plead said

defenses. Moreover, defendant's corresponding cross-motion for summary judgment on its counterclaims and affirmative defenses [55] is DENIED.

Furthermore, the parties shall submit a joint status report discussing further proceedings by Monday, August 5, 2002.

IT IS SO ORDERED.

## Footnotes

1    This opinion was originally filed under seal on July 3, 2002, pursuant to a protective order issued June 7, 2001. The parties agreed to the withdrawal of the protective order in a telephonic conference held on July 8, 2002. This Opinion and Order, therefore, is being reissued for publication as of this date.

2    In 1982, the rules established by applicable generally accepted accounting principles (GAAP) provided that, in mergers and acquisitions which used the purchase method of accounting, the book value of the assets and liabilities of an acquired thrift institution should be adjusted to fair market value or "marked to market" at the time of the acquisition. GAAP also provided that any excess in the cost of the acquisition (which included any liabilities assumed by the acquirer) over the fair market value of the acquirer assets should be separately recorded on the acquirer's institution's books as "goodwill"-an intangible, non-earning asset that may be amortized on a straight-line basis over a period of up to forty years.

3    Defendant's Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Cross–Mot. on Countercl.), Appendix (App.) at 11.

4    *Id.* at 104–05.

5    *Id.* at 139.

6    *Id.* at 147–48.

7    The C & D Order was issued with plaintiff's consent.

8    Plaintiff also sought permission to amend its expert report, which the court allowed.

9    Defendant's motion to dismiss Counts II–VII of plaintiff's complaint is not addressed in this opinion because the briefing is not complete. Arguments relating to Counts III–VII have been stayed until the court rules on plaintiff's breach of contract claim.

10    The court believes it is no longer necessary, however, to set forth a dissertation of the complete circumstances of *Winstar* and its progeny, as this analysis has been explained numerous times by other opinions of this court. *See, e.g., Bluebonnet II,* 47 Fed.Cl. at 158.

11    Transcript of Oral Argument (Tr.) at 28.

12    Defendant admitted in its response to the court's order to show cause filed June 10, 1998, that the court's December 22, 1997 opinion addressing cross-cutting issues could be interpreted as holding that a contract regarding the use of goodwill to satisfy FHLBB's minimum capital requirements is created by: (1) a document submitted to FHLBB or a supervisory agent that mentions purchase method accounting and (2) a second document generated by the government that recognizes the use of the purchase method of accounting to record the transaction. Response Of The United States To The Court's Order To Show Cause at 20. If this is the correct interpretation, defendant conceded that "[g]iven that documents of this type exist in this case, we can offer no reason why, if our interpretation of the Court's ruling is correct, the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case." *Id.* Defendant expressed at oral argument, however, that then Chief Judge Loren Smith coerced it into making this concession so it should be ignored. Tr. at 37. Indeed, defendant asked the court to overturn Judge Smith's previous decision *binding this case. Id.* at 38. Although decisions of the Court of Federal Claims in other cases are not precedential, the court will adhere to the rulings made by a judge previously assigned to this specific case. Thus, the court will not attempt to revisit the conclusions reached by Judge Smith.

13    Defendant also attempted to raise new arguments in its proposed findings of uncontroverted fact in support of its cross-motion for summary judgment as to liability filed on April 15, 2002. Indeed, defendant seems to have misunderstood the court's request for findings of fact on liability, because defendant used this opportunity to basically file another brief, under the guise of statements of fact, setting forth alternative arguments against plaintiff's claim. The court will mention these new issues only briefly, as they were not properly presented to this court. In addition, the court finds the arguments unpersuasive.

14    Defendant's Opposition To Plaintiff's Short–Form Motion For Partial Summary Judgment On Liability, And Defendant's Cross–Motion For Partial Summary Judgment (Def.'s Mot.) at 10 n.5.

15    Memorandum 31b was not specifically integrated into the Assistance Agreement, however, its applicability does not depend upon express incorporation. By its own terms, it automatically applies to "accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association." Defendant's Reply To Plaintiff's Response In Opposition To Government's Cross–Motion For Summary Judgment Regarding Count I Of Plaintiff's Complaint, Exhibit F (Memorandum 31b), at 1.

16    At oral argument, defendant raised the issue that plaintiff did not submit a letter explaining which accounting method it was going to follow, as required, so it is precluded from claiming there was a contract. Tr. at 50. This specific argument was rejected by then Chief Judge Smith in his common issue decision filed on December 22, 1997, which governs this case. *California Fed'l Bank,* 39 Fed.Cl. at 770. The court agrees with Judge Smith's ruling.

17    As plaintiff's counsel explained at oral argument, by the time plaintiff converted into a state-chartered bank it could no longer use supervisory goodwill because FIRREA had phased it out. Tr. at 17. Defendant's argument that plaintiff would not have converted into a state-chartered bank if the goodwill had any value is a complete "red herring."

18    At oral argument, defendant's counsel tried very hard to characterize the Lansing acquisition as a "sweetheart deal" with no risk to plaintiff. Tr. at 42. After reviewing the facts of this case, the court agrees with plaintiff that the acquisition posed a significant risk and that it would not have been rational for plaintiff to acquire Lansing without the contractual guarantees governing the treatment of goodwill.

19    Def.'s Mot. at 23 n.12.

20    Plaintiff's statute of limitations argument is a basis for asserting lack of subject-matter jurisdiction. *Burton v. United States,* 22 Cl.Ct. 706, 709 (1991).

21    Defendant learned of the defalcation in 1991. Under plaintiff's theory for the six-year statute of limitations, defendant needed to file its counterclaim by 1997.

22    Order dated September 18, 1996 (emphasis added).

23    In fact, plaintiff opposed discovery on the defalcation for awhile, apparently to hinder defendant's ability to file a counterclaim. Tr. at 132.

24    *Glendale* also addressed a special plea in fraud claim, but the court deems this opinion inapplicable to its statute of limitations analysis because the CMO specifically stated that it did not apply to *Glendale. See* Order dated September 18, 1996 ("this Order does not apply to *Glendale Federal Bank, FSB v. United States,* No. 90–772C").

25    The plaintiffs in *Landmark* and *Anderson* did not challenge the counterclaims based on the statute of limitations, nevertheless, the court presumably would have *sua sponte* addressed this jurisdictional issue if it was indeed relevant. *See* RCFC 12(h)(3) ("Whenever it appears by suggestion of the parties *or otherwise* that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added)); *Arctic Corner, Inc. v. United States,* 845 F.2d 999, 1000 (Fed.Cir.1988) ("A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt."); *Cupey Bajo Nursing Home, Inc. v. United States,* 36 Fed.Cl. 122, 132 (1996).

26    Tr. at 101.

27    Plaintiff's Reply Brief In Support Of Its Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses And Response To Government's Cross–Motion For Summary Judgment (Pl.'s Reply on Countercl.) at 13–14 (citing App. at 179, 188–189, 196–197, 209–210, 215–216, 296).

28    *Id.* at 19 (citing App. at 249, 442–447).

29    *Id.* at 20 (citing App. at 528–530, 596–597, 639, 641).

30    The court notes the parties' debate on whether Illinois law on imputation should apply. The court discusses this argument in more detail below while addressing the adverse interest exception. Specifically, the court chooses to follow the law of imputation as generally explained by the federal courts. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (concluding that if the rights and duties of the parties derive sufficiently from a federal source, then federal common law may be held to govern aspects of the case. This federal common law can be derived from state law, as long as there is uniformity between the states.). Illinois law, however, is in accordance with the court's analysis.

31    In addition, Mr. Orchowski was not the chief executive officer (CEO) of plaintiff, unlike the perpetrator in *Anderson,* who was the controlling shareholder and CEO. 47 Fed.Cl. at 447. This is one example of how *Anderson* is distinguishable from this case.

32    The court notes defendant's argument that Mr. Orchowski's conviction proves that plaintiff committed fraud against the government and collaterally estops plaintiff from challenging defendant's fraud claim. This argument fails because Mr. Orchowski never plead guilty to, and never was convicted of, defrauding *the government.* All of his actions were found to have been committed against plaintiff.

33    Tr. at 136.

34    As mentioned above, plaintiff argues that Illinois' law for imputation, which expressly follows the adverse interest exception, applies to this case. Defendant asserts that Illinois law is inapposite. The court does not need to decide this issue because it believes the adverse interest exception applies to the circumstances of this case-pursuant to the previous holdings of this court and other federal jurisdictions. The court would come to the same conclusion if Illinois law applied. It is therefore unnecessary to examine this choice of law issue because the same result would be reached by this court under Illinois law and the previous holdings of the federal courts.

35    Def.'s Cross–Mot. on Countercl., App. at 179.

36    Defendant's Proposed Findings Of Uncontroverted Facts In Support Of Its Cross–Motion For Summary Judgment As To Counterclaims And Affirmative Defenses (Def.'s Facts) at 18, ¶ 91.

37    Def.'s Cross–Mot. on Countercl., App. at 209–210.

38    *Id.* at 188–89.

39    *Id.* at 215–16.

40    *Id.* at 437–40.

41    As discussed below, the court believes plaintiff was operated in a safe and sound manner. The low ratings that resulted from the discovery of the defalcation only lasted for a short period of time. Also, plaintiff is still an existing, viable thrift.

42    One final issue defendant raises in connection to imputation is that Mr. Orchowski's actions were within his apparent authority, and thus, plaintiff is bound by them. This argument fails because the court has concluded that the defalcation was not in the best interest of plaintiff and did not benefit plaintiff. Also, plaintiff did not authorize Mr. Orchowski to embezzle money or make illegal loans. In addition, defendant cannot successfully prove that Mr. Orchowski made any misrepresentations to defendant.

43    Defendant suggested at oral argument that plaintiff knew about the defalcation earlier than 1991, but concealed this knowledge and did nothing to remedy the situation. Tr. at 143. Defendant relies on a report by the FDIC that incorporates a letter from plaintiff's counsel suggesting that familial relationships clouded the management's perspective on the issue. The court is not persuaded by defendant's argument because it is based on nothing more than a third party's speculative view of the circumstances. Also, defendant concedes in its findings of fact that plaintiff's management was unaware of the defalcation. Def.'s Facts at 18, ¶ 91.

44    Tr. at 156.

45    *Id.* at 178.

46    The court notes plaintiff's assertion at oral argument that the Assistance Agreement expired in 1985, and therefore, any safety and soundness requirement encompassed in it also terminated at that time. *Id.* at 177. The court does not agree with this argument because it believes that inherent in the contract was the requirement for plaintiff to manage Lansing in a safe and sound manner. The court has concluded that the contract was based on more than just the Assistance Agreement. Thus, notwithstanding the Assistance Agreement's expiration in 1985, the contract requirements continued to govern the parties' relationship.

47    An argument the court has already rejected.

48    Indeed, plaintiff asserts that, at most, it was guilty of negligence because it did not discover the defalcation on its own. Plaintiff's Motion To Dismiss Counts I And II Of Government's Counterclaim And Affirmative Defenses at 3. Defendant has not asserted a negligence claim.

49    Def.'s Facts at 18, ¶ 91.

50    Def.'s Cross–Mot. on Countercl. at 44.

51    *Id.,* App. at 249.

52    Pl.'s Reply on Countercl., App. at 596.

53    *Id.*

54    At oral argument, defendant's counsel argued that the harm it experienced was a breach of the public trust, a frustration of government policy objectives, and the loss of the $2 million plaintiff debited from the special reserve account. Tr. at 125. The court has concluded that Mr. Orchowski's actions cannot be imputed to plaintiff, that plaintiff did not misrepresent information to defendant, and that plaintiff was operated in a safe and sound manner. Therefore, there was no breach of the public trust or frustration of government policy objectives. In addition, plaintiff properly debited the $2 million in assistance per the terms of the contract.

55    Defendant has moved for summary judgment on three of its affirmative defenses: (1) federal common law fraud; (2) common law conflict of interest; and (3) prior material breach.

---

**End of Document**                                            © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 60

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 63 of 310

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

2009 WL 3568644

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. California.

The FLINTKOTE COMPANY, Plaintiff,

v.

GENERAL ACCIDENT ASSURANCE
COMPANY OF CANADA, et al., Defendants.

No. C 04-1827 MHP.    |    Oct. 27, 2009.

**Attorneys and Law Firms**

Marc S. Maister, Michael Richard Fehner, Irell & Manella, LLP, Newport Beach, CA, for Plaintiff.

Bonnie Margaret Ross, Jesse Frank Ruiz, Archie Stirling Robinson, Robinson & Wood, Inc., San Jose, CA, for Defendants.

Opinion

*MEMORANDUM & ORDER*

**Re: Defendant's Motion for
Application of Canadian Law**

MARILYN HALL PATEL, District Judge.

 **\*1** In this action, which was filed in May 2004, plaintiff The Flintkote Company ("Flintkote") alleged that defendant Aviva Insurance Company of Canada ("Aviva"), the successor-in-interest to General Accident Assurance Company of Canada ("General Accident"), failed to defend or indemnify Flintkote for claims covered under a primary insurance policy. The court has ruled on several motions. It has found that Flintkote was a named insured under the policy and that Aviva violated its contractual obligations to Flintkote. Defendant now moves the court to apply Ontario law to two questions: whether a particular letter, the contents of which might bear on the question of whether Flintkote is a "named insured" under the policy, should be admitted into evidence; and which method of allocation to apply among Flintkote's insurance policies. Having considered the parties'

arguments and submissions, the court enters the following memorandum and order.

*BACKGROUND*

**I.** *The Policy*

Plaintiff Flintkote, presently headquartered in San Francisco, is a company that formerly mined and sold asbestos and asbestos-based products. Defendant Aviva, based in Toronto, is the successor-in-interest to, among others, General Accident, which issued general liability policies to two Flintkote Canadian subsidiaries: The Flintkote Company of Canada Limited ("Flintkote Canada") and The Flintkote Mines Limited ("Flintkote Mines"). In 2004, Flintkote sought bankruptcy protection as a result of the large volume of asbestos-related litigation that arose in response to findings that exposure to asbestos fibers can have severe long-term health consequences. Flintkote brought the present action in order to secure declaratory relief related to the scope of coverage under its policy with Aviva and to obtain indemnification, on behalf of itself and its other insurance carriers, for money paid out as a result of past litigation.

The insurance policy at issue, number L-90-5010 ("the policy"), was a commercial general liability policy in force between 1958 and 1961. The policy obligates General Accident to pay on behalf of the insured sums arising from third-party bodily injury, property damage or products liability claims against the insured. *See* Docket No. 297 (Ross. Dec.), Exh. A at TR0000045. The policy also obligates General Accident to defend or indemnify the insured with respect to lawsuits falling within the ambit of the coverage. *See id.* The policy provides that the "Name of Insured" includes "THE FLINTKOTE COMPANY OF CANADA LIMITED and/or THE FLINTKOTE MINES LIMITED and/or Subsidiary or Affiliated corporation or corporations now existing or hereafter created as their respective interests may appear." *Id.* at TR0000041. Additionally, the policy states, "This policy shall apply to occurrences occurring anywhere in the World, provided suit is brought in the Dominion of Canada or the United States of America, its territories or possessions." *Id.* at TR0000047.

 **\*2** On October 12, 1982, Flintoke's risk manager gave notice of the first claim against the policy to Marsh & McLennan of Toronto, Flintkote's insurance broker. [1] *See* Docket No. 376 (Chen Dec .), Exh. 1. Neither General Accident nor Marsh & McLennan had a copy of the policy. Flintkote forwarded a copy to Marsh & McLennan on December 8, 1982. *Id.,*

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 64 of 310

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

Exh. 2. The copy of the policy Flintkote furnished included a letter dated May 23, 1958, from Eric Lawrence at General Accident in Toronto to C.D. Milling at Marsh & McLennan in Toronto ("the 1958 letter"). Lawrence's letter delivered the policy and stated, "This letter will confirm that the above-numbered policy is primary insurance applying to Canadian operations." Ross Dec., Exh. A at TR0000045.

## II. *Relevant Prior Decisions*

In January 2006, deciding a motion for summary judgment brought by Flintkote, this court concluded that the policy term "Affiliated corporations" included plaintiff The Flintkote Company, and that The Flintkote Company was therefore a "named insured." *Flintkote Co. v. Gen. Accident Assurance Co.,* 410 F.Supp.2d 875, 894 (N.D.Cal.2006) (Patel, J.); Docket No. 89 ("Order of January 2006"). In arguing that motion, Aviva raised the question of whether Canadian contract interpretation rules should apply to the instant action. Aviva's entire discussion of the issue read as follows:

> The subject policy was issued to Canadian insureds through a Canadian broker, Marsh. The contract was made in Canada. Under Canadian law, this contract is to be interpreted with respect to this issue according to the laws of Ontario. Section 123 of the Insurance Act of Ontario. (See Declaration of Judith Gold, ¶ 7, and Exhibit 7 thereto, and Request for Judicial Notice.) Aviva's research has disclosed that in the area of contract interpretation, there is slight or no difference between the laws of Ontario, and the laws of California. Because it is assumed the Court has more familiarity with California law than it has with Canadian law, Aviva has cited California law. Aviva's references to California law should not be construed as a waiver of Aviva's right to rely upon Canadian law under other circumstances.

Docket No. 64 (Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue) at 7:20-8:5. The court noted in its order:

> The parties dispute whether Canadian law or California law should govern interpretation of the policy, but defendants

concede that there are no material differences in the two bodies of law for purposes of deciding the instant motions. [Endnote.] The court will therefore apply California law.

> [Endnote:] Defendants somewhat confusingly include "Choice of Law" sections in their briefs in opposition, suggesting that the choice of law may have bearing on the resolution of the motions. In the same section, however, defendants note that "there is slight or no difference between the laws of Ontario, and the laws of California." As defendants have stated no cognizable argument based on choice of law, the court will assume that California law governs for purposes of deciding the instant motions.

**\*3**  410 F.Supp.2d at 880.

In March 2007, the court granted Flintkote's motion for summary judgment on Flintkote's claim for declaratory relief with respect to pending and future asbestos claims and on Flintkote's breach of contract claim with respect to the past paid asbestos claims. The court denied Aviva's partial motion for summary judgment that Flintkote's claims were barred by the applicable statutes of limitations. The court found that Flintkote had properly tendered its claims to Aviva through its various notices and communications. *Flintkote Co. v. Gen. Accident Assurance Co.,* 480 F.Supp.2d 1167, 1176 (N.D.Cal.2007) (Patel, J.); Docket No. 159. As regards the application of the policy's "other insurance" clause, the court noted: "The parties agree that interpretation and application of the 'other insurance' clause of the policy is appropriately left for the damages phase of this action. Accordingly, the court will entertain arguments on this issue at that time." Docket No. 159 at 11.

In August 2008, the court again ruled on cross-motions for partial summary judgment. It ruled that: (1) Flintkote is directly harmed by Aviva's failure to pay on past claims insofar as other insurance is prematurely exhausted and is unavailable to pay on future claims; (2) under recently executed settlement agreements containing undisputed assignments, as well as under the Wellington Agreement and others like it, Flintkote has the authority to assert claims on behalf of its other insurers to recover amounts those insurers paid in lieu of Aviva; and (3) the claims of the other insurers are equitably tolled. The court also adopted a pro rata by per occurrence standard to determine damages, as described in detail in the court's order. *Flintkote Co. v. Gen. Accident Assurance Co.,* 2008 WL 3270922 (N.D.Cal. Aug.6, 2008) (Patel, J.); Docket No. 244 ("August 2008 Order"). In its

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 65 of 310

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

briefing papers on these motions, Aviva never raised a choice of law issue and, indeed, relied upon California law. *See* Docket No. 202 (Def.'s Opp. to Pl.'s Mot. to Streamline Damages) at 7-15. Aviva did not cite a single Canadian case. *See id.* at iii-iv.

In September 2008, the court appointed a Special Master. The scope of his duties was described as follows:

> The Special Master shall review the provisions and/or policies at issue in light of the Court's August 6, 2008 Order. The Special Master shall issue a report and recommendation on the issues of which policies in dispute are general excess policies and which policies in dispute are specific excess policies in light of the August 6, 2008 Order, and which specific excess policies share defense and indemnity obligations with Aviva (including all issues regarding whether a policy drops down and shares with Aviva, including whether lower-level general excess policies or lower-level policies issued by insolvent insurers prevent higher-level specific excess policies from dropping down, whether an otherwise specific excess policy that attaches upon a certain amount of "loss" but excludes other insurance from its definition of covered loss would share with Aviva, and whether Aviva can share defense costs with a specific excess policy in which the ultimate net loss definition excludes defense costs if other insurance exists). The Special Master may review and/ or report on any additional disputes pursuant to the consent of both parties or further order of this Court.

 **\*4**  Docket No. 257 at 1. The parties stipulated to the selection of the Honorable Harry W. Low (Ret.) to serve as Special Master. Justice Low had previously served as Insurance Commissioner of the State of California and as a Justice of the California Court of Appeal. Low reviewed well over one hundred insurance policies, determining on a policy-by-policy basis, *inter alia,* which policies shared with Aviva and which dropped down. He applied California law

to reach his conclusions. He completed his final report on November 13, 2008. *See* Docket No. 260, Exh. A. The court adopted the Special Master's report and recommendations on February 11, 2009, rejecting Aviva's objections to the Special Master's findings. *See* Docket No. 278 (hearing transcript) at 26. Aviva relied exclusively upon California law in framing its objections. *See* Docket No. 262.

Currently remaining for adjudication are Flintkote's claim for bad faith and the final determination of damages for Flintkote's claims. Aviva filed the instant motion for application of Canadian law on August 31, 2009. Oral argument was heard on October 7, 2009.

## *LEGAL STANDARDS*

### I. *Choice of Law*

In a diversity action, a federal district court applies the choice of law rules of the state in which it sits. *Abogados v. AT & T, Inc.,* 223 F.3d 932, 934 (9th Cir.2000) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing." Fed.R.Civ.P. 44.1. To determine whether a party has given reasonable notice of its intent to invoke foreign law, a court should: (1) consider the stage which the case has reached at the time of notice; (2) evaluate the reason proffered by the party for the failure to give earlier notice; and (3) consider the importance to the case as a whole of the issue of foreign law. *See APL Co. Pte. Ltd. v. UK Aerosols Ltd. .,* 582 F.3d 947, 2009 WL 2988511, at \*6-8 (9th Cir. Sep.21, 2009). "Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum." *Hatfield v. Halifax PLC,* 564 F.3d 1177, 1184 (9th Cir.2009) (quoting *Interpol Ltd. v. Char Yigh Marine (Panama) S.A.,* 890 F.2d 1453, 1458 (9th Cir.1989)).

### II. *Law of the Case*

"The law of the case doctrine precludes a court from reconsidering an issue that it has already resolved. Issues that a district court determines during pretrial motions become law of the case." *United States v. Phillips,* 367 F.3d 846, 856 (9th Cir.2004) (footnotes omitted). The doctrine is not a limitation on a tribunal's power, but rather a guide to discretion. *United States. v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997). "A court may have discretion to depart from

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 66 of 310

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted).

### DISCUSSION

**\*5** On this motion Aviva requests an order applying Ontario law with the result that The Flintkote Company is found not to be a named insured under the policy. Aviva states that in so doing it is requesting the application of Ontario evidence law to the question of the 1958 letter's admissibility. Alternatively, Aviva requests an order deciding that Ontario's law applies to the allocation among Flintkote's policies, which would purportedly result in the application of a time-on-risk method of allocation. [2]

Aviva argues that, despite the lengthy analysis of the purported differences between California and Canadian contract law found in its briefs, *see, e.g.,* Docket No. 296 (Def.'s Mot.) at 7:9-12:12, 12:17-12:27, 13:4-14:2, Aviva is actually requesting the application of Canadian evidence law, not contract law. [3] The court understands Aviva's theory to be that if the 1958 letter were admitted, this court would find that The Flintkote Company is not a named insured under the policy. As noted, the letter states, "This letter will confirm that the above numbered policy is primary insurance applying to Canadian operations." Ross Dec., Exh. A at TR0000045. In Aviva's view, this sentence confirms that the parties intended the policy at issue to cover only Flintkote Canada and Flintkote Mines, not The Flintkote Company.

Flintkote responds, *inter alia,* that law of the case doctrine compels denial of the instant motion. On October 28, 2005, Flintkote filed an objection to admission of the 1958 letter as evidence. Aviva responded, relying exclusively upon the Federal Rules of Evidence. *See* Docket No. 86 (Def.'s Response to Pl.'s Objections). The court determined that the letter was inadmissible hearsay. Order of January 2006 at 11. Thus, the admissibility of the letter has already been decided. Prior to that decision, Aviva had an opportunity to argue Canadian law should apply but instead chose to rely on the Federal Rules of Evidence. The court has already decided the issue; therefore, law of the case doctrine requires a denial of the motion. A court has the discretion to depart from the law of the case under certain circumstances. *See Alexander,*

*106 F.3d at 876.* Here, no such circumstance obtains, and Aviva has not contended that such a circumstance obtains except insofar as it has simply expressed disagreement with the court's earlier decision.

The relevant authorities on choice of law also support denial of Aviva's motion. "Under California's choice of law rules, a California court 'will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.' " *Hatfield,* 564 F.3d at 1184 (quoting *Hurtado v. Superior Court,* 11 Cal.3d 574, 581, 114 Cal.Rptr. 106, 522 P.2d 666 (1974)). Aviva argues that the instant motion is timely and gives reasonable notice because it has been filed before pretrial hearings or trial. *See DP Aviation v. Smiths Indus. Aerospace & Defense Sys. Ltd.,* 268 F.3d 829, 848 (9th Cir.2001) (noting first consideration of foreign law may sometimes be appropriate after trial or even on appeal). Indeed, Aviva gave notice in 2005 that it might subsequently invoke Canadian law for purposes other than contract interpretation. *See* Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue at 7:20-8:5. Yet, subsequent to making this reservation, Aviva argued for admissibility of the 1958 letter using only California law. [4] Aviva did not "timely invoke[ ] foreign law ... at the first opportunity when the issue became material." *See APL,* 582 F.3d 947, 2009 WL 2988511, at *7. Aviva had an opportunity to invoke foreign law while advancing its evidentiary arguments regarding the 1958 letter, and it failed to do so. [5] Nor has Aviva offered *any* explanation why it did not give notice of its intent to rely upon foreign law at the time the issue of the letter's admissibility was adjudicated. *See id.* Nor was the evidentiary issue an isolated one, separate from the issues that had already been decided. *See id.* The issue has already been argued by the parties relying upon California law and decided by the court using California law. It is hard to imagine a clearer case in which the invocation of foreign law is untimely.

**\*6** Even if the instant evidentiary motion were timely, it would still be denied. "Most evidentiary rules are procedural in nature, and the Federal Rules of Evidence ordinarily govern in diversity cases." *Feldman v. Allstate Ins. Co.,* 322 F.3d 660, 666 (9th Cir.2003) (citing *Erie R.R. v. Tomkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) (citation and internal quotation marks omitted). State evidentiary rules are applied only when they are " 'intimately bound up' " with the rights and obligations being asserted, *Wray v. Gregory,* 61 F.3d 1414, 1417 (9th Cir.1995) (quoting *Erie,* 304 U.S. at 78), or when they "in fact serve substantive state policies and are more properly rules of substantive law

Case 09-10138-MEW    Doc 14225-46    Filed 08/15/14    Page 67 of 310

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

within the meaning of *Erie*," *id.* (quoting 19 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4512, at 194-95 (1985)). In *Wray*, the Ninth Circuit deferred to the evidentiary rules used by Nevada's medical malpractice screening panel where Nevada had established an integrated scheme for handling medical malpractice claims. The court found that federal courts' application of the Federal Rules of Evidence in derogation of the state rules would encourage forum shopping and undermine Nevada's scheme for dealing with this substantive area of the law. *Id.* at 1417-18. Similarly, the *Feldman* court held a provision of the California Penal Code that made taping a confidential conversation a crime to limit the admissibility of illegally intercepted conversations, even where the Federal Rules of Evidence would allow the evidence to be admitted. 322 F.3d at 666-67. The court found that the California statute embodied a substantive interest in the privacy of California citizens and was accordingly to be treated as substantive law for *Erie* purposes. *Id.* at 667. By contrast, Aviva has not shown that Ontario evidentiary law, under which Aviva purports the 1958 letter would be admissible, is intimately bound up with Aviva's rights or serves the substantive policies of Ontario. Aviva has shown only that Ontario may have a procedural rule that differs from the federal procedural rule. This does not provide grounds to subordinate the Federal Rules of Evidence to Ontario law. [6]

Aviva has also moved the court, should the court deny Aviva's motion pertaining to the "named insured" issue, to consider applying Ontario law to the allocation among Flintkote's policies. A separate choice of law inquiry is made with respect to each issue in a case. *Beech Aircraft Corp. v.*

*Superior Court*, 61 Cal.App.3d 501, 518, 132 Cal.Rptr. 541 (1976). Here too Aviva seeks to relitigate an issue that has already been litigated at great length and decided. Aviva specifically seeks "an Order that Ontario's law applies to the allocation among Flintkote's policies, such that the time on risk method is applied." Def.'s Mot. at 21. As noted above, Aviva has already had an opportunity to argue for the time-on-risk method. It briefed the issue extensively and relied exclusively on U.S. law. *See* Def.'s Opp. to Pl.'s Mot. to Streamline Damages at 7-15. Applying California law, the court rejected Aviva's argument: "Aviva argues for a per-occurrence method of apportionment, but further asks the court to consider the length of time the Aviva policy was in effect. Effectively, Aviva argues that a 'time-on-risk' system of coverage ought to be adopted.... [T]he court rejects Aviva's argument and adopts the standard pro rata method of apportionment according to per occurrence limits." August 2008 Order at 23-24. Aviva's instant motion fails as to the allocation issue for the same reasons it fails as the "named insured" issue. Aviva is simply trying to get a second lick from the lollipop. No litigant is entitled to relitigate an issue under the laws of various jurisdictions until it achieves its desired result. [7]

## CONCLUSION

**\*7** For the foregoing reasons, defendant's motion for the application of Canadian law is DENIED.

IT IS SO ORDERED.

Footnotes

1    The risk manager was employed by Genstar Corporation, which had taken over Flintkote by that time.

2    For the reasons discussed in this memorandum and order, the court does not reach the merits of Aviva's assertions pertaining to the content of relevant Canadian law.

3    Aviva apparently recognizes that it agreed to the application of California contract law in 2005, representing that "in the area of contract interpretation, there is slight or no difference between the laws of Ontario, and the laws of California." Def.'s Opp. to Pl.'s Mot. re: "Named Insured" Issue at 7:26-28.

4    As noted, the court remarked in its March 2007 order that interpretation and application of the "other insurance" clause would be left for the damages phase of the action. Aviva suggests that its instant motion is therefore timely because the litigants are now in the damages phase. This argument ignores the fact that the damages issue to which Aviva seeks to apply Canadian law was decided in August 2008. The court's March 2007 remark cannot be read to suggest that Aviva can raise the same issue *ad infinitum* as long as the action is still in the damages phase.

5    Aviva's assertion that the law of the case doctrine does not apply because the court "has never considered the issue of whether Canadian law applies," Docket No. 401 (Reply) at 6, is sophistry. The issue presented by the instant motion is not whether Canadian law applies in some abstract sense but whether it applies to the named insured and allocation issues. *See id.* at 14. The court has considered those issues, as described above.

Flintkote Co. v. General Acc. Assur. Co. of Canada, Not Reported in F.Supp.2d (2009)

6    Even if the 1958 letter were admissible, it would hardly provide a silver bullet. The supposed evidence of the parties' intent is embodied in one sentence lacking both context and unambiguous language conveying an understanding that the policy would *exclusively* cover only Flintkote Canada and Flintkote Mines.

7    Aviva argues that Flintkote has not been prejudiced by the timing of Aviva's motion. The court cannot agree. Flintkote briefed a motion using California law; it should not be required to brief a second motion on the same issue under different law due to Aviva's failure to timely invoke foreign law. Moreover, the court has devoted significant resources to deciding issues involving apportionment of damages. The interest in conservation of scarce judicial resources militates against allowing a party to relitigate an issue that has already been adjudicated.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 61

1929 CanLII 30 (SCC)

1929
*Apr. 23, 24,
25.
*June 13.

GEORGIA CONSTRUCTION COM-
PANY (Plaintiff) ................ } Appellant;

AND

PACIFIC GREAT EASTERN RAIL-
WAY COMPANY (Defendant)...... } Respondent.

### ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Contract—Railway construction—Method of doing work—"Extra haul" and "over-haul"—Meaning—Usage—When it forms an ingredient of the contract—Finding of the trial judge—Document filed at trial without objection—Exception to its admissibility taken on appeal.*

The appellant had a contract with the respondent for a work on the re-
spondent's line of railway, which work consisted of a cut and fill where
the line crossed a deep ravine. The old line was carried on a trestle,
and the new line was to be supported by a fill on a site adjacent to
the trestle, which was to be made with the earth excavated from a
bluff on the northerly side of the ravine through which the cut was to
pass. The contract stipulated for unit prices including "overhaul per
yard 1 cent"; and contained this clause: "12. The contract prices for
the several classes of excavation shall be taken to include the cost of
depositing the material in embankments, crib work, and all other ex-
penses connected therewith except extra haul, which will only be paid
for where it exceeds five hundred (500) feet, at so much per yard per
additional one hundred feet * * *." The appellant in excavating
the cut proceeded from the foot of the northerly slope of the bluff,
and by a circuitous route encircling the bluff on its westerly, south-
westerly and southerly sides carried the earth to the site of the
embankment. The appellant contended that it was entitled to be paid
for "overhaul" at the rate mentioned, that is to say, at the rate of
1 cent per cubic yard for every 100 feet of haul calculated by refer-
ence to the length of the route actually followed in excess of 500 feet.
The view of the contract advanced by the respondent was that the
contract phrases "extra haul" and "overhaul" have, by usage, in con-
struction contracts, or at all events in railway construction contracts,
a special and specific meaning; and that they signify that the length
of the haul in respect of which the contractor was entitled to charge

---

*Present:—Duff, Mignault, Newcombe, Lamont and Smith JJ.

for overhaul, was to be ascertained by taking the distance (measured along the centre line of the railway in process of construction) between the projections, first, of the centre of mass of earth, to be excavated in making the cut, and second, of the embankment, and deducting therefrom 500 feet; the projections being for this purpose the several points on the centre line nearest the respective centres of mass. The trial judge (40 B.C. Rep. 81) held that the usage alleged had not been established, and that the proper construction of the contract was that contended for by the appellant. The Court of Appeal ([1928] 3 W.W.R. 466) disagreed with this conclusion and accepted the view advanced by the respondent.

*Held,* reversing the judgment of the Court of Appeal ([1928] 3 W.W.R. 466), that the alleged usage had not been proven. It had been established that there was a practice widely followed of inserting in railway construction contracts a clause providing for the computation of payment for overhaul according to the method contended for by the respondent; but in the text books, engineering manuals and writings by engineers produced, there was no basis for the view that the effect of the words used in the present contract was, apart from such special stipulations, what is contended by the respondent. Usage, of course, where it is established, may annex an unexpressed incident to a written contract; but it must be reasonably certain and so notorious and so generally acquiesced in that it may be presumed to form an ingredient of the contract. *Juggomohun Ghose* v. *Manickchund* (7 Moore's Indian Appeals 263, at p. 282).

*Held,* also, that in substance, the question presented to the trial judge was whether there was evidence to satisfy him judicially that the alleged usage was, to quote the language of Banks L.J., in *Laurie* v. *Dudin* (95 L.J., K.B. 191, at 193), "so all pervading and so reasonable and so well known that everybody doing business" in railway construction "must be assumed to know" it, and to contract subject to it; and the finding of the trial judge should not have been disturbed by the appellate court.

At the trial, a report by the Deputy Minister of Railways and the Chief Engineer of the respondent, approving the appellant's system of handling the works, tendered by the appellant's counsel, was admitted and no exception to its admissibility was taken at any stage of the proceedings prior to the oral argument in this court. According to the record, counsel for the respondent was aware that the document could have been excluded if he had pressed an objection against it, and, moreover, he did not call either of the gentlemen who signed the report as a witness. If the objection had been pressed, the appellant's counsel would no doubt have felt obliged to call them as witnesses himself, as counsel for the respondent must have realized; but the latter seemed to have elected deliberately not to press the obvious objection to the document.

*Held,* that, in these circumstances, an exception to the admissibility of the report taken by the respondent's counsel before this court should be considered as being raised too late.

APPEAL from the decision of the Court of Appeal for British Columbia (1), reversing the judgment of the trial judge, Morrison J. (2), and dismissing the appellant's

(1) [1928] 3 W.W.R. 466.        (2) (1928) 40 B.C. Rep. 81.

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

1929 CanLII 30 (SCC)

SUPREME COURT OF CANADA              [1929

1929
GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.
———

action to recover for work done under a railway construction contract.

The material facts of the case and the questions at issue are stated in the head-note and in the judgment now reported.

*J. W. de B. Farris K.C.* for the appellant.

*Aimé Geoffrion K.C.* and *R. W. Lane* for the respondent.

The judgment of the court was delivered by

DUFF J.—The controversies in this appeal relate to questions of fact turning to some extent upon the effect of documentary evidence, and in part upon an appreciation of the weight of oral evidence adduced at the trial; upon which the conclusions of the learned trial judge were set aside by the Court of Appeal.

The appellants had a contract with the respondents dated May 20, 1926, for a work on the respondents' line of railway, which work consisted of a cut and fill where the line crossed a deep ravine. The old line was carried on a trestle, and the new line was to be supported by a fill on a site adjacent to the trestle, which was to be made with earth excavated from a bluff, on the northerly side of the ravine, through which the cut was to pass.

The contract stipulated for unit prices including " overhaul per yard 1 cent "; and contained this clause:

12. The contract prices for the several classes of excavation shall be taken to include the cost of depositing the material in embankments, crib work, and all other expenses connected therewith except extra haul, which will only be paid for where it exceeds five hundred (500) feet, at so much per yard per additional one hundred feet. No allowance or compensation whatever shall be due or paid to the contractor for any temporary roads, bridges or trestles he may make to facilitate his work.

The appellants in excavating the cut proceeded from the foot of the northerly slope of the bluff, and by a circuitous route encircling the bluff on its westerly, southwesterly and southerly sides carried the earth to the site of the embankment. The substantive issue is whether or not the appellants are entitled to be paid for " overhaul " at the rate mentioned, that is to say, at the rate of 1 cent per cubic yard for every 100 feet of haul calculated by reference to the length of the route actually followed in excess of 500 feet.

1929 CanLII 30 (SCC)

S.C.R.]    SUPREME COURT OF CANADA                          633

1929

GEORGIA
CONSTRUC-
TION CO.
v.
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

. The view of the contract advanced by the respondents is that the contract phrases " extra haul " and " overhaul " have, by usage, in construction contracts, or at all events in railway construction contracts, a special and specific meaning. They signify, according to this contention, to summarize it broadly, that the length of the haul in respect of which the contractor is entitled to charge for overhaul, is to be ascertained by taking the distance (measured along the centre line of the railway in process of construction) between the projections, first, of the centre of mass of the earth to be excavated in making the cut, and second, of the embankment, and deducting therefrom 500 feet; the projections being for this purpose the several points on the centre line nearest the respective centres of mass. The learned trial judge held that the usage alleged had not been established, and that the proper construction of the contract is that contended for by the appellants. The Court of Appeal disagreed with this conclusion and accepted the view advanced by the respondents.

If the learned trial judge was right, two further questions will require consideration. First, whether on the facts proved, the appellants have established their right to have their claim passed upon in the absence of a certificate by the engineer sanctioning it, and second, whether, assuming that to be so, the appellants' method of proceeding was an unnecessarily expensive one, or was dictated by the physical conditions of the work and by the terms of the contract as to the time of performance.

I shall consider these questions in the order in which I have stated them. And first, as to the construction of the contract. Usage, of course, where it is established, may annex an unexpressed incident to a written contract; but it must be reasonably certain and so notorious and so generally acquiesced in that it may be presumed to form an ingredient of the contract, *Juggomohun Ghose* v. *Manickchund* (1). In the Court of Appeal there was some disagreement with the view of the learned trial judge, that the respondents' contention as to the effect of the contract was based upon the alleged existence of usage or custom, both Martin J.A. and M. A. MacDonald J.A. expressing the opinion that they were confronted with a question of interpreta-

(1) 7 Moore's Indian Appeals 263, at p. 282.

1929

GEORGIA
CONSTRUC-
TION Co.
*v.*
PACIFIC
GREAT
EASTERN
RY. Co.
___

Duff J.
___

tion, merely.  The respondents themselves alleged the prac-
tice they sought to prove as a custom controlling the effect
of the contract; and I do not know that it is very material
whether you describe the subject of inquiry as a question
of the existence of a usage imparting a special meaning to
particular words when employed in contracts of a given
class, or as a question as to the existence of a usage annex-
ing an incident to such contracts in virtue of the presence
of such words.  I am disposed to think that the latter is
the more apt description of the question presented in this
case.

In substance, the question for the learned trial judge was
whether there was evidence to satisfy him judicially that
the alleged usage is, to quote the language of Banks L.J., in
*Laurie* v. *Dudin* (1),

so all pervading and so reasonable and so well known that everybody
doing business

in railway construction "must be assumed to know" it,
and to contract subject to it.  I am not satisfied that the
alleged usage has been established.  There is no doubt that
a practice widely prevails of inserting in railway construc-
tion contracts a clause providing for the computation of
payment for overhaul according to the method contended
for by the respondents; but in the text books, engineering
manuals and writings by engineers produced, there is no
basis for the view that the effect of the words used in the
contract before us is, apart from such special stipulations,
what is now contended.  More than one of the witnesses
called on behalf of the respondents admitted that he had
never in his own experience encountered a case in which
the earth excavated in making the cut had to be carried
to the fill by a circuitous route, that is to say in which
carriage along the line of railway was impracticable and
the circuitous route was not adopted to serve the con-
venience of the contractor, where overhaul had not been
calculated according to the length of the route actually
traversed.  Some said that they had never met a case in
which carriage on that line was not practicable.  Other
witnesses gave instances in which overhaul had been cal-
culated according to the rule advocated by the respondents,
though a circuitous route had been followed for the con-

(1) 95 L.J. K.B. 191, at 193.

venience of the contractor, but not because a shorter route was impracticable. The engineer in charge, McMillan, admitted he had never known a case of carriage by a circuitous route being compensated for on the basis of measurement along the line of the railway. He had, he stated, adopted this course on one occasion when the earth had been taken from a borrow pit, that is to say, from an excavation entirely outside the line of the railway; in that case he had measured the distance from the point on the railway nearest the borrow pit, to the centre of mass of the fill, but he admitted that the alleged usage had no relation to such a case; and that in principle he had been wrong.

It was argued, that a method of computation of overhaul commonly in use, described as the method by "mass diagram," would be incapable of application to a case like the present unless the distance were measured along the centre line of the railway; and this, it is urged, is sufficient ground for treating that method of measurement as ordained by the contract. This argument involves obviously the proposition that the method of mass diagram is so essential to such computations, or at all events so universally employed as to require a direction to employ it to be implied as an incident of the contract. Taking the evidence as a whole, I do not think this has been established; but in any case there is evidence by witnesses called on behalf of the respondents which it was quite open to the learned trial judge to accept, that this method (by "mass diagram") is applicable or may be applicable for the purpose of computing compensation for overhaul where the material is taken from a place outside the line on the railway ("a borrow pit") where the distance taken is that of the actual haul; and one of the most important witnesses called on behalf of the respondents explicitly admits that such a case presents no distinction in principle from those cases where the earth is excavated on the line of the railway. Distinction in principle between the case of the "borrow pit" and the case before us is not suggested.

The appellants, on the other hand, called a number of engineers of long experience and high repute, who denied without qualification the existence of any usage such as that alleged. I refer particularly to the evidence of Mr.

1929

GEORGIA
CONSTRUC-
TION CO.
v.
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

Hazen, the assistant chief engineer, of the Canadian National Railways. He stated that according to his experience, which had been chiefly in railway construction and which up to the time of the trial was of 39 years' duration, where it is impracticable to haul the excavated material from the cut to the fill along the line of the railway, and where a longer route is followed for this reason by the contractor, and not for his own convenience, the practice is to compute the compensation for overhaul by reference to the distance actually traversed, and not to the distance between the points on the centre line of the railway nearest the centres of mass measured along that line.

On this evidence the learned trial judge has held that the respondents failed to prove the alleged usage. I am unable myself to perceive any grounds, upon which, to quote the phrase of Scrutton L.J. in *Laurie* v. *Dudin* (1), the Court of Appeal could properly

interfere with the learned judge who saw the witnesses and heard them cross-examined and heard the way in which they gave their evidence.

I may add that, with the learned trial judge, I am not satisfied by the evidence that there is any practice of measuring distance for computing overhaul in the manner contended for, so well recognized, so well known among persons engaged in railway construction, and so widely prevailing as to justify a presumption that everybody who enters into a contract for such work does so with the intention of being bound by that usage.

I do not doubt, I may add, that the learned trial judge, in considering whether such a widely prevailing and generally recognized usage had been established, took into account, as he was entitled to do, the fact that neither the Deputy Minister, a railroad engineer of a life time's experience, nor Mr. Randall, the company's chief engineer, was called as a witness to affirm the existence of such a usage; or that he did not fail to note the rather discreditable effort of the respondents to create the impression in Mr. Hazen's mind that he would be guilty of some impropriety in stating, as a witness on behalf of the appellants, his view that no such usage exists.

Second, as to the absence of an engineer's certificate recognizing the appellant's claim. The pertinent clauses

(1) 95 L.J. K.B. 191, at p. 198.

1929 CanLII 30 (SCC)

S.C.R.]    SUPREME COURT OF CANADA    637

of the contract may conveniently be set out together, they are these:

1.* * *  The word "engineer" shall mean the chief engineer of the company (unless otherwise specified), or his duly authorized agents limited by the particular duties respectively entrusted to them. * * *

8. The engineer shall be the sole judge of work and material in respect of both quantity and quality, and his decision on all questions in dispute with regard thereto shall be final, and no work under this contract shall be deemed to have been performed, nor materials nor other things provided, so as to entitle the contractor to payment therefor, until the engineer is satisfied therewith, and has issued to the contractor his certificate in writing in respect thereof.

9. The work shall, in every particular, be under and subject to the control and supervision of the engineer; and all orders, directions or instructions, at any time given by the engineer with respect thereto, or concerning the conduct thereof, shall be by the contractor promptly and efficiently obeyed, performed and complied with to the satisfaction of the engineer. In particular, and without limiting the foregoing, the engineer shall have the right to control blasting operations, so as to protect the interests of the company, and to avoid injury or damage from excessive or improper blasting.

10. The respective descriptions of work and materials, or portions of the works referred to, in or covered by the individual items in the schedule of prices embodied in the proposal annexed to this contract, include not only the particular kinds of work or materials mentioned in the said items, but also all and every kind of work, labour, tools, plant, materials, equipment and things, whatsoever necessary for the full execution, completion and delivery, ready for use, of such descriptions of work and materials, or of such respective portions of the works, in accordance with the said drawings and specifications and to the satisfaction of the engineer. The said schedule as a whole is designed to cover not only the particular descriptions of work and materials mentioned therein, but also all and every kind of work, labour, tools, plant, material, equipment and things whatsoever necessary for the full execution, completion and delivery, finished and ready for use, for the entire work as herein contracted for, in accordance with said drawings and specifications, and the satisfaction of the engineer; in case of dispute as to what work, labour, tools, plant, materials, equipment and things are included in the works contracted for, or in the said schedule, or any item thereof, the decision of the engineer shall be final and conclusive.

*    *    *

27. The company covenants with the contractor, that the contractor having in all respects complied with the provisions of this contract, will be paid for and in respect of the works the various prices set out in the schedule of prices embodied in the accepted proposal of the contractor hereto annexed.

*    *    *

28. Cash payments equal to about ninety per cent of the value of the work done, approximately estimated from progress measurements and computed at the applicable schedule prices, or the prices fixed with respect thereto, as the case may be, under the provisions of this contract, will be made to the contractor monthly, on the written certificate of the engineer stating that the work for, or on account of which, the certificate is granted, has been done, and stating the value of such work computed

1929

GEORGIA
CONSTRUC-
TION CO.
v.
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

SUPREME COURT OF CANADA    [1929

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

as above mentioned; and the said certificate shall be a condition precedent to the right of the contractor to be paid the said ninety per cent or any part thereof. The remaining ten per cent shall be retained until the final completion of the whole work to the satisfaction of the engineer, and will be paid within two months after such completion. The written certificate of the engineer, certifying to the final completion of the said works to his satisfaction, shall be a condition precedent to the right of the contractor to receive or to be paid the said remaining ten per cent or any part thereof.

The contractors appear to have commenced work under the contract in the beginning of July, 1926. A gentleman named McMillan appears to have acted from the outset as engineer in charge of this particular work, and to have been recognized as such by the directors of the respondent, although as far as we can see he was not formally appointed until December of that year. Not until much later, apparently not earlier than the end of March, 1927, was there a chief engineer of the company who intervened in the contract. The minutes of the directors show that on the 20th of July, 1926, the board decided that all progress estimates of the engineer in charge " of the diversion at Mile 13·7 " should be submitted each month to the Deputy Minister of Railways for checking and for certification. There is no suggestion that the Deputy Minister of Railways, who signs as chief engineer of the railways as well as Deputy Minister, was ever appointed chief engineer of this company, and the resolution indicates that it was in his capacity as Deputy Minister that he was to check and certify the progress estimates. The engineer, for the purposes of the contract, as appears from the extracts already quoted, must be the chief engineer of the company or an agent of the chief engineer. The respondents allege in the statement of claim that McMillan was the " engineer " within the meaning and for the purposes of the contract. It is not alleged that he was chief engineer of the company, or that he was an agent of the chief engineer; admittedly he was not chief engineer and obviously he was not an agent of the chief engineer, prior at least to March, 1927, as there was no chief engineer to appoint an agent. Further, it is clear that McMillan had no authority even as agent of the company to grant progress certificates, all of which, in compliance with the resolution of the 20th July, 1926, down to the appointment of the chief engineer in 1927, are in fact the certificates of Mr. Griffith, the Deputy

Minister.  Authority under the contract, to give a binding decision as to the contractors' right to a certificate, McMillan had none.

No express authority is given to the engineer by the contract, to pass on any question as to the construction of the contract.  As the engineer is to certify to the performance of the work contracted for as a condition precedent of the contractors' right to be paid, he is necessarily obliged to read the contract and understand it, but it is his duty to, and it is the right of the contractor, that he shall give effect to the provisions of the contract according to their proper legal construction; and his only authority to pass upon that construction arises from, and is incidental to his authority to grant or withhold a certificate.  It may perhaps be right to observe, although it adds nothing to what has already been said, that McMillan, having no authority to grant certificates, or to decide upon the contractors' right to a certificate, was endowed with no authority, even incidentally, to bind anybody or affect anybody's rights under the contract, by his views as to its meaning.

The learned trial judge held that the

board of directors assumed the functions of the engineer under the contract.

That appears to be an inference fairly warranted by the correspondence and the resolutions passed by the board of directors; especially when read in light of the fact that for nine months after the signing of the contract, no engineer was appointed.  In order of date these are as follows:

July 13, 1926.

Mr. D. McMILLAN,
    Engineer,
        Bridge 13·7,
            Lillooet, B.C.

Referring to our conversation on Sunday last in connection with the overhaul claimed by the contractor, write me by return mail full particulars of this, together with their reason for claiming it.

T. KILPATRICK,<br>General Manager.

1929

GEORGIA
CONSTRUC-
TION CO.
v.
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

640                SUPREME COURT OF CANADA            [1929

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY CO.

Duff J.

Mile 13·7, Lillooet Sub-Div.,
July 14, 1926.

T. KILPATRICK, Esq.,
    General manager,
        P.G.E. Railway Co.,
            Vancouver, B.C.

In answer to your letter of July 13, the contractor purposes and is making preparation to take out the cut north of the fill at 13·7 by hauling out of the north end of the cut around by the P.G.E. Railway track to the fill south of the cut in question.

In a short talk with him he said he expected to be paid overhaul on this route, as it is the only way to take the cut out given as reason why he should be so paid.

He was told that overhaul is a constant, the same as the number of cubic feet in a yard and that his contention could not be supported. Not much was said but he still had his idea in mind.

The route to be used lengthens the distance over a centre line direct haul by from 3,000 to 3,500 feet.

D. McMILLAN,
Engineer in Charge of Diversion.

Copy of resolutions in minute book of defendant.

July 20, 1926.

It was decided by the board that *all the progress estimates of the engineer in charge of the work of the diversion at mile 13·7* should be submitted each month to the Deputy Minister of Railways, *for checking and for certification.*

Moved by Mr. W. Kitchen and seconded by Mr. C. Spencer that with reference to the question of overhaul, the engineer in charge of the work at diversion at mile 13·7 be instructed that the board cannot consider any other than the shortest haul or nearest way.

July 21, 1926.

Mr. D. McMILLAN,
    Engineer,
        Mile 13·7,
            Lillooet, B.C.

With reference to the question of overhaul, I am instructed to advise you that the board of directors cannot consider any other than the shortest haul or nearest way.

T. KILPATRICK,
General Manager.

September 10, 1926.

T. KILPATRICK, Esq.,
    General manager, P.G.E. Ry.,
        Vancouver Block.

Re contract overhaul.

Your engineer Mr. McMillan informs me he has instructions to the effect that overhaul on our contract at mile 13·7 Lillooet, is not to be

1929 CanLII 30 (SCC)

measured over the length of the dinky track but over a straight line from the point where the material originally lies to the fill.

You will recollect that when the writer was looking over the ground with yourself and others that I proposed the present method of doing the work and again on the day of signing the contract I was asked how I proposed to do the work, when I again proposed the present route for hauling as being the only feasible one. If it was the intention to allow overhaul by a direct line I should have been so advised at that time. I contend that the work cannot be effectively done by steam shovel in any other way and I am willing to submit the question to any practical two steam shovel men and abide by their decision.

For the above reasons I contend that overhaul must be allowed over the route the material has to be hauled and not over the direct line. If you decide otherwise, we may be compelled to close down the steam shovel part of the work. Please advise at your earliest convenience, and oblige,

GEORGIA CONSTRUCTION CO., LTD.<br>
Per T. R. Nickson.

September 14, 1926.

A letter was read from the Georgia Construction Company Limited protesting the decision of the directors that they could not consider any other than the shortest haul or nearest way and on motion, duly seconded, it was resolved that they be advised that we expect them to carry out the terms of their contract and that our interpretation of its conditions regarding overhaul is as previously advised.

September 15, 1926.

GEORGIA CONSTRUCTION Co., LTD.,
   Bank of Toronto Building,
      Vancouver, B.C.

I am in receipt of your letter of 10th inst. which was submitted to the board of directors at a meeting here yesterday and I am instructed to advise you that we expect you to carry out the terms of your contract and that our interpretation of its conditions regarding overhaul is as previously advised you by our Mr. D. McMillan, engineer in charge.

T. KILPATRICK,<br>
General Manager.

November 23, 1926.

Messrs. GEORGIA CONSTRUCTION Co., LTD.,
   Bank of Toronto Building,
      Vancouver, B.C.

I beg to advise you that your letter of 12th instant was submitted to the board of directors at a meeting here yesterday and I was instructed to advise you that the board can see no reason for changing the decision made, which was communicated to you, at their meeting on July 20, namely, that no other than the shortest haul or nearest way would be considered.

T. KILPATRICK,<br>
General Manager.

1929
GEORGIA
CONSTRUC-
TION Co.
*v.*
PACIFIC
GREAT
EASTERN
RY. Co.
———
Duff J.

1929 CanLII 30 (SCC)

SUPREME COURT OF CANADA [1929

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

These resolutions and communications all point to the conclusion at which the learned trial judge arrived and expressed in the sentence quoted above.

On behalf of the respondents, it was argued that the directors did nothing more than accept the decision of McMillan. The learned trial judge, while accepting McMillan's statement in his letter, as the expression of his own opinion, did not accept the view advanced by the respondents as to the conduct of the directors; it was his view that the directors had taken the matter into their own hands, and had issued instructions to McMillan as their own agent concerning the interpretation of the contract. The oral evidence adduced by the respondents in support of their allegations that the board had treated McMillan as an independent umpire and had deferred to his decisions as such, was not regarded by the trial judge as of sufficient weight to overbear the inferences arising from the tone and substance of the documents and from the undisputed facts.

I am not convinced that the learned trial judge was wrong; especially in view of the fact that neither Mr. Griffith, the Deputy Minister, who for nine months certified to the progress estimates, nor Mr. Rindal, who was appointed chief engineer, apparently in March, 1927, was called as a witness, although both of them must have had not a little knowledge of the relations between the board of directors and the company's engineers.

But the matter does not rest there. If McMillan had possessed power to certify under the contract, it is at least questionable whether he had not already disqualified himself, before the time came to grant a progress certificate, from passing upon the construction of the clause in question. At the trial he avowed without hesitation, that from the outset he had formed an opinion as to the effect of the clause, an opinion based upon his own experience, which had not, it appears, embraced a similar case, that is to say, any case in which compensation for a circuitous haul had been based upon the distance measured along the centre line of the railroad. This opinion was in accordance with the respondents' contention; he declared with emphasis that he had decided the question finally, without consulting other engineers, and that his mind was not open to influence from argument upon it.

The following is a passage from McMillan's evidence.

Q. Let me put it to you this way: You told me in discovery—I don't want to need to refer to it—that you had never known a case of this kind before?—A. Yes.

Q. And you also told me on discovery that so far as your experience was concerned you had never known a case where material was measured any other way than the way it was actually hauled?—A. Yes.

Q. Yes, so this was the first time in all your experience where you were confronted with the problem of saying whether you should measure overhaul in a way other than it was hauled?—A. Yes.

Q. Yes, and at that time you had read no authorities on it, had you? —A. Only in so far as I have followed the method used by the railway companies I was employed with.

Q. But that didn't deal with this special case. Don't nod your head? —A. No.

Q. So that you hadn't any experience then to help you on this special case, had you?—A. No.

Q. And you at that time had no opportunity, or took occasion to read any authorities to post yourself on the question?—A. No.

Q. Nor had you sought the advice of any independent engineer to advise you in it?—A. No.

Q. No. Well now, acting as a judge between the bodies, you would, at that time, with your limited experience, be quite open to receiving further information as authority, wouldn't you?—A. No, I didn't consider my experience limited.

Q. You did not; and yet you tell me that you never have had experience to meet the case?—A. No.

Q. And you say that your mind was so settled then that if authorities had been shown you dealing with such special case that you would not have given them consideration?—A. I didn't think authorities could be shown showing anything different.

Q. I see, so your mind was settled on this thing which you have never had any experience with right from the start, you hadn't an open mind to consider any authorities if they were suggested to you?—A. My mind was settled.

Q. Your mind was settled, you were not open to any argument on the matter?—A. No.

Q. So that if the Manual of Engineering had been produced and stated contrary, it would not have had any effect on you?—A. No.

Q. If authorities like Mr. Hazen of the Canadian National Railway had been quoted to you, or if you had seen him personally and he had told you that in his experience—that he had experience in special cases of this kind—that it should be paid for, that would have had no effect on you?—A. No.

Q. So that you are prepared to say that you had decided without authority and without seeing any?—A. No, I had the authority of my experience.

Q. Well, tell me any case in your experience that touched the case? —A. I had no experience that touched the case.

Q. No, so that the authority of your experience, being none, that was sufficient for your purpose?—A. The authorities of my experience taught me that in no other way was overhaul calculated.

1929

GEORGIA CONSTRUCTION CO.
v.
PACIFIC GREAT EASTERN RY. CO.

Duff J.

1929 CanLII 30 (SCC)

644                    SUPREME COURT OF CANADA                    [1929

1929 CanLII 30 (SCC)

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

———
Duff J.
———

There is high authority for the proposition that an engineer or architect, who has lapsed into that attitude of mind, is disqualified from acting as umpire under such a contract as this. (Per Lindley L.J. in *Jackson* v. *Barry Railway Co.* (1).)

At a later stage a chief engineer was appointed, Mr. Rindal, and the appellants having in April, 1927, requested that the points in difference should be submitted to arbitration, a report was made by him in which he expressed an opinion which accorded with that expressed by the board of directors in its instructions to McMillan. But the board of directors long before that had assumed the function of chief engineer; they had thereby placed themselves in a position in which they were precluded from insisting on the observance of the stipulations of the contract requiring a certificate by an engineer clothed with authority under the contract.

The last question to be dealt with is that which arises upon the respondents' allegation that it was quite practicable to make the cut through the bluff by proceeding from the southerly slope, and in such a manner that the material excavated could be hauled to the fill by the direct route, that is to say, along the centre line of the railway.

The evidence is overwhelming that Nickson, the manager of the appellants, proceeded with the cut under the belief that this course was not practicable, and that the only practicable method was that adopted by him. He says that before the execution of the contract, he informed Kilpatrick, the respondents' superintendent, of his plan, and Kilpatrick, although he says he cannot remember this communication, will not deny that it took place. It is admitted that at no time did McMillan or Kilpatrick or any other person on behalf of the respondents, suggest to the appellants that their method was an unnecessarily expensive one. Indeed, it is not open to dispute that according to the view of the officials of the respondents, the appellants were proceeding in a proper and workmanlike manner. A report by Mr. Griffith, the Deputy Minister and chief engineer of the respondents on the 23rd of July, 1927, contains this paragraph:

(1) (1893) 1 Ch. at 244 and 245.

In view of the knowledge we now have of the material in the bottom of the cut, we believe that the system chosen by the contractors of handling the work is the only way in which the contract could be completed anywhere near the time allotted for the work and there is no doubt that the material placed in the embankment has been placed there at a loss.

An objection was raised on the argument as to the admissibility of this report, which I shall discuss presently. In a practical sense this expression of opinion seems to be conclusive. Mr. Griffith, as already mentioned, had for nine months been responsible for progress certificates, and was no doubt fully acquainted with the work in every detail. It was the duty of the contractors to endeavour to complete the work within the time specified by the contract, and if in order to accomplish that object they adopted what they conceived to be the only practicable means of doing so, and if their view was based upon reasonable grounds and they acted in entire good faith, they are entitled to be paid for what they did according to the terms of the contract. This report seems to be conclusive upon the point that their plan was reasonable and that they were right in adopting it. Even if one were convinced by considerations *ex post facto,* that another course would have proved less expensive, that is not a ground for depriving them of the compensation, when it appears that the measures they adopted were reasonable and necessary not only in their own view, but in the view of the officials of the railway company as well.

As to the admissibility of the report. The document was tendered by Mr. Farris, and although no objection was taken to its admissibility, counsel for the respondents remarked that the letter was " without prejudice." The document was admitted and no exception to its admissibility was taken at any stage of the proceedings prior to the oral argument in this court. Obviously, counsel for the respondents was aware that the document could have been excluded if he had pressed an objection against it. And there appears to be not a little reason for thinking that he had his clients' interest in view in not doing so. I have already noticed the fact that the respondents called neither of the gentlemen who signed this report as a witness. Whatever be the explanation of that, no doubt the appellants had some good reason for not doing so. If the objection had been pressed, Mr. Farris would no doubt

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.

Duff J.

1929 CanLII 30 (SCC)

646                    SUPREME COURT OF CANADA                [1929

1929

GEORGIA
CONSTRUC-
TION CO.
*v.*
PACIFIC
GREAT
EASTERN
RY. CO.
___

Duff J.
___

have felt obliged to call them as witnesses himself, as counsel for the respondents must have realized. He seems to have elected deliberately not to press the obvious objection to the document. In these circumstances, the objection comes, I think, too late.

The appeal should be allowed and the judgment of the learned trial judge restored, with costs in all the courts.

*Appeal allowed with costs.*

Solicitors for the appellant: *Farris, Farris, Stultz & Sloan.*

Solicitors for the respondent: *Mayers, Locke, Lane & Thomson.*

TAB 62

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

1997 CarswellBC 2836
British Columbia Court of Appeal

Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C.
62, 164 W.A.C. 62, 49 B.C.L.R. (3d) 317, 76 A.C.W.S. (3d) 470

# Glaswegian Enterprises Inc., Plaintiff (Respondent) v.
# BC Tel Mobility Cellular Inc., Defendant (Appellant)

McEachern C.J.B.C., Lambert, Finch JJ.A.

Oral reasons: November 6, 1997
Docket: Vancouver CA022425

Proceedings: affirming (September 26, 1996), Doc. Vancouver C960162 (B.C.S.C.)

Counsel: *J.K. McEwan*, appearing for the Appellant.
*G.B. Gomery* and *S.R. Levine*, appearing for the Respondent.

Subject: Public; Contracts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Contracts --- Construction and interpretation — Intention of parties as expressed — General**

Plaintiff sold and leased cellular telephones — Parties entered into agreement whereby plaintiff earned commission for subscribers signed up for defendant's cellular telephone service — Commission was based on charges incurred by subscriber over five-year period — Commission arrangement survived expiration of agreement — Plaintiff sued for declaration that defendant was liable to pay commissions after expiration of agreement — Defendant interpreted contract as terminating obligation to pay commission once plaintiff stopped giving sales support — Action was allowed — Appeal was dismissed — Contractual term providing for commission arrangement was not ambiguous — Attributing defendant's meaning to contract terms would give rise to new agreement — Court cannot make new agreement — Plain meaning of contract terms was consistent with commercial reality and other clauses in contract.

**Table of Authorities**

**Cases considered by *Lambert J.A.*:**

*ACLI Ltd. v. Cominco Ltd./Cominco Ltée* (1985), 61 B.C.L.R. 177 (B.C. C.A.) — referred to

*Ahluwalia v. Richmond Cabs Ltd.* (1995), 13 B.C.L.R. (3d) 93, 42 C.P.C. (3d) 203, [1996] 1 W.W.R. 656, 63 B.C.A.C. 278, 104 W.A.C. 278 (B.C. C.A.) — referred to

*Black Swan Gold Mines Ltd. v. Goldbelt Resources Ltd.* (1996), 25 B.C.L.R. (3d) 285, 78 B.C.A.C. 193, 128 W.A.C. 193, [1997] 1 W.W.R. 605 (B.C. C.A.) — applied

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — referred to

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

APPEAL from judgment granting declaration that plaintuff was entitled to payment of commissions by defendant.

*Lambert J.A.* **(orally):**

1    This appeal is about the interpretation of a contract relating to the terms on which the plaintiff, Glaswegian Enterprises Inc., solicited and obtained customers for the cellular telephone service operated by the defendant, BC Tel Mobility Cellular Inc.

2    BC Tel Mobility Cellular is one of two licensed cellular phone operators in British Columbia. The other is Rogers Cantel Inc. They are hotly competitive with each other. Glaswegian is in the business of providing and servicing cellular telephones which are to be linked to one or other of the licensed cellular phone operators.

3    In 1988 Glaswegian began marketing the cellular telephone services of BC Tel Mobility as a non-exclusive dealer. It also marketed on behalf of Rogers Cantel. On 3 January 1989 the parties entered a written contract under which Glaswegian became an exclusive dealer for BC Tel Mobility, that is it would only offer a link up with BC Tel Mobility and not with Rogers Cantel.

4    For the first two years of the 1989 agreement Glaswegian was to receive a payment related to signing up new customers, a bonus or bonuses based on the number of subscribers signed up in a month over a certain number, and further commissions and bonuses if the subscriber continued for a second year. For the next three years of the 1989 agreement the structure changed to a smaller signing payment and a 10 percent commission on monthly charges for 60 months and five percent for a further 60 months after that.

5    The 1989 agreement was replaced in October 1990 by a somewhat different agreement for a five year period from 1 November 1990 to 31 October 1995. The 1990 agreement was amended in 1992 to increase the commission period from 36 months to 60 months. The compensation schedule thereafter read, in its applicable parts, for the rest of the term of the agreement in this way:

> a) In consideration of the AUTHORIZED REPRESENTATIVE acting as BCC's representative and performing all of the obligations of the AUTHORIZED REPRESENTATIVE under this Agreement, BCC shall pay to the AUTHORIZED REPRESENTATIVE, with respect to each new SUBSCRIBER who subscribes to the SERVICE through the AUTHORIZED REPRESENTATIVE:

> i) a one time fee of $200

> ii) a bonus of $25 if the number of six (6) month net new subscribers who have subscribed to the SERVICE through the AUTHORIZED REPRESENTATIVE, in the calendar month, exceeds a mutually agreeable number to be set annually

> iii) $25 per 36 month Preferred Pak or 36 months Equalizer sold by the AUTHORIZED REPRESENTATIVE

> iv) $25 per message centre sold by the AUTHORIZED REPRESENTATIVE

> v) a bonus of $25 if the net annual number of SUBSCRIBERS who have subscribed to the SERVICE through the AUTHORIZED REPRESENTATIVE exceeds a mutually agreeable figure to be set annually

> vi) a commission calculated as a percentage of the following monthly charges (excluding taxes) levied by BCC on the SUBSCRIBER with respect to the SERVICE:

> > monthly access charges

> > monthly usage charges

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-46   Filed 08/15/14   Page 90 of 310

Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc., 1997 CarswellBC 2836

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

b) The commission payable to the AUTHORIZED REPRESENTATIVE pursuant to paragraph (a) (vi) above shall, subject to the remaining provisions of this Schedule "A" be five percent (5%) for first sixty (60) months of service to the SUBSCRIBER.

. . . . .

i) BCC shall pay to the AUTHORIZED REPRESENTATIVE, twenty-five (25) business days subsequent to the end of each being period of the SERVICE, a commission as set out above. At the end of each year of the Agreement if the payments to BCC for that year differ from the charges levied for the SERVICE, a corresponding and appropriate adjustment will be made to the first commission payment of the next year of the Agreement

j) the case of termination of this Agreement, any final adjustment will be made subsequent to the end of the billing period which follows the last month on which any commissions would be normally payable to the AUTHORIZED REPRESENTATIVE.

. . . . .

(my emphasis)

**McEachern C.J.B.C.:**

24     I agree.

**Finch J.A.:**

25     I agree.

**McEachern C.J.B.C.:**

26     The appeal is dismissed.

*Appeal dismissed.*

### APPENDIX "A" — (Amended) Authorized Representative's Compensation

At this point I will also set out the first part of Schedule B to the 1989 agreement:

a) In consideration of the AUTHORIZED REPRESENTATIVE acting as BCC's representative and performing all of the obligations of the AUTHORIZED REPRESENTATIVE under this Agreement, BCC shall pay to the AUTHORIZED REPRESENTATIVE, with respect to each new SUBSCRIBER who subscribes to the SERVICE through the AUTHORIZED REPRESENTATIVE in either year three (3), four (4) or five (5) of this Agreement:

(i) $25 if the SUBSCRIBER underlines purchases a Message Centre and/or 36 Month Minute Package from the AUTHORIZED REPRESENTATIVE;

(my emphasis)

It is significant that much of the wording was incorporated from the 1989 agreement into the 1990 agreement as it was in existence in 1990 and as it was amended in 1992.

Before turning to the governing clause in this dispute it is important to understand that when Glaswegian signed up new customers the new customers entered into a BC Tel Mobility Cellular Standard Form Contract of adhesion. There was a usual 36 month term plan and that 36 month term was called the initial period. After the initial period the contract continued on a month to month basis.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.   3

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 91 of 310

Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc., 1997 CarswellBC 2836

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

The contract between Glaswegian and BC Tel Mobility ran its course and ended on 31 October 1995. The parties could not agree on a term of renewal and the contract terminated. That brought into effect Article IX, the relevant part of which reads in this way:

**Article IX - Results of Termination**

Upon termination or expiration of this Agreement:

a) commission arrangements will remain in effect for the SERVICE purchased by SUBSCRIBERS prior to such termination or expiration; ...

In interpreting both the compensation schedule and this contractual provision it is important to know that "service" is defined in the agreement. The definition reads like this:

**Article I - Definitions**

a) SERVICE - BCC's public mobile telephone service which provides to its SUBSCRIBERS cellular radiotelephone service by means of radio links in the frequency bands 835-845 and 880-890 MHZ.

After the termination Glaswegian started to enlist subscribers exclusively for Roger's Cantel. On 10 November 1995 it was sent a letter from BC Tel Mobility Cellular in these terms:

As Glaswegian now represents Cantel and your locations are actively competing with BC Tel Mobility for its customers, Glaswegian is neither performing nor able to perform its customer service obligations. Given this situation, residuals paid to compensate for such service are no longer payable to Glaswegian by BC Tel Mobility.

The reference in the letter is to Article III (e) of the 1990 contract as amended. The whole article provides the context for paragraph (e):

**Article III - The Authorized Representative's Obligations**

The AUTHORIZED REPRESENTATIVE shall:

a) maintain, at all times, at least one sales centre or authorized sales outlet with demonstration facilities and adequate stocks of the PRODUCTS and such other facilities as are necessary to maximize the <u>marketing and sale of the SERVICE</u> and the PRODUCTS;

b) maintain, at all times, at least one sales centre or authorized sales outlet with sales personnel, qualified and competent to provide SERVICE demonstrations, sales of the SERVICE and the PRODUCTS, CUSTOMER SERVICE for the PRODUCTS and hands-on training for the SUBSCRIBER in the use and benefits of the SERVICE;

c) accept responsibility for the quality of the sales and service staff and liability for any misrepresentation of the SERVICE;

d) commit the AUTHORIZED REPRESENTATIVE'S sales staff (including each DEALER'S sales staff, if any) for attendance at training seminars to be conducted by BCC from time to time;

e) provide <u>any necessary after-sales support</u> to the SUBSCRIBER and assist the SUBSCRIBER in the resolution of problems whether they are PRODUCT or SERVICE related and inform SUBSCRIBER that complaints relating to the PRODUCT or the SERVICE during the AUTHORIZED REPRESENTATIVE'S warranty period for the PRODUCT must be directed to the AUTHORIZED REPRESENTATIVE. The AUTHORIZED REPRESENTATIVE must first satisfy itself and, to the extent reasonably possible, the SUBSCRIBER that the SUBSCRIBER'S complaint does not involve the AUTHORIZED REPRESENTATIVE or the PRODUCTS before contacting BCC;

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 92 of 310

Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc., 1997 CarswellBC 2836

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

f) not bind BCC with respect to the SERVICE, but refer the SUBSCRIBER to BCC in order to enter into an agreement for the SERVICE. Any customer referred to BCC by the AUTHORIZED REPRESENTATIVE pursuant to the provisions of SCHEDULE "A" shall, for the purpose of Article V, be considered a SUBSCRIBER through the AUTHORIZED REPRESENTATIVE upon the sale of the SERVICE;

g) display BCC signage only and ensure the promotional material relating to the SERVICE is available to all potential SUBSCRIBERS;

h) advertise and promote the PRODUCTS and SERVICE and agree to allocate funds for the purpose of advertising and promoting on an annual basis as mutually agreed between BCC and the AUTHORIZED REPRESENTATIVE. BCC will provide advertising funds as detailed in Schedule "B".

(my emphasis)

I understand that BC Tel Mobility Cellular has now resiled from the position taken in the letter of 10 November 1995. Part of the reason for doing so may be that Article III, with its obligations on Glaswegian, does not survive the termination of the agreement, but that Article IX does, under the express terms of the survival clause.

Glaswegian's position on the interpretation of Article IX (a) is that it is entitled to commissions at the rate of five percent of the monthly access charges and monthly usage charges for 60 months following the date of signing of the subscriber and that such entitlement continues notwithstanding the termination of the agreement in the meantime.

BC Tel Mobility Cellular's position is that Article IX (a) only relates to the commissions at the rate of five percent on access charges and monthly charges incurred by the utilization of services by the customer before the Glaswegian contract terminated, but not billed to the customer until after the contract terminated.

The trial judge decided that the interpretation advanced by Glaswegian was the correct one. In the course of his reasons he said this:

9 The defendant says the meaning of the word service must be construed in the context of the "factual matrix" applying at the time the contract was executed. He argues that the original deal between the parties in the 1980s was that for each subscriber signed up by the plaintiff, the plaintiff would be paid a flat rate of $200.00. Subsequently, there were discussions which the defendant says were aimed at providing an incentive for the plaintiff to provide after sales support for customers. The theory was that if the plaintiff was paid over time on a percentage basis of access and usage fees rather than solely up front, it would have good reason to provide satisfactory service to customers. If it did not provide such support, they would cease to be subscribers and the plaintiff would cease to be paid its commission - or "residuals" as they are called in the contract.

10 The plaintiff argues the contract is clear and one does not have to go beyond it. But if one does, the plaintiff disputes the defendant's theory. It says there were advantages to the defendant paying over time rather than up front. And the "factual matrix", it points out, includes the fact that prior to the expiration of the contract the defendant proposed a renewal agreement including a new clause providing that it would not be obligated to pay ongoing commissions if the plaintiff failed to provide after sales customer support of cellular subscribers. This proposal was rejected by Glaswegian.

11 In any case, I am satisfied that it is not necessary to go into the factual matrix. The interpretation of contracts should rely upon such extrinsic evidence only if there is ambiguity. In my view the contract is clear. The defendant was to pay the plaintiff 5% of all earnings from access and usage fees for the first sixty months that each new customer "subscribes to the service" through the offices of the plaintiff. Service is defined expressly as "cellular radio telephone service by means of radio links" in specific frequency bands. This definition does not include after sales maintenance of the customer's equipment.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

12 The commission arrangement is said by the agreement itself to survive the expiry of the agreement. In the circumstances, I conclude that the construction of the contract argued by the plaintiff is the correct one.

13 The plaintiff seeks a declaration that the defendant remains liable to pay the commissions specified in Schedule "A." I am satisfied on the material before me that the declaration should be made.

(my emphasis)

I have underlined the first three sentences of paragraph 11 because they represent what BC Tel Mobility Cellular's counsel says is an error in the trial judgment. BC Tel Mobility says that the error entirely vitiates the trial judge's reasons.

I think that what the trial judge actually did was to interpret the agreement in the light of what has come to be called the "factual matrix". However, the trial judge did not state the law with complete clarity, perhaps through some confusion in argument about what indeed constitutes the "factual matrix". The factual matrix is the background of relevant facts that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement. It can throw light on what the parties must have meant by the words they chose to express their intention. In this respect it is much like trade usage and trade practice. If both parties were clearly using the language of the trade in their practice of the trade then evidence is always admissible to show the meaning of that language.

The relevance of the factual matrix in contract interpretation is established by, among other cases, *Prenn v. Simmonds*, [1971] 3 All E.R. 237 (U.K. H.L.); *ACLI Ltd. v. Cominco Ltd./Cominco Ltée* (1985), 61 B.C.L.R. 177 (B.C. C.A.) particularly at pp.180-181; and *Ahluwalia v. Richmond Cabs Ltd.* (1995), 13 B.C.L.R. (3d) 93 (B.C. C.A.). In addition to the relevant passages in those authorities I agree with the cautionary words of Mr. Justice Donald in *Black Swan Gold Mines Ltd. v. Goldbelt Resources Ltd.* (1996), 25 B.C.L.R. (3d) 285 (B.C. C.A.). In paragraph 19 at p.292, Mr. Justice Donald said this:

I am unable to give effect to Goldbelt's contention that the learned trial judge failed to take the relevant surrounding circumstances into account when interpreting this contract. In my respectful opinion, he properly kept the contextual facts in the background and the text of the agreement in the foreground as he examined the picture. The words of the contract must not be overwhelmed by a contextual analysis, otherwise there is little point in writing things down. No certainty could be achieved in choosing words to express a bargain. Contract disputes would have to be resolved by lengthy inquiries into what was fair in light of what happened before, during and after the making of a contract.

With respect I am content to adopt Mr. Justice Donald's statement. The factual matrix is the background which may deepen an understanding of what the parties meant by the language they used, but the Court cannot make a new agreement. Our search is always for the meaning intended by the parties as expressed in the agreement. I agree with the conclusion of the trial judge about the meaning of the relevant clauses. That meaning is the meaning most consistent with commercial reality and most consistent with the other clauses of the whole agreement. We are essentially being asked whether the word "purchased" in Article XI (a) refers to the totality of the whole service under the contract as contended by Glaswegian or to the services utilized each month by the subscriber as contended by BC Tel Mobility Cellular.

In my opinion, the correctness of the former meaning is revealed in the language in which the agreement was expressed. I particularly refer to the words "sale of the service" in Article III (a), to the words "after *sales* support to the subscriber" in Article III (e) and the words "upon *sale of the service*" in Artlcle III (f). I refer also to the words "if the subscriber *purchases message centre*" in Schedule B of the 1989 agreement.

I also think it is relevant that the reference to monthly access charges as well as to monthly usage charges, for the calculation of the commission, supports the view that Glaswegian's interpretation is more consistent with commercial reality.

For those reasons I would dismiss the appeal.

Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc., 1997 CarswellBC 2836

1997 CarswellBC 2836, [1997] B.C.J. No. 2946, 101 B.C.A.C. 62, 164 W.A.C. 62...

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 63

Greenberg v. Meffert, 1985 CarswellOnt 727

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 96 of 310

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

1985 CarswellOnt 727
Ontario Supreme Court, Court of Appeal

Greenberg v. Meffert

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31
A.C.W.S. (2d) 123, 37 R.P.R. 74, 50 O.R. (2d) 755, 7 C.C.E.L. 152, 9 O.A.C. 69

# GREENBERG v. MEFFERT et al.

Zuber, Morden and Robins JJ.A.

Heard: February 6, 1985
Judgment: May 16, 1985

Counsel: *Ronald Carr*, for appellant.
*Morley Wolfe, Q.C.*, for respondents Montreal Trust Company and Eric H. Meffert.
*Martin Kerbel, Q.C.*, for respondent Donato Melfi.

Subject: Contracts; Torts; Property; Employment

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Agency --- Real estate agents — Rights of agent — Commission — Commission of employees of agent**

Real estate agents — Contracts — Discretion — Real estate commission for listing payable to agent "at sole discretion" of employer in event sale completed after termination of employment — Discretion required to be exercised reasonably, honestly and in good faith.

The employment contract between the plaintiff salesman and the defendant real estate company provided that if the plaintiff's employment was terminated prior to the sale of a property, any commission otherwise payable for listing of that property was "at the sole discretion of the company". The plaintiff obtained a listing for the sale of a large property, and participated in negotiations for the sale. The sale was completed after the termination of the plaintiff's employment, to a purchaser found by M, another sales agent with the defendant company. M arranged to secretly split the listing agent's commission with the defendant company's office manager. The plaintiff's action for the listing commission against all of the defendants was dismissed at trial, and he appealed.

**Held:**

The appeal should be allowed.

The plaintiff's entitlement to a commission was conditional on his being an agent of the defendant company on the date the property was sold or listed, and "the sole discretion of the company" had to be exercised reasonably, honestly and in good faith to deprive a former salesman of a commission earned for a listing during his employment. The defendant company, not having shown any valid reason for denying the plaintiff his commission, is to be treated as having exercised its discretion favourably to the plaintiff.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    1

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

**Table of Authorities**

**Cases considered:**

Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 — *applied*

**Authorities considered:**

Corbin on Contracts (1960), Vol. 3A, ss. 644-648.

4 Hals. (4th ed.), p. 612, paras. 1198-99.

Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

Restatement, Contracts (2nd ed.), s. 228.

Williston on Contracts (3rd ed.), ss. 675A, 675B.

**Words and phrases considered:**

sole discretion

APPEAL from trial judgment dismissing plaintiff's claim for commission.

**The judgment of the Court was delivered by *Robins J.A.*:**

1     This appeal concerns the effect to be given to a clause in a contract of employment which grants a company "the sole discretion" to determine whether a salesman whose employment has been terminated shall receive commissions to which he would have been entitled had the employment relationship not been terminated.

2     The appellant is an experienced real estate salesman who initially became associated with the respondent Montreal Trust Company as the manager of its investment property office in Toronto. He had set up the office for the company and was paid a percentage of its profits together with any commissions he might earn as a salesman. In June 1980, the company instituted a new policy which required that all managers be salaried employees and not act as sales agents. This was not satisfactory to the appellant and it was agreed that he would relinquish his managerial position and continue with the company as a salesman.

3     The terms of his employment in this capacity are set forth in a "contract of employment" dated June 26, 1980. The contract stipulates the "commission split" between the company and the appellant and, among other things, provides that a company manual entitled "Terms of Relationship Between Montreal Trust Company and its Sales Agents" shall form part of the contract. The manual is some six pages in length but I shall make reference only to cl. 11 which is headed "Commissions & Listings" and is crucial to this appeal. It reads:

The sales agent is prohibited by law from taking any listings in his or her own name, and agrees that all listings shall be taken in the name of the company and turned over to the company within one day of receiving information. *In the event that a listing is sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.* It is further provided that the sales agent has no authority to change, alter, reduce or waive any commission earned by the company on transactions involving himself or herself, other sales agents or brokers, without the express consent of the company. The sales person is not entitled to any listing commission for a listing held in his or her possession or any listing that is given in conjunction with any offer.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

*It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.*

(Emphasis added.)

4    During the summer of 1980, the appellant on his own initiative sought and obtained a listing from Costain Limited, a major real estate corporation, for the sale of a very large residential complex in the City of Ottawa. This listing, while an open listing, was expressly found by the trial Judge to constitute "a listing" within the meaning and intent of cl. 11. The correctness of that finding, with which I respectfully agree, was not disputed in this appeal.

5    Having obtained the listing, the appellant then proceeded to inspect the property, to photograph it, to assemble the necessary financial data and other relevant information, and to prepare a brochure for presentation to prospective purchasers. In July, he procured an offer for $8.8 million which was accepted by Costain but was cancelled when certain conditions could not be satisfied. Shortly thereafter, the respondent Donato Melfi, another sales agent with Montreal Trust, found a purchaser who was interested in acquiring the property. Together with the appellant, he commenced negotiations which, as matters developed, extended over several months and followed a course not unusual in transactions of this magnitude. In January 1981, an agreement was finally reached and the property was sold by Costain to the purchaser introduced by Melfi for $9.1 million. As a result, the Montreal Trust Company received a commission of $175,000.

6    The company refused to pay the appellant any part of that commission, and as a result this action was instituted against it and the respondents Melfi and Eric Meffert, the latter being the manager of the company's office at the time. The appellant's claim against the company was based on its alleged breach of contract in not paying him the listing agent's commission or, alternatively, on the basis of quantum meruit; as against the other respondents, his claim was based on statements which allegedly constituted agreements requiring these respondents to pay the listing agent's commission or, alternatively, on the basis that they had themselves improperly received the listing agent's commission and on the doctrine of unjust enrichment were obliged to pay it to the appellant. The action was dismissed at trial against all respondents.

7    Had the appellant been in the employ of the company when the sale took place, he would unquestionably have been entitled to the listing agent's share of the commission. His employment relationship, however, was terminated during the currency of the negotiations. It appears that on September 18, 1980, apparently without prior notice, the company closed its investment property office and moved its sales personnel to a residential sales office at another location. This led to the resignation of a number of agents including the appellant. The facts surrounding the incident are of no consequence to this appeal save that the termination of the appellant's employment as of September 18, 1980, clearly brought into play cl. 11 of his contract. Thereafter, his entitlement to commission as the listing agent of the property in question became dependent on the provisions of that clause.

8    After leaving the company, the appellant, not surprisingly, became concerned about his potential commission. By then the negotiations were progressing favourably, and the prospect of a sale was good. Indeed, an agreement between Costain and Melfi's client was executed as early as October 27, 1980, but for reasons irrelevant to this appeal that agreement was later terminated. After further negotiations, the parties successfully concluded the agreement of January 1981, on the basis of which the transaction was closed.

9    Since I am of the opinion that the appellant's appeal must stand or fall on the basis of the written contract, I think it unnecessary to detail all that transpired between the date of termination of the appellant's relationship with the company and the date the commission was received by the company. It is, however, important to note that the appellant sought assurances that his commission as the listing agent would be protected. For this purpose he contacted both the respondent Melfi and the respondent Meffert. Meffert, as I have indicated, was the manager of the Montreal Trust office and admittedly was the person through whom the company acted throughout this matter. He was assured by Melfi that "whatever happens he [Melfi] would take care of me"; and, more important, was assured by Meffert, "Don't worry, the company won't screw you." The trial Judge found those statements to have been made, but concluded that they did not of themselves constitute promises of such a nature as to provide the basis for a cause of action.

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

10    Accepting that conclusion, it is nonetheless clear that the statements could not have been made honestly or in good faith. They no doubt were designed to forestall any action by the appellant that might interfere with the negotiations or the closing of the transaction. The fact is that these respondents had devised a scheme whereby they would divide the listing agent's commission between themselves and the appellant would receive no part of it. The trade record sheets of the company relating to the sale from the time of the incompleted October 27, 1980, agreement were drawn so as to show Melfi as both the "listing salesman" and the "selling salesman". These documents were prepared by Meffert and signed by Melfi both of whom were fully aware that the appellant, and not Melfi, was the listing salesman. According to the trade record sheet upon which the commission was divided, the $175,000 commission when received by the company was to be paid as follows:

Listing Salesman, Don Melfi ...... $57,625.00

Selling Salesman, Don Melfi ...... $65,625.00

Office, M.T.C. 1992 Yonge St. ...... $51,750.00

11    Meffert, as manager of the company, authorized payment accordingly and, as the evidence revealed, when Melfi received the listing and selling commissions he in turn paid Meffert $30,000. Since Meffert, as manager, held a salaried position and was not entitled to any commission, he was asked at trial to explain the basis upon which he received these moneys. He testified, as did Melfi, that the $30,000 payment represented, to the extent of $2,000, the repayment of a loan and, to the extent of $28,000, the payment of a "consulting fee". The so-called "consulting fee" was purportedly paid in consideration of Meffert's assistance to Melfi with respect to certain unnamed and incompleted transactions and was said to be entirely unrelated to the subject transaction. The trial Judge did not believe this. He characterized the payment of $28,000 as "a bribe" saying:

Meffert accepted a payment of $28,000.00 from Melfi which, in my opinion, amounted to a bribe to exercise his discretion and as such his company's discretion in favour of Melfi in so far as the selling [sic, listing] commission was concerned.

12    However, notwithstanding his view as to the patent impropriety of the respondents' conduct, the trial Judge went on to dismiss the appellant's claim insofar as it was based upon an alleged breach of the terms of the employment contract for the brief reasons set forth in the following paragraph of his judgment:

... I am prepared to accept that the obtaining of the information from Costain by Greenberg constituted a 'listing' within the provisions of the employment agreement. In my opinion, those parts of the employment agreement already quoted [cl. 11] can be read together. In order to be paid a commission the selling agent must have been employed by the company on the date the 'listing' was obtained but can only obtain payment 'at the sole discretion of the company'. Meffert may well have been bribed by Melfi to exercise the company's discretion in the way that it did but this exercise of discretion is not reviewable by a court as is the exercise of a discretion by some boards or tribunals.

13    With deference, I am unable to agree with that disposition of the case. The learned trial Judge's reference to the law relating to judicial review of the discretionary power of administrative tribunals is not apt. This is an action in contract. Whether a Court may interfere with the exercise of a discretion conferred by a contract depends upon the interpretation of the contract and the effect to be given its terms.

14    Clause 11, as I indicated earlier, is critical to the dispute in this case. The concluding paragraph of the clause, to repeat it, reads:

It is understood that all listings shall be the property of the company and that you shall be entitled to commission or other remuneration only if you are an agent of the company on the date the property is sold or listed.

15    Plainly, an agent's entitlement to commission is conditional upon his being an agent of the company on the date the property is either sold or listed. Here, the appellant was in fact an agent of the company on the date the property was listed and it follows, reading this part of cl. 11 alone, is entitled to the listing agent's share of the commission. Had he remained in the company's employ, he would without question have been entitled to the commission he earned by obtaining the listing. That

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Greenberg v. Meffert, 1985 CarswellOnt 727

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 100 of 310

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

entitlement, at least insofar as this provision is concerned, would be unaffected by the termination of his employment. On what basis then may he be deprived of his commission?

16    This brings into consideration the earlier provision of cl. 11 which deals specifically with a listing that is sold after a sales agent's employment is terminated. This provision, which must be read together with the concluding paragraph of cl. 11, states:

> In the event that a listing is sold after the sales agent's employment is terminated, any commission he or she receives will be at the sole discretion of the company, and the commission earned on the listing will be disbursed at the company's discretion.

17    From that, the company contends that the determination of whether a former sales agent is to be paid any commission on a listing is wholly within its discretion. That discretion, being a "sole discretion", may be exercised on the basis of purely personal or subjective considerations so that, the argument goes, if the company denies payment in circumstances which, viewed objectively, may appear unreasonable or even arbitrary, its decision is nonetheless not open to challenge. In short, the company's position is that a sales agent whose employment is terminated is not entitled to receive the commission earned on a listing if for any reason the company sees fit not to make the payment.

18    Notwithstanding the able argument of counsel for the company, that contention must fail. In my opinion, the company's discretion in this matter is not unbridled, firstly, because the nature of this contract and the subject matter of the discretion are such that the company's decision should be construed as being controlled by objective standards; and secondly, because the exercise of the discretion, whether measured by subjective or objective standards, is subject to a requirement of honesty and good faith.

19    Provisions in agreements making payment or performance subject to "the discretion", "the opinion" or "the satisfaction" of a party to the agreement or a third party, broadly speaking, fall into two general categories. In contracts in which the matter to be decided or approved is not readily susceptible of objective measurement — matters involving taste, sensibility, personal compatibility or judgment of the party for whose benefit the authority was given — such provisions are more likely construed as imposing only a subjective standard. On the other hand, in contracts relating to such matters as operative fitness, structural completion, mechanical utility or marketability, these provisions are generally construed as imposing an objective standard of reasonableness. See, generally, 4 Hals. (4th ed.), p. 612, paras. 1198-99; Corbin on Contracts (1960), Vol. 3A, ss. 644-648; Williston on Contracts (3rd ed.), ss. 675A and 675B; Hudson's Building and Engineering Contracts (10th ed., 1970), c. 7.

20    In any given transaction, the category into which such a provision falls will depend upon the intention of the parties as disclosed by their contract. In the absence of explicit language or a clear indication from the tenor of the contract or the nature of the subject matter, the tendency of the cases is to require the discretion or the dissatisfaction to be reasonable: Minster Trust Ltd. v. Traps Tractors Ltd., [1954] 1 W.L.R. 963, [1954] 3 All E.R. 136 at 145. This construction imposes the least hardship in that it produces a result that cannot be said to be unfair or unjust to either of the parties. Other things being equal, I think it preferable that provisions of this kind be construed as implying the less arbitrary standards of the objective test: Restatement, Contracts (2d), s. 228.

21    Returning to the instant case, it is significant that the clause in issue appears in a detailed manual defining the terms of the employment relationship which was prepared by the company and is weighted in its favour. Counsel concedes, and properly so, that any ambiguity or uncertainty in the clause should by the familiar rule of interpretation be construed most favourably to the appellant, and I approach the clause accordingly.

22    The subject matter of the discretion in this case is "the commission earned on the listing". It is significant that that commission was earned while the appellant was in the company's employ; the services rendered to earn the commission were fully performed before the employment was terminated; and, but for the termination, the appellant would have been entitled to the commission when the property was sold. Regardless of whether the agent remained with the company, the company profited from his performance when a sale of the listing was effected. In the context of this employment relationship, it is my view that

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

the sole discretion held by the employer ought not to be construed so as to authorize the employer to deprive a former salesman of commission earned through services performed during his employment without reasonable grounds for so doing.

23      Clause 11 makes it clear that all listings obtained by the agent become and remain the property of the company. On that understanding, as I view the clause, the company agrees to pay the agent his commission provided he is an agent on the date the property is either sold or listed. That promise is modified in the case of listings sold after the agent's employment is terminated; in that event the commission will be payable at the discretion of the company. To construe the discretionary power as the company urges it should be construed, the clause would mean no more than "We will pay you your commission only if we feel like it." That construction renders the clause meaningless, indeed, illusory.

24      A sales agent signing this contract has the right to expect that he will be dealt with fairly. Termination of employment does not automatically eliminate his entitlement to commission, call for the imposition of a penalty, or relieve the company of all obligation towards him. The clause does not so provide; quite to the contrary, its presence serves to assure the agent that notwithstanding termination, the company will make a discretionary decision with respect to the commission earned on the listing. If this provision is to have purpose and substance, the discretion must be exercised in a reasonable way, not arbitrarily or capriciously but for good reason. Simple fairness dictates that construction, and particularly so where the exercise of the discretion can result in a windfall to the company. It can keep for itself a commission which but for the termination it would not have obtained, while the agent whose listing led to the sale receives nothing. In this employment relationship, based as it is upon a splitting of commissions, I think it only fair and just, and not too onerous, to require the employer company to show that in the circumstances relevant to the transaction its decision was not unreasonable.

25      Manifestly, in this case the exercise of the discretion was not based on reasoned considerations. Meffert admittedly represented the company in this matter. He, in collusion with Melfi, directed payment of the listing agent's commission to Melfi so that the commission could be divided between them. This kick-back arrangement, or bribe as the trial Judge termed it, obviously formed the basis of the purported exercise of discretion on the company's behalf. The company, it is to be noted, did not seek to disassociate itself from the individual respondents but throughout these proceedings has sought to justify their conduct. Its failure to recognize any contractual responsibility to act fairly or reasonably towards the appellant in the exercise of its discretionary power is evidenced by the testimony at trial of its Ontario manager, who indicated that the company had no interest in the arrangements between Melfi and Meffert. "What Mr. Melfi does with his share of the commission", he said, "is Mr. Melfi's business and that has nothing to do with the company."

26      Apart altogether from the question of reasonableness, a discretion must be exercised honestly and in good faith. That proposition is so fundamental as to require no elaboration. The collusive conduct here clearly deprived the discretion of those qualities and contaminated the decisional process. That patently improper conduct vitiated not only the reasonableness required in the objective criteria but the good faith and honesty required whether the discretion is objective or subjective. In either case the decision to deprive the appellant of any commission was not made honestly and in good faith and cannot stand. Fair dealing is implicit in the contract. The clause in issue, in my opinion, ought not to be construed so as to shield the company's improper exercise of discretion from any review.

27      In light of the unjustifiable basis upon which the company purported to discharge its contractual obligation and in the absence of any valid reason for denying the appellant his commission, the matter must now be dealt with by treating the discretion as having been exercised favourably to the appellant. It follows that the appellant is entitled to the commission earned on the listing. The company, it might be added, has made no claim over against the individual respondents and has not sought to compel them to disgorge this commission. Having reached this conclusion I need not consider the appellant's alternate claim against the company, nor need I consider his claims against the individual respondents to which I referred earlier and which, as framed, were correctly dismissed by the learned trial Judge.

28      In the result, I would allow the appeal and award the appellant judgment against Montreal Trust Company in the amount of $57,625 together with the costs of the appeal and the trial. The appellant is entitled also to prejudgment interest, the calculation of which I would leave to counsel. If they are unable to agree, they may make written submissions to the Court. The appeal against the respondents Meffert and Melfi is dismissed but, in the circumstances, without costs.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Greenberg v. Meffert, 1985 CarswellOnt 727

1985 CarswellOnt 727, [1985] O.J. No. 2539, 18 D.L.R. (4th) 548, 31 A.C.W.S. (2d) 123...

*Appeal allowed.*

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 64

2011 WL 2682898
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

GRT, INC., a Delaware corporation, Plaintiff,
v.
MARATHON GTF TECHNOLOGY, LTD.,
a Delaware corporation, and Marathon Oil
Company, an Ohio corporation, Defendants.

Civil Action No. 5571–CS.    |    Submitted:
April 19, 2011.    |    Decided: July 11, 2011.

**Attorneys and Law Firms**

Arthur L. Dent, Esquire, Ryan T. Costa, Esquire, Potter
Anderson & Corroon LLP, Wilmington, Delaware; Jeffrey
T. Thomas, Esquire, Linda D. Lam, Esquire, Gibson Dunn
& Crutcher LLP, Esquire, Irvine, California, Attorneys for
Plaintiff GRT, Inc.

Kenneth J. Nachbar, Esquire, Megan Ward Cascio, Esquire,
Jay N. Moffitt, Esquire, Morris, Nichols, Arsht & Tunnell
LLP, Wilmington, Delaware; Bill Kroger, Esquire, Denmon
Sigler, Esquire, Baker Botts L.L.P., Houston, Texas; Michael
J. Barta, Esquire, Michael Calhoon, Esquire, Jeremy I.
Levin, Esquire, Baker Botts L.L.P., Washington, District
of Columbia, Attorneys for Defendants Marathon GTF
Technology, Ltd. and Marathon Oil Company.

Opinion

## OPINION

STRINE, Chancellor.

### I. *Introduction*

**\*1** The plaintiff and the defendant are both corporations
in the nascent business of developing and commercializing
methods to convert comparatively "abundan[t]" natural gas
into liquid transportation fuels such as gasoline. [1] The
plaintiff, as an investor, and the defendant, as a facilities
operator, formed a joint venture in which the operator, in
exchange for favorably priced access to some of the investor's

intellectual property, agreed to build a highly experimental
testing facility to enable the investor to conduct research on
some of its new technologies that would be useful to the
parties' shared business goals.

In the joint venture contract, the operator made a series of
representations that the facility was reasonably designed to
achieve certain objectives (the "Design Representations")
because the facility was experimental and not expected to
be complete until several months after the contract's closing
date. And, because the testing facility involved the operator's
proprietary information, the investor was not permitted access
to the facility or other pre-closing due diligence regarding
the facility's design. Instead, the investor was allowed,
after closing, to inspect the facility to make sure that the
facility was designed as the operator had represented in
the Design Representations. And, in order to give teeth to
the investor's post-closing inspection, the operator agreed
to a "Survival Clause" which provided that the Design
Representations would survive for a period of one year after
the closing (the "Survival Period"). When the Survival Period
expired, however, the contract made plain that the operator's
Design Representations, *as well as the contractually provided
remedies for their breach,* would terminate.

In the event that the investor proved that the operator breached
its representations about the facility's design, i.e., the Design
Representations, the contract provided that the operator
would have to modify the facility's design in order to make
the Design Representations true in all material respects. The
contract further provided that in the event that the operator
failed to remedy the breach in that manner, the investor could
sue the operator for a second breach of contract, and seek
specific performance.

The contract's closing date was July 18, 2008, at which point
the investor was granted access to the facility. The investor
filed this suit on June 16, 2010 claiming in Count I of its
complaint that the operator breached its contractual obligation
to remedy alleged breaches of its Design Representations that
the operator knew about because the investor "raised multiple
issues" about the facility's design with the operator within
months after closing. [2] In response, the operator has moved to
dismiss the investor's breach of contract claim on the ground
that it is time-barred by the contract's Survival Clause that
limits the survival of its Design Representations, as well as
the remedy for their breach, to the one-year Survival Period.
Thus, the operator's motion to dismiss raises a straightforward
question of contract interpretation: what does it mean when a

contract expressly provides that representations will survive for one year after closing but thereafter will terminate, together with the sole contractually provided remedy for their breach?

**\*2** According to the operator, because its Design Representations, as well as the contractual remedy for any breach thereof—the sole remedy—expired at the end of the Survival Period in July 2009, the contract plainly shortened the three-year statute of limitations applicable to breach of contract claims to one year. The investor responds in two ways. First, on the basis of case law from outside of Delaware, the investor says that the Survival Clause should not be read as shortening the time period in which a claim for breach must be brought, but instead only as shortening the period of time in which a breach may occur subject to the ordinarily applicable three-year statute of limitations. Second, the investor insists that it is not suing for a breach of the operator's Design Representations, representations it admits expired before it filed this suit, but is instead suing for a breach of the operator's remedial obligations that were triggered when, during the one-year Survival Period, the investor "informed" the operator that the testing facility's design was not as represented. [3]

In this opinion, I reject the investor's argument. The contract unambiguously sets forth a three-step liability scheme, the first of which requires that the investor sue and prove a breach of the operator's Design Representations. That first step is essential and cannot be skipped. The operator's contractual obligation to remedy the identified breach of its Design Representations is only triggered by a determination of breach. This makes practical sense because by proving that the operator breached its Design Representations, the investor establishes the "gap" between the operator's Design Representations and the facility's actual design. That gap is critical because it shapes the remedial plan the operator must implement at the court's direction, which is a plan that requires the operator to modify the facility's design to close the gap between what was represented, and the reality of the facility's actual design. If, after the investor has proven that the operator has breached its Design Representations (step one), the operator's contractual remedial obligation to close the design gap is triggered (step two), but the operator then fails to comply with a court's remedial order, step three of the contract's liability scheme is traversed, at which point the investor can sue the operator for a second breach of contract and seek an order of specific performance.

Although the investor admits that basic three-step scheme, its arguments against dismissal require accepting that the Survival Clause limits not the time in which an action for breach of the Design Representations must be filed (step one), but instead only limits the time in which a breach may occur. But that is not a reasonable reading of the contract's Survival Clause.

By its plain terms, the Survival Clause expressly says that the sole remedy for a breach of the Design Representations terminates along with the Design Representations themselves. Not only that, in contrast to the Design Representations that survive only for the one-year Survival Period, the contract provides that certain other representations and warranties survive indefinitely, and that still others survive until the applicable statutes of limitations expire. This makes clear that any claim for breach of the Design Representations had to be brought before the Survival Period expired.

**\*3** The investor attempts to undercut this reading, and to broaden the lens through which the court looks at the Survival Clause, by pointing to case law outside of Delaware that requires "clear and explicit" language for a court to conclude that a contract shortened the statute of limitations. [4] This line of argument is unconvincing for several reasons. For starters, even if the law of other states requiring "clear and explicit" language to contractually shorten the statute of limitations for breach of contract claims was applicable, [5] which it is not, the Survival Clause likely would meet that standard because, among other reasons, the Survival Clause expressly says that any remedy for a breach of the operator's Design Representations terminates along with the Design Representations themselves.

As important, unlike the law in some other jurisdictions, Delaware law does not have any bias against contractual clauses that shorten statutes of limitations because they do not violate the legislatively established statute of limitations, there are sound business reasons for such clauses, and our case law has long upheld such clauses as a proper exercise of the freedom of contract. [6] Consistent with that, prior case law in Delaware has read survival clauses like the one in this case as acting to shorten the statute of limitations and require that suit be brought before the relevant survival period expires. [7] That case law is also consistent with the treatise that most thoroughly addresses mergers and acquisitions agreements, generally, and the use of survival clauses in transactional

contracts more particularly. That treatise concludes that "[t]he survival period is, in effect, a contractual statute of limitations." [8]

Likewise, reading the Survival Clause as the investor wishes would result in the investor having up to four years after the contract closed to bring a suit, a result which clashes with the contractual text addressing other categories of representations and warranties, and does not seem plausible given the subject matter addressed by the Design Representations—the construction of a state of the art research facility, the very purpose for which could be thwarted by protracted proceedings for specific performance resulting from a lawsuit that, in the investor's view, could be filed up to four years after closing.

In sum, I conclude that the Survival Clause unambiguously establishes a one-year limitations period for filing claims alleging a breach of the Design Representations. Because the investor did not file its complaint until after that period expired, the investor's breach of contract claim in Count I based on the operator's alleged breach of its Design Representations is time-barred and dismissed.

## II. *Factual Background*

The standard of review applicable to a motion to dismiss brought under Court of Chancery Rule 12(b)(6) is well known, and applies when the motion is grounded, as is the case here, on an argument that the plaintiff's suit is untimely. [9] Under that standard, I am required to accept as true all well-pled factual allegations in the complaint as well as to draw all reasonable factual inferences in the plaintiff's favor. [10] In accordance with that standard, the following facts are drawn from the verified amended complaint and its attachments.

### A. *The Parties Enter Into A Contract Containing Design Representations That Would Survive For One Year From The Date Of The Contract's Closing*

**\*4** The plaintiff investor is GRT, Inc., a closely held Delaware corporation that develops and markets transformational gas to liquid fuels technology for eventual use in the production of transportation fuels such as automobile gasoline. [11] The defendant operator is Marathon GTF Technology, LTD, also a Delaware corporation engaged

in the experimental field of developing gas to liquid fuels technology. [12]

On July 18, 2008, after months of negotiation, GRT and Marathon entered into a series of contracts in order to form a joint venture, the purpose of which was to "cooperate on the advancement of technology for the conversion of natural gas into transportation fuels." [13] In broad strokes, those agreements provide that in exchange for licenses to use some of GRT's intellectual property, Marathon would grant GRT access to Marathon's "Pilot Unit," a small scale research unit, and more important for present purposes, to Marathon's "Demonstration Facility," a larger-scale testing facility that at the time of the agreements' execution and closing, was designed but still under construction. Because the construction and design of both facilities involved Marathon's proprietary information, GRT was not granted access to either facility during the time the contracts were negotiated and their terms finalized. In other words, GRT was unable to conduct pre-closing due diligence on the Demonstration Facility. [14]

Instead, in a contract known as the Securities Purchase Agreement (the "Purchase Agreement"), [15] Marathon made a series of representations about the Demonstration Facility's pre-existing design (i.e., the Design Representations) that expressly survived that agreement's closing—July 18, 2008—solely for a period of one year (i.e., the Survival Period). To give GRT a chance to determine for itself if the Demonstration Facility was in fact designed in accordance with Marathon's Design Representations, the Purchase Agreement granted GRT access to the Demonstration Facility after the Purchase Agreement's closing, at which point GRT could inspect the Demonstration Facility's design. [16] If GRT proved that Marathon breached any of its Design Representations, the Purchase Agreement required Marathon to remedy those breaches by undertaking, at its sole expense, the necessary modifications to the Demonstration Facility's design in order to make the Design Representations true in all material respects. [17] But, the lifespan of that remedy expressly terminated along with the Design Representations at the end of the Survival Period. [18]

### B. *GRT "Informed" Marathon That The Demonstration Facility Did Not Meet The Design Representations During*

*The Survival Period But Did Not Sue For Breach Of The Design Representations During The Survival Period*

Beginning on October 8, 2008, and continuing through April 9, 2009, GRT allegedly notified Marathon that the Demonstration Facility's design failed to meet the Design Representations.

**\*5** Specifically, GRT alleges that it "raised multiple issues" [19] with Marathon regarding the Design Representations and "informed" Marathon that it believed there were deficiencies in the Demonstration Facility's design. [20] Although GRT's complaint describes the Design Representations as hard and fast promises about the Demonstration Facility's ultimate physical specifications and technical capabilities such that anything short of measurable success constituted a breach, the Design Representations are couched in terms of the Facility's *design* and hoped-for outcomes on the basis of that design. [21] For instance, GRT alleges in its complaint that "[o]n April 9, 2009, GRT informed Marathon [ ] that the Demonstration Facility was unable to demonstrate a commercial scaleup process, as represented and warranted by Marathon [ ] under Section 4.6(b)(i)(C)." [22] But § 4.6(b)(i)(C) provides only that "[The Demonstration Facility] *[h]as been designed to* be of adequate size to provide data which is useful in the scaleup of a fixed bed vapor phase process to commercial scale applications...." [23]

In any event, GRT alleges that despite repeatedly "informing" Marathon about these purported "design" shortfalls during the Survival Period, Marathon failed to make any modifications to the design or construction of the Demonstration Facility, as GRT claims Marathon was obligated to do under the Purchase Agreement upon the breach of the Design Representations. [24] GRT further alleges that it even offered several proposed design modifications it believed would remedy the perceived flaws, and that Marathon agreed to test some of these proposed modifications in the smaller-scale Pilot Unit, but ultimately refused to do anything similar at the Demonstration Facility. [25]

But, despite its alleged serial communications to Marathon in which GRT expressed its opinion that the Demonstration Facility was not built in accordance with the Design Representations, GRT did not file suit against Marathon for breach of the Design Representations during the Survival Period, and further does not plead that Marathon, during the Survival Period, conceded that it breached any of the Design Representations.

Instead of filing suit against Marathon for breach of the Design Representations, GRT filed this action on June 16, 2010, nearly one year after the expiration of the Survival Period. Count I of the complaint's two counts is the only one subject to Marathon's motion to dismiss.

### III. *Analysis*

The primary issue raised by Marathon's motion to dismiss is whether GRT had to bring its claim in Count I within the one-year Survival Period, as Marathon contends, or whether GRT could, as it asserts, sue and prove a breach of the Design Representations at any time up to three years after the end of the Survival Period. In other words, the key question that I must answer is whether the Survival Clause acted to shorten the statute of limitations during which GRT could sue for a breach of the Design Representations. This is a question that may be resolved on a motion to dismiss if the relevant terms of the Purchase Agreement are unambiguous, and together with "the facts pled in the complaint, ... demonstrate that the claim[ ][is] untimely." [26]

**\*6** In Delaware, the default statute of limitations applicable to claims based on contract, including breach of contract, is three years. [27] The three-year period typically begins to run when the contract is breached, whether or not the plaintiff was aware of such breach. [28] Because representations and warranties about facts pre-existing, or contemporaneous with, a contract's closing are to be true and accurate when made, a breach occurs on the date of the contract's closing and hence the cause of action accrues on that date. [29]

Under Delaware law, however, parties to a contract are entitled to shorten the period of time in which a claim for breach may be brought, i.e., the statute of limitations, so long as the agreed upon time period is a reasonable one. [30] Shortening statutes of limitations, as opposed to lengthening them, does not conflict with the legislatively determined limitations period and, in fact, has been seen as being harmonious with the public policy purposes served by statutes of limitations in general. [31] As a venerable Delaware decision observed over a century and a half ago,

[S]tatutes of limitation are founded in wisdom and sound policy. They have been termed statutes of repose, and are regarded as highly beneficial. They proceed on the principle, that it is to the interest of the public to discourage the litigation of old or stale demands; and are designed ... to afford a security against the prosecution of the claims where, from lapse of time, the circumstances showing the true nature or state of the transaction, may have been forgotten; or may be incapable of explanation by reason of the uncertainty of human testimony, the death or removal of witnesses, or the loss of receipts, vouchers, or other papers. [32]

But, of course, the reality that parties to a contract may shorten the statute of limitations does not mean that they did, or did so unambiguously. To address that question, I also apply settled principles of Delaware law. These require that unambiguous contractual language be given "its ordinary and usual meaning." [33] And, because questions of contract interpretation are to be determined objectively, "the true test," it has been stated, is "what a reasonable person in the position of the parties would have thought it meant." [34]

To apply these principles in addressing the merits of Marathon's motion to dismiss, I first identify the key provisions of the Purchase Agreement that bear on the timeliness of GRT's claims in Count I and then summarize the parties' contending positions on what effect those provisions have on the timeliness of Count I.

### A. GRT's Breach Of Contract Claim In Count I Is Time–Barred

#### 1. The Relevant Provisions Of The Purchase Agreement

Section 4.6(b)(i) of the Purchase Agreement sets forth the Design Representations made by Marathon. As noted above, [35] the Design Representations are couched in terms of what the Demonstration Facility has been designed to be and do, not in terms of mandatory physical specifications. [36]

**\*7** Section 7.4(b)(ii) provides GRT with a remedy, the "sole and exclusive remed[y]," [37] should it turn out that after the Purchase Agreement's closing, GRT discovered that Marathon had breached its Design Representations made in § 4.6(b)(i):

In the event of a breach of any of [Marathon's] [Design] [R]epresentations in Section 4.6(b)(i), [Marathon] will, at its sole cost and expense and as promptly as reasonably practicable, make modifications to the design of the Demonstration Facility in order to make the [Design] [R]epresentations in Section 4.6[ (b)(i) ] true and correct in all material respects. If the design is modified pursuant hereto, then [Marathon] shall complete construction of or make modification (if any) to the Demonstration Facility in order to cause the Demonstration Facility to be constructed in accordance with the design as modified. Promptly following the occurrence of any such breach, [Marathon] shall deliver to [GRT] a work plan and proposed schedule for remedying such breach, and thereafter shall keep [GRT] informed at reasonable periodic intervals regarding progress toward remedying such breach. [38]

And, Marathon further promised in § 7.5 that in the event that it breached the Design Representations, [39] and thereafter failed to undertake its remedial obligations in § 7.4, GRT could sue to enforce those obligations and Marathon would not plead in defense that GRT had an adequate remedy at law. [40] In other words, GRT could, upon a breach of § 7.4(b)(ii), seek specific performance.

But, the parties also contractually limited the survival of the Design Representations and Marathon's related promise in § 7.4 to remedy any breach thereof by undertaking the necessary design modifications. Specifically, the parties agreed in § 7.1 of the Purchase Agreement, the Survival Clause, that Marathon's Design Representations, and the associated remedy for their breach provided for in § 7.4, would only survive for a period of one year after the closing of the Purchase Agreement (i.e., the Survival Period):

The representations and warranties of the Parties contained in Sections 3. 1, 3.3, 3.6, 4.1 and 4.2 shall survive the Closing indefinitely, together with any associated right of indemnification pursuant to Section 7.2 or 7.3. The representations and warranties of [GRT] contained in Section 3.16 shall survive until the expiration of the applicable statutes of limitations ..., and will thereafter terminate, together with any associated right of indemnification

pursuant to Section 7.3. *All other representations and warranties in Sections 3 and 4 will survive for twelve (12) months after the Closing Date, and will thereafter terminate, together with any associated right of indemnification pursuant to Section 7.2 or 7.3 or the remedies provided pursuant to Section 7.4.* [41]

### 2. *The Parties' Conflicting Arguments Regarding The Timeliness Of GRT's Breach Of Contract Claim In Count I*

**\*8** In support of its motion to dismiss, Marathon argues on the basis of the Purchase Agreement's clear language, that it has no remedial obligations under § 7.4 to modify the design of the Demonstration Facility unless and until it has first been proven that Marathon in fact breached the Design Representations. And, even though GRT contends that Count I asserts a claim not for a breach of the Design Representations, but instead for a breach of Marathon's remedial obligations under § 7.4 such that any shortened statute of limitations does not apply to that claim, Marathon responds by arguing that GRT is skipping an essential step by bypassing the liability determination that is a necessary predicate to any right to a remedy under § 7.4. Moreover, to the extent that GRT seeks to prove a breach of the Design Representations in this action, it is too late because the Survival Period, which under Marathon's reading is a contractual statute of limitations, expired before GRT filed its complaint. [42]

In that regard, Marathon contends that the Survival Clause shortened the statute of limitations for breach of contract claims grounded on the Design Representations to one year. By stating that the Design Representations and the "sole and exclusive" remedy for their breach survive the closing for the one-year Survival Period and thereafter terminate, the Survival Clause, says Marathon, unambiguously imposed an obligation on GRT to bring suit during the Survival Period and not after. Marathon says that its reading is the only reasonable one in view of the structure of the entire Survival Clause, which, in contrast to the Design Representations that were to survive for one year, provides that some representations would live indefinitely and some would survive for the applicable statute of limitations

period. Furthermore, says Marathon, prior Delaware cases interpreting similar contractual provisions support this as the only fair reading. [43]

GRT responds to Marathon's argument by offering several of its own. First and foremost, GRT argues by citation to cases outside of Delaware, that although parties may contractually shorten the otherwise applicable statute of limitations for breach of contract actions, in order for parties to do so successfully, they must use language that clearly and unequivocally evidences an intent to do so . [44] Because in GRT's view, the Survival Clause does not say anything, at least expressly, about when a claim or action for breach of the Design Representations must be brought, GRT argues that its claim in Count I is subject to the ordinarily applicable three-year statute of limitations for breach of contract claims.

Similarly, GRT argues that if a breach of the Design Representations occurs during the Survival Period, as opposed to after, GRT is entitled to sue Marathon for breach of contract just as any plaintiff could do, subject to the ordinarily applicable three-year statute of limitations. In other words, GRT argues that the Survival Clause limits only the time in which a breach of the Design Representations can occur, not when a suit can be brought to remedy a breach.

**\*9** In that vein, GRT posits that once GRT notifies Marathon of a "breach" of the Design Representations during the Survival Period, Marathon's obligation under § 7.4 to remedy that breach is "trigger[ed]." [45] "Only after [Marathon] [is] given an opportunity to modify the [Demonstration] Facility to bring it into conformance, and [Marathon] then fail[s] to do so ... can GRT sue to enforce the contract." [46] Under Marathon's proposed interpretation of the Survival Clause, argues GRT, GRT could notify Marathon of a breach within the Survival Period, Marathon could then promise to undertake the necessary design modifications as it is then, at least in GRT's view, contractually obligated to do under § 7.4, but then on the first day of the thirteenth month after the Purchase Agreement's closing, Marathon could walk away from the job, leaving GRT with a defective Demonstration Facility. "Indeed," argues GRT, "the whole purpose of Section 7.4 is to allow [Marathon] to fix [its] mistakes before the parties head to court, a purpose that would be thwarted by [Marathon's] interpretation." [47]

Alternatively, argues GRT, even if the Design Representations expired after the Survival Period, and as a

result, the right to sue for their breach, Marathon's motion to dismiss mischaracterizes its complaint. That is, GRT emphasizes the fact that it is not directly suing Marathon in Count I for a breach of the Design Representations. Rather, GRT alleges in Count I that Marathon breached § 7.4 when Marathon, despite having been "informed" of alleged breaches of the Design Representations, failed to remedy those breaches in accordance with its remedial obligations under § 7.4.

Finally, GRT argues that even if GRT's interpretation of the Purchase Agreement is not the only reasonable one, a finding of ambiguity requires the denial of Marathon's motion to dismiss.

### 3. *The Purchase Agreement Unambiguously Requires GRT To Sue And Prove A Breach Of The Design Representations Before Marathon Has A Contractual Obligation To Modify The Demonstration Facility's Design*

As an initial matter, I reject GRT's argument that the Survival Clause, which limits the survival of the Design Representations, has no effect on the timeliness of its breach of contract claim in Count I because that claim is, at least on its face, only a claim that Marathon breached § 7.4 of the Purchase Agreement.

Together, § 4.6(b)(i) (the Design Representations), § 7.1 (the Survival Clause), and § 7.5 create what can be best described as a three-step liability scheme for GRT to follow in order to hold Marathon to task on its Design Representations post-closing. Step one requires GRT to sue Marathon for breach of the Design Representations. To succeed, GRT must show that the Demonstration Facility's design does not meet the Design Representations. GRT's successful prosecution of such a claim is necessary to both trigger, and shape, the contractual remedy in § 7.4 (step two), which requires Marathon, upon a "breach" of the Design Representations, to close the gap (by making modifications to the design) between what it represented to GRT as the Demonstration Facility's design, and the actual design of the Demonstration Facility discovered by GRT when it was granted post-closing access to the Facility. Finally, if GRT sues Marathon for breach of its Design Representations successfully (step one), and thus obtains a remedial order obligating Marathon to modify the Demonstration Facility's design to the extent GRT has proven it falls short of the Design Representations (step

two), but Marathon fails to modify the Facility's design in a way that makes the Design Representations true "in all material respects," [48] then GRT can sue Marathon for a second breach of contract (based on Marathon's breach of its remedial obligations in § 7.4) and seek an order of specific performance under § 7.5 (step three).

**\*10** Importantly, a court cannot order a remedy under § 7.4 (step two) before GRT proves that Marathon breached the Design Representations by showing a material gap between the Design Representations and the Demonstration Facility's actual design (step one). Thus, this lawsuit represents an attempt by GRT to skip essential steps in the three-step liability scheme codified in the Purchase Agreement. That is, GRT seeks to sue Marathon for a breach of its remedial obligations under § 7.4 (step three) before GRT has proven that Marathon has breached the Design Representations (step one) and was therefore obligated, under § 7.4, to undertake remedial measures with respect to the Demonstration Facility's design (step two).

Counsel for GRT admitted at oral argument that in order to trigger Marathon's contractual obligation under § 7.4 to modify the Demonstration Facility's design, it must also prove that Marathon breached its Design Representations. [49] Because the Design Representations survive for a period of one year from the date of closing, and thereafter terminate, along with the remedy for their breach spelled out in § 7.4, the only remaining question I must answer is when an action for breach of the Design Representations must be brought. Unless GRT has brought suit within the time permitted to sue for a breach of the Design Representations, its claim in Count I must be dismissed as time-barred.

### 4. *The Purchase Agreement Shortened The Statute Of Limitations Applicable To GRT's Breach Of Contract Claim In Count I*

Having determined that Count I must be dismissed unless it asserts a timely claim for breach of the Design Representations, I now explain why any claim for a breach of the Design Representations had to have been filed while the Design Representations were alive and could not be brought after they and the remedy for their breach expired.

The conclusion that the only reasonable interpretation of the Purchase Agreement is the one advanced by Marathon is supported by: (i) a close reading of the relevant words

of the Survival Clause in full contractual context; (ii) a consideration of how similar text has been interpreted by Delaware courts and learned commentary and treatises on the subject; and (iii) the commercial realities and business context facing the parties at the time the Purchase Agreement was negotiated and consummated.

#### a. *The Text Of The Survival Clause Unambiguously Shortened The Statute Of Limitations Applicable To Claims For Breach Of The Design Representations To One Year After Closing*

After considering the text of the Purchase Agreement, and in particular, the Survival Clause in light of the relevant principles of contract interpretation, I find that the parties to the Purchase Agreement unambiguously shortened the statute of limitations applicable to claims for breach of the Design Representations to one year.

On its face, the Survival Clause is drafted in a liability-limiting fashion. It plainly states that the Design Representations in § 4.6(b)(i) will "terminate" one year after the Purchase Agreement's closing.[50] That the parties intended to shorten the time period during which GRT could sue Marathon for a breach of the Design Representations is also made clear by their decision to expressly "terminate" § 7.4's remedy for a breach of the Design Representations —the "sole and exclusive"[51] remedy—simultaneously with the expiration of the Design Representations. This makes plain that the expiration of the Design Representations was intended to foreclose claims filed after the Survival Period.

**\*11** Moreover, when, as required, I read the Survival Clause in full contractual context,[52] it further clarifies that in contrast to GRT's representations and warranties contained in §§ 3.1, 3.3, 3.6. 4.1 and 4.2 of the Purchase Agreement which "will survive the Closing indefinitely," and GRT's representations and warranties in § 3.16 of the Purchase Agreement, which "shall survive until the expiration of the applicable statutes of limitations ...,"[53] the parties intended to shorten the statute of limitations for claims brought for an alleged breach of Marathon's Design Representations which, "together with ... the remedies provided pursuant to § 7.4," "will terminate" after the conclusion of the Survival Period.[54] That the parties to the Purchase Agreement designated three specific buckets of representations and warranties, each of which provides for a different survival

period and one of which couches the survival period in terms of the "applicable statutes of limitations," confirms that the only reasonable way to read the Survival Clause is that it cabined the period of time in which GRT could timely file a claim for breach of the Design Representations to the one-year Survival Period.

#### b. *Reading The Survival Clause As Establishing A One–Year Period To Sue Is Supported By Delaware Precedent*

GRT's contrary reading of the text—that the Survival Clause limits only the time period in which a breach of the Design Representations can occur, not when an action for breach must be filed—does little to address the glaring fact that the Survival Clause expressly terminates the Design Representations *and the sole remedy for their breach* at the end of the Survival Period while having other representations and warranties survive indefinitely or until the traditional statutes of limitations expire. Instead, GRT relies heavily on an interpretive maxim utilized by courts in other jurisdictions. In California and New York, GRT says, courts refuse to read a survival clause that merely limits the survival of a contractual representation as also shortening the statute of limitations absent "clear and explicit" language to that effect.[55] That heightened requirement is an outgrowth of the public policy of California and New York that "does not favor contractual stipulations to limit a statute of limitation."[56] But even if the law of California or New York was applicable, and it is not, I am inclined to believe that the Survival Clause would meet that standard because unlike the survival clauses considered in the California and New York cases cited by GRT,[57] the Survival Clause in this case terminates not only the Design Representations, but also the sole remedy for their breach. That move underscores, to my mind, the parties' intention to make indisputably clear, perhaps in response to the very case law cited by GRT, that the Survival Clause was intended to establish the statute of limitations for claims alleging a breach of the Design Representations.

**\*12** The more fundamental problem for GRT is, of course, that the Purchase Agreement is governed by Delaware law,[58] not by some other state's, and GRT points to no Delaware decisions sharing the public policy concerns embraced by the courts of California and New York.[59] Under Delaware law, which is more contractarian than that of many other states,[60] parties' contractual choices are respected and there is no special rule requiring that in order to contractually shorten

the statute of limitations, parties utilize "clear and explicit" language.

In fact, the relevant Delaware precedent cuts against GRT. To wit, Delaware courts have interpreted contractual provisions that limit the survival of representations and warranties as evidencing an intent to shorten the period of time in which a claim for breach of those representations and warranties may be brought, i.e., the statute of limitations. [61] For instance, in *Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC,* [62] the Superior Court held, on the basis of a survival clause that "limit[ed] the survival of representations and warranties to six months after closing," that the contract placed "[t]ime limitations on claims," and therefore dismissed as time-barred an action filed more than six months after the closing alleging breaches of the expired representations and warranties. [63]

### c. *Learned Commentary And Treatises Support Reading The Survival Clause As Creating A Contractual Statute Of Limitations*

As most corporate lawyers know, there are a number of valuable treatises and casebooks on mergers and acquisitions that address the corporate and securities laws that influence such transactions. But, much harder to find is any learned consideration of the important contract issues that are often even more central to the parties to such transactions. [64] In law school, the basic contracts class does not often delve into the admittedly obscure differences between covenants, representations, warranties, and conditions, and how they work together in an acquisition agreement. [65] The mysteries of bring-down clauses and indemnification are difficult to shoehorn into a first-year course, and do not seem to tickle the fancy of many scholars.

In part for that reason, and also because of its sensible and clear consideration of some of these issues, most young transactional lawyers are told that they would be well-served by reading the now nearly forty-year-old, *Anatomy of a Merger: Strategies and Techniques for Negotiating Corporate Acquisitions,* by James C. Freund. [66] Along with that text, young lawyers are now often pointed to the sections of *Negotiated Acquisitions of Companies, Subsidiaries and Divisions,* by Lou R. Kling and Eileen T. Nugent, which

address in even more depth than Freund, just how complex acquisition agreements work. [67]

A consideration of these leading works helps to explain why I conclude that the Survival Clause can only be plausibly read as establishing a discrete, one-year period within which claims for breach of the Design Representations must be brought. In addressing these works, I acknowledge that there are strands of other commentary that do not necessarily accord in whole with these works. But a consideration of them reveals that, unlike Freund, Kling and Nugent, who attempt to explain what transactional lawyers have traditionally meant when using survival clauses, these other commentaries are trying to goad practitioners into using a new lexicon that their authors view, perhaps rightly, as preferable. Unlike a commentary designed to advocate for a change in commercial contracting techniques, however, a judicial decision interpreting a contract must respect the contractual lexicon the parties themselves chose to employ and accord the words their commonly accepted meaning within that tradition. When that approach is taken, the Survival Clause here emerges as establishing an unambiguous one-year limitations period.

**\*13** To explain why the most incisive learned commentary supports this conclusion, I begin by observing that there are at least four distinct possible ways to draft a contract addressing the life span of the contract's representations and warranties, with each possibility having the potential to affect the extent and nature of the representing and warranting party's post-closing liability for alleged misrepresentations.

The first possibility—i.e., where the contract expressly provides that the representations and warranties terminate upon closing—is the clearest of all. In that case, all the major commentaries agree that by expressly terminating representations and warranties at closing, the parties have made clear their intent that they can provide no basis for a post-closing suit seeking a remedy for an alleged misrepresentation. That is, when the representations and warranties terminate, so does any right to sue on them. For instance, Freund says that "[g]enerally speaking, there is no indemnification section in acquisition agreements between two public companies, *inasmuch as the agreement usually states that the respective representations and warranties terminate upon the closing* ." [68] It is therefore common in cases where the representations and warranties expire at closing for the parties to conduct robust due diligence *pre-closing,* with it being understood that the contractual

representations and warranties will be true as of the closing date and can provide a basis to avoid closing to the extent that their truth is made a condition to closing, but will not provide a basis for a post-closing lawsuit.[69]

The second possibility—i.e., where the contract is silent as to whether the representations and warranties survive or expire upon closing—is perhaps the least clear. The lack of clarity is most likely because it is a rare instance that parties to an M & A contract fail to address the issue of survival given the important implications survival or non-survival has for the representing and warranting party's potential post-closing liability, and for the non-representing and warranting party's post-closing remedy in the event it discovers that certain representations and warranties were not true when made. Thus, some commentaries and treatises take a cautionary approach, advising parties to make explicit their intentions with respect to survival. Indeed, Kling and Nugent opine that "*unless the contract specifically provides otherwise, it is not clear* that the representations and warranties contained in the acquisition agreement survive the closing (and form the basis for a cause of action)."[70] Kling and Nugent go on to suggest, in order to avoid that uncertainty,[71] that "if it is the intention of the parties that the Buyer may recover from the Seller post-closing for a misrepresentation, they should specifically provide that the Seller's representations and warranties survive the closing."[72] Adding to the lack of clarity in this category of contracts, there are some commentators, however, who suggest a hard and fast rule that "[u]nless the parties agree to a survival clause extending the representations and warranties in the agreement past the closing date, the breaching party *cannot be sued* for damages post-closing for their later discovered breach."[73] What can be concluded from the foregoing discussion is that contracting parties who decide to remain silent on the question of whether their representations and warranties survive closing do so at some risk, and the better and more certain practice is to have the contract expressly state whether or not the representations and warranties survive the closing, and therefore will provide a basis for a post-closing lawsuit.

**\*14** The third situation—i.e., where the contract contains a discrete survival period during which the representations and warranties will continue to be binding on the party who made them—is the one encountered here. The commentators and scholars who have chosen to tailor their analysis to contracts employing the traditional lexicon and the decisional law interpreting it have made plain their view that the effect

of a survival clause with a discrete survival period is to limit the time period during which a claim for breach of a representation or warranty may be filed. For example, consistent with the idea that when the representations and warranties expressly terminate at closing there can be no post-closing lawsuit for their breach, by parity of reasoning, Kling and Nugent conclude that when the survival period ends, so does the period to sue: "[t]he survival period is, in effect, a *contractual statute of limitations* .... Perhaps *in California,* language should be included expressly stating that the parties intend the language to operate as a contractual statute of limitations, *but this really should not be necessary.* "[74] Likewise, Professor Samuel C. Thompson, Jr. views "*it [as] clear* that a provision of an acquisition agreement that states, for example, that a representation and warranty survives for a year, means that any claim that such representation was false must be made prior to the end of the one-year period. *In other words, the survival period acts as a private statute of limitations on the claim.*"[75] Finally, although more oblique in his discussion, Freund seems to share the understanding that a survival period serves as a contractual statute of limitations for claims seeking post-closing remedies for breach of a representation or warranty. In his consideration of the issues that surround typical indemnification provisions in acquisition agreements between two privately held companies, Freund notes that a common defense raised by the seller to a purchaser's claim for indemnification is "the length of time that the representations survive [the closing]."[76] "It is not unreasonable," continues Freund, "that there should be a cut-off date beyond which the purchaser cannot assert claims. *The rationale is the same as underlies statutes of limitations ... .*"[77] This is consistent with Freund's view that no post-closing suit can be brought on representations and warranties that expressly do not survive the closing.[78]

Admittedly, there is some commentary that does not view a contractual survival clause as unambiguously establishing a contractual limitations period. But the purpose of that commentary is to urge practitioners to adopt a new approach to drafting the provisions of merger and acquisition agreements involving representations and warranties, their lifespan, and the ability to sue for their breach. This commentary is therefore designed more to advocate how M & A agreements should be drafted if the traditional lexicon is abandoned than to explain what the traditional lexicon means. But the task before me is the interpretation of a contract using the traditional lexicon. Moreover, the commentary of

this kind seems to hew more closely to the policy concerns embraced by the courts in California and New York that require "clear and explicit" language in order to conclude that a survival clause will act to set the limitations period. [79]

**\*15** The fourth situation—i.e., where the contract provides that the representations and warranties will survive indefinitely or otherwise does not bound their survival—is perhaps the most interesting. As a matter of strict or literal construction, one might imagine that a clause which provides that the representations and warranties shall survive indefinitely would mean that the representing and warranting party would face indefinite post-closing liability for its representations and warranties. But, in light of the public policy underlying statutes of limitations in general, and the widespread refusal of courts to permit parties to extend the limitations period beyond the legislatively determined statute of limitations and thereby violate the legislature's mandate, [80] the general rule is that in such a situation, courts will treat the indefinite survival of representations and warranties as establishing that the ordinarily applicable statute of limitations governs the time period in which actions for breach can be brought. [81] In other words, a survival clause that states generally that the representations and warranties will survive closing, or one that provides that the representations and warranties will survive indefinitely, is treated as if it expressly provided that the representations and warranties would survive for the applicable statute of limitations. [82]

Considering these scenarios and what they suggest about the case at hand, two general points about survival clauses and the third situation emerge that support my conclusion that the Survival Clause established a one-year limitations period. The first is that the presence (or absence) of a survival clause that expressly states that the covered representations and warranties will survive beyond the closing of the contract, although it may act to *shorten* the otherwise applicable statute of limitations, never acts to lengthen the statute of limitations, at least in jurisdictions, like Delaware, whose statutes have been read to forbid such extensions. This strengthens the argument of those commentators who equate the termination date for representations and warranties with the last date to sue on those representations and warranties. [83]

Second, and consistent with the prior point, the most persuasive authorities conclude that survival clause with a discrete survival period has the effect of granting the non-

representing and warranting party a limited period of time in which to file a post-closing lawsuit. A survival clause is like a provision expressly terminating representations and warranties at closing in the sense that it is a tool utilized by contracting parties to avoid the uncertainty that learned commentary suggests exists where the contract is silent on the issue of survival. Where a given contract expressly terminates the representations and warranties at closing, it is understood that there can be no post-closing lawsuit for their breach. [84] Thus, a party to a contract with an express termination clause ordinarily has no post-closing recourse against the representing and warranting party because the grounds for such a remedy were expressly terminated in the contract. [85] By parity of reasoning, then, a survival clause, like the one found in the Purchase Agreement, that expressly states that the covered representations and warranties will survive for a discrete period of time, but will thereafter "terminate," makes plain the contracting parties' intent that the non-representing and warranting party will have a period of time, i.e., the survival period, to file a claim for a breach of the surviving representations and warranties, but will thereafter, when the surviving representations and warranties terminate, be precluded from filing such a claim. [86]

**\*16** The Survival Clause at issue in this case goes a step further. That is, the Survival Clause not only expressly terminates the Design Representations upon the expiration of the Survival Period, it also terminates the "remedies provided pursuant to Section 7.4." [87] The parties' decision to terminate the Design Representations *and the sole remedy for their breach,* from an objective point of view, is further evidence of an intent to give GRT the one-year Survival Period to either file a claim for breach of the Design Representations, or accept the Demonstration Facility as designed, and move on.

### d. *The Business Context In Which The Purchase Agreement Was Negotiated Supports Reading The Survival Clause As Establishing A One–Year Limitations Period*

In addition to GRT's reading of the Survival Clause being unsupported by the Clause's plain language, Delaware case law interpreting similar language, and learned commentary and treatises on the subject, I find that the business context in which the Purchase Agreement was negotiated and executed further supports the reading of the Survival Clause that limits GRT's time to sue for breach of the Design

Representations.[88] As an initial matter, GRT's reading of the Survival Clause would require this court to accept the idea that by including the liability-limiting Survival Clause, the parties actually intended to lengthen the time that Marathon was exposed to liability for breach of the Design Representations. That is, under GRT's reading of the Survival Clause, GRT could discover (or claim or conclude or decide) on the last day of the Survival Period that Marathon breached the Design Representations, keep quiet for three years from that date, and then, on the last day of the traditional three-year statute of limitations for breach of contract claims, file suit against Marathon and obtain the contractual remedy in § 7.4.[89] That proposed reading of the Survival Clause, in addition to being at odds with our law addressing when a cause of action for a breach of a contractual representation accrues,[90] would give GRT up to four years from the Purchase Agreement's closing to bring suit against Marathon on the basis of the Design Representations—representations about the Demonstration Facility's existing design made at a time when the Demonstration Facility was still under construction.

In a highly experimental industry like the one in which both GRT and Marathon participate, where, like most industries that involve the novel commercialization of new scientific discoveries, time is of the essence, it does not seem plausible that the parties intended that the Survival Clause give GRT up to three or four years after the contract's closing to bring claims alleging that the cutting-edge Demonstration Facility's design, as represented on the closing date, did not meet the Design Representations and therefore obligate Marathon to redo its design after the Facility's construction was complete and its operations had commenced.[91] If the parties had wanted to do that, the Design Representations would have been in the category of the representations and warranties in the Survival Clause that were to live for the applicable statutes of limitations or in the category of representations and warranties that were to survive indefinitely. The fact that the parties explicitly chose to have the Design Representations live for only one year may only be plausibly read as a way to balance the commercial exigency of addressing design deficiencies promptly against GRT's lack of pre-closing due diligence by giving GRT a limited one-year period to conduct diligence and sue.

### e. *Count I, Which Was Filed After The Survival Period, Is Time–Barred And Dismissed*

**\*17** Having determined that any cause of action, like GRT's claim in Count I, premised on an alleged breach of the Design Representations accrued on the date the Purchase Agreement closed and further that the Survival Clause established a one-year statute of limitations for claims alleging a breach of the Design Representations, I note that GRT does not make any credible argument that the statute of limitations was, or should have been, tolled.[92] Although GRT does allege in Count I, without factual support, that "Marathon [ ] led GRT to believe [during the Survival Period] that it would repair and modify the Demonstration Facility so that it would meet" the Design Representations GRT claims it had breached, GRT does not argue, in the alternative, that if the Survival Clause shortened the statute of limitations for its claim, the doctrine of equitable tolling should be applied to revive Count I. Furthermore, to the extent that GRT's arguments in opposition to the motion to dismiss could be construed as an appeal to the law in other jurisdictions, like California, that, through a liberal application of the so-called "discovery rule," treats some breach of contract causes of action as accruing (and thus starting the running of the statute of limitations) on the date the plaintiff discovers the breach,[93] GRT's reliance is misplaced. Although Delaware courts do apply Delaware's own, narrower version of the discovery rule, they do so only in "narrowly confined" circumstances in which the plaintiff can show both: (i) that her injury was "inherently unknowable;" and (ii) was "sustained by a 'blamelessly ignorant' plaintiff."[94] GRT has not argued, nor has it pled facts from which the court could reasonably infer, that the alleged breaches of the Design Representations were "inherently unknowable" or that its failure to discover the breaches post-closing was a result of "blameless[ ] ignora[nce]." Instead, the complaint pleads facts that suggest that as early as October 8, 2008—less than four months after the Purchase Agreement's closing and well within the Survival Period—GRT "informed" Marathon of purported breaches of the Design Representations.[95] Thus, ordinary principles of claim accrual apply,[96] and in the absence of any basis for the contractual limitations period to be tolled, GRT's claim for breach of § 7.4,[97] the success of which requires that GRT first prove the existence of a predicate breach of the Design Representations, fails as untimely, and is dismissed in its entirety.

## IV. *Conclusion*

For the foregoing reasons, Marathon's motion to dismiss is GRANTED.[98] IT IS SO ORDERED.

Footnotes

1   "There is an abundance of natural gas in North America, but it is a non-renewable resource, the formation of which takes thousands and possibly millions of years." *How Much Natural Gas is There?,* NATURALGAS.ORG, ht tp://www.naturalgas.org/overview/ resources.asp (last visited July 10, 2011). NaturalGas.org is a website funded and maintained by The Natural Gas Supply Association, a trade organization representing producers and marketers of domestic natural gas.

2   Compl. ¶ 20.

3   Compl. ¶ 21.

4   Pl. Rep. Br. at 4 (citing *Western Filter Corp. v. Argan,* 540 F.3d 947, 949 (9th Cir.2008)).

5   E.g., *Western Filter,* 540 F.3d at 949.

6   *E.g., Shaw v. Aetna Life Ins. Co.,* 395 A.2d 384, 386 (Del.Super.1978) (citing *Keller v. President, Directors and Co. of Farmers Bank of State of Delaware,* 41 Del. 471 (Del.Super.1942) (quoting *Boston v. Bradley's Executor,* 4 Harr. 524, 526 (Del.Super.1847))).

7   E.g., *Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC,* 2008 WL 2582920, at *1 (Del.Super.Mar.28, 2008).

8   LOU R. KLING & EILEEN T. NUGENT, 2 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 15.02[2] n. 45 (2011).

9   *State ex rel. Brady v. Pettinaro Enters.,* 870 A.2d 513, 524–25 (Del. Ch.2005).

10   *Reid v. Spazio,* 970 A.2d 176, 182 (Del.2009).

11   Compl. ¶ 3.

12   There is a second defendant, Marathon Oil Company, the Ohio parent corporation of Marathon GTF Technology, LTD. Marathon Oil's liability rises and falls entirely with Marathon GTF's. For the sake of simplicity, I will limit my discussion to Marathon GTF and refer to it as "Marathon."

13   Compl. ¶ 1.

14   Compl. ¶ 14.

15   Compl. Ex. C ("Securities Purchase Agreement" (July 18, 2008)) ("Purchase Agreement").

16   Purchase Agreement § 5.12 ("Within ten (10) days following the Closing Date, [Marathon] shall permit [GRT] to inspect the Pilot Unit and Demonstration Facility....").

17   *Id.* § 7.4(b)(ii).

18   *Id.* § 7.1.

19   Compl. ¶ 20.

20   Compl. ¶¶ 21–26.

21   *See, e.g.,* §§ 4.6(b)(i)(A) ("To [Marathon's] knowledge, [the Demonstration Facility] has been designed using standard scientific and chemical engineering, pilot plant and analytical practices applicable to demonstration units."); 4.6(b)(i)(B) ("[The Demonstration Facility] [h]as been designed (x) to convert methane to higher molecular weight products, including liquid hydrocarbons, using bromine as a methane activating agent, and (y) for continuous, steady-state, integrated operation, including the regeneration of molecular bromine. Notwithstanding the foregoing, [GRT] acknowledges and agrees that the Demonstration Facility may be operated on an other than continuous basis."); 4.6(b)(i)(D) ("[The Demonstration Facility] [h]as been designed to have a capacity of at least five (5) barrels of liquid hydrocarbon products (if condensed) per day."); 4.6(b)(i)(E) ("[The Demonstration Facility] [h]as been designed to include (x) instrumentation and facilities for monitoring and sampling reaction products and intermediates which may contain bromine, and (y) complete and operational control instrumentation."); 4.6(b)(i)(F) ("[The Demonstration Facility] [h]as reactors that have been designed to operate within a range of reasonable reaction temperature and a reasonable range of pressure consistent with the purpose of the Demonstration Facility."); 4.6(b)(i)(G) ("[The Demonstration Facility] [i]s being constructed with the intent of accomplishing the design criteria described in Sections 4.6(b)(i)(A) through (F)....").

22   Compl. ¶ 24.

23   Purchase Agreement § 4.6(b)(i)(C) (emphasis added).

24   Compl. ¶ 27.

25   Compl. ¶ 28.

26  *CertainTeed Corp. v. Celotex Corp.,* 2005 WL 5757762, at *6 (Del. Ch. Jan. 24, 2005) (citing *In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *3 (Del. Ch. July 17, 1998); *Kahn v. Seaboard Corp.,* 625 A.2d 269, 277 (Del. Ch.1993)).

27  10 *Del. C.* § 8106; *see also CertainTeed,* 2005 WL 5757762, at *4 (citing 10 *Del. C.* § 8106; *Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999)).

28  *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 319 (Del.2004); *Allstate Ins. Co. v. Spinelli,* 443 A.2d 1286, 1292 (Del.1982); *see also Freedman v. Beneficial Corp.,* 406 F.Supp. 917, 923 (D.Del.1975) (applying Delaware law); 31 WILLISTON ON CONTRACTS § 79:14 (4th ed.2011).

29  *CertainTeed,* 2005 WL 5757762, at *7 (noting that a claim for breach of a contractual representation accrued on the date the contract closed because "[o]n that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented."). *Cf.* 31 WILLISTON ON CONTRACTS § 79:14 (4th ed.2011) (observing the analogous situation for contracts governed by the UCC and noting that a breach of warranty in a sale of goods contract accrues on the date the goods are tendered to the buyer).

30  *Smith v. Mattia,* 2010 WL 412030, at *3 (Del. Ch. Feb. 1, 2010); *Shaw v. Aetna Life Ins. Co.,* 395 A.2d 384, 386 (Del.Super .1978) (citing *Murray v. Lititz Mutual Ins. Co.,* 61 A.2d 409 (Del . Super.1948)); *Rumsey Elec. Co. v. Univ. of Del.,* 334 A.2d 226, 229–30 (Del.Super.1975), *aff'd,* 358 A.2d 712, 714 (Del.1976); *see also* CORBIN ON CONTRACTS § 83.8 at 287 (2003) ("Courts have held that parties can, by agreement in advance, limit the bringing of suit upon a contract to a shorter period than that fixed by the otherwise applicable statute of limitations....").

31  *Wesselman v. Travelers Indem. Co.,* 345 A.2d 423, 424 (Del.1975) ("[I]n the absence of an express statutory provision to the contrary, a statute of limitations does not proscribe the imposition of a shorter limitations period by contract."); *Shaw,* 395 A.2d at 386. *See also* CORBIN ON CONTRACTS § 83 .8 at 287 ("To [shorten the statute of limitations] is not contrary to public policy but rather assists the public policy behind statutes of limitations: preventing stale claims.").

32  *Boston v. Bradley's Executor,* 4 Harr. 524, 526 (Del.Super.1847); *see also Order of R.R. Telegraphers v. Ry. Express Agency,* 321 U.S. 342, 348–49 (1944) ("Statutes of limitation, like the equitable doctrine of laches, in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.").

33  *AT & T Corp. v. Lillis,* 953 A.2d 241, 252 (Del.2008) (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006)).

34  *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992).

35  *See supra* note 21 and accompanying text.

36  Purchase Agreement § 4.6(b)(i).

37  *Id.* § 7.6(c).

38  *Id.* § 7.4(b)(ii) (emphasis added).

39  Marathon Oil, a signatory to the Purchase Agreement and a defendant in Count I, agreed to "perform the actions set forth in Section 7.4(a) and 7.4(b), if required thereunder...." Purchase Agreement § 8.16(b). That is, Marathon Oil agreed that it, along with Marathon, would undertake the same contractual remedies as Marathon, in the event the Design Representations contained in § 4.6(b)(i) were breached. It is in that sense that the liability of Marathon Oil rises and falls with that of Marathon, and further the reason that Marathon moves to dismiss Count I with respect to both Marathon and Marathon Oil.

40  Section 7.5 of the Purchase Agreement provides:

    *Equitable Relief.* [Marathon] acknowledges that irreparable injury will result from a breach of [Marathon's] obligations under Section [ ] ... 7.4(b)(ii), and the Parties have agreed that an action for monetary damages is an inadequate remedy in the event of such a breach. In order to prevent such irreparable injury, in the event of any breach of Section [ ] ... 7.4(b)(ii) by [Marathon] ..., [GRT] will be entitled ... to injunctive and other equitable relief from any court of competent jurisdiction, and [Marathon] will not plead in defense thereto that there would be an adequate remedy at law.

41  *Id.* § 7.1(a) (emphasis added).

42  Marathon admits that had GRT filed suit before the expiration of the Survival Period, Count I would have been timely. Tr. at 7 (Counsel for Marathon).

43  Def. Op. Br. at 10–11 (citing *Rumsey Elec. Co. v. Univ. of Delaware,* 358 A.2d 712, 714 (Del.1976); *Wesselman v. Travelers Indem. Co.,* 345 A.2d 423, 424 (Del.1975); *Sterling Network Exch., LLC v. Digital Phoenix Van Buren, LLC,* 2008 WL 2582920, at *5 (Del.Super.Mar.28, 2008); *Strange v. Keiper Recaro Seating, Inc.,* 117 F.Supp.2d 408, 411 (D.Del.2000)).

44  Pl. Ans. Br. at 9–10 (citing *Hurlbut v. Christiano,* 405 N.Y.S.2d 871, 871 (N.Y.App.Div.1978); *Arcade Co. Ltd. v. Arcade, LLC,* 105 F. Appx. 808, 811 (6th Cir.2004)).

45  *Id.* at 13.

46  *Id.*

47   *Id.* at 14.

48   *Id.* § 7.4(b)(ii).

49   Tr. at 21 (Counsel for GRT) ("I have to prove two things [in order to maintain Count I]. I have to prove a breach of the [Design Representations], and I have to prove a breach of [§ ] 7.4, that [Marathon] did not adequately cure those breaches of the [Design Representations]. I have to prove both.").

50   *Id.*

51   *Id.* § 7.6(c).

52   *Kuhn Const., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396–97 (Del.2010) ("We will read a contract as a whole...."); *Eugene A. Delle Donne and Son, L.P. v. Applied Card Sys., Inc.,* 821 A.2d 885, 887 (Del.2003) ("In construing a contract, the document must be considered as a whole...."); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole....").

53   Purchase Agreement § 7.1.

54   *Id.*

55   *Western Filter Corp. v. Argan, Inc.,* 540 F.3d 947, 953 (9th Cir.2008) (citing *Lewis v. Hopper,* 295 P.2d 93 (Cal.Ct.App .2008)) ("[A] [contractual] stipulation [to shorten the statute of limitations] must be clear and explicit, and is to be strictly construed against the party invoking the provision."); *see also Herring v. Teradyne, Inc.,* 242 F. Appx. 469, 471 (9th Cir.2007) (applying California law) ("Here, we find no clear and unequivocal language in the survival clauses that permits the conclusion that the parties have unambiguously expressed a desire to reduce the statute of limitations."); *Hurlbut v. Christiano,* 63 A.D.2d 1116, 1117–18 (N.Y.App.Div.1978) (holding that a survival clause that limited the survival of contractual representations and warranties did not shorten the statute of limitations because the language was "clear and unambiguous and suggests nothing from which a shortened period of limitations can be inferred").

56   *Western Filter,* 540 F.3d at 953; *see also Herring,* 256 F.Supp.2d at 1126 (quoting *Hopper,* 295 P.2d at 95) ("In California, '[c]ontractual stipulations which limit the right to sue to a period shorter than granted by statute are not looked upon with favor because they are in derogation of the statutory limitation.' "); *Case Financial, Inc. v. Alden,* 2009 WL 2581873, at *13 (Del. Ch. Aug. 21, 2009) (applying California law) (citing *Western Filter,* 540 F.3d at 952) ("California courts disfavor contractual limitations on statutes of limitations."); *Hurlbut,* 63 A.D.2d at 1117 (quoting *Hauer Constr. Co. v. City of New York,* 85 N.Y.S .2d 42, 44 (N.Y.App. Term 1948)) (same).

57   The survival clause at issue in *Western Filter* that did not pass "explicit" muster provided only that "[t]he representations and warranties [of the parties] in this Agreement shall survive the Closing for a period of one year, except the representations and warranties contained in [§ Y] shall survive indefinitely." *Western Filter,* 540 F.3d at 949.

58   Purchase Agreement § 8.8.

59   To the contrary, the shortening of statutes of limitations by contract is viewed by Delaware courts as an acceptable and easily understood contractual choice because it does not contradict any statutory requirement, and is consistent with the premise of statutory limitations periods, namely, to encourage parties to bring claims with promptness, and to guard against the injustices that can result when parties change position before an adversary brings suit or where causes of action become stale, evidence is lost, or memories are dimmed by the passage of time. *See supra* notes 30–32 and accompanying text.

60   *See, e.g., Nemec v. Shrader,* 991 A.2d 1120, 1125 (Del.2010) ("[W]e must ... not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. *Parties have a right to enter into good and bad contracts, the law enforces both.*") (emphasis added); *Libeau v. Fox,* 880 A.2d 1049, 1056–57 (Del. Ch.2005), *aff'd in pertinent part,* 892 A.2d 1068 (Del.2006)) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."); *Asten, Inc. v. Wangner Sys. Corp.,* 1999 WL 803965, at *6 (Del. Ch. Sept. 23, 1999) ("Equity respects the freedom to contract....").

61   *See, e.g., Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC,* 2008 WL 2582920, at *1 (Del.Super.Mar.28, 2008); *Campanella v. General Motors Corp.,* 1996 WL 769769, at *1 (Del.Super.Nov.6, 1996) (holding that a contractual provision that provided that "the duration of the express warranty coverage is three years or 50,000 miles, whichever occurs first" effectively shortened the applicable statute of limitations to three years for a breach of warranty claim for a car that had not yet been driven 50,000 miles); *Strange v. Keiper Recaro Seating, Inc.,* 117 F.Supp.2d 408, 410–11 (D.Del.2000) (applying Delaware law) (holding on the basis of a contract governed by the UCC that provided that the "seller warrants for a period of twelve months from date of purchase that its products are manufactured and shipped free from substantial defects in materials and workmanship," that the statute

of limitations applicable to the plaintiff's breach of contract claim was twelve months and thus his claim, being filed after that twelve-month period, was time-barred).

62    2008 WL 2582920 (Del.Super.Mar.28, 2008).

63    *Id.* at \*1, \*2, \*5.

64    Examples of useful works that are helpful to M & A practitioners but that spend comparatively little time on contractual issues include: ARTHUR FLEISCHER, JR. AND ALEXANDER R. SUSSMAN, TAKEOVER DEFENSE: MERGERS AND ACQUISITIONS § 14.07 (Aspen Publishers 2010) (including a section on "Certain Merger Agreement Issues," but confining the analysis to topics like material adverse change provisions, disclosure regulations, and the circumstances under which a court might order specific performance"); STEPHEN M. BAINBRIDGE, MERGERS AND ACQUISITIONS 72–73 (2d ed.2009) (considering only the general nature and purpose of representations and warranties in a typical merger agreement); MARTIN LIPTON AND ERICA H. STEINBERGER, 1 TAKEOVERS & FREEZEOUTS § 1.09[5] (Law Journal Press 2009) (including subsections on "Contractual Provisions" and "Conditions" but not reaching the issue of representations, warranties, and their survival); WILLIAM J. CARNEY, MERGERS AND ACQUISITIONS 635 (Foundation Press 2000) (including materials, in a section on "The Due Diligence Process," suggesting that "[t]he extent of ... investigations prior to closing is dependent, in part, upon the nature of the representations and warranties, whether they survive the closing, and the strength of any indemnification," but otherwise not dealing with the issue of survival); and DALE A. OESTERLE, THE LAW OF MERGERS AND ACQUISITIONS 326–333 (Thomson West 2005) (considering the basic structure and content of a typical M & A contract, including an indemnification provision "to provide that the remedies *survive* the closing," but otherwise not dealing with the time-barring effect of survival clauses that contain discrete survival periods) (emphasis in original).

65    *See, e.g.,* EDWARD J. MURPHY ET AL., STUDIES IN CONTRACT LAW 724 (6th ed.2003) (including a subsection on "Representations and Warranties of Quality," largely based on the Uniform Commercial Code, which preliminarily acknowledges that "[m]odern corporate contracts (involving, inter alia, mergers and acquisitions or sales of assets) are carefully structured around the representations and warranties of each side," but otherwise not dealing with topics like survival, bring-down clauses, and the intricacies surfaced by the interplay between representations, warranties, and conditions. Perhaps unsurprisingly, popular hornbooks on basic principles in contract law also choose not to confuse first-year minds with these subjects. E.g., MARVIN A. CHIRELSTEIN, CONCEPTS AND CASE ANALYSIS IN THE LAW OF CONTRACTS 80 (5th ed.2006) (devoting a single page to representations and the concept of a misrepresentation as a defense raised to avoid a contract); CLAUDE D. ROHWER AND ANTHONY M. SKROCKI, CONTRACTS IN A NUTSHELL 290–93 (Thomson West 2006) (considering only the concept of misrepresentation as a defense affecting contractual assent).

66    JAMES C. FREUND, ANATOMY OF A MERGER: STRATEGIES AND TECHNIQUES FOR NEGOTIATING CORPORATE ACQUISITIONS (Law Journal Press 1975) ("FREUND").

67    LOU R. KLING & EILEEN T. NUGENT, 2 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS (2011) ("KLING & NUGENT").

68    FREUND at 231–32 (emphasis added); *see also* KLING & NUGENT § 15.02[2] n. 31 (noting that "[u]nless fraud is present, a court will generally enforce the *clear expression* of the parties' intent" with respect to whether or not the representations and warranties will survive the closing, which is necessary if they are to form the basis for a post-closing lawsuit alleging breach of contract); Samuel C. Thompson, Jr., Practising Law Institute, *Mergers, Acquisitions and Tender Offers* § 2:14 (observing that the effect of a typical "Non-survival" clause in acquisition agreements between public companies which provides that "[n]one of the representations [and] warranties ... in this Agreement ... shall survive the Effective Time ...." is to preclude a post-closing suit for breach of the representations and warranties); MARTIN D. GINSBURG AND JACK S. LEVIN, 4 MERGERS, ACQUISITIONS, AND BUYOUTS ¶ 1702.13.1.4 (Aspen Publishers 2011) ("[S]ellers will generally want the representations and warranties to terminate at the closing (i.e., *not to survive the closing, so that they merely function as closing conditions* ) ....") (emphasis added); ABA Model Agreement And Plan Of Merger (Jan. 20, 2010) § 2 cmt. at 13 ("Unlike in the typical acquisition of private companies, however, the target's representations and warranties in a public company acquisition agreement generally do not form the basis for any post-closing indemnification or other post-closing remedy. *Indeed, in public company acquisitions, it is customary to provide explicitly that the representations and warranties do not survive the consummation of the acquisition.*") (emphasis added); ABA Model Asset Purchase Agreement (2001) § 11.1 cmt. at 214 ("In acquisitions of assets of public companies without controlling shareholders, the seller's representations *typically terminate at closing* and, thus, serve principally as information-gathering mechanisms, closing conditions and a basis for liability if the closing does not occur.") (emphasis added); ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198 (same).

69    *See, e.g.,* FREUND at 160 ("But in acquiring a public company [where the representations and warranties expressly terminate at closing], your investigative prowess must be exhibited *prior* to the closing, so that you are in a position to use the reiteration of the representations as the basis for an out; if you do not catch the misrepresentation before you close, you may well lack recourse.")

(emphasis in original); *see also* GINSBURG ET AL. ¶¶ 1702.13.1.3, 1702.13.1.7 (noting that where representations and warranties "terminate at closing," they "merely function as closing conditions ....," and that in an acquisition of a publicly held company where the sellers' "representations and warranties generally do not survive the closing of the acquisition, [the purchaser] is generally not entitled to recover any of the purchase price from the sellers"); ABA Model Asset Purchase Agreement (2001) § 11.1 cmt. at 214 ("[T]he seller's representations typically terminate at the closing and, thus, serve principally as information-gathering mechanisms, closing conditions and a basis for liability if the closing does not occur."); ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198 (same); ABA Model Agreement And Plan Of Merger (Jan. 20, 2010) § 2 cmt. at 13 ("In a public company acquisition [where the representations and warranties expressly terminate at closing], the target's representations and warranties ... are a device for obtaining disclosures about the target before the signing of a definitive agreement and thus play a significant role in the buyer's diligence process."); Samuel C. Thompson, Jr., Practising Law Institute, *Mergers, Acquisitions and Tender Offers* § 2:14 ("The truthfulness of the representations and warranties as of the date of execution and, when appropriate, the date of the closing is generally a condition to the closing."); 58 FLETCHER CYC. OF THE LAW OF CORPORATIONS § 5615 at 336 (2009) (same).

70      KLING & NUGENT § 15.02[2]; *see also* ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198 ("In order to confirm that the sellers' representations are intended to provide a basis for post-closing liability, the acquisition agreement includes an express survival clause to avoid the possibility that a court might import the real property principle that obligations merge with the delivery of a warranty deed to hold that the representations merge with the sale of the shares and thus cannot form the basis of a remedy after the closing."); GINSBURG ET AL. ¶ 1702.13.1.1 ("[The purchaser] will desire sellers' representations and warranties to survive the closing of the acquisition for a long time, if not indefinitely, so [the purchaser] can recover for breaches...."); ABA Model Asset Purchase Agreement (2001) § 11.1 cmt. at 214 ("If the seller's representations are intended to provide a basis for post-closing liability, it is common for the acquisition agreement to include an express survival clause ... to avoid the possibility that a court might import the real property law principle that obligations merge in the delivery of a deed and hold that the representations merge with the sale of the assets and, thus, cannot form the basis of a remedy after closing.... *Although no such case is known, the custom of explicitly providing for survival of representations in business acquisitions is sufficiently well established that it is unlikely to be abandoned.*") (emphasis added).

71      Kling and Nugent do offer their best guess, that "[a]bsent express intention, [i.e., where the contract is silent with respect to survival,] normal principles of contract interpretation will be applied by a court. Thus, survival may be most likely for representations and warranties which refer to a post-closing event or circumstance, like projections of post-closing Company results or the ability to maintain customers. However, most typical representations do not address postclosing matters but the pre-closing condition of the Company's business and, further, are often given with respect to matters that the Buyer could have reasonably discovered in its due diligence investigation." KLING & NUGENT § 15.02 (citations omitted). Kling and Nugent's sentiment, at least with respect to representations and warranties the truth or falsity of which cannot be determined until after closing, is echoed by the ABA in the commentary to its draft Revised Stock Purchase Agreement: "Secondary authorities and their discussions by the courts might suggest that a survival clause is necessary for the representations to be enforced beyond the closing. That should not be the case. One would not expect that a manufacturer's warranty expired when delivery of the automobile was taken." ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198.

72      KLING & NUGENT § 15.02.

73      58 FLETCHER CYC. OF THE LAW OF CORPORATIONS § 5615 at 336 (2009) (citing *Western Filter*, 540 F.3d 947 (9th Cir.2008)) (emphasis added).

74      KLING & NUGENT § 15.02 n. 45 (emphasis added).

75      Samuel C. Thompson, Jr., Practising Law Institute, *Mergers, Acquisitions and Tender Offers* § 2:14 (2011) (emphasis added).

76      FREUND at 372.

77      *Id.* (emphasis added).

78      FREUND at 231–32.

79      A pertinent example of this type of commentary is Kenneth A. Adams' thought-provoking *A Manual of Style for Contract Drafting*. From the outset, Adams makes clear that his manual's purpose is not to comment on the traditional lexicon of contract drafting as it has evolved and been interpreted by the courts, but is instead to advocate for a method of contract drafting that prefers "standard English" over "tested" contract language, or what Adams pejoratively dubs "legalese." KENNETH A. ADAMS, A MANUAL OF STYLE FOR CONTRACT DRAFTING xxvi-xxvii (2d ed.2008). Indeed, his manual's opening section makes plain that "[t]he usages [the manual] recommend[s] are those that are *clearest and most efficient* for accomplishing a given drafting goal. That's the case *even if what [the manual] recommend[s] does battle with the conventional wisdom ....*" *Id.* at xxii (emphasis added).

         With respect to survival clauses, consistent with his manual's thematic underpinning—one that openly rejects the "popular rationale for retaining legalese in contracts ... [solely because] traditional contract language has been litigated, or 'tested,' and so has a

clearly established, or 'settled' meaning—Adams, *without citation,* advocates to putting an end to the standard practice of using survival clauses to serve as a contractual limitations period:

> *It's commonplace* for most representations in a given contract survive [sic] for a limited time (perhaps a year), whereas others survive until the applicable statutes of limitations expire and still others survive indefinitely. *Although it's entirely standard to refer in this manner to survival of representations,* it's unhelpful to do so. For one thing, you should resort to such legal jargon in a contract *only if no clearer alternative presents itself.* And furthermore, referring to survival of representations addresses only one of the potential bases of a claim for indemnification—for instance, it doesn't serve to put time limits on when you can bring a claim for indemnification for breach by the indemnifying party of any of its obligations. That's why *it's preferable* instead to address this topic, head-on and more broadly, in a section entitled "Time Limitations." ADAMS at xxvii, 300 (emphasis added). In other words, Adams suggests doing away with the use of the traditional approach to addressing the limitations period applicable to claims seeking remedies for breaches of representations and warranties, which has been tied to the lifespan of the representations and warranties themselves (such as their death at closing) and being more specific by setting forth an express limitations period. His view on progress has adherents. *See generally* LENNÉ EIDSON ESPENSCHIED, CONTRACT DRAFTING: POWERFUL PROSE IN TRANSACTIONAL PRACTICE 109–112 (ABA 2010) (considering and rejecting arguments against using "plain, conversational English" in contract drafting, including one that promotes adherence to the traditional lexicon because courts have " 'blessed' " the "archaic jargon and customs" in prior cases, because "language that has been litigated by definition is subject to two or more interpretations."); *see also* ABA Model Asset Purchase Agreement (2001) at 228–229 (advocating for the inclusion of a section that is separate and distinct from a general survival clause, entitled "Time Limitations," that expressly provides when claims for indemnification based on breaches of surviving representations and warranties must be noticed); ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) at 198 (same). Adams' policy proposal may well have utility, but its admirably candid nature as an advocacy piece underscores the difference between the roles served by courts and judges, on the one hand, and commentators like Adams, on the other. In contrast to a commentator, like Adams, who is free, as he does, to "disregard [ ] ["entrenched assumptions held by many who draft and review contracts"]" and espouse his own beliefs about the lexicon contracting parties ought to use, ADAMS at xxvi, a judge's role in a contractual interpretation case is to read and understand a contract in the manner that the parties who drafted it intended. *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006) ("When interpreting a contract, the role of the court is to effectuate the parties' intent."). Although reading a contract inherently involves a degree of interpretation, a judge's interpretive prowess must be constrained by settled principles of law that are themselves outgrowths of the traditional contractual lexicon as it has been developed by practitioners, and read and interpreted by the courts. One can even share and in fact applaud Adams' encouragement of clearer forms of contract drafting but find it not useful in interpreting a contract written in the form Adams wishes to abandon. The judge must honor the parties' bargain by being faithful to his role and not superimposing on them his own views of appropriate drafting.

80    Traditionally, this refusal has been justified and understood in terms of the public policy rationale underlying statutes of limitations in general. *E.g., Shaw,* 395 A.2d at 386–87 ("Conversely, a contractual period of limitations which attempts to lengthen or extend the period otherwise contained in a statute violates the aforesaid public policy interests [underlying statutes of limitations in general]...."); 15 CORBIN ON CONTRACTS § 83.8 at 289–90 ("Because the purpose of a statute of limitations is 'to prevent the bringing and enforcement of stale claims ...,' courts do not enforce parties' agreements to lengthen the limitations period.") (citing *Shaw,* 395 A.2d at 386) (internal citations omitted); 54 C.J.S. *Limitations of Actions* § 65 (2011) ("The public policy of some states prevents one from contractually extending a statute of limitations period...."). In explaining this case law, some of the general authorities, in my view, overemphasize the normative role that public policy as discerned by a court should play within the context of a court's application of a statute like 10 *Del. C.* § 8106, which provides that "*[n]o action based on a promise ... shall be brought after the expiration of 3 years from the accruing of the cause of action* ....") (emphasis added). A freely made contractual decision among private parties to shorten, rather than lengthen, the permitted time to file a lawsuit does not violate the unambiguous negative command of 10 *Del. C.* § 8106, but a decision to lengthen it does and allows access to the state's courts for suits the legislature has declared moribund.

81    *See* KLING & NUGENT § 15.02 ("[I]f the representations and warranties are said to survive the closing but no time limit is placed upon such survival, the Buyer may well have the ability to sue the Seller for misrepresentation until the expiration of the applicable statute of limitations.").

82    Careful readers will remember that the Survival Clause contains language to this effect: "The representations and warranties of the Parties contained in Sections 3.1, 3.3, 3.6, 4.1 and 4.2 *will survive the Closing indefinitely,* together with any associated right of indemnification pursuant to Section 7.2 or 7.3." Purchase Agreement § 7.1 (emphasis added). But, because those representations and warranties are separate and distinct from the Design Representations which survive for a discrete period of time (the Survival Period), I need not grapple with the potential issue raised by that language.

83    *E.g.,* FREUND at 231–32, 372; KLING & NUGENT § 15.02 n. 45; Thompson § 2:14.

84    *E.g.,* KLING & NUGENT § 15.02 n. 45; Thompson § 2:14; FREUND at 231–32.

85    *See, e.g.,* ABA Revised Model Stock Purchase Agreement With Commentary, Working Draft (Dec. 14, 2009) § 11.1 cmt. at 198 ("[W]hat is meant by saying the representations 'survive' *is that a remedy is preserved even after closing.*") (emphasis added); *see also* FREUND at 231–32 (stating that in the absence of a survival clause, there can be no post-closing remedy for a breach of a contractual representation or warranty).

86    KLING & NUGENT § 15.02 n. 45; Thompson § 2:14; FREUND at 372.

87    Purchase Agreement § 7.1(a).

88    *See, e.g., Pharm. Product Dev., Inc. v. TVM Life Science Ventures IV, L.P.,* 2011 WL 549163, at *4 n. 24 (Feb. 16, 2011) (citing *USA Cable v. World Wrestling Fed'n Entm't, Inc.,* 766 A.2d 462, 474 (Del.2000); *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 740 (Del.2006)) ("[T]he general business context in which a given contract was negotiated" is appropriate to consider because "the reality [is] that the same word can have more than one general meaning and that the commercial context can influence which meaning the parties intended." (citing various sources); *see also* 11 WILLISTON ON CONTRACTS § 32:7 (4th ed. 2011) ("[T]he circumstances surrounding the execution of a contract may always be shown and are always relevant to a determination of what the parties intended by the words they chose.... Some courts ... have held that the former rule runs afoul of ... the parol evidence rule.... These decisions in truth, reflect a misunderstanding ... of the parol evidence rule.... [T]he term ["surrounding circumstances"] refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.").

89    *See, e.g.,* Pl. Ans. Br. at 9 (citing *Hurlbut v. Christiano,* 63 A.D.2d 1116, 1117–18 (N.Y.App.Div.1978)) ("The plain language of [the Survival Clause] states that the [Design Representations] 'survive,' or remain in existence, for twelve months after closing. This means that if a breach of the [Design Representations] occurs while they are in effect, GRT is entitled to seek appropriate remedies. However, if the breach occurs *after* the twelve-month period, there is no remedy because the [Design Representations] no longer exist. In this way, the [S]urvival [C]lause limits the time when a breach may occur, not the time when suit based on that breach must be brought.") (emphasis in original).

90    *CertainTeed,* 2005 WL 5757762, at *7 ("CertainTeed's misrepresentations are also subject to a three-year statute of limitations ... [and] the accrual date as to all of these claims was the date of Closing. On that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented.").

91    Although when the Purchase Agreement closed on July 18, 2008 the Demonstration Facility was still under construction, one of the Design Representations in § 4.6(b)(i) provided that Marathon hoped the "process of commissioning and start-up" "may commence by June 30, 2008." Purchase Agreement § 4.6(b)(i)(G). But, it also notes that "[GRT] acknowledges that the process of commissioning and start-up may take several months to complete." *Id.* Thus, it is reasonable to infer that the parties contemplated that the Demonstration Facility would be fully constructed and operational within a few months after the Purchase Agreement's closing.

92    *CertainTeed,* 2005 WL 5757762, at *6–*7 (citing *Wal–Mart Stores,* 860 A.2d 312) ("In addressing the timeliness of [the plaintiff's claims], I am required to ... [ (i) ] ascertain the date of accrual of the cause of action ...; [ (ii) ] determine whether the statute of limitations has been tolled ...; [and] [ (iii) ] [a]ssuming a tolling exception applies, ... consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running."); *id.* at *7 ("Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies.").

93    *E.g., April Enters., Inc. v. KTTV,* 147 Cal.App.3d 805, 832 (Cal.Ct.App.1983) ("[In breach of contract actions,] [t]he discovery rule ... presumes that a plaintiff has knowledge of injury on the date of injury. In order to rebut the presumption, a plaintiff must plead facts sufficient to convince the trial judge that delayed discovery was justified.").

94    *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831, 835 (Del.1992) (quoting *Isaacson, Stolper & Co. v. Artisans' Sav. Bank,* 330 A.2d 130, 133 (Del.1974)) (citations omitted). "In such a case, the statute will begin to run only 'upon the discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts.' " *Wal–Mart Stores,* 860 A.2d at 319 (emphasis in original). Compl. ¶ 21.

95    Compl. ¶ 21.

96    *Wal–Mart Stores,* 860 A.2d at 319.

97    GRT also claims in Count I that Marathon breached § 5.10 when Marathon failed "to construct the Demonstration Facility as required by Section 5.10." Compl. ¶ 51. Section 5.10 of the Purchase Agreement requires that "[Marathon] shall complete construction of the Demonstration Facility in accordance with the design criteria described in [the Design Representations]." Purchase Agreement § 5.10. That claim, like the claim for breach of § 7.4, clearly requires that GRT prove that Marathon breached the Design Representations, a claim that I have already determined is time-barred by the Survival Clause. Moreover, GRT does not allege that the Demonstration Facility was not built. Rather, it alleges that the Demonstration Facility was not built in conformity with the Design Representations. But if GRT is unable, because of the expiration of the statute of limitations, to prove that Marathon breached the Design Representations, it is likewise precluded from proving that Marathon breached its obligation to construct the Demonstration Facility in accordance with the Design Representations, and that portion of Count I is also dismissed.

98    In addition, because I have already noted that Marathon Oil's liability rises and falls with that of its subsidiary, Marathon, I also dismiss Count I with respect to Marathon Oil. Because Count I is the only count in which Marathon Oil is a named defendant, I further grant Marathon's motion to dismiss the entire action with respect to Marathon Oil only. *See supra* notes 12, 39.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 65

2002 SCC 76
Supreme Court of Canada

Harvard College v. Canada (Commissioner of Patents)

2002 CarswellNat 3434, 2002 CarswellNat 3435, 2002 SCC 76, [2002] 4 S.C.R. 45, [2002] S.C.J. No. 77, 219 D.L.R. (4th) 577, 21 C.P.R. (4th) 417, 235 F.T.R. 214 (note), 296 N.R. 1, J.E. 2003-27, REJB 2002-35973

# Commissioner of Patents, Appellant v. President and Fellows of Harvard College, Respondent and Canadian Council of Churches, Evangelical Fellowship of Canada, Canadian Environmental Law Association, Greenpeace Canada, Canadian Association of Physicians for the Environment, Action Group on Erosion, Technology and Concentration, Canadian Institute for Environmental Law and Policy, Sierra Club of Canada, Animal Alliance of Canada, International Fund for Animal Welfare Inc. and Zoocheck Canada Inc., Interveners

Arbour J., Bastarache J., Binnie J., Gonthier J., Iacobucci
J., L'Heureux-Dubé J., LeBel J., Major J., McLachlin C.J.C

Judgment: December 5, 2002
Heard: May 21, 2002
Docket: 28155

Proceedings: reversing *Harvard College v. Canada (Commissioner of Patents)*, 2000 CarswellNat 1575, 189 D.L.R. (4th) 385, 7 C.P.R. (4th) 1, *(sub nom. President & Fellows of Harvard College v. Canada (Commissioner of Patents))* [2000] 4 F.C. 528, 1999 CarswellNat 3126, 290 N.R. 320, 223 F.T.R. 320 (note) (Fed. C.A.); reversing *Harvard College v. Canada (Commissioner of Patents)*, *(sub nom. President & Fellows of Harvard College v. Canada (Commissioner of Patents))* [1998] 3 F.C. 510, 79 C.P.R. (3d) 98, 1998 CarswellNat 683, 146 F.T.R. 279, 1998 CarswellNat 2067 (Fed. T.D.)

Counsel: *Graham Garton, Q.C.*, *Frederick B. Woyiwada*, for Appellant
*A. David Morrow*, *Steven B. Garland*, *Colin B. Ingram*, for Respondent
*William J. Sammon*, for Interveners, Canadian Council of Churches and Evangelical Fellowship of Canada
*Michelle Swenarchuk*, *Theresa McClenaghan*, *Paul Muldoon*, for Interveners, Canadian Environmental Law Association, Greenpeace Canada, Canadian Association of Physicians for the Environment, Action Group on Erosion, Technology and Concentration, Canadian Institute for Environmental Law and Policy
*Jerry V. DeMarco* (written), for Intervener, Sierra Club of Canada
*Clayton C. Ruby*, *Lesli Bisgould* (written), for Interveners, Animal Alliance of Canada, International Fund for Animal Welfare Inc. and Zoocheck Canada Inc.

Subject: Intellectual Property; Property

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Intellectual property --- Patents — Validity of patent — Patentable subject-matter — Biological or genetic matter

Gene introduced into chromosomes of mice to predispose them to development of malignant cancer tumours — Genetically-altered mouse not patentable — "Manufacture" and "composition of matter" in definition of "invention" do not include higher life forms.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 126 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

**Intellectual property --- Patents — Validity of patent — Patentable subject-matter — General**

Gene introduced into chromosomes of mice to predispose them to development of malignant cancer tumours — Genetically-altered mouse not patentable — "Manufacture" and "composition of matter" in definition of "invention" do not include higher life forms.

**Intellectual property --- Patents — Validity of patent — Invention — General**

Gene introduced into chromosomes of mice to predispose them to development of malignant cancer tumours — Genetically-altered mouse not patentable — "Invention" does not include higher life forms.

**Intellectual property --- Patents — Application for patent — General**

"Correctness" is standard of review of Commissioner of Patent's decision refusing patent for genetically-altered mouse — Court is in just as good position as commission to determine whether definition of "invention" in s. 2 of Patent Act includes higher life forms — Commissioner does not have discretion to refuse patent on basis of public policy considerations independent of express provisions in Act.

**Propriété intellectuelle --- Brevets — Validité du brevet — Objet brevetable — Objet biologique ou génétique**

Gène a été introduit dans les chromosomes de souris afin de prédisposer celles-ci au développement de tumeurs cancéreuses malignes — Souris génétiquement modifiée n'était pas brevetable — Termes « fabrication » ou « composition de matières » utilisés dans la définition du terme « invention » n'incluent pas les formes de vie supérieures.

**Propriété intellectuelle --- Brevets — Validité du brevet — Objet brevetable — En général**

Gène a été introduit dans les chromosomes de souris afin de prédisposer celles-ci au développement de tumeurs cancéreuses malignes — Souris génétiquement modifiée n'était pas brevetable — Termes « fabrication » ou « composition de matières » utilisés dans la définition du terme « invention » n'incluent pas les formes de vie supérieures.

**Propriété intellectuelle --- Brevets — Validité du brevet — Invention — En général**

Gène a été introduit dans les chromosomes de souris afin de prédisposer celles-ci au développement de tumeurs cancéreuses malignes — Souris génétiquement modifiée n'était pas brevetable — Terme « invention » n'inclut pas les formes de vie supérieures.

**Propriété intellectuelle --- Brevets — Demande de brevet — En général**

Norme de la « décision correcte » est la norme de contrôle applicable au refus du commissaire aux brevets d'accorder un brevet pour une souris génétiquement modifiée — Tribunal est tout aussi bien placé que le commissaire pour déterminer si la définition du terme « invention » de l'art. 2 de la Loi sur les brevets comprend les formes de vie supérieures — Commissaire n'a pas de pouvoir discrétionnaire indépendant des dispositions expresses de la Loi lui permettant de refuser un brevet pour des motifs d'intérêt public.


The applicant sought to produce animals susceptible to cancer in order to conduct animal carcinogenicity studies. A cancer-prone mouse was produced by using an activated oncogene sequence. A plasmid or carrier was constructed containing the oncogene. The plasmid was injected into a fertilized mouse egg. The injected egg was transferred into a female host mouse and allowed to develop to term. If the resulting mouse had all of its cells affected by the oncogene, it was called a founder mouse. A founder mouse was mated with an uninjected mouse. Fifty per cent of the resulting mice would have all of their cells affected by the oncogene and would be suitable for animal carcinogenic studies. The applicant sought to protect the process by which the oncomice were produced and the end product of the process, being the founder mouse and the offspring whose cells were affected by the oncogene. The Patent Examiner allowed a patent for the process claims but not the product claims. The Commissioner of Patents agreed. the commissioner was of the view that the product claims were outside the definition of "invention" in s. 2 of the Patent Act. The applicant unsuccessfully appealed to the Federal Court of Canada, Trial Division. The applicant successfully appealed to the Federal Court of Appeal. The Commissioner appealed.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

**Held:** The appeal was allowed.

Per Bastarache J. (L'Heureux-Dubé, Gonthier, Iacobucci and LeBel JJ. concurring): "Correctness" is the standard of review of this decision of the Commissioner of Patents. The court is as well placed as the commissioner to decide whether higher life forms are included in the definition of "invention" in s. 2 of the Act because the question approaches a pure determination of law having significant precedential value. There is no privative clause in the Act. The Act gives a broad right of appeal. To refuse a patent, the commissioner must be satisfied that the applicant is not "by law" entitled to the patent. Section 40 of the Act does not give the commissioner any discretion to refuse a patent on the basis of public policy considerations independent of any express provision in the Act.

The words of the Act are to be read in their entire context. They are to be read in their grammatical and ordinary sense, harmoniously with the scheme of the Act, the object of the Act and the intention of Parliament. The best reading of the Act supports the conclusion that higher life forms are not patentable.

The sole question was whether the words "manufacture" and "composition of matter" in the context of the Act are sufficiently broad to include higher life forms. The definition of "invention" is broad to encompass unforeseen and unanticipated technology, but is limited to any "art, process, machine, manufacture or composition of matter." "Machine" and "manufacture" do not imply a conscious, sentient living creature. The words "composition of matter" that complete the phrase are restricted to the same genus as the terms preceding, even though a collective term may ordinarily have a much broader meaning. The words "composition of matter" are best read as not including higher life forms. "Matter" captures one aspect of a higher life form. Higher life forms are generally regarded as possessing qualities and characteristics that transcend the particular genetic material of which they are composed. They cannot be conceptualized as mere compositions of matter in the context of the Act. The fact that inventions are unanticipated and unforeseeable does not mean that they are all patentable.

The patentability of higher life forms is a highly contentious matter raising serious practical, ethical and environmental concerns not contemplated by the Act. The issue raises questions of great significance and importance requiring a dramatic expansion of the traditional patent regime. The patenting of higher life forms raises unique concerns not applying to nonliving inventions and which are not addressed by the scheme of the Act. The Act is ill-equipped to deal appropriately with higher life forms. The court does not have the institutional competence to deal with issues of this complexity.

The objects of the Act are the advancement of research and development and the encouragement of broad economic activity. This does not imply that to promote ingenuity is to render all inventions patentable. A product of human ingenuity must fall within the terms of the Act to be patentable.

Given the ambiguity in the law, the substance and form of subsequent legislation such the Plant Breeders' Rights Act are relevant. This special legislation protects plant breeders but does not address other higher life forms. This shows that mechanisms other than the Patent Act may be used to encourage inventors to undertake innovative activity in the field of biotechnology. Many of the issues arising regarding intellectual property protection for plant varieties also arise when considering the patentability of higher life forms. If a special legislative scheme was needed to protect plant varieties, a subset of higher life forms, a similar scheme may also be required to deal with patenting higher life forms in general.

The distinction between lower and higher life forms is not explicit in the Patent Act but is defensible on the basis of the common sense differences between the two. There is a consensus that human life is not patentable but this distinction is not explicit in the Act. If the line between lower and higher life forms is indefensible and arbitrary, then so too is the line between human beings and other higher life forms. It is accepted that lower life forms are patentable but this does not lead to the conclusion that higher life forms are patentable. In part, this is because it is easier to conceptualize a lower life form as a "composition of matter" or "manufacture" than it is to conceptualize a higher life form in these terms. Micro-organisms

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 128 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

produced en masse as chemical compounds are prepared and are formed in such large numbers that any measurable quantity will possess uniform properties and characteristics. The same is not true for plants and animals. Several important features possessed by animals distinguish them from both micro-organisms and plants and remove them from being considered a "composition of matter" or a "manufacture." The specific exception for plants and animals in trade agreements shows that a distinction between higher and lower life forms is widely accepted as valid.

Per Binnie J. (dissenting)(McLachlin C.J.C., Major and Arbour JJ. concurring): The oncomouse has been patented in Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, The Netherlands, Portugal, Spain, Sweden, the United Kingdom and the United States. A similar patent has been issued in Japan. New Zealand has patented a transgenic mouse that has been genetically modified to be susceptible to HIV infection. The global mobility of capital and technology makes it desirable that comparable jurisdictions with comparable intellectual property legislation have similar legal results. There is no statutory basis to conclude that the oncomouse is not an invention in Canada.

The extraordinary scientific achievement of altering every single cell in the body of an animal which does not in this altered form exist in nature, by human modification of the genetic material of which it is composed is an inventive "composition of matter" within the meaning of s. 2 of the Act. Acknowledging that the fertilized, genetically altered oncomouse egg is an invention under the Act, there is no basis to conclude that the resulting oncomouse is not itself patentable because it is not an invention. The question is not whether Parliament intended to include "oncomice" or "higher life forms" or biotechnology generally in patent legislation, but whether Parliament intended to protect inventions that were unanticipated when the Act was enacted or at any time before the claimed invention. When enacting the definition of "invention" in 1869, Parliament did not contemplate moon rockets, antibiotics, telephones, e-mail or hand-held computers. The definition of "invention" should be read as a whole and expansively with a view to giving protection to what is novel and useful and unobvious. The context and scheme of the Act support a broad interpretation of the words "composition of matter" not confined to inanimate matter. The commissioner has no discretion to refuse a patent on the grounds of morality, public interest, public order or any other ground if the statutory conditions are met. The applicant met the statutory criteria and by law was entitled to the patent.

The adoption of the Plant Breeders' Rights Act does not mean that the subject-matter of patents excludes plants and other higher life forms such as seeds and animals. The rights available under the Plant Breeders' Rights Act fall short of those conferred by patent, both in comprehensiveness and duration. The language of the Patent Act predates Confederation. There was no repeal by implication by the Plant Breeders' Rights Act. The two Acts are not inconsistent.

The lack of a regulatory framework to address the ethical and scientific issues raised by genetic patents is not fatal. The court has no mandate to deny patentability because of the novelty or the potential social, economic or cultural impact of an invention. It is normal that regulation follows rather than precedes the invention. The regulatory regimes for inventions cannot and should not all be placed under the inadequate umbrella of the Patent Act. It is for Parliament to decide whether to make a subject-matter exception for higher life forms and to define it. Neither the commissioner nor the court has the authority to declare a moratorium on higher life patents until Parliament chooses to act.

Le demandeur voulait produire des animaux prédisposés au cancer en vue de les utiliser dans des études de cancérogénicité chez les animaux. Une souris prédisposée au cancer a été produite à l'aide d'une séquence activée d'oncogène. On a construit un plasmide ou transporteur qui contenait l'oncogène. Le plasmide a été injecté dans un oeuf de souris fécondé. L'oeuf fécondé a ensuite été implanté dans une souris femelle hôte, qui l'a porté jusqu'à terme. Si toutes les cellules de la souris qui résultait de cette opération étaient affectées par l'oncogène, la souris était appelée souris fondatrice. On accouplait celle-ci avec une souris qui n'avait reçu aucune injection. Des souris en résultant, cinquante pour cent auraient toutes les cellules affectées par l'oncogène et seraient ainsi utiles aux études de cancérogénicité chez les animaux. Le demandeur voulait protéger le procédé de production des souris oncogènes ainsi que le produit final du procédé, c'est-à-dire la souris fondatrice ainsi que sa progéniture dont les cellules étaient affectées par l'oncogène. L'examinateur aux brevets a accordé un brevet à l'égard des revendications relatives au procédé, mais a refusé celui-ci à l'égard de celles relatives au produit. Le

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 129 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

commissaire aux brevets était d'accord avec cette décision. Selon lui, les revendications relatives au produit n'étaient pas visées par la définition du terme « invention » qui se retrouve à l'art. 2 de la Loi sur les brevets. Le demandeur a interjeté appel, sans succès, devant la division de première instance de la Cour fédérale du Canada. Il a interjeté appel avec succès devant la Cour d'appel fédérale. Le commissaire a interjeté appel.

**Arrêt:** Le pourvoi a été accueilli.

Le juge Bastarache (les juges L'Heureux-Dubé, Gonthier, Iacobucci et LeBel y souscrivant): La norme de la « décision correcte » est la norme de contrôle applicable à la décision du commissaire aux brevets. Le tribunal est tout aussi bien placé que le commissaire pour déterminer si la définition du terme « invention » de l'art. 2 comprend les formes de vie supérieures, étant donné que la question requiert une simple décision sur un point de droit qui aura une grande valeur comme précédent. La Loi ne contient aucune clause privative. La Loi donne un large droit d'appel. Pour refuser un brevet, le commissaire doit s'être assuré que le demandeur n'est pas fondé en droit à l'obtenir. L'article 40 de la Loi ne confère au commissaire aucun pouvoir discrétionnaire indépendant des dispositions expresses de la Loi lui permettant de refuser un brevet pour des motifs d'intérêt public.

Les termes de la Loi doivent être interprétés en fonction de leur contexte global. Ils doivent être interprétés en fonction de leur sens grammatical et général, de façon harmonieuse avec le régime prévu par la Loi, l'objet de la Loi et l'intention du Parlement. L'interprétation la plus juste de la Loi étaye la conclusion que les formes de vie supérieures ne sont pas brevetables.

Il fallait uniquement répondre à la question de savoir si les termes « fabrication » et « composition des matières » utilisés dans la Loi ont une portée suffisamment large pour viser les formes de vie supérieures. La définition du terme « invention » est suffisamment large pour comprendre les techniques imprévues et imprévisibles, mais elle se limite à « [t]oute réalisation, tout procédé, toute machine, fabrication ou composition de matières ». Les termes « machine » et « fabrication » ne désignent pas une créature vivante, consciente et douée de sensation. L'expression « composition de matières » qui complète le membre de phrase se limite au même genre que ceux des termes précédents, même si un terme collectif a généralement une portée plus large. Cette expression devrait être interprétée comme ne visant pas les formes de vie supérieures. La « matière » ne vise qu'un seul aspect d'une forme de vie supérieure. Les formes de vie supérieures sont généralement perçues comme possédant les qualités et caractéristiques qui transcendent le matériel génétique particulier qui les compose. Elles ne peuvent être vues comme de simples compositions de matières au sens de la Loi. Le fait que les inventions ne sont pas anticipées ou prévisibles ne signifie pas qu'elles sont toutes brevetables.

La brevetabilité des formes de vie supérieures est une question extrêmement litigieuse qui soulève des préoccupations pratiques, éthiques et environnementales qui ne sont pas envisagées par la Loi. Cette question soulève des questions très importantes qui nécessitent un élargissement dramatique du régime traditionnel des brevets. La décision d'accorder un brevet à l'égard de formes de vie supérieures soulève des préoccupations uniques qui ne s'appliquent pas aux inventions non vivantes et qui ne sont pas abordées par le régime législatif. La Loi ne contient pas les outils nécessaires pour traiter les formes de vie supérieures de façon appropriée. Le tribunal n'a pas la compétence institutionnelle pour décider de questions si complexes.

La Loi vise à promouvoir la recherche ainsi qu'à développer et encourager l'activité économique en général. La décision de favoriser l'ingéniosité ne veut pas dire que tous les types d'inventions sont brevetables. Un produit de l'ingéniosité humaine doit remplir les conditions de la Loi pour être brevetable.

Étant donné l'ambiguïté de la Loi, la substance et la forme de lois subséquentes sont pertinentes, comme celles de la Loi sur la protection des obtentions végétales. Cette loi particulière protège les obtentions végétales, mais ne traite d'aucune autre forme de vie supérieure. Cela démontre que d'autres mécanismes que la Loi sur les brevets peuvent servir à encourager les inventeurs à se livrer à des activités novatrices dans le domaine de la biotechnologie. Bon nombre des questions qui

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 130 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

ont été soulevées au sujet de la protection en matière de propriété intellectuelle dont bénéficient les obtentions végétales se posent également lorsqu'il s'agit d'examiner la brevetabilité d'autres formes de vie supérieures. Si un régime législatif particulier était nécessaire pour assurer la protection des variétés végétales, lesquelles constituent un sous-ensemble des formes de vie supérieures, il se peut qu'un régime semblable soit aussi nécessaire pour régir la délivrance de brevets pour les formes de vie supérieures en général.

La Loi sur les brevets ne fait pas de distinction explicite entre les formes de vie supérieures et les formes de vie inférieures, mais une telle distinction est justifiable en raison des différences évidentes qui existent entre ces deux formes. L'idée que la vie humaine n'est pas brevetable semble faire l'objet d'un consensus, mais cette distinction n'est pas explicite dans la Loi. Si la ligne de démarcation entre les formes de vie supérieures et les formes de vie inférieures est injustifiable et arbitraire, il en sera de même de celle qui sépare les êtres humains des autres formes de vie supérieures. Le fait que les formes de vie inférieures sont considérées comme étant brevetables ne veut pas dire que les formes de vie supérieures le sont elles aussi. Cela est dû en partie au fait qu'il est plus facile de concevoir qu'une forme de vie inférieure soit une « composition de matières » ou une « fabrication » que de concevoir cela à propos d'une forme de vie supérieure. Les micro-organismes qui sont produits en grande quantité, comme des composés chimiques, le sont en si grand nombre que toute quantité mesurable possédera des propriétés et des caractéristiques uniformes. On ne peut pas en dire autant des plantes et des animaux. Les animaux ont plusieurs caractéristiques importantes qui les distinguent des micro-organismes et des plantes et les empêchent d'être considérés comme une « composition de matières » ou une « fabrication ». Le fait que des ententes de libre-échange comportent une exception applicable aux plantes et aux animaux démontre que la validité de la distinction entre les formes de vie supérieures et les formes de vie inférieures est largement reconnue.

Le juge Binnie (dissident) (la juge en chef McLachlin, les juges Major et Arbour y souscrivant): L'oncosouris a été brevetée en Autriche, en Belgique, au Danemark, en Finlande, en France, en Allemagne, en Grèce, en Irlande, en Italie, au Luxembourg, aux Pays-Bas, au Portugal, en Espagne, en Suède, au Royaume-Uni et aux États-Unis. Un brevet semblable a été délivré au Japon. La Nouvelle-Zélande a accordé un brevet pour une souris transgénique qui avait été génétiquement modifiée afin de la rendre vulnérable à l'infection par le VIH. Compte tenu de la mobilité mondiale des capitaux et de la technologie, il est souhaitable que, dans la mesure où leurs lois respectives les y autorisent, les ressorts comparables dotés d'une loi comparable en matière de propriété intellectuelle parviennent à des résultats juridiques similaires. Aucun fondement législatif ne permettait de conclure que l'oncosouris n'était pas une invention au Canada.

La réalisation scientifique exceptionnelle qu'est la modification de toutes les cellules d'un animal qui n'existe pas sous cette forme dans la nature, que l'être humain parvient à effectuer en modifiant le « matériel génétique qui [...] compose » l'animal, est une « composition de matières » ayant une valeur inventive, au sens de l'art. 2 de la Loi sur les brevets. Dès que l'on reconnaît que l'oeuf fécondé d'une oncosouris génétiquement modifiée constitue une invention en vertu de la Loi, rien ne justifie alors de conclure que l'oncosouris qui en résulte n'est pas brevetable parce qu'elle n'est pas une invention. La question n'était pas de savoir si le Parlement voulait inclure les « oncosouris », les « formes de vie supérieures », ou les biotechnologies en général dans la législation en matière de brevets, mais plutôt de savoir si le Parlement avait l'intention de protéger les inventions qui n'étaient pas anticipées au moment de l'adoption de la Loi ou à n'importe quel moment avant l'invention revendiquée. Lorsque le Parlement a adopté en 1869 la définition du terme « invention », il n'avait pas en tête les fusées lunaires, les antibiotiques, les téléphones, le courriel ou les ordinateurs portatifs. La définition d'« invention » devrait être interprétée dans son ensemble et de manière large de façon à accorder une protection à ce qui est nouveau, utile et non évident. Le contexte et le régime de la Loi appuient une interprétation large des termes « composition de matières » afin de ne pas les limiter à la seule matière inanimée. Dès que les conditions de la Loi sont remplies, le commissaire n'a pas le pouvoir discrétionnaire de refuser un brevet pour des motifs de moralité, d'intérêt public, d'ordre public ou tout autre motif. Le demandeur satisfaisait aux critères législatifs et était fondé en droit à obtenir le brevet.

L'adoption de la Loi sur la protection des obtentions végétales ne signifie pas qu'un brevet ne peut être accordé pour des plantes et autres formes de vie supérieures comme des graines et des animaux. Les droits prévus par la Loi sur la protection des obtentions végétales n'ont pas une portée aussi large que ceux conférés par le brevet, tant dans leur étendue que dans

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002 SCC...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

leur durée. Le libellé de la Loi sur les brevets est antérieur à la Confédération. La Loi sur la protection des obtentions végétales ne faisait aucune abrogation implicite. Les deux lois n'étaient pas incompatibles.

L'absence d'un cadre réglementaire pour trancher les questions d'ordre éthique et scientifique soulevées par la recherche génétique n'était pas fatale. Le tribunal n'a pas le mandat de refuser un brevet en raison de la nouveauté de l'invention ou de l'impact social, économique ou culturel qu'elle peut potentiellement avoir. Il est normal que la réglementation suive l'invention plutôt que de la précéder. Les régimes réglementaires régissant les inventions ne peuvent ni ne devraient être sous l'égide inadéquate de la Loi sur les brevets. C'est au Parlement qu'il revient de décider de la création ou non d'une exception pour les formes de vie supérieures et de la définir. Ni le commissaire ni le tribunal n'ont le pouvoir de déclarer un moratoire sur les brevets concernant les formes de vie supérieures en attendant que le Parlement décide d'agir.

**Table of Authorities**

**Cases considered by *Binnie J.*:**

*Abitibi Co., Re* (1982), 62 C.P.R. (2d) 81 (Can. Pat. App. Bd. & Pat. Commr.) — considered

*Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, 2002 CarswellNat 3436, 2002 CarswellNat 3437 (S.C.C.) — considered

*Application for Patent of Connaught Laboratories, Re* (1982), 82 C.P.R. (2d) 32 (Can. Pat. App. Bd. & Pat. Commr.) — considered

*Bishop v. Stevens*, 72 D.L.R. (4th) 97, [1990] 2 S.C.R. 467, 31 C.P.R. (3d) 394, 111 N.R. 376, 1990 CarswellNat 738, 1990 CarswellNat 1028 (S.C.C.) — considered

*Canada (Commissioner of Patents) v. Winthrop Chemical Co.*, 7 Fox Pat. C. 183, 7 C.P.R. 58, [1948] S.C.R. 46, [1948] 2 D.L.R. 561, 1948 CarswellNat 3 (S.C.C.) — considered

*Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504, 56 C.P.R. (2d) 145, 35 N.R. 390, 122 D.L.R. (3d) 203, 1981 CarswellNat 582F, 1981 CarswellNat 582 (S.C.C.) — considered

*Diamond v. Chakrabarty* (1980), 447 U.S. 303, 206 U.S.P.Q. 193, 100 S. Ct. 2204, 65 L. Ed. 2d 144 (U.S. Sup. Ct.) — considered

*Galerie d'art du Petit Champlain inc. c. Théberge*, 2002 SCC 34, 2002 CarswellQue 306, 2002 CarswellQue 307, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 17 C.P.R. (4th) 161, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 210 D.L.R. (4th) 385, 23 B.L.R. (3d) 1, *(sub nom. Théberge v. Galerie d'art du Petit Champlain inc.)* 285 N.R. 267 (S.C.C.) — considered

*General Electric Co.'s Application, Re*, [1961] R.P.C. 21 — referred to

*Hinks & Son v. Safety Lighting Co.* (1876), 4 Ch. D. 607 (Eng. Ch. Div.) — referred to

*J.E.M. AG Supply Inc. v. Pioneer Hi-Bred International Inc.* (2001), 122 S. Ct. 593, 151 L. Ed. 2d 508, 70 U.S.L.W. 4032, 60 U.S.P.Q.2d 1865 (U.S.S.C.) — considered

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 132 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

*J.R. Short Milling Co. (Can.) v. George Weston Bread & Cakes Ltd.*, [1942] S.C.R. 187, 2 Fox Pat. C. 103, 2 C.P.R. 1, [1942] 2 D.L.R. 114, 1942 CarswellNat 1 (S.C.C.) — considered

*Laboratoire Pentagone Ltée v. Parke, Davis & Co.*, 55 C.P.R. 111, [1968] S.C.R. 307, 37 Fox Pat. C. 186, 69 D.L.R. (2d) 267, 1968 CarswellQue 285 (S.C.C.) — considered

*Monsanto Canada Inc. v. Schmeiser*, 2002 CarswellNat 2199, 2002 CAF 309 (Fed. C.A.) — considered

*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, 14 C.P.C. (3d) 491, 77 N.R. 137, *(sub nom. Application for Patent of Pioneer Hi-Bred Ltd., Re)* 11 C.I.P.R. 165, 14 C.P.R. (3d) 491, 1987 CarswellNat 617, 1987 CarswellNat 850, [1987] 3 F.C. 8 (Fed. C.A.) — considered

*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, 25 C.P.R. (3d) 257, 25 C.I.P.R. 1, 60 D.L.R. (4th) 223, 97 N.R. 185, [1989] 1 S.C.R. 1623, 1989 CarswellNat 533, 1989 CarswellNat 696 (S.C.C.) — considered

*Somerset v. Stewart* (1772), 98 E.R. 499 (Eng. K.B.) — considered

*Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111, 33 D.L.R. (3d) 459, 8 C.P.R. (2d) 202, 1972 CarswellNat 423, 1972 CarswellNat 423F (S.C.C.) — referred to

**Cases considered by *Bastarache J.*:**

*Abitibi Co., Re* (1982), 62 C.P.R. (2d) 81 (Can. Pat. App. Bd. & Pat. Commr.) — referred to

*Application of Bergy, Re* (1977), 563 F.2d 1031, 195 U.S.P.Q. 344 (U.S. Ct. of Cust. & Patent App.) — considered

*Baker v. Canada (Minister of Citizenship & Immigration)*, 174 D.L.R. (4th) 193, 1999 CarswellNat 1124, 1999 CarswellNat 1125, 243 N.R. 22, 1 Imm. L.R. (3d) 1, 14 Admin. L.R. (3d) 173, [1999] 2 S.C.R. 817 (S.C.C.) — considered

*Bell ExpressVu Ltd. Partnership v. Rex*, 2002 SCC 42, 2002 CarswellBC 851, 2002 CarswellBC 852, 100 B.C.L.R. (3d) 1, [2002] 5 W.W.R. 1, 212 D.L.R. (4th) 1, 287 N.R. 248, 18 C.P.R. (4th) 289, 166 B.C.A.C. 1, 271 W.A.C. 1, 93 C.R.R. (2d) 189 (S.C.C.) — considered

*Canada (Director of Investigation & Research) v. Southam Inc.*, 144 D.L.R. (4th) 1, 71 C.P.R. (3d) 417, [1997] 1 S.C.R. 748, 209 N.R. 20, 50 Admin. L.R. (2d) 199, 1997 CarswellNat 368, 1997 CarswellNat 369 (S.C.C.) — considered

*Diamond v. Chakrabarty* (1980), 447 U.S. 303, 206 U.S.P.Q. 193, 100 S. Ct. 2204, 65 L. Ed. 2d 144 (U.S. Sup. Ct.) — considered

*Farbwerke Hoechst AG Vormals Meister Lucius & Bruning v. Canada (Commissioner of Patents)* (1963), [1964] S.C.R. 49, 25 Fox Pat. C. 99, 41 C.P.R. 9, 1963 CarswellNat 51 (S.C.C.) — referred to

*Free World Trust c. Électro Santé Inc.*, 2000 SCC 66, 2000 CarswellQue 2728, 2000 CarswellQue 2731, *(sub nom. Free World Trust v. Électro Santé Inc.)* 194 D.L.R. (4th) 232, *(sub nom. Free World Trust v. Électro Santé Inc.)* 263 N.R. 150, [2000] 2 S.C.R. 1024, *(sub nom. Free World Trust v. Électro Santé Inc.)* 9 C.P.R. (4th) 168 (S.C.C.) — referred to

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 133 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

*Hornblower v. Boulton* (1799), 8 T.R. 95, 101 E.R. 1285 (Eng. K.B.) — referred to

*Lawson v. Canada (Commissioner of Patents)* (1970), 62 C.P.R. 101 (Can. Ex. Ct.) — referred to

*Monsanto Co. v. Canada (Commissioner of Patents)*, 28 N.R. 181, 42 C.P.R. (2d) 161, [1979] 2 S.C.R. 1108, 100 D.L.R. (3d) 385, 1979 CarswellNat 637, 1979 CarswellNat 637F (S.C.C.) — considered

*Moreau-Bérubé c. Nouveau-Brunswick*, 2002 SCC 11, 2002 CarswellNB 46, 2002 CarswellNB 47, *(sub nom. Moreau-Bérubé v. New Brunswick (Judicial Council))* 209 D.L.R. (4th) 1, 36 Admin. L.R. (3d) 1, *(sub nom. Nouveau-Brunswick (Conseil de la magistrature) v. Moreau-Bérubé)* 281 N.R. 201, *(sub nom. Conseil de la magistrature (N.-B.) v. Moreau-Bérubé)* 245 N.B.R. (2d) 201, *(sub nom. Conseil de la magistrature (N.-B.) v. Moreau-Bérubé)* 636 A.P.R. 201 (S.C.C.) — considered

*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)* (1986), *(sub nom. Application for Patent of Pioneer Hi-Bred Ltd., Re)* 11 C.P.R. (3d) 311 (Can. Pat. App. Bd. & Pat. Commr.) — referred to

*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, 14 C.P.C. (3d) 491, 77 N.R. 137, *(sub nom. Application for Patent of Pioneer Hi-Bred Ltd., Re)* 11 C.I.P.R. 165, 14 C.P.R. (3d) 491, 1987 CarswellNat 617, 1987 CarswellNat 850, [1987] 3 F.C. 8 (Fed. C.A.) — considered

*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, 25 C.P.R. (3d) 257, 25 C.I.P.R. 1, 60 D.L.R. (4th) 223, 97 N.R. 185, [1989] 1 S.C.R. 1623, 1989 CarswellNat 533, 1989 CarswellNat 696 (S.C.C.) — considered

*Pushpanathan v. Canada (Minister of Employment & Immigration)*, 226 N.R. 201, *(sub nom. Pushpanathan v. Canada (Minister of Citizenship & Immigration))* 160 D.L.R. (4th) 193, *(sub nom. Pushpanathan v. Canada (Minister of Citizenship & Immigration))* [1998] 1 S.C.R. 982, 1998 CarswellNat 830, 1998 CarswellNat 831, 43 Imm. L.R. (2d) 117, 11 Admin. L.R. (3d) 1, 6 B.H.R.C. 387, [1999] I.N.L.R. 36 (S.C.C.) — considered

*R. v. Secretary of State for Home Development* (1988), [1989] 1 All E.R. 777 (Eng. C.A.) — referred to

*Rizzo & Rizzo Shoes Ltd., Re*, 1998 CarswellOnt 1, 1998 CarswellOnt 2, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, *(sub nom. Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006, 50 C.B.R. (3d) 163, *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173 (S.C.C.) — considered

*Smith, Kline & French Inter-American Corp. v. Micro Chemicals Ltd.* (1971), [1972] S.C.R. 506, 25 D.L.R. (3d) 79, 2 C.P.R. (2d) 193, 1971 CarswellNat 388F, 1971 CarswellNat 388 (S.C.C.) — referred to

*Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111, 33 D.L.R. (3d) 459, 8 C.P.R. (2d) 202, 1972 CarswellNat 423, 1972 CarswellNat 423F (S.C.C.) — considered

*Tremblay c. Daigle*, [1989] 2 S.C.R. 530, 62 D.L.R. (4th) 634, 102 N.R. 81, *(sub nom. Daigle v. Tremblay)* 11 C.H.R.R. D/165, *(sub nom. Daigle v. Tremblay)* 27 Q.A.C. 81, 1989 CarswellQue 124, 1989 CarswellQue 124F (S.C.C.) — referred to

*Winnipeg Child & Family Services (Northwest Area) v. G. (D.F.)*, 152 D.L.R. (4th) 193, 1997 CarswellMan 475, 1997 CarswellMan 476, 31 R.F.L. (4th) 165, *(sub nom. Child & Family Services of Winnipeg Northwest v. D.F.G.)*

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

219 N.R. 241, 121 Man. R. (2d) 241, 158 W.A.C. 241, [1998] 1 W.W.R. 1, 39 C.C.L.T. (2d) 203 (Fr.), [1997] 3 S.C.R. 925, 39 C.C.L.T. (2d) 155 (Eng.), 3 B.H.R.C. 611 (S.C.C.) — referred to

**Statutes considered by *Binnie J.*:**

*An Act to encourage the progress of useful Arts within this province*, S.U.C. 1826, c. 5
Generally — referred to

*An Act to promote the progress of useful Arts in this province*, S.L.C. 1824, c. 25
Generally — referred to

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11
s. 7 — referred to

s. 15 — referred to

*Constitution Act, 1867 (U.K.)*, 30 & 31 Vict., c. 3, reprinted R.S.C. 1985, App. II, No. 5
s. 91 ¶ 22 — considered

*Copyright Act*, R.S.C. 1985, c. C-42
s. 3(1) "copyright" (d) — referred to

*Patent Act*, S.C. 1869, c. 11
Generally — referred to

s. 6 — considered

*Patent Act*, R.S.C. 1970, c. P-4
s. 36(1) — referred to

*Patent Act*, R.S.C. 1985, c. P-4
Generally — considered

s. 2 "invention" — considered

s. 27(3) — referred to

s. 40 — considered

s. 44 — considered

*Patent Act, 1793*, 1 U.S. Stat. at Large, 318
Generally — referred to

*Plant Breeders' Rights Act*, S.C. 1990, c. 20
Generally — considered

*Statute of Monopolies*, 1623 (21 Ja. 1), c. 3
s. 6 — considered

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

**Statutes considered by *Bastarache J.*:**

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11

    Generally — referred to

    s. 1 — referred to

    s. 7 — considered

*Canadian Environmental Protection Act*, R.S.C. 1985, c. 16 (4th Supp.)

    Generally — referred to

*Patent Act*, R.S.C. 1970, c. P-4

    s. 41 — referred to

*Patent Act*, R.S.C. 1985, c. P-4

    Generally — considered

    s. 2 — considered

    s. 2 "invention" — considered

    s. 27(1) — considered

    s. 27(3) [rep. & sub. 1993, c. 44, s. 192] — referred to

    s. 27(3)(b) — referred to

    s. 40 — considered

*Patent Act, 1793*, 1 U.S. Stat. at Large, 318

    Generally — referred to

*Plant Breeders' Rights Act*, S.C. 1990, c. 20

    Generally — considered

*Plant Patent Act, 1930*, 35 U.S.C. 15

    Generally — referred to

*Plant Variety Protection Act, 1970*, 7 U.S.C. 57

    Generally — referred to

**Treaties considered by *Binnie J.*:**

*Agreement on Trade-Related Aspects of Intellectual Property Rights*, (1994) 25 I.I.C. 209

    Generally — referred to

    Article 27 ¶ 2 — considered

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 136 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

*Berlin Copyright Convention*, 1908
    Generally — referred to

*Berne Convention for the Protection of Literary and Artistic Works, 1886*, 828 U.N.T.S. 221
    Generally — referred to

*European Patent Convention*, 1973
    Generally — referred to

*North American Free Trade Agreement, 1992*, C.T.S. 1994/2, 32 I.L.M. 296,612
    Generally — referred to

    Article 1709(2) — considered

*Paris Convention for the Protection of Industrial Property*, 1883
    Generally — referred to

*Rome Convention for the Creation of an International Union for the Protection of Literary and Artistic works*, 1928
    Generally — referred to

*Universal Copyright Convention, 1952*, C.T.S. 1962/13, 216 U.N.T.S. 132
    Generally — referred to

**Treaties considered by *Bastarache J.*:**

*Agreement on Trade-Related Aspects of Intellectual Property Rights*, (1994) 25 I.I.C. 209
    Generally — referred to

*European Union Directive*, 98/44/EC
    Article 5 ¶ 1 — considered

    Article 6 ¶ 1 — considered

*North American Free Trade Agreement, 1992*, C.T.S. 1994/2, 32 I.L.M. 296,612
    Generally — referred to

**Words and phrases considered**

**COMPOSITION OF MATTER**

[Per Bastarache J. (L'Heureux-Dubé, Gonthier, Iacobucci and LeBel JJ. concurring):] If the words "composition of matter" [*Patent Act,* R.S.C. 1985, c. P-4, s. 2] are understood this broadly, then the other listed categories of invention, including "machine" and "manufacture", become redundant. This implies that "composition of matter" must be limited in some way. Although I do not express an opinion as to where the line should be drawn, I conclude that "composition of matter" does not include a higher life form such as the oncomouse.

**COMPOSITION OF MATTER**

[Per Binnie J. (dissenting)(McLachlin C.J.C., Major and Arbour JJ. concurring):] "Composition of matter" (*composition de matières*) [*Patent Act,* R.S.C. 1985, c. P-4, s. 2] is an open-ended expression. Statutory subject matter must be framed

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 137 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

broadly because by definition the *Patent Act* [R.S.C. 1985, c. P-4] must contemplate the unforeseeable. The definition is not expressly confined to inanimate matter, and the appellant Commissioner agrees that composition of organic and certain living matter can be patented. In the case of the oncomouse, the modified genetic material is a physical substance and therefore "matter". The fertilized mouse egg is a form of biological "matter". The combination of these two forms of matter by the process described in the disclosure is thus, as pointed out by Rothstein J.A. ([2000] 4 F.C. 528 (Fed. C.A.), at para. 120), a "composition of matter".

## INVENTION

[Per Bastarache J. (L'Heureux-Dubé, Gonthier, Iacobucci and LeBel JJ. concurring):] Having considered the relevant factors, I conclude that Parliament did not intend to include higher life forms within the definition of invention found in the *Patent Act* [R.S.C. 1985, c. P-4]. In their grammatical and ordinary sense alone, the words "manufacture" and "composition of matter" are somewhat imprecise and ambiguous. However, it is my view that the best reading of the words of the Act supports the conclusion that higher life forms are not patentable. [ . . . ] I do not believe that a higher life form such as the oncomouse is easily understood as either a "manufacture" or a "composition of matter". For this reason, I am not satisfied that the definition of "invention" in the *Patent Act* is sufficiently broad to include higher life forms. [ . . . ]

The definition of invention in s. 2 of the *Patent Act* lists five categories of invention: art (*réalisation*), process (*procédé*), machine (*machine*), manufacture (*fabrication*) or composition of matter (*composition de matières*). The first three, "art", "process" and "machine", are clearly inapplicable when considering claims directed toward a genetically engineered non-human mammal. If a higher life form is to fit within the definition of invention, it must therefore be considered to be either a "manufacture" or a "composition of matter".

[ . . . ]

I agree that the definition of invention in the *Patent Act* is broad. Because the Act was designed in part to promote innovation, it is only reasonable to expect the definition of invention to be broad enough to encompass unforeseen and unanticipated technology. I cannot however agree with the suggestion that the definition is unlimited in the sense that it includes "anything under the sun that is made by man". In drafting the *Patent Act*, Parliament chose to adopt an exhaustive definition that limits invention to any "art, process, machine, manufacture or composition of matter". Parliament did not define "invention" as "anything new and useful made by man". By choosing to define invention in this way, Parliament signalled a clear intention to include certain subject matter as patentable and to exclude other subject matter as being outside the confines of the Act. This should be kept in mind when determining whether the words "manufacture" and "composition of matter" include higher life forms.

## INVENTION

[Binnie J. (dissenting)(McLachlin C.J.C., Major and Arbour JJ. concurring) :] The definition of invention [*Patent Act*, R.S.C. 1985, c. P-4, s. 2] should be read as a whole and expansively with a view to giving protection to what is novel and useful and unobvious.

## MANUFACTURE

[Per Bastarache J. (L'Heureux-Dubé, Gonthier, Iacobucci and LeBel JJ. concurring):]With respect to the meaning of the word "manufacture" (*fabrication*) [*Patent Act*, R.S.C. 1985, c. P-4, s. 2], although it may be attributed a very broad meaning, I am of the opinion that the word would commonly be understood to denote a non-living mechanistic product or process.

## MANUFACTURE

[Per Binnie J. (dissenting)(McLachlin C.J.C., Major and Arbour JJ. concurring):] The inventors argued that the oncomouse falls within the *extended* definition of "manufacture" in s. 2 [of the *Patent Act*, R.S.C. 1985, c. P-4]. I do not accept that view, but the submission is of significance in terms of the correct approach to the interpretation of the *Patent Act*. The

Case 09-10138-MFW Doc 14225-46 Filed 08/15/14 Page 138 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

English law of patents finds its root in the *Statute of Monopolies* (1624), which defined the permissible subject matter for a patent in a rather limited way as the "sole working or making of any manner of new Manufactures" (s. 6). The definitional approach adopted by my colleague, Bastarache J., leads him to define "manufacture" in the context of the present s. 2 of the Act as "a non-living mechanistic product or process" (para. 159). However, the tradition of patent jurisprudence has been expansive, not restrictive. By 1851 the learned text *Godson on Patents* (2nd ed.) noted that the word "manufactures" had received from the English courts "very extended signification. It has not, as yet, been accurately defined; for the objects which may come within the spirit and meaning of that act, are *almost infinite*" (p. 35 (emphasis added)).

[ . . . ]

We should not encourage the Commissioner to try to circle each of the five definitional words with tight language that creates arbitrary gaps between, for example, "manufacture" and "composition of matter" through which useful inventions can fall out of the realm of patentability. To do so would conflict with this Court's earlier expression of a "judicial anxiety to support a really useful invention": *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504 (S.C.C.), *per* Dickson J., at p. 521, citing *Hinks & Son v. Safety Lighting Co.* (1876), 4 Ch. D. 607 (Eng. Ch. Div.). The definition of invention should be read as a whole and expansively with a view to giving protection to what is novel and useful and unobvious.

## MATTER

[Per Bastarache J. (L'Heureux-Dubé, Gonthier, Iacobucci and LeBel JJ. concurring):] It also is significant that the word "matter" captures but one aspect of a higher life form. As defined by the *Oxford English Dictionary, supra*, vol. IX, at p. 480, "matter" is a "[p]hysical or corporeal substance in general..., contradistinguished from immaterial or incorporeal substance (spirit, soul, mind), and from qualities, actions, or conditions". "*Matière*" is defined by the *Grand Robert de la langue française, supra*, vol. 4, p. 1260, as "[translation] "corporeal substance 'that is perceptible in space and has mechanical mass'". Although some in society may hold the view that higher life forms are mere "composition[s] of matter", the phrase does not fit well with common understandings of human and animal life. Higher life forms are generally regarded as possessing qualities and characteristics that transcend the particular genetic material of which they are composed. A person whose genetic make-up is modified by radiation does not cease to be him or herself. Likewise, the same mouse would exist absent the injection of the oncogene into the fertilized egg cell; it simply would not be predisposed to cancer. The fact that it has this predisposition to cancer that makes it valuable to humans does not mean that the mouse, along with other animal life forms, can be defined solely with reference to the genetic matter of which it is composed. The fact that animal life forms have numerous unique qualities that transcend the particular matter of which they are composed makes it difficult to conceptualize higher life forms as mere "composition[s] of matter". It is a phrase that seems inadequate as a description of a higher life form.

## MATTER

[Per Binnie J. (dissenting)(McLachlin C.J.C., Major and Arbour JJ. concurring):] My colleague, Bastarache J., quotes from the *Oxford English Dictionary* (2nd ed. 1989) vol. IX, at p. 480, the entry that "matter" is a "[p]hysical or corporeal substance in general ..., contradistinguished from immaterial or incorporeal substance (spirit, soul, mind), and qualities, actions, or conditions", but this, of course, depends on context. "Matter" is a most chameleon-like word. The expression "grey *matter*" refers in everyday use to "intelligence" — which is about as incorporeal as "spirit" or "mind". Indeed, the same Oxford editors define "grey matter" as "intelligence, brains" (*New Shorter Oxford English Dictionary* (1993), vol. 1, p. 1142). The *primary* definition of matter, according to the *Oxford English Dictionary*, is "[t]he substance, or the substances collectively, out of which a physical object is made or of which it consists; constituent material" (at p. 479). The definition of "*matière*" in *Le Grand Robert*, quoted by my colleague, is to the same effect. The question, then, is what, in the Commissioner's view, is the "constituent material" of the oncomouse as a physical entity? If the oncomouse is not composed of matter, what, one might ask, are such things as oncomouse "minds" composed of? The Court's mandate is to approach this issue as a matter (that slippery word in yet another context!) of law, not murine metaphysics. In the absence of any evidence or expert assistance, the Commissioner now asks the Court to take judicial notice of the oncomouse, if I

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 139 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

may use Arthur Koestler's phrase, as a "ghost in a machine" but this pushes the scope of judicial notice too far. With respect, this sort of literary metaphor (or its dictionary equivalent) is an inadequate basis on which to narrow the scope of the *Patent Act* [R.S.C. 1985, c. P-4], and thus to narrow the patentability of scientific invention at the dawn of the third Millennium.

**Termes et locutions cités**

**COMPOSITION DE MATIÈRES**

[Le juge Bastarache (les juges L'Heureux-Dubé, Gonthier, Iacobucci et LeBel y souscrivant):] Si on donne une interprétation aussi large de l'expression « composition de matières » [*Loi sur les brevets*, L.R.C. 1985, c. P-4, art. 2] les autres catégories d'inventions énumérées, y compris « machine » et « fabrication » deviennent alors redondantes. Cela signifie que l'expression « composition de matières » doit être limitée de quelque façon. Bien que je n'exprime aucune opinion quant à savoir où il y a lieu de tracer la ligne de démarcation, je conclus que l'expression « composition de matières » ne vise pas une forme de vie supérieure comme l'oncosouris.

**COMPOSITION DE MATIÈRES**

[Le juge Binnie (dissident) (la juge en chef McLachlin, les juges Major et Arbour y souscrivant):] L'expression « composition de matières » (« *composition of matter* ») [*Loi sur les brevets*, L.R.C. 1985, c. P-4, art. 2] se prête à diverses interprétations. L'objet susceptible d'être visé par la Loi doit être formulé de manière générale, étant donné que, par définition, la *Loi sur les brevets* doit prévoir l'imprévisible. La définition n'est pas expressément limitée à la matière inanimée, et le commissaire appelant reconnaît qu'une composition de matières organiques et de certaines matières vivantes peut être brevetée. Dans le cas de l'oncosouris, le matériel génétique modifié est une substance physique et, par conséquent, une « matière ». L'oeuf de souris fécondé est une forme de « matière » biologique. La combinaison de ces deux formes de matière par le procédé divulgué l'invention est donc une « composition de matières », comme l'a souligné le juge Rothstein ([2000] 4 C.F. 528, par. 120).

**INVENTION**

[Le juge Bastarache (les juges L'Heureux-Dubé, Gonthier, Iacobucci et LeBel y souscrivant):]Après avoir examiné les facteurs pertinents, je conclus que le législateur n'a pas voulu que la définition du terme « invention », dans la *Loi sur les brevets* [L.R.C. 1985, c. P-4], vise des formes de vie supérieures. Au sens ordinaire et grammatical seulement, les mots « fabrication » et « composition de matières » sont quelque peu imprécis et ambigus. Toutefois, j'estime que l'interprétation la plus juste des mots de la Loi étaye la conclusion que les formes de vie supérieures ne sont pas brevetables. [ . . . ][J]e ne crois pas qu'une forme de vie supérieure comme l'oncosouris puisse être aisément considérée comme une « fabrication » ou une « composition de matières ». Voilà pourquoi je ne suis pas convaincu que la définition du mot « invention » dans la *Loi sur les brevets* soit assez générale pour viser les formes de vie supérieures. [ . . . ]

La définition du terme « invention », à l'art. 2 de la *Loi sur les brevets*, énumère cinq catégories d'inventions : réalisation (*art*), procédé (*process*), machine (*machine*), fabrication (*manufacture*) ou composition de matières (*composition of matter*). Les trois premières, « réalisation », « procédé » et « machine » sont clairement inapplicables lorsqu'il s'agit d'examiner des revendications visant des mammifères non humains génétiquement modifiés. Pour être visée par la définition du mot « invention », une forme de vie supérieure doit être considérée comme une « fabrication » ou une « composition de matières ».

[ . . . ]

Je reconnais que la définition que la *Loi sur les brevets* donne du mot « invention » est générale. Comme cette loi a été conçue pour promouvoir l'innovation notamment, il est tout à fait raisonnable de s'attendre à ce que la définition du terme « invention » soit suffisamment large pour englober les techniques imprévues et imprévisibles. Je ne puis toutefois souscrire à l'affirmation que la définition est illimitée au sens de viser « tout ce qui est fabriqué par l'être humain ». En rédigeant la *Loi sur les brevets*, le législateur a choisi d'adopter une définition exhaustive qui limite l'invention à « [t]oute réalisation,

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

tout procédé, toute machine, fabrication ou composition de matières ». Le législateur n'a pas défini le terme « invention » comme « tout ce qui est fabriqué par l'être humain et qui présente le caractère de la nouveauté et de l'utilité ». En choisissant de définir ainsi le mot « invention », le législateur a indiqué qu'il avait clairement l'intention d'inclure certains objets comme étant brevetables et d'exclure d'autres objets pour le motif qu'ils ne relèvent pas de la Loi. Il y a lieu de garder cela à l'esprit au moment de décider si les mots « fabrication » et « composition de matières » visent des formes de vie supérieures.

## INVENTION

[Le juge Binnie (dissident) (la juge en chef McLachlin, les juges Major et Arbour y souscrivant :] La définition du mot « invention » [*Loi sur les brevets*, L.R.C. 1985, c. P-4, art. 2]doit être interprétée globalement et de manière libérale afin de protéger ce qui est nouveau, utile et non évident.

## FABRICATION

[Le juge Bastarache (les juges L'Heureux-Dubé, Gonthier, Iacobucci et LeBel y souscrivant):]Quant au sens du mot « fabrication » (« *manufacture* ») [*Loi sur les brevets* L.R.C. 1985, c. P-4, art. 2], 'estime que, même s'il est possible de lui donner un sens très large, l'on considérerait généralement qu'il désigne un produit ou un procédé mécanique non vivant.

## FABRICATION

[Le juge Binnie (dissident) (la juge en chef McLachlin, les juges Major et Arbour y souscrivant:] Les inventeurs ont fait valoir que l'oncosouris relève de la définition *élargie* du mot « fabrication » figurant à l'art. 2 [de la *Loi sur les brevets*, L.R.C. 1985, c. P-4].Je ne suis pas de cet avis, mais cet argument revêt une certaine importance sur le plan de l'approche à adopter en matière d'interprétation de la *Loi sur les brevets*. Le droit anglais des brevets émane du *Statute of Monopolies* de 1624, qui définissait l'objet brevetable d'une façon plutôt limitée comme étant le [traduction] « seul fonctionnement ou la seule création de quelque nouveau produit manufacturé (*new manufactures*) » (art. 6). L'approche que mon collègue le juge Bastarache adopte en matière de définition l'amène à définir le mot « fabrication », dans le contexte de l'art. 2 actuel de la Loi, comme étant « un produit ou un procédé mécanique non vivant » (par. 159). Cependant, la jurisprudence en matière de brevet prône traditionnellement le sens élargi et non le sens restrictif. Dès 1851, l'ouvrage intitulé *Godson on Patents* (2$^e$ éd.) signalait que les tribunaux anglais avait donné du mot « *manufactures* » (« produits manufacturés ») [traduction] « une interprétation très large. En réalité, il n'a pas encore été défini de manière précise; les objets susceptibles d'être visés éventuellement par l'esprit et le sens de cette loi sont *presque infinis* » (p. 35 (italiques ajoutés)).

[ . . . ]

Nous ne devrions pas encourager le commissaire à tenter de circonscrire chacun des cinq termes de la définition au moyen d'un langage précis qui crée entre eux (par exemple, entre « fabrication » et « composition de matières ») des fossés arbitraires susceptibles d'entraîner la non-brevetabilité d'inventions utiles. Agir ainsi irait à l'encontre du « souci judiciaire de confirmer une invention vraiment utile », dont a déjà parlé notre Cour : *Consolboard Inc. c. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 R.C.S. 504, p. 521, le juge Dickson (plus tard Juge en chef), citant la décision *Hinks & Son c. Safety Lighting Co. (1876), 4 Ch. D. 607*. La définition du mot « invention » doit être interprétée globalement et de manière libérale afin de protéger ce qui est nouveau, utile et non évident.

## MATIÈRE

[Le juge Bastarache (les juges L'Heureux-Dubé, Gonthier, Iacobucci et LeBel y souscrivant):]Il est également significatif que le mot « matière » n'englobe qu'un seul aspect d'une forme de vie supérieure. Selon la définition qu'en donne le *Oxford English Dictionary, op. cit.*, vol. IX, p. 480, le terme « *matter* » (« matière ») désigne une [traduction] « [s]ubstance matérielle ou corporelle en général [...], par opposition à une substance immatérielle ou incorporelle (conscience, âme, esprit), et aux attributs, actions ou conditions. » *Le Grand Robert de la langue française, op. cit.*, vol. 4, p. 1260, donne la définition suivante du terme « matière » : « Substance qui constitue les corps et "qui est objet d'intuition dans l'espace et possède une masse mécanique" ». Même si, dans la société, d'aucuns peuvent prétendre que les formes de vie supérieures

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

ne sont que des « composition[s] de matières », cette expression ne cadre pas bien avec l'idée que l'on se fait habituellement de la vie humaine et de la vie animale. On considère généralement que les formes de vie supérieures possèdent des attributs et des caractéristiques qui transcendent le matériel génétique qui les compose. Une personne dont le patrimoine génétique est modifié par radiation ne cesse pas d'être elle-même. On peut dire aussi que la même souris existerait sans l'injection de l'oncogène dans la cellule de l'oeuf fécondé; elle ne serait tout simplement pas prédisposée au cancer. Le fait que la valeur de la souris pour l'être humain découle de sa prédisposition au cancer ne signifie pas pour autant qu'il est possible de définir cette souris et d'autres formes de vie animale uniquement en fonction du matériel génétique qui les compose. Étant donné que les formes de vie animale possèdent de nombreux attributs exceptionnels qui transcendent la matière qui les compose, il est difficile de percevoir les formes de vie supérieures comme étant de simples « composition[s] de matières ». Cette expression ne semble pas convenir pour décrire une forme de vie supérieure.

**MATIÈRE**

[Le juge Binnie (dissident) (la juge en chef McLachlin, les juges Major et Arbour y souscrivant):] Au paragraphe 46, mon collègue le juge Bastarache tire des diverses pages du *Oxford English Dictionary* (2[e] éd. 1989), vol. IX, p. 480, dans lesquelles le terme « *matter* » (« matière ») est défini, le passage où on mentionne que ce terme désigne une [traduction] « [s]ubstance matérielle ou corporelle en général [...], par opposition à une substance immatérielle ou incorporelle (conscience, âme, esprit), et aux attributs, actions ou conditions ». Toutefois, il va sans dire que le sens du terme varie selon le contexte. La « matière » est un exemple parfait de terme « caméléon ». Par exemple, l'expression « *matière grise* » est une expression familière employée pour désigner l'intelligence — qui est à peu près aussi incorporelle que la « conscience » ou l'« esprit ». En fait, selon ces mêmes rédacteurs du *Oxford*, l'expression « *grey matter* » signifie « *intelligence, brains* » (« l'intelligence, la réflexion ») (*New Shorter Oxford English Dictionary* (1993), vol. 1, p. 1142). Selon le *Oxford English Dictionary*, la *première* définition du terme « *matter* » est la suivante : [traduction] « [l]a substance ou les substances considérées collectivement dont est fait ou composé un objet physique; substance qui constitue les corps ». La définition que *Le Grand Robert* donne du mot « matière », et que cite mon collègue, va dans le même sens. Il s'agit donc de savoir quelle *est*, d'après le commissaire, la « substance qui constitue » l'oncosouris en tant qu'entité physique. Si l'oncosouris n'est pas composée de matière, alors de quoi de telles choses comme les « êtres immatériels » que sont les oncosouris *sont*-elles composées, pourrait-on se demander? La Cour doit qu'il s'agit là d'une question de droit et non de métaphysique des murídés. En l'absence de preuve ou de l'aide d'un expert, le commissaire demande maintenant à la Cour de reconnaître d'office l'oncosouris comme étant, pour reprendre l'expression d'Arthur Koestler, le « cheval dans la locomotive » (« *ghost in a machine* »), mais cela pousse trop loin la portée de la connaissance d'office. En toute déférence, ce genre de métaphore (ou terme équivalent trouvé dans les dictionnaires) n'est pas une raison suffisante pour restreindre la portée de la *Loi sur les brevets* [L.R.C. 1985, c. P-4] et ainsi restreindre la brevetabilité d'une invention scientifique à l'aube du troisième millénaire.

APPEAL by Commissioner of Patents from judgment reported at (2000), 2000 CarswellNat 1575 (Fed. C.A.), allowing appeal from judgment of Federal Court of Canada, Trial Division which dismissed appeal from refusal of Commissioner of Patents to grant patent for claims regarding genetically altered nonhuman mammals for use in carcinogenicity studies.

POURVOI du Commissaire aux brevets à l'encontre de l'arrêt publié à (2000), 2000 CarswellNat 1575 (C.A. Féd.), qui a accueilli le pourvoi à l'encontre du jugement de la division de première instance de la Cour fédérale qui avait rejeté un appel à l'encontre du refus du Commissaire aux brevets d'accorder un brevet à l'égard de revendications visant des mammifères non humains génétiquement modifiés afin d'être utilisés dans le cadre d'études de cancérogénicité.

*Binnie J.*:

1     The biotechnology revolution in the 50 years since discovery of the structure of DNA has been fuelled by extraordinary human ingenuity and financed in significant part by private investment. Like most revolutions, it has wide ramifications, and presents potential and serious dangers as well as past and future benefits. In this appeal, however, we are only dealing with a small corner of the biotechnology controversy. We are asked to determine whether the oncomouse, a genetically modified

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 142 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

rodent with heightened genetic susceptibility to cancer, is an invention. The legal issue is a narrow one and does not provide a proper platform on which to engage in a debate over animal rights, or religion, or the arrogance of the human race.

2     The oncomouse has been held patentable, and is now patented in jurisdictions that cover Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, The Netherlands, Portugal, Spain, Sweden, the United Kingdom and the United States. A similar patent has been issued in Japan. New Zealand has issued a patent for a transgenic mouse that has been genetically modified to be susceptible to HIV infection. Indeed, we were not told of any country with a patent system comparable to Canada's (or otherwise) in which a patent on the oncomouse had been applied for and been refused.

3     If Canada is to stand apart from jurisdictions with which we usually invite comparison on an issue so fundamental to intellectual property law as what constitutes "an invention", the respondent, successful everywhere but in Canada, might expect to see something unique in our legislation. However, one looks in vain for a difference in definition to fuel the Commissioner's contention that, *as a matter of statutory interpretation*, the oncomouse is not an invention. The truth is that our legislation is not unique. The Canadian definition of what constitutes an invention, initially adopted in pre-Confederation statutes, was essentially taken from the United States *Patent Act of 1793*, a definition generally attributed to Thomas Jefferson. The United States patent on the oncomouse was issued 14 years ago. My colleague, Bastarache J., acknowledges that the fertilized, genetically altered oncomouse egg is an invention under our *Patent Act*, R.S.C. 1985, c. P-4 (para. 162). Thereafter, we part company, because my colleague goes on to conclude that the resulting *oncomouse*, that grows from the patented egg, is not itself patentable because it is not an invention. Subject matter patentability, on this view, is lost between two successive stages of a transgenic mouse's genetically pre-programmed growth. In my opinion, with respect, such a "disappearing subject-matter" exception finds no support in the statutory language.

4     A patent, of course, does not give its holder a licence to practise the invention free of regulatory control (any more than an *un*patented invention enjoys such immunity). On the contrary, the grant of a patent simply reflects the public interest in promoting the disclosure of advancements in learning by rewarding human ingenuity. Innovation is said to be the lifeblood of a modern economy. We neglect rewarding it at our peril. Having disclosed to the public the secrets of how to make or use the invention, the inventor can prevent *unauthorized* people for a limited time from taking a "free ride" in exploiting the information thus disclosed. At the same time, persons skilled in the art of the patent are helped to further advance the frontiers of knowledge by standing on the shoulders of those who have gone before.

5     The issues being thus identified, I think the majority decision of the Federal Court of Appeal was correct. The appeal should be dismissed.

**A. Statutory Interpretation**

6     The issue, in the words of s. 2 of the *Patent Act*, is whether the oncomouse that has been produced by a combination of genetic engineering and natural gestation is a "composition of matter" that is new, unobvious and useful. If it is, then the President and Fellows of Harvard University, who funded the research, are entitled to a patent. My colleague, Bastarache J., writes of the oncomouse as follows (at para. 163):

> The fact that it has this predisposition to cancer that makes it valuable to humans does not mean that the mouse, along with other animal life forms, can be defined <u>solely</u> with reference to the genetic <u>matter</u> of which it is <u>composed</u>. [Emphasis added.]

7     While acknowledging, therefore, that the oncomouse is a "composition of [genetic] matter", my colleague's contention is that the oncomouse is a "composition of [genetic] matter" *plus* something else, undefined. The respondent, however, does not claim to have invented the "plus". Its sole claim is to have modified what my colleague describes as the "genetic matter of which [the oncomouse] is composed", as described in the disclosure portion of the patent application:

> (i) the desired oncogene is obtained from the genetic code of a non-mammal source, such as a virus;

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 143 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

(ii) a vehicle for transporting the oncogene into the mammal's chromosomes is constructed using a small piece of circular bacterial DNA referred to as a plasmid; the plasmid is chemically cut and the oncogene is chemically "spliced" into the plasmid;

(iii) the plasmid containing the oncogene is then mechanically injected into fertilized eggs at a site called the male pronucleus;

(iv) the eggs are then implanted in a host mammal or "foster mother";

(v) the eggs are permitted to develop and the offspring are delivered by the foster mother;

(vi) after delivery, the offspring are tested for the presence of the oncogene; the offspring that contain the oncogene are called "founder" animals;

(vii) founder animals are subsequently mated with ordinary animals and the offspring are again tested for the presence of the oncogene before the offspring are used in research.

8    As will be explained more fully below, I believe that the extraordinary scientific achievement of altering every single cell in the body of an animal which does not in this altered form exist in nature, by human modification of "the genetic material of which it is composed", is an inventive "composition of matter" within the meaning of s. 2 of the *Patent Act*.

9    The position taken by the Commissioner of Patents is, I think, curious. While expressly acknowledging that the oncomouse is new, useful and non-obvious, and therefore meets the usual statutory criteria, the Commissioner of Patents denies that "higher life forms" fall within the *subject matter* contemplated by Parliament as patentable. He says, at para. 51 of his factum:

In 1869, when Parliament first made provision for the patenting of "any new and useful ... manufacture, or composition of matter", genetic engineering was unheard of. Thus, Parliament could not at the time of enactment have *intended* that higher life forms would come within the meaning of those words. [Emphasis added.]

10    It is true, of course, that in 1869, when the post-Confederation patent act was passed, Parliament did not contemplate genetically engineered "higher life forms" (*Act respecting Patents of Invention*, S.C. 1869, c. 11). Parliament in 1869 did not contemplate genetically engineered "*lower* life forms" either, although in recent years Canadian patents have regularly been issued for such inventions. (My colleague, Bastarache J., at para. 201, affirms that "lower life" forms will continue to be patentable.) Nor did Parliament in 1869 contemplate moon rockets, antibiotics, telephones, e-mail or hand-held computers. The proper question is not whether Parliament intended to include "oncomice" or "higher life forms" or biotechnology generally in patent legislation, but whether Parliament intended to protect "inventions" that were *not* anticipated at the time of enactment of the *Patent Act*, or indeed, at any time before the claimed invention.

11    I accept, as does my colleague, that the proper approach to interpretation of this statute is to read the words "in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87. In my opinion, with respect, the context and scheme of the *Patent Act* reinforce the expansive sense of the words "composition of matter" to render the oncomouse patentable. The intent that can properly be attributed to Parliament, based on the language it used and the context of patent legislation generally, is that it considered it to be in the public interest to encourage new and useful inventions without knowing what such inventions would turn out to be and to that end inventors who disclosed their work should be rewarded for their ingenuity. A further indication of Parliament's intent is that the Commissioner of Patents was given *no* discretion to refuse a patent on the grounds of morality, public interest, public order, or any other ground if the statutory criteria are met: *Patent Act*, s. 40. In my view, the respondent has fulfilled the statutory criteria and "by law" is entitled to the patent.

**B. International Scope of Intellectual Property Law**

WestlawNext®CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 144 of 310

*Harvard College v. Canada (Commissioner of Patents)*, 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

12     Intellectual property has global mobility, and states have worked diligently to harmonize their patent, copyright and trademark regimes. In this context, the Commissioner's approach to this case sounds a highly discordant note. Intellectual property was the subject matter of such influential agreements as the *International Convention for the Protection of Industrial Property* (*Paris Convention*) as early as 1883. International rules governing patents were strengthened by the *European Patent Convention* in 1973, and, more recently, the World Trade Organization *Agreement on Trade-Related Aspects of Intellectual Property Rights* (TRIPS) in 1994. Copyright was the subject of the *Berne Convention for the Protection of Literary and Artistic Works* in 1886, revised by the *Berlin Convention of 1908* and the *Rome Convention* of 1928. The *Universal Copyright Convention* was concluded in 1952. Legislation varies of course, from state to state, but broadly speaking Canada has sought to harmonize its concepts of intellectual property with other like-minded jurisdictions.

13     The mobility of capital and technology makes it desirable that comparable jurisdictions with comparable intellectual property legislation arrive (to the extent permitted by the specifics of their own laws) at similar legal results: *Galerie d'art du Petit Champlain inc. c. Théberge*, 2002 SCC 34 (S.C.C.) , at para. 6.

14     The appellant Commissioner's definition of *un*patentable "higher life forms" includes not only animals but also plants and seeds. Genetically modified foods are controversial, but these are not controversies that should be dealt with by judicial exclusion of "higher life forms" from the definition of "an invention". Parliament itself has clearly signalled its limited view of the role and function of the *Patent Act*. In 1993, it repealed the prohibition in the former s. 27(3) of the *Patent Act* against patenting "an invention that has an illicit object in view". It thereby made it clear that granting a patent is not an expression of approval or disapproval. At that time, Parliament did *not* add a provision, present in the *European Patent Convention* and in many civil law systems and international agreements, that patents will not be granted for inventions whose use or exploitation would be inconsistent with *ordre public*, public morality, or environmental or health protection. That type of provision would open the door to value judgments in assessing patentability. Parliament did not endorse such an approach, even though the 1993 amendments were introduced to bring Canadian patent law into compliance with various international agreements. Parliament thereby signalled, however passively, that these important aspects of public policy would continue to be dealt with by regulatory regimes outside the *Patent Act*.

15     A more recent indication of the government's approach is the *Assisted Human Reproduction Act*. A discussion paper was placed before the Canadian public in 2000 and a bill placed before Parliament by the Minister of Health as Bill C-56 on May 9, 2002 (re-introduced in the same form as Bill C-13 on October 9, 2002). The bill would prohibit the cloning of human beings, modifying the germ line identity of human beings and the use of human embryos for industrial or commercial purposes. At the same time, Bill C-13 would *not* prevent inventions in that regard from being patented in Canada. This illustrates, again, the fundamental distinction made by Parliament between patentability of an invention and regulation of activity associated with an invention.

## C. The Commercial and Scientific Context

16     Biotechnology is global in scope. Worldwide demand is expected to more than double from $20 billion in 1995 to $50 billion by 2005. Canada is a significant player. Statistics Canada reports that Canada's biotechnology sector in 1999 generated almost $2 billion in revenues, including $718 million in exports. These revenues are expected to exceed $5 billion in 2002. The Canadian Biotechnology Advisory Committee (CBAC), formed in 1999 to advise the federal government on these matters, recently reported that Canada has more biotechnology companies *per capita* than any other country: *Patenting of Higher Life Forms and Related Issues*: *Report to the Government of Canada Biotechnology Ministerial Coordinating Committee*, June 2002, p. 2. It was calculated by Ernst & Young in its *Seventh Annual European Life Sciences Report 2000*, that Canada is second behind the U.S. in terms of number of companies, third behind the U.S. and U.K. in revenues, and first in R&D *per* employee.

17     Genetic tests and "engineered" products hold out the possibility of modifying genetic mutations that either cause a disorder (e.g., Tay-Sachs disease, cystic fibrosis, Huntington's disease) or are responsible for increasing an individual's risk to develop, at some point during his or her lifetime, a particular disease (e.g., breast cancer). In addition, some research indicates a genetic element in some "behavioural illnesses" such as schizophrenia, Alzheimer's, autism, attention-deficit hyperactivity disorder,

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 145 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

and Tourette's syndrome: P. S. Florencio, "Genetics, Parenting, and Children's Rights in the Twenty-First Century" (2000), 45 *McGill L.J.* 527, at p. 535.

18    This is not to suggest that because something is beneficial it is necessarily patentable. As stated, such value judgments have been excluded from the administration of the *Patent Act*. It is to say, however, that the massive investment of the private sector in biotechnical research is exactly the sort of research and innovation that the *Patent Act* was intended to promote.

### D. Financing Research and Development

19    As this case demonstrates, even university research has to be paid for, and intellectual property rights are an important contributor.

20    We are told that in the United States (comparable statistics do not seem to be available in Canada), a health-related biotechnology product on average costs between 200 and 350 million dollars (U.S.) to develop, and takes 7 to 10 years from the research and development stage to bring it to market (*Biotechnology Use and Development — 1999*, Statistics Canada (March 2001), at p. 25). One would think it in the public interest to shorten the time and reduce the cost of research designed to minimize human suffering, and to reward those who develop research tools (such as the oncomouse) that might make this possible, provided the inventors disclose their work for others to build on.

21    Transgenic mice, including the oncomouse, have a role of potential importance. The evidence is that use of transgenic mice improves the effectiveness of the research that can be done, and shortens the time required to produce results. As Dr. Philip Leder, the co-inventor of the oncomouse, told a Congressional hearing in 1989:

In the past few weeks, the gene for cystic fibrosis has been identified and the ability to replace this gene, for example, in a mouse, with the defective human cystic fibrosis gene would constitute an extremely powerful model system for the development of an effective treatment.

For individuals and families at risk for this and other diseases, this would represent a priceless asset.

(Quoted in T. Schrecker, et al., *Ethical Issues Associated With the Patenting of Higher Life Forms* (1997), at pp. 25-26.)

22    Dr. Leder's view is widely shared:

Transgenic mice produced by DNA injection have been employed in a vast range of studies. For instance the method allows evaluation of the effects of gene mutations thought to be implicated in the inception of cancer. It has also contributed greatly to our understanding of the immune defence system. Indeed there are few areas of biology which have not been illuminated by the study of transgenic mice.

(Extract from J. Bishop, *Transgenic Mammals* (1999), at p. 7)

23    The CBAC report of June 2002 observed that healthcare is the major beneficiary of biotechnology. "More than 90 percent of the advanced biotechnology products on the world market are related to health. It is expected that about three-quarters of global biotechnology demand will continue to be in this area" (*supra*, p. 2). Medical research inevitably relates to life, and its products will often impinge, directly or indirectly, on "higher life forms".

24    The practical *application* of biotechnology is in large measure the preoccupation of enterprises that need to profit from their successes to finance continued research on a broader front. These successes are few and far between (*Biotechnology Use and Development — 1999, supra*, at pp. 13-14). It seems Du Pont spent about US $15 million to fund the oncomouse research: C. Arthur, "The onco-mouse that didn't roar" (1993), 138 *New Scientist* 4. Leder, the afore-mentioned co-inventor of the Harvard mouse, made the point to Congress as follows:

[T]he great and costly engine for invention can only be effectively driven with the support from the private sector, motivated to serve a public need.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 146 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

The patent system offers the only protection available for the intellectual product of this research, and thus, the only hope of a fair return against the great financial risks that investment in biotechnology entails.

(Quoted in Schrecker, *supra*, at p. 25)

25    There are those who question the level of incentive required to induce sufficient research in the biomedical field. Professor Richard Gold of McGill University argues:

The argument for greater patent protection should be understood for what it is: an attempt to maximize profit, not to maximize levels of innovation. Clearly, a company would prefer to have as large a monopoly as possible. ... But patent law is not about individual profit maximization; it is about maximizing the overall level of innovation in society. The two do not necessarily go together.

(E. R. Gold, "Biomedical Patents and Ethics: A Canadian Solution" (2000), 45 *McGill L.J.* 413, at p. 423)

Nevertheless it is indisputable that vast amounts of money must be found to finance biomedical research. It is necessary to feed the goose if it is to continue to lay the golden eggs. The *Patent Act* embodies the public policy that those who directly benefit from an invention should be asked, through the patent system, to pay for it, at least in part.

**E. Patenting Life Forms in Canada**

26    My colleague, Bastarache J., comments that "[t]he patentability of lower life forms is not at issue before this Court, and was in fact never litigated in Canada" (para. 198). However, certain enzyme products (which are living matter) were held to be patentable by this Court 60 years ago in *J.R. Short Milling Co. (Can.) v. George Weston Bread & Cakes Ltd.*, [1942] S.C.R. 187 (S.C.C.), as were engineered micro-organisms used as an antibiotic in *Laboratoire Pentagone Ltée v. Parke, Davis & Co.*, [1968] S.C.R. 307 (S.C.C.).

27    The attempt to patent life forms last came before this Court in *Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, [1989] 1 S.C.R. 1623 (S.C.C.). In that case, a patent was sought for a new soybean variety developed from artificial crossbreeding and selection, but cultivated naturally. The applicant's "disclosure" consisted of depositing seed samples with the Patent Office. This Court upheld the rejection of the patent application on the basis that filing a seed sample did not meet the disclosure requirements of s. 36(1) of the *Patent Act*, R.S.C. 1970, c. P-4, which then (as now (s. 27(3)) required the inventor to set forth clearly the various steps required to make the "composition of matter, in such full, clear, concise and exact terms as to enable any person skilled in the art or science to which it pertains, or with which it is most closely connected, to make ... it". In light of the deficient disclosure, the Court expressly declined to go on to consider whether the new soybean variety could be regarded as an invention within the meaning of s. 2.

28    In the course of his reasons for the Court, however, Lamer J. (as he then was) pointed out an important distinction between two approaches to "genetic engineering". The first method (employed by Pioneer Hi-Bred) was hybridization and selection. In this method, "[t]here is thus human intervention ... which does not alter the actual rules of reproduction, which continues to obey the laws of nature" (pp. 1632-33).

29    The second method (which was used here to develop the oncomouse) requires

change in the genetic material — an alteration of the genetic code affecting all the hereditary material — since in the latter case the intervention occurs inside the gene itself. The change made is thus a molecular one and the "new" gene is thus ultimately the result of a chemical reaction, which will in due course lead to a change in the trait controlled by the gene. While the first method [crossbreeding] implies an evolution based strictly on heredity and Mendelian principles, the second also employs a sharp and permanent alteration of hereditary traits by a change in the quality of the genes. [p. 1633]

30    I do not think Lamer J. expressed any doubt that an "alteration of the genetic code affecting all the hereditary material" produced "an invention" (although he did not decide the point). His doubts seemed rather to be related to whether crossbreeding

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    22

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 147 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

*without* altering the genetic code using modern variants of techniques that are almost as old as agriculture itself was inventive within the scope of the Act:

> The courts have regarded creations following the laws of nature as being mere discoveries the existence of which man has simply uncovered without thereby being able to claim he has invented them. Hi-Bred is asking this Court to reverse a position long defended in the case law. [p. 1634]

The Harvard researchers did not merely "uncover" a naturally occurring oncomouse. The complexity of the genetic splicing did not "follow" the laws of nature, but was a human intervention of a high order. They engineered that part of its genetic code that appears to be responsible for its commercial value.

31      Reference should also be made to *Abitibi Co., Re* (1982), 62 C.P.R. (2d) 81 (Can. Pat. App. Bd. & Pat. Commr.), in which the applicant sought to patent a living organism, namely a "mixed fungal yeast culture system" (p. 83) useful in digesting effluent from wood pulp mills. In holding the subject matter to be patentable, the Patent Appeal Board rejected the Patent Office's somewhat narrow view "derived from a time when the many gradations of living forms were not as fully apprehended as is now possible" (*General Electric Co.'s Application, Re*, [1961] R.P.C. 21, at p. 25, cited in *Abitibi Co.* at p. 85). Somewhat in advance of its time, the Patent Appeal Board in *Abitibi Co.* then commented at p. 90 that "[i]f an inventor creates a new and unobvious insect [i.e., a "*higher* life form"] which did not exist before (and thus is not a product of nature), and can recreate it uniformly and at will, and it is useful (for example to destroy the spruce bud worm), then it is every bit as much a new tool of man as a micro-organism" and thus, subject to certain conditions as to reproducibility, patentable. In relation to the Abitibi micro-organism at hand, the Patent Appeal Board ruled (at p. 91):

> The organism, to be claimed, should not of course have existed previously in nature, for in that event the "inventor" did not create it, and his "invention" is old. It must also be useful, in the sense that it carries out some useful known objective, such as separating oil from sand, producing antibiotics or the like. It cannot be a mere laboratory curiosity whose only possible claim to utility is as a starting material for further research. And it must be sufficiently different from known species that it can be said that its creation involved the necessary element of inventive ingenuity. In the present case we believe the product claims meets these tests, and the [Patent Office] objection should be withdrawn.

32      In *Application for Patent of Connaught Laboratories, Re* (1982), 82 C.P.R. (2d) 32 (Can. Pat. App. Bd. & Pat. Commr.), the Patent Appeal Board allowed that cell lines derived from "higher life forms" were patentable, thus removing another possible dividing line. Not all aspects of "higher life forms" were unpatentable. The Patent Office (now the Canadian Intellectual Property Office) regularly allows patents on human genes, proteins, cells and DNA sequences. Under Canadian law, it is not "life" *per se* which is unpatentable. The issues are, rather, the view taken by the Commissioner to narrow the range of living matter to be considered patentable, and where in the *Patent Act* is there statutory authority for the line the Commissioner wants to draw?

## F. Patenting of "Higher Life Forms" in Comparable Jurisdictions

33      In 1873, Louis Pasteur was granted a patent in the United States on a certain yeast, which is a living organism.

34      A patent for the Harvard oncomouse was issued by the United States Patent Office on April 12, 1988 and by the European Patent Office on May 13, 1992, despite the explicit power under the *European Patent Convention* to refuse a patent based on "morality" or "*ordre public*". As mentioned earlier, a similar patent has been issued in Japan, and New Zealand has issued a patent for a transgenic mouse.

35      The appellant Commissioner's principal argument is that to allow the oncomouse patent would be to "expand" the scope of the *Patent Act* (i.e., his factum, paras. 2, 3, 35, 73), but the opposite conclusion reached in so many countries with comparable legislation suggests the contrary. In those jurisdictions, patents for the oncomouse have been issued without any need for legislative amendment, including the United States where the language of our definition of "invention" originated. The Commissioner seeks to *restrict* the legislative definition of invention, and he does so (in my view) for policy reasons unrelated to the *Patent Act* or to its legitimate role and function.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 148 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

36    The majority of the Federal Court of Appeal in this case found persuasive the interpretative principles applied by the United States Supreme Court in *Diamond v. Chakrabarty*, 447 U.S. 303 (U.S. Sup. Ct. 1980) . In that case the inventor, Al Chakrabarty, had genetically engineered bacteria capable of breaking down crude oil spills. The invention was environmentally useful but the bacteria, necessarily, were alive. One of the arguments made by the U.S. Commissioner of Patents and Trademarks, echoed in this appeal before us 22 years later, was that

> micro-organisms cannot qualify as patentable subject matter until Congress expressly authorizes such protection. [The Commissioner's] position rests on the fact that genetic technology was unforeseen when Congress enacted § 101. From this it is argued that resolution of the patentability of inventions such as respondent's should be left to Congress. The legislative process, the [Commissioner] argues, is best equipped to weigh the competing economic, social, and scientific considerations involved, and to determine whether living organisms produced by genetic engineering should receive patent protection. [p. 314]

37    Burger C.J.'s answer (at p. 315), also applicable here, was that "[i]t is, of course, correct that Congress, not the courts, must define the limits of patentability; but it is equally true that once Congress has spoken it is 'the province and duty of the judicial department to say what the law is'". The 5-4 majority held at pp. 309-10 that the inventor's micro-organism

> plainly qualifies as patentable subject matter. His claim is not to a hitherto unknown natural phenomenon, but to a nonnaturally occurring *manufacture or composition of matter* — a product of human ingenuity "having a distinctive name, character [and] use". [Emphasis added.]

The proper distinction was not living *versus* inanimate but between the *discovery* of a product of nature (whether living or not) *versus* a human-made *invention*. Burger C.J. did not subscribe to the notion that patents could be obtained for "anything under the sun that is made by man", quoted as part of his narrative in footnote 6. In fact, at p. 309, he specifically states that "[T]his is not to suggest that [the Act] has no limits or that it embraces every discovery". On the contrary, the patent issued because its subject matter was held to be a "manufacture" or "composition of matter" within the statutory test laid down by Congress. "A rule that unanticipated inventions are without protection would conflict with the core concept of the patent law that anticipation undermines patentability" (*Chakrabarty* , at p. 316).

38    The appellant Commissioner argues that *Chakrabarty* should be rejected because of differences he perceives in the legislative history in Canada and the United States, an allegedly different common understanding of what "composition of matter" meant when the *Patent Act* was passed in 1869, and subsequent legislative action in Canada in 1990 with respect to plant breeders (factum, at paras. 60 and 61). In my view, for reasons given below, these distinctions are not well founded but, in any event, the only interest we have in *Diamond v. Chakrabarty* is the extent to which its reasoning adds persuasive force to the respondent's argument and confirms harmony, broadly speaking, in intellectual property matters among like-minded jurisdictions.

## G. The Interpretation of Section 2 of the Patent Act

39    The appellant Commissioner denies that a patent can be obtained in Canada for "anything under the sun that is made by man" and I agree. He says that this expression, used in Congressional hearings in 1952, distinguishes the U.S. legislative history from ours, but this is not so, strictly speaking. A 1952 expression of opinion by a Congressional Committee almost 150 years after the definition was inserted into the U.S. *Patent Act* of 1793 is scarcely *contemporanea expositio*.

40    The check on the indiscriminate grant of patents lies in the established criteria of utility, novelty and non-obviousness. Those are the criteria judged by Parliament to be relevant to its statutory purpose, which is to encourage ingenuity by rewarding its disclosure. The expression "composition of matter" was included in our patent laws prior to Confederation. It appears in 1824 in the Lower Canada statute entitled *An Act to promote the progress of useful Arts in this Province*, 4 Geo. 4, c. 25, and in Upper Canada two years later in *An Act to Encourage the Progress of Useful Arts within this Province*, 7 Geo. 4, c. 5. The 1826 Act included the terms "manufacture" and "composition of matter" in the preamble setting out its object:

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 149 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

Whereas it is expedient for the encouragement of Genius and of Arts in this Province to secure an exclusive right to the Inventor of any New and Useful Art, Machine, Manufacture, or Composition of Matter ...

41    Section 91(22) of the *Constitution Act, 1867*, assigned legislative competence in respect of "Patents of Invention and Discovery" to Parliament which two years later defined patentable subject matter as follows:

Any person ... having invented or discovered any new and useful art, machine, <u>manufacture, or composition of matter</u>, or any new and useful improvement on any art, machine, <u>manufacture or composition of matter</u>, not known or used by others before his invention or discovery thereof, or not being at the time of his application for a patent in public use or on sale in any of the Provinces of the Dominion with the consent or allowance of the inventor or discoverer thereof ... [Emphasis added.]

(*Patent Act*, S.C. 1869, c. 11, s. 6)

The wording has not changed much in the intervening years, apart from dropping the reference to "discovery". Section 2 of the present *Patent Act* now provides as follows:

"invention" means any new and useful art, process, machine, manufacture or composition of matter, or any new and useful improvement in any art, process, machine, manufacture or composition of matter.

« invention » Toute réalisation, tout procédé, toute machine, fabrication ou composition de matières, ainsi que tout perfectionnement de l'un d'eux, présentant le caractère de la nouveauté et de l'utilité.

42    It is common ground that to meet the subject matter criteria of the *Patent Act* the oncomouse must qualify as a "composition of matter" or a "manufacture".

### *(i) "Composition of Matter"*

43    "Composition of matter" (*composition de matières*) is an open-ended expression. Statutory subject matter must be framed broadly because by definition the *Patent Act* must contemplate the unforeseeable. The definition is not expressly confined to inanimate matter, and the appellant Commissioner agrees that composition of organic and certain living matter can be patented. In the case of the oncomouse, the modified genetic material is a physical substance and therefore "matter". The fertilized mouse egg is a form of biological "matter". The combination of these two forms of matter by the process described in the disclosure is thus, as pointed out by Rothstein J.A. ([2000] 4 F.C. 528 (Fed. C.A.), at para. 120), a "composition of matter".

44    What, then, is the justification under the *Patent Act* for drawing a line between certain compositions of living matter (*lower* life forms) and other compositions of living matter (*higher* life forms)?

45    My colleague, Bastarache J., quotes from the *Oxford English Dictionary* (2nd ed. 1989) vol. IX, at p. 480, the entry that "matter" is a "[p]hysical or corporeal substance in general ...", contradistinguished from immaterial or incorporeal substance (spirit, soul, mind), and qualities, actions, or conditions", but this, of course, depends on context. "Matter" is a most chameleon-like word. The expression "grey *matter*" refers in everyday use to "intelligence" — which is about as incorporeal as "spirit" or "mind". Indeed, the same Oxford editors define "grey matter" as "intelligence, brains" (*New Shorter Oxford English Dictionary* (1993), vol. 1, p. 1142). The *primary* definition of matter, according to the *Oxford English Dictionary*, is "[t]he substance, or the substances collectively, out of which a physical object is made or of which it consists; constituent material" (at p. 479). The definition of "*matière*" in *Le Grand Robert*, quoted by my colleague, is to the same effect. The question, then, is what, in the Commissioner's view, is the "constituent material" of the oncomouse as a physical entity? If the oncomouse is not composed of matter, what, one might ask, are such things as oncomouse "minds" composed of? The Court's mandate is to approach this issue as a matter (that slippery word in yet another context!) of law, not murine metaphysics. In the absence of any evidence or expert assistance, the Commissioner now asks the Court to take judicial notice of the oncomouse, if I may use Arthur Koestler's phrase, as a "ghost in a machine" but this pushes the scope of judicial notice too far. With respect, this sort of literary metaphor

Case 09-10138-MFW   Doc 14225-46   Filed 08/15/14   Page 150 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

(or its dictionary equivalent) is an inadequate basis on which to narrow the scope of the *Patent Act*, and thus to narrow the patentability of scientific invention at the dawn of the third Millennium.

### *(ii) Defining the Exception for "Higher Life Forms"*

46     The appellant Commissioner says the Federal Court of Appeal erred by allowing a patent on a "higher intelligent life form", but he himself offers no definition of an "intelligent" life form, much less does he identify a dividing line between a "higher" intelligent life form and a "lower" intelligent life form.

47     The *Patent Act* does not distinguish, in its definition of invention, between subject matter that is less complex ("lower life forms") and subject matter that is more complex ("higher life forms"). The degree of complexity is not a criterion found in the Act or in the jurisprudence in determining patentability. The distinction between "lower life forms" and "higher life forms" in its application to s. 2 is the invention of the Patent Office.

48     While refusing to issue a patent for a higher *animal* life form in this case, the Commissioner has issued patents under the *Patent Act* for higher *plant* life forms: see, e.g., Canadian Patent 1,313,830 issued February 23, 1993 for "Round-up Ready Canola", a genetically modified plant, recently before the courts in *Monsanto Canada Inc. v. Schmeiser*, [2002] F.C.J. No. 1209 (Fed. C.A.).

49     The CBAC report says, at p. 6:

The term "higher life form" is not defined in law. In common usage, it includes plants and non-human animals other than single-celled organisms.

The line, on this view, is not drawn between sentient beings and non-sentient beings or intelligent beings and unintelligent beings, but between simple one-cell organisms (such as bacteria) and their more complicated cousins, perhaps as rudimentary as moulds or other fungi.

50     Other approaches abound. In a paper prepared for the Intellectual Property Policy Directorate of Industry Canada, *A Study of Issues Relating to the Patentability of Biotechnological Subject Matter* (1996), J. R. Rudolph offered the following explanation, at pp. 11-12:

Microorganisms are a large and diverse group of organisms consisting of only one cell or cell clusters of prokaryotic or eucaryotic cells. Examples of eukaryotic organisms are algae, fungi, molds and yeasts. An example of prokaryotes is bacteria. An important distinction between single cells or cell clusters which are microorganisms, and single cells or cell clusters which are not microorganisms, is that microbial cells are able to live alone in nature: single animal or plant cells or cell clusters are unable to exist by themselves in nature and can only be successful in either a specialized environment such as a culture system (typically created by man in the laboratory) or as part of a multicellular organism such as a plant or animal. The so-called "higher life forms" are underlined complex multicellular organisms such as simple plants or oysters, for example, which contain thousands or hundreds of thousands of cells. The human, which is a complex multicellular organism, has been estimated to contain at least $10^{14}$ cells. [Emphasis added.]

51     My colleague, Bastarache J., takes the view that a key factor is "the unique ability of higher life forms to self-replicate" (para. 170), but in fact self-reproduction is also a fundamental characteristic of "lower life forms". Indeed, one of the most widely held objections to the genetically engineered bacteria in the *Chakrabarty* case was the potential for such unnatural bacteria to escape and reproduce in the wild with unknown consequences for the environment.

52     The various distinctions attempted to be made between "patentable" lower life composition of matter and "*un*patentable" higher life composition of matter, shows, I think, the arbitrariness of the Commissioner's approach. My colleague writes at para. 199:

Case 09-10138-MFW   Doc 14225-46   Filed 08/15/14   Page 151 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

The distinction between lower and higher life forms, though not explicit in the Act, is nonetheless defensible on the basis of common sense differences between the two.

With respect, there seems to be as many versions of "common sense" as there are commentators:

(1) Some would say all *living* organisms are excluded (e.g., Brennan J. for the dissenters in *Chakrabarty* );

(2) Some would allow micro-organisms but only those that can be produced *en masse with identical features*, like bacteria. In *Abitibi Co., Re*, *supra*, the Patent Appeal Board recommended that patents extend "to all new life forms which are produced *en masse* as chemical compounds are prepared, and are formed in such large numbers that any measurable quantity will possess uniform properties and characteristics" (p. 89). "Mass" live organisms have a long history of patentability, including food products such as beer and yogurt.

(3) Then there are the proponents of "*higher* life" organisms *versus* "*lower* life" organisms, the latter being defined by the CBAC as having only a single cell.

(4) Others divide the universe between *prokaryotic* cells (e.g., bacteria and certain forms of algae) and *eukaryotic* cells (more complex life forms) and consider "higher" life forms to start only with more "complex" multicellular organisms.

(5) The Patent Appeal Board allowed *multi-celled* organisms such as moulds and fungi in *Connaught Laboratories, supra*.

(6) Some argue that "*complex* life forms" are unpatentable. Nadon J. took this position at trial in this case, [1998] 3 F.C. 510 (Fed. T.D.), at para. 35.

(7) The Commissioner issues patents for genetically modified complex *plants* (*Monsanto Canada Inc.* , *supra*) but refuses to issue a patent for a genetically modified complex mouse.

(8) Others draw the line at *sentient* beings.

(9) Still others draw the line at "*intelligent*" beings.

(10) The Commissioner opened his argument in this case by asking whether "a complex intelligent living being could be considered an invention".

53      In my view, none of these proposed dividing lines arise out of the present text of the *Patent Act*. All of them are policy driven and, if they are to be introduced at all, should be introduced by Parliament.

54      The Federal Court of Appeal and CBAC drew the line at *human* bodies in their entirety at any stage of development, as discussed below. The true basis for the exclusion is not extraneous to the *Patent Act* but lies in an explicit limitation in s. 40 which provides that:

**40.** Whenever the Commissioner is satisfied that an applicant is not <u>by law</u> entitled to be granted a patent, he shall refuse the application ... [Emphasis added.]

**40.** Chaque fois que le commissaire s'est assuré que le demandeur n'est pas <u>fondé en droit</u> à obtenir la concession d'un brevet, il rejette la demande ... [Je souligne.]

The reference to "by law" is not limited to the *Patent Act* itself (as the French version "*fondé en droit*" makes clear). It has been established for over 200 years that people cannot, at common law, own people: *Somerset v. Stewart* (1772), Lofft 10, 98 E.R. 499 (K.B.) . The issue of whether a human being is a "composition of matter" does not, therefore, arise under the *Patent Act*. If further reinforcement is required, ss. 7 and 15 of the *Canadian Charter of Rights and Freedoms* would clearly prohibit an individual from being reduced to a chattel of another individual.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 152 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

55     The situation here bears some resemblance to *Bishop v. Stevens*, [1990] 2 S.C.R. 467 (S.C.C.), a copyright case, where this Court refused to read an "implied exception to the literal meaning" (p. 480) of the broad rights given to copyright holders in s. 3(1)(*d*) of the *Copyright Act* R.S.C. 1985, c. C-42. McLachlin J. (as she then was) stated that "policy considerations suggest that if such a change is to be made to the Act it should be made by the legislature, and not by a forced interpretation" (p. 485). And so it is in this case too.

56     The difference between the Commissioner and the CBAC is that the Commissioner wants the judges to read down the word "matter" to include only a subdivision of "matter" whereas the CBAC is making its proposal to the government, and through the government to Parliament, which is the proper forum in which such restrictions or regulatory structures should be debated and resolved.

### (iii) "Manufacture"

57     The inventors argued that the oncomouse falls within the *extended* definition of "manufacture" in s. 2. I do not accept that view, but the submission is of significance in terms of the correct approach to the interpretation of the *Patent Act*. The English law of patents finds its root in the *Statute of Monopolies* (1623), which defined the permissible subject matter for a patent in a rather limited way as the "sole working or makinge of any manner of new Manufactures" (s. 6). The definitional approach adopted by my colleague, Bastarache J., leads him to define "manufacture" in the context of the present s. 2 of the Act as "a non-living mechanistic product or process" (para. 159). However, the tradition of patent jurisprudence has been expansive, not restrictive. By 1851 the learned text *Godson on Patents* (2nd ed.) noted that the word "manufactures" had received from the English courts "very extended signification. It has not, as yet, been accurately defined; for the objects which may possibly come within the spirit and meaning of that act, are *almost infinite*" (p. 35 (emphasis added)).

58     Of course the word "manufacture" in our statute appears in conjunction with the words "art, ... machine ... or composition of matter" and must be read in context. Nevertheless, it is, I think, worth pointing out the contrast between the expansionist view that has characterized patent jurisprudence to date and the limiting view of the words "manufacture" and "composition of matter" now proposed by my colleague.

59     We should not encourage the Commissioner to try to circle each of the five definitional words with tight language that creates arbitrary gaps between, for example, "manufacture" and "composition of matter" through which useful inventions can fall out of the realm of patentability. To do so would conflict with this Court's earlier expression of a "judicial anxiety to support a really useful invention": *Consolboard Inc. v. MacMillan Bloedel (Sask.) Ltd.*, [1981] 1 S.C.R. 504 (S.C.C.), *per* Dickson J., at p. 521, citing *Hinks & Son v. Safety Lighting Co.* (1876), 4 Ch. D. 607 (Eng. Ch. Div.). The definition of invention should be read as a whole and expansively with a view to giving protection to what is novel and useful and unobvious.

### H. Negative Inference from the Plant Breeders' Rights Act

60     The Commissioner argues that we should take from the passage in 1990 of the *Plant Breeders' Rights Act*, S.C. 1990, c. 20, the negative inference that plants were not intended by Parliament to be patentable under the *Patent Act*. (I leave aside, for present purposes, the Commissioner's inconsistency in issuing a patent for Round-up Ready Canola in 1993, three years after the *Plant Breeders' Rights Act* was enacted — see *Monsanto Canada Inc.*, *supra*.) From this questionable premise, the Commissioner reasons that, if plants are not patentable subject matter, the exclusion must also apply to other "higher life forms" such as seeds and animals, all of which are able to reproduce themselves. When *Pioneer Hi-Bred Ltd.*, *supra*, was before the Federal Court of Appeal ([1987] 3 F.C. 8 (Fed. C.A.), at p. 14), Marceau J.A. expressed the view that, if Parliament had intended to include plants in the *Patent Act*, he would have expected that in the definition of invention in s. 2 "words such as 'strain', 'variety' or 'hybrid' would have appeared".

61     I do not accept this argument. Firstly, there is nothing in the *Plant Breeders' Rights Act* that expressly bars an application under the *Patent Act*, which confers much more exclusive and valuable rights. The *Plant Breeders' Rights Act* grants protection for 18 years on the sale and propagation for sale of enumerated new plant varieties — cultivars, clones, breeding lines, or hybrids that can be cultivated. The plant breeder pays "annual maintenance fees and [must] provide propagating material throughout

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

the term of [protection]. The right does not prevent the development of different varieties from protected plants or the use of seeds taken from protected varieties": D. Vaver, *Intellectual Property Law* (1997), at p. 126. As to the legislative purpose of the *Plant Breeders' Rights Act*, I agree with my colleague, Bastarache J., when he writes, at para. 192:

> [I]t may well be that the *Plant Breeders' Rights Act* was passed not out of recognition that higher life forms are not a patentable subject matter under the *Patent Act*, but rather out of recognition that plant varieties deserve some form of intellectual property protection despite the fact that they often do not meet the technical criteria of the *Patent Act*.

The rights available under the *Plant Breeders' Rights Act* fall well short of those conferred by patent, both in comprehensiveness and in duration.

62      Secondly, to address the comment of Marceau J.A., use of specific terms such as "strain" or "hybrid" would undermine the generality that s. 2 seeks to achieve by use of the term "composition of matter".

63      Thirdly, the *Patent Act* language reaches back (as stated) prior to Confederation. This particular argument suggests that a "negative inference", arising when the plant legislation was enacted in 1990, should somehow be read back to narrow a definition that had at that time been in effect more than a century. This would amount to a repeal by implication, and would necessarily require an inconsistency between the two pieces of legislation. There is no such inconsistency. Rights acquired under both Acts can live together. Similar arguments were rightly rejected by the United States Supreme Court in *J.E.M. AG Supply Inc. v. Pioneer Hi-Bred International Inc.*, 122 S. Ct. 593  (U.S.S.C. 2001) .

## I. Nature of Rights Granted by a Patent

64      A patent does not exempt the owner from any relevant regulation or prohibition. While s. 44 (now s. 42) of the *Patent Act* gives the owner, as against the rest of the world, "the *exclusive* right, privilege and liberty of making, constructing and using the invention and selling it to others to be used ..." (emphasis added), and in that respect is framed as a positive right, its effect is essentially to prevent others from practising an invention that, but for the patent monopoly, they would be permitted to practise. In exchange for disclosure to the public, the patent protects the disclosed information from unauthorized use for a limited time.

65      The limited nature of the rights conferred by a patent was fully appreciated by CBAC in its Interim Report, *Biotechnology and Intellectual Property: Patenting of Higher Life Forms and Related Issues* (November 2001), at p. vi:

> It is crucial for rational debate on questions related to what should or should not be patentable to recognize that patents confer only prohibitive rights. The Canadian patent system is not designed to decide about what uses of technology are permissible nor is the *Patent Act* designed to prevent dangerous or ethically questionable inventions from being made, used, sold or imported. The responsibility and tools for dealing with such matters resides elsewhere (e.g., through regulatory approval or product safety processes). [Emphasis added.]

I agree with this observation. This is not to say that patents are "neutral", or have no link to the ethical and social issues raised by the interveners. It is to say that those issues transcend the narrow question of patentability circumscribed by ss. 2 and 40 of the *Patent Act*.

## J. A Working Definition of "Life"

66      The subtext of much of the argument for the appellant Commissioner and his supporters invokes Dolly the cloned sheep and the potential of eugenics and "designer" human beings. However, the scientific notion of life begins at a much lower level. There is a good deal of debate about what constitutes "life" but some consensus about a few of its characteristics. These include the capacity to grow and develop (including reproduction), i.e., a metabolism, the ability of an organism to draw energy from its environment for this purpose, and the ability to respond to stimuli. Other characteristics are sometimes added. For example, the Massachusetts Institute of Technology, in designing its probe for extraterrestrial "life", suggests that the definition of live organisms includes their tendency to ensure self-preservation, and that they be significantly differentiated from their surrounding environment.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 154 of 310

**Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...**

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

67      Life is no less wondrous at the microscopic level, and to think of "life" primarily in terms of dolphins, chimpanzees and blue whales (examples urged by the appellant Commissioner in the oral hearing) is something of an oversimplification.

68      Some of the interveners objected to Harvard claiming credit for inventing a form of life. The Canadian Council of Churches and Evangelical Fellowship of Canada protested that the analysis of Rothstein J.A. "is built on a false premise that this [oncomouse] was a new form of life. It is not". That is true, of course. Harvard did not construct the mouse from scratch, nor did it create "life". What it did was to modify the genome of the oncomouse so that every cell in its body contained a modified gene. It is not like adding a new and useful propeller to a ship. The oncogene is everywhere in the genetically modified oncomouse, and it is this important modification that is said to give the oncomouse its commercial value, which is what interests the *Patent Act*.

69      The point is that Harvard is not being credited with inventing life. It claims to have modified every cell of a living creature in a new and useful way, and to the extent that modification is a valuable addition to the advancement of learning, Harvard claims only whatever rewards the *Patent Act* entitles it to for its disclosure.

## K. The Ongoing Parliamentary Process in Canada

70      The appellant Commissioner of Patents invites the Court to intervene in the debate about a proper legal framework for genetic research (or hasten its conclusion prematurely) that is already underway in the government and in Parliament. None of the parties suggested that the *Patent Act* was an adequate vehicle to deal with biotechnology in general or the ethical issues arising from research into "higher life forms" (however defined) in particular. Patent rights are such a limited aspect of the debate that one would not expect to find such comprehensive regulation jammed into the *Patent Act*.

71      Parliament seems to be of that view. On May 9, 2002, as mentioned, the Minister of Health introduced into Parliament the *Assisted Reproduction Act* based in part on the work of CBAC. In its recent report dated June 2002, the CBAC accepted that life forms come within the definition of "invention" of the present patent legislation, and recommended that life forms *continue* to be patentable, but proposed an express exception in the case of *human* life as follows (at p. x):

No patent shall be granted on human bodies at any stage of development.

This, as earlier stated, is consistent with both the common law and the *Charter*. Such an amendment, the CBAC reasoned, at p. 9, would

apply only to entire human bodies from the zygote to an adult body; DNA sequences, gametes, stem and other cells, or organs will <u>remain</u> patentable. [Emphasis added.]

72      The CBAC emphasized that its proposed exemption related to the "whole human body and not ... its parts" (for example, artificially created human organs), and intended the proposed exception to be "read narrowly" (p. 9). "It is important" opines the CBAC, "not to discourage research on stem cells and the creation of artificial organs" (p. 9). The CBAC recommended *against* extending *non*-patentability to *non*-human animals (which again presumes that under the current *Patent Act* non-human animals are patentable). The *Patent Act* is "not a sufficiently subtle instrument" for those evaluations, and the "dignity of and respect for animals can be better protected through animal welfare and habitat protection measures" (p. 10).

73      The majority of the CBAC also concluded that the "overall public good is best attained by providing patent rights over higher life forms, provided that these rights are no greater in substance than those granted over other inventions, taking into account the particularities of biologically based inventions" (p. 11). Given that one of those particularities is the ability to reproduce, among other characteristics, the CBAC states that this recommendation must be read together with several other recommendations, including the farmers' privilege, protection for innocent bystanders, research and experimental use exception, guidelines for biological inventions, and establishment of an opposition procedure.

74      It is not our job to comment on the CBAC proposals one way or the other except to say that they are directed to the proper destination — the legislators.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

## L. Policy Arguments Against Granting a Patent for the Oncomouse

75     The appellant Commissioner contends that the Federal Court of Appeal showed no understanding that this case is a "harbinger of a new era". The majority judgment, he says, looked narrowly at the case but failed to consider the broader context. What may have appeared as a small step for the oncomouse was, so to speak, a very large policy leap for patentability. Nevertheless, we must deal with the *Patent Act* as it is. Change ought to come through statutory amendment, not by the Court reading down the *Patent Act* to exclude non-human "higher life forms" from patentability by creative statutory interpretation.

76     The Court heard from a coalition of advocates opposed to the granting of a patent, including religious, environmentalist, agricultural, and non-profit research groups in addition to the concerns voiced by the Commissioner himself.

### (i) The Religious Objection

77     Some opponents object to scientists "playing God". A hint, perhaps, of their objection is reflected in the reasons of my colleague, Bastarache J., at para. 163:

> Although some in society may hold the view that higher life forms are mere "composition[s] of matter", the phrase does not fit well with common understandings of human and animal life.

78     I do not think that a court is a forum that can properly debate the mystery of mouse life. What we know, in this case, is that the inventors were able to modify a particular gene in the oncomouse genome, and produce a new, useful and unobvious result. That is all we know about the mysteries of oncomouse life and, in my view, it is all we need to know for the purposes of this appeal.

### (ii) The "Lack of Regulatory Framework" Objection

79     As already mentioned, much of the Commissioner's argument turned on the lack of the regulatory framework that is necessary, he says, to address the ethical and scientific issues raised by genetic research. The argument is that because in his view genetic patents should be regulated, and because the *Patent Act* fails to do the job, Parliament cannot in 1869 have intended to grant patents for genetically engineered "higher" life forms. My colleague, Bastarache J., accepts this argument at para. 167, where he writes:

> ... the fact that the *Patent Act* in its current state is ill-equipped to deal appropriately with higher life forms as patentable subject matter is an indication that Parliament never intended the definition of invention to extend to this type of subject matter.

With respect, I do not agree.

80     First, we all probably have strong views that certain activities or things should be regulated. Some say contraceptive devices should not be patented because their use is immoral and unregulated. Others might wish to deny patents to environmentally risky chemical compositions for which, in their view, there is no adequate regulation. On the other hand, others feel that the use of potentially dangerous inventions like explosives and firearms should *not* be regulated. I do not think patents should be denied as a protest against perceived shortcomings in regulatory structures. The opponents of such patents should address themselves to Parliament, not the courts. As Rand J. commented in *Canada (Commissioner of Patents) v. Winthrop Chemical Co.*, [1948] S.C.R. 46 (S.C.C.), at p. 57:

> ... the intention of a legislature must be gathered from the language it has used and the task of construing that language is not to satisfy ourselves that as used it is adequate to an intention drawn from *general considerations* or to a purpose which might seem to be more reasonable or equitable than what the language in its ordinary or primary sense indicates. [Emphasis added.]

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 156 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

This passage was quoted with approval in a patent context by Pigeon J. in *Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111 (S.C.C.), at p. 121, and again by Lamer J. in *Pioneer Hi-Bred Ltd.* , *supra*, at p. 1643. What I consider to be the Commissioner's misinterpretation of s. 2 of the *Patent Act* proceeds, with respect, from "general considerations" of what he considers to be "reasonable or equitable" regulation of a controversial area of biotechnology. His views may or may not reflect desirable public policy but they have nothing to do with "the language" used by Parliament in s. 2 of the *Patent Act*.

81     This is not to deny the importance of context as an aid to statutory construction. It is simply to say that a court has no mandate to deny patentability because of the novelty or the potential social, economic or cultural impact of an invention, whether it be nuclear technology in the 1950s, biotechnology in the 1990s, or reproductive technology in the year 2002.

82     Second, regulation necessarily follows, rather than precedes, the invention. No doubt most people would agree that nuclear technology requires regulation; yet the regulation could hardly have been anticipated in 1869, decades before Ernest Rutherford, while at McGill University, with Frederick Soddy, first formulated the theory of atomic disintegration. Prescription drugs are regulated, but the regulatory structure for new drug approval is not in the *Patent Act*. The grant of a patent does not allow the drug to be marketed. Nor should it. Health and safety are not, and never have been, the preoccupation of intellectual property legislation.

83     It is evident that there are as many areas of potential regulation as there are areas of invention. I think it is also evident that all of these regulatory regimes cannot and should not be put under the inadequate umbrella of the *Patent Act*. Parliament has shown a preference for using more specific statutes altogether outside the framework of patent law. This allows Parliament to tailor the statutory scheme and relevant incentives more precisely to the subject matters involved. Such collateral legislative activity, however, does not justify "reading down" the definition of "invention" in the *Patent Act*, in my opinion.

*(iii) The "Laws of Nature" Objection*

84     The appellant Commissioner rejected the oncomouse patent in part because the inventors exercised no control over the genetic characteristics of the mouse (hair colour, length of whiskers, etc.) except for the presence of the oncogene. Further, the Commissioner argued, the oncomouse is not reproducible *en masse* like bacteria. The trial judge upheld these objections. The animal resulting from the patented gene insertion process, he said, is "completely unknown and unknowable" because the mouse's "inherent genetic makeup" controls many characteristics and the whole mouse, *with the exception of the oncogene*, is completely independent of human intervention. This is true but not, in my opinion, relevant. The utility of the invention has nothing to do with the length of the mouse's whiskers. Its value, in terms of the patent, appears to reside wholly in the oncogene.

85     My colleague, Bastarache J., as stated, acknowledges that the fertilized genetically modified egg is patentable (para. 162) but accepts the Commissioner's argument that the oncomouse itself is unpatentable because it develops through the natural process of gestation (which everyone agrees was not invented by Harvard) without further "human intervention" (para. 162). Rothstein J.A. rejected this argument (at para. 121):

> Although the natural gestation process is required to allow the fertilized mouse egg to develop, this does not mean the organism ceases to become a "composition of matter" as it develops from the single-cell stage into an oncomouse. The founder oncomouse is therefore itself a composition of matter.

86     Counsel for the Commissioner says there is a world of difference between a fertilized single cell and the animal it becomes, but if the one is allowed, where is the cut-off point? At what point in the process of gestation does the fertilized single cell *cease* to be a "composition of matter"?

87     Counsel for the Commissioner says that growth from a single fertilized cell to the complete mouse has nothing to do with the inventors and everything to do with the "laws of nature". This is true (although each cell of the live mouse contains the genetic modification), but this is scarcely a fatal objection. The "laws of nature" are an essential part of the working of many and probably most patented inventions. Patents on biotechnical processes such as fermentation, wholly dependent on the

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 157 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

"laws of nature", were first issued in the early 1800s. Pharmaceutical drugs utilize the normal bodily processes and functions of animals and humans and are not on that account regarded as less patentable. The anti HIV-AIDS drug AZT ingested orally would achieve nothing were it not circulated and processed through the body by the "laws of nature". Indeed, the AZT pill, like the oncomouse, could not be brought into existence without reliance on "the laws of nature" in general and the processes of biochemistry in particular. In *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77 (S.C.C.) , released concurrently, we uphold as valid the AZT patent despite the fact that AZT would lack utility (a statutory prerequisite to the issuance of a patent) unless the "laws of nature" arranged for it to "be absorbed into the human blood stream, make its way to the T-cells infected with HIV, enter the T-cells and inhibit the reproduction of the HIV infection without proving toxic to other cells, and demonstrate clinical improvement in the patient" (para. 20). Such natural processes, before, during and after the construction of the pill, are no more the creation of the AZT inventor than the gestation of an oncomouse (essential to *its* utility) is the creation of the Harvard inventors. An inventor whose invention harnesses the forces of nature is no less an inventor.

### *(iv) The "De Minimis" Objection*

88     The Commissioner rather downplays the inventor's achievement. The implicit objection seems to be, "What's 1 gene in 30,000?". My colleague writes, at para. 163:

> A person whose genetic make-up is modified by radiation does not cease to be him or herself. Likewise, the same mouse would exist absent the injection of the oncogene into the fertilized egg cell; it simply would not be predisposed to cancer.

89     Such an argument, it seems to me, significantly understates the scientific achievement. The "modification" of the gene is not an add-on. Modification of even a single gene does not, with respect, leave the creature like "him or herself" or "the same mouse". Genetic modification is not like a haircut or a tonsillectomy. Modification or mutation of even a single gene can have colossal consequences. It is instructive, for example, to note the description of Tay-Sachs disease, mentioned earlier, which results in infantile deaths from the mutation of but a *single* gene:

> ... a familial disease of infancy in which there is a progressive degeneration of nerve cells throughout the whole nervous system and in the retina. It is characterized clinically by progressive muscular weakness and paralysis, mental deterioration and blindness, usually leading to death in coma or convulsions towards the end of the second year.

> (*Butterworths Medical Dictionary*, (2nd ed. 1978), at p. 1496)

Any suggestion that a child with or without the mutant Tay-Sachs gene is "the same person" would seriously underestimate the power of the science that we are being asked to consider.

### *(v) Ordre Public or Morality*

90     NAFTA and TRIPS each provide that contracting states may *exclude* from patentability inventions the exploitation of which would be contrary to *ordre public* (which seemingly equates to the protection of public security, the physical integrity of individuals as members of society, and the protection of the environment) or morality: *North American Free Trade Agreement Between the Government of Canada, the Government of the United Mexican States and the Government of the United States of America* (1992), Can T.S. 1994 No. 2 (entered into force January 1, 1994), art. 1709(2); *Agreement on Trade-Related Aspects of Intellectual Property Rights* (1994), 25 I.I.C. 209, art. 27(2). The exclusion presupposes a general rule of patentability. Parliament has amended the *Patent Act* to take account of each of these agreements, but has chosen not to include such an exclusion from patentability in the *Patent Act*.

91     The *European Patent Convention* contains an *ordre public* exclusion from patentability, and the corresponding European "oncomouse" patent application was examined having specific regard to this exclusion. In its decision of April 3, 1992, the Examining Division of the European Patent Office stated the issue as follows:

> In the case at hand three different interests are involved and require balancing: there is a basic interest of mankind to remedy widespread and dangerous diseases, on the other hand the environment has to be protected against the uncontrolled

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 158 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

dissemination of unwanted genes and, moreover, cruelty to animals has to be avoided. The latter two aspects may well justify regarding an invention as immoral and therefore unacceptable unless the advantages, i.e. the benefit to mankind, outweigh the negative aspects.

(*Grant of European patent No. 0 169 762 (Onco-mouse/Harvard)* (1992), OJ EPO 1992, 588, at pp. 591-92)

We do not possess such a "balancing" test in our *Patent Act*, though some thought must have been given to it when Parliament "opened up" the *Patent Act* for NAFTA and TRIPS-related amendments in 1994.

92    The Examining Division of the European Patent Office concluded that issuance of the oncomouse patent was *not* contrary to *ordre public* or public morality and further that "[i]f the legislator is of the opinion that certain technical knowledge should be used under limited conditions only it is up to him to enact appropriate legislation" (*ibid*, p. 591).

93    The European Community Directive on biotechnology (*Directive 98/44/EC of the European Parliament and of the Council of 6 July 1998 on the legal protection of biotechnological invention*) names specific inventions (human cloning, modifying germ line, commercial use of human embryos, and causing suffering to animals without substantial medical benefit to humans or animals) as contrary to *ordre public* or morality. If Parliament thinks it wise to spell out such a policy in the *Patent Act*, it will pass appropriate amendments. More likely, as the government has already signalled, such measures will be put into special legislation equivalent to the proposed *Assisted Human Reproduction Act*.

### (vi) Unjust Enrichment

94    Other critics take the view that the rewards given by a patent, whether they reflect innovation or not, are unjust. Why, it is asked, should Harvard be rewarded for "inventing" a creature that occurs in its original form in nature? In a scientific laboratory, the wild mouse becomes a research platform. Harvard researchers made an "improvement" by genetic modification, but the remaining unmodified genes contribute to producing the mouse, and shaping its reaction to the laboratory experiments. Why, then, should the whole mouse be considered "patentable"? Why should Harvard appropriate to itself the whole value attributable to the "platform" when all it contributed is an improvement to that platform?

95    Such an argument relates to remedies rather than patentability. A view that the *Patent Act* rewards a patent owner too richly is not a sound basis on which to deny a patent. The inventor of the frisbee (patented in 1967) would also, no doubt, be thought by some critics to have been excessively rewarded.

96    The scientific accomplishment manifested in the oncomouse is profound and far-reaching, and a numerical count of the genes modified and the genes not modified misses the point. Every cell in the animal's body has been altered in a way that is profoundly important to scientific research. If researchers were to discover that cancers were entirely attributable to one gene and then modified individuals so that they were cancer-free, no one would deny that such a modification would be of enormous importance regardless of the fact that only one gene was changed.

97    Researchers who wish to use a wild mouse can catch one in the parking lot. Harvard would have no complaint. It is only if they wish to take advantage of the advances in learning disclosed in the oncomouse patent that they would require authorization from the inventor who made the disclosure they now seek to exploit.

98    If the patent were refused on the oncomouse itself, it would be easy for "free riders" to circumvent the protection sought to be given to the inventor by the *Patent Act* simply by acquiring an oncomouse and breeding it to as many wild mice as desired and selling the offspring (probably half of which will be oncomice) to the public. The weakness of this protection would undermine the incentives intended by the *Patent Act*. I agree with William Hayhurst when he writes:

Some patents for processes may be of little practical value. To discover that a competitor is carrying out the process may be difficult. If a process produces a living organism that reproduces itself, the process may have to be carried out only once: competitors who are able to get their hands on the organism need not repeat the process of producing it. What is needed is a patent for the organism ...

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 159 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

(W. L. Hayhurst, "Exclusive Rights in Relation to Living Things" (1991), 6 *I.P.J.* 171, at p. 177)

99    On the other hand, if the oncomouse is patented, and Harvard obtains a judgment for the infringer's profits, the infringer could always contend that the profits should be apportioned between profits attributable to the invention and those profits not attributable to the invention. Harvard will contend that the whole of the laboratory value of the oncomouse is due to its genetic make-up. Others may disagree. Such questions remain, at this stage, entirely premature.

### *(vii) Animal Rights*

100    Animal rights supporters object to the fact that the oncomouse is deliberately designed to cause sentient beings to grow painful malignant tumours. Of course, whatever position is adopted under *patent* law, animals have been and will continue to be used in laboratories for scientific research. Pets are property. Mice are already commodified. Parliament may wish to address animal rights as a distinct subject matter. If the claim for the patent on the oncomouse itself is refused, the result will *not* be that Harvard is denied the opportunity to make, construct, use and sell the oncomouse. On the contrary, the result will be that *anyone* will be able to make, construct, use and sell the oncomouse. The only difference will be that Harvard will be denied the *quid pro quo* for the disclosure of its invention.

### *(viii) The Commodification of Human Life*

101    Some critics argue that life and property rights are incompatible. Patents, they say, treat "life" as a commodity that can be bought and sold, and therefore diminish the respect with which life ought to be regarded. Living entities become "objects".

102    The major concern is that human beings constitute a line that cannot be crossed. The CBAC agrees. But others argue that patenting *any* form of life puts us on a slippery slope. Today the oncomouse; tomorrow Frankenstein's creature. I do not agree. There is a qualitative divide between rodents and human beings. The broadest claim here specifically excepts humans from the scope of transgenic mammals. Moreover, for the reasons already expressed, I do not believe that the issue of patentability of a human being even arises under the *Patent Act*.

### *(ix) Environmental Protection*

103    Environmental concerns include the diversity of the gene pool and potential escape of genetically modified organisms into the environment. These are serious concerns which serious people would expect Parliament to address. The concerns, however, have little to do with the patent system. Patents or no patents, genetically engineered organisms have arrived in our midst. The genie is out of the bottle. As Rothstein J.A. observed, "even if the oncomouse were found not to be patentable, such a decision would not prevent inventors from developing the product or indeed, other genetically engineered living organisms" (at para. 197). Patentability addresses only the issue of rewarding the inventors for their disclosure of what they have done. Larger questions are answered elsewhere.

### *(x) Globalization*

104    Anti-globalization groups object to the impact of broad patentability on developing countries, noting that research dollars and the beneficial effects of patented products are concentrated in developed countries. This criticism is, of course, first a broad attack on intellectual property rights generally and, second, a vote of no confidence in multilateral agreements such as TRIPS. The concerns of developing countries have received wide attention, and rightly so. A countervailing consideration is that the developing world may lose as much benefit as the economically developed world if excessive emphasis is placed on granting equitable access to inventions already made as opposed to continuing to offer adequate incentives for inventions to come. This too is an issue that does not arise for consideration on this appeal.

### *(xi) Contrary Considerations*

105     If a certain subject matter is unpatentable as a matter of law, inventors who do carry on inventing will gravitate toward alternative sources of protection. The most obvious would be trade secrets protection. The problem with this alternative, in terms of the public interest, is that the public would lose the *quid pro quo* of public disclosure that they receive under patent law.

106     Lacking legal protection against unauthorized appropriation of ideas, ingenious people may tend to hide and hoard the products of their ingenuity rather than disclose them for others to build on that knowledge. The "hide and hoard" mentality was the very mischief the *Patent Act* was aimed at.

107     There are, in other words, many policy implications of *excluding* patent protection as well as the policy implications of inclusion relied upon by the appellant Commissioner. The balance between the competing interests is for Parliament to strike.

### *(xii) Policy Options*

108     Parliament may wish to regulate *outside* the framework of the *Patent Act* the creation and use of "higher life forms" (however Parliament chooses to define "higher" life forms) in many ways: ethics boards could be set up to consider "higher life form" patentability on a case-by-case basis, including any patent applications on human genetic material; animal rights legislation might require that all transgenic animal varieties be "engineered" to alleviate or mitigate pain from experimentation; a policy of balancing the potential alleviation of human suffering against animal suffering might be added. Patents on human genetic material, including stem cell research and cloning, might include a provision to exempt all research from patent infringement, or specify compulsory licences for such research.

109     Even a partial listing of the possibilities demonstrates why it should occasion no surprise that such regulatory structures are not crammed into the *Patent Act*, which has always had the more modest and focussed objective of simply encouraging the disclosure of the fruit of human inventiveness in exchange for the statutory rewards.

### M. Alleged Deficiencies in the Patent Regime

110     There is much scholarly controversy in Canada over the role of intellectual property in biotechnology: E. R. Gold, *Body Parts: Property Rights and the Ownership of Human Biological Materials* (1996); E. R. Gold, "Making Room: Reintegrating Basic Research, Health Policy, and Ethics Into Patent Law" in T. A. Caulfield and B. Williams-Jones, eds., *The Commercialization of Genetic Research: Ethical, Legal, and Policy Issues* (1999), 63; T. A. Caulfield, "Underwhelmed: Hyperbole, Regulatory Policy, and the Genetic Revolution" (2000), 45 *McGill L.J.* 437; B. M. Knoppers, "Reflections: The Challenge of Biotechnology and Public Policy" (2000), 45 *McGill L.J.* 559; P. R. Mooney, *The Impetus for and Potential of Alternative Mechanisms for the Protection of Biotechnological Innovations*, CBAC (March 2001), at p. 13.

111     Some thoughtful critics suggest that patents in this field may in fact deter rather than promote innovation: M. A. Heller and R. S. Eisenberg, "Can Patents Deter Innovation? The Anticommons in Biomedical Research" (1998), 280 *Science* 698; Gold, "Biomedical Patents and Ethics: A Canadian Solution", *supra*.

112     On a more technical level, it is pointed out that a 20-year patent is a very long time in the life cycle of biotechnology. A shorter patent life, with conditions more tailored to the industry, would, it is said, provide sufficient incentive. Then there are those who advocate the "farmers' privilege" to avoid farmers being subject to patent enforcement in the case of the progeny of patented plants and animals. Others advocate protection for "innocent bystanders" who inadvertently make use of a genetically engineered plant or animal, unaware of its being patented.

113     My colleague, Bastarache J., suggests that the *absence* of such provisions supports his conclusion that the oncomouse is unpatentable, but this approach, with respect, simply substitutes the Court's notion of good public policy for the judgment of Parliament, whose members are well aware of these and similar proposals. Parliament has had the *National Biotechnology Strategy* since 1983, renewed as the *Canadian Biotechnology Strategy: An Ongoing Renewal Process* fifteen years later in 1998, the work of the CBAC and *Proceed with Care: Final Report of the Royal Commission on New Reproductive Technologies* (1993).

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

114     Parliament may find merit in some of the CBAC proposals for legislative reform enumerated by my colleague, Bastarache J., in his judgment at paras. 169 to 175 and 183, but Parliament has not done so to date, and neither the Commissioner of Patents nor the courts have the authority to declare, in effect, a moratorium on life (or "higher" life) patents until Parliament chooses to act. The respondent is entitled to have the benefit of the *Patent Act* as it stands.

## N. Conclusion

115     In my view, the oncomouse is patentable subject matter. This does not mean that claims 1 to 12 therefore must be allowed. They ought to be considered by the Commissioner in accordance with the usual patent principles (note, for example, that the European Patent Office ultimately modified claim no. 1 to include only "transgenic rodents" rather than, as claimed, "transgenic non-human mammals": *European Patent Office Press Release*, November 7, 2001).

116     I would therefore have remitted the patent application to the Commissioner to have the specific claims 1 to 12 considered and dealt with.

117     I would dismiss the appeal.

***Bastarache J.***:

## I - Introduction

118     This appeal raises the issue of the patentability of higher life forms within the context of the *Patent Act*, R.S.C. 1985, C. P-4. The respondent, the President and Fellows of Harvard College, seeks to patent a mouse that has been genetically altered to increase its susceptibility to cancer, which makes it useful for cancer research. The patent claims also extend to all non-human mammals which have been similarly altered.

119     The Commissioner of Patents upheld the Patent Examiner's refusal to grant the patent. This decision was in turn upheld by the Federal Court Trial Division, but was overturned by a majority of the Federal Court of Appeal. A preliminary issue is the standard of review applicable to the Commissioner's decision to refuse the patent. *I agree with the majority of the Federal Court of Appeal that the standard applicable to the Commissioner's decision in this case is correctness. While the decision to refuse to grant a patent may in some cases be accorded deference, the nature of the question is in this case determinative. In my view, the courts are as well placed as the Commissioner to decide whether the definition of invention in s. 2 of the Patent Act encompasses higher life forms, since this question approaches a pure determination of law that has significant precedential value. Nor do I agree with the minority of the Federal Court of Appeal's position that the Commissioner's decision is owed deference for the reason that he has a discretion to refuse a patent on public policy grounds. To refuse a patent, the Commissioner must be satisfied that the applicant is not "by law" entitled to the patent, wording which indicates that the Commissioner has no discretion independent of the Patent Act* to consider the public interest when granting or denying a patent.

120     Given that there is no discretion on the part of the Commissioner to deny a patent on a particular subject matter of invention, the sole question is whether Parliament intended the definition of invention, and more particularly the words "manufacture" or "composition of matter", within the context of the *Patent Act*, to encompass higher life forms such as the oncomouse. In my opinion, Parliament did not intend higher life forms to be patentable. Had Parliament intended every conceivable subject matter to be patentable, it would not have chosen to adopt an exhaustive definition that limits invention to any "art, process, machine, manufacture or composition of matter". In addition, the phrases "manufacture" and "composition of matter" do not correspond to common understandings of animal and plant life. Even accepting that the words of the definition can support a broad interpretation, they must be interpreted in light of the scheme of the Act and the relevant context. The Act in its current form fails to address many of the unique concerns that are raised by the patenting of higher life forms, a factor which indicates that Parliament never intended the definition of invention to extend to this type of subject matter. Given the unique concerns associated with the grant of a monopoly right over higher life forms, it is my view that Parliament would not likely choose the *Patent Act* as it currently exists as the appropriate vehicle to protect the rights of inventors of this type of subject matter.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

## II - Factual Background

121    On June 21, 1985, the respondent, the President and Fellows of Harvard College ("Harvard"), applied for a patent on an invention entitled "transgenic animals". The invention aims to produce animals with a susceptibility to cancer for purposes of animal carcinogenic studies. The animals can be used to test a material suspected of being a carcinogen by exposing them to the material and seeing if tumours develop. Because the animals are already susceptible to tumour development, the amount of material used can be smaller, thereby more closely approximating the amounts to which humans are actually exposed. In addition, the animals will be expected to develop tumours in a shorter time period. The animals can also be used to test materials thought to confer protection against the development of cancer.

122    The technology by which a cancer-prone mouse ("oncomouse") is produced is described in the patent application disclosure. The oncogene (the cancer-promoting gene) is obtained from the genetic code of a non-mammal source, such as a virus. A vehicle for transporting the oncogene into the mouse's chromosomes is constructed using a small piece of bacterial DNA referred to as a plasmid. The plasmid, into which the oncogene has been "spliced", is injected into fertilized mouse eggs, preferably while they are at the one-cell stage. The eggs are then implanted into a female host mouse, or "foster mother", and permitted to develop to term. After the offspring of the foster mother are delivered, they are tested for the presence of the oncogene; those that contain the oncogene are called "founder" mice. Founder mice are mated with mice that have not been genetically altered. In accordance with Mendelian inheritance principles, 50 percent of the offspring will have all of their cells affected by the oncogene, making them suitable for the uses described above.

123    In its patent application, the respondent seeks to protect both the process by which the oncomice are produced and the end product of the process, i.e. the founder mice and the offspring whose cells are affected by the oncogene. The process and product claims also extend to all non-human mammals. In March 1993, by Final Action, a Patent Examiner rejected the product claims (claims 1 to 12) as being outside the scope of the definition of "invention" in s. 2 of the *Patent Act*, but allowed the process claims (claims 13 to 26). In August 1995, after a review by the Commissioner of Patents and a hearing before the Patent Appeal Board, the Commissioner confirmed the refusal to grant a patent for claims 1 to 12. The Federal Court Trial Division dismissed the respondent's appeal from the decision of the Commissioner. The respondent's further appeal to the Federal Court of Appeal was allowed by a majority of the court, Isaac J.A. dissenting. The Commissioner of Patents appeals from that decision.

## III - Relevant Statutory Provisions

124    *Patent Act*, R.S.C. 1985, c. P-4:

      2. In this Act, except as otherwise provided,

                                        . . . . .

      "invention" means any new and useful art, process, machine, manufacture or composition of matter, or any new and useful improvement in any art, process, machine, manufacture or composition of matter;

      27. (1) The Commissioner shall grant a patent for an invention to the inventor or the inventor's legal representative if an application for the patent in Canada is filed in accordance with this Act and all other requirements for the issuance of a patent under this Act are met.

      40. Whenever the Commissioner is satisfied that an applicant is not by law entitled to be granted a patent, he shall refuse the application and, by registered letter addressed to the applicant or his registered agent, notify the applicant of the refusal and of the ground or reason therefor.

      2. Sauf disposition contraire, les définitions qui suivent s'appliquent à la présente loi.

                                        . . . . .

      « invention » Toute réalisation, tout procédé, toute machine, fabrication ou composition de matières, ainsi que tout perfectionnement de l'un d'eux, présentant le caractère de la nouveauté et de l'utilité.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 163 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

27. (1) Le commissaire accorde un brevet d'invention à l'inventeur ou à son représentant légal si la demande de brevet est déposée conformément à la présente loi et si les autres conditions de celle-ci sont remplies.

40. Chaque fois que le commissaire s'est assuré que le demandeur n'est pas fondé en droit à obtenir la concession d'un brevet, il rejette la demande et, par courrier recommandé adressé au demandeur ou à son agent enregistré, notifie à ce demandeur le rejet de la demande, ainsi que les motifs ou raisons du rejet.

## IV - Judicial History

### A. Decision of the Patent Examiner - Final Action (March 24, 1993)

125    As noted above, the Patent Examiner refused claims 1 to 12, which pertain to the transgenic mice and mammals as products of the invention, but allowed claims 13 to 26 pertaining to the process.

126    The Patent Examiner's rejection of claims 1 to 12 was based on his conclusion that higher life forms fall outside the definition of invention as given in s. 2 of the *Patent Act*, and therefore are not patentable subject matter. He cited several cases for the proposition that the Commissioner has a right to interpret s. 2 as excluding certain subject matter from patentability on the basis that it is not in the public interest to grant a patent: *Farbwerke Hoechst AG Vormals Meister Lucius & Bruning v. Canada (Commissioner of Patents)* (1963), [1964] S.C.R. 49 (S.C.C.), at p. 56; *Lawson v. Canada (Commissioner of Patents)* (1970), 62 C.P.R. 101 (Can. Ex. Ct.), at p. 109; *Tennessee Eastman Co. v. Canada (Commissioner of Patents)* (1972), [1974] S.C.R. 111 (S.C.C.), at p. 119.

127    In addition, the Patent Examiner noted that neither the Patent Appeal Board nor the courts have expressly stated that higher life forms constitute patentable subject matter. In *Abitibi Co., Re* (1982), 62 C.P.R. (2d) 81 (Can. Pat. App. Bd. & Pat. Commr.), the Patent Appeal Board held only that lower life forms were patentable. In *Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)* (1986), 11 C.P.R. (3d) 311 (Can. Pat. App. Bd. & Pat. Commr.), the Commissioner rejected claims to a plant and its seed under s. 2 of the Act. While the Supreme Court of Canada did not make a ruling on the Commissioner's decision to reject the claims (see *Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, [1989] 1 S.C.R. 1623 (S.C.C.)), the majority of the Federal Court of Appeal upheld the Commissioner's rejection of these claims under s. 2 of the Act (*Pioneer Hi-Bred Ltd. v. Canada (Commissioner of Patents)*, [1987] 3 F.C. 8 (Fed. C.A.)). The Patent Examiner concluded that he was bound by the Federal Court of Appeal decision in *Pioneer Hi-Bred Ltd.* , *supra*, since if a plant is held to be non-patentable subject matter, then the same must be said for animals.

### B. Decision of the Commissioner of Patent (August 4, 1995)

128    The Commissioner of Patents disagreed that he had a right or an obligation to decide that a particular invention can be found unpatentable as a matter of policy or discretion rather than as a result of an interpretation of the provisions of the *Patent Act*: *Monsanto Co. v. Canada (Commissioner of Patents)*, [1979] 2 S.C.R. 1108 (S.C.C.); *Farbwerke Hoechst AG Vormals Meister Lucius & Bruning* , *supra*. The Commissioner stated that in order to reject an application, he must be satisfied that *by law* the applicant is not entitled to a patent and be able to give reasons based on an interpretation of the *Patent Act* and applicable jurisprudence.

129    The Commissioner went on to note that in *Pioneer Hi-Bred Ltd.* , *supra*, this Court deliberately chose not to decide whether the soybean resulting from artificial crossbreeding was a patentable invention under s. 2 of the Act. On this basis, the Commissioner concluded that neither he nor the examiner is bound by the decision of the Federal Court in that case: *R. v. Secretary of State for Home Development* (1988), [1989] 1 All E.R. 777 (Eng. C.A.). Nonetheless, he determined that the decision of the majority of the Federal Court of Appeal in *Pioneer Hi-Bred Ltd.* could be of high persuasive influence.

130    Turning to the issue at hand, the Commissioner expressed the view that the words "manufacture" and "composition of matter" as found in s. 2 apply to something that has been made under the control of the inventor. At the same time, the resulting product must be reproducible in a consistent manner. Considering the invention in question, the Commissioner determines

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

that there are two distinct phases. The first phase involves the preparation of the genetically engineered plasmid. The second involves the development of a genetically engineered mouse in the uterus of the host mouse. The Commissioner concluded that while the first phase is controlled by human intervention, in the second phase it is the laws of nature that take over to produce the mammalian end product. He was therefore unwilling to extend the meaning of "manufacture" or "composition of matter" to include a non-human mammal. In his view, the inventors do not have full control over all of the characteristics of the resulting mouse, and human intervention ensures that reproducibility extends only so far as the cancer-forming gene.

### C. Federal Court, Trial Division, - *[1998] 3 F.C. 510* (Fed. T.D.)

131    Nadon J. conceded that there is no dispute that the oncomouse is new, useful and unobvious. The question is whether it is an "invention" to which the *Patent Act* applies. He reviewed the decision of the U.S. Supreme Court in *Diamond v. Chakrabarty (1980), 447 U.S. 303* (U.S. Sup. Ct.) , a decision cited by Harvard in support of the grant of the patent. In *Chakrabarty* , a majority of five judges held that the proper question in patenting a bacterium used to degrade crude oil was whether the subject of the patent application was "human made" or was something occurring naturally. On that basis they allowed the claim. The minority of four referred to the existence of the 1930 *Plant Patent Act* and the 1970 *Plant Variety Protection Act* and concluded that Congress had provided separate intellectual property protection for living things within these statutes, thus signalling a lack of intention to include living things within the scope of the U.S. *Patent Act*. Nadon J. expressed his preference for the minority view.

132    Nadon J. turned next to examine what is meant by "manufacture" and "composition of matter" in the Canadian Act. He examined four issues which, in his view, serve as indicia of how s. 2 should be construed. First, he considered whether the degree of an inventor's control over the creation is a relevant factor. In this respect, he noted that the process of insertion of the oncogene into the fertilized mouse egg is already patented. But a mouse is a complex life form with many features that are not under the control of the inventors. Though the inventors have created a method to inject eggs with an oncogene, they have not invented the mouse. Nadon J. further stated that even on the broadest interpretation he could not find that a mouse is "raw material" which was given new qualities by the inventor.

133    Second, he considered the distinction between human intervention and the laws of nature. In this regard, he observed that anything which is merely a discovery is not patentable subject matter. There must be some inventive step involved. He agreed with the respondent that the essential feature of the mouse is the presence of the transgene, since this is what makes it useful for testing carcinogens. In addition, he agreed that the transgene would not be present without human intervention, rendering the oncomouse a "marriage between nature and human intervention" (para. 27). He noted, however, that not all the offspring mice have the gene. The presence of the gene only transfers with the natural rate of inheritance, the "Mendelian ratio". After the gene has been introduced, the gene passes with a normal breeding process. This, Nadon J. stated, is akin to the crossbreeding process that was suggested to be unpatentable in *Pioneer Hi-Bred Ltd.* , by reason that it is simply in line with the laws of nature. In a chemical process, the chemical reaction and its products are known and constant, whereas the parameters of the resulting mammal in this case are largely unknown and change every time.

134    Third, Nadon J. considered the relevance of the test of reproducibility. In his view, the question of reproducibility is related to the scope of the respondent's invention. He concluded that because the respondent is not merely claiming the transgene but the entire mammal, and the respondent has not made any claims to even minor control over any aspect of the mammal except the presence of the transgene, the respondent can make no claim to being able to reproduce the mammal at will by doing anything other than ordinary breeding.

135    Finally, Nadon J. considered whether it is appropriate to make distinctions between higher and lower life forms. He noted that *Abitibi Co.* , *supra*, only claimed lower life forms were patentable if they were reproducible *en masse*. Since the Federal Court of Appeal in *Pioneer Hi-Bred Ltd.*, *supra*, disallowed a patent claim over the result of the crossbreeding of soybeans, Nadon J. was of the view that the same result ought to apply to the "crossbreeding of mice" (para. 33), which is essentially what occurs when a founder mouse is bred with an ordinary mouse. Although he did not directly consider policy issues, Nadon J. remarked that it would be appropriate to make a distinction between higher and lower life forms on the grounds of policy. He further concluded that a complex life form does not fit within the current parameters of the *Patent Act* without stretching

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

the meaning of the words to the breaking point. If Parliament so wishes, it clearly can alter the legislation so that mammals can be patented.

**D. Federal Court of Appeal, [2000] 4 F.C. 528 (Fed. C.A.)**

*(1) Rothstein J.A.*

136      Speaking for the majority of the court, Rothstein J.A. reversed the decision of the court below and directed the Commissioner of Patents to grant a patent covering claims 1 to 12 of the Patent Application. At the outset, Rothstein J.A. remarked that s. 40 of the Act, which permits the Commissioner to refuse a patent, is not discretionary. In addition, he expressed the view that policy considerations were not relevant in the appeal since all that was at issue was the interpretation of the *Patent Act*.

137      Rothstein J.A. then stated his conclusion that the oncomouse is a "composition of matter". In this regard, he accepted the expansive definition adopted by the majority of the U.S. Supreme Court in *Chakrabarty* , *supra*, and further noted that "[t]he language of patent law is broad and general and is to be given wide scope because inventions are, necessarily, unanticipated and unforeseeable" (at para. 116). Rothstein J.A. explained that both the DNA and the fertilized mouse egg are forms of biological matter which, when combined, are a "composition of matter". This composition of matter is transferred to a host mouse and allowed to develop to term, resulting in a founder mouse that is the product of the "composition of matter". Similarly, offspring mice are the product, since they are linked to the transgenic unicellular material which the Patent Commissioner found to be a composition of matter. In addition, nothing in the term "composition of matter" suggests that living things are excluded from the definition. Nor is the oncomouse a mere discovery or product of nature, since its genetic structure is different from what it would have been without intervention at the genetic level.

138      Rothstein J.A. then outlined why he differs with the reasoning and conclusions of the Patent Commissioner and the trial judge. He reiterated his view that the majority reasoning in *Chakrabarty* , *supra*, was convincing and further rejected the minority position that there is a "common understanding" that patents are not available to cover living organisms. He turned next to the issue of control. In his view, it is apparent that the control (and reproducibility) tests are not freestanding, but are rather implicit in the statutory requirement that an "invention" be "useful". However, in this case, the Patent Commissioner and the trial judge applied a far broader control test, not implied by the usefulness requirement for an invention. He further concluded that control over the length of a tail, colour or eyes or texture of fur is irrelevant to the usefulness of the invention. All that is important for the usefulness of the product in this case is that a mouse is produced with all of its cells affected by the oncogene.

139      In respect to reproducibility, Rothstein J.A. reiterated his view that the fact that other characteristics of the oncomouse are not reproducible by will by the inventor or a person skilled in the science is irrelevant because they are not necessary for the usefulness of the oncomouse. Other than the requirement for sufficient disclosure of an invention in s. 27(3)(*b*), about which there is no dispute on this appeal, there is nothing in the *Patent Act* pertaining to reproducibility which the inventors can be said to have failed to meet. Rothstein J.A. also disagreed with the Commissioner's approach of dividing the invention into two phases on the basis that, once it is accepted that most inventions involve the laws of nature, "there can be no valid basis for splitting an invention between the portion that is the result of inventive ingenuity and the portion that is not" (at para. 167). He further noted that full protection for the inventors would require a patent on both the process and the product, since without a patent on the product anyone could purchase a founder mouse or offspring having the oncogene in its cells and breed it.

140      Rothstein J.A. went on to conclude that the court below placed too much emphasis on the Federal Court of Appeal reasons in *Pioneer Hi-Bred Ltd.* , *supra*. He distinguished *Pioneer Hi-Bred Ltd.* on the basis that it dealt with the crossbreeding of plants, whereas in the current case there is intervention at the genetic level and a sharp and permanent alteration of a hereditary trait. In response to Isaac J.A.'s findings on the standard of review, Rothstein J.A. concluded that the decision of the Commissioner should be reviewed on a standard of correctness since the issue — whether higher life forms come within the definition of "invention" — is a fundamental one which will have significant precedential value. In addition, even if the standard were reasonableness *simpliciter*, Rothstein J.A. would have concluded that the Commissioner's decision was clearly wrong.

Case 09-10138-MFW Doc 14225-46 Filed 08/15/14 Page 166 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

141    A final question considered by Rothstein J.A. was whether the *Patent Act* could be extended to cover human beings. Rothstein J.A. answered this question in the negative on the basis that patenting is a form of ownership of property which would be prohibited pursuant to s. 7 of the *Canadian Charter of Rights and Freedoms*.

*(2) Isaac J.A. (dissenting)*

142    Isaac J.A. dissented primarily on the grounds that the decision of the Commissioner should be accorded deference. In his view, the standard of review applicable to the Commissioner's decision was reasonableness *simpliciter*. This view was based on the Commissioner's expertise, the fact that the nature of the question (the patentability of the oncomouse) is squarely within that expertise and the purpose of the Act. In respect to purpose, Isaac J.A. expressed the view that the Commissioner is entitled to consider the public interest at stake when reviewing a patent application. Issac J.A. concluded that the Commissioner's decision was reasonable because it took a cautious approach to the patenting of new life forms. Isaac J.A. also noted that the Commissioner is entitled to refuse a patent under s. 40 if, by law, the applicant is not entitled to it. In his view, though the Commissioner was not bound by the Federal Court of Appeal decision in *Pioneer Hi-Bred Ltd.*, *supra*, he was entitled to find it highly persuasive. Finally, Issac J.A. noted that following the refusal of the Supreme Court of Canada in *Pioneer Hi-Bred Ltd.* to accommodate crossbred soybean varieties within the definition of "invention", Parliament enacted the *Plant Breeders' Rights Act*, S.C. 1990, c. 20. He concluded:

> In all the circumstances of this case, including the limited role that our jurisprudence has assigned to the courts in this area and the serious moral and ethical implications of this subject-matter, it seems to me that Parliament is the most appropriate forum for the resolution of the issues in dispute here.

## V - Analysis

### A. The Commissioner's Power to Refuse a Patent under Section 40

143    As noted above, the Patent Examiner concluded that the Commissioner of Patents has the right to deny a patent on the basis that it is not in the public interest to grant a patent on the subject matter in question. In his dissenting opinion, Isaac J.A. approved of this approach, stating that one of the purposes of the *Patent Act* is that the Commissioner must always be aware of, and take into account, the public interest in granting a patent. In a morally divisive case, the court should defer to the Commissioner's decision to refuse to grant a patent pursuant to s. 40 where this decision is informed by considerations of public policy.

144    I disagree that s. 40 of the *Patent Act* gives the Commissioner discretion to refuse a patent on the basis of public policy considerations independent of any express provision in the Act. The non-discretionary nature of the Commissioner's duty was explained in *Monsanto Co.*, *supra*, a case cited by Rothstein J.A. At pages 1119-20, after citing s. 40 (then s. 42) of the *Patent Act*, Pigeon J., speaking for the majority, stated:

> I have underlined by law [in s. 42] to stress that this is not a matter of discretion: the Commissioner has to justify any refusal. As Duff C.J. said in *Vanity Fair Silk Mills v. Commissioner of Patents* (at p. 246):
>
>> No doubt the Commissioner of Patents ought not to refuse an application for a patent unless it is clearly without substantial foundation ... [Emphasis added.]

145    Some commentators remark that the Canadian courts have in the past excluded certain subject matter from patentability on moral, ethical or policy grounds (J. R. Rudolph, *A Study of Issues Relating to the Patentability of Biotechnological Subject Matter* (1996); S. Chong, "The Relevancy of Ethical Concerns in the Patenting of Life Forms" (1993), 10 *C.I.P.R.* 189). While it is true that certain categories of invention were excluded from patentability with these policy concerns in mind, these exclusions were justified by reference to explicit provisions of the *Patent Act*. For example, patents on medical or surgical methods of treatment of animals, including humans, were disallowed, presumably so as not to impede physicians in the practice of their profession (see *Tennessee Eastman Co.*, *supra*, at p. 111; Chong, *supra*, at p. 198). In *Tennessee Eastman Co.*, however, the

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

determination that a method for bonding incisions and wounds was not an "art" or a "process" was based primarily on the fact that the bonding material itself when prepared for medical purposes would not be patentable under what was then s. 41 of the *Patent* Act. Section 41, since removed from the Act, restricted the scope of patents on substances prepared or produced by chemical processes and intended for food or medicine. The Court stated, at p.119, in this respect:

> ... if a method of treatment consisting in the application of a new drug could be claimed as a process apart from the drug itself, then the inventor, by making such a process claim, would have an easy way out of the restriction in s. 41(1).

146    In the absence of any discretion on the part of the Commissioner to refuse a patent on policy grounds, the sole question in this appeal is whether the words "manufacture" or "composition of matter", within the context of the *Patent Act*, are sufficiently broad to include higher life forms such as "inventions". The Commissioner correctly identified this as the relevant question and concluded that he could not, by law, extend the meaning of "manufacture" or "composition of matter" to include a non-human mammal.

147     In dissent, Isaac J.A. held that the Commissioner's decision in this regard should be accorded deference. This point was also argued before this Court by the interveners Sierra Club of Canada, Canadian Council of Churches and Evangelical Fellowship of Canada.

148     In my view, the decision of the Commissioner as to whether the definition of invention includes higher life forms is reviewable according to the correctness standard. The test to determine the appropriate standard of review was revisited by this Court in *Moreau-Bérubé c. Nouveau-Brunswick*, 2002 SCC 11  (S.C.C.) . As noted by Arbour J., at para. 37:

> This Court's jurisprudence has evolved to endorse a pragmatic and functional approach to determining the proper standard of review, which focuses on a critical question best expressed by Sopinka J. in *Pasiechnyk v. Saskatchewan (Workers' Compensation Board)*, [1997] 2 S.C.R. 890, at para. 18:
>
> > [W]as the question which the provision raises one that was intended by the legislators to be left to the exclusive decision of the Board?

In *Pushpanathan v. Canada (Minister of Employment & Immigration)*, [1998] 1 S.C.R. 982 (S.C.C.), *Canada (Director of Investigation & Research) v. Southam Inc.*, [1997] 1 S.C.R. 748 (S.C.C.) and *Baker v. Canada (Minister of Citizenship & Immigration)*, [1999] 2 S.C.R. 817 (S.C.C.), this Court set out a number of factors that a court should consider when attempting to determine whether a question is one which Parliament intended to be left to the exclusive decision of the administrative tribunal. Upon considering these factors, it is my opinion that the courts are as well placed as the Commissioner to determine whether a higher life form fits within the definition of invention.

149    Though it will not be determinative, the fact that the *Patent Act* contains no privative clause and gives applicants a broad right of appeal from the decision of the Commissioner is relevant and suggests a more searching standard of review (*Pushpanathan* , *supra*, at para. 30).

150    Perhaps more important in this case is the nature of the problem under review, i.e. whether it constitutes a question of law, fact or mixed law and fact. In my view, the question of whether a higher life form can be considered a "manufacture" or "composition of matter" approaches a pure determination of law. There is no disagreement in this case regarding the nature of the specific invention: if it is determined that higher life forms are "manufacture[s]" or "composition[s] of matter", then the oncomouse is an invention. The task is rather to determine whether Parliament intended the definition of invention to be interpreted broadly enough to encompass higher life forms, a question which the courts are as well suited to answer as the Commissioner. Since the determination of whether a higher life form is an invention within the meaning of the *Patent Act* is "a finding which will be of great, even determinative import for future decisions of lawyers and judges", less deference is warranted (*Southam Inc.* , *supra*, at paras. 36-37; *Pushpanathan* , *supra*, at para. 37). In addition, though the Commissioner does possess considerable expertise in the areas of science, medicine and engineering, this expertise must be considered in the context of the problem under review. In my view, this specialized training does not leave the Commissioner in a better position

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 168 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

than the courts to determine whether the creation in question is a "manufacture" or "composition of matter" since those are very broad phrases to which either a very narrow or very expansive meaning may be attached, depending on legislative intent.

151     The above in no way implies that decisions of the Commissioner will always be reviewed according to a correctness standard. If, for example, the question to be decided was whether or not a particular life form such as a fungus should be classified as a higher life form or as a lower life form, the Commissioner's decision would likely be accorded deference. As noted, s. 40 of the Act states that it is the Commissioner who must be "satisfied" that a patent should not be issued. In such an instance, the Commissioner's scientific expertise suggests that the courts defer to his decision in respect to whether he is satisfied that the life form falls within a category of patentable subject matter.

152     As discussed earlier, I disagree that the purpose of the *Patent Act* counsels deference to the Commissioner on a question such as this. I do not accept Isaac J.A.'s suggestion that the Commissioner is in a position to weigh competing policy interests for and against the grant of a patent and that this counsels deference. Nor do I agree that the wording of s. 40, which states that the Commissioner shall refuse an application where he is "satisfied" that an applicant is not by law entitled to be granted a patent, implies a discretion to refuse a patent on policy grounds. As noted above, the Commissioner must be satisfied that an applicant is not "by law" entitled to be granted a patent (See *Monsanto Co.* , *supra*, at p. 1119). Though Isaac J.A. cites *Farbwerke Hoechst AG Vormals Meister Lucius & Bruning* , *supra*, as support for the existence of a discretionary power on the part of the Commissioner to refuse a patent, the Court in that case pointed out that "[a]n inventor gets his patent according to the terms of the *Patent Act*, *no more and no less*" (p. 57) (emphasis added)).

### B. The Definition of Invention: Whether a Higher Life Form Is a "Manufacture" or a "Composition of Matter"

153     The sole question in this appeal is whether the words "manufacture" and "composition of matter", in the context of the *Patent Act*, are sufficiently broad to include higher life forms. If these words are not sufficiently broad to include higher life forms, it is irrelevant whether this Court believes that higher life forms such as the oncomouse ought to be patentable. The grant of a patent reflects the interest of Parliament to promote certain manifestations of human ingenuity. As Binnie J. indicates in his reasons, there are a number of reasons why Parliament might want to encourage the sort of biomedical research that resulted in the oncomouse. But there are also a number of reasons why Parliament might want to be cautious about encouraging the patenting of higher life forms. In my view, whether higher life forms such as the oncomouse ought to be patentable is a matter for Parliament to determine. This Court's views as to the utility or propriety of patenting non-human higher life forms such as the oncomouse are wholly irrelevant.

154     This Court has on many occasions expressed the view that statutory interpretation cannot be based on the wording of the legislation alone (*Rizzo & Rizzo Shoes Ltd., Re*, [1998] 1 S.C.R. 27 (S.C.C.)). Rather, the Court has adopted E. A. Driedger's statement in his text, *Construction of Statutes* (2nd ed. 1983), at p. 87: "[T]he words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament" (*Rizzo & Rizzo Shoes Ltd.* , *supra*, at para. 21).

155     Having considered the relevant factors, I conclude that Parliament did not intend to include higher life forms within the definition of invention found in the *Patent Act*. In their grammatical and ordinary sense alone, the words "manufacture" and "composition of matter" are somewhat imprecise and ambiguous. However, it is my view that the best reading of the words of the Act supports the conclusion that higher life forms are not patentable. As I discuss below, I do not believe that a higher life form such as the oncomouse is easily understood as either a "manufacture" or a "composition of matter". For this reason, I am not satisfied that the definition of "invention" in the *Patent Act* is sufficiently broad to include higher life forms. This conclusion is supported by the fact that the patenting of higher life forms raises unique concerns which do not arise in respect of non-living inventions and which are not addressed by the scheme of the Act. Even if a higher life form could, scientifically, be regarded as a "composition of matter", the scheme of the Act indicates that the patentability of higher life forms was not contemplated by Parliament. Owing to the fact that the patenting of higher life forms is a highly contentious and complex matter that raises serious practical, ethical and environmental concerns that the Act does not contemplate, I conclude that the Commissioner was correct to reject the patent application. This is a policy issue that raises questions of great significance and importance and that

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

would appear to require a dramatic expansion of the traditional patent regime. Absent explicit legislative direction, the Court should not order the Commissioner to grant a patent on a higher life form.

*(1) The Words of the Act*

156    The definition of invention in s. 2 of the *Patent Act* lists five categories of invention: art (*réalisation*), process (*procédé*), machine (*machine*), manufacture (*fabrication*) or composition of matter (*composition de matières*). The first three, "art", "process" and "machine", are clearly inapplicable when considering claims directed toward a genetically engineered non-human mammal. If a higher life form is to fit within the definition of invention, it must therefore be considered to be either a "manufacture" or a "composition of matter".

157    Rothstein J.A. concluded that the oncomouse was a "composition of matter", and therefore did not find it necessary to consider whether it was also a "manufacture". In coming to this conclusion, he relied, at para. 115, on the following definition of "composition of matter" adopted by the majority of the U.S. Supreme Court in *Chakrabarty* , *supra*, at p. 308:

> ... all compositions of two or more substances and ... all composite articles, whether they be the results of chemical union, or of mechanical mixture, or whether they be gases, fluids, powders or solids.

In *Chakrabarty* , the majority attributed the widest meaning possible to the phrases "composition of matter" and "manufacture" for the reason that inventions are, necessarily, unanticipated and unforeseeable. Burger C.J., at p.307, also referred to the fact that the categories of invention are prefaced by the word "any" ("*any* new and useful process, machine, manufacture, or composition of matter"). Finally, the Court referred to extrinsic evidence of Congressional intent to adopt a broad concept of patentability, noting at p. 309 that: "The Committee Reports accompanying the 1952 Act inform us that Congress intended statutory subject matter to 'include anything under the sun that is made by man'".

158    I agree that the definition of invention in the *Patent Act* is broad. Because the Act was designed in part to promote innovation, it is only reasonable to expect the definition of invention to be broad enough to encompass unforeseen and unanticipated technology. I cannot however agree with the suggestion that the definition is unlimited in the sense that it includes "anything under the sun that is made by man". In drafting the *Patent Act*, Parliament chose to adopt an exhaustive definition that limits invention to any "art, process, machine, manufacture or composition of matter". Parliament did not define "invention" as "anything new and useful made by man". By choosing to define invention in this way, Parliament signalled a clear intention to include certain subject matter as patentable and to exclude other subject matter as being outside the confines of the Act. This should be kept in mind when determining whether the words "manufacture" and "composition of matter" include higher life forms.

159    With respect to the meaning of the word "manufacture" (*fabrication*), although it may be attributed a very broad meaning, I am of the opinion that the word would commonly be understood to denote a non-living mechanistic product or process. For example, the *Oxford English Dictionary* (2nd ed. 1989), vol. IX, at p. 341, defines the noun "manufacture" as the following:

> [T]he action or process of making by hand... The action or process of making articles or material (in modern use, on a large scale) by the application of physical labour or mechanical power.

The *Grand Robert de la langue française* (2nd *ed. 2001), vol. 3, at p. 517, defines thus the word* "*fabrication*":

> [TRANSLATION]
>
> Art or action or manufacturing. ... The manufacture of a technical object (by someone). Manufacturing by artisans, by hand, by machine, industrially, by mass production ...

In *Chakrabarty* , *supra*, at p. 308, "manufacture" was defined as

> the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties, or combinations, whether by hand-labor or by machinery.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 170 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

These definitions use the terminology of "article", "material", and *objet technique*". Is a mouse an "article", "material", or an "*objet technique*"? In my view, while a mouse may be analogized to a "manufacture" when it is produced in an industrial setting, the word in its vernacular sense does not include a higher life form. The definition in *Hornblower v. Boulton* (1799), 8 T.R. 95, 101 E.R. 1285 (Eng. K.B.), cited by the respondent, is equally problematic when applied to higher life forms. In that case, the English courts defined "manufacture" as "something made by the hands of man" (at p. 1288). In my opinion, a complex life form such as a mouse or a chimpanzee cannot easily be characterized as "something made by the hands of man".

160    As regards the meaning of the words "composition of matter", I believe that they must be defined more narrowly than was the case in *Chakrabarty* , *supra*, at p. 308 namely "all compositions of two or more substances and ... all composite articles". If the words "composition of matter" are understood this broadly, then the other listed categories of invention, including "machine" and "manufacture", become redundant. This implies that "composition of matter" must be limited in some way. Although I do not express an opinion as to where the line should be drawn, I conclude that "composition of matter" does not include a higher life form such as the oncomouse.

161        The phrase "composition of matter" (*composition de matières*) is somewhat broader than the term "manufacture" (*fabrication*). It is a well-known principle of statutory interpretation that the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of the words or phrases associated with them (P.-A. Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at pp. 313-14. Also, a collective term that completes an enumeration is often restricted to the same genus as those words, even though the collective term may ordinarily have a much broader meaning (at p. 315). The words "machine" and "manufacture" do not imply a conscious, sentient living creature. This provides *prima facie* support for the conclusion that the phrase "composition of matter" is best read as not including such life forms. This argument is bolstered by the fact that there are a number of factors that make it difficult to regard higher life forms as "composition[s] of matter".

162    First, the *Oxford English Dictionary, supra*, vol. III, at p. 625, defines the word "composition" as "[a] substance or preparation formed by combination or mixture of various ingredients", the *Grand Robert de la langue française, supra*, vol. 2, at p. 367, defines "*composition*" as [translation] "[a]ction or manner of forming a whole, a set by assembling several parts, several elements". Within the context of the definition of "invention", it does not seem unreasonable to assume that it must be the inventor who has combined or mixed the various ingredients. Owing to the fact that the technology by which a mouse predisposed to cancer is produced involves injecting the oncogene into a fertilized egg, the genetically altered egg would appear to be cognizable as "[a] substance or preparation formed by combination or mixture of various ingredients" or as [translation] "[a]ction or manner of forming a whole ... by assembling several parts". However, it does not thereby follow that the oncomouse itself can be understood in such terms. Injecting the oncogene into a fertilized egg is the but-for cause of a mouse predisposed to cancer, but the process by which a fertilized egg becomes an adult mouse is a complex process, elements of which require no human intervention. The body of a mouse is composed of various ingredients or substances, but it does not consist of ingredients or substances that have been combined or mixed together by a person. Thus, I am not satisfied that the phrase "composition of matter" includes a higher life form whose genetic code has been altered in this manner.

163        It also is significant that the word "matter" captures but one aspect of a higher life form. As defined by the *Oxford English Dictionary, supra*, vol. IX, at p. 480, "matter" is a "[p]hysical or corporeal substance in general..., contradistinguished from immaterial or incorporeal substance (spirit, soul, mind), and from qualities, actions, or conditions". "*Matière*" is defined by the *Grand Robert de la langue française, supra*, vol. 4, p. 1260, as "[translation] "corporeal substance 'that is perceptible in space and has mechanical mass'". Although some in society may hold the view that higher life forms are mere "composition[s] of matter", the phrase does not fit well with common understandings of human and animal life. Higher life forms are generally regarded as possessing qualities and characteristics that transcend the particular genetic material of which they are composed. A person whose genetic make-up is modified by radiation does not cease to be him or herself. Likewise, the same mouse would exist absent the injection of the oncogene into the fertilized egg cell; it simply would not be predisposed to cancer. The fact that it has this predisposition to cancer that makes it valuable to humans does not mean that the mouse, along with other animal life forms, can be defined solely with reference to the genetic matter of which it is composed. The fact that animal life forms have

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 171 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

numerous qualities that transcend the particular matter of which they are composed makes it difficult to conceptualize higher life forms as mere "composition[s] of matter". It is a phrase that seems inadequate as a description of a higher life form.

164    Lastly, I wish also to address Rothstein J.A.'s assertion that "[t]he language of patent law is broad and general and is to be given wide scope because inventions are, necessarily, unanticipated and unforeseeable" (para. 116). In my view, it does not thereby follow that all proposed inventions are patentable. On the one hand, it might be argued that, in this instance, Parliament could foresee that patents might be sought in higher life forms. Although Parliament would not have foreseen the genetically altered mouse and the process of genetic engineering used to produce it, Parliament was well aware of animal husbandry or breeding. While the technologies used to produce a crossbred animal and a genetically engineered animal differ substantially, the end result, an animal with a new or several new features, is the same. Yet Parliament chose to define the categories of invention using language that does not, in common usage, refer to higher life forms. One might thus infer that Parliament did not intend to include higher life forms in the definition of "invention". Although he was referring specifically to crossbred plants and not to higher life forms in general, a similar point was made by Marceau J.A. in *Pioneer Hi-Bred Ltd.* (F.C.A.), *supra*, at p.14:

> It is argued that the very nature of the patent system and the benefits that were expected therefrom should lead to the conclusion that Parliament intended the most open and favourable approach to its statute. Maybe so, but I do not think that such an approach would permit the interpreter to dispense with the necessity to respect the results suggested by a careful analysis of the terms used in the statute. Besides, speaking of the intention of Parliament, given that plant breeding was well established when the Act was passed, it seems to me that the inclusion of plants within the purview of the legislation would have led first to a definition of invention in which words such as "strain", "variety" or "hybrid" would have appeared ...

165    On the other hand, it is important to recall that there is a qualitative difference between crossbreeding and genetic alteration. In *Pioneer Hi-Bred Ltd.* (S.C.C.) Lamer J. (as he then was) articulated that difference in the following terms (at p. 1633):

> While the first method implies an evolution based strictly on heredity and Mendelian principles, the second also employs a sharp and permanent alteration of hereditary traits by a change in the quality of the genes.

It is thus possible that Parliament did not regard crossbred plants and animals as patentable, not because they are higher life forms, but because they are better regarded as "discoveries". Unable to anticipate genetic alteration, Parliament would not have foreseen that higher life forms could be created in a manner reasonably understood as an invention. If this is the case, we should be wary of applying too broad or literal an interpretation of the phrase "composition[s] of matter". Even if higher life forms were more easily cognizable as "compositions of matter", I still would find it difficult to conclude that the definition of "invention" was intended to be sufficiently broad to include higher life forms.

166    Patenting higher life forms would involve a radical departure from the traditional patent regime. Moreover, the patentability of such life forms is a highly contentious matter that raises a number of extremely complex issues. If higher life forms are to be patentable, it must be under the clear and unequivocal direction of Parliament. For the reasons discussed above, I conclude that the current Act does not clearly indicate that higher life forms are patentable. Far from it. Rather, I believe that the best reading of the words of the Act supports the opposite conclusion — that higher life forms such as the oncomouse are not currently patentable in Canada.

*(2) The Scheme of the Act*

167    This interpretation of the words of the Act finds support in the fact that the patenting of higher life forms raises unique concerns which do not arise with respect to non-living inventions and which cannot be adequately addressed by the scheme of the Act. In *Pioneer Hi-Bred Ltd.* (F.C.A.), Marceau J.A. discussed the intention of Parliament to include crossbred plants in the following terms (at p. 14):

> ... it seems to me that the inclusion of plants within the purview of the legislation would have led ... to the enactment of special provisions capable of better adapting the whole scheme to a subject matter, the essential characteristic of which is that it reproduces itself as a necessary result of its growth and maturity. I do not dispute the appellant's contention that

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 172 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

those who develop new types of plants by cross-breeding should receive in this country, as they do elsewhere, some kind of protection and reward for their efforts but it seems to me that, to assure such result, the legislator will have to adopt special legislation, as was done a long time ago in the United States and in many other industrialized countries.

Marceau J.A.'s observation in this regard is compelling. The patenting of higher life forms raises special concerns that do not arise in respect of non-living inventions. Unlike other inventions, biologically based inventions are living and self-replicating. In addition, the products of biotechnology are incredibly complex, incapable of full description, and can contain important characteristics that have nothing to do with the invention (see Canadian Biotechnology Advisory Committee, *Patenting of Higher Life Forms and Related Issues: Report to the Government of Canada Biotechnology Ministerial Coordinating Committee*, June 2002, at p. 11; see also Rudolph, *supra*, at p. 5). In my view, the fact that the *Patent Act* in its current state is ill-equipped to deal appropriately with higher life forms as patentable subject matter is an indication that Parliament never intended the definition of invention to extend to this type of subject matter.

168      The respondent argues that the concerns arising out of higher life forms as patentable subject matter are "external to the *Patent Act* and its jurisprudence" and that there is therefore no statutory basis to reject the patentability of higher life forms on moral, ethical or environmental grounds. I agree with the respondent that some of the policy concerns raised by the interveners are more appropriately dealt with outside the patent system. For example, some interveners expressed concern for the environmental and animal welfare implications of biotechnology. These issues are only tenuously linked to the patentability of higher life forms and are more directly related to the development and use of the technology itself. With regard to research and experimentation involving animals, by the time a researcher is in a position to file for a patent, any harm to the animal resulting from research will already have been done. Correspondingly, it is preferable to address this issue through existing or new regimes for protecting animal welfare. Similarly, if it is determined that additional measures are needed to protect the environment from the products of biotechnology, this may be effected through the *Canadian Environmental Protection Act*, R.S.C. 1985, c. 16 (4th Supp.), or other comparable regulatory mechanisms.

169      While the above-mentioned concerns are only indirectly related to the *Patent Act*, several of the issues raised by the interveners and in the literature are more directly related to patentability and to the scheme of the *Patent Act* itself. These issues, which pertain to the scope and content of the monopoly right accorded to the inventor by a patent, have been explored in depth by the Canadian Biotechnology Advisory Committee (CBAC), a body created in 1999 with a mandate to provide the government with advice on policy issues associated with biotechnology. In June 2002, the CBAC released its final report, *The Patenting of Higher Life Forms and Related Issues, supra*. The report recommends that higher life forms should be patentable. Nonetheless, it concludes, at p. 7, that given the importance of issues raised by the patenting of higher life forms and the significant "values" content of the issues raised, Parliament and not the courts should determine whether and to what degree patent rights ought to extend to plants and animals.

170      Two of the issues addressed by the CBAC (farmers' privilege and innocent bystanders) arise out of the unique ability of higher life forms to self-replicate. Because higher life forms reproduce by themselves, the grant of a patent covers not only the particular plant, seed or animal sold, but also all of its progeny containing the patented invention. In the CBAC's view, this represents a significant increase in the scope of rights offered to patent holders that is not in line with the scope of patent rights provided in other fields (*Patenting of Higher Life Forms and Related Issues*, at p. 12).

171      One significant concern arising out of the increased scope of patent protection is the impact that it will have on Canada's agricultural industry. The CBAC recommends that a farmers' privilege provision be included in the Act. The privilege would permit farmers to collect and reuse seeds harvested from patented plants and to breed patented animals for their own use, so long as these were not sold for commercial breeding purposes. Although the CBAC puts forward suggestions pertaining to the general nature of such a provision, it nonetheless recognizes that more work would need to be done to identify the extent of the privilege in relation to plants and animals.

172      Another concern identified by the CBAC in respect to self-replication pertains to infringement. The CBAC observes that since plants and animals are often capable of reproducing on their own, it must be recognized that they will not always do so under the control or with the knowledge of those who grow the plants or raise the animals. Patent law does not currently require

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

a patent holder to prove that an alleged infringer knew or ought to have known about the reproduction of a patented invention. An "innocent bystander" may therefore be faced with high costs to defend a patent infringement suit and an award of damages for infringement without a countervailing remedy against the patent holder. The CBAC correspondingly recommends that the *Patent Act* contain a provision that would allow the so-called "innocent bystander" to rebut the usual presumption concerning knowledge of infringement in respect of inventions capable of reproducing, such as plants, seeds and animals.

173    In its recommendations, the CBAC also deals with a concern that was raised before this Court by the intervener Canadian Environmental Law Association. The intervener submitted that patents on life forms may actually deter further innovation in the biomedical field by foreclosing opportunities for research and product development to those that do not hold the patent. Arguably, this potential is inherent in the nature of a patent system. Yet the impact may be more significant with respect to the products of biotechnology. As noted by the CBAC, at p. 14: "Access to basic or platform technology such as DNA sequences, cell lines, plants and animals at reasonable cost is crucial to research". High research costs can be expected to drive up the price of the end product, which in the case of biotechnology includes diagnostic tests and therapeutic agents important to the health of Canadians (see T. Schrecker et al., *Ethical Issues Associated with the Patenting of Higher Life Forms* (1997), at p. 44).

174    In response to the above-stated concerns, the CBAC recommends that the *Patent Act* be amended to include a research and experimental use exception. The CBAC recognizes that this Court established a common law experimental use exception in the context of research aimed at sustaining a compulsory licence: see *Smith, Kline & French Inter-American Corp. v. Micro Chemicals Ltd.* (1971), [1972] S.C.R. 506 (S.C.C.). Nonetheless, the scope and nature of this exception is uncertain, particularly since Canada has since eliminated its compulsory licence provisions. The CBAC reiterates that it is Parliament and not the courts which should create the exception (at p. 15):

> First, the values content of the issues calls for a Parliamentary rather than a judicial approach. Second, the responses we received from the research community suggest that researchers do not feel that the current research exception is sufficiently clear. Third, studies have illustrated that the failure to have a clear research exception has curtailed important health research. Fourth, the member states of the European Union have included experimental use exceptions in their patent legislation without any apparent negative effect... Fifth, provincial governments have called for a clarification of the experimental use exception in Canada.

175    Perhaps the most significant issue addressed by the CBAC is the patentability of human life. The CBAC recommends that if Canada decides to permit patents over higher life forms, human bodies at all stages of development should be excluded. It observes in this regard that although humans are also animals, no country, including Canada, allows patents on the human body. According to the CBAC, this understanding derives from the universal principle of respect for human dignity, one element of which is that humans are not commodities (see CBAC, *supra*, at p. 8).

176    The potential for commodification of human life arises out of the fact that the granting of a patent is, in effect, a declaration that an invention based on living matter has the potential to be commercialized. The commodification of human beings is not only intrinsically undesirable; it may also engender a number of troubling consequences. Many of the consequentialist concerns (i.e., the creation of "designer human beings" or features) are directed at genetic engineering in general and not at patenting *per se*, and are perhaps better dealt with outside the confines of the *Patent Act* (see Schrecker, *supra*, at pp. 64-65). Nonetheless, there remains a concern that allowing patents on the human body will lead to human life being reconceptualized as genetic information. A related concern is the potential for objectification. As noted by Schrecker, *supra*, at p. 62: "[t]o objectify something is implicit in treating it as a market commodity, but what is disturbing about objectifying a person or organism is not so much the exchange of money as it is the notion that a subject, a moral agent with autonomy and dignity, is being treated as if it can be used as an instrument for the needs or desires of others without giving rise to ethical objections".

177    Whatever justification is used to support the assumption, there seems to be little debate that human life is not patentable. In response to the hypothetical question of whether patentability could be extended to human beings, Rothstein J.A. replied, at para. 207: "The answer is clearly that the *Patent Act* cannot be extended to cover human beings." He based this conclusion on the fact that patenting is a form of ownership of property and that ownership concepts cannot be extended to human beings pursuant to s. 7 of the *Charter*. He concluded the topic by remarking that "[t]here is, therefore, no concern by including non-

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

human mammals under the definition of (invention) in the *Patent Act*, that there is any implication that a human being would be patentable in the way that the oncomouse is"(para. 207).

178    In my view, this general response to concerns over the implications for human beings of patenting higher life forms is an oversimplification. Reference to the *Charter* does not address the issue of whether the definition of invention in s. 2 applies to human subject matter as a matter of statutory interpretation. Should this Court determine that higher life forms are within the scope of s. 2, this must necessarily include human beings. There is no defensible basis within the definition of invention itself to conclude that a chimpanzee is a "composition of matter" while a human being is not. As noted by this Court in *Bell ExpressVu Ltd. Partnership v. Rex*, 2002 SCC 42 (S.C.C.) , at para. 62, "*Charter* values" are to be used as an interpretative principle only in circumstances of genuine ambiguity, i.e. where a statutory provision is subject to differing but equally plausible interpretations. To read legislation in conformity with the *Charter* in cases where there is no real ambiguity is to deprive the government the opportunity to justify a provision that appears to conflict with the *Charter* under s. 1.

179    In addition, while it is likely that s. 7 of the *Charter* would have some impact on the patenting of human life, it is unlikely to resolve many of the more specific issues that may arise. Section 7 states that everyone has the right to "life, liberty and security of the person". Because the section deals only with "person[s]", it leaves the status of foetuses uncertain: see *Tremblay c. Daigle*, [1989] 2 S.C.R. 530 (S.C.C.), at p. 553; *Winnipeg Child & Family Services (Northwest Area) v. G. (D.F.)*, [1997] 3 S.C.R. 925 (S.C.C.). In its report to Parliament, the CBAC recommends that the *Patent Act* be amended to say that no patent shall be granted on human bodies "at any stage of development" (p. x.). In its view, this wording would demonstrate an intention not only to include human bodies of infants, children and adults, but also all precursors to the human body from zygotes to foetuses. Recognition by the CBAC of the necessity of specifically addressing this issue supports the view that reference to s. 7 of the *Charter* alone cannot dispose of concerns associated with the patenting of human life.

180    Applicants may also seek to patent human tissues and organs rather than the entire person, in which case s. 7 may not apply. The patenting of body parts raises yet another issue: the increasingly blurred line between human beings and other higher life forms. In the new field of xenotransplantation, human genes are introduced into mammals such as pigs to make the animals' organs more acceptable to the human body for the purposes of organ transplantation. As noted by the intervener Animal Alliance of Canada, at para. 68 of its submissions, this scientific development calls into question the once clear distinction between human and animal life:

> The pig receives human genes. The human receives pig organs. Where does the pig end and the human begin? How much DNA does it take before one becomes the other? The answer to these questions, once ridiculous and offensive, may now just be a matter of degree.

181    The problem posed by the above technology with respect to locating the defining line which separates humans from animals is not insurmountable. It does, however, call into question Rothstein J.A.'s assumption that s. 7 of the *Charter* is capable of addressing the issues associated with the patenting of human life. In my view, it is not an appropriate judicial function for the courts to create an exception from patentability for human life given that such an exception requires one to consider both what is human and which aspects of human life should be excluded.

182    The scenarios above demonstrate that the issue of patenting of human life forms is a complex one that cannot be readily dismissed by reference to the *Charter*. Once again, it is an issue that demands a comprehensive Parliamentary response. Illustrative in this regard is *Directive 98/44/EC of the European Parliament and of the Council of 6 July 1998 on the legal protection of biotechnological inventions*, which sets out several detailed exceptions to patentability pertaining to the human body. The first paragraph of article 5 of the Directive sets out the primary exception:

> The human body, at the various stages of its formation and development, and the simple discovery of one of its elements, including the sequence or partial sequence of a gene, cannot constitute patentable inventions.

The second paragraph allows for a patent on "[a]n element isolated from the human body or otherwise produced by means of a technical process, including the sequence or partial sequence of a gene ... even if the structure of that element is identical to that

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 175 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

of a natural element". Paragraph 1 of article 6 sets out a general exception to patentability for inventions where their commercial exploitation would be contrary to *ordre public* or morality". Paragraph 2 further specifies that processes for cloning human beings, processes for modifying the germ line genetic identity of human beings and uses of human embryos for industrial or commercial purposes are all considered unpatentable as being contrary to "*ordre public* or morality".

183    As noted earlier, the CBAC has recommended that higher life forms (i.e., plants, seeds and non-human animals) that meet the criteria of novelty, non-obviousness and utility be recognized as patentable. The concerns above therefore are not raised to justify a position that higher life forms should not be patentable, but rather serve to illustrate that the *Patent Act* in its current form is not well suited to address the unique characteristics possessed by higher life forms. The lack of direction currently in the *Patent Act* to deal with issues that might reasonably arise signals a legislative intention that higher life forms are currently not patentable. In addition, the discussion of the issues raised by the CBAC and other groups illustrates the complexity of the concerns. In my view, this Court does not possess the institutional competence to deal with issues of this complexity, which presumably will require Parliament to engage in public debate, a balancing of competing societal interests and intricate legislative drafting.

*(3) The Object of the Act*

184    The respondent submits that the object of the *Patent Act* is to encourage and reward the development of innovations and technology. In its view, this objective supports a broad reading of the definition of invention that does not exclude any area of technology save for the statutory exclusion in s. 27(3).

185    There is no doubt that two of the central objects of the Act are "to advance research and development and to encourage broader economic activity" (see *Free World Trust c. Électro Santé Inc.*, [2000] 2 S.C.R. 1024, 2000 SCC 66 (S.C.C.), at para. 42). As noted earlier, this does not, however, imply that "anything under the sun that is made by man" is patentable. Parliament did not leave the definition of invention open, but rather chose to define it exhaustively. Regardless of the desirability of a certain activity, or the necessity of creating incentives to engage in that activity, a product of human ingenuity must fall within the terms of the Act in order for it to be patentable. The object of the Act must be taken into account, but the issue of whether a proposed invention *ought* to be patentable does not provide an answer to the question of whether that proposed invention *is* patentable. In addition, the manner in which Canada has administered its patent regime in the past reveals that the promotion of ingenuity has at times been balanced against other considerations. For example, under the former provisions of the *Patent Act*, a licence could be granted to manufacture a patented medicine seven years after the patent first appeared on the market. The existence of this compulsory licence scheme demonstrates that other objectives, including fairness and the promotion of Canada's universal healthcare system, have at times existed as part of the patent regime (see Chong, *supra*; see also Rudolph, *supra*, at p. 35, note 74).

186    Given the above, the respondent's argument that the object of the Act leads inexorably to the broadest reading of the definition of invention possible is problematic and is, in my view, based on an oversimplification of the patent regime. In the court below, Rothstein J.A. preferred the approach taken by the majority of the U.S. Supreme Court in *Chakrabarty* , *supra*. The majority read the language of the Act expansively on the basis that the Act embodied Thomas Jefferson's philosophy that "ingenuity should receive a liberal encouragement". The minority of the court did not wholly accept this characterization, commenting in respect to the objective of the Act, at p. 319 of the reasons:

The patent laws attempt to reconcile this Nation's deep-seated antipathy to monopolies with the need to encourage progress. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 530-531 (1972); *Graham v. John Deere Co.*, 383 U.S.1, 7-10 (1966). Given the complexity and legislative nature of this delicate task, we must be careful to extend patent protection no further than Congress has provided. In particular, were there an absence of legislative direction, the courts should leave to Congress the decisions whether and how far to extend the patent privilege into areas where the common understanding has been that patents are not available.

187    Based on the language and the scheme of the Act, both of which are not well accommodated to higher life forms, it is reasonable to assume that Parliament did not intend the monopoly right inherent in the grant of a patent to extend to inventions of

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

this nature. It simply does not follow from the objective of promoting ingenuity that all inventions must be patentable, regardless of the fact that other indicators of legislative intention point to the contrary conclusion.

*(4) Related Legislation: The Plant Breeders' Rights Act*

188    It is a well established principle of statutory interpretation that given ambiguity in the law, the substance and the form of subsequent legislation may be relevant (see Côté, *supra*, pp. 343-44). Of significance to the interpretation of the *Patent Act* and the issue of its applicability to higher life forms is the *Plant Breeders' Rights Act*, passed in 1990 subsequent to this Court's decision in *Pioneer Hi-Bred Ltd.* , *supra*, in which it was determined that a crossbred soybean variety did not meet the disclosure requirements of the *Patent Act*. As noted by one commentator, the Act "is much better tailored than the *Patent Act* to the particular characteristics of plants" (N. Derzko, "Plant Breeders' Rights in Canada and Abroad: What are These Rights and How Much Must Society Pay for Them?" (1993-1994), 39 *McGill L.J.* 144, at p. 159). In return for specifically tailored and less onerous requirements a narrower monopoly right is granted than that available under the *Patent Act*.

189    The existence of the *Plant Breeders' Rights Act* is relevant to the issue of whether Parliament intended higher life forms to be patentable under the *Patent Act* for several reasons. First, it is argued that had plants been patentable under the *Patent Act*, it would have been unnecessary for Canada to pass a *Plant Breeders' Rights Act* to begin with. A related argument was put forward by the appellant, who submits that although Parliament passed "special legislation" to provide protection for plant breeders, it made no move to amend the *Patent Act* or to adopt other special legislation to provide for the protection of forms of animal life. In addition, in the face of Marceau J.A.'s opinion in *Pioneer Hi-Bred Ltd.* (speaking for a majority of the Federal Court of Appeal) that the *Patent Act* had *never* been intended or understood to include crossbred plants — one form of higher life — in patentable subject matter, Parliament did nothing to alter that intention or understanding. A final point is that the *Plant Breeders' Rights Act* was passed in recognition that the *Patent Act* was not tailored to plants due to their unique characteristics. Since other higher life forms share many of these characteristics, it is reasonable to assume that Parliament would choose to protect these life forms through legislation other than the *Patent Act* or through an amended *Patent Act* that is better suited to the subject matter.

190    In *Chakrabarty* , *supra*, a minority of four judges of the U.S. Supreme Court found that the passage of the 1930 *Plant Patent Act* and the 1970 *Plant Variety Protection Act* evidenced Congress's understanding that the *Patent Act* does not include living organisms. As noted, at p. 320:

> If newly developed living organisms not naturally occurring had been patentable under s. 101 [the equivalent to the definition of "invention" in s. 2 of the Canadian *Patent Act*], the plants included in the scope of the 1930 and 1970 Acts could have been patented without new legislation. Those plants, like the bacteria involved in this case, were new varieties not naturally occurring.

The minority went on to note, at pp. 321-22:

> ... the Court's decision does not follow the unavoidable implications of the statute. Rather, it extends the patent system to cover living material even though Congress plainly has legislated in the belief that §101 does not encompass living organisms. It is the role of Congress, not this Court, to broaden or narrow the reach of the patent laws. This is especially true where, as here, the composition sought to be patented uniquely implicates matters of public concern.

191    The majority of the court in *Chakrabarty* rejected the above argument, asserting that factors other than congressional intent to exclude higher life forms from the definition of invention were responsible for the passage of the Acts. In particular, the majority notes that, prior to 1930, the belief existed that plants, even those artificially bred, were products of nature for the purposes of the patent law. The second obstacle to patent protection for plants was the fact that plants were thought not amenable to the "written description" requirement of the patent law. In enacting the *Plant Patent Act*, Congress addressed both of these concerns. The majority also addressed the passage of the 1970 *Plant Variety Protection Act* which, in its view, was passed to provide protection for sexually reproduced plants not covered by the 1930 *Act*.

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 177 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

192    Given that the *Plant Breeders' Rights Act* was passed following this Court's decision in *Pioneer Hi-Bred Ltd.* that the soybean variety in question was unable to meet the written description requirement of the *Patent Act*, the point of view of the majority in *Chakrabarty* may have merit in the Canadian context. In other words, it may well be that the *Plant Breeders' Rights Act* was passed not out of recognition that higher life forms are not a patentable subject matter under the *Patent Act*, but rather out of recognition that plant varieties deserve some form of intellectual property protection despite the fact that they often do not meet the technical criteria of the *Patent Act*.

193    Nonetheless, this does not diminish the weight of the appellant's argument that although Parliament responded to *Pioneer Hi-Bred Ltd.* by enacting special legislation for the protection of plant breeders, it did not address other higher life forms. This is particularly significant given the majority of the Federal Court of Appeal's conclusion in that case that crossbred plants did not fall within the definition of invention in the *Patent Act*, and the fact that this Court did not broach the subject, effectively leaving open the issue of whether or not such plants and other higher life forms are patentable subject matter. Given that the *status quo* position of the Patent Commissioner is that higher life forms are not patentable, had Parliament intended to extend patentability to higher life forms other than crossbred plants, it would likely have done so at that time.

194    Though the arguments above are not absolutely indicative of parliamentary intent, they are of some significance. Far more significant, in my view, is that the passage of the *Plant Breeders' Rights Act* demonstrates that mechanisms other than the *Patent Act* may be used to encourage inventors to undertake innovative activity in the field of biotechnology. As discussed above, the *Plant Breeders' Rights Act* is better tailored than the *Patent Act* to the particular characteristics of plants, a factor which makes it easier to obtain protection. The *quid pro quo* is that a narrower monopoly right is granted. For example, the monopoly right relates only to the propagating material (the seed and the cuttings) and not to the actual plant. As explained by Derzko, *supra*, at p. 161, "[t]his is done because, unlike inert objects that are patentable, and unlike unicellular organisms that replicate into exact copies of each other, higher organisms such as plants start off from a cell and then grow and differentiate into a complete plant". The following statement of the Honourable Donald Mazankowski (then Minister of Agriculture) demonstrates that the *Plant Breeders' Rights Act* was passed to accommodate the special characteristics of crossbred plants as self-reproducing higher life forms while at the same time striking an appropriate balance between the holder of the monopoly right and others:

> ... Bill C-15 is designed to allow Canadian producers access to the best possible plant varieties, whatever country they originate in. It provides for certain rights for plant breeders and outlines their application and further details restrictions that will apply to these rights to better protect the public interest. The legislation is designed to deal with the complexities of the issue and that is why we have chosen this route rather than to amend the *Patent Act*.

> (See House of Commons, *Minutes of Proceedings and Evidence of the Legislative Committee on Bill C-15, An Act Respecting Plant Breeders' Rights*, Issue No 1, October 11, 1989 at p. 1115.)

195    Although legislation addressing the rights of plant breeders was introduced into the House of Commons as early as May 1980, the *Plant Breeders' Rights Act* was not passed and brought into force until August 1990, some 10 years later (see Canadian Food Inspection Agency, *10-Year Review of Canada's Plant Breeders' Rights Act* (2002)). The CBAC has only very recently issued its final report to the Government of Canada on the patenting of higher life forms. Given the opportunity to consider the recommendations therein and other sources of information on the topic, it is not clear that Parliament would choose to strike the balance between the inventor of a higher life form and the public in the same way that the *Patent Act* does.

196    Many of the issues that arose with respect to intellectual property protection for plant varieties also arise when considering the patentability of other higher life forms (e.g. impact on farmers and on research and development). If a special legislative scheme were needed to protect plant varieties, a subset of higher life forms, a similar scheme may also be necessary to deal with the patenting of higher life forms in general. As noted above, only Parliament is in the position to respond to the concerns associated with the patenting of all higher life forms, should it wish to do so, by creating a complex legislative scheme as in the case of crossbred plants or by amending the *Patent Act*. Conversely, it is beyond the competence of this Court to address in a comprehensive fashion the issues associated with the patentability of higher life forms.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

### C. Drawing the Line: Is it Defensible to Allow Patents on Lower Life Forms while Denying Patents on Higher Life Forms?

197      The respondent notes that the Commissioner of Patents has since 1982 accepted that lower life forms come within the definitions of "composition of matter" and "manufacture" and has granted patents on such life forms accordingly. It adds that the *Patent Act* does not distinguish, in its definition of invention, between subject matter that is less complex (lower life forms) and subject matter that is more complex (higher life forms). It submits that there is therefore no evidentiary or legal basis for the distinction the Patent Office has made between lower life forms such as bacteria, yeast and moulds, and higher life forms such as plants and animals.

198      The patentability of lower life forms is not at issue before this Court, and was in fact never litigated in Canada. In *Abitibi Co.* , *supra*, the Patent Appeal Board, the Commissioner concurring, rejected the prior practice of the Patent Office and issued a patent on a microbial culture that was used to digest, and thereby purify, a certain waste product that emanates from pulp mills. The decision, in this regard, was based largely on the U.S. Supreme Court's decision in *Chakrabarty* , *supra*, and on the practice in Australia, Germany and Japan. Having noted that judicial bodies in these countries altered their interpretation of patentable subject matter to include micro-organisms, the Board observed, at p. 88: "[o]bviously the answer to the question before us, which once had seemed so clear and definite has become clouded and uncertain". The Board was careful to limit the subject matter to which the decision would apply:

> ... this decision will extend to all micro-organisms, yeasts, moulds, fungi, bacteria, actinomycetes, unicellular algae, cell lines, viruses or protozoa; in fact to all new life forms which are produced *en masse* as chemical compounds are prepared, and are formed in such large numbers that any measurable quantity will possess uniform properties and characteristics.

199      Though this Court is not faced with the issue of the patentability of lower life forms, it must nonetheless address the respondent's argument that the line between higher and lower life forms is indefensible. As discussed above, I am of the opinion that the unique concerns and issues raised by the patentability of plants and animals necessitate a parliamentary response. Only Parliament has the institutional competence to extend patent rights or another form of intellectual property protection to plants and animals and to attach appropriate conditions to the right that is granted. In the interim, I see no reason to alter the line drawn by the Patent Office. The distinction between lower and higher life forms, though not explicit in the Act, is nonetheless defensible on the basis of common sense differences between the two. Perhaps more importantly, there appears to be a consensus that human life is not patentable; yet this distinction is also not explicit in the Act. If the line between lower and higher life forms is indefensible and arbitrary, so too is the line between human beings and other higher life forms.

200      The appellant submits that a fully developed non-human mammal is worlds apart from a yeast, a mould, or even the single-celled egg leading to its development. Whereas simple organisms are easily defined or identified by reference to a limited number of properties, complex life forms are not. In addition, simple organisms are often produced by processes similar to the manufacture of chemicals, while complex intelligent life forms are not.

201      As I stated above, the issue of whether a lower life form is a "composition of matter" or "manufacture" was never challenged in the courts in this country and it is difficult to say whether the Canadian courts would have followed the approach of the majority of the U.S. Supreme Court in *Chakrabarty* , *supra*, or whether the approach of the minority would have been preferred. Regardless of the wisdom of the decision, it is now accepted in Canada that lower life forms are patentable. Nonetheless, I agree with the appellant that this does not necessarily lead to the conclusion that higher life forms are patentable, at least in part for the reasons that it is easier to conceptualize a lower life form as a "composition of matter" or "manufacture" than it is to conceptualize a higher life form in these terms.

202      First, as noted in *Abitibi Co.* , *supra*, at p. 89, micro-organisms are produced "*en masse* as chemical compounds are prepared, and are formed in such large numbers that any measurable quantity will possess uniform properties and characteristics". The same cannot be said for plants and animals. In *Application of Bergy, Re*, 195 U.S.P.Q. 344 (U.S. Ct. of Cust. & Patent App. 1977) , the U.S. Court of Customs and Patent Appeals explained the distinction in terms of process, at p. 350:

Case 09-10138-MFW    Doc 14225-46    Filed 08/15/14    Page 179 of 310

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...
2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

The nature and commercial uses of biologically pure cultures of microorganisms ... are much more akin to inanimate chemical compositions such as reactants, reagents, and catalysts than they are to horses and honeybees or raspberries and roses ...

The difference in the end product was noted by Derzko, *supra*, at p. 161, in reference to the *Plant Breeders' Rights Act*:

The rights do not extend to the actual plant. This is done because, unlike inert objects that are patentable, and unlike unicellular organisms that replicate into exact copies of each other, higher organisms such as plants start off from a cell and then grow and differentiate into a complete plant. The difficulty lies in having to decide what should and should not be protected.

203      The above distinction was rejected by Rothstein J.A. on the rationale that so long as the mouse contains the desired feature (the oncogene), it does not matter whether the inventor is capable of controlling the other features of the mouse. I agree that Rothstein J.A.'s reasoning makes sense when approaching the issue of whether the invention meets the requirement of being new, useful and non-obvious. If the oncomouse contains the oncogene, it does not make any difference whether its fur is brown or grey. Nonetheless, the argument has some merit when considering the threshold issue of whether the mouse can be categorized as a "composition of matter" or "manufacture". For the reasons cited above, it is far easier to analogize a micro-organism to a chemical compound or other inanimate object than it is to analogize a plant or an animal to an inanimate object.

204      Second, this appeal deals specifically with the issue of whether an animal (in particular a mammal) can be considered to be a "composition of matter" or "manufacture". Several important features possessed by animals distinguish them from both micro-organisms and plants and remove them even further from being considered a "composition of matter" or a "manufacture". In particular, the capacity to display emotion and complexity of reaction and to direct behaviour in a manner that is not predictable as stimulus and response, is unique to animal forms of life. The interveners Animal Alliance of Canada, International Fund for Animal Welfare Inc. and Zoocheck Canada Inc. cast the distinction in the following terms: "[h]igher life forms are distinguishable from 'lower life forms' for which patents have already issued, in that, *inter alia*, they are sentient and conscious". Of course, if sentience is the determining factor that renders a higher life form incapable of receiving patent protection, then the current line between higher and lower life forms is misplaced. As stated earlier, given the complexity of the issues involved, it is not the task of the Court to situate the line. It may well be that Parliament chooses to exclude plants from patentability for other reasons, such as their capability to self-propagate and the infringement issues that this raises.

205      Finally, the respondent refers to the World Trade Organization's *Agreement on Trade Related Aspects of Intellectual Property Rights* (TRIPS), and the *North American Free Trade Agreement* (NAFTA), which both contain an article whereby members may "exclude from patentability" certain subject matter, including plants and animals other than micro-organisms. The respondent argues that it is apparent from this provision that plants and animals are considered patentable, unless specifically excluded from patentability. I see little merit to this argument since the *status quo* position in Canada is that higher life forms are not a patentable subject matter, regardless of the fact that there is no explicit exclusion in the *Patent Act*. In my view, the fact that there is a specific exception in TRIPS and NAFTA for plants and animals does however demonstrate that the distinction between higher and lower life forms is widely accepted as valid.

206      As I remarked above, it is up to Parliament and not the courts to assess the validity of the distinction drawn by the Patent Office between higher life forms and lower life forms. Yet, even if this Court were to alter the *status quo* and find higher life forms patentable, it would be unable to avoid engaging in line-drawing. The majority of the Federal Court of Appeal, which found that the *Patent Act* did apply to higher life forms, was nonetheless compelled to draw a distinction between higher life forms and human beings. In doing so, it merely substituted one line, that between humans and animals, for the line preferred by the Patent Office, that between higher and lower life forms. In my opinion, the decision to move the line in this manner was ill-advised. As I stated earlier when considering the definition of invention, the patenting of all plants and animals, and not just human beings, raises several concerns that are not appropriately dealt with in the *Patent Act*. In addition, a judicially crafted exception from patentability for human beings does not adequately address issues such as what defines a human being and whether parts of the human body as opposed to the entire person would be patentable.

Harvard College v. Canada (Commissioner of Patents), 2002 SCC 76, 2002...

2002 SCC 76, 2002 CarswellNat 3434, 2002 CarswellNat 3435, [2002] 4 S.C.R. 45...

**VI — Conclusion**

207     For the reasons given above, the appeal is allowed. No order as to costs will be given in light of the Commissioner's oral submissions.

*Appeal allowed.*

*Appeal allowed.*

*Pourvoi accueilli.*

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 66

147 Fed.Appx. 248
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

In re: HECHINGER INVESTMENT
COMPANY OF DELAWARE, Debtor,
Hechinger Litigation Trust, not individually,
but solely as indenture trustee a/
k/a HSBC Bank USA, Appellant,
v.
Bankboston Retail Finance, Inc., individually
and as agent for lenders under Credit Agreement
dated as of September 26, 1991, Credit Agreement
dated as of December 31, 1998, and Amended
and Restated Credit Agreement dated March
18, 1999; General Electric Capital Corporation,
Intervenor-Defendant in District Court,
Hechinger Liquidation Trust, Appellant.

No. 04-2112.    |    Argued June 30,
2005.    |    Decided July 29, 2005.

**Synopsis**
**Background:** Liquidation trust brought adversary
proceeding against lenders seeking "equitable lien" in
property of debtor and its subsidiaries and equitable
subordination. The United States District Court for the
District of Delaware, Sue L. Robinson, Chief Judge,
dismissed proceeding, 2004 WL 724960. Trust appealed.

**Holdings:** The Court of Appeals, Van Antwerpen, Circuit
Judge, held that:

[1] district court's factual findings provided basis for review,
and

[2] district court's valuation determination was not clearly
erroneous.

Affirmed.

West Headnotes (3)

[1]    **Federal Civil Procedure**
         🔑 Sufficiency

District court's factual findings with regard to
value of acquired company were sufficient to
indicate factual basis for ultimate conclusion
of whether debt assumed by debtor during
particular transaction caused breach of negative
pledge clause in prior indenture, and thus basis
for review had been provided, where court stated,
inter alia, that there was uncontroverted evidence
of professional advice and opinions with respect
to compliance with terms of clause, it was
uncontroverted that independent audit confirmed
post-merger valuation, and there was absence of
showing of fraud or bad faith with respect to
both debtor's valuation and auditor's independent
audit of that valuation.

Cases that cite this headnote

[2]    **Corporations and Business Organizations**
         🔑 Actions

District court's valuation determination of
acquired company was not clearly erroneous,
which afforded great weight to contemporaneous
valuation made by debtor in resolving issue
of whether debt assumed by debtor during
particular transaction caused breach of negative
pledge clause in prior indenture, where valuation
was confirmed by outside auditor and was further
corroborated by independent contemporaneous
evidence which included, inter alia, fact
that debtor and its counsel made multiple
representations to lenders that transaction had
not breached indenture's negative pledge clause.

Cases that cite this headnote

[3]    **Corporations and Business Organizations**
         🔑 Actions

District court's valuation determination of acquired company was not clearly erroneous, which rejected $10 million valuation proposed by liquidation trust in resolving issue of whether debt assumed by debtor during particular transaction caused breach of negative pledge clause in prior indenture, where trust's valuation omitted other non-cash consideration made in conjunction at the time, including 30 percent ownership in company, in form of warrant, that would have arisen from that transaction, subtenant in approximately 100 sites where rental obligation would have otherwise arisen, and $10.7 million promissory note.

1 Cases that cite this headnote

**\*250** On Appeal from the United States District Court for the District of Delaware. (D.C. No. 00-CV-973). District Judge: Honorable Sue L. Robinson.

**Attorneys and Law Firms**

Mark Minuti, Michael Bonkowski, Saul Ewing LLP, Wilmington, DE, David M. Friedman, David E. Ross, (Argued), Howard W. Schub, Andrew K. Glenn, Ian D. Katz, Marvin Peguese, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Appellant Hechinger Litigation Trust.

Teresa K.D. Currier, Peter J. Duhig, Klett Rooney Lieber & Schorling, Wilmington, DE, Paul S. Samson, (Argued), Jeffrey D. Ganz, Craig J. Ziady, Riemer & Braunstein LLP, Boston, MA, for Appellee Fleet Retail Finance, Inc.

Clay J. Pierce, Salans, New York, NY, Michael Kip Maly, (Argued), Winston & Strawn LLP, San Francisco, CA, Stephen M. Miller, Carl N. Kunz, III, Morris, James, Hitchens & Williams LLP, Wilmington, DE, for Appellee General Electric Capital Corporation.

Before FUENTES, SMITH and VAN ANTWERPEN, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

Appellant Hechinger Litigation Trust appeals from the March 31, 2004 judgment of the District Court entering judgment in favor of Appellees BankBoston Retail Finance, Inc. and General Electric Capital Corporation. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2) and § 1334(b). We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

### I.

Because we write only for the parties who are familiar with the factual and procedural background of this lawsuit, we need not recite the history of this case at length. In the proceedings below, pursuant to the governing indenture's negative pledge clause and the purchase money exception to that clause, the District Court instructed the parties to submit evidence addressing whether the assets and liabilities of Builders Square exceeded some $153 million of debt that Hechinger assumed during the 1997 merger between Hechinger and Builders Square (the "transaction"). The District Court then held a three-day bench trial to determine the fair market value of Builders Square. Through experts, the parties presented retrospective valuations created for purposes of the trial. The parties also presented contemporaneous evidence of the valuation of Builders Square dating to 1997. Specifically, Appellant claimed Builders Square assets and liabilities had a fair market value of $10 million, evidenced, they claimed, by the cash paid to acquire Builders Square at the start of the 1997 transaction. Appellees, in turn, presented evidence of Hechinger's 1997 valuation of Builders Square assets and liabilities pursuant to GAAP purchase accounting rules. That valuation led Hechingers to conclude that Builders Square had a fair market value of $260 million. This purchase accounting valuation was confirmed by an outside accounting firm, KPMG. Appellant did not argue before the District Court or this Court that either the Hechinger valuation or the KPMG audit were improper or otherwise in error, and Appellees independently presented evidence that the 1997 transaction was negotiated at arm's length, conducted in good faith, and employed sufficient due diligence. Upon reviewing the parties' evidence, the District Court, on the basis of Appellee's 1997 valuation evidence, determined that the value of Builders Square in 1997 was greater than $153 **\*251** million. It accordingly determined that the 1997 transaction had not breached the negative pledge clause and dismissed all claims against Appellees in an opinion dated March 28, 2004 and judgment dated March 31, 2004. This appeal followed.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

## II.

This Court exercises plenary review over a district court's selection of a valuation standard. *See, e.g., Amerada Hess Corp. v. C.I.R.,* 517 F.2d 75, 82 (3d Cir.1975). Once a standard is applied, a valuation is a question of fact that this Court reviews only for clear error. *See id.* Clear error, in turn, exists "only if [a finding] is completely devoid of a credible evidentiary basis...." *Shire U.S., Inc. v. Barr Labs., Inc.,* 329 F.3d 348, 352 (3d Cir.2003). As long as a district court's evidentiary determination is "plausible in light of the record," we may not reverse, even if convinced that we "would have weighed the evidence differently." *Anderson v. City of Bessemer,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). *See also Interfaith Comm. Org. v. Honeywell Intern., Inc.,* 399 F.3d 248, 254 (3d Cir.2005), *cert. denied,* 545 U.S. 1129, 125 S.Ct. 2951, 162 L.Ed.2d 869 (2005) (summarizing clear error review).

[1]    With these standards in mind, we have reviewed the District Court's March 28, 2004 opinion dismissing Appellant's claims. We find no error of law or fact for substantially those reasons set forth in the District Court's opinion. As the District Court correctly concluded, the fundamental question in this case is whether or not the debt assumed by Hechinger during the 1997 transaction caused a breach of the 1992 indenture. Dispositive to this question of breach, as the District Court also correctly concluded, is the fact that, under the indenture's purchase money exception to the negative pledge clause, breach was an impossibility absent a finding that the assets and liabilities of Builders Square at the time of the transaction were less than $153 million. The analysis, then, collapses to two fairly straightforward inquires: (1) did the District Court make a finding of fact with respect to the valuation of Builders Square; and (2), if so, was that finding clearly erroneous?

At oral argument, the parties invited us to decide that the District Court had not made a finding as to the Builders Square valuation. Based on our review of the District Court's thorough opinion, we decline such invitation. At a minimum, paragraphs 17, 21 and 30 of that opinion accurately summarize and reflect not only the indenture's governing language-the negative pledge clause and the purchase money exception-but also the parties' voluminous contemporary and retrospective valuation evidence. Paragraph 30 then sets forth multiple summary statements about the cumulative valuation

and breach evidence as it existed in 1997, specifically that there was (1) "uncontroverted" evidence of "professional advice and opinions with respect to *compliance* with the terms of the Negative Pledge" (emphasis added); (ii) that "[i]t is uncontroverted that post-merger, Hechinger valued Builders Square's net assets and liabilities at $260 million under GAAP fair market value standards for purchase accounting"; (iii) that "[i]t is also uncontroverted that an independent audit confirmed the post-merger valuation"; and (iv) that there was "the absence of a showing of fraud or bad faith" with respect to both Hechinger's valuation and KPMG's independent audit of that valuation. We believe that these articulations plainly satisfy the requirements for findings of fact. As the Supreme Court has stated, a district court's findings need only be "sufficient to indicate the factual basis for the ultimate conclusion." *Kelley v. Everglades* **\*252** *Drainage Dist.,* 319 U.S. 415, 422, 63 S.Ct. 1141, 87 L.Ed. 1485 (1943) (per curiam). And as this Court has stated, findings of fact will be deemed sufficient provided they "allow us to ascertain what evidence the District Judge accepted as credible or what he rejected ... and to provide a basis for review of the District Judge's finding[s]...." *Chalfant v. Wilmington Institute,* 574 F.2d 739, 751 (3d Cir.1978) (Garth, J. and Van Dusen, J., dissenting) (internal quotation omitted). We are satisfied here that the District Court's factual summary in its opinion is sufficiently comprehensive to satisfy these standards.

[2]    We therefore turn to the question of whether the District Court's valuation determination was clear error. It was not. " 'Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' " *Amerada Hess Corp.,* 517 F.2d at 83 (quoting *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973)) (internal quotation omitted). We have reviewed the evidentiary record and, in light of this definition, we find no error in the District Court affording great weight to the contemporaneous 1997 valuation made by Hechinger. This valuation was confirmed by an outside auditor and was further corroborated by independent contemporaneous evidence in the record. This included the fact that (1) Hechinger and its counsel made multiple representations to Appellees' predecessors that the 1997 transaction had not breached the indenture's negative pledge clause; (2) Hechinger found the valuation sufficiently reliable to submit it to the United States Securities and Exchange Commission for use in public filings; and (3) the Liquidation Trustee for Appellant, who was also both the former head of financial planning at

Hechinger and its Chief Financial Officer, testified that he himself did not know of a breach of the negative pledge clause by Hechinger at any time, including during the 1997 transaction.

 **[3]**    Similarly, we find no error in the District Court's decision to remain unpersuaded by Appellant's claim that "$10 million in cash" constituted the fair market value of Builders Square in 1997. Our review of the record shows that Appellant's purported $10 million valuation omits other non-cash consideration made in conjunction at the time, including (1) a thirty percent ownership in the company that would arise from the 1997 transaction, in the form of a warrant; (2) a subtenant in approximately 100 sites where a rental obligation would otherwise arise; and (3) a $10.7 million promissory note. While the value of these additional consideration components is not clear, they cast significant doubt upon Appellant's asserted valuation. For all of these reasons, we conclude that the District Court's valuation finding was manifestly correct, and therefore not clearly erroneous.

We have considered the remaining issues raised by the parties and conclude that no discussion is necessary in light of the District Court's valuation finding and its conclusion that the indenture was not breached.

### III

For the foregoing reasons, we will affirm the March 31, 2004 judgment of the District Court.

**Parallel Citations**

2005 WL 1793503 (C.A.3 (Del.))

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.                4

TAB 67

**Ontario Superior Court of Justice**
**Hemosol Corp. (Re)**
**Date: 2006-09-05**

Docket: Toronto 06-CL-6453

*O. Pasparakis, D. Cameron, A. Merskey, Ms S. Wood for Pricewaterhouse Coopers as Monitor and Interim Receiver of the assets, undertaking and property of Hemosol Corp. and Hemosol LP*

*W.J. Burden, Ms E. Finlay, S. Selznick for 2092248 Ontario Inc.*

*J. Fogarty, Ms D. Hussey, G. Finlayson, Ms J. Falevich for ProMetic BioSciences Inc.*

***N. Spies J.**, (orally):*

[1]     I am sorry that we had to delay the reasons until today, but as some of you may have noticed since I think Mr. Pasparakis was in court, I actually had lists on Wednesday and Thursday, so the plan wasn't perfectly executed in terms of my ability to work on this, but I have completed my reasons, which I will deliver now, and if you choose to have a transcript available on a rush basis we have a realtime reporter so you will be able to make arrangements to do that, in which case, obviously, I will see a draft, and I reserve the right to edit, delete, amplify and what not the reasons, although I hope that they will be very close to what you hear from me now.

**Introduction:**

[2]     This matter came to trial to determine certain issues that have arisen concerning the scope of a license agreement executed June 1st, 2004 ("the "License Agreement") between ProMetic BioSciences, Inc. ("ProMetic") and Hemosol LP ("Hemosol") relating to plasma protein purification technology referred to as the Cascade Process.

[3]     Hemosol is currently under the protection of the *Companies Creditors Arrangement Act,* and Pricewaterhouse Coopers, Inc. has been appointed as receiver of its assets (the "Receiver").

[4]     The License Agreement, along with a production facility, is Hemosol's major asset. The License Agreement provides Hemosol with the exclusive right to manufacture and sell specified proteins found in human blood plasma, utilizing the Cascade Process, a technology developed by ProMetic. These proteins have beneficial medical applications, and there is a large market for them in commercially significant quantities.

2006 CanLII 63699 (ON SC)

[5]     The Receiver has reached an agreement with 2092248 Ontario Inc. ("209") as a potential purchaser of the assets of Hemosol. 209 has been the Dip Lender and Plan Sponsor of Hemosol under the court-ordered sale process.

[6]     During the course of the sale negotiations, it became apparent that there is a serious dispute over the scope of the License Agreement. Specifically there is a dispute as to whether or not Hemosol is permitted, pursuant to the License Agreement, to exploit only a single step of the Cascade Process in order to exploit only one specified Protein and whether or not hyperimmune immunoglobulins are within the definition of Proteins in the License Agreement.

[7]     Whether or not the technology and rights granted by ProMetic to Nabi Pharmaceuticals ("Nabi") to produce certain hyperimmunes pursuant to a license agreement dated June 19, 2006, ("Nabi Agreement") falls within the scope of the License Agreement between ProMetic and Hemosol is also an issue.

[8]     The Receiver, ProMetic, and 209 agreed that in the interest of obtaining an expedited determination of this dispute, that they would state issues for determination by the court and proceed with a trial on an expedited basis. The Receiver, ProMetic, and 209 chose not to bring Nabi in as a party to this dispute, and so Nabi did not participate in this trial. The trial proceeded essentially as a summary trial. Save for ProMetic's expert, Dr. Goss, the witnesses gave some evidence in-chief and were cross-examined. Cross-examinations conducted on the affidavits filed in advance of the trial were treated as discovery transcripts. At the trial, ProMetic led its case first, and then the Receiver, supported by 209, responded.

**Issues:**

[9]     At the commencement of the trial I was advised that there were three main issues, although unfortunately, counsel had not reached an agreement as to how those issues would be worded. I raised this matter again during closing argument, and based on the submissions of counsel I framed the issues that I must decide as follows:

   1. Does the License Agreement between ProMetic and Hemosol include within it the exclusive license for any Primary Step (as defined in Article 1.1.50) or Additional Primary Step (as defined in Article 1.1.3) of the Cascade Process if performed as a single step for the capture of Proteins (as defined in Article 1.1.55) or Additional Proteins (as defined in 1.1.5) from Raw Material (as defined in Article 1.1.56)?

2. Does the License Agreement include the exclusive right to the capture of Proteins for the purpose of producing hyperimmune globulins ("Hyperimmunes")?

3. Do the rights and technology provided by ProMetic to Nabi for the production of Hyperimmunes pursuant to the Nabi Agreement fall within the scope of the License Agreement?

[10]    There is no serious dispute as to the principles of law that I should consider in interpreting the License Agreement. All counsel agree that as a matter of first principle, I should presume that the parties to the License Agreement — ProMetic and Hemosol, intended the legal consequences of their words: see *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.) at para 56. As affirmed by our Court of Appeal in *Toronto Dominion Bank* v. *Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, affirmed (1999), 45 O.R. (3d) 417 (Ont. C.A.):

> The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agreement, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand.

[11]    Furthermore, although this dispute centres on a few specific provisions of the License Agreement, I must consider the entire agreement. As summarized by Justice La Forest and Justice McLachlin in the case of *BG Checo International Ltd.* v. *British Columbia Hydro & Power Authority,* [1993] 1 S.C.R. 12 (S.C.C.) at pages 23-24.

> It is a cardinal rule of the construction of contracts that the various parts of the contract are to be interpreted in the context of the intentions of the parties as evident from the contract as a whole.

[12]    The court went on to deal with the problem of internal inconsistency and stated:

> "Where there are apparent inconsistencies between different terms of a contract the court should attempt to find an interpretation which can reasonably give meaning to each of the terms in question. Only if an interpretation giving reasonable consistency to the terms in question cannot be found will the court rule one clause or the other ineffective." (at page 24)

[13]    In order to construe the terms of the agreement harmoniously with other terms, the term in question may bear a meaning other than its most obvious meaning; (see John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law Inc., 2005) at 717, citing *Elderslie Steamship Co.* v. *Borthwick* (1904), [1905] A.C. 93 (U.K. H.L.)).

[14]    Furthermore, where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would

promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation which promotes a sensible commercial result: (see *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901).

[15]    Care must be taken in considering what are the sound commercial principles, and this must be done objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily be so for the other: *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.,* [1998] O.J. No. 4368 (Ont. C.A.) at para 27.

[16]    The courts have also said that in interpreting a contract, if it can be prevented, no clause, sentence or word should be considered superfluous, void or insignificant: *Elliott v. Billings (Township) Board of Education,* [1960] O.R. 583 (Ont. C.A.) at 587; see also *Lavin Agency Ltd.* v. *Blackhall & Co.,* 25 R.P.R. (4th) 230 (Ont. S.C.J.) at p. 233, *G.H.L. Fridman, The Law of Contract in Canada,* 4th ed. (Toronto: Cars well, 1999) at 494.

[17]    Finally, I should not consider the extrinsic evidence that I heard concerning what the parties intended or thought they had negotiated, unless I find that the meaning of the License Agreement is not clear. As stated by the Court of Appeal in *Venture Capital USA Inc.* v. *Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para 26

> The cardinal rule in contract interpretation 'is that the court should give effect to the intention of the parties as expressed in the written agreement', and where the intention of the parties 'is plainly expressed in the language of the agreement, the court should not stray beyond the four corners of the agreement.'

[18]    This does not mean, however, that I should interpret the License Agreement in a vacuum. I should also have regard to the evidence that I have heard of the surrounding circumstances or what is sometimes called the "factual matrix." In this regard, both sides to this dispute rely upon the decision of the English High Court, *Reardon Smith Line* v. *Hansen-Tangen,* [1976] 1 W.L.R. 989 (U.K. H.L.), approved by the Ont. C.A. in *Kentucky Fried Chicken Canada v. Scott's Food Services Inc. supra* at para. 25., which states:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

[19]    The scope of the surrounding circumstances to be considered will vary from case to case, but at this stage the court should not consider the parties' subjective intentions but rather evidence of the factual background known to the parties at or before the date of the contract including evidence of the "genesis" and objectively the "aim" of the transaction: *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of) supra.*

**Background Facts:**

[20]    With these broad principles of interpretation in mind, I turn to the evidence before me of the surrounding circumstances.

[21]    Hemosol is a biopharmaceutical company which develops products derived from blood. In 2003, Hemosol's primary development effort of a product known as Hemolink failed and it was left with a production facility and scientists on staff but no underlying business. As a result, Hemosol needed a replacement technology suited to its production facility.

[22]    ProMetic is also a biopharmaceutical company and is engaged in research, development and commercialization of a variety of biopharmaceutical applications developed from its own technology called Mimetic Ligand™ Technology. Aspects of this technology are used in the Cascade Process. ProMetic primarily deals with biopharmaceutical applications in the field of biotechnology and the blood plasma industry.

[23]    In 2003, ProMetic approached Hemosol with a view to commercializing the Cascade Process." Given Hemosol's facility, staff and capacity, it appeared to be a natural fit.

[24]    The Cascade Process is a novel plasma protein recovery system consisting of a series of filters through which human blood plasma is processed to recover the maximum yield of valuable therapeutic proteins directly from the plasma.

[25]    Plasma, a component of human blood, is the liquid left over when red blood cells, white blood cells and platelets are removed from blood. Plasma contains hundreds of proteins which have beneficial therapeutic effects on the body. The market for therapeutic proteins is worth billions of dollars in North America alone.

[26]    The Cascade Process is comprised of a series of primary capture steps in a specific sequence. At each step, a different protein is removed from the plasma and the remaining depleted plasma is then processed through the next step.

2006 CanLII 63699 (ON SC)

2006 CanLII 63699 (ON SC)

[27]    For each capture step of the Cascade Process, a specially developed resin is used to isolate and capture target proteins. The resin incorporates a chemical compound called a ligand. The ligand, which is part of ProMetic's Mimetic Ligand Technology, has an affinity for certain proteins and in effect acts as a chemical "hook" to capture the target protein. The resins and their uses were developed by Prometic and are protected with patents or patent applications, although a patent for the actual Cascade Process was not filed until after the License Agreement was entered into.

[28]    As the plasma passes through the resin, certain proteins bind to the ligand, while the depleted plasma passes on to the next step. The proteins are then "eluted" off the ligands and are further purified and processed. The product of each primary step (the captured proteins) is called the "bulk intermediate form" of the protein.

[29]    Once the primary step is completed, the bulk intermediate form is subject to secondary processing which removes viruses and other contaminants. The product of this secondary processing is called the "bulk active form" of the protein.

[30]    After the secondary process is complete, tertiary processing takes the "bulk active form" and formulates it into the final product ready to be administered to a patient. For example, tertiary processing could include the formulation of therapeutic proteins for intravenous or subcutaneous administration. These therapeutic proteins are sold to treat various conditions. There are approximately 500 different types of proteins in human blood plasma, over 15 of which are routinely extracted, purified and sold as medication to treat various illnesses. Protein-based therapeutics is a multi-billion dollar market.

[31]    The Cascade Process is revolutionary as compared to the Cohn Process which was commercialized in the 1970s. The commercial benefit of the Cascade Process is succinctly described in the Confidential Information Memorandum ("CIM") for the sales process prepared by the Receiver with the assistance of Hemosol. The CIM states that:

> Cascade is a revolutionary process that integrates proven technologies to significantly increase the production yields of certain proteins by 30-375 percent from a unit of plasma, while maintaining or increasing purity of the product. The process is expected to provide the Company (that is Hemosol) with a significant competitive advantage over the industry standard Cohn Process. Hemosol is targeting Intravenous Immunoglobulins (IGIV), Aplha -1 Antitrypsin (Al-PI) and Anti-Hemophilic Factor VIII proteins (vVWF/VIII) as the initial therapeutic proteins it plans to commercialize. However, the new technology can be used for other therapeutic proteins such as Fibrinogen, plasmin and albumin.

[32]    The License Agreement grants Hemosol the exclusive right to use the patents and patent applications covering the primary steps (the "Primary Steps") to capture certain defined proteins ("Proteins") that make up the Cascade Process. The secondary and tertiary processes are outside of the License Agreement.

[33]    The License Agreement is for a term of 45 years and includes terms allowing the parties to consent to adding "Additional Proteins."

[34]    The License Agreement required Hemosol to make a substantial financial commitment. In addition to an immediate payment of $ 1.5 million and certain equity, Hemosol also agreed to pay $14 million in milestone fees, incur significant development costs and, if ultimately successful, committed to paying royalties to ProMetic from the sale of protein products.

[35]    There is no dispute as well that prior to the License Agreement, ProMetic had invested millions of dollars in developing its Mimetic technology for the specific resins and the Cascade Process.

**Issue No. 1:**

[36]    I turn then to the first issue:

> Does the License Agreement between ProMetic and Hemosol include within it
> the exclusive license for any Primary Step (as defined in Article 1.1.50) or
> additional primary step (as defined in Article 1.1.3) of the Cascade Process if
> performed as a single step for the capture of Proteins (as defined in Article
> 1.1.55) or Additional Proteins (as defined in 1.1.5) from Raw Material (as defined
> in Article 1.1.56)?

**Analysis:**

***The License Agreement:***

[37]    In considering the first issue, I begin with the language of the grant set out in Article 2.1(a), as follows:

> Subject to the terms and conditions set forth in this Agreement, the Licensor hereby
> grants to the Licensee the <u>exclusive</u> right to <u>use</u> the Cascade Process <u>or part thereof</u>
> to manufacture in the Production Facility and any Additional Production Facilities in
> the Territory, and distribute and sell in the Territory the Proteins, Additional Proteins
> and Products. <u>For greater certainty without limiting the foregoing the right to use the</u>
> <u>Cascade Process also includes the exclusive right to use a limited number of Primary</u>
> <u>Steps</u> or an alternative sequence.

2006 CanLII 63699 (ON SC)

(emphasis added)

[38]    For my purposes the key portion of the grant is that Hemosol has the *exclusive* right to *use* the Cascade Process, as that term is defined in Article 1.1.11, "or *part thereof*" to manufacture, distribute and sell in North America (the territory) the Proteins as defined in Article 1.1.55. The last sentence of the grant is intended to clarify the meaning of the words "or part thereof which I will come back to.

[39]    In light of the wording of the grant, it is important to consider first the meaning of the term Cascade Process as defined in Article 1.1.11, as follows:

> *"Cascade Process"* means the aggregate of the Primary Steps, but for greater certainty may include only <u>some of them</u>, presented in the <u>Preferred Sequence</u> for the capture of each Proteins from the Raw Material in a <u>successive manner</u> to meet the Target Proteins Recovery Percentages, and also including: all Additional Primary Steps, Improvements, and Intellectual Property developed or to be developed by the Licensor (alone or with any other licensees of Cascade Process, its affiliates or the ARC) and owned by or under exclusive rights in favour of the Licensor."

(emphasis added)

[40]    All counsel agree that as far as the first portion of the definition is concerned, the Cascade Process requires at a minimum two of the six Primary Steps, i.e. "some", not one. I agree with this for the following reasons:

(a) the use of the phrase "some of them" in connection with Primary Steps suggests more than one step.

(b) the phrase "presented in the Preferred Sequence" which is defined in Article 1.1.49 to mean "capture of the Proteins…in a successive manner", clearly implies capture of more than one protein, i.e. more than one step.

(c) similarly the phrase "in a successive manner" suggests more than one step.

[41]    For these reasons, I find that Cascade Process as defined in Article 1.1.11 means two or more Primary Steps.

[42]    Although the way in which the Cascade Process is defined in the patent for the Cascade Process is not relevant to my interpretation of the License Agreement, as the patent came later, I note that there is no dispute between the parties that the patent contemplates a minimum of two Primary Steps. In other words, the Patent for the Cascade Process is worded in a way that is consistent with the way in which I have interpreted Article 1.1.11.

2006 CanLII 63699 (ON SC)

[43]    I come back then to the language of the grant in Article 2.1(a) and the meaning of the phrase "Cascade Process, or part thereof. Considering just the language of the grant, the argument advanced by Hemosol that the words "or part thereof must mean that Hemosol has the exclusive right to use a single Primary Step of the Cascade Process is compelling. Given the definition of Cascade Process in Article 1.1.11, on ProMetic's interpretation of the words "or part thereof, they would be superfluous. If the parties intended that the grant to Hemosol was to use a minimum of two Primary Steps of the Cascade Process, as argued by ProMetic, given how the term Cascade Process is defined in Article 1.1.11, it would have been enough to simply say in the grant: "Cascade Process". The only possible meaning that could be given to the phrase "or part thereof is to make it clear that Hemosol could use a *single* Primary Step to manufacture Proteins. Simply put, a "part" of a process defined as a minimum of two "parts" must refer to one part, or in this case one Primary Step.

[44]    I must now consider whether this interpretation of the phrase "Cascade Process, or part thereof is consistent with the balance of Article 2.1(a) and the entire License Agreement.

[45]    The last sentence of the grant in article 2.1(a) states as follows:

> For greater certainty, and without limiting the generality of the foregoing, the right to use the Cascade Process <u>also includes</u> the exclusive right to use a <u>limited number</u> of Primary Steps or an alternative sequence.
>
> (emphasis added)

[46]    The term "Primary Steps" is plural, but is a defined term which in Article 1.1.50 is stated to mean all of the six Primary Steps referred to in the License Agreement. Clearly, the phrase "limited number" means something less than six, and so in my view I can not draw a conclusion from the fact that the term Primary Steps is used to infer that the parties intended to refer to two or more Primary Steps.

[47]    As for the phrase "limited number", although I agree with the submissions of Mr. Fogarty that it would have been clearer if the phrase used was "one or more", and that this phrase is used in the License Agreement (see, for example, the definition of Intermediates in Article 1.1.34), I cannot conclude that the phrase "limited number" could not include one. One is a number. Furthermore, this language is added "for greater certainty" and is not intended to limit the "generality" of the phrase "Cascade Process or part thereof," and in fact is expressly stated to expand it further by the use of the words "also includes".

[48]    Given what in my view must be the clear meaning of the phrase "Cascade Process or part thereof," I can not conclude that this additional language in the grant is inconsistent with my conclusion as to the meaning of that phrase. As for the phrase "alternative sequence", although the term "sequence" clearly implies a plural, this phrase does not modify the wording of the rest of the sentence as it is an independent phrase prefaced by the word "or". Although I heard some evidence as to what the parties intended by the phrase "alternative sequence", in my view its meaning does not impact on the issues before me.

[49]    I have considered the arguments advanced by ProMetic that the description of the technology granted as a "Cascade" and "Process", both words which ordinarily mean a series of successive stages, suggest that the parties did not intend that Hemosol be able to use just a single Primary Step. This argument does not address, however, the plain meaning of the words, "or part thereof in the grant. As I have already found, the definition of Cascade Process in Article 1.1.11 means a minimum of two Primary Steps and so this argument does no more than to support this definition.

[50]    I have also considered the definition of the term "Proteins" with respect to this first issue, because all parties agree that the grant to Hemosol to use the Cascade Process or part thereof is limited to the right to manufacture, distribute and sell the Proteins as defined in Article 1.1.55.

[51]    Article 1.1.55 is as follows:

> 'Proteins' shall mean each of Fibrinogen, APO-A-1 VWF/FVIII, hSA, A1PI, IVIG, in bulk active form, which <u>can</u> be isolated from the Raw Material using the Cascade Process.
>
> (emphasis added)

[52]    It is important to note that in the definition of "Proteins" the phrase "or part thereof in connection with the Cascade Process is not included. In fact, throughout the License Agreement the term "Cascade Process" is either referred to on its own, or with the phrases "or part thereof or "any portion thereof or "and its components". It must be presumed that these differences were deliberate and should be considered by the court in determining the intention of the parties from the language of the License Agreement.

[53]    In the case of the definition of Proteins, as Mr. Pasparakis points out, the definition refers to what *"can"* be isolated using the Cascade Process not what *"must"* be isolated using the Cascade Process. Certainly, if this definition had said the Proteins "must" be

2006 CanLII 63699 (ON SC)

isolated using the Cascade Process that would suggest that at least two Primary Steps be used.

[54]    In my view, the word that is used, namely, that the Proteins "can" be isolated using the Cascade Process is consistent with the fact that the definition of Proteins refers to "each" of the six Proteins and there is no dispute that each single Primary Step produces a particular "Protein".

[55]    In other words, there is no doubt that when each of the six "Proteins" are isolated, they are isolated using a single Primary Step from the Cascade Process. I therefore find that there is no inconsistency between the definition of "Proteins" in Article 1.1.55 and the interpretation of the phrase "Cascade Process or part thereof in Article 2.1(a), advanced by Hemosol. On the other hand, the definition of Proteins does not assist in determining this first issue either.

[56]    Counsel agree that the definition of the term "Additional Proteins" in Article 1.1.5, which is also used in Article 2.1(a) does not shed any light on my determination of the first issue. Furthermore, the definition of the term "Products" in Article 1.1.54, also used in Article 2.1(a) does not impact on my determination of the first issue as it in turn refers back to "any *Proteins…*manufactured under the Cascade Process." (emphasis added)

[57]    Both Article 6.7 and Article 9.1 (a) of the License Agreement refer to the "Cascade Process or any portion thereof. No one suggests that the use of the word "portion" instead of "part" has any significance. In considering the reasonableness of Hemosol's interpretation of the phrase "Cascade Process or any part thereof in the grant, Article 2.1(a), I also considered the impact such an interpretation would have on both Article 6.7 which protects Hemosol from breaches of the License Agreement and Article 9.1(a) which sets out certain representations made by ProMetic. The meaning of these two articles becomes important to my determination of the third issue. With respect to the first issue, given my conclusion as to the meaning of Articles 6.7 and 9.1(a) which is set out below in connectin with the third issue, I am of the view that the language used of "any portion thereof is consistent with the language used in the grant of "any part thereof and that ascribing a meaning to that phrase of at least one Primary Step does not create either an internal inconsistency or provide protection for Hemosol that exceeds the legitimate scope of the License Agreement.

***The Factual Matrix:***

[58]    I turn then to a consideration of the factual matrix to consider whether that evidence is at odds with the interpretation advanced by Hemosol.

[59]    Mr. Fogarty argues that if you use one step then it does not conform to the business concept of eluting multiple proteins efficiently and profitably from plasma. He argues that using a single step would be inconsistent with the whole point of the Cascade Process and result in a commercial absurdity.

[60]    Counsel for the Receiver and 209 argue that because the Cascade Process was unproven technology, at least for commercial production, and given the investment Hemosol needed to make to secure the License Agreement and develop the technology, Hemosol would have needed to obtain as broad a license as possible and be protected from ProMetic licensing that technology to others who would then compete with Hemosol.

[61]    Setting aside the specific issues, it is of assistance to consider generally what the parties agree is and is not covered by the License Agreement. At paragraphs 18 and 20 to 21 of the closing statement of 209, the following is stated:

> 18. It is important to understand that the License Agreement only affects a portion of ProMetic's business. The rights granted to Hemosol are geographically restricted to North America and to the capture and elution of the specific proteins from human blood plasma. ProMetic is free to exploit its technology and sell its Resins:
>
> (a) outside of North America;
>
> (b) inside North America for proteins captured from human blood plasma, other than for the named proteins exclusively licensed to Hemosol; and,
>
> (c) inside North America for proteins, including those licensed to Hemosol, when the source of those proteins is not human blood plasma (for example, when the source is recombinant or yeast sources, or equine or bovine or other animal plasma).
>
> 20. Further, under the License Agreement, the Cascade Process is defined to include the Resins, and Hemosol was given the exclusive right, in North America, to use the Resins (which it purchases for ProMetic) for the purpose of extracting the named proteins from human blood plasma.
>
> 21. It is important to note that Hemosol claims no title to the Resins and ProMetic is free to use the Resins elsewhere for other purposes. However, by reason of the exclusive license granted to Hemosol, and the negative covenants, what ProMetic cannot do is sell the Resins to others for use in extracting the identified proteins from human blood plasma in North America.

[62]    Counsel for Hemosol agreed with this position taken by 209. Counsel for ProMetic confirmed that notwithstanding his position that Hemosol can not limit its license to a single Primary Step, ProMetic could not license any of its technology for the Cascade Process or

2006 CanLII 63699 (ON SC)

Primary Steps to a third party in order to manufacture any of the defined "Proteins" licensed under the License Agreement.

[63]    In my view, the real focus of the License Agreement, considering it as a whole, is on the Proteins. That is the purpose in ProMetic's licensing to Hemosol the use of the technology. From Hemosol's perspective, given the length of the license and the investment made to secure the License Agreement and the significant investment to be made to develop the Cascade Process to the point of commercial production, objectively one would expect Hemosol to require flexibility in how to use the technology. From ProMetic's perspective, given development of the Cascade Process or any variation was at the expense of Hemosol one would expect ProMetic to be less concerned about Hemosol having broad rights to use the technology, provided that use could only be for the purpose of manufacturing the defined Proteins. Hemosol would have no reason to abuse its right to use the technology, since it could only do so to manufacture the Proteins. Similarly, ProMetic would have no reason to care how Hemosol used the technology, provided it was only for the purpose of manufacturing the defined Proteins.

[64]    Furthermore, one would expect, as ProMetic concedes, that the License Agreement would prevent ProMetic from licensing single Primary Steps to third parties to manufacture the defined Proteins. Otherwise, ProMetic could theoretically license individual Primary Steps to different manufacturers who could each manufacture a single Protein covered by the License Agreement. This would totally undermine the value of the license granted to Hemosol. On the other hand, Hemosol has no interest in ProMetic's technology, except to the extent it is used to manufacture the Proteins covered by the License Agreement.

[65]    With this in mind, I find that the interpretation of the grant advanced by ProMetic leads to a commercial absurdity or at least a result that objectively, in light of the entire agreement and the general objectives of the parties, that I can glean from an objective review of the agreement, is an unlikely result.

[66]    Mr. Fogarty conceded that given ProMetic's interpretation of the grant, Hemosol is not permitted to manufacture only one of the specified Proteins using a single Primary Step. This would include VWF/FVIII (Factor 8), even though that protein is what is eluted from the first step in the Cascade Process. Given the focus of the License Agreement on protecting the right of Hemosol to manufacture the defined Proteins, it seems to me unlikely that the parties intended such a result. Although the advantage of the Cascade Process is to elute multiple proteins, given the technology had never been proven outside

a laboratory, there may have been a number of reasons for Hemosol to decide to stop at the first primary step and market Factor VIII. Certainly, there seems to be no reason, based on the language of the License Agreement and the objective intentions of the parties, that might lead one to conclude it was intended that Hemosol not be permitted to manufacture only Factor VIII, if it chose for its own reasons to do so.

[67]    The fact that Hemosol would not be permitted under ProMetic's interpretation of the License Agreement to manufacture only Factor VIII using the first Primary Step of the Cascade Process, in my view supports the argument of Hemosol and its interpretation of the grant. There could be no commercial reason for ProMetic to have intended to restrict Hemosol's use of the technology in this way.

[68]    Similarly, if adopting Hemosol's interpretation of the phrase "Cascade Process, or any part thereof had resulted in an interpretation of the License Agreement that gave Hemosol the right to restrict ProMetic's use of the patents related to the Cascade Process beyond the protection required for manufacture of the specified Proteins, that might have suggested that Hemosol's interpretation was too broad, notwithstanding my view of the plain meaning of the phrase "or any part thereof." As I have already stated, for the reasons that follow in connection with the third issue, I did not find this to be the case when I considered the meaning of Articles 6.7 and 9.1(a), presuming Hemosol's interpretation of the grant in Article 2.1(a).

[69]    In further support of my conclusion, I note that what is really at stake in this case is whether or not the grant to Hemosol includes the exclusive right to capture Proteins for the purpose of producing hyperimmune globulins. For example, although Hemosol takes the position that it has the right to do so pursuant to a single Primary Step using ProMetic's A2P Resin, if hyperimmune globulins fall within the definition of Proteins within the License Agreement, even if ProMetic is correct, that a minimum of two Primary Steps must be used, there is no doubt Hemosol could elute hyperimmunes in two steps (or possibly four, if the sequence cannot be altered for purity reasons) and this would be within the rights granted to Hemosol under anyone's interpretation of the License Agreement. Again this suggests to me that what was important was the definition of the Proteins included in the agreement.

[70]    I have considered ProMetic's argument that for commercial purposes it could never have been intended that Hemosol use only a single Primary Step of the Cascade Process because that defeats its commercial purpose, i.e., eluting multiple proteins with increased

yields. This proposition was disputed by Dr. Alkema, who testified that one step for Albumin alone would be profitable. In any event, as the courts have said, this issue must be considered objectively. Although there is no doubt that Hemosol's focus at the time the License agreement was negotiated was on three proteins with a view to expanding to a "full" Cascade, because that was how the Cascade Process distinguished itself, one could reasonably expect Hemosol might need to concentrate on one protein for financial reasons, as selling one product might be better financially than developing three, but having no ability to sell any product.

[71]    Certainly, given what evidence I have as to the surrounding circumstances, Hemosol's interpretation of the grant in the License Agreement as including the right to use a single Primary Step to manufacture a single specified Protein could not be considered commercially absurd. In fact, I find the position of ProMetic on this point to have no commercial purpose.

[72]    An issue arose, more in the context of the second issue, as to what know-how Hemosol is entitled to if it decides to manufacture a Protein using a single Primary Step. There is a dispute in the evidence as to whether in those circumstances the operating conditions are different, and although Hemosol argues that they are not, it was also suggested that in any event, if Hemosol has the right to use a single Primary Step it has the right to the know-how to do so.

[73]    That is not the case, because Article 1.1.37 defines "Know-How" as technical information "relating to the Cascade Process". The words "or part thereof are not included and so, if Hemosol choses to use only a single Primary Step, it is not entitled to any more technical information than if that step is part of the full Cascade Process.

[74]    I considered whether this impacted on my view of the grant in the License Agreement but concluded it did not as the operating conditions would likely change if, for example, Hemosol chose an alternative sequence. Presumably, in these types of circumstances the parties intended that Hemosol be on its own in terms of know-how. ProMetic is not required to provide any technical information to Hemosol unless it relates to the Cascade Process as defined in Article 1.1.11. This is also consistent with an objective for Hemosol of having flexibility to vary from the Cascade Process, without a requirement that ProMetic have to support attempts to vary the Cascade Process by Hemosol.

[75]    This conclusion is reinforced by the language in Article 1.1.12, defining the "Cascade Process documentation", which relates to the Cascade Process and "any of it components". The fact that the word "components" is used suggests there must be a difference from the words "or part thereof and if the term "components" means parts of the whole Cascade Process this provision can be interpreted in a way that is consistent with the definition of Know-How. In other words, Hemosol is only entitled to documentation related to the Cascade Process and its individual Primary Steps as part of the Cascade Process. ProMetic would not be obliged to provide documentation it may have with respect to the Primary Steps that is not also part of the Cascade Process.

[76]    This is also consistent with the definition of Patents in Article 1.1.46, which refers only to those patents which are necessary to use the Cascade Process as defined in Article 1.1.11 and would therefore not include any patents for Primary Steps if performed in isolation as a single Primary Step if the Know-How and operating conditions are different. Again, this is consistent with Hemosol needing flexibility to vary the Cascade Process on its own, but not being able to demand assistance from ProMetic in that regard.

[77]    For these reasons, I find that the evidence of the surrounding circumstances or factual matrix supports Hemosol's interpretation of the grant in the License Agreement and the language in the License Agreement is clear so that it is not necessary to consider all of the extrinsic evidence that I heard.

***The Extrinsic Evidence:***

[78]    Notwithstanding my conclusion, as the evidence was led, I have considered that evidence and have concluded that that evidence supports my conclusion and in any event certainly does not contradict it. A summary of that evidence is as follows.

[79]    Dr. Alkema, the former Vice President of Operations of Hemosol swore two affidavits and gave evidence at trial. Dr. Alkema, together with Lee Hartwell, the former CEO of Hemosol, negotiated the License Agreement with ProMetic. Thereafter, Dr. Alkema headed the development and implementation of the technology transfer. He continues to administer ongoing aspects of Hemosol's operation for the Receiver.

[80]    Pierre Laurin, the Chairman, President and Chief Executive Officer of ProMetic, swore two affidavits and gave evidence at trial.

[81]    Both Dr. Alkema and Mr. Laurin have expertise in the plasma industry and the closing submissions of counsel urge me to consider the qualifications of each carefully

before accepting some of their evidence. Both offered opinion evidence, although neither were formally qualified as experts. Because of the conclusions of fact I was able to reach on undisputed facts and my conclusions that certain contested areas of fact are not relevant, I was able to consider their evidence without having to scrutinize their expertise in the industry.

[82]    One conclusion that I did draw from this evidence was that both Dr. Alkema and Mr. Laurin have sufficient expertise such that I could rely on that fact and safely conclude that words and terms in the License Agreement with technical meaning were chosen deliberately and not by chance.

[83]    To the extent that both Dr. Alkema and Mr. Laurin gave evidence as to what they believed the License Agreement meant, I disregarded that evidence unless it was clearly parol evidence of what the parties intended at the time the License Agreement was negotiated. Otherwise, the evidence was really argument and not of assistance factually.

[84]    There was no suggestion that either party had any particular bargaining power. This was an opportunity both companies needed to seize upon.

[85]    There is no dispute that during the negotiations the parties debated the scope of the grant and the definition of the Cascade Process.

[86]    The drafts of the License Agreement passing between the parties, beginning with the draft of March 3, 2004, were exhibits to the affidavits of Dr. Alkema and Mr. Laurin. In the draft of March 3, 2004, the definition of the Cascade Process included a statement that "any reference in this agreement to the Cascade Process shall be deemed to refer to the Cascade Process and any portion thereof."

[87]    There was no evidence before me as to which party prepared this draft. There must have been further drafts not introduced into evidence because the next one that was entered into evidence was a draft agreement with changes made by hand by Dr. Alkema, which he mailed to Michelle Laflamme, in-house counsel at ProMetic, on April 23, 2004. In this draft, the definition of Cascade Process had already been changed to reflect the aggregate of the Primary Steps, i.e., the full Cascade Process. On this draft Dr. Alkema inserted the words "or any portion thereof in the definition of Cascade Process, the definition of Proteins, and elsewhere, although not in the grant clause."

[88]    A further draft from counsel for Hemosol to Ms. Laflamme, sent by e-mail May 6, 2004, proposed similar amendments to the definition of "Cascade Process" and a covering

memo set out the position of Hemosol that "any portion of the Cascade Process should be treated in the same manner as the whole Cascade Process.

[89]    Mr. Laurin took issue with this in an e-mail to Dr. Alkema on May 7, 2004. On this issue he stated:

> What is under license also is a sequence of capture steps. Hemosol may in fact only process three proteins out of the Cascade, but what we license is the Cascade.
>
> Adding the wording "any portion thereof the way it was done includes Resin and specific capture steps outside the context of the Cascade.
>
> When using "any portion thereof without judgment throughout the agreement, it basically prevents ProMetic to carry out its business. Any individual steps could be used in a Cohn plant to further process a paste. This is known by all parties since the beginning. No changes should be made to our definition of Cascade.

[90]    Mr. Laurin did not explain in his evidence the specific nature of his concern at the time. Although this e-mail clearly states his intention was only to license the Cascade Process, per se, (i.e. more than individual Primary Steps), it was never made clear whether that was his concern or that he was concerned that the wording proposed would prevent ProMetic from using the Primary Steps technology for other purposes. In any event, it is clear that Mr. Laurin was concerned that the proposed wording applied to individual Primary Steps.

[91]    In the affidavit of Dr. Alkema sworn July 31, 2006, he swore that he had a discussion with Ms. Laflamme on May 20, 2004 during which he "stressed that because it was an unproven technology, Hemosol needed the technology to be modifiable. We needed to be able to use the sequence in any way, i.e., by *single steps* or a variation of the preferred sequence, et cetera." (emphasis added)

[92]    Dr. Alkema did not refer to this evidence in-chief and he was not cross-examined on it. There was no evidence from Ms. Laflamme to the contrary. I have no reason then not to accept Dr. Alkema's evidence, although this is the only time, on the evidence before me, that the term "single step" is used with respect to the communications between the parties. There is no other evidence from the written communications between the parties that Hemosol's need for flexibility went to the point of wanting the ability to use only a single Primary Step of the Cascade Process. On the other hand, Hemosol would reasonably have wanted to ensure ProMetic could not license a single Primary Step to a third party for the purpose of manufacturing one of the specified Proteins.

[93]    I should say at this stage that although Dr. Alkema's credibility was challenged by ProMetic, in part because he will receive a bonus if the transaction with 209 closes, I see

no reason not to accept his evidence on this point. Not only was it not challenged, it makes sense. Hemosol would naturally want flexibility, as I have already said.

[94]    On May 21, 2004, Ms. Laflamme sent an e-mail to Dr. Alkema, which attached a revised draft of the License Agreement. She stated, in part:

> You will see that you have friends among our team …Chris made the same comment than you about the need to be flexible with the Cascade and the numbers of steps used. I made few little changes to reflect this.
> (emphasis added)

[95]    I note that the e-mail suggests that "part" will still mean more than one Primary Step and it is not clear from the proposed revisions whether or not Ms. Laflamme intended to go so far as to license single Primary Steps. Although it appears some concession was made, it is not clear from the evidence that ProMetic intended to go as far as Hemosol wanted. The wording proposed is not what was ultimately agreed to, but the language added to this draft of the grant (Article 2.1) "for greater certainty…" suggests more than a single Primary Step. Two further drafts followed.

[96]    Mr. Laurin testified that his concern was addressed by changes to the definition of Cascade Process in Article 1.1.11, but this was never explained. Certainly, the manner in which I have interpreted the License Agreement permits ProMetic to use its Mimetic technology for purposes other than the Proteins specified in the License Agreement, and there is no dispute about this. If that was Mr. Laurin's original concern, it was addressed, even if I accept Hemosol's position. As for the negotiations on this issue, they certainly support my conclusion, based on the plain wording of the grant, although it can not be said that there is any specific evidence in the drafts exchanged that Dr. Alkema secured what he spoke to Ms. Laflamme about, namely, a grant to use single Primary Steps. In that regard, the extrinsic evidence does not assist, although certainly it does not conflict with this interpretation.

[97]    Mr. Fogarty relies in part on the negotiations between ProMetic and 209 concerning a new License Agreement, as 209 does not want an assignment of the License Agreement. In those negotiations, 209 has asked that the words "or any of them" be added after the phrase "only some of them" in the definition of Cascade Process in the License Agreement, and other changes to the same effect. I have not considered this evidence or any of the other negotiations between ProMetic and 209, because 209 is not a party to the License Agreement and therefore this evidence could not constitute an admission against interest. Hemosol was involved in these negotiations too, but their attempts to modify the

License Agreement cannot be considered an admission either because the negotiations occurred after the issue concerning the scope of the License Agreement was raised.

[98]    In a memo from Mr. Hartwell to Mr. Laurin on April 25, 2006, Mr. Hartwell did state that the Cascade definition needs to be clarified, but claimed a single step had been discussed and agreed to at the outset, but that "based on our recent discussions this may be an issue." These further negotiations are therefore not relevant.

[99]    In support of their position, ProMetic introduced the evidence of Dr. Neil Goss, a biochemist with over 25 years of professional experience. Dr. Goss' qualifications to give opinion evidence were not challenged, although the admissibility of large parts of his affidavit were challenged.

[100]   After hearing submissions, I ruled several portions of the affidavit of Dr. Goss to be inadmissible. As for what was admitted, as Dr. Goss was not cross-examined, his evidence was not challenged except the Receiver and 209 submit that it should not be given any weight because Dr. Goss did not have an opportunity to review the affidavits. Given the evidence I ruled admissible and found helpful, the fact Dr. Goss did not have the affidavits was not material as his evidence was of a general nature concerning the plasma industry.

[101]   In connection with the first issue, ProMetic relies on the evidence of Dr. Goss that the operating conditions and know-how to perform the capture steps of the Cascade Process as a sequence as compared to where a particular capture step is performed as a single step are significantly different. As I have already said, since all variations to the Cascade Process, including the use of a single Primary Step if not part of the Cascade Process is the responsibility of Hemosol in terms of having to determine the proper operating conditions and know-how, I do not find this evidence to be relevant.

[102]   ProMetic also relies on various financial reports and public filings by Hemosol, which in various places describe the Cascade Process as a series or sequence of two or more capture steps. I do not find this evidence to be inconsistent with the position of Hemosol. These statements are consistent with the definition of the Cascade Process. The fact that Hemosol did not refer to its alleged right to use just a single Primary Step in their documents, and for that matter the fact that it never pursued that right until recently, does not mean it never considered that it had the right to do so or conceded that it did not.

***Conclusion:***

[103]   For these reasons, I find in answer to Issue No. 1, that the License Agreement does include within it the exclusive license for any Primary Step or Additional Primary Step, if performed as a single step for the capture of Proteins or Additional Proteins from Raw Material as defined in the License Agreement.

**Issue No. 2:**

[104]   Does the License Agreement include the exclusive right to the capture of Proteins for the purpose of producing hyperimmune globulins, or ("Hyperimmunes")?

**Analysis:**

***The License Agreement:***

[105]   In considering this issue, there are three important definitions in the License Agreement. Article 1.1.55 provides as follows:

> 'Proteins' shall mean each of the Fibrinogen, APO-A-1, VWF/FVIII, hSA, A1P1, IVIG, <u>in bulk form</u>, which can be isolated from the Raw Material using the Cascade Process.
> (emphasis added).

[106]   Article 1.1.35 provides that "IVIG" means intravenous immunoglobulin derived from Raw Material; and Article 1.1.36 provides that 'IVIG Primary Step' means the use of a Resin for the *capture of IVIG* from Raw Material.'" (emphasis added)

[107]   Counsel for the Receiver and 209 also rely on the "Target Protein Recovery Percentages" set out in Schedule 1.1.63 which sets out the Target Protein Recovery Percentages obtained from the Cascade Process before Secondary Processes and lists the target protein in issue as "immunoglobulin".

[108]   Mr. Fogarty suggests that the provisions in issue should be interpreted strictly against Hemosol in that they are "expropriatory". He relies on a decision of Cameron J, *Marble Trend Ltd. v. Sir Wynne - Highlands Inc.,* [2004] O.J. No. 3127 (Ont. S.C.J.) at para. 107. That case, however, involved the forfeiture of a deposit to the vendor relating to the purchase of a house. In my view, that legal principle does not apply here, although I do find that I must be careful to properly interpret the definition of Proteins so as on the one hand Hemosol is not unjustly benefitted by being able to use the Cascade Process for a protein the parties did not intend be included, and, conversely, that Hemosol is not deprived of the right to one that was to be part of the deal. In other words, the traditional principles for interpreting this definition that I have already set out at the outset apply.

2006 CanLII 63699 (ON SC)

***The Factual Matrix:***

[109]  The term hyperimmune globulins does not appear anywhere in the License Agreement, and given that this issue involves the interpretation of a technical term of the License Agreement, it is not possible for me to determine the intention of the parties from the wording of the License Agreement alone. Before determining whether or not I must consider the extrinsic evidence, I turn first to the surrounding circumstances at the time the License Agreement was entered into and some of the background facts that are not in dispute or at least not in dispute after the dust settled. The parties agree that the protein that is eluted using the Cascade Process and in particular the A2P resin is "immunoglobulin". Although there is evidence that there are different classes of immunoglobulins, the immunoglobulin targeted in the Cascade Process is described as Immunoglobulin G or IgG.

[110]  From at least the time of the License Agreement (June 2004) there was a product in the market derived from immunoglobulin G marketed as "IVIG" to replace antibodies that the patient is missing. Because the human blood plasma used to manufacture IVIG — the product — comes from a donor pool of average healthy people, it contains all of the antibodies of the average person. As such, the product IVIG is given to patients to boost their immune system generally rather than to prevent or cure a specific disease. IVIG as a product represents 98 percent of this market, and as the name suggests is given intravenously. The remaining 2 percent of this market is for intramuscular or subcutaneous formulations of IgG.

[111]  In the case of Hyperimmunes, the blood is collected by a procedure known as plasmapheresis where donors are identified and donate blood plasma. In this case, donors who have heightened antibodies to a specific disease due to previous exposure to that particular disease are used. For example, blood plasma collected from donors previously exposed to Hepatitis B contains not only the standard antibodies of the normal healthy donor, but also high levels of antibodies to the Hepatitis B virus. These antibodies are found in the immunoglobulin protein in the blood. Specific hyperimmunes are given to patients to prevent or cure a specific disease.

[112]  Based on the evidence before me, certainly by the early 2000's Hyperimmunes as a product were known and were being manufactured and sold as specific hyperimmune globulins. In the case of Hepatitis C, for example, the product was referred to as Hepatitis C hyperimmune globulin.

[113] Although the type of human blood plasma differs between that used for the preparation of the product IVIG and the product known as hyperimmune globulins, because of the different types of donors, there is no dispute that the definition of "Raw Material" in Article 1.1.56 of the License Agreement could apply to both as it simply defines Raw Materials as "human blood plasma recovered from whole blood donations or sourced by plasmapheresis procedures." There was no evidence or argument before me to suggest, for example, that plasmapheresis procedures are only used to collect blood plasma for Hyperimmunes. The definition then of "Raw Materials" is therefore consistent with both interpretations advanced concerning the scope of the License Agreement for the meaning of "IVIG". The fact, however, that the definition of Raw Materials does not exclude hyperimmune plasma is not determinative. Given that there are at least 500 proteins in human blood plasma clearly the "Raw Material" as defined, could produce many proteins that are not covered by the License Agreement.

[114]  All of the evidence before me of the plasma fractionation industry establishes that the term IVIG is used for a product that is administered intravenously and is used for different conditions than the specific hyperimmune products. They do not compete for the same market share. As Dr. Goss states in his affidavit, IVIG is registered for the treatment of diseases involving immune deficiency and neurological disorders, while hyperimmune globulins are individually registered for the prevention of or therapy against a specific pathogen. What they have in common is that they are both comprised of the protein Immunoglobulin G. The difference flows from the different donor source and as a result the hyperimmune immunoglobulins have a high concentration of specific antibodies not found in the general population or in the product known as IVIG.

[115] Another consideration on this issue is the fact that "Proteins" in the License Agreement are defined to be "in bulk active form". That phrase is not defined in the License Agreement, but as I have already said, there is no dispute that this form of the Protein occurs following secondary processing.

[116]  The final stage, the tertiary processing stage, formulates the "bulk active form" into the final product ready to be administered to a patient. The final product in the case of IVIG is administered intravenously and as I have said represents 98 percent of the market for this type of product.

[117] With respect to Hyperimmunes, the evidence before me is that they are administered to patients by both intravenous and subcutaneous methods. There was no

2006 CanLII 63699 (ON SC)

general evidence as to the breakdown as between intravenous and subcutaneous methods for Hyperimmunes.

[118]  ProMetic introduced into evidence documents prepared by the Marketing Research Bureau, which is an independent industry research group. In a chart headed "Plasma Product Market by Class and Product" prepared from market data for 2003, although the term IVIG is not used "intravenous immunoglobulin" is. It is by far the largest market ($2.3 billion U.S.) and is listed separately from "Hyperimmune globulins" with a market of $0.54 billion (U.S.).

[119]  Other market research produced by the same agency also clearly distinguishes between IVIG products and hyperimmune products. Based on data from the Marketing Research Bureau for Hepatitis B immunoglobulin in 2003, the total market for intramuscular formulations was 924,000 units as compared to 64,600 units of the intravenous formulation. This suggests that the intramuscular formulation of hyperimmune products was far more prevalent at the time the License Agreement was negotiated.

[120]  It is also significant to note that the market for the IVIG product represented a significant share of the entire market for therapeutic plasma proteins. I have already set out the numbers from the Market Research Bureau for 2003. The CIM states that in 2004 the North American market for all therapeutic plasma proteins was approximately U.S. $2.4 billion and U.S. sales of "IGIV" (which parties concede is the same as "IVIG") in 2004 were estimated to be U.S. $1.2 billion, i.e., half of the total market.

[121]  The position of ProMetic is that what Hemosol contracted for is IVIG in its bulk active form and that is immunoglobulin purified for and meeting all the stringent regulatory requirements to make it IVIG. ProMetic relies on the fact that IVIG refers to an industry standard recognized commercial product which is different from and does not include hyperimmune products.

[122]  The position of Hemosol and 209 is that the wording of the License Agreement permits Hemosol to extract immunoglobulins from human plasma including hyperimmune immunoglobulin. They say a "hyperimmune" is nothing more than a type of immunoglobulin with hyperimmunity to a specific pathogen. It is submitted that the A2P Resin captures all immunoglobulins regardless of whether they are hyperimmune or not and that the term IVIG is commonly used in place of immunoglobulins. It is argued that the definition of Protein in the License Agreement as IVIG "in bulk active form" makes it clear that what is intended is immunoglobulin, not just IVIG.

2006 CanLII 63699 (ON SC)

2006 CanLII 63699 (ON SC)

[123]   In my view, it is significant that the parties who negotiated the agreement with the assistance of counsel, namely Pierre Laurin for ProMetic and Dirk Alkema for Hemosol, chose to define the protein in question as intravenous immunoglobulin and use "IVIG" as the short form. There is agreement between the parties that the protein in question is in fact immunoglobulin G and a short form would be IgG. Certainly the product IVIG is not a protein nor can it be said that *intravenous* immunoglobulin is a protein. Given the sophistication of the parties, I must assume that the choice of words was deliberate.

[124]   First of all, I must consider the significance of the word "intravenous" in the definition. It is unnecessary, unless it was added to identify a type of immunoglobulin. Although on the evidence both immunoglobulins destined to become the product IVIG and those destined to become the hyperimmune products can be administered intravenously, it is significant that the intravenous method is the one that would be used to describe the IVIG product, which of course is administered intravenously. It is also significant that IVIG represents 98 percent of that market. In other words, the use of the word "intravenous" is to be expected if the term IVIG in the License Agreement was intended to be a reference to the product IVIG.

[125]   On the other hand, from the evidence before me there would be less reason to use the term "intravenous" in connection with Hyperimmunes. Although they can be administered intravenously, that on the evidence does not appear to be the most common formulation.

[126]   In my view, it is also significant that the short form used in the License Agreement is IVIG and not, for example, IVIgG or IV/IgG. On the evidence I have only seen the short form "IVIG" used in reference to the final product called IVIG.

[127]   The only variation on the use of the short form IVIG is in a Nabi Report which I will consider in more detail later, where this product is refereed to as "standard" IVIG. The word "standard" is clearly an adjective there as it is not capitalized, and given the nature of the product the adjective fits.

[128]   Dr. Alkema testified that the industry does not draw a distinction between IVIG and IG. He said he used the terms interchangeably, as does the industry. The only evidence that supports Dr. Alkema in part is the document from the Market Research Bureau which uses the term "Intravenous immunoglobulin" in a chart entitled Plasma Product Market by Class and Product. The presence of the word "intravenous", however, is significant, and that chart lists hyperimmunes separately.

[129]   Although I accept the fact that IVIG is manufactured from IgG into an intravenous formulation, I find no support in the evidence that the term IG or IgG is used interchangeably with IVIG. More importantly and critical to my analysis of this issue, there is absolutely no evidence before me that the term IVIG is ever used to describe hyperimmunes, even if formulated for intravenous use.

[130]   I must also consider the fact that the definition of Proteins in Article 1.1.55 refers to the Proteins "in bulk active form" i.e., after secondary processing. Presumably, this is because this is the stage when the purity of the product has been determined, although that is an inference from the evidence on my part. In any event, as there is no suggestion that secondary processing changes the fundamental characterization of the protein in question, the only significance to the term given the issue before me is that it does not define the proteins in their final form following tertiary processing.

[131]   Counsel for the Receiver and 209 rely heavily on this in support of their argument that the reference to "IVIG in bulk active form" must be interpreted to mean a reference to immunoglobulin G, but the problem is that it also cannot be said that *intravenous* immunoglobulin is a reference to the protein in question in either its bulk intermediate or bulk active form. Clearly the product does not become an intravenous product per se until the third stage. Certainly, there would be no need to add the term "intravenous" to describe the protein in its earlier form.

[132]   Furthermore, in the definition of the "IVIG Primary Step" in Article 1.1.36, the parties referred to the use of a Resin for the capture of IVIG. This is a reference to the first stage of the process when each particular protein is "eluted" from the Raw Material using a Resin and again clearly reference to IVIG as an end product or as an intravenous immunoglobulin would not be factually correct in terms of what is eluted as a result of the IVIG Primary Step. There is no dispute that the protein eluted is in fact immunoglobulin G or IgG as it is known. That is not the term the parties chose, however, to define this Protein.

[133]   I have already said that in my opinion the term "intravenous" is used to signify how the product following tertiary processing will be administered. In my view then, the fact that the phrase "bulk active form" is used does not necessarily mean that what the parties intended to refer to was the protein eluted at the first step of the Cascade Process, namely, immunoglobulin or IgG. Had that been the intention they could have clearly said so.

2006 CanLII 63699 (ON SC)

[134]   Given the inclusion of the word "intravenous" in the definition, given that IVIG was a product known to the parties at the time of negotiating the License Agreement, given that IVIG represented a significant part of the total market for proteins, and given that IVIG, the product, is administered by intravenous, in my view the parties intended to refer to immunoglobulin that is destined to become the IVIG product when they defined IVIG.

[135]   The argument of Hemosol and 209 really seeks to substitute the term "immunoglobulin" which is used in the Target Protein Schedule 1.1.63 as the defined Protein and have me ignore the reference to IVIG and intravenous or interpret IVIG as simply intravenous immunoglobulin and not the product IVIG.

[136]   In my view, the term "immunoglobulin" in the Target Protein Schedule is factually correct and can be reconciled with my interpretation of the IVIG definition. In fact, given a different term is used in the Schedule from that found in the definition of the Protein reinforces my view that the parties intended the IVIG definition to refer to the IVIG product.

[137]   In the alternative, Hemosol argues it should at least be permitted to manufacture intravenous hyperimmunes. The primary difficulty I have with this argument is that there would have been no commercial reason for the parties to wish to limit Hemosol to intravenous Hyperimmunes if Hyperimmunes were meant to be included in the definition of IVIG. "Intravenous" as an adjective fits the description of IVIG as a product because that is how it is formulated and administered to patients. IVIG represents 98 percent of the market, and so there would be no real commercial reason to include the other 2 percent of the production in the definition. On the other hand, there would be no reason to limit production of Hyperimmunes in this way given they are not predominantly formulated for intravenous. The reference to intravenous is entirely consistent with ProMetic's interpretation that the defined Protein is IgG *destined to become IVIG*. In addition, there is no reliable evidence to support the proposition that the term IVIG was intended to be a reference to anything other than the IVIG product.

[138]   This conclusion is consistent with the fundamental nature of the Cascade Process, namely, the elution of multiple proteins from a single source of plasma. There is no doubt that the full Cascade Process has the potential at least of producing six or seven different proteins from a single source of human blood plasma provided that plasma has been collected from average healthy donors.

[139]   In the case of hyperimmune plasma, the evidence of Mr. Laurin was that if the Cascade Process was used for hyperimmune plasma only Hyperimmune products could

be manufactured and the other proteins would be infected and therefore technically contaminated. This, of course, defeats the whole point of the Cascade Process which is to elute multiple proteins from a single source.

[140]  In closing argument, Mr. Pasparakis suggested that other proteins such as Factor VIII could be produced from hyperimmune plasma, but I could find no reference to this in the evidence of Dr. Alkema. Dr. Alkema did concede, however, that if one made the product IVIG from hyperimmune plasma it would not meet regulatory requirements, which seems consistent with the evidence of Mr. Laurin.

[141]  Although I have concluded, with respect to the first issue, that the License Agreement permits Hemosol to use only a single Primary Step of the Cascade Process, there is no evidence that Hemosol ever intended to do so until the Nabi opportunity arose. It is clear from the evidence that at the outset, when the License Agreement was being negotiated, that Hemosol wanted flexibility to use only part of the Cascade Process, but that part was to manufacture three proteins, namely, IVIG, A1P1 and Factor VIII.

[142]  There is no evidence before me that these or other defined proteins could be manufactured along with Hyperimmunes, from hyperimmune plasma. This supports my conclusion that what the parties must have intended in defining IVIG is to refer to the final product IVIG. This would then preclude the inclusion of Hyperimmunes as they are not considered IVIG, the product.

[143]  In determining this issue, I considered the fact that each Resin that is part of the Cascade Process is specific to a particular Protein and the argument of the Receiver and 209 that as a result, I should conclude that the Protein eluted by using the A2P Resin, namely, immunoglobulin, regardless of the donor source, be considered the protein that the parties intended. Certainly, the definition of Raw Material would permit me to reach that conclusion, but such a conclusion would result in my giving no real significance to the use of the word "intravenous" in the definition and the short form "IVIG". As I have already said, I find those aspects of the definition as strong evidence that the parties intended at the time to refer to immunoglobulin G destined to become the IVIG product.

[144]  I have also considered Hemosol's argument that Hemosol is given the right to manufacture Proteins and Products in Article 2.1. It is argued that the definition of "Products" in the License Agreement makes it clear that Hemosol can sell any products incorporated or derived from the bulk active form of the Protein, not just IVIG. I agree with Hemosol's submission that the definition of Product is intended to give Hemosol the right

2006 CanLII 63699 (ON SC)

to sell the Protein in bulk active form or the final product and that the definition does not work if IVIG is considered a final product. Nevertheless, in my view the evidence in support of my interpretation is very strong and the parties clearly chose to define this Protein as a final product. I am not persuaded that using Hemosol's logic I should in effect rectify the License Agreement and rewrite the definition to replace the IVIG definition with a simple reference to immunoglobulin G or immunoglobulin.

[145]  Furthermore, using ProMetic's interpretation, the definition of Product could still have meaning if the License Agreement is interpreted as giving Hemosol the right to manufacture and sell IVIG in bulk active form, i.e., IgG destined to become IVIG, in bulk active form and IVIG as a final product. This provides an interpretation that in my view is what the parties intended and is consistent with the definition of Product.

[146]  Had the parties intended the meaning advanced by Hemosol, as I have already stated, they could simply have referred to the Protein in question as immunoglobulin or immunoglobulin G or made it clear that the Proteins included in the License Agreement were whatever Proteins resulted from the use of a particular Resin.

### The Extrinsic Evidence:

[147]  The conclusion I have reached, in my view, is clearly supported by the language used in the License Agreement and the evidence before me of the factual matrix. I do not need to consider the extrinsic evidence. However, as I did with respect to Issue No. 1, I have also considered the extrinsic evidence before me concerning the negotiations of the License Agreement and as it is directly relevant, the Strategic Alliance Agreement. A review of this evidence has strengthened my view that the parties did not intend that Hyperimmunes be included in the License Agreement as part of the "IVIG" definition.

[148]  I should say, however, that although I considered the Strategic Alliance Agreement as part of the extrinsic evidence, in fact, its existence and the terms of that agreement could properly be considered as part of the factual matrix as it is further objective evidence of what the parties intended at the time.

[149]  Turning first to the negotiations and the draft agreement passing back and forth, the March 4, 2004 draft defined IVIG in the same way as the final form of the License Agreement. No changes were made to the definition by Dr. Alkema, in the marked-up draft he sent April 23, 2004 to Ms. Laflamme. What is significant, however, is that Dr. Alkema

2006 CanLII 63699 (ON SC)

suggested an amendment to the definition of "Proteins" to add "paraoxanase, plasminogen and plasmin;" that is, three more proteins.

[150]  Mr. Laurin did not agree and in his e-mail to Dr. Alkema dated May 7, 2004 complained that Hemosol was seeking to add three more proteins "for free". He referred to the history of the negotiations leading to the Memorandum of Understanding, where apparently Hemosol had sought to add these proteins and ProMetic had refused, taking the position they were future business opportunities that could be part of the License Agreement, but only on terms to be agreed to. These additional proteins were not in the next draft, and so it appears that Hemosol accepted that position.

[151]  Although there was no specific negotiation that I was made aware of concerning the meaning of the term IVIG as a Protein, the fact the proteins to be included was negotiated makes it clear that the parties were deliberate in what proteins would be subject to the License Agreement. This makes commercial sense, given that there are at least 500 proteins in blood plasma and ProMetic would want to limit the ones licensed unless additional payments and commitments were made by Hemosol. In fact, the agreement contemplates that the parties mutually agree on Additional Proteins. This exchange between Mr. Laurin and Dr. Alkema makes this clear.

[152]  Dr. Alkema swore in his first affidavit that the terms IVIG and IgG were used interchangeably in various drafts of the License Agreement and he had "no particular interest as to which term was reflected in the final version." This is in support of his position that the License Agreement covers IgG and both IVIG and Hyperimmunes are derived from IgG.

[153]  I do not accept this evidence. First of all, there is no evidence that the terms IVIG and IgG were used interchangeably in various drafts of the License Agreement. Secondly, based on the negotiations I do have evidence of, I could not conclude that the parties were not careful about the definition of Proteins. Although the definition of IVIG does not seem to have been debated, that does not mean that the way in which it was defined was not carefully considered. What is important from this evidence from Dr. Alkema is his admission that IgG is commonly formulated into a *product* called IVIG. He does not suggest that Hyperimmunes are ever referred to as IVIG products. It is also important to note that in Dr. Alkema's curriculum vitae he himself distinguishes between fractionation-produced IgG and hyperimmune IgGs.

*The Strategic Alliance Agreement:*

[154]  Although the negotiation of the License Agreement does not assist a great deal on this issue, ProMetic also relies on the Strategic Alliance Agreement ("SAA") which was negotiated at the same time as the License Agreement, and signed on the same day and by the same corporate representatives as the License Agreement. This agreement is important to review carefully as it does use the term "hyperimmune globulin G" and "IVIG".

[155]  In his affidavit sworn August 1, 2006, Mr. Laurin referred to the Strategic Alliance Agreement and stated that the "possibility for an opportunity in regard to hyperimmunes, such as the current Nabi scenario, was contemplated, but Hemosol and ProMetic agreed that such an opportunity was outside the License Agreement." Dr. Alkema did not respond to this or make any comment on the Strategic Alliance Agreement in his affidavit evidence, although he did give some *viva voce* evidence about it, which I will come to.

[156]  Because a consideration of the Strategic Alliance Agreement should begin with interpreting what it provides concerning Hyperimmunes, I begin by considering its terms without regard to the extrinsic evidence surrounding its meaning.

[157]  The objectives of the Strategic Alliance Agreement are set out in Article 2.1 and paragraph (a) provides that the goals and objectives of the agreement include working together on a "non-exclusive basis using a combination of ProMetic's protein purification expertise and Hemosol's engineering and process expertise and infrastructure to jointly develop and commercialize certain Systems in accordance with this Agreement."

[158]  A Co-developed Bioprocess is a "System" and is defined in Article 1.1.11 as follows:

> "*Co-developed Bioprocess*" means any bioprocess (for greater certainty. not including the Cascade Process) developed jointly by the Parties under this Agreement, with or without the collaboration of Third Parties, in favour of a Third Party that is involved in plasma-derived products development, in research and development of biologicals, or which has manufacturing needs in relation to plasma-derived biopharmaceuticals that can be filled with the combination of Hemosol's manufacturing infrastructure and ProMetic's Platform Technology including, for example, the removal of contaminants, hyper-immune globulin G for SARS. West Nile virus and other applications."
>
> (emphasis added)

[159]  It is important to note that the definition of Cascade Process in Article 1.1.6 of the Strategic Alliance Agreement is consistent with the definition of Cascade Process in Article 1.1.11 of the License Agreement. In other words, a Co-developed Bioprocess could involve a single Primary Step of the Cascade Process as by everyone's agreement the

2006 CanLII 63699 (ON SC)

Cascade Process as defined in the License Agreement involves two or more Primary Steps.

[160]  This is consistent with the definition of "Platform Technology", which is defined in Article 1.1.39 of the Strategic Alliance Agreement to include, among other things, ProMetic's Mimetic ligand technology and the Cascade Process and its components.

[161]  As I read these provisions together, the parties contemplated, among other things, the possibility of using the individual Resins or Primary Steps as single steps to manufacture proteins not dealt with in the License Agreement.

[162]  As argued by Hemosol, pursuant to Article 7.1.2 of the Strategic Alliance Agreement, if any Systems developed by the parties use the Cascade Process as defined in the Strategic Alliance Agreement and the License Agreement (which in this case would mean two or more Primary Steps) the License Agreement would govern. This could of course include hyperimmunes if they are included as Proteins in the License Agreement which is, of course, Hemosol's position.

[163]  However, given Hemosol's position in this trial concerning its right to exclusive use of the individual Primary Steps of the Cascade Process to manufacture the defined Proteins, the Strategic Alliance Agreement is inconsistent with that position unless the parties intended that hyperimmunes not be caught by the License Agreement. Given the definition of "Platform Technology" in the Strategic Alliance Agreement which includes the Mimetic ligands, and in this case the A2P Resin, the Strategic Alliance Agreement permits the parties together or *apart* to pursue certain Hyperimmunes using this technology as a single step. That would not be considered the Cascade Process as that is defined as two or more steps. If the Strategic Alliance Agreement is not to conflict with the License Agreement, then that would suggest the parties did not consider Hyperimmunes to be covered by the License Agreement at the time these two agreements were negotiated.

[164]  I recognize that the License Agreement provides that in the event of conflict the License Agreement will prevail (Article 20.7). However, clearly, the parties did not deliberately prepare conflicting agreements. In fact, Article 16.7 of the Strategic Alliance Agreement provides that the two agreements constitute the entire agreement of the parties. In my view, this conflict, if I accept the position of Hemosol, is relevant to my determination of the intentions of the parties from reviewing the terms of the two agreements. It supports my conclusion that Hyperimmunes were not intended to be caught by the IVIG definition in the License Agreement.

[165]   My view in this regard is reinforced by the fact that on the evidence before me there would not be a materially different process using the A2P Resin as a single Primary Step of the Cascade Process to elute hyperimmune globulin G for SARS than for Hepatitis B or Hepatitis C. In other words, there is no basis in the evidence before me to conclude that the two Hyperimmunes specified in the Strategic Alliance Agreement were unique or different from other Hyperimmunes in terms of how they might be isolated. The evidence was clear that the A2P Resin attracts all immunoglobulins and the difference is in the donor pool.

[166]   Although as Mr. Pasparakis points out, in the recitals to the Strategic Alliance Agreement "high-quality, next-generation plasma products" are referred to, setting aside future technology, on the plain reading of the Strategic Alliance Agreement ProMetic could allow a third party to use a single step, i.e., the A2P Resin to elute hyperimmune globulin G for SARS and West Nile Virus. This is at odds with Hemosol's claim of exclusivity to Hyperimmunes unless the overriding provision of the License Agreement is invoked in the case of conflict.

[167]   At the very least it is reasonable to conclude from the fact that the Strategic Alliance Agreement refers to "hyperimmune globulin G for SARS, West Nile virus" that the parties were aware of Hyperimmunes and used this language to describe them. Again, this supports my conclusion as this terminology is not found in the License Agreement.

[168]   My conclusion is also supported by the fact that the parties referred to the product "IVIG (intravenous immunoglobulin)" in Article 8.4 of the Strategic Alliance Agreement, again clearly distinguishing between IVIG and Hyperimmunes.

[169]   As for the extrinsic evidence concerning the Strategic Alliance Agreement itself, I have none concerning actual draft agreements passing back and forth. In a read-in from the examination of Mr. Hartwell, the former CEO of Hemosol, he said the reference to hyperimmune globulin G for SARS was in the Strategic Alliance Agreement because "they were issues at the time, they were examples."

[170]   In his evidence at trial, Dr. Alkema downplayed the significance of the Strategic Alliance Agreement and testified that not nearly as much time was spent negotiating that agreement and that it was intended as a guide for additional opportunities. Although I accept less time would have been spent on the Strategic Alliance Agreement, there is no evidence that it was not carefully prepared by the parties and their counsel. In my view, it is clearly reliable evidence of the parties' intentions and state of knowledge at the time.

[171]  When asked about the reference to Hyperimmunes in the Strategic Alliance Agreement, Dr. Alkema answered that at the time "they were hot topics, that is how they got into the agreement." Again, this makes it clear that Hyperimmunes were not examples drawn from the air. If they were "hot topics" they were clearly something the parties considered. They were referred to by different terminology than that found in the License Agreement. If the parties intended to include them in the definition of Proteins in the License Agreement it would have been very easy to do so. This is particularly true as the reference to certain Hyperimmunes in the Strategic Alliance Agreement did not give any rights to Hemosol. ProMetic was still free to develop processes to manufacture those Hyperimmunes using technology other than the Cascade Process as defined in the License Agreement.

***Other Extrinsic Evidence:***

[172]  In terms of extrinsic evidence, there is also the fact that Dr. Alkema did not respond to the position taken by Mr. Laurin in his e-mail to him of October 18, 2005 in which he stated:

> Manufacturing of hyperimmunes using A2P column is <u>outside the scope of Cascade</u>. ProMetic has no problem to allow Hemosol use of th A2P step to help secure an agreement with Nabi. We can sort out the details afterwards.

[173]  The failure of Hemosol to challenge Mr. Laurin's position at the time would be relevant if I find that this silence was tantamount to an admission that at the time Hemosol did not in fact disagree with this position. Certainly, given the commercial significance of Hyperimmunes, one would have expected an immediate response challenging Mr. Laurin's position.

[174]  At the time, however, Hemosol was in desperate financial condition and wanted the information Mr. Laurin offered. Although not expressed by Dr. Alkema this way, the decision to remain silent ensured that Mr. Laurin's willingness to share the information sought was not jeopardized. Although that could be considered a basis for other legal recourse by ProMetic, in terms of the issue before me, namely, interpretation of the License Agreement, I find that the existence of a motive to remain silent undermines any value I might otherwise place on the alleged admission by silence. I therefore did not rely on this evidence in coming to my decision.

[175] Furthermore, I did not consider Hemosol's argument that it understood Hyperimmunes to be included in the License Agreement when it began to draft an

agreement with Nabi nor for that matter ProMetic's belief it was entitled to later enter into the Nabi Agreement. This is self-serving evidence from both parties long after the License Agreement was entered into, which in my view is not relevant to the issue before me.

[176]  Similarly, I did not rely on the allegation of ProMetic that Hemosol's production facility was not intended for the manufacture of Hyperimmunes or the allegation that Hemosol does not have a supply agreement for the supply of hyperimmune plasma. Neither of these allegations, even if proven, would in my view constitute some sort of admission that Hyperimmunes were not included in the definition of Proteins in the License Agreement.

[177]  The fact Hemosol did not exercise what it alleges is its right to manufacture Hyperimmunes earlier does not mean it did consider that it had the right to do so or that it has given up a right to assert that it has such a right.

[178]  I have also been asked by Hemosol to consider evidence of how Mr. Laurin and Nabi have referred to Hyperimmunes since the execution of the License Agreement. This included both evidence presented at trial and "fresh evidence" provided by a letter from Mr. Burden, counsel for 209, dated August 30, 2006, sent following closing submissions.

[179]  The evidence of Mr. Laurin could be relevant if it can be treated as an admission. As for the evidence from Nabi, they are not a party to this litigation and the evidence relates to how they referred to their hyperimmune products at a time after the License Agreement was executed. That evidence would naturally be of little or no relevance to what the parties to the License Agreement and the Strategic Alliance Agreement understood in June 2004.

[180]  The affidavit of Dr. Alkema, sworn August 4, 2006, attached Nabi's 2005 Annual Report (the Nabi Report") in support of his position that Hyperimmunes in intravenous formulation are known as IVIG in the industry. In that report, Nabi stated:

> During 2006, we plan to pursue changes to the manufacturing process to reduce the production costs and minimize the yield for IVIG products and a number of niche plasma proteins that can be extracted from plasma.

[181]  The Nabi Report refers to Nabi's three products that were on the market at that time, one of which is Nabi HB Intravenous [Hepatitis B Immune Globulin (Human) Intravenous].

[182]  Although this confirms, as I have already noted, that Hyperimmune products can be administered intravenously, the term IVIG is not used in connection with these products. In the overview, the Nabi Report states that they plan to pursue development of *new* products including "Intravenous Immunoglobulin or IVIG." (emphasis added)

[183]  I note this language is consistent with the definition of IVIG in the License Agreement. Throughout the report IVIG products are dealt with separately from Nabi's Hyperimmune products. For example, under a heading "Specialty Antibodies" at page 15 of the Report, the use of specialty antibody donors to produce products such as Nabi-HB is referred to. Under the heading "Non-specific Antibodies" at page 16, the collection of "non-specific human antibodies from normal healthy donors" is referred to which are used by Nabi's customers to manufacture "standard IVIG, a product used to fight infection and several other conditions including chronic immunodeficiencies".

[184]  Mr. Pasparakis points out the word "standard" is used in connection with IVIG. I have already dealt with that, and in the context of the entire report there is no doubt in my mind that in the Nabi Report, IVIG is used as a term to refer to the product IVIG that is manufactured from normal healthy donors and is not used in any context to refer to Hyperimmune products.

[185]  In fact, in the section relied on by Dr. Alkema in his affidavit from page 7 of the Report, it is clear that Nabi intends to enter the market by manufacturing IVIG as a new product because of increased demand for IVIG in the U.S. Therefore, the Nabi Report, in my view, supports the conclusions I have reached that IVIG was and is known in the industry as a product for treatment of immune deficiencies and is not used as a term to describe Hyperimmune products.

[186]  As for the fresh evidence, counsel for 209 seeks to rely on a press release issued by Nabi in conjunction with ProMetic dated August 29, 2006. As the press release was issued the day after closing submissions were heard, it is submitted that this evidence could obviously not have been obtained prior to the trial.

[187]  In a letter from Ms. Hussey, counsel for ProMetic, she challenges the admissibility of this evidence arguing, among other things, that the press release was not issued in conjunction with ProMetic and consists of unsworn, out-of-court statements of a non-party. It is argued, in any event, that the evidence is consistent with the position of ProMetic.

[188]   As submissions were made by 209 and ProMetic in connection with the relevance of the press release, I decided to consider it in the same way as the Nabi Report. As for those portions of the press release that contain purported statements from Mr. Laurin, as Ms. Hussey did not challenge the accuracy of those statements, I considered that evidence on the basis that it might contain admissions against interest.

[189]   The press release is alleged to be relevant, firstly, on the basis that it establishes that "Nabi plans to produce intravenous immunoglobulin," and it is alleged that Mr Laurin himself is quoted as referring to hyperimmune products as immunoglobulin.

[190]   The passage relied upon is as follows:

> The advantage of the ProMetic technology is that it affords Nabi Biopharmaceuticals the ability to maximize the yield of <u>specific immunoglobulins</u> from a litre of <u>hyperimmune plasma</u>". Mr Laurin is quoted as saying:
>
> We are pleased to partner with one of the world's leaders in the field of blood-derived products. Nabi HB has over 85 percent of the <u>antihepatitis B immunoglobulin</u> U.S. market for the prevention of hepatitis B re-infection in hepatitis B-positive liver transplant patients.
>
> (emphasis added)

[191]   In addition, 209 relies on the following passage from the press release:

> Access to this technology [ProMetic technology] is expected to provide higher yields of Nabi Biopharmaceuticals' Civacar® [<u>Hepatitis C Immune Globulin</u> (human) and Altastaph® [Staphylococcus aureus <u>Immune Globulin Intravenous</u> (Human]. Nabi Biopharmaceuticals also has an option to use the technology with it marketed product, Nabi-HB® (Immune Globulin (Human)] and Nabi-HB (tm) intravenous [<u>Hepatitis B Immune Globulin (Human Intervenousl</u> …
>
> [emphasis added.]

[192]   Counsel for 209 argues that these quotes are admissions that Mr. Laurin and the industry refer to Hyperimmune products simply as immunoglobulin (Ig) and that the products licensed to Nabi by ProMetic, by Nabi's own description are intravenous immunoglobulin from a litre of "hyperimmune plasma."

[193]   I do not accept these submissions. Nowhere in the press release does either Nabi or Mr. Laurin refer to hyperimmunes as simply immunoglobulin. The closest is the term "specific immunoglobulins" but of course there is no dispute that hyperimmunes are in fact immunoglobulins. They are described as hyperimmune immunoglobulins or specific immunoglobulins such as Hepatitis B Immune Globulin in the press release, which throughout are referred to generally as "hyperimmune products." Nowhere is the term IVIG or "intravenous immunoglobulin" used. The fact some of Nabi's Hyperimmune products

2006 CanLII 63699 (ON SC)

are intravenous formulations has already been considered. The press release is consistent with the fact Nabi intends to use ProMetic's technology to manufacture specific hyperimmune products not the product known in the industry as IVIG.

[194]  The other issue that 209 argues the press release is relevant to is a quote purportedly from Mr. Laurin that they expect the ProMetic Mimetic Ligand Technology to allow Nabi to obtain higher recovery yields of "specific hyperimmunes for plasma." It is alleged that this is contrary to Mr. Laurin's evidence at trial. Ms. Hussey provided an explanation which contradicts this assertion. In my view, for reasons already stated, whether or not using a single Primary Step to produce a particular protein makes commercial sense or not is in dispute and a resolution of that dispute was not required to make my findings on the first issue. As for any challenge to Mr. Laurin's credibility, I do not accept that there is a conflict in his evidence on this issue.

[195]  Although not referred to by counsel, I note that the CIM prepared by the Receiver and Hemosol, with input from Dr. Alkema, distinguishes between IGIV (which as I have already stated the parties concede is the same as IVIG) and "hyperimmunes". This is consistent with the Nabi Report press release.

[196]  For these reasons, I find that the extrinsic evidence supports the conclusion I reached that the parties did not intend to include Hyperimmunes in the definition of IVIG.

**Conclusion:**

[197]  Accordingly, the answer to Issue No. 2 is that the License Agreement does not include the exclusive right to the capture of Proteins for the purpose of producing hyperimmune globulins. Hyperimmunes are not caught by the definition of IVIG in the License Agreement.

**Issue No. 3:**

[198]  I turn then to Issue No. 3:

> Do the rights and the technology provided by ProMetic to Nabi for the production of Hyperimmunes pursuant to the Nabi Agreement fall within the scope of the License Agreement?

*Analysis:*

[199]  Nabi has been granted a license to use ProMetic's A2P resin to isolate, by way of a single capture step, certain specified hyperimmune antibodies, namely, staphylococcus

2006 CanLII 63699 (ON SC)

hyperimmune, Clostridium hyperimmune, Hepatitis C hyperimmune, Hepatitis B hyperimmune, Varicella Zoster hyperimmune and Antimelanoyte hyperimmune. The A2P resin Nabi is licensed to use is the same as the Resin licensed to Hemosol to manufacture IVIG. Several provisions of the Nabi Agreement prevent Nabi from manufacturing or selling IVIG products.

[200] Given my finding that Hyperimmunes, even intravenous formulations of Hyperimmunes, are not within the scope of the License Agreement between Hemosol and ProMetic, clearly, the rights granted to Nabi to manufacture and sell specific hyperimmunes are outside the scope of Hemosol's License Agreement. The same is true of the technology, and in particular the A2P Resin, if Hemosol's License Agreement only protects Hemosol's use of that Resin to produce IVIG. This is conceded by Hemosol and 209.

[201] The provisions that relate to this are Articles 6.7 and 9.1(a) of the License Agreement.

[202] Article 6.7 of the License Agreement prevents ProMetic from allowing any Third Party to "use the Cascade Process". As the words "or part thereof do not appear here, this restriction does not apply to single Primary Steps, such as the use of the A2P resin. However, the definition of Cascade Process includes the intellectual property, which is defined as the patents "relating to the Cascade Process." Again, as the words "or part thereof are not used, the restriction on use by Third Parties of the individual Patents is if they are used as part of two or more Primary Steps of the Cascade Process.

[203] Article 6.7 also prevents ProMetic from allowing a third party to manufacture or sell Proteins or Products derived from the Cascade Process "or any portion thereof. This ensures that the technology can not be licensed to others to manufacture Proteins or Products caught by the License Agreement.

[204] In other words, Article 6.7 of the License Agreement does not prevent ProMetic from allowing a Third Party to use a single Primary Step such as the A2P resin provided it is not for the purpose of manufacturing a Protein covered by the License Agreement.

[205] Article 9.1(a) of the License Agreement sets out a representation by ProMetic that pursuant to Article 9.4 continues throughout the term of the Agreement. The representation is that "no Third Party has any license claim or other right, interest … in or to the Cascade Process or any portion thereof."

2006 CanLII 63699 (ON SC)

[206]  During closing argument, I raised with counsel my concern that if Hemosol's interpretation of the words "or part thereof is accepted, [or in this case "or any part thereof] this wording might be interpreted in a way that would prevent ProMetic from licensing its Mimetic Technology for Ligands and its Resins for any purpose, even if not for the manufacture of Proteins covered by the License Agreement and for that matter products not even manufactured from human blood plasma.

[207]  As counsel for the Receiver points out, however, the definition of Cascade Process in Article 1.1.11 refers to the use of the technology for the capture of the defined Proteins as defined in the License Agreement from Raw Material, which is defined as human blood plasma. As a result, ProMetic is not in breach of Article 9.1(a) if it licenses a single Primary Step of its Mimetic Technology, such as the use of the A2P Resin, to a third party to manufacture proteins not caught by the License Agreement whether or not human blood plasma is used.

[208]  For these reasons, I find that the rights granted to Nabi under the Nabi Agreement do not fall within the scope of the License Agreement, given those rights are limited to the manufacture of specific hyperimmunes that are not within the definition of Proteins in the License Agreement.

[209]  I should add that there was evidence before me of negotiations between Nabi and Hemosol which predated the Nabi Agreement. Those negotiations are, in my view, not relevant to a determination of the third issue. Furthermore, whether or not Hemosol acted improperly in its dealings with Nabi or, on the contrary, ProMetic improperly scooped the Nabi opportunity is not one of the issues I have been asked to decide.

***Conclusion:***

[210]  Accordingly, the answer to the question posed on Issue 3 is that neither the rights nor the technology granted to Nabi pursuant to the Nabi Agreement falls within the scope of the License Agreement.

*Order accordingly.*

2006 CanLII 63699 (ON SC)

TAB 68

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

**Henderson** v. Minister of National Revenue

Jack N Blinkoff and Janet Beach **Henderson**, Executors of the Estate of AM Collings **Henderson**, deceased, Appellants, and Minister of National Revenue, Respondent

The Bank of New York, Appellant, and Minister of National Revenue, Respondent

Bank of New York v. Minister of National Revenue

Federal Court — Trial Division

Cattanach, J

Judgment: September 6, **1973**

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: on appeal from assessments of the Minister of National Revenue

Counsel: *J M Rolland* for Appellants Blinkoff and Henderson.

*Stuart Thom*, QC for The Bank of New York.

*J A Scollin*, QC and *M Peterson* for the Respondent.

Subject: Securities; Estates and Trusts; Tax — Miscellaneous

Estates --- Estate tax and succession duties — Taxable property — Situs — Securities

Estates --- Estate tax and succession duties — Valuation — Securities

Estates --- Estate tax and succession duties — Payments — Liability for payment — Personal representative

Succession duty — Federal — Dominion Succession Duty Act, RSC 1952, c 89 — 6(1)(b), (2), 13, 23, 24, 49 — Canada-US Succession Duty Convention — Article II(f) — Valuation of mining shares — Valuation of share purchase warrants — Meaning of "fair market value" — Situs of share purchase warrants — Liability of executors — Meaning of "executor"; "executor de son tort" — Assessment of executor in personal capacity.

The deceased died in 1957 resident and domiciled in the State of New York. Among his assets were a large number of shares in two Canadian mining companies, "Campbell Chibougamau" and "Chibougamau Mining" and also some share purchase warrants, which were physically situate in New York, issued by Campbell Chibougamau.

In issue in the appeal by the executors was the determination of the fair market value of the shares and share purchase

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

warrants and also the situs of the warrants. On the valuation question, which reduced itself to the valuation of the Campbell Chibougamau shares, the closing market price on the date of death was $10 $^{7}/_{8}$ and, in recognition of the depressing effect the sale of the deceased's substantial holdings would have on the market if sold all at once, the Minister considered the fair market value of these shares to be $8 each, representing a discount of about 26%. The executors contended that the market price was not indicative of "fair market value" because the market was not in possession of accurate information concerning the ore reserves, that it was being manipulated by the deceased, and that it was under the influence of a "transient boom".

As to the situs of the share purchase warrants, the executors contended that since title passed on delivery their situs was where they were physically located, in New York, not in Canada. The Minister, on the other hand, considered them "rights in or over shares" within Article II of the Canada-US Convention, thus classifying them as shares and placing their situs in Canada.

In the second appeal, the bank contested an assessment against it personally under section 49 of the Act for an amount of unpaid duty up to the value of the deceased's property that had been under its control and had been transferred to beneficiaries without payment of duty. The grounds for this appeal were that an assessment was not the proper vehicle for recovering an amount from an executor under section 49, that the bank, being without a grant of probate in Canada, was not an "executor" within the meaning of the Act, that a foreign executor could not be required to furnish funds to pay a domestic tax, and that the assessment was for an excessive amount.

**HELD:**

In the appeal by the executors, on the question of valuation of the mining shares:

(i) there was no evidence that the deceased had been manipulating the market and even if he had been, that alone would not make the fair market value to be other than the price at which the shares were being traded;

(ii) there was no evidence that the optimistic estimate of ore reserves had had any dominating impact on the market; and

(iii) the consistency of the market around the time of the deceased's death indicated it to be the best guide to fair market value and ruled out the allegation of a transient boom.

The appellant's methods of valuing the shares were less appropriate than the method adopted by the Minister and the appeal in this respect was dismissed.

On the question of situs, a share purchase warrant was not a "right in or under a share" within Article II of the Convention and its situs therefore fell to be determined, under the Convention, by the law of Canada. A share purchase warrant, being a negotiable instrument, had its situs where physically situate. Here the situs was in New York and therefore beyond the reach of the Act. The appeal was allowed in this respect.

On the appeal by the bank:

(i) the effect of section 49 was to impose a liability for the duty upon the executor in the instant circumstances and the Minister was entitled to raise an assessment against the bank under section 24;

(ii) the bank by its actions had constituted itself an executor *de son tort* and therefore an "executor" as defined by the Act and, as such, it acted in a representative capacity and was personally liable for duty under section 49;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

(iii) the bank was liable for "all duties" and not merely the duty on the particular bequest which it had paid out; and

(iv) a foreign executor could be liable for Canadian taxes in Canada and that liability could be enforced in Canada against assets in Canada.

Although the appeal by the bank was dismissed on the main points the assessment was to be varied in other respects as agreed by the Minister.

**Cases referred to:**

*Untermyer Estate* v *Attorney-General for British Columbia*, [1929] S.C.R. 84;

*Dobieco Limited* v *MNR*, [1963] Ex. C.R. 348, [1963] C.T.C. 143, 63 D.T.C. 1063;

*Lawson* v *MNR*, [1965] 1 Ex. C.R. 64, [1964] C.T.C. 245, 64 D.T.C. 5147;

*Johnson's Asbestos Corp* v *MNR*, [1966] Ex. C.R. 212, [1965] C.T.C. 165, 65 D.T.C. 5089;

*Pellatt's Case* (1867), LR 2 Ch App 527;

*Brassard v. Smith*, [1925] A.C. 371;

*Webb, Hale & Co* v *The Alexandria Water Company (Limited)* (1905), 21 T.L.R. 572;

*Crosby* v *Prescott*, [1923] S.C.R. 446;

*Secretary of State of Canada and Custodian* v *Alien Property Custodian for the United States*, [1931] S.C.R. 169;

*New York Breweries Company v. Attorney General*, [1899] A.C. 62;

*Cook* v *Dodds*, [1903] 6 O.L.R. 608;

*United States of America* v *Harden*, [1963] S.C.R. 366;

*Hunt et al* v *The Queen*, [1967] 1 Ex. C.R. 101, [1966] C.T.C. 474, 66 D.T.C. 5322.

**Cattanach, J:**

1     The two appeals indicated in the above styles of cause came before the Court contemporaneously pursuant to an order dated June 23, 1970 given by the President of the Exchequer Court of Canada, now the Chief Justice of the Federal Court of Canada, whereby it was ordered that both appeals be tried together on common evidence.

2     The first appeal is that of the executors of the estate of A M Collings Henderson from the duty assessed by notice dated July 3, 1953 under section 23 of the *Dominion Succession Duty Act*, RSC 1952, c 89. Broadly speaking the issue in this appeal is the determination of the value for duty of shares in two mining companies and the situs and value of share warrants held by the deceased at the time of his death.

3     The second appeal is that of the Bank of New York from an assessment dated March 28, 1966 against the bank personally in its capacity as executor of the estate under section 49 of the *Dominion Succession Duty Act* (*supra*) in respect of unpaid duties that had been assessed against the estate. At this time the bank is no longer an executor of the estate having resigned in 1963 and which resignation was accepted by the Surrogate Court of the appropriate jurisdiction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

4      Again broadly speaking, the issues in the second appeal are threefold, (1) the validity of the assessment as such, (2) the legal liability of the Bank of New York to pay the amount so assessed or any amount, and (3) the amount of the unpaid duties assessed, which in turn is dependent on the value of the shares held by the deceased at the time of his death the determination of which is the issue in the first appal.

5      Counsel for the respondent were the same in both appeals but the appellants in the first appeal and the appellant in the second appeal were represented by different counsel.

6      The appeals were not consolidated nor was it requested that they should be.

7      It was agreed among counsel that the outcome of the estate evaluation in the appeal of the executors and the result-ant determination of the amount of succession duty payable in Canada will be accepted as determinative of that same is-sue in the appeal of the Bank of New York with respect to its personal liability.

8      With respect to the issues of the validity of the assessment and the liability of the Bank of New York to pay the amount assessed or any amount, counsel for the bank intimated that he would call evidence, which he subsequently did.

9      It was therefore proposed that the hearing of evidence and argument in the appeal of the Bank of New York on the matters other than the determination of the value of the shares and share warrants for estate tax purposes, which was the sole issue in the appeal of the executors, should be deferred until the conclusion of the appeal of the executors.

10      I acceded to that proposal because, in my view, it was in accordance with the order of the Chief Justice dated June 30, 1970 and the spirit thereof. The issue common to both appeals was the determination of the value of the shares and share warrants held by the deceased at the time of his death for estate tax purposes. Counsel for the Bank of New York agreed that the determination of that issue in the appeal of the executors would be accepted as a determination of that issue in the appeal of the bank. In respects other than that issue common to both appeals, the interests of the respect-ive appellants were not coincidental but were separate and readily susceptible of segregation. Accordingly the appeals were heard and conducted on that basis and it follows that these reasons will be given in the same manner.

11      Therefore I turn first to the appeal of the executors.

12      Prior to trial the parties by their counsel agreed upon the following Statement of Facts:

1. Collings Henderson (Henderson) died on February 2nd, 1957.

2. Henderson at the date of his death owned 471,984 and 6/8ths shares of Campbell Chibougamau Mines Limited ("Campbell Chibougamau") and 56,234 warrants to purchase Campbell Chibougamau shares at $4.00 per share.

3. The Minister of National Revenue on August 2nd, 1959, assessed duty against the Henderson Estate in the sum of $1,703,250.88 and in doing so placed a value of $8.00 per share on the shares of Campbell Chibougamau and valued the share purchase warrants at $4.00 per warrant.

4. Henderson also owned 288,384 shares of Chibougamau Mining and Smelting Company ("Chibougamau Mining"), which the Minister valued at $2.65 per share in assessing the Henderson Estate. It has been agreed for the purposes of trial that the value of the Chibougamau Mining shares be adjusted in relation to their listed market price as at Feb-ruary 2nd, 1957, in the same proportion as the value of the Campbell Chibougamau shares is adjusted, if at all.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

5. Campbell Chibougamau is a public company incorporated under the laws of Quebec on March 10th, 1950. Initially the stock traded over the counter and eventually in 1952 it was listed and traded on the Toronto Stock Exchange, the Canadian Stock Exchange (then known as the Montreal Curb Market), and the American Stock Exchange. On February 1st, 1957, which was a Friday, Campbell Chibougamau closed at $10 $^7/_8$ths on the Toronto Stock Exchange.

6. On February 2nd, 1957, there were 3,029,985 issued, allotted and outstanding shares of Campbell Chibougamau.

7. Campbell Chibougamau was incorporated for the purpose of acquiring exploring and developing mining claims in the Chibougamau area of northern Quebec. For the first few years Campbell Chibougamau was engaged in exploration on such claims and in the period 1952-1955 development work followed the discovery of the Merrill Island Mine, production commencing on May 29, 1955. The history of the activities of Campbell Chibougamau and its financial affairs are reported in a series of annual and semi-annual reports commencing with a report for the year ended May 31st, 1953.

8. During his life Henderson was the Chairman of the Board of Campbell Chibougamau from its incorporation and had responsibility for arranging financing for the company. Henderson maintained his office in New York and it was from New York that most of the financing of the company was arranged.

9. Shortly after the incorporation of Campbell Chibougamau an agreement was entered into among E O D Campbell and others including a nominee of Henderson providing an arrangement whereby certain optioned shares of Campbell Chibougamau would be taken down under the agreement through the syndicate thereby organized. Of the initial 3,000,000 issued shares all, except 360,375 which went to Consolidated Chibougamau Gold Fields Limited in exchange for mining claims, were taken down through the syndicate. Some of these shares were then sold to the public at the times and prices stipulated by Henderson who under the syndicate agreement controlled the sale of all the shares. The syndicate agreement is dated April 25th, 1950.

10. Under the agreement, the syndicate became entitled to take down shares under option as follows:

```
  400,000 shares @ 60c per share
1,800,000 shares @ $1.00 per share
  439,000 shares @ no cost after the initial 400,000 shares were taken down.
```

11. The syndicate, at the direction of Henderson, took down all the shares under option prior to April 1953. All of these shares were taken down either by brokerage houses pursuant to Henderson's direction, or by E O D Campbell. Subsequently, the shares were either held in margin accounts under syndicate control, or transferred into accounts of individuals who were part of the syndicate agreement. Mr Henderson at all times controlled the sale by the syndicate to the public of all shares so taken down.

12. In 1953, Henderson commenced litigation against E O D Campbell for the purpose of enforcing the provision of the syndicate agreement relating to sale of syndicate shares. E O D Campbell was selling such shares without Henderson's authorization. The litigation was eventually settled in March 1955 on the basis that Henderson took over E O D Campbell's stock.

13. Henderson himself retained shares of Campbell Chibougamau as part of the syndicate and from 1955 until his death the number of shares of Campbell Chibougamau he personally owned remained about constant. Although

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

Henderson's personal holdings of Campbell Chibougamau remained more or less constant, he bought and sold shares of Campbell in the market up to the time of his death. From available stock broking records some of his buying and selling is indicated below:

```
        Bought                              Sold
        ------                              ----
1951 41,700 @ $1.70 - $2.50        155,400 @ $ 2.05 - $ 2.70
1952 58,900 @ $2.00 - $2.95         49,750 @ $ 2.20 - $ 3.25
1953 76,500 @ $2.20 - $4.00        191,065 @ $ 2.28 - $ 4.60
1954 12,600 @ $2.00 - $3.75          3,900 @ $ 2.75 - $ 2.80
1955 14,400 @ $7.25 - $9.00        --
1956 --                             16,100 @ $18.00 - $28.00 1/8
```

14. It appears from the records of the three above-mentioned stock exchanges that the trading of Campbell Chibougamau shares during the years 1955-1958 was as follows:

```
1955  --  2,214,200
1956  --  2,803,667
1957  --  2,596,405
1958  --  3,529,733
```

15. Annexed hereto and marked as Exhibit "A" is a graph which illustrates the prices at which the shares of Campbell Chibougamau were trading on the stock market from the listing of the shares of the company until the end of 1958 on a monthly basis. It can be noted that the shares of Campbell Chibougamau rose from a market price of between $2.00 and $3.00 after the market was initially established to a high of $28.95 in 1956 before they started to fall in price.

16. Campbell Chibougamau started to produce copper concentrate on May 29th, 1955. In doing so, during the first year of operation, it milled its highest grade ore (2.95%). In succeeding years the grade of ore milled was lower (ie 2.38% in 1957 and 2.07% in 1958).

17. Prior to 1957, Campbell Chibougamau discovered and owned three ore bodies known as the Main Mine (Merrill Island Group), Cedar Bay Mine and Koko Creek Mine. Of these three the largest ore body was the Main Mine and it is from this mine that ore was mined prior to 1958.

18. In February 1956, Newlund Mines (Can. Co.) held 45 claims as part of a group of 437 claims in the Chibougamau area. The 45 claims were assigned under an option to New York and Honduras Rosario Mining Co and they in turn commenced exploration on the 45 claims. Chibougamau Mining had 50 neighbouring claims on which they were carrying out geophysical and magnetometer surveys. Yorcan Explorations Limited was incorporated on April 30th, 1956. Ownership of Yorcan was approximately 50% by Chibougamau Mining, 25% by New York and Honduras Rosario Mining Company and the remainder by Newlund and other interests. New York and Honduras Rosario Mining Company is an American company with long experience in the mining industry. The principal purpose of Yorcan was to explore the 95 claims previously mentioned. In the winter of 1956, Yorcan drilled approximately 25 holes on Lake Chibougamau, none of which were subsequently found to contribute to the Henderson ore body. Also in 1956, Campbell Chibougamau was carrying on surface exploration and diamond drilling in an area adjacent to the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

Yorcan holdings. This area was known as the "K" group and consisted of 2,006 acres held by Chibougamau Venture Ltd. At this time it was worked under the exclusive control of Campbell Chibougamau and was later acquired by Campbell Chibougamau. During 1956, Campbell Chibougamau drilled fifteen holes, three of which gave favourable indications that further drilling was warranted in the area of the three holes. The holes and the dates of completion were as follows:

```
K-8 completed April 7th, 1956
K-11 completed April 12th, 1956
K-12 completed April 20th, 1956
```

Annexed hereto and marked as Exhibit "B" is a table listing the results of the drill holes. Also annexed hereto and marked as Exhibit "C" is a copy of a map indicating all the drilling which was done in discovering the Henderson Mine.

19. As a result of the above favourable indications arising on the border of Yorcan and Campbell Chibougamau property, a joint exploration program was carried on in the winter of 1957. Prior to the death of A M Collings Henderson on February 2nd, 1957, the following holes had been drilled to completion and were among the holes which contributed to the discovery and delineation of the Henderson ore body. The holes and dates of completion are as follows:

```
T-23 completed January 12th, 1957
T-24 completed January 12th, 1957
T-27 completed January 21st, 1957
T-26 completed January 25th, 1957
T-33 completed January 27th, 1957
T-32 completed January 28th, 1957
```

(See Exhibit "B")

20. In the Semi-Annual Report for the period ended December 31st, 1956, the president of Campbell Chibougamau, in a letter to the shareholders dated February 15th, 1957, discusses the drilling program that was being carried on in conjunction with Yorcan under the heading "Activities in the Chibougamau Area". The stated indications from the drilling done as of that date, was that "underground development is warranted". No mention is made of probable ore reserves and the letter also indicates that some of the ore body was still unexplored. The following holes were mentioned in the letter:

```
T-33 completed January 27th, 1957
T-37 completed February 7th, 1957
T-38 completed February 18th, 1957
T-39 completed February 14th, 1957
T-45 completed February 9th, 1957
T-46 completed February 16th, 1957
T-47 completed February 13th, 1957
```

(See Exhibit "B") The last six of the above holes were all completed after Mr Henderson's death on February 2nd,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

1957. The following holes which were completed shortly after Mr Henderson's death also contributed to the ore body:

```
T-34 completed February 3rd, 1957
T-35 completed February 3rd, 1957
T-36 completed February 6th, 1957
```

Drilling continued over the whole of the winter of 1957 and many more holes were drilled which also contributed to the Henderson ore body's discovery.

21. In the Annual Report of Campbell Chibougamau for the year ended June 30th, 1957, the chief geologist, Dr S E Malouf, gave a report dated June 30th, 1957, which indicated the probable ore reserves in the Henderson ore body. An independent consulting geologist, Dr J E Gill, studied the ore body and recommended that it be integrated as a unit. On July 22nd, 1957, Campbell Chibougamau entered into an agreement with Yorcan to purchase all the assets of Yorcan, in return for 506,667 shares of Campbell Chibougamau. The price of the Campbell stock at that time was $9.00 per share. The agreement was ratified by the stockholders of Campbell Chibougamau on October 30th, 1957, when the price per share was $5.50.

22. The following is a table of the sales of shares of Campbell Chibougamau made by the executors from the Henderson Estate after Henderson's death and the prices received therefor which are within the range that such shares traded at the time of sale.

| YEAR | SHARES |  | TOTAL | AVERAGE PRICE |
|------|--------|--|-------|---------------|
| 1957 | 20,845 | $ | 95,915.90 | $4.60 |
| 1958 | 123,000 | $ | 779,173.18 | $6.33 |
| 1959 | 107,940 | $ | 831,895.44 | $7.70 |
| 1960 | 108,760 6/8 | $ | 657,563.62 | $6.08 |
| 1961 | 42,814 | $ | 328,929.88 | $7.68 |
|  | 403,359 6/8 | $ | 2,693,478.02 | |

23. The parties have agreed that the share purchase warrants owned by Henderson at the date of his death were in the form of a certificate which has been agreed upon. It is also agreed that the certificates were physically located in the State of New York at the date of Mr Henderson's death.

13   In paragraph 4 of the Agreed Statement of Facts the parties agreed that the value of shares held by the deceased in Chibougamau Mining should be adjusted in relation to their listed market price as at February 2, 1957, the date of the death of Henderson, in the same proportion as the value of the Campbell Chibougamau shares is adjusted, if the value of these shares should be adjusted. This agreement has the effect of narrowing the issues between the parties to (1) the value of the shares of Campbell Chibougamau as at the date of Henderson's death for estate tax purposes, rather than evaluation of shares in the two mining companies, and (2) the situs and value of share purchase warrants in Campbell Chibougamau.

14   Under the *Dominion Succession Duty Act* it is the statutory duty of the Minister to assess the succession duty pay-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

able under the Act (section 23) which is payable with respect to the succession of all property situated in Canada (section 6) and by virtue of subsection 6(2) shares in the capital stock of a corporation incorporated in Canada are deemed to be property situated in Canada. This manner of determining the situs of shares is confirmed in the Schedule to the *Canada-United States of America Tax Convention Act*, as amended. There is no issue between the parties as to the situs of the shares but only with respect to the situs of the share purchase warrants.

15    The succession duty, so to be assessed, is on the "aggregate net value" of the property of the deceased as at the date of his death.

16    In paragraph 2(a) of the *Dominion Succession Duty Act* "aggregate net value" is defined as follows:

2. In this Act,

(a) "aggregate net value" means the fair market value as at the date of death, of all the property of the deceased, wherever situated, together with the fair market value, as at the said date, of all such other property wherever situated, mentioned and described in section 3, as deemed to be included in a succession or successions, as the case may be, from the deceased as predecessor, after the debts, encumbrances and other allowances are deducted therefrom as authorized by subsection (9) or section 7 and by section 8:

. . . . .

17    Subsection 34(1) of the Act provides:

34. (1) Subject to the provisions of this Act, the fair market value of the property included in any succession for the purpose of duty shall be ascertained by the Minister in such manner and by such means as he thinks fit, and, if he authorizes a person to inspect any property and report to him the value thereof for the purposes of this Act, the person having the custody or possession of that property shall permit the person so authorized to inspect it at such reasonable times as the Minister thinks necessary.

18    This is what the Minister did. He placed a value of $8 per share on the shares of Campbell Chibougamau as at February 2, 1957. It is quite obvious how he arrived at the amount of $8 per share. February 2, 1957 was a Saturday and the stock exchanges were closed on that day. The closing price of Campbell Chibougamau on the Toronto Stock Exchange on Friday, February 1, 1957 was $10.78 [*sic*] per share. The deceased held 471,984 6/8 shares out of 3,029,985 issued shares which is a very large holding. No prudent shareholder would place the whole of such a large holding on the market at one time. To do so would result in an inevitable depression of the market. It is only reasonable to suppose that, if the shares were to be disposed of, they would have been fed into the market gradually as the market was capable of absorbing them without undue disturbance. To do otherwise would be to require the shares to be sold at a sacrifice or dumping value. On the other hand to dispose of the shares to best advantage requires time. The Minister allowed a discount from $10.78 to $8 per share or approximately 26% by some rule of thumb to offset that inconvenience, delay and uncertainty in realizing upon the shares. This is the amount that the Minister ascertained to be the "fair market value" per share.

19    This the appellants dispute. On their behalf two expert witnesses were called one of whom expressed the opinion that the "fair market value" per share at February 2, 1957 was $3.27 and the other that it was between $2.25 to $2.75.

20    Accordingly the first issue in the appeal of the executors is the determination of the fair market value of 471,984

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

6/8 shares of Campbell Chibougamau as at February 2, 1957.

21      The statute does not define the expression "fair market value", but the expression has been defined in many different ways depending generally on the subject matter which the person seeking to define it had in mind. I do not think it necessary to attempt an exact definition of the expression as used in the statute other than to say that the words must be construed in accordance with the common understanding of them. That common understanding I take to mean the highest price an asset reasonably be expected to bring if sold by the owner in the normal method applicable to the asset in question in the ordinary course of business in a market not exposed to any undue stresses and composed of willing buyers and sellers dealing at arm's length and under no compulsion to buy or sell. I would add that the foregoing understanding as I have expressed it in a general way includes what I conceive to be the essential element which is an open and unrestricted market in which the price is hammered out between willing and informed buyers and sellers on the anvil of supply and demand. These definitions are equally applicable to "fair market value" and "market value" and it is doubtful if the use of the word "fair" adds anything to the words "market value".

22      In my opinion the discussion of the meaning of the expression by Mr Justice Mignault in delivering the unanimous judgment of the Supreme Court of Canada in *Untermyer Estate v Attorney-General for British Columbia*, [1929] S.C.R. 84, is a most useful guide to the meaning of the words "fair market value" as used in the *Dominion Succession Duty Act* as applicable to shares listed on a stock exchange. He said at page 91:

We were favoured by counsel with several suggested definitions of the words "fair market value." The dominant word here is evidently "value," in determining which the price that can be secured on the market — if there be a market for the property (and there is a market for shares listed on the stock exchange) — is the best guide. It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. The value with which we are concerned here is the value at Untermyer's death, that is to say, the then value of every advantage which his property possessed, for these advantages, as they stood, would naturally have an effect on the market price. Many factors undoubtedly influence the market price of shares in financial or commercial companies, not the least potent of which is what may be called the investment value created by the fact — or the prospect as it then exists — of large returns by way of dividends, and the likelihood of their continuance or increase, or again by the feeling of security induced by the financial strength or the prudent management of a company. The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of the fair market value of property of this description.

I therefore think that the market price, in a case like that under consideration, where it is shown to have been consistent, determines the fair market value of the shares. I do not lose sight of the fact that mining operations are often of a speculative character, that there is always a danger of depletion, and that a time will sooner or later arrive when no more minerals will be available, unless other properties are secured to keep up the supply. But all these elements have an effect on the price of the shares on the stock exchange, and no doubt they were fully considered by the purchasers of the stock at the then prevailing prices.

23      In commenting upon the first paragraph of the passage quoted above I said in *Dobieco Limited v Minister of National Revenue*, [1963] Ex. C.R. 348 at 365, [1963] C.T.C. 143 at 157, 63 D.T.C. 1063 at 1071:

In the quoted passage Mignault, J treats the market price not as the fair market value, but as the best evidence of fair market value. The price at which the shares were selling on the stock market might be regarded as *prima facie* evid-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

ence of the fair market value, although not necessarily conclusive if rebutted by satisfactory evidence to the contrary.

24      As I understood the argument by counsel for the appellants, he accepted the basic premise in the *Untermyer* case (*supra*) as I have stated it above but sought to establish by the evidence adduced by him that the price at which the shares of Campbell Chibougamau traded on the stock exchange on February 2, 1957 was not the best guide to "fair market value" for three reasons, (1) that the prices of the shares on the stock exchange were going through a period of a "transient boom" which is typical of the shares of a mining company in the first year of its production, (2) that the market was not in possession of accurate and reliable information respecting the ore reserves, and (3) that there was some evidence from which it could be inferred that the deceased was supporting or manipulating the market.

25      It is a cardinal rule of legal interpretation of a statute that, if it be possible, effect must be given to every word used therein. I have said that the definitions and comments on the expressions "market value" and "fair market value" are synonymous and for that reason it seemed doubtful if any great significance should be attached to the introduction of the word "fair" but not to do so offends against the canon of construction that I have just mentioned.

26      Help can be obtained from the remarks of Mignault, J in the *Untermyer* case (*supra*) which I have quoted above but portions of which I shall repeat for emphasis:

... It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. ...

Later he said:

The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of the fair market value ...

Still later he said:

I therefore think that the market price, in a case like that under consideration, where it is shown to have been consistent, determines the fair market value of the shares. ...

27      The recurrent thought in these extracts is that the market price must have the element of consistency which precludes the existence of a transient boom or sudden panic and that the market price should be realistic rather than "ephemeral". If the undue stresses contemplated by Mignault, J are present then those influences will result in a volatile rather than a consistent market and accordingly I would conclude that a market price subject to such influences cannot be considered as the "fair" market value, which it would be otherwise, and that this is the significance attributed by Mr Justice Mignault in the use of the word "fair" before the words "market value".

28      That being so it remains to be considered if the market price of the shares in the present appeal is within the exception contemplated by Mr Justice Mignault for any one of the three reasons outlined by counsel for the appellants or a combination thereof.

29      I propose to consider those reasons in the reverse order to that in which they were submitted by counsel.

30      The third reason is that the deceased exercised control over the market.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

31     From the Agreed Statement of Facts it is evident from the syndicate agreement that the deceased and the syndicate of which he was the dominant member had an option on 2,600,000-odd shares of an authorized capital stock of 3,000,000 shares. The remaining free floating shares were exchanged for mining claims some of which developed into the main mine of the company. Under this agreement the deceased had control over the sale of shares initially. In addition he controlled the take down of 80% of the shares and Campbell 20%. As the result of the settlement of a law suit between them the deceased assumed the option of Campbell. By April 1953 all shares had been taken down and at the date of his death the deceased personally owned and exercised a form of control over 1,500,000 shares out of the total 3,000,000 outstanding shares.

32     It is also clear that during the years 1955 and 1956 the deceased was buying and selling shares on the market while his ownership of shares in the company remained constant. The evidence of the extent of the buying and selling by the deceased is neither conclusive nor satisfactory.

33     The inference sought to be drawn from the foregoing is that the deceased supported a declining market by buying and assisting a rising market by buying and selling. However this is only an inference and is not supported by evidence. Similarly there is a suggestion of "wash trading" by the deceased but again there is no evidence of that fact.

34     In my view what these facts do establish is that the deceased as promoter of the company owned and controlled over 50% of the shares in the company and he controlled the management and therefore was in the position to and had the opportunity of controlling the market. The evidence establishes nothing more than that.

35     In *Lawson* v *Minister of National Revenue*, [1965] 1 Ex. C.R. 64, [1964] C.T.C. 245, 64 D.T.C. 5147, an issue to be resolved was the determination of a closing inventory consisting of shares in a mining company at the lower of cost to the taxpayer or the fair market value in accordance with subsection 14(2) of the *Income Tax Act*. The appellant attempted to show that the market value of shares was less than the cost to the appellant. This contention was based on the hypothesis that, if what was being bought and sold on the market has an intrinsic value less than the price at which it is being bought and sold, the market value is the intrinsic value and not the amount that is being paid in the market.

36     In rejecting the appeal on this ground I said at page 67 [247, 5149]:

> ... I am of the view that market value is the amount being paid by those who buy and sell at arm's length in the open market and that no evidence was introduced to establish that the prices listed in the Toronto Stock Exchange did not fairly represent that price. Evidence that members of the general public were being incited to buy the shares of this company in an operation of gambling at prices far in excess of any sensible valuation, by the appellant's carefully planned programme of direct and indirect publicity and market operations, does not make the amounts paid by them any less the market price of the shares that they were buying.

37     It will be noted that the expression used in subsection 14(2) of the *Income Tax Act* is "fair market value" which is the identical expression used in the *Dominion Succession Duty Act*. While the same words used in different statutes may receive different constructions that is predicated upon the self-same set of words being used with reference to a different set of circumstances, different subject matter and different legislative object. The *Income Tax Act* and the *Dominion Succession Duty Act* are not strictly statutes *in pari materia* yet they both have the ultimate objective of imposing a tax based upon the fair market value of an asset. Therefore, in this instance, I can see no logical reason for ascribing other than a uniform meaning to the words "fair market value" as used in the *Dominion Succession Duty Act* and as used in subsection 14(2) of the *Income Tax Act* and that is, as I have said before, the common understanding of those words.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

38      In the extract quoted from the *Lawson v. MNR* case (*supra*) the words "market value" were used in a sense synonymous with the words "fair market value". In the *Lawson* case there was evidence of market manipulation. It was held in that case that these circumstances of which there was evidence did not detract from the price of the shares as listed in the exchange being the market value of the shares.

39      Assuming that there had been conclusive evidence of market manipulation by the deceased in the present instance, which I have found that there was not, then upon the reasoning adopted in the *Lawson* case, this does not make the fair market value other than the price at which the shares were being traded on the exchange.

40      The second reason advanced as to why the price at which the shares were being traded on the exchange as at the date of the death of the deceased was that accurate and reliable information as to the ore reserves of the company was not available to the persons who constituted the market. This argument is based upon the proposition that for the stock market to reflect the fair market value there must be a fair market and that for the market to be fair there should be ready access to the information that is essential to the determination of the worth of the company.

41      In 1956 a well known firm of brokers issued a circular dated March 21, 1956 in which it was stated that the proved reserves in wholly owned and leased ore bodies of the Merrill Island group totalled some 18 million tons of ore averaging 2.9 to 3.2% copper with additional values in gold and silver. It was also indicated that the tonnage below the 1,150 foot level might be as large.

42      The financial statements of the company for the years 1955 and 1956 do not make any reference to figures for ore reserves. All that was said about the ore reserves in the 1956 annual report was that they were very gratifying.

43      Subsequent to the issue of that report queries came to the company from shareholders as to the actual ore reserves. Accordingly the company circulated a letter reproducing excerpts from the chairman's address to the annual meeting reading as follows:

    Questions will be asked regarding ore reserves, I shall anticipate them now, confining the estimate ore reserves only to tonnage proven and to those indicated as a result of diamond drilling and cross cutting. The sum total of Campbell's holdings in Chibougamau at the main shaft Cedar Bay and Kokko Creek thus far considered proven and indicated as outlined below is 9,940,000 tons averaging 2.22 per cent copper, and .056 gold, based on present mill tonnage. This indicates in excess of 15 years of reserves.

44      In the 1957 annual report these estimates of ore reserves were reduced to between 5 and $5\frac{1}{2}$ million tons with not so high a grade. This downward revised estimate of the ore reserves came out just after the death of Mr Henderson. This revised estimate of reserves was based upon a report of the chief geologist for the company. An expert geologist called on behalf of the appellants expressed the view that the method of calculation of ore reserves used by the company in its 1957 report was optimistic. It was also pointed out that the conjectured future profit of $3.02 per share was overly optimistic and was never realized. One of the principal reasons for the failure to realize that estimated profit was a pronounced fall in copper prices.

45      On the other hand the broker's letters above referred to and others written at the same time were written well before the material date of February 2, 1957, the date of Mr Henderson's death. At that time potential investors had available to them cards issued by the *Financial Post* which gave a proper factual estimate of the company.

46      It is difficult, if not impossible, to assess the influence that the inaccuracies in the estimates of ore reserves and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

the optimistic forecasts of the company's future earnings may have had on the market price. In assessing the market price there are many factors present in the mind of an investor and many imponderables. Mining companies do not restrict themselves to one particular ore body that they have discovered. They recognize that a mine as a wasting asset and that it will be depleted. Accordingly they are constantly searching for other sources of supply. This is the essence of good management in a mining company.

47      During this period there was a substantial volume of sales at a reasonably constant level. Those who sold were undoubtedly satisfied with the market price they received and those who bought undoubtedly thought that they had made a good buy. This is the function of the market which cannot be ignored.

48      The suggestion is that the estimate of the ore reserves, which in 1957 had been made at between 5 and $5\frac{1}{2}$ million tons was overly optimistic as was the projection of future earnings. There were reserves in that neighbourhood. There was no suggestion that Mr Henderson was guilty of outright fraud. At the most he was guilty of excessive puffing.

49      That being so the buyers and sellers who constitute the market are free to put their own valuation on the shares and in so doing they place their own valuation on the sum total of all advantages over disadvantages and their evaluation constitutes the fair market value.

50      It has been established that, while Mr Henderson may have bought and sold shares, his holding in the company remained constant. He was the person possessed of the most extensive information about the company's ore reserves and future prospects and with that knowledge he did not see fit to get out but rather continued to hold his shares.

51      What I am obliged to assess is the fair market value and not the correct or absolutely right market value.

52      I accept that the estimate of the ore reserves in the letter of the broker dated March 21, 1956 was grossly exaggerated but it was reduced to a more realistic figure in 1957 which may have been inaccurate.

53      However it has not been established to my satisfaction that the optimistic estimate of ore reserves had a direct impact in the market to the exclusion of other factors present to the minds of traders.

54      The third and final reason advanced by the appellants in support of their position that the market price on the stock exchange is not the best guide to the fair market value is that the company at that time was in a period of transient boom.

55      This reason is predicated upon the statement of Mr Justice Mignault in the *Untermyer* case (*supra*) when he said:

> ... It may, perhaps, be open to question whether the expression "fair" adds anything to the meaning of the words "market value," except possibly to this extent that the market price must have some consistency and not be the effect of a transient boom or a sudden panic on the market. ...

56      If the shares in the company are subject to a transient boom then the market lacks the element of consistency which is a condition to the market price being the best evidence of fair market value.

57      The appellants therefore seek to rebut the presumption that the market price of shares traded on the exchange is not the best evidence of fair market value by bringing themselves within the exception contemplated by Mignault, J that the presumption does not apply when the shares are subject to the effect of a transient boom.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

58      In *Johnson's Asbestos Corp* v *Minister of National Revenue*, [1966] Ex. C.R. 212, [1965] C.T.C. 165, 65 D.T.C. 5089, Jackett, P considered the meaning of the phases or activities of mining preceding the delivery of ore to the pit head. They are fourfold, (1) prospecting, (2) exploration, (3) development, and (4) extraction or production. He then found the meaning of those words in the jargon of mining engineers to be,

(1) "prospecting" — the initial stage of locating the site of a possible mining operation;

(2) "exploration" — in general terms, is the operation of testing for the existence and extent of an ore body and includes prospecting;

(3) "development" of a mine, in general terms, means to uncover the body or area which is to be the subject matter of the extraction process; development is the preparation of the deposit or mining site for actual mining;

(4) the meaning of "production" or "extraction" in general terms is the removal of the ore to the pit head.

59      It is my understanding that in addition to extracting ore the company also operated a refining mill.

60      Mr Mars, an expert witness called on behalf of the appellants, accepted the foregoing stages but combined the prospecting and exploratory stages as one. He stated in paragraph 20 of his affidavit filed under Rule 482, as follows:

From my experience in analysing mining stocks, I have observed that they tend to follow a pattern which involves several phases.

61      At this point I might interject to point out that the phases contemplated by the witness are the phases outlined by Jackett, CJ as the phases of a mining operation on which phases this witness superimposes the pattern of prices in the stock market.

62      He continues,

Typically in the first phase, one expects during the exploratory stage leading up to the proving of a copper ore body, considerable stock market activity of a speculative nature.

63      Again I would interject to point out that during the prospecting and exploration stages leading to the discovery of its main mine the shares of Campbell Chibougamau were not listed and accordingly there is no evidence of the market price at that time.

In the second phase, during development and construction, the stock market tends to be more stable.

64      During this stage the evidence indicates that the shares of the company from 1951 to the beginning of 1955 were reasonably stable at about $4 per share.

Thirdly, as production commences, the price will often rise to reflect early operational results which may be significantly better than those which can be sustained on a permanent basis. This phase is a *transient boom*, (italics are mine) the magnitude of which will vary depending upon other factors such as the trend of metal prices. Eventually the stock market can be sustained on a permanent basis and will then be more likely to reflect the fair market value

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

of the stock in question. I have studied a graph of the market prices of the shares of Campbell Chibougamau from the establishment of a market for such shares in 1951 and in my opinion at the date of Mr Henderson's death the stock market was still within the third phase of transient boom. In my view, the rise of copper prices during 1955 and early 1956, together with the initial profits of the Company which could not be sustained, contributed to this phase in the case of the shares of Campbell Chibougamau.

65      The main mine of the company came into production on May 29, 1955.

66      Exhibit "A" to the Agreed Statement of Facts is a graph of the monthly high and low prices on the Toronto Stock Exchange for the shares of Campbell Chibougamau from March 31, 1952, the date of the first listing, until December 1958. This graph indicates that the shares followed the pattern described by this witness.

67      From March 31, 1956 until January 1955, that is during the development stage, the market price of the shares was reasonably constant at about $4 per share or slightly below. In January 1955 the shares began a precipitous rise to a high of $29 per share in April 1956 and May 1956. In June 1955 when the mine came into production the shares were trading at about $12 per share. From a high of $29 in May 1956 the shares began to fall to about $12 per share in February 1957 with a period of recovery to $22 per share in September and October 1956. The price of the shares remained comparatively constant at about $12 per share from February 1, 1957 until June 1957 when they began a decline to about $7 per share. From September 1957 the price per share remained at about $6 per share but between September 1958 to November 1958 they traded at about $10 per share.

68      It was established that the market for copper is a very volatile one subject to rapid fluctuations dependent upon the demand for this commodity. The time when the mine came into production in 1955 coincided with a rise in copper prices. Added to this the profits for the company in its first year of production, that is the year ending June 30, 1956 was $2.29 per share. For the financial year ending June 30, 1957 the profit declined to 26 cents per share.

69      The substantial profit per share for the financial year ending June 30, 1956 was attributed to the fact that the ore milled was of high grade, some 633,000 ore milled tons at a grade of 2.95%. In the next year the grade of ore was 2.38%, then declining in successive years to 2.07% and 1.97%. In 1960 and 1961 the grade of ore rose due to the fact that a newly discovered ore body came into production.

70      It is customary in the mining trade to high grade the ore in the first years of production.

71      In the June 30, 1956 year 13 months production was brought into income for that year.

72      Furthermore profits were calculated on the basis of estimated sale prices rather than actual sales. This is not a reprehensible accounting practice but it does have the effect of driving profits down in subsequent years if the price of copper should decline.

73      Also the company had stockpiled some 128,000 tons of ore from the preproduction tax-exempt period to which no cost was attributed.

74      It was therefore submitted that for these reasons the profits for the first year of production were inflated and that there are factors which would increase the magnitude of the transient boom which Mr Mars concludes that the company was in on February 2, 1957, the date of Mr Henderson's death.

75      The question which arises is whether the circumstances above described and what Mr Mars describes as a transient boom coincides with the meaning of the words "transient boom" used by Mr Justice Mignault in the *Untermyer* case (

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

*supra*), the pertinent extract I repeat for convenience, which is "that the market price must have some consistency and not be the effect of a transient boom or sudden panic".

76      I do not think that the words "transient boom" in the context in which they are used by Mr Mars are synonymous with these same words in the context of Mr Justice Mignault's statement. In the latter context the words "transient boom" are used in association with the words "sudden panic" as being diametric opposites. In my view the adjective "transient" as used by Mr Justice Mignault must take its meaning from the use of the words "sudden panic" and that being so it must mean a sudden or unusual circumstance not normally contemplated and which will pass away quickly.

77      On the contrary the various stages through which a mining company passes, as were described by Mr Mars, are the usual stages through which it must pass from the very nature of things. Accordingly the prices for which shares of a mining company are traded on the market are the usual market fluctuations due to the economic factors through which a mining company must pass coupled with other factors which habitually affect the price at which shares in mining companies are traded.

78      There was extensive trading in the shares of Cambell Chibougamau both before and after the death of Mr Henderson. In 1955, 2,214,200 shares were traded, in 1956, 2,803,667, in 1957, 2,596,405, and in 1958, 3,529,733.

79      In November and December 1956 and January 1957, the three months prior to Mr Henderson's death, some 600,000 shares were traded at prices averaging out to $13.78 per share and in the three months following his death, that is February, March and April 1957 500,000 shares were traded at prices averaging out to $11.45 per share. Over this six-month period there was an element of consistency present which, in my view, makes the market price the best guide to the fair market value.

80      In short, I am of the opinion that the appellants have not discharged the onus cast upon them to successfully rebut the presumption that such is the case for the reasons I have expressed.

81      In the circumstances of this particular appeal I therefore think that the market price, as at the death of Mr Henderson on February 2, 1957, determines the fair market value of the shares in Campbell Chibougamau held by him at that date, that is $10.78 per share.

82      The Minister did not assess the fair market value of the shares at the list price of $10.78 per share at which they were traded on the exchange on February 2, 1957 but rather he assessed the value at $8 per share. In doing so the Minister obviously recognized, because Mr Henderson owned 471,984 6/8 shares, that the estate would have difficulty in marketing such a large block of shares. To do so would make the measure of valuation a sacrifice or dumping value rather than the fair market value.

83      What is under appeal is the assessment. Accordingly if I conclude that the fair market value of the shares is $8 per share or more then the assessment by the Minister shall not be disturbed. That would only follow if it is found that the fair market value per share is less than $8.

84      It is the submission on behalf of the appellants based upon the opinions of two experts called on their behalf that the market value of the shares was substantially less than $8 per share. Dr Buffam expressed the opinion that the fair market value as at February 2, 1957 was between $2.25 and $2.75 per share and Mr Mars thought it to be $3.27 per share.

85      In reaching these conclusions Dr Buffam did so following an application of the Hoskold formula and Mr Mars

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

did so by following a variation thereof known as the present valuation method. As I understand the Hoskold formula it is an application of a mathematical calculation to the known ore reserve and in the result it is a determination of the value of the specific ore body.

86      In applying the Hoskold formula Dr Buffam found the valuation of the shares of Campbell Chibougamau to have been $3.39 per share with copper at 30 cents per pound in November 1957. In applying the present value method he reached a value of 46 cents per share as at November 1957. He concluded that since there was no difference between the value of the shares as at November 1957 and February 1957 the fair market value was in the range of $2.25 to $2.75 per share.

87      Dr Buffam had calculated the value of shares based upon the Hoskold theory to have been 67 cents with the copper price at 25 cents per pound and by the present value method to have been 46 cents per share, but he conceded an allowance should be made for the estimated future price of copper and for the speculative value of the shares. From the value of the shares that he found at 46 cents or 67 cents and his opinion of fair market value at $2.75 he must have multiplied these values between 5 and 6 times.

88      In Mr Mars's calculations to arrive at a value of $3.27 per share he used the same variables as in the Hoskold formula, which are basically ore reserves, price of copper, mill capacity and interest rates.

89      It is my conclusion that the Hoskold formula and the present value method are useful in determining the intrinsic value. As was stated in the *Lawson* case (*supra*) the fact that a commodity has an intrinsic value does not make that intrinsic value the fair market value.

90      Cambell Chibougamau recognized that a mining company possessed of only one ore body can expect that that ore body will be depleted and accordingly it was engaged actively in other explorations. There was a copper property in Mexico and current exploration of another ore body which became the Henderson mine and entered the production stage in 1960. Dr Buffam in making his estimate disregarded the Henderson ore body because in his opinion as a highly qualified geologist that ore body had not been sufficiently delineated as at the date of Mr Henderson's death. However the results of diamond drilling, though not as extensive as Dr Buffam would have wished to make an accurate estimate of the ore body, were known shortly prior to Mr Henderson's death and sufficient information was then available to justify an optimistic estimate of that discovery.

91      If my recollection of Mr Mars's evidence is correct he disregarded the Henderson ore body.

92      It appears to me that as at February 2, 1957 the company was concurrently in the production stage with respect to the main mine and in the exploration stage with respect to the Henderson ore body with the reaction in the market to those factors which Mr Mars described as "considerable stock market activity of a speculative nature", during the exploration stage.

93      I therefore conclude that the methods of estimating the fair market value of the shares adopted by the appellants are less appropriate than the method adopted by the Minister in assessing the appellant as he did.

94      I am confirmed in this conclusion by other circumstances.

95      The first such circumstance which I have previously mentioned was that for the three months prior and subsequent to Mr Henderson's death, a period of six months, there was a consistently large volume of trading at an average price of $12.62 per share.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

96    There were two methods available to the executors to dispose of the shares, if they should conclude it was obligatory upon them to do so, first the shares could have been sold *en bloc* to another mining company or secondly they could be disposed of on the market gradually so as not to have a depressive effect on the market.

97    The evidence of an executor was that attempts were made to sell the entire block of shares held by the deceased to other mining companies but that those attempts were unsuccessful. There was evidence to the effect that established mining companies are reluctant to purchase the properties of other established mining companies, their preference being to get in at an earlier stage. Added to this copper prices were declining. The significant factor is that the price asked by the executors of the deceased's total holding was $8 per share. The price of $8 is exactly that at which the Minister assessed the shares and not the fair market value not put forward by the appellants within the range between $2.25 and $2.75 and $3.27.

98    On April 30, 1956 a company known as Yorcan Exploration Limited was incorporated to explore some 95 mining claims. Yorcan was 50% owned by Campbell Chibougamau and the remaining 50% by other interests. Because of favourable indications arising on the border of the properties of these two companies an arrangement was made for a programme of joint exploration carried out through the winter of 1957. On July 22, 1957 the company entered into an agreement with Yorcan to purchase the assets of Yorcan in exchange for some 500,000-odd shares of the company at a price of $9 per share. There is no evidence that this was not a bona fide arrangement from which it follows that $9 per share was a realistic price.

99    In paragraph 22 of the Agreed Statement of Facts it is disclosed that the executors disposed of 403,359 6/8 shares in Campbell Chibougamau in the years 1957 to 1961 inclusive at the respective average prices per share of $4.60, $6.33, $7.70, $6.08 and $7.68, an overall average of approximately $6.48 per share.

100    I fully appreciate that the fair market value must be assessed as at the date of the deceased's death on February 2, 1957 and that at later dates different circumstances may well prevail. I have referred to the average prices at which the shares were actually disposed of at subsequent dates merely as a quick means of testing the estimates of the fair market value by the contending parties. The actual sale prices at subsequent dates are far in excess of the estimate of fair market value put forward by the appellants and are more approximate to the price of $8 per share which the Minister concluded to be the fair market value and assessed the estate accordingly.

101    Therefore I dismiss the appellants' appeal against the assessment respecting fair market value of the shares in Campbell Chibougamau as at February 2, 1957.

102    The other issue in the appeal of the executors against the assessment is with respect to 56,234 warrants to purchase an equal number of shares in Campbell Chibougamau at $4 per share which the Minister has assessed at a value of not less than $4 per warrant on the basis that such warrants had a situs in Canada. The appellants contend that the said warrants to purchase shares did not have a situs in Canada and accordingly should be excluded from assets subject to tax as situate in Canada and that in any event the warrants were worthless.

103    Obviously if the shares of Campbell Chibougamau could be purchased on the stock exchange at a price of $4 per share or less then the share purchase warrants would be valueless. On the other hand if the shares of the company were trading on the exchange at prices in excess of $4 per share then the value of the share warrants would be the difference between $4 and the higher price at which the shares were traded.

104    In view of the Minister's assessment of the shares at a fair market value of not less than $8 per share, which assessment I have concluded should not be varied for the reasons I have given, it follows likewise that the Minister's as-

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

sessment of the share purchase warrants at a value of $4 per warrant as at February 2, 1957 should not be varied.

105     Accordingly there remains the sole issue of the situs of the share purchase warrants.

106     The share purchase warrants were in the possession of the deceased at the date of his death and were physically situated in the State of New York.

107     Paragraph 6(1)(b) of the *Dominion Succession Duty Act* provides as follows:

6. (1) Subject to the exemptions mentioned in section 7, there shall be assessed, levied and paid at the rates provided for in the First Schedule duties upon or in respect of the following successions, that is to say,

(b) where the deceased was at the time of his death domiciled outside of Canada, upon or in respect of the succession to all property situated in Canada.

108     Subsection (2) of section 6 provides:

6. (2) For the purposes of this Act, shares in the capital stock of a corporation incorporated in Canada are deemed to be property situated in Canada.

109     Respecting the shares in Campbell Chibougamau by virtue of foregoing provisions they are situated in Canada but different considerations apply to the share purchase warrants.

110     There is a distinction between a share warrant and a share purchase warrant.

111     A company if authorized by its charter may issue share warrants which make the bearer of such warrant absolutely entitled to the shares in respect of which the share warrant is issued. What happens is that fully paid shares are issued by the company to a shareholder. However instead of the shareholder taking a share certificate as evidence of his title to the share he may exchange that certificate for a share warrant or he might be given a share warrant rather than a share certificate. The bearer of a share warrant is entitled upon surrender of the share warrant to be registered as a shareholder. The holder of a share warrant may be entitled to vote depending upon the conditions attaching to the share warrant.

112     The principal difference between a share certificate and a share warrant is that the transferee of a share certificate only perfects his title when the transfer is registered in the company's share register. On the other hand the bona fide holder of a share warrant acquires a title free from equities immediately. Accordingly, a share warrant is a negotiable instrument which passes by delivery free from equities.

113     With respect to share warrants, shares have been issued by the company.

114     A share purchase warrant is a certificate which entitles the bearer on surrender of the certificate, on, after or before dates specified, to purchase from the treasury of the company the number of shares stated in the warrant at the price therein provided.

115     The basic difference between a share warrant and a share purchase warrant is that in a share warrant share capital has actually been issued and funds acquired by the company, instead of a share certificate the holder gets a share warrant, whereas on a share purchase warrant no capital shares have been issued by the company. The bearer of a share purchase warrant is not a shareholder, rather he has the option to become a shareholder in that he may purchase the number

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

of shares at the price as is specified in the option. On its part the company undertakes to hold in its treasury sufficient shares to discharge its obligations under the share purchase warrants outstanding.

116    The share purchase warrants owned by the deceased at the date of his death were in the form agreed upon in paragraph 23 of the Agreed Statement of Facts. It is unquestionably a share purchase warrant as described above rather than a share warrant in that it entitles the bearer to purchase a specified number of shares of the par value of $1 each in Campbell Chibougamau for $4 per share, to be exercised by presentation of the share purchase warrant together with a certified cheque in payment of the subscription price to the company's transfer agent at Montreal, PQ on or before December 1, 1960. It is specifically stated in the conditions attaching to the warrant that title to the warrant shall pass by delivery. The warrant is signed by the company by its president and is countersigned by the transfer agent.

117    There is no indication in the attestation clause that the warrant was executed under the corporate seal.

118    There is no doubt in my mind that a share warrant, which is a document issued by a company instead of a share certificate, must be under the corporate seal and I would have expected that a share purchase warrant is also the type of document which should be executed under the corporate seal.

119    A document under seal is a specialty and the general rule is that a specialty has the situs where it is physically situated. It is impossible to determine from the photocopy of the warrant appended to the Agreed Statement of Facts if the warrant was executed under the seal. It has not been established in evidence that the share purchase warrants were so executed and accordingly I must decide the matter in the assumption that they were not so executed.

120    The situs of share purchase warrants is not dealt with in the *Dominion Succession Duty Act*, applicable in the present appeals, as is the situs of shares.

121    In Schedule B to an *Act to amend the Canada-United States of America Tax Convention Act, 1943 and the Canada-United States of America Tax Convention Act, 1944*, 14 Geo VI, c 27, the title and preamble to which indicates the object of the Convention to be "the avoidance of double taxation and the prevention of fiscal evasion in the case of estate taxes and succession duties", it is provided in Article II as follows:

> Where a person dies a citizen of the United States of America or domiciled in the United States of America or Canada, the situs of any rights or interests, legal or equitable, in or over any of the following classes of property, which for the purposes of tax form or are deemed to form part of the estate of such person or pass or are deemed to pass on his death, shall, for the purposes of the imposition of tax and for the purposes of the credit to be allowed under Article V, be determined exclusively in accordance with the following rules, but in cases not within such rules the situs of such rights or interests shall be determined for these purposes in accordance with the laws in force in the other contracting State: ...

122    Paragraph (f) of Article II reads as follows:

> (f) Shares, stock, bonds, debentures or debenture stock in a company (including any such property held by a nominee, whether the beneficial ownership is evidenced by scrip certificates or otherwise) shall be deemed to be situated at the place where the company is incorporated; ...

123    The argument on behalf of the appellants was, as I understood it, that because share purchase warrants are not mentioned in paragraph (f) it is not a case within the rules enumerated and, therefore, the situs of such warrants is to be

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

determined in accordance with the law of Canada, the "other contracting State". Following that premise it was then submitted that the situs of share purchase warrants is where they can be effectively dealt with and since title passes by delivery they can be effectively dealt with where they are physically located, that is, in the State of New York.

124      The rival contention on behalf of the Minister was, as I understood it, that under Article II of the Convention the situs of "any rights or interests, legal or equitable, in or over ..." the class of property set forth in paragraph (f), that is, "shares", shall be deemed to be situate at the place where the company was incorporated. It was the contention that the share purchase warrants constituted such a right in or over shares in the company.

125      I do not accept the construction of Article II advanced on behalf of the Minister. The share purchase warrants give the holder the right to have shares issued to him to the number specified in the warrant upon presentation of the warrant to the transfer agent together with payment of the subscription price on a date prior to December 1, 1960.

126      The rule in *Pellatt's Case* (1867), LR 2 Ch App 527, is that for shares to be issued there must be a subscription therefor and that offer is accepted by an allotment of shares and communication of that allotment to the subscriber. The right which the share purchase warrants in the present appeal bestow in the holders thereof is the right to subscribe for shares in accordance with the terms of the warrant whereas the company on its part warrants that such shares will be available from its authorized capital when application is made. However until subscription and allotment is made and communicated to the subscriber no shares come into existence. That being so the share purchase warrant does not confer rights on its holder in or over shares but only the right to have shares issued. It is a right in itself and property in itself.

127      I think that the words "any rights or interests, legal or equitable, in or over ..." in the initial language of Article II refers to rights or interests of a proprietary nature, either legal or equitable, with respect to the classes of property as are set forth subsequently in the Article. This is the construction and meaning to be ascribed to those words in the introductory portion of Article II in view of the fact that the rules which follow are complete with respect to the categories and situs of property to the exclusion of reference elsewhere. The category of property is set forth with certainty and the situs of that class of property is set forth with equal certainty.

128      Paragraph (f) refers to "shares, stock, bonds, debentures or debenture stock in a company". It does not include share warrants or share purchase warrants. (I might add parenthetically that this omission was corrected in subsequent legislation and also that "fair market" value of shares as comprising the aggregate net value of an estate was subsequently amended to be the price at which shares are traded on an exchange.)

129      Because paragraph (f) does not include share purchase warrants the situs of such warrants falls to be determined by the law of Canada.

130      That being so it was then contended on behalf of the Minister that the share purchase warrant is an option. For that option to be exercised certain acts must be done by the holder at the office of the company's tranfer agent in Montreal, PQ. If the company did not perform its obligation to the bearer of the share purchase warrant, assuming that all conditions precedent were complied with, then the bearer is entitled to specific performance which would be enforced where the company is resident and domiciled, which is in the Province of Quebec. In effect it is contended that the share purchase warrant is a simple contract which has its situs in the country where it can be enforced which is the residence of the company.

131      With respect to the situs of shares the leading decision is that the situs of the share certificate is not the situs of the shares of which the certificate is evidence of the title but that the situs is the location of the tranfer register.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

132    The Privy Council, in *Brassard v. Smith*, [1925] A.C. 371, said with respect to the situs of shares:

> This is, in their Lordships' opinion, the true test: Where can the shares be effectively dealt with? The answer in the case of these shares is in Nova Scotia only and that solves the question.

The shares in question in the Privy Council decision were shares in the Royal Bank of Canada whose head office was in the Province of Quebec and were part of the estate of a deceased who died intestate in Nova Scotia. The validity of a claim for duty for succession duties in Quebec depended upon the shares being actually situated in that province. The *Bank Act* provided that the bank might maintain a registry office in Nova Scotia at which shares of holders thereof within the province "shall be registered and at which, and not elsewhere, except as hereinafter provided, such shares may be validly transferred". Pursuant to that authority the bank opened a registry office in Nova Scotia.

133    However share certificates, share warrants and share purchase warrants are different things.

134    A share certificate is in no sense a contractual document and even though it is required to be issued under the corporate seal it is not a deed. The holder's legal right depends not on the certificate but upon entry in the share register. A share certificate is not a negotiable instrument whereas a share warrant or a share purchase warrant is.

135    The basic characteristics of negotiable instruments are that instruments when payable to bearer or endorsed in blank are transferable from hand to hand so that the right to maintain an action upon the instrument passes by the delivery of the instrument only in addition to the rights bestowed on a holder for value.

136    Because a share warrant and a share purchase warrant passes the right to maintain an action thereon merely by delivery, these documents are negotiable instruments. (See *Webb, Hale & Co* v *The Alexandria Water Company (Limited)* (1905), 21 T.L.R. 572.)

137    While it is a well settled doctrine that simple contract obligations of a debtor have a situs where the debtor resides, there is an exception to this rule in the case of negotiable instruments. This exception is based on the circumstance that the debt evidenced by an instrument transferable by delivering is capable of being reduced into possession of the instrument itself and that when such an instrument in the hands of bearer the bearer's title to the debt due upon the instrument is assimilated to a chattel. (See Duff, J in *Crosby v Prescott*, [1923] S.C.R. 446.) The rule with respect to the situs of negotiable instruments is where the instrument is physically situate.

138    In the present appeal the share purchase warrants, being physically situated in the State of New York, have their situs in that state even though the obligations under the document are to be performed by the company through its transfer agent in Quebec.

139    In *Secretary of State of Canada and Custodian v Alien Property Custodian for the United States*, [1931] S.C.R. 169, the Supreme Court of Canada considered the question of the situs of shares of the Canadian Pacific Railway and bearer share warrants of Imperial Oil Limited. The bearer share warrants were warrants declaring that the bearer is entitled to a specified number of shares in the capital stock of Imperial Oil Limited.

140    Mr Justice Duff (as he was then) said at page 195:

> On the question of the situs of two other groups of securities, those of the Canadian Pacific Railway Company and of the Imperial Oil Limited, special points are made which are not without their weight. As to the Imperial Oil Limited,

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

the provision quoted from the Supplementary Letters Patent makes it perfectly clear that the benefit of the obligation passes with the delivery of the instrument. The analogy of negotiable instruments, strictly so called, is pertinent, and indeed, seems to be almost, if not quite, complete. Such instruments have their situs where they are physically situated. There also is the situs of the obligation.

141      On the same page he dealt with the situs of the shares in the Canadian Pacific Railway. He said that the shares, for the purpose of determining the incidence of succession duty, had their situs at the branch office where they were registered and at which they could only be validly transferred. He followed *Brassard v. Smith* (*supra*) and, in applying the principle there enumerated, he said at page 195:

... in the case of the Canadian Pacific Railway Company's shares, the place for perfecting the legal title and thereby completing the disposition was New York. This also is not without its application to the Imperial Oil securities. The place of effective disposition was the place where the warrant was.

142      The warrants were physically situated in the State of New York and were described on page 174 as follows:

Bearer Share Warrants issued by the Imperial Oil Company and transferable by delivery without anything further having to be done, either in Canada or the United States, to perfect title.

143      It is true that if the bearer of the share warrants wished to become a registered shareholder he was obliged to present the share warrant to the registry office to become registered as a shareholder and receive in exchange therefor share certificates, but that does not alter the fact that title to the share warrants passed upon delivery.

144      Mr Justice Lamont said at page 182:

... The share warrants of the Imperial Oil Company, being payable to bearer, were property wherever they were physically situate, for they could be effectively dealt with there. ...

145      The characteristic common to the bearer share warrants of Imperial Oil Limited and the share purchase warrants which are the subject of the present appeal which make them analogous to "negotiable instruments, strictly so called", is that the benefit of the obligations covered by both such documents passes with delivery of the documents.

146      The share purchase warrants issued by Campbell Chibougamau therefore have a situs where the instruments were physically situated which, in accordance with the Agreed Statement of Facts, is in the State of New York.

147      Accordingly I allow the appeal in this respect and refer the assessment back to the Minister in order that the warrants to purchase shares of Campbell Chibougamau held by the deceased shall be excluded from the assets of the estate situated in Canada and so not subject to tax under the *Dominion Succession Duty Act*.

148      In the result the appeal by the executors with respect to the issue of the determination of the value for duty of the shares held by the deceased, A M Collings Henderson, in Campbell Chibougamau Mines Limited as at the date of his death on February 2, 1957 is dismissed and in accordance with the agreement between the parties as set forth in paragraph 4 of the Agreed Statement of Facts, the appeal with respect to the issue of the determination of the value for duty of the shares held by the deceased, A M Collings Henderson, in Chibougamau Mining and Smelting Co, Inc, as at the date of his death on February 2, 1957 is also dismissed.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

149      The appeal by the executors with respect to the inclusion of the warrants to purchase shares in Campbell Chibougamau Mines Limited held by the deceased at the date of his death as assets of the estate is allowed.

150      The Minister of National Revenue shall be entitled to his taxable costs attributable to the issue with respect to the determination of the value for duty of the shares held by the deceased in Campbell Chibougamau Mines Limited.

151      The executors as appellants shall be entitled to their taxable costs attributable to the issue with respect to the inclusion of the share purchase warrants in Campbell Chibougamau Mines Limited, on which issue they were successful, such costs to be set off against the costs recoverable by the Minister of National Revenue.

152      I now turn to the appeal of the Bank of New York from the assessment of the Minister dated March 28, 1966 against the bank personally in its capacity as an executor of the estate of the late A M Collings Henderson in respect of unpaid duties that had been assessed against the estate.

153      The relevant facts, with respect to which there is no dispute, are set forth in the statement of claim and may be summarized as follows:

154      A M Collings Henderson died resident and domiciled in the State of New York on February 2, 1957.

155      By his last will and testament made on January 13, 1950 he appointed his wife, Janet Beach, his attorney, business associate and friend Jack N Blinkoff and the Bank of New York, the appellant herein, the executors and trustees thereunder. All of the executors resided and were domiciled in New York.

156      The will was probated in the Surrogate Court of the County of New York on April 2, 1957. The probate was not resealed in any province of Canada, nor was there any ancillary grant of any nature in Canada.

157      In January 1958 the executors prepared and filed a form prescribed by the *Dominion Succession Duty Act*, RSC 1952, c 89, as amended by SC 1957, c 22, being a schedule of assets and declaring the assets of the estate to have an aggregate net value of $1,201,883.92 and the assets situate in Canada to have an aggregate value of approximately $737,000.

158      Among the assets disclosed in the schedule thereto the deceased at the time of his death was the owner of 471,984 6/8 shares of Campbell Chibougamau Mines Limited, 288,384 shares of Chibougamau Mining & Smelting Co Inc and warrants to purchase 56,234 shares of the par value of $1 each in Campbell Chibougamau Mines Limited at $4 per share.

159      The Minister fixed the fair market value of the shares in Campbell Chibougamau at $8 per share at the date of the death of the deceased for assessment purposes. The Minister fixed the fair market value of the shares in Chibougamau Mining & Smelting Co, Inc at $2.65 per share at the date of the death of the deceased for assessment pur poses, and the Minister assessed the estate on the basis that the share purchase warrants had their situs in Canada and had a value of $4 for each share covered thereby.

160      It will be recalled that the issue in the appeal of the executors was the determination of the value of the shares in Campbell Chibougamau and in Chibougamau Mining & Smelting Co, Inc for duty purposes and the situs and value for duty of the share purchase warrants.

161      Certificates for 128,845 6/8 shares in Campbell Chibougamau were held in Canada in Canadian accounts as were certificates for 87,666 shares in Chibougamau Mining & Smelting Co, Inc.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

162      Certificates for 87,350 shares in Campbell Chibougamau were held in Canada in Canadian accounts in New York and certificates for 142,857 shares in Chibougamau Mining & Smelting Co, Inc were similarly held.

163      Certificates for 255,789 shares in Campbell Chibougamau and certificates for 57,861 shares in Chibougamau Mining & Smelting Co, Inc were held in US accounts in New York.

164      The share purchase warrants were situated physically in New York State.

165      There is no question, as it was conceded readily by all parties, that the shares in Campbell Chibougamau and Chibougamau Mining & Smelting Co, Inc had their situs in Canada.

166      For the reasons I expressed in the appeal of the executors I concluded that the Minister's determination of the fair market value of the shares of Campbell Chibougamau should not be disturbed. Because of the agreement between the parties expressed in paragraph 4 of the Agreed Statement of Facts neither should there be any adjustment of the Minister's valuation of the shares in Chibougamau Mining & Smelting Co, Inc.

167      I also concluded that the Minister's valuation of the share purchase warrants for assessment purposes should not be varied but I did conclude that the situs of the share purchase warrants was in the State of New York and accordingly that those warrants should be excluded from assets subject to tax in Canada because they were not property situated in Canada.

168      While the question of the valuation of the shares in two mining companies and the value and situs of the share purchase warrants is an issue common to the appeal of the executors and the appeal of the Bank of New York, it was agreed among counsel that the determination of the assets subject to succession duty in Canada and the valuation thereof for succession duty purposes in the appeal of the executors would be accepted as determinative of that issue in the appeal of the Bank of New Nork.

169      Succession duty returns similar to the returns prepared and filed by the executors under the *Dominion Succession Duty Act* were also filed under *The Succession Duty Act* of Ontario and the Quebec *Succession Duties Act*.

170      By a notice of assessment dated August 2, 1969 the Minister considered the aggregate net value of the assets to the value of $3,771,008.03 to be Canadian assets and succession duties in the amount of $1,703,250.88 were claimed thereon.

171      The Province of Ontario adopted the share values fixed by the Minister and by an instrument dated April 11, 1960 advised the executors that Ontario duties were in the amount of $357,659.34.

172      In the notice of assessment dated March 28, 1966 and served on the Bank of New York it is indicated that an amount of $428,227.10 has been paid on account leaving a balance of duty in the amount of $1,275,023.78 payable in three annual instalments.

173      In paragraph 19 of the Statement of Claim it is alleged that duties in the amount of $212,448.10 have been paid to the Province of Ontario. In accordance with section 12 of the *Dominion Succession Duty Act* 50% of the duty payable to the Province of Ontario is deductible from the duty payable under the *Dominion Succession Duty Act*.

174      In paragraph 13 of his statement of defence the Minister concedes and states that he is prepared to allow in computing the duty payable a deduction in the amount of one half of the duties paid to the Province of Ontario. However he denied the amount alleged to have been paid to Ontario thereby putting the amount in issue. Evidence was not adduced

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

establishing that amount but in the prayer to his statement of defence the Minister asked that the appeal be allowed and the assessment referred back in order to allow a deduction of one half of the provincial duties paid to Ontario. It was my understanding that counsel would agree on the amount of the taxes so paid, which amount can be proven readily.

175      The Bank of New York during the period it was an executor and trustee of the estate carried all cash and securities received in the course of the administration of the estate in a trust ledger under the heading "Trust Account of the Estate of A M Collings Henderson".

176      Under the will of the deceased the principal beneficiaries were Mr Henderson's widow, Janet B Henderson, his son Bruce C C Henderson, and his daughter Antoinette E C Henderson. However there were other lesser bequests including an amount of $5,000 to Janet Beach Henderson, a bequest of the deceased's wearing apparel to his brother and his other personal effects to his son. The wearing apparel and personal effects were declared to have a value of $115 and were in the custody of Janet Henderson. The wearing apparel was delivered by her to the children of the deceased's brother who had predeceased him and the other personal effects were given by her to the deceased's son. The Bank denies that the wearing apparel and other personal effects were at any time in its control, or subject to control or disposition by it.

177      After the deceased's death his widow was without funds to meet her current living expenses. Accordingly on January 31, 1961 a cheque of the Bank of New York, termed an "official" cheque which I understand to be a draft issued by the bank authorizing the payee to draw on the funds of the bank, was given to the widow in the amount of $5,000 in payment of the legacy to her in that amount under the deceased's will. The amount of this cheque was charged to the trust account entitled "Trust Account of the Estate of A M Collings Henderson".

178      Save as aforesaid the beneficiaries under the will of the deceased derived no benefit thereunder during the period the bank was an executor.

179      Subsequent to this payment of $5,000 by the bank to the widow on January 31, 1961 the bank became very anxious about its position. I understood its concern to be primarily what assets of the estate it should make available to the Department of National Revenue for payment of Canadian succession duties. The bank consulted an independent legal adviser and as a consequence of that advice it applied to the Surrogate Court of the County of New York for leave to resign as executor and trustee of the estate. That leave was granted by order dated December 19, 1963 and the probate issued to the bank was revoked as of that date. This order was not applicable to the other two executors and trustees who continued in that capacity.

180      On March 30, 1966 a document entitled "Succession Duties — Notice of Assessments" dated March 28, 1966 and addressed to the Bank of New York was received by the bank. This document was received in evidence as Exhibit I. It refers to the duties payable being in the amount of $1,703,250.88 and that $428,227.10 had been paid on account leaving a balance due in the amount of $1,275,023.78. The document bears this endorsement:

This assessment is for the tax payable by you pursuant to sec. 49 of the Dominion Succession Duty Act RSC 1952, c 89, since you delivered or transferred property of A M Collings Henderson, deceased, to Janet Beach Henderson, successor, without either first paying all of the duties assessed and levied under the Dominion Succession Duty Act, as evidenced by a Notice of Assessment dated 6 Aug, 1959, which you were liable to pay in your representative capacity as an executor of the estate of A M Collings Henderson, deceased, or without furnishing security satisfactory to the Minister of National Revenue.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

181    This endorsement refers to facts in the present appeal and closely parallels the language of section 49 of the Act which reads as follows:

>    49. Before delivering or transferring any property of the deceased or any interest in such property to any heir, legatee, donee or other successor, the executor shall first pay all the duties assessed and levied under the Act to the extent to which he is liable in his representative capacity or shall furnish security satisfactory to the Minister for the payment of such duties, and any executor who acts in contravention of this provision is personally liable for the duties, and in addition is liable to a penalty equivalent to double the amount of such duties.

182    It is quite apparent that the Minister seeks to render the Bank of New York personally liable for the balance of the unpaid duties but he does not invoke nor seek to recover a penalty equivalent to double the amount of such duties.

183    The bank disputes its liability first on the ground that the assessment as evidenced by Exhibit I is a nullity.

184    As I understood the contention of counsel for the bank it was that liability under section 49 of the Act is not the proper subject matter of assessment, that the technique of proceeding by way of assessment is inappropriate and is not in contemplation of the general scheme of the Act nor is there any statutory authority for such an assessment. Further he contended that assessment is an administrative or ministerial act and since liability under section 49 involves a judicial or quasi judicial process the assessment is invalid. He submitted that, since there might be a debt due, the proper remedy would be for the Minister to proceed by way of a suit for debt.

185    Secondly he contended that if the first submission was decided adversely to his client's interest then the bank was not an executor within the meaning of and therefore not subject to the provisions of the *Dominion Succession Duty Act*. Basically I understand this submission to be that judgment cannot be given against a foreign executor who has not taken out an ancillary grant of letters probate in Canada. Therefore if the bank is not an executor it cannot be liable in its representative capacity. If the acts of the bank constituted it an executor *de son tort*, which counsel for the bank denied being the case, it was then his contention that an executor *de son tort* has no representative capacity, but that an executor *de son tort* is only liable to the extent of the value of the assets which he administered in Canada.

186    In the event that it should be resolved that the Bank of New York was effectively assessed and that it was an executor the third contention on behalf of the appellant is that it is under no liability in its representative capacity because foreign executors cannot be required to send assets from the foreign jurisdiction to pay a tax imposed by the domestic jurisdiction.

187    As an ancillary point counsel for the bank contended that the tax under the *Dominion Succession Duty Act* is a tax on a succession and because the bank paid a legacy of $5,000 the executor should be required to pay duties assessed and levied on that succession to the exclusion of other successions. In this context it may be appropriate to point out that the plural is used in the title to Exhibit I, "Succession Duties Notice of Assessments". If this is so he then points out that since $428,227.10 had been paid for duties and that the duty on a succession of $5,000 would be approximately $2,280 that the duty on this particular succession has been paid although he was frank to admit that no amount had been allocated to or identified as a payment of duty on this succession. He also cited this circumstance as a further example of a decision of a judicial nature being made and that the technique of assessment is inappropriate therefor.

188    The fourth ground advanced on behalf of the appellant was that assuming (1) the assessment was not a nullity, (2) the appellant was an executor within the meaning of the *Dominion Succession Duty Act* and (3) the appellant is liable to tax, then the assessment is for an excessive amount. The basis of this contention I understood to be that, at the time of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

the assessment the value of the assets had not been determined, that credit in respect of duties payable to the Province of Ontario has not been assessed and determined so that the calculation of the credit to which the appellant is entitled to is unknown for which reasons the liability of the Bank is unknown to the Minister until the liability of the estate has been determined and accordingly the assessment was premature. It was my recollection of the conclusion drawn from the fore-going by counsel for the appellant that the assessment should be struck out. This is contrary to the relief sought in para-graph 20(3) of the statement of claim which is a declaration that the liability of the appellant is limited to (1) the amount transferred by the appellant to the beneficiaries to which I have referred immediately above, (2) that the balance of the duties owing by the estate should be reassessed in accordance with the determination of the value of the assets of the es-tate which were situated in Canada, which was the issue in the appeal of the executors, and (3) by deducting one half of the provincial duties paid by the estate from the duty otherwise payable which the Minister in paragraph 13 of his state-ment of defence readily concedes and is prepared to allow in respect of duties paid to the Provinces of Quebec and Ontario.

189     It was admitted that there are assets still in the hands of the executors available for payment of duties. I assume that admission to refer to assets in the hands of the continuing executors but it is not clear if those assets are physically situated in Canada although I assume them to be. They are 53,000 shares of Campbell Chibougamau, 31,661 shares of Chibougamau Mining and an amount slightly in excess of $30,000 held by the National Trust Company.

190     It is obvious that even with the exclusion of the share purchase warrants from the assets of the estate as not sub-ject to tax in Canada, and the credit to be allowed for duties paid to the provinces, the proceeds from the assets available in Canada will not be sufficient to satisfy the unpaid balance of duties and that the Minister seeks to recover the defi-ciency from the bank under section 49 of the Act.

191     The first contention on behalf of the appellant is that the assessment dated March 28, 1966 made by the Minister is a nullity, in that assessment for duties under section 49 is not authorized by the Statute, and that the Minister in making the assessment was acting in an administrative or ministerial capacity and as such could not make judicial or quasi judi-cial decisions.

192     If the assessment is a nullity, as contended by the appellant, it is void from the outset and the appellant would be entitled to the relief sought in paragraph 20(1) of its statement of claim, that is a declaration that the assessment is null and void.

193     The object of an assessment is the ascertainment of the amount of the aggregate net value of all the property of the deceased, wherever situated, passing on his death, from which is computed the duty payable, and the fixation of the liability therefor in accordance with the provisions of the statute.

194     Assuming that assessment is the proper method of fixing liability for duties payable under section 49 of the Act, then the appellant has the right of appeal under section 37 to establish that the amount of the duty is erroneous and that it is not liable therefor.

195     In fixing liability under section 49 the Minister, of necessity, must make certain assumptions. The first of these assumptions must be that the appellant is an executor, second that the executor transferred property of the deceased to an heir without first paying or providing for the payment of the duties for which the executor is liable in its representative capacity and thirdly the amount of the personal liability of the executor under section 49.

196     The position taken by the appellant is that the Minister is precluded from determining those conditions preced-ent to liability because each determination involves a decision of a judicial or quasi judicial nature and the function of the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

Minister is administrative.

197      The assessment by the Minister is an administrative act. There is an appeal provided for in the Statute from that administrative act. Before the Minister can perform the assessment process he is obliged to make the assumptions from which liability follows.

198       In my view the statute contemplates that the Minister shall do so and provides for an appeal against those assumptions not being in accordance with the statutory provisions.

199      I therefore conclude that if the Minister is required to make decisions of a judicial or quasi judicial nature as in the assessment process, the statute requires that he shall do so and provides an appeal to correct any error which may have been made by the Minister with respect to the applicability of the provisions of the Act.

200      The persons who are liable for the duty under the Act are set forth in section 13 which reads:

13. (1) Every successor is liable for the duty by this Act levied upon or in respect of the succession to him, and the duty in respect of any gift or disposition *inter vivos* to a successor is also payable by and may be recovered from the executor of the property of the deceased, but such liability shall be in his capacity as executor only and for an amount not exceeding the value of the interest of the successor in the property administered by the executor.

(2) Subject to subsection (1), all the duties assessed and levied under this Act shall be payable by and may be recovered from the executor of the property of the deceased, but the liability of any executor under this subsection shall be a liability in his capacity as executor only and for an amount not exceeding the value of the property administered by him.

. . . . .

201      The successor is liable but the duty shall be payable by and is recoverable from the executor who is liable therefor in his capacity as executor and only to the extent of the property administered by him.

202      The successor is required to file a statement of assets with the Minister.

203      Section 23 then provides:

23. (1) After examination of the statement or statements so made and delivered the Minister shall assess the duty or duties payable under this Act and shall send notice of such assessment by registered mail to the executor and such notice shall be deemed to be notice of all persons liable for payment of the duties imposed by this Act.

(2) Where there is no executor liable or accountable for any duty or duties, notice of assessment shall be sent by registered mail to the successor.

. . . . .

204      This is the provision for assessment and notice thereof.

205      Under paragraph 59(2)(a) regulations may be made prescribing forms and the use thereof.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

206    Such a regulation was made prescribing the use of form SD-7 as the notice of assessment under section 23 of the Act.

207    In assessing the appellant as he did the Minister utilized form SD-7 but supplemented the information with the following typewritten language, which I have quoted before but which I repeat for convenience:

> This assessment is for the tax payable by you pursuant to sec. 49 of the Dominion Succession Duty Act RSC 1952, c. 89, since you delivered or transferred property of A. M. Collings Henderson, deceased, to Janet Beach Henderson, successor, without either first paying all of the duties assessed and levied under the Dominion Succession Duty Act, as evidenced by a Notice of Assessment dated 6 Aug., 1959, which you were liable to pay in your representative capacity as an executor of the estate of A. M. Collings Henderson, deceased, or without furnishing security satisfactory to the Minister of National Revenue.

208    There is no form of notice of assessment prescribed in the regulations for the notification of an assessment under section 49 of the Act.

209    Form SD-7 was utilized. There is no magic in the form. Because no form was provided in the regulations for an assessment under section 49 it does not follow that there is no right to assess. The substance of the assessment was endorsed upon the form.

210    Section 24 provides:

> 24. Subject to the provisions of section 36 and notwithstanding any prior assessment, or if no assessment has been made, the executor and the other person or persons liable for any duties payable under this Act continue to be liable for the said duties and to be assessed therefor and the Minister may at any time assess, re-assess, or make additional assessments upon any persons, and in respect of any property the subject-matter of a succession, for duties, interest and penalties.

. . . . .

211    The exception referred to in section 36 does not apply.

212    It is provided that "the executor and the other person or persons liable for any duties payable under this Act" shall continue to be liable for the duties. There is no reference to the executor being liable in a representative capacity only.

213    The section continues to provide that the Minister may at any time "assess, re-assess, or make additional assessments upon any persons ... for duties, interest and penalties".

214    The word "persons" as used in the context is a broad and uninhibited use of that word. It is not restricted to the "successors". If the Legislature had so intended it could have said so as it does elsewhere in the Act. Therefore an executor is included in the word "persons".

215    The question to be resolved is whether the "duties" for which an executor is personally liable, if the executor should contravene section 49, are "duties" coincident with the "duties" in section 24 for which the Minister may assess "any persons".

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

216     For convenience I repeat section 49 which reads:

> 49. Before delivering or transferring any property of the deceased or any interest in such property to any heir, leg-
> atee, donee or other successor, the executor shall first pay all the duties assessed and levied under this Act to the ex-
> tent to which he is liable in his representative capacity or shall furnish security satisfactory to the Minister for the
> payment of such duties, and any executor who acts in contravention of this provision is personally liable for the du-
> ties, and in addition is liable to a penalty equivalent to double the amount of such duties.

217     Section 49 is ranged under the heading, "Prohibitions and Penalties". The heading indicates the general object of
the provisions following and the heading may be referred to in order to determine the sense of a section under that head-
ing.

218     On behalf of the appellant it was contended that the imposition of a liability on an executor personally for the
duties is a penalty and as such is not the proper subject of assessment but is recoverable by other means.

219     In the sense that the executor becomes personally liable for the duties the section is penalizing in result.

220     However one word in the heading under which 49 is ranged is "Prohibitions". The executor is prohibited from
transferring any property to an heir without first paying or providing security for the payment of the duties exigible. If
the executor fails to do so then the executor becomes personally liable for the duty. This constitutes an additional source
to which the Exchequer can look for payment. That being so the purport of the section is merely to render another person
liable for the duty.

221     The executor is liable for the duties and in addition is liable to a "penalty" equivalent to double the amount of
the duties. It is this double amount of the duties that is the penalty. The Minister has not sought to impose that penalty on
the appellant. What the Minister is seeking is to exact the duties from the appellant.

222     In my view section 49 imposes a liability for the duties upon the executor when the circumstances contemplated
by the section exist. That being so the Minister is entitled to assess the appellant accordingly pursuant to section 24 of the
Act.

223     Because of the conclusion I have reached that it is a liability for duty imposed on the executor, I do not have to
consider whether a penalty is the proper subject matter of assessment, but if it were incumbent upon me to do so it would
appear to me that the language of several sections of the Act, such as sections 24, 57 and 58 contemplate an assessment
being made "for duties, interest and penalties".

224     Part VIII of the Act sets forth the remedies available to the Crown to recover duties.

225     Section 57 provides that "all duties, interest, penalties and costs assessed or imposed or ordered to be paid" un-
der the provisions of the Act shall be deemed a debt due and recoverable as such, that is by suit for debt.

226     This is a remedy for the Crown to obtain judgment and execution thereupon but it does not obviate the assess-
ment process which is a condition precedent to the debt arising.

227     Section 58 provides a further method of recovery. First there shall be determination of all duties, interest and
penalties payable under the Act. This must be done by an assessment by the Minister.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

228     Then all duties remaining unpaid after four months from the date of mailing of the "Notice of Assessments" may be certified by the Deputy Minister.

229     When the certificate is registered with the Exchequer Court it is the same as a judgment for the recovery of a debt and execution may be effected to the amount of the certification.

230     By subsection (3) of section 58 where such certificate is registered with respect of the liability of an executor, execution shall be against the property administered by the executor "unless he has been guilty of contravening section 49 in which case it may be executed against property owned by him personally".

231     The exception in subsection 58(3) is to preserve the personal liability imposed on the executor under section 49.

232     I do not construe the words "guilty of contravening section 49" as meaning that there must have been a prosecution and conviction therefor but rather as meaning that the executor as a question of fact delivered property of the deceased to an heir without first paying the duty thereon for which he is liable or has provided security therefor.

233     While it is not an issue before me it has been suggested that it is grossly unfair that an executor may be required to pay duties and cannot recover those duties from the estate. If the statute so provides, that is an end to the matter, but in view of my conclusion that section 49 imposes on the executor a liability to pay the duty personally it is, nevertheless, a duty required to be paid by the executor and it would appear that by section 15 the executor is entitled to deduct or recover the duty so paid from the assets of the estate.

234     In the result I have concluded that the assessment made by the Minister is not a nullity and should not be declared null and void. The assessment is valid until demonstrated by the appellant to have been erroneous as to the amount of the assessment or the assumptions made by the Minister in assessing the appellant as he did.

235     The appellant in effect contends that the assumptions of the Minister were an error in that the appellant is not an executor within the meaning of that word as used in the *Dominion Succession Duty Act* and even if the appellant is an executor it is not liable in a representative capacity.

236     For the proposition that the appellant is not an executor within the meaning of that word as used in the statute, counsel for the appellant relied upon a statement of the Earl of Halsbury, LC in *New York Breweries Company v. Attorney General*, [1899] A.C. 62.

237     New York Breweries Company, the appellant, was a company incorporated in England with its head office in London. It carried on a brewing business in New York. Clausen a citizen of New York and domiciled there died having by his will appointed two persons in New York his executors. Probate of the will was granted in New York to these two men, but they took no probate or administration in England. Clausen was the registered holder of shares in the company and of debentures. The executors appointed in New York requested the company to transfer to them all of Clausen's shares and debentures and to pay to them the interest and dividends due. The company, after notice to the Inland Revenue authorities and in order to test the question paid to the executors the interest and dividends then payable in respect of Clausen's shares and debentures and transferred in their books into the names of the executors two shares and a debenture then standing in Clausen's name.

238     It was held that the company had made itself an executor *de son tort*, that it had "taken possession of and administered" part of the testator's estate and, under the applicable English legislation that it was liable to penalties and to deliver an account and pay such duty as would have been payable if probate had been obtained in England.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

239      Lord Halsbury said at page 68:

> ... It is idle to suggest that in the Taxing Acts, where they are dealing with English finance, the words "executor" or "administrator", which terms we use popularly as applicable to a person who fills that character, to whatever country he belongs, are used in those statutes in any other sense than as meaning an English executor or an English administrator ...

240      Later at page 71 Lord Halsbury said,

> ... Then, my Lords, the learned judge goes on: "They have simply done that which the common law of England gives them the right to do, namely, to pay an executor." They have done nothing of the sort. The learned judge must forgive me for saying, when he says they have paid the executor, they have done no such thing. They have paid a person whom the learned judge calls an executor, but who is not an executor within the meaning of this Act; and when the learned judge says that they "have simply done that which the common law of England gives them the right to do, namely, to pay an executor without asking him for proof of his title by the production of the probate," I am afraid he forgets for a moment that what was done here was done with the full knowledge that the person whom they paid, not only was not an executor, but had given distinct notice that he never intended to become an executor within the meaning of the English law. ...

241      What Lord Halsbury has said is that the executors appointed under the law of New York were not executors within the meaning of the English statutes.

242      It may well be that Lord Halsbury's remarks, being made with respect to English legislation, are not applicable to legislation enacted by the Parliament of Canada.

243      There is no legislation whereby an executor can be appointed under federal jurisdiction. Executors and administrators are appointed by grant of letters probate or letters of administration under legislation enacted by the provinces of Canada. That being so an executor would be a person so appointed but that might well also apply to a person who is validly appointed by a jurisdiction other than a province of Canada, and who purports to administer assets of a deceased situated in Canada under that authority without obtaining letters probate in a province of Canada where the assets are situated.

244      Because of the view I take of the matter it is not necessary for me to resolve that question.

245      The word "executor" is defined in paragraph 2(f) of the *Dominion Succession Duty Act* as meaning

> the executor or administrator of a deceased person, and includes an executor *de son tort*.

246      An executor *de son tort* is one who takes upon himself the office of executor by intrusion, not being so constituted by the deceased and in the absence of that constitution not being substituted by competent authority to act as administrator.

247      An act of intermeddling with a deceased's assets makes a person an executor *de son tort*.

248      Here the appellant assumed control over all of the assets of the deceased, A M Collings Henderson, that were situated in Canada. The appellant completed the schedules of assets required to be filed with the Department of National

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

Revenue and signed such forms as executor. It directed and consented to the sale in Canada of some 600,000 shares in Campbell Chibougamau held by the deceased and which were situated in Canada. It engaged counsel in Canada to act on its behalf as executor in Canada.

249    In my opinion the appellant by its acts has constituted itself an executor *de son tort* of the deceased's assets in Canada.

250    Because the definition of an executor in paragraph 2(f) of the Act includes an executor *de son tort*, it follows that the appellant is an executor within the meaning of that word as used in the statute.

251    The question which follows from that conclusion is whether an executor *de son tort* can be liable for duties in a representative capacity.

252    Counsel for the appellant contends that he cannot because he is not a representative but an interloper.

253    Under section 13 of the Act the successor is liable for the duty in respect of the succession to him. That duty shall be recoverable from the executor of the property of the deceased but such liability shall be in his capacity as executor only and not for an amount exceeding the value of the interest of the successor in the property administered by him.

254    It is trite law that a foreign executor cannot be sued in his official character in a jurisdiction in which he has not taken out letters probate or letters of administration but this is subject to the exception that when the foreign executor is found to be an executor *de son tort* he can be sued.

255    In *Cook* v *Doods*, [1903] 6 O.L.R. 608, the defendant who had intermeddled with the assets of an estate, was held liable to a creditor of the deceased for the amount of that indebtedness to be paid out of the goods of the deceased, and failing such goods, out of the defendant's goods.

256    Meredith, CJ said at pages 611 and 612:

> It was long ago settled that a creditor, if he finds that some one has intermeddled with the personal estate of his deceased debtor, is not bound to enquire whether that person is the lawful personal representative of the debtor, but may sue him as executor, naming him as executor generally, and on proof, if the executorship is denied, either of a grant of probate to the defendant or of his having intermeddled with the personal property of the deceased in such a way as to constitute him executor *de son tort* will be entitled to recover against the defendant as executor of the debtor; and if the defendant has not pleaded *plene administravit*, or, having pleaded it, has failed upon his plea, the judgment will be for the recovery of the debt and costs to be levied of the goods and chattels of the deceased in the hands of the defendant to be administered, and if he has not so much thereof in his hands to be administered, then of his (the defendant's) own goods and chattels.

257    It will be noted that the creditor was not bound to enquire if he was the lawful personal representative of the deceased. By that I presume is meant, that the defendant was named as executor in the deceased's will and had taken out letters probate. All that was necessary was that the plaintiff sue the defendant as an executor generally. On proof that the defendant was an executor *de son tort* the plaintiff was entitled to recover from the defendant as executor.

258    The concept of executor *de son tort* is based upon estoppel so that one acting as an executor is faced with the consequences of so acting.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

259      It seems to me that the status to act as an executor flows from a person being named to that capacity in the will of the deceased. If the person so named obtains letters probate of the will he is confirmed in the capacity of executor and is generally immune from personal liability. He acts as executor and the very concept of an executor is that he acts as a representative.

260      If a person is named in a will as an executor and assumes the responsibility of so acting without first obtaining letters probate, I fail to follow how he can be said to be acting other than an executor but he is subject to personal liability in the administration of the estate. Having acted as an executor he has subjected himself to being treated as such and acts in that capacity as a representative of the deceased either rightly or wrongly.

261      The definition of executor in the *Dominion Succession Duty Act* includes an executor *de son tort*. Because an executor acts in a representative capacity and an executor *de son tort* is an executor, I fail to follow how an executor *de son tort* is not acting in a representative capacity and liable for succession duties in that capacity as he would have drawn that liability upon himself personally by intermeddling in the assets of the estate and thereby becoming an executor *de son tort*.

262      Having concluded that the appellant is an executor *de son tort* and that as an executor *de son tort* the appellant could and did act in a representative capacity it follows that under section 49 of the Act the appellant is personally liable for the payment of duties.

263      The question which follows from this conclusion is to what duties is the appellant personally liable.

264      Counsel for the appellant submitted that the appellant is liable only in respect of the duty payable upon the succession of the widow to the $5,000 legacy which was paid to her by the appellant and which would be in the approximate amount of $2,500. He further submitted that this approximate amount of $2,500 was included in the amount of $428,227.10 paid by the executor to the Department on account of the duties, although he is frank to admit that no part of the amount paid on account of duties was identified or allocated as being applicable to duty on this particular succession of the $5,000 legacy.

265      It is true that every successor is liable for the duty in respect of the particular succession to him, which presupposes a levy of duty on each succession, but under subsection 13(2) all duties assessed and levied under the Act are payable by and recoverable from the executor.

266      Under section 49 the executor is obligated, before transferring any property to an heir, to "pay all the duties assessed and levied under this Act". If an executor does not fulfil that obligation then the executor "is personally liable for the duties" and to a penalty equivalent to double the amount of "such duties".

267      The significant words are "all the duties". In my view the meaning of the section is clear. The executor, by contravening the prohibition from transferring any property of the deceased under his administration to a successor without first having paid all of the duties assessed and levied under the Act or furnished satisfactory security therefor, then draws upon himself personally the liability to pay "all the duties" and not only the duty on the amount of the particular succession which he has paid out.

268      Counsel for the appellant next contended, if the appellant is an executor and is liable for the duties in its representative capacity, which I have found to be the case in both circumstances, then the appellant is not liable for Canadian duties. He argued that because the appellant is a foreign executor, the Canadian taxes cannot be enforced against the executor in the foreign jurisdiction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

269    That premise is undisputable. In *United States of America* v *Harden*, [1963] S.C.R. 366, Mr Justice Cartwright referred to the well established rules (i) that a foreign state is precluded from suing in this country for taxes due under the law of the foreign state and (ii) that in a foreign judgment there is no merger of the original cause of action, it remains a claim for foreign taxes.

270    The converse is equally so. The Canadian Government cannot go to the foreign jurisdiction and there sue a person found in that jurisdiction for taxes for which he has been declared to be liable in Canada.

271    From this premise counsel for the appellant argued that because the appellant is not "liable" for Canadian taxes in New York State it cannot be liable in this jurisdiction.

272    There is a fallacy in this logic. The appellant is not liable in the State of New York for Canadian taxes because a judgment therefor cannot be enforced there. That does not detract from the fact that the appellant can be liable for Canadian taxes in Canada and that liability can be enforced in Canada against assets in Canada.

273    This was clearly stated by the present Chief Justice of this Court in *Hunt et al* v *The Queen*, [1967] 1 Ex. C.R. 101, [1966] C.T.C. 474, 66 D.T.C. 5322, where he said at page 103 [476, 5323-4]:

The situation is that the Estate has been validly made subject to tax under and by virtue of Canadian law but a judgment for the tax is enforceable only in Canada as, of course, the Courts of another country will not lend their assistance to enforce payment of taxes owing to the Government of Canada. The Government of Canada can only enforce payment of this tax debt, therefore, if it can find property of the Estate subject to execution in Canada.

274    The Chief Justice then found that shares of the estate were situated in Quebec and were therefore validly seized under a writ of *fieri facias* issuing out of this Court.

275    This Court is not precluded from determining the liability to tax of a foreign executor simply because there may be no assets in Canada against which a judgment for the tax can be enforced.

276    In paragraph 20 of its statement of claim the appellant claims as follows:

20. The Appellant therefore claims

1) a declaration that the purported assessment is null and void;

2) in the alternative, a declaration that it is not liable to pay any amount under s 49 of The Dominion Succession Duty Act;

3) in the further alternative a declaration that the liability of the Appellant, if any, under s 49 of The Dominion Succession Duty Act is limited either

i) to the amount transferred by the Appellant in contravention thereof, or

ii) to the balance of the duties owing by the Estate which duties should be re-assessed after amending the value of the assets of the Estate situated in Canada and subject to tax under the Act by

a) reducing the fair market value of the shares of Campbell Chibougamau Mines Limited owned by the Estate from $8 per share to not more than $2.25 per share;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

b) reducing the fair market value of the shares of Chibougamau Mining & Smelting Co Inc owned by the Estate from $2.65 per share to not more than 92c per share;

c) excluding the warrants to purchase shares of Campbell Chibougamau Mines Limited owned by the Estate from the assets situated in Canada subject to tax under the Act;

and by deducting one half the provincial duties paid by the Estate from the duty otherwise payable;

4) its costs of this Appeal.

277    For the reasons above expressed I decline the declaration that the assessment herein is null and void as prayed for in paragraph 20(1).

278    I also decline a declaration that the appellant is not liable to pay any amount under section 49 of the *Dominion Succession Duty Act* as prayed for in paragraph 20(2) and I also decline a declaration that the liability of the appellant under section 49 is limited to the amount of $5,000 transferred by the appellant to a beneficiary in contravention of section 49 as prayed for in paragraph 20(3)(i).

279    I shall not declare that the liability of the appellant shall be reduced by a reduction in the fair market value of the shares of Campbell Chibougamau Mines Limited and Chibougamau Mining & Smelting Co, Inc owned by the estate from the respective amounts of $8 per share and $2.65 per share as found by the Minister to have been the fair market value to lesser amounts, all as prayed for in paragraph 20(3)(ii)(a) and (b) of the statement of claim.

280    I decline to do so because I have found in the appeal by the executors (as contrasted with the appeal of the Bank of New York) that the valuation by the Ministers should not be disturbed. It was agreed among the parties that the determination of this issue in the appeal of the executors would be accepted as determinative of this same issue on the appeal of the Bank of New York.

281    With respect to paragraph 20(3)(ii)(c) of the statement of claim I have found in the appeal of the executors that the situs of the warrants to purchase shares in Campbell Chibougamau Mines Limited do not have a situs in Canada and should be excluded from the computation of tax on assets of the estate situated in Canada.

282    Accordingly there shall be a declaration to that effect.

283    Further the appellant claims under paragraph 20(3) of its statement of claim that there shall be deducted from the duty otherwise payable one half of the duty paid to the Province of Ontario.

284    Paragraph 13 of the Minister's statement of defence is as follows:

13. With reference to paragraph 19 of the Statement of Claim, the Respondent does not admit that $212,448.10 has been paid to the Province of Ontario, but concedes and is prepared to allow in computing the duty otherwise payable, an amount in respect of any duty paid to the Province of Quebec and to the Province of Ontario, calculated in accordance with the formula set forth in subsection (2) of section 12 of the *Dominion Succession Duty Act*.

WHEREFORE the Respondent prays:

(a) the appeal be allowed and the assessment referred back to the Respondent for the purpose of allowing as a deduction, one half of the provincial duties paid to either the Province of Ontario or the Province of Quebec;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1973 CarswellNat 189, [1973] C.T.C. 636, 73 D.T.C. 5471

(b) dismissing the appeal in every other respect with costs payable to the Respondent.

285     In assessing the appellant as he did the Minister did not allow a credit calculated in accordance with section 12 of the *Dominion Succession Duty Act*.

286     The appellant is entitled to the relief sought in paragraph 20(3) of its statement of claim.

287     This is admitted by the Minister but the amount of duty paid to the Province of Ontario is in dispute. No evidence was adduced in this respect. I should think that the amount so paid is readily ascertainable but it has been pointed out to me that, while the authorities of the Province of Ontario have accepted the valuation of the assets of the estate in Canada found by the Minister of National Revenue, the Province has not assessed the estate. If this is so then the duty payable by the estate has not been determined and accordingly the amount of the deduction is not ascertainable. Unless this amount can be agreed upon by the parties it may be that a reference should be directed to ascertain this amount.

288     The Minister, in his prayer for relief asks that the appeal be allowed and the assessment referred back to allow a deduction of one half of the Provincial duties paid, but that in all other respects the appeal should be dismissed with costs. The reason the Minister does this is for the obvious reason that if he asked that the appeal be dismissed he would be asking to deprive the appellant of relief to which he concedes it is entitled. Because the Minister has admitted the appellant's right to relief in this respect it follows that the appellant is not entitled to its costs in this respect.

289     It is my present view that because the appellant was successful only with respect to the issue as to the situs of the share purchase warrants it is entitled to its costs attributable to that issue only and that the Minister should be entitled to his costs with respect to all other issues upon which he has been successful. The issue of the situs of the share warrants was determined in the appeal of the executors, which by agreement was accepted as determinative of this issue in the appeal of the Bank of New York. Therefore there would be no costs attributable to this issue incurred at the trial.

290     In accordance with Rule 337 I would direct that Counsel for the Minister shall prepare a draft of an appropriate judgment to implement the conclusions herein.

291     If counsel for the appellant is in agreement with the form of the draft judgment and that it conforms to my conclusions as expressed above then counsel for the Minister may move for judgment in writing under Rule 324 without the necessity of counsel appearing.

292     However if such consent is not forthcoming the matter may be spoken to.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 69

551 F.Supp.2d 173
United States District Court,
S.D. New York.

HIGHLAND CAPITAL
MANAGEMENT, L.P., Plaintiff,
v.
Leonard SCHNEIDER, Leslie Schneider, Scott
Schneider, and Susan Schneider, Defendants.
Leonard Schneider, Leslie Schneider,
Scott Schneider, and Susan
Schneider, Third–Party Plaintiffs,
v.
RBC Capital Markets Corporation f/k/a/ RBC
Dominion Securities Corporation, Third–Party
Defendant and Third–Party Counterclaimant.

No. 02 Civ. 8098(PKL).    |    Jan. 31, 2008.

**Synopsis**
**Background:** Parties filed multiple motions in limine in
action to recover in contract from the defendants for their
refusal to sell certain promissory notes to plaintiff and third-
party-defendant and counterclaimant.

**Holdings:** The District Court, Leisure, J., held that:

[1] securities broker/arbitrator could testify as an expert as to
the customs and practices of the industry, and point to factors
indicating to him whether certain parties had authority to bind
defendant and whether there was an agreement, however, he
was not permitted to give his opinion as to the credibility of
witnesses, nor provide a factual narrative of events giving rise
to the action;

[2] witness was not required to have trading experience in
order to be qualified to give expert opinion testimony on
recordkeeping customs and practices in securities industry;

[3] attorney–created indices of taped conversations were
not admissible as summaries, and could not be used as
demonstrative aids; and

[4] evidence or testimony reflecting compromise or offers of
compromise between plaintiff and third–party defendant was
inadmissible.

Order in accordance with opinion.

West Headnotes (19)

[1] **Federal Civil Procedure**
👉 Motions in Limine

A district court's inherent authority to manage the
course of its trials encompasses the right to rule
on motions in limine.

15 Cases that cite this headnote

[2] **Federal Civil Procedure**
👉 Motions in Limine

Court's ruling regarding a motion in limine is
subject to change when the case unfolds.

18 Cases that cite this headnote

[3] **Evidence**
👉 Tendency to mislead or confuse

Exclusion of relevant evidence on ground that its
probative value is substantially outweighed by
the danger of unfair prejudice is an extraordinary
remedy that must be used sparingly. Fed.Rules
Evid.Rule 403, 28 U.S.C.A.

2 Cases that cite this headnote

[4] **United States Magistrates**
👉 Clear or manifest error

A district court is justified in finding a magistrate
judge's ruling clearly erroneous where, although
there is evidence to support it, the reviewing
court on the entire evidence is left with the
definite and firm conviction that a mistake has
been committed. Fed.Rules Civ.Proc.Rule 72(a),
28 U.S.C.A.

9 Cases that cite this headnote

[5] **Evidence**
👉 Matters directly in issue

In considering admissibility of expert testimony, court must determine whether the testimony would usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[6]** **Evidence**
👈 Matters directly in issue

An expert witness may testify to the ultimate issue of fact in the case, but such opinions may not be phrased in terms of inadequately explored legal criteria. Fed.Rules Evid.Rule 704(a), 28 U.S.C.A.

2 Cases that cite this headnote

**[7]** **Evidence**
👈 Matters directly in issue

**Evidence**
👈 Custom or usage

In securities case, securities broker/arbitrator could testify as an expert as to the customs and practices of the industry, and point to factors indicating to him whether certain parties had authority to bind seller and whether there was an agreement; however, expert was not permitted to give his opinion as to the credibility of witnesses, nor provide a factual narrative of events giving rise to the action since he had no personal knowledge of those facts and they were lay matters that the jury was capable of understanding and deciding without his testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

3 Cases that cite this headnote

**[8]** **Federal Civil Procedure**
👈 Failure to respond; sanctions

Factors considered when determining whether to exclude evidence for failure to comply with the requirement to supplement are: (1) the party's explanation for the failure to comply, (2) the importance of the testimony of the precluded witness, (3) the prejudice suffered by

the opposing party, and (4) the possibility of a continuance. Fed.Rules Civ.Proc.Rule 37(c)(1), 28 U.S.C.A.

Cases that cite this headnote

**[9]** **Evidence**
👈 Matters directly in issue

**Evidence**
👈 Damages

**Evidence**
👈 Damages

In securities case, expert would be permitted to opine as to third-party-defendant and counterclaimant's lost business damages since his opinion was based on sufficient facts, reliable principles, and reliable application of the principles to the facts and could prove helpful in providing the jury with the tools to make a determination, should such a determination be necessary; however, expert could not opine on a party's state of mind, opine as to the credibility of witnesses, or testify as to ultimate legal conclusions. Fed.Rules Evid.Rules 702, 704(a), 28 U.S.C.A.

3 Cases that cite this headnote

**[10]** **Federal Civil Procedure**
👈 Reception of Evidence

Proposed expert testimony of seven witnesses would be excluded from securities action on ground that it was needlessly cumulative; any admissible opinion testimony that those witnesses would offer could be addressed by either of two other experts. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

Cases that cite this headnote

**[11]** **Evidence**
👈 Preliminary evidence as to competency

Proponent of expert testimony has the burden of establishing admissibility by a preponderance of the evidence. Fed.Rules Evid.Rules 104, 702(a), 28 U.S.C.A.

Cases that cite this headnote

**[12]    Evidence**
👉 Conduct of business, custom, or usage

Witness was not required to have trading experience in order to be qualified to give expert opinion testimony on recordkeeping customs and practices in securities industry; his experience auditing records of broker-dealers was sufficient. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[13]    Evidence**
👉 Matters directly in issue

**Evidence**
👉 Custom or usage

Expert's testimony as to securities industry's customs and practices for recordkeeping and record making could include a discussion of regulatory rules and other guidelines; however, he could not opine as to whether such rules and guidelines were violated since he was not qualified to opine on that issue and it was an impermissible legal conclusion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

1 Cases that cite this headnote

**[14]    Witnesses**
👉 Use of documents, maps, plats, diagrams, or other matters to explain testimony

In breach of contract action, court would allow transcripts of the taped conversations for use as a demonstrative aid for the jury, but the transcripts would not be admitted into evidence; any disagreement as to accuracy of transcripts could be resolved by submission of competing transcripts, arguing to the jury in summation that one or several of the transcripts provided were deficient in some way, and/or a limiting instruction to the jury.

Cases that cite this headnote

**[15]    Evidence**

👉 Tendency to mislead or confuse

**Evidence**
👉 Grounds for Admission of Secondary Evidence

**Evidence**
👉 Exhibition of person or object in general

Attorney–created indices of taped conversations were not admissible as summaries, and could not be used as demonstrative evidence in breach of contract action since the recordings, illuminated by the use of transcripts were not confusing in content, and the indices were more confusing than they were helpful. Fed.Rules Evid.Rule 1006, 28 U.S.C.A.

Cases that cite this headnote

**[16]    Evidence**
👉 Tendency to mislead or confuse

**Securities Regulation**
👉 In general;  admissibility

In securities action, parties would be prohibited from characterizing admissible evidence and testimony as "securities fraud," "illegal," "insider trading," "inside information," and "market manipulation" since any probative value of the terms was outweighed by their misleading nature; however, term "material nonpublic information" could be used to refer to the information received by the defendants. Fed.Rules Evid.Rule 403, 28 U.S.C.A.

1 Cases that cite this headnote

**[17]    Assignments**
👉 Filing, recording, and registration

Any potential claims that third–party counterclaimant had on behalf of assignor were not relevant to issue whether third–party counterclaimant entered into an enforceable agreement with defendants, and thus was prosecuting its breach of contract counterclaim as real party in interest. Fed.Rules Civ.Proc.Rule 17(a), 28 U.S.C.A.; Fed.Rules Evid.Rule 401, 28 U.S.C.A.

1 Cases that cite this headnote

[18]   **Evidence**

👉 Offers of Compromise or Settlement

Evidence or testimony reflecting compromise or offers of compromise between plaintiff and third–party defendant was inadmissible in action concerning the sellers' alleged breach of an agreement to sell promissory notes to third–party defendant; such evidence could not be offered to prove liability or damages, there was no showing that the documents evidenced bias, prejudice, or any other permissible purpose, and there was a significant risk that the jury would consider the potential claims between third–party defendant and plaintiff in determining the claims against the defendants. Fed.Rules Evid.Rules 403, 408, 28 U.S.C.A.

Cases that cite this headnote

[19]   **Federal Courts**

👉 Effect of Decision in Lower Court

When an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*175** Lackey Hershman, L.L.P., Paul B. Lackey, Esq., Jamie R. Welton, Esq., Dallas, TX, for Plaintiff.

Troutman Sanders L.L.P., Alvin M. Stein, Esq., Katherine C. Ash, Esq., New York, NY, for Defendants/Third–Party Plaintiffs.

Seward & Kissel L.L.P., Jack Yoskowitz, Esq., Michael J. McNamara, Esq., New York, NY, for Third–Party Defendant/Third–Party Counterclaimant.

**Opinion**

### *OPINION AND ORDER*

LEISURE, District Judge.

Plaintiff Highland Capital Management, L.P. ("Highland") brings this action to recover in contract from the defendants, Leonard Schneider, Leslie Schneider, **\*176** Scott Schneider, and Susan Schneider (collectively, "the Schneiders") for their refusal to sell certain promissory notes, valued at $69 million, to Highland and third-party-defendant and counterclaimant, RBC Capital Markets Corporation, formerly known as RBC Dominion Securities Corporation ("RBC"). The parties have filed multiple motions *in limine* in anticipation of trial.

### BACKGROUND

The factual and procedural background of this case is explained in detail in the Court's recent summary judgment Opinion, dated January 16, 2008, familiarity with which is assumed. *See Highland Capital Mgmt., L.P. v. Schneider,* No. 02 Civ. 8098, 2008 WL 152778, 2008 U.S. Dist. LEXIS 3235 (S.D.N.Y. Jan.16, 2008). Any additional relevant facts are included in the discussion.

### DISCUSSION

#### I. Motions *in Limine* and Federal Rules of Evidence

[1]   [2]   A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine. See Luce v. United States,* 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Indeed, "[t]he purpose of an in *limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996) (internal quotation marks omitted); *see also Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.,* No. 01 Civ. 3796, 2005 WL 1026515, at \*3, 2005 U.S. Dist. LEXIS 7902, at \*9 (S.D.N.Y. May 2, 2005) (Leisure, J.) ("The purpose of a motion in *limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence."). "The court's ruling regarding a motion *in limine* is 'subject to change when the case unfolds.' " *Id.,* 2005 WL 1026515, at \*4, 2005 U.S. Dist. LEXIS 7902, at \*11 (quoting *Luce,* 469 U.S. at 41, 105 S.Ct. 460). Accordingly, this Opinion and Order constitutes a preliminary determination subject to change.

Rule 402 of the Federal Rules of Evidence provides that "[a]ll relevant evidence is admissible, except as otherwise provided

by ... Act of Congress, [or] by these rules.... Evidence which is not relevant is not admissible." Fed.R.Evid. 402. The "standard of relevance established by the Federal Rules of Evidence is not high." *United States v. Southland Corp.,* 760 F.2d 1366, 1375 (2d Cir.1985) (Friendly, J.). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401.

[3] Under Rule 403 of the Federal Rules of Evidence, the trial court has "broad discretion to exclude even relevant evidence if its probative value is substantially outweighed by the danger of confusion of the issues or if it would be needlessly cumulative." *United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1193 (2d Cir.1989) (citing Fed.R.Evid. 403; *United States v. Carter,* 801 F.2d 78, 83 (2d Cir.1986); *United States v. Martinez,* 775 F.2d 31, 37 (2d Cir.1985)). Rule 403 also provides for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Evidence is prejudicial under Rule 403 if it "involves some adverse effect ... beyond tending to prove the fact or issue that justified its **\*177** admission into evidence." *United States v. Gelzer,* 50 F.3d 1133, 1139 (2d Cir.1995). The Court will exclude such evidence if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed.R.Evid. 403, advisory committee's notes. Because Rule 403 excludes relevant evidence, "it is an extraordinary remedy that must be used sparingly." *George v. Celotex Corp.,* 914 F.2d 26, 31 (2d Cir.1990). The "district court retains broad discretion to balance the evidence's potential prejudice ... against its probative value." *United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002).

## II. Highland's Objections to Magistrate's Opinion and Order Striking Expert Testimony of Sean F. O'Shea

On July 19, 2005, Magistrate Judge Gabriel W. Gorenstein issued an Opinion and Order granting the Schneiders' Motion to Exclude Proposed Expert Testimony of Sean O'Shea and denying Highland's request to supplement the O'Shea Report (the "Gorenstein Order"). See *Highland Capital Mgmt., L.P. v. Schneider,* 379 F.Supp.2d 461 (S.D.N.Y.2005). On July 29, 2005, Highland objected to Magistrate Gorenstein's Opinion and Order. The Schneiders responded on August 10, 2005. The Court stayed ruling on Highland's objection because of the Court's dismissal of the case on July 25, 2005. However, in light of the Second Circuit's decision in this case, and the forthcoming trial, the Court now addresses Highland's

objection. For the reasons that follow, Highland's objection is DENIED.

Rule 72(a) of the Federal Rules of Civil Procedure governs the Court's review of objections to a magistrate judge's nondispositive pre-trial order. Rule 72(a) states that "[t]he district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a).

[4] A district court is justified in finding a magistrate judge's ruling "clearly erroneous" where, " 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Labarge v. Chase Manhattan Bank,* No. 95 Civ. 173, 1997 WL 583122, at \*1, 1997 U.S. Dist. LEXIS 13803, at \*3 (N.D.N.Y. Sept. 3, 1997) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)); *accord Am. Rock Salt Co., LLC v. Norfolk S. Corp.,* 371 F.Supp.2d 358, 360 (W.D.N.Y.2005) ( "[R]eversal is warranted only if the reviewing court is 'left with the definite and firm conviction that a mistake has been committed.' " (quoting *Easley v. Cromartie,* 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001))); *United Parcel Serv. of Am., Inc. v. The Net, Inc.,* 222 F.R.D. 69, 70–71 (E.D.N.Y.2004) ("An order is 'clearly erroneous' only when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " (quoting *Thompson v. Keane,* No. 95 Civ. 2442, 1996 WL 229887, at \*1 (S.D.N.Y. May 6, 1996))). Consequently, "parties seeking to overturn the Magistrate's discovery rulings 'bear a heavy burden.' " *Citicorp v. Interbank Card Ass'n,* 87 F.R.D. 43, 46 (S.D.N.Y.1980); *accord Com–Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 753 F.Supp. 1078, 1099 (E.D.N.Y.1990) (same); 12 Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, *Federal Practice and Procedure* § 3069, at 350–51 (2d ed. 1997) ("[I]t is extremely difficult to justify alteration of the magistrate judge's nondispositive actions by the district judge."). Given such a **\*178** highly deferential standard of review, magistrate judges are afforded broad discretion and "reversal is appropriate only if that discretion is abused." *Commodity Futures Trading Com'n v. Standard Forex, Inc.,* 882 F.Supp. 40, 42 (E.D.N.Y.1995); *accord Doe v. Marsh,* 899 F.Supp. 933, 934 (N.D.N.Y.1995) (stating abuse-of-discretion standard applies).

[5] The Court has reviewed the Gorenstein Order and finds no clear error. In considering expert testimony, the Court must

determine whether the testimony would "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (quoting *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994)) (internal quotation marks omitted). Magistrate Judge Gorenstein fairly and appropriately applied the law in this Circuit. He considered each section of the O'Shea Report in turn and found each section to be inadmissible. It was not clear error for Magistrate Judge Gorenstein to hold that O'Shea's testimony would impermissibly impinge upon the province of both the fact finder, *Highland Capital Mgmt.,* 379 F.Supp.2d at 469–70, and the Court, *id.* at 470–72, and is not relevant or necessary to assist the jury, *id.* at 473.

Additionally, Magistrate Judge Gorenstein's denial of Highland's request to defer consideration of the motion and supplement the report was appropriate. "Preclusion of testimony is an entirely appropriate measure when, as at present, the testimony a party seeks to present is simply inadmissible." *Taylor v. Evans,* No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr.1, 1997). Furthermore, the "curative measures" put forth by Highland would not have "alleviate[d] the underlying defects" in O'Shea's proffered testimony. *Id.* Magistrate Judge Gorenstein's analysis was sound, and certainly does not amount to clear error. The Court therefore accepts the Gorenstein Order, and affirms its grant of defendants' motion to exclude O'Shea's proffered testimony in its entirety and denial of Highland's request to supplement the O'Shea Report.

## III. Expert Witnesses

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. Furthermore, Rule 702 grants the district judge discretionary authority "to determine [the] reliability [of an expert's testimony] in light of the particular facts and circumstances of the particular case." *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 158, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry. *See, e.g., United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *S.E.C. v. Lorin,* 877 F.Supp. 192, 196 (S.D.N.Y.1995), *modified,* **\*179** 76 F.3d 458 (2d Cir.1996); *Marx & Co., Inc. v. Diners' Club, Inc.,* 550 F.2d 505, 511 (2d Cir.1977), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). In *Marx,* the Second Circuit recognized that while an expert "may testify to an ultimate fact, and to the practices and usages of a trade, we think care must be taken lest, in the field of securities law, he be allowed to usurp the function of the judge." 550 F.2d at 511.

In *Daubert v. Merrell Dow Pharms., Inc.,* the Supreme Court focused on the "admissibility of scientific expert testimony," and discussed specific factors in evaluating the reliability of that testimony, such as "testing, peer review, error rates and 'acceptability' in the relevant scientific community, some or all of which might prove helpful in determining reliability of a particular scientific 'theory or technique.' " *Kumho Tire Co., Ltd.,* 526 U.S. at 141, 119 S.Ct. 1167 (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 593–94, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). The Court has subsequently held that, "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine," and that, in fact, "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination". *Kumho,* 526 U.S. at 142, 153, 119 S.Ct. 1167.

[6]    Rule 704 of the Federal Rules of Evidence provides that "testimony in the form of an opinion or an inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Under Rule 704(a), an expert witness may testify to the ultimate

issue of fact in the case, "but such opinions may not be 'phrased in terms of inadequately explored legal criteria.' " *Media Sport & Arts v. Kinney Shoe Corp.,* No. 95 Civ. 3901, 1999 WL 946354, at *1, 1999 U.S. Dist LEXIS 16035, at *3 (S.D.N.Y. Oct.16, 1999) (Leisure, J.) (quoting Fed.R.Evid. 704(a), advisory committee's notes). While the expert can make factual conclusions that embrace an ultimate issue to be decided by the fact-finder, the expert cannot give testimony stating ultimate legal conclusions based upon those facts, nor can that testimony track the language of the statute or the law that the defendants are accused of violating. *See Bilzerian,* 926 F.2d at 1294; *United States v. Scop,* 846 F.2d 135, 140, modified, 856 F.2d 5 (2d Cir.1988); *Marx & Co., Inc.,* 550 F.2d at 510–11.

### A. The Schneiders' Motion in Limine No. 1 to Exclude Proposed Expert, Testimony Proffered by Highland and RBC

The Schneiders move pursuant to Rules 104, 401, 402, 403 and 702 of the Federal Rules of Evidence and Rule 37 of the Federal Rules of Civil Procedure to exclude proposed expert testimony proffered by Highland and RBC. The Schneiders' motion relates to ten witnesses proffered by Highland, one of whom also was proffered by RBC. Highland and RBC oppose the motion.

### 1. Sean O'Shea

The Schneiders move to preclude Highland and RBC from introducing any opinion testimony by O'Shea. As discussed above, Highland objected to the Gorenstein Order granting the Schneiders' motion to exclude O'Shea's testimony. In light of the Court's denial of Highland's objection and affirmance of the Gorenstein Order excluding O'Shea, the Schneiders' motion to preclude Highland and RBC from introducing any opinion testimony by O'Shea is GRANTED.

### *180  2. John J. Duval, Sr.

[7]    The Schneiders assert that the proposed testimony of John J. Duval, Sr. ("Duval") is inadmissible and should be excluded. The Schneiders state that Duval's opinion consists of *"ipse dixit* conclusions, based upon Duval's interpretation of the 'facts' and the law, and his views as to how the law, as he perceives it, ought to be applied to the facts as he interprets them and are all inadmissible." (Defs.' Mot. No. 1 at 18.)

As an initial matter, Duval is qualified to testify. He has over twenty years of experience in the securities industry,

as a retail broker and NASD and NYSE arbitrator. (Duval Report.) Duval also has extensive experience as a consultant and expert witness. (*Id.*)

Duval may testify as to the customs and practices of the industry. "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *Bilzerian,* 926 F.2d at 1294; *see also S.E.C. v. U.S. Envtl., Inc.,* No. 94 Civ. 6608, 2002 WL 31323832, at *2, 2002 U.S. Dist. LEXIS 19701, at *7 (S.D.N.Y. Oct. 16, 2002) (Leisure, J.). Industry custom and practice is relevant to the issues remaining in this case. Therefore, this testimony is admissible and helpful to the jury. The Court notes that " '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of attack." *In re Blech Sec. Litig.,* No. 94 Civ. 7696, 2003 WL 1610775, at *25, 2003 U.S. Dist. LEXIS 4650, at *69–70 (S.D.N.Y. Mar. 26, 2003) (Sweet, J.) (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786). This may include attack on what is the relevant industry, or what are the relevant customs and practices, for a transaction that the Schneiders assert concerns "a limited number of unusual instruments." (Defs.' Mot. No. 1 at 26–27.) Therefore, these " 'conventional devices, rather than wholesale exclusion' are 'the appropriate safeguards,' " for the Schneiders to attack Duval's testimony. *Blech Sec. Litig.,* 2003 WL 1610775, at *25, 2003 U.S. Dist. LEXIS. 4650, at *70 (quoting *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786). "[T]he jury can best form a judgment when presented with ... experts' competing theories." *Id.,* 2003 WL 1610775, at *20, 2003 U.S. Dist. LEXIS 4650, at *55.

The certified question posed to the New York Court of Appeals by the Second Circuit in this case established that the notes in question are "securities." *Highland Capital Mgmt., L.P. v. Schneider,* 8 N.Y.3d 406, 834 N.Y.S.2d 692, 866 N.E.2d 1020 (2007). Because this is a settled issue, Duval need not opine on whether or not the notes are securities. (Defs.' Mot. No. 1 at 15; Ash Decl. Ex. 8 at 3.) To the extent that the status of the notes as securities may inform Duval's testimony on other relevant issues, Duval may offer his opinion on those other relevant issues.

However, Duval's opinion as to the credibility of witnesses is inadmissible. *See Scop,* 846 F.2d at 142 ("[T]he credibility of witnesses is exclusively for the determination of the jury."). Duval may not testify regarding the credibility of Leonard Schneider, Glen Rauch ("Rauch"), or other witnesses. Such subjective review of the evidence is improper, and Duval

does not have "personal knowledge of the underlying facts." *See Blech Sec. Litig.,* 2003 WL 1610775, at *21–22, 2003 U.S. Dist. LEXIS 4650, at *62–65 (internal quotation marks omitted). Further, Duval's factual narrative of events giving rise to this action is inadmissible. Duval has no personal knowledge of these facts and they are lay matters that the jury is capable of understanding and deciding without Duval's testimony. *See, e.g., In re Rezulin Prods.* **\*181** *Liab. Lit.,* 309 F.Supp.2d 531, 541 (S.D.N.Y.2004).

Duval also cannot testify as to ultimate legal conclusions. "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian,* 926 F.2d at 1294. Duval, therefore, cannot state that he knows that Leonard Schneider or Rauch had authority to bind the Schneiders, or that there was a binding agreement. "Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case." *Media Sport & Arts s.r.l.,* 1999 WL 946354, at *3, 1999 U.S. Dist. LEXIS 16035, at *10 (citing *Bilzerian,* 926 F.2d at 1295). Duval can, however, based upon his experience, point to factors indicating to him that Leonard Schneider or Rauch had authority to bind the Schneiders or that there was an agreement. *See Blech Sec. Litig.,* 2003 WL 1610775, at *22–23, 2003 U.S. Dist. LEXIS 4650, at *62–65. Duval's testimony will likely prove helpful in allowing the trier of fact to better understand the evidence and providing the trier of fact with the tools necessary to make an ultimate determination.

The Schneiders also argue that Highland should be precluded from offering Duval's opinion from his Declaration, dated February 7, 2005, and submitted as part of Highland's Exhibit 169 in the Appendix in Support of Plaintiff's Opposition to the Schneiders' Motion for Summary Judgment. Specifically, the Schneiders contest Duval's addition of a new opinion with respect to the phrase in the Letter Agreement that "the consummation of any transaction remains in the sole discretion and satisfaction of the holders and RBC." (Defs.' Mot. No. 1 at 32–34.) The Schneiders oppose this testimony on the grounds that it is unsupported and that it goes beyond the scope of Duval's Rule 26 report. Highland fails to respond to the Schneiders' contentions on these issues.

 **[8]**  Rules 26 and 37 of the Federal Rules of Civil Procedure guide the Court's consideration here. Rule 26(e) governs supplementation of expert disclosures. [1] Rule 37(c)(1) provides sanctions for failure to comply with the

requirement to supplement. [2] When considering whether to exclude the evidence under Rule 37, Courts in this Circuit have considered four factors: "(1) the party's explanation for the failure to comply ..., (2) the importance of the testimony of the precluded witness, (3) the prejudice suffered by the opposing **\*182** party ...; and (4) the possibility of a continuance." *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997) (citing *Outley v. City of New York,* 837 F.2d 587, 590 (2d Cir.1988)); *see also In re Motel 6 Secs. Litig.,* 161 F.Supp.2d 227, 243 (S.D.N.Y.2001). Here, Highland provides no explanation, and this limited portion of Duval's testimony is not of great importance. Further, Duval's Declaration was filed after discovery was closed, therefore, the Schneiders would be prejudiced and a continuance would have been impractical. Thus, the factors favor exclusion. Duval's Declaration should be stricken and Duval cannot testify as to these new opinions.

### 3. Gerald A. Guild

Both Highland and RBC proffer Gerald A. Guild ("Guild") as an expert witness. Guild is qualified to testify. He has over forty years of experience in the securities industry and has testified numerous times in securities actions. (Guild Report.)

As with Duval's testimony on industry custom and practice, Guild, for the same reasons, may testify as to the customs and practices of the industry. It is relevant to this case and may prove helpful to the jury. The Court again reiterates that the Schneiders can, and should, use cross-examination, contrary evidence, and competing expert opinion to attack Highland's and RBC's experts' opinions. *See Blech Sec. Litig.,* 2003 WL 1610775, at *25, 2003 U.S. Dist. LEXIS 4650, at *69–70.

 **[9]**  Guild also may opine as to RBC's lost business damages. Lost business damages remains a relevant issue in this case. Guild's opinion is based on sufficient facts, reliable principles, and reliable application of the principles to the facts. Guild adopts a conservative approach to estimating a minimum spread, based on industry experience and available data. *See, e.g., U.S. Envtl., Inc.,* 2002 WL 31323832, at *3, 2002 U.S. Dist. LEXIS 19701, at *12–13 (holding that expert's conclusions based on analysis of documents and knowledge of standard practices in the securities industry were admissible where expert had over thirty years experience in the industry and testified as an expert in numerous securities actions). Thus, it is admissible. The Schneiders assert that Guild's lost business damages opinion

is speculative and unfounded. (Defs.' Mot. No. 1 at 28.) The proper remedy for the Schneiders is to use conventional methods at trial to attack Guild's opinion. For example, as discussed further below, their own expert, Michael Stupay, may provide a competing opinion on lost business damages. Nonetheless, Guild's testimony on lost business damages may prove helpful in providing the jury with the tools to make a determination, should such a determination be necessary, and the jury may afford Guild's opinion whatever weight it deems appropriate.

Guild may not, however, opine on a party's state of mind, including that of Leonard Schneider. (Guild Report at 9.) In his report, Guild states: "Clearly on that date Leonard Schneider believed that the value of these two issues of SPNs was a deeply discounted price, likely circa 40 to 50% at best." (Guild Report at 9.) Opining about a party's state of mind, as Guild does here, is impermissible. *See Rezulin,* 309 F.Supp.2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); *Taylor v. Evans,* No. 94 Civ. 8425, 1997 WL 154010, at *2, 1997 U.S. Dist. LEXIS 30107, at *5 (S.D.N.Y. Apr.1, 1997) (holding that expert's "musings as to defendants' motivations" were inadmissible). Guild's belief about a party's state of mind is an improper subject for expert testimony and cannot be saved by couching his **\*183** opinion as "industry custom and practice." (Defs.' Mot. No. 1 at 27.)

Further, Guild's opinion as to the credibility of witnesses is inadmissible. *See Scop,* 846 F.2d at 142 ("[T]he credibility of witnesses is exclusively for the determination of the jury."). Guild may not opine as to the credibility of Leonard Schneider, Rauch, RBC employees, or other witnesses. (Defs.' Mot. No. 1 at 19–20.) Such subjective review of the evidence is improper, and Guild does not have "personal knowledge of the underlying facts." *See Blech Sec. Litig.,* 2003 WL 1610775, at *21–22, 2003 U.S. Dist. LEXIS 4650, at *59 (internal quotation marks omitted). Additionally, Guild's factual narrative of events giving rise to this action is inadmissible. Guild has no personal knowledge of these facts and they are lay matters that the jury is capable of understanding and deciding without Guild's testimony. *See, e.g., Rezulin,* 309 F.Supp.2d at 541.

Guild also cannot testify as to ultimate legal conclusions. "[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian,* 926 F.2d at 1294. Guild, therefore, cannot state that he knows that

Rauch was the Schneiders' agent, that there was a "firm offer," that a binding agreement was formed, or that the Scheinders breached that agreement. (Defs.' Mot. No. 1 at 21.) "Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case." *Media Sport & Arts s.r.l.,* 1999 WL 946354, at *3, 1999 U.S. Dist. LEXIS 16035, at *10 (citing *Bilzerian,* 926 F.2d at 1295). Guild can, however, point to factors indicating to him that Rauch was the Schneiders' agent, that there was a "firm offer," that a binding agreement was formed, or that the Scheinders breached that agreement. *See Blech Sec. Litig.,* 2003 WL 1610775, at *22–23, 2003 U.S. Dist. LEXIS 4650, at *62–65.

## 4. Highland and RBC Officers and Employees

**[10]**  The Schneiders also seek to exclude Highland's proposed expert testimony of seven present or former officers or employees of Highland or RBC: Jim Dondero ("Dondero"), Mark Okada ("Okada"), Mike Rich ("Rich"), Ethan Underwood ("Underwood"), Ken Ambrecht ("Ambrecht"), Jim Wood ("Wood"), and Peter Parent ("Parent"). (Defs.' Mot. No. 1 at 23–24.) In its expert witness disclosures, Highland describes the proffered testimony of Dondero, Okada, Underwood, and Rich in nearly identical language. For example, for Underwood, Highland states that:

> Mr. Underwood may opine that the Notes were securities, that 51% of the face value of the Notes represented a fair price for the Notes in March 2001, and that agreeing orally to the price and size of a trade "subject to documentation" is binding in the industry and consistent with industry customs, practice, and course of dealing. Mr. Underwood may also opine that refusing to document a trade after agreeing to the price and size of a trade "subject to documentation" violates NASD regulations and is an actionable breach of the agreement to trade the securities. Based on the facts and circumstances in this case, Mr. Underwood may also opine that on March 14, 2001, Defendants entered into an oral agreement to sell the Notes at 51% of their face value.

(PTO at 41.) Highland's description of Dondero's testimony is identical to Underwood's. Descriptions of Okada's and Rich's testimony are the same as Underwood and Dondero, with the addition of **\*184** one sentence: "Mr. Okada may also opine as to the amount of pre-judgment interest owed to Highland." [3] (PTO at 41.) Similarly, Highland's descriptions of the proffered testimony of Wood, Ambrecht, and Parent are identical to each other, stating that each one "may opine that the Notes were securities and that 51% of the face value of the Notes represented a fair price for the Notes in March 2001." (PTO at 42.)

Rule 403 of the Federal Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403; *see also Int'l Minerals & Res., S.A. v. Pappas,* 96 F.3d 586, 596 (2d Cir.1996) ("A district judge has discretion to exclude evidence if it is cumulative of evidence already in the record."); *United States v. Holmes,* 44 F.3d 1150, 1157 (2d Cir.1995) ("Absent a clear abuse of discretion, a trial judge retains a wide latitude to exclude irrelevant, repetitive, or cumulative evidence."); *Rezulin,* 309 F.Supp.2d at 550. The proffered testimony of Dondero, Okada, Underwood, Rich, Wood, Ambrecht, and Parent is needlessly cumulative. Any admissible opinion testimony that they would offer could be addressed by either Duval or Guild. *See F.H. Krear & Co. v. Nineteen Named Trs.,* 810 F.2d 1250, 1258 (2d Cir.1987) (affirming district court's exclusion of expert testimony as cumulative where at least four other witnesses testified on the same subject). It is unnecessary and would be a waste of time for all of these experts to opine on the same subjects. Therefore, Highland is precluded from offering expert testimony from Dondero, Okada, Underwood, Rich, Wood, Ambrecht, and Parent.

In sum, the Schneiders motion to preclude the testimony of Duval and Guild is DENIED, subject to the limitations discussed above, and the motion to preclude the testimony of Dondero, Okada, Underwood, Rich, Wood, Ambrecht, and Parent is GRANTED. The Court advises Highland and RBC and their experts to be mindful, in the testimony given at trial, of the fine line between conclusions based upon a review of the facts, and legal conclusions, wherein the expert invades upon the function of the trier of fact by instructing the Court on the law. Furthermore, the Court may alter its decision on the admissibility of specific testimony when the context of

the trial renders more apparent whether such testimony is sufficiently relevant. *See Luce,* 469 U.S. at 41, 105 S.Ct. 460.

## B. *RBC's Motion to Preclude the Testimony of Defendants' Expert Witnesses Michael E. Stupay and William H. Purcell*

RBC moves pursuant to Rules 403, 702, and 704 of the Federal Rules of Evidence to preclude the Schneiders from offering any evidence or testimony at trial by expert witnesses Michael E. Stupay ("Stupay") **\*185** and William H. Purcell ("Purcell"). RBC asserts that both experts are unqualified and lack support for their opinions and conclusions. (RBC's Expert Mot. at 1.) [4] The Schneiders oppose this motion.

### 1. Michael E. Stupay

The Schneiders propose to use the testimony of Stupay "to discuss and explain broker-dealers' recordkeeping and record making practices and to evaluate a proffered computation of alleged lost profits by a broker-dealer." (Defs.' Opp. to RBC Expert Mot. at 5.) [5] The Schneiders contend that the absence of records of an alleged purchase of the notes is probative evidence from which a jury might conclude that no agreement was reached, contrary to RBC's and Highland's assertions. (Defs.' Opp. to RBC Expert Mot. at 24.) RBC argues that Stupay's testimony and report should be excluded because he is not qualified, and his opinions are irrelevant, unreliable, and improper legal conclusions. RBC further asserts that any probative value is outweighed by the risk of unfair prejudice and confusion.

**[11]** **[12]** As the proponent of the proposed testimony, the Schneiders have the burden of establishing admissibility by a preponderance of the evidence. *See* Fed.R.Evid. 104(a), 702; *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The Court notes that "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's notes. The Schneiders have met their burden. Stupay is a certified public account who also holds a NASD Series 27 license. (Stupay Report at 3.) He has experience auditing the records of registered broker-dealers. (*Id.*) Contrary to RBC's assertions, Stupay need not have trading experience in order to be qualified to opine on recordkeeping customs and practices; his experience auditing records of broker-dealers is sufficient. Therefore, Stupay is qualified to opine on recordkeeping and record making customs and practices. An evaluation of Stupay's

testimony should be left to the jury and RBC's criticisms should be raised on cross-examination.

RBC also asserts that Stupay's testimony regarding recordkeeping is irrelevant to the issues in this case. RBC argues that because it that admitted there was no documentation of the alleged agreement, any opinion on recordkeeping practices is irrelevant. However, the Court holds that such testimony is relevant. Even with RBC's admission, without industry context, the jury may have no understanding of the importance, or lack of importance, of such documentation. The jury may find that the absence of records goes directly to the central issue in this case—whether there was an agreement. RBC is free to attack Stupay's opinion at trial, however, it is relevant.

RBC claims that Stupay's opinion is unreliable because it consists of unsupported, conclusory assertions. (RBC's Expert Mot. at 8.) The trial court has flexibility in determining reasonable measures of reliability. *See Kumho,* 526 U.S. at 152, 119 S.Ct. 1167; *see also E.E.O.C. v. Morgan* **\*186** *Stanley & Co.,* 324 F.Supp.2d 451, 456 (S.D.N.Y.2004). Therefore, while the Court must focus "solely on principles and methodology, not on the conclusions that they generate," *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, it maintains discretion in determining how to assess reliability. *See Kumho,* 526 U.S. at 152, 119 S.Ct. 1167. Stupay's opinion regarding recordkeeping and record making practices in the industry is reliable; it is grounded in industry rules, practices, and guidelines, as well as Stupay's experience. *See Blech Sec. Litig.,* 2003 WL 1610775, at \*20, 2003 U.S. Dist. LEXIS 4650, at \*56–57 ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." (quoting Fed.R.Evid. 702 advisory committee's notes)).

Contrary to RBC's assertions, Stupay's testimony should not be excluded as unfairly prejudicial to RBC or due to a risk of confusion for the jury. *See* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."). "In conducting this balancing test, 'the general rule is that the balance should be struck in favor of admission.' " *Blech Sec. Litig.,* 2003 WL 1610775, at \*24, 2003 U.S. Dist. LEXIS 4650, at \*68 (quoting *United States v. Dennis,* 625 F.2d 782, 797 (8th Cir.1980)). Although the risk of confusion is heightened with expert witness testimony, *see Nimely v. City of New York,* 414 F.3d 381, 397 (2d Cir.2005), after carefully

weighing the risk of prejudice and confusion, the Court finds that wholesale exclusion would be inappropriate here. Because the Schneiders' negligence claim was dismissed on summary judgment, *see Highland Capital Mgmt.,* 2008 WL 152778, 2008 U.S. Dist. LEXIS 3235, there is no risk of confusion between Stupay's testimony and the negligence standards. (RBC Expert Mot. Reply at 6.) Further, as discussed below, Stupay is precluded from concluding that RBC violated the governing rules and guidelines. Therefore, Stupay's testimony would not be a waste of time or needlessly cumulative because, as discussed above, Stupay's testimony regarding industry practices is relevant to the central issues of this case and may prove helpful to the jury. Under the Rule 403 balancing test, the probative value of the evidence outweighs any risk of confusion or prejudice.

**[13]**    Stupay's testimony should not be completely excluded under Rule 704. (RBC Expert Mot. Reply at 8–9.) Stupay can testify as to what industry customs and practices are for recordkeeping and record making. His expert opinion may be helpful to the jury by providing context for RBC's admitted lack of documentation. He cannot conclude, however, that RBC violated NYSE, NASD, or compliance manual rules. Such testimony is improper in this case and must be excluded from both his report and his testimony at trial. Stupay's industry customs and practices testimony may include a discussion of regulatory rules and other guidelines, however, he may not opine as to whether such rules and guidelines were violated. Stupay can provide context that is helpful to the jury without making impermissible legal conclusions. In addition, Stupay cannot conclude whether or not there was a binding agreement. For example, his conclusion that "there was never a trade" is precluded. (Stupay Report at 9.) He is not qualified to opine on that issue and it is an impermissible legal conclusion.

The Schneiders also offer Stupay as a rebuttal expert regarding Guild's lost profit damages opinion. RBC seeks to exclude Stupay's opinion on these issues. "Courts have often allowed expert testimony for the sole purpose of critiquing and thereby **\*187** helping to explain the work of an expert witness retained by another party." *Blech Sec. Litig.,* 2003 WL 1610775, at \*20, 2003 U.S. Dist. LEXIS 4650, at \*56–57. Stupay's opinion of Guild's methodology should be assessed and weighed by the trier of fact. Stupay is qualified to testify on the damages issue and his testimony is sufficiently reliable to be presented to the jury. Any deficiency in Stupay's data analysis goes to the weight of Stupay's opinion, not its admissibility. *See, e.g., McCullock v. H.B. Fuller Co.,* 61 F.3d

1038, 1043 (2d Cir.1995). The jury will be able to best form a judgment by hearing the competing theories of Guild and Stupay.

## 2. William H. Purcell

The Schneiders have met their burden of showing that Purcell is qualified to testify. With thirty-five years of experience in the investment banking industry and extensive experience as an expert witness, Purcell is qualified to offer his opinion in this action. (Purcell Report at ¶ 2–5.) Purcell need not have trading experience of the exact type at issue in this case in order to be qualified to opine about industry customs and practices that may be helpful to the jury. RBC's attacks on Purcell's experience may impact his opinion's probative weight, but not its admissibility. *See, e.g., McCulloch,* 61 F.3d at 1043.

Purcell's proposed testimony regarding industry customs and practices for private placement transactions is relevant and reliable. Although RBC contests whether Purcell's private placement opinions apply to the transaction at issue in this case, the record supports the Schneiders assertion that it is relevant. (Defs.' Opp. to RBC Expert Mot. at 13.) RBC asserts that the specialized field of high-yield debt trading is not subject to the customs and practices of private placements on which Purcell opines. RBC, through cross examination and its own expert testimony, may put forth the customs and practices it claims are applicable, and attack Purcell's opinion. As a result, the jury will decide what weight to grant Purcell's opinion. Furthermore, Purcell's opinion is reliable. His opinion rests on industry principles and Purcell's extensive experience. *See Blech Sec. Litig.,* 2003 WL 1610775, at *20, 2003 U.S. Dist. LEXIS 4650, at *56–57.

Just as the Court has precluded Duval, Guild, and Stupay from testifying as to ultimate legal conclusions, Purcell also is precluded from doing so. As discussed above, Duval and Guild cannot testify regarding whether there was a binding contract or whether Rauch had authority to bind the Schneiders. As a rebuttal expert of Guild and Duval, Purcell also is precluded from testifying as to those, or similar, legal conclusions. *See* Fed.R.Evid. 704. Such ultimate legal conclusions cannot be saved by couching them in terms of industry practices. *Media Sport & Arts s.r.l.,* 1999 WL 946354, at *3, 1999 U.S. Dist. LEXIS 16035, at *3 (citing *Bilzerian,* 926 F.2d at 1295) ("Even if his testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case.").

Additionally, Purcell cannot provide a factual narrative or opine on a party's state of mind. Duval and Guild have been precluded from offering a recitation of the facts and Purcell also cannot do so; an expert's factual narrative is unnecessary and Purcell has no personal knowledge of the underlying facts. *See, e.g., Rezulin,* 309 F.Supp.2d at 541. Further, Purcell cannot state assumptions or make inferences regarding the knowledge and intent of RBC employees. *See id.* at 547 ("Inferences about the intent or motive of parties **\*188** or others lie outside the bounds of expert testimony."). This includes, for example, opining that RBC "appear[ed] concerned," (Purcell Report ¶ 24), as well as whether an individual "was pleased," (*Id.* ¶ 35), or "frustrated." (*Id.* ¶¶ 37–38). A jury is capable of understanding and deciding these issues without an expert's opinion.

Under the Rule 403 balancing test, the probative value of Purcell's testimony outweighs any potential unfair prejudice. *See* Fed.R.Evid. 403. The limitations on Purcell's testimony that are set forth above sufficiently diminish RBC's risk of unfair prejudice from his testimony. Further, as discussed above, Purcell is clearly qualified to testify in this action. Any lack of experience with the specific type of transaction may be raised at trial and considered by the jury in affording Purcell's opinion whatever weight it deems appropriate.

In sum, RBC's motion to preclude the testimony of Stupay and Purcell is DENIED, subject to the above-stated limitations on their testimony and reports. The Court advises the Schneiders and their experts, however, to be mindful, in the testimony given at trial, of the fine line between conclusions based upon a review of the facts, and legal conclusions, wherein the expert invades upon the function of the trier of fact by instructing the Court on the law. The Court reserves the right to alter its decision on the admissibility of specific testimony until the context of the trial renders more apparent whether such testimony is sufficiently relevant. *See Luce,* 469 U.S. at 41, 105 S.Ct. 460.

## IV. Taped Telephone Conversations

### A. *Designation of the Recorded Conversations*

Much of the evidence in this case is found on audio tape recordings of telephone conversations between RBC personnel and other parties. The Schneiders, who have specifically designated the portions of the recordings they intend to use as trial exhibits, object to Highland's and RBC's designations of those recordings. Both Highland and

RBC have generally designated the recordings, describing what they plan to use at trial as "Recorded Conversations" and "All Recorded Conversations," respectively. With nearly thirty hours of recorded conversations, the Court agrees with the Schneiders that such broad language serves to subvert the very purpose of designations in the pre-trial order. By *February 8, 2008,* Highland and RBC should inform the Schneiders of the particular tape segments it reasonably anticipates introducing at trial. Moreover, the Court does not expect the task to be onerous for Highland or RBC, who have already created indices of the various CD's and a "Compilation CD," highlighting the conversations most relevant to this action.

**B.** *Hearsay and Relevance*

The Schneiders seek a ruling excluding all taped conversations between Highland and RBC, between Fidelity and RBC, and amongst RBC employees. At this juncture, the Court cannot issue an *in limine* ruling excluding *all* of these taped conversations. Each conversation ultimately introduced by Highland and RBC may have unique features that require unique consideration by the Court, particularly as it may relate to hearsay. As such, the Schneiders' motion is DENIED without prejudice to its renewal upon objection at trial. Notwithstanding the premature nature of the objection, the Court generally is not persuaded by the Schneiders' argument that these tapes are irrelevant because they do not involve any of the Schneiders or Rauch. These tapes, which might show, for instance, that Highland and RBC believed a contract existed, appear relevant under the liberal requirements **\*189** of Rule 401. *See* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."). The Schneiders' contention that "[w]hatever Ambrecht tells a fellow employee, or RBC and Highland say to each other, cannot possibly be relevant or attributable to the Schneiders," (Defs.' Mot. No. 3 Reply at 7), is not germane to Rule 401, but rather is an argument to be made to the jury.

**C.** *Written Transcripts*

The Schneiders next seek to introduce into evidence written transcripts of the taped telephone conversations; alternatively, they request a ruling that the transcripts may be used as an aid to the jury while they listen to the tapes. Highland and RBC oppose this request and cross-move to exclude the transcripts.

**[14]**    As the Court indicated at the December 17, 2007 hearing on this matter, based upon prior experience, "to the extent it's helpful to the jury as an aid to have a transcript where they're following the recording and reading from the transcript, I found that to be helpful." (12/17/07 Tr. at 28.) Neither Highland nor RBC adequately has explained to the Court why transcripts would not be similarly helpful in this case. After hearing samples of the tapes at the December 17 hearing, the Court agrees with the Schneiders that audibility could be an issue at trial. Consequently, while listening to a recording, a juror should have the option to use a transcript as an aid. That the parties disagree as to the accuracy of parts of the transcripts [6] is an issue easily resolved by any or all of the following; (1) competing transcripts submitted by Highland and/or RBC; [7] *see United States v. Chalarca,* 95 F.3d 239, 246 (2d Cir.1996) (approving the district court's ruling that a party challenging the accuracy of a transcript "could offer an alternative transcript"); (2) Highland and/or RBC arguing to the jury in summation that one or several of the transcripts provided were deficient in some way; and (3) the Court giving a limiting instruction to the jury that "the transcripts themselves are not evidence and may be used as aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy." *United States v. Rosa,* 17 F.3d 1531, 1548 (2d Cir.1994). With these available safeguards, the risk of confusion without a transcript is greater than the risk of confusion with a transcript. Accordingly, the Schneiders' motion to allow transcripts of the taped conversation is GRANTED for use as a demonstrative aid for the jury; **\*190** the transcripts will not be admitted into evidence. *See, e.g., United States v. Gay,* 85 Fed.Appx. 794, 795 (2d Cir.2004) (referencing a district court's decision to allow a transcript to be used as an aid to the jury but not as an admitted piece of evidence). Highland's and RBC's cross-motions to exclude all transcripts are therefore DENIED to the extent they seek to completely eliminate the use of transcripts at trial.

**D.** *Attorney–Created Indices*

**[15]**    Defendants' Exhibit 308 is an index, created by the Schneiders, which lists all recordings in chronological order. Exhibit 176 is a subset of Exhibit 308, listing recorded conversations from March 12, 2001 through March 14, 2001. The Schneiders seek a ruling that the exhibits are admissible as evidence under Federal Rule of Evidence 1006, or, at the very least, that the exhibits may be used as demonstrative evidence. Highland and RBC oppose the request to admit the indices into evidence and cross-move to exclude them.

Rule 1006, an exception to the best evidence rule, states that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." Fed.R.Evid. 1006. The Schneiders do not allege that the recordings, illuminated by the use of transcripts, are confusing in content. Indeed, because the content is relatively straightforward, the recordings will conveniently be examined in court by the jury. See 6 Weinstein's Fed. Evid. § 1006.03 ("Under Rule 1006, charts, summaries, and calculations are only admissible to prove the content of Voluminous' writings, recordings or photographs that cannot be conveniently examined in court."). Thus, the indices cannot be admitted into evidence under Rule 1006.

The Schneiders nevertheless believe that the indices should be used as demonstrative aids to allow the jury to "more readily understand the dates, times and sequence of the recorded conversations and the participants." (Defs.' Mot. No. 3 at 12.) The Court disagrees for several reasons. First, the indices are more confusing than they are helpful. The Schneiders provide no reason for why it might be helpful for the jury to actually see the file number (e.g. "3.12.19"), the length of the conversation, or the CD from which the recording came (e.g. "17252"). While this information, as an organizational tool, may have helped the Schneiders' counsel prepare for depositions and trial, it is largely insignificant to jurors and may very well confuse them. Second, to the extent that the indices provide some important information, namely the dates of the conversations and the identities of the parties, such information is duplicative as it can be found in the Schneiders' transcripts. Third, through effective lawyering, and without the need for any indices, the jury should be able to accurately ascertain the chronology of conversations and events in this case. [8] Accordingly, the Schneiders' motion to admit Exhibits 308 and 176 into evidence, or to alternatively use them as demonstrative aids, is DENIED; RBC's and Highland's cross-motions seeking to exclude the same are GRANTED.

### E. *Exhibit 80C—Compilation CD*

Highland created a compilation CD of the conversations it believed to be most **\*191** relevant to this case. The Schneiders move to exclude this CD—Exhibit 80C—from evidence because it has not been properly authenticated under Fed.R.Evid. 901. The Court agrees. The February 9, 2005 Declaration of Jamie R. Welton does not serve to authenticate the compilation, nor does the Schneiders' lack of objection to

the CD during discovery. Like the indices that the Schneiders' sought to use, the compilation CD may have been a useful tool for Highland to organize the recorded conversations for depositions and for trial preparation. At trial, however, the jury should hear from the five authenticated CD's originally produced by RBC, and not a compilation thereof. As stated above, because Highland has already made a compilation CD, the Court does not expect it to be overly burdensome for them to now select the files they wish to play from the original CD's. Thus, the Schneiders' motion to exclude Highland's Exhibit 80C is GRANTED.

### V. The Schneiders' Additional Motions *in Limine*

#### A. *Motion in Limine No. 2*
The Schneiders second motion *in limine* generally seeks to exclude evidence and comments by any party suggesting that the Schneiders engaged in improper or illegal conduct. The Schneiders wish to preclude Highland and RBC from: (1) suggesting in the presence of jurors that any of the Schneiders or any nonparty associated with the Schneiders violated federal law or state law or regulation, violated McNaughton Apparel Group, Inc. ("McNaughton") internal policy, engaged in illegal or improper insider trading, breached any duties to McNaughton or any other nonparty, or improperly provided, received, or used documents or information; (2) suggesting in the presence of jurors that Leonard Schneider's sale of McNaughton common stock was illegal, improper, breached a duty to McNaughton, or violated any internal policy of McNaughton; (3) using, in the presence of jurors, the terms or labels "securities fraud," "inside information," "inside confidential information," "inside non-public information," "insider trading," "market manipulation," "illegal trading," "illegal inside information," "tippers," "tippees," or similar words or labels; and (4) introducing in evidence any testimony, deposition testimony, or exhibits related to (1), (2), or (3).

Highland opposes the Schneiders' motion in full, stating that, if granted, an "enormous" amount of relevant evidence would be excluded. Specifically, Highland believes that the jury would be deprived of: (1) information showing that the Schneiders wanted to leave McNaughton, which indicates that they intended to sell promptly their promissory notes; (2) the fact that the Schneiders received nonpublic information from McNaughton, which caused them to be willing to sell their notes at a discounted value; (3) corroboration from Peter Boneparth ("Boneparth") that the Schneiders were prepared to sell their notes; (4) evidence showing that testimony by the

Schneider children, denying that they intended to sell their notes or authorized Leonard Schneider to engage Rauch on their behalf, is incredulous; and (5) evidence showing that the Schneiders received nonpublic information that the notes would be paid out in full, which caused them to renege on the oral contract.

"[T]he decision whether to admit potentially prejudicial evidence is entrusted to the sound discretion of the district judge and will not be disturbed absent an abuse of discretion." *United States v. Gantzer,* 810 F.2d 349, 351 (2d Cir.1987). All evidence tending to demonstrate a defendant's liability, by its nature, will be prejudicial **\*192** in some respect to the defendant; Rule 403 is designed to exclude only *unfair* prejudice. *See Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 151 (2d Cir.1997) ("Although any evidence that tends to establish liability is prejudicial to the interests of the defendant, the prejudice is unfair only if the evidence has 'an undue tendency to suggest decision on an improper basis.' " (quoting Fed.R.Evid. 403 advisory committee's note)). Highland asserts that "[t]he truth may hurt, but Rule 403 does not make it inadmissible on that account." (Pl.'s Opp. to Defs.' Mot. No. 2 at 38.) While Highland's proposition is correct, it fails to expound on the more nuanced interpretation of Rule 403, namely whether the Schneiders seek to exclude *unfairly* prejudicial evidence from the trial.

Highland goes to great lengths—approximately thirty-seven pages in its opposition—to illustrate the fairly complex factual background in this case. And while there are documents and communications that tend to support Highland's recitation of the facts, Highland at no point explains why such evidence needs to be colored with terms such as "securities fraud." Nor does Highland explain why, in order to prove its third-party beneficiary breach of contract claim, it must also show that the Schneiders committed a securities law violation or breached a fiduciary duty to McNaughton. As the Schneiders suggest, the only apparent reason for such trial strategy would be to show the jury "that defendants are bad people...." (Defs.' 2d Reply Mot. No. 2 at 3.) *See Empire Gas Corp. v. Am. Bakeries Co.,* 646 F.Supp. 269, 276 (N.D.Ill.1986) (finding that testimony showing that the party and its lawyers were "bad people" was prejudicial, confusing, and misleading where the principal issue for the jury to decide whether there was a breach of contract).

Highland lists five broad categories of evidence that would be excluded should the Court grant the Schneiders' motion *in limine.* In so doing, Highland misconstrues the fairly narrow scope of the Schneiders' motion. For example, Highland claims that it will be precluded from showing that, based upon nonpublic information regarding McNaughton's financial condition, the Schneiders were willing to sell their notes at a discount. To the contrary, the effect of the Court's ruling will not be to conceal this relevant information from the jury, but to help the jury focus on this and other issues central to the case. Highland is thus precluded from coloring its case and wasting the jury's time with misleading and confusing testimony and evidence regarding securities law.[9]

RBC does not go as far as Highland in its opposition to the Schneiders' motion. It does not seek to prove or use evidence to show that the Schneiders violated securities laws or breached duties to McNaughton, and does not oppose the Schneiders' request to preclude use of the terms "securities fraud," "illegal," "market manipulation," or "insider trading." On the other hand, RBC opposes the motion to the extent that it seeks to preclude them from: (1) using evidence that shows that the Schneiders received nonpublic information; **\*193** and (2) using the terms "material nonpublic information," "inside information," "inside confidential information," and "inside nonpublic information."

First, RBC states that it should be able to use the October 26, 2000 letter from Boneparth to the Schneiders, the November 6, 2000 letter from Amanda Bokman ("Bokman") to Bruce Madnick ("Madnick"), and evidence related to the March 9, 2001 phone call. While the Schneiders "have never contested the admissibility of competent testimony concerning the March 9, 2001 Conversation," (Defs.' Reply Mot. No. 2 at 3), they argue that the October and November letters are irrelevant, presumably under Federal Rule of Evidence 401, because they do not contain any information that might show that the Schneiders entered into an oral contract and reneged on that contract. In this respect, the Schneiders' motion fails because:

> Evidence to be relevant does not by itself have to prove the ultimate proposition for which it is offered; nor does it have to make that ultimate proposition more probable than not. It is enough that the evidence has *a tendency* to make a consequential fact even the least bit more probable or less probable than it would be without the evidence. The question of relevance is thus

different from whether evidence is sufficient to prove a point.

Fed.R.Evid. 401 cmt. Here, the October and November letters meet the Rule 401 threshold for relevance and thus may be used at trial.

**[16]**    Second, RBC seeks to use terms such as, *inter alia,* "material nonpublic information," "inside information," "inside confidential information," and "inside nonpublic information." The Schneiders believe that such characterizations of the evidence are inflammatory and are not necessary to prove any of Highland's or RBC's claims. The Court agrees with the Schneiders that the evidence should not be labeled as "inside" information. Given the notoriety of insider trading, mere use of the term "inside information" may lead a juror to believe that the Schneiders engaged in improper or illegal conduct. Thus, any probative value of the term is outweighed by its misleading nature. Highland and RBC may, however, use the term "material nonpublic information" to refer to the information received by the Schneiders. Such a term does not have the same pejorative connotation as "inside" information.

In sum, the Schneiders' motion is GRANTED to the extent it seeks to exclude evidence and testimony related to securities fraud or a breach of fiduciary duty to McNaughton. Further, Hxghland and RBC may not characterize admissible evidence and testimony as "securities fraud," "illegal," "insider trading," "inside information," and "market manipulation." The motion is DENIED to the extent it seeks to exclude the October 26, 2000 and November 6, 2000 letters and to prevent use of the term "material nonpublic information."

**B. *Motion in Limine No. 4***
The Schneiders seek four rulings in their fourth motion *in limine.* First, they ask the Court to find that neither Highland nor RBC may adduce testimony by deposition from Max Holmes ("Holmes"), Boneparth, Bokman, Madnick, Brad Cost ("Cost"), Charles Greenman ("Greenman"), James Alterbaum ("Alterbaum"), and Rauch. In light of RBC's response, the Schneiders' request is DENIED without prejudice to its renewal upon objection at **\*194** trial.[10] Second, the Schneiders state that they "may" seek to adduce the testimony by deposition of Ambrecht, Holmes, and Parent, each of whom is listed on RBC's list of prospective live witnesses. If the Schneiders ultimately wish to do so at trial, the Court will rule on the request at that time. Third, the Schneiders assert their right to offer testimony of various

Rule 30(b)(6) witnesses should Highland or RBC dispute their right to do so. Highland has not opposed this motion and RBC states that it does not object except on the grounds of relevance and prejudice, which will be separately addressed below. Fourth, the Schneiders ask that RBC be directed to state whether it will produce certain witnesses at trial. RBC has already shown its intent to call some of these witnesses, and the Schneiders have indicated their intent to use the deposition testimony of the others. Further, RBC represents in its opposition that it "expects to further discuss the issues sufficiently prior to trial in order that trial subpoenas can be issued if necessary." (RBC's Opp. to Mot. No. 4 at 7.) As such, the Schneiders' last request is DENIED. The Court expects the parties to discuss the matters raised by the Schneiders without the need for pre-trial intervention by the Court.

**C. *Motion in Limine No. 5***
In the alleged oral agreement between the Schneiders and RBC, Fidelity Management and Research Company ("Fidelity") was to purchase Leonard Schneider's $23.6 million promissory note from RBC. Highland, the purported end-purchaser of the other seven notes, initiated this lawsuit against the Schneiders in October 2001, whereas Fidelity is not, and has never been, a party to this action. Instead, as part of a settlement agreement with RBC on May 3, 2004, Fidelity gave RBC an assignment of its claims (the "Assignment").[11] The Schneiders seek a ruling that: (1) RBC cannot assert any claims based upon the Assignment from Fidelity; (2) RBC and Highland cannot introduce as evidence or solicit any testimony related to the Assignment; and (3) RBC and Highland cannot argue that Fidelity had or believed it had an agreement with Leonard Schneider.[12]

The Court has little hesitation granting the Schneiders' first request. The law is clear that RBC cannot now add a new claim, especially in light of the fact that the Schneiders did not have the opportunity to conduct discovery of Fidelity. *See, ***\*195** *e.g., Missigman v. USI Northeast, Inc.,* 131 F.Supp.2d 495, 517–18 (S.D.N.Y.2001) (striking newly asserted claim where plaintiff had ample time to amend its pleading during pre-trial discovery and where defendant would be prejudiced because it could not conduct discovery relevant to the new claim). Indeed, RBC pointedly states that it does not seek to assert any new claims. Rather, RBC contends that it "now seeks to introduce the Assignment in response to Defendants' spurious defense that RBC is not a real party in interest to its breach of contract claim and in support of RBC's contention that RBC is entitled to full benefit of the bargain

damages." (RBC's Opp. to Defs.' Mot. No. 5 at 5.) Thus, the central issue raised by the Schneiders' motion is whether RBC may introduce the Assignment to clarify that it is a proper party to this action.

[17]  Status as a real party in interest is a procedural matter governed, in a diversity case, by Rule 17(a) of the Federal Rules of Civil Procedure. *See Brocklesby Transp. v. E. States Escort Servs.,* 904 F.2d 131, 133 (2d Cir.1990). Rule 17(a) requires that "every action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). RBC contends that the Assignment will show, contrary to the Schneiders' position, [13] that **\*196** RBC is a real party in interest, and further that RBC is entitled to full benefit of the bargain damages. This argument must fail. In order to be successful on its own claims, namely for the Schneiders' breach of the duty to negotiate and breach of contract, RBC must show that it entered into an enforceable agreement with the Schneiders. RBC acknowledged this at the summary judgment stage—"[t]he fact of the matter is that the oral agreement was between RBC and the Schneiders and RBC is entitled to the contractual damages" (RBC's Opp. at 22)—and in its opposition to the Schneiders' motion *in limine*—"the existence of a contract between RBC and Defendants for *all* $69 million of the Notes remains at the core of RBC's contract claim against Defendants." (RBC's Opp. to Defs.' Mot. No. 5 at 5.) Any potential claims that RBC may now have on behalf of Fidelity are irrelevant to this consideration. And even if the Assignment did have any probative value, with no discovery conducted on Fidelity, the prejudice to the Schneiders would be great. As such, RBC may not introduce evidence or question witnesses regarding the Assignment in order to prove that it is a proper party in this action.

## VI. RBC's Additional Motions *in Limine*

### A. *Motion to Exclude Evidence of Compromise and Offers to Compromise Between RBC and Highland*

RBC moves pursuant to Rules 403 and 408 of the Federal Rules of Evidence to prevent the Schneiders from offering any evidence or testimony at trial reflecting compromise or offers of compromise between RBC and Highland, including correspondence between attorneys for the parties. RBC asserts that the Schneiders' "only plausible reason [to] introduce this evidence is to confuse and mislead the jury in its determinations with respect to damages and liability." (RBC's Compromise Mot. at 1.) [14]

Highland initially filed a complaint in the District Court of Dallas County, Texas and included RBC as a defendant. Prior to and following that filing, RBC and Highland "negotiate[d] a possible resolution of the potential claims between them ...." (RBC's Compromise Mot. at 2.) Ultimately, RBC and Highland entered into a Tolling Agreement, dated May 9, 2002, postponing the statute of limitations on any claims between them until this action concludes, thereby postponing resolution of any dispute between RBC and Highland.

Rule 408 "embodies the strong federal policy favoring settlement of disputes by precluding the use of settlement-related materials as a means of establishing or disproving liability." *Tribune Co. v. Purcigliotti,* No. 93 Civ. 7222, 1996 WL 337277, at \*1, 1996 U.S. Dist. LEXIS 8433, at \*2 (S.D.N.Y. June 19, 1996) (Preska, J.); *see also Fed.R.Evid. 408,* advisory committee's note. This Rule excludes evidence of compromise or offers of compromise "when offered to prove liability for, invalidity of, or amount of a claim that was **\*197** disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed.R.Evid. 408(a). However, the rule does not require exclusion when the evidence is offered for another purpose, such as "proving a witness's bias or prejudice." Fed.R.Evid. 408(b).

RBC argues that there is no permissible use for this evidence under Rule 408. RBC asserts that the Schneiders want to use the settlement offers and negotiations to "create an inference of RBC's liability for the claims brought by Highland against the Schneiders themselves to buttress their claims against RBC." (RBC's Compromise Mot. at 3–4.) In addition, RBC states that the Schneiders seek to use correspondence "to attempt to show that RBC thought Highland had no claim." (RBC's Compromise Mot. at 4.) Further, RBC claims that the Schneiders intend to use the Tolling Agreement "to attempt to imply that the Defendants' own liability should be reduced as a result of the agreement." (RBC's Compromise Mot. at 5.)

The Schneiders assert that all but two of the documents identified by RBC in its supporting affidavit are not covered by Rule 408 because they do not concern compromise or offers of compromise. (Defs.' Opp. to RBC's Compromise Mot. at 2.) Contrary to the Schneiders' assertion, all of the documents identified by RBC concern compromise or offers of compromise. Although RBC and Highland did not ultimately resolve their dispute through these negotiations, the communications between RBC and Highland still concern

offers of compromise. Further, the Tolling Agreement evidences compromise, not a litigation strategy.

Because the documents identified by RBC concern compromise or offers of compromise, Rule 408 governs them. As discussed above, such evidence may not be offered to prove liability or damages. *See* Fed.R.Evid. 408(a). Evidence relating to compromise or offers of compromise, however, may be offered for other reasons, such as to show a witness's bias or prejudice. *See* Fed.R.Evid. 408(b). Most of the documents identified by RBC were communications between lawyers for RBC and Highland. Therefore, these communications could not be used to show bias or prejudice of any of RBC's witnesses. While the affidavit of Ambrecht, an RBC employee, was attached to the May 6, 2002 letter, (RBC's Compromise Mot., Yoskowitz Aff. Ex. 9), nothing in the Ambrecht Affidavit could be used to demonstrate bias because there is no evidence of inconsistent opinions. (RBC's Reply to Compromise Mot. at 7.) Further, although the Schneiders assert that "[t]he jury could certainly conclude that the negotiations and resulting agreement incentivized RBC to say there was an agreement on March 14 to sell the Notes," (Defs.' Opp. to RBC's Compromise Mot. at 6.), there is no evidence to support this. To that end, the Schneiders have not demonstrated that any of these documents evidence bias, prejudice, or any other permissible purpose under Rule 408.

 [18]    RBC also argues that the evidence proffered by the Schneiders should be excluded as irrelevant and prejudicial. This action concerns the Schneiders' alleged breach of an agreement to sell the notes to RBC. Discussions between lawyers for RBC and Highland regarding claims arising from an agreement between RBC and Highland are irrelevant to this action. The evidence identified by RBC is not probative of any relevant issue remaining in this case. Further, the compromise discussions occurred well after the events giving rise to this action. Contrary to the Schneiders' assertion, (Defs.' Opp. to RBC's Compromise Mot. at 17), they **\*198** would suffer no unfair prejudice by exclusion of this evidence. Rather, there is a substantial risk that the jury will be confused by the legal claims at issue between RBC and Highland, and further confused by the arguments set forth by the lawyers on behalf of RBC and Highland. There is a significant risk that the jury would consider the potential claims between RBC and Highland in determining the claims against the Schneiders. Therefore, RBC's motion to exclude any evidence or testimony at trial reflecting compromise or offers of compromise between RBC and

Highland, including correspondence between attorneys for the parties, is GRANTED.

**B.** *Motion to Exclude Evidence of NASD Arbitration Proceeding and Compromise Between RBC and GRS*

RBC moves pursuant to Rules 401, 402, 403, and 408 of the Federal Rules of Evidence to prevent the Schneiders from offering any evidence, testimony, argument, or reference at trial to an arbitration between RBC and Glen Rauch Securities, Inc. ("GRS") and the subsequent settlement agreement. [15] RBC filed a National Association of Securities Dealers, Inc. ("NASD") arbitration Statement of Claim against RBC in March 2003, asserting claims arising out of the role of GRS and Rauch, as agent of the Schneiders, for selling the notes at issue in this case. RBC and GRS entered into an agreement resolving the dispute and no arbitration hearing was held. In the instant case, the Schneiders moved to compel production of the settlement agreement. Magistrate Judge Gorenstein denied that request under Rule 26(b)(1) of the Federal Rules of Civil Procedure, in an Order dated September 28, 2007. *See* Order Denying Mot. to Compel, Sept. 28, 2007 (Gorenstein, M.J.). The Schneiders, however, included the Statement of Claim on their proposed exhibit list for trial. Thus, RBC seeks to exclude the Statement of Claim and any other evidence, testimony, or argument regarding the NASD arbitration and settlement agreement from being offered at trial.

RBC argues that any evidence, testimony, or argument regarding the arbitration should be excluded as irrelevant, and even if it is relevant, should be excluded as more prejudicial than probative. There was no adjudication of the claims or admission of liability arising out of the arbitration. Similarly, the arbitration related only to GRS's liability, not the Schneiders. Thus, the arbitration has no bearing upon the claims in this case. The Schneiders argue that the Statement of Claim is relevant, in part, because "[i]t contains an RBC version of the facts that gave rise to the claims ...." (Defs.' Opp. to RBC's NASD Mot. at 3.) This argument is unpersuasive as the facts set forth in the Statement of Claim against GRS and Rauch are irrelevant to the issues in this case. Additionally, even if it has some probative value, the danger of unfair prejudice substantially outweighs the probative value. There is a substantial risk that the jury would give undue weight to the arbitration proceedings and be confused by the evidence, testimony, or argument, in deciding the Schneiders' liability.

As for the settlement agreement between RBC and GRS, RBC claims that any evidence, testimony, or argument regarding this compromise should be excluded **199** under Rule 408, as irrelevant, and as more prejudicial than probative. As the Court stated above, Rule 408 "embodies the strong federal policy favoring settlement of disputes by precluding the use of settlement-related materials as a means of establishing or disproving liability." *Purcigliotti*, 1996 WL 337277, at *1, 1996 U.S. Dist. LEXIS 8433, at *2; *see also* Fed.R.Evid. 408, advisory committee's note. This Rule excludes evidence of compromise or offers to compromise "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed.R.Evid. 408(a). However, the rule does not require exclusion when the evidence is offered for another purpose, such as "proving a witness's bias or prejudice." Fed.R.Evid. 408(b). Nonetheless, as RBC has noted, the Schneiders assert nothing more than "[a] broad, generalized hope that the settlement agreement (or negotiation of its terms) be relevant ...." (RBC's NASD Mot. at 7.) [16] Therefore, "[t]o consider the terms of that settlement in this action would be improper and unjustified." *Playboy Enters., Inc. v. Chuckleberry Pub., Inc.,* 486 F.Supp. 414, 423 (S.D.N.Y.1980) (holding that plaintiff's settlement with one magazine was not admissible under Rule 408 in litigation with defendant, another magazine, to show that plaintiff's claim against defendant was unjustified).

In addition, the settlement agreement and any related evidence are not relevant to this case. As Magistrate Judge Gorenstein previously held, the settlement agreement does not contain any admissions of liability by GRS or Rauch, or any other material relating to the dispute. *See* Order Denying Mot. to Compel, Sept. 28, 2007 (Gorenstein, M.J.). Further, the settlement negotiations and agreement occurred after the events giving rise to this action. There is no showing that the settlement agreement or any related evidence are relevant to this case. Contrary to the Schneiders' assertions, (Defs.' Opp. to RBC's NASD Mot. at 5–6), the Court's determinations apply to not only the settlement agreement itself, but also the fact of settlement and the terms of settlement. Furthermore, under Rule 403, any probative value that the settlement agreement might have is far outweighed by the significant risk of unfair prejudice. There is a significant risk that the jury would infer from the settlement agreement that GRS or Rauch were the wrongdoers and consider that in determining the Schneiders' liability. RBC's motion is GRANTED and the Schneiders are precluded from offering evidence, testimony, argument, or reference to the NASD

arbitration and subsequent settlement agreement between RBC and GRS.

## C. *Motion to Exclude Evidence of an Alternate or Non–Existent Duty or Standard of Care*

RBC moves to prevent the Schneiders from offering any evidence, testimony, or argument regarding any alternate standard or duty of care, as irrelevant and more misleading or confusing than probative, pursuant to Rules 401, 402, and 403 of the Federal Rules of Evidence. (RBC's **200** Duty Mot. at 1.) [17] In support of its motion, RBC argues that any evidence or argument regarding recordkeeping and documentation of trades is irrelevant to whether there was an oral agreement to sell the notes. [18] RBC states that "the failure to document an *oral* agreement does not make the existence of such an *oral* agreement any more or less likely." (RBC Duty Mot. at 6.) In addition, RBC asserts that any probative value is outweighed by the risk of misleading or confusing the jury.

Although RBC admits that it did not document the agreement, (RBC Duty Mot. at 2, 6), the evidence regarding recordkeeping and trade documentation proffered by the Schneiders, generally, is relevant. Industry custom and practices regarding recordkeeping and documentation may be relevant to the jury's consideration of whether an oral agreement was reached. As discussed above regarding Stupay's testimony, even though RBC admits that it did not document the trade, without industry context, the jury may have no understanding of the importance, or lack of importance, of such documentation. Whether RBC violated these rules and guidelines is not an issue in this case, but the rules and guidelines are relevant to the central issue of whether a binding agreement was reached and provide evidence of industry standards.

The parties dispute what rules and guidelines apply to the type of transaction at issue in this case. Both sides may put forth evidence of the practices they contend apply to the type of transaction at issue and the jury will decide what weight to give the evidence.

Although this evidence is generally relevant, some of the evidence proffered by the Schneiders is irrelevant and should be excluded. The Schneiders identified RBC's entire Compliance Manual as its Exhibit 7 in the Pre–Trial Order, as well as selected excerpts from the Compliance Manual as additional exhibits. (RBC's Duty Mot. at 1 n. 1.) The Schneiders' Exhibit 7, which contains the entire

Compliance Manual, is excluded because it clearly contains irrelevant internal procedures and would be unnecessarily overwhelming to the jury. The sections separately identified by the Schneiders are generally admissible. However, the Compliance Manual's "Gifts and Gratuities" policy, (Defs.' Opp. to RBC's Duty Mot. at 8 n. 5 (quoting RBC 02023)), which the Schneiders seek to admit to show that RBC "was willing to bend over backwards to attempt to please Highland ....," (Defs.' Opp. to RBC's Duty Mot. at 8 n. 5), is inadmissible. The Schneiders' assertion is irrelevant to the issues in this case and this evidence unnecessarily presents the issue of whether RBC violated a tangential rule, therefore, this evidence would unfairly prejudice the jury and must be excluded. Similarly, the "Customer Complaints" section is irrelevant to the issues in this case and must be excluded. (Defs.' Opp. to RBC's Duty Mot. at 7 (quoting RBC 02078).) If the Schneiders seek to admit evidence of other tangential or irrelevant sections of the Compliance Manual, RBC may renew its objection at trial and the **\*201** Court will rule at that time. Additionally, the Court reiterates the limitations on Stupay's testimony, which are relevant to this motion as well, as set forth above.

RBC argues that under the Rule 403 balancing test, any probative value of the evidence is outweighed by the risk of misleading or confusing the jury. In their Third–Party Complaint, the Schneiders brought several claims, including a claim that RBC was negligent in performing its duties as a registered broker-dealer, and sought indemnification and contribution. In its motion *in limine,* RBC asserts that if the Schneiders present evidence of company and industry rules and guidelines, the jury likely will be confused between this evidence and the judge's instruction on the legal standard of care in a negligence action. (RBC Duty Mot. at 6–7.) However, after the parties submitted their papers on this motion *in limine,* the Court issued its summary judgment opinion and dismissed all claims asserted by the Schneiders against RBC. *See Highland Capital Mqmt.,* 2008 WL 152778 at *5–7, 2008 U.S. Dist. LEXIS 3235, at *18–29. Thus, RBC's argument that the jury would be confused between this evidence and the negligence legal standard of care, is irrelevant. Because the Court will not instruct the jury on the negligence legal standard, the risk of confusing or misleading the jury is significantly diminished. Thus, the Schneiders may present this evidence to the jury, subject to the limitations discussed above.

**VII. Highland's Motions**

### A. *Motion to Take Judicial Notice and Issue Preliminary Instructions*

[19]    The Second Circuit, by way of a certified question to the New York Court of Appeals, has determined that the promissory notes at issue in this case are securities under N.Y.U.C.C. § 8–102(a)(15), thereby rendering the Statute of Frauds inapplicable to the purported oral agreement for the notes. Highland asks the Court, pursuant to Federal Rule of Evidence 201, to take judicial notice that the promissory notes at issue in this case are securities, [19] and that oral agreements for the sale of securities are binding under New York law. This request is DENIED because the Second Circuit's ruling is the law of the case and does not require judicial notice. *See United States v. Cirami,* 563 F.2d 26, 32 (2d Cir.1977) ("When an appellate court has once decided an issue, the trial court, at a later stage in the litigation, is under a duty to follow the appellate court's ruling on that issue. This is what is meant by 'law of the case.' ") (internal citations omitted). To that end, the Court intends to instruct the jury as to the law of the case at the appropriate time. [20]

### B. *Motion In Limine No. 1*

In this motion *in limine,* Highland seeks an order prohibiting testimony by Barbara Bailey ("Bailey"), Tyler Lenane ("Lenane"), Nanci Weisbord ("Weisbord"), Allison **\*202** Caire Aucoin ("Aucoin"), and Lawrence Halperin ("Halperin"). Highland claims that because these individuals were not disclosed by the Schneiders during discovery pursuant to Federal Rule of Civil Procedure 26, it would be prejudicial to Highland if they testified at trial. As to Bailey, Lenane, Weisbord, and Aucoin, who were listed as potential witnesses by the Schneiders in the pre-trial order to support the authenticity of the transcripts and indices, the Court is confident that its determination of the Schneiders' motion *in limine* No. 3 largely resolves the issue. To the extent that Highland wishes to continue to challenge the accuracy of the transcripts at trial, the Schneiders should, as a matter of fairness, be able to call these witnesses to describe the methodology by which the transcripts were prepared.

Halperin, an outside attorney to RBC in 2001, "became known to defendants during the discovery phase of this action, through RBC's production of documents ...." (Defs.' Opp. to Pl.'s Mot. No. 1 at 1.) The Schneiders contend that Highland also became aware of Halperin at that time, and would thus not be prejudiced by his testimony at trial. Rule 37(c)(1) states that "[i]f a party fails to provide information

or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence ... at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c) (1); *Rhone v. United States,* No. 04 Civ. 5037, 2007 WL 3340836, at *8 n. 6, 2007 U.S. Dist. LEXIS 83322, at *24 n. 6 (S.D.N.Y. Nov. 9, 2007) (Leisure, J.) (stating that evidence preclusion under Rule 37(c)(1) is a drastic remedy and should be used with caution); *Ebewo v. Martinez,* 309 F.Supp.2d 600, 607 (S.D.N.Y.2004) (Koeltl, J.) ("The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence."). First, it does not appear that the Schneiders failed to satisfy Rule 26(a) or (e). The Schneiders obviously did not know about Halperin at the initial disclosure stage of this case. Further, under Rule 26(e), the initial disclosures must be supplemented "if the additional or corrective information *has not otherwise been made known to the other parties during the discovery process* or in writing." Fed.R.Civ.P. 26(e)(1)(A) (emphasis added).

Second, even if the Schneiders should have amended their disclosures, any failure to do so was harmless. Highland received documents relevant to Halperin and participated at a deposition in which these documents were used. Moreover, Highland will be aligned at trial with RBC, the party that originally produced the information related to Halperin. Thus, any prejudice to Highland is *de minimis.* Highland's motion *in limine* No. 1 is DENIED.

## CONCLUSION

The foregoing hereby constitutes the decisions of the Court on all currently pending motions *in limine* in this action. The parties are to appear for trial on February 19, 2008 at 9:30 a.m.

**SO ORDERED.**

Footnotes

1    Rule 26(e) states that:
         (1) In general. A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:
            (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
            (B) as ordered by the court.
         (2) Expert Witness. For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

2    Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless...."

3    The Schneiders assert that this additional language was not in Highland's Rule 26(a) disclosures. (Defs.' Mot. No. 1 at 23 n. 16.) Further, the Schneiders state that "[t]he customary computation of judgment interest is not a proper subject of expert testimony. If Highland has in mind some other computation, it should be required to disclose the contemplated computation ...." (Defs.' Mot. No. 1 at 23 n. 16.) Highland fails to respond to this point. Therefore, the Court assumes that Highland simply proffers testimony from Okada and Rich on the customary computation, which is inadmissible as expert testimony. However, if Highland proposes some alternative interest computation to be presented by Okada or Rich, it must disclose this information to the Schneiders, and, if necessary, the Court may revisit its decision on the admissibility of this testimony.

4    Third–Party Defendant and Third–Party Counter–Claimant RBC Capital Markets Corporation's Memorandum of Law in Support of its Motion *In Limine* to Preclude the Testimony of Defendants' Expert Witnesses Michael E. Stupay and William H. Purcell hereinafter will be cited as "RBC's Expert Mot."

5    Defendants' Memorandum of Law in Opposition to the Motion in Limine of Third–Party Defendant–Counterclaimant RBC Capital Markets Corp. to Exclude the Proposed Expert Testimony of Defendants' Expert Witnesses, Michael Stupay and William Purcell hereinafter will be cited as "Defs.' Opp. to RBC Expert Mot."

6    The Schneiders claim that any errors in their transcripts or differences between their transcripts and RBC's transcripts are "de minimis." (Defs.' Mot. No. 3 Reply at 4.) RBC and Highland believe that the Schneiders' transcripts are "riddled with inaccuracies," (RBC's Opp. to Defs.' Mot. No. 3 at 5), and are "merely Defendants' wishful spin on the underlying evidence." (Pl.'s

Opp. to Defs.' Mot. No. 3 at 10.) After reviewing some of the transcripts at the December 17, 2007 hearing, it appears that Highland and RBC have exaggerated the amount and significance of the Schneiders' errors.

**7**   To the extent that Highland or RBC wish to use their own transcripts in addition to the transcripts they have already created, they should produce those transcripts to the Schneiders by *February 12, 2008.* The Court does not believe that thirty days, the Schneiders requested time to review those exhibits, is necessary to afford them a fair opportunity to object. Thus, the Schneiders' motion to preclude Highland and RBC from introducing its own transcripts is denied without prejudice to its renewal upon objection at trial.

**8**   For the same reason, the Schneiders' request that Highland and RBC be barred from referencing taped conversations without identifying the date, time, and participants in accordance with Exhibit 308 is DENIED. As Highland states in its opposition papers, the parties are entitled to try their cases as they see fit.

**9**   The Schneiders' motion appends numerous exhibits and deposition transcripts that purportedly fall into this category of misleading and confusing evidence. The Court does not believe it is necessary to rule on the admissibility of each and every document at this point, and will do so as needed at trial. Nevertheless, the parties should proceed towards trial with the understanding that any evidence related to securities regulations and violations thereof likely will be excluded upon objection. *See, e.g.,* Pl.'s Ex. 2, McNaughton's Statement of Company policy re Insider Trading (June 1994); Pl.'s Ex. 7, McNaughton Memorandum re Insider Trading (Sept. 29, 2000).

**10**  The Schneiders' will not, as they claim, be hindered in their trial preparation by this ruling. Instead, based upon RBC's statement that it "intends to use the deposition testimony of these witnesses only in the case that such witnesses are unavailable to testify at trial," (RBC's Opp. to Mot. No. 4 at 2), the Schneiders should prepare for the live testimony of Holmes, Boneparth, Madnick, Cost, Greenman, Alterbaum, and Rauch. As for Bokman, RBC states in a footnote that it listed her as a prospective witness by deposition simply because the Schneiders had not listed her on their witness list. As RBC suggests, the Court will allow for good-faith discussions between the parties as to Bokman's testimony.

**11**  The Assignment, which is Exhibit C of the settlement agreement, assigned, transferred, and conveyed to RBC:

> [A]ll of Fidelity's claims, rights, title, interests or causes of action, in contract, tort or fraud, legal and equitable, accruing from, arising out of or in connection with the proposed purchase or sale of certain subordinated promissory notes issued by McNaughton Apparel Group, Inc. to Leonard Schneider, Leslie Schneider, Susan Schneider and Scott Schneider.

(RBC's Opp. to Defs.' Mot. No. 5, Aff. of Jack Yoskowitz, Ex. 4.)

**12**  The Schneiders do not elaborate on the third request in their memoranda of law. This request is thus DENIED without prejudice to its renewal upon objection at trial.

**13**  It is worth noting that the Schneiders' position does not appear to be tenable. "[T]he modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." Fed.R.Civ.P. 17 advisory committee's note to the 1966 amendment. Here, because the entire action hinges upon an alleged oral contract between RBC and the Schneiders, it seems axiomatic that RBC would be entitled to recover from the Schneiders. That Highland may be a third-party beneficiary to that contract does not alter the analysis. *See Weniger v. Union Ctr. Plaza Assocs.,* 387 F.Supp. 849, 855 (S.D.N.Y.1974) (finding that plaintiff was a real party in interest because "[t]he contract sued upon was made in plaintiff's name, and his alone, and the co-brokers are, at best, third party beneficiaries thereto"). Perhaps the Schneiders' argument stems from their misconception, as stated in the pre-trial order and the memorandum of law related to the fifth motion *in limine,* that one element of third-party beneficiary breach of contract is that the intended beneficiary must prove that it is the only party who may bring a claim for breach of contract. (PTO at 21; Defs.' Reply Mot. No. 5 at 6.) A review of New York law reveals this assertion to be erroneous. As this Court stated in its initial summary judgment opinion, in order to claim third-party beneficiary status, Highland must show: (1) the existence of a valid and binding contract between RBC and the Schneiders; (2) that the contract was intended for Highland's benefit; and (3) that the benefit to Highland was to be sufficiently immediate, rather than incidental. *See Highland Capital Mgmt., L.P. v. Schneider,* No. 02 Civ. 8098, 2005 WL 1765711, at *19, 2005 U.S. Dist. LEXIS 14912, at *66 (S.D.N.Y. July 26, 2005) (citations omitted). With respect to the second requirement, "New York has 'emphasized' when upholding the third party's right to enforce the contract that no one other than the third party can recover if the promisor breaches the contract,' *'or that the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party* as by fixing the rate or price at which the third party can obtain services or goods.' " 2005 WL 1765711, at *20, 2005 U.S. Dist. LEXIS 14912, at *68–69 (emphasis added) (quoting Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc., 66 N.Y.2d 38, 45, 495 N.Y.S.2d 1, 485 N.E.2d 208, 212 (1985)); *see also Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.,* No. 03 Civ. 1537, 2003 WL 23018888, at *11, 2003 U.S. Dist. LEXIS 23062, at *32 (S.D.N.Y. Dec. 22, 2003) ("Under New York law, when there is no showing of 'some obligation or duty running from the promisee to the third party beneficiary,' a third party still may enforce a contract when 'no one other than the third party can recover if the promisor breaches the contract.' ") (quoting Fourth Ocean Putnam Corp., 66 N.Y.2d at 45, 495 N.Y.S.2d 1, 485 N.E.2d at 212). "Here, *both* RBC and Highland can potentially recover under the contract," *Highland Capital Mgmt.,* 2005 WL 1765711, at *20, 2005 U.S. Dist. LEXIS 14912, at *69 (emphasis

added), because RBC may have had an obligation to Highland. The Schneiders are therefore mistaken in their belief that, if Highland recovers as a third-party beneficiary, "then RBC would lack standing" to recover under the same contract. (Defs.' Mot. No. 5 Reply Memo. of Law at 7.)

14    Third–Party Defendant and Third–Party Counter–Claimant RBC Capital Markets Corporation's Memorandum of Law in Support of its Motion *In Limine* to Exclude Evidence of Compromise and Offers to Compromise Between RBC Capital Markets Corporation and Highland Capital Management, L.P. hereinafter will be cited as "RBC's Compromise Mot."

15    Third–Party Defendant and Third–Party Counter–Claimant RBC Capital Markets Corporation's Memorandum of Law in Support of its Motion *In Limine* to Exclude Evidence of NASD Arbitration Proceeding and Compromise Between RBC and Glen Rauch Securities, Inc. hereinafter will be cited as "RBC's NASD Mot."

16    The Schneiders state that "[w]hile defendants have no reason to anticipate this will happen at trial, certainly if Glen Rauch were to testify inconsistently with his prior affirmation and deposition testimony the fact of the settlement or its terms could, in that circumstance, be admissible under Rule 408 as tending to explain such inconsistencies." (Defs.' Opp. to RBC's NASD Mot. at 5.) If these improbable events do occur at trial, then the Court, if necessary, may reconsider its ruling at that time.

17    Third–Party Defendant and Third–Party Counter–Claimant RBC Capital Markets Corporation's Memorandum of Law in Support of its Motion *In Limine* to Exclude Evidence of an Alternate or Non–Existent Duty or Standard of Care hereinafter will be cited as "RBC's Duty Mot."

18    Evidence proffered by the Schneiders that addresses these issues includes the RBC Compliance Manual, Securities and Exchange Commission ("SEC") rules, NASD guidelines, and other trading-related documents, as well as testimony from the Schneiders' expert, Michael Stupay, and RBC's Rule 30(b)(6) witnesses.

19    In addition to the applicable state law, Highland contends that the notes are securities under federal law, namely 15 U.S.C. § 78c(a)(10). Nothing in the record supports this assertion.

20    The Court's preliminary instructions to the jury are likely to be succinct in anticipation of the evidence to be presented. Further, in order to assuage the Schneiders' apprehension that Highland's proposed instruction on this issue "impermissibly minimizes important issues in this case and improperly suggests the absence of a dispute as to whether any oral agreement was reached ..." (Defs.' Opp. to Pl.'s Jud. Not. Mot. at 10), the Court notes that the instruction will be given evenhandedly, within the context of the central issues in the case.

---

**End of Document**        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 70

23 Fla. L. Weekly Fed. C 939

677 F.3d 1068
United States Court of Appeals,
Eleventh Circuit.

HOLSTON INVESTMENTS, INC. B.V.I.,
Albert P. Hernandez, Plaintiffs–Appellees,

v.

LANLOGISTICS CORP., Defendant–Appellant.

Nos. 10–13442, 11–11122.    |    April 17, 2012.

**Synopsis**
**Background:** Former shareholders of company sued company's owner after it sold company, along with two others, to third party, alleging breach of their right of first refusal respecting sale of company. The United States District Court for the Southern District of Florida, No. 1:08-cv-21569-FAM, Federico A. Moreno, Chief Judge, granted summary judgment to shareholders, and company appealed.

**Holdings:** The Court of Appeals held that:

[1] as a matter of first impression in the circuit, a dissolved corporation has no principal place of business, for purposes of diversity jurisdiction;

[2] dissolved corporation was only a citizen of Delaware, and this diversity jurisdiction existed; and

[3] district court prematurely decided a disputed issue of material fact in granting summary judgment.

Affirmed in part, reversed in part, and remanded.

West Headnotes (10)

[1]    **Federal Courts**
          👉 Jurisdiction

Whether a court has subject-matter jurisdiction to hear a matter is a question of law that Court of Appeals reviews de novo.

6 Cases that cite this headnote

[2]    **Federal Courts**
          👉 Questions of Law in General

A court's application of law to facts receives de novo review.

2 Cases that cite this headnote

[3]    **Federal Courts**
          👉 Summary judgment

Court of Appeals reviews the district court's grant of summary judgment de novo, applying the same legal standards as the district court.

2 Cases that cite this headnote

[4]    **Federal Courts**
          👉 Purpose of diversity jurisdiction

Congress extends the benefits and safeguard of federal courts to provide a separate forum for out-of-state citizens against the prejudices of local courts and local juries. 28 U.S.C.A. § 1332(a)(1).

Cases that cite this headnote

[5]    **Federal Courts**
          👉 Time as of which jurisdiction determined; change of citizenship pending suit

Diversity jurisdiction is determined at the time the complaint was filed. 28 U.S.C.A. § 1332(a).

1 Cases that cite this headnote

[6]    **Federal Courts**
          👉 Coplaintiffs and Codefendants;  Complete Diversity

To meet the requirements of diversity jurisdiction, the citizenship of each plaintiff must be different from that of each defendant. 28 U.S.C.A. § 1332(a).

2 Cases that cite this headnote

[7]    **Federal Courts**
          👉 Place of business

23 Fla. L. Weekly Fed. C 939

A dissolved corporation has no principal place of business, for purposes of diversity jurisdiction. 28 U.S.C.A. § 1332(c)(1).

Cases that cite this headnote

[8]    **Federal Courts**
    🔑 Corporations and Other Organizations

    **Federal Courts**
    🔑 Place of business

Dissolved corporation was only a citizen of Delaware, where it was incorporated, and not a citizen of Florida, where it had maintained its corporate headquarters, for purposes of diversity jurisdiction in shareholders' suit alleging breach of their right of first refusal respecting the sale of the corporation, where corporation dissolved and formally withdrew from business before suit was filed. 28 U.S.C.A. § 1332(c)(1).

Cases that cite this headnote

[9]    **Corporations and Business Organizations**
    🔑 Agreements for transaction

The determination of the purchase price of a company in a package purchase requires that the fair market value of the company be considered, for purposes of party's exercise of right of first refusal respecting sale of company.

Cases that cite this headnote

[10]    **Federal Civil Procedure**
    🔑 Corporations and business organizations

    **Federal Courts**
    🔑 Need for further evidence, findings, or conclusions

By deciding as a matter of law that the purchase price of company that owner sold, along with two others, to third party was $450,000, the district court prematurely decided a disputed issue of material fact in granting summary judgment to company's shareholders in their suit alleging owner breached their right of first refusal respecting sale of company, warranting remand for factual findings regarding the fair market value of each entity sold in the package deal to identify the percentage of the $3.5

million purchase price used to purchase the company; owner had not had an opportunity to present evidence on the fair market value of the company and the two others it sold or possible tax incentives for allocating $450,000 of the purchase price to the company.

Cases that cite this headnote

**Attorneys and Law Firms**

*1069 Jamie Zysk Isani, Marty Steinberg, Thomas Richard Julin, Hunton & Williams, LLP, Adriana Riviere–Badell, Kobre & Kim, Christopher N. Johnson, Gray Robinson, PA, Miami, FL, for Plaintiffs–Appellees.

Christopher N. Bellows, Jose A. Casal, Michael Edward Garcia, Rebecca M. Plasencia, Holland & Knight, LLP, Miami, FL, for Defendant–Appellant.

Appeals from the United States District Court for the Southern District of Florida.

Before TJOFLAT, PRYOR and FAY, Circuit Judges.

**Opinion**

PER CURIAM:

LanLogistics Corp. raises two issues on appeal. The first issue requires us to determine the citizenship of a dissolved corporation for purposes of diversity jurisdiction. The second issue involves whether summary judgment was appropriately entered where there may have been a genuine issue of material fact. We affirm the district court's holding as to the first issue, but reverse and remand for factual findings on the second issue.

**I.**

LanLogistics owned a company named LanBox Inc., which facilitates delivery of consumer purchases between customers in the United States, Latin America, and Europe. In 2007, LanLogistics sold LanBox and two other companies to Paul Gartlan ("Gartlan"). Gartlan paid $3.5 million for the three companies. The parties allocated $450,000 of the purchase price to LanBox.

LanLogistics's sale of LanBox breached a contract it previously formed with Holston Investments Inc. B.V.I. ("Holston"). In 2004, LanLogistics had promised Holston a right of first refusal, but LanLogistics never gave Holston an opportunity to match Gartlan's offer to purchase LanBox.

Alleging diversity jurisdiction, Holston sued in federal court. Holston is a citizen of Florida. LanLogistics was incorporated in Delaware and maintained its corporate headquarters in Miami, Florida, but by the time Holston filed suit, LanLogistics had dissolved and formally forfeited its authority **\*1070** to conduct business in Florida. [1]

After two years of litigation and final judgment had been entered on behalf of Holston, LanLogistics challenged the district court's subject-matter jurisdiction and moved to vacate the judgment. In support, LanLogistics asserts it is a citizen of Florida, like Holston, and that the parties are therefore not diverse under 28 U.S.C. § 1332.

## II.

**[1]** **[2]** **[3]** Whether a court has subject-matter jurisdiction to hear a matter is a question of law that we review *de novo. Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1340 (11th Cir.2011). A court's application of law to facts also receives *de novo* review. *United States v. Frank*, 599 F.3d 1221, 1228 (11th Cir.2010), *cert. denied,* ——— U.S. ———, 131 S.Ct. 186, 178 L.Ed.2d 112 (2010). Similarly, "[w]e review the district court's grant of summary judgment *de novo,* applying the same legal standards as the district court." *McCormick v. City of Fort Lauderdale,* 333 F.3d 1234, 1242–43 (11th Cir.2003) (citation omitted). "Summary judgment is appropriate if the evidence establishes 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Id.* at 1243 (citing Fed.R.Civ.P. 56(c)).

## III.

**[4]** Federal courts have subject-matter jurisdiction over civil actions in which: (1) "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs"; and (2) the action is between "citizens of different States." 28 U.S.C. § 1332(a)(1). Congress extends the benefits and safeguard of federal courts to "provide a separate forum for out-of-state citizens against the prejudices of local courts and

local juries." S.REP. NO. 1830, at 3 (1958), *reprinted in* 1958 U.S.C.C.A.N. 3099, 3101–02.

**[5]** **[6]** Diversity jurisdiction is determined at the time the complaint was filed. *See Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957) ("[J]urisdiction, once attached, is not impaired by a party's later change of domicile."). To meet the jurisdictional requirements of § 1332(a), the citizenship of each plaintiff must be different from that of each defendant. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). "[A] corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business ...." 28 U.S.C. § 1332(c)(1). The issue here is whether a dissolved or inactive corporation has a principal place of business. The Eleventh Circuit has not decided this issue, and the circuits that have disagree.

The Second Circuit has held that, for purposes of analysis under § 1332, a corporation's principal place of business must be identified regardless of whether the corporation is defunct. *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 141 (2d Cir.1991). The rule recognizes that when a corporation closes its doors and winds up its business, it might still have a local presence that would alleviate concerns about local bias. Finding citizenship in the state where a corporation last conducted business ensures **\*1071** federal jurisdiction will not be extended to corporations to which Congress had no intention of providing the benefit. *Id.*

The Third Circuit has also adopted a bright-line rule, but it rejects the idea that a court should strain to identify a principal place of business when one may not exist. In the Third Circuit, a dissolved or inactive corporation is a citizen only of the state in which it was incorporated. *Midlantic Nat'l Bank v. Hansen,* 48 F.3d 693, 696 (3d Cir.1995).

The Fourth and Fifth Circuits prefer the flexibility of a facts and circumstances test. *Harris v. Black Clawson Co.,* 961 F.2d 547, 551 (5th Cir.1992); *see also Athena Auto., Inc. v. DiGregorio,* 166 F.3d 288, 291 (4th Cir.1999). In those circuits, the extent of a corporation's local character drives the determination as to whether a principal place of business exists for purposes of federal jurisdiction. There, a corporation's last place of business is instructive but not dispositive. "[W]here a corporation has been inactive in a state for a substantial period of time ... that state is not the

corporation's principal place of business ...." *Harris*, 961 F.2d at 551 (footnotes omitted).

A recent decision by the Supreme Court is also relevant to this determination. In *Hertz Corp. v. Friend,* the Supreme Court held that simple jurisdictional tests are preferable even if application of the rule occasionally cuts against the basic rationale of § 1332. 559 U.S. 77, 130 S.Ct. 1181, 1193–94, 175 L.Ed.2d 1029 (2010).

> Complex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims. Complex tests produce appeals and reversals, encourage gamesmanship, and, again, diminish the likelihood that results and settlements will reflect a claim's legal and factual merits.

*Id.* at 1193 (citations omitted). The Court also reasoned that, because courts have an independent obligation to determine whether subject-matter jurisdiction exists, courts require "straightforward rules under which they can readily assure themselves of their power to hear a case." *Id.* Accordingly, the Court announced a simple rule wherein a corporation's principal place of business is determined based on where the corporation's "nerve center" is located.

[7] Considering the jurisdictional tests in the various circuits and the guidance of the Supreme Court in *Hertz*, we join the Third Circuit in holding a dissolved corporation has no principal place of business. This bright-line rule may open federal courts to an occasional corporation with a lingering local presence, but undeserved access to a fair forum is a small price to pay for the clarity and predictability that a bright-line rule provides. Moreover, in our opinion, the Third Circuit rule aligns most closely with the Supreme Court's analysis in *Hertz*. By contrast, for example, the Second Circuit's rule focuses not on a corporation's nerve center but where business was last conducted. Conceivably, under that rule a corporation could be considered a citizen of a state in which it was not a citizen before dissolution.

[8] Here, LanLogistics dissolved and formally withdrew from business before Holston filed suit. Under the rule we adopt today, LanLogistics is therefore only a citizen of Delaware, and this court has subject-matter jurisdiction.

IV.

[9] In a supplemental summary judgment order the district court held as a matter of law that the purchase price of LanBox was $450,000. In its analysis, the district court rejected LanLogistics's argument **\*1072** that, under the reasoning in *Pantry Pride Enterprises., Inc. v. Stop & Shop Cos., Inc.*, 806 F.2d 1227, 1231 (4th Cir.1986), the determination of the purchase price of a company in a package purchase requires that the fair market value of the company be considered. We find the reasoning in *Pantry Pride* persuasive and the district court's holding in error.

In *Pantry Pride,* the Fourth Circuit rejected the price allocated to a lease in a package purchase because the listed price represented neither the market value nor the actual value the parties placed on the lease. *Id.* In that case, a lessor had a right of first refusal option on a lease of a supermarket. *Id.* at 1228. The lessor sued when the lessee offered to sell the lease and various equipment as part of a package deal to a third party but refused to sell the lessor the lease at the price allocated in the package deal. *Id.* The court held that the lessor could exercise its right of first refusal but not at the artificially low price allocated to the lease in the package agreement. It found that the low price was allocated to the lease for tax purposes, and the lessor would enjoy a windfall if allowed to purchase the lease at the artificial price. *Id.* at 1231. The lessor was only entitled to purchase the lease at a fair price offered by a third party, but the artificial price allocated to the lease bore little relation to its worth. *Id.*

Requiring as a matter of law that the price allocated in a package purchase be used as the price for these types of claims may also discourage commerce or allow parties to destroy contractual rights. If first refusal rights could be exercised only at the price allocated in a contract, then buyers would be forced to allocate high prices to assets that are subject to rights of first refusal. *Id.* The inability to manipulate purchase prices for tax purposes ultimately may act as a restraint on alienation. *Id.* "The tax consequences of the transaction for the parties to a sale should not vary because some third party may possess a first refusal right." *Id.* Additionally, by inflating the price assigned to the subject of a first-refusal option, parties could defeat a contractual right of first refusal. *Id.* at 1231–32. While parties should be allowed to allocate prices for tax purposes, in a package deal, manipulated price

allocations should not be determinative as to agreements between those who extend or hold first-refusal options.

 [10]   Because the issue of LanBox's purchase price was disputed and the fair market value of LanBox and the other companies in the package deal should have been considered, summary judgment was improper. By deciding the issue on summary judgment before LanLogistics had an opportunity to present evidence on the fair market value of the companies or possible tax incentives for its purchase price allocation, the district court prematurely decided a disputed issue of material fact. *See Holly v. Clairson Indus., L.L.C.,* 492 F.3d 1247, 1264 (11th Cir.2007) (finding that it was error for the district court to grant summary judgment when there were genuine issues of material fact). Therefore, the district court's supplemental

summary judgment order is reversed and remanded. On remand, a determination should be made regarding the fair market value of each company in the package deal to identify the percentage of the $3.5 million purchase price used to purchase LanBox.

The district court is AFFIRMED in part and REVERSED in part. The case is remanded for determination of the purchase price and calculation of damages.

**AFFIRMED IN PART AND REVERSED IN PART.**

**Parallel Citations**

23 Fla. L. Weekly Fed. C 939

Footnotes

1   LanLogistics dissolved in Delaware on December 27, 2007. By January 16, 2008, the Florida Secretary of State processed and filed documents withdrawing LanLogistics's authority to transact business in Florida. Holston filed this lawsuit on June 6, 2008—more than four months after LanLogistics lost its ability to conduct business in Florida.

---

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 71

289 F.Supp.2d 493

United States District Court,

D. Delaware.

HONEYWELL INTERNATIONAL,

INC., et al., Plaintiffs,

v.

UNIVERSAL AVIONICS SYSTEMS

CORP., et al., Defendants.

No. C.A.02–359–MPT.    |    Oct. 28, 2003.

Parties filed cross-motions for summary judgment with respect to infringement of patents relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased. The District Court, Thynge, United States Magistrate Judge, held that: (1) there was no infringement of claim limitations of look ahead distance and terrain floor boundary, and (2) there could be no infringement of "$h_{max}$" claims because the claims required a map display with a plurality of terrain contours "including the highest $h_{max}$ and lowest $h_{min}$ terrain levels of said proportion of the terrain" nor infringement of warning display claims incorporating the warning means of the look ahead logic, which included the look ahead distance, flight path angle and terrain floor boundary limitations.

Defendants' motions granted.

West Headnotes (12)

[1]     **Patents**
        👉 Rejection and Amendment of Claims
        **Patents**
        👉 Substitution of equivalents
        Prosecution history estoppel provides a legal limitation on the application of the doctrine of equivalents by excluding from the range of equivalents subject matter surrendered during prosecution of the application for the patent.

        Cases that cite this headnote

[2]     **Patents**
        👉 Rejection and Amendment of Claims

**Patents**
👉 Substitution of equivalents

To determine the extent of the claim, prosecution history estoppel requires an examination of the subject matter surrendered; while the patent cannot extend as far as the original claim, the narrowing amendment does not relinquish unforeseen equivalents or those equivalents that do not vary far beyond a fair interpretation of the surrendered material.

Cases that cite this headnote

[3]     **Patents**
        👉 Examination of parties and others
        Patentee was precluded from relying on expert's deposition testimony to argue infringement by equivalents where patentee's position on the doctrine of equivalents was only supported by expert's deposition testimony on direct examination and was not contained in his expert report.

        2 Cases that cite this headnote

[4]     **Patents**
        👉 Particular cases
        Genuine issue of material fact existed as to whether defendant's calculation of flight path angle in its accused device infringed patent relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased, precluding summary judgment in favor of either party on infringement issue with regard to flight path angle claim limitation.

        Cases that cite this headnote

[5]     **Patents**
        👉 Particular cases
        Genuine issue of material fact existed as to whether defendant's system contained alert envelopes, precluding summary judgment in favor of either party on infringement issue with regard to alert envelope limitation of patent relating to terrain warning systems which warned

pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased.

1 Cases that cite this headnote

**[6]    Patents**

👉 Particular patents or devices

"Look ahead distance" of accused devices did not literally infringe claims of patent relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased; specification did not describe a time to impact application or fixed times in its alerting criteria to calculate look ahead distance as defendants' systems did, and there was no evidence that either defendant's system used pilot reaction time or an assumed or specific pilot reaction time in their determination of look ahead distance.

Cases that cite this headnote

**[7]    Patents**

👉 Reading limitations or elements into claims, or disregarding limitations or elements

When only one embodiment is provided, and patentee fails to support a broad meaning of the disputed language, court may limit the patentee to that embodiment.

Cases that cite this headnote

**[8]    Patents**

👉 Particular patents or devices

Defendants' respective accused devices did not calculate a clearance below the aircraft in accordance with the construction of the claim limitation "terrain floor boundary," and therefore did not literally infringe claims of patent relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased; one defendant's device's calculation of the clearance buffer used some other variable to form the lower boundary of the alert zone, and other defendant's device's calculation of its "terrain floor boundary" was not proportional to the distance to the closest runway as in case of

patented device, but the departure or destination runway.

Cases that cite this headnote

**[9]    Patents**

👉 Function, means, operation, and result

Literal infringement of means-plus-function claim requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification. 35 U.S.C.A. § 112.

Cases that cite this headnote

**[10]   Patents**

👉 Particular patents or devices

Accused's device did not infringe patent incorporating look ahead distance and terrain floor boundary claim limitations of patent relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased because the established claim limitations for "look ahead distance" and "terrain floor boundary" were not satisfied.

Cases that cite this headnote

**[11]   Patents**

👉 Particular patents or devices

Since there was no infringement of claim limitations of look ahead distance and terrain floor boundary, there could be no infringement of "$h_{max}$" claims because the claims required a map display with a plurality of terrain contours "including the highest $h_{max}$ and lowest $h_{min}$ terrain levels of said proportion of the terrain," nor infringement of warning display claims incorporating the warning means of the look ahead logic, which included the look ahead distance, flight path angle, and terrain floor boundary limitations as set forth in patent relating to terrain warning systems which warned pilots when the danger of having a "controlled flight into terrain" (CFIT) accident increased.

Cases that cite this headnote

[12]    **Patents**

👉 Original utility

5,839,080, 6,092,009, 6,138,060, 6,219,592. Not
Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*495** Thomas C. Grimm, Esquire, and Jack C. Schecter,
Esquire, Morris, Nichols, Arsht & Tunnell, Wilmington, DE,
for Plaintiffs, Honeywell International Inc., and Honeywell
Intellectual Properties Inc.

Frederick L. Cottrell, II, Esquire, and David A. Felice,
Esquire, Richards, Layton & Finger, Wilmington, DE, for
Defendant, Universal Avionics Systems Corp.

Thomas L. Halkowski, Esquire, Fish & Richardson, P.C.,
Wilmington, DE, for Defendant, Sandel Avionics, Inc.

**Opinion**

*MEMORANDUM*

THYNGE, United States Magistrate Judge.

**I. Introduction**

This is a patent infringement case involving technology in the
aviation industry. Plaintiffs, Honeywell International Inc. and
Honeywell Intellectual Properties Inc. ("Honeywell"),[1] filed
suit alleging infringement[2] of five patents (U.S. Patent Nos.
5,839,080 ("the '080 patent"), 6,219,592 ("the '592 patent"),
6,122,570 ("the '570 patent"), 6,138,060 ("the '060 patent"),
and 6,092,009 ("the '009 patent")) against defendants,
Universal Avionics Systems Corp. ("Universal")[3] and
Sandel Avionics ("Sandel").[4]

On July 30, 2003, Sandel moved for summary judgment on
non-infringement. D.I. 161. On August 28, 2003, Universal
moved for partial summary judgment of non-infringement.
D.I. 173. This is the court's opinion on the motions.[5]

**II. Background**[6]

Each of the five patents in this case concerns terrain warning
systems which warn pilots when the danger of having a
"controlled flight into terrain" ("CFIT") accident increases.
The patents-in-suit can be divided into two main categories:
"look ahead patents" ('080, '570 and '592) and the "display
patents" ('060 and '009). **\*496** The primary patent in this
litigation is the '080 patent, which claims "the core forward-
looking terrain alerting system." All of the patents-in-suit
contain the same specification related to this system. The '570
patent, a continuation-in-part of the '080 patent, claims the
ability to visually display the alert to the pilot, in addition
to the core system. The '592 patent, also a continuation-in-
part of the '080 patent, claims algorithms, which allow the
system to detect horizontal, as well as, vertical terrain threats,
in addition to the core system.

The display patents teach two methods for displaying the alert
information on a visual screen in the cockpit. The '060 patent
claims a system which causes certain information, including
the severity of an alert, to "pop-up" on the pilot's screen.
Similarly, the '009 patent claims a system which displays
terrain information, as well as, compares the terrain and
aircraft altitude and colors certain parts of the display based
on this comparison.

Honeywell, the assignee of these patents, uses the
technology of the patents in its Enhanced Ground Proximity
Warning System ("EGPWS"). Honeywell asserts that
each defendants' Terrain Awareness and Warning System
("TAWS") infringes.

**III. Standard of Review**

A grant of summary judgment pursuant to Fed.R.Civ.P.
56(c) is appropriate "if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law."[7] This standard is applicable
to all types of cases, including patent cases.[8] A Rule
56(c) movant bears the burden of establishing the lack of a
genuinely disputed material fact by demonstrating "that there
is an absence of evidence to support the nonmoving party's
case."[9] Therefore, summary judgment is appropriate when
there is no genuine issue of material fact or, when drawing
all factual inferences in favor of the nonmoving party, no

"reasonable jury could return a verdict for the nonmoving party." [10]

The non-movant must be given the benefit of all justifiable inferences and the court must resolve any disputed issue of fact in favor of the non-movant. [11] In cases when the nonmoving party will bear the burden of proof on a dispositive issue, the non-movant must designate "specific facts showing that there is a genuine issue for trial." [12] Material facts are those which "might affect the outcome of the suit under the governing law." [13] Any doubt as to the existence of any issue of material fact requires a denial of the motion. [14]

## IV. Positions of the Parties

The parties had the benefit of the court's claim construction opinion when **\*497** briefing these motions for summary judgment. [15] Despite this benefit, the parties reach a contradictory conclusion whether the asserted claims of the patents read on the accused products.

Defendants assert that their devices cannot infringe, because their TAWS systems do not contain one or more of the claim limitations as construed by the court. Sandel argues that its TAWS is missing one or more limitation of each of the claims at issue of the '080, '570 and '592 patents, as its system does not receive a signal representative of [16] flight path angle, [17] and does not define or use look ahead distance [18] as claimed. Sandel also argues its alerting methodology does not contain alert envelopes [19] as construed. Sandel asserts that its terrain alerts are not determined based on first and second functions of [20] look ahead distance, [21] flight path angle and terrain floor boundary [22] as construed.

Sandel argues that its TAWS does not infringe asserted claim 4 of '060 patent or that asserted claims 1–3, 8, 9, 13, 24, 27–36 and 41 of the '009 patent are infringed because the system does not show a numerical display of terrain elevations. [23] Therefore, according to Sandel, its TAWS does not include the 'h$_{max}$' requirement, or its structural equivalent, as recited in independent claims 1, 34, and 41 (and claims dependent thereof) of the '009 patent; its system does not include the "warning means" or its structural equivalent of claim 27 (and its dependents) of the '009 patent; and its TAWS does not have the claimed "means for determining a severity of a **\*498**

terrain threat" or its equivalents, as required by claim 4 of the '060 patent. [24]

Universal contends that its TAWS does not infringe the asserted claims of the '080, '009 and '592 patents. Since its system does not include the limitations: "look ahead distance," "terrain floor boundary," "highest h$_{max}$ and lowest h$_{min}$ terrain levels" expressed as numeric values, and/or "flight path angle" as constructed.

Honeywell asserts that the claim construction precludes a grant of summary judgment because the accused Sandel and Universal products literally and/or equivalently infringe the patents-in-suit. To the extent that defendants disagree, Honeywell contends that the non-infringement motions should be denied as genuine issues of material fact exist.

## V. Analysis

Patent infringement requires a two-step analysis. The first step is for the court to make the legal determination of how the claims at issue are to be construed. [25] The second step is a factual determination of comparing the properly construed claims to the accused product to determine whether the accused product contains all the limitations, either literally or by equivalents, in the claimed invention. [26] If the accused devices do not contain at least one limitation required by the asserted claims, the court must conclude that the devices do not infringe as a matter of law and grant defendants' summary judgment motions. [27]

**\*499** [1] [2] Absent literal infringement upon the express terms of the claim, infringement may be found under the doctrine of equivalents. Essential to the inquiry under the doctrine of equivalents is whether the accused product or process is identical or equivalent to each claimed element of the patented invention. [28] Nevertheless, prosecution history estoppel provides a legal limitation on the application of the doctrine of equivalents by excluding from the range of equivalents subject matter surrendered during prosecution of the application for the patent. [29]

### A. Doctrine of Equivalents

Before analyzing the parties' arguments regarding literal infringement, the court must address the dispute regarding whether the doctrine of equivalents is applicable to this case. Sandel and Universal argue that Honeywell should be

precluded from relying on equivalents because its expert report, authored by Dr. Hansman, contains no mention of this doctrine. In addition, Sandel contends that Dr. Hansman's "belated doctrine of equivalents testimony" should be stricken since it resulted from improper coaching in violation of court rules. [30]

[3]  A review of the portions of Dr. Hansman's deposition provided by the parties clearly shows that prior to his deposition, he did not evaluate Sandel's or Universal's system under the analysis of the doctrine of equivalents. There was no discussion in his report as to whether or not any differences between the accused systems and the claims of the patents were insubstantial. He was neither requested, nor did he analyze whether the accused systems, in relation to the claims of the patents, perform a similar function in substantially the same way to achieve substantially the same result. He agreed that such an analysis could have been done by him prior to the serving of his opening report, and before the rebuttal report of Sandel's expert, Mr. Gibson, "if [he] had been requested to." [31]

*500  According to the scheduling order entered in this matter, the exchange of initial expert reports operated on who had the burden of proof. Therefore, when the initial exchange of those reports occurred, Honeywell had the obligation to provide a "complete statement of all opinions to be expressed" by the expert "and the bases and reasons therefor," as well as, the data or other information considered by the expert in forming his opinions. [32] Since Honeywell's position on the doctrine of equivalents is only supported by Dr. Hansman's deposition testimony on direct examination and is not contained in his expert report, Honeywell is precluded from relying on his deposition testimony to argue infringement by equivalents.

As noted in the case law of this jurisdiction, the testimony of expert witnesses is limited to the information contained in their expert reports. [33] Therefore, since Hansman's testimony on the doctrine of equivalents would not be allowed at trial, it will not be relied upon by the court in deciding defendants' motions for summary judgment on non-infringement. The court's analysis on these motions shall be limited to an evaluation of literal infringement by the accused systems. [34]

**B. The Accused Devices**

Sandel asserts that at least five different limitations common to all the asserted claims are missing from its accused device, the ST3400 TAWS, as construed by the court. Universal asserts that its TAWS system does not include "flight path angle," "look ahead distance," "terrain floor boundary" and "highest $h_{max}$ and lowest $h_{min}$ terrain levels" expressed as numeric values as construed by the court. Defendants contend that Honeywell has failed meet its burden to provide evidence sufficient to raise a genuine issue of material fact with regard to each and every one of the claim limitations, and therefore, there can be no infringement.

**1. The Look Ahead Patents**
The independent claims of the three look ahead patents all share the same claim limitations. Sandel and Universal assert that their respective TAWS does not include one or more of these common limitations.

**a. Signals representative of ... a flight path angle**
[4]  The claim limitation flight path angle was construed as the "angle of climb or descent relative to level flight." The parties did not dispute the construction of this limitation. Both Sandel and Universal assert that their TAWS does not include this limitation as their system does not receive "signals representative of ... a flight path angle" of the aircraft.

Sandel contends that its TAWS does not include an input for receiving a signal representative of flight path angle. When *501 construing the claim term "signals representative of," the court reasoned that in order for the warning system to provide an alert to the potential of flying too close to dangerous terrain, an alert system must have stored information about the terrain in the vicinity of the aircraft and be able to access the speed, the angle of the flight path and the position of the plane. Because a pilot cannot read a signal, the signals are transformed into numbers. Sandel asserts that the court construed the limitation, whereby an input is required to *receive a* signal representative of flight path angle.

In his opening expert report, Hansman opines that the "Functional External Interface Diagram" of the Sandel TAWS indicates the existence of an input for receiving signals representative of the position and speed of the aircraft and flight path angle. Hansman opines that "flight path angle is indicated by the variable 'k_range' ... and 'proj_alt' ... as the vertical speed divided by the ground speed." Hansman states that this interface diagram contains vertical speed and ground speed inputs, which may be used in combination to calculate

flight path angle. The Function External Interface Diagram denotes the receipt of vertical speed and ground speed from the GPS/FMS receiver to the TAWS.

Sandel's software code calculates flight path angle by dividing vertical speed and ground speed. The software uses the k_range variable to represent this calculation. Sandel asserts that the calculation is made internally within the system and is not received through an input and thus does not meet the claim limitation. Sandel, therefore, argues that the variable is immaterial to the issue of whether the TAWS includes an input for receiving signal representative of flight path angle of the aircraft because the claim requires a recited value be received through an input.

While the k_range variable may be calculated internally, the system receives the values used to calculate vertical speed and/or ground speed from an outside source, namely the GPS/FMS receiver. Whether the TAWS receipt of these values, which are indicia of vertical speed and ground speed, from the GPS/FMS receiver constitutes the receipt of signals representative of flight path angle through an input is an issue beyond the scope of the construed claim limitations. Simply stated, genuine issues of material fact exist as to whether the Sandel system receives these values through an input.

Additionally, Universal argues that its TAWS never calculates or uses flight path angle to determine the boundaries of its alert envelope. Universal concedes that its TAWS does receive signals for vertical speed and ground speed from which flight path angle could be calculated, but contends that its TAWS uses only constant preset values, which do not modulate with the condition of the aircraft and therefore, does not meet this claim. Universal also claims that its TAWS does not receive signals representative of a flight path angle to construct alert envelopes because the forward extent of its envelopes are determined using a fixed time to impact, which is not affected by type of aircraft, ability to bank or bank angle.

Honeywell asserts that Universal's system uses a flight path angle that varies depending on whether the aircraft is in level flight, climbing or descending. Honeywell points to Universal's Software Requirements specification, which illustrate the envelopes for climb, level flight and descent as proof that the envelopes of Universal's TAWS vary as a function of the flight path angle. Honeywell notes that nothing in its claims requires precluding the use of preset values.

**\*502** While the Universal TAWS uses constant values for "near miss angle" and "look above angle" to calculate its alert envelope, this fact alone does not warrant a finding of non-infringement. The claim language clearly sets forth that there are two distinct alert zones, with boundaries that are formed as a first and second "function of flight path angle, look ahead distance, and terrain floor boundary." ("Two distinct alert zones, the boundaries of which are independently determined by distinct first and second functions of the same variables; specifically, flight path angle, look ahead distance and terrain floor boundaries.") The court did not construe how flight path angle is calculated for the purpose of meeting this limitation. As such, whether Universal's calculation of flight path angle infringes is a question left to the fact finder and not appropriate for summary judgment.

**b. Alert Envelopes**

 [5]    Sandel argues that its TAWS system does not contain alert envelopes, while Honeywell contends that Sandel's "search volume" satisfies the construed definition of an alert envelope. An "alert envelope" is a "term of art in avionics and means an at least 2–dimensional region in the vertical plane surrounded by a continuous boundary." In construing this limitation, the court relied on the claim language, which recognizes that an alert envelope is an area around the plane that is a danger zone.

Sandel contends that its system uses alerting criteria, which are applied on a cell-by-cell basis for the area in question, whereby the alerting algorithms comprise a straight-line analysis from the aircraft's current position to the center of individual tagged terrain cells. In order words, Sandel argues that this analysis is "one-dimensional" and not a volumetric or area-based analysis, and therefore, the output of the alert is not based on an envelope.

Sandel believes that the only two-dimensional region present in its alerting system is what is referred to as a "search volume." However, Sandel argues that this search volume lies only in the horizontal plane. Sandel contends that this search volume is used only to identify a subset of the terrain "cells" in memory that are examined further in determining whether an alert condition exists. Once these cells have been "tagged," Sandel notes that the search volume has no further role in determining the presence of an alert. In other words, Sandel contends that there may be terrain in a cell inside the search volume that is above the projected altitude, that is, a cell that intersects the projected altitude, yet an alert will not be generated. In further processing steps, its TAWS applies

additional alerting criteria to the terrain data within the search volume to determine whether or not to generate an alert.

Nevertheless, Sandel's search volume arguably may constitute an alert envelope because the system defines a vertical clearance below the flight path of the aircraft. Honeywell cites to diagrams set forth in Sandel's Design Requirements which suggest that the Sandel TAWS may create a two-dimensional region in the vertical plane surrounded by a continuous boundary. The documents provide that Sandel's Forward Looking Terrain Avoidance ("FLTA") capability looks ahead along and ahead below the aircraft's lateral and vertical flight path and provides an appropriate alert if a CFIT threat exists.

According to Sandel, the figure and text as set forth in the design requirements relied upon by Honeywell, are conceptual in nature and do not reflect the system's actual implementation. Sandel notes that Honeywell has failed to challenge its explanation of how the TAWS operates, despite **\*503** reviewing the source codes, which show the accurate implementation of the system. However, the issues related to the figure and text set forth in the design requirement go to the weight of the evidence, as the parties dispute the proper operation of the Sandel system. As a result, disputed issues material to the function of Sandel's system in relation to this claim term (alert envelope) exist.

As disputed factual issues remain whether Sandel's system contains alert envelopes, Sandel's argument that its system does not meet the additional "outputting" limitation of claim 1 [35] is similarly rejected. This limitation, "when a subset of the stored terrain information is located within the boundaries," was constructed based on the claim language. The limitation pertains to outputting an alert signal, and this depends upon the stored information within the boundaries of an alert envelope. Since disputed issues of material fact exist to whether Sandel's system contains alert envelopes, the information contained within said boundaries of the alert envelopes cannot be conclusively determined.

### c. Look Ahead Distance (LAD)

[6]    Both Sandel and Universal assert that their respective systems calculate look ahead distance differently than set forth in the claim. "Look ahead distance" is construed as "a distance along the ground track of the aircraft that marks the outer limit of each alert envelope and that is a function of aircraft speed and time to complete an evasive maneuver."

When construing the claim limitation, the court noted that Honeywell presented no evidence that showed a common understanding of "look ahead distance" at the time when the patent was filed in 1995. As such, the specification and prosecution history were used to understand the meaning of the term.

Sandel argues that the court's construction includes solely the embodiment as disclosed in the specification, which defines look ahead distance in terms of time to complete a specific, corrective maneuver. As a result, Sandel asserts that there is clearly no disclosure in the specification of a fixed time embodiment of look ahead distance. Honeywell argues that the court's construction did not limit the claim to specific evasive maneuvers or to the calculations in the specification.

Sandel's TAWS calculates the forward extent of its alerting volume based on fixed times, nominally 60 seconds, which is referred to as a "time to impact" scheme. Sandel's TAWS provides a "caution" alert at 60 seconds and a "warning" alert at 30 seconds, using the forward-looking extent of its alerting criteria. In certain conditions, such as when the aircraft nears the airport or is in a steep dive, the system can compress these times to eliminate some nuisance warnings. The system is predicated upon a certain predetermined amount of time before impact with the threatening terrain. According to Gibson, Sandel's expert, the Sandel system provides the pilot time to decide what is the best course of action under the unique circumstances presented. Honeywell contends that this comment by Gibson shows that Sandel's system calculates the look ahead distance consistent with the court's construction because the time provided would allow the pilot to avoid terrain.

However, Dr. Hansman testified that a fixed or predetermined look ahead time **\*504** may not provide the minimum amount of time necessary to complete an evasive maneuver in certain situations. Further, he also concluded that the specification of the '080 patent calculates look ahead distance as the time to complete two 180 degree turns plus a pilot's reaction time.

Universal asserts that its TAWS does not use look ahead distance as required by the patent claims. Like Sandel's system, rather than calculate look ahead distance based on time to complete an evasive maneuver, Universal's TAWS also uses a fixed "time to impact" which is a function of flight phase. Universal asserts that its TAWS look ahead distance does not depend on an aircraft's ability to bank or its bank angle. Honeywell argues that Universal's System

Requirements for the TAWS describes Universal's envelopes as a function of look ahead distance, which is calculated as a function of ground speed and look ahead time. Honeywell asserts that the look ahead times are set to a default of 30 and 60 seconds so that the boundaries of the envelope will give the pilot time to avoid the terrain.

At the time of the claim construction briefing and oral argument, Honeywell relied solely on the proposition that look ahead distance has a plain and ordinary meaning to one skilled in the art and required no construction. The court disagreed, finding that Honeywell presented no evidence showing a common understanding of the term at the time of the filing of the '080 patent application. As a result, there was no common usage in the art for the term in 1995. In such a circumstance, the patentee's definition, as seen through the specification, controls the interpretation of the claim language.

[7]    When only one embodiment is provided, and the patentee fails to support a broad meaning of the disputed language, as in this case, the court may limit the patentee to that embodiment. In construing look ahead distance, the court turned to the specification and the prosecution history, and found that Sandel's construction was consistent with the purpose of the invention. The single embodiment in the specification provides that the look ahead distance for a terrain advisory condition is considered first in determining the look ahead distance, on the assumption that the pilot could make a 30 bank turn at any time at a turning radius R. As a result, the look ahead distance is equal to the product of the speed of the aircraft and the *total* look ahead time. The calculation for the total look ahead time, as well as, equations for the elements within the calculation are described in detail in the specification, along with the calculation for the look ahead distance for the terrain warning. Clearly, the specification references certain equations (including calculations for R, $T_1$, $T_2$ and TG or roll) that are used to compute the time to complete an evasive maneuver. See also, Figure 5 and Table 1. In determining the time to complete an evasive maneuver, the invention provides and relies upon *how* to calculate the time to complete an evasive maneuver. [36] Although **\*505**  Honeywell is not the moving party, it does have the burden of proving infringement. Therefore, it is obligated to produce facts which show that there is a genuine issue for trial.

In calculating look ahead distance, as noted by the specification and testified to by Hansman, Honeywell

includes pilot reaction time as a component. Further, the specification does not describe a time to impact application or fixed times in its alerting criteria to calculate look ahead distance as Sandel's and Universal's systems do. Moreover, there is no evidence that either Sandel's or Universal's system uses pilot reaction time or an assumed or specific pilot reaction time in their determination of look ahead distance. [37] Although Sandel uses the term "look ahead distance" in its Design Requirements, that fact, in and of itself, does not rise to a genuine issue of material fact. [38] Similarly, Universal's use of "look-ahead" terminology does not rise to a genuine issue of material fact. Therefore, the court finds that the "look ahead distance" of the accused devices do not infringe claims 1 and 9 (the independent claims) of the '080 patent. As a result, Sandel's and Universal's look ahead distance does not infringe the remaining asserted claims, since they are dependent on claims 1 and 9 and contain the same claim limitation. [39]

### d. Terrain Floor Boundary

[8]    Both Sandel and Universal assert that their respective TAWS do not calculate a clearance below the aircraft in accordance with the construction of the claim limitation "terrain floor boundary." Terrain floor boundary was construed as "a boundary that extends downwardly below the aircraft which is proportional to the distance to the closest runway." When constructing this limitation, the court noted that Honeywell was estopped from asserting its patent against technology which uses some other variable to form the lower boundary of the alert zone.

In responding to Sandel's motion, Honeywell refers to Sandel's Design Requirements. Honeywell argues that "Figure 3–4: Search Volume" set forth in the design requirements show that Sandel's system calculates a clearance below the aircraft. Honeywell asserts that Sandel's Design Requirements also confirm that its TAWS includes a distance that is proportional to the distance to the closest runway. This argument is reflected in greater detail in Sandel's "Equation 2: RRTC Level Flight Terrain/Obstacle Clearances," where the Terrain/Obstacle Clearance varies **\*506** in proportion to the $R_{eff}$ (the Effective Range from the airport/runway threshold and the aircraft). Honeywell cites numerous equations showing that the calculation of the effective range as distance to the runway changes. Honeywell argues that the $R_{eff}$ variable varies in proportion to the distance to the runway, and its patent does not exclude this variation in steps. Rather, according to Honeywell, the stepped variation is exactly what

is shown in the example of the Honeywell patent, specifically Figure 6.

Sandel does not argue that its system makes this stepped variation calculation. However, Sandel again notes that Honeywell is trying to create an issue of fact by asserting that the Design Requirements somehow discredit the declaration of Leslie Corn (a software engineer and consultant to Sandel) that the clearance buffer is applied to specific terrain cells rather than as a "boundary ... below the aircraft." According to Sandel, this reliance on a conceptual drawing of its TAWS system is improper. Sandel argues that its system stores a "clearance buffer" in each terrain cell. The buffer is subtracted from the projected altitude for each cell and not used to generate a lower boundary for any part of an "envelope." As previously stated herein, disputed factual issues pertaining to the accuracy of the Sandel's Design Requirement documents as representative of Sandel's TAWS, that is, whether the TAWS calculates a clearance below the aircraft, is a question regarding the weight of the evidence that should be left to the finder of fact.

However, the Sandel TAWS does not meet the second part of the limitation which requires that terrain floor boundary be proportional to the distance to the closest runway. Although Honeywell correctly argues that Sandel's clearance buffer varies as a function of "Effective Range," it has not shown that the calculation of the clearance buffer is proportionate to the distance to the nearest runway.

Sandel's buffer is based on Effective Range and not distance to the closest runway. "Equation 1: RRTC Level Flight Look Ahead Ranges" establishes that the effective range calculation factors in both distance (from either a runway or an airport reference point) *and* the altitude of the aircraft above a blended runway elevation. Clearance buffer is a height, which is calculated, in part based on the "Effective Range." This effective range is based on both the distance of the aircraft from and the altitude of the aircraft above the weighted average distance of the nearest *runways* or airport reference points. As stated by Corn, this is not a simple distance calculation. Moreover, the value of the buffer is not directly proportional to this effective range as the buffer also varies with the vertical speed of the aircraft.

Additionally, since the Universal TAWS does not change the vertical boundary of its predictive envelope based on distance to the closest runway, it does not infringe the terrain floor boundary limitation. Instead of using the technology

set forth in the patented invention to calculate the terrain floor boundary, the Universal system uses flight phase to select the appropriate ROC ("Required Obstacle Clearance"), in addition to an alert mode. Universal explains that flight phase is determined as a function of position relative to the destination or departure airport. As shown by its TAWS software logic, once distance from the destination and ground speed is known, the TAWS establishes the vertical boundary of its alert envelope. The changes in ROC in enroute and terminal phases occur independent of distance to the closest runway, but are, instead, dependent on phase of flight and aircraft positional data.

**\*507** Unlike the patented system, the focal point of the Universal TAWS is the destination runway. The system determines the phase of flight and ROC based on TERPS recommendations. Thus, a greater protection occurs when an aircraft is in the vicinity of a "closest runway," but not landing at that runway. As a result of its TAWS focal point, the Universal system, when an aircraft is in the vicinity of an airport, would disregard the closest runway and change the ROC only when its destination is reached. In explaining the operation of its system, Universal relies on the deposition of Patrick Krohn, its former Director of Advanced Displays, who testified that the TAWS determines flight phase and distance from the destination airport. Universal's system does not just default to the closest runway, when the destination is not determined by FMS. As previously stated, the court's construction defines the boundary as proportional to the distance to the closest runway.

Since the calculation of the clearance buffer uses some other variable to form the lower boundary of the alert zone, the Sandel TAWS does not infringe claims 1 and 9 (the independent claims) of the '080 patent. As a result, Sandel's clearance buffer does not infringe the remaining asserted claims, since they are dependent of claims 1 and 9 and contain the same claim limitation. Additionally, Universal's TAWS does not literally infringe claims 1 and 9 (the independent claims) of the '080 patent as the calculation of its "terrain floor boundary" is not proportional to the distance to the closest runway, but the departure or destination runway. As a result, the Universal TAWS does not infringe the remaining asserted claims as they are dependent on claims 1 and 9 and contain the same claim limitation. [40]

## 2. Display Patents

Honeywell continues to assert infringement of claim 4 of the '060 patent and claims 27–33 of the '009 patent. The parties agree that these claims include the alerting logic set forth in the specification of the '080 patent. Honeywell and Sandel acknowledge that, pursuant 35 U.S.C. § 112 ¶ 6, claim 4 of the '060 patent includes the structural equivalents to the alerting logic.

### a. '060 Patent: Claim 4

[9]    Literal infringement of a claim pursuant to a 35 U.S.C. § 112 ¶ 6 limitation requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification.[41] The parties agree that the "Look-ahead Warning Generator" comprises hardware and software to implement the specific alerting algorithms disclosed in the specification, that is, the look ahead logic of the '080 patent. As noted in the court's recent opinion regarding invalidity of certain asserted claims of the display patents, a complete construction of this claim was not provided prior to briefing on case dispositive motions. The analysis and construction of this means-plus-function claim as set forth in the memorandum opinion of invalidity based on anticipation **508 is incorporated herein, and is described in footnote 24 in this opinion.

[10]    The calculation of look-ahead distance/direction described in Column 9, line 56 through Column 11, line 42, while the algorithms of the terrain threat boundaries are described in Column 11, line 42 through Column 22, line 14, and include a terrain floor boundary, terrain advisory boundaries and terrain warning boundaries. It has been previously found that Sandel's device does not infringe the '080 patent, specifically because the established claim limitations for "look ahead distance" and "terrain floor boundary" are not satisfied. Similarly, as claim 4 of the '060 patent incorporates the look ahead distance and terrain floor boundary claim limitations set forth in the '080 patent, there is also no infringement of this claim.

### b. '009 Patent

Defendants separate the asserted claims of the '009 patent into three categories: " 'h$_{max}$' claims," "warning display claims" and "relative altitude claims." Claims 1–3, 8–9, 13, 23, 24, 34–36, 39 and 41 are referred to as the " 'h$_{max}$' claims" because the claims require a map display with a plurality of terrain contours "including the highest h$_{max}$ and lowest

h$_{min}$ terrain levels of said proportion of the terrain." Claims 27–33 are the "warning display claims" since they teach a visual display in combination with the "warning display" of the type disclosed in the look ahead patents. The "relative altitude claims," claims 43–45, recite the additional limitation of color-coded contours based on elevation of the terrain relative to the proximity of the aircraft.[42]

### i. The 'h$_{max}$' max claims

[11]    Defendants asserts that their systems do not display numerical values and in fact, do not store values analogous to h$_{max}$ and h$_{min}$. These claims, that is, 1–3, 8–9, 13, 23, 24, 34–36, 39 and 41, were found to be invalid as anticipated.

Nevertheless, the accused TAWS products do not infringe these claims. Dr. Hansman opines that contour means of claim 1 of the '009 patent includes the look ahead warning logic. The court has previously concluded that the accused TAWS systems do not meet the look ahead and terrain floor boundary limitations as construed. Since the look ahead warning logic is a limitation of the 'h$_{max}$' claims, there can be no infringement of these claims.

Moreover, the construed limitation, "wherein said contour display includes highest h$_{max}$ and lowest h$_{min}$ terrain levels of said portion of terrain," requires that the display show a numeric value for the highest and lowest points. Based on this construction, Dr. Hansman agreed that the Sandel system does not infringe this claim because the accused system does not have numeric values of terrain levels.[43]

 **509 Similarly, Dr. Hansman did not initially limit his conclusions regarding the Universal TAWS to the construction by the court, but admits that this system does not display a numerical value for the highest and lowest points of terrain, and instead employs a color-coding to display terrain levels. Color-coding is insufficient to literally infringe the claim. As a result, Universal's system does not infringe these claims of the '009 patent.

### ii. The warning display claims

These claims incorporate the warning means of the look ahead logic, which includes the look ahead distance, flight path angle and terrain floor boundary limitations as set forth in the '080 patent.[44] Since the court has found that there is no infringement of the claim limitations of look ahead distance

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

and terrain floor boundary, there can be no infringement of these claims.

### iii. The relative altitude claims [45]

Both defendants assert non-infringement of these claims. The claims, that is, claims 43–45, were found to be invalid as anticipated. Dr. Hansman opines that the contour means of claims 43 and 44 [46] of the '009 patent includes the look ahead warning logic set forth in the '080 patent. Assuming *arguendo* that this is accurate, [47] and since the court has concluded previously that the accused TAWS products do not meet the look ahead and terrain floor boundary limitations as construed, defendants' systems do not infringe these claims.

Regarding claim 45, none of the parties in their briefs directly address this claim in any detail. Universal incorrectly asserted that the $h_{max}$ and $h_{min}$ limitations are part of this claim. A cursory reading of this claim contains no mention of these

limitations. The court has previously held that this claim is invalid and therefore, will not further address this claim.

### VI. Conclusion

Based on the application of the court's construction of certain disputed claim terms to the accused devices, defendants' systems do not infringe the asserted claims of the '080, '570 and '592 patents and the '009 patents. Additionally, Sandel's system does not infringe claim 4 of the '060 patent. As discussed herein, the Sandel and Universal systems cannot infringe because they do not contain the "look ahead distance" and "terrain floor boundary" limitations identical to that disclosed and claimed in the '080 patent.

For the reasons contained herein, Sandel's motion for summary judgment is GRANTED. Universal's motion for partial summary judgment is GRANTED.

### Footnotes

1 Honeywell International Inc. is a Delaware corporation with its principal place of business in New Jersey and Honeywell Intellectual Properties Inc. is an Arizona corporation with its principal place of business in Arizona.

2 An order entered January 31, 2003, dismissed two defendants, Goodrich Corporation and Goodrich Avionics Systems, Inc.

3 Universal is a Delaware corporation.

4 Sandel is a Delaware corporation.

5 Defendants have also filed summary judgment motions asserting that the patents-in-suit are invalid as anticipated and obvious based on the prior art, as well as, invalid as a result of the public use and on-sale bars. These motions are addressed in separate opinions.

6 All facts are taken from the patents, their prosecution histories, and relevant deposition testimony, declarations and other exhibits submitted with the parties' briefing.

7 FED. R. CIV. PRO. 56(c).

8 *Johnston v. IVAC Corp.,* 885 F.2d 1574, 1576–77 (Fed.Cir.1989).

9 *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

10 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

11 *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

12 *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

13 *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2505.

14 *Id.*

15 The court constructed the disputed claims of the patents-in-suit in its opinion dated May 30, 2003.

16 The construction of "signals representative of" is "the signals received by the apparatus are instantaneous values of the recited variables, i.e., they indicate the numerical value of the variable at a given sampling time." This construction applies to the '080, '592, '570 and '009 patents.

17 The term "flight path angle" is construed to mean "the angle of climb or descent relative to level flight." This construction applies to the asserted claims in the '080, '592 and '570 patents.

18 The court construed "look ahead distance" to mean "a distance along the ground track of the aircraft that makes the outer limit of each alert envelope and that is a function of aircraft speed and time to complete an evasive maneuver." This construction applies to the '080, '592 and '570 patents.

19 The term "alert envelope" is construed as a "term of art in avionics and means an at least 2–dimensional region in the vertical plane surrounded by a continuous boundary." This construction applies to the '080, '592 and '570 patents.

20 The construction of "function of" is "a mathematical or logical relationship." This construction applies to the '080, '592 and '570 patents.

21 The court construed the claim term "function of ... said look ahead distance" as "a mathematical or logical relationship to the look ahead distance."

22 "Terrain floor boundary" is construed to mean "a boundary that extends downwardly below the aircraft which is proportional to the distance to the closest runway." This construction applies to the '080, '592 and '570 patents.

23 The court construed the term "wherein said contour display includes highest $h_{max}$ and lowest $h_{min}$ terrain levels of said portion of terrain" to mean "the apparatus shows the highest and lowest points of the terrain within the portion of the terrain data displayed. This limitation requires that the display show a numeric value for the highest and lowest points." This applies the '009 patent and is found in independent claims 1 and 34, and the related dependent claims.

24 Initially, the court provided a limited construction of the term "means for determining a severity of a terrain threat, wherein the terrain information on the visual display changes color based on said severity" as a means-plus-function element. No further construction was provided. In its October 16, 2003, memorandum opinion on invalidity, in light of the requirements of 35 U.S.C. § 112, ¶ 6 (under means-plus-function, the claim is limited to the structure disclosed in the specification and its equivalents), the court found that the corresponding structure was required to include the look-ahead warning generator, as described in the specification at Column 9:49–59 ( which "generates both a terrain advisory signal and a terrain warning signal based upon the position and trajectory of the aircraft related to stored terrain data"); the two aspects of the generated signals (look-ahead distance/direction and terrain threat boundaries) found at Column 9:52–53, and their calculations or algorithms described in Column 9, line 56 through Column 22, line 14; a terrain floor boundary, terrain advisor boundaries and terrain warning boundaries; the structures necessary to translate the determined "severity of terrain threat" into a visual display found at 23:4–42; 24:12–18; 30:1–32:50 and Figures 1(as described at Column 5:51–65) and 1B. Since the court found that the function is for determining the severity of terrain threat, the structure that performs this function must be specifically programmed to perform the disclosed algorithms and calculations. Therefore, the details of the algorithms or calculations contained in the specification are essential to the structure of this means and serve to limit the structure and its equivalents. Thus, the portions of the specification, as outlined herein, disclose the corresponding structure that determines the terrain threat and supplies the information to the display to enable it to make the required color changes to the terrain information. To be an equivalent, the structure then must implement the disclosed algorithms or calculations substantially the same as those disclosed in the specification.

25 *CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1365 (Fed.Cir.2002).

26 *Id.*

27 See *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001)("[s]ummary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, such failure will render all other facts immaterial."); *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.1995); *see also Warner–Jenkinson Co. Inc., v. Hilton Davis Chem. Co.,* 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 1053–1054, 137 L.Ed.2d 146 (1997)("[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment.")

28 *Warner–Jenkinson Co. Inc.,* 520 U.S. at 40, 117 S.Ct. at 1054.

29 Prosecution history estoppel ensures that a doctrine of equivalents argument remains linked to its underlying purpose. It arises when an amendment is made to a patent during its prosecution and as a result, the scope of the patent is narrowed. To determine the extent of the claim, prosecution history estoppel requires an examination of the subject matter surrendered. While the patent cannot extend as far as the original claim, the narrowing amendment does not relinquish unforeseen equivalents or those equivalents that do not vary far beyond a fair interpretation of the surrendered material. See *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 737–738, 122 S.Ct. 1831, 1840–1841, 152 L.Ed.2d 944 (2002).

30 Under *Tuerkes–Beckers, Inc. v. New Castle Associates,* 158 F.R.D. 573, 575 (D.Del.1993), counsel for a witness may not consult with the witness regarding the subject matter of his testimony while the witness remains under examination by an opposing party. Further, in *Deutschman v. Beneficial Corp.,* C.A. No. 860595 at 3, MMS (D.Del. Feb. 20, 1990), Judge Schwartz held that "[i]t is improper for counsel during a recess to 'coach' a deponent off the record regarding deposition testimony already given or anticipated."

31 During his deposition, after being initially questioned by defense counsel on his comparison of the claims of the patents to defendants' products as based solely on direct infringement, he was requested to evaluate the alleged infringing products under the doctrine of equivalents during direct examination by Honeywell's counsel.

32 FED. R. CIV. P. 26(A)(2)(B).

33 See *Moore No. Amer., Inc. v. Poser Business Forms, Inc.,* 2001 WL 253117 at *7 (D.Del. Mar. 8, 2001) (where the court eliminated the defense of enablement and granted plaintiff's motion for summary judgment because defendant's expert reports/statements contained

nothing on that issue); *Arthrocare Corp. v. Smith & Nephew, Inc.,* 2003 WL 1905636, at \*1 (D.Del. April 14, 2003) (where the court excluded certain expert *testimony* of plaintiff because "experts are limited by their reports").

34    In light of this holding, the court need not address Sandel's arguments regarding alleged improper coaching of Dr. Hansman. Moreover, the court need not resolve whether Honeywell should be estopped as a matter of law, from raising the doctrine of equivalents based on the prosecution history of the patents-in-suit.

35    The court construed the limitation "when a subset of the stored terrain information is located within boundaries" as an alert signal is outputted every time the terrain data intersects with one of the "alert envelopes." This construction applies to the '080, '592 and '570 patents.

36    Although not part of the exhibits to this motion, in defendants' motion for invalidity based on the public use and on-sale bars, documents, in particular, notes maintained by the inventors (referred to as Muller–Grams) prior to the filing date show that time to impact was initially considered before developing the detailed equations for the time to complete an evasive maneuver. After those computations were developed, they were used rather than time to impact. Any subsequent modifications to or evaluation and testing of the system throughout its development did not rely upon time to impact. In fact, these notes reference the difference between the initial approach and what was eventually used in the Honeywell system and incorporated in the specification. Figure 5 of the patent is basically the same as drawing WX 11D captioned "turn distance calculation" contained in the Muller–Grams.

37    Honeywell emphasizes Sandel's Design Requirements as evidence that the TAWS computes look ahead distance consistent with the court's construction. While the parties dispute whether these documents are an accurate representation of Sandel's TAWS as implemented, the Design Requirements describe the search volume as consisting of a computed look ahead distance, which is "a lateral distance on both sides of the aircraft's flight path," and calculated as a function of aircraft speed, with warning and caution times of 30 and 60 seconds, respectively.

38    As discussed in the claim construction opinion, following the implementation of the Federal Aviation Association's ("FAA") Technical Standard Order ("TSO"), the phrase "look ahead distance" became more commonly used in the industry. This did not occur until after the filing of the application for the '080 patent.

39    The court acknowledges that its finding regarding look ahead distance may affect the non-infringement analysis of other terms to the extent that they rely upon look ahead distance.

40    The court acknowledges that its finding regarding terrain floor boundary may affect the non-infringement analysis of other terms to the extent that they rely upon terrain floor boundary.

41    *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1268–69 (Fed.Cir.1999). When construing claim 4 of the '060 patent, the court concluded that the limitation is written in a means-plus-function format, that is the claim recites a function to be performed rather than a definite structure. See also, footnote 24.

42    The October 16, 2003, memorandum opinion invalidated the the 'h$_{max}$' claims and relative altitude claims as anticipated by the prior art in the field. However, these claims will also be evaluated regarding non-infringement to complete the analysis. Although Honeywell argued in the invalidity motion, which is repeated in its defense of this motion, that there was no case or controversy and therefore, the court lacks jurisdiction to consider these claims, this argument was rejected by the court in its invalidity opinion. Although case law provides that an infringement analysis is not required since there can be no infringement of an invalid claim, case law also suggests such an instruction is nonsense. *See generally, Dow Chemical Co. v. Halliburton Oil Well Cementing Co.,* 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945); *Smith v. United States,* 136 Ct.Cl. 487, 145 F.Supp. 396 (1956); *Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1535 (Fed.Cir.1987).

43    Dr. Hansman admitted that his original conclusion that Sandel's system infringed this limitation of the '009 patent was not based on the court's claim construction and was not limited to numerical values.

44    The parties agree that these claims include the alerting logic set forth in the '080 patent.

45    Minimal argument by the parties were directed to these claims.

46    Dr. Hansman only expressed an opinion in his report regarding Universal's infringement of claim 44.

47    Sandel disputes that the contour means limitation applies to claim 44 and relies primarily on the argument that this claim is invalid.

---

**End of Document**                                               © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---